**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CF 135 FLAT LLC, CF 135 WEST MEMBERS LLC and THE CHETRIT GROUP, LLC, | Case No. 15-cv-05345-AJN |
| Interpleader Plaintiffs, | |
| -against- | **ANSWER, COUNTERCLAIMS, AND CROSSCLAIMS** |
| TRIADOU SPV S.A., CITY OF ALMATY, a foreign city, and BTA Bank, | |
| Interpleader Defendants. | |
| CITY OF ALMATY, KAZAKHSTAN and BTA BANK, | |
| Counterclaim and Crossclaim Plaintiffs, | |
| -against- | |
| JOSEPH CHETRIT, CF 135 FLAT LLC, CF 135 WEST MEMBER LLC, THE CHETRIT GROUP LLC, and 227 EAST 19TH HOLDER LLC, | |
| Counterclaim Defendants, | |
| -and- | |
| MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, and TRIADOU SPV S.A., | |
| Crossclaim Defendants. | |

# Table of Contents

ALMATY AND BTA BANK'S ANSWER TO THE  AMENDED INTERPLEADER COMPLAINT ................................................................................................ 1

ALMATY AND BTA BANK'S CLAIM TO THE INTERPLEADED FUNDS, COUNTERCLAIMS, AND CROSSCLAIMS ................................................................ 4

    INTRODUCTION ............................................................................................ 4

    THE PARTIES .................................................................................................. 8

    JURISDICTION AND VENUE ......................................................................... 10

    FACTUAL BACKGROUND ............................................................................. 11

        *Mukhtar Ablyazov Defrauded BTA Bank of in Excess of $6 billion.* ................ 11

        *Viktor Khrapunov Defrauded the City of Almaty of Approximately $300 million.* .......... 16

        *The Khrapunovs and Ablyazov Join Together to Launder Their Stolen Money.* ............... 18

        *The Ablyazov-Khrapunov Group Conspires to Transfer and Hide Illicit Funds in the United States.* ........................................................................................ 22

        *Through SDG, the Ablyazov-Khrapunov Group Creates Triadou to Hide their Illicit Funds in New York Real Estate Transactions with the Chetrit Group.* ............................ 23

        *Kazakh Authorities Target the Ablyazov-Khrapunov Group's Holdings in the United States, and the Ablyazov-Khrapunov Group Liquidates Those Assets at Below-Market Value with the Chetrit Group's Assistance.* ..................................... 28

    CLAIMS TO THE INTERPLEADED FUNDS ................................................... 31

    FIRST CAUSE OF ACTION ........................................................................... 32

        *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)) Against All Defendants*

    SECOND CAUSE OF ACTION ....................................................................... 37

        *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)) Against All Defendants except CF 135 West Member LLC*

    THIRD CAUSE OF ACTION ........................................................................... 39

        *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(a)) Against All Defendants except CF 135 West Member LLC*

    FOURTH CAUSE OF ACTION ....................................................................... 40

        *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)) Against All Defendants except 227 East 19th Holder LLC*

    FIFTH CAUSE OF ACTION ........................................................................... 41

        *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)) Against All Defendants*

    SIXTH CAUSE OF ACTION ........................................................................... 42

        *(ACTUAL FRAUDULENT TRANSFER) Against All Defendants*

SEVENTH CAUSE OF ACTION ........................................................................... 43

    *(CONSTRUCTIVE FRAUDULENT TRANSFER) Against All Defendants*

EIGHTH CAUSE OF ACTION ............................................................................. 44

    *(UNJUST ENRICHMENT) Against All Defendants*

NINTH CAUSE OF ACTION ................................................................................ 45

    *(ALTER EGO) Against All Crossclaim Defendants*

TENTH CAUSE OF ACTION ............................................................................... 46

    *(CONVERSION) Against All Defendants*

ELEVENTH CAUSE OF ACTION ........................................................................ 47

    *(CONSTRUCTIVE TRUST) Against All Defendants*

TWELFTH CAUSE OF ACTION .......................................................................... 48

    *(REPLEVIN) Against All Defendants*

THIRTEENTH CAUSE OF ACTION .................................................................... 48

    *(PURSUANT TO CPLR § 5239 FOR FRAUD AND CONVERSION) Against All Defendants*

DEMAND FOR JURY TRIAL .............................................................................. 49

DEMAND FOR RELIEF ....................................................................................... 49

**ALMATY AND BTA BANK'S ANSWER TO THE
<u>AMENDED INTERPLEADER COMPLAINT</u>**

Interpleader Defendants City of Almaty ("Almaty"), a foreign city in the Republic of

Kazakhstan, and BTA Bank, a Kazakhstan joint-stock company, provide their Answer to

Plaintiffs' Amended Interpleader Complaint, as follows:

<u>**NATURE OF THE PROCEEDING**</u>

1.      Paragraph 1 contains Plaintiffs' description of the action, to which no response is

required.  To the extent that a response is required, Almaty and BTA Bank admit the allegations

in Paragraph 1, except that they deny that Triadou SPV, S.A. has any entitlement to the disputed

sum of $21,000,000.00, and further aver that BTA Bank has claims against the disputed sum.

<u>**THE PARTIES**</u>

2.      Almaty and BTA Bank are without knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 2.

3.      Almaty and BTA Bank admit the allegations in Paragraph 3.

4.      Almaty and BTA Bank are without knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 4.

5.      Almaty and BTA Bank are without knowledge or information sufficient to form a

belief as to the truth of the allegations in Paragraph 5.

6.      Almaty and BTA Bank admit the allegations in Paragraph 6.

7.      Paragraph 7 of the Interpleader Complaint states a legal conclusion to which no

response is required.  To the extent that a response is required, Almaty and BTA Bank deny the

allegations in paragraph 7 and aver that jurisdiction is proper in this Court as set forth in

Almaty's Notice of Removal, and as set forth below.

## FACTUAL BACKGROUND

8.     Almaty and BTA Bank respectfully refer the Court to the full Agreement between Triadou SPV S.A. and CF 135 Flat LLC described by Plaintiffs in Paragraph 8 for an accurate description of its contents. To the extent that this Paragraph states any factual allegations, Almaty and BTA Bank are without knowledge or information sufficient to form a belief as to the truth of those allegations, except that Almaty and BTA Bank deny that Triadou ever validly assigned its interest in CF 135 West Member LLC, and further aver that Triadou had a 50% ownership interest, rather than 37.5% ownership interest, in CF 135 West Member LLC.

9.     Almaty and BTA Bank respectfully refer the Court to the full Guaranty executed by CF 135 West Member LLC and the Chetrit Group LLC described by Plaintiffs in Paragraph 9 for an accurate description of its contents.  To the extent that this Paragraph states any factual allegations, Almaty and BTA Bank are without knowledge or information sufficient to form a belief as to the truth of those allegations.

10.     Almaty and BTA Bank respectfully refer the Court to the four separate court actions described by Plaintiffs in Paragraph 10 for an accurate description of their allegations. To the extent that this Paragraph states any factual allegations, Almaty and BTA Bank are without knowledge or information sufficient to form a belief as to the truth of those allegations.

11.     Almaty and BTA Bank admit the allegations in Paragraph 11, and specifically admit that Triadou was funded with funds stolen from Almaty and BTA Bank and that Triadou's assignment of its interest in CF 135 West Member LLC was a fraudulent conveyance.  Almaty and BTA Bank respectfully refer the Court to their cross- and counterclaims below for a fuller description of their allegations.

12.     Almaty and BTA Bank deny the allegations in Paragraph 12, except that they admit that counsel for Almaty met with Plaintiffs' counsel on June 25, 2015, and discussed its allegations against Triadou.

13.     Paragraph 13 contains Plaintiffs' description of the action, to which no response is required.  To the extent that a response is required, Almaty and BTA Bank are without knowledge or information sufficient to form a belief as to the truth of those allegations, except that they admit that Plaintiffs commenced this action on July 7, 2105.

14.     Almaty and BTA Bank admit the allegations in Paragraph 14.

15.     Almaty and BTA Bank deny the allegations in Paragraph 15, except that they admit that counsel for Almaty met with counsel for Plaintiffs on July 23, 2015, and that counsel for Almaty discussed Almaty's potential claims against Plaintiffs, among other things, at that meeting, and showed counsel for Plaintiffs draft pleadings.

16.     Paragraph 16 of the amended Interpleader Complaint states legal conclusions to which no response is required. To the extent a response is required, Almaty and BTA Bank are without knowledge or information sufficient to form a belief as to the truth of those allegations.

17.     Paragraph 17 of the Interpleader Complaint states Plaintiffs' admissions and legal conclusions to which no response is required.  To the extent a response is required, Almaty and BTA Bank are without knowledge or information sufficient to form a belief as to the truth of those allegations, except Almaty and BTA Bank admit that Plaintiffs owe $21,000,000.00 (among other things) to Almaty and/or BTA Bank.

18.     Paragraph 18 of the Interpleader Complaint states Plaintiffs' admissions and legal conclusions to which no response is required.  To the extent a response is required, Almaty and

BTA Bank are without knowledge or information sufficient to form a belief as to the truth of those allegations.

### ALMATY AND BTA BANK'S CLAIM TO THE INTERPLEADED FUNDS, COUNTERCLAIMS, AND CROSSCLAIMS

Almaty and BTA Bank ("BTA" or "BTA Bank") (collectively, the "Kazakhstan Plaintiffs"), by and through their undersigned counsel, for the Kazakhstan Plaintiffs' claims to the interpleaded funds, crossclaims against Defendants Triadou SPV S.A., Viktor Khrapunov, Mukhtar Ablyazov, and Ilyas Khrapunov (collectively the "Ablyazov-Khrapunov Group"); and counterclaims against Joseph Chetrit, CF 135 FLAT LLC, CF 135 West Member LLC, The Chetrit Group LLC, and 227 East 19th Holder LLC (collectively the "Chetrit Group," and together with the Ablyazov-Khrapunov Group, the "Cross- and Counterclaim Defendants"), allege as follows:

### INTRODUCTION

19.     Counterclaim defendant Joseph Chetrit ("Chetrit") is a well-known New York based real estate developer, who, along with crossclaim defendants Mukhtar Ablyazov ("Ablyazov"), Victor Khrapunov, Ilyas Khrapunov and others known and unknown, combined, conspired, and confederated in the commission of an international scheme to launder and conceal at least $40 million stolen from the Kazakhstan Plaintiffs.  Chetrit conspired with these international criminals by, among other things, partnering with Triadou SPV S.A. ("Triadou"), a nominee entity owned, controlled, and funded by the Ablyazov-Khrapunov Group, for the purposes of converting the stolen funds into valuable New York City real estate.

20.     BTA, a bank based in Almaty, Kazakhstan, seeks to regain assets looted by its former Chairman, Mukhtar Ablyazov, who abused his position to enrich himself and treat BTA as his personal property.  BTA has commenced and successfully obtained judgments in proceedings

against Ablyazov in the courts of the United Kingdom for defrauding BTA Bank of no less than $4 billion.

21.     Almaty seeks to regain assets looted by its former mayor, Victor Khrapunov ("Khrapunov"), and his family and co-conspirators, to be returned for the benefit of the people of Almaty.  Khrapunov abused and corrupted his position as the mayor of Almaty for the purposes of embezzlement, fraudulent self-dealing, and blatant looting of public assets.  He reaped an estimated $300 million or more through various fraudulent activities, including rigged auctions, the improper sale of public property to friends and co-conspirators, and fraudulent abuse of eminent domain powers, before fleeing Kazakhstan and secreting these stolen funds across the globe.

22.     The Khrapunovs and Ablyazov, both fighting law enforcement investigations and asset seizures by Kazakh authorities, joined forces and commingled their stolen funds.  Through joint investments across the globe, the two renegade families combined and conspired to launder their illicit wealth into real estate, energy assets, and other investments in locales they deemed safe from seizure.  Ilyas Khrapunov, related by marriage to Ablyazov, orchestrated these efforts and steered the families' joint investments.

23.     Collectively, the Ablyazov-Khrapunov Group has been the subject of numerous proceedings and investigations across the globe, arising from their theft of billions of dollars from entities and municipalities in the Republic of Kazakhstan.  They have sought to hide their stolen wealth from investigators and law enforcement through a vast network of shell corporations and outwardly-legitimate investments, including major New York real estate developments such as the Flatotel and Cabrini Medical Center condominium conversions.  Through these investments, the Chetrit Group allied itself with the Ablyazov-Khrapunov Group and their global money laundering

endeavor.

24.      The Ablyazov-Khrapunov Group laundered their ill-gotten assets through a number of shell corporations, including Triadou.  With the help of Chetrit and the Chetrit Group, the Ablyazov-Khrapunov Group parked these corrupt assets in New York City real estate, hoping to avoid the scrutiny of escalating international investigations into the Ablyazov-Khrapunov Group's illicit activities.

25.      Due to heavy scrutiny by international law enforcement, including criminal investigations by the Kazakh and Swiss authorities, the funds that the Ablyazov-Khrapunov Group, through Triadou, invested into the Flatotel and Cabrini Medical Center projects could not pass through legitimate banking channels.  The Cross- and Counterclaim Defendants devised a plan to circumvent legitimate banks and transfer funds directly from the Ablyazov-Khrapunov Group's offshore accounts with FBME Bank Ltd. — which the United States government subsequently labelled "a foreign financial institution of primary money laundering concern" — to the escrow account of the Chetrit Group's long-time attorneys.

26.      In return for facilitating the Ablyazov-Khrapunov Group's money laundering scheme, the Chetrit Group got access to the stolen funds to fund its real estate projects, and entered into deals that entitled the Chetrit Group to a disproportionate share of the projects' profits.

27.      Due to concern that he was partnering with reputed international criminals, however, Chetrit conducted his communications with the Ablyazov-Khrapunov Group by using code names. For example, Chetrit used code names such as "Jose" and "Pedro" to refer to and communicate with crossclaim defendant Ilyas Khrapunov.  It was only in face-to-face meetings, many of which were secretly recorded, that Ablyazov's involvement, legal difficulties and

incarceration were openly discussed.

28.     Ultimately, Almaty and BTA Bank were able to trace the stolen assets to the United States.  Rather than let Almaty and BTA reclaim their rightful property, the Ablyazov-Khrapunov Group, through Triadou, began to urgently liquidate their real estate holdings, hoping to spirit their illicit funds to more permissive locales.  In an attempt to monetize the Ablyazov-Khrapunov Group's real estate interests as quickly as possible, Triadou entered into a fraudulent, below-market assignment with the Chetrit Group for Triadou's principal New York assets, interests in the Flatotel and Cabrini Medical Center real estate developments.

29.     Specifically, in May 2014, the City of Almaty filed an action in federal court in California against members of the Ablyazov-Khrapunov Group.  With the Kazakhstan Plaintiffs' collection efforts having expanded to the United States, and with the Ablyazov-Khrapunov Group in imminent danger of having its stolen assets seized or attached, the Ablyazov-Khrapunov Group, through Triadou, took immediate steps to liquidate its U.S. assets and move its money offshore again. The Chetrit Group's assistance was essential to placing the stolen assets out of the reach of the Kazakhstan authorities.

30.     Upon information and belief, Chetrit seized on this opportunity to double cross his co-conspirators.  Understanding that the potential asset seizures or restraints put the Ablyazov-Khrapunov Group in a desperate situation, he devised scheme to acquire Triadou's investments for a fraction of their value.  To achieve this result, Chetrit bribed Triadou's Director to drive down the purchase price of the assignment.  The Chetrit Group ultimately succeeded in acquiring Triadou's interest in both the Flatotel and Cabrini properties for as little as $26,000,000.00 — far less than even what Triadou had originally invested — at a time when real estate values in New York were at an all-time high.

31.     Almaty and BTA Bank now seek, among other relief, to unwind and recover the proceeds of these fraudulent transactions.   Doing so will hold  the Cross- and Counterclaim Defendants liable for their corruption and fraud, and  return the full value of Triadou's New York assets to their rightful owners: BTA Bank and the City of Almaty.

## THE PARTIES

32.     Cross- and counterclaim plaintiff Almaty is a legal subdivision of the Republic of Kazakhstan.  Almaty is the former capital of the country, and continues to be the largest city in the Republic of Kazakhstan, with more than 1.5 million residents.

33.     Cross- and counterclaim plaintiff BTA Bank is a Joint Stock Company and Kazakhstan bank with its headquarters in Almaty, Kazakhstan.  Until in or about September 2014, BTA Bank was majority owner and controlled by the Republic of Kazakhstan.

34.     Counterclaim defendant Joseph Chetrit, an individual, is a real estate  developer and resident of New York, with a principal place of business at 512 7th Avenue, New York, New York 10018.

35.     Counterclaim defendant Chetrit Group LLC is a limited liability corporation incorporated under the laws of New York, with a principal place of business at 512 7th Avenue, New York, New York 10018.

36.     Counterclaim defendant CF 135 FLAT LLC is a limited liability  corporation incorporated under the laws of Delaware, with a principal place of business at 512 7th Avenue, New York, New York 10018.

37.     Counterclaim defendant CF 135 West Member LLC is a limited liability corporation incorporated under the laws of Delaware, with a principal place of business at 512 7th Avenue, New York, New York 10018.

38.     Counterclaim defendant 227 East 19th Holder LLC is a limited liability corporation incorporated under the laws of Delaware, with a principal place of business at 512 7th Avenue, New York, New York 10018.

39.     Crossclaim defendant Triadou SPV S.A. is a special purpose investment vehicle incorporated under the laws of Luxembourg, with a principal place of business at 3, Rue du Mont-Blanc, 1201 Geneva, Switzerland. Triadou SPV S.A. is wholly-owned by SDG Capital S.A.

40.     Crossclaim defendant Viktor Khrapunov, an individual, is the former Mayor of the City of Almaty, who, upon information and belief, currently resides in the city of Geneva, Switzerland.

41.     Crossclaim defendant Mukhtar Ablyazov, an individual, is the former Chairman of BTA Bank and has been found liable for defrauding BTA of in excess of $6 billion. Ablyazov was the subject of eleven proceedings commenced by BTA Bank in the United Kingdom to recover assets Ablyazov stole. During those proceedings, Ablyazov was found by multiple international courts to have lied, misled, misconstrued, and concealed assets in blatant disregard of Court orders, and was ordered imprisoned for 22 months. During these proceedings, Ablyazov fled the United Kingdom to avoid the many judgments against him. He is currently incarcerated in France pending extradition to Russia or Ukraine.

42.     Crossclaim defendant Ilyas Khrapunov, an individual, is the son of Viktor Khrapunov, as well as the former president of SDG Capital S.A., who, upon information and belief, currently resides in the city of Geneva, Switzerland. Ilyas Khrapunov is married to Ablyazov's daughter, Madina, and manages Ablyazov's business affairs while his father-in-law remains incarcerated.

## JURISDICTION AND VENUE

43.     The Crossclaims and Counterclaims are brought under Rule 13 of the Federal Rules of Civil Procedure.  This Court has subject matter jurisdiction under 28 U.S.C. §  1331 and 18 U.S.C. § 1964(c) over the claims for relief alleging violations of the  federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§  1961 et seq. and for conspiracy to violate RICO.   This Court has supplemental jurisdiction  over the sixth through thirteenth claims for relief pursuant to 28 U.S.C. § 1367, as those  claims are substantially related to Almaty's and BTA Bank's claims under RICO and arise from a common  nucleus of operative facts, and thus they form part of the same case or controversy under  Article III of the United States Constitution.

44.     Alternatively, this Court has supplemental jurisdiction over Almaty's and BTA Bank's claims under 28 U.S.C. § 1367, as those  claims are substantially related to the original interpleader suit brought by Chetrit and arise from a common  nucleus of operative facts, and thus they form part of the same case or controversy under  Article III of the United States Constitution.

45.     Alternatively, the City of Almaty is a "foreign state" as that term is defined in 28 U.S.C. § 1603, and this Court has jurisdiction over Almaty's and BTA Bank's claims under 28 U.S.C. §§ 1330, 1441(d), which provide for the removal of any civil action brought in a State court against a foreign state.

46.     Alternatively, this Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because (i)  there is complete diversity of citizenship between the parties, and (ii) more than $75,000,  exclusive of interest and costs, is at stake.

47.     Venue is proper in this District and before this Court pursuant to 28 U.S.C.

§ 1391(b)(2) because events giving rise to Almaty's and BTA Bank's claims occurred in this District, including, among other things, the negotiation and transfer of interest in the Flatotel and Cabrini Medical Center properties located in New York, New York.

48.     This court has personal jurisdiction over Chetrit, Chetrit Group LLC, CF 135 FLAT LLC, CF 135 West Member LLC, and 227 East 19th Holder LLC, as all are residents of and/or regularly conduct business in New York City.

49.     This Court has personal jurisdiction over Triadou, Ablyazov, Viktor Khrapunov, and Ilyas Khrapunov because each of them knowingly committed acts in New York that form the basis of this action, directed or conspired with others to commit acts in New York, and/or purposely availed themselves of the privileges of doing business in New York, as fully set forth herein.

## FACTUAL BACKGROUND

### *Mukhtar Ablyazov Defrauded BTA Bank of in Excess of $6 billion.*

50.     Ablyazov was the Chairman of BTA Bank from May 2005 until February 2009. He is the father-in-law of crossclaim defendant Ilyas Khrapunov, who is married to Ablyazov's daughter, Madina. Along with crossclaim defendant Viktor Khrapunov, Ablyazov is a central member of the Ablyazov-Khrapunov Group money laundering and embezzlement conspiracy.

51.     As the Courts of the United Kingdom have found, while Chairman of BTA Bank, Ablyazov exercised virtually unfettered control over the bank's operations while hiding that control from Kazakhstan's banking regulators, and used this influence to treat BTA's assets as his own. As Justice Teare of the High Court of England and Wales (Commercial Court) found:

> [P]rior to the nationalisation of the Bank in February 2009, Mr. Ablyazov admitted to owning over 75% of the shares in the Bank. Those shares were not held by Mr. Ablyazov personally but by nine companies on his behalf. However, Mr. Ablyazov did not admit that ownership to the AFN, the banking regulator in Kazakhstan. In

11

January 2009, shortly before the nationalisation of the Bank, the AFN requested Mr. Ablyazov to state whether he owned more than 10% of the shares in the Bank. He replied on 19 January 2009 that he did not own directly or indirectly more than 10% of the shares in the Bank. That statement was untrue.

. . .

Banks in Kazakhstan tend to be operated in a different manner from that in which they are typically operated in the West. It is common for banks to be owned by a single shareholder who is both chairman of the board of directors and also closely involved in the management of the bank. He therefore has considerable influence over the operation of the bank. Mr. Ablyazov's relationship with the Bank conformed with this general description of Kazakh banking practice. Thus Mr. Talvitie, the independent member of the Board of Directors of the Bank from East Capital, gave evidence that it seemed to him that at board meetings Mr. Ablyazov had already made the decisions. He described the other members of the board as "straw men". Others in the Bank, below board level, had the same impression. Thus Ms. Tleukulova (a member of the Credit Committee) gave evidence in Russia in 2012 that "all top managers of the bank, including Board Members, have to obey him". Mr. Khazhaev also gave evidence in Russia in 2012 that Mr. Ablyazov was "the main" person in the Bank who controlled the granting of the largest and most important loans. Mr. Ablyazov's control of the Bank is illustrated by his issue of an order ("the Ablyazov Order") whereby he, as Chairman, amended certain procedural rules governing the grant of loans.

. . .

[O]fficers and staff in the Bank did not draw a clear distinction between the Bank having an interest in a project and Mr. Ablyazov, as shareholder in the Bank, having a personal interest in a project. Thus [Deputy Chairman] Zharimbetov, when being crossexamined, failed to draw a clear distinction, in the context of the offshore companies with which he dealt, between Mr. Ablyazov and the Bank. Thus the unfortunate reality appears to have been that little, if any, distinction was drawn by personnel in the Bank between the Bank's property and Mr. Ablyazov's property. The Vitino port project was an example of that reality. Mr. Khazhaev told a Russian court in 2012 that Mr. Ablyazov treated the Bank as his property.

52.     Ablyazov's abuse of his position as chairman took many forms, principally through enormous loans to valueless entities owned by Ablyazov, which would then be obscured by transfers among different shell corporations, and never repaid.

53.     For example, in one series of loans (referred to as the "Original Loans" by the UK court in the "Granton Action"), between March 2006 and August 2008, Ablyazov directed twenty loans totaling $1,428,840,000 to entities with minimal assets and for no apparent reason.  These

loans were made to entities outwardly unaffiliated with Ablyazov ("Original Borrowers"), but were actually transferred to entities controlled by Ablyazov ("Original Real Borrowers").  As the UK court found:

> Mr. Ablyazov did not disclose to the Board that he owned or controlled those [Original] Borrowers. He has never claimed that he did so and there is no evidence that he did. None of the represented Defendants has suggested that he did. In those circumstances there can be only one explanation for the fact that the very large sums of money which were advanced were immediately transferred to companies owned or controlled by Mr. Ablyazov, namely, that the Original Loans were part of a dishonest scheme whereby Mr. Ablyazov sought to misappropriate monies which belonged to the Bank. The scheme was fraudulent because Mr. Ablyazov did not disclose to the Board his interest in the Original Borrowers or that the real purpose of the loans was to pay out the Bank's money to the Original Real Borrowers who were to use the monies for Mr. Ablyazov's purposes. The purpose of such nondisclosure must have been to deceive the Board so that it remained in ignorance of the "related party" nature of the Original Loans and of their true purpose.

54.     When, in or about 2008, Ablyazov's involvement in the Original Loans was in danger of discovery, he directed that additional fraudulent loans be made in an attempt to cover up his earlier fraud.

55.     Between November 4, 2008, and December 4, 2008 a number of loans (the "Later Loans") totaling $1,031,263,000 were made, ostensibly for the purchase of oil and gas resources. The UK court, however, found it "beyond argument" that these loans of BTA funds were made only to hide Ablyazov's earlier theft:

> The Later Loans were made between 5 November and 8 December 2012 but they were paid out, not to the Later Borrowers, but to Intermediaries who paid them on to other companies, the Recipients, who in turn paid them to the Bank in apparent discharge of the Original Loans. They were not used for the purchase of oil and gas equipment. Documents said to support and evidence the Later Loans were created after the monies had been paid out by the Bank but backdated. Thus contracts for the purchase of oil and gas equipment supposedly by the Later Borrowers were still being prepared in late November 2008 and backdated to 23 October 2008.
>  . . .

Expert evidence as to the oil and gas industry was adduced by the Bank to establish that the oil and gas contracts were shams because of the lack of specific provisions which would be appropriate for contracts of their size. But such evidence was unnecessary. The email evidence shows that the contracts were prepared by persons within the Bank.

 . . .

It is beyond argument that the Later Loans were a mere cloak which sought to hide from view the reality, which was that money was being extracted from the Bank for the purpose of paying back the Original Loans. Since this circular exercise benefitted Mr. Ablyazov (because he owned or controlled the Original Borrowers) it is also clear that he must have orchestrated or, at the least, authorised this fraud.

56.     As a result of Ablyazov's siphoning billions out of the company, in 2009, BTA Bank defaulted on billions of dollars of debt held by investors including Credit Suisse Group AG, HSBC Holdings Plc, JPMorgan Chase & Co. and Royal Bank of Scotland Group Plc. Kazakhstan's sovereign wealth fund, Samruk-Kazyna, was forced to take control of BTA Bank, and Ablyazov fled to London.

57.     BTA then commenced the first in a series of lawsuits against Ablyazov, claiming that he had misappropriated approximately $295,000,000 pursuant to this fraudulent scheme. Other proceedings followed against Ablyazov in the Chancery Division and England High Court. In every proceeding, BTA alleged (and ultimately proved) that Ablyazov treated BTA as his own private source of funds.  In all, BTA commenced eleven proceedings against Ablyazov and his lieutenants for defrauding BTA in excess of $6 billion.  The UK courts took the unprecedented legal step of granting BTA a Worldwide Freezing Order over Ablyazov's assets.

58.     As part of these UK proceedings, in late 2010 BTA obtained a number of search and disclosure orders that uncovered a vast network of undisclosed companies and assets used by Ablyazov to hold and invest his stolen wealth.  The UK courts ordered Ablyazov's assets to be put in the receivership of the accounting firm KPMG (the "Receivership Order"), finding that Ablyazov had breached various disclosure and freezing orders against him.  The Receivership

Order gave the receiver the right to recover a network of many hundreds of entities, worth billions of dollars.

59.     On January 26, 2011, a further 212 companies were added to the scope of the Receivership Order and on April 8, 2011, a further 3,890 companies were added.

60.     After Ablyazov defied the Receivership Order entered by the UK courts, BTA obtained judgments and sanctions against him for, among other acts, flaunting court orders, fleeing and hiding from judicial proceedings, lying during proceedings, and refusing to comply with orders directing him to uncover assets.  For his numerous actions in contempt of court, Ablyazov was sentenced to 22 months imprisonment for his conduct.

61.     On February 16, 2012, despite having promised the court his attendance at his contempt hearing, Ablyazov did not appear.  Ablyazov left behind a 100-acre estate in the English countryside and a London mansion, valued at least 20 million pounds sterling (approximately $31 million) each, and no fewer than 750 shell companies used to invest his stolen funds in oil production, property development, and agriculture.

62.     On November 6, 2012, the Court of Appeal unanimously upheld the judgments and contempt orders against Ablyazov.  Concurring in the judgment, Lord Justice Maurice Kay stated that it was "difficult to imagine a party to commercial litigation who has acted with more cynicism, opportunism and deviousness towards court orders than Mr. Ablyazov."

63.     Following Ablyazov's flight from justice, BTA has been granted judgments in five of the 11 claims against Ablyazov and his associates, with others still pending, and has been awarded over $4 billion in damages by the UK courts, with interest continuing to accrue.

64.     After a global search spearheaded by BTA Bank, French special forces found and arrested Ablyazov in a luxury villa in France on July 31, 2013.  He remains detained in a French

prison pending extradition, and the courts of France have refused to release him on bail three times.

65.     Following Ablyazov's capture and imprisonment, his son-in-law, Ilyas Khrapunov, assumed control of much of Ablyazov's money laundering operations and has continued the Ablyazov-Khrapunov Group's combined efforts to hide their wealth.

### Viktor Khrapunov Defrauded the City of Almaty of Approximately $300 million.

66.     In 1991, the Republic of Kazakhstan declared its independence from the  former Soviet Union and began the process of transitioning from communism to an open  market economy.  This transition required substantial privatization of vast state assets in  order to restart the nation's economy and raise revenue for improvements to the nation's  infrastructure and public services.

67.      Viktor Khrapunov became mayor of the City of Almaty on or about June  16, 1997, and remained in that position until approximately December 2004.  At the time  Viktor Khrapunov took office, the Republic of Kazakhstan was experiencing the  beginning of a natural resources boom and accompanying drive for investment,  infrastructure upgrades, and new construction.  Almaty was the nation's former capital  and largest city, and held enormous public assets remaining to be privatized and  developed, a responsibility which the office of the mayor oversaw and directed.

68.     Before Viktor Khrapunov assumed the office of the mayor of Almaty, he took an oath of office to obey the Constitution and laws of the Republic of  Kazakhstan.  Among other things, he expressly and impliedly promised that he would  uphold his fiduciary duties to the people of Almaty, would honor his obligation to provide honest services, and would not convert money, property, or assets belonging to the City of Almaty for his own use or that of his family,

16

friends, or associates.

69.     In reality, Viktor Khrapunov, along with his son, Ilyas Khrapunov, and other Khrapunov family members and co-conspirators, almost immediately began a multi-year scheme to enrich themselves through the corrupt abuse of Khrapunov's public position as mayor.

70.     Viktor Khrapunov repeatedly and systemically used the powers of the office of the mayor to transfer public assets belonging to the City of Almaty to his family and their co-conspirators for prices that were a fraction of their fair value.  This  was often achieved by arranging fraudulent auctions to ensure that interested bidders won  these assets at nominal prices.  In other instances, Viktor Khrapunov used the  eminent domain powers of the office of the mayor to seize private property ostensibly for  the City of Almaty, but then promptly transferred that property to entities owned or  controlled by the Khrapunovs.  They would then pass these assets through a series  of shell or holding corporations to conceal the destination of these assets, before reselling  them for prices an order of magnitude greater than what they had paid the City of  Almaty.

71.     Three examples of these corrupt schemes to subvert and acquire the public property of the City of Almaty follow:

*Transaction One*

72.     In or about 2000, Viktor Khrapunov used his position as mayor of Almaty  to transfer a large tract of state-owned land near the two rivers area of Almaty to his  spouse and co-conspirator, Leila Khrapunov, for a total price of approximately $121,000.  The final recipient of this transfer was concealed through a series of fraudulent transactions and front  companies controlled by the Khrapunovs.  The Khrapunovs ultimately resold  this parcel of real estate for an estimated $15.57 million, a more than $15 million profit  on one interested transaction.

73.     In short, the Khrapunovs paid approximately $121,000 for a parcel of public real estate which they later resold for a total of $15.57 million; a 128,000 percent profit.

*Transaction Two*

74.     On or about April 16, 2001, Viktor Khrapunov used his position as mayor to cause a public building in Almaty to be sold at a fixed and rigged public auction to KRI, a company owned by Leila Khrapunov, for approximately $347,000.  The property was ultimately resold to an unrelated third party for approximately $4.1 million.

*Transaction Three*

75.      In addition to the sale of state-owned assets to Leila  Khrapunov and other family members and co-conspirators, Viktor Khrapunov also  abused his authority as mayor to enrich the Khrapunovs by seizing privately-owned property and transferring it to the Khrapunovs and others for resale.  For example, on or  about August 25, 2003, Viktor Khrapunov caused the City of Almaty to seize land owned  by privately-owned third party Shadid Engineering LLP. Approximately one month  later, he caused the property to be sold to Leila Khrapunov's company, Karasha, for  approximately $105,000.  Leila Khrapunov then caused Karasha to sell the property  directly to her, whereupon she transferred it to another company, BSC, and it was sold as part of BSC to an  unrelated third party, in a transaction that valued the parcel at approximately $2 million.  As a result, the Khrapunovs obtained nearly $1.9 million in unjustified profit.

76.     In short, through similar transactions uncovered and  still under investigation, the Khrapunovs are estimated to have illegally acquired at  least 80 pieces of real estate, which they converted into approximately $300 million in  illicit funds.

**The Khrapunovs and Ablyazov Join Together to Launder Their Stolen Money.**

77.     Seeking to avoid law enforcement attention and possible seizure of this ill-gotten

wealth, the Ablyazov-Khrapunov Group funneled their corrupt assets into real estate and development entities located in, among other places, the United States and Switzerland.

78.     The Ablyazov-Khrapunov Group first transferred their stolen funds to Switzerland,  where Ilyas Khrapunov and Madina Ablyazov reside, using accounts and sham entities owned or ultimately  controlled by the Ablyazov-Khrapunov Group.  The Ablyazov-Khrapunov Group ultimately transferred to  Switzerland an estimated three hundred million dollars or more, moved out of Kazakhstan by  Viktor Khrapunov and laundered through offshore holding companies to appear  legitimate.

79.     Seeking to hide the proceeds of their frauds, the Ablyazov-Khrapunov Group created a series of entities in Switzerland and overseas to launder these illicit funds into outwardly-legitimate investments.   One such entity was Swiss  Development Group, formally SDG Capital S.A., formed and controlled by Ilyas  Khrapunov for the benefit of the Ablyazov-Khrapunov Group.  Between 2008 and 2012, the  Ablyazov-Khrapunov Group and sham companies they controlled funneled at least $115 million  into SDG derived from the Ablyazov-Khrapunov Group's self-dealing and fraud.

80.     Through these foreign investment vehicles, the Ablyazov-Khrapunov Group sought  to obscure their wealth from law enforcement in the Republic of Kazakhstan and abroad, by maintaining the appearance of a modest family of civil servants.

81.     The Ablyazov-Khrapunov Group took numerous steps to maintain this facade and  conceal their looting of the City of Almaty's public assets from authorities.  Among other schemes,  Viktor Khrapunov regularly filed false annual tax returns with Kazakhstan's  taxation authority, the Tax Committee of the Ministry of Finance of Kazakhstan.  The  false returns concealed millions of dollars in monies, properties, and assets the  Ablyazov-Khrapunov Group

had acquired and laundered through their corrupt enterprise.

82.     For example, according to their 2007 tax returns, which required Viktor  and

Leila Khrapunov to list their entire net worth accumulated through all sources as of  December

31, 2007, Viktor Khrapunov reported a combined net worth  equivalent to $113,298, in addition

to three vehicles, five modest pieces of real estate,  and two parking stalls.  While claiming to

have a total net worth of less than $120,000,  Viktor Khrapunov had in fact amassed a fortune

estimated at no less than $300  million.  Indeed, according to public news reports, in 2009 Viktor

Khrapunov was one of  the richest people in Switzerland with a fortune of over $300 million.

Similarly, in 2012  Viktor Khrapunov was again listed among Switzerland's 300 richest people,

with a  fortune estimated at $324– $432 million.

### The Ablyazov-Khrapunov Group's Corruption is Exposed and Investigations Begin in Kazakhstan and Switzerland

83.     In late 2007, Viktor Khrapunov was tipped off that the Kazakh  government had

begun investigating the financial dealings of the  Ablyazov-Khrapunov Group and their

associates for a range of criminal acts and self-dealing.  In anticipation of possible criminal

charges, on or about November 9, 2007, Viktor and Leila Khrapunov boarded a private  jet and

fled Kazakhstan for Switzerland, where Ilyas Khrapunov and Madina Ablyazov resided, and  the

bulk of their looted funds were held.

84.     On or about May 27, 2011, the Investigation Department of the Agency  for

Economic and Corruption-Related Crimes of Kazakhstan (the "Investigation  Department") filed

two criminal cases against Viktor Khrapunov for abuse of power and  fraudulent acts, and on or

about July 21, 2011, obtained a court-ordered arrest warrant for  Viktor Khrapunov.  Through

2011 and 2012 additional charges were brought in  Kazakhstan against Viktor, Leila, and Ilyas

Khrapunov, arising from the theft of public  property and the ultimate laundering of funds during

Viktor Khrapunov's tenure as Mayor of Almaty.

85.     On or about February 20, 2012 and September 14, 2012, the Investigation
Department applied to the Federal Office of Justice in Switzerland for legal assistance in
connection with the effort to prosecute Viktor, Leila, and Ilyas Khrapunov for crimes in
Switzerland and Kazakhstan relating to their corrupt acts in Almaty and the laundering of  the
resulting funds.  In response to this request, in mid-2012 the Public Prosecutor of  Geneva opened
an investigation into the Ablyazov-Khrapunov Group on suspicion of violating  Swiss money
laundering laws.  The Public Prosecutor of Geneva subsequently seized  financial and banking
documents from the Ablyazov-Khrapunov Group and ordered Swiss accounts  and assets
belonging to them be frozen, including accounts held at Swiss banks Sarasin &  Co. Ltd., Credit
Suisse, and Schroeder & Co.  This investigation by the Swiss authorities is ongoing, and in
August 2013 the Public Prosecutor of Geneva froze additional assets  belonging to the Ablyazov-
Khrapunov Group.

86.     At this time, in addition to the numerous judgments against Ablyazov in the
United Kingdom, there are no less than 24 criminal charges pending against  Viktor Khrapunov
in Kazakhstan for embezzlement, fraud, money laundering,  establishing and directing an
organized criminal group for criminal purposes, abuse of  power, and bribery.  There are
additional charges pending against Leila  Khrapunov and Ilyas Khrapunov in Kazakhstan for,
among other offenses, money laundering and establishing and directing an  organized criminal
group for criminal purposes.  Assets of the Ablyazov-Khrapunov Group remain   frozen by Swiss
authorities, and the Government of the Republic of Kazakhstan has  formally requested
extradition of Viktor Khrapunov.

***The Ablyazov-Khrapunov Group Conspires to Transfer and Hide Illicit Funds in the United States.***

87.     In 2011 and 2012, in response to escalating pressure on the Ablyazov-Khrapunov Group from both Kazakh and Swiss authorities and legal proceedings in the United Kingdom, the Ablyazov-Khrapunov Group embarked on a  scheme to secret the families' illicit wealth in real estate investments in the United States.  Upon information and belief, the Ablyazov-Khrapunov Group selected the United States as a harbor  for these stolen funds because they believed real estate investments in the United States would be difficult for Kazakh authorities to access.

88.     To execute this scheme the Ablyazov-Khrapunov Group used SDG, their Swiss real estate vehicle, and Telford International Limited ("Telford"), a Dubai-based private contracting entity controlled by the Ablyazov-Khrapunov Group.

89.     To create the appearance that SDG was independent of the Ablyazov-Khrapunov Group, in 2012 SDG was purportedly sold to a close friend and political ally of the Ablyazov-Khrapunov Group, Philippe Glatz.  This sale was in fact a sham  transaction, with the Ablyazov-Khrapunov Group maintaining beneficial ownership and control of SDG.

90.     Upon information and belief, the Ablyazov-Khrapunov Group paid Mr. Glatz to purchase SDG using the Ablyazov-Khrapunov Group's own funds:  Glatz accepted a loan from the Ablyazov-Khrapunov Group and then repaid that loan while  outwardly claiming that this payment to the Ablyazov-Khrapunov Group was for the purchase of  SDG.  In fact, the transfer of SDG was illusory, as Mr. Glatz was merely repaying a prior  obligation, and effectively getting SDG for free.

91.     This sham transaction served the Ablyazov-Khrapunov Group's purposes by creating  the appearance that SDG had changed ownership, although the Ablyazov-Khrapunov Group  received no net consideration for the purported sale, and Glatz was left beholden to the

Ablyazov-Khrapunov Group and explicitly obligated to hold their interest in the investment.

92.     The capital structure, organization, management, and illicit purpose of SDG remained the same after the purported sale, and the Ablyazov-Khrapunov Group still profits from and manages SDG's operations.  Ilyas Khrapunov continues to control SDG while holding himself out to be a mere "outside advisor" to the company, all the while protecting and reaping the benefits of the Ablyazov-Khrapunov Group's investments in SDG.

### Through SDG, the Ablyazov-Khrapunov Group Creates Triadou to Hide their Illicit Funds in New York Real Estate Transactions with the Chetrit Group.

93.     In or about 2011, Ilyas Khrapunov, on behalf of the Ablyazov-Khrapunov Group, approached Nicolas Bourg, a Belgium-based real estate fund manager, seeking to create a new entity controlled by SDG to mask the Ablyazov-Khrapunov Group's efforts to invest in real estate opportunities in the United States.

94.     In consultation with Ilyas Khrapunov, Bourg formed a series of entities under the laws of Luxembourg for the specific purpose of investing the Ablyazov-Khrapunov Group's funds in real estate in the United States.  These entities included Triadou, an investment vehicle wholly owned and controlled by SDG, which was itself a front for the Ablyazov-Khrapunov Group's activities.

95.     Triadou is a special purpose vehicle:  a limited-liability legal entity created to fulfill a specific purpose, often used to insulate a parent entity from financial risk or liability. SPVs can also be used, as Triadou was, to hide the true ownership of assets held by the SPV, or to obscure relationships between individuals and entities.  Bourg became the sole director of Triadou, operating at the direction of the Ablyazov-Khrapunov Group, who continued to control SDG, Triadou's sole shareholder.

96.     At the direction of Ilyas Khrapunov, Bourg made contact with Eric Elkain, an

agent of Chetrit and the Chetrit Group.  Bourg and  Elkain agreed to arrange a meeting between

Chetrit and Ilyas Khrapunov for the purpose  of exploring concealed investments by the

Ablyazov-Khrapunov Group in the United States with the Chetrit Group.

97.     In or about 2012, Chetrit and his brother and partner Meyer  Chetrit met with Ilyas

Khrapunov and Bourg in Geneva, Switzerland.  While the Ablyazov-Khrapunov Group had

purportedly divested  itself of any interest in SDG by this time, Ilyas Khrapunov held himself out

to Chetrit as having a controlling ownership interest in SDG.

98.     At this meeting, Chetrit and Ilyas Khrapunov discussed  possible investment

strategies for the Ablyazov-Khrapunov Group in the United  States real estate sector.  In these

discussions, Ilyas Khrapunov disclosed the fact that the  Ablyazov-Khrapunov Group was facing

criminal charges and asset freezes directed by the  governments of Kazakhstan, Switzerland, and

the United Kingdom, and needed to move funds to other  jurisdictions.   During the continuing

course of his dealings with the Ablyazov-Khrapunov Group, this situation was repeatedly and

unequivocally made clear to Chetrit.  Specifically, the Ablyazov-Khrapunov Group needed to

move funds that were the subject of criminal charges and asset freezes as a result of the

proceedings both against Ablyazov and the Ablyazov-Khrapunov Group.  Chetrit expressed

sympathy with this situation, stating that his own family  had faced political sanctions in his

native Morocco, a result of having defrauded the King and being forced to flee.  Chetrit and Ilyas

Khrapunov agreed  in principle to seek joint investments in the United States, and agreed to meet

further.

99.     Following this meeting in Geneva, Ilyas Khrapunov and Bourg met with  Chetrit

again in New York City, to evaluate potential investment options.  While  discussing specific

investment opportunities, the parties again openly and repeatedly  discussed the criminal charges

against the Ablyazov-Khrapunov Group and the efforts of the  governments of Switzerland and

Kazakhstan to locate and seize the assets of the  Ablyazov-Khrapunov Group.  Again, Ilyas

Khrapunov acted on behalf of SDG and Triadou, despite the Ablyazov-Khrapunov Group's

purported sale of SDG a year prior.

100.    As a result of these discussions, the Ablyazov-Khrapunov Group invested,

through Triadou, with Chetrit and the  Chetrit Group in a number of real estate opportunities in

New York  City.  The most significant of these were investments in the Flatotel and Cabrini

Medical Center developments in New York City.

101.    The Flatotel is a 289-room business hotel opened in 1991, located at 135 West

52nd St, New York, New York.

102.    The Cabrini Medical Center hospital campus closed in 2008 and is now

comprised of several buildings containing approximately 250 condominium units.

103.    Both the Flatotel and the Cabrini Medical Center properties were purchased by

members of the Chetrit Group, along with co-investors.  The developers have  been executing

plans to convert both properties into luxury condominiums, and are close to completion.

104.    The Chetrit Group owned a 75% interest in the Flatotel, and created a series of

limited liability entities to hold that interest, including Counterclaim Defendants CF 135 FLAT

LLC and CF 135 West Member LLC.

105.    The Chetrit Group offered to sell half of their 75% investment in the Flatotel to

Triadou, after which the Chetrit Group and Triadou would each own 37.5%.  Triadou would

provide 70% of the capital needed – against Chetrit's 30%, the difference amounting to an

above-market "promote fee" for Chetrit that ensured that the Chetrit Group would reap the

largest profits from the Flatotel development, even as it put in the least capital – and the parties

would then divide the profits from the investment.  In or about March 25, 2013, Triadou accepted this offer, notwithstanding the fact that the terms strongly favored Chetrit, and committed to transmit funds to the Chetrit Group to secure the 37.5% interest in the Flatotel property.

106.    Chetrit understood at the time of this agreement that the funds the Ablyazov-Khrapunov Group sought to invest through Triadou were some of the same assets in controversy in proceedings in Switzerland, the Republic of Kazakhstan, and the United Kingdom.

107.    Chetrit was acutely aware of the criminal charges facing Ablyazov.  Even at the first meeting, Chetrit inquired about Ablyazov's current criminal status and the attempts being made worldwide to seize the Ablyazov-Khrapunov Group's funds.  Many subsequent meetings between and among Chetrit, Ilyas Khrapunov, and/or Bourg began with discussions of Ablyazov's current criminal status.  Many of these meetings were recorded.

108.    The Ablyazov-Khrapunov Group sought to fund Triadou's investments with money from Telford, held in accounts with FBME Bank, a Cyprus-based bank.

109.    Triadou attempted to transfer Telford's funds held in FBME Bank for the Flatotel and Cabrini deals through banks in Luxembourg, but those banks refused to accept wire transfers from the Ablyazov-Khrapunov Group's FBME accounts due in part to the investigations or proceedings led by the Kazakh, Swiss, and United Kingdom authorities.

110.    Bourg then contacted Chetrit about alternative wire transfer arrangements. Informed that commercial banks refused to handle Triadou's funds from Telford, Chetrit conspired to launder the money, instructing Bourg to disregard the banks and transfer funds directly from the Ablyazov-Khrapunov Group's offshore accounts to the escrow account of Chetrit's personal and corporate attorneys.  Bourg then directed a series of wire transfers, on

behalf of Triadou, from Telford's accounts at FBME Bank directly to Chetrit's counsel.

111.    At that time, the Cyprus-based FBME Bank was widely understood to be a bank through which money laundering transactions could be routed, including on behalf of drug traffickers and Hezbollah.  FBME Bank had also been, by that time, the subject of press reports investigating the links between FBME's activities in Cyprus and Ablyazov himself.   Subsequent to these transfers, in or about July 2014, the U.S. Financial Crimes Enforcement Network ("FinCEN") designated FBME Bank a "foreign financial institution of primary money laundering concern."  FinCEN found that FBME Bank was regularly "used by its customers to facilitate money laundering, terrorist financing, transnational organized crime," had "systemic failures in its anti-money laundering controls that attract high-risk shell companies," and performed a "significant volume of transactions and activities that have little or no transparency and often no apparent legitimate business purpose."  Under Section 311 of the PATRIOT Act, FinCEN barred U.S. financial institutions from opening or maintaining "payable-through" accounts with FBME.  The Central Bank of Cyprus then froze all assets transfers to or from FBME, and took control of the bank pending an investigation into its operations.

112.    Through Triadou, the Ablyazov-Khrapunov Group entered a second investment with  the Chetrit Group shortly thereafter.   In late 2012, Triadou agreed to invest $12  million in the Cabrini Medical Center conversion, a joint venture between the Chetrit  Group and another private developer to convert a former medical center in New  York City into luxury condominiums.

113.    Due to increasing scrutiny on the Ablyazov-Khrapunov Group's  finances, the contemplated $12 million investment became impossible.  Bourg discussed this obstacle  with Chetrit, who agreed that Triadou should invest $6 million, half the originally-agreed  amount,

until further funds became available.  In return for this $6 million investment, Triadou would receive a promissory note and the right to convert that note into equity in the entity holding the Chetrit Group's interest in the Cabrini deal, 227 East 19th Holder, LLC.

114.    Again, the funds to execute the Cabrini deal were  transferred, on May 20, 2013, directly from the Ablyazov-Khrapunov Group's Telford accounts at FBME Bank to a law firm in New  York working on Chetrit's behalf.

### *Kazakh Authorities Target the Ablyazov-Khrapunov Group's Holdings in the United States, and the Ablyazov-Khrapunov Group Liquidates Those Assets at Below-Market Value with the Chetrit Group's Assistance.*

115.    In 2014, Almaty filed an action in California federal court  against members of the Ablyazov-Khrapunov Group seeking to seize assets that they had attempted to  launder through real estate investments in California.   That action is *City of Almaty v.  Viktor Khrapunov, et al*, Case No. 2:14-cv-03650-FMO-CW (filed May 13, 2014; dismissed September 21, 2015) (the "California Litigation").  On information and belief, this lawsuit led the Ablyazov-Khrapunov Group to believe their assets in the U.S. were no longer safe from seizure by the government of Kazakhstan.

116.    In response, in late 2014, Ilyas Khrapunov directed Bourg, Triadou's  director, to begin liquidating Triadou's assets in New York so that the funds could  be removed from the United States and hidden.  Specifically, Ilyas Khrapunov told Bourg to liquidate Triadou's investments in Flatotel and the Cabrini Medical Center as quickly as possible.

117.    Bourg approached Chetrit, explaining that the threat of the California  Litigation was pressuring Triadou and the Ablyazov-Khrapunov Group into moving their assets out  of the United States.  Chetrit offered to purchase an assignment of Triadou's interest in  the Flatotel at a substantial discount from the price originally paid by  Triadou.  By this point, the value of

Triadou's investment had in fact increased  substantially beyond the funds originally invested.

118.    Chetrit simultaneously proposed to bribe Bourg, so Chetrit could further take advantage of Triadou and secretly influence it to obtain a discounted price.  Specifically, Chetrit proposed that Bourg covertly use  his position as director of Triadou to accept a lower price for the Chetrit Group's  purchase of an assignment, thus decreasing Triadou's recovery from the investment and  increasing the Chetrit Group's profit.  In return for securing for Chetrit a lower assignment price, Chetrit agreed to surreptitiously pay Bourg $3 million.

119.    In or about August  of 2014, Bourg, acting on behalf of Triadou and at the direction of the Ablyazov-Khrapunov Group, agreed to assign Triadou's interest in the Flatotel back  to the Chetrit Group for a price as low as $26 million, only a fraction of the fair  market value of the properties.  At the same time, Bourg executed a release of the promissory note that Triadou held entitling it to equity in the Cabrini Medical Center development.

120.    At the time of this assignment and release, Viktor Khrapunov was facing criminal charges as well possible fines and disgorgement in Kazakhstan; the Kazakh  government had formally sought extradition of Viktor Khrapunov from Switzerland; Ablyazov was being held in French prison awaiting extradition; and the Swiss assets of the Ablyazov-Khrapunov Group remained frozen.  Not only were all of these facts widely disseminated in the news, they were known by all parties to the assignment and release transactions, including Chetrit, and it was not uncommon for their meetings to begin with a discussion of the possibility of the incarceration of members of the Ablyazov-Khrapunov Group.

121.    Following the assignment and release, Bourg invoiced Chetrit for $1 million of the  agreed-upon $3 million bribe.  After  receiving the invoice, Chetrit paid Bourg $400,000, but refused to pay the full  amount demanded by Bourg.

122.    In or about March 2015, Bourg met with Chetrit, and recorded the meeting.  As captured on audio, Bourg demanded the remainder of his promised compensation.  Chetrit acknowledged that he had paid Bourg  "400 or 500," but responded that Bourg would receive the additional $600,000 only when  Chetrit paid what he owed Triadou for the assignment, and that he had no intention of  paying Triadou until forced to do so.  Chetrit further stated on tape that Bourg would not receive any remaining money.

123.    At that meeting, Bourg and Chetrit repeatedly discussed the legal troubles  of Mukhtar Ablyazov and Victor and Ilyas Khrapunov.  Chetrit repeatedly avoided using Ilyas Khrapunov's actual name, referring to him instead by the code name "Pedro."  Chetrit and Bourg discussed how "Pedro" was  "sought by Interpol" and his "father-in-law [was] still in prison," and Chetrit agreed that law enforcement was "coming at [the Ablyazov-Khrapunov Group] from all sides."

124.    Also at that meeting, Chetrit and Bourg discussed the fact that due to the investigation in Switzerland, Ilyas Khrapunov could not leave the country and was under intense law enforcement pressure.  In addition, Chetrit once again acknowledged his longstanding understanding that Ablyazov and his criminal situation was behind the motivations of the Ablyazov-Khrapunov investments in the United States.   Chetrit further acknowledged his longstanding understanding that the Ablyazov-Khrapunov Group had made similar investments in other countries, such as Greece, to conceal and launder the proceeds of their crimes.

125.    On or about March 22, 2015, after his meeting with Chetrit, Bourg  contacted Elkain, Chetrit's agent in Europe, and also recorded that phone call.  In that call, Bourg sought to confirm the  terms of his secret deal with Chetrit.   During this recorded conversation, Bourg and Elkain agreed  that the secret deal between Chetrit and Bourg called for $3 million in

compensation for Bourg. Elkain agreed that he "confirmed the deal" between Chetrit and Bourg, and "would have never said that if [Chetrit] hadn't told [him] so." Bourg requested Elkain's aid in receiving the remainder of his payment, but Elkain responded that whether or not the agreement would be honored was up to Chetrit.

126.    Despite the finalized assignment agreement and release, the Chetrit Group refused to make any payments to Triadou following the sale. In response, Triadou filed a series of actions in New York state courts, seeking summary judgment and payment of these obligations under the assignment agreement. Those actions are *Triadou SPV S.A. v. CF 135 FLAT LLC, et al*., No. 653462/2014 (Nov. 10, 2014); *Triadou SPV S.A. v. CF 135 FLAT LLC, et al*., No. 650239/2015 (Jan. 26, 2015); *Triadou SPV S.A. v. CF 135 FLAT LLC, et al*., No. 154681/2015 (May 11, 2015), and *Triadou SPV S.A. v. CF 135 FLAT LLC, et al*., No. 156907/2015 (July 9, 2015),

127.    Each of these actions seeks the payment of money to Triadou derived from the sale of property illicitly obtained by the Ablyazov-Khrapunov Group, and rightfully owned by BTA and Almaty.

128.    By this lawsuit, BTA Bank and the City of Almaty seek to hold Cross- and Counterclaim Defendants responsible for their illegal conduct in the United States in violation of U.S. law.

## CLAIMS TO THE INTERPLEADED FUNDS

129.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 128 as if fully set forth herein.

130.    The Ablyazov-Khrapunov Group stole or otherwise unlawfully obtained money and property from the City of Almaty and BTA Bank.

131.    On information and belief, the Ablyazov-Khrapunov Group invested proceeds of their illegal conduct — money belonging to BTA Bank and the City of Almaty — in Triadou through Telford.

132.    Chetrit colluded with the Ablyazov-Khrapunov Group to invest in and launder that money through New York real estate transactions, including the Cabrini and Flatotel developments.  The City of Almaty and BTA Bank have a right to recover the money that Triadou contributed to these transactions, and proceeds traceable to that investment.

133.    For the reasons stated above, and in partial satisfaction of their claims against the Ablyazov-Khrapunov Group, BTA Bank and Almaty each are entitled to the interpleaded funds, which represent a portion of the proceeds of Triadou's investment of stolen property into the Flatotel and Cabrini developments.

## FIRST CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))
*Against All Defendants*

134.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 133 as if fully set forth herein.

135.    This cause of action is against all Cross- and Counterclaim Defendants (the "Count 1 Defendants").

136.    From 1997 and continuing to the present, the Ablyazov-Khrapunov Group and numerous other individuals and entities, including SDG and Telford, have constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 1 Enterprise").

137.    In 2012, the Chetrit Group knowingly and willfully joined the  Count 1 Enterprise by aiding the Ablyazov-Khrapunov Group's schemes to hide and launder their illicit assets

through investments by SDG through Triadou in properties  owned by the Chetrit Group.

138.     The Count 1 Enterprise was engaged in, and the activities  of the Count 1
Defendants affected, interstate and foreign commerce.

139.     The Count 1 Defendants conducted or participated, directly or indirectly, in the
conduct of the affairs of the Count 1 Enterprise through a pattern of racketeering activity
consisting of the following predicate acts of racketeering within the meaning of 18 U.S.C.
§ 1961(1)(B):

     a.   The Count 1 Defendants engaged and conspired to  engage in money laundering
in violation of 18 U.S.C. § 1956 by conducting numerous  financial transactions
using illegally obtained funds to purchase real estate investments in  New York
City and elsewhere and to fund business entities including SDG and Triadou,
knowing that such funds were unlawfully converted from the City of Almaty and
BTA Bank, with the  goal of concealing the source of those funds.  The Count 1
Defendants  further engaged and conspired to engage in money laundering in
violation of 18 U.S.C. § 1956 by transporting, transmitting, and/or transferring
funds stolen from Almaty and BTA into and within the United States in order to
conceal their source and existence  from lawful investigations conducted by
Swiss, Kazakh, and United Kingdom authorities.

     b.   The Count 1 Defendants further engaged and conspired  to engage in money
laundering in violation of 18 U.S.C. § 1956 by conducting financial  transactions
using those stolen funds by, among other things, using stolen funds to  purchase
real estate and other assets in New York City and elsewhere and to fund  business
entities, including Triadou and SDG, with the intent to further the Count 1

Enterprise and to conceal the source of those funds.

c.   The Count 1 Defendants engaged and conspired to engage in money transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 by, among other things, knowingly transferring funds in excess of $10,000 stolen from Almaty and BTA into and within the United States to invest in real estate and other assets in New York City with the aid of the Chetrit Group, knowing that such funds were stolen from the City of Almaty and BTA Bank.

d.   The Count 1 Defendants engaged and conspired to engage in mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 by knowingly using the mails and wires to transfer illegally obtained funds into and within the United States, for the purpose of furthering the Count 1 Enterprise and, while concealing the funds' illegal source, used those funds to purchase real estate in New York City and to fund business entities, including SDG and Triadou, that enabled those entities to conduct business in the United States using the illegally-obtained funds.

e.   The Count 1 Defendants unlawfully transported or caused to be transported in interstate or foreign commerce securities or money having a value of $5,000 or more which was stolen, converted or taken by fraud from Almaty and BTA Bank, and knowing the same to be stolen, converted or taken by fraud in violation of 18 U.S.C. § 2314.

f.   The Count 1 Defendants received, possessed, concealed, sold, or disposed of securities or money having the value of $5,000 or more, or conspired to do the same, which crossed a state or United States boundary after being stolen,

unlawfully converted, or taken from Almaty and BTA Bank, and knowing the

securities or money to have been stolen, unlawfully converted, or taken in

violation of 18 U.S.C. § 2315.

140.     Each of the Count 1 Defendants conducted or  participated, directly or indirectly,

in the conduct of the affairs of the Count 1 Enterprise through a pattern of racketeering activity,

within the meaning of   18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).  Each of the

Count 1 Defendants engaged or conspired to engage in two or more predicate  acts of

racketeering, and each committed at least one such act of racketeering after the  effective date of

RICO.  From in or about 1997, and continuing to the present,  Count 1 Defendants associated

together, with one another and with  others, and acted in concert for the common and unlawful

purposes of the Count 1 Enterprise and in order to implement the schemes and employ the

devices  described herein.  The specific related predicate acts that constitute the pattern of

racketeering activity within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to,

the following acts of money laundering, transactions in money and property derived  from

specified unlawful activity, foreign transport of stolen money or property known to be stolen,

converted or taken by fraud, mail fraud, and/or wire fraud:

    a.  The 2012 sham sale of SDG to Philippe Glatz to create the appearance that SDG
was independent of the Ablyazov-Khrapunov Group;

    b.  the fraudulent loan from the Ablyazov-Khrapunov Group to Mr. Glatz to facilitate
the SDG sale transaction;

    c.  the formation of Triadou and other entities by SDG at the direction of Bourg and in
consultation with Ilyas Khrapunov;

    d.  Chetrit's meetings with Ilyas Khrapunov in or about 2012 in Switzerland and New

York City, and their subsequent agreement to invest the Ablyazov-Khrapunov Group's unlawfully obtained money in real estate in New York City;

e.  E-mails directly between Chetrit and Ilyas Khrapunov as well as through intermediaries discussing the Ablyazov-Khrapunov Group's possible investments in New York real estate;

f.  the formation of the investment vehicles necessary to facilitate the Flatotel and Cabrini investments;

g.  Telford's failed attempt to transfer funds held in FBME Bank for the Flatotel and Cabrini deals through banks in Luxembourg;

h.  the May 20, 2013 transfer of funds from Telford to Chetrit's attorney representing Triadou's investment of $6 million in the Cabrini deal, along with Chetrit's promissory note and Triadou's right to convert that debt into equity in Cabrini;

i.  a series of other wire transfers on behalf of Triadou from Telford's accounts at FBME Bank Ltd. to Chetrit's counsel in New York, including transfers on November 9, 2012, and January 22, February 13, February 19, April 8, April 16, and April 24, 2013;

j.  a May 22, 2013 wire transfer of $28 million from Telford to a different law firm's Citibank account in New York used for a separate New York real estate investment with Chetrit;

k.  a May 2014 agreement (executed August 2014) to transfer Triadou's interest in the Flatotel to the Chetrit Group at a below-market price;

l.  Chetrit's and Triadou's signed May 2014 release of the promissory note regarding Triadou's $6 million investment in the Cabrini Medical Center development;

36

m.  Chetrit's payment of $400,000 to Bourg in partial satisfaction of Chetrit's agreement with Bourg to pay him $3 million in exchange for securing Chetrit a lower assignment price for Triadou's interests in the Flatotel and Cabrini deals; and

n.  a payment of $1 million from Chetrit to Triadou in partial satisfaction of Chetrit's obligations under the fraudulent assignment.

141.    As a direct and proximate result of RICO violations by the Count 1 Defendants of 18 U.S.C. § 1962(c),  Almaty and BTA have suffered damages in an amount to be determined at trial and presently  estimated to be not less than $6 billion.  Almaty and BTA have been injured in their business or  property by reason of each Count 1 Defendants' violations and,  pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to  recover threefold the damages suffered, together with the costs of this suit and  reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))
### *Against All Defendants except CF 135 West Member LLC*

142.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 141 as if fully set forth herein.

143.    This cause of action is against all Cross- and Counterclaim Defendants except CF 135 West Member LLC (the "Count 2 Defendants").

144.    From its formation and continuing to the present, CF 135 West Member LLC, has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 2 Enterprise").

145.    The Count 2 Enterprise was engaged in, and the activities  of the Count 2 Defendants affected, interstate and foreign commerce.

146.     The Count 2 Defendants engaged in a pattern of racketeering activity consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) described in paragraph 139 above.

147.     Each of the Count 2 Defendants conducted or  participated, directly or indirectly, in the conduct of the affairs of the Count 2 Enterprise through a pattern of racketeering activity, within the meaning of  18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).  Each of the Count 2 Defendants engaged in two or more predicate  acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO.  The Count 2 Defendants associated together, with one another and with others, and acted in concert for the common and unlawful purposes of the Count 2 Enterprise and in order to implement the schemes and employ the devices described herein.  The specific related predicate acts that constitute the pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to, those acts described in paragraph 140 above.

148.     As a direct and proximate result of RICO violations by the Count 2 Defendants of 18 U.S.C. § 1962(c),  Almaty and BTA have suffered damages in an amount to be determined at trial.  Almaty and BTA have been injured in their business or  property by reason of each Count 2 Defendants' violations and,   pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to  recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

## THIRD CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(a))
### *Against All Defendants except CF 135 West Member LLC*

149.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 148 as if fully set forth herein.

150.    This cause of action is against all Cross- and Counterclaim Defendants except CF 135 West Member LLC (the "Count 3 Defendants").

151.    From its formation and continuing to the present, CF 135 West Member LLC, has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 3 Enterprise").

152.    The Count 3 Enterprise was engaged in, and the activities  of the Count 3 Defendants affected, interstate and foreign commerce.

153.    The Count 3 Defendants received income derived from a pattern of racketeering activity consisting of the related predicate acts of racketeering described in paragraphs 139  and 140 above.

154.    The Count 3 Defendants used or invested the income derived from their racketeering activity in the acquisition of an interest in, or the establishment or operation of, the Count 3 Enterprise in violation of 18 U.S.C. § 1962(a).

155.    The Count 3 Defendants used or invested the income derived from their racketeering activity in the Count 3 Enterprise in fraudulent and below-market transactions, including by accepting unreasonable contractual terms to transfer wealth to the Chetrit Group.

156.    As a direct and proximate result of RICO violations by the Count 3 Defendants of 18 U.S.C. § 1962(a),  Almaty and BTA have suffered damages in an amount to be determined at trial.  Almaty and BTA have been injured in their business or  property by reason of each Count 3

39

Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

## FOURTH CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))
### *Against All Defendants except 227 East 19th Holder LLC*

157.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 156 as if fully set forth herein.

158.    This cause of action is against all Cross- and Counterclaim Defendants except 227 East 19th Holder LLC (the "Count 4 Defendants").

159.    From its incorporation and continuing to the present, 227 East 19th Holder LLC has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 4 Enterprise").

160.    The Count 4 Enterprise was engaged in, and the activities of the Count 4 Defendants affected, interstate and foreign commerce.

161.    The Count 4 Defendants engaged a pattern of racketeering activity consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) described in paragraph 139 above.

162.    Each of the Count 4 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 4 Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c). Each of the Count 4 Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. The Count 4 Defendants associated together, with one another and with others, and acted in concert for the common and

unlawful purposes of the Count 4 Enterprise and in order to implement the schemes and employ

the devices described herein.  The specific related predicate acts that constitute the pattern of

racketeering activity within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to,

those acts described in paragraph 140 above.

163.    As a direct and proximate result of RICO violations by the Count 4 Defendants of

18 U.S.C. § 1962(c), Almaty and BTA have suffered damages in an amount to be determined at

trial.  Almaty and BTA have been injured in their business or  property by reason of each Count 4

Defendants' violations and,   pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are

thereby entitled to  recover threefold the damages suffered, together with the costs of this suit and

reasonable attorneys' fees.

<u>**FIFTH CAUSE OF ACTION**</u>

**(VIOLATIONS OF RICO, 18 U.S.C. § 1962(d))**
***Against All Defendants***

164.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 163

as if fully set forth herein.

165.    This cause of action is against all Cross- and Counterclaim Defendants (the "Count

5 Defendants").

166.     As alleged herein, Count 5 Defendants conspired to engage in the acts described

above in the United States to further the goals of their criminal enterprises in violation of U.S.

law.

167.     In so doing, Count 5 Defendants unlawfully, willfully, and knowingly did

combine, conspire, confederate, and agree together, with  each other and with others to commit

RICO violations under 18 U.S.C. § 1962(c) and,  thereby, violated 18 U.S.C. § 1962(d).  In

furtherance of the conspiracy and to achieve its  objectives, Count 5 Defendants committed the

overt acts as described in paragraph 140 in the Southern District of New York and elsewhere.

168.     As a direct and proximate result of RICO violations by the Count 5 Defendants of 18 U.S.C. § 1962(d),  Almaty and BTA have suffered damages in an amount to be determined at trial.  Almaty and BTA have been injured in their business or  property by reason of each Count 5 Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to  recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

## SIXTH CAUSE OF ACTION

### (ACTUAL FRAUDULENT TRANSFER)
### *Against All Defendants*

169.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 168 as if fully set forth herein.

170.     At all relevant times, the City of Almaty and BTA Bank have held an interest in the illicit funds  taken by the Ablyazov-Khrapunov Group and invested by and through Triadou, as these funds were  the unlawful profits of embezzlement, fraud, and the corruption of the public office of the mayor of Almaty.   The intermediary transfers or investment of those funds did not alter or diminish either Almaty or BTA's interest.

171.     The 2014 assignment of Triadou's interest in the Flatotel and Cabrini Medical Center was not for  adequate consideration, and in fact, represented a value significantly below the fair value of that interest, due to the improper motivations of Triadou's ownership, the Ablyazov-Khrapunov Group, to hide their illicit assets and move them offshore, and the Chetrit Group's  secret deal to drive down the price of the assignment through bribery.

172.     This assignment was made for the specific purpose of liquidating a fixed  asset to frustrate a future creditor.  Defendants knew of the numerous judgments against Ablyazov in the

United Kingdom, and of Almaty's claims against the Ablyazov-Khrapunov Group in the California Litigation, and knew that Triadou was owned and controlled by the defendants in those actions. Defendants intended and believed that the assignment of the Ablyazov-Khrapunov Group's interest in the Flatotel and Cabrini Medical Center would hinder, delay, and defraud current and future judgment creditors, specifically the City of Almaty and BTA Bank.

173.     For these reasons, the assignment was fraudulently and illegally intended to remove an asset from the jurisdiction of the United States, namely Triadou's interests in the Flatotel and Cabrini Medical Center, convert those assets to cash, and transfer those funds beyond the reach of the Swiss, Kazakh, and United Kingdom authorities

174.     As a result of the foregoing, pursuant to sections 275, 276, and 279 of the New York Debtor and Creditor Law, the August 2014 assignment agreement should be set aside as the product of clearly-inequitable conduct.

**SEVENTH CAUSE OF ACTION**

**(CONSTRUCTIVE FRAUDULENT TRANSFER)**
*Against All Defendants*

175.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 174 as if fully set forth herein.

176.     At all relevant times, the City of Almaty and BTA Bank have held an interest in the illicit funds taken by the Ablyazov-Khrapunov Group and invested by and through Triadou, as these funds were the unlawful profits of embezzlement, fraud, and corruption of the public office of the mayor of Almaty. The intermediary transfers or investment of those funds did not alter or diminish either Almaty or BTA's interest.

177.     Triadou, although an arm of a massive international fraud and money laundering conspiracy, is and has been insolvent itself. Triadou holds no funds or other assets of its own,

and relies on funding from other Ablyazov-Khrapunov Group entities, such as Telford, to meet its obligations. Assets that flow to Triadou are promptly moved to other Ablyazov-Khrapunov Group entities offshore.

178.     As Triadou is controlled by the Ablyazov-Khrapunov Group, whose members face multi-billion dollar judgments in other jurisdictions, Triadou is effectively kept insolvent at all times, so as to limit the Ablyazov-Khrapunov Group's exposure in the United States.

179.     Similarly, because Triadou is controlled by and is an alter ego of the Ablyazov-Khrapunov Group, at the time it liquidated the Flatotel and Cabrini interests and transferred the proceeds to other entities, it had liabilities – including resulting from the UK judgments – that far outstripped its assets.

180.     As a result of the foregoing, pursuant to sections 273 and 273-a of the  New York Debtor and Creditor Law, the August 2014 assignment agreement should be  set aside.

### EIGHTH CAUSE OF ACTION

**(UNJUST ENRICHMENT)**
***Against All Defendants***

181.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 180 as if fully set forth herein.

182.     The Ablyazov-Khrapunov Group, Triadou, and SDG have unjustly enriched themselves by investing funds wrongfully derived from the City of Almaty and BTA Bank.

183.     The Chetrit Group has, through unjust and unlawful means,  enriched themselves through the sale and resale of assets bought and sold with funds  wrongfully obtained from the City of Almaty.  The Chetrit Group sold an interest in the Flatotel and Cabrini properties to Triadou with knowledge of the illicit nature of the funds involved,  and then exploited the very same circumstances to repurchase that interest at a substantial  discount.  In doing so, the Chetrit

44

Group also bribed an officer of Triadou to capture an even greater profit at the expense of the rightful owners of that interest, the City of Almaty and BTA Bank.

184.    The Chetrit Group did so knowing that authorities of Switzerland, the Republic of Kazakhstan, and the United Kingdom were seeking the wrongfully-taken assets held by the Ablyazov-Khrapunov Group, and that further sales of the same assets would potentially frustrate their identification by the lawful authorities.

185.    It would be inequitable to permit Defendants to retain the profits derived from the looting of assets rightfully belonging to the City of Almaty and BTA Bank.

## NINTH CAUSE OF ACTION

### (ALTER EGO)
### *Against All Crossclaim Defendants*

186.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 185 as if fully set forth herein.

187.    The Ablyazov-Khrapunov Group, and specifically Ilyas Khrapunov, is legally indistinguishable from Triadou and SDG.

188.    Triadou has conceded before the Courts of New York State that it is wholly owned and controlled by SDG. SDG in turn is dominated and controlled by Ilyas Khrapunov and the Ablyazov-Khrapunov Group. The purported transaction transferring ownership of SDG from the Ablyazov-Khrapunov Group to Philippe Glatz was illusory, and for no actual consideration, as Glatz effectively bought SDG with its own money.

189.    Neither the management, control, organization, nor business purpose of SDG changed following the illusory sale to Glatz. Ilyas Khrapunov continues to run all operations and make all strategic decisions for the SDG. The sole and improper purpose of the purported sale of SDG was to obscure the company's ownership and prevent its assets from being frozen by

Swiss authorities.

190.     Triadou, as the alter ego of SDG and the Ablyazov-Khrapunov Group, is thus

liable for all current and future obligations against SDG and the Ablyazov-Khrapunov Group,

including any and all liabilities resulting from the California Litigation.

191.     SDG, as the alter ego of Ilyas Khrapunov and the Ablyazov-Khrapunov Group, is

thus liable for all current and future obligations of the Ablyazov-Khrapunov Group, including any

and all liabilities resulting from the California Litigation.

192.     Maintaining the separateness of Triadou and its alter egos, SDG and the

Ablyazov-Khrapunov Group, would allow the Ablyazov-Khrapunov Group and SDG to avoid

otherwise enforceable obligations and would be highly inequitable to the people of the city of

Almaty and BTA Bank.

### TENTH CAUSE OF ACTION

**(CONVERSION)**
*Against All Defendants*

193.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 192

as if fully set forth herein.

194.     None of the Defendants has a superior interest to the City of Almaty or BTA in

the assets wrongfully taken by the Ablyazov-Khrapunov Group. These funds, and the assets

they were used to purchase, are the rightful property of the people of Almaty and BTA.

195.     Defendants knowingly bought and sold assets obtained with these funds derived

from the corruption of the office of the mayor of the City of Almaty and control of BTA Bank.

196.     As a result, Defendants have wrongfully and without authorization exercised of

dominion and control over property of Almaty and BTA, and thus are liable for converting the

same.

## ELEVENTH CAUSE OF ACTION

### (CONSTRUCTIVE TRUST)
#### Against All Defendants

197.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 196 as if fully set forth herein.

198.     As mayor of Almaty, Viktor Khrapunov owed fiduciary duties to the people of Almaty, and through his oath of office, expressly promised to execute those duties.

199.     Despite that promise, Viktor Khrapunov breached those fiduciary duties repeatedly by transferring public assets of the City of Almaty to other members of the Ablyazov-Khrapunov Group for fractions of their market value, and then assisted the Ablyazov-Khrapunov Group in laundering the funds resulting from those illicit transfers of public property. Through these breaches of fiduciary duty, the Ablyazov-Khrapunov Group has been unjustly enriched.

200.     A constructive trust over the 50% interest in CF 135 West Member LLC assigned by Triadou, and all profits therefrom, is the appropriate equitable remedy to prevent further dissipation of the funds resulting from these breaches of fiduciary duty.

201.     Defendants have also conspired to fraudulently transfer Triadou's interest in the Flatotel for the purpose of hiding the Ablyazov-Khrapunov Group's assets and frustrating any recovery resulting from Almaty and BTA's investigations and pursuits of their stolen assets. Separate and aside from the Ablyazov-Khrapunov Group's breaches of fiduciary duty, this knowingly fraudulent transfer by Cross- and Counterclaim Defendants justifies imposition of a constructive trust to prevent any further transfers or encumbrances of this property.

202.     Absent this remedy, the Ablyazov-Khrapunov Group will continue to use Triadou and SDG to launder the fruits of these breaches of fiduciary duty and hide these assets from law enforcement, and the Chetrit Group will continue to be unjustly enriched by these acts

of fraud.

## TWELFTH CAUSE OF ACTION

### (REPLEVIN)
### *Against All Defendants*

203.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 202 as if fully set forth herein.

204.    None of the Defendants has a superior interest to the City of Almaty and BTA Bank in the assets wrongfully taken by the Ablyazov-Khrapunov Group.

205.    Defendants continue to possess the interests in the Flatotel and Cabrini Medical Center developments purchased by Triadou with funds stolen from Almaty and BTA Bank, despite Almaty's and BTA's superior interest.

206.    Almaty and BTA have demanded that the Chetrit Group return this property to the City of Almaty and BTA Bank, but the Chetrit Group has refused to return this property to its rightful owners.

## THIRTEENTH CAUSE OF ACTION

### (PURSUANT TO CPLR § 5239 FOR FRAUD AND CONVERSION)
### *Against All Defendants*

207.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 206 as if fully set forth herein.

208.    Triadou has filed serial actions in the courts of the state of New York seeking payment on the fraudulent assignment agreement between Triadou and the Chetrit Group. While Triadou has been awarded summary judgment in some of these actions, none of these judgments have been satisfied by any sheriff or receiver.

209.    The City of Almaty and BTA Bank are the rightful owners of Triadou's interest in the Flatotel and Cabrini Medical Center and/or any funds derived from the sale of that interest, as

48

the interest was purchased with funds unlawfully converted by the Ablyazov-Khrapunov Group and laundered through SDG and Triadou.

210.     Pursuant to CPLR § 5239, this court is empowered to vacate any such judgments and direct the disposition of the property in question, as well as direct which party should keep possession of the property during the pendency of this action.

211.     The court should set aside any judgments in Triadou's favor in light of the City of Almaty's and BTA's superior interest in this illicitly-obtained property, direct that Triadou's interest in the Flatotel and Cabrini Medical Center be transferred to the City of Almaty and BTA Bank, and pursuant to CPLR § 5239, award the City of Almaty and BTA Bank its reasonable attorneys' fees in bringing this claim.

## <u>DEMAND FOR JURY TRIAL</u>

Almaty and BTA Bank demand a jury trial on all claims for which trial by jury is available, including on the underlying interpleader action.

## <u>DEMAND FOR RELIEF</u>

WHEREFORE, Almaty and BTA Bank demand the Court enter judgment as follows:

A.     For injunctive relief and rescission of the 2014 assignment agreement and release;

B.     For compensatory, punitive, and treble damages;

C.     For declaratory relief;

D.     For all costs and fees incurred in prosecuting this Complaint;

E.     For such other and further relief as this Court deems just and proper.

Dated:  New York, New York
           October 12, 2015

                                          Respectfully Submitted,

                                          BOIES, SCHILLER & FLEXNER LLP


                              By:   /s/ Matthew L. Schwartz
                                    Matthew L. Schwartz
                                    Randall W. Jackson
                                    Daniel G. Boyle
                                    Craig Wenner

                                    BOIES, SCHILLER & FLEXNER LLP
                                    575 Lexington Avenue
                                    New York, New York 10022
                                    Telephone: 212-446-2300
                                    Facsimile: 212-446-2350