# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CF 135 FLAT LLC, CF 135 WEST MEMBERS LLC, and THE CHETRIT GROUP, LLC,

                    Interpleader Plaintiffs,

      - against -

TRIADOU SPV S.A. and CITY OF ALMATY, a foreign city,

                    Interpleader Defendants.

---

CITY OF ALMATY, KAZAKHSTAN and BTA BANK JSC,

                    Crossclaim Plaintiffs,

      - against -

MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, and TRIADOU SPV S.A.,

                    Crossclaim Defendants.

ECF Case

No. 15 CV 05345 (AJN)

## MEMORANDUM OF LAW IN SUPPORT OF CROSSCLAIM DEFENDANT TRIADOU SPV S.A.'S MOTION TO DISMISS THE CROSSCLAIMS

DICKSTEIN SHAPIRO LLP
1633 Broadway
New York, New York  10019-6708
Telephone: (212) 277-6500
Facsimile: (212) 277-6501

*Attorneys for Interpleader Defendant and Crossclaim Defendant Triadou SPV S.A.*

3382241

# TABLE OF CONTENTS

**Page**

Table of Authorities ................................................................................................. ii

Preliminary Statement .............................................................................................. 1

Procedural and Factual Background ......................................................................... 2

Argument ................................................................................................................. 10

I.     THE CROSSCLAIMS SHOULD BE DISMISSED ON *FORUM NON CONVENIENS* GROUNDS ........................................................................ 10

     A.    The Legal Standard For *Forum Non Conveniens* Dismissal ................. 11

     B.    Almaty-BTA's Choice Of Forum Should Be Afforded Little Or No Deference ........................................................................................ 12

     C.    Switzerland Is An Adequate Alternative Forum To Litigate The Crossclaims ..... 13

     D.    The Private And Public Interest Factors Weigh In Favor Of Dismissal ............... 16

          1.    The Private Interest Factors Militate Dismissal of the Crossclaims ......... 16

          2.    The Public Interest Factors Also Militate Dismissal of the Crossclaims ........................................................................................ 20

II.    THE CROSSCLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM ........................................................................................ 24

     A.    The Crossclaims Do Not Meet Rule 9(b)'s Specificity Requirements ................. 24

     B.    The RICO Crossclaims Should Be Dismissed Because They Are Based On Alleged Conduct That Is Almost Entirely Extraterritorial ................................... 29

          1.    The Majority of Case Law Holds That RICO Does Not Apply Extraterritorially ..................................................................................... 29

          2.    The RICO Crossclaims Are Unquestionably Extraterritorial ................... 31

Conclusion ............................................................................................................... 33

## <u>TABLE OF AUTHORITIES</u>

**CASES**                                                                                      **Page(s)**

*Amusement Industry, Inc. v. Stern*, 786 F. Supp. 2d 758 (S.D.N.Y. 2011) ................................28

*Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372 (S.D.N.Y. 2010) ................................28

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................................24

*Banco de Seguros del Estado v. J.P. Morgan Chase & Co.*,
   500 F. Supp. 2d 251 (S.D.N.Y. 2007) ....................................................................................20

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ................................................................24

*Cedeno v. Intech Grp., Inc.*, 733 F. Supp. 2d 471 (S.D.N.Y. 2010) (Rakoff, J.),
   *aff'd* 457 Fed. App'x 35 (2d Cir. 2012) ...........................................................................30, 32

*CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076 (10th Cir. 2014) ......................................30

*Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229 (S.D.N.Y. 2012) ................................30, 32, 33

*Daly v. Castro Llanes*, 30 F. Supp. 2d 407 (S.D.N.Y. 1998) ......................................................28

*European Cmty. v. RJR Nabisco, Inc.*, No. 02-CV-5771 (NGG) (VVP),
   2011 WL 843957 (E.D.N.Y. Mar. 8, 2011) ............................................................................32

*European Community v. RJR Nabisco, Inc.*, 783 F.3d 123 (2d Cir. 2015),
   *cert. granted* 136 S.Ct. 28 (2015) ....................................................................29, 30, 31

*First Capital Asset Management, Inc. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004) ....................................................................................................27

*Fitzgerald v. Texaco, Inc.*, 521 F.2d 448 (2d Cir. 1975) ............................................................14

*Franzone v. City of New York*, No. 13-CV-5282 (NG),
   2015 WL 2139121 (E.D.N.Y. May 4, 2015) ..........................................................................25

*Frota v. Prudential-Bache Sec., Inc.*, 639 F. Supp. 1186 (S.D.N.Y. 1986)............................25, 28

*Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) ................................................................11, 16, 20

*Hourani v. Mirtchev*, 943 F. Supp. 2d 159 (D.D.C. 2013),
   *aff'd* 796 F.2d 1 (D.C. Cir. 2015) ........................................................................................30

*In re Alcon Shareholder Litig.*, 719 F. Supp. 2d 263 (S.D.N.Y. 2010) ................................ passim

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   935 F. Supp. 2d 666 (S.D.N.Y. 2013)......................................................................................30

3382241

*Innovation Ventures, LLC v. Ultimate One Distrib. Corp.*, No. 12-CV-5354
(KAM) (RLM), 2014 WL 1311979 (E.D.N.Y. Mar. 28, 2014)..............................................26

*Iragorri v. United Techs. Corp.*, 274 F.3d 65 (2d Cir. 2001) ................................................ passim

*Jonas v. Estate of Leven*, No. 14-CV-3369 (SHS),
2015 WL 4522763 (S.D.N.Y. July 27, 2015) ..........................................................................28

*Kitaru Innovations Inc. v. Chandaria*, 698 F. Supp. 2d 386 (S.D.N.Y. 2010) ........................16, 17

*LaSala v. UBS, AG*, 510 F. Supp. 2d 213 (S.D.N.Y. 2007)..............................................12, 14, 15

*McLaughlin v. Anderson*, 962 F.2d 187 (2d Cir. 1992)............................................................27

*Morris v. N.Y. Dep't of Taxation & Fin.*, 82 N.Y.2d 135 (1993) .................................................28

*Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010) ......................................29, 30, 31

*Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146 (2d Cir. 2005) ...................................15

*Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29 (2d Cir. 2010) ....................................29

*Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64 (2d Cir. 2003) .........................11, 14

*Press Access LLC v. 1800 Postcards, Inc.*, No. 11 Civ. 1905 (KBF),
2012 WL 4857547 (S.D.N.Y. Oct. 9, 2012),
*aff'd* 543 Fed. App'x 23 (2d Cir. 2013)..................................................................................28

*PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65 (2d Cir. 1998) ...............................14

*Republic of Iraq v. ABB AG*, 920 F. Supp. 2d 517 (S.D.N.Y. 2013),
*aff'd* 768 F.3d 145 (2d Cir. 2014), *cert. denied* 135 S.Ct. 2836 (2015) ..................................30

*RJR Nabisco Inc. v. European Cmty.*, 136 S. Ct. 28 (2015)........................................................30

*Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*,
81 F.3d 1224 (2d Cir. 1996)....................................................................................................11

*Segal v. Gordon*, 467 F.2d 602 (2d Cir. 1972) ....................................................................25, 27

*Sendar Co. v. Megaware Inc.*, 705 F. Supp. 159 (S.D.N.Y. 1989)..............................................26

*Sussman v. Bank of Israel*, 801 F. Supp. 1068 (S.D.N.Y 1992),
*aff'd*, 990 F.2d 71 (2d Cir. 1993)............................................................................................14

*Transition Invs., Inc. v. The Allen O. Dragge, Jr. Family Trust*,
No. 11 Civ. 04775, 2012 WL 1848875 (S.D.N.Y. May 21, 2012)..........................................24

3382241

*Turedi v. Coca Cola Co.*, 460 F. Supp. 2d 507 (S.D.N.Y. 2006) *aff'd*, 343 Fed.
    App'x 623 (2d Cir. 2009) .................................................................................12, 20

*United States v. Xu*, 706 F.3d 965 (9th Cir. 2013).........................................................30

*Varnelo v. Eastwind Transp., Ltd.*, No. 02-CIV-2084 (KMW)(AJP),
    2003 WL 230741 (S.D.N.Y. Feb. 3, 2003)................................................. passim

*Yavuz v. 61 MM, Ltd.*, 576 F.3d 1166 (10th Cir. 2009) .............................................15

*Zap Cellular, Inc. v. Kurland,* No. 15 CIV. 682 (BMC),
    2015 WL 8207315 (E.D.N.Y. Dec. 6, 2015) .......................................................25

**RULES**

Fed. R. Civ. P. 9(b) ...........................................................................................25, 26, 27, 28

Fed. R. Civ. P. 12(b)(6)...................................................................................................24

iv

3382241

Crossclaim Defendant Triadou SPV S.A. ("Triadou") respectfully submits this memorandum of law in support of its Motion to Dismiss the crossclaims of the City of Almaty ("Almaty") and BTA Bank JSC ("BTA"), as set forth in the Crossclaim Plaintiffs' Answer, Counterclaims, and Crossclaims, dated October 12, 2015, ECF No. 49 (the "Crossclaims").[1]

## **Preliminary Statement**

The fundamental question before the Court regarding Almaty's and BTA's Crossclaims is whether conduct by Kazakh nationals – occurring almost entirely in Kazakhstan and Switzerland, relating to Kazakh real estate and Kazakh bank funds, and causing harm entirely in Kazakhstan – should properly be heard in a New York federal court. The simple, straightforward answer, is "No."

The principles of *forum non conveniens* call out for the dismissal of the Crossclaims, which are the result of Almaty taking what was already a complex three-party interpleader dispute over $21 million (plus interest) and transforming it into an effort to prosecute an alleged conspiracy spearheaded by several Kazakh nationals in which hundreds of millions (or even billions) of dollars were spirited out of Kazakhstan and into Switzerland. In doing so, Almaty and BTA assert claims that will be hugely inconvenient, expensive, and burdensome for the parties to litigate in the Southern District of New York – litigation that will entail increased discovery costs, the need to hire translators and interpreters, trans-Atlantic travel, and substantial difficulties in obtaining the presence of foreign non-party witnesses. In contrast, litigating the Crossclaims in Switzerland would be more convenient and cost-effective for all of the parties. Switzerland is a more-than-adequate alternative to litigating in New York – a conclusion already

---

[1]    For purposes of this motion only and for convenience, Triadou treats Almaty and Intervenor-Applicant BTA as co-Crossclaim Plaintiffs, insofar as Triadou's arguments apply to both entities' claims, but without waiver of its position that BTA should not be joined or permitted to intervene here.

reached by another federal district court regarding largely the same claims; and a review of the private and public interests implicated by the Crossclaims overwhelmingly confirms that Switzerland, not New York, is the better forum for those claims.

The Crossclaims also should be dismissed as to Triadou for the independent reason that Almaty and BTA have failed to plead with the requisite particularity the allegations of fraud that link Triadou to this purported conspiracy – i.e., that the transaction in which Crossclaim Defendant Ilyas Khrapunov sold Triadou was a "sham" transaction.  This failure dooms not only the RICO Crossclaims, but also the remaining state law Crossclaims, all of which are predicated on allegations of fraud.

Finally, even if the Court finds that Almaty and BTA have pled fraud with sufficient particularity, the RICO Crossclaims should still be dismissed because they improperly seek to extraterritorially apply the RICO statute.  Well-established and well-reasoned precedent in this Circuit had, until recently, mandated dismissal of RICO claims where the enterprise and pattern of racketeering were not located in the United States, which is precisely the case here.  While Triadou acknowledges that a slim majority of a 2015 Second Circuit en banc panel altered this precedent, the Crossclaims demonstrate the flaw in the Second Circuit's changed position.

Triadou thus respectfully requests that the Court dismiss the Crossclaims in their entirety.

<u>**Procedural and Factual Background**</u>[2]

**<u>Almaty and Viktor Khrapunov.</u>**   Crossclaim Plaintiff Almaty is a city in, and the former capital of, the Republic of Kazakhstan.  Crossclaims ¶ 32.  After serving as Almaty's mayor between 1997 and 2004, Defendant Viktor Khrapunov now allegedly resides in Geneva,

---

[2]     Triadou accepts as true all well-pleaded allegations set forth in the Crossclaims solely for purposes of this Motion to Dismiss.

3382241

Switzerland.  *Id.* ¶¶ 40, 67.   Throughout his tenure, Viktor Khrapunov allegedly "used the powers of the office of the mayor to transfer public assets belonging to the City of Almaty to his family and their co-conspirators for prices that were a fraction of their fair value," and "used the eminent domain powers of the office of the mayor to seize private property ostensibly for the City of Almaty, but then promptly transferred that property to entities owned or controlled" by his family.  *Id.* ¶ 70.  Almaty and BTA provide three examples of Viktor Khrapunov's alleged misconduct, occurring from 2000 to 2003, all of which involve Kazakh real estate. *Id.* ¶¶ 72-75.

Summarizing the multiyear history of the Khrapunovs' Kazakh-based misdeeds, the Crossclaims allege that "through similar transactions uncovered and still under investigation, the Khrapunovs are estimated to have illegally acquired at least 80 pieces of real estate, which they converted into approximately $300 million in illicit funds."  *Id.* ¶ 76.  Almaty's allegations thus relate to Viktor Khrapunov's alleged purchases, seizures, and sales of Kazakh real estate (both state- and privately-owned) that occurred at least ten years before the Crossclaims were filed, and that lacked a single alleged connection to the United States.  *See id.* ¶¶ 66-76.

**BTA Bank and Mukhtar Ablyazov.**  Beginning in May 2005, after Viktor Khrapunov left the office of mayor of Almaty, Crossclaim Defendant and Kazakh national Mukhtar Ablyazov ("Ablyazov") became Chairman of BTA Bank, a joint stock company and bank headquartered in Almaty, Kazakhstan.  *Id.* ¶¶ 33, 41, 50.[3]  Ablyazov held this position until February 2009.  *Id.* ¶ 50.  Almaty and BTA allege[4] that Ablyazov's "abuse of his position took many forms, principally through enormous loans to valueless entities owned by Ablyazov, which

---

[3]      The Crossclaims do not allege any contemporaneous connection between Viktor Khrapunov's alleged illicit real estate transactions as Almaty's mayor and Mukhtar Ablyazov's alleged embezzlement as BTA's Chairman.

[4]      The allegations cite findings from actions purportedly litigated in the United Kingdom, but without attaching or providing the opinions of the foreign courts. *Id.* ¶¶ 50-65.

would then be obscured by transfers among different shell corporations, and never repaid." *Id.* ¶ 52.  None of Ablyazov's alleged conduct as BTA Chairman relates to or occurred in the United States.  *See id.* ¶¶ 51-55.  Instead, the allegations concern the operations of a Kazakh bank in Kazakhstan between six and ten years ago.  *Id.* ¶¶ 50-56.

Almaty and BTA contend that the Ablyazov-directed transactions caused BTA to default on its debt obligations in 2009, which in turn led BTA to sue Ablyazov and his lieutenants in the United Kingdom (the "UK Actions") on the grounds that they defrauded BTA of more than $6 billion.  *Id.* ¶¶ 56-57.  The UK Actions resulted in the issuance of an order freezing Ablyazov's assets, and sometime before late 2010, those assets also were put into receivership. *Id.* ¶¶ 57-58.  While the receivership order allegedly authorized recovery from thousands of entities,[5] there is no allegation that the order (or any of the findings against Ablyazov) reference, include, or otherwise address SDG Capital, SA ("SDG") or Triadou.  *See id.* ¶¶ 57-59.  BTA claims to have been awarded over $4 billion in damages against Ablyazov in the UK Actions. *Id.* ¶ 63.  During the course of the UK Actions, Ablyazov allegedly fled to France where he was apprehended, and remains detained there pending extradition.  *Id.* ¶¶ 61-64.  Almaty and BTA offer only one allegation linking the Khrapunovs and Ablyazov, which states in conclusory fashion that Crossclaim Defendant Ilyas Khrapunov, as Ablyazov's son-in-law, "assumed control of much of Ablyazov's money laundering operations" after Ablyazov's capture.  *Id.* ¶ 65.

**The Arena Moves To Switzerland.**  Almaty and BTA allege that in late 2007, Viktor Khrapunov was "tipped off that the Kazakh government had begun investigating" his "financial

---

[5]     While Almaty and BTA are careful to note that the list of companies added to the scope of the Receivership Order expanded twice in 2011, they do *not* allege that the expansions covered SDG Capital, SA or Triadou.  Crossclaims ¶ 59.

dealings." *Id.* ¶ 83.[6]  Based on that tip, Almaty and BTA allege that "on or about November 9, 2007, Viktor and Leila Khrapunov boarded a private jet and fled Kazakhstan for Switzerland, where Ilyas Khrapunov and Madina Ablyazov resided. . . ." *Id.*  Ilyas Khrapunov, Viktor's son, allegedly resides in Switzerland, and is married to Ablyazov's daughter, Madina. *Id.* ¶ 42.

Almaty and BTA allege that this movement to Switzerland reflected an effort by the so-called Ablyazov-Khrapunov Group, "to avoid law enforcement attention and possible seizure of this ill-gotten wealth," amounting to more than $300 million. *Id.* ¶¶ 77-78.  In doing so, the Khrapunovs (and Ablyazov) allegedly "created a series of entities in Switzerland and overseas to launder these illicit funds into outwardly-legitimate investments.  One such entity was Swiss Development Group, formally SDG Capital S.A.," which was allegedly formed for the benefit of the Ablyazov-Khrapunov Group. *Id.* ¶¶ 78-79.[7]  Almaty and BTA allege, confusingly, that between 2008 and 2012, the "Ablyazov-Khrapunov Group and sham companies they controlled funneled at least $115 million into SDG derived from the Ablyazov-Khrapunov Group's self-dealing and fraud," but do not identify the "sham companies" or when in 2012 the group allegedly stopped funneling money into SDG. *Id.* ¶ 79. To conceal this activity, Viktor Khrapunov allegedly "filed false tax returns with Kazakhstan's taxation authority," although Almaty and BTA provide only a single example of this from 2007. *Id.* ¶¶ 81-82.

---

[6]     Almaty and BTA allege that the tip Viktor Khrapunov received covered the "Ablyazov-Khrapunov Group," but the use of that shorthand phrase appears inaccurate, given other allegations in the Crossclaims.  Crossclaims ¶ 83.  For example, as of 2007, Ablyazov was still Chairman of BTA, and there is no allegation that, at that time, BTA had any inkling that Ablyazov had allegedly abused his position. *See id.* ¶¶ 50-65.  Further, Almaty and BTA allege – in conclusory fashion – that it was not until *after* Ablyazov's capture and imprisonment in 2013, that his son-in-law and Crossclaim Defendant Ilyas Khrapunov "assumed control of much of Ablyazov's money laundering operations." *See id.* ¶¶ 64-65.

[7]     Almaty and BTA do not allege that any of those purported entities were created in, or had links to, the United States or New York; in fact, Almaty and BTA do not specifically identify any country connected to those entities other than Switzerland. *Id.* ¶ 79.

Back in Kazakhstan, by May 2011, the country's agency for investigating corruption (the "Investigation Department") filed two criminal cases against Viktor Khrapunov for his conduct as mayor of Almaty. *Id.* ¶ 84. In July 2011, the Investigation Department obtained a "court-ordered arrest warrant for Viktor Khrapunov," and throughout 2011 and 2012, additional charges were brought – also in Kazakhstan – against Viktor, Leila, and Ilyas Khrapunov for conduct that occurred while Viktor Khrapunov held office in Almaty. *Id.*

Subsequently, in February and September of 2012, the Investigation Department "applied to the Federal Office of Justice in Switzerland for legal assistance in connection with the effort to prosecute *Viktor, Leila, and Ilyas Khrapunov for crimes in Switzerland and Kazakhstan relating to their corrupt acts in Almaty and the laundering of the resulting funds*." *Id.* ¶ 85 (emphasis added). In response, in mid-2012, the Public Prosecutor of Geneva opened an investigation into these individuals and their alleged money laundering activities in Switzerland, which in turn led to a seizure of financial and banking documents from the Khrapunovs, and orders freezing their Swiss accounts and assets in 2012 and 2013. *Id.* Almaty and BTA allege that the Swiss investigation is ongoing, there are "criminal charges pending against Viktor Khrapunov in Kazakhstan," and additional charges against Ilyas Khrapunov also are pending in Kazakhstan. *Id.* ¶ 86. The assets of the Khrapunovs allegedly "remain frozen by Swiss authorities," and Kazakhstan "has formally requested extradition of Viktor Khrapunov." *Id.* Notably, Almaty and BTA do not allege that any of the investigations included or currently includes Triadou; nor do they allege that any of the assets belonging to SDG or Triadou were frozen. *See id.* ¶¶ 83-86.

**The Ablyazov-Khrapunov Group's Subsequent U.S. Investments.** In an effort to tie the acts of the Khrapunovs and Ablyazov to the United States, Almaty and BTA allege that in 2011 and 2012, the "Ablyazov-Khrapunov Group" determined to invest their purportedly ill-

3382241

gotten gains in real estate in the United States.  *Id.* ¶ 87.  The Group allegedly did this through SDG, and a Dubai-based private contracting entity called Telford International Limited ("Telford").  *Id.* ¶ 88.  Beyond the conclusory statement that Telford is "controlled" by the Ablyazov-Khrapunov Group, Almaty and BTA do not allege how the entity is connected to any of the Crossclaim Defendants.

Almaty and BTA next allege that "in 2012," SDG was "purportedly sold" to Mr. Philippe Glatz in "a sham transaction, with the Ablyazov-Khrapunov Group maintaining beneficial ownership and control of SDG."  *Id.* ¶ 89.  Almaty and BTA go on to allege, "upon information and belief," that

> the Ablyazov-Khrapunov Group paid Mr. Glatz to purchase SDG using the Ablyazov-Khrapunov Group's own funds:  Glatz accepted a loan from the Ablyazov-Khrapunov Group and then repaid that loan while outwardly claiming that this payment to the Ablyazov-Khrapunov Group was for the purchase of SDG.  In fact, the transfer of SDG was illusory, as Mr. Glatz was merely repaying a prior obligation, and effectively getting SDG for free.

*Id.* ¶ 90.  The allegations do not identify the nature of the alleged "prior obligation," what "sham" or fraudulent statements were made, who made them, or when an agreement was reached.  *See id.*  Almaty and BTA allege, in conclusory fashion, that after the sale, Mr. Glatz remained beholden to the Ablyazov-Khrapunov Group and that Ilyas Khrapunov "continues to control SDG while holding himself out to be a mere 'outside advisor' to the company."  *Id.* ¶¶ 91-92.

In 2011, before the sale of SDG to Mr. Glatz, Ilyas Khrapunov allegedly approached Nicolas Bourg, "a Belgium-based real estate manager, seeking to create a new entity controlled by SDG."  *Id.* ¶ 93.  Bourg – whom Almaty and BTA are not suing here – is alleged to have "formed a series of entities under the laws of Luxembourg," *id.* ¶ 94, including Triadou, with a principal place of business in Geneva, Switzerland, *id.* ¶¶ 39, 94.

Subsequently, after Bourg made contact with an agent of the Chetrits, Bourg, Ilyas Khrapunov, and the Chetrit Plaintiffs met "in Geneva Switzerland." *Id.* ¶¶ 96-97. The purported result of this meeting *in Switzerland* was that Joseph Chetrit and Ilyas Khrapunov "agreed in principle to seek joint investments in the United States." *Id.* ¶ 98. "Following this meeting in Geneva," Joseph Chetrit met with Ilyas Khrapunov and Bourg in New York City "to evaluate potential investment options." *Id.* ¶ 99. Once again, Almaty and BTA admit that the discussions happened subsequent to SDG's sale to Mr. Glatz. *Id.* These discussions purportedly led to Triadou's investment in two real estate investments, the Flatotel development and the Cabrini Medical Center development. *Id.* ¶ 100. The Ablyazov-Khrapunov Group purportedly sought to fund these investments with money from Telford, held in accounts of a Cyprus-based bank (FBME Bank). *Id.* ¶ 108. Due to issues with transferring money through those banks – supposedly related to the investigations into the Khrapunovs and Ablyazov – the Chetrit Plaintiffs directed Bourg to transfer funds to "the escrow account of Chetrit's personal and corporate attorneys." *Id.* ¶ 110. On May 20, 2013, Almaty and BTA allege that Triadou invested $6 million in Cabrini Medical Center. *Id.* ¶¶ 112-114.

**The Chetrits Bribe Bourg.** Allegedly, in response to the California federal court action filed by Almaty in 2014, Ilyas Khrapunov directed Bourg to begin liquidating Triadou's assets in the United States. *Id.* ¶ 116. Almaty and BTA assert that Bourg approached Joseph Chetrit and explained the threat of the California action, which in turn led Chetrit to offer to purchase Triadou's interest in the Flatotel development at a "substantial discount." *Id.* ¶ 117.[8] Chetrit

---

[8]     This allegation directly contradicts representations made by the Chetrit Plaintiffs in opposing Triadou's motion to dismiss the Amended Interpleader Complaint. Pls.' Mem. in Opp. to Mot. to Dismiss, 4 (Sept. 25, 2015) (ECF No. 39) ("Prior to receiving the Latham Letter [of April 30, 2015], Plaintiffs had no knowledge of the California Action or of Almaty's claims.").

allegedly offered to bribe Bourg "so Chetrit could further take advantage of Triadou and secretly influence it to obtain a discounted price." *Id.* ¶ 118. Next, Almaty and BTA allege, inconsistently, that Bourg, "acting on behalf of Triadou and at the direction of the Ablyazov-Khrapunov Group," agreed to assign Triadou's interest in the Flatotel development back to the Chetrit Plaintiffs for at least $26 million. *See id.* ¶ 119. After an alleged payment of a portion of the bribe, Bourg recorded a meeting with Joseph Chetrit whereby he acknowledged the bribe, and during which Chetrit stated he would not pay Triadou until forced to do so. *Id.* ¶ 122. The Chetrit Group thereafter "refused to make any payment to Triadou following the sale." *Id.* ¶ 126. Triadou filed four state court actions seeking payment of the obligations under the assignment agreement, but has not been paid. *Id.*

**Almaty's Dismissed California Federal Court Actions.** As referenced above, in 2014, Almaty filed a complaint in the Central District of California against Viktor Khrapunov, Ilyas Khrapunov, and other Khrapunov family members for alleged violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") and related conspiracy claims. *See* Compl., *City of Almaty v. Viktor Khrapunov, et al.*, No. 2014-cv-3650 (FMO) (C.D. Cal. May 13, 2014) (the "2014 California Action") (ECF No. 1) (Ex. 1).[9] After failing to effect service on the foreign Khrapunov defendants, and after the court denied Almaty's request for an enlargement of time to serve the defendants for lack of good cause, Almaty filed a new action on April 8, 2015 in the same court based on the same allegations in the 2014 California Action. *See* Compl., *City of Almaty v. Viktor Khrapunov, et al.*, No. 2015-cv-2628 (FMO) (C.D. Cal. Apr. 8, 2015) (the

---

[9]     Citations to exhibits reference the exhibits attached to the Declaration of Deborah Skakel, dated December 18, 2015 and filed with this memorandum.

"2015 California Action" and collectively, the "California Actions") (Ex. 2); s*ee also* 2014 Cal.

Action Order re: Pending Motion, at 3 (ECF No. 123) ("2014 California Action Order") (Ex. 3).

The allegations in the California Actions are virtually identical to those here. Specifically, Almaty alleged that Viktor Khrapunov and his family members stole hundreds of millions of dollars – acquired through illicit real estate transactions – from Almaty while he was mayor, from 1997 until 2004.  2014 Cal. Action Order at 1-2.  The complaints also alleged that the stolen funds were transferred out of Kazakhstan and into Switzerland, with only a fraction ever reaching the United States years after the alleged harmful conduct occurred.  *Id.* at 2.

On September 21, 2015, the Central District of California dismissed the 2014 California Action on *forum non conveniens* grounds.  *Id.* at 12.  The court noted that:

> When considered together, the . . . balance of the private and public factors weigh in favor of dismissal [for *forum non conveniens*].  Switzerland is not just an adequate forum, but a more appropriate and convenient one, given the particular facts and circumstances of this case, and the private and public interest factors strongly favor litigating this case there. . . . [The] relatively minor convenience [Almaty would gain from litigating in California] does not outweigh the alleged activities' fundamentally foreign nature and the fact that the evidence and witnesses required to prove those allegations are located primarily in Kazakhstan and Switzerland.

*Id.*  Two days later, the Central District issued an order applying its decision dismissing the 2014 California Action to dismiss the 2015 California Action.  *See* 2015 Cal. Action Order re: Pending Motion (ECF No. 39) ("2015 California Action Order") (Ex. 4).

## Argument

### I.    THE CROSSCLAIMS SHOULD BE DISMISSED ON *FORUM NON CONVENIENS* GROUNDS

All thirteen of Almaty's and BTA's Crossclaims should be dismissed on *forum non conveniens* grounds because (i) their choice to litigate in New York is entitled to little deference, (ii) Switzerland is an adequate alternative forum with a much stronger and already established

interest in the dispute, and (iii) the interests, both private and public, demonstrate that litigating in Switzerland would be substantially more convenient than litigating in New York, and would better serve the ends of justice.

### A.  The Legal Standard For *Forum Non Conveniens* Dismissal

"The equitable doctrine of *forum non conveniens* [] permits a court to 'resist imposition upon its jurisdiction even when jurisdiction is authorized by the letter of a general venue statute,'" where dismissal would be most convenient and best serve the interests of justice. *Varnelo v. Eastwind Transp., Ltd.*, No. 02-CIV-2084 (KMW)(AJP), 2003 WL 230741, at *5 (S.D.N.Y. Feb. 3, 2003) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 507 (1947)).  "The decision to dismiss a case on *forum non conveniens* grounds 'lies wholly within the broad discretion of the district court.'"  *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001) (en banc) (quoting *Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC*, 81 F.3d 1224, 1232 (2d Cir. 1996)); *Pollux Holding Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 70 (2d Cir. 2003).

The Second Circuit has set forth a three-step test to determine whether dismissal on *forum non conveniens* grounds is appropriate.  The Court's "first level of inquiry" is whether the plaintiff's choice of forum is "entitled to more or less deference."  *Pollux Holding*, 329 F.3d at 70 (quoting *Iragorri*, 274 F.3d at 73).  Next, the Court must "determine whether an adequate alternative forum exists."  *Id.* at 70.  The third step requires a balancing of private and public interests to decide, "based on weighing the relative hardships involved, whether the case should be adjudicated in the plaintiff's chosen forum or in the alternative forum suggested by the defendant."  *Id.* (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. at 507-09).  Proceeding through this inquiry demonstrates that the Crossclaims should be dismissed.

**B.**     **Almaty-BTA's Choice Of Forum Should Be Afforded Little Or No Deference**

While the *forum non conveniens* analysis usually begins with a presumption that the court affords plaintiff's choice of forum some deference, the Second Circuit has "instructed that the choice of a United States forum by a foreign plaintiff is entitled to less deference."  *Iragorri*, 274 F.3d at 71; *Varnelo*, 2003 WL 230741, at *7-8.  "[W]here the circumstances indicate that . . . in relation to the core operative facts in dispute [the parties and events] at best may have only marginal links to the plaintiff's choice of forum, that choice of venue is not entitled to special deference, in particular where the claimants are all foreign residents."  *Turedi v. Coca Cola Co.*, 460 F. Supp. 2d 507, 522 (S.D.N.Y. 2006) *aff'd*, 343 Fed. App'x 623 (2d Cir. 2009).  This rule is based "on a realistic prediction" that a foreign plaintiff suing in the United States has not chosen the most convenient forum, *Varnelo*, 2003 WL 230741, at *8 (citations omitted); rather, "a plausible likelihood exists that the selection was made for forum-shopping reasons," *Iragorri*, 274 F.3d at 71.  "[T]he 'degree of deference to be given to a plaintiff's choice of forum moves on a sliding scale depending on several relevant considerations,'" *LaSala v. UBS, AG*, 510 F. Supp. 2d 213, 223 (S.D.N.Y. 2007) (quoting *Iragorri*, 274 F.3d at 71), which assess "the lawsuit's bona fide connection to the United States and to the forum of choice," *Iragorri*, 274 F.3d at 72.  Here, those considerations reflect that Almaty's and BTA's choice of forum should be afforded little or no deference.

The core predicate acts of "the Ablyazov-Khrapunov Group" as alleged in the Crossclaims, "at best," have "only marginal links" to New York, and the Crossclaim Plaintiffs are both foreign.  Their chosen forum – the apparent result of forum shopping – is thus entitled to little or no deference.  *Iragorri*, 274 F.3d at 72 ("*the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons–such as attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case*, . . . or the inconvenience and

12

expense to the defendant resulting from litigation in that forum[10]–*the less deference the plaintiff's choice commands and, consequently, the easier it becomes for the defendant to succeed on a forum non conveniens* motion by showing that convenience would be better served by litigating in another country's courts"); *Varnelo*, 2003 WL 230741, at *8-9 (same).

Ample evidence demonstrates that Almaty and BTA are motivated by forum shopping considerations.  This is Almaty's third attempt to obtain relief in American courts, having already filed two actions in California in the last two years, both of which have been dismissed on *forum non conveniens* grounds.  *See* 2014 Cal. Action Order; 2015 Cal. Action Order.  It is also no surprise that all three of Almaty's actions have asserted RICO claims,[11] which carry treble damages if successful.  This seems to reflect a clear effort to benefit from U.S. laws and to obtain a tactical advantage by increasing the potential exposure of the Crossclaim Defendants.  Moreover, Almaty and BTA filed their claims in this Court, despite having full knowledge of the ongoing, multiyear Swiss investigation into the same core predicate acts, Crossclaims ¶¶ 83, 85, and in disregard of the Central District of California's ruling that Switzerland was "a more appropriate and convenient" forum, 2014 California Action Order at 12.

### C.  <u>Switzerland Is An Adequate Alternative Forum To Litigate The Crossclaims</u>

Having established that Almaty's and BTA's choice of forum is entitled to little or no deference, the Court must next determine whether Switzerland is an adequate alternative forum for litigating the Crossclaims.  An alternative forum is adequate "'if the defendants are amenable

---

[10]     Litigating in New York, as opposed to Switzerland, will dramatically increase the inconvenience and expense to Triadou (and likely to the other Crossclaim Defendants) by forcing discovery to occur overseas, increasing the need for translation and interpretation costs, hampering Triadou's ability to obtain evidence and testimony from relevant third-party foreign witnesses, and increasing travel costs and logistical inconvenience.  *See infra* Point I.D.1.

[11]     Crossclaims ¶¶ 134-68; 2014 Cal. Action 2d Am. Compl. ¶¶ 71-101 (ECF No. 58) (Ex. 5); 2015 Cal. Action Compl., ¶¶ 68-98 (ECF No. 1) (Ex. 2).

3382241

to service of process there, and if it permits litigation of the subject matter of the dispute.'" *LaSala*, 510 F. Supp. 2d at 222 (quoting *Pollux Holding*, 329 F.3d at 75). "The test does not require that the alternative forum provide the same degree of relief," and a forum is not inadequate merely because the law of that forum is less favorable to the plaintiff. *Id.* (citing *Fitzgerald v. Texaco, Inc.*, 521 F.2d 448, 453 (2d Cir. 1975)). Nor does the adequacy of an alternative forum depend on the existence of an identical cause of action. *Id.* (quoting *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 74 (2d Cir. 1998)). Consequently, American courts will not characterize foreign courts as "clearly unsatisfactory" absent a "fundamental obstacle to a plaintiff's recovery." *Id.* (quoting *Sussman v. Bank of Israel*, 801 F. Supp. 1068, 1076 (S.D.N.Y 1992), *aff'd*, 990 F.2d 71 (2d Cir. 1993)) (internal quotation marks omitted).

Here, Switzerland is an adequate alternative forum for litigating the Crossclaims. Almaty and BTA implicitly admit that three of the four Crossclaim Defendants are amenable to service in Switzerland, and that Switzerland is a more convenient forum than any court in the United States with respect to the sole remaining defendant. Specifically, Almaty and BTA allege that Triadou's principal place of business is Geneva, Switzerland, and that Viktor and Ilyas Khrapunov reside there as well. Crossclaims ¶¶ 39, 40, 42. And while Ablyazov is not alleged to reside in Switzerland, he is allegedly incarcerated in France, which is much closer to Switzerland than New York, and pending extradition, which will *not* be to New York. *Id.* ¶ 41.

Further, the Southern District of New York and several other courts have found that Switzerland is an adequate forum for *forum non conveniens* purposes, including for litigating disputes related to alleged money laundering. *See, e.g.*, *LaSala*, 510 F. Supp. 2d at 223 (granting dismissal in favor of Switzerland in action involving money laundering because Swiss laws are designed to prevent money laundering); *In re Alcon S'holder Litig.*, 719 F. Supp. 2d 263, 274-75

14

3382241

(S.D.N.Y. 2010) (finding Switzerland was an adequate alternative forum); *Yavuz v. 61 MM, Ltd.*, 576 F.3d 1166, 1174-77 (10th Cir. 2009) (affirming district court determination that Switzerland represented an adequate alternative forum in case that involved contract, tort, and RICO claims). That Almaty and BTA may not be able to pursue claims identical to those they have advanced here is of no moment.  *See, e.g.*, *LaSala*, 510 F. Supp. 2d at 222 (identical cause of action not required to find adequacy of alternative forum); *In re Alcon*, 719 F. Supp. 2d at 272 (quoting *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 158 (2d Cir. 2005) ("it is well-established that the 'availability of an adequate alternative forum does not depend on the existence of the identical cause of action in the other forum, nor on identical remedies'")); *Yavuz*, 576 F.3d at 1177 n.6 (citing Second, Third, Fifth, Ninth, and Eleventh Circuit cases and noting that a plaintiff's inability to pursue a RICO claim in a foreign jurisdiction does not preclude *forum non conveniens* dismissal) (citations omitted).  The Central District of California already has found that Switzerland is an adequate forum to adjudicate Almaty's (and by extension, BTA's) claims, which included the alleged investments in New York real estate. 2014 Cal. Action Order at 4-5.[12]

We anticipate that Almaty and BTA will argue (as Almaty did in the California Actions) that Triadou must establish that a Swiss court could issue a judgment against the allegedly embezzled funds in the United States, if Almaty and BTA were to prevail.  2014 Cal. Action Order at 5.  But, as Judge Olguin found, that is not Triadou's burden – i.e., an adequate alternate forum need not offer the same remedy; it must offer *some* remedy (even if not as favorable as that of the chosen forum).  *Id.*  And that ruling is consistent with the law of the Second Circuit

---

[12]     In reaching this conclusion, the court noted that Almaty did not dispute that "Swiss courts are an adequate forum to address allegations of money laundering."  2014 Cal. Action Order at 4.  The court also noted that "Swiss law provides for civil claims in connection with the criminal proceedings."  *Id.* at 5.

3382241

and this Court. *See, e.g.*, *In re Alcon*, 719 F. Supp. 2d at 274 (rejecting arguments about varied relief, stating that a difference in substantive law will be outcome-determinative only where "the relief available in Swiss courts is 'so clearly inadequate or unsatisfactory that it is no remedy at all'") (citation omitted); *Kitaru Innovations Inc. v. Chandaria*, 698 F. Supp. 2d 386, 394 (S.D.N.Y. 2010) (adequacy of alternative forum does not depend on existence of identical remedies); *Varnelo*, 2003 WL 230741, at *17 (finding lower recovery in Russia "would not render that forum inadequate" and citing several Second Circuit cases holding that fora with lesser remedies remain adequate) (citations omitted).

### D.      The Private And Public Interest Factors Weigh In Favor Of Dismissal

The third prong of the *forum non conveniens* test involves balancing "public and private interests to determine whether the convenience of the parties and the ends of justice would best be served by dismissal." *In re Alcon*, 719 F. Supp. 2d at 275 (citing *Gulf Oil v. Gilbert*, 330 U.S. at 508-09). Because "the balance of private and public interest considerations 'strongly' favors" Triadou, the Court should dismiss the Crossclaims on *forum non conveniens* grounds. *Id.*[13]

### 1.      The Private Interest Factors Militate Dismissal of the Crossclaims

The "private interest factors" in the *forum non conveniens* analysis relate to the "convenience of the litigants." *Varnelo*, 2003 WL 230741, at *18. "In considering these factors, the court is necessarily engaged in a comparison between the hardships the defendant would suffer through the retention of jurisdiction and the hardships the plaintiff would suffer as a result

---

[13]      While the balance of private and public interest factors tilts strongly in favor of dismissal – i.e., litigating in Switzerland would be substantially more convenient and cost-effective than litigating in New York – Triadou notes that it need only make a lesser showing due to the limited deference (if any) Almaty's and BTA's choice of forum is owed here. *See, e.g.*, *Iragorri*, 274 F.3d at 72 (deference owed to plaintiff's choice of forum moves on sliding scale, and where choice appears motivated by forum shopping considerations, "the easier it becomes for the defendant to succeed on a *forum non conveniens* motion by showing that convenience would be better served by litigating in another country's courts").

3382241

of the dismissal and the obligation to bring suit in another country." *Id.* (quoting *Iragorri*, 274 F.3d at 74).  The Second Circuit's private interest factors include

> the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive.

*Id.* (internal quotation marks and citation omitted); *Kitaru Innovations*, 698 F. Supp. 2d at 395. In evaluating these factors, the Court must focus "on the precise issues that are likely to be actually tried, taking into consideration the convenience of the parties and the availability of witnesses and the evidence needed for the trial of these issues." *Varnelo*, 2003 WL 230741, at *18 (quoting *Iragorri*, 274 F.3d at 73-74).  With that focus in mind, it is plain that the private interest factors weigh strongly in favor of litigating the Crossclaims in Switzerland.

The crux of the Crossclaims is the Khrapunovs' alleged abuse of power while Viktor Khrapunov served as mayor of Almaty from 1997 to 2004 (including 80 allegedly fraudulent real estate transactions in Kazakhstan), Ablyazov's alleged embezzlement from BTA in Kazakhstan while he was Chairman from 2005 to 2009, and the movement of Ablyazov's embezzled funds and the Khrapunovs' alleged $300 million in ill-gotten gains from Kazakhstan to Switzerland between 2008 and 2012.  *See* Crossclaims ¶¶ 50-82.  This is the conduct that allegedly proximately harmed Almaty and BTA, and which must be proven before they can attempt to prove that Triadou committed any misconduct (it did not).  Thus, the assessment of the private interest factors must center on the convenience of New York versus Switzerland to the evidence and witnesses most pertinent to these issues.

The majority of the evidence needed to litigate this action is therefore likely to be found either in Kazakhstan (in Almaty's and BTA's possession), or in Switzerland (in possession of

one of the three Crossclaim Defendants alleged to reside there).  *Id.* ¶¶ 39-42.  And given that Switzerland is allegedly the location where the Khrapunovs and Ablyazov spirited their ill-gotten gains, *see id.* ¶¶ 77-78, the parties are likely to require third-party discovery from Swiss banking institutions that may house the finances to which Almaty and BTA lay claim.[14]  In contrast, litigating in New York would require bringing documents and witnesses from two foreign countries, Kazakhstan and Switzerland, which would entail substantial costs and would be incredibly burdensome for all of the litigants.  While Triadou has a minor connection to New York in the form of its financial investment, its own witnesses and evidence are not located in New York.  In any event, Triadou's investment in New York real estate is alleged *to have originated from funds embezzled from Kazakhstan and transferred to Switzerland* (i.e., it is money purportedly obtained from alleged foreign misconduct), and the investment reflects only a small fraction of the total dollars Almaty and BTA seek in damages.  *See id.* ¶¶ 53, 57, 76; *see also id.* ¶¶ 129-133 (alleging the interpleaded funds are "a portion of the proceeds" stolen).[15]

Either this Court would be unable to compel the participation of unwilling foreign non-parties, including Swiss banking institutions and Nicolas Bourg, or, at a minimum, securing such presence "would implicate proceedings under the Hague Convention on Taking Evidence Abroad in Civil or Commercial Matters, a prospect that entails significant amounts of time even in ordinary cases." *See, e.g.*, *In re Alcon*, 719 F. Supp. 2d at 276 (noting that access to non-party

---

[14]     Ablyazov, the remaining Crossclaim Defendant, is allegedly incarcerated in France pending extradition to Russia or Ukraine, *id.* ¶ 41, all of which are much closer to Switzerland than New York.

[15]     The link between the Crossclaims and New York is even more attenuated given the allegations that (i) Triadou's investment in New York occurred *after* Ilyas Khrapunov sold SDG Capital, SA (and by extension, Triadou), and thus no longer owned the company, and (ii) Triadou's  investment occurred *after* the Swiss authorities began investigating the Khrapunovs, and after those authorities froze assets linked to the Khrapunovs. *Id.* ¶¶ 89, 97. Given this, and the fact that Almaty and BTA do not allege that the Swiss authorities took any adverse action against SDG Capital or Triadou or froze any of their assets, it is reasonable to infer that the Swiss authorities determined SDG was not implicated in its investigation.

witnesses in Switzerland whose testimony and documents would be necessary would be "beyond the reach of this Court's power to compel production," and that third-party witnesses would not be within the court's subpoena power).  Even the cost of obtaining the presence of willing witnesses would be more expensive, as it would require bringing them to the United States from Switzerland and from Kazakhstan, rather than simply bringing Kazakh witnesses to Switzerland, where Swiss witnesses already reside.

Litigating in New York also adds other logistical problems that would unnecessarily increase the parties' burden and expense.  For example, documentary evidence brought to New York from Kazakhstan and Switzerland will likely require translators for multiple languages, whereas litigating in Switzerland will moot any need to translate documents created there.  The same concern holds true for interpreters and live witness testimony.  *In re Alcon*, 719 F. Supp. 2d at 276 (finding that litigating in Switzerland would lessen burden to extent several parties were Swiss-based, while noting that bringing documents to New York would entail translation costs).  Because the predicate acts for the Crossclaims occurred almost entirely in Kazakhstan and Switzerland, litigating in New York would likely require the parties to retain experts on both Kazakh and Swiss law, while at least half of that cost can be eliminated by litigating in Switzerland.  The existence of the Swiss authorities' ongoing investigation concerning the Khrapunovs' alleged conduct means that both sets of parties may seek discovery from those authorities, which makes litigating in Switzerland substantially more convenient.[16]

In contrast, the only evidence easily accessible to New York will come from the Chetrit Plaintiffs – parties whose role in the harm Almaty and BTA allegedly suffered is far removed

---

[16]     In seeking *forum non conveniens* dismissal in California, the moving defendants noted that Kazakhstan already had sent a delegation of officials to participate in the Swiss investigation of the Khrapunovs.  2014 Cal. Action Order at 7 ("Kazakh investigators have already traveled to Switzerland to participate in ongoing Swiss proceedings.").

from the acts that proximately caused such harm.  *Compare* Crossclaims ¶¶ 50-82, *with id.* ¶¶ 96-126.[17]  Further, the Chetrit Plaintiffs' involvement in the prosecution of the Crossclaims need not be compelled by any court, as they have agreed (through settlement) to cooperate in such efforts.  Even absent such agreement, however, given the small proportion of evidence and witnesses conveniently available to New York, the private interest factors tilt strongly in favor of litigating in Switzerland, which houses a substantial portion of the evidence and witnesses needed to litigate the Crossclaims, and which is much closer geographically to Almaty.[18]  *See Turedi*, 460 F. Supp. 2d at 526 (finding private interest factors weigh in favor of *forum non conveniens* dismissal because the "wrongful conduct that Plaintiffs allege caused their injuries is fundamentally connected" with foreign conduct).

### 2.     The Public Interest Factors Also Militate Dismissal of the Crossclaims

The public interest factors, which strongly favor dismissal on *forum non conveniens* grounds, are:  "(a) administrative difficulties relating to court congestion; (b) imposing jury duty on citizens of the forum; (c) having local disputes settled locally; and (d) avoiding problems associated with the application of foreign law."  *In re Alcon*, 719 F. Supp. 2d at 275 (citing *Gilbert*, 330 U.S. at 508-09); *Iragorri*, 274 F.3d at 74 (citing *Gilbert*, 330 U.S. at 508-09).

---

[17]     The timeline of the predicate acts alleged in the Crossclaims is instructive:  (i) the Khrapunovs' alleged misdeeds occurred from 1997 to 2004; (ii) Ablyazov abused his BTA position from 2005 to 2009; (iii) the alleged laundering of $300 million to Switzerland took place from 2008 to 2012; (iv) investigations and legal proceedings occurred in the UK, Kazakhstan, and then Switzerland, beginning in 2009 and leading to judgments against Ablyazov in the billions of dollars; (v) charges, arrests, and asset freeze orders resulted in 2012 and 2013; and (vi) the Chetrits became involved in 2012 and 2013 regarding the New York transactions of only $27 million.

[18]     The factor relating to "the view of the premises" is not relevant to this inquiry.  *See Banco de Seguros del Estado v. J.P. Morgan Chase & Co.*, 500 F. Supp. 2d 251, 262 (S.D.N.Y. 2007) (noting this private interest factor "bears little relevance" where case was expected to be "document-intensive and testimony intensive").  Even if it were relevant, however, it would still weigh in favor of dismissal given that the allegations against Viktor Khrapunov involve the alleged acquisition of "at least 80 pieces" of Kazakh real estate.  *See* Crossclaims ¶¶ 72-76.

The interest in having local disputes settled locally presents the most important question, and fundamentally asks which forum has a greater interest in the dispute.  *See Varnelo*, 2003 WL 230741, at *29-30.  There is no question that Switzerland has a strong interest in the dispute, while New York's interest is, at best, attenuated.  Triadou's principal place of business is in Geneva, Switzerland, while Viktor and Ilyas Khrapunov are alleged to reside in Geneva as well.  Crossclaims ¶¶ 39, 40, 42.  Almaty and BTA allege that the Khrapunovs and Ablyazov funneled their ill-gotten gains into Switzerland from Kazakhstan.  *Id.* ¶¶ 78-82.  That Switzerland has a strong interest in the dispute is evidenced by the time and resources it has expended investigating the Khrapunovs' alleged conduct since 2012.  *Id.* ¶¶ 83-85.  Because the Swiss investigation is ongoing, the danger of an inconsistent judgment coming from this jurisdiction that could affect foreign nationals who reside in a foreign country underscores the importance of Almaty and BTA pursuing their claims in Switzerland.

In contrast, New York's connection to the dispute is limited.  The Chetrit Plaintiffs, the only entities involved in this alleged saga that reside in New York, already have settled with Almaty and BTA and agreed to cooperate in the prosecution of the Crossclaims.  Almaty/BTA Letter (Nov. 11, 2015) (ECF. No. 69).  Moreover, New York's connection amounts to Almaty and BTA locating some of the funds allegedly embezzled from Kazakhstan and transferred to Switzerland, but in a downstream location.[19]  It is the embezzlement and transfer of the $300 million out of Kazakhstan and into Switzerland that is of greatest import to the Crossclaims, however, not the trickle of a small fraction of those funds into the United States.

---

[19]     Even the Chetrit Plaintiffs' conduct bears a significant link to Switzerland, as Almaty and BTA allege that the initial meeting among the Chetrits, Ilyas Khrapunov, and Bourg occurred in Geneva, and that the Chetrits and Ilyas Khrapunov "agreed in principle to seek joint investments in the United States" at this meeting.  Crossclaims ¶¶ 97-98.

21

The Central District of California's succinct assessment of California's lack of interest in Almaty's claims in a *forum non conveniens* analysis is instructive: "it is clear that California has relatively little interest in a suit initiated by a city in Kazakhstan against Kazakh citizens, most of whom live in Switzerland, based primarily on conduct alleged to have occurred in Kazakhstan and Switzerland." 2014 Cal. Action Order at 9; *see also id.* at 4 (finding that a "cursory reading" of Almaty's Complaint reveals that "the vast majority of the alleged wrongdoing occurred in Kazakhstan" from 1997 to 2004, after which the Khrapunovs moved "hundreds of millions of dollars [] out of Kazakhstan" and into Switzerland, and only after that "did any of the funds ever reach the United States"). The court went on to note that the relatively small number of contacts with the United States "does not significantly change the analysis when weighed against the extent of the wrongdoing alleged to have occurred in Kazakhstan and Switzerland." *Id.* at 10. This analysis applies equally here, and inexorably leads to the same conclusions.

The issues of court congestion and the imposition of jury duty also weigh in favor of dismissal. While there is no evidence that Swiss courts are less congested than those in the Southern District, the fact that Almaty, BTA, Triadou, the Khrapunovs, and Ablyazov all reside overseas is likely to create "pretrial and trial inefficiencies" if this litigation is conducted in New York. *See Varnelo*, 2003 WL 230741, at *32 (noting party's overseas location, and need to communicate with multiple layers of counsel, would likely complicate pretrial administration). The progress of any discovery in New York will likely be hampered by the need to collect documents from multiple overseas locations, the need to seek third-party discovery from foreign entities, the need for translation services to interpret documents and witnesses, and the difficulty of obtaining the presence of foreign witnesses who are unwilling to participate without

3382241

compulsion.   In contrast, litigating in Switzerland will eliminate substantial expense and inconvenience that this Court (and the parties) would face.

It also would be unfair to impose jury duty on New York citizens who have no connection to the alleged misconduct by the Khrapunovs and Ablyazov that occurred entirely in Kazakhstan or Switzerland.  Crossclaims ¶¶ 50-82.  The Crossclaims focus on allegations that Ablyazov embezzled Kazakh money (from BTA) and the Khrapunovs purchased and sold Kazakh real estate (owned by Almaty or the Republic of Kazakhstan).  *See id.*  Forcing a New York jury to wade through more than a decade's worth of evidence regarding conduct that occurred in two foreign countries is highly burdensome.  In short, "[t]his action's connection to this forum is far too attenuated to justify burdening our citizens with jury duty."  *See Varnelo*, 2003 WL 230741, at *32 (jury duty factor weighed in favor of *forum non conveniens* dismissal).

Finally, while Almaty and BTA may assert that their claims focus on U.S. law, the majority of conduct upon which their claims are based occurred in Kazakhstan and Switzerland. *See, e.g.*, Crossclaims ¶¶ 50-82.  On largely the same allegations, the Central District of California found that "[t]here is no doubt that keeping this case here would require the court to both translate Kazakh and Swiss evidence and apply the law from those countries as well."  2014 Cal. Action Order at 10.  This reasoning applies here as well; the factor regarding the application of foreign law also compels dismissal of the Crossclaims.

Almaty's and BTA's allegations consistently show that the Crossclaims focus on conduct that occurred several years ago in Kazakhstan and Switzerland, and that such conduct bears a *de minimis* connection to New York.  Because Almaty's and BTA's choice of forum is entitled to little deference, Switzerland is an adequate alternative forum, and the private and public interest factors conclusively demonstrate that convenience and the ends of justice would be best served

23

by litigating the Crossclaims in Switzerland, the Court should dismiss the Crossclaims in their entirety (including the claim to the interpleader funds)[20] on *forum non conveniens* grounds.

## II.   THE CROSSCLAIMS SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM

Even if this Court does not dismiss the Crossclaims under *forum non conveniens*, those claims nonetheless should be dismissed for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), because Almaty and BTA have failed to meet the heightened pleading requirements necessary to support their allegations of fraud.  Additionally, Almaty's and BTA's RICO claims (Counts I-V) should be dismissed because they are impermissibly extraterritorial.

### A.   The Crossclaims Do Not Meet Rule 9(b)'s Specificity Requirements

To avoid dismissal pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Transition Invs., Inc. v. The Allen O. Dragge, Jr. Family Trust*, No. 11 Civ. 04775, 2012 WL 1848875, at *1 (S.D.N.Y. May 21, 2012) (Nathan, J.) (*quoting Iqbal*, 556 U.S. at 678). The Court should not assume the truth of allegations that consist of mere conclusory statements, as "recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.  The Court also is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal quotation marks and citation omitted).

---

[20]   Almaty's and BTA's claims to the interpleaded funds are, by their own admission, inextricably tied to the Crossclaims.  *See* Crossclaims ¶¶ 129-33.

3382241

Rule 9(b) extends to all averments of fraud or mistake, whatever the theory or legal duty. *Frota v. Prudential-Bache Sec., Inc.*, 639 F. Supp. 1186, 1192 (S.D.N.Y. 1986).  This means that "[i]n addition to meeting the plausibility standard, RICO allegations sounding in fraud must be pleaded with particularity pursuant to Fed. R. Civ. P. 9(b)."  *Franzone v. City of New York*, No. 13-CV-5282 (NG), 2015 WL 2139121, at *6 (E.D.N.Y. May 4, 2015).  "To satisfy Rule 9(b), a [pleading] must, at a minimum, '(1) specify the statements that the plaintiff contends are fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'"  *Id.* at *6 (citations omitted) (dismissing RICO and RICO conspiracy claims where amended complaint lumped all defendants together and failed to delineate the alleged predicate acts of each, and declining to exercise supplemental jurisdiction over state law claims, counterclaims and crossclaims); *see also Zap Cellular, Inc. v. Kurland,* No. 15 CIV. 682 (BMC), 2015 WL 8207315, at *5 (E.D.N.Y. Dec. 6, 2015) (under Rule 9(b)'s heightened pleading standard, a party must "specify the time, place, speaker, and content of the alleged misrepresentations" (citation omitted)).  Further, such pleadings generally cannot be based on information and belief.  *Zap Cellular*, 2015 WL 8207315, at *5.  While this rule is relaxed if the matters are "peculiarly within the adverse [party's] knowledge," the allegations "must then be accompanied by a statement of the facts upon which the belief is founded."  *Segal v. Gordon*, 467 F.2d 602, 608 (2d Cir. 1972).

Almaty and BTA have failed to plead the underlying fraud allegations as to Triadou with the particularity required by Fed. R. Civ. P. 9(b), despite acknowledging that the alleged predicates acts that form the basis of their Crossclaims sound in fraud.  *See* Crossclaims ¶¶ 54, 57 (describing Ablyazov's transactions as "fraudulent" and in furtherance of his "fraudulent scheme" against BTA); *id.* ¶ 70 (alleging Viktor Khrapunov arranged "fraudulent

3382241

auctions" to acquire public property); *id.* ¶¶ 91, 140 (characterizing the sale of Triadou as a "sham" involving a "fraudulent loan"); *id.* ¶ 140 (labeling the assignment agreement between Triadou and the Chetrit Group "fraudulent"). Rule 9(b)'s heightened pleading standard thus applies to the Crossclaims, but Almaty and BTA fall far short of meeting it.

Most glaringly, the allegations concerning the purportedly fraudulent sale of SDG to Mr. Glatz are conclusory and vague. The allegations do not specify the requisite "who, what, where, and when" of the allegedly fraudulent transaction. Instead, the Crossclaims simply allege "*upon information and belief*" that "the Ablyazov-Khrapunov Group" paid Mr. Glatz to purchase SDG by providing him "a loan" which he then repaid "while outwardly claiming that [the] payment to the Ablyazov-Khrapunov Group was for the purchase of SDG." *Id.* ¶ 90. Nowhere do Almaty and BTA allege *who* within the so-called "Ablyazov-Khrapunov Group" allegedly made this loan or conducted the "sham" sale to Mr. Glatz. *See id.* Nor is there any indication of *when* such a purported fraudulent loan was made, or *where* or *how* the transaction would have occurred. While the Crossclaims vaguely state that the sham sale occurred "in 2012," it provides no information as to the timing of the alleged loan to Mr. Glatz. In any event, the imprecise reference to "2012" does not satisfy the heightened pleading requirement of Rule 9(b). *See, e.g.,* *Innovation Ventures, LLC v. Ultimate One Distrib. Corp.,* No. 12-CV-5354 (KAM) (RLM), 2014 WL 1311979, at *4-5 (E.D.N.Y. Mar. 28, 2014) (citing *Sendar Co. v. Megaware Inc.,* 705 F. Supp. 159, 162 (S.D.N.Y. 1989)) (holding that "[a]lleging that fraudulent statements were made within a time range of several months is insufficient to plead fraud with particularity," and citing several Second Circuit cases in support). Nor have Almaty and BTA complied with the requirement to pair their allegations based on "information and belief" with any statement of facts upon which their belief could reasonably be founded. *See Segal,* 467 F.2d at 608.

The Crossclaims similarly fail to sufficiently plead how SDG – and, more importantly, Triadou – were left under control of the purported enterprise after the sale.  In conclusory fashion, the Crossclaims allege only that "[Mr.] Glatz was left beholden to the Ablyazov-Khrapunov Group," but provide no account of how Mr. Glatz would be under their apparent control, why Mr. Glatz would have agreed to such circumstances, or what the terms of any such understanding were with regard to the control and management of SDG.  Crossclaims ¶ 91.  Yet another naked assertion is that Mr. Glatz was "*explicitly* obligated to hold [the Ablyazov-Khrapunov Group's] interest in the investment," but that allegation is bereft of any detail whatsoever concerning the "explicit agreement," who was involved in reaching the agreement, when and where it was made, and what its terms were.  *Id.* ¶ 91 (emphasis added).  Such conclusory and vague allegations are not sufficiently particularized to satisfy Rule 9(b), and thus render Almaty's and BTA's Crossclaims deficient against Triadou.

Further, because RICO allegations must be evaluated "with respect to each defendant individually," *First Capital Asset Management, Inc. v. Satinwood, Inc.*, 385 F.3d 159, 180-181 (2d Cir. 2004), Almaty and BTA must show that each defendant individually committed or aided and abetted the commission of two predicate acts, and that those particular acts form a pattern of racketeering activity, *see McLaughlin v. Anderson*, 962 F.2d 187, 192 (2d Cir. 1992).  Here, having failed to properly plead that the sale of SDG to Mr. Glatz was fraudulent, or that Triadou is controlled by Ablyazov or the Khrapunovs, Almaty and BTA cannot sufficiently plead that the post-sale investments Triadou made in New York fall under the umbrella of the purported schemes by Ablyazov and the Khrapunovs.  By failing to plead the predicate link between Triadou and the purported conspiracy spearheaded by Ablyazov and the Khrapunovs with the requisite specificity, the RICO Crossclaims against Triadou should be dismissed.

Similarly, Almaty's and BTA's state law claims must also fail because they are all premised on the same allegations that Triadou was fraudulently sold, and, as shown above, those allegations fail to satisfy Rule 9(b)'s heightened pleading standard. *Daly v. Castro Llanes*, 30 F. Supp. 2d 407, 414 (S.D.N.Y. 1998) (holding that "[r]ule 9(b) does not apply only to claims under RICO and common law fraud, but also to elements of other claims that are premised on fraud," and dismissing RICO, conversion, and unjust enrichment claims for failure to satisfy Rule 9(b)); *see also id.* ("Merely pleading a close relationship with another entity that is alleged to have made particular misleading statements is insufficient to satisfy Rule 9(b) . . . ."); *Frota*, 639 F. Supp. at 1192 (dismissing common law claims for failure to plead allegations of fraud with particularity).  All of Almaty's and BTA's Crossclaims should therefore be dismissed.[21]

---

[21]    Several of the state law Crossclaims should be dismissed as to Triadou for independent reasons. First, Count IX for "Alter Ego" should be dismissed because it generally is not a cause of action in New York.  *See Morris v. N.Y. Dep't of Taxation & Fin.*, 82 N.Y.2d 135, 141 (1993) (noting that alter ego/piercing the corporate veil is not a cause of action); *Jonas v. Estate of Leven*, No. 14-CV-3369 (SHS), 2015 WL 4522763, at *8 n.10 (S.D.N.Y. July 27, 2015) ("[A]lter ego/hidden principal liability – is not a cognizable cause of action, but a means to impose liability on the moving defendants under the substantive counts.").  While judgment creditors have been permitted to bring causes of action for alter ego when enforcing judgments pursuant to Article 52 of the C.P.L.R., Almaty and BTA have not alleged that BTA's foreign judgments against Ablyazov have been recognized in New York; thus, BTA is not a judgment creditor.

Similarly, Count XI should be dismissed because a constructive trust is a remedy, not a cause of action.  *See, e.g.*, *Anwar v. Fairfield Greenwich Ltd.*, 728 F. Supp. 2d 372, 419 (S.D.N.Y. 2010) (holding that a "constructive trust is a remedy, not a cause of action," and is imposed only where plaintiff has no other adequate remedy at law, and dismissing the claim where plaintiff had several other causes of action seeking monetary relief).  In any event, the imposition of a constructive trust requires a "confidential or fiduciary relationship," *Amusement Industry, Inc. v. Stern*, 786 F. Supp. 2d 758, 785 (S.D.N.Y. 2011), and there is no allegation that Triadou had such a relationship with Almaty or BTA.  *See* Crossclaims ¶ 198.

Finally, while replevin (Count XII) is a cause of action, it fails here because it pertains to "chattel" – tangible goods or property – of which Triadou has nothing in its position that allegedly belongs to Almaty or BTA.  *See Press Access LLC v. 1800 Postcards, Inc.*, No. 11 Civ. 1905 (KBF), 2012 WL 4857547, at *1 (S.D.N.Y. Oct. 9, 2012) (a claim for replevin requires a showing that plaintiff "has a superior possessory right to the chattel," and that plaintiff "made a demand for possession of the chattel from the defendant"), *aff'd* 543 Fed. App'x 23 (2d Cir. 2013).  Here, Triadou assigned its interest in the Flatotel, and is owed only money.

**B.      The RICO Crossclaims Should Be Dismissed Because They Are Based On Alleged Conduct That Is Almost Entirely Extraterritorial**

Almaty's and BTA's RICO Crossclaims also should be dismissed because the alleged acts do not establish a sufficient connection to the United States.  While Triadou recognizes the Second Circuit's recent holding in *European Community v. RJR Nabisco, Inc.*, 783 F.3d 123 (2d Cir. 2015), *cert. granted* 136 S.Ct. 28 (2015), Triadou respectfully disagrees with the decision of a slim majority of that court, which radically changed existing precedent in this jurisdiction and held that RICO has extraterritorial reach where the statute for the predicate RICO act is intended to reach such conduct.  Instead, Triadou urges this Court to follow the comprehensive and well-reasoned past precedent within this Circuit and across several others to find that RICO does not apply here because its application would be entirely extraterritorial.

**1.      The Majority of Case Law Holds That RICO Does Not Apply Extraterritorially**

In *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010), the Supreme Court emphatically reaffirmed the presumption that federal statutes are not to be applied to conduct outside of the United States absent "clear indication of an extraterritorial application" in the statutory text.  561 U.S. at 248.  Prior to *RJR Nabisco*, courts applying *Morrison*'s holding – including the Second Circuit and courts in this District – unanimously held that the RICO statute lacks the requisite clear indication that Congress intended it to apply extraterritorially, and therefore does not so apply.  *See, e.g.*, *Norex Petroleum Ltd. v. Access Indus., Inc.*, 631 F.3d 29, 32-33 (2d Cir. 2010) ("RICO is silent as to any extraterritorial application" and "'[w]hen a statute gives no clear indication of an extraterritorial application, it has none'") (alteration in original) (quoting *Morrison*, 561 U.S. at 255); *accord Cedeno v. Intech Grp., Inc.*, 733 F. Supp. 2d 471, 473 (S.D.N.Y. 2010) (Rakoff, J.) (holding that RICO is not "sufficiently clear to overcome the presumption against extraterritoriality"), *aff'd* 457 Fed. App'x 35 (2d Cir. 2012);

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 731 (S.D.N.Y. 2013) ("RICO does not apply extraterritorially"); *Republic of Iraq v. ABB AG*, 920 F. Supp. 2d 517, 543 (S.D.N.Y. 2013) ("The RICO statutes do not apply extraterritorially."), *aff'd* 768 F.3d 145 (2d Cir. 2014), *cert. denied* 135 S.Ct. 2836 (2015); *Chevron Corp. v. Donziger*, 871 F. Supp. 2d 229, 239 (S.D.N.Y. 2012) (noting that the *Morrison* presumption against extraterritorial application is controlling as to RICO); *see also United States v. Xu*, 706 F.3d 965, 974-75 (9th Cir. 2013) ("RICO does not apply extraterritorially.");[22] *CGC Holding Co. v. Broad & Cassel*, 773 F.3d 1076, 1097 (10th Cir. 2014) ("RICO does not apply extraterritorially"); *Hourani v. Mirtchev*, 943 F. Supp. 2d 159, 164 (D.D.C. 2013) (noting that "RICO does not apply extraterritorially"), *aff'd* 796 F.2d 1 (D.C. Cir. 2015).

The Second Circuit's recent ruling in *RJR Nabisco*, which was published this past spring denying en banc review, deviates from this long line of precedent.[23]  By an eight to five vote, including four published dissents, the Second Circuit held that RICO applies extraterritorially "when liability is based on 'racketeering acts' consisting of violations of predicate statutes which Congress expressly made applicable to foreign conduct." *European Cmty. v. RJR Nabisco, Inc.*, 783 F.3d at 124.  In so holding, the panel deviated from its own precedent in *Norex* and held, for the first time, that RICO may apply extraterritorially.  It reasoned that the language of RICO's predicate statutes – not the language of the RICO statute itself – is determinative when evaluating RICO's extraterritorial application.  *Id.*

---

[22]     Notably, the holding in *RJR Nabisco* stands in direct conflict with the law of the Ninth Circuit with regard to extraterritorial application of RICO.  This divergence is more evidence that Almaty's and BTA's choice of forum in New York was motivated by forum shopping, which in turn further supports dismissal of those claims on *forum non conveniens* grounds.  *See supra* Point I.

[23]     In light of this jurisdictional split, the Supreme Court granted certiorari on October 1, 2015.  *See RJR Nabisco Inc. v. European Cmty.*, 136 S. Ct. 28 (2015).

Writing on behalf of all five dissenting judges, Judge Cabranes pointedly noted that this holding is "flatly inconsistent with years of precedent from [the Second Circuit], and the Supreme Court, that treats RICO as an offense distinct from its predicate acts." *Id.* at 129. "Although it is indisputable that Congress intended for certain RICO predicate statutes to apply to actions or events abroad, *there is no clear basis for concluding that Congress intended for RICO itself to go along with them*." *Id.* (emphasis added). Judge Jacobs, also joined by all other dissenters, noted the tension between *Norex* and the panel's holding. *Id.* at 127-28. Likewise, Judge Raggi (writing on behalf of the five dissenters), remarked that after *Morrison*, "courts in this circuit and around the nation uniformly have held that [RICO] does not apply extraterritorially," and the "panel's treatment of RICO's extraterritorial application conflicts with controlling precedent, specifically, (1) the Supreme Court's holding in *Morrison* . . . and (2) our holding in *Norex* (relying on *Morrison*) that RICO does not apply extraterritorially even though some of its predicate acts are crimes that could be prosecuted extraterritorially." *Id.* at 130-31.

Here, Triadou respectfully submits that pre-*RJR Nabisco* precedent in the Second Circuit, and existing Supreme Court precedent, overwhelmingly have held that RICO does not apply extraterritorially. Pursuant to *Morrison*, in the absence of a "clear indication" in the RICO statute's text that Congress intended it to apply extraterritorially, there is a presumption against such application; thus, a RICO claim does not lie where it seeks extraterritorial application. *See Morrison*, 561 U.S. at 267. To determine whether a claim requires extraterritorial application of a federal statute, the court must look to the "focus" of that statute. *Id.* at 266-68.

## 2.    The RICO Crossclaims Are Unquestionably Extraterritorial

Within the Second Circuit, courts have taken two different approaches to determine RICO's focus. Some courts look to the location of the RICO "enterprise." *See, e.g., Cedeno*, 733 F. Supp. 2d at 474 (noting that the "focus of RICO is on the enterprise as the recipient of, or

cover for, a pattern of criminal activity" and "RICO does not apply where . . . the alleged enterprise and the impact of the predicate activity upon it are entirely foreign").  To determine whether the enterprise is domestic or foreign, courts have applied the "nerve center test" to "identif[y] the place where overall [] policy originates or the nerve center from which it radiates out to its constituent parts and from which its [members] direct, control and coordinate all activities . . . ."  *European Cmty. v. RJR Nabisco, Inc.*, No. 02-CV-5771 (NGG) (VVP), 2011 WL 843957, at *6 (E.D.N.Y. Mar. 8, 2011).   Other courts have held that the focus is the "pattern" of racketeering.  *See, e.g.*, *Chevron*, 871 F. Supp. 2d at 245 ("[T]he focus [of RICO] properly is on the pattern of racketeering activity and its consequences.").  Thus, "[i]f there is a *domestic* pattern of racketeering activity aimed at or causing injury to a *domestic* plaintiff, the application . . . would not [be] extraterritorial . . . ."  *Id.* (emphasis added).

Here, the dispute as to which is the proper test is immaterial; both the location of the enterprise and the pattern of racketeering are almost entirely foreign.  As discussed in detail above, the "Ablyazov-Khrapunov Group" was unquestionably based overseas, either in Kazakhstan or Switzerland.  *See supra* Point I.D.  Almaty and BTA complain about misdeeds stemming as far back as 1997, yet not until 2012 does the alleged racketeering activity reach the United States – and even then, only a fraction of the allegedly stolen funds were invested in the United States (approximately $27 million of the $300 million allegedly taken by the Khrapunovs and the more-than $4 billion allegedly embezzled by Ablyazov), in what amounts to two alleged real estate investments (in contrast to the estimated 80 real estate transactions alleged to occur in Kazakhstan).  *See id*.  The alleged injury is likewise entirely foreign: Almaty is a foreign sovereign, and BTA is a Kazakh bank (formerly owned by the Republic of Kazakhstan), with no alleged connection to the United States.  *See* Crossclaims ¶¶ 32-33.  It is evident that the

32

enterprise, pattern of racketeering activity, *and* location of the injury are all foreign, and that the RICO Crossclaims are extraterritorial.  The RICO Crossclaims should therefore be dismissed.

<u>Conclusion</u>

For the reasons set forth above, Triadou respectfully requests that the Court dismiss Almaty's and BTA's Crossclaims in their entirety.  Should the Court dismiss the Crossclaims on *forum non conveniens* grounds, then it also should deny Almaty's pending motion for joinder and BTA's pending motion for intervention, and grant Triadou's motion to dismiss the Amended Interpleader Complaint.  Alternatively, if the Court dismisses the Crossclaims for failure to state a claim, then the Court should deny the joinder and intervention motions, but allow Triadou to establish its claim to the interpleaded funds, which in turn will merit distribution of those funds to Triadou.


Dated: New York, New York
       December 18, 2015                    Respectfully submitted,

                                           DICKSTEIN SHAPIRO LLP

                                           By:   s/Deborah A. Skakel
                                                 Deborah A. Skakel
                                                 Tessa B. Harvey
                                           1633 Broadway
                                           New York, New York  10019-6708
                                           Telephone: (212) 277-6500
                                           Facsimile: (212) 277-6501
                                           skakeld@dicksteinshapiro.com
                                           harveytessa@dicksteinshapiro.com

                                           *Attorneys for Interpleader Defendant and*
                                           *Crossclaim Defendant Triadou SPV S.A.*

3382241