UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CF 135 FLAT LLC, CF 135 WEST MEMBER LLC and THE CHETRIT GROUP, LLC,

        Interpleader Plaintiffs,

  -against-

TRIADOU SPV S.A., CITY OF ALMATY, a foreign city, and BTA BANK JSC,

        Interpleader Defendants.

---

CITY OF ALMATY, KAZAKHSTAN and BTA BANK JSC,

        Crossclaim Plaintiffs,

  -against-

MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, and TRIADOU SPV S.A.,

        Crossclaim Defendants.

15 Civ. 5345 (AJN) (SN)

---

**MEMORANDUM OF LAW IN SUPPORT OF
THE KAZAKH ENTITIES' MOTION FOR AN ORDER ENJOINING ENFORCEMENT
OF TRIADOU'S STATE COURT JUDGEMENTS**

## **TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

ARGUMENT .................................................................................................................................. 3

THE COURT SHOULD ENJOIN TRIADOU FROM ENFORCING ITS JUDGMENTS
AGAINST CHETRIT ................................................................................................................... 3

A. Legal Standard.................................................................................................... 3

B. The Kazakh Entities Will Suffer Irreparable Harm Absent Injunctive Relief ........... 4

    1. Without Injunctive Relief, the Kazakh Entities' Cross-Claims Will Be Irreparably Undermined ................................................................................... 5

    2. Without Injunctive Relief, Triadou's Enforcement Efforts Will Irreparably Endanger the Flatotel Development .................................................................. 7

    3. Without Injunctive Relief, Any Successful Enforcement Efforts by Triadou Will Place Assets Irrevocably Outside of the Jurisdiction of the Court ........... 9

C. The Kazakh Entities Have a Likelihood of Success on the Merits .......................... 10

D. The Balance of the Hardships Tips Decidedly In Favor of the Kazakh Entities ..... 11

CONCLUSION........................................................................................................................... 11

# **TABLE OF AUTHORITIES**

**Cases**
*Amusement Indus., Inc. v. Stern*,
   293 F.R.D. 420 (S.D.N.Y. 2013) ................................................................................... 10
*Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*,
   696 F.3d 206 (2d Cir. 2012) ............................................................................................ 3
*Cruz v. T.D. Bank, N.A.*,
   2014 WL 1569491 (S.D.N.Y. Apr. 17, 2014) ............................................................. 5, 7
*Lentjes Bischoff GmbH v. Joy Envtl. Techs., Inc.*,
   986 F. Supp. 183 (S.D.N.Y. 1997) .................................................................................. 9
*Walter E. Heller & Co., Inc. v. Cox*,
   379 F. Supp. 299 (S.D.N.Y. 1974) .................................................................................. 7

**Statutes**
28 U.S.C. § 2283 ..................................................................................................................... 7
N.Y. C.P.L.R. § 5239 .......................................................................................................... 4, 5
N.Y. Gen. Bus. Law § 351 ..................................................................................................... 8

BTA Bank and the City of Almaty, Kazakhstan (collectively the "Kazakh Entities") respectfully submit this memorandum of law in support of their motion for an order enjoining Triadou SPV, S.A. ("Triadou") from enforcing certain state court judgments, which are also the subject of this action.

## PRELIMINARY STATEMENT

The Kazakh Entities are undisputedly the victims of a multi-billion dollar fraud. BTA Bank has already secured judgments in excess of $4 billion, and obtained several global freezing and receivership orders from the courts of the United Kingdom against Defendants Mukhtar Ablyazov and Ilyas Khrapunov, which include the parent of Triadou, SDG. *See* Ex. A (10/21/2015 Judgment against Mukatar Ablyazov) at ¶ 3 ("The Bank has to date entered judgment against the respondent in four cases in an aggregate sum . . . of over US$4.4 billion. No part of these judgments has been paid by the respondent."); *see also* Ex. B (11/3/2012 Freezing Order against Mukhtar Ablyazov); Ex. C (8/6/2010 Receivership Order against Mukhtar Ablyazov); Ex. D (7/17/2015 Freezing Order against Ilyas Khrapunov); Ex E (1/20/2016 Judgment against Ilyas Khrapunov).[1]

As alleged in the Kazakh Entities' Answer and Cross-Claims, some of that stolen money was laundered through various entities, and ultimately was used by Triadou to invest in New York real estate, including the former Flatotel in Manhattan. [ECF No. 49, ¶¶100-114]. After Triadou and the people who controlled it learned that the Kazakh Entities were taking actions to trace their stolen assets, including to the United States, they arranged a below-market buyout of

---

[1] References to "Ex." are to the exhibits attached to the Declaration of Matthew L. Schwartz dated April 1, 2016, submitted in connection with this motion.

their Flatotel investment for $21 million. But the developer of the Flatotel project, who repurchased Triadou's interest, failed to pay, so Triadou sued the developer (The Chetrit Group and related entities, which we refer to simply as Chetrit) in state court for breach of contract. Ultimately, Triadou obtained two judgments for a total of $10.5 million, with motions for summary judgment pending with respect to the other half of the money.

As the Court is aware, once Chetrit learned that the Kazakh Entities also had a claim to that money, they filed an interpleader action in New York state court to determine who was rightfully owed the $21 million – Triadou, under the fraudulent assignment agreement, or the Kazakh Entities, because those funds were directly traceable to the money stolen from them and then invested in the Flatotel. By Order dated March 18, 2016, this Court dismissed the interpleader, [ECF No. 103]; simultaneously with this motion, the Kazakh Entities are respectfully seeking reconsideration of that order.

In the meantime, however, Triadou is now free to continue the state court litigation to which the Kazakh Entities are not a party: it may attempt to enforce its $10.5 million in judgments against Chetrit (and against the Flatotel itself), and it may attempt to obtain judgments for the other $10.5 million.[2] Triadou will also be able to continue litigating against the Chetrit Entities and use that litigation to attempt to gain a tactical advantage against the Kazakh Entities (who are not parties to the state court proceedings), including by taking discovery ostensibly – but not really – in aid of enforcing its judgments. Indeed, since the Court's order dismissing the Interpleader, Triadou has begun to use the state court proceedings to circumvent this Court's

---

[2] As the Court will recall, the state court offered to stay those proceedings for 120 days if Chetrit deposited the $21 million into the Court. Ultimately, Chetrit was unable to do so.

2

decisions. On March 29, 2016, Triadou served a subpoena deuces tecum on Chetrit (attached hereto as Ex. F), demanding the settlement agreement between the Chetrit Entities and the Kazakh Entities – the very same demand that this court denied on December 3, 2015. [ECF No. 81].

In order to prevent irreparable injury from befalling the Kazakh Entities, and to preserve this Court's jurisdiction, Triadou should be enjoined from enforcing its state court judgments during the pendency of this action.

## ARGUMENT

## THE COURT SHOULD ENJOIN TRIADOU FROM ENFORCING ITS JUDGMENTS AGAINST CHETRIT

The Kazakh Entities respectfully request that the Court enjoin any attempts by Triadou to enforce its state court judgments against Chetrit – including any attempts to take discovery in aid of such proceedings– during the pendency of this action. Doing so is necessary to protect this Court's jurisdiction and to avoid irreparable injury to the Kazakh Entities, who are non-parties to the state court proceedings.

**A.    Legal Standard**

As the Court recently recognized in its February 22 Order, "[t]o obtain a preliminary injunction, the moving party must show: (1) it will suffer irreparable harm absent the injunction and (2) a likelihood of success on the merits." [ECF No. 102, at 2] (internal quotations marks and citations omitted). Alternatively, a moving party may obtain an injunction by showing (1) irreparable harm if the injunction is not granted, (2) sufficiently serious questions going to the merits to make them fair ground for litigation, and (3) a balance of hardships tipping clearly in favor of the party requesting relief. *See Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings, Inc.*, 696 F.3d 206, 215 (2d Cir. 2012).

## B. The Kazakh Entities Will Suffer Irreparable Harm Absent Injunctive Relief

Absent an order preventing Triadou from enforcing its judgments against Chetrit, the Kazakh Entities will be irreparably injured in three separate ways. *First*, with respect to two of the state court cases in which Triadou already has judgments, any enforcement efforts will moot the Kazakh Entities' properly-pled crossclaims under N.Y. C.P.L.R. § 5239, which seek to vacate Triadou's judgments prior to any attempt at their enforcement. *Second*, any attempts by Triadou to take enforcement actions against the Flatotel property itself creates the very real risk that sales will not close or that the New York Attorney General, whose office is charged with reviewing and approving all condominium offering plans to ensure compliance with the relevant regulations and the Martin Act, will reinitiate regulatory review, thus stopping units in the conversion from closing and preventing the distribution of profits to the sponsors of the development. *Third*, any attempts by Triadou to take enforcement actions that result in cash recoveries will almost surely result in such funds being spirited outside of the United States and thus outside of the jurisdiction of the Court. Although loss of money does not typically constitute irreparable injury, it does where, as here, the cash comprises the only assets of an otherwise shell entity, and thus the Kazakh Entities would face enormous and expensive hurdles attempting to recover any assets that Triadou removes from the country (let alone washes through the elaborate web of shell entities that the criminals behind Triadou have used in the past).[3]

---

[3] In the event that the Court grants reconsideration and reinstates the interpleader action, an injunction would also be appropriate to protect this Court's jurisdiction over the interpleaded funds, as the Court recognized in its February 22, 2016 Order.

1. **Without Injunctive Relief, the Kazakh Entities' Cross-Claims Will Be Irreparably Undermined**

Permitting Triadou to enforce its judgments would undermine this Court's ability to hear and rule on the Kazakh Entities' crossclaims. Among other claims, the Kazakh Entities have asserted state law crossclaims against Triadou under Section 5239 of New York's C.P.L.R., seeking to "set aside any judgments in Triadou's favor in light of the City of Almaty's and BTA's superior interest in this illicitly-obtained property." [ECF No. 49, at ¶ 211].

C.P.L.R. § 5239 states, in relevant part,

> Prior to the application of property or debt by a sheriff or receiver to the satisfaction of a judgment, any interested person may commence a special proceeding against the judgment creditor or other person with whom a dispute exists to determine rights in the property or debt . . . . The court may vacate the execution or order, void the levy, direct the disposition of the property or debt, or direct that damages be awarded.

Courts in this district have recognized that claims under Section 5239 may be brought in federal court without a separate special proceeding, just as the Kazakh Entities have done here. *See Cruz v. T.D. Bank, N.A.*, No. 10 Civ. 8026 (PKC), 2014 WL 1569491, at *3 (S.D.N.Y. Apr. 17, 2014) (CPLR § 5239 claim "may be brought as an 'action' in a federal court, provided there is an independent ground for federal subject matter jurisdiction"), *reconsideration granted in part on other grounds*, 2014 WL 2506292 (S.D.N.Y. June 3, 2014).[4]

---

[4] Triadou has not disputed that this Court has subject matter jurisdiction to hear this action, and while Triadou has sought to have all of the Kazakh Entities' crossclaims dismissed on *forum non conveniens* grounds, Triadou did not attack the Kazakh Entities' Section 5239 claims on any substantive grounds in its motion to dismiss the crossclaims. In fact, Triadou did not mention these claims whatsoever. [ECF No. 86]. Of course, that is because New York is the logical forum to litigate the validity of Triadou's New York judgments.

The Kazakh Entities' Section 5239 claims are now properly before this court and the Kazakh Entities seek a ruling vacating Triadou's judgments based on the fraud, embezzlement, and theft detailed in the crossclaims. As just one example of how this fraud has extended into the state court proceedings that led to Triadou's judgments, Triadou has submitted sworn statements in those proceedings attesting that Ilyas Khrapunov has no interest "whatsoever" in either Triadou or its parent SDG, and that allegations that Khrapunov controls either entity are "completely untrue." *See* Ex. G (6/8/15 Aff. of Cesar Cerrito), at ¶ 2-3. Of course, the Kazakh Entities' Crossclaims detail how the Khrapunov family continues to control and profit from both SDG and Triadou, and how the conspirators arranged a sham sale to create the appearance of distance between SDG and Khrapunov [ECF No. 49, at ¶ 88-92] – the very same deception that Triadou has now repeated in the State Court Proceedings. Indeed, in July 2015 – one month *after* Triadou submitted its affidavit in the state court claiming that Ilyas Khrapunov had no connection to SDG and Triadou, the U.K. High Court of Justice issued a global freezing order against all of Khrapunov's assets, including "[t]he shares in an assets of Swiss Development Group S.A.," *i.e.*, SDG. *See* Ex. D at 2.

Permitting Triadou to enforce these judgments prior to any decision on the Kazakh Entities' Section 5239 claims would seriously undermine, if not entirely destroy, the effect of any future decision on those claims: a ruling vacating judgments that have already been enforced would be a nullity, particularly if Triadou has spirited away any assets collected upon. The Kazakh Entities would effectively be denied the hearing prior to any enforcement efforts that they are entitled to under the C.P.L.R.

Because Triadou's enforcement of these judgments prior to a ruling on the Section 5239 claims would render any future ruling of this Court toothless, Triadou should be enjoined from

6

enforcing its current judgments, or any others that may result from the state court proceedings during the pendency of this action. Such an injunction would fall within the exceptions to the Anti-Injunction Act, 28 U.S.C. § 2283, for injunctions "necessary in aid of [the Court's] jurisdiction, or to protect or effectuate [the Court's] judgments." *See also Cruz*, 2014 WL 1569491, at *7 (where § 5239 claims were properly before the court, Anti-Injunction Act was no barrier to injunction against future enforcement of judgments in question); *Walter E. Heller & Co., Inc. v. Cox*, 379 F. Supp. 299, 307 (S.D.N.Y. 1974) ("[28 U.S.C. § 2283] and its predecessors do not preclude injunctions against the institution of state court proceedings, but only bar stays of suits already instituted.").

### 2. Without Injunctive Relief, Triadou's Enforcement Efforts Will Irreparably Endanger the Flatotel Development

With respect to those actions where Triadou already has obtained judgments, absent injunctive relief, Triadou may take efforts to enforce those judgments. Any enforcement proceeding by Triadou may result in the attachment of the Flatotel (either the real property or the Chetrit Entities themselves), hindering the very asset that the Kazakh Entities seek to reclaim. Permitting Triadou to enforce its judgments against the property is likely to damage the Flatotel project itself.

In recent motion practice in the state court proceedings, Joseph Chetrit submitted an affidavit (Ex. H-1, at 2-8), detailing the financial state of the Chetrit Entities. That affidavit was supported by uncontested evidence including bank statements, documents evidencing loan balances, contracts on units in the Flatotel that were in the process of being sold, and other financial documents. Chetrit explained that the Chetrit Entities lacked the resources to pay $21 million into the state court at that time, due to their obligations to first use all proceeds from the Flatotel project to pay down the project's secured debt. *Id.*, at 3, ¶ 5-6. As closings in the Flatotel

have generated millions of dollars, these funds have continuously gone toward paying down the debt on the project (*id.*, at 77-80), or toward completing construction. *Id.*, at 4, ¶ 7. In part because the project has yet to generate any net profits while debt was paid down, the Chetrit Group currently runs a negative balance in its accounts. Ex. H-2, at 65-112. Chetrit expected that within 60 days the debt on the Flatotel Project would be retired, and the Chetrit Entities might begin to accrue funds from future closings. Triadou did not refute any of this evidence.

Because the Chetrit Entities are currently paying down the project's debt, any attempt by Triadou to enforce its judgments now would inevitably be against the Flatotel itself, as Chetrit has established that the Chetrit Entities currently have no other liquid assets. But Chetrit's affidavit also explains how permitting Triadou to enforce its judgments against the Flatotel at this point may threaten the entire project, leading to additional regulatory review and delaying or cancelling the more than $90 million in closings currently scheduled.

Under article 23-a of New York's General Business Law, commonly referred to as the Martin Act, an offering plan for any condominium development must be submitted to the Attorney General's Office for approval and regulatory review before the sale of units in any development. *See* N.Y. Gen. Bus. Law § 351e(1)(a); *see also* 13 N.Y.C.R.R. § 20.3 (detailing disclosure requirements of condominium offering plans). Should Triadou be permitted to enforce its judgments against the Flatotel, the Chetrit Entities may be forced to amend the offering plan already accepted by the Attorney General, leading to a new round of review, and delaying future closings. *See* 13 N.Y.C.R.R. § 20.3(r)(4) (requiring disclosure of "all leases, mortgages, liens, encumbrances and title exceptions that will affect the property after closing"). In light of the Chetrit Entities' current lack of funds, if Triadou attempts to enforce its judgments against the Flatotel, "many current and prospective buyers of Flatotel condominiums may terminate their

purchases, resulting in the failure of the entire Flatotel real estate condominium project." Ex.H-1, at 6, ¶ 15.

### 3. Without Injunctive Relief, Any Successful Enforcement Efforts by Triadou Will Place Assets Irrevocably Outside of the Jurisdiction of the Court

Finally, to the extent that Triadou may be able to enforce its existing judgments against liquid assets, the Kazakh Entities face irreparable harm because any funds transferred to Triadou as a result of such enforcement actions are certain to be removed overseas and beyond the Kazakh Entities' ability to pursue. As the Kazakh Entities alleged in their Crossclaims, [ECF No. 49], Triadou is a shell corporation used to launder the stolen funds of fugitives from justice in Kazakhstan. Triadou has no assets of which we are aware beyond its claims against the Chetrit Entities in the state court proceedings, and any funds transferred to Triadou are certain to leave the jurisdiction beyond the reach of either the Kazakh Entities or this Court, and indeed are likely to get lost in the complicated web of shell entities used in furtherance of an international money laundering scheme, of which Triadou is a part.  That is not mere allegation:  the individuals in control of Triadou have repeatedly disobeyed court orders, hidden assets, been held in contempt, and placed into receivership to protect against asset flight.  Ablyazov, Ilyas Khrapunov, and SDG are all currently under global freezing orders.  *See* Ex. A, B, C, D, E.  If Triadou is actually able to collect on its judgments, any assets will surely be dissipated.  *See Lentjes Bischoff GmbH v. Joy Envtl. Techs., Inc.,* 986 F. Supp. 183, 186 (S.D.N.Y. 1997) ("[C]ourts should avoid issuing preliminary injunctions in cases where money damages would be adequate compensation. . . . [h]owever, an exception to this rule exists when it is shown that satisfaction of a money judgment will be impossible without an injunction.").

**C.     The Kazakh Entities Have a Likelihood of Success on the Merits**

The Kazakh Entities remain confident that they will establish that Triadou was used to launder funds stolen from the Kazakh Entities. As detailed in their Crossclaims, [ECF No. 49, at ¶¶ 50-65], the Kazakh Entities currently hold billions of dollars in judgments from the U.K. courts against Mukhtar Ablyazov, the now-imprisoned former BTA Chairman who funded Triadou's acquisitions in New York. Ablyazov's son-in-law, Ilyas Khrapunov, controls Triadou's parent company, SDG, and was recently added to a global freezing order issued by the U.K. courts, preventing him from disposing of SDG's assets – and of course SDG's subsidiary Triadou is one of those assets. *See* Ex. D, at 2.  The Kazakh Entities will use this and other evidence at trial to establish that Triadou was funded with money stolen from the Kazakh Entities.  Further, both Ablyazov and Ilyas Khrapunov have invoked their rights against self-incrimination in connection with the U.K. proceedings, citing *this action* to argue that mandatory disclosure of their assets would expose them to criminal sanctions in numerous jurisdictions. *See* Ex. E, at ¶¶ 5-12, 20, 28-30. Such an invocation of privilege will support an adverse inference in this case. *See Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 427-28 (S.D.N.Y. 2013) ("A party invoking the privilege against self-incrimination disadvantages an opposing party by preventing it from obtaining otherwise relevant information. Thus, in a civil case, a court may draw an adverse inference against a person whose invocation of the Fifth Amendment results in obstruction of discovery." (internal citations omitted)). So long as Triadou is not permitted to take the money and run, the Kazakh Entities will establish its criminal nature.

For the same reasons, and those given in the Kazakh Entities' opposition to Triadou's motion to dismiss the crossclaims [ECF No. 88], there are certainly sufficiently serious questions going to the merits to make them fair ground for litigation.

**D.       The Balance of the Hardships Tips Decidedly In Favor of the Kazakh Entities**

As set out above, the Kazakh Entities will be irreparably injured in several independent ways without injunctive relief.  Any inconvenience to Triadou, however, will be slight. Triadou's only hardship will be a delay in enforcing the judgments it holds while this court rules on the validity of those judgments. As detailed above, the Chetrit Entities will not even have liquid funds for Triadou to collect against for at least 60-90 days, so any enforcement actions in the near-term will only damage the Flatotel project itself and delay the very closings that would provide liquid assets, to the detriment of the Kazakh Entities and the Flatotel project both. Moreover, the Chetrit Entities have already admitted that they owe $21 million to either Triadou or the Kazakh Entities, so once the Flatotel does start generating proceeds that can be used to satisfy Triadou's judgment, the Court may order them escrowed in an interest-bearing account, which protects Triadou completely.

## CONCLUSION

For the reasons just given, the Kazakh Entities respectfully request the court issue an order enjoining Triadou from enforcing any judgments it holds arising from the State Court Proceedings, or in the alternative, hold a hearing on this motion.

Dated: April 1, 2016

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By: /s/ Matthew L. Schwartz
Matthew L. Schwartz
Randall W. Jackson
Daniel G. Boyle
Craig Wenner

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
Telephone: 212-446-2300
Facsimile: 212-446-2350