# EXHIBIT A



**Michaelmas Term**
**[2015] UKSC 64**
*On appeal from: [2013] EWCA Civ 928*

# JUDGMENT

# JSC BTA Bank (Appellant) *v* Ablyazov (Respondent)

**before**

**Lord Neuberger, President**
**Lord Mance**
**Lord Kerr**
**Lord Clarke**
**Lord Hodge**

# JUDGMENT GIVEN ON

# 21 October 2015

**Heard on 28 July 2015**

*Appellant*
Stephen Smith QC
Tim Akkouh
(Instructed by Hogan
Lovells International LLP)

*Advocate to the Court*
Jonathan Crow QC
Adam Holliman
(Instructed by The
Government Legal
Department)

**LORD CLARKE: (with whom Lord Neuberger, Lord Mance, Lord Kerr and Lord Hodge agree)**

*Introduction*

1.     This appeal is concerned with the interpretation and application of the standard form freezing order. It arises in the course of long-running litigation between JSC BTA Bank ("the Bank") and Mr Mukhtar Ablyazov ("the respondent") in which the Bank has to date obtained a number of judgments against the respondent amounting in all to US$4.4 billion, none of which he has satisfied. Throughout much of this litigation the respondent was represented by solicitors and counsel. Indeed they filed a detailed notice of objection to the grant of permission to appeal to the Supreme Court and signed an agreed statement of facts and issues. However, they thereafter withdrew from the record and did not appear at the hearing of the appeal. The court is however grateful to Mr Jonathan Crow QC and Mr Adam Holliman who appeared as advocates to the court and made detailed submissions on the issues in this appeal.

2.     The statement of facts and issues identifies three issues, which all depend upon the terms of a freezing order which was made by Teare J on 12 November 2009 and was subsequently amended (together "the Freezing Order"). The issues were: (1) whether the respondent's right to draw down under certain loan agreements is an "asset" within the meaning of the Freezing Order; (2) if so, whether the exercise of that right by directing the lender to pay the sum to a third party constitutes "disposing of" or "dealing with" or "diminishing the value" of an "asset"; and (3) whether the proceeds of the loan agreements were "assets" within the meaning of the extended definition in paragraph 5 of the Freezing Order on the basis that the respondent had power "directly or indirectly to dispose of, or deal with [the proceeds] as if they were his own". It can be seen that these are essentially questions of construction of the Freezing Order.

*The background*

3.     The background can be taken shortly from the agreed statement of facts and issues. The Bank was one of Kazakhstan's four systemic banks. Between 2005 and early 2009, the respondent was its chairman and majority shareholder. When the Bank was nationalised in February 2009, the respondent fled to England and did not return to Kazakhstan. The Bank's case is that, while chairman, he presided over the misappropriation of over US$10 billion of the Bank's monies for his own personal benefit. The Bank commenced 11 sets of proceedings in this jurisdiction seeking

compensation of about US$6 billion. In a judgment handed down on 19 March 2013, Teare J found that two of the Bank's former senior officers and one offshore company formerly controlled by the respondent had knowingly assisted in three frauds perpetrated by the respondent which led to the misappropriation of sums exceeding US$1.5 billion. Further, on 26 November 2013, Henderson J granted the Bank summary judgment in an amount of US$295m plus interest, in respect of the respondent's fraudulent misappropriation of assets shortly before nationalisation. He was debarred from defending the three cases which went to trial, because he had failed to comply with several orders of the court. He was not however debarred from defending the summary judgment application, which he continued to do until just before the hearing, when he chose not to defend. The Bank has to date entered judgment against the respondent in four cases in an aggregate sum (as stated above) of over US$4.4 billion. No part of these judgments has been paid by the respondent, although small sums (relative to the value of the judgment) have been realised by the receivers appointed by the court, who are also in the process of selling certain assets found to belong to him.

*The Freezing Order*

4.     The Freezing Order includes the following provisions in so far as it relates to the Bank and the respondent:

> "4.     Until judgment or further order … the respondent must not, except with the prior written consent of the Bank's solicitors –
>
>> a.     Remove from England and Wales any of his assets which are in England and Wales … up to the value of £451,130,000 …
>>
>> b.     In any way dispose of, deal with or diminish the value of any of his assets in England and Wales up to the value of ... £451,130,000 …
>>
>> c.     In any way dispose of, deal with or diminish the value of any of his assets outside England and Wales unless the total unencumbered value … of all his assets in England and Wales ... exceeds £451,130,000 …
>
> 5.     Paragraph 4 applies to all the respondents' assets whether or not they are in their own name and whether they are

solely or jointly owned and whether or not the respondent asserts a beneficial interest in them. For the purpose of this Order the respondents' assets include any asset which they have power, directly or indirectly, to dispose of, or deal with as if it were their own. The respondents are to be regarded as having such power if a third party holds or controls the assets in accordance with their direct or indirect instructions.

…

EXCEPTIONS TO THIS ORDER

9.      a. Paragraph 4 of this Order does not prohibit the respondent from spending up to £10,000 a week … towards his individual ordinary living expenses … nor does it prohibit the respondent from spending a reasonable amount on legal advice and representation. But before spending any money on legal advice and representation the respondent must notify the Bank's legal representatives in writing where the money to be spent is to be taken from.

b.      This Order does not prohibit the respondent from dealing with or disposing of any of his assets in the ordinary and proper course of any business conducted by him personally.

…

19.     The respondent may apply to vary or discharge this Order …"

5.      In due course, the Court of Appeal confirmed that, (at least) in respect of certain transactions, the respondent had no business which would enable him to take advantage of the ordinary business proviso. So his permitted spending was limited, for relevant purposes, to (1) £10,000 per week plus (2) a reasonable amount on his own legal expenses. The Bank maintains that this exception does not allow a defendant to fund a co-defendant's legal expenses.

*The Loan Agreements*

6.     The issues in this appeal have proceeded on the basis that the respondent entered into two binding and effective loan facility agreements, dated 1 September 2009 and 1 April 2010, with a BVI company called Wintop Services Limited ("Wintop") and a further two agreements, dated 17 August 2010 and 1 December 2010, with another BVI company called Fitcherly Holdings Limited ("Fitcherly"), (collectively "the Loan Agreements"). In each case the respondent was described as the borrower and Wintop and Fitcherly were respectively described as the lenders. I note in passing that the Bank does not accept that Wintop and Fitcherly were third party lenders as the respondent maintains. Rather, the Bank contends (and Christopher Clarke J ("the judge") held (at [2011] EWHC 2664 (Comm), para 71) that there was "strong ground for believing" that they were the respondent's "creatures or conduits". However this appeal and the decisions of the lower courts have proceeded on the basis that the Loan Agreements are binding and effective.

7.     Clause 1 of each agreement provided for a loan facility of £10m and contained the following material terms under the heading "AMOUNT AND TERMS OF THE LOAN:

> "1.1 **Facility.** The Lender hereby agrees, subject to the terms and conditions set forth herein, to extend a loan facility to the Borrower in the principal amount of 10,000,000 GBP (ten million Great Britain pounds) ("the Loan Facility"). The loan facility shall be made available to the Borrower for two years as of the Date of the Agreement ("Availability Period").

> 1.2 **Disbursement.** The Loan Facility shall be disbursed in a form agreed by the Parties in one or several disbursements … upon the Borrower's written request …

> 1.3 **Interest**. The Loan Facility shall bear interest at the rate of 5% (five per cent) per annum. Interest for each Tranche shall accrue daily from the Date of Disbursement of such Tranche until repayment in full of the principal of the Tranche and all accrued interest thereon …

> 1.4 **Repayment**. All Tranches, together with all accrued and unpaid interest thereon, shall be payable by the Borrower upon the Lender's request, but not earlier than four years after the Date of the Agreement …

…

1.6 **Cancelation of the Loan Facility**. Notwithstanding section 1.1 hereof, any undrawn portion of the Loan Facility may be cancelled upon delivery to the Borrower of a written cancellation notice by the Lender.

…

1.8 **Binding Effect for the Borrower**. … this Agreement constitutes the legal, valid and binding obligations of the Borrower, enforceable against the Borrower in accordance with its terms …

…

1.11 **Binding Effect for the Lender**. …this Agreement constitutes the legal, valid and binding obligations of the Lender, enforceable against the Lender in accordance with its terms …

1.12 **Use of Proceeds**. The proceeds of the Loan Facility shall be used at the Borrower's sole discretion. The Borrower may direct the Lender to transfer the proceeds of the Loan Facility to any third party. …

1.16 **Assignment**. … The Borrower may not assign or transfer any of its rights under this Agreement without the prior written consent of the Lender."

8.    The Loan Agreements have been fully drawn down and pursuant to them the respondent has directed payments including (i) over US$16m to his former solicitors, Stephenson Harwood, (ii) about US$500,000 in relation to a property on Bishop's Avenue in London, (iii) about US$119,000 to corporate services providers associated with him and (iv) about US$390,000 to lawyers acting for other defendants to the Bank's claims. The Bank submits that, if the respondent had been using his own money: payment (i) would only have been permitted to the extent that the legal fees were reasonable; payment (ii) would only have been permitted to the extent that his weekly spending on individual ordinary living expenses did not exceed £10,000; and payments (iii) and (iv) would not have been permitted without

the consent of the Bank or the permission of the court (such payments not constituting either individual ordinary living expenses or reasonable legal expenses).

*The Bank's application*

9.     By an application notice dated 14 October 2011, the Bank applied, amongst other things, for declarations that if the Loan Agreements were valid agreements: (a) the respondent's rights thereunder were assets for the purposes of the Freezing Order and (b) any drawings under the Loan Agreements could only lawfully be made pursuant to the exceptions provided for in paragraph 9 of the Freezing Order.

*The proceedings at first instance*

10.     At first instance the judge dismissed the Bank's application for the reasons given in a judgment handed down on 4 July 2012 [2012] EWHC 1819 (Comm); [2012] 2 All ER (Comm) 1243. Expressed shortly, the judge held (1) that the respondent's right to borrow was not to be regarded as an "asset" within the meaning of the Freezing Order: paras 75 and 82; (2) that his exercise of the right to borrow did not constitute "disposing of" or "dealing with" his assets within the meaning of the Freezing Order: paras 77 and 82; and (3) that even if the Bank were right in submitting that the Freezing Order was also capable of bearing the meaning for which it contended, the Freezing Order did not do so unambiguously. He held that if there were two possible constructions, the court should, in a matter of this kind, which may give rise to a penal sanction, adopt the construction most favourable to the putative contemnor. It followed that, since this was such a case, the Freezing Order should be construed in favour of the respondent: para 81.

11.     In so holding, the judge accepted (para 76) that it was "not … possible to ignore the fact that choses in action are, in law, assets" but said that his conclusions were supported by what he considered to be the "odd effects" which would follow if the Bank were correct (para 78), and would otherwise give rise to "intractable questions of valuation" (para 79). The judge refused permission to appeal.

*The proceedings in the Court of Appeal*

12.     Permission to appeal to the Court of Appeal was granted on paper by Mummery LJ but the Court of Appeal (Rimer, Beatson and Floyd LJJ) dismissed the Bank's appeal for the reasons given in a judgment handed down on 25 July 2013: [2013] EWCA Civ 928, [2014] 1 WLR 1414. The leading judgment was given by Beatson LJ, who (at para 1) identified the issues before the Court of Appeal as follows: (a) whether a contractual right to draw down under an unsecured loan

facility qualifies, either generally or in particular circumstances, as an "asset" for the purposes of the standard form freezing order and (b) whether, if the right to draw down is an "asset", the defendant's exercise of the right by directing the lender to pay the sum drawn down to a third party constitutes "disposing of" or "dealing with" an asset.

13.    Beatson LJ identified three principles as of particular relevance. They were (i) the enforcement principle, namely that "the purpose of a freezing order is to stop the injuncted defendant dissipating or disposing of property which could be the subject of enforcement if the claimant goes on to win the case it has brought, and not to give the claimant security for his claim" (para 34); (ii) the flexibility principle, namely that "the jurisdiction to make a freezing order should be exercised in a flexible and adaptable manner so as to be able to deal with new situations and new ways used by sophisticated and wily operators to make themselves immune to the courts' orders or deliberately to thwart the effective enforcement of those orders" (para 36); and (iii) the strict construction principle, namely that, because the consequences of breach are serious, injunctions must be "clear and unequivocal" and "strictly construed" in favour of the addressee (para 37). Mr Smith QC told us that these three principles had not been described in this way in the course of argument in the Court of Appeal, which I of course accept. It is however convenient to use Beatson LJ's nomenclature in this judgment.

14.    At paras 38-39 Beatson LJ held that there were tensions between his three principles. Between paras 40 and 63 he discussed the question whether there was a principled objection to the recognition of the rights under the loan facility agreements as assets for the purposes of a freezing injunction and concluded that the answer was no. Between paras 64 and 91 he considered (a) whether the terms of the current standard Commercial Court form of freezing order make choses in action such as those under the Loan Agreements "assets" within the order and (b) if so, whether drawing down a loan amounts to disposing of, dealing with or diminishing the value of the assets. Beatson LJ concluded that the answer to both questions was no and that the appeal should be dismissed. Rimer LJ agreed with Beatson LJ that the appeal should be dismissed and expressed his own short reasons. Floyd LJ agreed with Beatson and Rimer LJJ and set out further short reasons. The Court of Appeal refused permission to appeal to the Supreme Court but permission was granted by Lord Mance, Lord Sumption and Lord Hughes on 21 February 2014.

*The Bank's case in this appeal*

15.    The Bank contends, on the assumption that the Loan Agreements create genuine obligations with third party lenders, that there were created relevant "assets" which could only be dealt with in accordance with the Freezing Order. As to the meaning of "asset" the Bank has alternative cases. Its primary case is that all choses

in action, including the respondent's rights to borrow, fall within the definition of "assets" in the Freezing Order. Its alternative case is that the proceeds of the Loan Agreements were "assets" within the meaning of the extended definition at paragraph 5 of the Freezing Order because the respondent had power "directly or indirectly, to dispose of, or deal with [the proceeds] as if they were his own". Both those propositions were challenged by the respondent and are now challenged by the advocates to the court. The issues in the appeal are essentially those set out in the statement of facts and issues as originally agreed and set out in para 2 above.

*Discussion*

16.    The argument in this appeal and in the courts below has included discussion of many of the now numerous decisions on the correct approach to freezing injunctions. However, it is important to note that the Freezing Order is not challenged in this appeal. It is not said that it ought not to have been made. Nor is it said, either that the court had no jurisdiction to make an order in the wide terms contended for on behalf of the Bank, or that, if it made such an order, it was wrong to do so as a matter of discretion. The sole question is what the Freezing Order in fact made means. It is also important to note that the answer to the question of construction does not depend upon any analysis of the respondent's conduct. The history is set out in a number of judgments including paras 2-5 of Beatson LJ's judgment in the Court of Appeal, where he described what he called the context. This included a decision by Teare J in February 2012 in which he held that the respondent was in contempt of court. Contrary to a clear promise to be present at the sentencing hearing, the respondent instead left the United Kingdom. It appears that he subsequently went to France, where he has been detained awaiting extradition to Russia or Ukraine. It is in these circumstances that he has not been represented before us.

17.    In para 5 of his judgment in the Court of Appeal Beatson LJ said that the context in which the scope of the Freezing Order falls for decision is one in which a court might be tempted to stretch legal analysis to capture what are seen as the merits or lack of merits of the case before it, but it is important not to succumb to that temptation. I agree. The question is simply what the Freezing Order means. If it is desirable that a broader meaning should be given to it than is appropriate applying ordinary principles, the solution is not to give it a meaning which it does not have but to vary the order (and the relevant standard form of order) appropriately for the future. As Beatson LJ observes in his para 1, the form of order used in this case is the standard Commercial Court form of freezing order set out in Appendix 5 of the Admiralty and Commercial Courts Guide.

18.    In this appeal both Mr Smith for the Bank and Mr Crow, as advocate to the court, agree that the Court of Appeal was wrong to have regard to what Beatson LJ

described as the flexibility principle. It is agreed that, whatever the position might be if the court were construing a contract, the flexibility principle has no role in the construction of the Freezing Order as an order of the court. As Mr Crow colourfully put it, the flexibility principle is that the court must be agile in this game of cat and mouse between claimants and defendants to make sure that it is making new orders to meet new avoidance measures, but that is not a justification for the expansive interpretation of an order which has already been made. I agree.

19.     I further agree that orders of this kind are to be restrictively construed in accordance with Beatson LJ's strict construction principle, which he described in this way in para 37:

> "The third principle follows from the 'fundamental requirement of an injunction directed to an individual that it shall be certain': *Z Ltd v A-Z and AA-LL* [1982] QB 558, 582 per Eveleigh LJ. It is that, because of the penal consequences of breaching a freezing order and the need of the defendant to know where he, she or it stands, such orders should be clear and unequivocal, and should be strictly construed: *Haddonstone Ltd v Sharp* [1996] FSR 767, 773 and 775 (per Rose and Stuart-Smith LJJ); *Federal Bank of the Middle East Ltd v Hadkinson* [2000] 1 WLR 1695, 1705C and 1713C-D (per Mummery and Nourse LJJ). In *Anglo Eastern Trust Ltd v Kermanshahchi* [2002] EWHC 1702 (Ch) Neuberger J stated: 'A freezing order, which has been referred to as a nuclear weapon, should … be construed strictly' because the court is 'concerned with an order which has a potentially draconian effect on the commercial and economic freedom of an individual against whom no substantive judgment has yet been granted'."

He added at para 66 that strict construction is also an aspect of the "great circumspection" with which Lord Mustill, in *Mercedes Benz AG v Leiduck* [1996] AC 284, 297, stated that the jurisdiction should be exercised. I agree. One of the reasons for this principle, as I see it, is the risk of oppression.

20.     What then of Beatson LJ's enforcement principle? As quoted in para 13 above, it is that the purpose of a freezing order is to stop the injuncted defendant from dissipating or disposing of property which could be the subject of enforcement if the claimant goes on to win the case it has brought, and not to give the claimant security for his claim. The principle has been put in much that way, not only by the courts below in this case but in many of the decided cases: see eg *JSC BTA Bank v Solodchenko* [2010] EWCA Civ 1436, [2011] 1 WLR 888 per Patten LJ, para 49(1)

and Longmore LJ, para 52. Aikens LJ agreed with both. Thus Longmore LJ said that the purpose of a freezing injunction is to preserve a defendant's assets, subject to dealings in the ordinary course of business so that, if and when a judgment is pronounced, the defendant still has assets to meet that judgment. See also the cases referred to in para 23 below.

21.     The expression "assets" is capable of having a wide meaning. For example it can include a chose in action. However, like any document, a freezing order must be construed in its context. That includes its historical context. It is for that reason that, in giving the leading judgment in *Solodchenko*, beginning at para 17 Patten LJ explained the development of the relevant clauses in the standard forms of freezing injunction. He referred first to *Federal Bank of the Middle East Ltd v Hadkinson* [2000] 1 WLR 1695 in which the Court of Appeal had to decide whether an order in the standard form of freezing order at that time was effective to cover assets which were held in the defendant's name but which belonged beneficially to third parties. The Court of Appeal held that it was not.

22.     In S*olodchenko* Patten LJ cited extensively from the judgments of Mummery and Nourse LJJ in *Hadkinson*. He explained at para 20 that the issue in *Solodchenko* was whether the subsequent changes to what had by then become the standard form of injunction made any difference. As Mummery LJ noted at p 1708, *Hadkinson* was decided in the 25th year after the original decision in *Mareva Cia Naviera SA v International Bulkcarriers SA* [1975] 2 Lloyd's Rep 509 and, as he put it, many thousands of orders must have been made in that form which had been in operation for many years. In no case over those years had it been suggested that the expression "assets or funds" used in the then standard form of injunction extended to sums not beneficially owned by the defendant.

23.     Mummery LJ said at p 1709F that he started from the position that in everyday usage the expression "his assets" refers to assets belonging to that person, not to assets belonging to another person. He then focused on the context in which the expression was used in the order. In doing so he identified the purpose of a freezing injunction in essentially the same terms as described by Beatson LJ in this case and by others in subsequent cases. Mr Crow referred to a large number of dicta to like effect, including the following: *Siskina (Owners of Cargo lately laden on board) v Distos Cia Naviera SA* [1979] AC 210, 253D per Lord Diplock; *A v C (Note)* [1981] QB 956, 960 per Robert Goff J; *A J Bekhor & Co Ltd v Bilton* [1981] QB 923, 941-942 per Ackner LJ; the *Mercedes Benz* case [1996] AC 284, 300F and 302C, per Lord Mustill; *Camdex International Ltd v Bank of Zambia (No 2)* [1997] 1 WLR 632, 636H, per Sir Thomas Bingham MR; *C Inc Plc v L* [2001] 2 Lloyd's Rep 459, para 31, per Aikens J; *Fourie v Le Roux* [2007] 1 WLR 320, para 21, per Lord Scott; *Solodchenko* [2011] 1 WLR 888, paras 32 and 49(1), per Patten LJ; *Lakatamia Shipping Co Ltd v Su* [2015] 1 WLR 291, para 46, per Rimer LJ and,

most recently, *JSC Mezhdunarodniy Promyshlenniy Bank v Pugachev* [2015] EWCA Civ 139, para 14, per Lewison LJ.

24.     In *Hadkinson* Mummery LJ concluded thus at p 1709H:

> "In my judgment, the language of the freezing order, read in context and with regard to the object of the order, naturally refers to assets and funds belonging to the defendant and which are and should remain available to satisfy the claim against him. Assets and funds which belong, or, as in this case, are assumed to belong, beneficially to someone else would not be available for that purpose."

25.     Mummery LJ then referred (at p 1710E) in particular to the well-known judgment of Robert Goff J in *Searose Ltd v Seatrain UK Ltd* [1981] 1 WLR 894, 897. He noted Robert Goff J's reference to the value of and the need for the *Mareva* jurisdiction and to the care to be taken to ensure that such orders are only to be made for the purposes for which they are intended, namely "to prevent the possible abuse of a defendant removing assets in order to prevent the satisfaction of a judgment in pending proceedings", and that they do not bear harshly upon innocent third parties. Mummery LJ concluded at p 1711B that the "hallowed" or standard form of freezing order referring to "his assets or funds" is not apt, without the addition of words clearly extending its effect, to cover an unidentified bank account held in the name of and under the control of Mr Hadkinson but which is assumed not to be his beneficially.

26.     Thus, as it seems to me, the decision in *Hadkinson* supports the conclusion that the context of a freezing order has been of particular importance in determining its true construction in a particular case. In my opinion, that is a sensible approach which we should not reverse. It is supported in a number of types of case, as is demonstrated by the judgments in *Solodchenko*.

27.     Paragraph 6 of the form of order considered in *Solodchenko* was very similar to that in paragraph 5 of the order in the instant case, which is quoted in para 4 above. Paragraph 6 was in these terms:

> "Paragraph 5 applies to all the freezing respondent's assets whether or not they are in its own name and whether they are solely or jointly owned and whether the respondent is interested in them legally, beneficially or otherwise. For the purpose of this Order the freezing respondent's assets include any asset

> which it has the power, directly or indirectly, to dispose of or
> deal with as if it were its own. The freezing respondent is to be
> regarded as having such power if a third party holds or controls
> the asset in accordance with its direct or indirect instructions."

I see no relevant distinction for present purposes between paragraph 6 of the order
in that case and paragraph 5 of the order in the instant case. However, as Patten LJ
observed in para 17, they were both different from the standard forms of order in the
CPR up to 2002 in respect of assets both within the jurisdiction and outside the
jurisdiction. In both orders the injunction restrained the defendant from disposing of
or dealing with his assets whether in his own name or not and whether solely or
jointly owned. However, the pre-2002 form of order did not include the extended
description of assets contained in the last two sentences of paragraph 6 of the order
in that case or of paragraph 5 of the order in this case or the additional words (ie
"whether the respondent is (or respondents are) interested in them legally,
beneficially or otherwise") which now appear in the form of freezing order
contained in the Commercial Court Guide.

28.     In paras 24-32 Patten LJ gave his reasons for concluding that the last two
sentences of paragraph 6 (or here paragraph 5) did not have the effect of including
trust assets. However, in para 33 he recognised that the basis of the decision in
*Hadkinson* was that the then standard form of freezing order did not extend to trust
assets but that the Court of Appeal in *Hadkinson* recognised that it would be possible
to frame an order in a way which did have the effect of freezing trust assets and that
in exceptional circumstances it might be appropriate to make an order in that form.
In *Solodchenko* itself all three members of the Court of Appeal ultimately concluded
that, although the last two sentences of paragraph 6 (here paragraph 5) did not have
the effect of extending the order to trust assets, the effect of the amendments to the
first part of paragraph 6 (here paragraph 5) did have that effect.

29.     The approach of the courts has thus been to approach the language of the
forms of order cautiously but to recognise that the forms have gradually been
extended. That seems to me to have been a sensible approach. So, for example, in
*Cantor Index Ltd v Lister* [2002] CP Rep 25 the court held that a defendant who
borrows money increases his indebtedness but does not dispose of, deal with or
diminish the value of his "assets" within the meaning of the then standard form of
freezing order. By borrowing money and spending the borrowed money the
defendant may reduce his net asset position but that is not what he is restrained from
doing by the standard form of wording. The text books are to much the same effect.
So, for example, in Hoyle on *Freezing and Search Orders,* 4th ed (2006), para 4.28
it is said:

> "The test must be whether the assets will be available on
> execution of a judgment and if they are they can be the subject
> of the order, as its purpose is to aid the court's process. It would
> otherwise be illogical to include them in the order."

See also Gee on *Commercial Injunctions*, 5th ed (2004), para 3.015 and to similar
effect Biscoe on *Freezing and Search Orders: Mareva and Anton Piller Orders*, 2nd
ed (2008), para 1.12:

> "A freezing order … provides a fund from which the
> applicant's claim may ultimately be paid in competition with
> other unsecured creditors of the respondent."

However it adds at para 1.12(e) that the usual terms do not prevent the respondent
borrowing money thereby increasing the total indebtedness.

30.     Both the 2013 and the current edition of the White Book say that a freezing
order restrains the respondent from dealing with his assets but does not prevent him
from borrowing money, thereby increasing his overall indebtedness. They both cite
two decisions of Neuberger J at first instance, namely *Cantor Index Ltd v Lister*
[2002] CP Rep 25 and *Anglo Eastern Trust Ltd v Kermanshahgi* [2002] EWHC 1702
(Ch).

31.     I was at one time attracted by the arguments on behalf of the Bank on issues
1 and 2 as set out in the agreed statement of facts and issues. After all Beatson LJ
said at para 60 that there was no difficulty in principle in finding that the choses in
action representing the rights under the four Loan Agreements initially qualified as
assets under the Freezing Order. In ordinary legal parlance they would I think be
regarded as assets.

32.     The Bank relies upon a number of cases in which the courts have treated
choses in action as assets for the purpose of a freezing order. For example, in *CBS
United Kingdom Ltd v Lambert* [1983] Ch 37, 42, although the case was not itself
concerned with choses in action, Lawton LJ observed in connection with what is
now section 37(3) of the Senior Courts Act 1981:

> "… there are no limitations put upon the word 'assets', from
> which it follows that this word includes chattels such as motor
> vehicles, jewellery, objets d'art and other valuables as well as
> choses in action."

Recently, in *Templeton Insurance Ltd v Thomas* [2013] EWCA Civ 35, which considered whether goodwill was to be regarded as an asset, the Court of Appeal held that it was, following *Darashah v UFAC (UK) Ltd* [1982] WL 222281; The Times, 30 March 1982. In the course of his judgment Rix LJ said at para 18:

> "It seems obvious that goodwill is among the most important intangible assets of a business. The fact that goodwill is an intangible makes it no less an asset than other intangibles, such as choses in action."

33.     There is force in the Bank's case that what used to be called the *Mareva* injunction has been extended in many ways since its inception, as for example to permit worldwide orders and to permit orders in respect of trust assets. There is also force in the point that choses in action have come to be regarded as within the ordinary meaning of "assets".

34.     However, as stated above, context is of particular importance in construing orders such as the Freezing Order in this case. The origin of the *Mareva* jurisdiction was consistent with the enforcement principle. In its historical context the word "asset" was prima facie part of a fund which would be available to the judgment creditor. The cases and legal writings referred to above show that there has over the years been a settled understanding that borrowings were not covered by the standard form of freezing order.

35.     In reaching his conclusions Beatson LJ considered in some detail the effect of the decisions of the Court of Appeal in *Hadkinson* and *Solodchenko,* especially the latter, where the words added to the standard form enabled the court to make an order covering assets apparently held as trustee or nominee for an innocent third party: see para 50, where Beatson LJ said that the recognition that it is legitimate in some circumstances to include within a freezing order property which appears to be held by a defendant as a nominee or trustee shows that the enforcement principle is not absolute. He added in para 52 that, since it was indisputably the case that the choses in action that were the borrower's rights to draw down under the Loan Agreements "belonged" to the respondent, the case was stronger than in *Solodchenko* and there was a stronger case for regarding all choses in action which undoubtedly belonged to an injuncted defendant as qualifying as assets within the freezing order even though, by the time of judgment, it might be the case that the claimant-creditor would not be able to enforce against a particular chose in action.

36.     Those considerations arose out of wording which had been added to the standard forms of order. Under the standard form of order before the addition of the words at the beginning and in the last two sentences of paragraph 6 (or paragraph

5), those considerations would not as I see it have been accepted. The decided cases and the principles set out in the text books seem to me to demonstrate a cautious approach to the standard terms, when construed in their context.

37.    Reliance was placed upon the decision of the Court of Appeal, Criminal Division, in *R v Kohn* (1979) 69 Cr App Rep 395, where it was held that an overdraft facility was property which could be the subject of a charge of theft. Reference was also made to some aspects of insolvency law. However, to my mind examples from different areas of the law are of very little assistance because there is no real doubt that a right to draw down moneys under a loan agreement could be construed as an asset. The question is whether it is appropriate so to construe it in the context of a freezing order.

38.    None of the cases relied upon by the Bank seems to me to support its case in so far as it relies upon the standard form of freezing order. The authorities do not support the proposition that the respondent's right to draw down the loans was an asset within the meaning of the Freezing Orders as originally drafted. While it would be open to this court to reverse those decisions, I do not think that it would be appropriate to do so. They have stood for many years and have been accepted both by the courts and the legal writers. Clarity is important and so is certainty in the context of penal orders. I would therefore answer the question posed by issue 1 in the statement of facts and issues in the negative. I would hold that the respondent's right to draw down under the Loan Agreements does not qualify as an "asset" within the meaning of the Freezing Order if it is construed without reference to the extended definition in the second sentence of paragraph 5. If that is correct, I do not think that anything the respondent had done amounts to disposing of, dealing with or diminishing the value of "assets" as that word has been construed in the original forms of freezing injunction; that is without reference to the extended definition in the second sentence of paragraph 5. I would therefore also answer the question posed by issue 2 in the negative. It follows that I would dismiss the Bank's appeal on those issues.

39.    I have however reached a different conclusion on issue 3. The position seems to me to be different in the more recent forms, which were used in this case and in *Solodchenko*. I would hold that the proceeds of the Loan Agreements were "assets" within the meaning of the extended definition in paragraph 5 of the Freezing Order in this case and would allow the appeal on this ground. For convenience I repeat paragraph 5, which I have already set out in para 4 above. It reads:

> "5.    Paragraph 4 applies to all the respondents' assets whether or not they are in their own name and whether they are solely or jointly owned and whether or not the respondent asserts a beneficial interest in them. For the purpose of this

> Order the respondents' assets include any asset which they
> have power, directly or indirectly, to dispose of, or deal with as
> if it were their own. The respondents are to be regarded as
> having such power if a third party holds or controls the assets
> in accordance with their direct or indirect instructions."

40.     The Bank submits that the respondent's right to draw down the loans was an
"asset" within the second sentence of paragraph 5 because it was an asset which the
respondent had the "power, directly or indirectly, to dispose of, or deal with as if it
were [his] own". As I see it, an instruction to the lender to pay the lender's money,
which is what it was, to a third party is dealing with the lender's assets as if they
were his own.

41.     I would accept the Bank's submission that the question which the extended
definition poses is whether the respondent had power to direct the lender what to do
with the funds that it was contractually obliged to make available to him. I would
further accept its submission that the answer to that question is yes. Beatson LJ said
at para 87 that he did not find this an easy question to answer but he dismissed the
argument for a number of reasons as follows.

42.     First, he said (at para 87) that the power to deal with the chose in action was
"subject to the lender's consent and to the lender not cancelling the facility". I agree
with the submission made on behalf of the Bank that that is not the relevant question.
As to consent, the only provision in the Loan Agreements of possible relevance is
clause 1.2, which provides "that the Loan Facility shall be disbursed in a form agreed
by the Parties". That clause provides only for an agreement as to the *form* of
disbursement and is irrelevant for present purposes. While it is true that clause 1.6
gives the lender a right to deliver to the borrower a written cancellation notice, unless
and until such a notice is given, the respondent has his rights as borrower under the
agreement, which by clause 1.11 expressly constitute legal obligations binding on
the lender. Those obligations include clause 1.12, which provides that the proceeds
of the loan facility shall be used at the respondent's sole discretion and includes a
power to direct the lender to transfer the proceeds to any third party.

43.     Secondly, Beatson LJ said (also at para 87) that the argument has a bootstraps
element. However I would not accept that view for the reasons given on behalf of
the Bank. Paragraph 5 of the order extends its scope to things which are not actually
in the respondent's ownership, so that there is no element of bootstraps because the
basic premise is that the respondent's right would not otherwise be viewed as an
"asset".

44.     Thirdly, Beatson LJ observed (at para 88) that the extended definition of "asset" was "primarily designed to catch assets which the defendant claimed he held on trust". However, I would accept that that is not correct because it is only the additional words at the beginning of the clause which catch assets which the defendant holds on trust. I respectfully disagree with the conclusion that the words of paragraph 5 were drafted "for a different purpose". Finally, I am unable to accept the view that the relevant words are not clear. In my opinion they are.

45.     Floyd LJ dismissed this part of the Bank's argument by saying (at para 98) that the money in the lender's hands, before being transferred to a third party, was not the respondent's "to deal with as if it were his own". For my part, I would not accept that because it seems to me to overlook the terms of the Loan Agreements. Under clause 1.12 of each agreement the respondent had an unfettered discretion (or power) to use the proceeds as he wished, which expressly included the power to transfer the proceeds to any third party.

46.     Rimer LJ also dismissed the argument, but for a different reason. He said (at para 103) that paragraph 5 "is about, and only about, dealings with 'assets'" of the respondent. I respectfully disagree. It is true that that was the case under the previous form of order (as construed in the cases referred to above) but the whole point of paragraph 5 is to extend the meaning previously given to "assets". In *Solodchenko* Patten LJ acknowledged that the new wording catches assets which are contained within a Liechtenstein Anstalt. Assets which the respondent owned beneficially were caught by the original word *"assets"*. Assets which the respondent owned legally but not beneficially were caught by the Commercial Court extended definition (but not otherwise, according to the Court of Appeal). The last two sentences of paragraph 5 are designed to catch assets which are not owned legally or beneficially, but over which the defendant (here the respondent) has control.

47.     In this context Mr Crow invited the court to adopt the judge's reasoning in para 83 of his judgment as follows:

> "83.    I do not regard the extended description or the Commercial Court words as altering the position. These provisions were drafted for a different purpose. There was, in my view, no asset of which Mr Ablyazov had legal or beneficial ownership or control of which he made a disposal or with which he dealt. Mr Ablyazov had a right to require the Lender to procure that third parties were paid (in a form which was to be agreed: clause 1.2). But he had no right of ownership or control in respect of any particular asset[s] nor any right to dispose of or deal with any asset as if it was his own. He exercised his right to borrow and, upon his so doing, the

Lenders disposed of monies, which, until they reached the payees, the Lenders owned and controlled and alone had the power to deal with as their own. It was up to the Lenders to decide what monies to use for the payment and, until payment was made, they could change their mind. In consequence of the payment to the payees, Mr Ablyazov incurred an obligation to repay the Lender. As in *Anglo Eastern Trust* it is not necessary to treat the money paid by the Lenders as being at some notional *scintilla temporis* the property of Mr Ablyazov or as disposed of or dealt with as if it was his own or held or controlled in accordance with his instructions."

48.     In my opinion, that is too narrow an approach to the new sentences at the end of paragraph 5 of the form of order used in this case. As stated in para 46 above, the whole point of the extended definition of "assets" is to catch rights which would not otherwise have been caught and, in particular, the "respondents' assets include any asset which they have power, directly or indirectly, to dispose of, or deal with as if it were their own". On the facts of this case, as I see it, the respondent did not own the relevant assets but under the Loan Agreements had power directly or indirectly to dispose of, or deal with them, as if they were his own.

49.     The whole focus of the second and third sentences of the paragraph is the respondent's power to deal with the lender's assets as if they were his own. It follows that the focus of the second sentence of paragraph 5 is not on assets which the respondent owns (whether legally or beneficially) but on assets which he does not own but which he has power to dispose of or deal with as if he did. Further, as I see it, the fact that he incurs a liability at some stage to reimburse the lender is immaterial. Finally, I do not read the last sentence of paragraph 5 as a restriction on the scope of the second sentence but (as Lord Hodge suggested in the course of the argument) as expansionary.

50.     For these reasons I would answer the question posed in issue 3 in the statement of facts and issues, namely whether the proceeds of the Loan Agreements were "assets" within the meaning of the extended definition in paragraph 5 of the Freezing Order because the respondent had the power "directly or indirectly to dispose of, or deal with [the proceeds] as if they were his own", in the affirmative. It follows that I would allow the appeal on this ground.

*Conclusion*

51.     I would dismiss the Bank's appeal on issues 1 and 2 but allow it on issue 3. I would invite the parties to make submissions in writing on the form of order and on costs within 21 days of this judgment being handed down.