# EXHIBIT H
## (PART 2 OF 2)

PURCHASE AGREEMENT

AGREEMENT made as of September 17, 2014 between 135 WEST 52nd STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and One Thirty Five 31C LLC residing at c/o Rheem Bell & Memelstein, LLP, 302 5th Avenue, 8th Floor, New York, New York 10001 ("Purchaser").

Purchaser's Attorney:  Christine Bell, Esq.

Address:  Rheem Bell & Memelstein, LLP

302 5th Avenue, 8th Floor

New York, New York 10001

Telephone: (212) 239 – 4001 (x102)  Fax: (212) 239 - 4125  Email: Christine@rbmllp.com

Percentage of Common Interest: 0.6600%  Common Charges: $1,521.88 per month

Residential Percentage of Common Interest: 0.9122%

Co-Broker: One and Only Realty, Inc. (Gennady Perepada)

Real Estate Taxes: $2,130.36 per month;  B.I.D. Tax: $18.81 per month;

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 31C ("Unit") in the building ("Building") known as 135 WEST 52nd STREET Condominium ("Condominium") and located at 135 WEST 52nd STREET, New York, New York 10019, together with a 0.6600% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York and in the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

**1. Purchase Price**

(a) The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below ("Purchase Price") is $3,525,000.00, payable as follows:

(i) $528,750.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5; and

(ii) $2,996,250.00, constituting the balance of the Purchase Price ("Balance"), by certified check of Purchaser or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined). All checks in payment of the Balance shall not have the right to unilaterally cancel this Agreement except as herein provided (such as in the case of an unpaid default by Purchaser) nor change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.

(c) All checks shall be unendorsed, made payable to the direct order of Rheem Livingston & Cholst LLP, as Escrow Agent" or (as to the Balance) to "135 West 52nd Street Owner LLC" or such payees as Sponsor may direct on not less than two (2) business days' prior oral or written notice to Purchaser. All checks shall be drawn on a bank that is a member of the New York Clearing House Association. All checks must be payable directly to the order of the required payees; they may not be endorsed.

1

(including, without limitation, amendments involving any changes, modifications, or updating of the projected Common Charges, the projected real estate taxes to be paid by Purchaser, or Schedule B "Budget for the First Year of Condominium Operation"). Except in the case of a material adverse amendment affecting Purchaser's Unit or as otherwise provided under the Plan, any such amendments shall neither excuse Purchaser from performing Purchaser's obligations hereunder nor entitle Purchaser to any offset or credit against the Purchase Price or claim of right of action against Sponsor, and any such amendment may be filed by Sponsor without Purchaser's consent or approval. However, Sponsor shall not have the right to unilaterally cancel this Agreement except as herein provided (such as in the case of an unpaid default by Purchaser) nor change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.

(d) The Plan is hereby incorporated in this Agreement with the same force and effect as if set forth at length. In the event of any inconsistency or conflict between the provisions of this Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding. Purchaser acknowledges having had full opportunity to examine all documents and investigate all statements made herein and in the Plan.

**4. Personal Property**

(a) At closing, the Unit will contain only those appliances, countertops, cabinets, flooring, sinks, vanities (if any), air conditioning units (if any), hardware and other fixtures and equipment installed therein as set forth in the Plan.

Sponsor has the right to substitute other appliances, countertops, cabinets, sinks, vanities, flooring and fixtures in place of those referred to in the Plan provided only that the substitutions are of equal or better quality and design.

(b) The Unit is being sold unfurnished, without window blinds or shades. Furniture, floor coverings, wall coverings, furnishings, decorations and the like in or about any model Unit are for display purposes only and are not included in this sale except to the extent set forth in the Plan. Any floor plans or sketches shown to Purchaser (including those contained in the Plan) are only approximations of the Unit's dimensions and arrangement and Purchaser acknowledges and agrees that he is not relying thereon. Sponsor shall not be liable for minor variations from any floor plans or structures.

(c) Sales model apartments may, at Sponsor's option, be sold furnished at a later date but will initially be withheld from sale.

(d) There will be no modifications or extras unless agreed to in writing by the parties. All modifications and alterations must be approved by Sponsor in writing and, if approved, shall be performed by Sponsor at Purchaser's expense (payable in the manner to be set forth in an addendum to this Agreement or by separate agreement between Sponsor and Purchaser).

**5. Purchase Monies to be Held in Trust**

(a) The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, New York, NY 10016, telephone number 212 687 7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser. Escrow Agent has designated the following attorneys to serve as signatories: Morton H Rosen, Peter I Livingston, Mary L Kosmerl, Bruce A. Cholst. All designated signatories are authorized to practice law in the State of New York. Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor, Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

(b) The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State

3

(d) Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing and, unless otherwise set forth herein, none of the provisions of this Agreement shall survive the closing. However, nothing contained herein shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of Purchaser under Article 23-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.

(e) Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under "Terms of Sale - Prerequisites to Closing of Title" in Part I of the Plan are met concurrently with, or prior to, closing.

**2. Definitions**  The following terms shall have the meanings ascribed to them:

(a) "Building" shall mean the building located at 135 West 52nd Street, New York, New York 10019.

(b) "Closing Date", "closing", "closing of title" and words of similar import are used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment to Sponsor of the Purchase Price and the delivery to Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.

(c) "Condominium" shall mean The 135 West 52nd Street Condominium.

(d) "Declaration" shall mean the Declaration of the 135 West 52nd Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.

(e) "Depository" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.

(f) "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.

(g) "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.

(h) "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.

All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

**3. Plan**

(a) Purchaser represents that Purchaser has possessed the Plan and any filed amendments thereto at least three (3) business days prior to submitting this Purchase Agreement; or

(b) In the event Purchaser does not wish to wait three (3) business days) Purchaser has the right to rescind this Purchase Agreement by sending written notice of his rescission to the Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement (time being of the essence to exercise such right of rescission within such seven (7) day period).

(c) Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Condominium Documents set forth in Part II of the Plan and Parts A and B of the Exhibits submitted with the Plan to the Department of Law) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor

2

of New York. The escrow account is entitled "[Purchaser's Name] Rosen Livingston & Cholst LLP Escrow Agent" ("Escrow Account"). The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit. Any deposit in excess of $250,000 will not be insured.

All deposits received by Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP as Escrow Agent.

Any deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of a written agreement between Purchaser and Sponsor.

The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts, which is currently 0.2%. Interest shall begin to accrue upon placing the Deposit into the Escrow Account. All interest earned thereon shall be paid to or credited to the Purchaser at closing. No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account. The Escrow Agreement appended hereto as Exhibit "A."

The Down Payment will not earn interest until the Purchaser's check has been deposited and cleared. Sponsor will be liable to Purchaser only for the amount of interest actually received from the Depository (which interest may be reduced by the Depository's service charge). The interest on the Down Payment, as same may be reduced by the Depository's service charge, is hereinafter referred to as "Interest".

Upon the payment and performance by Purchaser of all of Purchaser's obligations hereunder and the transfer to Purchaser of title to the Unit, Sponsor will instruct the Depository to pay to Purchaser any and all interest on monies deposited hereunder. It is possible that Purchaser may not receive interest on the Down Payment for the entire month in which the closing is scheduled to occur. The Sponsor and Selling Agent will not be liable to Purchaser for the amount of such interest or the payment thereof, except for any amount received from the Depository. All funds due to Sponsor and received under this Purchase Agreement will be handled in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and with Section 71-a(3) of the New York Lien Law.

**6. Closing of Title**

(a) The closing of title shall occur on the date and at the time and place in the City and State of New York as Sponsor shall designate to Purchaser on not less than thirty (30) days' prior written notice (unless waived by Purchaser). Sponsor shall have the right, from time to time, to adjourn such date and time for closing on written notice to Purchaser. If the Closing is adjourned by Sponsor, then Sponsor shall fix a new date and time for closing and shall give Purchaser not less than ten (10) days' prior written notice of the new scheduled date and time for closing.

**Purchaser shall be entitled to one (1) adjournment of the closing not to exceed five (5) days (the "Adjourned Closing Date"). The closing adjustments stated in section 12(c) shall not accrue unless Purchaser fails to close on such Adjourned Closing Date. Such adjournment must be exercised no less than two (2) days prior to the scheduled closing date.**

4

2

amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the policies of the lender, the number of months remaining between the closing of title and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amount of the taxes and other charges or impositions then payable; and

(v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender. Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of his lender with respect thereto.

(vi) If, in connection with such purchase, Purchaser has dealt with any broker except (A) the Selling Agent or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing;

(vii) Purchaser will pay to Rosen Livingston & Cholst LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owner's Power of Attorney, additional closing documents and for coordinating and attending the closing;

(viii) If Purchaser obtains financing and his lender refuses to close at the office of Rosen Livingston & Cholst LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and Purchaser pays Rosen Livingston & Cholst LLP, in addition to said closing fee set forth above, a travel fee of $500.00 if the closing is held in Manhattan or $700.00 if the closing is held in another borough. If the closing attended by a representative of Rosen Livingston & Cholst LLP is adjourned through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Cholst LLP an additional travel and attendance fee in the same amount as stated above for each attendance;

(vii) If Purchaser is other than a natural person, Purchaser will be required to provide a personal guaranty of Common Charges and other charges due to the Condominium and Purchaser will pay Rosen Livingston & Cholst LLP a fee of $500.00 for preparation of such guaranty;

(ix) If Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Cholst LLP a fee of $1,000.00 for the preparation of the splitter, substitute mortgage and assignment of mortgage documents; and

(x) Purchaser will pay the New York State Real Estate Transfer Tax (documentary stamps) to be affixed to the deed, the New York City Real Property Transfer Tax and (if applicable) the one (1%) percent "mansion tax";

(xi) Purchaser shall pay to 135 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit by Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.

All of the aforementioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's unendorsed, personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party-or if so  directed by the Sponsor, by wire transfer.

**14. Power of Attorney to Condominium Board, Sponsor, Retail Unit Owner and Commercial Unit Owners**

9

At closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit (or, if no representative is present, then to Sponsor's attorney), for recording in the New York City Register's Office a Power of Attorney in favor of the Condominium Board relative to purchasing or leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owners relative to amending the Condominium Documents to the extent permitted in the Power of Attorney. An originally recorded Power of Attorney shall be sent to the Condominium Board.

**15. Events of Default**

(a) The following shall constitute "Events of Default" hereunder:

(i) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 6 herein or to timely pay the applicable Rosen Livingston & Cholst LLP closing fee or any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Cholst LLP pursuant to paragraphs 12 and 13 above; or

(ii) the dishonor or failure of collection of Purchaser's Down Payment check; or

(iii) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder.

(b) Upon the occurrence of an Event of Default, Sponsor shall be entitled, in its sole and absolute discretion, to cancel this Purchase Agreement by giving Purchaser written notice of cancellation. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default. TIME IS OF THE ESSENCE TO CURE SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD. If the default is not cured within such thirty (30) day period, then this Agreement shall be deemed canceled and Sponsor shall have the right to retain, as and for liquidated damages, the Liquidated Sum. Any sums in excess thereof, together with any interest thereon shall be returned to Purchaser after cancellation.

Notwithstanding the foregoing, if Purchaser's check in payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in which to provide good funds for Purchaser's Down Payment, in which event Sponsor shall be deemed to have waived its right to sue Purchaser on the dishonored or uncollected check; or (ii) allow Purchaser thirty (30) days in which to make good Purchaser's Down Payment and if Purchaser fails to so do within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check. In the latter case, Purchaser will also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

Upon cancellation of this Agreement and disposing of the Down Payment and interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan. Thereafter, the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

10

**16. Risk of Loss; Casualty**

(a) Purchaser shall not be entitled to possession of the Unit nor to store any of Purchaser's furniture or belongings therein until the deed is delivered to Purchaser at closing.

(b) All other risk of loss prior to closing has been assumed by Sponsor, but without any obligation or liability of Sponsor to repair the damage or restore the Unit or its contents. If Sponsor or the Unit Owners elect to repair or replace the loss or damage, this Agreement shall continue in full force and effect. Purchaser shall not have the right to reject title to the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or replacements. Purchaser shall not be required to pay the Balance unless and until (i) the Unit has been substantially repaired as near as is reasonably possible to its condition immediately prior to the casualty; (ii) its essential services (such as gas, electricity, and heat) and a reasonable means of ingress and egress to the street have been restored; and (iii) any condition in the Unit for which a violation (if any) is noted or issued has been corrected (even if same is not yet removed of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser, its licensees, invitees and/or workers. (Sponsor will endeavor in good faith, and with reasonable diligence, to remove or cause to be removed subsequent to closing all violations of record it is obligated to correct.) Any proceeds received from insurance, or in satisfaction of any claim or action in connection with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners). If such proceeds are paid to Purchaser, Purchaser shall promptly turn them over to Sponsor upon request. The provisions of the two preceding sentences shall survive the closing.

(c) In the event that Sponsor notifies Purchaser that it does not elect to repair or restore the Unit or the Unit Owners do not resolve to make such repairs or restoration in accordance with the Condominium's By-Laws, this Agreement shall be deemed canceled and of no further force or effect, and Sponsor shall instruct the Depository to return to Purchaser all sums deposited hereunder, together with interest, if any, thereon, whereupon the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously canceled due to Purchaser's uncured default, Sponsor shall retain the Liquidated Sum as provided above.

**17. Inspection of Unit**

At least ten (10) days before the Balance is to be paid, Sponsor and the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Sponsor or the Selling Agent to inspect the Unit before the lapse of such ten (10) day period. Purchaser or his duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Report (in the form set forth as Exhibit B to this Agreement) and deliver same to the Sponsor or Selling Agent at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the completed Inspection Report shall not excuse Purchaser from paying the Balance when due (without provision for escrow) and shall constitute Purchaser's full acceptance of the Unit. However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of the Sponsor".

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Unit and the Retail Unit may be used for any lawful purpose and (ii) the Condominium Board, and the Residential Unit Owners do not have any right to approve the use or any changes in the use of the Unsold Residential Units, the

11

Commercial Units and the Retail Unit or any part thereof. This paragraph shall survive the closing of title.

**18. No Representations**

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, furnishings and fixtures contained in model units, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms or closets therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to his purchase of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and investigation thereof). No person has been authorized to make any representations on behalf of Sponsor. No representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not arising out of dimension of the Unit or any defect therein or in the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially to such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the closing of title.

**19. Negotiable Terms**

Sponsor reserves the right, in its sole and absolute discretion, to negotiate on an individual basis with each purchaser substantially more beneficial purchase terms than those offered or given to other purchasers. As a result, Purchaser may not benefit from a more favorable purchase term given to another purchaser and will not have the right to rescind this Purchase Agreement or recover his Down Payment or any other amount for not being given such benefit. The following is a list of only some of the purchase terms which may be negotiated: purchase price; the amount of the Down Payment; the right of a purchaser to cancel the Purchase Agreement and recover the Down Payment for failure to obtain financing or to close by a specific date; the closing date and minimum notice required to schedule the closing; upgraded appliances, fixtures or equipment or other alterations, improvements or additions to be performed by and at the expense of Sponsor; assuming a purchaser from closing costs and/or penalties for closing late; longer time periods to pay or perform obligations under the Purchase Agreement; elimination of "time of the essence" provisions; price or common charge rebates; assumption of payment of, or guarantee of, common charges for a given period; Sponsor financing provided and amendment to the Plan containing the terms thereof; in duly filed; allowances or credits against the purchase price for decorations; to install appliances or fixtures and providing to Purchaser the benefit of any one or more favorable terms offered or given to another purchaser.

**20. Notices**

All notices, elections, consents, demands and communications (collectively called "notices" or individually called "notice") shall be delivered personally or given in writing by registered or certified mail, return receipt requested, postage prepaid, and, if sent to Purchaser, addressed to Purchaser at Purchaser's address given above, with a copy to Purchaser's attorney, and, if sent to the Sponsor, addressed to the Sponsor at c/o Rosen Livingston & Cholst LLP, 275 Madison

12

Purchaser's money, and may not be comingled with any other money or pledged or hypothecated by Sponsor, as per GBL § 352-h.

I.     Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until after consummation of this Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law.  Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

J.     The Escrow Agent shall release the Deposit if so directed:

(a) pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 5 upon closing of title to the Unit; or

(b) in a subsequent writing signed by both Sponsor and Purchaser; or

(c) by a final, non-appealable order or judgment of a court.

If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit.  If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release.  If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within said thirty (30) day period, the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above.  Notwithstanding the foregoing, the Escrow Agent shall have the right at any time to deposit the Deposit contained in the Escrow Account with the clerk of the county where the Unit is located and shall give written notice to both parties of such deposit.

The Sponsor shall not object to the release of the Deposit to:

(a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an Amendment to the Plan; or

(b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

K.     Any provision of the [Purchase Agreement/Escrow Agreement] or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding any Deposit in trust is absolutely void.  The provisions of the Attorney General's regulations and GBL §§ 352-e(2-b) and 352-h concerning escrow trust funds shall prevail over any conflicting or inconsistent provisions in the Purchase Agreement, Plan, or any amendment thereto.

L.     Escrow Agent shall maintain the Escrow Account under its direct supervision and control.

17

M.     A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352(h).

N.     Escrow Agent may rely upon any paper or document which may be submitted to it in connection with its duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

O.     Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-(h) and the New York State Department of Law's regulations.

P.     Sponsor shall obtain or cause the selling agent under the Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement.  Q.     Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstance.

R.  Sponsor agrees to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in wilful disregard of the obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent.  This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

38. Counterpart Signature Pages

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument.  This Agreement may be executed by facsimile or .pdf and such shall be deemed originals.

[Signature page follows]

18



IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:                              PURCHASER:
135 WEST 52ND STREET OWNER            ONE THIRTY-FIVE 510 LLC
LLC

By: _____          _____
      Moujan Ghalili, Principal

By: _____
      David Bistricer, Principal

[Purchaser]
Date Accepted: _____

(*Please initial on line and print or type name under line.)

Purchaser acknowledges
Receipt of Offering Plan and
Amendments at __ on _____, 20__; and
on _____, 20__

Delivery of Purchase
Agreement and Check for
Down Payment at ____ [A.M.][P.M.]
on _____, 20__

19



IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:                              PURCHASER:
135 WEST 52ND STREET OWNER            ONE THIRTY-FIVE 510 LLC
LLC

By: _____          _____
      Moujan Ghalili, Principal       Ivona Vella as Director of Mirlew Holdings Limited,
                                      Sole Member of One Thirty Five 510 LLC
By: _____
      David Bistricer, Principal

[Purchaser]
Date Accepted: _____

(*Please initial on line and print or type name under line.)

Purchaser acknowledges
Receipt of Offering Plan and
Amendments at __ [A.M.][P.M.]
on _____, 20__; and
on _____, 20__

Delivery of Purchase
Agreement and Check for
Down Payment at ____ [A.M.][P.M.]
on _____, 20__

19

| Item | Exceptions (if any) | Purchaser's Initials |
|------|---------------------|----------------------|
| (m) | Bathroom sinks: | |
| (n) | Water closet: | |
| (o) | Bathtubs: | |
| (p) | Bathroom tile: | |
| (q) | Hardware: | |
| | (doorbell, doorknob, faucets, locks, etc.) | |
| (r) | Intercom: | |
| 2. | General Operating Condition: | |
| (a) | All Doors: | |
| (b) | All Windows: | |
| (c) | All Plumbing: | |
| (d) | All Hardware: | |
| (e) | Other: | |

The undersigned will sign and deliver to you a separate statement signifying my (our) satisfaction with each item excepted above (if any), immediately upon the completion of the repair, adjustment or correction of same. The undersigned understands and agrees that you shall not be obligated to make any repairs, adjustments or corrections to the Unit or any portion thereof or its fixtures, appliances, equipment, etc., contained therein, from or after the date of delivery of possession of the Unit to the undersigned, except as to those items (if any) expressly excepted above and your obligation regarding any such excepted items shall cease upon the completion of the repair, adjustment or correction of same. Nothing contained herein shall be construed to excuse Sponsor from its obligations to correct defects in construction or design to the extent required in the section entitled "Rights and Obligations of Sponsor" contained in the Offering Plan for Condominium Ownership of the 135 West 52nd Street Condominium. The undersigned shall be required to complete the payment of the Purchase Price (without the provision for an escrow) and accept title to the Unit on the closing date notwithstanding the presence of any exceptions.

Very truly yours,

_____
Purchaser's Signature

Agreed To:
135 West 52nd Street Owner
LLC

_____
Purchaser's Signature

By: _____

23

## PURCHASE AGREEMENT

AGREEMENT made as of August 3, 2014 between 135 WEST 62ND STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and Rui Huang residing at Wangjing Ccuii 68 Building 1st Unit, #501, ChaoYang, Beijing, CHINA ("Purchaser").

Purchaser's Attorney:   Allison G. Fung, Esq.

Address:   136-20 38th Avenue #11D

Flushing, New York 11354

Telephone: (718) 321 - 7000   Fax.   (718) 762 - 7679   Email: agfesq@gmail.com

Percentage of Common Interest: 0.6900%   Common Charges: $1,654.26 per month

Residential Percentage of Common Interest: 0.9316%

Co-Broker: Block and Lot Real Estate Management, Inc. (Liangshi "Michael" Mei)

Real Estate Taxes: $2,175.68 per month;   B.I.D. Tax: $19.99 per month;

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 32A ("Unit") in the building ("Building") known as 135 WEST 62ND STREET Condominium ("Condominium") and located at 135 WEST 62ND STREET, New York, New York 10019, together with a 0.6900% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

### 1.   Purchase Price

(a) The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below ("Purchase Price") is $3,800,000.00, payable as follows:

(i) $540,000.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5; and

(ii) $3,060,000.00 constituting the balance of the Purchase Price ("Balance"), by certified check of Purchaser or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined). All checks in payment of the balance of the Purchase Price shall be payable to the order of Sponsor (or as Sponsor otherwise directs. Sponsor reserves the right to require Purchaser to pay the Balance or any portion thereof in "immediately available funds" (i.e. by wire transfer to a bank account designated by Sponsor).

(c) All checks shall be unendorsed, made payable to the direct order of "Rosen Livingston & Cholst LLP, as Escrow Agent" or (as to the Balance) to "135 West 62ND Street Owner LLC" or such payees as Sponsor may direct on not less than two (2) business days' prior oral or written notice to Purchaser. All checks shall be drawn on a bank that is a member of the New York

Clearing House Association. All checks must be payable directly to the order of the required payee; they may not be endorsed.

(d) Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement, including the Sponsor's obligation to close and, unless otherwise set forth herein, none of the provisions of this Agreement shall survive the closing. However, nothing contained herein shall absolve Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of Purchaser under Article 23-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.

(e) Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under "Terms of Sale - Prerequisites to Closing of Title" in Part I of the Plan are met concurrently with, or prior to, closing.

### 2.   Definitions   The following terms shall have the meanings ascribed to them:

(a) "Building" shall mean the building located at 135 West 62ND Street, New York, New York 10018.

(b) "Closing Date", "closing", "closing of title" and words of similar import are used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment to Sponsor of the Purchase Price and the delivery to Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.

(c) "Condominium" shall mean The 135 West 62ND Street Condominium.

(d) "Declaration" shall mean the Declaration of the 135 West 62ND Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.

(e) "Depository" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.

(f) "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.

(g) "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon made fully described in the Declaration.

(h) "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.

All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

### 3.   Plan

(a) Purchaser represents that Purchaser has possessed the Plan and any filed amendments thereto at least three (3) business days prior to submitting this Purchase Agreement, or

(b) In the event Purchaser does not wish to wait three (3) business days) Purchaser has the right to rescind this Purchase Agreement by sending written notice of his rescission to the Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement (time being of the essence to exercise such right of rescission within such seven (7) day period).

(c) Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Condominium Documents set forth in Part II of the Plan and Parts A, B and C of the

1

2

---

Exhibits submitted with the Plan to the Department of Law) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan (including updating of the projected Common Charges, the projected real estate taxes to be paid by Purchaser, or Schedule B "Budget for the First Year of Condominium Operation"). Except in the case of a material adverse amendment affecting Purchaser's Unit or as otherwise provided under the Plan, any such amendments shall neither excuse Purchaser from performing Purchaser's obligations hereunder nor entitle Purchaser to any offset or credit against the Purchase Price or claim or right of action against Sponsor, and any such amendment may be filed by Sponsor without Purchaser's consent or approval. However, Sponsor shall not have the right to unilaterally cancel this Agreement except as herein provided (such as in the case of an uncured default by Purchaser) nor change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.

(d) The Plan is hereby incorporated in this Agreement with the same force and effect as if set forth at length. In the event of any inconsistency or conflict between the provisions of this Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding. Purchaser acknowledges having had full opportunity to examine all documents and investigate all statements made herein and in the Plan.

### 4.   Personal Property

(a) At closing, the Unit will contain only those appliances, countertops, cabinets, flooring, sinks, vanities (if any), air conditioning units (if any), hardware and other fixtures and equipment installed therein as set forth in the Plan.

Sponsor has the right to substitute other appliances, countertops, cabinets, sinks, vanities, flooring and fixtures in place of those referred to in the Plan provided only that the substitutions are of equal or better quality and design.

(b) The Unit is being sold unfurnished, without window blinds or shades. Furniture, floor coverings, wall coverings, furnishings, decorations and the like in or about any model Unit are for display purposes only and are not included in this sale except to the extent set forth in the Plan. Any floor plans or sketches shown to Purchaser (including those contained in the Plan) are only approximations of the Unit's dimensions and arrangement and Purchaser acknowledges and agrees that he is not relying thereon. Sponsor shall not be liable for minor variations from any floor plans or structures.

(c) Sales model apartments may, at Sponsor's option, be sold furnished at a later date but will initially be withheld from sale.

(d) There will be no modifications or extras unless agreed to in writing by the parties. All modifications and alterations must be approved by Sponsor in writing and, if approved, shall be performed by Sponsor at Purchaser's expense (payable in the manner to be set forth in an addendum to this Agreement or by separate agreement between Sponsor and Purchaser).

### 5.   Purchase Monies to be Held in Trust

(a) The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, New York, NY 10016, telephone number 212 687 7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser. Escrow Agent has designated the following attorneys to serve as signatories. Morton H Rosen, Peter I. Livingston, Mary L. Kosmark, Bruce A. Cholst. All designated signatories are admitted to practice law in the State of New York. Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor, Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

(b) The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York. The escrow account is entitled "[Purchaser's Name/Rosen Livingston & Cholst LLP Escrow Agent" ("Escrow Account"). The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit. Any deposit in excess of $250,000 will not be insured.

All Deposits received by Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP as Escrow Agent.

Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of a written agreement between Purchaser and Sponsor.

The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts, which is currently 0.2%. Interest shall begin to accrue upon placing the Deposit into the Escrow Account. All interest earned thereon shall be paid to or credited to the Purchaser at closing. No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account. The Escrow Agreement appended hereto as Exhibit "A."

The Down Payment will not earn interest until the Purchaser's check has been deposited and cleared. Sponsor will be liable to Purchaser only for the amount of interest actually received from the Depository (which interest may be reduced by the Depository's service charge). The interest on the Down Payment, as same may be reduced by the Depository's service charge, is hereinafter referred to as "interest".

Upon the payment and performance by Purchaser of all of Purchaser's obligations hereunder and the transfer to Purchaser of title to the Unit, Sponsor will instruct the Depository to pay to Purchaser any and all interest on monies deposited hereunder. It is possible that Purchaser may not receive interest on the Down Payment for the entire month in which the closing is scheduled to occur. The Sponsor and Selling Agent will not be liable to Purchaser for the amount of such interest or the payment thereof, except for any amount received from the Depository. All funds due to Sponsor and received under this Purchase Agreement will be handled in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and with Section 71-a(5) of the New York Lien Law.

### 6.   Closing of Title

(a) The closing of title shall occur on the date and at the time and place in the City and State of New York as Sponsor shall designate to Purchaser on not less than thirty (30) days' prior written notice (unless waived by Purchaser). Sponsor shall have the right, from time to time, to adjourn such date and time for closing on written notice to Purchaser. If the Closing is adjourned by Sponsor, then Sponsor shall fix a new date and time for closing and shall give Purchaser not less than ten (10) days' prior written notice of the new scheduled date and time for closing.

(b) The closing of title shall occur only after or concurrently with compliance with the prerequisites set forth under "Terms of Sale Prerequisites to Closing of Title" in Part I of the Plan.

3

4

(b) Purchaser will pay a fee for recording the Unit Deed and the Unit Owner's Power of Attorney;

(c) if Purchaser obtains a mortgage loan, Purchaser will pay:

(i) a fee and service charge for recording the mortgage;

(ii) a mortgage recording tax in the following amount: (a) for Residential Units, 2.05% of the face amount of a mortgage less than $500,000 for which mortgagor receives a $25 deduction, or 2.175% for a mortgage covering a Residential Unit equal to $500,000.00 or more, less $25 and (b) for non-residential Units, 2.05% of the face amount of a mortgage less than $500,000 or 2.80% for a mortgage covering a non-residential Unit equal to $500,000 or more;

(iii) if mortgage title insurance is required by Purchaser's lender, an additional premium for insuring the mortgagee's interest in an amount equal to the principal amount under the mortgage loan.

(iv) if required by Purchaser's lender, deposits for Common Charges, real estate taxes and assessments in an initial amount and in such monthly sums after closing as required by the lender (the amount of which monthly deposits may be changed periodically by the lender). The amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the policies of the lender, the number of months remaining between the closing of title and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amount of the taxes and other charges or impositions then payable; and

(v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender. Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of his lender with respect thereto;

(vi) if, in connection with the purchase, Purchaser has dealt with any broker except (A) the Selling Agent or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing.

(vii) Purchaser will pay to Rosen Livingston & Cholst LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owner's Power of Attorney, additional closing documents and for coordinating and attending the closing.

(viii) If Purchaser obtains financing and his lender refuses to close at the office of Rosen Livingston & Cholst LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and Purchaser pays Rosen Livingston & Cholst LLP, in addition to said closing fee set forth above, a travel fee of $500.00 if the closing is held in Manhattan or $700.00 if the closing is held in another borough. If the closing attended by a representative of Rosen Livingston & Cholst LLP is adjourned through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Cholst LLP an additional travel and attendance fee in the same amount as stated above for each attendance;

(viii) if Purchaser is other than a natural person, Purchaser will be required to provide a personal guaranty of Common Charges and other charges due to the Condominium and Purchaser will pay Rosen Livingston & Cholst LLP a fee of $500.00 for preparation of such Guaranty;

(ix) if Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Cholst LLP a fee of $1,000.00 for the preparation of the splitter, substitute mortgage and assignment of mortgage documents; and

9

(d) Purchaser will pay the New York State Real Estate Transfer Tax (documentary stamps) to affixed to the deed, the New York City Real Property Transfer Tax and (if applicable) the one (1%) percent "mansion tax";

(e) Purchaser will pay to 135 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit by Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.

All of the aforementioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's unendorsed, personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party, or if so directed by the Sponsor, by wire transfer.

**14.Power of Attorney to Condominium Board, Sponsor, Retail Unit Owner and Commercial Unit Owners**

At closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit (or, if no representative is present, then to Sponsor's attorney), for recording in the New York City Register's Office a Power of Attorney in favor of the Condominium Board relative to purchasing or leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owners relative to amending the Condominium Documents to the extent permitted in the Power of Attorney. An originally executed Power of Attorney shall be sent to the Condominium Board.

**15. Events of Default**

(a) The following shall constitute "Events of Default" hereunder:

(i) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 6 herein or to timely pay the applicable Rosen Livingston & Cholst LLP closing fee or any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Cholst LLP pursuant to paragraphs 12 and 13 above; or

(ii) the dishonor or failure of collection of Purchaser's Down Payment check; or

(iii) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder.

(b) Upon the occurrence of an Event of Default, Sponsor shall be entitled, in its sole and absolute discretion, to cancel this Purchase Agreement by giving Purchaser written notice of cancellation. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default. TIME IS OF THE ESSENCE TO CURE SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD. If the default is not cured within such thirty (30) day period, then this Agreement shall be deemed cancelled and Sponsor shall have the right to retain, as and for liquidated damages, the Liquidated Sum. Any sums in excess thereof, together with any interest thereon shall be returned to Purchaser after cancellation.

Notwithstanding the foregoing, if Purchaser's check in payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in which to provide good funds for Purchaser's Down Payment, in which event Sponsor shall be deemed to have waived its right to sue Purchaser on the dishonored or uncollected check; or (ii) allow Purchaser thirty (30) days in which to make good Purchaser's Down Payment and if Purchaser fails to so do within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check. In the latter case, Purchaser will also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

10

Upon cancellation of this Agreement and disposing of the Down Payment and Interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan. Thereafter, the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

**16. Risk of Loss; Casualty**

(a) Purchaser shall not be entitled to possession of the Unit nor to store any of Purchaser's furniture or belongings therein until the deed is delivered to Purchaser at closing.

(b) All other risk of loss prior to closing has been assumed by Sponsor, but without any obligation or liability of Sponsor to repair the damage or restore the Unit or its contents. If Sponsor or the Unit Owners elect to repair or replace the loss or damage, this Agreement shall continue in full force and effect, Purchaser shall not have the right to reject title to the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or replacements. Purchaser shall not be required to pay the Balance unless and until (i) the Unit has been substantially repaired as near as is reasonably possible to its condition immediately prior to the casualty; (ii) the essential services (such as gas, electricity, and heat) and a reasonable means of ingress and egress to the street have been restored; and (iii) any condition in the Unit for which a violation (if any) is noted or issued has been corrected (even if same is not yet removed of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser, its licensees, invitees and/or workers. (Sponsor will endeavor in good faith, with reasonable diligence, to remove or cause to be removed subsequent to closing all violations of record it is obligated to correct.) Any proceeds received from insurance, or in satisfaction of any claim or action in connection with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners). If such proceeds are paid to Purchaser, Purchaser shall promptly turn them over to Sponsor upon request. The provisions of the two preceding sentences shall survive the closing.

(c) In the event that Sponsor does not restore or make such repairs or restoration in accordance with the Condominium's By-Laws, this Agreement shall be deemed canceled and of no further force or effect, and Sponsor shall instruct the Depository to return to Purchaser all sums deposited hereunder, together with interest, if any, thereon, whereupon the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously canceled due to Purchaser's uncured default, Sponsor shall retain the Liquidated Sum as provided above.

**17. Inspection of Unit**

At least ten (10) days before the Balance is to be paid, Sponsor or the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Sponsor or the Selling Agent to inspect the Unit before the lapse of such ten (10) day period. Purchaser or his duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Report (in the form set forth as Exhibit B to this Agreement) and deliver same to the Sponsor or Selling Agent at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the completed Inspection Report shall not excuse Purchaser from paying the Balance when due (without provision for escrow) and shall constitute Purchaser's full acceptance of the Unit.

11

However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of the Sponsor".

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Units and the Retail Unit may be used for any lawful purpose and (ii) the Condominium Board, and the Residential Unit Owners do not have any right to approve the use or any changes in the use of the Unsold Residential Units, the Commercial Units and the Retail Unit or any part thereof. This paragraph shall survive the closing of title.

**18. No Representations**

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, furnishings and fixtures contained in model units, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms or closets therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to his purchase of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and investigation thereof). No person has been authorized to make any representations on behalf of Sponsor. No oral representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially to such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the closing of title.

**19. Negotiable Terms**

Sponsor reserves the right, in its sole and absolute discretion, to negotiate on an individual basis with each purchaser substantially more beneficial purchase terms than those offered or given to other purchasers. As a result, Purchaser may not benefit from a more favorable purchase term given to another purchaser and will not have the right to rescind this Purchase Agreement or recover his Down Payment or any other amount for not being given such benefit. The following is a list of only some of the purchase terms which may be negotiated: purchase price; the amount of the Down Payment; the right of a purchaser to cancel the Purchase Agreement and recover the Down Payment for failure to obtain financing or to close by a specific date; the closing date and minimum notice required to schedule the closing; upgraded appliances, fixtures or equipment or other alterations, improvements or additions to be performed by and at the expense of Sponsor; excusing a purchaser from closing costs and/or penalties for closing late, longer time periods to pay or perform obligations under the Purchase Agreement; elimination of "time of the essence" provisions; price or common charge rebates; assumption of payment of, or guarantee of, common charges for a given period; Sponsor financing (provided an amendment to the Plan containing the terms thereof is duly filed); allowances or credits against the purchase price for decorations; to install appliances or fixtures and granting to Purchaser the benefit of any one or more favorable terms offered or given to another purchaser.

12

7

work shall be initially deposited into the Escrow Account, and released in accordance to the terms of the Escrow Agreement.

G.     The Escrow Agent is obligated to send notice to the Purchaser once the Deposit is placed in the Escrow Account. If the Purchaser does not receive notice of such deposit within fifteen (15) business days after tender of the Deposit, he or she may cancel the Purchase Agreement within ninety (90) days after tender of the Purchase Agreement and Deposit to Escrow Agent. Complaints concerning the failure to honor such cancellation requests may be referred to the New York State Department of Law, Real Estate Finance Bureau, 120 Broadway, 23rd Floor, New York, N.Y. 10271. Rescission shall not be afforded where proof satisfactory to the Attorney General is submitted establishing that the Deposit was timely placed in the Escrow Account in accordance with the New York State Department of Law's regulations concerning Deposits and requisite notice was timely mailed to the Purchaser.

H.     All Deposits, except for advances made for upgrades, extras, or custom work received in connection with the Purchase Agreement, are and shall continue to be the Purchaser's money, and may not be comingled with any other money or pledged or hypothecated by Sponsor, as per GBL § 352-h.

I.     Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until after consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law. Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

J.     The Escrow Agent shall release the Deposit if so directed:

(a)  pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 5 upon closing of title to the Unit; or

(b) in a subsequent writing signed by both Sponsor and Purchaser; or

(c) by a final, non-appealable order or judgment of a court.

If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit. If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release. If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within said thirty (30) day period, the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above. Notwithstanding the foregoing, the Escrow Agent shall have the right at any time to deposit the Deposit contained in the Escrow Account with the clerk of the county where the Unit is located and shall give written notice to both parties of such deposit.

The Sponsor shall not object to the release of the Deposit to:

(a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an Amendment to the Plan; or

17

(b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

K.     Any provision of the [Purchase Agreement/Escrow Agreement] or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding any Deposit in trust is absolutely void. The provisions of the Attorney General's regulations and GBL §§ 352-e(2-b) and 352-h concerning escrow trust funds shall prevail over any conflicting or inconsistent provisions in the Purchase Agreement, Plan, or any amendment thereto.

L.     Escrow Agent shall maintain the Escrow Account under its direct supervision and control.

M.     A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352(h).

N.     Escrow Agent may rely upon any paper or document which may be submitted to it in connection with its duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

O.     Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-(h) and the New York State Department of Law's regulations.

P.     Sponsor shall obtain or cause the selling agent under the Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement. Q.     Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstance.

R.     Sponsor agrees to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of the obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent. This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

38. Counterpart Signature Pages

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument. This Agreement may be executed by facsimile or .pdf and such shall be deemed originals.

[Signature page follows]

18

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:                                      PURCHASER:
135 WEST 52nd STREET OWNER
LLC

By: _____          _____
      Meyer Chetrit, Principal                    Purchaser

By: _____          _____
      David Bistricer, Principal                  Co-Purchaser

(Purchaser) _____
Date Accepted: _____

(*Please initial on line and print or
type name under line.)

Purchaser acknowledges:          Initials: _____
Receipt of Offering Plan and      Purchaser
3  Amendments at _____ (A.M.)(P.M.)
KM  on ___8/18/14____, 2014; and

Delivery of Purchase                 Initials: _____
Agreement and Check for           Co-Purchaser
Down Payment at _____ (A.M.)(P.M.)
on _____, 2014

19

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:                                      PURCHASER:
135 WEST 52nd STREET OWNER
LLC

By: _____          _____
      Meyer Chetrit, Principal                    Purchaser

By: _____          _____
      David Bistricer, Principal                  Co-Purchaser

(Purchaser) _____
Date Accepted: _____

(*Please initial on line and print or
type name under line.)

Purchaser acknowledges:          Initials: _____
Receipt of Offering Plan and      Purchaser
Amendments at _____ (A.M.)(P.M.)
KM  on ___8/18/14____, 2014; and

Delivery of Purchase                 Initials: _____
Agreement and Check for           Co-Purchaser
Down Payment at _____ (A.M.)(P.M.)
on _____, 2014

19

| Item | Exceptions (if any) | Purchaser's Initials |
|---|---|---|
| (m) | Bathroom sinks: | |
| (n) | Water closet: | |
| (o) | Bath/tube: | |
| (p) | Bathroom tile: | |
| (q) | Hardware: | |
| | (doorbell, doorknob, faucets, locks, etc.) | |
| (r) | Intercom: | |

2. General Operating Condition:
   (a) All Doors: _____
   (b) All Windows: _____
   (c) All Plumbing: _____
   (d) All Hardware: _____
   (e) Other: _____

The undersigned will sign and deliver to you a separate statement signifying my (our) satisfaction with each item excepted above (if any), immediately upon the completion of the repair, adjustment or correction of same. The undersigned understands and agrees that you shall not be obligated to make any repairs, adjustments or corrections to the Unit or any portion thereof or its fixtures, appliances, equipment, etc., contained therein, from or after the date of delivery of possession of the Unit to the undersigned, except as to those items (if any) expressly excepted above and your obligation regarding any such excepted items shall cease upon the completion of the repair, adjustment or correction of same. Nothing contained herein shall be construed to excuse Sponsor from its obligations to correct defects in construction or design to the extent required in the section entitled "Rights and Obligations of Sponsor" contained in the Offering Plan for Condominium Ownership of the 135 West 52nd Street Condominium. The undersigned shall be required to complete the payment of the Purchase Price (without the provision for an escrow) and accept title to the Unit on the closing date notwithstanding the presence of any exceptions.
Very truly yours,

Purchaser's Signature _____

Purchaser's Signature _____

Agreed To:
135 West 52nd Street Owner LLC

By: _____

23

---

EXHIBIT C

TO PURCHASE AGREEMENT

APPLICATION TO PURCHASE

APPLICANT:

| Last Name | First | Middle | Date of Birth | Social Security Number |
|---|---|---|---|---|
| | | | | |

| Residence Address (City, State, Zip Code) | | Telephone No. | Years There | |
|---|---|---|---|---|

| Name and Address of Present Landlord (City, State, Zip Code) | Telephone No. |
|---|---|

| Previous Home Address (City, State, Zip Code) | Years There |
|---|---|

| Employed By | Type of Business | Position | Years There |
|---|---|---|---|

| Address | Telephone No. | Department | No. of |
|---|---|---|---|
| Dependents | | | |

$_____ $_____
Salary    Other    Income
(You need not reveal alimony,  Source of Other Income child support, or separate maintenance income, if you do not want it considered in evaluating this application.)

24

---

CO-APPLICANT:

| Last Name | First | Middle | Date of Birth | Social Security Number |
|---|---|---|---|---|
| | | | | |

| Residence Address (City, State, Zip Code) | Telephone No. | Years There |
|---|---|---|

| Name and Address of Present Landlord | Telephone No. |
|---|---|

| Previous Home Address (City, State, Zip Code) | Years There |
|---|---|

| Employed By | Type of Business | Position | Years There |
|---|---|---|---|

| Address | Telephone No. | Department | No. of |
|---|---|---|---|
| Dependents | | | |

$_____ $_____
Salary    Other Income    (You need not reveal alimony,  Source of Other Income child support, or separate maintenance income, if you do not want it considered in evaluating this application.)

25

---

ALL APPLICANTS

Liabilities: List all debts, installment loans, contracts, charge accounts, mortgages and all other applications elsewhere. If none, state "None". (Attach statement, if needed).

| Name of Bank/ Company | Address | Account No. | Original Amt. | Balance | Monthly Payments |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

List all judgments, suits, legal proceedings against you. (Attach statement giving all details). If none, state "None".

Assets - Bank Accounts

| Type | Amount | Name of Bank | Address | Account No. |
|---|---|---|---|---|
| | | | | |

Securities (Describe):          Real Estate (Describe):          Market Value

Market Value $_____                              $_____

Other Assets (Describe):                                    Life    Insurance
Coverage                                            $_____

(I) (We) certify that the information (I) (We) have furnished is true and correct. _____

(I) (We) authorize 135 West 52nd Street Owner LLC and/or its partners and/or Prudential Douglas Elliman to check (my) (our) credit history and to report to proper persons and credit bureaus its experience with my loans if grants (me) (us). This application shall remain the property of 135 West 52nd Street Owner LLC

Signature of Applicant _____          Signature of Co-Applicant _____

26

9

## PURCHASE AGREEMENT

AGREEMENT made as of September ___, 2014 between 135 WEST 52ND STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and Rui Huang residing at Wangjing Coull 8# Building 1st Unit, #601, ChaoYang, Beijing, CHINA ("Purchaser").

Purchaser's Attorney: Allison G. Fung, Esq.

Address:   136-20 38th Avenue #11D

Flushing, New York 11354

Telephone: (718) 321 - 7000   Fax:  (718) 762 - 7679   Email: agfesq@gmail.com

Percentage of Common Interest: 0.6200%  Common Charges: $1,338.39 per month

Residential Percentage of Common Interest: 0.8022%

Co-Broker: Block and Lot Real Estate Management, Inc. (Liangsh "Michael" Mei)

Real Estate Taxes: $1,873.50 per month;   B.I.D. Tax $17.18 per month;

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 32B ("Unit") in the building ("Building") known as 135 WEST 52ND STREET Condominium ("Condominium") and located at 135 WEST 52ND STREET, New York, New York 10019, together with a 0.6200% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York and the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

**1.  Purchase Price**

(a) The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below ("Purchase Price") is $3,100,000.00, payable as follows:

(i) $465,000.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5, and

(ii) $2,635,000.00, constituting the balance of the Purchase Price ("Balance"), by certified check or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State.  All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined).  All checks in payment of the balance of the Purchase Price shall be payable to the order of Sponsor (or as Sponsor otherwise directs.  Sponsor reserves the right to require Purchaser to pay the Balance or any portion thereof in "immediately available funds" (i.e. by wire transfer to a bank account designated by Sponsor)).

(c) All checks shall be uncollected, made payable to the direct order of "Rosen Livingston & Cholst LLP, as Escrow Agent" or (as to the Balance) to "135 West 52ND Street Owner LLC" or such payees as Sponsor may direct on not less than two (2) business days' prior oral or written notice to Purchaser.  All checks shall be drawn on a bank that is a member of the New York

1

Clearing House Association.  All checks must be payable directly to the order of the required payees; they may not be endorsed.

(d) Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing and, unless otherwise set forth herein, none of the provisions of this Agreement shall survive the closing.  However, nothing contained herein shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of Purchaser under Article 23-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.

(e) Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under "Terms of Sale - Prerequisites to Closing of Title" in Part I of the Plan are met concurrently with, or prior to, closing.

**2.  Definitions**   The following terms shall have the meanings ascribed to them:

(a) "Building" shall mean the building located at 135 West 52ND Street, New York, New York 10019.

(b) "Closing Date," "closing", "closing of title" and words of similar import are used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment of the Purchase Price and the delivery to Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.

(c) "Condominium" shall mean The 135 West 52ND Street Condominium.

(d) "Declaration" shall mean the Declaration of the 135 West 52ND Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.

(e) "Depository" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.

(f) "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.

(g) "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.

(h) "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.

All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

**3.  Plan**

(a) Purchaser represents that Purchaser has possessed the Plan and any filed amendments thereto at least three (3) business days prior to submitting this Purchase Agreement; or

(b) in the event Purchaser does not wish to wait three (3) business days Purchaser has the right to rescind this Purchase Agreement by sending written notice of his rescission to the Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement (time being of the essence to exercise such right of rescission within such seven (7) day period).

(c) Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Condominium Documents set forth in Part II of the Plan and Parts A, B and C of the

2

Exhibits submitted with the Plan to the Department of Law) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor (including, without limitation, amendments involving any changes, modifications, or updating of the projected Common Charges, the projected real estate taxes to be paid by Purchaser, or Schedule B "Budget for the First Year of Condominium Operation").  Except in the case of a material adverse amendment affecting Purchaser's Unit or as otherwise provided under the Plan, any such amendments shall neither excuse Purchaser from performing Purchaser's obligations hereunder nor entitle Purchaser to any offset or credit against the Purchase Price or claim or right of action against Sponsor, and any such amendment may be filed by Sponsor without Purchaser's consent or approval.  However, Sponsor shall not have the right to unilaterally cancel this Agreement except as herein provided (such as in the case of an uncured default by Purchaser) nor change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.

(d) The Plan is hereby incorporated in this Agreement with the same force and effect as if set forth at length.  In the event of any inconsistency or conflict between the provisions of this Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding.  Purchaser acknowledges having had full opportunity to examine all documents and investigate all statements made herein and in the Plan.

**4.  Personal Property**

(a) At closing, the Unit will contain only those appliances, countertops, cabinets, flooring, sinks, vanities (if any), air conditioning units (if any), hardware and other fixtures and equipment installed therein as set forth in the Plan.

Sponsor has the right to substitute other appliances, countertops, sinks, vanities, flooring and fixtures in place of those referred to in the Plan provided only that the substitutions are of equal or better quality and design.

(b) The Unit is being sold unfinished, without window blinds or shades.  Furniture, floor coverings, wall coverings, furnishings, decorations and the like in or about any model Unit are for display purposes only and are not included in this sale except to the extent set forth in the Plan.  Any floor plans or sketches shown to Purchaser (including those contained in the Plan) are only approximations of the Unit's dimensions and arrangement and Purchaser acknowledges and agrees that he is not relying thereon.  Sponsor shall not be liable for minor variations from any floor plans or structures.

(c) Sales model apartments may, at Sponsor's option, be sold furnished at a later date but will initially be withheld from sale.

(d) There will be no modifications or extras unless agreed to in writing by the parties.  All modifications and alterations must be approved by Sponsor in writing and, if approved, shall be performed by Sponsor and at Purchaser's expense (payable in the manner to be set forth in an addendum to this Agreement or by separate agreement between Sponsor and Purchaser).

**5.  Purchase Monies to be Held in Trust**

(a) The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, New York, NY 10016, telephone number 212 867 7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser.  Escrow Agent has designated the following attorneys to serve as signatories: Morton H Rosen, Peter I. Livingston, Mary L. Kesmark, Bruce A. Cholst.  All designated signatories are admitted to practice law in the State of New York.  Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor, Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

3

(b) The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York.  The escrow account is entitled "[Purchaser's Name] Rosen Livingston & Cholst LLP Escrow Agent" ("Escrow Account").  The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit.  Any deposit in excess of $250,000 will not be insured.

All Deposits received by Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP as Escrow Agent.

Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of a written agreement between Purchaser and Sponsor.

The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts, which is currently 0.2%.  Interest shall begin to accrue upon placing the Deposit into the Escrow Account.  All interest earned thereon shall be paid to or credited to the Purchaser at closing.  No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account.  The Escrow Agreement appended hereto as Exhibit "A."

The Down Payment will not earn interest until the Purchaser's check has been deposited and cleared.  Sponsor will be liable to Purchaser only for the amount of interest actually received from the Depository (which interest may be reduced by the Depository's service charge).  The interest on the Down Payment, as same may be reduced by the Depository's service charge, is hereinafter referred to as "Interest".

Upon the payment and performance by Purchaser of all of Purchaser's obligations hereunder and the transfer to Purchaser of title to the Unit, Sponsor will instruct the Depository to pay to Purchaser any and all Interest on monies deposited hereunder.  It is possible that Purchaser may not receive Interest on the Down Payment for the entire month in which the closing is scheduled to occur.  The Sponsor and Selling Agent will not be liable to Purchaser for the amount of such Interest or the payment thereof, except for any amount received from the Depository.  All funds due to Sponsor and received under this Purchase Agreement will be handled in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and with Section 71-a(3) of the New York Lien Law.

**6.  Closing of Title**

(a) The closing of title shall occur on the date and at the time and place in the City and State of New York as Sponsor shall designate to Purchaser on not less than thirty (30) days' prior written notice (unless waived by Purchaser).  Sponsor shall have the right, from time to time, to adjourn such date and time for closing on written notice to Purchaser.  If the Closing is adjourned by Sponsor, then Sponsor shall fix a new date and time for closing and shall give Purchaser not less than ten (10) days' prior written notice of the new scheduled date and time for closing.

(b) The closing of title shall occur only after or concurrently with compliance with the prerequisites set forth under "Terms of Sale Prerequisites to Closing of Title" in Part I of the Plan.

4

(b) Purchaser will pay a fee for recording the Unit Deed and the Unit Owner's Power of Attorney;

(c) If Purchaser obtains a mortgage loan, Purchaser will pay:

(i) a fee and service charge for recording the mortgage;

(ii) a mortgage recording tax in the following amount: (a) for Residential Units, 2.05% of the face amount of a mortgage less than $500,000 for which mortgagor receives a $25 deduction, or 2.175% for a mortgage covering a Residential Unit equal to $500,000.00 or more, less $25 and (b) for non-residential Units, 2.05% of the face amount of a mortgage less than $500,000 or 2.80% for a mortgage covering a non-residential Unit equal to $500,000 or more;

(iii) if mortgage title insurance is required by Purchaser's lender, an additional premium for insuring the mortgagee's interest in an amount equal to the principal amount of the mortgage loan.

(iv) if required by Purchaser's lender, deposits for Common Charges, real estate taxes and assessments in an initial amount and in such monthly sums after closing as required by the lender (the amount of which monthly deposits may be changed periodically by the lender). The amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the policies of the lender, the number of months remaining between the closing of title and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amount of the taxes and other charges or impositions then payable; and

(v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender. Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of his lender with respect thereto;

(vi) if, in connection with this purchase, Purchaser has dealt with any broker except (A) the Selling Agent or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing;

(vii) Purchaser will pay to Rosen Livingston & Cholst LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owner's Power of Attorney, additional closing documents and for coordinating and attending the closing.

(viii) If Purchaser obtains financing and his lender refuses to permit the use of the office of Rosen Livingston & Cholst LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and Purchaser pays Rosen Livingston & Cholst LLP, in addition to and including the out of town above, a travel fee of $500.00 if the closing is held in Manhattan or $700.00 if the closing is held in another borough. If the closing attended by a representative of Rosen Livingston & Cholst LLP is adjourned through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Cholst LLP an additional travel and attendance fee in the same amount as stated above for each attendance;

(ix) If Purchaser is other than a natural person, Purchaser will be required to provide a personal guaranty of Common Charges and other charges due to the Condominium and Purchaser will pay Rosen Livingston & Cholst LLP a fee of $500.00 for preparation of such Guaranty;

(x) If Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Cholst LLP a fee of $1,000.00 for the preparation of the splitter, substitute mortgage and assignment of mortgage documents; and

9

(d) Purchaser will pay the New York State Real Estate Transfer Tax (documentary stamps) to be affixed to the deed, the New York City Real Property Transfer Tax and (if applicable) the one (1%) percent "mansion tax";

(e) Purchaser will pay to 135 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit by Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.

All of the aforementioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's unendorsed, personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party, or if so directed by the Sponsor, by wire transfer.

## 14. Power of Attorney to Condominium Board, Sponsor, Retail Unit Owner and Commercial Unit Owners

At closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit (or, if no representative is present, then to Sponsor's attorney), for recording in the New York City Register's Office a Power of Attorney in favor of the Condominium Board relative to purchasing Register's Office a Power of Attorney in favor of Sponsor, the Retail Unit Owner and the or leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owners relative to amending the Condominium Documents to the extent permitted in the Power of Attorney. An originally recorded Power of Attorney shall be sent to the Condominium Board.

## 15. Events of Default

The following shall constitute "Events of Default" hereunder:

(a) The following shall constitute "Events of Default" hereunder:

(i) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 5 herein or to timely pay the applicable Rosen Livingston & Cholst LLP closing fee or any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Cholst LLP pursuant to paragraphs 12 and 13 above; or

(ii) the dishonor or failure of collection of Purchaser's Down Payment check; or

(iii) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder.

(b) Upon the occurrence of an Event of Default, Sponsor shall be entitled, in its sole and absolute discretion, to cancel this Purchase Agreement by giving Purchaser written notice of cancellation. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default. TIME IS OF THE ESSENCE TO CURE SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD. If the default is not cured within such thirty (30) day period, then this Agreement shall be deemed cancelled and Sponsor shall have the right to retain, as and for liquidated damages, the Liquidated Sum. Any sums in excess thereof, together with any interest thereon shall be returned to Purchaser after cancellation.

Notwithstanding the foregoing, if Purchaser's check in payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in which to provide good funds for Purchaser's Down Payment, in which event Sponsor shall be deemed to have waived its right to sue Purchaser on the dishonored or uncollected check; or (ii) allow Purchaser thirty (30) days in which to make good Purchaser's Down Payment and if Purchaser fails to so do within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check. In the latter case, Purchaser will also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

10

Upon cancellation of this Agreement and disposing of the Down Payment and Interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan. Thereafter, the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

## 16. Risk of Loss; Casualty

(a) Purchaser shall not be entitled to possession of the Unit nor to store any of Purchaser's furniture or belongings therein until the Unit is delivered to Purchaser at closing.

(b) All other risk of loss prior to closing has been assumed by Sponsor, but without any obligation or liability of Sponsor to repair the damage or restore the Unit or its contents. If Sponsor or the Unit Owners elect to repair or replace the loss or damage, this Agreement shall continue in full force and effect, Purchaser shall not have the right to reject title to the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or replacements. Purchaser shall not be required to pay the Balance unless and until (i) the Unit has been substantially repaired as near as is reasonably possible to its condition immediately prior to the casualty; (ii) its essential services (such as gas, electricity, and heat) and a reasonable means of ingress and egress to the street have been restored; and (iii) any condition in the Unit for which a violation (if any) is noted or issued has been corrected (even if same is not yet removed of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser, its licensees, invitees and/or workers. (Sponsor will endeavor in good faith, and with reasonable diligence, to remove or cause to be removed subsequent to closing all violations of record it is obligated to correct.) Any proceeds received from insurance, or in satisfaction of any claim or action in connection with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners). If such proceeds are paid to Purchaser, Purchaser shall promptly turn them over to Sponsor upon request. The provisions of the two preceding sentences shall survive the closing.

(c) In the event that Sponsor notifies Purchaser that it does not elect to repair or restore the Unit or if the Unit Owners do not resolve to make such repairs or restoration in accordance with the Condominium's By-Laws, this Agreement shall be deemed cancelled and of no further force or effect, and Sponsor shall instruct the Depository to return to Purchaser all sums deposited hereunder, together with interest, if any, thereon, whereupon the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously cancelled due to Purchaser's uncured default, Sponsor shall retain the Liquidated Sum as provided above.

## 17. Inspection of Unit

At least ten (10) days before the Balance is to be paid, Sponsor or the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Sponsor or the Selling Agent to inspect the Unit before the lapse of such ten (10) day period. Purchaser or his duly authorized designee shall inspect the Unit and shall complete, date and sign the Inspection Report (in the form set forth as Exhibit B to this Agreement) and deliver same to the Sponsor or Selling Agent at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the completed Inspection Report shall not excuse Purchaser from paying the Balance when due (without provision for escrow) and shall constitute Purchaser's full acceptance of the Unit.

11

However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of the Sponsor".

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Units and the Retail Unit may be used for any lawful purpose and (ii) the Condominium Board, and the Residential Unit Owners do not have any right to approve the use or any changes in the use of the Unsold Residential Units, the Commercial Units and the Retail Unit or any part thereof. This paragraph shall survive the closing of title.

## 18. No Representations

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, furnishings and fixtures contained in model units, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms or closets therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to his purchase of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and investigation thereof). No person has been authorized to make any representations on behalf of Sponsor. No representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially to such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the closing of title.

## 19. Negotiable Terms

Sponsor reserves the right, in its sole and absolute discretion, to negotiate on an individual basis with each purchaser substantially more beneficial purchase terms than those offered or given to other purchasers. As a result, Purchaser may not benefit from a more favorable purchase term given to another purchaser and will not have the right to rescind this Purchase Agreement or recover his Down Payment or any other amount for not having given such benefit. The following is a list of only some of the purchase terms which may be negotiated: purchase price; the amount of the Down Payment; the right of a purchaser to assign by a purchase Agreement and recover the Down Payment for failure to obtain financing or to close by a specific date; the closing date and minimum notice required to schedule the closing; upgraded appliances, fixtures or equipment or other alterations, improvements or additions to be performed by and at the expense of Sponsor; excusing a purchaser from closing costs and/or penalties for closing late; longer time periods to pay or perform obligations under the Purchase Agreement; elimination of "time of the essence" provisions; price or common charge rebates; assumption of payment of, or guarantee of, common charges for a given period; Sponsor financing (provided an amendment to the Plan containing the terms thereof is duly filed); allowances or credits against the purchase price for decorations; to install appliances or fixtures and granting to Purchaser the benefit of any one or more favorable terms offered or given to another purchaser.

12

11

work shall be initially deposited into the Escrow Account, and released in accordance to the terms of the Escrow Agreement.

G.    The Escrow Agent is obligated to send notice to the Purchaser once the Deposit is placed in the Escrow Account. If the Purchaser does not receive notice of such deposit within fifteen (15) business days after tender of the Deposit, he or she may cancel the Purchase Agreement within ninety (90) days after tender of the Purchase Agreement and Deposit to Escrow Agent. Complaints concerning the failure to honor such cancellation requests may be referred to the New York State Department of Law, Real Estate Finance Bureau, 120 Broadway, 23rd Floor, New York, N.Y. 10271. Rescission shall not be afforded where proof satisfactory to the Attorney General is submitted establishing that the Deposit was timely placed in the Escrow Account in accordance with the New York State Department of Law's regulations concerning Deposits and requisite notice was timely mailed to the Purchaser.

H.    All Deposits, except for advances made for upgrades, extras, or custom work received in connection with the Purchase Agreement, are and shall continue to be the Purchaser's money, and may not be comingled with any other money or pledged or hypothecated by Sponsor, as per GBL § 352-h.

I.    Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until after consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law. Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

J.    The Escrow Agent shall release the Deposit if so directed:

(a) pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 5 upon closing of title to the Unit; or

(b) in a subsequent writing signed by both Sponsor and Purchaser; or

(c) by a final, non-appealable order or judgment of a court.

If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit. If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release. If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within said thirty (30) day period, the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above. Notwithstanding the foregoing, the Escrow Agent shall have the right at any time to deposit the Deposit contained in the Escrow Account with the clerk of the county where the Unit is located and shall give written notice to both parties of such deposit.

The Sponsor shall not object to the release of the Deposit to:

(a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an Amendment to the Plan, or

17

(b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

K.    Any provision of the [Purchase Agreement/Escrow Agreement] or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding any Deposit in trust is absolutely void. The provision of the Attorney General's regulations and GBL §§ 352-e(2-b) and 352-h concerning escrow trust funds shall prevail over any conflicting or inconsistent provisions in the Purchase Agreement, Plan, or any amendment thereto.

L.    Escrow Agent shall maintain the Escrow Account under its direct supervision and control.

M.    A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352(h).

N.    Escrow Agent may rely upon any paper or document which may be submitted to it in connection with its duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

O.    Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-(h) and the New York State Department of Law's regulations.

P.    Sponsor shall obtain or cause the selling agent under the Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement. Q.    Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstances.

R. Sponsor agrees to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of the obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent. This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

38. Counterpart Signature Pages

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument. This Agreement may be executed by facsimile or .pdf and each such shall be deemed originals.

[Signature follows]

18

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:                              PURCHASER:
135 WEST 52ND STREET OWNER
LLC
By: _____          _____
    Meyer Chetrit, Principal              Purchaser

By: _____          _____
    David Bistricer, Principal            Co-Purchaser

(Purchaser)
Date Accepted:

(*Please initial on line and print or
type name under line.)

Purchaser acknowledges:
Receipt of Offering Plan and
Amendments at _____ (A.M.)(P.M.)
on _____, 2014; and

Delivery of Purchase
Agreement and Check for
Down Payment at _____ (A.M.)(P.M.)
on _____, 2014

Initials: _____
Purchaser: _____

Initials: _____
Co-Purchaser: _____

19

| Item | Exceptions (if any) | Purchaser's Initials |
|---|---|---|
| (m) | Bathroom sinks: | |
| (n) | Water closet: | |
| (o) | Bathtubs: | |
| (p) | Bathroom tile: | |
| (q) | Hardware: | |
| | (doorbell, doorknob, faucets, locks, etc.) | |
| (r) | Intercom: | |

2. General Operating Condition:
   (a) All Doors:
   (b) All Windows:
   (c) All Plumbing:
   (d) All Hardware:
   (e) Other:

The undersigned will sign and deliver to you a separate statement signifying my (our) satisfaction with each item excepted above (if any), immediately upon the completion of the repair, adjustment or correction of same. The undersigned understands and agrees that you shall not be obligated to make any repairs, adjustments or corrections to the Unit or any portion thereof or its fixtures, appliances, equipment, etc., contained therein, from or after the date of delivery of possession of the Unit to the undersigned, except as to those items (if any) expressly excepted above and your obligation regarding any such excepted items shall cease upon the completion of the repair, adjustment or correction of same. Nothing contained herein shall be construed to excuse Sponsor from its obligations to correct defects in construction or design to the extent required in the section entitled "Rights and Obligations of Sponsor" contained in the Offering Plan for Condominium Ownership of the 135 West 52ⁿᵈ Street Condominium. The undersigned shall be required to complete the payment of the Purchase Price (without the provision for an escrow) and accept title to the Unit on the closing date notwithstanding the presence of any exceptions.

Very truly yours,

Purchaser's Signature _____

Purchaser's Signature _____

Agreed To:
135 West 52ⁿᵈ Street Owner LLC

By: _____

23

---

EXHIBIT C

TO PURCHASE AGREEMENT

APPLICATION TO PURCHASE

APPLICANT:

| Last Name | First | Middle | Date of Birth | Social Security Number |
|---|---|---|---|---|

Residence Address          Telephone No.     Years There
(City, State, Zip Code)

Name and Address of Present Landlord                    Telephone No.
(City, State, Zip Code)

Previous Home Address                                   Years There
(City, State, Zip Code)

| Employed By | Type of Business | Position | Years There |
|---|---|---|---|

Address          Telephone No.     Department     No.          of
   Dependents

$_____   $_____
Salary     Other     Income
(You need not reveal alimony,  Source of Other Income child support, or separate maintenance income, if you do not want it considered in evaluating this application.)

24

---

CO-APPLICANT:

| Last Name | First | Middle | Date of Birth | Social Security Number |
|---|---|---|---|---|

Residence Address          Telephone No.     Years There
(City, State, Zip Code)

Name and Address of Present Landlord                    Telephone No.

Previous Home Address                                   Years There
(City, State, Zip Code)

| Employed By | Type of Business | Position | Years There |
|---|---|---|---|

Address          Telephone No.     Department     No.          of
   Dependents

$_____   $_____
Salary     Other Income     (You need not reveal alimony,  Source of Other Income child support, or separate maintenance income, if you do not want it considered in evaluating this application.)

25

---

ALL APPLICANTS

Liabilities:  List all debts, installment loans, contracts, charge accounts, mortgages and all other applications elsewhere.  If none, state "None". (Attach statement, if needed).

| Name of Bank/ Company | Address | Account No. | Original Amt. | Balance | Monthly Payments |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

List all judgments, suits, legal proceedings against you.  (Attach statement giving all details).  If none, state "None".

Assets - Bank Accounts

| Type | Amount | Name of Bank | Address | Account No. |
|---|---|---|---|---|

Securities (Describe):          Real Estate (Describe):          Market Value

Market Value  $_____          $_____

Other Assets (Describe):                          Life     Insurance
   Coverage

$_____

(I) (We) certify that the information (I) (We) have furnished is true and correct.

(I) (We) authorize 135 West 52ⁿᵈ Street Owner LLC and/or its partners and/or Prudential Douglas Elliman to check (my) (our) credit history and to report to proper persons and credit bureaus its experience with any loan it grants (me) (us).  This application shall remain the property of 135 West 52ⁿᵈ Street Owner LLC.

Signature of Applicant                    Signature of Co-Applicant

26

## PURCHASE AGREEMENT

AGREEMENT made as of August 22, 2014 between 135 WEST 52ND STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and One Thirty Five 32C LLC residing at c/o Rheem Bell & Mermelstein, LLP, 302 5th Avenue, 8th Floor, New York, New York 10001 ("Purchaser").

Purchaser's Attorney: Christine Bell, Esq.

Address: Rheem Bell & Mermelstein, LLP

302 5th Avenue, 8th Floor

New York, New York 10001

Telephone: (212) 239 – 4001 (x102) Fax: (212) 239 - 4125 Email: Christine@rbmllp.com

Percentage of Common Interest: 0.6900% Common Charges: $1,554.26 per month

Residential Percentage of Common Interest: 0.9316%

Co-Brokers: One and Only Realty, Inc. (Gennady Perepada)

Real Estate Taxes: $2,175.68 per month;    B.I.D. Tax: $19.89 per month;

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 32C ("Unit") in the building ("Building") known as 135 WEST 52ND STREET Condominium ("Condominium") and located at 135 WEST 52ND STREET, New York, New York 10019, together with a 0.6900% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York and the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

### 1.  Purchase Price

(a)  The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below ("Purchase Price") is $3,600,000.00, payable as follows:

(i) $540,000.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5; and

(ii) $3,060,000.00, constituting the balance of the Purchase Price ("Balance"), by certified check of Purchaser or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined). All checks in payment of the Balance of the Purchase Price shall be payable to the order of Sponsor (or as Sponsor otherwise directs).

(c) All checks shall be unendorsed, made payable to the direct order of "Rosen Livingston & Cholst LLP, as Escrow Agent" or (as to the Balance) to "135 West 52ND Street Owner LLC" or such payees as Sponsor may direct on not less than two (2) business days prior or written notice to Purchaser. All checks shall be drawn on a bank that is a member of the New York Clearing House Association. All checks must be payable directly to the order of the required payee; they may not be endorsed.

1

(including, without limitation, amendments involving any changes, modifications, or updating of the projected Common Charges, the projected real estate taxes to be paid by Purchaser, or Schedule B "Budget for the First Year of Condominium Operation"). Except in the case of a material adverse amendment affecting Purchaser's Unit or as otherwise provided under the Plan, any such amendments shall neither require Purchaser from performing Purchaser's obligations hereunder nor entitle Purchaser to any offset or credit against the Purchase Price or claim or right of action against Sponsor, and any such amendment may be filed by Sponsor without Purchaser's consent or approval.  However, Sponsor shall not have the right to unilaterally cancel this Agreement except as herein provided (such as in the case of an uncured default by Purchaser) or change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.

(d) The Plan is hereby incorporated in this Agreement with the same force and effect as if set forth at length. In the event of any inconsistency or conflict between the provisions of this Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding.  Purchaser acknowledges having had full opportunity to examine all documents and investigate all statements made herein and in the Plan.

### 4.  Personal Property

(a) At closing, the Unit will contain only those appliances, countertops, cabinets, flooring, sinks, vanities (if any), air conditioning units (if any), hardware and other fixtures and equipment installed therein as set forth in the Plan.

Sponsor has the right to substitute other appliances, countertops, cabinets, sinks, vanities, flooring and fixtures in place of those referred to in the Plan provided only that the substitutions are of equal or better quality and design.

(b) The Unit is being sold unfurnished, without window blinds or shades.  Furniture, floor coverings, wall coverings, furnishings, decorations and the like in or about any model Unit are for display purposes only and are not included in this sale except to the extent set forth in the Plan.  Any floor plans or sketches shown to Purchaser (including those contained in the Plan) are only approximations of the Unit's dimensions and arrangement and Purchaser acknowledges and agrees that he is not relying thereon. Sponsor shall not be liable for minor variations from any floor plans or structures.

(c) Unless model apartments may, at Sponsor's option, be sold furnished at a later date but will in fact be withheld from sale.

(d) There will be no modifications or extras unless agreed to in writing by the parties.  All modifications and alterations must be approved by Sponsor in writing and, if approved, shall be performed by Sponsor at Purchaser's expense (payable in the manner to be set forth in an addendum to this Agreement, or by separate agreement between Sponsor and Purchaser).

### 5.  Purchase Monies to be Held in Trust

(a) The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, New York, NY 10016, telephone number 212 687 7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser.  Escrow Agent has the authority to designate the following attorneys to serve as signatories: Morton H. Rosen, Peter I. Livingston, Mary L. Kennark, Bruce A. Cholst.  All designated signatories are admitted to practice law in the State of New York. Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor, Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

(b) The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State

3

(d) Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing and, unless otherwise set forth herein, none of the provisions of this Agreement shall survive the closing.  However, nothing contained herein shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of Purchaser under Article 23-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.

(e) Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under "Terms of Sale - Prerequisites to Closing of Title" in Part I of the Plan are met concurrently with, or prior to, closing.

### 2.  Definitions   The following terms shall have the meanings ascribed to them:

(a) "Building" shall mean the building located at 135 West 52ND Street, New York, New York 10019.

(b) "Closing Date", "closing", "closing of title" and words of similar import are used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment to Sponsor of the Purchase Price and the delivery to Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.

(c) "Condominium" shall mean The 135 West 52ND Street Condominium.

(d) "Declaration" shall mean the Declaration of the 135 West 52ND Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.

(e) "Depository" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.

(f) "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.

(g) "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.

(h) "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.

All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

### 3.  Plan

(a) Purchaser represents that Purchaser has possessed the Plan and any filed amendments thereto at least three (3) business days prior to submitting this Purchase Agreement; or

(b) in the event Purchaser does not wish to wait three (3) business days) Purchaser has the right to rescind this Purchase Agreement by sending written notice of his rescission to the Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement (time being of the essence to exercise such right of rescission within such seven (7) day period).

(c) Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Condominium Documents set forth in Part II of this Plan and Parts A and B of the Exhibits submitted with the Plan to the Department of Law) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor

2

of New York.  The escrow account is entitled "[Purchaser's Name] Rosen Livingston & Cholst LLP Escrow Agent" ("Escrow Account").  The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit.  Any deposit in excess of $250,000 will not be insured.

All Deposits received by Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP as Escrow Agent.

Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of a written agreement between Purchaser and Sponsor.

The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts, which is currently 0.2%.  Interest shall begin to accrue upon placing the Deposit into the Escrow Account.  All interest earned thereon shall be paid to or credited to the Purchaser at closing.  No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account.  The Escrow Agreement appended hereto as Exhibit "A."

The Down Payment will not earn interest until the Purchaser's check has been deposited and cleared.  Sponsor will be liable to Purchaser only for the amount of interest actually received from the Depository (which interest may be reduced by the Depository's service charge).  The interest on the Down Payment, as same may be reduced by the Depository's service charge, is hereinafter referred to as "Interest".

Upon the payment and performance by Purchaser of all of Purchaser's obligations hereunder and the transfer to Purchaser of title to the Unit, Sponsor will instruct the Depository to pay to Purchaser any and all interest on monies deposited hereunder.  It is provided that Purchaser may not receive interest on the Down Payment for the entire month in which the closing is scheduled to occur.  The Sponsor and Selling Agent will not be liable to Purchaser for the amount of such interest or the payment thereof, except for any amount received from the Depository.  All funds due to Sponsor and received under this Purchase Agreement will be handled in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and with Section 71-a(2) of the New York Lien Law.

### 6.  Closing of Title

(a) The closing of title shall occur on the date and at the time and place in the City and State of New York as Sponsor shall designate to Purchaser on not less than thirty (30) days' prior written notice (unless waived by Purchaser).  Sponsor shall have the right, from time to time, to adjourn such date and time for closing on written notice to Purchaser.  If the Closing is adjourned by Sponsor, then Sponsor shall fix a new date and time for closing and shall give Purchaser not less than ten (10) days' prior written notice of the new scheduled date and time for closing.

Purchaser shall be entitled to one (1) adjournment of the closing not to exceed five (5) days (the "Adjourned Closing Date").  The closing adjustments stated in section 12(a) shall not accrue unless Purchaser fails to close on such Adjourned Closing Date.  Such adjournment must be exercised no less than two (2) days prior to the scheduled closing date.

4

14

amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the policies of the lender, the number of months remaining between the closing of title and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amount of the taxes and other charges or impositions then payable; and

(v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender. Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of his lender with respect thereto;

(vi) if, in connection with Purchaser's purchase, Purchaser has dealt with any broker except (A) the Selling Agent or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing;

(vii) Purchaser will pay to Rosen Livingston & Cholst LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owners' Power of Attorney, additional closing documents and for coordinating and attending the closing;

(vii) if Purchaser obtains financing and his lender refuses to close at the office of Rosen Livingston & Cholst LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and Purchaser pays Rosen Livingston & Cholst LLP, in addition to said closing fee set forth above, a travel fee of $500.00 if the closing is held in Manhattan or $700.00 if the closing is held in another borough. If the closing attended by a representative of Rosen Livingston & Cholst LLP is adjourned through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Cholst LLP an additional travel and attendance fee in the same amount as stated above for each attendance;

(viii) If Purchaser is other than a natural person, Purchaser will be required to provide a personal guaranty of Common Charges and other charges due to the Condominium and Purchaser shall pay Rosen Livingston & Cholst LLP a fee of $500.00 for preparation of such Guaranty;

(ix) if Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Cholst LLP a fee of $1,000.00 for the preparation of the splitter, substitute mortgage and assignment of mortgage documents; and

(d) Purchaser will pay the New York State Real Estate Transfer Tax (documentary stamps) to be affixed to the deed, the New York City Real Property Transfer Tax and (if applicable) the one (1%) percent "mansion tax";

(e) Purchaser will pay its 135 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit by Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.

All of the aforementioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's unendorsed, personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party, ~~and to be directed by the Sponsor, by wire transfer.~~

**14. Power of Attorney to Condominium Board, Sponsor, Retail Unit Owner and Commercial Unit Owners**

9

---

At closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit, or his representative in present, then to Sponsor's attorney), for recording in the New York City Register's Office a Power of Attorney in favor of the Condominium Board relative to purchasing or leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owners relative to amending the Condominium Documents to the extent permitted in the Power of Attorney. An originally recorded Power of Attorney shall be sent to the Condominium Board.

**15. Events of Default**

(a) The following shall constitute "Events of Default" hereunder:

(i) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 6 herein or to timely pay the applicable Rosen Livingston & Cholst LLP closing fee or any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Cholst LLP pursuant to paragraphs 12 and 13 above; or

(ii) the dishonor or failure of collection of Purchaser's Down Payment check; or

(iii) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder.

(b) Upon the occurrence of an Event of Default, Sponsor shall be entitled, in its sole and absolute discretion, to cancel this Purchase Agreement by giving Purchaser written notice of cancellation. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default. TIME IS OF THE ESSENCE TO CURE SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD. If the default is not cured within such thirty (30) day period, then this Agreement shall be deemed canceled and Sponsor shall have the right to retain, as and for liquidated damages, the Liquidated Sum. Any sums in excess thereof, together with any interest thereon shall be returned to Purchaser after cancellation.

Notwithstanding the foregoing, if Purchaser's check in payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in which to provide good funds for Purchaser's Down Payment, in which event Sponsor shall be deemed to have waived its right to sue Purchaser on the dishonored or uncollected check; or (ii) allow Purchaser thirty (30) days in which to make good Purchaser's Down Payment and if Purchaser fails to do so within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check. In the latter case, Purchaser will also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

Upon cancellation of this Agreement and disposing of the Down Payment and interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan. Thereafter, the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

10

---

**16. Risk of Loss, Casualty**

(a) Purchaser shall not be entitled to possession of the Unit nor to store any of Purchaser's furniture or belongings therein until the deed is delivered to Purchaser.

(b) All other risk of loss prior to closing has been assumed by Sponsor, but without any obligation or liability of Sponsor to repair the damage or restore the Unit or its contents. If Sponsor or the Unit Owners elect to repair or replace the loss or damage, this Agreement shall continue in full force and effect, Purchaser shall not have the right to reject title to the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or replacements. Purchaser shall not be required to pay the Balance unless and until (i) the Unit has been substantially repaired as near as is reasonably possible to its condition immediately prior to the casualty; (ii) its essential services (such as gas, electricity, and heat) and a reasonable means of ingress and egress to the street have been restored, and (iii) any condition in the Unit for which a violation (if any) is noted or issued has been corrected (even if same is not yet removed of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser, its licensees, invitees and/or workers. (Sponsor will endeavor in good faith, and with reasonable diligence, to remove or cause to be removed subsequent to closing all violations of record it is obligated to correct.) Any proceeds received from insurance, or in satisfaction of any claim or action in connection with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners). If such proceeds are paid to Purchaser, Purchaser shall promptly turn them over to Sponsor upon request. The provisions of the two preceding sentences shall survive the closing.

(c) In the event that Sponsor notifies Purchaser that it does not elect to repair or restore the Unit or if the Unit Owners do not resolve to make such repairs or restoration in accordance with the Condominium's By-Laws, this Agreement shall be deemed canceled and of no further force or effect, and Sponsor shall instruct the Depository to return to Purchaser all sums deposited hereunder, together with interest, if any, thereon, whereupon the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously canceled due to Purchaser's uncured default, Sponsor shall retain the Liquidated Sum as provided above.

**17. Inspection of Unit**

At least ten (10) days before the Balance is to be paid, Sponsor or the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Sponsor or the Selling Agent to inspect the Unit before the lapse of such ten (10) day period. Purchaser or his duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Report (in the form set forth as Exhibit B to this Agreement) and deliver same to the Sponsor or Selling Agent at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the completed Inspection Report shall not excuse Purchaser from paying the Balance when due (without provision for escrow) and shall constitute Purchaser's full acceptance of the Unit. However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of Sponsor".

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Units and the Retail Unit may be used for any lawful purpose and (ii) the Condominium Board, and the Residential Unit Owners do not have any right to approve the use or any changes in the use of the Unsold Residential Units, the

11

---

Commercial Units and the Retail Unit or any part hereof. This paragraph shall survive the closing of title.

**18. No Representation**

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, furnishings and fixtures contained in model units, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms or closets therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to his purchase of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and investigation thereof). No representation has been authorized to make any representations on behalf of Sponsor. No oral representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially to such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the closing of title.

**19. Negotiable Terms**

Sponsor reserves the right, in its sole and absolute discretion, to negotiate on an individual basis with each purchaser substantially more beneficial purchase terms than those offered or given to other purchasers. As a result, Purchaser may not benefit from a more favorable purchase term given to another purchaser and will not have the right to rescind this Purchase Agreement or recover his Down Payment or any other amount for not being given such benefit. The following is a list of only some of the purchase terms which may be negotiated: purchase price; the amount of the Down Payment; the right of a purchaser to cancel the Purchase Agreement and recover the Down Payment for failure to obtain financing or to close by a specific date; the closing date and minimum notice required to schedule the closing; upgraded appliances, fixtures or equipment or other alterations, improvements or additions to be performed by and at the expense of Sponsor; escapting a purchaser from closing costs and/or penalties for closing late; longer time periods to pay or perform obligations under the Purchase Agreement; elimination of "time of the essence" provisions; price or common charge rebates; assumption of payment of, or guarantee of, common charges for a given period; Sponsor financing (provided an amendment to the Plan containing the terms thereof is duly filed); allowances or credits against the purchase price for decorations; to install appliances or fixtures and granting to Purchaser the benefit of any one or more favorable terms offered or given to another purchaser.

**20. Notices**

All notices, elections, consents, demands and communications (collectively called "notices" or individually called "notice") shall be delivered personally or given in writing by registered or certified mail, return receipt requested, postage prepaid, and, if sent to Purchaser, addressed to Purchaser at Purchaser's address given above, with a copy to Purchaser's attorney, and, if sent to the Sponsor, addressed to the Sponsor at c/o Rosen Livingston & Cholst LLP, 275 Madison

12

Purchaser's money, and may not be comingled with any other money or pledged or hypothecated by Sponsor, as per GBL § 352-h.

I.    Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until after consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law. Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

J.    The Escrow Agent shall release the Deposit if so directed:

(a) pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 5 upon closing of title to the Unit; or

(b) in a subsequent writing signed by both Sponsor and Purchaser; or

(c) by a final, non-appealable order or judgment of a court.

If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit. If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release. If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within said thirty (30) day period, the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above. Notwithstanding the foregoing, the Escrow Agent shall have the right at any time to deposit the Deposit contained in the Escrow Account with the clerk of the county where the Unit is located and shall give written notice to both parties of such deposit.

The Sponsor shall not object to the release of the Deposit to:

(a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an Amendment to the Plan; or

(b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

K.    Any provision of the [Purchase Agreement/Escrow Agreement] or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding any Deposit in trust is absolutely void. The provisions of the Attorney General's regulations and GBL §§ 352-e(2-b) and 352-h concerning escrow trust funds shall prevail over any conflicting or inconsistent provisions in the Purchase Agreement, Plan, or any amendment thereto.

L.    Escrow Agent shall maintain the Escrow Account under its direct supervision and control.

17

M.    A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352-h(n).

N.    Escrow Agent may rely upon any paper or document which may be submitted to it in connection with its duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

O.    Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-(h) and the New York State Department of Law's regulations.

P.    Sponsor shall obtain or cause the selling agent under the Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement. Q.    Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstance.

R.    Sponsor agrees to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of the obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent. This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

38. Counterpart Signature Pages

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument. This Agreement may be executed by facsimile or .pdf and such shall be deemed originals.

[Signature page follows]

18

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:
135 WEST 52ND STREET OWNER
LLC

By: _____
Meyer Chetrit, Principal

By: _____
David Bistricer, Principal

PURCHASER:
ONE THIRTY FIVE 52C LLC

By: _____
Ivone Vella as Director of Cadwell International S.A.,
Sole Member of One Thirty Five 52C LLC

(Purchaser)
Date Accepted:

(*Please initial on line and print or type name under line:)

Purchaser acknowledge[s]
Receipt of Offering Plan and
Amendments at _____ (A.M./P.M.)
on _____, 2014; and

Initials: _____
Purchaser, One Thirty Five 52C LLC

Delivery of Purchase
Agreement and Check for
Down Payment at _____ (A.M./P.M.)
on _____, 2014

19

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:
135 WEST 52ND STREET OWNER
LLC

By: _____
Meyer Chetrit, Principal

By: _____
David Bistricer, Principal

PURCHASER:
ONE THIRTY FIVE 52C LLC

By: _____
Ivone Vella as Director of Cadwell International S.A.,
Sole Member of One Thirty Five 52C LLC

(Purchaser)
Date Accepted:

(*Please initial on line and print or type name under line:)

Purchaser acknowledge[s]
Receipt of Offering Plan and
Amendments at _____ (A.M./P.M.)
on _____, 2014; and

Initials: _____
Purchaser, One Thirty Five 52C LLC

Delivery of Purchase
Agreement and Check for
Down Payment at _____ (A.M./P.M.)
on _____, 2014

29

| Item | Exceptions (if any) | Purchaser's Initials |
|---|---|---|
| (m) | Bathroom sinks: | |
| (n) | Water closet: | |
| (o) | Bathtubs: | |
| (p) | Bathroom tile: | |
| (q) | Hardware: | |
| | (doorbell, doorknob, faucets, locks, etc.) | |
| (r) | Intercom: | |
| 2. | General Operating Condition: | |
| (a) | All Doors: | |
| (b) | All Windows: | |
| (c) | All Plumbing: | |
| (d) | All Hardware: | |
| (e) | Other: | |

The undersigned will sign and deliver to you a separate statement signifying my (our) satisfaction with each item excepted above (if any), immediately upon the completion of the repair, adjustment or correction of same. The undersigned understands and agrees that you shall not be obligated to make any repairs, adjustments or corrections to the Unit or any portion thereof or its fixtures, appliances, equipment, etc., contained therein, from or after the date of delivery of possession of the Unit to the undersigned, except as to those items (if any) expressly excepted above and your obligation regarding any such excepted items shall cease upon the completion of the repair, adjustment or correction of same. Nothing contained herein shall be construed to excuse Sponsor from its obligations to correct defects in construction or design to the extent required in the section entitled "Rights and Obligations of Sponsor" contained in the Offering Plan for Condominium Ownership of the 135 West 52nd Street Condominium. The undersigned shall be required to complete the payment of the Purchase Price (without the provision for an escrow) and accept title to the Unit on the closing date notwithstanding the presence of any exceptions.

Very truly yours,

_____
Purchaser's Signature

_____
Purchaser's Signature

Agreed To:
135 West 52nd Street Owner LLC

By:_____

23

## PURCHASE AGREEMENT

AGREEMENT made as of May 16, 2015 between 135 WEST 52ND STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and Weijian Bi residing at 311 Small Road, Apartment 115B, Syracuse, New York 13210 ("Purchaser").

Purchaser's Attorney: ~~Dennis Chang, Esq.~~ Lillian Zhou

Address: Dai & Associates
1980 Broadway, 22nd Floor
Times Square Plaza
New York, NY 10013

Telephone: (212) 730 6880  Fax: (212) 730 8869  Email: dwgongeun@daiassociates.com

Percentage of Common Interest: 0.6200 %  Common Charges: $1,381.57 per month

Residential Percentage of Common Interest: 0.8281%

Selling Agent: Douglas Elliman (Vanessa Fioravanti)

Co-Broker: Douglas Elliman (Ruixi (Alicia) Dong)

Real Estate Taxes: $1,933.94 per month;  B.I.D. Tax: $17.15 per month;

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 33B ("Unit") in the building ("Building") known as 135 WEST 52ND STREET Condominium ("Condominium") and located at 135 WEST 52ND STREET, New York, New York 10019, together with a 0.6200% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

### 1. Purchase Price

(a) The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below ("Purchase Price") is $3,245,000.00, payable as follows:

(i) $324,500.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held to escrow pursuant to paragraph 6; **with a remaining downpayment of $162,250.00 (the "Second Downpayment") by check which shall also be subject to collection, to be made on or before twenty (20) days after the date of this Agreement, pursuant to paragraph 33;** and

(ii) $2,758,250.00, constituting the balance of the Purchase Price ("Balance"), by certified check of Purchaser or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined). All checks in payment of the balance of the Purchase Price shall be payable to the order of Sponsor (or as Sponsor otherwise directs. Sponsor reserves

---

the right to require Purchaser to pay the Balance or any portion thereof in "immediately available funds" (i.e. by wire transfer to a bank account designated by Sponsor).

(c) All checks shall be uncertioned, made payable to the direct order of "Rosen Livingston & Cholet LLP, as Escrow Agent" or (as to the Balance) to "135 West 52ND Street Owner LLC" or such payees as Sponsor may direct on not less than two (2) business days' prior oral or written notice to Purchaser. All checks shall be drawn on a bank that is a member of the New York Clearing House Association. All checks must be payable directly to the order of the required payee; they may not be endorsed.

(d) Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing and, unless otherwise set forth herein, none of the provisions of this Agreement shall survive the closing. However, nothing contained herein shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of Purchaser under Article 23-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.

(e) Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under "Terms of Sale - Prerequisites to Closing of Title" in Part I of the Plan are met concurrently with, or prior to, closing.

### 2. Definitions  The following terms shall have the meanings ascribed to them:

(a) "Building" shall mean the building located at 135 West 52ND Street, New York, New York 10019.

(b) "Closing Date", "closing", "closing of title" and words of similar import are used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment to Sponsor of the Purchase Price and the delivery by Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.

(c) "Condominium" shall mean The 135 West 52ND Street Condominium.

(d) "Declaration" shall mean the Declaration of the 135 West 52ND Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.

(e) "Depository" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.

(f) "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.

(g) "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.

(h) "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.

All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

### 3. Plan

(a) Purchaser represents that Purchaser has possessed the Plan and any filed amendments thereto at least three (3) business days prior to submitting this Purchase Agreement; or

(b) in the event Purchaser does not wish to wait three (3) business days) Purchaser has the right to rescind this Purchase Agreement by sending written notice of the rescission to the

1

---

Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement (time being of the essence to exercise such right of rescission within such seven (7) day period).

(c) Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Condominium Documents set forth in Part II of the Plan and Parts A and B of the Exhibits submitted with the Plan to the Department (at Law) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor (including, without limitation, amendments involving any changes, modifications, or updating of the projected Common Charges, the projected real estate taxes to be paid by Purchaser, or Schedule B "Budget for the First Year of Condominium Operation"). Except in the case of a material adverse amendment affecting Purchaser's Unit or as otherwise provided under the Plan, any such amendments shall neither excuse Purchaser from performing Purchaser's obligations hereunder nor entitle Purchaser to any offset or credit against the Purchase Price or claim or right of action against Sponsor, and any such amendment may be filed by Sponsor without Purchaser's consent or approval. However, Sponsor shall not have the right to unilaterally cancel this Agreement except as herein provided (such as in the case of an uncured default by Purchaser) nor change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.

(d) The Plan is hereby incorporated in this Agreement with the same force and effect as if set forth at length. In the event of any inconsistency or conflict between the provisions of this Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding. Purchaser acknowledges having had full opportunity to examine all documents and investigate all statements made herein and in the Plan. **Notwithstanding the foregoing, if any of the negotiated provisions of this Purchase Agreement are inconsistent with those in the template Purchase Agreement and Offering Plan, the provisions stated herein shall govern.**

### 4. Personal Property

(a) At closing, the Unit will contain only those appliances, countertops, cabinets, flooring, sinks, vanities (if any), air conditioning units (if any), hardware and other fixtures and equipment installed therein as set forth in the Plan.

Sponsor has the right to substitute other appliances, countertops, cabinets, sinks, vanities, flooring and fixtures in place of those referred to in the Plan provided only that the substitutions are of equal or better quality and design.

(b) The Unit is being sold unfurnished, without window blinds or shades.  Furniture, floor coverings, wall coverings, furnishings, decorations and the like in or about any model Unit are for display purposes only and are not included in this sale except to the extent set forth in the Plan.  Any floor plans or sketches shown to Purchaser (including those contained in the Plan) are only approximations of the Unit's dimensions and arrangement and Purchaser acknowledges and agrees that he is not relying thereon. Sponsor shall not be liable for minor variations from any floor plans or structures.

(c) Sales model apartments may, at Sponsor's option, be sold furnished at a later date but will initially be withheld from sale.

(d) There will be no modifications or extras unless agreed to in writing by the parties.  All modifications and alterations must be approved by Sponsor in writing and, if approved, shall be performed by Sponsor at Purchaser's expense (payable in the manner to be set forth in an addendum to this Agreement or by separate agreement between Sponsor and Purchaser).

### 5. Purchase Monies to be Held in Trust

3

---

(a) The law firm of Rosen Livingston & Cholet, LLP, with an address at 275 Madison Avenue, New York, NY 10016, telephone number 212 687 7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser.  Escrow Agent has designated the following attorneys to serve as signatories: Morton H Rosen, Peter I. Livingston, Mary L. Kosmark, Bruce A. Cholet.  All designated signatories are admitted to practice law in the State of New York. Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor, Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

(b) The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in New York State.  The escrow account is entitled "[Purchaser's Name] Rosen Livingston & Cholet LLP Escrow Agent" ("Escrow Account").  The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit.  Any deposit in excess of $250,000 will not be insured.

All Deposits received by Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholet LLP as Escrow Agent.

Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of a written agreement between Purchaser and Sponsor.

The Interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts, which is currently 0.2%.  Interest shall begin to accrue upon placing the Deposit into the Escrow Account.  All interest earned thereon shall be paid to or credited to the Purchaser at closing.  No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account.  The Escrow Agreement appended hereto as Exhibit "A."

The Down Payment will not bear interest until the Purchaser's check has been deposited and cleared.  Sponsor will be liable to Purchaser only for the amount of interest actually received from the Depository (which interest may be reduced by the Depository's service charge).  The interest on the Down Payment, as same may be reduced by the Depository's service charge, is hereinafter referred to as "interest".

Upon the payment and performance by Purchaser of all of Purchaser's obligations hereunder and the transfer to Purchaser of title to the Unit, Sponsor will instruct the Depository to pay to Purchaser any and all interest on monies deposited hereunder. It is possible that Purchaser may not receive interest on the Down Payment for the entire month in which the closing is scheduled to occur.  The Sponsor and Selling Agent will not be liable to Purchaser for the amount of such interest on the payment thereof, except for any amount received from the Depository.  All funds due to Sponsor and received under this Purchase Agreement will be handled in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and with Section 71-a(3) of the New York Lien Law.

### 6. Closing of Title

(a) The closing of title shall occur on the date and at the time and place in the City and State of New York as Sponsor shall designate to Purchaser on not less than thirty (30) days'

4

---

this paragraph 12, Purchaser shall be deemed at fault for not timely sending notice of the non-Permitted Encumbrance and the adjournment of the closing to allow Sponsor to correct or remove the non-Permitted Encumbrance shall be considered at the request of Purchaser and not Sponsor. Delivery of a title report to Sponsor's attorney, stating such non-Permitted Encumbrance no less than ten (10) days prior to closing shall be deemed notice pursuant to this paragraph.

### 13. Purchaser's Closing Costs

At closing, Purchaser will pay certain costs in connection with the purchase of his Unit in addition to the legal fees of Purchaser's counsel (if any) and the amount of any net credit in favor of Sponsor that may result from the closing apportionments described in the preceding paragraph. Such closing costs will include the following, the amounts of which (where applicable) are based on rates in effect on the date of the Plan and are subject to change without prior notice:

(a) If Purchaser elects to obtain fee title insurance, Purchaser will pay a premium to the title company for such insurance, which premium may vary depending upon the title insurance company and the amount of insurance requested. A lower combined rate may be available if fee and mortgage insurance are ordered simultaneously.

(b) Purchaser will pay a fee for recording the Unit Deed and the Unit Owner's Power of Attorney;

(c) If Purchaser obtains a mortgage loan, Purchaser will pay:

(i)  a fee and service charge for recording the mortgage;

(ii)  a mortgage recording tax in the following amount: (a) for Residential Units, 2.05% of the face amount of a mortgage less than $500,000 for which mortgagor receives a $25 deduction, or 2.175% for a mortgage covering a Residential Unit equal to $500,000.00 or more, less $25 and (b) for non-residential Units, 2.05% of the face amount of a mortgage less than $500,000 or 2.80% for a mortgage covering a non-residential Unit equal to $500,000 or more;

(iii) if mortgage title insurance is required by Purchaser's lender, an additional premium for insuring the mortgagee's interest in an amount equal to the principal amount under the mortgage loan.

(iv) if required by Purchaser's lender, deposits for Common Charges, real estate taxes and assessments in an initial amount and in such monthly sums after closing as required by the lender (the amount of which monthly deposits may be changed periodically by the lender). The amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the policies of the lender, the number of months remaining between the closing of title and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amount of the taxes and other charges or impositions then payable; and

(v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender. Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of his lender with respect thereto;

(vi) if, in connection with this purchase, Purchaser has dealt with any broker except (A) the Selling Agent and Co-Broker listed on Page 1 of this Agreement or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing;

9

(vii) Purchaser will pay to Rosen Livingston & Cholst LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owner's Power of Attorney, additional closing documents and for coordinating and attending the closing;

(vi) If Purchaser obtains financing and his lender refuses to close at the office of Rosen Livingston & Cholst LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and Purchaser pays Rosen Livingston & Cholst LLP, in addition to said closing fee set forth above, a travel fee of $500.00 if the closing is held in Manhattan or $700.00 if the closing is held in another borough. If the closing attended by a representative of Rosen Livingston & Cholst LLP is adjourned through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Cholst LLP an additional travel and attendance fee in the same amount as stated above for each attendance;

(vii)  if Purchaser is other than a natural person, a principal of the Purchaser will be required to provide a personal guaranty of Common Charges and other charges due to the Condominium and Purchaser will pay Rosen Livingston & Cholst LLP a fee of $500.00 for preparation of such Guaranty;

(x) If Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Cholst LLP a fee of $1,000.00 for the preparation of the splitter, substitute mortgage and assignment of mortgage documents; and

(xi) Purchaser will pay the New York State Real Estate Transfer Tax (documentary stamps) to be affixed to the deed, the New York City Real Property Transfer Tax and (if applicable) the one (1%) percent "mansion tax";

(xi) Purchaser will pay to 135 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit by Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.

All of the aforementioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's unendorsed, personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party, or if so directed by the Sponsor, by wire transfer.

### 14. Power of Attorney to Condominium Board, Sponsor, Retail Unit Owner and Commercial Unit Owners

At closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit (or, if no representative is present, then to Sponsor's attorney), for recording in the New York City Register's Office a Power of Attorney in favor of the Condominium Board relative to purchasing or leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owners relative to amending the Condominium Documents to the extent permitted in the Power of Attorney. An originally executed Power of Attorney shall be sent to the Condominium Board.

### 15. Events of Default

(a) The following shall constitute "Events of Default" hereunder:

(i) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 6 herein or to timely pay the applicable Rosen Livingston & Cholst LLP closing fee or any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Cholst LLP pursuant to paragraphs 12 and 13 above; or

10

(ii)  the dishonor or failure of collection of Purchaser's Down Payment check; or

(iii) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder.

(b) Upon the occurrence of an Event of Default, Sponsor shall be entitled, in its sole and absolute discretion, to cancel this Purchase Agreement by giving Purchaser written notice of cancellation. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default. TIME IS OF THE ESSENCE TO CURE SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD. If the default is not cured within such thirty (30) day period, then this Agreement shall be deemed canceled and Sponsor shall have the right to retain, as and for liquidated damages, the Downpayment. Any sums in excess thereof, together with any interest thereon shall be returned to Purchaser within ten (10) days.

Notwithstanding the foregoing, if Purchaser's default is payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in which to provide good funds for Purchaser's Down Payment, in which event Sponsor shall be deemed to have waived its right to sue Purchaser on the dishonored or uncollected check; or (ii) allow Purchaser thirty (30) days in which to make good Purchaser's Down Payment and if Purchaser fails to do so within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check. In the latter case, Purchaser shall also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

Upon cancellation of this Agreement and disposing of the Down Payment and interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan. Thereafter, the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

### 16. Risk of Loss; Casualty

(a) Purchaser shall not be entitled to possession of the Unit nor to store any of Purchaser's furniture or belongings therein until the deed is delivered to Purchaser at closing.

(b) All other risk of loss prior to closing has been assumed by Sponsor, but without any obligation or liability of Sponsor to repair the damage or restore the Unit or its contents. If Sponsor or the Unit Owners elect to repair or replace the loss or damage, this Agreement shall continue in full force and effect, Purchaser shall not have the right to reject title to the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or replacements. Purchaser shall not be required to pay the Balance unless and until (i) the Unit has been substantially repaired as near as is reasonably possible to its condition immediately prior to the casualty; (ii) is essentially serviceable (such as gas, electricity, and heat) and a reasonable means of ingress and egress to the street have been restored; and (iii) any condition in the Unit for which a violation (if any) is noted or issued has been corrected (even if same is not yet removed of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser, its licensees, invitees and/or workers. (Sponsor will endeavor in good faith, and with reasonable diligence, to remove or cause to be removed subsequent to closing all violations of record it is obligated to correct.) Any proceeds received from insurance, or in satisfaction of any claim or action in connection with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners). If such proceeds are paid to Purchaser, Purchaser shall promptly turn them over to Sponsor upon request. The provisions of the two preceding sentences shall survive the closing.

(c) In the event that Sponsor notifies Purchaser that it does not elect to repair or restore the Unit or if the Unit Owners do not resolve to make such repairs or restoration in accordance with

11

the Condominium's By-Laws, this Agreement shall be deemed canceled and of no further force or effect, and Sponsor shall instruct the Depository to return to Purchaser all sums deposited hereunder, together with interest, if any, thereon, whereupon the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously canceled due to Purchaser's uncured default, Sponsor shall retain the Liquidated Sum as provided above.

### 17. Inspection of Unit

At least ten (10) days before the Balance is to be paid, Sponsor or the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Sponsor or the Selling Agent to inspect the Unit before the lapse of such ten (10) day period. Purchaser or his duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Report (in the form set forth as Exhibit G to this Agreement) and deliver same to the Sponsor or Selling Agent at the conclusion of the inspection. Purchaser's failure either to arrange such appointment or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the completed Inspection Report shall not excuse Purchaser from paying the Balance when due (without provision for escrow) and shall constitute Purchaser's full acceptance of the Unit. However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of Purchaser".

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Units and the Retail Unit may be used for any lawful purpose and (ii) the Condominium Board, and the Residential Unit Owners do not have any right to approve the use or any change in the use of the Unsold Residential Units, the Commercial Units and the Retail Unit or any part thereof. This paragraph shall survive the closing of title.

### 18. No Representations

Purchaser acknowledges that Purchaser has not relied upon any of architect's plans, scales plans, furnishings and fixture contained in model units, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms or closets therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to his purchase of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and investigation thereof). No person has been authorized to make any representations on behalf of Sponsor. No oral representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially to such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the closing of title.

### 19. Negotiable Terms

12

19

closing.  No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the Escrow Account.

F.  Within five (5) business days after the Purchase Agreement has been tendered to Escrow Agent along with the Deposit, the Escrow Agent shall sign the Escrow Agreement and place the Deposit into the Escrow Account.  Within ten (10) business days of the placing the deposit in the Escrow Account, Escrow Agent shall provide written notice to Purchaser and Sponsor, confirming the Deposit. The notice shall provide the account number and the initial interest rate to be earned on the Deposit.  Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of the Escrow Agreement.

G.  The Escrow Agent is obligated to send notice to the Purchaser once the Deposit is placed in the Escrow Account. If the Purchaser does not receive notice of such deposit within fifteen (15) business days after tender of the Deposit, he or she may cancel the Purchase Agreement within ninety (90) days after tender of the Purchase Agreement and Deposit to Escrow Agent.  Complaints concerning the failure to honor such cancellation requests may be referred to the New York State Department of Law, Real Estate Finance Bureau, 120 Broadway, 23rd Floor, New York, N.Y. 10271.  Rescission shall not be afforded where proof satisfactory to the Attorney General is submitted establishing that the Deposit was timely placed in the Escrow Account in accordance with the New York State Department of Law's regulations concerning Deposits and requisite notice was timely mailed to the Purchaser.

H.  All Deposits, except for advances made for upgrades, extras, or custom work received in connection with the Purchase Agreement, are and shall continue to be the Purchaser's money, and may not be comingled with any other money or pledged or hypothecated by Sponsor, as per GBL § 352-h.

I.  Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until after consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law.  Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

J.  The Escrow Agent shall release the Deposit if so directed:

(a) pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 5 upon closing of title to the Unit; or

(b) in a subsequent writing signed by both Sponsor and Purchaser; or

(c) by a final, non-appealable order or judgment of a court.

If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit.  If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release.  If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within said thirty (30) day period,

17

the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above. Notwithstanding the foregoing, the Escrow Agent shall have the right at any time to deposit the Deposit contained in the Escrow Account with the clerk of the county where the Unit is located and shall give written notice to both parties of such deposit.

The Sponsor shall not object to the release of the Deposit to:

(a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an Amendment to the Plan; or

(b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

K.  Any provision of the [Purchase Agreement/Escrow Agreement] or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding any Deposit in trust is absolutely void.  The provisions of the Attorney General's regulations and GBL §§ 352-e(2-b) and 352-h concerning escrow trust funds shall prevail over any conflicting or inconsistent provisions in the Purchase Agreement, Plan, or any amendment thereto.

L.  Escrow Agent shall maintain the Escrow Account under its direct supervision and control.

M.  A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352-h).

N.  Escrow Agent may rely upon any paper or document which may be submitted to it in connection with its duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

O.  Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-(h) and the New York State Department of Law's regulations.

P.  Sponsor shall obtain or cause the selling agent under the Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement. O.  Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstance.

R.  Sponsor agrees to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of the obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent.  This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

18

38. Counterpart Signature Pages

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument.  This Agreement may be executed by facsimile or .pdf and each shall be deemed originals.

39. Additional 5% Downpayment.

Purchaser agrees to pay the Second Downpayment on or before twenty (20) days after the date of this Agreement. If the additional 5% downpayment is not received on or before said date, it shall be deemed a material default of this Agreement and Sponsor has the right to exercise any and all remedies available to it pursuant to this Agreement, including but not limited to cancelling this Agreement and retaining the downpayment of $324,500.00 as liquidated damages.  Notwithstanding anything to the contrary herein, Purchaser shall be given a period of five (5) days from any notice to cure its default.

[Signature page follows]

19

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:                                          PURCHASER:
135 WEST 52nd STREET OWNER
LLC

By: _____                      _____
     Mayer Cheili, Principal                               Purchaser

By: _____                      _____
     David Bistricer, Principal                            Co-Purchaser

[Purchaser]
Date Accepted:

[*Please initial on line and print or
type name under line.]

Purchaser acknowledges:                           Initials: WB
Receipt of Offering Plan and                      Purchaser: _____
Amendment at ____ (A.M./P.M.)
on ___ day ___ , 2015; and

Delivery of Purchase                              Initials: _____
Agreement and Check for                           Co-Purchaser: _____
Down Payment at ___ (A.M./P.M.)
on ___ 6/5 , 2015

19

20

| Item | Exceptions (if any) | Purchaser's Initials |
|---|---|---|
| (m) | Bathroom sinks: | |
| (n) | Water closet: | |
| (o) | Bathtubs: | |
| (p) | Bathroom tile: | |
| (q) | Hardware: | |
| | (doorbell, doorknob, faucets, locks, etc.) | |
| (r) | Intercom: | |
| 2. | General Operating Condition: | |
| (a) | All Doors: | |
| (b) | All Windows: | |
| (c) | All Plumbing: | |
| (d) | All Hardware: | |
| (e) | Other: | |

The undersigned will sign and deliver to you a separate statement signifying my (our) satisfaction with each item excepted above (if any), immediately upon the completion of the repair, adjustment or correction of same. The undersigned understands and agrees that you shall not be obligated to make any repairs, adjustments or corrections to the Unit or any portion thereof or its fixtures, appliances, equipment, etc., contained therein, from or after the date of delivery of possession of the Unit to the undersigned, except as to those items (if any) expressly excepted above and your obligation regarding any such excepted items shall cease upon the completion of the repair, adjustment or correction of same. Nothing contained herein shall be construed to excuse Sponsor from its obligations to current defects in construction or design to the extent required in the section entitled "Rights and Obligations of Sponsor" contained in the Offering Plan for Condominium. Ownership of the 135 West 52nd Street Condominium. The undersigned shall be required to complete the payment of the Purchase Price (without the provision for an escrow) and accept title to the Unit on the closing date notwithstanding the presence of any exceptions.
Very truly yours,

Purchaser's Signature _____

Agreed To:
135 West 52nd Street Owner
LLC

Purchaser's Signature _____

By: _____

24

---

### RIDER TO AGREEMENT

Date: June 1 6, 2015

Re: 135 West 52nd Street Owner LLC to Weijian Bi
 Unit 33B
 135 West 52nd Street Condominium
 135 West 52nd Street, New York, NY 10019

This Rider (the "Rider") amends and modifies the Purchase Agreement (the "Agreement") by and between 135 West 52nd Street Owner LLC ("Sponsor") and Weijian Bi ("Purchaser") with respect to the above-referenced Unit in the condominium known as 135 West 52nd Street Condominium. In case of any inconsistencies between any of the terms and conditions of the Agreement and the terms and conditions of this Rider, the terms and conditions of this Rider shall prevail.

A. Not withstanding anything to the contrary contained herein, in the event of any inconsistency between the provisions of the Plan, the Agreement and this Rider, the provisions of this Rider shall govern and be binding which inconsistencies arise from changes to the Agreement negotiated between Sponsor and Purchaser.

B. The Co-Broker has agreed to waive $3,000.00 of its commission, and accept $94,350.00 as its full commission, as stated in the letter dated June 8, 2015. Such waived portion of the Co-Broker's commission ($3,000.00) will be credited to Purchaser at closing.

[END OF TEXT – SIGNATURE PAGE FOLLOWS]

[RIDER SIGNATURE PAGE ONLY]

Page 1 of 2



Purchaser: _____ 6/11/2015
 Weijian Bi

Sponsor: 135 West 52nd Street Owner LLC

By: _____
 Mayer Chetrit, Principal

_____
 David Bistricer, Principal

PURCHASE AGREEMENT

AGREEMENT made as of May 5-1 2015 between 135 WEST 52ND STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and Madridista Enterprises LLC residing at 500 West 56th Street, Apt 2264, New York, NY 10019 ("Purchaser").

Purchaser's Attorney:   Dylan Chen, Esq.
Address:   Dylan Chen Law Firm
130 Centre Street, Suite 820
New York, NY 10013

Telephone: (212) 274 0930   Fax: (212) 274 8613   Email: mail@dchanlaw.com
Percentage of Common Interest: 1.9300 %   Common Charges: $3,712.06 per month
Residential Percentage of Common Interest: 2.2265%
Selling Agent: Douglas Elliman (Stacy Spielman)
Co-Broker: Bellmarc (Joseph Corde)
Real Estate Taxes: $6,197.48 per month;   B.I.D. Tax: $53.39 per month;

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 36A ("Unit") in the building ("Building") known as 135 WEST 52ND STREET Condominium ("Condominium") and located at 135 WEST 52ND STREET, New York, New York 10019, together with a 1.9300% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

1.  Purchase Price

The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below ("Purchase Price") is $8,600,000.00, payable as follows:

(i) $1,720,000.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5; and

(ii) $6,880,000.00, constituting the balance of the Purchase Price ("Balance"), by certified check or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined). All checks in payment of the balance of the Purchase Price shall be payable to the order of Sponsor (or as Sponsor otherwise directs. Sponsor reserves the right to require Purchaser to pay the Balance or any portion thereof in "immediately available funds" (i.e. by wire transfer to a bank account designated by Sponsor).

(c) All checks shall be unendorsed, made payable to the direct order of "Rosen Livingston & Cholst LLP, as Escrow Agent" or (as to the Balance) to "135 West 52nd Street Owner LLC" or

1

(c) Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Condominium Documents set forth in Part II of the Plan and Parts A and B of the Exhibits submitted with the Plan to the Department of Law) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor (including, without limitation, amendments involving any changes, modifications, or updating of the projected Common Charges, the projected real estate taxes to be paid by Purchaser, or Schedule B "Budget for the First Year of Condominium Operation"). Except in the case of a material adverse amendment affecting Purchaser's Unit or as otherwise provided under the Plan, any such amendments shall neither excuse Purchaser from performing Purchaser's obligations hereunder nor entitle Purchaser to any offset or credit against the Purchase Price or claim or right of action against Sponsor, and any such amendment may be filed by Sponsor without Purchaser's consent or approval. However, Sponsor shall not have the right to unilaterally cancel this Agreement except as herein provided (such as in the case of an uncured default by Purchaser) nor change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.

(d) The Plan is hereby incorporated in this Agreement with the same force and effect as if set forth at length. In the event of any inconsistency or conflict between the provisions of this Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding. Purchaser acknowledges having had full opportunity to examine all documents and investigate all statements made herein and in the Plan.

4.  Personal Property

(a) At closing, the Unit will contain only those appliances, countertops, cabinets, flooring, sinks, vanities (if any), air conditioning units (if any), hardware and other fixtures and equipment installed therein as set forth in the Plan.

Sponsor has the right to substitute other appliances, countertops, cabinets, sinks, vanities, flooring and fixtures in place of those referred to in the Plan provided only that the substitutions are of equal or better quality and design.

(b) The Unit is being sold unfurnished, without window blinds or shades. Furniture, floor coverings, wall coverings, furnishings, decorations and the like in or about any model Unit are for display purposes only and are not included in this sale except to the extent set forth in the Plan. Any floor plans or sketches shown to Purchaser (including those contained in the Plan) are only approximations of the Unit's dimensions and arrangement and Purchaser acknowledges and agrees that he is not relying thereon. Sponsor shall not be liable for minor variations from any floor plans or structures.

(c) Sales model apartments may, at Sponsor's option, be sold furnished at a later date but will initially be withheld from sale.

(d) There will be no modifications or extras unless agreed to in writing by the parties. All modifications and alterations must be approved by Sponsor in writing and, if approved, shall be performed by Sponsor at Purchaser's expense (payable in the manner to be set forth in an addendum to this Agreement or by separate agreement between Sponsor and Purchaser).

5.  Purchase Monies to be Held in Trust

(a) The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, New York, NY 10016, telephone number 212 687 7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser. Escrow Agent has designated the following attorneys to serve as signatories: Morton H Rosen, Peter I. Livingston, Mary L. Kosmark, Bruce A. Cholst. All designated signatories are authorized to practice law in the State of New York. Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor,

such payee as Sponsor may direct on not less than two (2) business days' prior oral or written notice to Purchaser. All checks shall be drawn on a bank that is a member of the New York Clearing House Association. All checks must be payable directly to the order of the required payee; they may not be endorsed.

(d) Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing and, unless otherwise set forth herein, none of the provisions of this Agreement shall survive the closing. However, nothing contained herein shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of Purchaser under Article 23-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.

(e) Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under "Terms of Sale - Prerequisites to Closing of Title" in Part I of the Plan are met concurrently with, or prior to, closing.

2.  Definitions   The following terms shall have the meanings ascribed to them:

(a) "Building" shall mean the building located at 135 West 52ND Street, New York, New York 10019.

(b) "Closing Date", "closing", "closing of title" and words of similar import are used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment to Sponsor of the Purchase Price and the delivery to Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.

(c) "Condominium" shall mean The 135 West 52ND Street Condominium.

(d) "Declaration" shall mean the Declaration of the 135 West 52ND Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.

(e) "Depository" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.

(f) "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.

(g) "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.

(h) "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.

All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

3.  Plan

(a) Purchaser represents that Purchaser has possessed the Plan and any filed amendments thereto prior to signing the Plan or submitting this Purchase Agreement; or

(b) In the event Purchaser does not wish to wait three (3) business days) Purchaser has the right to rescind this Purchase Agreement by sending written notice of his rescission to the Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement (time being of the essence to exercise such right of rescission within such seven (7) day period).

2

Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

(b) The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York. The escrow account is entitled "[Purchaser's Name] Rosen Livingston & Cholst LLP Escrow Agent" ("Escrow Account"). The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit. Any deposit in excess of $250,000 will not be insured.

All Deposits received by Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP as Escrow Agent.

Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of a written agreement between Purchaser and Sponsor.

The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts, which is currently 0.2%. Interest shall begin to accrue upon placing the Deposit into the Escrow Account. All interest earned thereon shall be paid to or credited to the Purchaser at closing. No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account. The Escrow Agreement appended hereto as Exhibit "A".

The Down Payment will not earn interest until the Purchaser's check has been deposited and cleared. Sponsor will be liable to Purchaser only for the amount of interest actually deposited from the Depository (which interest may be reduced by the Depository's service charge). The interest on the Down Payment, at same may be reduced by the Depository's service charge, is hereinafter referred to as "Interest".

Upon the payment and performance by Purchaser of all of Purchaser's obligations hereunder and the transfer to Purchaser of title to the Unit, Sponsor will instruct the Depository to pay to Purchaser any and all interest on monies deposited hereunder. It is possible that Purchaser may not receive Interest on the Down Payment for the entire month in which the closing is scheduled to occur. The Sponsor and Selling Agent will not be liable to Purchaser for the amount of such interest or the payment thereof, except for any amount received from the Depository. All funds due to Sponsor and received under this Purchase Agreement will be handled in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and with Section 71-a(3) of the New York Lien Law.

6.  Closing of Title

(a) The closing of title shall occur on the date and at the time and place in the City and State of New York as Sponsor shall designate to Purchaser on not less than thirty (30) days' prior written notice (unless waived by Purchaser). Sponsor shall not provide such written notice to Purchaser until Sponsor has attained a Temporary or Permanent Certificate of Occupancy for the Unit. Sponsor shall not specify a closing date prior to February 1, 2016. Sponsor shall have the right, from time to time, to adjourn such date and time for closing on written notice to Purchaser. If the Closing is adjourned by Sponsor, then Sponsor shall fix a

4

remove the non-Permitted Encumbrance shall be considered at the request of Purchaser and not Sponsor.

**12. Purchaser's Closing Costs**

At closing, Purchaser will pay certain costs in connection with the purchase of his Unit in addition to the legal fees of Purchaser's counsel (if any) and the amount of any net credit in favor of Sponsor that may result from the closing apportionments described in the preceding paragraph. Such closing costs will include the following, the amounts of which (where applicable) are based on rates in effect on the date of the Plan and are subject to change without prior notice:

(a) If Purchaser elects to obtain fee title insurance, Purchaser will pay a premium to the title company for such insurance, which premium may vary depending upon the title insurance company and the amount of insurance requested. A lower combined rate may be available if fee and mortgage insurance are ordered simultaneously.

(b) Purchaser will pay a fee for recording the Unit Deed and the Unit Owner's Power of Attorney;

(c) If Purchaser obtains a mortgage loan, Purchaser will pay:

(i) a fee and service charge for recording the mortgage.

(ii) a mortgage recording tax in the following amount: (a) for Residential Units, 2.05% of the face amount of a mortgage less than $500,000 (for which mortgagor receives a $25 deduction, or 2.175% for a mortgage covering a Residential Unit equal to $500,000.00 or more, less $25 and (b) for non-residential Units, 2.05% of the face amount of a mortgage less than $500,000 or 2.80% for a mortgage covering a non-residential Unit equal to $500,000 or more;

(iii) if mortgage title insurance is required by Purchaser's lender, an additional premium for insuring the mortgagee's interest in an amount equal to the principal amount under the mortgage loan.

(iv) if required by Purchaser's lender, deposits for Common Charges, real estate taxes and assessments in an initial amount and in such monthly sums after closing as required by the lender (the amount of which monthly deposits may be changed periodically by the lender). The lender (the amount of such monthly deposits may be changed periodically by the lender). The amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the portion of the lender, the number of months remaining between the closing of title and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amount of the taxes and other charges or impositions then payable; and

(v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender. Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of his lender with respect thereto.

(vi) if, in connection with this purchase, Purchaser has dealt with any broker except (A) the Selling Agent and Co-Broker listed on Page 1 of this Agreement or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing;

(vii) Purchaser Sponsor will pay to Rosen Livingston & Cholst LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owner's Power of Attorney, additional closing documents and for coordinating and attending the closing;

(viii) If Purchaser obtains financing and his lender refuses to close at the office of Rosen Livingston & Cholst LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and

9

---

Purchaser pays Rosen Livingston & Cholst LLP, in addition to said closing fee set forth above, a travel fee of $500.00 if the closing is held in Manhattan or $700.00 if the closing is held in another borough. If the closing attended by a representative of Rosen Livingston & Cholst LLP is adjourned through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Cholst LLP an additional travel and attendance fee in the same amount as stated above for each attendance;

(viii)   If Purchaser is other than a natural person, a principal of the Purchaser will be required to provide a personal guaranty of Common Charges and other charges due to the Condominium and Purchaser will pay Rosen Livingston & Cholst LLP a fee of $500.00 for preparation of such Guaranty.

(b) If Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Cholst LLP a fee of $1,000.00 for the preparation of the splitter, substitute mortgage and assignment of mortgage documents; and

(d) Purchaser Sponsor will pay the New York State Real Estate Transfer Tax (documentary stamps) to be affixed to the deed and the New York City Real Property Transfer Tax; Purchaser will pay (if applicable) the one (1%) percent "mansion tax".

(e) Purchaser will pay to 135 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit by Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.

All of the aforementioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's unendorsed, personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party, or if so directed by the Sponsor, by wire transfer.

**14. Power of Attorney to Condominium Board, Sponsor, Retail Unit Owner and Commercial Unit Owners**

At Closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit (or, if no representative is present, then to Sponsor's attorney), for recording in the New York City Register's Office a Power of Attorney in favor of the Condominium Board relative to purchasing or leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owners relative to amending the Condominium Documents to the extent permitted in the Power of Attorney. An originally recorded Power of Attorney shall be sent to the Condominium Board.

**15. Events of Default**

(a) The following shall constitute "Events of Default" hereunder:

(i) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 8 herein or to timely pay the applicable Rosen Livingston & Cholst LLP closing fee or any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Cholst LLP pursuant to paragraphs 12 and 13 above; or

(ii) the dishonor or failure of collection of Purchaser's Down Payment check; or

(iii) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder;

(iv) the occurrence of an Event of Default, Sponsor shall be entitled, in its sole and absolute discretion, to cancel this Purchase Agreement by giving Purchaser written notice of cancellation. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default. TIME IS OF THE ESSENCE FOR CURE

10

---

SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD. If the default is not cured within such thirty (30) day period, then this Agreement shall be deemed cancelled and Sponsor shall have the right to retain, as and for liquidated damages, the Downpayment. Any sums in excess thereof, together with any interest thereon shall be returned to Purchaser after cancellation.

Notwithstanding the foregoing, if Purchaser's check in payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in which to provide good funds for Purchaser's Down Payment, in which event Sponsor shall be deemed to have waived its right to sue Purchaser on the dishonored or uncollected check; or (ii) upon the occurrence of an Event of Default, Sponsor shall be entitled to the Down Payment and if Purchaser fails to so do within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check. In the latter case, Purchaser will also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

Upon cancellation of this Agreement and disposing of the Down Payment and interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan. Thereafter, the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

**16. Risk of Loss; Casualty**

(a) Purchaser shall not be entitled to possession of the Unit nor to store any of Purchaser's furniture or belongings therein until the deed is delivered to Purchaser at closing.

(b) After closing, the whole risk of loss prior to closing has been assumed by Sponsor, but without any obligation or liability of Sponsor to repair the mortgage or the loss or damage, that Agreement shall Sponsor or the Unit Owners elect to repair or replace the loss or damage, this Agreement shall continue in full force and effect, Purchaser shall not have the right to reject title to the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or improvements. Purchaser shall not be required to pay the Balance unless and until the Unit has been substantially repaired as near as is reasonably possible to its condition immediately prior to the casualty; (ii) no essential services (such as gas, electricity, and heat) and a reasonable means of ingress and egress to the street have been restored; and (iii) any condition in the Unit for which a violation (if any) is noted or issued has been corrected (even if same is not yet removed of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser, its licensees, invitees and/or workers. (Sponsor will endeavor in good faith, and with reasonable diligence, to correct any cause to be removed subsequent to closing all violations of record it is obligated to correct.) Any proceeds received from insurance, or in satisfaction of any claim or action in connection with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners). If such proceeds are paid to Purchaser, Purchaser shall promptly turn them over to Sponsor upon request. The provisions of the two preceding sentences shall survive the closing.

(c) In the event that Sponsor notifies Purchaser that it does not elect to repair or restore the Unit or if the Unit Owners do not resolve to make such repairs or restoration in accordance with the Condominium's By-Laws, this Agreement shall be deemed cancelled and of no further force or effect, and Sponsor shall instruct the Depository to return to Purchaser all sums deposited hereunder, together with interest, if any, thereon, whereupon the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously cancelled due to Purchaser's uncured default, Sponsor may retain the Liquidated Sum as provided above.

11

---

**17. Inspection of Unit**

At least ten (10) days before the Balance is to be paid, Sponsor or the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Sponsor or the Selling Agent to inspect the Unit before the lapse of such ten (10) day period. Purchaser or his duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Report (in the form set forth as Exhibit B to this Agreement) and deliver same to the Sponsor or Selling Agent at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the completed Inspection Report shall not excuse Purchaser from paying the Balance when due (without provision for escrow) and shall constitute Purchaser's full acceptance of the Unit. However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of the Sponsor".

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Units and the Retail Unit may be used for any lawful purpose and (ii) the Condominium Board, and the Residential Unit Owners do not have any right to approve the use or any changes in the use of the Unsold Residential Units, the Commercial Units and the Retail Unit or any part thereof. This paragraph shall survive the closing of title.

**18. No Representations**

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, furnishings and fixtures contained in model units, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size of the dimensions of the Unit or the rooms or closets therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to his purchase of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and investigation thereof). No person has been authorized to make any representations on behalf of Sponsor. No oral representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially to such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the closing of title.

**19. Negotiable Terms**

Sponsor reserves the right, in its sole and absolute discretion, to negotiate on an individual basis with each purchaser substantially more beneficial purchase terms than those offered or given to other purchasers. As a result, Purchaser may not benefit from a more favorable purchase term given to another purchaser and will not have the right to rescind this Purchase Agreement or recover his Down Payment or any other amount for not being given such benefit. The following is a list of only some of the purchase terms which may be negotiated: purchase

12

---

23

work shall be initially deposited into the Escrow Account, and released in accordance to the terms of the Escrow Agreement.

G.    The Escrow Agent is obligated to send notice to the Purchaser once the Deposit is placed in the Escrow Account. If the Purchaser does not receive notice of such deposit within fifteen (15) business days after tender of the Deposit, he or she may cancel the Purchase Agreement within ninety (90) days after tender of the Purchase Agreement and Deposit to Escrow Agent. Complaints concerning the failure to honor such cancellation requests may be referred to the New York State Department of Law, Real Estate Finance Bureau, 120 Broadway, 23rd Floor, New York, N.Y. 10271. Rescission shall not be afforded where proof satisfactory to the Attorney General is submitted establishing that the Deposit was timely placed in the Escrow Account in accordance with the New York State Department of Law's regulations concerning Deposits and requisite notice was timely mailed to the Purchaser.

H.    All Deposits, except for advances made for upgrades, extras, or custom work received in connection with the Purchase Agreement, are and shall continue to be the Purchaser's money, and may not be comingled with any other money or pledged or hypothecated by Sponsor, as per GBL § 352-h.

I.    Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until after consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law. Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

J.    The Escrow Agent shall release the Deposit if so directed:

(a) pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 5 upon closing of title to the Unit; or

(b) in a subsequent writing signed by both Sponsor and Purchaser; or

(c) by a final, non-appealable order or judgment of a court.

If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit. If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release. If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within said thirty (30) day period, the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above. Notwithstanding the foregoing, the Escrow Agent shall have the right at any time to deposit the Deposit with the clerk of the Escrow Account with the clerk of the county where the Unit is located and shall give written notice to both parties of such deposit.

The Sponsor shall not object to the release of the Deposit to:

(a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an Amendment to the Plan; or

17

(b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

K.    Any provision of the Purchase Agreement/Escrow Agreement) or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding any Deposit in trust is absolutely void. The provisions of the Attorney General's regulations and GBL §§ 352-e(2-b) and 352-h concerning escrow trust funds shall prevail over any conflicting or inconsistent provisions in the Purchase Agreement, Plan, or any amendment thereto.

L.    Escrow Agent shall maintain the Escrow Account under its direct supervision and control.

M.    A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352(h).

N.    Escrow Agent may rely upon any paper or document which may be submitted to it in connection with its duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

O.    Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-(h) and the New York State Department of Law's regulations.

P.    Sponsor shall obtain or cause the selling agent under the Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement. Q.    Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstance.

R.    Sponsor agrees to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in wilful disregard of the obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent.  This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

38. Counterpart Signature Pages

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument.  This Agreement may be executed by facsimile or .pdf and such shall be deemed originals.

39.   Notwithstanding the foregoing, Sponsor will pay the NYC Real Property Transfer Tax and the NYS Real Property Transfer Tax (excluding the 1% "mansion tax" which

18

shall be paid by Purchaser); such payment shall not exceed $158,950.00. Notwithstanding the foregoing.

40.   Notwithstanding the foregoing, Sponsor shall pay Sponsor's legal fees in the amount of $2,000.00.

41.   Sponsor will give a closing cost credit of $215,000.00 to Purchaser at the closing.

42.   Sponsor will make the following modifications to the Unit:  I) in the Master Bedroom, the South bathroom shall be eliminated and converted into a walk-in closet closet by capping off the plumbing, closing off the door into the shower and continuing the wood flooring from the Master Bedroom into this room; II) in the Master Bedroom, the North bathroom an additional sink shall be added with Fanjini faucets and fittings, and the mirror and medicine cabinet will conform in size with the additional sink, and III) a sheetrock wall with a pocket door (as high as possible, in Sponsor's discretion) will be built that will close off the eastern portion of the living room.
Sponsor will update the Offering Plan to reflect these modifications, and the as built floor plans shall be filed by the Sponsor with all appropriate city agencies.

[Signature page follows]

19

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:                                        PURCHASER:
135 WEST 52ND STREET OWNER                      MADRIGISTA ENTERPRISES LLC
LLC

By:                                             By:
        Meyer Chetrit, Principal                        Purchaser

By:                                             By:
        David Bistricer, Principal                       Co-Purchaser

(Purchaser)
Date Accepted:

[Please initial on line and print or
type name under line.]

Purchaser acknowledges:                         Initials:  WXB
Receipt of Offering Plan and                    Purchaser:  WONG XINBO
Amendments at _____ (A.M.)(P.M.)
on _____, 2015; and

Delivery of Purchase                            Initials:
Agreement and Check for                         Co-Purchaser:
Down Payment at _____ (A.M.)(P.M.)
on  5/26 , 2015

                    KM

20

24

EXHIBIT B
INSPECTION REPORT

Date: _____
135 West 52nd Street Owner LLC
512 Seventh Avenue
New York, New York 10018

Re.   Unit _____
135 West 52nd Condominium
135 West 52nd Street
New York, New York 10019

Gentlemen:
This is to confirm that based on the undersigned's personal inspection of the above referenced Unit, I (we) have found the Unit, its floors, walls, doors, fixtures, appliances, equipment, hardware and all other items listed below, to be in good and satisfactory condition, free of chips, mars, scratches, breaks or other defects, except for those matters (if any) expressly noted below under "exceptions" requiring repair, adjustment or correction:

| Item | Exceptions (if any) | Purchaser's Initials |
|------|---------------------|----------------------|
| 1.   | Unit Interior:      |                      |
| (a)  | Walls: _____ | _____             |
| (b)  | Floors: _____ | _____             |
| (c)  | Ceilings: _____ | _____             |
| (d)  | Windows: _____ |                      |
|      | (glass, sash, pane, sill, etc.) |          |
| (e)  | Doors: _____ | _____             |
| (f)  | Electrical fixtures: _____ | _____    |
| (g)  | Painted surfaces: _____ | _____    |
| (h)  | Kitchen cabinets: _____ | _____    |
| (i)  | Appliances: _____ | _____             |
| (j)  | Kitchen sink: _____ | _____             |
| (k)  | Medicine cabinets: _____ |            |
|      | (doors & mirror)    |                      |
| (l)  | Vanities: _____ | _____             |

23

| Item | Exceptions (if any) | Purchaser's Initials |
|------|---------------------|----------------------|
| (m)  | Bathroom sinks: ____ | _____            |
| (n)  | Water closet: _____ | _____            |
| (o)  | Bathtub: _____ | _____            |
| (p)  | Bathroom tile: _____ | _____            |
| (q)  | Hardware: _____ | _____            |
|      | (doorbell, doorknob, faucets, locks, etc.) |  |
| (r)  | Intercom: _____ | _____            |
| 2.   | General Operating Condition: |            |
| (a)  | All Doors: _____ | _____            |
| (b)  | All Windows: _____ | _____            |
| (c)  | All Plumbing: _____ | _____            |
| (d)  | All Hardware: _____ | _____            |
| (e)  | Other: _____ | _____            |

The undersigned will sign and deliver to you a separate statement signifying my (our) satisfaction with each item excepted above (if any) immediately upon the completion of the repair, adjustment or correction of same. The undersigned understands and agrees that you shall not be obligated to make any repairs, adjustments or corrections to the Unit or any portion thereof or its fixtures, appliances, equipment, etc., contained therein, from or after the date of delivery of possession of the Unit to the undersigned, except as to those items (if any) expressly excepted above and your obligation regarding any such excepted items shall cease upon the completion of the repair, adjustment or correction of same. Nothing contained herein shall be construed to excuse Sponsor from its obligations to correct defects in construction or design to the extent required in the section entitled "Rights and Obligations of Sponsor" contained in the Offering Plan for Condominium Ownership of the 135 West 52nd Street Condominium. The undersigned shall be required to complete the payment of the Purchase Price (without the provision for an escrow) and accept title to the Unit on the closing date notwithstanding the presence of any exceptions.

Very truly yours,

_____
Purchaser's Signature

_____
Purchaser's Signature

Agreed To:
135 West 52nd Street Owner
LLC

By: _____

24

## PURCHASE AGREEMENT

AGREEMENT made as of October 13, 2014 between 135 WEST 52nd STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and Keding Zhu and Miao Qian residing at Unit 59, No. 759 Yandu Road, Shanghai, CHINA ("Purchaser").

Purchaser's Attorney:  Jay Lau, Esq.

Address:  Lau & Associates, P.C.

133-47 Sanford Avenue, Unit C1E

Flushing, New York 11355

Telephone: (718) 359 9700    Fax:   (718) 762 9385 Email: jlau@laupc.com

Percentage of Common Interest: 0.4869% Common Charges: $868.38 per month

Residential Percentage of Common Interest: 0.6331%

Selling Agent: Douglas Elliman

Co-Broker: Douglas Elliman (Grace Chang)

Real Estate Taxes: $1,244.97 per month;    B.I.D. Tax: $13.28 per month;

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 16B ("Unit") in the building ("Building") known as 135 WEST 52nd STREET Condominium ("Condominium") and located at 135 WEST 52nd STREET, New York, New York 10019, together with a 0.4869% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

**1.  Purchase Price.**

(a) The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below ("Purchase Price") is $2,190,000.00, payable as follows:

(i) $328,500.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5; and

(ii) $1,861,500.00, constituting the balance of the Purchase Price ("Balance"), by certified check or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined). All checks in payment of the balance of the Purchase Price shall be payable to the order of Sponsor (or as Sponsor otherwise directs. Sponsor reserves the right to require Purchaser to pay the Balance or any portion thereof in "immediately available funds" (i.e. by wire transfer to a bank account designated by Sponsor).

(c) All checks shall be unendorsed, made payable to the direct order of "Rosen Livingston & Cholst LLP, as Escrow Agent" or (as to the Balance) to "135 West 52nd Street Owner LLC" or

1

(c) Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Condominium Documents set forth in Part II of the Plan and Parts A and B of the Exhibits submitted with the Plan to the Department of Law) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor (including, without limitation, amendments involving any changes, modifications, or updating of the projected Common Charges, the projected real estate taxes to be paid by Purchaser, or Schedule B "Budget for the First Year of Condominium Operation"). Except in the case of a material adverse amendment affecting Purchaser's Unit or as otherwise provided under the Plan, any such amendments shall neither excuse Purchaser from performing Purchaser's obligations hereunder nor entitle Purchaser to any offset or credit against the Purchase Price or claim or right of action against Sponsor, and any such amendment may be filed by Sponsor without Purchaser's consent or approval.  However, Sponsor shall not have the right to unilaterally cancel this Agreement except as herein provided (such as in the case of an uncured default by Purchaser) nor change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.

(d) The Plan is hereby incorporated in this Agreement with the same force and effect as if set forth at length.  In the event of any inconsistency or conflict between the provisions of this Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding.  Purchaser acknowledges having had full opportunity to examine all documents and investigate all statements made herein and in the Plan.

**4.  Personal Property.**

(a) All closing, the Unit will contain only those appliances, countertops, cabinets, flooring, sinks, vanities (if any), air conditioning units (if any), hardware and other fixtures and equipment installed therein as set forth in the Plan.

Sponsor has the right to substitute other appliances, countertops, cabinets, sinks, vanities, flooring and fixtures in place of those referred to in the Plan provided only that the substitutions are of equal or better quality and design.

(b) The Unit is being sold unfurnished, without window blinds or shades.  Furniture, floor coverings, wall coverings, furnishings, decorations and the like in or about any model Unit are for display purposes only and are not included in this sale except to the extent set forth in the Plan.  Any floor plans or sketches shown to Purchaser (including those contained in the Plan) are only approximations of the Unit's dimensions and arrangement and Purchaser acknowledges and agrees that he is not relying thereon.  Sponsor shall not be liable for minor variations from any floor plans or structures.

(c) Sales model apartments may, at Sponsor's option, be sold furnished at a later date but will initially be withheld from sale.

(d) There will be no modifications or extras unless agreed to in writing by the parties.  All modifications and alterations must be approved by Sponsor in writing and, if approved, shall be performed by Sponsor at Purchaser's expense (payable in the manner to be set forth in an addendum to this Agreement or by separate agreement between Sponsor and Purchaser).

**5.  Escrow Monies to be Held in Trust**

(a) The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, New York, NY 10016, telephone number 212 637 7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser.  Escrow Agent has designated the following attorneys to serve as signatories: Morton H Rosen, Peter I. Livingston, Mary L. Kosmark, Bruce A. Cholst.  All designated signatories are admitted to practice law in the State of New York.  Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor,

3

such payee as Sponsor may direct on not less than two (2) business days' prior oral or written notice to Purchaser.  All checks shall be drawn on a bank that is a member of the New York Clearing House Association.  All checks must be payable directly to the order of the required payee; they may not be endorsed.

(d) Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing and, unless otherwise set forth herein, none of the provisions of this Agreement shall survive the closing.  However, nothing contained herein shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of Purchaser under Article 23-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.

(e) Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under "Terms of Sale - Prerequisites to Closing of Title" in Part I of the Plan are met concurrently with, or prior to, closing.

**2.  Definitions.**  The following terms shall have the meanings ascribed to them:

(a) "Building" shall mean the building located at 135 West 52nd Street, New York, New York 10019.

(b) "Closing Date", "closing", "closing of title" and words of similar import are used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment to Sponsor of the Purchase Price and the delivery to Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.

(c) "Condominium" shall mean The 135 West 52nd Street Condominium.

(d) "Declaration" shall mean the Declaration of the 135 West 52nd Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.

(e) "Depository" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.

(f) "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.

(g) "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.

(h) "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.

All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

**3.  Plan**

(a) Purchaser represents that Purchaser has possessed the Plan and any filed amendments thereto at least three (3) business days prior to submitting this Purchase Agreement; or

(b) In the event Purchaser does not wish to wait three (3) business days) Purchaser has the right to rescind this Purchase Agreement by sending written notice of his rescission to the Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement (time being of the essence to exercise such right of rescission within such seven (7) day period).

2

Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

(b) The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York.  The escrow account is entitled "Purchaser's Name) Rosen Livingston & Cholst LLP Escrow Agent" ("Escrow Account").  The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit.  Any deposit in excess of $250,000 will not be insured

All Deposits received by Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP as Escrow Agent.

Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of a written agreement between Purchaser and Sponsor.

The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts, which is currently 0.2%.  Interest shall begin to accrue upon placing the Deposit into the Escrow Account.  All interest earned thereon shall be paid to or credited to the Purchaser at closing.  No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account.  The Escrow Agreement appended hereto as Exhibit "A."

The Down Payment will not earn interest until the Purchaser's check has been deposited and cleared.  Sponsor will be liable to Purchaser only for the amount of interest actually received from the Depository (which interest may be reduced by the Depository's service charge).  The interest on the Down Payment, as same may be reduced by the Depository's service charge, is hereinafter referred to as "Interest".

Upon the payment and performance by Purchaser of all of Purchaser's obligations hereunder and the transfer to Purchaser of title to the Unit, Sponsor will instruct the Depository to pay to Purchaser any and all interest on monies deposited hereunder.  It is possible that Purchaser may not receive interest on the Down Payment for the entire month in which the closing is scheduled to occur.  The Sponsor and Selling Agent will not be liable to Purchaser for the amount of such interest or the payment thereof, except for any amount received from the Depository.  All funds due to Sponsor and received under this Purchase Agreement will be handled in accordance with Sections 362-e(2)(b) and 352-h of the New York General Business Law and with Section 71-a(3) of the New York Lien Law.

**6.  Closing of Title**

(a) The closing of title shall occur on the date and at the time and place in the City and State of New York as Sponsor shall designate to Purchaser on not less than thirty (30) days' prior written notice (unless waived by Purchaser).  Sponsor shall have the right, from time to time, to adjourn such date and time for closing on written notice to Purchaser.  If the Closing is adjourned by Sponsor, then Sponsor shall fix a new date and time for closing and shall give Purchaser not less than ten (10) days' prior written notice of the new scheduled date and time for closing.

4

26

(b) The closing of title shall occur only after or concurrently with compliance with the prerequisites set forth under "Terms of Sale Prerequisites to Closing of Title" in Part I of the Plan.

(c) Sponsor has targeted the First Closing for January 1, 2015 based on the current construction schedule. The actual date for the First Closing is not assured or warranted and may be earlier or substantially later depending on the progress of sales and construction and compliance with the other prerequisites recited in the section of the Plan entitled "Terms of Sale". However, if through no fault of Purchaser the First Closing does not take place by January 1, 2016, Purchaser shall have the right to rescind this Purchase Agreement and recover its Down Payment with all interest thereon.

Purchaser acknowledges that Units may be completed at varying times over a prolonged period that will extend beyond the First Closing. In such event, the order in which Units will be completed is within the sole discretion of Sponsor and may not coincide with the chronology in which Units are contracted for sale nor the numeric order of the floors. Many unforeseeable factors can affect the completion of Units. Accordingly, the sequence in which Units (including the subject Unit) will actually be finished cannot reasonably be predicted. No representation is made nor any assurance given that the closing of the subject Unit will occur contemporaneously with the First Closing.

Purchaser further acknowledges that construction and, therefore, the closing may be delayed by late delivery of material and equipment, labor difficulties, unavailability of building trades, casualty, inclement weather and other events beyond Sponsor's control.

Purchaser agrees that Sponsor is to be afforded liberal and broad latitude in time and in all decisions concerning the completion of the Property and the Unit pursuant to the Plan. Purchaser will not be excused from paying the full Purchase Price, without credit or set off, and will have no claim against Sponsor for damages or losses in the event the First Closing occurs substantially later than the targeted date or the time to complete and close title to Purchaser's Unit is delayed or postponed by Sponsor.

Notwithstanding the foregoing, Purchaser may rescind this Agreement and receive the prompt refund of his or her Downpayment if the construction of the Unit is not complete within two years of the date Purchaser signed this Agreement by giving written notice of his or her election to do so to the Sponsor no later than fifteen days after the date that such right arises.

### 7. Representations, Warranties and Covenants

Sponsor represents, warrants and covenants that:

(a) Sponsor is the sole owner of the Unit and the property referred to in paragraph 1, and Sponsor has the full right, power and authority to sell, convey and transfer the same;

(b) The common charges (excluding separately billed utility charges) for the Unit on the date hereof are set forth on page 1 of this Agreement;

(c) Sponsor has not received any written notice of any imposition of any assessment or increase in common charges not reflected in subparagraph 7(b). Purchaser acknowledges that it will not have the right to cancel this Agreement in the event of the imposition of any assessment or increase in common charges after the date hereof of which Sponsor has not heretofore received written notice;

(d) The real estate taxes as of the date of this Agreement are set forth on page 1 of this Agreement;

(e) All refrigerators, freezers, ranges, dishwashers, washing machines, clothes dryers and air conditioning equipment included in this sale will be in working order at the time of the Closing; and

(f) Sponsor is not a "foreign person" as defined in IRC § 1445, as amended, and the regulations issued thereunder.

### 10. Title Company Approval

Subject to the terms of paragraph 11 below, Sponsor shall give, and Purchaser shall accept, such title as the Title Insurance Company will approve and insure at its regular rate and without additional premium, provided that the only liens, encumbrances and conditions affecting title shall be the Permitted Encumbrances. Sponsor is not obligated to cure Purchaser's title company to omit any exception to title if the Title Insurance Company will insure against collection out of the Unit.

### 11. Sponsor's Inability to Convey Title

(a) In the event that Sponsor is unable to deliver title to the Unit to Purchaser in accordance with the provisions of this Agreement, to remove or cure a non-Permitted Encumbrance and elects not to do so, then Sponsor will amend the Plan to disclose the title defect and offer Purchaser the right for fifteen (15) days after Sponsor notifies Purchaser of Sponsor's refusal to remedy the title defect, to elect either to (i) waive the title defect and take the subject thereto (without abatement in or credit against the Purchase Price) or claim or right of action against Sponsor for damages or otherwise) or (ii) rescind and recover the Down Payment with any earned interest. If Purchaser fails to elect to rescind within such fifteen (15) day period, then Purchaser will be presumed conclusively to have elected the first option to waive and close title subject to the title defect. Purchaser's sole right and remedy in such case shall be to either waive the title defect and close or to rescind.

(b) If Purchaser timely elects to rescind, Sponsor shall instruct the Depositary, within ten (10) days after receipt of Purchaser's rescission notice, to return to Purchaser all monies deposited hereunder with any interest thereon within thirty (30) days from receipt of said rescission notice. Upon making such refund, this Agreement shall be null and void and neither party shall have any further rights, obligations or liabilities with respect to the other hereunder or under the Plan.

(c) If Sponsor notifies Purchaser that it will remove or cure a non-Permitted Encumbrance, then Purchaser cannot cancel this Purchase Agreement for so long as Sponsor is using reasonable efforts to diligently remove or cure such non-Permitted Encumbrance.

### 8. Closing Documents

(a) At closing, Sponsor shall deliver to Purchaser:

(i) a Bargain and Sale Deed with covenant against grantor's acts transferring to Purchaser full ownership (fee simple title) to the Unit and its Common Interest, subject only to the Permitted Encumbrances (see Exhibit A below).

The grantor's covenant is for the personal benefit of Purchaser and will not inure to the benefit of Purchaser's successors or assignees (including, without limitation, Purchaser's title insurance company). Purchaser must first look to Purchaser's title insurance company before seeking recourse against Sponsor for recovery on any claim based on an alleged breach of such covenant. This provision shall survive the closing.

The deed shall be substantially in the form reproduced as Document Number 3 in Part II of the Plan and shall be executed and acknowledged by grantor in form for recording. Such executed deed shall be promptly delivered to the representative of the title insurance company insuring Purchaser's title (or, if no such representative is present, then to Purchaser's attorney) for recording. After being recorded, the deed shall be returned to Purchaser or Purchaser's attorney.

(ii) A statement to the Condominium or its managing agent that the common charges and any assessments then due and payable the Condominium have been paid to the date of the Closing;

(iii) All keys to the doors of, and mailbox for, the Unit;

(iv) New York City Real Property Transfer Tax return ("RPT") and New York State Real Estate Transfer Tax return (documentary stamps), prepared, executed and acknowledged by Sponsor in proper form for submission;

(v) Affidavit that a single station smoke detecting alarm device is installed pursuant to New York Executive Law § 378(5);

(vi) New York State Equalization Return executed and acknowledged, in proper form for submission.

(b) At Closing, Purchaser shall execute and deliver to Sponsor as directed by Sponsor:

(i) New York City Real Property Transfer Tax return ("RPT") and New York State Real Estate Transfer Tax return (documentary stamps);

(ii) Affidavit that a single station smoke detecting alarm device is installed pursuant to New York Executive Law § 378(5);

(iii) Unit Owner's Power of Attorney, as described in paragraph 14 below;

(iv) New York State Equalization Return executed and acknowledged, in proper form for submission;

(v) Personal Guaranty of Common Charges and other sums due to the Condominium if Purchaser is not a natural person;

(vi) Window Guard Notice; and

(vii) Balance of the Purchase Price and any other amounts due pursuant to this Agreement, in a form and to payee(s) specified by Sponsor.

### 9. State of Title

(a) Legal ownership to the Unit shall be transferred to Purchaser at Closing subject only to the liens, encumbrances and title conditions (hereinafter called the "Permitted Encumbrances") enumerated in Exhibit A to this Agreement. The existence of the Permitted Encumbrances shall not be deemed a breach of Sponsor's covenant in the deed, even though the deed does not expressly provide that it is given subject to the Permitted Encumbrances. It is intended and agreed that the deed for the Unit to be given by Sponsor to Purchaser at closing shall be

deemed to be subject to the Permitted Encumbrances to the same effect as if set forth therein at length.

(b) Any liens, encumbrances, or conditions not included in the Permitted Encumbrances shall not be an objection to title if: (i) the instrument required to remove it "as of record" has been delivered to the Title Insurance Company for recording in the proper office, together with the requisite recording or filing fees and a copy of said instrument is delivered to the representative of Purchaser's title insurance company (or, if none, to purchaser's attorney); or (ii) the Title Insurance Company is willing to insure Purchaser (at its regular rate and without additional premium) against collection or enforcement out of the Unit. Sponsor shall be entitled to adjourn the closing to remove or correct any non-Permitted Encumbrance. However, if the non-Permitted Encumbrance existed (and was known or should have been known by Purchaser or his attorney but was not known or could not reasonably have been known by Sponsor) at least ten (10) days prior to closing and Purchaser or Purchaser's attorney failed to send to Purchaser's attorney, Rosen Livingston & Cholst LLP, at least ten (10) days in advance of the closing, written notice of the non-Permitted Encumbrance, then for purposes of paragraph 12 "Closing Adjustments", Purchaser shall be deemed at fault for not timely sending notice of the non-Permitted Encumbrance and the adjournment of the closing to allow Sponsor to correct or remove the non-Permitted Encumbrance shall be considered at the request of Purchaser and not Sponsor.

### 12. Closing Adjustments

(a) At closing, Sponsor and Purchaser shall apportion, as of 11:59 p.m. of the day preceding the closing:

(i) Real estate taxes, B.I.D. tax, and assessments, if any (as discussed below) (for purposes of this paragraph 12, the term real estate taxes shall be deemed to include assessments, if any. Real estate taxes and B.I.D. tax will be apportioned at closing between Sponsor and the Purchaser based on the period such taxes have been prepaid by Sponsor); and

(ii) Common Charges for the month in which title closes (based on the number of days in the month in which title closing occurs).

(b) The "Customs in Respect to Title Closings" recommended by The Real Estate Board of New York, Inc., as amended to date, shall apply to the adjustments and other matters therein mentioned, except as otherwise provided herein.

(c) Any errors or omissions in computing apportionments at closing shall be corrected and payment made to the proper party promptly after discovery. This provision shall survive the closing.

(d) Installments for tax assessments due after the delivery of the deed, if any, shall be paid by the Purchaser and shall not be considered a defect in title.

(e) If, through no fault of Sponsor, Purchaser fails for any reason to close on the Closing Date, or is deemed at fault for not timely sending a notice of a title defect as provided above, then all closing adjustments will be calculated as of 11:59 P.M. of the day immediately preceding the originally scheduled Closing Date and Purchaser will, at closing:

(i) reimburse Sponsor the daily sum equal to .044% (which is equivalent to an annual rate of approximately 16%) times the Unit's Purchase Price for each day's delay commencing with the date originally scheduled for closing through the day prior to the actual Closing Date; and

(ii) pay Rosen Livingston & Cholst LLP the sum of $250 for each default letter sent to Purchaser for each rescheduled closing date to reimburse such firm for the costs incurred in connection with sending such default letter or rescheduling the closing date.

All sums under clauses (i) and (ii) above shall be paid by unendorsed personal certified check of Purchaser or official cashier's or bank check.   Sponsor shall be entitled to adjourn the closing to remove or correct any non-Permitted Encumbrance.  However, if the non-Permitted Encumbrance existed at least ten (10) days prior to closing and Purchaser or Purchaser's attorney failed to send to Sponsor's attorney, Rosen Livingston & Cholst LLP, notice of such non-Permitted Encumbrance, then for purposes of the closing adjustments under this paragraph 12, Purchaser shall be deemed at fault for not timely sending notice of the non-Permitted Encumbrance and the adjournment of the closing to allow Sponsor to correct or remove the non-Permitted Encumbrance shall be considered at the request of Purchaser and not Sponsor.

### 13. Purchaser's Closing Costs

At closing, Purchaser will pay certain costs in connection with the purchase of his Unit in addition to the legal fees of Purchaser's counsel (if any) and the amount of any net credit in favor of Sponsor that may result from the closing apportionments described in the preceding paragraph. Such closing costs will include the following, the amounts of which (where applicable) are based on rates in effect on the date of the Plan and are subject to change without prior notice:

(a) If Purchaser elects to obtain fee title insurance, Purchaser will pay a premium to the title company for such insurance, which premium may vary depending upon the title insurance company and the amount of insurance requested. A lower combined rate may be available if fee and mortgage insurance are ordered simultaneously.

(b) Purchaser will pay a fee for recording the Unit Deed and the Unit Owner's Power of Attorney;

(c) If Purchaser obtains a mortgage loan, Purchaser will pay:

(i) a fee and service charge for recording the mortgage;

(ii) a mortgage recording tax in the following amount: (a) for Residential Units, 2.05% of the face amount of a mortgage less than $500,000 for which mortgagor receives a $25 deduction, or 2.175% for a mortgage covering a Residential Unit equal to $500,000.00 or more, less $25 and (b) for non-residential Units, 2.05% of the face amount of a mortgage less than $500,000 or 2.80% for a mortgage covering a non-residential Unit equal to $500,000 or more;

(iii) if mortgage title insurance is required by Purchaser's lender, an additional premium for insuring the mortgagee's interest in an amount equal to the principal amount under the mortgage loan.

(iv) if required by Purchaser's lender, deposits for Common Charges, real estate taxes and assessments in an initial amount and in such monthly sums after closing as required by the lender (the amount of which monthly deposits may be changed periodically by the lender). The amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the policies of the lender, the number of months remaining between the closing of title and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amount of the taxes and other charges or impositions then payable; and

(v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender. Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of his lender with respect thereto;

(vi) if, in connection with Purchaser's purchase, Purchaser has dealt with any broker except (A) the Selling Agent or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing;

(vii) Purchaser will pay to Rosen Livingston & Cholet LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owner's Power of Attorney, additional closing documents and for coordinating and attending the closing;

(viii) if Purchaser obtains financing and his lender refuses to close at the office of Rosen Livingston & Cholet LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and Purchaser pays Rosen Livingston & Cholet LLP, in addition to said closing fee set forth above, a travel fee of $500.00 if the closing is held in Manhattan or $700.00 if the closing is held in another borough. If the closing attended by a representative of Rosen Livingston & Cholet LLP is adjourned through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Cholet LLP an additional travel and attendance fee in the same amount as stated above for each attendance;

(viii) if Purchaser is other than a natural person, Purchaser will be required to provide a personal guaranty of Common Charges and other charges due to the Condominium and Purchaser will pay Rosen Livingston & Cholet LLP a fee of $500.00 for preparation of such Guaranty;

(ix) if Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Cholet LLP a fee of $1,000.00 for the preparation of the splitter, substitute mortgage and assignment of mortgage documents; and

9

(d) Purchaser will pay the New York State Real Estate Transfer Tax (documentary stamps) to be affixed to the deed, the New York City Real Property Transfer Tax and (if applicable) the one (1%) percent "mansion tax";

(e) Purchaser will pay to 135 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit by Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.

All of the aforementioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's unendorsed, personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party, or if so directed by the Sponsor, by wire transfer.

**14. Power of Attorney to Condominium Board, Sponsor, Retail Unit Owner and Commercial Unit Owners**

At closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit (or, if no representative is present, then to Sponsor's attorney), for recording in the New York City Register's Office a Power of Attorney in favor of the Condominium Board relative to purchasing or leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owners relative to amending the Condominium Documents to the extent permitted in the Power of Attorney. An originally recorded Power of Attorney shall be sent to the Condominium Board.

**15. Events of Default**

(a) The following shall constitute "Events of Default" hereunder:

(i) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 6 herein or to timely pay the applicable Rosen Livingston & Cholet LLP closing fee or any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Cholet LLP pursuant to paragraphs 12 and 13 above; or

(ii) the dishonor or failure of collection of Purchaser's Down Payment check; or

(iii) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder.

(b) Upon the occurrence of an Event of Default, Sponsor shall be entitled, in its sole and absolute discretion, to cancel this Purchase Agreement by giving Purchaser written notice of cancellation. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default. TIME IS OF THE ESSENCE TO CURE SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD. If the default is not cured within such thirty (30) day period, then this Agreement shall be deemed canceled and Sponsor shall have the right to retain, as and for liquidated damages, the Downpayment. Any sums in excess thereof, together with any interest thereon shall have to returned to Purchaser after cancellation.

Notwithstanding the foregoing, if Purchaser's check in payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in which to provide good funds for Purchaser's Down Payment, in which event Sponsor shall be deemed to have waived its right to sue Purchaser on the dishonored or uncollected check; or (ii) allow Purchaser thirty (30) days in which to make good Purchaser's Down Payment and if Purchaser fails to so do within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check, in the latter case, Purchaser will also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

10

Upon cancellation of this Agreement and disposing of the Down Payment and interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan. Thereafter, the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

**16. Risk of Loss; Casualty**

(a) Purchaser shall not be entitled to possession of the Unit nor to store any of Purchaser's furniture or belongings therein until the deed is delivered to Purchaser at closing.

(b) All other risk of loss prior to closing has been assumed by Sponsor, but without any obligation or liability of Sponsor to repair the damage or restore the Unit or its contents. If Sponsor or the Unit Owners elect to repair or replace the loss or damage, this Agreement shall continue in full force and effect. Purchaser shall not have the right to reject title to the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or replacements. Purchaser shall not be required to pay the Balance unless and until (i) the Unit has been substantially repaired as near as is reasonably possible to its condition immediately prior to the casualty; (ii) its essential services (such as gas, electricity, and heat) and a reasonable means of ingress and egress to the street have been restored; and (iii) any condition in the Unit for which a violation (if any) is noted or issued has been corrected (even if same is not yet removed of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser, its licensees, invitees and/or workers. Sponsor will endeavor in good faith, and with reasonable diligence, to remove or cause to be removed subsequent to closing all violations of record it is obligated to correct.) Any proceeds received from insurance, or in satisfaction of any claim or action in connection with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners). If such proceeds are paid to Purchaser, Purchaser shall promptly turn them over to Sponsor upon request. The provisions of the two preceding sentences shall survive the closing.

(c) In the event that Sponsor notifies Purchaser that it does not elect to repair or restore the Unit or if the Unit Owners do not resolve to make such repairs or restoration in accordance with the Condominium's By-Laws, this Agreement shall be deemed canceled and of no further force or effect, and Sponsor shall instruct the Depositary to return to Purchaser all sums deposited hereunder, together with interest, if any, thereon, whereupon the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously canceled due to Purchaser's uncured default, Sponsor shall retain the Liquidated Sum as provided above.

**17. Inspection of Unit**

At least ten (10) days before the Balance is to be paid, Sponsor or the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Sponsor or the Selling Agent to inspect the Unit before the lapse of such ten (10) day period. Purchaser or his duly authorized agent shall attend such inspection and shall complete, date and sign the inspection Report (in the form set forth as Exhibit B to this Agreement) and deliver same to the Sponsor or Selling Agent at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the completed Inspection Report shall not excuse Purchaser from paying the Balance when due (without provision for escrow) and shall constitute Purchaser's full acceptance of the Unit.

11

However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of the Sponsor".

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Units and the Retail Unit may be used for any lawful purpose and (ii) the Condominium Board, and the Residential Unit Owners do not have any right to approve the use or any changes in the use of the Unsold Residential Units, the Commercial Units and the Retail Unit or any part thereof. This paragraph shall survive the closing of title.

**18. No Representations**

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, furnishings and fixtures contained in model units, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms or closets therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to his purchase of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and investigation thereof). No person has been authorized to make any representations on behalf of Sponsor. No oral representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, without affect or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially to such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the closing of title.

**19. Negotiable Terms**

Sponsor reserves the right, in its sole and absolute discretion, to negotiate on an individual basis with each purchaser substantially more beneficial purchase terms than those offered or given to other purchasers. As a result, Purchaser may not benefit from a more favorable purchase term given to another purchaser and will not have the right to rescind the Purchase Agreement or recover his Down Payment or any other amount for not being given such benefit. The following is a list of only some of the purchase terms which may be negotiated: purchase price; the amount of the Down Payment; the right of a purchaser to cancel the Purchase Agreement and recover the Down Payment if unable to obtain financing or to close by a specific date; the closing date and minimum notice required to schedule the closing; upgraded appliances, fixtures or equipment or other alterations, improvements or additions to be performed by and at the expense of Sponsor; excusing a purchaser from closing costs and/or penalties for closing late; longer lime periods to pay or perform obligations under the Purchase Agreement; elimination of "time of the essence" provisions; price or common charge rebates; assumption or payment of, or guaranties of, common charges for a given period; Sponsor financing (provided an amendment to the Plan containing the terms thereof is duly filed); allowances or credits against the purchase price for decorations; to install appliances or fixtures and granting to Purchaser the benefit of any one or more favorable terms offered or given to another purchaser.

12

## 20. Notices

All notices, elections, consents, demands and communications (collectively called "notices" or individually called "notice") shall be delivered personally or given in writing by registered or certified mail, return receipt requested, postage prepaid, and, if sent to Purchaser, addressed to Purchaser at Purchaser's address given above, with a copy to Purchaser's attorney, and, if sent to the Sponsor, addressed to the Sponsor at c/o Rosen Livingston & Cholst LLP, 275 Madison Avenue, New York, New York 10016, Attention: Andrew B. Freedland, Esq. Either party may, by notice to the other, change the address to which notices are to be sent. Unless otherwise provided herein, all notices shall be deemed given when personal delivery is effected or when deposited in any branch, station or depository maintained by the U.S. Postal Service in the City and State of New York, except that a notice of a new address shall be deemed given when actually received.

Sponsor has authorized the Selling Agent and Rosen Livingston & Cholst LLP, its partners, associates and legal assistants to sign and deliver on behalf of Sponsor any and all notices (including, without limitation, notices fixing and adjourning the closing date, notice of default, etc.) required or permitted to be given hereunder.

## 21. Broker

Purchaser represents to Sponsor that Purchaser has not dealt with any broker in connection with this transaction apart from the Selling Agent and the Co-Broker whose name appears on page 1. Purchaser shall pay the commission of any broker with whom Purchaser may have dealt (other than the Selling Agent and the Co-Broker) and Purchaser agrees that should any claim be made against Sponsor for commissions by any other broker on account of any acts or dealings of Purchaser or of Purchaser's representatives, Purchaser will indemnify and hold Sponsor free and harmless from any and all liabilities and expenses in connection therewith, including (without limitation) reasonable legal fees and disbursements. The provisions of this paragraph shall survive the closing.

## 22. No Lien; Agreement Subordinate to Mortgage

(a) No lien or encumbrance shall arise against the Property or the Unit as a result of this Agreement or any monies deposited hereunder. This Agreement shall not be recorded and any purported recordation hereof by Purchaser shall be void and constitute an Event of Default.

(b) In furtherance, and not in limitation, of the provisions of the preceding subparagraph (a), Purchaser agrees that the provisions of this Agreement are, and shall continue to be, subject and subordinate to the lien of any mortgages heretofore or hereafter made and any payments or expenses already made or incurred or which hereafter may be made or incurred pursuant to the terms thereof, or incidental thereto, or to protect the security thereof, to the full extent, without the execution of any further legal documents by Purchaser.  In the event of the existence of such mortgage(s), Sponsor shall, at its option, either satisfy such mortgages or obtain a release of the Unit and its undivided interest in the Common Elements from the lien of such mortgages on or prior to the Closing Date.  The existence of any mortgage or mortgages encumbering the Property, or portions thereof, other than the Unit and its undivided interest in the Common Elements, shall not constitute an objection to title or excuse Purchaser from completing payment of the Purchase Price or performing all of Purchaser's other obligations hereunder or be the basis of any claim against, or liability of, Sponsor, provided that the Unit is released from the lien of such mortgage at closing.

## 23. Entire Agreement

This Purchase Agreement, together with the Plan, as the Plan and Purchase Agreement may be amended from time to time, constitutes the entire agreement between the parties as to the subject matter hereof and supersedes all prior understandings and agreements.

## 24. Agreement May Not Be Assigned Without Consent

Purchaser does not have the right to assign this Agreement without the express prior written consent of Sponsor in each instance.  Sponsor is not obligated to give such consent and if Sponsor refuses to consent Purchaser will not be excused from Purchaser's obligations under this Agreement.

If Sponsor, in its sole discretion, elects to permit Purchaser to assign this Agreement, Purchaser shall pay to Rosen Livingston & Cholst LLP, simultaneously with Purchaser's execution and delivery of such assignment, a fee of $350 for preparing such assignment.

## 25. Joint Purchasers

The term "Purchaser" shall be read as "Purchasers" if the Unit is being purchased by more than one person, in which case their obligations shall be joint and several.

## 26. Acts of God

Sponsor shall be excused from performing any obligations or undertaking provided for in this Agreement for so long as such performance is prevented, delayed, or hindered by an act of God, fire, flood, explosion, war, riot, sabotage, inability to procure or, general shortage of, energy, labor, equipment, facilities, materials, or supplies in the open market, failure of transportation, strike, lock-out, action of labor unions or any other cause (whether similar or dissimilar to the foregoing) not within the reasonable control of Sponsor.  Sponsor's time to perform such obligations or undertaking shall be tolled for the length of the period during which such performance was excused.

## 27. Further Assurances

Either party shall execute, acknowledge and deliver to the other party such instruments and take such other actions, in addition to the instruments and actions specifically provided for herein, as such other party may reasonably request in order to effectuate the provisions of this Agreement or of any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction.

## 28. Severability

If any provision of this Agreement or the Plan is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement or the Plan and the applicability of such provision to other persons or circumstances shall not be affected thereby.  Each provision of this Agreement or the Plan, except as otherwise herein or therein provided, shall be valid and enforced to the fullest extent permitted by law.

## 29. Strict Compliance

Any failure by Sponsor to insist upon strict performance by Purchaser of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof, irrespective of the number of violations or breaches that may occur, and Sponsor, notwithstanding any such failure, shall have the right thereafter to insist upon strict performance by Purchaser of any and all of the provisions of this Agreement to be performed by Purchaser.

## 30. Governing Law

The provisions of this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York.

## 31. Waiver of Jury Trial

Except as prohibited by law, the parties shall, and they hereby do, expressly waive trial by jury in any litigation arising out of, connected with, or relating to this Agreement or the relationship created hereby or in the Plan.  With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.

## 32. Gender

A reference in this Agreement to any one gender, masculine, feminine, or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context otherwise requires.

## 33. Certain References

The term "herein", "hereof" or "hereunder" or similar terms used in this Agreement refer to this entire Agreement and to the particular provision in which the term is used.  Unless otherwise stated, all references herein to paragraphs, subparagraphs or other provisions are references to paragraphs, subparagraphs or other provisions of this Agreement.

## 34. Captions

The captions in this Agreement are for convenience and reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

## Successors and Assigns

The provisions of this Agreement shall bind and inure to the benefit of Purchaser and Purchaser's heirs, legal representatives, successors and permitted assigns and shall bind and inure to the benefit of Sponsor and its successors and assigns.

## 35. No Oral Changes

This Agreement cannot be changed or any provision waived orally.  ANY CHANGES OR ADDITIONAL PROVISIONS OR WAIVERS MUST BE SET FORTH IN A RIDER ATTACHED HERETO OR IN A SEPARATE WRITTEN AGREEMENT SIGNED BY THE PARTIES.

## 36. Acceptance of Purchase Agreement

(a) This Agreement shall not be binding upon Sponsor until a duplicate hereof, executed by Sponsor or its duly authorized agent, is delivered to Purchaser.  The submission of a Plan or Purchase Agreement to a prospective purchaser shall not be construed as Sponsor's approval of such sale.  If such executed duplicate of this Agreement is not out of delivered to Purchaser within thirty (30) days after same is received by the Selling Agent along with a check for the Down Payment, it shall be deemed rejected and canceled and all monies paid by Purchaser shall be promptly refunded without interest.  Upon such refund being made, neither party shall have any further rights or obligations hereunder with respect to the other.  Sponsor shall have the right to reject this Agreement without cause or explanation to Purchaser, provided such rejection is not due to Purchaser's sex, race, creed, color, national origin, ancestry, disability, marital status or other ground proscribed by law.

## 37. Escrow Provisions

A.  The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, Suite 500, New York, NY 10016, telephone number 212 687-7770, shall serve as

escrow agent ("Escrow Agent") for Sponsor and Purchaser.  Escrow Agent has designated the following attorneys to serve as signatories: Morton H. Rosen, Peter I. Livingston, Bruce A. Cholst, Mary L. Kosmark.  All designated signatories are admitted to practice law in the State of New York.  Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor, Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

B.  Escrow Agent and all authorized signatories hereby submit to the jurisdiction of the State of New York and its Courts for any cause of action arising out of the Purchase Agreement or otherwise concerning the maintenance or release of the Deposit from escrow.

C.  The Escrow Agent has established the escrow account at Signature Bank, located at 950 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York.  The escrow account is entitled "(Purchaser's Name) Rosen Livingston & Cholst LLP as Escrow Agent" ("Escrow Account").  The Escrow Account is not an IOLA account.  The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit.  Any deposit in excess of $250,000 will not be insured.

D.  All Deposits received from Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP, as Escrow Agent.

E.  The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts.  Interest shall begin to accrue upon placing the Deposit into the Escrow Account.  All interest earned thereon shall be paid to or credited to the Purchaser at closing.  No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account.

F.  Within five (5) business days after the Purchase Agreement has been tendered to Escrow Agent along with the Deposit, the Escrow Agent shall sign the Escrow Agreement and place the Deposit into the Escrow Account.  Within ten (10) business days of the placing the deposit in the Escrow Account, Escrow Agent shall provide written notice to Purchaser and Sponsor, confirming the Deposit.  The notice shall provide the account number and the initial interest rate to be earned on the Deposit.  Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of the Escrow Agreement.

G.  The Escrow Agent is obligated to send notice to the Purchaser once the Deposit is placed in the Escrow Account.  If the Purchaser does not receive notice of such deposit within fifteen (15) business days after tender of the Deposit, he or she may cancel the Purchase Agreement within ninety (90) days after tender of the Purchase Agreement and Deposit to Escrow Agent.  Complaints concerning the failure to honor such cancellation requests may be referred to the New York State Department of Law, Real Estate Finance Bureau, 120 Broadway, 23rd Floor, New York, N.Y. 10271.  Rescission shall not be afforded where proof satisfactory to the Attorney General is submitted establishing that the Deposit was timely placed in the Escrow Account in accordance with the New York State Department of Law's regulations concerning Deposits and requisite notice was timely mailed to the Purchaser.

H.  All Deposits, except for advances made for upgrades, extras, or custom work received in connection with the Purchase Agreement, are and shall continue to be the

Purchaser's money, and may not be comingled with any other money or pledged or hypothecated by Sponsor, as per GBL § 352-h.

    I.    Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until after consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law.  Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

    J.    The Escrow Agent shall release the Deposit if so directed:

    (a) pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 5 upon closing of title to the Unit; or

    (b) in a subsequent writing signed by both Sponsor and Purchaser; or

    (c) by a final, non-appealable order or judgment of a court.

If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit.  If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release.  If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within said thirty (30) day period, the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above.  Notwithstanding the foregoing, the Escrow Agent shall have the right at any time to deposit the Deposit contained in the Escrow Account with the clerk of the county where the Unit is located and shall give written notice to both parties of such deposit.

The Sponsor shall not object to the release of the Deposit to:

    (a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an Amendment to the Plan; or

    (b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

    K.    Any provision of the (Purchase Agreement/Escrow Agreement) or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding any Deposit in trust is absolutely void.  The provisions of the Attorney General's regulations and GBL §§ 352-e(2-b) concerning escrow trust funds shall prevail over any conflicting or inconsistent provisions in the Purchase Agreement, Plan, or any amendment thereto.

    L.    Escrow Agent shall maintain the Escrow Account under its direct supervision and control.

17

    M.    A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352(h).

    N.    Escrow Agent may rely upon any paper or document which may be submitted to it in connection with its duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

    O.    Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-(h) and the New York State Department of Law's regulations.

    P.    Sponsor shall obtain or cause the selling agent under the Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement.  Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstance.

    R.    Sponsor agrees to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of the obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent.  This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

### 38.  Counterpart Signature Pages

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument.  This Agreement may be executed by facsimile or .pdf and such shall be deemed originals.

[Signature page follows]

18

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:
135 WEST 52nd STREET OWNER
LLC

By: _____
    Meyer Chetrit, Principal

By: _____
    David Bistricer, Principal

(Purchaser)
Date Accepted: _____

(**Please initial on line and print or type name under line.)

Purchaser acknowledges:
Receipt of Offering Plan and
Amendments at _____ (A.M./P.M.)
on _____, 2014; and

Delivery of Purchase
Agreement and Check for
Down Payment at _____ (A.M./P.M.)
on _____, 2014

PURCHASER:

_____
    Purchaser

_____
    Co-Purchaser

Initials: K
Purchaser: ZHU KEQING

Initials: M
Co-Purchaser: QIAN MIAO

19

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:
135 WEST 52nd STREET OWNER
LLC

By: _____
    Meyer Chetrit, Principal

By: _____
    David Bistricer, Principal

(Purchaser)
Date Accepted: _____

(**Please initial on line and print or type name under line.)

Purchaser acknowledges:
Receipt of Offering Plan and
Amendments at _____ (A.M./P.M.)
on _____, 2014; and

Delivery of Purchase
Agreement and Check for
Down Payment at _____ (A.M./P.M.)
on _____, 2014

PURCHASER:

_____
    Purchaser

_____
    Co-Purchaser

Initials: K
Purchaser: ZHU KEQING

Initials: M
Co-Purchaser: QIAN MIAO

19

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:
135 WEST 52ND STREET OWNER
LLC

By: _____
Mayer Chetrit, Principal

By: _____
David Bistricer, Principal

PURCHASER:

_____
Purchaser

_____
Co-Purchaser

(Purchaser)
Date Accepted:
11/6/14 @ 3:30-pm   MB
('Please initial on line and print or
type name under line.)

Purchaser acknowledges:
Receipt of Offering Plan and
Amendments at _____ (A.M.)(P.M.)
on _____, 2014; and

Initials: K   ZHI KEBIN/=

Delivery of Purchase
Agreement and Check for
Down Payment at _____ (A.M.)(P.M.)
on 11/6/11, 2014

Initials: M   QIAN MIRv

19

---

EXHIBIT A TO PURCHASE AGREEMENT
Permitted Encumbrances

1.      Building restrictions and zoning laws and other regulations, resolutions and ordinances and any amendments thereto now or hereafter adopted by any governmental or quasi-governmental authority having jurisdiction, provided they do not prevent the use of the subject Unit for dwelling purposes.

2.      State of facts shown on a survey made by Earl B. Lovell-S.P. Belcher, Inc. dated March 12, 2013 and any state of facts which a more recent survey or personal inspection of the land and building would show, provided such additional state of facts would not prevent the use of the subject Residential Unit for dwelling purposes or, if applicable, the subject Commercial or Retail Unit for the purposes permitted by Law and further provided that such state of facts do not render title unmarketable.

3.      The terms, burdens, covenants, restrictions, conditions, easements and rules and regulations set forth in the Declaration, the By-Laws (and the Rules and Regulations thereto), the Power of Attorney from Purchaser to the Condominium Board, Sponsor, the Commercial Unit Owners and the Retail Unit Owner and the Floor Plans, all as same may be amended from time to time.

4.      Consents by Sponsor, or any former owner of the Land for the erection of any structure or structures on, under or above any land, street or streets on which the Land may abut.

5.      Any easement or right of use in favor of any utility company for construction, use, maintenance, repair and replacement of all utility lines, wires, terminal boxes, mains, pipes, cables, conduits, poles, connections and other equipment and facilities on, under and across the Land and Building.

6.      Revocability of licenses for vault space, if any, under the sidewalks and streets and the lien of any unpaid vault tax (which is to be paid by the Condominium Board, the Retail Unit Owner or the Commercial Unit Owners (as the case may be)).

7.      Encroachments of stoops, areas, cellar steps or doors, trim, copings, retaining walls, bay windows, terraces, balconies, sidewalk elevators, fences, fire escapes, cornices, foundations, footings, chutes, fuel oil lines, drainage and vent pipes, and similar projections, if any, on, over, or under the Property or the streets or sidewalks abutting the property and the rights of governmental authorities to require the removal of any such projections, and variations between record lines of the Property and retaining walls and the like, if any.

20

---

8.      Leases and service, maintenance, employment, management, concessionaire and license agreements, if any, of other Units or portions of the Common Elements, provided same are disclosed in the Plan or in an amendment thereto.

9.      The lien of any unpaid Common Charge, real estate tax, water charge or sewer rent, provided the same are adjusted at the closing of title.

10.     The lien of any unpaid assessment payable in installments (whether imposed by a taxing authority or the Condominium Board), except that Sponsor shall pay all such assessments due prior to the Closing Date and Purchaser shall pay all assessments due from and after such date (however, the then current installment shall be adjusted at closing).

11.     Any encumbrances as to which either the Title Insurance Company or the title insurance company which insures Purchaser's title to the Unit would be willing to insure at its regular rates, without additional premium, in a fee policy issued by it to Purchaser to insure that such encumbrances, (a) will not be collected out of or enforced against the Unit if it is a lien and (b) will not prevent the use of the subject Residential Unit for dwelling purposes.  (Any exception which the Title Insurance Company has omitted or insured at its regular rates and without additional premium, which will not be collected out of or enforced against a Unit, in a fee title insurance policy for other Units, is not an objection to title.)

12.     The Certificate of Occupancy to be issued covering the Building, provided it authorizes occupancy of the subject Residential Unit for residential purposes.

13.     Any violations against the Property (other than the subject Unit) which are the obligation of the Condominium Board or another Unit Owner to correct.

14.     Standard printed exceptions contained in the form of fee title insurance policy then issued by the title insurance company insuring Purchaser's title to the subject Unit.

15.     Any easement or right of use required for Sponsor to obtain a temporary, final or amended Certificate of Occupancy for the Building, provided such easement or right of use will not prevent the use of the subject Residential Unit for dwelling purposes.

16.     Distinctive Street Improvement Maintenance Agreement in Reel 1109 Page 882.

17.     Zoning Lot Certification in Reel 789 Page 115.

21

---

EXHIBIT B
INSPECTION REPORT

Date:
135 West 52nd Street Owner LLC
512 Seventh Avenue
New York, New York 10018

Re:     Unit _____
135 West 52nd Street Condominium
135 West 52nd Street
New York, New York 10019

Gentlemen:
This is to confirm that based on the undersigned's personal inspection of the above referenced Unit, I (we) have found the Unit, its floors, walls, doors, fixtures, appliances, equipment, hardware and all other items listed below, to be in good and satisfactory condition, free of chips, mars, scratches, breaks or other defects, except for those matters (if any) expressly noted below under "exceptions" requiring repair, adjustment or correction:

|   | Item | Exceptions (if any) | Purchaser's Initials |
|---|------|---------------------|----------------------|
| 1. | Unit Interior: | | |
|   | (a) Walls: | _____ | _____ |
|   | (b) Floors: | _____ | _____ |
|   | (c) Ceilings: | _____ | _____ |
|   | (d) Windows: (glass, sash, pane, sill, etc.) | _____ | _____ |
|   | (e) Doors: | _____ | _____ |
|   | (f) Electrical fixtures: | _____ | _____ |
|   | (g) Painted surfaces: | _____ | _____ |
|   | (h) Kitchen cabinets: | _____ | _____ |
|   | (i) Appliances: | _____ | _____ |
|   | (j) Kitchen sink: | _____ | _____ |
|   | (k) Medicine cabinets: | _____ | _____ |
|   | (l) (doors & mirror) Vanities: | _____ | _____ |

22

| Item | Exceptions (if any) | Purchaser's Initials |
|------|---------------------|----------------------|
| (m) | Bathroom sinks: | |
| (n) | Water closet: | |
| (o) | Bathtubs: | |
| (p) | Bathroom tile: | |
| (q) | Hardware: | |
| | (doorbell, doorknob, faucets, locks, etc.) | |
| (r) | Intercom: | |
| 2. | General Operating Condition: | |
| (a) | All Doors: | |
| (b) | All Windows: | |
| (c) | All Plumbing: | |
| (d) | All Hardware: | |
| (e) | Other: | |

The undersigned will sign and deliver to you a separate statement signifying my (our) satisfaction with each item excepted above (if any), immediately upon the completion of the repair, adjustment or correction of same. The undersigned understands and agrees that you shall not be obligated to make any repairs, adjustments or corrections to the Unit or any portion thereof or its fixtures, appliances, equipment, etc., contained therein, from or after the date of delivery of possession of the Unit to the undersigned, except as to those items (if any) expressly excepted above and your obligation regarding any such excepted items shall cease upon the completion of the repair, adjustment or correction of same. Nothing contained herein shall be construed to excuse Sponsor from its obligations to correct defects in construction or design to the extent required in the section entitled "Rights and Obligations of Sponsor" contained in the Offering Plan for Condominium Ownership of the 135 West 52nd Street Condominium. The undersigned shall be required to complete the payment of the Purchase Price (without the provision for an escrow) and accept title to the Unit on the closing date notwithstanding the presence of any exceptions.

Very truly yours,

_____
Purchaser's Signature

Agreed To:
135 West 52nd Street Owner
LLC

_____
Purchaser's Signature

By: _____

23

## PURCHASE AGREEMENT

AGREEMENT made as of ~~January~~ _Februa[ry]_, 2016 between 135 WEST 52ND STREET OWNER, LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and Jessica Rodriguez residing at 345 East 56th Street, Apartment 9EE, New York, NY 10022 ("Purchaser").

Purchaser's Attorney:  Keith A. Schuman, Esq.

Address:  Schuman & Associates LLC
1535 Third Avenue, 4th Floor
New York, NY 10028

Telephone: (212) 490 0100 x302   Fax:   Email: keith@schumanlawfirm.com

Percentage of Common Interest: 0.7300 %  Common Charges: $1,603.02 per month

Residential Percentage of Common Interest: 0.9975%

Selling Agent: Douglas Elliman (Stacy Spielman)

Co-Broker: Brown Harris Stevens Residential Sales, LLC (Stacey Lynn Oury)

Real Estate Taxes: $1,494.77 per month;   B.I.D. Tax: $26.19 per month;

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 17B ("Unit") in the building ("Building") known as 135 WEST 52ND STREET Condominium ("Condominium") and located at 135 WEST 52ND STREET, New York, New York 10019, together with a 0.7300% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein.  The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

### 1.  Purchase Price

(a) The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below ("Purchase Price") is $3,710,000.00, payable as follows:

(i) $555,000.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 6; and

(ii) $3,145,000.00, constituting the balance of the Purchase Price ("Balance"), by certified check of Purchaser or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State.  All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined).  All checks in payment of the balance of the Purchase Price shall be payable to the order of Sponsor (or as Sponsor otherwise directs.  Sponsor reserves the right to require Purchaser to pay the Balance or any portion thereof in "immediately available funds" (i.e. by wire transfer to a bank account designated by Sponsor).

(c) All checks shall be unendorsed, made payable to the direct order of 'Rosen Livingston & Cholst LLP, as Escrow Agent' or (as to the Balance) to '135 West 52ND Street Owner LLC' or

such payees as Sponsor may direct on not less than two (2) business days' prior oral or written notice to Purchaser.  All checks shall be drawn on a bank that is a member of the New York Clearing House Association.  All checks must be payable directly to the order of the required payee; they may not be endorsed.

(d) Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing and, unless otherwise set forth herein, none of the provisions of this Agreement shall survive the closing.  However, nothing contained herein shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of Purchaser under Article 23-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.

(e) Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under "Terms of Sale - Prerequisites to Closing of Title" in Part I of the Plan are met concurrently with, or prior to, closing.

### 2.  Definitions   The following terms shall have the meanings ascribed to them:

(a) "Building" shall mean the building located at 135 West 52ND Street, New York, New York 10019.

(b) "Closing Date", "closing", "closing of title" and words of similar import are used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment to Sponsor of the Purchase Price and the delivery to Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.

(c) "Condominium" shall mean The 135 West 52nd Street Condominium.

(d) "Declaration" shall mean the Declaration of the 135 West 52ND Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.

(e) "Depository" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.

(f) "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto at least three (3) business days after which Purchaser signs this Agreement.

(g) "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.

(h) "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.

All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

### 3.  Plan

(a) Purchaser represents that Purchaser has possessed the Plan and any filed amendments thereto at least three (3) business days prior to submitting this Purchase Agreement; or

(b) in the event Purchaser does not wish to wait three (3) business days) Purchaser has the right to rescind this Purchase Agreement by sending written notice of his rescission to the Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement (time being of the essence to exercise such right of rescission within such seven (7) day period).

(c) Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Condominium Documents set forth in Part II of the Plan and Parts A and B of the Exhibits submitted with the Plan to the Department of Law) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor (including, without limitation, amendments involving any changes, modifications, or updating of the projected Common Charges, the projected real estate taxes to be paid by Purchaser, or Schedule B "Budget for the First Year of Condominium Operation").  Except in the case of a material adverse amendment affecting Purchaser's Unit or an otherwise amended under the Plan, any such amendments shall neither excuse Purchaser from performing Purchaser's obligations hereunder nor entitle Purchaser to any offset or credit against the Purchase Price or claim or right of action against Sponsor; and any such amendment may be filed by Sponsor without Purchaser's consent or approval.  However, Sponsor shall not have the right to unilaterally cancel this Agreement except as herein provided (such as in the case of an uncured default by Purchaser) nor change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.

(d) The Plan is hereby incorporated in this Agreement with the same force and effect as if set forth at length.  In the event of any inconsistency or conflict between the provisions of this Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding.  Purchaser acknowledges having had full opportunity to examine all documents and investigate all statements made herein and in the Plan.

### 4.  Personal Property

(a) At closing, the Unit will contain only those appliances, countertops, cabinets, flooring, sinks, vanities (if any), air conditioning units (if any), hardware and other fixtures and equipment installed therein as set forth in the Plan.

Sponsor has the right to substitute other appliances, countertops, cabinets, sinks, vanities, flooring and fixtures in place of those referred to in the Plan provided only that the substitutions are of equal or better quality and design.

(b) The Unit is being sold unfurnished, without window blinds or shades.  Furniture, floor coverings, wall coverings, furnishings, decorations and the like in or about any model Unit are for display purposes only and are not included in this sale except to the extent set forth in the Plan.  Any floor plans or sketches shown to Purchaser (including those contained in the Plan) are only approximations of the Unit's dimensions and arrangement and Purchaser acknowledges and agrees that he is not relying thereon.  Sponsor shall not be liable for minor variations from any floor plans or structures.

(c) Sales model apartments may, at Sponsor's option, be sold furnished at a later date but will initially be withheld from sale.

(d) There will be no modifications or extras unless agreed to in writing by the parties.  All modifications and alterations must be approved by Sponsor in writing and, if approved, shall be performed by Sponsor at Purchaser's expense (payable in the manner to be set forth in an addendum to this Agreement or by separate agreement between Sponsor and Purchaser).

### 5.  Purchase Monies to be Held in Trust

(a) The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, New York, NY 10016, telephone number 212 867 7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser.  Escrow Agent has designated the following attorneys to serve as signatories: Marion H Rosen, Peter I Livingston, Andrew B. Freedland, Bruce A. Cholst.  All designated signatories are admitted to practice law in the State of New York.  Neither the Escrow Agent nor any authorized signatories on the account are the

Sponsor, Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

(b) The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York.  The escrow account is entitled "[Purchaser's Name] Rosen Livingston & Cholst LLP Escrow Agent" ("Escrow Account").  The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit.  Any deposit in excess of $250,000 will not be insured.

All Deposits received by Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP as Escrow Agent.

Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of a written agreement between Purchaser and Sponsor.

The interest rate for all Deposits held into the Escrow Account shall be the prevailing rate for such accounts, which is currently 0.2%.  Interest shall begin to accrue upon placing the Deposit into the Escrow Account.  All interest earned thereon shall be paid to or credited to the Purchaser at closing.  No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account.  The Escrow Agreement appended hereto as Exhibit "A."

The Down Payment will not earn interest until the Purchaser's check has been deposited and cleared.  Sponsor will be liable to Purchaser only for the amount of interest actually received from the Depository (which interest may be reduced by the Depository's service charge).  The interest on the Down Payment, as same may be reduced by the Depository's service charge, is hereinafter referred to as "interest".

Upon the payment and performance by Purchaser of all of Purchaser's obligations hereunder and the transfer to Purchaser of title to the Unit, Sponsor will instruct the Depository to pay to Purchaser any and all interest on the monies deposited hereunder.  It is possible that Purchaser may not receive interest on the Down Payment for the entire month in which the closing is scheduled to occur.  The Sponsor and Selling Agent will not be liable to Purchaser for the amount of such interest or the payment thereof, except for any amount received from the Depository.  All funds due to Sponsor and received under this Purchase Agreement will be handled in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and with Section 71-a(3) of the New York Lien Law.

### 6.  Closing of Title

(a) The closing of title shall occur on the date and at the time and place in the City and State of New York as Sponsor shall designate to Purchaser on not less than thirty (30) days' prior written notice (unless waived by Purchaser).  Sponsor shall have the right, from time to time, to adjourn such date and time for closing on written notice to Purchaser.  If the closing is adjourned by Sponsor, then Sponsor shall fix a new date and time for closing and shall give Purchaser not less than ten (10) days' prior written notice of the new scheduled date and time for closing.

Purchaser shall be entitled to one (1) adjournment of the closing not to exceed five (5) days (the "Adjourned Closing Date"). The closing adjustments stated in section 12(e) shall not accrue unless Purchaser fails to close on each Adjourned Closing Date. Such adjournment must be exercised no less than two (2) days prior to the scheduled closing date.

(b) The closing of title shall occur only after or concurrently with compliance with the prerequisites set forth under "Terms of Sale Prerequisites to Closing of Title" in Part I of the Plan.

(c) Sponsor has targeted the First Closing for June 1, 2015 based on the current construction schedule. The actual date for the First Closing is not assured or warranted and may be earlier or substantially later depending on the progress of sales and construction and compliance with the other prerequisites recited in the section of the Plan entitled "Terms of Sale". However, if through no fault of Purchaser the First Closing does not take place by June 1, 2016, Purchaser shall have the right to rescind this Purchase Agreement and recover his Down Payment with all interest thereon by giving written notice of his or her election to do so to the Sponsor no later than fifteen days after the date that such right arises.

Purchaser acknowledges that Units may be completed at varying times over a prolonged period that will extend beyond the First Closing. In such event, the order in which Units will be completed is within the sole discretion of Sponsor and may not coincide with the chronology in which Units are contracted for sale nor the numeric order of the floors. Many unforeseeable factors can affect the completion of Units. Accordingly, the sequence in which Units (including the subject Unit) will actually be finished cannot reasonably be predicted. No representation is made nor any assurance given that the closing of the subject Unit will occur contemporaneously with the First Closing.

Purchaser further acknowledges that construction (and, therefore, the closing) may be delayed by late delivery of material and equipment, labor difficulties, unavailability of building trades, casualty, inclement weather and other events beyond Sponsor's control.

Purchaser agrees that Sponsor is to be afforded any broad latitude in time and in all decisions concerning the completion of the Property and the Units pursuant to the Plan. Purchaser will not be excused from paying the full Purchase Price, without credit or set off, and will have no claim against Sponsor for damages or losses in the event the First Closing occurs substantially later than the targeted date or the item to complete and close title to Purchaser's Unit is delayed or postponed by Sponsor.

Notwithstanding the foregoing, Purchaser may rescind this Agreement and receive the prompt refund of his or her Downpayment if the construction of the Unit is not complete within one year of the date Purchaser signed this Agreement by giving written notice of his or her election to do so to the Sponsor no later than fifteen days after the date that such right arises.

### 7.   Representations, Warranties and Covenants

Sponsor represents, warrants and covenants that:

(a) Sponsor is the sole owner of the Unit and the property referred to in paragraph 1, and Sponsor has the full right, power and authority to sell, convey and transfer the same;

(b) The common charges (excluding separately billed utility charges) for the Unit on the date hereof are set forth on page 1 of this Agreement;

(c) Sponsor has not received any written notice of any intended assessment or increase in common charges not reflected in subparagraph 7(b). Purchaser acknowledges that it will not have the right to cancel this Agreement in the event of the imposition of any assessment or increase in common charges after the date hereof of which Sponsor has not heretofore received written notice;

5

### 9.   State of Title

(a) Legal ownership to the Unit shall be transferred to Purchaser at Closing subject only to the liens, encumbrances and title conditions (hereinafter called the "Permitted Encumbrances") enumerated in Exhibit A to this Agreement. The existence of the Permitted Encumbrances shall not be deemed a breach of Sponsor's covenant in the deed, even though the deed does not expressly provide that it is given subject to the Permitted Encumbrances. It is intended and agreed that the deed for the Unit to be given by Sponsor to Purchaser at closing shall be deemed to be subject to the Permitted Encumbrances to the same effect as if set forth therein at length.

(b) Any liens, encumbrances, or conditions not included in the Permitted Encumbrances shall not be an objection to title if: (i) the instrument required to remove it "as of record" has been delivered to the Title Insurance Company for recording in the proper office, together with the requisite recording or filing fees and a copy of said instrument is delivered to the representative of Purchaser's title insurance company (or, if none, to purchaser's attorney), or (ii) the Title Insurance Company is willing to insure Purchaser (at its regular rate and without additional premium) against collection or enforcement out of the Unit. Sponsor shall be entitled to adjourn the closing to remove or correct any non-Permitted Encumbrance. However, if the non-Permitted Encumbrance existed (and was known or should have been known by Sponsor) or his attorney but was not known or could not reasonably have been known by Sponsor) at least ten (10) days prior to closing and Purchaser or Purchaser's attorney failed to send to Sponsor's attorney, Rosen Livingston & Cholst LLP, at least ten (10) days in advance of the closing, written notice of the non-Permitted Encumbrance, then for purposes of paragraph 12 "Closing Adjustments", Purchaser shall be deemed at fault for not timely sending notice of the non-Permitted Encumbrance and the adjournment of the closing to allow Sponsor to correct or remove the non-Permitted Encumbrance shall be considered at the request of Purchaser and not Sponsor. Delivery of a title report and the supplements to Seller's attorney shall be deemed written notice of the non-Permitted Encumbrances for the purpose of this section.

### 10. Title Company Approval

Subject to the terms of paragraph 11 below, Sponsor shall give, and Purchaser shall accept, such title as the Title Insurance Company will approve and insure at its regular rate and without additional premium, provided that the only liens, encumbrances and conditions affecting title shall be the Permitted Encumbrances. Sponsor is not obligated to cause Purchaser's title company to omit any exception to title if the Title Insurance Company will insure against collection out of the Unit.

### 11. Sponsor's Inability to Convey Title

(a) In the event that Sponsor is unable to deliver title to the Unit to Purchaser in accordance with the provisions of this Agreement, to remove or cure a non-Permitted Encumbrance and elects not to do so, then Sponsor will amend the Plan to disclose the title defect and offer Purchaser the right for fifteen (15) days only after Sponsor notifies Purchaser of Sponsor's refusal to remedy the title defect, to elect either to (i) waive the title defect and take title subject thereto (without abatement in or credit against the Purchase Price or claim or right of action against Sponsor for damages or otherwise) or (ii) rescind and recover the Down Payment with any earned interest. If Purchaser fails to elect to rescind within such fifteen (15) day period, then Purchaser will be presumed conclusively to have elected the first option to waive and close

7

(d) The real estate taxes as of the date of this Agreement are set forth on page 1 of this Agreement;

(e) All refrigerators, freezers, ranges, dishwashers, washing machines, clothes dryers and air conditioning equipment included in this sale will be in working order at the time of the Closing. Sponsor shall forward all existing equipment warranties to Purchaser at or immediately following the closing; and

(f) Sponsor is not a "foreign person" as defined in IRC § 1445, as amended, and the regulations issued thereunder, and Sponsor shall execute and deliver to Purchaser at Closing a Certification of Non-Foreign Status.

### 8.   Closing Documents

(a) At closing, Sponsor shall deliver to Purchaser:

(i)  a Bargain and Sale Deed with covenant against grantor's acts transferring to Purchaser full ownership (fee simple title) to the Unit and its Common Interest, subject only to the Permitted Encumbrances (see Exhibit A below).

The grantor's covenant is for the personal benefit of Purchaser and will not inure to the benefit of Purchaser's successors or assignees (including, without limitation, Purchaser's title insurance company). Purchaser must first look to Purchaser's title insurance company before seeking recourse against Sponsor for recovery on any claim based on an alleged breach of such covenant. This provision shall survive the closing.

The deed shall be substantially in the form reproduced as Document Number 5 in Part II of the Plan and shall be executed and acknowledged by grantor in form for recording. Such executed deed shall be promptly delivered to the representative of the title insurance company insuring Purchaser's title (or, if no such representative is present, then to Purchaser's attorney) for recording. After being recorded, the deed shall be returned to Purchaser or Purchaser's attorney.

(ii)  A statement by the Condominium or its managing agent that the common charges and any assessments then due and payable the Condominium have been paid to the date of the Closing;

(iii)  All keys to the doors of, and mailbox for, the Unit;

(iv)  New York City Real Property Transfer Tax return ("RPT") and New York State Real Estate Transfer Tax return (documentary stamps), prepared, executed and acknowledged by Sponsor in proper form for submission;

(v)  Affidavit that a single station smoke detecting alarm device is installed pursuant to New York Executive Law § 378(5);

(vi)  New York State Equalization Return executed and acknowledged, in proper form for submission.

(b) At Closing, Purchaser shall execute and deliver to Sponsor or as directed by Sponsor:

(i)  New York City Real Property Transfer Tax return ("RPT") and New York State Real Estate Transfer Tax return (documentary stamps);

(ii)  Affidavit that a single station smoke detecting alarm device is installed pursuant to New York Executive Law § 378(5);

(iii)  New York State Equalization Return executed and acknowledged, in proper form for submission;

(iv)  Personal Guaranty of Common Charges and other sums due to the Condominium if Purchaser is not a natural person;

(v)  Window Guard Notice; and

(vi)  Balance of the Purchase Price and any other amounts due pursuant to this Agreement, in a form and to payee(s) specified by Sponsor.

6

title subject to the title defect. Purchaser's sole right and remedy in such case shall be to either waive the title defect and close or to rescind.

(b) If Purchaser timely elects to rescind, Sponsor shall instruct the Depository, within ten (10) days after receipt of Purchaser's rescission notice, to return to Purchaser all monies deposited hereunder with any interest thereon within thirty (30) days from receipt of said rescission notice. Upon making such refund, this Agreement shall be null and void and neither party shall have any further rights, obligations or liabilities with respect to the other hereunder or under the Plan.

(c) If Sponsor notifies Purchaser that it will remove or cure a non-Permitted Encumbrance, then Purchaser cannot cancel this Purchase Agreement for so long as Sponsor is using reasonable efforts to diligently remove or cure such non-Permitted Encumbrance.

### 12. Closing Adjustments

(a) Sponsor and Purchaser shall apportion, as of 11:59 p.m. of the day preceding the closing:

(i)  Real estate taxes, B.I.D. tax, and assessments, if any (as discussed below) (for purposes of this paragraph 12, the term real estate taxes shall be deemed to include assessments, if any. Real estate taxes and B.I.D. tax will be apportioned at closing between Sponsor and the Purchaser based on the period such taxes have been prepaid by Sponsor); and

(ii)  Common Charges for the month in which title closes (based on the number of days in the month in which title closing occurs).

(b) The "Customs in Respect to Title Closings" recommended by The Real Estate Board of New York, Inc., as amended to date, shall apply to the adjustments and other matters therein mentioned, except as otherwise provided herein.

(c) Any errors or omissions in computing apportionments at closing shall be corrected and payment made to the proper party promptly after discovery. This provision shall survive the closing.

(d) Installments for tax assessments due after the delivery of the deed, if any, shall be paid by the Purchaser and shall not be considered a defect in title.

(e) If, through no fault of Sponsor, Purchaser fails for any reason to close on the Closing Date, or is deemed at fault for not timely sending a notice of a title defect as provided above, then all closing adjustments will be calculated as of 11:59 P.M. of the day immediately preceding the originally scheduled Closing Date and Purchaser will, at closing:

(i)  reimburse Sponsor the daily sum equal to .044% (which is equivalent to an annual rate of approximately 16%) times the Unit's Purchase Price for each day's delay commencing with the date originally scheduled for closing through the day prior to the actual Closing Date; and

(ii)  pay Rosen Livingston & Cholst LLP the sum of $250 for each default letter sent to Purchaser for each rescheduled closing date to reimburse such firm for the costs incurred in connection with sending such default letter or rescheduling the closing date.

All sums under clauses (i) and (ii) above shall be paid by uncollected personal certified check of Purchaser or official cashier's or bank check.   Sponsor shall be entitled to adjourn the closing to remove or correct any non-Permitted Encumbrance. However, if the non-Permitted Encumbrance existed at least ten (10) days prior to closing and Purchaser or Purchaser's attorney failed to send to Sponsor's attorney, Rosen Livingston & Cholst LLP, notice of such non-Permitted Encumbrance, then for purposes of the closing adjustments under this paragraph 12, Purchaser shall be deemed at fault for not timely sending notice of the non-Permitted Encumbrance and the adjournment of the closing to allow Sponsor to correct or remove the non-Permitted Encumbrance shall be considered at the request of Purchaser and not Sponsor. Delivery of a title report to Sponsor's attorney, stating such non-Permitted

8

34

Encumbrance no less than ten (10) days prior to closing shall be deemed notice pursuant to this paragraph.

### 13. Purchaser's Closing Costs

At closing, Purchaser will pay certain costs in connection with the purchase of his Unit in addition to the legal fees of Purchaser's counsel (if any) and the amount of any net credit in favor of Sponsor that may result from the closing apportionments described in the preceding paragraph. Such closing costs will include the following, the amounts of which (where applicable) are based on rates in effect on the date of the Plan and are subject to change without prior notice:

(a) If Purchaser elects to obtain fee title insurance, Purchaser will pay a premium to the title company for such insurance, which premium may vary depending upon the title insurance company and the amount of insurance requested. A lower combined rate may be available if fee and mortgage insurance are ordered simultaneously.

(b) Purchaser will pay a fee for recording the Unit Deed and the Unit Owner's Power of Attorney;

(c) If Purchaser obtains a mortgage loan, Purchaser will pay:

(i) a fee and service charge for recording the mortgage;

(ii) a mortgage recording tax in the following amount: (a) for Residential Units, 2.05% of the face amount of a mortgage less than $500,000 for which mortgagor receives a $25 deduction, or 2.175% for a mortgage covering a Residential Unit equal to $500,000.00 or more, less $25 and (b) for non-residential Units, 2.05% of the face amount of a mortgage less than $500,000 or 2.80% for a mortgage covering a non-residential Unit equal to $500,000 or more;

(iii) if mortgage title insurance is required by Purchaser's lender, an additional premium for insuring the mortgagee's interest in an amount equal to the principal amount under the mortgage loan.

(iv) if required by Purchaser's lender, deposits for Common Charges, real estate taxes and assessments in an initial amount and in such monthly sums after closing as required by the lender (the amount of which monthly deposits may be changed periodically by the lender). The amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the policies of the lender, the number of months remaining between the closing of title and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amount of the taxes and other charges or impositions then payable; and

(v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender. Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of his lender with respect thereto;

(vi) if, in connection with this purchase, Purchaser has dealt with any broker except (A) the Selling Agent and Co-Broker listed on Page 1 of this Agreement or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing.

(vii) Purchaser will pay to Rosen Livingston & Cholst LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owner's Power of Attorney, additional closing documents and for coordinating and attending the closing;

(viii)   If Purchaser obtains financing and his lender refuses to close at the office of Rosen Livingston & Cholst LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and

9

Purchaser pays Rosen Livingston & Cholst LLP, in addition to said closing fee set forth above, a travel fee of $500.00 if the closing is held in Manhattan or $700.00 if the closing is held in another borough. If the closing attended by a representative of Rosen Livingston & Cholst LLP is adjourned through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Cholst LLP an additional travel and attendance fee in the same amount as stated above for each attendance;

(viii)   If Purchaser is other than a natural person, a principal of the Purchaser will be required to provide a personal guaranty of Common Charges and other charges due to the Condominium and Purchaser will pay Rosen Livingston & Cholst LLP a fee of $500.00 for preparation of such Guaranty;

(ix) If Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Cholst LLP a fee of $1,000.00 for the preparation of the splitter, substitute mortgage and assignment of mortgage documents; and

(x) Purchaser will pay the New York State Real Estate Transfer Tax (documentary stamps) to be affixed to the deed, the New York City Real Property Transfer Tax and (if applicable) the one (1%) percent "mansion tax";

(xi) Purchaser will pay to 135 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit by Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.

All of the aforementioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's unendorsed, personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party, or if so directed by the Sponsor, by wire transfer.

### 14. Power of Attorney to Condominium Board, Sponsor, Retail Unit Owner and Commercial Unit Owners

At closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit (or, if no representative is present, then to Sponsor's attorney) for recording in the New York City Register's Office a Power of Attorney in favor of the Condominium Board relative to purchasing or leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owners relative to amending the Condominium Documents to the extent permitted in the Power of Attorney. An originally recorded Power of Attorney shall be sent to the Condominium Board.

### 15. Events of Default

The following shall constitute "Events of Default" hereunder:

(i) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 8 herein or to timely pay the applicable Rosen Livingston & Cholst LLP closing fee or any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Cholst LLP pursuant to paragraphs 12 and 13 above; or

(ii) the dishonor or failure of collection of Purchaser's Down Payment check; or

(iii) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder

(b) Upon the occurrence of an Event of Default, Sponsor shall be entitled, in its sole and absolute discretion, to cancel this Purchase Agreement by giving Purchaser notice of cancellation. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default. TIME IS OF THE ESSENCE TO CURE

10

SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD. If the default is not cured within such thirty (30) day period, then this Agreement shall be deemed canceled and Sponsor shall have the right to retain, as and for liquidated damages, the Downpayment. Any sums in excess thereof, together with any interest thereon shall be returned to Purchaser after cancellation.

Notwithstanding the foregoing, if Purchaser's check in payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in which to provide good funds for Purchaser's Down Payment, in which event Sponsor shall be deemed to have waived its right to sue Purchaser on the dishonored or uncollected check; or (ii) allow Purchaser thirty (30) days in which to make good Purchaser's Down Payment and if Purchaser fails to so within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check. In the latter case, Purchaser will also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

Upon cancellation of this Agreement and disposing of the Down Payment and interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan. Thereafter, the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

### 16. Risk of Loss; Casualty

(a) Purchaser shall not be entitled to possession of the Unit nor to store any of Purchaser's furniture or belongings therein until the deed is delivered to Purchaser at closing.

(b) All other risk of loss prior to closing has been assumed by Sponsor, but without any obligation or liability of Sponsor to repair the damage or restore the Unit or its contents. If Sponsor or the Unit Owners elect to repair or replace the loss or damage, this Agreement shall continue in full force and effect. Purchaser shall not have the right to reject title to the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or replacements. Purchaser shall not be required to pay the Balance unless and until (i) (i) allow Purchaser thirty (30) days in which is are reasonably possible to fix condition immediately prior to the casualty; (ii) as essential services (such as gas, electricity, and heat) and a reasonable means of ingress and egress to the street have been restored; and (iii) any condition in the Unit for which a violation (if any) is noted or issued has been corrected (even if same is not yet removed of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser, its families, invitees and/or workers. (Sponsor will endeavor in good faith, and with reasonable diligence, to remove or cause to be removed subsequent to closing all violations of record it is obliged to correct.) Any proceeds received from insurance, or in satisfaction of any claim or action in connection with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners). If such proceeds are paid to Purchaser, Purchaser shall promptly turn them over to Sponsor upon request. The provisions of the two preceding sentences shall survive the closing.

(c) In the event that Sponsor notifies Purchaser that it does not elect to repair or restore the Unit or if the Unit Owners do not resolve to make such repairs or restoration in accordance with the Condominium's By-Laws, this Agreement shall be deemed canceled and of no further force or effect, and Sponsor shall instruct the Depository to return to Purchaser all sums deposited hereunder, together with interest, if any, thereon, whereupon the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously canceled due to Purchaser's uncured default, Sponsor shall retain the Liquidated Sum as provided above.

11

### 17. Inspection of Unit

At least ten (10) days before the Balance is to be paid, Sponsor or the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Sponsor or the Selling Agent to inspect the Unit before the lapse of such ten (10) day period. Purchaser or his duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Report (in the form set forth as Exhibit B to this Agreement) and deliver same to the Sponsor or Selling Agent at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the completed Inspection Report shall not excuse Purchaser from paying the Balance when due (without provision for escrow) and shall constitute Purchaser's full acceptance of the Unit. However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of the Sponsor".

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Units and the Retail Unit may be used for any lawful purpose and (ii) the Condominium Board, and the Residential Unit Owners do not have any right to approve the use or any changes in the use of the Unsold Residential Units, the Commercial Units and the Retail Unit or any part thereof. This paragraph shall survive the closing of title.

### 18. No Representations

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, furnishings and fixtures contained in model units, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms or closets therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to his purchase of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and investigation thereof). No person has been authorized to make any representations on behalf of Sponsor. No oral representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, without either or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially in such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the closing of title.

### 19. Negotiable Terms

Sponsor reserves the right, in its sole and absolute discretion, to negotiate on an individual basis with each purchaser substantially more beneficial purchase terms than those offered or given to other purchasers. As a result, Purchaser may not benefit from a more favorable purchase term given to another purchaser and will not have the right to rescind this Purchase Agreement or recover his Down Payment or any other amount for not being given such benefit. The following is a list of only some of the purchase terms which may be negotiated; purchase

12

price; the amount of the Down Payment; the right of a purchaser to cancel the Purchase Agreement and recover the Down Payment for failure to obtain financing or to close by a specific date; the closing date and minimum notice required to schedule the closing; upgraded appliances, fixtures or equipment or other alterations, improvements or additions to be performed by and at the expense of Sponsor; excusing a purchaser from closing costs and/or penalties for closing late; longer time periods to pay or perform obligations under the Purchase Agreement; elimination of "time of the essence" provisions; price or common charge rebates; assumption of payment of, or guarantee of, common charges for a given period; Sponsor financing (provided an amendment to the Plan containing the same interest is duly filed); allowances or credits against the purchase price for decorations; to install appliances or fixtures and granting to Purchaser the benefit of any one or more favorable terms offered or given to another purchaser.

**20. Notices**

All notices, elections, consents, demands and communications (collectively called "notices" or individually called "notice") shall be delivered personally or given in writing by registered or certified mail, return receipt requested, postage prepaid, and, if sent to Purchaser, addressed to Purchaser at Purchaser's address given above, with a copy to Purchaser's attorney, and, if sent to the Sponsor, addressed to the Sponsor at c/o Rosen Livingston & Cholst LLP, 275 Madison Avenue, New York, New York 10016, Attention: Andrew B. Freedland, Esq. Either party may, by notice to the other, change the address to which notices are to be sent. Unless otherwise provided herein, all notices shall be deemed given when personal delivery is effected or when deposited in any branch, station or depository maintained by the U.S. Postal Service in the City and State of New York, except that a notice of a new address shall be deemed given when actually received.

Sponsor has authorized the Selling Agent and Rosen Livingston & Cholst LLP, its partners, associates and legal assistants to sign and deliver on behalf of Sponsor any and all notices (including, without limitation, notices fixing and adjourning the closing date, notice of default, etc.) required or permitted to be given hereunder. All notices sent by Sponsor or its attorney to Purchaser shall be simultaneously sent to Purchaser's attorney.

**21. Broker**

Purchaser represents to Sponsor that Purchaser has not dealt with any broker in connection with this transaction apart from the Selling Agent and the Co-Broker whose name appears on page 1. Purchaser shall pay the commission of any broker with whom Purchaser may have dealt (other than the Selling Agent and the Co-Broker) and Purchaser represents that should any claim be made against Sponsor for commissions by any other broker on account of any acts or dealings of Purchaser or of Purchaser's representatives, Purchaser will indemnify and hold Sponsor free and harmless from any and all liabilities and expenses in connection therewith, including (without limitation) reasonable legal fees and disbursements. The provisions of this paragraph shall survive the closing.

**22. No Lien; Agreement Subordinate to Mortgage**

(a) No lien or encumbrance shall arise against the Property or the Unit as a result of this Agreement or any monies deposited hereunder. This Agreement shall not be recorded and any purported recordation hereof by Purchaser shall be void and constitute an Event of Default.

(b) In furtherance, and not in limitation, of the provisions of the preceding subparagraph (a), Purchaser agrees that the provisions of this Agreement are, and shall continue to be, subject and subordinate to the lien of any mortgages heretofore or hereafter made and any payments

13

**23. Entire Agreement**

This Purchase Agreement, together with the Plan, as the Plan and this Agreement may be amended from time to time, constitutes the entire agreement between the parties as to the subject matter hereof and supersedes all prior understandings and agreements.

**24. Agreement May Not Be Assigned Without Consent**

Purchaser does not have the right to assign this Agreement without the express prior written consent of Sponsor to such assignment. Sponsor is not obligated to give such consent and if Sponsor refuses to consent Purchaser will not be excused from Purchaser's obligations under this Agreement.

If Sponsor, in its sole discretion, elects to permit Purchaser to assign this Agreement, Purchaser shall pay to Rosen Livingston & Cholst LLP, simultaneously with Purchaser's execution and delivery of such assignment, a fee of $350 for preparing such assignment. Notwithstanding the foregoing, consent of the Sponsor shall not be unreasonably withheld, conditioned or delayed to an assignment of this Agreement to a limited liability company of which the Purchaser owns not less than a fifty (50%) percent membership interest and is the managing member. Purchaser shall be required to pay all fees associated with such assignment.

**25. Joint Purchasers**

The term "Purchaser" shall be read as "Purchasers" if the Unit is being purchased by more than one person, in which case their obligations shall be joint and several.

**26. Acts of God**

Sponsor shall be excused from performing any obligations or undertaking provided for in this Agreement for so long as such performance is prevented, delayed, or hindered by an act of God, fire, flood, explosion, war, riot, sabotage, inability to procure or, general shortage of, energy, labor, equipment, facilities, materials, or supplies in the open market, failure of transportation, strike, lock-out, action of labor unions or any other cause (whether similar or dissimilar to the foregoing) not within the reasonable control of Sponsor. Sponsor's time to perform such obligations or undertaking shall be tolled for the length of the period during which such performance was excused.

**27. Further Assurances**

Either party shall execute, acknowledge and deliver to the other party such instruments and take such other actions, in addition to the instruments and actions specifically provided for herein, as such other party may reasonably request in order to effectuate the provisions of this

14

Agreement or of any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction.

**28. Severability**

If any provision of this Agreement or the Plan is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement or the Plan and the applicability of such provision to other persons or circumstances shall not be affected thereby. Each provision of this Agreement or the Plan, except as otherwise herein or therein provided, shall be valid and enforced to the fullest extent permitted by law.

**29. Strict Compliance**

Any failure by Sponsor to insist upon strict performance by Purchaser of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof, irrespective of the number of violations or breaches that may occur, and Sponsor, notwithstanding any such failure, shall have the right thereafter to insist upon strict performance by Purchaser of any and all of the provisions of this Agreement to be performed by Purchaser.

**30. Governing Law**

The provisions of this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York.

**31. Waiver of Jury Trial**

Except as prohibited by law, the parties shall, and they hereby do, expressly waive trial by jury in any litigation arising out of, connected with, or relating to this Agreement or the relationship created hereby or in the Plan. With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.

**32. Gender**

A reference in this Agreement to any one gender, masculine, feminine, or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context otherwise requires.

**33. Certain References**

The term "herein", "hereof" or "hereunder" or similar terms used in this Agreement refer to this entire Agreement and to the particular provision in which the term is used. Unless otherwise stated, all references herein to paragraphs, subparagraphs or other provisions are references to paragraphs, subparagraphs or other provisions of this Agreement.

**34. Captions**

A reference in this Agreement to any provision by number is for convenience and reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

**Successors and Assigns**

The provisions of this Agreement shall bind and inure to the benefit of Purchaser and Purchaser's heirs, legal representatives, successors and permitted assigns and shall bind and inure to the benefit of Sponsor and its successors and assigns.

**35. No Oral Changes**

15

This Agreement cannot be changed or any provision waived orally. ANY CHANGES OR ADDITIONAL PROVISIONS OR WAIVERS MUST BE SET FORTH IN A RIDER ATTACHED HERETO OR IN A SEPARATE WRITTEN AGREEMENT SIGNED BY THE PARTIES.

**36. Acceptance of Purchase Agreement**

(a) This Agreement shall not be binding upon Sponsor until a duplicate hereof, executed by Sponsor or its duly authorized agent, is delivered to Purchaser. The submission of a Plan or Purchase Agreement to a prospective purchaser shall not be construed as Sponsor's approval of such sale. If such executed duplicate of this Agreement is not sent or delivered to Purchaser within thirty (30) days after same is received by the Selling Agent along with a check for the Down Payment, it shall be deemed rejected and cancelled and all monies paid by Purchaser shall be promptly refunded without interest. Upon such refund being made, neither party shall have any further rights or obligations hereunder with respect to the other. Sponsor shall have the right to reject this Agreement without cause or explanation to Purchaser, provided such rejection is not due to Purchaser's sex, race, creed, color, national origin, ancestry, disability, marital status or other ground proscribed by law.

**37. Escrow Provisions**

A.    The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, Suite 500, New York, NY 10016, telephone number 212 687-7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser. Escrow Agent has designated the following attorneys to serve as signatories: Morton H. Rosen, Peter I. Livingston, Bruce A. Cholst, Andrew B. Freedland,. All designated signatories are admitted to practice law in the State of New York. Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor, Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

B.    Escrow Agent and all authorized signatories hereby submit to the jurisdiction of the State of New York and its Courts for any cause of action arising out of the Purchase Agreement or otherwise concerning the maintenance or release of the Deposit from escrow.

C.    The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York. The escrow account is entitled "(Purchaser's Name) Rosen Livingston & Cholst LLP as Escrow Agent" ("Escrow Account"). The Escrow Account is an IOLA account. The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit. Any deposit in excess of $250,000 will not be insured.

D.    All Deposits received from Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP, as Escrow Agent.

E.    The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts. Interest shall begin to accrue upon placing the Deposit into the Escrow Account. All interest earned thereon shall be paid to or credited to the Purchaser at closing. No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account.

F.    Within five (5) business days after the Purchase Agreement has been tendered to Escrow Agent along with the Deposit, the Escrow Agent shall sign the Escrow Agreement

16

36

and place the Deposit into the Escrow Account.  Within ten (10) business days of the placing the deposit in the Escrow Account, Escrow Agent shall provide written notice to Purchaser and Sponsor, confirming the Deposit. The notice shall provide the account number and the initial interest rate to be earned on the Deposit. Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of the Escrow Agreement.

G.     The Escrow Agent is obligated to send notice to the Purchaser once the Deposit is placed in the Escrow Account. If the Purchaser does not receive notice of such deposit within fifteen (15) business days after tender of the Deposit, he or she may cancel the Purchase Agreement within ninety (90) days after tender of the Purchase Agreement and Deposit to Escrow Agent.  Complaints concerning the failure to honor such cancellation requests may be referred to the New York State Department of Law, Real Estate Finance Bureau, 120 Broadway, 23rd Floor, New York, N.Y. 10271.  Rescission shall not be afforded where proof satisfactory to the Attorney General is submitted establishing that the Deposit was timely placed in the Escrow Account in accordance with the New York State Department of Law's regulations concerning Deposits and requisite notice was timely mailed to the Purchaser.

H.     All Deposits, except for advances made for upgrades, extras, or custom work received in connection with the Purchase Agreement, are and shall continue to be the Purchaser's money, and may not be comingled with any other money or pledged or hypothecated by Sponsor, as per GBL § 352-h.

I.     Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until after consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law.  Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

J.     The Escrow Agent shall release the Deposit if so directed:

(a) pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 5 upon closing of title to the Unit; or

(b) in a subsequent writing signed by both Sponsor and Purchaser; or

(c) by a final, non-appealable order or judgment of a court.

If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit.  If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release.  If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within said thirty (30) day period, the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above. Notwithstanding the foregoing, the Escrow Agent shall have the right at any time to deposit the Deposit contained in the Escrow Account with the clerk of the county where the Unit is located and shall give written notice to both parties of such deposit.

17

The Sponsor shall not object to the release of the Deposit to:

(a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an Amendment to the Plan; or

(b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

K.     Any provision of the Purchase Agreement/Escrow Agreement or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding any Deposit in trust is absolutely void.  The provisions of the Attorney General's regulations and GBL §§ 352-e(2-b) and 352-h concerning escrow trust funds shall prevail over any conflicting or inconsistent provisions in the Purchase Agreement, Plan, or any amendment thereto.

L.     Escrow Agent shall maintain the Escrow Account under its direct supervision and control.

M.     A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352(h).

N.     Escrow Agent may rely upon any paper or document which may be submitted to it in connection with its duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

O.     Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-(h) and the New York State Department of Law's regulations.

P.     Sponsor shall obtain or cause the selling agent under the Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement. Q.     Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstance.

R.     Sponsor agrees to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of the obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent.  This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

38. Counterpart Signature Pages

18

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument.  This Agreement may be executed by facsimile or .pdf and such shall be deemed originals.

[Signature page follows]

19

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:                                          PURCHASER:
135 WEST 52nd STREET OWNER
LLC

By: _____                  _____
    Meyer Chetrit, Principal                        Purchaser

By: _____                  _____
    David Blatreer, Principal                       Co-Purchaser

(*Purchaser)
Date Accepted
 1/27/2016

(*Please initial on line and print or
type name under line.)

Purchaser acknowledges:                      Initials: _____
Receipt of Offering Plan and                 Purchaser:
Amendments at ____ (A.M.)(P.M.)
on _____, 20___; and

Delivery of Purchase                         Initials: _____
Agreement and Check for                      Co-Purchaser: _____
Down Payment at ____ (A.M.)(P.M.)
on 1/27/ 20___

20

37

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:                                    PURCHASER:
135 WEST 52ⁿᵈ STREET OWNER
LLC

By: _____              _____
    Meyer Chetrit, Principal                 Purchaser

By: _____              _____
    David Bistricer, Principal               Co-Purchaser

(Purchaser)
Date Accepted:
__11/24/2016____

(*Please initial on line and print or
type name under line.)

Purchaser acknowledges:
Receipt of Offering Plan and
Amendments at ___ (A.M.)(P.M.)
on ___11/26___, 2016 and

Delivery of Purchase
Agreement and Check for
Down Payment at ___11___ (A.M.)(P.M.)
on ___11/24/2016___, 2016

Initials: _____
Purchaser: _____

Initials: _____
Co-Purchaser: _____

---

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:                                    PURCHASER:
135 WEST 52ⁿᵈ STREET OWNER
LLC

By: _____              _____
    Meyer Chetrit, Principal                 Purchaser

By: _____              _____
    David Bistricer, Principal               Co-Purchaser
    2/1/16  $ 3,700,600  178

(Purchaser)
Date Accepted:
__11/24/2016____

(*Please initial on line and print or
type name under line.)

Purchaser acknowledges:
Receipt of Offering Plan and
Amendments at ___ (A.M.)(P.M.)
on ___11/26___, 2016 and

Delivery of Purchase
Agreement and Check for
Down Payment at ___ (A.M.)(P.M.)
on ___11/24/2016___, 2016

Initials: _____
Purchaser: _____

Initials: _____
Co-Purchaser: _____

20

---

## EXHIBIT A TO PURCHASE AGREEMENT
### Permitted Encumbrances

1.  Building restrictions and zoning laws and other regulations, resolutions and ordinances and any amendments thereto now or hereafter adopted by any governmental or quasi-governmental authority having jurisdiction, provided they do not prevent the use of the subject Unit for dwelling purposes.

2.  State of facts shown on a survey made by Earl B. Lovell-S.P. Belcher, Inc. dated March 12, 2013 and any state of facts which a more recent survey or personal inspection of the land and building would show, provided such additional state of facts would not prevent the use of the subject Residential Unit for dwelling purposes or, if applicable, the subject Commercial or Retail Unit for the purposes permitted by Law and further provided that such state of facts do not render title unmarketable.

3.  The terms, burdens, covenants, restrictions, conditions, easements and rules and regulations set forth in the Declaration, the By-Laws (and the Rules and Regulations thereto), the Power of Attorney from Purchaser to the Condominium Board, Sponsor, the Commercial Unit Owners and the Retail Unit Owner and the Floor Plans, all as same may be amended from time to time.

4.  Consents by Sponsor, or any former owner of the Land for the erection of any structure or structures on, under or above any land, street or streets on which the Land may abut.

5.  Any easement or right of use in favor of any utility company for construction, use, maintenance, repair and replacement of all utility lines, wires, terminal boxes, mains, pipes, cables, conduits, poles, connections and other equipment and facilities on, under and across the Land and Building.

6.  Revocability of licenses for vault space, if any, under the sidewalks and streets and the lien of any unpaid vault tax (which is to be paid by the Condominium Board, the Retail Unit Owner or the Commercial Unit Owners (as the case may be)).

7.  Encroachments of stoops, areas, cellar steps or doors, trim, copings, retaining walls, bay windows, terraces, balconies, sidewalk elevators, fences, fire escapes, cornices, foundations, footings, chutes, fuel oil lines, drainage and stand pipes, and similar projections, if any, on, over, or under the Property or the streets or sidewalks abutting the property and the rights of governmental authorities to require the removal of any such projections, and variations between record lines of the Property and retaining walls  and the like, if any.

8.  Leases and service, maintenance, employment, management, concessionaire and license agreements, if any, of other Units or portions of the Common Elements, provided same are disclosed in the Plan or in an amendment thereto.

9.  The lien of any unpaid Common Charge, real estate tax, water charge or sewer rent, provided the same are adjusted at the closing of title.

10.  The lien of any unpaid assessment payable in installments (whether imposed by a taxing authority or the Condominium Board), except that Sponsor shall pay all such assessments due prior to the Closing Date and Purchaser shall pay all assessments due from and after such date (however, the then current installment shall be adjusted at closing).

11.  Any encumbrance as to which either the Title Insurance Company or the title insurance company which insures Purchaser's title to the Unit would be willing to insure at its regular rates, without additional premium, in a fee policy issued by it to Purchaser to insure that such encumbrance, (a) will not be collected out of or enforced against the Unit if it is a lien and (b) will not prevent the use of the subject Residential Unit for dwelling purposes.  (Any exception which the Title Insurance Company has omitted or insured at its regular rates and without additional premium, which will not be collected out of or enforced against a Unit, in a fee title insurance policy for other Units, is not an objection to title.)

12.  The Certificate of Occupancy to be issued covering the Building, provided it authorizes occupancy of the subject Residential Unit for residential purposes.

13.  Any violations against the Property (other than the subject Unit) which are the obligation of the Condominium Board or another Unit Owner to correct.

14.  Standard printed exceptions contained in the form of fee title insurance policy then issued by the title insurance company insuring Purchaser's title to the subject Unit.

15.  Any easement or right of use required for Sponsor to obtain a temporary, final or amended Certificate of Occupancy for the Building, provided such easement or right of use will not prevent the use of the subject Residential Unit for dwelling purposes.

16.  Distinctive Street Improvement Maintenance Agreement in Reel 1109 Page 882.

17.  Zoning Lot Certification in Reel 759 Page 115.

21                                          22

EXHIBIT B
INSPECTION REPORT

Date:
135 West 52nd Street Owner LLC
512 Seventh Avenue
New York, New York 10018

Re:   Unit
135 West 52nd Street Condominium
135 West 52nd Street
New York, New York 10019

Gentlemen:
This is to confirm that based on the undersigned's personal inspection of the above referenced Unit, I (we) have found the Unit, its floors, walls, doors, fixtures, appliances, equipment, hardware and all other items listed below, to be in good and satisfactory condition, free of chips, marrs, scratches, breaks or other defects, except for those matters (if any) expressly noted below under "exceptions" requiring repair, adjustment or correction:

| | Item | Exceptions (if any) | Purchaser's Initials |
|---|---|---|---|
| 1. | | Unit Interior: | |
| | (a) | Walls: | |
| | (b) | Floors: | |
| | (c) | Ceilings: | |
| | (d) | Windows: (glass, sash, pane, sill, etc.) | |
| | (e) | Doors: | |
| | (f) | Electrical fixtures: | |
| | (g) | Painted surfaces: | |
| | (h) | Kitchen cabinets: | |
| | (i) | Appliances: | |
| | (j) | Kitchen sink: | |
| | (k) | Medicine cabinets: | |
| | (l) | (doors & mirror) Vanities: | |

23

| | Item | Exceptions (if any) | Purchaser's Initials |
|---|---|---|---|
| | (m) | Bathroom sinks: | |
| | (n) | Water closet: | |
| | (o) | Bathtubs: | |
| | (p) | Bathroom tile: | |
| | (q) | Hardware: | |
| | | (doorbell, doorknob, faucets, locks, etc.) | |
| | (r) | Intercom: | |
| 2. | | General Operating Condition: | |
| | (a) | All Doors: | |
| | (b) | All Windows: | |
| | (c) | All Plumbing: | |
| | (d) | All Hardware: | |
| | (e) | Other: | |

The undersigned will sign and deliver to you a separate statement signifying my (our) satisfaction with each item excepted above (if any), immediately upon the completion of the repair, adjustment or correction of same. The undersigned understands and agrees that you shall not be obligated to make any repairs, adjustments or corrections to the Unit or any portion thereof or its fixtures, appliances, equipment, etc., contained therein, from or after the date of delivery of possession of the Unit to the undersigned, except as to those items (if any) expressly excepted above and your obligation regarding any such excepted items shall cease upon the completion of the repair, adjustment or correction of same. Nothing contained herein shall be construed to excuse Sponsor from its obligations to correct defects in construction or design to the extent required in the section entitled "Rights and Obligations of Sponsor" contained in the Offering Plan for Condominium Ownership of the 135 West 52nd Street Condominium. The undersigned shall be required to complete the payment of the Purchase Price (without the provision for an escrow) and accept title to the Unit on the closing date notwithstanding the presence of any exceptions.
Very truly yours,

_____
Purchaser's Signature

_____
Purchaser's Signature

Agreed To:
135 West 52nd Street Owner
LLC

By:_____

24

## PURCHASE AGREEMENT

AGREEMENT made as of April 21, 2015 between 135 WEST 52ND STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and 135 West 52nd Street 17C LLC with its principal place of business at 525 West Monroe Street, Suite 2350, Chicago, IL 60661 ("Purchaser").

Purchaser's Attorney:  Bruce Katz, Esq.
Address:  Katz and Matz
1350 Avenue of the Americas, 3rd Floor
New York, NY 10019

Telephone: (212) 244 4630  Fax:  (646) 219 5717   Email: bruce@katzmatz.net

Percentage of Common Interest: 0.8200%  Common Charges: $1,770.13 per month

Residential Percentage of Common Interest: 1.0610%

Selling Agent: Douglas Elliman (TD Team)

Co-Broker: Sotheby's International Realty (Ruben Perez)

Real Estate Taxes: $2,477.86 per month;   B.I.D. Tax: $22.68 per month;

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 17C ("Unit") in the building ("Building") known as 135 WEST 52ND STREET Condominium ("Condominium") and located at 135 WEST 52ND STREET, New York, New York 10019, together with a 0.8200% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

### 1. Purchase Price

(a) The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below ("Purchase Price") is $4,100,000.00, payable as follows:

(i) $615,000.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5; and

(ii) $3,485,000.00, constituting the balance of the Purchase Price ("Balance"), by certified check of Purchaser or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined). All checks in payment of the Balance of the Purchase Price shall be payable to the order of Sponsor (or as Sponsor otherwise directs. Sponsor reserves the right to require Purchaser to pay the Balance or any portion thereof in "immediately available funds" (i.e. by wire transfer to a bank account designated by Sponsor).

(c) All checks shall be unendorsed, made payable to the direct order of Rosen Livingston & Cholst LLP, as Escrow Agent" or (as to the Balance) to "135 West 52nd Street Owner LLC" or

1

such payees as Sponsor may direct on not less than two (2) business days' prior oral or written notice to Purchaser. All checks shall be drawn on a bank that is a member of the New York Clearing House Association. All checks must be payable directly to the order of the required payee; they may not be endorsed.

(d) Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and the Agreement to be performed by Sponsor prior to closing and, unless otherwise set forth herein, none of the provisions of this Agreement shall survive the closing. However, nothing contained herein shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of Purchaser under Article 23-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.

(e) Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under "Terms of Sale - Prerequisites to Closing of Title" in Part I of the Plan are met concurrently with, or prior to, closing.

### 2. Definitions    The following terms shall have the meanings ascribed to them:

(a) "Building" shall mean the building located at 135 West 52ND Street, New York, New York 10019.

(b) "Closing Date", "closing", "closing of title" and words of similar import are used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment to Sponsor of the Purchase Price and the delivery to Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.

(c) "Condominium" shall mean The 135 West 52ND Street Condominium.

(d) "Declaration" shall mean the Declaration of the 135 West 52ND Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.

(e) "Depository" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.

(f) "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.

(g) "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.

(h) "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.

All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

### 3. Plan

(a) Purchaser represents that Purchaser has possessed the Plan and any filed amendments thereto at least three (3) business days prior to submitting this Purchase Agreement; or

(b) In the event Purchaser does not wish to wait three (3) business days) Purchaser has the right to rescind this Purchase Agreement by sending written notice of his rescission to the Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement (time being of the essence to exercise such right of rescission within such seven (7) day period).

2

(c) Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Condominium Documents set forth in Part II of the Plan and Parts A and B of the Exhibits submitted with the Plan to the Department of Law) and agrees to abide and to be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor (including, without limitation, amendments involving any changes, modifications, or updating of the projected Common Charges, the projected real estate taxes to be paid by Purchaser, or Schedule B "Budget for the First Year of Condominium Operation"). Except in the case of a material adverse amendment affecting Purchaser's Unit or as otherwise provided under the Plan, any such amendments shall neither excuse Purchaser from performing Purchaser's obligations hereunder nor entitle Purchaser to any offset or credit against the Purchase Price or claim or right of action against Sponsor, and any such amendment may be filed by Sponsor without Purchasers' consent or approval. However, Sponsor shall not have the right to unilaterally cancel this Agreement except as herein provided (such as in the case of an uncured default by Purchaser) nor change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.

(d) The Plan is hereby incorporated in this Agreement with the same force and effect as if set forth at length. In the event of any inconsistency or conflict between the provisions of this Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding. Purchaser acknowledges having had full opportunity to examine all documents and investigate all statements made herein and in the Plan.

### 4. Personal Property

(a) At closing, the Unit will contain only those appliances, countertops, cabinets, flooring, shelving, vanities (if any), air conditioning units (if any), hardware and other fixtures and equipment installed therein as set forth in the Plan.

Sponsor has the right to substitute other appliances, countertops, cabinets, sinks, vanities, flooring and fixtures in place of those referred to in the Plan provided only that the substitutions are of equal or better quality and design.

(b) The Unit is being sold unfurnished, without window blinds or shades. Furniture, floor coverings, wall coverings, furnishings, decorations and the like in or about any model Unit are for display purposes only and are not included in this sale except to the extent set forth in the Plan. Any floor plans or sketches shown to Purchaser (including those contained in the Plan) are only approximations of the Unit's dimensions and arrangement and Purchaser acknowledges and agrees that he is not relying thereon. Sponsor shall not be liable for minor variations from any floor plans or structures.

(c) Sales model apartments may, at Sponsor's option, be sold furnished at a later date but will initially be withheld from sale.

(d) There will be no modifications or extras unless agreed to in writing by the parties. All modifications and alterations must be approved by Sponsor in writing and, if approved, shall be performed by Sponsor at Purchaser's expense (payable in the manner to be set forth in an addendum to this Agreement or by separate agreement between Sponsor and Purchaser).

### 5. Purchase Monies to be Held in Trust

(a) The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, New York, NY 10016, telephone number 212 687 7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser. Escrow Agent has designated the following attorneys to serve as signatories: Morton H Rosen, Peter L Livingston, Mary L Kosmack, Bruce A. Cholst. All designated signatories are identified to practice law in the State of New York. Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor,

3

Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

(b) The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York.  The escrow account is entitled "[Purchaser's Name] Rosen Livingston & Cholst LLP Escrow Agent" ("Escrow Account").  The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit. Any deposit in excess of $250,000 will not be insured.

All Deposits received by Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP as Escrow Agent.

Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of a written agreement between Purchaser and Sponsor.

The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts, which is currently 0.2%.  Interest shall begin to accrue upon placing the Deposit into the Escrow Account.  All interest earned thereon shall be paid to or credited to the Purchaser at closing.  No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with this maintenance of the Escrow Account.  The Escrow Agreement appended hereto as Exhibit "A."

The Down Payment will earn interest until the Purchaser's check has been deposited and cleared.  Sponsor will be liable to Purchaser only for the amount of interest actually received from the Depository (which interest may be reduced by the Depository's service charge).  The interest on the Down Payment, as same may be reduced by the Depository's service charge, is hereinafter referred to as "Interest".

Upon the payment and performance by Purchaser of all of Purchaser's obligations hereunder and the transfer to Purchaser of title to the Unit, Sponsor will instruct the Depository to pay to Purchaser any and all interest on monies deposited hereunder. It is possible that Purchaser may not receive interest on the Down Payment for the entire month in which the closing is scheduled to occur.  The Sponsor and Selling Agent will not be liable to Purchaser for the amount of such interest or the payment thereof, except for any amount received from the Depository. All funds due to Sponsor and received under this Purchase Agreement will be handled in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and with Section 71-a(3) of the New York Lien Law.

### 6. Closing of Title

(a) The closing of title shall occur on the date and at the time and place in the City and State of New York as Sponsor shall designate to Purchaser on not less than thirty (30) days' prior written notice (unless waived by Purchaser).  Sponsor shall have the right, from time to time, to adjourn such date and time for closing on written notice to Purchaser.  If the Closing is adjourned by Sponsor, then Sponsor shall fix a new date and time for closing and shall give Purchaser not less than ten (10) days' prior written notice of the new scheduled date and time for closing.

4

Purchaser shall be entitled to one (1) adjournment of the closing not to exceed five (5) days (the "Adjourned Closing Date"). The closing adjustments stated in section 12(e) shall not accrue unless Purchaser fails to close on such Adjourned Closing Date. Such adjournment must be exercised no less than two (2) days prior to the scheduled closing date.

(b) The closing of title shall occur only after or concurrently with compliance with the prerequisites set forth under "Terms of Sale Prerequisites to Closing of Title" in Part I of the Plan.

(c) Sponsor has targeted the First Closing for June 1, 2015 based on the current construction schedule. The actual date for the First Closing is not assured or warranted and may be earlier or substantially later depending on the progress of sales and construction and compliance with the other prerequisites recited in the section of the Plan entitled "Terms of Sale". However, if through no fault of Purchaser the First Closing does not take place by June 1, 2016, Purchaser shall have the right to rescind this Purchase Agreement and recover his Down Payment with all interest thereon by giving written notice of his or her election to do so to the Sponsor no later than fifteen days after the date that such right arises.

Purchaser acknowledges that Units may be completed at varying times over a prolonged period that will extend beyond the First Closing. In such event, the order in which Units will be completed is within the sole discretion of Sponsor and may not coincide with the chronology in which Units are contracted for sale nor the numeric order of the floors. Many unforeseeable factors can affect the completion of Units. Accordingly, the sequence in which Units (including the subject Unit) will actually be finished cannot reasonably be predicted. No representation is made nor any assurance given that the closing of the subject Unit will occur contemporaneously with the First Closing.

Purchaser further acknowledges that construction (and, therefore, the closing) may be delayed by late delivery of material and equipment, labor difficulties, unavailability of building trades, casualty, inclement weather and other events beyond Sponsor's control.

Purchaser agrees that Sponsor is to be afforded liberal and broad latitude in time and in all decisions concerning the construction of the Property and the Units pursuant to the Plan. Purchaser will not be excused from paying the full Purchase Price, without credit or set off, and will have no claims against Sponsor for damages or losses in the event the First Closing occurs substantially later than the targeted date or the time to complete and close title to Purchaser's Unit is delayed or postponed by Sponsor.

Notwithstanding the foregoing, Purchaser may rescind this Agreement and receive the prompt refund of his or her Downpayment if the construction of the Unit is not complete within two years of the date Purchaser signed this Agreement by giving written notice of his or her election to do so to the Sponsor no later than fifteen days after the date that such right arises.

## 7. State, Warranties and Covenants

Sponsor represents, warrants and covenants that:

(a) Sponsor is the sole owner of the Unit and the property referred to in paragraph 1, and Sponsor has the full right, power and authority to sell, convey and transfer the same;

(b) The common charges (excluding separately billed utility charges) for the Unit on the date hereof are set forth on page 1 of this Agreement;

(c) Sponsor has not received any written notice of any intended assessment or increase in common charges not reflected in subparagraph 7(b). Purchaser acknowledges that it will not have the right to cancel this Agreement in the event of the imposition of any assessment or increase in common charges after the date hereof of which Sponsor has not heretofore received written notice;

(c) The real estate taxes as of the date of this Agreement are set forth on page 1 of this Agreement;

(e) All refrigerators, freezers, ranges, dishwashers, washing machines, clothes dryers and air conditioning equipment included in this sale will be in working order at the time of the Closing; and

(f) Sponsor is not a "foreign person" as defined in IRC § 1445, as amended, and the regulations issued thereunder, and Sponsor shall execute and deliver to Purchaser at Closing a Certification of Non-Foreign Status.

## 8. Closing Documents

(a) At closing, Sponsor shall deliver to Purchaser:

(i) a Bargain and Sale Deed with covenant against grantor's acts transferring to Purchaser full ownership (fee simple title) to the Unit and its Common Interest, subject only to the Permitted Encumbrances (see Exhibit A below).

The grantor's covenant is for the personal benefit of Purchaser and will not inure to the benefit of Purchaser's successors or subrogees (including, without limitation, Purchaser's title insurance company). Purchaser must first look to the Permitted Encumbrances before seeking recourse against Sponsor for recovery on any claim based on an alleged breach of such covenant. This provision shall survive the closing.

The deed shall be substantially in the form reproduced as Document Number 3 in Part II of the Plan and shall be executed and acknowledged by grantor in form for recording. Such executed deed shall be promptly delivered to the representative of the title insurance company insuring Purchaser's title (or, if no such representative is present, then to Purchaser's attorney) for recording. After being recorded, the deed shall be returned to Purchaser or Purchaser's attorney;

(ii) A statement by the Condominium or its managing agent that the common charges and any assessments then due and payable for the Condominium have been paid to the date of the Closing;

(iii) All keys to the doors of, and mailbox for, the Unit;

(iv) New York City Real Property Transfer Tax return ("RPT") and New York State Real Estate Transfer Tax return (documentary stamps), prepared, executed and acknowledged by Sponsor in proper form for submission;

(v) Affidavit that a single station smoke detecting alarm device is installed pursuant to New York Executive Law § 378(5);

(vi) New York State Equalization Return executed and acknowledged, in proper form for submission.

(b) At Closing, Purchaser shall execute and deliver to Sponsor as directed by Sponsor:

(i) New York City Real Property Transfer Tax return ("RPT") and New York State Real Estate Transfer Tax return (documentary stamps);

(ii) Affidavit that a single station smoke detecting alarm device is installed pursuant to New York Executive Law § 378(5);

(iii) New York State Equalization Return executed and acknowledged, in proper form for submission;

(iv) Personal Guaranty of Common Charges and other sums due to the Condominium if Purchaser is not a natural person;

(v) Window Guard Notice; and

(vi) Balance of the Purchase Price and any other amounts due pursuant to this Agreement, in a form and to payee(s) specified by Sponsor.

5

6

## 9. State of Title

(a) Legal ownership of the Unit shall be transferred to Purchaser at Closing subject only to the liens, encumbrances and title conditions (hereinafter called the "Permitted Encumbrances") enumerated in Exhibit A to this Agreement. The existence of the Permitted Encumbrances shall not be deemed a breach of Sponsor's covenant in the deed, even though the deed does not expressly provide that it is given subject to the Permitted Encumbrances. It is intended and agreed that the deed for the Unit to be given to Purchaser at closing shall be deemed to be subject to the Permitted Encumbrances to the same effect as if set forth therein at length.

(b) Any liens, encumbrances, or conditions not included in the Permitted Encumbrances shall not be an objection to title if: (i) the instrument required to remove it "as of record" has been delivered to the Title Insurance Company for recording in the proper office, together with the requisite recording or filing fees and a copy of said instrument is delivered to the representative of Purchaser's title insurance company (or, if none, to purchaser's attorney); or (ii) the Title Insurance Company is willing to insure Purchaser (at its regular rate and without additional premium) against collection or enforcement out of the Unit. Sponsor shall be entitled to adjourn the closing to remove or correct any non-Permitted Encumbrance. However, if the non-Permitted Encumbrance existed (and was known or should have been known by Purchaser or his attorney but was not known or could not reasonably have been known by Sponsor) at least ten (10) days prior to closing and Purchaser or Purchaser's attorney failed to send to Sponsor's attorney, Rosen Livingston & Cholst LLP, at least ten (10) days in advance of the closing, written notice of the non-Permitted Encumbrance, then for purposes of paragraph 12 "Closing Adjustments", Purchaser shall be deemed at fault for not timely sending notice of the non-Permitted Encumbrance and the adjournment of the closing to allow Sponsor to correct or remove the non-Permitted Encumbrance shall be considered at the request of Purchaser and not Sponsor.

## 10. Title Company Approval

Subject to the terms of paragraph 11 below, Sponsor shall give, and Purchaser shall accept, such title as the Title Insurance Company will approve and insure at its regular rate and without additional premium, provided that the only liens, encumbrances and conditions affecting title shall be the Permitted Encumbrances. Sponsor is not obligated to cause Purchaser's title company to omit any exception to title if the Title Insurance Company will insure against collection out of the Unit.

## 11. Sponsor's Inability to Convey Title

(a) In the event that Sponsor is unable to deliver title to the Unit to Purchaser in accordance with the provisions of this Agreement, to remove or cure a non-Permitted Encumbrance and elects not to do so, then Sponsor will amend the Plan to disclose the title defect and offer Purchaser the right for fifteen (15) days only after Sponsor notifies Purchaser of Sponsor's refusal to remedy the title defect, to elect either to (i) waive the title defect and take title subject thereto (without abatement in or credit against the Purchase Price or claim or right of action against Sponsor for damages or otherwise) or (ii) rescind and recover the Down Payment with any earned interest. If Purchaser fails to elect to rescind within such fifteen (15) day period, then Purchaser will be presumed conclusively to have elected the first option to waive and close title subject to the title defect. Purchaser's sole right and remedy in such case shall be to either waive the title defect and close or to rescind.

(b) If Purchaser timely elects to rescind, Sponsor shall instruct the Depository, within ten (10) days after receipt of Purchaser's rescission notice, to return to Purchaser all monies

deposited hereunder with any interest thereon within thirty (30) days from receipt of said rescission notice. Upon making such refund, this Agreement shall be null and void and neither party shall have any further rights, obligations or liabilities with respect to the other hereunder or under the Plan.

(c) If Sponsor notifies Purchaser that it will remove or cure a non-Permitted Encumbrance, then Purchaser cannot cancel this Purchase Agreement for so long as Sponsor is using reasonable efforts to diligently remove or cure such non-Permitted Encumbrance.

## 12. Closing Adjustments

(a) At closing, Sponsor and Purchaser shall apportion, as of 11:59 p.m. of the day preceding the closing:

(i) Real estate taxes, B.I.D. tax, and assessments, if any (as discussed below) (for purposes of this paragraph 12, the term real estate taxes shall be deemed to include assessments, if any. Real estate taxes and B.I.D. tax will be apportioned at closing between Sponsor and the Purchaser based on the period such taxes have been prepaid by Sponsor); and

(ii) Common Charges for the month in which title closes (based on the number of days in the month in which title closing occurs).

(b) The "Customs in Respect to Title Closings" recommended by The Real Estate Board of New York, Inc., as amended to date, shall apply to the adjustments and other matters therein mentioned, except as otherwise provided herein.

(c) Any errors or omissions in computing apportionments at closing shall be corrected and payment made in the proper party promptly after discovery. This provision shall survive the closing.

(d) Installments for tax assessments due after the delivery of the deed, if any, shall be paid by the Purchaser and shall not be apportioned.

(e) If, through no fault of Sponsor, Purchaser fails for any reason to close on the Closing Date, or is deemed at fault for not timely sending a notice of a title defect as provided above, then all closing adjustments will be calculated as of 11:59 P.M. of the day immediately preceding the originally scheduled Closing Date and Purchaser will, at closing:

(i) reimburse Sponsor the daily sum equal to .044% (which is equivalent to an annual rate of approximately 16%) times the Unit's Purchase Price for each day's delay commencing with the date originally scheduled for closing through the day prior to the actual Closing Date; and

(ii) pay Rosen Livingston & Cholst LLP the sum of $250 for each default letter sent to Purchaser for each rescheduled closing date to reimburse such firm for its costs incurred in connection with sending such default letter or rescheduling the closing date.

All sums under clauses (i) and (ii) above shall be paid by uncertified personal certified check of Purchaser or official cashier's or bank check. Sponsor shall be entitled to adjourn the closing to remove or correct any non-Permitted Encumbrance. However, if the non-Permitted Encumbrance existed at least ten (10) days prior to closing and Purchaser or Purchaser's attorney failed to send to Sponsor's attorney, Rosen Livingston & Cholst LLP, notice of such non-Permitted Encumbrance, then for purposes of the closing adjustments under this paragraph 12, Purchaser shall be deemed at fault for not timely sending notice of the non-Permitted Encumbrance and the adjournment of the closing to allow Sponsor to correct or remove the non-Permitted Encumbrance shall be considered at the request of Purchaser and not Sponsor.

## 13. Purchaser's Closing Costs

At closing, Purchaser will pay certain costs in connection with the purchase of his Unit in addition to the legal fees of Purchaser's counsel (if any) and the amount of any net credit in

7

8

41

favor of Sponsor that may result from the closing apportionments described in the preceding paragraph. Such closing costs will include the following, the amounts of which (where applicable) are based on rates in effect on the date of the Plan and are subject to change without prior notice:

(a) If Purchaser elects to obtain fee title insurance, Purchaser will pay a premium to the title company for such insurance, which premium may vary depending upon the title insurance company and the amount of insurance requested. A lower combined rate may be available if fee and mortgage insurance are ordered simultaneously.

(b) Purchaser will pay a fee for recording the Unit Deed and the Unit Owner's Power of Attorney;

(c) If Purchaser obtains a mortgage loan, Purchaser will pay:
 (i)  a fee and service charge for recording the mortgage;
 (ii) a mortgage recording tax in the following amount: (a) for Residential Units, 2.05% of the face amount of a mortgage less than $500,000 for which mortgagor receives a $25 deduction, or 2.175% for a mortgage covering a Residential Unit equal to $500,000.00 or more, less $25 and (b) for non-residential Units, 2.05% of the face amount of a mortgage less than $500,000 or 2.80% for a mortgage covering a non-residential Unit equal to $500,000 or more;
 (iii) if mortgage title insurance is required by Purchaser's lender, an additional premium for insuring the mortgagee's interest in an amount equal to the principal amount under the mortgage loan.
 (iv) if required by Purchaser's lender, deposits for Common Charges, real estate taxes and assessments in an initial amount and in such monthly sums after closing as required by the lender (the amount of which monthly deposits may be changed periodically by the lender).  The amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the policies of the lender, the number of months remaining between the closing of title and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amount of the taxes and other charges or impositions then payable; and
 (v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender.  Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of his lender with respect thereto;

(vi) if, in connection with this purchase, Purchaser has dealt with any broker except (A) the Selling Agent or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing;

(vii) Purchaser will pay to Rosen Livingston & Cholst LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owner's Power of Attorney, additional closing documents and for coordinating and attending the closing;

(viii) if Purchaser obtains financing and his lender refuses to close at the office of Rosen Livingston & Cholst LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and Purchaser pays Rosen Livingston & Cholst LLP, in addition to said closing fee set forth above, a travel fee of $500.00 if the closing is held in Manhattan or $700.00 if the closing is held in another borough.  If the closing attended by a representative of Rosen Livingston & Cholst LLP is adjourned through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Cholst LLP an additional travel and attendance fee in the same amount as stated above for such attendance;

9

Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in which to provide good funds for Purchaser's Down Payment, in which event Sponsor shall be deemed to have waived its right to sue Purchaser on the dishonored or uncollected check; or (ii) allow Purchaser thirty (30) days in which to make good Purchaser's Down Payment and if Purchaser fails to do so within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check.  In the latter case, Purchaser will also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

Upon cancellation of this Agreement and disposing of the Down Payment and interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan.  Thereafter, the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

**16. Risk of Loss; Casualty**

(a) Purchaser shall not be entitled to possession of the Unit or to store any of Purchaser's furniture or belongings therein until the deed is delivered to Purchaser at closing.

(b) All other risk of loss prior to closing has been assumed by Sponsor, but without any obligation or liability of Sponsor to repair the damage or restore the Unit or its contents.  If Sponsor or the Unit Owners elect to repair or replace the loss or damage, this Agreement shall continue in full force and effect, Purchaser shall not have the right to reject title to the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or replacements.  Purchaser shall not be required to pay the Balance unless and until (i) the Unit has been substantially repaired as near as is reasonably possible to its condition immediately prior to the casualty; (ii) its essential services (such as gas, electricity, and heat) and a reasonable means of ingress and egress to the Unit have been restored; and (iii) any condition in the Unit for which a violation (if any) is noted or issued has been corrected (even if same is not yet removed of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser, its licensees, invitees and/or workers.  (Sponsor will endeavor in good faith, and with reasonable diligence, to remove or cause to be removed subsequent to closing all violations of record if it is obligated to correct.)  Any proceeds received from insurance, or in satisfaction of any claim or action in connection with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners).  If such proceeds are paid to Purchaser, Purchaser shall promptly turn them over to Sponsor upon request.  The provisions of the two preceding sentences shall survive the closing.

(c) In the event that Sponsor notifies Purchaser that it does not elect to repair or restore the Unit or if the Unit Owners do not resolve to make such repairs or restoration in accordance with the Condominium's By-Laws, this Agreement shall be deemed canceled and of no further force or effect, and Sponsor shall instruct the Depository to return to Purchaser all sums deposited hereunder, together with interest, if any, thereon, whereupon the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously canceled due to Purchaser's uncured default, Sponsor shall retain the Liquidated Sum as provided above.

**17. Inspection of Unit**

At least ten (10) days before the Balance is to be paid, Sponsor or the Selling Agent shall notify Purchaser that the Unit is ready for inspection.  Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Sponsor or the Selling Agent to inspect the Unit before the lapse of such ten (10) day period.  Purchaser or his duly authorized agent shall

11

(viii) If Purchaser is other than a natural person, a principal of the Purchaser will be required to provide a personal guaranty of Common Charges and other charges due to the Condominium and Purchaser will pay Rosen Livingston & Cholst LLP a fee of $500.00 for preparation of such Guaranty;

(ix) if Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Cholst LLP a fee of $1,000.00 for the preparation of the splitter, substitute mortgage and assignment of mortgage documents; and

(x) Purchaser will pay the New York State Real Estate Transfer Tax (documentary stamps) to be affixed to the deed, the New York City Real Property Transfer Tax and (if applicable) the one (1%) percent "mansion tax";

(e) Purchaser will pay to 135 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit by Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.

All of the aforementioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's unendorsed, personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party, or if so directed by the Sponsor, by wire transfer.

**14. Power of Attorney to Condominium Board, Sponsor, Retail Unit Owner and Commercial Unit Owner**

At closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit (or, if no representative is present, then to Sponsor's attorney), for recording in the New York City Register's Office a Power of Attorney in favor of the Condominium Board relative to purchasing or leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owners relative to amending the Condominium Documents to the extent permitted in the Power of Attorney.  An originally recorded Power of Attorney shall be sent to the Condominium Board.

**15. Events of Default**

(a) The following shall constitute "Events of Default" hereunder:
 (i) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 6 herein or to timely pay the applicable Rosen Livingston & Cholst LLP closing fee or any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Cholst LLP pursuant to paragraphs 12 and 13 above; or
 (ii) the dishonor or failure of collection of Purchaser's Down Payment check; or
 (iii) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder.

(b) Upon the occurrence of an Event of Default, Sponsor shall be entitled, in its sole and absolute discretion, to cancel this Purchase Agreement by giving Purchaser written notice of cancellation.  If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default.  TIME IS OF THE ESSENCE TO CURE SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD.  If the default is not cured within such thirty (30) day period, then this Agreement shall be deemed canceled and Sponsor shall have the right to retain, as and for liquidated damages, the Downpayment.  Any sums in excess thereof, together with any interest thereon shall be returned to Purchaser after cancellation.

Notwithstanding the foregoing, if Purchaser's check in payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to

10

attend such inspection and shall complete, date and sign the Inspection Report (in the form set forth as Exhibit B to this Agreement) and deliver same to the Sponsor or Selling Agent at the conclusion of the inspection.  Failure of Purchaser either to arrange such appointment or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the completed Inspection Report shall not excuse Purchaser from paying the Balance when due (without provision for escrow) and shall constitute Purchaser's full acceptance of the Unit.  However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of the Sponsor".

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Units and the Retail Unit may be used for any lawful purpose and (ii) the Condominium Board, and the Residential Unit Owners do not have any right to approve the use or any changes in the use of the Unsold Residential Units, the Commercial Units and the Retail Unit or any part thereof.  This paragraph shall survive the closing of title.

**16. No Representations**

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, furnishings and fixtures contained in model units, sales brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms or closets therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to his purchase of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and investigation thereof).  No person has been authorized to make any representations on behalf of Sponsor.  No oral representations or statements shall be considered a part of this Agreement.  Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially to such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error.  The provisions of this paragraph shall survive the closing of title.

**18. Negotiable Terms**

Sponsor reserves the right, in its sole and absolute discretion, to negotiate on an individual basis with each purchaser substantially more beneficial purchase terms than those offered or given to other purchasers.  As a result, Purchaser may not benefit from a more favorable purchase term given to another purchaser and will not have the right to rescind this Purchase Agreement or recover the Down Payment or any other amount for not being given such benefit.  The following is a list of only some of the purchase terms which may be negotiated: purchase price; the amount of the Down Payment; the right of a purchaser to cancel the Purchase Agreement and recover the Down Payment for failure to obtain financing or to close by a specific date; the closing date and minimum notice required to schedule the closing; upgraded appliances, fixtures or equipment or other alterations, improvements or additions to be performed by and at the expense of Sponsor; excusing a purchaser from closing costs and/or penalties for closing late; longer time periods to pay or perform obligations under the Purchase

12

Agreement; elimination of "time of the essence" provisions; price or common charge rebates; assumption of payment of, or guarantee of, common charges for a given period; Sponsor financing (provided an amendment to the Plan containing the terms thereof is duly filed); allowances or credits against the purchase price for decorations; to install appliances or fixtures and granting to Purchaser the benefit of any one or more favorable terms offered or given to another purchaser.

**20. Notices**

All notices, elections, consents, demands and communications (collectively called "notices" or individually called "notice") shall be delivered personally or given in writing by registered or certified mail, return receipt requested, postage prepaid, and, if sent to Purchaser, addressed to Purchaser at Purchaser's address given above, with a copy to Purchaser's attorney, and, if sent to the Sponsor, addressed to the Sponsor at c/o Rosen Livingston & Cholst LLP, 275 Madison Avenue, New York, New York 10016, Attention: Andrew B. Freedland, Esq. Either party may, by notice to the other, change the address to which notices are to be sent. Unless otherwise provided herein, all notices shall be deemed given when personal delivery is effected or when deposited in any branch, station or depository maintained by the U.S. Postal Service in the City and State of New York, except that a notice of a new address shall be deemed given when actually received.

Sponsor has authorized the Selling Agent and Rosen Livingston & Cholst LLP, its partners, associates and legal assistants to sign and deliver on behalf of Sponsor any and all notices (including, without limitation, notices fixing and adjourning the closing date, notice of default, etc.) required or permitted to be given hereunder.

**21. Broker**

Purchaser represents to Sponsor that Purchaser has not dealt with any broker in connection with this transaction apart from the Selling Agent and the Co-Broker whose name appears on page 1. Purchaser shall pay the commission of any broker with whom Purchaser may have dealt (other than the Selling Agent and the Co-Broker) and Purchaser agrees that should any claim be made against Sponsor for commissions by any other broker on account of any acts or dealings of Purchaser or Purchaser's representatives, Purchaser will indemnify and hold Sponsor free and harmless from any and all liabilities and expenses in connection therewith, including (without limitation) reasonable legal fees and disbursements. The provisions of this paragraph shall survive the closing.

**22. No Lien; Agreement Subordinate to Mortgage**

(a) No lien or encumbrance shall arise against the Property or the Unit as a result of this Agreement or any monies deposited hereunder. This Agreement shall not be recorded and any purported recordation hereof by Purchaser shall be void and constitute an Event of Default.

(b) In furtherance, and not in limitation, of the provisions of the preceding subparagraph (a), Purchaser agrees that the provisions of this Agreement are, and shall continue to be, subject and subordinate to the lien of any mortgages heretofore or hereafter made and any payments or expenses already made or incurred or which hereafter may be made or incurred pursuant to the terms thereof, or incidental thereto, or to protect the security thereof. To the full extent, without the execution of any further legal documents by Purchaser. In the event of the existence of such mortgage(s), Sponsor shall, at its option, either satisfy such mortgages or obtain a release of the Unit and its undivided interest in the Common Elements from the lien of such mortgages on or prior to the Closing Date. The existence of any mortgage or mortgages encumbering the Property, or portions thereof, other than the Unit and its undivided interest in

13

the Common Elements, shall not constitute an objection to title or excuse Purchaser from completing payment of the Purchase Price or performing all of Purchaser's other obligations hereunder or be the basis of any claim against, or liability of, Sponsor, provided that the Unit is released from the lien of such mortgage at closing.

**23. Entire Agreement**

This Purchase Agreement, together with the Plan, as the Plan and Purchase Agreement may be amended from time to time, constitutes the entire agreement between the parties as to the subject matter hereof and supersedes all prior understandings and agreements.

**24. Agreement May Not Be Assigned Without Consent**

Purchaser does not have the right to assign this Agreement without the express prior written consent of Sponsor to such assignment. Sponsor is not obligated to give such consent and if Sponsor refuses to consent Purchaser will not be excused from Purchaser's obligations under this Agreement.

If Sponsor, in its sole discretion, elects to permit Purchaser to assign this Agreement, Purchaser shall pay to Rosen Livingston & Cholst LLP, simultaneously with Purchaser's execution and delivery of such assignment, a fee of $350 for preparing such assignment.

**25. Joint Purchasers**

The term "Purchaser" shall be read as "Purchasers" if the Unit is being purchased by more than one person, in which case their obligations shall be joint and several.

**26. Acts of God**

Sponsor shall be excused from performing any obligations or undertaking provided for in this Agreement for so long as such performance is prevented, delayed, or hindered by an act of God, fire, flood, explosion, war, riot, sabotage, inability to procure or, general shortage of, energy, labor, equipment, facilities, materials, or supplies in the open market, failure of transportation, strike, lock-out, action of labor unions or any other cause (whether similar or dissimilar to the foregoing) not within the reasonable control of Sponsor. Sponsor's time to perform such obligations or undertaking shall be tolled for the length of the period during which such performance was excused.

**27. Further Assurances**

Either party shall execute, acknowledge and deliver to the other party such instruments and take such other actions, in addition to the instruments and actions specifically provided for herein, as such other party may reasonably request in order to effectuate the provisions of this Agreement or of any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction.

**28. Severability**

If any provision of this Agreement or the Plan is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement or the Plan and the applicability of such provision to other persons or circumstances shall not be affected thereby. Each provision of this Agreement or the Plan, except as otherwise herein or therein provided, shall be valid and enforced to the fullest extent permitted by law.

**29. Strict Compliance**

Any failure by Sponsor to insist upon strict performance by Purchaser of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof,

14

irrespective of the number of violations or breaches that may occur, and Sponsor, notwithstanding any such failure, shall have the right thereafter to insist upon strict performance by Purchaser of any and all of the provisions of this Agreement to be performed by Purchaser.

**30. Governing Law**

The provisions of this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York.

**31. Waiver of Jury Trial**

Except as prohibited by law, the parties shall, and they hereby do, expressly waive trial by jury in any litigation arising out of, connected with, or relating to this Agreement or the relationship created hereby or in the Plan. With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.

**32. Gender**

A reference in this Agreement to any one gender, masculine, feminine, or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context otherwise requires.

**33. Certain References**

The term "herein", "hereof" or "hereunder" or similar terms used in this Agreement refer to this entire Agreement and to the particular provision in which the term is used. Unless otherwise stated, all references herein to paragraphs, subparagraphs or other provisions are references to paragraphs, subparagraphs or other provisions of this Agreement.

**34. Captions**

The captions in this Agreement are for convenience and reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

**Successors and Assigns**

The provisions of this Agreement shall bind and inure to the benefit of Purchaser and Purchaser's heirs, legal representatives, successors and permitted assigns and shall bind and inure to the benefit of Sponsor and its successors and assigns.

**35. No Oral Changes**

This Agreement cannot be changed or any provision waived orally. ANY CHANGES OR ADDITIONAL PROVISIONS OR WAIVERS MUST BE SET FORTH IN A RIDER ATTACHED HERETO OR IN A SEPARATE WRITTEN AGREEMENT SIGNED BY THE PARTIES.

**36. Acceptance of Purchase Agreement**

(a) This Agreement shall not be binding upon Sponsor until a duplicate hereof, executed by Sponsor or its duly authorized agent, is delivered to Purchaser. The submission of a Plan or Purchase Agreement to a prospective purchaser shall not be construed as Sponsor's approval of such sale. If such executed duplicate of this Agreement is not sent or delivered to Purchaser within thirty (30) days after same is received by the Selling Agent along with a check for the Down Payment, it shall be deemed rejected and cancelled and all monies paid by Purchaser shall be promptly refunded without interest. Upon such refund being made, neither party shall have any further rights or obligations hereunder with respect to the other. Sponsor shall have the right to reject this Agreement without cause or explanation to Purchaser, provided such

15

rejection is not due to Purchaser's sex, race, creed, color, national origin, ancestry, disability, marital status or other ground proscribed by law.

**37. Escrow Provisions**

A.   The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, Suite 600, New York, NY 10016, telephone number 212 587-7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser. Escrow Agent has designated the following attorneys to serve as signatories: Marlon H. Rosen, Peter I. Livingston, Bruce A. Cholst, Mary L. Kosmark. All designated signatories are admitted to practice law in the State of New York. Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor, Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

B.   Sponsor and all authorized signatories hereby submit to the jurisdiction of the State of New York and its Courts for any cause of action arising out of the Purchase Agreement or otherwise concerning the maintenance of release of the Deposit from escrow.

C.   The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York. The escrow account is entitled "(Purchaser's Name) Rosen Livingston & Cholst LLP as Escrow Agent" ("Escrow Account"). The Escrow Account is not an IOLA account. The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit. Any deposit in excess of $250,000 will not be insured.

D.   All Deposits received from Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP, as Escrow Agent.

E.   The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts. Interest shall begin to accrue upon placing the Deposit into the Escrow Account. All interest earned thereon shall be paid to or credited to the Purchaser at closing. No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account.

F.   Within five (5) business days after the Purchase Agreement has been tendered to Escrow Agent along with the Deposit, the Escrow Agent shall sign the Escrow Agreement and place the Deposit into the Escrow Account. Within ten (10) business days of the placing the deposit in the Escrow Account, Escrow Agent shall provide written notice to Purchaser and Sponsor, confirming the Deposit. The notice shall provide the account number and the initial interest rate to be earned on the Deposit. Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of the Escrow Agreement.

G.   The Escrow Agent is obligated to send notice to the Purchaser once the Deposit is placed in the Escrow Account. If the Purchaser does not receive notice of such deposit within fifteen (15) business days after tender of the Deposit, he or she may cancel their Purchase Agreement within ninety (90) days after tender of the Purchase Agreement and Deposit to Escrow Agent. Complaints concerning the failure to honor such cancellation requests may be referred to the New York State Department of Law, Real Estate Finance Bureau, 120 Broadway, 23rd Floor, New York, N.Y. 10271. Rescission shall not be afforded where post

16

43

satisfactory to the Attorney General is submitted establishing that the Deposit was timely placed in the Escrow Account in accordance with the New York State Department of Law's regulations concerning Deposits and requisite notice was timely mailed to the Purchaser.

H.    All Deposits, except for advances made for upgrades, extras, or custom work received in connection with the Purchase Agreement, are and shall continue to be the Purchaser's money, and may not be commingled with any other money or pledged or hypothecated by Sponsor, as per GBL § 352-h.

I.    Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until after consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law. Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

J.    The Escrow Agent shall release the Deposit if so directed:

(a) pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 5 upon closing of title to the Unit; or

(b) in a subsequent writing signed by both Sponsor and Purchaser; or

(c) by a final, non-appealable order or judgment of a court.

If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit. If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release. If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within said thirty (30) day period, the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above. Notwithstanding the foregoing, the Escrow Agent shall have the right at any time to deposit the Deposit contained in the Escrow Account with the clerk of the county where the Unit is located and shall give written notice to both parties of such deposit.

The Sponsor shall not object to the release of the Deposit to:

(a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an Amendment to the Plan; or

(b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

K.    Any provision of the [Purchase Agreement/Escrow Agreement] or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or

17

indemnify any obligation of the Escrow Agent holding any Deposit in trust is absolutely void. The provisions of the Attorney General's regulations and GBL §§ 352-e(2-b) and 352-h concerning escrow trust funds shall prevail over any conflicting or inconsistent provisions in the Purchase Agreement, Plan, or any amendment thereto.

L.    Escrow Agent shall maintain the Escrow Account under its direct supervision and control.

M.    A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352(h).

N.    Escrow Agent may rely upon any paper or document which may be submitted to it in connection with its duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

O.    Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-(h) and the New York State Department of Law's regulations.

P.    Sponsor shall obtain or cause the selling agent under the Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement. O.    Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstance.

R.    Sponsor agrees to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of its obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent. This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

38. Counterpart Signature Pages

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument. This Agreement may be executed by facsimile or .pdf and such shall be deemed originals.

39. Transfer tax

Notwithstanding the foregoing, Sponsor will pay one half of the NYC Real Property Transfer Tax and the NYS Real Property Transfer Tax; such payment shall not exceed $37,412.50.

[Signature page follows]

18

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:
135 WEST 52ND STREET OWNER LLC

By: _____
Meyer Chetrit, Principal

By: _____
David Blatrier, Principal

(Purchaser)
Date Accepted:

(*Please initial on line and print or type name under line.)

Purchaser acknowledges:                Initials: _AN_
Receipt of Offering Plan and           Purchaser: ___Antoine Nohra___
Amendments at _____ (A.M.)(P.M.)
on _____ 2015; and

Delivery of Purchase                   Initials:
Agreement and Check for                Co-Purchaser: _____
Down Payment at _____ (A.M.)(P.M.)
on _4/21_ 2015

KM

PURCHASER:
135 WEST 52ND STREET 17C LLC

By: _____
Purchaser

By: _____
Co-Purchaser

19

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:
135 WEST 52ND STREET OWNER LLC

By: _____
Meyer Chetrit, Principal

By: _____
David Blatrier, Principal
4/23/15  $4,100,000  17C

(Purchaser)
Date Accepted:

(*Please initial on line and print or type name under line.)

Purchaser acknowledges:                Initials: _AN_
Receipt of Offering Plan and           Purchaser: ___Antoine Nohra___
Amendments at _____ (A.M.)(P.M.)
on _____ 2015; and

Delivery of Purchase                   Initials:
Agreement and Check for                Co-Purchaser: _____
Down Payment at _____ (A.M.)(P.M.)
on _4/21_ 2016

KM

PURCHASER:
135 WEST 52ND STREET 17C LLC

By: _____
Purchaser

By: _____
Co-Purchaser

19

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

| | |
|---|---|
| SPONSOR:<br>135 WEST 52ᴺᴰ STREET OWNER LLC | PURCHASER:<br>135 WEST 52ND STREET 17C LLC |
| By: _____<br>Meyer Chetrit, Principal | By: _____<br>Purchaser |
| By: _____<br>David Bistricer, Principal | By: _____<br>Co-Purchaser |

(Purchaser)
Date Accepted: _____

(*Please initial on line and print or
type name under line.)

Purchaser acknowledges:          Initials: _AN_
Receipt of Offering Plan and
Amendments at _____ (A.M.)(P.M.)     Purchaser: ___Antoine Nohra___
on _____, 2015; and

Delivery of Purchase          Initials: _____
Agreement and Check for          Co-Purchaser: _____
Down Payment at _____ (A.M.)(P.M.)
on _4/2/_, 2015

---

1.     Building restrictions and zoning laws and other regulations, resolutions and ordinances and any amendments thereto now or hereafter adopted by any governmental or quasi-governmental authority having jurisdiction, provided they do not prevail the use of the subject Unit for dwelling purposes.

2.     State of facts shown on a survey made by Earl B. Lovell-S.P. Belcher, Inc. dated March 12, 2013 and any state of facts which a more recent survey or personal inspection of the land and building would show, provided such additional state of facts would not prevent the use of the subject Residential Unit for dwelling purposes or, if applicable, the subject Commercial or Retail Unit for the purposes permitted by Law and further provided that such state of facts do not render title unmarketable.

3.     The terms, burdens, covenants, restrictions, conditions, easements and rules and regulations set forth in the Declaration, the By-Laws (and the Rules and Regulations thereto), the Power of Attorney from Purchaser to the Condominium Board, Sponsor, the Commercial Unit Owners and the Retail Unit Owner and the Floor Plans, all as same may be amended from time to time.

4.     Consents by Sponsor, or any former owner of the Land for the erection of any structure or structures on, under or above any land, street or streets on which the Land may abut.

5.     Any easement or right of use in favor of any utility company for construction, use, maintenance, repair and replacement of all utility lines, wires, terminal boxes, mains, pipes, cables, conduits, poles, connections and other equipment and facilities on, under and across the Land and Building.

6.     Revocability of licenses for vault space, if any, under the sidewalks and streets and the lien of any unpaid vault tax (which is to be paid by the Condominium Board, the Retail Unit Owner or the Commercial Unit Owners (as the case may be)).

7.     Encroachments of stoops, areas, cellar steps or doors, trim, copings, retaining walls, bay windows, terraces, balconies, sidewalk elevators, fences, fire escapes, cornices, foundations, footings, chutes, fuel oil lines, drainage and stand pipes, and similar projections, if any, on, over, or under the Property or the streets or sidewalks abutting the property and the rights of governmental authorities to require the removal of any such projections, and variations between record lines of the Property and retaining walls and the like, if any.

---

8.     Leases and service, maintenance, employment, management, concessionaire and license agreements, if any, of other Units or portions of the Common Elements, provided same are disclosed in the Plan or in an amendment thereto.

9.     The lien of any unpaid Common Charge, real estate tax, water charge or sewer rent, provided the same are adjusted at the closing of title.

10.     The lien of any unpaid assessment payable in installments (whether imposed by a taxing authority or the Condominium Board), except that Sponsor shall pay all such assessments due prior to the Closing Date and Purchaser shall pay all assessments due from and after such date (however, the then current installment shall be adjusted at closing).

11.     Any encumbrance as to which either the Title Insurance Company or the title insurance company which insures Purchaser's title to the Unit would be willing to insure at its regular rates, without additional premium, in a fee policy issued by it to Purchaser to insure that such encumbrance, (a) will not be collected out of or enforced against the Unit if it is a lien and (b) will not prevent the use of the subject Residential Unit for dwelling purposes. (Any exception which the Title Insurance Company has omitted or insured at its regular rates and without additional premium, which will not be collected out of or enforced against a Unit, in a fee title insurance policy for other Units, is not an objection to title.)

12.     The Certificate of Occupancy to be issued covering the Building, provided it authorizes occupancy of the subject Residential Unit for residential purposes.

13.     Any violations against the Property (other than the subject Unit) which are the obligation of the Condominium Board or another Unit Owner to correct.

14.     Standard printed exceptions contained in the form of fee title insurance policy then issued by the title insurance company insuring Purchaser's title to the subject Unit.

15.     Any easement or right of use required for Sponsor to obtain a temporary, final or amended Certificate of Occupancy for the Building, provided such easement or right of use will not prevent the use of the subject Residential Unit for dwelling purposes.

16.     Distinctive Street Improvement Maintenance Agreement in Reel 1109 Page 652.

17.     Zoning Lot Certification in Reel 766 Page 115.

---

Date:
135 West 52ᴺᴰ Street Owner LLC
512 Seventh Avenue
New York, New York 10018

Re:     Unit
135 West 52ᴺᴰ Street Condominium
135 West 52nd Street
New York, New York 10019

Gentlemen:
This is to confirm that based on the undersigned's personal inspection of the above referenced Unit, I (we) have found the Unit, its floors, walls, doors, fixtures, appliances, equipment, hardware and all other items listed below, to be in good and satisfactory condition, free of chips, mars, scratches, breaks or other defects, except for those matters (if any) expressly noted below under "exceptions" requiring repair, adjustment or correction:

| Item | Exceptions<br>(if any) | Purchaser's<br>Initials |
|---|---|---|
| 1. | Unit Interior: | |
| (a) | Walls: _____ | _____ |
| (b) | Floors: _____ | _____ |
| (c) | Ceilings: _____ | _____ |
| (d) | Windows:<br>(glass, sash, pane, sill, etc.) _____ | _____ |
| (e) | Doors: _____ | _____ |
| (f) | Electrical fixtures: _____ | _____ |
| (g) | Painted surfaces: _____ | _____ |
| (h) | Kitchen cabinets: _____ | _____ |
| (i) | Appliances: _____ | _____ |
| (j) | Kitchen sink: _____ | _____ |
| (k) | Medicine cabinets:<br>(doors & mirror) _____ | _____ |
| (l) | Vanities: _____ | _____ |

| Item | Exceptions (if any) | Purchaser's Initials |
|------|--------------------|--------------------|
| (m) | Bathroom sinks: | |
| (n) | Water closet: | |
| (o) | Bathtubs: | |
| (p) | Bathroom tile: | |
| (q) | Hardware: | |
| | (doorbell, doorknob, faucets, locks, etc.) | |
| (r) | Intercom: | |
| 2. | General Operating Condition: | |
| (a) | All Doors: | |
| (b) | All Windows: | |
| (c) | All Plumbing: | |
| (d) | All Hardware: | |
| (e) | Other: | |

The undersigned will sign and deliver to you a separate statement, signifying my (our) satisfaction with each item excepted above (if any), immediately upon the completion of the repair, adjustment or correction of same. The undersigned understands and agrees that you shall not be obligated to make any repairs, adjustments or corrections to the Unit or any portion thereof or its fixtures, appliances, equipment, etc. contained therein, from or after the date of delivery of possession of the Unit to the undersigned, except as to those items (if any) expressly excepted above and your obligation regarding any such excepted items shall cease upon the completion of the repair, adjustment or correction of same. Nothing contained herein shall be construed to excuse Sponsor from its obligations to correct defects in construction or design to the extent required in the section entitled "Rights and Obligations of Sponsor" contained in the Offering Plan for Condominium Ownership of the 135 West 52nd Street Condominium. The undersigned shall be required to complete the payment of the Purchase Price (without the provision for an escrow) and accept title to the Unit on the closing date notwithstanding the presence of any exceptions.

Very truly yours,

_____
Purchaser's Signature

Agreed To:
135 West 52nd Street Owner LLC

_____
Purchaser's Signature

By:_____

23

PURCHASE AGREEMENT

AGREEMENT made as of November ___3___, 2015 between 135 WEST 52ND STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and Lili Shen, Ying Jin and Hao Shen residing at c/o Fuhao Yang, Esq., 7 Mott Street, Sixth Floor, New York, NY 10013 ("Purchaser").

Purchaser's Attorney:   Fuhao Yang, Esq.

7 Mott Street, Sixth Floor

New York, New York 10013

Telephone: (212) 966 9078 Fax: (212) 966 9078 Email: lawoffice.fuhaoyang@gmail.com

Percentage of Common Interest: 0.7800 %  Common Charges: $1,737.76 per month

Residential Percentage of Common Interest: 1.0416%

Selling Agent: Douglas Elliman (Stacy Spielman)

Co-Broker: Sotheby's International Realty (Yi Chen)

Real Estate Taxes: $1,843.63 per month;    B.I.D. Tax: $29.81 per month;

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 19C ("Unit") in the building ("Building") known as 135 WEST 52ND STREET Condominium ("Condominium") and located at 135 WEST 52ND STREET, New York, New York 10019, together with a 0.7800% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

1.   Purchase Price

(a) The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below ("Purchase Price") is $4,025,000.00, payable as follows:

(i) $603,750.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5; **with a remaining downpayment of $402,500.00 (the "Second Downpayment") by check which shall also be subject to collection to be made on or before January 28, 2016, pursuant to paragraph 39, to be held in escrow pursuant to paragraph 5;** and

(ii) $3,018,750.00, constituting the balance of the Purchase Price ("Balance"), by certified check of Purchaser or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined). All checks in payment of the balance of the Purchase Price shall be payable to the order of Sponsor (or as Sponsor otherwise directs. Sponsor reserves the right to require Purchaser to pay the Balance or any portion thereof in "immediately available funds" (i.e. by wire transfer to a bank account designated by Sponsor).

1

(c) All checks shall be unendorsed, made payable to the direct order of "Rosen Livingston & Cholst LLP, as Escrow Agent" or (as in the Balance) to "135 West 52ND Street Owner LLC or such payees as Sponsor may direct on not less than two (2) business days' prior oral or written notice to Purchaser. All checks shall be drawn on a bank that is a member of the New York Clearing House Association. All checks must be payable directly to the order of the required payee; they may not be endorsed.

(d) Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing and, unless otherwise set forth herein, none of the provisions of this Agreement shall survive the closing. However, nothing contained herein shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of Purchaser under Article 23-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.

(e) Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under "Terms of Sale - Prerequisites to Closing of Title" in Part I of the Plan are met concurrently with, or prior to, closing.

2.   Definitions   The following terms shall have the meanings ascribed to them.

(a) "Building" shall mean the building located at 135 West 52ND Street, New York, New York 10019.

(b) "Closing Date", "closing", "closing of title" and words of similar import are used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment to Sponsor of the Purchase Price and the delivery by Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.

(c) "Condominium" shall mean The 135 West 52ND Street Condominium.

(d) "Declaration" shall mean the Declaration of the 135 West 52ND Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.

(e) "Depository" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.

(f) "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.

(g) "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.

(h) "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.

All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

3.   Plan

(a) Purchaser represents that Purchaser has purchased the Plan and any filed amendments thereto at least three (3) business days prior to submitting this Purchase Agreement; or

(b) In the event Purchaser does not wish to wait three (3) business days) Purchaser has the right to rescind this Purchase Agreement by sending written notice of his rescission to the Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement

2

(time being of the essence to exercise such right of rescission within such seven (7) day period)

(c) Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Condominium Documents set forth in Part II of the Plan and Parts A and B of the Exhibits submitted with the Plan to the Department of Law) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor (including, without limitation, amendments involving any changes, modifications, or updating of the projected Common Charges, the projected real estate taxes to be paid by Purchaser, or Schedule B "Budget for the First Year of Condominium Operation"). Except in the case of a material adverse amendment affecting Purchaser's Unit or as otherwise provided under the Plan, any such amendments shall neither excuse Purchaser from performing Purchaser's obligations hereunder nor entitle Purchaser to any offset or credit against the Purchase Price or claim or right of action against Sponsor, and any such amendment may be filed by Sponsor without Purchaser's consent or approval. However, Sponsor shall not have the right to unilaterally cancel this Agreement except as herein provided (such as in the case of an uncured default by Purchaser) nor change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.

(d) The Plan is hereby incorporated in this Agreement with the same force and effect as if set forth at length. In the event of any inconsistency or conflict between the provisions of this Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding. Purchaser acknowledges having had full opportunity to examine all documents and investigate all statements made herein and in the Plan.

4.   Personal Property

(a) At closing, the Unit will contain only those appliances, countertops, cabinets, flooring, sinks, vanities (if any), air conditioning units (if any), hardware and other fixtures and equipment installed therein as set forth in the Plan.

Sponsor has the right to substitute other appliances, countertops, cabinets, sinks, vanities, flooring and fixtures in place of those referred to in the Plan provided only that the substitutions are of equal or better quality and design.

(b) The Unit is being sold unfurnished, without window blinds or shades. Furniture, floor coverings, wall coverings, furnishings, decorations and the like in or about any model Unit are for display purposes only and are not included in this sale except to the extent set forth in the Plan. Any floor plans or sketches shown to Purchaser (including those contained in the Plan) are only approximations of the Unit's dimensions and arrangement and Purchaser acknowledges and agrees that he is not relying thereon. Sponsor shall not be liable for minor variations from any floor plans or structures.

(c) Sales model apartments may, at Sponsor's option, be sold furnished at a later date but will initially be withheld from sale.

(d) There will be no modifications or extras unless agreed to in writing by the parties. All modifications and alterations must be approved by Sponsor in writing and, if approved, shall be performed by Sponsor at Purchaser's expense (payable in the manner to be set forth in an addendum to this Agreement or by separate agreement between Sponsor and Purchaser).

5.   Purchase Monies to be Held in Trust

(a) The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, New York, NY 10016, telephone number 212 687 7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser. Escrow Agent has designated the following attorneys to serve as signatories: Morton H Rosen, Peter I. Livingston, Andrew B. Freedland, Bruce A. Cholst. All designated signatories are admitted to practice law in the State of New

3

York. Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor, Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

(b) The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York. The escrow account is entitled "[Purchaser's Name] Rosen Livingston & Cholst LLP Escrow Agent" ("Escrow Account"). The Escrow Account is federally insured by the FDIC up to the maximum amount of $250,000 per deposit. Any deposit in excess of $250,000 will not be insured.

All Deposits received by Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP as Escrow Agent.

Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of a written agreement between Purchaser and Sponsor.

The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts, which is currently 0.2%. Interest shall begin to accrue upon placing the Deposit into the Escrow Account. All interest earned thereon shall be paid to or credited to the Purchaser at closing. No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account. The Escrow Agreement appended hereto as Exhibit "A."

The Down Payment will not earn interest until the Purchaser's check has been deposited and cleared. Sponsor will be liable to Purchaser only for the amount of interest actually received from the Depository (which interest may be reduced by the Depository's service charge). The interest on the Down Payment, as same may be reduced by the Depository's service charge, is hereinafter referred to as "Interest".

Upon the payment and performance by Purchaser of all of Purchaser's obligations hereunder and the transfer to Purchaser of title to the Unit, Sponsor will instruct the Depository to pay to Purchaser any and all interest on monies deposited hereunder. It is possible that Purchaser may not receive interest on the Down Payment for the entire month in which the closing is scheduled to occur. The Sponsor and Selling Agent will not be liable to Purchaser for the amount of such interest or the payment thereof, except for any amount received from the Depository. All funds due to Sponsor and received under this Purchase Agreement will be handled in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and with Section 71-a(3) of the New York Lien Law.

6.   Closing of Title

(a) The closing of title shall occur on the date and at the time and place in the City and State of New York as Sponsor shall designate to Purchaser on not less than thirty (30) days' prior written notice (unless waived by Purchaser). Sponsor shall not specify a closing date prior to March 31, 2016. Sponsor shall have the right, from time to time, to adjourn such date and time for closing on written notice to Purchaser. If the Closing is adjourned by Sponsor, then Sponsor shall fix a new date and time for closing and shall give Purchaser not less than ten (10) days' prior written notice of the new scheduled date and time for closing.

4

Purchaser shall be entitled to one (1) adjournment of the closing not to exceed five (5) days (the "Adjourned Closing Date"). The closing adjustments stated in section 12(e) shall not accrue unless Purchaser fails to close on such Adjourned Closing Date. Such adjournment must be exercised no less than two (2) days prior to the scheduled closing date.

Sponsor shall not provide such written notice to Purchaser until Sponsor has obtained a Temporary or Permanent Certificate of Occupancy for the Unit.

(b) The closing of title shall occur only after or concurrently with compliance with the prerequisites set forth under "Terms of Sale Prerequisites to Closing of Title" in Part I of the Plan.

(c) Sponsor has targeted the First Closing for June 1, 2016 based on the current construction schedule. The actual date for the First Closing is not assured or warranted and may be earlier or substantially later depending on the progress of sales and construction and compliance with the other prerequisites recited in the section of the Plan entitled "Terms of Sale". However, if through no fault of Purchaser the First Closing does not take place by June 1, 2016, Purchaser shall have the right to rescind this Purchase Agreement and recover his Down Payment with all interest thereon by giving written notice of his or her election to do so to the Sponsor no later than fifteen days after the date that such right arises.

Purchaser acknowledges that Units may be completed at varying times over a prolonged period that will extend beyond the First Closing. In such event, the order in which Units will be completed is within the sole discretion of Sponsor and may not coincide with the chronology in which Units are contracted for sale nor the numeric order of the floors. Many unforeseeable factors can affect the completion of Units. Accordingly, the sequence in which Units (including the subject Unit) will actually be finished cannot reasonably be predicted. No representation is made nor any assurance given that the closing of the subject Unit will occur contemporaneously with the First Closing.

Purchaser further acknowledges that construction (and, therefore, the closing) may be delayed by late delivery of material and equipment, labor difficulties, unavailability of building trades, casualty, inclement weather and other events beyond Sponsor's control.

Purchaser agrees that Sponsor is to be afforded liberal and broad latitude in time and in all decisions concerning the completion of the Property and the Units pursuant to the Plan. Purchaser will not be excused from paying the full Purchase Price, without credit or set off, and will have no claim against Sponsor for damages or losses in the event the First Closing occurs substantially later than the targeted date or the time to complete and close title to Purchaser's Unit is delayed or postponed by Sponsor.

Notwithstanding the foregoing, Purchaser may rescind this Agreement and receive the prompt refund of his or her Downpayment if the construction of the Unit is not complete within two years of the date Purchaser signed this Agreement by giving written notice of his or her election to do so to the Sponsor no later than fifteen days after the date that such right arises.

**7. Representations, Warranties and Covenants**

Sponsor represents, warrants and covenants that:

(a) Sponsor is the sole owner of the Unit and the property referred to in paragraph 1, and Sponsor has the full right, power and authority to sell, convey and transfer the same;

(b) The common charges (excluding separately billed utility charges) for the Unit on the date hereof are set forth on page 1 of this Agreement;

(c) Sponsor has not received any written notice of any instance or increase in common charges not reflected in subparagraph 7(b). Purchaser acknowledges that it will not have the right to cancel this Agreement in the event of the imposition of any assessment or

5

increase in common charges after the date hereof of which Sponsor has not heretofore received written notice;

(d) The real estate taxes as of the date of this Agreement are set forth on page 1 of this Agreement;

(e) All refrigerators, freezers, ranges, dishwashers, washing machines, clothes dryers and air conditioning equipment included in this sale will be in working order at the time of the Closing; and

(f) Sponsor is not a "foreign person" as defined in IRC § 1445, as amended, and the regulations issued thereunder, and Sponsor shall execute and deliver to Purchaser at Closing a Certification of Non-Foreign Status.

**8. Closing Documents**

(a) At closing, Sponsor shall deliver to Purchaser:

(i) a Bargain and Sale Deed with covenant against grantor's acts transferring to Purchaser full ownership (fee simple title) to the Unit and its Common Interest, subject only to the Permitted Encumbrances (see Exhibit A below).

The grantor's covenant is for the personal benefit of Purchaser and will not inure to the benefit of Purchaser's successors or subrogees (including, without limitation, Purchaser's title insurance company). Purchaser must first look to Purchaser's title insurance company before seeking recourse against Sponsor for recovery on any claim based on an alleged breach of such covenant. This provision shall survive the closing.

The deed shall be substantially in the form reproduced as Document Number 3 in Part II of the Plan and shall be executed and acknowledged by grantor in form for recording. Such executed deed shall be promptly delivered to the representative of the title insurance company insuring Purchaser's title (or, if no such representative is present, then to Purchaser's attorney) for recording. After being recorded, the deed shall be returned to Purchaser or Purchaser's attorney.

(ii) A statement by the Condominium or its managing agent that the common charges and any assessments then due and payable the Condominium have been paid to the date of the Closing;

(iii) All keys to the doors of, and mailbox for, the Unit;

(iv) New York City Real Property Transfer Tax return ("RPT") and New York State Real Estate Transfer Tax return (documentary stamps), prepared, executed and acknowledged by Sponsor in proper form for submission;

(v) Affidavit that a single station smoke detecting alarm device is installed pursuant to New York Executive Law § 378(5);

(vi) New York State Equalization Return executed and acknowledged, in proper form for submission.

(b) At Closing, Purchaser shall execute and deliver to Sponsor or as directed by Sponsor:

(i) New York City Real Property Transfer Tax return ("RPT") and New York State Real Estate Transfer Tax return (documentary stamps);

(ii) Affidavit that a single station smoke detecting alarm device is installed pursuant to New York Executive Law § 378(5);

(iii) Unit Owner's Power of Attorney, as described in paragraph 14 below;

(iv) New York State Equalization Return executed and acknowledged, in proper form for submission;

(v) Personal Guaranty of Common Charges and other sums due to the Condominium if Purchaser is not a natural person;

(vi) Window Guard Notice; and

5

(vii) Balance of the Purchase Price and any other amounts due pursuant to this Agreement, in a form and to payee(s) specified by Sponsor.

**9. State of Title**

(a) Legal ownership to the Unit shall be transferred to Purchaser at Closing subject only to the liens, encumbrances and title conditions (hereinafter called the "Permitted Encumbrances") enumerated in Exhibit A to this Agreement. The existence of the Permitted Encumbrances shall not be deemed a breach of Sponsor's covenant in the deed, even though the deed does not expressly provide that it is given subject to the Permitted Encumbrances. It is intended and agreed that the deed for the Unit to be given by Sponsor to Purchaser at closing shall be deemed to be subject to the Permitted Encumbrances to the same effect as if set forth therein at length.

(b) Any liens, encumbrances, or conditions not included in the Permitted Encumbrances shall not be an objection to title if: (i) the instrument required to remove it "as of record" has been delivered to the Title Insurance Company for recording in the proper office, together with the requisite recording or filing fees and a copy of said instrument is delivered to the representative of Purchaser's title insurance company (or, if none, to purchaser's attorney); or (ii) the Title Insurance Company is willing to insure Purchaser (at its regular rate and without additional premium) against collection or enforcement against the Unit. Sponsor shall be entitled to adjourn the closing to remove or correct any non-Permitted Encumbrance. However, if the non-Permitted Encumbrance existed (and was known or should have been known by Sponsor) at the closing but it was not known or could not reasonably have been known by Sponsor) at least ten (10) days prior to closing and Purchaser or Purchaser's attorney failed to send to Sponsor's attorney, Rosen Livingston & Cholst LLP, at least ten (10) days in advance of the closing, written notice of the non-Permitted Encumbrance, then for purposes of paragraph 12 "Closing Adjustments", Purchaser shall be deemed at fault for not timely sending notice of the non-Permitted Encumbrance and the adjournment of the closing to allow Sponsor to correct or remove the non-Permitted Encumbrance shall be considered at the request of Purchaser and not Sponsor.

Delivery of a title report and its supplements to Seller's attorney shall be deemed written notice of the non-Permitted Encumbrances for the purpose of this section.

**10. Title Company Approval**

Subject to the terms of paragraph 11 below, Sponsor shall give, and Purchaser shall accept, such title as the Title Insurance Company will approve and insure at its regular rate and without additional premium, provided that the only liens, encumbrances and conditions affecting title shall be the Permitted Encumbrances. Sponsor is not obligated to cause Purchaser's title company to omit any exception to title if the Title Insurance Company will insure against collection out of the Unit.

**11. Sponsor's Inability to Convey Title**

(a) In the event that Sponsor is unable to deliver title to the Unit to Purchaser in accordance with the provisions of this Agreement, to remove or cure a non-Permitted Encumbrance and elects not to do so, then Sponsor will amend the Plan to disclose the title defect and offer Purchaser the right for fifteen (15) days only after Sponsor notifies Purchaser of Sponsor's refusal to remedy the title defect, to elect either to (i) waive the title defect and take title subject thereto (without abatement in or credit against the Purchase Price or claim or right of action against Sponsor for damages or otherwise) or (ii) rescind and recover the Down Payment with any earned interest. If Purchaser fails to elect to rescind within such fifteen (15) day period,

7

then Purchaser will be presumed conclusively to have elected the first option to waive and close title subject to the title defect. Purchaser's sole right and remedy in such case shall be to either waive the title defect and close or to rescind.

(b) If Purchaser timely elects to rescind, Sponsor shall instruct the Depository, within ten (10) days after receipt of Purchaser's rescission notice, to return to Purchaser all monies deposited hereunder with any interest thereon within thirty (30) days from receipt of said rescission notice. Upon making such refund, this Agreement shall be null and void and neither party shall have any further rights, obligations or liabilities with respect to the other hereunder or under the Plan.

(c) If Sponsor notifies Purchaser that it will remove or cure a non-Permitted Encumbrance, then Purchaser cannot cancel this Purchase Agreement for so long as Sponsor is using reasonable efforts to diligently remove or cure such non-Permitted Encumbrance.

**12. Closing Adjustments**

(a) At closing, Sponsor and Purchaser shall apportion, as of 11:59 p.m. of the day preceding the closing:

(i) Real estate taxes, B.I.D. tax, and assessments, if any (as discussed below) (for purposes of this paragraph 12, the term real estate taxes shall be deemed to include assessments, if any. Real estate taxes and B.I.D. tax will be apportioned at closing between Sponsor and the Purchaser based on the period such taxes have been prepaid by Sponsor); and

(ii) Common Charges for the month in which title closes (based on the number of days in the month in which title closing occurs).

(b) The "Customs in Respect to Title Closings" recommended by The Real Estate Board of New York, Inc., as amended to date, shall apply to the adjustments and other matters therein mentioned, except as otherwise provided herein.

(c) Any errors or omissions in computing apportionments at closing shall be corrected and payment made to the proper party promptly after discovery. This provision shall survive the closing.

(d) Installments for tax assessments due after the delivery of the deed, if any, shall be paid by the Purchaser and shall not be considered a defect in title.

(e) If, through no fault of Sponsor, Purchaser fails for any reason to close on the Closing Date, or is deemed at fault for not timely sending a notice of a title defect as provided above, then all closing adjustments will be calculated as of 11:59 P.M. of the day immediately preceding the originally scheduled Closing Date and Purchaser will, at closing:

(i) reimburse Sponsor the daily sum equal to .0441% (which is equivalent to an annual rate of approximately 16%) times the Unit's Purchase Price for each day's delay commencing with the date originally scheduled for closing through the day prior to the actual Closing Date; and

(ii) pay Rosen Livingston & Cholst LLP the sum of $250 for each default letter sent to Purchaser for each rescheduled closing date to reimburse such firm for the costs incurred in connection with sending such default letter or rescheduling the closing date.

All sums under clauses (i) and (ii) above shall be paid by unreduced personal certified check of Purchaser or official cashier's or bank check. Sponsor shall be entitled to adjourn the closing to remove or correct any non-Permitted Encumbrance. However, if the non-Permitted Encumbrance existed at least ten (10) days prior to closing and Purchaser or Purchaser's attorney failed to send to Sponsor's attorney, Rosen Livingston & Cholst LLP, notice of such non-Permitted Encumbrance, then for purposes of the closing adjustments under this paragraph 12, Purchaser shall be deemed at fault for not timely sending notice of the non-Permitted Encumbrance and the adjournment of the closing to allow Sponsor to correct or

8

48

remove the non-Permitted Encumbrance shall be considered at the request of Purchaser and not Sponsor.

**13. Purchaser's Closing Costs**

At closing, Purchaser will pay certain costs in connection with the purchase of his Unit in addition to the legal fees of Purchaser's counsel (if any) and the amount of any net credit in favor of Sponsor that may result from the closing apportionments described in the preceding paragraph. Such closing costs will include the following, the amounts of which (where applicable) are based on rates in effect on the date of the Plan and are subject to change without prior notice:

(a) If Purchaser elects to obtain fee title insurance, Purchaser will pay a premium to the title company for such insurance, which premium may vary depending upon the title insurance company and the amount of insurance requested. A lower combined rate may be available if fee and mortgage insurance are ordered simultaneously.

(b) Purchaser will pay a fee for recording the Unit Deed and the Unit Owner's Power of Attorney.

(c) If Purchaser obtains a mortgage loan, Purchaser will pay:

(i)  a fee and service charge for recording the mortgage.

(ii) a mortgage recording tax in the following amount: (a) for Residential Units, 2.05% of the face amount of a mortgage less than $500,000 for which mortgagor receives a $25 deduction, or 2.175% for a mortgage covering a Residential Unit equal to $500,000.00 or more, less $25 and (b) for non-residential Units, 2.05% of the face amount of a mortgage less than $500,000.00 or 2.80% for a mortgage covering a non-residential Unit equal to $500,000 or more;

(iii) if mortgage title insurance is required by Purchaser's lender, an additional premium for insuring the mortgagee's interest in an amount equal to the principal amount under the mortgage loan.

(iv) if required by Purchaser's lender, deposits for Common Charges, real estate taxes and assessments in an initial amount and in such monthly sums after closing as required by the lender (the amount of which monthly deposits may be changed periodically by the lender). The amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the policies of the lender, the number of months remaining between the closing of title and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amount of the taxes and other charges or impositions then payable; and

(v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender. Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of his lender with respect thereto;

(vi) if, in connection with this purchase, Purchaser has dealt with any broker except (A) the Selling Agent and Co-Broker listed on Page 1 of this Agreement or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing;

(vii) Purchaser Sponsor will pay to Rosen Livingston & Cholst LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owner's Power of Attorney, additional closing documents and for coordinating and attending the closing;

(viii)  if Purchaser obtains financing and his lender refuses to close at the office of Rosen Livingston & Cholst LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and

9

Purchaser pays Rosen Livingston & Cholst LLP, in addition to legal closing fee set forth above, a travel fee of $500.00 if the closing is held in Manhattan or $700.00 if the closing is held in another borough. If the closing attended by a representative of Rosen Livingston & Cholst LLP is adjourned through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Cholst LLP an additional travel and attendance fee in the same amount as stated above for each attendance;

(vii)  if Purchaser is other than a natural person, a principal of the Purchaser will be required to provide a personal guaranty of Common Charges and other charges due to the Condominium and Purchaser will pay Rosen Livingston & Cholst LLP a fee of $500.00 for preparation of such Guaranty;

(ix) if Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Cholst LLP a fee of $1,000.00 for the preparation of the splitter, substitute mortgage and assignment of mortgage documents; and

(d) Purchaser will pay the New York State Real Estate Transfer Tax (documentary stamps) to be affixed to the deed, the New York City Real Property Transfer Tax and (if applicable) the one (1%) percent "mansion tax";

(e) Purchaser will pay to 135 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit by Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.

All of the aforementioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's unendorsed personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party, or if so directed by the Sponsor, by wire transfer.

**14. Power of Attorney to Condominium Board, Sponsor, Retail Unit Owner and Commercial Unit Owners**

At closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit (or, if no representative is present, then to Sponsor's attorney), for recording in the New York City Register's Office a Power of Attorney in favor of the Condominium Board relative to purchasing or leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owners relative to amending the Condominium Documents to the extent permitted in the Power of Attorney. An originally recorded Power of Attorney shall be sent to the Condominium Board.

**15. Events of Default**

(a) The following shall constitute "Events of Default" hereunder:

(i) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 6 herein or to timely pay the applicable Rosen Livingston & Cholst LLP closing fee or any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Cholst LLP pursuant to paragraphs 12 and 13 above; or

(ii) the dishonor or failure of collection of Purchaser's Down Payment check; or

(iii) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder.

(b) Upon the occurrence of an Event of Default, Sponsor shall be entitled, at its sole and absolute discretion, to cancel this Purchase Agreement by giving Purchaser written notice of cancellation. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default. TIME IS OF THE ESSENCE TO CURE

10

SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD. If the default is not cured within such thirty (30) day period, then this Agreement shall be deemed cancelled and Sponsor shall have the right to retain, as and for liquidated damages, the Down-payment. Any sums in excess thereof, together with any interest thereon shall be returned to Purchaser after cancellation.

Notwithstanding the foregoing, if Purchaser's check in payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in which to provide good funds for Purchaser's Down Payment, in which event Sponsor shall be deemed to have waived its right to sue Purchaser on the dishonored or uncollected check; or (ii) allow Purchaser thirty (30) days in which to make good Purchaser's Down Payment and if Purchaser fails to so do within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check. In the latter case, Purchaser will also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

Upon cancellation of this Agreement and disposing of the Down Payment and interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan. Thereafter, the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

**16. Risk of Loss; Casualty**

(a) Purchaser shall not be entitled to possession of the Unit nor to store any of Purchaser's furniture or belongings therein until the deed is delivered to Purchaser at closing.

(b) All other risk of loss prior to closing has been assumed by Sponsor, but without any obligation or liability of Sponsor to repair the damage or restore the Unit or its contents. If Sponsor or the Unit Owners elect to repair or replace the loss or damage, this Agreement shall continue in full force and effect. Purchaser shall not have the right to reject title to the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or replacements. Purchaser shall not be required to pay the Balance unless and until (i) the Unit has been substantially repaired as near as is reasonably possible to its condition immediately prior to the casualty; (ii) its essential services (such as gas, electricity, and heat) and a reasonable means of ingress and egress to the street have been restored, and (iii) any condition in the Unit for which a violation (if any) is noted or caused has been corrected (even if same is not yet removed of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser, its licensees, invitees and/or workers. (Sponsor will endeavor in good faith, and with reasonable diligence, to remove or cause to be removed subsequent to closing all violations of record it is obligated to correct.) Any proceeds received from insurance, or in satisfaction of any claim or action in connection with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners). If such proceeds are paid to Purchaser, Purchaser shall promptly turn them over to Sponsor upon request. The provisions of the two preceding sentences shall survive the closing.

(c) In the event that Sponsor notifies Purchaser that it does not elect to repair or restore the Unit or if the Unit Owners do not resolve to make such repairs or restoration in accordance with the Condominium's By-Laws, this Agreement shall be deemed canceled and of no further force or effect, and Sponsor shall instruct the Depository to return to Purchaser all sums deposited hereunder, together with interest, if any, thereon, whereupon the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously canceled due to Purchaser's uncured default, Sponsor shall retain the Liquidated Sum as provided above.

11

**17. Inspection of Unit**

At least ten (10) days before the Balance is to be paid, Sponsor or the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Sponsor or the Selling Agent to inspect the Unit before the lapse of such ten (10) day period. Purchaser or his duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Report (in the form set forth as Exhibit B to this Agreement) and deliver same to the Sponsor or Selling Agent at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the completed Inspection Report shall not excuse Purchaser from paying the Balance when due (without provision for escrow) and shall constitute Purchaser's full acceptance of the Unit. However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of the Sponsor".

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Units and the Retail Unit may be used for any lawful purpose and (ii) the Condominium Board, and the Residential Unit Owners do not have any right to approve the use or any changes in the use of the Unsold Residential Units, the Commercial Units and the Retail Unit or any part thereof. This paragraph shall survive the closing of title.

**18. No Representations**

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, furnishings and fixtures contained in model units, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms or closets therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to his purchase of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and investigation thereof). No person has been authorized to make any representations on behalf of Sponsor. No oral representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, without effect or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially to such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the closing of title.

**19. Negotiable Terms**

Sponsor reserves the right, in its sole and absolute discretion, to negotiate on an individual basis with each purchaser substantially more beneficial purchase terms than those offered or given to other purchasers. As a result, Purchaser may not benefit from a more favorable purchase term given to another purchaser and will not have the right to rescind this Purchase Agreement or recover his Down Payment or any other amount for not being given such benefit. The following is a list of only some of the purchase terms which may be negotiated: purchase

12

49

price; the amount of the Down Payment; the right of a purchaser to cancel the Purchase Agreement and recover the Down Payment for failure to obtain financing or to close by a specific date; the closing date and minimum notice required to schedule the closing, upgraded appliances, fixtures or equipment or other alterations, improvements or additions to be performed by and at the expense of Sponsor; excusing a purchaser from closing costs and/or penalties for closing late; longer time periods to pay or perform obligations under the Purchase Agreement; elimination of "time of the essence" provisions; price or common charge rebates; assumption of payment of, or guarantee of, common charges for a given period; Sponsor financing (provided an amendment to the Plan containing the terms thereof is duly filed); allowances or credits against the purchase price for decorations; to install appliances or fixtures and granting to Purchaser the benefit of any one or more favorable terms offered or given to another purchaser.

**20. Notices**

All notices, elections, consents, demands and communications (collectively called "notices" or individually called "notice") shall be delivered personally or given in writing by registered or certified mail, return receipt requested, postage prepaid, and, if sent to Purchaser, addressed to Purchaser at Purchaser's address given above, with a copy to Purchaser's attorney, and, if sent to the Sponsor, addressed to the Sponsor at c/o Rosen Livingston & Cholst LLP, 275 Madison Avenue, New York, New York 10016, Attention: Andrew B. Freedland, Esq. Either party may, by notice to the other, change the address to which notices are to be sent. Unless otherwise provided herein, all notices shall be deemed given when personal delivery is effected or when deposited in any branch, station or depository maintained by the U.S. Postal Service in the City and State of New York, except that a notice of a new address shall be deemed given when actually received.

Sponsor has authorized the Selling Agent and Rosen Livingston & Cholst LLP, its partners, associates and legal assistants to sign and deliver on behalf of Sponsor any and all notices (including, without limitation, notices fixing and adjourning the closing date, notice of default, etc.) required or permitted to be given hereunder.

**21. Broker**

Purchaser represents to Sponsor that Purchaser has not dealt with any broker in connection with this transaction apart from the Selling Agent and the Co-Broker whose name appears on page 1. Purchaser shall pay the commission of any broker with whom Purchaser may have dealt (other than the Selling Agent and the Co-Broker) and Purchaser agrees that should any claim be made against Sponsor for commissions by any other broker on account of any acts or dealings of Purchaser or of Purchaser's representatives, Purchaser will indemnify and hold Sponsor free and harmless from any and all liabilities and expenses in connection therewith, including (without limitation) reasonable legal fees and disbursements. The provisions of this paragraph shall survive the closing.

**22. No Lien; Agreement Subordinate to Mortgage**

(a) No lien or encumbrance shall arise against the Property or the Unit as a result of this Agreement or any monies deposited hereunder. This Agreement shall not be recorded and any purported recordation hereof by Purchaser shall be void and constitute an Event of Default.

(b) In furtherance, and not in limitation, of the provisions of the preceding subparagraph (a), Purchaser agrees that the provisions of this Agreement are, and shall continue to be, subject and subordinate to the lien of any mortgages heretofore or hereafter made and any payments or expenses already made or incurred or which hereafter may be made or incurred pursuant to

13

the terms thereof, or incidental thereto, or to protect the security thereof, to the full extent, without the execution of any further legal documents by Purchaser. In the event of the existence of such mortgage(s), Sponsor shall, at its option, either satisfy such mortgages or obtain a release of the Unit and its undivided interest in the Common Elements from the lien of such mortgages on or prior to the Closing Date. The existence of any mortgage or mortgages encumbering the Property, or portions thereof, other than the Unit and its undivided interest in the Common Elements, shall not constitute an objection to title or excuse Purchaser from completing payment of the Purchase Price or performing all of Purchaser's other obligations hereunder or be the basis of any claim against, or liability of, Sponsor, provided that the Unit is released from the lien of such mortgage at closing.

**23. Entire Agreement**

This Agreement, together with the Plan, as the Plan and Purchase Agreement may be amended from time to time, constitutes the entire agreement between the parties as to the subject matter hereof and supersedes all prior understandings and agreements.

**24. Agreement May Not Be Assigned Without Consent**

Purchaser does not have the right to assign this Agreement without the express prior written consent of Sponsor to such assignment. Sponsor is not obligated to give such consent and if Sponsor refuses to consent Purchaser will not be excused from Purchaser's obligations under this Agreement.

If Sponsor, in its sole discretion, elects to permit Purchaser to assign this Agreement, Purchaser shall pay to Rosen Livingston & Cholst LLP, simultaneously with Purchaser's execution and delivery of such assignment, a fee of $360 for preparing such assignment.

**25. Joint Purchasers**

The term "Purchaser" shall be read as "Purchasers" if the Unit is being purchased by more than one person, in which case their obligations shall be joint and several.

**26. Act of God**

Sponsor shall be excused from performing any obligations or undertaking provided for in this Agreement for so long as such performance is prevented, delayed, or hindered by an act of God, fire, flood, explosion, war, riot, sabotage, inability to procure or, general shortage of, energy, labor, equipment, facilities, materials, or supplies in the open market, failure of transportation, strike, lock-out, action of labor unions or any other cause (whether similar or dissimilar to the foregoing) not within the reasonable control of Sponsor. Sponsor's time to perform such obligations or undertaking shall be tolled for the length of the period during which such performance was excused.

**27. Further Assurances**

Either party shall execute, acknowledge and deliver to the other party such instruments and take such other actions, in addition to the instruments and actions specifically provided for herein, as such other party may reasonably request in order to effectuate the provisions of this Agreement or of any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction.

**28. Severability**

If any provision of this Agreement or the Plan is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement or the Plan and the applicability of such provision to other persons or circumstances shall not be affected thereby.

14

Each provision of this Agreement or the Plan, except as otherwise herein or therein provided, shall be valid and enforced to the fullest extent permitted by law.

**29. Strict Compliance**

Any failure by Sponsor to insist upon strict performance by Purchaser of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof, irrespective of the number of violations or breaches that may occur, and Sponsor, notwithstanding any such failure, shall have the right thereafter to insist upon strict performance by Purchaser of any and all of the provisions of this Agreement to be performed by Purchaser.

**30. Governing Law**

The provisions of this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York.

**31. Waiver of Jury Trial**

Except as prohibited by law, the parties shall, and they hereby do, expressly waive trial by jury in any litigation arising out of, connected with, or relating to this Agreement or the relationship created hereby or in the Plan. With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.

**32. Gender**

A reference in this Agreement to any one gender, masculine, feminine, or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context otherwise requires.

**33. Certain References**

The term "herein", "hereof" or "hereunder" or similar terms used in this Agreement refer to this entire Agreement and to the particular provision in which the term is used. Unless otherwise stated, all references herein to paragraphs, subparagraphs or other provisions are references to paragraphs, subparagraphs or other provisions of this Agreement.

**34. Captions**

The captions in this Agreement are for convenience and reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

**Successors and Assigns**

The provisions of this Agreement shall bind and inure to the benefit of Purchaser and Purchaser's heirs, legal representatives, successors and permitted assigns and shall bind and inure to the benefit of Sponsor and its successors and assigns.

**35. No Oral Changes**

This Agreement cannot be changed or any provision waived orally. ANY CHANGES OR ADDITIONAL PROVISIONS OR WAIVERS MUST BE SET FORTH IN A RIDER ATTACHED HERETO OR IN A SEPARATE WRITTEN AGREEMENT SIGNED BY THE PARTIES.

**36. Acceptance of Purchase Agreement**

(a) This Agreement shall not be binding upon Sponsor until a duplicate hereof, executed by Sponsor or its duly authorized agent, is delivered to Purchaser. The submission of a Plan or Purchase Agreement to a prospective purchaser shall not be construed as Sponsor's approval of such sale. If such executed duplicate of this Agreement is not sent or delivered to Purchaser

15

within thirty (30) days after same is received by the Selling Agent along with a check for the Down Payment, it shall be deemed rejected and cancelled and all monies paid by Purchaser shall be promptly refunded without interest. Upon such refund being made, neither party shall have any further rights or obligations hereunder with respect to the other. Sponsor shall have the right to reject this Agreement without cause or explanation to Purchaser, provided such rejection is not due to Purchaser's sex, race, creed, color, national origin, ancestry, disability, marital status or other ground proscribed by law.

**37. Escrow Provisions**

A.    The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, Suite 500, New York, NY 10016, telephone number 212 687-2770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser. Escrow Agent has designated the following attorneys to serve as signatories: Morton H. Rosen, Peter I. Livingston, Bruce A. Cholst, Andrew B. Freedland. All designated signatories are admitted to practice law in the State of New York. Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor, Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

B.    Escrow Agent and all authorized signatories hereby submit to the jurisdiction of the State of New York and its Courts for any cause of action arising out of the Purchase Agreement or otherwise concerning the maintenance or release of the Deposit from escrow.

C.    The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York. The escrow account is entitled ("Purchaser's Name) Rosen Livingston & Cholst LLP as Escrow Agent" ("Escrow Account"). The Escrow Account is not an IOLA account. The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit. Any deposit in excess of $250,000 will not be insured.

D.    All Deposits received from Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP, as Escrow Agent.

E.    The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts. Interest shall begin to accrue upon placing the Deposit into the Escrow Account. All interest earned thereon shall be paid to or credited to the Purchaser at closing. No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account.

F.    Within five (5) business days after the Purchase Agreement has been tendered to Escrow Agent along with the Deposit, the Escrow Agent shall sign the Escrow Agreement and place the Deposit into the Escrow Account. Within ten (10) business days of the placing the deposit in the Escrow Account, Escrow Agent shall provide written notice to Purchaser and Sponsor, confirming the Deposit. The notice shall provide the account number and the initial interest rate to be earned on the Deposit. Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of the Escrow Agreement.

G.    The Escrow Agent is obligated to send notice to the Purchaser once the Deposit is placed in the Escrow Account. If the Purchaser does not receive notice of such deposit within

16

fifteen (15) business days after tender of the Deposit, he or she may cancel the Purchase Agreement within ninety (90) days after tender of the Purchase Agreement and Deposit to Escrow Agent. Complaints concerning the failure to honor such cancellation requests may be referred to the New York State Department of Law, Real Estate Finance Bureau, 120 Broadway, 23rd Floor, New York, N.Y. 10271. Rescission shall not be afforded when proof satisfactory to the Attorney General is submitted establishing that the Deposit was timely placed in the Escrow Account in accordance with the New York State Department of Law's regulations concerning Deposits and requisite notice was timely mailed to the Purchaser.

H.     All Deposits, except for advances made for upgrades, extras, or custom work received in connection with the Purchase Agreement, are and shall continue to be the Purchaser's money, and may not be comingled with any other money or pledged or hypothecated by Sponsor, as per GBL § 352-h.

I.     Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until after consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law. Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

J.     The Escrow Agent shall release the Deposit if so directed:

(a) pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 5 upon closing of title to the Unit; or

(b) in a subsequent writing signed by both Sponsor and Purchaser; or

(c) by a final, non-appealable order or judgment of a court.

If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit. If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release. If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within said thirty (30) day period, the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above. Notwithstanding the foregoing, the Escrow Agent shall have the right at any time to deposit the Deposit contained in the Escrow Account with the clerk of the county where the Unit is located and shall give written notice to both parties of such deposit.

The Sponsor shall not object to the release of the Deposit to:

(a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an Amendment to the Plan; or

(b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

17

The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

K.     Any provision of the Purchase Agreement/Escrow Agreement or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding any Deposit in trust is absolutely void. The provisions of the Attorney General's regulations and GBL §§ 352-e(2-b) and 352-h concerning escrow trust funds shall prevail over any conflicting or inconsistent provisions in the Purchase Agreement, Plan, or any amendment thereto.

L.     Escrow Agent shall maintain the Escrow Account under its direct supervision and control.

M.     A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352(h).

N.     Escrow Agent may rely upon any paper or document which may be submitted to it in connection with its duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

O.     Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-(h) and the New York State Department of Law's regulations.

P.     Sponsor shall obtain or cause the willing agent under the Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement.   Q.     Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstance.

R.     Sponsor agrees to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of the obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent. This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

29.     Counterpart Signature Pages

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument. This Agreement may be executed by facsimile or .pdf and such shall be deemed originals.

30.     Transfer tax

Notwithstanding the foregoing, Sponsor will pay half of the NYC Real Property Transfer Tax and the NYS Real Property Transfer Tax; such payment shall not exceed $26,720.00.

18

40.     Notwithstanding anything in this Agreement or the Plan to the contrary, Sponsor shall pay Sponsor's legal fee in the amount of $4,000.00.

41.     Sponsor shall leave the floors of the Unit sanded, unfinished, and sealed with a clear coat.

32.     Additional 10% Downpayment

Purchaser agrees to pay the Second Downpayment on or before January 29, 2015. If the additional 10% downpayment is not received on or before said date, it shall be deemed a material default of this Agreement and Sponsor has the right to exercise any and all remedies available to it pursuant to this Agreement, including but not limited to cancelling this Agreement and retaining the downpayment of $903,750.00 as liquidated damages.  Notwithstanding anything to the contrary herein, Purchaser shall be given a period of five (5) days from any notice to cure its default.

[Signature page follows]

19

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:                                    PURCHASER:
_____                           _____
151 WEST 21ST STREET OWNER

By: _____                       _____
     Boyd Charles, Principal                Purchaser

By: _____                       _____
     Royce Galicki??, Principal             Co-Purchaser

51

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:
130 WEST 31ST STREET OWNER
LLC

By: _____
        Jacob Chetrit, Principal

By: _____

Intials: _____ of Kares Yon Inc.

PURCHASER:

_____
Purchaser

_____
Co-Purchaser

(Purchaser)
Date Accepted:

(*Please listed on line and print or type name on/for line.)

Purchaser acknowledges:
Receipt of Offering Plan and
Amendment # _____ (A.B.)(P.M.)
on _____, 20__ hrs

Delivery of Purchaser
Agreement and Check for
Down Payment of $ ___ (A.B.)(P.M.)
on __10/26__, 20__

Initials: _____  _____
Purchaser

Initials: _____  _____
Co-Purchaser

Initials: _____  _____
Co-Purchaser

---

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:
130 WEST 31ST STREET OWNER
LLC

By: _____
        Jacob Chetrit, Principal

By: _____

(Same Business, Principal)

PURCHASER:

_____
Purchaser

_____
Co-Purchaser

(Purchaser)
Date Accepted:

(*Please listed on line and print or type name on/for line.)

Purchaser acknowledges:
Receipt of Offering Plan and
Amendment # _____ (A.B.)(P.M.)
on _____, 20__ hrs

Delivery of Purchaser
Agreement and Check for
Down Payment of $ ___ (A.B.)(P.M.)
on __10/26__, 20__

Initials: _____  _____
Purchaser

Initials: _____  _____
Co-Purchaser

Initials: _____  _____
Co-Purchaser

---

## EXHIBIT A TO PURCHASE AGREEMENT
### Permitted Encumbrances

1.    Building restrictions and zoning laws and other regulations, resolutions and ordinances and any amendments thereto now or hereafter adopted by any governmental or quasi-governmental authority having jurisdiction, provided they do not prevent the use of the subject Unit for dwelling purposes.

2.    State of facts shown on a survey made by Earl B. Lovell-S.P. Belcher, Inc. dated March 12, 2013 and any state of facts which a more recent survey or personal inspection of the land and building would show, provided such additional state of facts would not prevent the use of the subject Residential Unit for dwelling purposes or, if applicable, the subject Commercial or Retail Unit for the purposes permitted by Law and further provided that such state of facts do not render title unmarketable.

3.    The terms, burdens, covenants, restrictions, conditions, easements and rules and regulations set forth in the Declaration, the By-Laws (and the Rules and Regulations thereto), the Power of Attorney from Purchaser to the Condominium Board, Sponsor, the Commercial Unit Owners and the Retail Unit Owner and the Floor Plans, all as same may be amended from time to time.

4.    Consents by Sponsor, or any former owner of the Land for the erection of any structure or structures on, under or above any land, street or streets on which the Land may abut.

5.    Any easement or right of use in favor of any utility company for construction, use, maintenance, repair and replacement of all utility lines, wires, terminal boxes, mains, pipes, cables, conduits, poles, connections and other equipment and facilities on, under and across the Land and Building.

6.    Revocability of licenses for vault space, if any, under the sidewalks and streets and the lien of any unpaid vault tax (which is to be paid by the Condominium Board, the Retail Unit Owner or the Commercial Unit Owners (as the case may be)).

7.    Encroachments of stoops, areas, cellar steps or doors, trim, copings, retaining walls, bay windows, terraces, balconies, sidewalk, elevators, fences, fire escapes, cornices, foundations, footings, chutes, fuel oil lines, drainage and stand pipes, and similar projections, if any, on, over, or under the Property or the streets or sidewalks abutting the property and the rights of governmental authorities to require the removal of any such projections, and variations between record lines of the Property and retaining walls  and the like, if any.

8.    Leases and service, maintenance, employment, management, concessionaire and license agreements, if any, of other Units or portions of the Common Elements, provided same are disclosed in the Plan or in an amendment thereto.

9.    The lien of any unpaid Common Charge, real estate tax, water charge or sewer rent, provided the same are adjusted at the closing of title.

10.    The lien of any unpaid assessments payable in installments (whether imposed by a taxing authority or the Condominium Board), except that Sponsor shall pay all such assessments due prior to the Closing Date and Purchaser shall pay all assessments due from and after such date (however, the then current installment shall be adjusted at closing).

11.    Any encumbrance as to which either the Title Insurance Company or the title insurance company which insures Purchaser's title to the Unit would be willing to insure at its regular rates, without additional premium, or in a fee policy issued by it to Purchaser to insure that such encumbrance, (x) will not be collected out of or enforced against the Unit if it is a lien and (b) will not prevent the use of the subject Residential Unit for dwelling purposes.  (Any exception which the Title Insurance Company has omitted or insured at its regular rates and without additional premium, which will not be collected out of or enforced against a Unit, in a fee title insurance policy for other Units, is not an objection to title.)

12.    The Certificate of Occupancy to be issued covering the Building, provided it authorizes occupancy of the subject Residential Unit for residential purposes.

13.    Any violations against the Property (other than the subject Unit) which are the obligation of the Condominium Board or another Unit Owner to correct.

14.    Standard printed exceptions contained in the form of fee title insurance policy then issued by the title insurance company insuring Purchaser's title to the subject Unit.

15.    Any easement or right of use required for Sponsor to obtain a temporary, final or amended Certificate of Occupancy for the Building, provided such easement or right of use will not prevent the use of the subject Residential Unit for dwelling purposes.

16.    Distinctive Street Improvement Maintenance Agreement in Reel 1109 Page 882.

17.    Zoning Lot Certification in Reel 789 Page 115.

EXHIBIT B
INSPECTION REPORT

Date: _____
135 West 52nd Street Owner LLC
512 Seventh Avenue
New York, New York 10018

Re:    Unit ____
135 West 52nd Street Condominium
135 West 52nd Street
New York, New York 10019

Gentlemen:
This is to confirm that based on the undersigned's personal inspection of the above referenced Unit, I (we) have found the Unit, its floors, walls, doors, fixtures, appliances, equipment, hardware and all other items listed below, to be in good and satisfactory condition, free of chips, mars, scratches, breaks or other defects, except for those matters (if any) expressly noted below under "exceptions" requiring repair, adjustment or correction:

| | Item | Exceptions (if any) | Purchaser's Initials |
|---|---|---|---|
| 1. | Unit Interior: | | |
| | (a) Walls: | _____ | _____ |
| | (b) Floors: | _____ | _____ |
| | (c) Ceilings: | _____ | _____ |
| | (d) Windows: (glass, sash, pane, sill, etc.) | _____ | _____ |
| | (e) Doors: | _____ | _____ |
| | (f) Electrical fixtures: | _____ | _____ |
| | (g) Painted surfaces: | _____ | _____ |
| | (h) Kitchen cabinets: | _____ | _____ |
| | (i) Appliances: | _____ | _____ |
| | (j) Kitchen sink: | _____ | _____ |
| | (k) Medicine cabinets: | _____ | _____ |
| | (l) Vanities: (doors & mirror) | _____ | _____ |

23

| | Item | Exceptions (if any) | Purchaser's Initials |
|---|---|---|---|
| | (m) Bathroom sinks: | _____ | _____ |
| | (n) Water closet: | _____ | _____ |
| | (o) Bathtubs | _____ | _____ |
| | (p) Bathroom tile: | _____ | _____ |
| | (q) Hardware: (doorbell, doorknob, faucets, locks, etc.) | _____ | _____ |
| | (r) Intercom: | _____ | _____ |
| 2. | General Operating Condition: | | |
| | (a) All Doors: | _____ | _____ |
| | (b) All Windows: | _____ | _____ |
| | (c) All Plumbing: | _____ | _____ |
| | (d) All Hardware: | _____ | _____ |
| | (e) Other: | _____ | _____ |

The undersigned will sign and deliver to you a separate statement signifying my (our) satisfaction with each item excepted above (if any), immediately upon the completion of the repair, adjustment or correction of same.  The undersigned understands and agrees that you shall not be obligated to make any repairs, adjustments or corrections to the Unit or any portion thereof or its fixtures, appliances, equipment, etc., contained therein, from or after the date of delivery of possession of the Unit to the undersigned, except as to those items (if any) expressly excepted above and your obligation regarding any such excepted items shall cease upon the completion of the repair, adjustment or correction of same.  Nothing contained herein shall be construed to excuse Sponsor from its obligations to correct defects in construction or design to the extent required in the section entitled "Rights and Obligations of Sponsor" contained in the Offering Plan for Condominium Ownership of the 135 West 52nd Street Condominium.  The undersigned shall be required to complete the payment of the Purchase Price (without the provision for an escrow) and accept title to the Unit on the closing date notwithstanding the presence of any exceptions.
Very truly yours,

_____
Purchaser's Signature

_____
Purchaser's Signature

Agreed To:
135 West 52nd Street Owner
LLC

By:_____

24

---

RIDER TO AGREEMENT

Re.:  135 West 52nd Street Owner LLC to Lili Shen, Ying Jia & Hao Shen
Unit 19C
135 West 52nd Street Condominium
135 West 52nd Street, New York, NY 10019

The Rider (the "Rider") amends and modifies the Purchase Agreement (the "Agreement") by and between 135 West 52nd Street Owner LLC ("Sponsor") and Lili Shen, Ying Jia & Hao Shen ("Purchaser") with respect to the above-referenced Unit in the condominium known as 135 West 52nd Street Condominium. In case of any inconsistencies between any of the terms and conditions of the Agreement and the terms and conditions of this Rider, the terms and conditions of this Rider shall prevail. All of the paragraphs and provisions contained in this Rider are incorporated into the Agreement and made a part thereof with the same force and effect as if therein originally contained.

A.    Notwithstanding anything to the contrary contained herein, in the event of any inconsistency between the provisions of the Plan, the Agreement and this Rider, the provisions of this Rider shall govern and be binding where inconsistencies arise from changes to the Agreement negotiated between Sponsor and Purchaser.

B.    Sponsor represents that all of the appliances included in this sale and all of the plumbing, heating and electrical systems servicing the Unit shall be in working order on the Closing Date.

C.    The Unit shall be delivered in broom clean and vacant condition and free of all leases, occupants and tenancies.

[END OF TEXT – SIGNATURE PAGE FOLLOWS]

[RIDER SIGNATURE PAGE ONLY]

Purchaser
_____
Lili Shen

_____
Ying Jia

_____
Hao Shen

Page 1 of 2

Sponsor: 135 West 52nd Street Owner LLC

By: _____
Meyer Chetrit, Principal

_____
David Shizter, Principal

11/01/15  $4,025,000  19C

Page 2 of 2

Sponsor: 135 West 52nd Street Owner LLC

By: _____
Mayr Cheng, Principal

_____
David Blitzner, Principal

Page 2 of 2

## PURCHASE AGREEMENT

AGREEMENT made as of February March 8, 2016 between 135 WEST 52ND STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and Mathis Aerts and Amalia Lizada-Aerts residing at Acacia Circle 5, Gaston Heights, Ladislawa Village, Buhangin, Davao City, Davao del Sur, Philippines 06000 ("Purchaser").

**Purchaser's Attorney:** Griffin deNoyelles, Esq.

**Address:** Griffin deNoyelles Attorney At Law

360 West 22nd Street, Suite #3-L

New York, NY 10011

**Telephone:** (212) 884-8666   **Fax:**   **Email:** gdenoc@gmail.com

**Percentage of Common Interest:** 0.6800 %  **Common Charges:** $1,613.88 per month

**Residential Percentage of Common Interest: 0.9840%**

**Selling Agent:** Douglas Elliman (Stacy Spielman)

**Co-Broker:** Corcoran Group (Rice Vergara Beck)

**Real Estate Taxes:** $1,653.46 per month;   **B.I.D. Tax: $18.99 per month:**

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 21B ("Unit") in the building ("Building") known as 135 WEST 52ND STREET Condominium ("Condominium") and located at 135 WEST 52ND STREET, New York, New York 10019, together with a 0.6800% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

### 1. Purchase Price

(a) The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below ("Purchase Price") is $3,725,000.00, payable as follows:

(i) $558,750.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5; and

(ii) $3,166,250.00, constituting the balance of the Purchase Price ("Balance"), by certified check of Purchaser or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined). All checks in payment of the balance of the Purchase Price shall be payable to the order of Sponsor (or as Sponsor otherwise directs. Sponsor reserves the right to require Purchaser to pay the balance or any portion thereof in "immediately available funds" (i.e. by wire transfer to a bank account designated by Sponsor).

(time being of the essence to exercise such right of rescission within such seven (7) day period).

(c) Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Condominium Documents set forth in Part II of the Plan and Parts A and B of the Exhibits submitted with the Plan to the Department of Law) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor (including, without limitation, amendments involving any changes, modifications, or updating of the projected Common Charges, the projected real estate taxes to be paid by Purchaser, or Schedule B "Budget for the First Year of Condominium Operation"). Except in the case of a material adverse amendment affecting Purchaser's Unit or as otherwise provided under the Plan, any such amendments shall neither excuse Purchaser from performing Purchaser's obligations hereunder nor entitle Purchaser to any offset or credit against the Purchase Price or claim or right of action against Sponsor, and any such amendment may be filed by Sponsor without Purchaser's consent or approval. However, Sponsor shall not have the right to unilaterally cancel this Agreement except as herein provided (such as in the case of an uncured default by Purchaser) nor change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.

(d) The Plan is hereby incorporated in this Agreement with the same force and effect as if set forth at length. In the event of any inconsistency or conflict between the provisions of this Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding. Purchaser acknowledges having had full opportunity to examine all documents and investigate all statements made herein and in the Plan.

### 4. Personal Property

(a) At closing, the Unit will contain only those appliances, countertops, cabinets, flooring, sinks, vanities (if any), air conditioning units (if any), hardware and other fixtures and equipment installed therein as set forth in the Plan.

Sponsor has the right to substitute other appliances, countertops, cabinets, sinks, vanities, flooring and fixtures in place of those referred to in the Plan provided only that the substitutions are of equal or better quality and design.

(b) The Unit is being sold unfurnished, without window blinds or shades. Furniture, floor coverings, wall coverings, furnishings, decorations and the like in or about any model Unit are for display purposes only and are not included in this sale except to the extent set forth in the Plan. Any floor plans or sketches shown to Purchaser (including those contained in the Plan) are only approximations of the Unit's dimensions and arrangement and Purchaser acknowledges and agrees that he is not relying thereon. Sponsor shall not be liable for minor variations from any floor plans or structures.

(c) Sales model apartments may, at Sponsor's option, be sold furnished at a later date but will initially be withheld from sale.

(d) There will be no modifications or extras unless agreed to in writing by the parties. All modifications and alterations must be approved by Sponsor in writing and, if approved, shall be performed by Sponsor at Purchaser's expense (payable in the manner to be set forth in an addendum to this Agreement or by separate agreement between Sponsor and Purchaser).

### 5. Purchase Monies to be Held in Trust

(a) The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, New York, NY 10016, telephone number 212 687 7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser. Escrow Agent has designated the following attorneys to serve as signatories: Morton H Rosen, Peter I. Livingston, Andrew B. Freedland, Bruce A. Cholst. All designated signatories are admitted to practice law in the State of New

(c) All checks shall be unendorsed, made payable to the direct order of "Rosen Livingston & Cholst LLP, as Escrow Agent" or (as to the Balance) to "135 West 52ND Street Owner LLC" or such payees as Sponsor may direct on not less than two (2) business days' prior oral or written notice to Purchaser. All checks shall be drawn on a bank that is a member of the New York Clearing House Association. All checks must be payable directly to the order of the required payee; they may not be endorsed.

(d) Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing and, unless otherwise set forth herein, none of that provisions of this Agreement shall survive the closing. However, nothing contained herein shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the obligations of Sponsor under Article 23-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.

(e) Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under "Terms of Sale - Prerequisites to Closing of Title" in Part I of the Plan are met concurrently with, or prior to, closing.

### 2. Definitions   The following terms shall have the meanings ascribed to them:

(a) "Building" shall mean the building located at 135 West 52ND Street, New York, New York 10019.

(b) "Closing Date", "closing", "closing of title" and words of similar import as used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment to Sponsor of the Purchase Price and the delivery to Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.

(c) "Condominium" shall mean The 135 West 52ND Street Condominium.

(d) "Declaration" shall mean the Declaration of the 135 West 52ND Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.

(e) "Depository" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.

(f) "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.

(g) "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.

(h) "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.

(i) All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

### 3. Plan

(a) Purchaser represents that Purchaser has possessed the Plan and any filed amendments thereto at least three (3) business days prior to submitting this Purchase Agreement; or

(b) In the event Purchaser does not wish to wait three (3) business days) Purchaser has the right to rescind this Purchase Agreement by sending written notice of his rescission to the Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement

York. Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor, Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

(b) The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York. The escrow account is entitled "[Purchaser's Name] Rosen Livingston & Cholst LLP Escrow Agent" ("Escrow Account"). The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit. Any deposit in excess of $250,000 will not be insured.

All Deposits received by Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP as Escrow Agent.

Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of a written agreement between Purchaser and Sponsor.

The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts, which is currently 0.2%. Interest shall begin to accrue upon placing the Deposit into the Escrow Account. All interest earned thereon shall be paid to or credited to the Purchaser at closing. No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account. The Escrow Agreement appended hereto as Exhibit "A."

The Down Payment will not earn interest until the Purchaser's check has been deposited and cleared. Sponsor will be liable to Purchaser only for the amount of interest actually received from the Depository (which interest may be reduced by the Depository's service charge). The interest on the Down Payment, as same may be reduced by the Depository's service charge, is hereinafter referred to as "Interest".

Upon the payment and performance by Purchaser of all of Purchaser's obligations hereunder and the transfer to Purchaser of title to the Unit, Sponsor will instruct the Depository to pay to Purchaser any and all interest on monies deposited hereunder. It is possible that Purchaser may not receive interest on the Down Payment for the entire month in which the closing is scheduled to occur. The Sponsor and Selling Agent will not be liable to Purchaser for the amount of such interest or the payment thereof, except for any amount received from the Depository. All funds due to Sponsor and received under this Purchase Agreement will be handled in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and with Section 71-a(3) of the New York Lien Law.

### 6. Closing of Title

(a) The closing of title shall occur on the date and at the time and place in the City and State of New York as Sponsor shall designate to Purchaser on not less than thirty (30) days' prior written notice (unless waived by Purchaser). Sponsor shall make best efforts to specify a closing date between May 8, 2016 and May 20, 2016, however Sponsor makes no guarantee that closing of title shall occur within said time interval. Sponsor shall have the right, from time to time, to adjourn such date and time for closing on written notice to Purchaser. If the Closing is adjourned by Sponsor, then Sponsor shall fix a new date and time

1

2

3

4

for closing and shall give Purchaser not less than ten (10) days' prior written notice of the new scheduled date and time for closing.

(b) The closing of title shall occur only after or concurrently with compliance with the prerequisites set forth under "Terms of Sale Prerequisites to Closing of Title" in Part I of the Plan.

(c) Sponsor has targeted the First Closing for June 1, 2015 based on the current construction schedule. The actual date for the First Closing will be dependent on warranted and may be earlier or substantially later depending on the progress of sales and construction and compliance with the other prerequisites recited in the section of the Plan entitled "Terms of Sale". However, if through no fault of Purchaser the First Closing does not take place by June 1, 2016, Purchaser shall have the right to rescind this Purchase Agreement and recover his Down Payment with all interest thereon by giving written notice of his or her election to do so to the Sponsor no later than fifteen days after the date that such right arises.

Purchaser acknowledges that Units may be completed at varying times over a prolonged period that will extend beyond the First Closing. In such event, the Unit in which Units will be completed is within the sole discretion of Sponsor and may not coincide with the chronology in which Units are contracted for sale nor the numeric order of the floors. Many unforeseeable factors can affect the completion of Units. Accordingly, the sequence in which Units (including the subject Unit) will actually be finished cannot reasonably be predicted. No representation is made nor any assurance given that the closing of the subject Unit will occur contemporaneously with the First Closing.

Purchaser further acknowledges that construction (and, therefore, the closing) may be delayed by late delivery of material and equipment, labor difficulties, unavailability of building trades, casualty, inclement weather and other events beyond Sponsor's control.

Purchaser agrees that Sponsor is to be afforded liberal and broad latitude in time and in all decisions concerning the completion of the Property and the Units comprising in the Plan. Purchaser will not be excused from paying the full Purchase Price, without credit or set off, and will have no claim against Sponsor for damages or losses in the event the First Closing occurs substantially later than the targeted date or the time to complete and close title to Purchaser's Unit is delayed or postponed by Sponsor.

Notwithstanding the foregoing, Purchaser may rescind this Agreement and receive the prompt refund of his or her Downpayment if the construction of the Unit is not complete within two years of the date Purchaser signed this Agreement by giving written notice of his or her election to do so to the Sponsor no later than fifteen days after the date that such right arises.

## 7. Representations, Warranties and Covenants

Sponsor represents, warrants and covenants that:
(a) Sponsor is the sole owner of the Unit and the property referred to in paragraph 1, and Sponsor has the full right, power and authority to sell, convey and transfer the same;
(b) The common charges (excluding separately billed utility charges) for the Unit on the date hereof are set forth on page 1 of this Agreement;
(c) Sponsor has not received any written notice of any intended assessment or increase in common charges not reflected in subparagraph 7(b). Purchaser acknowledges that it will not have the right to cancel this Agreement in the event of the imposition of any assessment or increase in common charges after the date hereof of which Sponsor has not heretofore received written notice;
(d) The real estate taxes as of the date of this Agreement are set forth on page 1 of this Agreement;

5

(a) Legal ownership to the Unit shall be transferred to Purchaser at Closing subject only to the liens, encumbrances and title conditions (hereinafter called the "Permitted Encumbrances") enumerated in Exhibit A to this Agreement. The existence of the Permitted Encumbrances shall not be deemed a breach of Sponsor's covenant in the deed, even though the deed does not expressly provide that it is given subject to the Permitted Encumbrances. It is intended and agreed that the deed for the Unit to be given by Sponsor to Purchaser at closing shall be deemed to be subject to the Permitted Encumbrances to the same effect as if set forth therein at length.

(b) Any liens, encumbrances, or conditions not included in the Permitted Encumbrances shall not be an objection to title if: (i) the instrument required to remove it has of record has been delivered to the Title Insurance Company for recording in the proper office, together with the requisite recording or filing fees and a copy of said instrument is delivered to the representative of Purchaser's title insurance company (or, if none, to purchaser's attorney); or (ii) the Title Insurance Company is willing to insure Purchaser (at its regular rate and without additional premium) against collection or enforcement out of the Unit. Sponsor shall be entitled to adjourn the closing to remove or correct any non-Permitted Encumbrance. However, if the non-Permitted Encumbrance existed (and was known or should have been known by Purchaser or his attorney but was not known or could not reasonably have been known by Sponsor) at least ten (10) days prior to closing and Purchaser or Purchaser's attorney failed to send to Sponsor's attorney, Rosen Livingston & Cholst LLP, at least ten (10) days in advance of the closing, written notice of the non-Permitted Encumbrance, then for purposes of paragraph 12 "Closing Adjustments", Purchaser shall be deemed in fault for not timely sending notice of the non-Permitted Encumbrance and the adjournment of the closing to allow Sponsor to correct or remove the non-Permitted Encumbrance shall be considered at the request of Purchaser and not Sponsor.

## 10. Title Company Approval

Subject to the terms of paragraph 11 below, Sponsor shall give, and Purchaser shall accept, such title as the Title Insurance Company will approve and insure at its regular rate and without additional premium, provided that the only liens, encumbrances and conditions affecting title shall be the Permitted Encumbrances. Sponsor is not obligated to cause Purchaser's title company to omit any exception to title if the Title Insurance Company will insure against collection out of the Unit.

## 11. Sponsor's Inability to Convey Title

(a) In the event that Sponsor is unable to deliver title to the Unit to Purchaser in accordance with the provisions of this Agreement, to remove or cure a non-Permitted Encumbrance and elects not to do so, then Sponsor will amend the Plan to disclose the title defect and offer Purchaser the right for fifteen (15) days only after Sponsor notifies Purchaser of Sponsor's refusal to remedy the title defect, to elect either to (i) waive the title defect and take title subject thereto (without abatement in or credit against the Purchase Price or claim or right of action against Sponsor for damages or otherwise) or (ii) rescind and recover the Down Payment with any earned interest. If Purchaser fails to elect to rescind within such fifteen (15) day period, then Purchaser will be presumed conclusively to have elected the first option to waive and close title subject to the title defect. Purchaser's sole right and remedy in such case shall be to either waive the title defect and close or rescind.

(b) If Purchaser timely elects to rescind, Sponsor shall instruct the Depositary, within ten (10) days after receipt of Purchaser's rescission notice, to return to Purchaser all monies deposited hereunder with any interest thereon within thirty (30) days from receipt of said rescission notice. Upon making such refund, this Agreement shall be null and void and neither

7

(e) All refrigerators, freezers, ranges, dishwashers, washing machines, clothes dryers and air conditioning equipment included in this sale will be in working order at the time of the Closing; and

(f) Sponsor is not a "foreign person" as defined in IRC § 1445, as amended, and the regulations issued thereunder, and Sponsor shall execute and deliver to Purchaser at Closing a Certification of Non-Foreign Status.

## 8. Closing Documents

(a) At closing, Sponsor shall deliver to Purchaser:
(i) a Bargain and Sale Deed with covenant against grantor's acts transferring to Purchaser full ownership (fee simple title) to the Unit and its Common Interest, subject only to the Permitted Encumbrances (see Exhibit A below).

The grantor's covenant is for the personal benefit of Purchaser and will not inure to the benefit of Purchaser's successors or assignees (including, without limitation, Purchaser's title insurance company). Purchaser must first look to Purchaser's title insurance company before seeking recourse against Sponsor for recovery on any claim based on an alleged breach of such covenant. This provision shall survive the closing.

The deed shall be substantially in the form reproduced as Document Number 3 in Part II of the Plan and shall be executed and acknowledged by grantor in form for recording. Such executed deed shall be properly delivered to the representative of the title insurance company insuring Purchaser's title (or, if no such representative is present, then to Purchaser's attorney) for recording. After being recorded, the deed shall be returned to Purchaser or Purchaser's attorney.

(ii) A statement by the Condominium or its managing agent that the common charges and any assessments then due and payable the Condominium have been paid to the date of the Closing;
(iii) All keys to the doors of, and mailbox for, the Unit.
(iv) New York City Real Property Transfer Tax return ("RPTT") and New York State Real Estate Transfer Tax return (documentary stamps), prepared, executed and acknowledged by Sponsor in proper form for submission;
(v) Affidavit that a single station smoke detecting alarm device is installed pursuant to New York Executive Law § 378(6);
(vi) The New York State Equalization Return executed and acknowledged, in proper form for submission.
(b) At Closing, Purchaser shall execute and deliver to Sponsor or as directed by Sponsor:
(i) New York City Real Property Transfer Tax return ("RPTT") and New York State Real Estate Transfer Tax return (documentary stamps);
(ii) Affidavit that a single station smoke detecting alarm device is installed pursuant to New York Executive Law § 378(6);
(iii) Unit Owner's Power of Attorney, as described in paragraph 14 below;
(iv) New York State Equalization Return executed and acknowledged, in proper form for submission;
(v) Personal Guaranty of Common Charges and other sums due to the Condominium if Purchaser is not a natural person;
(vi) Window Guard Notice; and
(vii) Balance of the Purchase Price and any other amounts due pursuant to this Agreement, in a form and to payee(s) specified by Sponsor.

## 9. State of Title

6

party shall have any further rights, obligations or liabilities with respect to the other hereunder or under the Plan.

(c) If Sponsor notifies Purchaser that it will remove or cure a non-Permitted Encumbrance, then Purchaser cannot cancel this Purchase Agreement for so long as Sponsor is using reasonable efforts to diligently remove or cure such non-Permitted Encumbrance.

## 12. Closing Adjustments

(a) At closing, Sponsor and Purchaser shall apportion, as of 11:59 p.m. of the day preceding the closing:
(i) Real estate taxes, B.I.D. tax, and assessments, if any (as discussed below) (for purposes of this paragraph 12, the term real estate taxes shall be deemed to include assessments, if any. Real estate taxes and B.I.D. tax will be apportioned at closing between Sponsor and Purchaser only though such real estate taxes have been prepaid by Sponsor); and
(ii) Common Charges for the month in which the Unit closes (based on the number of days in the month in which title closing occurs).
(b) The "Customs in Respect to Title Closings" recommended by The Real Estate Board of New York, Inc., as amended to date, shall apply to the adjustments and other matters therein mentioned, except as otherwise provided herein.
(c) Any errors or omissions in computing apportionments at closing shall be corrected and payment made to the proper party promptly after discovery. This provision shall survive the closing.
(d) Installments for tax assessments due after the delivery of the deed, if any, shall be paid by the Purchaser and shall not be considered a defect in title.
(e) If, through no fault of Sponsor, Purchaser fails for any reason to close on the Closing Date, or is delayed at fault for not timely sending a notice of a title defect as provided above, then all closing adjustments will be calculated as of 11:59 P.M. of the day immediately preceding the originally scheduled Closing Date and Purchaser will, at closing:
(i) reimburse Sponsor for the daily sum equal to 0.044% (which is equivalent to an annual rate of approximately 16%) times the Unit's Purchase Price for each day's delay commencing with the date originally scheduled for closing through the day prior to the actual Closing Date; and
(ii) pay Rosen Livingston & Cholst LLP the sum of $250 for each default letter sent to Purchaser for each rescheduled closing date to reimburse such firm for the costs incurred in connection with sending such default letter or rescheduling the closing date.

At sums under clauses (i) and (ii) above shall be paid by unendorsed personal certified check of Purchaser or official cashier's or bank check. Sponsor shall be entitled to adjourn the closing to remove or correct any non-Permitted Encumbrance. However, if the non-Permitted Encumbrance existed at least ten (10) days prior to closing and Purchaser or Purchaser's attorney failed to send to Sponsor's attorney, Rosen Livingston & Cholst LLP, notice of such non-Permitted Encumbrance, then for purposes of the closing adjustments under this paragraph 12, Purchaser shall be deemed at fault for not timely sending notice of the non-Permitted Encumbrance and the adjournment of the closing to allow Sponsor to correct or remove the non-Permitted Encumbrance shall be considered at the request of Purchaser and not Sponsor.

## 13. Purchaser's Closing Costs

(a) At closing, Purchaser will pay certain costs in connection with the purchase of the Unit in addition to the legal fees of Purchaser's counsel (if any) and the amount of any net credit in favor of Sponsor that may result from the closing apportionments described in the preceding paragraph. Such closing costs will include the following, the amounts of which (where

8

applicable) are based on rates in effect on the date of the Plan and are subject to change without prior notice:

(a) If Purchaser elects to obtain fee title insurance, Purchaser will pay a premium to the title company for such insurance, which premium may vary depending upon the title insurance company and the amount of insurance requested. A lower combined rate may be available if fee and mortgage insurance are ordered simultaneously.

(b) Purchaser will pay a fee for recording the Unit Deed and the Unit Owner's Power of Attorney;

(c) If Purchaser obtains a mortgage loan, Purchaser will pay:

(i) a fee and service charge for recording the mortgage;

(ii) a mortgage recording tax in the following amount: (a) for Residential Units, 2.05% of the face amount of a mortgage less than $500,000 for which mortgagor receives a $25 deduction, or 2.175% for a mortgage covering a Residential Unit equal to $500,000.00 or more, less $25 and (b) for non-residential Units, 2.05% of the face amount of a mortgage less than $500,000 or 2.80% for a mortgage covering a non-residential Unit equal to $500,000 or more;

(iii) if mortgage title insurance is required by Purchaser's lender, an additional premium for insuring the mortgagee's interest in an amount equal to the principal amount under the mortgage loan.

(iv) if required by Purchaser's lender, deposits for Common Charges, real estate taxes and assessments in an initial amount and in such monthly sums after closing as may be required by the lender (the amount of which monthly deposits may be changed periodically by the lender). The amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the policies of the lender, the number of months remaining between the closing of title and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amounts of the taxes and other charges or impositions then payable; and

(v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender. Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of its lender with respect thereto;

(vi) If, in connection with this purchase, Purchaser has dealt with any broker except (A) the Selling Agent and Co-Broker listed on Page 1 of this Agreement or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing;

(vii)Purchaser Sponsor will pay to Rosen Livingston & Cholet LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owner's Power of Attorney, additional closing documents and for coordinating and attending the closing;

(viii)    If Purchaser obtains financing and the lender refuses to close at the office of Rosen Livingston & Cholet LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and Purchaser pays Rosen Livingston & Cholet LLP, in addition to said closing fee set forth above, a travel fee of $500.00 if the closing is held in Manhattan or $700.00 if the closing is held in another borough. If the closing attended by a representative of Rosen Livingston & Cholet LLP is adjourned through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Cholet LLP an additional travel and attendance fee in the same amount as stated above for each attendance;

(ix) If Purchaser is other than a natural person, a principal of the Purchaser will be required to provide a personal guaranty of Common Charges and other charges due to the

9

Condominium and Purchaser will pay Rosen Livingston & Cholet LLP a fee of $500.00 for preparation of such Guaranty;

(x) if Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Cholet LLP a fee of $1,000.00 for the preparation of the splitter, substitute mortgage and assignment of mortgage documents; and

(d) Because Sponsor will pay the New York State Real Estate Transfer Tax (documentary stamps) to be affixed to the deed and the New York City Real Property Transfer Tax (such payment shall not exceed $67,891.26); and Purchaser will pay (if applicable) the one (1%) percent "mansion tax";

(e) Purchaser will pay to 135 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit by Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.

All of the above-mentioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's unendorsed, personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party, or if so directed by the Sponsor, by wire transfer.

**14. Power of Attorney to Condominium Board, Sponsor, Retail Unit Owner and Commercial Unit Owners**

At closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit (or, if no representative is present, than to Sponsor's attorney), for recording in the New York City Register's Office a Power of Attorney in favor of the Condominium Board relative to purchasing or leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owners relative to amending the Condominium Documents to the extent permitted in the Power of Attorney. An originally executed Power of Attorney shall be sent to the Condominium Board.

**15. Events of Default**

(a) The following shall constitute "Events of Default" hereunder:

(i) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 9 herein or to timely pay the applicable Rosen Livingston & Cholet LLP closing fee or any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Cholet LLP pursuant to paragraphs 12 and 13 above; or

(ii) the dishonor or failure of collection of Purchaser's Down Payment check; or

(iii) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder.

(b) Upon the occurrence of an Event of Default, Sponsor shall be entitled, in its sole and absolute discretion, to cancel this Purchase Agreement by giving Purchaser written notice of cancellation. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default. TIME IS OF THE ESSENCE TO CURE SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD. If the default is not cured within such thirty (30) day period, then this Agreement shall be deemed cancelled and Sponsor shall have the right to retain, as and for liquidated damages, the Downpayment. Any sums in excess thereof, together with any interest thereon shall be returned to Purchaser after cancellation.

Notwithstanding the foregoing, if Purchaser's check in payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period

10

in which to provide good funds for Purchaser's Down Payment, in which event Sponsor shall be deemed to have waived its right to sue Purchaser on the dishonored or uncollected check; or (ii) allow Purchaser thirty (30) days in which to make good Purchaser's Down Payment and if Purchaser fails to so do within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check. In the latter case, Purchaser will also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

Upon cancellation of this Agreement and Purchaser owner and Interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan. Thereafter, the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

**16. Risk of Loss; Casualty**

(a) Purchaser shall not be entitled to possession of the Unit nor to store any of Purchaser's furniture or belongings therein until the deed is delivered to Purchaser at closing.

(b) All other risk of loss prior to closing has been assumed by Sponsor, but without any obligation or liability of Sponsor to repair the damage or restore the Unit or its contents. If Sponsor or the Unit Owners elect to repair or replace the loss or damage, this Agreement shall continue in full force and effect. Purchaser shall not have the right to reject title to the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or replacements. Purchaser shall not be required to pay the Balance unless and until (i) the Unit has been substantially repaired as near as is reasonably possible to its condition immediately prior to the casualty; (ii) its essential services (such as gas, electricity, water and heat) and a reasonable means of ingress and egress to the Unit have been restored; and (iii) any condition in the Unit for which a violation of (if any) is noted or issued has been corrected (even if same is not yet removed of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser. Its licensees, invitees and/or workers. (Sponsor will endeavor in good faith, and with reasonable diligence, to remove or cause to be removed subsequent to closing all violations of record it is obligated to correct.) Any proceeds received from insurance, or in satisfaction of any claim or action in connection with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners). If such proceeds are paid to Purchaser, Purchaser shall promptly turn them over to Sponsor upon request. The provisions of the two preceding sentences shall survive the closing.

(c) In the event that Sponsor notifies Purchaser that it does not elect to repair or restore the Unit or if the Unit Owners do not resolve to make such repairs or restoration in accordance with the Condominium's By-Laws, this Agreement shall be deemed cancelled and of no further force or effect, and Sponsor shall instruct the Depository to return to Purchaser all sums deposited hereunder, together with interest, if any, thereon, whereupon the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously cancelled due to Purchaser's uncured default, Sponsor shall retain the Liquidated Sum as provided above.

**17. Inspection of Unit**

At least ten (10) days before the Balance is to be paid, Sponsor or the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Sponsor or the Selling Agent to inspect the Unit before the lapse of such ten (10) day period. Purchaser or his duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Report (in the form set

11

forth as Exhibit B to this Agreement) and deliver same to the Sponsor or Selling Agent at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the completed Inspection Report shall not prevent Purchaser from paying the Balance when due (without provision for escrow) and shall constitute Purchaser's full acceptance of the Unit. However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of Sponsor".

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Units and the Retail Unit may be used for any lawful purpose and (ii) the Condominium Board, and the Residential Unit Owners do not have any right to approve the use or any changes in the use of the Unsold Residential Units, the Commercial Units and the Retail Unit or any part thereof. This paragraph shall survive the closing of title.

**18. No Representations**

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, furnishings and fixtures contained in model units, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms or closets therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to his purchase of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and investigation thereof). No person has been authorized to make any representations on behalf of Sponsor. No oral representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially to such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the closing of title.

**19. Negotiable Terms**

Sponsor reserves the right, in its sole and absolute discretion, to negotiate on an individual basis with each purchaser substantially more beneficial purchase terms than those offered or given to other purchasers. As a result, Purchaser may not benefit from a more favorable purchase term given to another purchaser and will not have the right to rescind the Purchase Agreement or recover his Down Payment or any other amount for not being given such benefit. The following is a list of only some of the purchase terms which may be negotiated: purchase price; the amount of the Down Payment; the right of a purchaser to cancel the Purchase Agreement and recover the Down Payment for failure to obtain financing or to close by a specific date; the closing date and minimum notice required to schedule the closing; upgraded appliances, fixtures or equipment or other alterations, improvements or additions to be performed by and at the expense of Sponsor; excusing a purchaser from closing costs and/or penalties for closing late; longer time periods to pay or perform obligations under the Purchase Agreement; elimination of "time of the essence" provisions; price or common charge rebates;

12

assumption of payment of, or guarantee of, common charges for a given period; Sponsor financing (provided an amendment to the Plan containing the terms thereof is duly filed); allowances or credits against the purchase price for decorations; to install appliances or fixtures and granting to Purchaser the benefit of any one or more favorable terms offered or given to another purchaser.

### 20. Notices

All notices, elections, consents, demands and communications (collectively called "notices" or individually called "notice") shall be delivered personally or given in writing by registered or certified mail, return receipt requested, postage prepaid, and, if sent to Purchaser, addressed to Purchaser at Purchaser's address given above, with a copy to Purchaser's attorney, and, if sent to the Sponsor, addressed to the Sponsor at c/o Rosen Livingston & Cholst LLP, 275 Madison Avenue, New York, New York 10016, Attention: Andrew B. Freedland, Esq. Either party may, by notice to the other, change the address to which notices are to be sent. Unless otherwise provided herein, all notices shall be deemed given when personal delivery is effected or when deposited in any branch, station or depository maintained by the U.S. Postal Service in the City and State of New York, except that a notice of a new address shall be deemed given when actually received.

Sponsor has authorized the Selling Agent and Rosen Livingston & Cholst LLP, its partners, associates and legal assistants to sign and deliver on behalf of Sponsor any and all notices (including, without limitation, notices fixing and adjourning the closing date, notice of default, etc.) required or permitted to be given hereunder.

### 21. Broker

Purchaser represents to Sponsor that Purchaser has not dealt with any broker in connection with this transaction apart from the Selling Agent and the Co-Broker whose name appears on page 1. Purchaser shall pay the commission of any broker with whom Purchaser may have dealt (other than the Selling Agent and the Co-Broker) and Purchaser agrees that should any claim be made against Sponsor for commissions by any other broker on account of any acts or dealings of Purchaser or of Purchaser's representatives, Purchaser will indemnify and hold Sponsor free and harmless from any and all liabilities and expenses in connection therewith, including (without limitation) reasonable legal fees and disbursements. The provisions of this paragraph shall survive the closing.

### 22. No Lien; Agreement Subordinate to Mortgage

(a) No lien or encumbrance shall arise against the Property or the Unit as a result of this Agreement at any monies deposited hereunder. This Agreement shall not be recorded and any purported recordation hereof by Purchaser shall be void and constitute an Event of Default.

(b) In furtherance, and not in limitation, of the provisions of the preceding subparagraph (a), Purchaser agrees that the provisions of this Agreement are, and shall continue to be, subject and subordinate to the lien of any mortgages heretofore or hereafter made and any payments or expenses already made or incurred or which hereafter may be made or incurred pursuant to the terms thereof, or incidental thereto, or to protect the security thereof, to the full extent, without the execution of any further legal documents by Purchaser. In the event of the existence of such mortgage(s), Sponsor shall, at its option, either satisfy such mortgages or obtain a release of the Unit and its undivided interest in the Common Elements from the lien of such mortgages on or prior to the Closing Date. The existence of any mortgage or mortgages encumbering the Property, or portions thereof, other than the Unit and its undivided interest in the Common Elements, shall not constitute an objection to title or excuse Purchaser from

13

notwithstanding any such failure, shall have the right thereafter to insist upon strict performance by Purchaser of any and all of the provisions of this Agreement to be performed by Purchaser.

### 30. Governing Law

The provisions of this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York.

### 31. Waiver of Jury Trial

Except as prohibited by law, the parties shall, and they hereby do, expressly waive trial by jury in any litigation arising out of, connected with, or relating to this Agreement or the relationship created hereby or in the Plan. With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.

### 32. Gender

A reference in this Agreement to any one gender, masculine, feminine, or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context otherwise requires.

### 33. Certain References

The term "herein", "hereof" or "hereunder" or similar terms used in this Agreement refer to this entire Agreement and to the particular provision in which the term is used. Unless otherwise stated, all references herein to paragraphs, subparagraphs or other provisions are references to paragraphs, subparagraphs or other provisions of this Agreement.

### 34. Captions

The captions in this Agreement are for convenience and reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

### Successors and Assigns

The provisions of this Agreement shall bind and inure to the benefit of Purchaser and Purchaser's heirs, legal representatives, successors and permitted assigns and shall bind and inure to the benefit of Sponsor and its successors and assigns.

### 35. No Oral Changes

This Agreement cannot be changed or any provision waived orally. ANY CHANGES OR ADDITIONAL PROVISIONS OR WAIVERS MUST BE SET FORTH IN A RIDER ATTACHED HERETO OR IN A SEPARATE WRITTEN AGREEMENT SIGNED BY THE PARTIES.

### 36. Acceptance of Purchase Agreement

(a) This Agreement shall not be binding upon Sponsor until a duplicate hereof, executed by Sponsor or its duly authorized agent, is delivered to Purchaser. The submission of a Plan or Purchase Agreement to a prospective purchaser shall not be construed as Sponsor's approval of such sale. If such executed duplicate of this Agreement is not sent or delivered to Purchaser within thirty (30) days after same is received by the Selling Agent along with a check for the Down Payment, it shall be deemed rejected and cancelled and all monies paid by Purchaser shall be promptly refunded without interest. Upon such refund being made, neither party shall have any further rights or obligations hereunder with respect to the other. Sponsor shall have the right to reject (the Agreement without cause or explanation to Purchaser, provided such rejection is not due to Purchaser's sex, race, creed, color, national origin, ancestry, disability, marital status or other ground proscribed by law.

15

completing payment of the Purchase Price or performing all of Purchaser's other obligations hereunder on the basis of any claim against, or liability of, Sponsor, provided that the Unit is released from the lien of such mortgage at closing.

### 23. Entire Agreement

This Purchase Agreement, together with the Plan, as the Plan and Purchase Agreement may be amended from time to time, constitutes the entire agreement between the parties as to the subject matter hereof and supersedes all prior understandings and agreements.

### 24. Agreement May Not Be Assigned Without Consent

Purchaser does not have the right to assign this Agreement without the express prior written consent of Sponsor to such assignment. Sponsor is not obligated to give such consent and if Sponsor refuses to consent Purchaser will not be excused from Purchaser's obligations under this Agreement.

If Sponsor, in its sole discretion, elects to permit Purchaser to assign this Agreement, Purchaser shall pay to Rosen Livingston & Cholst LLP, simultaneously with Purchaser's execution and delivery of such assignment, a fee of $350 for preparing such assignment.

### 25. Joint Purchasers

The term "Purchaser" shall be read as "Purchasers" if the Unit is being purchased by more than one person, in which case their obligations shall be joint and several.

### 26. Acts of God

Sponsor shall be excused from performing any obligations or undertaking provided for in this Agreement for so long as such performance is prevented, delayed, or hindered by an act of God, fire, flood, explosion, war, riot, sabotage, inability to procure or, general shortage of, energy, labor, equipment, facilities, materials, or supplies in the open market, failure of transportation, strike, lock-out, action of labor unions or any other cause (whether similar or dissimilar to the foregoing) not within the reasonable control of Sponsor. Sponsor's time to perform such obligations or undertaking shall be tolled for the length of the period during which such performance was excused.

### 27. Further Assurances

Either party shall execute, acknowledge and deliver to the other party such instruments and take such other actions, in addition to the instruments and actions specifically provided for herein, as each other party may reasonably request in order to effectuate the provisions of this Agreement or of any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction.

### 28. Severability

If any provision of this Agreement or the Plan is invalid or unenforceable as against any person or under certain circumstances, the remainder of this Agreement or the Plan and the applicability of such provision to other persons or circumstances shall not be affected thereby. Each provision of this Agreement or the Plan, except as otherwise herein or therein provided, shall be valid and enforced to the fullest extent permitted by law.

### 29. Strict Compliance

Any failure by Sponsor to insist upon strict performance by Purchaser of any of the provisions of this Agreement shall not be deemed a waiver of any of the provisions hereof. Irrespective of the number of violations or breaches that may occur, and Sponsor,

14

### 37. Escrow Provisions

A. The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, Suite 600, New York, NY 10016, telephone number 212 687-7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser. Escrow Agent has designated the following attorneys to serve as signatories: Morton H. Rosen, Peter I. Livingston, Bruce A. Cholst, Andrew B. Freedland. All designated signatories are admitted to practice law in the State of New York. Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor, Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

B. Escrow Agent and all authorized signatories hereby submit to the jurisdiction of the State of New York and its Courts for any cause of action arising out of the Purchase Agreement or otherwise concerning the maintenance or release of the Deposit from escrow.

C. The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York. The escrow account is entitled "(Purchaser's Name) Rosen Livingston & Cholst LLP as Escrow Agent" ("Escrow Account"). The Escrow Account is not an IOLA account. The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit. Any deposit in excess of $250,000 will not be insured.

D. All Deposits received from Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP, as Escrow Agent.

E. The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts. Interest shall begin to accrue upon placing the Deposit into the Escrow Account. All interest earned thereon shall be paid to or credited to the Purchaser at closing. No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account.

F. Within five (5) business days after the Purchase Agreement has been tendered to Escrow Agent along with the Deposit, the Escrow Agent shall sign the Escrow Agreement and place the Deposit into the Escrow Account. Within ten (10) business days of the placing the deposit in the Escrow Account, Escrow Agent shall provide written notice to Purchaser and Sponsor, confirming the Deposit. The notice shall provide the account number and the initial interest rate to be earned on the Deposit. Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of the Escrow Agreement.

G. The Escrow Agent is obligated to send notice to the Purchaser once the Deposit is placed in the Escrow Account. If the Purchaser does not receive notice of such deposit within fifteen (15) business days after tender of the Deposit, he or she may cancel the Purchase Agreement within ninety (90) days after tender of the Purchase Agreement and receive a refund. Complaints concerning the failure to honor such cancellation requests may be referred to the New York State Department of Law, Real Estate Finance Bureau, 120 Broadway, 23rd Floor, New York, N.Y. 10271. Rescission shall not be afforded where proof satisfactory to the Attorney General is submitted establishing that the Deposit was timely placed

16

in the Escrow Account in accordance with the New York State Department of Law's regulations concerning Deposits and requisite notice was timely mailed to the Purchaser.

H.   All Deposits, except for advances made for upgrades, extras, or custom work received in connection with the Purchase Agreement, are and shall continue to be the Purchaser's money, and may not be comingled with any other money or pledged or hypothecated by Sponsor, as per GBL § 352-h.

I.   Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until after consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law. Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

J.   The Escrow Agent shall release the Deposit if so directed:

(a) pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 5 upon closing of title to the Unit; or

(b) in a subsequent writing signed by both Sponsor and Purchaser; or

(c) by a final, non-appealable order or judgment of a court.

If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit. If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release. If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within said thirty (30) day period, the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above. Notwithstanding the foregoing, the Escrow Agent shall have the right at any time to deposit the Deposit contained in the Escrow Account with the clerk of the county where the Unit is located and shall give written notice to both parties of such deposit.

The Sponsor shall not object to the release of the Deposit to:

(a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an Amendment to the Plan; or

(b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

K.   Any provision of the Purchase Agreement/Escrow Agreement or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding any Deposit in trust is absolutely void. The provisions of

17

the Attorney General's regulations and GBL §§ 352-e(2-b) and 352-h concerning escrow trust funds shall prevail over any conflicting or inconsistent provisions in the Purchase Agreement, Plan, or any amendment thereto.

L.   Escrow Agent shall maintain the Escrow Account under its direct supervision and control.

M.   A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352(h).

N.   Escrow Agent may rely upon any paper or document which may be submitted to it in connection with its duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

O.   Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-(h) and the New York State Department of Law's regulations.

P.   Sponsor shall obtain or cause the selling agent under the Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement.   Q.   Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstance.

R.   Sponsor agrees to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of the obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent.   This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

38.   Counterpart Signature Pages

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument. This Agreement may be executed by facsimile or .pdf and such shall be deemed originals.

39.   Transfer Taxes

Notwithstanding the foregoing, Sponsor shall pay the NYC Real Property Transfer Tax and the NYS Real Property Transfer Tax; such payment shall not exceed $67,691.25.

40.   Sponsor's Legal Fee

Notwithstanding anything in this Agreement or the Plan to the contrary, Sponsor shall pay Sponsor's legal fee in the amount of $2,000.00.

18

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:
135 WEST 52ND STREET OWNER
LLC

By: _____
    Mayer Chetrit, Principal

By: _____
    David Bistricer, Principal

[Purchaser]
Date Accepted: _____

(*Please initial on line and print or
type name under line.)

Purchaser acknowledges:
Receipt of Offering Plan and
Amendments at _____ (A.M.)(P.M.)
on _____, 2016; and

Delivery of Purchase
Agreement and Check for
Down Payment at _____ (A.M.)(P.M.)
on _____, 2016

PURCHASER:

_____
Purchaser

_____
Co-Purchaser

Initials:
Purchaser

Initials:
Co-Purchaser

19

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:
135 WEST 52ND STREET OWNER
LLC

By: _____
    Mayer Chetrit, Principal

By: _____
    David Bistricer, Principal
    3/3/16   $3,795,000   *218

[Purchaser]
Date Accepted: 3/3/16

(*Please initial on line and print or
type name under line.)

Purchaser acknowledges:
Receipt of Offering Plan and
Amendments at _____ (A.M.)(P.M.)
on _____, 2016; and

Delivery of Purchase
Agreement and Check for
Down Payment at _____ (A.M.)(P.M.)
on _____, 2016

PURCHASER:

_____
Purchaser

_____
Co-Purchaser

Initials:
Purchaser

Initials:
Co-Purchaser

19

**EXHIBIT A TO PURCHASE AGREEMENT**
Permitted Encumbrances

1.      Building restrictions and zoning laws and other regulations, resolutions and ordinances and any amendments thereto now or hereafter adopted by any governmental or quasi-governmental authority having jurisdiction, provided they do not prevent the use of the subject Unit for dwelling purposes.

2.      State of facts shown on a survey made by Earl B. Lovell-S.P. Belcher, Inc. dated March 12, 2013 and any state of facts which a more recent survey or personal inspection of the land and building would show, provided such additional state of facts would not prevent the use of the subject Residential Unit for dwelling purposes or, if applicable, the subject Commercial or Retail Unit for the purposes permitted by Law and further provided that such state of facts do not render title unmarketable.

3.      The terms, burdens, covenants, restrictions, conditions, easements and rules and regulations set forth in the Declaration, the By-Laws (and the Rules and Regulations thereto), the Power of Attorney from Purchaser to the Condominium Board, Sponsor, the Commercial Unit Owners and the Retail Unit Owner and the Floor Plans, all as same may be amended from time to time.

4.      Consents by Sponsor, or any former owner of the Land for the erection of any structure or structures on, under or above any land, street or streets on which the Land may abut.

5.      Any easement or right of use in favor of any utility company for construction, use, maintenance, repair and replacement of all utility lines, wires, terminal boxes, mains, pipes, cables, conduits, poles, connections and other equipment and facilities on, under and across the Land and Building.

6.      Revocability of licenses for vault space, if any, under the sidewalks and streets and the lien of any unpaid vault tax (which is to be paid by the Condominium Board, the Retail Unit Owner or the Commercial Unit Owners (as the case may be)).

7.      Encroachments of stoops, areas, cellar steps or doors, trim, copings, retaining walls, bay windows, terraces, balconies, sidewalk elevators, fences, fire escapes, cornices, foundations, footings, chutes, fuel oil lines, drainage and stand pipes, and similar projections, if any, on, over, or under the Property or the streets or sidewalks abutting the property and the rights of governmental authorities to require the removal of any such projections, and variations between record lines of the Property and retaining walls and the like, if any.

20

8.      Leases and service, maintenance, employment, management, concessionaire and license agreements, if any, of other Units or portions of the Common Elements, provided same are disclosed in the Plan or in an amendment thereto.

9.      The lien of any unpaid Common Charge, real estate tax, water charge or sewer rent, provided the same are adjusted at the closing of title.

10.     The lien of any unpaid assessment payable in installments (whether imposed by a taxing authority or the Condominium Board), except that Sponsor shall pay all such assessments due prior to the Closing Date and Purchaser shall pay all assessments due from and after such date (however, the then current installment shall be adjusted at closing).

11.     Any encumbrance as to which either the Title Insurance Company or the title insurance company which insures Purchaser's title to the Unit would be willing to insure at its regular rates, without additional premium, in a fee policy issued by it to Purchaser to insure that such encumbrance, (a) will not be collected out of or enforced against the Unit if it is a lien and (b) will not prevent the use of the subject Residential Unit for dwelling purposes. (Any exception which the Title Insurance Company has omitted or insured at its regular rates and without additional premium, which will not be collected out of or enforced against a Unit, in a fee title insurance policy for other Units, is not an objection to title.)

12.     The Certificate of Occupancy to be issued covering the Building, provided it authorizes occupancy of the subject Residential Unit for residential purposes.

13.     Any violations against the Property (other than the subject Unit) which are the obligation of the Condominium Board or another Unit Owner to correct.

14.     Standard printed exceptions contained in the form of fee title insurance policy then issued by the title insurance company insuring Purchaser's title to the subject Unit.

15.     Any easement or right of use required for Sponsor to obtain a temporary, final or amended Certificate of Occupancy for the Building, provided such easement or right of use will not prevent the use of the subject Residential Unit for dwelling purposes.

16.     Distinctive Street Improvement Maintenance Agreement in Reel 1109 Page 882.

17.     Zoning Lot Certification in Reel 769 Page 115.

21

---

**EXHIBIT B**
INSPECTION REPORT

Date: _____
135 West 52nd Street Owner LLC
512 Seventh Avenue
New York, New York 10018

Re:     Unit ____
135 West 52nd Street Condominium
135 West 52nd Street
New York, New York 10019

Gentlemen:
This is to confirm that based on the undersigned's personal inspection of the above referenced Unit, I (we) have found the Unit, its floors, walls, doors, fixtures, appliances, equipment, hardware and all other items listed below, to be in good and satisfactory condition, free of chips, mars, scratches, breaks or other defects, except for those matters (if any) expressly noted below under 'exceptions' requiring repair, adjustment or correction:

| Item | Exceptions (if any) | Purchaser's Initials |
|---|---|---|
| 1.  Unit Interior: | | |
| (a)  Walls: | | |
| (b)  Floors: | | |
| (c)  Ceilings: | | |
| (d)  Windows: (glass, sash, pane, sill, etc.) | | |
| (e)  Doors: | | |
| (f)  Electrical fixtures: | | |
| (g)  Painted surfaces: | | |
| (h)  Kitchen cabinets: | | |
| (i)  Appliances: | | |
| (j)  Kitchen sink: | | |
| (k)  Medicine cabinets: (doors & mirror) | | |
| (l)  Vanities: | | |

22

| Item | Exceptions (if any) | Purchaser's Initials |
|---|---|---|
| (m)  Bathroom sinks: | | |
| (n)  Water closet: | | |
| (o)  Bathtubs: | | |
| (p)  Bathroom tile: | | |
| (q)  Hardware: (doorbell, doorknob, faucets, locks, etc.) | | |
| (r)  Intercom: | | |
| 2.  General Operating Condition: | | |
| (a)  All Doors: | | |
| (b)  All Windows: | | |
| (c)  All Plumbing: | | |
| (d)  All Hardware: | | |
| (e)  Other: | | |

The undersigned will sign and deliver to you a separate statement signifying my (our) satisfaction with each item excepted above (if any) immediately upon the completion of the repair, adjustment or correction of same. The undersigned understands and agrees that you shall not be obligated to make any repairs, adjustments or corrections to the Unit or any portion thereof or its fixtures, appliances, equipment, etc., contained therein, from or after the date of delivery of possession of the Unit to the undersigned, except as in those items (if any) expressly excepted above and your obligation regarding any such excepted items shall cease upon the completion of the repair, adjustment or correction of same. Nothing contained herein shall be construed to excuse Sponsor from its obligations to correct defects in construction or design to the extent required in the section entitled "Rights and Obligations of Sponsor" contained in the Offering Plan for Condominium Ownership of the 135 West 52nd Street Condominium. The undersigned shall be required to complete the payment of the Purchase Price (without the provision for an escrow) and except title to the Unit on the closing date notwithstanding the presence of any exceptions.
Very truly yours,

Purchaser's Signature  _____          Agreed To:
                                        135 West 52nd Street Owner
                                        LLC

Purchaser's Signature  _____          By: _____

23

# EXHIBIT H

## Closing Schedule

Schedule A

| Closing Schedule | |
|---|---|
| | $43,740,000 |
| | $44,175,000 |
| Total Closed | $91,865,000 |

| Unit | SQ FT | Bal. SQ FT | BHDS/BATH | Minimum Rebate Price | Minimum Release PSF | Schedule A Pricing | Previous Cumulative Change | Current Change | Total Cumulative Change | Revised Schedule A Pricing | Offer Amount | Offer PSF | Counter Ex. | Closing Schedule | Proceed to Pay Down Loan | Closing Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 3a | 995 | 0 | 2/2 | $1,176,478 | $1,143 | $1,850,000 | $0 | $0 | $0 | $1,850,000 | $1,850,000 | $1,849 | X | | | |
| 10a | 1,124 | 0 | 2/2.5 | $1,393,667 | $1,066 | $2,060,000 | $100,000 | $40,000 | $140,000 | $2,200,000 | $2,195,000 | $1,953 | X | | | |
| 14f | 1,001 | 0 | 2/2 | $1,245,104 | $1,207 | $2,250,000 | $100,000 | $0 | $100,000 | $2,350,000 | $2,340,000 | $2,398 | X | | | |
| | | | | | | | | | | | | | X | | | |



| Subtotal | 56,485 | 1,385 | | $93,384,520 | $1,456 | $82,750,000 | $285,000 | $280,000 | $615,000 | $83,365,000 | $83,365,000 | $2,285 | X | $83,365,000 | | |
| Total | 5,003 | 155 | | $11,001,100 | | | | | | | | | | | | |
| Grand Total | 61,515 | 1,385 | | $93,384,320 | $4,070 | $82,750,000 | $285,000 | $280,000 | $655,000 | $91,865,000 | $91,865,000 | $4,473 | | $91,865,000 | | |

Schedule A 62

## Availability Schedule

**DB**

| Unit | SQ FT | Exc. SQ FT | BEDS/BAT H/HO | Minimum Release Price | Minimum Release PSF | Schedule A Pricing | Previous Cumulative Change | Current Change | Total Cumulative Change | Revised Schedule A Pricing | Offer Amount | Offer PSF | Contract Sent | Closing Schedule | Proceed to Pay Down Loan | Closing Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 8a | 2,118 | 420 | 3/3 | $2,943,651 | $1,390 | $4,650,000 | | $0 | $0 | $4,650,000 | | $0 | | | | |
| 8b | 512 | 0 | 0/1 | $474,782 | $927 | $750,000 | | $0 | $0 | $750,000 | | $0 | | | | |
| 8c | 1,114 | 0 | 2/2 | $1,033,127 | $927 | $1,632,000 | | $0 | $0 | $1,632,000 | | $0 | | | | |
| 8d | 2,121 | 420 | 3/3 | $2,943,651 | $1,388 | $4,650,000 | | $0 | $0 | $4,650,000 | | $0 | | | | |
| 17a | 1,783 | 333 | 2/3/1HO | $2,595,477 | $1,456 | $4,100,000 | | $0 | $0 | $4,100,000 | | $0 | | | | |
| 19a | 1,805 | 0 | 2/3/1HO | $2,547,999 | $1,412 | $4,025,000 | | $0 | $0 | $4,025,000 | | $0 | | | | |
| 28e | 1,810 | 0 | 2/3/1HO | $2,578,651 | $1,425 | $4,075,000 | | $0 | $0 | $4,075,000 | | $0 | | | | |
| 28b | 2,207 | 421 | 3/3.5 | $3,291,825 | $1,492 | $5,200,000 | | $0 | $0 | $5,200,000 | | $0 | | | | |
| 28a | 2,327 | 0 | 4/3.5 | $3,355,129 | $1,507 | $5,300,000 | | $0 | $0 | $5,300,000 | | $0 | | | | |
| 29b | 2,232 | 0 | 3/3.5 | $3,291,825 | $1,475 | $5,200,000 | | $0 | $0 | $5,200,000 | | $0 | | | | |
| 33c | 1,946 | 0 | 2/2.5 | $2,942,262 | $1,513 | $3,700,000 | | $50,000 | $50,000 | $3,750,000 | | $0 | | | | |
| 34a | 3,673 | 799 | 3/3.5 | $5,697,389 | $1,551 | $9,000,000 | | $0 | $0 | $9,000,000 | | $0 | | | | |
| 35a | 3,726 | 153 | 3/3.5 | $5,380,858 | $1,444 | $8,500,000 | | $0 | $0 | $8,500,000 | | $0 | | | | |
| 37a | 3,726 | 153 | 3/3.5 | $5,507,476 | $1,478 | $8,700,000 | | $0 | $0 | $8,700,000 | | $0 | | | | |
| 36a | 3,726 | 153 | 3/3.5 | $5,558,120 | $1,492 | $8,780,000 | | $20,000 | $20,000 | $8,800,000 | | $0 | | | | |
| 39a | 3,726 | 153 | 3/3.5 | $5,634,085 | $1,512 | $9,000,000 | | $0 | $0 | $9,000,000 | | $0 | | | | |
| 40a | 3,726 | 153 | 3/3.5 | $5,697,389 | $1,529 | $9,000,000 | | $0 | $0 | $9,000,000 | | $0 | | | | |
| PH5 | 4,973 | 653 | 5/4.5 | $8,387,925 | $1,918 | $13,250,000 | | $0 | $0 | $13,250,000 | | $0 | | | | |
| PH4 | 2,601 | 306 | 3/3.5 | $4,526,259 | $1,740 | $7,150,000 | | $0 | $0 | $7,150,000 | | $0 | | | | |
| PH3 | 2,910 | 0 | 3/3.5 | $5,054,546 | $1,740 | $8,000,000 | | $0 | $0 | $8,000,000 | | $0 | | | | |
| PH2 | 2,601 | 306 | 3/3.5 | $4,621,216 | $1,777 | $7,300,000 | | $0 | $0 | $7,300,000 | | $0 | | | | |
| PH1 | 5,153 | 1,101 | 5/4/2.5 | $9,970,431 | $1,935 | $15,750,000 | | $1,050,000 | $1,050,000 | $16,800,000 | | $0 | | | | |
| Grand Total | 59,416 | 5,524 | | $93,444,779 | $1,573 | $147,612,000 | | $1,120,000 | $1,120,000 | $148,732,000 | | $0 | | | | |

# EXHIBIT J



## STERLING
### NATIONAL BANK

**January 2016**

Reporting Activity 01/01 - 01/31          *Page 1 of 20*

21 Scarsdale Road
Yonkers, New York 10707

**RETURN SERVICE REQUESTED**

CHETRIT GROUP LLC
C/O CHETRIT GROUP LLC
512 FASHION AVE FL 15
NEW YORK NY 10018-4603

### Contact Us

| | | |
|---|---|---|
| | Client Services | 855-274-2800 |
| | Automated Telephone Banking | 855-274-2802 |
| | Mailing Address | 21 Scarsdale Road Yonkers, NY 10707 |
| | Online Access | https://www.snb.com |

---

## SUMMARY OF ACCOUNTS

| ACCOUNT TYPE | ACCOUNT NUMBER | ENDING BALANCE |
|---|---|---|
| **ANALYZED BUSINESS CHECKING** | XXXXXX4801 | **-$139,417.48** |

New Chip Technology Coming Soon to Your Sterling Debit MasterCard.

Sterling Debit MasterCard will soon feature the latest chip technology, which provides an added layer of security for greater protection against fraud. Chip cards are widely accepted around the globe, making traveling easier and more convenient. Your card will continue to have the traditional magnetic stripe on the back, so you can continue to use it at merchants without chip-enabled terminals.

Look for this new card feature when you receive new or replacement debit cards. Chip debit cards will be provided to replace lost or stolen cards after December 15, 2015. Chip debit cards will be provided for automatic renewals in early 2016. If you have any additional questions concerning your Debit MasterCard, please contact Client Services and follow the prompts to be connected to a debit card representative:

Business Client Services 855-274-2800
Personal Client Services 855-274-2801

---

## ANALYZED BUSINESS CHECKING - XXXXXX4801

### Account Summary

| Date | Description | | | |
|---|---|---|---|---|
| 01/01/2016 | **Beginning Balance** | -$174,968.53 | Average Ledger Balance | -$83,031.68 |
| | 133 Debit(s) this period | $464,459.25 | Average Available Balance | -$83,031.68 |
| | 1 Credit(s) this period | $500,000.00 | | |
| 01/31/2016 | **Ending Balance** | -$139,417.48 | | |
| | Service Charges | $42.00 | | |



**MEMBER FDIC**



**STERLING** NATIONAL BANK

**_January 2016_**

_Reporting Activity 01/01 - 01/31_          **_Page 2 of 20_**

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

**Transaction Activity**

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 01/01/2016 | Beginning Balance | | | -$174,968.53 |
| 01/04/2016 | MBFS.COM      AUTO PAY | -$1,487.60 | | -$176,456.13 |
| 01/04/2016 | AMEX EPayment   ACH PMT | -$71.41 | | -$176,527.54 |
| 01/04/2016 | CHECK #16642 | -$30,000.00 | | -$206,527.54 |
| 01/04/2016 | CHECK #16659 | -$1,800.00 | | -$208,327.54 |
| 01/05/2016 | CHECK #16636 | -$1,000.00 | | -$209,327.54 |
| 01/05/2016 | CHECK #16670 | -$2,500.00 | | -$211,827.54 |
| 01/06/2016 | CHECK #16696 | -$1,500.00 | | -$213,327.54 |
| 01/06/2016 | CHECK #16628 | -$3,089.29 | | -$216,416.83 |
| 01/06/2016 | CHECK #16689 | -$500.00 | | -$216,916.83 |
| 01/06/2016 | CHECK #16688 | -$180.00 | | -$217,096.83 |
| 01/06/2016 | Daily OD Fee Charge | -$7.00 | | -$217,103.83 |
| 01/07/2016 | Chetrit Gr004LCx TAXIMPOUN | -$20,625.59 | | -$237,729.42 |
| 01/07/2016 | ATT         Payment | -$1,498.35 | | -$239,227.77 |
| 01/07/2016 | CHECK #42005 | -$1,595.96 | | -$240,823.73 |
| 01/07/2016 | CHECK #16668 | -$485.63 | | -$241,309.36 |
| 01/07/2016 | CHECK #16578 | -$360.00 | | -$241,669.36 |
| 01/07/2016 | CHECK #16667 | -$185.00 | | -$241,854.36 |
| 01/07/2016 | Daily OD Fee Charge | -$7.00 | | -$241,861.36 |
| 01/08/2016 | Chetrit Group  L BILLING | -$213.50 | | -$242,074.86 |
| 01/08/2016 | CHECK #42004 | -$1,650.43 | | -$243,725.29 |
| 01/08/2016 | CHECK #41997 | -$1,714.71 | | -$245,440.00 |
| 01/08/2016 | CHECK #242003 | -$1,156.20 | | -$246,596.20 |
| 01/08/2016 | CHECK #42015 | -$1,126.49 | | -$247,722.69 |
| 01/08/2016 | CHECK #41978 | -$1,098.75 | | -$248,821.44 |
| 01/08/2016 | CHECK #42012 | -$724.35 | | -$249,545.79 |
| 01/08/2016 | CHECK #16695 | -$217.57 | | -$249,763.36 |
| 01/08/2016 | Daily OD Fee Charge | -$7.00 | | -$249,770.36 |
| 01/11/2016 | INTUIT      QBOOKS/PRO | -$462.96 | | -$250,233.32 |
| 01/11/2016 | CHECK #42016 | -$2,663.51 | | -$252,896.83 |
| 01/11/2016 | CHECK #42009 | -$1,529.95 | | -$254,426.78 |
| 01/11/2016 | CHECK #42001 | -$1,004.79 | | -$255,431.57 |
| 01/11/2016 | CHECK #41998 | -$1,001.73 | | -$256,433.30 |
| 01/11/2016 | CHECK #16700 | -$449.94 | | -$256,883.24 |
| 01/11/2016 | CHECK #42002 | -$353.62 | | -$257,236.86 |
| 01/11/2016 | CHECK #16680 | -$313.00 | | -$257,549.86 |
| 01/11/2016 | Daily OD Fee Charge | -$7.00 | | -$257,556.86 |



**STERLING**
**NATIONAL BANK**

**_January 2016_**

**_Reporting Activity 01/01 - 01/31_**                **_Page 4 of 20_**

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Transaction Activity (continued)

| Transaction Date | Description | | Debits | Credits | Balance |
|---|---|---|---|---|---|
| 01/19/2016 | CHECK #16710 | | -$6,500.00 | | $57,553.18 |
| 01/19/2016 | CHECK #42000 | | -$6,267.87 | | $51,285.31 |
| 01/19/2016 | CHECK #16674 | | -$5,500.00 | | $45,785.31 |
| 01/19/2016 | CHECK #16703 | | -$4,000.00 | | $41,785.31 |
| 01/19/2016 | CHECK #16637 | | -$2,000.00 | | $39,785.31 |
| 01/19/2016 | CHECK #16629 | | -$126.00 | | $39,659.31 |
| 01/20/2016 | CHECK #16721 | | -$5,833.33 | | $33,825.98 |
| 01/20/2016 | CHECK #16681 | | -$3,086.80 | | $30,739.18 |
| 01/20/2016 | CHECK #41999 | | -$2,537.63 | | $28,201.55 |
| 01/20/2016 | CHECK #16671 | | -$500.00 | | $27,701.55 |
| 01/20/2016 | CHECK #16699 | | -$194.27 | | $27,507.28 |
| 01/21/2016 | Chetrit Gr004N31 TAXIMPOUN | | -$21,113.47 | | $6,393.81 |
| 01/21/2016 | CHECK #16720 | | -$2,500.00 | | $3,893.81 |
| 01/21/2016 | AMEX EPayment   ACH PMT | | -$18,928.86 | | -$15,035.05 |
| 01/21/2016 | CHECK #16704 | | -$10,000.00 | | -$25,035.05 |
| 01/22/2016 | Chetril Group  L BILLING | | -$67.20 | | -$25,102.25 |
| 01/22/2016 | CHECK #42019 | | -$1,692.46 | | -$26,794.71 |
| 01/22/2016 | CHECK #42029 | | -$1,473.24 | | -$28,267.95 |
| 01/22/2016 | CHECK #42018 | | -$1,099.14 | | -$29,367.09 |
| 01/22/2016 | CHECK #16735 | | -$406.20 | | -$29,773.29 |
| 01/22/2016 | CHECK #16709 | | -$4,000.00 | | -$33,773.29 |
| 01/22/2016 | CHECK #42033 | | -$1,529.95 | | -$35,303.24 |
| 01/22/2016 | CHECK #42025 | | -$1,215.24 | | -$36,518.48 |
| 01/22/2016 | CHECK #42039 | | -$1,126.49 | | -$37,644.97 |
| 01/22/2016 | CHECK #42027 | | -$1,056.80 | | -$38,701.77 |
| 01/22/2016 | CHECK #42040 | | -$991.66 | | -$39,693.43 |
| 01/22/2016 | CHECK #42028 | | -$790.19 | | -$40,483.62 |
| 01/22/2016 | CHECK #42036 | | -$724.35 | | -$41,207.97 |
| 01/22/2016 | CHECK #16739 | | -$500.00 | | -$41,707.97 |
| 01/22/2016 | CHECK #42024 | | -$353.62 | | -$42,061.59 |
| 01/22/2016 | CHECK #16484 | | -$52.00 | | -$42,113.59 |
| 01/25/2016 | NYC FINANCE   PARKINGTKT | | -$1,715.00 | | -$43,828.59 |
| 01/25/2016 | NYC FINANCE   PARKINGTKT | | -$240.00 | | -$44,068.59 |
| 01/25/2016 | NYC FINANCE   PARKINGTKT | | -$70.00 | | -$44,138.59 |
| 01/25/2016 | CHECK #42017 | | -$3,095.76 | | -$47,234.35 |
| 01/25/2016 | CHECK #42041 | | -$2,663.51 | | -$49,897.86 |
| 01/25/2016 | CHECK #42035 | | -$1,895.43 | | -$51,793.29 |


# STERLING
## NATIONAL BANK

**_January 2016_**

_Reporting Activity 01/01 - 01/31_          Page 3 of 20

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Transaction Activity (continued)

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 01/12/2016 | PER CLIENT REQUEST TRANSFER FROM ACCOUNT ENDING IN 1550 | | $500,000.00 | $242,443.14 |
| 01/12/2016 | OUTGOING WIRE,SKY LAND INTERNA TIONAL LIMITED,HSBC USA,,23082 5 | -$95,419.73 | | $147,023.41 |
| 01/12/2016 | CHECK #16692 | -$6,178.58 | | $140,844.83 |
| 01/12/2016 | CHECK #16691 | -$4,133.10 | | $136,711.73 |
| 01/12/2016 | CHECK #16690 | -$3,659.80 | | $133,051.93 |
| 01/12/2016 | CHECK #41996 | -$3,095.76 | | $129,956.17 |
| 01/12/2016 | CHECK #42008 | -$1,485.08 | | $128,471.09 |
| 01/12/2016 | CHECK #16694 | -$736.87 | | $127,734.22 |
| 01/12/2016 | CHECK #16698 | -$492.34 | | $127,241.88 |
| 01/12/2016 | CHECK #16673 | -$371.48 | | $126,870.40 |
| 01/12/2016 | CHECK #16678 | -$326.89 | | $126,543.51 |
| 01/12/2016 | CHECK #16675 | -$112.50 | | $126,431.01 |
| 01/13/2016 | CHECK #16693 | -$3,157.52 | | $123,273.49 |
| 01/13/2016 | CHECK #42006 | -$2,203.00 | | $121,070.49 |
| 01/13/2016 | CHECK #42011 | -$1,895.43 | | $119,175.06 |
| 01/13/2016 | CHECK #16677 | -$707.79 | | $118,467.27 |
| 01/13/2016 | CHECK #16679 | -$479.17 | | $117,988.10 |
| 01/13/2016 | CHECK #42014 | -$150.00 | | $117,838.10 |
| 01/13/2016 | CHECK #42010 | -$150.00 | | $117,688.10 |
| 01/13/2016 | CHECK #16682 | -$46.27 | | $117,641.83 |
| 01/13/2016 | CHECK #42013 | -$34.61 | | $117,607.22 |
| 01/14/2016 | CHECK #16706 | -$5,000.00 | | $112,607.22 |
| 01/14/2016 | CHECK #16676 | -$5,000.00 | | $107,607.22 |
| 01/14/2016 | CHECK #16672 | -$724.24 | | $106,882.98 |
| 01/14/2016 | CHECK #16686 | -$232.96 | | $106,650.02 |
| 01/14/2016 | CHECK #16701 | -$128.00 | | $106,522.02 |
| 01/14/2016 | CHECK #16685 | -$77.49 | | $106,444.53 |
| 01/15/2016 | MBFS.COM        AUTO PAY | -$1,585.12 | | $104,859.41 |
| 01/15/2016 | CHECK #16705 | -$10,000.00 | | $94,859.41 |
| 01/15/2016 | CHECK #16683 | -$2,931.55 | | $91,927.86 |
| 01/15/2016 | CHECK #16684 | -$1,821.91 | | $90,105.95 |
| 01/15/2016 | CHECK #16702 | -$241.99 | | $89,863.96 |
| 01/19/2016 | CHECK #16719 | -$2,500.00 | | $87,363.96 |
| 01/19/2016 | CHECK #16715 | -$1,974.57 | | $85,389.39 |
| 01/19/2016 | CHECK #16711 | -$11,707.97 | | $73,681.42 |
| 01/19/2016 | CHECK #16707 | -$9,628.24 | | $64,053.18 |



**January 2016**

*Reporting Activity 01/01 - 01/31*              **Page 5 of 20**

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Transaction Activity (continued)

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 01/25/2016 | CHECK #16669 | -$1,800.00 | | -$53,593.29 |
| 01/25/2016 | CHECK #42032 | -$1,485.08 | | -$55,078.37 |
| 01/25/2016 | CHECK #16714 | -$1,239.83 | | -$56,318.20 |
| 01/25/2016 | CHECK #42023 | -$1,004.79 | | -$57,322.99 |
| 01/25/2016 | CHECK #42020 | -$1,001.73 | | -$58,324.72 |
| 01/25/2016 | CHECK #16713 | -$724.42 | | -$59,049.14 |
| 01/25/2016 | CHECK #16717 | -$292.97 | | -$59,342.11 |
| 01/25/2016 | CHECK #16718 | -$159.59 | | -$59,501.70 |
| 01/25/2016 | CHECK #42038 | -$150.00 | | -$59,651.70 |
| 01/25/2016 | CHECK #42037 | -$34.61 | | -$59,686.31 |
| 01/26/2016 | CHECK #16732 | -$23,018.79 | | -$82,705.10 |
| 01/26/2016 | CHECK #16734 | -$5,000.00 | | -$87,705.10 |
| 01/26/2016 | CHECK #16712 | -$626.70 | | -$88,331.80 |
| 01/26/2016 | CHECK #42026 | -$253.88 | | -$88,585.68 |
| 01/26/2016 | CHECK #42034 | -$150.00 | | -$88,735.68 |
| 01/26/2016 | CHECK #16725 | -$114.95 | | -$88,850.63 |
| 01/27/2016 | CHECK #16727 | -$774.11 | | -$89,624.74 |
| 01/27/2016 | CHECK #16733 | -$311.29 | | -$89,936.03 |
| 01/27/2016 | CHECK #16728 | -$169.17 | | -$90,105.20 |
| 01/27/2016 | CHECK #16731 | -$74.10 | | -$90,179.30 |
| 01/28/2016 | CHECK #16744 | -$35,030.81 | | -$125,210.11 |
| 01/28/2016 | CHECK #16730 | -$5,612.32 | | -$130,822.43 |
| 01/28/2016 | CHECK #16584 | -$360.00 | | -$131,182.43 |
| 01/28/2016 | CHECK #16745 | -$360.00 | | -$131,542.43 |
| 01/28/2016 | CHECK #16726 | -$212.71 | | -$131,755.14 |
| 01/28/2016 | Daily OD Fee Charge | -$7.00 | | -$131,762.14 |
| 01/29/2016 | Brands Tax 2038  TaxImpou | -$357.24 | | -$132,119.38 |
| 01/29/2016 | CHECK #16729 | -$3,066.80 | | -$135,186.18 |
| 01/29/2016 | CHECK #16737 | -$3,066.80 | | -$138,252.98 |
| 01/29/2016 | CHECK #16724 | -$1,209.80 | | -$139,462.78 |
| 01/29/2016 | Daily OD Fee Charge | -$7.00 | | -$139,469.78 |
| 01/31/2016 | ATM SURCHARGE REBATE | | $52.30 | -$139,417.48 |
| 01/31/2016 | Ending Balance | | | -$139,417.48 |

### Debits

| Date | Description | | Amount |
|---|---|---|---|
| 01/04/2016 | MBFS.COM | AUTO PAY | -$1,487.60 |



**STERLING** NATIONAL BANK

**January 2016**

Reporting Activity 01/01 - 01/31                    Page 6 of 20

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Debits (continued)

| Date | Description | Amount |
|------|-------------|--------|
| 01/04/2016 | AMEX EPayment   ACH PMT | -$71.41 |
| 01/06/2016 | Daily OD Fee Charge | -$7.00 |
| 01/07/2016 | Chetrit Gr004LCx TAXIMPOUN | -$20,625.59 |
| 01/07/2016 | ATT        Payment | -$1,498.35 |
| 01/07/2016 | Daily OD Fee Charge | -$7.00 |
| 01/08/2016 | Chetrit Group  L BILLING | -$213.50 |
| 01/08/2016 | Daily OD Fee Charge | -$7.00 |
| 01/11/2016 | INTUIT      QBOOKS/PRO | -$462.96 |
| 01/11/2016 | Daily OD Fee Charge | -$7.00 |
| 01/12/2016 | OUTGOING WIRE,SKY LAND INTERNA TIONAL LIMITED,HSBC USA,,23082 5 | -$95,419.73 |
| 01/15/2016 | MBFS.COM     AUTO PAY | -$1,585.12 |
| 01/21/2016 | Chetrit Gr004N31 TAXIMPOUN | -$21,113.47 |
| 01/21/2016 | AMEX EPayment   ACH PMT | -$18,928.86 |
| 01/22/2016 | Chetrit Group  L BILLING | -$67.20 |
| 01/25/2016 | NYC FINANCE     PARKINGTKT | -$1,715.00 |
| 01/25/2016 | NYC FINANCE     PARKINGTKT | -$240.00 |
| 01/25/2016 | NYC FINANCE     PARKINGTKT | -$70.00 |
| 01/28/2016 | Daily OD Fee Charge | -$7.00 |
| 01/29/2016 | Brands Tax 2038 TaxImpou | -$357.24 |
| 01/29/2016 | Daily OD Fee Charge | -$7.00 |

### Credits

| Date | Description | Amount |
|------|-------------|--------|
| 01/12/2016 | PER CLIENT REQUEST TRANSFER FROM ACCOUNT ENDING IN 1550 | $500,000.00 |
| 01/31/2016 | ATM SURCHARGE REBATE | $52.30 |

### Checks Cleared

| Check Number | Check Date | Check Amount | Check Number | Check Date | Check Amount |
|--------------|-----------|--------------|--------------|-----------|--------------|
| 16484 | 01/22/2016 | $52.00 | 16667* | 01/07/2016 | $185.00 |
| 16578* | 01/07/2016 | $360.00 | 16668 | 01/07/2016 | $485.63 |
| 16584* | 01/28/2016 | $360.00 | 16669 | 01/25/2016 | $1,800.00 |
| 16628* | 01/06/2016 | $3,089.29 | 16670 | 01/05/2016 | $2,500.00 |
| 16629 | 01/19/2016 | $126.00 | 16671 | 01/20/2016 | $500.00 |
| 16636* | 01/05/2016 | $1,000.00 | 16672 | 01/14/2016 | $724.24 |
| 16637 | 01/19/2016 | $2,000.00 | 16673 | 01/12/2016 | $371.48 |
| 16642* | 01/04/2016 | $30,000.00 | 16674 | 01/19/2016 | $5,500.00 |
| 16659* | 01/04/2016 | $1,800.00 | 16675 | 01/12/2016 | $112.50 |



# STERLING
## NATIONAL BANK

### *January 2016*

**Reporting Activity 01/01 - 01/31**                     *Page 7 of 20*

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Checks Cleared (continued)

| Check Number | Check Date | Check Amount | Check Number | Check Date | Check Amount |
|---|---|---|---|---|---|
| 16676 | 01/14/2016 | $5,000.00 | 16711 | 01/19/2016 | $11,707.97 |
| 16677 | 01/13/2016 | $707.79 | 16712 | 01/26/2016 | $626.70 |
| 16678 | 01/12/2016 | $326.89 | 16713 | 01/25/2016 | $724.42 |
| 16679 | 01/13/2016 | $479.17 | 16714 | 01/25/2016 | $1,239.83 |
| 16680 | 01/11/2016 | $313.00 | 16715 | 01/19/2016 | $1,974.57 |
| 16681 | 01/20/2016 | $3,086.80 | 16717* | 01/25/2016 | $292.97 |
| 16682 | 01/13/2016 | $46.27 | 16718 | 01/25/2016 | $159.59 |
| 16683 | 01/15/2016 | $2,931.55 | 16719 | 01/19/2016 | $2,500.00 |
| 16684 | 01/15/2016 | $1,821.91 | 16720 | 01/21/2016 | $2,500.00 |
| 16685 | 01/14/2016 | $77.49 | 16721 | 01/20/2016 | $5,833.33 |
| 16686 | 01/14/2016 | $232.96 | 16724* | 01/29/2016 | $1,209.80 |
| 16688* | 01/06/2016 | $180.00 | 16725 | 01/26/2016 | $114.95 |
| 16689 | 01/06/2016 | $500.00 | 16726 | 01/28/2016 | $212.71 |
| 16690 | 01/12/2016 | $3,659.80 | 16727 | 01/27/2016 | $774.11 |
| 16691 | 01/12/2016 | $4,133.10 | 16728 | 01/27/2016 | $169.17 |
| 16692 | 01/12/2016 | $6,178.58 | 16729 | 01/29/2016 | $3,066.80 |
| 16693 | 01/13/2016 | $3,157.52 | 16730 | 01/28/2016 | $5,612.32 |
| 16694 | 01/12/2016 | $736.87 | 16731 | 01/27/2016 | $74.10 |
| 16695 | 01/08/2016 | $217.57 | 16732 | 01/26/2016 | $23,018.79 |
| 16696 | 01/06/2016 | $1,500.00 | 16733 | 01/27/2016 | $311.29 |
| 16698* | 01/12/2016 | $492.34 | 16734 | 01/26/2016 | $5,000.00 |
| 16699 | 01/20/2016 | $194.27 | 16735 | 01/22/2016 | $406.20 |
| 16700 | 01/11/2016 | $449.94 | 16737* | 01/29/2016 | $3,066.80 |
| 16701 | 01/14/2016 | $128.00 | 16739* | 01/22/2016 | $500.00 |
| 16702 | 01/15/2016 | $241.99 | 16744* | 01/28/2016 | $35,030.81 |
| 16703 | 01/19/2016 | $4,000.00 | 16745 | 01/28/2016 | $360.00 |
| 16704 | 01/21/2016 | $10,000.00 | 41978* | 01/08/2016 | $1,098.75 |
| 16705 | 01/15/2016 | $10,000.00 | 41996* | 01/12/2016 | $3,095.76 |
| 16706 | 01/14/2016 | $5,000.00 | 41997 | 01/08/2016 | $1,714.71 |
| 16707 | 01/19/2016 | $9,628.24 | 41998 | 01/11/2016 | $1,001.73 |
| 16709* | 01/22/2016 | $4,000.00 | 41999 | 01/20/2016 | $2,537.63 |
| 16710 | 01/19/2016 | $6,500.00 | 42000 | 01/19/2016 | $6,267.87 |



## STERLING NATIONAL BANK

### January 2016

Reporting Activity 01/01 - 01/31          Page 8 of 20

---

**ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)**

### Checks Cleared (continued)

| Check Number | Check Date | Check Amount | Check Number | Check Date | Check Amount |
|---|---|---|---|---|---|
| 42001 | 01/11/2016 | $1,004.79 | 42023* | 01/25/2016 | $1,004.79 |
| 42002 | 01/11/2016 | $353.62 | 42024 | 01/22/2016 | $353.62 |
| 42004* | 01/08/2016 | $1,650.43 | 42025 | 01/22/2016 | $1,215.24 |
| 42005 | 01/07/2016 | $1,595.96 | 42026 | 01/26/2016 | $253.88 |
| 42006* | 01/13/2016 | $2,203.00 | 42027 | 01/22/2016 | $1,056.80 |
| 42008* | 01/12/2016 | $1,485.08 | 42028 | 01/22/2016 | $790.19 |
| 42009 | 01/11/2016 | $1,529.95 | 42029 | 01/22/2016 | $1,473.24 |
| 42010 | 01/13/2016 | $150.00 | 42032* | 01/25/2016 | $1,485.08 |
| 42011 | 01/13/2016 | $1,895.43 | 42033 | 01/22/2016 | $1,529.95 |
| 42012 | 01/08/2016 | $724.35 | 42034 | 01/26/2016 | $150.00 |
| 42013 | 01/13/2016 | $34.61 | 42035 | 01/25/2016 | $1,895.43 |
| 42014 | 01/13/2016 | $150.00 | 42036 | 01/22/2016 | $724.35 |
| 42015 | 01/08/2016 | $1,126.49 | 42037 | 01/25/2016 | $34.61 |
| 42016 | 01/11/2016 | $2,663.51 | 42038 | 01/25/2016 | $150.00 |
| 42017 | 01/25/2016 | $3,095.76 | 42039 | 01/22/2016 | $1,126.49 |
| 42018 | 01/22/2016 | $1,099.14 | 42040 | 01/22/2016 | $991.66 |
| 42019 | 01/22/2016 | $1,692.46 | 42041 | 01/25/2016 | $2,663.51 |
| 42020 | 01/25/2016 | $1,001.73 | 242003* | 01/08/2016 | $1,156.20 |

* Indicates skipped check number

### Daily Balances

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 12/31/2015 | -$174,968.53 | 01/12/2016 | $126,431.01 | 01/22/2016 | -$42,113.59 |
| 01/04/2016 | -$208,327.54 | 01/13/2016 | $117,607.22 | 01/25/2016 | -$59,686.31 |
| 01/05/2016 | -$211,827.54 | 01/14/2016 | $106,444.53 | 01/26/2016 | -$88,850.63 |
| 01/06/2016 | -$217,103.83 | 01/15/2016 | $89,863.96 | 01/27/2016 | -$90,179.30 |
| 01/07/2016 | -$241,861.36 | 01/19/2016 | $39,659.31 | 01/28/2016 | -$131,762.14 |
| 01/08/2016 | -$249,770.36 | 01/20/2016 | $27,507.28 | 01/29/2016 | -$139,417.48 |
| 01/11/2016 | -$257,556.86 | 01/21/2016 | -$25,035.05 | | |

### Service Charge Summary

| Description | Amount |
|---|---|
| | $0.00 |
| | $6.00 |



# STERLING
## NATIONAL BANK

**21 Scarsdale Road**
**Yonkers, New York 10707**

### *December 2015*

Reporting Activity 12/01 - 12/31                    Page 1 of 24

**RETURN SERVICE REQUESTED**

CHETRIT GROUP LLC
C/O CHETRIT GROUP LLC
512 FASHION AVE FL 15
NEW YORK NY 10018-4603

### *Contact Us*

| | | |
|---|---|---|
| | Client Services | 855-274-2800 |
| | Automated Telephone Banking | 855-274-2802 |
| | Mailing Address | 21 Scarsdale Road Yonkers, NY 10707 |
| | Online Access | https://www.snb.com |

## SUMMARY OF ACCOUNTS

| ACCOUNT TYPE | ACCOUNT NUMBER | ENDING BALANCE |
|---|---|---|
| **ANALYZED BUSINESS CHECKING** | XXXXXX4801 | **-$174,968.53** |

New Chip Technology Coming Soon to Your Sterling Debit MasterCard.

Sterling Debit MasterCard will soon feature the latest chip technology, which provides an added layer of security for greater protection against fraud. Chip cards are widely accepted around the globe, making traveling easier and more convenient. Your card will continue to have the traditional magnetic stripe on the back, so you can continue to use it at merchants without chip-enabled terminals.

Look for this new card feature when you receive new or replacement debit cards. Chip debit cards will be provided to replace lost or stolen cards after December 15, 2015. Chip debit cards will be provided for automatic renewals in early 2016. If you have any additional questions concerning your Debit MasterCard, please contact Client Services and follow the prompts to be connected to a debit card representative:

Business Client Services 855-274-2800
Personal Client Services 855-274-2801

## ANALYZED BUSINESS CHECKING - XXXXXX4801

### Account Summary

| Date | Description | | | |
|---|---|---|---|---|
| 12/01/2015 | **Beginning Balance** | **-$112,716.59** | Average Ledger Balance | $49,477.90 |
| | 162 Debit(s) this period | $1,713,813.20 | Average Available Balance | $49,390.44 |
| | 5 Credit(s) this period | $1,651,555.52 | | |
| 12/31/2015 | **Ending Balance** | **-$174,968.53** | | |
| | Service Charges | $49.00 | | |



**MEMBER**
**FDIC**



# STERLING
## NATIONAL BANK

### *December 2015*

Reporting Activity 12/01 - 12/31          Page 2 of 24

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Transaction Activity

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 12/01/2015 | Beginning Balance | | | -$112,716.59 |
| 12/01/2015 | MBFS.COM        AUTO PAY | -$1,487.60 | | -$114,204.19 |
| 12/01/2015 | CHECK #16499 | -$144.00 | | -$114,348.19 |
| 12/01/2015 | CHECK #41934 | -$3,355.45 | | -$117,703.64 |
| 12/01/2015 | CHECK #41950 | -$1,894.38 | | -$119,598.02 |
| 12/01/2015 | CHECK #16552 | -$180.00 | | -$119,778.02 |
| 12/01/2015 | CHECK #41949 | -$150.00 | | -$119,928.02 |
| 12/01/2015 | Daily OD Fee Charge | -$7.00 | | -$119,935.02 |
| 12/02/2015 | CHECK #16554 | -$126.00 | | -$120,061.02 |
| 12/02/2015 | Daily OD Fee Charge | -$7.00 | | -$120,068.02 |
| 12/03/2015 | CHECK #16475 | -$4,000.00 | | -$124,068.02 |
| 12/03/2015 | CHECK #16494 | -$3,600.00 | | -$127,668.02 |
| 12/03/2015 | CHECK #16581 | -$3,067.64 | | -$130,735.66 |
| 12/03/2015 | CHECK #16538 | -$180.00 | | -$130,915.66 |
| 12/03/2015 | CHECK #16561 | -$126.00 | | -$131,041.66 |
| 12/03/2015 | Daily OD Fee Charge | -$7.00 | | -$131,048.66 |
| 12/04/2015 | PER CLIENT REQUEST TRANSFER FROM ACCOUNT ENDING IN 1550 | | $300,000.00 | $168,951.34 |
| 12/04/2015 | PER CLIENT REQUEST TRANSFER TO ACCOUNT ENDING IN 1550 | -$163,975.99 | | $4,975.35 |
| 12/04/2015 | ALL WAYS FOR2618 DEBITS | -$475.00 | | $4,500.35 |
| 12/04/2015 | CHECK #41946 | -$2,202.35 | | $2,298.00 |
| 12/04/2015 | CHECK #16564 | -$1,800.00 | | $498.00 |
| 12/04/2015 | CHECK #16585 | -$180.00 | | $318.00 |
| 12/04/2015 | CHECK #16471 | -$140.00 | | $178.00 |
| 12/04/2015 | CHECK #16563 | -$126.00 | | $52.00 |
| 12/04/2015 | CHECK #16483 | -$52.00 | | $0.00 |
| 12/07/2015 | CHECK #16595 | -$1,942.50 | | -$1,942.50 |
| 12/07/2015 | CHECK #16594 | -$473.34 | | -$2,415.84 |
| 12/07/2015 | CHECK #16590 | -$2,500.00 | | -$4,915.84 |
| 12/07/2015 | CHECK #16535 | -$1,200.00 | | -$6,115.84 |
| 12/07/2015 | CHECK #16571 | -$736.87 | | -$6,852.71 |
| 12/07/2015 | CHECK #16566 | -$707.79 | | -$7,560.50 |
| 12/07/2015 | CHECK #16568 | -$326.89 | | -$7,887.39 |
| 12/07/2015 | CHECK #16572 | -$59.28 | | -$7,946.67 |
| 12/08/2015 | CHECK #41948 | -$1,529.85 | | -$9,476.52 |
| 12/08/2015 | CHECK #16593 | -$10,000.00 | | -$19,476.52 |
| 12/08/2015 | CHECK #16574 | -$2,346.74 | | -$21,623.26 |



**STERLING**
NATIONAL BANK

*December 2015*

Reporting Activity 12/01 - 12/31          Page 3 of 24

### ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

**Transaction Activity (continued)**

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 12/08/2015 | CHECK #16583 | -$2,202.84 | | -$24,026.10 |
| 12/08/2015 | CHECK #16569 | -$165.80 | | -$24,191.90 |
| 12/09/2015 | AMEX EPayment    ACH PMT | -$21,422.23 | | -$45,614.13 |
| 12/09/2015 | NYC FINANCE    PARKINGTKT | -$115.00 | | -$45,729.13 |
| 12/09/2015 | NYC FINANCE    PARKINGTKT | -$60.00 | | -$45,789.13 |
| 12/09/2015 | CHECK #16597 | -$10,000.00 | | -$55,789.13 |
| 12/09/2015 | CHECK #16565 | -$5,000.00 | | -$60,789.13 |
| 12/09/2015 | CHECK #16577 | -$2,346.74 | | -$63,135.87 |
| 12/09/2015 | CHECK #16573 | -$1,735.95 | | -$64,871.82 |
| 12/09/2015 | CHECK #16576 | -$586.69 | | -$65,458.51 |
| 12/09/2015 | CHECK #16575 | -$586.69 | | -$66,045.20 |
| 12/10/2015 | Chetrit Gr004HUj TAXIMPOUN | -$14,088.19 | | -$80,133.39 |
| 12/10/2015 | CHECK #16604 | -$5,000.00 | | -$85,133.39 |
| 12/10/2015 | CHECK #41957 | -$1,357.91 | | -$86,491.30 |
| 12/10/2015 | CHECK #41973 | -$1,125.82 | | -$87,617.12 |
| 12/10/2015 | CHECK #41956 | -$1,098.78 | | -$88,715.90 |
| 12/10/2015 | CHECK #16550 | -$520.00 | | -$89,235.90 |
| 12/10/2015 | CHECK #41974 | -$348.06 | | -$89,583.96 |
| 12/10/2015 | CHECK #16588 | -$173.61 | | -$89,757.57 |
| 12/10/2015 | CHECK #16560 | -$126.00 | | -$89,883.57 |
| 12/10/2015 | CHECK #16589 | -$79.56 | | -$89,963.13 |
| 12/11/2015 | Chetrit Group  L BILLING | -$59.25 | | -$90,022.38 |
| 12/11/2015 | CHECK #41962 | -$353.63 | | -$90,376.01 |
| 12/11/2015 | CHECK #41969 | -$1,529.85 | | -$91,905.86 |
| 12/11/2015 | CHECK #1968 | -$1,472.08 | | -$93,377.94 |
| 12/11/2015 | CHECK #41964 | -$1,056.43 | | -$94,434.37 |
| 12/11/2015 | CHECK #41965 | -$972.53 | | -$95,406.90 |
| 12/11/2015 | CHECK #41972 | -$908.69 | | -$96,315.59 |
| 12/11/2015 | CHECK #16600 | -$833.33 | | -$97,148.92 |
| 12/11/2015 | CHECK #4196 | -$817.88 | | -$97,966.80 |
| 12/11/2015 | CHECK #16599 | -$611.19 | | -$98,577.99 |
| 12/11/2015 | CHECK #16587 | -$409.68 | | -$98,987.67 |
| 12/14/2015 | CHECK #16609 | -$1,500.00 | | -$100,487.67 |
| 12/14/2015 | CHECK #16586 | -$25,000.00 | | -$125,487.67 |
| 12/14/2015 | CHECK #41960 | -$6,715.71 | | -$132,203.38 |
| 12/14/2015 | CHECK #41975 | -$2,661.99 | | -$134,865.37 |
| 12/14/2015 | CHECK #41959 | -$2,536.38 | | -$137,401.75 |



## STERLING
### NATIONAL BANK

### *December 2015*

*Reporting Activity 12/01 - 12/31*          **Page 4 of 24**

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

**Transaction Activity (continued)**

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 12/14/2015 | CHECK #16603 | -$2,500.00 | | -$139,901.75 |
| 12/14/2015 | CHECK #41971 | -$1,894.38 | | -$141,796.13 |
| 12/14/2015 | CHECK #41968 | -$1,484.50 | | -$143,280.63 |
| 12/14/2015 | CHECK #41961 | -$1,004.71 | | -$144,285.34 |
| 12/14/2015 | CHECK #41958 | -$1,001.46 | | -$145,286.80 |
| 12/14/2015 | CHECK #16553 | -$126.00 | | -$145,412.80 |
| 12/14/2015 | Daily OD Fee Charge | -$7.00 | | -$145,419.80 |
| 12/15/2015 | MBFS.COM         AUTO PAY | -$1,585.12 | | -$147,004.92 |
| 12/15/2015 | CHECK #16608 | -$10,000.00 | | -$157,004.92 |
| 12/15/2015 | CHECK #16596 | -$126.00 | | -$157,130.92 |
| 12/15/2015 | Daily OD Fee Charge | -$7.00 | | -$157,137.92 |
| 12/16/2015 | CHECK #16551 | -$180.00 | | -$157,317.92 |
| 12/16/2015 | CHECK #16598 | -$126.00 | | -$157,443.92 |
| 12/16/2015 | Daily OD Fee Charge | -$7.00 | | -$157,450.92 |
| 12/17/2015 | CHECK #41955 | -$3,355.44 | | -$160,806.36 |
| 12/17/2015 | CHECK #16582 | -$2,595.95 | | -$163,402.31 |
| 12/17/2015 | CHECK #16492 | -$360.00 | | -$163,762.31 |
| 12/17/2015 | CHECK #1970 | -$150.00 | | -$163,912.31 |
| 12/17/2015 | CHECK #16607 | -$126.00 | | -$164,038.31 |
| 12/17/2015 | Daily OD Fee Charge | -$7.00 | | -$164,045.31 |
| 12/18/2015 | TRANSFER FROM 5220001198 PER CUST REQ | | $350,000.00 | $185,954.69 |
| 12/18/2015 | CHECK #16626 | -$126.00 | | $185,828.69 |
| 12/21/2015 | CORRECTION OF TRANSFER MADE 12 /18/15 TRANSFER WAS POSTED TO THE WRONG ACCOUNT | -$350,000.00 | | -$164,171.31 |
| 12/21/2015 | CHECK #16633 | -$2,653.85 | | -$166,825.16 |
| 12/21/2015 | CHECK #16631 | -$2,491.38 | | -$169,316.54 |
| 12/21/2015 | CHECK #16632 | -$1,329.13 | | -$170,645.67 |
| 12/21/2015 | CHECK #16622 | -$9,668.10 | | -$180,313.77 |
| 12/21/2015 | CHECK #16621 | -$2,500.00 | | -$182,813.77 |
| 12/21/2015 | CHECK #16623 | -$1,162.50 | | -$183,976.27 |
| 12/21/2015 | CHECK #16610 | -$710.47 | | -$184,686.74 |
| 12/21/2015 | CHECK #16627 | -$360.00 | | -$185,046.74 |
| 12/22/2015 | DEPOSIT | | $1,555.52 | -$183,491.22 |
| 12/22/2015 | CHECK #16500 | -$2,629.77 | | -$186,120.99 |
| 12/22/2015 | CHECK #16612 | -$626.70 | | -$186,747.69 |
| 12/22/2015 | CHECK #16615 | -$241.80 | | -$186,989.49 |
| 12/22/2015 | CHECK #16611 | -$187.11 | | -$187,176.60 |



# STERLING
## NATIONAL BANK

### *December 2015*

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Transaction Activity (continued)

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 12/22/2015 | CHECK #16617 | -$158.50 | | -$187,335.10 |
| 12/23/2015 | TRANSFER FROM 5220001550 PER CUST REQ | | $560,000.00 | $372,664.90 |
| 12/23/2015 | TRANSFER FROM 3802654801 PER CUS REQ | | $440,000.00 | $812,664.90 |
| 12/23/2015 | OUTGOING WIRE,SKYLAND INTERNAT IONAL LIMITED,HSBC USA,,225105 | -$115,174.50 | | $697,490.40 |
| 12/23/2015 | CHECK #16663 | -$7,000.00 | | $690,490.40 |
| 12/23/2015 | CHECK #16644 | -$2,500.00 | | $687,990.40 |
| 12/23/2015 | CHECK #16646 | -$1,500.00 | | $686,490.40 |
| 12/23/2015 | CHECK #16654 | -$1,000.00 | | $685,490.40 |
| 12/23/2015 | CHECK #16616 | -$23,018.79 | | $662,471.61 |
| 12/23/2015 | CHECK #16656 | -$15,000.00 | | $647,471.61 |
| 12/23/2015 | CHECK #16635 | -$5,000.00 | | $642,471.61 |
| 12/23/2015 | CHECK #41986 | -$1,472.08 | | $640,999.53 |
| 12/23/2015 | CHECK #41994 | -$1,125.81 | | $639,873.72 |
| 12/23/2015 | CHECK #16613 | -$704.35 | | $639,169.37 |
| 12/23/2015 | CHECK #16650 | -$500.00 | | $638,669.37 |
| 12/23/2015 | CHECK #16618 | -$369.61 | | $638,299.76 |
| 12/23/2015 | CHECK #16606 | -$126.00 | | $638,173.76 |
| 12/23/2015 | CHECK #16605 | -$126.00 | | $638,047.76 |
| 12/24/2015 | Chetrit Gr004Jlp TAXIMPOUN | -$14,216.05 | | $623,831.71 |
| 12/24/2015 | CHECK #16647 | -$10,000.00 | | $613,831.71 |
| 12/24/2015 | CHECK #16640 | -$10,000.00 | | $603,831.71 |
| 12/24/2015 | CHECK #16643 | -$10,000.00 | | $593,831.71 |
| 12/24/2015 | CHECK #16653 | -$5,000.00 | | $588,831.71 |
| 12/24/2015 | CHECK #16639 | -$5,000.00 | | $583,831.71 |
| 12/24/2015 | CHECK #16634 | -$5,000.00 | | $578,831.71 |
| 12/24/2015 | CHECK #16601 | -$5,000.00 | | $573,831.71 |
| 12/24/2015 | CHECK #16655 | -$5,000.00 | | $568,831.71 |
| 12/24/2015 | CHECK #16619 | -$3,165.56 | | $565,666.15 |
| 12/24/2015 | CHECK #41993 | -$908.69 | | $564,757.46 |
| 12/24/2015 | CHECK #16645 | -$500.00 | | $564,257.46 |
| 12/24/2015 | CHECK #16620 | -$223.81 | | $564,033.65 |
| 12/28/2015 | Chetrit Group  L BILLING | -$59.25 | | $563,974.40 |
| 12/28/2015 | CHECK #16664 | -$20,000.00 | | $543,974.40 |
| 12/28/2015 | CHECK #16666 | -$60,509.94 | | $483,464.46 |
| 12/28/2015 | CHECK #16651 | -$15,000.00 | | $468,464.46 |
| 12/28/2015 | CHECK #16638 | -$10,000.00 | | $458,464.46 |



### STERLING
### NATIONAL BANK

## *December 2015*

Reporting Activity 12/01 - 12/31          Page 6 of 24

---

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Transaction Activity (continued)

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 12/28/2015 | CHECK #41977 | -$3,355.45 | | $455,109.01 |
| 12/28/2015 | CHECK #41990 | -$1,529.85 | | $453,579.16 |
| 12/28/2015 | CHECK #16591 | -$1,200.00 | | $452,379.16 |
| 12/28/2015 | CHECK #41988 | -$1,200.00 | | $451,179.16 |
| 12/28/2015 | CHECK #41985 | -$1,056.40 | | $450,122.76 |
| 12/28/2015 | CHECK #16592 | -$1,050.00 | | $449,072.76 |
| 12/28/2015 | CHECK #41979 | -$1,001.46 | | $448,071.30 |
| 12/28/2015 | CHECK #41984 | -$817.88 | | $447,253.42 |
| 12/28/2015 | CHECK #16662 | -$102.07 | | $447,151.35 |
| 12/29/2015 | AMEX EPayment   ACH PMT | -$4,617.95 | | $442,533.40 |
| 12/29/2015 | CHECK #16641 | -$50,000.00 | | $392,533.40 |
| 12/29/2015 | CHECK #16665 | -$25,000.00 | | $367,533.40 |
| 12/29/2015 | CHECK #16648 | -$10,000.00 | | $357,533.40 |
| 12/29/2015 | CHECK #16649 | -$7,500.00 | | $350,033.40 |
| 12/29/2015 | CHECK #41981 | -$6,715.71 | | $343,317.69 |
| 12/29/2015 | CHECK #41995 | -$2,661.99 | | $340,655.70 |
| 12/29/2015 | CHECK #41987 | -$2,202.35 | | $338,453.35 |
| 12/29/2015 | CHECK #41967 | -$2,202.35 | | $336,251.00 |
| 12/29/2015 | CHECK #41989 | -$1,484.50 | | $334,766.50 |
| 12/29/2015 | CHECK #41983 | -$353.63 | | $334,412.87 |
| 12/29/2015 | CHECK #41991 | -$150.00 | | $334,262.87 |
| 12/29/2015 | CHECK #16614 | -$25.00 | | $334,237.87 |
| 12/29/2015 | CHECK #16661 | -$500,000.00 | | -$165,762.13 |
| 12/30/2015 | CHECK #41992 | -$1,894.38 | | -$167,656.51 |
| 12/30/2015 | CHECK #16660 | -$1,800.00 | | -$169,456.51 |
| 12/30/2015 | CHECK #16624 | -$1,209.80 | | -$170,666.31 |
| 12/30/2015 | CHECK #41982 | -$1,004.71 | | -$171,671.02 |
| 12/31/2015 | CHECK #41980 | -$2,536.36 | | -$174,207.38 |
| 12/31/2015 | CHECK #16657 | -$679.89 | | -$174,887.27 |
| 12/31/2015 | CHECK #16625 | -$136.00 | | -$175,023.27 |
| 12/31/2015 | ATM SURCHARGE REBATE | | $54.74 | -$174,968.53 |
| 12/31/2015 | Ending Balance | | | -$174,968.53 |

### Debits

| Date | Description | Amount |
|---|---|---|
| 12/01/2015 | MBFS.COM      AUTO PAY | -$1,487.60 |
| 12/01/2015 | Daily OD Fee Charge | -$7.00 |



## STERLING
### NATIONAL BANK

**December 2015**

Reporting Activity 12/01 - 12/31          Page 7 of 24

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Debits (continued)

| Date | Description | Amount |
|---|---|---|
| 12/02/2015 | Daily OD Fee Charge | -$7.00 |
| 12/03/2015 | Daily OD Fee Charge | -$7.00 |
| 12/04/2015 | PER CLIENT REQUEST TRANSFER TO ACCOUNT ENDING IN 1550 | -$163,975.99 |
| 12/04/2015 | ALL WAYS FOR2618 DEBITS | -$475.00 |
| 12/09/2015 | AMEX EPayment   ACH PMT | -$21,422.23 |
| 12/09/2015 | NYC FINANCE    PARKINGTKT | -$115.00 |
| 12/09/2015 | NYC FINANCE    PARKINGTKT | -$60.00 |
| 12/10/2015 | Chetrit Gr004HUj TAXIMPOUN | -$14,088.19 |
| 12/11/2015 | Chetrit Group L BILLING | -$59.25 |
| 12/14/2015 | Daily OD Fee Charge | -$7.00 |
| 12/15/2015 | MBFS.COM      AUTO PAY | -$1,585.12 |
| 12/15/2015 | Daily OD Fee Charge | -$7.00 |
| 12/16/2015 | Daily OD Fee Charge | -$7.00 |
| 12/17/2015 | Daily OD Fee Charge | -$7.00 |
| 12/21/2015 | CORRECTION OF TRANSFER MADE 12 /18/15 TRANSFER WAS POSTED TO THE WRONG ACCOUNT | -$350,000.00 |
| 12/23/2015 | OUTGOING WIRE,SKYLAND INTERNAT IONAL LIMITED,HSBC USA,,225105 | -$115,174.50 |
| 12/24/2015 | Chetrit Gr004Jlp TAXIMPOUN | -$14,216.05 |
| 12/28/2015 | Chetrit Group L BILLING | -$59.25 |
| 12/29/2015 | AMEX EPayment   ACH PMT | -$4,617.95 |

### Credits

| Date | Description | Amount |
|---|---|---|
| 12/04/2015 | PER CLIENT REQUEST TRANSFER FROM ACCOUNT ENDING IN 1550 | $300,000.00 |
| 12/18/2015 | TRANSFER FROM 5220001198 PER CUST REQ | $350,000.00 |
| 12/22/2015 | DEPOSIT | $1,555.52 |
| 12/23/2015 | TRANSFER FROM 5220001550 PER CUST REQ | $560,000.00 |
| 12/23/2015 | TRANSFER FROM 3802654801 PER CUS REQ | $440,000.00 |
| 12/31/2015 | ATM SURCHARGE REBATE | $54.74 |

### Checks Cleared

| Check Number | Check Date | Check Amount | Check Number | Check Date | Check Amount |
|---|---|---|---|---|---|
| 1966 | 12/11/2015 | $1,472.08 | 16492* | 12/17/2015 | $360.00 |
| 1970* | 12/17/2015 | $150.00 | 16494* | 12/03/2015 | $3,600.00 |
| 4196* | 12/11/2015 | $817.88 | 16499* | 12/01/2015 | $144.00 |
| 16471* | 12/04/2015 | $140.00 | 16500 | 12/22/2015 | $2,629.77 |
| 16475* | 12/03/2015 | $4,000.00 | 16535* | 12/07/2015 | $1,200.00 |
| 16483* | 12/04/2015 | $52.00 | 16538* | 12/03/2015 | $180.00 |



**STERLING**
NATIONAL BANK

### December 2015

Reporting Activity 12/01 - 12/31          Page 8 of 24

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Checks Cleared (continued)

| Check Number | Check Date | Check Amount | Check Number | Check Date | Check Amount |
|---|---|---|---|---|---|
| 16550* | 12/10/2015 | $520.00 | 16594 | 12/07/2015 | $473.34 |
| 16551 | 12/16/2015 | $180.00 | 16595 | 12/07/2015 | $1,942.50 |
| 16552 | 12/01/2015 | $180.00 | 16596 | 12/15/2015 | $126.00 |
| 16553 | 12/14/2015 | $126.00 | 16597 | 12/09/2015 | $10,000.00 |
| 16554 | 12/02/2015 | $126.00 | 16598 | 12/16/2015 | $126.00 |
| 16560* | 12/10/2015 | $126.00 | 16599 | 12/11/2015 | $611.19 |
| 16561 | 12/03/2015 | $126.00 | 16600 | 12/11/2015 | $833.33 |
| 16563* | 12/04/2015 | $126.00 | 16601 | 12/24/2015 | $5,000.00 |
| 16564 | 12/04/2015 | $1,800.00 | 16603* | 12/14/2015 | $2,500.00 |
| 16565 | 12/09/2015 | $5,000.00 | 16604 | 12/10/2015 | $5,000.00 |
| 16566 | 12/07/2015 | $707.79 | 16605 | 12/23/2015 | $126.00 |
| 16568* | 12/07/2015 | $326.89 | 16606 | 12/23/2015 | $126.00 |
| 16569 | 12/08/2015 | $165.80 | 16607 | 12/17/2015 | $126.00 |
| 16571* | 12/07/2015 | $736.87 | 16608 | 12/15/2015 | $10,000.00 |
| 16572 | 12/07/2015 | $59.28 | 16609 | 12/14/2015 | $1,500.00 |
| 16573 | 12/09/2015 | $1,735.95 | 16610 | 12/21/2015 | $710.47 |
| 16574 | 12/08/2015 | $2,346.74 | 16611 | 12/22/2015 | $187.11 |
| 16575 | 12/09/2015 | $586.89 | 16612 | 12/22/2015 | $626.70 |
| 16576 | 12/09/2015 | $586.69 | 16613 | 12/23/2015 | $704.35 |
| 16577 | 12/09/2015 | $2,346.74 | 16614 | 12/29/2015 | $25.00 |
| 16581* | 12/03/2015 | $3,067.64 | 16615 | 12/22/2015 | $241.80 |
| 16582 | 12/17/2015 | $2,595.95 | 16616 | 12/23/2015 | $23,018.79 |
| 16583 | 12/08/2015 | $2,202.84 | 16617 | 12/22/2015 | $158.50 |
| 16585* | 12/04/2015 | $180.00 | 16618 | 12/23/2015 | $369.61 |
| 16586 | 12/14/2015 | $25,000.00 | 16819 | 12/24/2015 | $3,165.56 |
| 16587 | 12/11/2015 | $409.68 | 16620 | 12/24/2015 | $223.81 |
| 16588 | 12/10/2015 | $173.61 | 16621 | 12/21/2015 | $2,500.00 |
| 16589 | 12/10/2015 | $79.56 | 16622 | 12/21/2015 | $9,668.10 |
| 16590 | 12/07/2015 | $2,500.00 | 16623 | 12/21/2015 | $1,162.50 |
| 16591 | 12/28/2015 | $1,200.00 | 16624 | 12/30/2015 | $1,209.80 |
| 16592 | 12/28/2015 | $1,050.00 | 16625 | 12/31/2015 | $136.00 |
| 16593 | 12/08/2015 | $10,000.00 | 16626 | 12/18/2015 | $126.00 |

 **STERLING** NATIONAL BANK

**December 2015**

*Reporting Activity 12/01 - 12/31*                    *Page 9 of 24*

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Checks Cleared (continued)

| Check Number | Check Date | Check Amount | Check Number | Check Date | Check Amount |
|---|---|---|---|---|---|
| 16627 | 12/21/2015 | $360.00 | 41946* | 12/04/2015 | $2,202.35 |
| 16631* | 12/21/2015 | $2,491.38 | 41948 | 12/08/2015 | $1,529.85 |
| 16632 | 12/21/2015 | $1,329.13 | 41949 | 12/01/2015 | $150.00 |
| 16633 | 12/21/2015 | $2,653.85 | 41950 | 12/01/2015 | $1,894.38 |
| 16634 | 12/24/2015 | $5,000.00 | 41955* | 12/17/2015 | $3,355.44 |
| 16635 | 12/23/2015 | $5,000.00 | 41956 | 12/10/2015 | $1,098.78 |
| 16638* | 12/28/2015 | $10,000.00 | 41957 | 12/10/2015 | $1,357.91 |
| 16639 | 12/24/2015 | $5,000.00 | 41958 | 12/14/2015 | $1,001.46 |
| 16640 | 12/24/2015 | $10,000.00 | 41959 | 12/14/2015 | $2,536.38 |
| 16641 | 12/29/2015 | $50,000.00 | 41960 | 12/14/2015 | $6,715.71 |
| 16643* | 12/24/2015 | $10,000.00 | 41961 | 12/14/2015 | $1,004.71 |
| 16644 | 12/23/2015 | $2,500.00 | 41962 | 12/11/2015 | $353.63 |
| 16645 | 12/24/2015 | $500.00 | 41964* | 12/11/2015 | $1,056.43 |
| 16646 | 12/23/2015 | $1,500.00 | 41965 | 12/11/2015 | $972.53 |
| 16647 | 12/24/2015 | $10,000.00 | 41967* | 12/29/2015 | $2,202.35 |
| 16648 | 12/29/2015 | $10,000.00 | 41968 | 12/14/2015 | $1,484.50 |
| 16649 | 12/29/2015 | $7,500.00 | 41969 | 12/11/2015 | $1,529.85 |
| 16650 | 12/23/2015 | $500.00 | 41971* | 12/14/2015 | $1,894.38 |
| 16651 | 12/28/2015 | $15,000.00 | 41972 | 12/11/2015 | $908.69 |
| 16653* | 12/24/2015 | $5,000.00 | 41973 | 12/10/2015 | $1,125.82 |
| 16654 | 12/23/2015 | $1,000.00 | 41974 | 12/10/2015 | $348.06 |
| 16655 | 12/24/2015 | $5,000.00 | 41975 | 12/14/2015 | $2,661.99 |
| 16656 | 12/23/2015 | $15,000.00 | 41977* | 12/28/2015 | $3,355.45 |
| 16657 | 12/31/2015 | $679.89 | 41979* | 12/28/2015 | $1,001.46 |
| 16660* | 12/30/2015 | $1,600.00 | 41980 | 12/31/2015 | $2,536.36 |
| 16661 | 12/29/2015 | $500,000.00 | 41981 | 12/29/2015 | $6,715.71 |
| 16662 | 12/28/2015 | $102.07 | 41982 | 12/30/2015 | $1,004.71 |
| 16663 | 12/23/2015 | $7,000.00 | 41983 | 12/29/2015 | $353.63 |
| 16664 | 12/28/2015 | $20,000.00 | 41984 | 12/28/2015 | $817.88 |
| 16665 | 12/29/2015 | $25,000.00 | 41985 | 12/28/2015 | $1,056.40 |
| 16666 | 12/28/2015 | $60,509.94 | 41986 | 12/23/2015 | $1,472.08 |
| 41934* | 12/01/2015 | $3,355.45 | 41987 | 12/29/2015 | $2,202.35 |



**December 2015**

*Reporting Activity 12/01 - 12/31*          Page 10 of 24

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Checks Cleared (continued)

| Check Number | Check Date | Check Amount | Check Number | Check Date | Check Amount |
|---|---|---|---|---|---|
| 41988 | 12/28/2015 | $1,200.00 | 41992 | 12/30/2015 | $1,894.38 |
| 41989 | 12/29/2015 | $1,484.50 | 41993 | 12/24/2015 | $908.69 |
| 41990 | 12/28/2015 | $1,529.85 | 41994 | 12/23/2015 | $1,125.81 |
| 41991 | 12/29/2015 | $150.00 | 41995 | 12/29/2015 | $2,661.99 |

\* Indicates skipped check number

### Daily Balances

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 11/30/2015 | -$112,716.59 | 12/10/2015 | -$89,963.13 | 12/22/2015 | -$187,335.10 |
| 12/01/2015 | -$119,935.02 | 12/11/2015 | -$98,987.67 | 12/23/2015 | $638,047.76 |
| 12/02/2015 | -$120,068.02 | 12/14/2015 | -$145,419.80 | 12/24/2015 | $564,033.65 |
| 12/03/2015 | -$131,048.66 | 12/15/2015 | -$157,137.92 | 12/28/2015 | $447,151.35 |
| 12/04/2015 | $0.00 | 12/16/2015 | -$157,450.92 | 12/29/2015 | -$165,762.13 |
| 12/07/2015 | -$7,946.67 | 12/17/2015 | -$164,045.31 | 12/30/2015 | -$171,671.02 |
| 12/08/2015 | -$24,191.90 | 12/18/2015 | $185,828.69 | 12/31/2015 | -$174,968.53 |
| 12/09/2015 | -$66,045.20 | 12/21/2015 | -$185,046.74 | | |

### Service Charge Summary

| Description | Amount |
|---|---|
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |

 **STERLING**
NATIONAL BANK

**November 2015**

400 Rella Blvd
Montebello, NY 10901

Reporting Activity 11/01 - 11/30          Page 1 of 22

**RETURN SERVICE REQUESTED**

CHETRIT GROUP LLC
C/O CHETRIT GROUP LLC
512 FASHION AVE FL 15
NEW YORK NY 10018-4603

## *Contact Us*

| | | |
|---|---|---|
|  | Client Services | 855-274-2800 |
| | Automated Telephone Banking | 855-274-2802 |
| | Mailing Address | 400 Rella Blvd Montebello, NY 10901 |
| | Online Access | https://www.snb.com |

## SUMMARY OF ACCOUNTS

| ACCOUNT TYPE | ACCOUNT NUMBER | ENDING BALANCE |
|---|---|---|
| **ANALYZED BUSINESS CHECKING** | XXXXXX4801 | **-$112,716.59** |

New Chip Technology Coming Soon to Your Sterling Debit MasterCard.

Sterling Debit MasterCard will soon feature the latest chip technology, which provides an added layer of security for greater protection against fraud. Chip cards are widely accepted around the globe, making traveling easier and more convenient. Your card will continue to have the traditional magnetic stripe on the back, so you can continue to use it at merchants without chip-enabled terminals.

Look for this new card feature when you receive new or replacement debit cards. Chip debit cards will be provided to replace lost or stolen cards after December 15, 2015. Chip debit cards will be provided for automatic renewals in early 2016. If you have any additional questions concerning yourDebit MasterCard, please contact Client Services and follow the prompts to be connected to a debit card representative:

Business Client Services 855-274-2800
Personal Client Services 855-274-2801

## ANALYZED BUSINESS CHECKING - XXXXXX4801

### Account Summary

| Date | Description | | | |
|---|---|---|---|---|
| 11/01/2015 | **Beginning Balance** | **-$110,038.10** | Average Ledger Balance | $165,305.34 |
| | 151 Debit(s) this period | $1,255,734.62 | Average Available Balance | $165,305.34 |
| | 6 Credit(s) this period | $1,253,010.67 | | |
| 11/30/2015 | **Ending Balance** | **-$112,716.59** | | |
| | Service Charges | $28.00 | | |



**STERLING**
NATIONAL BANK

## November 2015

Reporting Activity 11/01 - 11/30          Page 2 of 22

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

**Transaction Activity**

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 11/01/2015 | Beginning Balance | | | -$110,038.10 |
| 11/02/2015 | Chetrit Gr004DVH TAXIMPOUN | -$7,458.54 | | -$117,496.64 |
| 11/02/2015 | MBFS.COM      AUTO PAY | -$1,487.60 | | -$118,984.24 |
| 11/02/2015 | Chetrit Group L BILLING | -$39.25 | | -$119,023.49 |
| 11/02/2015 | CHECK #16474 | -$4,000.00 | | -$123,023.49 |
| 11/02/2015 | CHECK #41912 | -$2,661.99 | | -$125,685.48 |
| 11/02/2015 | CHECK #41906 | -$2,202.35 | | -$127,887.83 |
| 11/02/2015 | CHECK #41907 | -$1,484.50 | | -$129,372.33 |
| 11/02/2015 | CHECK #16441 | -$1,200.00 | | -$130,572.33 |
| 11/02/2015 | CHECK #16442 | -$1,050.00 | | -$131,622.33 |
| 11/02/2015 | CHECK #16473 | -$1,048.46 | | -$132,670.79 |
| 11/02/2015 | CHECK #256 | -$1,001.46 | | -$133,672.25 |
| 11/02/2015 | CHECK #16465 | -$250.00 | | -$133,922.25 |
| 11/02/2015 | Daily OD Fee Charge | -$7.00 | | -$133,929.25 |
| 11/03/2015 | CHECK #41913 | -$17,502.21 | | -$151,431.46 |
| 11/03/2015 | CHECK #41896 | -$3,093.13 | | -$154,524.59 |
| 11/03/2015 | CHECK #41900 | -$2,536.38 | | -$157,060.97 |
| 11/03/2015 | CHECK #41902 | -$1,004.71 | | -$158,065.68 |
| 11/03/2015 | CHECK #16398 | -$1,000.00 | | -$159,065.68 |
| 11/03/2015 | CHECK #16472 | -$536.04 | | -$159,601.72 |
| 11/03/2015 | CHECK #16446 | -$500.00 | | -$160,101.72 |
| 11/03/2015 | CHECK #16466 | -$250.00 | | -$160,351.72 |
| 11/03/2015 | CHECK #16458 | -$52.00 | | -$160,403.72 |
| 11/03/2015 | Daily OD Fee Charge | -$7.00 | | -$160,410.72 |
| 11/04/2015 | CHECK #16391 | -$10,000.00 | | -$170,410.72 |
| 11/04/2015 | CHECK #41901 | -$6,793.60 | | -$177,204.32 |
| 11/04/2015 | CHECK #16449 | -$1,209.80 | | -$178,414.12 |
| 11/04/2015 | CHECK #16445 | -$925.00 | | -$179,339.12 |
| 11/04/2015 | CHECK #16476 | -$500.00 | | -$179,839.12 |
| 11/04/2015 | CHECK #16447 | -$500.00 | | -$180,339.12 |
| 11/04/2015 | CHECK #1909 | -$150.00 | | -$180,489.12 |
| 11/04/2015 | Daily OD Fee Charge | -$7.00 | | -$180,496.12 |
| 11/05/2015 | TRNS FROM AC 5220001550 PER MEYER CHETRIT | | $350,000.00 | $169,503.88 |
| 11/05/2015 | OUTGOING WIRE,SLY LAND INTERNA TIONAL LIMITED,HSBC USA,,96660 | -$90,254.79 | | $79,249.09 |
| 11/05/2015 | CHECK #16480 | -$1,000.00 | | $78,249.09 |
| 11/05/2015 | CHECK #16469 | -$900.00 | | $77,349.09 |



## November 2015

**Reporting Activity 11/01 - 11/30**                    Page 3 of 22

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

**Transaction Activity (continued)**

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 11/05/2015 | CHECK #16470 | -$900.00 | | $76,449.09 |
| 11/06/2015 | CHECK #16399 | -$560.00 | | $75,889.09 |
| 11/06/2015 | CHECK #16479 | -$126.00 | | $75,763.09 |
| 11/09/2015 | PER CLIENT REQUEST TRANSFER FROM ACCOUNT ENDING IN 6896 | | $28.33 | $75,791.42 |
| 11/09/2015 | PER CLIENT REQUEST TRANSFER FROM ACCOUNT ENDING IN 5439 | | $273.32 | $76,064.74 |
| 11/09/2015 | PER CLIENT REQUEST TRANSFER FROM ACCOUNT ENDING IN 4970 | | $109.12 | $76,173.86 |
| 11/09/2015 | CHECK #16488 | -$1,417.50 | | $74,756.36 |
| 11/09/2015 | CHECK #16489 | -$837.00 | | $73,919.36 |
| 11/09/2015 | CHECK #16477 | -$126.00 | | $73,793.36 |
| 11/10/2015 | CHECK #16490 | -$603.33 | | $73,190.03 |
| 11/10/2015 | CHECK #16444 | -$180.00 | | $73,010.03 |
| 11/12/2015 | INCOMING WIRE,775 COLUMBUS LLC ,NEW YORK COMMERCIA,,17510373 | | $877,500.00 | $950,510.03 |
| 11/12/2015 | Chetrit Gr004ETk TAXIMPOUN | -$14,007.35 | | $936,502.68 |
| 11/12/2015 | CHECK #16485 | -$3,000.00 | | $933,502.68 |
| 11/12/2015 | CHECK #16375 | -$1,800.00 | | $931,702.68 |
| 11/12/2015 | CHECK #16491 | -$1,800.00 | | $929,902.68 |
| 11/12/2015 | CHECK #16468 | -$544.38 | | $929,358.30 |
| 11/12/2015 | CHECK #16345 | -$500.00 | | $928,858.30 |
| 11/13/2015 | DEPOSIT | | $25,099.90 | $953,958.20 |
| 11/13/2015 | Chetrit Group L BILLING | -$59.25 | | $953,898.95 |
| 11/13/2015 | CHECK #16519 | -$319.81 | | $953,579.14 |
| 11/13/2015 | CHECK #21916 | -$1,586.55 | | $951,992.59 |
| 11/13/2015 | CHECK | -$1,529.85 | | $950,462.74 |
| 11/13/2015 | CHECK #41925 | -$1,253.93 | | $949,208.81 |
| 11/13/2015 | CHECK | -$1,098.76 | | $948,110.05 |
| 11/13/2015 | CHECK #1923 | -$1,056.42 | | $947,053.63 |
| 11/13/2015 | CHECK #41922 | -$817.87 | | $946,235.76 |
| 11/13/2015 | CHECK | -$429.59 | | $945,806.17 |
| 11/13/2015 | CHECK #41921 | -$353.64 | | $945,452.53 |
| 11/13/2015 | CHECK #16478 | -$126.00 | | $945,326.53 |
| 11/16/2015 | MBFS.COM         AUTO PAY | -$1,585.12 | | $943,741.41 |
| 11/16/2015 | CHECK #16521 | -$1,500.00 | | $942,241.41 |
| 11/16/2015 | CHECK #41933 | -$2,661.99 | | $939,579.42 |
| 11/16/2015 | CHECK #41931 | -$1,125.82 | | $938,453.60 |



## STERLING
### NATIONAL BANK

## *November 2015*

**Reporting Activity 11/01 - 11/30**      **Page 4 of 22**

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

**Transaction Activity (continued)**

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 11/16/2015 | CHECK #41917 | -$1,001.45 | | $937,452.15 |
| 11/16/2015 | CHECK #41932 | -$361.03 | | $937,091.12 |
| 11/16/2015 | CHECK #16520 | -$360.00 | | $936,731.12 |
| 11/17/2015 | AMEX EPayment    ACH PMT | -$10,925.32 | | $925,805.80 |
| 11/17/2015 | CHECK #16523 | -$4,500.00 | | $921,305.80 |
| 11/17/2015 | CHECK #16487 | -$6,000.00 | | $915,305.80 |
| 11/17/2015 | CHECK #41926 | -$2,202.36 | | $913,103.44 |
| 11/17/2015 | CHECK #41930 | -$1,894.38 | | $911,209.06 |
| 11/17/2015 | CHECK #4927 | -$1,484.50 | | $909,724.56 |
| 11/17/2015 | CHECK #16497 | -$780.00 | | $908,944.56 |
| 11/17/2015 | CHECK #16513 | -$235.25 | | $908,709.31 |
| 11/17/2015 | CHECK #41929 | -$150.00 | | $908,559.31 |
| 11/17/2015 | CHECK #16503 | -$116.25 | | $908,443.06 |
| 11/17/2015 | CHECK #16504 | -$116.25 | | $908,326.81 |
| 11/17/2015 | CHECK #16481 | -$52.00 | | $908,274.81 |
| 11/18/2015 | PER CLIENT REQUEST TRANSFER TO ACCOUNT ENDING IN 1198 | -$877,500.00 | | $30,774.81 |
| 11/18/2015 | CHECK #41914 | -$3,216.80 | | $27,558.01 |
| 11/18/2015 | CHECK #41918 | -$2,536.38 | | $25,021.63 |
| 11/18/2015 | CHECK #16522 | -$1,000.00 | | $24,021.63 |
| 11/18/2015 | CHECK #16510 | -$736.87 | | $23,284.76 |
| 11/18/2015 | CHECK #16505 | -$707.79 | | $22,576.97 |
| 11/18/2015 | CHECK #16502 | -$626.70 | | $21,950.27 |
| 11/18/2015 | CHECK #16498 | -$585.00 | | $21,365.27 |
| 11/18/2015 | CHECK #16496 | -$360.00 | | $21,005.27 |
| 11/18/2015 | CHECK #16506 | -$326.89 | | $20,678.38 |
| 11/18/2015 | CHECK #16518 | -$116.66 | | $20,561.72 |
| 11/19/2015 | CHECK #41919 | -$6,793.60 | | $13,768.12 |
| 11/19/2015 | CHECK #16501 | -$5,000.00 | | $8,768.12 |
| 11/19/2015 | CHECK #16515 | -$1,806.32 | | $6,961.80 |
| 11/19/2015 | CHECK #16507 | -$1,334.58 | | $5,627.22 |
| 11/19/2015 | CHECK #16514 | -$712.30 | | $4,914.92 |
| 11/19/2015 | CHECK #16511 | -$327.46 | | $4,587.46 |
| 11/19/2015 | CHECK #16517 | -$226.68 | | $4,360.78 |
| 11/19/2015 | CHECK #16314 | -$180.00 | | $4,180.78 |
| 11/19/2015 | CHECK #16495 | -$102.00 | | $4,078.78 |
| 11/19/2015 | CHECK #16516 | -$81.33 | | $3,997.45 |



## November 2015

**Reporting Activity 11/01 - 11/30**          Page 5 of 22

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Transaction Activity (continued)

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 11/19/2015 | CHECK #16482 | -$52.00 | | $3,945.45 |
| 11/19/2015 | CHECK #16512 | -$46.51 | | $3,898.94 |
| 11/20/2015 | CHECK #16509 | -$3,066.80 | | $832.14 |
| 11/20/2015 | CHECK #16429 | -$750.00 | | $82.14 |
| 11/20/2015 | CHECK #16531 | -$5,833.33 | | -$5,751.19 |
| 11/20/2015 | CHECK #16425 | -$260.00 | | -$6,011.19 |
| 11/23/2015 | CHECK #16525 | -$5,000.00 | | -$11,011.19 |
| 11/23/2015 | CHECK #16530 | -$2,500.00 | | -$13,511.19 |
| 11/23/2015 | CHECK #16529 | -$2,261.80 | | -$15,772.99 |
| 11/23/2015 | CHECK #16534 | -$750.00 | | -$16,522.99 |
| 11/23/2015 | CHECK #16524 | -$555.99 | | -$17,078.98 |
| 11/23/2015 | CHECK #16539 | -$108.41 | | -$17,187.39 |
| 11/24/2015 | CHECK #16549 | -$10,000.00 | | -$27,187.39 |
| 11/24/2015 | CHECK #16556 | -$1,404.38 | | -$28,591.77 |
| 11/24/2015 | CHECK #16527 | -$23,018.79 | | -$51,610.56 |
| 11/24/2015 | CHECK #16542 | -$2,399.06 | | -$54,009.62 |
| 11/24/2015 | CHECK #16528 | -$780.00 | | -$54,789.62 |
| 11/24/2015 | CHECK #16537 | -$360.00 | | -$55,149.62 |
| 11/24/2015 | CHECK #16486 | -$360.00 | | -$55,509.62 |
| 11/25/2015 | CHECK #16559 | -$1,287.20 | | -$56,796.82 |
| 11/25/2015 | CHECK #16533 | -$1,050.00 | | -$57,846.82 |
| 11/25/2015 | CHECK #16558 | -$321.36 | | -$58,168.18 |
| 11/25/2015 | CHECK #16526 | -$1,209.80 | | -$59,377.98 |
| 11/25/2015 | CHECK #21935 | -$1,098.76 | | -$60,476.74 |
| 11/25/2015 | CHECK #16547 | -$1,000.00 | | -$61,476.74 |
| 11/25/2015 | CHECK #41951 | -$827.74 | | -$62,304.48 |
| 11/25/2015 | CHECK #41942 | -$817.88 | | -$63,122.36 |
| 11/25/2015 | CHECK #16493 | -$360.00 | | -$63,482.36 |
| 11/25/2015 | CHECK #16545 | -$335.00 | | -$63,817.36 |
| 11/27/2015 | Chetrit Gr004Glk TAXIMPOUN | -$14,157.89 | | -$77,975.25 |
| 11/27/2015 | AMEX EPayment   ACH PMT | -$4,489.88 | | -$82,465.13 |
| 11/27/2015 | Chetrit Group  L BILLING | -$60.25 | | -$82,525.38 |
| 11/27/2015 | CHECK #24936 | -$1,727.25 | | -$84,252.63 |
| 11/27/2015 | CHECK #41945 | -$1,253.94 | | -$85,506.57 |
| 11/27/2015 | CHECK #41943 | -$1,056.42 | | -$86,562.99 |
| 11/27/2015 | CHECK #41944 | -$852.22 | | -$87,415.21 |
| 11/27/2015 | CHECK #16544 | -$3,066.80 | | -$90,482.01 |



**November 2015**

*Reporting Activity 11/01 - 11/30*          Page 6 of 22

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Transaction Activity (continued)

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 11/27/2015 | CHECK #16532 | -$1,200.00 | | -$91,682.01 |
| 11/27/2015 | CHECK #16557 | -$909.93 | | -$92,591.94 |
| 11/27/2015 | CHECK #16541 | -$787.92 | | -$93,379.86 |
| 11/27/2015 | CHECK #41953 | -$361.03 | | -$93,740.89 |
| 11/27/2015 | CHECK #16540 | -$185.49 | | -$93,926.38 |
| 11/27/2015 | CHECK #16546 | -$179.10 | | -$94,105.48 |
| 11/27/2015 | CHECK #16555 | -$126.00 | | -$94,231.48 |
| 11/30/2015 | CHECK #41939 | -$6,724.37 | | -$100,955.85 |
| 11/30/2015 | CHECK #41954 | -$2,661.99 | | -$103,617.84 |
| 11/30/2015 | CHECK #41938 | -$2,536.37 | | -$106,154.21 |
| 11/30/2015 | CHECK #41947 | -$1,484.50 | | -$107,638.71 |
| 11/30/2015 | CHECK #41952 | -$1,125.82 | | -$108,764.53 |
| 11/30/2015 | CHECK #41940 | -$1,004.71 | | -$109,769.24 |
| 11/30/2015 | CHECK #41920 | -$1,004.71 | | -$110,773.95 |
| 11/30/2015 | CHECK #299 | -$1,001.46 | | -$111,775.41 |
| 11/30/2015 | CHECK #16543 | -$474.02 | | -$112,249.43 |
| 11/30/2015 | CHECK #41941 | -$353.62 | | -$112,603.05 |
| 11/30/2015 | CHECK #16536 | -$180.00 | | -$112,783.05 |
| 11/30/2015 | Daily OD Fee Charge | -$7.00 | | -$112,790.05 |
| 11/30/2015 | ATM SURCHARGE REBATE | | $73.46 | -$112,716.59 |
| 11/30/2015 | Ending Balance | | | -$112,716.59 |

### Debits

| Date | Description | Amount |
|---|---|---|
| 11/02/2015 | Chetrit Gr004DVH TAXIMPOUN | -$7,458.54 |
| 11/02/2015 | MBFS.COM     AUTO PAY | -$1,487.60 |
| 11/02/2015 | Chetrit Group  L BILLING | -$39.25 |
| 11/02/2015 | Daily OD Fee Charge | -$7.00 |
| 11/03/2015 | Daily OD Fee Charge | -$7.00 |
| 11/04/2015 | Daily OD Fee Charge | -$7.00 |
| 11/05/2015 | OUTGOING WIRE,SLY LAND INTERNA TIONAL LIMITED,HSBC USA,,96660 | -$90,254.79 |
| 11/12/2015 | Chetrit Gr004ETk TAXIMPOUN | -$14,007.35 |
| 11/13/2015 | Chetrit Group  L BILLING | -$59.25 |
| 11/16/2015 | MBFS.COM     AUTO PAY | -$1,585.12 |
| 11/17/2015 | AMEX EPayment   ACH PMT | -$10,925.32 |
| 11/18/2015 | PER CLIENT REQUEST TRANSFER TO ACCOUNT ENDING IN 1198 | -$877,500.00 |
| 11/27/2015 | Chetrit Gr004Glk TAXIMPOUN | -$14,157.89 |



**STERLING**
NATIONAL BANK

*November 2015*

*Reporting Activity 11/01 - 11/30*           Page 7 of 22

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Debits (continued)

| Date | Description | Amount |
|------|-------------|--------|
| 11/27/2015 | AMEX EPayment   ACH PMT | -$4,489.88 |
| 11/27/2015 | Chetrit Group  L BILLING | -$60.25 |
| 11/30/2015 | Daily OD Fee Charge | -$7.00 |

### Credits

| Date | Description | Amount |
|------|-------------|--------|
| 11/05/2015 | TRNS FROM AC 5220001550 PER MEYER CHETRIT | $350,000.00 |
| 11/09/2015 | PER CLIENT REQUEST TRANSFER FROM ACCOUNT ENDING IN 6896 | $28.33 |
| 11/09/2015 | PER CLIENT REQUEST TRANSFER FROM ACCOUNT ENDING IN 5439 | $273.32 |
| 11/09/2015 | PER CLIENT REQUEST TRANSFER FROM ACCOUNT ENDING IN 4970 | $109.12 |
| 11/12/2015 | INCOMING WIRE,775 COLUMBUS LLC ,NEW YORK COMMERCIA,,17510373 | $877,500.00 |
| 11/13/2015 | DEPOSIT | $25,099.90 |
| 11/30/2015 | ATM SURCHARGE REBATE | $73.46 |

### Checks Cleared

| Check Number | Check Date | Check Amount | Check Number | Check Date | Check Amount |
|-------------|-----------|-------------|-------------|-----------|-------------|
| 0 | 11/13/2015 | $1,529.85 | 16445 | 11/04/2015 | $925.00 |
| 0* | 11/13/2015 | $1,098.76 | 16446 | 11/03/2015 | $500.00 |
| 0* | 11/13/2015 | $429.59 | 16447 | 11/04/2015 | $500.00 |
| 256* | 11/02/2015 | $1,001.46 | 16449* | 11/04/2015 | $1,209.80 |
| 299* | 11/30/2015 | $1,001.46 | 16458* | 11/03/2015 | $52.00 |
| 1909* | 11/04/2015 | $150.00 | 16465* | 11/02/2015 | $250.00 |
| 1923* | 11/13/2015 | $1,056.42 | 16466 | 11/03/2015 | $250.00 |
| 4927* | 11/17/2015 | $1,484.50 | 16468* | 11/12/2015 | $544.38 |
| 16314* | 11/19/2015 | $180.00 | 16469 | 11/05/2015 | $900.00 |
| 16345* | 11/12/2015 | $500.00 | 16470 | 11/05/2015 | $900.00 |
| 16375* | 11/12/2015 | $1,800.00 | 16472* | 11/03/2015 | $536.04 |
| 16391* | 11/04/2015 | $10,000.00 | 16473 | 11/02/2015 | $1,048.46 |
| 16398* | 11/03/2015 | $1,000.00 | 16474 | 11/02/2015 | $4,000.00 |
| 16399 | 11/06/2015 | $560.00 | 16476* | 11/04/2015 | $500.00 |
| 16425* | 11/20/2015 | $260.00 | 16477 | 11/09/2015 | $126.00 |
| 16429* | 11/20/2015 | $750.00 | 16478 | 11/13/2015 | $126.00 |
| 16441* | 11/02/2015 | $1,200.00 | 16479 | 11/06/2015 | $126.00 |
| 16442 | 11/02/2015 | $1,050.00 | 16480 | 11/05/2015 | $1,000.00 |
| 16444* | 11/10/2015 | $180.00 | 16481 | 11/17/2015 | $52.00 |



**STERLING**
NATIONAL BANK

*November 2015*

*Reporting Activity 11/01 - 11/30*          Page 8 of 22

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Checks Cleared (continued)

| Check Number | Check Date | Check Amount | Check Number | Check Date | Check Amount |
|---|---|---|---|---|---|
| 16482 | 11/19/2015 | $52.00 | 16521 | 11/16/2015 | $1,500.00 |
| 16485* | 11/12/2015 | $3,000.00 | 16522 | 11/18/2015 | $1,000.00 |
| 16486 | 11/24/2015 | $360.00 | 16523 | 11/17/2015 | $4,500.00 |
| 16487 | 11/17/2015 | $6,000.00 | 16524 | 11/23/2015 | $555.99 |
| 16488 | 11/09/2015 | $1,417.50 | 16525 | 11/23/2015 | $5,000.00 |
| 16489 | 11/09/2015 | $837.00 | 16526 | 11/25/2015 | $1,209.80 |
| 16490 | 11/10/2015 | $603.33 | 16527 | 11/24/2015 | $23,018.79 |
| 16491 | 11/12/2015 | $1,800.00 | 16528 | 11/24/2015 | $780.00 |
| 16493* | 11/25/2015 | $360.00 | 16529 | 11/23/2015 | $2,261.80 |
| 16495*** | 11/19/2015 | $102.00 | 16530 | 11/23/2015 | $2,500.00 |
| 16496 | 11/18/2015 | $360.00 | 16531 | 11/20/2015 | $5,833.33 |
| 16497 | 11/17/2015 | $780.00 | 16532 | 11/27/2015 | $1,200.00 |
| 16498 | 11/18/2015 | $585.00 | 16533 | 11/25/2015 | $1,050.00 |
| 16501* | 11/19/2015 | $5,000.00 | 16534 | 11/23/2015 | $750.00 |
| 16502 | 11/18/2015 | $626.70 | 16536* | 11/30/2015 | $180.00 |
| 16503 | 11/17/2015 | $116.25 | 16537 | 11/24/2015 | $360.00 |
| 16504 | 11/17/2015 | $116.25 | 16539* | 11/23/2015 | $108.41 |
| 16505 | 11/18/2015 | $707.79 | 16540 | 11/27/2015 | $185.49 |
| 16506 | 11/18/2015 | $326.89 | 16541 | 11/27/2015 | $787.92 |
| 16507 | 11/19/2015 | $1,334.58 | 16542 | 11/24/2015 | $2,399.06 |
| 16509* | 11/20/2015 | $3,066.80 | 16543 | 11/30/2015 | $474.02 |
| 16510 | 11/18/2015 | $736.87 | 16544 | 11/27/2015 | $3,066.80 |
| 16511 | 11/19/2015 | $327.46 | 16545 | 11/25/2015 | $335.00 |
| 16512 | 11/19/2015 | $46.51 | 16546 | 11/27/2015 | $179.10 |
| 16513 | 11/17/2015 | $235.25 | 16547 | 11/25/2015 | $1,000.00 |
| 16514 | 11/19/2015 | $712.30 | 16549* | 11/24/2015 | $10,000.00 |
| 16515 | 11/19/2015 | $1,806.32 | 16555* | 11/27/2015 | $126.00 |
| 16516 | 11/19/2015 | $81.33 | 16556 | 11/24/2015 | $1,404.38 |
| 16517 | 11/19/2015 | $226.68 | 16557 | 11/27/2015 | $909.93 |
| 16518 | 11/18/2015 | $116.66 | 16558 | 11/25/2015 | $321.36 |
| 16519 | 11/13/2015 | $319.81 | 16559 | 11/25/2015 | $1,287.20 |
| 16520 | 11/16/2015 | $360.00 | 21916* | 11/13/2015 | $1,586.55 |



**November 2015**

Reporting Activity 11/01 - 11/30          Page 9 of 22

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Checks Cleared (continued)

| Check Number | Check Date | Check Amount | Check Number | Check Date | Check Amount |
|---|---|---|---|---|---|
| 21935* | 11/25/2015 | $1,098.76 | 41929* | 11/17/2015 | $150.00 |
| 24936* | 11/27/2015 | $1,727.25 | 41930 | 11/17/2015 | $1,894.38 |
| 41896* | 11/03/2015 | $3,093.13 | 41931 | 11/16/2015 | $1,125.82 |
| 41900* | 11/03/2015 | $2,536.38 | 41932 | 11/16/2015 | $361.03 |
| 41901 | 11/04/2015 | $6,793.60 | 41933 | 11/16/2015 | $2,661.99 |
| 41902 | 11/03/2015 | $1,004.71 | 41938* | 11/30/2015 | $2,536.37 |
| 41906* | 11/02/2015 | $2,202.35 | 41939 | 11/30/2015 | $6,724.37 |
| 41907 | 11/02/2015 | $1,484.50 | 41940 | 11/30/2015 | $1,004.71 |
| 41912* | 11/02/2015 | $2,661.99 | 41941 | 11/30/2015 | $353.62 |
| 41913 | 11/03/2015 | $17,502.21 | 41942 | 11/25/2015 | $817.88 |
| 41914 | 11/18/2015 | $3,216.80 | 41943 | 11/27/2015 | $1,056.42 |
| 41917* | 11/16/2015 | $1,001.45 | 41944 | 11/27/2015 | $852.22 |
| 41918 | 11/18/2015 | $2,536.38 | 41945 | 11/27/2015 | $1,253.94 |
| 41919 | 11/19/2015 | $6,793.60 | 41947* | 11/30/2015 | $1,484.50 |
| 41920 | 11/30/2015 | $1,004.71 | 41951* | 11/25/2015 | $827.74 |
| 41921 | 11/13/2015 | $353.64 | 41952 | 11/30/2015 | $1,125.82 |
| 41922 | 11/13/2015 | $817.87 | 41953 | 11/27/2015 | $361.03 |
| 41925* | 11/13/2015 | $1,253.93 | 41954 | 11/30/2015 | $2,661.99 |
| 41926 | 11/17/2015 | $2,202.36 | | | |

* Indicates skipped check number

### Daily Balances

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 10/31/2015 | -$110,038.10 | 11/10/2015 | $73,010.03 | 11/20/2015 | -$6,011.19 |
| 11/02/2015 | -$133,929.25 | 11/12/2015 | $828,858.30 | 11/23/2015 | -$17,187.39 |
| 11/03/2015 | -$160,410.72 | 11/13/2015 | $945,326.53 | 11/24/2015 | -$55,509.62 |
| 11/04/2015 | -$180,496.12 | 11/16/2015 | $936,731.12 | 11/25/2015 | -$63,817.36 |
| 11/05/2015 | $76,449.09 | 11/17/2015 | $908,274.81 | 11/27/2015 | -$94,231.48 |
| 11/06/2015 | $75,763.09 | 11/18/2015 | $20,561.72 | 11/30/2015 | -$112,716.59 |
| 11/09/2015 | $73,793.36 | 11/19/2015 | $3,898.94 | | |

### Service Charge Summary

| Description | Amount |
|---|---|
| | $0.00 |



**STERLING**
NATIONAL BANK

400 Rella Blvd
Montebello, NY 10901

*October 2015*

Reporting Activity 10/01 - 10/31          Page 1 of 18

RETURN SERVICE REQUESTED

CHETRIT GROUP LLC
C/O CHETRIT GROUP LLC
512 FASHION AVE FL 15
NEW YORK NY 10018-4603

## Contact Us



| | | |
|---|---|---|
| Client Services | 855-274-2800 |
| Automated Telephone Banking | 855-274-2802 |
| Mailing Address | 400 Rella Blvd Montebello, NY 10901 |
| Online Access | https://www.snb.com |

## SUMMARY OF ACCOUNTS

| ACCOUNT TYPE | ACCOUNT NUMBER | ENDING BALANCE |
|---|---|---|
| ANALYZED BUSINESS CHECKING | XXXXXX4801 | -$110,038.10 |

## ANALYZED BUSINESS CHECKING - XXXXXX4801

### Account Summary

| Date | Description | | | |
|---|---|---|---|---|
| 10/01/2015 | Beginning Balance | $137,767.90 | Average Ledger Balance | $35,101.35 |
| | 125 Debit(s) this period | $251,680.98 | Average Available Balance | $34,632.18 |
| | 1 Credit(s) this period | $3,836.04 | | |
| 10/31/2015 | Ending Balance | -$110,038.10 | | |
| | Service Charges | $14.00 | | |

### Transaction Activity

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 10/01/2015 | Beginning Balance | | | $137,767.90 |
| 10/01/2015 | Chetrit Gr0049IE TAXIMPOUN | -$13,023.21 | | $124,744.69 |
| 10/01/2015 | MBFS.COM      AUTO PAY | -$1,487.60 | | $123,257.09 |
| 10/01/2015 | CHECK #41863 | -$1,098.78 | | $122,158.31 |
| 10/01/2015 | CHECK #41864 | -$1,463.42 | | $120,694.89 |
| 10/02/2015 | Chetrit Group  L BILLING | -$55.25 | | $120,639.64 |
| 10/02/2015 | CHECK #41870 | -$817.88 | | $119,821.76 |
| 10/02/2015 | CHECK #16370 | -$2,500.00 | | $117,321.76 |
| 10/02/2015 | CHECK #41871 | -$1,253.93 | | $116,067.83 |
| 10/02/2015 | CHECK #41877 | -$1,125.82 | | $114,942.01 |



## STERLING
### NATIONAL BANK

### *October 2015*

**Reporting Activity 10/01 - 10/31**          **Page 2 of 18**

---

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Transaction Activity (continued)

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 10/02/2015 | CHECK #41869 | -$353.64 | | $114,588.37 |
| 10/05/2015 | CHECK #41867 | -$6,793.59 | | $107,794.78 |
| 10/05/2015 | CHECK #41862 | -$3,093.13 | | $104,701.65 |
| 10/05/2015 | CHECK #41878 | -$2,661.98 | | $102,039.67 |
| 10/05/2015 | CHECK #41873 | -$1,484.50 | | $100,555.17 |
| 10/05/2015 | CHECK #41865 | -$1,001.45 | | $99,553.72 |
| 10/06/2015 | CHECK #41875 | -$150.00 | | $99,403.72 |
| 10/07/2015 | CHECK #41874 | -$1,529.85 | | $97,873.87 |
| 10/08/2015 | CHECK #16303 | -$260.00 | | $97,613.87 |
| 10/08/2015 | CHECK #16325 | -$99.90 | | $97,513.97 |
| 10/09/2015 | CHECK #41872 | -$2,202.36 | | $95,311.61 |
| 10/09/2015 | CHECK #41876 | -$1,894.38 | | $93,417.23 |
| 10/13/2015 | CHECK #16396 | -$521.90 | | $92,895.33 |
| 10/13/2015 | CHECK #41868 | -$1,004.71 | | $91,890.62 |
| 10/14/2015 | AMEX EPayment    ACH PMT | -$3,757.44 | | $88,133.18 |
| 10/14/2015 | CHECK #16426 | -$5,000.00 | | $83,133.18 |
| 10/14/2015 | CHECK #16394 | -$1,033.50 | | $82,099.68 |
| 10/14/2015 | CHECK #16392 | -$415.12 | | $81,684.56 |
| 10/14/2015 | CHECK #1692 | -$410.00 | | $81,274.56 |
| 10/14/2015 | CHECK #16395 | -$353.62 | | $80,920.94 |
| 10/14/2015 | CHECK #16336 | -$180.00 | | $80,740.94 |
| 10/15/2015 | Chetrit Gr004BDI TAXIMPOUN | -$12,831.11 | | $67,909.83 |
| 10/15/2015 | MBFS.COM        AUTO PAY | -$1,585.12 | | $66,324.71 |
| 10/15/2015 | CHECK #16393 | -$2,957.05 | | $63,367.66 |
| 10/15/2015 | CHECK #16424 | -$360.00 | | $63,007.66 |
| 10/15/2015 | CHECK #16319 | -$180.00 | | $62,827.66 |
| 10/16/2015 | DEPOSIT | | $3,836.04 | $66,663.70 |
| 10/16/2015 | Chetrit Group  L BILLING | -$55.25 | | $66,608.45 |
| 10/16/2015 | CHECK #41891 | -$1,529.85 | | $65,078.60 |
| 10/16/2015 | CHECK #41881 | -$1,146.85 | | $63,931.75 |
| 10/16/2015 | CHECK #41888 | -$1,253.95 | | $62,677.80 |
| 10/16/2015 | CHECK #41880 | -$1,098.76 | | $61,579.04 |
| 10/16/2015 | CHECK #41887 | -$817.88 | | $60,761.16 |
| 10/16/2015 | CHECK #41886 | -$353.62 | | $60,407.54 |
| 10/19/2015 | STATE FARM RO 08 CPC-CLIENT | -$1,389.04 | | $59,018.50 |
| 10/19/2015 | CHECK #16406 | -$8,213.12 | | $50,805.38 |
| 10/19/2015 | CHECK #16397 | -$4,000.00 | | $46,805.38 |



**STERLING**
NATIONAL BANK

*October 2015*

*Reporting Activity 10/01 - 10/31*          *Page 3 of 18*

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Transaction Activity (continued)

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 10/19/2015 | CHECK #41895 | -$2,662.00 | | $44,143.38 |
| 10/19/2015 | CHECK #41866 | -$2,536.38 | | $41,607.00 |
| 10/19/2015 | CHECK #16420 | -$2,182.39 | | $39,424.61 |
| 10/19/2015 | CHECK #41893 | -$1,894.38 | | $37,530.23 |
| 10/19/2015 | CHECK #16407 | -$1,209.80 | | $36,320.43 |
| 10/19/2015 | CHECK #41894 | -$1,125.82 | | $35,194.61 |
| 10/19/2015 | CHECK #41885 | -$1,004.71 | | $34,189.90 |
| 10/19/2015 | CHECK #41882 | -$1,001.47 | | $33,188.43 |
| 10/19/2015 | CHECK #16329 | -$1,000.00 | | $32,188.43 |
| 10/19/2015 | CHECK #16410 | -$994.37 | | $31,194.06 |
| 10/19/2015 | CHECK #16405 | -$745.01 | | $30,449.05 |
| 10/19/2015 | CHECK #16413 | -$736.87 | | $29,712.18 |
| 10/19/2015 | CHECK #16408 | -$354.89 | | $29,357.29 |
| 10/19/2015 | CHECK #16401 | -$239.81 | | $29,117.48 |
| 10/19/2015 | CHECK #16335 | -$180.00 | | $28,937.48 |
| 10/19/2015 | CHECK #16416 | -$168.75 | | $28,768.73 |
| 10/19/2015 | CHECK #16404 | -$112.50 | | $28,656.23 |
| 10/19/2015 | CHECK #16415 | -$15.19 | | $28,641.04 |
| 10/20/2015 | AMEX EPayment   ACH PMT | -$4,604.78 | | $24,036.26 |
| 10/20/2015 | CHECK #41884 | -$6,793.60 | | $17,242.66 |
| 10/20/2015 | CHECK #41883 | -$2,536.36 | | $14,706.30 |
| 10/20/2015 | CHECK #41890 | -$1,484.50 | | $13,221.80 |
| 10/20/2015 | CHECK #16421 | -$1,360.24 | | $11,861.56 |
| 10/20/2015 | CHECK #16427 | -$500.00 | | $11,361.56 |
| 10/20/2015 | CHECK #16414 | -$300.39 | | $11,061.17 |
| 10/20/2015 | CHECK #16423 | -$237.57 | | $10,823.60 |
| 10/20/2015 | CHECK #16434 | -$225.00 | | $10,598.60 |
| 10/20/2015 | CHECK #16302 | -$200.00 | | $10,398.60 |
| 10/20/2015 | CHECK #41892 | -$150.00 | | $10,248.60 |
| 10/20/2015 | CHECK #16400 | -$149.71 | | $10,098.89 |
| 10/20/2015 | CHECK #16422 | -$9.44 | | $10,089.45 |
| 10/21/2015 | CHECK #16403 | -$1,290.00 | | $8,799.45 |
| 10/21/2015 | CHECK #16409 | -$1,009.22 | | $7,790.23 |
| 10/21/2015 | CHECK #16417 | -$488.68 | | $7,301.55 |
| 10/21/2015 | CHECK #16411 | -$413.00 | | $6,888.55 |
| 10/21/2015 | CHECK #16419 | -$310.00 | | $6,578.55 |
| 10/22/2015 | CHECK #16454 | -$1,732.50 | | $4,846.05 |



## STERLING
### NATIONAL BANK

### *October 2015*

*Reporting Activity 10/01 - 10/31*          **Page 4 of 18**

### ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

**Transaction Activity (continued)**

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 10/22/2015 | CHECK #16453 | -$380.00 | | $4,466.05 |
| 10/22/2015 | CHECK #16438 | -$3,097.00 | | $1,369.05 |
| 10/22/2015 | CHECK #16430 | -$555.99 | | $813.06 |
| 10/22/2015 | CHECK #16402 | -$5,000.00 | | -$4,186.94 |
| 10/22/2015 | CHECK #41879 | -$3,093.15 | | -$7,280.09 |
| 10/22/2015 | CHECK #16412 | -$3,066.80 | | -$10,346.89 |
| 10/22/2015 | CHECK #41889 | -$2,202.34 | | -$12,549.23 |
| 10/23/2015 | CHECK #16440 | -$5,833.33 | | -$18,382.56 |
| 10/23/2015 | CHECK #16460 | -$1,500.00 | | -$19,882.56 |
| 10/23/2015 | CHECK #16448 | -$5,000.00 | | -$24,882.56 |
| 10/23/2015 | CHECK #16436 | -$1,862.44 | | -$26,745.00 |
| 10/23/2015 | CHECK #16373 | -$1,800.00 | | -$28,545.00 |
| 10/23/2015 | CHECK #16437 | -$129.18 | | -$28,674.18 |
| 10/23/2015 | CHECK #16435 | -$64.00 | | -$28,738.18 |
| 10/26/2015 | CHECK #16439 | -$2,500.00 | | -$31,238.18 |
| 10/26/2015 | CHECK #16432 | -$626.70 | | -$31,864.88 |
| 10/26/2015 | CHECK #16433 | -$473.71 | | -$32,338.59 |
| 10/26/2015 | CHECK #16431 | -$440.28 | | -$32,778.87 |
| 10/26/2015 | CHECK #16315 | -$360.00 | | -$33,138.87 |
| 10/26/2015 | CHECK #16459 | -$126.00 | | -$33,264.87 |
| 10/26/2015 | CHECK #16457 | -$52.00 | | -$33,316.87 |
| 10/27/2015 | CHECK #16450 | -$23,018.79 | | -$56,335.66 |
| 10/27/2015 | CHECK #16461 | -$12,944.00 | | -$69,279.66 |
| 10/27/2015 | CHECK #16451 | -$2,600.00 | | -$71,879.66 |
| 10/27/2015 | CHECK #16455 | -$1,184.86 | | -$73,064.52 |
| 10/27/2015 | CHECK #16463 | -$126.00 | | -$73,190.52 |
| 10/27/2015 | CHECK #16452 | -$126.00 | | -$73,316.52 |
| 10/28/2015 | CHECK #16462 | -$7,601.71 | | -$80,918.23 |
| 10/29/2015 | Chetrit Gr004CRy TAXIMPOUN | -$12,959.18 | | -$93,877.41 |
| 10/29/2015 | CHECK #16443 | -$3,073.18 | | -$96,950.59 |
| 10/29/2015 | CHECK #16456 | -$1,500.00 | | -$98,450.59 |
| 10/29/2015 | CHECK #16418 | -$1,389.04 | | -$99,839.63 |
| 10/29/2015 | Dally OD Fee Charge | -$7.00 | | -$99,846.63 |
| 10/30/2015 | Chetrit Group  L BILLING | -$55.25 | | -$99,901.88 |
| 10/30/2015 | CHECK #41903 | -$353.62 | | -$100,255.50 |
| 10/30/2015 | CHECK #41910 | -$1,894.37 | | -$102,149.87 |
| 10/30/2015 | CHECK #41908 | -$1,529.86 | | -$103,679.73 |



## STERLING
### NATIONAL BANK

### *October 2015*
**Reporting Activity 10/01 - 10/31**          Page 5 of 18

---

**ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)**

### Transaction Activity (continued)

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 10/30/2015 | CHECK #1898 | -$1,357.91 | | -$105,037.64 |
| 10/30/2015 | CHECK | -$1,253.94 | | -$106,291.58 |
| 10/30/2015 | CHECK #41911 | -$1,125.82 | | -$107,417.40 |
| 10/30/2015 | CHECK #41897 | -$1,098.76 | | -$108,516.16 |
| 10/30/2015 | CHECK #41904 | -$817.88 | | -$109,334.04 |
| 10/30/2015 | CHECK #16305 | -$500.00 | | -$109,834.04 |
| 10/30/2015 | CHECK #16467 | -$250.00 | | -$110,084.04 |
| 10/30/2015 | Daily OD Fee Charge | -$7.00 | | -$110,091.04 |
| 10/31/2015 | ATM SURCHARGE REBATE | | $52.94 | -$110,038.10 |
| 10/31/2015 | Ending Balance | | | -$110,038.10 |

### Debits

| Date | Description | Amount |
|---|---|---|
| 10/01/2015 | Chetrit Gr0049IE TAXIMPOUN | -$13,023.21 |
| 10/01/2015 | MBFS.COM      AUTO PAY | -$1,487.60 |
| 10/02/2015 | Chetrit Group  L BILLING | -$55.25 |
| 10/14/2015 | AMEX EPayment   ACH PMT | -$3,757.44 |
| 10/15/2015 | Chetrit Gr004BDI TAXIMPOUN | -$12,831.11 |
| 10/15/2015 | MBFS.COM      AUTO PAY | -$1,585.12 |
| 10/16/2015 | Chetrit Group  L BILLING | -$55.25 |
| 10/19/2015 | STATE FARM RO 08 CPC-CLIENT | -$1,389.04 |
| 10/20/2015 | AMEX EPayment   ACH PMT | -$4,604.78 |
| 10/29/2015 | Chetrit Gr004CRy TAXIMPOUN | -$12,959.18 |
| 10/29/2015 | Daily OD Fee Charge | -$7.00 |
| 10/30/2015 | Chetrit Group  L BILLING | -$55.25 |
| 10/30/2015 | Daily OD Fee Charge | -$7.00 |

### Credits

| Date | Description | Amount |
|---|---|---|
| 10/16/2015 | DEPOSIT | $3,836.04 |
| 10/31/2015 | ATM SURCHARGE REBATE | $52.94 |

### Checks Cleared

| Check Number | Check Date | Check Amount | Check Number | Check Date | Check Amount |
|---|---|---|---|---|---|
| 0 | 10/30/2015 | $1,253.94 | 16302* | 10/20/2015 | $200.00 |
| 1692* | 10/14/2015 | $410.00 | 16303 | 10/08/2015 | $260.00 |
| 1898* | 10/30/2015 | $1,357.91 | 16305* | 10/30/2015 | $500.00 |



**STERLING** NATIONAL BANK

*October 2015*
Reporting Activity 10/01 - 10/31                    Page 6 of 18

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Checks Cleared (continued)

| Check Number | Check Date | Check Amount | Check Number | Check Date | Check Amount |
|---|---|---|---|---|---|
| 16315* | 10/26/2015 | $360.00 | 16418 | 10/29/2015 | $1,389.04 |
| 16319* | 10/15/2015 | $180.00 | 16419 | 10/21/2015 | $310.00 |
| 16325* | 10/08/2015 | $99.90 | 16420 | 10/19/2015 | $2,182.39 |
| 16329* | 10/19/2015 | $1,000.00 | 16421 | 10/20/2015 | $1,360.24 |
| 16335* | 10/19/2015 | $180.00 | 16422 | 10/20/2015 | $9.44 |
| 16336 | 10/14/2015 | $180.00 | 16423 | 10/20/2015 | $237.57 |
| 16370* | 10/02/2015 | $2,500.00 | 16424 | 10/15/2015 | $360.00 |
| 16373* | 10/23/2015 | $1,800.00 | 16426* | 10/14/2015 | $5,000.00 |
| 16392* | 10/14/2015 | $415.12 | 16427 | 10/20/2015 | $500.00 |
| 16393 | 10/15/2015 | $2,957.05 | 16430* | 10/22/2015 | $555.99 |
| 16394 | 10/14/2015 | $1,033.50 | 16431 | 10/26/2015 | $440.28 |
| 16395 | 10/14/2015 | $353.62 | 16432 | 10/26/2015 | $626.70 |
| 16396 | 10/13/2015 | $521.90 | 16433 | 10/26/2015 | $473.71 |
| 16397 | 10/19/2015 | $4,000.00 | 16434 | 10/20/2015 | $225.00 |
| 16400* | 10/20/2015 | $149.71 | 16435 | 10/23/2015 | $64.00 |
| 16401 | 10/19/2015 | $239.81 | 16436 | 10/23/2015 | $1,862.44 |
| 16402 | 10/22/2015 | $5,000.00 | 16437 | 10/23/2015 | $129.18 |
| 16403 | 10/21/2015 | $1,290.00 | 16438 | 10/22/2015 | $3,097.00 |
| 16404 | 10/19/2015 | $112.50 | 16439 | 10/26/2015 | $2,500.00 |
| 16405 | 10/19/2015 | $745.01 | 16440 | 10/23/2015 | $5,833.33 |
| 16406 | 10/19/2015 | $8,213.12 | 16443* | 10/29/2015 | $3,073.18 |
| 16407 | 10/19/2015 | $1,209.80 | 16448* | 10/23/2015 | $5,000.00 |
| 16408 | 10/19/2015 | $354.89 | 16450* | 10/27/2015 | $23,018.79 |
| 16409 | 10/21/2015 | $1,009.22 | 16451 | 10/27/2015 | $2,600.00 |
| 16410 | 10/19/2015 | $994.37 | 16452 | 10/27/2015 | $126.00 |
| 16411 | 10/21/2015 | $413.00 | 16453 | 10/22/2015 | $380.00 |
| 16412 | 10/22/2015 | $3,066.80 | 16454 | 10/22/2015 | $1,732.50 |
| 16413 | 10/19/2015 | $736.87 | 16455 | 10/27/2015 | $1,184.86 |
| 16414 | 10/20/2015 | $300.39 | 16456 | 10/29/2015 | $1,500.00 |
| 16415 | 10/19/2015 | $15.19 | 16457 | 10/26/2015 | $52.00 |
| 16416 | 10/19/2015 | $168.75 | 16459* | 10/26/2015 | $126.00 |
| 16417 | 10/21/2015 | $466.68 | 16460 | 10/23/2015 | $1,500.00 |



## STERLING
### NATIONAL BANK

*October 2015*

*Reporting Activity 10/01 - 10/31*          *Page 7 of 18*

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Checks Cleared (continued)

| Check Number | Check Date | Check Amount | Check Number | Check Date | Check Amount |
|---|---|---|---|---|---|
| 16461 | 10/27/2015 | $12,944.00 | 41880 | 10/16/2015 | $1,098.76 |
| 16462 | 10/28/2015 | $7,601.71 | 41881 | 10/16/2015 | $1,146.85 |
| 16463 | 10/27/2015 | $126.00 | 41882 | 10/19/2015 | $1,001.47 |
| 16467* | 10/30/2015 | $250.00 | 41883 | 10/20/2015 | $2,536.36 |
| 41862* | 10/05/2015 | $3,093.13 | 41884 | 10/20/2015 | $6,793.60 |
| 41863 | 10/01/2015 | $1,098.78 | 41885 | 10/19/2015 | $1,004.71 |
| 41864 | 10/01/2015 | $1,463.42 | 41886 | 10/16/2015 | $353.62 |
| 41865 | 10/05/2015 | $1,001.45 | 41887 | 10/16/2015 | $817.88 |
| 41866 | 10/19/2015 | $2,536.38 | 41888 | 10/16/2015 | $1,253.95 |
| 41867 | 10/05/2015 | $6,793.59 | 41889 | 10/22/2015 | $2,202.34 |
| 41868 | 10/13/2015 | $1,004.71 | 41890 | 10/20/2015 | $1,484.50 |
| 41869 | 10/02/2015 | $353.64 | 41891 | 10/16/2015 | $1,529.85 |
| 41870 | 10/02/2015 | $817.88 | 41892 | 10/20/2015 | $150.00 |
| 41871 | 10/02/2015 | $1,253.93 | 41893 | 10/19/2015 | $1,894.38 |
| 41872 | 10/09/2015 | $2,202.36 | 41894 | 10/19/2015 | $1,125.82 |
| 41873 | 10/05/2015 | $1,484.50 | 41895 | 10/19/2015 | $2,662.00 |
| 41874 | 10/07/2015 | $1,529.85 | 41897* | 10/30/2015 | $1,098.76 |
| 41875 | 10/06/2015 | $150.00 | 41903* | 10/30/2015 | $353.62 |
| 41876 | 10/09/2015 | $1,894.38 | 41904 | 10/30/2015 | $817.88 |
| 41877 | 10/02/2015 | $1,125.82 | 41908* | 10/30/2015 | $1,529.86 |
| 41878 | 10/05/2015 | $2,661.98 | 41910* | 10/30/2015 | $1,894.37 |
| 41879 | 10/22/2015 | $3,093.15 | 41911 | 10/30/2015 | $1,125.82 |

* Indicates skipped check number

### Daily Balances

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 09/30/2015 | $137,767.90 | 10/09/2015 | $93,417.23 | 10/21/2015 | $6,578.55 |
| 10/01/2015 | $120,694.89 | 10/13/2015 | $91,890.62 | 10/22/2015 | -$12,549.23 |
| 10/02/2015 | $114,588.37 | 10/14/2015 | $80,740.94 | 10/23/2015 | -$28,738.18 |
| 10/05/2015 | $99,553.72 | 10/15/2015 | $62,827.66 | 10/26/2015 | -$33,316.87 |
| 10/06/2015 | $99,403.72 | 10/16/2015 | $60,407.54 | 10/27/2015 | -$73,316.52 |
| 10/07/2015 | $97,873.87 | 10/19/2015 | $28,641.04 | 10/28/2015 | -$80,918.23 |
| 10/08/2015 | $97,513.97 | 10/20/2015 | $10,089.45 | 10/29/2015 | -$99,846.63 |



**STERLING**
**NATIONAL BANK**

*October 2015*

*Reporting Activity 10/01 - 10/31*              *Page 8 of 18*

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

**Daily Balances (continued)**

| Date | Amount |
|------|--------|
| 10/30/2015 | -$110,038.10 |

**Service Charge Summary**

| Description | Amount |
|-------------|--------|
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| Total Service Charge | $14.00 |



## STERLING
### NATIONAL BANK

**400 Rella Blvd**
**Montebello, NY 10901**

**RETURN SERVICE REQUESTED**

CHETRIT GROUP LLC
C/O CHETRIT GROUP LLC
512 FASHION AVE FL 15
NEW YORK NY 10018-4603

# *September 2015*

*Reporting Activity 09/01 - 09/30*          *Page 1 of 18*

## *Contact Us*

| | Client Services | 855-274-2800 |
| --- | --- | --- |
| | Automated Telephone Banking | 855-274-2802 |
| | Mailing Address | 400 Rella Blvd Montebello, NY 10901 |
| | Online Access | https://www.snb.com |

## SUMMARY OF ACCOUNTS

| ACCOUNT TYPE | ACCOUNT NUMBER | ENDING BALANCE |
| --- | --- | --- |
| ANALYZED BUSINESS CHECKING | XXXXXX4801 | $137,767.90 |

## ANALYZED BUSINESS CHECKING - XXXXXX4801

### Account Summary

| Date | Description | | | |
| --- | --- | --- | --- | --- |
| 09/01/2015 | Beginning Balance | $90,561.34 | Average Ledger Balance | $110,574.99 |
| | 119 Debit(s) this period | $407,728.71 | Average Available Balance | $110,261.60 |
| | 3 Credit(s) this period | $454,900.82 | | |
| 09/30/2015 | Ending Balance | $137,767.90 | | |
| | Service Charges | $0.00 | | |

### Transaction Activity

| Transaction Date | Description | | Debits | Credits | Balance |
| --- | --- | --- | --- | --- | --- |
| 09/01/2015 | Beginning Balance | | | | $90,561.34 |
| 09/01/2015 | MBFS.COM | AUTO PAY | -$1,487.60 | | $89,073.74 |
| 09/01/2015 | CHECK #16321 | | -$525.00 | | $88,548.74 |
| 09/01/2015 | CHECK #16322 | | -$397.14 | | $88,151.60 |
| 09/01/2015 | CHECK #16275 | | -$1,550.00 | | $86,601.60 |
| 09/01/2015 | CHECK #16308 | | -$1,209.80 | | $85,391.80 |
| 09/01/2015 | CHECK #16267 | | -$1,000.00 | | $84,391.80 |
| 09/01/2015 | CHECK #16299 | | -$360.00 | | $84,031.80 |
| 09/01/2015 | CHECK #16310 | | -$196.50 | | $83,835.30 |
| 09/01/2015 | CHECK #16313 | | -$180.00 | | $83,655.30 |



# STERLING
## NATIONAL BANK

### *September 2015*

Reporting Activity 09/01 - 09/30          Page 2 of 18

---

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Transaction Activity (continued)

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 09/02/2015 | CHECK #41812 | -$2,536.37 | | $81,118.93 |
| 09/02/2015 | CHECK #16291 | -$109.00 | | $81,009.93 |
| 09/03/2015 | Chetrit Gr0046MR TAXIMPOUN | -$13,024.35 | | $67,985.58 |
| 09/03/2015 | CHECK #41828 | -$1,357.91 | | $66,627.67 |
| 09/03/2015 | CHECK #41827 | -$1,098.75 | | $65,528.92 |
| 09/03/2015 | CHECK #16306 | -$5,000.00 | | $60,528.92 |
| 09/03/2015 | CHECK #41841 | -$1,125.83 | | $59,403.09 |
| 09/03/2015 | CHECK #41842 | -$361.03 | | $59,042.06 |
| 09/03/2015 | CHECK #16271 | -$250.00 | | $58,792.06 |
| 09/04/2015 | Chetrit Group L BILLING | -$56.25 | | $58,735.81 |
| 09/04/2015 | CHECK #16333 | -$394.58 | | $58,341.23 |
| 09/04/2015 | CHECK #41838 | -$1,529.84 | | $56,811.39 |
| 09/04/2015 | CHECK | -$817.88 | | $55,993.51 |
| 09/04/2015 | CHECK #16332 | -$360.00 | | $55,633.51 |
| 09/04/2015 | CHECK | -$353.62 | | $55,279.89 |
| 09/04/2015 | CHECK #16330 | -$150.00 | | $55,129.89 |
| 09/08/2015 | DEPOSIT | | $4,900.82 | $60,030.71 |
| 09/08/2015 | AMEX EPayment   ACH PMT | -$2,632.07 | | $57,398.64 |
| 09/08/2015 | CHECK #41831 | -$6,793.60 | | $50,605.04 |
| 09/08/2015 | CHECK #16327 | -$4,000.00 | | $46,605.04 |
| 09/08/2015 | CHECK #16324 | -$3,500.00 | | $43,105.04 |
| 09/08/2015 | CHECK #41826 | -$3,093.14 | | $40,011.90 |
| 09/08/2015 | CHECK #41843 | -$2,661.99 | | $37,349.91 |
| 09/08/2015 | CHECK #41836 | -$2,202.36 | | $35,147.55 |
| 09/08/2015 | CHECK #4837 | -$1,484.50 | | $33,663.05 |
| 09/08/2015 | CHECK #41835 | -$1,253.93 | | $32,409.12 |
| 09/08/2015 | CHECK #41829 | -$1,001.45 | | $31,407.67 |
| 09/08/2015 | CHECK #16323 | -$443.52 | | $30,964.15 |
| 09/08/2015 | CHECK #16320 | -$180.00 | | $30,784.15 |
| 09/09/2015 | AMEX EPayment   ACH PMT | -$13,990.39 | | $16,793.76 |
| 09/09/2015 | CHECK #16334 | -$10,000.00 | | $6,793.76 |
| 09/09/2015 | CHECK #41832 | -$1,004.71 | | $5,789.05 |
| 09/10/2015 | PER CLIENT REQUEST TRANSFER FROM ACCOUNT ENDING IN 1198 | | $150,000.00 | $155,789.05 |
| 09/11/2015 | 8.28.15 CHECK #16317 PAID AS $108.00, SHOULD BE $180.00 | -$72.00 | | $155,717.05 |
| 09/11/2015 | CHECK #41840 | -$1,894.39 | | $153,822.66 |
| 09/11/2015 | CHECK #41839 | -$150.00 | | $153,672.66 |



# STERLING
## NATIONAL BANK

### *September 2015*

*Reporting Activity 09/01 - 09/30*                    *Page 3 of 18*

---

**ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)**

## Transaction Activity (continued)

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 09/14/2015 | CHECK #41830 | -$2,536.37 | | $151,136.29 |
| 09/14/2015 | CHECK #16340 | -$1,312.50 | | $149,823.79 |
| 09/14/2015 | CHECK #16341 | -$360.00 | | $149,463.79 |
| 09/14/2015 | CHECK #16342 | -$180.00 | | $149,283.79 |
| 09/14/2015 | CHECK #16326 | -$103.62 | | $149,180.17 |
| 09/15/2015 | MBFS.COM        AUTO PAY | -$1,585.12 | | $147,595.05 |
| 09/15/2015 | CHECK #16339 | -$120,797.77 | | $26,797.28 |
| 09/17/2015 | Chetrit Gr00481U TAXIMPOUN | -$12,915.84 | | $13,881.44 |
| 09/17/2015 | CHECK #16344 | -$300.00 | | $13,581.44 |
| 09/18/2015 | Chetrit Group  L BILLING | -$56.25 | | $13,525.19 |
| 09/18/2015 | CHECK #41845 | -$1,098.76 | | $12,426.43 |
| 09/18/2015 | CHECK #41856 | -$1,529.86 | | $10,896.57 |
| 09/18/2015 | CHECK #41853 | -$1,253.94 | | $9,642.63 |
| 09/18/2015 | CHECK | -$1,182.02 | | $8,460.61 |
| 09/18/2015 | CHECK #41859 | -$1,125.81 | | $7,334.80 |
| 09/18/2015 | CHECK #41852 | -$817.87 | | $6,516.93 |
| 09/18/2015 | CHECK #41860 | -$361.03 | | $6,155.90 |
| 09/18/2015 | CHECK #41851 | -$353.62 | | $5,802.28 |
| 09/21/2015 | TRNS FROM 5220001550 PER MICHAEL WEISS | | $300,000.00 | $305,802.28 |
| 09/21/2015 | CHECK #41849 | -$6,793.60 | | $299,008.68 |
| 09/21/2015 | CHECK #16355 | -$3,750.00 | | $295,258.68 |
| 09/21/2015 | CHECK #41861 | -$2,661.99 | | $292,596.69 |
| 09/21/2015 | CHECK #41858 | -$1,894.37 | | $290,702.32 |
| 09/21/2015 | CHECK #16363 | -$1,328.44 | | $289,373.88 |
| 09/21/2015 | CHECK #7 | -$1,001.46 | | $288,372.42 |
| 09/21/2015 | CHECK #16331 | -$260.00 | | $288,112.42 |
| 09/21/2015 | CHECK #16337 | -$180.00 | | $287,932.42 |
| 09/22/2015 | CHECK #16376 | -$1,312.50 | | $286,619.92 |
| 09/22/2015 | CHECK #16379 | -$1,000.00 | | $285,619.92 |
| 09/22/2015 | CHECK #16351 | -$15,000.00 | | $270,619.92 |
| 09/22/2015 | CHECK #41844 | -$3,093.13 | | $267,526.79 |
| 09/22/2015 | CHECK #15679 | -$2,500.00 | | $265,026.79 |
| 09/22/2015 | CHECK #16362 | -$2,158.82 | | $262,867.97 |
| 09/22/2015 | CHECK #16356 | -$1,862.44 | | $261,005.53 |
| 09/22/2015 | CHECK #350269 | -$1,484.50 | | $259,521.03 |
| 09/22/2015 | CHECK #41850 | -$1,004.71 | | $258,516.32 |
| 09/22/2015 | CHECK #16347 | -$584.57 | | $257,931.75 |



## STERLING NATIONAL BANK

### *September 2015*

*Reporting Activity 09/01 - 09/30*          *Page 4 of 18*

---

**ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)**

**Transaction Activity (continued)**

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 09/22/2015 | CHECK #16372 | -$487.00 | | $257,444.75 |
| 09/22/2015 | CHECK #16304 | -$260.00 | | $257,184.75 |
| 09/22/2015 | CHECK #41857 | -$150.00 | | $257,034.75 |
| 09/22/2015 | CHECK #16349 | -$150.00 | | $256,884.75 |
| 09/22/2015 | CHECK #16361 | -$148.82 | | $256,735.93 |
| 09/23/2015 | CHECK #16359 | -$23,018.79 | | $233,717.14 |
| 09/23/2015 | CHECK #16387 | -$2,500.00 | | $231,217.14 |
| 09/23/2015 | CHECK #16381 | -$2,500.00 | | $228,717.14 |
| 09/23/2015 | CHECK #16386 | -$2,500.00 | | $226,217.14 |
| 09/23/2015 | CHECK #41854 | -$2,202.35 | | $224,014.79 |
| 09/23/2015 | CHECK #16385 | -$1,500.00 | | $222,514.79 |
| 09/23/2015 | CHECK #16365 | -$1,016.46 | | $221,498.33 |
| 09/23/2015 | CHECK #16377 | -$1,000.00 | | $220,498.33 |
| 09/23/2015 | CHECK #16346 | -$848.50 | | $219,649.83 |
| 09/23/2015 | CHECK #16352 | -$745.01 | | $218,904.82 |
| 09/23/2015 | CHECK #16357 | -$736.87 | | $218,167.95 |
| 09/23/2015 | CHECK #16350 | -$626.70 | | $217,541.25 |
| 09/23/2015 | CHECK #16371 | -$360.00 | | $217,181.25 |
| 09/23/2015 | CHECK #16353 | -$326.89 | | $216,854.36 |
| 09/23/2015 | CHECK #16364 | -$167.97 | | $216,686.39 |
| 09/23/2015 | CHECK #16360 | -$85.25 | | $216,601.14 |
| 09/24/2015 | CHECK #16384 | -$2,500.00 | | $214,101.14 |
| 09/24/2015 | CHECK #16366 | -$136.61 | | $213,964.53 |
| 09/25/2015 | CHECK #16369 | -$5,833.33 | | $208,131.20 |
| 09/25/2015 | CHECK #16389 | -$1,500.00 | | $206,631.20 |
| 09/25/2015 | CHECK #41848 | -$2,536.38 | | $204,094.82 |
| 09/25/2015 | CHECK #16382 | -$2,500.00 | | $201,594.82 |
| 09/25/2015 | CHECK #16380 | -$1,000.00 | | $200,594.82 |
| 09/25/2015 | CHECK #16374 | -$1,000.00 | | $199,594.82 |
| 09/25/2015 | CHECK #16354 | -$551.74 | | $199,043.08 |
| 09/25/2015 | CHECK #16358 | -$464.63 | | $198,578.45 |
| 09/25/2015 | CHECK #16338 | -$180.00 | | $198,398.45 |
| 09/28/2015 | CHECK #16388 | -$50,000.00 | | $148,398.45 |
| 09/28/2015 | CHECK #16348 | -$2,875.00 | | $145,523.45 |
| 09/28/2015 | CHECK #16383 | -$2,500.00 | | $143,023.45 |
| 09/28/2015 | CHECK #16367 | -$1,200.00 | | $141,823.45 |
| 09/28/2015 | CHECK #16368 | -$1,050.00 | | $140,773.45 |



**STERLING**
NATIONAL BANK

*September 2015*
*Reporting Activity 09/01 - 09/30*        Page 5 of 18

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Transaction Activity (continued)

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 09/28/2015 | CHECK #16258 | -$360.00 | | $140,413.45 |
| 09/28/2015 | CHECK #16343 | -$180.00 | | $140,233.45 |
| 09/29/2015 | CHECK #16378 | -$2,500.00 | | $137,733.45 |
| 09/30/2015 | ATM SURCHARGE REBATE | | $34.45 | $137,767.90 |
| 09/30/2015 | Ending Balance | | | $137,767.90 |

### Debits

| Date | Description | Amount |
|---|---|---|
| 09/01/2015 | MBFS.COM     AUTO PAY | -$1,487.60 |
| 09/03/2015 | Chetrit Gr0046MR TAXIMPOUN | -$13,024.35 |
| 09/04/2015 | Chetrit Group L BILLING | -$56.25 |
| 09/08/2015 | AMEX EPayment   ACH PMT | -$2,632.07 |
| 09/09/2015 | AMEX EPayment   ACH PMT | -$13,990.39 |
| 09/11/2015 | 8.28.15 CHECK #16317 PAID AS $108.00, SHOULD BE $180.00 | -$72.00 |
| 09/15/2015 | MBFS.COM     AUTO PAY | -$1,585.12 |
| 09/17/2015 | Chetrit Gr00481U TAXIMPOUN | -$12,915.84 |
| 09/18/2015 | Chetrit Group L BILLING | -$56.25 |

### Credits

| Date | Description | Amount |
|---|---|---|
| 09/08/2015 | DEPOSIT | $4,900.82 |
| 09/10/2015 | PER CLIENT REQUEST TRANSFER FROM ACCOUNT ENDING IN 1198 | $150,000.00 |
| 09/21/2015 | TRNS FROM 5220001550 PER MICHAEL WEISS | $300,000.00 |
| 09/30/2015 | ATM SURCHARGE REBATE | $34.45 |

### Checks Cleared

| Check Number | Check Date | Check Amount | Check Number | Check Date | Check Amount |
|---|---|---|---|---|---|
| 0 | 09/04/2015 | $817.88 | 16275* | 09/01/2015 | $1,550.00 |
| 0* | 09/04/2015 | $353.62 | 16291* | 09/02/2015 | $109.00 |
| 0* | 09/18/2015 | $1,182.02 | 16299* | 09/01/2015 | $360.00 |
| 7* | 09/21/2015 | $1,001.46 | 16304* | 09/22/2015 | $260.00 |
| 4837* | 09/08/2015 | $1,484.50 | 16306* | 09/03/2015 | $5,000.00 |
| 15679* | 09/22/2015 | $2,500.00 | 16308* | 09/01/2015 | $1,209.80 |
| 16258* | 09/28/2015 | $360.00 | 16310* | 09/01/2015 | $196.50 |
| 16267* | 09/01/2015 | $1,000.00 | 16313* | 09/01/2015 | $180.00 |
| 16271* | 09/03/2015 | $250.00 | 16320* | 09/08/2015 | $180.00 |



**September 2015**

Reporting Activity 09/01 - 09/30                    Page 6 of 18

---

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Checks Cleared (continued)

| Check Number | Check Date | Check Amount | Check Number | Check Date | Check Amount |
|---|---|---|---|---|---|
| 16321 | 09/01/2015 | $525.00 | 16359 | 09/23/2015 | $23,018.79 |
| 16322 | 09/01/2015 | $397.14 | 16360 | 09/23/2015 | $85.25 |
| 16323 | 09/08/2015 | $443.52 | 16361 | 09/22/2015 | $148.82 |
| 16324 | 09/08/2015 | $3,500.00 | 16362 | 09/22/2015 | $2,158.82 |
| 18326* | 09/14/2015 | $103.62 | 16363 | 09/21/2015 | $1,328.44 |
| 16327 | 09/08/2015 | $4,000.00 | 16364 | 09/23/2015 | $167.97 |
| 16330* | 09/04/2015 | $150.00 | 16365 | 09/23/2015 | $1,016.46 |
| 16331 | 09/21/2015 | $260.00 | 16366 | 09/24/2015 | $136.61 |
| 16332 | 09/04/2015 | $360.00 | 16367 | 09/28/2015 | $1,200.00 |
| 16333 | 09/04/2015 | $394.58 | 16368 | 09/28/2015 | $1,050.00 |
| 16334 | 09/09/2015 | $10,000.00 | 16369 | 09/25/2015 | $5,833.33 |
| 16337* | 09/21/2015 | $180.00 | 16371* | 09/23/2015 | $360.00 |
| 16338 | 09/25/2015 | $180.00 | 16372 | 09/22/2015 | $487.00 |
| 16339 | 09/15/2015 | $120,797.77 | 16374* | 09/25/2015 | $1,000.00 |
| 16340 | 09/14/2015 | $1,312.50 | 16376* | 09/22/2015 | $1,312.50 |
| 16341 | 09/14/2015 | $360.00 | 16377 | 09/23/2015 | $1,000.00 |
| 16342 | 09/14/2015 | $180.00 | 16378 | 09/29/2015 | $2,500.00 |
| 16343 | 09/28/2015 | $180.00 | 16379 | 09/22/2015 | $1,000.00 |
| 16344 | 09/17/2015 | $300.00 | 16380 | 09/25/2015 | $1,000.00 |
| 16346* | 09/23/2015 | $848.50 | 16381 | 09/23/2015 | $2,500.00 |
| 16347 | 09/22/2015 | $584.57 | 16382 | 09/25/2015 | $2,500.00 |
| 16348 | 09/28/2015 | $2,875.00 | 16383 | 09/28/2015 | $2,500.00 |
| 16349 | 09/22/2015 | $150.00 | 16384 | 09/24/2015 | $2,500.00 |
| 16350 | 09/23/2015 | $626.70 | 16385 | 09/23/2015 | $1,500.00 |
| 16351 | 09/22/2015 | $15,000.00 | 16386 | 09/23/2015 | $2,500.00 |
| 16352 | 09/23/2015 | $745.01 | 16387 | 09/23/2015 | $2,500.00 |
| 16353 | 09/23/2015 | $326.89 | 16388 | 09/28/2015 | $50,000.00 |
| 16354 | 09/25/2015 | $551.74 | 16389 | 09/25/2015 | $1,500.00 |
| 16355 | 09/21/2015 | $3,750.00 | 41812* | 09/02/2015 | $2,536.37 |
| 16356 | 09/22/2015 | $1,862.44 | 41826* | 09/08/2015 | $3,093.14 |
| 16357 | 09/23/2015 | $736.87 | 41827 | 09/03/2015 | $1,098.75 |
| 16358 | 09/25/2015 | $464.63 | 41828 | 09/03/2015 | $1,357.91 |



## STERLING
### NATIONAL BANK

**September 2015**

Reporting Activity 09/01 - 09/30          Page 7 of 18

---

**ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)**

### Checks Cleared (continued)

| Check Number | Check Date | Check Amount | Check Number | Check Date | Check Amount |
|---|---|---|---|---|---|
| 41829 | 09/08/2015 | $1,001.45 | 41848* | 09/25/2015 | $2,536.38 |
| 41830 | 09/14/2015 | $2,536.37 | 41849 | 09/21/2015 | $6,793.60 |
| 41831 | 09/08/2015 | $6,793.60 | 41850 | 09/22/2015 | $1,004.71 |
| 41832 | 09/09/2015 | $1,004.71 | 41851 | 09/18/2015 | $353.62 |
| 41835* | 09/08/2015 | $1,253.93 | 41852 | 09/18/2015 | $817.87 |
| 41836 | 09/08/2015 | $2,202.36 | 41853 | 09/18/2015 | $1,253.94 |
| 41838* | 09/04/2015 | $1,529.84 | 41854 | 09/23/2015 | $2,202.35 |
| 41839 | 09/11/2015 | $150.00 | 41856* | 09/18/2015 | $1,529.86 |
| 41840 | 09/11/2015 | $1,894.39 | 41857 | 09/22/2015 | $150.00 |
| 41841 | 09/03/2015 | $1,125.83 | 41858 | 09/21/2015 | $1,894.37 |
| 41842 | 09/03/2015 | $361.03 | 41859 | 09/18/2015 | $1,125.81 |
| 41843 | 09/08/2015 | $2,661.99 | 41860 | 09/18/2015 | $361.03 |
| 41844 | 09/22/2015 | $3,093.13 | 41861 | 09/21/2015 | $2,661.99 |
| 41845 | 09/18/2015 | $1,098.76 | 350269* | 09/22/2015 | $1,484.50 |

* Indicates skipped check number

### Daily Balances

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 08/31/2015 | $90,561.34 | 09/10/2015 | $155,789.05 | 09/22/2015 | $256,735.93 |
| 09/01/2015 | $83,655.30 | 09/11/2015 | $153,672.66 | 09/23/2015 | $216,601.14 |
| 09/02/2015 | $81,009.93 | 09/14/2015 | $149,180.17 | 09/24/2015 | $213,964.53 |
| 09/03/2015 | $58,792.06 | 09/15/2015 | $26,797.28 | 09/25/2015 | $198,398.45 |
| 09/04/2015 | $55,129.89 | 09/17/2015 | $13,581.44 | 09/28/2015 | $140,233.45 |
| 09/08/2015 | $30,784.15 | 09/18/2015 | $5,802.28 | 09/29/2015 | $137,733.45 |
| 09/09/2015 | $5,789.05 | 09/21/2015 | $287,932.42 | 09/30/2015 | $137,767.90 |

### Service Charge Summary

| Description | Amount |
|---|---|
|  | $0.00 |
|  | $0.00 |
|  | $0.00 |
|  | $0.00 |
|  | $0.00 |
|  | $0.00 |



# STERLING
## NATIONAL BANK

**400 Rella Blvd**
**Montebello, NY 10901**

**RETURN SERVICE REQUESTED**

CHETRIT GROUP LLC
C/O CHETRIT GROUP LLC
512 FASHION AVE FL 15
NEW YORK NY 10018-4603

## *August 2015*

*Reporting Activity 08/01 - 08/31*          *Page 1 of 18*

### *Contact Us*

| | | |
|---|---|---|
| | Client Services | 855-274-2800 |
| | Automated Telephone Banking | 855-274-2802 |
| | Mailing Address | 400 Rella Blvd Montebello, NY 10901 |
| | Online Access | https://www.snb.com |

---

## SUMMARY OF ACCOUNTS

| ACCOUNT TYPE | ACCOUNT NUMBER | ENDING BALANCE |
|---|---|---|
| ANALYZED BUSINESS CHECKING | XXXXXX4801 | $90,561.34 |

---

## ANALYZED BUSINESS CHECKING - XXXXXX4801

### Account Summary

| Date | Description | | | |
|---|---|---|---|---|
| 08/01/2015 | Beginning Balance | $85,437.99 | Average Ledger Balance | $46,372.02 |
| | 124 Debit(s) this period | $244,842.06 | Average Available Balance | $46,372.02 |
| | 3 Credit(s) this period | $250,000.41 | | |
| 08/31/2015 | Ending Balance | $90,561.34 | | |
| | Service Charges | $35.00 | | |

### Transaction Activity

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| | Beginning Balance | | | $85,437.99 |
| 08/01/2015 | Beginning Balance | | | $85,437.99 |
| 08/03/2015 | CORPORATION SERV LEGAL SVCS | -$2,500.00 | | $82,937.99 |
| 08/03/2015 | CORPORATION SERV LEGAL SVCS | -$1,611.26 | | $81,326.73 |
| 08/03/2015 | MBFS.COM      AUTO PAY | -$1,487.60 | | $79,839.13 |
| 08/03/2015 | CHECK #16251 | -$1,653.75 | | $78,185.38 |
| 08/03/2015 | CHECK #16252 | -$558.00 | | $77,627.38 |
| 08/03/2015 | CHECK #16248 | -$3,500.00 | | $74,127.38 |
| 08/03/2015 | CHECK #16106 | -$360.00 | | $73,767.38 |
| 08/03/2015 | CHECK #16227 | -$287.76 | | $73,479.62 |
| 08/03/2015 | CHECK #16147 | -$126.00 | | $73,353.62 |


# STERLING
## NATIONAL BANK

## *August 2015*

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Transaction Activity (continued)

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 08/04/2015 | CHECK #16263 | -$3,000.00 | | $70,353.62 |
| 08/04/2015 | CHECK #16237 | -$8,106.00 | | $62,247.62 |
| 08/04/2015 | CHECK #16239 | -$6,725.27 | | $55,522.35 |
| 08/04/2015 | CHECK #16243 | -$3,066.80 | | $52,455.55 |
| 08/04/2015 | CHECK #16214 | -$2,600.00 | | $49,855.55 |
| 08/04/2015 | CHECK #16236 | -$1,312.68 | | $48,542.87 |
| 08/04/2015 | CHECK #16234 | -$630.08 | | $47,912.79 |
| 08/04/2015 | CHECK #16240 | -$388.30 | | $47,524.49 |
| 08/04/2015 | CHECK #16233 | -$186.01 | | $47,338.48 |
| 08/04/2015 | CHECK #16225 | -$102.00 | | $47,236.48 |
| 08/05/2015 | AMEX EPayment   ACH PMT | -$5,690.63 | | $41,545.85 |
| 08/05/2015 | AMEX EPayment   ACH PMT | -$4,178.25 | | $37,367.60 |
| 08/05/2015 | CHECK #16260 | -$1,000.00 | | $36,367.60 |
| 08/05/2015 | CHECK #16249 | -$10,000.00 | | $26,367.60 |
| 08/05/2015 | CHECK #16231 | -$6,000.00 | | $20,367.60 |
| 08/05/2015 | CHECK #16219 | -$2,500.00 | | $17,867.60 |
| 08/05/2015 | CHECK #16259 | -$360.00 | | $17,507.60 |
| 08/05/2015 | CHECK #16232 | -$64.00 | | $17,443.60 |
| 08/06/2015 | Chetrit Gr0043Fo TAXIMPOUN | -$12,832.27 | | $4,611.33 |
| 08/06/2015 | CHECK #41792 | -$1,041.33 | | $3,570.00 |
| 08/06/2015 | CHECK | -$1,098.76 | | $2,471.24 |
| 08/06/2015 | CHECK #16255 | -$702.71 | | $1,768.53 |
| 08/06/2015 | CHECK #16230 | -$370.99 | | $1,397.54 |
| 08/06/2015 | CHECK #16250 | -$190.00 | | $1,207.54 |
| 08/06/2015 | CHECK #16264 | -$180.00 | | $1,027.54 |
| 08/06/2015 | CHECK #16228 | -$5,000.00 | | -$3,972.46 |
| 08/06/2015 | CHECK #16256 | -$4,498.77 | | -$8,471.23 |
| 08/07/2015 | Chetrit Group  L BILLING | -$56.25 | | -$8,527.48 |
| 08/07/2015 | CHECK #41799 | -$1,253.93 | | -$9,781.41 |
| 08/07/2015 | CHECK #16018 | -$1,200.00 | | -$10,981.41 |
| 08/07/2015 | CHECK #41805 | -$1,125.82 | | -$12,107.23 |
| 08/07/2015 | CHECK #41798 | -$817.88 | | -$12,925.11 |
| 08/07/2015 | CHECK #41806 | -$361.03 | | -$13,286.14 |
| 08/07/2015 | CHECK #16224 | -$300.00 | | -$13,586.14 |
| 08/07/2015 | CHECK #16261 | -$180.00 | | -$13,766.14 |
| 08/10/2015 | CHECK #41795 | -$6,793.60 | | -$20,559.74 |
| 08/10/2015 | CHECK #16253 | -$3,500.00 | | -$24,059.74 |



**STERLING**
NATIONAL BANK

## *August 2015*

Reporting Activity 08/01 - 08/31          *Page 3 of 18*

---

### ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

#### Transaction Activity (continued)

| Transaction Date | Description | | Debits | Credits | Balance |
|---|---|---|---|---|---|
| 08/10/2015 | CHECK #41807 | | -$2,661.99 | | -$26,721.73 |
| 08/10/2015 | CHECK #41804 | | -$1,894.38 | | -$28,616.11 |
| 08/10/2015 | CHECK #41801 | | -$1,484.50 | | -$30,100.61 |
| 08/10/2015 | CHECK #16254 | | -$1,209.80 | | -$31,310.41 |
| 08/10/2015 | CHECK #16265 | | -$1,178.43 | | -$32,488.84 |
| 08/10/2015 | CHECK #41796 | | -$1,004.71 | | -$33,493.55 |
| 08/10/2015 | CHECK #41793 | | -$1,001.45 | | -$34,495.00 |
| 08/10/2015 | CHECK #4797 | | -$353.63 | | -$34,848.63 |
| 08/11/2015 | CITIBANK XFER | IIT_CREDIT | | $0.30 | -$34,848.33 |
| 08/11/2015 | CITIBANK XFER | IIT_CREDIT | | $0.11 | -$34,848.22 |
| 08/11/2015 | CITIBANK XFER | IIT_DEBIT | -$0.41 | | -$34,848.63 |
| 08/11/2015 | CHECK #16223 | | -$833.33 | | -$35,681.96 |
| 08/11/2015 | CHECK #41794 | | -$2,536.37 | | -$38,218.33 |
| 08/11/2015 | CHECK #41800 | | -$2,202.36 | | -$40,420.69 |
| 08/11/2015 | CHECK | | -$1,529.85 | | -$41,950.54 |
| 08/11/2015 | CHECK #16257 | | -$1,000.00 | | -$42,950.54 |
| 08/12/2015 | CHECK #4790 | | -$3,093.14 | | -$46,043.68 |
| 08/12/2015 | CHECK #16268 | | -$260.00 | | -$46,303.68 |
| 08/12/2015 | CHECK #41803 | | -$150.00 | | -$46,453.68 |
| 08/13/2015 | CHECK #16266 | | -$1,500.00 | | -$47,953.68 |
| 08/13/2015 | CHECK #16269 | | -$375.55 | | -$48,329.23 |
| 08/13/2015 | Daily OD Fee Charge | | -$7.00 | | -$48,336.23 |
| 08/14/2015 | CHECK #16270 | | -$2,600.00 | | -$50,936.23 |
| 08/14/2015 | Daily OD Fee Charge | | -$7.00 | | -$50,943.23 |
| 08/17/2015 | MBFS.COM     AUTO PAY | | -$1,585.12 | | -$52,528.35 |
| 08/17/2015 | CHECK #16229 | | -$2,137.25 | | -$54,665.60 |
| 08/17/2015 | Daily OD Fee Charge | | -$7.00 | | -$54,672.60 |
| 08/18/2015 | Daily OD Fee Charge | | -$7.00 | | -$54,679.60 |
| 08/19/2015 | CHECK #16217 | | -$1,000.00 | | -$55,679.60 |
| 08/19/2015 | Daily OD Fee Charge | | -$7.00 | | -$55,686.60 |
| 08/20/2015 | PER CLIENT REQUEST TRANSFER FROM ACCOUNT ENDING IN 1550 | | | $250,000.00 | $194,313.40 |
| 08/20/2015 | Chetrit Gr0043Fr TAXIMPOUN | | -$12,832.21 | | $181,481.19 |
| 08/20/2015 | CHECK #16288 | | -$1,509.38 | | $179,971.81 |
| 08/20/2015 | CHECK #41817 | | -$1,253.95 | | $178,717.86 |
| 08/20/2015 | CHECK #41823 | | -$1,125.82 | | $177,592.04 |
| 08/20/2015 | CHECK #41809 | | -$1,098.77 | | $176,493.27 |



**STERLING**
NATIONAL BANK

**August 2015**

Reporting Activity 08/01 - 08/31                    *Page 4 of 18*

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

**Transaction Activity (continued)**

| Transaction Date | Description | Debits | Credits | Balance |
|---|---|---|---|---|
| 08/20/2015 | CHECK #41810 | -$1,041.33 | | $175,451.94 |
| 08/21/2015 | Chetrit Group  L BILLING | -$56.25 | | $175,395.69 |
| 08/21/2015 | CHECK #16282 | -$5,833.33 | | $169,562.36 |
| 08/21/2015 | CHECK #41816 | -$817.88 | | $168,744.48 |
| 08/21/2015 | CHECK #41815 | -$353.63 | | $168,390.85 |
| 08/21/2015 | CHECK #16241 | -$53.60 | | $168,337.25 |
| 08/21/2015 | CHECK #16242 | -$51.65 | | $168,285.60 |
| 08/24/2015 | CHECK #41825 | -$2,661.99 | | $165,623.61 |
| 08/24/2015 | CHECK #41822 | -$1,894.38 | | $163,729.23 |
| 08/24/2015 | CHECK #41820 | -$1,529.85 | | $162,199.38 |
| 08/24/2015 | CHECK #41819 | -$1,484.50 | | $160,714.88 |
| 08/24/2015 | CHECK #16295 | -$1,050.00 | | $159,664.88 |
| 08/24/2015 | CHECK #41811 | -$1,001.47 | | $158,663.41 |
| 08/24/2015 | CHECK #41824 | -$361.03 | | $158,302.38 |
| 08/25/2015 | AMEX EPayment    ACH PMT | -$5,531.20 | | $152,771.18 |
| 08/25/2015 | CHECK #41813 | -$6,793.60 | | $145,977.58 |
| 08/25/2015 | CHECK #41808 | -$3,093.14 | | $142,884.44 |
| 08/25/2015 | CHECK #16294 | -$274.90 | | $142,609.54 |
| 08/25/2015 | CHECK #41821 | -$150.00 | | $142,459.54 |
| 08/26/2015 | CHECK #16285 | -$1,200.00 | | $141,259.54 |
| 08/27/2015 | CHECK #16272 | -$770.99 | | $140,488.55 |
| 08/27/2015 | CHECK #16274 | -$290.61 | | $140,197.94 |
| 08/27/2015 | CHECK #16300 | -$180.00 | | $140,017.94 |
| 08/27/2015 | CHECK #16297 | -$79.97 | | $139,937.97 |
| 08/28/2015 | CHECK #16289 | -$23,018.79 | | $116,919.18 |
| 08/28/2015 | CHECK #16311 | -$3,698.32 | | $113,220.86 |
| 08/28/2015 | CHECK #16284 | -$1,862.44 | | $111,358.42 |
| 08/28/2015 | CHECK #16280 | -$1,523.65 | | $109,834.77 |
| 08/28/2015 | CHECK #16301 | -$1,200.00 | | $108,634.77 |
| 08/28/2015 | CHECK #16197 | -$852.90 | | $107,781.87 |
| 08/28/2015 | CHECK #16278 | -$707.79 | | $107,074.08 |
| 08/28/2015 | CHECK #16276 | -$626.70 | | $106,447.38 |
| 08/28/2015 | CHECK #16286 | -$437.87 | | $106,009.51 |
| 08/28/2015 | CHECK #16287 | -$305.96 | | $105,703.55 |
| 08/28/2015 | CHECK #16292 | -$238.13 | | $105,465.42 |
| 08/28/2015 | CHECK #16317 | -$108.00 | | $105,357.42 |
| 08/28/2015 | CHECK #16296 | -$33.44 | | $105,323.98 |



## August 2015

**Reporting Activity 08/01 - 08/31**        **Page 6 of 18**

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Credits (continued)

| Date | Description | Amount |
|---|---|---|
| 08/11/2015 | CITIBANK XFER   IIT_CREDIT | $0.11 |
| 08/20/2015 | PER CLIENT REQUEST TRANSFER FROM ACCOUNT ENDING IN 1550 | $250,000.00 |

### Checks Cleared

| Check Number | Check Date | Check Amount | Check Number | Check Date | Check Amount |
|---|---|---|---|---|---|
| 0 | 08/06/2015 | $1,098.76 | 16243 | 08/04/2015 | $3,066.80 |
| 0* | 08/11/2015 | $1,529.85 | 16248* | 08/03/2015 | $3,500.00 |
| 4790* | 08/12/2015 | $3,093.14 | 16249 | 08/05/2015 | $10,000.00 |
| 4797* | 08/10/2015 | $353.63 | 16250 | 08/06/2015 | $190.00 |
| 16018* | 08/07/2015 | $1,200.00 | 16251 | 08/03/2015 | $1,653.75 |
| 16106* | 08/03/2015 | $360.00 | 16252 | 08/03/2015 | $558.00 |
| 16147* | 08/03/2015 | $126.00 | 16253 | 08/10/2015 | $3,500.00 |
| 16197^ | 08/28/2015 | $852.90 | 16254 | 08/10/2015 | $1,208.80 |
| 16214* | 08/04/2015 | $2,600.00 | 16255 | 08/06/2015 | $702.71 |
| 16217* | 08/19/2015 | $1,000.00 | 16256 | 08/06/2015 | $4,498.77 |
| 16219* | 08/05/2015 | $2,500.00 | 16257 | 08/11/2015 | $1,000.00 |
| 16223* | 08/11/2015 | $833.33 | 16259* | 08/05/2015 | $360.00 |
| 16224 | 08/07/2015 | $300.00 | 16260 | 08/05/2015 | $1,000.00 |
| 16225 | 08/04/2015 | $102.00 | 16261 | 08/07/2015 | $180.00 |
| 16227* | 08/03/2015 | $287.76 | 16263* | 08/04/2015 | $3,000.00 |
| 16228 | 08/06/2015 | $5,000.00 | 16264 | 08/06/2015 | $180.00 |
| 16229 | 08/17/2015 | $2,137.25 | 16265 | 08/10/2015 | $1,178.43 |
| 16230 | 08/06/2015 | $370.99 | 16266 | 08/13/2015 | $1,500.00 |
| 16231 | 08/05/2015 | $6,000.00 | 16268* | 08/12/2015 | $260.00 |
| 16232 | 08/05/2015 | $64.00 | 16269 | 08/13/2015 | $375.55 |
| 16233 | 08/04/2015 | $186.01 | 16270 | 08/14/2015 | $2,600.00 |
| 16234 | 08/04/2015 | $630.08 | 16272* | 08/27/2015 | $770.99 |
| 16236* | 08/04/2015 | $1,312.68 | 16273 | 08/31/2015 | $789.42 |
| 16237 | 08/04/2015 | $8,106.00 | 16274 | 08/27/2015 | $290.61 |
| 16239* | 08/04/2015 | $6,725.27 | 16276* | 08/28/2015 | $626.70 |
| 16240 | 08/04/2015 | $388.30 | 16277 | 08/31/2015 | $133.50 |
| 16241 | 08/21/2015 | $53.60 | 16278 | 08/28/2015 | $707.79 |
| 16242 | 08/21/2015 | $51.65 | 16280* | 08/28/2015 | $1,523.65 |



## STERLING NATIONAL BANK

### *August 2015*

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Checks Cleared (continued)

| Check Number | Check Date | Check Amount | Check Number | Check Date | Check Amount |
|---|---|---|---|---|---|
| 16282* | 08/21/2015 | $5,833.33 | 41795 | 08/10/2015 | $6,793.60 |
| 16284* | 08/28/2015 | $1,862.44 | 41796 | 08/10/2015 | $1,004.71 |
| 16285 | 08/26/2015 | $1,200.00 | 41798* | 08/07/2015 | $817.88 |
| 16286 | 08/28/2015 | $437.87 | 41799 | 08/07/2015 | $1,253.93 |
| 16287 | 08/28/2015 | $305.96 | 41800 | 08/11/2015 | $2,202.36 |
| 16288 | 08/20/2015 | $1,509.38 | 41801 | 08/10/2015 | $1,484.50 |
| 16289 | 08/28/2015 | $23,018.79 | 41803* | 08/12/2015 | $150.00 |
| 16290 | 08/31/2015 | $44.33 | 41804 | 08/10/2015 | $1,894.38 |
| 16292* | 08/28/2015 | $238.13 | 41805 | 08/07/2015 | $1,125.82 |
| 16293 | 08/31/2015 | $256.50 | 41806 | 08/07/2015 | $361.03 |
| 16294 | 08/25/2015 | $274.90 | 41807 | 08/10/2015 | $2,661.99 |
| 16295 | 08/24/2015 | $1,050.00 | 41808 | 08/25/2015 | $3,093.14 |
| 16296 | 08/28/2015 | $33.44 | 41809 | 08/20/2015 | $1,098.77 |
| 16297 | 08/27/2015 | $79.97 | 41810 | 08/20/2015 | $1,041.33 |
| 16298 | 08/31/2015 | $2,500.00 | 41811 | 08/24/2015 | $1,001.47 |
| 16300* | 08/27/2015 | $180.00 | 41813* | 08/25/2015 | $6,793.60 |
| 16301 | 08/28/2015 | $1,200.00 | 41814 | 08/31/2015 | $1,004.71 |
| 16307* | 08/31/2015 | $75.00 | 41815 | 08/21/2015 | $353.63 |
| 16309* | 08/31/2015 | $3,066.80 | 41816 | 08/21/2015 | $817.88 |
| 16311* | 08/28/2015 | $3,698.32 | 41817 | 08/20/2015 | $1,253.95 |
| 16312 | 08/31/2015 | $3,150.04 | 41818 | 08/31/2015 | $2,202.34 |
| 16316* | 08/31/2015 | $160.00 | 41819 | 08/24/2015 | $1,484.50 |
| 16317 | 08/28/2015 | $108.00 | 41820 | 08/24/2015 | $1,529.85 |
| 16318 | 08/31/2015 | $180.00 | 41821 | 08/25/2015 | $150.00 |
| 16328* | 08/31/2015 | $1,200.00 | 41822 | 08/24/2015 | $1,894.38 |
| 41792* | 08/06/2015 | $1,041.33 | 41823 | 08/20/2015 | $1,125.82 |
| 41793 | 08/10/2015 | $1,001.45 | 41824 | 08/24/2015 | $361.03 |
| 41794 | 08/11/2015 | $2,536.37 | 41825 | 08/24/2015 | $2,661.99 |

* Indicates skipped check number

### Daily Balances

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 07/31/2015 | $85,437.99 | 08/03/2015 | $73,353.62 | 08/04/2015 | $47,236.48 |



## STERLING
### NATIONAL BANK

### *August 2015*

**Reporting Activity 08/01 - 08/31**          *Page 8 of 18*

## ANALYZED BUSINESS CHECKING - XXXXXX4801 (continued)

### Daily Balances (continued)

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|
| 08/05/2015 | $17,443.60 | 08/14/2015 | -$50,943.23 | 08/25/2015 | $142,459.54 |
| 08/06/2015 | -$8,471.23 | 08/17/2015 | -$54,672.60 | 08/26/2015 | $141,259.54 |
| 08/07/2015 | -$13,766.14 | 08/18/2015 | -$54,679.60 | 08/27/2015 | $139,937.97 |
| 08/10/2015 | -$34,848.63 | 08/19/2015 | -$55,686.60 | 08/28/2015 | $105,323.98 |
| 08/11/2015 | -$42,950.54 | 08/20/2015 | $175,451.94 | 08/31/2015 | $90,561.34 |
| 08/12/2015 | -$46,453.68 | 08/21/2015 | $168,285.60 | | |
| 08/13/2015 | -$48,336.23 | 08/24/2015 | $158,302.38 | | |

### Service Charge Summary

| Description | Amount |
|-------------|--------|
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| | $0.00 |
| Total Service Charge | $35.00 |

# EXHIBIT K

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---

CF 135 FLAT LLC, CF 135 WEST
MEMBERS LLC, and THE CHETRIT
GROUP LLC,

                Plaintiffs,

    -against-

TRIADOU SPV S.A. and CITY OF
ALMATY, a foreign city,

                Defendant.

Case No.

---

## NOTICE OF REMOVAL

Matthew L. Schwartz
Randall W. Jackson
Daniel G. Boyle

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Telephone: 212-446-2300
Facsimile: 212-446-2350

**TO THE CLERK OF THE ABOVE-ENTITLED COURT:**

**PLEASE TAKE NOTICE** that, on this date, defendant the City of Almaty,

Kazakhstan ("Almaty"), by its undersigned counsel, files this Notice of Removal

pursuant to 28 U.S.C. § 1452, removing this entire action from the Supreme Court of the

State of New York, County of New York (the "State Court Action"), to the United States

District Court for the Southern District of New York. This Court has jurisdiction over

this matter pursuant to 28 U.S.C. § 1332.

In support of this Notice of Removal, Almaty states as follows:

## THE INTERPLEADER COMPLAINT

1.      On July 7, 2015, Almaty was notified of an interpleader complaint filed

against it by CF 135 FLAT LLC, CF 135 West Member LLC, and the Chetrit Group

("Plaintiffs") in the State Court Action. A copy of that interpleader complaint in the State

Court Action is attached hereto as Exhibit A.

2.      Plaintiffs filed this interpleader complaint in the State Court Action to

resolve the proper distribution of at least $21,000,000.00 in funds resulting from the sale

of an interest in real property in the City of New York.

3.      On August 4, 2014, Plaintiffs and defendant Triadou SPV. S.A.

("Triadou") entered into an agreement whereby Triadou would assign to Plaintiffs a

37.5% interest held by Triadou in the Flatotel building, located at located at 135 W 52nd

St, New York, NY (the "Flatotel"). In consideration for this assignment, Plaintiffs agreed

to pay Triadou $21,000,000.00, in four installment payments.

4.      Almaty objects to this assignment, and contends that the assets which

Triadou used to purchase this interest in the Flatotel were the rightful property of the

people of Almaty, embezzled by a family of corrupt public servants and then laundered through foreign shell corporations before being invested in New York real estate.

5. In 2008, Almaty and other departments of the government of the Republic of Kazakhstan began a series of investigations into the family of Viktor Khrapunov, the former mayor of Almaty, based on allegations that Mr. Khrapunov had abused his position to transfer public assets to himself and his family members. Almaty and other governmental authorities subsequently discovered that Mr. Khrapunov had looted an estimated $300 million during his tenure as mayor, funneling these assets through his family members into foreign holding companies. In response to this investigation, Mr. Khrapunov fled Kazakhstan to reside in Switzerland, and has not returned to answer these charges.

6. Through law enforcement cooperation with authorities in Switzerland, Almaty and other departments of the government of the Republic of Kazakhstan traced Mr. Khrapunov's ill-gotten assets to a series of shell corporations. Almaty discovered that Triadou was one of these corporations, used to launder Mr. Khrapunov's and his associates' embezzled assets by purchasing real estate investments in the United States.

7. As a result, Almaty contends that Triadou's assets, including its interest in the Flatotel or any profits from the disposition of the same, are the rightful property of the people of Almaty, and that any transfer of that interest was a fraudulent conveyance at a below-market rate, intended to frustrate Almaty's recovery of those assets.

8. Almaty notified Plaintiffs of its objections to the assignment and its claims to Triadou's assets as the products of embezzled or converted public funds.

9. Plaintiffs have failed to make any installment payments under the

assignment agreement as these payments came due, and Triadou has filed a series of

separate actions in New York state courts, seeking summary judgment and payment of

these obligations. Those actions are *Triadou SPV S.A. v. CF 135 FLAT LLC, et al.*, No.

653462/2014 (Nov. 10, 2014); *Triadou SPV S.A. v. CF 135 FLAT LLC, et al.*, No.

650239/2015 (Jan. 26, 2015); *Triadou SPV S.A. v. CF 135 FLAT LLC, et al.*, No.

154681/2015 (May 11, 2015).

10.    Faced with competing claims as to the validity and disposition of

Triadou's assignment of its interest in the Flatotel, Plaintiffs filed the instant interpleader

complaint. *See* Ex. A, at ¶ 10-11.

## GROUNDS FOR REMOVAL

11.    This Court has jurisdiction over the State Court Action under 28 U.S.C.

§ 1332(a) because (i) there is complete diversity of citizenship between Plaintiffs and

Defendants Triadou SPV S.A. and Almaty, and (ii) more than $75,000, exclusive of

interest and costs, is at stake.

12.    Plaintiff CF 135 FLAT LLC is a Delaware limited liability company, with

a place of business at 512 Seventh Avenue, 15th Floor, New York, New York, 10018,

and is authorized to conduct business in the state of New York. *See* Ex. A, at ¶ 2.

13.    Plaintiff CF 135 West Member LLC is a Delaware limited liability

company, with a place of business at 512 Seventh Avenue, 15th Floor, New York, New

York, 10018, and is authorized to conduct business in the state of New York. *See* Ex. A,

at ¶ 3.

14.    Plaintiff the Chetrit Group is a New York limited liability company, with a

place of business at 512 Seventh Avenue, 15th Floor, New York, New York, 10018, and

is authorized to conduct business in the state of New York. *See* Ex. A, at ¶ 4.

15.    Defendant Triadou SPV S.A. is a special purpose investment vehicle

formed under the laws of the Grand Duchy of Luxembourg, with addresses at 3, Rue du

Mont-Blanc, 1201 Genève Switzerland and 40 Wall Street, New York, New York 10005.

*See* Ex. A, at ¶ 5.

16.    Defendant Almaty is a foreign city located in the Republic of Kazakhstan.

*See* Ex. A, at ¶ 6.

17.    The amount in controversy is at least $21,000,000.00, well in excess of the

statutory requirement of $75,000.00.  The State Court Action concerns the assignment of

an interest in real property for $21,000,000.00, to be paid in four installments of

$5,250,000.00.  *See* Ex. A, at ¶ 10.

18.    This Notice of Removal is being filed within 30 days of July 7, 2015, the

date that defendant Almaty received the interpleader complaint in this matter.  Removal

is therefore timely in accordance with 28 U.S.C. § 1446(b).

19.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1441(a) and

1446(a) because the United States District Court for the Southern District of New York is

the federal judicial district that embraces the County of New York, where the State Court

Action is pending.

20.    By this Notice of Removal, Defendant Almaty does not waive any

objections it may have as to service, jurisdiction, or venue, or any other defenses or

objections it may have to this action. Almaty intends no admission of fact, law or liability

by this Notice, and expressly reserves all defenses and rights, including whether the

claims are arbitrable.


Dated:          July 9, 2015

                                    Respectfully Submitted,

                                    BOIES, SCHILLER & FLEXNER LLP

                                    By: _____
                                          Matthew L. Schwartz

                                    Randall W. Jackson
                                    Daniel G. Boyle

                                    BOIES, SCHILLER & FLEXNER LLP
                                    575 Lexington Avenue
                                    New York, NY  10022
                                    Telephone: 212-446-2300
                                    Facsimile: 212-446-2350

# EXHIBIT L

UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

CF 135 FLAT LLC, CF 135 WEST MEMBER LLC,
and THE CHETRIT GROUP LLC,

                            Plaintiffs,

         -against-

TRIADOU SPV S.A. and CITY OF ALMATY,
a foreign city,

                         Defendants.

----------------------------------------------------------------X

Docket No. 1:15-cv-05345(AJN)

**AMENDED INTERPLEADER
COMPLAINT**

Plaintiffs CF 135 Flat LLC, CF 135 West Member LLC, and The Chetrit Group LLC ("Plaintiffs"), by their attorneys, Sukenik, Segal, & Graff, P.C., as and for their amended interpleader complaint in this action, allege as follows:

## NATURE OF ACTION

1.     This is an interpleader action by Plaintiffs to determine which of the defendants, Triadou SPV S.A. or the City of Almaty, Kazakhstan, should be paid the disputed sum of $21,000,000.00, and to discharge Plaintiffs from further liability to defendants upon deposit of the disputed sum with the Court.

## THE PARTIES

2.     Plaintiff CF 135 Flat LLC ("CF 135") is a Delaware limited liability company, with a place of business at 512 Seventh Avenue, 15th Floor, New York, New York, 10018, and is authorized to conduct business in the State of New York.

3.     Plaintiff CF 135 West Member LLC ("CF") is a Delaware limited liability

1

company, with a place of business at 512 Seventh Avenue, 15th Floor, New York, New York, 10018, and is authorized to conduct business in the State of New York.

    4.    Plaintiff The Chetrit Group LLC ("Chetrit") is a New York limited liability company, with a place of business at 512 Seventh Avenue, 15th Floor, New York, New York, 10018, and is authorized to conduct business in the State of New York.

    5.    Upon information and belief, defendant Triadou SPV SA ("Triadou") is a corporation formed under the laws of the Grand Duchy of Luxembourg, with an address at 40 Wall Street, New York, New York 10005.

    6.    Upon information and belief, defendant City of Almaty ("Almaty") is a foreign city located in the country of Kazakhstan.

    7.    This Court has jurisdiction over this dispute under CPLR 302, CPLR 303, and BCL 307, and venue is proper pursuant to CPLR 503.

## FACTUAL BACKROUND

    8.    On or about August 4, 2014, Triadou and CF 135 entered into a written agreement (the "Agreement"), whereby Triadou assigned its 37.5% ownership interest in CF to CF 135, and CF 135 agreed to pay Triadou a total of $21,000,000.00 in four installment payments of $5,250,000.00.

    9.    On or about August 4, 2014, CF and Chetrit executed a written guaranty (the "Guaranty") of certain of the Agreement's obligations.

    10.    Triadou has alleged, by way of four separate court actions pending in the Supreme Court of New York, New York County, that Plaintiffs have failed to make each the four installment payments due under the Agreement and the Guaranty. On such basis, Triadou alleges that Plaintiffs presently owe it $21,000,000.00 in principal.

2

11.     However, Almaty has alleged that Triadou was funded with funds stolen from Almaty and that Triadou's assignment of its interest in CF was a fraudulent conveyance designed the frustrate Almaty's recovery of the stolen funds.  On such basis, Almaty has alleged that it, not Triadou, is the party which should recover from Plaintiffs, and that it is entitled either to the assigned interest or the value of such interest.

12.     Almaty raised these specific allegations, and made clear its intent to commence suit to undo Triadou's assignment and to recover from Plaintiffs, during a June 25, 2015 meeting between Almaty's New York counsel, Boies, Schiller & Flexner LLP ("Boies, Schiller") and Plaintiffs' undersigned counsel, Sukenik, Segal & Graff, P.C. ("SSG").

13.     Because Triadou and Almaty have competing and adverse claims against Plaintiffs arising from the subject assignment, Plaintiffs commenced this offensive interpleader action, naming Almaty and Triadou as defendants, on July 7, 2015.

14.     Plaintiffs originally commenced this action in the Supreme Court of the New York, County of New York.  Following Plaintiffs' commencement of this action in state court, Alamty filed a Notice of Removal removing this action to federal court.  In paragraphs 7-8 of the Notice of Removal, Almaty alleges that Triadou's assignment was an improper fraudulent transfer and that Almaty has given Plaintiffs notice of its claims against them.

15.     At another meeting between Boies, Schiller and SSG on July 23, 2015, Almaty's attorneys showed Plaintiffs' attorneys a draft complaint setting forth the causes of action which Almaty will raise against Plaintiffs in this action.  One such cause of action seeks to undo Triadou's assignment as a fraudulent conveyance under New York Debtor and Creditor Law and to recover the value of the assigned interest from Plaintiffs.

3

16.    Plaintiffs cannot be liable to both Plaintiff and Almaty for the assignment.   Either Triadou's assignment of its interest in CF to CF 135 was valid or it was invalid.   If the assignment was valid, Plaintiffs must pay Triadou $21,000,000.00, but owe Almaty nothing.   If the assignment was improperly made, Plaintiffs may not owe Traidou anything, but may be liable to Almaty for the value of the improperly assigned interest.

17.    Plaintiffs admit that the sum of $21,000,000.00 is due and owing either to Triadou or to Almaty.   However, Plaintiffs are unable to determine to whom such sum should be paid and which of the defendants is entitled thereto.   As a result of such adverse claims, Plaintiffs are or may be exposed to double liability.

18.    As a condition of being discharged from this action and from further liability to either defendant, Plaintiffs are ready, willing, and able to pay the sum of $21,000,000.00 to whichever defendant the court shall adjudge is entitled thereto, or to pay the money into court to await the determination thereof.

WHEREFORE, Plaintiffs demand judgment that:

1.    Defendants be required to interplead each other concerning their claims to the disputed sum.

2.    Defendants be restrained and enjoined from commencing any actions on the disputed sum.

3.    Plaintiffs be permitted to pay the amount of the disputed sum into court, and upon such payment into court, be discharged from any further liability to any of the parties to this action.

4.    Plaintiffs have such other and further relief as to the court may seem just and proper together with the costs and disbursements of this action, including reasonable attorneys' fees, to

4

be paid out of the amount due in dispute.

Dated:   August 14, 2015
         New York, New York

                                        Yours, etc.

                                        SUKENIK, SEGAL & GRAFF, P.C.

                                        By: _____
                                             David C. Segal, Esq.
                                        *Attorneys for Plaintiffs*
                                        404 Fifth Avenue, 5th Floor
                                        New York, New York 10018
                                        (212) 725-9300

# EXHIBIT M

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: IAS PART 58
------------------------------------------x
TRIADOU SPV S.A.,

                    Plaintiff,

          -against-

CF 135 FLAT LLC, CF 135 WEST MEMBER LLC,
and THE CHETRIT GROUP LLC,

                    Defendants.

------------------------------------------x

Index No.  154681/15
           650239/15
           653462/14
           156907/15

Donna Mills, J.:

          These are related breach of contract actions and motions for

summary judgment in lieu of complaint, arising from an agreement

between plaintiff, Triadou SPV S.A. (Triadou) and defendant CF 135

Flat LLC (CF 135 Flat), whereby Triadou agreed to sell to CF 135

Flat all of Triadou's interests in defendant CF 135 West Member LLC

(CF 135 West).  The purchase price was $28 million, to be paid in

installments.

          In the action commenced under index No. 653462/14, defendants

move, in motion sequence No. 004, to vacate a judgment of this

court, in plaintiff's favor, dated February 3, 2015 (February 3rd

judgment), for $5,250,000.  In motion sequence No. 005, in the same

action, defendants move for a stay of enforcement of the February

3rd judgment.

          In the action commenced under index No. 650239/15, defendants

1

move, in motion sequence No. 003, to vacate a judgment of this court in plaintiff's favor, dated April 15, 2015 (April 15th judgment), for $5,250,000. In motion sequence No. 004, in the same action, defendants move for a stay of enforcement of the April 15th judgment.

In the action commenced under index No. 154681/15, plaintiff moves, pursuant to CPLR 3213, for an order granting summary judgment in lieu of complaint, $5.25 million, for a payment which allegedly came due on April 1, 2015. Defendants cross-move, pursuant to CPLR 3211(a)(10), for an order dismissing the action for failure to join a necessary party.

In a letter dated July 23, 2015, defendants requested that the court stay the actions under index Nos., 653462/14, 650239/15, 156907/15 and 154681/15. The request for a stay arises from defendants' commencement of an action for interpleader in this court, which was subsequently removed to federal court.

For the reasons stated below, the request for a stay is granted and the actions are stayed for 120 days, provided that defendants demonstrate, within 20 days of service of a copy of this order with notice of entry, that they have paid the $21 million at issue in these actions into either this court, pursuant to CPLR § 2601, or into the federal court pursuant to the federal

2

interpleader statute.

**Background**

On August 4, 2014, Triadou and CF 135 Flat executed an agreement (Agreement) whereby Triadou agreed to assign and sell to CF 135 Flat all of Triadou's rights, title and membership interest in CF 135 West for $28 million.  CF 135 West is the owner of the real property located at 135 West 52nd street in Manhattan.  The purchase price was to be paid in installments, including, relevant here, four payments of $5.25 million each, totaling $21 million. On August 4, 2014, CF 135 West and defendant The Chetrit Group LLC (Chetrit) executed a guaranty agreement unconditionally guaranteeing the prompt and complete payment of each of the amounts set forth in the Agreement.

The first payment of $5.25 million was due on or before November 2, 2014. After not receiving payment, plaintiff commenced an action for summary judgment in lieu of complaint, under index No. 653462/14.  In an order dated February 3, 2015, this court granted plaintiff's motion and directed the entry of a judgment for $5.25 million.  On July 13, 2015, this court issue an order temporarily restraining Triadou from enforcing this judgment, pending the outcome of the various motions at issue here, including

3

defendants' motions to stay each of the actions.

On January 26, 2015, Triadou commenced an action for summary judgment in lieu of complaint, under index No. 650239/15, seeking the $5.25 million payment which was due on January 1, 2015. On April 15, 2015, this court granted plaintiff's motion and directed the entry of a judgment for $5.25 million. Again, on July 13, 2015, this court issued an order temporarily restraining Triadou from enforcing this judgment.

In the meantime, on May 8, 2015, Triadou commenced another action for summary judgment in lieu of complaint, under index No. 154681/15, seeking the $5.25 million payment which was scheduled to come due on April 1, 2015. Defendants cross-moved to dismiss for failure to join a necessary party.

Specifically, defendants' cross motion contends that Triadou failed to join the city of Almaty, Kazakhstan (Almaty) as a necessary party. Defendants assert that Almaty is a necessary party based on a letter received by defendants, dated April 30, 2015, from the attorneys for Almaty (Letter). The Letter states that Almaty had commenced an action in federal court in California, against its former mayor Viktor Khrapunov and members of his family, including his son Iliyas. As discussed below, Almaty alleges that, among other things, Khrapunov and his family

4

embezzled approximately $300 million from Almaty, and laundered the money through numerous foreign shell corporations, including Triadou, before eventually investing the money in New York real estate.

The Letter stated that, as a result, Almaty was claiming an interest in CF 135 West, and was demanding that all parties refrain from taking any action with respect to that interest. The Letter also stated that Almaty was prepared to intervene in the various actions commenced in this court.

On July 9, 2015, Triadou commenced another action for summary judgment in lieu of complaint, under index No. 156907/15, seeking the $5.25 million payment which was scheduled to come due on June 30, 2015.

In the meantime, on July 7, 2015, CF 135 Flat, CF 135 West and Chetrit, as plaintiffs, commenced an interpleader action in this court, under index No. 156834/15, against Triadou and the City of Almaty. In the interpleader complaint, the plaintiffs, who are defendants here, "admit that the sum of $21,000,000.00 is due and owing either to Triadou or to Almaty." Interpleader complaint, ¶ 13. However, they state that they "are unable to determine to whom such sum should be paid and which of the defendants is entitled thereto." Id. As such, they contend that they "are or may be

5

exposed to double liability." *Id.*  They also state that they are willing to deposit the money into court, to await determination as to whether Triadou or Almaty is entitled to it.  *Id.*, ¶ 14.

On July 9, 2015, Almaty filed a Notice of Removal of the interpleader action to the United States District Court for the Southern District of New York.  In its Notice of Removal, Almaty states that it objects to the assignment, by Triadou, which is at issue in the instant actions.  It states that the assets which Triadou originally used to purchase its interest in CF 135 West were the rightful property of the people of Almaty, "embezzled by a family of corrupt public servants and then laundered through foreign shell corporations before being invested in New York real estate."  Notice of Removal, ¶ 4.

Almaty states that, in 2008, it and other departments of the government of the Republic of Kazakhstan "began a series of investigations into the family of Viktor Khrapunov, the former mayor of Almaty, based on allegations that Mr. Khrapunov had abused his position to transfer public assets to himself and his family members."  *Id.*, ¶ 5.  It further states that "Almaty and other governmental authorities subsequently discovered that Mr. Khrapunov had looted an estimated $300 million during his tenure as mayor, funneling these assets through his family members into foreign

6

holding companies." *Id.* Almaty states that the embezzled funds were traced to a series of shell corporations including Triadou. *Id.,* ¶ 6.

As such, Almaty contends that Triadou's assets or any profits from the disposition of such assets are the rightful property of Almaty, and that any transfer of that interest would constitute a fraudulent conveyance at a below-market rate, intended to frustrate Almaty's recovery of those assets. *Id.,* ¶ 7.

**Request for Stay of Actions**

Defendants now request that this court stay the instant actions pending resolution of the interpleader action. Defendants concede that they owe $21 million to either Triadou or Almaty but contend that a stay of the instant actions is necessary to avoid potential double liability in the event that the court in the interpleader action determines that the money should be paid to Almaty.

Pursuant to CPLR 2201, the court has the discretion to "grant a stay of proceedings in a proper case, upon such terms as may be just." *See Asher v Abbott Labs.,* 307 AD2d 211, 211 (1st Dept 2003). In deciding whether to grant a stay of one action in favor of another, the court will examine certain factors, including

7

duplication of effort, waste of judicial resources, and the possibility of inconsistent rulings in the absence of a stay, as well as any possible prejudice to the non-moving party. *See OneBeacon Am. Ins. Co. v Colgate-Palmolive Co.*, 96 AD3d 541 (1st Dept 2012). The court will also examine whether the issues, the relief sought, and the parties in the two actions, are substantially identical. *Asher v Abbott Labs.*, 307 AD2d at 211. In deciding whether to stay a New York action in favor of an action in federal court, the court will also consider issues of comity, orderly procedure, and judicial economy. *Id.*

Here, the court finds that, for several reasons, a stay of the instant proceedings is appropriate, pending disposition of the interpleader action.

First, there is a substantial identity of parties because the instant defendants are the plaintiffs in the interpleader action and Triadou, the plaintiff here, is a defendant in the interpleader action. Moreover, while Almaty has not yet been joined in the instant actions, it has expressed its intent to intervene in these actions if necessary, and it is a defendant in the interpleader action.

The court also finds that there is a substantial identity of issues and relief sought to the extent that both the instant

8

actions, and the interpleader action, will determine whether defendants have to pay the $21 million to Triadou or not.

As set forth above, defendants have conceded owing the money, but seek a determination as to which party is entitled to that money. Clearly, a possibility of inconsistent rulings exists since, in the instant actions, this court has already granted judgments in Triadou's favor whereas the court in the interpleader action may determine that the money is properly payable to Almaty.

The court also finds that a stay would avoid a duplication of effort and waste of judicial resources, and would pay due consideration to judicial comity.

As to the issue of prejudice to Triadou, that can be avoided by compelling defendants to pay the $21 million into court, in order to protect Triadou's interest in the judgments which it has already received as well as its interest in the pending motions for summary judgment in lieu of complaint. Triadou has already asserted in this action that defendants should be compelled to pay the money at issue into court, in order to protect Triadou's interests. Further, as set forth above, defendants have stated in the interpleader complaint that they are prepared to deposit $21 million into court, which would encompass the four installment payments at issue in the various actions which Triadou has

9

commenced.

The parties disagree as to whether defendants will be required to pay the money into the district court under the statutes and rules pertaining to interpleader in federal court, and that issue has not yet been determined in that court. Therefore, the court finds that, in order to avoid prejudice to Triadou, defendants must pay the $21 million into this court, pursuant to CPLR § 2601, within 20 days of service of a copy of this order with notice of entry. If necessary, defendants may seek to modify this order at such time as they can demonstrate that the money must be paid into the district court.

Accordingly, it is

ORDERED that the motion for a stay proceedings is granted to the extent of staying further proceedings in the actions commenced under index Nos. 156907/15, 154681/15, 650239/15 and 653462/14, except for an application to vacate or modify said stay, provided that defendants pay $21 million into this court within 20 days of service of a copy of this order with notice of entry; and it is further

ORDERED that either party may make an application by order to show cause to vacate or modify this stay upon the final determination of the action/proceeding known as CF 135 Flat LLC, CF

10

135 West Member LLC, and The Chetrit Group LLC v Triadou SPV S.A. and City of Almaty, index No. 156834/15, pending before the United States District Court for the Southern District of New York; and it is further

ORDERED that the movant is directed to serve a copy of this order with notice of entry on the Trial Support Office (Room 158).

DATED: 2|2|16

ENTER:

_____

J.S.C.

11

138

# EXHIBIT N

# BOIES, SCHILLER & FLEXNER LLP

575 LEXINGTON AVENUE • 7th FLOOR • NEW YORK, NY 10022 • PH. 212-446-2300 • FAX 212-446-2350

MATTHEW L. SCHWARTZ
Tel.: (212) 303-3646
E-mail:  mlschwartz@bsfllp.com

February 19, 2016

VIA ECF

Hon. Alison J. Nathan
United States District Judge
Southern District of New York
40 Foley Square, Room 2102
New York, New York 10007

Re:   *CF 135 Flat LLC et al. v. Triadou SPV S.A., et al.*,
No. 15 Civ. 5345 (AJN) (SN)

Dear Judge Nathan:

We represent the City of Almaty and BTA Bank ("the Kazakh Entities"). We write in response to Your Honor's Order of February 18, 2016 [ECF No. 97], regarding the application of Plaintiffs CF 135 Flat LLC, CF 135 West Member LLC, and the Chetrit Group LLC (collectively, the "Chetrit Group") for a stay of the February 3, 2016 Decision and Order of New York State Supreme Court Justice Donna Mills [ECF No. 94].

The Kazakh Entities agree that the State Court proceedings should be stayed in favor of this action, which (as that Court acknowledged) subsumes the issues before the New York State court.  Indeed, the Kazakh Entities strongly believe that litigating the various claims amongst the parties in a single forum – this Court – is preferable to the piecemeal litigation in various forums that some parties have advocated.

As for that aspect of Justice Mills' order that would require the Chetrit Group to deposit $21 million either with this Court or the State Court:  while the Kazakh Entities would certainly not object to the security of having those funds deposited with this Court, the Chetrit Group seems to be correct that the Federal Rules do not require as much.  Further, the Kazakh Entities have little doubt that there is sufficient equity in the Flatotel development to satisfy any judgment against the interpleaded funds.

More to the point, to the extent that the State Court imposed depositing the interpleaded fund into a court as a condition of staying the State Court actions, the Kazakh Entities believe

that the State Court proceedings should be stayed whether or not the funds are deposited. Further, the Kazakh Entities believe that the State Court actions should be stayed during the full pendency of this action, and not for the limited duration contained in Justice Mills' order.  In short, the Kazakh Entities join in the Chetrit Group's application that this Court stay the State Court proceedings.

      Thank you for your consideration.

                        Respectfully,

                        /s/  Matthew L. Schwartz
                        Matthew L. Schwartz
                        Randall W. Jackson

cc:     BY ECF

       All counsel of record