# Exhibit 1

## Skakel, Deborah

**Subject:**   FW: NYSCEF Notification: New York - Commercial (General) - <AFFIDAVIT OR
AFFIRMATION IN OPPOSITION TO ORDER TO SHOW CAUSE> 653462/2014 (TRIADOU
SPV S.A. - v. - CF 135 FLAT LLC et al)

**From:** efile@nycourts.gov [mailto:efile@nycourts.gov]
**Sent:** Tuesday, May 3, 2016 11:48 PM
**To:** natasa.colovic@peyrotlaw.com; Phil Smith <psmith@kravit.com>; dsalhanick@ssglaw.com; efile@nycourts.gov;
david.vanleeuwen@peyrotlaw.com
**Subject:** NYSCEF Notification: New York - Commercial (General) - <AFFIDAVIT OR AFFIRMATION IN OPPOSITION TO
ORDER TO SHOW CAUSE> 653462/2014 (TRIADOU SPV S.A. - v. - CF 135 FLAT LLC et al)



# *New York County Supreme Court*
# *Notification 05/03/2016*

This is an AUTOMATED response for Supreme Court / Court of Claims cases.
*Please retain this notification for your records.*

The NYSCEF web site has received documents from the filing user, **DAVID SALHANICK** , for the following
case/claim.

## Case Information

Index #: **653462/2014**
Short Caption: **TRIADOU SPV S.A. - v. - CF 135 FLAT LLC et al**
Assigned Case Judge: **David B Cohen**

## Filing User Information

User Name: **DAVID SALHANICK**
Phone Number: **212-725-9300**
Fax Number:
Email Service Address: dsalhanick@ssglaw.com
Work Address: **404 Fifth Avenue, 5th Floor, New York, NY, 10016**

## Documents Filed

*(To view a document, click the document type link)*

| Doc # | Document Type | Additional Doc Info | Special Instructions | Filed Date |
|---|---|---|---|---|
| | | | | |

| 158 | <u>AFFIDAVIT OR AFFIRMATION IN OPPOSITION TO ORDER TO SHOW CAUSE</u> | Supplemental affirmation in opposition<br>**Motion #: 008** | 05/03/2016 |
|---|---|---|---|
| 159 | EXHIBIT(S) | Meltsner affidavit<br>**Exhibit #: A**<br>**Motion #: 008** | 05/03/2016 |
| 160 | EXHIBIT(S) | Graff Affidavit<br>**Exhibit #: B**<br>**Motion #: 008** | 05/03/2016 |
| 161 | EXHIBIT(S) | Eichen affidavit<br>**Exhibit #: C**<br>**Motion #: 008** | 05/03/2016 |

**For any procedures specific to the assigned Judge, please consult the county protocol and/or the part rules.**

## E-mail Service Notifications Sent

| Name | Email Address |
|---|---|
| DAVID SALHANICK | dsalhanick@ssglaw.com |
| DAVID VAN LEEUWEN | david.vanleeuwen@peyrotlaw.com |
| PHILIP SMITH | psmith@kravit.com |

*THIS E-MAIL IS INTENDED ONLY FOR THE USE OF THE NAMED ADDRESSEE(S) AND FOR THE PURPOSES OF THE NEW YORK STATE COURTS ELECTRONIC FILING SYSTEM. IF YOU ARE NEITHER THE INTENDED RECIPIENT NOR A PERSON DESIGNATED TO RECEIVE MESSAGES ON BEHALF OF THE INTENDED RECIPIENT, PLEASE NOTIFY THE SENDER IMMEDIATELY. THANK YOU.*

**Hon. Milton A. Tingling , New York County Clerk and Clerk of the Supreme Court**
**Phone:** 646-386-5956     **Website:** http://www.nycourts.gov/courts/1jd/supctmanh/county_clerk_operations.shtml

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------

TRIADOU SPV S.A.

                     Plaintiff,

           -against-

CF 135 FLAT LLC, CF 135 WEST
MEMBER LLC, and THE CHETRIT
GROUP, LLC,

                  Defendants.

------------------------------------------------------------

Index No. : 653462/14

**SUPPLEMENTAL
AFFIRMATION IN
OPPOSITION TO
PLAINTIFF'S MOTION FOR
A RECEIVER**

David Salhanick, an attorney admitted to practice law in the Courts of the State of New York, affirms under penalty of perjury as follows:

1.    I am an associate in the law firm of Sukenik, Segal & Graff, P.C., counsel to CF 135 Flat LLC, CF 135 West Member LLC, and The Chetrit Group LLC in the above-captioned case. I have personal knowledge of the following facts.

2.    I submit this supplemental affirmation in opposition to Plaintiff Triadou SPV S.A.'s Motion to Appoint a Receiver. Attached as exhibits hereto are copies of the following affidavits executed on May 3, 2016 in the related federal court action *CF 135 Flat LLC, CF 135 West Member LLC, and The Chetrit Group LLC v. Triadou SPV S.A. and City of Almaty* (1:15-cv-5345)(AJN):

        Exhibit A:   Affidavit of Matthew Meltsner

        Exhibit B:   Affidavit of Jehoshua Graff

        Exhibit C:   Affidavit of Lee Eichen

1

WHEREFORE, it is respectfully requested that the court issue an order denying

Plaintiff's motion and for such other relief that the Court shall deem just and fair.

Dated:       New York, New York
            May 3, 2016

                      SUKENIK, SEGAL & GRAFF, P.C.

                      By: /s/ David Salhanick
                            David Salhanick, Esq.
                      *Attorneys for Defendants*
                      450 Seventh Avenue, 42nd Floor
                      New York, New York 10123
                      (212) 725-9300

2

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CF 135 FLAT LLC, CF 135 WEST MEMBER
LLC and THE CHETRIT GROUP, LLC,

Interpleader Plaintiffs,

-against-

TRIADOU SPV S.A., CITY OF ALMATY, a
foreign city, and BTA BANK JSC,

Interpleader Defendants.

---

CITY OF ALMATY, KAZAKHSTAN and BTA
BANK JSC,

Crossclaim Plaintiffs,

-against-

MUKHTAR ABLYAZOV, VIKTOR
KHRAPUNOV, ILYAS KHRAPUNOV, and
TRIADOU SPV S.A.,

Crossclaim Defendants.

15 Civ. 5345 (AJN) (SN)

---

## AFFIDAVIT OF MATTHEW MELTSNER

STATE OF NEW YORK )
               ss.:
COUNTY OF NEW YORK )

      Matthew Meltsner, being duly sworn, deposes and states under penalty of perjury:

      1.    I am currently the Project Manager for 135 West 52nd Street Owner, LLC. which

is the fee owner (the "Fee Owner") of the real property located at 135 West 52nd Street, New

York, New York ("the Flatotel").

      2.    I have held the position of Project Manager for the Flatotel for nearly three years,

throughout the project's development.

3. The Flatotel project, which I currently oversee, involves the conversion of a former hotel into a commercial component and retail component and condominium apartments.

4. When the Fee Owner first acquired the property in 2013, the building located thereon was vacant.

5. When construction is complete, the Flatotel project will be a 46-story tower consisting of retail space on the ground floor, six floors of office space (ground floor lobby, and forty floors of luxury residential units. As described below, some of the residential units have already been sold, the commercial condominium was sold, and the retail space is in contract and will soon house a BLT restaurant.

6. As Project Manager, I interface on a daily basis with the many contractors, engineers, architects, and consultants that are continuing to work on the project. I also speak daily with the brokers and marketing specialists responsible for sales of units in the Flatotel. Overall, my job is to ensure that the project continues on schedule so that units in the Flatotel can be sold, closed upon, and occupied. As part of my work, I speak with, and report to, Chetrit on a regular basis, and with David Bistricer somewhat less frequently. Mr. Chetrit approves all major expenditures or change orders on the project.

7. Deutsche Bank ("the Lender") held a mortgage on the Flatotel ("the Mortgage") that was continuously paid down with proceeds from closings of units in the Flatotel. That debt on the project, which was initially approximately $228 million, has now been retired through the payment of funds from closings. Prior to the satisfaction of the project debt, as units in the Flatotel closed, all funds after fees and commissions were transferred by the condominium attorneys, Rosen Livingston & Cholst, LLP ("Rosen Livingston"), to a lockbox fund, which the Lender then drew on periodically to pay down the Mortgage. The Fee Owner did not have access

2

to this lockbox fund as per the loan documents.

7.     In mid-April, 2016, there was approximately $23 million in the Lender's lockbox. This amount exceeded the approximate $21 million balance remaining on the Mortgage, and as such, on April 26, 2016, approximately $1.9 million was released by the Lender to Rosen Livingston. Those funds have been earmarked by the Fee Owner to pay contractor and vendor invoices.

8.     Because the Lender has certified that the Mortgage has been paid, funds from future closings will no longer be deposited in the lockbox, and should be used first toward completing the cost of construction of the project and paying other project-related expenses such as marketing costs. At this time, there are an estimated $15 million in costs required to finish construction of the Flatotel and satisfy other payables; this figure is referred to as the "Balance to Finish." This amount includes direct expenditures expected, as well as contingency costs to ensure development is completed on schedule.

9.     While this work is described as "finishing" in the industry, it involves major construction that is critical to the success of the project. At this time, the Flatotel has a "TCO," or Temporary Certificate of Occupancy from the New York City Department of Buildings. A TCO allows certain floors to be occupied while construction continues on other floors of the building and common areas and amenities are completed. At this time, floors below the 33rd floor may be occupied, but most of the units on floors 33 through 46 are not available for occupancy and have major work remaining to be done.

10.     Construction is continuing on the Flatotel's common areas and amenities, and work is also needed on the exterior of the building completing the façade where the construction elevator was erected and matching that to the rest of the building's exterior. The elevator repair

3

work consists of an area approximately 15 feet wide, running the entire height of the building, from the ground to the 46th floor, and must be completed. Funds for completing this significant construction are one part of the estimated Balance to Finish.

11.     The Balance to Finish will also be used to complete interior work on units which have yet to be listed for sale. At this time, there are approximately 21 units remaining to be sold, including the super's unit and including many of the largest and most expensive upper-floor units. In total, at their offering price set forth in the offering plan, these unsold units represent an estimated $144 million in gross revenue prior to costs of sale. (To date, the units that have sold in the project have typically sold at approximately the asking price). Many of these upper floor units need extensive internal finishing, including glass shaping and installation, staircase construction and installation, tiling and flooring, appliances and installation, and lighting fixtures. Much of this is intricate work that must be done by particularly skilled craftspeople to meet the standards of buyers for these types of units, some of which will be marketed for in excess of $8-10 million. The Balance to Finish represents the estimated costs of paying for construction crews and artisans to complete this work on time so that these units may be finished and sold on schedule.

12.     Additional work is also needed on units in contract and scheduled to close, but which have not yet closed. At this time, there are approximately six such units including the retail unit, which represent approximately $34 million in gross sales revenue, less brokers' fees and other costs. Before a buyer closes on a unit, they conduct a walkthrough of the unit and create a "punch list" of changes and corrections to be completed before any closing. While these changes are often minor in scale compared to the project itself, they are very personal to the buyer and in my experience are often the subject of significant negotiations and discussions. Part

4

of the Balance to Finish represents costs of materials and contractors' charges related to these punch list items, which can be difficult to estimate prior to consultation with each buyer.

13. The Balance to Finish also covers retention of independent consultants and engineers to ensure that the Flatotel passes all inspections. Because the building only has a TCO at this time, numerous inspections remain before the building is issued its permanent Certificate of Occupancy from the Department of Buildings. To ensure that these detail-intensive inspections are passed, and the project can remain on schedule and buyers can move into upper floors, numerous independent consultants and engineers have been retained who must continue to be paid in a timely manner. Part of the Balance to Finish represents the costs of these experts and ensuring that the project continues to pass inspections and stay on schedule.

14. Failure to prioritize and timely pay the Balance to Finish would disrupt closings of units and interfere with future sales, potentially delaying the completion of the Flatotel project. The closing proceeds should be used to pay contractors and consultants critical to both scheduled closings and the completion of the building generally. The Balance to Finish must be paid promptly as these costs come due, or the Flatotel project risks delay. If final construction cannot be completed, then units will not be available to close. Equally important, if funds are not available to meet buyers' punch lists on units that are scheduled to close, then those closing are likely to be delayed. Construction teams will not work without payment, or at best, will work only on a reduced schedule, thus further pushing back completion. Similarly, inspections will have to be delayed as construction slows down, limiting the ability to show and sell high-value upper-floor units. Without the ability to promptly make payments needed to satisfy the Balance to Finish, work will slow down and push the project off schedule. Particularly as the high-end

5

condominium market has showed signs of weakening, these kinds of delays could deter buyers and further disrupt sales in the project.

15. In short, the Flatotel is a $300-plus million project that is in the midst of active construction and marketing. As Project Manager with a long history and understanding of this project, I make most managerial decisions and often approve vendor payments with respect to ongoing work, although for significant decisions and payments, I do so in consultation with Chetrit. Any delay in payments would cause great harm to the completion of the project, as described above. If someone unfamiliar with the project were empowered to make payment decisions, it would take weeks for that person simply to get up to speed on the detailed status of the project. That person would be unfamiliar with our construction crews, craftspeople, architects, consultants, vendors, and other professionals. Under such a scenario, even if the current project managers and I continued to have complete control over the development and operations of the project, there would necessarily be a significant delay, likely of at least several weeks, before the project could restore anything like normal operations. In that time, all of the consequences I described above would materialize, including delays in construction, sales, and marketing.

Matthew Meltsner

Sworn to before me on this
3rd day of May, 2016

DAVID SALHANICK ESq.
Rockland County, NY
# 02S4029195
CTD. 1/24/16

# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CF 135 FLAT LLC, CF 135 WEST MEMBER LLC and THE CHETRIT GROUP, LLC,<br><br>     Interpleader Plaintiffs,<br><br> -against-<br><br>TRIADOU SPV S.A., CITY OF ALMATY, a foreign city, and BTA BANK JSC,<br><br>     Interpleader Defendants.<br><br>CITY OF ALMATY, KAZAKHSTAN and BTA BANK JSC,<br><br>     Crossclaim Plaintiffs,<br><br> -against-<br><br>MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, and TRIADOU SPV S.A.,<br><br>     Crossclaim Defendants. | 15 Civ. 5345 (AJN) (SN) |

## AFFIDAVIT OF JEHOSHUA GRAFF

STATE OF NEW YORK )
         ss.:
COUNTY OF NEW YORK )

   Jehoshua Graff, being duly sworn, deposes and states under penalty of perjury:

   1.  I am a member of the law firm of Sukenik, Segal & Graff, P.C., attorneys for interpleader plaintiffs The Chetrit Group, LLC, CF 135 Flat LLC, and CF 135 West Member LLC (the "Chetrit Entities"). I practice in the area of real estate transactional law involving large, complex real estate projects, and have done so for the past 35 years.

1

2.  In 2012, Triadou SPV S.A. ("Triadou") entered into agreements with certain of the Chetrit Entities to obtain a 37.5% indirect ownership interest in 135 West 52nd Street Owner, LLC (the "Fee Owner"), which was converting the former Flatotel, located at 135 West 52nd Street, NY, NY, into office and retail components and into condominium apartments. Triadou did so by acquiring a 50% interest in CF 135 West Member LLC, which in turn is the 75% owner of other LLCs in the corporate structure. The other 25% interest is held by entities controlled by David Bistricer. A chart depicting the current corporate structure of the Flatotel development is attached as Exhibit A.

3.  At the time that Triadou acquired its interest in the Flatotel, the parties signed an operating agreement, which required Triadou to make equity payments and meet certain capital calls which would be used to fund the Flatotel's operations and conversion.

4.  I "negotiated" the operating agreements with Triadou's counsel at the time, Arnie Herz. During the negotiations, I was told that Triadou was an entity formed in Switzerland. When it came time to close the deal in 2012 and we were responding to due diligence requests from AIG, the first mortgagee at the time, Mr. Herz informed me that Phillipe Glatz was the ultimate beneficial owner of Triadou. I passed that information on to AIG.

5.  I believe that I only met Triadou's representative, Nicolas Bourg, once. My principal contact with Triadou after the closing was another of Triadou's attorneys, Diane Artal of Rosabianca & Associates, PLLC.

*Sources of Funds for Triadou's Investments*

6.  Over the course of my career in structuring complex real estate deals, including many for Joseph Chetrit and David Bistricer, I have become familiar with sending and receiving

2

money using international wires. In my experience, wire transfers take less than one day, sometimes two for overseas transactions.

7.     In late 2012, Herz informed me that Triadou's equity requirements to be used to acquire Triadou's interest in the Flatotel project would be wired to an escrow account held by Sukenik, Segal & Graff, P.C. at Citibank, N.A.

8.     In late 2012, and continuing through mid-2013, funds were wired to my firm's escrow account to meet Triadou's capital obligations relating to Triadou's business dealings with the Chetrit Entities. These funds were wired from an unknown foreign entity named Telford International Limited. Triadou did not tell me why they were sending money through this entity. Our firm's escrow account never received any money from Triadou, and to my knowledge, no funds were ever sent from Triadou to the Chetrit Entities.

9.     Telford International sent several wires to my firm's escrow account to be used in connection with the Flatotel and other projects with the Chetrit Entities. In each case, Mr. Herz would tell me that a wire had been sent, but my firm did not receive it within the next day or two. In fact, the time between when Mr. Herz said that the wires had been sent and when funds were actually received took a week, and sometimes even longer.

10.    I have personally observed Society for Worldwide Interbank Financial Telecommunication, or "SWIFT," messages confirming that these funds for the benefit of Triadou came from accounts in the name of Telford International Limited held at FBME Bank in Nicosa, Cyprus. Attached as Exhibit B are true and correct copies of emails I sent and received describing the details of the wire transfers sent to my firm's escrow account from Telford.

3

*Payment to SDG on Triadou's Assignment*

11. In mid-2014, Triadou executed an assignment transferring its interest in the Flatotel to CF 135 Flat LLC. As an initial payment for the assignment, CF 135 Flat LLC paid Triadou $1 million. This $1 million payment, along with $6 million in repayment of a loan previously made by Triadou to a Chetrit entity relating to a different property, were wired to Compagnie Privee do Conseils et d'Investissements S.A., for the benefit of SDG Capital S.A., and identified as a "loan on behalf of Triadou SPV S.A." The wire transfer is attached as Exhibit C.

*March 2015 Recordings*

12. I have listened to two recordings, represented to me as made on March 22 and March 23, 2015, and recognize one of the voices recorded as that of Joseph Chetrit. Copies of the recordings, designated here as Exhibits D and E, are provided electronically with this Declaration. Translated transcripts are attached as Exhibits F and G.

*A Receiver May Pose a "Special Risk" Under the Martin Act and Require Disclosure*

13. Based on my experience as a transactional lawyer in the real estate industry, I know that condominium conversions are subject to review by the New York State Attorney General. If a receiver is appointed herein, the sponsor of the condominium plan may be required to amend the offering plan already accepted by the Attorney General, leading to a new round of review, thereby delaying future closings. The Martin Act also requires disclosure of "special risks" to the project. 13 N.Y.C.R.R. § 20.3(c). If potential Flatotel condominium buyers need to be informed about any receivership because of the potential risks the receivership poses to the project, potential buyers may decline to purchase units and current buyers may seek to back out of their contracts.

4

14.     Any review by the Attorney General could delay the project for several months or

longer, pushing back scheduled closings. This delay could introduce additional uncertainty into

the project and, with an extremely competitive market for high-end condominiums, threaten the

project's viability.

Jehoshua Graff, Esq.

Sworn to before me on this
3rd day of May, 2016

DAVID SALHANICK, ESJ.
Rockland County, NY
# 02SA6291185
Exp. 9/24/18

5

# EXHIBIT C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CF 135 FLAT LLC, CF 135 WEST MEMBER
LLC and THE CHETRIT GROUP, LLC,

                Interpleader Plaintiffs,

      -against-

TRIADOU SPV S.A., CITY OF ALMATY, a
foreign city, and BTA BANK JSC,

                Interpleader Defendants.

---

CITY OF ALMATY, KAZAKHSTAN and BTA
BANK JSC,

                Crossclaim Plaintiffs,

      -against-

MUKHTAR ABLYAZOV, VIKTOR
KHRAPUNOV, ILYAS KHRAPUNOV, and
TRIADOU SPV S.A.,

                Crossclaim Defendants.

15 Civ. 5345 (AJN) (SN)

### DECLARATION OF LEE EICHEN

I, Lee Eichen, hereby declare as follows under penalty of perjury.

### BACKGROUND AND QUALIFICATIONS

1.     I am presently a Managing Director and Founding Partner of Centerboard Group,

LLC, a boutique financial advisory firm located at 410 Park Avenue, 8th Floor, New York, New

York 10022.

2.     I have over 20 years of real estate investment experience, having begun my career

in 1995 at Salomon Smith Barney, Inc. Prior to forming Centerboard, I most recently ran the

Real Estate Mergers & Acquisitions business of Bank of America Securities, LLC, a leading

global investment banking franchise. In that role, I personally advised clients on more than $100

billion of real estate mergers and acquisitions deals from 2006 to 2009, including many industry-leading transactions such as Equity Office Properties ($36 billion buyside of office building real estate investment trust on behalf of Blackstone), Archstone Smith ($22 billion buyside of apartment building real estate investment trust on behalf of Tishman and Lehman) and CNL Lodging ($6 billion sellside of hotel real estate investment trust which included the development and sale of condominimum units to the public).

3.     At Centerboard, in addition to advising on numerous real estate transactions in an advisory role, I am presently the managing member of a dedicated real estate private equity fund which invests in and manages its own development projects. In that capcacity, I personally oversee all development activity undertaken by the funds' portfolio companies.

4.     I am also currently advising the Department of Justice as asset manager for various real estate assets which were forfeited in connection with the Bernard L. Madoff Ponzi scheme and have worked extensively with Irving Picard, the court-appointed SIPA trustee for Bernard L. Madoff Investment Securities, LLC. In connection with that assignment, I am familiar with the process of a court-appointed trustee and the accompanying impacts on decision making, project execution and valuation.

5.     Additional information on my educational background and work experience is attached hereto as Exhibit 11.

6.     I have been retained by Boies, Schiller & Flexner LLP, on behalf of the City of Almaty and BTA Bank, to offer my opinion as to the consequences, if any, of judgment enforcement efforts generally, and the imposition of a receiver specifically, on the condominium conversion of the former Flatotel, located at 135 West 52nd Street, New York, New York (the "Flatotel" or the "Project"). In connection with this work, Centerboard has been paid my usual

2

hourly rate, which is $855. Other Centerboard employees have assisted me in this work, at their usual hourly rates, which range from $400 to $855. In sum, Centerboard has billed approximately $31,070 in connection with this assignment.

## OVERVIEW OF OPINIONS

7.     In my opinion, enforcement of judgments against the managers of the Flatotel, and certainly the imposition of a receiver, will present a number of grave risks to the Flatotel, and will delay and disrupt construction, deter buyers, and potentially stall the Project entirely. Even the imposition of a very limited receiver will, in my opinion, carry these extreme consequences as the market, vendors, and others will react to the news of a receiver being appointed, rather than the particular features of the receivership. If a receiver is appointed who has the power to make operational decisions or who must approve payments, the consequences to the Project will be particularly severe as the delay caused by the new receiver familiarizing him- or herself with the project and all of the people involved will deter buyers, frustrate vendors, and risk the completion of the Project altogether.

8.     A complete list of the documents that I considered in forming the opinions expressed herein is attached as Exhibit 12.

9.     I have also spoken with Matthew Meltsner, the project manager for 135 West 52nd Street Holder LLC (the "Project Manager").

## IMPACT ON BUYERS

10.    Appointment of a receiver over the Project will have a significant negative impact on the ability to market and sell new units. In my experience, the market for high end residential units in New York City is characterized by a limited number of marketing agents, brokers, lawyers, and other professionals. Trade publications such as "The Real Deal" immediately

3

publicize news about large developments, and news that a project such as the Flatotel was placed in receivership will sure to be covered. For example, "The Real Deal" covered extensively the 2010 receivership of a much smaller condominium development, the Sorrento New York, (e.g., David Jones, Receiver appointed at $84 million Midtown hotel and condo foreclosure, The Real Deal, Nov. 23, 2010, available at http://bit.ly/1SJn7aW), and generally covers significant projects in apparent distress (e.g., David Jones, Relying on receivers again, The Real Deal, Apr. 1, 2009, available at http://bit.ly/1X5uNcI (quoting a developer as saying, "I would think the worst thing for the lender and the property is [to hand it over to a] receiver. . . . Really, a receiver is a last resort.").

11.      I would expect that the appointment of a receiver will be immediately reported by New York real estate media, and in my opinion, based on investing and advising in this market for over 20 years, the uniform perception of the marketplace, regardless of the exact details of the receivership, will be that the Project is experiencing extreme financial distress. This will lead to strong hesitation by prospective buyers (and the broker community at large), who will be reluctant to become involved in a project that they perceive may ultimately fail and be unable to complete the promised build-out and/or fund startup operating expenses.

12.      Prospective buyers will also be seriously deterred by the fact that receivership will be pereceived as causing – and is in fact likely to cause – a delay in construction, as well as to create uncertainty as to when their units would be available, and to make financing their purchase more difficult and cloud the possibility of resale.

13.      New buyers are critical to the success of the Project, as it currently has 22 units remaining to be sold, representing an expected $148 million in revenue, or approximately 40% of the Project's total expected revenue for sale of residential units. The inventory remaining

4

consists of the more expensive, upper-floor units (which range from $8 million to $16 million in asking price) and will be marketed toward more sophisticated purchasers who typically have greater resources in perfoming due diligence and negotiating for concessions as a result of any perceived defect.

14. The market for such units has softened over the past several months, with more inventory becoming available and prices beginning to slump. In 2017, it is expected that more than 14,000 new units will become available.

15. The mere fact that a receiver has been appointed, along with this increase in high-end condominium inventory, will in my opinion place the Project at a serious disadvantage relative to comparable properties on the market.

16. Moreover, as discussed below, I understand from speaking to the Project Manager that many of the Project's amenities – including the fitness center and pool – have not yet been completed. Prospective buyers of multi-million dollar units demand these amenities, and the uncertainty created by receivership will impair the sales and marketing of even units that are already substantially complete.

17. Buyers who are under contract, but have yet to close, will also be significantly disrupted by the appointment of a receiver. Even where potential buyers are willing to purchase in a development under receivership—possibly after extracting price discounts or other concessions—financing for those purchases will be difficult. Most buyers rely on some level of financing for purchases in a development such as the Flatotel. Banks, however, carefully review the circumstances of each new development Project they are lending against and will be reluctant to finance purchases in a development under receivership, limiting even willing purchasers' ability to close.

5

18.     Although I am not an expert in condominium law, I am aware as an experienced New York City real estate investor that New York General Business Law §352e requires all condominium offerings to file an offering plan with the New York Attorney General's office, and that 13 N.Y.C.R.R. § 20.3(r)(4) requires that offering plan to identify any "special risks" in the project. Any potential buyer will review the condominium's offering plan and any amendments. If the appointment of a receiver is considered a special risk that requires an amendment to be filed, or if the receivership is disclosed on an amended offering plan for any other reason, that fact will certainly be noted by any sophisticated purchaser, advised by a real estate attorney. The disclosure of receivership as a "special risk" in the offering plan will amplify the consequences of publicity, described above, by making buyers and lenders even more hesitant to invest in the Project when there are so many other comparable choices.

19.     In addition, the Flatotel offering plan is referenced in each of the sales contracts of units in the Flatotel. For example, attached as Exhibit 13 is the Purchase Agreement for Unit 31C in the Flatotel. While amendments to the plan generally do not excuse performance by purchasers, that is not the case where an amendment includes a "material adverse amendment." Ex13, at ¶ 3(c). This term is defined in the plan as any change "affecting the rights, obligations or liabilities of then existing purchasers or reducing the undertakings or obligations of [the developer]." (Offering Plan, at 177). Purchasers are able to argue that the addition of a new "special risk" such as a receiver constitutes such a material adverse change, and may seek to withdraw from their contracts. Alternatively, if the offering plan is not amended, purchasers looking to withdraw from their contracts without sacrificing their deposits may claim that the offering plan needed to be amended, and use that as a reason to break their contracts. Particularly as the Manhattan condominium market shifts in buyers' favor, high-end buyers will

6

find other, less risky developments to buy into.

20.     Furthermore, buyers nearing closing expect numerous "punch list" items to be completed and construction defects in their units to be remedied prior to closing. In my experience this process is prone to conflicts arising between buyers and the sponsor, to the extent that some developers even hire specialized companies to handle the punch list process and ensure that a buyer is satisfied and closes as scheduled. This is especially true in the most expensive units, because they are likely to be the most intricate and customized. Buyers nearing closing who are dissatisfied with their units (or their decision to purchase at all, in light of prevailing market conditions) will undoubtedly use the appointment of a receiver as an additional reason to back out of their purchase obligation.

21.     Finally, appointment of a receiver will also have a negative impact on buyers who have already closed. These buyers will perceive that the value of their investment has been impaired and will worry about the orderly completion of construction, the ongoing stability of the Project and the impact on resale of their units. These concerns are likely to result in litigation which will be expensive to defend and divert management time and resources during a critical point in the Project.

## IMPACT ON OUTSTANDING CONSTRUCTION AND COMPLETION

22.     Based on my discussions with the Project Manager, I understand that significant construction remains to be done on the exterior of the building and common areas in the Flatotel, including the public lobby, the 7th floor amenities (including the fitness center, pool, and residents' lounge), and the roof deck. Construction and inspections are also required on all floors above the 33rd prior to any Certificate of Occupancy being issued by the New York City Department of Buildings. At this point in a project such as the Flatotel, first hand knowledge

7

and experience with the specific issues which arose during construction is critical for all finishing work and inspections.

23.     Appointment of a receiver that displaced the Project's current management would be enormously disruptive. New management at this phase would inevitably delay finishing construction, as that management would need to be educated on the project's prior issues, current status, and current construction plan before making any decisions. This Project in particular encountered unique and difficult structural issues due to the age of the building and former use as a hotel, which had to be addressed early on in the construction phase and the remaining work includes some of the more complex items involved in the Project, such as intricate interior work on the most expensive units. Transferring responsibility for such construction matters would be, at the very least, difficult and time-consuming and likely to lead to delays and increased cost.

24.     Preserving current management, but layering a receiver on top of that structure would create a separate, but still serious set of problems as the same education process would need to precede any decision by the receiver to authorize an expenditure. I know from my experience in this market generally and from talking to the Project Manager that current management makes numerous operational decisions every day that require the authority to commit funding. For example, currently, I understand that Joseph Chetrit personally approves the expenditures for many significant change orders, and that the Project Manager has authority to approve smaller expenditures. The multitude of decisions and expenditures that must be made by management daily would be hindered by a continuing need to educate the receiver on the basis for each management expenditure. Indeed, a receiver who did not slow the pace of work on the project in order to become familiar with the justifications for all expenditures would likely be violating his or her fiduciary or professional obligations as an agent of the court. To do the

8

task he or she is appointed to do, the receiver would necessarily have to disrupt the current management and decision making.

25. Moreover, a receiver would not have the extensive relationships that exist between current management and the various construction crews, architects, consultants, and other professionals who work on the Project. Currently, those professionals will execute on management's instructions immediately, often without need for documented and approved change orders, in light of their course of dealing with one another over a period of years. If a receiver is appointed, however, I would expect that those professionals will require written approval of all change orders before undertaking the work, for fear of not being paid. This will cause continuous delays that will further hinder completion of the Project and deter buyers and lenders.

26. There is also no efficient procedure for managing disputes between management and a receiver in such a hypothetical receivership, other than referring matters to the Court for resolution. For example, there are many situations which will arise where management recommends a course of action in order to finish construction and market the remaining units, but the receiver disagrees. These disputes could very well arise from and be exacerbated by the fact that management is primarily focused on maximizing the overall value of the Project and the receiver is seeking to preserve sufficient value for satisfaction of the existing judgments. The disputes, if unresolved, could lead management to conclude that it is unwilling to continue to work on the Project if it has limited ability to control the outcome but would retain legal and reputational risk. Such disputes would presumably need to be brought to the Court, which would inevitably lead to further delay and potentially disrupt the entire Project.

27. The consequenes of delay to a construction project like the Flatotel are

9

significant. When development of a project is delayed, it causes units to be sold more slowly and for lower prices, which in turn depletes the capital available to complete the project, which is a further discentive to buyers and lenders. This cycle has the potential to stall the entire project, requiring outside funding to complete the work, which is unlikely for any project in receivership in the current market.

## IMPACT ON RELATIONSHIPS WITH THIRD PARTIES

28.    I know from speaking to the Project Manager that current management has developed a relationship and course of dealing over the past several years with various critical third parties who are necessary in successful completion of the Project. These third parties include the marketing firm, the general contractor, trade suppliers, government departments and agencies, city inspectors, purchasers of the retail and office condos and various others. Each of these relationships needs to be individually managed based on the circumstances and personalities, and current management has invested a significant amount of time and effort to develop a good working relationship with each of the parties involved.

29.    These relationships are developed over time and are not easily transferrable to a receiver, especially when the Project is so near completion. At the very least, each of these critical third parties has been operating under a particular strategy and mandate and will be confused by the appointment of a receiver of any type. Each of these third parties will require clarification and reassurance that the mandate has not shifted and that they will continue to be paid by remaining with the Project. Some may even require financial guarantees due to the general perception that any court-ordered receivership is accompanied by financial distress.

## ALTERNATIVE TO RECEIVERSHIP

30.    In my opinion, the negative consequences of receivership are grossly

10

disproportional to the size of the judgments in question. The sponsor currently has approximately $100 million of equity invested in the Project and has retired all of the secured debt on the project. The remaining value of units left to be sold (i.e., the anticipated profit) is approximately $150 million. In contrast, the Judgment Creditor currently holds judgments worth $10.5 million, a fraction of the value of the units remaining to be sold in the Project and roughly the same order of magnitude as the sale of a single remaining condo unit.

31.     I understand that an alternative has been proposed whereby 75% of all net sale proceeds will be placed into escrow until the amount is sufficient to satisfy the outstanding judgments. In my opinion, this would be a far less disruptive and more appropriate alternative to receivership and would ensure the Project could move forward in an orderly fashion toward completion without the substantial negative impacts from appointment of a receiver, while at the same time providing security for the Judgment Creditor. Based on the fact that the amount in question is only $10.5 million, I would expect the escrow to be fully funded quickly.

## CONCLUSION

32.     In my opinion, based upon my analysis of relevant documents, my conversation with Mr. Meltsner, and my knowledge of the relevant markets, receivership presents a number of grave risks to the Flatotel, and will delay and disrupt construction, deter buyers, and potentially stall the Project entirely.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
May 2, 2016

Lee Eichen

11

STATE OF NEW YORK )

: SS.:

COUNTY OF NEW YORK )

On the 3rd day of May , in the year 2016, before me, the undersigned, a

notary public in and for said state, personally appeared Lee L Fichen.

personally known to me or proved to me on the basis of satisfactory evidence to be the individual

whose name is subscribed to the within instrument and acknowledged to me that he/she executed

the same in his/her capacity, and that by his/her signature on the instrument, the individual, or

the person upon behalf of which the individual acted, executed the instrument.

MISAEL MENDOZA
Notary Public - State of New York
No. 01ME6276796
Qualified in New York County
My Commission Expires Feb. 25, 2017

Notary Public

12