# BOIES, SCHILLER & FLEXNER LLP

575 LEXINGTON AVENUE • 7th FLOOR • NEW YORK, NY 10022 • PH. 212-446-2300 • FAX 212-446-2350

MATTHEW L. SCHWARTZ
Tel.: (212) 446-2300
E-mail: mlschwartz@bsfllp.com

May 6, 2016

**VIA ECF**

The Honorable Alison J. Nathan
United States District Judge
Southern District of New York
40 Foley Square, Room 2102
New York, New York 10007

Re:   *CF 135 Flat LLC et al. v. Triadou SPV S.A. et al*.
      **Case No. 15-CV-5345 (AJN)**

Dear Judge Nathan:

      We represent the City of Almaty and BTA Bank (the "Kazakh Entities") and write in response to (a) the letter sent by counsel for Triadou SPV S.A. this morning requesting that the Court strike the affidavits of Jehoshua Graff and Matthew Meltsner [ECF No. 134]; and (b) the letter sent by counsel for Triadou yesterday afternoon [ECF No. 132] requesting that the Court cancel the evidentiary hearing scheduled for May 19th or, in the alternative, to strike the affidavits of Lee Eichen, Jehoshua Graff, and Matthew Meltsner. For the following reasons, those applications should be denied.

**I.   The Court Should Not Strike the Affidavits of Jehoshua Graff and Matthew Meltsner**

      In a letter motion filed this morning, counsel for Triadou asks the Court to strike the May 3, 2016 affidavits of Matthew Meltsner and Jehoshua Graff, which we submitted to the Court and Triadou on Wednesday in lieu of direct testimony at the evidentiary hearing in this matter scheduled for May 19th.

      The Court should deny Triadou's request because (1) the Kazakh Entities diligently sought affidavits from third-party witnesses they do not control; (2) the Court's Individual Rules anticipate that witnesses out of a party's control might need to appear for direct testimony via subpoena, and we followed those rules; and (3) there is no prejudice to Triadou.

      *First*, the Kazakh Entities diligently sought to obtain – and did eventually obtain – affidavits from Messrs. Meltsner and Graff, whom the Kazakh Entities do not control. Prior to the deadline of May 2nd to submit direct testimony affidavits, the Kazakh Entities were in discussions with the Chetrit Entities about the scope of testimony for witnesses under the Chetrit Entities' control (and we of course interviewed both witnesses). However, those discussions broke down on Monday afternoon, when the Chetrit Entities absolutely refused – despite our

repeated requests – to provide affidavits for the two witnesses, which resulted in the Kazakh Entities informing those witnesses that they would be required to appear pursuant to subpoenas, which we filed that evening. On Monday evening, pursuant to the Court's scheduling order and its Individual Rules, we provided copies of the affidavits of three other witnesses to the Court and Triadou, and noted:

> The other two witnesses that we identified in our joint letter to the Court – Flatotel Project Manager Matthew Meltsner and Chetrit attorney Jehoshua Graff – have declined to provide affidavits. We will continue to attempt to secure affidavits from these witnesses in lieu of direct testimony out of respect for the Court's time, but in accordance with Your Honor's Individual Rules, we have served Mr. Meltsner and Mr. Graff with subpoenas to appear at the hearing on the 19th.

5/2/2016 E-mail from Matthew L. Schwartz to the Court (attached as Exhibit A). We also indicated that, in order to provide Triadou with sufficient notice, we were producing the exhibits we intend to use in the direct testimony of Messrs. Graff and Meltsner. *Id.*

Our discussions with the witnesses and the Chetrit Entities regarding the affidavits continued through Tuesday, including numerous conversations with counsel for the Chetrit Entities, as well as conversations with both witnesses.

Finally, on Tuesday evening at 8:37 PM, we were able to obtain signed affidavits from the two witnesses, and served them on Triadou and the Court the following day. *See* 5/4/2016 E-mail from Matthew L. Schwartz to the Court (attached as Exhibit B). Presumably the Chetrit Entities were motivated to finalize the affidavits in advance of the hearing scheduled in state court for the 4th. However, and despite the insinuation in Triadou's letter, we had no involvement in the papers filed by the Chetrit Entities in the state court that night: aside from the affidavits, which we saw at 8:37 PM, we saw the other papers filed by the Chetrit Entities for the first time when they were publically docketed.[1]

In short, the Kazakh Entities diligently pursued obtaining affidavits from Messrs. Graff and Meltsner, but they are ultimately not under our control, and the witnesses and counsel for the Chetrit Entities squarely refused to finalize or sign the affidavits on Monday despite our repeated (and often heated) attempts.

---

[1] Triadou argues that we "fail[ed] to inform" the Court that the Chetrit Entities had filed the affidavits in the state court case. We did not mention this fact in our one-paragraph e-mail only because we did not believe it to be relevant. Our only purpose was to serve the affidavits that we intend to use in lieu of direct testimony on the Court and Triadou; the fact that Triadou had also received the same affidavit shortly before midnight the night before through Chetrit's state court filing is besides the point. To the extent that Triadou is implying that we had any role in coordinating the Chetrit Entities' state court filing, as set forth above, they are wrong. (Not that there would be anything wrong with it if we had).

*Second*, the Kazakh Entities' actions were consistent with Your Honor's Individual Practices in Civil Cases, and Your Honor's Order dated April 27, 2016, and instructions at the conference on April 27, 2016.  The Court's rules anticipate that witnesses who are not in a party's control may need to be compelled to appear for testimony at a hearing.  The Court's Individual Practice Rule 5(F)(iii) requires parties to serve "copies of affidavits constituting the direct testimony of each trial witness, except for the direct testimony of an adverse party, a person whose attendance is compelled by subpoena, or a person for whom the Court has agreed to hear direct testimony live at the trial."  At the conference, Your Honor divided the time for the presentation of evidence "between the two of you for purposes of your either cross-examination or declarations submitted or, to the extent there is anyone who is out of your control, you can't get a declaration for eliciting direct testimony."  Hearing Tr. 29:13-16 (April 27, 2016).  The Order, which Triadou says the Kazakh Entities failed to comply with, required the Kazakh Entities' to "provide their witness affidavits," but does not preclude the Kazakh Entities from calling witnesses they do not control and who refuse to sign affidavits.

While the Kazakh Entities anticipated and hoped that they would be able to secure affidavits from witnesses from Messrs. Graff and Meltsner, those witnesses and the Chetrit Entities simply refused to timely cooperate.  As a result, we filed the affidavits of the witnesses we were able to obtain and subpoenas for those we weren't.  As described above, we wrote that we would "continue to attempt to secure affidavits from these witnesses in lieu of direct testimony out of respect for the Court's time, but in accordance with Your Honor's Individual Rules, we have served Mr. Meltsner and Mr. Graff with subpoenas to appear at the hearing on the 19th."  The Kazakh Entities should not be penalized because a third party whom we cannot control refused to execute an affidavit.

*Third*, even if the Kazakh Entities had submitted the affidavits untimely, there is absolutely no prejudice to Triadou in allowing Messrs. Meltsner and Graff to proceed by affidavit in lieu of direct testimony.[2]  Triadou has sufficient notice of the content of their testimony.  With the filing of Ms. Tudor's declaration on May 2, the Kazakh Entities provided to Triadou "the documents that we intend to use in Mr. Graff and Mr. Meltsner's direct examinations."  Triadou was then served the very same affidavits by the Chetrit Entities the next day on May 3.  To make up for any conceivable lost time, the Kazakh Entities stated on May 4

---

[2]   Assuming for the sake of argument that the affidavits were improperly submitted late, the Court should excuse the lateness.  Under Federal Rule of Civil Procedure 6(b)(1)(B), "the court may, for good cause, extend the time" "on motion made after the time has expired if the party failed to act because of excusable neglect."  As explained above, Messrs. Graff and Meltsner's refusal to sign was "beyond the control of" the Kazakh Entities.  Further, and without prejudice to Triadou, the Kazakh Entities continued in their efforts to obtain affidavits, which were served on Triadou late the following day by the Chetrit Entities, and on Triadou and the Court the day after that by the Kazakh Entities.  If the Court considers the affidavits to have been served untimely, therefore, that minimal lateness should be excused.  *See LoSacco v. City of Middletown*, 71 F.3d 88, 93 (2d Cir. 1995); *Cedar Petrochemicals, Inc. v. Dongbu Hannong Chem. Co.*, 769 F. Supp. 2d 269, 281 (S.D.N.Y. 2011).

that they "have no objection to extending Triadou's time to notify the Court and us of whether it intends to cross-examine these witnesses to three business days from today, per Your Honor's individual rules." (Earlier this afternoon, Triadou advised that it wishes to cross-examine both witnesses).

Indeed, Triadou is in a far better position having been provided the affidavits than if the Kazakh Entities put on the live testimony of witnesses it had been forced to subpoena. By the same token, the appropriate remedy for the "untimely" service of the affidavits would not be to strike the witnesses' testimony, it would merely be to strike the affidavits. "'Before granting the extreme sanction of preclusion,' the Court 'should inquire more fully into the actual difficulties which the violation causes, and must consider less drastic responses.'" *Teras Int'l Corp. v. Gimbel*, No. 13-CV-6788 VEC, 2014 WL 7177972, at *14 (S.D.N.Y. Dec. 17, 2014) (quoting *Ritchie Risk–Linked Strategies Trading (Ir.), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 157 (S.D.N.Y. 2012)). Indeed, Triadou's letter does not even *ask* the Court to strike the witnesses' testimony. The Kazakh Entities are of course perfectly comfortable putting on the witnesses' direct testimony live, but that would seem to run counter to the Court's preference and be an undesirable and unnecessary use of the Court's time and resources.

## II. The Kazakh Entities Did Not Consent to the State Court Monitorship Order, and There is No Basis to Avoid an Evidentiary Hearing or to Strike the Testimony of Certain Witnesses.

In its letter of yesterday, [ECF No. 132], Triadou argues that in light of the New York State Court's entry of an order imposing a monitor over the Chetrit Entities, there is no need for an evidentiary hearing or, in the alternative, the Court should strike the affidavits of Lee Eichen and Messrs. Graff and Meltsner. That application should be denied for several reasons. *First*, it is factually incorrect for Triadou to argue that the Kazakh Entities consented or agreed in any way to the monitorship order or the imposition of a monitor at all. *Second*, and more importantly, our preliminary injunction motion identified three distinct sources of irreparable injury: (1) that enforcement actions, such as but not limited to receivership, would injure the Flatotel project; (2) that any funds collected by Triadou would be removed from the jurisdiction and lost in the Ablyazov-Khrapunov group's web of shell entities; and (3) that allowing Triadou to enforce its judgments would moot certain of the Kazakh Entities' valid claims in this Court challenging those judgments, and would therefore undermine this Court's jurisdiction. If it is relevant at all, the monitorship order speaks only to the first of these three harms. Moreover, Triadou's letter makes no showing that by calling it a "monitorship," the Flatotel will escape the harms set out in our declarations of "receivership." An evidentiary hearing, based on the testimony of all of the witnesses proffered by the Kazakh Entities, is still necessary to resolve all of these factual disputes.

As an initial matter, Triadou argues that because the monitorship order was fully consensual, that fact demonstrates that the appointment of a monitor would not cause irreparable harm to the Flatotel project. **But it is simply not true that the Kazakh Entities consented to the order, or "took part in approving the substantive terms of the Monitorship Order."** The Kazakh Entities are not a party to the state court proceedings, did not sign the monitorship order, and did not indicate their assent to the order in any way, shape, or form. It is true that a

Boies, Schiller & Flexner associate was *present* at the receivership hearing, but we did not "participate" in the negotiations or "approve" anything. If the Court has any doubt on this score, we would be happy to put in a sworn affidavit. To the contrary, we indicated to counsel for the Chetrit Entities throughout the day that we opposed the entry of any monitorship order, precisely because all of the concerns we have previously raised about "receivership" – particularly the consequences of adverse publicity on buyers, lenders, and others – apply with equal force to "monitorship."

Notably, counsel for Triadou in this case left the state court hearings in the middle of negotiations between Triadou and the Chetrit Entities, and before the language of the monitorship order was agreed to and signed off on by Triadou's state court counsel and the Chetrit Entities. Had counsel stayed, she might be aware that paragraph J – which Triadou seeks to dismiss out of hand, in a footnote – was included specifically for the purpose of limiting Triadou's ability to do exactly what it is now attempting: agreeing to a watered-down version of the receivership order that Triadou might use to undercut the Kazakh Entities' motion for an injunction preventing *all types* of enforcement of Triadou's judgments.

Triadou's tactics are obvious when viewed in context: first, on April 1, 2016, the Kazakh Entities moved this Court for an order enjoining any and all enforcement of Triadou's judgments. [ECF No. 106]. In response, on April 8, 2016, Triadou moved for a receivership in the state court. Triadou then sought to narrow that receivership at and following the April 27, 2016 conference before Your Honor, and then to water it down even further before Justice Cohen on May 4th. Now Triadou seeks to use this supposedly limited monitorship order to nullify the Kazakh Entities' motion for a Preliminary Injunction – which was filed before any discussion of receivership even began. In short, Triadou created a controversy and then resolved it, claiming that the resolution – of which we were not a part – undermines the Kazak Entities' effort to seek an injunction here. This is nothing but gamesmanship, playing Triadou's presence in two courts to tactical advantage, in an effort to sideline this Court.

The Kazakh Entities' motion for a Preliminary Injunction sought "an order enjoining Triadou from enforcing any judgments it holds arising from the State Court Proceedings, or in the alternative, hold a hearing on this motion." [ECF No. 107, at 11]. Triadou's hasty creation and resolution of a dispute over a discrete type of enforcement does not negate any of the harms stated in the Kazakh Entities' initial motion, particularly when Triadou's supposedly harmless enforcement efforts occurred after the filing of the Kazakh Entities' motion. Triadou's enforcement of its judgments would still negate the Kazakh Entities' pending Crossclaims [ECF No. 107, at 5-7], and place assets to be enforced against outside the jurisdiction of this court, *id*., at 9, in addition to the harms of monitorship. Even if Triadou were correct and the monitorship order truly did negate any irreparable harm *to the project*, that order does nothing to limit the other independent harms *to the Kazakh Entities* demonstrated in the Preliminary Injunction motion.

These concerns are laid out in the testimony of the witnesses put forward by the Kazakh Entities, and that testimony is as relevant today as it was prior to the entry of the order. If Triadou believes otherwise, it is free to decline to cross-examine those witnesses, but it has offered no basis on which to strike their testimony or to cancel the hearing when the question of

the consequences of monitorship and other enforcement efforts is still very much contested. Indeed, it is the stipulation between Triadou and the Chetrit entities that should be struck, since it is an inadmissible settlement document – and not even a settlement to which the Kazakh Entities are a party – used in contravention of Federal Rule of Evidence 408.  *See Wm. Wrigley Jr. Co. v. Swerve IP, LLC*, 900 F. Supp. 2d 794, 803 (N.D. Ill. 2012) ("[T]he Court finds that it would better serve the purpose of the Rule to exclude this evidence than to allow any settlement talks . . . to undermine a claim for injunctive relief."); *Cenveo Corp. v. Diversapack LLC*, No. 09 CIV. 7544 (SAS), 2009 WL 3169484, at *5 (S.D.N.Y. Oct. 1, 2009) (noting that material which "violate[d] Federal Rule of Evidence Rule 408 . . has been excluded from consideration" at preliminary injunction hearing); *RGIS LLC v. A.S.T. Inc.*, No. CIV. 07-10975, 2008 WL 878908, at *3 (E.D. Mich. Mar. 28, 2008) (offer of compromise inadmissible under Fed. R. Evid. 408 for purpose of preliminary injunction motion).

   Finally, even if the Court indulges Triadou's argument, the testimony of Jehoshua Graff is relevant not only to the irreparable harm caused by monitorship, but also the irreparable harm caused by asset flight – because his testimony demonstrates that all funds due to Triadou were immediately wired to SDG, a foreign entity with foreign bank accounts that is currently the subject of a global freezing order – as well as to the merits question of whether Triadou continues to be controlled by Ilyas Khrapunov and Mukhtar Ablyazov and their family – because his testimony demonstrates that the source of funds for Triadou's investment was Telford International; that Triadou's counsel did not negotiate the terms of any relevant deals; and that Triadou's counsel falsely represented that wires had been sent when in fact it took weeks to receive Triadou's money, proving that Kazakh Entities' allegations about the difficulties that Ablyazov had in moving his stolen money into the United States.  Mr. Graff's testimony also authenticates the presence of Joseph Chetrit in conversations with Nicholas Bourg, in which the two openly (and also using code words) discussed the criminal investigations of Ilyas Khrapunov and Mukhtar Ablyazov.  This testimony is therefore relevant in any event.  Having now seen the Kazakh Entities' direct testimony declarations, Triadou is simply making a last attempt to avoid an evidentiary hearing that will produce facts fatal to its case.

*  *  *

   For the foregoing reasons, the Kazakh Entities respectfully request that the Court deny Triadou's application in its entirety.  We are of course available should the Court have any questions.

                Respectfully submitted,

                /s/ Matthew L. Schwartz
                Matthew L. Schwartz, Esq.
                Randall W. Jackson, Esq.
                BOIES, SCHILLER & FLEXNER LLP
                575 Lexington Avenue
                New York, NY  10022

cc:  All attorneys of record (by ECF)