**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CF 135 FLAT LLC, CF 135 WEST MEMBER LLC and THE CHETRIT GROUP, LLC, <br><br> Interpleader Plaintiffs, <br><br> -against- <br><br> TRIADOU SPV S.A., CITY OF ALMATY, a foreign city, and BTA BANK JSC, <br><br> Interpleader Defendants. <br><br>――――――――――――――――――――<br><br> CITY OF ALMATY, KAZAKHSTAN and BTA BANK JSC, <br><br> Crossclaim Plaintiffs, <br><br> -against- <br><br> MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, and TRIADOU SPV S.A., <br><br> Crossclaim Defendants. | 15 Civ. 5345 (AJN) (SN) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS AND CROSSCLAIM-PLAINTIFFS BTA BANK AND CITY OF ALMATY, KAZAKHSTAN'S MOTION FOR ANORDER OF ATTACHMENT**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF RELEVANT FACTS .................................................................................... 2

ARGUMENT ............................................................................................................................... 5

   I.   The Kazakh Entities Are Entitled to an Order of Attachment .............................................. 5

      A.   Applicable Law ............................................................................................................ 5

      B.   The Kazakh Entities Have Stated Numerous Causes of Action ................................... 6

      C.   The Kazakh Entities Have Shown a Probability of Success on the Merits ................. 9

      D.   The Kazakh Entities Have Shown That Grounds for Attachment Exist Under CPLR § 6201(1) and § 6201(3) ................................................................................................ 14

         1.   CPLR § 6201(1) is Satisfied because Triadou is A Foreign Corporation Not Qualified to do Business in the State ................................................................................................ 14

         2.   CPLR § 6201(3) is Satisfied, as Triadou has Evidenced Intent to Move Assets Outside the State to Frustrate Any Future Judgment. ......................................................... 15

      E.   The Amount Demanded Is Greater than the Amount of All Counterclaims................. 17

      F.   Attachment is Particularly Merited Here Due to Defendants' Past Conduct ................. 17

   II.   Under the Circumstances, a Minimal Undertaking is Appropriate ............................... 19

   III.   Alternately, Attachment of the Assets of Triadou is Justified Here Given Ablyazov's Judicially-Established Record of Asset Hiding and Defiance of Court Orders ....................... 20

   IV.   Plaintiffs Are Entitled to Attach the Assets and Real Property Described Herein ........ 22

CONCLUSION............................................................................................................................ 24

# TABLE OF AUTHORITIES

## Cases

*Allstate Ins. Co. v. Rozenberg*,
  771 F. Supp. 2d 254 (E.D.N.Y. 2011) ................................................................. 9

*Allstate Ins. Co. v. TMR Medibill Inc.*,
  CV–00–0002 (CPS), 2000 WL 34011895 (E.D.N.Y. July 13, 2000) ..................... 23

*Ally Bank v. Reimer*,
  No. CV 09-2795 ADS WDW, 2010 WL 446025 (E.D.N.Y. Jan. 29, 2010) ............ 8

*Ames v. Clifford*,
  863 F.Supp. 175 (S.D.N.Y.1994) ......................................................................... 20

*Ayyash v. Bank Al-Madina*,
  233 F.R.D. 325 (S.D.N.Y. 2005) ........................................................................... 9

*Bank of China, New York Branch v. NBM L.L.C.*,
  192 F. Supp. 2d 183 (S.D.N.Y. 2002) ............................................................. 7, 22

*Bank of Leumi Trust Co. of New York v. Istim, Inc.*,
  892 F. Supp. 478 (S.D.N.Y. 1995) ............................................................. 8, 11, 19

*Briarpatch Ltd., L.P v. Phoenix Pictures, Inc.*,
  373 F.3d 296 (2d Cir. 2004) ........................................................................... 10, 13

*CI Sys. (Israel) Ltd. v. Melamed*,
  290 A.D.2d 266, 735 N.Y.S.2d 769 (1st Dep't 2002) ......................................... 20

*Considar, Inc. v. Redi Corp. Establishment*,
  238 A.D.2d 111 (1st Dep't 1997) ......................................................................... 17

*Cruz v. FXDirectDealer, LLC*,
  720 F.3d 115 (2d Cir. 2013) .................................................................................. 9

*Deutsche Anlagen-Leasing GMBH v. Kuehl*,
  111 A.D.2d 69 (1st Dep't 1985) ........................................................................... 21

*DLJ Mortgage Capital, Inc. v. Kontogiannis*,
  594 F. Supp. 2d 308 (E.D.N.Y. 2009) .............................................................. 7, 12

*Gala Enterprises, Inc. v. Hewlett Packard* Co.,
  970 F. Supp. 212 (S.D.N.Y. 1997) ....................................................................... 24

*Helicon Partners, LLC v. Kim's Provision Co.*,
  No. ADV 12-01602 SMB, 2013 WL 1881744 (Bankr. S.D.N.Y. May 6, 2013) ....... 22

*In re Amaranth Natural Gas Commodities Litigation*,
  711 F. Supp.2d 301 (S.D.N.Y. 2010) .................................................................. 21

*In re Hypnotic Taxi LLC*,
  543 B.R. 365 (Bankr. E.D.N.Y. 2016) .................................................................. 18

ii

*JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*,
   306 F. Supp. 2d 482 (S.D.N.Y. 2004) ........................................................................... 12, 19

*McDonald v. Brown*,
   No. 12 CIV. 7109 WHP, 2014 WL 116003 (S.D.N.Y. Jan. 13, 2014) ................................. 15

*Michaels Elec. Supply Corp. v. Trott Elec. Inc.*,
   231 A.D.2d 695 (2d Dep't 1996) ....................................................................................... 24

*OSRecovery, Inc. v. One Group Int'l, Inc.*,
   205 F. Supp.2d 340 (S.D.N.Y. 2004) ................................................................................ 21

*Pac. M. Int'l Corp. v. Raman Int'l Gems, Ltd.*,
   888 F. Supp. 2d 385 (S.D.N.Y. 2012) ............................................................................... 10

*Priestley v. Panmedix Inc.*,
   18 F. Supp. 3d 486 (S.D.N.Y. 2014) ................................................................................ 14

*Sotheby's, Inc. v. Shene*,
   No. 04 CIV 10067 (TPG), 2009 WL 762697 (S.D.N.Y. Mar. 23, 2009) ........................... 15

*Thornapple Associates, Inc. v. Sahagen*,
   No. 06 Civ. 6412 (JFK), 2007 WL 747861 (S.D.N.Y. March 12, 2007) ............................ 20

*U. R. C. Inc. v. Applied Images Inc.*,
   106 Misc. 2d 1034, 431 N.Y.S.2d 859 (Sup. Ct. Nassau Cnty. 1980) .............................. 24

*U.S. Fidelity and Guar. Co. v. J. United Elec. Contracting Corp.*,
   62 F. Supp. 2d 915 (E.D.N.Y. 1999) ................................................................................ 21

*United States v. Orozco-Prada*,
   636 F. Supp. 1537 (S.D.N.Y. 1986) .................................................................................. 15

**Statutes**

18 U.S.C. § 1961 ............................................................................................................................ 9

18 U.S.C. § 1962 ............................................................................................................................ 8

CPLR § 5201 ................................................................................................................................ 24

CPLR § 6201 ............................................................................................................................ 7, 16

CPLR § 6202 ................................................................................................................................ 24

CPLR § 6211 .................................................................................................................................. 7

CPLR § 6212 ....................................................................................................................... 7, 19, 21

N.Y. D.C.L. § 276 ........................................................................................................................ 14

Pursuant to Federal Rule of Civil Procedure 64 and New York Civil Practice Law Rules ("CPLR") §§ 6201 *et seq.*, Defendants and Crossclaim-Plaintiffs BTA Bank and City of Almaty, Kazakhstan (collectively, the "Kazakh Entities"), respectfully submit this memorandum of law in support of their motion for an order of attachment of the assets of Defendant Triadou SPV S.A. ("Triadou").

## PRELIMINARY STATEMENT

The Kazakh Entities have been pursuing the outlaw Ablyazov-Khrapunov families for the better part of the last decade.  In this pursuit, they have obtained billions of dollars in judgments in the courts of the United Kingdom, receivership and freezing orders against Ablyazov and his son-in-law Ilyas Khrapunov, and spearheaded a global series of investigations into billions in laundered funds. Throughout this process, the Ablyazov-Khrapunov families have endeavored to keep their illicit assets one step ahead of the law by hiding assets, entering fraudulent transfers, and defying and violating court orders.  Speaking about Mukhtar Ablyazov, the now-imprisoned patriarch of the Ablyazov-Khrapunov alliance, Lord Justice Maurice Kay of the U.K. Court of Appeals stated that it was "difficult to imagine a party to commercial litigation who has acted with more cynicism, opportunism and deviousness towards court orders than Mr. Ablyazov." Tudor Decl., Ex. 34, ¶ 9. [1]

---

[1]     "Tudor Decl." refers to the May 2, 2016 Declaration of Abigail Tudor, "Bourg Decl." refers to the May 2, 2016 Declaration of Nicolas Bourg, and "Exhibit" or "Ex." refer to the continuously-numbered exhibits supporting these declarations, copies of which accompany this motion. These declarations and all supporting exhibits cited herein were served upon the Court and the parties on May 2, 2016 by e-mail, pursuant to the Rule 5(F)(iii) of the Court's Individual Practices in Civil Cases.

In light of the recent monitorship and escrow agreement between Triadou and the Chetrit Entities[2] regarding distribution of funds derived from the Flatotel condominium conversion project ("the Flatotel"), the Kazakh Entities respectfully move for an order of attachment of Triadou's assets, specifically including certain assets which may be held in escrow under this agreement.  As set forth below, the facts that establish the Kazakh Entities' entitlement to the remedy of attachment are largely the same as the facts that establish their entitlement to a preliminary injunction.  Accordingly, the Kazakh Entities respectfully request that that Court consider this motion in light of the record submitted in connection with their preliminary injunction motion, including the facts to be established at the evidentiary hearing scheduled for May 19, 2016.

## STATEMENT OF RELEVANT FACTS[3]

The Kazakh Entities consist of BTA Bank, one of the largest banks in Kazakhstan, which until recently was under public ownership, and the City of Almaty, the largest city and former capital of the Republic of Kazakhstan. The Kazakh Entities have cooperated with each other and law enforcement to track down and recover stolen assets from an extended family of corrupt public servants. Mukhtar Ablyazov is BTA Bank's former chairman, who abused his position at BTA Bank to steer billions in funds to himself through a web of shell entities, and then fled the country when his self-dealing led to the bank's near collapse in 2008. Viktor Khrapunov is Almaty's former Mayor, who embezzled millions of dollars through abuse of his

---

[2]    "Chetrit Entities" refers to Plaintiffs CF 135 Flat LLC, CF 135 West Member LLC, and the Chetrit Group, LLC. "Crossclaims" refers to the October 12, 2015 Answer and Crossclaims filed in this action. [ECF No. 49].

[3]    For a complete recitation of the facts, the Kazakh Entities respectfully refer the Court to the Crossclaims, as well as to the exhibits and affidavits previously submitted in connection with the Kazakh Entities' motion for a preliminary injunction. For the Court's convenience, the relevant facts are also briefly summarized here.

position, which he then laundered out of the country with the aid of his wife, Leila, and his son Ilyas. Ilyas Khrapunov, who is Ablyazov's son-in-law and financial adviser, has been the front for the combined families' efforts to hide and launder their collective stolen assets. This laundering enterprise includes numerous investment vehicles and shell companies, among them, the Swiss Development Group (formally SDG Capital S.A., hereinafter "SDG") and its subsidiary, Triadou.

Through Triadou, the Ablyazov-Khrapunov families invested no less than $38.5 million with the Chetrit Group, a real estate development entity co-owned by prominent developer Joseph Chetrit. Triadou, which was a shell company operating as a front for SDG, was the face for these investments with Chetrit, but the funds for these investments came directly from a separate Ablyazov-controlled entity, Telford International Limited. *See* Bourg Decl., ¶ 20-21. The bulk of Triadou's investment with Chetrit was in the condominium conversion of the former Flatotel in Manhattan. *See Id.*, ¶ 11-19; Crossclaims, ¶100-114.

When Triadou and the people who controlled it learned that the Kazakh Entities had traced their stolen assets to the United States, however, Triadou executed a hasty, below-market transfer of its Flatotel investment back to the Chetrit Entities. *See* Bourg Decl., ¶ 37-41. But the Chetrit Entities failed to pay, so Triadou sued the Chetrit Entities in New York state court for breach of contract. Ultimately, Triadou obtained two judgments for a total of $10.5 million, with motions for summary judgment pending with respect to an additional $10.5 million.

The Kazakh Entities' global pursuit of the Ablyazov-Khrapunov families' money laundering network led them to the investments with the Chetrit Entities in New York, and when the Chetrit Entities were put on notice that the Kazakh Entities had claims to the funds invested by Triadou, they filed an interpleader action in New York state court to determine who was

3

rightfully owed the funds deriving from Triadou's investment in the Flatotel. That interpleader

action was removed to this court. [ECF No. 1]. The Kazakh Entities then filed extensive

crossclaims against Triadou, as well as against Ablyazov and Ilyas and Viktor Khrapunov. [ECF

No. 49].

By Order dated March 18, 2016, this Court dismissed the interpleader. [ECF No. 103].

With the dismissal of the interpleader action, the Kazakh Entities moved this court for a

preliminary injunction, seeking to enjoin any attempt by Triadou to enforce judgments it holds

against the Chetrit Entities during the pendency of this action. [ECF No. 106].[4]  In response to

the Kazakh Entities' motion for a preliminary injunction, Triadou moved in the state court for

appointment of a receiver to take control of the Flatotel project and begin distributing funds to

Triadou to satisfy its judgments. The Chetrit Entities opposed any receivership, and the state

court scheduled a hearing on the motion for May 4, 2016.

On May 4th, the Chetrit Entities and Triadou appeared before Justice Cohen in the state

court regarding Triadou's motion for a receiver. The parties there ultimately reached an

agreement to appoint the Honorable Herman Cahn of Wolf Haldenstein Adler Freeman & Herz

LLP as a monitor over the Chetrit Entities' membership interests in 135 West 52nd Street Holder

LLC (the "Monitorship Agreement"). This monitor was appointed "for the sole purpose of

monitoring the financial transactions of the Flatotel Condominium project and monitoring and

collecting all distributions and any other funds to which Defendants 135 Flat and 135 West

Member are entitled up to the amount so as to satisfy Triadou's judgments." Monitorship

Agreement, ECF No. 132-1, ¶ A. Under the Monitorship Agreement, the monitor collects and

---

[4]        As the Court is aware, the Kazakh Entities have also filed a motion for reconsideration of
that decision.  [ECF No. 104].  Should the Court grant reconsideration and decline to dismiss the
interpleader, the funds allegedly due to Triadou would be deposited with the Court.

holds in escrow any and all "distributions and any other funds to which [the Chetrit Entities] are entitled with respect to the Flatotel Project sufficient to satisfy the outstanding judgments in favor of Triadou including any accrued pre- or post-judgment interest." *Id.*, ¶ C. The monitor holds these funds in escrow until released by order of the state court to satisfy Triadou's judgments. *Id.*, ¶ G. Triadou has represented that should the Kazakh Entities' motion for a preliminary injunction be denied, it will move immediately for the release of any funds held in escrow by the monitor.

## ARGUMENT

### I.     The Kazakh Entities Are Entitled to an Order of Attachment

#### A.     Applicable Law

"Federal Rule of Civil Procedure 64 permits federal litigants to seek an order of attachment in the manner provided by the law of the state in which the district court sits." *DLJ Mortgage Capital, Inc. v. Kontogiannis*, 594 F. Supp. 2d 308, 318 (E.D.N.Y. 2009); Fed. R. Civ. P. 64(a) (identifying attachment as a remedy "under the law of the state where the court is located" available to federal litigants).

CPLR § 6211(a) provides that an "order of attachment may be granted without notice, before or after service of summons and at any time prior to judgment."  Under New York law, a party is entitled to an order of attachment upon demonstrating that: (1) the party has a cause of action; (2) it is likely to succeed on the merits; (3) one or more grounds for attachment set out in CPLR § 6201 exists; and (4) the amount demanded exceeds all counterclaims known to the party. CPLR § 6212(a); *see also Bank of China, New York Branch v. NBM L.L.C.*, 192 F. Supp. 2d 183, 187 (S.D.N.Y. 2002) ("[O]n a motion for or to confirm an order of attachment, a plaintiff is required to show, by affidavit or other written evidence, that (1) there is a cause of action; (2)

it is probable that plaintiff will succeed on the merits; (3) one or more of the § 6201 grounds for attachment exist; and (4) the amount demanded from the defendant exceeds all counterclaims known to the plaintiff."). When considering the first two requirements, "the court must give the plaintiff the benefit of all the legitimate inferences that can be drawn from the facts." *Bank of Leumi Trust Co. of New York v. Istim, Inc.,* 892 F. Supp. 478, 482 (S.D.N.Y. 1995).

### B.      The Kazakh Entities Have Stated Numerous Causes of Action

The Kazakh Entities have stated a number of causes of action, and thus met the first prong under Section 6212(a). As described in detail in the Crossclaims, Triadou is liable to the Kazakh Entities for a violations of RICO, 18 U.S.C. § 1962(c)), for fraudulent transfer, conversion, unjust enrichment, and for other appropriately pleaded causes of action. Moreover, "[t]he standard for determining whether a cause of action exists for purposes of attachment under New York law is a liberal one. Unless the plaintiff's papers clearly establish that the plaintiff must ultimately be defeated, a cause of action exists." *Ally Bank v. Reimer*, No. CV 09-2795 ADS WDW, 2010 WL 446025, at *3 (E.D.N.Y. Jan. 29, 2010) (internal quotations and citations omitted).

The Kazakh Entities have pleaded extensive RICO claims (Crossclaims, ¶¶ 134-168), and submitted supporting affidavits and documentary evidence detailing Triadou's role as a shell corporation used by the Ablyazov-Khrapunov families to launder funds through New York real estate. "To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. § 1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962. To establish a violation of § 1962(c), in turn, a plaintiff must show that a person engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering

activity." *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (internal citations and quotation marks omitted).[5]

The Crossclaims allege all elements of several civil RICO claims. The Ablyazov-Khrapunov Group – alone and together with the Chetrit Entities – as well as defendant LLCs constitute "enterprises" as associations-in-fact and legal entities, respectively. 18 U.S.C. § 1961(4); *see also* Crossclaims ¶¶ 136-137, 144, 151, 159. The individual defendants gained control of and conducted the affairs of these enterprises through their racketeering activity, for example, by participating in the scheme to launder money through New York real estate investments. Crossclaims ¶¶ 139, 147, 162; *see also id.* ¶¶ 153-155 (describing the investment of racketeering proceeds in enterprises). The numerous related acts of money laundering, mail and wire fraud, and transactions in stolen property committed by the individual defendants form a "pattern of racketeering activity." 18 U.S.C. § 1961(5); *see* Crossclaims ¶ 140. Defendants' acts are all related to the goal of frustrating the Kazakh Entities' efforts at reclaiming its stolen property by hiding and laundering those assets in New York real estate. Together, these allegations adequately support claims under RICO sufficient for an order of attachment. *See Allstate Ins. Co. v. Rozenberg*, 771 F. Supp. 2d 254, 269 (E.D.N.Y. 2011) ("[E]vidence of [a] money laundering scheme, in connection with evidence of specific actions taken by [defendants] that provided circumstantial evidence of [defendants'] intent to move their assets in order to frustrate a judgment, was sufficient to satisfy the Plaintiffs' burden under CPLR § 6201(3)."); *Ayyash v. Bank Al-Madina*, 233 F.R.D. 325, 327 (S.D.N.Y. 2005) (granting RICO plaintiff's motion for attachment, noting that "[w]hile the difficulty of prevailing in civil RICO actions

---

[5]     The Kazakh Entities also allege violations of § 1962(a), which concerns the investment of income derived from a pattern of racketeering activity in the acquisition of an enterprise. *See* Crossclaims ¶¶ 149-156.

gives some pause, plaintiff has made a substantial showing of merit to his claims, and there are no known counterclaims.") (Lynch, J.).

In addition to the RICO claims, the Kazakh Entities have brought numerous state and common law claims, including fraudulent transfer (Counts VI, VII), unjust enrichment (Count VII), and conversion (Count X). Crossclaims, ¶ 169-180, 181-185,193-196. These claims are also adequately pleaded. For example, "[t]he basic elements of an unjust enrichment claim in New York require proof that (1) defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience militate against permitting defendant to retain what plaintiff is seeking to recover." *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc*., 373 F.3d 296, 306 (2d Cir. 2004). The Kazakh Entities have alleged and provided evidence to demonstrate that that (1) Triadou received a valuable asset in the form of the Flatotel interest (Crossclaims, ¶ 105), (2) purchased with funds stolen from the Kazakh Entities (*id*., ¶¶ 88, 108-110, 131; Bourg Decl., ¶10, 20), and (3) that it "would be inequitable to permit Defendants to retain the profits derived from the looting of assets rightfully belonging to the [Kazakh Entities]." *Id*., ¶ 185; *see also* Bourg Decl., ¶ 17-22.

Similarly, the "[t]wo key elements of conversion are (1) plaintiff's possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiffs [sic] rights." *Pac. M. Int'l Corp. v. Raman Int'l Gems, Ltd*., 888 F. Supp. 2d 385, 396 (S.D.N.Y. 2012) (internal citations omitted). Additionally, "[a] plaintiff alleging conversion need not show fault by the defendant." *Id*. The Kazakh Entities have alleged and demonstrated (1) that "[n]one of the Defendants has a superior interest to the [Kazakh Entities] in the assets wrongfully taken by the Ablyazov-Khrapunov Group. These funds, and the assets they were used to purchase, are the rightful property of the people of the [Kazakh Entities],"

(Crossclaims, ¶ 194), and that (2) "Defendants have wrongfully and without authorization exercised of dominion and control over property of [the Kazakh Entities]." *Id.*, ¶ 196.

Notably, while Triadou has moved to dismiss all of the Crossclaims on the grounds of *forum non convenience,* and disputed the validity of some of the Kazakh Entities' state and common law claims, Triadou did not move to dismiss the Kazakh Entities' fraudulent transfer, conversion, or unjust enrichment claims. *See* Triadou's Mem. of Law in support of Mot. to Dismiss, ECF No. 86, at 28, n.21 (Identifying Counts IX, XI, and XII as deficient). Triadou's failure to attack these state and common law claims, even while moving to dismiss others, is sufficient to establish that the Kazakh Entities have brought legitimate causes of action. This is particularly true given the requirement that the Court give the Kazakh Entities the benefit of all legitimate inferences that can be drawn from the facts. *Bank of Leumi*, 892 F. Supp. at 482.

While the Kazakh Entities have also sought equitable relief, the Crossclaims seek "compensatory, punitive, and treble damages." Crossclaims, at 49.  The full extent of the Kazakh Entities damages would be proven at trial, but this amount is certain to be no less than the approximately $38,475,000 wired to fund Triadou's investments in New York. *See* Bourg Decl., Ex. 4, 5 (compilation of wire transfer records and accompanying correspondence).

### C.    The Kazakh Entities Have Shown a Probability of Success on the Merits

The details of the Crossclaims and the documents submitted by the Kazakh Entities in support demonstrate that the second prong of the test has also been satisfied. Under CPLR § 6212(a), in order to secure an order of attachment, a party must also demonstrate a "probability of success on the merits." The party must demonstrate by affidavit, and any other evidence, that it is "more likely than not that it will succeed on its claims." *DLJ Mortgage Capital, Inc. v. Kontogiannis*, 594 F. Supp. 2d 308, 319 (E.D.N.Y. 2009).  Unlike the somewhat more

demanding standard at play in deciding a motion for injunctive relief, "[i]n determining whether there is a likelihood of success on the merits [for purposes of an order of attachment], all legitimate inferences should be drawn in favor of the party seeking the attachment." *JSC Foreign Econ. Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 306 F. Supp. 2d 482, 485 (S.D.N.Y. 2004).

Here, the Kazakh Entities have submitted, among other evidence: (1) an affidavit of Nicolas Bourg, Triadou's sole Director during all relevant times, demonstrating that Triadou was a shell company used to invest the funds of the Ablyazov Khrapunov families covertly; (2) an affidavit of Jehoshua Graff, counsel for the Chetrit Entities, establishing that all funds received on Triadou's behalf came from Telford International, *see* Graff Aff., ¶ 8-10; (3) numerous judgments from the U.K. Courts against Ablyazov detailing Ablyazov's fraud and awarding BTA Bank billions in damages, *see* Tudor Decl., Ex. 22, 34, 35; (4) freezing and receivership orders of the U.K. Courts as to Ablyazov and Ilyas Khrapunov's interest in SDG and/or Triadou, *see* Tudor Decl., Ex. 23, 24, 25; (5) a number of other documents corroborating the Kazakh Entities' allegations of fraud and money laundering.

The Kazakh Entities have provided sufficient evidence establishing that Triadou was and is a front used for money laundering purposes, intended solely to move, invest, and obscure funds stolen from the Kazakh Entities:

- The Courts of the United Kingdom have awarded BTA Bank numerous judgments finding that Ablyazov abused his position as Chairman of BTA Bank to enrich himself by at least $4 billion dollars. Tudor Decl., Ex. 34, 35.

- Triadou was incorporated under the laws of Luxembourg as a subsidiary of SDG, which was owned and controlled by Ablyazov' son-in-law, Ilyas Khrapunov, and operated at Ablyazov's direction to "manag[e] a large amount of Ablyazov's money." Bourg Decl. ¶ 6-9.

10

- Documentary evidence including Society for Worldwide Interbank Financial Telecommunication, or "SWIFT," messages establishes that Triadou's investments with the Chetrit Entities were funded by Telford International Ltd., through FBME Bank in Nicosia, Cyprus. Bourg Decl., Ex. 4, 5.

- The sworn testimony of Triadou's former director establishes that "Telford was an Ablyazov investment entity used to conceal and move his funds, and was controlled by Eesh Aggerwal, a financial advisor loyal to Ablyazov." Bourg Decl., ¶ 10.

- Triadou's parent, SDG, was the subject of a sham sale intended to disguise the ownership of its assets, including Triadou. Bourg Decl., ¶ 32-33 ("While the Flatotel deal was being negotiated, pressure on Ilyas and his extended family began to mount as the investigations in Kazakhstan extended into Switzerland and his extended family's assets began to be frozen or scrutinized. . . A sale of SDG to Glatz was described to me by Ilyas as the solution to this increasing scrutiny on SDG. . . This sham sale of SDG to Glatz was directly in response to banks' refusals to move money for SDG, and was intended to increase SDG's investment opportunities.").

- The below-market assignment of Triadou's interest in the Flatotel, which is the basis of Triadou's judgments, was made directly in response to the Kazakh Entities' filing of a lawsuit against Triadou's beneficial owners, in order to frustrate any judgment and hide assets. Bourg Decl., ¶ 37-38.

This evidence is more than enough to establish that "it is probable that the plaintiff will succeed on the merits." CPLR § 6212(a). For example, as noted above, an unjust enrichment claim in New York requires proof that (1) the defendant was enriched, (2) at plaintiff's expense, and (3) equity and good conscience prohibits defendant from retaining what the plaintiff is seeking to recover. *Briarpatch Ltd.*, 373 F.3d at 306. Here, (1) Triadou gained the Flatotel interest – which it assigned for at least $26 million – (2) with funds Ablyazov stole and hid from the Kazakh Entities, and (3) now seeks to retain the fruits of that investment of stolen money. *See* Bourg Decl., ¶¶ 10, 17-20.

Similarly, the Kazakh Entities have established that they are more likely than not to prevail on their fraudulent transfer claims:  New York Debtor and Creditor Law § 276 provides that "[e]very conveyance made and every obligation incurred with actual intent, as distinguished

from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors." N.Y. D.C.L. § 276. Fraud is "broadly defined" under § 276 "to include an 'actual intent to hinder, delay, or defraud.'" *Priestley v. Panmedix Inc*., 18 F. Supp. 3d 486, 502 (S.D.N.Y. 2014). Here, Bourg has testified that "[i]n response to" the lawsuit in California, Ilyas Khrapunov told him to "begin liquidating Triadou's assets in New York so that funds could be removed from the United States and concealed elsewhere." Bourg Decl., ¶ 38. This record further establishes that Triadou assigned its interest for as little as $26 million, when it invested at least $38.5 million with Chetrit, internally valued the Flatotel interest at $62,000,000 shortly beforehand, and projected it to be worth an estimated $114,000,000 upon exit. Bourg Decl., Ex. 6, at 6. These are obvious "badges of fraud . . . *i.e.,* circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *Priestley*, 18 F. Supp. 3d at 502.

Triadou's only rebuttal thus far has been to claim that SDG's purported sale in 2013 to Phillippe Glatz, an associate of Ilyas Khrapunov's, was legitimate. This claim has been rebutted by the testimony of Triadou's own director (Bourg Decl., ¶¶29-34), and the documented refusals of financial institutions to do business with SDG after these banks' due diligence determined that "[h]ow and where . . . Mr. Glatz found the [Swiss francs] 10 million that was used to recapitalize SDG is unclear," leaving the bank's compliance officers "not persuaded that there's been any real change in the ownership of SDG." Bourg Decl., Ex. 7, at 3.

Nonetheless, even if Triadou were able to establish that the sale to Glatz in 2013 was not a sham, the Kazakh Entities would still prevail on their claims. Bourg's testimony, e-mails, and SWIFT records establish that approximately $38.5 million of Ablyazov's stolen money was wired from Telford, at Ilyas Khrapunov's direction, to purchase the Flatotel interest prior to any

purported acquisition. A subsequent purchase of SDG's assets (including Triadou and the Flatotel interest) would not prevent the Kazakh Entities' claims from succeeding: "A good-faith purchaser of a stolen object is not considered to have valid title to the object, because 'a purchaser cannot acquire good title from a thief.'" *Sotheby's, Inc. v. Shene*, No. 04 CIV 10067 (TPG), 2009 WL 762697, at *2 (S.D.N.Y. Mar. 23, 2009) (quoting *Kunstsammlungen zu Weimar v. Elicofon*, 678 F.2d 1150, 1160 (2d Cir.1982)).[6]

In addition to the evidence presented above, the court has already ordered an evidentiary hearing on the Kazakh Entities' pending motion for preliminary injunction [ECF No. 106], which is currently scheduled for May 19, 2016. [ECF No. 122]. The evidence adduced in that hearing will go to many of the ***exact same*** questions at issue here – the Kazakh Entities' likelihood of success on the merits – and will augment this record while presenting no additional burden on the Court or parties. To the contrary, Triadou is in a far better position than the typical litigant facing a motion for attachment, as Triadou has already seen the evidence the Kazakh Entities will rely on, will be able to cross examine the witnesses the Kazakh Entities have identified, and has notified the court that it intends to call its own witnesses, including one of its own Directors. [ECF No. 134].

---

[6] Even if the purported sale to Glatz actually occurred, it is not remotely clear that Glatz would qualify for the protection afforded a "bona fide purchaser." *See McDonald v. Brown*, No. 12 CIV. 7109 WHP, 2014 WL 116003, at *3 (S.D.N.Y. Jan. 13, 2014) ("A bona fide purchaser is one who obtains title for valuable consideration and lacks notice of 'the fraudulent intent of his immediate grantor, or of the fraud rendering void the title of such grantor.'" (quoting *Morris v. Adams*, 919 N.Y.S.2d 36, 37 (2d Dep't 2011))). The burden of proving these elements would be on Glatz himself, who has not been noticed as a witness at the upcoming evidentiary hearing. *See United States v. Orozco-Prada*, 636 F. Supp. 1537, 1542 (S.D.N.Y. 1986), aff'd, 847 F.2d 836 (2d Cir. 1988) ("[T]he burden of proof rests with [transferees] to establish that, indeed, they were *bona fide* purchasers for valuable consideration and had neither actual nor constructive knowledge that the conveyance [to transferee] was fraudulent.").

**D.     The Kazakh Entities Have Shown That Grounds for Attachment Exist Under CPLR § 6201(1) and § 6201(3)**

The third requirement under Section 6212(a) is that a party demonstrate the applicability of any one of the five grounds under CPLR § 6201.  Here, the Kazakh Entities can demonstrate that this case falls under the first and third provisions of this Section. The first provision provides that an order of attachment may be granted where the plaintiff can demonstrate that "the defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state." CPLR § 6201(1).  Subsection three provides that such an order may be granted where the Defendant "with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts." CPLR § 6201(3).

**1.     *CPLR § 6201(1) is Satisfied because Triadou is A Foreign Corporation Not Qualified to do Business in the State***

Triadou is a foreign corporation, organized under the laws of Luxembourg. Bourg Decl., ¶ 6. Triadou is not registered to do business in New York and does not appear in a search of the New York Secretary of State's Corporation and Business Entity Database.[7] Triadou has in fact affirmatively argued that it has limited, if any, connections with this state already, moving to dismiss the Kazakh Entities' Crossclaims on the grounds of *forum non conveniens*, and stating that "Triadou's principal place of business is in Geneva, Switzerland" and that Triadou has only

---

[7]     Search of the Corporation & Business Entity Database, N.Y. Dep't of State, http://www.dos.ny.gov/corps/bus_entity_search.html (search "Triadou" for (1), "ALL" for (2), and "CONTAINS" for (3)).

a "minor connection to New York in the form of its financial investment." ECF No. 86, at 21, 18.[8]

The Kazakh Entities have thus satisfied the requirements of CPLR 6201(1). *See, e.g.*, *Considar, Inc. v. Redi Corp. Establishment*, 238 A.D.2d 111, 111-13 (1st Dep't 1997) (reversing lower court's denial of the plaintiff's motion for an attachment where it was undisputed that the defendant was a foreign corporation not qualified to do business in New York).

### 2. CPLR § 6201(3) is Satisfied, as Triadou has Evidenced Intent to Move Assets Outside the State to Frustrate Any Future Judgment.

In addition to meeting the requirements of CPLR § 6201(1), the Kazakh Entities motion for attachment also satisfies CPLR 6201(3). Should the escrow be released to Triadou, all funds would immediately be moved out of the jurisdiction for the purposes of frustrating any future judgments in favor of the Kazakh Entities. Triadou has no known bank accounts in this jurisdiction, and any funds released to Triadou from the escrow will immediately be moved overseas. Bourg Decl., ¶ 43. Where Triadou has been owed funds in the past, those funds were wired directly to Swiss banking institutions, for the benefit of Triadou's parent, SDG. *See* Tudor Decl., Ex. 16 (wire transfer authorization from the Chetrit Entities to Compagnie Privee du Conseils et d'Investissements S.A. in Geneva, Switzerland, for the benefit of SDG, identified as "loan on behalf of Triadou SPV S.A."). Bourg, Triadou's former sole director, has confirmed that "[w]here Triadou has been owed funds in the past, that money never went directly to

---

[8]     The individual defendants, Mukhtar Ablyazov, Viktor Khrapunov, and Ilyas Khrapunov, who either have not answered or are in the process of being served by foreign authorities, all are non-domiciliaries that do not reside in New York. New York law defines domicile in terms of the "union of residence in fact and an absolute and fixed intention to abandon the former and make the new locality a fixed and permanent home." *Hosley v. Curry*, 85 N.Y.2d 447, 451 (1995). Ablyazov is currently incarcerated in France and was served with process there (ECF No. 123), and prior to his incarceration, resided in the United Kingdom. Crossclaims, ¶ 41. Both Viktor and Ilyas Khrapunov reside in Geneva, Switzerland. Crossclaims, ¶ 40-42.

Triadou or remained in the United States, and was always moved directly to other entities."
Bourg Decl., ¶ 43.

As noted above, "[b]ecause '[f]raudulent intent is rarely susceptible to direct proof,'
courts look to 'badges of fraud' to establish actual intent." *In re Hypnotic Taxi LLC*, 543 B.R.
365, 374 (Bankr. E.D.N.Y. 2016) (quoting *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir.1983)).
These badges include the inadequacy of the consideration paid, the relationship between the
parties, the seller's financial position, and the chronology of events. *Id.* Triadou's fraudulent
intent here is evidenced by its prior attempts to fraudulently convey property to frustrate the
Kazakh Entities, as detailed in the Crossclaims and Bourg Declaration. *See* Crossclaims, ¶ 115-
120; Bourg Decl., ¶ 37-40.

The City of Almaty brought racketeering claims in California in May of 2014 against
some of Triadou's beneficial owners, including Ilyas Khrapunov. Crossclaims, ¶ 115. Ilyas
Khrapunov then immediately "directed [Bourg] to begin liquidating Triadou's assets in New
York so that funds could be removed from the United States and concealed elsewhere," (Bourg.
Decl., ¶ 38), and within 90 days, Triadou had assigned its interest in the Flatotel back the Chetrit
entities for less than was originally paid, despite the value of that investment appreciating since
the initial investment. Triadou's own November 2013 financial report valued the Flatotel interest
at $62,000,000 at that time, and projected it to be worth an estimated $114,000,000 upon exit in
2015. Bourg Decl., Ex. 6, at 6. Yet less than one year later, Triadou hastily assigned away that
same interest for as little as $26 million. Bourg Decl., ¶ 40.

Such a substantial discount on an otherwise valuable asset, made in secret shortly after
and because of the filing of racketeering claims against Triadou's beneficial owner, evidences
Triadou's intent to defraud and frustrate any judgments against is. "The overwhelming weight of

authority in New York State courts and courts in this District favors the view that § 6201(3) may

be satisfied where the plaintiff merely demonstrates *past* fraudulent transfers by the defendant."

*New York Dist. Council of Carpenters Pension Fund v. KW Const., Inc.*, No. 07 CIV. 8008

(RJS), 2008 WL 2115225, at *6 (S.D.N.Y. May 16, 2008).

### E.      The Amount Demanded Is Greater than the Amount of All Counterclaims

The fourth prong of CPLR § 6212(a) requires that the Kazakh Entities demonstrate that

"the amount demanded exceeds all counterclaims known to the plaintiff." Triadou has brought

no crossclaims against the Kazakh Entities, and the courts have noted that this prong will be

satisfied where, as here, defendants have not set forth any counterclaims. *JSC Foreign Econ.*

*Ass'n Technostroyexport v. Int'l Dev. & Trade Servs., Inc.*, 306 F. Supp. 2d 482, 485 (S.D.N.Y.

2004). Moreover, courts will only consider the potential counterclaims that the movant

"concedes are just" and thus pending counterclaims not endorsed by plaintiff will not defeat an

order of attachment. *Bank of Leumi Trust Co. of New York*, 892 F. Supp. at 482 (collecting cases

showing that in "determining whether the fourth requirement, that 'the amount demanded from

the defendant exceeds all counterclaims known to the plaintiff' is met, courts are to examine only

the amount of the counterclaims that the plaintiff concedes are just."). Thus the Kazakh Entities

have satisfied this requisite showing under CPLR § 6212(a).

### F.      Attachment is Particularly Merited Here Due to Triadou's Past Conduct

Where non-domiciliary defendants have consented to jurisdiction and attachment is

sought for security purposes and not to establish jurisdiction, courts in New York have

sometimes required that movant make an additional showing, establishing that the attachment is

merited due to plaintiff's need to protect enforcement of a judgment. "New York courts have

required an additional showing that something, whether it is a defendant's financial position or

past and present conduct, poses a real risk of the enforcement of a future judgment." *Ames v. Clifford*, 863 F.Supp. 175, 177 (S.D.N.Y.1994) (citations omitted). "Courts have granted orders of attachment in aid of security against a non-domiciliary defendant after finding that the defendant did not have sufficient assets in New York." *Thornapple Associates, Inc. v. Sahagen*, No. 06 Civ. 6412 (JFK), 2007 WL 747861, at *8 (S.D.N.Y. March 12, 2007) (collecting cases).

Here, Triadou has represented to the court that it has only a "minor connection to New York in the form of its financial investment." ECF No. 86, at 21, 18. Triadou's former director has also testified that Triadou does not hold funds, but rather immediately moves all liquid assets to other entities overseas. Bourg Decl., ¶ 43 ("[M]oney never went directly to Triadou or remained in the United States, and was always moved directly to other entities."). Plaintiffs are aware of no assets, other than the monitor's escrow, that Triadou has an interest in which might come close to the Kazakh Entities' expected damages, or even the approximately $38.5 million transferred directly into New York for Triadou's investments. *See Davila Pena v. Morgan*, 149 F.Supp.2d 91, 94 (S.D.N.Y.2001) (ordering attachment in aid of security where most of defendant's assets were outside of New York, and noting defendant's failure to "give any assurance that assets will be kept in any jurisdictions where they readily could be applied to any judgment."); *Thornapple Associates, Inc,,* 2007 WL 747861, at *6 (finding that defendant's "lack of assets in New York, apart from the easily transferable cash . . . thus weighs in favor of attachment.").

Courts have also found the additional necessity showing satisfied where defendant is likely to face a significant monetary judgment, has overseas familial connections and business ties, and has the incentive to secrete or dispose of assets. *CI Sys. (Israel) Ltd. v. Melamed*, 290 A.D.2d 266, 735 N.Y.S.2d 769 (1st Dep't 2002) (finding "clear necessity for a continuance of

the levy of attachment on defendant's three condominium style apartments in New York City,

given the ease with which the property can be liquidated and the substantial allegations of

misappropriation against defendant."); *Deutsche Anlagen-Leasing GMBH v. Kuehl*, 111 A.D.2d

69, 71 (1st Dep't 1985) (finding need for security demonstrated where defendant was non-

domiciliary and nonresident, the attached assets were liquid, and defendant faced fraud

prosecution in Germany). Here, all of these factors apply. Triadou is beneficially owned and

operated by foreign citizens with substantial family and business ties overseas. The Ablyazov-

Khrapunov families have numerous incentives and options to dispose of assets, particularly

given the global investigations centered on them and the incarceration and impending extradition

of Ablyazov himself. To the extent that any special necessity demonstration is warranted, the

Kazakh Entities have met it here.

## II.     Under the Circumstances, a Minimal Undertaking is Appropriate

Where, as here, a plaintiff's likelihood of success is high, courts typically require a

minimal undertaking. *See, e.g., U.S. Fidelity and Guar. Co. v. J. United Elec. Contracting Corp.*,

62 F. Supp. 2d 915, 925 (E.D.N.Y. 1999) (ordering undertaking in amount of $500 "in light of

the likelihood that the Sureties will prevail on their claims"). CPLR § 6212(b) requires the

posting of an undertaking in an amount no less than $500, to be determined by the court. Courts

have found undertakings between .04% and .35% of the amount being attached sufficient. *See,*

*e.g., In re Amaranth Natural Gas Commodities Litigation,* 711 F. Supp.2d 301, 313 (S.D.N.Y.

2010) (undertaking of $250,000 sufficient to secure attachment in amount of $72.4 million which

is .35% of the assets); *OSRecovery, Inc. v. One Group Int'l, Inc.*, 205 F. Supp.2d 340, 348

(S.D.N.Y. 2004) (undertaking of $1 million sufficient where attachment sought assets totaling

$250 million which was .04 percent of the assets sought to be attached). Based on the compelling

circumstances here, the Kazakh Entities respectfully submit that a minimal undertaking is

appropriate for this attachment.  In this case, an undertaking in the amount of $10,000, or .05%

of the $21 million in controversy, is more than sufficient. *See Bank of China*, 192 F. Supp. 2d at

185-86 (endorsing sufficiency of $5,000 undertaking where a $34 million debt was at issue).

### III.     Alternately, Attachment of the Assets of Triadou is Justified Here Given Ablyazov's Judicially-Established Record of Asset Hiding and Defiance of Court Orders

While an order of attachment is fully justified based on Triadou's own conduct and the

Kazakh Entities' pending crossclaims against Triadou, attachment is also warranted based on the

judicially-established record of Ablyazov's efforts to hide his assets from the Kazakh Entities.

The Kazakh Entities have offered evidence that Triadou existed to obscure and launder

Ablyazov's wealth, and that Ablyazov held final managerial control over all of Triadou's

actions:

> Ilyas repeatedly informed me that the person who gave him final
> approval for all deals was Ablyazov. Ilyas stated to me that he was
> managing a large amount of Ablyazov's money, and for that
> reason, Ablyazov was the ultimate decision maker on all of
> Triadou's investments. According to Ilyas, he had significant
> freedom in the management of various investments, but the final
> decisions were always received directly from Ablyazov. This
> arrangement was confirmed for me on several occasions when I
> observed that Ilyas needed to wait for Ablyazov's approval before
> authorizing a particular Triadou investment or payment.

Bourg Decl., ¶ 9. While Triadou's day-to-day management was at the direction of Ilyas

Khrapunov, the company was strategically controlled by Ablyazov for the purpose of hiding his

assets from the Kazakh Entities.

"Alter egos own a pool of common assets, and creditors may look to the assets of one to

satisfy claims against the other . . . . Hence, the creditor of one alter ego can attach the assets

held in the name of the other alter ego." *Helicon Partners, LLC v. Kim's Provision Co.*, No.

ADV 12-01602 SMB, 2013 WL 1881744, at *7 (Bankr. S.D.N.Y. May 6, 2013). Piercing the corporate veil generally requires showing that the owners of the separate entities dominated the corporation in respect to the transactions in question and did so to promote fraud or injustice. *Allstate Ins. Co. v. TMR Medibill Inc.*, CV–00–0002 (CPS), 2000 WL 34011895, at * 16 (E.D.N.Y. July 13, 2000) (allowing attachment of non-party's assets because plaintiffs made sufficient showing regarding its reverse corporate veil piercing claim). "New York law, however, also recognizes 'reverse piercing,' which seeks to hold a corporation accountable for actions of its shareholders." *Id*.

The Kazakh Entities unquestionably have extensive claims against Ablyazov, and have already succeeded on similar claims as to other Ablyazov assets in the United Kingdom. *See, e.g.* Tudor Decl., Ex. 34 at ¶ 93 ("I am satisfied that the Bank's application for summary judgment should succeed. The principal amount for which judgment is claimed in the application notice is US$294,138,715.27 . . . I will order Mr Ablyazov to pay that sum, which represents the financial benefit received by his companies as a result of his fraud.").

Ablyazov's assets are currently under global freezing and receivership orders, which were based on findings as to his willingness and intent to hide his assets from the Kazakh Entities. *See* Tudor Decl., Ex. 23, 24. Both Ablyazov and Ilyas Khrapunov have invoked their rights against self-incrimination in connection with those freezing orders, citing this action to argue that mandatory disclosure of their assets would expose them to criminal sanctions in numerous jurisdictions. *See* Tudor Decl., Ex. 25, at ¶¶ 5-12, 20, 28-30. Ablyazov exercised dominion and control over SDG and Triadou, and used them to hide and launder his assets in order to frustrate the enforcement of the Kazakh Entities judgments, thus meriting an order of attachment here.

21

IV.     **Plaintiffs Are Entitled to Attach the Assets of Triadou Described Herein**

By this motion, accompanying affidavits, and proposed order, the Kazakh Entities seek to attach all assets belonging to Triadou in this jurisdiction, specifically including (but not limited to), those held in escrow by the Honorable Herman Cahn pursuant to the Monitorship Agreement, or which may accumulate in such escrow pursuant to the Monitorship Agreement in the future.

Under New York law, any debt or property against which a money judgment may be enforced under CPLR § 5201 is also subject to prejudgment attachment. CPLR § 6202. A sheriff may levy, pursuant to an order of attachment, "any property which could be assigned or transferred, whether it consists of a present or future right or interest and whether or not it is vested, unless it is exempt from application to the satisfaction of ... [a money] judgment." CPLR § 5201.  A movant may secure the attachment of any non-exempt tangible or intangible property, either real or personal, in which the defendant has a recognizable interest. *See Michaels Elec. Supply Corp. v. Trott Elec. Inc.*, 231 A.D.2d 695 (2d Dep't 1996). The property is attachable only to the extent of the defendant's interest. The test of that interest is whether the property or any part of it is within the present or future control of the defendant. *Id.*

"Funds that belong to the defendant but are in the hands of another may also be attached, such as money in a bank account . . . Funds placed into an escrow account are likewise subject to attachment." *Gala Enterprises, Inc. v. Hewlett Packard* Co., 970 F. Supp. 212, 217 (S.D.N.Y. 1997) (citations omitted). "With regard to escrow funds . . . , the test is, does the defendant have an interest in the fund; or stated otherwise, is the money, or any part of it within the present or future control of the defendant." *U. R. C. Inc. v. Applied Images Inc.*, 106 Misc. 2d 1034, 1039, 431 N.Y.S.2d 859, 862 (Sup. Ct. Nassau Cnty. 1980); *see also Potter v. MacLean*, 75 A.D.3d 686, 687, 904 N.Y.S.2d 551, 553 (3d Dep't, 2010) ("[F]unds held by an attorney as a retainer for

22

legal services to be rendered have been found to be subject to a preattachment restraining order .
. . Such funds, even if deposited in an escrow account, may be attached as long as they are
subject to the judgment debtor's present or future control.") (internal quotation marks omitted).
An order of attachment may also issue where a defendant merely has a contingent interest in the
funds in escrow. *See U. R. C. Inc*., 106 Misc. 2d at 1040 ("Even if the debtor's interest in the
'fund' is contingent, attachment is not precluded.").

The stated purpose of the Monitorship Agreement is to "satisfy Triadou's judgments . . .
in the aggregate amounts of $10.5 million together with pre- and post-judgment interest, and any
judgments hereafter entered." Monitorship Agmt. at ¶ A. Under the Monitorship Agreement,
upon motion to the state court, the monitor is empowered to release funds in escrow to Triadou.
*Id*., at ¶ G. As such, the funds held by the monitor are held for Triadou's benefit and Triadou has
a future interest in the funds in escrow, and the escrow is therefore subject to attachment.

## <u>CONCLUSION</u>

For the foregoing reasons, the Kazakh Entities respectfully request that this Court issue an order of attachment directing Triadou to transfer its interest in all attachable property to the U.S. Marshals.

Dated: May 11, 2016

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By:       /s/ Matthew L. Schwartz    
      Matthew L. Schwartz
      Randall W. Jackson
      Daniel G. Boyle
      Craig Wenner

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
Telephone: 212-446-2300
Facsimile: 212-446-2350