UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CF 135 FLAT LLC, CF 135 WEST MEMBER LLC and THE CHETRIT GROUP, LLC,<br><br>    Interpleader Plaintiffs,<br><br> -against-<br><br>TRIADOU SPV S.A., CITY OF ALMATY, a foreign city, and BTA BANK JSC,<br><br>    Interpleader Defendants.<br><br>CITY OF ALMATY, KAZAKHSTAN and BTA BANK JSC,<br><br>    Crossclaim Plaintiffs,<br><br> -against-<br><br>MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, and TRIADOU SPV S.A.,<br><br>    Crossclaim Defendants. | 15 Civ. 5345 (AJN) (SN) |

**DECLARATION OF NICOLAS BOURG**

I, NICOLAS BOURG, hereby declare as follows under penalty of perjury:

1. I am a Belgian national, and currently reside in Belgium, where I was born. I attended the University of Leuven, where I studied economics. After my education I worked at a family business, C.P. Bourg, before transitioning to work in real estate finance.

2. I was the sole director of Triadou SPV S.A. ("Triadou") from its formation in 2011 by myself and Ilyas Khrapunov ("Ilyas") until my termination in late 2014. As such, I worked closely with Ilyas on all aspects of Triadou's operations and management, and

1

executed most of Triadou's investments, including those in the United States, during that time.

### *Relationship with Ilyas*

3.     In 2006, I was involved in a real estate deal in Switzerland. As part of that transaction, I first met Ilyas. Ilyas was attending university in Switzerland at that time, but expressed an interest in real estate investing. In 2008-2009, I again met Ilyas in Switzerland, at which time he proposed forming a real estate investment fund together.

4.     At that time, Ilyas told me that he had access to large amounts of capital, both through his immediate family and through his father-in-law, Mukhtar Ablyazov ("Ablyazov"). Ilyas stated that his immediate and extended family were in exile from Kazakhstan after being persecuted by that country's government, and for that reason, they needed to keep their finances secret and conceal their business dealings.

### *Formation of Triadou*

5.     In or about 2011, Ilyas contacted me seeking to create a real estate fund that would be a subsidiary of an entity controlled by his family, the Swiss Development Group, formally, SDG Capital S.A. ("SDG"). The real estate fund proposed by Ilyas would invest in real estate opportunities worldwide, including in the United States.

6.     At Ilyas's direction, I formed a series of entities under the laws of Luxembourg for the purpose of investing his family's funds in real estate. One of these entities was Triadou, an investment vehicle wholly owned and controlled by SDG. SDG itself was owned and controlled by Ilyas and his family, and used to conceal the movement and investment of his family's money, including that of Ablyazov.

7.     Triadou is a shell entity for SDG, and has no corporate presence separate from

SDG. Triadou had no employees and no offices or headquarters. Although I was Triadou's sole director, I was paid by SDG as an "independent consultant," conducted all business meetings at SDG's offices, had an SDG e-mail address, and received all of my instructions from Ilyas, acting as SDG's president.

8. Monthly meetings occurred in Geneva between myself, Ilyas, Peter Sztyk (an advisor of Ilyas) and, at times, my longtime business partner, Laurent Foucher. The agenda at each meeting was to discuss all investments of the Ablyazov-Khrapunov family's' money (*i.e.*, not only money invested through SDG or Triadou). At those meetings, I frequently received directions from Ilyas regarding various business ventures, including Triadou and others that the Ablyazov-Khrapunov family was involved in.

9. Although I was the sole director of Triadou, Ilyas was in charge of Triadou's operations and investments. I would research investment opportunities, Ilyas would select which deals to invest in, and then he would negotiate the deal and organize payment. However, Ilyas repeatedly informed me that the person who gave him final approval for all deals was Ablyazov. Ilyas stated to me that he was managing a large amount of Ablyazov's money, and for that reason, Ablyazov was the ultimate decision maker on all of Triadou's investments. According to Ilyas, he had significant freedom in the management of various investments, but the final decisions were always received directly from Ablyazov. This arrangement was confirmed for me on several occasions when I observed that Ilyas needed to wait for Ablyazov's approval before authorizing a particular Triadou investment or payment.

10. Ilyas told me that he often used a company named Telford International Limited ("Telford") to move Ablyazov's funds to execute these deals. Ilyas informed me that

Telford was an Ablyazov investment entity used to conceal and move his funds, and was controlled by Eesh Aggerwal, a financial advisor loyal to Ablyazov.

*Triadou's United States Investments*

11. At Ilyas's direction, I contacted Eric Elkain, whom I knew from my professional experience to be an agent of Joseph Chetrit, a well-known real estate developer in New York. Elkain agreed to arrange a meeting between Chetrit and Ilyas to discuss possible investments by Ilyas in the United States.

12. In or about early 2012, Chetrit and his partner met with Ilyas and myself in Geneva, Switzerland, to assess possible investment opportunities. At that meeting, Ilyas stated to Chetrit that he and his extended family were political opponents of the current government of Kazakhstan, and had to keep their business dealing covert in order to avoid worldwide persecution from that government. Chetrit stated that he sympathized with Ilyas' professed situation, as his own family had been politically persecuted in Morocco. (I know from official public documents that the U.S. State Department has held out the prosecution and jailing of Chetrit's father and brother as an example of Morocco's denial of fair public trials. A true and correct copy of the State Department's Morocco Report on Human Rights Practices for 1996 is attached as Exhibit 1).

13. The meeting was productive, and shortly thereafter Ilyas and I traveled to New York and met with Chetrit again to discuss specific investment opportunities.

14. As a result of these discussions, Ilyas agreed to invest with Chetrit through Triadou in a number of real estate opportunities in New York City. These included investments in the Flatotel and the Cabrini Medical Center condominium conversion

developments in New York City.

15.     The Flatotel was a 289-room business hotel, located at 135 West 52nd St, New York, New York. The Cabrini Medical Center hospital campus closed in 2008 and is now comprised of several buildings containing approximately 250 condominium units. The Chetrit Group has been executing plans to convert both properties into luxury condominiums, and both are close to completion.

16.     Chetrit held a 75% interest in the Flatotel, while 25% of the development was owned by another developer, David Bistricer. Chetrit had created a series of limited liability entities, including CF 135 FLAT LLC and CF 135 West Member LLC, to hold his 75% interest in the Flatotel.

17.     Chetrit offered to sell half of the Chetrit Group's 75% investment in the Flatotel to Triadou. Under this agreement, Chetrit would manage the development of the Flatotel while Triadou would passively invest capital. Profits would be split equally between Triadou and Chetrit, but Triadou would be responsible for 70% of CF 135 West Member LLC's capital obligations. It was estimated that Triadou would ultimately need to provide at least $40 million in capital for the deal. At Ilyas' direction, after he obtained Ablyazov's approval, I agreed to this proposal. Attached as Exhibit 2 is a letter dated October 23, 2012, from the Chetrit Group, outlining the expected terms of the investment.

18.     Based on evaluations of the real estate market in New York City at that time, Triadou's interest in this transaction was estimated to ultimately be worth at least $100 million with reimbursement of the initial investment.

19.     After this deal was agreed to, Triadou began to encounter problems moving

5

funds for its initial equity payments to Chetrit through ordinary banking channels in Luxembourg.

20. Telford funded all of the money Triadou was obligated to invest in the Flatotel. Telford's accounts were at Federal Bank of the Middle East ("FBME") in Cyprus. From Ilyas, I learned that attempts to transfer funds to from Telford to Triadou, to then be sent to Chetrit, were unsuccessful, and that correspondent banks in Luxembourg refused to accept funds from Telford's accounts. (I know from official public sources that the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") subsequently imposed a prohibition on U.S. financial institutions from opening or maintaining a correspondent account on behalf of FBME on July 29, 2015. A true and correct copy of FinCEN's July 29, 2015 announcement of that rule is attached as Exhibit 3)

21. As a result, I contacted counsel for Chetrit and proposed that the funds for Triadou's equity payments be wired directly from Telford to Chetrit's escrow account held by his counsel. Chetrit's counsel agreed, and the wires were executed from Telford to Chetrit's escrow.

22. I attach as Exhibit 4 an e-mail chain between myself and Joseph Chetrit, dated December 12, 2013, at 3:56 p.m. EST, forwarding numerous Society for Worldwide Interbank Financial Telecommunication, or "SWIFT", messages confirming that these funds were wired directly from Telford's accounts at FBME to the escrow account held by Chetrit's counsel.

23. Included at the beginning of chain is an email I received from Ilyas, using a pseudonymous email account of his: "Elvis Elvis" at the email address "theuraniumguy@gmail.com." Exhibit 4, at 9.

6

24. This email chain also shows Ilyas receiving these SWIFT confirmations from Aggarwal, Ablyazov's adviser who controlled the Telford accounts. Exhibit 4, at 9.

25. I attach a compilation of these SWIFT records I received from Ilyas as Exhibit 5.

26. Through Triadou, Ilyas also entered a second investment with Chetrit shortly thereafter. In late 2012, Triadou agreed to invest $12 million in the Cabrini Medical Center conversion, a joint venture between Chetrit and another private developer to convert a former medical center in New York City into luxury condominiums.

27. Due to increasing scrutiny of Ablyazov's finances, the $12 million investment became impossible. I discussed this obstacle with Chetrit, who agreed that Triadou would invest half the originally-agreed amount, $6 million, until more funds became available. Again, the funds to close this deal were transferred directly from the offshore accounts of Telford on May 20, 2013, to accounts held by Chetrit's counsel. *See* Ex. 5, at ¶ 7.

28. The Flatotel and Cabrini were only two of Triadou's investments. Attached as Exhibit 6 is a corporate profile and financial report of Triadou, dated November 14, 2013. This document identifies that I was the sole director of Triadou (Ex. 6, at 3), that Telford was responsible for funding Triadou's investments (Ex. 6, at 4), and provides a summary of Triadou's investments at that time (Ex. 6, at 6).

*The Sham Sale of SDG after Triadou's U.S. Investments*

29. In March of 2013, After Triadou's investment in the Flatotel, and after Telford began funding that investment, Ilyas purported to sell SDG to a friend of his, Philippe Glatz.

7

30.     Ilyas met Glatz through their mutual involvement in a Swiss political party, the Party Democrat Christian. Ilyas informed me that Glatz was an ideal front and the best protection to help insulate Ilyas and his extended family's money from scrutiny by law enforcement or financial institutions.

31.     As explained above, SDG was created with the funds of the Khrapunov extended family, members of which (including Ablyazov, and Ilyas's father, Viktor Khrapunov) I understood to be facing criminal investigations in Kazakhstan, and eventually, in Switzerland.

32.     SDG was managed by Ilyas and used to move and invest both his family's money and that of Ablyazov. While the Flatotel deal was being negotiated, pressure on Ilyas and his extended family began to mount as the investigations in Kazakhstan extended into Switzerland and his extended family's assets began to be frozen or scrutinized. According to Ilyas, it became increasingly hard for Telford to fund Triadou or SDG's investments. A sale of SDG to Glatz was described to me by Ilyas as the solution to this increasing scrutiny on SDG.

33.     At that time, Glatz was held out as the owner and President of SDG, but in reality, Ilyas continued to run all aspects of the company, ostensibly as an "external adviser" to SDG. The supposed sale of SDG to Glatz was conducted in 2013 as if it were a real transaction, with money changing hands from Glatz to the Khrapunov family. However, Ilyas informed me that the money paid by Glatz for SDG was itself loaned to Glatz by Ilyas, thus creating an apparent sale, but effectively leaving the parties in the same position financially. This sham sale of SDG to Glatz was directly in response to banks' refusals to move money for SDG, and was intended to increase SDG's investment opportunities.

34. Consistent with Ilyas' description to me of Glatz being nothing more than a nominee, during all the years that I ran Triadou and was involved in other related entities, I never saw Glatz in any meetings, nor did he ever come to the U.S. to participate in any meetings. Glatz never took any role in the decision-making process and was not copied on e-mails during this three-year period. I only met Glatz on three occasions, for approximately 10 minutes each time, and he never discussed SDG's or Triadou's operations in those brief meetings, which were purely social.

35. I observed that this sham sale to Glatz created its own issues for SDG. In one instance, a potential investment in Porto Heli, Greece failed when a financial institution, Black Sea Trade & Development Bank ("Black Sea"), declined to provide funding when its Know-Your-Customer due diligence of SDG determined that Glatz did not have the financial resources to actually purchase SDG, and was merely a straw purchaser, while the original ownership and control of SDG by the Khrapunov family had not actually changed.

36. Attached as Exhibit 7 is an email chain between myself and Ilyas, dated July 16, 2013, regarding Black Sea's refusal to fund SDG. Earlier in this chain is an email from Alexey Alekseev, Black Sea's Director of Banking, stating that "[t]he new ultimate owner of SDG is said to be Mr. Philippe Glatz. Greencos S.A., the company through which Mr. Glatz acquired SDG, has a charter capital of [Swiss francs] 100,000 and its financial strength is estimated by D&B at [Swiss francs] 90,000. How and where Greencos and Mr. Glatz found the [Swiss francs] 10 million that was used to recapitalize SDG is unclear. I am not persuaded that there's been any real change in the ownership of SDG." Ex. 6, at 2.

***The California Action and Assignment of the Flatotel***

9

37. In 2014, I learned that the City of Almaty, Kazakhstan had filed an action in the state of California against members of the Khrapunov family, seeking to seize real estate investments the Khrapunov family owned in that state.

38. In response to this lawsuit, Ilyas directed me to begin liquidating Triadou's assets in New York so that funds could be removed from the United States and concealed elsewhere. Specifically, Ilyas instructed me to liquidate Triadou's investment in Flatotel and the Cabrini Medical Center as quickly as possible.

39. I contacted Chetrit, explaining that the threat of the litigation in California required Triadou to liquidate and transfer their assets out of the United States. Chetrit offered to repurchase Triadou's interest in the Flatotel at a substantial discount from the price originally paid by Triadou, and return the capital invested in Cabrini. By this point, based on the state of the New York high-end real estate market and the progress of the Flatotel development, the value of Triadou's investments in the Flatotel and Cabrini had increased substantially beyond the approximately $40 million originally invested and I estimated that they would be worth more than $100 million.

40. In or about August of 2014, at the direction of the Ilyas, upon Ablyazov's approval, Triadou's interests in the Flatotel and Cabrini Medical Center were assigned back to Chetrit for a price including $21 million in deferred compensation, representing a fraction of the fair market value of the property.

41. Shortly after this assignment, I ceased to be paid by SDG, and was then terminated from Triadou. As noted above, Triadou is merely a shell company used for masking the investments of SDG, and thus, my termination letter came from SDG. I attach as Exhibit 8

my termination letter from SDG.

42. Prior to my termination, I was owed significant sums by Ilyas and SDG in connection with my work for Triadou and other SDG entities, representing both my compensation and costs for Triadou's registration under the laws of Luxembourg, which I had personally advanced and which SDG had promised to reimburse. When I requested that SDG reimburse these costs and pay my compensation, Ilyas stated that the money owed to me belonged to his father-in-law, Ablyazov, and thus he could not release it. I subsequently communicated with Ilyas, but these conversations were unpleasant and unproductive.

*Funds Payable to Triadou*

43. Based on my experience as Triadou's director over a more than three year period, any funds transferred for Triadou's benefit would immediately be moved overseas through a chain of other Ablyazov- or Khrapunov-controlled entities. Where Triadou has been owed funds in the past, that money never went directly to Triadou or remained in the United States, and was always moved directly to other entities. Two examples illustrate this practice:

44. In April of 2013, Triadou entered into a commercial real estate investment, the purchase of the Tri-County Mall in Cincinnati, Ohio. Triadou invested approximately $29 million in the commercial property, and resold that interest at auction three months later for approximately $40 million, after costs and commissions. Much like the Flatotel, the funds invested in the Tri-County mall came directly from Telford, and once that interest was liquidated, those funds did not flow to Triadou, but were instead moved to other Ablyazov-Khrapunov entities and then out of the United States.

45. Other funds from the assignment of Triadou's interest in the Flatotel have

already been moved away from Triadou. Pursuant to the assignment, the Chetrit Entities made a $1 million initial payment in [year] when Chetrit bought out Triadou's interest in the Flatotel development. This $1 million payment, along with $6 million for the termination of an unrelated investment, was wired to Compagnie Privee do Conseils et d'Investissements S.A. in Geneva, Switzerland, for the benefit of SDG, identified as a "loan on behalf of Triadou SPV S.A.".

### *Meetings with Chetrit*

46.     On March 22, 2015 and March 23, 2015, I met with Joseph Chetrit in New York, New York. I recorded discussion between Chetrit and myself at both of those meetings. I have reviewed those recordings and can confirm the voices on those recordings are those of myself and Joseph Chetrit. Certified transcripts of those recordings are attached as Exhibits 9 and 10. In these recordings, Chetrit and I discuss the assignment of Triadou's interest in the Flatotel to the Chetrit Entities the previous year, as well as the investigations into Ilyas's holdings and Ablyazov's imprisonment. In these recordings, Ilyas is referred to by the pseudonym "Pedro," and Ablyazov is referred to either as the "Father-in-Law" or the "Stepfather."

I declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct.

Executed on this 2nd day of May, 2016.

_____
NICHOLAS BOURG