# Exhibit 1

# 1996 Human Rights Report: Morocco

The State Department web site below is a permanent electronic archive of information released online from January 1, 1997 to January 20, 2001. Please see www.state.gov for current material from the Department of State. Or visit http://2001-2009.state.gov for information from that period. Archive sites are not updated, so external links may no longer function. Contact us with any questions about finding information. NOTE: External links to other Internet sites should not be construed as an endorsement of the views contained therein.



# U.S. Department of State

## Morocco Report on Human Rights Practices for 1996

Released by the Bureau of Democracy, Human Rights, and Labor, January 30, 1997.

**MOROCCO**

The Constitution of Morocco provides for a monarchy with a parliament and an independent judiciary. Ultimate authority, however, rests with the King, who may at his discretion terminate the tenure of any minister, dissolve the Parliament, and rule by decree. The present Parliament was created in 1993 through a two-stage process: 222 deputies were elected by direct universal suffrage, and an additional 111 were selected by labor syndicates, professional organizations, and local authorities. The Cabinet continues to be composed largely of technocrats. Parliamentary elections are expected in 1997, following the September 13, 1996 referendum on the creation of a second legislative chamber. The referendum was approved by 99 percent of the vote. The Government reported that 82 percent of the electorate voted, although most observers believe this figure is exaggerated.

The security apparatus includes several overlapping police and paramilitary organizations. The border police, the national security police, and the judicial police are departments of the Ministry of Interior, while the Royal Gendarmerie reports directly to the Palace. The security forces continued to commit human rights abuses.

Morocco has a mixed economy based largely on agriculture, fishing, light industry, phosphate mining, tourism, and remittances from citizens working abroad. Illegal cannabis production is also a significant economic activity. While a series of debilitating droughts has challenged generally strong economic

growth in recent years, good rainfall during the year was expected to contribute to an economic upswing.

The Government's human rights record remained largely the same as the preceding year. Security forces occasionally abuse and torture detainees and prison conditions remain harsh. The Government's anti-contraband (assainissement) campaign resulted in numerous violations of citizen's human rights. Allegations of arbitrary arrest and physical abuse increased in the wake of this campaign, and the Government failed to investigate thoroughly allegations of abuse by security forces. The then-Minister for Human Rights resigned, citing excesses committed by security forces during this campaign. The King then appointed the Minister of Justice as Minister of Human Rights, although the Ministry of Justice is considered by some to be one of the primary obstacles to improved human rights.

Citizens do not have the right to change their government. The judiciary is subject to corruption and Interior Ministry influence. The authorities at times ignore due process rights and infringe on citizens' privacy rights. The Government restricts freedom of speech and the press in certain areas, and limits the freedoms of assembly, association, religion, and movement. While the Government generally tolerates peaceful

protests and sit-ins, it does not tolerate marches and demonstrations. On three occasions during the year, including on the eve of a 1-day general strike in June and during a female textile workers demonstration in March, several protesters were seriously beaten, and scores were arrested. Discrimination and domestic violence against women are common. Child labor is a problem, and the Government has not acted to end the plight of young girls who work in exploitive domestic servitude. Unions are subject to government interference.

A large number of the allegations of governmental human rights abuse involve the Ministry of Interior. The Ministry is responsible for: The direction of most security forces; the conduct of elections, including cooperation with the United Nations in a referendum on the Western Sahara; the appointment and training of many local officials; the allocation of local and regional budgets; the oversight of university campuses; and the licensing of associations and political parties. Less formally, the Ministry exerts substantial pressure on the judicial system.

**RESPECT FOR HUMAN RIGHTS**

**Section 1. Respect for the Integrity of the Person, Including Freedom from:**

a. Political and Other Extrajudicial Killing

Although no deaths of persons in police custody could be conclusively attributed to security force brutality, there were several instances of death under suspicious circumstances that remain unresolved. In January Yahya Salhi was found dead in the Oujda gendarmerie detention center. Salhi had been arrested 2 days earlier for theft. Officials allege that Salhi committed suicide.

In February Babeha Lahssen died while in custody at the gendarmerie center in Khemisset. According to human rights activists, Lahssen was arrested following a fight with a tribal chief. Several days after the arrest, Lahssen's family was informed that he had committed suicide. The Lahssen family's request for an autopsy was reportedly denied by the Court of First Instance.

In May 16-year-old Abdelhamid M'rabet died while in police custody in Tangier. Press reports state that M'rabet was arrested during a fight with a local police officer's son. In the course of the arrest, M'rabet was reportedly severely beaten about the head. He died shortly after arriving at the police station. Tangier officials detained the arresting officer and launched an investigation. The outcome of the investigation has not been made public.

Hussein El Mernissi was arrested on July 11 and died the next day at Asfi police station, purportedly taking his own life. The Moroccan Organization for Human Rights (OMDH) has filed a court action regarding this case, demanding that a second autopsy be performed.

In May Jalal Mohamed died in prison. Human rights activists attribute his death to official negligence (see Section 1.c.).

Human rights organizations continue to complain that security forces too often act with impunity; deaths in custody and other instances of potential abuse are not thoroughly investigated. None of the cases outstanding from 1995 have been publicly resolved. These include the deaths in custody of Hamza Daghdagh and Mustapha Benderweesh. However, in October a court acquitted two police officers accused of the 1993 torture death of Mustapha Hamzaoui and earlier cases. Since October local media reported four other cases of persons who died while in police custody: Mohamed Fedaoui; Omar Bouhdoun; Said Hammouch; and Rachid Rami.

Detainees claimed that several prisoners died during the year due to harsh prison conditions and inadequate medical care (see 1.c.).

b. Disappearance

There were no new cases of disappearance during the year. This contrasts with 1995 when there were reports of over 20. However, the practice of the forced disappearance of individuals who opposed the Government and its policies dates back several decades. Many of those who disappeared were members of the military who were implicated in attempts to overthrow the Government in 1971 and 1972. Others were Sahrawis or Moroccans who challenged the Government's claim to the Western Sahara or other government policies. Many of those who disappeared were held in secret detention camps. To this day, hundreds of Saharan and Moroccan families do not have any information about their missing relatives, many of whom have been missing over 20 years.

The Government continues to deny that it has any knowledge of the whereabouts of those still missing. In recent years it has quietly released several hundred persons who had disappeared, including about

300 in June 1991, but no explanation for their incarceration has ever been provided. Local human rights monitors have concluded that many others died while at the notorious Tazmamart Prison, which has since been closed. The Government has acknowledged 34 of these deaths and has provided death certificates to the families of all but 1 of the 34 who died.

OMDH and other human rights organizations continued to pursue the issue of unresolved disappearances. OMDH reports that its efforts to meet with the Minister of Justice and Human Rights to discuss this issue have been unsuccessful.

There were no developments in the disappearance of Abdullah Sherrouq, a student, who was reportedly detained by security services on June 22, 1981. After 15 years, his family has still been unable to learn anything of his whereabouts or his fate, despite appeals by Amnesty International.

A group representing Tazmamart prison survivors and the families of persons who disappeared continues to call for an accounting of unresolved cases, compensation to families of those who disappeared, proper burial of victims' remains, and prosecution of responsible officials. The Government has not responded to their demands.

The Government continued to pay a small monthly stipend to the 28 former prisoners who survived 18 to 20 years in solitary confinement at Tazmamaart prison--without health care or sanitary facilities. The 28 are former military men who had been arrested in connection with the failed coup attempts in 1971 and 1972. After their release, the Government prohibited them from speaking out publicly about their detention. In exchange, the Government gave the 28 assurances that it would help them find jobs and reintegrate them into society.

c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

Morocco ratified the U.N. Convention against Torture in 1993. The Government claims that the use of torture has been discontinued, but newspapers and other sources indicate that security forces still abuse and torture detainees. The fact that detainees are not allowed to have contact with family or lawyers during the first 48 hours of incarceration (see Section 1.d.) increases the likelihood of torture and abuse.

According to local human rights advocates, one of the problems in documenting torture and abuse is that autopsies are not routine. They are only carried out at the request of the state prosecutor and at the order of a judge. The lack of autopsies indicates that follow-up investigations into deaths in custody are inadequate.

In June OMDH issued a report charging that torture is still prevalent. OMDH officials attribute the phenomenon to officials' attempts to elicit information from detainees in the anticontraband and antinarcotics campaigns. In addition, the report charges that allegations of abuse are frequently not investigated, and that officials often act with impunity.

In January the press and human rights organizations reported eyewitness accounts that those arrested during the Government's anticontraband campaign were subjected to physical abuse and torture during interrogation. There were also reports of due process violations and irregularities in the course of their trials (see Section 1.e.). Government officials have denied that any abuses occurred.

In April defendants arrested during a government antinarcotics crackdown charged that they had been subjected to abuse while in police custody. They also alleged that their signed confessions had been obtained through police pressure and coercion.

Although prison conditions remain harsh, they have reportedly improved in recent years, due in part to reforms undertaken at the suggestion of the Royal Consultative Council of Human Rights. Nonetheless, credible reports indicate that harsh treatment and conditions continue, with state security prisoners more likely to be victimized. On October 24, detainees at Kenitra central prison sent an open letter countering the Government's assertions that the prisons are being reformed and detailing the poor conditions at Kenitra. The prisoners, mostly political and Islamist detainees, alleged that the prison lacks the most basic needs, including ventilation and medical care. The letter states that seven prisoners died this year and alleged medical neglect. Causes of death ranged from cancer and tuberculosis to injuries sustained through physical assault. In May Jalaal Mohamed, a prisoner at El-Jadida Civil Prison, died while unloading a supply truck. Mohamed reportedly suffered from heart and other health problems. Human rights activists charge that his death was due to the negligence of prison officials.

The Government does not generally permit prison visits by human rights monitors. Notable exceptions occurred in February and March 1995, when human rights monitors, along with several journalists and an investigating commission, visited prisons in Tangiers, Mohammedia, El-Jadida, Casablanca, and Khenifra following a prison riot in Khenifra.

d. Arbitrary Arrest, Detention, or Exile

Legal provisions for due process have been revised extensively in recent years, although reports indicate that the authorties sometimes ignored them (see Section 1.c.). Although police usually make arrests in public, they do not always identify themselves and do not always obtain warrants. Incommunicado (garde-a-vue) detention is limited to 48 hours, with one 24-hour extension allowed at the prosecutor's discretion. In state security cases, the garde-a-vue period is 96 hours; this may also be extended by the prosecutor. It is during this

initial period, when defendants are denied access to counsel, that the accused is interrogated and abuse is most likely to occur. Some members of the security forces, long accustomed to indefinite precharge access to detainees, continue to resist the new rules.

Lawyers are not always informed of the date of arrest, and thus are unable to monitor compliance with the garde-a-vue detention limits. While the law provides for a limited system of bail, it is rarely used. Defendants are, however, sometimes released on their own recognizance. The law does not provide for

habeas corpus or its equivalent. Under a separate code of military justice, military authorities may detain members of the military without warrants or public trial.

Although the accused are generally brought to trial within

2 months, prosecutors may order up to five 2-month extensions of pretrial detention. Thus, an accused person can be kept in pretrial detention for up to 1 year.

There are no known instances of enforced exile, although a number of dissidents live abroad in self-imposed exile. Their number has been steadily diminishing, however, as many returned to Morocco following a broad-based amnesty decree issued by the Government in 1994.

In May Mamoun Balghiti Alaoui returned to Morocco after

30 years of exile in Syria. Alaoui was a dissident in the 1960's who was forced to flee the country. He was later tried and sentenced to death in absentia. He was included in the global royal pardon issued by the King in 1994.

Many human rights groups consider Abraham Serfaty to be a Moroccan exile. A member of the (now defunct) Communist Party and a supporter of Saharan independence, Serfaty was released in 1991 after 17 years in prison. Upon his release, the Government declared that Serfaty was a Brazilian rather than a Moroccan citizen because his father was a naturalized Moroccan citizen originally from Brazil. Based on this Serfaty was expelled from Morocco. This decision has been widely criticized by human rights groups. In July Serfaty's wife was stopped at the Casablanca airport and prohibited from entering the country.

e. Denial of Fair Public Trial

The Constitution provides for an independent judiciary, but all courts are subject to extrajudicial pressures, including bribery and government influence.

There are three levels in the court system, courts of first instance, the appeals Court, and the Supreme Court. While in theory there is a single court system under the Ministry of

Justice, two other courts also operate: the Special Court of Justice that handles cases of civil servants implicated in corruption and the Military Tribunal for cases involving military personnel and on certain occasions matters pertaining to state security, although state security also falls within the jurisdiction of regular court system.

Although there is a single court system for most nonmilitary matters, family issues such as marriage, divorce, child support and custody, and inheritance are adjudicated by judges trained in Islamic law, or Shari'a. Judges considering criminal cases or cases in non-family areas of civil law are generally trained in the French legal tradition. All judges trained in recent years are graduates of the National Institute for

Judicial Studies, where they undergo 2 years of study heavily focused on human rights and the rule of law. It is not necessary to be a lawyer to become a judge and the majority of judges are not lawyers.

In general detainees are arraigned before a court of first instance. If the infraction is minor and not contested, the judge may order the defendant released or impose a light sentence. If an investigation is required, the judge may release defendants on their own recognizance. Cases are often adjudicated on the basis of confessions, some of which are obtained under duress, according to reliable sources.

All courts are subject to extrajudicial pressures. Salaries for both judges and their staffs are extremely modest; as a result, petty bribery has become a routine cost of court business. In many courts, especially in minor criminal cases, defendants or their families pay bribes to court officers and judges to secure a favorable disposition.

A more subtle corruption derives from the judiciary's relationship with the Ministry of Interior. Judges work closely with the Ministry's network of local officials, or caids, who serve as members of the judicial police and often assume personal responsibility for the questioning of criminal detainees. They also frequently prepare the written summary of an arrest and subsequent interrogation. The summary is admissible in court and may be the only evidence introduced at trial, effectively rendering it an instruction passed from the caid's office to the court. Credible sources report that judges who hope for higher salaries and career advancement follow the caid's guidance closely.

The law does not distinguish political and security cases from common criminal cases. In serious state security cases, communications between the Ministry of Interior and the court are more direct. At the Government's discretion, such cases may be brought before a specially constituted military tribunal, which is subservient to other branches of the Government, notably the military and the Ministry of Interior.

Aside from external pressures, the court system is also subject to resource constraints. Consequently, criminal defendants charged with less serious offenses often receive only cursory hearings, with judges relying on police reports to render decisions. Although the Government provides an attorney at public expense for serious crimes (i.e., when the offense carries a maximum sentence of over 5 years), appointed attorneys often provide inadequate representation.

In January the OMDH charged that defendants arrested in the anticontraband crackdown were denied access to attorneys during interrogation and that defendants were not allowed to submit evidence (some of which investigators had earlier requested they present) to counter charges against them (see Section 1.c.). Later, the attorneys for nine of the defendants walked out of court in protest after charging that they had not been given enough time to study the case against their clients. One of the more extreme examples involved the trial of David and Simon Chetrit, father and son importers, who were pronounced guilty at 3:30 AM after the defense team had spent more than 17 hours in the courtroom without a rest or food break, and were repeatedly denied an opportunity to present a defense. The Chetrits were each

sentenced to 5 years' imprisonment and received one of the largest fines of any of those convicted during the campaign on charges of importing contraband and bribing customs officials. Among those criticizing the way in which the anticontraband campaign was conducted was Human Rights Minister Mohamed Ziane. Ziane's outspoken disapproval of the campaign led to his resignation from the Ministry in January, and the human rights portfolio was assumed by the Minister of Justice. However, some observers consider the Ministry of Justice to be a major obstacle to an improved human rights record. Although their missions are not completely incompatible, combining the Ministry of Justice and the Ministry of Human Rights portfolios does not advance the stated objective of the Government and the King to protect and promote human rights.

The Moroccan Organization of Human Rights (OMDH) estimates that there are some 60 political prisoners, of which 50 are Islamists and the remainder are leftists. Among the 50 alleged Islamists are 16 members of the "Group of 26." Three of this group were convicted of arms smuggling in 1986, but the others were apparently arrested for Islamist activities. International human rights groups estimate of the number of persons in prison for advocating independence for the Western Sahara vary from none to 700.

f. Arbitrary Interference with Privacy, Family, Home, or Correspondence

The Constitution states that the home is inviolable and that no search or investigation may take place without a search warrant. The law stipulates that a search warrant may be issued by a prosecutor on good cause. Nonetheless, during the Government's recent anticontraband campaign several businesses and places of residence were entered without the requisite search warrant.

Government security services monitor certain persons and organizations, both foreign and Moroccan and government informers monitor activities on university campuses.

**Section 2. Respect for Civil Liberties, Including:**

a. Freedom of Speech and Press

Although the Constitution provides for freedom of expression, the Government seriously restricts press freedom in certain areas.

The Government owns the official press agency, Maghreb Arab Press, and the Arabic daily Al-Anbaa. A 1958 decree grants the Government the authority to register and license domestic newspapers and journals. Authorities can use the licensing process to prevent the publication of materials that they believe cross the threshold of tolerable dissent. Offending publications may be declared a danger to state security, seized, and the publisher's license suspended and equipment destroyed. The Ministry of Interior can control foreign publications by collecting "banned" publications after they have been distributed. In general, however, the Government does not employ extreme measures since the media regularly engage in self-censorship to avoid the Government's attention and possible sanctions.

The Press Code empowers the Minister of Interior to confiscate publications that are judged offensive by the Government. Under the Code the Prime Minister may order the indefinite suspension of a publication. On November 19, the Government formally banned the Arabic-language weekly Al-Usbu Al-Sahfi Wa'l Siyassi, and declared all distribution of this weekly illegal. The police notice banning the paper offered no justification, but credible sources confirm that the Minister of Interior and the Prime Minister were both angered by a series of articles on the "business activities" of the Moroccan elite, including their sons. The publisher was warned several weeks earlier to "lay off people who work closely with the King." The Moroccan Press Syndicate and a Moroccan human rights organization are filing a court case in an effort to rescind the Government's decision.

The Press Code empowers the Government to censor newspapers directly by ordering them not to report on specific items or events. In most instances, government control of the media generally is exercised through directives and "guidance" from the Ministry of the Interior. Nonetheless, the Government generally tolerates satirical and often stinging editorials in the opposition parties' dailies. However, both law and tradition prohibit criticism on three topics: the monarchy, Morocco's claim to the Western Sahara, and the sanctity of Islam.

There were some notable instances of censorship during the year. The Government continues its November 1995 ban on Jeune Afrique, which had published an article describing the King's health and its impact on the political scene. Since October Jeune Afrique has been distributed, but has--perhaps not coincidentally--recently refrained from publishing any negative stories about the royal family.

In January the OADP daily, Anoual, was seized twice by local authorities in Casablanca. No reason was given for the seizure. Also in January, the weekly magazine Maroc Hebdo was sued for defamation at the request of the Prime Minister. Maroc-Hebdo had reprinted selections from a report by the European Observatoire Geopolitique Des Drogues implicating high-level Moroccan officials in drug trafficking.

In February comedian Ahmed Snoussi (also known as Bziz) was prohibited from performing in Casablanca. Bziz, Morocco's best-known political satirist, has been banned from television appearances for the past 5 years. In April the government-owned television station dismissed its editor-in-chief after she participated in a seminar on the role of journalism in the democratic process and the protection of human rights. The dismissal was severely criticized by press and human rights groups.

The Government owns the only television station whose broadcasts can be received nationwide without decoder or satellite dish antennas. The Government purchased a majority share in 2M, the country's sole private station, which can be received in most urban areas with the rental of an inexpensive decoder. The ostensible reason for the Government's action was to save 2M from bankruptcy; the Government now owns 68 percent of 2M stock and the Minister of Information by virtue of hsi position has become the chairman of the board. Dish antennas are available on the market and permit free access to a variety of foreign broadcasts. Residents of the north can receive Spanish broadcasts with standard antennas. The Government does not impede the reception of foreign broadcasts.

The universities enjoy relative academic freedom in most areas.

b. Freedom of Peaceful Assembly and Association

Although the Constitution provides for freedom of assembly and association, the law also permits the Government to suppress even peaceful demonstrations and mass gatherings. Most conferences and demonstrations require the prior authorization of the Ministry of Interior, ostensibly for security reasons.

In January members of the Association of Unemployed University Graduates, an unofficial organization not sanctioned by the Government, began a sit-in in front of the Ministry of Education to protest high unemployment and government inaction. There was little official reaction until March, when security forces dispersed the group, allegedly injuring

14 persons.

The unemployed graduates resumed their sit-in in May. For several weeks, police barricaded the building where the youths were assembled, preventing them from leaving as a group to demonstrate in the streets. Occasionally the police and the unemployed graduates clashed, most notably on May 24 when the protesters tried to march out of the building that they were occupying. Police blocked their exit and injured some

60 demonstrators. On June 4, on the eve of a nationwide general strike, police beat and injured numerous demonstrators, including humorist Bziz, who had gone to the sit-in to express his support for the unemployed graduates. The sit-in continued until late June, when the graduates voluntarily returned to their homes.

The right to form organizations is limited. Under a1958 decree, persons wishing to create an organization must obtain the approval of the Ministry of Interior before holding meetings. In practice the Ministry uses this requirement to prevent persons suspected of advocating causes opposed by the Government from forming legal organizations. Islamist and leftist groups have the greatest difficulty in obtaining official approval, although there are over 20 active Islamist groups. The Government has prohibited membership in two, Justice and Charity and Jama'a Islamia, due to their perceived antimonarchy rhetoric. Political parties must also be approved by the Ministry of Interior, which uses this power to control participation in the political process.

On January 9, a group of university professors, lawyers, and journalists formed an association, called Transparency Maroc, dedicated to fighting corruption at all levels. This organization is also not sanctioned by the Government. Transparency is operating, but always in concert with other organizations that are recognized by the Government.

c. Freedom of Religion

Although the Constitution provides for freedom of worship, only Islam, Christianity, and Judaism are tolerated in practice.

Islam is the official religion. Ninety-nine percent of Moroccans are Sunni Muslims, and the King bears the title Commander of the Faithful. The Jewish community of approximately 6,000 is allowed to practice its faith, as is the somewhat larger foreign Christian community. The Baha'i community of 150 to 200 people has been forbidden to meet or hold communal activities since 1983.

Islamic law and tradition calls for strict punishment of any Muslim who converts to another faith. Any attempt to induce a Muslim to convert is similarly illegal. Foreign missionaries either limit their proselytizing to non-Muslims or conduct their work quietly.

The Ministry of Islamic Affairs monitors Friday mosque sermons and the Koranic schools to ensure the teaching of approved doctrine. The authorities sometimes suppress the activities of Islamists, but generally tolerate activities limited to the propagation of Islam, education, and charity. Security forces commonly close mosques to the public shortly after Friday services to prevent use of the premises for unauthorized political activity.

d. Freedom of Movement Within the Country, Foreign Travel, Emigration, and Repatriation

Although the Constitution provides for freedom of movement, in practice security forces set up checkpoints throughout the country and stop traffic at will. In some regions the checkpoints have been maintained in the same places for years, creating what some characterize as internal frontiers. Reports persist that police use these checkpoints to demand monetary payments. In the Moroccan-administered portion of the Western Sahara, movement is restricted in areas regarded as militarily sensitive.

The Ministry of Interior restricts freedom to travel outside Morocco in certain circumstances. OMDH, a human rights group, has compiled a list of individuals who have reportedly been denied passports. In addition, all civil servants must obtain written permission from their ministries to leave the country.

In June Maria Oufkir, who had spent 14 years under house arrest, was able to leave Morocco and emigrate to France. Oufkir is the daughter of Mohamed Oufkir, a general and Interior Minister during the 1960's who was implicated in the 1971 coup attempt against King Hassan. Oufkir died under

mysterious circumstances in 1972. His family spent the following 14 years under house arrest. Although they were nominally released in 1986, the Oufkir family remained barred from traveling outside Morocco until Maria Oufkir's move to France. While her flight has been described as an escape, sources report that the Oufkirs were issued passports shortly before her departure, and it is acknowledged that she departed with at least the tacit consent of the Government.

Moroccans may not renounce their citizenship, but the King retains the power--rarely used--to revoke it. Tens of thousands of Moroccans hold more than one citizenship and travel on passports from two or

more countries. While in Morocco, they are regarded as Moroccan citizens. As a result, the Government has sometimes refused to recognize the right of foreign embassies to act on behalf of dual nationals or even to be informed of their arrest and imprisonment. Dual nationals sometimes complain of harassment by immigration inspectors.

The Government welcomes voluntary repatriation of Jews who have emigrated. Moroccan Jewish emigres, including those with Israeli citizenship, freely visit Morocco. The Government also encourages the return of Sahrawis who have departed Morocco due to the conflict in the Western Sahara--provided they recognize the Government's claim to the region. The Government does not permit Saharan nationalists who have been released from prison to live in the disputed territory. The Government cooperates with the U.N. High Commissioner for Refugees (UNHCR) and other humanitarian organizations in assisting refugees. There were no reports of forced expulsion of anyone having a valid claim to refugee status. While Morocco has from time to time provided political asylum to individuals, the issue of first asylum has never arisen.

**Section 3. Respect for Political Rights: The Right of Citizens to Change Their Government**

Constitutional provisions notwithstanding, in practice citizens do not have the right to change their national government by democratic means. The King, as Head of State, appoints the Prime Minister, who is the titular head of government. The Parliament has the theoretical authority to effect change in the system of government, but has never exercised it. Moreover, the Constitution may not be changed without the King's approval. The Ministry of Interior appoints the provincial governors and local caids. Municipal councils are elected.

Constitutional changes in 1992 authorized the Prime Minister to nominate all government ministers, but the King has the power to replace any minister at will. Any significant surrender of power from the Crown to the Prime Minister's office was further

diluted when the King transferred to the Secretaries General, who serve at the King's pleasure, many of the powers previously vested in the ministers.

Morocco has a unicameral legislature, two-thirds directly elected, and another third indirectly selected by various labor and professional organizations. Eleven parties have members in Parliament. The opposition parties have consistently urged that all members of Parliament be directly elected by the people. Instead, the King proposed creating a bicameral legislature, whereby all members of the lower chamber would be directly elected by the people and all members of the second chamber indirectly selected. On September 13, a referendum was held in which voters approved a constitutional amendment creating this bicameral parliament. The referendum was approved by 99 percent of the vote. The Government reported that 82 percent of the electorate voted, although most observers believe this figure is exaggerated. There were no restrictions on the electorate and there were no serious accusations of fraud. Allegations of fraud during the 1993 elections are still pending before the Supreme

Court.

Women are underrepresented in government and politics. There are no female ministers, and there are only two women among the 333 members of Parliament.

## Section 4. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights

There are three officially recognized nongovernmental human rights groups: The Moroccan Human Rights Organization, the Moroccan League for the Defense of Human Rights (LMDH), and the Moroccan Human Rights Association (AMDH). A fourth group, the Committee for the Defense of Human Rights (CDDH), was formed in 1992 by former AMDH members.

The Royal Consultative Council on Human Rights (CCDH), an advisory body to the King, exists in sometimes uneasy coordination with the Ministry of Human Rights, which was established by Parliament. While their common mission provoked an adversarial relationship in the past, a clearer division of roles has emerged, with the CCDH issuing advice on matters such as prison reform, and the Ministry of Human Rights exercising a principally executive role.

Amnesty International (AI) has local chapters in Rabat, Casablanca, and Marrakech. These chapters participate in AI international letter campaigns outside Morocco.

## Section 5. Discrimination Based on Race, Sex, Religion, Disability, Language, or Social Status

Although the Constitution states that all citizens are equal, non-Muslims and women face discrimination in the law and traditional practice.

Women

The law and social practice concerning violence against women reflects the importance society places on the honor of the family. The Criminal Code includes severe punishment for men convicted of rape or violating a woman or a girl. The defendants in such cases bear the burden of proving their innocence. However, sexual assaults often go unreported because of the stigma attached to the loss of virginity. A rapist may be offered the opportunity to marry his victim in order to preserve the honor of the victim's family. The law is more lenient toward men with respect to crimes committed against their wives; for example, a light sentence or reprimand may be accorded a man who has murdered his wife after catching her in the act of adultery.

Spousal violence is common. Although a battered wife has the right to complain to the police, as a practical matter she would do so only if prepared to bring criminal charges.

Women suffer various forms of legal and cultural discrimination. The civil law status of women is governed by the Moudouwana, or Code of Personal Status, which is based on Islamic law. Although the

Moudouwana was reformed in 1993, women's groups still complain of unequal treatment, particularly under the laws governing marriage and divorce.

In order to marry, a woman is generally required to obtain the permission of her "tuteur," or legal guardian, usually her father. Except in unusual circumstances, only if her father is deceased may she act as her own "tuteur."

It is far easier for a man to divorce his wife than for a women to divorce her husband. Rather than asking for a divorce, a man may simply repudiate his wife. Under the 1993 reforms to the Moudouwana, a woman's presence in court is required in order for her husband to divorce her, although women's groups report that this law is frequently ignored. The divorce can be finalized even over the woman's objections, although in such cases the court grants her unspecified allowance rights.

A woman seeking a divorce has several alternatives. She may offer her husband money to agree to a divorce (known as a Khol'a divorce). The husband must agree to the divorce and is allowed to specify the amount that he will be paid--without

limit. According to women's groups, many men pressure their wives to pursue this kind of divorce. A woman may also file for a judicial divorce if her husband chooses to take a second wife, if she has been abandoned by her husband, or if she is a victim of physical abuse. However, divorce procedures in these cases are lengthy and complicated. For example, while physical abuse is a legal ground for divorce, the court will only grant it if the woman can provide two witnesses to the abuse. Even medical certificates are not sufficient. If the court finds against the woman, she is returned to her husband's home. Consequently, few women report abuse to the authorities.

Under the Criminal Code, women are generally accorded the same treatment as men, but this is not the case for family and estate law, which is based on the Malikite school of Islamic law. Under this law, women inherit only half as much as male heirs. Moreover, even where the law guarantees equal status, cultural norms often prevent a woman from exercising those rights. When a women inherits property, for example, male relatives may pressure her to relinquish her interest.

While many well-educated women pursue careers in law, medicine, education, and government service, few make it to the top echelons of their professions. Women comprise approximately

35 percent of the work force, with the majority in the industrial, service, and teaching sectors. The illiteracy rate for women is 78 percent, compared with 51 percent for men. Women in rural areas suffer most from inequality. Rural women perform most hard physical labor, and the literacy rate in the countryside is significantly lower for women than for men. Girls are much less likely to be sent to school than are boys. Women who do earn secondary school diplomas, however, have equal access to university education.

Children

The Government has taken little action to end child labor (see Section 6.d.). Young girls in particular are exploited as domestic servants. Some orphanages are knowing accomplices to the practice of adoptive servitude, in which families adopt young girls who perform the duties of domestic servants in their new homes. Credible reports of physical abuse are widespread. The practice is often rationalized as a better alternative to keeping the girls in orphanages. This practice is socially accepted, attracts little criticism and is unregulated by the Government.

Another problem facing orphans of both sexes is lack of civil status. Normally, men are registered at local government offices; their wives and unmarried children are included in this registration, which confers civil status. Civil status is necessary to obtain a birth certificate, passport, or marriage license. If a father does not register his child, the child is without civil status and the benefits of citizenship. It is possible for an individual to self-register, but the process is long and cumbersome.

People with Disabilities

A high incidence of disabling disease, especially polio, has produced a large population of disabled persons. While the Ministry of Social Affairs contends that the Government endeavors to integrate the disabled into society, in practice this is left largely to private charities. However, even charitable special education programs are priced beyond the reach of most families. Typically, disabled persons survive by begging. The Government continued a pilot training program for the blind sponsored in part by a member of the royal family. There are no laws mandating physical changes to buildings to facilitate access by the disabled.

National/Racial/Ethnic Minorities

The Constitution affirms, and the Government respects, the legal equality of all citizens. The official language is Arabic. Both French and Arabic are used in the news media and educational institution. Science and technical courses are taught in French, thereby eliminating the large, monolingual Arabic-speaking population from these programs. Educational reforms in the past decade have stressed the use of Arabic in secondary schools. Failure to similarly transform the university system has effectively disqualified many students from higher education in lucrative fields. This is especialy true among the poor, for whom French training is not always affordable.

Some 60 percent of the population claim Berber heritage. Berber cultural groups contend that Berber traditions and the three remaining Berber languages are rapidly being lost. Their repeated requests to the King to permit the teaching of Berber languages in the schools led to a royal decree authorizing the necessary curriculum changes, although no changes have yet occurred.

In June a number of Berber associations issued a communique petitioning the Government to recognize their language, Amzaghi, as an official language and to acknowledge the Amzaghi culture as a part of Moroccan society. The Government thus far has made no response to the petition.

**Section 6. Worker Rights**

a. The Right of Association

Although workers are free to establish and join trade unions, the unions themselves are not completely free from government interference. Perhaps half a million of Morocco's 9 million workers are unionized in 17 trade union federations. Three federations dominate the labor scene: the Union Marocain de Travail (UMT), the Confederation Democratique de Travail (CDT), and the Union Generale des Travailleurs Marocains (UGTM). The UMT has no political affiliation, but the CDT is affiliated with the Socialist Union of Popular Forces, and the UGTM to the Istiqlal Party.

In practice the Ministry of Interior is believed to have informants within the unions who monitor union activities and the election of officers. Sometimes union officers are subject to government pressure. Union leadership does not always uphold the rights of members to select their own leaders. There has been no case of the rank and file voting out its current leadership and replacing it with another.

Workers have the right to strike and do so. Work stoppages are normally intended to advertise grievances and last 48 to72 hours or less. Secondary school teachers and university professors held several strikes throughout the year and there were a number of limited duration strikes in the phosphate, banking, and health care sectors, and at the port of Casablanca.

On June 5, the CDT and UGTM labor federations joined forces to stage a 24-hour general strike throughout Morocco to protest perceived government indifference to the economic and social situation of the workers. The strike was relatively quiet and violence-free except in a neighborhood of the northern city of Tangier, where there was sporadic violence involving teenagers and young adults, rather than union activists. The UMT did not participate in the strike and, overall, an estimated 50 to 60 percent of shops and factories nationwide closed in compliance with the call to strike.

UMT unionists at a yeast production company in Casablanca began a strike in February, when management fired a union representative. The strike continues as the plant owner received permission to import yeast to make up for shortages in the market.

Unions belong to regional labor organizations and maintain ties with international trade secretariats.

b. The Right to Organize and Bargain Collectively

The right to organize and bargain collectively is implied in the constitutional provisions on the right to strike and the right to join organizations. Trade union federations compete

among themselves to organize workers. Any group of eight workers may organize a union and a worker may change union affiliation easily. A work site may contain several independent locals or locals affiliated with more than one labor federation.

In general the Government ensures the observance of labor laws in larger companies and in the public sector. In the informal economy, and in the textile and handicrafts industries, both the Government and management routinely ignore labor laws and regulations. As a practical matter, unions have no judicial recourse to oblige the Government to enforce labor laws and regulations.

The laws governing collective bargaining are inadequate. Collective bargaining has been a long-standing tradition in some parts of the economy such as the industrial sector, especially heavy industry, but the practice has not spread to other sectors such as the service and informal sectors. The wages and conditions of employment of unionized workers are generally set in discussions between employer and worker representatives. However, wages for the vast majority of workers are unilaterally set by employers.

Employers wishing to dismiss workers are required by law to notify the provincial governor through the labor inspector's office. In cases where employers plan to replace dismissed workers, a government labor inspector provides replacements and mediates the cases of workers who protest their dismissal. Any worker dismissed for committing a serious infraction of work rules is entitled by law to a court hearing.

There is no law specifically prohibiting antiunion discrimination. Employers commonly dismiss workers for union activities regarded as threatening to employer interests. The courts have the authority to reinstate such workers, but are unable to ensure that employers pay damages and back pay.

Ministry of Labor inspectors serve as investigators and conciliators in labor disputes, but they are few in number and do not have the resources to investigate all cases. Unions have increasingly resorted to litigation to resolve labor disputes.

The labor law applies equally to the small Tangier export zone. The proportion of unionized workers in the export zone is about the same as in the rest of the economy.

c. Prohibition of Forced or Compulsory Labor

Forced or compulsory labor is prohibited by the International Labor Organization's (ILO) Convention 29, which was adopted by royal decree. When authorities become aware of instances of

forced labor, courts enforce the decree. However, in practice, the Government lacks the resources to inspect all places of work to ensure that forced labor is not being used.

d. Minimum Age for Employment of Children

Abuse of the child labor laws is common. The law prohibits the employment or apprenticeship of any child under 12 years of age. Education is compulsory for children between the ages of 7 and 13 years. Special regulations cover the employment of children between the ages of 12 and 16 years. In practice,

children are often apprenticed before age 12, particularly in the handicraft industry. The use of minors is common in the rug-making industry and also exists to some extent in the textile and leather goods industries. Children are also employed informally as domestics and usually receive little or no wages. Safety and health conditions as well as wages in enterprises employing children are often substandard.

Ministry of Labor inspectors are responsible for enforcing child labor regulations, which are generally well observed in the industrialized, unionized sector of the economy. However, the inspectors are not authorized to monitor the conditions of domestic servants.

e. Acceptable Conditions of Work

The June 5 general strike led to negotiations among the Government, the manufacturers' association, and the labor confederations over increasing the minimum wage and improving health benefits, social benefits, and housing. In August all three parties agreed to a 10 percent increase in the minimum wage retroactive to July 1, raising it to approximately $193 (1,661 dirhams) per month in the industrialized sector and to approximately $9.41 (80.96 dirhams) per day for agricultural workers. Neither provides a decent standard of living for a worker and family--even with government subsidies for food, diesel fuel, and public transportation. In many cases, several family members combine their income to support the family. Most workers in the industrial sector earn more than the minimum wage. They are generally paid between 13 and 16 months salary, including bonuses, each year.

The minimum wage is not enforced effectively in the informal and handicraft sectors, and even the Government pays less than the minimum wage to workers at the lowest civil service grades. To increase employment opportunities for recent graduates, the Government allows firms to hire them for a limited period at less than the minimum wage.

The law provides for a 48-hour maximum workweek with no more than 10 hours in any single day, premium pay for overtime, paid public and annual holidays, and minimum conditions for health

and safety, including a prohibition on night work for women and minors. As with other regulations and laws, these are not universally observed in the informal sector.

Occupational health and safety standards are rudimentary, except for a prohibition on the employment of women in certain dangerous occupations. Labor inspectors endeavor to monitor working conditions and accidents, but lack sufficient resources. While workers, in principle, have the right to remove themselves from work situations that endanger health and safety without jeopardizing their continued employment, there were no reports of any instances in which a worker attempted to exercise this right.

[end of document]



Return to 1996 Human Rights Practices report home page.

Return to DOSFAN home page.

This is an official U.S. Government source for information on the WWW. Inclusion of non-U.S. Government links does not imply endorsement of contents.