# **Exhibit 19**

Execution Version

TO BE FILED IN THE OFFICE OF THE CLERK OF NEW YORK COUNTY

---

**$69,470,050 BUILDING LOAN**

**BUILDING LOAN AGREEMENT**

Dated as of August 25, 2014

Between

135 West 52nd Street Owner LLC, a Delaware limited liability company
as Borrower,

Deutsche Bank AG New York Branch,
as Agent, and

German American Capital Corporation, AND THE OTHER LENDERS SIGNATORY HERETO,
collectively, as Lender

---

| | |
|---|---|
| Location: | 135 West 52nd Street, New York, New York |
| Section: | 4 |
| Block: | 1005 |
| Lot: | 13 |
| County: | New York |

PREPARED BY AND UPON
RECORDATION RETURN TO:
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attention:  Eric M. Feuerstein, Esq.

# TABLE OF CONTENTS

Page

**Article I DEFINITIONS; PRINCIPLES OF CONSTRUCTION** .............................................1
    Section 1.1      Definitions ................................................................. 1
    Section 1.2      Principles of Construction ........................................... 32

**Article II GENERAL TERMS** .............................................................................**33**
    Section 2.1      Loan Commitment; Disbursement to Borrower ............ 33
    Section 2.2      Interest Rate ............................................................ 35
    Section 2.3      Loan Payment .......................................................... 41
    Section 2.4      Prepayments ........................................................... 42
    Section 2.5      Release of Property .................................................. 44
    Section 2.6      Extension Option ...................................................... 45
    Section 2.7      Payments Not Conditional .......................................... 46
    Section 2.8      Initial Advance ......................................................... 46
    Section 2.9      Advances ................................................................ 51
    Section 2.10     Conditions of Final Advance ...................................... 53
    Section 2.11     No Reliance ............................................................. 54
    Section 2.12     Method of Disbursement of Loan Proceeds ................... 54
    Section 2.13     Interest Rate Cap Agreement ..................................... 57

**Article III CONSTRUCTION REPRESENTATIONS AND COVENANTS** ........................**60**
    Section 3.1      The Project Improvements. ........................................ 60
    Section 3.2      Intentionally Omitted ................................................ 61
    Section 3.3      Completion of Improvements. ..................................... 61
    Section 3.4      Correction of Defects ................................................ 62
    Section 3.5      Building Loan Budget. ................................................ 62
    Section 3.6      Project Budget .......................................................... 62
    Section 3.7      Feasibility ............................................................... 63
    Section 3.8      Change Orders ........................................................ 63
    Section 3.9      Cost Savings and Contingency Reserve ....................... 63
    Section 3.10     Stored Materials ...................................................... 64
    Section 3.11     Construction Consultant ............................................ 65

**Article IV REPRESENTATIONS AND WARRANTIES** ..............................................**66**
    Section 4.1      Borrower Representations .......................................... 66
    Section 4.2      Incorporation of Representations ................................ 76
    Section 4.3      Survival of Representations ........................................ 76

i

## TABLE OF CONTENTS
### (*continued*)

Page

**Article V BORROWER COVENANTS ............................................................76**

Section 5.1    Affirmative Covenants .................................................... 76

Section 5.2    Negative Covenants ..................................................... 101

Section 5.3    Covenants after Conversion ......................................... 109

**Article VI INSURANCE; CASUALTY;  CONDEMNATION; REQUIRED
REPAIRS ........................................................................109**

Section 6.1    Insurance ...................................................................... 109

Section 6.2    Casualty and Condemnation. ....................................... 114

Section 6.3    Application of Net Proceeds ......................................... 120

**Article VII RESERVE FUNDS .......................................................................120**

Section 7.1    Deposit Account ........................................................... 120

Section 7.2    Reserve Accounts ......................................................... 121

Section 7.3    Security Interest in Funds ............................................ 122

Section 7.4    Order of Priority of Funds in Deposit Account ........... 123

**Article VIII DEFAULTS ................................................................................123**

Section 8.1    Event of Default ........................................................... 123

Section 8.2    Remedies ...................................................................... 127

Section 8.3    Remedies Cumulative; Waivers ................................... 128

**Article IX SPECIAL PROVISIONS ...............................................................129**

Section 9.1    Sale of Loan ................................................................. 129

Section 9.2    Severance Documentation ........................................... 131

Section 9.3    Expenses ...................................................................... 132

Section 9.4    Recourse ....................................................................... 132

Section 9.5    Servicer ........................................................................ 136

**Article X MISCELLANEOUS .......................................................................137**

Section 10.1    Survival ........................................................................ 137

Section 10.2    Agent's and Lender's Discretion ................................. 137

Section 10.3    Governing Law ............................................................. 137

Section 10.4    Modification, Waiver in Writing .................................. 138

Section 10.5    Delay Not a Waiver ...................................................... 139

Section 10.6    Notices ......................................................................... 139

# TABLE OF CONTENTS

### (*continued*)

Page

Section 10.7    Trial by Jury ........................................................................................ 141

Section 10.8    Headings ............................................................................................. 141

Section 10.9    Severability ........................................................................................ 141

Section 10.10    Preferences ....................................................................................... 141

Section 10.11    Waiver of Notice .............................................................................. 141

Section 10.12    Remedies of Borrower ..................................................................... 142

Section 10.13    Expenses; Indemnity ....................................................................... 142

Section 10.14    Schedules Incorporated ................................................................... 144

Section 10.15    Offsets, Counterclaims and Defenses .............................................. 144

Section 10.16    No Joint Venture or Partnership; No Third Party Beneficiaries ........ 144

Section 10.17    Publicity ........................................................................................... 144

Section 10.18    Waiver of Marshalling of Assets ..................................................... 144

Section 10.19    Waiver of Counterclaim ................................................................... 145

Section 10.20    Conflict; Construction of Documents; Reliance ............................... 145

Section 10.21    Brokers and Financial Advisors ....................................................... 146

Section 10.22    Prior Agreements ............................................................................. 146

Section 10.23    Liability ............................................................................................ 146

Section 10.24    Negation of Implied Right to Cure Events of Default ....................... 146

**Article XI AGENT** ........................................................................................................**146**

Section 11.1    Appointment ...................................................................................... 146

Section 11.2    Delegation of Duties .......................................................................... 147

Section 11.3    Exculpatory Provisions ...................................................................... 147

Section 11.4    Reliance by Agent .............................................................................. 147

Section 11.5    Notice of Default ................................................................................ 147

Section 11.6    Non-Reliance on Agent and Other Lenders ......................................... 148

Section 11.7    Indemnification .................................................................................. 148

Section 11.8    Agent in Its Individual Capacity ......................................................... 148

Section 11.9    Successor Agent ................................................................................. 149

Section 11.10    Limitations on Agent's Liability ...................................................... 149

## **SCHEDULES**

Schedule I          Organizational Chart of Borrower

Schedule II         Borrower's Intellectual Property

Schedule III        Reserved

Schedule IV         Custom Materials and Machinery; Deposit Amounts

Schedule V          Litigation

Schedule VI         Requirements for a Special Purpose Entity

Schedule VII        Required Offering Plan Amendments

## **EXHIBITS**

Exhibit A           RESERVED

Exhibit B           RESERVED

Exhibit C           Form of Datedown Endorsement

Exhibit D           Form of Assignment of Contracts

Exhibit E           Affirmation of Payment (AIA Form G706)

Exhibit F           Forms of Architect's Certificate

Exhibit G           Form of Performance Letter

Exhibit H           Permitted Fund Managers

Exhibit I           Anticipated Costs Report Forms

Exhibit J           Form of Lien Waivers

Exhibit K           RESERVED

Exhibit L           Form of Borrower's Requisition

Exhibit M           Application and Certificate for Payment (AIA Form G702)

Exhibit N           Section 22 Affidavit

Exhibit O           Form of Condominium Endorsement

Exhibit P           RESERVED

Exhibit Q           Tax Certificates

## BUILDING LOAN AGREEMENT

**THIS BUILDING LOAN AGREEMENT**, dated as of August 25, 2014 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**" or sometimes "**Building Loan Agreement**"), among **German American Capital Corporation**, a Maryland corporation, having an address at 60 Wall Street, 10th Floor, New York, New York 10005 (together with its successors and assigns and such other co-lenders as may exist from time to time, "**Lender**"), **Deutsche Bank AG New York Branch**, a branch of Deutsche Bank AG, a banking corporation organized under the laws of the Federal Republic of Germany, licensed by the New York State Banking Department, having an address at 60 Wall Street, 10th Floor, New York, New York 10005, as agent for Lender (together with its successors and assigns, "**Agent**"), and **135 West 52nd Street Owner LLC**, a Delaware limited liability company, having its principal place of business at c/o The Chetrit Group, LLC, 512 Seventh Avenue, New York, New York 10018 (together with its permitted successors and assigns, collectively, "**Borrower**").

## W I T N E S S E T H:

**WHEREAS**, Borrower desires to obtain the Building Loan (as hereinafter defined) from Lender; and

**WHEREAS**, Lender is willing to make the Building Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents (as hereinafter defined).

**NOW THEREFORE**, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows:

## ARTICLE I

## DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1    Definitions**.  For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**Accounts**" shall have the meaning specified in Section 7.1 hereof.

"**Acknowledgment**" shall mean the Acknowledgment, dated on or about the date hereof made by Counterparty, or as applicable, Approved Counterparty.

"**Actual Return Amount**" shall mean the aggregate sum actually paid to Lender of all Monthly Debt Service Payment Amounts (excluding Service Fees), and any payments in reduction of the Outstanding Principal Balance (in each case excluding interest at the Default Rate, repayment of protective advances, any Exit Fee, Structuring Fee and/or any other fees of Agent and/or Lender or any Affiliate thereof, and any reimbursement or other payment of costs or expenses incurred by Agent and/or Lender required to be reimbursed by Borrower to Agent and/or Lender hereunder).

"**ADA**" means the Americans with Disabilities Act, of July 26, 1990, Pub. L. No. 101-336, 104 Stat. 327, 42 U.S.C. § 12101, et. seq., as amended from time to time.

"**Advance**" or "**Advances**" shall mean any disbursement of the proceeds of the Building Loan by Lender pursuant to the terms of this Agreement or disbursement of the proceeds of the Project Loan pursuant to the terms of the Project Loan Agreement, or disbursements of the proceeds of the Senior Loan pursuant to the terms of the Senior Loan Agreement, as applicable.

"**Affiliate**" shall mean, as to any Person, any other Person that (i) owns directly or indirectly ten percent (10%) or more of all equity interests in such Person or is under common ownership, directly or indirectly, with ten percent (10%) or more of all equity interests of such Person, and/or (ii) is in direct and/or indirect control of, is directly and/or indirectly controlled by or is under common direct and/or indirect ownership or control with such Person, and/or (iii) is a direct or indirect director, officer, manager, trustee or agent of such Person or of an Affiliate of such Person, and/or (iv) is the spouse, issue or parent of such Person or of an Affiliate of such Person.

"**Affiliate Contracts**" shall mean any Contract between Borrower and a Borrower Related Party, which shall be subject to prior written approval by Agent.

"**Affirmation of Payment**" shall mean the Construction Manager's affirmation of payment (AIA Form G706) in the form attached hereto as Exhibit E.

"**Agent**" shall have the meaning set forth in the introductory paragraph hereto.

"**Agreement**" shall have the meaning set forth in the introductory paragraph hereto.

"**ALTA**" shall mean American Land Title Association or any successor thereto.

"**Annual Budget**" shall mean, for the period from and after Substantial Completion, the operating and capital budget for the Property (prior to the Conversion Date) and for the Unsold Units (from and after the Conversion Date), setting forth, on a month-by-month basis, in reasonable detail, each line item of Borrower's good faith estimate of anticipated operating income, operating expenses and capital expenditures for the applicable Fiscal Year.

"**Applicable Rate**" shall mean (a) LIBOR, or (b) if and only for so long as LIBOR is unavailable in accordance with the definition of "LIBOR," the Prime Equivalent Rate.

"**Applicable Similar Law**" shall have the meaning set forth in Section 4.1.10 hereof.

"**Appraisal**" shall mean, as of any date, a then-current "as-is" appraisal of the Property (prior to the Conversion Date) or the Unsold Units (after the Conversion Date), as the case may be, addressed to Agent by an appraiser selected by (or acceptable to) Agent and determined on the assumption that the Project Improvements have been completed in accordance with the Plans and Specifications, and net of estimated brokerage, legal, marketing and other closing costs, which appraisal shall be in compliance with the Financial Institutions Reform, Recovery and Enforcement Act of 1989 (as amended from time to time, and the regulations promulgated and

rulings issued thereunder) and acceptable to Agent in its sole discretion subject to the terms of this Agreement.

"**Appraised Value**" shall mean the fair market value of the Property (prior to the Conversion Date) or the Unsold Units (after the Conversion Date), as the case may be, and as determined by an Appraisal.

"**Approved Annual Budget**" means an Annual Budget for a given Fiscal Year which has been approved by Agent in accordance with this Agreement.

"**Approved Counterparty**" shall mean a bank or other financial institution which has a long-term unsecured debt rating of "A+" or higher by S&P (with downgrades permitted to "A").

"**Architect's Certificate**" shall have the meaning as set forth in Section 2.8.1(n).

"**Architect's Contract**" shall mean that certain agreement to be entered into between Borrower and Borrower's Architect in accordance herewith, as the same may be amended from time to time in compliance with the terms hereof.

"**Assessments**" shall mean any and all common charges and assessments under the Condominium Documents (including without limitation, regular and special assessments), together with any and all interest and penalties thereon, now or hereafter levied or assessed or imposed against Borrower, the Unsold Units, the Property or any part thereof.

"**Assignment of Contracts**" shall mean that certain Assignment of Plans, Specifications, Permits, Contracts, Licenses, Entitlements and Intangibles dated as of the date hereof by Borrower in favor of Agent (for the benefit of Lender) in the form attached hereto as Exhibit D.

"**Assignment of Leases**" shall mean a certain Assignment of Leases and Rents, dated as of the date hereof, from Borrower, as assignor, to Agent (for the benefit of Lender), as assignee, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Assignment of Construction Management Agreement**" shall mean that certain Assignment of Construction Management Agreement and Subordination of Construction Management Fees dated as of the date hereof, among Borrower, Construction Manager and Agent (for the benefit of Lender), with respect to the Construction Management Agreement.

"**Assignment of Rate Cap**" shall mean that certain Collateral Assignment of Interest Rate Protection Agreement, dated as of the date hereof, from Borrower, as assignor, to Agent (for the benefit of Lender), as assignee, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Assignment of Sales Agency Agreement**" shall mean that certain Assignment of Sales Agency Agreement and Subordination of Sales Fees dated as of the date hereof, among Borrower, Sales Agent and Agent (for the benefit of Lender), with respect to the Sales Agency Agreement.

"**Award**" shall mean any compensation paid by any Governmental Authority in connection with a Condemnation in respect of all or any part of the Property.

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, 11 U.S.C. §101, et seq., as the same may be amended from time to time, and any successor statute or statutes and all rules and regulations from time to time promulgated thereunder, and any comparable foreign laws relating to bankruptcy, insolvency or creditors' rights or any other Federal or state bankruptcy or insolvency law.

"**Board Turnover Date**" shall mean the date on which Borrower (or the Affiliate of Borrower or the designee of Borrower (or its Affiliate) that is the "sponsor" under the Offering Plan) no longer controls the Condominium Board.

"**Borrower**" shall have the meaning set forth in the introductory paragraph hereto.

"**Borrower Operating Account**" shall mean Borrower's Operating Account at Sterling National Bank.

"**Borrower Operating Account Agreement**" shall mean that certain Account Control Agreement for Bank Accounts dated as of the date hereof, among Borrower, Agent and Sterling National Bank.

"**Borrower Party**" means each of Borrower, Sole Member and Guarantor.

"**Borrower Related Party**" means, collectively and individually, any Borrower Party and any Affiliate of any of the foregoing, and any officer, director, manager, agent, employee or immediate family member of the foregoing, and any Person acting at the direction of any of the foregoing.

"**Borrower's Architect**" shall mean CetraRuddy Architecture D.P.C., or any other architect approved in writing by Agent.

"**Borrower's Requisition**" shall have the meaning set forth in Section 2.12.1 hereof.

"**Breakage Costs**" shall have the meaning specified in Section 2.2.4(c) hereof.

"**Broker**" shall have the meaning specified in Section 10.21 hereof.

"**Building Loan**" shall mean the loan made by Lender to Borrower pursuant to this Agreement in the principal amount of up to the Building Loan Amount.

"**Building Loan Agreement**" shall have the meaning set forth in the introductory paragraph hereto.

"**Building Loan Amount**" shall mean an amount equal to Sixty-Nine Million, Four Hundred Seventy Thousand, Fifty and No/100 Dollars ($69,470,050.00).

"**Building Loan Budget**" shall have the meaning set forth in Section 3.5.1 hereof.

4

"**Building Loan Costs**" shall mean all costs and expenses of constructing and renovating the Project Improvements (including Hard Costs and Soft Costs) that are Costs of the Improvements.

"**Building Loan Documents**" shall mean, collectively, this Agreement, the Building Loan Note, the Building Loan Mortgage, the Common Loan Documents, and all other documents now or hereafter executed and/or delivered with respect to the Building Loan.

"**Building Loan Mortgage**" shall mean that certain Building Loan Mortgage, Assignment of Leases and Rents and Security Agreement dated the date hereof, executed and delivered by Borrower to Agent (for the benefit of Lender) as security for the Building Loan and encumbering the Property, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Building Loan Note**" shall mean that certain Building Loan Promissory Note, dated as of the date hereof, in the principal amount of up to $69,470,050.00 made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Bulk Sale**" shall mean a sale at any time during the term of this Agreement (including an agreement to sell at a later date) of five (5) or more Units to one Person, and for which purpose a sale to any Affiliate of such Person shall be deemed a sale to one Person. All sales of Units to a single Person or to Affiliates of such Person shall be aggregated and deemed to be one sale for purposes of determining whether the same constitute a Bulk Sale. Any Units that have been legally combined in accordance with the Condominium Documents and all applicable laws and regulations (including, without limitation, the issuance of a temporary certificate of occupancy, if required) shall be deemed to be one (1) Unit for purposes of this definition.

"**Business Plan**" shall mean the business plan attached as Exhibit C to the Project Loan Agreement and any modified or substitute business plan for the ownership, conversion, renovation, marketing and/or development of the Property or the Unsold Units, as may be proposed by Borrower and approved by Agent in accordance with Section 5.2.11 hereof. The Business Plan shall include the following, and such other items as Agent may require in its reasonable discretion: (i) the Building Loan Budget, the Project Loan Budget and the Project Budget, (ii) the strategy for completion of the Project Improvements and the Conversion (including, without limitation, timing of entering into Construction Contracts and the strategy to be implemented to obtain any required zoning, CPC or other approvals from Governmental Authorities necessary to complete the Project Improvements), (iii) the Construction Schedule, (iv) the Minimum Release Prices approved by Agent in accordance with this Agreement, and strategy for the sale of Units and sale projections, (v) if then applicable, the Annual Budget, (vi) the Major Milestones, (vii) procedures for procuring bids for all Construction Contracts, and (viii) other pertinent details for the execution of the Project.

"**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which national banks in New York, New York are not open for business.

"**By-Laws**" shall mean the "By-Laws" as such term is defined in the Offering Plan.

"**Carry Costs**" shall mean Taxes, Insurance Premiums, operating expenses, Other Charges, Assessments, Construction Consultant costs, fees or expenses, and any other costs necessary or reasonably desirable to own and operate the Property (or, after the Conversion, the Unsold Units) as determined by Agent in its reasonable discretion.

"**Carry Cost Account**" shall have the meaning set forth in <u>Section 7.2.1</u> of the Senior Loan Agreement.

"**Carry Cost Available Advances**" shall mean, at any time, the difference between (a) the Carry Cost Cap, and (b) all amounts previously advanced (as of such time) by Lender as Advances in respect of Carry Costs.

"**Carry Cost Available Amount**" shall mean, at any given time, the amount that Agent, in its sole discretion, estimates will be available to pay Carry Costs hereunder, taking into consideration, among other things, projected timing of Unit sales, projected receipt of Gross Revenue (other than Unit sale proceeds), Carry Cost Available Advances and amounts deposited in the Carry Cost Account.

"**Carry Cost Cap**" shall mean $945,000.

"**Carry Cost Funds**" shall have the meaning set forth in <u>Section 7.2.1</u> of the Senior Loan Agreement.

"**Cash Management Agreement**" shall mean that certain Cash Management Agreement dated as of the date hereof between Borrower, Deposit Bank and Agent.

"**Casualty**" shall have the meaning set forth in <u>Section 6.2.1</u> hereof.

"**Casualty Consultant**" shall have the meaning set forth in <u>Section 6.2.4(d)</u> hereof.

"**Casualty Retainage**" shall have the meaning set forth in <u>Section 6.2.4(e)</u> hereof.

"**Change Order**" means any change in, modification to or deviation from the Plans and Specifications or any Construction Contract, whether designated a change order or construction change directive, and whether or not there is a change in the contract sum or contract time under any Construction Contract.

"**Clearing Account**" shall have the meaning set forth in <u>Section 7.1</u> hereof.

"**Clearing Bank**" shall have the meaning set forth in <u>Section 7.1</u> hereof.

"**Clearing Account Control Agreement**" shall mean that certain Account Control Agreement for Bank Accounts dated as of the date hereof, among Borrower, Agent and Sterling National Bank.

"**Closing Costs**" means, customary and reasonable third party out of pocket costs and expenses (including brokerage, legal, and marketing fees, transfer taxes (if applicable) and rebates and/or reimbursements to the purchaser of such Unit) actually incurred by Borrower in connection

with the sale of a given Unit; provided, however, that (i) such Closing Costs shall only be paid to third parties unaffiliated with any Borrower Related Party unless such costs and expenses are paid to such Person in an arms-length market transaction and are approved by Agent acting in its sole discretion; (ii) unless Agent approves the same in writing (which approval may be granted or withheld in Agent's sole and absolute discretion), such Closing Costs shall not, when aggregated with any concessions and credits provided to a purchaser, exceed the Closing Cost Cap and (iii) Lender shall have received reasonable supporting documentation with respect to such Closing Costs.

"**Closing Cost Cap**" means (i) 8.0% of the Gross Sales Proceeds for the sale of any residential Unit, or (ii) 5% of the Gross Sales Proceeds for the sale of any office or retail Unit.

"**Closing Date**" shall mean the date hereof.

"**Code**" shall mean the Internal Revenue Code of 1986, as amended, as it may be further amended from time to time, and any successor statutes thereto, and applicable U.S. Department of Treasury regulations issued pursuant thereto in temporary or final form.

"**Collateral**" shall have the meaning ascribed thereto in the Pledge Agreement.

"**Common Loan Documents**" shall mean, collectively, the Assignment of Construction Management Agreement, the Assignment of Sales Agency Agreement and any other assignment and/or subordination of contracts or other agreements delivered during the Term in connection with the Loan, the Assignment of Rate Cap, the Guaranty, the Environmental Indemnity, the Guaranty of Completion, the Limited Payment Guaranty, the Assignment of Contracts, the Pledge Agreement, the Pledge Agreement Guaranty, the Cash Management Agreement, the Borrower Operating Account Agreement, the Clearing Account Control Agreement, the Assignment of Leases, and all other documents now or hereafter executed and/or delivered with respect to the Loan.

"**Condemnation**" shall mean a temporary or permanent taking by any Governmental Authority as the result or in lieu or in anticipation of the exercise of the right of condemnation or eminent domain, of all or any part of the Property, or any interest therein or right accruing thereto, including any right of access thereto or any change of grade affecting the Property or any part thereof.

"**Condominium**" shall mean the condominium which will be established pursuant to the terms of the Declaration of Condominium.

"**Condominium Act**" shall mean Article 9-B of the New York Real Property Law (339-d *et seq*.) of the State of New York and all modifications, supplements and replacements thereof and all regulations with respect thereto, now or hereafter enacted or promulgated.

"**Condominium Board**" shall mean the condominium board to be established pursuant to the terms of the Declaration of Condominium and which will be governed pursuant to the terms of the bylaws set forth in the Declaration of Condominium.

7

"**Condominium Budget**" shall have the meaning set forth in Section 5.1.12(b)(v) hereof.

"**Condominium Documents**" shall mean all documents as required by the Condominium Act and relating to the submission of the Property to the provisions of the Condominium Act, including the Offering Plan, Declaration of Condominium, By-Laws, the tax lot drawings, any and all filings and other Governmental Approvals and any and all other documentation related to the proper formation and operation of the condominium regime to be established at the Property under New York law and the marketing and sale of Units to the public, each as may be may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Condominium Policy**" means the property insurance policy insuring the common elements of the Condominium carried by the Condominium Board after commencement of operation of the Condominium.

"**Construction Consultant**" shall mean, collectively, IVI International Inc., and/or such other or additional Person (which may be an Affiliate of Agent and/or Servicer) as Agent may designate and engage to inspect the Improvements and the Property as construction progresses and consult with and to provide advice to and to render reports to Agent.

"**Construction Contract**" shall mean any agreement, contract, subcontract or purchase order entered into by Borrower or by the Construction Manager in which the Contractor thereunder agrees to provide labor, equipment, services and/or materials in connection with the construction, renovation, development or operation of the Project Improvements.

"**Construction Costs**" shall have the meaning set forth in the defined term "Project Related Costs".

"**Construction Management Agreement**" shall mean that certain Construction Management Agreement, dated as of October 1, 2013, by and among Borrower and Construction Manager, for the supervision of the construction and development of the Project Improvements, as the same may be modified in accordance with Section 5.1.33(b) hereof.

"**Construction Manager Fee**" shall have the meaning set forth in Section 5.2.17 hereof.

"**Construction Manager**" shall mean New Line Structures Inc., a New York corporation, or any replacement construction manager appointed in accordance with Section 5.1.33(b) hereof.

"**Construction Schedule**" shall mean a reasonably detailed construction schedule based on the status of the Project and the development and construction of the Project Improvements at such time, including the dates of commencement and completion (broken down by trade) for each stage of the Project Improvements and other milestones (including the Major Milestones), certified by Borrower to Agent and approved by Agent as part of the Business Plan. The initial Construction Schedule is set forth in the initial Business Plan attached as Exhibit C to the Project Loan Agreement

"**Contract**" shall mean shall mean any (i) Construction Contract or (ii) cleaning, maintenance, service, repair, supply, credit, personnel, staffing or other contract or agreement of

8

any kind relating to the use, development, operation, maintenance, repair or restoration of the Property or otherwise binding on Borrower or any Affiliate of the foregoing (on behalf of Borrower), whether written or oral, other than the Construction Management Agreement.

"**Contractor**" shall mean any contractor, subcontractor or other Person (including, without limitation, the Construction Manager) supplying services, labor or materials in connection with the Project Improvements.

"**Control**" or "**control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise, including, without limitation, having approval or consent rights over the actions or conduct of a Person.

"**Conversion**" shall have the meaning set forth in Section 5.1.32(a)(i) hereof.

"**Conversion Date**" shall have the meaning set forth in Section 5.1.32(a)(i) hereof.

"**Cost Savings**" shall mean (x) (1) the amount, if any, remaining in any Line Item in the Building Loan Budget (solely with respect to Construction Costs), after (a) completion of 90%  of the work relating to such Line Item, (b) the existence of (or entering into) a fixed price contract with respect to the entire cost of completing such Line Item (and a corresponding deduction for the amount owed but not yet paid with respect to such fixed price contracts), (c) all Contractors, materialmen and other Persons have been paid in full for work performed to date and materials provided with respect to the component of the Project to be funded from such Line Item and (d) delivery to Agent of lien waivers with regard to all sums due to date and a bond with respect to any items in dispute for which any Liens have been filed or subordinations of Liens from such Contractors and other Persons, in each case in form and substance satisfactory to Agent and in recordable form, if requested by Agent, and (2) without duplication of any Cost Savings achieved pursuant to the operation of the immediately preceding clause (1), the positive difference, if any, between the amount allocated to a Line Item for Construction Costs in the Building Loan Budget carried as an "allowance" and the amount remaining in such Line Item after entering into a fixed price contract in accordance with the Loan Documents (after assuming the full payment of all amounts due under such fixed price contract), with respect to the entire cost of completing such Line Item, and provided that such fixed price contract is not subject to any conditions or exclusions other than those that are acceptable to Agent and the Construction Consultant; (y) the amount, if any, remaining in any Line Item in the Building Loan Budget (solely with respect to Construction Costs) after (A) completion of 100% of the work relating to such Line Item, (B) all Contractors, materialmen and other Persons have been paid in full for work performed and materials provided with respect to the component of the Project to be funded from such Line Item, and (C) delivery to Agent of lien waivers from such Contractors and any other Persons, in form and substance reasonably satisfactory to Agent and in recordable form, if requested by Agent; and (z) the amount, if any, remaining in any Line Item in the Building Loan Budget with respect to the cost of materials, equipment, or Fixtures purchased by Borrower covering the full amount or quantity of such materials, equipment, or Fixtures required for the Project, upon delivery to Agent of (A) the applicable Contract, bills of sale or other evidence of the cost of and Borrower's title in and to such materials, equipment, or fixtures, (B) proof such materials, equipment, or fixtures have been

9

delivered to the Property, and (C) proof such materials, equipment, or fixtures have been paid for in full and all lien rights or claims of the supplier have been released, in each case in form and substance reasonably satisfactory to Agent.

"**Costs of the Improvement**" shall mean those items defined as an "improvement" and/or a "cost of improvement" under Section 2 of Article 1 the Lien Law, as such term applies to the construction of the Project Improvements in accordance with the Plans and Specifications.

"**Counterparty**" shall mean, with respect to the Interest Rate Cap Agreement, SMBC Capital Markets Inc. and with respect to any Replacement Interest Rate Cap Agreement, any Approved Counterparty thereunder.

"**CPC**" shall mean the New York City Planning Commission.

"**Debt**" shall mean the outstanding principal amount of the Building Loan set forth in, and evidenced by, this Agreement, the Building Loan Documents and the Building Loan Note, together with all interest accrued and unpaid thereon, including all other sums (including, without limitation, the Exit Fee and, if applicable, the Return Differential) due to Agent or Lender in respect of the Building Loan under the Building Loan Note, this Agreement, the Building Loan Mortgage or any other Building Loan Documents.

"**Debt Service**" shall mean, with respect to any particular period, the amount of interest due pursuant to and in accordance with the operation of <u>Section 2.2.1</u> of each of the Loan Agreements, and the portion of the Servicing Fee due in accordance with the Loan Agreements.

"**Debt Service Available Advances**" shall mean, at any time, the difference between (a) the Debt Service Cap, and (b) all amounts previously advanced (as of such time) by Lender as Advances in respect of Debt Service.

"**Debt Service Available Amount**" shall mean, at any given time, the amount that Agent, in its reasonable discretion, estimates will be available to pay Debt Service (including all Monthly Debt Service Payment Amounts), taking into consideration, among other things, projected timing of Unit sales, projected receipt of Gross Revenue (other than Unit sale proceeds), Debt Service Available Advances, and amounts deposited in the Interest Reserve Account.

"**Debt Service Cap**" shall mean $9,475,000.

"**Declaration of Condominium**" shall mean that certain declaration of condominium with respect to the Property (including the bylaws, rules and regulations and other exhibits and schedules thereto) to be recorded with the New York City Register, subject to the prior written approval of Agent in accordance with this Agreement, as may be may be amended, restated, replaced, supplemented or otherwise modified from time to time. (The initial form of Declaration of Condominium has been submitted to the DOL together with the Offering Plan, as noted in the definition of Offering Plan.)

"**Default**" shall mean the occurrence of any event hereunder or under any other Loan Document which, but for the giving of notice or passage of time, or both, would be an Event of Default.

"**Default Rate**" shall mean, with respect to the Loan, a rate per annum equal to the lesser of (a) the maximum rate permitted by applicable law or (b) five percent (5%) above the Interest Rate.

"**Deposit Account**" shall mean an Eligible Account under the sole dominion and control of Agent at the Deposit Bank.

"**Deposit Bank**" shall mean Deutsche Bank Trust Company Americas, or the bank or banks approved by Agent in its sole discretion to maintain the Accounts.

"**Deposits**" shall have the meaning set forth in Section 3.10(b) hereof.

"**DOL**" shall mean the New York State Department of Law or the Office of the Attorney General.

"**Draw Request**" shall mean, with respect to each Advance, Borrower's request for such Advance, together with Borrower's Requisition and all other documents and information required by this Agreement to be furnished to Agent as a condition to such Advance.

"**Easements**" shall have the meaning set forth in Section 4.1.17(a) hereof.

"**Eligibility Requirements**" shall mean, with respect to any Person, that such Person (a) has total assets (in name or under management, and inclusive of unfunded capital commitments) in excess of $400,000,000 and (except with respect to a pension advisory firm or similar fiduciary) capital/statutory surplus, shareholder's equity or market capitalization (in each case, inclusive of unfunded capital commitments) of $200,000,000, and (b) is regularly engaged in the business of making or owning commercial real estate loans or operating commercial real estate properties.

"**Eligible Account**" shall mean a separate and identifiable account from all other funds held by the holding institution that is either (a) an account maintained with a federal or state-chartered depository institution or trust company which complies with the definition of Eligible Institution or (b) a segregated trust account maintained with a federal or state chartered depository institution or trust company acting in its fiduciary capacity which, in the case of a state chartered depository institution or trust company, is subject to regulations substantially similar to 12 C.F.R. §9.10(b), having in either case a combined capital and surplus of at least Fifty Million and 00/100 Dollars ($50,000,000.00) and subject to supervision or examination by federal and state authority. An Eligible Account will not be evidenced by a certificate of deposit, passbook or other instrument.

"**Eligible Assignee**" shall mean a Person that is:

(a)       a real estate investment trust, bank, saving and loan association, investment bank, insurance company, trust company, commercial credit corporation, pension plan, pension fund or

11

pension advisory firm, mutual fund, government entity or plan that satisfies the Eligibility Requirements;

(b)      an investment company, money management firm or "qualified institutional buyer" within the meaning of Rule 144A under the Securities Act of 1933, as amended, or an institutional "accredited investor" within the meaning of Regulation D under the Securities Act of 1933, as amended, that satisfies the Eligibility Requirements;

(c)      an institution substantially similar to any of the foregoing entities described in clauses (a) and (b) that satisfies the Eligibility Requirements;

(d)      an investment fund, limited liability company, limited partnership or general partnership with committed capital of at least $200,000,000 where a Permitted Fund Manager or an entity that is described in under clauses (a) through (c) above acts (directly or indirectly) as the general partner, managing member or fund manager and at least 50% of the equity interests in such investment vehicle are directly owned by one or more entities that are entities described under clauses (a) through (c) above or Affiliates thereof (provided that such Persons need not satisfy clause (b) of the definition of Eligibility Requirements so long as the person acting in the capacity of Permitted Fund Manager does satisfy such requirements); or

(e)      any entity Controlling, Controlled by or under common Control with any of the entities described in clauses in clauses (a) through (d) above.

"**Eligible Institution**" shall mean a depository institution or trust company insured by the Federal Deposit Insurance Corporation the short term unsecured debt obligations or commercial paper of which are rated at least A-1 by S&P, P-1 by Moody's, and F-1+ by Fitch in the case of accounts in which funds are held for thirty (30) days or less or, in the case of Letters of Credit or accounts in which funds are held for more than thirty (30) days, the long term unsecured debt obligations of which are rated at least "AA" by Fitch and S&P and "Aa2" by Moody's.

"**Embargoed Person**" shall have the meaning set forth in Section 5.1.24(c) hereof.

"**Environmental Indemnity**" shall mean that certain Environmental Indemnity Agreement, dated as of the date hereof, executed by Borrower and Guarantor in connection with the Loan for the benefit of Agent (for the benefit of Lender), as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Environmental Report**" shall have the meaning set forth in Section 2.8.1(w) hereof.

"**Equipment**" shall have the meaning as set forth in the granting clause of the Building Loan Mortgage.

"**Equity Collateral Enforcement Action**" shall have the meaning as set forth in Section 9.4.4(x) hereof.

"**Equity Collateral Transfer Date**" shall have the meaning as set forth in Section 9.4.4(x) hereof.

"**ERISA**" shall have the meaning set forth in Section 5.2.8(a).

"**ERISA Affiliate**" shall mean any trade or business (whether or not incorporated) under common control with Borrower and any other trade or business which, together with Borrower, is treated as a single employer under any or all of Section 414(b), (c), (m) or (o) of the Code.

"**Escrow Agent**" shall have the meaning set forth in Section 5.1.32(c) hereof.

"**Event of Default**" shall have the meaning set forth in Section 8.1(a) hereof.

"**Excluded Taxes**" means any of the following Taxes imposed on or with respect to a Lender or Agent or required to be withheld or deducted from a payment to a Lender or Agent, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Lender or Agent being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or (ii) such Lender changes its lending office (other than pursuant to a request by Borrower pursuant to Section 2.2.4(b), except in each case to the extent that, pursuant to Section 2.2.4, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Lender's or Agent's failure to comply with Section 2.2.4(h) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"**Existing Loan**" shall mean that certain mortgage loan in the initial principal amount of $115,000,000.00 by The Variable Annuity Life Insurance Company, a Texas corporation, as lender, to Borrower, which is secured by, among other things, a mortgage and security agreement encumbering the Property.

"**Exit Fee**" shall mean, in connection with any repayment or prepayment of principal, a non-refundable fee equal to 0.25% of the Loan Amount being repaid at such time, not to exceed 0.25% of the Loan Amount, subject to Section 2.3.4.

"**Extension Maturity Date**" shall mean August 25, 2017.

"**Extension Option**" shall have the meaning set forth in Section 2.6 hereof.

"**Extension Period**" shall mean, if the Extension Option has been duly exercised in accordance with this Agreement, the period starting on the first day after the Initial Maturity Date and ending on the Extension Maturity Date.

"**Extraordinary Expense**" means an extraordinary operating expense or capital expense not set forth in the Approved Annual Budget.

"**FATCA**" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"**Final Advance**" shall mean the Advance whereby the Loan has been fully funded by Lender in accordance with this Agreement.

"**Final Completion**" shall mean that (i) Substantial Completion shall have occurred and all Punch List Items shall have been completed in accordance with the Plans and Specifications (as the same may be amended in accordance with this Agreement), all applicable Legal Requirements, and this Agreement, (ii) all Project Related Costs in connection with the Project Improvements have been paid in full and unconditional Lien waivers substantially in the form set forth in Exhibit J from all Contractors who performed any work with regard to all work performed and/or all materials supplied (in each case, in connection with the Project Improvements) have been delivered to Agent, (iii) no conditions to the issuance of a permanent certificate of occupancy for the entire Project exist other than those approved by Agent acting in its reasonable discretion and to address conditions relating to work done or to be done by any tenant or any third party purchaser of any other Unit or such other conditions reasonably approved by Agent, and (iv) Borrower shall have delivered to Agent copies of all operating manuals, warranties and other material documentation relating to the Property, the Improvements and any fixtures, furniture and equipment used in accordance therewith to the extent in any Borrower Related Party's possession or control and a final "as built" set of drawings and "as built" survey of the Project Improvements in a form reasonably acceptable to Agent; with completion of such requirements set forth in (i) through (iv) above to be evidenced to the reasonable satisfaction of Agent, together with the delivery to Agent of a temporary certificate of occupancy, with regard to the Project Improvements as a whole, provided that to the extent a temporary certificate of occupancy for the Project Improvements is obtained and delivered, Borrower shall use diligent and good faith efforts to obtain a permanent certificate of occupancy for the Project Improvements as a whole as soon as practical.

"**Final Completion Date**" shall have the meaning set forth in the definition of Major Milestones.

"**Fiscal Year**" shall mean each twelve (12) month period commencing on January 1 and ending on December 31 during each year of the term of the Loan.

"**Fitch**" shall mean Fitch, Inc.

"**Fixtures**" shall have the meaning set forth in the Mortgage.

"**Force Majeure**" shall mean acts of God (such as tornado, flood, hurricane, etc.), fires and other casualties; embargos, disruption to transportation or supply lines affecting Manhattan generally that first arise after the Closing Date; sabotage; terrorism; or any similar types of events; provided that, with respect to any of the circumstances described in this definition:

14

(i)    for the purposes of this Agreement, any period of Force Majeure shall apply only to such Person's performance of the obligations necessarily affected by such circumstance and shall continue only so long as such Person is continuously and diligently using all reasonable efforts to minimize the effect and duration thereof, and in no event, for longer than ninety (90) days from the commencement of the Force Majeure period (in the aggregate for all Force Majeure events);

(ii)    notwithstanding anything to the contrary set forth herein, Force Majeure shall not include the unavailability or insufficiency of funds and shall only be applicable to the extent such Force Majeure event has a demonstrable effect on the Project; and

(iii)    Borrower shall have notified Agent of any Force Majeure promptly following the occurrence thereof.

"**Foreign Lender**" means (a) if Borrower is a U.S. Person, a Lender that is not a U.S. Person, and (b) if Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which Borrower is resident for tax purposes.

"**GAAP**" shall mean generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"**Government Lists**" shall have the meaning specified in <u>Section 5.1.24(b)</u> hereof.

"**Governmental Approvals**" shall mean all approvals, consents, waivers, orders, acknowledgments, authorizations, inspections, signoffs, permits and licenses required under applicable Legal Requirements to be obtained from any Governmental Authority for the remediation of the Property and/or construction of the Project Improvements, the Conversion and/or the use, occupancy and operation of the Improvements and/or sale of Units to the public before the commencement and during and following completion of construction of the Project, as the context requires, including, without limitation, all land use, building, subdivision, zoning, environmental, conservation and similar ordinances and regulations promulgated by any Governmental Authority.

"**Governmental Authority**" shall mean any court, board, agency, commission, office or other authority of any nature whatsoever for any governmental unit (foreign, federal, state, county, district, municipal, city or otherwise) whether now or hereafter in existence.

"**Gross Revenue**" shall mean all revenue or other proceeds, derived from the ownership, operation, financing, leasing or sale of the Property (or, after the Conversion, the Unsold Units) or any portion thereof from whatever source (including, without limitation, Gross Sales Proceeds, Rents, amounts received from the Condominium, and any revenue or proceeds received by any Borrower Related Party relating to the Property, the Project or the Unsold Units), any forfeited Unit Sale Contract Deposit and all other amounts received from a defaulting purchaser with regard to such Unit; <u>provided</u>, <u>however</u>, Gross Revenue shall not include any Awards or Insurance Proceeds (other than the proceeds of rent loss and/or business interruption insurance) or disbursements of any Reserve Funds from the Accounts.

"**Gross Sales Proceeds**" shall mean as to any Unit, the gross proceeds from the sale of such Unit and any payments made to any Borrower Related Party for a license or sale of any storage unit (including, without limitation, any fees or expenses of any Borrower Related Party or any mortgage recording tax or transfer tax reimbursement in each case paid to any Borrower Related Party by such purchaser; any customary closing prorations paid to any Borrower Related Party by such purchaser, such as real estate taxes in respect of accrual periods from and after the closing; and any payments made for any additional services provided to or in connection with a Unit).

"**Guarantor**" shall mean individually and collectively, (i) Meyer Chetrit, an individual, (ii) David Bistricer, an Individual, and (iii) any other Person who any time becomes a guarantor and/or indemnitor of any obligations of Borrower under this Agreement or any other Loan Documents.

"**Guaranty**" shall mean that certain Guaranty of Recourse Obligations, dated as of the date hereof, executed and delivered by Guarantor in connection with the Loan to and for the benefit of Agent (for the benefit of Lender), as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Guaranty of Completion**" shall mean that certain Guaranty of Completion, dated as of the date hereof, executed by Guarantor in connection with the Loan to and for the benefit of Agent (for the benefit of Lender), as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Hard Costs**" shall mean those Building Loan Costs which are for labor, materials, tools, equipment, and fixtures.

"**Immediate Family Member**" shall mean a sibling, family trust, parent, spouse, child (or step-child), grandchild or other lineal descendant of the interest holder.

"**Improvements**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Indebtedness**" of a Person, at a particular date, means the sum (without duplication) at such date of (a) all indebtedness or liability of such Person (including, without limitation, amounts for borrowed money and indebtedness in the form of mezzanine debt or preferred equity); (b) obligations evidenced by bonds, debentures, notes, or other similar instruments; (c) obligations for the deferred purchase price of property or services (including trade obligations); (d) reimbursement obligations under letters of credit; (e) all guaranties, endorsements (other than for collection or deposit in the ordinary course of business) and other contingent obligations to purchase, to provide funds for payment, to supply funds, to invest in any Person or entity, or otherwise to assure a creditor against loss; and (f) obligations secured by any Liens, whether or not the obligations have been assumed (other than the Permitted Encumbrances).

"**Indemnified Liabilities**" shall have the meaning set forth in <u>Section 10.13(b)</u> hereof.

"**Indemnified Party**" or "**Indemnified Parties**" shall have the meaning specified in <u>Section 10.13(b)</u> hereof.

"**Indemnified Taxes**" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of any Borrower Party under any Loan Document and (b) to the extent not otherwise described in (a), Other Taxes.

"**Initial Advance**" shall mean the advance of the Senior Loan Amount.

"**Initial Interest Period**" shall mean the period from the Closing Date to the last day of the calendar month in which the Closing Date occurs.

"**Initial Maturity Date**" shall mean August 25, 2016.

"**Insurance Premiums**" shall have the meaning set forth in Section 6.1.1(e) hereof.

"**Insurance Proceeds**" shall mean the net amount of all insurance proceeds received by Agent as a result of a Casualty, after deduction of the reasonable costs and expenses (including, but not limited to, reasonable counsel fees), if any, in collecting same.

"**Intellectual Property**" shall have the meaning set forth in Section 4.1.38 hereof.

"**Interest Determination Date**" shall mean, (A) with respect to the Initial Interest Period, the date that is two (2) Business Days before the Closing Date and (B) with respect to any other Interest Period, the date which is two (2) Business Days prior to the first (1st) day of each calendar month.  When used with respect to an Interest Determination Date, Business Day shall mean any day on which banks are open for dealing in foreign currency and exchange in London.

"**Interest Period**" shall mean, (a) in connection with the calculation of interest to be paid as of the Closing Date, the Initial Interest Period, and (b) in connection with the calculation of interest accrued with respect to any specified Payment Date, the period commencing on the first day of the prior calendar month and ending on the last day of such prior calendar month.

"**Interest Rate**" shall mean for a particular Interest Period an interest rate per annum equal to the sum of (a) the greater of (i) the Applicable Rate, determined as of the Interest Determination Date immediately preceding the commencement of such Interest Period, and (ii) one-quarter of one percent (0.25%), and (b) six and one-half of one percent (6.50%).

"**Interest Rate Cap Agreement**" shall mean the Confirmation and Agreement (together with the confirmation and schedules relating thereto), dated on or about the Closing Date, between the Counterparty and Borrower, obtained by Borrower and collaterally assigned to Agent (for the benefit of Lender) pursuant to this Agreement.  After delivery of a Replacement Interest Rate Cap Agreement to Agent, the term Interest Rate Cap Agreement shall be deemed to mean such Replacement Interest Rate Cap Agreement.  The Interest Rate Cap Agreement shall be governed by the laws of the State of New York and shall contain each of the following:

(a)     the notional amount of the Interest Rate Cap Agreement shall be equal to the Loan Amount;

(b)    the remaining term of the Interest Rate Cap Agreement shall at all times extend through the end of the Interest Period in which the Maturity Date occurs as extended from time to time pursuant to this Agreement and the Loan Documents;

(c)    the Interest Rate Cap Agreement shall be issued by the Counterparty to Borrower and shall be pledged to Agent (for the benefit of Lender) by Borrower in accordance with this Agreement;

(d)    the Counterparty under the Interest Rate Cap Agreement shall be obligated to make a stream of payments, directly to the Deposit Account (whether or not an Event of Default has occurred) from time to time equal to the product of (i) the notional amount of such Interest Rate Cap Agreement multiplied by (ii) the excess, if any, of the Applicable Rate (including any upward rounding under the definition of the Applicable Rate) over the Strike Price;

(e)    the Counterparty under the Interest Rate Cap Agreement shall execute and deliver the Acknowledgment; and

(f)    the Interest Rate Cap Agreement shall impose no material obligation on the beneficiary thereof (after payment of the acquisition cost) and shall be in all material respects satisfactory in form and substance to Agent.

"**Interest Reserve Account**" shall have the meaning set forth in Section 7.2.3 of the Senior Loan Agreement.

"**Interest Reserve Funds**" shall have the meaning set forth in Section 7.2.3 of the Senior Loan Agreement.

"**Key Man**" shall mean Meyer Chetrit, an individual.

"**Lease**" shall mean any lease, sublease or subsublease, letting, license, concession, easement, or other agreement (whether written or oral and whether now or hereafter in effect) pursuant to which any Person is granted a possessory interest in, or right to use or occupy all or any portion of any space in the Property, and every modification, amendment or other agreement relating to such lease, sublease, subsublease, license, easement or other agreement entered into in connection with such lease, sublease, subsublease, license, easement or other agreement and every guarantee of the performance and observance of the covenants, conditions and agreements to be performed and observed by the other party thereto.

"**Leasing Report**" shall mean a leasing report setting forth (i) a true, correct and complete rent roll for the Property, including the current annual rent and the expiration date under each Lease, (ii) the percentage of gross leasable area of the Property leased as of the last day of the preceding calendar month, (iii) whether Borrower has during the immediately preceding calendar month issued a notice of default with respect to any Lease which has not been cured (together with an explanation of the nature of such default), and (iv) current leasing efforts and statistics and future leasing estimates, together with general economic conditions of the local area, in a form and with such information required by Agent.

18

"**Legal Requirements**" shall mean, all federal, state, county, municipal and other governmental statutes, laws, rules, orders, regulations, ordinances, judgments, decrees and injunctions of Governmental Authorities having jurisdiction over the Loan, Borrower, the Property, the Collateral or any part thereof or the Conversion, Condominium or Units, or the construction, use, alteration operation or sale thereof, or any part thereof, whether now or hereafter enacted and in force, and all permits, licenses and authorizations and regulations relating thereto, and all covenants, agreements, restrictions and encumbrances contained in any instruments, either of record or known to Borrower, at any time in force affecting the Property or any part thereof or the Conversion or Condominium, including, without limitation, any which may (a) require repairs, modifications or alterations in or to the Property or any part thereof, or (b) in any way limit the use and enjoyment thereof.

"**Lender**" shall have the meaning set forth in the introductory paragraph hereto.

"**LIBOR**" shall mean, with respect to each Interest Period and each Interest Determination Date, the rate per annum (rounded upwards, if necessary, to the nearest 1/1,000 of 1%) calculated by Agent as set forth below:

(a)    The rate for deposits in U.S. Dollars for a one-month period that appears on Reuters Screen LIBOR01 Page (or its equivalent) as of 11:00 a.m., London time, on such Interest Determination Date.

(b)    If such rate does not appear on Reuters Screen LIBOR01 Page (or its equivalent) as of 11:00 a.m., London time, on the applicable Interest Determination Date, Agent shall request the principal London office of any four major reference banks in the London interbank market selected by Agent to provide such reference bank's offered quotation to prime banks in the London interbank market for deposits in United States dollars for a one month period as of 11:00 a.m., London time, on such Interest Determination Date in a principal amount of not less than $1,000,000 that is representative for a single transaction in the relevant market at the relevant time.  If at least two such offered quotations are so provided, LIBOR shall be the arithmetic mean of such quotations.  If fewer than two such quotations are so provided, Agent shall request any three major banks in New York City selected by Agent to provide such bank's rates for loans in U.S. Dollars to leading European banks for a one-month period as of 11:00 a.m., New York City time, on such Interest Determination Date in a principal amount not less than $1,000,000 that is representative for a single transaction in the relevant market at the relevant time.  If at least two such rates are so provided, LIBOR shall be the arithmetic mean of such rates.  If fewer than two rates are so provided, or if LIBOR is unavailable for any reason or Agent is unable to use LIBOR for any reason, then, for such period for which LIBOR is unavailable or for which Agent is otherwise unable to use LIBOR, LIBOR shall not be the Applicable Rate.

"**Lien**" shall mean, any mortgage, deed of trust, lien (statutory or otherwise), pledge, hypothecation, assignment, security interest, or any other encumbrance or charge affecting Borrower, the Property, the Collateral, any portion of the Property or any interest therein, including, without limitation, any conditional sale or other title retention agreement, any financing lease having substantially the same economic effect as any of the foregoing, the filing of any financing statement, and mechanic's, materialmen's and other similar liens and encumbrances.

19

"**Lien Law**" shall mean the Lien Law of the State of New York.

"**Limited Payment Guaranty**" shall mean that certain Limited Payment Guaranty, dated as of the date hereof, executed and delivered by Guarantor in connection with the Loan to and for the benefit of Agent (for the benefit of Lender), as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Line Item**" shall have the meaning set forth in Section 3.5.1 hereof.

"**Loan**" shall mean collectively, the Senior Loan, the Building Loan and the Project Loan.

"**Loan Agreement**" shall mean collectively, the Senior Loan Agreement, the Building Loan Agreement, and the Project Loan Agreement.

"**Loan Amount**" shall mean $228,500,000, being the sum of the Senior Loan Amount, the Building Loan Amount and the Project Loan Amount.

"**Loan Documents**" shall mean collectively, the Senior Loan Documents, the Building Loan Documents and the Project Loan Documents.

"**Loan to Value Ratio**" shall mean, as of any date, the ratio, as determined by Agent, of (a) (i) the Outstanding Principal Balance, *plus* (ii) with respect to any date of determination prior to the Initial Maturity Date, the aggregate amount of all Advances available and not yet advanced under the Loan, to (b) the Appraised Value of the Property (or, after the Conversion, the Unsold Units).  Agent's determination of the Loan to Value Ratio shall be conclusive in the absence of manifest error.

"**Major Contractor**" shall mean any Contractor hired by or on behalf of Borrower, supplying labor or materials, or both, in connection with the Project Improvements under a Major Contract.

"**Major Contracts**" shall mean (a) the Construction Management Agreement, the Architect's Contract and the Sales Agency Contract, and any other Contract providing for property or project management services with respect to the Property, (b) any contract which is, when aggregated with all other contracts with such Contractor, Other Design Professional or subcontractor (or any Affiliate of any of the foregoing) hired by (or on behalf of) Borrower, and taking into account all Change Orders under such contract, for an aggregate contract price equal to or greater than $250,000, (c) any Contract relating to environmental remediation or other environmental matters, or (d) any Contract with a Borrower Related Party.

"**Major Lease**" shall mean any Lease which (i) either individually, or when taken together with any Lease with the same tenant and/or its Affiliates, and assuming the exercise of all options and rights provided to the tenant (and/or the applicable Affiliate) under such Lease and/or Leases, affects (or could affect) more than 5,000 square feet, (ii) contains an option or other preferential right to purchase all or any portion of the Property, (iii) has a term (taking into account and assuming the exercise by tenant of all options and rights that tenant is entitled to thereunder) in

20

excess of twenty-four (24) months, (iv) is entered into during the continuance of an Event of Default, and/or (v) is with a Borrower Related Party.

"**Major Milestones**" shall mean the fulfillment, of the following milestones for the Project as determined by Agent in its reasonable discretion: (i)  the substantial completion of the façade and enclosures as necessary to make the Project Improvements watertight by May 1, 2015, (ii) subject only to delays for Force Majeure, Substantial Completion shall occur no later than October 31, 2015 (the "**Substantial Completion Date**"), (iii) subject only to delays for Force Majeure, Final Completion shall occur no later than April 30, 2016 (the "**Final Completion Date**"), and (iv) the Declaration of Condominium has been approved by all applicable Governmental Authorities and submitted for recording with the New York City Register no later than April 15, 2015 (provided that Borrower shall not be deemed to have failed to satisfy the Milestones set forth in the foregoing clause (iv) so long as Borrower is diligently pursuing in good faith the completion of such Milestone).

"**Maturity Date**" shall mean the Initial Maturity Date, provided that in the event of the exercise by Borrower of the Extension Option pursuant to, and subject to the conditions set forth in, Section 2.6, the Maturity Date shall be the Extension Maturity Date, or, in any case, on such earlier date on which the final payment of principal of the Note becomes due and payable as herein or therein provided, whether at the Initial Maturity Date, the Extension Maturity Date, the sale of the last Unsold Unit, by declaration of acceleration, or otherwise.

"**Maximum Legal Rate**" shall mean the maximum nonusurious interest rate, if any, that at any time or from time to time may be contracted for, taken, reserved, charged or received on the indebtedness evidenced by the Note and as provided for herein or the other Loan Documents, under the laws of such state or states whose laws are held by any court of competent jurisdiction to govern the interest rate provisions of the Loan.

"**Minimum Release Price**" shall mean with respect to each Unit, the applicable minimum release price set forth in Schedule I to the Senior Loan Agreement, subject to reduction pursuant to Section 5.1.32(l).

"**Minimum Return Amount**" shall mean the difference between (a) (1) $243,923,750 less (2) the product of (x) .0675 and (y) all payments in reduction of the Outstanding Principal Balance received in connection with Unit sales (other than Bulk Sales) in accordance with this Agreement, and (b) the positive difference between (i) $228,500,000 and (ii) the aggregate amount of all Advances (which, for the avoidance of doubt, shall exclude protective advances) made under the Loan Documents.

"**Monthly Debt Service Payment Amount**" shall mean on each Payment Date through and including the Maturity Date, an amount equal to sum of the (i) interest accruing on the Outstanding Principal Balance at the Interest Rate for the immediately preceding Interest Period, which interest shall be calculated in accordance with Section 2.2 hereof, and (ii) the portion of the Servicing Fee then due.

"**Moody's**" shall mean Moody's Investors Service, Inc.

"**Mortgage**" shall mean, collectively, the Building Loan Mortgage, the Project Loan Mortgage and the Senior Loan Mortgage, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Net Proceeds**" shall mean: (i) the net amount of all Insurance Proceeds payable as a result of a Casualty to the Property, after deduction of reasonable costs and expenses (including reasonable attorneys' fees and costs), if any, incurred in collecting such Insurance Proceeds, or (ii) the net amount of the Award, after deduction of reasonable costs and expenses (including reasonable attorneys' fees and costs), if any, incurred in collecting such Award.  For avoidance of doubt, Net Proceeds shall not include any Net Proceeds Deficiency from Borrower.

"**Net Proceeds Deficiency**" shall have the meaning set forth in Section 6.2.4(h) hereof.

"**Net Sales Proceeds**" shall mean as to any Unit, the Gross Sales Proceeds from such Unit minus Closing Costs incurred in connection with the sale of such Unit. All forfeited Unit Sale Contract Deposits shall be deemed to be Net Sales Proceeds hereunder.

"**Note**" shall mean, collectively, the Building Loan Note, the Project Loan Note and the Senior Loan Note.

"**Notice**" shall have the meaning specified in Section 10.6 hereof.

"**Obligations**" shall mean Borrower's obligations for the payment of the Total Debt and the performance of the Other Obligations.

"**OFAC**" shall have the meaning set forth in Section 5.1.24(b) hereof.

"**Offering Plan**" shall mean the offering plan for the submission of the Property to a condominium (together with all exhibits, schedules and attachments thereto, including an initial form of Declaration of Condominium) submitted to the DOL and accepted for filing on June 27, 2014, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Officer's Certificate**" shall mean a certificate delivered to Agent by Borrower which is signed by an authorized officer of Borrower.

"**Other Connection Taxes**" means, with respect to any Lender or Agent, Taxes imposed as a result of a present or former connection between such Lender or Agent and the jurisdiction imposing such Tax (other than connections arising solely from such Lender or Agent having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Loan Document, or sold or assigned an interest in any Loan or Loan Document).

"**Other Charges**" shall mean all maintenance charges, impositions other than Taxes, and any other charges, including, without limitation, vault charges and license fees for the use of vaults, chutes and similar areas adjoining the Property, now or hereafter levied or assessed or

22

imposed against the Property or any part thereof; provided that "Other Charges" shall not include Assessments.

"**Other Debt**" shall mean, collectively, the "**Debt**" as defined in each of the Project Loan Agreement and the Senior Loan Agreement.

"**Other Design Professionals**" shall mean any architect (other than Borrower's Architect), engineer, expediter or other professionals engaged to work on the Project Improvements having compensation which is, when aggregated with all other compensation received by such professional (and any Affiliate of such professional) under any Contract relating to the Project Improvements, in excess of $100,000.

"**Other Obligations**" shall mean (a) the performance of all obligations of Borrower contained herein; (b) the performance of each obligation of Borrower contained in any other Loan Document; and (c) the performance of each obligation of Borrower contained in any renewal, extension, amendment, modification, consolidation, change of, or substitution or replacement for, all or any part of this Agreement, the Notes or any other Loan Document.

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"**Outstanding Principal Balance**" means, as of any date, the then outstanding principal balance of the Loan.

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, as amended from time to time.

"**Patriot Act Offense**" shall have the meaning set forth in <u>Section 5.1.24(b)</u> hereof.

"**Payment Date**" shall mean the first day of every calendar month during the term of the Loan, beginning with the month immediately following the first full month after the month in which the Closing Date occurred, until and including the Maturity Date.

"**Performance Letter**" shall mean a performance letter substantially in the form attached as <u>Exhibit G</u> hereto.

"**Permitted Encumbrances**" shall mean, with respect to the Property, collectively, (a) the Liens and security interests created by the Loan Documents, (b) all Liens, encumbrances and other matters disclosed in the Title Insurance Policy, (c) Liens, if any, for Taxes imposed by any Governmental Authority not yet due or delinquent, unless and to the extent being contested by Borrower in express compliance with the terms of this Agreement, (d) following the Conversion and provided all conditions precedent set forth in <u>Section 5.1.32(g)</u> hereof have been satisfied, the Declaration of Condominium, and (e) such other title and survey exceptions as Agent has approved or may approve in writing in Agent's sole discretion.

23

"**Permitted Fund Manager**" shall mean any Person that on the date of determination is (a) a Person listed on Exhibit H hereto (or an Affiliate of such Person), a nationally recognized manager of investment funds investing in debt or equity interests relating to commercial real estate or an entity that is an Eligible Assignee under clauses (a), (b), (c) or (d) of the definition thereof, and (b) investing through a fund with committed capital of at least $200,000,000.

"**Permitted Indebtedness**" shall have the meaning set forth in Section 5.2.6 hereof.

"**Permitted Investments**" shall mean the following, subject to qualifications hereinafter set forth:

(i)     obligations of, or obligations guaranteed as to principal and interest by, the U.S. government or any agency or instrumentality thereof, when such obligations are backed by the full faith and credit of the United States of America;

(ii)     federal funds, unsecured certificates of deposit, time deposits, banker's acceptances, and repurchase agreements having maturities of not more than 365 days of any bank, the short-term debt obligations of which are rated A-1+ (or the equivalent) by each of the Rating Agencies, it being understood that the A-1+ benchmark rating and other benchmark ratings in this Agreement are intended to be the ratings, or the equivalent of ratings, issued by S&P;

(iii)     deposits that are fully insured by the Federal Deposit Insurance Corp.;

(iv)     debt obligations that are rated AA (or the equivalent) by each of the Rating Agencies having maturities of not more than 365 days;

(v)     commercial paper rated A–1+ (or the equivalent) by each of the Rating Agencies; and

(vi)     investment in money market funds rated AAAm or AAAm–G (or the equivalent) by each of the Rating Agencies or AAA rated money market funds registered under the Investment Act of 1940.

Notwithstanding the foregoing, "**Permitted Investments**" (i) shall exclude any security with the S&P's "r" symbol (or any other Rating Agency's corresponding symbol) attached to the rating (indicating high volatility or dramatic fluctuations in their expected returns because of market risk), as well as any mortgage-backed securities and any security of the type commonly known as "strips"; (ii) shall not have maturities in excess of one year; (iii) shall be limited to those instruments that have a predetermined fixed dollar of principal due at maturity that cannot vary or change; and (iv) shall exclude any investment where the right to receive principal and interest derived from the underlying investment provides a yield to maturity in excess of 120% of the yield to maturity at par of such underlying investment.  Interest may either be fixed or variable, and any variable interest must be tied to a single interest rate index plus a single fixed spread (if any), and move proportionately with that index.  No investment shall be made which requires a payment above par for an obligation if the obligation may be prepaid at the option of the issuer thereof prior to its maturity.  All investments shall mature or be redeemable without penalty or discount upon the option of the holder thereof on or prior to the earlier of (x) three months from the date of their

24

purchase or (y) the Business Day preceding the day before the date such amounts are required to be applied hereunder.

"**Permitted Transfers**" shall have the meaning set forth in <u>Section 5.2.9(d)</u> hereof.

"**Person**" shall mean any individual, corporation, partnership, joint venture, limited liability company, estate, trust, unincorporated association, any federal, state, county or municipal government or any bureau, department or agency thereof and any fiduciary acting in such capacity on behalf of any of the foregoing.

"**Personal Property**" shall have the meaning set forth in the granting clause of the Mortgage.

"**Plans and Specifications**" shall mean the plans and specifications for the Project Improvements, including any architectural, structural, mechanical, electrical, plumbing, fire protection and elevator plans and specifications, prepared by Borrower's Architect and the Other Design Professionals and reviewed and approved by Agent in accordance with the terms hereof, as any of the same may be amended and supplemented from time to time in accordance with the terms of this Agreement.

"**Pledge Agreement**" shall mean that certain Pledge and Security Agreement dated as of the date hereof by Sole Member in favor of Agent (for the benefit of Lender).

"**Pledge Agreement Guaranty**" shall mean that certain Payment Guaranty dated as of the date hereof by Sole Member in favor of Agent (for the benefit of Lender).

"**Policies**" shall have the meaning specified in <u>Section 6.1.1(e)</u> hereof.

"**Policy**" shall have the meaning specified in <u>Section 6.1.1(e)</u> hereof.

"**Prime Adjustment Amount**" shall mean the difference between (a) the Prime Rate, and (b) LIBOR, as calculated by Agent as of the last date on which LIBOR was determinable in accordance with this Agreement.

"**Prime Equivalent Rate**" shall mean, as of any date of determination, the difference between (a) the Prime Rate, and (b) the Prime Adjustment Amount.

"**Prime Rate**" shall mean the rate of interest published in The Wall Street Journal from time to time as the "Prime Rate." If more than one "Prime Rate" is published in The Wall Street Journal for a day, the average of such "Prime Rates" shall be used, and such average shall be rounded up to the nearest one-eighth of one percent (0.125%). If The Wall Street Journal ceases to publish the "Prime Rate," Agent shall select an equivalent publication that publishes such "Prime Rate," and if such "Prime Rates" are no longer generally published or are limited, regulated or administered by a governmental or quasi-governmental body, then Agent shall select a comparable interest rate index.

"**Prohibited Transferee Determination**" shall have the meaning specified in Section 5.2.9(d)(iii)(E).

"**Project**" shall mean Borrower's development, renovation and conversion of the Property together with all Improvements currently located upon or to be constructed upon the Land (as defined in the Mortgage), including but not be limited to, the following: approximately 109 for-sale residential condominium units totaling approximately 174,737 net sellable square feet of residential condominium apartments, approximately 5 for-sale office condominium units totaling approximately 53,000 net rentable square feet of office space on floors 2-6, and approximately 5,023 gross square feet of retail space on the ground floor, subject to and in accordance with the Plans and Specifications and Business Plan.

"**Project Budget**" shall mean the budget, with sufficient detail on a line item basis, and including a projected funding schedule on a monthly basis, which details all Project Related Costs, in Borrower's best estimate, to be incurred by Borrower during the term of the Loan (including, without limitation, for the operation of the Property through Final Completion) (and shall include contingency line items for Hard Costs and Soft Costs in amounts acceptable to Agent).  The initial Project Budget is set forth on Exhibit D to the Project Loan Agreement.

"**Project Development Team**" shall have the meaning specified in Section 5.1.34.

"**Project Improvements**" shall mean the development, remediation, renovation and construction of the Improvements (and, as the context may require, the Improvements or Units, as so developed, remediated, renovated and constructed) in accordance with the Plans and Specifications, Business Plan and all Legal Requirements.

"**Project Loan**" shall mean the loan being made by Lender to Borrower pursuant to the Project Loan Agreement in the principal amount of up to the Project Loan Amount.

"**Project Loan Agreement**" shall mean that certain Project Loan Agreement dated the date hereof among Agent, Lender and Borrower, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Project Loan Amount**" shall mean $12,441,650.

"**Project Loan Budget**" shall mean the budget which details all amounts to be advanced to Borrower pursuant to the Project Loan.

"**Project Loan Costs**" shall mean all costs and expenses in the Project Budget which are not Building Loan Costs and are not funded as part of the Senior Loan.

"**Project Loan Documents**" shall have the meaning as set forth in the Project Loan Agreement.

"**Project Loan Mortgage**" shall have the meaning as set forth in the Project Loan Agreement.

"**Project Loan Note**" shall have the meaning as set forth in the Project Loan Agreement.

"**Project Related Costs**" shall mean all direct and indirect costs and expenses of (i) refinancing the Existing Loan, (ii) closing the Loan, (iii) designing, inspecting, remediating, renovating, constructing, and developing the Project to Final Completion ("**Construction Costs**"), and (iv) operating the same throughout the term of this Agreement and selling and marketing the Units, but excluding Carry Costs and Debt Service.

"**Project Report**" shall mean periodic reports to be prepared by the Construction Consultant, based on its review of the Project Budget, the Plans and Specifications, the Construction Schedule, all in final form, the Construction Management Agreement, the Contracts, the Major Contracts, inspections of the Project, and such other documents and information required by the Construction Consultant.

"**Property**" shall mean the real property located at 135 West 52nd Street, New York, New York 10019, the Improvements thereon and all personal property owned by Borrower and encumbered by the Mortgage, together with all rights pertaining to such property and Improvements, in each case, as more particularly described in the granting clauses of the Mortgage and referred to therein as the "**Property**"; provided, however, upon the sale of a Unit and issuance by Lender of a release, the term "**Property**" shall be deemed to exclude such Unit and all real property interests conveyed to the purchaser of such Unit.

"**Punch List Items**" shall mean, collectively, minor or insubstantial details of construction, decoration, mechanical adjustment or installation, the non-completion of which do not hinder or impede the use, operation, or maintenance of the Property or the ability to obtain a temporary certificate of occupancy with respect thereto or the ability to market and sell Units to the public in accordance with this Agreement and the Condominium Documents.

"**Qualified Transferee**" shall mean a transferee for whom (a) prior to the Transfer, Agent shall have received evidence that the proposed transferee (1) has never been indicted or convicted of, or plead guilty or no contest to, a felony, (2) has never been indicted or convicted of, or plead guilty or no contest to, a Patriot Act Offense and is not on any Government List, and (3) has not been the subject of a voluntary or involuntary (to the extent the same has not been discharged) bankruptcy proceeding within the last seven (7) years, and (b) Agent has not delivered to Borrower a Prohibited Transferee Determination.

"**Rate Cap Collateral**" shall have the meaning set forth in Section 2.13(b).

"**Rating Agencies**" shall mean each of S&P, Moody's and Fitch, or any other nationally recognized statistical rating agency which has been approved by Agent.

"**Rebalancing Reserve Account**" shall have the meaning set forth in Section 7.2.5 hereof.

"**Related Unit Purchaser**" shall mean any prospective purchaser of a Unit that is not an Unrelated Unit Purchaser.

27

"**Rents**" shall mean, all rents, rent equivalents, revenues, moneys payable as damages or in lieu of rent or rent equivalents, royalties (including, without limitation, all oil and gas or other mineral royalties and bonuses), income, receivables, receipts, revenues, deposits (including, without limitation, security, utility and other deposits), accounts, cash, issues, profits, charges for services rendered, and other consideration of whatever form or nature received by or paid to or for the account of or benefit of Borrower or any Borrower Related Party from any and all sources arising from or attributable to the Property (or, after the Conversion, the Unsold Units), and proceeds, if any, from business interruption or other loss of income or insurance.

"**Repayment Date**" shall mean the date upon which the Total Debt shall be indefeasibly repaid in full.

"**Replacement Interest Rate Cap Agreement**" shall mean an interest rate cap agreement from an Approved Counterparty with terms that are the same in all material respects as the terms of the Interest Rate Cap Agreement except that the same shall be effective as of (i) in connection with a replacement pursuant to Section 2.13 following a downgrade, withdrawal or qualification of the long-term unsecured debt rating of the Counterparty, the date required in Section 2.13(c), or (ii) in connection with a replacement (or extension of the then-existing Interest Rate Cap Agreement) in connection to an extension of the Maturity Date pursuant to Section 2.6, the commencement of the Extension Period.

"**Requested Advance Date**" shall have the meaning set forth in Section 2.12.2(a) hereof.

"**Required Borrower Equity**" shall have the meaning set forth in Section 2.1.8 hereof.

"**Required Release Price**" shall have the meaning set forth in Section 5.1.32(h)(vii).

"**Reserve Funds**" shall mean, collectively, all amounts in the Accounts, and any other escrow fund established by the Loan Documents.

"**Restoration**" shall have the meaning specified in Section 6.2.1 hereof.

"**Restoration Threshold**" shall have the meaning specified in Section 6.2.3(a) hereof.

"**Retainage**" shall mean, for each Construction Contract, the greater of (a) ten percent (10%) of all costs funded to the Contractor under the Contract, until 50% of the work to be performed under such Contract has been completed, and thereafter, five percent (5%) of all costs funded to the Contractor under the Contract, and (b) the actual retainage required under such Contract.

"**Return Differential**" shall mean, if the Actual Return Amount is less than the Minimum Return Amount, an amount equal to (x) the Minimum Return Amount, minus (y) the Actual Return Amount.

"**S&P**" shall mean Standard & Poor's Ratings Group, a division of the McGraw-Hill Companies.

28

"**Sale or Pledge**" shall mean a voluntary or involuntary sale, conveyance, assignment, transfer, encumbrance or pledge of a legal or beneficial interest, whether direct or indirect.

"**Sales Agency Contract**" shall mean that certain Exclusive Sale Agreement dated as of October 2, 2013 by and between Borrower and the Sales Agent, pursuant to which the Sales Agent is to provide Unit marketing and sales services with respect to the sale of Units at the Property, as the same may be modified in accordance with Section 5.1.33(b) hereof.

"**Sales Agent**" shall mean Douglas Elliman, LLC or any replacement sales agent appointed in accordance with Section 5.1.33(b) hereof.

"**Sales and Marketing Report**" shall mean a sales and marketing report setting forth current sales and marketing efforts and statistics and future sales estimates, together with general economic conditions of the local area, in a form and with such information required by Agent and attaching copies of all Unit Sale Contracts entered into by Borrower since the delivery of the last Sales and Marketing Report to Agent.

"**Secondary Market Transactions**" shall have the meaning specified in Section 9.1.1 hereof.

"**Section 22 Affidavit**" shall mean an affidavit of Borrower in the form attached hereto as Exhibit N made pursuant to and in compliance with Section 22 of the Lien Law

"**Section 9.4 Liabilities**" shall have the meaning set forth in Section 9.4.4.

"**Section 9.4 Obligations**" shall have the meaning set forth in Section 9.4.3.

"**Senior Loan**" shall mean the loan being made by Lender to Borrower pursuant to the Senior Loan Agreement in the principal amount of up to the Senior Loan Amount.

"**Senior Loan Agreement**" shall mean that certain Senior Loan Agreement dated the date hereof, among Agent, Lender and Borrower, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Senior Loan Amount**" shall mean $146,588,300.

"**Senior Loan Documents**" shall have the meaning set forth in the Senior Loan Agreement.

"**Senior Loan Mortgage**" shall have the meaning as set forth in the Senior Loan Agreement.

"**Senior Loan Note**" shall have the meaning as set forth in the Senior Loan Agreement.

"**Servicer**" shall have the meaning set forth in Section 9.5 hereof.

"**Servicing Fee**" shall have the meaning set forth in Section 9.5 hereof.

"**Shortfall**" shall have the meaning set forth in <u>Section 2.1.7</u>.

"**Shortfall Notice**" shall have the meaning set forth in <u>Section 2.1.7</u>.

"**Soft Costs**" shall mean those Building Loan Costs which are not Hard Costs, including but not limited to, architect's, engineer's and contractor's fees, recording taxes and title charges in respect of the Building Loan Mortgage, Taxes and Other Charges, Insurance Premiums and such other non-construction costs as are part of the Cost of the Improvements.

"**Sole Member**" shall mean 135 West 52nd Street Mezz LLC, a Delaware limited liability company.

"**Solvent**" or "**Solvency**" means, with respect to any Person as of a particular date, that on such date (a) such Person is able to pay its debts and other liabilities, contingent obligations and other commitments as they mature in each case in the normal course of its business, (b) such Person does not incur debts or liabilities beyond its ability to pay such debts and liabilities as they mature in their ordinary course, (c) such Person is not engaged in a business or a transaction, and is not about to engage in a business or a transaction, for which its property would constitute unreasonably small capital after giving due consideration to the prevailing practice in the industry in which such Person is engaged or is about to engage, and (d) the present fair saleable value of its assets is not less than the amount that will be required to pay the probable liability of such Person on its debts as they become absolute and matured.

"**Special Purpose Entity**" shall mean a corporation, limited liability company or limited partnership which, at all times on and after the date hereof, complies with the requirements set out in <u>Schedule VI</u> hereto, and since the date of its formation has complied with the requirements set forth in subsections (a) through (n) and (v) through (bb) set out in <u>Schedule VI</u> hereto.

"**Springing Recourse Event**" shall have the meaning specified in <u>Section 9.4.5</u> hereof.

"**State**" shall mean the State of New York.

"**Stored Materials**" shall have the meaning set forth in <u>Section 3.10(a)</u> hereof.

"**Strike Price**" shall mean three percent (3%) per annum.

"**Structuring Fee**" shall mean 0.75% of the Loan Amount, paid to Lender on the Closing Date, which fee shall be deemed fully earned and non-refundable upon receipt.

"**Substantial Completion**" shall mean (i) the occurrence of substantial completion of the Project Improvements (other than Punch List Items) in accordance with the Plans and Specifications (as the same may be amended in accordance with this Agreement), the Business Plan, all applicable Legal Requirements, all Permitted Encumbrances and this Agreement, (ii) that Borrower has delivered to Agent of an AIA Form G704 (Certificate of Substantial Completion) executed by Borrower's Architect and Borrower in connection with the Project Improvements, (iii) that the Project Improvements shall contain all fixtures, furniture and equipment required for the use and operation of the Improvements for their intended use or which may be required by the

Condominium Documents or by any Governmental Authority or under any Legal Requirement and (iv) that all utilities necessary to serve the Property have been connected and are in operation, with completion of such requirements set forth in (i) through (iv) above to be evidenced to the reasonable satisfaction of Agent, together with the delivery to Agent of a temporary certificate of occupancy, with regard to the Project Improvements as a whole and with no material conditions to the future issuance of a permanent certificate of occupancy, other than those approved by Agent acting in its reasonable discretion; together with evidence that all other applicable Governmental Approvals, to the extent required under applicable Legal Requirements, have been issued and all other applicable Legal Requirements have been satisfied to the extent necessary so as to allow the Project Improvements to be used, operated and/or sold in accordance with the Loan Documents and the Condominium Documents such that Units may be sold to the public in accordance with the Loan Documents, the Condominium Documents, and all applicable Legal Requirements.

"**Substantial Completion Date**" shall have the meaning set forth in the definition of Major Milestones.

"**Survey**" shall mean a survey of the Property prepared by a surveyor licensed in the State and satisfactory to Agent and the company or companies issuing the Title Insurance Policy, and containing a certification of such surveyor satisfactory to Agent.

"**Taxes**" shall mean all present or future taxes (including, without limitation, real estate and personal property taxes or assessments), levies, imposts, duties, deductions, withholdings (including backup withholding), assessments, fees or other charges (including any interest, additions to tax or penalties applicable thereto) now or hereafter levied or assessed or imposed by any Governmental Authority against Borrower, the Property or part thereof.

"**Term**" shall mean the entire term of this Agreement, which shall expire upon repayment in full of the Debt.

"**Threshold Amount**" shall have the meaning set forth in Section 5.1.20 hereof.

"**Title Company**" shall mean, collectively, Continental Abstract Corporation, as agent for Chicago Title Insurance Company, as lead insurer, and Langdon Title Agency, LLC, as agent for Stewart Title Insurance Company, as co-insurer.

"**Title Insurance Policy**" shall mean, collectively, ALTA mortgagee title insurance policies issued by the Title Company with respect to the Property and insuring the lien of the Building Loan Mortgage, Project Loan Mortgage and Senior Loan Mortgage, subject to no exceptions other than Permitted Encumbrances and those approved by Agent in its sole discretion.

"**Total Debt**" shall mean, collectively, the Debt and Other Debt.

"**Transfer**" shall have the meaning set forth in Section 5.2.9(b) hereof.

"**UCC**" or "**Uniform Commercial Code**" shall mean the Uniform Commercial Code as in effect in the State in which the Property is located.

31

"**UCC Title Insurance Policy**" shall mean a UCC Title Policy with regard to the pledge by the Sole Member of 100% of its membership interest in Borrower, in a form reasonably acceptable to Agent.

"**Unit**" or "**Units**" shall mean each individual condominium unit (including any appurtenant interest in the common elements) in the Land and the Improvements created by the submission of the Property to the provisions of the Condominium Act in accordance with the Condominium Documents.

"**Unit Sale Contract**" shall have the meaning set forth in Section 5.1.32(b) hereof.

"**Unit Sale Contract Deposit**" or "**Unit Sale Contract Deposits**" shall have the meaning set forth in Section 5.1.32(e) hereof.

"**Unrelated Unit Purchaser**" shall mean a prospective purchaser of a Unit that is not a Borrower Related Party and has not entered into any agreement or understanding, written, oral or otherwise, to reconvey such Unit or any interest (directly or indirectly, and regardless of whether such interest is then exercisable or contingent) therein to a Borrower Related Party at any time after the Transfer of such Unit to such prospective purchaser.

"**Unsold Units**" shall mean, at any given time, all of the Units that have not been sold.

"**Updated Information**" shall have the meaning specified in Section 9.1.2(a) hereof.

"**U.S. Obligations**" shall mean non-redeemable securities evidencing an obligation to timely pay principal and/or interest in a full and timely manner that are direct obligations of the United States of America for the payment of which its full faith and credit is pledged.

"**U.S. Person**" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"**U.S. Tax Compliance Certificate**" has the meaning assigned to such term in Section 2.2.4(h)(ii)(B)(iii).

**Section 1.2      Principles of Construction**.

(a)      All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. All references to, representations by and covenants of "Borrower" shall mean "each Borrower" unless the context shall indicate otherwise. All references to "saleable" or "rentable" square feet of a Unit shall refer to the square feet attributable to such Unit in the Offering Plan (to the extent approved by Agent in accordance with this Agreement).

(b)     With respect to any cross-reference to, incorporation by reference from, and/or any other reference or allusion to the Building Loan Documents, the Project Loan Documents, and/or the Senior Loan Documents, as the case may be, such references shall be to referenced defined terms, provisions, sections, schedules, and/or exhibits, as the case may be, as the same are set forth in the Building Loan Documents, the Project Loan Documents, and/or the Senior Loan Documents, as the case may be, as of the date hereof, and as each of the same may be amended, modified, supplemented, extended, replaced and/or restated from time to time, and shall survive the repayment or satisfaction of the Building Loan, the Project Loan, and/or the Senior Loan, as the case may be, and/or the termination of the Building Loan Documents, the Project Loan Documents and/or the Senior Loan Documents, as the case may be, until the occurrence of the Repayment Date.

# ARTICLE II

## GENERAL TERMS

**Section 2.1     Loan Commitment; Disbursement to Borrower**.

2.1.1     **Agreement to Lend and Borrow**.  Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept Advances in respect of the Building Loan as more particularly set forth in this Agreement.

2.1.2     **No Reborrowings**.  Any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

2.1.3     **The Note, Mortgage and Loan Documents**.  The Building Loan shall be evidenced by the Building Loan Note and secured by the Building Loan Mortgage covering the fee simple interest of Borrower in the Property, the Improvements and other property, rights and interests of Borrower in the Property, and the other Building Loan Documents and made subject to the terms and conditions of this Agreement, and advanced in accordance with the provisions of this Agreement.

2.1.4     **Use of Proceeds**.  Borrower hereby agrees that Borrower shall (i) use the proceeds of the Senior Loan solely to repay in full and satisfy the Existing Loan on the Closing Date, pay other costs on the Closing Date, and fund Accounts as approved by Agent, in its sole discretion, (ii)  use the proceeds of the Building Loan solely to pay for Building Loan Costs actually incurred in connection with the construction of the Project Improvements to the extent such costs are set forth in the Building Loan Budget and use (iii) the proceeds of the Project Loan solely to pay for Project Related Costs which are not Building Loan Costs actually incurred in connection with the construction of the Project Improvements if and to the extent that such Project Related Costs are reflected in the Project Loan Budget.

2.1.5     **Loan Advances**.  Subject to compliance by Borrower with the terms and conditions of this Agreement, Lender shall make Advances under this Agreement for Building Loan Costs to Borrower for the payment of such Building Loan Costs, each as set forth in the Building Loan Budget, as the same may be revised in accordance with the provisions of this Agreement. If Lender is comprised of more than one Person, then no Lender shall be obligated to

advance more than its *pro rata* share of any Advance hereunder. Lender shall not be required to make Advances under the Building Loan for costs incurred by Borrower with respect to materials stored on or off the Property unless Borrower has furnished satisfactory evidence that such materials are stored, secured and insured in accordance with the provisions of <u>Section 3.10</u> hereof. The Building Loan Budget shall reflect, by category and Line Item, the purposes and the amounts of each Building Loan Cost for which funds to be advanced by Lender under this Agreement are to be used.  Lender shall not be required to disburse for any category or Line Item more than the amount specified therefor in the Building Loan Budget, subject to Agent's prior written consent in accordance with <u>Sections 3.5</u> and <u>3.9</u> hereof.  No Advances or any portion thereof shall be made directly or indirectly for payments to a Borrower Related Party, except for fees payable to any Borrower Related Party that are expressly set forth in the Project Budget and approved by Agent (and subject to <u>Section 5.2.16</u>).

2.1.6    <b>Retainage.</b>

(a)    For any Advance under the Building Loan Budget, in no event shall (x) (i) such Advance under the Building Loan Budget plus (ii) all previous Advances under the Building Loan Budget exceed (y) (i) all Building Loan Costs incurred or to be incurred by Borrower through the date of the Draw Request that are the subject of such Advance under the Building Loan Budget *plus* (ii) the full amount of Building Loan Costs actually paid with the proceeds of any previous Advance under the Building Loan Budget *minus* (iii) the applicable Retainage for each Construction Contract relating to the Building Loan Costs.

(b)    The Retainage shall be disbursed on request by Borrower on a per Construction Contract basis after completion and closeout of each Construction Contract, subject to confirmation thereof by the Construction Consultant and receipt by Agent of final lien waiver(s) and sign offs for the applicable Construction Contracts and satisfaction of all other conditions precedent to such Advance set forth herein.

2.1.7    <b>Insufficiency of Loan Proceeds</b>.  At any time and from time to time during the term of the Loan, Agent shall have the right (but not the obligation) to notify Borrower in writing (the "<b>Shortfall Notice</b>") that, as determined in Agent's sole and absolute discretion, (a) the cost of all Project Related Costs (excluding Carry Costs and Debt Service) necessary to achieve Final Completion that remain unpaid at the time in question exceeds the undisbursed proceeds of the Loan (taking into account amounts on deposit in the Rebalancing Reserve Account, but excluding Debt Service Available Advances and Carry Cost Available Advances), or (b) the cost of completing any Line Item in the Project Budget exceeds the remaining undisbursed portion of the Loan allocated to such Line Item in the Project Budget (taking into account (y) amounts on deposit in the Rebalancing Reserve Account that are attributable to such Line Items, and (z) any permitted and/or approved reallocations of "Contingency" in accordance with <u>Section 3.9.2</u> hereof) (the amount of any such deficiency under clauses <u>(a)</u> and <u>(b)</u>, or the amount of any Project Loan Shortfall (as defined in the Project Loan Agreement) being herein referred to as the "<b>Shortfall</b>"). If Agent at any time shall deliver a Shortfall Notice to Borrower, Borrower shall within ten (10) Business Days of delivery of the Shortfall Notice, deposit in the Rebalancing Reserve Account an amount equal to such Shortfall, which Agent may from time to time apply (or allow Borrower to apply) to such Project Related Costs in accordance with the conditions set forth

34

in the Loan Documents regarding Advances (as if such reserved funds were Advances hereunder). Lender shall have no obligation to make further Advances until the sums required to be deposited in the Rebalancing Reserve Account pursuant to this <u>Section 2.1.7</u> have been exhausted and, in any such case, the Loan is back "in balance". Any such sums not used as provided shall be released to Borrower when and to the extent that Agent determines that a Shortfall does not exist, <u>provided, however,</u> that should an Event of Default occur, Agent, in its sole discretion, may apply such amounts either to the remaining Project Related Costs or to the immediate payment of any Obligations of Borrower.

   2.1.8 **Required Equity Funds**. Section 2.1.8 of the Senior Loan Agreement is hereby incorporated herein by reference as if fully set forth herein and remade by Borrower.

   2.1.9 **Quality of Work**. No Advance or any portion thereof shall be made with respect to defective work or to any contractor that has performed work that is defective and that has not been cured, as confirmed by the report of the Construction Consultant, but Lender may disburse all or part of any Advance before the sum shall become due if Agent believes it advisable for Lender to do so, and all such Advances or parts thereof shall be deemed to have been made pursuant to this Agreement.

  **Section 2.2** **Interest Rate**.

   2.2.1 **Interest Rate**.

   (a) <u>Interest Rate</u>. So long as no Event of Default is continuing, interest on the Loan shall accrue for each Interest Period at the Interest Rate.

   (b) <u>Default Rate</u>. In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the Loan and, to the extent not prohibited by applicable law, all other portions of the Total Debt, shall accrue interest at the Default Rate, calculated from the date such payment was due or such Event of Default shall have occurred without regard to any grace or cure periods contained herein. Interest at the Default Rate shall be paid immediately upon demand, which demand may be made as frequently as Agent shall elect, to the extent not prohibited by applicable law.

   2.2.2 **Interest Calculation**. Interest on the Loan, whether at the Interest Rate or at the Default Rate, shall be calculated by multiplying (a) the actual number of days in the period for which the calculation is being made, by (b) a daily rate equal to the Interest Rate or the Default Rate (or, the weighted average of the Interest Rate and the Default Rate, based on the number of days in the respective period of calculation for which each such rate is applicable for any period during which both the Interest Rate and Default Rate are applicable), as applicable, *divided* by 360, by (c) the average Outstanding Principal Balance during the relevant Interest Period for which interest is being calculated, and shall accrue with regard to each of the Building Loan, Senior Loan and Project Loan based on the Outstanding Principal Balance applicable to each of the Building Loan, Senior Loan and the Project Loan, respectively. The accrual period for calculating interest due on each Payment Date shall be the Interest Period immediately prior to such Payment Date.

35

2.2.3     **Monthly Payments**.  On each Payment Date (or, on the date hereof with respect to the Initial Interest Period), Borrower shall pay an amount equal to the Monthly Debt Service Payment Amount.  Subject to the provisions of Sections 2.2.4 below, Borrower shall pay all other accrued interest on the Outstanding Principal Balance due under each of the Building Loan, Senior Loan and Project Loan from the Deposit Account in accordance with the order of distributions set forth in Section 7.4 of the Senior Loan Agreement.

2.2.4     **Gross Up**.

(a)     All payments made by any Borrower Party pursuant to any Loan Document shall be made free and clear of, and without reduction for or on account of, Taxes, except as required by applicable law.  If any Taxes are required to be withheld from any amounts payable to Agent or Lender hereunder, the applicable Borrower Party shall be entitled to make such withholding and shall timely pay the full amount withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Borrower Party shall be increased as necessary so that after such withholding has been made (including such withholdings applicable to additional sums payable under this Section 2.2) the applicable Agent or Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.  Whenever any Tax is payable pursuant to applicable law by Borrower, as promptly as possible thereafter, Borrower shall send to Agent an original official receipt, if available, or certified copy thereof showing payment of such Tax.  Borrower hereby indemnifies Agent and Lender for any incremental taxes, interest or penalties that may become payable by Agent or Lender which may result from any failure by Borrower to pay any such Tax when due to the appropriate taxing authority or any failure by Borrower to remit to Agent the required receipts or other required documentary evidence.

(b)     In the event that any change in any requirement of law, rule regulation or treaty, or in the interpretation or application thereof, or compliance by Agent or Lender with any request or directive hereafter issued from any central bank or other Governmental Authority:

(i)     shall hereafter impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Agent or Lender;

(ii)     shall hereafter have the effect of reducing the rate of return on Lender's capital as a consequence of its obligations under this Section 2.2.4(b) to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by any amount deemed by Lender to be material;

(iii)     shall hereafter impose on Agent or Lender any other condition and the result of any of the foregoing is to materially increase the cost to Agent or Lender of making, renewing or maintaining loans or extensions of credit or to reduce any amount receivable hereunder; or

36

(iv) shall hereafter subject Agent or Lender to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

then, in any such case, Borrower shall promptly pay Agent (for disbursement to Lender), within ten (10) days following demand together with documentation in reasonable detail describing such cost, any additional amounts necessary to compensate Lender for such additional cost or reduced amount receivable which Lender deems to be material as determined by Lender in its reasonable discretion.  If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.4(b), Agent shall provide Borrower with not less than thirty (30) days written notice specifying the additional amount required to fully compensate Lender for such additional cost or reduced amount together with a statement setting forth the basis for requesting such compensation and the method for determining the amount thereof.  A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence submitted by Agent to Borrower shall be conclusive in the absence of manifest error.  Agent and each Lender agree to use reasonable efforts to designate a different lending office to maintain its portion of the Loan if, in the judgment of such Lender, such different designation would avoid, or reduce, the amount of additional costs and Indemnified Taxes described in Sections 2.2.4(a) and 2.2.4(b) and will not subject Agent or Lender to any unreimbursed cost or expense and would not otherwise be materially disadvantageous to Agent or Lender, provided that Agent and Lender shall have no obligation to designate a lending office in the United States.

(c) Borrower agrees to indemnify Agent and Lender within ten (10) days after demand therefor, and to hold Agent and Lender harmless from, any loss or expense which Agent or Lender sustains or incurs as a consequence of (i) any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.2.4) payable or paid by Agent or Borrower or required to be withheld or deducted from a payment to Agent or Borrower and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority, and (ii) any prepayment of the Loan on a day that (A) is not a Payment Date or (B) is a Payment Date if Borrower did not give the prior written notice of such prepayment required pursuant to the terms of this Agreement, including, without limitation, such loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain the Loan hereunder (the amounts referred to above are herein referred to collectively as the "**Breakage Costs**"); provided, however, (other than with respect to clause (i) above) Borrower shall not indemnify Agent or Lender from any loss or expense arising from Agent's or Lender's willful misconduct, illegal acts, fraud or gross negligence. This provision shall survive payment of the Note in full and the satisfaction of all other obligations of Borrower under this Agreement and the other Loan Documents.

(d) Agent and Lender agree to endeavor to take reasonable steps to mitigate the effect of any Indemnified Taxes, increased cost or reduction in amounts received or receivable hereunder that would entitled Lender to claim compensation pursuant to this Section 2.2.4, provided that neither Agent nor Lender shall be required to take any such action that

37

would otherwise have a material and adverse effect on the rights of Agent or Lender under this Agreement.

(e)    If Lender becomes aware that it is entitled to receive a refund in respect of amounts paid by Borrower pursuant to Sections 2.2.4(a) or 2.2.4(b) which refund in the good faith judgment of Lender is allocable to such payment, it shall promptly notify Borrower of the availability of such refund and shall, within thirty (30) days after the receipt of a request by Borrower, apply for such refund. If Lender receives such a refund, it shall pay Borrower the refund (but only to the extent of payments made under this Section 2.2.4 giving rise to such refund) net of any reasonable out-of-pocket expenses of Lender and without interest (other than any interest paid by the relevant taxation authority with respect to such refund).  Borrower, upon the request of Agent or Lender, shall repay to Agent or Lender the amount paid over pursuant to this paragraph (e) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that Agent or Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (e), in no event will Agent or Lender be required to pay any amount to Borrower pursuant to this paragraph (e) the payment of which would place Agent or Lender in a less favorable net after-Tax position than it would have been in if the costs subject to indemnification or payment under this Section 2.2.4 had never been incurred (or the Tax subject to indemnification had not been deducted, withheld or otherwise imposed) and the payments giving rise to such refund had never been paid.  This paragraph shall not be construed to require Agent or Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Borrower Party or any other Person, but upon request Agent shall provide a written explanation (without disclosing confidential information) of the basis for its determination pursuant to the preceding sentence.

(f)    Each Lender shall severally indemnify Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that no Borrower Party has already indemnified Agent for such Indemnified Taxes and without limiting the obligation of the Borrower Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.1.4(b) relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to any Lender by Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by Agent to the Lender from any other source against any amount due to Agent under this paragraph (f)

(g)    Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of Agent timely reimburse it for the payment of, any Other Taxes.

(h)    **Status of Lenders**.

(i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to Borrower and Agent, at the time or times reasonably requested by Borrower or Agent, such properly completed and executed documentation reasonably requested by Borrower or Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by Borrower or Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrower or Agent as will enable Borrower or Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in <u>Section 2.2.4(h)(ii)(A)</u>, <u>(ii)(B)</u> and <u>(ii)(D)</u> below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing, in the event that Borrower is a U.S. Person,

(A)     any Lender that is a U.S. Person shall deliver to Borrower and Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrower and Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or Agent), whichever of the following is applicable:

i)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

ii)     executed originals of IRS Form W-8ECI;

iii)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of **Exhibit Q-1** to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of Borrower

39

within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "**U.S. Tax Compliance Certificate**") and (y) executed originals of IRS Form W-8BEN; or

iv)      to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate substantially in the form of **Exhibit Q-2** or **Exhibit Q-3**, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of **Exhibit Q-4** on behalf of each such direct and indirect partner;

(C)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrower and Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit Borrower or Agent to determine the withholding or deduction required to be made; and

(D)      if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrower and Agent at the time or times prescribed by law and at such time or times reasonably requested by Borrower or Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower or Agent as may be necessary for Borrower and Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower and Agent in writing of its legal inability to do so.

(i)      For purposes of this Section 2.2.4, the term "applicable law" includes FATCA.

2.2.5 **Usury Savings**. This Agreement, the Note and the other Loan Documents are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender or Agent to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate. If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Interest Rate, or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder. All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

### Section 2.3 Loan Payment

2.3.1 **Payment**. Borrower shall pay to Agent (for disbursement to Lender) on the Maturity Date or such earlier date on which the Loan becomes due and payable, either by acceleration or otherwise:

>　(a)　the Outstanding Principal Balance;

>　(b)　any protective advances funded by Lender;

>　(c)　all accrued and unpaid interest and Servicing Fees due under the Note, the Mortgage and the other Loan Documents, whether at the Default Rate or otherwise;

>　(d)　the Exit Fee;

>　(e)　the Return Differential, if applicable; and

>　(f)　all other amounts due hereunder and under the Note, the Mortgage and the other Loan Documents.

Notwithstanding anything to the contrary set forth in the Loan Documents, the Building Loan Mortgage shall secure only the obligations with regard to the payment of the Building Loan, the Building Loan Note and the other Building Loan Documents and shall not secure the obligations with regard to the payment of the Project Loan or the Senior Loan or the obligations with regard Project Loan Note or Senior Loan Note or the Project Loan Mortgage or Senior Loan Mortgage. Borrower, Agent and Lender further agree that all interest or fees payable with regard to the Loan, including without limitation, the Monthly Debt Service Payment Amount, other accrued interest, default interest, and the Return Differential shall be allocated by Agent to the Senior Loan, Building Loan and Project Loan in accordance with the portion of the Outstanding Principal Balance attributable to the Senior Loan, Building Loan or Project Loan, respectively, as of such date as determined by Agent in its sole discretion, and such allocation by

Agent shall be deemed to be the allocation of such amounts between the Senior Loan, Building Loan and Project Loan.

2.3.2   **Late Payment Charge**.  If any sum (other than principal or any Exit Fee due on the Maturity Date) is due under the Loan Documents and not paid by Borrower on or prior to the date on which it is due, Borrower shall pay to Agent (on behalf of Lender) upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the Maximum Legal Rate in order to defray the expense incurred by Agent and Lender in handling and processing such delinquent payment and to compensate Agent and Lender for the loss of the use of such delinquent payment.  Any such amount shall be secured by the Mortgage and the other Loan Documents to the extent permitted by applicable law.  The acceptance of a late payment charge shall not constitute a waiver of any Default or Event of Default then existing pursuant to the Loan Documents.  Agent's failure to collect a late payment charge at any time shall not constitute a waiver of Agent's and Lender's right thereafter, at any time and from time to time (including upon acceleration of the Notes or upon payment in full of the Loan), to collect such previously uncollected late payment charge or to collect subsequently accruing late payment charges.  To the extent that Lender is required pursuant to <u>Section 7.2.4</u> of the Senior Loan Agreement to apply Interest Reserve Funds to the payment of the Monthly Debt Service Payment Amount due on any Payment Date and there are sufficient funds in the Interest Reserve Account to make such payment, failure of Lender to apply such funds to the Monthly Debt Service Payment Amount shall not give rise to a late payment charge with regard to such payment hereunder.

2.3.3   **Method and Place of Payment**. Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Agent not later than 3:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Agent's office or as otherwise directed in writing by Agent, and any funds received by Agent after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day. Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day, the due date thereof shall be the immediately preceding Business Day.

2.3.4   **Exit Fee.** Upon any repayment or prepayment of the Loan, Borrower shall pay to Agent on the date of such repayment or prepayment the Exit Fee applicable thereto. Without limiting any restrictions on prepayment of the Loan set forth herein, on the earlier to occur of (a) any acceleration of the Loan, (b) the Maturity Date, or (c) the prepayment in full of all of the Obligations, the Exit Fee due and payable shall equal the amount by which (i) $571,250.00 exceeds (ii) the total amount of Exit Fees theretofore paid by Borrower pursuant to this Agreement. All Exit Fees hereunder shall be deemed to be earned by Lender on the Closing Date.

### Section 2.4   Prepayments

2.4.1   **Voluntary Prepayments**

(a)   Notwithstanding anything to the contrary set forth herein, the principal balance of the Note may not be prepaid in whole or part (including, without limitation, pursuant to a refinancing or similar transaction) prior to the Initial Maturity Date except (i) in

connection with a Casualty or Condemnation in accordance with Section 2.4.2(a) below, (ii) in connection with the sale of Units in accordance with Section 5.1.32 hereof, or (iii) as provided under Section 2.4.1(b), and in each case subject to Agent's (on behalf of Lender) receipt of all amounts set forth in Section 2.3 hereof.

(b)     The Debt may be prepaid in whole (but not in part) if (i) Borrower delivers Agent a written notice specifying the date of prepayment, no later than thirty (30) days prior to such specified date, which notice shall be revocable (provided Borrower shall reimburse Agent and Lender for any out of pocket costs and expenses actually incurred as a result of the delivery of such notice); and (ii) on or prior to such date of prepayment, Borrower pays Agent (for the benefit of Lender) all amounts due under the Loan, including without limitation, the Return Differential (if any), the Exit Fee and all other amounts set forth in Section 2.3 hereof.

(c)     In each instance of prepayment permitted under this Section 2.4.1, Borrower shall be required to pay all other sums due hereunder and no principal amount repaid may be reborrowed.  Notwithstanding anything to the contrary set forth in the Loan Documents, once the Loan has been repaid in full, Lender shall not be obligated to make any further Advance under the Loan Documents.

## 2.4.2     **Mandatory Prepayments**

(a)     If Agent is not obligated to make Net Proceeds available to Borrower for Restoration in accordance with Section 6.2 of this Agreement or in the event that there are excess Net Proceeds after the completion of Restoration, on the next occurring Payment Date following the date on which (a) Agent actually receives any Net Proceeds, and (b) Agent has determined that such Net Proceeds shall be applied against the Total Debt, Borrower shall prepay, or Agent shall apply Net Proceeds as a prepayment of, the Total Debt in an amount equal to one hundred percent (100%) of such Net Proceeds. Except during an Event of Default, such Net Proceeds that Agent is not obligated to make available to Borrower for Restoration in accordance with Section 6.2 or any excess Net Proceeds after the completion of Restoration shall be applied by Agent in the order and priority set forth in Section 7.4 of the Senior Loan Agreement as if such amounts were deposited in the Deposit Account (for purposes of which the first Business Day after the receipt of such excess Net Proceeds shall be deemed to be a Payment Date), provided that no Return Differential shall be payable in connection with any prepayment made pursuant to this Section 2.4.2(a).

(b)     In addition, in accordance with the provisions of Section 5.1.32 hereof, and in accordance with the priority of distributions from the Deposit Account set forth in Section 7.4 of the Senior Loan Agreement, Borrower shall partially prepay the Loan in connection with each Unit sale.

(c)     Borrower shall partially prepay a portion of the Total Debt equal to $5,000,000 on June 1, 2015 (exclusive of any prepayments that may be required under the Loan Documents, including, without limitation, any prepayments in connection with any release of any Unit), unless prior to such date (i) Borrower has consummated a Unit sale in accordance with Section 5.1.32 with respect to the retail Unit for a sale price resulting in Net Sales Proceeds greater than or equal to the Minimum Release Price for such retail Unit, or (ii) Borrower has consummated

43

Unit sales in accordance with <u>Section 5.1.32</u> with respect to the office Units for sale prices resulting in aggregate Net Sales Proceeds greater than or equal to the aggregate Minimum Release Price for such commercial Units.

2.4.3     **Miscellaneous**

(a)     The making of an Advance by Lender shall not constitute Agent's or Lender's approval or acceptance of the construction theretofore completed or materials furnished with respect thereto. Agent's or Lender's inspection and approval of any Plans and Specifications, the construction of the Project Improvements, or the workmanship and materials used therein, shall impose no liability of any kind on Agent or Lender, the sole obligation of Agent and Lender as the result of such inspection and approval being to make the Advances if and to the extent, required by this Agreement.

(b)     ALL POTENTIAL LIENORS ARE HEREBY CAUTIONED TO EXERCISE SOUND BUSINESS JUDGMENT IN THE EXTENSION OF CREDIT TO BORROWER. NO POTENTIAL LIENOR SHOULD EXPECT LENDER TO MAKE ADVANCES OF THE LOAN IN AMOUNTS AND AT TIMES SUCH THAT IT WILL NOT BE NECESSARY FOR EACH SUCH POTENTIAL LIENOR TO EXERCISE SOUND BUSINESS JUDGMENT IN THE EXTENSION OF CREDIT TO BORROWER.

**Section 2.5**     **Release of Property**

(a)     Except as set forth in this <u>Section 2.5</u> and in <u>Section 5.1.32</u> no repayment or prepayment of all or any portion of the Loan shall cause, give rise to a right to require, or otherwise result in, the release of the Lien of the Mortgage on the Property.

(b)     Agent shall, upon the written request of Borrower, on the Repayment Date, at the expense of Borrower and subject to the further provisions of <u>Section 2.5(c)</u>, (i) release the Lien of the Mortgage and terminate the Assignment of Leases, or (ii) assign the Mortgage and Note, without recourse, covenant or warranty of any nature, express or implied, to a new lender designated by Borrower and shall execute, acknowledge and deliver to such new lender the assignment of Mortgage and Note, <u>provided</u> that (a) Borrower shall pay the actual third party expenses incurred by Agent and Lender in connection therewith, and Agent's and Lender's reasonable attorneys' fees for the preparation and delivery of the assignment or release documentation, (b) Borrower shall have caused the delivery of an executed Statement of Oath under Section 255 and Section 275 of the New York Real Property Law, and (c) such an assignment is not then prohibited by any federal, state or local law, rule, regulation or order or by any governmental authority.

(c)     In connection with the release or satisfaction of the Mortgage and the Assignment of Leases or the assignment of the Mortgage on the Repayment Date, as applicable, Borrower shall submit to Agent, not less than five (5) Business Days prior to the Payment Date on which Borrower intends to pay the Total Debt in full, a release of Mortgage and Assignment of Leases for the Property or assignment of Mortgage and Note, as applicable, for execution by Agent. Such release or satisfaction or assignment shall be in a form appropriate in the jurisdiction in which the Property is located and that would be reasonably satisfactory to a

44

prudent lender and contains standard provisions, if any, protecting the rights of the releasing or assigning lender.  In addition, Borrower shall provide all other documentation (including, without limitation, UCC-3 financing statements) Agent reasonably requires to be delivered by Borrower in connection with such release of the Mortgage and Assignment of Leases and other Loan Documents or assignment of Mortgage and Note, as applicable.

Section 2.6    **Extension Option**.  Subject to the provisions of this <u>Section 2.6</u>, Borrower shall have the one-time option (the "**Extension Option**") to extend the Maturity Date until the Extension Maturity Date. Borrower's right to so extend the Maturity Date shall be subject to the satisfaction of each of the following conditions precedent prior to such extension:

(i)    Borrower shall have given Agent written irrevocable notice of such extension (x) no later than thirty (30) days prior to the Initial Maturity Date and (y) no earlier than ninety (90) days prior to the Initial Maturity Date;

(ii)    No monetary Default, material non-monetary Default or any Event of Default, shall have occurred and be continuing at the time of the delivery of the written extension notice or as of the Initial Maturity Date;

(iii)    Agent shall have received a title continuation letter from the Title Company (x) confirming that the Mortgage remains a valid first-priority Lien against the Property, subject only to Permitted Encumbrances, (y) showing title to the Property vested in Borrower, and (z) showing no exceptions to title other than those previously approved by Agent or permitted under the Loan Documents, in a form reasonably satisfactory to Agent;

(iv)    Borrower shall have paid all costs and expenses actually incurred by Agent and Lender in connection with such extension, including underwriting, title and reasonable legal fees and costs;

(v)    The Loan to Value Ratio as of the Initial Maturity Date shall not exceed sixty-five percent (65%) based on an Appraisal; <u>provided</u>  that Borrower shall have the right to repay a portion of the Outstanding Principal Balance as of the Initial Maturity Date in an amount sufficient to satisfy the foregoing Loan to Value Ratio requirement, provided that no Return Differential shall be payable in connection with any prepayment made pursuant to this <u>Section 2.6(v)</u>;

(vi)    Final Completion shall have occurred (except the requirement therein that all Punch List Items shall have been completed) and Agent shall have received confirmation from Construction Consultant with respect thereto;

(vii)    At least fifty percent (50%) of the residential Units (as to both net sellable square footage and number of units) either (A) are subject to fully executed Unit Sale Contracts entered into in accordance with this Agreement, pursuant to which the sale thereunder is scheduled to close within ninety (90) days after the Initial Maturity Date, with no financing contingencies or adjournment rights for the applicable purchasers thereunder, and further provided there is no outstanding dispute under such applicable Unit Sale Contracts or with regard to such residential Units , or (B) have been sold (*i.e.*, fee title to such residential Units has

45

been conveyed to the applicable purchasers pursuant to condominium unit deeds) in accordance with this Agreement;

(viii)   There shall be no challenge, action, suit, proceeding, or investigation is pending or threatened in writing against any part of the Property or Borrower by any person, in any court or before any Governmental Authority which is reasonably likely to materially interfere with the sale of Units, or otherwise materially adversely affect the value of the Property, as determined by Agent acting in its reasonable discretion;

(ix)   Guarantor continues to comply with the covenants contained in the Guaranty, Environmental Indemnity and Guaranty of Completion, and Guarantor has provided to Agent a reaffirmation of the same in a form reasonably acceptable to Agent;

(x)   Borrower shall have made a deposit into the Carry Cost Account in an amount equal to the amount required to be deposited in the Carry Cost Account pursuant to Section 7.2.1 of the Senior Loan Agreement as of the Initial Maturity Date;

(xi)   Borrower shall have made a deposit into the Interest Reserve Account in an amount equal to the amount required to be deposited in the Interest Reserve Account pursuant to Section 7.2.3 of the Senior Loan Agreement as of the Initial Maturity Date;

(xii)   Each of the Building Loan, the Senior Loan and the Project Loan must be concurrently extended to the extent the same remain outstanding;

(xiii)   Borrower shall have entered into an Interest Rate Cap Agreement for the Extension Period and complied with the provisions of Section 2.13;

(xiv)   No Shortfall shall exist as of the Initial Maturity Date; and

(xv)   The representations and warranties made by Borrower in the Loan Documents or otherwise made by Borrower in connection therewith after the date thereof shall have been true and correct in all material respects on the date on which made and shall also be true and correct as if remade upon the exercise of the Extension Option and on Initial Maturity Date (unless the same solely relate to a different time period).

**Section 2.7    Payments Not Conditional**. All payments required to be made by Borrower hereunder or under the Note or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

**Section 2.8    Initial Advance**

2.8.1    **Conditions of Initial Advance**. The obligation of Lender to make the Initial Advance shall be subject to the following conditions precedent, all of which conditions precedent must be satisfied prior to the making of the Initial Advance:

46

(a)    <u>Loan Documents</u>. Agent shall have received and approved fully executed originals of the Loan Documents.

(b)    <u>Performance; No Default</u>. Borrower shall have performed and complied with all terms and conditions herein required to be performed or complied with by it at or prior to the date of such Initial Advance, and on the date of such Initial Advance there shall exist no Default or Event of Default.

(c)    <u>Representations and Warranties</u>. The representations and warranties made by the Borrower Parties in the Loan Documents shall be true and correct in all material respects.

(d)    <u>UCC Searches</u>.  Agent shall have received Federal, state and local tax and judgment lien searches and searches of the appropriate Uniform Commercial Code filing offices showing no Liens affecting the Property or any Borrower Party, other than the Permitted Encumbrances.

(e)    <u>Insurance</u>.  Agent shall have received, at least four (4) Business Days prior to the Closing Date, original copies of the insurance certificates required under <u>Section 6.1</u> (other than <u>Section 6.1.1(b)</u>), showing that all such insurance is in effect, satisfactory to Agent in its sole  discretion, together with evidence of the payment of all premiums payable for the existing policy period.

(f)    <u>Formation, Authority and Good Standing Documents</u>. Agent shall have received and approved the following items: (i) evidence of the due organization or incorporation and good standing of each Borrower Party (if a legal entity), as certified by the Secretary of State of such party's State of organization or incorporation, the Secretary of State of the State where the Property is located and any other jurisdiction where such party is required to qualify to do business and maintain its good standing therein; (ii) true, correct and complete copies of all organizational documents of each Borrower Party (if a legal entity); and (iii) evidence of the due authorization of this transaction by each Borrower Party (if a legal entity), including, without limitation, corporate, partnership or limited liability company resolutions specifically authorizing this transaction and incumbency certificates with original specimen signatures for the officers signing the Loan Documents.

(g)    <u>Opinions of each Borrower Party's Counsel</u>. Agent shall have received and approved legal opinions from each Borrower Party's counsel, whose identity must be reasonably satisfactory to Agent, addressing corporate, partnership and limited liability organization, authority and good standing, the enforceability of the Loan Documents and such other matters which Agent may reasonably request in form and substance reasonably acceptable to Agent, and subject to typical carve-outs and exclusions.

(h)    <u>Financial Statements</u>.  Agent shall have received and approved the most current financial statements available for each Borrower Party, certified as required in and meeting the other requirements of <u>Section 5.1.12</u>.

(i)      Compliance with Laws. Agent shall have received evidence reasonably satisfactory to it that the Property is in compliance with all Legal Requirements (including all local, state and federal environmental laws), other than non-material violations that will be cured during construction of the Project Improvements, and that will not prevent issuance of any necessary Governmental Approvals in accordance with the Construction Schedule and the Plans and Specifications or otherwise materially and adversely affect Borrower's completion of the Project Improvements, and that there are no conditions existing currently or that would reasonably be expected to exist during the term of the Loan that require or are likely to require clean-up, removal or other remedial action pursuant to any of the aforesaid environmental laws (other than in the ordinary course of construction of the Project Improvements).

(j)      Licenses and Permits. Borrower shall have delivered to Agent evidence that (a) any and all building permits required for the continuous construction of the Project Improvements in accordance with the Construction Schedule, Business Plan and Plans and Specifications have been obtained in accordance with all Legal Requirements (and that any and all notices required by any Governmental Authority or by any applicable Legal Requirement to be filed prior to commencement of construction of the Project Improvements shall have been filed), and (b) all other material Governmental Approvals, third-party approvals and Easements necessary for the construction and completion of the Project Improvements as contemplated by the Plans and Specifications (including, without limitation, applications, approvals and/or waivers from the CPC), have been obtained and are in full force and effect, including, without limitation, permits for cranes and hoists, scaffolds, sidewalk or road closures, and the final approval of the Plans and Specifications and for the commencement and undertaking of the work contemplated by this Agreement by the Department of Buildings, the City, County and State of New York and any other applicable Governmental Authorities for the Project Improvements, as applicable.

(k)      Plans and Specifications. Agent shall have received two (2) complete sets of the Plans and Specifications and any and all modifications and amendments made thereto which shall have been reviewed and approved in writing by Agent and Construction Consultant. Borrower shall deliver to Agent a list identifying all Plans and Specifications and any and all modifications and amendments made thereto.

(l)      Agreements. Agent shall have received copies of all development, redevelopment, reciprocal easement or other material agreements or Easements relating to the Property or Condominium (including each of the agreements and contracts described in this Section 2.8.1), each certified by Borrower as being true, correct and complete; and Lender shall have determined, in its reasonable discretion, that the terms of the Loan do, and will not, breach or conflict with the terms of any such material agreements.

(m)      Construction Contracts. Borrower shall have executed all of the Construction Contracts required to be executed prior to commencing construction pursuant to the Business Plan (including that Borrower shall have entered into Construction Contracts accounting for 80% of the Hard Costs set forth in the Project Budget), and each such Construction Contract shall have been bid out in accordance with the Business Plan. Borrower shall have delivered to Agent, and Agent and Construction Consultant shall have approved a list (which approval shall be in Agent's reasonable discretion, other than with respect to any Contractors that are Borrower

48

Related Parties, in which case the same shall be subject to Agent's approval in its sole discretion), certified by Borrower, of all Contractors who have been or will be supplying labor or materials for the Property.  The list of Contractors may be amended from time to time subject to the reasonable approval of Agent and Construction Consultant. If requested by Agent, Borrower shall have delivered a Performance Letter from such Major Contractors as Agent shall designate. If requested by Agent, any or all Contractors and Other Design Professionals (in addition to those for whom same is expressly required under this Agreement) shall have delivered a Consent, Certification, Waiver and Agreement to the assignment to each of their Contracts, in form and substance set forth on Exhibit A to the Assignment of Contracts (or otherwise satisfactory to Agent), and Agent shall have received a certified copy or a fully executed duplicate original of each such Contract.

(n)     Architect's Contract. Agent shall have received the Architect's Contract and shall have approved the same in writing, and the Architect's Contract shall be in full force and effect. Agent shall have received a certificate from Borrower's Architect (the "**Architect's Certificate**") substantially in the form attached hereto as Exhibit F-1, and Borrower's Architect shall have duly executed and delivered to Agent a fully executed original of the Consent, Certification, Waiver and Agreement in the form of Exhibit A to the Assignment of Contracts from Borrower's Architect. All Other Design Professionals shall deliver to Agent a fully executed original of the Consent, Certification, Waiver and Agreement in the form of Exhibit A to the Assignment of Contracts.

(o)     Construction Management Agreement. Agent shall have received the Construction Management Agreement and shall have approved the same in writing, and the Construction Management Agreement shall be in full force and effect. Construction Manager shall have delivered the Assignment of Construction Management Agreement to Agent.

(p)     [Intentionally omitted.]

(q)     Sales Agreement. Agent shall have received the Sales Agency Agreement and shall have approved the same in writing, and the Sales Agency Agreement shall be in full force and effect. Sales Agent shall have delivered the Sales Agency Agreement to Agent.

(r)     Project Team. The members of Borrower's Project team (including the architect and sales agent) shall have been identified to and approved by Agent.

(s)     Affiliate Contracts. Agent shall have received copies of all executed Affiliate Contracts (including the Construction Management Agreement), each certified by Borrower and approved by Agent.

(t)     Appraisal. Agent shall have received a current Appraisal of the Property.

(u)     Title Insurance Policy; UCC Title Insurance Policy. Agent shall have received and approved the Title Insurance Policy, insuring that Agent has a valid and perfected first Lien as of the Closing Date on the Property, with respect to the Mortgage, and the UCC Title Insurance Policy, insuring that Agent has a valid and perfected first Lien as of the Closing Date on the Collateral.

49

(v)     Survey. Agent shall have received the Survey, which shall be prepared and be certified to the Title Company, Agent and their respective successors and assigns, in accordance with a survey certification acceptable to Agent in its reasonable discretion.

(w)     Environmental Report. Agent shall have received a complete Phase I environmental report (and, if recommended by the Phase I environmental report, a Phase II environmental report) addressed to Agent and satisfactory in form and substance to Agent (collectively, the "**Environmental Report**"), prepared in such detail as Agent may require by a firm approved by Agent in its sole discretion, together with complete copies of all existing environmental and hazardous material studies and reports, and any disclosure document required pursuant to the laws of the state where the Property is located, together with an acceptable reliance letter addressed to Agent provided by the issuer of the Environmental Report.

(x)     Construction Risk Assessment. Agent shall have received a Construction Risk Assessment with respect to the Property from the Construction Consultant, which Construction Risk Assessment shall be satisfactory in form and substance to Agent.

(y)     No Damage. The Improvements shall not have been injured or damaged by fire, explosion, accident, flood or other casualty, unless Agent shall be satisfied, in the judgment of Agent, that sufficient insurance proceeds or other funds provided by Borrower will be available to effect the satisfactory restoration of the Improvements and to permit Substantial Completion prior to the Substantial Completion Date.

(z)     Zoning. Agent shall have received evidence confirming that the development and planned use of the Property for a mixed use residential, office and retail condominium (together with such other uses as described in the definition of Project or the Business Plan) are consistent with applicable zoning laws and other Legal Requirements.

(aa)     Utilities. Agent shall have received evidence that all sewer, water, electrical, telephone and any other utility services are available at the Property in adequate supply.

(bb)     Required Equity. Agent shall have received evidence satisfactory to Agent that the Required Borrower Equity has been invested in the Property in accordance with Section 2.1.8 hereof.

(cc)     Condominium Documents. Any proposed amendments or supplements to the Offering Plan shall have been approved by Agent in accordance with this Agreement.

(dd)     Business Plan. Agent shall have received the Business Plan, and Agent shall have approved such Business Plan in its sole discretion.

(ee)     Patriot Act. Agent shall have received all documents and information deemed necessary by Agent to comply with Section 326 of the Patriot Act and regulations promulgated pursuant to such law.

50

(ff)    Interest Rate Cap Agreement.  Borrower shall have complied with Section 2.13 hereto and entered into an Interest Rate Cap Agreement which is in full force and effect.  The issuer under the Interest Rate Cap Agreement shall have duly executed and delivered to Agent a fully executed original of the Consent, Certification, Waiver and Agreement in the form of Exhibit A to the Assignment of Rate Cap.

(gg)    Accounts.  All Accounts which are required to be opened prior to the Initial Advance hereunder shall have been opened.

(hh)    Further Documents.  Agent shall have received such other documents and further approvals, opinions, documents and information as Agent or its counsel may have reasonably requested, including the Loan Documents, in form and substance satisfactory to Agent and its counsel.

(ii)    Structuring Fee.  Lender shall have received the Structuring Fee.

**Section 2.9    Advances**

2.9.1    **Conditions of all Advances**.  The obligation of Lender to make Advances (including the Initial Advance) shall be subject to the following conditions precedent, all of which conditions precedent must be satisfied prior to Lender making any such Advance:

(a)    Prior Conditions Satisfied. All conditions precedent (including, without limitation, any documents and/or other deliverables that Agent is or was permitted to require in connection with any prior Advance, including the Initial Advance) shall continue to be satisfied (or expressly waived in writing by Agent in its sole discretion) as of the date of such subsequent Advance irrespective of whether or not such conditions are repeated in this Section 2.9.

(b)    Performance; No Default. Borrower shall have performed and complied with all terms and conditions herein required to be performed or complied with by it at or prior to the date of such Advance, and on the date of such Advance there shall exist no monetary Default, material non-monetary Default, Event of Default and/or Shortfall.

(c)    Representations and Warranties. The representations and warranties made by Borrower in the Loan Documents or otherwise made by or on behalf of Borrower in connection therewith shall have been true and correct in all material respects on the date on which made and shall also be true and correct as if remade on the date of such Advance.

(d)    Deliveries. The following items or documents shall have been delivered to Agent:

(i)    *Endorsement to Title Insurance Policy*. A "datedown" endorsement to Agent's title insurance policy in the form set forth in Exhibit C hereto, which endorsement shall increase the coverage of the Title Insurance Policy by the amount of the Advance through the pending disbursement clause (but not the overall policy amount which shall be for the full amount of the Loan), amend the effective date of the Title Insurance Policy to the date of such Advance, continue to insure the lien of the Mortgage

51

subject to no liens or encumbrances other than the Permitted Encumbrances and which shall state that since the last disbursement of the Loan there have been no changes in the state of title to the Property (other than Permitted Encumbrances) and that there are no additional survey exceptions not previously approved by Agent.

(ii)     *Evidence of Sufficiency of Funds*. Evidence satisfactory to Agent that the proceeds of the Loan will be sufficient to cover all remaining Project Related Costs anticipated by Agent to be incurred and to satisfy the Obligations of Borrower to Agent and Lender and under the Loan Documents.

(iii)     *Draw Request*. A Draw Request complying with the provisions of this Agreement, including Borrower's Requisition (and all deliverables required to be provided in connection therewith pursuant to Section 2.12.1 hereto), and which shall constitute Borrower's representation and warranty to Agent and Lender that: (a) any completed construction is substantially in accordance with the applicable Plans and Specifications, (b) all costs for the payment of which Lender has previously advanced funds have in fact been paid, (c) all the representations and warranties contained in Articles III and IV of this Agreement continue to be true and correct in all material respects, (d) no monetary Default, material non-monetary Default or Event of Default shall have occurred and be continuing hereunder, and (e) Borrower continues to be in compliance with all of the other terms, covenants and conditions contained in this Agreement.

(iv)     *Project Report*.  A Project Report with regard to the period since the last Project Report shall have been delivered to Agent by the Construction Consultant.

(e)     Additional Searches.  Agent shall have received a certification from the Title Company or other service satisfactory to Agent or counsel satisfactory to Agent (which shall be updated from time to time at Borrower's expense upon request by Agent in connection with future Advances) that a search of the public records disclosed no significant or material changes since the date of this Agreement including no judgment or tax liens affecting any Borrower Party, the Property or the Personal Property, and no conditional sales contracts, chattel mortgages, leases of personalty, financing statements (other than those in favor of Agent) or title retention agreements which affect the Property.

(f)     Construction Consultant Approval.  Agent has received advice from the Construction Consultant, satisfactory to Agent, as to Construction Consultant's determination based on on-site inspections of the Improvements and the data submitted to and reviewed by it as part of Borrower's Requisition of the value of the labor and materials in place, that the construction of the Project Improvements is proceeding satisfactorily and according to schedule and that the work on account of which the Advance is sought has been completed in a good and workmanlike manner to such Construction Consultant's satisfaction within the Building Loan Budget (as the same may be updated from time to time) and substantially in accordance with the applicable Plans and Specifications and Legal Requirements, with Agent having the right to require additional testing in accordance with this Agreement as a condition to Lender's Advance hereunder.

(g)      <u>Condominium Documents</u>. Borrower shall have delivered to Agent, prior to the Lender making such Advance, a certification of Borrower, which shall be true, correct and complete as of the date when made, that Borrower has no knowledge of, nor has received any notice from the New York Attorney General or any other Governmental Authority that (i) sales of Units will be required to be discontinued, (ii) any amendment to the Condominium Documents approved by Agent in accordance with this Agreement will be rejected, or (iii) any purchaser will or has been afforded the right to rescind its Unit Sale Contract pursuant to the terms of any Offering Plan.

(h)      <u>No Material Adverse Change</u>. Since the Closing Date (or, in the case of the Initial Advance, since the date of the most recent financial statements for the Borrower Parties previously delivered to Agent), there has been no (i) change, occurrence or development that could, in the opinion of the Agent, have a material adverse effect on the business condition (financial or otherwise), operation, or performance of Borrower or (ii) event, circumstance, or information or matter which in the Agent's judgment is inconsistent in a material adverse manner with any event, circumstance, or information or other matter previously disclosed to Agent by Borrower relating to any Borrower Party or the Property.

(i)      <u>Further Documents</u>. Agent shall have received such other documents and further approvals, opinions, documents and information as Agent or its counsel may have reasonably requested, including the Loan Documents, in form and substance satisfactory to Agent and its counsel.

(j)      <u>Deposits</u>.  With respect to any Advance to be made for a Deposit, Borrower shall have delivered to Agent a copy of the applicable Contract pursuant to which such Deposit is to be delivered which shall be reasonably acceptable to Agent and Construction Consultant. If requested by Agent, Borrower shall provide a Performance Letter with respect to such Contract, if such Contract is a Major Contract.

**Section 2.10   Conditions of Final Advance**. In addition to the conditions set forth in <u>Section 2.9</u>, above, Lender's obligation to disburse the final Advance for Retainage pursuant to this Agreement shall be subject to receipt by Agent of the following:

(a)      <u>Completion of Improvements</u>.  Evidence satisfactory to Agent of Final Completion, including a final Project Report from the Construction Consultant with respect to the same.

(b)      <u>Certificates</u>.  Certificate of Borrower's Architect substantially in the form attached hereto as <u>Exhibit F-2</u> and closeout letters from all other Major Contractors as required by Agent.

(c)      <u>Lien Waivers</u>.  Duly executed final lien waivers in the form attached hereto as <u>Exhibit J</u> from all Contractors who have performed work, for the work so performed, and/or who have supplied labor and/or materials for the labor and/or materials so supplied.

53

(d)      "As-Built" Plans and Specifications.  A full and complete set of (x) final "as built" drawings for the Project Improvements from Major Contractors, and (y) final conformed Plans and Specifications certified to by Borrower's Architect.

(e)      Other Documents.  Such documents, letters, affidavits, reports and assurances, as Agent, Agent's counsel and the Construction Consultant may reasonably require, completed AIA Form G707 (Consent of Surety to Final Payments) and all necessary Governmental Approvals from all applicable Governmental Authorities.

**Section 2.11    No Reliance**.  All conditions and requirements of this Agreement are for the sole benefit of Agent and Lender and no other person or party (including, without limitation, the Construction Consultant, the Construction Manager and subcontractors (including, without limitation, Major Contractors) and materialmen engaged in the construction of the Project Improvements) shall have the right to rely on the satisfaction of such conditions and requirements by Borrower. Agent shall have the right, in its sole and absolute discretion, to waive any such condition or requirement and Borrower shall be authorized to rely on such waiver if and to the extent such waiver is in writing and signed by Agent.

**Section 2.12    Method of Disbursement of Loan Proceeds.**

2.12.1    **Draw Request to Be Submitted to Agent**. At such time as Borrower shall desire to obtain an Advance (the date of such Advance being required to be a Business Day), Borrower shall complete, execute and deliver to Agent a Borrower's Requisition in the form attached hereto as Exhibit L ("**Borrower's Requisition**"). With regard to Advances for Hard Costs, Borrower's Requisition shall be accompanied by:

(a)      a completed and itemized Application and Certificate for Payment (AIA Document No. G702 and No. G703) attached hereto as Exhibit M or similar form approved by Agent, containing the certification of the Construction Manager or each Contractor to whom such payment is made, as applicable, and Borrower's Architect as to the accuracy of same, together with invoices relating to all items of Project Related Costs covered thereby and accompanied by a cost breakdown showing the cost of work on, and the cost of materials incorporated into, the Project Improvements to the date of the requisition. The cost breakdown shall also show the percentage of completion of each Line Item on the Project Budget, and the accuracy of the cost breakdown shall be certified by Borrower and by Borrower's Architect. All such applications for payment shall also show all Contractors, including Major Contractors, by name and trade, the total amount of each Construction Contract, the amount theretofore paid to each Contractor as of the date of such application, and the amount to be paid from the proceeds of the Advance to each Contractor;

(b)      a certificate or report of Borrower's Architect to Agent based upon a site observation of the Property made by Borrower's Architect  not more than thirty (30) days prior to the date of such draw, in which Borrower's Architect shall in substance: (i) verify that the portion of the Project Improvements completed as of the date of such site observation has been completed substantially in accordance with the Plans and Specifications; and (ii) state its estimate of (1) the percentages of the construction of the Project Improvements completed as of the date of such site observation on the basis of work in place as part of the Project Improvements and the

54

Building Loan Budget, (2) the Hard Costs actually incurred for work in place as part of the Project Improvements as of the date of such site observation, (3) the sum necessary to complete construction of the Project Improvements in accordance with the Plans and Specifications, and (4) the amount of time from the date of such inspection that will be required to achieve Substantial Completion;

        (c)     an anticipated cost report (A) in the form set forth in Exhibit I-1 executed by the Construction Manager which sets forth the anticipated Hard Costs to complete construction of the Project Improvements to Final Completion, after giving effect to costs incurred to date and the determination of costs relating to any anticipated Change Orders and (B) in the form set forth in Exhibit I-2 executed by Borrower which sets forth, with respect to all costs to complete construction of the Project Improvements to Final Completion, on a cumulative basis and broken down by Line Item, percentage of completion, the original budgeted amount, the current budgeted amount pursuant to an updated Project Budget approved by Agent, costs incurred to date, projected costs to complete, explanations of any Project Budget variances, a summary of any budget reallocations (regardless of whether such reallocations required approval pursuant to this Agreement or if such reallocations were permitted without Agent's approval), a summary of permitted, approved, pending and anticipated Change Orders, an explanation of any variances from the approved Construction Schedule and an updated Construction Schedule for which Borrower has requested Agent's approval;

        (d)     an Affirmation of Payment;

        (e)     duly executed lien waivers, which shall be conditional lien waivers (for payments to be made from the pending Advance) and unconditional lien waivers (for all payments from prior Advances), as applicable, and otherwise substantially in the form set forth in Exhibit J, from all Contractors for all work performed, and all labor or material supplied prior to the date of the Advance;

        (f)     copies of all executed Change Orders, contracts and subcontracts, and, to the extent requested by Agent, of all inspection or test reports and other documents relating to the construction of the Project Improvements not previously delivered to Agent; and

        (g)     such other information, documentation and certification as Agent shall reasonably request, including without limitation, any documents required pursuant to Section 2.9 above.

### 2.12.2   **Procedure of Advances.**

        (a)     Each Draw Request shall be submitted to Agent at least ten (10) Business Days prior to the date of the requested Advance (the "**Requested Advance Date**"), and no more frequently than monthly (unless otherwise approved by Agent in its sole discretion). Agent shall make the requested Advance on the Requested Advance Date so long as all conditions to such Advance are satisfied or waived. Any Advance under the Project Loan, if any, shall be made on same day as Advances of the Building Loan made hereunder.

(b)      Each Advance (other than the Final Advance) shall be in an amount of not less than $500,000.

(c)      Each Advance shall be made on a Payment Date or such other date requested by Borrower and approved by Agent.

2.12.3   **Funds Advanced**. Each Advance made directly to Borrower shall be made by Lender by wire transfer (or other transfer) to the Borrower Operating Account and Borrower agrees that it shall have no other operating account or checking account other than the "Borrower Operating Account". All proceeds of all Advances shall be used by Borrower only for the purposes for which such Advances were made. Borrower shall not commingle such funds with other funds of Borrower.

2.12.4   **Direct Advances to Third Parties**. If a monetary Default, material non-monetary Default or Event of Default has occurred and remains uncured, at Agent's option, Agent may direct Lender to make any or all Advances directly or through the Title Company to (i) any Contractor, (ii) Borrower's Architect, (iii) the Construction Consultant to pay its fees, (iv) Agent's or Lender's counsel to pay the reasonable fees incurred by the same, (v) to pay (x) any expenses incurred by Agent or Lender which are reimbursable by Borrower under the Loan Documents (including, without limiting the generality of the foregoing, attorneys' fees and expenses and other fees and expenses incurred by Agent or Lender), provided that Borrower shall theretofore have received notice from Agent thereof, or (y) following the occurrence and continuation of an Event of Default, any other sums due to Agent or Lender under the Notes, this Agreement or any of the other Loan Documents, all to the extent that the same are not paid by the respective due dates thereof, and (vi) any other Person to whom Agent determines payment is due. Any portion of the Loan disbursed by Lender as set forth above shall be deemed disbursed as of the date on which the Person to whom such payment is made receives the same. The execution of this Agreement by Borrower shall, and hereby does, constitute an irrevocable authorization to disburse the Loan directly to any such Person or through the Title Company to such Persons in accordance with this Section 2.12.4 as amounts become due and payable to them hereunder and any portion of the Loan so disbursed by Lender shall be deemed disbursed as of the date on which the Person to whom payment is made receives the same.  No further authorization from Borrower shall be necessary to warrant such direct Advances to such relevant Person, and all such Advances shall satisfy *pro tanto* the obligations of Agent and Lender hereunder and shall be secured by the Mortgage and the other Loan Documents as fully as if made directly to Borrower. In all other events, all Advances shall be made to the Borrower Operating Account in accordance with Section 2.12.3.

2.12.5   **One Advance Per Month**. Lender shall have no obligation to make Advances more often than once in each calendar month, except that Agent, in its sole discretion, shall have the right but not the obligation, to direct Lender to make Advances during any month for interest, fees, expenses, construction draws or any other amounts due under the Loan Documents. In addition, Lender may at any time, in Lender's sole discretion and without request therefore from Borrower, make Advances to pay amounts that are due to Lender or Agent under the Building Loan Documents.

56

2.12.6 **Advances Do Not Constitute a Waiver**. No Advance shall constitute a waiver of any of the conditions of Lender's obligation to make further Advances, nor, in the event Borrower is unable to satisfy any such condition, shall any Advance have the effect of precluding Agent from thereafter declaring such inability to be an Event of Default hereunder.

2.12.7 **Trust Fund Provisions**. All proceeds advanced hereunder shall be subject to the trust fund provisions of Section 13 of the Lien Law. The Section 22 Affidavit is made pursuant to and in compliance with Section 22 of the Lien Law, and, if so indicated in said affidavit, Building Loan proceeds will be used, in part, for reimbursement for payments made by Borrower prior to the Initial Advance hereunder but subsequent to the commencement of the construction and equipping of the Improvements for items constituting Costs of the Improvement.

2.12.8 **Extension Period**. Lender shall not be obligated to make any further Advances after the Initial Maturity Date; provided that, for the avoidance of doubt, subject to availability and satisfaction of all applicable conditions to Advances hereunder, Borrower may request and receive an Advance on the Initial Maturity Date to make the deposits set forth in Sections 2.6(x) and (xi), to the extent set forth in Line Items for such purpose in the Approved Annual Budget or Project Budget, as applicable.

2.12.9 **Advances and Disbursements Under Guaranty of Completion**. Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Document, Borrower hereby irrevocably and unconditionally authorizes Agent, acting in its sole discretion to make any disbursements of proceeds of the Loan or of any Reserve Funds held by Agent to Guarantor to complete the Guaranteed Work (as defined in the Guaranty of Completion), and grants to Guarantor all rights of access to the Property and materials relating to the Project necessary to enable Guarantor to complete the Guaranteed Work.

**Section 2.13   Interest Rate Cap Agreement**

(a)   Interest Rate Cap Agreement. Prior to or contemporaneously with the Closing Date, Borrower shall have obtained, and thereafter maintain in effect, the Interest Rate Cap Agreement, which shall have a term expiring no earlier than the last day of the Interest Period in which the Initial Maturity Date occurs and have a notional amount which shall not at any time be less than the Loan Amount. The Interest Rate Cap Agreement shall have a strike rate equal to the Strike Price.

(b)   Pledge and Collateral Assignment. As security for the payment and performance of the Total Debt when due (whether upon stated maturity, by acceleration, early termination or otherwise), Borrower, as pledgor, hereby pledges, assigns, hypothecates, transfers and delivers to Agent (for the benefit of Lender) as collateral and hereby grants to Agent a continuing first priority lien on and security interest in, to and under all of the following whether now owned or hereafter acquired and whether now existing or hereafter arising (the "**Rate Cap Collateral**"): all of the right, title and interest of Borrower in and to (i) the Interest Rate Cap Agreement; (ii) all payments, distributions, disbursements or proceeds due, owing, payable or required to be delivered to Borrower in respect of the Interest Rate Cap Agreement or arising out of the Interest Rate Cap Agreement, whether as contractual obligations, damages or otherwise; and (iii) all of Borrower's claims, rights, powers, privileges, authority, options, security interests, liens

57

and remedies, if any, under or arising out of the Interest Rate Cap Agreement, in each case including all accessions and additions to, substitutions for and replacements, products and proceeds of any or all of the foregoing.

(c)   <u>Covenants</u>.

(i)   Borrower shall comply with all of its obligations under the terms and provisions of the Interest Rate Cap Agreement.  All amounts paid by the Counterparty under the Interest Rate Cap Agreement to Borrower or Agent shall be deposited immediately into the Deposit Account pursuant to <u>Section 7.1</u>. Subject to terms hereof, provided no Event of Default has occurred and is continuing, Borrower shall be entitled to exercise all rights, powers and privileges of Borrower under, and to control the prosecution of all claims with respect to, the Interest Rate Cap Agreement and the other Rate Cap Collateral.  Borrower shall take all actions reasonably requested by Agent to enforce Borrower's rights under the Interest Rate Cap Agreement in the event of a default by the Counterparty thereunder and shall not waive, amend or otherwise modify any of its rights thereunder.

(ii)   Borrower shall defend Agent's right, title and interest in and to the Rate Cap Collateral pledged by Borrower pursuant hereto or in which it has granted a security interest pursuant hereto against the claims and demands of all other Persons.

(iii)   In the event that the Counterparty is downgraded below "A" by S&P, Borrower shall deliver a Replacement Interest Rate Cap Agreement within ten (10) Business Days following the date of such downgrade.

(iv)   In the event that Borrower fails to purchase and deliver to Agent the Interest Rate Cap Agreement as and when required hereunder, Agent may, after notice to Borrower of not less than three (3) Business Days, purchase the Interest Rate Cap Agreement and the cost incurred by Agent in purchasing the Interest Rate Cap Agreement shall be paid by Borrower to Agent with interest thereon at the Default Rate from the date such cost was incurred by Agent until such cost is paid by Borrower to Agent.

(v)   Borrower shall not sell, assign, or otherwise dispose of, or mortgage, pledge or grant a security interest in, any of the Rate Cap Collateral or any interest therein, and any sale, assignment, mortgage, pledge or security interest whatsoever made in violation of this covenant shall be a nullity and of no force and effect, and upon demand of Agent, shall forthwith be cancelled or satisfied by an appropriate instrument in writing.

(vi)   Borrower shall not (i) without the prior written consent of Agent, modify, amend or supplement the terms of the Interest Rate Cap Agreement, (ii) without the prior written consent of Agent, except in accordance with the terms of the Interest Rate Cap Agreement, cause the termination of the Interest Rate Cap Agreement prior to its stated maturity date, (iii) without the prior written consent of Agent, except as aforesaid, waive or release any obligation of the Counterparty (or any successor or substitute party to the Interest Rate Cap Agreement) under the Interest Rate Cap

58

Agreement, (iv) without the prior written consent of Agent, consent or agree to any act or omission to act on the part of the Counterparty (or any successor or substitute party to the Interest Rate Cap Agreement) which, without such consent or agreement, would constitute a default under the Interest Rate Cap Agreement, (v) fail to exercise promptly and diligently each and every material right which it may have under the Interest Rate Cap Agreement, (vi) take or intentionally omit to take any action or intentionally suffer or permit any action to be omitted or taken, the taking or omission of which would result in any right of offset against sums payable under the Interest Rate Cap Agreement or any defense by the Counterparty (or any successor or substitute party to the Interest Rate Cap Agreement) to payment or (vii) fail to give prompt notice to Agent of any notice of default given by or to Borrower under or with respect to the Interest Rate Cap Agreement, together with a complete copy of such notice.

(vii)    In connection with an Interest Rate Cap Agreement, Borrower shall obtain and deliver to Agent an opinion of counsel from counsel (which counsel may be in-house counsel for the Counterparty) for the Counterparty upon which Agent, Lender and their successors and assigns may rely, under New York law and, if the Counterparty is a non-U.S. entity, the applicable foreign law, which shall provide in relevant part, that: (i) the issuer is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and has the organizational power and authority to execute and deliver, and to perform its obligations under, the Interest Rate Cap Agreement; (ii) the execution and delivery of the Interest Rate Cap Agreement by the issuer, and any other agreement which the issuer has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been and remain duly authorized by all necessary action and do not contravene any provision of its certificate of incorporation or by-laws (or equivalent organizational documents) or any law, regulation or contractual restriction binding on or affecting it or its property; (iii) all consents, authorizations and approvals required for the execution and delivery by the issuer of the Interest Rate Cap Agreement, and any other agreement which the issuer has executed and delivered pursuant thereto, and the performance of its obligations thereunder have been obtained and remain in full force and effect, all conditions thereof have been duly complied with, and no other action by, and no notice to or filing with any governmental authority or regulatory body is required for such execution, delivery or performance; and (iv) the Interest Rate Cap Agreement, and any other agreement which the issuer has executed and delivered pursuant thereto, has been duly executed and delivered by the issuer and constitutes the legal, valid and binding obligation of the issuer, enforceable against the issuer in accordance with its terms, subject to applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law).

(viii)   Borrower shall at all times comply with all Legal Requirements related to the Interest Rate Cap Agreement, including, without limitation, the requirement to maintain a "CFTC Interim Compliant Identifier" number with respect to the Interest Rate Cap Agreement, and Borrower shall, upon request by Agent, provide

59

Agent with evidence reasonably satisfactory to Agent that Borrower has complied with such requirements.

(d)  <u>Reduction of Notional Amount</u>.  From and after the date on which Borrower is no longer entitled to any further Advances of the Loan, Borrower shall be permitted, at Borrower's sole cost and expense, to arrange for the reduction of the notional amount of the Interest Rate Cap Agreement upon any repayment of a portion of the principal balance of the Loan, <u>provided</u> that after giving effect to such reduction, the aggregate notional amount of the Interest Rate Cap Agreement then in effect under this Agreement is not less than the then Outstanding Principal Balance and <u>provided</u>, <u>further</u>, that (i) no Event of Default is then continuing, (ii) Borrower shall have delivered to Agent at least ten (10) Business Days' prior notice of Borrower's intended actions under this provision and the amount of the reduction of the notional amount, (iii) Borrower shall deliver the documents necessary to accomplish the foregoing at least Five (5) Business Days' prior to the effectiveness thereof, which documents must be satisfactory to Agent, and (iv) Borrower shall execute such amendments to the Loan Documents as Agent may require to effectuate such actions.

## ARTICLE III

## CONSTRUCTION REPRESENTATIONS AND COVENANTS

### Section 3.1    The Project Improvements.

(a)  Borrower represents and warrants to Agent and Lender as of the Closing Date that Borrower has furnished Agent true and complete sets of the Plans and Specifications which comply with all applicable Legal Requirements (including, without limitation, all requirements of the ADA), all Governmental Approvals, the requirements set forth in the Offering Plan, and are the Plans and Specifications that are the basis for all Governmental Approvals required to construct the Project Improvements, and such Plans and Specifications have been approved by any applicable Governmental Authority and Borrower's Architect as required for construction of the Project Improvements in accordance with this Agreement, and are the same Plans and Specifications submitted to Construction Manager and to all Contractors performing work at the Property.

(b)  Borrower represents and warrants to Agent and Lender as of the Closing Date that appropriate Governmental Authorities have issued all Governmental Approvals required for the commencement of construction of the Improvements in accordance with the Plans and Specifications.  Each addition to or modification of the Plans and Specifications shall be subject to approval in writing by Agent, and, to the extent required by law, by the appropriate Governmental Authorities.

(c)  Borrower shall not commence any work on any stage or phase of the Project Improvements unless all required Governmental Approvals have been issued or obtained from the appropriate Governmental Authorities with respect to the commencement of such stage or phase of construction. All Plans and Specifications shall become the property of Agent upon the occurrence of an Event of Default under the Loan Documents.

(d)      The Project Improvements shall be constructed and equipped in compliance with the requirements of the Governmental Authorities and the appropriate Board of Fire Underwriters, if any, or other similar body, if any, acting in and for the locality in which the Property is situated.  Compliance with the provisions of this <u>Article III</u> and any other provisions of this Agreement relating to the construction and equipping of the Project Improvements shall be determined by Agent in its sole discretion.

(e)      At all times Agent, the Construction Consultant, and their respective agents and employees, shall have the right of entry and free access to the Property to inspect the Project Improvements, subject to the rights of any third party Unit owners with respect to individual Units, provided that Agent, the Construction Consultant, and their respective agents and employees shall use reasonable efforts not to unreasonably interfere with Borrower's construction of the Project Improvements.

(f)      Borrower hereby acknowledges and agrees that neither Agent, Lender nor the Construction Consultant's approval of any Plans and Specifications (or any revisions thereto), nor its inspection of the performance of the construction, nor its right to inspect such work, shall impose upon Agent, Lender and/or Construction Consultant any obligation or liability whatsoever with respect thereto, including, without limitation, any obligation or liability that might arise as a result of such work not being performed in accordance with Legal Requirements or with the Plans and Specifications (and revisions thereto) approved by Agent, Lender and Construction Consultant or otherwise.  The review or approval by Agent, Lender and Construction Consultant of any Plans and Specifications or any revisions thereto is solely for Agent's and Lender's benefit, and is without any representation or warranty whatsoever with respect to the adequacy, correctness or efficiency thereof or otherwise.  Neither the granting by Agent, Lender and/or Construction Consultant of its approval of any Plans and Specifications or any revisions thereto, shall in any manner constitute or be deemed to constitute a judgment or acknowledgment by Agent or Lender as to their legality or compliance with Legal Requirements .

**Section 3.2      Intentionally Omitted**.

**Section 3.3      Completion of Improvements.**

(a)      Borrower shall diligently pursue construction and completion of all of the Project Improvements to Substantial Completion on or prior to the Substantial Completion Date and Final Completion on or prior to the Final Completion Date, all in accordance with the Plans and Specifications, the Construction Schedule (including Major Milestones), the Business Plan, the Condominium Documents, and in compliance with all restrictions, covenants and Easements affecting the Property, all applicable Legal Requirements, all applicable Governmental Approvals, and the terms and conditions of the Loan Documents, and free and clear of all liens, encumbrances and security instruments (other than the Permitted Encumbrances).

(b)      Borrower shall promptly pay all sums and perform such duties as may be necessary to complete such construction of the Project Improvements in accordance with the applicable Plans and Specifications and in compliance with all restrictions, covenants and Easements affecting the Property, all Legal Requirements and all applicable Governmental Approvals, and in accordance with all terms and conditions of the Loan Documents free from any

61

Liens, claims or assessments (actual or contingent) asserted against the Property for any material, labor or other items furnished in connection therewith.

(c)     Borrower agrees to use best efforts to obtain a permanent certificate of occupancy for the entire Property as soon as reasonably practicable and in any event within the time periods required by law or as set forth in the Offering Plan.

**Section 3.4     Correction of Defects**. Borrower shall promptly correct (or cause the responsible Contractor to correct) all defects in the Project Improvements or any departure from the applicable Plans and Specifications not previously approved by Agent to the extent required hereunder.  Borrower agrees that the advance of any proceeds of the Loan whether before or after such defects or departures from the applicable Plans and Specifications are discovered by, or brought to the attention of, Agent shall not constitute a waiver of Agent's right to require compliance with this covenant.

**Section 3.5     Building Loan Budget.**

3.5.1     <u>**Generally**</u>. Borrower has prepared a budget, which details all Building Loan Costs to be incurred by Borrower until Final Completion in accordance with the Plans and Specifications (the "**Building Loan Budget**"), which is attached to the Project Loan Agreement as <u>Exhibit A</u> thereto and Borrower represents and warrants same to be its best estimate of the Building Loan Costs to be incurred by Borrower until Final Completion (including completion of all Punch List Items and obtaining a permanent certificate of occupancy) in accordance with the Plans and Specifications and all Legal Requirements. Each category of direct and indirect cost, including, without limitation, the major trades or project components within such category (the "**Line Items**"), shall be delineated in the Project Budget with those that are approved as Project Related Costs to be disbursed out of Building Loan proceeds subject to availability and satisfaction of all applicable conditions to Advances hereunder, being so indicated. The Building Loan Budget shall contain a "Contingency" Line Item.  Any revision to the Building Loan Budget will be subject to Agent's approval, in its sole and absolute discretion (except as expressly set forth in <u>Section 3.9</u>).

3.5.2     <u>**Cost Overruns**</u>. If Borrower becomes aware of any change in Building Loan Costs which will increase a category or Line Item of Building Loan Costs reflected on the Building Loan Budget, Borrower shall promptly notify Agent in writing and promptly submit to Agent for its approval a revised Building Loan Budget.  Any reallocation of any category or Line Items in the Building Loan Budget in connection with cost overruns shall be subject to Agent's approval in Agent's sole discretion (except as expressly set forth in <u>Section 3.9</u>).  Agent shall have no obligation to make any further Advances unless and until the revised Building Loan Budget so submitted by Borrower, as applicable, is approved by Agent, and Agent reserves the right to approve or disapprove any revised Building Loan Budget in its sole and absolute discretion (except as expressly set forth in <u>Section 3.9</u>) and to require the funding of a Shortfall if required pursuant to <u>Section 2.1.7</u> hereof.

**Section 3.6     Project Budget**. Borrower represents and warrants, as of the date hereof and on each date that Borrower submits a revised Project Budget to Agent, that the Project Budget which is attached as <u>Exhibit D</u> to the Project Loan Agreement (or the revised Project Budget

62

submitted to Agent from time to time, as applicable) is its best estimate of the Project Related Costs, Carry Costs and Debt Service to be incurred by Borrower until Final Completion and the consummation of the sale of each of the Units (including completion of all Punch List Items and obtaining a permanent certificate of occupancy) in accordance with the Plans and Specifications, Business Plan and all Legal Requirements. Any revision to the Project Budget will be subject to Agent's approval, in its sole and absolute discretion (except as expressly set forth in <u>Section 3.9</u>).

**Section 3.7    Feasibility**. The Construction Schedule is accurate and complete and represents the schedule of construction that the Construction Manager is required to adhere to pursuant to the Construction Management Agreement and, to Borrower's best information and belief, can be met as and when required thereunder.

**Section 3.8    Change Orders**. Borrower shall permit no Change Orders or deviations from any Plans and Specifications, the Construction Schedule or Project Budget or any amendment, modification or supplement to any Major Contract during construction without the prior written consent of Agent acting in its sole discretion. Any Change Orders shall clearly delineate the proposed changes to the applicable Plans and Specifications with bubbles or other clear method of indicating revisions to the prior version.

**Section 3.9    Cost Savings and Contingency Reserve**.

3.9.1    <u>Reallocation of Cost Savings to Contingency.</u>

(a)    With respect to Hard Costs set forth in the Building Loan Budget, after Borrower has delivered to Agent reasonably satisfactory evidence that the requirements set forth in the definition of "Cost Savings" have been satisfied, Borrower may revise the Building Loan Budget from time to time to reallocate demonstrated Cost Savings available under any Line Item for other Hard Costs in the Building Loan Budget (but not for any costs in the Project Loan Budget) to the "Contingency" Line Item in the Building Loan Budget (and subsequently utilized in accordance with <u>Section 3.9.2</u>). Notwithstanding the foregoing, until such time as Borrower is entitled to an Advance in respect of Retainage pursuant to the terms hereof, Borrower shall not have the right to reallocate as Cost Savings any amounts required to be set aside as Retainage for such Line Item.

(b)    With respect to Soft Costs set forth in the Project Loan Budget, after Borrower has delivered to Agent reasonably satisfactory evidence that the requirements set forth in the definition of "Cost Savings" have been satisfied, Borrower may revise the Project Loan Budget from time to time to reallocate demonstrated Cost Savings available under any Line Item for other Soft Costs in the Project Loan Budget (but not for any costs in the Building Loan Budget) to the "Contingency" Line Item in the Project Loan Budget (and subsequently utilized in accordance with <u>Section 3.9.2</u>).

3.9.2    <u>Reallocation of Contingency to Other Line Items</u>. Subject to the prior written approval of Agent, Borrower may reallocate "Contingency" in the Building Loan Budget to other Line Items for costs in the Building Loan Budget (but not for any costs in the Project Loan Budget), <u>provided</u>, <u>however</u>, that Lender shall not unreasonably withhold its approval to such reallocation of "Contingency" to other Line Items of the Building Loan Budget if the amount so

63

reallocated (together with all other amounts of "Contingency" previously reallocated), when expressed as a percentage of total "Contingency" in the Building Loan Budget (taking into account demonstrated Cost Savings reallocated pursuant to Section 3.9.1), is equal to or less than the percentage of completion of the Project Improvements at the time of such reallocation; except that Agent's consent shall not be required for the reallocation of the first 20% of the "Contingency" line item (as of the Closing Date) to other Line Items of the Building Loan Budget.

**Section 3.10   Stored Materials**.

(a)   Lender shall not be required to disburse any funds for any materials, machinery or other Personal Property not yet incorporated into the Project Improvements (the "**Stored Materials**"), unless the following conditions are satisfied at Borrower's sole cost and expense:

(i)   Borrower shall deliver to Agent bills of sale or other evidence satisfactory to Agent of the cost of, and, subject to the payment therefor, Borrower's title in and to such Stored Materials;

(ii)   The Stored Materials are identified to the Property and Borrower, are segregated so as to adequately give notice to all third parties of Borrower's title in and to such materials, and are components in substantially final form ready for incorporation into the Project Improvements;

(iii)   The Stored Materials are stored at the Property or at such other third-party owned and operated site as Agent shall approve, and are protected against theft and damage in a manner satisfactory to Agent, including, if requested by Agent, storage in a bonded warehouse in the greater metropolitan area in which the Property is located;

(iv)   The Stored Materials will be paid for in full with the funds to be disbursed, and all lien rights or claims of the supplier will be released upon full payment;

(v)   Agent (for the benefit of Lender) has or will have upon payment with disbursed funds a perfected, first priority security interest in the Stored Materials;

(vi)   The Stored Materials are insured for an amount equal to their replacement costs in accordance with Section 6.1 of this Agreement;

(vii)   The aggregate cost of Stored Materials stored at the Property is approved by the Construction Consultant and, if required by Agent, the Construction Consultant shall certify that it has inspected such Stored Materials and they are in good condition and suitable for use in connection with the Project Improvements; and

(viii)   The aggregate cost of Stored Materials stored on the Property at any one time shall not exceed $3,000,000 and the aggregate cost of Stored Materials stored off the Property at any one time shall not exceed $2,000,000 unless otherwise approved by Agent acting in its sole discretion.

64

(b)      Notwithstanding Section 3.10(a) above, upon satisfaction of the conditions precedent in Section 2.9.1(j) (as well as satisfaction of all other applicable conditions precedent to an Advance), Lender shall fund deposits (x) for the custom materials and machinery listed on Schedule IV attached hereto up to the amounts specified on Schedule IV or (y) such other custom materials and machinery approved by Agent acting in its sole discretion up to the amounts approved by Agent acting in its reasonable discretion ("**Deposits**"), provided that there shall not be Deposits in the amount of more than $1,000,000 in the aggregate outstanding at any given time without the prior written consent of Agent it its sole discretion.

### Section 3.11   Construction Consultant.

3.11.1   Borrower acknowledges that (i) the Construction Consultant has been retained by Agent to act as a consultant and only as a consultant to Agent in connection with the construction of the Project Improvements and has no duty to Borrower, (ii) the Construction Consultant shall in no event have any power or authority to give any approval or consent or to do any other act or thing which is binding upon Agent, (iii) Agent reserves the right to make any and all decisions required to be made by Agent under this Agreement and to give or refrain from giving any and all consents or approvals required to be given by Agent under this Agreement and to accept or not accept any matter or thing required to be accepted by Agent under this Agreement, and without being bound or limited in any manner or under any circumstance whatsoever by any opinion expressed or not expressed, or advice given or not given, or information, certificate or report provided or not provided, by the Construction Consultant with respect thereto, (iv) Agent reserves the right in its sole and absolute discretion to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by the Construction Consultant to Agent or any other person or party, and (v) Agent reserves the right to replace the Construction Consultant with another construction consultant at any time and without prior notice to or approval by Borrower.

3.11.2   The Construction Consultant shall perform the following services on behalf of Agent:

(a)      Prepare the Project Reports;

(b)      Review and advise Agent whether, in the opinion of the Construction Consultant, the Plans and Specifications  are satisfactory;

(c)      Review Draw Requests and Change Orders;

(d)      Make inspections and visits in accordance with Section 5.1.5;

(e)      Attend all meetings of any nature relating to the Project;

(f)      Review any Contracts, Governmental Approvals or other documentation relating to the Project requested by Agent or the Construction Consultant; and

(g)      Take such other actions deemed necessary by Agent or the Construction Consultant in order to effectively administer and review the Project.

3.11.3   The fees of the Construction Consultant shall be paid by Borrower (and expenses incurred by Agent on account thereof shall be reimbursed to Agent) after Borrower receives the Construction Consultant's invoice approved by Agent for payment to the extent such fees are set forth in the Project Budget or, if not set forth in the Project Budget, within fifteen (15) days of request therefor, but neither Agent nor the Construction Consultant shall have any liability to Borrower on account of (i) the services performed by the Construction Consultant, (ii) any neglect or failure on the part of the Construction Consultant to properly perform its services or (iii) any approval by the Construction Consultant of construction of the Project Improvements. Neither Agent nor the Construction Consultant assumes any obligation to Borrower or any other Person concerning the quality of construction of the Project Improvements or the absence therefrom of defects.

# ARTICLE IV

# REPRESENTATIONS AND WARRANTIES

**Section 4.1     Borrower Representations**.  Except as otherwise expressly set forth in this Article, Borrower represents and warrants to Agent and Lender as of the Closing Date, as of the date of each Advance and each other date on which the representations and warranties set forth herein are required to be remade that:

4.1.1     **Organization**.  Borrower has been duly organized since the date of its formation and is, and has been since the date of its formation been and is, validly existing and in good standing with requisite power and authority to own its properties and to transact the businesses in which it is now engaged.  Borrower is, and has been since the date of its formation, duly qualified to do business and is in good standing in each jurisdiction where it is required to be so qualified in connection with its properties, businesses and operations.  Borrower possesses all Governmental Approvals necessary to entitle it to own its properties and to transact the businesses in which it is now engaged, including without limitation, the ownership, management, operation, construction, leasing and sale of the Property and the sole business of Borrower is the ownership, management, operation, development, construction, leasing and sale of the Property (or, after the Conversion, the Unsold Units).  Borrower has no knowledge of any dispute or objection to the issuance or validity of such Governmental Approvals or any fact that would cause such Governmental Approvals to be terminated or rescinded by the applicable Governmental Authority. The ownership interests in Borrower, Sole Member and such other Persons as set forth on the organizational chart attached hereto as <u>Schedule I</u> are true and correct depictions of the ownership interests in such Persons. Each of Borrower and Sole Member is and has been since its formation a Special Purpose Entity. Borrower does not own or use any assets other than its interests in the Property and personal property incidental to the business of owning, constructing, operating and selling the Property and activities incidental thereto; without limiting the foregoing, the Property is and always has been operated as a single property or project, generating substantially all of Borrower's gross income, and Borrower acknowledges and agrees that it is Borrower's understanding and intent that the Property constitutes "single asset real estate" for purposes of Section 362(d)(3) of the Bankruptcy Code.

4.1.2 **Proceedings**. Borrower has taken all necessary action to authorize the execution, delivery and performance of this Agreement and the other Loan Documents. This Agreement and such other Loan Documents have been duly executed and delivered by or on behalf of Borrower and constitute legal, valid and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms, subject only to applicable bankruptcy, insolvency and similar laws affecting rights of creditors generally, and subject, as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding in equity or at law). The Loan Documents are not subject to any right of rescission, set-off, counterclaim or defense by any Borrower Party including the defense of usury, nor would the operation of any of the terms of the Loan Documents, or the exercise of any right thereunder, render the Loan Documents unenforceable, and no Borrower Party has asserted any right of rescission, set-off, counterclaim or defense with respect thereto.

4.1.3 **No Conflicts**. The execution, delivery and performance of this Agreement and the other Loan Documents by Borrower will not conflict with or result in a breach of any of the terms or provisions of, or constitute a default under, or result in the creation or imposition of any lien, charge or encumbrance (other than pursuant to the Loan Documents) upon any of the property or assets of Borrower pursuant to the terms of any indenture, mortgage, deed of trust, loan agreement, partnership agreement, management agreement or other agreement or instrument to which Borrower is a party or by which any of Borrower's property or assets is subject, nor will such action result in any violation of the provisions of any statute or any order, rule or regulation of any Governmental Authority having jurisdiction over Borrower or any of Borrower's properties or assets, and any consent, approval, authorization, order, registration or qualification of or with any court or any such Governmental Authority required for the execution, delivery and performance by Borrower of this Agreement or any other Loan Documents has been obtained and is in full force and effect.

4.1.4 **Litigation**. There are no actions, suits or proceedings at law or in equity or any mediations or arbitrations by or before any Governmental Authority or other agency or tribunal now pending, and Borrower has no knowledge of any threatened, against or affecting any Borrower Party, the Property or the Collateral, which actions, suits or proceedings, if determined against any  Borrower Party, the Property or the Collateral, might adversely affect the condition (financial or otherwise) or business of any Borrower Party, the condition, ownership or use of the Property, the marketability of the Project or the sale of Units to the public.  Except as set forth on Schedule V, Borrower has not received any written notice, and Borrower has no knowledge, that it is in default or violation of any order, writ, injunction, decree, regulation or demand of any Governmental Authority.

4.1.5 **Agreements**.  Borrower is not a party to any agreement or instrument or subject to any restriction which might adversely affect Borrower, the Property, the Collateral, or Borrower's business, properties or assets, operations or condition, financial or otherwise.  To Borrower's knowledge, Borrower is not in default in any respect in the performance, observance or fulfillment of any of the obligations, covenants or conditions contained in any agreement or instrument to which it is a party or by which Borrower or the Property is bound.

4.1.6    **Consents**.  No consent, approval, authorization nor order of nor notice of filing with, any court or  Governmental Authority or other Person is required for the execution, delivery and performance by Borrower of, or compliance by Borrower with, this Agreement or the other Loan Documents or the consummation of the transactions contemplated hereby, other than those which have been obtained by Borrower.

4.1.7    **Title**.  Borrower has good, marketable and insurable fee simple title to the land and real property comprising the Property and good title to the balance of the Property, free and clear of all Liens whatsoever except the Permitted Encumbrances, such other Liens as are permitted pursuant to the Loan Documents and the Liens created by the Loan Documents. The Permitted Encumbrances in the aggregate do not, and will not, (i) adversely affect (a) the operation or use of the Property (as currently used, and as contemplated to be used in accordance with the Business Plan and Plans and Specifications), (b) the ability to sell Units to the public, or (c) Borrower's ability to pay its Obligations in a timely manner, or (ii) materially interfere with the benefits of the security intended to be provided by this Agreement and the other Loan Documents. Sole Member owns the Collateral free and clear of all Liens whatsoever other than the Lien of the Loan Documents.  The Mortgage, when properly recorded in the appropriate records will create a valid perfected first priority Lien on all of the Property that is real property subject only to Permitted Encumbrances. The filing of a Uniform Commercial Code financing statement covering all personalty of Borrower with the Delaware Secretary of State will create perfected security interests in and to, and perfected collateral assignments of, all personalty, all in accordance with the terms thereof, in each case subject only to any applicable Permitted Encumbrances and such other Liens as are expressly permitted pursuant to the Loan Documents. The Pledge Agreement, together with any Uniform Commercial Code financing statements required to be filed in connection therewith and the delivery of the original Certificate (as defined in the Pledge Agreement) to Agent, will create a valid, first priority, perfected Lien on Sole Member's interest in the Collateral, all in accordance with the terms thereof.  There are no claims for payment for work, labor or materials affecting the Property which are or may become a Lien prior to, or of equal priority with, the Liens created by the Loan Documents.

4.1.8    **Solvency**.  Borrower has (a) not entered into this transaction or executed the Note, this Agreement or any other Loan Documents with the actual intent to hinder, delay or defraud any creditor and (b) received reasonably equivalent value in exchange for its obligations under such Loan Documents.  Upon the closing of the Loan, the fair saleable value of Borrower's assets exceeds and will, immediately following the making of the Loan, exceed Borrower's total liabilities, including, without limitation, subordinated, unliquidated, disputed and contingent liabilities.  The fair saleable value of Borrower's assets is and will, immediately following the making of the Loan, be greater than Borrower's probable liabilities, including the maximum amount of its contingent liabilities on its debts as such debts become absolute and matured. Borrower's assets do not and, immediately following the making of the Loan will not, constitute unreasonably small capital to carry out its business as conducted or as proposed to be conducted. Borrower does not intend to, and does not believe that it will, incur debt and liabilities (including contingent liabilities and other commitments) beyond its ability to pay such debt and liabilities as they mature (taking into account the timing and amounts of cash to be received by Borrower and the amounts to be payable on or in respect of obligations of Borrower).  No petition in bankruptcy has been filed against any Borrower Party, and no Borrower Party has ever made an assignment for

68

the benefit of creditors or taken advantage of any insolvency act for the benefit of debtors. No Borrower Party is contemplating either the filing of a petition by it under any state or federal bankruptcy or insolvency laws or the liquidation of all or a major portion of any Borrower Party's assets or property, and Borrower has no knowledge of any Person contemplating the filing of any such petition against any Borrower Party.

4.1.9 **Full and Accurate Disclosure**. No statement of fact made by Borrower in this Agreement or in any of the other Loan Documents contains any untrue statement of a fact and Borrower has no knowledge that any such statement omits to state any fact necessary to make statements contained herein or therein not misleading. There is no fact of which Borrower has knowledge which has not been disclosed to Agent which adversely affects, nor as far as Borrower can foresee, might adversely affect the Property or the Collateral or the business, operations or condition (financial or otherwise) of Borrower. As of the date of this Agreement Borrower has delivered to Agent all Contracts relating to the Property, and has specified in writing to Agent any contract or agreement relating to the Property where a Borrower Related Party is a party thereto. As of the date of this Agreement, to the best of Borrower's knowledge, Borrower has delivered to Agent all documentation relating to the zoning and entitlement of the Property.

4.1.10 **No Plan Assets**. As of the date hereof and throughout the term of this Agreement (i) Borrower is not an "employee benefit plan," as defined in Section 3(3) of ERISA which is subject to title I of ERISA, (ii) none of the assets of Borrower constitutes or will constitute "plan assets" of one or more such plans within the meaning of 29 C.F.R. Section 2510.3-101 as modified by Section 3(42) of ERISA ("**Plan Assets**"), (iii) Borrower is not and will not be a "governmental plan" within the meaning of Section 3(32) of ERISA, and (iv) Borrower is not and will not be subject to state statutes regulating investment of, and fiduciary obligations with respect to, governmental plans that would be violated by the transaction contemplated by this Agreement. As of the date hereof, neither Borrower nor any ERISA Affiliate maintains, sponsors or contributes to a pension plan" (within the meaning of Section 3(2) of ERISA) that is subject to Title IV of ERISA. Borrower's representations in this Section 4.1.10 above and in Section 5.2.8 below are based on the assumption that no portion of the assets used by Lender in connection with the transactions contemplated under this Agreement and the other Loan Documents constitutes assets of a (i) "benefit plan investor" within the meaning of Section 3(42) of ERISA, unless the Lender relied on an available prohibited transaction exemption, all of the conditions of which are satisfied or (ii) governmental plan which is subject to any provision which is similar to the prohibited transaction provisions of Title I of ERISA or Section 4975 of the Code ("**Applicable Similar Law**"), unless the acquisition and holding of the Loan or any interest therein does not give rise to a violation of any such Applicable Similar Law.

4.1.11 **Compliance**. Borrower and the Property (including, but not limited to, the Improvements) and the current (and after Substantial Completion, intended) use thereof comply in all respects with all applicable Legal Requirements, including, without limitation, building and zoning ordinances and codes. The Property is currently zoned and entitled as necessary, and pursuant to all Legal Requirements, for the use of the Property as a mixed use residential, retail and office condominium building (together with such other uses as described in the definition of Project or the Business Plan). Borrower is not in default or violation of any order, writ, injunction, decree or demand of any Governmental Authority. There has not been committed by any Borrower

69

Party, Construction Manager, or, to the best of Borrower's knowledge, any other Person in occupancy of or involved with the operation or use of the Property any act or omission affording the federal government or any other Governmental Authority the right of forfeiture as against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents. All necessary action has been taken to construct the Project in accordance with the Loan Documents and the full use of the Property for its intended purpose under applicable Legal Requirements and in accordance with this Agreement. The Improvements on the Property comply with all applicable Legal Requirements. There are no open violations or notices of violations of any Legal Requirements relating to Borrower or the Property.

4.1.12 **Americans with Disabilities Act Compliance**. The Project Improvements will be designed, and will be constructed and completed, and thereafter maintained, in strict accordance and full compliance with all of the requirements of the ADA. Borrower shall be responsible for all ADA compliance costs.

4.1.13 **Financial Information**. All reports, documents, instruments, information and financial data, including, without limitation, the statements of cash flow and income and operating expense and evidence of equity, that have been delivered to Agent in connection with the Loan (i) are true, complete and correct, (ii) accurately represent the financial condition of Borrower, Guarantor and the Property, as applicable, as of the date of such reports, and (iii) to the extent prepared or audited by an independent certified public accounting firm, have been prepared in accordance with GAAP or on an income tax basis throughout the periods covered, except as disclosed therein. Borrower does not have any contingent liabilities, liabilities for taxes, unusual forward or long-term commitments or unrealized or anticipated losses from any unfavorable commitments reasonably likely to have an adverse effect on the Collateral, the Property, the operations thereof or Borrower's ability to repay the Loan in accordance with the Loan Documents, except as referred to or reflected in said financial statements or disclosed to Agent in writing. Since the date of such financial statements, there has been no adverse change in the financial condition, operations or business of Borrower from that set forth in said financial statements.

4.1.14 **Condemnation**. No Condemnation or other proceeding has been commenced or, to Borrower's knowledge, threatened or contemplated, with respect to all or any portion of the Property or for the relocation of roadways providing access to the Property.

4.1.15 **Federal Reserve Regulations**. No part of the proceeds of the Loan will be used for the purpose of purchasing or acquiring any "margin stock" within the meaning of Regulation U of the Board of Governors of the Federal Reserve System or for any other purpose which would be inconsistent with such Regulation U or any other Regulations of such Board of Governors, or for any purposes prohibited by Legal Requirements or by the terms and conditions of this Agreement or the other Loan Documents.

4.1.16 **Bank Holding Company**. Borrower is not a "bank holding company" or a direct or indirect subsidiary of a "bank holding company" as defined in the Bank Holding Company Act of 1956, as amended, and Regulation Y thereunder of the Board of Governors of the Federal Reserve System.

70

4.1.17   **Easements; Utilities and Public Access**.

(a)      All easements, cross or reciprocal easements, licenses, air rights and rights-of-way or other similar property interests (collectively, "**Easements**"), if any, necessary for the construction of, completion and full utilization of the Project Improvements for their intended purposes have been obtained, are described in the Title Insurance Policy and are in full force and effect without default thereunder. The Property has rights of access to public ways and is served by water, sewer, sanitary sewer storm drain facilities and all other public utilities adequate for the use, construction, operation, maintenance and sale of the Property as intended. All roads and streets necessary for the full utilization of the Improvements for their intended purpose have been completed and dedicated to public use and accepted by such Governmental Authority allowing for the use and operation of, and access to the Project Improvements.

(b)      All public utilities necessary or convenient for the full use and enjoyment of the Property as intended are located either in the public right-of-way abutting the Property (which are connected so as to serve the Property without passing over other property) or in recorded easements serving the Property and such easements are set forth in and insured by the Title Insurance Policy.

4.1.18   **Not a Foreign Person**. Borrower is not a "foreign person" within the meaning of §1445 or §7701 of the Code.

4.1.19   **Separate Lots**. The Property is comprised of one (1) or more parcels which constitute a separate tax lot or lots and does not constitute a portion of any other tax lot not a part of the Property.

4.1.20   **Assessments**.  Borrower has no knowledge of any pending or proposed special or other assessments for public improvements or otherwise affecting the Property, or any contemplated improvements to the Property that may result in such special or other assessments, other than as disclosed to Agent in writing and which are contemplated in the Project Budget.

4.1.21   **Control.** Key Man (i) is actively involved in the Project and the day to day operation and management thereof, (ii) directly or indirectly Controls Borrower, Sole Member and the operation and development of the Project, and (iii) directly or indirectly owns (and at all times shall own) not less than 6.25% of the direct and/or indirect membership interests in Borrower and the Project.

4.1.22   **Insurance**.  Borrower has obtained and has delivered to Agent certificates representing the Policies reflecting the insurance coverages, amounts and other requirements set forth in this Agreement.  No claims have been made or are currently pending, outstanding or otherwise remain unsatisfied under any such Policy, and neither Borrower nor any other Person, has done, by act or omission, anything which would impair the coverage of any such Policy.

4.1.23   **Flood Zone.**  None of the Improvements are within an area that has been designated or identified as an area having special flood hazards by the Secretary of Housing and Urban Development or by such other official as shall from time to time be authorized by federal or state law to make such designation pursuant to the National Flood Insurance Act of 1968, as such

act may from time to time be amended, or pursuant to any other national, state, county or city program of flood control.

4.1.24 **Physical Condition**. To the best of Borrower's knowledge, the Property, including, without limitation (in each case, to the extent applicable), all buildings, Improvements, sidewalks, storm drainage systems, roofs, plumbing systems, HVAC systems, fire protection systems, electrical systems, equipment, elevators, exterior sidings and doors, landscaping and all structural components, are in good condition, order and repair in all material respects. To the best of Borrower's knowledge, there exists no structural or other material defects or damages in or to the Property, whether latent or otherwise, and Borrower has not received any notice from any insurance or bonding company of any defects or inadequacies in the Property, or any part thereof, which would adversely affect the insurability of the same or cause the imposition of extraordinary premiums or charges thereon or of any termination or threatened termination of any policy of insurance or bond.

4.1.25 **Boundaries / Survey**. All of the improvements which were included in determining the appraised value of the Property lie wholly within the boundaries and building restriction lines of the Property. No improvements on adjoining properties encroach upon the Property, and no Easements or other encumbrances upon the Property encroach upon any of the Improvements, so as to affect the value or marketability of the Property except those which are insured against by the Title Insurance Policy. To the best of Borrower's knowledge, the Survey for the Property delivered to Agent in connection with this Agreement does not fail to reflect any matter customarily disclosed in a survey affecting the Property or the title thereto.

4.1.26 **Leases**. The Property is not subject to any Leases or other occupancy agreement, including but not limited to any ground lease or similar lease agreement, and no Person (other than Borrower) has, or claims, any possessory interest in the Property or right to occupy the same.

4.1.27 **Inventory**. Borrower is the owner of all of the Equipment, Fixtures and Personal Property (as such terms are defined in the Mortgage) located on or at the Property and shall not lease any Equipment, Fixtures or Personal Property other than with Agent's prior written consent. All of the Equipment, Fixtures and Personal Property are sufficient to operate the Property in the manner required hereunder and in the manner in which it is currently operated.

4.1.28 **Filing and Recording Taxes**. All transfer taxes, deed stamps, intangible taxes or other amounts in the nature of transfer taxes required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the transfer of the Property to Borrower have been paid.

4.1.29 **Special Purpose Entity/Separateness**. Until all amounts due hereunder have been paid in full, Borrower hereby represents warrants and covenants that each of Borrower and Sole Member are, shall be and shall continue to be a Special Purpose Entity, in accordance with the terms of this Agreement.

4.1.30 **Illegal Activity**. The Loan is a business loan transaction in the stated amount solely for the purpose of carrying on the business of Borrower and none of the proceeds of

the Loan will be used for personal, family or agricultural purposes.  No portion of the Property has been or will be purchased with proceeds of any illegal activity.

4.1.31    **No Change in Facts or Circumstances; Disclosure**. The information submitted by and on behalf of Borrower to Agent and all financial statements, reports, certificates and other documents submitted in connection with the Loan or in satisfaction of the terms thereof and all statements of fact made by Borrower in this Agreement or in any other Loan Document, are accurate, complete and correct. There has been no adverse change in any condition, fact, circumstance or event that would make any such information inaccurate, incomplete or otherwise misleading or that otherwise adversely affects or might adversely affect the use, operation or value of the Collateral, the Property or the construction and marketability of the Project and the sale of Units or the business operations or the financial condition of Borrower.

4.1.32    **Investment Company Act**.  Borrower is not (a) an "investment company" or a company "controlled" by an "investment company," within the meaning of the Investment Company Act of 1940, as amended; (b) a "holding company" or a "subsidiary company" of a "holding company" or an "affiliate" of either a "holding company" or a "subsidiary company" within the meaning of the Public Utility Holding Company Act of 2005, as amended; or (c) subject to any other federal or state law or regulation which purports to restrict or regulate its ability to borrow money.

4.1.33    **Principal Place of Business; State of Organization.**

(a)    Borrower's exact legal name is: 135 West 52nd Street Owner LLC, a Delaware limited liability company. Borrower's Organizational Number is 5231802 and its Tax I.D. number is 46-1340806.  Borrower's principal place of business as of the date hereof is the address set forth in the introductory paragraph of this Agreement.  Borrower is a limited liability company organized under the laws of the State of Delaware and is in good standing in Delaware and is qualified to do business in the State of New York.

(b)    Sole Member's exact legal name is: 135 West 52nd Street Mezz LLC, a Delaware limited liability company. Sole Member's Organizational Number is 5297063 and its Tax I.D. number is 90-0949732. Sole Member's principal place of business as of the date hereof is the address set forth in the introductory paragraph of this Agreement. Sole Member is a limited liability company organized under the laws of the State of Delaware and is in good standing in Delaware.

4.1.34    **Taxes**. As of the Closing Date, and on every date thereafter on which these representations are remade, all tax returns required to be filed by Borrower in any jurisdiction have been filed (or extensions have been granted with respect to such filing) and all taxes, assessments, fees, and other governmental charges upon Borrower or upon any of its properties, income or franchises (including, without limitation, all state, county and municipal mortgage, mortgage recording, stamp, intangible or other similar tax required to be paid by any Person under applicable Legal Requirements currently in effect in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including, without limitation, the Mortgage) have been paid that are required to be paid prior to the time that the non-payment of such taxes could give rise to a lien on any asset of Borrower, unless such tax,

73

assessment, fee or charge is being contested in accordance with <u>Section 5.1.2</u> hereof. To Borrower's knowledge, there is no material proposed tax assessment against the Property (or any portion thereof) or to Borrower's knowledge any basis for such assessment which is material and has not been disclosed to Agent. The Property is separately assessed from all other adjacent land for purposes of real estate taxes, and for all purposes may be dealt with as an independent parcel. The Property is not presently benefitted by any tax abatement such as those available pursuant to "421-a" or "J-51" programs.

   4.1.35 **Condominium Documents**. Borrower has provided Agent with a true, correct and complete copy of the Offering Plan (including the form of Declaration of Condominium and By-Laws annexed thereto) in the form submitted to DOL and previously provided to Agent, and Borrower has paid any and all amounts due and payable by Borrower in connection with such submission. The Offering Plan (i) complies with all applicable Legal Requirements (including, without limitation, all Federal and State Securities Laws, all Federal and State Truth-in-Lending Statutes, and HUD filings regarding interstate sales, if applicable), (ii) contains provisions which (from and after the Conversion Date) will (a) permit the Property to be encumbered by a mortgage subordinate to the Declaration of Condominium, and (b) provide Agent (on behalf of Lender) the opportunity to cure any default under the Condominium Documents that is curable by an owner of a Unit, after the receipt of notice of the default, before the Condominium Board or its representative thereunder may exercise remedies against Borrower or the Property or any Unsold Units; (iii) does not contain any provision which will at any time prevent the exercise of any and all remedies available to the holder of the Loan, including acquisition of fee title to the remaining Units then owned by Borrower through foreclosure, deed in lieu thereof or otherwise, by their terms or under applicable law without the requirement for consent of or approval by the Condominium Board or any Unit owner. No other Condominium Documents have been (a) submitted or filed with the DOL or any other Governmental Authority or (b) distributed to any potential purchasers of any Units. Borrower does and shall continue to comply with the terms of the Offering Plan and all Legal Requirements (including, without limitation, all Federal and State Securities Laws) pertaining thereto.

   4.1.36 **Unit Contracts**.  All Unit Sale Contracts entered into by Borrower (x) will be, subject to the terms and conditions therein contained and applicable law, the valid and binding obligations of Borrower and the purchaser (subject to principles of equity and bankruptcy, insolvency and other laws generally applicable to creditors' rights and the enforcement of debtors' obligations; and assuming the competence, of the purchaser and the execution and delivery of the applicable contract to Borrower by the purchaser) and, except as approved by Agent with respect to an individual Unit Sale Contract, shall not be rescindable for any reason except for failure to complete construction of the Project Improvements, as required in accordance with applicable Legal Requirements or as otherwise set forth in the Offering Plan, and (y) shall be in the form of Unit Sale Contract set forth in the Offering Plan, subject to non-material modifications of customary negotiable terms pursuant to bona fide arms-length negotiations in connection with the sale of Units.

   4.1.37 **Trade Name; Other Intellectual Property**. Borrower owns and possesses or licenses (as the case may be) all such trademarks, trademark rights, patents, patent rights, trade names, trade name rights, service marks, service mark rights, websites, domain names

74

and copyrights, as more particularly described on Schedule II, as Borrower considers necessary for the conduct of its business as now conducted without, individually or in the aggregate, any infringement upon rights of other Persons, in each case except as could not reasonably be expected to (i) adversely affect the value of the Property, (ii) impair the use and operation of the Property or (iii) impair Borrower's ability to pay its obligations in a timely manner, and there is no individual patent, patent right, trademark, trademark right, trade name, trade name right, service mark, service mark right or copyright the loss of which would (a) adversely affect the value of the Property, (b) impair the use and operation of the Property or the construction of the Project and marketability and sale of Units or (c) impair Borrower's ability to pay its obligations in a timely manner (collectively, the "**Intellectual Property**").

4.1.38   **Architect's Contract**.   (i) The Architect's Contract is in full force and effect and has not been amended; (ii) Borrower and Borrower's Architect are in compliance with their respective obligations under the Architect's Contract; and (iii) the work to be performed by Borrower's Architect under the Architect's Contract shall be the architectural services required to design the Project Improvements to be built in accordance with the Plans and Specifications and all architectural services required to complete the Project Improvements in accordance with the Plans and Specifications as provided for under the Architect's Contract.

4.1.39   **No Other Debt**.   Other than prior loans which are being repaid in full on the date hereof, Borrower has not borrowed or received debt financing other than the Debt and the Other Debt, and there is no other Indebtedness to which Borrower is a party or by which Borrower or the Property or any excess cash flow or any residual interest therein is bound, whether secured or unsecured.

4.1.40   **Major Contracts.**

(a)   Borrower has not entered into, and neither Borrower nor the Property is bound by, any Major Contract which continues in existence, except those previously disclosed in writing to Agent.

(b)   Each of the Major Contracts is in full force and effect, there are no monetary or other material defaults by Borrower thereunder and, to the knowledge of Borrower, there are no monetary or other material defaults thereunder by any other party thereto.  None of Borrower, Construction Manager or any other Person acting on Borrower's behalf has given or received any notice of default under any of the Major Contracts that remains uncured or in dispute.

(c)   Neither the execution and delivery of the Loan Documents nor Borrower's performance thereunder will adversely affect the rights of Borrower under any Major Contract or require the consent or approval of any Person thereunder (other than consents and approvals which have been obtained and written copies of which have been delivered to Agent on or prior to the Closing Date).

(d)   Borrower has delivered true, correct and complete copies of the Major Contracts (including all amendments and supplements thereto) to Agent.

(e)     No Major Contract has as a party an Affiliate of Borrower. All fees and other compensation for services previously performed under the Construction Management Agreement have been paid in full.

4.1.41 **Labor Relations**. As of the date hereof, Borrower is not a party to any collective bargaining agreement. To Borrower's knowledge, there are no material grievances, disputes or controversies with any union or any other organization of employees at the Property, or threats of strikes, work stoppages or any asserted pending demands for collective bargaining by any union or organization.

4.1.42 **Purchase Options**. Neither the Property nor any part thereof are subject to any purchase or lease options, rights of first refusal, rights of first offer or other similar rights in favor of any Person.

4.1.43 **Interests in Borrower Certificated**. The limited liability company interests in Borrower are and shall at all times during the Term be evidenced by a "certificated security" governed by Article 8 of the UCC.  Borrower has "opted in" to Article 8 of the UCC, has not opted out and shall not opt out of such Article 8 of the UCC, and shall cause a registry of the holders of limited liability company interests in Borrower to be maintained at all times.

**Section 4.2     Incorporation of Representations**. All representations and warranties contained in any other Loan Document (including, without limitation, any Officer's Certificate) furnished to Agent by or on behalf of Borrower, as part of or in support of its application for the Loan or pursuant to this Agreement or any of the other Loan Documents are hereby incorporated by reference as if fully set forth herein.

**Section 4.3     Survival of Representations**. Borrower agrees that all of the representations and warranties of Borrower set forth in <u>Section 4.1</u> and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Agent or Lender under this Agreement or any of the other Loan Documents by Borrower. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied upon by Agent and Lender notwithstanding any investigation heretofore or hereafter made by Agent and Lender or on their behalf.

**ARTICLE V**

**BORROWER COVENANTS**

**Section 5.1     Affirmative Covenants**. From the date hereof and until the Repayment Date, Borrower hereby covenants and agrees with Agent and Lender that:

5.1.1     **Existence; Compliance with Legal Requirements**.  Borrower shall do or cause to be done all things necessary to preserve, renew and keep in full force and effect its existence, rights, licenses, permits and franchises and comply with all Legal Requirements applicable to it, the Property and the Collateral.  There shall never be committed by Borrower, and Borrower shall never permit any other Person in occupancy of or involved with the operation or

76

use of the Property to commit any act or omission affording any Governmental Authority the right of forfeiture against the Property or any part thereof or any monies paid in performance of Borrower's obligations under any of the Loan Documents.  Borrower hereby covenants and agrees not to commit, permit or suffer to exist any act or omission affording such right of forfeiture. Borrower shall at all times maintain, preserve and protect all franchises and trade names and preserve all the remainder of its property used or useful in the conduct of its business and shall keep the Property in reasonably good working order and repair, and from time to time make, or cause to be made, all reasonably necessary repairs, renewals, replacements, betterments and improvements thereto, all as more fully provided in the Mortgage.  Borrower shall promptly repair, replace or rebuild any part of the Property than becomes damaged, worn or dilapidated and shall complete and pay for any Improvements at any time in the process of construction or repair, to the extent a prudent operator of a Property similar to the Property would do so.  Borrower shall keep the Property insured at all times by financially sound and reputable insurers, to such extent and against such risks, and maintain liability and such other insurance, as is more fully provided in this Agreement. After prior written notice to Agent, Borrower, at its own expense, may contest by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any Legal Requirement, the applicability of any Legal Requirement to Borrower or the Property or any alleged violation of any Legal Requirement, provided that (i) no monetary Default, material non-monetary Default or Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of the Mortgage and shall not constitute a default thereunder or the other Loan Documents and such proceeding shall be conducted in accordance with all applicable Legal Requirements; (iii) none of the Collateral, the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall promptly upon final determination thereof comply with any such Legal Requirement determined to be valid or applicable or cure any violation of any Legal Requirement; (v) such proceeding shall suspend the enforcement of the contested Legal Requirement against Borrower or the Property; (vi) Borrower shall furnish such security as may be required in the proceeding, or as may be requested by Agent, to insure compliance with such Legal Requirement, together with all interest and penalties payable in connection therewith; and (vii) such contest shall not delay or affect the construction of the Project or adversely affect the sale of Units or the operation of the Property, each as required under this Agreement. Agent may apply any such security, as necessary to cause compliance with such Legal Requirement at any time when, in the judgment of Agent, the validity, applicability or violation of such Legal Requirement is finally established, the Collateral or the Property (or any part thereof or interest therein) could be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of the Mortgage being primed by any related Lien.

5.1.2 **Taxes and Other Charges**. Borrower shall pay all Taxes and Other Charges now or hereafter levied or assessed or imposed against the Property or any part thereof as the same become due and payable. Borrower will deliver to Agent receipts for payment or other evidence satisfactory to Agent that the Taxes and Other Charges have been so paid or are not then delinquent no later than ten (10) days prior to the date on which the Taxes and/or Other Charges would otherwise be delinquent if not paid. Borrower shall furnish to Agent receipts for the payment of the Taxes and the Other Charges prior to the date the same shall become delinquent. Borrower shall not suffer and shall promptly cause to be paid and discharged any Lien or charge

whatsoever which may be or become a Lien or charge against the Property, and shall promptly pay for all utility services provided to the Property. After prior written notice to Agent, Borrower, at its own expense, may contest by appropriate legal proceeding, promptly initiated and conducted in good faith and with due diligence, the amount or validity or application in whole or in part of any Taxes or Other Charges, underlined provided that (i) no monetary Default, material non-monetary Default or Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and be conducted in accordance with the provisions of any other instrument to which Borrower is subject and shall not constitute a default thereunder and such proceeding shall be conducted in accordance with all applicable Legal Requirements; (iii) neither the Property nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (iv) Borrower shall promptly upon final determination thereof pay the amount of any such Taxes or Other Charges, together with all costs, interest and penalties which may be payable in connection therewith; (v) such proceeding shall suspend the collection of such contested Taxes or Other Charges from the Property; (vi) Borrower shall furnish such security as may be required in the proceeding, or as may be reasonably requested by Agent, to insure the payment of any such Taxes or Other Charges, together with all interest and penalties thereon; (vii) such contest shall not delay or affect the construction of the Project or adversely affect the sale of Units or the operation of the Property, each as required under this Agreement; and (viii) failure to pay such Taxes or Other Charges will not subject Lender or Agent to any civil or criminal liability; and (ix) Borrower shall, upon requested by Agent, give Agent prompt notice of the status of such proceedings and/or confirmation of the continuing satisfaction of the conditions set forth in clauses (i) through (viii) of this Section 5.1.2.  Agent may pay over any such cash deposit or part thereof held by Agent to the claimant entitled thereto at any time when, in the judgment of Agent, the entitlement of such claimant is established or the Property or the Collateral (or part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost or there shall be any danger of the Lien of the Mortgage or the Collateral being primed by any related Lien.

       5.1.3 **Costs**.  Subject to the contest rights permitted hereunder and solely to the extent the same are pursued in accordance with this Agreement, Borrower shall pay when due all Project Related Costs, Carry Costs, Debt Service and other costs and expenses required under this Agreement and all other Contracts to which Borrower is a party for the construction and ownership of the Project Improvements in accordance with the provisions of this Agreement, including without limitation, any repair and restoration of the Project Improvements.

       5.1.4 **Litigation**.  Borrower shall give prompt written notice to Agent of any litigation, mediation, arbitration or proceedings that is pending or threatened in writing against any Borrower Party or relates to the Property, Collateral or the Condominium (including any arbitration proceedings under any Condominium Documents) if such proceeding, together with the claims under all other proceedings of which Borrower has not provided Agent notice pursuant to this Section 5.1.4, if determined adversely to Borrower, the Property, Collateral and/or the Condominium, could result in liability in excess of $100,000 in the aggregate. Borrower shall not initiate or settle any litigation (or permit any other Person to initiate or settle any litigation) without Agent's prior written consent, which consent shall not be unreasonably withheld, and shall keep Agent apprised of the status of any litigation.

5.1.5     **Access to Property**. Borrower shall permit Agent, the Construction Consultant and their respective representatives, upon prior notice to enter upon the Property, inspect the Project Improvements and all materials to be used in the construction thereof, to examine the Plans and Specifications or any Contracts, Governmental Approvals or other documentation relating to the Project requested by Agent or the Construction Consultant and to perform such testing as Agent or Construction Consultant reasonably deem desirable at the Project at all times at which Agent or the Construction Consultant reasonably deems necessary or desirable. Borrower shall cooperate, and cause the Construction Manager and the Contractors to cooperate, with Agent and Construction Consultant to enable each Person to perform its functions hereunder. Agent, Construction Consultant or their agents, representatives, consultants and employees as part of any inspection may take soil, air, water, building material and other samples from the Property and shall have the right to undertake testing of such soil, air, water, building material and other samples at Borrower's cost and expense in the event that, in Agent's opinion, such testing is necessary.

5.1.6     **Notice of Default**. Borrower shall promptly advise Agent of any adverse change in Borrower's condition, financial or otherwise, or of the occurrence of any Default or Event of Default of which Borrower has knowledge.

5.1.7     **Cooperate in Legal Proceedings**. Borrower shall cooperate fully with Agent with respect to any proceedings before any court, board or other Governmental Authority or tribunal (including any arbitration or mediation) which may in any way adversely affect the rights of Agent or Lender hereunder or any rights obtained by Agent or Lender under any of the other Loan Documents and, in connection therewith, permit Agent, at its election and expense, to participate in any such proceedings; provided, however, that if any such proceeding is reasonably likely to adversely affect Agent or Lender, such participation shall be at Borrower's expense.

5.1.8     **Perform Loan Documents**. Borrower shall observe, perform and satisfy all the terms, provisions, covenants and conditions of, and shall pay when due all costs, fees and expenses to the extent required under the Loan Documents executed and delivered by, or applicable to, Borrower.

5.1.9     **Award and Insurance Benefits**. Borrower shall cooperate with Agent in obtaining for Agent the benefits of any Net Proceeds lawfully or equitably payable in connection with the Property, and Agent shall be reimbursed for any third party expenses actually incurred in connection therewith (including reasonable attorneys' fees and disbursements, and the payment by Borrower of the expense of an Appraisal on behalf of Agent in case of Casualty or Condemnation affecting the Property or any part thereof) out of such Net Proceeds.

5.1.10   **Further Assurances**. Borrower shall, at Borrower's sole cost and expense:

(a)     furnish to Agent all instruments, documents, boundary surveys, footing or foundation surveys, certificates, plans and specifications, appraisals, title and other insurance reports and agreements, and each and every other document, certificate, agreement and instrument required to be furnished by Borrower pursuant to the terms of the Loan Documents or which are requested by Agent in connection therewith;

(b)    cure any defects in the execution and delivery by Borrower or a Borrower Related Party of the Loan Documents and execute and deliver to Agent such documents, instruments, certificates, assignments and other writings, and do such other acts necessary or desirable, to evidence, preserve and/or protect the Property, Collateral and any other collateral at any time securing or intended to secure the obligations of Borrower under the Loan Documents, as Agent may  require including, without limitation, the execution and delivery of all such writings necessary to transfer any licenses with respect to the Property into the name of Agent or its designee after the occurrence, and during the continuance, of an Event of Default; and

(c)    do and execute all and such further lawful and reasonable acts, conveyances and assurances for the better and more effective carrying out of the intents and purposes of this Agreement and the other Loan Documents, as Agent shall require from time to time.

5.1.11    **Principal Place of Business, State of Organization**. Borrower will not cause or permit any change to be made in its name, identity or corporate or partnership structure. Borrower's principal place of business and chief executive office, and the place where Borrower keeps its books and records, including recorded data of any kind or nature, regardless of the medium or recording, including software, writings, plans, specifications and schematics, has been for the entire period of the existence of Borrower and will continue to be the address of Borrower set forth at the introductory paragraph of this Agreement, unless Borrower provides Agent with thirty (30) days written notice of any change of the foregoing and adequate information as to the new location of Borrower's principal place of business, chief executive office and location of its books and records.  Borrower's organizational identification number, if any, assigned by the state of incorporation or organization is correctly set forth in the introductory paragraph of this Agreement. Borrower shall promptly notify Agent of any change in its organizational identification number. If Borrower does not now have an organizational identification number and later obtains one, Borrower promptly shall notify Agent of such organizational identification number.

5.1.12    **Financial and Other Reporting.**

(a)    Borrower will keep and maintain or will cause to be kept and maintained on a Fiscal Year basis, in accordance with GAAP or on an income tax basis throughout the periods covered (or such other accounting basis acceptable to Agent), complete and accurate books, records and accounts reflecting the financial affairs of Borrower and all items of income and expense in connection with the operation of the Property. Agent shall have the right from time to time at all times during normal business hours upon reasonable prior notice to examine such books, records and accounts at the office of Borrower or any other Person maintaining such books, records and accounts and to make such copies or extracts thereof as Agent shall desire. After the occurrence of an Event of Default, Borrower shall pay any costs and expenses incurred by Agent and Lender to examine Borrower's accounting records with respect to the Property, as Agent shall determine to be necessary or appropriate in the protection of Agent's and Lender's interest.  Upon Agent's request, Borrower shall furnish, to the extent in any Borrower Related Party's possession or control, such other information necessary and sufficient to fairly represent the financial condition of Borrower and the Property.

80

(b)      Borrower will deliver to Agent:

(i)      on or before thirty (30) days after the end of each calendar month, and accompanied by an Officer's Certificate stating that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower and the Property (subject to normal year-end adjustments), as applicable, monthly and year-to-date operating statements (including operating income and operating expenses) prepared for each calendar month, noting all Unit sales closing during such month (and the Net Sales Proceeds thereof) and all Unit Sales Contracts and Leases entered into during such months (and the sales prices and/or rental rates provided for therein, as applicable), operating expenses, updates to the Leasing Report and the Sales and Marketing Report, a log of Stored Materials in a form acceptable to Agent, and such other information as Agent may reasonably request and other information necessary and sufficient to fairly represent the financial position and results of operation of Borrower (and, after the Conversion Date, the Condominium Board) and the Property during such calendar month and containing a comparison of budgeted income and expenses and the actual income and expenses together with a detailed explanation of any variances of five percent (5%) or more between budgeted amounts (as provided in the Business Plan approved by Agent) and actual amounts for such periods, all in form satisfactory to Agent. In addition, to the extent not duplicative of materials already provided in connection with Advances, each month until Final Completion and upon final close-out of the Project Budget, Borrower shall provide a monthly cost report for the construction of the Project on a cumulative basis and broken down by Line Item, showing percentage of completion, the original budgeted amount, the current budgeted amount pursuant to an updated Project Budget approved by Agent, costs incurred to date, projected costs to complete, explanations of any Project Budget variances, a summary of any approved (or, as applicable, permitted) reallocations, a summary of permitted approved and pending Change Orders, an explanation of any variances from the approved Construction Schedule and an updated Construction Schedule for which Borrower has requested Agent's approval.

(ii)      quarterly, within forty-five (45) days following the end of each quarter of each Fiscal Year of Borrower, and accompanied by an Officer's Certificate stating that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower (and, after the Conversion Date, the Condominium Board) and the Property (subject to normal year-end adjustments), as applicable, a complete copy of Borrower's quarterly financial statements acceptable to Agent prepared in accordance with GAAP or on an income tax basis throughout the periods covered (or such other accounting basis acceptable to Agent), covering the Property for such quarter and including a balance sheet, statement of operations (income and expenses), statement of cash flow, contingent liability schedule, any other financial information with respect to Borrower (and, after the Conversion Date, the Condominium Board) or the Property as shall be reasonably required by Agent, and other information necessary and sufficient to fairly represent the financial position and results of operation of Borrower (and, after the Conversion Date, the Condominium Board) and the Property during such quarter.

81

(iii)    annually, within one hundred and twenty (120) days following the end of each Fiscal Year of Borrower, and accompanied by an Officer's Certificate stating that such items are true, correct, accurate, and complete and fairly present the financial condition and results of the operations of Borrower (and, after the Conversion Date, the Condominium Board) and the Property, as applicable, a complete copy of Borrower's (and, after the Conversion Date, the Condominium Board's) annual financial statements (which need not be audited, but, if audited, such audited statements shall be delivered to Agent) prepared by Marks Paneth LLP or another independent certified public accountant acceptable to Agent in accordance with GAAP or on an income tax basis throughout the periods covered (or such other accounting basis acceptable to Agent) covering the Property for such Fiscal Year and include a balance sheet, statement of operations (income and expenses), statement of cash flow, contingent liability schedule, as applicable, and any other financial information with respect to Borrower (and, after the Conversion Date, the Condominium Board) or Property as shall be reasonably required by Agent and other information necessary and sufficient to fairly represent the financial position and results of operation of Borrower (and, after the Conversion Date, the Condominium Board) and the Property during such Fiscal Year.

(c)    Borrower will deliver to Agent, in each case subject to Agent's approval in accordance with Section 5.2.11, (a) not later than thirty (30) days prior to the commencement of each Fiscal Year, a proposed updated Business Plan (including a Building Loan Budget and Project Budget, and any proposed updates to the Construction Schedule), and (b) as soon as practicable upon Borrower becoming aware of circumstances that could materially affect the then-existing Business Plan for any Fiscal Year, a proposed updated Business Plan for such Fiscal Year. Any material changes to the Business Plan shall be subject to Agent's prior written approval.

(d)    Borrower will deliver to Agent, in each case subject to Agent's approval in accordance with Section 5.2.11, (a) not later than thirty (30) days prior to the estimated date of Substantial Completion, an initial proposed Annual Budget for the remainder of the Fiscal Year in which Substantial Completion occurs; (b) not later than thirty (30) days prior to the commencement of each subsequent Fiscal Year, a proposed updated Annual Budget for such Fiscal Year; and (c) as soon as practicable upon Borrower becoming aware of circumstances that could materially affect the then-existing Annual Budget for any Fiscal Year, a proposed updated Annual Budget for such Fiscal Year. Until such time that Agent approves a proposed Annual Budget, the most recently Approved Annual Budget shall apply; provided that, such most recently Approved Annual Budget shall be adjusted to reflect actual increases in Taxes, Insurance Premiums and Other Charges.

(e)    For the partial year period commencing on the Conversion Date, and for each Fiscal Year thereafter, Borrower will furnish to Agent annually, no later than thirty (30) days prior to the commencement of each Fiscal Year, an updated operating and capital budget for the Condominium for the following Fiscal Year (each, a "**Condominium Budget**"), which, prior to the Board Turnover Date, shall be subject to Agent's prior written approval, in its reasonable discretion. After the Board Turnover Date, Borrower hereby covenants and agrees that it shall not vote (or permit its designees on the Condominium Board to vote) in favor of approving

or otherwise adopting a Condominium Budget that has not previously been approved in writing by Agent.

(f)     From and after Substantial Completion, as soon as practicable, but in any event no later than thirty (30) days after the end of each calendar quarter, Borrower shall deliver to Agent a certificate executed by an officer of a member of Borrower stating that a review of the activities of Borrower and the Property during such calendar quarter has been made by such individual and to the best knowledge and belief of such individual after reasonable and due investigation, (i) there exists no monetary Default or Event of Default as of the date of such certificate or, if any such event shall have occurred, specifying the nature and status thereof, (ii) to such Person's knowledge, no default, failure of performance of a term, provision or covenant or terminating event has occurred under any Major Contract that is reasonably likely to have a material adverse effect on the Property, Project or Conversion or on any Borrower Party's ability to perform their obligations under the Loan Documents, and Borrower has not received any notice that any party to any such Major Contract has challenged or denied the validity or enforceability thereof, given any notice of default, termination or intent to terminate thereunder, or if any such notice has been received or given, specifying the nature and status thereof, and (iii) there is no litigation, mediation or arbitration pending with respect to Borrower, the Property or the Condominium that is reasonably likely to have a material adverse effect on the Property, Project or Conversion or on any Borrower Party's ability to perform their obligations under the Loan Documents, or, if any such litigation, mediation, or arbitration is pending, specifying the nature and status thereof.

(g)     In the event that Borrower at any time must incur an Extraordinary Expense, then Borrower shall promptly deliver to Agent a reasonably detailed explanation of such proposed Extraordinary Expense for Agent's approval.

5.1.13  **Business and Operations**. Borrower will continue to engage in the ownership, maintenance, construction, development, management and operation of the Project and the sale of Units.  Borrower will qualify to do business and will remain in good standing under the laws of the jurisdiction as and to the extent the same are required for the ownership, maintenance, management and operation of the Property. Borrower shall at all times during the term of the Loan, continue to own all of the Equipment, Fixtures and Personal Property which are necessary to operate the Property in the manner required hereunder and in the manner in which it is currently operated.

5.1.14  **Title to the Property**. Borrower will warrant and defend (a) Borrower's title to the Property and every part thereof, subject only to Liens expressly permitted hereunder (including Permitted Encumbrances), (b) the validity and priority of the Lien of the Mortgage and the Assignment of Leases on the Property, subject only to Liens expressly permitted hereunder (including Permitted Encumbrances), (c) title to the Collateral and every part thereof, and (d) the validity and priority of the Liens of the Pledge Agreement on the Collateral, subject only to the Liens and security interests created by the Loan Documents, in each case against the claims of all Persons whomsoever.  Borrower shall reimburse Agent and Lender for any losses, costs, damages or expenses (including reasonable attorneys' fees and court costs) incurred by Agent or Lender if

an interest in the Property or the Collateral, other than as permitted hereunder, is claimed by another Person.

      5.1.15   **Costs of Enforcement**.  In the event (a) that the Mortgage is foreclosed in whole or in part or that the Mortgage is put into the hands of an attorney for collection, suit, action or foreclosure, (b) that the Pledge Agreement encumbering the Collateral is foreclosed in whole or in part or that the Pledge Agreement is put into the hands of an attorney for collection, suit, action or foreclosure, (c) of the foreclosure of any mortgage (or pledge) encumbering the Property (or any direct or indirect ownership interests in Borrower) prior to or subsequent to the Mortgage (or Pledge Agreement) in which proceeding Agent or Lender is made a party, or (d) of the bankruptcy, insolvency, rehabilitation or other similar proceeding in respect of Borrower, the Sole Member or any Guarantor or an assignment by Borrower, Sole Member or Guarantor for the benefit of its creditors, Borrower, its successors or assigns, shall be chargeable with and agrees to pay all costs of collection and defense, including reasonable attorneys' fees and costs, incurred by Agent or Lender in connection therewith and in connection with any appellate proceeding or post-judgment action involved therein, together with all required service or use taxes.

      5.1.16   **Estoppel Statement.**

      (a)   After request by Agent, but not more than twice during any calendar year unless an Event of Default has occurred and is continuing, Borrower shall within ten (10) Business Days furnish Agent with a statement, duly acknowledged and certified, setting forth (i) the original principal amount of the Note, (ii) the unpaid principal amount of the Note, (iii) the Interest Rate of the Note, the Exit Fee and any other amount payable to Agent and/or Lender under the Loan Documents (including, without limitation, the Return Differential), (iv) the date interest and/or principal were last paid, (v) any offsets or defenses to the payment of the Debt, if any, (vi) any unfunded portion of the total available amount of the Loan, if any, (vii) that the Note, this Agreement, the Mortgage and the other Loan Documents are valid, legal and binding obligations and have not been modified (or if modified, giving particulars of such modification), and (viii) such other items that Agent may reasonably request.

      (b)   From and after the Conversion Date and upon request by Agent, but not more than twice during any calendar year unless an Event of Default has occurred and is continuing, Borrower shall (and after the Board Turnover Date, shall use commercially reasonable efforts to) within ten (10) Business Days, cause the Condominium Board to furnish Agent with a statement, duly acknowledged and certified, setting forth (i) the current amount of the Assessments per Units owned by Borrower, (ii) the amount of the last Assessment paid and the date on which such payment was made, (iii) whether or not a default exists under the Condominium Documents on the part of Borrower, (iv) whether there have been any modifications to the Condominium Documents (or if modified, giving particulars of such modification), and (v) such other items that Agent may reasonably request.

      5.1.17   **Performance by Borrower**.  Borrower shall in a timely manner observe, perform and fulfill each and every covenant, term and provision of each Loan Document executed and delivered by, or applicable to, Borrower, shall not enter into or otherwise suffer or permit any amendment, waiver, supplement, termination or other modification of any Loan Document

executed and delivered by, or applicable to, Borrower or any other Borrower Party without the prior written consent of Agent. Borrower shall (i) at all times comply in all material respects with all Easements, covenants, restrictions, declarations or other agreements of record to which Borrower is a party or to which Borrower or the Property is bound, and (ii) without the prior written consent of Agent, will not terminate, or amend or modify in any material respect, any of the foregoing.

        5.1.18   **No Joint Assessment**.   Borrower shall not suffer, permit or initiate the joint assessment of the Property (a) with any other real property constituting a tax lot separate from the Property, and (b) which constitutes real property with any portion of the Property which may be deemed to constitute personal property, or any other procedure whereby the lien of any taxes which may be levied against such personal property shall be assessed or levied or charged to such real property portion of the Property.

        5.1.19   **Leasing.**

        (a)   Borrower may not enter into, amend, modify, or grant a waiver of any provision or right of Borrower under, or enter into or permit or suffer any assignment or sublease of, any Lease for any portion of the Property, without Agent's prior written consent, which Agent may withhold in its sole discretion. Notwithstanding the foregoing, without Agent's prior consent, Borrower may enter into any non-residential Lease which is not a Major Lease, and any renewal, amendment or modification of any non-residential Lease which is not a Major Lease (provided such renewal, amendment or modification is not a Major Lease) that meets the following requirements:  (i) such non-residential Lease provides for economic terms, including rental rates and ancillary service rates, comparable to existing local market rates for similar properties and is otherwise on commercially reasonable terms, (ii) unless a subordination, non-disturbance and attornment agreement acceptable to Agent in its reasonable discretion is delivered to Agent, such non-residential Lease provides that it is subordinate to the Mortgage and the Assignment of Leases and that the tenant thereunder will attorn to Agent and any purchaser at a foreclosure sale, and (iii) is with tenants that are creditworthy. Borrower shall not permit or consent to any assignment or sublease of any Major Lease without Agent's prior written approval (other than assignments or subleases expressly permitted under such Major Lease pursuant to a unilateral right of the tenant thereunder not allowing for any exercise of discretion by the Borrower). Upon request, Borrower shall furnish Agent with executed copies of all Leases then in effect. Agent, at Borrower's sole cost and expense, shall execute and deliver its standard form of subordination, non-disturbance and attornment agreement to tenants under any future non-residential Major Lease approved by Agent upon request, with such commercially reasonable changes as may be requested by such tenants and which are reasonably acceptable to Agent.

        (b)   Borrower (i) shall observe and perform the obligations imposed upon the lessor under the Leases in a commercially reasonable manner; (ii) shall enforce the terms, covenants and conditions contained in the Leases upon the part of the tenants thereunder to be observed or performed in a commercially reasonable manner, provided, however, Borrower shall not terminate or accept a surrender of a Major Lease without Agent's prior written approval, unless the tenant thereunder is in default under its Lease, and Borrower shall only terminate and/or accept a surrender of a Lease that is not a Major Lease if such action is commercially reasonable; (iii)

shall not collect any of the Rents more than one (1) month in advance (other than security deposits); (iv) shall not execute any assignment of lessor's interest in the Leases or the Rents (except as contemplated by the Loan Documents); and (v) shall not alter, modify or change any Major Lease so as to change the amount of or payment date for rent, change the expiration date, grant any option for additional space or term, materially reduce the obligations of the tenant or increase the obligations of the lessor.  Borrower shall promptly send copies to Agent of all written notices of material default which Borrower shall send or receive under the Leases.

(c)     All security deposits of tenants, whether held in cash or any other form, shall be held in compliance with all Legal Requirements.  During the continuance of an Event of Default, Borrower shall, upon Agent's request, if permitted by applicable Legal Requirements, cause all such security deposits (and any interest theretofore earned thereon) to be transferred into the Deposit Account (which shall then be held by Deposit Bank in a separate Account), which shall be held by Deposit Bank subject to the terms of the Leases.  Any bond or other instrument which Borrower is permitted to hold in lieu of cash security deposits under any applicable Legal Requirements (i) shall be maintained in full force and effect in the full amount of such deposits unless replaced by cash deposits as herein above described, (ii) shall, if permitted pursuant to any Legal Requirements, name Agent as payee or mortgagee thereunder (or at Agent's option, be fully assignable to Agent), and (iii) shall in all respects comply with any applicable Legal Requirements and otherwise be reasonably satisfactory to Agent. Borrower shall, upon request, provide Agent with evidence reasonably satisfactory to Agent of Borrower's compliance with the foregoing.

5.1.20   **Alterations**. Borrower shall obtain Agent's prior written consent to any alterations to any Improvements or the Property (other than for purposes of achieving Final Completion in accordance with this Agreement). Notwithstanding the foregoing, from and after Final Completion, Agent's consent shall be reasonable in its approval of (i) any alterations that will not have an adverse effect on Borrower's financial condition, the zoning, Governmental Approvals for the Project, the value of the Property or marketability or anticipated sales price of the Units, and not affecting any structural component of any Improvements, any utility or HVAC system contained in any Improvements or the exterior of any building constituting a part of any Improvements and which are not reasonably expected to cost more than $1,000,000 in the aggregate (as to any and all such alterations) (the "**Threshold Amount**"), or (ii) alterations performed in connection with the Restoration of the Property after the occurrence of a Casualty or Condemnation in accordance with the terms and provisions of this Agreement.  Agent's approval shall not be required for alterations to a Unit being sold as required by such Unit Sale Contract provided that, to the extent required by the Loan Documents, Agent has approved such Unit Sale Contract.  If, following Substantial Completion, the estimated cost of the alterations approved by Agent hereunder shall at any time exceed the Threshold Amount as determined by Agent acting in its sole but reasonable discretion, Borrower shall promptly prior to commencing such alterations, deliver to Agent (for the benefit of Lender) as security for the payment of such amounts and as additional security for Borrower's obligations under the Loan Documents any of the following: (A) cash, (B) U.S. Obligations, (C) other securities having a rating acceptable to Agent or (D) a completion and performance bond or an irrevocable letter of credit (payable on sight draft only) issued by a financial institution having a rating by S&P of not less than "A-1+" if the term of such bond or letter of credit is no longer than three (3) months or, if such term is in excess of three (3)

86

months, issued by a financial institution having a rating that is acceptable to Agent and in a form acceptable to Agent.  Such security shall be in an amount equal to the excess of the total estimated cost of the alterations as determined by Agent over the Threshold Amount and Agent may apply such security from time to time at the option of Agent to pay for such alterations.

5.1.21  **Survey**. Within 60 days after the date on which Substantial Completion has occurred, Borrower shall deliver to Agent an updated "as built" Survey, which shall be prepared and be certified to the Title Company, Agent and their respective successors and assigns, in accordance with a survey certification in the same form as the original Survey.

5.1.22  **Architect's Contract**. Borrower shall (a) enforce the provisions of the Architect's Contract in the best interests of the Project using sound business judgment, (b) waive none of the obligations of Borrower's Architect thereunder, (c) do no act which would relieve Borrower's Architect from its obligations under the Architect's Contract and (d) not enter into any amendments (other than de minimis amendments) to the Architect's Contract (or enter into any new or replacement architect's contract) without the prior written approval of Agent, in its reasonable discretion.  Upon request by Agent, Borrower shall cause Borrower's Architect to provide Agent with reports in regard to the status of construction of the Project Improvements, in such form and detail as requested by Agent.

5.1.23  **Special Purpose Entity**. Borrower shall (and shall cause Sole Member to) at all times continue to be a Special Purpose Entity, in accordance with the terms of this Agreement.  Borrower will not own or use any assets other than its interests in the Property and personal property incidental to the business of owning, constructing, operating and selling the Property and activities incidental thereto; without limiting the foregoing, the Property shall be operated as a single property or project, generating substantially all of Borrower's gross income, it being Borrower's intent that the Property shall at all times and from time to time constitute "single asset real estate" for purposes of Section 362(d)(3) of the Bankruptcy Code.

5.1.24  **Patriot Act.**

(a)    Borrower will use its good faith and commercially reasonable efforts to comply with the Patriot Act and all applicable requirements of Governmental Authorities having jurisdiction over Borrower and/or the Property, including those relating to money laundering and terrorism and shall put into place all policies, practices and procedures as required by Legal Requirements to insure that each Borrower Party and each of their direct or indirect owners are in compliance with the representations, warranties and covenants set forth in this Section 5.1.24. Agent shall have the right to audit Borrower's compliance with the Patriot Act and all applicable requirements of Governmental Authorities having jurisdiction over Borrower and/or the Property, including those relating to money laundering and terrorism. In the event that Borrower fails to comply with the Patriot Act or any such requirements of Governmental Authorities, then Agent may, at its option, cause Borrower to comply therewith and any and all costs and expenses incurred by Agent in connection therewith shall be secured by the Mortgage and the other Loan Documents and shall be immediately due and payable.

(b)    Neither Borrower nor any Borrower Party nor any direct or indirect owner of any Borrower Party (i) is listed on any Government Lists, (ii) is a person who has been

87

determined by competent authority to be subject to the prohibitions contained in Presidential Executive Order No. 13224 (Sept. 23, 2001) or any other similar prohibitions contained in the rules and regulations of OFAC or in any enabling legislation or other Presidential Executive Orders in respect thereof, (iii) has been previously indicted for or convicted of any felony involving a crime or crimes of moral turpitude or for any Patriot Act Offense, or (iv) is currently under investigation by any Governmental Authority for alleged criminal activity. For purposes hereof, the term "**Patriot Act Offense**" means any violation of the criminal laws of the United States of America or of any of the several states, or that would be a criminal violation if committed within the jurisdiction of the United States of America or any of the several states, relating to terrorism or the laundering of monetary instruments, including any offense under (A) the criminal laws against terrorism; (B) the criminal laws against money laundering, (C) the Bank Secrecy Act, as amended, (D) the Money Laundering Control Act of 1986, as amended, or (E) the Patriot Act. "**Patriot Act Offense**" also includes the crimes of conspiracy to commit, or aiding and abetting another to commit, a Patriot Act Offense. For purposes hereof, the term "**Government Lists**" means (1) the Specially Designated Nationals and Blocked Persons Lists maintained by the Office of Foreign Assets Control ("**OFAC**"), (2) any other list of terrorists, terrorist organizations or narcotics traffickers maintained pursuant to any of the Rules and Regulations of OFAC that Agent notified Borrower in writing is now included in "**Government Lists**", or (3) any similar lists maintained by the United States Department of State, the United States Department of Commerce or any other Governmental Authority or pursuant to any Executive Order of the President of the United States of America that Agent notified Borrower in writing is now included in "**Government Lists**".

(c)     At all times throughout the term of the Loan, including after giving effect to any Transfers permitted pursuant to the Loan Documents, (a) none of the funds or other assets of Borrower or any Borrower Party or any direct or indirect owner thereof are or shall constitute property of, or are or shall be beneficially owned, directly or indirectly, by any Person subject to trade restrictions under United States law, including, but not limited to, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701 et seq., The Trading with the Enemy Act, 50 U.S.C. App. 1 et seq., and any Executive Orders or regulations promulgated thereunder, with the result that the investment in Borrower or any other Borrower Party, as applicable (whether directly or indirectly), would be prohibited by law (each, an "**Embargoed Person**"), or the Loan made by Lender would be in violation of law, (b) no Embargoed Person shall have any interest of any nature whatsoever in Borrower or any other Borrower Party or any direct or indirect owner thereof , as applicable, with the result that the investment in Borrower or any other Borrower Party, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law, and (c) none of the funds of Borrower, any other Borrower Party or any direct or indirect owner thereof, as applicable, shall be derived from any unlawful activity with the result that the investment in Borrower or any other Borrower Party, as applicable (whether directly or indirectly), would be prohibited by law or the Loan would be in violation of law.

(d)     Borrower shall provide Agent with any information that Agent deems reasonably necessary from time to time and on Agent's request in order to ensure compliance with this Section 5.1.24 and the other provisions of this Agreement relating to the Patriot Act and any other Legal Requirements concerning money laundering and similar activities.

88

5.1.25   **Licenses; Intellectual Property; Website.**  Except to the extent the same are contributed to the Condominium Board in connection with the Conversion:

(a)   **Licenses**. Borrower shall keep and maintain all certifications, permits, licenses and approvals (including without limitation, certificates of completion and occupancy permits required of Borrower) for the legal use, occupancy and operation of the Property for its then-current use, and shall not transfer any of the foregoing.

(b)   **Intellectual Property**. Borrower shall keep and maintain all Intellectual Property relating to the use or operation of the Property and all Intellectual Property shall be held by and (if applicable) registered in the name of Borrower. Borrower shall not Transfer or let lapse any Intellectual Property without Agent's prior consent.

(c)   **Website**. Any website with respect to the Property shall be maintained by or on behalf of Borrower, and any such website shall be registered in the name of Borrower. Borrower shall not Transfer (or permit the Transfer of) any such website without Agent's prior consent.

5.1.26   **Business Maintenance**. Borrower shall maintain operational requirements for the Property such that the Property is maintained in accordance with the standards consistent with commercially reasonable customs and practices in the area where the Property is located (subject to normal wear and tear), and with the commercially reasonable customs and practice found in the development and management of first class mixed use condominium developments similar to the Property.

5.1.27   **Easements and Restrictions; Zoning**. Borrower shall submit to Agent for Agent's approval prior to the execution thereof by Borrower all proposed Easements, restrictions, covenants, permits, licenses, and other instruments which would affect the title to the Property or use of the Property for its intended purposes, accompanied by a Survey showing the exact proposed location thereof and such other information as Agent shall require. Borrower shall not subject the Property or any part thereof to any Easement, restriction or covenant (including any restriction or exclusive use provision in any lease or other occupancy agreement) which is not a Permitted Encumbrance without the prior approval of Agent. With respect to any and all existing Easements, restrictions, covenants or operating agreements which benefit or burden the Property, any Easement, restriction or covenant to which the Property may hereafter be subjected in accordance with the provisions hereof and any zoning or land use classification of the Property approved by Agent, Borrower shall: (a) observe and perform the obligations imposed upon Borrower or the Property; (b) not alter, modify or change the same without the prior written approval of Agent; (c) enforce its rights thereunder in a commercially reasonable manner so as to preserve for the benefit of the Property the full benefits of the same; and (d) deliver to Agent a copy of any notice of default or other notice or correspondence received or delivered by Borrower in respect of the same promptly after Borrower's receipt or within a reasonable period of time before delivery of such notice or correspondence.

5.1.28   **Laborers, Subcontractors and Materialmen**. Borrower shall notify Agent promptly, and in writing, if Borrower receives any written default notice, notice of lien or demand for past due payment, from any contractor, laborer, subcontractor or materialmen.

Borrower will also furnish to Agent at any time and from time to time upon demand by Agent, lien waivers in conformity with the Lien Law and otherwise in form satisfactory to Agent bearing a then current date from the Contractors.

       5.1.29   **Ownership of Personalty**. Borrower shall furnish to Agent, if Agent so requests, photocopies of the fully executed contracts, bills of sale, receipted vouchers and agreements, or any of them, under which Borrower claims title to the materials, articles, fixtures and other personal property used or to be used in the construction or operation of the Improvements.

       5.1.30   **Comply with Other Loan Documents**. Borrower shall perform all of Borrower's Obligations under the Note and the other Loan Documents.

       5.1.31   **Purchase of Material Under Conditional Sale Contract**. Borrower shall not permit any materials, equipment, fixtures or any other part of the Improvements to be purchased or installed under any security agreement or other arrangements wherein the seller reserves or purports to reserve the right to remove or to repossess any such items or to consider them personal property after their incorporation in the Property, unless previously authorized by Agent in writing.

       5.1.32   **Condominium.**

       (a)      Condominium Documents.

       (i)      Borrower will diligently and expeditiously take any and all actions required to establish the Property as a condominium form of ownership pursuant to the Condominium Act, including, without limitation, causing the Offering Plan to be accepted for filing by the DOL and keeping the same updated in accordance with Legal Requirements and DOL regulations, and declared effective upon sale of the minimum number of Units required pursuant to applicable Legal Requirements and recording the Declaration of Condominium (and tax lot drawings as required under Legal Requirements) with the New York City Register as and when required in accordance with this Agreement (the "**Conversion**" and the date of the consummation of the first sale of a Unit, the "**Conversion Date**"). On or before the date which is thirty (30) days after the Closing Date, Borrower shall submit to the DOL an amendment to the Offering Plan in compliance with Legal Requirements and acceptable to Agent, which amendment shall provide for the modifications to the Offering Plan set forth on Schedule VII, and Borrower shall diligently and expeditiously take any and all actions required to cause the amendment to the Offering Plan to be accepted for filing by the DOL on or before the date which is sixty (60) days after such amendment is submitted to the DOL.

       (ii)      Borrower shall keep Agent fully and regularly apprised of Borrower's efforts to prepare, process, and file any amendment to the Offering Plan, including without limitation, by providing a memorandum or e-mail communication from its counsel concurrently with any request for approval of any draft of the Offering Plan stating that to the best of its knowledge such form of draft of the Offering Plan is in compliance with Legal Requirements, and upon request by Agent give a general update on

90

the timing and status of the DOL process as reasonably requested by Agent.  Borrower shall promptly provide Agent with a copy of any (i) submissions made to the DOL or any other Governmental Authority from and after the date hereof in connection with the Conversion, and (ii) responses or other correspondence received from DOL with regard to the Offering Plan or any other Condominium Documents or the Property.  If the DOL objects to any comments to any Condominium Document made by Agent, Borrower shall promptly advise Agent of same, including the basis for such objection, and Borrower shall cooperate to modify the applicable Condominium Document in a manner that is acceptable to Agent and the DOL or such other Governmental Authority.

(iii)     Notwithstanding anything to the contrary contained herein, and subject to Borrower's fiduciary duty as a member of the Condominium Board, Borrower shall not (and, as applicable, shall not vote, or permit its designees on the Condominium Board to vote, or otherwise give any consent, to) enter into or submit for filing or recording, amend, modify, change, alter, supplement, terminate, accept a surrender of, or waive any material right under, any Condominium Document in any respect (either orally or in writing) without Agent's prior written approval in its sole discretion, and any such act taken without the prior consent of Agent shall be an Event of Default hereunder and void and of no force and effect; provided that Agent shall not unreasonably withhold, delay or condition its approval to the extent that such amendment or modification is (A) required by the DOL or applicable Legal Requirements, (B) necessary to extend the Offering Plan to allow sales of Units to continue, (C) necessary to change the sales price of a Unit and provided that such sales price is greater than the Minimum Release Price for such Unit, or (D) necessary to declare the Offering Plan effective upon the sale of a sufficient number of Units for the same.

(iv)     In furtherance of clause (iii) above, Borrower hereby assigns to Agent (for the benefit of Lender), as further security for the payment and performance of the Obligations and for the performance and observance of the terms, covenants and conditions of the Mortgage, this Agreement and the other Loan Documents, all of the rights, privileges and prerogatives of Borrower under the Condominium Documents (whether as the "Declarant" or Sponsor, the owner of any Unsold Units or as a member of the Condominium Board) to enter into or submit for filing or recording, amend, modify, change, alter, supplement, terminate, accept a surrender of, or waive any material right under, any Condominium Document (provided that rights shall only be exercised by Agent following the occurrence and during the continuance of an Event of Default).

(v)     Borrower agrees that upon an Event of Default, (a) Agent in its sole discretion may, but shall not be obligated to, perform any act, employ any Person, and cast any vote on behalf of Borrower (whether as the "Declarant" or Sponsor, the owner of any Unsold Units or as a member of the Condominium Board) pursuant to the Condominium Documents, subject to Borrower's fiduciary duty as a member of the Condominium Board, and (b) Borrower shall, upon request from Agent, promptly deliver to Agent such documents and instruments as Agent may require to evidence its authority concerning the same).

(vi)     Borrower shall deliver to Agent, as of the date of filing of the Declaration of Condominium, an update of the Title Insurance Policy insuring the Mortgage and all of the other Loan Documents other than Declaration of Condominium and the Permitted Encumbrances, and including a condominium endorsement and such other endorsements as Agent may require.

(vii)     Borrower shall execute and deliver to Agent any such additional documents (including, without limitation, any modifications or amendments to the Loan Documents or the Condominium Documents) as Agent may require in connection with the Conversion in order to perfect the Lien of the Loan Documents (to the extent permitted under applicable law), including, without limitation, (A) conditional resignations of the officers and members of the board of managers of the Condominium Board who have been appointed or designated by Borrower or any Affiliate of Borrower (and replacements thereof, if Borrower's representative resigns or is removed and is replaced by another person appointed by Borrower) and (B) irrevocable proxies in form and substance acceptable to Agent, executed in blank, enabling Agent in its sole discretion after the occurrence and during the continuance of an Event of Default to exercise the votes held by Borrower under the Condominium Documents with respect to the Unsold Units.   In furtherance of the foregoing, Borrower shall promptly notify Agent if Borrower has the right to appoint a replacement officer and/or member to the Condominium Board, and such replacement officer and/or member shall execute and deliver to Agent the documents contemplated pursuant to this clause (vii).

(viii)     If the Condominium Documents provide for a "mortgagee representative" (or equivalent thereto), then Agent shall be named in the Condominium Documents as such mortgagee representative for so long as the Loan is outstanding and shall give notice to the Condominium Board and any other Persons as necessary for Agent to be recognized as a mortgagee under the Condominium Documents.

(ix)     Borrower shall pay all costs and expenses incurred by Agent and Lender in connection with the Conversion (including, without limitation, reasonable costs and expenses associated with conducting any investigations, reviews, valuations or searches which Agent shall deem necessary), obtaining updated title insurance and the preparation and review of any documents and/or modifications or amendments to any of the Loan Documents which Agent, Lender or their attorneys shall deem necessary, including without limitation, reasonable costs and expenses incurred by Agent and Lender in connection with any review of the Condominium Documents.

(x)     Without the prior written consent of Agent, unless otherwise required by Legal Requirements, in no event shall Borrower suffer or permit any other Person to cause the Board Turnover Date to occur prior to the earlier to occur of (I) four (4) years after the consummation of the first residential Unit sale, and (II) the consummation of the sale of at least fifty percent (50%) of the residential Units in accordance with this Agreement.

(xi)    Borrower shall pay all Assessments, statutory reserve fund contributions and other sums required to be paid by Borrower on account of the Unsold Units or otherwise under and pursuant to the provisions of the Condominium Documents, as and when such Assessments, contributions or other charge is payable, but in all events prior to delinquency.

(xii)    Borrower shall (a) diligently perform and observe all of the terms, covenants and conditions of the Condominium Documents on the part of Borrower to be performed and observed, and any rules and regulations that may be adopted for the Condominium (as the same shall be in force and effect from time to time), (b) cause the Condominium Documents to comply with all applicable Legal Requirements, and (c) comply with all Legal Requirements in connection with the offering and sale of Units.

(xiii)    Borrower shall promptly notify Agent upon receipt or discovery of any written notice by the Condominium Board or other Person or any other document concerning (a) any default by Borrower in the performance or observance of any of the terms, covenants or conditions of the Condominium Documents on the part of Borrower to be performed or observed, (b) any requirement for the performance of any material act by Borrower with respect to any obligation of Borrower under the Condominium Documents (*e.g.*, notice of imposition of "special" Assessments), (c) any pending or threatened litigation affecting the Condominium Board or the Condominium Documents and, in each such case, deliver to Agent a true copy of each such notice or other document, or (d) any lien filed (or threatened to be filed) against the Property. Additionally, Borrower shall promptly notify Agent of the receipt of any written notice from the DOL with respect to the Property or Condominium.

(xiv)    Borrower shall promptly notify Agent of (a) any rescission right obtained by any purchaser under a Unit Sale Contract and (b) any rescission right exercised by any purchaser under a Unit Sale Contract.

(xv)    Borrower shall not, without the prior written consent of Agent, (a) institute any action or proceeding for partition of the property of which the Property is a part, (b) vote in opposition to a motion to repair, restore, or rebuild in the event of any structural or other damage to or destruction of the Improvements, or (c) vote in any manner, cause or permit its designees on the Condominium Board to vote, or otherwise consent, to any action of the Condominium Board that is prohibited or requires Agent's consent under the Loan Documents (except in the case of an emergency).

(xvi)    If Borrower shall default in any material respect in the performance or observance of any term, covenant or condition of the Condominium Documents on the part of Borrower to be performed or observed (and has failed to timely commence and/or is not diligently prosecuting the cure of such default within any applicable notice and/or cure periods provided in the Condominium Documents), then, without limiting the generality of the other provisions of the Mortgage, this Agreement and the other Loan Documents, and without waiving or releasing Borrower from any of its Obligations hereunder, Agent shall have the right, but shall be under no obligation, to pay any sums and to perform any act or take any action as may be appropriate to cause all of the terms, covenants and conditions of the Condominium Documents on the part of Borrower to be performed or observed or to be promptly performed or observed on

93

behalf of Borrower, to ensure that the rights of Borrower, Agent and Lender in, to and under the Condominium Documents shall be kept unimpaired as a result thereof and free from default, even though the existence of such event of default or the nature thereof be questioned or denied by Borrower or by any party on behalf of Borrower. In any such event, Agent and any Person designated as Agent's agent by Agent shall have, and are hereby granted, to the extent permitted by Legal Requirements, the right to enter upon the Property at any time with prior notice (which may be given verbally if such entrance is due to an emergency relating to the Project, to remedy any imminent danger on or to the Project or in order to investigate and cure an Event of Default hereunder) and from time to time for the purpose of taking any such action to cause all such terms, covenants and conditions to be performed. Agent may pay and expend such sums of money as Agent deems necessary for any such purpose. Borrower hereby agrees to pay to Agent promptly following demand, all such sums so paid and expended by Agent, together with interest thereon at the Default Rate from the day on which Borrower receives such demand until paid.  All sums so paid and expended by Agent and the interest thereon shall be secured by the legal operation and effect of the Mortgage.

(b)     Borrower shall only sell (i) residential Units using the form of contract of sale for the residential Units contained in the Offering Plan and approved by Agent, (ii) office Units using the form of contract of sale for the office Units contained in the Offering Plan and approved by Agent, and (iii) retail Units using the form of contract of sale for the retail Units contained in the Offering Plan and approved by Agent (in each case, which may be subject to non-material modifications of customary negotiable terms pursuant to bona fide arms-length negotiations in connection with the sale of Units) (for each residential, office and retail Unit, as applicable, a "**Unit Sale Contract**"). Within two (2) Business Days of execution by Borrower and purchaser of any such Unit Sale Contract a copy of such Unit Sale Contract shall be delivered to Agent.

(c)     Borrower (1) shall cause any deposits in connection with any Unit Sale Contract (collectively, the "**Unit Sale Contract Deposits**" or each individually, a "**Unit Sale Contract Deposit**") to be held in an account maintained with an escrow agent (the "**Escrow Agent**"), which shall (i) be an attorney, (ii) be designated under the Offering Plan (or otherwise be acceptable to Agent), and (iii) execute an agreement pursuant to which escrow agent recognizes the Lien of the Loan Documents and agrees to direct all Unit Sale Contract Deposits in accordance with Agent's instructions (to the fullest extent permitted under applicable law, including, without limitation, the escrow regulations of the DOL), and (2) shall not withdraw such deposits (or direct that such deposits be withdrawn) for any purpose except as expressly provided in the applicable Unit Sale Contract or as required by Legal Requirements or the Offering Plan. Concurrently with the execution of this Agreement, Borrower shall, in accordance with, and to the extent permitted pursuant to Legal Requirements, assign its rights in all Unit Sale Contract Deposits (whenever deposited) to Agent (for the benefit of Lender) pursuant to a form acceptable to Agent and, if required, approved by the DOL, which form shall be executed by Escrow Agent to confirm its acknowledgement of such assignment and its agreement to act in accordance therewith, subject to Legal Requirements. Without limiting the foregoing, Borrower shall not permit the proceeds of any such Unit Sale Contract Deposits to be used to pay for construction or other costs related to the Improvements except with Agent's prior express written approval acting in its sole and absolute

discretion and, if approved by Agent, in accordance with the Offering Plan, the Unit Sale Contracts and any other requirements of the DOL.

(d)       Borrower, Agent and Lender hereby acknowledge that at the closing of the first Unit, if the sale of such Unit closes under a temporary certificate of occupancy, Borrower will be required to escrow with its attorney the costs needed to obtain a permanent certificate of occupancy, as certified by Sponsor's architect or engineer in accordance with the DOL regulations. In the event any such amounts are required to be escrowed as aforesaid, Lender shall (subject to all other conditions that would be applicable to Advances of such funds hereunder) make an Advance in such amounts to the extent such amounts are reflected in the approved Project Budget, and, to the fullest extent permitted under applicable law, Borrower shall, and is hereby deemed to, grant to Agent (for the benefit of Lender) a continuing first priority lien on and security interest in such amounts.

(e)       If the purchaser under any Unit Sale Contract shall default in the performance of its obligations thereunder beyond all applicable grace, notice and cure periods and Borrower shall, to the extent permitted by the Offering Plan, retain the Unit Sale Contract and Legal Requirements, retain the Unit Sale Contract Deposit thereunder as liquidated damages, then Borrower shall give prompt notice to Agent of such retention and shall, if permitted by the Offering Plan and Legal Requirements, deposit the Unit Sale Contract Deposit and all other amounts received from the defaulting purchaser from such forfeiture into the Deposit Account within one (1) Business Day after receipt, and if such delivery to the Deposit Account is not permitted by the Offering Plan and Legal Requirements, to the extent permitted by applicable Governmental Authorities, such deposits shall, to the extent permitted by Legal Requirements and applicable Governmental Authorities be deemed to be collateral for the Obligations and shall be held in trust by Escrow Agent for the benefit of Agent (for the benefit of Lender) and shall not be distributed to any other Person without Agent's prior written consent and then only if such distribution so consented to is in accordance with Legal Requirements.

(f)       Without the prior written consent of Agent, Borrower shall not:

(i)       sell or offer for sale any Units except in compliance with the Condominium Documents and all applicable Legal Requirements or sell a Unit except pursuant to a Unit Sale Contract;

(ii)       enter into any Unit Sale Contract unless (A) with  respect to an Unrelated Unit Purchaser, either: (y) the sale price will result in Net Sales Proceeds greater than or equal to the Minimum Release Price for such Unit or; (z) if the Unit Sale Contract provides for a sales price that will result in Net Sales Proceeds of less than the Minimum Release Price for such Unit, Borrower shall deposit with Agent (for the benefit of Lender) in cash an amount equal to the difference between the Minimum Release Price for such Unit and the projected Net Sales Proceeds for the sale of such Unit not less than five (5) Business Days prior to the closing for such Unit, (B) with respect to any Unit Sale Contract entered into with a Related Unit Purchaser, the Unit Sale Contract has been approved in writing by Agent acting in its sole discretion, (C) the Unit Sale Contract provides that the sale price is payable in full by bank or certified check or wire transfer of

immediately available funds at closing, (D) such Unit Sale Contract shall require the purchaser to deposit with the Escrow Agent a cash amount equal to not less than ten percent (10%) of the total purchase price and shall provide that such amount shall be retained by Borrower as liquidated damages upon default beyond all applicable grace, notice and cure periods by the purchaser of its purchase obligation under such Unit Sale Contract, and (E) such Unit Sale Contract shall be subject to no conditions precedent to the purchaser's obligations (except for customary title conditions, notice of closing and rights of rescission required by Legal Requirements);

(iii)     Borrower shall not, subject to Borrower's fiduciary duty as a member of the Condominium Board (and, as applicable, shall not vote, or permit its designees on the Condominium Board to vote, or otherwise give any consent to), enter into or submit for filing or recording, amend, modify, change, alter, supplement, terminate, accept a surrender of, or waive any material right under, any Condominium Document in any respect (either orally or in writing) or take any other action which could adversely affect, alter or impair the lien of the Mortgage or the security therefor or the Property or the Collateral, or increase the obligations or diminish the rights of Agent or Lender.

(iv)     (A) amend, modify or supplement any Unit Sale Contract or terminate any Unit Sale Contract (except for default on the part of a purchaser thereto but with prompt notice to Agent), or permit any of the foregoing actions to be taken or (B) release any Unit Sale Contract Deposit under any Unit Sale Contract except in each case as required under the terms of such Unit Sale Contract, the Offering Plan, or any regulations promulgated by the DOL or any other Legal Requirements, provided that Borrower shall be permitted to return the applicable Unit Sale Contract Deposit in connection with the settlement of any dispute under a Unit Sale Contract with the prior consent of Agent, which shall not be unreasonably withheld;

(v)     abandon or change its plan for submission of the Property to the condominium form of ownership;

(vi)     permit (prior to the Board Turnover Date) or vote to permit or allow its designees on the Condominium Board to vote to permit (after the Board Turnover Date) the Condominium Board to incur any Indebtedness;

(vii)     enter into, or permit to be entered into, any lease, license or other occupancy agreement with respect to any Unit; and

(viii)     sell, license, lease or otherwise provide any right of occupancy to any Person in any parking space or storage unit at the Property, unless set forth in the Offering Plan or if Agent has expressly approved the same in connection with its approval any modifications to the Offering Plan; provided that the minimum price for a parking space or storage space to be sold to any Borrower Related Parties or to the Sellers shall be no less than the price set forth for such storage space or parking space, as applicable, in the Offering Plan (or modification thereto approved by Agent).

(g)      Provided that no monetary Default, material non-monetary Default or Event of Default has occurred and shall be continuing, Agent shall, on Borrower's written request, subordinate the lien of the Building Loan Mortgage, the Senior Loan Mortgage and the Project Loan Mortgage to the Declaration of Condominium and shall execute the appropriate instruments (satisfactory in all respects to Agent and the Title Company) in recordable form to effect such subordination, upon the satisfaction of the conditions enumerated below:

(i)      Agent shall have received and approved in all respects the Condominium Documents (to the extent not previously approved in writing by Agent) which shall be in proper form for recording or filing, as necessary, in the appropriate offices;

(ii)      the Title Insurance Policy shall have been endorsed to provide affirmative insurance in the form of Exhibit O attached hereto, to the effect that the Property constitutes a condominium validly created under the Condominium Act and Agent shall have received such endorsement from the Title Company;

(iii)      Borrower shall, to the extent permissible under Legal Requirements, have duly executed and delivered, or caused to be duly executed and delivered, to Agent (a) a conditional assignment of Borrower's or the declarant's (if the declarant under the applicable Condominium Documents is other than Borrower) rights under the Condominium Documents in a form acceptable to Agent and (b) such conditional resignations and proxies as described in Section 5.32(a)(vii);

(iv)      the Offering Plan for the Condominium shall have been declared effective, and an amendment to the Offering Plan disclosing the same shall have been accepted for filing by the DOL, in accordance with the Offering Plan and applicable Legal Requirements;

(v)      either Borrower or the Condominium Board shall have furnished to Agent, at no cost or expense to Agent, policies of insurance that comply with the requirements contained in Article VI of this Agreement and the other Loan Documents;

(vi)      Agent shall have received an opinion from Borrower's counsel to the effect that (A) the Condominium Documents satisfy all Legal Requirements, (B) the Condominium Documents have been duly authorized, executed, and delivered by the respective parties thereto and are enforceable against said parties in accordance with their respective terms, (C) assuming due recordation or filing of the applicable Condominium Documents, all applicable Legal Requirements have been duly satisfied and the Condominium has been duly created pursuant to the Condominium Act, (D) no other filing, registration or other compliance with any Federal or State Securities Law or other Legal Requirements will be required in connection with the sale of Units in New York State, or if such filing is necessary, that the applicable Legal Requirements governing the same have been fully complied with, and (E) the documents referred to in this Section have each been duly authorized, executed and delivered by the respective parties thereto and are enforceable against said parties in accordance with their respective terms;

(vii)      At least fifteen percent (15%) of the residential Units shall be subject to binding Unit Sales Contracts (i) with scheduled closing dates within sixty (60) days

97

of the Conversion Date, and (ii) that comply in all respects with all DOL and other Legal Requirements for counting such residential Units towards the requirement that at least fifteen percent (15%) of the residential Units shall be sold to bona fide purchasers as a condition to declaring the Offering Plan effective, including, without limitation, that each purchaser under such a Unit Sale Contract shall cooperate with all requests and requirements of the DOL, including, without limitation, delivery of all affidavits, questionnaires and other documents required by the DOL;

(viii)   Guarantor shall deliver a ratification agreement in a form reasonably acceptable to Agent pursuant to which such Guarantor reaffirms all of its obligations under each Loan Document to which Guarantor is a party; and

(ix)   Borrower shall have complied with its obligation to fund the reserve fund required pursuant to Local Law 70 – Reserve Fund Law §26-701 to §26-708 in a manner approved by Agent.

(h)   Provided that no Event of Default has occurred and is continuing under this Agreement, Borrower shall have a right to sell one or more Units and Agent shall release such Units from the lien of the Senior Loan Mortgage, the Building Loan Mortgage and the Project Loan Mortgage and all other Loan Documents securing the indebtedness evidenced by the Senior Loan Note, the Building Loan Note and the Project Loan Note (and from any UCC-1 financing statements in favor of Agent covering such Units) and deliver to Borrower a duly executed release(s) in recordable form, UCC-3 release(s) of security interest, affidavits under Sections 255 and 275 of the New York Real Property Law and other such documents as may be required to release the Unit(s) from the lien and/or security interest of the Senior Loan Documents, the Building Loan Documents and the Project Loan Documents upon satisfaction of each of the following conditions:

(i)   The Conversion shall have occurred in accordance with this Agreement and Borrower shall have fully complied with the provisions of subsections (a) through (g) of this Section 5.1.32;

(ii)   Agent shall have received a copy of an executed Unit Sale Contract with reference to such Unit;

(iii)   Agent shall have received not less than five (5) Business Days prior written notice of the proposed release and not less than two (2) Business Days prior to the release a pro forma settlement statement acceptable to Agent and signed by Borrower and reflecting the Gross Sales Proceeds, Net Sales Proceeds and Required Release Price;

(iv)   the closing of the sale of such Unit pursuant to a Unit Sale Contract shall occur within five (5) Business Days of receipt of the release from Agent, such release to have been delivered by Agent to Escrow Agent to be held in escrow pending such closing pursuant to an escrow arrangement by and between Escrow Agent and Agent in a form required by Agent;

98

(v)     the Unit to be released will constitute one or more tax lots separate and distinct from the tax lot or lots applicable to the remaining portion of the Property (including all Unsold Units) encumbered by the lien of the Senior Loan Mortgage, the Building Loan Mortgage and Project Loan Mortgage;

(vi)    neither the release from the lien of the Senior Loan Mortgage, the Building Loan Mortgage and Project Loan Mortgage, nor the conveyance to the transferee of such Unit will violate any applicable zoning or subdivision laws;

(vii)   the greater of (x) the Minimum Release Price for such Unit or (y) the Net Sales Proceeds (the amount described in clause (x), or (y), as applicable, in respect of each Unit being the "**Required Release Price**") shall have been received by Escrow Agent at the closing of the sale of the Unit and Escrow Agent shall be irrevocably committed to transferring the Required Release Price to the Deposit Account upon sale of the Unit;

(viii)  a temporary certificate of occupancy or a permanent certificate of occupancy is in effect for each Unit to be released;

(ix)    Agent shall have received such other documents, certificates, instruments, opinions or assurances as Agent may reasonably request;

(x)     if such Unit is part of a Bulk Sale, Agent shall have approved the sale of all such Units constituting the Bulk Sale acting in its sole discretion; and

(xi)    (1) payment of Agent's actual out-of-pocket expenses (including reasonable legal fees) incurred in connection with the release, together with (2) an administrative fee of five hundred dollars ($500) in connection with such release shall be delivered to Escrow Agent for delivery to Agent at closing of the sale of the Unit.

(i)     The Condominium By-Laws shall require delivery of any proposed Condominium Budget to the members of the Condominium Board at least fifteen (15) days prior to any vote on such Condominium Budget.

(j)     Borrower shall not submit for recording or filing the Declaration of Condominium until the Offering Plan has been declared effective, but shall in all events submit the Declaration of Condominium for recording or filing (as applicable) before the conveyance of the first Unit.

(k)     Borrower shall remake the representations and warranties set forth in Article IV above as of the date of the Conversion Date.

(l)     Notwithstanding anything to the contrary herein, (i) upon the earlier of such time as Borrower has (A) made the prepayment required pursuant to Section 2.4.2(c) or (B) Borrower has consummated a Unit sale in accordance with this Section 5.1.32 with respect to the retail Unit for a sale price resulting in Net Sales Proceeds greater than or equal to the Minimum Release Price for such retail Unit, the aggregate Minimum Release

Price for the office Units shall be reduced by an amount equal to $5,000,000, which reduction shall be allocated among the office Units pro rata in accordance with their relative Minimum Release Prices as of the date hereof (regardless of whether such Units have been sold at such time), and (ii) upon the earlier of such time as Borrower has (Y) made the prepayment required pursuant to Section 2.4.2(c) or (B) Borrower has consummated Unit sales in accordance with this Section 5.1.32 with respect to one or more offices Units for sale prices resulting in aggregate Net Sales Proceeds greater than or equal to the aggregate Minimum Release Prices for all office Units, the Minimum Release Price for the retail Unit shall be reduced by an amount equal to $5,000,000.

5.1.33   **Construction Manager; Sales Agent.**

(a)   **Construction Management Agreement; Sales Agency Agreement**. Borrower shall (i) cause (a) the Construction Manager to manage the construction of the Project Improvements in accordance with the Construction Management Agreement, and (b) the Sales Agent to manage the marketing and sales of Units in accordance with the Sales Agency Contract, each in the best interests of the Project consistent with the Business Plan using sound business judgment, (ii) diligently perform and observe all of the terms, covenants and conditions of the Construction Management Agreement and Sales Agency Agreement, in each case on the part of Borrower to be performed and observed, (iii) promptly notify Agent of any default under the Construction Management Agreement or Sales Agency Agreement of which Borrower is aware, (iv) promptly deliver to Agent a copy of each financial statement, business plan, capital expenditures plan, development plan, marketing plan, report and estimate and any other information, as applicable, received by it under the Construction Management Agreement or Sales Agency Agreement, and, upon request by Agent, shall cause Sales Agent to provide Agent with reports in regard to the sales of Units at the Project, in such form and detail as requested by Agent, (v) promptly enforce the performance and observance of all of the covenants required to be performed and observed by Construction Manager under the Construction Management Agreement and Sales Agent under the Sales Agency Agreement, (vi) cause Construction Manager to ensure that the work to be performed by each Contractor under each Construction Contract is the work called for by the Plans and Specifications (other than de minimis changes to reflect site conditions), and (vii) ensure that all work on the Improvements shall be completed in accordance with the Plans and Specifications in a good and workmanlike manner and shall be free of any defects.  Borrower shall, upon request by Agent, cause Construction Manager to provide Agent and Construction Consultant with reports in regard to the status of construction of the Project Improvements, in such form and detail as reasonably requested by Agent.  If Borrower shall default in the performance or observance of any term, covenant or condition of the Construction Management Agreement and/or Sales Agency Agreement on the part of Borrower to be performed or observed, then, without limiting Agent's or Lender's other rights or remedies under this Agreement or the other Loan Documents, and without waiving or releasing Borrower from any of its Obligations hereunder or under the Construction Management Agreement and/or Sales Agency Agreement, as applicable, Agent shall have the right, but shall be under no obligation, to pay any sums and to perform any act as may be appropriate to cause all the terms, covenants and conditions of the Construction Management Agreement and/or Sales Agency Agreement, as applicable, on the part of Borrower to be performed or observed.  Borrower hereby agrees to pay to Agent promptly following demand, all such sums so paid and expended by Agent, together with interest thereon at the Default Rate from the day on which Borrower receives such demand until paid.  All

100

sums so paid and expended by Agent and the interest thereon shall be secured by the legal operation and effect of the Mortgage.

(b) **Prohibition Against Entry, Termination or Modification**. Borrower shall not (i) surrender, terminate, cancel, modify (other than to a de minimis extent), renew or extend the Construction Management Agreement or Sales Agency Agreement except as otherwise permitted under this Agreement or the Loan Documents, (ii) enter into any other agreement relating to the management (including any property management agreement), leasing, sale, marketing, development or operation of the Property or Units or any part thereof with Construction Manager, Sales Agent or any other Person, (iii) consent to the assignment by the Construction Manager or Sales Agent of its interest under the Construction Management Agreement or Sales Agency Agreement, as applicable, other than in favor of Agent pursuant to the Loan Documents, (iv) waive or release any of its rights and remedies under the Construction Management Agreement and/or Sales Agency Agreement, or (v) do any act which would relieve the Construction Manager under the Construction Management Agreement or Sales Agent under the Sales Agency Agreement of any material obligation thereunder, in each case without the express written consent of Agent, which consent shall not be unreasonably withheld so long as the counterparty is not an Affiliate of Borrower.

5.1.34 **Replacement of Project Development Team or Construction Manager or Sales Agent**. Without limiting any other rights of Agent and Lender under the Loan Documents, at Agent's election, Borrower shall remove and replace the Construction Manager, Sales Agent and all other Persons (the "**Project Development Team**") involved in the management, construction, development, marketing or sale of the Project working on behalf of Borrower or any other Borrower Related Party, as applicable, with a Person or Persons approved by Agent acting in its sole discretion (or if no such Person or Persons are approved by Agent within thirty (30) days of such election, with such Person(s) chosen by Agent acting in its sole discretion) in accordance with and upon the occurrence of any one or more of the following events: (i) with regard to replacement of the Sales Agent, Construction Manager and/or any member of the Project Development Team, (a) any or all of such parties, at any time following the occurrence and during the continuance of an Event of Default or (b) any such party if such party has engaged in gross negligence, fraud, willful misconduct or misappropriation of funds; and (ii) with regard to replacement of Construction Manager or Sales Agent, as applicable, any such party if it (a) shall be in material default under the Construction Management Agreement or Sales Agency Agreement, as applicable, or (b) become insolvent or a debtor in any bankruptcy or insolvency proceeding.

5.1.35 **After Acquired Property**. Without limitation of Borrower's other obligations described herein, Borrower hereby grants to Agent (on behalf of Lender) a first Lien security interest in and to all equipment and other personal property owned, leased or licensed by Borrower, whether or not used in the maintenance and/or operation of the Improvements, immediately upon acquisition of same or any part of same following the date hereof.

**Section 5.2    Negative Covenants**. From the date hereof until payment and performance in full of all obligations of Borrower under the Loan Documents or the earlier release of the Lien of the Mortgage and any other Collateral in accordance with the terms of this Agreement and the

other Loan Documents, Borrower covenants and agrees with Agent and Lender that it will not do, directly or indirectly, any of the following:

       5.2.1    **Liens**. Borrower shall not create, incur, assume, permit or suffer to exist any Lien on any portion of the Property or the Collateral, except for the Liens created by the Loan Documents and Permitted Encumbrances. After prior written notice to Agent, Borrower, at its own expense, may contest by appropriate legal proceeding promptly initiated and conducted in good faith and with due diligence, the validity of any Lien, <u>provided</u> that (i) no monetary Default, material non-monetary Default or Event of Default has occurred and remains uncured; (ii) such proceeding shall be permitted under and conducted in accordance with all applicable Legal Requirements; (iii) none of the Property, Collateral nor any part thereof or interest therein will be in danger of being sold, forfeited, terminated, cancelled or lost; (iv) such contest shall not affect or delay the construction of the Project or the sale of Units, each as required under this Agreement; (v) failure to pay such Liens will not subject Agent or Lender to any civil or criminal liability; (vi) if the Lien has not been discharged by bonding, to insure the payment of such Lien, Borrower shall deliver to Agent cash, or other security as may be approved by Agent, in an amount equal to one hundred twenty-five percent (125%) of the contested amount; (vii) the aggregate amount of all such liens that have not been discharged by bonding and are being contested at any given time does not exceed $500,000; (viii) Borrower shall promptly upon final determination thereof pay the amount of such Lien, together with all costs, interest and penalties which may be payable in connection therewith; and (ix) Borrower shall, upon request by Agent, give Agent prompt notice of the status of such proceedings and/or confirmation of the continuing satisfaction of the conditions set forth in the foregoing <u>clauses (i)</u> through <u>(viii)</u>.  Agent may pay over any such cash or other security held by Agent to the claimant entitled thereto at any time when, in the reasonable judgment of Agent, the entitlement of such claimant is established by unappealable final judgment or the Property (or any part thereof or interest therein) shall be in danger of being sold, forfeited, terminated, cancelled or lost, or there shall be any danger of the Lien of the Mortgage being primed by any other Lien.

       5.2.2    **Dissolution**.  Borrower shall not (a) engage in any dissolution, liquidation or consolidation or merger with or into any other business entity, (b) engage in any business activity not related to the ownership improvement, operation and Conversion of the Property and the sale of the Units, (c) transfer, lease or sell, in one transaction or any combination of transactions, the assets or all or substantially all of the properties or assets of Borrower except to the extent permitted by the Loan Documents, or (d) modify, amend, waive or terminate its organizational documents or its qualification and good standing in any jurisdiction in each case, without obtaining the prior written consent of Agent or Agent's designee.

       5.2.3    **Change In Business**. Borrower shall not enter into any line of business other than the ownership, operation, development and Conversion of the Property and the sale of the Units, or make any change in the scope or nature of its business objectives, purposes or operations, or undertake or participate in activities other than the continuance of its present business.

       5.2.4    **Debt Cancellation**. Borrower shall not cancel or otherwise forgive or release any claim or debt owed to Borrower by any Person**.**

5.2.5 **Zoning**. Borrower shall not initiate or consent to any zoning reclassification of any portion of the Property or seek any variance or special permit under any existing zoning ordinance, or use or permit the use of any portion of the Property in any manner that could result in such use becoming a non-conforming use under any zoning ordinance or any other applicable land use law, rule or regulation, without the prior consent of Agent; provided that the foregoing shall not limit Borrower's right to undertake the Conversion in accordance with this Agreement.

5.2.6 **Indebtedness**. Borrower shall not directly or indirectly create, incur or assume any indebtedness other than the Debt and unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Property, which in the case of such unsecured trade payables (A) are not evidenced by a note, (B) do not exceed, at any time, a maximum aggregate amount of $2,000,000, and (C) are paid within sixty (60) days of the date invoiced, provided that the same may be paid later so long as no amounts are delinquent by sixty (60) days or more ("**Permitted Indebtedness**").

5.2.7 **Change of Name, Identity, Structure or Place of Organization**. Borrower shall not change its name, identity (including its trade name or names), place of organization or formation (as set forth in Section 4.1.33 hereof) or Borrower's corporate, partnership or other structure, without first obtaining the prior written consent of Agent. Upon Agent's request, Borrower shall execute and deliver additional financing statements, security agreements and other instruments which may be necessary to effectively evidence or perfect Agent's security interest in the Property and/or the Collateral as a result of such change of principal place of business or place of organization. At the request of Agent, Borrower shall execute a certificate in form satisfactory to Agent listing the trade names under which Borrower intends to operate the Property, and representing and warranting that Borrower does business under no other trade name with respect to the Property.

5.2.8 **ERISA.**

(a) Borrower shall not engage in any transaction which would cause any obligation, or action taken or to be taken, hereunder (or the exercise by Agent or Lender of any of their rights under the Note, this Agreement or the other Loan Documents) to be a non-exempt (under a statutory or administrative class exemption) prohibited transaction under the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**").

(b) Borrower shall not maintain, sponsor, contribute to or become obligated to contribute to, or suffer or permit any ERISA Affiliate to, maintain, sponsor, contribute to or become obligated to contribute to, any "pension plan" (as defined in Section 3(2) of ERISA) that is subject to Title IV of ERISA or permit the assets of Borrower to become Plan Assets.

(c) Borrower shall deliver to Agent such certifications or other evidence from time to time throughout the term of this Agreement, as requested by Agent, that (A) Borrower is not an "employee benefit plan" as defined in Section 3(3) of ERISA, which is subject to Title I of ERISA, or a "governmental plan" within the meaning of Section 3(32) of ERISA; (B) Borrower is not subject to state statutes regulating investments and fiduciary obligations with

respect to governmental plans that would be violated by the transactions contemplated by this Agreement; and (C) the assets of Borrower do not constitute Plan Assets.

        5.2.9     **Transfers.**

        (a)     Borrower acknowledges that Agent and Lender have examined and relied on the experience of Borrower and the other Borrower Related Parties in owning, development, construction, operating, marketing and selling properties such as the Property and condominium units like the Units in agreeing to make the Loan, and will continue to rely on Borrower's ownership of the Property as a means of maintaining the value of the Property as security for repayment of the Total Debt and the performance of the Other Obligations.  Borrower acknowledges that Agent and Lender have a valid interest in maintaining the value of the Property so as to ensure that, should Borrower default in the repayment of the Total Debt or the performance of the Other Obligations, Agent and Lender can recover the Total Debt by a sale of the Property or the Collateral.

        (b)     Without the prior written consent of Agent, and except to the extent otherwise set forth in this <u>Section 5.2.9</u>, Borrower shall not, and shall not permit any Borrower Party or any other Person having a direct or indirect ownership or beneficial interest in Borrower or Sole Member, whether voluntarily or involuntarily, to do any of the following (collectively, a "**Transfer**"): (i) sell, convey, mortgage, grant, bargain, encumber, pledge, assign, grant options with respect to, lease, license, rent, or otherwise transfer or dispose of (directly or indirectly, voluntarily or involuntarily, by operation of law or otherwise, and whether or not for consideration or of record) the Property or any part thereof (and, after the Conversion Date, any Unit) or any direct or indirect legal or beneficial interest therein or in any Borrower Party, directly or indirectly, at any tier of ownership, or (ii) permit a Sale or Pledge of any direct or indirect interest in any Borrower Party or any Person having a direct or indirect ownership or beneficial interest in a Borrower Party, in each case, other than Permitted Transfers.

        (c)     A Transfer shall include, but not be limited to, (i) an installment sales agreement wherein Borrower agrees to sell Units, the Property or any part thereof for a price to be paid in installments; (ii) an agreement by Borrower leasing all or a substantial portion of the Property or a sale, assignment or other transfer of, or the grant of a security interest in, Borrower's right, title and interest in and to any Gross Revenue or any Condominium Documents; (iii) if a Borrower Party or its direct or indirect owners is a corporation, any merger, consolidation or Sale or Pledge of such corporation's stock or the creation or issuance of new stock; (iv) if a Borrower Party or its direct or indirect owners is a limited or general partnership or joint venture, any merger or consolidation or the change, removal, resignation or addition of a general partner or the Sale or Pledge of the partnership interest of any general partner or any profits or proceeds relating to such partnership interest, or the Sale or Pledge of limited partnership interests or any profits or proceeds relating to such limited partnership interest or the creation or issuance of new limited partnership interests; (v) if a Borrower Party or its direct or indirect owners is a limited liability company, any merger or consolidation or the change, removal, resignation or addition of a managing member or non-member manager (or if no managing member, any member) or the Sale or Pledge of the membership interest of a managing member (or if no managing member, any member) or any profits or proceeds relating to such membership interest, or the Sale or Pledge of non-managing

104

membership interests or the creation or issuance of new non-managing membership interests; (vi) if a Borrower Party or its direct or indirect owners is a trust or nominee trust, any merger, consolidation or the Sale or Pledge of the legal or beneficial interest in such Borrower Party or its direct or indirect owners or the creation or issuance of new legal or beneficial interests; (vii) any direct and/or indirect change of Control of Borrower such that Key Man no longer directly and/or indirectly Controls Borrower (except to the extent such change of Control is due to death or disability as set forth in Section 8.1(xiv) hereof); (viii) entering into any contract to do any of the foregoing (unless closing of such contract is conditioned on obtaining Agent's consent), or (ix) any contractual arrangement intended to provide similar benefits (regardless of whether or not such benefits are limited to economic participation, control and/or otherwise) to the counterparties thereto as would be obtained by consummating a Transfer.

(d)    Notwithstanding anything to the contrary contained in this Section 5.2.9, the following Transfers (herein, the "**Permitted Transfers**" or each individually, a "**Permitted Transfer**") shall be permitted hereunder without the consent of Agent (unless such consent is otherwise required pursuant to this Agreement):

(i)    sales of Units consummated in compliance with each of the provisions set forth in Section 5.1.32(h) hereof;

(ii)    Leases entered into in accordance with the Loan Documents;

(iii)    provided no Event of Default shall then exist, a Transfer of any direct or indirect interest in Sole Member related to or in connection with the estate planning of such transferor to (1) an Immediate Family Member of such interest holder (or to partnerships or limited liability companies Controlled solely by one or more of such family members) or (2) a trust established for the benefit of such Immediate Family Member, provided that:

(A)    Borrower shall provide to Agent thirty (30) days prior written notice thereof;

(B)    such Transfer shall not otherwise result in a change of Control of Borrower or Sole Member or change of the day to day management and operations of the Property;

(C)    each of Borrower and Sole Member shall continue to be a Special Purpose Entity;

(D)    such transferee shall be a Qualified Transferee; and

(E)    in connection with any Transfer in which a Person that did not previously own twenty percent (20%) or more of the aggregate direct and/or indirect ownership interests (at any tier of ownership) in Sole Member shall acquire such a twenty percent (20%) direct and/or indirect ownership interest (at any tier of ownership) in Sole Member, Borrower shall, at least twenty (20) days before such Transfer, provide copies of all

105

instruments effectuating such Transfer, together with all organizational documents that Agent shall require, and such other information as Agent shall reasonably request regarding the proposed transferee so as to conduct such background checks, investigations, Patriot Act, OFAC and other searches (including all such searches as are necessary to satisfy any regulatory requirements and/or internal compliance, "know your customer" and/or committee requirements of Agent, to the extent such internal requirements are applied on a non-discriminatory basis) as Agent shall require (at Borrower's sole cost and expense), and Agent does not, within fifteen (15) days of receiving such notice from Borrower, send a notice to Borrower that Agent has in good faith determined that such Transfer will result in a violation of its legal, regulatory or internal organizational requirements (such a determination by Agent in its good faith discretion, a "**Prohibited Transferee Determination**").

(iv)　provided no Event of Default shall then exist, Transfers of up to forty-nine (49%) in the aggregate (at all times from and after the Closing Date) of the indirect interests in Sole Member, provided that, with respect to each such Transfer:

(A)　Borrower shall provide to Agent thirty (30) days prior written notice thereof;

(B)　the transferee shall be a Qualified Transferee;

(C)　each of Borrower and Sole Member shall continue to be a Special Purpose Entity;

(D)　following any such Transfer, Key Man (1) remains actively involved in the Project and the day to day operation and management thereof, and (2) continues to directly or indirectly Control Borrower, Sole Member and the operation and development of the Project;

(E)　following any such Transfer, (1) Key Man continues to own not less than 6.25% of the direct and/or indirect membership interests in Borrower and the Project, (2) Joseph Chetrit continues to own not less than 6.25% of the direct and/or indirect membership interests in Borrower and the Project, (3) Jacob Chetrit continues to own not less than 6.25% of the direct and/or indirect membership interests in Borrower and the Project and (4) David Bistricer continues to own not less than 6.25% of the direct and/or indirect membership interests in Borrower and the Project; and

(F)　in connection with any Transfer in which a Person that did not previously own twenty percent (20%) or more of the aggregate direct and/or indirect interests (at any tier of ownership) in Sole Member shall acquire such a twenty percent (20%) direct and/or indirect interests (at any tier of ownership) in Sole Member, Borrower shall, at least twenty (20)

106

days before such Permitted Transfer, notify Agent of the proposed transfer and provide copies of all instruments effectuating such transfer, and any organizational documents that Agent shall require, and such other information as Agent shall reasonably request regarding the proposed transferee so as to conduct such background checks, investigations, Patriot Act, OFAC and other searches (including all such searches as are necessary to satisfy any regulatory requirements and/or internal compliance, "know your customer" and/or committee requirements of Agent, to the extent such internal requirements are applied on a non-discriminatory basis) as Agent shall require (at Borrower's sole cost and expense), and Agent does not, within fifteen (15) days of receiving such notice from Borrower, send a notice to Borrower of a Prohibited Transferee Determination.

(v)     provided no Event of Default shall then exist, Transfers of the indirect interests in Sole Member to any Person that owns an indirect interest in Sole Member as of the Closing Date, provided that, with respect to each such Transfer:

(A)     each of Borrower and Sole Member shall continue to be a Special Purpose Entity;

(B)     following any such Transfer, Key Man (1) remains actively involved in the Project and the day to day operation and management thereof, and (2) continues to directly or indirectly to Control Borrower, Sole Member and the operation and development of the Project;

(C)     following any such Transfer, (1) Key Man continues to own not less than 6.25% of the direct and/or indirect membership interests in Borrower and the Project, (2) Joseph Chetrit continues to own not less than 6.25% of the direct and/or indirect membership interests in Borrower and the Project, (3) Jacob Chetrit continues to own not less than 6.25% of the direct and/or indirect membership interests in Borrower and the Project and (4) David Bistricer continues to own not less than 6.25% of the direct and/or indirect membership interests in Borrower and the Project; and

(D)     in connection with any Transfer in which a Person that did not previously own twenty percent (20%) or more of the aggregate direct and/or indirect interests (at any tier of ownership) in Sole Member shall acquire such a twenty percent (20%) direct and/or indirect interests (at any tier of ownership) in Sole Member, Borrower shall, at least twenty (20) days before such Permitted Transfer, notify Agent of the proposed transfer and provide copies of all instruments effectuating such transfer, and any organizational documents that Agent shall require, and such other information as Agent shall reasonably request regarding the proposed transferee so as to conduct such background checks, investigations, Patriot Act, OFAC and other searches (including all such searches as are necessary

107

to satisfy any regulatory requirements and/or internal compliance, "know your customer" and/or committee requirements of Agent, to the extent such internal requirements are applied on a non-discriminatory basis) as Agent shall require (at Borrower's sole cost and expense), and Agent does not, within fifteen (15) days of receiving such notice from Borrower, send a notice to Borrower of a Prohibited Transferee Determination.

5.2.10   **No Distributions**. Borrower shall not make any distributions or other disbursements except in accordance with <u>Section 7.4</u> of the Senior Loan Agreement.

5.2.11   **Budgets and Schedules**. Except to the extent otherwise expressly permitted hereunder, Borrower shall not amend, modify or supplement the Business Plan, the Project Budget, the Building Loan Budget, the Annual Budget or the Construction Schedule without the prior written consent of Agent.  Borrower shall expend funds only in accordance with the Project Budget and pursuant to the Construction Schedule and the Plans and Specifications, and any reallocation of any category or Line Items in the Project Budget shall be made in accordance with this Agreement.

5.2.12   **Contracts**.  Borrower shall not (and shall not permit any other Person to) enter into, amend, modify, supplement or terminate any Major Contract or appoint or change Borrower's Architect or any Major Contractor without the prior written consent of Agent in its reasonable discretion (except that such approval shall be in Agent's sole discretion if the Contractor under such Major Contract is a Borrower Related Party).

5.2.13   **Minimum Release Prices**. Any amendments to the Minimum Release Prices shall be subject to Agent's prior written consent.

5.2.14   **Casualty; Condemnation**. Borrower shall not take any action with regard to a Casualty or Condemnation except in strict accordance with <u>Section 6.2</u> below.

5.2.15   **Affiliate Transactions**. Borrower shall not enter into, or be a party to, any transaction with a Borrower Related Party without obtaining Agent's prior written consent.

5.2.16   [Intentionally omitted]

5.2.17   **Construction Manager Fee Cap.** Notwithstanding anything contained herein or in any other Loan Document to the contrary (including, without limitation, Borrower's ability to request amendments to the Project Budget), in no event shall the aggregate fees paid to Construction Manager in connection with the Project (the "**Construction Manager Fee**") exceed $2,000,000, which Construction Manager Fee will be used for payment of Construction Manager's actual and reasonable out-of pocket expenses and costs in connection with the performance of its services under the Construction Management Agreement and will be subordinated to the repayment of the Loan (in accordance with the Assignment of Construction Management Agreement).

108

5.2.18    **Borrower Accounts**. Borrower shall have no operating accounts or bank accounts except for those explicitly permitted and contemplated by this Agreement and the Cash Management Agreement.

5.2.19    **Required Consent**. Borrower shall not take any action or fail to act in any way to the extent that such action or inaction requires Agent's prior written consent under the Loan Documents without obtaining Agent's (as applicable) prior written consent.

**Section 5.3    Covenants after Conversion**. From and after the Conversion until the Board Turnover Date, each covenant in this Agreement or any other Loan Document requiring Borrower to take (or refrain from taking) any action shall be read to also require Borrower to, prior to the Board Turnover Date, cause the Condominium Board to take (or refrain from taking) such action (without excusing Borrower from performance of the same to the extent such covenant is capable of being performed by Borrower), subject to Borrower's fiduciary duty as a member of the Condominium Board. From and after the Board Turnover Date, each covenant in this Agreement or any other Loan Document requiring Borrower to take (or refrain from taking) any action shall be read to also require Borrower to cause the members of the Condominium Board designated by Borrower to vote in a manner consistent with such covenant (without excusing Borrower from performance of the same to the extent such covenant is capable of being performed by Borrower), subject to Borrower's fiduciary duty as a member of the Condominium Board.

**ARTICLE VI**

**INSURANCE; CASUALTY;
CONDEMNATION; REQUIRED REPAIRS**

**Section 6.1    Insurance**

6.1.1    **Insurance Policies**. Borrower, at its sole cost and expense, shall obtain and maintain, or cause to be maintained, the following insurance policies:

(a)    At all times after the commencement of construction and prior to Final Completion and at any time thereafter during which construction work is being performed at the Property:

(A)    Builder's Risk "All Risk" insurance in such amount as Agent shall require but in no event less than one hundred percent (100%) of the replacement cost of the existing building, plus 100% of the Hard Costs as identified in the current Project Budget, but excluding foundations and any other improvements not subject to physical damage). Such policy shall be written on a Builder's Risk Completed Value Form (100% non-reporting) or its equivalent and shall include, without limitation, permission to occupy completed units, coverage for loss by testing, collapse, theft, terrorism, and earth movement, and, if any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area", flood hazard insurance in an amount equal to the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended, or such

109

greater amount as Agent shall require, with permission granted to occupy with a sublimit for earth movement and, if applicable, flood, in an amount approved by Agent.  Such insurance Policy shall also include coverage for:

(i)      Loss suffered with respect to materials, equipment, heating and air conditioning machinery, machinery, and supplies, in each case owned by Borrower or required to be insured by Borrower, whether on-site, in transit, or stored offsite and with respect to temporary structures, hoists, sidewalks, retaining walls, and underground property in each case owned by Borrower or required to by insured by Borrower;

(ii)     Soft costs that are recurring costs, which shall include, without limitation, delayed opening loss of income/revenue coverage for a period of recovery of not less than twelve (12) months commencing from the date the Project was to be completed agreed to by Agent, as well as costs to reproduce plans, specifications, blueprints and models in connection with any restoration following a casualty with coverage in an amount of no less than 100% of such Soft Costs as identified in the most recent approved Project Budget;

(iii)    Demolition, debris removal and increased cost of construction, including, without limitation, increased costs arising out of changes in applicable laws and codes; and

(iv)    Operation of building laws.

(B)      Borrower shall cause Borrower's Architect and any engineer providing services for the Project to obtain and maintain Architect's or Professional Liability insurance during the period commencing on the date of the Architect's Contract or applicable Contract relating to such engineer's provision of services, as applicable, and expiring no earlier than five (5) years after Substantial Completion.  Such insurance shall be in an amount equal to at least $2,000,000 per claim or as otherwise acceptable to Agent.

(C)      Workers Compensation, Employer's Liability coverage and Disability insurance as required by law covering employees, if any, of Borrower or any Affiliate.

(D)      Prior to or simultaneously with its entering into the Construction Management Agreement, Borrower shall cause the Construction Manager to obtain and maintain, and Borrower shall maintain, Commercial General Liability coverage, including, without limitation, products and completed operations and containing no "X", "C", "U" exclusion if excavation and/or demolition is to be provided (and, with regard to Borrower's and the Construction Manager's products and completed operations insurance, shall be without exclusion for construction defects), and Automobile Liability insurance with no less than $50,000,000 in limits per occurrence and in the aggregate per project through primary and umbrella liability coverages, with three year extended completed operations "tail" coverage (which, for the Construction Manager "tail" coverage, may be maintained through annual renewals).  Such insurance shall name

110

Borrower or the Construction Manager, as the case may be, as the insured and Agent as additional insured.  Borrower shall also require that all Contractors cause all of its respective subcontractors to maintain similar coverage with limits of no less than $1,000,000 per occurrence and shall include Borrower and Agent as additional insureds. All Persons engaged in work on the improvements at the Property shall maintain statutory Workers Compensation and Disability insurance in force for all workers on the job.

(b)     At all times:

(A)     Insurance against loss customarily included under standard "All Risk" policies including earthquake and, if any portion of the Improvements is currently or at any time in the future located in a federally designated "special flood hazard area", flood hazard insurance in an amount equal to the maximum amount of such insurance available under the National Flood Insurance Act of 1968, the Flood Disaster Protection Act of 1973 or the National Flood Insurance Reform Act of 1994, as each may be amended, or such greater amount as Agent shall require, with permission granted to occupy with a sublimit for earth movement and, if applicable, flood, in an amount approved by Agent (with the sublimits for flood and earthquakes set forth above), terrorism, vandalism, and malicious mischief, boiler and machinery, and such other insurable hazards as, under good insurance practices, from time to time are insured against for other property and buildings similar to the Property in nature, use, location, height, and type of construction. Such insurance Policy shall also insure costs of demolition and increased cost of construction.  The amount of such insurance shall be not less than one hundred percent (100%) of the replacement cost value of the improvements at the Property.  Each such insurance Policy shall contain an agreed amount replacement cost endorsement.  If the insurance required under this paragraph is not obtained by blanket insurance policies, the insurance policy shall be endorsed to also provide guaranteed building replacement cost, subject to typical sublimits, to the improvements at the Property in an amount to be subject to the approval of Agent.  Agent shall be named Loss Payee on a Standard Mortgagee Endorsement.

(B)     Agent shall be named as Loss Payee for insurance coverage with regard to payment of Taxes, Assessments, and Other Charges for Unsold Units.

(C)     Comprehensive Boiler and Machinery coverage, if applicable, with a minimum limit as shall be required by Agent, for all mechanical and electrical equipment against physical damage, rent loss and improvements loss, with exclusions for testing removed.

(c)     At all times:

(A)     Public Liability insurance, including, without limitation, vacant building, Commercial General Liability insurance; Owned Hired and Non-Owned Auto Liability; and Umbrella Liability coverage for Personal Injury, Bodily Injury, Death, Accident and Property Damage, providing in combination no less than $50,000,000 per occurrence and in the annual aggregate on per location basis, if aggregate

111

limits are shared with other locations the amount of Umbrella Liability insurance to be provided shall be not less than $75,000,000.  The policies described in this paragraph shall cover, without limitation:  elevators, escalators, independent contractors, Contractual Liability (covering, to the maximum extent permitted by law, Borrower's obligation to indemnify Agent and Lender as required under this Agreement), Products and Completed Operations Liability coverage. Such insurance shall name Borrower as the insured and Agent as an additional insured.

        (B)    Workers Compensation and Disability insurance as required by applicable law.

        (C)    Intentionally Omitted.

        (D)    Such other types and amounts of insurance with respect to the Property as may from time to time be required by Agent.

        (d)    After the Conversion Date, Borrower shall cause the Condominium Board to maintain the insurance provided for in this Section 6.1 until the Loan is repaid in full. Such costs shall be reflected in the budget for the Condominium which is included in the Offering Plan, and shall include such modifications as might be required by the DOL or applicable regulations.

        (e)    All insurance provided for in this Section 6.1 shall be obtained under valid and enforceable policies (collectively, the "**Policies**" or in the singular, the "**Policy**"), and, to the extent not specified above, shall be subject to the approval of Agent as to deductibles, loss payees and insureds.  Not less than five (5) days prior to the expiration dates of the Policies theretofore furnished to Agent, certificates of insurance evidencing the Policies acceptable to Agent shall be delivered by Borrower to Agent. Within forty five (45) days after commencement of the new or renewal Policy evidence satisfactory to Agent of payment of the premiums due thereunder (the "**Insurance Premiums**") shall be delivered by Borrower to Agent.  Not later than ninety (90) days after the renewal or replacement of each of the Policies, Borrower shall deliver to Agent an original or certified copy (as required pursuant to this paragraph) of a renewal or replacement Policy or Policies.

        (f)    Prior to the renewal or replacement of the existing Policy, any required insurance may be procured under a blanket insurance Policy covering the Property and other properties or assets of Borrower or its Affiliates, provided that any such blanket insurance Policy shall specifically allocate to the Property the amount of coverage from time to time required hereunder and shall otherwise provide the same protection as would a separate Policy insuring only the Property in compliance with the provisions of this Article VI. Agent shall determine whether such blanket Policies provide sufficient limits of insurance.

        (g)    Unless otherwise specified, all Policies of insurance provided for or contemplated by this Article VI shall, in the case of property damage, builder's risk, boiler and machinery, flood and earthquake insurance, name Borrower as the insured and Agent as the additional insured and shall contain a so-called New York standard non-contributing mortgagee clause or its equivalent in favor of Agent (including Agent as mortgagee and loss payee) providing

that the loss thereunder shall be payable to Agent and providing thirty (30) days' advance notice of cancellation to Agent. Notwithstanding the foregoing, if Borrower converts the Property to condominium form of ownership in accordance with the terms hereof, from and after the condominium conversion, Agent's rights under this Article VI shall be subject to the terms of the Declaration of Condominium; however, Borrower agrees to designate Agent as the "Insurance Trustee" under the Condominium Documents until the Loan is repaid in full.

        (h)     All Property insurance also shall include a co-insurance waiver and Agreed Amount Endorsement. The amount of any deductible under any Policy must be acceptable to Agent. Without Agent's prior written consent, Borrower shall not name any Person other than Agent, as loss payee, as it pertains to the Property, nor shall Borrower carry separate or additional insurance coverage covering the improvements at the Property concurrent in form or contributing in the event of loss with that required by this Agreement or; provided that, if blanket policies are obtained, this sentence shall not apply to property covered by such blanket policies other than the improvements at the Property and such tenant improvements and betterments that Borrower is required to insure pursuant to the applicable Lease.

        (i)     Each Policy shall contain a provision whereby the insurer: (i) agrees that such Policy shall not be canceled or terminated, the coverage, deductible, and limits of such Policy shall not be modified, other provisions of such Policy shall not be modified if such Policy, after giving effect to such modification, would not satisfy the requirements of this Agreement, and such Policy shall not be so modified, canceled or fail to be renewed, without in each case, at least thirty (30) days prior written notice to Agent, (ii) waives any right to claim any Insurance Premiums and commissions against Agent or Lender, provided that the Policy need not waive the requirement that the Insurance Premiums be paid in order for a claim to be paid to the insured and (iii) provides that Agent is permitted to make payments to effect the continuation of such policy upon notice of cancellation due to non-payment of premiums. In the event any Policy (except for general public and other liability and Workers Compensation insurance) shall contain breach of warranty provisions, such Policy shall not be invalidated by and shall insure Agent regardless of (A) any act, failure to act or negligence of or violation of warranties, declarations or conditions contained in such Policy by any named insured, (B) the occupancy or use of the Property for purposes more hazardous than permitted by the terms thereof, or (C) any foreclosure or other action or proceeding taken by Agent pursuant to any provision of the Mortgage or any other Loan Document.

        (j)     Borrower shall pay the Insurance Premiums for the Policies as the same become due and payable. Borrower shall deliver to Agent certified copies of the Policies required to be maintained pursuant to this Article VI; provided, however, Agent shall not be deemed by reason of the custody of such Policies to have knowledge of the contents thereof. Borrower also shall deliver to Agent within ten (10) days after Agent's request, a statement setting forth the particulars as to all such Policies, indicating that all Insurance Premiums due thereon have been paid and that the same are in full force and effect.

        (k)     If at any time Agent is not in receipt of written evidence that all insurance required hereunder is maintained in full force and effect, Agent shall have the right (but not the obligation), upon notice to Borrower, to take such action as Agent deems necessary to

protect Agent's and Lender's interest in the Property, including, without limitation, the obtaining of such insurance coverage as Agent deems appropriate and all Insurance Premiums incurred by Agent in connection with such action or in obtaining such insurance and keeping it in effect shall be paid by Borrower to Agent upon demand and until paid shall be secured by the Building Loan Mortgage and/or the Senior Loan Mortgage and/or the Project Loan Mortgage, as determined by Agent, and shall bear interest at the Default Rate.

(i)     In the event of foreclosure of the Building Loan Mortgage and/or the Senior Loan Mortgage and/or the Project Loan Mortgage or other transfer of title to the Property in extinguishment in whole or in part of the Total Debt, all right, title and interest of Borrower in and to the Policies that are not blanket Policies then in force concerning the Property and all proceeds payable thereunder shall thereupon vest in the purchaser at such foreclosure or Agent or other transferee in the event of such other transfer of title (except, if the Conversion Date shall have occurred, other than with respect to Policies or other insurance maintained by the Condominium Board).

6.1.2    **Insurance Company**. The Policies shall be issued by financially sound and responsible insurance companies authorized to do business in the state in which the Property is located and having a claims paying ability rating of "A/X" or better by A.M. Best Company, Inc. or of at least "A" or better from S&P**,** and (i) shall contain a waiver of subrogation against Agent, (ii) shall contain such provisions as Agent deems reasonably necessary or desirable to protect its interest, including endorsements providing for a deductible per loss of an amount not more than that which is customarily maintained by prudent owners of properties with a standard of operation and maintenance comparable to and in the general vicinity of such Property, but in no event in excess of an amount reasonably acceptable to Agent, and (iii) shall be satisfactory in form and substance to Agent and shall be approved by Agent as to amounts, form, risk coverage, deductibles, loss payees and insureds. No insurance policy required hereunder shall include any so called "terrorist exclusion" or similar exclusion or exception to insurance coverage relating to the acts of terrorist groups or individuals; provided that, for so long TRIA is in effect, Agent shall accept terrorism insurance with coverage against acts which are "certified" within the meaning of TRIA.

**Section 6.2     Casualty and Condemnation**.

6.2.1    **Casualty**. If the Property shall be damaged or destroyed, in whole or in part, by fire or other casualty (a "**Casualty**"), Borrower shall give prompt notice of such Casualty to Agent and, underlined provided that, if required to do so pursuant to this Agreement, Agent makes the Net Proceeds available to Borrower in accordance with the provisions of this Agreement, Borrower shall promptly commence and diligently prosecute to completion the repair and restoration of the Property as nearly as possible to the condition the Property was in immediately prior to such Casualty (a "**Restoration**") and otherwise in accordance with this Agreement.  Borrower shall pay all costs of such Restoration whether or not such costs are covered by insurance.  Agent may, but shall not be obligated to, make proof of loss if not made promptly by Borrower.

6.2.2    **Condemnation**. Borrower shall give Agent prompt notice of any actual or, to Borrower's knowledge, threatened Condemnation by any Governmental Authority of all or any

114

part of the Property and shall deliver to Agent a copy of any and all papers served in connection with such proceedings. Agent may participate in any such proceedings, and Borrower shall from time to time deliver to Agent all instruments requested by Agent to permit such participation. Borrower shall, at its expense, diligently prosecute any such proceedings, and shall consult with Agent, its attorneys and experts, and cooperate with them in the carrying on or defense of any such proceedings. Notwithstanding any Condemnation, Borrower shall continue to pay the Total Debt at the time and in the manner provided for in the Note and the Loan Agreement. Agent shall not be limited to the interest paid on the Award by any Governmental Authority but shall be entitled to receive out of the Award interest and additional interest (if any) at the rate or rates provided in the Loan Agreement and Note. If the Property or any portion thereof is taken by any Governmental Authority, provided that, if required to do so pursuant to this Agreement, Agent makes the Net Proceeds available to Borrower in accordance with the provisions of this Agreement, Borrower shall promptly commence and diligently prosecute the Restoration of the Property and otherwise comply with the provisions of hereof. If the Property is sold, through foreclosure or otherwise, prior to the receipt by Agent of the Award, Agent shall have the right, whether or not a deficiency judgment on the Note shall have been sought, recovered or denied, to receive the Award, or a portion thereof sufficient to pay the Total Debt.

### 6.2.3    **Delivery of Net Proceeds.**

(a)    <u>Minor Casualty or Condemnation</u>. If a Casualty or Condemnation has occurred to the Property, Borrower's right, title and interest in and to all Net Proceeds are, except as otherwise herein provided, hereby assigned by Borrower to Agent and all Net Proceeds shall, except as otherwise herein provided, be paid to Agent.  Borrower shall, in good faith and in a commercially reasonable manner, file and prosecute the adjustment, compromise or settlement of any claim for Net Proceeds and, subject to Borrower's right to receive the direct payment of any Net Proceeds as herein provided, will cause the same to be paid directly to Agent to be held and applied in accordance with the provisions of this Agreement.  Except upon the occurrence and during the continuance of an Event of Default, Borrower may settle any insurance claim with respect to Net Proceeds which do not exceed $2,000,000 (the "**Restoration Threshold**"). Whether or not an Event of Default shall have occurred and be continuing, Agent shall have the right to participate in any settlement discussions and approve any settlement which would in Agent's judgment result in Net Proceeds which exceed the Restoration Threshold and Borrower shall deliver or cause to be delivered to Agent all instruments requested by Agent to permit such approval. Borrower shall pay all reasonable costs, fees and expenses incurred by Agent and Lender (including all reasonable attorneys' fees and expenses, the fees of insurance experts and adjusters and costs incurred in any litigation or arbitration), and interest thereon at the Default Rate to the extent not paid within twenty (20) days after delivery of a written request for reimbursement by Agent, accompanied by reasonable back-up documentation, in connection with the settlement of any claim for Proceeds and the seeking and obtaining of any payment on account thereof in accordance with the foregoing provisions. If any Net Proceeds are received by Borrower and may be retained by Borrower pursuant to this <u>Section 6.2</u>, such Net Proceeds shall, until the completion of the related work, be held in trust for Agent and shall be segregated from other funds of Borrower to be used to pay for the cost of the Restoration in accordance with the terms hereof, and to the extent such Net Proceeds exceed the Restoration Threshold, such Net Proceeds shall be forthwith paid directly to and held by Agent to be applied or disbursed in accordance with this <u>Article VI</u>. If

115

an Event of Default shall have occurred and be continuing, or if Borrower fails to file any insurance claim for a period of thirty (30) days, or to prosecute the same with commercially reasonable diligence following Borrower's receipt of written notice to do so from Agent, Borrower hereby irrevocably empowers Agent, in the name of Borrower as its true and lawful attorney-in-fact, to file and prosecute such claim (including settlement thereof) with counsel satisfactory to Agent and to collect and to make receipt for any such payment, all at Borrower's expense (including payment of interest at the Default Rate for any amounts advanced by Agent pursuant to this sentence).

(b)     If a Casualty or Condemnation has occurred to the Property and the Net Proceeds shall be less than the Restoration Threshold and the costs of completing the Restoration shall be less than the Restoration Threshold, and provided no Event of Default shall have occurred and remain uncured and the Note is not otherwise required to be prepaid, the Net Proceeds will be disbursed by Agent to Borrower to be applied to restoration of the Property in accordance with the terms hereof. As soon as reasonably practicable after receipt of the Net Proceeds Borrower shall commence and satisfactorily complete with due diligence: (x) Substantial Completion prior to the Initial Maturity Date in accordance with the terms of this Agreement, if such Casualty or Condemnation occurs prior to  Substantial Completion; or (y) the Restoration in accordance with the terms of this Agreement, if such Casualty or Condemnation occurs after Substantial Completion. If at any time the Net Proceeds shall not, in the reasonable opinion of Agent in consultation with the Casualty Consultant, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion of the Restoration, Borrower shall deposit the deficiency with Agent before any further disbursement of the Net Proceeds shall be made, which deficiency shall be held by Agent and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds set forth in Section 6.2.4 below, and until so disbursed shall constitute additional security for the Total Debt.

### 6.2.4   Major Casualty or Condemnation.

(a)     If a Casualty or Condemnation has occurred to the Property, Borrower shall commence and satisfactorily complete with due diligence the Restoration in accordance with the terms of this Agreement, provided that, if required to pursuant to the terms of this Agreement, Agent shall have made the Net Proceeds available to Borrower in accordance with the provisions of this Agreement. If the Net Proceeds are equal to or greater than the Restoration Threshold or the costs of completing the Restoration, or completing the Improvements, as applicable, is equal to or greater than the Restoration Threshold (or, with respect to the Condominium Policy after the Conversion, if the Condominium Documents so require), Agent shall make the Net Proceeds available for the Restoration, provided that each of the following conditions are met:

(1)     If the Casualty or Condemnation occurs prior to Substantial Completion:

(i)     No Event of Default shall have occurred and be continuing;

116

(ii)     Agent is  satisfied that the Net Proceeds plus any Advances available under the Building Loan Agreement and Project Loan Agreement are sufficient to cause Final Completion and pay all Project Related Costs to be incurred in connection therewith provided however to the extent that Net Proceeds plus any Advances available under this Agreement and the Project Loan Agreement are insufficient to cause Final Completion and pay all Project Related Costs to be incurred in connection therewith, Borrower may deposit into a reserve account held and controlled by Agent additional funds in an amount equal to the shortfall; and

(iii)     Agent shall be  satisfied that  Substantial Completion will be achieved on or prior to the Substantial Completion Date and Final Completion will be achieved on or prior to the Final Completion Date.

(2)     If  the  Casualty  or  Condemnation  occurs  following  Substantial Completion:

(i)     No Event of Default shall have occurred and be continuing;

(ii)     In the event the Net Proceeds are insurance proceeds, less than twenty-five percent (25%) of the total floor area of both the Improvements at the Property and the Unsold Units then secured by the Lien of the Mortgage has been damaged, destroyed or rendered unusable as a result of such Casualty, and less than twenty-five percent (25%) of the total floor area  has been damaged, or (B) in the event the Net Proceeds are an Award, less than ten percent (10%) of the land constituting the Property or the Unsold Units then secured by the Lien of the Mortgage is taken, and such land is located along the perimeter or periphery of the Property, and no portion of any building that is a part of the Improvements is the subject of the Condemnation;

(iii)     Borrower  shall  commence  the  Restoration  as  soon  as reasonably practicable (but in no event later than sixty (60) days after receipt of the Net Proceeds related to such Casualty or Condemnation, whichever the case may be) provided the Net Proceeds are agreed by Agent to be made available to Borrower and shall diligently pursue the same to satisfactory completion;

(iv)     Agent shall be  satisfied that any Project Related Costs, Carry Costs and all payments of principal and interest under the Note will be paid during the period required for Restoration from (A) Advances available under this Agreement and the Project Loan Agreement, (B) the Net Proceeds, and/or (C) other funds of Borrower;

(v)     Agent shall be satisfied (exercising reasonable judgment) that the Restoration will be achieved, on or before the earliest to occur of (A) the date six (6) months prior to the Maturity Date, (B) such time as may be required under applicable Legal Requirements in order to repair and restore the Property to the condition it was in immediately prior to such Casualty or to as nearly as possible the condition it was in immediately prior to such Condemnation, as applicable or (C) the expiration of any insurance coverage required under this Agreement.

(vi)     The Property and the use thereof after the Restoration will be in compliance with and permitted under all applicable Legal Requirements;

(vii)     The Restoration shall be done and completed by Borrower in an expeditious and diligent fashion and in compliance with all applicable Legal Requirements; and

(viii)   Such Casualty or Condemnation, as applicable, does not result in a loss of access to the Property or the related Improvements for a period in excess of one hundred eighty (180) days;

(ix)     If such Casualty or Condemnation occurs after the Board Turnover Date, Restoration will concurrently occur with regard to the balance of the Units not under the control of Borrower in accordance with this <u>Section 6.2.4</u> as determined by Agent; and.

(x)     Following Restoration, the Loan to Value Ratio as of such date shall be no more than 65%.

(b)     The Net Proceeds shall be paid directly to Agent and held by Agent in an interest-bearing account and, until disbursed in accordance with the provisions of this <u>Section 6.2.4</u> shall constitute additional security for the Total Debt. With respect to Net Proceeds resulting from a Casualty or Condemnation occurring prior to Substantial Completion, the same shall be disbursed in the same manner and subject to the satisfaction by Borrower of the same conditions precedent as are applicable to the disbursement of Advances under this Agreement.

(c)     Net Proceeds shall be disbursed by Agent to, or as directed by, Borrower from time to time during the course of the Restoration, upon receipt of evidence satisfactory to Agent that (A) all requirements set forth in <u>Section 6.2.4(a)</u> have been satisfied, (B) all relevant conditions to the making of Advances of the Loan shall have been satisfied with respect to disbursements of Net Proceeds for Restoration as though such disbursements were of Loan Proceeds rather than Net Proceeds, it being understood however that disbursements of Net Proceeds shall not be deemed to be Advances of the Loan, (C) all materials installed and work and labor performed (except to the extent that they are to be paid for out of the requested disbursement) in connection with the Restoration have been paid for in full, and (D) there exist no notices of pendency, stop orders, mechanic's or materialman's liens or written notices of intention to file same, or any other Liens of any nature whatsoever on the Property arising out of the Restoration which have not either been fully bonded to the satisfaction of Agent and discharged of record or in the alternative fully insured to the satisfaction of Agent by the title company issuing the Title Insurance Policy.

(d)     All plans and specifications required in connection with the Restoration shall be subject to prior reasonable approval by Agent, in consultation with an independent architect selected by Agent (which shall be the Construction Consultant if the Casualty or Condemnation occurs prior to Substantial Completion) (the "**Casualty Consultant**"). The identity of the contractors, subcontractors and materialmen engaged in the Restoration, as well as the contracts under which they have been engaged, shall be subject to approval by Agent acting

118

in its reasonable discretion. All costs and expenses incurred by Agent and Lender in connection with recovering, holding and advancing the Net Proceeds for the Restoration including, without limitation, attorneys' fees and disbursements and the Casualty Consultant's fees and disbursements, shall be paid by Borrower.

(e)       In no event shall Lender be obligated to make Advances until all Net Proceeds have been utilized.

(f)       In no event shall Agent be obligated to make disbursements of the Net Proceeds in excess of an amount equal to the costs actually incurred from time to time for work in place as part of the Restoration, as certified by the Casualty Consultant, less the Casualty Retainage. The term "**Casualty Retainage**" shall mean, as to each contractor, subcontractor or materialman engaged in the Restoration, an amount equal to ten percent (10%) of the costs actually incurred for work in place as part of the Restoration, as certified by the Casualty Consultant, until such time as the Restoration work is fifty percent (50%) complete, and five percent (5%) of such costs thereafter. The Casualty Retainage shall in no event, and notwithstanding anything to the contrary set forth above, be less than the amount actually held back by Borrower from contractors, subcontractors and materialmen engaged in the Restoration.  The Casualty Retainage shall not be released until the Casualty Consultant certifies to Agent that the Restoration has been completed in accordance with the provisions of this Section 6.2.4(e) and all applicable Legal Requirements and that all approvals necessary for the re-occupancy and use of the Property have been obtained from all appropriate Governmental Authorities, and Agent receives evidence satisfactory to Agent that the costs of the Restoration have been paid in full or will be paid in full out of the Casualty Retainage; provided, however, that Agent will release the portion of the Casualty Retainage being held with respect to any contractor, subcontractor or materialman engaged in the Restoration as of the date upon which the Casualty Consultant certifies to Agent that the contractor, subcontractor or materialman has satisfactorily completed all work and has supplied all materials in accordance with the provisions of such contractor's, subcontractor's or materialman's contract, the contractor, subcontractor or materialman delivers the lien waivers and evidence of payment in full of all sums due to the contractor, subcontractor or materialman as may be requested by Agent or by the title company issuing the Title Insurance Policy, and Agent receives an endorsement to the Title Insurance Policy insuring the continued priority of the Lien of the Mortgage and evidence of payment of any premium payable for such endorsement.  If required by Agent, the release of any such portion of the Casualty Retainage shall be approved by the surety company, if any, which has issued a payment or performance bond with respect to the contractor, subcontractor or materialman.

(g)       Agent shall not be obligated to make disbursements of the Net Proceeds more frequently than once every calendar month, unless a more frequent disbursement schedule is approved by Agent it its sole good faith discretion.

(h)       If at any time the Net Proceeds or the undisbursed balance thereof (together with Advances available under the Building Loan and the Project Loan, if such Casualty or Condemnation occurs prior to Substantial Completion) shall not, in the opinion of Agent in consultation with the Casualty Consultant, be sufficient to pay in full the balance of the costs which are estimated by the Casualty Consultant to be incurred in connection with the completion

of the Restoration, Borrower shall deposit the deficiency (the "**Net Proceeds Deficiency**") with Agent before any further disbursement of the Net Proceeds shall be made.  The Net Proceeds Deficiency deposited with Lender shall be held by Agent and shall be disbursed for costs actually incurred in connection with the Restoration on the same conditions applicable to the disbursement of the Net Proceeds, and until so disbursed pursuant to this Section 6.2.4 shall constitute additional security for the Total Debt.

(i)     The excess, if any, of the Net Proceeds Deficiency deposited with Agent after the Casualty Consultant certifies to Agent that the Restoration has been completed in accordance with the provisions of this Section 6.2.4, and the receipt by Agent of evidence satisfactory to Agent that all costs incurred in connection with the Restoration have been paid in full, shall be remitted by Agent to Borrower, so long as no monetary Default or Event of Default shall have occurred and be continuing.

(j)     All Net Proceeds not required to be made available for the Restoration shall be applied in accordance with the provisions of Section 2.4.2 above.

(k)     Notwithstanding the foregoing, Agent's rights and obligations with respect to this Article VI shall be subject to the terms of the Condominium Documents from and after the sale by Borrower and release of the first Unit at the Property from the Lien of the Mortgage in accordance with the terms hereof.

**Section 6.3     Application of Net Proceeds**. Upon the occurrence and continuation of an Event of Default Agent, at its option, may withdraw all the Net Proceeds or the undisbursed balance thereof and the remaining balance, if any, of the Net Proceeds Deficiency deposited with Agent and may apply such Net Proceeds and Net Proceeds Deficiency either to the payment of Restoration costs or to payment of the Total Debt in such order, proportion and priority as Agent may determine in its sole discretion subject to Section 2.4.2. Agent's right to withdraw and apply such Net Proceeds and Net Proceeds Deficiency shall be in addition to all other rights and remedies provided to Agent and Lender under the Loan Documents. Notwithstanding the foregoing, Agent's rights and obligations with respect to this Section 6.3 shall be subject to the terms of the Condominium Documents from and after the sale by Borrower and release of the first Unit at the Property from the Lien of the Mortgage in accordance with the terms hereof.

**ARTICLE VII**

**RESERVE FUNDS**

**Section 7.1     Deposit Account**. Borrower shall cause all Gross Revenue (other than amounts in respect of Net Sales Proceeds, which shall be deposited directly in the Deposit Account pursuant to this Section 7.1 to the extent Gross Sales Proceeds are not in escrow pursuant to Section 5.1.32 hereof and/or pursuant to the Condominium Documents) to be transmitted directly into a trust account (the "**Clearing Account**") established on or prior to the Closing Date and maintained by Borrower at a bank that is an Eligible Institution and is reasonably approved by Lender (the "**Clearing Bank**"), as more fully described in the Clearing Account Control Agreement executed in connection with the opening of the Clearing Account. Borrower shall cause all Net Sales Proceeds (to the extent Gross Sales Proceeds are not in escrow pursuant to

120

Section 5.1.32 hereof and/or pursuant to the Condominium Documents) to be transmitted directly into the Deposit Account. Without in any way limiting the foregoing, if Borrower or any other Person shall receive any Net Sales Proceeds or other Gross Revenue from the Property, then (i) such amounts shall be deemed to be collateral for the Obligations and shall be held in trust for the benefit, and as the property, of Agent (on behalf of Lender), (ii) such amounts shall not be commingled with any other funds or property of Borrower or such Person, and (iii) Borrower or such Person shall deposit (x) such Gross Revenue (other than Net Sales Proceeds) in the Clearing Account, and (y) such Net Sales Proceeds in the Deposit Account, in each case, within one (1) Business Day of receipt. All funds deposited into the Clearing Account shall be swept by the Clearing Bank on a daily basis into the Deposit Account. Funds deposited into the Deposit Account shall be applied and disbursed in accordance with this Agreement. Agent may also establish subaccounts of the Deposit Account which shall at all times be Eligible Accounts (or may be ledger or book entry accounts and not actual accounts) (such Deposit Account along with the Clearing Account, the Carry Cost Account, the Interest Reserve Account and the Rebalancing Reserve Account and all other accounts and subaccounts established pursuant to the Loan Documents are referred to herein as "**Accounts**"). The Deposit Account and all other Accounts will be under the sole control and dominion of Agent, and Borrower shall have no right of withdrawal therefrom.  Borrower shall pay for all expenses of opening and maintaining all of the Accounts.  Failure to make any deposit into any Account as and when required pursuant to this Agreement shall be an immediate Event of Default.

### Section 7.2    Reserve Accounts.

7.2.1    Section 7.2.1 of the Senior Loan Agreement, and all accompanying definitions, schedules, and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

7.2.2    Section 7.2.2 of the Senior Loan Agreement, and all accompanying definitions, schedules, and exhibits, is hereby incorporated herein by reference as if fully set forth herein.  Section 7.2.3 of the Senior Loan Agreement, and all accompanying definitions, schedules, and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

7.2.4    Section 7.2.4 of the Senior Loan Agreement, and all accompanying definitions, schedules, and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

7.2.5    **Rebalancing Reserve Account**.  As and when required under Section 2.1.7 Borrower shall deposit into an account controlled by Agent (the "**Rebalancing Reserve Account**") such amounts as required to be deposited by Borrower pursuant to Section 2.1.7 to be disbursed to Borrower in express accordance with Section 2.1.7.

7.2.6    [Intentionally omitted.]

7.2.7    [Intentionally omitted.]

7.2.8    **Borrower Operating Account**. Provided no monetary Default, material non-monetary Default or Event of Default has occurred and is continuing, subject to the terms of

the Loan Documents, Borrower shall be entitled to cause funds on deposit in the Borrower Operating Account to be applied to the Project Related Costs and Carry Costs (but not Debt Service) that are scheduled to be paid during such month pursuant to the Project Budget and/or the Approved Annual Budget. On a quarterly basis as of the last Payment Date in each calendar quarter, Borrower shall deliver to Agent a reconciliation of amounts funded into and utilized from the Borrower Operating Account on account of Project Related Costs and Carry Costs with the actual amount expended during such quarter for Project Related Costs and Carry Costs, with any resulting surplus or deficiency being credited or debited, as applicable, against amounts to be disbursed to the Borrower Operating Account pursuant to the Loan Documents.

7.2.9    **Application of Accounts following Default**. Upon the occurrence and continuation of an Event of Default, Agent, at its option, may withdraw all amounts in the Accounts and if Agent does so, shall apply such amounts either to the payment of Carry Costs, to the Project, to the Total Debt or any other Obligations in such order, proportion and priority as Agent may determine in its sole discretion. Agent's right to withdraw and apply amounts in the Accounts shall be in addition to all other rights and remedies provided to Agent and Lender under the Loan Documents**.**

### Section 7.3    Security Interest in Funds.

7.3.1    **Grant of Security Interest**.  Borrower grants to Agent (for the benefit of Lender) a first-priority perfected security interest in the Accounts and the Reserve Funds and any and all monies now or hereafter deposited in each Account as additional security for payment of the Total Debt. Until expended or applied in accordance herewith, the Reserve Funds shall constitute additional security for the Total Debt. During the continuance of an Event of Default, Agent may, in addition to any and all other rights and remedies available to Agent and Lender, apply any sums then present in any or all of the Accounts to the payment of the Total Debt or any other Obligations in any order in its sole discretion. The Reserve Funds shall not constitute trust funds and may be commingled with other monies held by Agent. The Reserve Funds shall be held in an Eligible Account and, if invested, shall only be invested in Permitted Investments. Provided no Event of Default exists, all interest which accrues on the funds in any Account shall accrue for the benefit of Borrower and shall be taxable to Borrower and shall be added to and disbursed in the same manner and under the same conditions as the principal sum on which said interest accrued. Agent shall not be liable for any loss sustained on the investment of any funds constituting the Reserve Funds. Borrower shall indemnify Agent and Lender and hold Agent and Lender harmless from and against any and all actions, suits, claims, demands, liabilities, losses, damages, obligations and actual costs and expenses (including reasonable litigation costs and reasonable attorneys' fees and expenses) arising from or in any way connected with the Reserve Funds or the Accounts or the performance of the obligations for which the Accounts were established. Borrower shall assign to Agent all rights and claims Borrower may have against all persons or entities supplying labor, materials or other services which are to be paid from or secured by the Reserve Funds; provided, however, that Agent may not pursue any such right or claim unless an Event of Default has occurred and is continuing.

BUILDING LOAN AGREEMENT.DOCX

7.3.2     **Income Taxes**. Borrower shall be responsible for payment of any federal, state or local income or other tax applicable to the interest earned on the Reserve Funds credited or paid to Borrower.

7.3.3     **Prohibition Against Further Encumbrance**. Borrower shall not, without obtaining the prior written consent of Agent, further pledge, assign or grant any security interest in any Reserve Fund or the monies deposited therein or permit any lien or encumbrance to attach thereto (other than Permitted Encumbrances), or any levy to be made thereon, or any UCC-1 Financing Statements, except those naming Agent as the secured party, to be filed with respect thereto and except for those that Borrower has not authorized the filing of, so long as promptly upon learning of the unauthorized filing, it pursues its rights under Section 9-513 and promptly has such UCC-1 Financing Statement terminated, and in all events within thirty (30) days after such filing.

**Section 7.4     Order of Priority of Funds in Deposit Account**. Section 7.4 of the Senior Loan Agreement, and all accompanying definitions, schedules, and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

## ARTICLE VIII

## DEFAULTS

**Section 8.1     Event of Default**.

(a)     Each of the following events, after the giving of any required notice and the passage of any applicable grace or cure period expressly set forth below (without the alleged failure or breach having been cured), shall constitute an event of default hereunder (an "**Event of Default**"):

(i)     if any portion of the Total Debt is not paid when due;

(ii)     if Borrower shall fail to make any deposit into any Account (including, without limitation, the Carry Cost Account, the Interest Reserve Account and the Rebalancing Reserve Account) as and when required hereunder;

(iii)     if the Policies are not kept in full force and effect, or if certified copies of the Policies are not delivered to Agent as and when required pursuant to the terms hereof;

(iv)     any Transfer other than a Permitted Transfer occurs without Agent's prior written consent;

(v)     if, any representation or warranty made by any Borrower Party herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Agent or Lender shall

have been false or misleading in any material respect as of the date the representation or warranty was made, repeated or deemed repeated;

(vi)     if any Borrower Party (1) shall make an assignment for the benefit of creditors, (2) has admitted in writing its inability to pay its debts or (3) is not Solvent; or Borrower shall not generally be paying its debts as they become due;

(vii)    if a receiver, liquidator or trustee shall be appointed for any Borrower Party or if any Borrower Party shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, any Borrower Party, or if any proceeding for the dissolution or liquidation of any Borrower Party shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to, acquiesced in by or solicited by any Borrower Party, such Event of Default shall be deemed cured and no longer continuing if such proceeding is discharged, stayed or dismissed within ninety (90) days of commencement of the same;

(viii)   if any Borrower Party attempts to transfer its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(ix)     if Borrower breaches any covenant contained in Section 2.4.2(c), Article III, Sections 4.1.21, 4.1.29, 4.1.44, 5.1.18, 5.1.23, 5.1.24, 5.1.27, 5.1.32 or 5.2 hereof;

(x)      if Borrower breaches the covenants set forth in Section 5.1.12 hereof and such breach is not cured within ten (10) Business Days of Borrower receiving notice of the same;

(xi)     if one or more judgments or decrees shall be entered against (i) Borrower involving in the aggregate a liability in excess of $250,000, or against Guarantor (collectively) involving in the aggregate a liability in excess of $1,000,000, and in either case, the same shall not have been vacated, bonded, satisfied or stayed pending appeal within thirty (30) days from the date of entry of such judgment;

(xii)    if any Borrower Party breaches any covenant, warranty or representation contained in any of the Loan Documents beyond any applicable notice and cure period, including without limitation, any obligation of Guarantor under the Guaranty, or if any Borrower Party shall for any reason contest, repudiate or purport to revoke any Loan Document;

(xiii)   if any Major Milestone has not been timely satisfied as provided in the definition of "Major Milestones";

(xiv)    if Key Man ceases to (A) be actively involved in the Project and the day to day operation and management thereof, or (B) directly or indirectly

124

Control Borrower, Construction Manager or the operation and development of the Project; except that, only in the case of death or incapacity of Key Man, such failure shall not constitute an Event of Default if within twenty (20) days of such death or incapacity, an individual is appointed as the replacement for Key Man (which such individual shall satisfy the provisions of this Agreement applicable to Key Man, other than any specific ownership requirement) subject to the prior written approval of Agent in its sole but reasonable discretion;

(xv)   if any draw request is fraudulently submitted by Borrower or in connection with any Advance for services performed or for materials used in or furnished for the Property;

(xvi)   if, following the commencement of construction of the Project Improvements, there is any cessation at any time in construction of the Project Improvements for more than fifteen (15) consecutive Business Days after notice thereof and a failure to resume construction within such period, other than as a result of Force Majeure;

(xvii)   if Borrower expressly confesses in writing to Agent or Lender its inability to continue or complete construction of the Project Improvements in accordance with this Agreement;

(xviii)  if Agent, the Construction Consultant or either of their representatives are not permitted at all reasonable times upon not less than one (1) Business Days' notice to enter upon the Property in violation of this Agreement to inspect the Improvements and the construction thereof and all materials, fixtures and articles used or to be used in the construction and to examine all the Plans and Specifications, or if Borrower shall fail to furnish to Agent or its authorized representative, when requested upon not less than three (3) Business Days' notice, copies of the Plans and Specifications and any other information required to be delivered to Agent pursuant to the Loan Documents, to the extent in any Borrower Related Party's possession or control;

(xix)   the occurrence of any event or circumstance set forth herein or in any other Loan Document that is stated to be an Event of Default;

(xx)   if the Property shall be taken (other than as a result of a Condemnation in accordance with this Agreement), attached, sequestered on execution or other process of law in any action against Borrower; and such action is not stayed or bonded over in a manner acceptable to Agent within ten (10) Business Days thereof, or is not capable of being bonded over or stayed in a manner acceptable to Agent;

(xxi)   [Intentionally omitted];

(xxii)   if Borrower shall be in default under and as defined in any Condominium Document and such default remains uncured beyond any applicable notice or cure period provided for in such Condominium Documents;

(xxiii) if any Governmental Approval is withdrawn, suspended or cancelled, terminated or modified to the detriment of Borrower (including, without limitation, if at any time the DOL or any other applicable Governmental Authority prohibits, or requires Borrower to discontinue or cease, the sales of Units for any reason), the Property or the construction of any of the Project Improvements or any stop work order is issued, unless Borrower restates and confirms in all respects such Governmental Approval or terminates such stop work order within a period of twenty (20) Business Days thereafter;

(xxiv) if any Loan Documents shall fail to be in full force and effect to give Agent or Lender the Liens, rights, powers and privileges purported to be created thereby, or if any Borrower Party shall assert that any Loan Document is not in full force and effect or fails to give Agent or Lender the Liens, rights, powers and privileges purported to be created thereby;

(xxv) if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in subsections (i) through (xxiv) above or subsections (xxvi) through (xxviii) below, for ten (10) days after notice to Borrower from Agent, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Agent in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided, further, that Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed seventy-five (75) days; or

(xxvi) if there shall be a default by any Borrower Party or any other Affiliate of Borrower under any of the other Loan Documents, beyond applicable cure periods, if any, contained in such Loan Documents;

(xxvii) Borrower fails to comply with any of the terms, covenants or conditions of Section 9.2 after expiration of ten (10) Business Days after notice thereof from Agent; or

(xxviii) if there shall be a default by Guarantor of its covenants under the Guaranty, beyond applicable cure periods, if any, contained in the Guaranty.

(b)      Upon the occurrence of an Event of Default and at any time thereafter, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, Agent may take such action, without notice or demand, that Agent deems advisable to protect and enforce the rights of Agent and Lender against Borrower and the Property, including, without limitation, declaring the Total Debt to be immediately due and payable, and Agent may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and any or all of the Property and/or the

126

Collateral, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (vi) or (vii) above, the Total Debt and Other Obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

Section 8.2    **Remedies**.

(a)    Upon the occurrence of and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Agent against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Agent at any time and from time to time, whether or not all or any of the Total Debt shall be declared due and payable, and whether or not Agent shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to all or any part of the Property and/or the Collateral.  Any such actions taken by Agent shall be cumulative and concurrent and may be pursued independently, singularly, successively, together or otherwise, at such time and in such order as Agent may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Agent and Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) Agent is not subject to any "one action" or "election of remedies" law or rule, and (ii) all liens and other rights, remedies or privileges provided to Agent shall remain in full force and effect until Agent has exhausted all of its remedies against the Property and/or the Collateral and the Mortgage has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Total Debt or the Total Debt has been paid in full.

(b)    With respect to Borrower, the Property and the Collateral, nothing contained herein or in any other Loan Document shall be construed as requiring Agent to resort to the Property or the Collateral for the satisfaction of any of the Total Debt in any preference or priority, and Agent may seek satisfaction out of the Property and/or the Collateral, or any part thereof, in its absolute discretion in respect of the Total Debt.  In addition, Agent shall have the right from time to time following an Event of Default to partially foreclose the Mortgage or any Pledge in any manner and for any amounts secured by the Mortgage and/or the Pledge Agreements then due and payable as determined by Agent in its sole discretion including, without limitation, the following circumstances:  (i) in the event Borrower Defaults in the payment of one or more scheduled payments of principal and interest, Agent may foreclose the Mortgage and/or the Pledge Agreement to recover such delinquent payments or (ii) in the event Agent elects to accelerate less than the entire Outstanding Principal Balance of the Loan, Agent may foreclose the Mortgage and/or the Pledge Agreement to recover so much of the principal balance of the Loan as Agent may accelerate and such other sums secured by the Mortgage and/or the Pledge Agreement as Agent may elect. Notwithstanding one or more partial foreclosures, the Property and the Collateral shall remain subject to the Mortgage and the Pledge Agreements, as applicable, to secure payment of sums secured by the Mortgage and/or the Pledge Agreement, and not previously recovered.

127

(c)     In addition to all remedies conferred it by law and by the terms of this Agreement and the other Loan Documents, upon the occurrence and during the existence of an Event of Default, Agent (for the benefit of Lender) may pursue any one or more of the following remedies concurrently or successively, it being the intent hereof that none of such remedies shall be to the exclusion of any other, and with full rights to reimbursement from Borrower and any Guarantor:

(i)     take possession of the Property and complete any construction work at the Property, including, without limitation, the right to avail itself of and procure performance of existing contracts or let any contracts with the same contractors or others and to employ watchmen to protect the Property from injury.  Without restricting the generality of the foregoing and for the purposes aforesaid to be exercised during the existence and continuance of an Event of Default, Borrower hereby appoints and constitutes Agent (for the benefit of Lender) its lawful attorney-in-fact with full power of substitution to complete any construction work at the Property in the name of Borrower;

(ii)     except as set forth herein, use Reserve Funds to complete any construction work at the Property;

(iii)     enter into Change Orders which shall be necessary or desirable to complete any construction work at the Property in substantially the manner contemplated by such Plans and Specifications;

(iv)     retain or employ new general contractors, subcontractors, architects, engineers and inspectors as shall be required for said purposes; to pay, settle or compromise all existing bills and claims which may be liens or security interests, or to avoid such bills and claims becoming liens against the Property, or as may be necessary or desirable for the completion of any construction work at the Property or for the clearance of title to the Property;

(v)     execute all applications and certificates in the name of Borrower which may be required by any of the contract documents;

(vi)     prosecute and defend all actions or proceedings in connection with any construction work at the Property; and

(vii)     take any action and require such performance as it deems necessary to be furnished hereunder and to make settlements and compromises with the surety or sureties thereunder, and in connection therewith, to execute instruments of release and satisfaction.

**Section 8.3     Remedies Cumulative; Waivers**. The rights, powers and remedies of Agent and Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Agent or Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Agent's and Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Agent may determine in Agent's sole discretion. No delay or omission to

exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

## ARTICLE IX

## SPECIAL PROVISIONS

### Section 9.1    Sale of Loan.

9.1.1    Lender shall have the right (a) to sell or otherwise transfer the Loan or any portion thereof, or (b) to issue or sell one or more participation interests in the Loan (collectively, "**Secondary Market Transactions**") without the consent of Borrower or any other Person. Notwithstanding the foregoing, so long as no Event of Default has occurred, prior to the date when Borrower is no longer entitled to any further Advances of the Loan, Lender shall only sell or transfer (excluding, for the avoidance of doubt, participation interests) the Loan (or any portion thereof or interest therein) to Eligible Assignees.

9.1.2    If requested by Agent, Borrower (at no out of pocket cost to Borrower) shall cooperate with Agent in satisfying the market standards to which Agent customarily adheres or which may be required in the marketplace in connection with any Secondary Market Transactions, including, without limitation, to:

(a)    (i) provide updated financial and other information with respect to the Property, the Project, the construction of the Improvements, the sale of Units or the  Borrower, (ii) provide updated budgets relating to the Property, and (iii) provide updated appraisals, market studies, environmental reviews and reports (Phase I's and, if appropriate, Phase II's), property condition reports and other due diligence investigations of the Property (the "**Updated Information**"), together, if customary, with appropriate verification of the Updated Information through letters of auditors or opinions of counsel acceptable to Agent;

(b)    provide opinions of counsel, which may be relied upon by Agent, Lender and their successors, assigns and participants customary in Secondary Market Transactions with respect to the Property and Borrower and its Affiliates, which counsel and opinions shall be reasonably satisfactory to Agent;

(c)    provide updated, as of the closing date of the Secondary Market Transaction, representations and warranties made in the Loan Documents to the extent applicable;

(d)    execute amendments to the Loan Documents and Borrower's organizational documents and such other documents requested by Agent, including without limitation, those documents required pursuant to Section 9.2 below; provided, however, that Borrower shall not be required to modify or amend any Loan Document if such modification or amendment would (i) change the interest rate, the stated maturity or the amortization of principal

129

as set forth herein or in the Note, (ii) alter the rights or increase the obligations of Borrower or Guarantor under the Loan Documents, or (iii) subject to <u>Section 9.2</u>, modify or amend any other economic or other material term of the Loan; and

(e)     at Agent's request, make such representatives of Borrower requested by Agent available to meet with any to investors or prospective investors in any potential Secondary Market Transaction at Borrower's offices.

9.1.3     Agent may, in connection with any Secondary Market Transaction, disclose to an assignee or participant, or proposed assignee or participant, any information relating to a Person that is a party to a Loan Document; <u>provided,</u> <u>however</u>, that, prior to any such disclosure of non-public or confidential information, such assignee or participant or proposed assignee or participant shall be advised of the confidentiality of any non-public or confidential information received by it.

9.1.4     **Register**.

(a)     <u>Loan Registry</u>. Borrower hereby designates Agent to serve as Borrower's agent, solely for purposes of this <u>Section 9.1.4</u>, to maintain at one of its offices a register for the recordation of the names and addresses of the Lenders, and the principal amount of the Loans (or portions thereof) owing to and/or Advances to be funded by, each Lender pursuant to the terms hereof from time to time and each repayment with respect to the principal amount of the Loan of each Lender (the "**Register**"). Failure to make any such recordation, or any error in such recordation shall not affect Borrower's, Agent's or any Lender's obligations in respect of the Loan.  Without limiting the terms and provisions of <u>Section 9.1.1</u> hereof, no assignment, sale, negotiation, pledge, hypothecation or other transfer of any part of any Lender's interest in and to the Loan shall be effective until such Lender shall have provided Agent with written notice of such transfer and Agent shall have registered such assignee's name and address in the Register. The entries in the Register shall be conclusive absent manifest error, and Borrower, Agent and Lender may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice. Lender hereby agrees to indemnify Agent and to hold Agent harmless from any actions, suits, claims, demands, liabilities, losses, damages, obligations and actual costs and expenses which Lender sustains or incurs as a consequence of Agent maintaining the Registry, except to the extent such loss or expense is caused by Agent's fraud or willful misconduct.

(b)     <u>Participation Registry</u>. Each Lender that sells a participation interest in the Loan shall, acting solely for this purpose as an agent of Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under the Loan Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in the Loan or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such Loan or

130

other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, Agent shall have no responsibility for maintaining a Participant Register.

(c)      Sections 9.1.4(a) and (b), the Register and the Participant Register are intended to be construed so that the Note is at all times maintained in "registered form" within the meaning of Section 5f.103-1(c) of the United States Treasury Regulations (or any other successor provision of such regulations).

**Section 9.2     Severance Documentation**.  Agent, without in any way limiting Agent's and Lender's other rights hereunder, in its sole and absolute discretion, shall have the right, at any time (whether prior to or after any Secondary Market Transaction), to require Borrower to execute and deliver "component" notes and/or one or more substitute notes evidencing the portion of the Loan held by a particular Lender (and the term "Note" as used in this Agreement and in all the other Loan Documents shall include all such component notes and/or substitute notes but shall exclude any Note replaced by the same), and/or modify the Loan in order to create one or more senior and subordinate notes (*e.g.*, an A/B or A/B/C structure) or pari passu notes and/or one or more additional components of the Note or Notes (including the implementation of a mezzanine loan structure secured by a pledge of direct and indirect ownership interests, which may require the creation of additional borrower entities), reduce the number of components of the Note or Notes, revise the interest rate for each component, reallocate the principal balances of the Notes and/or the components, eliminate the component structure and/or the multiple note structure of the Loan (including the elimination of the related allocations of principal and interest payments) or divide the Loan into one or more pari passu or mezzanine and mortgage component(s), in each case, underlined provided that the Outstanding Principal Balance and the aggregate monthly payments required of all components after the effective date of such modification equals the Outstanding Principal Balance and the aggregate monthly payments required prior to such modification, the weighted average of the interest rates for all components after the effective date of such modification equals the interest rate of the original Note prior to such modification (*e.g.*, there shall be no "rate creep" prior to the occurrence of an Event of Default and/or application of Net Proceeds).  At Agent's election, each note comprising the Loan may be subject separately to one or more Secondary Market Transactions.  Agent shall have the right to modify the Note and/or Notes and any components in accordance with this Section 9.2 and, provided that such modification shall comply with the terms of this Section 9.2, such modification shall become immediately effective.  If requested by Agent, Borrower shall promptly execute an amendment to the Loan Documents to evidence any such modification.  Borrower shall (1) cooperate with all reasonable requests of Agent in order to establish the "component" notes, and (2) execute and deliver such documents as shall be reasonably required by Agent in connection therewith, all in form and substance reasonably satisfactory to Agent, including, without limitation, the severance of security documents if requested, provided, however, that Borrower shall not be required to modify or amend any Loan Document if such modification or amendment would (i) change the weighted interest rate effective prior to such modification (*e.g.*, there shall be no "rate creep" prior to the occurrence of an Event of Default and/or application of Net Proceeds), the stated maturity date or

the amortization of principal as set forth herein or in the Notes (provided that such weighted average interest rate may change after the occurrence of an Event of Default and/or the application of Net Proceeds pursuant hereto), or (ii) subject to Section 9.2, modify or amend any other economic or other material term of the Loan in a manner that is detrimental to Borrower.  In the event Borrower fails to execute and deliver such documents to Agent within ten (10) Business Days following such request by Agent, Borrower hereby absolutely and irrevocably appoints Agent as its true and lawful attorney, coupled with an interest, in its name and stead to make and execute all documents necessary or desirable to effect such transactions, Borrower hereby ratifying all that such attorney shall do by virtue thereof.

**Section 9.3      Expenses**.  In connection with any Secondary Market Transaction, severance or other transaction permitted pursuant to Section 9.1 or 9.2, Agent shall pay or reimburse the reasonable out of pocket expenses (including legal fees) incurred by the Borrower Parties in connection therewith (including with respect to executing any documentation, or providing any Updated Information or other documentation, in accordance therewith, and otherwise cooperating with Agent and complying with the provisions thereof), and Agent and Lender shall pay their own expenses (including legal fees) incurred in connection therewith.

**Section 9.4      Recourse**.

9.4.1      Notwithstanding anything to the contrary set forth in the Loan Documents, including without limitation this Section 9.4, the Loan shall be fully recourse to Borrower. The provisions of Article 8 of the Building Loan Note are hereby incorporated by reference as if set forth at length herein.

9.4.2      In furtherance and not in limitation of either the foregoing or any other provision of this Agreement or any of the other Loan Documents, Borrower shall pay and perform each of the Section 9.4 Obligations (as defined below) upon demand, which shall be guaranteed by Guarantor in accordance with the Guaranty.

9.4.3      As used herein, the term "**Section 9.4 Obligations**" means (i) Borrower's Section 9.4 Liabilities (as defined below), and (ii) the full repayment of all of the Obligations in the event that any Springing Recourse Event (as defined below) occurs.

9.4.4      As used herein, the term "**Section 9.4 Liabilities**" means indemnification from any actual loss, damage, cost, expense, liability, claim or other obligation incurred by Agent or Lender (including attorneys' fees and costs incurred and any costs of enforcement or collection) arising out of, related to or in connection with the following:

(i)      fraud, gross negligence, willful misconduct, any intentional failure to disclose a material fact that makes a representation of a Borrower Related Party untrue or misleading, or any intentional misrepresentation by any Borrower Related Party in connection with the Loan;

(ii)      the breach of any representation, warranty, covenant or indemnification provision in the Environmental Indemnity concerning environmental

132

laws, hazardous substances and asbestos and any indemnification of Agent of Lender with respect thereto in such document;

(iii)     the wrongful removal or destruction of any portion of the Property or Improvements (other than a *de minimis* portion thereof) in violation of the Loan Documents, or damage to the Property or Improvements caused by the willful misconduct or gross negligence of any Borrower Related Party;

(iv)     any intentional physical waste of the Property by any Borrower Related Party;

(v)     the forfeiture by Borrower of the Property as a result of the criminal acts of any Borrower Related Party;

(vi)     failure of Borrower to (A) obtain and maintain the Policies required to be obtained and maintained in accordance with the provisions of the Loan Documents, and/or (B) pay when due any and all Insurance Premiums required to be paid in connection therewith until such times Borrower is no longer the owner of all or any portion of the Property, <u>except</u> if (1) funds to pay such amounts were, at the time in question, available in the Carry Cost Account (or other applicable Account) or as Advances for such specified purpose pursuant to an approved Project Budget, and (2) Agent and Lender failed to pay (or make such funds available to pay) such amounts after Borrower satisfied all conditions precedent to disbursement of such amounts (other than the condition precedent that no Event of Default exists solely with respect to an Event of Default that is not susceptible of being cured by Borrower and is not related to a bankruptcy, insolvency or other similar event);

(vii)     failure by Borrower to pay when due any and all Taxes, Assessments and Other Charges (including, without limitation, transfer taxes, deed stamps, intangible taxes, mortgage recording, stamp or similar taxes, or any other amounts in the nature of transfer taxes required to be paid under applicable Legal Requirements) required to be paid in connection with or relating to (1) the Loan or the transactions contemplated by the Loan Documents, (2) Borrower's ownership of the Property, (3) the execution, delivery, recordation, filing, registration, perfection or enforcement of any of the Loan Documents, including without limitation the Mortgage or the Pledge Agreement, (4) the acquisition of title by Agent and/or Agent's designee to the Property and/or any direct or indirect interest therein after an Event of Default, and/or (5) any transfer of the Property and/or any direct or indirect interest in any of the foregoing from Agent and/or Agent's designee to any other Person(s), <u>except</u> if (i) the relevant charges are the subject of a bona fide dispute in which Borrower is contesting the amount or validity thereof in accordance with its rights under the Loan Documents and neither Agent nor Lender incurs a loss on account thereof, or (ii) (A) funds to pay such charges were, at the time in question, available in the Carry Cost Account (or other applicable Account) or as Advances for such specified purpose pursuant to an approved Project Budget, and (B) Agent and Lender failed to pay (or make such funds available to pay) such amounts after Borrower satisfied all conditions precedent to disbursement of such amounts (other than the condition

precedent that no Event of Default exists solely with respect to an Event of Default that is not susceptible of being cured by Borrower and is not related to a bankruptcy, insolvency or other similar event);

(viii)   the failure of Borrower to pay any amounts that cause Liens on the Property, except if (i) the relevant amounts are the subject of a bona fide dispute in which Borrower is contesting the amount or validity thereof in accordance with its rights under the Loan Documents and neither Agent nor Lender incurs a loss on account thereof, or (ii) (A) funds to pay such amounts were, at the time in question, available in the Rebalancing Reserve Account or as Advances for such specified purpose pursuant to an approved Project Budget, and (B) Agent and Lender failed to pay (or make such funds available to pay) such amounts after Borrower satisfied all conditions precedent to disbursement of such amounts (other than the condition precedent that no Event of Default exists solely with respect to an Event of Default that is not susceptible of being cured by Borrower and is not related to a bankruptcy, insolvency or other similar event);

(ix)   the failure by any Borrower Related Party to apply in accordance with the express terms of the Loan Documents: (A) any Net Proceeds paid by reason of any loss, damage or destruction to the Property, (B) any Awards received in connection with a Condemnation of all or a portion of the Property, (C) any Gross Sales Proceeds, Net Sales Proceeds or other Gross Revenue of any nature, which shall include the failure of any Borrower Related Party to deposit such amounts in the Deposit Account in accordance with this Agreement, (D) any security deposits, advance deposits, Unit Sale Contract Deposits or any other deposits collected by or controlled by any Borrower Related Party with respect to the Property (except to the extent any such security deposits, Unit Sale Contract Deposits or other deposits were applied as expressly required in accordance with the express terms and conditions of the Offering Plan or Legal Requirements), (E) any Advances, disbursements of Reserve Funds or amounts on deposit in the Borrower Operating Account, (F) any Rents, or (G) any other funds due to any Contractor or to Agent or Lender;

(x)   (a) any obligation of Borrower to indemnify any Person that, immediately prior to any acquisition of title to the Collateral pursuant to a UCC foreclosure sale, a UCC strict foreclosure, an assignment in lieu of foreclosure or other enforcement action under the Loan Documents (collectively, an "**Equity Collateral Enforcement Action**"; and the date on which an Equity Collateral Enforcement Action is consummated, an "**Equity Collateral Transfer Date**"), was a Borrower Related Party, to the extent such obligation continues to be the obligation of the applicable entity acquired in connection with such Equity Collateral Enforcement Action and is not expressly waived in writing by the Persons covered by such indemnification obligation and (b) any obligation of Borrower accruing prior to the Equity Collateral Transfer Date to pay amounts due under any contract between Borrower, on the one hand, and any Borrower Related Party, on the other hand (unless such contract is assumed in writing by the Person acquiring the Collateral on or after the Equity Collateral Transfer Date);

(xi)   any liabilities of the "Sponsor" or "Declarant" to purchasers of Units under the Condominium Documents;

(xii)   any material breach of the covenants of Borrower related to the requirement that Borrower shall be a Special Purpose Entity that does not result in the substantive consolidation of the assets and liabilities of such Borrower with any other Person; or

(xiii)   any liabilities of the Borrower arising out of facts coming into existence prior to the Closing Date but after the date that Borrower acquired the Property that would not exist if the Property had been purchased by a newly formed legal entity in an arm's-length transaction on the Closing Date.

9.4.5   Notwithstanding anything to the contrary in this Agreement, the Note or any of the Loan Documents, (A) Agent and Lender shall not be deemed to have waived any right which Agent or Lender may have under Section 506(a), 506(b), 1111(b) or any other provisions of the Bankruptcy Code to file a claim for the full amount of the Total Debt secured by the Mortgage or to require that all collateral shall continue to secure all of the Total Debt owing to Lender in accordance with the Loan Documents, and (B) notwithstanding that the Loan is fully recourse to Borrower, for the avoidance of doubt, the Total Debt and other Obligations shall be fully recourse to Borrower and Guarantor in the event of (each a "**Springing Recourse Event**"):

(i)   Borrower and/or any Guarantor files a voluntary petition under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law;

(ii)   any Borrower Related Party solicits or causes to be solicited petitioning creditors for the filing by any Person(s) of any involuntary petition against any Borrower Party under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law;

(iii)   an involuntary petition is filed against any Borrower Party under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law by any Person in which any Borrower Related Party colludes with or otherwise assists such Person;

(iv)   any Borrower Related Party files an answer consenting to, or otherwise acquiescing in, or joining in, any involuntary petition filed against any Borrower Party by any other Person under the Bankruptcy Code or any other Federal or state bankruptcy or insolvency law;

(v)   any Borrower Related Party consents to, or acquiesces in, or joins in, an application for the appointment of a custodian, receiver, trustee or examiner for any Borrower Party or any portion of the Property or the Collateral or colludes with or otherwise assists any Person in filing such an application;

(vi)   any Borrower Party makes an assignment for the benefit of creditors, or admitting in any legal proceeding, its insolvency or inability to pay its debts as

they become due (provided, that if such Borrower Party is required by applicable law to admit the same in a legal proceeding and such Borrower Party is in fact insolvent, then such admission, in and of itself, shall not be a Springing Recourse Event);

(vii)    Borrower fails to obtain Agent's prior written consent to any Indebtedness or Lien encumbering the Property or the Collateral (other than Permitted Indebtedness) if such Lien was filed by, or such filing was affirmatively approved or acquiesced to by, a Borrower Related Party;

(viii)    Other than a Permitted Transfer, the occurrence, without the prior written consent of Agent, of (A) any Transfer of all or any portion of the Property (or any interest therein) that constitutes real property (other than as a result of the exercise of remedies in connection with the enforcement of an involuntary lien), (B) any voluntary Transfer of all or any material portion of the Property that does not constitute real property (or any interest therein), (C) other than as result of the exercise of remedies by a subordinate lender under a mezzanine loan that is expressly permitted under the Loan Documents, (1) any Transfer of any direct or indirect interest in Borrower other than as expressly permitted under the Loan Documents, or (2) any change in Control of Borrower, and/or (D) without limitation of the foregoing clauses (A), (B) and (C), a voluntary Sale or Pledge of the Property (or any interest therein) or any direct or indirect interest in Borrower in order to obtain additional financing for any Borrower Related Party.

(ix)    any breach or violation of Section 4.1.43 of this Agreement;

(x)    the breach of any covenant contained herein relating to the requirement that Borrower shall be a Special Purpose Entity, if such breach is a material factor in Borrower subsequently being substantively consolidated with any other Person; or

(xi)    if any Borrower Related Party interferes with or hinders (by asserting a frivolous defense) the prosecution of any enforcement action or exercise of rights or remedies by Agent or Lender under any Loan Document, other than legitimate defenses brought by a Borrower Related Party in a court proceeding in objective good faith without intent to interfere with or hinder the prosecution of any enforcement action or exercise of rights or remedies by Agent or Lender under the Loan Documents.

**Section 9.5    Servicer**. At the option of Agent, the Loan may be serviced by one or multiple servicers/trustees (any such servicers/trustees, together with their agent's, nominees or designees, are collectively referred to as "**Servicer**") selected by Agent and Agent may delegate all or any portion of its responsibilities under this Agreement and the other Loan Documents to Servicer, which may be done by Agent pursuant to a servicing agreement between Agent and Servicer. Servicer may, at any time, delegate all or any portion of its responsibilities for the servicing and administration of the Loan to a sub-servicer or sub-servicers. Borrower shall be responsible for any costs and expenses of Servicer to the extent such costs and expenses would otherwise be payable by Borrower if incurred by Agent or Lender hereunder. Agent and Borrower agree that Hanover Street Capital, LLC shall be the initial Servicer hereunder. Borrower agrees

that the Servicer shall be paid an annual fee of $75,000.00 payable monthly (in advance) starting on the Closing Date and each month thereafter (the "**Servicing Fee**").

## ARTICLE X

## MISCELLANEOUS

**Section 10.1   Survival**.  This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Obligations are outstanding and unpaid unless a longer period is set forth herein or in the other Loan Documents.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.  All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Agent and Lender.

**Section 10.2   Agent's and Lender's Discretion**. Whenever pursuant to this Agreement, Agent or Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Agent or Lender, the decision of Agent or Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise expressly otherwise herein provided) be in the sole and absolute discretion of Agent or Lender and shall be final and conclusive.  All consents or approvals of Agent or Lender given by Agent or Lender pursuant to the Loan Documents shall not be deemed to have given by Agent or Lender unless such consent or approval is in writing. Whenever pursuant to this Agreement or any other Loan Document, Agent or Lender are required to be reasonable in making any determination or granting any consent or approval, such qualification of reasonability shall be disregarded at any time that an Event of Default has occurred and is continuing.

**Section 10.3   Governing Law**.

(A)   THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIEN AND SECURITY

INTEREST CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER, AGENT AND LENDER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(B)   ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST AGENT, LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT AGENT'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER, AGENT AND LENDER WAIVE ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER, AGENT AND LENDER HEREBY IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  BORROWER AGREES THAT SERVICE OF PROCESS UPON BORROWER AT THE ADDRESS SET FORTH HEREIN AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN WITH COPIES TO BORROWER'S COUNSEL AT ITS ADDRESS SET FORTH BELOW SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.  BORROWER (I) SHALL GIVE PROMPT NOTICE TO AGENT OF ANY CHANGE IN THE ADDRESS FOR BORROWER SET FORTH HEREIN, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE AN AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK, AND (III) SHALL PROMPTLY DESIGNATE AN AUTHORIZED AGENT IF BORROWER CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK.  NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF AGENT OR LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

**Section 10.4  Modification, Waiver in Writing**.   No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of the Note, or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no

notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

**Section 10.5   Delay Not a Waiver**.   Neither any failure nor any delay on the part of Agent or Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.   In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Agent and Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

**Section 10.6   Notices**.   All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "<u>Notice</u>") required, permitted or desired to be given hereunder shall be in writing and shall be (i) delivered by hand (with signed acknowledgement of receipt by the designated recipient) or (ii) by reputable overnight courier, addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party may hereafter specify in accordance with the provisions of this <u>Section 10.6</u>. Notwithstanding the foregoing, any ordinary course communications related to the loan, including requests for leasing approvals and delivery of financial reporting (but not any request for other consent or modification of the Loan) may be delivered by electronic mail, provided that the subject line of such electronic mail correspondence begins with the following words in all capital letters: "MESSAGE CONTAINS WRITTEN NOTICE UNDER LOAN DOCUMENTS," and provided further that such notice shall not be deemed given if the sender of the same receives a reply indicating that the message was not delivered to any of its intended recipients.   Any Notice shall be deemed to have been received:  (a) on the next Business Day if sent by an overnight commercial courier and (b) on the date of delivery by hand if delivered and acknowledged during business hours of a Business Day, and in each case addressed to the parties as follows:

| | |
|---|---|
| If to Agent: | Deutsche Bank AG New York Branch |
| | 60 Wall Street, 10th Floor |
| | New York, NY  10005 |
| | Attention: Ian McColough |
| | Facsimile No.  (212) 797-4489 |
| | Email: ian.mccolough@db.com |
| | |
| with a copy to: | Gibson Dunn & Crutcher LLP |
| | 200 Park Avenue |
| | New York, NY 10166 |
| | Attention:  Eric M. Feuerstein, Esq. |
| | Facsimile No. (212) 351-5223 |
| | Email: efeuerstein@gibsondunn.com |

| | |
|---|---|
| with a copy to: | Hanover Street Capital, LLC<br>48 Wall Street, 14th Floor<br>New York, NY  10005<br>Attention:  Amy Sinensky<br>Facsimile No. 212-380-9405<br>Email: amy.sinensky@hanoverstcap.com |
| If to Lender: | German American Capital Corporation<br>60 Wall Street, 10th Floor<br>New York, NY 10005<br>Attention: Ian McColough<br>Facsimile No. 212-797-4489<br>Email: ian.mccolough@db.com |
| with a copy to: | Gibson Dunn & Crutcher LLP<br>200 Park Avenue<br>New York, NY 10166<br>Attention:  Eric M. Feuerstein, Esq.<br>Facsimile No. (212) 351-5223<br>Email: efeuerstein@gibsondunn.com |
| with a copy to: | Hanover Street Capital, LLC<br>48 Wall Street, 14th Floor<br>New York, NY  10005<br>Attention:  Amy Sinensky<br>Facsimile No. 212-380-9405<br>Email: amy.sinensky@hanoverstcap.com |
| If to Borrower: | 135 West 52nd Street Owner LLC<br>c/o The Chetrit Group, LLC<br>512 Seventh Avenue<br>New York, NY  10018<br>Attention:  Meyer Chetrit<br>Facsimile No. (646) 230-9372<br>Email: mc@chetritgroup.com |
| with a copy to: | David Bistricer<br>4611 Twelfth Avenue<br>Apartment 1L<br>Brooklyn, NY 11219<br>Facsimile No. 718-435-3848<br>Email: david@clipperequity.com |
| with a copy to: | Sukenik, Segal & Graff, P.C.<br>404 Fifth Avenue, Fifth Floor<br>New York, N.Y. 10018 |

BUILDING LOAN AGREEMENT.DOCX

Attention:  Josh Graff, Esq.
Facsimile No. (212) 779-8095
Email: jgraff@ssglaw.com

Any party may change the address to which any such Notice is to be delivered by furnishing ten (10) days' written notice of such change to the other parties in accordance with the provisions of this Section 10.6.  Notices shall be deemed to have been given on the date set forth above, even if there is an inability to actually deliver any Notice because of a changed address of which no Notice was given or there is a rejection or refusal to accept any Notice offered for delivery.  Notice for any party may be given by its respective counsel.  Additionally, Notice from Agent may also be given by Servicer.

**Section 10.7   Trial by Jury**.   BORROWER, AGENT AND LENDER HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AGENT AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  AGENT IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.

**Section 10.8   Headings**.  The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only, shall in no way affect the interpretation of this Agreement and shall not constitute a part of this Agreement for any other purpose.

**Section 10.9   Severability**.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 10.10 Preferences**.  Agent and Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder in accordance with this Agreement.  To the extent Borrower makes a payment or payments to Agent or Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Agent or Lender.

**Section 10.11 Waiver of Notice**.  Borrower shall not be entitled to any notices of any nature whatsoever from Agent or Lender except with respect to matters for which this Agreement

141

or the other Loan Documents specifically and expressly provide for the giving of notice by Agent to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Agent or Lender with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Agent to Borrower.

**Section 10.12  Remedies of Borrower**.  In the event that a claim or adjudication is made that Agent or Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Agent, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Agent, Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  The parties hereto agree that any action or proceeding to determine whether Agent or Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

**Section 10.13  Expenses; Indemnity**.

(a)  Borrower covenants and agrees to pay or, if Borrower fails to pay, to reimburse, Agent upon receipt of written notice from Agent for all actual out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred by Agent, Lender or their Affiliates in connection with (i) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower (including without limitation any opinions requested by Agent or Lender as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Property and/or the Collateral), including without limitation, any and all diligence costs, legal fees, consultant costs, accounting fees, costs of obtaining third party reports and underwriting costs; (ii) Borrower's ongoing performance of and compliance with Borrower's respective agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the date of this Agreement, including, without limitation, confirming compliance with environmental and insurance requirements; (iii) Agent, Lender, Construction Consultant and Servicer's ongoing performance and compliance with all agreements and conditions contained in this Agreement and the other Loan Documents on its part to be performed or complied with; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Agent or Lender; (v) securing Borrower's compliance with any requests made in accordance with provisions of this Agreement; (vi) the filing and recording fees and expenses, title insurance, and other similar expenses incurred in creating and perfecting the Lien in favor of Agent pursuant to this Agreement and the other Loan Documents; (vii) the costs of any appraisal of the Property obtained by or on behalf of Agent and/or Lender; (viii) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, this Agreement, the other Loan Documents, the Property, the Collateral, or any other security given for the Loan; and (ix) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to

142

the Property and/or the Collateral (including any fees incurred by Servicer in connection with the transfer of the Loan to a special servicer prior to a Default or Event of Default) or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the illegal acts, fraud or willful misconduct of Agent or Lender.

(b)       Borrower shall indemnify, defend and hold harmless Agent, Lender, Construction Consultant, Servicer, their direct or indirect constituent owners, each of their respective Affiliates, and each of their respective successors, assigns, employees, agents, officers, directors, shareholders and members (each, an "**Indemnified Party**" and together, the "**Indemnified Parties**") from and against any and all other liabilities, obligations, actual losses, actual damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for Agent or Lender in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnified Party shall be designated a party thereto), that may be imposed on, incurred by, or asserted against such Indemnified Party in any manner relating to or arising out of (i) any breach by Borrower of its Obligations under, or any misrepresentation by Borrower contained in, this Agreement or the other Loan Documents, (ii) the use or intended use of the proceeds of the Loan, (iii) any information provided by or on behalf of Borrower, or contained in any documentation approved by Borrower; (iv) ownership of the Mortgage, the Pledge Agreements, the Property, the Collateral or any interest in any of the foregoing, or receipt of any Net Sales Proceeds, Rents or other Gross Revenue; (v) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vi) any use, nonuse or condition in, on or about the Property or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vii) performance of any labor or services or the furnishing of any materials or other property in respect of the Property, including without limitation, the construction of the Project; (viii) any failure of the Property to comply with any Legal Requirement; (ix) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease, sale of a Unit or other transaction involving the Property or any part thereof, or any liability asserted against Agent or Lender with respect thereto;  (x) the claims of any lessee of any portion of the Property or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease; (xi) any and all claims of any Unit owner or proposed purchaser or lessee of a Unit or any Person acting through or under any such owner or proposed purchaser or lessee; and (xii) any failure to pay any permit and application fees, violations, fines and/or any other penalty incurred in connection with ownership, use, leasing and/or development of the Property (collectively, the "**Indemnified Liabilities**"); provided, however, that Borrower shall not have any obligation to any such Indemnified Party hereunder to the extent that such Indemnified Liabilities arise from the illegal acts, fraud or willful misconduct of such Indemnified Party.  To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by each Indemnified Party.

143

**Section 10.14 Schedules Incorporated**. The Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

**Section 10.15 Offsets, Counterclaims and Defenses**. Any assignee of Agent's or Lender's interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**Section 10.16 No Joint Venture or Partnership; No Third Party Beneficiaries**.

(a) Borrower, Agent and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender. Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower, Agent and Lender nor to grant Agent or Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b) This Agreement and the other Loan Documents are solely for the benefit of Agent, Lender and Borrower and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Agent, Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein. All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Agent and Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Agent or Lender if, in Agent's or Lender's sole discretion, Agent or Lender deems it advisable or desirable to do so.

**Section 10.17 Publicity**. All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, to Agent, Lender or any of their Affiliates shall be subject to the prior written approval of Agent. Agent and Lender shall have the right to have a sign at the Property in a form acceptable to Agent stating that Agent, Lender and their Affiliates are providing financing for the Project and including Agent's, Lender's or their Affiliates logos.

**Section 10.18 Waiver of Marshalling of Assets**. To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshaling of the assets of Borrower, Borrower's partners and others with interests in Borrower, and of the Property, and agrees not to assert any right under any laws pertaining to the marshaling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the rights of Agent or Lender under the

Loan Documents to a sale of the Property and/or the Collateral for the collection of the Total Debt without any prior or different resort for collection or of the right of Agent and Lender to the payment of the Total Debt out of the net proceeds of the Property and/or the Collateral in preference to every other claimant whatsoever.

**Section 10.19 Waiver of Counterclaim**.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Agent, Lender or their agents.

**Section 10.20 Conflict; Construction of Documents; Reliance**.

(a)      In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.  Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Agent or Lender or any parent, subsidiary or Affiliate of Agent or Lender.  Agent and Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to them under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by them or any parent, subsidiary or Affiliate of Agent or Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Agent's or Lender's exercise of any such rights or remedies.  Borrower acknowledges that Agent, Lender and their Affiliates engage in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

(b)      Notwithstanding anything to the contrary set forth herein, in the event that Agent's or Lender's consent or approval is required to be reasonable or Agent or Lender is required to not unreasonably withhold, condition or delay their consent hereunder, notwithstanding any other reason that Agent or Lender may reasonably withhold, condition or delay its consent or approval, Agent and Lender may reasonably withhold, condition or delay their consent or approval in the event that (i) the granting of such consent shall have any material adverse effect on Borrower or the Project, including without limitation Borrower's ability to complete the Project in accordance with the Loan Documents or such granting of consent may result in a decrease in the market value of the Project, (ii) as a result of such consent Borrower will not be able to achieve Final Completion with such amounts that remain unadvanced to Borrower under the Loan and will be advanced to Borrower in accordance with the terms and conditions of the Loan Documents, (iii) such consent will result in any impairment of the Lien, priority or enforceability of the Mortgage, the Pledge Agreement or the Loan Agreement or the enforceability of the other Loan Documents, (iv) the action or request that is the subject of such consent will give purchasers of Units the right to terminate or rescind any Unit Sale Contract, or (v) there exists any monetary Default, material non-monetary Default or Event of Default.

**Section 10.21 Brokers and Financial Advisors**.  Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement other than Meridian Capital (the "**Broker**").  Borrower hereby agrees to indemnify, defend and hold Agent and Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Agent's and Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person (including Broker) that such Person acted on behalf of Borrower, Agent or Lender in connection with the transactions contemplated herein and is owed any type of commission, fee, concession, reimbursement or other compensation.  The provisions of this <u>Section 10.21</u> shall survive the expiration and termination of this Agreement and the payment and performance of the Obligations.

**Section 10.22 Prior Agreements**.  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

**Section 10.23 Liability**.

(a)     If Borrower consists of more than one (1) Person the obligations and liabilities of each Person comprising Borrower shall be joint and several.

(b)     If Lender consists of more than one (1) Person the obligations and liabilities of each Person comprising Lender shall be several, and not joint.

**Section 10.24 Negation of Implied Right to Cure Events of Default**.  Notwithstanding anything contained in this Agreement or any of the other Loan Documents providing that certain rights, remedies or privileges are only available to Agent or Lender during the "continuance" of an Event of Default (or words of similar import), Borrower expressly acknowledges and agrees that it does not have the right to cure an Event of Default once the same has occurred under this Agreement or any other Loan Document without the consent of Agent, which consent may be withheld, delayed or denied by Agent in its sole and absolute discretion.

## ARTICLE XI

## AGENT

**Section 11.1   Appointment**.  Lender hereby irrevocably designates and appoints Agent as the Agent of Lender hereunder and under the other Loan Documents, including, without limitation, acting as collateral agent for Lender under the Loan Documents, or any of them.  Lender hereby irrevocably authorizes Agent to take such action on its behalf under the provisions of the Loan Documents and to exercise such powers and perform such duties as are expressly delegated to Agent by the terms of the Loan Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in the Loan Documents, Agent shall not have any duties or responsibilities to Lender, except those expressly set forth herein or therein, or any fiduciary relationship with Lender, and no implied

covenants, functions, responsibilities, duties, obligations or liabilities shall be read into the Loan Documents or otherwise exist against Agent and in favor of Lender.

Section 11.2   **Delegation of Duties**.  Agent may execute any of its duties under the Loan Documents by or through Agent or attorneys-in-fact and shall be entitled to receive and rely upon advice of counsel concerning all matters pertaining to such duties.  Agents shall not be responsible to Lender for the negligence or misconduct of any agents or attorneys-in-fact selected by it with reasonable care.

Section 11.3   **Exculpatory Provisions**.  Neither Agent nor any of its respective officers, directors, employees, agents, attorneys-in-fact or affiliates shall be (1) liable to Lender for any action lawfully taken or omitted to be taken by it or such Person under or in connection with the Loan Documents (except for its or such Person's own gross negligence or willful misconduct), or (2) responsible in any manner to Lender for any recitals, statements, representations or warranties made by Borrower  or any officer of Borrower contained in the Loan Documents or in any certificate, report, statement or other document referred to or provided for in, or received by Agent under or in connection with the Loan Documents or for the value, validity, effectiveness, genuineness, enforceability or sufficiency of the Loan Documents or for any failure of Borrower to perform its obligations hereunder.  Agent shall not be under any obligation to Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, the Loan Documents or to inspect the properties, books or records of Borrower.

Section 11.4   **Reliance by Agent**.  Agent shall be entitled to rely, and shall be fully protected in relying, upon any note, writing, resolution, notice, consent, certification, affidavit, letter, cablegram, telegram, telecopy, telex or teletype message, statement, order or other document or conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to Borrower), independent accountants and other experts selected by Agent.  As to Lender, Agent shall take any and all direction with regard to administration of the Loan Documents from the Lenders holding such portion of the Loan as may be agreed by the Lenders separately in writing.  Notwithstanding anything to the contrary set forth herein:  (1) Agent shall be fully justified in failing or refusing to take any action under the Loan Documents unless it shall first receive such advice or concurrence of the Lender or it shall first be indemnified to its satisfaction by the Lenders ratably in accordance with its percentage share of the loan against any and all liability and expense which may be incurred by it by reason of taking or continuing to take any action (except for liabilities and expenses resulting from Agent's gross negligence or willful misconduct), (2) Agent shall in all cases be fully protected in acting, or in refraining from acting, under the Loan Documents in accordance with a request of the Lender, and such request and any action taken or failure to act pursuant thereto shall be binding upon Lender.

Section 11.5   **Notice of Default**.  Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless Agent has received notice from Lender or Borrower referring to the Loan Documents, describing such Default or Event of Default and stating that such notice is a "notice of default."  In the event that Agent receives such a notice and a Default has occurred, Agent shall promptly give notice thereof to Lender.  Agent shall take such action with respect to such Default or Event of Default as may be agreed by Agent and

147

the Lenders separately in writing; provided, however, that, unless and until Agent shall have received such directions, Agent may (but shall not be obligated to) take such action, or refrain from taking such action, with respect to such Default or Event of Default as it shall deem advisable in the best interest of Lender.

**Section 11.6   Non-Reliance on Agent and Other Lenders**.   Lender expressly acknowledges that neither Agent nor any of their respective officers, directors, employees, agents, attorneys-in-fact or affiliates has made any representations or warranties to it, and that no act by Agent hereinafter taken, including any review of the affairs of Borrower, shall be deemed to constitute any representation or warranty by Agent to Lender.  Lender represents to Agent that it has, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it has deemed appropriate, made its own appraisal of, and investigation into the business, operations, property, financial and other condition and creditworthiness of Borrower and made its own decision to make its loans hereunder and enter into this Agreement.  Lender also represents that it will, independently and without reliance upon Agent or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of Borrower.  Except for notices, reports and other documents expressly required to be furnished to Lender by Agent hereunder, Agent shall not have any duty or responsibility to provide Lender with any credit or other information concerning the business, operations, property, financial and other condition or creditworthiness of Borrower which may come into the possession of Agent or any of their officers, directors, employees, Agent, attorneys-in-fact or affiliates.

**Section 11.7   Indemnification**.   Lender agrees to indemnify Agent, in their respective capacities as such (to the extent not reimbursed by Borrower and without limiting the obligation, if any, of Borrower to do so), ratably according to the respective amounts of their percentage share of the Loan, from and against any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever which may at any time (including without limitation at any time following the payment of the Obligations) be imposed on, incurred by or asserted against Agent in any way relating to or arising out of the Loan Documents or any documents contemplated by or referred to herein or the transactions contemplated hereby or any action taken or omitted by Agent under or in connection with any of the foregoing; provided, however, that Lender shall not be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements resulting from Agent's gross negligence or willful misconduct, respectively.  The provisions of this <u>Section 11.7</u> shall survive the payment of the Obligations and the termination of this Agreement.

**Section 11.8   Agent in Its Individual Capacity**.   Agent and its affiliates may make loans to, accept deposits from and generally engage in any kind of business with Borrower and affiliates as though Agent were not Agent hereunder.  With respect to such loans made or renewed by it and any note issued to it, Agent shall have the same rights and powers under the Loan Documents as Lender and may exercise the same as though it was not Agent, and the term "Lender" shall include Agent in its individual capacity.

148

**Section 11.9   Successor Agent**.  Agent may resign as Agent under the Loan Documents upon thirty (30) days' notice to Lender and Borrower. If Agent shall resign, Lender shall appoint a successor Agent.  The term "Agent" shall mean each such successor Agent, effective upon its appointment, and the former Agent's rights, powers and duties as Agent shall be terminated, without any other or further act or deed on the part of such former Agent or any of the parties to this Agreement or any of the Loan Documents or successors thereto.  After any retiring Agent's resignation hereunder as Agent, the provisions of the Loan Documents shall inure to its benefit as to any actions taken or omitted to be taken by it while it was an Agent under the Loan Documents. In no event shall there be more than one Agent hereunder.

**Section 11.10 Limitations on Agent's Liability**.  No syndication agents, arranger, or book running manager, in such capacities, shall have any right, power, obligation, liability, responsibility or duty under this Agreement.

[NO FURTHER TEXT CONTINUES ON THIS PAGE]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

BORROWER:

**135 WEST 52ND STREET OWNER LLC,**
a Delaware limited liability company

By:_____
Name: Meyer Chetrit
Title: President


By:_____
Name: David Bistricer
Title: Secretary

STATE OF NEW YORK    )
                            ) ss.
COUNTY OF NEW YORK  )

On the 21 day of August in the year 2014 before me, the undersigned, a notary public in and for said state, personally appeared Meyer Chetrit , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

STATE OF NEW YORK    )
                            ) ss.
COUNTY OF NEW YORK  )

On the _____ day of _____ in the year 2014 before me, the undersigned, a notary public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

[Signature Page to Building Loan Agreement]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**135 WEST 52ND STREET OWNER LLC,**
a Delaware limited liability company

By:_____
Name: Meyer Chetrit
Title: President

By:_____
Name: David Bistricer
Title: Secretary

STATE OF NEW YORK     )
                              ) ss.
COUNTY OF NEW YORK  )

      On the _____ day of _____ in the year 2014 before me, the undersigned, a notary public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                    _____
                                    Notary Public


STATE OF NEW YORK     )
                              ) ss.
COUNTY OF NEW YORK  )

      On the _22_ day of __A__ in the year 2014 before me, the undersigned, a notary public in and for said state, personally appeared _Dal Bistric_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                    _____
                                    Notary Public

CHAYA SARA BEER
Notary Public, State of New York
No. 24-4960111
Qualified in Kings County
Commission Expires Dec. 18, 2018

**LENDER**:

**GERMAN AMERICAN CAPITAL
CORPORATION**,
a Maryland corporation

By: _____
Name:
Title:   Ian McColough
         Managing Director

By: _____
Name:
Title:   MURRAY MACKINNON
         VICE PRESIDENT

**AGENT**:

**DEUTSCHE BANK AG NEW YORK BRANCH**,
a branch of Deutsche Bank AG, a banking
corporation organized under the laws of the Federal
Republic of Germany, licensed by the New York
State Banking Department

By: _____
Name:   Ian McColough
Title:   Managing Director

By: _____
Name:   Robert W. Pettinato
Title:   Managing Director

[Signature Page to Building Loan Agreement]

STATE OF NEW YORK      )
                       ) ss.
COUNTY OF NEW YORK  )

On the 21ˢᵗ day of August in the year 2014 before me, the undersigned, a notary public in and for said state, personally appeared Ian MColough, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

SASKIA A. LABRIEL
Notary Public, State of New York
No. 01LA6274940
Qualified in Kings County
Commission Expires January 14, 2017

STATE OF NEW YORK      )
                       ) ss.
COUNTY OF NEW YORK  )

On the 21ˢᵗ day of August in the year 2014 before me, the undersigned, a notary public in and for said state, personally appeared Murray MacKinnon, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

SASKIA A. LABRIEL
Notary Public, State of New York
No. 01LA6274940
Qualified in Kings County
Commission Expires January 14, 2017

[Acknowledgment to Building Loan Agreement]

STATE OF NEW YORK          )
                           ) ss.
COUNTY OF NEW YORK         )

On the __2/__ day of _August_ in the year 2014 before me, the undersigned, a notary public in and for said state, personally appeared _Ian McColough_ , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

SASKIA A. LABRIEL
Notary Public, State of New York
No. 01LA6274940
Qualified in Kings County
Commission Expires January 14, 2017

STATE OF NEW YORK          )
                           ) ss.
COUNTY OF NEW YORK         )

On the __2/st__ day of _August_ in the year 2014 before me, the undersigned, a notary public in and for said state, personally appeared _Robert Petknato_ , personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

SASKIA A. LABRIEL
Notary Public, State of New York
No. 01LA6274940
Qualified in Kings County
Commission Expires January 14, 2017

[Acknowledgment to Building Loan Agreement]

**SCHEDULE I**

**ORGANIZATIONAL CHART OF BORROWER**

[See attached]

# Organizational Structure Chart for
## 135 West 52nd Street, New York, New York



**SCHEDULE II**

**BORROWER'S INTELLECTUAL PROPERTY**

None.

**SCHEDULE III**

**RESERVED**

**SCHEDULE IV**

**CUSTOM MATERIALS AND MACHINERY; DEPOSIT AMOUNTS**

None.

**SCHEDULE V**

**LITIGATION**

None.

**SCHEDULE VI**

**REQUIREMENTS OF SPECIAL PURPOSE ENTITY**

(a)     With regard to Borrower, Borrower (i) has been, is, and will be organized solely for the purpose of acquiring, developing, owning, holding, selling, leasing, transferring, exchanging, managing and operating the Property, entering into the applicable Loan Documents with the Lender, refinancing the Property in connection with a permitted repayment of the Loan, and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing, and (ii) has not owned, does not own, and will not own any asset or property other than (A) the Property, and (B) incidental personal property necessary for the ownership or operation of the Property.  With regard to Sole Member, Sole Member (i) has been, is, and will be organized solely for the purpose of acquiring, owning, holding, selling, transferring, exchanging, managing and operating the Collateral (as defined in the Pledge Agreement), entering into the applicable Loan Documents with the Lender and transacting lawful business that is incident, necessary and appropriate to accomplish the foregoing, and (ii) has not owned, does not own, and will not own any asset or property other than the Collateral (as defined in the Pledge Agreement).

(b)     With regard to the Borrower, Borrower has not engaged and will not engage in any business other than the ownership, management, development and operation of the Property and Borrower will conduct and operate its business as presently conducted and operated.  With regard to the Sole Member, Sole Member has not engaged and will not engage in any business other than the ownership and management of the Collateral (as defined in the Pledge Agreement) and Sole Member will conduct and operate its business as presently conducted and operated.

(c)     Such Person has not and will not enter into any contract or agreement with any Affiliate of such Person, except upon terms and conditions that are intrinsically fair, commercially reasonable, and no less favorable to it than would be available on an arms-length basis with third parties other than any such party.

(d)     Such Person has not incurred and will not incur any Indebtedness other than the Indebtedness evidenced and/or expressly permitted by the Loan Documents.

(e)     Such Person has not made and will not make any loans or advances to any third party (including any Affiliate or constituent party), and has not and shall not acquire obligations or securities of its Affiliates.

(f)     Such Person has been, is, and intends to remain solvent and such Person has paid and will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets; provided that the foregoing shall not require any direct or indirect member, partner or shareholder of such Person (or any principal thereof) to make any additional capital contributions to such Person.  The foregoing shall not vitiate the obligations of Guarantor under the Guaranty or Guaranty of Completion.

(g)     Such Person has done or caused to be done, and will do, all things necessary to observe organizational formalities and preserve its existence, and such Person has not and will not (i) terminate or fail to comply with the provisions of its organizational documents, or (ii) without Agent's prior written consent, amend, modify or otherwise change its operating agreement or other organizational documents.

(h)     Except to the extent that such Person is (i) required to file consolidated tax returns by law; or (ii) treated as a "disregarded entity" for tax purposes and is not required to file tax returns under applicable law, (1) such Person has maintained and will maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates and any other Person; (2) such Person's assets will not be listed as assets on the financial statement of any other Person; it being understood that such Person's assets may be included in a consolidated financial statement of its Affiliates provided that (i) appropriate notation shall be made on such consolidated financial statements to indicate the separateness of such Person and such Affiliates and to indicate that such Person's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person, and (ii) such assets shall be listed on such Person's own separate balance sheet; and (3) such Person will file its own tax returns (to the extent such Person is required to file any tax returns) and will not file a consolidated federal income tax return with any other Person.  Such Person has maintained and shall maintain its books, records, resolutions and agreements in accordance with this Agreement.

(i)     Such Person has been, will be, and at all times has held and will hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of such Person or any constituent party of such Person (recognizing that such Person may be treated as a "disregarded entity" for tax purposes and is not required to file tax returns for tax purposes under applicable law)), shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name, shall not identify itself or any of its Affiliates as a division or department or part of the other and shall, to the extent reasonably necessary for the operation of its business, maintain and utilize separate stationery, invoices and checks bearing its own name.

(j)     Such Person has maintained and intends to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; provided that the foregoing shall not require any direct or indirect member, partner or shareholder of such Person to make any additional capital contributions to such Person. The foregoing shall not vitiate the obligations of Guarantor under the Guaranty or Guaranty of Completion.

(k)     Neither such Person nor any constituent party of such Person has sought or will seek or effect the liquidation, dissolution, winding up, consolidation or merger, in whole or in part, of such Person.

(l)     Such Person has not and will not commingle the funds and other assets of such Person with those of any Affiliate or constituent party or any other Person, and has held and will hold all of its assets in its own name.

(m)     Such Person has and will maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party or any other Person.

(n)     Such Person has not and will not assume or guarantee or become obligated for the debts of any other Person and does not and will not hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person.

(o)     The organizational documents of such Person shall provide that the business and affairs of such Person shall be managed solely by its sole member or a board of directors, and at all times there shall be at least two (2) duly appointed Independent Directors or Independent Managers.  In addition, the organizational documents of such Person shall provide that no Independent Director or Independent Manager (as applicable) of such Person may be removed or replaced without Cause and unless such Person provides Agent with not less than three (3) Business Days' prior written notice of (a) any proposed removal of an Independent Director or Independent Manager (as applicable), together with a statement as to the reasons for such removal, and (b) the identity of the proposed replacement Independent Director or Independent Manager, as applicable, together with a certification that such replacement satisfies the requirements set forth in the organizational documents for an Independent Director or Independent Manager (as applicable).

(p)     The organizational documents of such Person shall also provide an express acknowledgment that each of Agent and Lender is an intended third-party beneficiary of the "special purpose" provisions of such organizational documents.

(q)     The organizational documents of such Person shall provide that neither the sole member nor the board of directors of such Person shall take any action which, under the terms of any certificate of formation, limited liability company operating agreement or any voting trust agreement, requires the vote of the Independent Director or Independent Manager (as applicable) unless at the time of such action such Independent Directors or Independent Managers (as applicable) shall have participated in such vote.  The organizational documents of such Person shall provide that, notwithstanding any other provision of the organizational documents of such Person or any provision of law that otherwise so empowers such Person, its sole member or the board of directors or any other Person, neither such Person nor its sole member nor its board of directors nor any other Person will and such Person agrees that it will not, without the unanimous written consent of the sole member and the Independent Directors or Independent Managers (as applicable) of such Person (i) file or consent to the filing of any petition, either voluntary or involuntary, to take advantage of any applicable insolvency, bankruptcy, liquidation or reorganization statute, (ii) seek or consent to the appointment of a receiver, liquidator or any similar official of such Person or a substantial part of its business, (iii) take any action that might cause such entity to become insolvent, (iv) make an assignment for the benefit of creditors, (v) admit in writing its inability to pay debts generally as they become due, (vi) declare or effectuate a moratorium on the payment of any obligations, or (vii) take any action in furtherance of the foregoing.  Such Person shall not take any of the foregoing actions without the unanimous written consent of its sole member and all Independent Directors or Independent Managers, as applicable.  In addition, the organizational documents of such Person shall provide that, when voting with respect to any matters set forth in the immediately preceding

VI-3

sentence of this clause (q), notwithstanding any duty otherwise existing at law or equity, the Independent Directors or Independent Managers (as applicable) shall consider only the interests of such Person, including its creditors, and shall have a duty of loyalty and care to such Person and its creditors similar to that of a director of a business corporation.  Without limiting the generality of the foregoing, such documents shall expressly provide that, to the greatest extent permitted by law, except for duties to such Person (including duties to the members of such Person solely to the extent of their respective economic interest in such Person and to such Person's creditors as set forth in the immediately preceding sentence), such Independent Directors or Independent Managers (as applicable) shall not owe any fiduciary duties to, and shall not consider, in acting or otherwise voting on any matter for which their approval is required, the interests of (i) the members of such Person, (ii) other Affiliates of such Person, or (iii)  any group of Affiliates of which such Person is a part); provided, however, the foregoing shall not eliminate the implied contractual covenant of good faith and fair dealing.

(r)      The organizational documents of such Person shall provide that, as long as any portion of the Obligations remains outstanding, upon the occurrence of any event that causes sole member of such Person to cease to be a member of such Person  (other than (i) upon an assignment by the sole member of such Person of all of its limited liability company interest in such Person and the admission of the transferee, if permitted pursuant to the organizational documents of such Person and the Loan Documents, or (ii) the resignation of sole member of such Person and the admission of an additional member of such Person, if permitted pursuant to the organizational documents of such Person and the Loan Documents), each of the persons acting as an Independent Director or Independent Manager (as applicable) of such Person shall, without any action of any Person and simultaneously with sole member of such Person ceasing to be a member of such Person, automatically be admitted as members of such Person (in each case, individually, a "**Special Member**" and collectively, the "**Special Members**") and shall preserve and continue the existence of such Person without dissolution.  The organizational documents of such Person shall further provide that for so long as any portion of the Obligations is outstanding, no Special Member may resign or transfer its rights as Special Member unless (i) a successor Special Member has been admitted to such Person as a Special Member, and (ii) such successor Special Member has also accepted its appointment as an Independent Director or Independent Manager (as applicable).

(s)      The organizational documents of such Person shall provide that, as long as any portion of the Obligations remains outstanding, except as expressly permitted pursuant to the terms of this Agreement, (i) the sole member of such Person may not resign, and (ii) no additional member shall be admitted to such Person.

(t)      The organizational documents of such Person shall provide that, as long as any portion of the Obligations remains outstanding: (i) such Person shall be dissolved, and its affairs shall be wound up, only upon the first to occur of the following: (A) the termination of the legal existence of the last remaining member of such Person or the occurrence of any other event which terminates the continued membership of the last remaining member of such Person in such Person unless the business of such Person is continued in a manner permitted by its operating agreement or the Delaware Limited Liability Company Act (the "**DE Act**") or the New York Limited Liability Law (the "**NY LLC Law**"), or (B) the entry of a decree of judicial dissolution under Section 702 of the DE Act or Section 701 of the NY LLC Law; (ii) upon the occurrence of

any event that causes the last remaining member of such Person to cease to be a member of such Person or that causes the sole member of such Person to cease to be a member of such Person (other than (A) upon an assignment by the sole member of such Person of all of its limited liability company interest in such Person and the admission of the transferee, if permitted pursuant to the organizational documents of such Person and the Loan Documents, or (B) the resignation of the sole member of such Person and the admission of an additional member of such Person, if permitted pursuant to the organizational documents of such Person and the Loan Documents), to the fullest extent permitted by law, the personal representative of such last remaining member shall be authorized to, and shall, within ninety (90) days after the occurrence of the event that terminated the continued membership of such member in such Person, agree in writing (I) to continue the existence of such Person, and (II) to the admission of the personal representative or its nominee or designee, as the case may be, as a substitute member of such Person, effective as of the occurrence of the event that terminated the continued membership of such member in such Person; (iii) the bankruptcy of the sole member of such Person or a Special Member shall not cause the sole member of such Person or Special Member, respectively, to cease to be a member of such Person and upon the occurrence of such an event, the business of such Person shall continue without dissolution; (iv) in the event of the dissolution of such Person, such Person shall conduct only such activities as are necessary to wind up its affairs (including the sale of the assets of such Person in an orderly manner), and the assets of such Person shall be applied in the manner, and in the order of priority, set forth in Section 704 of the DE Act or Section 704 of the NY LLC Law; and (v) to the fullest extent permitted by law, each of the sole member of such Person and the Special Members shall irrevocably waive any right or power that they might have to cause such Person or any of its assets to be partitioned, to cause the appointment of a receiver for all or any portion of the assets of such Person, to compel any sale of all or any portion of the assets of such Person pursuant to any applicable law or to file a complaint or to institute any proceeding at law or in equity to cause the dissolution, liquidation, winding up or termination of such Person.

(u)     Intentionally Omitted.

(v)     Such Person has not permitted and will not permit any Affiliate or constituent party independent access to its bank accounts.

(w)     Such Person has paid and shall pay its own liabilities and expenses, including the salaries of its own employees (if any) from its own funds, and has maintained and shall maintain a sufficient number of employees (if any) in light of its contemplated business operations; provided that the foregoing shall not require any direct or indirect member, partner or shareholder of such Person to make any additional capital contributions to such Person.  The foregoing shall not vitiate the obligations of Guarantor under the Guaranty or Guaranty of Completion.

(x)     Such Person has compensated and shall compensate each of its consultants and agents from its funds for services provided to it and pay from its own assets all obligations of any kind incurred; provided that the foregoing shall not require any direct or indirect member, partner or shareholder of such Person to make any additional capital contributions to such Person.  The foregoing shall not vitiate the obligations of Guarantor under the Guaranty or Guaranty of Completion.

(y)     Such Person has allocated and will allocate fairly and reasonably any overhead expenses that are shared with any Affiliate, including shared office space.

(z)     Except in connection with the Loan, such Person has not pledged and will not pledge its assets for the benefit of any other Person.

(aa)     Such Person has and will have no obligation to indemnify its officers, directors, members or Special Members, as the case may be, or has such an obligation that is fully subordinated to the Debt and will not constitute a claim against it if cash flow in excess of the amount required to pay the Debt is insufficient to pay such obligation.

(bb)     Such Person has not, does not, and will not have any of its obligations guaranteed by any Affiliate (other than from the Guarantor or Sole Member with respect to the Loan).

As used herein:

"**Cause**" shall mean, with respect to an Independent Director or Independent Manager, (i) acts or omissions by such Independent Director or Independent Manager, as applicable, that constitute willful disregard of, or gross negligence with respect to, such Independent Director's or Independent Manager's, as applicable, duties, (ii) such Independent Director or Independent Manager, as applicable, has engaged in or has been charged with or has been indicted or convicted for any crime or crimes of fraud or other acts constituting a crime under any law applicable to such Independent Director or Independent Manager, as applicable, (iii) such Independent Director or Independent Manager, as applicable, has breached its fiduciary duties of loyalty and care as and to the extent of such duties in accordance with the terms of the Borrower's or Sole Member's (as applicable) organizational documents, (iv) there is a material increase in the fees charged by such Independent Director or Independent Manager, as applicable, or a material change to such Independent Director's or Independent Manager's, as applicable, terms of service, (v) such Independent Director or Independent Manager, as applicable, is unable to perform his or her duties as Independent Director or Independent Manager, as applicable, due to death, disability or incapacity, or (vi) such Independent Director or Independent Manager, as applicable, no longer meets the definition of Independent Director or Independent Manager, as applicable.

"**Independent Director**" or "**Independent Manager**" shall mean a natural person selected by Borrower or Sole Member, as applicable, (a) with prior experience as an independent director, independent manager or independent member, (b) with at least three (3) years of employment experience, (c) who is provided by a Nationally Recognized Service Company, (d) who is duly appointed as an Independent Director or Independent Manager and is not, will not be while serving as Independent Director or Independent Manager (except pursuant to an express provision in Borrower's or Sole Member's (as applicable) operating agreement providing for the appointment of such Independent Director or Independent Manager to become a "special member" upon the last remaining member of Borrower or Sole Member (as applicable) ceasing to be a member of Borrower or Sole Member, respectively) and shall not have been at any time during the preceding five (5) years, any of the following:

VI-6

(i)      a stockholder, director (other than as an Independent Director), officer, employee, partner, attorney or counsel of Borrower, Sole Member, any Affiliate of Borrower or Sole Member or any direct or indirect parent of Borrower or Sole Member;

(ii)      a customer, supplier or other Person who derives any of its purchases or revenues from its activities with Borrower or Sole Member or any Affiliate of Borrower or Sole Member;

(iii)      a Person or other entity Controlling or under common control with any such stockholder, partner, customer, supplier or other Person described in clause (i) or clause (ii) above; or

(iv)      a member of the immediate family of any such stockholder, director, officer, employee, partner, customer, supplier or other Person described in clause (i) or clause (ii) above.

A natural person who otherwise satisfies the foregoing definition and satisfies subparagraph (i) by reason of being the Independent Director or Independent Manager of a "special purpose entity" affiliated with Borrower or Sole Member shall be qualified to serve as an Independent Director or Independent Manager of Borrower or Sole Member, provided that the fees that such individual earns from serving as Independent Director or Independent Manager of affiliates of Borrower in any given year constitute in the aggregate less than five percent (5%) of such individual's annual income for that year.

"**Nationally Recognized Service Company**" shall mean CT Corporation or Corporation Service Company.

**SCHEDULE VII**

**REQUIRED OFFERING PLAN AMENDMENTS**

- **Federal Interstate Land Full Disclosure Act ("ILSA")**

  o Disclose that ILSA is applicable, but an exemption is available where a seller agrees to complete construction of a condominium unit within two years. Specifically, Sponsor must unconditionally agree to substantially complete the units (eligible for a TCO) within two years, (ii) not limit the remedies of purchasers at law or in equity if Sponsor fails to so complete a unit, (iii) not apply the Acts of God provision to lengthen such two year period and (iv) grant existing purchasers a right of rescission.

- **Declaration/Easements:**

  o Add Commercial Unit Owners to those provisions in Par. 10(d) giving Sponsor and the Retail Unit Owner an easement in, over, on and across the Common Elements for sale, rental, operation, management and rental of their Units.

  o Add Commercial Unit Owners to those provisions in Par. 10(c) benefiting the Retail Unit Owner with respect to initial signage and additional signage.

  o Add Commercial Unit Owners to those provisions in Par. 10(f) giving Sponsor and Retail Unit Owner an easement in, over, on and across the Common Elements for making repairs, alterations and improvements.

  o Add specific easements for antennae, satellite dishes and other communication equipment for Sponsor, Retail Unit Owner and Commercial Unit Owners.

- **Declaration/Amendments:**

  o Make all amendments to Declaration require 66 2/3% of all Unit Owners in number and Common Interest, including Declaration Pars. 9, 10, 11, 12, 14, 15 and 16 which currently require 80%.

  o Add Commercial Unit Owners to those provisions in Par. 18(b) and 18(c) pertaining to the special rights given Sponsor and Retail Unit Owner.

  o Add provision that any amendment or modification which adversely affects the lien of any Permitted Mortgage (including Lender) requires the written consent of such mortgagees.

- **Declaration/Definitions:**

    o   Revise definitions of Mortgage Representatives, Permitted Mortgage and Permitted Mortgagee to include Lender.

- **By-Laws/Board of Managers**

  o   Revise the Control by Sponsor section of the Plan and Sections 2.7 (B) and 2.8 of the By-laws which refer to 9 Board members to conform to actual number listed elsewhere in Plan (7).

- **By-Laws/Operation of Property**

  o   **Budget**   Include in By-Laws the provision in the BLA that requires that Lender to be provided with a copy of the proposed budget 15 days prior to such budget being voted upon by the Board.

  o   **Maintenance/Repairs in Common Elements**  Commercial Unit Owners and Retail Unit Owner have broad rights to install and maintain equipment and systems subject, however, to Board approval which must be granted provided certain conditions are met (work does not materially adversely affect Building or encroaches upon Common Elements) (Section 5.1(A, Page H28-29).  Delete the requirement for Board approval while keeping conditions in place.

- **By-Laws/Amendments**

  o   Add provision that any amendment or modification which adversely affects the lien of any Permitted Mortgage (including Lender) requires the written consent of such mortgagees.

- **Purchase Agreement**

  o   Although there is no right to specific performance under the Purchase Agreement (only liquidated damages), Special Risk 2 states that Sponsor may sue for specific performance. The special risk should be revised to conform to the Purchase Agreement.

**EXHIBIT A**

**RESERVED**

**EXHIBIT B**

**RESERVED**

**EXHIBIT C**

**FORM OF DATEDOWN ENDORSEMENT**

[LETTERHEAD OF TITLE COMPANY]

_____, 201__

Deutsche Bank AG New York Branch,
     as agent
60 Wall Street, 10th Floor
New York, New York 10005
Attention: Ian McColough

Re:    _____
      Title No. [ _____ ]

Ladies and Gentlemen:

Please be advised that [_____] (the "**Company**") has continued its title examinations and tax searches in the above referenced matter from _____ to _____. There have been no changes to title and the tax search shows all items have been paid.

The effective date of the policy is changed to _____.  The Company acknowledges that the amount of this advance is $ _____ and that, with this advance, the total amount advanced to date and insured hereby is $_____.

The policy excepts changes made since the last date of the survey set forth in Schedule B of our policy unless specifically referenced above.

Very truly yours,

[_____]

By: _____
Name:
Title

**EXHIBIT D**

**ASSIGNMENT OF CONTRACTS**

[See attached]

## ASSIGNMENT OF PLANS, SPECIFICATIONS, PERMITS, CONTRACTS, LICENSES, ENTITLEMENTS AND INTANGIBLES

This ASSIGNMENT OF PLANS, SPECIFICATIONS, PERMITS, CONTRACTS, LICENSES, ENTITLEMENTS AND INTANGIBLES (this "**Assignment**") is made as of [_____], 2014, by **135 WEST 52ND STREET OWNER LLC**, a Delaware limited liability company, having its principal place of business at c/o The Chetrit Group, LLC, 512 Seventh Avenue, New York, New York 10018 ("**Borrower**"), in favor of **DEUTSCHE BANK AG NEW YORK BRANCH**, a branch of Deutsche Bank AG, a banking corporation organized under the laws of the Federal Republic of Germany, licensed by the New York State Banking Department, as agent (together with its successors and assigns, hereinafter referred to as "**Agent**"), for the benefit of **GERMAN AMERICAN CAPITAL CORPORATION**, a Maryland corporation, having an address at 60 Wall Street, 10th Floor, New York, New York 10005, and the other lenders party to the Loan Agreement, as defined below (collectively, together with their successors and assigns, and such other co-lenders as may exist from time to time, hereinafter referred to as "**Lender**").

## W I T N E S S E T H:

A.     This Assignment is given in connection with a loan in the maximum aggregate principal amount of $[220,000,000.00] (the "**Loan**"), being advanced pursuant to (i) that certain Senior Loan Agreement (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Senior Loan Agreement**"), (ii) that certain Building Loan Agreement (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Building Loan Agreement**") and (iii) that certain Project Loan Agreement (as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time, the "**Project Loan Agreement**"), each of which is dated as of the date hereof among Borrower, Agent and Lender (the Senior Loan Agreement, Building Loan Agreement and Project Loan Agreement, collectively, the "**Loan Agreement**"), and evidenced by (a) that certain Senior Loan Note, (b) that certain Building Loan Note and (c) that certain Project Loan Note, each of which is dated as of the date hereof made by Borrower to Lender (as the same may each be amended, restated, replaced, supplemented or otherwise modified from time to time, collectively, the "**Note**").  All initially capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Building Loan Agreement.

B.     (i) the Senior Loan Note is secured by that certain Consolidated, Amended and Restated Senior Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, (ii) the Building Loan Note is secured by that certain Building Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing and (iii) the Project Loan Note is secured by that certain Project Loan Mortgage, Assignment of Leases and Rents, Security Agreement and Fixture Filing, each of which is dated as of the date hereof made by Borrower to Agent for the benefit of Lender (as the same may each be amended, restated, replaced, supplemented or otherwise modified from time to time, collectively the "**Mortgage**"), encumbering the Property.

C.     Borrower has agreed to execute and deliver this Assignment to further secure the payment and performance of all of the obligations under the Note, the Loan Agreement and the other Loan Documents.

D.     This Assignment is given to induce Lender to make the Loan and payment, fulfillment, and performance by Borrower of its obligations under the Loan Documents is secured hereby, and each and every term and provision of the Loan Agreement and the Note, including the rights, remedies, obligations, covenants, conditions, agreements, indemnities, representations and warranties therein, are hereby incorporated by reference herein as though set forth in full and shall be considered a part of this Assignment.

NOW, THEREFORE, in consideration of the mutual covenant herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Borrower agrees as follows:

1.     <u>Assignment</u>.  Borrower hereby irrevocably, absolutely and unconditionally assigns and transfers to Agent (for the benefit of Lender) all of Borrower's right, title and interest in, to and under all of the following:

(i)     all contract rights (including, without limitation, voting rights) and benefits, documents, insurance policies, contracts, agreements, bonds, deposits and other instruments relating to, affecting, associated with or in connection with the Property or any part thereof and all other contractual arrangements creating a right in Borrower as a result of its ownership, operation, maintenance, repair, replacement, or improvement of or to all or any part of the Property, whether written or verbal, now or hereafter in existence or arising, including, without limitation, all Contracts (including subcontracts); the Construction Management Agreement and any other agreement or contract with Construction Manager; all Major Contracts; any other agreement or contract with any Contractor; the Architect's Contract and any other agreement or contract with Architect; the Sales Agency Contract and any other agreement with Sales Agent; the Condominium Documents; any Unit Sale Contract; any Lease; any property management agreement; and all union contracts, employment agreements, service contracts, management agreements, development agreements, leasing, rental and brokerage agreements, operating agreements, equipment leasing agreements, condominium documents, home owners' association documents or restrictive covenants, reciprocal easement agreements and other agreements or instruments containing any conditions, covenants or restrictions benefitting, burdening or otherwise affecting the Property or any part thereof, and warranties and guaranties relating to the Property or any equipment, appliances or fixtures now or hereafter located on, placed upon or used in connection with the Property, including all deposits or bonds associated with the foregoing, including, without limitation, the Unit Sale Contract Deposits (and including, without limitation, its rights as owner of the Units and its rights as "Sponsor" under the Condominium Documents), in each case, whether now or hereafter in existence or arising (collectively, the "**Contracts**");

(ii)     all surveys, plans, specifications and other documents, and all permits, certificates of use and occupancy (or their equivalent), entitlements, licenses, authorizations, applications and approvals issued by any governmental authority or agency, including, without limitation, hotel/motel licenses, health

2

permits, restaurant licenses, liquor licenses and agreements with any utility companies, all deposits associated with the foregoing, and any other consents and approvals, including without limitation any Plans and Specifications and any and all Governmental Approvals, in each case whether now or hereafter in existence or arising, with respect to or in connection with the construction, ownership, management, operation, occupation and/or use of the Property or respecting any business or activity conducted thereon (collectively, the "**Permits**"); and

(iii)    all tradenames, trademarks, servicemarks, logos, copyrights, goodwill, books and records and all other general intangibles relating to or used in connection with the operation of the Property, in each case, whether now or hereafter in existence or arising (collectively, the "**Intangibles**", and together with the Contracts and the Permits, collectively, the "**Assigned Documents**").

2.      <u>Nature of Assignment</u>.  This Assignment is intended by Borrower, Agent and Lender to create, and shall be construed to create an absolute assignment to Agent, for the benefit of Lender, subject only to the terms and provisions hereof and the other Loan Documents.  This Assignment is effective immediately.  Notwithstanding the foregoing, Agent hereby grants to Borrower, not as a limitation or condition hereof, but as a personal covenant available only to Borrower, and not to any lessee or other person, a revocable license to perform under the Assigned Documents, and to retain, use and enjoy the same.  Such license shall be revoked automatically upon the occurrence and during the continuance of any Event of Default as set forth in the Loan Documents.

3.      <u>Rights to Enforce and Collect</u>.  Subject to the license granted pursuant to <u>Section 2</u> above and the terms of the Loan Agreement and the Cash Management Agreement, Borrower does hereby authorize and empower Agent to collect or enforce the Assigned Documents and does hereby direct each and all of the contractual obligors of Borrower to pay any income directly to Agent, or as Agent shall direct, and to perform any obligations on its or their part to be performed, upon demand for payment or performance thereof by Agent, and upon the occurrence and during the continuance of an Event of Default such obligors of Borrower shall pay the sums due or perform the obligations owing to Lender and Agent upon such demand without further inquiry. No such obligor shall be obligated to account to Borrower for any amounts paid to Agent by reason of any payment made to Agent pursuant to such demand or to inquire as to the existence of any default or whether Lender and/or Agent are otherwise entitled to such amounts, and Borrower agrees to look exclusively to Agent for such amounts in the event Borrower shall claim that such demand was not properly made.  Until the revocation of the license described in <u>Section 2</u> above, Borrower is authorized to collect or enforce or continue collecting or enforcing the Assigned Documents.

The sole signature of Agent shall be sufficient for the exercise of any rights under this Assignment.  Borrower hereby irrevocably constitutes and appoints Agent the attorney-in-fact and agent of Borrower, which appointment shall be coupled with an interest, for the purpose of executing and delivering any notice in connection with this Assignment.

4.      <u>No Other Assignments</u>.  Borrower hereby covenants and warrants that, other than pursuant to the Mortgage and the other applicable Loan Documents, it has not executed any prior

3

assignment or pledge of any of the Assigned Documents which remains in effect, nor performed any act or executed any other instrument which might prevent Agent from operating under any of the terms and conditions of this Assignment, or which would limit Agent in such operation.

5.    No Further Assignments.  Borrower hereby agrees that so long as the Total Debt, or any part thereof, shall remain unpaid, without the prior written consent and approval of Agent in each instance, Borrower will not assign, pledge, hypothecate or otherwise encumber any of the rights under the Assigned Documents.

6.    Certain Covenants with Respect to Assigned Documents.  Borrower agrees that at its sole expense it (i) will duly perform and comply with any and all representations, warranties, covenants, terms and provisions to be performed or complied with by it in any of the Assigned Documents; (ii) will not terminate, accept a voluntary surrender of, cancel, abridge, otherwise modify or waive its rights or the obligations of any other party under any of the Permits, without the express written consent of Agent (except as expressly permitted under the Loan Documents); (iii) will maintain the Permits in full force and effect; (iv) will enforce the Permits in accordance with their terms; (v) will not terminate, accept a voluntary surrender of, cancel, abridge, otherwise modify any of the material terms of or waive any of its or the obligations of any other party under any of the Contracts, except in the ordinary course of Borrower's business or otherwise expressly provided in the Loan Documents; provided, however, in no event shall Borrower fail to perform such covenant with respect to any Major Contracts, without Agent's prior express written consent; (vi) will maintain the Contracts in full force and effect, except in the ordinary course of Borrower's business; provided, however, in no event shall Borrower fail to perform such material covenant with respect to any Major Contracts, without Agent's prior express written consent; (vii) will enforce the Contracts in accordance with their terms, except in the ordinary course of Borrower's business; provided, however, in no event shall Borrower fail to perform such covenant with respect to any Major Contracts, without Agent's prior express written consent; (viii) will not terminate, accept a voluntary surrender of, cancel, abridge, otherwise modify or waive its rights or the obligations of any other party under any of the Intangibles, without the express written consent of Agent (except as expressly permitted under the Loan Documents); (ix) will maintain the Intangibles in full force and effect; (x) will enforce the Intangibles in accordance with their terms; (xi) will appear in and defend any action or proceeding arising under or in any manner connected with any of the Assigned Documents or the representations, warranties, covenants and agreements of it or the other party or parties thereto; (xii) will furnish Agent, within five (5) Business Days of written request therefor, to the extent in any Borrower Related Party's possession or control, with original executed counterparts of all Assigned Documents now or hereafter created relating to the Property; and (xiii) will take all additional action to these ends as from time to time may be requested in writing by Agent.  Any such action in violation of this paragraph shall be voidable at the option of Agent.

7.    Indemnification of Lender and Agent.  Neither Lender nor Agent shall be obligated to perform or discharge any obligation of Borrower as a result of the assignment hereby effected, and Borrower agrees to indemnify, defend and hold Lender and Agent harmless against any and all liability, cost, expense, loss or damage which it actually incurs by reason of any act of Lender or Agent under this Assignment, except only for liability to the extent directly arising out of the gross negligence or willful misconduct of Lender or Agent.  Should Lender or Agent incur any such liability, cost, expense, loss or damage by reason of this Assignment, or in defense against any

4

such claims or demands, the amount thereof, including out of pocket costs, expenses and reasonable attorney's fees and disbursements, together with interest thereon at the Default Rate shall be included in the Total Debt, and Borrower shall reimburse Agent and Lender therefor within five (5) Business Days of Agent's written demand.

8.      Further Assurances.  Borrower agrees from time to time to execute, acknowledge and deliver all such instruments and to take all such reasonable action for the purpose of effectuating this Assignment and the carrying out of the terms hereof as may be requested by Agent.

9.      Agent, Lender Not a Mortgagee-In-Possession.  Nothing herein contained shall be construed as making Lender or Agent, or either Lender's or Agent's successors or assigns a mortgagee-in-possession; nor shall Lender or Agent, or either Lender's or Agent's successors or assigns be liable for laches or failure to collect or enforce the Contracts or Permits.

10.      No Release; No Waiver.  Neither the execution of this Assignment nor any action or inaction on the part of Lender or Agent under this Assignment shall release Borrower from any of its obligations under any or all of the Assigned Documents or constitute an assumption of any such obligations on the part of the Lender or Agent.  No action or failure to act on the part of Borrower shall adversely affect or limit, in any way, the rights of Lender or Agent under this Assignment or, through this Assignment, under any and all of the Assigned Documents.  Neither the existence of this Assignment nor the exercise of its privilege to collect or enforce the Assigned Documents hereunder shall be construed as a waiver by Lender or Agent or Lender's or Agent's successors or assigns of the right to enforce payment of the Total Debt in strict accordance with the terms and provisions of the Note and other Loan Documents.  No waiver of any term or condition of this Assignment, whether by delay, omission or otherwise, shall be effective unless in writing and signed by the party or parties sought to be charged, and then such waiver shall be effective only in the specific instance and for the purpose for which given.

11.      Release of this Assignment.  This Assignment shall be deemed released, terminated and of no further force or effect whatsoever upon the indefeasible payment in full of the Obligations without the need to execute any further instruments.

12.      Savings Clause.  This Assignment shall be of no force or effect with respect to any Assigned Documents with respect to which an assignment is prohibited by the terms thereof and would cause a termination thereof without the consent of any party thereto other than Borrower (but only to the extent such consent has not been given), and this Assignment shall be construed so as not to assign such Assigned Documents.  Upon the request of Agent, Borrower shall obtain and deliver to  Agent a written consent and acknowledgment in the form attached hereto as Exhibit A, pursuant to which, among other things, all parties (other than Borrower) to each Assigned Document acknowledge and consent to the assignment of such Assigned Document to Agent pursuant to this Assignment and agree to the terms hereof.

13.      Successors and Assigns.  This Assignment shall be binding upon and inure to the benefit of the parties hereto, their respective successors and permitted assigns.  Agent and Lender shall have the right to assign or transfer its rights under this Assignment in connection with any assignment of the Loan and the Loan Documents in accordance with the Loan Documents.  Any

5

assignee or transferee of Lender or Agent shall be entitled to all the benefits afforded to Lender or Agent, respectively, under this Assignment.  Borrower shall not have the right to assign or Transfer its rights or obligations under this Assignment except as expressly provided in the Loan Documents, and any attempted assignment without such consent shall be null and void.

14.    Notices.    All notices, demands, requests, consents, approvals or other communications required, permitted or desired to be given hereunder shall be in writing and shall be delivered in accordance with Section 10.6 of the Building Loan Agreement.

15.    Severability.    Wherever possible, each provision of this Assignment shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Assignment shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Assignment.

16.    Governing Law; Jurisdiction; Service of Process.  (a) **THIS ASSIGNMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE NOTE DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS ASSIGNMENT, THE NOTE, THE LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICT OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, IT BEING UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL OF THE OBLIGATIONS ARISING HEREUNDER. TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER AND AGENT HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS ASSIGNMENT, THE NOTE, THE LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS, AND THIS ASSIGNMENT, THE NOTE, THE LOAN AGREEMENT AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.**

(b)    **ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST AGENT, LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS ASSIGNMENT MAY AT AGENT'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK,**

**PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER AND AGENT WAIVE ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER AND AGENT HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. BORROWER AGREES THAT SERVICE OF PROCESS UPON BORROWER AT THE ADDRESS FOR BORROWER SET FORTH IN THE LOAN AGREEMENT AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED IN THE LOAN AGREEMENT SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK. BORROWER (I) SHALL GIVE PROMPT NOTICE TO AGENT OF ANY CHANGE IN THE ADDRESS FOR BORROWER SET FORTH IN THE LOAN AGREEMENT, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE AN AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK, AND (III) SHALL PROMPTLY DESIGNATE AN AUTHORIZED AGENT IF BORROWER CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK. NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF AGENT OR LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.**

17. <u>Headings</u>. The headings of the articles, sections and subsections of this Assignment are for the convenience of reference only and shall not constitute a part of this Assignment for any other purpose.

18. <u>Recitals</u>. The Recitals set forth at the beginning of this Assignment are hereby incorporated into and made a part of the substantive provisions of this Assignment.

19. <u>No Amendment</u>. Nothing contained in this Assignment shall be construed to amend, modify, alter, change or supersede the terms and provisions of the Loan Agreement or any of the other Loan Documents. In the event of a conflict between the terms hereof and the terms of the Loan Agreement, the terms of the Loan Agreement shall govern and control.

20. <u>Recourse</u>. The loan is fully recourse to the Borrower.

21. <u>Entire Agreement</u>. This Assignment constitutes the entire and final agreement amongst the parties with respect to the subject matter hereof and may not be changed, terminated or otherwise varied, except by a writing duly executed by the parties.

22. <u>Incorporation by Reference</u>. To the extent that any provisions or defined terms contained in any other Loan Document (including, without limitation, the Building Loan Agreement) are used herein or incorporated herein by reference, and such other Loan Document is terminated or otherwise satisfied prior to the termination of this Assignment, then, for the avoidance of doubt, such provisions and/or defined terms shall survive until the satisfaction of the Obligations without regard to the fact that the Loan Document originally containing the same has been otherwise terminated or satisfied.

[NO FURTHER TEXT CONTINUES ON THIS PAGE]

IN WITNESS WHEREOF, Borrower has executed this Assignment as of the day and year first above written.

**BORROWER**

**135 WEST 52ND STREET OWNER LLC,**
A Delaware limited liability company


By:_____
Name:
Title:

**EXHIBIT A**

**FORM OF**

**CONSENT, CERTIFICATION, WAIVER & AGREEMENT**

The undersigned ("Consenting Party") hereby consents to the assignment by Borrower of the Assigned Document entered into by and between Borrower and Consenting Party (together with all attachments and addenda thereto, dated _____ (the "Underlying Document") to the Agent pursuant to that certain Assignment Of Plans, Specifications, Permits, Contracts, Licenses, Entitlements And Intangibles by Borrower in favor of Agent, for the benefit of Lender (the "Assignment"), to which reference is made for the definition of capitalized terms not otherwise defined herein; and, in order to satisfy a condition of Agent and Lender to enter into the Loan Agreement with the Borrower described in the Assignment, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Consenting Party agrees with Agent as follows:

1.      Upon written notice to the Consenting Party of an Event of Default under the Loan Documents and at the request of Agent, the Consenting Party will continue performance on behalf of Agent, for the benefit of Lender, under the Underlying Document in accordance with the terms thereof, provided that no default shall exist with respect to Borrower's obligations under the Underlying Document.

2.      Upon written notice to Consenting Party of an Event of Default under the Loan Documents, Agent may require Consenting Party to continue to perform under the Underlying Document, and if, but only if, Agent requires the Consenting Party to continue to perform under the Underlying Document, Agent shall perform the obligations of Borrower under the Underlying Document which arise subsequent to the date of such notice, and Consenting Party will accept such performance in lieu of performance by Borrower in satisfaction of Borrower's obligations thereunder.

3.      Consenting Party will not terminate the Underlying Document on account of any default of Borrower thereunder without written notice to Agent and first providing Agent and Lender a reasonable opportunity, but not less than the greater of (i) thirty (30) days and (ii) the cure period set forth in the Underlying Document, to effect a cure of the default or to declare Borrower in default under the Loan Agreement or any of the Loan Documents and commence to complete or cause the completion of construction of the Improvements.  In the event Agent or Lender so elects to complete or cause the completion of the Improvements, Consenting Party agrees not to terminate, and agrees to diligently continue to perform its services under, the Underlying Document so long as the defaults of Borrower thereunder are cured by Agent or Lender.  Nothing contained herein, however, shall require either Agent or Lender to cure any default of Borrower under the Underlying Document, but shall only give Agent and Lender the option to do so if Agent desires that Consenting Party continue performance under the Underlying Document.  If Agent elects not to cure such default, Consenting Party shall not be required to continue any work under the Underlying Document except work for which it has been paid. Agent,

for the benefit of Lender, shall have the right to retain possession of and use any applicable surveys, plans, specifications and other documents provided by Consenting Party or its agents. Consenting Party shall permit Agent to use the applicable surveys, plans, specifications and other documents provided by Consenting Party or its agents, without additional cost to Agent or Lender.

4.      Consenting Party hereby represents and warrants to Agent that (i) the Underlying Document is valid and enforceable, and attached hereto as <u>Exhibit A</u> is a true, complete, and final copy of such contract, together with all amendments, modifications, and exhibits thereto, (ii) Consenting Party has not previously assigned, and has no notice that Borrower has previously assigned, the Underlying Document, and Consenting Party will not cause or agree to any future assignment of the Underlying Document, (iii) neither Consenting Party, nor Borrower, is in default under the Underlying Document, (iv) all covenants, conditions and agreements have been performed as required therein except those not due to be performed until after the date hereof, (v) $_____ has been paid to Consenting Party under the Underlying Document and $_____ has been earned but not paid to this date, and (vi) Consenting Party is duly licensed to conduct its business in the jurisdiction where such construction is to be performed and will maintain said license in full force and effect throughout the life of the Underlying Document.

5.      Consenting Party further represents and warrants that, to the best of Consenting Party's knowledge, information and belief, that any applicable surveys, plans, specifications and other similar documents comply with all applicable Laws and the requirements of all applicable governmental and public authorities, including without limitation, the Americans with Disabilities Act.

[Signature page follows]

Dated: _____          **CONSENTING PARTY**:

_____

By: _____

Name:_____

Its:_____

**<u>Exhibit A to Consent, Certification, Waiver and Agreement</u>**

**EXHIBIT E**

**AFFIRMATION OF PAYMENT (AIA FORM G706)**

[See attached]

Appendix 49

DRAFT **AIA® Document G706™ – 1994**

**Contractor's Affidavit of Payment of Debts and Claims**

**PROJECT:** *(Name and address)*
Sample Affidavit of Payment of
Debts & Claims
Sample
**TO OWNER:** *(Name and address)*

**ARCHITECT'S PROJECT NUMBER:**

**CONTRACT FOR:**
**CONTRACT DATED:**

OWNER: ☐
ARCHITECT: ☐
CONTRACTOR: ☐
SURETY: ☐
OTHER: ☐

**STATE OF:**
**COUNTY OF:**

The undersigned hereby certifies that, except as listed below, payment has been made in full and all obligations have otherwise been satisfied for all materials and equipment furnished, for all work, labor, and services performed, and for all known indebtedness and claims against the Contractor for damages arising in any manner in connection with the performance of the Contract referenced above for which the Owner or Owner's property might in any way be held responsible or encumbered.

**EXCEPTIONS:**

SUPPORTING DOCUMENTS ATTACHED HERETO:

1.    Consent of Surety to Final Payment. Whenever
      Surety is involved, Consent of Surety is
      required. AIA Document G707, Consent of
      Surety, may be used for this purpose
Indicate Attachment          ☐ Yes    ☐ No

*The following supporting documents should be attached
hereto if required by the Owner:*

1.    Contractor's Release or Waiver of Liens,
      conditional upon receipt of final payment.

2.    Separate Releases or Waivers of Liens from
      Subcontractors and material and equipment
      suppliers, to the extent required by the Owner,
      accompanied by a list thereof.

3.    Contractor's Affidavit of Release of Liens (AIA
      Document G706A).

**CONTRACTOR:** *(Name and address)*

BY: _____
      *(Signature of authorized representative)*

_____
      *(Printed name and title)*

Subscribed and sworn to before me on this date:

Notary Public:
My Commission Expires:

AIA Document G706™ – 1994. Copyright © 1970 and 1994 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 09:08:16 on 03/16/2005 under Order No.1000167257_1 which expires on 3/7/2006, and is not for resale.
User Notes:                                                                                                          (1298689883)

1

Appendix 50

# DRAFT AIA® Document G706A™ – 1994

## Contractor's Affidavit of Release of Liens

| PROJECT: *(Name and address)* | ARCHITECT'S PROJECT NUMBER: | OWNER: ☐ |
| --- | --- | --- |
| Sample Affidavit of Release of Liens Sample | | ARCHITECT: ☐ |
| | CONTRACT FOR: | CONTRACTOR: ☐ |
| TO OWNER: *(Name and address)* | CONTRACT DATED: | SURETY: ☐ |
| | | OTHER: ☐ |

STATE OF:
COUNTY OF:

The undersigned hereby certifies that to the best of the undersigned's knowledge, information and belief, except as listed below, the Releases or Waivers of Lien attached hereto include the Contractor, all Subcontractors, all suppliers of materials and equipment, and all performers of Work, labor or services who have or may have liens or encumbrances or the right to assert liens or encumbrances against any property of the Owner arising in any manner out of the performance of the Contract referenced above.

EXCEPTIONS:

SUPPORTING DOCUMENTS ATTACHED HERETO:

CONTRACTOR: *(Name and address)*

1.  Contractor's Release or Waiver of Liens, conditional upon receipt of final payment.

2.  Separate Releases or Waivers of Liens from Subcontractors and material and equipment suppliers, to the extent required by the Owner, accompanied by a list thereof.

BY:

_____
*(Signature of authorized representative)*

_____
*(Printed name and title)*

Subscribed and sworn to before me on this date:

Notary Public:
My Commission Expires:

AIA Document G706A™ – 1994. Copyright © 1982 and 1994 by The American Institute of Architects. All rights reserved. WARNING: This AIA® Document is protected by U.S. Copyright Law and International Treaties. Unauthorized reproduction or distribution of this AIA® Document, or any portion of it, may result in severe civil and criminal penalties, and will be prosecuted to the maximum extent possible under the law. This draft was produced by AIA software at 09:09:53 on 03/16/2005 under Order No.1000167257_1 which expires on 3/7/2006, and is not for resale.
User Notes:                                                                                          (3949367301)

**EXHIBIT F**

**ARCHITECT'S CERTIFICATES**

[See attached]


1.      Form of Architect's Certification and Consent to be delivered prior to commencement of construction.

2.      Form of Architect's Completion Certificate to be delivered prior to each "Final Advance".

**EXHIBIT F-1**

**ARCHITECT'S CERTIFICATION AND CONSENT**

[Letterhead of Borrower's Architect]

_____ , 201_

Deutsche Bank AG New York Branch,
    as agent
60 Wall Street, 10th Floor
New York, New York 10005
Attention: Ian McColough

    Re:   _____

Ladies and Gentlemen:

The undersigned ("**Architect**") understands that German American Capital Corporation, a Maryland corporation, and the other lenders party to the loan agreements listed below ("**Lender**") have made a loan (the "**Loan**") and will continue to make advances under the Loan to 135 West 52nd Street Owner LLC, a Delaware limited liability company ("**Borrower**"), which Loan and such advances, among other things, will be used to finance construction by Borrower of the improvements (the "**Improvements**") on the premises more particularly described in Exhibit A hereto (the "**Land**") and will be advanced pursuant to that certain Senior Loan Agreement, that certain Building Loan Agreement (the "**Building Loan Agreement**") and that certain Project Loan Agreement entered into by Deutsche Bank AG New York Branch, a branch of Deutsche Bank AG, a banking corporation organized under the laws of the Federal Republic of Germany, licensed by the New York State Banking Department, as agent for Lender ("**Agent**"), Lender and Borrower dated as of [_____], 2014.  Initially capitalized terms not defined herein shall have the meanings ascribed to them in the Building Loan Agreement.

Architect has prepared certain Plans and Specifications in connection with the construction of the Improvements, which are described in Exhibit B hereto (the "**Plans and Specifications**").  In addition, Architect has been engaged to act as the Architect for the Improvements and such engagement has been confirmed by that certain [Agreement for Architectural Services] between Borrower and Architect dated [_____] (the "**Contract**").

Based on its on-site observation of the Improvements, including, without limitation, its review of the Plans and Specification, each to the date of this Certificate, to its best professional knowledge, Architect states to Agent and Lender that upon completion in accordance with the Plans and Specifications, the Improvements shall be available for occupancy in accordance with its contemplated uses, as identified to us by Borrower (that is, as a mixed-use development), and will comply with all applicable building codes, project approvals (as may be modified during the course of construction of the project) and all other governmental rules, laws and regulations

relating to its design and engineering, to the extent applicable and in effect as of the date hereof, and a permanent certificate of occupancy for the use of the Improvements for their intended purposes shall be issued by the City of New York upon review and inspection of the Improvements by the appropriate departments in the City of New York.

To the best of its professional knowledge, Architect further states to Agent and Lender that (a) there will be sufficient access and egress to and from the Land and the Improvements for their use for their intended purposes, (b) all utilities (including, if applicable, electric, gas, telephone, water and sewer services) necessary to service the Improvements are available to be delivered by the appropriate utility companies directly to the Property from (i) [_____ Street] where the same abuts the Property or (ii) over properly recorded easements abutting the Property which run to [_____ Street], and (c) all areas necessary for all utility lines and systems not totally included within the Property (including those necessary for drainage and flood control) are available to the Property over dedicated public streets or over properly recorded easements, abutting the Property, and such easements are sufficient for the construction, use, maintenance and replacement of all such lines and systems.

The schedule for the completion of the project attached hereto as Exhibit C, establishing a timetable for completion of the Improvements and showing on a monthly basis the anticipated progress of the work, appears realistic and to the best of its professional knowledge, Architect believes that such schedule can be adhered to.

Architect understands that as additional security for the Loan, Borrower has assigned its interests under the Contract and in and to the Plans and Specifications to Agent (for the benefit of Lender) pursuant to a collateral assignment of contracts and Architect hereby consents to such assignment. Architect acknowledges that Agent and Lender shall not be obligated to perform or discharge, nor has Agent or Lender undertaken to perform or discharge any of the obligations of Borrower under the Contract and that so long as no Event of Default is continuing, Borrower shall have the right to enjoy and utilize the rights and privileges of the contracting party under the Contract.

In consideration of your making the Loan to finance the construction of the Improvements, Architect agrees that in the event of default by Borrower under any of the Loan Documents, Architect will, at Agent's request, continue performance on Agent's (for the benefit of Lender) behalf under the Contract for all services rendered or to be rendered for the benefit of Agent, Lender, and their nominee, subsidiary or assign(s), provided that Agent shall pay Architect for all work and services rendered, pursuant to the Contract whether prior to or subsequent to such request, for which Architect has not otherwise received payment. Nevertheless, the time periods set forth in the Contract for the performance by owner of its obligations thereunder shall be deemed extended by the period of time necessary to allow Agent to obtain possession of the Property in the manner Agent decides pursuant to its remedies under the Loan Documents.

Architect hereby further agrees that if, at any time, Agent or its designee shall become the owner of the Property or the Borrower or otherwise requires the use of the Plans and Specifications in connection with the Property, Agent shall have the right to use the Plans and Specifications, together with any and all modifications thereof (including any additions,

enlargements or extensions thereof) without any additional cost or expense other than payment of any balance and other sums that may be due or owing to Architect by Borrower for the preparation of the Plans and Specifications, pursuant to the terms of the Contract. In the event that Lender or its designee uses the Plans and Specifications to complete the project without Architect, such party agrees to make commercially reasonable efforts to supersede Architect and Architect's consultants with new professionals on all applications, permits and filings within 60 days of commencing such use. Such party shall make commercially reasonable efforts to cause its superseding professional(s) to remove Architect's signature, seal and other identifying information and to sign and seal any Plan or Specification that has been modified by said professional, including the date and reference to the particular modification made.  Lender shall not use the Plans and Specifications if passage of time or change in law renders them unfit for the use for which they are intended.

Architect's statements in this letter have been made and the services of Architect have been performed in accordance with the standards of care and skill of the Architect's profession in the New York metropolitan area for building projects of the scope and quality of the Improvements.  This letter is being issued with the intent that it shall be relied on by Borrower, Agent, Lender and their respective successors and assigns, in connection with the disbursements for the construction of the Improvements as contemplated by the Building Loan Agreement and the other Loan Documents referenced therein, and any lender refinancing the Loan evidenced by the Loan Documents, and does not alter or increase the term; obligations or liabilities of the undersigned to Borrower, Agent, Lender or their respective successor's and assigns under the Contract.

In any conflict of terms between this Architect's Certification and Consent on the one hand, and the Consent, Certification, Waiver & Agreement (Exhibit A to Borrower's Assignment of Plans, Specifications, Permits, Contracts, Licenses, Entitlements and Intangibles, dated [_____]) on the other, the terms of this Architect's Certification and Consent shall prevail over and notwithstanding anything to the contrary contained in such Exhibit A.

The provisions set forth in this letter shall be binding upon Architect and' Architect's successors and assigns and shall inure to the benefit of Agent, Lender and their respective successors and assigns.

[ _____ ]

By: _____

Name:
Title:

## Exhibit A

### (Legal Description of the Land)

## Exhibit B

### (Plans and Specifications)

## Exhibit C

### (Construction Schedule)

**EXHIBIT F-2**

**ARCHITECT'S COMPLETION CERTIFICATE**

[Letterhead of Borrower's Architect]

Deutsche Bank AG New York Branch,
     as agent
60 Wall Street, 10th Floor
New York, New York 10005
Attention: Ian McColough

_____, 201__

     Re:    _____

Ladies and Gentlemen:

The undersigned ("**Architect**") understands that German American Capital Corporation, a Maryland corporation, and the other lenders party to the loan agreements listed below ("**Lender**") have made a loan (the "**Loan**") to 135 West 52nd Street Owner LLC, a Delaware limited liability company ("**Borrower**"), which Loan, among other things, was used to finance construction by Borrower of the improvements (the "**Improvements**") on the premises more particularly described in Exhibit A hereto (the "**Land**") and was advanced pursuant to that certain Senior Loan Agreement, that certain Building Loan Agreement and that certain Project Loan Agreement entered into by Deutsche Bank AG New York Branch, a branch of Deutsche Bank AG, a banking corporation organized under the laws of the Federal Republic of Germany, licensed by the New York State Banking Department, as agent for Lender ("**Agent**"), Lender and Borrower as of [_____].  Initially capitalized terms not defined herein shall have the meanings ascribed to them in the Building Loan Agreement.

Architect prepared certain Plans and Specifications in connection with the construction of the Improvements.  In addition, Architect has been engaged to act as the Architect for the Improvements and such engagement has been confirmed by that certain [Agreement for Architectural Services] between Borrower and Architect dated [_____ ].

Based on its on-site observation of the Improvements, including, without limitation, the observation of the Plans and Specification, each to the date of this Certificate, to its best professional knowledge, Architect states to Agent and Lender that (a) except as the same relates to Punch List Items (as hereinafter defined), the Improvements and its contemplated uses, as identified to us by Borrower (that is, as a residential condominium development) comply with all applicable building codes and all other governmental rules, laws and regulations relating to its design and engineering, to the extent applicable and in effect as of the date hereof, and a permanent certificate of occupancy for the Property, and (b) all building permits, licenses and other approvals (collectively, the "**Approvals**") required for the construction of the Improvements in accordance with the Plans and Specifications have been obtained (or, with respect to approvals not obtained by the date of this Certificate, are capable of being obtained' within time periods consistent with the projected completion dates of the Improvements).

To the best of its professional knowledge, Architect states to Agent and Lender that the Improvements comply (and after the completion of the Punch List Items will comply) with all applicable requirements of the applicable zoning and building laws and ordinances which are in effect as of the date hereof.

To the best of its professional knowledge, there is (and after the completion of the Punch Line Items will be) sufficient access and egress to and, from the Land and the Improvements for their use for their intended purposes.

Architect hereby certifies to the best of its professional knowledge to Agent and Lender that subject only to the completion of the Punch List Items, the Improvements have been completed in a good and workmanlike manner in accordance with the Plans and Specifications. The term "**Punch List Items**" shall mean the work set forth on Exhibit B hereto, the completion of which will not cost in excess of $[**___**] in the aggregate, and such work shall be limited to site work, interior finishes, mechanical adjustments; landscaping and decorative work.  If the completion of the Punch List Items is diligently pursued, completion of all Punch List Items is expected within [_____  (_)] months from the date hereof.

Signed this _____ of _ 201_

[ _____ ]

By: _____
Name:
Title:

By signing below, [ _____ ] hereby estimates, to the best of its professional knowledge, that the cost to complete the Punch List Items will not exceed $[X] in the aggregate.

**[General Contractor]**

By: _____
Name:
Title:

## Exhibit A

## (Legal Description of Land)

EXHIBIT G

FORM OF PERFORMANCE LETTER

[Letterhead of Major Contractor/Contractor]

_____, 201__

Deutsche Bank AG New York Branch,
      as agent
60 Wall Street, 10th Floor
New York, New York 10005
Attention: Ian McColough

     Re:    Property Address: 135 West 52nd Street, New York, NY
             Project Name: [_____]
             Borrower: 135 West 52nd Street Owner LLC
             Change Order Amount: _____ of Contract

Ladies and Gentlemen:

The undersigned, a [contractor] [subcontractor] ("**Contractor**") on the captioned project (the "**Project**"), understands that German American Capital Corporation, a Maryland corporation, and the other lenders party to the loan agreement listed below ("**Lender**") are about to make a loan (the "**Loan**") and will continue to make advances under the Loan to 135 West 52nd Street Owner LLC, a Delaware limited liability company ("**Borrower**"), which Loan and such advances, among other things, will be used to finance construction by Borrower of the improvements (the "**Improvements**") at the Project and will be advanced pursuant to that certain Senior Loan Agreement, that certain Building Loan Agreement (the "**Building Loan Agreement**") and that certain Project Loan Agreement, entered into by Deutsche Bank AG New York Branch, a branch of Deutsche Bank AG, a banking corporation organized under the laws of the Federal Republic of Germany, licensed by the New York State Banking Department, as agent for Lender ("**Agent**"), Lender and Borrower as of even date herewith.  Attached hereto is a true and complete copy of our agreement [with [_____] (the "**CM**")] [or with Borrower], dated [_____], 201_, to construct and/or renovate a portion of the Improvements (including the Conditions attached thereto, the "**Contract**") in accordance with the plans and specifications set forth with respect to such portion of the Improvements as more particularly described in the Contract.

Contractor hereby agrees with Agent and Lender as follows:

1.      If Borrower defaults beyond applicable notice and cure periods under the documents evidencing the Loan, or if there is a foreclosure of any mortgage securing payment of the Loan, or if Borrower becomes insolvent, at the election and option of Agent by notice from Lender to Contractor, either (i) Contractor will complete its obligations under the Contract with respect to the construction of the Improvements for the benefit of Agent (for the benefit of

Lender), its nominee, subsidiary or assign(s), <u>provided</u> that Agent shall pay Contractor for all work and services rendered, pursuant to the Contract whether prior to or subsequent to such election, for which Contractor has not otherwise received payment and for which Agent has not paid the CM or (ii) the Contract shall terminate and at Agent's election Contractor shall immediately assign all of its rights under any sub-contracts to Agent.  In the event that Agent elects to have Contractor continue performance on Agent's behalf under the Contract, the time periods set forth in the Contract for performance by owner or CM (as the case may be) of its obligations thereunder shall be deemed extended by the period of time necessary to allow Agent to obtain possession of the Property in the manner Agent decides pursuant to its remedies under the Loan Documents.

2.      Contractor hereby acknowledges and consents to a collateral assignment of the Contract to Agent (for the benefit of Lender), which assigns all of Borrower's rights, if any, under the Contract to Agent. In the event the Agent, its nominee, subsidiary, successor(s) or assign(s) (the "**Successor**"), succeeds to the rights of Borrower under the Contract, then, at the request of the Successor, and upon Successor's written agreement to accept Contractor's attornment, Contractor shall attorn and shall promptly execute and deliver any instrument the Successor may require to evidence such attornment.  Upon such attornment, the Contract shall continue in full force and effect as if it were a direct agreement between the Successor and Contractor.

3.      Contractor shall not agree to any amendment, modification, release or discharge (in whole or in part) of the Contract, nor waive or claim any waiver in any respect of any provision thereof, without first obtaining the prior written consent of Agent, and no such amendment, modification, release, discharge or waiver, without such consent, shall be binding upon Agent or Lender.

4.      Contractor shall send copies to Agent of all notices of default sent by Contractor to Borrower or CM or by Borrower or CM to Contractor pursuant to the Contract and no such notice shall be effective for any purpose unless and until a copy thereof shall have been received by Agent.

5.      Contractor agrees that it shall not perform work pursuant to any deviations from the plans and specifications set forth in the Contract (a "**Change Order**") unless Contractor shall have received specific written approval of such Change Order from Agent.

6.      The person executing this letter on behalf of Contractor hereby certifies that he or she has the authority to do so and that Contractor has full authority under all state and local laws and regulations to perform all of its obligations under the Contract in accordance with the terms thereof.

7.      The provisions set forth in this letter shall be binding upon Contractor and Contractor's successors and assigns and shall inure to the benefit of Agent, Lender and their respective successors and assigns.

8.      A true and complete copy of the Contract is attached as Schedule I hereto.

Very truly yours,

[ _____ ]

By: _____

    Name:
    Title:

**Schedule I – Copy of Contract**

**(Attached)**

# EXHIBIT H

## PERMITTED FUND MANAGERS

a.  iStar Financial Inc.

b.  Blackstone Real Estate Partners

c.  Goldman, Sachs & Co.

d.  The Blackstone Group International Ltd.

e.  Apollo Global Real Estate

f.  Colony Capital, LLC / Colony Financial, Inc.

g.  Praedium Group

h.  Fortress Investment Group LLC

i.  Lonestar Funds

j.  Rockwood Capital, LLC

k.  Clarion Partners

l.  Walton Street Capital, LLC

m.  Starwood Capital Group/Starwood Property Trust, Inc.

n.  Blackrock, Inc.

o.  AREA Property Partners

p.  Garrison Investment Group

q.  LoanCore Capital/DivCore Capital

r.  Rockpoint Group

s.  Torchlight Investors

t.  Westbrook Partners

u.  One William Street Capital Management, L.P.

v.  Och Ziff Management

w.  Vornado Realty Trust

x.  SL Green Realty Corp.

y.  Boston Properties

z.  J.P. Morgan Asset Management

aa.  Morgan Stanley Prime Property Fund

bb.  AEW Capital Management

cc.  H2 Capital Partners

**EXHIBIT I-1**

**CONSTRUCTION MANAGER ANTICIPATED COSTS REPORT FORM**

[See attached]

**Project Name**
**Sample Anticipated Cost Report**

| Description of Work | Contract Amount | | | | | Projected Costs | | | | | | | Notes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Original GMP Budget A | Approved Scope Chgs & Revisions B | Current GMP Budget (A+B=C) C | Pending Scope Chgs & Revisions D | Anticipated Budget (C+D=E) E | Committed Contracts F | Committed Contract Chg Orders G | Current Commitment (F+G=H) H | Pending Change Event I | Est Addtl' & Future Commitment J | Anticipated Cost (H+I+J=K) K | Variance (Over) / Under (E-K=L) L | |
| Site Improvements | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| Concrete | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| Masonry | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| | $0 | | | | | | | | | | $0 | | |
| | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| Contractor's Bond Cost | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| Estimated OCIP Credit | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| **SUBTOTAL** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | |
| Contractor Contingency | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| **CONTRACT SUBTOTAL** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | |
| Fee | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| **TOTAL CONTRACT AMOUNT** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | |

https://gateway.ivi-intl.com/sites/V20912117/Project Documents/IVI/10 Loan Agreements, Commitment/[Sample Anticipated Cost Report.xls]Sheet1

**EXHIBIT I-2**

**BORROWER ANTICIPATED COSTS REPORT FORM**

[See attached]

**Project Name**
**Sample Anticipated Cost Report: I-2**

| Description of Work | Contract Amount | | | | Projected Costs | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | Original Budget A | Approved Chgs & Revisions B | Approved Budget Reallocations C | Current Budget (A+B+C=D) D | Costs Incurred to Date E | Projected Costs to Complete F | Total Projected Costs (D+E=F) G | Percentage of Completion G/D | Variance (G-D=I) I | Variance Explanation |
| | | | | | | | | #DIV/0! | $0 | |
| | | | | | | | | #DIV/0! | $0 | |
| | | | | | | | | #DIV/0! | $0 | |
| | | | | | | | | #DIV/0! | $0 | |
| | | | | | | | | #DIV/0! | $0 | |
| | | | | | | | | #DIV/0! | $0 | |
| | | | | | | | | #DIV/0! | $0 | |
| **SUBTOTAL - DIRECT HARD COSTS** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | #DIV/0! | $0 | |
| Contractor Contingency | $0 | $0 | $0 | $0 | $0 | $0 | $0 | #DIV/0! | $0 | |
| **CONTRACT SUBTOTAL** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | #DIV/0! | $0 | |
| Contractor Fee | $0 | $0 | $0 | $0 | $0 | $0 | $0 | #DIV/0! | $0 | |
| **TOTAL GC CONTRACT AMOUNT** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | #DIV/0! | $0 | |
| | | | | | | | | #DIV/0! | $0 | |
| | | | | | | | | #DIV/0! | $0 | |
| | | | | | | | | #DIV/0! | $0 | |
| | | | | | | | | #DIV/0! | $0 | |
| | | | | | | | | #DIV/0! | $0 | |
| | | | | | | | | #DIV/0! | $0 | |
| | | | | | | | | #DIV/0! | $0 | |
| **SUBTOTAL - OTHER HARD COSTS** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | #DIV/0! | $0 | |
| | | | | | | | | #DIV/0! | $0 | |
| | | | | | | | | #DIV/0! | $0 | |
| | | | | | | | | #DIV/0! | $0 | |
| | | | | | | | | #DIV/0! | $0 | |
| | | | | | | | | #DIV/0! | $0 | |
| | | | | | | | | #DIV/0! | $0 | |
| **SUBTOTAL - SOFT COSTS** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | #DIV/0! | $0 | |
| **CONSTRUCTION MANGEMENT FEE** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | #DIV/0! | $0 | |
| **TOTAL PROJECT COSTS** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | **$0** | #DIV/0! | $0 | |

**EXHIBIT J**

**FORM OF LIEN WAIVERS**

[To be provided]

[CITI NY FORM 1-18-10]

## WAIVER AND RELEASE OF LIEN UPON PROGRESS PAYMENT
## (NEW YORK)

### Unconditional Waiver and Release

TO WHOM IT MAY CONCERN:

CONTRACTOR/SUBCONTRACTOR NAME: _____

PROJECT NAME/PREMISES: _____

TYPE OF WORK AND/OR MATERIAL: _____

OWNER NAME: _____

The undersigned does hereby acknowledge, certify and warrant that the following statement of contract account is correct and complete to and including the date hereof, and that all charges and amounts now due to the undersigned and all charges and costs heretofore incurred by or for the undersigned for labor and materials in connection with the above described premises or improvements thereon have been paid in full (less retainage):

### Statement of Contract Account

| | |
|---|---|
| Original Contract Amount | $_____ |
| Approved Change Orders | $_____ |
| Total Revised Contract | $_____ |
| Total Payments to Date (net of retainage /current request | |
| not included) | $_____ |
| Total Amount of Retention Withheld: | $_____ |

### Conditional Waiver and Release

The undersigned, for and in consideration of $_____ for invoice No. ____, effective upon the Owner making payment on the invoice, does hereby waive and release any right which it now has or in the future may have under the statutes of the State of New York, relating to mechanics' and materialmens' liens on: (i) the above described premises and improvements thereon; (ii) the Owner, its title company, lender and their employees, officers and agents; and (iii) the surety or sureties of the Owner, for anything whatsoever related to the Project (including, but not limited

10723904-v2

to, moneys or other considerations due or to become due from the Owner, whether billed or unbilled) through the date hereof, on account of labor, services, materials, fixtures or apparatus heretofore furnished to this date by the undersigned for the above premises and improvements thereon. The undersigned further covenants and agrees to save and hold harmless the Owner listed above, from any and all liability or expenses on account of any charges or claims for labor and/or materials provided by the undersigned on or for said project on or prior to the date hereof.

In order to induce payment to be made to the undersigned, the undersigned certifies that it has paid all of its subcontractors, suppliers and employees for all items connected with the above-referenced project all amounts owed for the labor and/or materials covered by payments which the undersigned has received for the project prior to the date hereof.

The undersigned agrees that this Waiver and Release of Lien may be filed and recorded in the recorder's office of the county in which the above described premises are located and that filing and recording of this waiver shall be constructive notice of its contents to all parties and persons whomsoever.

The undersigned has executed this waiver voluntarily and with full knowledge of the undersigned's rights under law.

DATE: _____, 20____


[NAME OF CONTRACTOR/SUBCONTRACTOR]

By: _____

Name: _____

Title: _____


STATE OF NEW YORK      )
                       )  ss.:
COUNTY OF NEW YORK   )

On _____, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

[CITI NY FORM 11-11-10]

## CONDITIONAL WAIVER AND RELEASE OF LIEN UPON FINAL PAYMENT
### (NEW YORK)

TO WHOM IT MAY CONCERN:

CONTRACTOR/SUBCONTRACTOR NAME: _____

PROJECT NAME/PREMISES: _____

TYPE OF WORK AND/OR MATERIAL: _____

OWNER NAME: _____

The undersigned does hereby acknowledge, certify and warrant that the following statement of contract account is correct and complete to and including the date hereof, and that all charges and amounts now due to the undersigned and all charges and costs heretofore incurred by or for the undersigned for labor and materials in connection with the above described premises or improvements thereon have been paid in full (less retainage):

### Statement of Contract Account

| | |
|---|---|
| Original Contract Amount | $_____ |
| Approved Change Orders | $_____ |
| Total Revised Contract | $_____ |
| Total Payments to Date (net of retainage /current request | |
| not included) | $_____ |
| Total Amount of Retention Withheld: | $_____ |

### Conditional Waiver and Release of Lien

The undersigned, for and in consideration of the final payment of $_____ for invoice No. _____, effective upon the Owner making payment on the invoice, does hereby conditionally waive and release any right which it now has or in the future may have under the statutes of the State of New York, relating to mechanics' and materialmens' liens on: (i) the above described premises and improvements thereon; (ii) the Owner, its title company, lender and their employees, officers and agents; and (iii) the surety or sureties of the Owner, for anything whatsoever related to the Project (including, but not limited to, moneys or other considerations

10723910-v3

due or to become due from the Owner, whether billed or unbilled) through _____, 20__, on account of labor, services, materials, fixtures or apparatus heretofore furnished through such date by the undersigned for the above premises and improvements thereon. The undersigned further covenants and agrees to save and hold harmless the Owner listed above, from any and all liability or expenses on account of any charges or claims for labor and/or materials provided by the undersigned on or for said project on or prior to the date hereof.

In order to induce payment to be made to the undersigned, the undersigned certifies that it has paid all of its subcontractors, suppliers and employees for all items connected with the above-referenced project all amounts owed for the labor and/or materials covered by payments which the undersigned has received for the project prior to the date hereof.

The undersigned agrees that this Conditional Waiver and Release of Lien may be filed and recorded in the recorder's office of the county in which the above described premises are located and that filing and recording of this waiver shall be constructive notice of its contents to all parties and persons whomsoever.

The undersigned has executed this waiver voluntarily and with full knowledge of the undersigned's rights under law.

DATE: _____, 20___


[NAME OF CONTRACTOR/SUBCONTRACTOR]

By: _____

Name: _____

Title: _____


STATE OF NEW YORK )
                  ) ss.:
COUNTY OF NEW YORK )

On _____, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

                                   _____
                                   Notary Public

[CITI NY FORM 5-19-11]

## UNCONDITIONAL WAIVER AND RELEASE OF LIEN UPON FINAL PAYMENT
### (NEW YORK)

TO WHOM IT MAY CONCERN:

CONTRACTOR/SUBCONTRACTOR NAME: _____

PROJECT NAME/PREMISES: _____

TYPE OF WORK AND/OR MATERIAL: _____

OWNER NAME: _____

The undersigned does hereby acknowledge, certify and warrant that the following statement of contract account is correct and complete to and including the date hereof, and that all charges and amounts now due to the undersigned and all charges and costs heretofore incurred by or for the undersigned for labor and materials in connection with the above described premises or improvements thereon have been paid in full:

### Statement of Contract Account

| | |
|---|---|
| Original Contract Amount | $_____ |
| Approved Change Orders | $_____ |
| Total Revised Contract | $_____ |
| Total Payments Received | $_____ |

### Unconditional Waiver and Release of Lien

The undersigned hereby acknowledges and certifies: (i) receipt of the amount of Total Payments Received (in cash only and not in equivalents or other agreements) stated above, (ii) that this amount represents payment in full for all amounts due to the undersigned and all charges and costs incurred by or for the undersigned for labor and materials in connection with the above described premises or improvements thereon, as increased or decreased by the Approved Change Orders amount stated above, and (iii) that the amounts stated above are true and correct and there are no additional costs or claims for any extras or additions for labor, material or supplies in connection with the premises.

The undersigned does hereby waive and release any right which it now has or in the future may have under the statutes of the State of New York, relating to mechanics' and materialmens' liens on: (i) the above described premises and improvements thereon; (ii) the Owner, its title company,

10723906-v3

lender and their employees, officers and agents; and (iii) the surety or sureties of the Owner, for anything whatsoever related to the Project (including, but not limited to, moneys or other considerations due or to become due from the Owner, whether billed or unbilled), on account of labor, services, materials, fixtures or apparatus furnished by the undersigned for the above premises and improvements thereon. The undersigned further covenants and agrees to save and hold harmless the Owner listed above, from any and all liability or expenses on account of any charges or claims for labor and/or materials provided by the undersigned on or for said project.

The undersigned certifies that it has been paid in full and has paid in full all of its subcontractors, suppliers and employees for all items connected with the above-referenced project, including all amounts owed for the labor, materials, services and supplies for the project.

The undersigned agrees that this Unconditional Waiver and Release of Lien may be filed and recorded in the recorder's office of the county in which the above described premises are located and that filing and recording of this waiver shall be constructive notice of its contents to all parties and persons whomsoever.

The undersigned has executed this waiver voluntarily and with full knowledge of the undersigned's rights under law.

DATE: _____, 20____

[NAME OF CONTRACTOR/SUBCONTRACTOR]

By: _____

Name: _____

Title: _____

STATE OF NEW YORK     )
                      ) ss.:
COUNTY OF NEW YORK    )

On _____, before me, the undersigned, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____

Notary Public

**EXHIBIT K**

**RESERVED**

**EXHIBIT L**

**FORM OF OFFICER'S CERTIFICATE OF BORROWER'S REQUISITION**

[Letterhead of Borrower]

_____, 201__

Deutsche Bank AG New York Branch,
     as agent
60 Wall Street, 10th Floor
New York, New York 10005
Attention: Ian McColough

     Re:   _____

Ladies and Gentlemen:

This Certificate is furnished pursuant to and in accordance with that certain Building Loan Agreement (the "**Building Loan Agreement**") dated as _____, 2014, between Deutsche Bank AG New York Branch, a branch of Deutsche Bank AG, a banking corporation organized under the laws of the Federal Republic of Germany, licensed by the New York State Banking Department, as agent ("**Agent**"), the lenders party thereto ("**Lender**") and 135 West 52nd Street Owner LLC, a Delaware limited liability company ("**Borrower**"), and that certain Project Loan Agreement (the "**Project Loan Agreement**," and together with the Building Loan Agreement, the "**Loan Agreement**"), dated as of _____, 2014 between Agent, Lender and Borrower. This Certificate will serve as the Borrower's Requisition requesting the sum of $ _____ under the Building Loan Agreement and the sum of $ _____ under the Project Loan Agreement.  Unless otherwise defined herein, capitalized terms used in this Certificate have the meanings ascribed thereto in the Building Loan Agreement or Project Loan Agreement, as applicable to such disbursement.

The draw amount for this month is as follows:

| | |
|---|---|
| Current Total Draw Amount: | $ _____ |
| less Lender holdbacks for reimbursements: | ($ _____) |
| Net Amount of Wire: | $ _____ |

Please wire the funds on [DATE] as follows:

     Amount:
     Bank:
     ABA#:
     Account:
     Account Number:

The support for the above Advances is provided in the attached draw schedules.  Please advise the undersigned as soon as the Advance has been credited.

Borrower hereby acknowledges that it has no outstanding defenses, claims, counterclaims or offsets against Lender under the Loan Documents.

The undersigned hereby represents, warrants and certifies to Agent and Lender as of the date hereof as follows:

(i)     The undersigned is an authorized representative of the Borrower.

(ii)    This Certificate and the requisition contained herein meets all applicable conditions contained in the Building Loan Agreement or the Project Loan Agreement (as applicable to such Advance).

(iii)   All amounts shown on all previous Borrowers' Requisitions have been paid in full and all amounts requested herein have been paid or will be paid in full from the proceeds of the disbursement requested hereby.  The amount requested to be disbursed does not exceed the amount available to Borrower as an Advance as of the date of Borrower's request for disbursement and the date on which such disbursement is to be made, such that at no time shall Lender be obligated to pay amounts to Borrower in excess of the total amount available to Borrower as an Advance at the time of disbursement.

(iv)    All work on the Property to the date of this Certificate has been performed in accordance with the Plans and Specifications and otherwise in accordance with the terms and conditions set forth in the Loan Documents and there have been no changes to the Plans and Specifications except as approved by Agent in writing or permitted by the Loan Documents.    The following are attached and the undersigned certifies as true, complete, and correct: (i) sworn unconditional lien waivers from (A) contractors and subcontractors and (B) materialmen, suppliers and vendors, covering all work for which funds have been disbursed pursuant to a prior request for disbursement as required pursuant to the Building Loan Agreement or the Project Loan Agreement (as applicable to such Advance), and (ii) invoices, contracts, or other supporting documentation supplied.

(v)     All labor, materials, and/or services shown on each draw schedule, for which funds have been or are requested, are incorporated into the Property, as defined in the Building Loan Agreement, at this date, or in the case of Stored Materials, have been stored in accordance with, and otherwise satisfy the requirements of, the Building Loan Agreement.

(vi)    None of the amounts for which payment is requested in this Certificate have been included in any prior Borrower's Requisition.  All Construction Costs for which the current disbursement is sought have been incurred and are included as part of the most recently approved Project Budget.

(vii)    To the extent required to date, all Governmental Approvals of the Plans and Specifications by any Governmental Authority have been obtained.

(viii)    All building permits required for the commencement of construction of the Improvements in accordance with the Plans and Specifications and Construction Schedule, to the extent the same may be issued given the stage of construction, have been obtained in accordance with all Legal Requirements and are in full force and effect.

(ix)    All work on the Property, which has been completed or which is in progress as of this date does not violate any applicable Legal Requirement.

(x)    No Event of Default or monetary default has occurred or is continuing.

(xi)    The representations and warranties reaffirmed by this request for disbursement of Building Loan and/or Project Loan proceeds pursuant to the Building Loan Agreement and/or the Project Loan Agreement, respectively, are true and correct on and as of the date of this Certificate and will be true and correct on and as of the date of such disbursement (unless the same solely relate to a different time period), and except to the extent any such representations or warranties have become untrue due to the mere passage of time or occurrences after the date in which they were made provided that such occurrences do not individually or collectively, constitute a Default or an Event of Default.

(xii)    The Improvements have not been injured or damaged by fire, explosion, accident, flood or other casualty, except as previously disclosed in writing to Lender.

(xiii)    The Schedule of Units attached to this Certificate details all Unit Sale Contracts for Units at the Property which have been executed as of the last day of the month preceding the date of this Certificate, the sale price, the name of each purchaser, and the Unit purchased.  As to each such Unit Sale Contract, Borrower has complied with all applicable provisions of the Building Loan Agreement, the Project Loan Agreement and the Loan Documents.

Very truly yours,

_____

Name:
Title:

L-3

**EXHIBIT M**

**APPLICATION AND CERTIFICATE FOR PAYMENT (AIA FORM G702 AND G703)**

[See attached]

# INSTRUCTION SHEET

## AIA DOCUMENTS G702 and G703

### A. GENERAL INFORMATION

#### 1. Purpose and Related Documents

AIA Document G702, Application and Certificate for Payment, is to be used in conjunction with AIA Document G703, Continuation Sheet. These documents are designed to be used on a Project where a Contractor has a direct Agreement with the Owner. Procedures for their use are covered in AIA Document A201, General Conditions of the Contract for Construction, 1987 Edition.

#### 2. Use of Current Documents

Prior to using any AIA document, the user should consult the AIA, an AIA component chapter or a current AIA Documents List to determine the current edition of each document.

#### 3. Limited License for Reproduction

AIA Documents G702 and G703 are copyrighted works and may not be reproduced or excerpted from in substantial part without the express written permission of the AIA. The documents are intended to be used as consumables—that is, the original documents purchased by the user are intended to be consumed in the course of being used. There is no implied permission to reproduce these documents, nor does membership in The American Institute of Architects confer any further rights to reproduce G702 and G703.

A limited license is hereby granted to retail purchasers to reproduce a maximum of ten copies of a completed or executed G702 and G703, but only for use in connection with a particular Project. Further reproductions are prohibited without the express written permission of the AIA.

### B. COMPLETING THE G702 FORM:

After the Contractor has completed AIA Document G703, Continuation Sheet, summary information should be transferred to AIA Document G702, Application and Certificate for Payment.

The Contractor should sign G702, have it notarized and submit it, together with G703, to the Architect.

The Architect should review G702 and G703 and, if they are acceptable, complete the Architect's Certificate for Payment on G702. The Architect may certify a different amount than that applied for, pursuant to Paragraphs 9.5 and 9.6 of A201. The Architect should then initial all figures on G702 and G703 that have been changed to conform to the amount certified and attach an explanation. The completed G702 and G703, should be forwarded to the Owner.

### C. COMPLETING THE G703 FORM:

**Heading:** This information should be completed to be consistent with similar information on AIA Document G702, Application and Certificate for Payment.

**Columns A, B & C:** These columns should be completed by identifying the various portions of the Project and their scheduled value consistent with the schedule of values submitted to the Architect at the commencement of the Project or as subsequently adjusted. The breakdown may be by sections of the Work or by Subcontractors and should remain consistent throughout the Project. Multiple pages should be used when required.

Column C should be subtotaled at the bottom when more than one page is used and totaled on the last page. Initially, this total should equal the original Contract Sum. The total of column C may be adjusted by Change Orders during the Project.

**Column D:** Enter in this column the amount of completed work covered by the previous application (columns D — E from the previous application). Values from column F (Materials Presently Stored) from the previous application should not be entered in this column.

**Column E:** Enter here the value of Work completed at the time of this application, including the value of materials incorporated into the project which were listed on the previous application under Materials Presently Stored (column F).

**Column F:** Enter here the value of Materials Presently Stored for which payment is sought. The total of the column *must* be recalculated at the end of each pay period. This value covers both materials newly stored for which payment is sought and materials previously stored which are not yet incorporated into the Project. Mere payment by the Owner for stored materials does not result in a deduction from this column. Only as materials are incorporated into the Project is their value deducted from this column and incorporated into column E (Work Completed—This Period).

**Column G:** Enter here the total of columns D, E and F. Calculate the percentage completed by dividing column G by column C.

**Column H:** Enter here the difference between column C (Scheduled Value) and column G (Total Completed and Stored to Date).

**Column I:** This column is normally used only for contracts where variable retainage is permitted on a line-item basis. It need not be completed on projects where a constant retainage is withheld from the overall contract amount.

**Change Orders:** Although Change Orders could be incorporated by changing the schedule of values each time a Change Order is added to the Project, this is not normally done. Usually, Change Orders are listed separately, either on their own G703 form or at the end of the basic schedule. The amount of the original contract adjusted by Change Orders is to be entered in the appropriate location on the G702 form.

Construction Change Directives: Amounts not in dispute that have been included in Construction Change Directives should be incorporated into one or more Change Orders. Amounts remaining in dispute should be dealt with according to Paragraph 7.3 in A201.

### D. MAKING PAYMENT

The Owner should make payment directly to the Contractor based on the amount certified by the Architect on AIA Document G702, Application and Certificate for Payment. The completed form contains the name and address of the Contractor. Payment should not be made to any other party unless specifically indicated on G702.

### E. EXECUTION OF THE DOCUMENT

Each person executing the Agreement should indicate the capacity in which they are acting (i.e., president, secretary, partner, etc.) and the authority under which they are executing the Agreement. Where appropriate, a copy of the resolution authorizing the individual to act on behalf of the firm or entity should be attached.

# APPLICATION AND CERTIFICATE FOR PAYMENT

AIA DOCUMENT G702 (Instructions on reverse side) PAGE ONE OF     GES

TO OWNER:                    PROJECT:                         APPLICATION NO.:                    Distribution to:
                                                              PERIOD TO:                          ☐ OWNER
                                                              PROJECT NOS.:                       ☐ ARCHITECT
                                                                                                  ☐ CONTRACTOR
FROM CONTRACTOR:             VIA ARCHITECT:                   CONTRACT DATE:                       ☐

CONTRACT FOR:

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
Continuation Sheet, AIA Document G703, is attached.

1. ORIGINAL CONTRACT SUM . . . . . . . . . . . . . . . . . . $

2. Net change by Change Orders . . . . . . . . . . . . . . . $

3. CONTRACT SUM TO DATE (Line 1 ± 2) . . . . . . . . $

4. TOTAL COMPLETED & STORED TO DATE . . . . . . $
   (Column G on G703)

5. RETAINAGE:
   a. _____ % of Completed Work        $
      (Columns D + E on G703)
   b. _____ % of Stored Material       $
      (Column F on G703)
   Total Retainage (Line 5a + 5b or
   Total in Column 1 of G703) . . . . . . . . . . . . . . . . $

6. TOTAL EARNED LESS RETAINAGE . . . . . . . . . . $
   (Line 4 less Line 5 Total)

7. LESS PREVIOUS CERTIFICATES FOR PAYMENT
   (Line 6 from prior Certificate) . . . . . . . . . . . . . . $

8. CURRENT PAYMENT DUE . . . . . . . . . . . . . . . . . $

9. BALANCE TO FINISH, INCLUDING RETAINAGE
   (Line 3 less Line 6)                                    $

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | | |
| Total approved this Month | | |
| TOTALS | | |
| NET CHANGES by Change Order | | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR:

By: _____      Date: _____

State of:
County of:
Subscribed and sworn to before
me this            day of
Notary Public:
My Commission expires:

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Architect certifies to the Owner that to the best of the Architect's knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED . . . . . . . . . . . . . . . . . . . . . . $
(Attach explanation if amount certified differs from the amount applied for. Initial all figures on this Application and on the Continuation Sheet that are changed to conform to the amount certified.)
ARCHITECT:
By: _____      Date: _____
This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

AIA DOCUMENT G702 • APPLICATION AND CERTIFICATE FOR PAYMENT • 1992 EDITION • AIA® • ©1992 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK
AVENUE, N.W., WASHINGTON, D.C. 20006-5292 • WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

This standard document is NOT a model form. Its inclusion in the Architect's Handbook of Professional Practice, 12th Edition, does not constitute a grant of any implied or explicit license to copy it in whole or in part.
See the Instruction Sheet for information on licensed reproduction.

G702-1992

CAUTION: You should use an original AIA document which has this caution printed in red. An original assures that changes will not be obscured as may occur when documents are reproduced.

# INSTRUCTION SHEET
FOR AIA DOCUMENT G702/CMa, APPLICATION AND CERTIFICATE FOR PAYMENT
CONSTRUCTION MANAGER-ADVISER EDITION

## A. GENERAL INFORMATION

AIA Document G702/CMa, Application and Certificate for Payment, Construction Manager-Adviser Edition, is to be used in conjunction with AIA Document G703, Continuation Sheet. These documents are designed to be used on a Project where a Construction Manager is employed as an adviser to the Owner, but not as a constructor, and where multiple Contractors have direct Agreements with the Owner. Procedures for their use are covered in AIA Document A201/CMa, General Conditions of the Contract for Construction, Construction Manager-Adviser Edition, 1992 Edition.

## B. COMPLETING THE G702/CMa FORM:

After the Contractor has completed AIA Document G703, Continuation Sheet, summary information should be transferred to AIA Document G702/CMa, Application and Certificate for Payment, Construction Manager-Adviser Edition.

The Contractor should sign G702/CMa, have it notarized and submit it, together with G703, to the Construction Manager and Architect.

The Construction Manager and Architect should review G702/CMa and G703 and, if they are acceptable, complete the Certificate for Payment on G702/CMa. The Construction Manager and Architect may certify a different amount than that applied for, pursuant to Paragraphs 9.5 and 9.6 of A201/CMa. They should then initial all figures on G702/CMa and G703 that have been changed to conform to the amount certified and attach an explanation. The completed G702/CMa and G703 should be forwarded to the Owner.

## C. COMPLETING THE G703 FORM:

**Heading:** This information should be completed to be consistent with similar information on AIA Document G702/CMa, Application and Certificate for Payment, Construction Manager-Adviser Edition.

**Columns A, B & C:** These columns should be completed by identifying the various portions of the Project and their scheduled value consistent with the schedule of values submitted to the Architect at the commencement of the Project or as subsequently adjusted. The breakdown may be by sections of the Work or by Subcontractors and should remain consistent throughout the Project. Multiple pages should be used when required.

Column C should be subtotaled at the bottom when more than one page is used and totaled on the last page. Initially, this total should equal the original Contract Sum. The total of column C may be adjusted by Change Orders during the Project.

**Column D:** Enter in this column the amount of completed work covered by the previous application (columns D & E from the previous application). Values from column F (Materials Presently Stored) from the previous application should not be entered in this column.

**Column E:** Enter here the value of Work completed at the time of this application, including the value of materials incorporated into the project which were listed on the previous application under Materials Presently Stored (column F).

**Column F:** Enter here the value of Materials Presently Stored for which payment is sought. The total of the column *must* be recalculated at the end of each pay period. This value covers both materials newly stored for which payment is sought and materials previously stored which are not yet incorporated into the Project. Mere payment by the Owner for stored materials does not result in a deduction from this column. Only as materials are incorporated into the Project are their value deducted from this column and incorporated into column E (Work Completed—This Period).

**Column G:** Enter here the total of columns D, E and F. Calculate the percentage completed by dividing column G by column C.

**Column H:** Enter here the difference between column C (Scheduled Value) and column G (Total Completed and Stored to Date).

**Column I:** This column is normally used only for contracts where variable retainage is permitted on a line-item basis. It need not be completed on projects where a constant retainage is withheld from the overall contract amount.

**Change Orders:** Although Change Orders could be incorporated by changing the schedule of values each time a Change Order is added to the Project, this is not normally done. Usually, Change Orders are listed separately, either on their own G703 form or at the end of the basic schedule. The amount of the original contract adjusted by Change Orders is to be entered in the appropriate location on the G702/CMa form.

**Construction Change Directives:** Amounts not in dispute that have been included in Construction Change Directives should be incorporated into one or more Change Orders. Amounts remaining in dispute should be dealt with according to Paragraph 7.3 in A201/CMa.

## D. MAKING PAYMENT

The Owner should make payment directly to the Contractor based on the amount certified by the Construction Manager and Architect on AIA Document G702/CMa, Application and Certificate for Payment, Construction Manager-Adviser Edition. The completed form contains the name and address of the Contractor. Payment should not be made to any other party unless specifically indicated on G702/CMa.

# APPLICATION AND CERTIFICATE FOR PAYMENT   CONSTRUCTION MANAGER-ADVISER EDITION

AIA DOCUMENT G702/CMa   (Instructions on reverse side)

PAGE ONE OF

TO OWNER:                          PROJECT:                          APPLICATION NO.:          Distribution to:
                                                                     PERIOD TO:                  ☐ OWNER
                                                                     PROJECT NOS.:               ☐ CONSTRUCTION
                                                                                                      MANAGER
FROM CONTRACTOR:                                                     CONTRACT DATE:              ☐ ARCHITECT
                                                                                                 ☐ CONTRACTOR
                                    VIA CONSTRUCTION MANAGER:
                                    VIA ARCHITECT:
CONTRACT FOR:

## CONTRACTOR'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
Continuation Sheet, AIA Document G703, is attached.

1. ORIGINAL CONTRACT SUM . . . . . . . . . . . . . . . . . $

2. Net Change By Change Orders . . . . . . . . . . . . . $

3. CONTRACT SUM TO DATE (Line 1 ± 2) . . . . . . . $

4. TOTAL COMPLETED & STORED TO DATE . . . . . . $
   (Column G on G702)

5. RETAINAGE:
   a. _____ % of Completed Work          $
      (Columns D + E on G703)
   b. _____ % of Stored Material         $
      (Column F on G703)
   Total Retainage (Line 5a + 5b or
   Total in Column I of G703) . . . . . . . . . . . . . . . $

6. TOTAL EARNED LESS RETAINAGE . . . . . . . . . . . $
   (Line 4 less Line 5 Total)

7. LESS PREVIOUS CERTIFICATES FOR PAYMENT
   (Line 6 from prior Certificate) . . . . . . . . . . . . $

8. CURRENT PAYMENT DUE . . . . . . . . . . . . . . . . . [   $   ]

9. BALANCE TO FINISH, INCLUDING RETAINAGE
   (Line 3 less Line 6)                     $

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved in previous months by Owner | | |
| Total approved this Month | | |
| TOTALS | | |
| NET CHANGES by Change Order | | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge, information and belief the Work covered by this Application for Payment has been completed in accordance with the Contract Documents, that all amounts have been paid by the Contractor for Work for which previous Certificates for Payment were issued and payments received from the Owner, and that current payment shown herein is now due.

CONTRACTOR:

By: _____          Date: _____

State of:
County of:
Subscribed and sworn to before
me this _____ day of _____
Notary Public:
My Commission expires:

## CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data comprising this application, the Construction Manager and Architect certify to the Owner that to the best of their knowledge, information and belief the Work has progressed as indicated, the quality of the Work is in accordance with the Contract Documents, and the Contractor is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED . . . . . . . . . . . . . . . . . . $_____

(Attach explanation if amount certified differs from the amount applied for. Initial all figures on this Application and on the Continuation Sheet that changed to conform to the amount certified.)

CONSTRUCTION MANAGER:

By: _____          Date: _____
ARCHITECT:

By: _____          Date: _____
This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the Contractor named herein. Issuance, payment and acceptance of payment are without prejudice to any rights of the Owner or Contractor under this Contract.

This standard document is NOT a model form. Its inclusion in the Architect's Handbook of Professional Practice, 12th Edition, does not constitute a grant of any implied or explicit license to copy it in whole or in part. See the Instruction Sheet for information on licensed reproduction.

G702/CMa-1992

AIA DOCUMENT G702/CMa • APPLICATION AND CERTIFICATE FOR PAYMENT • CONSTRUCTION MANAGER-ADVISER EDITION
1992 EDITION • AIA® • ©1992 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, N.W., WASHINGTON,
D.C. 20006-5292 • WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.

CAUTION: You should use an original AIA document which has this caution printed in red. An original assures that changes will not be obscured as may occur when documents are reproduced.

# INSTRUCTION SHEET
## AIA DOCUMENTS G702 and G703

### A.  GENERAL INFORMATION

#### 1. Purpose and Related Documents

AIA Document G702, Application and Certificate for Payment, is to be used in conjunction with AIA Document G703, Continuation Sheet. These documents are designed to be used on a Project where a Contractor has a direct Agreement with the Owner. Procedures for their use are covered in AIA Document A201, General Conditions of the Contract for Construction, 1987 Edition.

#### 2. Use of Current Documents

Prior to using any AIA document, the user should consult the AIA, an AIA component chapter or a current AIA Documents List to determine the current edition of each document.

#### 3. Limited License for Reproduction

AIA Documents G702 and G703 are copyrighted works and may not be reproduced or excerpted from in substantial part without the express written permission of the AIA. The documents are intended to be used as consumables-- that is, the original documents purchased by the user are intended to be consumed in the course of being used. There is no implied permission to reproduce these documents, nor does membership in The American Institute of Architects confer any further rights to reproduce G702 and G703.

A limited license is hereby granted to purchasers to reproduce a maximum of ten copies of a completed or executed G702 and G703, but only for use in connection with a particular Project. Further reproductions are prohibited without the express written permission of the AIA.

### B.  COMPLETING THE G702 FORM:

After the Contractor has completed AIA Document G703, Continuation Sheet, summary information should be transferred to AIA Document G702, Application and Certificate for Payment.

The Contractor should sign G702, have it notarized and submit it, together with G703, to the Architect.

The Architect should review G702 and G703 and, if they are acceptable, complete the Architect's Certificate for Payment on G702. The Architect may certify a different amount than that applied for, pursuant to Paragraphs 9.5 and 9.6 of A201. The Architect should then initial all figures on G702 and G703 that have been changed to conform to the amount certified and attach an explanation. The completed G702 and G703 should be forwarded to the Owner.

### C.  COMPLETING THE G703 FORM:

**Heading:** This information should be completed to be consistent with similar information on AIA Document G702, Application and Certificate for Payment.

**Columns A, B & C:** These columns should be completed by identifying the various portions of the Project and their scheduled value consistent with the schedule of values submitted to the Architect at the commencement of the Project or as subsequently adjusted. The breakdown may be by sections of the Work or by Subcontractors and should remain consistent throughout the Project. Multiple pages should be used when required.

Column C should be subtotaled at the bottom when more than one page is used and totaled on the last page. Initially, this total should equal the original Contract Sum. The total of column C may be adjusted by Change Orders during the Project.

**Column D:** Enter in this column the amount of completed work covered by the previous application (columns D    E from the previous application). Values from column F (Materials Presently Stored) from the previous application should not be entered in this column.

**Column E:** Enter here the value of Work completed at the time of this application, including the value of materials incorporated into the project which were listed on the previous application under Materials Presently Stored (column F).

**Column F:** Enter here the value of Materials Presently Stored for which payment is sought. The total of the column *must* be recalculated at the end of each pay period. This value covers both materials newly stored for which payment is sought and materials previously stored which are not yet incorporated into the Project. Mere payment by the Owner for stored materials does not result in a deduction from this column. Only as materials are incorporated into the Project is their value deducted from this column and incorporated into column E (Work Completed--This Period).

**Column G:** Enter here the total of columns D, E and F. Calculate the percentage completed by dividing column G by column C.

**Column H:** Enter here the difference between column C (Scheduled Value) and column G (Total Completed and Stored to Date).

**Column I:** This column is normally used only for contracts where variable retainage is permitted on a line item basis. It need not be completed on projects where a constant retainage is withheld from the overall contract amount.

**Change Orders:** Although Change Orders could be incorporated by changing the schedule of values each time a Change Order is added to the Project, this is not normally done. Usually, Change Orders are listed separately, either on their own G703 form or at the end of the basic schedule. The amount of the original contract adjusted by Change Orders is to be entered in the appropriate location on the G702 form.

Construction Change Directives: Amounts not in dispute that have been included in Construction Change Directives should be incorporated into one or more Change Orders. Amounts remaining in dispute should be dealt with according to Paragraph 7.3 in A201.

### D.  MAKING PAYMENT

The Owner should make payment directly to the Contractor based on the amount certified by the Architect on AIA Document G702, Application and Certificate for Payment. The completed form contains the name and address of the Contractor. Payment should not be made to any other party unless specifically indicated on G702.

### E.  EXECUTION OF THE DOCUMENT

Each person executing the Agreement should indicate the capacity in which they are acting (i.e., president, secretary, partner, etc.) and the authority under which they are executing the Agreement. Where appropriate, a copy of the resolution authorizing the individual to act on behalf of the firm or entity should be attached.

# CONTINUATION SHEET

AIA DOCUMENT G703   (Instructions on reverse side)

AIA Document G702, APPLICATION AND CERTIFICATE FOR PAYMENT,
containing Contractor's signed Certification, is attached.
In tabulations below, amounts are stated to the nearest dollar.
Use Column I on Contracts where variable retainage for line items may apply.

APPLICATION NO.:
APPLICATION DATE:
PERIOD TO:
ARCHITECT'S PROJECT NO.:

PAGE     OF     PAGES

| A | B | C | D | E | F | G | | H | I |
|---|---|---|---|---|---|---|---|---|---|
| | | | WORK COMPLETED | | | | | | |
| ITEM NO. | DESCRIPTION OF WORK | SCHEDULED VALUE | FROM PREVIOUS APPLICATION (D + E) | THIS PERIOD | MATERIALS PRESENTLY STORED (NOT IN D OR E) | TOTAL COMPLETED AND STORED TO DATE (D+E+F) | % (G ÷ C) | BALANCE TO FINISH (C − G) | RETAINAGE (IF VARIABLE RATE) |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |
| | | | | | | | | | |

AIA DOCUMENT G703 • CONTINUATION SHEET FOR G702 • 1992 EDITION • AIA® • ©1992 • THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVENUE, NW, WASHINGTON, D.C. 20006-5292 • **WARNING: Unlicensed photocopying violates U.S. copyright laws and will subject the violator to legal prosecution.**

G703-1992

This standard document is NOT a model form. Its inclusion in the Architect's Handbook of Professional Practice, 12th Edition, does not constitute a grant of any implied or explicit license to copy it in whole or in part. See the Instruction Sheet for information on licensed reproduction.

CAUTION: You should use an original AIA document which has this caution printed in red. An original assures that changes will not be obscured as may occur when documents are reproduced.

**EXHIBIT N**

**SECTION 22 AFFIDAVIT**

[See attached]

**AFFIDAVIT UNDER SECTION 22 OF THE**

**LIEN LAW OF NEW YORK**

State of New York    )
                          ) ss:
County of New York  )

The undersigned, being duly sworn, deposes and says that:

(1) I am the authorized signatory of 135 West 52nd Street Owner LLC, a Delaware limited liability company.

(2) The amount of the Loan is $_____.

(3) The consideration for the loan to be paid and the other expenses heretofore incurred or to be incurred in connection with and paid out of the Loan are (or are estimated to be) as follows:

     Commitment fee, if any, for the Loan: $_____

     Mortgage recording taxes: $_____

     Examination of title, title insurance and recording fees: $_____

     Fees of Lender's legal counsel: $_____

     Fees of Lender's Construction Consultant: $_____

     Interest on the Building Loan Mortgage: $_____

                                       Total $_____

(4) The amount, if any, to be advanced from the Loan to repay amounts previously advanced to the Borrower pursuant to Notices of Lending for costs of the Improvements is: $_____

(5) The amount, if any, to be advanced from the Loan to reimburse the Borrower for costs of the Improvements expended by the Borrower after the commencement of the Improvements but prior to the date hereof are itemized as follows: $_____

(6) The estimated amount to be advanced from the Loan for indirect costs of the Improvements which may become due and payable after the date hereof and during the construction of the

Improvements (such as bond and insurance premiums, fees of architects, engineers and surveyors, ground rents, taxes, assessments and water and sewer rent) is: $_____.

(7) The net sum which the Borrower estimates will be available to it from the Loan to pay contractors, subcontractors, laborers and materialmen for the Improvements is: $_____.

(8) The Estimated amount of Loan Contingencies are $2,500,000.00 "Contingency" which may also be used by Borrower for Building Loan Costs set forth in Paragraph 6 above with the prior written approval of Lender.

(9) This affidavit is made pursuant to and in compliance with Section 22 of the Lien Law of the State of New York.

(10) If the Borrower is a corporation or partnership, this statement is verified by deponent and not by Borrower because the Borrower is a corporation or partnership (of which the deponent is an officer or general partner).

(11) The facts stated above and any costs itemized on this statement are true to the knowledge of the undersigned.

135 WEST 52nd STREET OWNER LLC,
a Delaware limited liability company

By: _____
Name:  Meyer Chetrit
Title:   President

Sworn to before me this _____ day
of _____, 2014.

_____

Notary Public

**EXHIBIT O**

**FORM OF CONDOMINIUM ENDORSEMENT**

[See attached]

## CONDOMINIUM  ENDORSEMENT

### - NEW YORK -

Attached to and made a part of Policy Number:  7230732-91738843

The company insures the insured against loss or damage sustained by reason of:

1. The failure of the unit identified in Schedule A and its common elements to be part of a condominium within the meaning of the condominium statutes of the State of New York.

2. The failure of the documents required by the condominium statutes to comply with the requirements of the statutes to the extent that such failure afffects the Title to the unit and its common elements.

3. Present violations of any restrictive covenants which restrict the use of the unit and its common elements and which are created by the condominium documents, except violations relating to environmental protection unless a notice of a violation thereof has been recorded or filed in the Public Records and is not excepted Schedule B.  The restrictive covenants do not contain any provisions which will cause a forfeiture or reversion of title.

4. The priority of any lien for charges and assessments at Date of Policy provided for in the condominium statutes and condominium documents over the lien of any Insured Mortgage identified in Schedule A.

5. The failure of the unit and its common elements to be entitled by law to be assessed for real property taxes as a separate parcel.

6. Any obligation to remove any improvements that exist at Date of Policy because of any present encroachments or because of any future unintentional encroachment of the common elements upon any unit or of any unit upon the common elements or another unit.

7. The failure of the Title by reason of a right of first refusal to purchase the unit and its common elements which was exercised or could have been exercised at Date of Policy.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.  Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the amount of insurance.

Continental Abstract Corporation
One Old Country Road
Suite 467
Carle Place, NY 11514
Phone (516) 248-1180  Fax (516) 248-7596

CHICAGO TITLE INSURANCE COMPANY

By: _John Raw_
President

By: _Thomas J Adams_
Secretary

By: _____
Authorized Signature

# EXHIBIT Q

## TAX CERTIFICATES

EXHIBIT [Q-1]

U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain Building Loan Agreement by and among 135 West 52nd Street Owner LLC, a Delaware limited liability company ("Borrower"), Deutsche Bank AG New York Branch, a branch of Deutsche Bank AG, a banking corporation organized under the laws of the Federal Republic of Germany, licensed by the New York State Banking Department, as agent ("Agent"), and the Lenders party thereto (as defined therein) dated as of [_____] (the "Agreement").  Capitalized terms that are used but not defined herein shall have the meanings given to such terms in the Agreement.

Pursuant to the provisions of Section 2.2.4(h) of the Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan (as well as any Note evidencing such Loan) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished Agent and Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E, as applicable.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform Borrower and Agent, and (2) the undersigned shall have at all times furnished Borrower and Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]

By:_____
    Name:
    Title:

Date: _____ __, 20[  ]

EXHIBIT Q-2

U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to that certain Building Loan Agreement by and among 135 West 52nd Street Owner LLC, a Delaware limited liability company ("Borrower"), Deutsche Bank AG New York Branch, a branch of Deutsche Bank AG, a banking corporation organized under the laws of the Federal Republic of Germany, licensed by the New York State Banking Department, as agent ("Agent"), and the Lenders party thereto (as defined therein) dated as of [_____] (the "Agreement").  Capitalized terms that are used but not defined herein shall have the meanings given to such terms in the Agreement.

Pursuant to the provisions of Section 2.2.4(h) of the Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E, as applicable.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]

By:_____
     Name:
     Title:

Date: _____ __, 20[  ]

EXHIBIT Q-3

U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)


       Reference is hereby made to that certain Building Loan Agreement by and among 135 West 52nd Street Owner LLC, a Delaware limited liability company ("Borrower"), Deutsche Bank AG New York Branch, a branch of Deutsche Bank AG, a banking corporation organized under the laws of the Federal Republic of Germany, licensed by the New York State Banking Department, as agent ("Agent"), and the Lenders party thereto (as defined therein) dated as of [_____] (the "Agreement").  Capitalized terms that are used but not defined herein shall have the meanings given to such terms in the Agreement.

       Pursuant to the provisions of <u>Section 2.2.4(h)</u> of the Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of the Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

       The undersigned has furnished its participating Lender with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF PARTICIPANT]


By:_____
    Name:
    Title:


Date: _____ __, 20[  ]

EXHIBIT Q-4

U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

        Reference is hereby made to that certain Building Loan Agreement by and among 135 West 52nd Street Owner LLC, a Delaware limited liability company ("Borrower"), Deutsche Bank AG New York Branch, a branch of Deutsche Bank AG, a banking corporation organized under the laws of the Federal Republic of Germany, licensed by the New York State Banking Department, as agent ("Agent"), and the Lenders party thereto (as defined therein) dated as of [_____] (the "Agreement").  Capitalized terms that are used but not defined herein shall have the meanings given to such terms in the Agreement.

        Pursuant to the provisions of Section 2.2.4(h) of the Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan (as well as any Note evidencing such Loan) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan (as well as any Note evidencing such Loan), (iii) with respect to the extension of credit pursuant to this Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to Borrower as described in Section 881(c)(3)(C) of the Code.

        The undersigned has furnished Agent and Borrower with IRS Form W-8IMY accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E, as applicable, or (ii) an IRS Form W-8IMY accompanied by an IRS Form W-8BEN or W-8BEN-E, as applicable, from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption.  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform Borrower and Agent, and (2) the undersigned shall have at all times furnished Borrower and Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

[NAME OF LENDER]


By:_____
    Name:
    Title:

      Date: _____ __, 20[  ]