# **Exhibit 20**

Execution Version

---

**$12,441,650 PROJECT LOAN**

**PROJECT LOAN AGREEMENT**

Dated as of August 25, 2014

Between

135 West 52nd Street Owner LLC, a Delaware limited liability company
as Borrower,

Deutsche Bank AG New York Branch,
as Agent, and

German American Capital Corporation, AND THE OTHER LENDERS SIGNATORY HERETO,
collectively, as Lender

---

# TABLE OF CONTENTS

Page

**Article I DEFINITIONS; PRINCIPLES OF CONSTRUCTION** .............................................1

Section 1.1 Definitions.................................................................. 1

Section 1.2 Principles of Construction........................................... 5

**Article II GENERAL TERMS**.............................................................................................**5**

Section 2.1 Loan Commitment; Disbursement to Borrower ............ 5

Section 2.2 Interest Rate ............................................................... 6

Section 2.3 Loan Payment ........................................................... 12

Section 2.4 Prepayments ............................................................. 14

Section 2.5 Release of Property .................................................. 15

Section 2.6 Extension Option ...................................................... 16

Section 2.7 Payments Not Conditional ........................................ 18

Section 2.8 Initial Advance .......................................................... 18

Section 2.9 Advances .................................................................. 18

Section 2.10 Conditions of Final Advance .................................... 18

Section 2.11 No Reliance ............................................................. 18

Section 2.12 Method of Disbursement of Loan Proceeds.............. 18

Section 2.13 Interest Rate Cap Agreement .................................. 19

**Article III CONSTRUCTION REPRESENTATIONS AND COVENANTS** ........................**19**

Section 3.1 The Project Improvements......................................... 19

Section 3.2 Intentionally Omitted ................................................. 21

Section 3.3 Completion of Improvements. .................................... 21

Section 3.4 Correction of Defects ................................................ 21

Section 3.5 Project Loan Budget. ................................................. 21

Section 3.6 Project Budget........................................................... 22

Section 3.7 Feasibility.................................................................. 22

Section 3.8 Change Orders .......................................................... 22

Section 3.9 Cost Savings and Contingency Reserve .................... 22

Section 3.10 Intentionally Omitted ............................................... 23

Section 3.11 Construction Consultant............................................ 23

**Article IV REPRESENTATIONS AND WARRANTIES**.....................................................**24**

Section 4.1 Borrower Representations.......................................... 24

Section 4.2 Incorporation of Representations ............................... 24

Section 4.3 Survival of Representations ....................................... 24

i

# TABLE OF CONTENTS
## (*continued*)

Page

**Article V BORROWER COVENANTS**....................................................................**25**

Section 5.1     Affirmative Covenants ............................................. 25

Section 5.2     Negative Covenants ................................................. 25

Section 5.3     Covenants after Conversion ..................................... 25

**Article VI INSURANCE; CASUALTY;  CONDEMNATION; REQUIRED REPAIRS** ...............................................................**25**

Section 6.1     Incorporation of Building Loan Agreement ............... 25

**Article VII RESERVE FUNDS** ....................................................................**26**

Section 7.1     Deposit Account ..................................................... 26

Section 7.2     Reserve Accounts .................................................... 26

Section 7.3     Security Interest in Funds ....................................... 26

Section 7.4     Order of Priority of Funds in Deposit Account ......... 26

**Article VIII DEFAULTS** ...........................................................................**27**

Section 8.1     Event of Default ..................................................... 27

Section 8.2     Remedies ................................................................ 30

Section 8.3     Remedies Cumulative; Waivers ............................... 32

**Article IX SPECIAL PROVISIONS** ..........................................................**32**

Section 9.1     Incorporation of Building Loan Agreement ............... 32

**Article X MISCELLANEOUS** ....................................................................**33**

Section 10.1     Survival .................................................................. 33

Section 10.2     Agent's and Lender's Discretion .............................. 33

Section 10.3     Governing Law ....................................................... 33

Section 10.4     Modification, Waiver in Writing .............................. 34

Section 10.5     Delay Not a Waiver ................................................ 35

Section 10.6     Notices .................................................................. 35

Section 10.7     Trial by Jury .......................................................... 37

Section 10.8     Headings ................................................................ 37

Section 10.9     Severability ........................................................... 37

Section 10.10   Preferences ............................................................ 37

Section 10.11   Waiver of Notice .................................................... 37

Section 10.12   Remedies of Borrower ............................................ 38

ii

**TABLE OF CONTENTS**
(*continued*)

Page

Section 10.13    Expenses; Indemnity ........................................................................ 38

Section 10.14    Schedules Incorporated .................................................................... 40

Section 10.15    Offsets, Counterclaims and Defenses .............................................. 40

Section 10.16    No Joint Venture or Partnership; No Third Party Beneficiaries ................. 40

Section 10.17    Publicity .......................................................................................... 40

Section 10.18    Waiver of Marshalling of Assets ..................................................... 40

Section 10.19    Waiver of Counterclaim .................................................................. 41

Section 10.20    Conflict; Construction of Documents; Reliance ............................ 41

Section 10.21    Brokers and Financial Advisors ...................................................... 42

Section 10.22    Prior Agreements ............................................................................ 42

Section 10.23    Liability ........................................................................................... 42

Section 10.24    Negation of Implied Right to Cure Events of Default ................... 42

Section 10.25    Exhibits ........................................................................................... 42

**Article XI AGENT** ...............................................................................................**43**

Section 11.1    Incorporation of Building Loan Agreement .................................. 43

iii

## **<u>EXHIBITS</u>**

Exhibit A      Building Loan Budget

Exhibit B      Project Loan Budget

Exhibit C      Business Plan

Exhibit D      Project Budget

## PROJECT LOAN AGREEMENT

**THIS PROJECT LOAN AGREEMENT**, dated as of August 25, 2014 (as amended, restated, replaced, supplemented or otherwise modified from time to time, this "**Agreement**" or sometimes "**Project Loan Agreement**"), among German American Capital Corporation, a Maryland corporation, having an address at 60 Wall Street, 10th Floor, New York, New York 10005 (together with its successors and assigns and such other co-lenders as may exist from time to time, "**Lender**"), Deutsche Bank AG New York Branch, a branch of Deutsche Bank AG, a banking corporation organized under the laws of the Federal Republic of Germany, licensed by the New York State Banking Department, having an address at 60 Wall Street, 10th Floor, New York, New York 10005, as agent for Lender (together with its successors and assigns, "**Agent**"), and 135 West 52nd Street Owner LLC, a Delaware limited liability company, having its principal place of business at c/o The Chetrit Group, LLC, 512 Seventh Avenue, New York, New York 10018 (together with its permitted successors and assigns, collectively, "**Borrower**").

### W I T N E S S E T H:

**WHEREAS**, Borrower desires to obtain the Project Loan (as hereinafter defined) from Lender; and

**WHEREAS**, Lender is willing to make the Project Loan to Borrower, subject to and in accordance with the terms of this Agreement and the other Loan Documents (as hereinafter defined).

**NOW THEREFORE**, in consideration of the making of the Loan by Lender and the covenants, agreements, representations and warranties set forth in this Agreement, the parties hereto hereby covenant, agree, represent and warrant as follows (and all other initially capitalized terms not defined herein shall have the meaning given to such term in the Building Loan Agreement (as defined below)):

### ARTICLE I

### DEFINITIONS; PRINCIPLES OF CONSTRUCTION

**Section 1.1    Definitions**.   For all purposes of this Agreement, except as otherwise expressly required or unless the context clearly indicates a contrary intent:

"**Accounts**" shall have the meaning specified in Section 7.1 hereof.

"**Actual Return Amount**" shall mean the aggregate sum actually paid to Lender of all Monthly Debt Service Payment Amounts (excluding Service Fees), and any payments in reduction of the Outstanding Principal Balance (in each case excluding interest at the Default Rate, repayment of protective advances, any Exit Fee, Structuring Fee and/or any other fees of Agent and/or Lender or any Affiliate thereof, and any reimbursement or other payment of costs or expenses incurred by Agent and/or Lender required to be reimbursed by Borrower to Agent and/or Lender hereunder).

"**ADA**" means the Americans with Disabilities Act, of July 26, 1990, Pub. L. No. 101-336, 104 Stat. 327, 42 U.S.C. § 12101, et. seq., as amended from time to time.

"**Advance**" or "**Advances**" shall mean any disbursement of the proceeds of the Building Loan by Lender pursuant to the terms of the Building Agreement or disbursement of the proceeds of the Project Loan pursuant to the terms of this Agreement, or disbursements of the proceeds of the Senior Loan pursuant to the terms of the Senior Loan Agreement, as applicable.

"**Agent**" shall have the meaning set forth in the introductory paragraph hereto.

"**Agreement**" shall have the meaning set forth in the introductory paragraph hereto.

"**Borrower**" shall have the meaning set forth in the introductory paragraph hereto.

"**Breakage Costs**" shall have the meaning specified in Section 2.2.4(c) hereof.

"**Broker**" shall have the meaning specified in Section 10.21 hereof.

"**Building Loan**" shall mean the loan made by Lender to Borrower pursuant to the Building Loan Agreement in the principal amount of up to the Building Loan Amount.

"**Building Loan Agreement**" shall mean that certain Building Loan Agreement dated as of the date hereof among Agent, Lender and Borrower, as the same may be amended, restated supplemented or otherwise modified from time to time.

"**Building Loan Amount**" shall mean an amount equal to Sixty-Nine Million, Four Hundred Seventy Thousand, Fifty and No/100 Dollars ($69,470,050).

"**Closing Date**" shall mean the date hereof.

"**Collateral**" shall have the meaning ascribed thereto in the Pledge Agreement.

"**Common Loan Documents**" shall mean, collectively, the Assignment of Construction Management Agreement, the Assignment of Sales Agency Agreement and any other assignment and/or subordination of contracts or other agreements delivered during the Term in connection with the Loan, the Assignment of Rate Cap, the Guaranty, the Environmental Indemnity, the Guaranty of Completion, the Limited Payment Guaranty, the Assignment of Contracts, the Pledge Agreement, the Pledge Agreement Guaranty, the Cash Management Agreement, the Borrower Operating Account Agreement, the Clearing Account Control Agreement, the Assignment of Leases, and all other documents now or hereafter executed and/or delivered with respect to the Loan.

"**Control**" or "**control**" shall mean the possession, directly or indirectly, of the power to direct or cause the direction of management, policies or activities of a Person, whether through ownership of voting securities, by contract or otherwise, including, without limitation, having approval or consent rights over the actions or conduct of a Person.

"**Debt**" shall mean the outstanding principal amount of the Project Loan set forth in, and evidenced by, this Agreement, the Project Loan Documents and the Project Loan Note, together with all interest accrued and unpaid thereon, including all other sums (including, without limitation, the Exit Fee and, if applicable, the Return Differential) due to Agent or Lender in respect of the Project Loan under the Project Loan Note, this Agreement, the Project Loan Mortgage or any other Project Loan Documents.

"**Event of Default**" shall have the meaning set forth in Section 8.1(a) hereof.

"**Extension Maturity Date**" shall mean August 25, 2017.

"**Extension Option**" shall have the meaning set forth in Section 2.6 hereof.

"**Indemnified Liabilities**" shall have the meaning set forth in Section 10.13(b) hereof.

"**Indemnified Party**" or "**Indemnified Parties**" shall have the meaning specified in Section 10.13(b) hereof.

"**Initial Interest Period**" shall mean the period from the Closing Date to the last day of the calendar month in which the Closing Date occurs.

"**Initial Maturity Date**" shall mean August 25, 2016.

"**Key Man**" shall mean Meyer Chetrit, an individual.

"**Lender**" shall have the meaning set forth in the introductory paragraph hereto.

"**Line Item**" shall have the meaning set forth in Section 3.5.1 hereof.

"**Minimum Return Amount**" shall mean the difference between (a) (1) $243,923,750 less (2) the product of (x) .0675 and (y) all payments in reduction of the Outstanding Principal Balance received in connection with Unit sales (other than Bulk Sales) in accordance with this Agreement, and (b) the positive difference between (i) $228,500,000 and (ii) the aggregate amount of all Advances (which, for the avoidance of doubt, shall exclude protective advances) made under the Loan Documents.

"**Monthly Debt Service Payment Amount**" shall mean on each Payment Date through and including the Maturity Date, an amount equal to sum of the (i) interest accruing on the Outstanding Principal Balance at the Interest Rate for the immediately preceding Interest Period, which interest shall be calculated in accordance with Section 2.2 hereof, and (ii) the portion of the Servicing Fee then due.

"**Notice**" shall have the meaning specified in Section 10.6 hereof.

"**Other Debt**" shall mean, collectively, the "**Debt**" as defined in each of the Building Loan Agreement and the Senior Loan Agreement.

3

"**Other Taxes**" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment.

"**Outstanding Principal Balance**" means, as of any date, the then outstanding principal balance of the Loan.

"**Project Loan**" shall mean the loan made by Lender to Borrower pursuant to this Agreement in the principal amount of up to the Project Loan Amount.

"**Project Loan Agreement**" shall have the meaning set forth in the introductory paragraph hereto.

"**Project Loan Amount**" shall mean $12,441,650.

"**Project Loan Budget**" shall have the meaning set forth in Section 3.5.1 hereof.

"**Project Loan Documents**" shall mean, collectively, the Common Loan Documents, this Agreement, the Project Loan Note and the Project Loan Mortgage, as well as all other documents now or hereafter executed and/or delivered with respect to the Project Loan.

"**Project Loan Mortgage**" shall mean that certain Project Loan Mortgage, Assignment of Leases and Rents and Security Agreement dated the date hereof, executed and delivered by Borrower to Agent (for the benefit of Lender) as security for the Project Loan and encumbering the Property, as the same may be amended, restated, supplemented or otherwise modified from time to time.

"**Project Loan Note**" shall mean that certain Project Loan Promissory Note, dated as of the date hereof, in the principal amount of up to $12,441,650 made by Borrower in favor of Lender, as the same may be amended, restated, replaced, supplemented or otherwise modified from time to time.

"**Repayment Date**" shall mean the date upon which the Total Debt shall be indefeasibly repaid in full.

"**Required Borrower Equity**" shall have the meaning set forth in Section 2.1.8 hereof.

"**Return Differential**" shall mean, if the Actual Return Amount is less than the Minimum Return Amount, an amount equal to (x) the Minimum Return Amount, minus (y) the Actual Return Amount.

"**Term**" shall mean the entire term of this Agreement, which shall expire upon repayment in full of the Debt.

"**Total Debt**" shall mean, collectively, the Debt and Other Debt.

4

"**U.S. Tax Compliance Certificate**" has the meaning assigned to such term in Section 2.2.4(h)(ii)(B)(iii).

**Section 1.2     Principles of Construction**.

(a)     All references to sections and schedules are to sections and schedules in or to this Agreement unless otherwise specified.  All uses of the word "including" shall mean "including, without limitation" unless the context shall indicate otherwise.  Unless otherwise specified, the words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  Unless otherwise specified, all meanings attributed to defined terms herein shall be equally applicable to both the singular and plural forms of the terms so defined. All references to, representations by and covenants of "Borrower" shall mean "each Borrower" unless the context shall indicate otherwise. All references to "saleable" or "rentable" square feet of a Unit shall refer to the square feet attributable to such Unit in the Offering Plan (to the extent approved by Agent in accordance with this Agreement).

(b)     With respect to any cross-reference to, incorporation by reference from, and/or any other reference or allusion to the Building Loan Documents, the Project Loan Documents, and/or the Senior Loan Documents, as the case may be, such references shall be to referenced defined terms, provisions, sections, schedules, and/or exhibits, as the case may be, as the same are set forth in the Building Loan Documents, the Project Loan Documents, and/or the Senior Loan Documents, as the case may be, as of the date hereof, and as each of the same may be amended, modified, supplemented, extended, replaced and/or restated from time to time, and shall survive the repayment or satisfaction of the Building Loan, the Project Loan, and/or the Senior Loan, as the case may be, and/or the termination of the Building Loan Documents, the Project Loan Documents and/or the Senior Loan Documents, as the case may be, until the occurrence of the Repayment Date.

**ARTICLE II**

**GENERAL TERMS**

**Section 2.1     Loan Commitment; Disbursement to Borrower**.

2.1.1     **Agreement to Lend and Borrow**.  Subject to and upon the terms and conditions set forth herein, Lender hereby agrees to make and Borrower hereby agrees to accept Advances in respect of the Project Loan as more particularly set forth in this Agreement.

2.1.2     **No Reborrowings**.  Any amount borrowed and repaid hereunder in respect of the Loan may not be reborrowed.

2.1.3     **The Note, Mortgage and Loan Documents**.  The Project Loan shall be evidenced by the Project Loan Note and secured by the Project Loan Mortgage covering the fee simple interest of Borrower in the Property, the Improvements and other property, rights and interests of Borrower in the Property, and the other Project Loan Documents and made subject to

5

the terms and conditions of this Agreement, and advanced in accordance with the provisions of this Agreement.

2.1.4   **Use of Proceeds**.   Borrower hereby agrees that Borrower shall use the proceeds of the Project Loan solely to pay for Project Related Costs which are not Building Loan Costs actually incurred in connection with the construction of the Project Improvements if and to the extent that such Project Related Costs are reflected in the Project Loan Budget. No portion of the proceeds of the Project Loan are being used for the improvement (as defined in Section 2(4) of the Lien Law) of the Property.

2.1.5   **Loan Advances**.   Subject to compliance by Borrower with the terms and conditions of this Agreement, Lender shall make Advances under this Agreement for Project Loan Costs to Borrower for the payment of such Project Loan Costs, each as set forth in the Project Loan Budget, as the same may be revised in accordance with the provisions of this Agreement. If Lender is comprised of more than one Person, then no Lender shall be obligated to advance more than its *pro rata* share of any Advance hereunder. Lender shall not be required to make Advances under the Project Loan for costs incurred by Borrower with respect to materials stored on or off the Property unless Borrower has furnished satisfactory evidence that such materials are stored, secured and insured in accordance with the provisions of <u>Section 3.10</u> of the Building Loan Agreement.  The Project Loan Budget shall reflect, by category and Line Item, the purposes and the amounts of each Project Loan Cost for which funds to be advanced by Lender under this Agreement are to be used.  Lender shall not be required to disburse for any category or Line Item more than the amount specified therefor in the Project Loan Budget, subject to Agent's prior written consent in accordance with <u>Sections 3.5</u> and <u>3.9</u> of the Building Loan Agreement.  No Advances or any portion thereof shall be made directly or indirectly for payments to a Borrower Related Party, except for fees payable to any Borrower Related Party that are expressly set forth in the Project Budget and approved by Agent (and subject to <u>Section 5.2.16</u> of the Building Loan Agreement).

2.1.6   **Intentionally Omitted.**

2.1.7   **Insufficiency of Loan Proceeds**.   Section 2.1.7 of the Building Loan Agreement, and all accompanying definitions, schedules and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

2.1.8   **Required Equity Funds**. As of the Closing Date, Agent shall have received evidence acceptable to Agent that direct and/or indirect members of Borrower have, on the Closing Date, collectively contributed at least $92,250,000 in cash to Borrower in respect of acquisition costs, Carry Costs and construction costs associated with the Project (the "**Required Borrower Equity**").

**Section 2.2    Interest Rate**.

2.2.1   **Interest Rate**.

(a)   <u>Interest Rate</u>. So long as no Event of Default is continuing, interest on the Loan shall accrue for each Interest Period at the Interest Rate.

6

(b)    Default Rate.  In the event that, and for so long as, any Event of Default shall have occurred and be continuing, the Loan and, to the extent not prohibited by applicable law, all other portions of the Total Debt, shall accrue interest at the Default Rate, calculated from the date such payment was due or such Event of Default shall have occurred without regard to any grace or cure periods contained herein. Interest at the Default Rate shall be paid immediately upon demand, which demand may be made as frequently as Agent shall elect, to the extent not prohibited by applicable law.

2.2.2    **Interest Calculation**.  Interest on the Loan, whether at the Interest Rate or at the Default Rate, shall be calculated by multiplying (a) the actual number of days in the period for which the calculation is being made, by (b) a daily rate equal to the Interest Rate or the Default Rate (or, the weighted average of the Interest Rate and the Default Rate, based on the number of days in the respective period of calculation for which each such rate is applicable for any period during which both the Interest Rate and Default Rate are applicable), as applicable, *divided* by 360, by (c) the average Outstanding Principal Balance during the relevant Interest Period for which interest is being calculated, and shall accrue with regard to each of the Building Loan, Senior Loan and Project Loan based on the Outstanding Principal Balance applicable to each of the Building Loan, Senior Loan and the Project Loan, respectively.  The accrual period for calculating interest due on each Payment Date shall be the Interest Period immediately prior to such Payment Date.

2.2.3    **Monthly Payments**.  On each Payment Date (or, on the date hereof with respect to the Initial Interest Period), Borrower shall pay an amount equal to the Monthly Debt Service Payment Amount.  Subject to the provisions of Sections 2.2.4 below, Borrower shall pay all other accrued interest on the Outstanding Principal Balance due under each of the Building Loan, Senior Loan and Project Loan from the Deposit Account in accordance with the order of distributions set forth in Section 7.4 of the Senior Loan Agreement.

2.2.4    **Gross Up**.

(a)    All payments made by any Borrower Party pursuant to any Loan Document shall be made free and clear of, and without reduction for or on account of, Taxes, except as required by applicable law.  If any Taxes are required to be withheld from any amounts payable to Agent or Lender hereunder, the applicable Borrower Party shall be entitled to make such withholding and shall timely pay the full amount withheld to the relevant Governmental Authority in accordance with applicable law and, if such Tax is an Indemnified Tax, then the sum payable by the applicable Borrower Party shall be increased as necessary so that after such withholding has been made (including such withholdings applicable to additional sums payable under this Section 2.2) the applicable Agent or Lender receives an amount equal to the sum it would have received had no such deduction or withholding been made.  Whenever any Tax is payable pursuant to applicable law by Borrower, as promptly as possible thereafter, Borrower shall send to Agent an original official receipt, if available, or certified copy thereof showing payment of such Tax.  Borrower hereby indemnifies Agent and Lender for any incremental taxes, interest or penalties that may become payable by Agent or Lender which may result from any failure by Borrower to pay any such Tax when due to the appropriate taxing authority or any failure by Borrower to remit to Agent the required receipts or other required documentary evidence.

(b)     In the event that any change in any requirement of law, rule regulation or treaty, or in the interpretation or application thereof, or compliance by Agent or Lender with any request or directive hereafter issued from any central bank or other Governmental Authority:

(i)     shall hereafter impose, modify or hold applicable any reserve, special deposit, compulsory loan or similar requirement against assets held by, or deposits or other liabilities in or for the account of, advances or loans by, or other credit extended by, or any other acquisition of funds by, any office of Agent or Lender;

(ii)    shall hereafter have the effect of reducing the rate of return on Lender's capital as a consequence of its obligations under this Section 2.2.4(b) to a level below that which Lender could have achieved but for such adoption, change or compliance (taking into consideration Lender's policies with respect to capital adequacy) by any amount deemed by Lender to be material;

(iii)   shall hereafter impose on Agent or Lender any other condition and the result of any of the foregoing is to materially increase the cost to Agent or Lender of making, renewing or maintaining loans or extensions of credit or to reduce any amount receivable hereunder; or

(iv)    shall hereafter subject Agent or Lender to any Taxes (other than (A) Indemnified Taxes, (B) Taxes described in clauses (b) through (d) of the definition of Excluded Taxes and (C) Connection Income Taxes) on its loans, loan principal, letters of credit, commitments, or other obligations, or its deposits, reserves, other liabilities or capital attributable thereto;

then, in any such case, Borrower shall promptly pay Agent (for disbursement to Lender), within ten (10) days following demand together with documentation in reasonable detail describing such cost, any additional amounts necessary to compensate Lender for such additional cost or reduced amount receivable which Lender deems to be material as determined by Lender in its reasonable discretion.  If Lender becomes entitled to claim any additional amounts pursuant to this Section 2.2.4(b), Agent shall provide Borrower with not less than thirty (30) days written notice specifying the additional amount required to fully compensate Lender for such additional cost or reduced amount together with a statement setting forth the basis for requesting such compensation and the method for determining the amount thereof.  A certificate as to any additional costs or amounts payable pursuant to the foregoing sentence submitted by Agent to Borrower shall be conclusive in the absence of manifest error.  Agent and each Lender agree to use reasonable efforts to designate a different lending office to maintain its portion of the Loan if, in the judgment of such Lender, such different designation would avoid, or reduce, the amount of additional costs and Indemnified Taxes described in Sections 2.2.4(a) and 2.2.4(b) and will not subject Agent or Lender to any unreimbursed cost or expense and would not otherwise be materially disadvantageous to Agent or Lender, provided that Agent and Lender shall have no obligation to designate a lending office in the United States.

(c)     Borrower agrees to indemnify Agent and Lender within ten (10) days after demand therefor, and to hold Agent and Lender harmless from, any loss or expense

8

which Agent or Lender sustains or incurs as a consequence of (i) any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 2.2.4) payable or paid by Agent or Borrower or required to be withheld or deducted from a payment to Agent or Borrower and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority, and (ii) any prepayment of the Loan on a day that (A) is not a Payment Date or (B) is a Payment Date if Borrower did not give the prior written notice of such prepayment required pursuant to the terms of this Agreement, including, without limitation, such loss or expense arising from interest or fees payable by Lender to lenders of funds obtained by it in order to maintain the Loan hereunder (the amounts referred to above are herein referred to collectively as the "**Breakage Costs**"); provided, however, (other than with respect to clause (i) above) Borrower shall not indemnify Agent or Lender from any loss or expense arising from Agent's or Lender's willful misconduct, illegal acts, fraud or gross negligence. This provision shall survive payment of the Note in full and the satisfaction of all other obligations of Borrower under this Agreement and the other Loan Documents.

(d)     Agent and Lender agree to endeavor to take reasonable steps to mitigate the effect of any Indemnified Taxes, increased cost or reduction in amounts received or receivable hereunder that would entitled Lender to claim compensation pursuant to this Section 2.2.4, provided that neither Agent nor Lender shall be required to take any such action that would otherwise have a material and adverse effect on the rights of Agent or Lender under this Agreement.

(e)     If Lender becomes aware that it is entitled to receive a refund in respect of amounts paid by Borrower pursuant to Sections 2.2.4(a) or 2.2.4(b) which refund in the good faith judgment of Lender is allocable to such payment, it shall promptly notify Borrower of the availability of such refund and shall, within thirty (30) days after the receipt of a request by Borrower, apply for such refund. If Lender receives such a refund, it shall pay Borrower the refund (but only to the extent of payments made under this Section 2.2.4 giving rise to such refund) net of any reasonable out-of-pocket expenses of Lender and without interest (other than any interest paid by the relevant taxation authority with respect to such refund). Borrower, upon the request of Agent or Lender, shall repay to Agent or Lender the amount paid over pursuant to this paragraph (e) (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that Agent or Lender is required to repay such refund to such Governmental Authority. Notwithstanding anything to the contrary in this paragraph (e), in no event will Agent or Lender be required to pay any amount to Borrower pursuant to this paragraph (e) the payment of which would place Agent or Lender in a less favorable net after-Tax position than it would have been in if the costs subject to indemnification or payment under this Section 2.2.4 had never been incurred (or the Tax subject to indemnification had not been deducted, withheld or otherwise imposed) and the payments giving rise to such refund had never been paid.  This paragraph shall not be construed to require Agent or Lender to make available its Tax returns (or any other information relating to its Taxes that it deems confidential) to any Borrower Party or any other Person, but upon request Agent shall provide a written explanation (without disclosing confidential information) of the basis for its determination pursuant to the preceding sentence.

9

(f)     Each Lender shall severally indemnify Agent, within 10 days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that no Borrower Party has already indemnified Agent for such Indemnified Taxes and without limiting the obligation of the Borrower Parties to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of Section 9.1.4(b) of the Building Loan Agreement relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that are payable or paid by Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by Agent shall be conclusive absent manifest error.  Each Lender hereby authorizes Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by Agent to the Lender from any other source against any amount due to Agent under this paragraph (f)

(g)     Borrower shall timely pay to the relevant Governmental Authority in accordance with applicable law, or at the option of Agent timely reimburse it for the payment of, any Other Taxes.

(h)     **Status of Lenders**.

(i)     Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to Borrower and Agent, at the time or times reasonably requested by Borrower or Agent, such properly completed and executed documentation reasonably requested by Borrower or Agent as will permit such payments to be made without withholding or at a reduced rate of withholding.  In addition, any Lender, if reasonably requested by Borrower or Agent, shall deliver such other documentation prescribed by applicable law or reasonably requested by Borrower or Agent as will enable Borrower or Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements.  Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in Section 2.2.4(h)(ii)(A), (ii)(B) and (ii)(D) below) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(ii)     Without limiting the generality of the foregoing, in the event that Borrower is a U.S. Person,

(A)     any Lender that is a U.S. Person shall deliver to Borrower and Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or Agent), executed originals of IRS Form W-9 certifying that such Lender is exempt from U.S. federal backup withholding tax;

10

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrower and Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or Agent), whichever of the following is applicable:

i)     in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, executed originals of IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

ii)     executed originals of IRS Form W-8ECI;

iii)     in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of **Exhibit Q-1** of the Building Loan Agreement to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "**U.S. Tax Compliance Certificate**") and (y) executed originals of IRS Form W-8BEN; or

iv)     to the extent a Foreign Lender is not the beneficial owner, executed originals of IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN, a U.S. Tax Compliance Certificate substantially in the form of **Exhibit Q-2** of the Building Loan Agreement or **Exhibit Q-3** of the Building Loan Agreement, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of **Exhibit Q-4** of the Building Loan Agreement on behalf of each such direct and indirect partner;

(C)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to Borrower and Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of Borrower or Agent), executed originals of any other form prescribed by applicable law as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by applicable law to permit Borrower or Agent to determine the withholding or deduction required to be made; and

11

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to Borrower and Agent at the time or times prescribed by law and at such time or times reasonably requested by Borrower or Agent such documentation prescribed by applicable law (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by Borrower or Agent as may be necessary for Borrower and Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment.  Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify Borrower and Agent in writing of its legal inability to do so.

(i)     For purposes of this Section 2.2.4, the term "applicable law" includes FATCA.

2.2.5   **Usury Savings**.  This Agreement, the Note and the other Loan Documents are subject to the express condition that at no time shall Borrower be obligated or required to pay interest on the principal balance of the Loan at a rate which could subject Lender or Agent to either civil or criminal liability as a result of being in excess of the Maximum Legal Rate.  If, by the terms of this Agreement or the other Loan Documents, Borrower is at any time required or obligated to pay interest on the principal balance due hereunder at a rate in excess of the Maximum Legal Rate, the Interest Rate, or the Default Rate, as the case may be, shall be deemed to be immediately reduced to the Maximum Legal Rate and all previous payments in excess of the Maximum Legal Rate shall be deemed to have been payments in reduction of principal and not on account of the interest due hereunder.  All sums paid or agreed to be paid to Lender for the use, forbearance, or detention of the sums due under the Loan, shall, to the extent permitted by applicable law, be amortized, prorated, allocated, and spread throughout the full stated term of the Loan until payment in full so that the rate or amount of interest on account of the Loan does not exceed the Maximum Legal Rate of interest from time to time in effect and applicable to the Loan for so long as the Loan is outstanding.

**Section 2.3     Loan Payment**

2.3.1   **Payment**.  Borrower shall pay to Agent (for disbursement to Lender) on the Maturity Date or such earlier date on which the Loan becomes due and payable, either by acceleration or otherwise:

(a)     the Outstanding Principal Balance;

(b)      any protective advances funded by Lender;

(c)      all accrued and unpaid interest and Servicing Fees due under the Note, the Mortgage and the other Loan Documents, whether at the Default Rate or otherwise;

(d)      the Exit Fee;

(e)      the Return Differential, if applicable; and

(f)      all other amounts due hereunder and under the Note, the Mortgage and the other Loan Documents.

Notwithstanding anything to the contrary set forth in the Loan Documents, the Project Loan Mortgage shall secure only the obligations with regard to the payment of the Project Loan, the Project Loan Note and the other Project Loan Documents and shall not secure the obligations with regard to the payment of the Building Loan or the Senior Loan or the obligations with regard Building Loan Note or Senior Loan Note or the Building Loan Mortgage or Senior Loan Mortgage.  Borrower, Agent and Lender further agree that all interest or fees payable with regard to the Loan, including without limitation, the Monthly Debt Service Payment Amount, other accrued interest, default interest, and the Return Differential shall be allocated by Agent to the Senior Loan, Building Loan and Project Loan in accordance with the portion of the Outstanding Principal Balance attributable to the Senior Loan, Building Loan or Project Loan, respectively, as of such date as determined by Agent in its sole discretion, and such allocation by Agent shall be deemed to be the allocation of such amounts between the Senior Loan, Building Loan and Project Loan.

2.3.2    **Late Payment Charge**.  If any sum (other than principal or any Exit Fee due on the Maturity Date) is due under the Loan Documents and not paid by Borrower on or prior to the date on which it is due, Borrower shall pay to Agent (on behalf of Lender) upon demand an amount equal to the lesser of five percent (5%) of such unpaid sum or the Maximum Legal Rate in order to defray the expense incurred by Agent and Lender in handling and processing such delinquent payment and to compensate Agent and Lender for the loss of the use of such delinquent payment.  Any such amount shall be secured by the Mortgage and the other Loan Documents to the extent permitted by applicable law.  The acceptance of a late payment charge shall not constitute a waiver of any Default or Event of Default then existing pursuant to the Loan Documents.  Agent's failure to collect a late payment charge at any time shall not constitute a waiver of Agent's and Lender's right thereafter, at any time and from time to time (including upon acceleration of the Notes or upon payment in full of the Loan), to collect such previously uncollected late payment charge or to collect subsequently accruing late payment charges.  To the extent that Lender is required pursuant to <u>Section 7.2.4</u> of the Senior Loan Agreement to apply Interest Reserve Funds to the payment of the Monthly Debt Service Payment Amount due on any Payment Date and there are sufficient funds in the Interest Reserve Account to make such payment, failure of Lender to apply such funds to the Monthly Debt Service Payment Amount shall not give rise to a late payment charge with regard to such payment hereunder.

2.3.3    **Method and Place of Payment**. Except as otherwise specifically provided herein, all payments and prepayments under this Agreement and the Note shall be made to Agent

13

not later than 3:00 P.M., New York City time, on the date when due and shall be made in lawful money of the United States of America in immediately available funds at Agent's office or as otherwise directed in writing by Agent, and any funds received by Agent after such time shall, for all purposes hereof, be deemed to have been paid on the next succeeding Business Day. Whenever any payment to be made hereunder or under any other Loan Document shall be stated to be due on a day which is not a Business Day, the due date thereof shall be the immediately preceding Business Day.

2.3.4    **Exit Fee.** Upon any repayment or prepayment of the Loan, Borrower shall pay to Agent on the date of such repayment or prepayment the Exit Fee applicable thereto. Without limiting any restrictions on prepayment of the Loan set forth herein, on the earlier to occur of (a) any acceleration of the Loan, (b) the Maturity Date, or (c) the prepayment in full of all of the Obligations, the Exit Fee due and payable shall equal the amount by which (i) $571,250.00 exceeds (ii) the total amount of Exit Fees theretofore paid by Borrower pursuant to this Agreement. All Exit Fees hereunder shall be deemed to be earned by Lender on the Closing Date.

### Section 2.4    Prepayments

2.4.1    **Voluntary Prepayments**

(a)    Notwithstanding anything to the contrary set forth herein, the principal balance of the Note may not be prepaid in whole or part (including, without limitation, pursuant to a refinancing or similar transaction) prior to the Initial Maturity Date except (i) in connection with a Casualty or Condemnation in accordance with Section 2.4.2(a) below, (ii) in connection with the sale of Units in accordance with Section 5.1.32 of the Building Loan Agreement, or (iii) as provided under Section 2.4.1(b), and in each case subject to Agent's (on behalf of Lender) receipt of all amounts set forth in Section 2.3 hereof.

(b)    The Debt may be prepaid in whole (but not in part) if (i) Borrower delivers Agent a written notice specifying the date of prepayment, no later than thirty (30) days prior to such specified date, which notice shall be revocable (provided Borrower shall reimburse Agent and Lender for any out of pocket costs and expenses actually incurred as a result of the delivery of such notice); and (ii) on or prior to such date of prepayment, Borrower pays Agent (for the benefit of Lender) all amounts due under the Loan, including without limitation, the Return Differential (if any), the Exit Fee and all other amounts set forth in Section 2.3 hereof.

(c)    In each instance of prepayment permitted under this Section 2.4.1, Borrower shall be required to pay all other sums due hereunder and no principal amount repaid may be reborrowed.  Notwithstanding anything to the contrary set forth in the Loan Documents, once the Loan has been repaid in full, Lender shall not be obligated to make any further Advance under the Loan Documents.

2.4.2    **Mandatory Prepayments**

(a)    If Agent is not obligated to make Net Proceeds available to Borrower for Restoration in accordance with Section 6.2 of the Building Loan Agreement or in the event that there are excess Net Proceeds after the completion of Restoration, on the next occurring

14

Payment Date following the date on which (a) Agent actually receives any Net Proceeds, and (b) Agent has determined that such Net Proceeds shall be applied against the Total Debt, Borrower shall prepay, or Agent shall apply Net Proceeds as a prepayment of, the Total Debt in an amount equal to one hundred percent (100%) of such Net Proceeds. Except during an Event of Default, such Net Proceeds that Agent is not obligated to make available to Borrower for Restoration in accordance with Section 6.2 of the Building Loan Agreement or any excess Net Proceeds after the completion of Restoration shall be applied by Agent in the order and priority set forth in Section 7.4 of the Senior Loan Agreement as if such amounts were deposited in the Deposit Account (for purposes of which the first Business Day after the receipt of such excess Net Proceeds shall be deemed to be a Payment Date), provided that no Return Differential shall be payable in connection with any prepayment made pursuant to this Section 2.4.2(a).

(b)     In addition, in accordance with the provisions of Section 5.1.32 of the Building Loan Agreement, and in accordance with the priority of distributions from the Deposit Account set forth in Section 7.4 of the Senior Loan Agreement, Borrower shall partially prepay the Loan in connection with each Unit sale.

(c)     Borrower shall partially prepay a portion of the Total Debt equal to $5,000,000 on June 1, 2015 (exclusive of any prepayments that may be required under the Loan Documents, including, without limitation, any prepayments in connection with any release of any Unit), unless prior to such date (i) Borrower has consummated a Unit sale in accordance with Section 5.1.32 of the Building Loan Agreement with respect to the retail Unit for a sale price resulting in Net Sales Proceeds greater than or equal to the Minimum Release Price for such retail Unit, or (ii) Borrower has consummated Unit sales in accordance with Section 5.1.32 of the Building Loan Agreement with respect to the office Units for sale prices resulting in aggregate Net Sales Proceeds greater than or equal to the aggregate Minimum Release Price for such commercial Units.

2.4.3     **Miscellaneous.** The making of an Advance by Lender shall not constitute Agent's or Lender's approval or acceptance of the construction theretofore completed or materials furnished with respect thereto.  Agent's or Lender's inspection and approval of any Plans and Specifications, the construction of the Project Improvements, or the workmanship and materials used therein, shall impose no liability of any kind on Agent or Lender, the sole obligation of Agent and Lender as the result of such inspection and approval being to make the Advances if and to the extent, required by this Agreement.

## Section 2.5    Release of Property

(a)     Except as set forth in this Section 2.5 and in Section 5.1.32 of the Building Loan Agreement, no repayment or prepayment of all or any portion of the Loan shall cause, give rise to a right to require, or otherwise result in, the release of the Lien of the Mortgage on the Property.

(b)     Agent shall, upon the written request of Borrower, on the Repayment Date, at the expense of Borrower and subject to the further provisions of Section 2.5(c), (i) release the Lien of the Mortgage and terminate the Assignment of Leases, or (ii) assign the Mortgage and Note, without recourse, covenant or warranty of any nature, express

15

or implied, to a new lender designated by Borrower and shall execute, acknowledge and deliver to such new lender the assignment of Mortgage and Note, provided that (a) Borrower shall pay the actual third party expenses incurred by Agent and Lender in connection therewith, and Agent's and Lender's reasonable attorneys' fees for the preparation and delivery of the assignment or release documentation, (b) Borrower shall have caused the delivery of an executed Statement of Oath under Section 255 and Section 275 of the New York Real Property Law, and (c) such an assignment is not then prohibited by any federal, state or local law, rule, regulation or order or by any governmental authority.

(c)     In connection with the release or satisfaction of the Mortgage and the Assignment of Leases or the assignment of the Mortgage on the Repayment Date, as applicable, Borrower shall submit to Agent, not less than five (5) Business Days prior to the Payment Date on which Borrower intends to pay the Total Debt in full, a release of Mortgage and Assignment of Leases for the Property or assignment of Mortgage and Note, as applicable, for execution by Agent.  Such release or satisfaction or assignment shall be in a form appropriate in the jurisdiction in which the Property is located and that would be reasonably satisfactory to a prudent lender and contains standard provisions, if any, protecting the rights of the releasing or assigning lender.  In addition, Borrower shall provide all other documentation (including, without limitation, UCC-3 financing statements) Agent reasonably requires to be delivered by Borrower in connection with such release of the Mortgage and Assignment of Leases and other Loan Documents or assignment of Mortgage and Note, as applicable.

**Section 2.6     Extension Option**.  Subject to the provisions of this Section 2.6, Borrower shall have the one-time option (the "**Extension Option**") to extend the Maturity Date until the Extension Maturity Date. Borrower's right to so extend the Maturity Date shall be subject to the satisfaction of each of the following conditions precedent prior to such extension:

(i)     Borrower shall have given Agent written irrevocable notice of such extension (x) no later than thirty (30) days prior to the Initial Maturity Date and (y) no earlier than ninety (90) days prior to the Initial Maturity Date;

(ii)     No monetary Default, material non-monetary Default or any Event of Default, shall have occurred and be continuing at the time of the delivery of the written extension notice or as of the Initial Maturity Date;

(iii)     Agent shall have received a title continuation letter from the Title Company (x) confirming that the Mortgage remains a valid first-priority Lien against the Property, subject only to Permitted Encumbrances, (y) showing title to the Property vested in Borrower, and (z) showing no exceptions to title other than those previously approved by Agent or permitted under the Loan Documents, in a form reasonably satisfactory to Agent;

(iv)     Borrower shall have paid all costs and expenses actually incurred by Agent and Lender in connection with such extension, including underwriting, title and reasonable legal fees and costs;

(v)     The Loan to Value Ratio as of the Initial Maturity Date shall not exceed sixty-five percent (65%) based on an Appraisal; provided  that Borrower shall have the

16

right to repay a portion of the Outstanding Principal Balance as of the Initial Maturity Date in an amount sufficient to satisfy the foregoing Loan to Value Ratio requirement, provided that no Return Differential shall be payable in connection with any prepayment made pursuant to this Section 2.6(v);

(vi)    Final Completion shall have occurred (except the requirement therein that all Punch List Items shall have been completed) and Agent shall have received confirmation from Construction Consultant with respect thereto;

(vii)    At least fifty percent (50%) of the residential Units (as to both net sellable square footage and number of units) either (A) are subject to fully executed Unit Sale Contracts entered into in accordance with this Agreement, pursuant to which the sale thereunder is scheduled to close within ninety (90) days after the Initial Maturity Date, with no financing contingencies or adjournment rights for the applicable purchasers thereunder, and further provided there is no outstanding dispute under such applicable Unit Sale Contracts or with regard to such residential Units , or (B) have been sold (*i.e.*, fee title to such residential Units has been conveyed to the applicable purchasers pursuant to condominium unit deeds) in accordance with this Agreement;

(viii)    There shall be no challenge, action, suit, proceeding, or investigation is pending or threatened in writing against any part of the Property or Borrower by any person, in any court or before any Governmental Authority which is reasonably likely to materially interfere with the sale of Units, or otherwise materially adversely affect the value of the Property, as determined by Agent acting in its reasonable discretion;

(ix)    Guarantor continues to comply with the covenants contained in the Guaranty, Environmental Indemnity and Guaranty of Completion, and Guarantor has provided to Agent a reaffirmation of the same in a form reasonably acceptable to Agent;

(x)    Borrower shall have made a deposit into the Carry Cost Account in an amount equal to the amount required to be deposited in the Carry Cost Account pursuant to Section 7.2.1 of the Senior Loan Agreement as of the Initial Maturity Date;

(xi)    Borrower shall have made a deposit into the Interest Reserve Account in an amount equal to the amount required to be deposited in the Interest Reserve Account pursuant to Section 7.2.3 of the Senior Loan Agreement as of the Initial Maturity Date;

(xii)    Each of the Building Loan, the Senior Loan and the Project Loan must be concurrently extended to the extent the same remain outstanding;

(xiii)    Borrower shall have entered into an Interest Rate Cap Agreement for the Extension Period and complied with the provisions of Section 2.13 of the Building Loan Agreement;

(xiv)    No Shortfall shall exist as of the Initial Maturity Date; and

17

(xv)     The representations and warranties made by Borrower in the Loan Documents or otherwise made by Borrower in connection therewith after the date thereof shall have been true and correct in all material respects on the date on which made and shall also be true and correct as if remade upon the exercise of the Extension Option and on Initial Maturity Date (unless the same solely relate to a different time period).

**Section 2.7     Payments Not Conditional**. All payments required to be made by Borrower hereunder or under the Note or the other Loan Documents shall be made irrespective of, and without deduction for, any setoff, claim or counterclaim and shall be made irrespective of any defense thereto.

**Section 2.8     Initial Advance**

2.8.1     **Conditions of Initial Advance**. Section 2.8.1 of the Building Loan Agreement, and all accompanying definitions, schedules and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

**Section 2.9     Advances**

2.9.1     **Conditions of all Advances**.   Section 2.9.1 of the Building Loan Agreement, and all accompanying definitions, schedules and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

**Section 2.10   Conditions of Final Advance**. Section 2.10 of the Building Loan Agreement, and all accompanying definitions, schedules and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

**Section 2.11   No Reliance**.  All conditions and requirements of this Agreement are for the sole benefit of Agent and Lender and no other person or party (including, without limitation, the Construction Consultant, the Construction Manager and subcontractors (including, without limitation, Major Contractors) and materialmen engaged in the construction of the Project Improvements) shall have the right to rely on the satisfaction of such conditions and requirements by Borrower. Agent shall have the right, in its sole and absolute discretion, to waive any such condition or requirement and Borrower shall be authorized to rely on such waiver if and to the extent such waiver is in writing and signed by Agent.

**Section 2.12   Method of Disbursement of Loan Proceeds.**

2.12.1   **Draw Request to Be Submitted to Agent**. At such time as Borrower shall desire to obtain an Advance (the date of such Advance being required to be a Business Day), Borrower shall complete, execute and deliver to Agent a Borrower's Requisition in the form attached as Exhibit L to the Building Loan Agreement. With regard to Advances for Project Loan Costs, Borrower's Requisition shall be accompanied by:

(a)     invoices evidencing such Project Loan Costs in form reasonably acceptable to Agent; and

(b)        such other information, documentation and certification as Agent shall reasonably request with respect to the Project Loan Costs to be paid from such Advance.

2.12.2    **Procedure of Advances.** Section 2.12.2 of the Building Loan Agreement, and all accompanying definitions, schedules and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

2.12.3    **Funds Advanced**. Section 2.12.3 of the Building Loan Agreement, and all accompanying definitions, schedules and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

2.12.4    **Direct Advances to Third Parties**. Section 2.12.3 of the Building Loan Agreement, and all accompanying definitions, schedules and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

2.12.5    **One Advance Per Month**. Section 2.12.5 of the Building Loan Agreement, and all accompanying definitions, schedules and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

2.12.6    **Advances Do Not Constitute a Waiver**.  Section 2.12.6 of the Building Loan Agreement, and all accompanying definitions, schedules and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

2.12.7    **Trust Fund Provisions**.  All proceeds advanced hereunder shall be subject to the trust fund provisions of Section 13 of the Lien Law.

2.12.8    **Extension Period**. Section 2.12.8 of the Building Loan Agreement, and all accompanying definitions, schedules and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

2.12.9    **Advances and Disbursements Under Guaranty of Completion**. Section 2.12.9 of the Building Loan Agreement, and all accompanying definitions, schedules and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

**Section 2.13    Interest Rate Cap Agreement** Section 2.13 of the Building Loan Agreement, and all accompanying definitions, schedules and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

**ARTICLE III**

**CONSTRUCTION REPRESENTATIONS AND COVENANTS**

**Section 3.1    The Project Improvements.**

(a)        Borrower represents and warrants to Agent and Lender as of the Closing Date that Borrower has furnished Agent true and complete sets of the Plans and Specifications which comply with all applicable Legal Requirements (including, without

19

limitation, all requirements of the ADA), all Governmental Approvals, the requirements set forth in the Offering Plan, and are the Plans and Specifications that are the basis for all Governmental Approvals required to construct the Project Improvements, and such Plans and Specifications have been approved by any applicable Governmental Authority and Borrower's Architect as required for construction of the Project Improvements in accordance with this Agreement, and are the same Plans and Specifications submitted to Construction Manager and to all Contractors performing work at the Property.

(b)      Borrower represents and warrants to Agent and Lender as of the Closing Date that appropriate Governmental Authorities have issued all Governmental Approvals required for the commencement of construction of the Improvements in accordance with the Plans and Specifications.  Each addition to or modification of the Plans and Specifications shall be subject to approval in writing by Agent, and, to the extent required by law, by the appropriate Governmental Authorities.

(c)      Borrower shall not commence any work on any stage or phase of the Project Improvements unless all required Governmental Approvals have been issued or obtained from the appropriate Governmental Authorities with respect to the commencement of such stage or phase of construction. All Plans and Specifications shall become the property of Agent upon the occurrence of an Event of Default under the Loan Documents.

(d)      The Project Improvements shall be constructed and equipped in compliance with the requirements of the Governmental Authorities and the appropriate Board of Fire Underwriters, if any, or other similar body, if any, acting in and for the locality in which the Property is situated.  Compliance with the provisions of this Article III and any other provisions of this Agreement relating to the construction and equipping of the Project Improvements shall be determined by Agent in its sole discretion.

(e)      At all times Agent, the Construction Consultant, and their respective agents and employees, shall have the right of entry and free access to the Property to inspect the Project Improvements, subject to the rights of any third party Unit owners with respect to individual Units, provided that Agent, the Construction Consultant, and their respective agents and employees shall use reasonable efforts not to unreasonably interfere with Borrower's construction of the Project Improvements.

(f)      Borrower hereby acknowledges and agrees that neither Agent, Lender nor the Construction Consultant's approval of any Plans and Specifications (or any revisions thereto), nor its inspection of the performance of the construction, nor its right to inspect such work, shall impose upon Agent, Lender and/or Construction Consultant any obligation or liability whatsoever with respect thereto, including, without limitation, any obligation or liability that might arise as a result of such work not being performed in accordance with Legal Requirements or with the Plans and Specifications (and revisions thereto) approved by Agent, Lender and Construction Consultant or otherwise.  The review or approval by Agent, Lender and Construction Consultant of any Plans and Specifications or any revisions thereto is solely for Agent's and Lender's benefit, and is without any representation or warranty whatsoever with respect to the adequacy, correctness or efficiency thereof or otherwise.  Neither the granting by

20

Agent, Lender and/or Construction Consultant of its approval of any Plans and Specifications or any revisions thereto, shall in any manner constitute or be deemed to constitute a judgment or acknowledgment by Agent or Lender as to their legality or compliance with Legal Requirements .

Section 3.2    **Intentionally Omitted**.

Section 3.3    **Completion of Improvements.**

(a)    Borrower shall diligently pursue construction and completion of all of the Project Improvements to Substantial Completion on or prior to the Substantial Completion Date and Final Completion on or prior to the Final Completion Date, all in accordance with the Plans and Specifications, the Construction Schedule (including Major Milestones), the Business Plan, the Condominium Documents, and in compliance with all restrictions, covenants and Easements affecting the Property, all applicable Legal Requirements, all applicable Governmental Approvals, and the terms and conditions of the Loan Documents, and free and clear of all liens, encumbrances and security instruments (other than the Permitted Encumbrances).

(b)    Borrower shall promptly pay all sums and perform such duties as may be necessary to complete such construction of the Project Improvements in accordance with the applicable Plans and Specifications and in compliance with all restrictions, covenants and Easements affecting the Property, all Legal Requirements and all applicable Governmental Approvals, and in accordance with all terms and conditions of the Loan Documents free from any Liens, claims or assessments (actual or contingent) asserted against the Property for any material, labor or other items furnished in connection therewith.

(c)    Borrower agrees to use best efforts to obtain a permanent certificate of occupancy for the entire Property as soon as reasonably practicable and in any event within the time periods required by law or as set forth in the Offering Plan.

Section 3.4    **Correction of Defects**. Borrower shall promptly correct (or cause the responsible Contractor to correct) all defects in the Project Improvements or any departure from the applicable Plans and Specifications not previously approved by Agent to the extent required hereunder.  Borrower agrees that the advance of any proceeds of the Loan whether before or after such defects or departures from the applicable Plans and Specifications are discovered by, or brought to the attention of, Agent shall not constitute a waiver of Agent's right to require compliance with this covenant.

Section 3.5    **Project Loan Budget.**

3.5.1    **Generally**. Borrower has prepared a budget, which details all Project Loan Costs to be incurred by Borrower until Final Completion in accordance with the Plans and Specifications (the "**Project Loan Budget**"), which is attached hereto as Exhibit B and Borrower represents and warrants same to be its best estimate of the Project Loan Costs to be incurred by Borrower until Final Completion (including completion of all Punch List Items and obtaining a permanent certificate of occupancy) in accordance with the Plans and Specifications and all Legal Requirements. Each category of direct and indirect cost, including, without limitation, the major trades or project components within such category (the "**Line Items**"), shall be delineated in the

21

Project Budget with those that are approved as Project Related Costs to be disbursed out of Project Loan proceeds subject to availability and satisfaction of all applicable conditions to Advances hereunder, being so indicated. The Project Loan Budget shall contain a "Contingency" Line Item. Any revision to the Project Loan Budget will be subject to Agent's approval, in its sole and absolute discretion (except as expressly set forth in <u>Section 3.9</u>).

   3.5.2 **Cost Overruns**. If Borrower becomes aware of any change in Project Loan Costs which will increase a category or Line Item of Project Loan Costs reflected on the Project Loan Budget, Borrower shall promptly notify Agent in writing and promptly submit to Agent for its approval a revised Project Loan Budget. Any reallocation of any category or Line Items in the Project Loan Budget in connection with cost overruns shall be subject to Agent's approval in Agent's sole discretion (except as expressly set forth in <u>Section 3.9</u>). Agent shall have no obligation to make any further Advances unless and until the revised Project Loan Budget so submitted by Borrower, as applicable, is approved by Agent, and Agent reserves the right to approve or disapprove any revised Project Loan Budget in its sole and absolute discretion (except as expressly set forth in <u>Section 3.9</u>) and to require the funding of a Shortfall if required pursuant to <u>Section 2.1.7</u> of the Building Loan Agreement.

  **Section 3.6** **Project Budget**. Borrower represents and warrants, as of the date hereof and on each date that Borrower submits a revised Project Budget to Agent, that the Project Budget which is attached hereto as <u>Exhibit D</u> (or the revised Project Budget submitted to Agent from time to time, as applicable) is its best estimate of the Project Related Costs, Carry Costs and Debt Service to be incurred by Borrower until Final Completion and the consummation of the sale of each of the Units (including completion of all Punch List Items and obtaining a permanent certificate of occupancy) in accordance with the Plans and Specifications, Business Plan and all Legal Requirements. Any revision to the Project Budget will be subject to Agent's approval, in its sole and absolute discretion (except as expressly set forth in <u>Section 3.9</u>).

  **Section 3.7** **Feasibility**. The Construction Schedule is accurate and complete and represents the schedule of construction that the Construction Manager is required to adhere to pursuant to the Construction Management Agreement and, to Borrower's best information and belief, can be met as and when required thereunder.

  **Section 3.8** **Change Orders**. Borrower shall permit no Change Orders or deviations from any Plans and Specifications, the Construction Schedule or Project Budget or any amendment, modification or supplement to any Major Contract during construction without the prior written consent of Agent acting in its sole discretion. Any Change Orders shall clearly delineate the proposed changes to the applicable Plans and Specifications with bubbles or other clear method of indicating revisions to the prior version.

  **Section 3.9** **Cost Savings and Contingency Reserve**.

   3.9.1 <u>Reallocation of Cost Savings to Contingency.</u> With respect to Construction Costs set forth in the Project Loan Budget, after Borrower has delivered to Agent reasonably satisfactory evidence that the requirements set forth in the definition of "Cost Savings" have been satisfied, Borrower may revise the Project Loan Budget from time to time to reallocate demonstrated Cost Savings available under any Line Item for other Construction Costs in the

22

Project Loan Budget (but not for any costs in the Building Loan Budget) to the "Contingency" Line Item in the Project Loan Budget (and subsequently utilized in accordance with Section 3.9.2).

       3.9.2   Reallocation of Contingency to Other Line Items. Subject to the prior written approval of Agent, Borrower may reallocate "Contingency" in the Project Loan Budget to other Line Items for Construction Costs in the Project Loan Budget, provided, however, that Lender shall not unreasonably withhold its approval to such reallocation of "Contingency" to other Line Items of the Project Loan Budget if the amount so reallocated (together with all other amounts of "Contingency" previously reallocated), when expressed as a percentage of total "Contingency" in the Project Loan Budget (taking into account demonstrated Cost Savings reallocated pursuant to Section 3.9.1), is equal to or less than the percentage of completion of the Project Improvements at the time of such reallocation; except that Agent's consent shall not be required for the reallocation of the first 20% of the "Contingency" line item (as of the Closing Date) to other Line Items of the Project Loan Budget.

**Section 3.10   Intentionally Omitted**.

**Section 3.11   Construction Consultant.**

       3.11.1   Borrower acknowledges that (i) the Construction Consultant has been retained by Agent to act as a consultant and only as a consultant to Agent in connection with the construction of the Project Improvements and has no duty to Borrower, (ii) the Construction Consultant shall in no event have any power or authority to give any approval or consent or to do any other act or thing which is binding upon Agent, (iii) Agent reserves the right to make any and all decisions required to be made by Agent under this Agreement and to give or refrain from giving any and all consents or approvals required to be given by Agent under this Agreement and to accept or not accept any matter or thing required to be accepted by Agent under this Agreement, and without being bound or limited in any manner or under any circumstance whatsoever by any opinion expressed or not expressed, or advice given or not given, or information, certificate or report provided or not provided, by the Construction Consultant with respect thereto, (iv) Agent reserves the right in its sole and absolute discretion to disregard or disagree, in whole or in part, with any opinion expressed, advice given or information, certificate or report furnished or provided by the Construction Consultant to Agent or any other person or party, and (v) Agent reserves the right to replace the Construction Consultant with another construction consultant at any time and without prior notice to or approval by Borrower.

       3.11.2   The Construction Consultant shall perform the following services on behalf of Agent:

         (a)     Prepare the Project Reports;

         (b)     Review and advise Agent whether, in the opinion of the Construction Consultant, the Plans and Specifications  are satisfactory;

         (c)     Review Draw Requests and Change Orders;

23

(d)      Make inspections and visits in accordance with <u>Section 5.1.5</u> of the Building Loan Agreement;

(e)      Attend all meetings of any nature relating to the Project;

(f)      Review any Contracts, Governmental Approvals or other documentation relating to the Project requested by Agent or the Construction Consultant; and

(g)      Take such other actions deemed necessary by Agent or the Construction Consultant in order to effectively administer and review the Project.

3.11.3   The fees of the Construction Consultant shall be paid by Borrower (and expenses incurred by Agent on account thereof shall be reimbursed to Agent) after Borrower receives the Construction Consultant's invoice approved by Agent for payment to the extent such fees are set forth in the Project Budget or, if not set forth in the Project Budget, within fifteen (15) days of request therefor, but neither Agent nor the Construction Consultant shall have any liability to Borrower on account of (i) the services performed by the Construction Consultant, (ii) any neglect or failure on the part of the Construction Consultant to properly perform its services or (iii) any approval by the Construction Consultant of construction of the Project Improvements. Neither Agent nor the Construction Consultant assumes any obligation to Borrower or any other Person concerning the quality of construction of the Project Improvements or the absence therefrom of defects.

**ARTICLE IV**

**REPRESENTATIONS AND WARRANTIES**

**Section 4.1    Borrower Representations**.  The representations and warranties set forth in Section 4.1 of the Building Loan Agreement, and all accompanying definitions, schedules and exhibits, are hereby incorporated herein by reference as if fully set forth herein and remade by Borrower; <u>provided</u>, <u>however</u>, that all references to "Building Loan," "Building Loan Mortgage," "Building Loan Note," and "Building Loan Documents," shall be replaced with references to the "Project Loan," "Project Loan Mortgage," "Project Loan Note," and "Project Loan Documents," respectively.

**Section 4.2    Incorporation of Representations**. All representations and warranties contained in any other Loan Document (including, without limitation, any Officer's Certificate) furnished to Agent by or on behalf of Borrower, as part of or in support of its application for the Loan or pursuant to this Agreement or any of the other Loan Documents are hereby incorporated by reference as if fully set forth herein.

**Section 4.3    Survival of Representations**. Borrower agrees that all of the representations and warranties of Borrower set forth in <u>Section 4.1</u> of the Building Loan Agreement and elsewhere in this Agreement and in the other Loan Documents shall survive for so long as any amount remains owing to Agent or Lender under this Agreement or any of the other Loan Documents by Borrower. All representations, warranties, covenants and agreements made in this Agreement or in the other Loan Documents by Borrower shall be deemed to have been relied

24

upon by Agent and Lender notwithstanding any investigation heretofore or hereafter made by Agent and Lender or on their behalf.

**ARTICLE V**

**BORROWER COVENANTS**

**Section 5.1    Affirmative Covenants**. The covenants set forth in Section 5.1 of the Building Loan Agreement, and all accompanying definitions, schedules and exhibits, are hereby incorporated herein by reference as if fully set forth herein and remade by Borrower; provided, however, that all references to "Building Loan," "Building Loan Mortgage," "Building Loan Note," and "Building Loan Documents," shall be replaced with references to the "Project Loan," "Project Loan Mortgage," "Project Loan Note," and "Project Loan Documents," respectively.

**Section 5.2    Negative Covenants**.  The covenants set forth in Section 5.2 of the Building Loan Agreement, and all accompanying definitions, schedules and exhibits, are hereby incorporated herein by reference as if fully set forth herein and remade by Borrower; provided, however, that all references to "Building Loan," "Building Loan Mortgage," "Building Loan Note," and "Building Loan Documents," shall be replaced with references to the "Project Loan," "Project Loan Mortgage," "Project Loan Note," and "Project Loan Documents," respectively.

**Section 5.3    Covenants after Conversion**. From and after the Conversion until the Board Turnover Date, each covenant in the Building Loan Agreement or any other Loan Document requiring Borrower to take (or refrain from taking) any action shall be read to also require Borrower to, prior to the Board Turnover Date, cause the Condominium Board to take (or refrain from taking) such action (without excusing Borrower from performance of the same to the extent such covenant is capable of being performed by Borrower), subject to Borrower's fiduciary duty as a member of the Condominium Board. From and after the Board Turnover Date, each covenant in the Building Loan Agreement or any other Loan Document requiring Borrower to take (or refrain from taking) any action shall be read to also require Borrower to cause the members of the Condominium Board designated by Borrower to vote in a manner consistent with such covenant (without excusing Borrower from performance of the same to the extent such covenant is capable of being performed by Borrower), subject to Borrower's fiduciary duty as a member of the Condominium Board.

**ARTICLE VI**

**INSURANCE; CASUALTY;
CONDEMNATION; REQUIRED REPAIRS**

**Section 6.1    Incorporation of Building Loan Agreement**. Article VI of the Building Loan Agreement, and all accompanying definitions, schedules and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

25

## ARTICLE VII

## RESERVE FUNDS

**Section 7.1      Deposit Account**. Borrower shall cause all Gross Revenue (other than amounts in respect of Net Sales Proceeds, which shall be deposited directly in the Deposit Account pursuant to this <u>Section 7.1</u> to the extent Gross Sales Proceeds are not in escrow pursuant to <u>Section 5.1.32</u> of the Building Loan Agreement and/or pursuant to the Condominium Documents) to be transmitted directly into a trust account (the "**Clearing Account**") established on or prior to the Closing Date and maintained by Borrower at a bank that is an Eligible Institution and is reasonably approved by Lender (the "**Clearing Bank**"), as more fully described in the Clearing Account Control Agreement executed in connection with the opening of the Clearing Account. Borrower shall cause all Net Sales Proceeds (to the extent Gross Sales Proceeds are not in escrow pursuant to <u>Section 5.1.32</u> of the Building Loan Agreement and/or pursuant to the Condominium Documents) to be transmitted directly into the Deposit Account. Without in any way limiting the foregoing, if Borrower or any other Person shall receive any Net Sales Proceeds or other Gross Revenue from the Property, then (i) such amounts shall be deemed to be collateral for the Obligations and shall be held in trust for the benefit, and as the property, of Agent (on behalf of Lender), (ii) such amounts shall not be commingled with any other funds or property of Borrower or such Person, and (iii) Borrower or such Person shall deposit (x) such Gross Revenue (other than Net Sales Proceeds) in the Clearing Account, and (y) such Net Sales Proceeds in the Deposit Account, in each case, within one (1) Business Day of receipt. All funds deposited into the Clearing Account shall be swept by the Clearing Bank on a daily basis into the Deposit Account. Funds deposited into the Deposit Account shall be applied and disbursed in accordance with this Agreement. Agent may also establish subaccounts of the Deposit Account which shall at all times be Eligible Accounts (or may be ledger or book entry accounts and not actual accounts) (such Deposit Account along with the Clearing Account, the Carry Cost Account, the Interest Reserve Account and the Rebalancing Reserve Account and all other accounts and subaccounts established pursuant to the Loan Documents are referred to herein as "**Accounts**"). The Deposit Account and all other Accounts will be under the sole control and dominion of Agent, and Borrower shall have no right of withdrawal therefrom.  Borrower shall pay for all expenses of opening and maintaining all of the Accounts.  Failure to make any deposit into any Account as and when required pursuant to this Agreement shall be an immediate Event of Default.

**Section 7.2      Reserve Accounts**. Section 7.2 of the Senior Loan Agreement, and all accompanying definitions, schedules and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

**Section 7.3      Security Interest in Funds**. Section 7.3 of the Building Loan Agreement, and all accompanying definitions, schedules and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

**Section 7.4      Order of Priority of Funds in Deposit Account**.  Section 7.4 of the Senior Loan Agreement, and all accompanying definitions, schedules and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

26

# ARTICLE VIII

## DEFAULTS

**Section 8.1     Event of Default**.

(a)     Each of the following events, after the giving of any required notice and the passage of any applicable grace or cure period expressly set forth below (without the alleged failure or breach having been cured), shall constitute an event of default hereunder (an "**Event of Default**"):

(i)     if any portion of the Total Debt is not paid when due;

(ii)     if Borrower shall fail to make any deposit into any Account (including, without limitation, the Carry Cost Account, the Interest Reserve Account and the Rebalancing Reserve Account) as and when required hereunder;

(iii)     if the Policies are not kept in full force and effect, or if certified copies of the Policies are not delivered to Agent as and when required pursuant to the terms hereof;

(iv)     any Transfer other than a Permitted Transfer occurs without Agent's prior written consent;

(v)     if, any representation or warranty made by any Borrower Party herein or in any other Loan Document, or in any report, certificate, financial statement or other instrument, agreement or document furnished to Agent or Lender shall have been false or misleading in any material respect as of the date the representation or warranty was made, repeated or deemed repeated;

(vi)     if any Borrower Party (1) shall make an assignment for the benefit of creditors, (2) has admitted in writing its inability to pay its debts or (3) is not Solvent; or Borrower shall not generally be paying its debts as they become due;

(vii)     if a receiver, liquidator or trustee shall be appointed for any Borrower Party or if any Borrower Party shall be adjudicated a bankrupt or insolvent, or if any petition for bankruptcy, reorganization or arrangement pursuant to federal bankruptcy law, or any similar federal or state law, shall be filed by or against, consented to, or acquiesced in by, any Borrower Party, or if any proceeding for the dissolution or liquidation of any Borrower Party shall be instituted; provided, however, if such appointment, adjudication, petition or proceeding was involuntary and not consented to, acquiesced in by or solicited by any Borrower Party, such Event of Default shall be deemed cured and no longer continuing if such proceeding is discharged, stayed or dismissed within ninety (90) days of commencement of the same;

27

(viii)   if any Borrower Party attempts to transfer its rights under this Agreement or any of the other Loan Documents or any interest herein or therein in contravention of the Loan Documents;

(ix)   if Borrower breaches any covenant contained in Section 2.4.2(c), Article III, Sections 4.1.21, 4.1.29, 4.1.44, 5.1.18, 5.1.23, 5.1.24, 5.1.27, 5.1.32 or 5.2 of the Building Loan Agreement;

(x)   if Borrower breaches the covenants set forth in Section 5.1.12 of the Building Loan Agreement and such breach is not cured within ten (10) Business Days of Borrower receiving notice of the same;

(xi)   if one or more judgments or decrees shall be entered against (i) Borrower involving in the aggregate a liability in excess of $250,000, or against Guarantor (collectively) involving in the aggregate a liability in excess of $1,000,000, and in either case, the same shall not have been vacated, bonded, satisfied or stayed pending appeal within thirty (30) days from the date of entry of such judgment;

(xii)   if any Borrower Party breaches any covenant, warranty or representation contained in any of the Loan Documents beyond any applicable notice and cure period, including without limitation, any obligation of Guarantor under the Guaranty, or if any Borrower Party shall for any reason contest, repudiate or purport to revoke any Loan Document;

(xiii)   if any Major Milestone has not been timely satisfied as provided in the definition of "Major Milestones";

(xiv)   if Key Man ceases to (A) be actively involved in the Project and the day to day operation and management thereof, or (B) directly or indirectly Control Borrower, Construction Manager or the operation and development of the Project; except that, only in the case of death or incapacity of Key Man, such failure shall not constitute an Event of Default if within twenty (20) days of such death or incapacity, an individual is appointed as the replacement for Key Man (which such individual shall satisfy the provisions of this Agreement applicable to Key Man, other than any specific ownership requirement) subject to the prior written approval of Agent in its sole but reasonable discretion;

(xv)   if any draw request is fraudulently submitted by Borrower or in connection with any Advance for services performed or for materials used in or furnished for the Property;

(xvi)   if, following the commencement of construction of the Project Improvements, there is any cessation at any time in construction of the Project Improvements for more than fifteen (15) consecutive Business Days after notice thereof and a failure to resume construction within such period, other than as a result of Force Majeure;

(xvii)   if Borrower expressly confesses in writing to Agent or Lender its inability to continue or complete construction of the Project Improvements in accordance with the Building Loan Agreement;

(xviii) if Agent, the Construction Consultant or either of their representatives are not permitted at all reasonable times upon not less than one (1) Business Days' notice to enter upon the Property in violation of this Agreement to inspect the Improvements and the construction thereof and all materials, fixtures and articles used or to be used in the construction and to examine all the Plans and Specifications, or if Borrower shall fail to furnish to Agent or its authorized representative, when requested upon not less than three (3) Business Days' notice, copies of the Plans and Specifications and any other information required to be delivered to Agent pursuant to the Loan Documents, to the extent in any Borrower Related Party's possession or control;

(xix)   the occurrence of any event or circumstance set forth herein or in any other Loan Document that is stated to be an Event of Default;

(xx)   if the Property shall be taken (other than as a result of a Condemnation in accordance with the Building Loan Agreement), attached, sequestered on execution or other process of law in any action against Borrower; and such action is not stayed or bonded over in a manner acceptable to Agent within ten (10) Business Days thereof, or is not capable of being bonded over or stayed in a manner acceptable to Agent;

(xxi)   [Intentionally omitted];

(xxii)  if Borrower shall be in default under and as defined in any Condominium Document and such default remains uncured beyond any applicable notice or cure period provided for in such Condominium Documents;

(xxiii) if any Governmental Approval is withdrawn, suspended or cancelled, terminated or modified to the detriment of Borrower (including, without limitation, if at any time the DOL or any other applicable Governmental Authority prohibits, or requires Borrower to discontinue or cease, the sales of Units for any reason), the Property or the construction of any of the Project Improvements or any stop work order is issued, unless Borrower restates and confirms in all respects such Governmental Approval or terminates such stop work order within a period of twenty (20) Business Days thereafter;

(xxiv)  if any Loan Documents shall fail to be in full force and effect to give Agent or Lender the Liens, rights, powers and privileges purported to be created thereby, or if any Borrower Party shall assert that any Loan Document is not in full force and effect or fails to give Agent or Lender the Liens, rights, powers and privileges purported to be created thereby;

(xxv)  if Borrower shall continue to be in Default under any of the other terms, covenants or conditions of this Agreement not specified in subsections (i) through (xxiv) above or subsections (xxvi) through (xxviii) below, for ten (10) days

29

after notice to Borrower from Agent, in the case of any Default which can be cured by the payment of a sum of money, or for thirty (30) days after notice from Agent in the case of any other Default; provided, however, that if such non-monetary Default is susceptible of cure but cannot reasonably be cured within such thirty (30) day period and provided, further, that Borrower shall have commenced to cure such Default within such thirty (30) day period and thereafter diligently and expeditiously proceeds to cure the same, such thirty (30) day period shall be extended for such time as is reasonably necessary for Borrower in the exercise of due diligence to cure such Default, such additional period not to exceed seventy-five (75) days; or

(xxvi) if there shall be a default by any Borrower Party or any other Affiliate of Borrower under any of the other Loan Documents, beyond applicable cure periods, if any, contained in such Loan Documents;

(xxvii) Borrower fails to comply with any of the terms, covenants or conditions of Section 9.2 of the Building Loan Agreement after expiration of ten (10) Business Days after notice thereof from Agent; or

(xxviii) if there shall be a default by Guarantor of its covenants under the Guaranty, beyond applicable cure periods, if any, contained in the Guaranty.

(b)     Upon the occurrence of an Event of Default and at any time thereafter, in addition to any other rights or remedies available to it pursuant to this Agreement and the other Loan Documents or at law or in equity, Agent may take such action, without notice or demand, that Agent deems advisable to protect and enforce the rights of Agent and Lender against Borrower and the Property, including, without limitation, declaring the Total Debt to be immediately due and payable, and Agent may enforce or avail itself of any or all rights or remedies provided in the Loan Documents against Borrower and any or all of the Property and/or the Collateral, including, without limitation, all rights or remedies available at law or in equity; and upon any Event of Default described in clauses (vi) or (vii) above, the Total Debt and Other Obligations of Borrower hereunder and under the other Loan Documents shall immediately and automatically become due and payable, without notice or demand, and Borrower hereby expressly waives any such notice or demand, anything contained herein or in any other Loan Document to the contrary notwithstanding.

Section 8.2    Remedies.

(a)     Upon the occurrence of and during the continuance of an Event of Default, all or any one or more of the rights, powers, privileges and other remedies available to Agent against Borrower under this Agreement or any of the other Loan Documents executed and delivered by, or applicable to, Borrower or at law or in equity may be exercised by Agent at any time and from time to time, whether or not all or any of the Total Debt shall be declared due and payable, and whether or not Agent shall have commenced any foreclosure proceeding or other action for the enforcement of its rights and remedies under any of the Loan Documents with respect to all or any part of the Property and/or the Collateral.  Any such actions taken by Agent shall be cumulative and concurrent and may be pursued independently, singularly, successively,

30

together or otherwise, at such time and in such order as Agent may determine in its sole discretion, to the fullest extent permitted by law, without impairing or otherwise affecting the other rights and remedies of Agent and Lender permitted by law, equity or contract or as set forth herein or in the other Loan Documents. Without limiting the generality of the foregoing, Borrower agrees that if an Event of Default is continuing (i) Agent is not subject to any "one action" or "election of remedies" law or rule, and (ii) all liens and other rights, remedies or privileges provided to Agent shall remain in full force and effect until Agent has exhausted all of its remedies against the Property and/or the Collateral and the Mortgage has been foreclosed, sold and/or otherwise realized upon in satisfaction of the Total Debt or the Total Debt has been paid in full.

(b)     With respect to Borrower, the Property and the Collateral, nothing contained herein or in any other Loan Document shall be construed as requiring Agent to resort to the Property or the Collateral for the satisfaction of any of the Total Debt in any preference or priority, and Agent may seek satisfaction out of the Property and/or the Collateral, or any part thereof, in its absolute discretion in respect of the Total Debt.  In addition, Agent shall have the right from time to time following an Event of Default to partially foreclose the Mortgage or any Pledge in any manner and for any amounts secured by the Mortgage and/or the Pledge Agreements then due and payable as determined by Agent in its sole discretion including, without limitation, the following circumstances:  (i) in the event Borrower Defaults in the payment of one or more scheduled payments of principal and interest, Agent may foreclose the Mortgage and/or the Pledge Agreement to recover such delinquent payments or (ii) in the event Agent elects to accelerate less than the entire Outstanding Principal Balance of the Loan, Agent may foreclose the Mortgage and/or the Pledge Agreement to recover so much of the principal balance of the Loan as Agent may accelerate and such other sums secured by the Mortgage and/or the Pledge Agreement as Agent may elect. Notwithstanding one or more partial foreclosures, the Property and the Collateral shall remain subject to the Mortgage and the Pledge Agreements, as applicable, to secure payment of sums secured by the Mortgage and/or the Pledge Agreement, and not previously recovered.

(c)     In addition to all remedies conferred it by law and by the terms of this Agreement and the other Loan Documents, upon the occurrence and during the existence of an Event of Default, Agent (for the benefit of Lender) may pursue any one or more of the following remedies concurrently or successively, it being the intent hereof that none of such remedies shall be to the exclusion of any other, and with full rights to reimbursement from Borrower and any Guarantor:

(i)     take possession of the Property and complete any construction work at the Property, including, without limitation, the right to avail itself of and procure performance of existing contracts or let any contracts with the same contractors or others and to employ watchmen to protect the Property from injury.  Without restricting the generality of the foregoing and for the purposes aforesaid to be exercised during the existence and continuance of an Event of Default, Borrower hereby appoints and constitutes Agent (for the benefit of Lender) its lawful attorney-in-fact with full power of substitution to complete any construction work at the Property in the name of Borrower;

(ii)     except as set forth herein, use Reserve Funds to complete any construction work at the Property;

31

(iii)     enter into Change Orders which shall be necessary or desirable to complete any construction work at the Property in substantially the manner contemplated by such Plans and Specifications;

(iv)     retain or employ new general contractors, subcontractors, architects, engineers and inspectors as shall be required for said purposes; to pay, settle or compromise all existing bills and claims which may be liens or security interests, or to avoid such bills and claims becoming liens against the Property, or as may be necessary or desirable for the completion of any construction work at the Property or for the clearance of title to the Property;

(v)     execute all applications and certificates in the name of Borrower which may be required by any of the contract documents;

(vi)     prosecute and defend all actions or proceedings in connection with any construction work at the Property; and

(vii)     take any action and require such performance as it deems necessary to be furnished hereunder and to make settlements and compromises with the surety or sureties thereunder, and in connection therewith, to execute instruments of release and satisfaction.

**Section 8.3     Remedies Cumulative; Waivers**. The rights, powers and remedies of Agent and Lender under this Agreement shall be cumulative and not exclusive of any other right, power or remedy which Agent or Lender may have against Borrower pursuant to this Agreement or the other Loan Documents, or existing at law or in equity or otherwise. Agent's and Lender's rights, powers and remedies may be pursued singularly, concurrently or otherwise, at such time and in such order as Agent may determine in Agent's sole discretion. No delay or omission to exercise any remedy, right or power accruing upon an Event of Default shall impair any such remedy, right or power or shall be construed as a waiver thereof, but any such remedy, right or power may be exercised from time to time and as often as may be deemed expedient. A waiver of one Default or Event of Default with respect to Borrower shall not be construed to be a waiver of any subsequent Default or Event of Default by Borrower or to impair any remedy, right or power consequent thereon.

## ARTICLE IX

## SPECIAL PROVISIONS

**Section 9.1     Incorporation of Building Loan Agreement**. Article IX of the Building Loan Agreement, and all accompanying definitions, schedules and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

32

# ARTICLE X

# MISCELLANEOUS

**Section 10.1   Survival**.  This Agreement and all covenants, agreements, representations and warranties made herein and in the certificates delivered pursuant hereto shall survive the making by Lender of the Loan and the execution and delivery to Lender of the Note, and shall continue in full force and effect so long as all or any of the Obligations are outstanding and unpaid unless a longer period is set forth herein or in the other Loan Documents.  Whenever in this Agreement any of the parties hereto is referred to, such reference shall be deemed to include the legal representatives, successors and assigns of such party.   All covenants, promises and agreements in this Agreement, by or on behalf of Borrower, shall inure to the benefit of the legal representatives, successors and assigns of Agent and Lender.

**Section 10.2   Agent's and Lender's Discretion**.  Whenever pursuant to this Agreement, Agent or Lender exercises any right given to it to approve or disapprove, or any arrangement or term is to be satisfactory to Agent or Lender, the decision of Agent or Lender to approve or disapprove or to decide whether arrangements or terms are satisfactory or not satisfactory shall (except as is otherwise expressly otherwise herein provided) be in the sole and absolute discretion of Agent or Lender and shall be final and conclusive.  All consents or approvals of Agent or Lender given by Agent or Lender pursuant to the Loan Documents shall not be deemed to have given by Agent or Lender unless such consent or approval is in writing. Whenever pursuant to this Agreement or any other Loan Document, Agent or Lender are required to be reasonable in making any determination or granting any consent or approval, such qualification of reasonability shall be disregarded at any time that an Event of Default has occurred and is continuing.

**Section 10.3   Governing Law**.

(A)   THIS AGREEMENT WAS NEGOTIATED IN THE STATE OF NEW YORK, THE LOAN WAS MADE BY LENDER AND ACCEPTED BY BORROWER IN THE STATE OF NEW YORK, AND THE PROCEEDS OF THE LOAN DELIVERED PURSUANT HERETO WERE DISBURSED FROM THE STATE OF NEW YORK, WHICH STATE THE PARTIES AGREE HAS A SUBSTANTIAL RELATIONSHIP TO THE PARTIES AND TO THE UNDERLYING TRANSACTION EMBODIED HEREBY, AND IN ALL RESPECTS, INCLUDING, WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE, THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS AND THE OBLIGATIONS ARISING HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK APPLICABLE TO CONTRACTS MADE AND PERFORMED IN SUCH STATE (WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAWS) AND ANY APPLICABLE LAW OF THE UNITED STATES OF AMERICA, EXCEPT THAT AT ALL TIMES THE PROVISIONS FOR THE CREATION, PERFECTION, AND ENFORCEMENT OF THE LIEN AND SECURITY INTEREST CREATED PURSUANT HERETO AND PURSUANT TO THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED ACCORDING TO THE LAW OF THE STATE IN WHICH THE PROPERTY IS LOCATED, IT BEING

33

UNDERSTOOD THAT, TO THE FULLEST EXTENT PERMITTED BY THE LAW OF SUCH STATE, THE LAW OF THE STATE OF NEW YORK SHALL GOVERN THE CONSTRUCTION, VALIDITY AND ENFORCEABILITY OF ALL LOAN DOCUMENTS AND ALL OF THE OBLIGATIONS ARISING HEREUNDER OR THEREUNDER.  TO THE FULLEST EXTENT PERMITTED BY LAW, BORROWER, AGENT AND LENDER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVE ANY CLAIM TO ASSERT THAT THE LAW OF ANY OTHER JURISDICTION GOVERNS THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS, AND THIS AGREEMENT, THE NOTE AND THE OTHER LOAN DOCUMENTS SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK PURSUANT TO SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW.

(B)     ANY LEGAL SUIT, ACTION OR PROCEEDING AGAINST AGENT, LENDER OR BORROWER ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE OTHER LOAN DOCUMENTS MAY AT AGENT'S OPTION BE INSTITUTED IN ANY FEDERAL OR STATE COURT IN THE CITY OF NEW YORK, COUNTY OF NEW YORK, PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW AND BORROWER, AGENT AND LENDER WAIVE ANY OBJECTIONS WHICH IT MAY NOW OR HEREAFTER HAVE BASED ON VENUE AND/OR FORUM NON CONVENIENS OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND BORROWER, AGENT AND LENDER HEREBY IRREVOCABLY SUBMIT TO THE EXCLUSIVE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING.  BORROWER AGREES THAT SERVICE OF PROCESS UPON BORROWER AT THE ADDRESS SET FORTH HEREIN AND WRITTEN NOTICE OF SAID SERVICE MAILED OR DELIVERED TO BORROWER IN THE MANNER PROVIDED HEREIN WITH COPIES TO BORROWER'S COUNSEL AT ITS ADDRESS SET FORTH BELOW SHALL BE DEEMED IN EVERY RESPECT EFFECTIVE SERVICE OF PROCESS UPON BORROWER IN ANY SUCH SUIT, ACTION OR PROCEEDING IN THE STATE OF NEW YORK.  BORROWER (I) SHALL GIVE PROMPT NOTICE TO AGENT OF ANY CHANGE IN THE ADDRESS FOR BORROWER SET FORTH HEREIN, (II) MAY AT ANY TIME AND FROM TIME TO TIME DESIGNATE AN AUTHORIZED AGENT WITH AN OFFICE IN NEW YORK, NEW YORK, AND (III) SHALL PROMPTLY DESIGNATE AN AUTHORIZED AGENT IF BORROWER CEASES TO HAVE AN OFFICE IN NEW YORK, NEW YORK.  NOTHING CONTAINED HEREIN SHALL AFFECT THE RIGHT OF AGENT OR LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW.

**Section 10.4  Modification, Waiver in Writing**.  No modification, amendment, extension, discharge, termination or waiver of any provision of this Agreement, or of the Note, or of any other Loan Document, nor consent to any departure by Borrower therefrom, shall in any event be effective unless the same shall be in a writing signed by the party against whom enforcement is sought, and then such waiver or consent shall be effective only in the specific instance, and for the purpose, for which given.  Except as otherwise expressly provided herein, no notice to, or demand on Borrower, shall entitle Borrower to any other or future notice or demand in the same, similar or other circumstances.

**Section 10.5   Delay Not a Waiver**.  Neither any failure nor any delay on the part of Agent or Lender in insisting upon strict performance of any term, condition, covenant or agreement, or exercising any right, power, remedy or privilege hereunder, or under the Note or under any other Loan Document, or any other instrument given as security therefor, shall operate as or constitute a waiver thereof, nor shall a single or partial exercise thereof preclude any other future exercise, or the exercise of any other right, power, remedy or privilege.  In particular, and not by way of limitation, by accepting payment after the due date of any amount payable under this Agreement, the Note or any other Loan Document, Agent and Lender shall not be deemed to have waived any right either to require prompt payment when due of all other amounts due under this Agreement, the Note or the other Loan Documents, or to declare a default for failure to effect prompt payment of any such other amount.

**Section 10.6   Notices**.  All notices, demands, requests, consents, approvals or other communications (any of the foregoing, a "Notice") required, permitted or desired to be given hereunder shall be in writing and shall be (i) delivered by hand (with signed acknowledgement of receipt by the designated recipient) or (ii) by reputable overnight courier, addressed to the party to be so notified at its address hereinafter set forth, or to such other address as such party may hereafter specify in accordance with the provisions of this Section 10.6. Notwithstanding the foregoing, any ordinary course communications related to the loan, including requests for leasing approvals and delivery of financial reporting (but not any request for other consent or modification of the Loan) may be delivered by electronic mail, provided that the subject line of such electronic mail correspondence begins with the following words in all capital letters: "MESSAGE CONTAINS WRITTEN NOTICE UNDER LOAN DOCUMENTS," and provided further that such notice shall not be deemed given if the sender of the same receives a reply indicating that the message was not delivered to any of its intended recipients.  Any Notice shall be deemed to have been received:  (a) on the next Business Day if sent by an overnight commercial courier and (b) on the date of delivery by hand if delivered and acknowledged during business hours of a Business Day, and in each case addressed to the parties as follows:

|  |  |
|---|---|
| If to Agent: | Deutsche Bank AG New York Branch |
|  | 60 Wall Street, 10th Floor |
|  | New York, NY  10005 |
|  | Attention: Ian McColough |
|  | Facsimile No.  (212) 797-4489 |
|  | Email: ian.mccolough@db.com |
|  |  |
| with a copy to: | Gibson Dunn & Crutcher LLP |
|  | 200 Park Avenue |
|  | New York, NY 10166 |
|  | Attention:  Eric M. Feuerstein, Esq. |
|  | Facsimile No. (212) 351-5223 |
|  | Email: efeuerstein@gibsondunn.com |

35

with a copy to:      Hanover Street Capital, LLC
48 Wall Street, 14th Floor
New York, NY  10005
Attention:  Amy Sinensky
Facsimile No. 212-380-9405
Email: amy.sinensky@hanoverstcap.com

If to Lender:      German American Capital Corporation
60 Wall Street, 10th Floor
New York, NY 10005
Attention: Ian McColough
Facsimile No. 212-797-4489
Email: ian.mccolough@db.com

with a copy to:      Gibson Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166
Attention:  Eric M. Feuerstein, Esq.
Facsimile No. (212) 351-5223
Email: efeuerstein@gibsondunn.com

with a copy to:      Hanover Street Capital, LLC
48 Wall Street, 14th Floor
New York, NY  10005
Attention:  Amy Sinensky
Facsimile No. 212-380-9405
Email: amy.sinensky@hanoverstcap.com

If to Borrower:      135 West 52nd Street Owner LLC
c/o The Chetrit Group, LLC
512 Seventh Avenue
New York, NY  10018
Attention:  Meyer Chetrit
Facsimile No. (646) 230-9372
Email: mc@chetritgroup.com

with a copy to:      David Bistricer
4611 Twelfth Avenue
Apartment 1L
Brooklyn, NY 11219
Facsimile No. 718-435-3848
Email: david@clipperequity.com

with a copy to:      Sukenik, Segal & Graff, P.C.
404 Fifth Avenue, Fifth Floor
New York, N.Y. 10018

36

Attention:  Josh Graff, Esq.
Facsimile No. (212) 779-8095
Email: jgraff@ssglaw.com

Any party may change the address to which any such Notice is to be delivered by furnishing ten (10) days' written notice of such change to the other parties in accordance with the provisions of this Section 10.6.  Notices shall be deemed to have been given on the date set forth above, even if there is an inability to actually deliver any Notice because of a changed address of which no Notice was given or there is a rejection or refusal to accept any Notice offered for delivery.  Notice for any party may be given by its respective counsel.  Additionally, Notice from Agent may also be given by Servicer.

**Section 10.7   Trial by Jury**.   BORROWER, AGENT AND LENDER HEREBY AGREE NOT TO ELECT A TRIAL BY JURY OF ANY ISSUE TRIABLE OF RIGHT BY JURY, AND WAIVES ANY RIGHT TO TRIAL BY JURY FULLY TO THE EXTENT THAT ANY SUCH RIGHT SHALL NOW OR HEREAFTER EXIST WITH REGARD TO THE LOAN DOCUMENTS, OR ANY CLAIM, COUNTERCLAIM OR OTHER ACTION ARISING IN CONNECTION THEREWITH.  THIS WAIVER OF RIGHT TO TRIAL BY JURY IS GIVEN KNOWINGLY AND VOLUNTARILY BY BORROWER, AGENT AND LENDER, AND IS INTENDED TO ENCOMPASS INDIVIDUALLY EACH INSTANCE AND EACH ISSUE AS TO WHICH THE RIGHT TO A TRIAL BY JURY WOULD OTHERWISE ACCRUE.  AGENT IS HEREBY AUTHORIZED TO FILE A COPY OF THIS PARAGRAPH IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER BY BORROWER.

**Section 10.8   Headings**.  The Article and/or Section headings and the Table of Contents in this Agreement are included herein for convenience of reference only, shall in no way affect the interpretation of this Agreement and shall not constitute a part of this Agreement for any other purpose.

**Section 10.9   Severability**.  Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Agreement.

**Section 10.10 Preferences**.   Agent and Lender shall have the continuing and exclusive right to apply or reverse and reapply any and all payments by Borrower to any portion of the obligations of Borrower hereunder in accordance with this Agreement.   To the extent Borrower makes a payment or payments to Agent or Lender, which payment or proceeds or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, receiver or any other party under any bankruptcy law, state or federal law, common law or equitable cause, then, to the extent of such payment or proceeds received, the obligations hereunder or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment or proceeds had not been received by Agent or Lender.

**Section 10.11 Waiver of Notice**.   Borrower shall not be entitled to any notices of any nature whatsoever from Agent or Lender except with respect to matters for which this Agreement

37

or the other Loan Documents specifically and expressly provide for the giving of notice by Agent to Borrower and except with respect to matters for which Borrower is not, pursuant to applicable Legal Requirements, permitted to waive the giving of notice.  Borrower hereby expressly waives the right to receive any notice from Agent or Lender with respect to any matter for which this Agreement or the other Loan Documents do not specifically and expressly provide for the giving of notice by Agent to Borrower.

     **Section 10.12  Remedies of Borrower**.  In the event that a claim or adjudication is made that Agent or Lender or its agents have acted unreasonably or unreasonably delayed acting in any case where by law or under this Agreement or the other Loan Documents, Agent, Lender or such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Agent, Lender nor its agents shall be liable for any monetary damages, and Borrower's sole remedies shall be limited to commencing an action seeking injunctive relief or declaratory judgment.  The parties hereto agree that any action or proceeding to determine whether Agent or Lender has acted reasonably shall be determined by an action seeking declaratory judgment.

     **Section 10.13  Expenses; Indemnity**.

         (a)     Borrower covenants and agrees to pay or, if Borrower fails to pay, to reimburse, Agent upon receipt of written notice from Agent for all actual out-of-pocket costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) incurred by Agent, Lender or their Affiliates in connection with (i) the preparation, negotiation, execution and delivery of this Agreement and the other Loan Documents and the consummation of the transactions contemplated hereby and thereby and all the costs of furnishing all opinions by counsel for Borrower (including without limitation any opinions requested by Agent or Lender as to any legal matters arising under this Agreement or the other Loan Documents with respect to the Property and/or the Collateral), including without limitation, any and all diligence costs, legal fees, consultant costs, accounting fees, costs of obtaining third party reports and underwriting costs; (ii) Borrower's ongoing performance of and compliance with Borrower's respective agreements and covenants contained in this Agreement and the other Loan Documents on its part to be performed or complied with after the date of this Agreement, including, without limitation, confirming compliance with environmental and insurance requirements; (iii) Agent, Lender, Construction Consultant and Servicer's ongoing performance and compliance with all agreements and conditions contained in this Agreement and the other Loan Documents on its part to be performed or complied with; (iv) the negotiation, preparation, execution, delivery and administration of any consents, amendments, waivers or other modifications to this Agreement and the other Loan Documents and any other documents or matters requested by Agent or Lender; (v) securing Borrower's compliance with any requests made in accordance with provisions of this Agreement; (vi) the filing and recording fees and expenses, title insurance, and other similar expenses incurred in creating and perfecting the Lien in favor of Agent pursuant to this Agreement and the other Loan Documents; (vii) the costs of any appraisal of the Property obtained by or on behalf of Agent and/or Lender; (viii) enforcing or preserving any rights, in response to third party claims or the prosecuting or defending of any action or proceeding or other litigation, in each case against, under or affecting Borrower, this Agreement, the other Loan Documents, the Property, the Collateral, or any other security given for the Loan; and (ix) enforcing any obligations of or collecting any payments due from Borrower under this Agreement, the other Loan Documents or with respect to

38

the Property and/or the Collateral (including any fees incurred by Servicer in connection with the transfer of the Loan to a special servicer prior to a Default or Event of Default) or in connection with any refinancing or restructuring of the credit arrangements provided under this Agreement in the nature of a "work-out" or of any insolvency or bankruptcy proceedings; provided, however, that Borrower shall not be liable for the payment of any such costs and expenses to the extent the same arise by reason of the illegal acts, fraud or willful misconduct of Agent or Lender.

(b)     Borrower shall indemnify, defend and hold harmless Agent, Lender, Construction Consultant, Servicer, their direct or indirect constituent owners, each of their respective Affiliates, and each of their respective successors, assigns, employees, agents, officers, directors, shareholders and members (each, an "**Indemnified Party**" and together, the "**Indemnified Parties**") from and against any and all other liabilities, obligations, actual losses, actual damages, penalties, actions, judgments, suits, claims, costs, expenses and disbursements of any kind or nature whatsoever (including, without limitation, the reasonable fees and disbursements of counsel for Agent or Lender in connection with any investigative, administrative or judicial proceeding commenced or threatened, whether or not such Indemnified Party shall be designated a party thereto), that may be imposed on, incurred by, or asserted against such Indemnified Party in any manner relating to or arising out of (i) any breach by Borrower of its Obligations under, or any misrepresentation by Borrower contained in, this Agreement or the other Loan Documents, (ii) the use or intended use of the proceeds of the Loan, (iii) any information provided by or on behalf of Borrower, or contained in any documentation approved by Borrower; (iv) ownership of the Mortgage, the Pledge Agreements, the Property, the Collateral or any interest in any of the foregoing, or receipt of any Net Sales Proceeds, Rents or other Gross Revenue; (v) any accident, injury to or death of persons or loss of or damage to property occurring in, on or about the Property or on the adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vi) any use, nonuse or condition in, on or about the Property or on adjoining sidewalks, curbs, adjacent property or adjacent parking areas, streets or ways; (vii) performance of any labor or services or the furnishing of any materials or other property in respect of the Property, including without limitation, the construction of the Project; (viii) any failure of the Property to comply with any Legal Requirement; (ix) any claim by brokers, finders or similar persons claiming to be entitled to a commission in connection with any Lease, sale of a Unit or other transaction involving the Property or any part thereof, or any liability asserted against Agent or Lender with respect thereto;  (x) the claims of any lessee of any portion of the Property or any Person acting through or under any lessee or otherwise arising under or as a consequence of any Lease; (xi) any and all claims of any Unit owner or proposed purchaser or lessee of a Unit or any Person acting through or under any such owner or proposed purchaser or lessee; and (xii) any failure to pay any permit and application fees, violations, fines and/or any other penalty incurred in connection with ownership, use, leasing and/or development of the Property (collectively, the "**Indemnified Liabilities**"); provided, however, that Borrower shall not have any obligation to any such Indemnified Party hereunder to the extent that such Indemnified Liabilities arise from the illegal acts, fraud or willful misconduct of such Indemnified Party.  To the extent that the undertaking to indemnify, defend and hold harmless set forth in the preceding sentence may be unenforceable because it violates any law or public policy, Borrower shall pay the maximum portion that it is permitted to pay and satisfy under applicable law to the payment and satisfaction of all Indemnified Liabilities incurred by each Indemnified Party.

**Section 10.14 Schedules Incorporated**.   The Schedules annexed hereto are hereby incorporated herein as a part of this Agreement with the same effect as if set forth in the body hereof.

**Section 10.15 Offsets, Counterclaims and Defenses**.   Any assignee of Agent's or Lender's interest in and to this Agreement, the Note and the other Loan Documents shall take the same free and clear of all offsets, counterclaims or defenses which are unrelated to such documents which Borrower may otherwise have against any assignor of such documents, and no such unrelated counterclaim or defense shall be interposed or asserted by Borrower in any action or proceeding brought by any such assignee upon such documents and any such right to interpose or assert any such unrelated offset, counterclaim or defense in any such action or proceeding is hereby expressly waived by Borrower.

**Section 10.16 No Joint Venture or Partnership; No Third Party Beneficiaries**.

(a)      Borrower, Agent and Lender intend that the relationships created hereunder and under the other Loan Documents be solely that of borrower and lender.  Nothing herein or therein is intended to create a joint venture, partnership, tenancy-in-common, or joint tenancy relationship between Borrower, Agent and Lender nor to grant Agent or Lender any interest in the Property other than that of mortgagee, beneficiary or lender.

(b)      This Agreement and the other Loan Documents are solely for the benefit of Agent, Lender and Borrower and nothing contained in this Agreement or the other Loan Documents shall be deemed to confer upon anyone other than Agent, Lender and Borrower any right to insist upon or to enforce the performance or observance of any of the obligations contained herein or therein.  All conditions to the obligations of Lender to make the Loan hereunder are imposed solely and exclusively for the benefit of Agent and Lender and no other Person shall have standing to require satisfaction of such conditions in accordance with their terms or be entitled to assume that Lender will refuse to make the Loan in the absence of strict compliance with any or all thereof and no other Person shall under any circumstances be deemed to be a beneficiary of such conditions, any or all of which may be freely waived in whole or in part by Agent or Lender if, in Agent's or Lender's sole discretion, Agent or Lender deems it advisable or desirable to do so.

**Section 10.17 Publicity**. All news releases, publicity or advertising by Borrower or its Affiliates through any media intended to reach the general public which refers to the Loan Documents or the financing evidenced by the Loan Documents, to Agent, Lender or any of their Affiliates shall be subject to the prior written approval of Agent.  Agent and Lender shall have the right to have a sign at the Property in a form acceptable to Agent stating that Agent, Lender and their Affiliates are providing financing for the Project and including Agent's, Lender's or their Affiliates logos.

**Section 10.18 Waiver of Marshalling of Assets**.  To the fullest extent permitted by law, Borrower, for itself and its successors and assigns, waives all rights to a marshaling of the assets of Borrower, Borrower's partners and others with interests in Borrower, and of the Property, and agrees not to assert any right under any laws pertaining to the marshaling of assets, the sale in inverse order of alienation, homestead exemption, the administration of estates of decedents, or any other matters whatsoever to defeat, reduce or affect the rights of Agent or Lender under the

40

Loan Documents to a sale of the Property and/or the Collateral for the collection of the Total Debt without any prior or different resort for collection or of the right of Agent and Lender to the payment of the Total Debt out of the net proceeds of the Property and/or the Collateral in preference to every other claimant whatsoever.

**Section 10.19  Waiver of Counterclaim**.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Agent, Lender or their agents.

**Section 10.20  Conflict; Construction of Documents; Reliance**.

(a)     In the event of any conflict between the provisions of this Agreement and any of the other Loan Documents, the provisions of this Agreement shall control. The parties hereto acknowledge that they were represented by competent counsel in connection with the negotiation, drafting and execution of the Loan Documents and that such Loan Documents shall not be subject to the principle of construing their meaning against the party which drafted same.  Borrower acknowledges that, with respect to the Loan, Borrower shall rely solely on its own judgment and advisors in entering into the Loan without relying in any manner on any statements, representations or recommendations of Agent or Lender or any parent, subsidiary or Affiliate of Agent or Lender.  Agent and Lender shall not be subject to any limitation whatsoever in the exercise of any rights or remedies available to them under any of the Loan Documents or any other agreements or instruments which govern the Loan by virtue of the ownership by them or any parent, subsidiary or Affiliate of Agent or Lender of any equity interest any of them may acquire in Borrower, and Borrower hereby irrevocably waives the right to raise any defense or take any action on the basis of the foregoing with respect to Agent's or Lender's exercise of any such rights or remedies.  Borrower acknowledges that Agent, Lender and their Affiliates engage in the business of real estate financings and other real estate transactions and investments which may be viewed as adverse to or competitive with the business of Borrower or its Affiliates.

(b)     Notwithstanding anything to the contrary set forth herein, in the event that Agent's or Lender's consent or approval is required to be reasonable or Agent or Lender is required to not unreasonably withhold, condition or delay their consent hereunder, notwithstanding any other reason that Agent or Lender may reasonably withhold, condition or delay its consent or approval, Agent and Lender may reasonably withhold, condition or delay their consent or approval in the event that (i) the granting of such consent shall have any material adverse effect on Borrower or the Project, including without limitation Borrower's ability to complete the Project in accordance with the Loan Documents or such granting of consent may result in a decrease in the market value of the Project, (ii) as a result of such consent Borrower will not be able to achieve Final Completion with such amounts that remain unadvanced to Borrower under the Loan and will be advanced to Borrower in accordance with the terms and conditions of the Loan Documents, (iii) such consent will result in any impairment of the Lien, priority or enforceability of the Mortgage, the Pledge Agreement or the Loan Agreement or the enforceability of the other Loan Documents, (iv) the action or request that is the subject of such consent will give purchasers of Units the right to terminate or rescind any Unit Sale Contract, or (v) there exists any monetary Default, material non-monetary Default or Event of Default.

**Section 10.21 Brokers and Financial Advisors**.  Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement other than Meridian Capital (the "**Broker**"). Borrower hereby agrees to indemnify, defend and hold Agent and Lender harmless from and against any and all claims, liabilities, costs and expenses of any kind (including Agent's and Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person (including Broker) that such Person acted on behalf of Borrower, Agent or Lender in connection with the transactions contemplated herein and is owed any type of commission, fee, concession, reimbursement or other compensation.  The provisions of this <u>Section 10.21</u> shall survive the expiration and termination of this Agreement and the payment and performance of the Obligations.

**Section 10.22 Prior Agreements**.  This Agreement and the other Loan Documents contain the entire agreement of the parties hereto and thereto in respect of the transactions contemplated hereby and thereby, and all prior agreements among or between such parties, whether oral or written, are superseded by the terms of this Agreement and the other Loan Documents.

**Section 10.23 Liability**.

(a)    If Borrower consists of more than one (1) Person the obligations and liabilities of each Person comprising Borrower shall be joint and several.

(b)    If Lender consists of more than one (1) Person the obligations and liabilities of each Person comprising Lender shall be several, and not joint.

**Section 10.24 Negation of Implied Right to Cure Events of Default**.  Notwithstanding anything contained in this Agreement or any of the other Loan Documents providing that certain rights, remedies or privileges are only available to Agent or Lender during the "continuance" of an Event of Default (or words of similar import), Borrower expressly acknowledges and agrees that it does not have the right to cure an Event of Default once the same has occurred under this Agreement or any other Loan Document without the consent of Agent, which consent may be withheld, delayed or denied by Agent in its sole and absolute discretion.

**Section 10.25 Exhibits**.

(a)    The Building Loan Budget as of the Closing Date is attached as <u>Exhibit A</u> hereto.

(b)    The Project Loan Budget as of the Closing Date is attached as <u>Exhibit B</u> hereto.

(c)    The initial Business Plan as of the Closing Date is attached as <u>Exhibit C</u> hereto.

(d)    The Project Budget as of the Closing Date is attached as <u>Exhibit D</u> hereto.

42

**ARTICLE XI**

**AGENT**

    **Section 11.1   Incorporation of Building Loan Agreement**. Article XI of the Building Loan Agreement, and all accompanying definitions, schedules and exhibits, is hereby incorporated herein by reference as if fully set forth herein.

[NO FURTHER TEXT CONTINUES ON THIS PAGE]

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

**BORROWER:**

**135 WEST 52ND STREET OWNER LLC,**
a Delaware limited liability company

By:_____
Name: Meyer Chetrit
Title: President


By:_____
Name: David Bistricer
Title: Secretary

[Signature Page to Project Loan Agreement]

STATE OF NEW YORK    )
                            ) ss.

COUNTY OF NEW YORK  )

      On the 21 day of August in the year 2014 before me, the undersigned, a notary public in and for said state, personally appeared Meyer Chetrit, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                      Notary Public

JEFFREY GDANSKI
STATE OF NEW YORK
NOTARY PUBLIC
Qualified in Nassau County
02GD6128011
MY COMMISSION EXPIRES 06/06/2017

STATE OF NEW YORK    )
                            ) ss.

COUNTY OF NEW YORK  )

      On the _____ day of _____ in the year 2014 before me, the undersigned, a notary public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                _____

Notary Public

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their duly authorized representatives, all as of the day and year first above written.

BORROWER:

**135 WEST 52ND STREET OWNER LLC,**
a Delaware limited liability company

By:_____
Name: Meyer Chetrit
Title: President


By:_____
Name: David Bistricer
Title: Secretary

[Signature Page to Project Loan Agreement]

STATE OF NEW YORK      )
                       ) ss.
COUNTY OF NEW YORK  )

On the _____ day of _____ in the year 2014 before me, the undersigned, a notary public in and for said state, personally appeared _____, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public


STATE OF NEW YORK      )
                       ) ss.
COUNTY OF NEW YORK  )

On the 2ʳ day of Avyr in the year 2014 before me, the undersigned, a notary public in and for said state, personally appeared David Bistric, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public                  _____Chya sr_____

CHAYA SARA BEER
Notary Public, State of New York
No. 24-4960111
Qualified in Kings County
Commission Expires Dec. 18, 20 1 8

[Acknowledgment to Project Loan Agreement]

**LENDER**:

**GERMAN AMERICAN CAPITAL CORPORATION**, a Maryland corporation

By:

Name: Ian McColough

Title: Managing Director

By:

Name: MURRAY MACKINNON

Title: VICE PRESIDENT

**AGENT**:

**DEUTSCHE BANK AG NEW YORK BRANCH**, a branch of Deutsche Bank AG, a banking corporation organized under the laws of the Federal Republic of Germany, licensed by the New York State Banking Department

By:

Name: Ian McColough

Title: Managing Director

By:

Name: Robert W. Pettinato

Title: Managing Director

STATE OF NEW YORK    )
                             ) ss.
COUNTY OF NEW YORK  )

On the _21st_ day of _August_ in the year 2014 before me, the undersigned, a notary public in and for said state, personally appeared _Ian McColough_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                                Notary Public

SASKIA A. LABRIEL
Notary Public, State of New York
No. 01LA6274940
Qualified in Kings County
Commission Expires January 14, 2017

STATE OF NEW YORK    )
                             ) ss.
COUNTY OF NEW YORK  )

On the _21st_ day of _August_ in the year 2014 before me, the undersigned, a notary public in and for said state, personally appeared _Murray Mackinnon_, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

                                                Notary Public

SASKIA A. LABRIEL
Notary Public, State of New York
No. 01LA6274940
Qualified in Kings County
Commission Expires January 14, 2017

STATE OF NEW YORK     )
                                   ) ss.
COUNTY OF NEW YORK   )

On the 21st day of August in the year 2014 before me, the undersigned, a notary public in and for said state, personally appeared Ian McColough, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

SASKIA A. LABRIEL
Notary Public, State of New York
No. 01LA6274940
Qualified in Kings County
Commission Expires January 14, 2017

STATE OF NEW YORK     )
                                   ) ss.
COUNTY OF NEW YORK   )

On the 21st day of August in the year 2014 before me, the undersigned, a notary public in and for said state, personally appeared Robert Petrinato personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

Notary Public

SASKIA A. LABRIEL
Notary Public, State of New York
No. 01LA6274940
Qualified in Kings County
Commission Expires January 14, 2017

[Acknowledgment to Project Loan Agreement]

**EXHIBIT A**

**BUILDING LOAN BUDGET**

[See attached.]

135 West 52nd Street Owner LLC
**Building Loan**
**Requisition # 16**
**7/31/2014**

| A | B | C | D | E | F | G | | H | | |
|---|---|---|---|---|---|---|---|---|---|---|
| COST CODES | DESCRIPTION OF WORK | Company | Original Contract Buyout | Previous Cumulative Change | Current Change this Period | Total Cumulative Change | Amount to Buy-Pending Change Orders | Revised Contract Amount (Forecast Cost) | Paid | Balance |
| | | | 1 | 2 | 3 | 4 (2+3) | 5 | 6 (1+4+5) | 7 | 8 (6-5) |
| | | | $0.00 | $0.00 | | - | | $ - | | |
| A2010b | Basement Excavation | | | | | - | 100,000.00 | $ 100,000.00 | | $ 100,000.00 |
| B1011a | Concrete Superstructure (incl. Conc. Stairs)- Carbon Strips | Structural Preservation Systems | 590,000.00 | 135,300.00 | | 135,300.00 | | $ 725,300.00 | $ 224,386.80 | $ 500,913.20 |
| B1011b | Concrete Superstructure (incl. Conc. Stairs)- Concrete Infills | Europa Construction Corp. | 170,000.00 | 25,000.00 | | 25,000.00 | | $ 195,000.00 | $ 95,850.00 | $ 99,150.00 |
| B1013a | Structural Steel Framing | GMC Contracting | 2,425,000.00 | 563,656.00 | | 563,656.00 | | $ 2,988,656.00 | $ 1,197,052.40 | $ 1,791,603.60 |
| B1025 | Spray-On Fireproofing | Paola Painting & Renovations | 250,000.00 | 38,000.00 | | 38,000.00 | | $ 288,000.00 | $ 80,424.00 | $ 207,576.00 |
| B2005a | Masonry Façade, Stucco, and Parging | | | - | | - | | $ - | | $ - |
| B2005b | Masonry Façade, Stucco, and Parging - Local Law 11 | Flagg Waterproofing | 135,000.00 | 9,000.00 | | 9,000.00 | | $ 144,000.00 | $ - | $ 144,000.00 |
| B2011a | EIFS Exterior Insulation and Finish System | ACIES Group | 715,000.00 | | | - | | $ 715,000.00 | $ - | $ 715,000.00 |
| B2013a | Panels and Siding- Metal Panels, Windows, Louvers, Setbacks | Crowne Architectural Systems | 3,150,000.00 | (50,000.00) | | (50,000.00) | | $ 3,100,000.00 | $ 10,026.90 | $ 3,089,973.10 |
| B2013b | Panels and Siding - Stone Panels - Materials | Stone Sheets | 575,000.00 | 25,845.00 | | 25,845.00 | | $ 600,845.00 | $ 200,000.00 | $ 400,845.00 |
| B2013c | Panels and Siding - Stone Panels - Installation | | - | | | - | 400,000.00 | $ 400,000.00 | $ - | $ 400,000.00 |
| B2019a | Exterior Louvers | | - | - | | - | | $ - | | $ - |
| B2020a | Balcony Walls (Glass Enclosure) and Handrails | | - | - | | - | | $ - | | $ - |
| B2023a | Windows | | - | - | | - | | $ - | | $ - |
| B2025a | Curtain Walls- Demo & Replace CW | Crowne Architectural Systems | 5,648,503.00 | 3,067,421.00 | | 3,067,421.00 | (13,200.00) | $ 8,702,724.00 | $ 5,537,753.50 | $ 3,164,970.50 |
| B2025b | Curtain Walls- at Residential Setbacks | | - | - | | - | | $ - | | $ - |
| B2025c | Curtain Walls-7th Floor | | | | | | | $ - | | $ - |
| B2027a | Storefronts | | - | - | | - | | $ - | | $ - |
| B2031a | Revolving and Overhead Doors | | | | | - | 180,000.00 | $ 180,000.00 | $ - | $ 180,000.00 |
| B2039a | Other Doors and Entrances | | - | - | | - | 263,400.00 | $ 263,400.00 | $ - | $ 263,400.00 |
| B3015a | Built-Up and Membrane Roofing | City Skyline | 665,000.00 | 49,240.00 | | 49,240.00 | | $ 714,240.00 | $ 271,124.10 | $ 443,115.90 |
| B3017a | Roof Specialties and Accessories | | - | - | | - | | $ - | $ - | $ - |
| C1001a | Masonry Partitions | Paola Painting & Renovations | 335,000.00 | 2,145,225.00 | | 2,145,225.00 | | $ 2,480,225.00 | $ 419,699.70 | $ 2,060,525.30 |
| C1007a | Misc. Metals (General) | | | | | - | | $ - | | $ - |
| C1011 | Finish Carpentry - Kitchen Cabinets (Materials) | Modulo 3 Corp. | 2,250,000.00 | | | - | | $ 2,250,000.00 | $ 514,467.00 | $ 1,735,533.00 |
| C1011b | Finish Carpentry - Kitchen Cabinets (Installation) | | 350,000.00 | | | - | | $ 350,000.00 | $ - | $ 350,000.00 |
| C1011c | Finish Carpentry - Bathroom Vanities | Best Mark | 865,000.00 | 4,943.00 | | 4,943.00 | | $ 869,943.00 | $ 200,000.00 | $ 669,943.00 |
| C1011d | Misc. Finish Carpentry and Architectural Woodwork | | - | - | | - | 2,300,000.00 | $ 2,300,000.00 | $ - | $ 2,300,000.00 |
| C1011e | Misc. Finish Carpentry and Architectural Woodwork-Sales Office | WoodMotif Cabinetry | 32,000.00 | - | | - | | $ 32,000.00 | $ 28,800.00 | $ 3,200.00 |
| C1011f | Misc. Finish Carpentry and Architectural Woodwork-Sales Office | Best Mark Millwork Corp. | 40,000.00 | - | | - | | $ 40,000.00 | $ 40,000.00 | $ - |
| C1011g | Misc. Finish Carpentry and Architectural Woodwork (Furnish) | Dom Industries | 160,000.00 | | | - | | $ 160,000.00 | $ 32,000.00 | $ 128,000.00 |
| C1011h | Misc. Finish Carpentry and Architectural Woodwork (Install) | New Industries | 38,122.00 | 2,798.00 | | 2,798.00 | | $ 40,920.00 | $ - | $ 40,920.00 |
| C1011J | Finish Carpentry - Installation of Doors/Jambs | | | | | - | 685,000.00 | $ 685,000.00 | $ - | $ 685,000.00 |
| C1011K | Finish Carpentry - Trim | | | | | - | 225,000.00 | $ 225,000.00 | $ - | $ 225,000.00 |
| C1013a | Firestopping | | - | - | | - | | $ - | $ - | $ - |
| C1017a | Drywall | A&V Drywall Inc. | 4,100,000.00 | 288,694.00 | | 288,694.00 | (1,510,082.00) | $ 2,878,612.00 | $ 959,913.90 | $ 1,918,698.10 |
| C1017b | Drywall-Kadex Coatings (Ceilings) | Horizon Construction | 142,500.00 | | | - | (75,000.00) | $ 67,500.00 | $ - | $ 67,500.00 |
| C1017c | Drywall- Level 5 Finish | | | | | - | 624,720.00 | $ 624,720.00 | $ - | $ 624,720.00 |
| C1025a | Interior Windows and Storefronts | Quick-Slide Corp | 55,000.00 | (2,443.00) | - | (2,443.00) | (4,675.00) | $ 47,882.00 | $ 27,885.60 | $ 19,996.40 |
| C1029a | Doors, Frames, and Hardware | NYC Doors | 1,300,000.00 | 15,000.00 | | 15,000.00 | 1.00 | $ 1,315,001.00 | $ 193,430.00 | $ 1,121,571.00 |
| C1029b | Doors, Frames, and Hardware - Sliding Wall Panels (Furnish) | Dom Industries | 545,490.00 | - | | - | | $ 545,490.00 | $ 109,098.00 | $ 436,392.00 |
| C1029c | Doors, Frames, and Hardware - Sliding Wall Panels (Install) | New Industries | 99,510.00 | - | | - | | $ 99,510.00 | $ 14,510.00 | $ 85,000.00 |
| C1039a | Information Specialties (Signage) | | - | - | | - | 113,870.00 | $ 113,870.00 | $ - | $ 113,870.00 |
| C1047a | Toilet, Bath, and Laundry Accessories | | - | - | | - | 359,086.00 | $ 359,086.00 | $ - | $ 359,086.00 |
| C1048A | Glass Shower Doors & Toilet Closets | | | | | - | 700,500.00 | $ 700,500.00 | $ - | $ 700,500.00 |
| C1049a | Fireplaces on 7th Floor and Penthouse | | | | | - | 100,000.00 | $ 100,000.00 | $ - | $ 100,000.00 |
| C1055a | Postal Specialties | | - | - | | - | 21,800.00 | $ 21,800.00 | $ - | $ 21,800.00 |
| C2017a | Decorative Stairs and Railings | | - | - | | - | 750,000.00 | $ 750,000.00 | $ - | $ 750,000.00 |
| C3017a | Tiling (Ceramic, Stone, etc)-Install, Partial Furnish | Supreme Flooring-Stone, Tile F&I | 3,050,000.00 | 3,000.00 | | 3,000.00 | | $ 3,053,000.00 | $ 354,747.95 | $ 2,698,252.05 |

135 West 52nd Street Owner LLC
**Building Loan**
**Requisition # 16**
**7/31/2014**

| A COST CODES | B DESCRIPTION OF WORK | C Company | D Original Contract Buyout 1 | E Previous Cumulative Change 2 | F Current Change this Period 3 | G Total Cumulative Change 4 (2+3) | Amount to Buy-Pending Change Orders 5 | H Revised Contract Amount (Forecast Cost) 6 (1+4+5) | Paid 7 | Balance 8 (6-5) |
|---|---|---|---|---|---|---|---|---|---|---|
| C3017b | Tiling (Ceramic, Stone, etc.) Furnish, except Lobby | Nemo Tile Co | 1,767,912.00 | 13,442.00 | | 13,442.00 | | 1,781,354.00 | 924,279.76 | 857,074.24 |
| C3017c | Tiling (Ceramic, Stone, etc.) Furnish Lobby only w/ Feature wall | | | | | - | 500,000.00 | 500,000.00 | - | 500,000.00 |
| C3017d | Tiling (Ceramic, Stone, etc.) Furnish Sales Office only | | - | - | | - | 50,000.00 | 50,000.00 | - | 50,000.00 |
| C2017E | Tiling (Ceramic, Stone, etc.) master Bath Sinks | | | | | - | 4,000.00 | 4,000.00 | - | 4,000.00 |
| C3019a | Acoustical Ceilings | | - | - | | - | | - | - | - |
| C3022a | Self Leveling Concrete | | - | | | - | | - | - | - |
| C3023a | Flooring Treatment (Scarifying) | All Stone Restoration, LLC | 280,000.00 | - | | - | | 280,000.00 | 232,092.00 | 47,908.00 |
| C3025a | Specialty Flooring | | | - | | - | 25,000.00 | 25,000.00 | | 25,000.00 |
| C3029a | Wood Flooring | A&E Surfaces, Co | 1,700,000.00 | | | - | | 1,700,000.00 | 102,779.10 | 1,597,220.90 |
| C3031a | Resilient Flooring and Carpeting | | - | | | - | 36,161.00 | 36,161.00 | - | 36,161.00 |
| C3041a | Interior Painting, Staining, and Coatings (Sales Office) | Zenco Group | 7,000.00 | 2,500.00 | | 2,500.00 | | 9,500.00 | - | 9,500.00 |
| C3041b | Interior Painting, Staining, and Coatings | | - | | | - | 1,526,295.00 | 1,526,295.00 | | 1,526,295.00 |
| D1011a | Elevators | Schindler Elevators | 1,990,000.00 | 557,500.00 | | 557,500.00 | | 2,547,500.00 | 331,444.14 | 2,216,055.86 |
| D1025a | Powered Scaffolding (Window Washing) | Tractel Swingstage Division | 270,000.00 | - | | - | | 270,000.00 | - | 270,000.00 |
| D1029a | Trash Chutes | US Chutes | 54,000.00 | - | | - | | 54,000.00 | - | 54,000.00 |
| D2010a | Plumbing Fixtures | A & R Kitchen & Bath Inc. | 1,195,000.00 | 118,660.00 | | 118,660.00 | | 1,313,660.00 | 305,024.10 | 1,008,635.90 |
| D2010b | Plumbing Fixtures-Sales Office Sink | Signature Plumbing | 2,502.00 | - | | - | | 2,502.00 | 2,501.95 | 0.05 |
| D2011a | Plumbing | S&J Industrial | 4,150,000.00 | 47,274.00 | | 47,274.00 | (7,200.00) | 4,190,074.00 | 794,448.00 | 3,395,626.00 |
| D2011b | BLR3-3D Modeling | | 24,000.00 | | | - | (24,000.00) | - | - | - |
| D3011a | HVAC | Demar | 7,700,000.00 | 130,000.00 | | 130,000.00 | (6,000.00) | 7,824,000.00 | 1,083,186.00 | 6,740,814.00 |
| D4011a | Fire Protection | Capitol Fire Sprinkler Company | 1,226,000.00 | 80,000.00 | | 80,000.00 | (2,400.00) | 1,303,600.00 | 220,095.00 | 1,083,505.00 |
| D5011a | Electrical Services & Distribution | Recon Electric | 3,750,000.00 | 159,446.00 | | 159,446.00 | 50,000.00 | 3,959,446.00 | 900,174.60 | 3,059,271.40 |
| D5022a | Lighting Equipment-Main Building | Chelesa Lighting | 825,000.00 | 193,253.00 | | 193,253.00 | 52,000.00 | 1,070,253.00 | - | 1,070,253.00 |
| D5022b | Lighting Equipment-Lobby Chandelier & MB Pendant | | | | | - | 500,000.00 | 500,000.00 | | 500,000.00 |
| D5022c | Lighting Equipment-Lighting Controls | | | | | - | 100,000.00 | 100,000.00 | | 100,000.00 |
| D5022d | Lighting Equipment-Sales Office | Expressive Lighting | 110,000.00 | 6,190.00 | | 6,190.00 | | 116,190.00 | 66,070.79 | 50,119.21 |
| D5030a | Telecommunications Systems | CEM (Communication Engineering Management) | 1,100,000.00 | - | | - | | 1,100,000.00 | 42,773.02 | 1,057,226.98 |
| D5038a | Security & Detection Systems | | - | | | - | | - | | - |
| E1030a | Vehicle and predestrian Equipment | | | | | - | 10,000.00 | 10,000.00 | | 10,000.00 |
| E1091a | Residential Appliances | P.C. Richards | 2,086,500.00 | - | | - | | 2,086,500.00 | - | 2,086,500.00 |
| E1091b | Residential Appliances-Penthouse Wet bars & BBQ, Cellar, 7th | | | - | | - | 45,000.00 | 45,000.00 | | 45,000.00 |
| E2017 | Furniture, Furnishings and Accessories, Rugs (By Owner) | | - | - | | - | | - | | - |
| F1001a | Swimming Pools and Tubs | | - | | | - | 450,000.00 | 450,000.00 | - | 450,000.00 |
| F1017a | Special Activity Rooms (Saunas, Steam, Athletic) | | - | | | - | 1,450,000.00 | 1,450,000.00 | | 1,450,000.00 |
| F2010a | Building Elements Demolition | GMC Contracting | 1,050,000.00 | 1,760,050.00 | | 1,760,050.00 | | 2,810,050.00 | 2,242,359.90 | 567,690.10 |
| G2010a | Roadways | | - | - | | - | 121,600.00 | 121,600.00 | | 121,600.00 |
| G2050a | Landscaping | | | - | | - | 375,000.00 | 375,000.00 | | 375,000.00 |
| J1010a | Hoisting and Roof Protection | S&E Scaffolding | 790,000.00 | 1,019,648.00 | | 1,019,648.00 | 380,000.00 | 2,189,648.00 | 762,392.70 | 1,427,255.30 |
| J1020a | Temporary Protection (incl. in J1010A) | | - | - | | - | | - | | - |
| J3010a | Trmporary Power and Temporary Service (inv in D5011a) | | - | - | | - | | - | | - |
| J3020a | Temporary Plumbing (Incl. in D2011a) | | - | | | - | | - | | - |
| J9010a | NLS Misc. Non-General Conditions Cost | | | | | - | 3,800.00 | 3,800.00 | | 3,800.00 |
| | Office Fit out | | | | | - | | - | | |
| | SUB-TRADES TOTAL | | $ 57,764,039.00 | $ 10,408,642.00 | $ - | $ 10,408,642.00 | $ 10,859,676.00 | $ 79,032,357.00 | $ 18,520,790.91 | $ 60,511,566.09 |
| | | | | | | | | | | |
| | Contingency | | 2,578,807.00 | | | | 121,193.00 | 2,700,000.00 | | 2,700,000.00 |
| | General Conditions | | 3,809,001.00 | | | | 2,467,813.00 | 6,276,814.00 | 1,470,163.27 | 4,806,650.73 |
| | Insurance (to be provided ny Owner) | | | | | | | - | | - |
| | Fee | | 2,000,000.00 | | | | | 2,000,000.00 | 651,850.57 | 1,348,149.43 |
| | Sub total | | 8,387,808.00 | - | - | - | 2,589,006.00 | 10,976,814.00 | 2,122,013.84 | 8,854,800.16 |

F:\Users\37135\AppData\Local\Microsoft\Windows\Temporary Internet Files\Content.Outlook\WV2R8THY\Budget Worksheet 08 25 14 v13.xlsx

135 West 52nd Street Owner LLC
**Building Loan**
**Requisition # 16**
**7/31/2014**

| A | B | C | D | E | F | G | Amount to Buy- | H | | |
|---|---|---|---|---|---|---|---|---|---|---|
| COST CODES | DESCRIPTION OF WORK | Company | Original Contract Buyout | Previous Cululative Change | Current Change this Period | Total Cumulative Change | Pending Change Orders | Revised Contract Amount (Forecast Cost) | Paid | Balance |
| | | | 1 | 2 | 3 | (2+3) 4 | 5 | 6  (1+4+5) | 7 | 8 (6-5) |
| | Sub Total-Trades, Contingency,General Conditions, Fee | | 66,151,847.00 | 10,408,642.00 | - | 10,408,642.00 | 13,448,682.00 | $  90,009,171.00 | $  20,642,804.75 | $   69,366,366.25 |
| | | | | | | | | | | |
| | Owner General Conditions | | 1,094,798.00 | | | - | | $   1,094,798.00 | $    991,114.21 | $    103,683.79 |
| | | | | | | | | | | |
| | Grand Total | | 67,246,645.00 | 10,408,642.00 | - | 10,408,642.00 | 13,448,682.00 | 91,103,969.00 | 21,633,918.96 | 69,470,050.04 |

3

**EXHIBIT B**

**PROJECT LOAN BUDGET**

[See attached.]

**135 West 52nd St**

**Soft Cost Budget**

| Company | Description | Total | Spent to-date | Prior to Rec #15 Cost-to-Complete | | |
|---|---|---|---|---|---|---|
| Frank Seta | Window Wall Roofing Consultant | 135,000 | 121,246 | 13,754 | Soft Costs Spent | 3,872,580 |
| Shen Milson Wilke | Acoustical Consultant | 26,000 | 23,196 | 2,804 | Soft Costs Remaining | 2,021,650 |
| Jenkins Huntington | Elevator Consultant | 48,000 | 37,000 | 11,000 | Total | 5,740,860 |
| 20/20 Inspections | Special Inspections | 17,000 | 17,000 | - | | |
| OneLux | Lighting Consultant | 26,000 | 18,700 | 7,300 | | |
| MPFP | Landscape Consultant | 100,000 | 33,876 | 66,124 | | |
| Cosentini | MEP Consultant | 365,000 | 334,837 | 30,163 | | |
| Cantor Seinuk | Structural Engineer | 220,000 | 210,275 | 9,725 | | |
| Joel Trace | Pool Consultant | 46,500 | 41,043 | 5,457 | | |
| Deployed Technology | Low Voltage Consultant | 55,000 | 45,650 | 9,350 | | |
| JM Zoning | Expeditor | 57,000 | 86,056 | - | | |
| Domani | Special Inspections | 91,460 | 30,085 | 61,375 | | |
| Fire and Building Code | Fire & Building Code Consultant | 84,900 | - | 84,900 | | |
| Entek | Window Washing Consultant | 37,500 | 34,000 | 3,500 | | |
| Cetra Ruddy | Archetict Designer | 1,773,500 | 1,354,749 | 418,751 | | |
| Seiden and Schein | Lawyer | 40,000 | 10,065 | 29,935 | | |
| Rosen Livingston | Lawyer | 53,500 | 28,000 | 25,500 | | |
| Kramer, Levin and Naftalis | Lawyer | 200,000 | 81,167 | 118,833 | | |
| Williams NY | Branding/ Marketing | 460,000 | 439,500 | 20,500 | | |
| M18 | Publicist | 36,000 | 51,021 | - | | |
| Printing Costs | Printing Costs | 400,000 | 101,784 | 298,216 | | |
| Marketing Costs | Marketing Costs | 400,000 | 4,500 | 395,500 | | |
| Online Marketing Group | SEO | 79,500 | - | 79,500 | | |
| Sales Office | Sales Office | 600,000 | 513,465 | 86,535 | | |
| WSP Sells | Surveyor | 134,000 | 134,436 | - | | |
| Thierry Dryefus | Lighting Artist | 70,000 | 62,000 | 8,000 | | |
| Bug Doctor | Exterminator | 40,000 | 5,073 | 34,927 | | |
| TEI/Schindler | Elevator Maintenance | 45,000 | 53,857 | - | | |
| Bank Consultant | Bank Construction Consultant | 100,000 | - | 100,000 | | |
| Contingency | | | | 100,000 | | |
| Taxes | | | | 945,000 | | |
| Insurance | | | | - | | |
| Debt Service | | | | 9,475,000 | | |
| **Grand Total** | | **$5,740,860** | **$3,872,580** | 12,441,650 | | |
| **Subtotal excl. taxes, insurance, debt service** | | | | 2,021,650 | | |

**EXHIBIT C**

**BUSINESS PLAN**

[See attached.]

**EXHIBIT [ ]**

**INITIAL BUSINESS PLAN**

"Initial Business Plan" means the following business plan for the Property, which the Borrower will adopt:

(i)      Sponsor purchased the Property in 2013 with the intention of converting the building into luxury residential condominiums and commenced construction in 2013. Currently, the Property is as-of-right and fully entitled, having received all necessary approvals to convert the building.

(ii)     Existing building will be gutted and converted into 109 residential units totaling 174,737 net sellable square feet. The Property will have a total of 232,769 of net sellable/rentable square feet, including approximately 53,000 net rentable square feet of office space and 5,032 net rentable square feet of retail space.

(iii)    Key parties involved in this development project are:
      a.  Sponsor / Guarantor – Meyer Chetrit and David Bistricer
      b.  Architect – CetraRuddy
      c.  General Contractor – New Line Structures
      d.  Residential Sales Team – Douglas Elliman
      e.  Commercial Sales Team – Possibly NGKF
      f.  Retail Sales Team – No sales team working with restaurant directly

(iv)    Construction started on October 31st, 2013 with a 24 month construction schedule to substantial construction completion.

(v)     Offering Plan was approved on June 27th, 2014 and the Sales Center opened on the ground level on July 29th, 2014.

(vi)    Douglas Elliman projects that 135 W 52nd Street will be able to achieve premium pricing due to the significant demand for quality residences in midtown, New York. The Sales Center on the ground level includes a model unit and a display of the Project. Pre-sales have begun as of July, 2014.

(vii)   The Borrower has committed to the following milestones:
      a.  substantial completion of the façade and enclosures as necessary to make the Project Improvements watertight by May 1, 2015
      b.  subject only to delays for Force Majeure, Substantial Completion shall occur no later than October 31, 2015 (the "Substantial Completion Date")
      c.  subject only to delays for Force Majeure, Final Completion shall occur no later than April 30, 2016 (the "Final Completion Date")
      d.  the Declaration of Condominium has been approved by all applicable Governmental Authorities and submitted for recording with the New York City Register no later than April 15, 2015 (provided that Borrower shall not be deemed to have failed to satisfy the Milestones set forth in the foregoing clause (iv) so long as Borrower is diligently pursuing in good faith the completion of such Milestone)

(viii)  Mandatory amortization payment of at least $5 million by June 1, 2015

1

For internal use only
For Internal Use Only

**EXHIBIT D**

**PROJECT BUDGET**

[See attached.]

**Flatotel Project Budget**

| | Senior Loan | Building Loan | Project Loan | Total |
|---|---|---|---|---|
| DB Loan | 146,588,300 | 69,470,050 | 12,441,650 | 228,500,000 |
| | | | | |
| Uses | | | | |
| *Existing Loan Payoff* | | | | |
| Net AIG Payoff | 82,474,365 | - | - | 82,474,365 |
| Mezz Loan Payoff | 63,766,799 | - | - | 63,766,799 |
| Existing Loan Payoff | 146,241,164 | - | - | 146,241,164 |
| | | | | |
| *Closing Costs* | | | | |
| Origination fee | 1,713,750 | - | - | 1,713,750 |
| MRT | 3,178,000 | - | - | 3,178,000 |
| Title Fees | 554,059 | - | - | 554,059 |
| Meridian (Broker Fee) | 550,000 | - | - | 550,000 |
| Gibson Dunn (Lender's Legal Fees) | 195,000 | - | - | 195,000 |
| Stub DB Interest | 192,397 | - | - | 192,397 |
| DBTCA | 14,000 | - | - | 14,000 |
| Hanover (First Month Servicing Fees) | 6,250 | - | - | 6,250 |
| Hanover (Technical Due Diligence Review) | 500 | - | - | 500 |
| Graff (Borrower's Legal Fees) | 100,000 | - | - | 100,000 |
| Rockpoint (Existing Mezz Legal Fees) | 27,032 | - | - | 27,032 |
| Rockpoint (Compass Fees) | 5,670 | - | - | 5,670 |
| Rockpoint (Compass Fees) | 10,379 | - | - | 10,379 |
| Miller Cicero (Appraisal) | 16,000 | - | - | 16,000 |
| Starr Associates (Condo Counsel) | 20,250 | - | - | 20,250 |
| Herrick (Zoning Counsel) | 8,185 | - | - | 8,185 |
| IVI (Phase I) | 2,200 | - | - | 2,200 |
| Willis (Insurance) | 5,500 | - | - | 5,500 |
| Chatham Financial (Cap Broker) | 8,630 | - | - | 8,630 |
| Insurance Premium | 83,889 | - | - | 83,889 |
| SMBC (Interest Rate Cap) | 86,300 | - | - | 86,300 |
| Richard Layton Finger | 9,500 | - | - | 9,500 |
| UCC Cancellation | 916 | - | - | 916 |
| IVI (Construction Report) | 9,900 | - | - | 9,900 |
| Closing Costs | 6,798,306 | - | - | 6,798,306 |
| | | | | |
| Hard Costs | - | 69,470,050 | - | 69,470,050 |
| Soft Costs | - | - | 2,021,650 | 2,021,650 |
| Taxes | - | - | 945,000 | 945,000 |
| Interest | - | - | 9,475,000 | 9,475,000 |
| Total | 153,039,470 | 69,470,050 | 12,441,650 | 234,951,170 |
| | | | | |
| Borrower Diligence Deposit | 150,000 | | | 150,000 |
| Cash Equity Required | 6,301,170 | | | 6,301,170 |
| at Closing | | | | |