# **Exhibit 26**

IN THE HIGH COURTS OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

Case No: CL-2015-000549
NCN: 2016 EWHC 289 (Comm)

The Royal Courts of Justice
7 Rolls Building
London EC4A 1NL

20 January 2016

**Before:**

**MR JUSTICE PHILLIPS**

BETWEEN:

**JSC BTA BANK**

**Claimant/Applicant**

-v-

**(1) MUKHTAR ABLYAZOV**

**1st Defendant**

**(2) ILYAS KHRAPUNOV**

**2nd Defendant/Respondent**

**Stephen Smith QC** and **Tim Akkouh** (instructed by **Hogan Lovells International LLP**) appeared on behalf of the **Claimant/Applicant**

**Charles Samek QC** and **Marc Delehanty** (instructed by **Hughmans Solicitors**) appeared on behalf of the **Second Defendant/Respondent**

**APPROVED JUDGMENT**

MR JUSTICE PHILLIPS:

1.    This is an application by the claimant ("the Bank") for an order that the second
      defendant ("Mr Khrapunov"), be required to give disclosure of his assets pursuant
      to a provision to that effect in a worldwide freezing order ("WFO"),
      notwithstanding that Mr Khrapunov claims that such disclosure might reasonably
      be expected to expose him to the risk of criminal prosecution in overseas
      jurisdictions. The Bank does not accept that any such risk has been made out to the
      requisite standard, but in any event contends that such risk has been removed by the
      existing requirement that such disclosure be made only to solicitors and counsel
      directly involved in the case and kept confidential by them.

2.    The proceedings arise from the substantial judgments the Bank has obtained in
      proceedings in this jurisdiction against the first defendant ("Mr Ablyazov") in
      respect of the misappropriation of the Bank's assets whilst Mr Ablyazov was its
      Chairman. The judgments total in the region of US$4.5 billion. In these
      proceedings, the Bank claims that Mr Khrapunov has conspired with Mr Ablyazov,
      his father-in-law, to injure the Bank by unlawful means. The gist of the allegation
      is that Mr Khrapunov has assisted Mr Ablyazov to conceal various assets by
      a series of unlawful dealings and sham agreements in breach of freezing orders and
      receivership orders made by the courts of this jurisdiction. The Bank claims
      damages for losses thereby suffered.

3.    On 17 July 2015 Males J granted, without notice, an unlimited WFO against
      Mr Khrapunov. Paragraph 7(1)(a) of that order required Mr Khrapunov within 10

days of service of the order, and to the best of his ability, to inform the Bank's solicitors of all his assets worldwide exceeding £10,000 in value, whether in his own name or not and whether solely or jointly owned, and whether Mr Khrapunov is interested in the said assets legally, beneficially or otherwise, giving the value, location and details of all such assets.

Paragraph 7(2) provided as follows:

> "*If the provision of any of this information is likely to incriminate the Respondent in any jurisdiction, he may be entitled to refuse to provide it, but is recommended to take legal advice before refusing to provide this information. Wrongful refusal to provide the information is contempt of court and may render the Respondent liable to be imprisoned, fined or have his assets seized.*"

4.    It is common ground that a party does not have an automatic right to the privilege against self-incrimination in relation to prosecution in overseas jurisdictions, but that there is a discretion for the court to allow such a privilege from giving self-incriminatory evidence: see <u>Brannigan v Davison</u> [1997] AC 238 (PC). It is also common ground that the effect of paragraph 7(2) of the WFO is that Mr Khrapunov is entitled to refuse to give disclosure under paragraph 7(1)(a) if the effect of doing so would be to incriminate himself in relation to prosecutions overseas. The Claimant has not sought to resile from that position on this application.

5.    On 30 October 2015 Mr Khrapunov wrote to Hogan Lovells, solicitors for the Bank. At that stage Mr Khrapunov was acting in person, although he has subsequently acknowledged that he was in receipt of legal advice and assistance. In that letter, he

invited the Bank's agreement to a number of matters, including that:

*"The affidavit, information and documentation to be provided pursuant to paragraphs 7 and 8 of the Freezing Order be provided ... subject to the following ... the asset disclosure shall be confidential, the information being limited to a club comprising only specific named solicitors of your firm and counsel (with appropriate safeguards in place to avoid wider dissemination of the information), the members of whom can be varied by agreement in writing or by Order of the Court."*

6.    On 5 November 2015, in a further letter, Mr Khrapunov stated in relation to asset disclosure as follows:

*"There are serious concerns about the manner in which the disclosure order has been obtained on a without notice basis. There are also serious concerns as to what your client will do with that disclosure once it has been provided. The restriction to a confidentiality club of Solicitors and Counsel, pending argument at an 'on notice' application, will prevent the risk that I will be irreparably harmed by the provision of asset disclosure to your client, who has it appears employed illegal methods of pursuing parties close to Mr Ablyazov for the purposes of extracting evidence."*

7.    On 6 November 2015, the day after that letter, the Bank appeared before Popplewell J seeking various further relief. Popplewell J made an order, which included at paragraph 3 a provision that Mr Khrapunov should comply with paragraph 7(1)(a) of the WFO by 4 pm on 13 November 2015, giving disclosure of his asset position as of 11 September 2015 and addressing any dealings with assets of value of more than £10,000 that had taken place thereafter. Paragraph 4 of the order provided as follows:

*"Until the return date or further order, the disclosure to be given*

> *pursuant to paragraph 7 of the Freezing Order shall only be provided to, and shall be kept confidential by, partners and employees of Hogan Lovells International LLP who are concerned with the case and counsel who are instructed in relation to the case."*

8. It will be seen that that provision reflected the restriction proposed by Mr Khrapunov himself in his earlier letters.

9. On the date disclosure was required by that order, Mr Khrapunov, now represented by solicitors and counsel, applied to Cooke J for an order that the disclosure required that day be postponed or stayed until the return date of the WFO listed for 26 and 27 January 2016. Cooke J refused that application but granted a short extension until 23 November 2015 for the provision of the disclosure. Cooke J also made a slight variation to the confidentiality regime, requiring that disclosure be made only to those directly concerned in the case, the word "directly" being inserted.

10 On 23 November 2015, Hughmans Solicitors, acting for Mr Khrapunov, wrote to Hogan Lovells, stating:

> *"We refer to para 7(1)(a) of the Order of 17 July 2015 as varied by Popplewell J on 6 November 2015 and by Cooke J on 13 November 2015.*
>
> *Having taken appropriate foreign legal advice in accordance with para 7(2), without intending any discourtesy to the court our client declines to provide the relevant disclosure."*

11. The Bank issued the present application on 24 November 2015, seeking an order that Mr Khrapunov do provide proper particulars of the claim to the privilege

against self-incrimination. That application came before me on 1 December 2015. The day before, Mr Khrapunov had sworn an affidavit giving further details of his claim under paragraph 7(2) of the WFO. At paragraph 5 he set out the investigations and proceedings in other jurisdictions upon which he relied:

> "(a) Mr Ablyazov is currently in prison in France awaiting extradition to Russia to face criminal charges based on allegations made by the Bank;
>
> (b) My father and I are both subject to a criminal investigation by the Kazakhstan authorities based on allegations made by the City of Almaty. In 2012 both our names were added to the Interpol list of wanted persons at the request of the Government of Kazakhstan;
>
> (c) The Swiss authorities are currently carrying out a criminal investigation into me and my father involving allegations of money laundering;
>
> (d) In May 2014 civil proceedings were brought against me, my father and others by the City of Almaty in the United States District Court, Central District of California alleging (amongst other things) violations of the Racketeer Influenced and Corrupt Organisations Act ('RICO'), breach of fiduciary duty, conversion and fraud. Those proceedings were stayed on 21 September 2015 on the grounds of forum non conveniens;
>
> (e) Civil proceedings are also ongoing in United States District Court, Southern District of New York ('the New York proceedings') in which the Bank and the City of Almaty (who are working together and instructing the same lawyers) are applying to add me, my father and Mr Ablyazov as Defendants to a claim for (amongst other things) breaches of RICO, fraudulent transfer, unjust enrichment, fraud and conversion."

12. At paragraph 7 Mr Khrapunov referred to the advice he had received, without waiving any legal professional privilege, stating in subparagraph (d) that, as a result of the legal advice he had received, he believed that he was entitled to claim to refuse to provide any of the information he would otherwise be required to disclose

under 7(1)(a) of the worldwide freezing order, on the grounds that provision of such information is likely to incriminate him in those foreign jurisdictions. He further confirmed in subparagraph (e) that he had carefully considered the position separately in relation to each of the assets that fall within the definition of paragraph 7(1)(a); and in subparagraph (f) that the advice had taken into account the confidentiality provisions made in the order of 6 November of Popplewell J. Mr Khrapunov further confirmed at paragraph 14 that he did not seek to claim any privilege against self-incrimination under English law; that is, in relation to any English criminal process or sanction.

13.   In light of that material, the Bank's stance changed. The Bank sought to argue that the matters set out by Mr Khrapunov did not amount to a sufficient claim for privilege on any basis, but particularly given the confidentiality regime in place. Given that change of stance, and the lack of court time, I adjourned the application to the first available date. The hearing resumed yesterday, 19 January.

14.   Mr Smith QC, who appeared for the Bank on the adjourned hearing, leading Mr Akkouh who had appeared alone on 1 December, submitted that Mr Khrapunov's evidence was wholly insufficient to demonstrate a proper claim for privilege against self-incrimination. He referred to a number of statements of principle, as follows. In <u>Triplex Safety Glass Co Ltd v Lancegaye Safety Glass</u> [1939] 2 KB 395, Du Parcq LJ, giving the judgment of the court, stated as follows:

> "*The court has, none the less, a duty to make sure, so far as may be, that the protection of the rule is not accorded to persons who have in*

*truth no claim to it. To this end certain principles have in course of
time been established which may be stated shortly as follows:*

*(1) The mere fact that a party or a witness swears that his answer
would tend to criminate him is not conclusive. The Court may have
a duty, notwithstanding this assertion of a claim to privilege, to
compel him to answer.*

*(2) The Court will insist upon an answer if, in the words of Pollock CB,
'the witness is trifling with the authority of the Court, and availing
himself of the rule of law to keep back the truth, having in reality no
ground whatever for claiming the privilege'..."*

15.  In <u>Sociedade Nacional v Lundqvist</u> [1991] 2 QB 310, Staughton LJ, at page 324F,

stated as follows:

*"The substance of the test is thus that there must be grounds to
apprehend danger to the witness, and those grounds must be
reasonable, rather than fanciful."*

16.  Beldam LJ stated at page 331G:

*"I would therefore hold that the court is not simply bound by the
statement of the defendants that to give the information requested
would put them in peril of incrimination. The court is not only entitled
but is bound to look further and to consider the merits of the claim
which is advanced."*

17.  In <u>JSC BTA Bank v Ablyazov</u> [2010] 1 All ER (Comm) 1029, Sedley LJ

emphasised that in order to redress the balance, the court must expose a claim to

privilege to "close scrutiny".

18.  Mr Samek QC, who appeared for Mr Khrapunov, did not dispute those principles,

but referred to the other side of the equation, and in particular to a summary by

Mann J of the relevant principles in <u>Phillips v Newsgroup Newspapers</u> [2010]

EWHC 2952 (Ch):

*"23. The question for the court is whether the risk of exposure to criminal proceedings is sufficient to give rise to the privilege. The classic statement of the relevant level of risk is in <u>R v Boyes</u> [1861] 1B&S 311 at page 330:*

*'To entitle a witness to the privilege of not answering a question as tending to incriminate him, the court must see, from the circumstances of the case and the nature of the evidence which the witness is called to give, that there is reasonable grounds to apprehend danger to the witness from his being compelled to answer. If the facts of the witness being endangered be once made to appear, great latitude should be allowed to him in judging the effect of any particular question. The danger to be apprehended must be real and appreciable, with reference to the ordinary operation of law in the ordinary course of things, and not a danger of imaginary character having reference to some barely possible contingency.'*

*24. The degree or level of risk was further amplified in <u>Rio Tinto Zinc v Westinghouse Electric Co</u>. [1978] AC547 at page 574:*

*'There is the further point: once it appears that a witness is at risk, then 'great latitude should be allowed to him in judging for himself the effect of any particular question': see <u>R v Boyes</u> ... It may only be one link in the chain, or only corroborative of existing material, but still he is not bound to answer if he believes on reasonable grounds that it could be used against him. It is not necessary for him to show that proceedings are likely to be taken against him, or would probably be taken against him. It may be improbable that they will be taken, but nevertheless, if there is some risk of their being taken – a real and appreciable risk – as distinct from a remote or insubstantial risk, then he should not be made to answer or to disclose the documents ... But where there is a real and appreciable risk, or an increase of an existing risk, then his objection should be upheld.'*

*25. Roskill LJ added:*

*'It cannot, I think, be right in these cases for the court to attempt a quantitive assessment of the probability one way or the other of the risk of proceedings ultimately being taken, and then to seek to draw the line, one way where the probabilities in the view of the court are thought to be more or less evenly balanced and the other where the balance is more disparate. It is not for the court to resolve problems of this kind by calculating odds. I think that the right question is to ask that posed by Shaw LJ on Friday afternoon. Can exposure to the risk of penalties (or in other cases to the risk of prosecution for a criminal offence) be regarded as so far beyond the bounds of reason*

*as to be no more than a fanciful possibility?"*

19. On the basis of those principles, Mann J concluded that:

> *"... considerable latitude is given to the person claiming the privilege and, putting the matter slightly colloquially, he is entitled to the benefit of any doubt."*

20. I accept Mr Smith's contention that Mr Khrapunov's own summary in his affidavit is lacking in particulars, and in itself would not amount to a sufficient basis for claiming privilege against self-incrimination. But there is also in evidence, exhibited to a witness statement of Mr Khrapunov's solicitor dated 13 November 2015, a pleading served in proceedings in the United States District Court Southern District of New York to which both the Bank and Mr Khrapunov are party. The pleading is entitled "Answer, Counterclaims and Crossclaims" and was served by three parties, including the City of Almaty in Kazakhstan and the Bank. It is a lengthy document. The gist of the contentions is that various parties, including Mr Ablyazov and Mr Khrapunov and his father, were involved in an international scheme to launder and conceal at least US$40 million stolen from the Kazakhstan plaintiffs, and that amongst the purposes of the scheme, one was converting stolen funds into valuable New York City real estate. At paragraph 22, it is asserted that:

> *"The Khrapunovs and Ablyazov, both fighting law enforcement investigations and asset seizures by Kazakh authorities, joined forces and commingled their stolen funds. Through joint investments across the globe, the two renegade families combined and conspired to launder their illicit wealth into real estate, energy assets, and other investments in locales they deemed safe from seizure. Ilyas Khrapunov [the second Defendant in these proceedings], related by marriage to Ablyazov, orchestrated these efforts and steered the families' joint*

*investments."*

21. Paragraph 23 refers to the fact of an alleged theft of billions of dollars from entities and municipalities in the Republic of Kazakhstan. In paragraph 77 the pleading starts to set out the case of money laundering, and at 79 refers to the Ablyazov-Khrapunov group creating "*a series of entities in Switzerland and overseas to launder these illicit funds into outwardly-legitimate investments*" and referring to Swiss Development Group, an entity which is referred to in the present proceedings in England.

22. At paragraph 84, the pleading refers to the fact that charges were brought in Kazakhstan against, among others, Mr Khrapunov, arising from theft of public property and laundering of funds during Mr Khrapunov's father's tenure as Mayor of Almaty. Paragraph 85 refers to the Investigation Department applying to the Federal Office of Justice in Switzerland for legal assistance in connection with the effort to prosecute the Khrapunovs for crimes in Switzerland and Kazakhstan relating to their corrupt acts in Almaty and the laundering of the resulting funds, and that "*in response to this request, in mid-2012 the Public Prosecutor of Geneva opened an investigation into the Ablyazov-Khrapunov Group on suspicion of violating Swiss money laundering laws*". It further refers to the fact that "*this investigation by the Swiss authorities is ongoing, and in August 2013 the Public Prosecutor of Geneva froze additional assets belonging to the Ablyazov-Khrapunov Group.*" Then paragraph 86 refers to "*additional charges pending against Leila Khrapunov and Ilyas Khrapunov in Kazakhstan for, among other offences, money laundering and establishing and directing an organised criminal group for*

*criminal purposes.*"

23. Paragraph 139 sets out the legal allegations against the Defendants in the United States, including numerous accounts of racketeering activity under the RICO statute, 18 USC, and includes allegations of engaging in mail fraud and wire fraud, "*knowingly using mails and wires to transfer illegally obtained funds into and within the United States, for the purpose of furthering the Count 1 Enterprise and, while concealing the funds' illegal source, used those funds to purchase real estate in New York City and to fund business entities, including SDG and Triadou, that enabled those entities to conduct business in the United States using the illegally obtained funds*"; and "*the Defendants unlawfully transported or caused to be transported in interstate or foreign commerce securities or money having a value of $5,000 or more which was stolen, converted or taken by fraud from Almaty and BTA Bank, and knowing the same to be stolen, converted or taken by fraud.*" Paragraph 140 alleges that each of the Defendants "*engaged or conspired to engage in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO.*" Then there is an allegation that from "*in or about 1997, and continuing to the present, the ... Defendants associated together, with one another and with others, and acted in concert for the common and unlawful purposes of the Count 1 Enterprise.*"

24. Given that the Bank has itself recently and is still currently alleging such a wide range of serious and continuing criminal offences against Mr Khrapunov in New York, and refers to criminal charges against him in Kazakhstan and criminal

investigations ongoing in Switzerland, I readily accept that Mr Khrapunov faces the risk of prosecution in each of those jurisdictions. Further, given the nature of the allegations relates to the movement of assets (including, as I have mentioned, wire fraud, transportation, et cetera), in my judgment it is certainly not fanciful that the disclosure of his assets will increase the risk of criminal charges and the likelihood of incrimination in relation to such charges.

25.     Against that background, I am satisfied that Mr Khrapunov is entitled to the latitude referred to by Mann J and that regard must be had to his assertion, based on, he says, legal advice (and Mr Smith does not suggest that Mr Khrapunov has not had such advice) that disclosing his assets would incriminate him.

26.     The further question is, therefore, whether the provision relating to disclosure to a "confidentiality club" removes that risk to such a degree that it becomes merely fanciful and ceases to be a real risk. The use of a restricted information regime or confidentiality club or some other such device to remove the risk of self-incrimination has been recognised in a number of authorities. In Crédit Suisse Fides Trust SA v Cuoghi [1998] QB 818, Millett LJ, at page 830E, stated as follows:

> "*It will still be open to CSFT to suggest measures which will ensure that there is no significant risk that incriminating information will come into the possession of the Swiss prosecuting authorities. The best way of doing this is to prevent it coming into the possession of CSFT. There are various mechanisms that could be put in place to ensure this without reducing the effectiveness of the Mareva relief. Some of them were suggested in the course of argument. So far as bank accounts are concerned, it appears to be the entries in the*

> *accounts which are thought to be sensitive rather than the location and amount of the final balances. It should not be beyond the skill of those advising Mr Cuoghi to find a means of providing the latter information without disclosing the former."*

27. Lord Bingham of Cornhill CJ stated at 833D:

> *"It is still open to CSFT to show that there will be no significant risk of self-incrimination in practice because effective measures can and will be taken to ensure that incriminating disclosures do not become known to the prosecuting authorities in Switzerland..."*

28. In the earlier proceedings by the Bank against Mr Ablyazov, in a decision dated 11 September 2009, Flaux J considered the question of Mr Ablyazov's privilege against self-incrimination in relation to prosecution in England but also in relation to proceedings in Kazakhstan or Latvia. He referred to the fact that the Claimant's solicitors, then known as Lovells, had proposed a confidentiality club on a similar basis to that contained in the order of Popplewell J. Flaux J concluded:

> *"On the basis of that offer it seems to me that there is no ground for any suggestion that disclosure to the claimant's legal advisors would expose the fourth defendant to the risk of proceedings against it in Kazakhstan or Latvia. In the circumstances, it seems to me that the fourth defendant has not demonstrated any basis upon which it can justify refusing to disclose its assets in accordance with the order of the court and the claimants are entitled to the relief they seek."*

29. In the decision in the Court of Appeal in JSC BTA Bank v Ablyazov [2010] 1 All ER (Comm) 1029, to which I have already referred above, Pill LJ stated at paragraph 26:

> *"At the hearing before this court, the claimants offered a concession. Disclosure need only be to their solicitors and counsel. That concession, if acted upon, greatly diminishes the risk of information reaching the prosecuting authorities in Kazakhstan as a result of an*

> *order for disclosure. The court indicated that it was prepared to act on that concession though reservations were expressed, repeated by Sedley LJ in his judgment, about problems which may result. In post-hearing written submissions, the defendants argued that only named counsel and named representatives of the claimants' solicitors should be entitled to see the documents. That submission was rejected but the documents may be seen only by those representatives directly concerned with the case."*

30. Sedley LJ did indeed, at paragraph 41, express concerns as to potential complications which might arise from such a confidentiality regime, but he did not dissent from the imposition of that regime as a way forward in that case. I should add that I am told by Mr Smith, who has acted throughout the Ablyazov litigation, that there have been no problems with the operation of the confidentiality club in relation to disclosure by Mr Ablyazov.

31. There is, of course, also the standard provision in the worldwide freezing order in the form of an undertaking by the Bank that it *"will not without permission of the court use any information obtained as a result of this order for the purposes of any civil or criminal proceedings, either in England or Wales or in any other jurisdiction, other than this claim."* Therefore, the Bank is not entitled to use any information disclosed to take proceedings abroad without permission of the court. The confidentiality provisions add a further significant layer of protection to Mr Khrapunov, in that, self-evidently, the material cannot be disclosed to anyone other than the lawyers directly involved in the case, and in particular the Bank itself will not have access to the materials.

32. Mr Samek argued that the confidentiality club provisions did not, in fact, remove

the risk of incrimination sufficiently, or indeed barely at all. He submitted that once the documents were, as he put it, "out there", there were numerous ways in which they could, whether inadvertently or otherwise, come into the hands of the prosecuting authorities in one or more of the relevant jurisdictions. By way of specific examples, Mr Samek relied upon evidence from two foreign lawyers. In relation to Switzerland, he relied upon the evidence of Mr Chandrasekharan, an attorney-at-law in the firm of Des Gouttes & Associés. His evidence was that the Swiss prosecutor or court could only directly obtain disclosure from the Claimant's solicitors, Hogan Lovells, if either they or the disclosure documents were located at any moment in Switzerland. Mr Samek suggested that this was a risk for Mr Khrapunov, because the disclosure would be in Mr Khrapunov's hands, physically or electronically, at the point at which he transmitted it, presumably to his solicitors in England, and therefore would be liable to disclosure.

33. In my judgment, that is a difficult position to follow. If the documents to be disclosed are in his hands in Switzerland, either the Swiss authorities can obtain them from him by ordinary means or they cannot. The fact that the documents are going to be given by way of disclosure in England does not seem to me to affect that position. But in any event, it is difficult to see why arrangements cannot be made so that the disclosure, in such form as it is, is not constituted or retained by Mr Khrapunov in Switzerland.

34. Mr Chandrasekharan also confirmed that a Swiss prosecutor could seek disclosure through the European Convention on Mutual Assistance in Criminal Matters by

requesting the authorities in the United Kingdom to obtain such disclosure on its behalf. It was common ground that any such process would involve a hearing and discretionary decision by an English court, which certainly would take into account the privilege and the confidentiality regime, and I do not consider that it is a significant risk that such a process would be utilised and would result in disclosure, particularly as it is confirmed in Mr Chandrasekharan's report that the Swiss authorities fully recognise the privilege against self-incrimination.

35. In relation to the United States, and in particular the State of New York, Mr Khrapunov relied upon the witness report of Mr Burlingame, an experienced and highly qualified attorney-at-law who has, as well as working in private practice, worked for nine years as a federal prosecutor. His evidence is that it was at least in principle possible that a grand jury could be empanelled in New York, and that the US Government, through the grand jury, could issue a subpoena to the Hogan Lovells US firm. Although accepting that the Hogan Lovells United States firm is a separate legal entity from Hogan Lovells International LLP (the Bank's solicitors in these proceedings), Mr Burlingame suggests that there is a prospect that arguments could be mounted that the US firm was acting as agent for Hogan Lovells International, and therefore that Hogan Lovells International would be subject to its jurisdiction, and thereupon would be required to produce the documents.

36. Whilst on that evidence it cannot be said that that theoretical possibility does not exist, in my judgment it is a remote and indeed fanciful possibility. In neither

Switzerland nor the United States has there been any indication of criminal proceedings, notwithstanding that the allegations against Mr Ablyazov and Mr Khrapunov have been extant and well known for some considerable period of time. The suggestion that now a grand jury might seek to obtain disclosure of this confidential material through this route is particularly fanciful, and I do not consider it to be a real risk. One question which arises is, how would the foreign authorities even know that this material was in the hands of Hogan Lovells? Certainly it is the case that if an order is made, that order will, in the ordinary event, be a public order which could be transmitted to the Bank and then on to third parties. However, steps could be taken to deal with that concern if it is thought to be a real one.

37. Mr Samek further contended that there was a risk that, notwithstanding that the materials would be kept confidential, perfectly proper steps or enquiries, taken without disclosing the confidential material, might nonetheless tip off the authorities as to the existence of those assets, and would thereby indirectly result in incrimination by virtue of the disclosure, and that should be a factor which militated against the confidentiality club being a sufficient answer. Again, in my judgment, that is a highly unlikely scenario. Hogan Lovells would be required to keep such material confidential and only to take further proceedings abroad with the leave of the court. Any enquiries they made would have to be without referring to the confidential material. If those enquiries independently obtained independent evidence of assets, then there does not seem any reason why that material should be treated as subject to a privilege against self-incrimination.

38.  My conclusion that the confidentiality regime is sufficient to remove any real risk to Mr Khrapunov is reinforced by the fact that this was the view initially taken by Mr Khrapunov himself, with the benefit of legal advice. Mr Khrapunov's subsequent changed stance in relation to the effectiveness of a regime he himself had proposed suggests that his present motivation is to avoid giving proper disclosure to the Bank, not a genuine concern as to an increased risk of prosecution.

39.  I raised the question of how Hogan Lovells would be able to enforce and police the freezing order if they are subject to the confidentiality regime in relation to their client, the Bank. The answer is that Hogan Lovells have a broad mandate from the Bank to take measures to protect assets. In my judgment, there is no reason why the Bank should be deprived of the opportunity to protect their assets in circumstances where they can do so by this regime without prejudicing any rights Mr Khrapunov has in relation to self-incrimination.

40.  In any event, to the extent that the recognition of a privilege against self-incrimination in relation to foreign proceedings is a matter of the court's discretion, it must also be a matter of discretion as to the circumstances and conditions upon which that privilege should be recognised and given effect. In my judgment, and as an exercise of my discretion, I will only recognise any such privilege to the extent that the documents should only be disclosed to the confidentiality club. Provided they are disclosed subject to that restriction, I do not consider that any further protection is necessary, proper or proportionate as a matter of discretion. I will therefore order disclosure subject to the existing confidentiality

regime.

41.  It might be said that there is a degree of uncertainty in the order as to exactly who is bound by what aspect and in what way. If Mr Samek were to invite me to do so, I would suggest that, rather than an order, the matter be dealt with by way of undertakings clarifying exactly who is undertaking what obligations. The application is so determined.