# Exhibit 29
## (PART 1 OF 2)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
------------------------------------------------------------------x

TRIADOU SPV S.A.,

                                        Plaintiff,

                    -against-

CF 135 FLAT LLC, CF 135 WEST MEMBER LLC
and THE CHETRIT GROUP LLC,

                                        Defendants.

------------------------------------------------------------------x

Index No. 653462/14

**AFFIDAVIT OF JOSEPH
CHETRIT IN SUPPORT OF
DEFENDANTS'
ORDER TO SHOW CAUSE**

STATE OF NEW YORK      )
                       ss.:
COUNTY OF NEW YORK )

        JOSEPH CHETRIT, being duly sworn, deposes and says:

        1.      I am a member of The Chetrit Group LLC ("The Chetrit Group"), a defendant

herein, and as such am fully familiar with the facts of this action.

        2.      I submit this affirmation in support of the motion by Defendants, by order to show

cause submitted herewith, for an Order, *inter alia*, modifying this Court's existing order, dated

February 2, 2016, and extending to May 10, 2016 the deadline by which Defendants may obtain

a stay of these proceedings by depositing the sum of $21 million with this Court.

        3.      As part of Defendants' prior July 7, 2015 motion, submitted by order to show

cause, seeking a stay of this action (the "Prior Motion"), Defendants offered, if required by the

Court as a condition of obtaining a stay, to make a deposit into this Court to secure plaintiff

Triadou SPV S.A.'s ("Plaintiff") existing judgments. I understand that this Court's February 2,

2016 decision and order granting that motion requires Defendants to deposit $21 million with the

Court by March 7, 2016 in order to obtain a stay. That deadline was extended for 48 hours by

Order of this Court, dated March 8, 2016.   However, due to unexpected circumstances, Defendants require a 60-day extension of the Court's current deposit deadline, from March 10, 2016 to May 10, 2016.

    4.      The reason that such extension is warranted is that Defendants' offer in the Prior Motion to make a deposit into Court was premised on the anticipated sale of condominium units at the Flathotel, located at 135 W. 52nd St, New York, New York.   Defendant CF 135 West Member LLC ("CF West") holds a 75% interest in the Flatotel.   However, to date, sales of condominium units at the Flatotel have failed to generate enough funds to cover the required deposit.   As a result, Defendants will not be able to make the $21 million deposit by the current March 10, 2016 deadline.

    5.      To date, the net sum of total sales from Flatotel condominium units is $179,643,359.00. (*see* copies of all condominium closing statements to date, "Exhibit A," and a summary of the dates and net proceeds of those closings, "Exhibit B.")   However, none of the proceeds of these prior sales are still available to Defendants, as such funds were used to pay down the project's construction loan from Deutsche Bank.

    6.      Indeed, to date, Defendants have yet to realize *any* post-expense income from the Flatotel project.   This is because before the Flatotel can generate such income, the Deutsche Bank loan must be repaid in full.   As of March 9, 2016, the outstanding balance on the Deutsche Bank loan was approximately $49,909,562.00, calculated as such:

| | |
|---|---|
| Loan Balance as of 3/1/16: | $94,353,279.00 |
| Allocations to be applied to Loan Balance as of 3/1/16: | - $11,971,760.00 |
| Payments to lender lockbox which have not yet been applied; | - $32,471,950.00 |
| Loan Balance as of 3/9/16: | = $49,909,562.00 |

9

*(see* a copy of the loan servicer's March 1, 2016 statement, "Exhibit C," and the Chetrit Group's accounting statement, dated March 1, 2016, reflecting lockbox repayments which have not yet been credited against the loan, "Exhibit D.")

7.      Additionally, the Flatotel's current "balance to finish" – the total expected cost of future development work at the Flatotel – plus expected contingency payments, is $17,000.000. *(see* a copy of the Flatotel's recent loan requisition reflecting a balance to finish of $11,415,512.85, "Exhibit E," and The Chetrit Group's accounting statement, generated March 8, 2016, reflecting an additional expected contingency of $5,518,487.75, "Exhibit F.")  That $17,000,000.00 sum is an additional expense which, like the loan repayment, must be paid out of the proceeds of future closings before any profits are realized.

8.      There are twenty-two existing contracts of sale for Flatotel condominiums that are scheduled to close within the next 60 days.  The total expected gross value of these closings is $91,865,000.00.  *(see* copies of the Flatotel's contracts of sale, "Exhibit G," and a summary of the expected dates and values of future closings, "Exhibit H.")  After deducting fees and commissions estimated at 6%-8%, the expected net value of these closing is $85,434,450.00

9.      Accordingly, after the outstanding loan balance is satisfied and the expected development costs and contingencies are repaid, the twenty-two closings which are to take place over the next 60 days are expected to generate post-expense income of $18,524,888.00 ($85,434,450.00 in closing proceeds, less $49,909,562.00 payable for the loan, less $17,000,000.00 payable for development work and contingencies = $18,524,888.00).  As CF West holds a 75% interest in the Flatotel, 75% of that income will be accessible to Defendants. Therefore, after 60 days, Defendants should have available at least $13,893,666.00.

3

10. Additionally, there are twenty-two unsold condominium units at the Flatotel worth a total of $148,732,000.00 (*see* a list of unsold condominium units and their offering prices, "Exhibit I") Defendants expect that many, if not most, of these units will soon be purchased, and that some purchases may be settled before May 10, 2016. However, even if sufficient additional units are not sold over the next few weeks, Defendants will still have $21 million in hand by May 10, 2016. Either I, Joseph Chetrit, will purchase as many condominium units as are necessary to insure that Defendants have $21 million by May 10, 2016, or else Defendants will borrow against the unsold units to obtain any additional funds necessary for the deposit.

11. Accordingly, there is every reason to trust that Defendants will have $21 million on May 10, 2016. If no additional units sell between now and May 10, 2016 – which is very unlikely – Defendants should still have almost $14 million in hand on May 10, 2016 based on *existing* contacts of sale; Defendants fully expect to sell additional units over the new few weeks; and if no additional units are sold, the remaining $7 million or so required for the deposit (above and beyond the almost $14 million coming from scheduled closings) will be financed through my purchase of condominium units or through Defendants' secured borrowing.

12. Furthermore, because nearly all the proceeds from prior condominium sales were used to pay down the Deutsche Bank loans, Defendants do not have any money now. Neither CF 135 Flat LLC nor CF 135 has a bank account or any liquid assets. The Chetrit Group's most recent available bank statements, from August 2015 through January 2016, demonstrate that The Chetrit Group had a negative account balance for most of that period. (*see* copies of The Cheterit Group's bank statements from 8/15-1/16, "Exhibit J")

13.     As Defendants have no available funds with which to make a deposit, but should be expected to have $21 million in hand by May 10, 2016, an extension of the deposit deadline is appropriate. If the Court does not extend the deposit deadline, Plaintiff may immediately act to enforce its judgments. That would put defendants at risk of irreparable harm, for two reasons.

14.     First, the City of Almaty, Kazakhstan ("Almaty") has alleged in a related Federal interpleader action involving defendants, Plaintiff, and Almaty that Plaintiff, a Luxembourg entity, is part of a sophisticated international crime syndicate which stole more than $300 million from municipalities and banks located in Kazakhstan and laundered those stolen funds thorough European shell companies. On that basis, Almaty contends that it, not Plaintiff, should be paid by defendants. (*see* a copy of Almaty's notice of removal of Defendants' related interpleader action, "Exhibit K") If these allegations are proven true, and the Federal court rules that Almaty, rather than Plaintiff, should be paid by Defendants, any funds paid to Triadou in this action will have to be returned to defendants. By that time, however, defendants' funds will likely be unrecoverable, as Triadou will have transferred such funds outside the United States or taken steps to conceal their whereabouts.

15.     Second, if Almaty acts to enforce its judgments before a deposit can be made, many current and prospective buyers of Flatotel condominiums may terminate their purchases, resulting in the failure of the entire Flatotel real estate condominium project. Defendants, and everyone else with an interest in the Flatotel – including various non-parties – would be irreparably harmed. There is no reason that the entire Flatotel project should be put at risk simply because defendants need a few more weeks to make the deposit.

16.     To prove that the entire project may fail if an extension is not granted, I asked the attorney overseeing the Flatotel condominium offering and the real estate broker marketing the

5

condominiums to prepare letters attesting to the risk of irreparable harm. Regrettably, those documents could not be prepared in time for the expeditious filing of this motion. However, the condominium attorney advises that if Plaintiff is permitted to seize Defendants' interest in the Flatotel, the condominium offering plan may have to be redrafted and resubmitted to the New York Attorney General for review, which could hold up the project for several months or longer. The real estate broker advises that in this competitive condominium market, the enforcement of judgments against the Flatotel's current owners may create a cloud of uncertainty over the entire project which could deter prospective and future buyers. If the condominium attorney and broker are correct – and I believe they both are – then Plaintiff's enforcement of its judgments would put the financial viability of the entire Flatotel project at risk.

17.     Conversely, Plaintiff will suffer little prejudice if this motion is granted. At worse, Plaintiff will have to wait a few more weeks for the deposit to be made. Even without a deposit having been made, Plaintiff's judgments are fully secured by CF 135's interest in the Flatotel, which by even the most conservative estimates is worth at least $21 million.

18.     Alternatively, should the Court decline to extend the deposit deadline in each of Plaintiff's four related actions against Defendants, the Court should at the very least extend the deadline in the two actions in which judgments have already been entered (this action, and Index No. 650239/2015). As discussed, based on existing contracts of sale, Defendants should have $14 million in hand by May 10, 2016. The sum of the two judgments entered against Defendants in $10.5 million. Thus, even if the Court doubts that additional condominiums will be sold before May 10, 2016 or that Defendants will borrow additions sums, the Court should nonetheless stay the enforcement of Plaintiff's existing judgments based on existing sale contacts exceeding the value of those judgments.

WHEREFORE, and for the reasons set forth in the accompanying affirmation of David Salhanick, Esq., it is respectfully requested that the Court issue an Order (i) pursuant to CPLR 5015(a)(2) and CPLR 2201, modifying this Court's existing order, dated February 2, 2016, and extending to May 10, 2016 the deadline by which defendants may obtain a stay of these proceedings by depositing of the sum of $21 million with this Court, and (ii) pursuant to CPLR 6301, temporarily staying all proceedings in this action until the earlier of (i) service of a decision on this motion with notice of entry, or (ii) defendants' deposit of $21 million with the Court

_____
JOSEPH CHETRIT

Sworn to before me on this
18 day of March, 2016

JEHOSHUA GRAFF
Notary Public, State of New York
No. 02GR4518172
Qualified in Nassau County
Commission Expires February 28, 2019

6

# EXHIBIT A

**CHECK LIST**                                     Date: *11/20/2015*
**135 West 52nd Street, Unit** *9B*    Purchaser(s) *Richard & Min Jung Kim*

**PURCHASE PRICE:** *1,915,000.00*
Checks to Deutsche Bank AG New York Branch, as agent:
         ✓ 1. *1,274,242.87* ;
         ✓ 2. *353,507.13* ;
         3._____ ;
         4._____ ;

**TOTAL**                          ✓ *1,627,750.00*

Check to 135 West 52nd Street Owners LLC
    Adjustments          1. ✓ *10,476.63*

Checks to 135 West 52nd Street Condominium
    Capital Contribution     1. ✓ *1,640.62*
    Next Month Common Charges 2._____

Check to Rosen Livingston & Cholst   1. ✓ *2,000.00*

Down Payment:                *287,250.00*

Down Payment with Interest       *288,361.40*

Check #*6610* to DE         1. ✓ *28,725.00*

Check # *6607* to Co-broker *Halstead*    . ✓ *57,450.00* (*COPY*)
                       *PROPERTY*
Check #*6608* to *TitleTrak Agency*
Title Company recording fee    1.___ ✓ *600.00* (*COPY*)

~~Check #_____ to~~
~~Title Company transfer taxes~~    1._____

Check #*6609* to purchaser *Richard Kim* ✓ *1,111.40* (*COPY*)
Interest on Down Payment
Balance of Down Payment --wire   1. *200,475.00*
**TOTAL w/Balance of Down Payment:** *1,828,225.00*

# CLOSING STATEMENT

**135 West 52nd Street, Unit #9C**
**Purchaser(s): Steve Zhang**

| Closed On: |
| :-- |
| Dec 1, 2015 |

Funds Disbursed To Deutsche Bank:

| Balance of Purchase Price – Check(s) | $1,309,000.00 |
| :-- | --: |
| Balance of Down Payment – Wire | $153,400.00 |
| **TOTAL** | $1,462,400.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
| :-- | :-- | --: |
| | 1. | $1,000,000.00 |
| | 2. | $100,000.00 |
| | 3. | $140,000.00 |
| | 4. | $69,000.00 |
| **Balance of Purchase Price – Check(s)** | | $1,309,000.00 |

Check to 135 West 52nd Street Owners LLC:

| Adjustments | 1. | $525.06 |
| :-- | :-- | --: |

Checks to 135 West 52nd Street Condominium:

| Capital Contribution | 1. | $1,295.22 |
| :-- | :-- | --: |
| Next Month Common Charges | 2. | |

Check to Rosen Livingston & Cholst LLP: 1.      $2,000.00

1

## CLOSING STATEMENT

**135 West 52nd Street, Unit #9D**
**Purchaser(s): Hong Yuan Zhang**

> **Closed On:**
> **Nov 18, 2015**

Checks to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| Balance of Purchase Price | 1. | $1,247,400.00 |
| | 2. | $78,600.00 |
| **TOTAL** | | $1,326,000.00 |

Check to 135 West 52nd Street Owners LLC

| | | |
|---|---|---|
| Adjustments | 1. | $724.87 |
| | 2. | |

Checks to 135 West 52nd Street Condominium

| | | |
|---|---|---|
| Capital Contribution | 1. | $1,295.22 |
| Next Month Common Charges | 2. | |

| | | |
|---|---|---|
| Check to Rosen Livingston & Cholst | 1. | $2,000.00 |
| Down Payment: | | $234,000.00 |
| Down Payment with Interest: | | $234,836.19 |
| Check #6583 to Douglas Elliman | 1. | $23,400.00 |
| Check #6584 to Co-broker Douglas Elliman | 1. | $46,800.00 |
| Check #6585 to Title Company VP Abstract Services | 1. | $600.00 |
| Check #6586 to Purchaser Hong Yuan Zhang | 1. | $836.19 |
| Balance of Down Payment: Wire to Deutsche Bank | | $163,200.00 |

\* Enclosed: copy of checks, Unit Deed, Window Guard Notice,
FIRPTA Affidavit, 1099 Form, and Unit Power of Attorney.

# CLOSING STATEMENT

### 135 West 52nd Street, Unit #9E
### Purchaser(s): Yuan Yang

Closed On:
Dec 15, 2015

Funds Disbursed To Deutsche Bank:

  Balance of Purchase Price -- Check(s)    $1,653,250.00

  Balance of Down Payment -- Wire    $193,900.00

  **TOTAL**    $1,847,150.00


CHECKS to Deutsche Bank AG New York Branch, as agent:

    1.   $1,653,250.00

  **Balance of Purchase Price -- Check(s)**   $1,653,250.00

Check to 135 West 52nd Street Owners LLC:

  Adjustments    1.   $480.85

Checks to 135 West 52nd Street Condominium:

  Capital Contribution    1.   $1,640.62

  Next Month Common Charges [50%] 2.   $410.16


Check to Rosen Livingston & Cholst LLP:   1.   $2,000.00


ESCROW ACCOUNT

  Down Payment:    $291,750.00

  Down Payment with Interest:    $292,850.32


1

# **CLOSING STATEMENT**

**135 West 52nd Street, Unit #9F**
**Purchaser(s): Amy Wen Xu & Gang Xu**

<div style="border:1px solid">

**Closed On:**
**Nov 16, 2015**

</div>

Checks to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| Balance of Purchase Price | 1. | $1,286,090.73 |
| | 2. | $260,913.99 |
| **TOTAL** | | $1,547,004.72  *paid $4.72 extra* |

Check to 135 West 52nd Street Owners LLC

| | | |
|---|---|---|
| Adjustments | 1. | $964.06 |

Checks to 135 West 52nd Street Condominium

| | | |
|---|---|---|
| Capital Contribution | 1. | $1,554.26 |
| Next Month Common Charges | 2. | — |

| | | |
|---|---|---|
| Check to Rosen Livingston & Cholst | 1. | $2,000.00 |
| Down Payment: | | $273,000.00 |
| Down Payment with Interest: | | $274,016.09 |
| Check #6571 to Douglas Elliman | 1. | $27,300.00 |
| Check #6572 to Co-broker *Douglas Elliman* | 1. | $54,600.00 |
| Check #6570 to Title Company *Partners Abstract Corp.* | 1. | $600.00 |
| Check #6573 to Seller's attorney *Rosen Livingston & Cholst* | 1. | $20,000.00 |
| Check #6574 to Purchaser *Gang Xu* | 1. | $1,020.81  *paid back extra $4.72* |
| Balance of Down Payment: Wire to Deutsche Bank | | $170,495.28 |

*\* Enclosed: copy of checks, Unit Deed, Window Guard Notice,*
*FIRPTA Affidavit, 1099 Form, and Unit Power of Attorney.*

# CLOSING STATEMENT

**135 West 52nd Street, Unit #10A**
**Purchaser(s): Vinay Viralam**

> **Closed On:**
> **Jan 28, 2016**

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $1,564,000.00 |
| Balance of Down Payment -- Wire | $229,400.00 |
| **TOTAL** | $1,793,400.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | $1,000,000.00 |
| | 2. | $603.39 |
| | 3. | $563,396.61 |
| **Balance of Purchase Price – Check(s)** | | $1,564,000.00 |

Check to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $9,013.99 |

Checks to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Capital Contribution | 1. | $1,577.02 |
| Next Month Common Charges | 2. | — |

| | | |
|---|---|---|
| Check to Rosen Livingston & Cholst LLP: | 1. | $2,000.00 |

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $276,000.00 |
| Down Payment with Interest: | $277,182.13 |

1

29

11/19/2015

## CHECK LIST

__135 West 52nd Street, Unit__ *10 B*    __Purchaser(s)__ *REZNIKOV, ELENA*

*PURCHASE PRICE: $2,000,000.00*

Checks to Deutsche Bank AG New York Branch, as agent:

1. *181,801.18* ;
2. *1,518,198.82* ;
3. _____ ;
4. _____ ;

**TOTAL**   ✓ *1,700,000.00*

Check to 135 West 52nd Street Owners LLC
    Adjustments
1. ✓ *10,733.63*
2. _____
3. _____

Checks to 135 West 52nd Street Condominium
    Capital Contribution
    Next Month Common Charges
1. ✓ *1,657.88*
2. _____

Check to Rosen Livingston & Cholst
1. ✓ *2,000.00*

Down Payment:    *300,000.00*

Down Payment with Interest    *301,074.50*

Check # *6595* to DE    1. *30,000.00*    *(copy)*

Check # *6596* to Co-broker *DE*    1. *55,000.00*    *(copy)*

Check # *6597* to *CHESTER ABSTRACT*
Title Company recording fee    1. *600.00*    *(copy)*

*CHECK # 6080 CHESTER ABSTRACT*    *5,000.00*    *(copy)*
~~Check #_____ to _____~~
~~Title Company transfer taxes~~    1. _____

Check # *6598* to purchaser *REZNIKOV*    1. *1,074.50*    *(copy)*
Interest on Down Payment

Balance of Down Payment --wire    1. *809 400.00*

*TOTAL w/BALANCE OF DP*    *$1,909,400.00*

30

# CLOSING STATEMENT

### 135 West 52nd Street, Unit #10C
### Purchaser(s): Hsueh-Chen Liu & Kenny Chen

> **Closed On:**
> Dec 29, 2015

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $1,338,750.00 |
| Balance of Down Payment – Wire | $156,900.00 |
| **TOTAL** | $1,495,650.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | $1,338,750.00 |
| **Balance of Purchase Price – Check(s)** | | $1,338,750.00 |

Check to 135 West 52nd Street Owners LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $94.70 |

Checks to 135 West 52nd Street Condominium:

| | | |
|---|---|---|
| Capital Contribution | 1. | $1,308.18 |
| Next Month Common Charges | 2. | |

Check to Rosen Livingston & Cholst LLP: 1.   $2,000.00

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $236,250.00 |
| Down Payment with Interest: | $237,176.09 |

1

31

11/19/2015

## CHECK LIST

**135 West 52nd Street, Unit** *100*      **Purchaser(s)** *Ajar LLC*

*PURCHASE PRICE: 1,575,000.00*

Checks to Deutsche Bank AG New York Branch, as agent:

1. *1,338,750.00* ;
2. _____ ;
3. _____ ;
4. _____ ;

**TOTAL**      *1,338,750.00*

Check to 135 West 52nd Street Owners LLC
    Adjustments

1. *709.50*
2. _____
3. _____

Checks to 135 West 52nd Street Condominium
    Capital Contribution          1. *1,308.18*
    Next Month Common Charges     2. _____

Check to Rosen Livingston & Cholst      1. *2,000.00*

Down Payment:      *236,250.00*

Down Payment with Interest      *236,996.80*

Check #*6587* to DE      1. *31,500.00  (copy)*

Check #*6588* to Co-broker *DE*      1. *47,250.00  (copy)*

Check #*6589* to *DE TITLE SVCS*
Title Company recording fee      1. *600.00  (copy)*

~~Check #~~ _____ ~~to~~ ___
~~Title Company transfer taxes~~      1. ————

Check #*6590* to purchaser *Ajar LLC*
Interest on Down Payment      1. *746.80  (copy)*

Balance of Down Payment --wire      1. *156,900.00*

*TOTAL w/Balance of DP      $1,495,650.00*

32

## CLOSING STATEMENT

> **Closed On:**
> **Nov 19, 2015**

**135 West 52nd Street, Unit #10E**
**Purchaser(s): RJJ Holdings LLC**

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $1,670,250.00 |
| Balance of Down Payment -Wire | $205,725.00 |
| **TOTAL** | $1,875,975.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | $1,670,250.00 |
| | 2. | |
| **Balance of Purchase Price – Check(s)** | | $1,670,250.00 |

Check to 135 West 52nd Street Owners LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $1,125.42 |

Checks to 135 West 52nd Street Condominium:

| | | |
|---|---|---|
| Capital Contribution | 1. | $1,657.88 *paid in cash Rosen Livingston & Cholst will issue check |
| Next Month Common Charges | 2. | |

Check to Rosen Livingston & Cholst LLP: 1.  $2,000.00

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $294,750.00 |
| Down Payment with Interest: | $295,747.37 |

1

33

# CLOSING STATEMENT

135 West 52nd Street, Unit #10F
**Purchaser(s): Wa Xu Sudderth**

| Closed On: |
|---|
| Dec 30, 2015 |

Funds Disbursed To Deutsche Bank:

    Balance of Purchase Price – Check(s)     *$1,598,000.00*

    Balance of Down Payment – Wire     *$187,400.00*

    **TOTAL**     *$1,785,400.00*

CHECKS to Deutsche Bank AG New York Branch, as agent:

    1.    *$900,000.00*

    2.    *$499,000.00*

    3.    *$100,000.00*

    4.    *$99,000.00*

**Balance of Purchase Price – Check(s)**    *$1598,000.00*

Check to 135 West 52nd Street Owner LLC:

    Adjustments    1.    *$101.22*

Checks to 135 West 52nd Street *Owner LLC* :

    Capital Contribution    1.    *$1,571.54*

    *3rd Quarter Real Estate Taxes*    2.    *$1,768.60*

Check to Rosen Livingston & Cholst LLP:    1.    *$2,000.00*

ESCROW ACCOUNT

    Down Payment:    *$282,000.00*

    Down Payment with Interest:    *$283,098.45*

1

# CLOSING STATEMENT

**135 West 52nd Street, Unit #11A**
**Purchaser(s): Kathy Chang**

| Closed On: |
|---|
| Dec 2, 2015 |

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $1,615,000.00 |
| Balance of Down Payment – Wire | $189,400.00 |
| **TOTAL** | $1,804,400.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | $1,615,000.00 |
| | 2. | |
| **Balance of Purchase Price – Check(s)** | | $1,615,000.00 |

Check to 135 West 52nd Street Owners LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $650.30 |

Checks to 135 West 52nd Street Condominium:

| | | |
|---|---|---|
| Capital Contribution | 1. | $1,588.80 |
| Next Month Common Charges | 2. | |

Check to Rosen Livingston & Cholst LLP: 1. $2,000.00

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $285,000.00 |
| Down Payment with Interest: | $285,797.56 |

1

35

## CLOSING STATEMENT

> Closed On:
> Nov 20, 2015

### 135 West 52nd Street, Unit #11B
### Purchaser(s): Kirill Istomin & Nataliya Istomina

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $1,717,000.00 |
| Balance of Down Payment – Wire | $201,400.00 |
| **TOTAL** | $1,918,400.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | $1,350,000.00 |
| | 2. | $350,000.00 |
| | 3. | $17,000.00 |
| **Balance of Purchase Price – Check(s)** | | $1,717,000.00 |

Check to 135 West 52nd Street Owners LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $979.14 |

Checks to 135 West 52nd Street Condominium:

| | | |
|---|---|---|
| Capital Contribution | 1. | $1,675.16 |

Check to Rosen Livingston & Cholst LLP: 1. $2,000.00

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $303,000.00 |
| Down Payment with Interest: | $304,037.78 |

1

# CLOSING STATEMENT

### 135 West 52nd Street, Unit #11C
### Purchaser(s): Chao Fang

<div style="border: 1px solid black; display: inline-block;">

**Closed On:**
**Mar 4, 2016**

</div>

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $1,351,500.00 |
| Balance of Down Payment – Wire | $158,400.00 |
| **TOTAL** | $1,509,900.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | $947,887.48 |
| | 2. | $403,612.52 |
| **Balance of Purchase Price – Check(s)** | | $1,351,500.00 |

Checks to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $29,501.76 |

Check to 135 West 52nd Street Condominium:

| | | |
|---|---|---|
| Capital Contribution | 1. | $1,325.74 |
| Next Month Common Charges | 2. | $662.87 |

Check to Rosen Livingston & Cholst LLP: 1.    $2,600.00

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $238,500.00 |
| Down Payment with Interest: | $239,366.04 |

1

# CLOSING STATEMENT

Closed On:
Nov 24, 2015

## 135 West 52nd Street, Unit #11D
### Purchaser(s): Arthur Tu

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $ 1,317,500.00 |
| Balance of Down Payment – Wire | $ 154,400.00 |
| **TOTAL** | $ 1,471,900.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | $ 1,317,500.00 |
| | 2. | |
| **Balance of Purchase Price – Check(s)** | | $ 1,317,500.00 |

Check to 135 West 52nd Street Owners LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $ 605.65 |

Checks to 135 West 52nd Street Condominium:

| | | |
|---|---|---|
| Capital Contribution | 1. | $ 1,321.12 |
| Next Month Common Charges | 2. | |

| | | |
|---|---|---|
| Check to Rosen Livingston & Cholst LLP: | 1. | $ 2,000.00 |

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $ 232,500.00 |
| Down Payment with Interest: | $ 233,409.47 |

1

38

# CLOSING STATEMENT

**Closed On:
Dec 3, 2015**

### 135 West 52nd Street, Unit #11E
### Purchaser(s): Eaton Brian Ong & Christine Lam

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $1,687,250.00 |
| Balance of Down Payment – Wire | $197,900.00 |
| **TOTAL** | $1,885,150.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | |
|---|---|
| 1. | $691,819.98 |
| 2. | $691,819.98 |
| 3. | $303,610.04 |
| **Balance of Purchase Price – Check(s)** | $1,687,250.00 |

Check to 135 West 52nd Street Owners LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $10,392.31 |

Checks to 135 West 52nd Street Condominium:

| | | |
|---|---|---|
| Capital Contribution | 1. | $1,675.16 |

Check to Rosen Livingston & Cholst LLP:  1.  $2,000.00

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $297,750.00 |
| Down Payment with Interest: | $298,816.46 |

1

# CLOSING STATEMENT

**135 West 52nd Street, Unit #11F**
**Purchaser(s): Aiden Taeyeon Kim**

> **Closed On:**
> **Nov 18, 2015**

Checks to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| Balance of Purchase Price | 1. | $1,615,000.00 |
| | 2. | |
| **TOTAL** | | $1,615,000.00 |

Check to 135 West 52nd Street Owners LLC

| | | |
|---|---|---|
| Adjustments | 1. | $924.84 |
| | 2. | |

Checks to 135 West 52nd Street Condominium

| | | |
|---|---|---|
| Capital Contribution | 1. | $1,588.80 |
| Next Month Common Charges | 2. | |

| | | |
|---|---|---|
| Check to Rosen Livingston & Cholst | 1. | $2,000.00 |
| Down Payment: | | $285,000.00 |
| Down Payment with Interest: | | $285,689.52 |
| Check #6579 to Douglas Elliman | 1. | $38,000.00 |
| Check #_____ to Co-broker | 1. | |
| Check #6582 to Title Company _Summit Associates_ | 1. | $600.00 |
| Check #6580 to Purchaser _Aiden Taeyeon Kim_ | 1. | $689.52 |
| Balance of Down Payment: Wire to Deutsche Bank | | $246,400.00 |

\* Enclosed: copy of checks, Unit Deed, Window Guard Notice,
FIRPTA Affidavit, 1099 Form, and Unit Power of Attorney.

# CLOSING STATEMENT

**135 West 52nd Street, Unit #12A**
**Purchaser(s): Mamuka Nanikashvili**

> **Closed On:**
> **Feb 26, 2016**

Funds Disbursed To Deutsche Bank:

    Balance of Purchase Price – Check(s)    $1,632,000.00

    Balance of Down Payment – Wire    $191,400.00

    **TOTAL**    $1,823,400.00

CHECKS to Deutsche Bank AG New York Branch, as agent:

    1.    $623,413.59

    2.    $239,586.41

    3.    $280,000.00

    4.    $240,000.00

    5.    $249,000.00

    **Balance of Purchase Price – Check(s)**    $1,632,000.00

Checks to 135 West 52nd Street Owner LLC:

    Adjustments    1.    $8,678.52

    Capital Contribution    2.    $1,611.68

Check to 135 West 52nd Street Condominium:

    Next Month Common Charges    1.    $805.84

Check to Rosen Livingston & Cholst LLP:    1.    $2,000.00

1

## CLOSING STATEMENT

| Closed On: |
|---|
| 12/16/2015 |

135 West 52nd Street, Unit # *12B*
Purchaser(s): *Sung Pil Cho and*
*Yun Yon Cho*

Funds Disbursed To Deutsche Bank:

Balance of Purchase Price – Check(s)     *1,674,500.00*

Balance of Down Payment -Wire     *196,400,00*

**TOTAL**     *1,870,900.00*

CHECKS to Deutsche Bank AG New York Branch, as agent:

✓ 1.     *1,354,478.86*

✓ 2.     *320,021.14*

**Balance of Purchase Price – Check(s)**     *1,674,500.00*

Check to 135 West 52nd Street Owners LLC:

Adjustments ✓ 1.     *477.31*

Checks to 135 West 52nd Street Condominium:

Capital Contribution ✓ 1.     *1,701.06*

Next Month Common Charges    2.     ——

Check to Rosen Livingston & Cholst LLP: 1.     *2,000.00*

ESCROW ACCOUNT

Down Payment:     *295,500.00*

Down Payment with Interest:     *296,726.65*

1

42

**CHECK LIST**                                   Date: _11/20/2015_
**135 West 52nd Street, Unit** _12C_     Purchaser(s) _JOHN ZHANG_

**PURCHASE PRICE:** _1,610,000.00_
Checks to Deutsche Bank AG New York Branch, as agent:
    ✓ 1. _378,500.00_ ;
    ✓ 2. _307,000.00_ ;
    ✓ 3. _683,000.00_ ;
       4. _____ ;

**TOTAL**                        _1,368,500.00_

Check to 135 West 52nd Street Owners LLC
    Adjustments            ✓1. _694.13_

Checks to 135 West 52nd Street Condominium
    Capital Contribution       ✓1. _1,338.40_
    Next Month Common Charges   2. _____

Check to Rosen Livingston & Cholst  ✓1. _2,000.00_

Down Payment:                 _241,500.00_

Down Payment with Interest         _242,317.19_

Check # _6604_ to DE        ✓1. _40,250.00 (copy)_

Check # _____ to Co-broker _____  1. _____

Check # _6605_ to _Summit Associates_
Title Company recording fee     ✓1. _600.00 (copy)_

~~Check # _____ to~~
~~Title Company transfer taxes~~   1. _____

Check # _6606_ to purchaser _John Zhang_ 1. _817.19 (copy)_
Interest on Down Payment
Balance of Down Payment --wire   1. _200,650.00_
**TOTAL w/Balance of Down Payment:** _1,569,150.00_

# CLOSING STATEMENT

| | |
|---|---|
| | **Closed On:** Nov 19, 2015 |

## 135 West 52nd Street, Unit #12D
## Purchaser(s): Alexander Pua Uy & Rosie Go Tan

**Funds Disbursed To Deutsche Bank:**

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $1,368,500.00 |
| Balance of Down Payment - Wire | $160,400.00 |
| **TOTAL** | $1,528,900.00 |

**CHECKS to Deutsche Bank AG New York Branch, as agent:**

| | | |
|---|---|---|
| | 1. | $547,463.19 |
| | 2. | $547,463.19 |
| | 3. | $273,573.62 |
| **Balance of Purchase Price – Check(s)** | | $1,368,500.00 |

**Check to 135 West 52nd Street Owners LLC:**

| | | |
|---|---|---|
| Adjustments | 1. | $6,766.85 |

**Checks to 135 West 52nd Street Condominium:**

| | | |
|---|---|---|
| Capital Contribution | 1. | $1,338.40 |
| Next Month Common Charges | 2. | |

**Check to Rosen Livingston & Cholst LLP:** 1. $2,000.00

**ESCROW ACCOUNT**

| | |
|---|---|
| Down Payment: | $241,500.00 |
| Down Payment with Interest: | $242,321.80 |

1

## CLOSING STATEMENT

135 West 52nd Street, Unit #: *12E*
Purchaser(s): *BAKER STREET FINANCIAL, INC.*

> **Closed On:**
> *Dec. 7*, 2015

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | *$1,712,750.00* |
| Balance of Down Payment -Wire | *200,900.00* |
| **TOTAL** | *1,913,650.00* |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | *1,712,750.00* |
| | 2. | |
| **Balance of Purchase Price – Check(s)** | | *1,712,750.00* |

Check to 135 West 52nd Street Owners LLC:

| | | |
|---|---|---|
| Adjustments | 1. | *$701.50* |

Checks to 135 West 52nd Street Condominium:

| | | |
|---|---|---|
| Capital Contribution | 1. | *$1,701.06* |
| Next Month Common Charges | 2. | |

Check to Rosen Livingston & Cholst LLP: 1. *$2,500.00.*

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | *$302,250.00* |
| Down Payment with Interest: | *$303,188.01* |

1

**CHECK LIST**                                          Date: *11/24/2015*
**135 West 52nd Street, Unit** *12F*     **Purchaser(s)** *MYASNIKOV - MYASNIKOV*

**PURCHASE PRICE:** *1,920,000.00*
Checks to Deutsche Bank AG New York Branch, as agent:
        1. *1,632,000.00* ;
        2. _____ ;
        3. _____ ;
        4. _____ ;

**TOTAL**                       *1,632,000.00*

Check to 135 West 52nd Street Owners LLC
    Adjustments      1. *829.37*

Checks to 135 West 52nd Street Condominium
    Capital Contribution      1. *1,606.08*
    Next Month Common Charges  2. _____

Check to Rosen Livingston & Cholst   1. *2,000.00*

Down Payment:                  *288,000.00*

Down Payment with Interest         *288,786.95*

Check # *6617* to DE          1. *48,000.00*

Check # _____ to Co-broker _____   1. *N/A*

Check # *6618* to *Exclusive Land*
Title Company recording fee *Services* 1. *600.00*  *(copy)*

~~Check # _____ to~~
~~Title Company transfer taxes~~   1. *N/A*

Check # *6620* to purchaser *Igor Myasnikov* *786.95* *(copy)*
Interest on Down Payment
Balance of Down Payment --wire  1. *239,400.00*
**TOTAL w/Balance of Down Payment:**  *1,871,400.00*

46

# CLOSING STATEMENT

**135 West 52nd Street, Unit #14A**
**Purchaser(s): 135W52 NYC LLC**

| Closed On: |
| Dec 30, 2015 |

Funds Disbursed To Deutsche Bank:

    Balance of Purchase Price – Check(s)     $1,657,500.00

    Balance of Down Payment – Wire     $194,400.00

    **TOTAL**     $1,851,900.00

CHECKS to Deutsche Bank AG New York Branch, as agent:

            1.     $1,657,500.00

    **Balance of Purchase Price – Check(s)**     $1,657,500.00

Check to 135 West 52nd Street Owner LLC:

    Adjustments     1.     $103.97

Checks to 135 West 52nd Street Owner LLC   :

    Capital Contribution     1.     $1,631.98

    Next Month Common Charges     2.

Check to Rosen Livingston & Cholst LLP:     1.     $2,850.00

ESCROW ACCOUNT

    Down Payment:     $292,500.00

    Down Payment with Interest:     $293,410.17

1

*11/16/2015*

## CHECK LIST

__135 West 52nd Street, Unit *14B*__        Purchaser(s) *RUIFEN ZHOU, Haidong Liang*

Checks to Deutsche Bank AG New York Branch, as agent:

1. *1,951,612.90* ;
2. *130,887.10* ;
3. _____ ;
4. _____ ;

**TOTAL**        *2,082,500.00*

Check to 135 West 52nd Street Owners LLC
Adjustments

1. *1,726.96*
2.
3.

Checks to 135 West 52nd Street Condominium
Capital Contribution
Next Month Common Charges

1. *1,224.61*
2.

Check to Rosen Livingston & Cholst        1. *1000.00*

Down Payment:        *367,500.00*

Down Payment with Interest        *367,953.35*

Check #*6565* to DE        1. *43,425.58*

Check #*6561* to Co-broker *NY BEST Homes RE*        1. *73,500.00*

Check #*6563* to *KONG ABSTRACT*
Title Company recording fee        1. *600.00*

~~Check # _____ to _____~~
~~Title Company transfer taxes~~        1.

Check #*6564* to purchaser *RUIFEN ZHOU*.        *453.35*
Interest on Down Payment

Balance of Down Payment --wire        1. *249,974.62*

48

# CLOSING STATEMENT

**135 West 52nd Street, Unit #14C**
**Purchaser(s): Stephen Sobhani**

| Closed On: |
|---|
| Dec 2, 2015 |

Funds Disbursed To Deutsche Bank:

    Balance of Purchase Price – Check(s)    $1,385,500.00

    Balance of Down Payment – Wire    $203,150.00

    **TOTAL**    $1,588,650.00

CHECKS to Deutsche Bank AG New York Branch, as agent:

    1.    $1,107,688.60

    2.    $277,811.40

    **Balance of Purchase Price – Check(s)**    $1,385,500.00

Check to 135 West 52nd Street Owners LLC:

    Adjustments    1.    $6,793.50

Checks to 135 West 52nd Street Condominium:

    Capital Contribution    1.    $1,372.94

    Next Month Common Charges    2.

Check to Rosen Livingston & Cholst LLP:    1.    $2,000.00

ESCROW ACCOUNT

    Down Payment:    $244,500.00

    Down Payment with Interest:    $245,236.61

1

## CLOSING STATEMENT

**135 West 52nd Street, Unit #14D**
**Purchaser(s): Stoneridge Holding LLC**

| Closed On: Nov 24, 2015 |

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $1,385,500.00 |
| Balance of Down Payment – Wire | $162,400.00 |
| **TOTAL** | $1,547,900.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | $500,000.00 |
| | 2. | $500,000.00 |
| | 3. | $385,500.00 |
| **Balance of Purchase Price – Check(s)** | | $1,385,500.00 |

Check to 135 West 52nd Street Owners LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $654.47 |

Checks to 135 West 52nd Street Condominium:

| | | |
|---|---|---|
| Capital Contribution | 1. | $1,355.66 |

Check to Rosen Livingston & Cholst LLP:  1.  $2,000.00

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $244,500.00 |
| Down Payment with Interest: | $245,315.25 |

1

# CLOSING STATEMENT

### 135 West 52nd Street, Unit #14E
### Purchaser(s): Virgil Alagon

> **Closed On:**
> **Dec 1, 2015**

Funds Disbursed To Deutsche Bank:

    Balance of Purchase Price – Check(s)     $1,759,500.00

    Balance of Down Payment – Wire     $206,400.00

    **TOTAL**     $1,965,900.00

CHECKS to Deutsche Bank AG New York Branch, as agent:

    1.     $1,534,393.03

    2.     $225,106.97

    **Balance of Purchase Price – Check(s)**     $1,759,500.00

Check to 135 West 52nd Street Owners LLC:

    Adjustments    1.     $10,668.03

Checks to 135 West 52nd Street Condominium:

    Capital Contribution    1.     $1,726.96

    Next Month Common Charges    2.     —

Check to Rosen Livingston & Cholst LLP:    1.     $2,000.00

ESCROW ACCOUNT

    Down Payment:     $310,500.00

    Down Payment with Interest:     $311,645.45

1

11/18/2015

## CHECK LIST

__135 West 52nd Street, Unit__ *14F*        Purchaser(s) *Vinod & Indu Madhok*

Checks to Deutsche Bank AG New York Branch, as agent:

1. *495,000.00* ;
2. *600,000.00* ;
3. *300,000.00* ;
4. *211,500.00* ;

**TOTAL**  *1,606,500.00*

Check to 135 West 52nd Street Owners LLC
   Adjustments   1. *7,950.27*
                 2. _____
                 3. _____

Checks to 135 West 52nd Street Condominium
   Capital Contribution        1. *1,631.98*
   Next Month Common Charges    2. _____

Check to Rosen Livingston & Cholst   1. *2,000.00*

Down Payment:   *$283,500.00*

Down Payment with Interest   *$284,594.94*

Check #*6575* to DE   1. *37,800.00*

Check #*6576* to Co-broker *ELLEGRAN* 1. *56,700.00*

Check #*6577* to *CORNERSTONE Land*
Title Company recording fee   1. *600.00*

~~Check # ____ to _____~~
~~Title Company transfer taxes~~   1. _____

Check #*6578* to purchaser *Vinod & Indu* 1. *1,094.94*
Interest on Down Payment *Madhok*

Balance of Down Payment --wire   1. *188,400.00*

# CLOSING STATEMENT

**135 West 52nd Street, Unit #15A**
**Purchaser(s): Simon Wu & Xiaobin Wu**

> **Closed On:**
> **Feb 25, 2016**

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | # 1,632,000.00 |
| Balance of Down Payment -- Wire | # 191,400.00 |
| **TOTAL** | # 1,823,400.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | # 1,632,000.00 |
| **Balance of Purchase Price – Check(s)** | | # 1,632,000.00 |

Checks to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Adjustments | 1. | # 761.62 |
| Capital Contribution | 2. | # 1,663.68 |

Check to 135 West 52nd Street Condominium:

| | | |
|---|---|---|
| Next Month Common Charges | 1. | # 831.84 |

Check to Rosen Livingston & Cholst LLP: 1.    # 2,350.00

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | # 288,000.00 |
| Down Payment with Interest: | # 289,373.83 |

1

# CLOSING STATEMENT

**135 West 52ⁿᵈ Street, Unit #15B**
**Purchaser(s): JJ52 Realty LLC**

<div style="border:1px solid">

**Closed On:**
**Dec 8, 2015**

</div>

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $1,725,500.00 |
| Balance of Down Payment – Wire | $202,400.00 |
| **TOTAL** | $1,927,900.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | |
|---|---|
| 1. | $900,000.00 |
| 2. | $500,000.00 |
| 3. | $325,500.00 |
| **Balance of Purchase Price – Check(s)** | $1,725,500.00 |

Check to 135 West 52ⁿᵈ Street Owners LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $676.59 |

Checks to 135 West 52ⁿᵈ Street Condominium:

| | | |
|---|---|---|
| Capital Contribution | 1. | $1,752.86 |

Check to Rosen Livingston & Cholst LLP: 1. $2,500.00

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $304,500.00 |
| Down Payment with Interest: | $305,758.97 |

1

54

## CLOSING STATEMENT

**135 West 52nd Street, Unit #15C**
**Purchaser(s): HSRE USA LLC**

> **Closed On:**
> **Dec 8, 2015**

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $1,353,500.00 |
| Balance of Down Payment – Wire | $156,400.00 |
| **TOTAL** | $1,509,900.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | $1,247,000.00 |
| | 2. | $106,500.00 |
| **Balance of Purchase Price – Check(s)** | | $1,353,500.00 |

Check to 135 West 52nd Street Owners LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $431.87 |

Checks to 135 West 52nd Street Condominium:

| | | |
|---|---|---|
| Capital Contribution | 1. | $1,372.94 |
| Next Month Common Charges | 2. | |

Check to Rosen Livingston & Cholst LLP: 1. $2,500.00

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $238,500.00 |
| Down Payment with Interest: | $239,479.50 |

1

55

# CLOSING STATEMENT

**135 West 52nd Street, Unit #15D**
**Purchaser(s): Chaogang Wang**

> **Closed On:**
> **Nov 20, 2015**

Funds Disbursed To Deutsche Bank:

    Balance of Purchase Price – Check(s)      $1,402,500.00

    Balance of Down Payment – Wire      $164,400.00

    **TOTAL**      $1,566,900.00

CHECKS to Deutsche Bank AG New York Branch, as agent:

    1.    $1,402,500.00

    2.

    **Balance of Purchase Price – Check(s)**    $1,402,500.00

Check to 135 West 52nd Street Owners LLC:

    Adjustments    1.    $638.57

Checks to 135 West 52nd Street Condominium:

    Capital Contribution    1.    $1,372.94

    Next Month Common Charges    2.

Check to Rosen Livingston & Cholst LLP:    1.    $2,000.00

ESCROW ACCOUNT

    Down Payment:    $247,500.00

    Down Payment with Interest:    $248,264.02

1

56

**CHECK LIST**                                                    Date: _11/25/2015_
135 West 52nd Street, Unit _15E_    Purchaser(s) _LINGLI KONG_

**PURCHASE PRICE:** _2,105,000.00_
Checks to Deutsche Bank AG New York Branch, as agent:
    ✓ 1. _1,173,383.40_ ;
    ✓ 2. _615,866.60_ ;
       3. _____ ;
       4. _____ ;

**TOTAL**    ✓ _1,789,250.00_

Check to 135 West 52nd Street Owners LLC
    Adjustments    1. ✓ _10,817.60_

Checks to 135 West 52nd Street Condominium
    Capital Contribution    1. ✓ _1,752.76_
    Next Month Common Charges    2. _____

Check to Rosen Livingston & Cholst    1. ✓ _2,000.00_

Down Payment:    _$315,750.00_

Down Payment with Interest    _316,802.78_

Check # _6630_ to DE    1. ✓ _42,100.00_

Check # _6631_ to Co-broker _DE_    1. ✓ _63,150.00_

Check # _6632_ to _Federal Standard_
Title Company recording fee _Abstract_ 1. ✓ _600.00 (copy)_

~~Check # _____ to ~~
~~Title Company transfer taxes~~    1. _____

Check # _6633_ to purchaser _LINGLI KONG_ 1. ✓ _1,052.78 (copy)_
Interest on Down Payment
Balance of Down Payment --wire    1. _203,900.00_
**TOTAL w/Balance of Down Payment:**    _1,999,150.00_

## CLOSING STATEMENT

<div style="border:1px solid black; display:inline-block">

**Closed On:**
Nov 20, 2015

</div>

**135 West 52nd Street, Unit #15F**
**Purchaser(s): Michelangelo Kho Samson**
**& Lourdes Abela Samson**

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $1,683,000.00 |
| Balance of Down Payment – Wire | $207,300.00 |
| **TOTAL** | $1,890,300.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | $1,386,000.00 |
| | 2. | $297,000.00 |
| **Balance of Purchase Price – Check(s)** | | $1,683,000.00 |

Check to 135 West 52nd Street Owners LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $8,847.19 |

Checks to 135 West 52nd Street Condominium:

| | | |
|---|---|---|
| Capital Contribution | 1. | $1,657.88 |
| Next Month Common Charges | 2. | |

Check to Rosen Livingston & Cholst LLP:    1.    $2,000.00

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $297,000 |
| Down Payment with Interest: | $298,004.99 |

1

# CLOSING STATEMENT

<div>

**135 West 52nd Street, Unit #16A**
**Purchaser(s): Youngyee Cho**

</div>

> **Closed On:**
> Feb 22, 2016

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price -- Check(s) | $1,700,000.00 |
| Balance of Down Payment -- Wire | $199,400.00 |
| **TOTAL** | $1,899,400.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | $1,183,636.16 |
| | 2. | $516,363.84 |
| **Balance of Purchase Price -- Check(s)** | | $1,700,000.00 |

Checks to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $8,989.13 |
| Capital Contribution | 2. | $1,681.00 |

Check to 135 West 52nd Street Condominium:

| | | |
|---|---|---|
| Next Month Common Charges | 1. | $840.50 |

Check to Rosen Livingston & Cholst LLP: 1. $2,000.00

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $300,000.00 |
| Down Payment with Interest: | $301,069.57 |

1

59

# CLOSING STATEMENT

**135 West 52nd Street, Unit #16C**
**Purchaser(s): Jiong You & Yi He**

> Closed On:
> Mar 1, 2016

Funds Disbursed To Deutsche Bank:

Balance of Purchase Price – Check(s)     $1,419,500.00

Balance of Down Payment – Wire     $166,400.00

**TOTAL**     $1,585,900.00

CHECKS to Deutsche Bank AG New York Branch, as agent:

1.     $1,419,500.00

**Balance of Purchase Price – Check(s)**     $1,419,500.00

Checks to 135 West 52nd Street Owner LLC:

Adjustments     1.     $522.72

Capital Contribution     2.     $1,395.06

Check to 135 West 52nd Street Condominium:

Next Month Common Charges     1.     $697.53

Check to Rosen Livingston & Cholst LLP:     1.     $2,000.00

ESCROW ACCOUNT

Down Payment:     $250,500.00

Down Payment with Interest:     $251,479.87

1

60

## CLOSING STATEMENT

**135 West 52nd Street, Unit #16D**
**Purchaser(s): Garry M. Chien & Jennifer V. Chien**

| | |
|---|---|
| **Closed On:** | **Mar 2, 2016** |

Funds Disbursed To Deutsche Bank:

    Balance of Purchase Price – Check(s)      $1,419,500.00

    Balance of Down Payment – Wire      $166,400.00

    **TOTAL**      $1,585,900.00

CHECKS to Deutsche Bank AG New York Branch, as agent:

    1.      $1,000,000.00

    2.      $419,500.00

    **Balance of Purchase Price – Check(s)**      $1,419,500.00

Checks to 135 West 52nd Street Owner LLC:

    Adjustments      1.      $1,181.68

    Capital Contribution      2.      $1,345.06

Check to 135 West 52nd Street Condominium:

    Next Month Common Charges      1.      $697.53

Check to Rosen Livingston & Cholst LLP:      1.      $2,350.00

ESCROW ACCOUNT

    Down Payment:      $250,500.00

    Down Payment with Interest:      $251,388.94

1

61

# CLOSING STATEMENT

<div style="border:1px solid;display:inline-block;">

**Closed On:**
Mar 7, 2016

</div>

### 135 West 52nd Street, Unit #16E
### Purchaser(s): Jonathan Que

Funds Disbursed To Deutsche Bank:

    Balance of Purchase Price -- Check(s)     $1,814,750.00

    Balance of Down Payment -- Wire     $212,900.00

    **TOTAL**     $2,027,650.00

CHECKS to Deutsche Bank AG New York Branch, as agent:

    1.     $1,383,201.02

    2.     $431,548.98

    **Balance of Purchase Price – Check(s)**     $1,814,750.00

Checks to 135 West 52nd Street Owner LLC:

    Adjustments     1.     $11,427.00

Check to 135 West 52nd Street Condominium:

    Capital Contribution     1.     $1,784.98

    · Next Month Common Charges     2.     $892.49

Check to Rosen Livingston & Cholst LLP:     1.     $2,000.00

**ESCROW ACCOUNT**

    Down Payment:     $320,250.00

    Down Payment with Interest:     $321,653.39

1

## CLOSING STATEMENT

135 West 52nd Street, Unit # *18A*

Purchaser(s): *18A 135 West 52nd Holdings LLC*

Closed On:
*03/01/2016*

Funds Disbursed To Deutsche Bank: *Wire*

Balance of Purchase Price – ~~Check(s)~~    *$3,378,750.00*

Balance of Down Payment -Wire    *$396,900.00*

**TOTAL**    *3,775,650.00*

CHECKS to Deutsche Bank AG New York Branch, as agent:

1.

2.

**Balance of Purchase Price – Check(s)**

Check to 135 West 52nd Street Owners LLC:

Adjustments    1.    *$1,357.91*

~~Checks to 135 West 52nd Street Condominium:~~

Capital Contribution    1.    *$3,444.34*

Next Month Common Charges    2.    *$1,722.17*
*TO 135 West 52nd Street Condominium*

Check to Rosen Livingston & Cholst LLP:    1.    *$3,100.00*

ESCROW ACCOUNT

Down Payment:    *$596,250.00*

Down Payment with Interest:    *$598,822.28*

1

63

# CLOSING STATEMENT

**135 West 52nd Street, Unit #18B**
**Purchaser(s): Casa West 52nd St., LLC**

> **Closed On:**
> **Jan 8, 2016**

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $2,975,000.00 |
| Balance of Down Payment – Wire | $317,462.50 |
| **TOTAL** | $3,292,462.50 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | $2,975,000.00 |
| **Balance of Purchase Price – Check(s)** | | $2,975,000.00 |

Check to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $3,064.46 |

Checks to 135 West 52nd Street Owner LLC

| | | |
|---|---|---|
| Capital Contribution | 1. | $3,022.18 |
| Next Month Common Charges | 2. | |

Check to Rosen Livingston & Cholst LLP: 1. $2,950.00

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $525,000.00 |
| Down Payment with Interest: | $526,296.11 |

1

64

# CLOSING STATEMENT

**135 West 52nd Street, Unit #18C**
**Purchaser(s): Sophia Art Group Inc.**

> **Closed On:**
> **Dec 14, 2015**

Funds Disbursed To Deutsche Bank:

    Balance of Purchase Price – ~~Check(s)~~ *Wire*      $3,378,750.00

    Balance of Down Payment – Wire      $396,900.00

    **TOTAL**      $3,775,650.00

*WIRE*
~~CHECKS~~ to Deutsche Bank AG New York Branch, as agent:

    **Balance of Purchase Price – Wire**      $3,378,750.00

Check to 135 West 52nd Street Owners LLC:

    Adjustments      1.      $874.87

Checks to 135 West 52nd Street Condominium:

    Capital Contribution      1.      $3,432.34

    Next Month Common Charges      2.      _____

Check to Rosen Livingston & Cholst LLP:      1.      $2,500.00

ESCROW ACCOUNT

    Down Payment:      $596,250.00

    Down Payment with Interest:      $596,652.00

1

# CLOSING STATEMENT

<table>
<tr><td></td><td>Closed On:<br>Jan 12, 2016</td></tr>
</table>

**135 West 52nd Street, Unit #19B**
**Purchaser(s): Guihua He**

Funds Disbursed To Deutsche Bank:

    Balance of Purchase Price – Check(s)      *$3,014,500.00*

    Balance of Down Payment – Wire      *$357,400.00*

    **TOTAL**      *$3,371,900.00*

CHECKS to Deutsche Bank AG New York Branch, as agent:

                1.      *$3,014,500.00*

    **Balance of Purchase Price – Check(s)**      *$3,014,500.00*

Check to 135 West 52nd Street Owner LLC:

    Adjustments       1.      *$2,921.22*

Checks to 135 West 52nd Street Owner LLC:

    Capital Contribution     1.      *$3,065.36*

    Next Month Common Charges     2.

Check to Rosen Livingston & Cholst LLP:   1.      *$2,000.00*    *✳ CASH*

ESCROW ACCOUNT

    Down Payment:      *$535,500.00*

    Down Payment with Interest:      *$535,654.07*

1

# CLOSING STATEMENT

**135 West 52nd Street, Unit #20A**
**Purchaser(s): 135 W 52 ST LLC**

> **Closed On:**
> **Feb 29, 2016**

Funds Disbursed To Deutsche Bank:

|  |  |
|---|---|
| Balance of Purchase Price – Check(s) | $3,463,750.00 |
| Balance of Down Payment – Wire | $369,715.62 |
| **TOTAL** | $3,833,465.62 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

|  |  |  |
|---|---|---|
| | 1. | $3,463,750.00 |
| **Balance of Purchase Price – Check(s)** | | $3,463,750.00 |

Checks to 135 West 52nd Street Owner LLC:

|  |  |  |
|---|---|---|
| Adjustments | 1. | $1,417.06 |
| Capital Contribution | 2. | $3,530.98 |

Check to 135 West 52nd Street Condominium:

|  |  |  |
|---|---|---|
| Next Month Common Charges | 1. | $1,765.49 |

Check to Rosen Livingston & Cholst LLP: 1.     $2,500.00

ESCROW ACCOUNT

|  |  |
|---|---|
| Down Payment: | $611,250.00 |
| Down Payment with Interest: | $612,779.18 |

1

# CLOSING STATEMENT

**135 West 52nd Street, Unit #20B**
**Purchaser(s): Banafsheh Kalantari & Xuekang Dai**

> **Closed On:**
> **Jan 12, 2016**

Funds Disbursed To Deutsche Bank:

    Balance of Purchase Price – Check(s)     $ 3,102,500.00

    Balance of Down Payment – Wire     $ 293,787.50

    **TOTAL**     $ 3,396,287.50

CHECKS to Deutsche Bank AG New York Branch, as agent:

    1.     $ 3,102,500.00

    **Balance of Purchase Price – Check(s)**     $ 3,102,500.00

Check to 135 West 52nd Street Owner LLC:

    Adjustments     1.     $ 2,965.33

Checks to 135 West 52nd Street Owner LLC:

    Capital Contribution     1.     $ 3,151.70

    Next Month Common Charges     2.     —

ESCROW ACCOUNT

    Down Payment:     $ 547,500.00

    Down Payment with Interest:     $ 547,567.50

    Check # 6746 to Douglas Elliman     1.     $ 73,000.00

    Check #6747 to Co-broker     1.     $ 109,500.00
    Douglas Elliman

1

# CLOSING STATEMENT

135 West 52nd Street, Unit #21A
**Purchaser(s): Nicholas P. Leone & Grace Leone**

> **Closed On:**
> **Feb 24, 2016**

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $ 3,506,250.00 |
| Balance of Down Payment – Wire | $ 334,618.75 |
| **TOTAL** | $ 3,840,868.75 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | $ 3,506,250.00 |
| **Balance of Purchase Price – Check(s)** | | $ 3,506,250.00 |

Checks to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $ 1,645.02 |
| Capital Contribution | 2. | $ 3,574.30 |

Check to 135 West 52nd Street Condominium:

| | | |
|---|---|---|
| Next Month Common Charges | 1. | $ 1,787.15 |

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $ 618,750.00 |
| Down Payment with Interest: | $ 620,461.10 |

| | | |
|---|---|---|
| Check # 6825 to Douglas Elliman | 1. | $ 82,500.00 |
| Check # 6826 to Co-broker *The Corcoran Group, Inc.* | 1. | $ 123,750.00 |

1

69

# CLOSING STATEMENT

**135 West 52nd Street, Unit #21C**
**Purchaser(s): West 52nd Holdings LLC**

> **Closed On:**
> **Dec 22, 2015**

Funds Disbursed To Deutsche Bank:

    Balance of Purchase Price – Check(s)     #3,487,093.11

    Balance of Down Payment – Wire     #331,056.89

    **TOTAL**     #3,818,150.00

CHECKS to Deutsche Bank AG New York Branch, as agent:

                   1.    #3,487,093.11

    **Balance of Purchase Price – Check(s)**    #3,487,093.11

Check to 135 West 52nd Street Owners LLC:

    Adjustments               1.    #558.05

Checks to 135 West 52nd Street Condominium:

    Next Month Common Charges    1.    #890.47

**\* only collect 50% for Jan 2016**

Check to Rosen Livingston & Cholst LLP:   1.    #500.00

ESCROW ACCOUNT

    Down Payment:             #618,750.00

    Down Payment with Interest:      #619,070.48

1

# CLOSING STATEMENT

**135 West 52nd Street, Unit #22A**
**Purchaser(s): Irina Agalarova & Sheila Agalarova**

| Closed On: |
|---|
| Feb 26, 2016 |

Funds Disbursed To Deutsche Bank:

Balance of Purchase Price – Check(s)   $2,125,000.00

Balance of Down Payment – Wire   $249,400.00

**TOTAL**   $2,374,400.00

CHECKS to Deutsche Bank AG New York Branch, as agent:

1.   $2,125,000.00

**Balance of Purchase Price – Check(s)**   $2,125,000.00

Checks to 135 West 52nd Street Owner LLC:

Adjustments   1.   $955.80

Capital Contribution   2.   $2,166.24

Check to 135 West 52nd Street Condominium:

Next Month Common Charges   1.   $1,083.12

Check to Rosen Livingston & Cholst LLP:   1.   $2,000.00

ESCROW ACCOUNT

Down Payment:   $375,000.00

Down Payment with Interest:   $376,717.62

1

# CLOSING STATEMENT

**135 West 52nd Street, Unit #22B**
**Purchaser(s): Yanan Zhao**

| Closed On: |
|---|
| **Jan 20, 2016** |

Funds Disbursed To Deutsche Bank:

    Balance of Purchase Price – Wire/Check      $2,562,750.00

    Balance of Down Payment – Wire      $298,900.00

    **TOTAL**      $2,861,650.00

WIRE/CHECK to Deutsche Bank AG New York Branch, as agent:

    1.      $1,597,085.17 — wire

    2.      $965,664.83 — check

    **Balance of Purchase Price – Wire/Check**      $2,562,750.00

Check to 135 West 52nd Street Owner LLC:

    Adjustments      1.      $2,477.02

Checks to 135 West 52nd Street Owner LLC:

    Capital Contribution      1.      $2,568.86

    Next Month Common Charges      2.

ESCROW ACCOUNT

    Down Payment:      $452,250.00

    Down Payment with Interest:      $453,396.31

1

# CLOSING STATEMENT

**135 West 52nd Street, Unit #22C**
**Purchaser(s): 22C-135W52ST LLC**

> **Closed On:**
> **Jan 11, 2016**

Funds Disbursed To Deutsche Bank:

    Balance of Purchase Price – Check(s)     $2,528,750.00

    Balance of Down Payment – Wire     $216,900.00

    **TOTAL**     $2,825,650.00

CHECKS to Deutsche Bank AG New York Branch, as agent:

    1.     $2,528,750.00

    **Balance of Purchase Price – Check(s)**     $2,528,750.00

Check to 135 West 52nd Street Owner LLC:

    Adjustments     1.     $2,736.21

Checks to 135 West 52nd Street Owner LLC:

    Capital Contribution     1.     $2,568.86

    Next Month Common Charges     2.

Check to Rosen Livingston & Cholst LLP:     1.     $2,500.00

ESCROW ACCOUNT

    Down Payment:     $446,250.00

    Down Payment with Interest:     $448,351.11

1

## CLOSING STATEMENT

135 West 52nd Street, Unit # *220*
Purchaser(s): *Youcong Li*

Closed On:
*01/19/2016*

Funds Disbursed To Deutsche Bank:

Balance of Purchase Price – Check(s)          *2,150,500.00*

Balance of Down Payment - Wire               *252,400.00*

**TOTAL**                                    *2,402,900.00*


CHECKS to Deutsche Bank AG New York Branch, as agent:

1.     *2,150,500.00*

2.     ─────────

**Balance of Purchase Price – Check(s)**     *2,150,500.00*

Check to 135 West 52nd Street Owners LLC:

Adjustments          1.   ✓   *2,158.70  1,933.28*

Checks to 135 West 52nd Street Condominium:

Capital Contribution     1.   ✓   *2,158.70*

Next Month Common Charges  2.   ─────────

Check to Rosen Livingston & Cholst LLP:  1.  ✓  *2,000.00*


ESCROW ACCOUNT

Down Payment:               *$379,500.00*

Down Payment with Interest:  *$380,940.31*

1

# CLOSING STATEMENT

**135 West 52nd Street, Unit #23A**
**Purchaser(s): Linda Ling**

<div style="border:1px solid">

**Closed On:**
**Mar 8, 2016**

</div>

Funds Disbursed To Deutsche Bank:

    Balance of Purchase Price – Check(s)    $2,176,000.00

    Balance of Down Payment – Wire    $255,400.00

    **TOTAL**    $2,431,400.00

CHECKS to Deutsche Bank AG New York Branch, as agent:

    1.    $1,296,000.00

    2.    $880,000.00

    **Balance of Purchase Price – Check(s)**    $2,176,000.00

Checks to 135 West 52nd Street Owner LLC:

    Adjustments    1.    $1,518.15

Check to 135 West 52nd Street Condominium:

    Capital Contribution    1.    $2,192.24

    Next Month Common Charges    2.    $1,096.12

Check to Rosen Livingston & Cholst LLP:    1.    $2,250.00

ESCROW ACCOUNT

    Down Payment:    $384,000.00

    Down Payment with Interest:    $385,581.33

1

# CLOSING STATEMENT

**Closed On:**
**Jan 21, 2016**

### 135 West 52nd Street, Unit #23B
### Purchaser(s): Byoung Ju Im & Myung Ja Im

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $2,571,250.00 |
| Balance of Down Payment -- Wire | $301,900.00 |
| **TOTAL** | $2,873,150.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | $1,495,674.86 |
| | 2. | $1,075,575.14 |
| **Balance of Purchase Price – Check(s)** | | $2,571,250.00 |

Check to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $15,579.23 |

Checks to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Capital Contribution | 1. | $2,621.16 |
| Next Month Common Charges | 2. | — |

Check to Rosen Livingston & Cholst LLP:  1.  $2,000.00

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $453,750.00 |
| Down Payment with Interest: | $455,663.50 |

1

## CLOSING STATEMENT

| Closed On: |
|---|
| Jan 14, 2016 |

### 135 West 52nd Street, Unit #23C
### Purchaser(s): Mondher Mahjoubi & Raoudha Mahjoubi

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $2,601,000.00 |
| Balance of Down Payment – Wire | $305,400.00 |
| **TOTAL** | $2,906,400.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | $1,000,000.00 |
| | 2. | $1,000,000.00 |
| | 3. | $601,000.00 |
| **Balance of Purchase Price – Check(s)** | | $2,601,000.00 |

Check to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $15,838.12 |

Checks to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Capital Contribution | 1. | $2,612.02 |

Check to Rosen Livingston & Cholst LLP: 1.    $2,000.00

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $459,000.00 |
| Down Payment with Interest: | $460,651.59 |

1

77

# CLOSING STATEMENT

135 West 52nd Street, Unit #23D
**Purchaser(s): ShengSheng Xu & Laizhu Wang**

**Closed On:**
**Jan 13, 2016**

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $2,176,000.00 |
| Balance of Down Payment – Wire | $255,400.00 |
| **TOTAL** | $2,431,400.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | $2,176,000.00 |
| **Balance of Purchase Price – Check(s)** | | $2,176,000.00 |

Check to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $2,109.96 |

Checks to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Capital Contribution | 1. | $2,184.60 |
| Next Month Common Charges | 2. | |

Check to Rosen Livingston & Cholst LLP:

| | | |
|---|---|---|
| | 1. | $2,000.00 |
| | 2. | $350.00 |

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $384,000.00 |
| Down Payment with Interest: | $385,397.55 |

1

## <u>CLOSING STATEMENT</u>

| Closed On: |
| --- |
| 01/11/2016 |

135 West 52nd Street, Unit # *24A*
Purchaser(s): *RENEE BOMCHILL*

Funds Disbursed To Deutsche Bank:

| | |
| --- | --- |
| Balance of Purchase Price – Check(s) | *2,235,500.00* |
| Balance of Down Payment -Wire | *260,400.00* |
| **TOTAL** | *2,495,900.00* |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
| --- | --- | --- |
| ✓ | 1. | *1,983,674.22* |
| ✓ | 2. | *251,825.78* |
| **Balance of Purchase Price – Check(s)** | | *2,235,500.00* |

Check to 135 West 52nd Street Owners LLC:

| | | |
| --- | --- | --- |
| Adjustments | 1. | ✓ *12,374.95* |

Checks to 135 West 52nd Street Condominium:

| | | |
| --- | --- | --- |
| Capital Contribution | 1. | ✓ *2,210.50* |
| Next Month Common Charges | 2. | |

~~Check to Rosen Livingston & Cholst LLP:~~ 1.

ESCROW ACCOUNT

| | |
| --- | --- |
| Down Payment: | *394,500.00* |
| Down Payment with Interest: | *395,633.25* |

1

# CLOSING STATEMENT

> **Closed On:**
> **Jan 20, 2016**

### 135 West 52nd Street, Unit #24B
### Purchaser(s): 24B W 52nd Street LLC

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $2,550,000.00 |
| Balance of Down Payment – Wire | $299,400.00 |
| **TOTAL** | $2,849,400.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | $2,550,000.00 |
| **Balance of Purchase Price – Check(s)** | | $2,550,000.00 |

Check to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $2,516.81 |

Checks to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Capital Contribution | 1. | $2,655.20 |
| Next Month Common Charges | 2. | — |

Check to Rosen Livingston & Cholst LLP: 1. $2,850.00

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $450,000.00 |
| Down Payment with Interest: | $451,426.22 |

1

# CLOSING STATEMENT

**135 West 52nd Street, Unit #24C**
**Purchaser(s): Chunliu Ren**

> **Closed On:**
> **Feb 8, 2016**

Funds Disbursed To Deutsche Bank:

    Balance of Purchase Price – Wire     $2,643,500.00

    Balance of Down Payment – Wire     $386,150.00

    **TOTAL**     $3,029,650.00

WIRE to Deutsche Bank AG New York Branch, as agent:

                                1.     $2,643,500.00

    **Balance of Purchase Price – WIRE**     $2,643,500.00

Check to 135 West 52nd Street Owner LLC:

    Adjustments                  1.     $1,824.53

Checks to 135 West 52nd Street Owner LLC:

    Capital Contribution         1.     $2,664.48

    Next Month Common Charges   2.     —————

ESCROW ACCOUNT

    Down Payment:     $466,500.00

    Down Payment with Interest:     $467,797.78

1

81

# CLOSING STATEMENT

### 135 West 52nd Street, Unit #24D
### Purchaser(s): Zhengtao Shi

| | |
|---|---|
| **Closed On:** | |
| **Jan 19, 2016** | |

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $ 2,176,000.00 |
| Balance of Down Payment – Wire | $ 255,400.00 |
| **TOTAL** | $ 2,431,400.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | $ 2,176,000.00 |
| **Balance of Purchase Price – Check(s)** | | $ 2,176,000.00 |

Check to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $ 1,952.82 |

Checks to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Capital Contribution | 1. | $ 2,210.50 |
| Next Month Common Charges | 2. | — |

| | | |
|---|---|---|
| Check to Rosen Livingston & Cholst LLP: | 1. | $ 2,350.00 |

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $ 384,000.00 |
| Down Payment with Interest: | $ 385,651.04 |

1

82

# CLOSING STATEMENT

<table>
<tr><td></td><td>**Closed On:**<br>**Jan 15, 2016**</td></tr>
</table>

### 135 West 52nd Street, Unit #25B
### Purchaser(s): Sen BO Real Estate, LLC

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $2,690,250.00 |
| Balance of Down Payment – Wire | $315,900.00 |
| **TOTAL** | $3,006,150.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | $2,690,250.00 |
| **Balance of Purchase Price – Check(s)** | | $2,690,250.00 |

Check to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $2,687.86 |

Checks to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Capital Contribution | 1. | $2,698.38 |
| Next Month Common Charges | 2. | |

| | | |
|---|---|---|
| Check to Rosen Livingston & Cholst LLP: | 1. | $2,500.00 |

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $474,750.00 |
| Down Payment with Interest: | $476,477.82 |

1

83

# CLOSING STATEMENT

> **Closed On:**
> Mar 3, 2016

### 135 West 52nd Street, Unit #25C
### Purchaser(s): One Thirty Five 25C LLC

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $2,656,250.00 |
| Balance of Down Payment – Wire | $311,900.00 |
| **TOTAL** | $2,968,150.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | $2,656,250.00 |
| | 2. | |
| **Balance of Purchase Price – Check(s)** | | $2,656,250.00 |

Checks to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $2,312.21 |
| Capital Contribution | 2. | $1,924.28 |

Check to 135 West 52nd Street Condominium:

| | | |
|---|---|---|
| Capital Contribution | 1. | $783.52 |
| Next Month Common Charges | 2. | $1,353.90 |

Check to Rosen Livingston & Cholst LLP: 1.    $2,500.00

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $468,750.00 |
| Down Payment with Interest: | $470,486.91 |

1

84

# CLOSING STATEMENT

**Closed On:**
**Feb 16, 2016**

### 135 West 52nd Street, Unit #25D
### Purchaser(s): Rogerio Filadelfo Lobo &
### Renata Fracaroli Vilanova Lobo

Funds Disbursed To Deutsche Bank:

  Balance of Purchase Price – Check(s)    $2,273,750.00

  Balance of Down Payment – Wire    $266,900.00

  **TOTAL**    $2,540,650.00

CHECKS to Deutsche Bank AG New York Branch, as agent:

          1.   $1,397,986.22

          2.   $875,763.78

  **Balance of Purchase Price – Check(s)**   $2,273,750.00

Checks to 135 West 52nd Street Owner LLC:

  Adjustments     1.   $11,681.54

  Capital Contribution   2.   $2,252.90

Check to 135 West 52nd Street Condominium:

  Next Month Common Charges   1.   $1,126.45

Check to Rosen Livingston & Cholst LLP:   1.   $2,000.00

ESCROW ACCOUNT

  Down Payment:    $401,250.00

  Down Payment with Interest:    $402,809.64

1

85

# CLOSING STATEMENT

135 West 52nd Street, Unit #27B
Purchaser(s): Gladyray Enterprises, LLC

> Closed On:
> Jan 28, 2016

Funds Disbursed To Deutsche Bank:

| | |
|---|---|
| Balance of Purchase Price – Check(s) | $4,250,000.00 |
| Balance of Down Payment – Wire | $499,400.00 |
| **TOTAL** | $4,749,400.00 |

CHECKS to Deutsche Bank AG New York Branch, as agent:

| | | |
|---|---|---|
| | 1. | $2,418,914.71 |
| | 2. | $1,831,085.29 |
| **Balance of Purchase Price – Check(s)** | | $4,250,000.00 |

Check to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Adjustments | 1. | $24,391.95 ( need to refund $30.36 for BID tax ) |

Checks to 135 West 52nd Street Owner LLC:

| | | |
|---|---|---|
| Capital Contribution | 1. | $4,317.40 |
| | 2. | $15.10 |
| Next Month Common Charges | 3. | |

Check to Rosen Livingston & Cholst LLP: 1.  $2,850.00

ESCROW ACCOUNT

| | |
|---|---|
| Down Payment: | $750,000.00 |
| Down Payment with Interest: | $753,206.15 |

1

# EXHIBIT B

## Closed Units Schedule

Exhibit 3

| Unit | SQ FT | Est. SQ FT | BRPIX/BMT REPO | Minimum Release Price | Minimum Release PSF | Schedule A Pricing | Previous Cumulative Change | Current Change | Total Cumulative Change | Revised Schedule A Pricing | Offer Amount | Offer PSF | Contract Sent | Closing Schedule | Net Proceed to Pay Down Loan | Closing Date |
|------|-------|------------|----------------|----------------------|---------------------|--------------------|---------------------------|----------------|------------------------|---------------------------|--------------|-----------|---------------|-----------------|------------------------------|--------------|

**Closed Units Schedule**

| | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Subtotal | 77,466 | | $96,896,763 | $1,251 | | $153,065,000 | $1,945,000 | $628,000 | $2,465,000 | $155,670,000 | $155,660,000 | $155,645,359 |
| Grand Total | 164,821 | | $129,896,763 | $1,629 | | | | | | $191,920,000 | $191,910,000 | $179,643,559 |

# EXHIBIT C


**Situs**

**Situs Asset Management LLC**
**2975 Regent Blvd, Box 201341**
**Irving, TX 75063**

| Loan Number | Payment Due Date | Current Amount Due | Past Due Payment | Total Payment Due |
|---|---|---|---|---|
| 5920038A | 03/01/2016 | $527,234.76 | $0.00 | $527,234.76 |

| Additional funds to be applied per the terms of your loan |
|---|
| |

For address changes, please contact Vanessa Shields at (713) 328-4369.

**Mail To:** 135 West 52nd Street Owner LLC
512 Seventh Avenue, 16th Floor

New York, NY 10018

**\*\*Please reference your loan number on checks or wires to ensure timely credit\*\***

**Situs**

| LOAN NUMBER | PROPERTY ADDRESS |
|---|---|
| 5920038A | 135 West 52nd Street<br>New York, NY 10018 |

For questions, arranging a wire payment or to obtain loan payoff information please contact Vanessa Shields at (713) 328-4369.

### LOAN INFORMATION

| | |
|---|---|
| Current Principal Balance | $94,353,279.08 |
| Current Interest Rate | 6.92700000 % |
| Maturity Date | 08/25/2016 |
| Tax Escrow Balance | $0.00 |
| Property Insurance Escrow Balance | $0.00 |
| Reserve Escrow Balance | $1,029,837.69 |
| Misc. Escrow Balance | $0.00 |
| Deferred Interest Balance | $0.00 |
| Unapplied Balance | $0.00 |
| Suspense Balance | $0.00 |

### PAST DUE PAYMENT INFORMATION

| | |
|---|---|
| Past Due Principal | $0.00 |
| Past Due Interest | $0.00 |
| Past Due Tax Escrow | $0.00 |
| Past Due Insurance Escrow | $0.00 |
| Past Due Reserves | $0.00 |
| Past Due Late Charges | $0.00 |
| TOTAL | $0.00 |

### CURRENT AMOUNTS DUE

| | |
|---|---|
| Current Principal Due | $0.00 |
| Current Interest Due | $520,984.76 |
| Current Tax Escrow Due | $0.00 |
| Current Insurance Escrow Due | $0.00 |
| Current Reserve Due | $6,250.00 |
| Current Misc. Escrow Due | $0.00 |
| Accrued Late Charges Due | $0.00 |
| Current Misc. Fee Due | $0.00 |
| Protective Advance Balance Due | $0.00 |
| TOTAL | $527,234.76 |

### LATE CHARGE FEE

A LATE CHARGE FEE will be charged to this account if payment is not received by the applicable grace period provided in your loan documents.

### SPECIAL MESSAGES

### TOTAL DUE

| | |
|---|---|
| TOTAL PAYMENT DUE | $527,234.76 |
| Date Payment Due | 03/01/2016 |

*Statement Date:* 02/16/2016

**Please note payments are not accepted at our office address**

**Please Make Check Payable to:**
Situs Asset Management LLC
PO Box 201341
Dallas, TX 75320-1341

**Overnight Delivery:**
Situs Asset Management LLC
Wells Fargo Lockbox
Attn: Box 201341
2975 Regent Blvd
Irving, TX 75063

**Disclosures:** This statement reflects loan activity up until the Statement Date. Any loan activity occurring after the Statement Date for the remainder of the Statement Period and any necessary adjustments in connection with such loan activity will be reflected in your next statement. This statement does not constitute a payoff quote or alter the terms of your loan documents. A late fee will be incurred per the terms of your loan documents if your payment is not received when due and will be reflected on your next Loan Invoice.

Hanover Street Capital
135 West Street Fee Owner LLC - Situs Loan 5920038
135 West Street
ALLOCATIONS    March 1, 2016

| | | | |
|---|---|---|---|
| Section 7.4 of Senior Loan Agreement | | | |
| Cash Available in the Deposit Account | | 12,528,924.66 | |
| Less Rebalancing Account Escrow | | - | |
| Cash Available in the REBALANCING Account to pay interest and fees | | - | |
| | | | |
| **Total Available for Distribution** | | 12,528,924.66 | |
| | | | |
| First   Less Servicing Fee | | 6,250.00 | |
| $75,000 annual paid monthly in advance | | | |
| | | | |
| Second Less Monthly Debt Service | | 520,984.76 | |
| | | | |
| Third   Less Cary Costs | | | |
| | | | |
| Fourth  Less to be applied to Outstanding Principal Balance | | 11,971,760.50 | |
| | | | |
| and Exit Fee | | 29,929.40 | |
| Exit Fee is defined at 0.25% of the Loan Amount being paid at this time | | | |
| | | | |
| Fifth   Less Return Differential | | 0.00 | |
| | | | |
| Sixth   Less all amounts due and payable | | 0.00 | |
| | | | |
| Seventh             To Borrower | | **0.00** | |

| | | |
|---|---|---|
| **PAY DOWN** | | |
| $ 11,971,760.50 | Senior | |
| $ - | Building | |
| $ 11,971,760.50 | | |
| | | |
| $ 82,381,518.58 | New UPB Senior | |

3/1/16

92

# EXHIBIT D

**3/1/16 Loan Paydown**

| Senior UPB | $94,353,273.08 |
|---|---|
| March 1st Paydown | ($11,971,760.50) |
| Loan Balance | $82,381,512.58 |
| Lock Box Balance | $32,471,950.00 |
| Loan Balance as of 3/9/2016 | $49,909,562.58 |

| | | | | | | |
|---|---|---|---|---|---|---|
| January Closings: | 10A | Closed | 1/28/2016 | $ | 1,564,000.00 | |
| | 27B | Closed | 1/28/2016 | $ | 4,250,000.00 | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| February Closings: | 24C | Closed | 2/8/2016 | $ | 2,643,500.00 | $ | 366,150.00 |
| | 25D | Closed | 2/16/2016 | $ | 2,273,750.00 | $ | 266,900.00 |
| | 16A | Closed | 2/22/2016 | $ | 1,700,000.00 | $ | 199,400.00 |
| | 21A | Closed | 2/24/2016 | $ | 3,506,250.00 | $ | 334,618.75 |
| | 15A | Closed | 2/25/2016 | $ | 1,632,000.00 | $ | 191,400.00 |
| | 22A | Closed | 2/26/2016 | $ | 2,125,000.00 | $ | 249,400.00 |
| | 12A | Closed | 2/26/2016 | $ | 1,632,000.00 | $ | 191,400.00 |
| | 20A | Closed | 2/29/2016 | $ | 3,463,750.00 | $ | 359,715.62 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| March Closings: | 18A | Closed | 3/1/2016 | $ | 3,378,750.00 | $ | 396,900.00 |
| | 16C | Closed | 3/1/2016 | $ | 1,419,500.00 | $ | 166,400.00 |
| | 16D | Closed | 3/2/2016 | $ | 1,419,500.00 | $ | 166,400.00 |
| | 25C | Closed | 3/3/2016 | $ | 2,656,250.00 | $ | 311,900.00 |
| | 11C | Closed | 3/4/2016 | $ | 1,351,500.00 | $ | 158,400.00 |
| | 16E | Closed | 3/7/2016 | $ | 1,814,750.00 | $ | 212,900.00 |
| | 23A | Closed | 3/8/2016 | $ | 2,176,000.00 | $ | 255,400.00 |
| | 27A | Closed | 3/9/2016 | $ | 2,588,250.00 | $ | 303,900.00 |
| | 30B | Closed | 3/9/2016 | $ | 4,420,000.00 | $ | 422,500.00 |

| | | | |
|---|---|---|---|
| | $ 15,937,500.00 | $ | 2,188,984.37 |
| Lock Box Balance | $ 32,471,950.00 | | |

| | | | |
|---|---|---|---|
| Cleared Funds: | $ | 18,126,484.37 | |
| | $ | (1,865,551.76) | Draw 33 Cost Overrun |
| | $ | (3,693,507.95) | Remaining Cost Overruns |
| Available Funds: | $ | 12,567,424.66 | |
| | $ | (38,500.00) | Amount Prev Applied to UPB |
| | $ | (6,250.00) | Servicing Fee |
| | $ | (520,984.76) | Interest |
| | $ | (11,971,760.50) | Pay down |
| | $ | (29,929.40) | Exit Fee |
| | $ | - | |

94

# EXHIBIT E

# APPLICATION AND CERTIFICATION FOR PAYMENT

AIA DOCUMENT G702

PAGE ONE OF    PAGES 1 of 1

TO LENDER : Deutsche Bank Trust Company Americas

PROJECT:    135 West 52nd Street

APPLICATION NO: 34

Distribution to:
☐ OWNER
☐ ARCHITECT
☐ LENDER

PERIOD TO: January 31, 2016

PROJECT NOS:

FROM CONTRACTOR:

OWNER: 135 West 52nd Street Owner LLC
512 Seventh Avenue 15th Fl
New York NY 10018

CONTRACT DATE:

CONTRACT FOR:    Cetra-Ruddy

## OWNER'S APPLICATION FOR PAYMENT

Application is made for payment, as shown below, in connection with the Contract.
Continuation Sheet, AIA Document G703, is attached.

| | | ADDITIONS | DEDUCTIONS |
|---|---|---|---|
| 1. Original Contract Sum | $ 91,103,969.00 | | |
| 2. Net change by Change Orders | 9,246,876.07 | | |
| 3. CONTRACT SUM TO DATE (Line 1 ± 2) | 100,350,845.07 | | |
| 4. TOTAL COMPLETED & STORED TO DATE (Column I on G703) | 94,858,792.29 | | |
| 5. RETAINAGE: | | | |
|   a.    10%  of Completed Work | $  5,989,459.47 | | |
|   (Column E + F on G703) | | | |
|   b.    10%  of Stored Material | $           D | | |
|   (Column G on G703) | | | |
|   Total Retainage (Lines 5a + 5b or Total in Column I of G703 | 5,989,459.47 | | |
| 6. TOTAL EARNED LESS RETAINAGE | $ 88,869,332.82 | | |
|   (Line 4 Less Line 5 Total) | | | |
| 7. LESS PREVIOUS CERTIFICATES FOR PAYMENT | 86,771,076.10 | | |
|   (Line 6 from prior Certificate) | | | |
| 8. CURRENT PAYMENT DUE | $  2,098,256.72 | | |
| 9. BALANCE TO FINISH, INCLUDING RETAINAGE | $ 11,481,512.25 | | |
|   (Line 3 less Line 6) | | | |

| CHANGE ORDER SUMMARY | ADDITIONS | DEDUCTIONS |
|---|---|---|
| Total changes approved In previous months by Owner | $9,246,876.07 | |
| Total approved this Month | | $0.00 |
| TOTALS | $9,246,876.07 | |
| NET CHANGES by Change Order | 99,246,876.07 | |

The undersigned Contractor certifies that to the best of the Contractor's knowledge,
information and belief the Work covered by this Application for Payment has been
completed in accordance with the Contract Documents, that all amounts have been paid by
the Contractor for Work for which previous Certificates for Payment were issued and
payments received from the Owner, and that current payment shown herein is now due.

OWNER
135 West 52nd Street Owner LLC

By:

State of New York
County of New York
Subscribed and sworn to before me this 24 day of Feb 2016
Notary Public:
My Commission expires:

LOIS HUTTER SANCHEZ
Notary Public, State of New York
No. 01HU6325616
Qualified in Queens County
Commission Expires April 24, 2016

Date: 2/24/2016

## ARCHITECT'S CERTIFICATE FOR PAYMENT

In accordance with the Contract Documents, based on on-site observations and the data
comprising the application, the Architect certifies to the Owner that to the best of the
Architect's knowledge, information and belief the Work has progressed as indicated,
the quality of the Work is in accordance with the Contract Documents, and the Contractor
is entitled to payment of the AMOUNT CERTIFIED.

AMOUNT CERTIFIED . . . . . . . . . . $  2,098,256.72

(Attach explanation if amount certified differs from the amount applied. Initial all figures on this
Application and on the Continuation Sheet that are changed to conform with the amount certified.)

ARCHITECT: Cetra-Ruddy

By:    Date: 3/2/16

This Certificate is not negotiable. The AMOUNT CERTIFIED is payable only to the
Contractor named herein. Issuance, payment and acceptance of payment are without
prejudice to any rights of the Owner or Contractor under this Contract.

THE AMERICAN INSTITUTE OF ARCHITECTS, 1735 NEW YORK AVE., N.W., WASHINGTON, DC 20006-5292

AIA DOCUMENT G702 - APPLICATION AND CERTIFICATION FOR PAYMENT - 1992 EDITION - AIA - ©1992.
Users may obtain validation of this document by requesting a completed AIA Document D401 - Certification of Document's Authenticity from the Licensee.

S:\Personal\Accountancy\REQUISITIONS\Req 034 01.31.16\Req 034 01.31.16.docx.docx

96

# EXHIBIT F

## 135 West 52nd Street

| | | |
|---|---|---|
| Balance to Finish | $ | 11,481,512.25 |
| Contingency | $ | 5,518,487.75 |
| Total | $ | 17,000,000.00 |

# EXHIBIT G

## PURCHASE AGREEMENT

AGREEMENT made as of September ___, 2014 between 135 WEST 52ⁿᵈ STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and Yanxiang Lu residing at 23/F/BLK 41 Baguiovilla 550, Victoria Road, Pokkulam, Hong Kong ("Purchaser").

**Purchaser's Attorney:**  Jeff Albara, Esq.

**Address:**  Albara & Reed

15 Fisher Lane, Suite 200

White Plains, New York 10603

**Telephone:** (914) 458 4020 Fax: (212) 201 2133 Email: jalbara@albarareed.com

**Percentage of Common Interest:** 0.3700%  **Common Charges:** $777.13 per month

**Residential Percentage of Common Interest:** 0.4658%

**Selling Agent:** Douglas Elliman (Stacy Spielman)

**Co-Broker:** Town Greenwich LLC (Peter Wei)

**Real Estate Taxes:** $1,087.84 per month;   B.I.D. Tax: $10.24 per month;

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 8A ("Unit") in the building ("Building") known as 135 WEST 52ⁿᵈ STREET Condominium ("Condominium") and located at 135 WEST 52ⁿᵈ STREET, New York, New York 10019, together with a 0.3700% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

**1.  Purchase Price**

(a)  The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below ("Purchase Price") is $1,860,000.00, payable as follows.

(i) $279,000.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5; and

(ii) $1,581,000.00, constituting the balance of the Purchase Price ("Balance"), by certified check of Purchaser or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined). All checks in payment of the balance of the Purchase Price shall be payable to the order of Sponsor (or as Sponsor otherwise directs. Sponsor reserves the right to require Purchaser to pay the Balance or any portion thereof in "immediately available funds" (i.e. by wire transfer to a bank account designated by Sponsor).

(c) All checks shall be unendorsed, made payable to the direct order of "Rosen Livingston & Cholst LLP, as Escrow Agent" or (as to the Balance) to "135 West 52ⁿᵈ Street Owner LLC" or

1

such payees as Sponsor may direct on not less than two (2) business days' prior oral or written notice to Purchaser. All checks shall be drawn on a bank that is a member of the New York Clearing House Association. All checks must be payable directly to the order of the required payee; they may not be endorsed.

(d) Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing and, unless otherwise set forth herein, none of the provisions of this Agreement shall survive the closing. However, nothing contained herein shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of Purchaser under Article 23-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.

(e) Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under "Terms of Sale - Prerequisites to Closing of Title" in Part I of the Plan are met concurrently with, or prior to, closing.

**2.  Definitions.** The following terms shall have the meanings ascribed to them:

(a) "Building" shall mean the building located at 135 West 52ⁿᵈ Street, New York, New York 10019.

(b) "Closing Date," "closing", "closing of title" and words of similar import are used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment to Sponsor of the Purchase Price and the delivery to Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.

(c) "Condominium" shall mean "The 135 West 52ⁿᵈ Street Condominium.

(d) "Declaration" shall mean the Declaration of the 125 West 52ⁿᵈ Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.

(e) "Depository" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.

(f) "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.

(g) "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.

(h) "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.

All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

**3.  Plan**

(a) Purchaser represents that Purchaser has possessed the Plan and any filed amendments thereto at least three (3) business days prior to submitting this Purchase Agreement; or

(b) in the event Purchaser does not which is well three (2) business days) Purchaser has the right to rescind this Purchase Agreement by sending written notice of his rescission to the Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement (time being of the essence to exercise such right of rescission within such seven (7) day period).

2

(c) Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Condominium Documents set forth in Part II of the Plan and Parts A and B of the Exhibits submitted with the Plan to the Department of Law) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor (including, without limitation, amendments involving any changes, modifications, or updating of the projected Common Charges, the projected real estate taxes to be paid by Purchaser, or Schedule B "Budget for the First Year of Condominium Operation"). Except in the case of a material adverse amendment affecting Purchaser's Unit or as otherwise provided under the Plan, any such amendments shall neither excuse Purchaser from performing Purchaser's obligations hereunder nor entitle Purchaser to any offset or credit against the Purchase Price or claim or right of action against Sponsor, and any such amendment may be filed by Sponsor without Purchaser's consent or approval. However, Sponsor shall not have the right to unilaterally cancel this Agreement except as herein provided (such as in the case of an unsured default by Purchaser) nor change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.

(d) The Plan is hereby incorporated in this Agreement with the same force and effect as if set forth at length. In the event of any inconsistency or conflict between the provisions of this Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding. Purchaser acknowledges having had full opportunity to examine all documents and investigate all statements made herein and in the Plan.

**4.  Personal Property**

(a) At closing, the Unit will contain only those appliances, countertops, cabinets, flooring, sinks, vanities (if any), air conditioning units (if any), hardware and other fixtures and equipment installed therein as set forth in the Plan.

Sponsor has the right to substitute other appliances, countertops, cabinets, sinks, vanities, flooring and fixtures in place of those referred to in the Plan provided only that the substitutions are of equal or better quality and design.

(b) The Unit is being sold unfurnished, without window blinds or shades. Furniture, floor coverings, wall coverings, furnishings, decorations and the like in or about any model Unit are for display purposes only and are not included in this sale except to the extent set forth in the Plan. Any floor plans or sketches shown to Purchaser (including those contained in the Plan) are only approximations of the Unit's dimensions and arrangement and Purchaser acknowledges and agrees that he is not relying thereon. Sponsor shall not be liable for minor variations from any floor plans or structures.

(c) Sales model apartments may, at Sponsor's option, be sold furnished at a later date but will initially be sold without firm sale.

(d) There will be no modifications or extras unless agreed to in writing by the parties. All modifications and alterations must be approved by Sponsor in writing and, if approved, shall be performed by Sponsor at Purchaser's expense (payable in the manner to be set forth in an addendum to this Agreement or by separate agreement between Sponsor and Purchaser).

**5  Escrow Monies to be Held in Trust**

(a) The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, New York, NY 10016, telephone number 212 687 7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser. Escrow Agent has designated the following attorneys to serve as signatories: Morton H Rosen, Peter I. Livingston, Mary L. Krasnick, Bruce A. Cholst. All designated signatories are entitled to practice law in the State of New York. Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor,

3

Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

(b) The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York. The escrow account is entitled ("Purchaser's Name) Rosen Livingston & Cholst LLP Escrow Agent" ("Escrow Account"). The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit. Any deposit in excess of $250,000 will not be insured.

All Deposits received by Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP as Escrow Agent.

Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of a written agreement between Purchaser and Sponsor.

The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts, which is currently 0.2%. Interest shall begin to accrue upon placing the Deposit into the Escrow Account. All interest earned thereon shall be paid to or credited to the Purchaser at closing. No loss of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account. The Escrow Agreement appended hereto as Exhibit "A."

The Down Payment will not earn interest until the Purchaser's check has been deposited and cleared. Sponsor will be liable to Purchaser only for the amount of interest actually received from the Depository (which interest may be reduced by the Depository's service charge). The interest on the Down Payment, if and same may be reduced by the Depository's service charge, is hereinafter referred to as "interest."

Upon the payment and performance by Purchaser of all of Purchaser's obligations hereunder and the transfer to Purchaser of title to the Unit, Sponsor will instruct the Depository to pay to Purchaser any and all interest on monies deposited hereunder. It is possible that Purchaser may not receive interest on the Down Payment for the entire month in which the closing is scheduled to occur. The Sponsor and Selling Agent will not be liable to Purchaser for the amount of such interest or the payment thereof, except for any amount received from the Depository. All funds due to Sponsor and received under this Purchase Agreement will be handled in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and with Section 71-a(3) of the New York Lien Law.

**6.  Closing of Title**

(a) The closing of title shall occur on the date and at the time and place in the City and State of New York as Sponsor shall designate to Purchaser on not less than thirty (30) days' prior written notice (unless waived by Purchaser). Sponsor shall have the right, from time to time, to adjourn such date and time for closing on written notice to Purchaser. If the Closing is adjourned by Sponsor, then Sponsor shall fix a new date and time for closing and shall give Purchaser not less than ten (10) days' prior written notice of the new scheduled date and time for closing.

4

100

(b) Purchaser will pay a fee for recording the Unit Deed and the Unit Owner's Power of Attorney;

(c) If Purchaser obtains a mortgage loan, Purchaser will pay:

(i) a fee and service charge for recording the mortgage;

(ii) a mortgage recording tax in the following amount: (a) for Residential Units, 2.05% of the face amount of a mortgage less than $500,000 for which mortgagor receives a $25 deduction, or 2.175% for a mortgage covering a Residential Unit equal to $500,000.00 or more, less $25 and (b) for non-residential Units, 2.05% of the face amount of a mortgage less than $500,000 or 2.80% for a mortgage covering a non-residential Unit equal to $500,000 or more;

(iii) if mortgage title insurance is required by Purchaser's lender, an additional premium for insuring the mortgagee's interest in an amount equal to the principal amount under the mortgage loan.

(iv) if required by Purchaser's lender, deposits for Common Charges, real estate taxes and assessments in an initial amount and in such monthly sums after closing as required by the lender (the amount of which monthly deposits may be changed periodically by the lender). The amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the policies of the lender, the number of months remaining between the closing of title and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amount of the taxes and other charges or impositions then payable; and

(v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender. Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of his lender with respect thereto;

(vi) if, in connection with the purchase, Purchaser has dealt with any broker except (A) the Selling Agent or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing;

(vii) Purchaser will pay to Rosen Livingston & Cholst LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owner's Power of Attorney, additional closing documents and for coordinating and attending the closing;

(viii) If Purchaser obtains financing and his lender refuses to close at the office of Rosen Livingston & Cholst LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and Purchaser pays Rosen Livingston & Cholst LLP, in addition to said charge set forth above, a travel fee of $500.00 if the closing is held in Manhattan or $700.00 if the closing is held in another borough. If the closing attended by a representative of Rosen Livingston & Cholst LLP is adjourned through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Cholst LLP an additional travel and attendance fee in the same amount as stated above for each attendance;

(ix) If Purchaser is other than a natural person, Purchaser will be required to provide a personal guaranty of Common Charges and other charges due to the Condominium and Purchaser will pay Rosen Livingston & Cholst LLP a fee of $500.00 for preparation of such Guaranty;

(x) If Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Cholst LLP a fee of $1,500.00 for the preparation of the splitter, substitute mortgage and assignment of mortgage documents; and

(d) Purchaser will pay the New York State Real Estate Transfer Tax (documentary stamps) to be affixed to the deed, the New York City Real Property Transfer Tax and (if applicable) the one (1%) percent "mansion tax";

(e) Purchaser will pay to 135 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit for Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.

All of the aforementioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's unendorsed, personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party, or if so directed by the Sponsor, by wire transfer.

**14. Power of Attorney to Condominium Board, Sponsor, Retail Unit Owner and Commercial Unit Owners**

At closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit (or, if no representative is present, then to Sponsor's attorney), for recording in the New York City Register's Office a Power of Attorney in a form satisfactory to the Condominium Board relative to purchasing or leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owners relative to amending the Condominium Documents to the extent permitted in the Power of Attorney. An originally recorded Power of Attorney shall be sent to the Condominium Board.

**15. Events of Default**

(a) The following shall constitute "Events of Default" hereunder:

(i) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 6 herein or to timely pay the applicable Rosen Livingston & Cholst LLP closing fee or any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Cholst LLP pursuant to paragraphs 12 and 13 above; or

(ii) the failure or failure of collection of Purchaser's Down Payment check or

(iii) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder.

(b) Upon the occurrence of an Event of Default, Sponsor shall be entitled, in its sole and absolute discretion, to cancel this Purchase Agreement by giving Purchaser written notice of cancellation. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default. TIME IS OF THE ESSENCE TO CURE SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD. If the default is not cured within such thirty (30) day period, then this Agreement shall be deemed canceled and Sponsor shall have the right to retain, as and for liquidated damages, the Downpayment. Any sums in excess thereof, together with any interest thereon shall be returned to Purchaser after cancellation.

Notwithstanding the foregoing, if Purchaser's check in payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in which to provide good funds for Purchaser's Down Payment, in which event Sponsor shall be deemed to have waived its right to sue Purchaser on the dishonored or uncollected check; or (ii) allow Purchaser thirty (30) days in which to make good Purchaser's Down Payment and if Purchaser fails to so do within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check. In the latter case, Purchaser will also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

9

10

Upon cancellation of this Agreement and disposing of the Down Payment and interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan. Thereafter, the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

**16. Risk of Loss; Casualty**

(a) Purchaser shall not be entitled to possession of the Unit nor to store any of Purchaser's furniture or belongings therein until the deed is delivered to Purchaser at closing.

(b) All other risk of loss prior to closing has been assumed by Sponsor, but without any obligation or liability of Sponsor to repair the damage or restore the Unit or its contents. If Sponsor or the Unit Owners elect to repair or restore the loss or damage, this Agreement shall continue in full force and effect, Purchaser shall not have the right to reject title to the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or replacements. Purchaser shall not be required to pay the Balance unless and until (i) the Unit has been substantially repaired as near as is reasonably possible to its condition immediately prior to the casualty; (ii) its essential services (such as gas, electricity, and heat) and a reasonable means of ingress and egress to the street have been restored; and (iii) any condition in the Unit for which a violation (if any) is noted or issued has been corrected (even if same is not yet removed of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser, its licensees, invitees and/or servants. (Sponsor will endeavor in good faith, and with reasonable diligence, to remove or cause to be removed subsequent to closing all violations of record it is solely caused.) Any proceeds received from insurance, or in satisfaction of any claim or action in connection with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners). If such proceeds are paid to Purchaser, Purchaser shall promptly turn them over to Sponsor upon request. The provisions of the two preceding sentences shall survive the closing.

(c) In the event that Sponsor notifies Purchaser that it does not elect to repair or restore the Unit or if the Unit Owners do not resolve to make such repairs or restoration in accordance with the Condominium's By-Laws, this Agreement shall be deemed canceled and of no further force or effect, and Sponsor shall instruct the Depository to return to Purchaser all sums deposited hereunder, together with interest, if any, thereon, whereupon the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously canceled due to Purchaser's uncured default, Sponsor shall retain the Liquidated Sum as provided above.

**17. Inspection of Unit**

At least ten (10) days before the Balance is to be paid, Sponsor or the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Selling Agent to inspect the Unit before the lapse of such ten (10) day period. Purchaser or his duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Report (in the form set forth as Exhibit B to this Agreement) and deliver same to the Sponsor or Selling Agent at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the completed Inspection Report shall not excuse Purchaser from paying the Balance when due (without provision for escrow) and shall constitute Purchaser's full acceptance of the Unit.

However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of the Sponsor".

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Units and the Retail Unit may be used for any lawful purpose and (ii) the Condominium Board, and the Residential Unit Owners do not have any right to approve the use or any changes in the use of any Unsold Residential Units, the Commercial Units and the Retail Unit or any part thereof. This paragraph shall survive the closing of title.

**18. No Representation**

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, furnishings and fixtures contained in model units, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms or closets therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to the purchase of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and investigation thereof). No person has been authorized to make any representations on behalf of Sponsor. No oral representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, without either or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially to such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the closing of title.

**19. Negotiable Terms**

Sponsor reserves the right, in its sole and absolute discretion, to negotiate on an individual basis with each purchaser substantially more beneficial purchase terms than those offered or given to other purchasers. As a result, Purchaser may not benefit from a more favorable purchase term given to another purchaser and will not have the right to rescind this Purchase Agreement or recover the Down Payment or any other amount for not being given such benefit. The following is a list of only some of the purchase terms which may be negotiated: purchase price; the amount of the Down Payment; the right of a purchaser to cancel the Purchase Agreement and recover the Down Payment for failure to obtain financing or to close by a specific date; the closing date and minimum notice required to schedule the closing; upgraded appliances, fixtures or equipment or other alterations, improvements or additions to be performed by and at the expense of Sponsor; assuming a purchaser from closing costs and/or penalties for closing later (longer time periods to pay or perform obligations under the Purchase Agreement); elimination of "time of the essence" provisions; price or common charge credits; assumption of payment of, or guarantee of, common charges for a given period; Sponsor financing (provided an amendment to the Plan permitting the same thereof is duly filed); allowances or credits against the purchase price for decorations; to install appliances or fixtures and granting to Purchaser the benefit of any one or more favorable terms offered or given to another purchaser.

11

12

101

Purchaser's money, and may not be comingled with any other money or pledged or hypothecated by Sponsor as per GBL § 352-h.

I. Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until after consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law. Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

J. The Escrow Agent shall release the Deposit if so directed:

(a) pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 6 upon closing of title to the Unit; or

(b) in a subsequent writing signed by both Sponsor and Purchaser; or

(c) by a final, non-appealable order or judgment of a court.

If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit. If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release. If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within said thirty (30) day period, the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above. Notwithstanding the foregoing, the Escrow Agent shall have the right at any time to deposit the Deposit contained in the Escrow Account with the clerk of the county where the Unit is located and shall give written notice to both parties of such deposit.

The Sponsor shall not object to the release of the Deposit to:

(a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an Amendment to the Plan; or

(b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

K. Any provision of the [Purchase Agreement/Escrow Agreement] or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding any Deposit in trust is absolutely void. The provisions of the Attorney General's regulations and GBL §§ 352-e(2-b) and 352-h concerning escrow trust funds shall prevail over any conflicting or inconsistent provisions in the Purchase Agreement, Plan, or any amendment thereto.

L. Escrow Agent shall maintain the Escrow Account under its direct supervision and control.

17

M. A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352(h).

N. Escrow Agent may rely upon any paper or document which may be submitted to it in connection with its duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

O. Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-(h) and the New York State Department of Law's regulations.

P. Sponsor shall obtain or cause the selling agent under the Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement. Q. Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstances.

R. Sponsor agrees to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of the obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent. This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

**38. Counterpart Signature Pages**

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument. This Agreement may be executed by facsimile or .pdf and each such shall be deemed originals.

[Signature page follows]

18

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:                                    PURCHASER:
126 WEST 52ND STREET OWNER
LLC

By: _____               _____
    Meyer Chetrit, Principal                    Purchaser

By: _____               _____
    David Bistricer, Principal                  Co-Purchaser

[Purchaser]
Date Accepted:
_____
[*Please initial on line and print or
type name under line.]

Purchaser acknowledges:              Initials: _____
Receipt of Offering Plan and         Purchaser
Amendments at _____ (A.M./P.M.)
on _____, 2014; and

Delivery of Purchase                 Initials: _____
Agreement and Check for              Co-Purchaser
Down Payment at _____ (A.M./P.M.)
on _____, 2014

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:                                    PURCHASER:
126 WEST 52ND STREET OWNER
LLC

By: _____               _____
    Meyer Chetrit, Principal                    Purchaser

By: _____               _____
    David Bistricer, Principal                  Co-Purchaser

[Purchaser]
Date Accepted:
_____
[*Please initial on line and print or
type name under line.]

Purchaser acknowledges:              Initials: _____
Receipt of Offering Plan and         Purchaser
Amendments at _____ (A.M./P.M.)
on _____, 2014; and

Delivery of Purchase                 Initials: _____
Agreement and Check for              Co-Purchaser
Down Payment at _____ (A.M./P.M.)
on _____, 2014

PURCHASE AGREEMENT

AGREEMENT made as of September __18__, 2014 between 135 WEST 52ND STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and Bryan Villanueva and Jennifer Villanueva residing at 3C Ford Avenue, Holland, 268727, SINGAPORE ("Purchaser"). Christina Jaicis

Purchaser's Attorney: Timothy Costello, Esq.   Sandy Schwartz
Address: Costello & Associates, P.C.   Schwartz, Levine & Kaplan PLLC
260 Madison Avenue, 15th Floor   7 Penn Plaza, Suite 210
New York, New York 10016   NY NY 10001

(646) 518-7273 x 101
Telephone: (212) 785 – 4321 Fax: (212) 785 - 2606   Email: tim@c-a-law.com

Percentage of Common Interest: 0.3800%   Common Charges: $837.58 per month
Residential Percentage of Common Interest: 0.5020%   $ 840.50
Co-Broker: Knight Frank (Louisa Yap)   Lot 1048

Real Estate Taxes: $1,172.45 per month;   B.I.D. Tax: $10.79 per month;

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 18F ("Unit") in the building ("Building") known as 135 WEST 52ND STREET Condominium ("Condominium") and located at 135 WEST 52ND STREET, New York, New York 10019, together with a 0.3900% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

1. Purchase Price

(a) The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below (the "Purchase Price") is $2,000,000.00, payable as follows:

(i) $300,000.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5; and

(ii) $1,700,000.00, constituting the balance of the Purchase Price ("Balance"), by certified check of Purchaser or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined). All checks in payment of the balance of the Purchase Price shall be payable to the order of Sponsor or as Sponsor otherwise directs. Sponsor reserves the right to require Purchaser to pay the Balance or any portion thereof in "immediately available funds" (i.e. by wire transfer to a bank account designated by Sponsor).

(c) All checks shall be unendorsed, made payable to the direct order of "Rosen Livingston & Cholst LLP, as Escrow Agent" or (as to the Balance) to "135 West 52ND Street Owner LLC" or such payees as Sponsor may direct on not less than two (2) business days' prior oral or written notice to Purchaser. All checks shall be drawn on a bank that is a member of the New York

Clearing House Association. All checks must be payable directly to the order of the required payee; they may not be endorsed.

(d) Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing and, unless otherwise set forth herein, none of the provisions of this Agreement shall survive the closing. However, nothing contained herein shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of Purchaser under Article XX-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.

(e) Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under "Terms of Sale - Prerequisites to Closing of Title" in Part I of the Plan are met concurrently with, or prior to, closing.

2. Definitions    The following terms shall have the meanings ascribed to them:

(a) "Building" shall mean the building located at 135 West 52nd Street, New York, New York 10019.

(b) "Closing Date", "closing", "closing of title" and words of similar import are used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment to Sponsor of the Purchase Price and the delivery to Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.

(c) "Condominium" shall mean The 135 West 52ND Street Condominium.

(d) "Declaration" shall mean the Declaration of the 135 West 52ND Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.

(e) "Depository" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.

(f) "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.

(g) "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.

(h) "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.

All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

3. Plan

(a) Purchaser represents that Purchaser has possessed the Plan and any final amendments thereto at least three (3) business days prior to submitting this Purchase Agreement; or

(b) in the event Purchaser does not wish to wait three (3) business days) Purchaser has the right to rescind this Purchase Agreement by sending written notice of his rescission to the Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement (time being of the essence to exercise such right of rescission within seven (7) day period).

(c) Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Condominium Documents set forth in Part II of the Plan and Parts A and B of the Exhibits

(b) The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York. The escrow account is entitled ("Purchaser's Name) Rosen Livingston & Cholst LLP Escrow Agent" ("Escrow Account"). The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit. Any deposit in excess of $250,000 will not be insured.

All Deposits received by Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP as Escrow Agent.

Any Deposits made for vegetables, curious, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of a written agreement between Purchaser and Sponsor.

The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts, which is currently 0.2%. Interest shall begin to accrue upon placing the Deposit into the Escrow Account. All interest earned thereon shall be paid to or credited to the Purchaser at closing. No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account. The Escrow Agreement appended hereto as Exhibit "A."

The Down Payment will not earn interest until the Purchaser's check has been deposited and cleared. Sponsor will be liable to Purchaser only for the amount of interest actually received from the Depository (which interest may be reduced by the Depository's service charge). The interest on the Down Payment, as same may be reduced by the Depository's service charge, is hereinafter referred to as "interest".

Upon the payment and performance by Purchaser of all of Purchaser's obligations hereunder and the transfer to Purchaser of title to the Unit, Sponsor will instruct the Depository to pay to Purchaser any and all interest on monies deposited hereunder. It is possible that Purchaser may not receive interest on the Down Payment for the entire month in which the closing is scheduled to occur. The Sponsor and Selling Agent will not be liable to Purchaser for the amount of such interest or the payment thereof, except for any amount received from the Depository. All funds due to Sponsor and released under this Purchase Agreement will be handled in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and with Section 71-a(3) of the New York Lien Law.

4. Closing of Title

(a) The closing of title shall occur on the date and at the time and place in the City and State of New York as Sponsor shall designate to Purchaser on not less than thirty (30) days' prior written notice (unless waived by Purchaser). Sponsor shall have the right, from time to time, to adjourn such date and time for closing on written notice to Purchaser. If the Closing is adjourned by Sponsor, then Sponsor shall fix a new date and time for closing and shall give Purchaser not less than ten (10) days' prior written notice of the new scheduled date and time for closing.

Purchaser shall be entitled to one (1) adjournment of the closing not to exceed five (5) days (the "Adjourned Closing Date"). The closing adjournments granted in Section 12(c) shall not accrue unless Purchaser fails to close on such Adjourned Closing Date. Such

applicable) are based on rates in effect on the date of the Plan and are subject to change without prior notice.

(ii) If Purchaser elects to obtain the title insurance, Purchaser will pay a premium to the title company for such insurance, which premium may vary depending upon the title insurance company and the amount of insurance requested. A lower combined rate may be available if fee and mortgage insurance are ordered simultaneously.

(b) Purchaser will pay a fee for recording the Unit Deed and the Unit Owner's Power of Attorney.

(c) If Purchaser obtains a mortgage loan, Purchaser will pay:
   (i) a fee and service charge for recording the mortgage;
   (ii) a mortgage recording tax in the following amount: (A) for Residential Units, 2.05% of the face amount of a mortgage less than $500,000 for which mortgagee receives a $25 deduction, or 2.175% for a mortgage covering a Residential Unit equal to $500,000.00 or more, less $25 and (B) for non-residential Units, 2.05% of the face amount of a mortgage less than $500,000 or 2.80% for a mortgage covering a non-residential Unit equal to $500,000 or more;
   (iii) if mortgagee title insurance is required by Purchaser's lender, an additional premium for insuring the mortgagee's interest in an amount equal to the principal amount under the mortgage loan.

(iv) if required by Purchaser's lender, deposits for Common Charges, real estate taxes and assessments in an initial amount and in such monthly sums after closing as required by the lender (the amount of which monthly deposits may be changed periodically by the lender). The amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the policies of the lender, the number of months remaining between the closing of title and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amount of the taxes and other charges or impositions then payable; and

(v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender. Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of his lender with respect thereto;

(vi) if, in connection with this purchase, Purchaser has dealt with any broker except (A) the Selling Agent or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing;

(vii) if Purchaser obtains financing to Rosen Livingston & Cholst LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owner's Power of Attorney, additional closing documents and for coordinating and attending the closing;

(viii) if Purchaser obtains financing and his lender refuses to close at the office of Rosen Livingston & Cholst LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and Purchaser pays Rosen Livingston & Cholst LLP, in addition to said closing fee set forth above, a travel fee of $500.00 if the closing is held in Manhattan or $700.00 if the closing is held in another borough. If the closing attended by a representative of Rosen Livingston & Cholst LLP is adjourned through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Cholst LLP an additional travel and attendance fee in the same amount as stated above for each attendance;

(viii) if Purchaser is other than a natural person, Purchaser will be required to provide a personal guaranty of Common Charges and other charges due to the Condominium and

9

Purchaser will pay Rosen Livingston & Cholst LLP a fee of $500.00 for preparation of such Guaranty;

(x) if Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Cholst LLP a fee of $1,000.00 for the preparation of the splitter, substitute mortgage and assignment of mortgage documents; and

(d) Purchaser will pay the New York State Real Estate Transfer Tax (documentary stamps) to be affixed to the deed, the New York City Real Property Transfer Tax (if applicable) the one (1%) percent "mansion tax".

(e) Purchaser will pay to 135 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit by Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.

All of the aforementioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's unendorsed, personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party, or if so directed by the Sponsor, by wire transfer.

14. Power of Attorney to Condominium Board, Sponsor, Retail Unit Owner and Commercial Unit Owners

At closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit (or, if no representative is present, then to Sponsor's attorney), for recording in the New York City Register's Office a Power of Attorney in the form of the Condominium Board relative to purchasing or leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owner relative to renewing the Condominium Documents to the extent permitted in the Power of Attorney. An originally recorded Power of Attorney shall be sent to the Condominium Board.

15. Events of Default

The following shall constitute "Events of Default" hereunder:

(a) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 6 herein or to timely pay the applicable Rosen Livingston & Cholst LLP closing fee or any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Cholst LLP pursuant to paragraphs 12 and 13 above; or

(b) the dishonor or failure of collection of Purchaser's Down Payment check; or

(c) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder.

(d) Upon the occurrence of an Event of Default, Sponsor shall be entitled, in its sole and absolute discretion, to cancel this Purchase Agreement by giving Purchaser written notice of cancellation. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default. TIME IS OF THE ESSENCE TO CURE SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD. If the default is not cured within such thirty (30) day period, then this Agreement shall be deemed cancelled and Sponsor shall have the right to retain, as and for liquidated damages, the Downpayment. Any sums in excess thereof, together with any interest thereon shall be returned to Purchaser after cancellation.

Notwithstanding the foregoing, if Purchaser's check in payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in which to provide good funds for Purchaser's Down Payment, in which event Sponsor shall be

10

deemed to have waived its right to sue Purchaser on the dishonored or uncollected check; or (ii) allow Purchaser thirty (30) days in which to make good Purchaser's Down Payment and if Purchaser fails to do so within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check. In the latter case, Purchaser will also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

Upon cancellation of this Agreement and disposing of the Down Payment and interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan. Thereafter, the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

16. Risk of Loss; Casualty

(a) Purchaser shall not be entitled to possession of the Unit nor to share any of Purchaser's furniture or belongings therein until the deed is delivered to Purchaser at closing.

(b) All other risk of loss prior to closing has been reserved by Sponsor, but without any obligation of liability of Sponsor to repair the damage or restore the Unit or its contents. If Sponsor or the Unit Owners elect to repair or replace the loss or damage, this Agreement shall continue in full force and effect, Purchaser shall not have the right to an abatement of the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or replacements. Purchaser shall not be required to pay the Balance unless and until (i) the Unit has been substantially repaired as near as is reasonably possible to its condition immediately prior to the casualty; (ii) its essential services (such as gas, electricity, and heat) and a reasonable course of ingress and egress to the street have been restored; and (iii) any condition in the Unit for which a violation (if any) is noted or issued has been corrected (even if same is not yet secured of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser, its licensees, invitees and/or workmen. (Sponsor will endeavor to good faith, and with reasonable diligence, to remove or cause to be removed subsequent to closing all violations of record it is applicable to correct.) Any proceeds received from insurance, or in satisfaction of any claim or action in connection with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners). If such proceeds are paid to Purchaser, Purchaser shall promptly turn them over to Sponsor upon request. The provisions of the two preceding sentences shall survive the closing.

(c) In the event that Sponsor notifies Purchaser that it does not elect to repair or restore the Unit or if the Unit Owners do not resolve to make such repair or restoration in accordance with the Condominium's By-Laws, this Agreement shall be deemed cancelled and of no further force or effect, and Sponsor shall instruct the Depository to return to Purchaser all sums theretofore deposited hereunder, together with interest, if any, thereon, whereupon the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously cancelled due to Purchaser's insured default, Sponsor shall retain the Liquidated Sum as provided above.

17. Inspection of Unit

At least ten (10) days before the Balance is to be paid, Sponsor or the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Sponsor or the Selling Agent to inspect the Unit before the lapse of such ten (10) day period. Purchaser or his duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Report (in the form set forth as Exhibit S to this Agreement) and deliver same to the Sponsor or Selling Agent at the

11

conclusion of the inspection. Failure of Purchaser either to arrange such appointment, or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the completed Inspection Report shall not excuse Purchaser from paying the Balance when due (without prejudice for escrow) and shall constitute Purchaser's full acceptance of the Unit. However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of Sponsor."

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Units and the Retail Unit may be used for any lawful purpose and (ii) the Condominium Board, and the Residential Unit Owners do not have any right to approve the use or any changes in the use of the Unsold Residential Units, the Commercial Units and the Retail Unit or any part thereof. This paragraph shall survive the closing of title.

18. No Representations

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, furnishings and fixtures contained in model units, exhibit brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms or closets therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to his purchase of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and Plan). No purchase has been authorized to make any representations on behalf of Sponsor. No oral representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, without reliance upon any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof or of the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially to such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the closing of title.

19. Negotiable Terms

Sponsor reserves the right, in its sole and absolute discretion, to negotiate on an individual basis with each purchaser substantially more beneficial purchase terms than those offered or given to other purchasers. As a result, Purchaser may not benefit from a more favorable purchase term given to another purchaser and will not have the right to rescind this Purchase Agreement or recover his Down Payment or any other amount for not being given such benefit. The following is a list of only some of the purchase terms which may be negotiated: purchase price; the amount of the Down Payment; the right of a purchaser to cancel the Purchase Agreement and recover the Down Payment for failure to obtain financing or to close by a specific date; the closing date and minimum notice required to schedule the closing; upgraded appliances, fixtures or equipment or other alterations, improvements or additions to be performed by and at the expense of Sponsor; mounting a purchaser from closing costs and/or penalties for closing late; longer time periods to pay or perform obligations under the Purchase Agreement; elimination of "time of the essence" provisions; price or common charge rebates, assumption of payment of, or guarantee of, common charges for a given period; Sponsor

12

referred to the New York State Department of Law, Real Estate Finance Bureau, 120 Broadway, 23rd Floor, New York, N.Y. 10271. Rescission shall not be effected where proof satisfactory to the Attorney General is submitted establishing that the Deposit was timely placed in the Escrow Account in accordance with the New York State Department of Law's regulations concerning Deposits and requisite notice was timely mailed to the Purchaser.

H. All Deposits, except for advances made for upgrades, extras, or custom work received in connection with the Purchase Agreement, are and shall continue to be the Purchaser's money, and may not be comingled with any other money or pledged or hypothecated by Sponsor, as per GBL § 352-h.

I. Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until after consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law. Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

J. The Escrow Agent shall release the Deposit if so directed:

(a) pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 5 upon closing of title to the Unit; or

(b) in a subsequent writing signed by both Sponsor and Purchaser; or

(c) by a final, non-appealable order or judgment of a court.

If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit. If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release. If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within said thirty (30) day period, the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above. Notwithstanding the foregoing, the Escrow Agent shall have the right at any time to deposit the Deposit contained in the Escrow Account with the clerk of the county where the Unit is located and shall give written notice to both parties of such deposit.

The Sponsor shall not object to the release of the Deposit to:

(a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an Amendment to the Plan; or

(b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

K. Any provision of the [Purchase Agreement/Escrow Agreement] or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding any Deposit in trust is absolutely void. The provisions of the Attorney General's regulations and GBL §§ 352-e(2-b) and 352-h concerning escrow trust funds shall prevail over any conflicting or inconsistent provision in the Purchase Agreement, Plan, or any amendment thereto.

L. Escrow Agent shall maintain the Escrow Account under its direct supervision and control.

M. A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

N. Escrow Agent may rely upon any paper or document which may be submitted to it in connection with the duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

O. Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-h) and the New York State Department of Law's regulations.

P. Sponsor shall retain or cause the selling agent under the Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement. Q. Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstance.

R. Sponsor agrees to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of its obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent. The indemnity include, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

**38. Counterpart Signature Pages**

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument. This Agreement may be executed by facsimile or .pdf and each shall be deemed originals.

**39. 1031 Exchange**

Purchaser shall have the right to structure the transaction contemplated by this contract so that it qualifies under the exchange provision of Section 1031 of the Internal Revenue Code. In the event Purchaser elects to structure this transaction so that it qualifies under such provisions, Seller shall use commercially reasonable efforts to cooperate with Purchaser in connection with efforts to effect the exchange transaction, including, without limitation, the use of a "qualified intermediary" or an "exchange accommodation titleholder" within the meaning of the Income Tax Regulations and related authority (including any assignment of this contract by Purchaser to such a

"qualified intermediary" or such an "exchange accommodation titleholder" provided that Purchaser shall remain primarily liable under this contract), and Seller agrees to execute and deliver all such documents and instruments as Purchaser may reasonably require in connection therewith; provided, however, that (1) Purchaser's ability or inability to so structure and quality the transaction contemplated by this contract shall not impair Purchaser's obligations hereunder or be a condition precedent to Closing and (2) Purchaser shall indemnify Seller with respect to any costs incurred in connection with any such cooperation, except such minimal cost of its attorney and other advisors as may be required in connection with the review of any documents which relate to the proposed exchange transaction.

[Signature page follows]

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:
135 WEST 52nd STREET OWNER LLC

By: _____
Meyer Chetrit, Principal

By: _____
David Bistricer, Principal

(Purchaser)
Date Accepted: _____

PURCHASER:

By: _____ (signature)

Co-Purchaser: _____ (signature)

(*Please initial on the seal point or
type name under line.)

Purchaser acknowledges
Receipt of Offering Plan and
Amendments at _____ (A.M./P.M.)
on _____, 2014; and

Initials: ____
Purchaser: BRYAN VILLANUEVA

Delivery of Purchase
Agreement and Check for
Down Payment at _____ (A.M./P.M.)
on _____, 2014

Initials: ____
Co-Purchaser: JENNIFER VILLANUEVA

EXHIBIT B
INSPECTION REPORT

Date:
135 West 52nd Street Owner LLC
512 Seventh Avenue
New York, New York 10018

Re:    Unit ____
135 West 52nd Street Condominium
135 West 52nd Street
New York, New York 10019

Gentlemen:

This is to confirm that based on the undersigned's personal inspection of the above referenced Unit, I (we) have found the Unit, its floors, walls, doors, fixtures, appliances, equipment, hardware and all other items listed below, to be in good and satisfactory condition, free of chips, cracks, scratches, breaks or other defects, except for those matters (if any) expressly noted below under "exceptions" requiring repair, adjustment or correction:

| | Item | Exceptions (if any) | Purchaser's Initials |
|---|---|---|---|
| 1. | Unit Interior: | | |
| | (a) Walls: | | |
| | (b) Floors: | | |
| | (c) Ceilings: | | |
| | (d) Windows: (glass, sash, pane, sill, etc.) | | |
| | (e) Doors: | | |
| | (f) Electrical fixtures: | | |
| | (g) Painted surfaces: | | |
| | (h) Kitchen cabinets: | | |
| | (i) Appliances: | | |
| | (j) Kitchen sink: | | |
| | (k) Medicine cabinets: (doors & mirror) | | |
| | (l) Vanities: | | |

| | Item | Exceptions (if any) | Purchaser's Initials |
|---|---|---|---|
| | (m) Bathroom sinks: | | |
| | (n) Water closet: | | |
| | (o) Bathtub: | | |
| | (p) Bathroom tile: | | |
| | (q) Hardware: (doorbell, doorknob, faucets, locks, etc.) | | |
| | (r) Intercom: | | |
| 2. | General Operating Condition: | | |
| | (a) All Doors: | | |
| | (b) All Windows: | | |
| | (c) All Plumbing: | | |
| | (d) All Hardware: | | |
| | (e) Other: | | |

The undersigned will sign and deliver to you a separate statement, signifying my (our) satisfaction with each item excepted above (if any), immediately upon the completion of the repair, adjustment or correction of same. The undersigned understands and agrees that you shall not be obligated to make any repairs, adjustments or corrections to the Unit or any portion thereof or its fixtures, appliances, equipment, etc., contained therein, from or after the date of delivery of possession of the Unit to the undersigned, except as to those items (if any) expressly excepted above and your obligation regarding any such excepted items shall cease upon the completion of the repair, adjustment or correction of same. Nothing contained herein shall be construed to excuse Sponsor from its obligations to correct defects in construction or design to the extent required in the section entitled "Rights and Obligations of Sponsor" contained in the Offering Plan for Condominium Ownership of the 135 West 52nd Street Condominium. The undersigned shall be required to complete the payment of the Purchase Price (without the provision for an escrow) and accept title to the Unit on the closing date notwithstanding the presence of any exceptions.

Very truly yours,


_____          Agreed To:
Purchaser's Signature                     135 West 52nd Street Owner LLC


_____          By: _____
Purchaser's Signature

23

24

PURCHASE AGREEMENT

AGREEMENT made as of March 23, 2015 between 135 WEST 52ND STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and Ms. Linul Ceng residing at 28 Long Guan Dong Road, Shenzhen, China ("Purchaser").

Purchaser's Attorney:  Dylan Chan, Esq.

Address:  Dylan Chan Law Firm

139 Centre Street, Suite 822

New York, NY 10013

Telephone: (212) 274 9930  Fax: (212) 274 8613  Email: mail@dchanlaw.com

Percentage of Common Interest: 0.5000%  Common Charges: $1,222.52 per month

Residential Percentage of Common Interest: 0.6728%

Selling Agent: Douglas Elliman (TD Team)

Co-Broker: Lin Pan Realty (Jing (Andy) Wang)

Real Estate Taxes: $1,571.33 per month;  B.I.D. Tax: $13.83 per month;

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 25A ("Unit") in the building ("Building") known as 135 WEST 52ND STREET Condominium ("Condominium") and located at 135 WEST 52ND STREET, New York, New York 10019, together with a 0.5000% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

1. Purchase Price
(a) The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below (the "Purchase Price") is $2,725,000.00, payable as follows:
(i) $408,750.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5; and
(ii) $2,316,250.00, constituting the balance of the Purchase Price ("Balance"), by certified check of Purchaser or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.
(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined). All checks in payment of the balance of the Purchase Price shall be payable to the order of Sponsor or as Sponsor otherwise directs. Sponsor reserves the right to require Purchaser to pay the Balance or any portion thereof in "immediately available funds" (i.e. by wire transfer to a bank account designated by Sponsor).
(c) All checks shall be unendorsed, made payable to the direct order of 'Rosen Livingston & Cholst LLP, as Escrow Agent' or (as to the Balance) to '135 West 52ND Street Owner LLC' or

1

such payees as Sponsor may direct on not less than two (2) business days' prior oral or written notice to Purchaser. All checks shall be drawn on a bank that is a member of the New York Clearing House Association. All checks must be payable directly to the order of the required payee; they may not be endorsed.
(d) Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing and, unless otherwise set forth herein, none of the provisions of this Agreement shall survive the closing. However, nothing contained herein shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of Purchaser under Article 23-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.
(e) Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under "Terms of Sale - Prerequisites to Closing of Title" in Part I of the Plan are met concurrently with, or prior to, closing.

2. Definitions  The following terms shall have the meanings ascribed to them:
(a) "Building" shall mean the building located at 135 West 52ND Street, New York, New York 10019.
(b) "Closing Date", "closing", "closing of title" and words of similar import are used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment to Sponsor of the Purchase Price and the delivery to Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.
(c) "Condominium" shall mean The 135 West 52ND Street Condominium.
(d) "Declaration" shall mean the Declaration of the 135 West 52ND Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.
(e) "Depository" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.
(f) "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.
(g) "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.
(h) "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.
All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

3. Plan
(a) Purchaser represents that Purchaser has possessed the Plan and any filed amendments thereto at least three (3) business days prior to submitting this Purchase Agreement; or
(b) in the event Purchaser does not wish to wait three (3) business days Purchaser has the right to rescind this Purchase Agreement by sending written notice of his rescission to the Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement (time being of the essence to exercise such right of rescission within such seven (7) day period);

2

(c) Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Condominium Documents set forth in Part II of the Plan and Parts A and B of the Exhibits submitted with the Plan to the Department of Law) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor (including, without limitation, amendments involving any changes, modifications, or updating of the projected Common Charges, the projected real estate taxes to be paid by Purchaser, or Schedule B "Budget for the First Year of Condominium Operation"). Except in the case of a material adverse amendment affecting Purchaser's Unit or as otherwise provided under the Plan, any such amendments shall neither excuse Purchaser from performing Purchaser's obligations hereunder nor entitle Purchaser to any offset or credit against the Purchase Price or claim or right of action against Sponsor, and any such amendment may be filed by Sponsor without Purchaser's consent or approval. However, Sponsor shall not have the right to unilaterally cancel this Agreement except as herein provided (such as in the case of an uncured default by Purchaser) nor change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.
(d) The Plan is hereby incorporated in this Agreement with the same force and effect as if set forth at length. In the event of any inconsistency or conflict between the provisions of this Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding. Purchaser acknowledges having had full opportunity to examine all documents and investigate all statements made herein and in the Plan.

4. Personal Property
(a) At closing, the Unit will contain only those appliances, countertops, cabinets, flooring, sinks, vanities (if any), air conditioning units (if any), hardware and other fixtures and equipment installed therein as set forth in the Plan.
Sponsor has the right to substitute other appliances, countertops, cabinets, sinks, vanities, flooring and fixtures in place of those referred to in the Plan provided only that the substitutions are of equal or better quality and design.
(b) The Unit is being sold unfurnished, without window blinds or shades. Furniture, floor coverings, wall coverings, furnishings, decorations and the like in or about any model Unit are for display purposes only and are not included in this sale except to the extent set forth in the Plan. Any floor plans or sketches shown to Purchaser (including those contained in the Plan) are only approximations of the Unit's dimensions and arrangement and Purchaser acknowledges and agrees that he is not relying thereon. Sponsor shall not be liable for minor variations from any floor plans or structures.
(c) Sales model apartments may, at Sponsor's option, be sold furnished at a later date but will initially be withheld from sale.
(d) There will be no modifications or extras unless agreed to in writing by the parties. All modifications and alterations must be approved by Sponsor in writing and, if approved, shall be performed by Sponsor at Purchaser's expense (payable in the manner to be set forth in an addendum to this Agreement or by separate agreement between Sponsor and Purchaser).

5. Purchase Monies to be Held in Trust
(a) The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, New York, New York 10016, telephone number 212 687 7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser. Escrow Agent has designated the following attorneys to serve as signatories: Morton H Rosen, Peter I. Livingston, Mary L. Kosmark, Bruce A. Cholst. All designated signatories are admitted to practice law in the State of New York. Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor,

3

Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.
(b) The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York. The escrow account is entitled "[Purchaser's Name] Rosen Livingston & Cholst LLP Escrow Agent" ("Escrow Account"). The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit. Any deposit in excess of $250,000 will not be insured.

All deposits received by Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP as Escrow Agent.

Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of a written agreement between Purchaser and Sponsor.

The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts, which is currently 0.2%. Interest shall begin to accrue upon placing the Deposit into the Escrow Account. All interest earned thereon shall be paid to or credited to the Purchaser at closing. No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account. The Escrow Agreement appended hereto as Exhibit "A."

The Down Payment will not earn interest until the Depository's check has been deposited and cleared. Sponsor will be liable to Purchaser only for the amount of interest actually received from the Depository (which interest may be reduced by the Depository's service charge). The interest on the Down Payment, as same may be reduced by the Depository's service charge, is hereinafter referred to as "Interest".

Upon the payment and performance by Purchaser of all of Purchaser's obligations hereunder and the transfer to Purchaser of title to the Unit, Sponsor will instruct the Depository to pay to Purchaser any and all interest on monies deposited hereunder. It is possible that Purchaser may not receive Interest on the Down Payment for the entire month in which the closing is scheduled to occur. The Sponsor and Selling Agent will not be liable to Purchaser for the amount of such Interest or Down Payment Interest, except for any amount received from the Depository. All funds due to Sponsor and received under this Purchase Agreement will be handled in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and with Section 71-a(3) of the New York Lien Law.

6. Closing of Title
(a) The closing of title shall occur on the date and at the time and place in the City and State of New York on Sponsor shall designate to Purchaser on not less than thirty (30) days' prior written notice (unless waived by Purchaser). Sponsor shall not provide such written notice to Purchaser until Sponsor has obtained a Temporary or Permanent Certificate of Occupancy for the Unit. Sponsor shall have the right, from time to time, to adjourn such date and time for closing on written notice to Purchaser. If the Closing is adjourned by Sponsor, then Sponsor shall fix a new date and time for closing and shall give Purchaser not less than ten (10) days' prior written notice of the new scheduled date and time for closing.

4

107

**13. Purchaser's Closing Costs**

At closing, Purchaser will pay certain costs in connection with the purchase of his Unit in addition to the legal fees of Purchaser's counsel (if any) and the amount of any net credit in favor of Sponsor that may result from the closing apportionments described in the preceding paragraph. Such closing costs will include the following, the amounts of which (where applicable) are based on rates in effect on the date of the Plan and are subject to change without prior notice:

(a) If Purchaser elects to obtain fee title insurance, Purchaser will pay a premium to the title company for such insurance, which premium may vary depending upon the title insurance company and the amount of insurance requested. A lower combined rate may be available if fee and mortgage insurance are ordered simultaneously.

(b) Purchaser will pay a fee for recording the Unit Deed and the Unit Owner's Power of Attorney;

(c) If Purchaser obtains a mortgage loan, Purchaser will pay:

(i) a fee and service charge for recording the mortgage;

(ii) a mortgage recording tax in the following amount: (a) for Residential Units, 2.05% of the face amount of a mortgage less than $500,000 for which mortgagor receives a $25 deduction, or 2.175% for a mortgage covering a Residential Unit equal to $500,000.00 or more, less $25 and (b) for non-residential Units, 2.05% of the face amount of a mortgage less than $500,000 or 2.80% for a mortgage covering a non-residential Unit equal to $500,000 or more;

(iii) if mortgage title insurance is required by Purchaser's lender, an additional premium for insuring the mortgagee's interest in an amount equal to the principal amount under the mortgage loan.

(iv) if required by Purchaser's lender, deposits for Common Charges, real estate taxes and assessments in an initial amount and in such monthly sums after closing as required by the lender (the amount of which monthly deposits may be changed periodically by the lender). The amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the policies of the lender, the number of months remaining between the closing of title and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amount of the taxes and other charges or impositions then payable; and

(v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender. Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of his lender with respect thereto;

(vi) if, in connection with this purchase, Purchaser has dealt with any broker except (A) the Selling Agent or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing;

(vii)Purchaser will pay to Rosen Livingston & Cholst LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owner's Power of Attorney, additional closing documents and for coordinating and attending the closing;

(viii) If Purchaser obtains financing and his lender refuses to close at the office of Rosen Livingston & Cholst LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and Purchaser pays Rosen Livingston & Cholst LLP, in addition to said closing fee set forth above, a travel fee of $500.00 if the closing is held in Manhattan or $700.00 if the closing is held in

9

another borough. If the closing attended by a representative of Rosen Livingston & Cholst LLP is adjourned through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Cholst LLP an additional travel and attendance fee in the same amount as stated above for each attendance;

(viii) If Purchaser is other than a natural person, Purchaser will be required to provide a personal guaranty of Common Charges and other charges due to the Condominium and Purchaser will pay Rosen Livingston & Cholst LLP a fee of $500.00 for preparation of such Guaranty;

(ix) If Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Cholst LLP a fee of $1,000.00 for the preparation of the splitter, substitute mortgage and assignment of mortgage documents; and

(d) Purchaser will pay the New York State Real Estate Transfer Tax (documentary stamps) to be affixed to the deed, the New York City Real Property Transfer Tax and (if applicable) the one (1%) percent "mansion tax";

(e) Purchaser will pay to 135 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit by Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.

All of the aforementioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's unendorsed, personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party, or if so directed by the Sponsor, by wire transfer.

**14. Power of Attorney to Condominium Board, Sponsor, Retail Unit Owner and Commercial Unit Owners**

At closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit (or, if no representative is present, then to Sponsor's attorney), for recording in the New York City Register's Office a Power of Attorney in favor of the Condominium Board relative to purchasing or leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owners relative to amending the Condominium Documents to the extent permitted in the Power of Attorney. An originally recorded Power of Attorney shall be sent to the Condominium Board.

**15. Events of Default**

(a) The following shall constitute "Events of Default" hereunder:

(i) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 6 herein or to timely pay the applicable Rosen Livingston & Cholst LLP closing fee or any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Cholst LLP pursuant to paragraphs 12 and 13 above; or

(ii) the dishonor or failure of collection of Purchaser's Down Payment check; or

(iii) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder.

(b) Upon the occurrence of an Event of Default, Sponsor shall be entitled, in its sole and absolute discretion, to cancel this Purchase Agreement by giving Purchaser written notice of cancellation. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default. TIME IS OF THE ESSENCE TO CURE SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD. If the default is not cured within such thirty (30) day period, then this Agreement shall be deemed cancelled and Sponsor shall

10

have the right to retain, as and for liquidated damages, the Downpayment. Any sums in excess thereof, together with any interest thereon shall be returned to Purchaser after cancellation.

Notwithstanding the foregoing, if Purchaser's check in payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in which to provide good funds for Purchaser's Down Payment, in which event Sponsor shall be deemed to have waived its right to sue Purchaser on the dishonored or uncollected check; or (ii) allow Purchaser thirty (30) days in which to make good Purchaser's Down Payment and if Purchaser fails to so do within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check. In the latter case, Purchaser will also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

Upon cancellation of this Agreement and disposing of the Down Payment and interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan. Thereafter, the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

**16. Risk of Loss; Casualty**

(a) Purchaser shall not be entitled to possession of the Unit nor to store any of Purchaser's furniture or belongings therein until the deed is delivered to Purchaser at closing.

(b) All other risk of loss prior to closing has been assumed by Sponsor, but without any obligation or liability of Sponsor to repair the damage or restore the Unit or its contents. If Sponsor or the Unit Owners elect to repair or replace the loss or damage, this Agreement shall continue in full force and effect, Purchaser shall not have the right to reject title to the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or replacements. Purchaser shall not be required to pay the Balance unless and until (i) the Unit has been substantially repaired as near as is reasonably possible to its condition immediately prior to the casualty; (ii) its essential services (such as gas, electricity, and heat) and a reasonable means of ingress and egress to the street have been restored; and (iii) any condition in the Unit for which a violation (if any) is noted or issued has been corrected (even if same is not yet removed of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser, its licensees, invitees and/or workers. (Sponsor will endeavor in good faith, and with reasonable diligence, to remove or cause to be removed subsequent to closing all violations of record it is obligated to correct.) Any proceeds received from insurance, or in satisfaction of any claim or action in connection with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners). If such proceeds are paid to Purchaser, Purchaser shall promptly turn them over to Sponsor upon request. The provisions of the two preceding sentences shall survive the closing.

(c) In the event that Sponsor notifies Purchaser that it does not elect to repair or restore the Unit or if the Unit Owners do not resolve to make such repairs or restoration in accordance with the Condominium's By-Laws, this Agreement shall be deemed cancelled and of no further force or effect, and Sponsor shall instruct the Depository to return to Purchaser all sums deposited hereunder, together with interest, if any, thereon whereupon the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously cancelled due to Purchaser's uncured default, Sponsor shall retain the Liquidated Sum as provided above.

**17. Inspection of Unit**

11

At least ten (10) days before the Balance is to be paid, Sponsor or the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Sponsor or the Selling Agent to inspect the Unit before the lapse of such ten (10) day period. Purchaser or his duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Report (in the form set forth as Exhibit B to this Agreement) and deliver same to the Sponsor or Selling Agent at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the completed Inspection Report shall not excuse Purchaser from paying the Balance when due (without provision for escrow) and shall constitute Purchaser's full acceptance of the Unit. However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of the Sponsor".

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Units and the Retail Unit may be used for any lawful purpose and (ii) the Condominium Board, and the Residential Unit Owners do not have any right to approve the use or any changes in the use of the Unsold Residential Units, the Commercial Units and the Retail Unit or any part thereof. This paragraph shall survive the closing of title.

**18. No Representations**

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, furnishings and fixtures contained in model units, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms or closets therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to his purchase of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and investigation thereof). No person has been authorized to make any representations on behalf of Sponsor. No oral representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially to such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the closing of title.

**19. Negotiable Terms**

Sponsor reserves the right, in its sole and absolute discretion, to negotiate on an individual basis with each purchaser substantially more beneficial purchase terms than those offered or given to other purchasers. As a result, Purchaser may net benefit from a more favorable purchase term given to another purchaser and will not have the right to rescind this Purchase Agreement or recover his Down Payment or any other amount for not being given such benefit. The following is a list of only some of the purchase terms which may be negotiated: purchase price; the amount of the Down Payment; the right of a purchaser to cancel the Purchase Agreement and recover the Down Payment for failure to obtain financing or to close by a

12

work shall be initially deposited into the Escrow Account, and released in accordance to the terms of the Escrow Agreement.

G.    The Escrow Agent is obligated to send notice to the Purchaser once the Deposit is placed in the Escrow Account. If the Purchaser does not receive notice of such deposit within fifteen (15) business days after tender of the Deposit, he or she may cancel the Purchase Agreement within ninety (90) days after tender of the Purchase Agreement and Deposit to Escrow Agent. Complaints concerning the failure to honor such cancellation requests may be referred to the New York State Department of Law, Real Estate Finance Bureau, 120 Broadway, 23rd Floor, New York, N.Y. 10271. Rescission shall not be afforded where proof satisfactory to the Attorney General is submitted establishing that the Deposit was timely placed in the Escrow Account in accordance with the New York State Department of Law's regulations concerning Deposits and requisite notice was timely mailed to the Purchaser.

H.    All Deposits, except for advances made for upgrades, extras, or custom work received in connection with the Purchase Agreement, are and shall continue to be the Purchaser's money, and may not be comingled with any other money or pledged or hypothecated by Sponsor, as per GBL § 352-h.

I.    Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until after consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law. Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

J.    The Escrow Agent shall release the Deposit if so directed:

(a) pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 5 upon closing of title to the Unit; or

(b) in a subsequent writing signed by both Sponsor and Purchaser; or

(c) by a final, non-appealable order or judgment of a court.

If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit. If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release. If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within said thirty (30) day period, the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above. Notwithstanding the foregoing, the Escrow Agent have the right at any time to deposit the Deposit contained in the Escrow Account with the clerk of the county where the Unit is located and shall give written notice to both parties of such deposit.

The Sponsor shall not object to the release of the Deposit to:

(a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an Amendment to the Plan; or

17

(b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

K.    Any provision of the [Purchase Agreement/Escrow Agreement] or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding any Deposit in trust is absolutely void. The provisions of the Attorney General's regulations and GBL §§ 352-e(2-b) and 352-h concerning escrow trust funds shall prevail over any conflicting or inconsistent provisions in the Purchase Agreement, Plan, or any amendment thereto.

L.    Escrow Agent shall maintain the Escrow Account under its direct supervision and control.

M.    A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352-h).

N.    Escrow Agent may rely upon any paper or document which may be submitted to it in connection with its duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

O.    Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-(h) and the New York State Department of Law's regulations.

P.    Sponsor shall obtain or cause the selling agent under the Plan to obtain a completed and original Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement. Q.    Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstance.

R.    Sponsor agrees to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in wilful disregard of the obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent. This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

38. Counterpart Signature Pages

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument. This Agreement may be executed by facsimile or .pdf and such shall be deemed originals.

18

39.    Notwithstanding the foregoing, Sponsor shall reasonably cooperate with Purchaser's lender in clearing the loan to close, including but not limited to access to the Unit for appraisals, once the Unit can be safely accessed.
Notwithstanding the foregoing, nothing herein should make this Agreement contingent on Purchaser's obtaining equity financing, or shall permit Purchaser's delay the closing except as explicitly stated in Paragraph 6.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:
136 WEST 52ND STREET OWNER
LLC

By: _____
     Meyer Chetrit, Principal

By: _____
     David Bistricer, Principal

(Purchaser)
Date Accepted: _____

(*Please initial on line and print or type name under line.)

Purchaser acknowledges:
Receipt of Offering Plan and          Initials: _____
Amendments at _____ (A.M.)(P.M.)     Purchaser: _____
on _____, 2015; and

Delivery of Purchase                   Initials: _____
Agreement and Check for                Co-Purchaser: _____
Down Payment at _____ (A.M.)(P.M.)
on 3/16, 2015

PURCHASER:

_Li Hui Deng_
Purchaser

_____
Co-Purchaser

19

39.    Notwithstanding the foregoing, Sponsor shall reasonably cooperate with Purchaser's lender in clearing the loan to close, including but not limited to access to the Unit for appraisals, once the Unit can be safely accessed.
Notwithstanding the foregoing, nothing herein should make this Agreement contingent on Purchaser's obtaining equity financing, or shall permit Purchaser's delay the closing except as explicitly stated in Paragraph 6.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:
136 WEST 52ND STREET OWNER
LLC

By: _____
     Meyer Chetrit, Principal

By: _____
     David Bistricer, Principal

(Purchaser)
Date Accepted: $2,725,000 25ft
3/11/17

(*Please initial on line and print or type name under line.)

Purchaser acknowledges:
Receipt of Offering Plan and          Initials: LD
Amendments at _____ (A.M.)(P.M.)     Purchaser: Li Hui Deng
on _____, 2015; and

Delivery of Purchase                   Initials: _____
Agreement and Check for                Co-Purchaser: _____
Down Payment at _____ (A.M.)(P.M.)
on 3/16, 2015

PURCHASER:

_Li Hui Deng_
Purchaser

_____
Co-Purchaser

19

109

| Item | Exceptions (if any) | Purchaser's Initials |
|------|---------------------|----------------------|
| (m) | Bathroom sinks: | |
| (n) | Water closet: | |
| (o) | Bathtubs: | |
| (p) | Bathroom tile: | |
| (q) | Hardware: | |
| | (doorbell, doorknob, faucets, locks, etc.) | |
| (r) | Intercom: | |
| 2. | General Operating Condition: | |
| (a) | All Doors: | |
| (b) | All Windows: | |
| (c) | All Plumbing: | |
| (d) | All Hardware: | |
| (e) | Other: | |

The undersigned will sign and deliver to you a separate statement signifying my (our) satisfaction with each item excepted above (if any), immediately upon the completion of the repair, adjustment or correction of same. The undersigned understands and agrees that you shall not be obligated to make any repairs, adjustments or corrections to the Unit or any portion thereof or its fixtures, appliances, equipment, etc., contained therein, from or after the date of delivery of possession of the Unit to the undersigned, except as to those items (if any) expressly excepted above and your obligation regarding any such excepted items shall cease upon the completion of the repair, adjustment or correction of same. Nothing contained herein shall be construed to excuse Sponsor from its obligations to correct defects in construction or design to the extent required in the section entitled "Rights and Obligations of Sponsor" contained in the Offering Plan for Condominium Ownership of the 135 West 52nd Street Condominium. The undersigned shall be required to complete the payment of the Purchase Price (without the provision for an escrow) and accept title to the Unit on the closing date notwithstanding the presence of any exceptions.
Very truly yours,

Agreed To:
135 West 52nd Street Owner
LLC

_____
Purchaser's Signature

_____
Purchaser's Signature                By:_____

23

## PURCHASE AGREEMENT

AGREEMENT made as of April ___, 2015 between 135 WEST 52ND STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and Shenbin Yuan and Qiyuan Lin residing at 88 Meadow Woods Road, Great Neck, NY 11020 ("Purchaser").

Purchaser's Attorney: Dylan Chen, Esq.

Address: Dylan Chan Law Firm

139 Centre Street, Suite 622

New York, NY 10013

Telephone: (212) 274 9930  Fax: (212) 274 8613  Email: mail@dchanlaw.com

Percentage of Common Interest: 1.0500%  Common Charges: $2,331.40 per month

Residential Percentage of Common Interest: 1.3974%

Selling Agent: Douglas Elliman (TD Team)

Co-Broker: Lin Pan Realty (Jing (Andy) Wang)

Real Estate Taxes: $3,263.62 per month;  B.I.D. Tax: $29.05 per month;

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 26A ("Unit") in the building ("Building") known as 135 WEST 52ND STREET Condominium ("Condominium") and located at 135 WEST 52ND STREET, New York, New York 10019, together with a 1.0500% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

**1. Purchase Price**

(a) The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below ("Purchase Price") is $6,400,000.00, payable as follows:

(i) $910,000.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5; and

(ii) $4,590,000.00, constituting the balance of the Purchase Price ("Balance"), by certified check of Purchaser or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined). All checks in payment of the Balance of the Purchase Price shall be payable to the order of Sponsor (or as Sponsor otherwise directs. Sponsor reserves the right to require Purchaser to pay the Balance or any portion thereof in "immediately available funds" (i.e. by wire transfer to a bank account designated by Sponsor).

(c) All checks shall be uncertioned, made payable to the direct order of "Rosen Livingston & Cholst LLP, as Escrow Agent" or (as to the Balance) to "135 West 52ND Street Owner LLC" or such payees as Sponsor may direct on not less than two (2) business days' prior oral or written

notice to Purchaser. All checks shall be drawn on a bank that is a member of the New York Clearing House Association. All checks must be payable directly to the order of the required payee; they may not be endorsed.

(d) Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing and, unless otherwise set forth herein, none of the provisions of this Agreement shall survive the closing. However, nothing contained herein shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of Purchaser under Article 23-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.

(e) Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under "Terms of Sale - Prerequisites to Closing of Title" in Part I of the Plan are met concurrently with, or prior to, closing.

**2. Definitions**  The following terms shall have the meanings ascribed to them:

(a) "Building" shall mean the building located at 135 West 52ND Street, New York, New York 10019.

(b) "Closing Date", "closing", "closing of title" and words of similar import are used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment to Sponsor of the Purchase Price and the delivery to Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.

(c) "Condominium" shall mean The 135 West 52ND Street Condominium.

(d) "Declaration" shall mean the Declaration of the 135 West 52ND Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time

(e) "Depository" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.

(f) "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.

(g) "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.

(h) "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.

All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

**3. Plan**

(a) Purchaser represents that Purchaser has possessed the Plan and any filed amendments thereto at least three (3) business days prior to submitting this Purchase Agreement; or

(b) In the event Purchaser does not wish to wait the three (3) business days) Purchaser has the right to rescind this Purchase Agreement by sending written notice of his rescission to the Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement (time being of the essence to exercise such right of rescission within such seven (7) day period).

2

(c) Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Condominium Documents set forth in Part II of the Plan and Parts A and B of the Exhibits submitted with the Plan to the Department of Law) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor (including, without limitation, amendments involving any changes, modifications, or updating of the projected Common Charges, the projected real estate taxes to be paid by Purchaser, or Schedule B "Budget for the First Year of Condominium Operation"). Except in the case of a material adverse amendment affecting Purchaser's Unit or as otherwise provided under the Plan, any such amendments shall neither excuse Purchaser from performing Purchaser's obligations hereunder nor entitle Purchaser to any offset or credit against the Purchase Price or claim or right of action against Sponsor, and any such amendment may be filed by Sponsor without Purchaser's consent or approval. However, Sponsor shall not have the right to unilaterally cancel this Agreement as herein provided (such as in the case of an uncured default by Purchaser) nor change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.

(d) The Plan is hereby incorporated in this Agreement with the same force and effect as if set forth at length. In the event of any inconsistency or conflict between the provisions of this Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding. Purchaser acknowledges having had full opportunity to examine all documents and investigate all statements made herein and in the Plan.

**4. Personal Property**

(a) At closing, the Unit will contain only those appliances, countertops, cabinets, flooring, sinks, vanities (if any), air conditioning units (if any), hardware and other fixtures and equipment installed therein as set forth in the Plan.

Sponsor has the right to substitute other appliances, countertops, cabinets, sinks, vanities, flooring and fixtures in place of those referred to in the Plan provided only that the substitutions are of equal or better quality and design.

(b) The Unit is being sold unfurnished, without window blinds or shades. Furniture, floor coverings, wall coverings, furnishings, decorations and the like in or about any model Unit are for display purposes only and are not included in this sale except to the extent set forth in the Plan. Any floor plans or sketches shown to Purchaser (including those contained in the Plan) are only approximations of the Unit's dimensions and arrangement and Purchaser acknowledges and agrees that he is not relying thereon. Sponsor shall not be liable for minor variations from any floor plans or structures.

(c) Sales model apartments may, at Sponsor's option, be sold furnished at a later date but will initially be withheld from sale.

(d) There will be no modifications or extras unless agreed to in writing by the parties. All modifications and alterations must be approved by Sponsor in writing and, if approved, shall be performed by Sponsor at Purchaser's expense (payable in the manner to be set forth in an addendum to this Agreement or by separate agreement between Sponsor and Purchaser).

**5. Purchase Monies to be Held in Trust**

(a) The law firm of Rosen Livingston & Cholst LLP, with an address of 275 Madison Avenue, New York, New York 10016, telephone number 212 687 7770, and serves as escrow agent ("Escrow Agent") for Sponsor and Purchaser. Escrow Agent has designated the following attorneys to serve as signatories: Morton H Rosen, Peter I. Livingston, Mary L. Kosmark, Bruce A. Cholst. All designated signatories are admitted to practice law in the State of New York. Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor,

Purchaser shall be entitled to one (1) adjournment of the closing for not to exceed fifteen (15) days (the "Adjourned Closing Date"). The closing adjustments stated in section 12(c) shall not accrue unless Purchaser fails to close on such Adjourned Closing Date. Such adjournment must be exercised no less than two (2) days prior to the scheduled closing date.

(b) The closing of title shall occur at or concurrently with compliance with the prerequisites set forth under "Terms of Sale Prerequisites to Closing of Title" in Part I of the Plan.

(c) Sponsor has targeted the First Closing for June 1, 2015 based on the current construction schedule. The actual date for the First Closing is not assured or warranted and may be earlier or substantially later depending on the progress of sales and construction and compliance with the other prerequisites recited in the section of the Plan entitled "Terms of Sale". However, if through no fault of Purchaser the First Closing does not take place by June 1, 2016, Purchaser shall have the right to rescind this Purchase Agreement and recover his Down Payment with all interest thereon by giving written notice of his or her election to do so to the Sponsor no later than fifteen days after the date that such right arises.

Purchaser acknowledges that Units may be completed at varying times over a prolonged period that will extend beyond the First Closing. In such event, the order in which Units will be completed is within the sole discretion of Sponsor and may not coincide with the chronology in which Units are contracted for sale nor the numeric order of the floors. Many unforeseeable factors can affect the completion of Units. Accordingly, the sequence in which Units (including the subject Unit) will actually be finished cannot reasonably be predicted. No representation is made nor any assurance given that the closing of the subject Unit will occur contemporaneously with the First Closing.

Purchaser further acknowledges that construction (and, therefore, the closing) may be delayed by late delivery of material and equipment, labor difficulties, unavailability of building trades, casualty, inclement weather and other events beyond Sponsor's control.

Purchaser agrees that Sponsor is to be afforded liberal and broad latitude in time and in all decisions concerning the completion of the Property and the Units pursuant to the Plan. Purchaser will not be excused from paying the full Purchase Price, without credit or set off, and will have no claim against Sponsor for damages or losses in the event the First Closing occurs substantially later than the targeted date or the time to complete and close title to Purchaser's Unit is delayed or postponed by Sponsor.

Notwithstanding the foregoing, Purchaser may rescind this Agreement and receive the prompt refund of his or her Downpayment if the construction of the Unit is not complete within two years of the date Purchaser signed this Agreement by giving written notice of his or her election to do so to the Sponsor no later than fifteen days after the date that such right arises.

**7. Representations, Warranties and Covenants**

Sponsor represents, warrants and covenants that:

(a) Sponsor is the sole owner of the Unit and the property referred to in paragraph 1, and Sponsor has the full right, power and authority to sell, convey and transfer the same;

(b) The common charges (excluding separately billed utility charges) for the Unit on the date hereof are set forth on page 1 of this Agreement;

(c) Sponsor has not received any written notice of any intended assessment or increase in common charges not reflected in subparagraph 7(b). Purchaser acknowledges that it will not have the right to cancel this Agreement in the event of the imposition of any assessment or increase in common charges after the date hereof of which Sponsor has not heretofore received written notice;

3

5

**13. Purchaser's Closing Costs**

At closing, Purchaser will pay certain costs in connection with the purchase of his Unit in addition to the legal fees of Purchaser's counsel (if any) and the amount of any net credit in favor of Sponsor that may result from the closing apportionments described in the preceding paragraph. Such closing costs will include the following, the amounts of which (where applicable) are based on rates in effect on the date of the Plan and are subject to change without prior notice:

(a) If Purchaser elects to obtain fee title insurance, Purchaser will pay a premium to the title company for such insurance, which premium may vary depending upon the title insurance company and the amount of insurance requested. A lower combined rate may be available if fee and mortgage insurance are ordered simultaneously.

(b) Purchaser will pay a fee for recording the Unit Deed and the Unit Owner's Power of Attorney.

(c) If Purchaser obtains a mortgage loan, Purchaser will pay:

(i) a fee and service charge for recording the mortgage;

(ii) a mortgage recording tax in the following amount: (a) for Residential Units, 2.05% of the face amount of a mortgage less than $500,000 for which mortgagor receives a $25 deduction, or 2.175% for a mortgage covering a Residential Unit equal to $500,000.00 or more, less $25 and (b) for non-residential Units, 2.05% of the face amount of a mortgage less than $500,000 or 2.80% for a mortgage covering a non-residential Unit equal to $500,000 or more;

(iii) if mortgage title insurance is required by Purchaser's lender, an additional premium for insuring the mortgagee's interest in an amount equal to the principal amount under the mortgage loan.

(iv) if required by Purchaser's lender, deposits for Common Charges, real estate taxes and assessments in an initial amount and in such monthly sums after closing as required by the lender (the amount of which monthly deposits may be changed periodically by the lender). The amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the policies of the lender, the number of months remaining between the closing of title and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amount of the taxes and other charges or impositions then payable; and

(v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender. Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of his lender with respect thereto;

(vi) if, in connection with this purchase, Purchaser has dealt with any broker except (A) the Selling Agent or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing;

(vii) Purchaser will pay to Rosen Livingston & Cholst LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owner's Power of Attorney, additional closing documents and for coordinating and attending the closing.

(viii) if Purchaser obtains financing and his lender refuses to close at the office of Rosen Livingston & Cholst LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and Purchaser pays Rosen Livingston & Cholst LLP, in addition to said closing fee set forth above, a travel fee of $500.00 if the closing is held in Manhattan or $700.00 if the closing is held in

another borough. If the closing attended by a representative of Rosen Livingston & Cholst LLP is adjourned through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Cholst LLP an additional travel and attendance fee in the same amount as stated above for each attendance;

(vii) if Purchaser is other than a natural person, a principal of the Purchaser will be required to provide a personal guaranty of Common Charges and other charges due to the Condominium and Purchaser will pay Rosen Livingston & Cholst LLP a fee of $500.00 for preparation of such Guaranty;

(ix) if Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Cholst LLP a fee of $1,000.00 for the preparation of the seller, substitute mortgage and assignment of mortgage documents; and

(d) Purchaser will pay the New York State Real Estate Transfer Tax (documentary stamps) to be affixed to the deed, the New York City Real Property Transfer Tax and (if applicable) the one (1%) percent "mansion tax".

(e) Purchaser will pay to 135 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit by Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.

All of the aforementioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's unendorsed, personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party, or if so directed by the Sponsor, by wire transfer.

**14. Power of Attorney to Condominium Board, Sponsor and Retail Unit Owner and Commercial Unit Owners**

At closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit (or, if no representative is present, then to Sponsor's attorney), for recording in the New York City Register's Office a Power of Attorney in favor of the Condominium Board relative to purchasing or leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owners relative to attending the Condominium Documents to the extent permitted in the Power of Attorney. An originally executed Power of Attorney shall be sent to the Condominium Board.

**15. Events of Default**

(a) The following shall constitute "Events of Default" hereunder:

(i) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 6 herein or to timely pay the applicable Rosen Livingston & Cholst LLP closing fee or any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Cholst LLP pursuant to paragraphs 12 and 13 above; or

(ii) the dishonor or failure of collection of Purchaser's Down Payment check; or

(iii) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder.

(b) Upon the occurrence of an Event of Default, Sponsor shall be entitled, in its sole and absolute discretion, to cancel this Purchase Agreement by giving Purchaser written notice of cancellation. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default. TIME IS OF THE ESSENCE TO CURE SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD. If the default is not cured within such thirty (30) day period, then this Agreement shall be deemed canceled and Sponsor shall

have the right to retain, as and for liquidated damages, the Downpayment. Any sums in excess thereof, together with any interest thereon shall be returned to Purchaser after cancellation.

Notwithstanding the foregoing, if Purchaser's check in payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in which to provide good funds for Purchaser's Down Payment, in which event Sponsor shall be deemed to have waived its right to take purchaser on the dishonored or uncollected check; or (ii) allow Purchaser thirty (30) days in which to make good Purchaser's Down Payment and if Purchaser fails to so do within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check. In the latter case, Purchaser will also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

Upon cancellation of this Agreement and disposing of the Down Payment and interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan. Thereafter, the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

**16. Risk of Loss; Casualty**

(a) Purchaser shall not be entitled to possession of the Unit nor to store any of Purchaser's furniture or belongings therein until the deed is delivered to Purchaser at closing.

(b) All other risk of loss prior to closing has been assumed by Sponsor, but without any obligation or liability of Sponsor to repair the damage or restore the Unit or its contents. If Sponsor or the Unit Owners elect to repair or restore the loss or damage, this Agreement shall continue in full force and effect. Purchaser shall not have the right to reject title to the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or replacements. Purchaser shall not be required to pay the Balance unless and until (i) the Unit has been substantially repaired as near as is reasonably possible to its condition immediately prior to the casualty; (ii) its essential services (such as gas, electricity, and heat) and a reasonable means of ingress and egress to the street have been restored; and (iii) any condition in the Unit for which a violation (if any) is noted or issued has been corrected (even if same is not yet removed of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser, its licensees, invitees and/or workers. (Sponsor will endeavor in good faith, and with reasonable diligence, to remove or cause to be removed subsequent to closing all violations of record if it diligently is unable to correct.) Any proceeds received from insurance, or in satisfaction of any claim or action in connection with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners). If such proceeds are paid to Purchaser, Purchaser shall promptly turn them over to Sponsor upon request. The provisions of the two preceding sentences shall survive the closing.

(c) In the event that Sponsor notifies Purchaser that it does not elect to repair or restore the Unit or if the Unit Owners do not resolve to make such repairs or restoration in accordance with the Condominium By-Laws, this Agreement shall be deemed canceled and of no further force or effect, and Sponsor shall instruct the Depository to return to Purchaser all sums deposited hereunder, together with interest, if any, thereon, whereupon the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously canceled due to Purchaser's uncured default, Sponsor shall retain the Liquidated Sum as provided above.

**17. Inspection of Unit**

At least ten (10) days before the Balance is to be paid, Sponsor or the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Sponsor or the Selling Agent to inspect the Unit before the lapse of such ten (10) day period. Purchaser or his duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Report (in the form set forth as Exhibit B to this Agreement) and deliver same to the Sponsor or Selling Agent at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the completed Inspection Report shall not excuse Purchaser from paying the Balance when due (without provision for escrow) and shall constitute Purchaser's full acceptance of the Unit. However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of the Sponsor".

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Units and the Retail Unit may be used for any lawful purpose and (ii) the Condominium Board, and the Residential Unit Owners do not have any right to approve the use or any changes in the use of the Unsold Residential Units, the Commercial Units and the Retail Unit or any part thereof. This paragraph shall survive the closing of title.

**18. No Representations**

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, furnishings and fixtures contained in model units, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, either written or oral, made by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms or closets therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to his purchase of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and investigation thereof). No person has been authorized to make any representations on behalf of Sponsor. No oral representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, relying on his own judgment and not on any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially to such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the closing of title.

**19. Negotiable Terms**

Sponsor reserves the right, in its sole and absolute discretion, to negotiate on an individual basis with each purchaser substantially more beneficial purchase terms than those offered or given to other purchasers. As a result, Purchaser may not benefit from a more favorable purchase term given to another purchaser and will not have the right to rescind this Purchase Agreement or recover his Down Payment or any other amount for not being given such benefit. The following is a list of only some of the purchase terms which may be negotiated: purchase price; the amount of the Down Payment; the right of a purchaser to cancel the Purchase Agreement and recover the Down Payment for failure to obtain financing or to close by a

9

10

11

12

work shall be initially deposited into the Escrow Account, and released in accordance to the terms of the Escrow Agreement.

G.  The Escrow Agent is obligated to send notice to the Purchaser once the Deposit is placed in the Escrow Account. If the Purchaser does not receive notice of such deposit within fifteen (15) business days after tender of the Deposit, he or she may cancel the Purchase Agreement within ninety (90) days after tender of the Purchase Agreement and Deposit to Escrow Agent. Complaints concerning the failure to honor such cancellation requests may be referred to the New York State Department of Law, Real Estate Finance Bureau, 120 Broadway, 23rd Floor, New York, N.Y. 10271. Rescission shall not be afforded where proof satisfactory to the Attorney General is submitted establishing that the Deposit was timely placed in the Escrow Account in accordance with the New York State Department of Law's regulations concerning Deposits and requisite notice was timely mailed to the Purchaser.

H.  All Deposits, except for advances made for upgrades, extras, or custom work received in connection with the Purchase Agreement, are and shall continue to be the Purchaser's money, and may not be commingled with any other money or pledged or hypothecated by Sponsor, as per GBL § 352-h.

I.  Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until after consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law. Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

J.  The Escrow Agent shall release the Deposit if so directed:

(a) pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 5 upon closing of title to the Unit; or

(b) in a subsequent writing signed by both Sponsor and Purchaser; or

(c) by a final, non-appealable order or judgment of a court.

If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit. If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release. If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within thirty (30) day period, the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above. Notwithstanding the foregoing, the Escrow Agent shall have the right at any time to deposit the Deposit contained in the Escrow Account with the clerk of the county where the Unit is located and shall give written notice to both parties of such deposit.

The Sponsor shall not object to the release of the Deposit to:

(a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an Amendment to the Plan; or

17

(b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

K.  Any provision of the [Purchase Agreement/Escrow Agreement] or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding any Deposit in trust is absolutely void. The provisions of the Attorney General's regulations and GBL §§ 352-e(2-b) and 352-h concerning escrow trust funds shall prevail over any conflicting or inconsistent provisions in the Purchase Agreement, Plan, or any amendment thereto.

L.  Escrow Agent shall maintain the Escrow Account under its direct supervision and control.

M.  A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352(h).

N.  Escrow Agent may rely upon any paper or document which may be submitted to it in connection with its duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

O.  Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-(h) and the New York State Department of Law's regulations.

P.  Sponsor shall obtain or cause the selling agent under the Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement. Q.  Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstance.

R.  Sponsor agrees to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in wilful disregard of the obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent. This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

**38. Counterpart Signature Pages**

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument. This Agreement may be executed by facsimile or .pdf and such shall be deemed originals.

[Signature page follows]

18



| Item | Exceptions (if any) | Purchaser's Initials |
|---|---|---|
| (m) | Bathroom sinks: | |
| (n) | Water closet: | |
| (o) | Bathtubs: | |
| (p) | Bathroom tile: | |
| (q) | Hardware: | |
| | (doorbell, doorknob, faucets, locks, etc.) | |
| (r) | Intercom: | |

2. General Operating Condition:
   (a) All Doors:
   (b) All Windows:
   (c) All Plumbing:
   (d) All Hardware:
   (e) Other:

The undersigned will sign and deliver to you a separate statement signifying my (our) satisfaction with each item excepted above (if any), immediately upon the completion of the repair, adjustment or correction of same. The undersigned understands and agrees that you shall not be obligated to make any repairs, adjustments or corrections to the Unit or any portion thereof or its fixtures, appliances, equipment, etc., contained therein, from or after the date of delivery of possession of the Unit to the undersigned, except as to those items (if any) expressly excepted above and your obligation regarding any such excepted items shall cease upon the completion of the repair, adjustment or correction of same. Nothing contained herein shall be construed to excuse Sponsor from its obligations to correct defects in construction or design to the extent required in the section entitled "Rights and Obligations of Sponsor" contained in the Offering Plan for Condominium Ownership of the 135 West 52nd Street Condominium. The undersigned shall be required to complete the payment of the Purchase Price (without the provision for an escrow) and accept title to the Unit on the closing date notwithstanding the presence of any exceptions.
Very truly yours,

_____
Purchaser's Signature

Agreed To:
135 West 52nd Street Owner
LLC

_____
Purchaser's Signature

By:_____

23

## PURCHASE AGREEMENT

AGREEMENT made as of February 23, 2016 between 135 WEST 52ND STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and Tianchu He residing at 792 Columbus Avenue, Apt #11B, New York, NY 10025 ("Purchaser").

Purchaser's Attorney: Jamie Heiberger Harrison, Esq.

Address: Heiberger & Associates, P.C.

589 8th Avenue, 10th Floor

New York, NY 10018

Telephone: (212) 532-2067    Fax:    Email: jamie@heibergerlaw.com

Percentage of Common Interest: 1.0100 %  Common Charges: $2,269.57 per month

Residential Percentage of Common Interest: 1.319%

Selling Agent: Douglas Elliman (Stacy Spielman)

Co-Broker: Citi Habitate (Kevin Tsun)

Real Estate Taxes: $1,509.26 per month;     B.I.D. Tax: $28.21 per month;

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 28B ("Unit") in the building ("Building") known as 135 WEST 52ND STREET Condominium ("Condominium") and located at 135 WEST 52ND STREET, New York, New York 10019, together with a 1.0100% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

### 1. Purchase Price

(a) The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below ("Purchase Price") is $5,100,000.00, payable as follows:

(i) $765,000.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5; and

(ii) $4,335,000.00, constituting the balance of the Purchase Price ("Balance"), by certified check of Purchaser or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined). All checks in payment of the balance of the Purchase Price shall be payable to the order of Sponsor (or as Sponsor otherwise directs. Sponsor reserves the right to require Purchaser to pay the Balance or any portion thereof in "immediately available funds" (i.e. by wire transfer to a bank account designated by Sponsor).

(c) All checks shall be unendorsed, made payable to the direct order of 'Rosen Livingston & Cholst LLP, as Escrow Agent' or (as to the Balance) to '135 West 52nd Street Owner LLC" or

1

such payees as Sponsor may direct on not less than two (2) business days' prior oral or written notice to Purchaser. All checks shall be drawn on a bank that is a member of the New York Clearing House Association. All checks shall not be payable directly to the order of the required payee; they may not be endorsed.

(d) Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing and, unless otherwise set forth herein, none of the provisions of this Agreement shall survive the closing. However, nothing contained herein shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of Purchaser under Article 23-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.

(e) Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under "Terms of Sale - Prerequisites to Closing of Title" in Part I of the Plan are met concurrently with, or prior to, closing.

### 2. Definitions    The following terms shall have the meanings ascribed to them:

(a) "Building" shall mean the building located at 135 West 52ND Street, New York, New York 10019.

(b) "Closing Date", "closing", "closing of title" and words of similar import when used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment to Sponsor of the Purchase Price and the delivery to Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.

(c) "Condominium" shall mean The 135 West 52ND Street Condominium.

(d) "Declaration" shall mean the Declaration of the 135 West 52ND Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.

(e) "Depository" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.

(f) "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.

(g) "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.

(h) "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.

All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

### 3. Plan

(a) Purchaser represents that Purchaser has possessed the Plan and any filed amendments thereto at least three (3) business days prior to submitting this Purchase Agreement; or

(b) In the event Purchaser does not wish to wait three (3) business days) Purchaser has the right to rescind this Purchase Agreement by sending written notice of his rescission to the Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement (time being of the essence to exercise such right of rescission within such seven (7) day period).

2

(c) Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Condominium Documents set forth in Part II of the Plan and Parts A and B of the Exhibits submitted with the Plan to the Department of Law) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor (including, without limitation, amendments involving any changes, modifications, or updating of the projected Common Charges, the projected real estate taxes to be paid by Purchaser, or Schedule B "Budget for the First Year of Condominium Operation"). Except in the case of a material adverse amendment affecting Purchaser's Unit or as otherwise provided under the Plan, any such amendments shall neither excuse Purchaser from performing Purchaser's obligations hereunder nor entitle Purchaser to any offset or credit against the Purchase Price or claim or right of action against Sponsor, and any such amendment may be filed by Sponsor without Purchaser's consent or approval. However, Sponsor shall not have the right to unilaterally cancel this Agreement except as herein provided (such as in the case of an uncured default by Purchaser) nor change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.

(d) The Plan is hereby incorporated in this Agreement with the same force and effect as if set forth at length. In the event of any inconsistency or conflict between the provisions of this Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding. Purchaser acknowledges having had full opportunity to examine all documents and investigate all statements made herein and in the Plan.

### 4. Personal Property

(a) At closing, the Unit will contain only those appliances, countertops, cabinets, flooring, sinks, vanities (if any), air conditioning units (if any), hardware and other fixtures and equipment installed therein as set forth in the Plan.

(b) The Unit is being sold unfurnished, without window blinds or shades. Furniture, floor coverings, wall coverings, furnishings, decorations and the like in or about any model Unit are for display purposes only and are not included in this sale except to the extent set forth in the Plan. Any floor plans or sketches shown to Purchaser (including those contained in the Plan) are only approximations of the Unit's dimensions and arrangement and Purchaser acknowledges and agrees that he is not relying thereon. Sponsor shall not be liable for minor variations from any floor plans or structures.

(c) Sales model apartments may, at Sponsor's option, be sold furnished at a later date but will initially be unfinished from sale.

(d) There will be no modifications or extras unless agreed to in writing by the parties. All modifications and alterations must be approved by Sponsor in writing and, if approved, shall be performed by Sponsor at Purchaser's expense (payable in the manner to be set forth in an addendum to this Agreement or by separate agreement between Sponsor and Purchaser).

### 5. Purchase Monies to be Held in Trust

(a) The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, New York, NY 10016, telephone number 212 867 7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser. Escrow Agent has designated the following attorneys to serve as signatories: Morton H Rosen, Peter I. Livingston, Andrew B. Freedland, Bruce A. Cholst. All designated signatories are admitted to practice law in the State of New York. Neither the Escrow Agent nor any authorized signatories on the account are the

3

Sponsor, Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

(b) the Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York. The escrow account is entitled "[Purchaser's Name] Rosen Livingston & Cholst LLP Escrow Agent" ("Escrow Account"). The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit. Any deposit in excess of $250,000 will not be insured.

All Deposits received by Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP as Escrow Agent.

Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of a written agreement between Purchaser and Sponsor.

The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts, which is currently 0.2%. Interest shall begin to accrue upon placing the Deposit into the Escrow Account. All interest earned thereon shall be paid to or credited to the Purchaser at closing. No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account. The Escrow Agreement appended hereto as Exhibit "A."

The Down Payment will not earn interest until the Purchaser's check has been deposited and cleared. Sponsor will be liable to Purchaser only for the amount of interest actually received from the Depository (which interest may be reduced by the Depository's service charge). The interest on the Down Payment, as same may be reduced by the Depository's service charge, is hereinafter referred to as "Interest".

Upon the payment and performance by Purchaser of all of Purchaser's obligations hereunder and the transfer to Purchaser of title to the Unit, Sponsor will instruct the Depository to pay to Purchaser any and all interest on monies deposited hereunder. It is possible that Purchaser may not receive interest on the Down Payment for the entire month in which the closing is scheduled to occur. The Sponsor and Selling Agent will not be liable to Purchaser for the amount of such interest or the payment thereof, except for any amount received from the Depository. All funds due to Sponsor and received under this Purchase Agreement will be handled in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and with Section 71-a(3) of the New York Lien Law.

### 6. Closing of Title

(a) The closing of title shall occur on the date and at the time and place in the City and State of New York as Sponsor shall designate to Purchaser on not less than thirty (30) days' prior written notice (unless waived by Purchaser)  Sponsor shall not specify a closing date prior to June 30, 2016.  Time shall be of the essence with respect to Purchaser's obligation to close title of the Unit on or before July 31, 2016. Sponsor shall have the right, from time to time, to adjourn such date and time for closing on written notice to Purchaser. If the Closing is adjourned by Sponsor, then Sponsor shall fix a new date and time for closing and

4

paragraph. Such closing costs will include the following, the amounts of which (where applicable) are based on rates in effect on the date of the Plan and are subject to change without prior notice:

(a) If Purchaser elects to obtain fee title insurance, Purchaser will pay a premium to the title company for such insurance, which premium may vary depending upon the title insurance company and the amount of insurance requested. A lower combined rate may be available if fee and mortgage insurance are ordered simultaneously.

(b) Purchaser will pay a fee for recording the Unit Deed and the Unit Owner's Power of Attorney;

(c) If Purchaser obtains a mortgage loan, Purchaser will pay:

(d) a fee and service charge for recording the mortgage;

(i) a mortgage recording tax in the following amount: (a) for Residential Units, 2.05% of the face amount of a mortgage less than $500,000 for which mortgagor receives a $25 deduction, or 2.175% for a mortgage covering a Residential Unit equal to $500,000.00 or more, less $25 and (b) for non-residential Units, 2.05% of the face amount of a mortgage less than $500,000 or 2.80% for a mortgage covering a non-residential Unit equal to $500,000 or more;

(ii) if mortgage title insurance is required by Purchaser's lender, an additional premium for insuring the mortgagee's interest in an amount equal to the principal amount under the mortgage loan.

(iv) if required by Purchaser's lender, deposits for Common Charges, real estate taxes and assessments in an initial amount and in such monthly sums after closing as required by the lender (the amount of which monthly deposits may be changed periodically by the lender). The amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the policies of the lender, the number of months remaining between the closing of title and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amount of the taxes and other charges or impositions then payable; and

(v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender. Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of his lender with respect thereto;

(vi) if, in connection with this purchase, Purchaser has dealt with any broker except (A) the Selling Agent and Co-Broker listed on Page 1 of this Agreement or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing;

(vii)Purchaser Sponsor will pay to Rosen Livingston & Cholst LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owner's Power of Attorney, additional closing documents and for coordinating and attending the closing;

(vii) If Purchaser obtains financing and his lender refuses to close at the office of Rosen Livingston & Cholst LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and Purchaser pays Rosen Livingston & Cholst LLP, in addition to said closing fee set forth above, a travel fee of $500.00 if the closing is held in Manhattan or $700.00 if the closing is held in another borough. If the closing attended by a representative of Rosen Livingston & Cholst LLP is adjourned through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Cholst LLP an additional travel and attendance fee in the same amount as stated above for each closing.

9

---

(vii) If Purchaser is other than a natural person, a principal of the Purchaser will be required to provide a personal guaranty of Common Charges and other charges due to the Condominium and Purchaser will pay Rosen Livingston & Cholst LLP a fee of $500.00 for preparation of such Guaranty;

(b) if Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Cholst LLP a fee of $1,000.00 for the preparation of the satisfaction, substitute mortgage and assignment of mortgage documents; and

(d) Purchaser Sponsor will pay the New York State Real Estate Transfer Tax (documentary stamps) to be affixed to the deed and the New York City Real Property Transfer Tax (such payment shall not exceed $93,675.00); and Purchaser will pay (if applicable) the one (1%) percent "mansion tax";

(e) Purchaser will pay to 135 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit by Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.

All of the aforementioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's unendorsed, personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party, or if so directed by the Sponsor, by wire transfer.

**14. Power of Attorney to Condominium Board, Sponsor, Retail Unit Owner and Commercial Unit Owners**

At closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit (or, if no representative is present, then to Sponsor's attorney), for recording in the New York City Register's Office a Power of Attorney in favor of the Condominium Board relative to purchasing or leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owners relative to amending the Condominium Documents to the extent permitted in the Power of Attorney. An originally executed Power of Attorney shall be used to the Condominium Board.

**15. Events of Default**

(a) The following shall constitute "Events of Default" hereunder:

(i) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 8 herein or to timely pay the applicable Rosen Livingston & Cholst LLP closing fee or any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Cholst LLP pursuant to paragraphs 12 and 13 above; or

(ii) the dishonor or failure of collection of Purchaser's Down Payment check; or

(iii) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder.

(b) Upon the occurrence of an Event of Default, Sponsor shall be entitled, in its sole and absolute discretion, to cancel this Purchase Agreement by giving Purchaser written notice of cancellation. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default. TIME IS OF THE ESSENCE TO CURE SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD. If the default is not cured within such thirty (30) day period, then this Agreement shall be deemed canceled and Sponsor shall have the right to retain, as and for liquidated damages, the Downpayment. Any sums in excess thereof, together with any interest thereon shall be returned to Purchaser after cancellation.

10

---

Notwithstanding the foregoing, if Purchaser's check in payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in which to provide good funds for Purchaser's Down Payment, in which event Sponsor shall be deemed to have waived its right to sue Purchaser on the dishonored or uncollected check; or (ii) allow Purchaser thirty (30) days in which to make good Purchaser's Down Payment and if Purchaser fails to do so within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check. In the latter case, Purchaser will also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

Upon cancellation of this Agreement and disposing of the Down Payment and interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan. Thereafter, the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

**16. Risk of Loss; Casualty**

(a) Purchaser shall not be entitled to possession of the Unit nor to store any of Purchaser's furniture or belongings therein until the deed is delivered to Purchaser at closing.

(b) All other risk of loss prior to closing has been assumed by Sponsor, but without any obligation or liability of Sponsor to repair the damage or restore the Unit or its contents. If Sponsor or the Unit Owners elect to repair or replace the loss or damage, this Agreement shall continue in full force and effect. Purchaser shall not have the right to reject title to the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or replacements. Purchaser shall not be required to pay the Balance unless and until (i) the Unit has been substantially repaired at near as is reasonably possible to its condition immediately prior to the casualty; (ii) its essential services (such as gas, electricity, and heat) and a reasonable means of ingress and egress in the street have been restored; and (iii) any condition in the Unit for which a violation (if any) is noted or issued has been corrected (even if same is not yet removed of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser, its licensees, invitees and/or workers. (Sponsor will endeavor in good faith, and with reasonable diligence, to remove or cause to be removed subsequent to closing all violations of record it is obligated to correct.) Any proceeds received from insurance, or in satisfaction of any claim or action in connection with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners). If such proceeds are paid to Purchaser, Purchaser shall promptly turn them over to Sponsor upon request. The provisions of the two preceding sentences shall survive the closing.

(c) In the event that Sponsor enables Purchaser to take possession or restore the Unit or if the Unit Owners do not resolve to make such repairs or restoration in accordance with the Condominium's By-Laws, this Agreement shall be deemed cancelled and of no further force or effect, and Sponsor shall instruct the Depository to return to Purchaser all sums deposited hereunder, together with interest, if any, thereon, whereupon the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously cancelled due to Purchaser's uncured default, Sponsor shall retain the Liquidated Sum as provided above.

11

---

**17. Inspection of Unit**

At least ten (10) days before the Balance is to be paid, Sponsor or the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Sponsor or the Selling Agent to inspect the Unit before the type of such ten (10) day period. Purchaser or his duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Report (in the form set forth on Exhibit II to this Agreement) and deliver same to the Sponsor or Selling Agent at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the completed Inspection Report shall not excuse Purchaser from paying the Balance when due (without provision for escrow) and shall constitute Purchaser's full acceptance of the Unit. However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of the Sponsor".

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Units and the Retail Unit may be used for any lawful purpose and (ii) the Condominium Board, and the Residential Unit Owners do not have any right to approve the use or any changes in the use of the Unsold Residential Units, the Commercial Units and the Retail Unit or any part thereof. This paragraph shall survive the closing of title.

**18. No Representations**

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, furnishings and fixtures contained in model units, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms or closets therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to his purchase of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and investigation thereof). No person has been authorized to make any representations on behalf of Sponsor. No oral representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially to such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the closing of title.

**19. Negotiable Terms**

Sponsor reserves the right, in its sole and absolute discretion, to negotiate on an individual basis with each purchaser substantially more beneficial purchase terms than those offered or given to other purchasers. As a result, Purchaser may not benefit from a more favorable purchase term given to another purchaser and will not have the right to rescind this Purchase Agreement or recover his Down Payment or any other amount for not being given such benefit. The following is a list of only some of the purchase terms which may be negotiated: purchase price; the amount of the Down Payment; the right of a purchaser to cancel the Purchase

12

work shall be initially deposited into the Escrow Account, and released in accordance to the terms of the Escrow Agreement.

G.    The Escrow Agent is obligated to send notice to the Purchaser once the Deposit is placed in the Escrow Account. If the Purchaser does not receive notice of such deposit within fifteen (15) business days after tender of the Deposit, he or she may cancel the Purchase Agreement within ninety (90) days after tender of the Purchase Agreement and Deposit to Escrow Agent. Complaints concerning the failure to honor such cancellation requests may be referred to the New York State Department of Law, Real Estate Finance Bureau, 120 Broadway, 23rd Floor, New York, N.Y. 10271. Rescission shall not be afforded where proof satisfactory to the Attorney General is submitted establishing that the Deposit was timely placed in the Escrow Account in accordance with the New York State Department of Law's regulations concerning Deposits and requisite notice was timely mailed to the Purchaser.

H.    All Deposits, except for advances made for upgrades, extras, or custom work received in connection with the Purchase Agreement, are and shall continue to be the Purchaser's money, and may not be comingled with any other money or pledged or hypothecated by Sponsor, as per GBL § 352-h.

I.    Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until after consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law. Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

J.    The Escrow Agent shall release the Deposit if so directed:

(a) pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 5 upon closing of title to the Unit; or

(b) in a subsequent writing signed by both Sponsor and Purchaser; or

(c) by a final, non-appealable order or judgment of a court.

If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit. If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release. If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within said thirty (30) day period, the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above. Notwithstanding the foregoing, the Escrow Agent shall have the right at any time to deposit the Deposit contained in the Escrow Account with the clerk of the county where the Unit is located and shall give written notice to both parties of such deposit.

The Sponsor shall not object to the release of the Deposit to:

(a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an Amendment to the Plan; or

17

(b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

K.    Any provision of the Purchase Agreement/Escrow Agreement or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding any Deposit in trust is absolutely void. The provisions of the Attorney General's regulations and GBL §§ 352-e(2-b) and 352-h concerning escrow but funds shall prevail over any conflicting or inconsistent provisions in the Purchase Agreement, Plan, or any amendment thereto.

L.    Escrow Agent shall maintain the Escrow Account under its direct supervision and control

M.    A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352(h)

N.    Escrow Agent may rely upon any paper or document which may be submitted to it in connection with its duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

O.    Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-(h) and the New York State Department of Law's regulations.

P.    Sponsor shall obtain or cause the selling agent under the Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement. Q.    Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstance.

R.    Sponsor agrees to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of the obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent. This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

38. Counterpart Signature Pages

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument. This Agreement may be executed by facsimile or .pdf and such shall be deemed originals.

18

39. Transfer Taxes

Notwithstanding the foregoing, Sponsor shall pay the NYC Real Property Transfer Tax and the NYS Real Property Transfer Tax such payment shall not exceed $93,074.00.

40. Sponsor's Legal Fee

Notwithstanding anything in this Agreement or the Plan to the contrary, Sponsor shall pay Sponsor's legal fee in the amount of $2,000.00.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:                                    PURCHASER:
136 WEST 52ND STREET OWNER
LLC

By:_____                        _Troncelliti MD_____
     Meyer Chetrit, Principal                   Purchaser

By:_____
     David Blatman, Principal                   _____
     2/26/16  $5,100,000  $288                  Co-Purchaser
(Purchaser)
Date Accepted:

(*Please initial on line and print or
type name under line.)

Purchaser acknowledges:                     Initials: _T.I._
Receipt of Offering Plan and                Purchaser:
Amendments at _____ (A.M.)(P.M.)
on _____, 2016; and

Delivery of Purchase                        Initials: _____
Agreement and Check for                     Co-Purchaser:
Down Payment at _____ (A.M.)(P.M.)
on _____, 2016

19

EXHIBIT A TO PURCHASE AGREEMENT
Permitted Encumbrances

1.    Building restrictions and zoning laws and other regulations, resolutions and ordinances and any amendments thereto now or hereafter adopted by any governmental or quasi-governmental authority having jurisdiction, provided they do not prevent the use of the subject Unit for dwelling purposes.

2.    State of facts shown on a survey made by Earl B. Lovell-S.P. Belcher, Inc. dated March 12, 2013 and any state of facts which a more recent survey or personal inspection of the land and building would show, provided such additional state of facts would not prevent the use of the subject Residential Unit for dwelling purposes or, if applicable, the subject Commercial or Retail Unit for the purposes permitted by Law and further provided that such state of facts do not render title unmarketable.

3.    The terms, burdens, covenants, restrictions, conditions, easements and rules and regulations set forth in the Declaration, the By-Laws (and the Rules and Regulations thereto), the Power of Attorney from Purchaser to the Condominium Board, Sponsor, the Commercial Unit Owners and the Retail Unit Owner and the Floor Plans, all as same may be amended from time to time.

4.    Consents by Sponsor, or any former owner of the Land for the erection of any structure or structures on, under or above any land, street or streets on which the Land may abut.

5.    Any easement or right of use in favor of any utility company for construction, use, maintenance, repair and replacement of all utility lines, wires, terminal boxes, mains, pipes, cables, conduits, poles, connections and other equipment and facilities on, under and across the Land and Building.

6.    Revocability of licenses for vault space, if any, under the sidewalks and streets and the lien of any unpaid vault tax (which is to be paid by the Condominium Board, the Retail Unit Owner or the Commercial Unit Owners (as the case may be)).

7.    Encroachments of stoops, areas, cellar steps or doors, trim, copings, retaining walls, bay windows, terraces, balconies, sidewalk elevators, fences, fire escapes, cornices, foundations, footings, chutes, fuel oil lines, drainage and stand pipes, and similar projections, if any, on, over, or under the Property or the streets or sidewalks abutting the Property and the rights of governmental authorities to require the removal of any such projections and variations between record lines of the Property and retaining walls  and the like, if any.

20

PURCHASE AGREEMENT

AGREEMENT made as of April 16, 2016 between 135 WEST 52ND STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and Tulip Park PTE Ltd, residing at c/o Jill Ames, Esq., Paul, Hastings, Janofsky & Walker LLP, 75 East 55th Street, 9th Floor, New York, NY 10022 ("Purchaser").

Purchaser's Attorney:     Jill Ames, Esq.

Address:   Paul Hastings LLP
75 East 55th Street, 9th Floor
New York, NY 10022

Telephone: (212) 318 6048  Fax:       Email: jillames@paulhastings.com

Percentage of Common Interest: 1.0200 %  Common Charges: $2,335.40 per month

Residential Percentage of Common Interest: 1.3974%

Selling Agent: Douglas Elliman (Vanessa Fitzgerald)

Co-Broker: Halstead Property (Silvia Acevedo Murphy)

Real Estate Taxes: $3,263.92 per month;    R.I.D. Tax: $26.22 per month;

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 29A ("Unit") in the building ("Building") known as 135 WEST 52ND STREET Condominium ("Condominium") and located at 135 WEST 52ND STREET, New York, New York 10019, together with a 1.0200% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

1.  Purchase Price.

(a) The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below ("Purchase Price") is $6,400,000.00, payable as follows:

(i) $810,000.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5; and

(ii) $4,590,000.00, constituting the balance of the Purchase Price ("Balance"), by certified check of Purchaser or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined). All checks in payment of the balance of the Purchase Price shall be payable to the order of Sponsor (or as Sponsor otherwise directs. Sponsor reserves the right to require Purchaser to pay the Balance or any portion thereof in "immediately available funds" (i.e. by wire transfer to a bank account designated by Sponsor).

(c) All checks shall be unendorsed, made payable to the direct order of 'Rosen Livingston & Cholst LLP, as Escrow Agent" or (as to the Balance) to "135 West 52ND Street Owner LLC" or

1

such payees as Sponsor may direct on not less than two (2) business days' prior oral or written notice to Purchaser or their attorneys. All checks shall be drawn on a bank that is a member of the New York Clearing House Association. All checks must be payable directly to the order of the required payee; they may not be endorsed.

(d) Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing and, unless otherwise set forth herein, none of the provisions of this Agreement shall survive the closing. However, nothing contained herein shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of Purchaser under Article 23-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.

(e) Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under "Terms of Sale - Prerequisites to Closing of Title" in Part I of the Plan are met concurrently with, or prior to, closing.

2.  Definitions.  The following terms shall have the meanings ascribed to them:

(a) "Building" shall mean the building located at 135 West 52ND Street, New York, New York 10019.

(b) "Closing Date", "closing", "closing of title" and the words of similar import are used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment to Sponsor of the Purchase Price and the delivery to Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.

(c) "Condominium" shall mean The 135 West 52ND Street Condominium.

(d) "Declaration" shall mean the Declaration of the 135 West 52ND Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.

(e) "Depositary" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.

(f) "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.

(g) "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.

(h) "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.

All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

3.  Plan

(a) Purchaser represents that Purchaser has possessed the Plan and any final amendments thereto at least three (3) business days prior to submitting this Purchase Agreement; or

(b) In the event Purchaser does not wish to wait three (3) business days) Purchaser has the right to rescind this Purchase Agreement by sending written notice of his rescission to the Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement (time being of the essence to exercise such right of rescission within such seven (7) day period).

2

(c) Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Condominium Documents set forth in Part II of the Plan and Parts A and B of the Exhibits submitted with the Plan to the Department of Law) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor (including, without limitation, amendments involving any changes, modifications, or updating of the projected Common Charges, the projected real estate taxes to be paid by Purchaser, or Schedule B "Budget for the First Year of Condominium Operation"). Except in the case of a material adverse amendment affecting Purchaser's Unit or an otherwise provided under the Plan, any such amendments shall neither excuse Purchaser from performing Purchaser's obligations hereunder nor entitle Purchaser to any offset or credit against the Purchase Price or claim or right of action against Sponsor, and any such amendment may be filed by Sponsor without Purchaser's consent or approval.  However, Sponsor shall not have the right to unilaterally cancel this Agreement except as herein provided (such as in the case of an incurable default by Purchaser) nor change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.

(d) The Plan is hereby incorporated in this Agreement with the same force and effect as if set forth at length. In the event of any inconsistency or conflict between the provisions of this Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding. Purchaser acknowledges having had full opportunity to examine all documents and investigate all statements made herein and in the Plan.

4.  Personal Property

(a) At closing, the Unit will contain only those appliances, countertops, cabinets, flooring, sinks, vanities (if any), air conditioning units (if any), hardware and other fixtures and equipment installed therein as set forth in the Plan.

Sponsor has the right to substitute other appliances, countertops, cabinets, sinks, vanities, flooring and fixtures in place of those referred to in the Plan provided only that the substitutions are of equal or better quality and design.

(b) The Unit is being sold unfurnished, without window blinds or shades.  Furniture, floor coverings, wall coverings, furnishings, decorations and the like in or about any model Unit are for display purposes only and are not included in this sale except to the extent set forth in the Plan.  Any floor plans or sketches shown to Purchaser (including those contained in the Plan) are only approximations of the Unit's dimensions and arrangement and Purchaser acknowledges and agrees that he is not relying thereon. Sponsor shall not be liable for minor variations from any floor plans or sketches.

(c) Sales model apartments may, at Sponsor's option, be sold furnished at a later date but will initially be withheld from sale.

(d) There will be no modifications or extras unless agreed to in writing by the parties. All modifications and alterations must be approved by Sponsor in writing and, if approved, shall be performed by Sponsor at Purchaser's expense (payable in the manner to be set forth in an addendum to this Agreement or by separate agreement between Sponsor and Purchaser).

5.  Purchase Monies to be Held in Trust

(a) The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, New York, NY 10016, telephone number 212 687 7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser.  Escrow Agent has designated the following attorneys to serve as signatories: Morton H Rosen, Peter I. Livingston, Mary L. Kesmatt, Bruce A. Cholst.  All designated signatories are admitted to practice law in the State of New York. Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor,

3

Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

(b) The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York.  The escrow account is entitled "[Purchaser's Name] Rosen Livingston & Cholst LLP Escrow Agent" ("Escrow Account").  The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit.  Any deposit in excess of $250,000 will not be insured.

All Deposits received by Purchaser shall be in the form of checks, money orders, wire transfers, or other instrument, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP as Escrow Agent.

Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of a written agreement between Purchaser and Sponsor.

The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts, which is currently 0.2%.  Interest shall begin to accrue upon placing the Deposit into the Escrow Account.  All interest earned thereon shall be paid to or credited to the Purchaser at closing.  No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account.  The Escrow Agreement appended hereto as Exhibit "A."

The Down Payment will not earn interest until the Purchaser's check has been deposited and cleared.  Sponsor will be liable to Purchaser only for the amount of interest actually received from the Depositary (which interest may be reduced by the Depositary's service charge).  The interest on the Down Payment, as same may be reduced by the Depositary's service charge, is hereinafter referred to as "Interest."

Upon the payment and performance by Purchaser of all of Purchaser's obligations hereunder and the transfer to Purchaser of title to the Unit, Sponsor will instruct the Depositary to pay to Purchaser any and all interest on monies deposited hereunder.  It is possible that Purchaser may not receive interest on the Down Payment for the entire month in which the closing is scheduled to occur.  The Sponsor and Selling Agent will not be liable to Purchaser for the amount of such interest on the payment thereof, except for any amount received from the Depositary.  All funds due to Sponsor and received under this Purchase Agreement will be handled in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and with Section 71-a(3) of the New York Lien Law.

6.  Closing of Title

(a) The closing of title shall occur on the date and at the time and place in the City and State of New York as Sponsor shall designate to Purchaser on not less than thirty (30) days' prior written notice (unless waived by Purchaser).  Sponsor shall not specify a closing date prior to October 31, 2016.  Sponsor shall have the right, from time to time, to adjourn such date and time for closing on written notice to Purchaser.  If the Closing is adjourned by Sponsor, then Sponsor shall fix a new date and time for closing and shall give Purchaser not less than ten (10) days' prior written notice of the new scheduled date and time for closing.

4

At closing, Purchaser will pay certain costs in connection with the purchase of his Unit in addition to the legal fees of Purchaser's counsel (if any) and the amount of any net credit in favor of Sponsor that may result from the closing apportionments described in the preceding paragraph. Such closing costs will include the following, the amounts of which (where applicable) are based on rates in effect on the date of the Plan and are subject to change without prior notice:

(a) If Purchaser elects to obtain for title insurance, Purchaser will pay a premium to the title company for such insurance, which premium may vary depending upon the title insurance company and the amount of insurance requested. A lower combined rate may be available if fee and mortgage insurance are ordered simultaneously.

(b) Purchaser will pay a fee for recording the Unit Deed and the Unit Owner's Power of Attorney;

(c) If Purchaser obtains a mortgage loan, Purchaser will pay:
   (i) a fee and service charge for recording the mortgage;
   (ii) a mortgage recording tax in the following amount: (a) for Residential Units, 2.05% of the face amount of a mortgage less than $500,000 for which mortgagor receives a $25 deduction, or 2.175% for a mortgage covering a Residential Unit equal to $500,000.00 or more, less $25 and (b) for non-residential Units, 2.05% of the face amount of a mortgage less than $500,000 or 2.80% for a mortgage covering a non-residential Unit equal to $500,000 or more;
   (iii) if mortgage title insurance is required by Purchaser's lender, an additional premium for insuring the mortgagee's interest in an amount equal to the principal amount under the mortgage loan.
   (iv) if required by Purchaser's lender, deposits for Common Charges, real estate taxes and assessments in an initial amount and in such monthly sums after closing as required by the lender (the amount of which monthly deposits may be changed periodically by the lender). The amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the policies of the lender, the number of months remaining between the closing of this and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amount of the taxes and other charges or impositions then payable; and
   (v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender. Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of his lender with respect thereto;

(d) In connection with this purchase, Purchaser has dealt with any broker except (A) the Selling Agent or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing;
   (vi) Purchaser (Sponsor) will pay to Rosen Livingston & Choist LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owner's Power of Attorney, additional closing documents and for coordinating and attending the closing;
   (vii) If Purchaser obtains financing and his lender refuses to close at the office of Rosen Livingston & Choist LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and Purchaser pays Rosen Livingston & Choist LLP, in addition to said closing fee set forth above, a travel fee of $500.00 if the closing is held in Manhattan or $700.00 if the closing is held in another borough. If the closing attended by a representative of Rosen Livingston & Choist LLP is adjourned through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Choist

9

15. Risk of Loss; Casualty
Purchaser shall not be entitled to possession of the Unit nor to store any of Purchaser's furniture or belongings therein until the deed is delivered to Purchaser at closing.

default is not cured within such thirty (30) day period, then this Agreement shall be deemed canceled and Sponsor shall have the right to retain, as and for liquidated damages, the Downpayment. Any sums in excess thereof, together with any interest thereon shall be returned to Purchaser after cancellation.

Notwithstanding the foregoing, if Purchaser's check in payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in which to provide good funds for Purchaser's Down Payment, in which event Sponsor shall be deemed to have waived its right to sue Purchaser on the dishonored or uncollected check; or (ii) allow Purchaser thirty (30) days in which to make good Purchaser's Down Payment and if Purchaser fails to do so within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check. In the latter case, Purchaser will also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

Upon cancellation of this Agreement and disposing of the Down Payment and interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan. Thereafter, the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

(b) All other risk of loss prior to closing has been assumed by Sponsor, but without any obligation or liability of Sponsor to repair the damage or restore the Unit to its contents. If Sponsor or the Unit Owners elect to repair or replace the loss or damage, this Agreement shall continue in full force and effect. Purchaser shall not have the right to reject title to the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or replacements. Purchaser shall not be required to pay the Balance unless and until (i) the Unit, and access thereto, has been substantially repaired as near as is reasonably possible to its condition immediately prior to the casualty, (ii) its essential services (such as gas, electricity, and heat) and a reasonable means of ingress and egress to the street have been restored, and (iii) any condition in the Unit for which a violation (if any) is noted or issued has been corrected (even if same is not yet removed of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser, its licensees, invitees and/or workers. (Sponsor will endeavor in good faith, and with reasonable diligence, to remove or cause to be removed subsequent to closing all violations of record it is obligated to correct.) Any proceeds received from insurance, or in satisfaction of any claim or action in connection with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners). If such proceeds are not required by Purchaser, Purchaser shall promptly turn them over to Sponsor upon request. The provisions of the two preceding sentences shall survive the closing.

(c) In the event that Sponsor notifies Purchaser that it does not elect to repair or restore the Unit or if the Unit Owners do not resolve to make such repairs or restoration in accordance with the Condominium's By-Laws, this Agreement shall be deemed canceled and of no further force or effect, and Sponsor shall instruct the Depository to return to Purchaser all sums deposited hereunder, together with interest, if any, thereon, whereupon the parties shall be released and discharged of all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously canceled due to Purchaser's uncured default, Sponsor shall retain the Liquidated Sum as provided above.

11

LLP an additional travel and attendance fee in the same amount as stated above for each attendance.
   (viii)   Purchaser shall, at closing, deposit with the Condominium's Managing Agent the sum of $13,386.03, which shall be held pursuant to an escrow agreement to be prepared by Sponsor's attorney. Purchaser shall reimburse Sponsor's attorney the sum of $500.00 for the preparation of such escrow agreement. The escrow funds shall be held by the Condominium's Managing Agent.

(b) If Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Choist LLP a fee of $1,000.00 for the preparation of the splitter, substitute mortgage and assignment of mortgage documents; and

(d) Pursuant to Paragraph 39, Sponsor will pay one half of the NYC Real Property Transfer Tax and the NYS Real Property Transfer Tax; such payment shall not exceed $49,276.00. Purchaser will pay the remaining New York State Real Estate Transfer Tax (documentary stamps) to be affixed to the deed, the New York City Real Property Transfer Tax and (if applicable) the one (1%) percent "mansion tax".
   (2) Purchaser will pay in 135 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit by Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.
   All of the aforementioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's unendorsed, personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party, or if so directed by the Sponsor, by wire transfer.

14. Power of Attorney to Condominium Board, Sponsor, Retail Unit Owner and Commercial Unit Owners
   At closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit (or, if no representation is present, then to Sponsor's attorney, for recording in the New York City Register's Office a Power of Attorney in favor of the Condominium Board relative to previously of leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owners relative to amending the Condominium Documents to the extent permitted in the Power of Attorney. An originally executed Power of Attorney shall be sent to the Condominium Board.

15. Events of Default
   (a) The following shall constitute "Events of Default" hereunder:
      (i) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 6 herein or to timely pay the applicable Rosen Livingston & Choist LLP fee or pay any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Choist LLP pursuant to paragraphs 12 and 13 above; or
      (ii) the dishonor or failure of collection of Purchaser's Down Payment check; or
      (iii) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder.
      (b) Upon the occurrence of an Event of Default, Sponsor shall be entitled, in its sole and absolute discretion, as its sole remedy, to cancel this Purchase Agreement by giving Purchaser written notice of cancellation. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default. TIME IS OF THE ESSENCE TO CURE SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD. If the

10

17. Inspection of Unit
   At least ten (10) days before the Balance is to be paid, Sponsor or the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Sponsor or the Selling Agent to inspect the Unit before the lapse of such ten (10) day period. Purchaser or his duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Report (in the form set forth as Exhibit B in this Agreement) and either execute it to the Sponsor or Selling Agent at the conclusion of the inspection. Failure of Purchaser to arrange such appointment or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the completed Inspection Report shall not excuse Purchaser from paying the Balance when due (without provision for escrow) and shall constitute Purchaser's full acceptance of the Unit. However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of the Sponsor".

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Units and the Retail Unit may be used for any any right to approve the use or any changes in the use of the Unsold Residential Units, the Commercial Units and the Retail Unit or any part thereof. This paragraph shall survive the closing of title.

18. No Representations
   Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, furnishings and fixtures contained in model units, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms or closets therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to his purchases of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and investigation thereof). No person has been authorized to make any representations on behalf of Sponsor. No oral representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially to such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the closing of title.

19. Negotiable Terms
   Sponsor reserves the right, in its sole and absolute discretion, to negotiate on an individual basis with each purchaser substantially more beneficial purchase terms than those offered or given to other purchasers. As a result, Purchaser may not benefit from a more favorable purchase term given to another purchaser and will not have the right to rescind this Purchase Agreement or recover his Down Payment or any other amount for not being given such benefit. The following is a list of only some of the purchase terms which may be negotiated: purchase

12

119

and place the Deposit into the Escrow Account. Within ten (10) business days of the placing this deposit in the Escrow Account, Escrow Agent shall provide written notice to Purchaser and Sponsor, confirming the Deposit. The notice shall provide the account number and the initial interest rate to be earned on the Deposit. Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of the Escrow Agreement.

G.    The Escrow Agent is obligated to send notice to the Purchaser once the Deposit is placed in the Escrow Account, if the Purchaser does not receive notice of such deposit within fifteen (15) business days after tender of the Deposit, he or she may cancel the Purchase Agreement within ninety (90) days after tender of the Purchase Agreement and Deposit to Escrow Agent. Complaints concerning the failure to honor such cancellation requests may be referred to the New York State Department of Law, Real Estate Finance Bureau, 120 Broadway, 23rd Floor, New York, N.Y. 10271. Rescission shall not be afforded where proof satisfactory to the Attorney General is submitted establishing that the Deposit was timely placed in the Escrow Account in accordance with the New York State Department of Law's regulations concerning Deposits and requisite notice was timely mailed to the Purchaser.

H.    All Deposits, except for advances made for upgrades, extras, or custom work received in connection with the Purchase Agreement, are and shall continue to be the Purchaser's money, and may not be commingled with any other money or pledged or hypothecated by Sponsor, as per GBL § 352-h.

I.    Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until after consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law. Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

J.    The Escrow Agent shall release the Deposit if so directed:

(a) pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 5 upon closing of title to the Unit; or

(b) in a subsequent writing signed by both Sponsor and Purchaser; or

(c) by a final, non-appealable order or judgment of a court.

If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit. If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release. If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within said thirty (30) day period, the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above. Notwithstanding the foregoing, the Escrow Agent shall have the right at any time to deposit the Deposit contained in the Escrow Account with the clerk of the county where the Unit is located and shall give written notice to both parties of such deposit.

17

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument. This Agreement may be executed by facsimile or .pdf and such shall be deemed originals.

**39. Transfer tax and Legal Fees**

Notwithstanding the foregoing, in this Agreement and any terms regarding Transfer Taxes or Sponsor's legal fees in the Offering Plan, Sponsor will pay one half of the NYC Real Property Transfer Tax and the NYS Real Property Transfer Tax. Such payment shall not exceed $49,275.00. Notwithstanding the foregoing, Sponsor shall pay Sponsor's legal fees in the amount of $2,030.00.

**40.** Sponsor shall install radiant heating in all of the bathroom floors of the Unit (including the powder room) at no additional cost to Purchaser. Sponsor shall make the third bathroom an "en suite" bathroom by installing a door in the hallway between the second and third bedrooms.

**41.** Sponsor agrees to assist Purchaser with any reasonable requests by Purchaser's lender. If any. Access to the Unit for an appraisal will be provided for a bank appraisal, at reasonable times and upon reasonable notice, once the Unit is substantially complete. Notwithstanding the preceding sentence, this Agreement is not contingent upon issuance of a loan commitment letter or Purchaser obtaining financing of any type.

[Signature page follows]

19

The Sponsor shall not object to the release of the Deposit to:

(a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in an Amendment to the Plan; or

(b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

K.    Any provision of the [Purchase Agreement/Escrow Agreement] or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding any Deposit in trust is absolutely void. The provisions of the Attorney General's regulations and GBL §§ 352-e(2-b) and 352-h concerning escrow trust funds shall prevail over any conflicting or inconsistent provisions in the Purchase Agreement, Plan, or any amendment thereto.

L.    Escrow Agent shall maintain the Escrow Account under its direct supervision and control.

M.    A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352(h).

N.    Escrow Agent may rely upon any paper or document which may be submitted to it in connection with its duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

O.    Sponsor agrees that it shall act to interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-(h) and the New York State Department of Law's regulations.

P.    Sponsor shall obtain or cause the selling agent under the Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement. Q.    Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstance.

R.    Sponsor agrees to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of the obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent. This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

**38. Counterpart Signature Pages**

18

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:
135 WEST 52ND STREET OWNER
LLC

By: _____
     Meyer Chetrit, Principal

By: _____
     David Bistricer, Principal

(Purchaser)
Date Accepted:

(*Please initial on line and print or type name under line.)

Purchaser acknowledges:
Receipt of Offering Plan and
Amendments at _____ (A.M.)(P.M.)
on _____, 2015; and

Delivery of Purchase
Agreement and Check for
Down Payment at _____ (A.M.)(P.M.)
on _____4/13___, 2015

PURCHASER:
TULIP PARK PTE LTD.

By: _____
     *Purchaser

By: _____
     Co-Purchaser

Initials: _____
Purchaser: _____

Initials: _____
Co-Purchaser: _____

20

120

EXHIBIT B
INSPECTION REPORT

Date: _____
135 West 52nd Street Owner LLC
512 Seventh Avenue
New York, New York 10018

Re:  Unit _____
135 West 52nd Street Condominium
135 West 52nd Street
New York, New York 10019

Gentlemen:
This is to confirm that based on the undersigned's personal inspection of the above referenced Unit, I (we) have found the Unit, its floors, walls, doors, fixtures, appliances, equipment, hardware and all other items listed below, to be in good and satisfactory condition, free of chips, mars, scratches, breaks or other defects, except for those matters (if any) expressly noted below under "exceptions" requiring repair, adjustment or correction:

| | Item | Exceptions (if any) | Purchaser's Initials |
|---|---|---|---|
| 1. | Unit Interior: | | |
| | (a) Walls: | | |
| | (b) Floors: | | |
| | (c) Ceilings: | | |
| | (d) Windows: (glass, sash, pane, sill, etc.) | | |
| | (e) Doors: | | |
| | (f) Electrical fixtures: | | |
| | (g) Painted surfaces: | | |
| | (h) Kitchen cabinets: | | |
| | (i) Appliances: | | |
| | (j) Kitchen sink: | | |
| | (k) Medicine cabinets: (doors & mirror) | | |
| | (l) Vanities: | | |

23

| | Item | Exceptions (if any) | Purchaser's Initials |
|---|---|---|---|
| | (m) Bathroom sinks: | | |
| | (n) Water closet: | | |
| | (o) Bathtub: | | |
| | (p) Bathroom tile: | | |
| | (q) Hardware: (doorbell, doorknob, faucets, locks, etc.) | | |
| | (r) Intercom: | | |
| 2. | General Operating Condition: | | |
| | (a) All Doors: | | |
| | (b) All Windows: | | |
| | (c) All Plumbing: | | |
| | (d) All Hardware: | | |
| | (e) Other: | | |

The undersigned will sign and deliver to you a separate statement signifying my (our) satisfaction with each item excepted above (if any), immediately upon the completion of the repair, adjustment or correction of same. The undersigned understands and agrees that you shall not be obligated to make any repairs, adjustments or corrections to the Unit or any portion thereof or its fixtures, appliances, equipment, etc., contained therein, except as to those items (if any) delivery of possession of the Unit to the undersigned, except as to those items (if any) expressly excepted above and your obligation regarding any such excepted items shall cease upon the completion of the repair, adjustment or correction of same. Nothing contained herein shall be construed to excuse Sponsor from its obligations to correct defects in construction or design to the extent required in the section entitled "Rights and Obligations of Sponsor" contained in the Offering Plan for Condominium Ownership of the 135 West 52nd Street Condominium. The undersigned shall be required to complete the payment of the Purchase Price (without the provision for an escrow) and accept title to the Unit on the closing date notwithstanding the presence of any exceptions.

Very truly yours,

_____
Purchaser's Signature

_____
Purchaser's Signature

Agreed To:
135 West 52nd Street Owner
LLC

By: _____

24

## PURCHASE AGREEMENT

AGREEMENT made as of March 24, 2015 between 135 WEST 52ND STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and Celina Shi residing at 9 West 31st Street, Apartment 18A, New York, New York 10001 ("Purchaser").

Purchaser's Attorney:  Leon Luk, Esq.

Address:  Luk and Luk, LLP

254 Canal Street, Suite 2001

New York, NY 10013

Telephone: (212) 219 8686  Fax: (212) 219 8517  Email: lukspc@aol.com

Percentage of Common Interest: 0.6800 %  Common Charges: $1,511.09 per month

Residential Percentage of Common Interest: 0.9057%

Selling Agent:  Douglas Elliman (Stacy Spielman)

Co-Broker: Douglas Elliman (Sherri XL Shang)

Real Estate Taxes: $2,115.25 per month,  B.I.D. Tax: $18.81 per month;

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 30A ("Unit") in the building ("Building") known as 135 WEST 52ND STREET Condominium ("Condominium") and located at 135 WEST 52ND STREET, New York, New York 10019, together with a 0.6800% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

### 1.   Purchase Price

(a)  The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below ("Purchase Price") is $3,550,000.00, payable as follows:

(i) $532,500.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5; and

(ii) $3,017,500.00, constituting the balance of the Purchase Price ("Balance"), by certified check of Purchaser or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.

(b)  All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined). All checks in payment of the Balance of the Purchase Price shall be payable to the order of Sponsor (or as Sponsor otherwise directs. Sponsor reserves the right to require Purchaser to pay the Balance or any portion thereof in "immediately available funds" (i.e. by wire transfer to a bank account designated by Sponsor).

(c)  All checks shall be uncndorsed, made payable to the direct order of 'Rosen Livingston & Cholst LLP, as Escrow Agent" or (as to the Balance) to "135 West 52ND Street Owner LLC" or

1

(c)  Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Condominium Documents set forth in Part II of the Plan and Parts A and B of the Exhibits submitted with the Plan to the Department of Law) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor (including, without limitation, amendments involving any changes, modifications, or updating of the projected Common Charges, the projected real estate taxes to be paid by Purchaser, or Schedule B 'Budget for the First Year of Condominium Operation'). Except in the case of a material adverse amendment affecting Purchaser's Unit or as otherwise provided under the Plan, any such amendments shall neither excuse Purchaser from performing Purchaser's obligations hereunder nor entitle Purchaser to any offset or credit against the Purchase Price or claim or right of action against Sponsor, and any such amendment may be filed by Sponsor without Purchaser's consent or approval.  However, Sponsor shall not have the right to unilaterally cancel this Agreement except as herein provided (such as in the case of an uncured default by Purchaser) nor change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.

(d)  The Plan is hereby incorporated in this Agreement with the same force and effect as if set forth at length.  In the event of any inconsistency or conflict between the provisions of this Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding.  Purchaser acknowledges having had full opportunity to examine all documents and investigate all statements made herein and in the Plan.

### 4.   Personal Property

(a)  At closing, the Unit will contain only those appliances, countertops, cabinets, flooring, sinks, vanities (if any), air conditioning units (if any), hardware and other fixtures and equipment installed therein as set forth in the Plan.

Sponsor has the right to substitute other appliances, countertops, cabinets, sinks, vanities, flooring and fixtures in place of those referred to in the Plan provided only that the substitutions are of equal or better quality and design.

(b)  The Unit is being sold unfurnished, without window blinds or shades.  Furniture, floor coverings, wall coverings, furnishings, decorations and the like in or about any model Unit are for display purposes only and are not included in this sale except to the extent set forth in the Plan.  Any floor plans or sketches shown to Purchaser (including those contained in the Plan) are only approximations of the Unit's dimensions and arrangement and Purchaser acknowledges and agrees that he is not relying thereon. Sponsor shall not be liable for minor variations from any floor plans or structures.

(c)  Sales model apartments may, at Sponsor's option, be sold furnished at a later date but will initially be withheld from sale.

(d)  There will be no modifications or extras unless agreed to in writing by the parties.  All modifications and alterations must be approved by Sponsor in writing and, if approved, shall be performed by Sponsor at Purchaser's expense (payable in the manner to be set forth in an addendum to this Agreement or by separate agreement between Sponsor and Purchaser).

### 5.   Purchase Monies to be Held in Trust

(a)  Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, New York, NY 10016, telephone number 212 687 7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser.  Escrow Agent has designated the following attorneys to serve as signatories: Morton H Rosen, Peter I. Livingston, Mary L. Koenrah, Bruce A. Cholst. All designated signatories are admitted to practice law in the State of New York. Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor,

3

such payees as Sponsor may direct on not less than two (2) business days' prior oral or written notice to Purchaser.  All checks shall be drawn on a bank that is a member of the New York Clearing House Association.  All checks must be payable directly to the order of the required payee; they may not be endorsed.

(d)  Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing and, unless otherwise set forth herein, none of the provisions of this Agreement shall survive the closing.  However, nothing contained herein shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of Purchaser under Article 23-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.

(e)  Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under "Terms of Sale - Prerequisites to Closing of Title" in Part I of the Plan are met concurrently with, or prior to, closing.

### 2.   Definitions  The following terms shall have the meanings ascribed to them.

(a)  "Building" shall mean the building located at 135 West 52ND Street, New York, New York 10019.

(b)  "Closing Date", "closing", "closing of title" and words of similar import are used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment to Sponsor of the Purchase Price and the delivery to Purchaser of the deed transferring full ownership (see simple title) to the Unit on the terms set forth in this Agreement.

(c)  "Condominium" shall mean The 135 West 52ND Street Condominium.

(d)  "Declaration" shall mean the Declaration of The 135 West 52ND Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.

(e)  "Depository" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.

(f)  "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.

(g)  "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.

(h)  "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.

All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

### 3.   Plan

(a)  Purchaser represents that Purchaser has possessed the Plan and any filed amendments thereto at least three (3) business days prior to submitting this Purchase Agreement; or

(b)  in the event Purchaser does not wish to wait three (3) business days) Purchaser has the right to rescind this Purchase Agreement by sending written notice of his rescission to the Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement (time being of the essence to exercise such right of rescission within such seven (7) day period).

2

Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

(b)  The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York.  The escrow account is entitled ('Purchaser's Name) Rosen Livingston & Cholst LLP Escrow Agent" ("Escrow Account").  The Escrow Account is federally insured by the FDIC in the maximum amount of $250,000 per deposit.  Any deposit in excess of $250,000 will not be insured.

All Deposits received by Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP as Escrow Agent.

Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of a written agreement between Purchaser and Sponsor.

The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts, which is currently 0.2%.  Interest shall begin to accrue upon placing the Deposit into the Escrow Account.  All interest earned thereon shall be paid to or credited to the Purchaser at closing.  No less of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account.  The Escrow Agreement appended hereto as Exhibit "A."

The Down Payment will not earn interest until the Purchaser's check has been deposited and cleared.  Sponsor will be liable to Purchaser only for the amount of interest actually received from the Depository (which interest may be reduced by the Depository's service charge).  The interest on the Down Payment, as same may be reduced by the Depository's service charge, is hereinafter referred to as "Interest".

Upon the payment and performance by Purchaser of all of Purchaser's obligations hereunder and the transfer to Purchaser of title to the Unit, Sponsor will instruct the Depository to pay to Purchaser any and all interest on monies deposited hereunder.  It is possible that Purchaser may not receive interest on the Down Payment for the entire month in which the closing is scheduled to occur.  The Sponsor and Selling Agent will not be liable to Purchaser for the amount of such interest or the payment thereof, except for any amount received from the Depository.  All funds due to Sponsor and received under this Purchase Agreement will be handled in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and with Section 71-a(3) of the New York Lien Law.

### 6.   Closing of Title

(a)  The closing of title shall occur on the date and at the time and place in the City and State of New York as Sponsor shall designate to Purchaser on not less than thirty (30) days' prior written notice (unless waived by Purchaser).  Sponsor shall have the right, from time to time, to adjourn such date and time for closing on written notice to Purchaser.  If the Closing is adjourned by Sponsor, then Sponsor shall fix a new date and time for closing and shall give Purchaser not less than ten (10) days' prior written notice of the new scheduled date and time for closing.

4

(a) If Purchaser elects to obtain fee title insurance, Purchaser will pay a premium to the title company for such insurance, which premium may vary depending upon the title insurance company and the amount of insurance requested. A lower combined rate may be available if fee and mortgage insurance are ordered simultaneously.

(b) Purchaser will pay a fee for recording the Unit Deed and the Unit Owner's Power of Attorney;

(c) If Purchaser obtains a mortgage loan, Purchaser will pay:

(i) a fee and service charge for recording the mortgage;

(ii) a mortgage recording tax in the following amount: (A) for Residential Units, 2.05% of the face amount of a mortgage less than $500,000 for which mortgagor receives a $25 deduction, or 2.175% for a mortgage covering a Residential Unit equal to $500,000.00 or more, less $25 and (B) for non-residential Units, 2.05% of the face amount of a mortgage less than $500,000 or 2.80% for a mortgage covering a non-residential Unit equal to $500,000 or more;

(iii) if required by Purchaser's lender, an additional premium for insuring the mortgagee's interest in an amount equal to the principal amount under the mortgage loan.

(iv) if required by Purchaser's lender, deposits for Common Charges, real estate taxes and assessments in an initial amount and in such monthly sums after closing as required by the lender (the amount of which monthly deposits may be changed periodically by the lender). The amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the policies of the lender, the number of months remaining between the closing of title and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amount of the taxes and other charges or impositions then payable; and

(v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender. Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of its lender with respect thereto;

(vi) if, in connection with this purchase, Purchaser has dealt with any broker except (A) the Selling Agent or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing;

(vii) Purchaser will pay to Rosen Livingston & Cholst LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owner's Power of Attorney, additional closing documents and for coordinating and attending the closing.

(viii) if Purchaser obtains financing and his lender refuses to close at the office of Rosen Livingston & Cholst LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and Purchaser pays Rosen Livingston & Cholst LLP, in addition to said closing fee set forth above, a travel fee of $500.00 if the closing is held in Manhattan or $700.00 if the closing is held in another borough. If the closing attended by a representative of Rosen Livingston & Cholst LLP is adjourned through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Cholst LLP an additional travel and attendance fee in the same amount as stated above for each attendance;

(viii) If Purchaser is other than a natural person, Purchaser will be required to provide a personal guaranty of Common Charges and other charges due to the Condominium and Purchaser will pay Rosen Livingston & Cholst LLP a fee of $500.00 for preparation of such Guaranty;

9

(ix) if Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Cholst LLP a fee of $1,000.00 for the preparation of the splitter, substitute mortgage and assignment of mortgage documents; and

(d) Purchaser will pay the New York State Real Estate Transfer Tax (documentary stamps) to be affixed to the deed, the New York City Real Property Transfer Tax and (if applicable) the one (1%) percent "mansion tax";

(e) Purchaser will pay to 135 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit by Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.

All of the aforementioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's unendorsed, personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party, or if so directed by the Sponsor, by wire transfer.

**14. Power of Attorney to Condominium Board, Sponsor, Retail Unit Owner and Commercial Unit Owners**

At closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit (or, if no representative is present, then to Sponsor's attorney), for recording in the New York City Register's Office a Power of Attorney in favor of the Condominium Board relative to purchasing or leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owners relative to amending the Condominium Documents to the extent permitted in the Power of Attorney. An originally recorded Power of Attorney shall be sent to the Condominium Board.

**15. Events of Default**

(a) The following shall constitute "Events of Default" hereunder:

(i) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 6 herein or to timely pay the applicable Rosen Livingston & Cholst LLP closing fee or any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Cholst LLP pursuant to paragraphs 12 and 13 above; or

(ii) the dishonor or failure of collection of Purchaser's Down Payment check; or

(iii) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder.

(b) Upon the occurrence of an Event of Default, Sponsor shall be entitled, in its sole and absolute discretion, to cancel this Purchase Agreement by giving Purchaser written notice of cancellation. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default. TIME IS OF THE ESSENCE TO CURE SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD. If the default is not cured within such thirty (30) day period, then this Agreement shall be deemed cancelled and Sponsor shall have the right to retain, as and for liquidated damages, the Downpayment. Any sums in excess thereof, together with any interest thereon shall be returned to Purchaser after cancellation.

Notwithstanding the foregoing, if Purchaser's check in payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in which to provide good funds for Purchaser's Down Payment, in which event Sponsor shall be deemed to have waived its right to sue Purchaser on the dishonored or uncollected check; or (ii) allow Purchaser thirty (30) days in which to make good Purchaser's Down Payment and if

10

Purchaser fails to do so within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check. In the latter case, Purchaser will also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

Upon cancellation of this Agreement and disposing of the Down Payment and interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan. Thereafter, the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

**16. Risk of Loss; Casualty**

(a) Purchaser shall not be entitled to possession of the Unit nor to store any of Purchaser's furniture or belongings therein until the deed is delivered to Purchaser at closing.

(b) All other risk of loss prior to closing has been assumed by Sponsor, but without any obligation or liability of Sponsor to repair the damage or restore the Unit or its contents. If Sponsor or the Unit Owners elect to repair or replace the loss or damage, this Agreement shall continue in full force and effect. Purchaser shall not have the right to close the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or replacements. Purchaser shall not be required to pay the Balance unless and until (i) the Unit has been substantially repaired as near as is reasonably possible to its condition immediately prior to the casualty; (ii) its essential services (such as gas, electricity, and heat) and a reasonable means of ingress and egress to the street have been restored; and (iii) any condition in the Unit for which a violation (if any) is noted or issued has been corrected (even if same is not yet removed of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser, its licensees, invitees and/or workers. (Sponsor will endeavor in good faith, and with reasonable diligence, to remove or cause to be removed subsequent to closing all violations of record it is obligated to correct.) Any proceeds received from insurance, or in satisfaction of any claim or action in connection with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners). If such proceeds are paid to Purchaser, Purchaser shall promptly turn them over to Sponsor upon request. The provisions of the two preceding sentences shall survive the closing.

(c) In the event that Sponsor notifies Purchaser that it does not elect to repair or restore the Unit or if the Unit Owners do not resolve to make such repairs or restoration in accordance with the Condominium's By-Laws, this Agreement shall be deemed cancelled and of no further force or effect, and Sponsor shall instruct the Depository to return to Purchaser all sums deposited hereunder, together with interest, if any, thereon, whereupon the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously cancelled due to Purchaser's uncured default, Sponsor shall retain the Liquidated Sum as provided above.

**17. Inspection of Unit**

At least ten (10) days before the Balance is to be paid, Sponsor or the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Sponsor or the Selling Agent to inspect the Unit before the lapse of such ten (10) day period. Purchaser or his duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Report (in the form set forth as Exhibit B to this Agreement) and deliver same to the Sponsor or Selling Agent at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the

11

completed Inspection Report shall not excuse Purchaser from paying the Balance when due (without provision for escrow) and shall constitute Purchaser's full acceptance of the Unit. However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of the Sponsor".

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Units and the Retail Unit may be used for any lawful purpose and (ii) the Condominium Board, and the Residential Unit Owners do not have any right to approve the use or any changes in the use of the Unsold Residential Units, the Commercial Units and the Retail Unit or any part thereof. This paragraph shall survive the closing of title.

**18. No Representations**

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, furnishings and fixtures contained in model units, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms or closets therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to his purchase of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and investigation thereof). No person has been authorized to make any representations on behalf of Sponsor. No oral representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially to such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the closing of title.

**19. Negotiable Terms**

Sponsor reserves the right, in its sole and absolute discretion, to negotiate on an individual basis with each purchaser substantially more beneficial purchase terms than those offered or given to other purchasers. As a result, Purchaser may not benefit from a more favorable purchase term given to another purchaser and will not have the right to rescind this Purchase Agreement or rescind his Down Payment or any other amount for not being given such benefit. The following is a list of only some of the purchase terms which may be negotiated: purchase price; the amount of the Down Payment; the right of a purchaser to cancel the Purchase Agreement and recover the Down Payment for failure to obtain financing or to close by a specific date; the closing date and minimum notice required to schedule the closing; upgraded appliances, fixtures or equipment or other alterations, improvements or additions to be performed by and at the expense of Sponsor; excusing a purchaser from closing costs and/or penalties for closing late; longer time periods to pay or perform obligations under the Purchase Agreement; elimination of "time of the essence" provisions; price or common charge rebates; assumption of payment of, or guarantee of, common charges for a given period; Sponsor financing (provided an amendment to the Plan containing the terms thereof is duly filed); allowances or credits against the purchase price for decorations; to install appliances or fixtures

12

123

H.   All Deposits, except for advances made for upgrades, extras, or custom work received in connection with the Purchase Agreement, are and shall continue to be the Purchaser's money, and may not be comingled with any other money or pledged or hypothecated by Sponsor, as per GBL § 352-h.

I.   Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until after consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law. Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

J.   The Escrow Agent shall release the Deposit if so directed:

(a) pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 5 upon closing of title to the Unit; or

(b) in a subsequent writing signed by both Sponsor and Purchaser; or

(c) by a final, non-appealable order or judgment of a court.

If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit. If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release. If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within said thirty (30) day period, the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above. Notwithstanding the foregoing, the Escrow Agent shall have the right at any time to deposit the Deposit contained in the Escrow Account with the clerk of the county where the Unit is located and shall give written notice to both parties of such deposit.

The Sponsor shall not object to the release of the Deposit to:

(e) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an Amendment to the Plan; or

(b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

K.   Any provision of the [Purchase Agreement/Escrow Agreement], or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding any Deposit in trust is absolutely void. The provisions of the Attorney General's regulations and GBL §§ 352-e(2-b) and 352-h concerning escrow trust funds shall prevail over any conflicting or inconsistent provisions in the Purchase Agreement, Plan, or any amendment thereto.

17

L.   Escrow Agent shall maintain the Escrow Account under its direct supervision and control.

M.   A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352(h).

N.   Escrow Agent may rely upon any paper or document which may be submitted to it in connection with its duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

O.   Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-(h) and the New York State Department of Law's regulations.

P.   Sponsor shall obtain or cause the selling agent under the Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement. Q.   Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstance.

R.   Sponsor agrees to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in wilful disregard of the obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent. This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

38. Counterpart Signature Pages

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument. This Agreement may be executed by facsimile or .pdf and such shall be deemed originals.

39. Transfer tax

Notwithstanding the foregoing, Sponsor will pay one half of the NYC Real Property Transfer Tax and the NYS Real Property Transfer Tax; such payment shall not exceed $32,383.75.

[Signature page follows]

18

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:                          PURCHASER:
135 WEST 52ND STREET OWNER
LLC

By: _____              x _____
Meyer Chetrit, Principal              Purchaser

By: _____              _____
David Bistricer, Principal            Co-Purchaser

(Purchaser)
Date Accepted:
_____

(*Please initial on line and print or
type name under line.)

Purchaser acknowledges:          Initials:
Receipt of Offering Plan and     Purchaser: x _____
Amendments at _____ (A.M./P.M.)
on _____, 2016; and

Delivery of Purchase             Initials:
Agreement and Check for          Co-Purchaser: _____
Down Payment at _____ (A.M./P.M.)
on _____, 2015

19

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:                          PURCHASER:
135 WEST 52ND STREET OWNER
LLC

By: _____              x _____
Meyer Chetrit, Principal              Purchaser

By: _____              _____
David Bistricer, Principal            Co-Purchaser
$300 $3,553,000

(Purchaser)
Date Accepted:
_____

(*Please initial on line and print or
type name under line.)

Purchaser acknowledges:          Initials:
Receipt of Offering Plan and     Purchaser: x _____
Amendments at _____ (A.M./P.M.)
on _____, 2016; and

Delivery of Purchase             Initials:
Agreement and Check for          Co-Purchaser: _____
Down Payment at _____ (A.M./P.M.)
on _____, 2015

19

PURCHASE AGREEMENT
(LANGREN)

AGREEMENT made as of October __18__, 2014 between 135 WEST 52ND STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and American Institute of CPA's residing at 220 Leigh Farm Road, Durham, NC 27707 ("Purchaser").

Purchaser's Attorney:  Gary Berman

Address:  Robinson & Cole LLP

280 Trumbull Street, Hartford, CT 06103

Telephone:  (860) 275-8204    Fax:    Email: gberman@rc.com

Percentage of Common Interest: 0.6100%  Common Charges: $1,295.22 per month

Residential Percentage of Common Interest: 0.7763%

Selling Agent: Douglas Elliman (Stacy Spielman)

Co-Broker: Sotheby's International Realty (Kevin Brown)

Real Estate Taxes: $1,813.07 per month;   B.I.D. Tax: $16.87 per month;

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 30B ("Unit") in the building ("Building") known as 135 WEST 52ND STREET Condominium ("Condominium") and located at 135 WEST 52ND STREET, New York, New York 10019, together with a 0.6100% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

**1. Purchase Price**

(a) The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below ("Purchase Price") is $3,045,000.00, payable as follows:

(i) $456,750.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5; and

(ii) $2,588,250.00, constituting the balance of the Purchase Price ("Balance"), by certified check or banker's or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined). All checks in payment of the balance of the Purchase Price shall be payable to the order of Sponsor (or as Sponsor otherwise directs. Sponsor reserves the right to require Purchaser to pay the Balance or any portion thereof in "immediately available funds" (i.e. by wire transfer to a bank account designated by Sponsor).

(c) All checks shall be uncendorsed, made payable to the direct order of 'Rosen Livingston & Cholst LLP, as Escrow Agent" or (as to the Balance) to "135 West 52ND Street Owner LLC" or such payees as Sponsor may direct on not less than two (2) business days' prior oral or written notice to Purchaser. All checks shall be drawn on a bank that is a member of the New York

Clearing House Association. All checks must be payable directly to the order of the required payee; they may not be endorsed.

(d) Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing and, unless otherwise set forth herein, none of the provisions of this Agreement shall survive the closing. However, nothing contained herein shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of Purchaser under Article 23-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.

(e) Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under "Terms of Sale - Prerequisites to Closing of Title" in Part I of the Plan are met concurrently with, or prior to, closing.

**2. Definitions** The following terms shall have the meanings ascribed to them:

(a) "Building" shall mean the building located at 135 West 52ND Street, New York, New York 10019.

(b) "Closing Date", "closing", "closing of title" and words of similar import are used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment to Sponsor of the Purchase Price and the delivery to Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.

(c) "Condominium" shall mean The 135 West 52ND Street Condominium.

(d) "Declaration" shall mean the Declaration of the 135 West 52ND Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.

(e) "Depository" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.

(f) "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.

(g) "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.

(h) "Title Insurance Company" shall mean any reputable title insurance company licensed to do-business in the State of New York.

All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

**3. Plan**

(a) Purchaser represents that Purchaser has possessed the Plan and any filed amendments thereto at least three (3) business days prior to submitting this Purchase Agreement; or

(b) In the event Purchaser does not wish to wait three (3) business days) Purchaser has the right to rescind this Purchase Agreement by sending written notice of his rescission to the Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement (time being of the essence to exercise such right of rescission within such seven (7) day period).

(c) Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Condominium Documents set forth in Part II of the Plan and Parts A and B of the Exhibits

2

submitted with the Plan) to the Department of Law) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor (including, without limitation, amendments involving any charges, modifications, or updating of the projected Common Charges, the projected real estate taxes to be paid by Purchaser, or Schedule B "Budget for the First Year of Condominium Operation"). Except in the case of a material adverse amendment affecting Purchaser's Unit or as otherwise provided under the Plan, any such amendments shall neither excuse Purchaser from performing Purchaser's obligations hereunder nor entitle Purchaser to any offset or credit against the Purchase Price or claim or right of action against Sponsor, and any such amendment may be filed by Sponsor without Purchaser's consent or approval. However, Sponsor shall not have the right to unilaterally cancel this Agreement except as herein provided (such as in the case of an uncured default by Purchaser) nor change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.

(d) The Plan is hereby incorporated in this Agreement with the same force and effect as if set forth at length. In the event of any inconsistency or conflict between the provisions of this Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding. Purchaser acknowledges having had full opportunity to examine all documents and investigate all statements made herein and in the Plan.

**4. Personal Property**

(a) At closing, the Unit will contain only those appliances, countertops, cabinets, flooring, sinks, vanities (if any), air conditioning units (if any), hardware and other fixtures and equipment installed therein as set forth in the Plan.

Sponsor has the right to substitute other appliances, countertops, cabinets, sinks, vanities, flooring and fixtures in place of those referred to in the Plan provided only that the substitutions are of equal or better quality and design.

(b) The Unit is being sold unfurnished, without window blinds or shades. Furniture, floor coverings, wall coverings, furnishings, decorations and the like in or about any model Unit are for display purposes only and are not included in this sale except to the extent set forth in the Plan. Any floor plans or sketches shown to Purchaser (including those contained in the Plan) are only approximations of the Unit's dimensions and arrangement and Purchaser acknowledges and agrees that he is not relying thereon. Sponsor shall not be liable for minor variations from any floor plans or structures.

(c) Sales model apartments may, at Sponsor's option, be sold furnished at a later date but will initially be withheld from sale.

(d) There will be no modifications or extras unless agreed to in writing by the parties. All modifications and alterations must be approved by Sponsor in writing and, if approved, shall be performed by Sponsor at Purchaser's expense (payable in the manner to be set forth in an addendum to this Agreement or by separate agreement between Sponsor and Purchaser).

**5. Purchase Monies to be Held in Trust**

(a) The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, New York, NY 10016, telephone number 212 687 7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser. Escrow agent has designated the following attorneys to serve as signatories: Morton H Rosen, Peter L Livingston, Mary L Alpaugh, Bruce A. Cholst. All designated signatories are admitted to practice law in the State of New York. Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor, Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

(b) The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York. The escrow account is entitled "American Institute of CPA's Rosen Livingston & Cholst LLP Escrow Agent" ("Escrow Account"). The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit. Any deposit in excess of $250,000 will not be insured.

All Deposits received by Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP as Escrow Agent.

Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of a written agreement between Purchaser and Sponsor.

The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts, which is currently 0.2%. Interest shall begin to accrue upon placing the Deposit into the Escrow Account. All interest earned thereon shall be paid to or credited to the Purchaser at closing. No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account. The Escrow Agreement appended hereto as Exhibit "A."

The Down Payment will not earn interest until the Purchaser's checks has been deposited and cleared. Sponsor will be liable to Purchaser only for the amount of interest actually received from the Depository (which interest may be reduced by the Depository's service charge). The interest on the Down Payment, at same may be reduced by the Depository's service charge, is hereinafter referred to as "interest".

Upon the payment and performance by Purchaser of all of Purchaser's obligations hereunder and the transfer to Purchaser of title to the Unit, Sponsor will instruct the Depository to pay to Purchaser any and all interest on monies deposited hereunder. It is possible that Purchaser may not receive interest on the Down Payment for the entire month in which the closing is scheduled to occur. The Sponsor and Selling Agent will not be liable to Purchaser for the amount of such interest or the payment thereof, except for any amount received from the Depository. All funds due to Sponsor and received under this Purchase Agreement will be handled in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and with Section 71-a(3) of the New York Lien Law.

**6. Closing of Title**

(a) The closing of title shall occur on the date and at the time and place in the City and State of New York as Sponsor shall designate to Purchaser on not less than thirty (30) days' prior written notice (unless waived by Purchaser). Sponsor shall have the right, from time to time, to adjourn such date and time for closing on written notice to Purchaser. If the Closing is adjourned by Sponsor, then Sponsor shall fix a new date and time for closing and shall give Purchaser not less than ten (10) days' prior written notice of the new scheduled date and time for closing.

(b) The closing of title shall occur only after or concurrently with compliance with the prerequisites set forth under "Terms of Sale Prerequisites to Closing of Title" in Part I of the Plan.

(a) If Purchaser elects to obtain fee title insurance, Purchaser will pay a premium to the title company for such insurance, which premium may vary depending upon the title insurance company and the amount of insurance requested. A lower combined rate may be available if fee and mortgage insurance are ordered simultaneously.

(b) Purchaser will pay a fee for recording the Unit Deed and the Unit Owner's Power of Attorney.

(c) If Purchaser obtains a mortgage loan, Purchaser will pay:
   (i) a fee and service charge for recording the mortgage;
   (ii) a mortgage recording tax in the following amount: (a) for Residential Units, 2.05% of the face amount of a mortgage less than $500,000 for which mortgagor receives a $25 deduction, or 2.175% for a mortgage covering a Residential Unit equal to $500,000.00 or more, less $25 and (b) for non-residential Units, 2.05% of the face amount of a mortgage less than $500,000 or 2.80% for a mortgage covering a non-residential Unit equal to $500,000 or more;
   (iii) if mortgage title insurance is required by Purchaser's lender, an additional premium for insuring the mortgagee's interest in an amount equal to the principal amount under the mortgage loan.

(iv) if required by Purchaser's lender, deposits for Common Charges, real estate taxes and assessments in an initial amount and in such monthly sums after closing as required by the lender (the amount of which monthly deposits may be changed periodically by the lender). The amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the policies of the lender, the number of months remaining between the closing of title and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amount of the taxes and other charges or impositions then payable; and

(v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender. Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of his lender with respect thereto.

(vi) if, in connection with this purchase, Purchaser has dealt with any broker except (A) the Selling Agent or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing.

(vii)Purchaser will pay to Rosen Livingston & Cholst LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owner's Power of Attorney, additional closing documents and for coordinating and attending the closing;

(viii)   If Purchaser obtains financing and his lender refuses to close at the office of Rosen Livingston & Cholst LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and Purchaser pays Rosen Livingston & Cholst LLP, in addition to said closing fee set forth above, a travel fee of $500.00 if the closing is held in Manhattan or $700.00 if the closing is held in another borough. If the closing attended by a representative of Rosen Livingston & Cholst LLP is adjourned through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Cholst LLP an additional travel and attendance fee in the same amount as stated above for each attendance;

(viii)   If Purchaser is other than a natural person, Purchaser will be required to provide a personal guaranty of Common Charges and other charges due to the Condominium and Purchaser will pay Rosen Livingston & Cholst LLP a fee of $500.00 for preparation of such Guaranty;

9

(ix) if Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Cholst LLP a fee of $1,000.00 for the preparation of the splitter, substitute mortgage and assignment of mortgage documents; and

(d) Purchaser will pay the New York State Real Estate Transfer Tax (documentary stamps) to be affixed to the deed, the New York City Real Property Transfer Tax and (if applicable) the one (1%) percent "mansion tax";

(e) Purchaser will pay to 125 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit by Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.

All of the aforementioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's unendorsed, personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party, or if so directed by the Sponsor, by wire transfer.

**14. Power of Attorney to Condominium Board, Sponsor, Retail Unit Owner and Commercial Unit Owners**

At closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit (or, if no representative is present, then to Sponsor's attorney), for recording in the New York City Register's Office a Power of Attorney in favor of the Condominium Board relative to purchasing or leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owners relative to amending the Condominium Documents to the extent permitted in the Power of Attorney. An originally executed Power of Attorney shall be sent to the Condominium Board.

**15.Events of Default**

(a) The following shall constitute "Events of Default" hereunder:
   (i) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 6 herein or to timely pay the applicable Rosen Livingston & Cholst LLP closing fee or any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Cholst LLP pursuant to paragraphs 12 and 13 above; or
   (ii) the dishonor or failure of collection of Purchaser's Down Payment check; or
   (iii) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder.
   (b) Upon the occurrence of an Event of Default, Sponsor shall be entitled, in its sole and absolute discretion, to cancel this Purchase Agreement by giving Purchaser written notice of cancellation. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default. TIME IS OF THE ESSENCE TO CURE SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD. If the default is not cured within such thirty (30) day period, then this Agreement shall be deemed cancelled and Sponsor shall have the right to retain, as and for liquidated damages, the Downpayment. Any sums in excess thereof, together with any interest thereon shall be returned to Purchaser after cancellation.

Notwithstanding the foregoing, if Purchaser's check in payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in which to provide good funds for the Down Payment, in which event Sponsor shall be deemed to have waived its right to sue Purchaser on the dishonored or uncollected check; or (ii) allow Purchaser thirty (30) days in which to make good Purchaser's Down Payment and if

10

Purchaser fails to do so within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check. In the latter case, Purchaser will also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

Upon cancellation of this Agreement and disposing of the Down Payment and interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan. Thereafter, the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

**16. Risk of Loss; Casualty**

(a) Purchaser shall not be entitled to possession of the Unit nor to store any of Purchaser's furniture or belongings therein until the deed is delivered to Purchaser at closing.

(b) All other risk of loss prior to closing has been assumed by Sponsor, but without any obligation or liability of Sponsor to repair the damage or restore the Unit or its contents. If Sponsor or the Unit Owners elect to repair or replace the loss or damage, this Agreement shall continue in full force and effect, Purchaser shall not have the right to reject title to the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or replacements. Purchaser shall not be required to pay the Balance unless and until (i) the Unit has been substantially repaired as near as is reasonably possible to its condition immediately prior to the casualty, (ii) its essential services (such as gas, electricity, and heat) and a reasonable means of ingress and egress to the street have been restored; and (iii) any condition in the Unit for which a violation (if any) is noted or issued has been corrected (even if same is not yet removed of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser, its licensees, invitees and/or servants. Sponsor will endeavor in good faith, and with reasonable diligence, to remove or cause to be removed a violation caused to closing all violations of record (if any), written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners). If such proceeds are paid to Purchaser, Purchaser shall promptly turn them over to Sponsor upon request. The provisions of the two preceding sentences shall survive the closing.

(c) In the event that Sponsor notifies Purchaser that it does not elect to repair or restore the Unit or if the Unit Owners do not resolve to make such repairs or restoration in accordance with the Condominium's By-Laws, this Agreement shall be deemed cancelled and of no further force or effect, and Sponsor shall instruct the Depository to return to Purchaser all sums deposited hereunder, together with interest, if any, thereon, whereupon the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously canceled due to Purchaser's uncured default, Sponsor shall retain the Liquidated Sum as provided above.

**17. Inspection of Unit**

At least ten (10) days before the Balance is to be paid, Sponsor and the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Sponsor or the Selling Agent to inspect the Unit before the lapse of such ten (10) day period. Purchaser or his duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Report (in the form set forth as Exhibit B to this Agreement) and deliver same to the Sponsor or Selling Agent at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the

11

completed Inspection Report shall not excuse Purchaser from paying the Balance when due (without provision for escrow) and shall constitute Purchaser's full acceptance of the Unit. However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of the Sponsor".

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Units and the Retail Unit may be used for any lawful purpose and (ii) the Condominium Board, and the Residential Unit Owners do not have any right to approve the use or any changes in the use of the Unsold Residential Units, the Commercial Units and the Retail Unit or any part thereof. This paragraph shall survive the closing of title.

**18. No Representations**

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, furnishings and fixtures contained in model units, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms or closets therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to his purchase of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and investigation thereof). No person has been authorized to make any representations on behalf of Sponsor. No oral representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially to such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the closing of title.

**19. Negotiable Terms**

Sponsor reserves the right, in its sole and absolute discretion, to negotiate on an individual basis with each purchaser substantially more beneficial purchase terms than those offered or given to other purchasers. As a result, Purchaser may not benefit from a more favorable purchase term given to another purchaser and will not have the right to rescind this Purchase Agreement or recover his Down Payment or any other amount for not being given such benefit. The following is a list of only some of the purchase terms which may be negotiated: purchase price; the amount of the Down Payment; the right of a purchaser to cancel the Purchase Agreement and recover the Down Payment for failure to obtain financing or to close by a specific date; the closing date and minimum notice required to schedule the closing; upgraded appliances, fixtures or equipment or other alterations, improvements or additions to be performed by and at the expense of Sponsor; securing a purchaser from closing costs and/or penalties for closing late; longer time periods to pay or perform obligations under the Purchase Agreement; elimination of "time of the essence" provisions; price or common charge rebates; assumption of payment of, or guarantee of, common charges for a given period; Sponsor financing (provided an amendment to the Plan containing the terms thereof is duly filed); allowances or credits against the purchase price for decorations; to install appliances or fixtures

12

H.    All Deposits, except for advances made for upgrades, extras, or custom work received in connection with the Purchase Agreement, are and shall continue to be the Purchaser's money, and may not be comingled with any other money or pledged or hypothecated by Sponsor, as per GBL § 352-h.

I.    Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until after consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law. Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

J.    The Escrow Agent shall release the Deposit if so directed:

     (a) pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 5 upon closing of title to the Unit; or

     (b) in a subsequent writing signed by both Sponsor and Purchaser; or

     (c) by a final, non-appealable order or judgment of a court.

     If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit. If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release. If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within said thirty (30) day period, the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above. Notwithstanding the foregoing, the Escrow Agent shall have the right at any time to deposit the Deposit contained in the Escrow Account with the clerk of the county where the Unit is located and shall give written notice to both parties of such deposit.

     The Sponsor shall not object to the release of the Deposit to:

     (a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an Amendment to the Plan; or

     (b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

     The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

K.    Any provision of the [Purchase Agreement/Escrow Agreement] or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding any Deposit in trust is absolutely void. The provisions of the Attorney General's regulations and GBL §§ 352-e(2-b) and 352-h concerning escrow trust funds shall prevail over any conflicting or inconsistent provisions in the Purchase Agreement, Plan, or any amendment thereto.

17

L.    Escrow Agent shall maintain the Escrow Account under its direct supervision and control.

M.    A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352(h).

N.    Escrow Agent may rely upon any paper or document which may be submitted to it in connection with its duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

O.    Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-(h) and the New York State Department of Law's regulations.

P.    Sponsor shall obtain or cause the selling agent under the Plan to obtain a complete and signed Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement. Q.    Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstance.

R.    Sponsor agrees to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of the obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent. This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

38. Counterpart Signature Pages

     This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument. This Agreement may be executed by facsimile or .pdf and such shall be deemed originals.

39. Modifying Section 9(b)(II). Purchaser will order a title insurance commitment from Stewart Title Insurance Company. No item shall constitute a Permitted Exception if same materially adversely affects the marketability of the Unit, the use, or occupancy of the Unit as a residential dwelling or Purchaser's access to the Unit.

40. Sponsor shall promptly notify Purchaser of any of the following occurring prior to the Closing: (a) any modifications or amendments to the Plan, the Declaration, the By-Laws or the Rules and Regulations of the Condominium; (b) any increase in the amount of monthly common charges or real estate taxes for the Unit; (c) any intended or proposed assessment; (d) any intended or proposed additions or changes to any transfer or other fee charged by the Condominium or its managing agent with respect to the sale of a unit in the Building; (e) any damage or casualty to the Unit or the Building; and (f) any litigation, action or other proceedings affecting the Unit.

18

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

[Signature page follows]

SPONSOR:
135 WEST 52ND STREET OWNER LLC

By: _____
     Meyer Chetrit, Principal

By: _____
     David Bistricer, Principal

(Purchaser)
Date Accepted: _November 5, 2014_

(*Please initial on line and print or type name under line.)

Purchaser acknowledges:
Receipt of Offering Plan and Amendments at _4:02_ (A.M.)(P.M.) on _November 5_, 2014; and

Delivery of Purchase Agreement and Check for Down Payment at _____ (A.M.)(P.M.) on _Nov 7_, 2014

PURCHASER:

_____ *
Purchaser Tim LaSpaluto, Controller

_____ *
Co-Purchaser

Initials: _TL_
Purchaser ____ Tim LaSpaluto Controller

Initials: _____
Co-Purchaser _____

19                                        20

EXHIBIT B
INSPECTION REPORT

Date:
135 West 52nd Street Owner LLC
512 Seventh Avenue
New York, New York 10018

Re: Unit
135 West 52nd Street Condominium
135 West 52nd Street
New York, New York 10019

Gentlemen:
This is to confirm that based on the undersigned's personal inspection of the above referenced Unit, I (we) have found the Unit, its floors, walls, doors, fixtures, appliances, equipment, hardware and all other items listed below, to be in good and satisfactory condition, free of chips, mars, scratches, breaks or other defects, except for those matters (if any) expressly noted below under "exceptions" requiring repair, adjustment or correction:

| | Item | Exceptions (if any) | Purchaser's Initials |
|---|---|---|---|
| 1. | Unit Interior: | | |
| | (a) Walls: | _____ | _____ |
| | (b) Floors: | _____ | _____ |
| | (c) Ceilings: | _____ | _____ |
| | (d) Windows: | _____ | _____ |
| | (glass, sash, pane, sill, etc.) | | |
| | (e) Doors: | _____ | _____ |
| | (f) Electrical fixtures: | _____ | _____ |
| | (g) Painted surfaces: | _____ | _____ |
| | (h) Kitchen cabinets: | _____ | _____ |
| | (i) Appliances: | _____ | _____ |
| | (j) Kitchen sink: | _____ | _____ |
| | (k) Medicine cabinets: | _____ | _____ |
| | (doors & mirror) | | |
| | (l) Vanities: | _____ | _____ |

23

| | Item | Exceptions (if any) | Purchaser's Initials |
|---|---|---|---|
| | (m) Bathroom sinks: | _____ | _____ |
| | (n) Water closet: | _____ | _____ |
| | (o) Bathtubs: | _____ | _____ |
| | (p) Bathroom tile: | _____ | _____ |
| | (q) Hardware: | _____ | _____ |
| | (doorbell, doorknob, faucets, locks, etc.) | | |
| | (r) Intercom: | _____ | _____ |
| 2. | General Operating Condition: | | |
| | (a) All Doors: | _____ | _____ |
| | (b) All Windows: | _____ | _____ |
| | (c) All Plumbing: | _____ | _____ |
| | (d) All Hardware: | _____ | _____ |
| | (e) Other: | _____ | _____ |

The undersigned will sign and deliver to you a separate statement signifying my (our) satisfaction with each item excepted above (if any), immediately upon the completion of the repair, adjustment or correction of same. The undersigned understands and agrees that you shall not be obligated to make any repairs, adjustments or corrections to the Unit or any portion thereof or its fixtures, appliances, equipment, etc., contained therein, from or after the date of delivery of possession of the Unit to the undersigned, except as to those items (if any) expressly excepted above and your obligation regarding any such excepted items shall cease upon the completion of the repair, adjustment or correction of same. Nothing contained herein shall be construed to excuse Sponsor from its obligations to correct defects in construction or design to the extent required in the section entitled "Rights and Obligations of Sponsor" contained in the Offering Plan for Condominium Ownership of the 135 West 52nd Street Condominium. The undersigned shall be required to complete the payment of the Purchase Price (without the provision for an escrow) and accept title to the Unit on the closing date notwithstanding the presence of any exceptions.
Very truly yours,

_____
Purchaser's Signature

Agreed To:
135 West 52nd Street Owner
LLC

_____
Purchaser's Signature

By:_____

24

**PURCHASE AGREEMENT**

AGREEMENT made as of July 24, 2014 between 135 WEST 52ND STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and Guoqin Zhang and Lei Wang residing at 275 Henry Street, Paramus, NJ 07652 ("Purchaser").

Purchaser's Attorney:  Ronald H. Gitter, Esq.

Address:  110 East 59th Street, 23rd Floor, New York, New York 10022

Telephone: (212) 826-2405 Fax: (646) 536-8715 Email: rm@gitterlaw.com

Percentage of Common Interest: 0.6800% Common Charges: $1,611.09 per month

Residential Percentage of Common Interest: 0.9057%

Co-Broker: Keller Williams (Ying Li-Oshrin)

Real Estate Taxes: $2,116.25 per month;  B.I.D. Tax: $18.81 per month;

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 30C ("Unit") in the building ("Building") known as 135 WEST 52ND STREET Condominium ("Condominium") and located at 135 WEST 52ND STREET, New York, New York 10019, together with a 0.6800% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

**1.  Purchase Price**

(a) The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below ("Purchase Price") is $3,600,000.00, payable as follows:

(i) $625,000.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5; and

(ii) $2,975,000.00, constituting the balance of the Purchase Price ("Balance"), by certified check or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined). All checks in payment of the balance of the Purchase Price shall be payable to the order of Sponsor (or as Sponsor otherwise directs. Sponsor reserves the right to require Purchaser to pay the Balance or any portion thereof in "immediately available funds" (i.e. by wire transfer to a bank account designated by Sponsor).

(c) All checks shall be uncertored, made payable to the direct order of "Rosen Livingston & Cholst LLP, as Escrow Agent" or (as to the Balance) to "135 West 52nd Street Owner LLC" or such payees as Sponsor may direct on not less than two (2) business days' prior oral or written notice to Purchaser. All checks shall be drawn on a bank that is a member of the New York Clearing House Association. All checks must be payable directly to the order of the required payee; they may not be endorsed.

1

(d) Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing and, unless otherwise set forth herein, none of the provisions of this Agreement shall survive the closing. However, nothing contained herein shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of Purchaser under Article 23-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.

(e) Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under "Terms of Sale - Prerequisites to Closing of Title" in Part I of the Plan are met concurrently with, or prior to, closing.

**2.  Definitions**  The following terms shall have the meanings ascribed to them:

(a) "Building" shall mean the building located at 135 West 52nd Street, New York, New York 10019.

(b) "Closing Date", "closing", "closing of title" and words of similar import are used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment to Sponsor of the Purchase Price and the delivery to Purchaser of the deed transferring fee simple title) to the Unit on the terms set forth in this Agreement.

(c) "Condominium" shall mean The 135 West 52nd Street Condominium.

(d) "Declaration" shall mean the Declaration of the 135 West 52nd Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.

(e) "Depository" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.

(f) "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto that relate to the date upon which Purchaser signs this Agreement.

(g) "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon made fully described in the Declaration.

(h) "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.

All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

**3.  Plan**

(a) Purchaser represents that Purchaser has possessed the Plan and any filed amendments thereto at least three (3) business days prior to submitting this Purchase Agreement; or

(b) in the event Purchaser does not wish to wait three (3) business days) Purchaser has the right to rescind this Purchase Agreement by sending written notice of his rescission to the Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement (time being of the essence to exercise such right of rescission within such seven (7) day period).

(c) Purchaser hereby adopts, accepts and approves the Plan (without limitation, the Condominium Documents set forth in Part II of the Plan and Parts A, B and C of the Exhibits submitted with the Plan to the Department of Law) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by

2

Sponsor (including, without limitation, amendments involving any changes, modifications, or updating of the projected Common Charges, the projected real estate taxes to be paid by Purchaser, or Schedule B "Budget for the First Year of Condominium Operation"). Except in the case of a material adverse amendment affecting Purchaser's Unit or as otherwise provided under the Plan, any such amendments shall neither excuse Purchaser from performing Purchaser's obligations hereunder nor entitle Purchaser to any offset or credit against his Purchase Price or claim or right of action against Sponsor, and any such amendment may be filed by Sponsor without Purchaser's consent or approval. However, Sponsor shall not have the right to unilaterally void this Agreement except (a) as herein provided (such as in the case of an uncured default by Purchaser) nor change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.

(d) The Plan is hereby incorporated in this Agreement with the same force and effect as if set forth at length. In the event of any inconsistency or conflict between the provisions of this Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding. Purchaser acknowledges having had full opportunity to examine all documents and investigate all statements made herein and in the Plan.

**4.  Personal Property**

(a) At closing, the Unit will contain only those appliances, countertops, cabinets, flooring, sinks, vanities (if any), air conditioning units (if any), hardware and other fixtures and equipment installed therein as set forth in the Plan.

Sponsor has the right to substitute other appliances, countertops, cabinets, sinks, vanities, flooring and fixtures in place of those referred to in the Plan provided only that the substitutions are of equal or better quality and design.

(b) The Unit is being sold unfurnished, without window blinds or shades. Furniture, floor coverings, wall coverings, furnishings, decorations and the like in or about any model Unit are for display purposes only and are not included in this sale except to the extent set forth in the Plan. Any floor plans or sketches shown to Purchaser (including those contained in the Plan) are only approximations of the Unit's dimensions and arrangement and Purchaser acknowledges and agrees that he is not relying thereon. Sponsor shall not be liable for minor variations from any floor plans or structures.

(c) Sales model apartments may, at Sponsor's option, be sold furnished at a later date but will initially be withheld from sale.

(d) There will be no modifications or extras unless agreed to in writing by the parties. All modifications and alterations must be approved by Sponsor in writing and, if approved, shall be performed by Sponsor at Purchaser's expense (payable in the manner to be set forth in an addendum to this Agreement or by separate agreement between Sponsor and Purchaser).

**5.  Purchase Monies to be Held in Trust**

(a) The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, New York, NY 10016, telephone number 212 687 7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser. Escrow Agent has designated the following attorneys to serve as signatories: Morton H Rosen, Peter I. Livingston, Mary L. Kasmark, Bruce A. Cholst. All designated signatories are admitted to practice law in the State of New York. Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor, Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing;

(b) The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State

3

of New York. The escrow account is entitled "[Purchaser's Name] Rosen Livingston & Cholst LLP Escrow Agent" ("Escrow Account"). The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit. Any deposit in excess of $250,000 will not be insured.

All Deposits received by Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP as Escrow Agent.

Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of a written agreement between Purchaser and Sponsor.

The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts, which is currently 0.2%. Interest shall begin to accrue upon placing the Deposit into the Escrow Account. All interest earned thereon shall be paid to or credited to the Purchaser at closing. No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account. The Escrow Agreement appended hereto as Exhibit "A."

The Down Payment will not earn interest until the Purchaser's check has been deposited and cleared. Sponsor will be liable to Purchaser only for the amount of interest actually received from the Depository (which interest may be reduced by the Depository's service charge). The interest on the Down Payment, as same may be reduced by the Depository's service charge, is hereinafter referred to as "interest".

Upon the payment and performance by Purchaser of all of Purchaser's obligations hereunder and the transfer to Purchaser of title to the Unit, Sponsor will instruct the Depository to pay to Purchaser any and all interest on monies deposited hereunder. It is possible that the Down Payment may not receive interest on the Down Payment for the entire month in which the closing is scheduled to occur. The Sponsor and Selling Agent will not be liable to Purchaser for the amount of such interest or the payment thereof, for any amount received from the Depository. All funds due to Sponsor and received under this Purchase Agreement will be handled in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and with Section 71-a(3) of the New York Lien Law.

**6.  Closing of Title**

(a) The closing of title shall occur on the date and at the time and place in the City and State of New York as Sponsor shall designate to Purchaser on not less than thirty (30) days' prior written notice (unless waived by Purchaser). Sponsor shall have the right, from time to time, to adjourn such date and time for closing on written notice to Purchaser. If the Closing is adjourned by Sponsor, then Sponsor shall fix a new date and time for closing and shall give Purchaser not less than ten (10) days' prior written notice of the new scheduled date and time for closing. Purchaser shall be entitled to one (1) adjournment of the closing but to exceed five (5) days (the "Adjourned Closing Date"). The closing adjustments stated in section 12(a) shall not accrue unless Purchaser fails to close on such Adjourned Closing Date.

(b) The closing of title shall occur only after or concurrently with compliance with the prerequisites set forth under "Terms of Sale Prerequisites to Closing of Title" in Part I of the Plan.

129

(f) a mortgage recording tax in the following amount: (e) for Residential Units, 2.05% of the face amount of a mortgage less than $500,000 for which mortgage receives a $25 deduction, or 2.175% for a mortgage covering a Residential Unit equal to $500,000.00 or more, less $25 and (b) for non-residential Units, 2.05% of the face amount of a mortgage less than $500,000 or 2.80% for a mortgage covering a non-residential Unit equal to $500,000 or more;

(iii) if mortgage title insurance is required by Purchaser's lender, an additional premium for insuring the mortgagee's interest in an amount equal to the principal amount under the mortgage loan;

(iv) if required by Purchaser's lender, deposits for Common Charges, real estate taxes and assessments in an initial amount and in such monthly sums after closing as required by the lender (the amount of which monthly deposits may be changed periodically by the lender). The amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the policies of the lender, the number of months remaining between the closing of title and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amount of the taxes and other charges or impositions then payable; and

(v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender. Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of his lender with respect thereto;

(vi) if, in connection with this purchase, Purchaser has dealt with any broker except (A) the Selling Agent or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing;

(vii) Purchaser will pay to Rosen Livingston & Cholst LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owner's Power of Attorney, additional closing documents and for coordinating and attending the closing;

(viii) If Purchaser obtains financing and his lender refuses to close at the office of Rosen Livingston & Cholst LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and Purchaser pays Rosen Livingston & Cholst LLP, in addition to said closing fee set forth above, a travel fee of $500 if the closing is held in Manhattan or $700 if the closing is held in another borough. If the closing attended by a representative of Rosen Livingston & Cholst LLP is adjourned through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Cholst LLP an additional travel and attendance fee in the same amount as stated above for each attendance;

(viii) if Purchaser is other than a natural person, Purchaser will be required to provide a personal guaranty of Common Charges and other charges due to the Condominium and Purchaser will pay Rosen Livingston & Cholst LLP a fee of $600 for preparation of such Guaranty;

(b) if Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Cholst LLP a fee of $1,000.00 for the preparation of the splitter, substitute mortgage and assignment of mortgage documents; and

(c) Purchaser will pay the New York State Real Estate Transfer Tax (documentary stamps) to be affixed to the deed, the New York City Real Property Transfer Tax and (if applicable) the one (1%) percent "mansion tax";

9

(e) Purchaser will pay to 135 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit by Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.

All of the aforementioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's unendorsed, personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party, or if so directed by the Sponsor, by wire transfer.

**14. Power of Attorney to Condominium Board, Sponsor, Retail Unit Owner and Commercial Unit Owners**

At closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit (or, if no representative is present, then to Sponsor's attorney), for recording in the New York City Register's Office a Power of Attorney in favor of the Condominium Board relative to purchasing or leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owners relative to amending the Condominium Documents to the extent permitted in the Power of Attorney. An originally recorded Power of Attorney shall be sent to the Condominium Board.

**15. Events of Default**

(a) The following shall constitute "Events of Default" hereunder:

(i) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 7 herein or to timely pay the applicable Rosen Livingston & Cholst LLP closing fee or any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Cholst LLP pursuant to paragraphs 12 and 13 above; or

(ii) the dishonor or failure of collection of Purchaser's Down Payment check; or

(iii) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder.

(b) Upon the occurrence of an Event of Default, Sponsor shall be entitled, in its sole and absolute discretion, to cancel this Purchase Agreement by giving Purchaser written notice of cancellation. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default. TIME IS OF THE ESSENCE TO CURE SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD. If the default is not cured within such thirty (30) day period, then this Agreement shall be deemed cancelled and Sponsor shall have the right to retain, as and for liquidated damages, the Liquidated Sum. Any sums in excess thereof, together with any interest thereon shall be returned to Purchaser after cancellation.

Notwithstanding the foregoing, if Purchaser's check in payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in which to provide good funds to Purchaser in payment of the Down Payment, in which event Sponsor shall be deemed to have waived its right to sue Purchaser on the dishonored or uncollected check; or (ii) allow Purchaser thirty (30) days in which to make good Purchaser's Down Payment and if Purchaser fails to do so within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check. In the latter case, Purchaser will also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

Upon cancellation of this Agreement and disposing of the Down Payment and interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan. Thereafter, the

10

Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

**16. Risk of Loss; Casualty**

(a) Purchaser shall not be entitled to possession of the Unit nor to store any of Purchaser's furniture or belongings therein until the deed is delivered to Purchaser at closing.

(b) All other risk of loss prior to closing has been assumed by Sponsor, but without any obligation on liability of Sponsor to repair the damage or restore the Unit or its contents. If Sponsor or the Unit Owners elect to repair or replace the loss or damage, this Agreement shall continue in full force and effect, Purchaser shall not have the right to reject title to the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or replacements. Purchaser shall not be required to pay the Balance unless and until (i) the Unit has been substantially repaired as near as is reasonably possible to its condition immediately prior to the casualty; (ii) its essential services (such as gas, electricity, and heat) are in a reasonable means of ingress and egress to the street have been restored; and (iii) any condition in the Unit for which a violation (if any) is noted or issued has been corrected (were it same is not yet removed of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser, its licensees, invitees and/or workers. (Sponsor will endeavor in good faith, and with reasonable diligence, to remove or cause to be removed subsequent to closing all violations of record it is obligated to correct.) Any proceeds received from insurance, or in satisfaction of any claim or action in connection with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners). If such proceeds are paid to Purchaser, Purchaser shall promptly turn them over to Sponsor upon request. The provisions of the three preceding sentences shall survive the closing.

(c) In the event that Sponsor notifies Purchaser that it does not elect to repair or restore the Unit or if the Unit Owners do not resolve to make such repairs or restoration in accordance with the Condominium's By-Laws, this Agreement shall be deemed canceled and of no further force or effect, and Sponsor shall instruct the Depository to return to Purchaser all sums deposited hereunder, together with interest, if any, thereon, whereupon the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously canceled due to Purchaser's uncured default, Sponsor shall retain the Liquidated Sum as provided above.

**17. Inspection of Unit**

At least ten (10) days before the Balance is to be paid, Sponsor or the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Sponsor or the Selling Agent to inspect the Unit before the lapse of such ten (10) day period. Purchaser or his duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Report (in the form set forth as Exhibit B to this Agreement) and deliver same to Sponsor or Selling Agent at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the completed Inspection Report shall not excuse Purchaser from paying the Balance when due (without provision for escrow) and shall constitute Purchaser's full acceptance of the Unit. However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of the Sponsor".

11

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Units and the Retail Unit may be used for any lawful purpose and (ii) the Condominium Board, and the Residential Unit Owners do not have any right to approve the use or any changes in the use of the Unsold Residential Units, the Commercial Units and the Retail Unit or any part thereof. This paragraph shall survive the closing of title.

**18. No Representations**

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, furnishings and fixtures contained in model units, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms or checks therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to his purchase of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and investigation thereof). No person has been authorized to make any representations on behalf of Sponsor. No oral representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially to such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the closing of title.

**19. Negotiable Terms**

Sponsor reserves the right, in its sole and absolute discretion, to negotiate on an individual basis with each purchaser substantially more beneficial purchase terms than those offered or given to other purchasers. As a result, Purchaser may not benefit from a more favorable purchase term given to another purchaser and will not have the right to rescind this Purchase Agreement or recover his Down Payment or any other amount for not being given such benefit. The following is a list of only some of the purchase terms which may be negotiated: purchase price; the amount of the Down Payment; the right of a purchaser to cancel the Purchase Agreement and recover the Down Payment for failure to obtain financing or to close by a specific date; the closing date and minimum notice required to schedule the closing; upgraded appliances, fixtures or equipment or other alterations, improvements or additions to be performed by and at the expense of Sponsor; excusing a purchaser from closing costs and/or penalties for closing late; longer time periods to pay or perform obligations under the Purchase Agreement; elimination of "time of the essence" provisions; price or common charge rebates; assumption of payment of, or guarantee of, common charges for a given period; Sponsor financing (provided an amendment to the Plan containing the terms thereof is duly filed); allowances or credits against the purchase price for concessions; to install appliances or fixtures and granting to Purchaser the benefit of any one or more favorable terms offered or given to another purchaser.

**20. Notices**

12

Agreement within ninety (90) days after tender of the Purchase Agreement and Deposit to Escrow Agent. Complaints concerning the failure to honor such cancellation requests may be referred to the New York State Department of Law, Real Estate Finance Bureau, 120 Broadway, 23rd Floor, New York, N.Y. 10271. Rescission shall not be afforded where proof satisfactory to the Attorney General is submitted establishing that the Deposit was timely placed in the Escrow Account in accordance with the New York State Department of Law's regulations concerning Deposits and requisite notice was timely mailed to the Purchaser.

H. All Deposits, except for advances made for upgrades, extras, or custom work received in connection with the Purchase Agreement, are and shall continue to be the Purchaser's money, and may not be comingled with any other money or pledged or hypothecated by Sponsor, as per GBL § 352-h.

I. Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until after consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law. Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

J. The Escrow Agent shall release the Deposit if so directed:

(a) pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 5 upon closing of title to the Unit; or

(b) in a subsequent writing signed by both Sponsor and Purchaser; or

(c) by a final, non-appealable order or judgment of a court.

If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit. If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release. If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within said thirty (30) day period, the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above. Notwithstanding the foregoing, the Escrow Agent shall have the right at any time to deposit the Deposit contained in the Escrow Account with the clerk of the county where the [unit/building] is located and shall give written notice to both parties of such deposit.

The Sponsor shall not object to the release of the Deposit to:

(a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an Amendment to the Plan; or

(b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

17

The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

K. Any provision of the [Purchase Agreement/Escrow Agreement] or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding any Deposit in trust is absolutely void. The provisions of the Attorney General's regulations and GBL §§ 352-e(2-b) and 352-h concerning escrow funds that involve any conflicting or inconsistent provisions in the Purchase Agreement, Plan, or any amendment thereto.

L. Escrow Agent shall maintain the Escrow Account under its direct supervision and control.

M. A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352(h).

N. Escrow Agent may rely upon any paper or document which may be submitted to it in connection with its duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

O. Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-(h) and the New York State Department of Law's regulations.

P. Sponsor shall obtain or cause the selling agent under the Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement; Q. Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstance.

R. Sponsor agree to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of the obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent. This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

18

38. Counterpart Signature Pages

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument. This Agreement may be executed by facsimile or .pdf and such shall be deemed originals.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:
135 WEST 52nd STREET OWNER
LLC

By: _____
David Bistricer, Principal

By: _____
Meyer Chetrit, Principal

(Purchaser)
Date Accepted: 7/31/14  $1,750,000  $0C

(*Please initial on line and print or
type name under line.)

Purchaser acknowledges: → Initials: GZ

Receipt of Offering Plan and
Amendments at 3.00(A.M.)(P.M.)
on July 14, 2014 , 200__; and

Delivery of Purchase
Agreement and Check for
Down Payment at (A.M.)(P.M.)
on July 22 , 2014

PURCHASER:

_____
Lei Wang
(Co-Purchaser)

Purchaser: Guoqin Zhang

Initials: LW
Co-Purchaser: Lei Wang

19

38. Counterpart Signature Pages

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument. This Agreement may be executed by facsimile or .pdf and such shall be deemed originals.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:
135 WEST 52nd STREET OWNER
LLC

By: _____
David Bistricer, Principal

By: _____
Meyer Chetrit, Principal

(Purchaser)
Date Accepted: _____

(*Please initial on line and print or
type name under line.)

Purchaser acknowledges: → Initials: GZ

Receipt of Offering Plan and
Amendments at 3.00(A.M.)(P.M.)
on July 14, 2014 , 200__; and

Delivery of Purchase
Agreement and Check for
Down Payment at (A.M.)(P.M.)
on July 22 , 2014

PURCHASER:

_____
Lei Wang
(Co-Purchaser)

Purchaser: Guoqin Zhang

Initials: LW
Co-Purchaser: Lei Wang

19

**EXHIBIT C**

**TO PURCHASE AGREEMENT**

**APPLICATION TO PURCHASE**

**APPLICANT:**

| Last Name | First | Middle | Date of Birth | Social Security Number |
|---|---|---|---|---|
| | | | | |

| Residence Address (City, State, Zip Code) | Telephone No. | Years There |
|---|---|---|
| | | |

| Name and Address of Present Landlord | Telephone No. |
|---|---|
| | |

| Previous Home Address (City, State, Zip Code) | Years There |
|---|---|
| | |

| Employed By | Type of Business | Position | Years There |
|---|---|---|---|
| | | | |

| Address | Telephone No. | Department | No. of Dependents |
|---|---|---|---|
| | | | |

$_____ $_____
Salary    Other    Income
(You need not reveal alimony, Source of Other Income child support, or separate maintenance income, if you do not want it considered in evaluating this application.)

24

**CO-APPLICANT:**

| Last Name Number | First | Middle | Date of Birth | Social Security |
|---|---|---|---|---|
| | | | | |

| Residence Address (City, State, Zip Code) | Telephone No. | Years There |
|---|---|---|
| | | |

| Name and Address of Present Landlord | Telephone No. |
|---|---|
| | |

| Previous Home Address (City, State, Zip Code) | Years There |
|---|---|
| | |

| Employed By | Type of Business | Position | Years There |
|---|---|---|---|
| | | | |

| Address | Telephone No. | Department | No. of Dependents |
|---|---|---|---|
| | | | |

$_____ $_____
Salary    Other Income    (You need not reveal alimony,  Source of Other Income child support, or separate maintenance income, if you do not want it considered in evaluating this application.)

25

**ALL APPLICANTS**

Liabilities:  List all debts, installment loans, contracts, charge accounts, mortgages and all other applications elsewhere.  If none, state "None". (Attach statement, if needed).

| Name of Bank/ Company | Address | Account No. | Original Amt. | Balance | Monthly Payments |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

List all judgments, suits, legal proceedings against you.  (Attach statement giving all details).  If none, state "None".

Assets - Bank Accounts

| Type | Amount | Name of Bank | Address | Account No. |
|---|---|---|---|---|
| | | | | |

Securities (Describe)          Real Estate (Describe)          Market Value

Market Value  $_____          $_____

Other Assets (Describe):                                    Life    Insurance
    Coverage
                                                           $_____

(I) (We) certify that the information (I) (We) have furnished is true and correct. _____

(I) (We) authorize 135 West 52nd Street Owner LLC and/or its partners and/or Prudential Douglas Elliman to check (my) (our) credit history and to report to proper persons and credit bureaus its experience with any loan it grants (me) (us).  This application shall remain the property of 135 West 52nd Street Owner LLC

_____          _____
Signature of Applicant                Signature of Co-Applicant

26

If 135 West 52nd Street Owner LLC and/or any of its partners and/or Prudential Douglas Elliman obtains a credit report for your loan application, or any updates, renewals, or extensions of any credit report then, upon written request, 135 West 52nd Street Owner LLC and/or Prudential Douglas Elliman will give you the name and address of the agency furnishing the report.

Dated:_____, 20___

All Applicants Please Note:

All self employed applicants must, if requested, submit a signed copy of their most recent federal income tax return.

27

# PURCHASE AGREEMENT

AGREEMENT made as of March 23, 2015 between 135 WEST 52ND STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and Melody Zui Tao residing at c/o Tan and Associates, 110 East 59th Street, #3200, New York, NY 10022 ("Purchaser").

Purchaser's Attorney: Susan Tan, Esq.

Address: Tan and Associates

110 East 59th Street #3200

New York, NY 10022

Telephone: (212) 530 8198  Fax: (888) 306 8666  Email: susan.tan@ncny-law.com

Percentage of Common Interest: 0.8900 %  Common Charges: $1,521.88 per month

Residential Percentage of Common Interest: 0.9122%

Selling Agent: Douglas Elliman (Janice Chang Team)

Co-Broker: N/A

Real Estate Taxes: $2,130.36 per month;  B.I.D. Tax: $19.09 per month;

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 31A ("Unit") in the building ("Building") known as 135 WEST 52ND STREET Condominium ("Condominium") and located at 135 WEST 52ND STREET, New York, New York 10019, together with a 0.8900% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

## 1. Purchase Price

(a) The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below ("Purchase Price") is $3,575,000.00, payable as follows:

(i) $536,250.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5; and

(ii) $3,038,750.00, constituting the balance of the Purchase Price ("Balance"), by certified check of Purchaser or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined). All checks in payment of the balance of the Purchase Price shall be payable to the order of Sponsor (or as otherwise directed). Sponsor reserves the right to require Purchaser to pay the Balance or any portion thereof in "immediately available funds" (i.e. by wire transfer to a bank account designated by Sponsor).

(c) All checks shall be unendorsed, made payable to the direct order of "Rosen Livingston & Cholst LLP, as Escrow Agent" or (as to the Balance) to "135 West 52ND Street Owner LLC" or

1

such payees as Sponsor may direct on not less than two (2) business days' prior oral or written notice to Purchaser. All checks shall be drawn on a bank that is a member of the New York Clearing House Association. All checks must be payable directly to the order of the required payee; they may not be endorsed.

(d) Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing and, unless otherwise set forth herein, none of the provisions of this Agreement shall survive the closing. However, nothing contained herein shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of Purchaser under Article 23-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.

(e) Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under "Terms of Sale - Prerequisites to Closing of Title" in Part I of the Plan are met concurrently with, or prior to, closing.

## 2. Definitions  The following terms shall have the meanings ascribed to them:

(a) "Building" shall mean the building located at 135 West 52ND Street, New York, New York 10019.

(b) "Closing Date", "closing", "closing of title" and words of similar import are used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment to Sponsor of the Purchase Price and the delivery to Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.

(c) "Condominium" shall mean The 135 West 52ND Street Condominium.

(d) "Declaration" shall mean the Declaration of the 135 West 52ND Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.

(e) "Depositary" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.

(f) "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.

(g) "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.

(h) "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.

All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

## 3. Plan

(a) Purchaser represents that Purchaser has possessed the Plan and any filed amendments thereto at least three (3) business days prior to submitting this Purchase Agreement; or

(b) In the event Purchaser does not wish to wait three (3) business days) Purchaser has the right to rescind this Purchase Agreement by sending written notice of this rescission to the Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement (time being of the essence to exercise such right of rescission within such seven (7) day period).

2

(c) Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Condominium Documents set forth in Part II of the Plan and Parts A and B of the Exhibits submitted with the Plan to the Department of Law) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor (including, without limitation, amendments involving any changes, modifications, or updating of the projected Common Charges, the projected real estate taxes to be paid by Purchaser, or Schedule B "Budget for the First Year of Condominium Operation"). Except in the case of a material adverse amendment affecting Purchaser's Unit or as otherwise provided under the Plan, any such amendments shall neither excuse Purchaser from performing Purchaser's obligations hereunder nor entitle Purchaser to any offset or credit against the Purchase Price or claim of right of action against Sponsor, and any such amendment may be filed by Sponsor without Purchaser's consent or approval. However, Sponsor shall not have the right to unilaterally cancel this Agreement except as herein provided (such as in the case of an uncured default by Purchaser) nor change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.

(d) The Plan is hereby incorporated in this Agreement with the same force and effect as if set forth at length. In the event of any inconsistency or conflict between the provisions of this Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding. Purchaser acknowledges having had full opportunity to examine all documents and investigate all statements made herein and in the Plan.

## 4. Personal Property

(a) At closing, the Unit will contain only those appliances, countertops, cabinets, flooring, sinks, vanities (if any), air conditioning units (if any), hardware and other fixtures and equipment installed therein as set forth in the Plan.

Sponsor has the right to substitute other appliances, countertops, cabinets, sinks, vanities, flooring and fixtures in place of those referred to in the Plan provided only that the substitutions are of equal or better quality and design.

(b) The Unit is being sold unfurnished, without window blinds or shades. Furniture, floor coverings, wall coverings, furnishings, decorations and the like in or about any model Unit are for display purposes only and are not included in this sale except to the extent set forth in the Plan. Any floor plans or sketches shown to Purchaser (including those contained in the Plan) are only approximations of the Unit's dimensions and arrangement and Purchaser acknowledges and agrees that he is not relying thereon. Sponsor shall not be liable for minor variations from any floor plans or structures.

(c) Sales model apartments may, at Sponsor's option, be sold furnished at a later date but will initially be withheld from sale.

(d) There will be no modifications or extras unless agreed to in writing by the parties. All modifications and alterations must be approved by Sponsor and, if approved, shall be performed by Sponsor at Purchaser's expense (payable in the manner to be set forth in an addendum to this Agreement or by separate agreement between Sponsor and Purchaser).

## 5. Purchase Monies to be Held in Trust

(a) The law firm of Rosen Livingston & Cholst LLP, with an address of 275 Madison Avenue, New York, NY 10016, telephone number 212 687 7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser. Escrow Agent has designated the following attorneys to serve as signatories: Michael H Rosen, Peter I. Livingston, Mary L. Kesmark, Bruce A. Cholst. All designated signatories are admitted to practice law in the State of New York. Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor,

3

Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

(b) The Escrow Agent has established the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York. The escrow account is entitled "Purchaser's Name] Rosen Livingston & Cholst LLP Escrow Agent ("Escrow Account"). The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit. Any deposit in excess of $250,000 will not be insured.

All Deposits received by Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP as Escrow Agent.

Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of a written agreement between Purchaser and Sponsor.

The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for such accounts, which is currently 0.2%. Interest shall begin to accrue upon placing the Deposit into the Escrow Account. All interest earned thereon shall be paid to or credited to the Purchaser at closing. No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account. The Escrow Agreement appended hereto as Exhibit "A."

The Down Payment will not earn interest until the Purchaser's check has been deposited and cleared. Sponsor will be liable to Purchaser only for the amount of interest actually received from the Depository (which interest may be reduced by the Depository's service charge). The interest on the Down Payment, as same may be reduced by the Depository's service charge, is hereinafter referred to as "Interest".

Upon the payment and performance by Purchaser of all of Purchaser's obligations hereunder and the transfer to Purchaser of title to the Unit, Sponsor will instruct the Depository to pay to Purchaser any and all Interest on monies deposited hereunder. It is possible that Purchaser may not receive interest on the Down Payment for the entire month in which the closing is scheduled to occur. The Sponsor and Selling Agent will not be liable to Purchaser for the amount of such Interest or the payment thereof, except for any amount received from the Depository. All funds due to Sponsor and received under this Purchase Agreement will be handled in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and with Section 71-a(3) of the New York Lien Law.

## 6. Closing of Title

(a) The closing of title shall occur on the date and at the time and place in the City and State of New York as Sponsor shall designate to Purchaser on not less than thirty (30) days' prior written notice (unless waived by Purchaser). Sponsor shall have the right, from time to time, to adjourn such date and time for closing on written notice to Purchaser. If the Closing is adjourned by Sponsor, then Sponsor shall fix a new date and time for closing and shall give Purchaser not less than ten (10) days' prior written notice of the new scheduled date and time for closing.

4

**13. Purchaser's Closing Costs**

At closing, Purchaser will pay certain costs in connection with the purchase of his Unit in addition to the legal fees of Purchaser's counsel (if any) and the amount of any net credit in favor of Sponsor that may result from the closing apportionments described in the preceding paragraph. Such closing costs will include the following, the amounts of which (where applicable) are based on rates in effect on the date of the Plan and are subject to change without prior notice:

(a) If Purchaser elects to obtain fee title insurance, Purchaser will pay a premium to the title company for such insurance, which premium may vary depending upon the title insurance company and the amount of insurance requested. A lower combined rate may be available if fee and mortgage insurance are ordered simultaneously.

(b) Purchaser will pay a fee for recording the Unit Deed and the Unit Owner's Power of Attorney;

(c) If Purchaser obtains a mortgage loan, Purchaser will pay:
  (i) a fee and service charge for recording the mortgage;
  (ii) a mortgage recording tax in the following amount: (a) for Residential Units, 2.05% of the face amount of a mortgage less than $500,000 for which mortgagor receives a $25 deduction, or 2.175% for a mortgage covering a Residential Unit equal to $500,000 or more, less $25 and (b) for non-residential Units, 2.05% of the face amount of a mortgage less than $500,000 or 2.80% for a mortgage covering a non-residential Unit equal to $500,000 or more;

(d) If mortgage title insurance is required by Purchaser's lender, an additional premium for insuring the mortgagee's interest in an amount equal to the principal amount under the mortgage loan.

(e) If required by Purchaser's lender, deposits for Common Charges, real estate taxes and assessments in an initial amount and in such monthly sums after closing as required by the lender (the amount of which monthly deposits may be changed periodically by the lender). The amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the policies of the lender, the number of months remaining between the closing of title and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amount of the taxes and other charges or impositions then payable; and

(v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender. Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of his lender with respect thereto;

(vi) If, in connection with this purchase, Purchaser has dealt with any broker except (A) the Selling Agent or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing;

(vii) Purchaser will pay to Rosen Livingston & Cholst LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owner's Power of Attorney, additional closing documents and for coordinating and attending the closing;

(viii) If Purchaser obtains financing and his lender refuses to close at the office of Rosen Livingston & Cholst LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and Purchaser pays Rosen Livingston & Cholst LLP, in addition to said closing fee set forth above, a travel fee of $500.00 if the closing is held in Manhattan or $700.00 if the closing is held in another borough. If the closing attended by a representative of Rosen Livingston & Cholst LLP

9

have the right to retain, as and for liquidated damages, the Downpayment. Any sums in excess thereof, together with any interest thereon shall be returned to Purchaser after cancellation.

Notwithstanding the foregoing, if Purchaser's check in payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in which to provide good funds for Purchaser's Down Payment, in which event Sponsor shall be deemed to have waived its right to sue Purchaser or the dishonored or uncollected check; or (ii) grant Purchaser thirty (30) days in which to make good Purchaser's Down Payment and if Purchaser fails to so do within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check. In the latter case, Purchaser will also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

Upon cancellation of this Agreement and disposing of the Down Payment and interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan. Thereafter, the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

**16. Risk of Loss; Casualty**

(a) Purchaser shall not be entitled to possession of the Unit nor to store any of Purchaser's furniture or belongings therein until the deed is delivered to Purchaser at closing.

(b) All other risk of loss prior to closing has been assumed by Sponsor, but without any obligation or liability of Sponsor to repair the damage or restore the Unit or its contents. If Sponsor or the Unit Owners elect to repair or replace the loss or damage, this Agreement shall continue in full force and effect. Purchaser shall not have the right to reject title to the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or replacements. Purchaser shall not be required to pay the Balance unless and until (i) the Unit has been substantially repaired as near as is reasonably possible to its condition immediately prior to the casualty; (ii) the essential services (such as gas, electricity, and heat) and a reasonable means of ingress and egress to the street have been restored; and (iii) any condition in the Unit for which a violation (if any) is noted or issued has been corrected (even if same is not yet removed of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser, its licensees, invitees and/or workers. (Sponsor will endeavor in good faith, and with reasonable diligence, to remove or cause to be removed subsequent to closing all violations of record it is obligated to correct.) Any proceeds received from insurance, or in satisfaction of any claim or action in connection with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners). If such proceeds are paid to Purchaser, Purchaser shall promptly turn them over to Sponsor upon request. The provisions of the two preceding sentences shall survive the closing.

(c) In the event that Sponsor notifies Purchaser that it does not elect to repair or restore the Unit or if the Unit Owners do not resolve to make such repairs or restoration in accordance with the Condominium's By-Laws, this Agreement shall be deemed canceled and of no further force or effect, and Sponsor shall instruct the Depositary to return to Purchaser all sums deposited hereunder, together with interest, if any, thereon, whereupon the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously canceled due to Purchaser's uncured default, Sponsor shall retain the Liquidated Sum as provided above.

**17. Inspection of Unit**

11

is adjourned through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Cholst LLP an additional travel and attendance fee in the same amount as stated above for each attendance;

(viii) If Purchaser is other than a natural person, Purchaser will be required to provide a personal guaranty of Common Charges and other charges due to the Condominium and Purchaser will pay Rosen Livingston & Cholst LLP a fee of $500.00 for preparation of such Guaranty;

(ix) If Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Cholst LLP a fee of $1,000.00 for the preparation of the splitter, substitute mortgage and assignment of mortgage documents; and

(d) Purchaser will pay the New York State Real Estate Transfer Tax (documentary stamps) to be affixed to the deed, the New York City Real Property Transfer Tax and (if applicable) the one (1%) percent "mansion tax";

(e) Purchaser will pay to 135 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit by Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.

All of the aforementioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's uncertified, personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party, or if so directed by the Sponsor, by wire transfer.

**14. Power of Attorney to Condominium Board, Sponsor, Retail Unit Owner and Commercial Unit Owners**

At closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit (or, if no representative is present, then to Sponsor's attorney), for recording in the New York City Register's Office a Power of Attorney in favor of the Condominium Board relative to purchasing or leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owners relative to amending the Condominium Documents to the extent permitted in the Power of Attorney. An originally recorded Power of Attorney shall be sent to the Condominium Board.

**15. Events of Default**

(a) The following shall constitute "Events of Default" hereunder:
  (i) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 6 herein or to timely pay the applicable Rosen Livingston & Cholst LLP closing fee or any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Cholst LLP pursuant to paragraphs 12 and 13 above; or
  (ii) the dishonor or failure of collection of Purchaser's Down Payment check; or
  (iii) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder.
  (b) Upon the occurrence of an Event of Default, Sponsor shall be entitled, in its sole and absolute discretion, to cancel this Purchase Agreement by giving Purchaser written notice of cancellation. If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default. TIME IS OF THE ESSENCE TO CURE SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD. If the default is not cured within such thirty (30) day period, then this Agreement shall be deemed canceled and Sponsor shall

10

At least ten (10) days before the Balance is to be paid, Sponsor or the Selling Agent shall notify Purchaser that the Unit is ready for inspection. Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Sponsor or the Selling Agent to inspect the Unit before the lapse of such ten (10) day period. Purchaser or his duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Report (in the form set forth as Exhibit B to this Agreement) and deliver same to the Sponsor or Selling Agent at the conclusion of the inspection. Failure of Purchaser either to arrange such appointment or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the completed Inspection Report shall not excuse Purchaser from paying the Balance when due (without provision for escrow) and shall constitute Purchaser's full acceptance of the Unit. However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of the Sponsor".

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Units and the Retail Unit may be used for any lawful purpose and (ii) the Condominium Board, and the Residential Unit Owners do not have any right to approve the use or any changes in the use of the Unsold Residential Units, the Commercial Units and the Retail Unit or any part thereof. This paragraph shall survive the closing of title.

**18. No Representations**

Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, furnishings and fixtures contained in model units, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms or closets therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to his purchase of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and investigation thereof). No person has been authorized to make any representations on behalf of Sponsor. No oral representations or statements shall be considered a part of this Agreement. Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not any layout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially to such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error. The provisions of this paragraph shall survive the closing of title.

**19. Negotiable Terms**

Sponsor reserves the right, in its sole and absolute discretion, to negotiate on an individual basis with each purchaser substantially more beneficial purchase terms than those offered or given to other purchasers. As a result, Purchaser may not benefit from a more favorable purchase term given to another purchaser and will not have the right to rescind this Purchase Agreement or recover his Down Payment or any other amount for not being given such benefit. The following is a list of only some of the purchase terms which may be negotiated: purchase price; the amount of the Down Payment; the right of a purchaser to cancel the Purchase Agreement and recover the Down Payment for failure to obtain financing or to close by a

12

work shall be initially deposited into the Escrow Account, and released in accordance to the terms of the Escrow Agreement.

G.   The Escrow Agent is obligated to send notice to the Purchaser once the Deposit is placed in the Escrow Account. If the Purchaser does not receive notice of such deposit within fifteen (15) business days after tender of the Deposit, he or she may cancel the Purchase Agreement within ninety (90) days after tender of the Purchase Agreement and Deposit to Escrow Agent. Complaints concerning the failure to honor such cancellation requests may be referred to the New York State Department of Law, Real Estate Finance Bureau, 120 Broadway, 23rd Floor, New York, N.Y. 10271. Rescission shall not be afforded where proof satisfactory to the Attorney General is submitted establishing that the Deposit was timely placed in the Escrow Account in accordance with the New York State Department of Law's regulations concerning Deposits and requisite notice was timely mailed to the Purchaser.

H.   All Deposits, except for advances made for upgrades, extras, or custom work received in connection with the Purchase Agreement, are and shall continue to be the Purchaser's money, and may not be comingled with any other money or pledged or hypothecated by Sponsor, as per GBL § 352-h.

I.   Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until either consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law. Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

J.   The Escrow Agent shall release the Deposit if so directed:

(a) pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 5 upon closing of title to the Unit; or

(b) in a subsequent writing signed by both Sponsor and Purchaser; or

(c) by a final, non-appealable order or judgment of a court.

If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit. If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release. If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within said thirty (30) day period, the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above. Notwithstanding the foregoing, the Escrow Agent shall have the right at any time to deposit the Deposit contained in the Escrow Account with the clerk of the county where the Unit is located and shall give written notice to both parties of such deposit.

The Sponsor shall not object to the release of the Deposit to:

(a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an Amendment to the Plan; or

17

(b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

K.   Any provision of the Purchase Agreement/Escrow Agreement or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent holding any Deposit in trust is absolutely void. The provisions of the Attorney General's regulations and GBL §§ 352-e(2-b) and 352-h concerning escrow trust funds shall prevail over any conflicting or inconsistent provisions in the Purchase Agreement, Plan, or any amendment thereto.

L.   Escrow Agent shall maintain the Escrow Account under its direct supervision and control.

M.   A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352(h).

N.   Escrow Agent may rely upon any paper or document which may be submitted to it in connection with its duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

O.   Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-(h) and the New York State Department of Law's regulations.

P.   Sponsor shall obtain or cause the selling agent under the Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement. Q.   Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstance.

R.   Sponsor agrees to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of the obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent. This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

38. Counterpart Signature Pages

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument. This Agreement may be executed by facsimile or .pdf and such shall be deemed originals.

18

---

39. Transfer Taxes and Sponsor's Legal Fees

Notwithstanding the foregoing, Sponsor shall pay one half of the NYC Real Property Transfer Tax and the NYS Real Property Transfer Tax; such payment shall not exceed $17,871.88.

40. Sponsor shall leave the floors of the Unit sanded and unfinished.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:
135 WEST 52nd STREET OWNER LLC

PURCHASER:

By: _____          _____
    Meyer Chetrit, Principal                     Purchaser

By: _____          _____
    David Bistricer, Principal                    Co-Purchaser

(Purchaser)
Date Accepted:
   3/20/2015

(*Please initial on line and print or type name under line.)

Purchaser acknowledges:          Initials: MTT
Receipt of Offering Plan and      Purchaser:
Amendments at ___ (A.M.)(P.M.)
on March 19 , 2015; and

Delivery of Purchase              Initials:
Agreement and Check for           Co-Purchaser:
Down Payment at ___ (A.M.)(P.M.)
on  3/23 , 2015

          KM

19

39. Transfer Taxes and Sponsor's Legal Fees

Notwithstanding the foregoing, Sponsor shall pay one half of the NYC Real Property Transfer Tax and the NYS Real Property Transfer Tax; such payment shall not exceed $17,871.88.

40. Sponsor shall leave the floors of the Unit sanded and unfinished.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:
135 WEST 52nd STREET OWNER LLC

PURCHASER:

By: _____          _____
    Meyer Chetrit, Principal                     Purchaser

By: _____          _____
    David Bistricer, Principal                    Co-Purchaser

(Purchaser)
Date Accepted:
   3/20/2015

(*Please initial on line and print or type name under line.)

Purchaser acknowledges:          Initials: MTT
Receipt of Offering Plan and      Purchaser:
Amendments at ___ (A.M.)(P.M.)
on March 19 , 2015; and

Delivery of Purchase              Initials:
Agreement and Check for           Co-Purchaser:
Down Payment at ___ (A.M.)(P.M.)
on  3/23 , 2015

          KM

20

| Item | Exceptions (if any) | Purchaser's Initials |
|------|---------------------|----------------------|
| (m) | Bathroom sinks: | |
| (n) | Water closet: | |
| (o) | Bathtubs: | |
| (p) | Bathroom tile: | |
| (q) | Hardware: | |
| | (doorbell, doorknob, faucets, locks, etc.) | |
| (r) | Intercom: | |

2.  General Operating Condition:

| | | |
|------|---------------------|----------------------|
| (a) | All Doors: | |
| (b) | All Windows: | |
| (c) | All Plumbing: | |
| (d) | All Hardware: | |
| (e) | Other: | |

The undersigned will sign and deliver to you a separate statement signifying my (our) satisfaction with each item excepted above (if any), immediately upon the completion of the repair, adjustment or correction of same. The undersigned understands and agrees that you shall not be obligated to make any repairs, adjustments or corrections to the Unit or any portion thereof or its fixtures, appliances, equipment, etc., contained therein, from or after the date of delivery of possession of the Unit to the undersigned, except as to those items (if any) expressly excepted above and your obligation regarding any such excepted items shall cease upon the completion of the repair, adjustment or correction of same. Nothing contained herein shall be construed to excuse Sponsor from its obligations to correct defects in construction or design to the extent required in the section entitled "Rights and Obligations of Sponsor" contained in the Offering Plan for Condominium Ownership of the 135 West 52nd Street Condominium. The undersigned shall be required to complete the payment of the Purchase Price (without the provision for an escrow) and accept title to the Unit on the closing date notwithstanding the presence of any exceptions.
Very truly yours,

_____
Purchaser's Signature

Agreed To:
135 West 52nd Street Owner
LLC

_____
Purchaser's Signature

By:_____

X-23

## PURCHASE AGREEMENT

AGREEMENT made as of February 26, 2016 between 135 WEST 52ND STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, New York, New York 10018 ("Sponsor"), and Julie Yeh residing at Apartment 47A, Tower 3, 23 Tai Hang Drive, Hong Kong, China ("Purchaser").

Purchaser's Attorney:  Sherry L. Chu, Esq.

Address:  Chu Law Firm, PLLC

39-07 Prince Street, Suite 5D

Flushing, New York 11354

Telephone: (718) 939 7600    Fax:   (718) 939 4954    Email:

Percentage of Common Interest: 0.6100% Common Charges: $1,316.81 per month

Residential Percentage of Common Interest: 0.7993%

Selling Agent: Douglas Elliman (The De Niro Team)

Co-Broker: Citi Habitats (Joe Liu)

Real Estate Taxes: $1,843.29 per month;    B.I.D. Tax: $16.87 per month;

Sponsor agrees to sell and convey, and Purchaser agrees to purchase, Unit No. 31B ("Unit") in the building ("Building") known as 135 WEST 52ND STREET Condominium ("Condominium") and located at 135 WEST 52ND STREET, New York, New York 10019, together with a 0.6100% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein. The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

**1.  Purchase Price**

(a) The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 12 and 13 below ("Purchase Price") is $3,096,000.00, payable as follows:

(i) $464,250.00 ("Downpayment") on the signing of this Agreement by check subject to collection, the receipt of which is hereby acknowledged, to be held in escrow pursuant to paragraph 5; and

(ii) $2,630,750.00, constituting the balance of the Purchase Price ("Balance"), by certified check of Purchaser or official bank check (except as otherwise provided in this Agreement) on the delivery of the deed as hereinafter provided.

(b) All checks in payment of the Purchase Price shall represent United States currency and be drawn on or issued by a bank or trust company authorized to accept deposits in New York State. All checks in payment of the Downpayment shall be payable to the order of Escrow Agent (as hereinafter defined). All checks in payment of the Balance of the Purchase Price shall be payable to the order of Sponsor (or as Sponsor otherwise directs). Sponsor reserves the right to require Purchaser to pay the Balance or any portion thereof in "immediately available funds" (i.e. by wire transfer to a bank account designated by Sponsor).

(c) All checks shall be unendorsed, made payable to the direct order of "Rosen Livingston & Cholst LLP, as Escrow Agent" or (as to the Balance) to "135 West 52nd Street Owner LLC" or

1

such payees as Sponsor may direct on not less than two (2) business days' prior oral or written notice to Purchaser. All checks shall be drawn on a bank that is a member of the New York Clearing House Association. All checks must be payable directly to the order of the required payee; they may not be endorsed.

(d) Purchaser's payment of the Balance and acceptance of a deed to the Unit shall constitute Purchaser's recognition that Sponsor has satisfactorily performed those obligations stated in the Plan and this Agreement to be performed by Sponsor prior to closing and, unless otherwise set forth herein, none of the provisions of this Agreement shall survive the closing. However, nothing contained herein shall excuse Sponsor from performing those obligations (if any) expressly stated herein or in the Plan to be performed subsequent to the closing, and nothing herein shall be in derogation of the rights of Purchaser under Article 23-A of the General Business Law, the Plan or the applicable Regulations issued by the Department of Law.

(e) Purchaser is not required to pay the Balance or accept title to the Unit unless all of the prerequisites set forth under 'Terms of Sale - Prerequisites to Closing of Title' in Part I of the Plan are met concurrently with, or prior to, closing.

**2.  Definitions** The following terms shall have the meanings ascribed to them:

(a) "Building" shall mean the building located at 135 West 52nd Street, New York, New York 10019.

(b) "Closing Date", "closing", "closing of title" and words of similar import are used synonymously and mean the settlement of the mutual obligations of Sponsor and Purchaser under this Purchase Agreement, including the payment to Sponsor of the Purchase Price and the delivery to Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.

(c) "Condominium" shall mean The 135 West 52nd Street Condominium.

(d) "Declaration" shall mean the Declaration of the 135 West 52nd Street Condominium establishing Condominium ownership of the Property, as same may be amended from time to time.

(e) "Depositary" shall mean Signature Bank, 300 Park Avenue, New York, New York 10022.

(f) "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.

(g) "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.

(h) "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.

All other terms not defined elsewhere herein shall have the meanings ascribed to them in the Plan.

**3.  Plan**

(a) Purchaser represents that Purchaser has possessed the Plan and any first amendments thereto at least three (3) business days prior to submitting this Purchase Agreement; or

(b) In the event Purchaser does not wish to wait three (3) business days) Purchaser has the right to rescind this Purchase Agreement by sending written notice of the rescission to the Selling Agent by certified or registered mail, return receipt requested (and post-marked), or by personal delivery to the Selling Agent, within seven (7) days of submission of this Agreement (time being of the essence to exercise such right of rescission within such seven (7) day period).

2

Selling Agent, Managing Agent, or any principal thereof, or have any beneficial interest in any of the foregoing.

(b) The Escrow Agent has established the escrow account on the escrow account at Signature Bank, located at 300 Park Avenue, New York, New York ("Bank"), a bank authorized to do business in the State of New York. The escrow account is entitled "[Purchaser's Name] Rosen Livingston & Cholst LLP Escrow Agent" ("Escrow Account"). The Escrow Account is federally insured by the FDIC at the maximum amount of $250,000 per deposit. Any deposit in excess of $250,000 will not be insured.

All Deposits received by Purchaser shall be in the form of checks, money orders, wire transfers, or other instruments, and shall be made payable to or endorsed by the Purchaser to the order of Rosen Livingston & Cholst LLP as Escrow Agent.

Any Deposits made for upgrades, extras, or custom work shall be initially deposited into the Escrow Account, and released in accordance to the terms of a written agreement between Purchaser and Sponsor.

The interest rate for all Deposits made into the Escrow Account shall be the prevailing rate for each accounts, which is currently 0.2%. Interest shall begin to accrue upon placing the Deposit into the Escrow Account. All interest earned thereon shall be paid to or credited to the Purchaser at closing. No fees of any kind may be deducted from the Escrow Account, and the Sponsor shall bear all costs associated with the maintenance of the Escrow Account. The Escrow Agreement appended hereto as Exhibit "A."

The Down Payment will not earn interest until the Purchaser's check has been deposited and cleared. Sponsor will be liable to Purchaser only for the amount of interest actually received from the Depository (which interest may be reduced by the Depository's service charge). The interest on the Down Payment, as same may be reduced by the Depository's service charge, is hereinafter referred to as "Interest".

Upon the payment and performance by Purchaser of all of Purchaser's obligations hereunder and the transfer to Purchaser of title to the Unit, Sponsor will instruct the Depository to pay to Purchaser any and all interest on monies deposited hereunder. It is possible that Purchaser may not receive interest on the Down Payment for the entire month in which the closing is scheduled to occur. The Sponsor and Selling Agent will not be liable to Purchaser for the amount of such Interest or the payment thereof, except for any amount received from the Depository. All funds due to Sponsor and received under this Purchase Agreement will be handled in accordance with Sections 352-e(2)(b) and 352-h of the New York General Business Law and with Section 71-a(3) of the New York Lien Law.

**6.  Closing of Title**

(a) The closing of title shall occur on the date and at the time and place in the City and State of New York as Sponsor shall designate to Purchaser on not less than thirty (30) days' prior written notice (unless waived by Purchaser). Sponsor shall have the right, from time to time, to adjourn such date and time for closing on written notice to Purchaser. If the Closing is adjourned by Sponsor, then Sponsor shall fix a new date and time for closing and shall give Purchaser not less than ten (10) days' prior written notice of the new scheduled date and time for closing.

4

(c) Purchaser hereby adopts, accepts and approves the Plan (including, without limitation, the Condominium Documents set forth in Part II of the Plan and Parts A and B of the Exhibits submitted with the Plan to the Department of Law) and agrees to abide and be bound by the terms and conditions thereof, as well as all amendments to the Plan duly filed by Sponsor (including, without limitation, amendments involving any changes, modifications, or updating of the projected Common Charges, the projected real estate taxes to be paid by Purchaser, or Schedule B "Budget for the First Year of Condominium Operation"). Except in the case of a material adverse amendment affecting Purchaser's Unit or as otherwise provided under the Plan, any such amendments shall neither excuse Purchaser from performing Purchaser's obligations hereunder nor entitle Purchaser to any offset or credit against the Purchase Price or claim or right of action against Sponsor, and any such amendment may be filed by Sponsor without Purchaser's consent or approval. However, Sponsor shall not have the right to unilaterally cancel this Agreement except as herein provided (such as in the case of an uncured default by Purchaser) nor change the Purchase Price or payment terms contained in this Agreement, unless Purchaser consents thereto in writing.

(d) The Plan is hereby incorporated in this Agreement with the same force and effect as if set forth at length. In the event of any inconsistency or conflict between the provisions of this Agreement and those contained in the Plan, the provisions of the Plan shall govern and be binding. Purchaser acknowledges having had full opportunity to examine all documents and investigate all statements made herein and in the Plan.

**4.  Personal Property**

(a) At closing, the Unit will contain only those appliances, countertops, cabinets, flooring, sinks, vanities (if any), air conditioning units (if any), hardware and other fixtures and equipment installed therein as set forth in the Plan.

Sponsor has the right to substitute other appliances, countertops, cabinets, sinks, vanities, flooring and fixtures in place of those referred to in the Plan provided only that the substitutions are of equal or better quality and design.

(b) The Unit is being sold unfurnished, without window blinds or shades. Furniture, floor coverings, wall coverings, furnishings, decorations and the like in or about any model Unit are for display purposes only and are not included in this sale except to the extent set forth in the Plan. Any floor plans or sketches shown to Purchaser (including those contained in the Plan) are only approximations of the Unit's dimensions and arrangement and Purchaser acknowledges and agrees that is is not relying thereon. Sponsor shall not be liable for minor variations from any floor plans or structures.

(c) Sales model apartments may, at Sponsor's option, be sold furnished at a later date but will initially be withheld from sale.

(d) There will be no modifications or extras unless agreed to in writing by the parties. All modifications and alterations must be approved by Sponsor in writing and, if approved, shall be performed by Sponsor at Purchaser's expense (payable in the manner to be set forth in an addendum to this Agreement or by separate agreement between Sponsor and Purchaser).

**5.  Purchase Monies to be Held in Trust**

(a) The law firm of Rosen Livingston & Cholst LLP, with an address at 275 Madison Avenue, New York, NY 10016, telephone number 212 687 7770, shall serve as escrow agent ("Escrow Agent") for Sponsor and Purchaser. Escrow Agent has designated the following attorneys to serve as signatories: Morton H Rosen, Peter I. Livingston, Mary L. Koenard, Bruce A. Cholst. All designated signatories are selected to practice law in the State of New York. Neither the Escrow Agent nor any authorized signatories on the account are the Sponsor,

3

(a) If Purchaser elects to obtain fee title insurance, Purchaser will pay a premium to the title company for such insurance, which premium may vary depending upon the title insurance company and the amount of insurance requested. A lower combined rate may be available if fee and mortgage insurance are ordered simultaneously.

(b) Purchaser will pay a fee for recording the Unit Deed and Unit Owner's Power of Attorney;

(c) If Purchaser obtains a mortgage loan, Purchaser will pay:
(i)  a fee and service charge for recording the mortgage;
(ii) a mortgage recording tax in the following amount  (a) for Residential Units, 2.05% of the face amount of a mortgage less than $500,000 for which mortgagor receives a $30 deduction, or 2.175% for a mortgage covering a Residential Unit equal to $500,000.00 or more, less $25 and (b) for non-residential Units, 2.05% of the face amount of a mortgage less than $500,000 or 2.80% for a mortgage covering a non-residential Unit equal to $500,000 or more;
(iii) If mortgage title insurance is required by Purchaser's lender, an additional premium for insuring the mortgagee's interest in an amount equal to the principal amount under the mortgage loan.

(iv) If required by Purchaser's lender, deposits for Common Charges, real estate taxes and assessments in an initial amount and in such monthly sums after closing as required by the lender (the amount of which monthly deposits may be changed periodically by the lender). The amount to be initially deposited at closing and the amount of the monthly sums thereafter payable cannot now be determined and will depend upon the policies of the lender, the number of months remaining between the closing of title and the date upon which the taxes and other charges or impositions next due are to be paid and the lender's estimate of the amount of the taxes and other charges or impositions then payable; and

(v) all other closing costs and expenses required to be paid to, or on behalf of, such lender (which costs and expenses may include the fees of such lender's counsel), in amounts to be determined by the lender.  Sponsor makes no representation or warranty as to the nature or amounts of the closing costs and/or the expenses to be paid in connection with such financing, and it is recommended that Purchaser consult with a representative of his lender with respect thereto;

(vi) If, in connection with the purchase, Purchaser has dealt with any broker except (A) the Selling Agent or (B) any other broker who has been engaged in writing by Sponsor, then Purchaser will be required to pay a commission to such broker unless Sponsor agrees otherwise in writing;

(vii) Purchaser Sponsor will pay to Rosen Livingston & Cholst LLP, Sponsor's counsel, a fee of $2,000.00 for services rendered in connection with preparing the Unit Deed, Unit Owner's Power of Attorney, additional closing documents and for coordinating and attending the closing;

(viii)  If Purchaser obtains financing and its lender refuses to close at the office of Rosen Livingston & Cholst LLP, then the closing will be held at the office of Purchaser's lender or such lender's counsel on condition that the closing is held in the City of New York and Purchaser pays Rosen Livingston & Cholst LLP, in addition to said closing fee (i) the amount of Rosen Livingston & Cholst LLP, from the closing held at some other office of Purchaser's lender or such lender's counsel on condition that the closing is held in another borough. If the closing attended by a representative of Rosen Livingston & Cholst LLP is approved through no fault of Sponsor, then Purchaser shall pay Rosen Livingston & Cholst LLP an additional travel and attendance fee in the same amount as stated above for each attendance;

(vii)   If Purchaser is other than a natural person, Purchaser will be required to provide a personal guaranty of Common Charges and other charges due to the Condominium and Purchaser will pay Rosen Livingston & Cholst LLP a fee of $500.00 for preparation of the Guaranty;

9

(ix) If Sponsor arranges a partial assignment of mortgage from its construction lender so that Purchaser can avoid paying mortgage tax, Purchaser shall pay Rosen Livingston & Cholst LLP a fee of $1,000.00 for the preparation of the splitter, substitute mortgage and assignment of mortgage documents; and

(d) Purchaser Sponsor will pay the New York State Real Estate Transfer Tax (documentary stamps) to be affixed to the deed and the New York City Real Property Transfer Tax. Purchaser will pay the one (1%) percent "mansion tax";

(e) Purchaser will pay to 135 West 52nd Street Condominium an amount equal to two (2) months' Common Charges for the Unit by Purchaser's good personal certified check or official cashier's or bank check as a contribution to the Working Capital Fund.

All of the aforementioned costs, fees and charges are cumulative.

The payments described above shall be payable at or prior to the Closing by Purchaser's unendorsed, personal certified check or official cashier's or bank check drawn on a member bank of the New York Clearing House Association made payable directly to the appropriate party, or if so directed by the Sponsor, by wire transfer.

14. Power of Attorney to Condominium Board, Sponsor, Retail Unit Owner and Commercial Unit Owners

At closing, Purchaser shall execute, acknowledge and deliver to the representative of the title insurance company insuring Purchaser's title to the Unit (or, if no representative is present, then to Sponsor's attorney), for recording in the New York City Register's Office a Power of Attorney in favor of the Condominium Board relative to purchasing or leasing of Residential Units and in favor of Sponsor, the Retail Unit Owner and the Commercial Unit Owners relative to amending the Condominium Documents to the extent permitted in the Power of Attorney.  An originally recorded Power of Attorney shall be sent to the Condominium Board.

15. Events of Default
(a) The following shall constitute "Events of Default" hereunder:
(i) Purchaser's failure to pay the Balance on the Closing Date designated by Sponsor pursuant to paragraph 6 herein or to timely pay the applicable Rosen Livingston & Cholst LLP closing fee or any applicable travel and attendance fee or any other closing costs, adjustments or expenses payable to Sponsor or Rosen Livingston & Cholst LLP pursuant to paragraphs 12 and 13 above; or
(ii) the dishonor or failure of collection of Purchaser's Down Payment check; or
(iii) Purchaser's failure to pay, perform, or observe any of his other obligations hereunder.
(b) Upon the occurrence of an Event of Default, Sponsor shall be entitled, in its sole and absolute discretion, to cancel this Purchase Agreement by giving Purchaser written notice of cancellation.  If Sponsor elects to cancel, Purchaser shall have thirty (30) days from the giving of notice of cancellation to cure the specified default. TIME IS OF THE ESSENCE TO CURE SUCH DEFAULT WITHIN SAID THIRTY (30) DAY PERIOD.  If the default is not cured within such thirty (30) day period, then this Agreement shall be deemed cancelled and Sponsor shall have the right to retain, as and for liquidated damages, the Downpayment.  Any sums in excess thereof, together with any interest thereon shall be returned to Purchaser after cancellation.

Notwithstanding the foregoing, if Purchaser's check in payment of the Down Payment is dishonored or fails of collection, Sponsor, at its option, may elect, by written notice to Purchaser, to cancel this Purchase Agreement and to (i) not allow Purchaser any grace period in which to provide good funds for Purchaser's Down Payment, in which event Sponsor shall be deemed to have waived its right to sue Purchaser on the dishonored or uncollected check; or (ii) allow Purchaser thirty (30) days in which to make good Purchaser's Down Payment and if

10

Purchaser fails to do so within such thirty (30) day period, to sue Purchaser on the dishonored or uncollected check.  In the latter case, Purchaser will also be liable to reimburse Sponsor for all litigation costs and other costs of collection.

Upon cancellation of this Agreement and disposing of the Down Payment and interest thereon in accordance with the foregoing, Purchaser and Sponsor will be released and discharged of all further liability and obligations hereunder and under the Plan.  Thereafter, the Unit may be sold to another as though this Agreement had never been made, and without accounting to Purchaser for the proceeds of such sale.

16. Risk of Loss; Casualty
(a) Purchaser shall not be entitled to possession of the Unit nor to store any of Purchaser's furniture or belongings therein until the deed is delivered to Purchaser at closing.
(b) All risk of loss prior to closing has been assumed by Sponsor, but without any obligation or liability of Sponsor to repair the damage or restore the Unit to its contents.  If Sponsor or the Unit Owners elect to repair or replace the loss or damage, this Agreement shall continue in full force and effect, Purchaser shall not have the right to reject title to the Unit or to receive a credit against, or abatement in, the Purchase Price, and Sponsor shall be entitled to a reasonable period of time to complete or to permit the Condominium Board to complete such repairs or replacements.  Purchaser shall not be required to pay the Balance unless and until (i) the Unit has been substantially repaired as near as is reasonably possible to its condition immediately prior to the casualty; (ii) its essential services (such as gas, electricity, and heat) and a reasonable means of ingress and egress to the street have been restored; and (iii) any condition in the Unit for which a violation (if any) is noted or issued has been corrected (even if same is not yet removed of record), other than those that are the obligations of Purchaser to cure or that are caused by the act or omission of Purchaser, its licensees, invitees and/or workers.  (Sponsor will endeavor in good faith, and with reasonable diligence, to remove or cause to be removed subsequent to closing at violation if required, other than is obligated to correct).  Any proceeds received from insurance, or in satisfaction of any claim or action in connection with such loss, shall belong entirely to Sponsor (subject to the rights, if any, of the Condominium Board or of other Unit Owners).  If such proceeds are paid to Purchaser, Purchaser shall promptly turn them over to Sponsor upon request.  The provisions of the two preceding sentences shall survive the closing.
(c) In the event that Sponsor notifies Purchaser that it does not elect to repair or restore the Unit or if the Unit Owners do not resolve to make such repairs or restoration in accordance with the Condominium's By-Laws, this Agreement shall be deemed cancelled and no further force or effect, and Sponsor shall instruct the Depository to return to Purchaser all sums deposited hereunder, together with interest, if any, thereon, whereupon the parties shall be released and discharged from all obligations and liability hereunder and under the Plan, except that, if this Agreement has been previously cancelled due to Purchaser's uncured default, Sponsor shall retain the Liquidated Sum as provided therein.

17. Inspection of Unit
At least ten (10) days before the Balance is to be paid, Sponsor or the Selling Agent shall notify Purchaser that the Unit is ready for inspection.  Upon receipt of the notice, Purchaser shall promptly arrange an appointment with the Sponsor or the Selling Agent to inspect the Unit before the lapse of such ten (10) day period.  Purchaser or his duly authorized agent shall attend such inspection and shall complete, date and sign the Inspection Report (in the form set forth as Exhibit D to this Agreement) and deliver same to the Sponsor or Selling Agent at the conclusion of the inspection.  Failure of Purchaser either to arrange such appointment or to inspect the Unit within ten (10) days of receipt of said notice or to so sign and deliver the

11

completed Inspection Report shall not excuse Purchaser from paying the Balance when due (without provision for escrow) and shall constitute Purchaser's full acceptance of the Unit.  However, nothing herein shall relieve Sponsor of its obligations as set forth in the section of the Plan entitled "Rights and Obligations of the Sponsor".

Except as otherwise set forth in the Declaration and By-Laws, Purchaser acknowledges that (i) the Unsold Residential Units, the Commercial Units and the Retail Unit may be used for any lawful purpose and (ii) the Condominium Board, and the Residential Unit Owners do not have any right to approve the use or any changes in the use of the Unsold Residential Units, the Commercial Units and the Retail Unit or any part thereof.  This paragraph shall survive the closing of title.

18. No Representations
Purchaser acknowledges that Purchaser has not relied upon any architect's plans, sales plans, furnishings and fixtures contained in model units, selling brochures, advertisements, representations, warranties, statements or estimates of any nature whatsoever, whether written or oral, made by Sponsor, Selling Agent or others, including, but not limited to, any relating to the description or physical condition of the Property, the Building or the Unit, or the size or the dimensions of the Unit or the rooms or closets therein contained or any other physical characteristics thereof, the services to be provided to Unit Owners or the projected Common Charges and projected real estate taxes for the Unit, the right to any income tax deduction for any real estate taxes or mortgage interest paid by Purchaser, or any other information relative to his purchase of the Unit, except as may be specifically represented herein or in the Plan (Purchaser having relied on Purchaser's own examination and investigation thereof).  No person has been authorized to make any representations on behalf of Sponsor.  No oral representations or statements shall be considered a part of this Agreement.  Purchaser agrees (a) to purchase the Unit, without offset or any claim against, or liability of, Sponsor, whether or not any sprout or dimension of the Unit or any part thereof, or of the Common Elements, as shown on the floor plans, is accurate or correct, provided the layouts and dimensions conform substantially to such floor plans and (b) that Purchaser shall not be relieved of any of Purchaser's obligations hereunder by reason of any minor inaccuracy or error.  The provisions of this paragraph shall survive the closing of title.

19. Negotiable Terms
Sponsor reserves the right, in its sole and absolute discretion, to negotiate on an individual basis with each purchaser substantially more beneficial purchase terms than those offered or given to other purchasers.  As a result, Purchaser may not benefit from a more favorable purchase term given to another purchaser and will not have the right to rescind this Purchase Agreement or recover the Down Payment or any other amount for not being given such benefit.  The following is a list of only some of the purchase terms which may be negotiated: purchase price; the amount of the Down Payment; the right of a purchaser to cancel the Purchase Agreement and recover the Down Payment for failure to obtain financing or to close by a specific date; the closing date and minimum notice required to schedule the closing; upgraded appliances, fixtures or equipment or other alterations, improvements or additions to be performed by and at the expense of Sponsor; excusing a purchaser from closing and certain penalties for closing late; longer time periods to pay or perform obligations under the Purchase Agreement; elimination of "time of the essence" provisions; price or common charge rebates; assumption of payment of, or guarantee of, common charges for a given period; Sponsor financing (provided an amendment to the Plan containing the terms thereof is duly filed); allowances or credits against the purchase price for decorations; to install appliances or fixtures

12

138

H. All Deposits, except for advances made for upgrades, extras, or custom work received in connection with the Purchase Agreement, are and shall continue to be the Purchaser's money, and may not be comingled with any other money or pledged or hypothecated by Sponsor, as per GBL § 352-h.

I. Under no circumstances shall Sponsor seek or accept release of the Deposit of a defaulting Purchaser until after consummation of the Plan, as evidenced by the acceptance of a post-closing amendment by the New York State Department of Law. Consummation of the Plan does not relieve the Sponsor of its obligations pursuant to GBL §§ 352-e(2-b) and 352-h.

J. The Escrow Agent shall release the Deposit if so directed:

(a) pursuant to terms and conditions set forth in the Purchase Agreement in Paragraph 5 upon closing of title to the Unit; or

(b) in a subsequent writing signed by both Sponsor and Purchaser; or

(c) by a final, non-appealable order or judgment of a court.

If the Escrow Agent is not directed to release the Deposit pursuant to paragraphs (a) through (c) above, and the Escrow Agent receives a request by either party to release the Deposit, then the Escrow Agent must give both the Purchaser and Sponsor prior written notice of not fewer than thirty (30) days before releasing the Deposit. If the Escrow Agent has not received notice of objection to the release of the Deposit prior to the expiration of the thirty (30) day period, the Deposit shall be released and the Escrow Agent shall provide further written notice to both parties informing them of said release. If the Escrow Agent receives a written notice from either party objecting to the release of the Deposit within said thirty (30) day period, the Escrow Agent shall continue to hold the Deposit until otherwise directed pursuant to paragraphs (a) through (c) above. Notwithstanding the foregoing, the Escrow Agent shall have the right at any time to deposit the Deposit contained in the Escrow Account with the clerk of the county where the Unit is located and shall give written notice to both parties of such deposit.

The Sponsor shall not object to the release of the Deposit to:

(a) a Purchaser who timely rescinds in accordance with an offer of rescission contained in the Plan or an Amendment to the Plan; or

(b) all Purchasers after an Amendment abandoning the Plan is accepted for filing by the Department of Law.

The Department of Law may perform random reviews and audits of any records involving the Escrow Account to determine compliance with all applicable statutes and regulations.

K. Any provision of the Purchase Agreement/Escrow Agreement or separate agreement, whether oral or in writing, by which a Purchaser purports to waive or indemnify any obligation of the Escrow Agent's holding any Deposit in trust is absolutely void. The provisions of the Attorney General's regulations and GBL §§ 352-e(2-b) and 352-h concerning escrow trust funds shall prevail over any conflicting or inconsistent provisions in the Purchase Agreement, Plan, or any amendment thereto.

17

L. Escrow Agent shall maintain the Escrow Account under its direct supervision and control.

M. A fiduciary relationship shall exist between Escrow Agent and Purchaser, and Escrow Agent acknowledges its fiduciary and statutory obligations pursuant to GBL §§ 352-e(2-b) and 352(h).

N. Escrow Agent may rely upon any paper or document which may be submitted to it in connection with its duties under this Purchase Agreement and which is believed by Escrow Agent to be genuine and to have been signed or presented by the proper party or parties and shall have no liability or responsibility with respect to the form, execution, or validity thereof.

O. Sponsor agrees that it shall not interfere with Escrow Agent's performance of its fiduciary duties and statutory obligations as set forth in GBL §§ 352-e(2-b) and 352-(h) and the New York State Department of Law's regulations.

P. Sponsor shall obtain or cause the selling agent under the Plan to obtain a completed and signed Form W-9 or W-8, as applicable, from Purchaser and deliver such form to Escrow Agent together with the Deposit and this Purchase Agreement. Q. Prior to release of the Deposit, Escrow Agent's fees and disbursements shall neither be paid by Sponsor from the Deposit nor deducted from the Deposit by any financial institution under any circumstances.

R. Sponsor agrees to defend, indemnify, and hold Escrow Agent harmless from and against all costs, claims, expenses and damages incurred in connection with or arising out of Escrow Agent's responsibilities arising in connection with this Purchase Agreement or the performance or non-performance of Escrow Agent's duties under this Purchase Agreement, except with respect to actions or omissions taken or suffered by Escrow Agent in bad faith or in willful disregard of the obligations set forth in this Purchase Agreement or involving gross negligence of Escrow Agent. This indemnity includes, without limitation, disbursements and attorneys' fees either paid to retain attorneys or representing the hourly billing rates with respect to legal services rendered by Escrow Agent to itself.

38. Counterpart Signature Pages

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument. This Agreement may be executed by facsimile or .pdf and such shall be deemed originals.

[Signature page follows]

18

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:
135 WEST 52ND STREET OWNER
LLC

PURCHASER:

By: _____
Meyer Chetrit, Principal

_____
Purchaser

By: _____
David Bistricer, Principal

_____
Co-Purchaser

(Purchase)
Date Accepted: _____

(*Please initial on line and print or
type name under line.)

Purchaser acknowledges:          Initials: _HS_
Receipt of Offering Plan and     Purchaser: Julies Yith
Amendments of _____ (A.M.)(P.M.)
on _____, 2015; and

Delivery of Purchase             Initials:
Agreement and Check for          Co-Purchaser:
Down Payment at _____ (A.M.)(P.M.)
on _____ 2015

KM

19

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SPONSOR:
135 WEST 52ND STREET OWNER
LLC

PURCHASER:

By: _____
Meyer Chetrit, Principal

_____
Purchaser

By: _____
David Bistricer, Principal

_____
Co-Purchaser

(Purchase)
Date Accepted: _____

(*Please initial on line and print or
type name under line.)

Purchaser acknowledges:          Initials: _HS_
Receipt of Offering Plan and     Purchaser: Julies Yith
Amendments of _____ (A.M.)(P.M.)
on _____, 2015; and

Delivery of Purchase             Initials:
Agreement and Check for          Co-Purchaser:
Down Payment at _____ (A.M.)(P.M.)
on _____ 2015

KM

19

| Item | Exceptions (if any) | Purchaser's Initials |
|---|---|---|
| (m) | Bathroom sinks: | |
| (n) | Water closet: | |
| (o) | Bathtubs: | |
| (p) | Bathroom tile: | |
| (q) | Hardware: | |
| | (doorbell, doorknob, faucets, locks, etc.) | |
| (r) | Intercom: | |
| **2.** | **General Operating Condition:** | |
| (a) | All Doors: | |
| (b) | All Windows: | |
| (c) | All Plumbing: | |
| (d) | All Hardware: | |
| (e) | Other: | |

The undersigned will sign and deliver to you a separate statement signifying my (our) satisfaction with each item excepted above (if any), immediately upon the completion of the repair, adjustment or correction of same. The undersigned understands and agrees that you shall not be obligated to make any repairs, adjustments or corrections to the Unit or any portion thereof or its fixtures, appliances, equipment, etc., contained therein, from or after the date of delivery of possession of the Unit to the undersigned, except as to those items (if any) expressly excepted above and your obligation regarding any such excepted items shall cease upon the completion of the repair, adjustment or correction of same. Nothing contained herein shall be construed to excuse Sponsor from its obligations to correct defects in construction or design to the extent required in the section entitled "Rights and Obligations of Sponsor" contained in the Offering Plan for Condominium Ownership of the 135 West 52nd Street Condominium. The undersigned shall be required to complete the payment of the Purchase Price (without the provision for an escrow) and accept title to the Unit on the closing date notwithstanding the presence of any exceptions.

Very truly yours,

_____
Purchaser's Signature

Agreed To:
135 West 52nd Street Owner
LLC

_____
Purchaser's Signature

By:_____

23