# **Exhibit 30**

Case 1:15-cv-05345-AJN-KHP   Document 143-17   Filed 05/12/16   Page 2 of 83

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TRIADOU SPV S.A.,

         Plaintiff,

   -against-

CF 135 FLAT LLC, CF 135 WEST MEMBER LLC,
and THE CHETRIT GROUP LLC,

         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Index no. 653462/2014

 

 

# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR A RECEIVER

 

 

KRAVIT PARTNERS, LLC

79 Madison Avenue

New York, NY 10016

(212) 252-0550

*Attorneys for Plaintiff Triadou SPV S.A.*

Plaintiff Triadou SPV S.A. ("Triadou") respectfully submits this memorandum of law in support of its motion pursuant to CPLR § 5228(a) for a receiver to be appointed over defendant judgment debtors CF 135 Flat LLC and CF 135 West Member LLC and the limited liability company ("LLC") membership interests in 135 West 52nd Street Holder LLC, an LLC owned by CF 135 West Member LLC (collectively, the "135 LLCs").

## PRELIMINARY STATEMENT

Triadou has obtained and is the judgment creditor with respect to two judgments in the aggregate amount of $10.5 million against the Defendants (the "Judgments"), and will shortly obtain additional judgments for another $10.5 million against the Defendants, together with pre-judgment and post-judgment interest at 9%.  On March 16, 2016, this Court ended the Defendants' groundless efforts to stay enforcement of the Judgments.  The only assets of the 135 LLCs appear to be their LLC membership interests in LLCs that own a valuable new condominium project located at 135 West 52nd Street in Manhattan (the "Flatotel Condominium").  The only conceivable pathway for the 135 LLCs to obtain funds to satisfy Triadou's Judgments is for a receiver to cause the 135 LLCs to monetize their interest in the Flatotel Condominium through the LLC interests they own and control.  As such, Triadou requests that a receiver knowledgeable about complex real estate development projects be appointed by the Court over the 135 LLCs to administer and collect all distributions, profits and any other funds to which the 135 LLCs are entitled so as to satisfy the Judgments.

## PROCEDURAL AND FACTUAL BACKGROUND

135 Flat and Triadou are parties to an agreement dated August 4, 2014 whereby Triadou assigned to 135 Flat Triadou's interest in 135 West Member (the "Assignment").  Pursuant to an agreement dated August 4, 2014, Defendants 135 Flat and 135 West Member, together with The

2

Chetrit Group, LLC (collectively, the "Guarantors"), agreed to guaranty the obligations of 135 Flat under the Assignment (the "Guaranty"). Affirmation of Craig B. Kravit, dated April 8, 2016 ("Kravit Aff.") ¶ 2.

As part of the consideration to Triadou for the Assignment, 135 Flat agreed to pay Triadou $21 million in four installments of $5,250,000 each between November 2, 2014 and June 30, 2015 (the "Installment Obligations") and the Guarantors agreed to guaranty such payments. As this Court is aware, and Defendants have openly acknowledged, 135 Flat failed to make any of Installment Obligations and was and is in default under the Assignment. The Guarantors similarly failed to make any of Installment Obligations upon 135 Flat's default and were also in default under the Guaranty. Each of the defaulted Installment Obligations carry 9% default interest from the date of default. *Id.* ¶ 3.

As a result, Triadou has been forced to commence four (4) actions in New York Supreme Court against 135 Flat, 135 West Member and The Chetrit Group (the "Judgment Debtors") bearing index numbers 653462/2014, 650239/2015, 154681/2015 and 156907/2015 to collect on the four (4) defaulted Installment Obligations. Judgments have been issued in the actions bearing index numbers 653462/2014 and 650239/2015 in the amounts of $5,250,000 each, together with interest of 9% from the dates of default. Triadou has filed motions for summary judgment in lieu of complaint in the actions bearing index numbers 154681/2015 and 156907/2015. (The two issued Judgments and any other judgments that are issued in Triadou's favor in the future are hereinafter referred to as the "135 Judgments"). Kravit Aff. ¶ 5.

On July 7, 2015, Defendants moved by order to show cause for a stay of proceedings on the purported ground that Defendants were at risk of potential double liability to Triadou and non-party City of Almaty, Kazakhstan ("Almaty"). For that reason, and in anticipation that a

3

stay would be granted, Defendants commenced an interpleader action on July 7, 2015 in the Supreme Court of the State of New York, New York County, naming Triadou and Almaty as defendants.  *Id.* ¶ 6.

On July 9, 2015, Almaty filed a notice of removal of Defendants' interpleader action to the United State District Court for the Southern District of New York.  The removed interpleader action is entitled *CF 135 Flat LLC, CF 135 West Member LLC, and The Chetrit Group LLC v. Triadou SPV S.A. and City of Almaty, a foreign city*, 15-cv-5345 (AJN) (hereafter, the "Federal Interpleader Action"). *Id.* ¶ 7.

On July 13, 2015, this Court issued an order temporarily staying proceedings in this action pending the Court's disposition of Defendants' order to show cause.  On February 2, 2016, Justice Mills issued a decision and order ((NYSCEF Doc. No. 95) determining, inter alia, that "a possibility of inconsistent judgments exists . . .[since] the court in the interpleader action may determine that [the $21 million] should be paid to Almaty," and granting Defendants' motion for a stay of proceedings on the condition that Defendants deposit the sum of $21 million with the Court within 20 days of service of the order with notice of entry." *Id.* ¶ 8.  Consistent with their pattern of disrespect for this Court's orders, Defendants sought from the Federal court in the interpleader action a stay of the proceedings in this Court and specifically Judge Mills February 2, 2016 order.  That stay was summarily denied by the Federal court (Nathan, J.) on February 22, 2016.  (A copy of Judge Nathan's February 22, 2016 decision and order is annexed as Exhibit E to the Kravit Aff.)

On February 16, 2016, Triadou served Defendants with a copy of the February 2 Order with notice of entry.  On March 8, 2015, this Court issued an Order extending the deposit deadline by 48 hours to March 10, 2016.  The Court held as follows:

4

Upon the foregoing papers, it is ordered that the Court declines to sign the Order to Show Cause as the movant has failed to present to the Court sufficient proof of irreparable injury and that it would likely be successful on the merits.  Movant has not provided sufficient proof that the alleged deal would fall through, that it lacks the funds to pay the amount ordered by Judge Mills or that equities favor movant. In this matter (and related matters) Judge Mills stayed all proceedings for the movant to deposit the $21 million into Court.  The Order was based upon representations of movant that it would do so.  *Now, without any sufficient evidence to the contrary and despite admitting that it owes the money, but just not sure who to pay, movant seeks to extend the time for such payment despite its own earlier representations to the contrary.  Without further explanation and [illegible] it seeks to backtrack on its earlier representations, the Court declines to sign the OSC with restraints at this time.* [Illegible].  (Italics added for emphasis).

Kravit Aff. ¶ 9.

Undeterred, Defendants moved again by order to show cause on March 10, 2016 requesting another 60 days to deposit the $21 million they admit is due and owing to Triadou. The Court rejected Defendants' application and issued the following order dated March 16, 2016 and entered on March 22, 2016 (NYSCEF Doc. No. 133):

Upon the foregoing papers, it is ordered that [Defendants' motion to stay proceedings] is denied for the reasons stated upon the record.  There is no good cause basis to extend the time to post the $21 million [illegible] which Justice Mills ordered paid into court in consideration for obtaining the stay of entry and enforcement of judgments in this matter.  All stays are vacated.   This decision closes all motions extending the deadline including 156907/2015, 154681/2015 or 650239/2015. (Italics added for emphasis).

Kravit Aff. ¶ 10.  (The transcript of the March 16, 2016 hearing before this Court is annexed as Exhibit A to the Kravit Aff.)

On March 18, 2016, Judge Nathan in the Federal Interpleader Action dismissed Defendants' interpleader claim entirely, holding that the Defendants' were not subject to potential double liability to both Triadou and Almaty because the $21 million claimed by Triadou is not the same claim Almaty has to an interest in the Flatotel Condominium project:

"Triadou seeks from Plaintiffs the $21 million purchase price of its assignment, while Almaty

5

could only seek to set aside the assignment and recover its interest in the real estate holding company. Because Plaintiffs here do not face "multiple claims to the same fund, interpleader is not appropriate in this case." *CF 135 Flat LLC v. Triadou SPV S.A.*, No. 15-cv- 5345 (AJN), 2016 WL 1109092, at *5 (S.D.N.Y. Mar. 18, 2016). As Judge Nathan's decision revealed, the Defendants' interpleader complaint was nothing more than a misguided stalling tactic. Kravit Aff. ¶ 11.

Significantly, Defendants have continued the interpleader action even though it has settled with Almaty and faces no exposure to Almaty at all. According to its own acknowledgement and submission to Judge Nathan in the Federal Interpleader Action, Almaty and the Defendants entered into a settlement agreement with one another (the "Settlement Agreement"). While Defendants have refused to produce the Settlement Agreement to Triadou (which will be the subject of a separate application to the Court), Defendants apparently conveyed to Almaty an interest in the Flatotel Condominium project. What that means is that Almaty and Defendants are now on the same side fighting Triadou's enforcement of the Judgments because every dollar paid to Triadou is less money from the project that Defendants and Almaty will receive. *Id.* ¶ 12.

Thus, it came as no surprise that Almaty has now become the Defendants' stalking horse in trying to block Triadou's enforcement efforts. Incredibly, Almaty has recently made yet another application to Judge Nathan, this time for an injunction restraining Triadou from enforcing the Judgments in this action. While we believe that Judge Nathan will not enjoin these state court proceedings under any circumstances, particularly in light of her dim view of the Defendants' interpleader gambit and this Court's March 8 and March 16, 2016 orders, the Defendants' latest tactic of using it new partner, Almaty, as a stalking horse in a further attempt

6

to impede Triadou's enforcement of the Judgments strongly suggests a contumacious attitude towards this Court's March 16, 2016 order vacating, once and for, all stays on Triadou's enforcement efforts. *Id.* ¶ 13.

**The Need For a Receiver**

There is no question at this point that Defendants will never willingly pay Triadou the amounts Defendants concede they owe to Triadou.  As a consequence, Triadou must proceed with the most appropriate enforcement methods available.  For the following reasons, the most appropriate enforcement method here is the appointment of a receiver over the 135 LLCs and the valuable LLC membership interests owned by the 135 LLCs, which LLCs indirectly own the valuable Flatotel Condominium.

It is clear that enforcement methods other than a receiver will likely be fruitless.  The Defendants have represented to this Court that they have no funds to pay Triadou or to pay the promised interpleader funds into Court because the Flatotel Condominium it still selling its multi-million dollar units and the construction lender, Deutsche Bank, was still owed a substantial amount on the construction loan.  *See* Affidavit of Joseph Chetrit, sworn to on March 10, 2016 ("Chetrit Aff.") (NYSCEF Doc. No. 109), ¶ 12 ("Defendants do not have any money now. Neither CF 135 Flat LLC nor CF 135 has a bank account or any liquid assets. The Chetrit Group's most recent available bank statements, from August 2015 through January 2016, demonstrate that The Chetrit Group had a negative account balance for most of that period.")  Thus, there are apparently no bank accounts in the name of the Defendants with funds to levy upon.  Kravit Aff. ¶ 15.

However, Mr. Chetrit also swore in his affidavit that the Deutsche Bank loan would soon be paid off and the Flatotel Condominium would be shortly generating tens of millions of

7

dollars, including enough to pay the $21 million owed to Triadou.  Chetrit Aff.  ¶¶ 8-11.  Mr. Chetrit continues to thumb his nose at Triadou, however, and it is extremely unlikely he will authorize the LLCs owned by the Defendants to distribute cash through the chain of control to the Defendants while Triadou's Judgments are outstanding.  Mr. Chetrit, through the LLCs owned by Defendant Judgment Debtors, controls the actions of the Defendants and those LLCs, a fact of which he assured Triadou when Triadou invested in the Flatotel Condominium project.  Kravit Aff. ¶ 6.  *See* Exhibit B annexed to the Kravit Aff. hereto which include assurance letters appended to the 135 Flat Operating Agreement.  .

Leaving the Defendants and their interest in the LLCs in Mr. Chetrit's hands virtually assures that Defendants will never receive the funds to which they are entitled under the relevant operating agreements because there is no one to oppose Mr. Chetrit's wishes as to how funds are distributed through the chain of LLCs to Defendants.  As a consequence, the appointment of a receiver to pursue the Defendants' right to distributions from the Flatotel Condominium project is the best way — and possibly the only way — for the Defendants to obtain funds to satisfy Triadou's Judgments.

Specifically, a receiver must be appointed over the 135 LLCs and their membership interests in 135 West 52nd Street Holder LLC.  Since, according to the original agreement between Defendant 135 Flat and Triadou, "[t]he operating agreements for the Fee Owner [i.e., 135 West 52nd Street Owner LLC which owns the Flatotel Condominium] and Mezz [i.e., 135 West 52nd Street Mezz LLC which owns all of the membership interests in the Fee Owner] shall provide that all actions on the part of the Fee Owner and Mezz shall require the consent of [Defendant CF 135 West Member LLC]," control by a receiver of Defendant 135 West Member would control the underlying assets (Kravit Aff., Ex. B ¶ 4.)  In addition, the operating

8

agreement for Defendant 135 West Member (Kravit Aff., Ex C) provides that it controls the management of 135 West 52nd Street Holder LLC. The operating agreement of 135 West 52nd Street Holder LLC (Kravit Aff., Ex. D hereto), in turn, provides that 135 West Member is the managing member of 135 West 52nd Street Holder LLC and is empowered and has the duty to cause the Fee Owner and Mezz to operate and manage the Flatotel Condominium project, subject to approval of certain decisions by the 25% owner of 135 West 52nd Street Holder LLC, Clipper 135 West LLC. (Kravit Aff., Ex. D, Section 6.1.) Thus, if a receiver is appointed over Defendant 135 West Member and its membership interest in 135 West 52nd Street Holder LLC, that receiver will have the power to exercise control over the Fee Owner, Mezz, and the development of the Flatotel Condominium project which is essential to the effective marshalling of assets for the satisfaction of Triadou's Judgments.

## ARGUMENT

CPLR § 5228(a) provides: "Upon motion of a judgment creditor ... the court may appoint a receiver who may be authorized to administer, collect, improve, lease, repair or sell any real or personal property in which the judgment debtor has an interest or to do any other acts designed to satisfy the judgment." The appointment of a receiver is a matter within this Court's discretion. *Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303, 317 (2010). In deciding whether the appointment of receiver is justified, the Courts should consider the "(1) alternative remedies available to the creditor ...; (2) the degree to which receivership will increase the likelihood of satisfaction ...; and (3) the risk of fraud or insolvency if a receiver is not appointed." *Id.* (*quoting* (*United States v. Zitron*, 80-cv-6535 (RLC), 1990 WL 13278, at *1 (S.D.N.Y., Feb. 2, 1990)). "A receivership has been held especially appropriate when the property interest involved is intangible, lacks a ready market, and presents nothing that a sheriff can work with at an auction,

such as the interest of a psychiatrist/judgment debtor in a professional corporation of which he is a member." Siegel, N.Y. Prac. § 512, at 872 (4th ed). *See Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303 at 317.

An appointment of a receiver over the 135 LLCs and their membership interests is especially appropriate because the Defendants themselves have represented to the Court that they have no assets beyond their membership interests in companies owning the valuable Flatotel Condominium. As a consequence, Triadou has no "alternative remedies" because it cannot levy upon any of the Defendants' bank accounts because they admittedly have no funds. *See, e.g,, Coscia v. Eljamal*, 48 Misc.3d 361, 366 (Sup. Ct. West. Cty. 2015) (appointment of a receiver over the defendant's LLC membership interest is appropriate based on the defendant's admission that he had insufficient assets to satisfy the judgment).

Moreover, the Defendants are likely to actively frustrate Triadou's recovery by refusing to cause the lower level LLCs to distribute funds up to Defendants, their parent companies. Indeed, Defendants have gone to great lengths to frustrate Triadou efforts to collect the funds Defendants concede they owe to Triadou. Defendants have opposed each and every one of Triadou's motions for summary judgment in lieu of complaints; they have filed a misguided interpleader action; received numerous stays based on their misrepresentations the Court that they would pay the $21 million into court; and they are continuing their scheme to thwart Triadou's enforcement of the Judgments by using Almaty as a stalking horse to make another motion to enjoin Triadou's collection efforts. *See Am. Honda Fin. Corp. v. Route 57 Dev., LLC*, No. 7:13-cv-0260(GTS)(ATB), 2016 WL 843377, at *16 (N.D.N.Y., Mar. 1, 2016) (appointing a receiver based upon, among other things, the defendant ignoring the judgment and the probability that the defendant would continue to frustrate the collection efforts). Therefore,

10

simply obtaining a "charging interest" in the distribution and profits allocated to Defendants (*see, e.g.*, *Am. Honda Fin. Corp. v. Route 57 Dev., LLC*, 2016 WL 843377, at *14-15) — which Defendants will never allow — is not an adequate alternative remedy.

Most importantly, the appointment of a receiver over the 135 LLCs and their membership interests in 135 West 52nd Street Holder LLC is particularly appropriate because the 135 LLCs and their membership interests in the underlying LLCs are not marketable without the control of a manager.  Thus, "turning over the [LLC membership interests] over to the sheriff would not be helpful in trying to satisfy the judgment."  *See Hotel 71 Mezz Lender LLC v. Falor*, 14 N.Y.3d 303 at 318; *see also Coscia v. Eljamal*, 48 Misc.3d at 366 (lack of marketability of membership interest in an LLC justifies the appointment of a receiver).  Because the 135 LLCs membership interests lack marketability, a receiver is necessary to obtain value for the 135 LLCs membership interests by exercising the powers and rights the LLC membership interests represent, *i.e.*, in this case the ability to become the managing member of the lower level LLCs.  Kravit Aff. ¶ 18.

## CONCLUSION

For all of the foregoing reason, Triadou respectfully request that the Court grant Triadou's application for a receiver pursuant to CPLR § 5228(a) over the Defendants CF 135 Flat LLC, CF 135 West Member LLC, and CF 135 West Member LLC's membership interest in 135 West 52nd Street Holder LLC and to act as the managing member 135 West 52nd Street Holder LLC to exercise the rights as managing member to collect all distributions, profits and

11

any other funds to which Defendants CF 135 Flat LLC and CF 135 West Member LLC are

entitled so as to satisfy the Judgments.

Dated: April 8, 2016

                       KRAVIT PARTNERS, LLC


                       By: /s/ Philip M. Smith
                           Craig B. Kravit
                           Philip M. Smith

                       79 Madison Avenue
                       New York, NY 10016
                       (212) 252-0550

                       Email: cbk@kravit.com
                                 psmith@kravit.com

                       *Attorneys for Plaintiff Triadou SPV S.A.*

12

At I.A.S. Part \_\_\_, of the Supreme Court of the State of New York, held in and for the County of New York, at 111 Centre Street, New York, New York, on the \_\_\_\_ day of April, 2016

P R E S E N T:  DAVID B. COHEN, J.S.C.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TRIADOU SPV S.A.,

                         Plaintiff,

    -against-

CF 135 FLAT LLC, CF 135 WEST MEMBER LLC, and THE CHETRIT GROUP LLC,

                      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Index no. 653462/2014

**ORDER TO SHOW CAUSE**

Upon the affirmation of Craig B. Kravit, Esq., dated April 8, 2016, and the exhibits annexed thereto, and the accompanying memorandum of law, and sufficient cause appearing therefore, it is hereby

**ORDERED**, that Defendants CF 135 Flat LLC and CF 135 West Member LLC show cause at I.A.S. Part 58 of the Supreme Court of the State of New York, for the County of New York, at the Courthouse located at 111 Centre Street, New York, NY, on the \_\_\_ day of April, 2016 at 9:30 in the forenoon of that day, or as soon thereafter as counsel can be heard, why an order should not be entered, pursuant to CPLR § 5228(a) for a receiver to be appointed over defendant judgment debtors CF 135 Flat LLC and CF 135 West Member LLC and CF 135 West Member LLC's limited liability company ("LLC") membership interests in 135 West 52nd Street Holder LLC, and such other and further relief as may to the Court seem just and proper.

2538

ORDERED, that any opposition to the relief sought herein shall be served on Triadou's attorneys, Kravit Partners, LLC and Peyrot & Associates, P.C., via electronic filing (NYSCEF) on or before the ___ day of April, 2016.

ORDERED, that any reply papers in further support of the relief sought herein shall by served upon Defendants' attorneys, Sukenik, Segal & Graff, P.C. via electronic filing (NYSCEF) on or before the ___ day of April, 2016.

Sufficient cause appearing therefor, let service of a copy of this order, the affirmation in support and accompanying memorandum of law upon the attorneys for the Defendants, Sukenik, Segal & Graff, P.C. on or before the ___ day of April, 2016 be good and sufficient.

ENTER:

_____, J.S.C.

2538

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

TRIADOU SPV S.A.,

                              Plaintiff,

           -against-

CF 135 FLAT LLC, CF 135 WEST MEMBER LLC,
and THE CHETRIT GROUP LLC,

                              Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

INDEX # 653462/2014

**AFFIRMATION IN**
**SUPPORT OF MOTION**
**FOR RECEIVER**

Craig B. Kravit, an attorney admitted to practice in the courts of the State of New York, affirms the following under penalty of perjury:

1.       I am the managing member of Kravit Partners LLC, attorneys for plaintiff Triadou SPV S.A. ("Triadou"), together with Peyrot & Associates P.C. ("Peyrot"). I make this affirmation in support of Triadou's motion pursuant to CPLR § 5228(a) for a receiver to be appointed over defendant judgment debtors CF 135 Flat LLC ("135 Flat") and CF 135 West Member LLC ("135 West Member") and the limited liability company ("LLC") membership interests in 135 West 52nd Street Holder LLC, an LLC owned by CF 135 West Member LLC (collectively with 135 Flat and 135 West member, the "135 LLCs"). As set forth more fully in this affirmation and in the accompanying memorandum of law, Triadou has obtained and is the judgment creditor with respect to two judgments in the aggregate amount of $10.5 million against the Defendants (the "Judgments"), and will shortly obtain additional judgments for another $10.5 million against the Defendants, together with pre-judgment and post-judgment interest at 9%.

1

2.     On March 16, 2016, this Court ended the Defendants' groundless efforts to stay enforcement of the Judgments.  The only assets of the 135 LLCs appear to be their LLC membership interests in LLCs that own a valuable new condominium project located at 135 West 52nd Street in Manhattan (the "Flatotel Condominium").  The only conceivable pathway for the 135 LLCs to obtain funds to satisfy Triadou's Judgments is for a receiver to cause the 135 LLCs to monetize their interest in the Flatotel Condominium through the LLC interests they own and control.  As such, Triadou requests that a receiver knowledgeable about complex real estate development projects be appointed by the Court over the 135 LLCs to administer and collect all distributions, profits and any other funds to which the 135 LLCs are entitled so as to satisfy the Judgments.

## BACKGROUND AND PROCEDUAL HISTORY

3.     135 Flat and Triadou are parties to an agreement dated August 4, 2014 whereby Triadou assigned to 135 Flat Triadou's interest in 135 West Member (the "Assignment").  Pursuant to an agreement dated August 4, 2014, Defendants 135 Flat and 135 West Member, together with The Chetrit Group, LLC (collectively, the "Guarantors"), agreed to guaranty the obligations of 135 Flat under the Assignment (the "Guaranty").

4.     As part of the consideration to Triadou for the Assignment, 135 Flat agreed to pay Triadou $21 million in four installments of $5,250,000 each between November 2, 2014 and June 30, 2015 (the "Installment Obligations") and the Guarantors agreed to guaranty such payments.  As this Court is aware, and Defendants have openly acknowledged, 135 Flat failed to make any of Installment Obligations and was and is in default under the Assignment.  The Guarantors similarly failed to make any of Installment Obligations upon 135 Flat's default and

2

were also in default under the Guaranty.  Each of the defaulted Installment Obligations carry 9% default interest from the date of default.

5.      As a result, Triadou has been forced to commence four (4) actions in New York Supreme Court against 135 Flat, 135 West Member and The Chetrit Group (the "Judgment Debtors") bearing index numbers 653462/2014, 650239/2015, 154681/2015 and 156907/2015 to collect on the four (4) defaulted Installment Obligations.  Judgments have been issued in the actions bearing index numbers 653462/2014 and 650239/2015 in the amounts of $5,250,000 each, together with interest of 9% from the dates of default.  Triadou has filed motions for summary judgment in lieu of complaint in the actions bearing index numbers 154681/2015 and 156907/2015.  (The two issued Judgments and any other judgments that are issued in Triadou's favor in the future are hereinafter referred to as the "135 Judgments")

6.      On July 7, 2015, Defendants moved by order to show cause for a stay of proceedings on the purported ground that Defendants were at risk of potential double liability to Triadou and non-party City of Almaty, Kazakhstan ("Almaty").  For that reason, and in anticipation that a stay would be granted, Defendants commenced an interpleader action on July 7, 2015 in the Supreme Court of the State of New York, New York County, naming Triadou and Almaty as defendants.

7.      On July 9, 2015, Almaty filed a notice of removal of Defendants' interpleader action to the United State District Court for the Southern District of New York.  The removed interpleader action is entitled *CF 135 Flat LLC, CF 135 West Member LLC, and The Chetrit Group LLC v.  Triadou SPV S.A. and  City of Almaty, a foreign city,* 15-cv-5345 (AJN) (hereafter, the "Federal Interpleader Action")

3

8.      On July 13, 2015, this Court issued an order temporarily staying proceedings in this action pending the Court's disposition of Defendants' order to show cause.  On February 2, 2016, Justice Mills issued a decision and order ((NYSCEF Doc. No. 95) determining, *inter alia,* that "a possibility of inconsistent judgments exists . . .[since] the court in the interpleader action may determine that [the $21 million] should be paid to Almaty," and granting Defendants' motion for a stay of proceedings on the condition that Defendants deposit the sum of $21 million with the Court within 20 days of service of the order with notice of entry."  Consistent with their pattern of disrespect for this Court's orders, Defendants sought from the Federal court in the interpleader action a stay of the proceedings in this Court and specifically Judge Mills February 2, 2016 order.  That stay was summarily denied by the Federal court (Nathan, J.) on February 22, 2016.  (A copy of Judge Nathan's February 22, 2016 decision and order is annexed hereto as Exhibit E.)

9.      On February 16, 2016, Triadou served Defendants with a copy of the February 2 Order with notice of entry.  On March 8, 2015, this Court issued an Order extending the deposit deadline by 48 hours to March 10, 2016.  The Court held as follows:

> Upon the foregoing papers, it is ordered that the Court declines to sign the Order to Show Cause as the movant has failed to present to the Court sufficient proof of irreparable injury and that it would likely be successful on the merits.  Movant has not provided sufficient proof that the alleged deal would fall through, that it lacks the funds to pay the amount ordered by Judge Mills or that equities favor movant. In this matter (and related matters) Judge Mills stayed all proceedings for the movant to deposit the $21 million into Court. *The Order was based upon representations of movant that it would do so.  Now, without any sufficient evidence to the contrary and despite admitting that it owes the money, but just not sure who to pay, movant seeks to extend the time for such payment despite its own earlier representations to the contrary.  Without further explanation and [illegible] it seeks to backtrack on its earlier representations, the Court declines to sign the OSC with restraints at this time.* [Illegible].  (Italics added for emphasis).

4

10.     Undeterred, Defendants moved again by order to show cause on March 10, 2016 requesting another *60 days* to deposit the $21 million they admit is due and owing to Triadou. The Court rejected Defendants' application and issued the following order dated March 16, 2016 and entered on March 22, 2016 (NYSCEF Doc. No. 133):

> Upon the foregoing papers, it is ordered that [Defendants' motion to stay proceedings] is denied for the reasons stated upon the record.  There is no good cause basis to extend the time to post the $21 million [illegible] which Justice Mills ordered paid into court in consideration for obtaining the stay of entry and enforcement of judgments in this matter.  *All stays are vacated.   This decision closes all motions extending the deadline including 156907/2015, 154681/2015 or 650239/2015.* (Italics added for emphasis).

The transcript of the March 16, 2016 hearing before this Court is annexed as Exhibit A hereto.

11.     On March 18, 2016, Judge Nathan in the Federal Interpleader Action dismissed Defendants' interpleader claim entirely, holding that the Defendants' were not subject to potential double liability to both Triadou and Almaty because the $21 million claimed by Triadou is not the same claim Almaty has to an interest in the Flatotel Condominium project: "Triadou seeks from Plaintiffs the $21 million purchase price of its assignment, while Almaty could only seek to set aside the assignment and recover its interest in the real estate holding company. Because Plaintiffs here do not face multiple claims to the same fund, interpleader is not appropriate in this case." *CF 135 Flat LLC v. Triadou SPV S.A.*, No. 15-cv- 5345 (AJN), 2016 WL 1109092, at *5 (S.D.N.Y. Mar. 18, 2016)(citation omitted).  As Judge Nathan's decision revealed, the Defendants' interpleader complaint was nothing more than a misguided stalling tactic.

12.     Significantly, Defendants have continued the interpleader action even though it has settled with Almaty and faces no exposure to Almaty at all.  According to its own acknowledgement and submission to Judge Nathan in the Federal Interpleader Action, Almaty

5

and the Defendants entered into a settlement agreement with one another (the "Settlement Agreement"). While Defendants have refused to produce the Settlement Agreement to Triadou (which will be the subject of a separate application to the Court), Defendants apparently conveyed to Almaty an interest in the Flatotel Condominium project. What that means is that Almaty and Defendants are now on the same side fighting Triadou's enforcement of the Judgments because every dollar paid to Triadou is less money from the project that Defendants and Almaty will receive.

13.     Thus, it came as no surprise that Almaty has now become the Defendants' stalking horse in trying to block Triadou's enforcement efforts. Incredibly, Almaty has recently made an yet another application to Judge Nathan, this time for an injunction restraining Triadou from enforcing the Judgments *in this action*. While we believe that Judge Nathan will not enjoin these state court proceedings under any circumstances, particularly in light of her dim view of the Defendants' interpleader gambit and this Court's March 8 and March 16, 2016 orders, the Defendants' latest tactic of using it new partner, Almaty, as a stalking horse in a further attempt to impede Triadou's enforcement of the Judgments strongly suggests a contumacious attitude towards this Court's March 16, 2016 order vacating, once and for, all stays on Triadou's enforcement efforts.

## **NEED FOR A RECEIVER**

14.     There is no question at this point that Defendants will never willingly pay Triadou the amounts Defendants concede they owe to Triadou. As a consequence, Triadou must proceed with the most appropriate enforcement methods available. For the following reasons, the most appropriate enforcement method here is the appointment of a receiver over the 135 LLCs and the

6

valuable LLC membership interests owned by the 135 LLCs, through which LLCs indirectly own the valuable Flatotel Condominium.

15.     It is clear that enforcement methods other than a receiver will likely be fruitless. The Defendants have represented to this Court that they have no funds to pay Triadou or to pay the promised interpleader funds into Court because the Flatotel Condominium is still selling its multi-million dollar units and the construction lender, Deutsche Bank, was still owed a substantial amount on the construction loan.  *See* Affidavit of Joseph Chetrit, sworn to on March 10, 2016 ("Chetrit Aff.") (NYSCEF Doc. No. 109), ¶ 12 ("Defendants do not have any money now. Neither CF 135 Flat LLC nor CF 135 has a bank account or any liquid assets. The Chetrit Group's most recent available bank statements, from August 2015 through January 2016, demonstrate that The Chetrit Group had a negative account balance for most of that period.")[1] Thus, there are apparently no bank accounts in the name of the Defendants with funds to levy upon.

16.     However, Mr. Chetrit also swore in his affidavit that the Deutsche Bank loan would soon be paid off and the Flatotel Condominium would be shortly generating tens of millions of dollars, including enough to pay the $21 million owed to Triadou. *Id.* ¶¶ 8-11.  Mr. Chetrit continues to thumb his nose at Triadou, however, and it is extremely unlikely he will authorize the LLCs owned by the Defendants to distribute cash through the chain of control to the Defendants while Triadou's Judgments are outstanding.  Mr. Chetrit, through the LLCs owned by Defendant Judgment Debtors, controls the actions of the Defendants and those LLCs,

---

[1] Mr. Chetrit is a well-known New York real estate developer who has bought and sold a multitude of signature properties, including but certainly not limited to, the Sears Tower in Chicago and the Sony Building in New York, and was reported to keep $100 million in his personal checking account.  See http://nymag.com/daily/intelligencer/2011/07/apparently_keeping_100000000_i.html#

7

a fact of which he assured Triadou when Triadou invested in the Flatotel Condominium project. *See* Exhibit B annexed hereto which include assurance letters appended to the 135 Flat Operating Agreement.

17.     Leaving the Defendants and their interest in the LLCs in Mr. Chetrit's hands virtually assures that Defendants will never receive the funds to which they are entitled under the relevant operating agreements because there is no one to oppose Mr. Chetrit's wishes as to how funds are distributed through the chain of LLCs to Defendants.  As a consequence, the appointment of a receiver to pursue the Defendants' right to distributions from the Flatotel Condominium project is the best way — and possibly the only way — for the Defendants to obtain funds to satisfy Triadou's Judgments.

18.     Specifically, a receiver must be appointed over the 135 LLCs and their membership interest in 135 West 52nd Street Holder LLC.  Since, according to the original agreement between Defendant 135 Flat and Triadou, "[t]he operating agreements for the Fee Owner [*i.e.*, 135 West 52nd Street Owner LLC which owns the Flatotel Condominium] and Mezz [*i.e.*, 135 West 52nd Street Mezz LLC which owns all of the membership interests in the Fee Owner] shall provide that all actions on the part of the Fee Owner and Mezz shall require the consent of [Defendant CF 135 West Member LLC]," control by a receiver of Defendant 135 West Member would control the underlying assets (Exhibit B hereto, ¶ 4.)  In addition, the operating agreement for Defendant 135 West Member (Exhibit C hereto) provides that it controls the management of 135 West 52nd Street Holder LLC.  The operating agreement of 135 West 52nd Street Holder LLC (Exhibit D hereto), in turn, provides that 135 West Member is the managing member of 135 West 52nd Street Holder LLC and is empowered and has the duty to cause the Fee Owner and Mezz to operate and manage the Flatotel Condominium project, subject

8

to approval of certain decisions by the 25% owner of 135 West 52nd Street Holder LLC, Clipper

135 West LLC. (Ex. D, Section 6.1.).  Thus, if a receiver is appointed over Defendant 135 West

Member and its membership interest in 135 West 52nd Street Holder LLC, that receiver will have

the power to exercise control over the Fee Owner, Mezz, and the development of the Flatotel

Condominium project which is essential to the effective marshalling of assets for the satisfaction

of Triadou's 135 Judgments.

      19.     No prior application has been made for the relief requested herein.

      WHEREFORE, for all of the foregoing reasons and those in the accompanying

memorandum of law, it is respectfully requested that the Court grant Triadou's application for a

receiver pursuant to CPLR § 5228(a) over the Defendants 135 Flat, 135 West Member, and 135

West Member's membership interest in 135 West 52nd Street Holder LLC and to act as the

managing member 135 West 52nd Street Holder LLC to exercise the rights as managing member

to collect all distributions, profits and any other funds to which Defendants 135 Flat and 135

West Member are entitled so as to satisfy Triadou's 135 Judgments.

Dated:  April 8, 2016

                                  _____

                                     Craig B. Kravit

9

EXHIBIT A

1

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:    CIVIL TERM PART 4
- - - - - - - - - - - - - - - - - - - - - - X

TRIADOU SPV S.A.,

                        Plaintiff,
                                          INDEX NUMBERS:
          - against -                       653462/2014
                                            650239/2015
CF 135 FLAT LLC, CF 135 WEST MEMBER LLC,    154681/2015
and THE CHETRIT GROUP LLC,                  154907/2015

                        Defendant.

- - - - - - - - - - - - - - - - - - - - - - X
                        111 Centre Street
                        New York, New York
                        March 16, 2016

BEFORE:

          HONORABLE DAVID B. COHEN, Justice.

APPEARANCES:

    PEYROT & ASSOCIATES, ATTORNEYS AT LAW
    Attorney for the Plaintiff
    62 William Street, 9th Floor
    New York, New York  10005
    BY:   DAVID VAN LEEUWEN, ESQ.
          NATASA COLOVIC, ESQ.


    SUKENIK, SEGAL & GRAFF, P.C.
    Attorney for the Defendants
    450 Seventh Avenue, 42nd Floor
    New York, New York 10123
    BY:   DAVID C. SEGAL, ESQ.
          DAVID SALHANICK, ESQ.


                        Margaret Baumann
                    Official Court Reporter

2

1                          Proceedings

2              THE COURT:  On the record, this is Triadou SPV S.A.

3     versus CF 135, et al.

4              Counsel, we have your appearances.

5              Your motion, counsel.  Do you wish to -- I know we

6     tried to work on this yesterday off the record, came back

7     today to see if we could resolve it and/or take argument if

8     we could not.

9              We don't have a resolution, is that correct?

10             MR. SEGAL:  No, we have one stumbling block.  Maybe

11    off the record we could ask the Court's assistance on that

12    if possible?

13             THE COURT:  Let's go off the record.

14             (A discussion was then held off the record.)

15             THE COURT:  Let's go on the record.

16             MR. SEGAL:  Your Honor, I would ask that --

17             THE COURT:  Make your motion, Mr. Segal.

18             MR. SEGAL:  Our motion is to modify Judge Mills'

19    stay by providing that rather than it be a 60-day stay, it

20    would be 120-day stay, and that there would be, conditioned

21    upon us putting up now $2.1 million with the Court with

22    another $18.9 million within 120 days, and that would be

23    secured by a confession of judgment of Joseph Chetrit, who

24    is a principal of one of the Defendants, which would be held

25    by me, my firm, in escrow and delivered to Plaintiff's

26    counsel if upon ten days' notice that there was a default in

3

1                           Proceedings

2          the putting up of that balance of the money, unless, of

3          course that was cured.

4                    We would also ask that it would be conditioned

5          upon -- there are four pending actions, two of which have

6          been reduced to judgment, two have not.  We would agree that

7          Plaintiff can enter judgment on the remaining two actions

8          that he brought.

9                    And, the reason that we ask this is because of the

10         risk of the damage that we would face in case there would be

11         an attachment by Plaintiff of the interests of the

12         Defendants in the entity that has submitted a condo plan to

13         the Attorney General.  I am advised by the attorney who is

14         representing the condo, the fee owner, that it may be

15         necessary or if there was such an attachment to notify the

16         Attorney General, and the Attorney General may require an

17         amendment to the plan which could cause either a delay or

18         cessation in the sales of the property.

19                   We have submitted to your Honor copies of contracts

20         which have been executed and signed and which should close

21         within 60 days that would not result in a full $21 million

22         being available for my client because the first 60 or 70

23         million dollars of the proceeds have to be paid to Deutsche

24         Bank to pay off their mortgage, then the balance is

25         distributed, 25 percent to a different partner, who is not

26         involved in this litigation, 75 percent to my client, to the

4

Proceedings

2   Defendants.  That 75 percent, based upon the contracts that

3   are in effect today, would result in the payment of the bank

4   in full and approximately 14 or 15 million dollars left over

5   to go in to reduce the 21.  The difference of 7 or 8 million

6   dollars would be supplied as we said by, either my client

7   borrowing on the remaining unencumbered apartments or buying

8   some of the apartments to do that.

9         It is correct that originally with Judge Mills we

10   had asked for the stay on the basis of $21 million being put

11   up by a certain time.  However, that was based on my

12   client's understanding of when the closings of these

13   apartments would occur and cash flow being paid to him.  He

14   has told me that he has approximately or he and his group

15   have approximately 60 to 80 million dollars invested in this

16   project, and to invest an additional 21 is not possible now

17   because he needs it for other ventures that he is involved

18   in.

19         He personally is not a defendant in this action,

20   and there is no judgments against him.

21         The Defendants in this action are entities who I am

22   told have no assets other than their interest in the

23   project, and that is two of the entities, that is, CF 135

24   Flat and CF 135 West Member, who have interest either

25   directly or beneficially in the fee owner of the property.

26         THE COURT:  And both have no money?

mb

5

Proceedings

MR. SEGAL: Those have no money, no. They are entities that were formed to hold that interest. They have no money.

Their money is the investment of 60 or 80 million in the project. So they have assets being the interest in the property, but they have no cash.

The Chetrit Group is also not an entity that has liquid assets. In fact, it doesn't have assets. It is used as a conduit to pay certain bills and all of that has been submitted to you in the papers with copies of bank accounts' statements.

THE COURT: But there are some assets in the operating account that you indicated.

MR. SEGAL: No, the operating account is not of the CF entities. No, they don't have bank accounts.

THE COURT: Of the Chetrit Group.

MR. SEGAL: The Chetrit Group have some, but I don't think they are substantive.

I mean it is a lot of money as far as an an average person is concerned.

THE COURT: But not with respect to $21 million.

MR. SEGAL: That's correct.

What we have offered in this is a confession of a judgment of an individual who Plaintiff I believe concedes has sufficient funds to ultimately pay that $21 million and

1                          Proceedings

2      that is what we ask this Court to do.

3              Thank you.   Your Honor.

4              MR. VAN LEEUWEN:   Judge, as we indicated in our

5      papers, counsel comes from the Federal Court Southern

6      District of New York making exactly the same motion, taking

7      exception with the condition that they had offered not

8      recently, but more than eight months ago that they would pay

9      this money in the court as a condition of the stay.   There

10     is nothing unanticipated that has happened.   They have been

11     denied in Federal Court.

12             They come across the street or come next door, and

13     they come in here asking for exactly the same relief which

14     should be precluded by collateral estoppel.   They have come

15     forward with no case law or legal basis whatsoever for a

16     stay other than, We don't have the money.   We'd like some

17     more time.

18             THE COURT:   It is not uncommon for statutory

19     provisions to permit stay applications to be made in

20     multiple places depending on the circumstance such as where

21     there is an appeal pending.   That is not unprecedented.

22             I don't know if seeking a stay of this action in

23     the Federal Court precludes me from granting a stay here.   I

24     don't believe it does.   I think have the discretion probably

25     under 2221 to stay my own action.

26             MR. VAN LEEUWEN:   In the interest of justice that

1              Proceedings

2    may be, your Honor.  At least you should draw a negative

3    inference or at least draw some persuasion from a very well

4    respected judge in Southern District.

5              THE COURT:  Let's get to what is going on here.

6              MR. VAN LEEUWEN:  The Defendants are attempting to

7    create this small universe that has something to do with

8    this particular project and limiting it to this particular

9    project.

10             However, this is not something that should be

11   limited.  There are entities, Chetrit Group has, as you have

12   seen in our papers, made proposals, Hey, we will put up $225

13   million dollars for a stay in New York project.  We are

14   financially viable.

15             This whole application is laughable.  It is almost

16   as if Bill Gates came in here and said, You know what,

17   Judge, I don't have any money.  I need some more time.

18   These are the kinds of people we are talking about.

19             This man's word means literally nothing.  No

20   objection to counsel, but he said he'd do things and he

21   doesn't do it.  Even in the context of these applications

22   his first start, Hey, we want 60 days.  We will have money

23   in 60 days.

24             Now all of a sudden it's 120.

25             THE COURT:  You are telling me they indicate that

26   the Chetrit Group has agreed to post significant amounts of

1                        Proceedings

2    money on other cases in other areas?

3              MR. VAN LEEUWEN:  Well, there is a proposal they

4    submitted, this is back in 2014, but while the case was

5    pending, and it is an exhibit in the papers.  Exhibit --

6              THE COURT:  Okay.

7              MR. VAN LEEUWEN:  -- C, I believe, in there, and I

8    quoted it in my affirmation as well that, I'll read it to

9    you, and, it says here on I believe the second page:

10             "The Chetrit Group is extremely well capitalized

11   and can quickly close on this transaction.  Alternatively,

12   we are willing to offer $226 million to SUNY and improved

13   vanilla..."

14             This whole fiction they don't have any money and

15   are not operating a comprehensive real estate portfolio is

16   ludicrous.  They sold Willis Tower for $1.3 billion dollars.

17   There is money in this entity, and they haven't even

18   bothered to say, Oh, we submitted one bank account from one

19   entity.  They didn't even say that is the only account we

20   have.  They have not said, We haven't been able to get

21   loans.  They haven't said anything.

22             My client has been reasonable in trying to resolve

23   this motion today.  We have come down from our position

24   10.25, down to 8 down to 5.25, and they can't come up with

25   more money.

26             It is not my ability to convince my client any

9

1                             Proceedings

2      further.  I cannot have my client bargain against themselves

3      any further, and their motion has no basis, and it should be

4      denied.

5              MR. SEGAL:  May I just ask a question?

6              THE COURT:  Ask a question.

7              MR. SEGAL:  Where were you quoting as to the 20, 28

8      million dollars?

9              THE COURT:  It is in that Exhibit C.

10             MR. SEGAL:  That is not from The Chetrit Group.

11             THE COURT:  It does not, but it does reference the

12     Chetrit Group.

13             MR. SEGAL:  But, it is not The Chetrit Group.  The

14     Chetrit Group does not have assets, your Honor.  Each one of

15     these entities.

16             THE COURT:  Obviously, this is somebody named Meyer

17     Chetrit --

18             MR. SEGAL:  That's one of the brothers.

19             THE COURT:  -- signed a letter saying that that, "

20     The Chetrit Group is extremely well capitalized and can

21     quickly close on this transaction."

22             MR. SEGAL:  Well, The Chetrit Group --

23             THE COURT:  And that was at a full market price of

24     $251 million.

25             MR. SEGAL:  Nothing is in the name of The Chetrit

26     Group.

10

1                              Proceedings

2              The Chetrit Group is an entity that manages a

3       business, but all of the assets --

4              THE COURT:  That's what you say, but that's not

5       what the letter says, and I think counsel pointed out that

6       your client, although providing a bank account, didn't say

7       this was their exclusive bank account.  There were no other

8       bank accounts.

9              MR. SEGAL:  My client told me -- I could represent

10      that my client told me that this is the only bank account.

11             THE COURT:  This is my ruling on the motion:

12             A while back, a motion came before Judge Mills.

13      The motion was to seek a stay of enforcement of the

14      Plaintiff's two judgments and a stay of entry or the

15      granting of judgments on the other two matters.  Those

16      motions were granted by Judge Mills with the contingency.

17      The stay was granted, and there was no duration of the stay.

18      It will presumably be indefinite until the Federal matter

19      got resolved.

20             However, Judge Mills ordered that $21 million be

21      paid into court by the Defendants, and as Mr. Segal

22      acknowledged that was at the Defendants' suggestion that, if

23      required, that that is what the Defendants were willing and

24      presumably able to do.

25             The 20 days passed.  More than a week has passed

26      since then.  I had a motion that I previously denied without

                                   mb

Proceedings

prejudice, and the $21 million is nowhere to be found.

        Instead of actually indicating that $21 million is available, the Defendants now come in and say, We have no money, which indicates to the Court that if the Defendants knew that they had no money in any of the three Defendants' accounts, in any of the three Defendants' names as they indicate now, how they made a representation to Judge Mills that they would pay that money into court is a little baffling.

        I will say that Judge Mills gave 20 days, and, perhaps, the representations by Mr. Segal here now is that maybe the expectation was that they would have more time.  I don't know why that would have been the expectation, especially in light of the fact that the whole idea of posting the $21 million was an acknowledgment that the debt is owed, and merely guaranteeing that whoever ultimately is entitled to it, based upon the rulings in the Federal Court case, that that money would be available to pay off those judgments.

        So, at this juncture we are here now and the Defendants still have no money, although one of their principals, Joseph Chetrit, has represented that he is willing to put ten percent of the money that the Defendants had originally agreed to post into court today in hopeful consideration of getting an extension of time.

12

1                     Proceedings

2           Counsel has, based upon our conversations yesterday

3      and today, gotten this individual to agree to an escrow

4      confession of judgment that would give him some time to get

5      the money together.  The representation is that as condos

6      get sold in a particular development that money, once

7      Deutsche Bank is paid off by that money, that money starts

8      becoming available to pay off these amounts of money.

9           But, there is no present ability to pay the $21

10     million.  There is no representation that any of the

11     Defendants or anyone else is willing at this juncture to

12     post the $21 million that Judge Mills ordered, and this

13     motion is really proverbially a day late and 18 or 19

14     million dollars short, and that is where we are today.

15           So, for all those reasons, I am finding that there

16     is no good cause to extend the time to post the money, and

17     that there is no stay in effect.

18           To the extent that there are any stays, they are

19     vacated.

20           The Plaintiffs can go ahead and seek to enforce any

21     judgments they have and go before Judge Mills to get Judge

22     Mills to make those rulings on the remaining two judgments.

23           That is my ruling.

24     MR. VAN LEEUWEN:  Thank you, Judge.

25     MR. SEGAL:  Have a good day, your Honor.

26     THE COURT:  Good day, counsel.

                              mb

13

1                          Proceedings

2                  (Proceedings recessed.)

3

4

5

6                         - - -

7              CERTIFIED TO BE A TRUE
               AND CORRECT TRANSCRIPT
8

9

10             *Margaret Baumann*
               ――――――――――――――――――――
11             MARGARET BAUMANN
               OFFICIAL COURT REPORTER
12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

# EXHIBIT B

**CF 135 FLAT LLC**
**c/o The Chetrit Group LLC**
**512 Seventh Avenue**
**New York, New York  10018**

November 5, 2012

Triadou SPV S.A.
Attn: Mr. Nicholas Bourg

Gentlemen:

Reference is made to an Operating Agreement for CF 135 West Member LLC, a Delaware limited liability company, being executed by and between CF 135 Flat LLC and Triadou SPV S.A., as the members.

This will confirm that Triadou SPV S.A. shall have the right to assign its interests in CF 135 West Member LLC to an affiliate and to replace funds being delivered upon execution of this Operating Agreement with funds belonging to said affiliate.

Very truly yours,

CF 135 FLAT LLC

By: _____

Acknowledged:

TRIADOU SPV S.A.

By: _____

F:\WP\NANCY\CHETRIT\FLAT HOTEL\Letter.docx

**CF 135 Flat LLC**
**c/o the Chetrit Group LLC**
**512 Seventh Avennue**
**New York, NY 10018**

November 7, 2012

Triadou SPV S.A.
Attn: Mr. Nicolas Bourg

Gentlemen:

Reference is made to an Operating Agreement ("Operating Agreement") for CF 135 West Member LLC, a Delaware limited liability company, being executed by and between CF 135 Flat LLC and Triadou SPV S.A. as the members, with CF 135 Flat LLC serving as the "Manager".

Manager represents and warrants as follows:

1. 135 West 52nd Street Owner LLC ("Fee Owner") will at all times have one member, namely, 135 West 52$^{nd}$Street Mezz LLC, a Delaware limited liability company ("Mezz"), that will own all of the membership interests in Fee Owner.

2. Mezz will be the borrower of the Mezzanine Loan referred to in the Operating Agreement. Mezz will at all times have one member, namely, 135 West 52nd Street Holder LLC, owning all of the membership interests in Mezz.

3. The members in 135 West 52nd Street Holder LLC will be CF 135 West Member LLC which shall own 75% of the membership interests and an entity owned by an investor that will own 25% of the membership interests (the "25% Investor").

4. The operating agreements for the Fee Owner and Mezz shall provide that all actions on the part of Fee Owner and Mezz shall require the consent of the Company.

5. The Operating Agreement for 135 West 52nd Street Holder LLC with the 25% Investor shall contain provisions similar to the provisions contained in the Operating Agreement, including but not limited to Articles III, IV and V.

6. Initial Capital Funding and timing of funding for the 25% Investor, CF 135 Flat LLC and Triadou SPV S.A, shall be as set forth on the attached Exhibit A. Reference in Exhibit A to SDG shall mean Triadou SPV SA; Chetrit shall mean CF 135 Flat LLC; and Investor shall mean the 25% Investor.

Very Truly Yours,

CF 135 Flat LLC

By: _____
        Joseph Chetrit, Manager

# EXHIBIT D

LIMITED LIABILITY COMPANY AGREEMENT
OF
135 WEST 52ND STREET HOLDER LLC

A Delaware Limited Liability Company

Dated as of March 25, 2013

THE INTERESTS OF THE MEMBERS ISSUED UNDER THIS AGREEMENT HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933 OR THE SECURITIES LAWS OF ANY STATE OR THE DISTRICT OF COLUMBIA.  NO RESALE OR TRANSFER OF AN INTEREST BY A MEMBER IS PERMITTED EXCEPT IN ACCORDANCE WITH THE PROVISIONS OF THIS AGREEMENT AND ANY APPLICABLE FEDERAL OR STATE SECURITIES LAWS, AND ANY VIOLATION OF SUCH PROVISIONS COULD EXPOSE THE SELLING OR TRANSFERRING MEMBER AND THE COMPANY TO LIABILITY.

# LIMITED LIABILITY COMPANY AGREEMENT
## OF
### 135 WEST 52ND STREET HOLDER LLC

This LIMITED LIABILITY COMPANY AGREEMENT (this "**Agreement**") of 135 West 52nd Street Holder LLC, a Delaware limited liability company (the "**Company**") dated as of March 25, 2013 (the "**Effective Date**"), by CF 135 West Member LLC, a Delaware limited liability company having an address c/o The Chetrit Group, LLC, 512 Seventh Avenue, 15th Floor, New York, New York 10018 ("**CF Member**"), and Clipper 135 West LLC, a Delaware limited liability company having an address c/o Clipper Equity, 4611 12th Avenue, Suite 1L, Brooklyn, New York 11219 ("**Clipper Member**"). Each of the foregoing is referred to hereinafter individually as a "**Member**" and/or collectively as the "**Members**".

## RECITALS

WHEREAS, the Company was formed pursuant to that certain Certificate of Formation dated as of March 4, 2013 and filed with the Secretary of State of the State of Delaware (the "**Secretary of State**") on March 4, 2013 (the "**Certificate**") in accordance with the provisions of the Delaware Limited Liability Company Act, Delaware Code, Title 6 Section 18-101, et seq., as amended from time to time (the "**Act**"); and

WHEREAS, the Members hereto desire to enter into this Agreement to provide for the respective rights, obligations and interests of the Members to each other and to the Company and the terms and conditions on which the Company will conduct its business. This Agreement shall apply to and govern the management and operation of the Company from the date hereof and shall bind each and every present and future Member of the Company.

NOW, THEREFORE, in consideration of the agreements and obligations set forth herein and for other good and valuable consideration the sufficiency of which are hereby acknowledged, the Members hereby agree as follows:

## ARTICLE I
## DEFINITIONS

For purposes of this Agreement, the following terms shall have the following meanings:

1.1   "**135 West 52nd Street Mezz LLC**" means 135 West 52nd Street Mezz LLC, a Delaware limited liability company whose sole member is the Company.

1.2   "**135 West 52nd Street Mezz LLC Company Interest**" means the limited liability company interest in 135 West 52nd Street Mezz LLC held by the Company.

1.3   "**Acquisition Loans**" means the Senior Loan and the Mezz Loan.

1.4   "**Acquisition Loan Guaranties**" means the Senior Loan Guaranties and the Mezz Guaranties.

1.5    "**Acquisition Loan Guarantors**" means Meyer Chetrit and David Bistricer.

1.6    "**Act**" shall have the meaning ascribed to such term in the Recitals.

1.7    "**Additional Capital Contribution**" shall mean, with respect to a Member, a Capital Contribution to the Company made by the Member pursuant to Sections 7.2(a) or 7.2(b) hereof.

1.8    "**Adjusted Capital Account Balance**" means with respect to any Member, such Member's Adjusted Capital Account Balance shall be the balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year or at any time, after giving effect to the following adjustments:

     (a)    credit to such Capital Account any amount which such Member is obligated to restore pursuant to any provision of this Agreement or is deemed obligated to restore pursuant to the penultimate sentence of Sections 1.704-2(g)(1)(ii) and 1.704-2(i)(5) of the Regulations; and

     (b)    debit to such Capital Account the items described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), and 1.704-1(b)(2)(ii)(d)(6) of the Regulations.

     The foregoing definition of Adjusted Capital Account Balance is intended to comply with the provisions of Section 1.704-1(b)(2)(ii)(d) of the Regulations and shall be interpreted consistently therewith.

1.9    "**Admission Date**" shall have the meaning set forth in <u>Section 13.3</u>.

1.10    "**Affiliate**" shall mean with respect to any Member, any other Person that directly or indirectly through one or more intermediaries Controls or is Controlled by or is under common Control with the Member or any officer, director, manager, employee, partner or member of the Member.

1.11    "**Agreement**" shall have the meaning ascribed to such term in the Preamble.

1.12    "**Annual Budget**" means the annual budget for the day-to-day operations of the Project, or any component thereof, then in effect as adopted pursuant to <u>Section 6.3(a)</u>.

1.13    "**Book Basis**" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

     (i)    the initial Book Basis of any asset contributed (or deemed contributed) to the Company shall be such asset's gross fair market value at the time of such contribution as reasonably determined by the Manager and the Members;

     (ii)    the Book Basis of all Company assets may be adjusted in the discretion of the Managing Member and the Members to equal their respective gross fair market values, as reasonably determined by the Managing Member and the Members, at the times specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(f);

(iii)     any adjustments to the adjusted basis of any asset of the Company pursuant to Section 734 or Section 743 of the Code shall be taken into account in determining such asset's Book Basis in a manner consistent with Treasury Regulations Section 1.704-1(b)(2)(iv)(m);

(iv)     the Book Basis of any Company asset distributed or deemed distributed by the Company to any Member shall be adjusted immediately prior to such distribution to equal its gross fair market value as of the date of distribution, as reasonably determined by the Managing Member and the Members; and

(v)     if the Book Basis of an asset has been determined pursuant to clause (i), (ii) or (iii) of this definition, such Book Basis shall thereafter be adjusted in the same manner as would the asset's adjusted basis for federal income tax purposes, except that depreciation deductions shall be computed based on the asset's Book Basis as so determined, rather than on its adjusted tax basis.

1.14     **"Capital Account"** shall have the meaning set forth in <u>Section 7.3</u>.

1.15     **"Capital Contribution"** means with respect to each Member, the aggregate amount of cash contributed by such Member to the Company.

1.16     **"Certificate"** shall have the meaning ascribed to such term in the Recitals.

1.17     **"CF Member"** shall have the meaning ascribed to such term in the preamble.

1.18     **"Clipper Member"** shall have the meaning ascribed to such term in the Preamble.

1.19     **"Code"** means the Internal Revenue Code of 1986, as amended from time to time, or any corresponding provisions of succeeding law.

1.20     **"Company"** shall have the meaning ascribed to such term in the Preamble.

1.21     **"Company Property"** means any and all assets of the Company, whether tangible or intangible, or any portion thereof including, without limitation, the 135 West 52nd Street Mezz LLC Company Interest.

1.22     **"Control"** means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, contract or otherwise.  "Controlling" and "Controlled" shall have correlative meanings.  Without limiting the generality of the foregoing, a Person shall be deemed to Control any other Person in which it owns, directly or indirectly, a majority of the ownership interests.

1.24     **"Distributable Cash"** means, for the applicable period, (i) the Gross Receipts of the Company for such period less (ii) Operating Expenses for such period and less (iii) such reasonable reserves determined by the Managing Member (and approved by the Non-Manging Members) to be held by the Company.

1.25   **"Effective Date"** shall have the meaning ascribed to such term in the Preamble.

1.26   **"Excluded Guarantor Payments"** shall mean any amounts paid under (i) a nonrecourse carveout guaranty by a Guarantor to the extent that a "bad boy" act committed by such Guarantor (or its Affiliates) was the cause of such funding requirement or (ii) an environmental indemnity by an indemnitor thereunder to the extent that gross negligence, willful misconduct or fraud by such indemnitor (or its Affiliates) was the cause of such funding requirement.

1.27   **"Federal Act"** means the United States Securities Act of 1933, as amended.

1.28   **"Fiscal Year"** means the twelve month period ending December 31 of each year; provided that the first Fiscal Year shall be the period beginning on the date hereof and ending on December 31, 2013, and the last Fiscal Year shall be the period beginning on January 1 of the calendar year in which the final liquidation and termination of the Company is completed and ending on the date such final liquidation and termination is completed (to the extent any computation or other provision hereof provides for an action to be taken on a Fiscal Year basis, an appropriate proration or other adjustment shall be made in respect of the first or final Fiscal Year to reflect that such period is less than a full calendar year period).

1.29   **"Funding Member"** shall have the meaning set forth in <u>Section 7.2(b)</u>.

1.30   **"Gross Receipts"** means, all revenues, proceeds and receipts (other than funds received as capital contributions from the Members), calculated on a cash basis, from the conduct of the business of the Company.

1.31   **"Guarantor(s)"** means any Member (or any Affiliate of a Member) which executes or provides a Guaranty.

1.32   **"Guarantor Payments"** shall mean any payments made by a Guarantor to a Lender (or to any other party which is an indemnitee under a Guaranty or which is expressly entitled to a payment thereunder) under or with respect to a Guaranty and all out of out pocket expenses incurred by a Guarantor in connection with or arising from such payments.

1.33   **"Guarantor Reimbursement Amount"** shall mean the amount of any Guarantor Payments that are not Excluded Guarantor Payments.

1.34   **"Guaranty"** means any guaranty, master lease, letter of credit, indemnity agreement or similar instrument that a Guarantor is, at any time required to deliver to a Lender in connection with a Loan.

1.35   **"Initial Capital Contributions"** shall have the meaning set forth in <u>Section 7.1</u>.

1.36   **"Interest"** means a Member's ownership interest in the Company, including such Member's Percentage Interest in, share of the Net Profit and Net Loss of and right to receive distributions from the Company.

1.37   **"Lender"** means any third-party holders or holder of a Loan from time to time.

1.38   **"Loan"** means a mortgage loan secured in whole or in part by the Property or any portion thereof, or a so-called "mezzanine loan" secured by pledges of any Owner Entity's membership interests.

1.39   **"Loan Documents"** means any loan documents evidencing or securing a Loan or any documents otherwise entered into with respect to any Loan, in each case, as the same may be amended or modified from time to time.

1.40   **"Managing Member"** means CF Member, or any successor which becomes Managing Member in accordance with the provisions of this Agreement.

1.41   **"Member"** shall have the meaning ascribed to such term in the Preamble.  The names and addresses of the Members shall be set forth on Exhibit B hereto.

1.42   **"Mezz Guaranties"** means (a) that certain Mezzanine Guaranty of Recourse Obligations, dated as of the date hereof executed by the Acquisition Loan Guarantors in favor of the Mezz Lender and (b) that certain Mezzanine Environmental Indemnity Agreement, dated as of the date hereof executed by 135 West 52nd Street Mezz LLC and the Acquisition Loan Guarantors in favor of the Mezz Lender.

1.43   **"Mezz Lender"** means RPAP Hotel Debt (FLATOTEL), L.L.C., a Delaware limited liability company.

1.44   **"Mezz Loan"** means that certain mezzanine loan in the amount of $60,000,000.00 made on the date hereof by the Mezz Lender to 135 West 52nd Street Mezz LLC.

1.45   **"Net Profit and Net Loss"** means for each Fiscal Year or other period, an amount equal to the Company's taxable income or loss for such Fiscal Year or period, determined in accordance with Code Section 703(a) and Regulation Section 1.703-1 (for this purpose, all items of income, gain, loss, or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

   (a)   items of income, gain, loss and deduction (inlcuding, without limitation, gain or loss on the disposition of any Company asset and depreciation or other cost recovery deduction or expense) shall be computed based on the Book Basis of the Company's assets rather than upon such assets' adjusted bases for income tax purposes;

   (b)   any income of the Company that is exempt from federal income tax  and not otherwise taken into account in computing Net Profit or Net Loss pursuant to this definition shall be added to such taxable income or loss;

   (c)   any expenditures of the Company described in Code Section 705(a)(2)(B) or treated as Code Section 705(a)(2)(B) expenditures pursuant to Regulations Section 1.704-1(b)(2)(iv)(i), and not otherwise taken into account in computing Net Profit or Net Loss pursuant to this definition shall be subtracted from such taxable income or loss;

   (d)   there shall be taken into account any separately stated items under Section 702(a) of the Code;

(e)       notwithstanding any other provision of this definition, any items which are specially allocated pursuant to <u>Section 8.4</u> or otherwise shall not be taken into account in computing Net Profit and Net Loss; andif the Book Basis of any Company asset is adjusted pursuant to to clauses (ii) or (iv) of the definition thereof, the amount of such adjustment shall be taken into account in the period of adjustment as gain or loss from the disposition of deemed disposition of such asset for purposes of computing Net Profits and Net Losses.

1.46    "**Non-Funded Amount**" shall have the meaning set forth in <u>Section 7.2(b)</u>.

1.47    "**Non-Funding Member**" shall have the meaning set forth in <u>Section 7.2(b)</u>.

1.48    "**Non-Managing Member(s)**" means any Member that is not the Managing Member at a given time.

1.49    "**Notice**" shall have the meaning set forth in <u>Section 7.2(a)</u>.

1.50    "**Owner**" means 135 West 52nd Street Owner LLC, a Delaware limited liability company whose sole member is 135 West 52nd Street Mezz LLC.

1.51    "**Owner Entities**" means 135 West 52nd Street Mezz LLC and Owner.

1.52    "**Operating Expenses**" means all expenditures of any kind made with respect to the operations of the Company in the normal course of business including, but not limited to, debt service (principal and interest) then due and payable or other permitted Loans of the Company, ad valorem taxes, insurance premiums, repair and maintenance expense, capital expenditures related to the Company, management fees or salaries, advertising expenses, professional fees, wages, and utility costs.

1.53    "**Percentage Interest**" shall mean with respect to any Member that percentage set forth opposite such Member's name on <u>Exhibit B</u> hereto, as adjusted from time to time in accordance with the terms of this Agreement.

1.54    "**Person**" means an individual, partnership, limited liability company, association, corporation or any other legal entity.

1.55    "**Property**" means that certain parcel of real property located at 135 West 52nd Street, New York, New York including all buildings, structures and improvements located thereon, and as more particularly described on <u>Exhibit A</u> attached hereto and incorporated herein by this reference.

1.56    "**PSA**" means means that certain Purchase and Sale Agreement (as amended) dated October 29, 2012, between RPAP Hotel Debt (FLATOTEL), L.L.C., as seller, and Owner, as purchaser, providing for the purchase of the Property.

1.57    "**Regulations**" means the regulations of the United States Department of Treasury promulgated under the Code.

1.58   "**Senior Loan**" means that certain mortgage loan in the amount of $115,000,000.00 made on the date hereof by the Senior Loan Lender to Owner.

1.59   "**Senior Loan Guaranties**" means (a) that certain Guaranty Agreement (Non-Recourse Carveout), dated as of the date hereof, executed by the Acquisition Loan Guarantors in favor of the Senior Loan Lender and (b) that certain Environmental Indemnity Agreement, dated as of the date hereof, executed by Owner and the Acquisition Loan Guarantors in favor of the Senior Loan Lender.

1.60   "**Senior Loan Lender**" means THE VARIABLE ANNUITY LIFE INSURANCE COMPANY, a Texas corporation.

1.61   "**Subsidiary**" means an entity owned, directly or indirectly, by the Company.

1.62   "**Substituted Member**" shall have the meaning set forth in Section 13.4.

1.63   "**Transfer**" shall mean, when used as a noun, any direct or indirect voluntary sale, hypothecation, pledge, assignment, or other transfer, and, when used as a verb, shall mean voluntarily to directly or indirectly sell, hypothecate, pledge, assign, or otherwise transfer.

1.64   "**Unreturned Additional Capital**" shall mean, with respect to a Member, the excess, if any, of (i) the Member's aggregate Additional Capital Contribution less (ii) the aggregate amount of distributions to the Member pursuant to Section 9.1(a) hereof, in each case since the inception of the Company.

1.65   "**Unreturned Initial Capital**" shall mean, with respect to a Member, the excess, if any, of (i) the Member's Initial Capital Contribution less (ii) the aggregate amount of distributions to the Member pursuant to Section 9.1(b) hereof since the inception of the Company

## ARTICLE II
## FORMATION

2.1   Formation.   The Company was formed as a Delaware limited liability company by execution and delivery of the Certificate to the Secretary of State of the State of Delaware in accordance with the provisions of the Act.  The rights and obligations of the Members shall be governed by this Agreement and the Act.  If there is a conflict between the provisions of this Agreement and the Act, the provisions of the Act shall control (it being understood, however, that if the Act provides for a particular rule but allows the members of a limited liability company to provide to the contrary in their operating agreement, and if the parties hereto have so provided hereunder, then such provisions shall not be deemed to constitute a conflict for purposes of the foregoing).

2.2   Name.   The name of the Company is "135 West 52nd Street Holder LLC" and all business of the Company shall be conducted under such name or or such other name as the Members approve (to the extent permitted by law).

2.3   Effective Date.   This Agreement shall become effective as of the Effective Date.

2.4    Term.  The term of the Company commenced on the date the Certificate was filed with the Secretary of State of the State of Delaware and shall continue until the Company is dissolved in accordance with the provisions of the Act and this Agreement.

2.5    Registered Office and Agent.  The address of the Company's registered office in the State of Delaware is 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle, 19808.  The registered agent at this address is Corporation Service Company.

2.6    Principal Office.  The principal office of the Company shall be located c/o The Chetrit Group LLC, 512 Seventh Avenue, 15th Floor, New York, New York 10018, or at such other place which the Members designate from time to time.

## ARTICLE III
## BUSINESS OF THE COMPANY

3.1    Purposes.  The Company is organized for the purposes of, directly or indirectly, through one or more Owner Entities or Subsidiaries (i) to acquire, own, hold, operate, manage, finance, refinance, encumber, service, pledge, sell, transfer, exchange and otherwise dispose of the Property; (ii) obtain and enter into any loan, and perform the obligations of the borrower, mortgagor, assignor or debtor under the corresponding loan documents; and (iii) subject to any approval of the Members required hereunder, as may be necessary, transact any and all lawful business for which a limited liability company may be organized under the Act that is incident, necessary or appropriate to accomplish the foregoing, including, without limitation, contracting for necessary or desirable services of professionals and others.

3.2    Other Activities of the Members.  Each Member understands that the other Member or the Affiliates of the other Member may be interested, directly or indirectly, in various other businesses and undertakings not included in the Company.  Subject to Section 6.2, the Members agree that: (i) each Member shall have the right to have such other interests and activities and to receive and enjoy profits or compensation therefrom; (ii) each Member waives any right it might otherwise have to share or participate in such other interests or activities of the other; (iii) some of the other business interests, activities and investments of the Members may be in conflict or competition with the business of the Company; (iv) each of the Members may engage in or possess an interest in any other business or venture of any kind, independently or with others, including, without limitation, owning, financing, acquiring, leasing, promoting, developing, improving, operating, managing and servicing real property; (v) each Member may engage in any such activities, whether or not competitive with the Company, or to the other Member, without any obligation to offer any interest in such activities to the Company; the pursuit of such activities, even if competitive with the business of the Company, shall not be deemed wrongful or improper (including leasing space to tenants or selling lots or parcels of real estate to purchasers at locations other than the Property or not owned by the Company); and (vi) no Member or any other Person employed by, related to or in any way affiliated with any Member shall have any duty or obligation to disclose or offer to any other Member, or obtain for the benefit of the other Member, any other activity or venture or interest therein.  No Member, nor any of its creditors or any other Person having an interest in such Member shall have any claim, right or cause of action against any other Member or any other Person employed by, related to or in any

way affiliated with any other Member by reason of any direct or indirect investment or other participation, whether active or passive, in any such activity or interest therein, or any right to any such activity or interest therein or the income or profits derived therefrom.

## ARTICLE IV
## FINANCIAL MATTERS

4.1   Accounting Period.   The Company's accounting period and tax year shall be the Fiscal Year, unless another period is required by the Code or Regulations.

4.2   Records to be Maintained.

(a)   At its principal office, the Company shall maintain its records, including:

(i)   a current list of the name and last known address of each Member;

(ii)   a copy of the Certificate and all amendments thereto;

(iii)   copies of the Company's federal, foreign, state and local income tax returns and reports, if any;

(iv)   a copy of this Agreement and all amendments thereto; and

(v)   copies of any financial statements of the Company.

(b)   A Member may, at such Member's own expense, inspect and copy any Company record upon reasonable request during ordinary business hours.  The Company shall cause all financial statements of the Company, including all reports provided to any mortgagee of the Property, to be contemporaneously distributed to each Member.

4.3   Accounts.   The Company shall maintain a record of Capital Accounts for each Member in accordance with Article VII hereof.  The Company shall maintain one or more bank accounts at such banking institutions as are designated from time to time by the Members. Notwithstanding any provision of this Agreement to the contrary, the manual signature of a representative of all of the Members shall be required for checks written against or other withdrawals from the Company's bank accounts.

4.4   Tax Returns.   The Managing Member shall cause all Company tax and information returns that the Company may be required to file to be filed on a timely basis (taking into account any extensions) at Company expense with the appropriate governmental authorities.

4.5   Tax Elections.   Except as expressly provided otherwise herein, the Managing Member shall determine whether to make any and all tax elections under the Code and Regulations or under any state or local law, rule or regulation, including without limitation, an election on behalf of the Company under Section 754 of the Code in connection with a sale of a Member's interest or part thereof.  Notwithstanding the foregoing, upon the request of an assignee or other transferee of the Interest of a Member or the assignee or other transferee of an

interest in a Person who indirectly has owned an Interest in the Company, the Managing Member shall make the election referred to in Section 754 of the Code.

4.6   <u>Designation of Tax Matters Partner</u>.   The CF Member is hereby designated the "Tax Matters Partner" as provided in the Regulations pursuant to Section 6231 of the Code. The Tax Matters Partner shall have all the authority and power granted to the "tax matters member" under the Code and Regulations.   The Tax Matters Partner shall receive no compensation for its services.   All third-party costs and expenses incurred by the Tax Matters Partner in performing its duties as such (including legal and accounting fees) shall be borne by the Company.   The Tax Matters Partner shall not enter into any settlement with any taxing authority (federal, state or local), or extend the statute of limitations, on behalf of the Company without the prior written approval of the Members, or otherwise take a position that has an adverse effect on a Member without the consent of such Member, which consent shall not be unreasonably withheld, delayed or conditioned.

4.7   <u>Reimbursements Other Than For Overhead Expenses</u>.   Subject to the terms of this Agreement, each of the Members may incur from time to time third-party out-of-pocket costs and expenses (including, without limitation, legal and due diligence expenses) in connection with the performance of their respective duties under this Agreement.   The Company shall pay or reimburse each of the Members for all such reasonable third-party out-of-pocket costs and expenses actually incurred by the Member on behalf of the Company for legitimate businsss purposes and which are properly documented to the Company, to the extent set forth in the Annual Budget; provided, however, that each of the Members shall be solely responsible for paying its own costs and expenses (including, without limitation, attorneys' fees) in connection with the negotiation of this Agreement; provided further, that neither Member shall be entitled to reimbursement for any of its overhead expenses, it being the express intent of the parties hereto that only third-party, out-of-pocket costs and expenses are subject to reimbursement in accordance with this <u>Section 4.7</u>.

4.8   <u>No Member Guarantees</u>.   The parties hereto hereby agree that, except with the approval of the Members, no Member, Affiliate of any Member or any principal of any Member (including, without limitation, David Bistricer or Meyer Chetrit) shall be obligated at any time to provide any form of Guaranty in respect of any financing entered into by or on behalf of the Company other than a Guaranty of the customary carveouts to the nonrecourse provisions of such loans and environmental indemnity agreements (including the Acquisition Loan Guaranties which have been executed and delivered on the date hereof by the Acquisition Loan Guarantors in connection with the Acquisition Loans), and if necessary in connection with any construction loan or any acquisition financing which requires one or more construction reserves funded by borrower or a mezzanine lender, a guaranty of completion; provided, however, the Managing Member shall make every effort to obtain each such guaranty of completion on behalf of the Company from another source.   The Members agree that in connection with the Acquisition Loan Guaranties to be delivered on the date hereof, each of the Members and their respective Affiliate Guarantor will enter into a contribution and reimbursement agreements substantially in the form attached hereto as <u>Exhibit D</u> (the "**Reimbursement Agreement**").

# ARTICLE V
## MEMBER NAMES AND ADDRESSES

5.1 <u>Names and Addresses</u>.  The names and addresses of the Members are as set forth from time to time on <u>Exhibit B</u> hereto.

# ARTICLE VI
## MANAGEMENT

6.1 <u>In General</u>.

(a)  (i)  The Members hereby designate the CF Member as the Managing Member of the Company, subject to the provisions hereof, including those regarding approval of Major Decisions (as defined in Section 6.2 hereof) by the Members (subject to Clipper Member's right to remove the Managing Member pursuant to the terms of <u>Article XI</u> hereof).

(i)  The Managing Member shall be a fiduciary of the Company and shall act in good faith and in a manner which it reasonably believes to be in the best interests of the Company, subject to the availability of funds and the limitations on Managing Member's authority provided for herein.

(ii)  Without limitation of the foregoing, the Managing Member shall use commercially reasonable efforts, subject to the availability of funds and to the limitations on Managing Member's powers hereunder and in accordance with the provisions of this Agreement, to cause the Company to cause the Owner Entities and Subsidiaries to develop, operate, manage, lease and sell, all or any part of the Property in accordance with the Annual Budget, and in connection therewith, to use commercially reasonable efforts to (1) implement all Major Decisions approved by the Members in accordance with the terms hereof, (2) comply with and enforce agreements entered into by the Company, Owner Entities and the Subsidiaries, (3) conduct the routine, day-to-day business and affairs of the Company, Owner Entities and the Subsidiaries in accordance with good industry practice and this Agreement, including without limitation, performing, complying with and enforcing, on behalf of the Company, Owner Entities and the Subsidiaries, the Company's, Owner Entities' and the Subsidiaries' obligations and rights with respect to all Loans and Loan Documents and any other agreements affecting or encumbering the Property or any Owner Entity, (4) cause the Company, Owner Entities or the Subsidiaries (as applicable) to pay all obligations of the Company, Owner Entities and the Subsidiaries when due, including without limitation, real estate taxes for the Property, (5) cause the Company, Owner Entities and the Subsidiaries to comply with all applicable laws, rules and regulations and (6) coordinate, supervise and direct all aspects of the ownership, development, management and operation of the Property.

(iii)  To the extent that the Managing Member is aware, Managing Member shall promptly advise the Members in writing of (which written notice shall provide reasonable specificity regarding) (1) any failure of the Company, any Owner Entity or any Subsidiary to pay any taxes or insurance premiums for which it is liable or responsible on or before the date on which such taxes or premiums would become delinquent, (2) any litigation threatened in writing against any Subsidiary, any Owner Entity, the Company or its Members

relating to the Property, (3) any dispute or claim relating to the Company, any Owner Entity or any Subsidiary, including, without limitation, (x) any dispute of or a default by any party under any agreements to which the Company, any Owner Entity or any Subsidiary is a party or which otherwise adversely affects the Property (including, without limitation, all Loans and Loan Documents) and (y) any other occurrence of material significance to the Company, Owner Entity, any Subsidiary or the Property.  Without limitation of the foregoing, the Managing Member shall provide the Non-Managing Members with copies of all material correspondence (including default notices) or other communications under any agreement (including, without limitation, any Loan Document) affecting or encumbering the Property.

(iv)    In addition to the express powers granted to the Managing Member under any other provision of this Agreement, and subject to the limitations on Managing Member's powers hereunder and in accordance with the provisions of this Agreement, the Managing Member shall have the authority to implement and to carry out the ordinary day-to-day management of the Company, the Owner Entities, the Subsidiaries and any entity in which the Company is a member or managing member consistent with and in accordance with the terms of this Agreement and the Annual Budget.

(b)    From time to time, upon the prior written approval of all of the Non-Managing Members, the Managing Member may appoint officers and delegate the day-to-day operations of the Company to such officers, subject to the supervision and direction of the Managing Member, and may act through its duly authorized officers. The officers of the Company may include a president, a treasurer, a secretary, one or more vice presidents and such other officers as the Managing Member may from time to time consider appropriate (collectively, the "**Officers**"). Such Officers shall exercise such duties as customarily pertain to such offices as reasonably determined by the Managing Member, *provided* that in no case shall any Officer have any authority or power beyond that granted to the Managing Member hereunder. The acts and omissions of such Officers shall be deemed to be the acts and omissions of the Company and of the Managing Member hereunder (provided, however, the Managing Member shall be liable (and the Non-Managing Members shall have no liability) for the acts and omissions of any Officer appointed by the Managing Member constituting gross negligence, willful misconduct or fraud). The initial Officers of the Company, which the Members hereby consent to, shall be as set forth on Exhibit C.  The Officers shall not receive any compensation from the Company for their services to the Company.

6.2    Major Decisions.

(a)    Notwithstanding anything to the contrary contained in this Agreement, the Managing Member shall not, nor shall it have the power to, make, implement, nor bind the Company, any Owner Entity or any Subsidiary with respect to any Major Decision (as hereinafter defined) without the prior written consent of all of the Members, including the Non-Managing Member. For purposes of this Agreement, decisions, agreements or other actions regarding each of the following matters shall be deemed to be a "**Major Decision**":

(i)    any loan or borrowing by the Company, any Owner Entity or any Subsidiary and the execution and delivery of any documents (including, without limitation, any guaranty and any pledge of or security interest in the limited liability company interests of any

Owner Entity) evidencing, governing or securing any such loan or borrowing (and any modification or amendment thereof);

(ii)     the decision to make a capital call and/or require Additional Capital Contributions pursuant to Section 7.2(a) hereof;

(iii)    any agreement to bring in a third party capital partner, or the admission of any new member into the Company, any Owner Entity or any Subsidiary, or the Transfer of any Interest in the Company other than in accordance with the provisions of Article XIII, or the Transfer of any membership interest in any Owner Entity or any Subsidiary;

(iv)    a sale or other disposition of all or any portion of the Company, any Owner Entity, or any Subsidiary (or any of them) or all of the Company's, any Owner Entity's or any Subsidiary's respective assets or the engagement of a broker or finder in connection with the foregoing;

(v)     approval of or modifications to the Annual Budget pursuant to Section 6.3; provided, however, that in the event an Annual Budget is not approved for any Fiscal Year, the previous Annual Budget approved by the Members shall remain in effect until a new Annual Budget shall be approved by the Members, subject to increases each Fiscal Year for each line item not to exceed ten (10%) percent per item and five (5%) percent in the aggregate;

(vi)    the terms of any transaction or agreement (or any amendment thereto) between the Company, any Owner Entity or any Subsidiary, on the one hand, and any Person or entity affiliated with or related to any Member, on the other hand, (collectively, "**Affiliate Agreements**"), provided, that Clipper Member shall have the right to (A) enforce, on behalf of the Company, the applicable Owner Entity or the applicable Subsidiary, any Affiliate Agreement with any Affiliate of the CF Member and (B) hire a qualified replacement at market rates in the event an Affiliate Agreement with an Affiliate of the CF Member is terminated by Clipper Member on behalf of the Company pursuant to the terms of such Affiliate Agreement;

(vii)   any dissolution of the Company, any Owner Entity or any Subsidiary, or any modification of or amendment to this Agreement, the operating agreements or organizational documents of any Owner Entity or any Subsidiary;

(viii)  any decision by the Company, any Owner Entity or any Subsidiary to (A) commence any case, proceeding or other action under any existing or future law of any jurisdiction, domestic or foreign, relating to bankruptcy, insolvency, reorganization or relief of debtors, seeking to have an order for relief entered with respect to it, or seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, winding-up, liquidation, dissolution, composition or other relief with respect to it or its debts, (B) seek appointment of a receiver, trustee, custodian or other similar official for it (or for all or any substantial part of its assets) or the decision by the Company, any Owner Entity, or any Subsidiary to make a general assignment for the benefit of its creditors, (C) admit in writing its inability to pay its debts as they become due or (D) allow the entry of a confession of judgment against the Company, any Owner Entity, or any Subsidiary;

(ix)     any decision by the Company, any Owner Entity or any Subsidiary to be part of or take part in any merger or consolidation;

(x)     granting of a deed in lieu of foreclosure or assignment in lieu of foreclosure to any Person with respect to the Property or any limited liability company interest in any Owner Entity;

(xi)     acquisition of any real property, other than the Property;

(xii)     the issuance or registration of any securities or additional membership interests in the Company, any Owner Entity or any Subsidiay;

(xiii)     any lease for space at the Property or any other portion thereof (and any amendment or modification of any lease); and

(xiv)     the formation of one or more Subsidiaries to operate, finance, hold title to property, or for any other purpose in connection with the Property or any Owner Entity.

(b)     A Major Decision may be proposed by any Member.  All requests for the approval of a Major Decision shall be made in writing by the proposing Member and shall be accompanied by pertinent information regarding the Major Decision.  With respect to any Major Decision, the proposing Member shall provide to the other Members any additional information reasonably requested by the Members, provided such information is in the possession of or reasonably obtainable by the proposing Member.  If a response is not received from a Member to any request to approve a Major Decision under this Section 6.2 within ten (10) business days after delivery of (x) such request for approval and (y) such additional information reasonably requested by the Member whose approval was sought, then the Member shall be deemed to have approved such request for approval of the Major Decision.

(c)     Any and all references herein to the Company, Managing Member, Non-Managing Members, or other Member causing or directing any action by or on behalf of the Company shall be deemed to refer to the Company causing (or the Managing Member or other Member causing the Company to cause), in its capacity as the managing member, general partner or directing Person of the Owner Entities and Subsidiaries, such action to be taken for and on behalf such Owner Entity or Subsidiary.  Notwithstanding anything contained herein to the contrary, any action to be taken or made by or on behalf of an Owner Entity or a Subsidiary that, if taken or made by or on behalf of the Company would constitute a Major Decision, will require the approval of the Non-Managing Members.  It is expressly understood that the Company may conduct its business directly or indirectly through one or more Owner Entity or Subsidiaries; it being the intent of the Members that the organizational documents relating to any Owner Entity or Subsidiary shall be interpreted together with the provisions of this Agreement to have substantially the same effect as would be the case if all the interests therein were held or all such business were conducted by the Company pursuant to the terms of this Agreement (including, without limitation, the provisions herein regarding the management and governance of the Company).  Any action to be taken by any such Owner Entity or Subsidiary shall be construed as an action taken by the Company and shall be subject to the same rights and limitations granted

and imposed on the Managing Member and any other Members under this Agreement. With respect to each Owner Entity and Subsidiary, and in the event that the Company conducts its business through one or more Owner Entities or Subsidiaries, the Managing Member shall perform, with no additional compensation, the same or substantially identical services for each such Owner Entity and Subsidiary as the Managing Member performs for the Company, subject to the terms, conditions, limitations and restrictions set forth in this Agreement. The Managing Member agrees to perform such duties, and in such circumstances and with regard to such duties, the Managing Member shall be subject to the same standards of conduct and shall have the same duties and obligations with regard to such matters performed or to be performed on behalf of each such Owner Entity and Subsidiary as are set forth in this Agreement with regard to the same or substantially identical services to be performed for or on behalf of the Company. Notwithstanding the foregoing, the provisions of this Section 6.2(c) are not intended to cause the legal personality or separateness or special purpose entity provisions of any Owner Entity or Subsidiary to be disregarded.

6.3     Annual Budget.

(a)     At least forty five (45) days prior to the beginning of each Fiscal Year, the Managing Member shall deliver to the Non-Managing Member a proposed budget for such Fiscal Year, it being understood and agreed that the adoption, approval or modification of the Annual Budget shall be a Major Decision. Notwithstanding the foregoing, the Managing Member may make modifications to particular line items of the Annual Budget if a proposed Annual Budget has not been approved for any Fiscal Year as provided in Section 6.2(a)(vi) until an Annual Budget shall have been approved by the Members for such Fiscal Year.

6.4     Reliance by Third Parties. Any Person dealing with the Company or a Member may rely upon a certificate signed by the Managing Member or an Officer of the Company, as to:

(a)     the identity of any Member hereof;

(b)     the authorization of such Member or any Officer or agent to act;

(c)     the existence or non-existence of any fact or facts which constitute a condition precedent to acts by the Company or in any other manner germane to the affairs of the Company; or

(d)     the Persons who are authorized to execute and deliver any instrument or document of or on behalf of the Company.

No such certificate shall serve to modify, amend or expand the authority of the Managing Member or the applicable Officer as expressly provided in this Agreement.

## ARTICLE VII
## CONTRIBUTIONS AND CAPITAL ACCOUNTS

7.1     Capital Contributions. Each of the Members hereby acknowledges and agrees that the Capital Contributions of the Members as of the Effective Date (the "**Initial Capital Contributions**") are as set forth on Exhibit B hereto.

7.2     Additional Capital Needs.

(a)     In the event that the Company's capital needs are beyond that required to be contributed under Section 7.1 above, the Managing Member and the Non-Managing Member, acting jointly, may require all of the Members to make Additional Capital Contributions (the "**Additional Capital Contributions**") to the Company by delivering written notice thereof to all of the Members (the "Notice").  In the event the Managing Member and the Non-Managing deliver the Notice to the Members, each of the Members shall be obligated to make such required Additional Capital Contribution to the Company in accordance with their respective Percentage Interests.

(b)     In the event that any Member (the "**Non-Funding Member**") fails to fully fund its share of a required Additional Capital Contribution (the "**Non-Funded Amount**"), and such failure shall continue for ten (10) days after Notice has been received by the Non-Funding Member, then any of the other non-defaulting Member(s) (each, respectively, a "**Funding Member**") may, provided they have contributed their full share of such Additional Capital Contribution, in their sole discretion, elect to either (i) fund as a Capital Contribution all or a portion of the Non-Funded Amount, (ii) make a loan as permitted under Section 7.2(c) below, or (iii) take no action regarding such failure of the Non-Funding Member.  Immediately upon any such Capital Contribution of the Non-Funded Amount by the Funding Member, the Percentage Interests of each Member (including the Non-Funding Member) shall be adjusted to reflect such Capital Contribution and shall thereafter be equal to a fraction, expressed as a percentage rounded to the nearest fourth decimal point, (x) the numerator of which shall equal the sum of such Member's (or its predecessor in interest's) actual Capital Contributions (including its Additional Capital Contributions) and (y) the denominator of which shall equal the sum of the Capital Contributions made by all Members (including the aggregate Additional Capital Contributions).

(c)     If the Funding Member so elects, the Funding Member may fund its portion of the Non-Funded Amount as a Capital Contribution to the Company on behalf of the Non-Funding Member in the form of a loan (a "**Capital Advance**") from such Funding Member to the Non-Funding Member on the following terms: (i) the interest rate per annum shall be equal to the lesser of the commercial prime interest rate as announced or published by Citibank, N.A. plus five percent (5.0%) or the maximum interest rate allowed by applicable law; (ii) such Capital Advance shall not be a demand loan but shall be repaid from Disributable Cash to the Non-Funding Member in accordance with Article IX or upon any dissolution of the Company as provided in Article XV; and (iii) only if all of the Non-Funded Amount is contributed in accordance with this paragraph (c), neither the Company nor any Member shall have any other rights or remedies against the Non-Funding Member, and the Non-Funding Member shall not be deemed to be in default of Section 7.2(a) above as a result of its failure to make its share of any such Additional Capital Contribution.  In the event there is more than one such Capital Advance outstanding, the Capital Advances shall have be repayable on the basis of the most recent such Capital Advance having the first priority.

7.3     Capital Account.

(a)     Separate **"Capital Accounts"** will be maintained for each Member in the manner required by Section 1.704-1(b)(2)(iv) of the Regulations.   To the extent consistent therewith, each Member's Capital Account shall be equal to the sum of the following:

(i)     the amount of any cash and the agreed to fair market value of any property that the Member contributes to the Company (net of liabilities securing the property that the Company is considered to assume or take subject to under Section 752 of the Code and the Regulations promulgated thereunder); plus

(ii)     the aggregate Net Profit and items in the nature of income or gain allocated to the Member under Article VIII of this Agreement or other positive adjustment required by the Regulations; minus

(iii)     the amount of any cash and the agreed to fair market value of any property distributed to the Member (net of liabilities securing the property that the Member is considered to assume or take subject to under Section 752 of the Code and the Regulations promulgated thereunder), as of the date of distribution; and minus

(iv)     the aggregate Net Loss and items in the nature of deduction or losses allocated to the Member under Article VIII of this Agreement or other negative adjustment required by the Regulations.

(b)     In the event that all or a portion of an Interest is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred interest.

(c)     The Capital Account of each Member shall be adjusted to reflect any adjustment to the Book Basis of the Company's assets attributable to the application of Section 734 or 743 of the Code to the extent required by Section 1.704-1(b)(2)(iv)(m) of the Regulation.

(d)     Except as otherwise provided in this Agreement, whenever it is necessary to determine the Capital Account balance of any Member, the Capital Account balance of such Member shall be determined after giving effect to all allocations pursuant to this Agreement and all contributions and distributions prior to the time at which such determination is made.

7.4     The Company shall be obligated to reimburse each Guarantor for the Guarantor Reimbursement Amount expended by such Guarantor immediately after such Guarantor makes a Guarantor Payment.   To the extent necessary for the Company to make such reimbursement, each Member shall be required, within ten (10) business days after receipt of notice, to immediately make an Additional Capital Contribution in an amount equal to their respective Percentage Interest of the Guarantor Reimbursement Amount.   Until reimbursed, the Member who made (or whose Affiliate Guarantor made) the Guarantor Payment shall be deemed to have made, on the date of the payment, an Additional Capital Contribution as to its Percentage Interest and a Capital Advance as to the balance.   Notwithstanding the foregoing, amounts funded under a Guaranty by the Guarantor to the extent that such Guarantor's (or its Affiliate's) gross negligence, willful misconduct or fraud gave rise to such funding requirement shall not be reimbursable to such Guarantor and shall not constitute a Capital Contribution, but shall be deemed an Excluded Guarantor Payment.   Other than any amounts paid pursuant to Sections 3(a)

and 3(b) of the Reimbursement Agreement, all amounts paid by each Guarantor under any Reimbursement Agreement shall be deemed to be an Additional Capital Contribution of each Member, as the case may be, under Section 7.2.

## ARTICLE VIII
## ALLOCATIONS

8.1     Net Profit and Net Loss. After the application of Section 8.4, Net Profits and Net Losses for any taxable year, or portion thereof, shall be allocated among the Members in a manner such that the Capital Account of each Member, immediately after making such allocation, and after taking into account actual distributions made during such taxable year, or portion thereof, is, as nearly as possible, equal (proportionately) to (i) the distributions that would be made to such Member pursuant to Section 15.3(b)(v) if the Company were dissolved, its affairs wound up and its assets sold for cash equal to their Book Basis, all Company liabilities, including the Company's share of any liability of any entity treated as a partnership for U.S. federal income tax purposes in which the Company is a partner, were satisfied (limited with respect to each nonrecourse liability to the Book Basis of the assets securing such liability) and the net assets of the Company were distributed in accordance with Section 15.3(b)(v) to the Members immediately after making such allocation, minus (ii) such Member's share of Company minimum gain and Member nonrecourse debt minimum gain determined pursuant to Sections 1.704-2(g)(1) and 1.704-2(i)(5) of the Regulations, computed immediately prior to the hypothetical sale of assets.

8.2     Limitation on Net Loss Allocations.   Notwithstanding any provision of this Agreement to the contrary, in no event shall Net Loss or any item of loss or deduction be allocated to a Member if such allocation would result in such Member's having or increasing a negative Adjusted Capital Account Balance at the end of any Fiscal Year. All Net Loss in excess of the limitation set forth in this Section 8.2 shall be allocatedto the Members in accordance with Section 8.1 as if such Member were not a Member.

8.3     Tax Allocations.    Subject to the other provisions of this Article VIII, an allocation to a Member of a share of Net Profit or Net Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Net Profit or Net Loss.

8.4   Special Allocations.   The following special allocations shall be made in the following order:

(a)     Minimum Gain Chargeback. To the extent required by Regulation Section 1.704-2(f), if there is a net decrease in "partnership minimum gain" (within the meaning of Regulation Section 1.704-2(b)(2)) in a Fiscal Year, then each Member will be allocated items of income and gain that Fiscal Year, before any other allocation of Net Profit or Net Loss, equal to that Member's share of the net decrease in partnership minimum gain.

(b)     Member Minimum Gain Chargeback. If a Member suffers a net decrease in "partner nonrecourse debt minimum gain" (within the meaning of Regulation Section 1.704-

2(i)(4)) in any Fiscal Year, then that Member will be allocated items of income and gain to the extent required by Regulation Section 1.704-2(i)(4).

    (c)    <u>Qualified Income Offset</u>.  In the event any Member unexpectedly receives any adjustments, allocations, or distributions described in Regulation Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5) or 1.704-1(b)(2)(ii)(d)(6), items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Regulations, the negative Adjusted Capital Account Balance of such Member as quickly as possible, provided that an allocation pursuant to this Section 8.4(c) shall be made if and only to the extent that such Member would have a negative Adjusted Capital Account Balance after all other allocations provided for in this <u>Article VIII</u> have been tentatively made as if this <u>Section 8.4(c)</u> were not in this <u>Article VIII</u>.  This provision is intended to constitute a "qualified income offset" within the meaning of Regulation Section 1.704-2(b)(ii)(d).

8.5    <u>Other Allocation Rules</u>.  The following rules shall apply for purposes of making tax allocations:

    (a)    For purposes of determining the Net Profit, Net Loss or any other items allocable to any period, Net Profit, Net Loss and any such other items shall be determined on a daily, monthly or other basis, as selected by the Managing Members using any permissible method under Code Section 706 and the Regulations promulgated thereunder.

    (b)    The Members are aware of the income tax consequences of the allocations made by this <u>Article VIII</u> and hereby agree to be bound by the provisions of this <u>Article VIII</u> in reporting their shares of the Company income and loss for income tax purposes.

    (c)    "Nonrecourse deductions" (as defined in Section 1.704-2(b) of the Regulations, and "excess nonrecouse deductions" (as defined in Section 1.752-3(a) of the Regulations) shall be allocated to the Members in proportion to their respective Percentage Interests.

    (d)    "Partner nonrecourse deductions" (as defined in Section 1.704-2(i) of the Regulations) shall be allocated to the Member that bears the economic riks of loss within the meaning of Section 1.704-2(i) of the Regulations.

8.6    <u>Section 704(c) Allocation</u>.  Notwithstanding any other provision of this Agreement to the contrary, any gain or loss and any depreciation and cost recovery deductions recognized by the Company for income tax purposes in any Fiscal Year with respect to all or any part of the Company's property that is required or permitted to be allocated among the Members in accordance with Code Section 704(c) and any Regulations promulgated thereunder so as to take into account the variation, if any, between the adjusted tax basis of such property at the time of its contribution and the fair market value of such property at the time of its contribution, shall be allocated to the Members for income tax purposes using any method described in Section 1.704-3 of the Regulations as selected by the Managing Members.  If and when the Capital Accounts of the Members are required to be adjusted pursuant to Sections 1.704-1(b)(2)(iv)(f) or (g) of the Regulations with respect to a revaluation of any asset of the Company, then subsequent

allocations of income, gain, loss, and deduction, including without limitation depreciation or deductions for cost recovery with respect to such asset, shall take into account any variation between the then existing adjusted basis of such asset for federal income tax purposes and the agreed value of such asset, as such computations may be required under Code Sections 704(b) and 704(c) and Section 1.704-1(b)(4)(i) of the Regulations. Any elections or other decisions relating to such allocations shall be determined by the Managing Members, subject to the consent of any Member adversely affected, which consent shall not be unreasonably withheld, delayed or conditioned.

8.7    Curative Allocations.  The allocations set forth in Sections 8.4, 8.5 and 8.6 (the "**Regulatory Allocations**") are intended to comply with certain requirements of Regulations Sections 1.704-1(b) and 1.704-2(b).  Notwithstanding any other provisions of this Agreement, other than the Regulatory Allocations, the Regulatory Allocations shall be taken into account in allocating other items of income, gain, loss and deduction among the Members so that, to the extent possible, the net amount of such allocations of other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to such Member if the Regulatory Allocations had not occurred.  The Members as a Major Decision, with respect to each Fiscal Year, may apply the provisions of this Section 8.7 in whatever manner is likely to minimize the economic distortions that might otherwise result from the Regulatory Allocations.

# ARTICLE IX
# DISTRIBUTIONS TO MEMBERS

9.1    Distributable Cash.  Su ject to the provisions of Sections 7.2(c) h ereof, and except as provided in Section 15.3 hereof, the Company shall distribute Distributable Cash to the Members as and when determined by the Managing Member, but not less frequently than quarterly (except that any net proceeds from a sale or refinancing of Company Property shall be distributed to the Members as soon as practicable following receipt thereof by the Company (but in no event more than ten (10) days after the closing of such sale or refinancing)), to the Members in the order of priority as follows:

(a)    First, to the Members pro rata to the extent of the balance, if any, in their respective Unreturned Additional Capital accounts;

(b)    Second, to the Members pro rata to the extent of the balance, if any, in their respective Unreturned Initial Capital Contributions; and

(c)    Thereafter, to the Members pro rata in accordance with their then respective Percentage Interests.

9.2    Limitation Upon Distributions.  No distribution shall be made to Members if prohibited by Section 18-607 of the Act.

9.3    Interest On and Return of Capital Contributions.  No Member shall be entitled to interest on such Member's Capital Contributions or to a return of its Capital Contributions, except as otherwise specifically provided for in this Agreement.

9.4   <u>Shabbos Clause</u>.  Notwithstanding the foregoing, if the Property or any portion thereof is converted and used as a hotel, the Members agree to admit a non-Jewish Person (the **"Shabbos Member"**) so that that all profits and losses derived from the operation of the Property on Shabbos and Jewish Holdiays are to be distributed to Shabbos Member upon terms mutually agreeable to the Members, subject to the consent of any Lender under Loan Document (including any Lender under any Acquisition Loan).

# ARTICLE X
# PERCENTAGE INTERESTS

10.1   <u>Percentage Interests</u>.  Each Member's Percentage Interest in the Company shall be as set forth on <u>Exhibit B</u> hereto, which shall be adjusted from time to time in accordance with this Agreement.

# ARTICLE XI
# REMOVAL OF MANAGING MEMBER

11.1   <u>Major Defaults</u>.

(a)   Notwithstanding anything to the contrary contained herein, the occurrence of any fraudulent act or act of gross negligence or willful misconduct, or the intentional making of a material misrepresentation, by any Member in connection with or in any way relating to the Company or any asset of the Company (including, without limitation, any Owner Entity or Subsidiary) shall be a "Major Default" hereunder.  The Member with respect to whom a Major Default has occurred is referred to as a "Defaulting Member".  In addition, the following circumstances shall constitute a "Removal Default" with respect to the Managing Member:

(i)   if Managing Member or any Affiliate of the Managing Member is found guilty of (or pleads guilty to) a felony or other crime involving moral turpitude which has or can reasonably be expected to have a material adverse effect on the Company, any Owner Entity, either Member or the Property;

(ii)   if the Managing Member or any Affiliate of the Managing Member misapplies any funds derived from the Property (including lease payments, unit sales proceeds, security deposits, insurance proceeds and condemnation awards), or commingles funds derived from the Property with other funds;

(iii)   if the Company fails to maintain insurance as required under any Loan as a result of the act or omission of the Managing Member or any Affiliate of the Managing Member provided that sufficient funds therefor have been made available to the Managing Member (or its Affiliate) by the Company, which default remains uncured upon the earlier of (x) three (3) business days after written notice thereof to the Managing Member, and (y) the cancellation of any such insurance;

(iv)   if the Managing Member or any Affiliate of the Managing Member fails to pay any taxes or assessments affecting the Property when due provided that sufficient funds therefor have been made available to the Managing Member (or its Affiliate) by the Company, which default remains uncured upon the earlier of (x) five (5) Business Days after

written notice thereof to the Managing Member, and (y) the forfeiture and sale of the Property as the result of any lien arising out of any such taxes;

(v)     if any event of default under any Loan is due to the actions or inactions of the Managing Member or any Affiliate of the Managing Member (other than any actions taken by the Managing Member or such Affiliate within the scope of its authority as Managing Member, in good faith and in the best interests of the Company, and not otherwise in violation of this Agreement, and other than the failure of the Managing Member to make payments under the Loan for which Company funds are not available), and the event of default is not cured within any applicable cure period allowed under the applicable Loan Document(s);

(vi)     the filing of a voluntary bankruptcy by the Company or any Owner Entity or Subsidiary (unless consented to by Clipper Member) or by the Managing Member and the filing of an involuntary bankruptcy against the Managing Member and such involuntary bankruptcy is not dismissed within thirty (30) days of the filing;

(vii)     the liquidation or dissolution of the Managing Member;

(viii)     if the Managing Member commits any other material breach of or default under this Agreement (including taking any action with respect to a Major Decision without the prior written approval of Clipper Member), which breach or default continues for ten (10) days after receipt by the Managing Member or any Affiliate of the Managing Member of notice of its occurrence from Clipper Member; and

(ix)     the occurrence of a Major Default by the Managing Member.

(b)     If a Major Default or a Removal Default by a Member has occurred, such Defaulting Member shall be liable to the Company and the other Members for all costs arising directly or indirectly from or in connection with any such Major Default or Removal Default, as the case may be, including, without limitation, attorneys' fees, expenses, losses, liabilities and damages suffered or incurred or incurred by the other Members or by the Company, and shall indemnify the Company and the other Members and hold each of them harmless from and against any and all losses, costs, expenses, obligations or liabilities resulting or arising from such Major Default or Removal Default, as the case may be.  No costs or expenses incurred by the Defaulting Member in connection with the foregoing indemnity shall be considered a contribution of capital hereunder or a loan to the Company nor included in calculating such Member's Capital Account or otherwise considered in determining any ownership interest or right to receive any distribution or other payments from the Company or the other Members.  In addition to all other remedies, the Company shall have the right to reduce and to set off against any amounts payable to such Member pursuant to this Agreement.

11.2     Removal of the Managing Member.

(a)     If at any time there shall have occurred a Removal Default by or with respect to the Managing Member, then in addition to any rights and remedies available to Clipper Member hereunder, at law or in equity, Clipper Member may (subject to the written consent of any Lender which may be required under Loan Documents) elect to remove the Managing Member as the Managing Member of the Company by giving the Managing Member written

notice (the "**Removal Notice**") at any time after the occurrence of such Removal Default by the Managing Member. In the event Clipper Member elects to remove the Managing Member as the Managing Member as set forth above, the Managing Member shall be removed and shall be deemed a Non-Managing Member hereunder, except that in no event shall such removed Managing Member have any approval or consent rights with respect to Major Decisions other than the Major Decisions set forth in Sections 6.2(ix), (x), and (xiv).

(b)     Upon the removal of the Managing Member as provided herein, Clipper Member may, in its discretion, but subject to any of Lender's written consent which may be required under any Loan Documents, (1) elect to become the new Managing Member of the Company or (2) select a new third party Managing Member. In the event a third-party manager is chosen, (x) such third-party manager must have not less than ten (10) years' experience in the management of real estate projects similar to the Property in New York, New York and (y) Clipper Member may cause the Company to compensate such manager at commercially reasonable rates. Further, upon the removal of the Managing Member as provided herein, Clipper Member, at its option and without cost, expense or liability to Clipper Member or the Company (any such cost, expense or liability to be borne by the Managing Member), may terminate any contracts or agreements between the Company (or any Owner Entity) and any Affiliate of CF Member.

(c)     In the event that the Managing Member is removed from such position pursuant to Section 11.2(b), then upon the written request of Clipper Member, such former Managing Member shall reasonably cooperate to facilitate the substitution of the successor Managing Member, even where the former Managing Member was removed as a result of a Removal Default.

# ARTICLE XII
## CESSATION OF MEMBERSHIP

12.1   Cessation. Except as set forth in this Article XII, a Member shall cease to be a Member as of the date of the occurrence of any of the events set forth in Section 18-304 of the Act, including, without limitation, the following:

(a)     All of such Member's Interests in the Company are purchased by the Company or the other Members or otherwise in accordance with Article XIII below;

(b)     Such Member makes an assignment for the benefit of creditors; files a voluntary petition in bankruptcy; is adjudicated bankrupt or insolvent or has entered against it an order for relief in any bankruptcy or insolvency proceeding; files a petition or answer seeking for the Member any reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation; files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against the Member in any proceeding of this nature; or seeks, consents to, or acquiesces in the appointment of a trustee, receiver, or liquidator of the Member or of all of any substantial part of the Member's properties; or

(c)    If within one hundred twenty (120) days after the commencement of any proceeding against such Member seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law, or regulation, the proceeding has not been dismissed, or if within ninety (90) days after the appointment without the Member's consent or acquiescence of a trustee, receiver, or liquidator of the Member or of all or any substantial part of the Member's properties, the appointment is not vacated or stayed, or within ninety (90) days after the expiration of any stay, the appointment is not vacated.

12.2    <u>Withdrawal</u>.  No Member may withdraw from the Company pursuant to the Act or otherwise.

12.3    <u>Cessation With Respect to Member</u>.  The Members hereby agree that cessation with respect to any Member shall not result in the dissolution of the Company.

## ARTICLE XIII
## TRANSFER OF MEMBERSHIP INTERESTS

13.1    <u>Prohibition on Transfers</u>.

(a)    No Member may (i) Transfer all, or any portion of, or any interest or rights in, such Member's Interest, (ii) permit any direct or indirect member, partner or equity owner of such Member to Transfer any portion of its direct or indirect interest in such Member, or (iii) cause or permit a change of Control of such Member, without the approval of the other Member, which approval may be granted or withheld in the sole discretion of such Member; provided, however, that nothing contained herein shall prohibit the Transfer of any direct or indirect Interest of the Shabbos Member.  Each Member hereby acknowledges the reasonableness of this prohibition in view of the purposes of the Company and the relationship of the Members.  The attempted Transfer of any Interest or any portion of any Interest not in accordance with this <u>Article XIII</u> shall be invalid, null and void, and of no force or effect.  Each transferor of an Interest hereby indemnifies the Company and the remaining Members from and against any and all losses, liabilities, damages and expenses arising directly or indirectly out of any Transfer or purported Transfer of an Interest in violation of this Agreement.  Notwithstanding any provision of this Agreement to the contrary, no Transfer of an Interest shall be permitted to the extent such Transfer violates the terms of any Loan Document of the Company or any Owner Entity (or any guaranty executed in connection therewith).

(b)    Notwithstanding anything else contained herein to the contrary, any Transfer of an Interest pursuant to this Agreement shall nevertheless remain subject to the provisions of this Agreement, and the transferee (if not already a party to this Agreement) shall execute and deliver to each other party hereto, as a condition precedent to such Transfer, documents reasonably satisfactory to the Company confirming that such Person agrees to be bound by each and every term of this Agreement in the same manner as its transferor, except as otherwise specifically provided in this Agreement.

(c)    No Transfer of an Interest shall be made except in accordance with the Federal Act and the rules and regulations promulgated thereunder and any applicable state securities laws and regulations, as the same may be amended from time to time.  Any Member

who proposes to Transfer all of its Interests shall be required to pay to the Company a sum sufficient to cover all reasonable expenses (including legal and accounting fees) in connection with the Company's consideration and processing of such proposed Transfer. This <u>Section 13.1(c)</u> shall apply to all Transfers of Interests in the Company.

13.2 <u>Assignee's Rights.</u>

(a) A permitted Transfer of any Interests in the Company ("**Transferred Interests**") shall be effective as of the date of assignment and compliance with the conditions to such Transfer (which shall include the requirement that the assignee submit to the Company a letter of acceptance of all the terms and conditions of this Agreement), and such Transfer, upon its so becoming effective, shall be shown on the books and records of the Company. Profit, losses and other Company items shall be allocated between the transferor ("**Transferring Member**") and the assignee as determined by the Managing Member in accordance with the provisions of Code Section 706. Distributions made before the effective time of such Transfer shall be paid to the Transferring Member, and distributions made after such date shall be paid to the Substituted Member (as hereianfter defined).

(b) Unless and until an assignee becomes a Substituted Member pursuant to <u>Section 13.4</u> hereof, the assignee shall not be entitled to any rights to vote or any of the other rights granted to a Member hereunder or under applicable law, other than the rights granted specifically to an assignee pursuant to this Agreement, <u>provided</u> t hat without relieving the transferring Member from any such limitations or obligations as more fully described in <u>Section 13.3</u> hereof, such assignee shall be bound by any limitations and obligations of a Member contained herein by which a Member would be bound on account of the assignee's interest.

13.3 <u>Assignor's Rights and Obligations.</u> Any Member who shall Transfer all of its Interests in accordance with the terms hereof (i) shall cease to be a Member and (ii) shall no longer have any rights or privileges, or, except as set forth in this <u>Section 13.3</u>, duties and liabilities, of a Member with respect to such Transferred Interests (it being understood, however, that the applicable provisions of <u>Section 14.2</u> shall continue to inure to such Person's benefit), except that unless and until the assignee is admitted as a Substituted Member in accordance with the provisions of <u>Section 13.4</u> (the "**Admission Date**"), (A) such Transferring Member shall retain all of the duties and liabilities of a Member with respect to such Interests, and (B) the Transferring Member may, in its sole discretion, reinstate all or any portion of its rights and privileges with respect to such Transferred Interests for any period of time prior to the Admission Date. Nothing contained herein shall relieve any Member who Transfers any Interest from any liabilities that such Member may have to the Company with respect to such Interest that may exist on the Admission Date or that are otherwise specified in the Act and incorporated into this Agreement or for any liability to the Company or any other Person for any materially false statement made by such Member (in its capacity as such) herein or for any present or future breaches of any representations, warranties or covenants by such Member (in its capacity as such) contained herein or in other agreements with the Company.

13.4 <u>Substituted Members.</u> In connection with the permitted Transfer of all of a Member's Interests, the transferee shall become a substituted Member on the effective time of such Transfer (a "**Substituted Member**"), which effective time shall not be earlier than the date

of compliance with the conditions to such Transfer (including, without limitation, the consent of the Members), including the conditions that such transferee, unless already a Member, shall furnish the non-transferring Member (i) a letter of acceptance of all the terms and conditions of this Agreement and (ii) such other documents or instruments as may be necessary or appropriate to effect such Person's admission as a Member. Such admission shall become effective on the date on which such conditions have been satisfied, and when any such admission is shown on the books and records of the Company. The Transferring Member shall pay, or reimburse the Company for, all costs incurred by the Company in connection with the Transfer or admission on or before the tenth (10th) business day after the receipt by the Transferring Member of the Company's invoice for the amount due and the proposed assignee being admitted shall not be deemed a Member until such invoice is paid.

**ARTICLE XIV**
**OTHER MATTERS REGARDING MEMBERS**

14.1    <u>Liability of Members</u>.  Each Member's liability shall be limited or eliminated to the extent permitted by the Act and other applicable law.  Neither the Company nor any Member shall, by virtue of executing this Agreement, be responsible or liable for any indebtedness or obligation of any other Member incurred or arising either before or after the Effective Date of this Agreement, except as to those responsibilities, liabilities, indebtedness, or obligations expressly assumed by the Company in writing as of the Effective Date or incurred by the Company after the Effective Date pursuant to and as limited by the terms of this Agreement.

14.2    <u>Indemnification</u>.  Except in respect of a Member's indemnification obligations under <u>Section 14.3</u> hereof, to the fullest extent permitted by applicable law, the Company shall indemnify each Member for all actual out-of-pocket costs and expenses (including reasonable attorney's fees and disbursements), losses, liabilities and damages paid or accrued by such Member in connection with any act or omission performed by such person in good faith in connection with the business of the Company.  Subject to <u>Section 6.2(xxv)</u>, and to the fullest extent permitted by applicable law, expenses (including reasonable attorneys' fees and disbursements) incurred by any such Member in defending any claim, demand, action, suit or proceeding may, from time to time, upon approval by the Managing Member, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding, subject to recapture by the Company following a later determination that such Member or Affiliate was not entitled to indemnification hereunder.  Notwithstanding the foregoing, no such Member or Affiliate shall be indemnified against liability for any fraud, intentional misconduct, gross negligence and/or any knowing violation of law or any transaction in which such Member or Affiliate receives a personal benefit in violation or breach of the Act or this Agreement.

14.3    <u>Representations by Members</u>.  The Clipper Member hereby represents and warrants to the Members on and as of the Effective Date that David Bistricer Controls the Bistricer Entity.  The CF Member hereby represents and warrants to the Members on and as of the Effective Date that Meyer Chetrit Controls the CF Member.  All of the Members hereby further represent, warrant, agree and acknowledge that:

(a)    it hereby represents and warrants to each of the other Members and to the Company that such Member has acquired its Interest in the Company for investment solely for

its own account with the intention of holding such Interest for investment purposes only. Each Member represents and warrants that it is familiar with the business of the Company and has had access to all material information concerning its investment in the Company;

(b)     it hereby acknowledges that such Member is aware that such Member's Interest has not been registered under the Federal Act, the Act or under any other state securities laws. Each Member further understands and agrees that his or her representations and warranties contained in this Section 14.3 are being relied upon by the Company and by the other Members as the basis for the exemption of the Members' Interests from the registration requirements of the Federal Act and under all other state securities laws. Each Member further acknowledges and agrees that the Company will not and has no obligation to recognize any sale, transfer, or assignment of a Member's Interest to any person or entity unless and until the provisions of Article XIII hereof have been fully satisfied;

(c)     it hereby acknowledges and agrees that a legend reflecting the restrictions imposed upon the transfer of his or her Interest under this Agreement, under the Federal Act, the Act and under state securities laws shall be placed on the first page of this Agreement;

(d)     its execution and delivery of this Agreement and the performance of its obligations hereunder will not conflict with, result in a breach of or constitute a default (or any event that, with notice or lapse of time, or both, would constitute a default) or result in the acceleration of any obligation under any of the terms, conditions or provisions of any other agreement or instrument to which it is a party or by which it is bound or to which any of its property or assets are subject, or violate any statute or any order, rule or regulation of any court or governmental or regulatory agency, body or official, that would materially and adversely affect the performance of its duties hereunder; such Member has obtained any consent, approval, authorization or order of any court or governmental agency or body required for the execution, delivery and performance by such Member of its obligations hereunder;

(e)     there is no action, suit or proceeding pending against such Member or, to its knowledge, threatened in any court or by or before any other governmental agency or instrumentality that could adversely affect or would prohibit its entering into or performing its obligations under this Agreement;

(f)     this Agreement is a binding agreement on the part of such Member enforceable in accordance with its terms against such Member; and

(g)     it has been provided with, or has had access to, such information as it deems necessary to or useful in its evaluation of the merits, risks and tax consequences of an investment in the Company and of making an informed investment decision.

Each Member shall and hereby agrees to indemnify, defend and hold harmless the Company and the other Members from any liability, loss, cost, damage and expense (including, without limitation, the costs of litigation and attorneys' fees) arising out of, resulting from, or in any way related to the breach of any representation or warranty of such Member set forth in this Section 14.3.

## ARTICLE XV
## DISSOLUTION AND WINDING UP

15.1    <u>Dissolution</u>.  The Company shall be dissolved upon the occurrence of any of the following events:

(a)    the written consent of all Members except the Shabbos Member, if applicable; or

(b)    entry of a decree of judicial dissolution under Section 18-802 of the Act; or

(c)    sale or other disposition of all the assets of the Company.

15.2    <u>Effect of Dissolution</u>.  Upon dissolution, the Company shall cease to carry on its business, except as permitted by Section 18-803 of the Act.

15.3    <u>Winding Up, Liquidation and Distribution of Assets</u>.

(a)    Upon dissolution of the Company, an accounting shall be made by the Company's independent accountants of the accounts of the Company and of the Company's assets, liabilities and operations, from the date of the last previous accounting until the date of dissolution.  The Managing Member shall immediately proceed to wind up the affairs of the Company.

(b)    If the Company is dissolved and its affairs are to be wound up, the Managing Member shall:

(i)    Sell or otherwise liquidate all of the Company's assets as promptly as practicable;

(ii)    Allocate any Net Profit or Net Loss resulting from such sales to the Members in accordance with <u>Article VIII</u> hereof;

(iii)    Discharge all liabilities of the Company, other than liabilities to Members, and establish such reserves as may be reasonably necessary to provide for contingent liabilities of the Company;

(iv)    Discharge liabilities of the Company to Members; and

(v)    Thereafter, to the Members in accordance with <u>Section 9.1</u> hereof.

(c)    Notwithstanding anything to the contrary in this Agreement, upon a liquidation within the meaning of Section 1.704-1(b)(2)(ii)(g) of the Regulations, if any Member has a negative Adjusted Capital Account Balance (after giving effect to all contributions, distributions, allocations and other Capital Account adjustments for all taxable years, including the year during which such liquidation occurs), such Member shall have no obligation to make

any capital contribution and the negative balance of such Member's Capital Account shall not be considered a debt owed by such Member to the Company or to any other person for any purpose whatsoever.

(d)     It is intended that prior to a distribution of the proceeds from a liquidation of the Company pursuant to Section 15.3(b)(v), the positive Capital Account balance of each Member shall be equal to the amount that such Member is entitled to receive pursuant to Section 9.1.   Accordingly, notwithstanding anything to the contrary in Article VIII, to the extent permissible under Sections 704(b) of the Code and the Regulations promulgated thereunder, Net Profits and Net Losses and, if necessary, items of gross income and gross deductions, of the Company for the year of liquidation of the Company (or, if earlier, the year in which all or substantially all of the Company's assets are sold, transferred or disposed of) shall be allocated among the Members so as to bring the positive Capital Account balance of each Member as close as possible to the amount that such Member would receive if the Company were liquidated and all the proceeds were distributed in accordance with Section 9.1.

(e)     Upon completion of the winding up, liquidation and distribution of the assets, the Company shall be deemed terminated.

(f)     The Managing Member shall comply with the requirements of applicable law pertaining to the winding up of the affairs of the Company and the final distribution of its assets.

15.4     Certificate of Termination.  When all debts, liabilities and obligations have been paid and discharged or adequate provisions have been made therefor and all of the remaining property and assets have been distributed to the Members, the Members may file a certificate of cancellation pursuant to Section 18-203 of the Act.

## ARTICLE XVI
## MISCELLANEOUS PROVISIONS

16.1     Entire Agreement; Amendment.  This Agreement, together with the exhibits and schedules attached hereto, represents the entire agreement among all the parties hereto concerning the subject matter hereof.  This Agreement and the Certificate may only be amended by a written agreement signed by all of the Members (except the Shabbos Member).

16.2     No Partnership Intended for Nontax Purposes.  The Members have formed the Company under the Act, and expressly do not intend hereby to form a partnership under either the Delaware Revised Uniform Partnership Act or the Delaware Revised Uniform Limited Partnership Act.  The Members do not intend to be partners one to another or partners as to any third party in connection with the business of the Company.

16.3     Application of Delaware Law.  This Agreement, the application and interpretation hereof shall be governed exclusively by its terms and the laws of the State of Delaware without regard to its conflict of laws provisions.

16.4   <u>Execution of Additional Instruments</u>.   Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments necessary to comply with any laws, rules or regulations.

16.5   <u>Construction</u>.   Whenever the singular form is used in this Agreement, and when required by the context, the same shall include the plural and vice versa, and the masculine gender shall include the feminine and neuter genders and vice versa.   This Agreement and any documents or instruments delivered pursuant hereto shall be construed without regard to the identity of the Person who drafted the various provisions of the same.   Further, each Member has been or has declined to be represented by legal counsel in connection with the drafting and negotiation of this Agreement and the other agreements referred to herein.   Consequently, each Member acknowledges and agrees that any rule of construction that a document is to be construed against the drafting party shall not be applicable either to this Agreement or such other documents and instruments.

16.6   <u>Headings</u>.   The headings in this Agreement are inserted for convenience only and are in no way intended to describe, interpret, define, or limit the scope, extent or intent of the Agreement or any provision hereof.

16.7   <u>Waivers</u>.   The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Agreement shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation.

16.8   <u>Rights and Remedies Cumulative</u>.   The rights and remedies provided by this Agreement are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right not use any or all other remedies.   Such rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

16.9   <u>Counterparts</u>.   This Agreement may be executed in counterparts, each of which shall be deemed an original but all of which shall constitute one and the same instrument.   Any signature page of any such counterpart, or any electronic facsimile thereof, may be attached or appended to any other counterpart to complete a fully executed counterpart of this Agreement, and any telecopy or other facsimile transmission of any signature shall be deemed an original and shall bind such party.

16.10   <u>Further Assurances</u>.   The Members each agree to cooperate, and to execute and deliver in a timely fashion any and all additional documents necessary to effectuate the purposes of the Company and this Agreement.

16.11   <u>Notices</u>.   All notices, consents, requests and other communications hereunder shall be in writing and shall be sent by hand delivery, by certified or registered mail (return-receipt requested) or by a recognized national overnight courier service to the addresses set forth on <u>Exhibit B</u> hereto.   Notices delivered pursuant to this Section shall be deemed given:   at the time delivered, if personally delivered; three (3) business days after being deposited in the mail, if mailed; and one (1) business day after timely delivery to the courier, if by overnight courier

service.  Any party may change the address to which notice is to be sent by written notice to each other party hereto in accordance with this <u>Section 16.11</u>.

16.12   <u>Certification of Non-Foreign Status</u>.  In order to comply with Section 1445 of the Code and the applicable Regulations thereunder, in the event of the disposition by the Company of a United States real property interest as defined in the Code and Regulations, each Member shall provide to the Company, an affidavit stating, under penalties of perjury, (i) the Member's address, (ii) United States taxpayer identification number, and (iii) that the Member is not a foreign person as that term is defined in the Code and Regulations.  Failure by any Member to provide such affidavit by the date of such disposition shall authorize the Manager to withhold thirty-five percent (35%) (or other percentage or amount required by the Code or Regulations) of each such Member's allocable share of the gain realized by the Company on the disposition.

16.13   <u>No Third Party Beneficiaries</u>.  This Agreement is not intended and shall not be construed as granting any rights, benefits or privileges to any Person not a party to this Agreement.

**[The remainder of this page is intentionally blank.]**

IN WITNESS WHEREOF, the parties hereto have executed or caused this Agreement to be executed to be effective as of the date first set forth above.

CF MEMBER:

**CF 135 WEST MEMBER LLC,**
**a Delaware limited liability company**

By:        CF 135 Flat LLC,
              a Delaware limited liability company,
              its manager

        By: _____
            Name: Meyer Chetrit
            Title: Managing Member

CLIPPER MEMBER:

**CLIPPER 135 WEST LLC,**
**a Delaware limited liability company**

By: _____
      Name:   David Bistricer
      Title: Manager

EXHIBIT A

PROPERTY

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the Northerly side of West 52nd Street, distant 375 feet Westerly from the Northwesterly corner of Avenue of the Americas (formerly known as Sixth Avenue) and West 52nd Street;

RUNNING THENCE Northerly and parallel with Avenue of the Americas, 100 feet 5 inches to the center line of the block between West 52nd Street and West 53rd Street;

THENCE Westerly along the said center line of the block, 82 feet 6 inches;

THENCE Northerly parallel with Avenue of the Americas, 100 feet 5 inches to the Southerly side of West 53rd Street;

THENCE Westerly along the Northerly side of West 53rd Street, 37 feet 6 inches;

THENCE Southerly parallel with Avenue of the Americas and part of the distance through a party wall, 100 feet 5 inches to the center line of the block;

THENCE Westerly along the center line of the block, 5 feet 0 inches;

THENCE Southerly parallel with Avenue of the Americas, 100 feet 5 inches to the Northerly side of West 52nd Street;

THENCE Easterly along the Northerly side of West 52nd Street, 125 feet 0 inches to the point or place of BEGINNING.

EXHIBIT B

MEMBERS

| Name and Address | Initial Capital Contribution | Percentage Interests |
|---|---|---|
| Clipper 135 West LLC<br>c/o Clipper Equity 4611, Suite 1L<br>Brooklyn, New York 11219<br>Attention: David Bistricer | $100 | 25% |

With a copy sent to:

Sukenik, Segal & Graff, P.C.
404 Fifth Avenue, 5th Floor
New York, New York 10018
Attention:  Josh Graff, Esq.

| CF Member<br>c/o The Chetrit Group, LLC<br>512 Seventh Avenue, 15th Floor<br>New York, New York 10012<br>Attention:  Meyer Chetrit | $300 | 75% |

With a copy sent to:

Sukenik, Segal & Graff, P.C.
404 Fifth Avenue, 5th Floor
New York, New York 10018
Attention:  Josh Graff, Esq.

EXHIBIT C

<u>OFFICERS</u>

| <u>OFFICERS</u> | <u>TITLE</u> |
|---|---|
| Meyer Chetrit | President |
| Joseph Chetrit | Vice President, Treasurer |
| David Bistricer | Secretary |

# EXHIBIT E

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
┌─────────────────────────────────────┐
│                                      │
│   CF 135 Flat LLC et al.,            │
│                                      │
│                      Plaintiffs,     │
│                                      │
│              –v–                     │
│                                      │
│   Triadou SPV S.A. et al.,           │
│                                      │
│                      Defendants.     │
│                                      │
└─────────────────────────────────────┘
```

```
┌──────────────────────────────────────────┐
│  USDC SDNY                                 │
│  DOCUMENT                                  │
│  ELECTRONICALLY FILED                      │
│  DOC #:_____                   │
│  DATE FILED: FEB 2 2 2016                  │
└──────────────────────────────────────────┘
```

15-CV-5345 (AJN)

MEMORANDUM AND
ORDER

ALISON J. NATHAN, District Judge:

On February 2, 2016, New York state court Justice Donna Mills granted Plaintiffs'

request for a stay of state court proceedings related to this action. *See* Dkt. No. 93 Ex. A; Dkt.

No. 94. However, this stay was subject to the condition that Plaintiffs "pay the $21 million in

controversy into the New York State Court." Dkt. No. 94 at 1. Because Plaintiffs take issue

with this condition, they now request that the Court "issue an injunction staying all of the state

court proceedings, pending resolution of this action."[1] *Id.* at 2. For the reasons articulated

below, Plaintiffs' request is DENIED.

I.    **BACKGROUND**

In August 2014, Defendant Triadou assigned its ownership interest in a limited liability

company to Plaintiffs. Am. Comp. ¶ 8. In exchange, Plaintiffs agreed to pay Defendant Triadou

$21 million in four installment payments. *Id.* Alleging that Plaintiffs had failed to make the

installment payments, Defendant Triadou initiated a series of New York state court lawsuits

against Plaintiffs. *Id.* ¶ 9. These state court proceedings are currently pending before Justice

---

[1] Plaintiffs alternatively phrase their request as a request to "enjoin any attempt by Triadou to enforce any judgment
in the state court proceedings" before Justice Mills. Dkt. No. 94 at 3.

1

Donna Mills. Dkt. No. 94. At some point thereafter, Plaintiffs initiated this interpleader action against Defendant Triadou and Defendant Almaty. Based on the interpleader action, Plaintiffs went to the state court and requested a stay. *See* Dkt. No. 93. On February 2, 2016, Justice Mills issued an order granting the requested stay on the condition that Plaintiffs pay the $21 million in controversy to the New York state court. Dkt. No. 93 Ex. A at 12; Dkt. No. 94.

On February 17, 2016, Plaintiffs informed the Court of Justice Mills's decision and took issue with its "most problematic condition"—the requirement to deposit $21 million with the state court. Dkt. No. 94 at 1. In order to avoid compliance with this condition but still obtain the desired stay, Plaintiffs now request that this Court "issue an injunction staying all of the state court proceedings, pending resolution of this action." *Id*. at 2.

## II.    DISCUSSION

"[A] federal court presiding over [a Rule 22] interpleader action may stay pending state court proceedings involving the same interpled fund under the 'necessary in aid of its jurisdiction' exception to the Anti–Injunction Act." *Geler v. Nat'l Westminster Bank USA*, 763 F. Supp. 722, 727 (S.D.N.Y. 1991) (quoting *Gen. Ry. Signal Co. v. Corcoran*, 921 F.2d 700, 707 (7th Cir. 1991)). In order to grant such relief, however, "the usual standards for granting a preliminary injunction must be satisfied." *Id*. at 729. To obtain a preliminary injunction, "the moving party must show: (1) it will suffer irreparable harm absent the injunction and (2) a likelihood of success on the merits. *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233 (2d Cir. 1999) (quoting *Jolly v. Coughlin*, 76 F.3d 468, 473 (2d Cir. 1996)) (internal quotation marks omitted).

Plaintiffs cannot demonstrate irreparable harm. In their letter, they suggest that they face the irreparable harm of "inconsistent judgments if the state court proceedings resume and/or

2

Triadou attempts to enforce the judgments it holds." Dkt. No. 94 at 3. While the risk of inconsistent judgments may be an irreparable harm justifying a stay, the state court has already issued a conditional stay. Dkt. No. 93 Ex. A at 12. Thus, the relevant inquiry here is whether complying with the state court's condition for obtaining the requested stay (i.e. paying $21 million to the New York state court) constitutes an irreparable injury. Although Plaintiffs allege that "Justice Mills' Order gives Plaintiffs no way to withdraw the stake from state court," Dkt. No. 94 at 2, it strains credulity to claim that Plaintiffs will be unable to recover their $21 million from the state court upon resolution of this interpleader action.

Furthermore, Plaintiffs previously represented to this Court that they were willing, if necessary, to deposit the interpleader funds into the state court to obtain a stay from that court. In their opposition to Defendant Triadou's motion to dismiss, Plaintiffs write:

> "As part of Plaintiffs' July 7, 2015 order to show cause in State Action 1, Plaintiffs stated that they would, *if (and only if) required by the state court as a condition of obtaining a stay*, deposit an amount equal to the judgment sum in that action . . . into *state* court. . . . Plaintiffs made this same conditional offer in State Action 2. . . . If the state court ultimately requires that a deposit must be made, then Plaintiffs will make the required deposit into state court."

Dkt. No. 39 at 19-20. Their prior consent to this condition seriously undermines their current argument that the condition constitutes irreparable injury.

## III.   CONCLUSION

Because Plaintiffs cannot demonstrate that paying the $21 million of disputed funds to the New York state court constitutes an irreparable injury, particularly in light of their previous consent to this condition, Plaintiffs' motion is DENIED.

As a final note, Justice Mills's order provides that Plaintiffs "may seek to modify this order at such time as they can demonstrate that the money must be paid into the district court."

Dkt. No. 93 Ex. A. at 10.  Thus, if, at a later date, this Court orders Plaintiffs to deposit the interpleader funds with the Clerk of Court in this district, the Court will give Plaintiffs adequate time to apply to Justice Mills for appropriate relief from its state court obligations.

     This resolves Dkt. No. 94.

     SO ORDERED.

Dated: February ____, 2016
      New York, New York

_____
      ALISON J. NATHAN
      United States District Judge

4