# **Exhibit 33**



# England and Wales High Court (Commercial Court) Decisions

[New search] [Printable RTF version] [Help]

**Neutral Citation Number: [2013] EWHC 510 (Comm)**

Case No: 2010 Folio 706, 2009 Folio 1099, 2010 Folio 93

**IN THE HIGH COURT OF JUSTICE**
**QUEEN'S BENCH DIVISION**
**COMMERCIAL COURT**

Royal Courts of Justice
Strand, London, WC2A 2LL

19/03/2013

B e f o r e :

**THE HONOURABLE MR. JUSTICE TEARE**

_____

Between:

**(GRANTON ACTION)**
**JSC BTA BANK**

Claimant

-and-
**(1) MUKHTAR ABLYAZOV**
**(2) ZHAKSYLYK ZHARIMBETOV**
**and OTHERS**

Defendants

**(DREY ACTION)**
**JSC BTA BANK**

Claimant

-and-
**(1) MUKHTAR ABLYAZOV**
**(2) ZHAKSYLYK ZHARIMBETOV**
**and OTHERS**

Defendants

**(CHRYSOPA ACTION)**
**JSC BTA BANK**

Claimant

**– and –**

## (1) MUKHTAR ABLYAZOV
## (2) ILDAR GAYAREVICH KHAZHAEV
## (5) USAREL INVESTMENTS LTD
## and OTHERS

**Defendants**

_____

**Stephen Smith QC, Philip Marshall QC, Mr. Nigel Hood, Mr. Tim Akkouh, Ms Ruth den Besten and Ms Emily Gillett (instructed by Hogan Lovells International LLP) for the Claimant**
**Hugh Norbury QC (instructed by Peters & Peters Solicitors LLP) for Zhaksylyk Zharimbetov**
**Jeffrey Chapman QC and Mr. Simon Attrill (instructed by Olswang LLP) for Ildar Gayarevich Khazhaev**
**Cyril Kinsky QC and Mr. Peter Griffiths (instructed by Edwin Coe LLP) for Usarel Investments Ltd**

**Hearing dates: 7, 8, 13-15, 19-22, 26-29 November 2012, 3-6, 10-13, 17-20 December 2012, 14-18, 21, 22, 28-31 January 2013, 4-7, 11-14 February 2013**

_____

## HTML VERSION OF JUDGMENT

_____

Crown Copyright ©

**Mr. Justice Teare :**

1.  The following note of the contents of this judgment may assist the reader:

|  | Paragraphs |
|---|---|
| Introduction | 2-8 |
| The Bank and its officers | 9-29 |
| The investigations of the AFN | 30-41 |
| The nationalisation of the Bank | 42-46 |
| Witnesses | 47-74 |
| The alleged fraud in Granton | 75-95 |
| The alleged fraud in Drey | 96-110 |
| The alleged fraud in Chrysopa | 111-172 |
| The claim against Mr. Zharimbetov in Granton | 172-244 |
| Knowing assistance | 171-204 |
| Liability under Kazakh law | 205-207 |
| Need for a shareholders' resolution | 208-218 |
| Limitation | 219-242 |
| Quantum | 243-244 |

| | |
|---|---|
| The claim against Mr. Zharimbetov in Drey | 245-266 |
| Knowing assistance | 245-260 |
| Causation and Quantum | 261-266 |
| The claim against Mr. Khazhaev in Chrysopa | 267-311 |
| Knowing assistance and | 267-300 |
| "deliberate damage" | |
| Causation and Limitation | 301-311 |
| The claim against Usarel for the shares as "dokhody" | 312-344 |
| The claim against Usarel for damages | 345-348 |
| Conclusion | 349-351 |

<u>Introduction</u>

2. JSC BTA Bank, a bank in Kazakhstan ("the Bank"), has commenced 11 actions against its former chairman, Mukhtar Ablyazov ("Mr. Ablyazov"), and others in which it is alleged that the Bank has been defrauded of up to US$6 billion. This is the judgment of the court in 3 of those actions. They were selected for trial after a contested case management conference (the "CMC") on 29 March 2011 in which the many parties put forward different views as to which actions should be tried first. The Bank wanted only one to be tried. Mr. Ablyazov wanted five actions to be tried and there was a variety of other views. In the event, for reasons given at the CMC, three were selected for trial. They are known as the Granton action, the Drey action and the Chrysopa action. The material events in the Granton action span the period March 2006 – December 2008. The material events in the Drey and Chrysopa actions took place in 2008.

3. In essence the Bank claims that Mr. Ablyazov defrauded it by procuring the payment of the Bank's money to offshore companies which he owned or controlled. In the Granton action the Bank claims that sums approaching US$2.5bn. were paid away in this fashion. In the Drey action the Bank claims that some US$400m. was paid away and in the Chrysopa action the Bank claims that US$120m. was paid away. The Bank's claims have been pressed with notable vigour and were, until very recently, defended with equal vigour by Mr. Ablyazov. However, in the aftermath of contempt proceedings brought by the Bank against Mr. Ablyazov (see [2012] EWHC 237 (Comm)) the court made an order on 29 February 2012 (see [2012] EWHC 455 (Comm)) that unless Mr. Ablyazov gave full disclosure of his assets and surrendered to the Tipstaff his defence would be struck out. The operation of that order was suspended to permit an appeal by Mr. Ablyazov. But the Court of Appeal gave judgment on 6 November 2012 dismissing his appeal (see [2012] EWCA Civ 1411). On 21 February 2013 the Supreme Court refused permission to appeal. Since Mr. Ablyazov did not give any further disclosure of his assets and did not surrender to the Tipstaff his defence has been struck out. Anticipating that event Mr. Ablyazov had determined (by no later than the pre-trial review on 2 October 2012) that he would take no part in the trial. Thus it was that, having defended the claims brought against him for some three years, Mr. Ablyazov took no part in the trial and therefore gave no evidence. Mr. Ablyazov has complained of this but, as any reader of the contempt judgments at first instance and on appeal will appreciate, he has brought this situation on himself. He has fled to an undisclosed location.

4. As a result of his defence being struck out the Bank has now obtained judgment against Mr. Ablyazov in the Drey action for a sum in excess of US$400m.. It has also obtained judgment on the same basis against Mr. Ablyazov in what is known as the DCM action for a sum in excess of £1 billion with interest accruing on the judgment in a sum of in excess £225,000 per day. At

the end of the trial the Bank sought judgment on the same basis against Mr. Ablyazov in the Granton action in a sum in excess of US$1 billion and in the Chrysopa action in a sum to be assessed. Judgment was also sought against Chrysopa (a Dutch company) and Lux (a Cypriot company) in a sum to be assessed on the basis that their defences had also been struck out. The court was asked to grant such judgments when handing down this judgment and so no formal order has yet been made. I merely record that there is no reason why such judgments should not be given at that time. Finally, judgment was sought in default of acknowledgment of service against Mr. Rybalkin, a Russian lawyer. Again, there is no reason why such judgment should not be given.

5. Notwithstanding the judgments which have been given or will be given against Mr. Ablyazov the Bank seeks judgment in the Granton and Drey actions against Mr. Zharimbetov (a 45 year old Kazakhstani citizen who now lives in London but who held office in the Bank under Mr. Ablyazov) and in the Chrysopa action against Mr. Khazhaev (a 31 year old Russian citizen who lives in Moscow and was employed by the Bank in Moscow) and Usarel (a Cypriot company). What prospect, if any, the Bank has of executing any judgment it obtains against Mr. Zharimbetov and Mr. Khazhaev is, at best, unclear. However, Usarel used the proceeds of the Chrysopa loan to purchase the Vitino port in the White Sea on the northern coast of Russia and the Bank asserts against that asset what it says is the Kazakhstani equivalent of a tracing claim in English law (*dokhody*). The Vitino port therefore appears to be a real and substantial prize in the Chrysopa action.

6. These proceedings arise out of events in Kazakhstan. They are being heard in the English Commercial Court because Mr. Ablyazov and Mr. Zharimbetov, having taken up residence in London, were sued in this jurisdiction and had no interest in suggesting that the *forum conveniens* for determining the disputes against them was Kazakhstan. They do not consider themselves safe in Kazakhstan. No other party sought a stay on the grounds of *forum conveniens*.

7. The opening skeleton arguments ran to some 240 pages plus appendices. The trial lasted 44 days. There was a vast amount of documentary evidence which could be accessed electronically and 10 witnesses of fact were called to give oral evidence. In addition, experts in Kazakh and Russian law, Kazakh banking practice, the oil and gas industry and handwriting gave oral evidence. The closing written submissions ran to some 500 pages plus extensive appendices. Despite the length of the trial, the array of evidence and the extensive and detailed written and oral submissions, the principal issues in the trial can be simply described, as follows:

Granton and Drey

a) Did Mr. Ablyazov commit a fraud on the Bank ?

b) If so, did Mr. Zharimbetov know of that fraud and assist Mr. Ablyazov to commit it ?

c) If so, is Mr. Zharimbetov liable to the Bank under Kazakh law ?

Chrysopa

d) Did Mr. Ablyazov commit a fraud on the Bank ?

e) If so, did Mr. Khazhaev know of that fraud and assist Mr. Ablyazov to commit it ?

f) If so, is Mr. Khazhaev liable to the Bank under Russian law ?

g) What liability, if any, does Usarel have to deliver up the shares in the White Sea port of Vitino and/or to pay damages under Kazakh law ?

8.  Before resolving those issues it is necessary to describe the Bank and its officers and to recount the investigations of the AFN, the regulator, into the Bank leading to the nationalisation of the Bank in February 2009.

The Bank and its officers

9.  The Bank was formed by a merger of Turan Bank and Alem Bank in January 1997. Both banks had been plagued by financial problems in 1996 and 1997 and the merger was imposed upon them by the National Bank of Kazakhstan and by the Ministry of Finance of the Kazakhstani government. The merged company was initially known as Bank TuranAlem and was privatized by auction in March 1998. From January 2008 it was known as JSC BTA Bank or just "BTA".

10.  In my judgment in the contempt proceedings, [2012] EWHC 237 (Comm), in which proceedings Mr. Ablyazov gave oral evidence through an in interpreter, I summarised Mr. Ablyazov's career in this way at paragraph 78:

"He is aged 47 or 48. He graduated in theoretical physics and worked in the department of physics at the Kazakhstan State University. After the break-up of the Soviet Union he started a career in business. He established a company called Astana-Holding Company which, he said, became one of the largest multi-sector private holding companies in Kazakhstan. It acquired banking and media interests. He entered public service and became Minister of Energy, Industry and Trade in Kazakhstan. However, he had differences of opinion with the President and became an opponent of him. In 2002 he was imprisoned on what he and others say were politically motivated charges. He claims to have been tortured and ill-treated whilst in prison and to have been the victim of an assassination plot. He claims that his assets were seized. He was released in May 2003 but was required to give up politics. He moved to Moscow and started to rebuild his business career but secretly continued with his political activities. In 2005 the President asked him to return to Kazakhstan to run the Bank on condition that he did not interfere in politics. In May 2005 he took over as Chairman of the Bank. In 2009 he was dismissed as Chairman and left Kazakhstan hurriedly. The claims of the Bank in this litigation stem from Mr. Ablyazov's time as Chairman of the Bank."

11.  Mr. Ablyazov was the most prominent businessman publically associated with the Bank. There was no dispute at trial that certain of Mr. Ablyazov's business interests were located in the Eurasia Group of companies of which Mr. Ablyazov was described as president in a press release issued at the time of his appointment as chairman of the Bank. His interests in the Eurasia Group were managed by IPG Eurasia until sometime in 2008. Those interests and other interests of Mr. Ablyazov were also managed by a company called Eastbridge Capital both in London and in Moscow.

12.  In my judgment on the receivership application, [2010] EWHC 1779 (Comm) at paragraph 7, I described the manner in which Mr. Ablyazov held his assets in these terms:

"Mr. Ablyazov does not hold his assets in his own name. Rather, a trusted associate appears to hold shares in a holding company on his behalf and by that means controls the shareholdings in a chain of other companies at the bottom of which chain is an operating business. The use of a nominee and of companies registered in offshore jurisdictions makes it difficult to trace his assets. He says that the elaborate scheme by which he owns his assets is necessary to protect him from unlawful depredations by the President of Kazakhstan."

13. As is apparent from my judgment on the contempt application, [2012] EWHC 237 (Comm), at paragraph 18 the trusted associate was often to be found at Eastbridge.

> "Mr. Alexander Udovenko was one of Mr. Ablyazov's most trusted associates until sometime in late 2009 (when, it seems, he disappeared). He was a Russian lawyer who had practised with an American firm in Moscow and had then worked for an American bank in Moscow. From 2001-2003 he studied in London obtaining a diploma in law and an MBA. From 2003 he worked at Eastbridge Capital Limited in London. He appears to have provided his services to Mr. Ablyazov in London at the offices of Eastbridge. He was the nominee UBO [ultimate beneficial owner] of at least some of Mr. Ablyazov's companies and as such made use of corporate service providers in off-shore jurisdictions, in particular in Cyprus and the BVI. He was assisted by Syrym Shalabayev, Mr. Ablyazov's brother-in-law who, in the Autumn of 2008, replaced Mr. Udovenko as the nominee "beneficial owner" of at least some of Mr. Ablyazov's companies and was perceived by at least one person familiar with the workings of Eastbridge as Mr. Udovenko's "successor". The family connection was continued by the assistance given from time to time by Salim Shalabayev, a younger brother of Syrym, whose name was either used or suggested as a nominee UBO of at least two companies. In the Autumn of 2009, after the WFO [worldwide freezing order] had been granted and Mr. Udovenko had disappeared, Syrym Shalabayev appears to have transferred the work of Eastbridge Capital in London to Euroguard in Cyprus. "

14. In these proceedings Mr. Ablyazov has disclosed ownership of a valuable portfolio of 17 assets through a trusted associate but, as was found in the contempt judgment, he in fact owned further assets through a trusted associate which he had not disclosed.

15. This trial has been conducted upon the unchallenged basis that Mr. Ablyazov was the majority shareholder of the Bank at all material times. This assumption would not have been disputed by Mr. Ablyazov had he participated in the trial and given evidence. In his 18th witness statement made in preparation for the trial he stated that before 2002 he held a controlling interest in the Bank. He said that 75% of the shares in the Bank were held by Mr. Tatishev (the former chairman of the Bank), 60% of those shares being held for Mr. Ablyazov and 40% being held for Mr. Tatishev. In December 2004 Mr. Tatishev was killed in a hunting accident and the shares which had been held by him passed to his widow. When Mr. Ablyazov became Chairman of the Bank (in succession to Mr. Tatishev in 2005) the shares held by Mrs. Tatishev were, over time, transferred into the control of Mr. Ablyazov. Some of the shares which had been held beneficially by Mr. Tatishev were sold by Mrs. Tatisheva to Mr. Ablyazov. In the result, prior to the nationalisation of the Bank in February 2009, Mr. Ablyazov admitted to owning over 75% of the shares in the Bank. Those shares were not held by Mr. Ablyazov personally but by nine companies on his behalf. However, Mr. Ablyazov did not admit that ownership to the AFN, the banking regulator in Kazakhstan. In January 2009, shortly before the nationalisation of the Bank, the AFN requested Mr. Ablyazov to state whether he owned more than 10% of the shares in the Bank. He replied on 19 January 2009 that he did not own directly or indirectly more than 10% of the shares in the Bank. That statement was untrue.

16. The Board of Directors of the Bank at the times material to this litigation consisted of the following persons, in addition to Mr. Ablyazov. Ms. Ablyazova was related to Mr. Ablyazov and was thought by an independent director to be an aunt of Mr. Ablyazov. There were two Messrs. Tatishev who were relatives of the former chairman and may have been his sons or his brothers. Mr. Solodchenko worked closely with Mr. Ablyazov and was chairman of the Bank's Management Board, the operating board below the Board of Directors. Mr. Akhsambiev was thought (by the independent director) to vote with Mr. Ablyazov. Finally, there was Mr. Talvitie, the independent director who represented the interests of East Capital, an investor in

the Bank.

17. Mr. Solodchenko had been an advisor to Mr. Ablyazov in 2005 and subsequently became the Chief Financial Officer of the Bank. In February 2007 he was promoted to the position of Chief Executive Officer and Executive Director of the Bank. At some stage he also became Chairman of the Bank's Management Board. He is a defendant to the Drey action but on 14 November 2012 he wrote to the court stating that the effect of Mr. Ablyazov being debarred from defending himself was that it was impossible for Mr. Solodchenko to support his own defence and so he was "withdrawing from further participation in these proceedings." Accordingly the Bank obtained judgment against him pursuant to CPR Part 39.3 by reason of his failure to attend the trial for the purpose of defending the claim brought against him.

18. Mr. Zharimbetov joined the Bank in 2005 and became a Deputy Chairman of the Management Board in 2007 and First Deputy Chairman of the Management Board in 2008. He was also a member of several committees, in particular the Credit Committee whose task was to consider whether credit applications were in the Bank's best interests. He is a defendant in both the Granton and Drey proceedings.

19. Banks in Kazakhstan tend to be operated in a different manner from that in which they are typically operated in the West. It is common for banks to be owned by a single shareholder who is both chairman of the board of directors and also closely involved in the management of the bank. He therefore has considerable influence over the operation of the bank. Mr. Ablyazov's relationship with the Bank conformed with this general description of Kazakh banking practice. Thus Mr. Talvitie, the independent member of the Board of Directors of the Bank from East Capital, gave evidence that it seemed to him that at board meetings Mr. Ablyazov had already made the decisions. He described the other members of the board as "straw men". Others in the Bank, below board level, had the same impression. Thus Ms. Tleukulova (a member of the Credit Committee) gave evidence in 2012 that "all top managers of the bank, including Board Members, have to obey him". Mr. Khazhaev also gave evidence in Russia in 2012 that Mr. Ablyazov was "the main" person in the Bank who controlled the granting of the largest and most important loans. Mr. Ablyazov's control of the Bank is illustrated by his issue of an order ("the Ablyazov Order") whereby he, as Chairman, amended certain procedural rules governing the grant of loans.

20. The Bank borrowed considerable sums from Western financial institutions and in turn lent considerable sums itself. The Bank's Balance Sheet for 31 December 2007 recorded a substantial increase in loans made to customers between 2005 and 2007. In 2005 the loans amounted to 680,385 millions of Kazakhstani tenge ("KZT"). In 2007 they amounted to 2,379,810 millions of KZT.

21. There was evidence that prior to the appointment of Mr. Ablyazov as chairman the Bank had a practice (managed by the "Investment Block") of taking an equity stake in the projects in connection with which it lent money. Whether that was so or not (the Bank said that the evidence was unreliable) there was no dispute that after his appointment there was a practice of loans being made to finance ventures in which Mr. Ablyazov had an interest. In the 2007 report of the CIS Financing Department (the "CISFD"), the division responsible for lending outside Kazakhstan, a distinction was drawn between "group" or shareholding projects and "market" projects. That "group" projects were "shareholder" projects is apparent from the oral evidence of two of the Bank's witnesses, Ms. Gozhakhmetova (who worked in the "middle office" ensuring that credit files were correctly maintained) and Ms. Niyazova (who also worked in the "middle office" before being seconded to BTA Moscow in September 2008). In an email dated 10 September 2008 from Ms. Musina (head of the administrative department which provided support for the CISFD) she stated that she had received an instruction "to divide projects into market ones and shareholder ones". The Ablyazov Order itself referred to "shareholding projects".

22. CISFD had a presence in both Almaty, Kazakhstan and in Moscow. Its function in Moscow was described as "front office" and its function in Almaty as "middle" or "back office". In Moscow its office was located on the 7th floor of the BTA Moscow building. Eastbridge and Eurasia Logistics occupied the 6th floor. Mr. Ablyazov had an office on the 14th floor. CISFD was responsible for over a third of the Bank's lending portfolio between 2005 and 2008. As of 1 January 2008 the lending portfolio was valued at US$5.191 billion, having grown from US$2.932 billion the previous year. About 60% was accounted for by "group" or shareholder projects. CISFD was therefore a substantial and important part of the Bank's (and Mr. Ablyazov's) operations.

23. The report of CISFD provided to the Management Board in January 2008 divided group projects into "financial companies of the group" and "BTA Capital projects." The report envisaged that the value of BTA Capital projects would increase during the year to US$500m. One such project was the Vitino port project which is the subject of the Chrysopa action.

24. It is necessary to identify "BTA Capital" more precisely because there are two companies with similar names and therefore scope for confusion. The first is Investment Group BTA Capital LLC ("IGBTA"). The second is BTA Capital LLC. The former, IGBTA, was established in March 2007 by Mr. Ablyazov, Ms. Zhankulieva (head of the Bank's representative office in Moscow until succeeded by Mr. Khazhaev) and others. Mr. Ablyazov had a 51% interest. Records at Russian Companies House show that Ms. Zhankulieva is or was the President and that the company has two shareholders, Konami Corporation of the Seychelles which holds 51% of the shares and Lindfield Corporate Inc which holds 49% of the shares. There is evidence that Konami is owned by Mr. Ablyazov; it has been added to the receivership. IGBTA is therefore not a subsidiary of the Bank but is, rather, a company owned and controlled (to the extent of 51%) by Mr. Ablyazov. The other company, BTA Capital LLC, *was* a subsidiary of the Bank. BTA Capital LLC had been incorporated in 2006 but it was reported in the Bank's 2007 accounts that it did not operate and in the Bank's 2008 accounts that it had been liquidated. It therefore seems more likely than not that the reference in the reports of the CISFD to BTA Capital was to IGBTA. The further references which I shall make in this judgment to BTA Capital are therefore references to IGBTA, a company owned and controlled by Mr. Ablyazov by reason of his 51% shareholding in it.

25. The Vitino port project was a BTA Capital project and was dealt with by the CISFD front office in Moscow. Mr. Khazhaev worked there. He was born on 13 July 1981. He graduated as an economist in 2003 and worked in two banks in Moscow as an economist until 2006. In April 2006, when he was 24 years old, he joined the representative office of the Bank in Moscow as a credit analyst in CISFD. He then had a swift rise to become head of CISFD in June 2006 and head of the Bank's representative office in Moscow in March 2008. Although he formally took over that position in March 2008 his predecessor, Ms. Zhankulieva, was leaving and he was treated as the effective head from about October 2007. Thus, when he became the effective head of the representative office in Moscow he was aged 26.

26. BTA Moscow, a Russian bank, was involved in much of the work of the Bank's representative office. That was because the Central Bank of Russia considered it inappropriate for a representative office to be involved in real banking activity. As a result the banking activity of CISFD was conducted largely by BTA Moscow.

27. Within the Bank in Almaty was a lending division known as UKB6. It was, as the evidence in the Granton action shows, closely involved with the making of loans to off-shore companies owned or controlled by Mr. Ablyazov and was operated differently from other lending departments.

28. There is no dispute that if Mr. Ablyazov had an interest in a transaction in respect of which the Bank was providing finance such interest ought to have been disclosed to the Board of Directors by Mr. Ablyazov because only the Board had authority to sanction such transactions. This is the effect of Articles 64-74 of the Joint Stock Companies Law of Kazakhstan ("the JSC law"). It appears that Mr. Ablyazov did not comply with this obligation. Thus Mr. Talvitie, the only independent director on the Board, did not know that Mr. Ablyazov was interested in Drey, the payee of sums payable by the Bank under what are known in this action as the Compensation Agreements. Below Board level Mr. Ablyazov's connection with certain transactions must have been known to some extent by some people but it does not appear that anyone was able or willing to dispute the propriety of such transactions.

29. It seems likely that some officers and staff in the Bank did not draw a clear distinction between the Bank having an interest in a project and Mr. Ablyazov, as shareholder in the Bank, having a personal interest in a project. Thus Mr. Zharimbetov, when being cross-examined, failed to draw a clear distinction, in the context of the offshore companies with which he dealt, between Mr. Ablyazov and the Bank. Thus the unfortunate reality appears to have been that little, if any, distinction was drawn by personnel in the Bank between the Bank's property and Mr. Ablyazov's property. The Vitino port project was an example of that reality. Mr. Khazhaev told a Russian court in 2012 that Mr. Ablyazov treated the Bank as his property.

The investigations of the AFN

30. When the availability of credit evaporated in 2007 and 2008 (the "credit crunch") the Bank found itself under pressure because of the difficulty of borrowing on the market. The minutes of the meeting of the Assets and Liability Committee dated 11 April 2008 expressly refer to a shortage of funds and mention the need to offer high rates of interest to attract deposits.

31. In April 2008 the Financial Market and Financial Organisations Control and Supervision Agency of the Kazakh Government (the "AFN") provided to the Bank a working report on its investigation of the Bank's internal risk management system. The Bank's credit files had been found to be deficient and not in accordance with the standards set by the Bank's own Corporate Lending Manual. Evidence of a conflict of interest was found in the circumstance that Mr. Ablyazov was Chairman of the Board of Directors and yet also headed the Regional Credit Committee. This confused a supervisory role with an operational role. Notwithstanding this criticism, when the Regional Credit Committee was divided into two, one for Russia and the other for the CIS, Mr. Ablyazov was appointed head of both committees. Evidence was also found of loans being made to borrowers for the purpose of buying property from an entity affiliated to the Bank, namely, Mr. Ablyazov. The Bank was urged to improve its procedures and to comply with its own internal policies and legal requirements. The AFN was particularly concerned with the proper monitoring of affiliates of the Bank. The Bank was reminded that responsibility for an effective system of risk management was placed on the Board of Directors.

32. On 11 June 2008 the AFN provided to the Bank a "Comprehensive Inspection Report" which highlighted the fact that much of the Bank's lending was to entities outside the Republic of Kazakhstan,

> "to borrowers registered in the British Virgin Islands, the Seychelles, Cyprus and Panama, with obscure founders' structure and where no information about participants is available to the Bank. In this regard, the question remains open as to the fact that these borrowers might be persons/entities having special relationship with the Bank. Also the lending schemes used by the Bank ...........show that those borrowers as a rule are used as "buffer" companies and act as nominal borrowers, whereas the Bank's funds are actually disposed by other companies which do not have any contractual relations with the Bank."

33. In addition the AFN was concerned that such borrowers had no assets.

34. The AFN considered that the Bank lacked adequate risk management and reviewed the Bank's classification of its loan portfolio. The AFN disagreed with the Bank's classification of its portfolio. In particular, whereas the Bank considered that only 1% of its portfolio was non-performing, the AFN considered that 8% was non-performing. This resulted in a requirement that the Bank make an additional provision in respect of its loan portfolio of the equivalent of some KZT322,144 million or about US$2.7 billion. This was based upon the financial position as at 1 January 2008.

35. There is evidence that the need for such a provision did not come as a surprise to Mr. Ablyazov or Mr. Zharimbetov. This is because Mr. Zharimbetov accepted in his 7th witness statement served on the eve of the trial that he had been aware in 2006 of "large shortfall in the Bank's capital requirement…in the region of $900 million to $1 billion in size." When cross-examined he accepted that the extent of this shortfall increased. He said that he informed the "shareholders" of this shortfall which indicates that Mr. Ablyazov must have known about it too.

36. So serious did the AFN consider the Bank's poor risk management of its loans that it recommended the Bank dismiss Mr. Zharimbetov. This recommendation was not accepted. On 28 July 2008 Mr. Ablyazov replied to the AFN pointing out that Mr. Zharimbetov had only become a member of the Management Board in July 2007 and had been appointed First Deputy Chairman of that board after the Bank had become aware of the tentative results of the AFN's inspection. Mr. Zharimbetov had since been tasked to build a comprehensive risk management system with a view to enhancing the Bank's financial stability.

37. On 3 September 2008 the AFN returned to the subject of the Bank's lending to entities in the BVI, Seychelles, Cyprus and Panama and required the Bank to take measures to decrease such lending and to report on a weekly basis the measures it was taking in that regard. On 10 September 2008 Mr. Ablyazov replied to the AFN. Regarding lending to non-resident borrowers he said that "all projects funded over the period from May 1 through July 1, 2008 …..can be successfully executed" and that termination of such facilities "may entail some risks related to the fulfilment of obligations…." He said that the Bank's Financial Director would report to the AFN on a monthly basis as to the progress made by the Bank pursuant to its Action Plan "to cure violations in Kazakhstan law and internal regulations of the Bank, referred to in the Report."

38. Also on 10 September 2008 Mr. Ablyazov ordered the Bank to explore ways of settling some of the debt owed to the Bank by "early payment via affiliated companies", "revising the repayment schedules" and "transferring debts to other clean companies". Such methods were intended to reduce the size of the provisions against debt required by the AFN.

39. On 8 October 2008 (shortly after the collapse of Lehman Brothers) the Product Development Director informed the Corporate Business Managers that there was "no money for credit granting" and that "banking and investment projects shall be terminated." Expenditure cuts were planned and consideration was being given to dismissing 1000 out of 8000 employees. Shortly afterwards, on 20 October 2008, Mr. Zharimbetov refused permission for the making of a number of loans due to "lack of liquidity".

40. On 19 November 2008 the AFN required documents and information concerning certain loans. The AFN had learnt from its continuing inspections that loans were being made to borrowers incorporated in Luxembourg with no business and no income and so no ability to pay interest on the loans. Further demands for documents and information as to the Bank's loan portfolio were requested on 27 November 2008.

41. On 22 January 2009 the AFN sent the Bank its final report following its inspections between 22 October and 12 December 2008, the purpose of which had been (a) to check on whether the Bank had implemented a plan to eliminate the violations found in the previous inspection and (b) to classify the Bank's loan portfolio. The AFN concluded that the required steps to improve the Bank's business had not been taken. The AFN noted the continuing practice of lending to companies in the BVI and the Seychelles and that notwithstanding the AFN's advice about a conflict of interest the Bank had, on 30 April 2008, arranged for Mr. Ablyazov to chair the regional credit committees for Russia and the CIS. Following its review of the loan portfolio (in which the AFN classified 19.46% of the portfolio as non-performing whereas the Bank had classified only 1.82% as non-performing) the AFN required additional provisions of KZT443,148,000,000 or about US$3.58 billion based upon the financial position as at 1 October 2008.

The nationalisation of the Bank

42. On 30 January 2009 the Bank informed the AFN that it could not meet its obligations. On 1 February 2009 the AFN requested the Government purchase the Bank and on 2 February 2009 the AFN removed Mr. Ablyazov and Mr. Zharimbetov from their offices of Chairman of the Board of Directors and First Deputy Chairman of the Management Board of the Bank. They fled to London.

43. The consolidated financial statements for the year ended 31 December 2008 (produced in May 2009 by the Bank's auditors, Ernst and Young) disclosed a net loss in 2008 of US$9.9bn and liabilities of the Bank which exceeded its assets by US$6.2bn. Whereas the gross value of loans to customers was KZT2,834,341 million Ernst and Young valued them at KZT1,617,063 million.

44. KPMG was instructed to advise the new management of the Bank and reported in June 2009 that a commercial assessment of the loan portfolio resulted in a Loans Lost Provision of about US$10.1 billion (based upon the financial position as at 31 March 2009). In September 2009 KPMG advised that total provisions of some KZT2,089 billion were required, or about US$ 17.4 billion (based upon the financial position as at 30 June 2009). In November 2009 that figure was adjusted downwards to KZT1,965 billion or about US$16.5 billion.

45. Since being nationalised the Bank has, with the assistance of its Western bank creditors, sought to restructure itself. The Bank has also formed the view that Mr. Ablyazov and certain of the Bank's senior management acted in breach of their duty to the Bank thereby causing the Bank and its creditors to suffer very substantial losses.

46. Mr. Norbury QC, on behalf of Mr. Zharimbetov, submitted that there can be little doubt that the AFN's investigations were politically motivated. Mr. Zharimbetov gave evidence to that effect and it reflects what Mr. Ablyazov has been saying in this litigation since it began. Whether or not the AFN's investigations were politically motivated, at least in part, Mr. Zharimbetov's admission that there was a shortfall in the Bank's capital requirement of almost US$1bn. in 2006, which increased in size, showed that there was cause for the AFN to investigate the Bank and to be critical of its management.

Witnesses

47. Before making findings as to the factual issues in the case it is necessary to mention the witnesses of fact who gave oral evidence and my views as to the extent to which I could rely on them.

48. The Bank called several witnesses.

49. Mr. Jyrki Talvitie was a Finnish banker who has held management positions in Western banks and has served on the board of several Russian banks. From 2005 until 2010 he was head of the Russian office of East Capital, a Swedish owned independent asset manager. He served on the Bank's Board of Directors representing the interests of East Capital, a minority shareholder, prior to nationalisation. After the Bank was nationalised in 2009 he continued to serve on the board as an independent director. He gave his evidence in English in a clear and confident manner. An important part of his evidence was that prior to nationalisation he had been unaware that Mr. Ablyazov had a controlling shareholding interest in the Bank. It was suggested that he, on behalf of East Capital, must have known of Mr. Ablyazov's interest in the Bank before East Capital decided to invest in the Bank. However, although he accepted that he knew that he had to deal with Mr. Ablyazov and that Mr. Ablyazov "controlled" the Bank he said that he did not know whether Mr. Ablyazov controlled it on his own behalf as the majority shareholder or on behalf of someone else. It was hinted that his recollection was affected by the desirability of distancing himself from the Bank's collapse into nationalisation. But there was no firm evidential foundation for the suggestion that Mr. Talvitie in fact knew of Mr. Ablyazov's controlling interest in the Bank. He was, perhaps, a little reluctant to accept, when cross-examined by Mr. Kinsky QC on behalf of Usarel, that the other members of the Board might have approved the Chrysopa loan even if Mr. Ablyazov had disclosed his interest in Chrysopa but that reluctance did not persuade me that he was not telling the court the truth when he said that he did not know whether Mr. Ablyazov was controlling the Bank on behalf of himself or on behalf of someone else. His evidence that he did not know was corroborated by the evidence of Mr. Zharimbetov who referred to Mr. Ablyazov's interest in the Bank as having been "hidden from everybody" and who took steps to ensure that Mr. Ablyazov's controlling interest in the Bank was not disclosed. It is however consistent with his evidence and in accordance with the probabilities that Mr. Talvitie must have suspected that Mr. Ablyazov had a controlling interest in the Bank.

50. Mr. Anvar Saidenov, the Chairman of the Bank's Board of Directors from February 2009, also gave evidence in English. (He had worked in London for the European Bank of Reconstruction in London during the 1990s.) He had been the Governor of the National Bank of Kazakhstan from 2004 until January 2009 and as such had been one of four external members of the board of the AFN during the same period. (The board typically comprised about 8 members, four being external – the Governor of the National Bank, two government ministers and a representative of the President – and four being internal). He gave his evidence with clarity and fairness. Thus, when asked about corruption amongst employees of the AFN, he recognised that they could not be immune from corruption. Similarly, when asked questions (in general terms) as to when the Bank had knowledge of the claims in this action (a matter which is relevant to the limitation issue) he was not evasive in his answers. The principal matter about which he gave evidence was that, whilst he had his suspicions that Mr. Ablyazov had an ownership interest in the Bank, he had never been informed that Mr. Ablyazov had such an interest. He also said that he had had no knowledge of Mr. Ablyazov's interest in BTA Moscow, BTA Ukraine and BTA Belarus. If he had been informed of such matters he would have expected them to have been discussed by the AFN and there were no such discussions. There was no reason to doubt his evidence on these matters.

51. Ms. Palymbetova gave evidence in Russian through an interpreter though she had some command of the English language. She worked for the Bank from 2006 to 2012 initially as head of the "methodology" division providing analytical support and later as deputy head and then head of the Department of Analysis of Corporate Business. The subject matter of her evidence concerned the operation of UKB6 and the manner in which UKB6 and Mr. Khazhaev responded to the demands of the AFN for proper credit files in support of loans made by the Bank. She gave her evidence in a clear and intelligent manner. She did not hesitate in her answers save when the passage of time from the events in question meant that she had not, and could not be expected to have, a clear recollection of the events in question. She was also fair in

her answers and did not appear to be deliberately favouring the Bank. Thus she accepted that a possible reason for the Bank's loans being irrecoverable after nationalisation was that BTA Moscow (who had or may have had the relevant loan documentation) had broken off contact with the Bank. I have no reason not to regard her as an honest witness though that does not mean that all of her evidence is reliable. Where it is not supported by contemporaneous documents there is the possibility that, having regard to the passage of time since 2006-2009, her recollection, though honest, may be mistaken.

52. Ms. Chegimbaeva gave evidence in Russian through an interpreter and did not appear to have any real command of the English language. From November 2006 until November 2008 she worked in the "middle office" in Almaty providing support to the credit committees. From November 2008 she was the secretary to the Bank's Credit Committee in Almaty until sometime in 2010. She also gave her evidence clearly and without hesitation and appeared to me to be a fair and honest witness who recognised the limits of her evidence. The main thrust of her evidence concerned the operation of UKB6 which she said was different from that of other corporate business departments. Since her evidence was in part based upon what a previous secretary had told her my findings as to the operation of UKB6 must depend, not only on her evidence, but on the documentary evidence.

53. Ms. Gozhakhmetova gave evidence through an interpreter. She was the secretary of the Bank's regional credit committees, prior to which she had been the secretary of the Head Bank Credit Committee. She gave her evidence in a particularly clear and forceful manner. Her concern to state what she recollected as the truth was demonstrated by the circumstance that her line manager, Ms. Baizakova, objected to a passage in her statement and required her to take it out. She refused and it remained in. This incident was a factor leading to her departure from the Bank in June 2012. She also appeared to have been particularly zealous with regard to her attitude to the procedures of the committees she served. She formed the opinion that the Regional Committee for Russia did not actually meet (as opposed to voting by signing for or against a proposal on paper) and as a result removed references to a "quorum" in the minutes. Whilst the force and clarity with which she gave her evidence was striking there was, it seemed to me, no reason for doubting that she sought to give her evidence to the best of her recollection. However, since the events in question were in 2008, her recollection may be mistaken and so my findings as to the procedures of the committees (in so far as is necessary to make such findings) can only be formed after consideration of the contemporaneous documents and such other evidence as bears upon the subject.

54. Ms. Niyazova was the last of the Bank's witnesses of fact to give evidence in Russian through an interpreter. Between September 2008 and February 2009 she was seconded to BTA Moscow as head of the Corporate Business Monitoring Section and was responsible for the sealing of documents and the maintenance of credit files for each borrower. She had custody of the BTA Moscow seal which she kept in a locked safe in her office. She gave evidence about two principal matters. The first was whether she had sealed an apparent pledge by Lux of its shares in Usarel in November 2008. The second was her encounter with Mr. Khazhaev over the weekend of Friday 30 January and Tuesday 3 February 2009 when the Bank was nationalised. She appeared to be a conscientious and helpful witness, often answering questions with a simple yes or no.

55. However, with regard to the question of whether she had sealed a pledge by Lux in or before November 2008 there were indications that her evidence owed rather more to an analysis of the document said to be the sealed pledge than to her recollection. Indeed, it is unlikely that she would have had any specific recollection of *not* sealing such a pledge. Whilst I have no reason to doubt that she honestly believed that she had not sealed such a document my finding as to whether or not she had must depend upon a consideration of the features of the suggested pledge in the light of her evidence and upon other relevant evidence.

56. With regard to her evidence of her encounter with Mr. Khazaev over the weekend prior to nationalisation she gave her evidence with clarity and firmness. This episode was on any view an unusual episode concerning the seal and it is to be expected that she had some recollection of it. I did not doubt that she gave me her honest recollection of the episode, though it is possible that some of the details may have been misrecollected given the passage of time. Also, some of her evidence, for example her evidence that she was sure that she had not signed the "transfer document" which Mr. Khazaev said she had signed, was, to a great extent, dependent upon a consideration of the document itself as to which there may be scope for debate.

57. The Bank also called Mr. Kenyon, a forensic accountant with PriceWaterhouseCoopers, to give evidence as to his work for the Bank since July 2009 and as to the Bank's state of knowledge of its claims under the Granton later loans up until 2 December 2009. This was relevant to the limitation issue. He gave his evidence carefully and honestly. However, the Bank did not waive privilege in relation to the documents produced by Price Waterhouse for the Bank and in those circumstances, notwithstanding that Mr. Kenyon said that he was careful to base his evidence upon material which had been disclosed and was not privileged, I remained doubtful as to the weight that could be placed on his evidence. For example, without seeing what the Bank told him in July 2009 or the content of his presentation to the Bank in London on 2 December 2009 it is difficult to compare what the Bank knew on 2 December 2009 with what it knew earlier as a result of its own investigations and those of KPMG.

58. The defendants Mr. Zharimbetov and Mr. Khazaev gave evidence. Mr. Pukhlikov gave evidence on behalf of Usarel.

59. Mr. Zharimbetov, a defendant in the Drey and Granton actions, gave evidence through an interpreter. He was first cross-examined on 29 November 2012. (His further cross-examination was then adjourned until 6 December 2012 in order to take the evidence of Mr. Khazaev by video-link from Moscow). During the first period of cross-examination my overriding impression was that he was reluctant to assist when faced with contemporaneous documents which suggested that he had responsibility for certain matters. His typical response was that he could not remember the document. Having regard to the passage of time (four years or more) it can surely be said that he could not be expected to have any, or any detailed, recollection of many documents. Nevertheless, it *was* surprising that he had no recollection of some documents, for example, the elaborate instructions for dealing with offshore companies which were copied to him in May 2006 inviting his comments and which listed him as one of the persons responsible for this matter. He was stated to be one of the two persons who could approve the incurring of obligations in excess of US$1m. A series of emails dating from June - December 2007 indicated that he had had an active involvement in the procedure contemplated by the elaborate instructions. Other contemporaneous documents (dating from 2007 and 2008) suggested that he had had a role in the registration and purchase of offshore companies. In those circumstances one would have expected him to have had some recollection of the instructions concerning off-shore companies.

60. During the second stage of his cross-examination Mr. Zharimbetov showed himself to be most reluctant to accept the indications in contemporaneous documents that he had been involved in certain activities. This suggested to me that he was not being honest with the court. He was also evasive in his answers on many occasions. For example, when confronted with statements made by him in letters which he had signed setting out untrue statements as to the ultimate beneficial owner of certain shares in the Bank, he could not bring himself to accept that he had made untrue statements.

61. I therefore did not find him to be a reliable witness. I accept that during the long period of four and half days over which he was cross-examined he answered the many questions put to him with patience and courtesy but it was the content of his answers which compelled me to treat him as an unreliable witness. In particular, he often rejected the inferences which could be

reasonably drawn from the contemporaneous documents. It was improbable that the contemporaneous documents could be wrong as many times as Mr. Zharimbetov's answers required them to be. On the contrary, such documents are likely to be reliable. His "distancing" of himself from the contemporaneous documents suggested that the safe course was to rely upon inferences from the contemporaneous documents and the probabilities rather than upon his own evidence. The passage of time from 2006 - 2008 would also suggest that that would be the safe course.

62. Mr. Khazhaev gave his evidence by video link from Moscow through an interpreter over a period of three and half days. He was extremely cautious when answering questions, very often seeking clarification of what appeared to be simple questions. Whilst it is understandable that a defendant to a serious charge (and giving evidence through an interpreter) may wish to ensure that he understands the question being put to him the frequency with which he sought a clarification of simple questions caused me to doubt that he was seeking to assist the court but instead was seeking to ensure that he said as little as possible. His caution was also illustrated by his reluctance to accept that it was likely that an email shown to have been copied to him was received by him. Another feature of his evidence was that from time to time he would assert that he was sure that he had *not* attended a particular meeting or had *not* read a particular e-mail. It was odd that he could be so sure of what he had *not* done or read given the lapse of time since the alleged (non) events. When asked why he was sure of such matters he rarely had a convincing answer.

63. As with Mr. Zharimbetov there were instances when his evidence contradicted the contemporaneous documents. His willingness to contradict that which was indicated by contemporaneous indications was a remarkable feature of his evidence. It was only on rare occasions that he accepted the implications of the contemporaneous documents. On occasion he even contradicted his own evidence. In his second witness statement he referred to the Big Credit Committee of BTA Moscow. When asked questions about a document he had disclosed which related to that committee concerning the proposed loan to Usarel he said that such a committee never existed. When asked to explain the reference to the committee in his witness statement he said that he was only referring there to the "idea" of such a committee. It never existed.

64. I was thus left with the very clear impression that he was seeking to distance himself from such events or documents as he considered might advance the Bank's case or harm his own. I was therefore unable to regard him as a reliable witness and, as with Mr. Zharimbetov, I considered that the safe course was to base my findings upon the contemporaneous documents and the probabilities rather than upon what he chose to tell me.

65. Mr. Pukhlikov gave evidence, through an interpreter, on behalf of Usarel. He was examined for a day. In common, I regret to say, with Mr. Zharimbetov and Mr. Khazhaev, he showed himself to be an evasive witness, reluctant to face up to the difficulties created by the probabilities of the contemporaneous documents. Thus, although his company was engaged in the refining and delivery of oil, certain documents appeared to state that in January 2009 his company obtained a very substantial credit facility from the Bank to assist it in the performance of its obligations under a contract for the purchase of a very large quantity of frozen chicken. It was the Bank's case that the company was never a party to a contract to buy frozen chicken and that this was a false explanation of why the company needed a substantial loan facility in January 2009. I considered that Mr. Pukhlikov was evasive when asked whether his company had ever agreed to purchase a quantity of frozen chicken.

66. Mr. Pukhlikov gave evidence that when his company entered into a joint venture to purchase the Vitino port he believed that his co-venturer, BTA Capital, represented the Bank. It was the Bank's case that he understood that his co-venturer was Mr. Ablyazov and Mrs. Zhankulieva as suggested by a previous statement of his and other documents. Mr. Pukhlikov was evasive when

asked about these matters.

67. He was therefore, in my judgment, an unreliable witness and, as with Mr. Zharimbetov and Mr. Khazhaev, I concluded that the only safe course was to rely upon the contemporaneous documents (where there was no dispute as to their authenticity) and the probabilities.

68. The parties called a number of expert witnesses to give oral evidence. On the subject of Kazakh law the Bank adduced evidence from Mr. Vataev, who is a partner in Dechert LLP in Kazakhstan. He is head of the dispute resolution practice and has practised law in Kazakhstan since 1992, focussing on commercial litigation and arbitration. He has also studied law in the United States and has worked with Coudert Brothers LLP in Washington. He speaks excellent English and wrote his reports in English. He was an impressive witness though he sometimes struggled to give clear answers to the questions put to him. It was suggested to him that he had sought to give answers which supported the Bank's case. I was not at all persuaded that this was so. Rather, the law of Kazakhstan, based upon recently drafted codes, is to some extent uncertain and clear answers are not always possible. In cases of doubt or difficulty Mr. Vataev sought to give answers which, in the language of Article 2 of the Civil Code, ensured the "restoration of rights violated". This approach cannot be criticised albeit that the rights in question were those of the Bank. I considered that he was throughout his evidence seeking to give the court his honest opinion on the questions put to him as to Kazakh law.

69. The Defendants, that is, Mr. Zharimbetov, Mr. Khazhaev and Usarel adduced evidence from Professor Maggs. Although not a practising Kazakh lawyer like Mr. Vataev, he was also an impressive witness. He is an academic lawyer and has been a student of Russian and Kazakh law for a great many years. He is a professor at the University of Illinois College of Law, has taught there since 1964 and has advised and been consulted on, inter alia, the law of Kazakhstan both for government agencies and for lawyers advising clients on investing in and trading with Kazakhstan. He speaks Russian and has translated Russian legal texts. He is the author of many books and articles on Russian law and has also published books on the law of Kazakhstan. He took part in drafting the civil codes for the former Soviet Republics including Kazakhstan. He gave evidence in a clear, authoritative and fair manner. It was a striking feature of his evidence that whatever question he was asked he had, without hesitation, a clear answer to it. I concluded that he had an exceptionally clear grasp and understanding of the relevant codes. If he had a weakness it was that he tended to give insufficient weight to Articles 2 and 6 of the Civil Code which, as the experts agreed, enabled the Kazakhstani court to adopt a purposive construction in cases of ambiguity or lack of clarity. It may be that his lack of practical experience in the Kazakhstani courts contributed to this weakness and to his over-reliance on the apparent rigidity of the codes.

70. Where Mr. Vataev and Professor Maggs disagreed each had his reasons for his point of view. It was tempting to prefer Mr. Vataev on practical or procedural issues because he is a practising lawyer and Professor Maggs is not. It was also tempting to prefer Professor Maggs on issues concerning the true construction of the Kazakh codes of law because he had, over many years, given them considerable study. But the better course seemed to me to resolve the disputes between the experts by examining and weighing the reasons each witness gave for his opinion, always bearing in mind the different exposure which each witness has had to the law of Kazakhstan, and ultimately deciding which opinion appeared to me more likely than not to represent the law of Kazakhstan.

71. Professor Maggs also gave evidence on Russian law which was relevant to the case against Mr. Khazhaev. The Bank adduced evidence on Russian law from Professor Sergeyev. He is the Head of the Civil Law department at the St. Petersburg University and is also "counsel" with DLA Piper in St. Petersburg. He has published law books and commentaries, has participated in the drafting of many Russian laws and has advised companies and individuals for over 15 years. He gave his evidence through an interpreter. He tended to give long answers and appeared to be

argumentative. However, I concluded that he was seeking to give the court his honest and truthful answers to the questions put to him. As with the experts on Kazakh law it will be necessary, where there is a difference of opinion on Russian law, to consider the reasons each witness gives for his point of view and decide which view is more likely to represent Russian law.

72. The parties adduced evidence on Kazakh banking practice. The Bank called Mr. von Gleich. He has worked in banking for 17 years most of which time has been spent in Russia and the CIS, including Kazakhstan. His experience of banking in Kazakhstan did not concern large loans but was sufficient for him to give expert evidence. There was one matter in his experience which he ought to have disclosed but did not; his connection with the sovereign wealth fund which became the majority shareholder of the Bank on nationalisation. However, I formed the view that he was seeking to give the court his honest opinion on the matters put to him. Mr. Khazhaev adduced evidence from Mr. Connell who had worked in banking for 38 years, 13 of which involved Russia and the countries formerly part of the USSR. He gave his evidence in a clear and very fair manner. For example he expressed the opinion that the making of the Chrysopa loan to a shareholder was not a one off event but was a "habit." He was not at all evasive or argumentative. Mr. Zharimbetov adduced evidence from Dr. Zubov who gave evidence through an interpreter. He is an academic who lectures at the National Research University of Economy. He has participated in research projects and has published papers on financial topics. Although he has also worked in the financial sector it was unclear whether he had any relevant experience either as to the granting of bank loans or of Kazakh banking practice. He was also on occasion evasive. Some of his answers and opinions were difficult to accept. I formed the opinion that in terms of the subject matter of his evidence he was out of his depth and also that he had an inadequate understanding of his role as an expert. He appeared to be an advocate rather than expert witness. In the result I decided that I could not rely on his evidence. However, given the nature of the case (fraud and assistance to commit fraud) there were, ultimately, few issues in respect of which the expert evidence could materially assist.

73. The Bank and Mr. Zharimbetov also called evidence as to the practice in the oil and gas industry. The issue was whether certain alleged oil and gas contracts were genuine contracts. In the event it was clear from the contemporaneous documents that they were not and so this expert evidence did not materially assist. The Bank called Mr. Bryce from Aberdeen and Mr. Zharimbetov called Professor Cameron from Dundee. Mr. Bryce was able to comment on the alleged contracts on the basis of his experience and appeared to be a fair witness. Professor Cameron did not appear to have the necessary experience of business and market practice to comment on the alleged contracts.

74. Dr. Audrey Giles was called by the Bank to give evidence as to whether a signature on a (copy) document appeared genuine. There was no reason to doubt the opinion she expressed. No opposing expert evidence was called.

The frauds alleged against Mr. Ablyazov in the three actions

75. Before the court can consider the case against each defendant it is necessary to consider the frauds alleged against Mr. Ablyazov in each action. That is because the factual case against Mr. Zharimbetov and Mr. Khazhaev is that each in effect knowingly assisted Mr. Ablyazov to carry out a fraud. With regard to Usarel the nature of the fraud committed by Mr. Ablyazov is relevant to the claim against Usarel.

76. In considering whether the Bank has proved its allegations of fraud against Mr. Ablyazov I have kept well in mind that as a result of Mr. Ablyazov's decision not to comply with the court's orders his defence has been struck out and there was therefore no evidence from him with regard to the frauds alleged against him. However, since the alleged frauds are an essential part of the case alleged against Mr. Zharimbetov, Mr. Khazhaev and Usarel it is necessary,

notwithstanding Mr. Ablyazov's absence from the trial, to consider whether, on the evidence before the court, the Bank has made good its case that there was a fraud. I have also kept well in mind that although the standard of proof is the civil standard, the balance of probabilities, the cogency of the evidence relied upon must be commensurate with the seriousness of the conduct alleged.

<u>Granton</u>

77. Between March 2006 and August 2008 the Bank made 20 loans to 17 companies totalling US\$1,428,840,000 ("the Original Loans"). Those 17 companies are listed in Appendix 5 to the Bank's Skeleton Argument and are known as the "Original Borrowers" (described in the Appendix as Recipients). However, the Original Borrowers paid almost all of the loaned sums to other companies, known as the "Original Real Borrowers". There were many of them and they are also listed in Appendix 5 (described in the Appendix as Payees). The Original Real Borrowers then used the funds for a variety of purposes as is apparent from Appendix 5 (see onward payments 2 and 3 in the Appendix). Some funds ended up with the Bank ostensibly in repayment of other loans made to the Original Real Borrowers, others were used to pay for the insurance which was apparently in place as security for other loans and yet other funds were paid to other companies for unknown purposes.

78. It is the Bank's case that the Original Loans were "a misappropriation of money from the Bank by Mr. Ablyazov on a massive scale, crudely disguised as commercial lending." The Bank says that the companies involved in the Original Loans were affiliated to Mr. Ablyazov, that this affiliation was not disclosed to the Bank's Board of Directors and that the true purpose of the loans, namely, to benefit Mr. Ablyazov, was not disclosed to the Board.

79. Mr. Zharimbetov did not have a case as to whether the Original Borrowers were owned or controlled by Mr. Ablyazov but if they were his case was that he was unaware of that. As to the Original Loans being for the purpose of benefitting Mr. Ablyazov Mr. Zharimbetov does not accept that they were but if they were his case was that he was unaware that they were. He says that effective due diligence took place and that the loans were in the best interests of the Bank.

80. Between 4 November and 4 December 2008 a number of loans ("the Later Loans") totalling US\$1,031,263,000 were made. The loan agreements suggest that they were made to four borrowers (the "Later Borrowers"), Branden, Granton, Zafferant and Aldridge and that the purpose of the Later Loans was to finance the acquisition of oil and gas equipment. But the Later Loans were in fact paid to other companies ("the Intermediaries") who were, apparently, to source and deliver the equipment to the Later Borrowers. It is the Bank's case that in fact the Later Loans, having been paid to the Intermediaries, were transferred to other companies, the Recipients, and applied by them to discharge many of the Original Loans. The Intermediaries and Recipients are set out in Appendix 10 to the Bank's Skeleton Argument (the Recipients being described as Payees under onward payment 1). The Bank says that the companies involved in the Later Loans were affiliated to Mr. Ablyazov, that this affiliation was not disclosed to the Board and that the true purpose of the loans, namely, to benefit Mr. Ablyazov, was not disclosed to the Board.

81. Mr. Zharimbetov accepts that the purpose of the Later Loans was to provide funds to the Recipients so that the Original Loans might be repaid. He says that the loans were "to be used in the refinancing of the Original Loans but subsequently to develop oil and gas exploitation in the Caspian Sea." He says that the "refinancing" scheme was in the Bank's best interests and that he had no knowledge of any fraudulent purpose to the scheme.

82. I have already set out the manner in which Mr. Ablyazov held his assets through trusted associates and by means of off-shore companies administered by Eastbridge. The Original and the Original Real Borrowers were registered in off-shore jurisdictions such as Cyprus and the

BVI and appear to be the type of company which Mr. Ablyazov used to hold his assets. Indeed two of the Original Borrowers, Bergtrans and Carsonway, were found in the Contempt Judgment to have been beneficially owned by Mr. Ablyazov; see paragraph 205 of the Contempt Judgment, [2012] EWHC 237. Moreover, twelve of the Original Real Borrowers have been admitted by Mr. Ablyazov to be owned or controlled by him. These companies are set out in Appendix 6 to the Bank's Skeleton Argument. So far as the others are concerned there are several matters which lead to the inference that they were also owned or controlled by Mr. Ablyazov.

83. First, the size of the 20 Original Loans was considerable. They ranged from US$35m. to US$140m. and totalled US$1.428 billion. Despite the very large size of the loans they were made to companies with apparently minimal assets such that there must have been little if any reason to believe that the companies would be able to repay the loans. An example, said without challenge to be representative of the Original Loans, was the loan of US$76m. made to AstroGold Corporation on 13 November 2007 of which US$45m. was drawn down on that date. AstroGold was a company incorporated in the BVI on 27 December 2006. Its director was a gentleman with an address in Cyprus, Mr. Emilios Hadjivangeli, to whom 5000 shares were allotted. As of 1 October 2007 AstroGold was reported as having assets of US$5,000 and authorised capital of US$5,000. Yet on 30 October 2007 the company resolved, through Mr. Hadjivangeli, to apply to the Bank for a credit facility of US$76m. On the same day the company applied for the said loan for a period of two years at a rate of interest of 16%. The purpose of the loan was stated to be "to replenish the Borrowers' own working capital". The size of the loans was such, that if there was no apparent reason to expect that they would be repaid in accordance with their terms, there must have been some other reason for making them.

84. Second, although the loans were said to be for the purpose of providing working capital for the Original Borrower, each loan was immediately paid out to the Original Real Borrowers. Since many of the Original Real Borrowers are known to be companies controlled by Mr. Ablyazov it is likely that those not known to be such were in fact such. Otherwise it would be a remarkable coincidence that the loans to those companies were also paid on immediately to other companies and not used to provide working capital for the Original Borrowers.

85. Third, there is considerable email material dating from late 2008 which strongly suggests that almost all of the companies in question were administered by Eastbridge and in particular by Mr. Udovenko and Mr. Shalabayev. Eastbridge, Mr. Udovenko and Mr. Shalabayev are so closely involved with Mr. Ablyazov's companies that this is a strong indication that the companies in question are owned or controlled by Mr. Ablyazov.

86. Fourth, each loan was administered by UKB6. Ms. Chegimbaeva, who worked in the "middle office" providing support to the credit committees gave evidence that UKB6 was the only lending department which was responsible for its own credit files. The middle office compiled or stored credit files for the other lending departments. Similar evidence was also given by Ms. Palymbetova who was in the "methodology" department from 2006 and from June 2008 was in the Department of Analysis of Corporate Business. She said that UKB6 was different from other departments. It compiled and stored its own credit files. There is therefore evidence that UKB6 operated differently from other departments. I accept this evidence of Ms. Chegimbaeva and Ms. Palymbetova and reject the evidence of Mr. Zharimbetov that the middle office served all the departments, including UKB6, in the same way. Further, there is email evidence of information being provided by Eastbridge to UKB6 (a report on the raising of funds to finance lending by UKB6 and a list of companies administered by Eastbridge which included some of the Original Borrowers and some of the Original Real Borrowers). The fact that each loan was administered by UKB6 in a manner different from other departments and that there was communication between Eastbridge and UKB6 tends to suggest that the companies in question were owned or controlled by Mr. Ablyazov.

87.  There is therefore cogent evidence, which I accept, that the Original Borrowers and the Original Real Borrowers were companies owned or controlled by Mr. Ablyazov.

88.  It is also clear that Mr. Ablyazov did not disclose to the Board that he owned or controlled those Borrowers. He has never claimed that he did so and there is no evidence that he did. None of the represented Defendants has suggested that he did. In those circumstances there can be only one explanation for the fact that the very large sums of money which were advanced were immediately transferred to companies owned or controlled by Mr. Ablyazov, namely, that the Original Loans were part of a dishonest scheme whereby Mr. Ablyazov sought to misappropriate monies which belonged to the Bank. The scheme was fraudulent because Mr. Ablyazov did not disclose to the Board his interest in the Original Borrowers or that the real purpose of the loans was to pay out the Bank's money to the Original Real Borrowers who were to use the monies for Mr. Ablyazov's purposes. The purpose of such non-disclosure must have been to deceive the Board so that it remained in ignorance of the "related party" nature of the Original Loans and of their true purpose.

89.  The Original Loans were made between March 2006 and August 2008. Whether they represented all of the loans made by UKB6 for Mr. Ablyazov's benefit during that period is not apparent from the evidence (though the Bank has its suspicions that there were more.) They have been identified as a group of loans merely because they were "repaid" by the Later Loans.

90.  The genesis of the Later Loans was the AFN's investigation of the Bank's lending practices and the demands for improvement of those practices and for the requirement for provisions against apparently non-performing loans. On 10 September 2008 Mr. Ablyazov gave an order in response to the demands made by the AFN:

"Regarding the extent of the implementation of the plan of the [AFN] with regard to increasing provisions – the option of early repayment should be explored with borrowers, and the option of transferring debts to other clean companies to avoid the necessity of additionally creating reserves should also be considered in the first instance, this affects borrowers in respect of which the AFN has already calculated reserves of 50-100%. However, the obligation transfer scheme should be very correct."

91.  Thereafter, on or about 7 October 2008 Mr. Zharimbetov set up a working group to "develop the proposals on performance of the relevant measures to decrease the debt of [the UKB6] portfolio". He appointed himself the Chairman of the working group and reserved to himself "control over performance of this Instruction."

92.  The working group developed schemes which were designed to give the impression to the AFN that UKB6's portfolio had been reduced by the apparent repayment of the Original Loans. However, the repayment was achieved by using another US$1bn. of the Bank's money to repay such loans. This is apparent from a report dated 28 December 2008 addressed to Mr. Zharimbetov as "chairman of the work group for the optimisation of loan indebtedness of UKB6." It describes two "schemes of financing large subsoil use projects" which were used as "measures regarding the decrease in loan indebtedness on the projects of UKB6". The aim was to justify further loans from the Bank by saying that they were required for the purchase of oil and gas equipment. But, as the notes to the scheme said, the amounts required for the purchase of such equipment were "large which makes it impossible to economically justify".

93.  The Later Loans were made between 5 November and 8 December 2012 but they were paid out, not to the Later Borrowers, but to Intermediaries who paid them on to other companies, the Recipients, who in turn paid them to the Bank in apparent discharge of the Original Loans. They were not used for the purchase of oil and gas equipment. Documents said to support and evidence the Later Loans were created after the monies had been paid out by the Bank but

backdated. Thus contracts for the purchase of oil and gas equipment supposedly by the Later Borrowers were still being prepared in late November 2008 and backdated to 23 October 2008. Loan agreements and credit committee extracts were still in draft in mid-December 2008. When completed they were backdated. Other documents were still being prepared in January 2009. As the report dated 28 December 2008 said "at the present time work on preparation of full file on all borrowers is being performed. Opinions: business plan, legal examination by the CRD, reappraisal of pledge or rights to subsoil use will be prepared for analysis of the CBD. Opinions of the Legal Service and the Security Service will be prepared." It is plain there can have been no Credit Committee meetings in respect of the Later Loans.

94. Expert evidence as to the oil and gas industry was adduced by the Bank to establish that the oil and gas contracts were shams because of the lack of specific provisions which would be appropriate for contracts of their size. But such evidence was unnecessary. The email evidence shows that the contracts were prepared by persons within the Bank.

95. It is beyond argument that the Later Loans were a mere cloak which sought to hide from view the reality, which was that money was being extracted from the Bank for the purpose of paying back the Original Loans. Since this circular exercise benefitted Mr. Ablyazov (because he owned or controlled the Original Borrowers) it is also clear that he must have orchestrated or, at the least, authorised this fraud.

### Drey

96. In mid-2008, at a time when the AFN was investigating the Bank's loan portfolio, the Bank, under the control of Mr. Ablyazov, entered into transactions to purchase a controlling interest in three foreign banks in Moscow, Belarus and the Ukraine. It is the Bank's case that these transactions were in reality a means by which Mr. Ablyazov procured the payment out by the Bank of its money for Mr. Ablyazov's purposes.

97. The scheme was in two parts.

98. First, the Bank entered into agreements relating to the Bank's purchase of shares in three foreign banks, BTA Moscow, BTA Belarus and BTA Ukraine ("the Target Banks"). The structure of the purchase involved (i) a number of sale and purchase agreements with selling shareholders ("the SPAs") and (ii) three "compensation agreements" with Drey, an English company, whereby Drey was to be paid for procuring the agreement of various (non-selling) shareholders in the Target Banks not to exercise alleged pre-emption rights. The Bank says that the Target Banks were owned and controlled by Mr. Ablyazov, that his affiliation with them was not disclosed to the Bank's Board of Directors, that the total price to be paid by the Bank was greatly in excess of the market value of the Target Banks and that because the Target Banks were owned and controlled by Mr. Ablyazov there was no need for the compensation agreements. Thus the Bank says that Mr. Ablyazov engineered a scheme whereby (i) the money paid by the Bank under the compensation agreements was used for his own purposes (in particular repaying loans made by the Bank to other companies owned or controlled by Mr. Ablayzov) and (ii) the Bank overpaid for the shares in the three foreign banks.

99. The second part of the scheme was a plan, in relation to at least BTA Moscow and BTA Ukraine, whereby there would be a new share issue by those banks and that more of the Bank's money, under the guise of loans to companies owned or controlled by Mr. Ablyazov, was to be used to purchase the new shares issued by the Target Banks with the result that, notwithstanding the purchase of the old shares in the Target Banks, Mr. Ablyazov would remain in control of the Target Banks.

100. This second plan was reflected in a remarkable email dated 26 May 2008 sent by Mr. Kamalov, the Bank's Financial Director, to Mr. Ablyazov and Mr. Zharimbetov entitled "Ukraine and

Russia: new Issue of Shares". The email attaches what appear to be power-point presentations of the second plan. It is not possible to explain all aspects of these power-point presentations but the following points stand out. The Bank's funds were to be used to purchase shares in BTA Ukraine and BTA Moscow. The source of the funds was to be non-traceable and the arrangement was not to provide for the repayment of the funds to the Bank. Reference was made to the "Fog of War". It is unclear to what this is a reference but it is possible, and indeed likely, that this is a reference to the investigations being conducted and concerns being expressed by the AFN in mid-2008. The date of this email shows that the second plan was being conceived at the same time as the scheme based on the SPAs and Compensation Agreements.

101. It is necessary to give some further detail as to the chronology of the SPAs, the Compensation Agreements and the additional "loans" for the purchase of the new share issue. There was uncertainty as to whether the various documents were signed on the date they bore or whether they had been back-dated. The following dates are therefore approximate.

102. <u>BTA Moscow</u>: In or about June 2008 (possibly 13 and 19 June 2008 respectively) the Compensation Agreement and SPAs were executed. Payments under the Compensation Agreement (some US$133,876,080) and SPAs (some US$88,227,663) were made in June and July 2008. On 3 September 2008 a total of US$300m. was provided by the Bank to Avonhill, Kinmate and Bresnop pursuant to loan agreements which made no provision for security. This money was to be used for the purchase of new shares in BTA Moscow by other companies owned or controlled by Mr. Ablyazov. However, the Bank makes no claim for this US$300m. because there is some evidence that it was repaid following a request by the AFN for the provision of credit files regarding the loans.

103. <u>BTA Belarus</u>: In or about August 2008 (possibly after 15 and on 18 August respectively) the SPAs and Compensation Agreements were executed. Payments under the SPA (some US$17,855,709) and Compensation Agreement (some US$11,349,840) were made in October 2008. I was not referred to any evidence which suggested that there was a plan for companies owned or controlled by Mr. Ablyazov to acquire new shares in BTA Belarus obtained from the Bank under loan agreements.

104. <u>BTA Ukraine</u>: In about November and December 2008 (possibly on 3 November and after 30 December 2008 respectively) the Compensation Agreement and SPAs were executed. Payment of US$150,149,477 was made under the Compensation Agreement on 31 October 2008. The sum of approximately US$77m. which was due under the SPAs was never paid by the Bank. On 28 January 2009 the SPAs were cancelled even though US$150m. had been paid by the Bank under the Compensation Agreement.

105. There are several clear indications that these agreements were not what they appeared to be.

106. First, the sums paid in respect of the shares of the three foreign banks appear to have been greatly in excess of their value. The total price paid in respect of BTA Moscow was some US$222m. There is no evidence as to how that price was determined. The Bank's valuation expert Mr. Alaverdov, whose evidence was unchallenged, was unable to value the shares in BTA Moscow because it was not possible to verify figures used in the Bank's statements. Further, the license of the Bank was revoked for failure to observe the laws regulating banking activities. In particular, the Bank allocated funds to low quality assets without creating adequate reserves for potential losses. The Bank failed to comply with instructions regarding accurate valuation of assets and formation of reserves. In March 2012 the Bank went into forced liquidation with claims of 31.9 billion rubles compared with assets of 4.5 billion rubles. The amount to be paid in respect of BTA Ukraine was US$227m. but Mr. Alaverdov's unchallenged valuation of those shares was US$43.2m. The shares in BTA Belarus for which the Bank paid US$29m. could not be valued because of the difficulty of verifying the figures used in the Bank's statements. All of this makes it most unlikely that there had been a commercially fair

and open determination of the price to be paid for the shares in the Target Banks and more likely than not that the total sums paid in respect of the shares was greatly in excess of their value.

107. Second, it is common ground that Mr. Ablyazov was the owner of the selling and non-selling shareholders in the Target Banks. In those circumstances the Compensation Agreements appear to have been a mere device to extract more money from the Bank, in excess of the value of the shares being bought.

108. Third, the payments were made under the Compensation Agreements to Drey, an English company which was also owned or controlled by Mr. Ablyazov. They were not paid to the non-selling shareholders but were immediately paid out to other companies under Mr. Ablyazov's control. The greater part of the payments made under the Compensation Agreements ended up with the Bank in apparent settlement of debts owed by other companies of Mr. Ablyazov to the Bank.

109. Fourth, Mr. Ablyazov's affiliation or connection with the Target Banks and Drey was not formally disclosed to the Bank's Board of Directors. There is no evidence that it was. It is likely that Mr. Talvitie suspected that Mr. Ablyazov might control the Target Banks and that he might be connected with Drey. That is what he told Mr. Varenko in 2009. He raised his concerns with Mr. Solodchenko but was advised that the overall price was suitable and so voted in favour of the BTA Moscow transaction. (He also voted in favour of the BTA Belarus SPAs but abstained from the vote in relation to the BTA Belarus Compensation Agreement. He does not appear to have voted with regard to the BTA Ukraine Compensation Agreement.) However, I accept his evidence that he did not know that Mr. Ablyazov owned or controlled both the Drey and the Target Banks. No such affiliations had been disclosed in any of the voting papers. He certainly cannot have known of the share dilution scheme or of the use to which the payments made to Drey were put.

110. For these reasons I consider it much more probable than not that the Compensation Agreements were dishonest and fraudulent devices orchestrated or authorised by Mr. Ablyazov to enable the Bank's money to be extracted from it for the purpose, in substantial part, of repaying other loans to the Bank in order to give the impression to the AFN that those other loans were "performing". The overpayment for the shares in the Target Banks is likely to have been part and parcel of this scheme. The later scheme to diminish the Bank's shareholding in the BTA Moscow and BTA Ukraine was an obviously fraudulent scheme.

Chrysopa

111. In August 2008 the Bank paid US$120m. to Chrysopa Holding BV, a Dutch company ("Chrysopa") pursuant to a loan transaction. It was passed on to Usarel, a Cypriot company who used it to purchase the Vitino port on the White Sea.

112. It is the Bank's case that, although the funds were in fact used by Usarel to purchase the Vitino port, the transaction between the Bank and Chrysopa was a sham transaction because there was no intention that Chrysopa would repay the loan and that the transaction was only entered into because Mr. Ablyazov, who owned Chrysopa, required the funds to enable Usarel, with which he was also associated, to purchase the Vitino port. If the loan transaction was not a sham it was, says the Bank, brought about by the fraud of Mr. Ablyazov who, by failing to disclose his interest in the transaction to the Board, kept the Board in ignorance of the fact that the loan was being used for the purpose of funding Mr. Ablyazov's own business interests.

113. Usarel accepts that Mr. Ablyazov acted dishonestly but not in the manner suggested by the Bank. It is Usarel's case that the loan agreement between the Bank and Chrysopa was not a sham and that nobody at the Bank was deceived because nobody drew a distinction between

investment projects of the Bank and investment projects of Mr. Ablyazov. However, in early 2009, when Mr. Ablyazov was dismissed from the Bank, he dishonestly diverted Usarel's income from the port which was to have been used to pay the interest on the sub-loan from Usarel to Chrysopa and so Mr. Ablyazov ensured that Chrysopa was unable to pay interest on the loan to the Bank.

114. It is also Mr. Khazhaev's case that the loan agreement between the Bank and Chrysopa was not a sham. He does not have a positive case as to the actions of Mr. Ablyazov but says that whatever it was Mr. Ablyazov was doing, he, Mr. Khazhaev, did not act in breach of his duty to the Bank.

115. In order to resolve this dispute as to whether the loan agreement was a sham and whether Mr. Ablyazov defrauded the Bank, and if so how, it is necessary to recount the events leading up to the making of the Chrysopa loan and some of the events thereafter.

116. The Vitino port (or the White Sea group of companies which formed the port) was owned by the Nitek group. In 2007 the Rusneftekhim group of oil companies, owned or controlled by Mr. Pukhlikov and Mr. Sheklanov, was interested in purchasing the Vitino port. In April 2007 Mr. Pukhlikov approached the Bank for finance. Rusneftekhim had had a loan facility from the Bank since 2006.

117. On 9 July 2007 a Ms. Kravets sent to Mr. Udovenko at Eastbridge an email attaching a document entitled "Explanation note for the project". She did so at the request of Mr. Khazhaev who at the time was head of the CISFD in Moscow. The fact that she sent this note at the request of Mr. Khazhaev suggests that she had a role in his office. Her email suggests that she also had a role in BTA Moscow. The dramatis personae with which I was provided said she also had a role in BTA Capital and Mr. Kinsky QC, on behalf of Usarel, submitted that she had sent the email in her role at BTA Capital.

118. There was no clear evidence as to who was the author of this document. The Bank and Usarel suggested that it was Mr. Khazhaev. He said it was not. Since he had become the head of CISFD in Moscow in June 2006 and Ms. Kravets had sent the note at his request it is likely that this document, if not written by him, was at least read and approved by him.

119. The note recorded that BTA Capital was to take a 20% equity interest and that a return of 25% was anticipated over the life of the intended six year loan.

120. It would appear that the proposal was quickly approved because in a report prepared for a meeting of the Management Board on 25 July 2007 the loan was included in a list of projects whose limits had been approved.

121. Negotiations continued between the Nitek and Rusneftekhim groups for the sale and purchase of the port and between the latter and BTA Capital for the provision of finance. On 15 August 2007 the Rusneftekhim group and BTA Capital signed a Framework Agreement pursuant to which a joint venture vehicle, owned as to 51% by BTA Capital and as to 49% by Rusneftekhim, would purchase the port. BTA Capital would provide 90% of the funding and Rusneftekhim would provide 10%. The joint venture vehicle would have 5 directors, 3 appointed by BTA Capital and 2 by Rusneftekhim. Important decisions would require a majority of 4 directors.

122. On 29 February 2008 the proposed loan to Usarel was considered and approved by the Regional Credit Committee. It seems more probable than not having regard to the evidence of Ms. Gozhakhmetova and the circumstance that the materials to be considered were sent by email on 28 February 2008 that there was no physical meeting. Votes were noted in writing and sent by email. It is likely that the loan was also considered at a meeting of the Big (sometimes

translated as Major, Large or Plenary) Credit Committee of BTA Moscow. (The reason why the Big Credit Committee of BTA Moscow was considering the loan was that the regulator in Moscow had objected to the Bank's representative office conducting banking business and so the business and the Bank's personnel (though not Mr. Khazhaev) were moved to BTA Moscow).

123. A number of reports had been prepared for the members of the Big Credit Committee and for the members of the Bank's Regional Credit Committee. The Legal Department had produced a report dated 9 October 2007 which noted that because Usarel was a foreign company advice from a foreign lawyer was required on the question whether Usarel had power to enter into the proposed loan. The Economic Security report dated 20 February 2008 concluded that certain risks flowed from the fact that the proposed borrower, Usarel, was foreign and because its shareholding was not transparent. A Risk Management report dated 26 February 2008 noted that the proposed security was a pledge over the shares in Usarel and over the shares in the acquired companies but identified 7 respects in which the proposed loan would not meet the Bank's requirements and described the degree of risk as "high". The credit analyst, Ms. Skripko, noted in her report that BTA Capital's 51% interest in Usarel was to be held through Wenus Products Limited which belonged to Eurasia. She agreed that the risks were "high" but concluded that they "may be overcome". The Regional Credit Committee approved the loan and it is likely that the Big Credit Committee did so also.

124. On 4 May 2008 a framework agreement was concluded for the acquisition of the port by Usarel at a price of US$125,933,750.

125. On 22 May 2008 Mr. Khazhaev sent a memorandum to the Regional Credit Committee for Russia ("the RCCR") proposing that Usarel, a Cypriot company, be replaced as borrower by Chrysopa, a Dutch company, and that Chrysopa make a sub-loan to Usarel. On 3 June 2008 the RCCR (of which Mr. Khazhaev was now a member) approved this proposal. There was no due diligence on Chrysopa. Mr. Khazhaev's explanation for this change was that as from 1 April 2008 a higher provision was required for loans to Cypriot companies than for loans to Dutch companies. There was in fact such a change in reserving requirements but the Bank submitted that whilst there may have been an intention to avoid the need for such higher provision the primary purpose in introducing Chrysopa between the Bank and Usarel was to introduce a "buffer" company between the Bank and the "real" borrower. This had been the practice at the Bank as had been noted by the AFN in its report dated 11 June 2008 in which it had criticised "lending schemes used by the Bank ………..[in which the] borrowers as a rule are used as "buffer" companies and act as nominal borrowers, whereas the Bank's funds are actually disposed by other companies which do not have any contractual relations with the Bank." This is an accurate description of the interposition of Chrysopa and I therefore find on the balance of probabilities that the primary reason for the introduction of Chrysopa was to act as a "buffer" between the Bank and Usarel.

126. Both Usarel and Chrysopa were shell companies. Whether the Bank lent money to Usarel or to Chrysopa the Bank could only be assured of repayment if it had guaranteed access to the revenues from the port. In that sense it mattered not whether it had a right to sue Chrysopa or Usarel for the debt. In both cases security over the revenues from the port was required. However, the use of buffer companies was capable of damaging the interests of the Bank because the result is that the Bank has no contractual relations with the real borrower who disposes of the funds, as had been observed by the AFN. The interposition of Chrysopa is therefore a cogent indication that those responsible for its interposition did not have the best interests of the Bank at heart. Of course the Bank's interests need not have been harmed by the interposition of Chrysopa. By appropriate drafting the loans could have been made, in the language of Mr. Connell, "interlocking." But in the event there was no such interlocking; no assignment of Chrysopa's rights under the sub-loan was taken. Indeed the terms of the Chrysopa

loan and of the sub-loan from Chrysopa to Usarel were not identical.

127. On 7 June 2008 a Shareholders Agreement was entered into regulating the affairs of Lux which was to be the company which held the shares in Usarel. This agreement was between Vetabet (owned by Mr. Pukhlikov and Mr. Scheklanov) and Tedcom (owned by Mr. Ablyazov – through Direct Logistic - as to 75% and as to 25% by Ms. Zhankulieva – though Med Consulting). Mr. Pukhlikov gave evidence that he believed that Tedcom was owned by BTA Capital and that BTA Capital was part of the Bank. But in the light of the letter which stated who the ultimate beneficial owners of Tedcom were (Mr. Ablyazov and Ms. Zhankulieva) and which formed an integral part of the Shareholders' Agreement I am unable to accept this evidence. Thus, whatever may have been the position prior to this date, after 7 June 2008 it must have been clear to Mr. Pukhlikov that the 51% interest was to be taken by Mr. Ablyazov and Ms. Zhankulieva. Mr. Pukhlikov would surely have been careful to know with whom he was entering into the joint venture.

128. On 24 June 2008 the RCCR approved (1) a proposal to defer the grant of a pledge over Lux's shares in Usarel until 3 months after the loan to Chrysopa had been drawn down and (2) the postponement for not more than 2 months after drawdown of the completion of the credit file. The second proposal was marked "for the safe" which, on the evidence of Mr. von Gleich, the Bank's Kazakh banking expert, meant that it was to be kept confidential and not disclosed to the regulator. That was also the understanding of Ms. Gozhakhmetova.

129. At the same time, or shortly afterwards, advice was being sought by Ms. Kravets as to the drafting of a pledge agreement. On 3 July 2008 Lux resolved to approve the creation of pledges over the assets to be acquired and over its own shares in Usarel.

130. On 8 July 2008 a "Fee, Reimbursement and Indemnity Agreement" was signed by Usarel, though not by Chrysopa. There is therefore no evidence that it was a binding document. However, Recital C referred to a "non-Recourse Letter" which was said to prevent the Bank from recovering from Chrysopa to the extent that Chrysopa had not recovered from Usarel.

131. On 9 July 2008 Ayzhan Musina, head of the Transaction Administration Department of CISFD, wrote to Mr. Zharimbetov with regard to the Usarel transaction. The effect of the email was that, although concerns had been expressed in the due diligence reports on Usarel in late 2007, permission was sought to make the loan to Chrysopa without a further legal opinion on the grounds of "the direct connection of the Company [presumably Chrysopa or Usarel]" and on account of the fact Usarel and Chrysopa are "included in Eurasia".

132. It is plain from this memorandum that the connection between Chrysopa, Usarel and Eurasia (and hence Mr. Ablyazov) was known and was not considered an obstacle to the loan being approved. The explanation must have been that it was a shareholders' project and that such projects were routinely permitted.

133. On 10 or 11 July 2008 (the date is unclear) Chrysopa and Usarel concluded the sub-loan agreement. Remarkably it was for a period of 2 years whereas the loan agreement between the Bank and Chrysopa was intended to be for a period of 6 years. Article 5 was "an overriding principle" the effect of which appears to have been to ensure that the amounts paid by Usarel to Chrysopa equalled the amount paid by Chrysopa to the Bank.

134. On 14 July 2008 Vetabet paid US$6m. to Usarel in respect of the anticipated purchase of the port by Usarel.

135. On 1 August 2008 several events took place. The RCCR approved certain amendments to the loan to Chrysopa, with Mr. Khazhaev voting in favour. Mr. Khazhaev also signed the Chrysopa loan agreement on behalf of the Bank. Lastly, the Bank paid US$120m to Chrysopa who paid it

on (together with the $6m. from Vetabet) to Usarel's account at UBS.

136. On 8 August 2008 Usarel completed the purchase of the Vitino port by paying US$125,949,750 to the Nitek group.

137. Thereafter Vetabet managed the port whilst BTA Capital administered the financial affairs of the port. Mr. Pukhlikov gave evidence that he expected sufficient dividends to be transferred to Usarel to permit it to pay the interest due on the loan from Chrysopa.

138. The material events after the signing and making of the loan can be briefly summarised.

139. On 30 September 2008 the RCCR approved certain amendments to the Chrysopa loan which were to the disadvantage of the Bank. Remarkably, one of these gave Mr. Khazaev authority "to make any other amendments not expressly mentioned…...above". On 4 November 2008 the RCCR made further amendments to the Chrysopa loan. The first interest payment (of some US$5.5m) was changed from 1 November 2008 until 2 February 2009 (when almost US$11m. would be due).

140. There is evidence that on 20 November 2008 Usarel passed a resolution that a dividend of US$10.9m be paid and that US$10.875m would be paid as interest.

141. In late January 2009 the RCCR made further changes to the schedule for payment of interest.

142. On the weekend before the Bank was nationalised there was an extraordinary attempt by the Bank's representative office, headed by Mr. Khazaev, to assign the Chrysopa and other loans to BTA Moscow. Mr. Khazaev described it as "rehanging" the loan portfolio from one bank to another. Staff were required to work over the weekend and through the night.

143. Mr. Kinsky submitted, based upon what Ms. Zhankuliyeva has said in proceedings in Cyprus, that US$8m. had been accumulated for the payment of interest by Usarel and Chrysopa but that Mr. Ablyazov, having been deposed as chairman of the Bank, did not permit the payment to be made.

144. There is evidence that on 2 February 2009 the loan agreement was amended by deleting the requirement for security.

145. Having set out the history of the Chrysopa loan I can return to the Bank's case on fraud. Mr. Smith QC submitted on behalf of the Bank that the Chrysopa loan agreement was a sham in that neither party intended it to give rise to any legal consequences, specifically, to any obligation on the part of Chrysopa to pay interest or to repay the principal. If correct, this submission has the surprising result that the Bank, having paid out US$120m. to Chrysopa apparently on the basis of a loan agreement, would have no contractual right to recover the loan or interest from Chrysopa. (It might have other restitutionary claims but it would have no simple claim in debt.)

146. There are documents in evidence which illustrate that there were people in the Bank who were acting as if the loan agreement was a genuine agreement. Counsel for Mr. Khazaev and Usarel referred to many such documents. I will merely refer to three by way of example: first, the drafts of the Lux pledge agreement which was considered in June 2008, second, the advice on such drafts in June 2008 and third, the detailed amendments to the loan agreement.

147. Mr. Smith's submission on sham was not, however, based upon the intentions or understanding of those people in the Bank below the Board of Directors who acted as if the loan agreement was genuine. It was based upon Mr. Ablyazov's intentions as the Chairman of the Board of Directors and majority shareholder in the Bank. It was said that he had no intention that the loan agreement would give rise to legally enforceable obligations and that his intentions can be

attributed to both the Bank and Chrysopa, of which he was also the owner and controller. If this is right then neither party to the alleged loan had any intention that the loan agreement would give rise to legally enforceable obligations with the result that the loan agreement was a sham.

148. It is therefore necessary to consider at least two questions. First, what was Mr. Ablyazov's intention ? Second, can his intention be attributed to the Bank ?

149. <u>Intention.</u> The first matter relied upon by Mr. Smith in support of his submission is the fact that no interest has been paid either by Chrysopa or by Usarel under the sub-loan and that the commission and monitoring fees have not been paid.

150. I do not think it safe to base any inferences as to the parties' intentions in August 2008 on the fact of non-payment of interest which fell due for payment after the nationalisation of the Bank in January/February 2009 and the flight of Mr. Ablyazov from Kazakhstan to London. Plainly the factual context was then very different from what it had been in August 2008. However, I accept that the non-payment of the first instalment of interest and the change in the date for repayment from 1 November 2008 until 2 February 2009 raise questions about the parties' true intentions. However, Mr. Kinsky has submitted that the reason for the non-payment of interest in November 2008 (and the change in the date for payment) may have been that the financial results of the port operation had not been as expected. But the basis for these submissions is a curious and unexplained PowerPoint presentation of a board meeting, said to be of Lux, on 13 November 2008. However, Lux had only one director at this time and so there is doubt as to whether or not there was a meeting as suggested.

151. The second matter relied upon is the fact that no security was provided. The Chrysopa loan agreement made provision for security although the Russian version (which is the governing version) provided that the pledge of Usarel's shares by Lux need not be provided until 1 November 2008 (which was three months after the loan was made) and no date was given for the date when the pledge of the shares in the White Sea group of companies was to be provided. To permit a substantial loan to be made without immediate security to a company without any obvious assets again raises a question as to the parties' true intentions. It is common ground that no effective security was ever provided and there is a dispute as to whether a document purporting to be a pledge of Usarel's shares by Lux was genuine. If it was not genuine this creates further doubt as to the parties' true intentions. If it was genuine (but not effective because of a technical defect) that suggests that the parties in fact had an intention to provide security which would in turn suggest that the loan agreement was intended to be enforced. It is therefore necessary to consider the disputed pledge.

152. It is the case of Mr. Khazhaev that a pledge of Lux's shares in Usarel was executed in November 2008, albeit in a defective manner. The Bank's case is that the pledge was a "concoction designed to mislead the AFN."

153. Mr. Khazhaev gave evidence that the pledge had been circulated by email but was unable to produce any such email. He said that he had kept a copy of it on his computer. The metadata of the pdf file containing the pledge shows that it was produced on 25 November 2008.

154. There is evidence that the pledge was unknown to Lux, Usarel and the Bank. First, Lux and Usarel have pleaded that they had no knowledge of any pledge before 30 July 2010. Second, the Bank has found no trace of any such pledge in its documents. Third, the Bank's witnesses Ms. Niyazova and Ms. Gozhakhmetova gave credible evidence as to where the pledge would have been recorded or stored had it been provided to the Bank. Thus, data relating to it would have been entered onto the Bank's IBS system. There was no such data. An original of the pledge would have been sent to Almaty for storage and a photocopy of it kept on a duplicate file. There was no such original or photocopy. Fourth, a Lotus note memorandum would have mentioned that the original was being sent to Almaty. There is no such memorandum. There would also

have been an act of transfer certificate, a signed copy of which would have been kept on the credit file. There was no such document.

155. There is also cogent evidence that the alleged pledge was not in the form which would have been expected had it been genuine. Ms. Niyazova referred to four detailed points in this regard. For example, it did not include the prefix RF which would be usual and referred to Limassol, instead of to Moscow or Almaty, which would be usual.

156. It was the opinion of Dr. Audrey Giles, the well-known handwriting expert, that there was strong positive evidence that the signature of Asia Gabidullina found on the pledge was written by a different person from the person who signed the majority of documents available to the parties which bore her signature. There was no contrary expert evidence.

157. Certain events after 25 November 2008 tend to suggest that no pledge was executed on or about that day. The pledge was not registered and in December 2008 subordinates of Mr. Khazhaev were debating the terms in which a pledge could be granted.

158. As against this array of evidence in support of the Bank's case Mr. Chapman QC, on behalf of Mr. Khazhaev, relied upon a number of matters to suggest that the pledge was a genuine, albeit ineffective, document. The most cogent was that there was evidence that the pledge was being drafted and considered in June 2008. At that time it provided for Russian law to govern. In July 2008 it was suggested that Cypriot law should govern and that advice on that should be sought. This was before the AFN demand for documents in November 2008. Mr. Chapman addressed all of the points made by the Bank. For example, he said that the Bank's IBS system appeared to be flawed. There were multiple pledges with the same "unique" reference number and certain other numbers were missing. The absence of a record of the pledge could be explained by the pledge not having been registered; hence the missing numbers. It may not have been registered because it did not contain the usual prefix RF. Dr. Giles only had copy documents to work on and was not sure that the signature was written by a different person. He also made other points. For example the pledge bore the Moscow seal which suggests it was genuine. A relevant document, the handwritten Moscow register, was not in evidence.

159. The Bank did not answer many of the detailed points made by Mr. Chapman. Ms. Niyazova was not able to answer them effectively when cross-examined. But the pledge by Lux ought to have been produced by 1 November. There is no explanation as to why it was not, especially in circumstances where a draft had been under consideration in June and July. The purported pledge was produced after the AFN had requested documents in November 2008. If the pledge was a genuine one would have expected to find some reference to it in the correspondence between Moscow and Almaty. There is none. In the result, whilst questions remain as to the quality of the system used by the Bank to record pledges, I am persuaded that it is more likely than not that the purported pledge was not genuine but was produced to show to the AFN.

160. As with the non-payment of interest the non-provision of security raises the possibility that Mr. Ablyazov had no intention that the loan agreement was intended to give rise to legal rights.

161. The third matter relied upon is that the loan from the Bank and the sub-loan to Usarel did not appear on Chrysopa's balance sheet. I accept that this is a further matter which raises a question as to whether Chysopa intended that the loan and sub-loan would give rise to real obligations. Mr. Chapman relied upon Mr. Khazhaev's undated letter to the AFN stating that "correct financial reporting information" had been provided. However, in the same letter Mr. Khazhaev said that Chrysopa was "a technical company of the Rusneftekhim Group" which he must have known to be untrue. I am unable to place any weight on this letter.

162. The fourth matter relied upon is that Mr. Khazhaev had no understanding of the rights to be created by the loan agreement. Mr. Smith relied upon several comments made by Mr. Khazhaev

with regard to the Chrysopa loan, suggested that he had not paid attention to the basic features of the loan transaction and submitted that the explanation was that it was not a loan at all but a proprietary transaction. I was not persuaded that this point materially advanced the "sham" claim. First, Mr. Khazaev was an unreliable witness and I am wary of basing any finding on his evidence. Second, the Vitino port transaction involved a proprietary transaction (by BTA Capital) but the money used for the purchase of the port was obtained by way of a loan from the Bank. Mr. Smith relied heavily upon the views of Mr. Connell, the banking expert called by Mr. Khazaev, who said that the loan did not "stack up" as a loan but was a proprietary transaction "dressed up" as a loan. There were certainly defects in the loan (it was a "bad" loan in many respects) and in that sense it did not "stack up" but the proprietary transaction was different from the loan. The loan enabled the proprietary transaction to be effected. Whilst Mr. Connell's "dressed up" comment reflects the underlying fraud I am not persuaded that it can be taken as far as Mr. Smith seeks to do.

163. The fifth matter relied upon was that it would have been remarkable had Mr. Ablyazov intended to give the Bank rights. It was said that "the writing was on the wall" in that the Bank was short of funds and the AFN was demanding provisions. It would be remarkable if, in those circumstances, Mr. Ablyazov intended to give the Bank rights.

164. I accept that the Bank has raised several matters which raise the possibility that Mr. Ablyazov did not intend that Chrysopa would repay the loan. But, although Mr. Ablyazov plainly had great power over the affairs of the Bank it is unlikely that he thought he could extract money from the Bank pursuant to loan agreements and yet never have to arrange for the payment of interest or for such loans to be repaid. Notwithstanding his power over the Bank it is unlikely that he thought that no questions at all would be asked either at the Bank or by the AFN if repayment obligations were simply ignored. The Bank accepts in the Granton action that some $260m of the Original Loans were repaid other than by way of the Later Loans and does not suggest that those repayments must be "improper" repayments. Moreover, if Chrysopa did not pay interest on the loan there must have been a risk that the attention of the Bank and/or the AFN would focus on the loan and imperil Mr. Ablyazov's interest in the Vitino port. It seems to me that whilst the matters relied upon by Mr. Smith are consistent with the loan agreement being a sham they are also consistent with Mr. Ablyazov intending that it be a genuine loan transaction but one which was a bad loan from the Bank's point of view and difficult to enforce (eg the absence of security and the interposition of Chrysopa as a "buffer" company). Finally, in order to get the money out of the Bank there had to be a loan agreement. Mr. Ablyazov must have intended that at least that part of the loan agreement was real and not a sham. My conclusion is therefore that Mr. Ablyazov intended that the loan agreement would give rise to enforceable obligations but that he hoped that the Bank would find it difficult to enforce Chrysopa's obligations under the loan agreement.

165. In his submissions in Reply Mr. Smith submitted that the obligation to repay was a "pretence" but that the loan agreement otherwise had legal consequences. He relied upon landlord and tenant cases where that which was described as a licence was in fact a tenancy. This appeared to me a change of position from his submission throughout the trial which had been that the loan agreement was not intended to have any legal consequences. In circumstances where the point was only advanced by way of reply at the end of a very long trial I do not consider it appropriate to permit this new submission.

166. Attribution: If, contrary to my view, Mr. Ablyazov did not intend that the loan agreement would give rise to enforceable obligations the question arises as to whether that intention can be attributed to the Bank. It was common ground that this was a matter of Kazakh law. However, both experts agreed that there was no developed law of attribution in Kazakh law beyond the application of common sense. Ordinarily, the knowledge of Mr. Ablyazov, its Chairman and effective controller, would be attributed to the Bank since it acted through him. However, I was

referred to *In re Hampshire Land* [1896] 2 Ch. 743 in which it was said where an agent had acted in fraud of the company his knowledge would not be imputed to the company. Reliance was placed on "common sense". In *Stone & Rolls v Moore Stephens* [2009] 1 AC at 1504 this was described as the adverse interest rule and said to be based upon common sense and justice. I was invited to treat that as a guide to the application of common sense by the Kazakh courts which, in the absence of any other guidance, I shall do. Accordingly, if it is the case that Mr. Ablyazov intended that the loan agreement would give rise to no enforceable obligations he was acting in fraud of the Bank (because he was procuring the payment of US$120m. by the Bank under the guise of a loan) and so common sense, and therefore the law of Kazakhstan, would not attribute his intentions to the Bank. Since a sham requires both parties to have no intention to give rise to enforceable obligations the loan agreement cannot have been a sham.

167. I am happy to reach this conclusion because it would seem to me odd and unjust if, having paid out $120m. pursuant to a loan agreement signed by it and Chrysopa, the Bank nevertheless had no contractual right to claim repayment of the loan from Chrysopa as a simple debt, which would be the case if Mr. Smith's submission were correct. Mr. Smith submitted in Reply that the Bank could adopt the loan agreement as its own and so get over this difficulty. This point was not developed. It was not explained how adoption by one side could produce a bilateral contract. The point was raised at a very late stage. I was not persuaded that it was an effective answer.

168. I therefore turn to the Bank's alternative case that it entered into the loan agreement as a result of a fraud by Mr. Ablyazov. The nature of the Bank's case in this regard is that Mr. Ablyazov did not disclose to the Board of the Bank that he was interested in Chrysopa and in the proprietary transaction which the US$120m. was to fund, namely, the Vitino port. The Board was therefore kept in ignorance of those facts.

169. Mr. Kinsky submitted that the Bank was unable to establish a fraud because it could not show that anyone was deceived. Personnel at the Bank were well aware that funds were provided to shareholders, that is, to Mr. Ablyazov and no-one took exception to such lending.

170. It seems to be true that at least some people below Board level were aware that funds were being provided to Mr. Ablyazov. However, Article 73 of the JSC law requires that transactions in which an affiliate was interested had to be approved by a majority of the Board. The purpose of that Article is to protect a company from transactions which are not in its best interests and indeed from fraud. The Board was never asked to take such a decision with regard to the Chrysopa loan because Mr. Ablyazov had not declared his interest in it and so was kept in ignorance of that interest. That, in my judgment, was a deception and so a fraud on the Bank. The wrongful withholding of information can amount to deception; see *Kensington International v Republic of Congo* [2008] 1 WLR 1144 at para.59 per Moore-Bick LJ. It is not saved from being a deception because there were persons in the Bank below Board level who appreciated that Mr. Ablyazov had an interest in the transaction and did nothing about it.

171. I accept that there is evidence that in 2009 Mr. Ablyazov diverted monies which had been intended by Usarel to fund the interest payable by Usarel to Chrysopa and by Chrysopa to the Bank but, assuming that he did divert such monies, that was a further act of fraud or dishonesty by Mr. Ablyazov. It does not mean that he did not perpetrate a fraud on the Bank in mid 2008 when he ensured that the Board was kept in ignorance of his interest.

### The cases against Mr. Zharimbetov and Mr. Khazaev

172. Having considered the nature of the frauds committed by Mr. Ablyazov it is now necessary to consider whether Mr. Zharimbetov and Mr. Khazaev knowingly assisted him to commit those frauds in a manner which exposes them to liability to the Bank under Kazakh or Russian law.

Mr. Zharimbetov

173. It is first necessary, when assessing Mr. Zharimbetov's knowledge of the frauds being committed by Mr Ablyazov, to note the history of Mr. Zharimbetov's connection with Mr. Ablyazov which goes back for some years before they worked with each other at the Bank. In 1992 Mr. Zharimbetov was introduced to Mr. Ablyazov by Mr. Tatishev (who later became the Chairman of the Bank). He formed a business which traded with companies owned or controlled by Mr. Ablyazov and Mr. Tatishev. Between 1993 and 1996 Mr. Zharimbetov worked in a bank of which Mr. Ablyazov was deputy chairman of the board of directors. In 1996 Mr. Zharimbetov worked at a grain company in which Mr. Ablyazov and Mr. Tatishev were shareholders. Mr. Zharimbetov sold his interest in it in 2000 to Mr. Tatishev. Thereafter, when Mr. Ablyazov was head of the company operating the Kazakhstan Electric Grid, Mr. Zharimbetov joined that company.

174. In about 2000 both Mr. Ablyazov and Mr. Zharimbetov were imprisoned by the authorities in Kazakhstan though Mr. Zharimbetov was never convicted of any offence. After his release he left Kazakhstan and lived and worked in Moscow. Upon Mr. Ablyazov's release from prison in 2003 Mr. Zharimbetov sold his trading company in order to move to a coal mining business in Siberia at the request of Mr. Ablyazov. Finally, when Mr. Ablyazov became Chairman of the Bank Mr. Zharimbetov accepted office as a director and subsequently became First Deputy Chairman of the Management Board and Chairman of the Credit Committee.

175. It would thus appear, at the very least, that Mr. Ablyazov was willing to place considerable trust in Mr. Zharimbetov's abilities and that Mr. Zharimbetov was willing to work closely with Mr. Ablyazov.

176. It does not appear that Mr. Zharimbetov held any position in the Bank whilst Mr. Tatishev was the Chairman of the Bank. Mr. Zharimbetov said that when he was offered a position in the Bank there were disputes between Mr. Ablyazov and the Tatishev family but that the latter was content for Mr. Zharimbetov to join the Bank "as a kind of compromise" between the Ablyazov and Tatishev interests. However, he said that he never had to get involved in any disputes between Mr. Ablyazov and the Tatishev family.

177. Mr. Norbury QC submitted on behalf of Mr. Zharimbetov that the connections between Mr. Ablyazov and Mr. Zharimbetov prior to the latter's involvement at the Bank were secondary to the Tatishev connection. Mr. Zharimbetov appears to have had connections with Mr. Tatishev but I was not persuaded that they were more solid or more potent than his connections with Mr. Ablyazov.

178. There is also evidence that Mr. Zharimbetov was trusted to deal with companies owned or controlled by Mr. Ablyazov. Thus Mr. Zharimbetov held powers of attorney in respect of many such companies.

179. Mr. Zharimbetov suggested that such powers of attorney were a form of security provided by companies which borrowed money from the Bank. But this seemed a most improbable explanation; first, some powers of attorney were granted after loans had been made, second, some powers of attorney were granted in respect of companies which were not clients of the Bank, and third, neither of the experts on Kazakh banking practice was familiar with powers of attorney being used as security. In his oral evidence Mr. Zharimbetov said that powers of attorney held by him in relation to companies involved in the Drey litigation related to his role as a trusted compromise figure between Mr. Ablyazov and the Tatishev family. This also seems improbable because it is difficult to see how they would assist in that regard and in any event, as stated by Mr. Zharimbetov in his witness statement, he never had to get involved in disputes between Mr. Ablyazov and the Tatishev family.

180. There was, in addition, evidence that Mr. Zharimbetov had real familiarity with Eastbridge and its role in administering the many off-shore companies owned or controlled by Mr. Ablyazov. Mr. Norbury submitted that the court could not draw inferences from isolated emails where the context in which the emails were sent could not be explored. He also submitted that there were surprisingly few of those emails which related to Eastbridge which were sent or copied to Mr. Zharimbetov. But in my judgment there were enough emails to paint a consistent picture. The material was not, as Mr. Norbury put it, "thin". Thus, on 23 December 2005 Mr. Udovenko emailed Mr. Zharimbetov with regard to a number of companies of which at least three were amongst the Real Original Borrowers (Advisys, Highview and Solent) which he described as "active" and "under our control". On 2 May 2006 Mr. Udovenko emailed his "colleagues", one of whom was Mr. Zharimbetov, with draft instructions for dealing with off–shore companies which were to be submitted for approval by "the boss". "The boss" can only have been Mr. Ablyazov. In those instructions Mr. Zharimbetov was one of the "persons responsible" who had, in particular, responsibility for approving obligations of a company in excess of US$1m. On 27 July 2007 Mr. Udovenko informed Mr. Khablov by email that Mr. Zharimbetov was to approve the functions of Eastbridge Capital Kazakhstan, no.7 of which was that Mr. Zharimbetov was to determine the budget and personnel. On 24 September 2007 Mr. Udovenko emailed Mr. Zharimbetov informing him that "the boss" had approved a payment of US$1.25m to be made to Devesta and asking him to order that the payment be made "ASAP." On 21 July 2008 Mr. Udovenko informed his colleagues, one of whom was Mr. Zharimbetov, that the "new procedure" for dealing with holding and financial companies within Eastbridge's responsibility had been tested and he hoped that it would be accepted. Although Mr. Zharimbetov's pleaded position was that he knew little of Mr. Udovenko's association with Mr. Ablyazov such position cannot withstand exposure to the contemporaneous documents (of which the above is a sample) which indicate that Mr. Zharimbetov was closely involved with Mr.Udovenko in running companies which were owned or controlled by "the boss", Mr. Ablyazov. Such was his involvement with Mr. Udovenko, Eastbridge and Mr. Ablyazov's companies, as revealed by the contemporaneous documents, that the reality must have been, as submitted on behalf of the Bank, that Mr. Zharimbetov worked closely with Mr. Udovenko and Eastbridge from 2005. Mr. Zharimbetov suggested that the explanation for some of the contemporaneous documents was that he was mediating between Mr. Ablyazov and the Tatishev family and Mr. Norbury submitted on his behalf that the contemporaneous documents can be explained as emails which were sent to Mr. Zharimbetov as a senior manager within the Bank and the person nominated by the main shareholders as their conciliator. But the suggestion does not sit comfortably with Mr. Zharimbetov's witness statement where he said that he was not called upon to get involved in disputes between Mr. Ablyazov and the Tatishev family and the submission does not sit comfortably with the text of at least some of the contemporaneous documents. I have therefore concluded that it is more probable than not that the reason Mr. Zharimbetov held powers of attorney over companies owned or controlled by Mr. Ablyazov was to assist Eastbridge in the administration and management of such companies. Thus on 11 December 2009, after the nationalisation of the Bank, Mr. Zharimbetov was able to give instructions for certain companies to be put into liquidation.

181. That Mr. Zharimbetov had this role in connection with Mr. Ablyazov's companies indicates that Mr. Ablyazov was willing to place considerable trust in Mr. Zharimbetov not only with regard to the running of the Bank but also with regard to the companies owned or controlled by Mr. Ablyazov. I am unable to accept Mr. Norbury's submission that Mr. Zharimbetov did not perform a high level role for Mr. Ablyazov personally as opposed to the high level role he performed at the Bank.

182. With that background to the close and trusted relationship between Mr. Ablyazov and Mr. Zharimbetov I can turn to Mr. Zharimbetov's work in the Bank. There can be no doubt that he held a very senior position in the Bank. In 2006 he was a member of the Credit Committee and by mid-2007 Chairman of the Credit Committee. By 2007 he was Deputy Chairman of the

Management Board and by May 2008 First Deputy Chairman of the Management Board. When, in 2008, the AFN requested that he be dismissed, Mr. Ablyazov refused to do so. He was not on the Board of Directors but he must have worked closely with Mr. Ablyazov in running or operating the Bank. That is indicated by the fact that the remarkable email dated 26 May 2008 concerning the plan to dilute the Bank's shares in BTA Moscow and BTA Ukraine was sent by Mr. Kamalov, the Bank's Financial Director, to two people, namely Mr. Ablyazov and Mr. Zharimbetov.

183. Mr. Zharimbetov accepts that this elaborate plan was devised or approved by the Bank's Strategy Committee. The contemporaneous documents indicate that Mr. Zharimbetov was a member of that committee. At first Mr. Zharimbetov said that he was not a member of the committee but when cross-examined he said that he could not remember whether he was a member of the committee. That seems improbable since it was, according to him, "second only to the Board of Directors in the bank's hierarchy of decision making". I accept the clear indications in the contemporaneous documents that he was a member of the committee and had particular responsibility for the "allocation of finances" relating to "bank capital deals".

184. There was also a dispute as to Mr. Zharimbetov's role in UKB6. But it is clear that he had an important role in connection with it. In December 2006 a decree or order stated that loans made by UKB6 had to be authorised by minutes of the Credit Committee signed by Mr. Mameshtegi and Mr. Zharimbetov. In September 2007 he received an email entitled "regarding the credits of UKB6" which suggested that the large loans issued by UKB6 be divided into smaller loans so that the borrowers from UKB6 did not feature in the list of the Bank's major borrowers. In December 2007 he was described as the "immediate supervisor" of UKB6. In January 2008 he received an email entitled "UKB6 analysis for Zh. Zharimbetov." In May 2008 a decree or order stated that loans made by UKB6 had to be authorised by minutes of the Credit Committee signed by Mr. Zharimbetov (Mr. Mameshtegi having left the Bank.) In October 2008 Mr. Zharimbetov set up a working party to "develop the proposals on performance of the relevant measures to decrease the debt of [the UKB6] portfolio". He appointed himself the Chairman of the Working Group and reserved to himself "control over performance of this Instruction."

185. I have considered the submission of Mr. Norbury that Mr. Zharimbetov merely had UKB6 under his "indirect supervision" or "indirect control". I think this greatly understates Mr. Zharimbetov's involvement with UKB6.

<u>Granton</u>

186. So far as the Original Loans made by UKB6 are concerned the most important function of Mr. Zharimbetov was that he had to sign the minutes of the Credit Committee before a loan could be made. The purpose of such signature was said to be to control or monitor the growth rate or "growth dynamics" of UKB6's loan portfolio. Whatever the true meaning of this stated purpose, it is clear that without his signature UKB6 could not make the loan. In the event his signature appeared in the top right hand corner of the credit committee minutes for each of the loans (apart from the earliest in favour of Westrade dated 20 March 2006 which was signed by Mr. Mameshtegi.) On some occasions he authorised a loan by email. Thus in March 2007 he was asked for his permission to issue a loan to Grundberg Inc. in the sum of US$96m. He gave his permission for a loan in the sum of US$105m., though only US$96m. was in fact lent. He also authorised by email the loan to Mabco Inc. for US$65m. and the loan to Balgaven for US$55m.

187. The Bank alleged that although Mr. Zharimbetov signed minutes of the Credit Committee relating to each Original Loan there were in fact no such meetings. The minutes were, it was said, a fiction. The oral evidence in support of this allegation was not particularly cogent. Ms. Chegimbaeva gave evidence that loans made by UKB6 were never discussed at the Credit Committee meetings. However, she only became the secretary of the Committee in November 2008 and the latest of the Original Loans was dated August 2008. Her evidence appears to have

been based upon what she had been told by previous secretaries. It is possible that she was also referring to what she experienced with regard to further loans made by UKB6 after November 2008 but, apart from the Later Loans, no such loans were specifically identified. Ms. Palembetova's evidence confirmed that UKB6 loans were treated differently from loans made by other divisions but did not assist on the question whether credit committee meetings concerning UKB6 loans actually took place. No evidence was called from those who allegedly signed the credit committee minutes. One of those was Ms. Tleukulova. Although she no longer works for the Bank no reason was given for the absence of evidence from her. Mr. Zharimbetov was one of the signatories and his evidence was that, although he could not remember individual meetings, such meetings had taken place. However, as I have said when discussing his evidence, I am unable to regard him as a reliable witness.

188. The case that there were no meetings of the Credit Committee concerning UKB6 loans must, in my judgment, depend upon whether an inference can be drawn that there were no such meetings from the surrounding circumstances and in particular from the absence of those supporting documents which one would expect to exist.

189. The Bank's own Guidelines on Corporate Lending described procedures whereby the viability of a lending proposal would be closely examined. For example there was to be an economic examination of the project, a legal examination of the project, an examination by the compliance control department, an examination by the economic security department, an appraisal of the pledged property and an expert examination by the Credit Risks Department. Mr. Zharimbetov accepted in cross-examination that the Bank's Guidelines were put in place to comply with the requirements of the AFN and, in answer to a question by me, that it was good practice to comply with them.

190. The example of AstroGold, which was said, without contradiction, to be representative of the Original Loans, is striking. First, an application for a loan of US$76m. was made on 30 October 2007 by a company in the BVI with one director in Cyprus and assets of only $5,000. Second, an opinion on the lending project by the Economic Security Department was apparently produced with great speed on 2 November 2007. It described the available information (which was, to say the least, sparse) as "fully credible". Third, it was stated that the purpose of the loan was to replenish working capital and to "purchase certain premises and garages and develop certain construction project documentation" but there was no business plan giving any further information. Fourth, it was recorded that "we have no negative information on the Borrower's business" but added "we were, however, unable to subject the Borrower to a more comprehensive due diligence as it is located outside of the CIS." Fifth, the Credit Committee was said to have approved the loan on 5 November 2007. These circumstances, and the deficiencies in the due diligence, are so striking that in my judgment it is not credible that the proposed loan to AstroGold was in fact considered and approved by the Credit Committee. In reaching this conclusion I have taken into account Mr. Norbury's submission that there was in Kazakhstan a "different business culture" from that in the West but even allowing for that it is not credible that the proposed loan to AstroGold was in fact considered and approved by the Credit Committee.

191. Mr. Zharimbetov was asked about these documents. He first suggested that relevant due diligence documents originally in the credit file had been lost. But this is improbable. The complaints by the AFN in April and June 2008 that the contents of the credit files were inadequate indicates that the documents on the file always were inadequate. Indeed, an email dated 15 May 2008 suggested that certain of the documents apparently considered by the Credit Committee for the Original Loans were still "to be prepared". Moreover, Mr. Zharimbetov's suggestion that other documents had been lost did not deal with the unsatisfactory features of the documents themselves. When asked about those features he suggested that the documents were not considered by the Credit Committee or by himself as head of the Credit Committee.

What was important, he said, was that the opinions had been prepared. But this suggestion was wholly implausible and cannot be true. The purpose of the Credit Committee was surely to examine the reports to see whether it was appropriate for the Bank to make the loan which had been requested. No Credit Committee viewing the AstroGold file could reach the conclusion that the loan should be approved.

192. Although I was not referred to the credit files of any other loans I have myself referred to the credit file for one of the largest loans, that of US$96m. to Grundberg. It shows, as I was told it would, the same picture. A company incorporated in the Seychelles in May 2006 with a sole director, a Panamanian company, and assets of only US5,000 as of 1 January 2007, applied for a loan of US$105m. on 14 March 2007 to replenish its working capital. The Credit Committee, with the same meagre opinions before it as with AstroGold, authorised a loan of US$96m. on 19 March 2007.

193. Mr. Zharimbetov said that off-shore companies were used by long-standing clients as special purpose vehicles and that the Credit Committee would consider the underlying client and business. However, there was no evidence identifying who that client was or what his business was.

194. I have taken into account that the Bank has not called to give evidence any other persons who signed the minutes. But Mr. Zharimbetov was the head of the Credit Committee and he could not explain how the loans were approved given the poor supporting documents.

195. For these reasons I have concluded that there never were meetings of the Credit Committee which approved the making of the Original Loans. Consistent with this conclusion and supportive of it is the email evidence that in relation to some of the Original Borrowers the requisite opinions were being sought after the date on which the Credit Committee had apparently approved the loan. For example a report on the incorporation documents of Grundberg was being sought on 25 March 2007.

196. It follows that Mr. Zharimbetov signed "minutes" of Credit Committee meetings which had not taken place and by doing so authorized the Original Loans pursuant to the orders or decrees dated 5 December 2006 and 7 May 2008. His signature on the loans enabled Mr. Ablyazov's fraud on the Bank to take place. The need for his signature was not merely "an additional layer of protection" as Mr. Norbury submitted. On the contrary his signature was the only layer of protection. Mr. von Gleich gave evidence that in Kazakhstan formal processes might be bypassed so long as the "key decision maker" had approved the loan. It appears that this is what happened with the Original Loans.

197. So far as Mr. Zharimbetov's own liability for the Bank's losses is concerned it is necessary to determine whether, when he signed the "minutes", he knew that Mr. Ablyazov was, by means of the Original Loans, misappropriating the Bank's money for his own purposes.

198. Mr. Zharimibetov said that he did not know this. He is not a reliable witness but I have to decide whether the Bank has established that he did know. The Bank must do so on the balance of probabilities but the allegation is extremely serious and exposes Mr. Zharimbetov to a personal liability of over US$1 billion. The evidence must therefore be of a cogency commensurate with the seriousness of the allegation. The Bank's case is based upon inference from circumstantial evidence. In this regard it is helpful to recall what Rix LJ said about circumstantial evidence in his judgment on the occasion of Mr. Ablyazov's appeal against the finding of contempt at [2012] EWCA Civ 1411 at paragraph 52:

> "It is, however, the essence of a successful case of circumstantial evidence that the whole is stronger than individual parts. It becomes a net from which there is no escape. That is why a jury is often directed to avoid piecemeal consideration of a

circumstantial case: *R v. Hillier* (2007) 233 ALR 63 (HCA), cited in *Archbold 2012* at para 10-3. Or, as Lord Simon of Glaisdale put it in *R v. Kilbourne* [1973] AC 729 at 758, "Circumstantial evidence…works by cumulatively, in geometrical progression, eliminating other possibilities". The matter is well put in *Shepherd v. The Queen* (1990) 170 CLR 573 (HCA) at 579/580 (but also passim):

> "…the prosecution bears the burden of proving all the elements of the crime beyond reasonable doubt. That means that the essential ingredients of each element must be so proved. It does not mean that every fact – every piece of evidence – relied upon to prove an element by inference must itself be proved beyond reasonable doubt. Intent, for example, is, save for statutory exceptions, an element of every crime. It is something which, apart from admissions, must be proved by inference. But the jury may quite properly draw the necessary inference having regard to the whole of the evidence, whether or not each individual piece of evidence relied upon is proved beyond reasonable doubt, provided they reach their conclusion upon the criminal standard of proof. Indeed, the probative force of a mass of evidence may be cumulative, making it pointless to consider the degree of probability of each item of evidence separately."

199. The circumstantial evidence which, in my judgment, bears upon Mr. Zharimbetov's knowledge is the following:

i) Mr. Ablyazov and Mr. Zharimbetov had worked together before. They had worked with each other in the 1990s in a grain company and in an electricity generating company and Mr. Zharimbetov, having sold his own business, moved to Siberia to operate a coal mining company at the behest of Mr. Ablyazov.

ii) Mr. Zharimbetov's position in the Bank as Deputy Chairman of the Management Board appears to have been the third most powerful in the Bank, after Mr. Ablyazov and Mr. Solodchenko.

iii) In addition he performed a high level and trusted role for Mr. Ablyazov personally. He had a close involvement with Mr. Ablyazov's "secret" companies being managed by Eastbridge.

iv) He had authority to decide whether UKB6 made loans to those companies.

v) For Mr. Zharimbetov to be appointed to his position in the Bank, to be permitted to have a role in the operation of Mr. Ablyazov's companies, and to be the person who was authorised to approve loans by UKB6 to such companies Mr. Ablyazov must have had complete trust in Mr. Zharimbetov. That is also shown by the circumstance that when, in 2008, the AFN demanded that Mr. Zharimbetov be dismissed, Mr. Ablyazov refused to do so.

vi) Mr. Zharimbetov authorized the Original Loans. They were so substantial (from US$35m. to US$140m.) that he must have paid attention to them. It cannot have escaped his notice that the loans were being made to offshore companies with no known assets. He must have known that the Credit Committee, of which he was the head and which was required by the Bank's own Guidelines to approve such loans after extensive due diligence, had not approved the loans.

vii) Mr. Zharimbetov has given evidence to the court which he must have known to be untrue. He must have known that his evidence that the Credit Committee had approved the Original Loans was untrue. He must also have known that his evidence that the Credit Committee merely checked that reports on proposed loans had been made rather than considered the contents of the reports was untrue. There is no innocent explanation for those lies. He must have lied

because he realized that he had no honest explanation for the absence of Credit Committee meetings and because he realised that the sparse information about the proposed borrowers in the credit files was quite insufficient to justify the making of the loans by the Credit Committee.

200.   In my judgment it is an inevitable inference from these matters that Mr. Zharimbetov must have known that the loans were being made for the secret benefit of Mr. Ablyazov. The alternative, that Mr. Zharimbetov, as the third most powerful man in the Bank, responsible for the safe management of the Bank's assets, voted as chairman of the Credit Committee to approve these loans when the necessary due diligence was so lacking is incredible. That being so there had to be another explanation for his approval of the Original Loans. The only other explanation is that Mr. Zharimbetov approved them because they were for Mr. Ablyazov's benefit. That explanation is the most probable explanation and, indeed, is in my judgment the inevitable inference from the circumstances before the court. I have taken into account that there is no evidence that Mr. Zharimbetov benefitted from the Original Loans. That is true but proof of motive is not essential if the evidence is otherwise strong enough to prove the case which in my judgment it is. In any event the likely explanation for Mr. Zharimbetov's conduct is that he must have considered it in his interests to assist Mr. Ablyazov to defraud the Bank. In reaching the above conclusions I have considered the careful and detailed submissions made by Mr. Norbury on behalf of Mr. Zharimbetov, in particular those between paragraphs 214 and 280 of his Closing Submissions. However, for the reasons I have given I am unable to accept them. Many of the submissions are based upon the evidence of Mr. Zharimbetov and Dr. Zubov. But, for the reasons I have given, that evidence is not reliable.

201.   There is no doubt that Mr. Zharimbetov was also closely involved with the Later Loans. They were made on the recommendations of the Working Party of which he was the chairman. The report to him dated 28 December 2008 states that the loans were made on the basis of "safe" instructions signed by three persons of whom he was one ("safe" documents being documents not seen by the AFN) and only later covered by "standard" extracts (that is, ones that would be seen by the AFN).

202.   Mr. Zharimbetov must have known that the Later Loans were going to be used to repay earlier loans made by the Bank because such repayment was one of the ways in which the Working Party he chaired was to decrease the volume of loans to which the Bank was exposed. He must also have known that the loans which were to be repaid had been made to Mr. Ablyazov's secret companies for it is unrealistic to suggest that he arranged to repay loans made to wholly independent third parties. He maintained in evidence that although the loans were to be used for the repayment of earlier loans there would be yet further loans which would be used for the purchase of oil and gas equipment. But this suggestion was unsupported by any documentary evidence and was not mentioned in the report to him dated 28 December 2008. But even more significantly it would negate the purpose of the Later Loans which was to decrease the volume of loans made by the Bank. His evidence therefore makes no sense. The suggestion was untrue and Mr. Zharimbetov must have known it was untrue because it made no sense. There can be only one explanation for that lie. It was a desperate attempt to explain that which could not be honestly explained, namely, that the Bank was making loans ostensibly for the purpose of financing the purchase of oil and gas equipment when in fact it was to repay loans made earlier to Mr. Ablyazov's secret companies. When the loans were made, ostensibly to Granton, Aldridge, Zafferant and Branden, but in fact to other companies, the Credit Committee of which Mr. Zharimbetov was the chairman had not met to consider such loans. The supporting material was produced after the event, as he must have appreciated. In cross-examination he was unable to give any satisfactory explanation of the many documents which showed the supporting documentation being produced after the event. Mr. Norbury described the Bank's reliance on such documentation as "flimsy and forensic" in circumstances where it has not called any of the persons whose signature appears on the Credit Committee minutes to give evidence. However, in my judgment the contemporaneous documents clearly show that the loans were made to the

Intermediaries before the underlying documents were prepared. The Credit Committee minutes can only have been created after the event.

203. I consider that it is a necessary and inevitable inference from the foregoing matters that Mr. Zharimbetov knew that the scheme prepared by his working party was a means by which the Bank's money was to be misappropriated for the dishonest purpose of persuading the AFN that the Original Loans made by UKB6 to Mr. Ablyazov's secret companies had been repaid.

204. In reaching the above conclusions I have considered the careful and detailed submissions made by Mr. Norbury on behalf of Mr. Zharimbetov, in particular those between paragraphs 281 and 328 of his Closing Submissions. However, for the reasons I have given I am unable to accept them. Many of the submissions are based upon the evidence of Mr. Zharimbetov and Dr. Zubov. But, for the reasons I have given, that evidence is not reliable.

<u>Mr. Zharimbetov's liability under Kazakh law</u>

205. The Bank's cause of action against Mr. Zharimbetov arises under Articles 62 and 63 of the JSC Law which provide as follows:

> "62. Principles of activities of officials of a company
>
> A company's officials:
>
>> (1) shall discharge their entrusted obligations in good faith and by means that are to the utmost extent in the best interests of the company and its shareholders …………
>>
>> (2) may not use or permit the use of the assets of the company in violation of the company's charter or decisions of a general shareholders' meeting or the board of directors or for personal gain nor abuse the company's assets in transactions with their own affiliates………..
>
> 63. Responsibilities of officials of a company
>
>> (1) Officials of a company shall be liable to the company and the shareholders for damage caused by their actions (omission), in accordance with Kazakhstan legislation, including for damage caused by:
>>
>>> (i) Presentation of misleading or false information;
>>>
>>> (ii) Violation of the procedure for disclosure of information established by this law.
>>
>> (2) Based upon a decision of a general shareholders' meeting, a company may file with a court a claim against an official for reimbursement of damage or losses caused by such official to the company.

206. If, as I have found, Mr. Zharimbetov knowingly assisted Mr. Ablyazov to carry out the Granton fraud, there is no dispute that Mr. Zharimbetov is, in principle, liable to the Bank for breach of Article 62 of the JSC Law.

207. Mr. Norbury took two points which, if correct, deprive the Bank of its claim.

The need for a shareholders' resolution

208. Mr. Norbury submits that Article 63(2) of the JSC Law imposes a condition which must be complied with before a claim may be filed, namely, there must be a decision in favour of bringing a claim by the shareholders. In the present case the claim form was issued on 17 June 2010 and the shareholders' resolution was not passed until 19 August 2010. Accordingly no claim can legitimately be brought against Mr. Zharimbetov.

209. The Bank's response to this argument is, first, that the shareholders' decision need not predate the commencement of the action, second, that if it must predate the commencement of the action a later resolution with retrospective effect will suffice and, third, the requirement is procedural and not substantive and so is not a bar to an action before the English court.

210. It is convenient to take the first two points together. Professor Maggs expressed his view that the resolution had to precede the bringing of the claim. Mr. Vataev expressed the opinion that a later resolution of retrospective effect would suffice.

211. Mr. Vataev said transactions can be approved retrospectively. Article 165 of the Civil Code demonstrated that. That Article provides:

> "A transaction concluded in the name of another person by a person not empowered to conclude a transaction or in excess of the power shall create, change, and terminate civil rights and duties for the person represented only in the event of the subsequent approval by him of this transaction.
>
> The subsequent approval by the person represented shall make the transaction valid from the moment of its conclusion."

212. Professor Maggs did not say that retrospective authority could not suffice in general but he said that the clear requirement of Article 63(2) of the JSC Law could not be circumvented by retrospective authority.

213. I prefer the opinion of Mr. Vataev on this issue. The experts agreed that "where there is ambiguity or a lack of clarity in the literal meaning of the words, the courts construe the legislation in a manner which is similar to the "purposive approach" adopted in common law legal systems." There is an ambiguity or a lack of clarity in the literal meaning of Article 63(2) of the JSC Law. "Based upon" could mean that there must be a prior resolution or it could mean that the bringing of a claim must be authorised by the shareholders. In my judgment the latter meaning is to be preferred. It is more consistent with the purpose of Article 63(2) which is to ensure that claims are not brought unless the shareholders agree. The former meaning is too narrow. It excludes a retrospective grant of authority for no apparent purpose. Professor Maggs had difficulty in identifying any such purpose. In essence a retrospective authorisation is no different from a prospective grant of authority. Authority can be granted either prospectively or retrospectively as Article 165 of the Civil Code contemplates with regard to transactions. If either exists the bringing of the claim can be said to "based upon" the shareholders' resolution.

214. I have therefore concluded that the bringing of the Granton action is not precluded by Article 63(2) of the JSC Law.

215. In those circumstances it is unnecessary to consider the difficult question whether the requirement of Article 63(2) is a matter of procedure and not of substantive law with the result that this court is not bound by it. I will merely express my view very shortly, in case it is required.

216. Article 63(2) is not part of a procedural code of the courts in Kazakhstan. Rather, it is part of

the JSC Law which suggests that it is substantive. Mr. Norbury also relied upon the decision of the Court of Appeal in *Haugesund Kommune v Depfa Bank* [2012] QB 549 at paragraphs 47-48 to the effect that a lack of a substantive power to enter a particular type of contract was equivalent to a lack of capacity and accordingly a matter of substantive law. However, Article 63(2) refers expressly to "filing with the court a claim" which gives the provision a procedural flavour. Indeed, Professor Maggs on occasion described it as procedural. Mr. Smith said that the cause of action was complete when the breach of duty occurred and therefore the requirement for a shareholders' resolution must be procedural. In that regard he relied upon the Australian case of *Hamilton v Merck* [2006] NSWCA 55 at paragraph 143.

217. I was not persuaded that either authority to which counsel referred provided a clear answer. *Haugesund* was dealing with capacity rather than with the difference between substantive law and procedure. *Hamilton* was dealing with a limitation provision. Nor does *Harding v Wealands* [2007] 2 AC 1 provide a clear answer. It concerned the correct characterisation of a foreign law which imposed restrictions on the amount of damages which could be recovered.

218. I consider that Article 63(2) is a provision which limits the circumstances in which a joint stock company may bring a claim against an official for breach of duty. It reflects a legislative aim that shareholders should be entitled to say whether or not companies may sue the officers of the company for breach of duty. It is therefore more akin to the substantive law than to procedural law and, if it were necessary to do so, I would so hold.

Limitation

219. Mr. Norbury submitted that as a result of a principle of Kazakhstan law known as the competition of claims any claim against Mr. Zharimbetov had to be brought pursuant to the provisions of the Labour Code. He accepted however that breaches of the duties set out in Article 62 of the JSC law could be enforced against an employee because such duties formed part of his contract of employment. The significance of Mr. Norbury's submission was that Article 172 of the Labour Code required that any claim by an employer against an employee had to be brought within one year from the day when

> "the employer became aware or should have become aware of the violation of their rights."

220. The Granton action had been commenced on 17 June 2010 and it was said that before 17 June 2009 the Bank had been aware or should have been aware of the violation of its rights with the result that no claim could be brought against Mr. Zharimbetov. The Bank disputed the application of the principle of competition of claims but, if it applied, said that the Bank had not become aware of the violation of its rights until after 17 June 2009.

221. The principle of the competition of claims is not to be found expressly stated in any code. However, the principle has been explained in these terms by a leading commentator on Kazakh law, Academician M.K.Suleimenov, himself quoting a Russian legal commentator, E.A.Sukhanov:

> "…under our legislation there is not allowed the "competition of claims" that is widely applied in Anglo-American law. By "competition of claims" is generally meant the possibility of presenting several different claims for protection of one and the same interest, with the satisfaction of one of these claims preventing (extinguishing) the possibility of presenting others.

222. Academician Suleimenov continued:

> "In Kazakhstan's legislation, competition is allowed only by way of an exception in

cases directly provided by legislative acts (for example in protection of the rights of consumers in cases of harm being caused to them by defects in goods sold to them).

In remaining cases competition of claims is not allowed. This means that if a dispute arises from contractual relations, a suit may be presented only with respect to contractual liability. One cannot bring a claim for non-contractual harm. One cannot use the rules governing obligations for compensation for harm."

223. Professor Maggs agrees with this statement and has expressed his opinion that its consequence is that any claim against Mr. Zharimbetov must be brought in accordance with the provisions of the Labour Code. Mr. Vataev was initially not inclined, when cross-examined, to accept the principle of competition of claims but eventually accepted the existence of the principle. However, he was firmly of the opinion that it did not operate so as to limit the Bank to claims governed by the Labour Code in circumstances where the Bank had claims available to it under the Civil Code or under the Joint Stock Company Law.

224. I accept that the principle of competition of claims is part of the law of Kazakhstan. It appears to be implicitly recognised (as Professor Maggs said in evidence) by Article 947 of the Civil Code which expressly states that a claim may be brought under the legislation which provides consumers with a cause of action in respect of defective goods, irrespective of whether the consumer is in contractual relations with the supplier or not.

225. However, Professor Maggs was not able to refer to any decided case which determined that the principle operated so as to require a company to bring claims against an officer of the company for breach of his duties as officer in accordance with the Labour Code.

226. Mr. Vataev, for his part, had difficulty in articulating precisely why the Bank was not limited to the provisions of the Labour Code.

227. In light of the acceptance by both experts of the principle in question I accept that claims in delict or tort must be brought in accordance with the Labour Code where there is a contact of employment. But I find it difficult to accept, in circumstances where Articles 62 and 63 of the JSC Law impose duties upon the officers of a company and provide an express remedy for breach of such duties, that such remedies may only be exercised in accordance with the provisions of the Labour Code where there is also a relationship of employer/employee between the company and the officer. In particular it is difficult to accept that, although the JSC Law provides for unlimited liability and a limitation period of three years, the more restrictive limitation provisions of the Labour Code must apply. I accept that this may be the reaction of a common lawyer rather than that of a lawyer familiar with the principle of the competition of claims but I take comfort from the circumstance that Mr. Vataev, not a common lawyer, was also unable to accept the apparent logic of Professor Maggs' opinion.

228. Ultimately I have been persuaded that the principle which governs parallel claims in contract and tort does not apply to parallel claims for breach of a contractual duty as employee and for breach of a statutory duty as officer of a joint stock company. The latter is not a claim in delict or tort but one which arises from the defendant's status as an officer of the company. The latter status gives rise to the obligations under the JSC Law whether or not the officer is an employee of the company. In the absence of clear decisions of the Kazakhstan courts showing that the Labour Code applies exclusively to claims against officers for breach of their duties under the JSC Law I was not persuaded that the remedies for breach of those duties should be limited in the manner in which claims against an employee under the Labour Code are.

229. I have noted Mr. Norbury's submission that the Labour Code, being a Code, takes precedence over the JSC Law, which is only a law and not a code. However, I remain of the view that the clear statement as to the limitation period applicable to officers in the JSC Law must have been

intended to apply where officers are sued. There is no indication in the Labour Code that its provisions were intended to apply to claims against officers of the company for breach of their duties as officers and not as employees. I have also noted that in the *Fiona Trust & Holding Corporation v Privalov* [2010] EWHC 3199 (Comm) Andrew Smith J. held (*obiter*) that in Russian law an employee could only be held liable in accordance with the Labour Code and not in tort. However, that case concerned Russian, not Kazakh law, and it is not clear whether any submission was made with regard to the duties of an officer of a company.

230. It follows that where breach of Article 62 of the JSC Law is relied upon against an officer of the company the Bank has three years in which to bring its claim. The one year limitation in the Labour Code is inapplicable.

231. In case my conclusion in this respect is wrong I must record what my findings would have been had the one year limitation period of the Labour Code been applicable.

232. The English court would be obliged to apply that limitation period; see section 1(1) of the Foreign Limitations Periods Act 1984. The burden of proof would lie on the Bank to show that it had brought its claims within the foreign limitation period; see *Cartledge v E. Jopling & Sons Limited* [1963] AC 758 and *Fiona Trust & Holding Corporation v Privalov* [2010] EWHC 3199 Comm at paragraph 135.

233. Notwithstanding the burden of proof Mr. Norbury advanced a positive case on limitation. First, the AFN reports in 2008 and January 2009 identified the Original and Later Loans as potential problem accounts. Either Mr. Saidenov must have been informed of this on taking over the Bank following nationalisation or the new management was immediately able to check the contents of the AFN reports. Second, criminal proceedings were commenced against Mr. Zharimbetov and others in March 2009 in respect of loans made to companies affiliated with Mr. Ablyazov. These included some of the Original and Later Loans. There was likely to have been liaison between the prosecutor's office and the Bank's investigation team. For these two reasons it was said that the Bank was aware or should have become aware of the violation of its rights in respect of the Granton loans before June 2009.

234. The positive case advanced by the Bank was that when the new management took over the focus of attention was on the liquidity position. Reliance was placed on a comment to this effect by Mr. Saidenov when cross-examined. Reliance was also placed on the evidence of Mr. Kenyon of PWC who was instructed to investigate claims against former management in July 2009. However, privilege was not waived and no evidence was called from the management to say what steps had been taken prior to July 2009 to investigate the extent to which Mr. Zharimbetov had violated the rights of the Bank. Mr. Kenyon said that he understood that prior to the involvement of PWC outside accountants had been involved on restructuring rather than on possible claims against former management, that it was not until December 2009 that PWC was able to advise the Bank about possible claims in respect of the Later Loans and that possible claims in relation to the Original Loans (which were thought to have been repaid) did not arise until much later. This is of some help to the Bank but the Court is left to infer what the Bank's state of knowledge was in June 2009 in circumstances where no officer from the Bank has been called to discharge the burden of proof on the Bank. Mr. Saidenov does not appear to have been involved in the investigation of claims. Mr. Varenko was but he was not called. Mr. Marshall QC submitted on behalf of the Bank that the effect of Mr. Kenyon's evidence was that before the arrival of PWC "there was simply no one at the Bank performing the work which PWC were subsequently retained to perform." But no officer from the Bank has been called to state that.

235. It is first necessary to decide what awareness of "the violation of rights" means. It is common ground that knowledge of loss alone is insufficient. But is it enough for the Bank to know in general terms that its rights have been violated by an employee or must it know the name of that

employee ? Mr. Vataev thought that it was necessary to know the identity of the employee; otherwise the one year period would be unduly restrictive.

236. The phrase "aware of the violation of its rights" does not expressly require an awareness of the identity of the person who has violated the employer's rights. Yet it may be difficult to be aware that one's rights have been violated unless one knows who has violated them. For one employee's duties may be different from another's.

237. Since Article 172 does not expressly require an awareness of the identity of the violator I am not persuaded that such a requirement should be implied into the Article. However, depending upon the circumstances of the individual case it may often be difficult to be aware of a violation without also being aware of the violator.

238. The next question is whether the Bank can establish on the balance of probabilities that it brought its claim against Mr. Zharimbetov within one year of being aware, or when it ought to have been aware, of the violation of its rights. By far the greater part of the Bank's claim in the Granton action relates to the Original Loans. Those loans had, in the main, apparently been repaid and so they did not feature in the claim when it was originally advanced. It can hardly be said that the Bank was aware or ought to have been aware of the violation of its rights with regard to the original Loans before June 2009. They were only added to the claim in January 2011 when it was realised, following disclosure by the Granton Corporate Defendants in September 2010 how they had been "repaid". I am satisfied that in relation to the Original Loans the claim was brought within one year of the Bank being aware, or when it ought to have been aware, of the violation of the Bank's rights with regard to those loans.

239. The position with regard to the (relatively) small part of the claim which relates to the Later Loans is more difficult. The Bank says, in reliance on the evidence of Mr. Kenyon, that before PWC was instructed in July 2009 the Bank's attention had been focussed upon restructuring and not on identifying such claims as it may have had against former officers and employees for violating the Bank's rights. Mr. Kenyon's evidence provides some support for this contention, albeit by inference. The difficulty is that the Bank has called no witness from the Bank to say what its state of knowledge was by June 2009 as to possible claims against Mr. Zharimbetov and has not waived privilege in respect of any documents which might bear on this issue.

240. Notwithstanding the absence of direct evidence from the Bank I cannot turn a blind eye to the realities of the situation of the Bank between February and June 2009 and to the inherent probabilities. Upon nationalisation the new management of the Bank had a considerable task. The AFN had requested the nationalisation because the old management had not made the substantial provisions of US$3.58 billion demanded by the AFN against its loan portfolio. The Bank's auditors reported in May 2009 that the Bank's liabilities exceeded its assets by US$6.2 billion. In these circumstances it is, it seems to me, more likely than not the Bank's new management concentrated on the survival of the Bank in the early months of 2009 rather than upon possible claims against Mr. Ablyazov and Mr. Zharimbetov (who had fled to England) arising out of the operation of the loan portfolio. Although KPMG had investigated the loan portfolio prior to the arrival of PWC it seems likely, as stated by Mr. Kenyon, that such efforts were directed towards the restructuring of the Bank. The number of loan projects was about 300 which had generated some 3,700 loans. Any attempt to discover what claims there were against the former management would have been, and no doubt was, a very considerable and detailed exercise. I consider it more likely than not that by mid-June 2009 the Bank was not aware of the violation its rights in respect of the Later Loans and could not reasonably have been expected to be. The fact that the AFN had found many loans to be potential problem accounts including the Later Loans is evidence that losses may be sustained on them, not that losses had been sustained or that the Bank's rights had been violated. It was hardly unreasonable for the new management to concentrate on the survival of the Bank rather than on investigating potential claims between February and June 2009. Nor does knowledge that the police were bringing charges against Mr.

Zharimbetov in March 2009 establish an awareness on the part of the Bank that its rights had been violated in respect of the Later Loans. That would require a very detailed knowledge of the police investigations. Whilst it is probable that there was some contact between the new management and the police it is also probable that the new management concentrated on the Bank's survival and left the police to carry out their own investigations.

241. In case, contrary to my view, the Bank was aware or ought to have been aware that its rights had been violated more than a year before the Granton action was commenced, I should consider the final point raised by the Bank. It is common ground that in Kazakh law the court has a discretion to extend the limitation where there is a "valid reason" for doing so. This is not stated in any code but has been stated by the Supreme Court. Mr. Norbury submitted that this did not apply to employers who were companies rather than natural persons. He based this submission on Article 185 of the Civil Code which gives a similar discretion but which Professor Maggs said did not apply to companies. I preferred Mr. Vataev's opinion that Article 185 also applied to companies. A purposive construction leads to the conclusion that a company can rely upon the discretion just as a natural person can. In any event there was no evidence that the Supreme Court restricted its ruling to employers who were natural persons.

242. I consider that there is a valid reason to extend the limitation period (which would otherwise expire on an unidentified date between February and 17 June 2010) until 17 June 2010 when the Granton action was commenced. That valid reason was that it was reasonable to delay the commencement of proceedings against Mr. Zharimbetov until (a) PWC had had an opportunity to carry out a systematic investigation of the loan portfolio with a view to identifying claims against the former management (b) the management had had an opportunity to consider the results of PWC's investigations and (c) legal advice had been obtained with regard to such claims. Such delay was reasonable having regard to the magnitude of the sums involved and the complexity of the investigation required to establish the frauds alleged by the Bank.

Quantum

243. In Granton the losses claimed by the Bank against Mr. Zharimbetov total just over US$1 billion. The sum is made up as follows:

i) The value of the Original Loans $1,428,840,000

ii) The sums advanced under the Later Loans which were not used to repay the Original Loans $13,359,090

iii) Sum paid to Trasta Bank by way of commissions for transactions connected to the Later Loans $396,194.50

Less

iv) Other repayments of the original Loans $260,864,207.33

Total $1,181,731,078.17

244. There is no dispute as to these figures or that, on the facts which I have found, Mr. Zharimbetov's breach of duty caused the losses claimed by the Bank. There is however a problem with one of the Original Loans, namely, that made to Westrade in the sum of US$35.5m. on 20 March 2006. This was not authorised by Mr. Zharimbetov but by Mr. Mameshtegi. Mr. Marshall submitted that Mr. Zharimbetov should nevertheless be liable in respect of this loan because he was in charge of UKB6. However, whilst it may be inferred from the decrees requiring his signature for loans made by UKB6 that he was in charge of UKB6 the first decree was dated December 2006. There is very little to suggest that in March

2006 Mr. Zharimbetov was in charge of UKB6 though he might have been. Reliance was also placed on the fact that arrangements were in hand for him to hold a power of attorney for Westrade but that was in May 2007. Finally reliance was placed on the fact that the loan to Westrade was dealt with in the same way as others in the Later Loan scheme. I do not consider that this assists to show that he was responsible for the loan in March 2006. I was therefore not persuaded that the damages claimed against Mr. Zharimbetov should include the Westrade loan. The claim must therefore be amended by deducting $35.5m. from the total.

<u>Drey</u>

245. The Drey transactions were not loans as in the Granton action. The ostensible origin of the Drey transactions lay in an apparent desire by the Bank to acquire a controlling interest in three foreign banks, BTA Moscow, Belarus and Ukraine, in which the Bank already had an interest. Mid to late 2008 was not an auspicious time to acquire a controlling interest in three foreign banks. Lehman Brothers collapsed in September 2008. However, whilst it seems that Mr. Ablyazov wished the Bank to buy out his interests in the three banks at a price which exceeded the value of his interest, he had no intention that the Bank would in fact acquire a controlling interest, at any rate in BTA Moscow and BTA Ukraine. Rather, he intended that there would be a new share issue in those banks which would be bought by his companies using the Bank's money with the result that the Bank would not have a controlling interest in those banks. The Drey transactions were in reality a rather complicated scheme to appropriate the Bank's money for Mr. Ablyazov's purposes. Unlike the Granton loans and the Chrysopa loan which did not go to the Board of Directors of the Bank, because Mr. Ablyazov had not disclosed his interest in them, the Drey transactions, being an apparent purchase of a controlling interest in three foreign banks, did go before the Board of Directors. However, Mr. Ablyazov did not disclose his interest in the three banks and so the Board was unaware of that interest.

246. The important factual question, from the point of view of Mr. Zharimbetov's liability in respect of the Drey transactions, is whether he knew of Mr. Ablyazov's fraudulent aims and assisted him to achieve them.

247. Mr. Zharimbetov does not deny that he was aware of the Drey transactions but he says that his knowledge was limited and that his involvement was pursuant to the direction of Mr. Solodchenko. He does not accept that he knew that the Drey transactions were a scheme to benefit Mr. Ablyazov.

248. The Bank's case that Mr. Zharimbetov knew that the Drey transactions were a secret scheme to benefit Mr. Ablyazov is again based upon inference from circumstantial evidence. The following matters are relied upon by the Bank in this regard.

249. First, Mr. Zharimbetov had a role in hiding Mr. Ablyazov's ownership of the Bank. Mr. Zharimbetov said in cross-examination that from the time of Mr. Tatishev's death in 2004 the fact of Mr. Ablyazov's interest in the Bank was "hidden from everybody". Some shares in the Bank were owned by Drey. In October 2007 Mr. Stroud, one of the defendants in the Drey Action who is elderly and unwell and did not attend trial to defend himself, was asked by Mr. Udovenko to sign a document addressed to Ernst and Young, the Bank's auditors, stating that he was the beneficial owner of Drey. Mr. Stroud was reluctant to do so because it was not the truth. Mr. Ablyazov was the beneficial owner of Drey as he has admitted. However, by 20 December 2007 Mr. Stroud was prepared to sign the document stating that he, Mr. Stroud, was the beneficial owner of Drey, thereby giving Ernst and Young false information. In February 2008 Mr. Stroud was asked to procure another signed letter in respect of Strident Energy, another shareholder in the Bank. The letter was to be signed by his son-in-law, Mr. Wilson, another defendant to the Drey action. Mr. Stroud was unwilling to ask Mr. Wilson to sign the letter because "we both know the true beneficial owner is Mukhtar." Mr. Stroud met Mr. Zharimbetov in Almaty in February 2008. On 18 February 2008 Mr. Stroud informed Mr.

Udovenko that having discussed the matter with Mr. Zharimbetov the latter's response was "change the director". It is therefore apparent from this contemporaneous correspondence that Mr. Zharimbetov must have been aware of the scheme to hide the ownership of Strident Energy from Ernst and Young, the Bank's auditors.

250. On 6 October 2008 Mr. Zharimbetov signed a letter addressed to Mizuho, a Japanese Bank, listing those companies which owned shares in the Bank and their beneficial owner. Mr. Ablyazov was listed as the beneficial owner of 8.86% of shares held by InvestCapital. The beneficial owners of Drey and Strident were said to be Mr. Stroud and Mr. Wilson. Mr. Zharimbetov must have known that the information he gave with regard to Strident was untrue. In cross-examination he also admitted that he knew that Mr. Stroud was not the real owner of Drey but only a nominee. He was reluctant to admit that he had told a lie. But he had. He wrote letters to other banks, Societe General and Standard Bank, giving the same untrue information. Mr. Norbury submitted that this was "just part of the formal dance that went on in Kazakhstan in relation to the ownership by the rich of their assets." I am unable to accept that hiding ownership interests from the Bank's auditors and other banks was part of a "formal dance".

251. It is very likely that if Mr. Zharimbetov was concerned to ensure that neither the Bank's auditors nor the Bank's counterparties were aware of Mr. Ablyazov's controlling interest in the Bank that he also knew that such interest had not been disclosed to the Board.

252. Second, Mr. Zharimbetov was aware that Mr. Ablyazov owned or controlled the shareholders in the Target Banks. In his Closing Submissions Mr. Norbury accepted on behalf of Mr. Zharimbetov that he knew that Mr. Ablyazov was connected to the owners of the shares in the Target Banks and subsequently learned that Mr. Ablyazov was the ultimate beneficial owner of the shares in the Target Banks being purchased.

253. Third, for the reasons which I have already given Mr. Zharimbetov was a member of the Strategy Committee. He accepted that the Drey transactions had been devised by the Strategy Committee and so it is likely that he knew what was involved in the Drey transactions and that his knowledge was not "limited". This is most clearly illustrated by the PowerPoint presentation emailed to him and Mr. Ablyazov on 26 May 2008 which explained the share dilution plan with regard to BTA Moscow and BTA Ukraine. That he, along with Mr. Ablyazov, were the two addressees of this email is significant. It shows his important role in the Bank. Although there is no similar document which illustrates his knowledge of the SPAs and Compensation Agreements there can be no doubt that he was aware of those agreements. As to the SPAs he accepts that he was present at a meeting of the Strategy Committee when the price of the shares in BTA Moscow was discussed. As to the Compensation Agreements he authorised a payment of US$50m pursuant to them. Although he denied approving the Drey transactions the overwhelming probability arising from the trust and confidence which Mr. Ablyazov had in him, his very senior position in the Bank (only Mr. Ablyazov and Mr. Solodchenko were above him) and his efforts to keep Mr. Ablyazov's ownership of Drey and Strident Energy secret is that he was well aware of the Drey transactions and approved them.

254. Fourth, he approved three loans totalling US$300m. in support of the share dilution scheme. As Head of the Credit Committee Mr. Zharimbetov approved three loans of US$110m., US$115m. and US$75m. which were to be used to purchase new shares in the BTA Moscow in the name of other companies owned or controlled by Mr. Ablyazov. The loans were said to be for the purpose of replenishing the working capital of the borrowing companies but, as Mr. Zharimbetov knew, this was not the purpose of the loans. In addition he signed the three loan agreements. In cross-examination he said that he could not remember the details of these transactions but suggested that the loans were necessary to protect the Bank from the AFN. Notwithstanding the reference to the "fog of war" in the PowerPoint presentation concerning the share dilution scheme it is difficult to understand this suggestion or make sense of it. He also suggested that the loans did not harm the Bank. This suggestion was not true. The aim of the

loans was to finance the acquisition of new shares in the BTA Moscow by other companies which were owned and controlled by Mr. Ablyazov and so prevent the Bank having a controlling interest in the BTA Moscow.

255. These matters give rise to a powerful case that Mr. Zharimbetov, the third most powerful man in the Bank, must have appreciated that the Drey transactions were in reality a means by which the Bank's money was extracted for the secret benefit of Mr. Ablyazov. In short, Mr. Zharimbetov was party to the plan devised by the Strategy Committee, he had been instrumental in keeping secret Mr. Ablyazov's interest in Drey and he performed a leading role in the share dilution scheme. It can be inferred from those matters that Mr. Zharimbetov was well aware that Mr. Ablyazov was keeping his ownership of Drey (and, it seems likely, of the Target Banks) secret from the Board of Directors of the Bank with a view to benefitting personally from the transactions.

256. Mr. Norbury submitted that no such inference could be drawn. He made detailed and careful and detailed submissions on this matter between paragraphs 158 and 200 of his Closing Submissions. In short he submitted that although Mr. Zharimbetov attended some meetings of the Strategy Committee the principal architects of the Drey transactions were Mr. Solodchenko and Mr. Kamalov, the Bank's Chief Finance Officer. Mr. Zharimbetov was merely a senior manager, not a key strategist. He was not aware of the details of the transactions but understood that there had been a commercially open and fair determination of the price. In so far as he signed documents he did so pursuant to a power of attorney given to him by Mr. Solodchenko. If Mr. Solodchenko approved of the transactions, which he did, there was nothing further for Mr. Zharimbetov to do but sign. The share dilution scheme was not his responsibility "as he had enough to keep him busy trying to manage the Bank's operational side". In any event he believed that the Board had approved the Drey transactions. The Board knew of Mr. Ablyazov's beneficial interests in the Bank and in the Target Banks.

257. Much of this case is based upon the evidence of Mr. Zharimbetov which is not, in my judgment, reliable. I am unable to accept Mr. Norbury's submissions.

i) The suggestion that Mr. Zharimbetov was merely "a senior manager" with no input into the Drey transactions is improbable and contrary to the contemporaneous documents. It is improbable because Mr. Zharimbetov was trusted by Mr. Ablyazov. His role in and knowledge of the administration of Mr. Ablyazov's secret companies shows that. He had a powerful position in the Bank. He was Deputy Chairman of the Management Board, second only to Mr. Solodchenko. He was chairman of the Credit Committee and very closely involved in the operation of UKB6. When the AFN required him to be dismissed, Mr. Ablyazov refused to do so. All this makes it highly probable that he had a deep involvement in the Drey Transactions. The email dated 26 May 2008 addressed to him and Mr. Ablyazov concerning the share dilution scheme shows that, as does his approval of the loans required for that scheme.

ii) There is no corroboration for Mr. Zharimbetov's evidence that the price to be paid by the Bank for the shares in the Target Banks was a commercially open and fair determination of the price. I have already summarised the Bank's unchallenged expert evidence on the question of the value of the shares in the Target Banks.

iii) Whereas there was evidence of a culture in Kazakhstan whereby subordinates signed that which had been approved by their superior it is, in my judgment, unrealistic to suggest that a man in Mr. Zharimbetov's position was merely following the instructions of Mr. Solodchenko when he signed the loans which would fund the share dilution scheme. The suggestion that the share dilution scheme was not his responsibility flies in the face of the email sending Mr. Zharimbetov and Mr. Ablyazov the PowerPoint presentation of the share dilution scheme and Mr. Zharimbetov's approval of the required loans.

iv) Finally, the suggestion that the Board knew of Mr. Ablyazov's beneficial ownership of the Bank and of the Target Banks is difficult to reconcile with Mr. Zharimbetov's involvement in keeping Mr. Ablyazov's beneficial ownership of the Bank secret from the Bank's auditors and from the Bank's counterparties. It seems likely that Mr. Solodchenko knew of Mr. Ablyazov's interest in the Bank and in the Target Banks and it is possible that those other members of the Board who could be relied upon to support Mr. Ablyazov may also have known of Mr. Ablyazov's interests. It is also likely that Mr. Talvitie suspected that Mr. Ablyazov owned the Bank but I accept that he was not told that and that no document recorded that. Mr. Zharimbetov was instrumental in ensuring that there was no such document. It is also likely that Mr. Talvitie suspected that Mr. Ablyazov might control the Target Banks and that he might be connected with Drey. That is what he told Mr. Varenko in 2009. He raised his concerns with Mr. Solodchenko but was advised that the overall price was suitable and so voted in favour of the BTA Moscow transaction. (He voted in favour of the BTA Belarus SPA but abstained from the vote in relation to the BTA Belarus Compensation Agreement. He does not appear to have voted with regard to the BTA Ukraine Compensation Agreement.) However, I accept his evidence that he did not know that Mr. Ablyazov owned or controlled both the Drey and the Target Banks. No such affiliations had been disclosed in any of the voting papers. If they had been it is more likely than not that Mr. Talvitie would have required a valuation by a major accountancy firm. He certainly cannot have known of the share dilution scheme. There was no reason why Mr. Zharimbetov who had sought to keep Mr. Ablyazov's ownership of Drey secret should have assumed that a member of the Board representing an independent investor would know of Mr. Ablyazov's interest in Drey and the Target Banks. It is therefore most improbable that Mr. Zharimbetov regarded the Board's approval of the Drey transactions as having been given by the Board in circumstances where all of the members knew of the extent of Mr. Ablyazov's ownership of the Bank, Drey and the Target Banks.

258. The burden lies upon the Bank to persuade me on the balance of probabilities but with evidence of a cogency commensurate with the seriousness of the allegation that Mr. Zharimbetov knew that the Drey transactions were a means of enriching Mr. Ablyazov at the expense of the Bank and that the Board had approved the Drey transactions without Mr. Ablyazov's affiliation with the Bank, Drey and the Target Banks having been disclosed to the Board. I consider that that is the only reasonable inference which can be drawn from the facts which the Bank has proved.

259. The remaining question is whether, with that knowledge, Mr. Zharimbetov assisted Mr. Ablyazov to commit the Drey fraud. I am persuaded that he did. With regard to the three Target Banks he must, as a member of the Strategy Committee, have considered and approved the plan to acquire them using both the SPAs and the Compensation Agreements. He assisted Mr. Ablyazov in keeping his ownership of Drey secret. Further, with regard to BTA Moscow he must, as a member of the Strategy Committee, have also considered and approved the share dilution scheme. He assisted Mr. Ablyazov by approving and signing the loans which were to fund the share dilution scheme. With regard to BTA Belarus he also signed the Compensation Agreement and one of the SPAs. With regard to BTA Ukraine he also signed the Cancellation Agreements which purported to cancel the SPAs without, in circumstances where US$150m. had been paid under the Compensation Agreement, securing the return of that sum.

260. For these reasons I find that that Mr. Zharimbetov knowingly assisted Mr. Ablyazov to commit the Drey fraud. There is no dispute as to his liability pursuant to Articles 62 and 63 of the JSC Law save for the point on shareholders' approval with which I have already dealt.

Causation

261. Mr. Norbury submitted that Mr. Zharimbetov's actions or inactions made no difference and cannot have caused any loss because the Board, or at any rate a majority of the Board, would have approved the Drey transactions even if Mr. Ablyazov had declared his affiliations with the Bank, Drey and the Target Banks.

262. It is possible (though not inevitable) that the Board, by a majority, would have approved the Drey transactions even if Mr. Ablyazov had declared his affiliations. That is because there was evidence that the majority was likely to support Mr. Ablyazov, whatever he wanted. But the difficulty in the way of Mr. Norbury's submission is the finding I have made that Mr. Zharimbetov knowingly assisted Mr. Ablyazov to defraud the Bank. Mr. Ablyazov, with the assistance of Mr. Zharimbetov, extracted money from the Bank pursuant to the Drey transactions for his own purposes. The non-disclosure of Mr. Abyazov's interest in the Bank, Drey and the Target Banks was only one aspect of the fraud, albeit an important one given the presence of an independent director on the Board. The fraud commenced with Mr. Zharimbetov's approval, as a member of the Strategy Committee and a trusted associate of Mr. Ablyazov, of the Drey transactions. In any event, one who assists another to commit fraud cannot escape liability by saying that the fraud would have been committed even without his assistance. Nor can such a person escape liability by saying that one part of the fraud (the non-disclosure of Mr. Ablyazov's affiliations) may have been unnecessary.

263. Mr. Norbury accepted that no point could be taken on limitation if it were held, as it has been, that Mr. Zharimbetov was a knowing participant in fraud. The Drey action was commenced on 13 August 2009 and the knowledge of his co-conspirators prior to 13 August 2008 cannot be attributed to the Bank.

Quantum

264. The losses claimed exceed US$401 million. They are made up as follows:

| | |
|---|---|
| BTA Moscow Compensation Agreement | $133,876,080 |
| BTA Moscow SPAs | $88,277,663 |
| BTA Belarus Compensation Agreement | $11,349,840 |
| BTA Belarus SPAs | $17,855,709 |
| BTA Ukraine Compensation Agreement | $150,149,477 |
| Total | $401,508,769 |

265. The Bank has retained the shares in the three Target Banks but has given no credit in respect of them because, in the case of BTA Moscow and BTA Belarus there is no evidence that they have a value and in the case of BTA Ukraine (whose shares are worth in excess of $40m.) the Bank is being sued in the Ukraine for the return of the shares and so will either have to return them or pay for them.

266. There is no dispute as to these figures.

Mr. Khazhaev; the Chrysopa action

267. Unlike Mr. Zharimbetov, Mr. Khazhaev was not someone whom Mr. Ablyazov had known for some years. Also, unlike Mr. Zharimbetov, he worked in Moscow, not in the Bank's head office in Almaty. Nevertheless, the Bank's case is that Mr. Khazhaev, as head (or effective head) of the Bank's representative office in Moscow since October 2007, was one of Mr. Ablyazov's most important lieutenants, was aware of Mr. Ablyazov's interest in the Vitino port transaction and assisted him with it because that was what Mr. Ablyazov required. The Bank says that Mr. Khazhaev did not act in the best interests of the Bank and acted in bad faith. The Bank accepts that Russian law is the applicable law and that in order to succeed it must establish that Mr. Khazhaev "deliberately harmed" the Bank. It further accepts that "deliberate harm" requires it to

show that Mr. Khazhaev was consciously aware of his wrongdoing. Mr. Khazhaev says that he did not know that Chrysopa and Usarel were affiliated to Mr. Ablyazov and did not act in bad faith. He considered that he was acting in the best interests of the Bank.

268.   As with the claim against Mr. Zharimbetov in the Granton and Drey actions the Bank's case against Mr. Khazhaev requires it to establish that he knowingly assisted Mr. Ablyazov to defraud the Bank. In order to decide whether the Bank has made good that case it is necessary to review Mr. Khazhaev's conduct at the material time.

269.   The first material event is the analytical note on the Vitino port project sent to Mr. Udovenko at Eastbridge by Ms. Kravets at the request of Mr. Khazhaev on 9 July 2007. Mr. Khazhaev was head of the CISFD at the material time. Whether or not Mr. Khazhaev was the author he plainly requested Ms. Kravets to send the note to Mr. Udovenko. He gave evidence that he was not involved with the project at this time but there is no reason why Ms. Kravets should have said in July 2007 that she had been requested to send the note by Mr. Khazhaev if she had not been so requested. It is likely that he was involved given that he was head of the CISFD at the time. If not the author of the note it is likely that he authorised the production of the note. The note can only have been prepared for the purpose of deciding whether the Bank should provide finance to Rusneftekhim. Mr. Ablyazov would have been closely involved with such a decision. The fact that Mr. Khazhaev requested Ms. Kravets to send the note to Mr. Udovenko indicates that Mr. Khazhaev was well aware that Mr. Udovenko at Eastbridge acted on behalf of Mr. Ablyazov and that Mr. Ablyazov might wish to be interested in the project through the companies administered by Eastbridge. The note suggests that the "BTA Group" would have a 20% interest in the project. This in turn indicates that Mr. Khazhaev was aware that Mr. Ablyazov was interested in the BTA Group; otherwise there would be no purpose in sending the note to Mr. Udovenko at Eastbridge.

270.   On 25 July 2007 there was a meeting of the Management Board of the Bank. The agenda for the meeting contemplated that Mr. Khazhaev would present a report on the work of CISFD for the first six months of 2007. The minutes of the meeting record that he did. It is therefore highly probable that he did present the report. Mr. Khazhaev denied that he did but I am unable to accept that evidence, notwithstanding the absence of any evidence that he was sent an agenda or board materials and the other textual points relied upon by Mr. Chapman in support of Mr. Khazhaev's denial. The PowerPoint presentations attached to the agenda contain a report which includes amongst the "Group" projects several of which Mr. Ablyazov is known to have been interested in, for example, Kaluga, Domededovo, Paveletskaya and Oceanarium. Mr. Khazhaev denied in evidence that he understood the meaning of "group" projects. However, it is probable, having regard to his position as head of the CISFD and to the fact that he was presenting a report on the CISFD to the Management Board that he well understood that group projects included those in which Mr. Ablyazov was interested.

271.   On 23 January 2008 there was a further meeting of the Management Board of the Bank. The agenda for the meeting contemplated that Mr. Khazhaev would present a report on the CISFD's portfolio for 2007 and the minutes recorded that he did. Mr. Khazhaev denied that he did so and said that he was in Australia. However, although he had an opportunity to provide the court with evidence corroborating his evidence that he had been in Australia he provided none. It is most improbable that the contemporaneous minutes are mistaken. There were also in evidence certain work related emails sent by him during the time he said he was in Australia. He had no explanation for these. In his witness statement he had said that he only had access to his work email account when he was in the office. He did not say in his oral evidence that he had sent the emails from Australia. I must therefore reject his evidence that he was in Australia.

272.   The report that he presented at the Management Board meeting in January 2008 noted that the Vitino port project was a BTA Capital project "in study".

273.   It is highly probable that just as Mr. Khazaev must have known the meaning of "group" projects he must also have known that Mr. Ablyazov had an interest in BTA Capital which was to take a 51% interest in the Vitino port project. The report which he presented in January 2008 listed BTA Capital's projects under the heading of "group" projects and the due diligence reports expressly linked the 51% interest with Eurasia. Mr. Khazaev denied that he knew whilst he was at the Bank that Mr. Ablyazov was the beneficial owner of Eurasia. However, this evidence does not sit comfortably with his evidence to the Russian court in 2012 which suggests that he was aware of Mr. Ablyazov's ownership of Eurasia. It is also most improbable that, in circumstances where his report given in July 2007 referred to Eurasia being a debtor of the Bank in the sum of about US$1 billion, he was unaware who the beneficial owner of Eurasia was. He was unable to explain his plea in the Tekhinvest proceedings that he knew in 2006 that there was a relationship between "Mr. Ablyazov (or the Eurasia group)" and Tekhinvest. I am satisfied that Mr. Khazaev knew from 2006 that Mr. Ablyazov was behind Eurasia.

274.   There is evidence that on 29 February 2008 there was a meeting of the Big Credit Committee in Moscow to consider the Vitino port project, although signed minutes of this meeting were not, I think, identified in evidence. The Big Credit Committee was a committee of BTA Moscow which was, for the reasons previously noted, carrying out the banking business of CISFD in Moscow. In cross examination Mr. Khazaev made the surprising suggestion that the Big Credit Committee did not exist. This suggestion was untrue. Mr. Khazaev's Job Description dating from August 2007 noted that he was to "participate in meetings of the Grand Credit Committee of SlavinvestBank LLC [BTA Moscow]" and he referred to the committee in his evidence in chief. On 28 February 2008 he had been sent the documents for the meeting. The subject matter of the email referred to the BCC, that is, the Big Credit Committee. He himself disclosed a copy of the unsigned minutes of the meeting of the Big Credit Committee on 29 February 2008.

275.   The documents for the meeting (which were for both the Big Credit Committee of BTA Moscow and the Regional Credit Committee of the Bank) came in two parts which needed to be opened and decompressed in order to read them. It is likely that, as the head of CISFD and effective head of the Bank's Representative Office in Moscow, he would wish to access the documents for the meeting of the Big Credit Committee and the Regional Credit Committee. It is unlikely that as a young man he was unable to access the documents from his computer. The documents noted that the project was a joint project of BTA Capital and Rusneftekhim and that BTA Capital was to take a 51% interest. It was also noted that that 51% interest belonged to the Eurasia group of companies. As has already been noted the due diligence noted the high risks associated with the project. Mr. Khazaev denied that he had read these documents. Although, as Mr. Chapman has emphasised, Mr. Khazaev was not a member of the Regional Credit Committee at this time, this seems highly improbable. The documents were copied to him and were surely of great relevance to him. They concerned a loan being promoted by the CISFD of which he was the head. He had been involved with it since at least July 2007 and had requested that the report on the project be sent to Mr. Udovenko. He was one of the persons charged with "control over performance" of the loan and he signed each page of the minutes of the Regional Credit Committee dated 29 February 2009 recording the decision to approve the loan. It is more likely than not that he read the due diligence reports.

276.   Mr. Chapman QC, on behalf of Mr. Khazaev, made a number of detailed points concerning the existence, role and inter-relation of the Big Credit Committee and the Regional Credit Committee; see in particular paragraphs 6.2 and 11.15 – 11.27 of his Closing Submissions. It appears to be correct that the role of the Big Credit Committee on 29 February 2008 was only appreciated by the Bank during the trial when the correct translation of the 28 February 2008 email was given. It is also true that some obscurity remains as to the relationship between the work of the two committees on 29 February 2008. However, the critical point is whether Mr. Khazaev was involved in a decision taken on 29 February 2008 to approve the loan in support

of the Vitino port project. I am satisfied that he was. The materials were sent to him on 28 February 2008 and he signed the minutes of the Regional Credit Committee approving the loan in support of the project.

277. In May 2008 Mr. Khazhaev, after he had become a member of the new Regional Credit Committee for Russia, proposed that the loan which was to have been made to Usarel should in fact be made to Chrysopa. That proposal was adopted by the Regional Credit Committee for Russia in June 2008, Mr. Ablyazov and Mr. Khazhaev being two members of the committee who voted in favour of the proposal. There was no further due diligence carried out. I have already made my finding as to the probable reason for this change, namely, to create a buffer between the Bank and Usarel in the expectation that this would make it more difficult for the Bank to enforce the terms of the loan. Mr. Khazhaev must have been aware that this was the reason. I have noted Mr.Chapman's submissions at paragraph 12.2 – 12.10 of his Closing Submissions, in particular his reliance on the evidence of Mr. Connell who said that there was nothing wrong about the interposition of an offshore company because the loans can be made "interlocking". This is true but such precautions were not taken by the Bank.

278. The email dated 9 July 2008 which referred to Chrysopa and Usarel being part of Eurasia was sent to Mr. Khazhaev on 9 and 10 July. The significance of the email is that it stated that Chrysopa and Usarel were Ablyazov companies, being part of the Eurasia group, and for that reason no further legal due diligence was required. He denied reading it but that is improbable. The subject matter was the Chrysopa and Usarel loans. He had been closely involved with both of them. He was head of the CISFD which was sponsoring the loan. It must be very probable that he did read it. Mr. Chapman said that the letter of credit mentioned in the email was not a matter for Mr. Khazhaev but a later document dated 18 July 2008 signed by Mr. Khazhaev suggested that he was involved with the issue of the letter of credit. Mr. Chapman also noted that the email said that the Compliance Control Department had provided a report. Whether or not such a report was issued the email clearly identified Chrysopa and Usarel as part of the Eurasia Group.

279. On 24 July 2008 the Regional Credit Committee for Russia approved a proposal to amend the terms of the loan to Chrysopa by deferring the grant of a pledge over Lux's shares in Usarel "for a period of three months from the financing start date". The effect of this was that the loan was to be unsecured. The explanation for this can only be, as recognised by Mr. Connell, that the transaction was "in-house". Mr. Khazhaev agreed to the proposal. If he had been protecting the interests of the Bank he would not have done so. It is likely that he was protecting the interests of Mr. Ablyazov.

280. On 1 August 2008 Mr. Khazhaev signed the Chrysopa loan agreement on behalf of the Bank. On the same date the loan was paid out to Chrysopa and on by Chrysopa to Usarel.

281. Mr. Chapman submitted that if the Chrysopa loan was a valid transaction and not a sham transaction then the claim against Mr. Khazhaev must fail. I am unable to accept that submission. It ignores the wider case of fraud. The question is (a) whether Mr. Khazhaev was aware of the fraud Mr. Ablyazov was committing on the Bank and (b) if so, whether he assisted Mr. Ablyazov to commit that fraud.

282. Before answering that question it is necessary to state what the Bank must establish under Russian law. The relevant Articles of the Russian Labour Code are these:

> "21. …………The employee shall: perform his/her work duties vested by the labour contract in good faith……….
>
> 233(1) Unless otherwise provided by this Code or other federal laws, financial liability of a party to the employment contract arises where damage was caused by

that party as a result of the first party's culpable misconduct (action or inaction) ……

241. A worker shall bear material liability for damage caused, within the limits of his average monthly wage, unless otherwise stipulated in this Code or other federal laws.

243. An employee shall be subject to material liability for damage in full in instances:

(3) where damage was caused deliberately;

………..

(5) where damage was caused as a result of the employee's criminal actions, established by a court decision………

277(1) The head of an organisation shall bear full financial liability for any direct actual damage caused to the organisation."

283. There was no dispute that under Article 233 of the Russian Labour Code Mr. Khazhaev would be liable to the Bank for "culpable misconduct" if he acted in breach of his duty under Article 21 of the Labour Code to perform his duties "in good faith". Pursuant to Article 241 of the Labour Code his liability would be limited to one month's salary. However, he would be exposed to full (in the sense of unlimited) liability if "damage was caused deliberately"; see Article 243(3) of the Labour Code. Thus the Bank has to establish that Mr. Khazhaev acted in breach of good faith and caused damage to the Bank deliberately. It is common ground that the latter requires Mr. Khazhaev to have had a subjective awareness of the wrongful nature of his actions and that he foresaw the possibility or inevitability of damage to the Bank.

284. Mr. Smith submitted that nobody in Mr. Khazhaev's position would think it "appropriate for the Chairman of the Bank to help himself to the Bank's money in a secret way."

285. In circumstances where Mr. Khazhaev knew that Mr. Ablyazov was behind BTA Capital rather than the Bank, where BTA Capital was taking a 51% interest in a venture financed by the Bank and where the loan was to be made to Chrysopa instead of to Usarel without any further due diligence and without security, there is a cogent argument that Mr. Khazhaev appreciated that Mr. Ablyazov was "helping himself to the Bank's money in a secret way." Such a loan could not have been approved by the Board if it were mindful of the interests of the Bank.

286. Notwithstanding the cogency of Mr. Smith's submission I have asked myself whether, in circumstances where the connection between Mr. Ablyazov and Chrysopa and Usarel had been flagged up and yet the loans to Usarel and then to Chrysopa had been approved by others, Mr. Khazhaev, then aged about 26 and with relatively little experience of banking, could fairly be said to have acted in bad faith and to have had a subjective awareness of the wrongful nature of his actions. Was he only doing that which other more senior people in the Bank were doing and may he therefore have thought that what he was doing was in order ? This was not of course Mr. Khazhaev's own case and he did not give evidence which would support it. His case and his evidence was that he did not know that the Chrysopa loan was for Mr. Ablyazov's benefit. Nevertheless, I consider that in fairness to Mr. Khazhaev and in order to ensure that justice is done I must consider the possibility that he did not appreciate that what he was doing was wrong. Mr. Connell, who was under no illusion as to how business at the Bank was conducted, was clearly troubled by Mr. Khazhaev's age and lack of experience. So was I.

287. The connection between Mr. Ablyazov and the Vitino port project was apparent from the

reference to Eurasia, which was known to be owned by Mr. Ablyazov, in the due diligence report provided to the Big Credit Committee and the Regional Credit Committee in February 2008. The following statements were made in the report of the Risk Management Office:

> "Oil trader Rusneftekhim is the Initiator of the project. The Project under financing is a joint project of IG BTA-Capital LLC and Rusneftekhim Group of Companies ………….The ownership structure provided in the Expert Opinion (page 2) shows a direct interest of the Eurasia Group of Companies in the transaction (51%). Given that the Eurasia Group of Companies has a large number of liabilities to BTA, the loan under this transaction should be viewed as joint liabilities of the Eurasia Group of Companies. It is necessary to Compliance Control to provide Major Borrowers Risk management Office with an opinion on Borrowers' affiliation."

288.   The reference to page 2 of the Expert Opinion was to a diagram showing the proposed structure of the project which stated that a company known as Wenus Products in the Eurasia group would own 51% of Lux which would in turn own Usarel.

289.   Thus any reader of these reports would appreciate that Mr. Ablyazov, the known owner of Eurasia, was to benefit from the proposed loan. Notwithstanding this the Regional Credit Committee approved the proposed loan. Those voting in favour were Mr. Ablyazov, Mr. Zharimbetov and Mr. Kolpakov, (the latter two being members of the Board of Management) and Ms. Zhankulieva (who, with Mr. Ablyazov, owned BTA Capital). Mr. Khazhaev signed each page of the minutes also. He was not a member of the Regional Credit Committee but was one of 5 persons with "control over performance" of the loan. Similarly the memorandum of 9 July 2008 which also referred to the Eurasia connection and was sent to 11 people in the Bank does not appear to have caused any alarm. Another document dated 14 July 2008 referred to the Eurasia connection and was sent to a similar number of people in the Bank and does not appear to have caused any alarm. Thus it appears that Mr. Khazhaev was not alone in failing to object to the loan.

290.   However, there is evidence that it was appreciated within the Bank that it was improper for a loan to be made to BTA Capital and Eurasia. That evidence consists of copies of the due diligence reports on Usarel in which the references to BTA Capital and Eurasia have been removed. Thus, although nobody blew the whistle, there was, it seems, a recognition that loans for the benefit of BTA Capital and Eurasia were not permitted. It was the Bank's case that Mr. Khazhaev was responsible for the removal of the references to BTA Capital and Eurasia from the reports and that the references had been removed so that they would not be seen by the AFN. This submission was based upon a number of emails but primarily upon 2 emails dated 2 December 2008 the import of which was that the Bank in Almaty, faced with a request for documents by the AFN, requested Mr. Khazhaev and his office in Moscow to approve and if necessary prepare the requisite reports. There is no email which expressly refers to the Vitino project and no evidence which clearly links the amended reports to Mr. Khazhaev rather than to the other recipients of the emails of 2 December 2008. However, it is difficult to think of a reason why the reports should have been amended other than for the purpose of showing them to the AFN and Mr. Khazhaev was the head of the representative office in Moscow. The Bank's submission is also consistent with the undated letter from Mr. Khazhaev to the AFN in which he informs the AFN that Chrysopa was a company of the Rusneftekhim Group. No mention was made of Eurasia. It is therefore, in my judgment, more likely than not that either Mr. Khazhaev was personally responsible for the changes to the reports or that he authorised the changes. This is therefore an indication that he realised that loans should not be made for the effective benefit of BTA Capital and Eurasia.

291.   Further, there is the fact that Mr. Khazhaev was not honest with the court. His repeated denials of what the contemporaneous documents from July 2007 to August 2008 showed cannot be explained by an honest failure to recollect what happened several years ago or a misrecollection

of what happened several years ago. They can only be explained by the realisation on his part that the story told by the contemporaneous documents did not assist his case and that he therefore had to deny what they showed. He can have had no honest belief in the truth of his answers to questions based upon the contemporaneous documents. Mr. Smith submitted that he lied on his oath. I find myself compelled to agree that he did. Three examples will suffice. His evidence that he was in Australia in January 2008 was a lie. His evidence that he did not know that Mr. Ablyazov was behind Eurasia and BTA Capital was a lie. His evidence that he believed that the loan transaction with Chrysopa was a transaction with Rusneftekhim only and not also with Eurasia, and hence Mr. Ablyazov, was a lie.

292. It is necessary to ask why did he lie? Lies can be told for "innocent" reasons as juries are frequently told. It was suggested by Mr. Chapman that he lied because he was under considerable pressure, particularly in Russia where his conduct is being investigated. I agree that these proceedings and other proceedings in Russia must be very stressful for Mr. Khazhaev. However, I have reached the clear conclusion that he lied because he realised that he did not have an honest answer to give to the questions based upon the contemporaneous documents. Acceptance of what the contemporaneous documents showed would, he recognised, be fatal to his defence. The fact that he lied is therefore another indication that he realised at the time that what he was doing was wrong.

293. These considerations persuade me that Mr. Khazhaev, despite his youth and inexperience, did in fact appreciate in 2007 and 2008 that what he was doing to assist Mr. Ablyazov to obtain the Bank's money to finance his own purchase of a 51% interest in the Vitino port project was wrong. I am satisfied that Mr. Khazhaev did know that Mr. Ablyazov was seeking to benefit himself by procuring a loan from the Bank to finance the purchase of the Vitino port without disclosing to the Board his interest in that purchase. I am also satisfied that Mr. Khazhaev assisted Mr. Ablyazov to achieve his fraudulent aim by his work as head of CISFD in putting forward the loan for approval by the Regional Credit Committee in February 2008, by approving the loan to Chrysopa instead of to Usarel as a member of the Regional Credit Committee for Russia in June 2008 and by signing the loan agreement on 1 August 2008. He acted in bad faith and with a conscious awareness of his wrongdoing.

294. The Bank accepts that it must also be shown that Mr. Khazhaev foresaw the possibility or inevitability of damage to the Bank. In circumstances where he acted in bad faith and with a conscious awareness of his wrongdoing there can be no doubt that he also foresaw that harm would be caused to the Bank by the assistance he was giving Mr. Ablyazov. This conclusion is entirely consistent with Mr. Khazhaev's conduct after the loan to Chrysopa was made in August 2008. He approved amendments which were detrimental to the interest of the Bank. His role in the "rehanging" exercise whereby an attempt was made to assign the loan portfolio from the Bank to BTA Moscow can only have been intended to damage the interests of the Bank. (It is unnecessary to lengthen this judgment further by a detailed consideration of the evidence relating to Mr. Khazhaev's misappropriation of the BTA Moscow seal which occurred during the "rehanging" exercise. I will merely record that I accept Ms. Niyazova's account and am unable to accept Mr. Khazhaev's account. Her account is corroborated by a contemporaneous account given on 4 February 2009. His account is bizarre and improbable.)

295. In those circumstances the Bank has established that Mr. Khazhaev deliberately caused damage to the Bank such that he is liable for the loss thereby caused pursuant to Article 243(3) of the Russian Labour Code.

296. In reaching this conclusion I have borne in mind that cogent evidence commensurate with the seriousness of the conduct alleged against Mr. Khazhaev is required. But I think such evidence has been adduced by the Bank. I have also borne in mind that there is no evidence that Mr. Khazhaev profited from assisting Mr. Ablyazov to defraud the Bank. Evidence of motive is not required if the evidence is otherwise strong enough to prove the Bank's case which in my

judgment it is. However, it seems to me very likely that Mr. Khazhaev regarded it as in his interests to assist Mr. Ablyazov. He had received a bonus of $300,000 for his work in 2007 and no doubt expected another substantial bonus for his work in 2008.

297. I have also borne in mind Mr. Chapman's submission that the Bank could and should have called other witnesses and that in their absence inferences should be drawn against the Bank. But the case against Mr. Khazhaev that he dishonestly assisted Mr. Ablyazov with regard to the Chrysopa loan in the period 2007-2008 could only be established by the contemporaneous documents and those documents have established the Bank's case. In that regard Mr. Chapman submitted that much documentation has not been disclosed by the Bank. This is unlikely. The scope of the Bank's electronic disclosure was considered at a CMC on 12 July 2011. At that time I described it as "huge" and referred to the searches from 250 databases, a central file server, three email servers and 2217 hard drives. There were 15 specialist IT experts and 92 PWC staff. Almost a million documents had been identified for review. I have been told by Mr. Smith that the Chrysopa chronological bundles prepared for trial run to over 6000 pages. It is unlikely that anything of real significance has been missed. It is accepted that BTA Moscow has not given disclosure but having regard to the fact that employees of BTA Moscow were in fact doing the banking work of the CISFD in Moscow and that emails were exchanged between those employees and the Bank it is likely that the significant documentation has been recovered. In addition Mr. Khazhaev has himself disclosed BTA Moscow documents which he kept on his laptop. I am wholly unpersuaded that this case suffers from a shortage of contemporaneous documents. On the contrary, it suffers from a surfeit of documents.

298. In the light of my findings as to "deliberate damage" it is unnecessary for me to decide whether the Bank can establish its case by reference to the other exceptions to the limited liability of an employee as to which there were disagreements between the experts on Russian law. I shall express in short form what my conclusions would have been.

299. "Head of the organisation", Article 277(1). I do not accept that Mr. Khazhaev was head of an organisation. He was head of a representative office of an organisation, namely, the Bank. If that is wrong, there is no evidence that the representative office suffered any damage.

300. "Criminal actions established by a court decision", Article 243(5). The aim or object of this exception appears to be that where the employee's conduct amounts to a crime and has been found to be such then he has unlimited liability. There was no dispute that the conduct alleged against Mr. Khazhaev amounts to a crime. However, it has been proved to a civil standard and not to the criminal standard. I am not persuaded that the exception applies in such circumstances.

Causation

301. If the Bank is entitled to recover the shares in the Vitino port from Usarel and they are worth at least $120m. then the Bank will not be able to obtain double recovery from Mr. Khazhaev. Mr. Smith therefore accepts that if the Bank recovers the shares there must be an inquiry into their value to see whether there is any scope for any award of damages against Mr. Khazhaev.

302. Leaving that point to one side the Bank says that Mr. Khazhaev's wrongdoing was causative of loss. He assisted Mr. Ablyazov to commit a fraud on the Bank from July 2007 until August 2008. The result of that fraud is that the loan of $120m. has been lost.

303. Mr. Chapman says that causation cannot be proved. First, he says that the loss would have been sustained had Mr. Khazhaev not assisted Mr. Ablyazov. This is not a good point. A person who assists another to commit fraud cannot say he is not liable for the loss thereby caused because if he had not assisted the fraudster someone else would have done so. Second, he says that in so far as the losses result from the invalidity or unenforceability of the loan that is the fault of the

Bank's lawyer in Moscow. But the losses result from the fact that the Bank made the loan because of Mr. Ablyazov's fraud in which he was assisted by Mr. Khazhaev. Third, Mr. Chapman says that the loss was caused by Mr. Mukhametzhanov who approved the loan in the midst of a liquidity crisis. But had there been no fraud there would have been no loan.

304. I am therefore satisfied, subject to any objection based upon double recovery, that the Bank can establish that Mr. Khazhaev's conduct has caused loss to the Bank.

Limitation

305. Article 392 of the Russian Labour Code provides that claims must be brought "within one year from the date when the damage has been identified." It also provides that the time limit may extended by the court "with good reason."

306. The Chrysopa action was commenced on 28 January 2010.

307. There was a dispute between Professor Maggs and Professor Sergeyev as to when the limitation period began. Professor Maggs said that it was when the damage was discovered by the Bank. Professor Sergeyev said that it was when the employer determined that it had been wronged and by whom. I prefer Professor Maggs' view since it seems to me to accord with the language of the Article. Thus the question is whether the Bank discovered the damage before 28 January 2009.

308. The first (postponed) payment of interest was not due until 2 February 2009. On 5 June 2009 the Bank demanded repayment of the loan. No response was received. These matters would suggest that the damage was not discovered until some time between 2 February and 5 June 2009, alternatively shortly after 5 June 2009 when no response was received.

309. Mr. Chapman relies upon the circumstance that in October 2008 the AFN rated the Chrysopa loan as irrecoverable and required 100% provision against it. However, this was not the discovery of damage. At most it was a warning that damage might be sustained in the future. The same rating was given by the AFN on 23 January 2009.

310. I have therefore concluded that the Bank has established that the Chrysopa action was commenced within the limitation period.

311. If, contrary to my view, the ratings of the AFN amount to the discovery of damage then there is good reason to extend time. The new management was not in place until February 2009 and cannot reasonably have been expected to have learnt of the AFN's ratings until some time thereafter, no earlier than 2 March 2009. If time is extended until one year after that date the Chrysopa claim was issued within time.

The Claim against Usarel for the Vitino port as "*dokhody.*"

312. The claim against Usarel for delivery up of the shares in the White Sea group of companies which own the Vitino port was put in different ways under Kazakh law giving rise to arguments which were often puzzling, perhaps because of the imperfect translation of some of the relevant provisions of the Kazakh codes and because the impressive experts on Kazakh law disagreed on important points.

313. There were two main strands to the Bank's claim against Usarel. The first involved the invalidation of the loan agreement between the Bank and Chrysopa and the remedy granted to the Bank in those circumstances to demand the "proceeds" ("*dokhody*") of that which had been transferred under the invalidated agreement. The Bank relied on no less than five routes to invalidation and no less than four arguments as to why the Usarel sub-loan was not an obstacle

to recovery.

314. The second strand to the Bank's argument involved a claim for *dokhody* on the grounds of unjust enrichment. I prefer to consider this argument first because it is simpler than the several arguments based upon invalidation.

315. Articles 953-958 of the Civil Code provide as follows:

> "953(1) A person (acquirer) who without grounds established by legislation or transaction acquired or saved property (unjustly enriched) at the expense of another person (victim) shall be obliged to return to the last property unjustly acquired or saved…..
>
> 954 ….the rules of the present Chapter shall be applied also to demands
>
> (i) concerning the return of that performed under an invalid transaction ….
>
> (iv) concerning compensation of harm, including that caused by the behaviour not in good faith of the enriched person.
>
> 955. Property comprising unjust enrichment of the acquirer must be returned to the victim in kind.
>
> 956(1) In the event it is impossible to return in kind property unjustly received or saved, the acquirer must compensate the victim for the real value of this property at the moment of its acquisition…………..
>
> 958(1) The person who unjustly received or saved property shall be obliged to return or to compensate the victim for all proceeds ["*dokhody*"] which he derived or should have arrived from this property from the time when he knew or should have known about the unjust enrichment."

316. There is no dispute that Article 953 applies to bank transfers or money in a bank account. There was a suggestion by Mr. Kinsky that Article 953 only applied if the Bank made one of the demands in Article 954. I was not persuaded that that was right. Article 953 establishes the obligation to return that which has been acquired in circumstances of unjust enrichment. Article 954 merely applies Article 953 to particular circumstances.

317. Mr. Smith submitted that the Bank could rely upon Article 953 (without reference to Article 954) and upon Article 954(iv). It is convenient to deal with his reliance on Article 954(iv) because Professor Maggs accepted that the unjust enrichment provisions of Article 953 would apply if Usarel were liable for causing harm under Article 917 (liability in tort or delict).

318. Article 917 provided as follows:

> "1. Harm…caused by the unlawful actions …to property ….shall be subject to compensation in full by the person who caused the harm. ………………….
>
> 2. A person who has caused harm shall be relieved from compensation thereof if it is proved that the harm was caused not though his fault……"

319. Whether Usarel is liable in tort or delict pursuant to Article 917 of the Civil Code depends upon whether Mr. Ablyazov's knowledge and intentions can be attributed to Usarel when entering into and receiving the proceeds of the sub-loan.

320. There is no specific Kazakh law on attribution. Both experts referred to the court applying

common sense.

321. The sole director of Usarel at the material time was Maria Toma who appears to have been appointed by a corporate services provider. On 24 March 2008 Maria Toma appointed Mr. Udovenko the true and lawful attorney of Usarel. It seems that Mr. Rybalkin, the Russian lawyer who worked at Eastbridge and is a defendant to the Chrysopa proceedings, also held a power of attorney because he signed the sub-loan between Chrysopa and Usarel on behalf of Usarel. Thus, although Maria Toma was the sole director of Usarel, known associates of Mr. Ablyazov were able to act on behalf of Usarel. In addition Mr. Udovenko held powers of attorney over Lux, the owner of Usarel, and over Tedcom (which owned 51% of Lux) and over Direct Logistic (which held Mr. Ablyazov's 75% of Tedcom). The arrangement contemplated by the Lux shareholders agreement by which there would be a number of directors appointed by Tedcom and Vetabet had not been activated.

322. Mr. Smith submitted that in those circumstances Mr. Ablyazov's actions and intentions should be attributed to Usarel because those authorised to act on behalf of Usarel took their instructions from Mr. Ablyazov. Further, the circumstance that Mr. Ablyazov's actions and intention were designed to benefit Usarel was another reason why his actions and intentions should be attributed to Usarel.

323. Mr. Kinsky's submissions were more extensive. The main planks of his submissions appeared to me to be these. First, he submitted that Mr. Ablyazov's only wrongdoing occurred in February 2009 when he was dismissed from the Bank. I have not accepted that submission. Second, he submitted that there was no basis for suggesting that Usarel was an instrument of Mr. Ablyazov's fraud. However, Usarel received the proceeds of the fraud and at the material time there was only one director who had given powers of attorney to Mr. Ablyazov's associates. In those circumstances Usarel was an instrument of Mr. Ablyazov's fraud. Third, he submitted that Usarel was as a much a victim of Mr. Ablyazov's fraud as the Bank was and therefore it makes no sense (cf *In re Hampshire Land*) to attribute the intentions of Mr. Ablyazov to Usarel. However, in circumstances where Usarel benefitted from Mr. Ablyazov's fraud by receiving US$120m. and used it to purchase the shares in the Vitino port it is unrealistic, it seems to me, to characterise Usarel as the victim. Fourth, Mr. Ablyazov's interest in Usarel has been declared by the Cypriot court to be only 38.75% and so, it was submitted, Mr. Ablyazov does not have and did not have a controlling interest. However, at the material time Mr. Ablyazov was in fact in control of Usarel.

324. I was troubled by a point articulated by Mr. Kinsky in his oral submissions. He submitted that when Mr. Ablyazov defrauded the Bank by not disclosing to the Bank's Board of Directors his interest in the Chrysopa loan and in the Vitino port project it could be said that he was wearing his hat as an officer of the Bank and not his hat as the de facto controller of Usarel and that in those circumstances his actions and intentions should not be attributed to Usarel. However, I was persuaded by Mr. Smith's submission that in circumstances where Mr. Ablyazov had de facto control over Usarel and where the object of his fraud was to benefit Usarel by enabling it to purchase the shares in the Vitino port it was appropriate to attribute Mr. Ablyazov's actions and intentions to Usarel. This seems to be the common sense approach. It does not mean, as submitted by Mr. Kinsky, that Mr. Ablyazov's intentions are to be attributed to every one of his companies for it was only Usarel that was intended to benefit. Mr. Kinsky submitted that Usarel would only benefit if it knew that the loan did not have to be repaid. But this is, in my judgment, too narrow a test of benefit. Accordingly, in circumstances where both experts agreed that the Kazakh courts would apply a common sense approach to the question of attribution, I concluded that Mr. Ablyazov's actions and intentions should be attributed to Usarel.

325. This approach to the question of attribution is consistent with the English law approach. The court attributes to the company "the mind and will of the natural person or persons who manage and control its actions"; see *El Ajou v Dollar Land Holdings* [1994] BCC 143 at p.150 per

Nourse LJ. In the case of Usarel that person was at the material time Mr. Ablyazov who instructed both the director of Usarel and those who held powers of attorney to act on behalf of Usarel.

326. It follows that Usarel is liable to pay compensation to the Bank pursuant to Article 917 of the Civil Code because Usarel caused harm to the Bank by its unlawful actions and its own fault.

327. On that basis and in circumstances where it is common ground that the US$120m. could not be returned in kind Usarel is obliged to return to the Bank "all proceeds ["*dokhody*"] which [Usarel] derived" from the money.

328. Mr. Smith submitted that since Usarel has spent that money on the purchase of the shares in the Vitino port those shares are "proceeds" ("*dokhody*") which Usarel is obliged to return to the Bank pursuant to Article 958.

329. Mr. Kinsky submitted that the shares were not "proceeds" or "*dokhody*". "*Dokhody*" does not mean proceeds in the broad sense but income or revenue. Thus, as it was put by Professor Maggs, the *dokhody* of a stolen cow was its milk. *Dokhody* did not extend to the cartload of hay for which the cow was exchanged. Applying that to money meant that the interest earned on money may be recovered as *dokhody* but not the shares which were purchased with the money.

330. Professor Maggs said that *dokhody* was correctly translated as incomes, rather than proceeds, and in this regard relied upon Article 123 of the Civil Code which refers to receipts (fruits, product and incomes (*dokhody)*) from the "use of property". Such receipts did not encompass the shares for which the US$120m. had been exchanged. Mr. Kinsky supported Professor Maggs' opinion by textual points on the construction of Article 958 which he suggested showed that the Article contemplated recovery of the property in question and that which had been earned from the use of the property. The Article did not, he submitted, contemplate, in the alternative, recovery of that for which the property had been exchanged. By contrast Mr. Vataev preferred the translation of *dokhody* as proceeds though he agreed that receipts was a possible translation. His main point was that in construing and applying *dokhody* the Kazakh courts would adopt a construction which fully protected the victim of unjust enrichment. Thus if money were stolen from its rightful owner and used to purchase other property his opinion was that the Kazakh courts would permit the rightful owner to recover the property which had been purchased with the money rather than permit the wrongdoer to avoid the consequences of unlawful possession by the simple expedient of purchasing property with the stolen money.

331. It is perhaps surprising that this important aspect of Kazakh law is not yet settled but the explanation may be that the Civil Code is of recent origin. In my judgment Mr. Vataev's opinion is to be preferred to that of Professor Maggs. Articles 2 and 6 of the Civil Code provide that where different understandings of the words used in legislation are possible preference shall be given to that understanding which corresponds to the basic principles of civil legislation which include "the necessity for the unobstructed effectuation of civil law rights, ensuring the restoration of rights violated and the judicial defence thereof." Mr. Vataev's opinion enables the Bank's rights to be restored. Professor Maggs' opinion and Mr. Kinsky's textual points do not.

332. It follows that, in my judgment, the Bank is entitled to delivery up by Usarel of the shares in the White Sea port. No submissions were made as to how Kazakh law would deal with the question of the US$6m. of Rusneftekhim's money which was also used to purchase the shares. However, the question of remedy is a matter for this court and I do not consider that the Bank can claim delivery up of such portion of the shares as were bought with Rusneftekhim's money rather than with the Bank's money. I will ask counsel to agree an order which recognises this, based upon the observations of Lord Millett in *Foskett v Mckeown* 2001 1 AC 102 at p.131.

333. In these circumstances it is unnecessary to deal with the other ways in which the Bank puts its

claim based upon the invalidation of the Chrysopa loan. However, in case my views are required I shall set out shortly what my views would have been.

Routes to invalidation

334. Pursuant to Article 159(9) of the Civil Code a transaction concluded under the influence of fraud may be deemed by a court to be invalid at the suit of the victim. The loan agreement between the Bank and Chrysopa was procured by fraud and therefore the Bank would have been entitled to apply for an order declaring the loan agreement to be invalid.

335. Pursuant to Article 159(10) of the Civil Code a transaction concluded as a consequence of bad faith collusion of the representative of one party with the other may be deemed by a court to be invalid at the suit of the victim. The Chrysopa loan was signed on behalf of the Bank by Mr. Khazhaev and on behalf of Chrysopa by Equity Trust, the director. Since Mr. Ablyazov controlled Chrysopa there was, having regard to my findings of fact, bad faith collusion between Mr. Khazhaev and Mr. Ablyazov. Thus the Bank would also have been entitled to apply for an order declaring the loan agreement to be invalid pursuant to Article 159(10) of the Civil Code.

336. Pursuant to Article 160(1) of the Civil Code a fictitious transaction concluded only for form without the intention to give rise to legal consequences shall be invalid. In view of my finding that the Chrysopa loan agreement was not a sham it would not have been invalidated by this Article.

337. Pursuant to Articles 1 and 64-74 of the JSC Law transactions shall be invalidated if the provisions on disclosure of interest by an affiliated party are not complied with. It is sufficient to consider only Mr. Ablyazov's position. He was an affiliate of the Bank because he had the opportunity to determine or influence decisions made by the Bank; see Article 1.3 of the JSC Law. He was also an affiliate of Chrysopa because, being the owner and controller of Chrysopa with power to dismiss the director and appoint another director, he had the opportunity to determine or influence decisions made by Chrysopa; see Article 1.3 of the JSC Law. He was interested in the Chrysopa loan because Chrysopa was a party to the Chrysopa loan; see Article 71(2) of the JSC Law. As such he was obliged to disclose to the Board of Directors of the Bank the legal entities with which he was affiliated and the transactions in which he was interested; see Article 72.1(2) and (3) of the JSC Law. He did not make such disclosure and accordingly the Chrysopa loan transaction was liable to be invalidated pursuant to Article 74.1 of the JSC Law.

338. Pursuant to Article 40(2) of the Law on Banks a bank may not grant an unsecured loan to persons connected to the bank by special relations which expression includes a bank's affiliates. Chrysopa was an affiliate of the Bank because it was a legal entity controlled by Mr. Ablyazov, being an individual who was a major shareholder or an official in the Bank; see Article 64.1(4) of the JSC Law. The loan made to Chrysopa was unsecured. Accordingly pursuant to Article 158.1 of the Civil Code it was invalid. (In the light of this conclusion it is unnecessary to consider whether the loan was also invalid because, contrary to Article 35.2 of the Law on Banks, the loan was made to an entity which was neither solvent nor reliable.)

Consequences of invalidation

339. Since the Chrysopa loan would be declared invalid the question would arise whether the Usarel sub-loan would also be declared invalid. The Bank said it would be invalid because the loan and sub-loan were one and the same transaction. I would not have found that that loan agreement and the sub-loan were one and the same transaction. The loan agreement and the sub-loan were obviously connected and the one would not have happened without the other. But they were separate and different transactions. They were signed on different dates and the terms were not

identical. The Bank was party to one but not to the other.

340. The Bank's further argument was based upon a suggested "domino" effect, that is, that if the loan agreement fell, so did the sub-loan. This was supported by the opinion of Mr. Vataev who relied upon the *Kazvtorchermet* case. However, that case involved a sale of land by A to B and then by B to C. The sale by A to B was invalidated on two grounds. The effect was that B was "not entitled to dispose of this property" to C. I am not persuaded that the same result applies in the case of the loan and sub-loan. Although the loan between the Bank and Chrysopa is invalidated Chrysopa may still enter into a loan agreement with Usarel. The loan agreement between Chrysopa and Usarel does not depend upon a chain of title to an object such as real estate. Further, the US$120m. has been passed on to the White Sea group of companies. It cannot be restored to the Bank as the title to property could in the *Kazvtorchermet* case.

341. The Bank's third argument was that the Usarel sub-loan was invalid under Cypriot law because its consideration or object was fraudulent. There was unchallenged expert evidence of Cypriot law to this effect. I am therefore satisfied that in the light of my findings as to fraud that the Usarel sub-loan was invalid. (In the light of this conclusion it is unnecessary to deal with the Bank's fourth argument based upon abuse of right.)

342. In those circumstances the Bank would be entitled to claim the US$120m. transferred to Usarel under the invalid sub-loan pursuant to Article 954 (1) of the Civil Code and, since that sum could not be returned because it had been exchanged for shares, the shares could be claimed as "*dokhody*" pursuant to Article 958 of the Civil Code for the reasons already given.

343. The Bank also claimed the shares as "*dokhody*" pursuant to Articles 260-263 of the Civil Code. There was however a dispute between the experts as to whether these Articles applied only to "things" or also applied to the right to demand the payment of money (as in a bank account). Professor Maggs had a powerful argument based upon Article 115 and the fact that Articles 260-263 were part of the law of "things" that Articles 260-263 only applied to money in specie and not to the right to demand the payment of money. However, Article 115 on which this argument was based applied "unless provided otherwise by the present Code …or arises from the essence of the obligation." To exclude rights to demand the payment of money from the remedies provided by Articles 260-263 of the Civil Code would construe Articles 260-263 in a manner which did not ensure the "restoration of rights violated"; see Articles 2 and 6 of the Civil Code. I therefore prefer the opinion of Mr. Vataev who considered that the context of Articles 260-263 required those Articles to apply to demands for the payment of money. Thus the Bank would also have succeeded in its claim for *dokhody* pursuant to Articles 260-263 of the Civil Code.

344. Mr. Smith, at a late stage in the case, put forward, in addition to his claims based on Kazakh law, a claim to delivery up of the shares in the White Sea group of companies based upon the English law of tracing. In view of my finding that the Bank has succeeded on its claim to the shares as *dokhody* on the basis of the Kazakh law of unjust enrichment it is unnecessary to lengthen this judgment by a consideration of the interesting question whether, if the Bank cannot succeed on its claim to the shares as *dokhody* on the basis of the Kazakh law of unjust enrichment, it can nevertheless obtain the shares pursuant to the English law of tracing.

Usarel's liability in damages

345. I have already held that Usarel is liable in tort or delict pursuant to Article 917 of the Civil Code on the basis that Mr. Ablyazov's knowledge and intentions are to be attributed to Usarel. In circumstances where the claim to the shares in the White Sea port has succeeded there will only be a loss suffered by the Bank if the shares are not worth US$120m. plus interest. If they are not worth US$120m. plus interest then the shortfall will have been caused by Usarel's unlawful action in assisting Mr. Ablyazov to defraud the Bank.

346. Another suggested basis of liability in tort or delict was that Usarel had failed to disclose its affiliations and its interest in the Chrysopa loan to the Bank. Had it been necessary to make findings on these matters I would have found that Usarel was an affiliate of the Bank on the basis that Usarel was a legal entity which was controlled by Mr. Ablyazov who was a major shareholder or official of the Bank; see Article 64.1(4) of the JSC Law. Mr. Ablyazov controlled Usarel at the material time because the director had given power of attorney to at least two of Mr. Ablyazov's associates. Usarel was also an affiliate of Chrysopa because, pursuant to Article 1(3) of the JSC Law, Usarel had the opportunity to determine or influence decisions by Chrysopa. That opportunity arose from the circumstance that Mr. Ablyazov was able to control both Usarel and Chrysopa. (I do not consider that reliance can be placed on Article 64 because Chrysopa is not a Kazakh company and is therefore not covered by Article 64.1. However, it is accepted by Mr. Kinsky that Article 1(3) is not so restricted.) Usarel made no disclosures pursuant to Article 72 (2) and (3) of the JSC Law and is therefore liable to the Bank in the amount of the loss caused by that failure to disclose pursuant to Article 74(2). To the extent that there is a shortfall between the US$120m. and the value of the shares Usarel's failure to disclose to the Board of the Bank that Mr. Ablyazov was one of its affiliates was probably causative of that loss. Mr. Kinsky disputed causation, arguing, based upon what Mr. Talvitie had told Mr. Varenko concerning the Drey transactions, that it was highly unlikely that Mr. Talvitie would have gone to the AFN. It would have been the "surest way" of putting East Capital's investment in jeopardy. However, it is more likely than not that, had disclosure been made by Usarel so that it was apparent that the Bank's money was being provided for Mr. Ablyazov's own benefit, Mr. Talvitie would have been most concerned. He had, from the outset, been concerned at the standard of governance at the Bank and in his time on the board of other banks he had not come across one which would allow related party transactions to be approved in an informal and undocumented way. In his re-examination he said that he would have considered informing the AFN. I accept that it is unlikely that this would have been his first reaction but if the other members of the Board were willing to approve the loan to Chrysopa in circumstances where it could be seen to be for the benefit of Mr. Ablyazov rather than for the benefit of the Bank it is more likely than not, it seems to me, that he would have informed the AFN. For it would have appeared to him an improper and unwise thing for the Board to do and such conduct would have imperilled East Capital's investment. Had he done so it is more likely than not that in those circumstances the AFN would have intervened to prevent the loan being made.

347. Mr. Kinsky submitted that any such loss could not be recovered pursuant to Article 935.1 of the Civil Code because it arose as a consequence of the intent of the victim, the Bank. Where Mr. Ablyazov has acted in fraud of the Bank common sense militates against attributing his intentions to the Bank. I do not consider therefore that the Bank can be said to have intended the loss. For the same reason I do not consider that Usarel can avail itself of the "contributory negligence" defence afforded by Article 935.2 of the Civil Code.

348. Mr. Kinsky submitted that the claim for *dokhody* and damages should not be permitted in circumstances where Valenora, the assignee of Chrysopa, is suing Usarel under the sub-loan in Cyprus. There is therefore a risk of double jeopardy. However, Valenora is managed by the Receivers who are officers of the court and so, if there is any risk of double jeopardy, the court can order the Receivers not to proceed with the claim.

Conclusions:

349. Granton: Mr. Zharimbetov knowingly assisted Mr. Ablyazov to defraud the Bank by means of the Original and Later Loans. Mr. Zharimbetov is liable under Kazakh law for the loss thereby caused which amounted to US$1,145,231,078.17.

350. Drey: Mr. Zharimbetov knowingly assisted Mr. Ablyazov to defraud the Bank by means of the Drey Transactions. Mr. Zharimbetov is liable under Kazakh law for the loss thereby caused

which amounted to US$401,508,769.

351. <u>Chrysopa</u>: (i) Usarel is liable under Kazakh law to deliver up to the Bank the shares in the White Sea Group of companies which own the Vitino port (save for the shares which were purchased with the US$6m. provided by the Rusneftekhim Group). (ii) Usarel knowingly assisted Mr. Ablyazov to defraud the Bank by means of the Usarel loan and, to the extent that the value of the shares is less than US$120m. plus interest, is liable to compensate the Bank under Kazakh law. (iii) Mr. Khazhaev knowingly assisted Mr. Ablyazov to defraud the Bank by means of the Chrysopa loan and, to the extent that the value of the shares is less than US$120m. plus interest, is liable to compensate the Bank under Russian law.

---

**BAILII:** Copyright Policy | Disclaimers | Privacy Policy | Feedback | Donate to BAILII
URL: *http://www.bailii.org/ew/cases/EWHC/Comm/2013/510.html*