# **Exhibit 34**



# England and Wales High Court (Chancery Division) Decisions

Neutral Citation Number: **[2013] EWHC 3691 (Ch)**

Case No: HC10C02462

**IN THE HIGH COURT OF JUSTICE**
**CHANCERY DIVISION**

Rolls Building,
Royal Courts of Justice
Fetter Lane, London, EC4A 1NL
26/11/2013

B e f o r e :

**MR JUSTICE HENDERSON**

———————————

Between:

**JSC BTA BANK**

**- and -**

**MUKHTAR KABULOVICH ABLYAZOV**

Claimant/
Applicant

18th Defendant/
Respondent

———————————

**Mr Stephen Smith QC and Ms Emily Gillett (instructed by Hogan Lovells International LLP)**
**for the Claimant**
**Hearing dates: 8 and 9 October 2013**

———————————

**HTML VERSION OF JUDGMENT**

———————————

Crown Copyright ©

**Mr Justice Henderson:**

**Introduction**

1. On 8 and 9 October 2013 I heard the adjourned application by the claimant JSC BTA Bank ("the Bank") for summary judgment against the 18th defendant, Mukhtar Kabulovich **Ablyazov** ("Mr **Ablyazov**"). The application was undefended, as Mr **Ablyazov**'s solicitors (Addleshaw Goddard LLP) had informed the Bank's solicitors (Hogan Lovells International LLP) by a letter dated 12 September 2013 that he would "not be further defending" the application. This statement was accompanied by the following explanation and reservation of rights:

> "You and your client are well aware of our client's current personal circumstances, and that of his family.
>
> All of our client's rights are reserved and our client's decision not to defend the application further should not be taken as an admission or acceptance of liability for factual findings in the AAA proceedings or those already made against him in the wider proceedings, including the committal proceedings."

On the eve of the hearing, Addleshaw Goddard confirmed that Mr **Ablyazov**'s instructions remained unchanged.

2. Behind the brief introduction which I have just given, there lies a background of ever-increasing, and at times bewildering, complexity. The present action ("the AAA proceedings") is just one of a total of 11 sets of proceedings in England and Wales in which the Bank, a major bank in Kazakhstan which was effectively nationalised in February 2009, seeks to recover sums in excess of US$5 billion which it alleges were fraudulently misappropriated by its former chairman, Mr **Ablyazov**, acting in concert with other former members of the Bank's senior management, for the ultimate benefit of Mr **Ablyazov** himself. It is alleged that he has obtained this benefit through a web of offshore companies controlled and managed on his behalf by, or through, a network of nominees and trusted associates.

3. All of the proceedings, apart from the AAA proceedings, were begun in the Commercial Court, where they have been principally managed by Teare J. He has delivered a number of major judgments, including two which are of particular importance for present purposes.

4. First, on 16 February 2012 Teare J gave judgment following the hearing of committal proceedings based on three sample allegations of contempt of court made by the Bank against Mr **Ablyazov**: see JSC BTA Bank v Mukhtar **Ablyazov** [2012] EWHC 237 (Comm). Teare J held all three allegations to be proved to the criminal standard of proof, that is to say beyond reasonable doubt. One of the allegations was that Mr **Ablyazov** had failed, in breach of the worldwide freezing order previously made against him, to disclose his beneficial ownership of the shares in a company incorporated in the British Virgin Islands ("BVI") called Bubris Investments Limited ("Bubris"). Under its later name of Celina Holding Investments Limited, Bubris is the fourth defendant in the AAA proceedings and is alleged by the Bank to have played a key role, together with four other BVI companies which are the fifth to eighth defendants (together "the BVI Defendants"), in the alleged fraud which forms the subject matter of those proceedings. In the committal proceedings, which were heard over a period of about three weeks between 30 November and 21 December 2011, Mr **Ablyazov** was represented by a team of two leading and two junior counsel, instructed by Addleshaw Goddard. During the hearing, he elected to give evidence and was cross-examined for two and a half days.

5. Mr **Ablyazov** failed to attend the handing down of judgment in the committal proceedings, and instead absconded. He was sentenced in his absence to 22 months' imprisonment on each count, the terms to run concurrently. The judge also made an "unless" order ("the Unless Order") debarring him from defending the claims made against him in the Commercial Court

proceedings, and striking out his defences, unless within a stated period he both surrendered to custody and made proper disclosure of all his assets and his dealings with them. The stated periods for compliance with these conditions expired in March 2012, but the order also provided that, in the event of an appeal, the sanctions for non-compliance would not take effect until seven days after the dismissal of the appeal. Mr **Ablyazov** had an unfettered right to appeal against the committal order and sentence; the judge also granted him permission to appeal from the Unless Order.

6. Mr **Ablyazov** has remained a fugitive from justice since February 2012, and his whereabouts remained unknown to the Bank until he was discovered in the South of France on 31 July 2013. Since then he has been held in custody by the French authorities, while extradition proceedings against him by at least three countries (which do not include the United Kingdom, because civil contempt of court is not an extraditable offence) are pending.

7. Despite his flight from the jurisdiction of the English court, Mr **Ablyazov** has continued to give instructions to his lawyers and to be represented in court proceedings when it has suited his interests to do so (although more recently courts have begun to refuse to hear submissions on his behalf while his multiple contempts remain unpurged). His appeals in the committal proceedings, including an appeal from the Unless Order, were heard by the Court of Appeal (Maurice Kay LJ VP, Rix and Toulson LJJ) in early July 2012, and judgment was handed down on 6 November 2012: see JSC BTA Bank v Mukhtar **Ablyazov** [2012] EWCA Civ 1411. All of Mr **Ablyazov**'s grounds of appeal were comprehensively dismissed, subject to one minor point of disagreement which made no difference to the outcome (Toulson LJ considered that surrender to custody should not have been made a condition of the Unless Order, whereas the majority agreed with Teare J that it should). The leading judgment was delivered by Rix LJ, who (among much else) reviewed the evidence relating to the beneficial ownership of Bubris before concluding at paragraph [74]:

> "There is thus compelling circumstantial evidence that Mr **Ablyazov** was the true owner of Bubris. There is no documentary evidence to the contrary … The judge was entitled and right to discount the evidence of Mr **Ablyazov** and his other witnesses, and indeed to find that such evidence was incredible and to be lies."

8. Having considered, and rejected, Mr **Ablyazov**'s appeal in relation to the other two alleged contempts, Rix LJ concluded the relevant part of his judgment as follows:

> "96. I would end this section of my judgment by saying this. It is noticeable from the facts of this case, both as found by the judge, but also in the nature of the structure of the arguments as they have developed, how time and time again, as some aspect of Mr **Ablyazov**'s conduct has come under question, so the evidence deployed has become remarkable for the way in which it has taken tortuous turnings which have asked the court to suspend its belief in reality in favour of reduplicating unrealities. Thus in the case of Bubris, the court was asked to believe both that Mr Batyrgarejev, one of Mr **Ablyazov**'s dedicated lieutenants, had been appointed UBO [*ultimate beneficial owner*] of Bubris by mistake, and that the true UBO had only emerged in September 2010, albeit backdated to May 2010, after two years in which a succession of nominal UBOs had been declared. The significance of September 2010 is that the freezing order against Bubris was served at the end of July 2010.
>
> …
>
> 100. As this series of coincidences, misfortunes, errors, misunderstandings and inexplicable developments multiply, the court is entitled to stand back and ask

whether there is in truth a defence or defences as alleged, even if no burden rests on Mr ♨ Ablyazov ↘, and the burden remains on the bank, or whether there is at any rate the realistic possibility of such, or on the other hand whether the court is being deceived. The trial judge decided that it was being deceived by witnesses without credibility. It is not for this court to say that he was wrong without strong grounds for doing so, grounds which have simply not been formulated.

101. I would therefore conclude that the appeal on each element of the committal judgment should be dismissed."

9.  In his short concurring judgment, Maurice Kay LJ said this:

"202. It is difficult to imagine a party to commercial litigation who has acted with more cynicism, opportunism and deviousness towards court orders than Mr ♨ Ablyazov ↘. Rix LJ has described in trenchant terms the factors which cause me to express myself in this way. There can be no complaint that Teare J decided that the court's powers should be deployed so as to put the maximum pressure on Mr ♨ Ablyazov ↘ to comply with its orders so as to endeavour to prevent its fair procedures from being subverted."

10.  The effect of the dismissal of Mr ♨ Ablyazov ↘'s appeal was to trigger the Unless Order, and on 9 November 2012 Teare J made a declaration that Mr ♨ Ablyazov ↘ had failed to comply with the surrender and disclosure obligations, as a result of which he was debarred from defending the Bank's Commercial Court proceedings with effect from 13 November 2012. The trial of three of those proceedings (known as the Drey, Granton and Chrysopa proceedings) had begun before Teare J on 7 November, the day after the Court of Appeal's judgment. Mr ♨ Ablyazov ↘ was the first defendant in each of them. After Mr ♨ Ablyazov ↘'s defences had been struck out, the trial continued against the remaining defendants until its conclusion on 14 February 2013. On 19 March 2013 Teare J handed down his judgment ("the Trial Judgment"): see [2013] EWHC 510 (Comm). This is the second of the important judgments of Teare J to which I referred in paragraph 3 above. For present purposes, its main significance lies in the findings which Teare J made, having heard expert evidence on both sides, about various disputed issues of Kazakh law. It should also be noted that the first issue for consideration in each case was whether Mr ♨ Ablyazov ↘ had committed a fraud on the Bank: see paragraph [7]. The reason for this was that primary liability on the part of Mr ♨ Ablyazov ↘ had to be established before accessory liability for knowing assistance by other defendants could be established. In each case, Teare J held that both the primary liability of Mr ♨ Ablyazov ↘ and the relevant accessory liability were established to his satisfaction.

11.  As a result of the Unless Order, default judgments totalling at least US$3.6 billion have now been entered against Mr ♨ Ablyazov ↘ in various of the Commercial Court proceedings, as well as a judgment for damages to be assessed in the Chrysopa proceedings. In addition, very substantial costs orders have been made against him. None of these judgments and orders has been satisfied.

12.  To complete the picture, I should mention that in the committal proceedings the Court of Appeal refused to grant Mr ♨ Ablyazov ↘ permission to appeal to the Supreme Court. Mr ♨ Ablyazov ↘ subsequently sought permission from the Supreme Court, although only in relation to the debarring provisions of the Unless Order. On 21 February 2013, the Supreme Court rejected Mr ♨ Ablyazov ↘'s application, holding that it did not raise an arguable point of law of general public importance.

**The AAA proceedings**

13.  The main difference between the AAA proceedings and the Commercial Court proceedings lies

in the general nature of the fraud alleged. In the Commercial Court proceedings, the claims typically concern huge unsecured loans made by the Bank, on very unfavourable terms, to offshore companies alleged to be beneficially owned by Mr ♻ **Ablyazov** ↘. By contrast, the AAA proceedings concern a portfolio of ten holdings of AAA-rated securities with a market value of approximately US$300 million (hence the label attached to the proceedings) which was allegedly misappropriated for the ultimate benefit of Mr ♻ **Ablyazov** ↘ by a series of linked transactions which took place in 2008 and early 2009. This difference of subject matter may explain why the AAA proceedings were the only ones to be started in the Chancery Division of the High Court, on 28 July 2010. At that stage, the Bank had insufficient evidence to implicate Mr ♻ **Ablyazov** ↘ in the alleged fraud, so he was not joined as a party. The first defendant, Roman Vladimirovich Solodchenko ("Mr Solodchenko"), had been chairman of the Bank's management board at all material times until 3 February 2009, and the impugned transfers of the AAA securities to the BVI Defendants in January 2009 were made under his signature. The BVI Defendants, as I have already said, were the fourth to eighth defendants. The ninth to twelfth defendants (three more companies incorporated in the BVI, and one incorporated in the Seychelles) constituted a second tier of offshore companies involved in the alleged fraud ("the Further Recipients"). Mr ♻ **Ablyazov** ↘ was not joined as a defendant until 14 March 2011, when permission was granted to the Bank to re-amend its particulars of claim. No freezing or ancillary relief was sought against Mr ♻ **Ablyazov** ↘ at that date, but only because a worldwide freezing order had already been made against him in the Commercial Court proceedings and his assets were subject to a receivership order which by then extended over several hundred companies, including the BVI Defendants and the Further Recipients.

14.    The general nature of the alleged fraud is pleaded as follows in the Bank's re-amended particulars of claim:

"1. As set out in more detail below, this claim concerns the transfers of certain AAA-rated investment bonds (the "AAA Investments"), which were acquired by the [*Bank*] in May 2008 with a nominal value of US$292 million and a market value in excess of US$300 million, to the [*BVI Defendants*] on or around 22 January 2009 (the "January 2009 Transfers"). The January 2009 Transfers were effected upon the instructions and orders of [*Mr Solodchenko*], for the ultimate undisclosed benefit of [*Mr ♻ Ablyazov ↘*].

2. The [*Bank*] received no payment or other consideration in exchange for the transfer of the AAA Investments. The [*BVI*] Defendants no longer hold the AAA Investments. The [*Bank*] claims that, it is to be inferred, [that] the January 2009 Transfers were consequent on [*Mr Solodchenko*] and/or [*Mr ♻ Ablyazov ↘*], in June 2008, having allowed or caused the AAA Investments to be used as a form of security (formal or otherwise) for obligations owed by the [*BVI*] Defendants to a third party (the "June 2008 Security"). At present the [*Bank*] does not know the precise nature of the June 2008 Security.

3. Neither the grant of the June 2008 Security nor the January 2009 Transfers had any commercial purpose or benefit for the [*Bank*], and they both lacked any justification from the [*Bank's*] perspective. The June 2008 Security and/or the January 2009 Transfers were a means of misappropriating and/or wrongfully dissipating the [*Bank's*] assets."

15.    In a little more detail, the main stages in the alleged fraud, as pleaded by the Bank and as evidenced by the documents in the chronological bundle prepared by the Bank, appear to have been as follows:

(1) Between 21 and 22 May 2008, the Bank acquired the AAA Investments. These were initially held on the Bank's behalf by State Street Corporation, a company

incorporated in Massachusetts. On or about 22 May 2008, the Bank arranged to, and did, transfer the AAA Investments to an account in the Bank's name with an affiliate in Kazakhstan of OJSC Alfa-Bank ("Alfa Russia").

(2) On 23 May 2008, the Bank, acting by Mr Solodchenko, entered into a brokerage agreement with Alfa Equity Investments Limited ("Alfa Equity"), a BVI company affiliated to Alfa Russia which provided brokerage services to the Bank and the BVI Defendants (with whom it also entered into brokerage agreements around the same time). The brokerage agreement with the Bank provided, by clause 1.4, that the Bank would remain at all times the sole beneficial owner of securities transferred to or acquired by Alfa Equity under the agreement.

(3) Between 23 May and 10 June 2008, Mr Solodchenko procured the transfer of the AAA Investments from the Bank's account at Alfa Russia to an account in the name of the Bank at Alfa Equity. No payment was made for the transfers, and once they had been effected Alfa Equity was obliged to hold the AAA Investments in accordance with the terms of the brokerage agreement. Alfa Equity then continued to hold the AAA Investments on behalf of the Bank until they were transferred to the BVI Defendants on 22 January 2009.

(4) On 9 June 2008, each BVI Defendant entered into a separate loan agreement with one of the Further Recipients. Under these agreements, the BVI Defendants together purported to lend to the Further Recipients sums totalling US$250.1 million within the next ten days, the money to be transferred to bank accounts held by the borrowers with Trasta Komercbanka in Riga, Latvia ("TKB" or "Trasta"). The loans were purportedly repayable over periods of either eight, nine or ten years by one or more instalments, with interest at the rate of either 5% or 6% per annum to be repaid with the principal amount of the loan. Thus it was apparently open to the borrower to defer repayment of both principal and interest until a date which (depending on the agreement) was either 9 June 2016, 9 June 2017 or 9 June 2018. Furthermore, the loans were apparently unsecured.

(5) Between 10 and 17 June 2008, the BVI Defendants contracted to sell securities of the same descriptions and amounts as the AAA Investments to Alfa Equity, for a consideration of approximately US$294.1 million. These appear to have been "short" sales, because the BVI Defendants did not at that time own the securities which they contracted to sell. The purchase price under the agreements was payable almost immediately, but delivery of the securities did not have to be made until 31 December 2008 (or, in the case of two transactions with the fifth defendant, 10 June 2009).

(6) The consideration for the short sales was duly paid by Alfa Equity to the BVI Defendants at Alfa Equity, and was then transferred to accounts held by them at TKB in Latvia.

(7) Around the same time, in mid-June 2008, approximately US$250 million of the proceeds of the transfers to the BVI Defendants' accounts at TKB were paid to further accounts at TKB in the names of the Further Recipients. These payments were, at least ostensibly, made pursuant to the loan agreements dated 9 June 2008. The remaining US$44 million-odd was not paid to the Further Recipients. Most of this balance (amounting to some US$42.5 million) appears to have been retained by Bubris which then used it to deal in bonds.

(8) On this application, the Bank does not allege that Alfa Equity was complicit in the fraud. Accordingly, to make commercial sense of the short sale agreements, it

invites the court to infer that the Bank must have pledged the AAA Investments to Alfa Equity, or granted some form of security over them, in order to secure the delivery obligations of the BVI Defendants under the sale agreements. On the available evidence, I agree that this inference should be drawn. It is incredible that Alfa Equity would have agreed to pay the purchase price under the sale agreements to the BVI Defendants in June 2008, without the assurance that the BVI Defendants would in due course be able to honour their delivery obligations, whether at the end of December 2008 or in June 2009.

(9) On 13 June 2008, a potentially significant email was sent by Anton Rybalkin, a lawyer at Eastbridge Capital (Moscow) Limited ("Eastbridge Moscow"), the Russian subsidiary of the thirteenth defendant Eastbridge Capital Limited ("Eastbridge"), an English company providing corporate services of which the fifteenth defendant, Aleksandr Udovenko ("Mr Udovenko") and the seventeenth defendant, Anatoly Ereshchenko ("Mr Ereshchenko") were then directors. The email was copied to Mr Udovenko, and its subject was "Agreements to be signed by R. Solodchenko". It read as follows:

> "As agreed: I am sending the documents that need to be signed by [*Mr Solodchenko*]. The seal is required. Please sign the scans and transfer the signed documents to me with Igor in Moscow. The original documents go to Moscow, as we get them – we will send them for the subsequent signature. The transaction with Alfa Bank is under the control of MKA [*i.e. Mr* **Ablyazov**]. If necessary the explanation can be given by [*Mr Udovenko*], [*Mr Ereshchenko*] and me.
>
> Thanks for the co-operation."

(10) The Bank relies on this email as contemporary evidence that the transactions with Alfa Bank relating to the AAA Investments were under the personal control of Mr **Ablyazov**. Mr **Ablyazov** accepts that the reference to "MKA" is probably a reference to himself, but says he had never seen the email before it was put to him in cross-examination in the committal trial, and he has no knowledge of its subject matter or the transaction to which it refers. He says that employees of the Bank were keen to use his name "in order to give weight to proposals of all kinds", even when he had nothing to do with them. He adds (paragraph 45 of his first witness statement in opposition to the summary judgment application):

> "This might happen in relation to the holding of festivities or holidays, or in relation to arrangements that the [*Bank*] was to enter into. It was part of the psychology of employees in large companies in the CIS countries to do this by using the name of the head of the organisation to lend weight to a proposal. I anticipate that this is what Mr Rybalkin was doing in this document."

(11) On 22 January 2009, Mr Solodchenko signed transaction forms instructing Alfa Equity to transfer the AAA Investments from the Bank's Alfa Equity account to the BVI Defendants' Alfa Equity accounts. The Bank alleges that it received no consideration for these transfers. It is the Bank's case that this was the means whereby the BVI Defendants were enabled to fulfil their delivery obligations under the June 2008 sale contracts. As it is put in the re-amended particulars of claim:

> "71. Having received the AAA Investments on behalf of the BVI Defendants, Alfa Equity then acquired the AAA Investments from the BVI Defendants in satisfaction of the Delivery Obligations. The BVI

Defendants no longer hold the AAA Investments.

> 72. In summary, as at the end of January 2009 and as a result of the matters set out above:
>
> (a) the BVI Defendants obtained the benefit of substantial payments from Alfa Equity totalling US$294,138,715.27 …; and
>
> (b) the Bank was deprived of the AAA Investments. It did not receive and has still not received any consideration in return, whether a sum representing the nominal value of the AAA Investments or their market value or any other value.

In short, as a result of the matters set out above, the Bank no longer has the AAA Investments or any sum in return for them."

16. Mr Ablyazov's defence was served on 31 May 2011 by the solicitors then acting for him, Stephenson Harwood. It was settled by counsel instructed on his behalf, Mr George Hayman, and runs to some 60 pages. The nub of his defence is contained in the following three paragraphs:

> "15. Because of his position within the [*Bank*] Mr Ablyazov had no involvement in (and has no knowledge of) the transactions and documents which form the basis of this claim.
>
> 16. At all times Mr Ablyazov complied with his duties under the JSC Law, the Regulations of the Board of Directors, the [*Bank's*] Charter, the Civil Code, duties of a fiduciary nature (which are denied in any event), the Code of Corporate Governance of the [*Bank*], his Contract of Employment and the Labour Code.
>
> 17. It is denied that Mr Ablyazov was or is the ultimate beneficial owner of the BVI Defendants and the Further Recipients."

17. In view of Mr Ablyazov's denial that he was involved in the transactions, and his disclaimer of any knowledge of them, it is unsurprising that much of his defence consists of bare denials or non-admissions of matters which are said to be outside his knowledge. The defence also sets out his contentions in relation to various issues of Kazakh law, to which I will need to return.

18. It should also be noted that Mr Ablyazov claims to be "significantly disadvantaged … by the paucity of documentation available to him", because he is no longer employed by the Bank and therefore has no access to documentation, and because of the circumstances in which he left Kazakhstan (paragraph 3 of the defence). By contrast, he says, the Bank "has control over the vast majority of the documentation relating to the matters in dispute", and he is "entirely dependent" upon the Bank for the release of that documentation (*ibid*.).

## The history of the summary judgment application

19. The Bank issued its application for summary judgment against Mr Ablyazov and the BVI Defendants on 15 March 2012, a few weeks after Teare J had delivered his judgment on the committal application and sentenced Mr Ablyazov in his absence to 22 months' imprisonment. In support of the application, the Bank relied on the re-amended particulars of claim, the eighteenth witness statement of Christopher Hardman (the partner at Hogan Lovells who has throughout had conduct of the proceedings on the Bank's behalf) and an expert report on Kazakh law dated 14 March 2012 prepared by Vsevolod Markov ("Mr Markov"), a citizen of Kazakhstan who has significant experience of practising law in that country, specialising in

cross-border and domestic finance and capital market transactions. Mr Markov is currently a partner at BMF Group LLP, a Kazakh law firm that has provided legal services in Kazakhstan for more than 17 years.

20. In his eighteenth statement, Mr Hardman set out much of the relevant background, explained the nature of the Bank's claims against Mr ⚑ **Ablyazov** ↘ and the BVI Defendants, and went through the matters relied on in support of the application, including the judgment of Teare J in the committal proceedings regarding the true ultimate beneficial ownership of Bubris. He pointed out that, although Teare J's judgment related only to Bubris, the BVI Defendants had consistently made common cause, and in their joint defence served on 21 November 2011 they had themselves asserted that they were in common beneficial ownership, albeit not the ownership of Mr ⚑ **Ablyazov** ↘. Their pleaded case was that they were in the common beneficial ownership of a Mr Sadykov, who managed the companies through his own nominees, and had never himself been a nominee of Mr ⚑ **Ablyazov** ↘.

21. In the section of his statement dealing with the alleged inherent implausibility of the defences, Mr Hardman said this:

> "62. The overall tenor of the defences advanced by Mr ⚑ **Ablyazov** ↘ and the BVI Defendants is inherently implausible and does not suggest any commercial rationale for the AAA Transactions. Even aside from Mr Justice Teare's findings and the evidence I refer to above showing that the story about Mr Sadykov being the UBO of the BVI Defendants is untrue, it is wholly implausible that the series of transactions set out at paragraphs 55 to 75 of the RAPOC [*re-amended particulars of claim*] were ordinary commercial transactions conducted with parties who were at arms' length with the Bank. No payment was ever made to the Bank in consideration for the January 2009 Transfers and (notwithstanding the circulation of unsigned draft agreements apparently intended for backdated execution) no agreements were ever executed to underpin those transfers. Further, the BVI Defendants have provided no explanation about how loans made by the Bank might ever have been properly repaid.
>
> 63. The only attempt at an explanation provided by the BVI Defendants was that the Further Recipients purchased bonds issued by the Bank using (some of) the money they had received as a result of the Onward Transfers from the BVI Defendants. Even if it is the case that the Further Recipients purchased such bonds, the receipt by the Bank of monies in consideration for the purchase of those securities is not the repayment of monies to the Bank owed by the BVI Defendants or others, nor does it amount to consideration for the AAA Investments themselves (being, on the BVI Defendants' own case, consideration for the purchase of entirely different bonds)."

22. I will have to return later to Teare J's rejection of the story about Mr Sadykov being the UBO of the BVI Defendants, and to the apparent attempt by Mr Solodchenko and others to provide a retrospective justification for the January 2009 transfers by means of back-dated sale and purchase agreements. As to the point made by Mr Hardman in paragraph 63, I agree with him that even if much of the money did eventually return to the Bank as the purchase price of different bonds, such payment would have been made for fresh consideration and could not possibly have constituted repayment of any part of the value of the AAA Investments.

23. Mr ⚑ **Ablyazov** ↘'s evidence in answer to the application consisted of a witness statement by himself dated 2 May 2012, and an expert dated 3 May 2012 by Professor Peter Maggs, who is Professor of Law at the University of Illinois College of Law and specialises in the law of the former Soviet Republics, including Kazakhstan. Professor Maggs has published widely in these areas, and is an experienced expert witness in cases involving Soviet law and the law of

Kazakhstan. It was in this statement that Mr ♨ **Ablyazov** ↘ gave the explanation of the email dated 13 June 2008 to which I have already referred: see paragraph 15(10) above. He also commented that the email was "just one item of correspondence" held by the Bank, upon which it sought to rely. He suggested that once full disclosure had been given by the Bank of documents from its own records, "a fuller (and perhaps complete) picture of the AAA Transactions will become apparent at trial". Mr ♨ **Ablyazov** ↘ continued to deny his beneficial ownership of Bubris, and also denied his ownership of the Further Recipients. Replying to what Mr Hardman had said about the alleged inherent implausibility of the defences, he said:

> "58. Given that I do not own any of the companies involved in the AAA Transactions, did not control or authorise any of the transactions, and knew nothing about the transactions, it is impossible for me to give any explanation for them. All I could do is speculate as to the commercial rationale having now seen some of the transactional documents (albeit many of them are only draft documents)."

24. While conceding that he was necessarily speculating, Mr ♨ **Ablyazov** ↘ went on to suggest that the transactions might have constituted, or formed part of, a "repo deal", by which he meant "a repurchase transaction under a contract for the sale of a property with its subsequent purchase back at a fixed price". He added that the purpose of the "repo deal" is not the sale of the asset, but a secured loan. He said he was aware that the Bank had entered into treasury transactions of that nature before his appointment as chairman, and expressed his belief that the practice had continued after his appointment because the same treasury personnel had remained in post, including the Head of Treasury, Mr Mukhametzhanov.

25. In another section of his statement (paragraphs 64 to 75), Mr ♨ **Ablyazov** ↘ set out a number of reasons why he claimed that he would be unable to receive a fair trial. He referred to the political position in Kazakhstan, and the power wielded by President Nazarbayev, Mr ♨ **Ablyazov** ↘'s former political opponent. He said that any statement given by anyone at the Bank was likely to be given under duress, and that pressure had already been exerted on persons who were, or were perceived to be, associated with him. He repeated his belief that the only way for a complete picture of the AAA transactions to emerge would be for the case to proceed to trial, with full disclosure and cross-examination of relevant employees of the Bank.

26. By way of reply to the evidence served on behalf of Mr ♨ **Ablyazov** ↘, the Bank filed a further statement by Mr Hardman (his nineteenth, dated 24 May 2012) and a statement by Mr Mukhametzhanov of the same date.

27. Mr Hardman recorded that no evidence had been filed by the BVI Defendants, and their solicitors (Keystone Law) had confirmed that they had no further evidence to serve in connection with the application. Mr Hardman also pointed out that Mr ♨ **Ablyazov** ↘ had not adduced any evidence from Mr Solodchenko to support his defence, despite the fact that they were both represented by the same solicitors. Similarly, no evidence had been adduced from Mr Sadykov (a former senior employee of the Bank) or from Syrym Shalabayev (Mr ♨ **Ablyazov** ↘'s brother in law, who administered the BVI Defendants, and was their "nominee ultimate beneficial owner" from October 2008 to April 2009), even though both had given evidence on behalf of Mr ♨ **Ablyazov** ↘ at the trial of the committal proceedings.

28. In relation to an issue of causation under Kazakh law raised by Professor Maggs, Mr Hardman said that he had spoken to Jyrkie Talvitie ("Mr Talvitie"), who had been an independent member of the Bank's board of directors at the relevant time, and who was still on the board. When the AAA transactions had been explained to him, Mr Talvitie:

> "… confirmed to me, in his capacity as Board member representing the interests of a major shareholder of the Bank, that he would not have voted to approve the Bank entering into those transactions had they come before the Board of Directors of the

Bank because of the extremely high risks involved for the Bank and the lack of any apparent commercial reason for the Bank to do so."

Likewise, Mr Talvitie said he would not have voted in favour of the Bank granting security in 2008 in favour of Alfa Equity so that the BVI Defendants could enter into the short sale agreements, nor would he have voted in January 2009 for the Bank to transfer the AAA Investments for no consideration. He said "he would have regarded such a transaction as of no value to the Bank and completely uncommercial".

29. Mr Mukhametzhanov explained in his evidence that he had held the position of Head of Treasury of the Bank since 2002. Between 2005 and May 2008 he reported to Mr Solodchenko. Thereafter, until the nationalisation in February 2009, he reported to Mr Zharimbetov. He set out his understanding of "repo" transactions, and the limited circumstances in which the Bank made use of them. He said that the counterparties to such transactions which the Bank entered into before February 2009 were either "recognised international financial institutions", or the transaction was conducted through the Kazakh stock exchange, in which case the ultimate counterparty would not be known to the Bank. He continued:

> "I cannot recall any REPO transactions where the counter party was known to the Bank and was not a bank or other financial institution. As far as I remember, the Bank did not ever enter into REPO transactions with related parties."

30. In relation to the initial transfer of the AAA Investments to Alfa Equity, Mr Mukhametzhanov said that as far as he was aware it was a routine operational transfer, probably made because unlike other custodians Alfa Equity agreed not to charge the Bank for holding the securities. The AAA Investments formed part of the Bank's investment portfolio, as opposed to its trading portfolio, and if the Bank was to hold them for a significant period, the reduction in custody fees was an obvious attraction.

31. At a hearing for directions on 26 March 2012, Mann J had set a timetable for evidence on the summary judgment application and ordered that it be expedited and listed for hearing with a three day time estimate before 18 July 2012. It appears to have been common ground at that stage that the application was a relatively straightforward one, that the scope of the evidence would not go beyond matters raised by the Bank in its initial evidence in support, and that the Bank's evidence in reply would be evidence in reply, strictly so called. In the light of that understanding, and the directions given by Mann J, a dispute arose as to whether the Bank's evidence in reply, including in particular the statement of Mr Mukhametzhanov, fell within the scope of the order. This concern was raised by Mr Ablyazov, in a second statement of his dated 23 June 2012. He also took the opportunity to reply to Mr Hardman's nineteenth statement, and expressed some disparaging views about Mr Talvitie's knowledge and experience.

32. Two further statements were also filed on Mr Ablyazov's behalf: one from Mr Solodchenko, and the other from Lara Melrose, an associate of Addleshaw Goddard. Mr Solodchenko responded to the Bank's evidence in reply, and among other things firmly denied that he had authorised or overseen the AAA transactions. He did not, however, offer any explanation of his apparent role in them. The evidence of Ms Melrose was primarily directed to challenges to the receivership order over Mr Ablyazov's assets, and submissions that it would be unjust to allow the Bank to rely on Teare J's findings about the beneficial ownership of Bubris because only limited disclosure had taken place in the committal proceedings.

33. On 5 July 2012, Mr Hardman responded to this additional evidence in his twenty-first statement. He also said it had been "noticed" that not all of the documents relied upon by Teare J in relation to Bubris, nor all of the documents referred to in the re-amended particulars of claim, were in evidence before the court. He sought to remedy these deficiencies by exhibiting

key further documents in his exhibits CGH 39 and 40.

34. On 6 July 2012, the Bank issued an application for permission to rely on additional materials in relation to the summary judgment application, including Mr Hardman's twenty-first statement with its exhibits and a supplementary expert report from Mr Markov. Meanwhile, on 2 to 4 July the Court of Appeal had heard Mr ♆ Ablyazov ⬎'s appeal from the orders made by Teare J on the committal application and the Unless Order. The Court of Appeal had reserved judgment, and it was thought unlikely that its decision would be available before the end of term on 31 July.

35. It was against this background that the summary judgment application came on for hearing before Vos J on 11 July 2012. On that day and the next, he heard argument on behalf of the Bank from leading counsel (then, as now, Mr Stephen Smith QC leading Ms Emily Gillett). Mr ♆ **Ablyazov** ⬎ was represented by Mr Charles Béar QC leading Mr George Hayman. On the third day of the hearing, Friday 13 July 2012, Vos J heard and determined a formal application by Mr ♆ **Ablyazov** ⬎ to strike out the summary judgment application. Vos J dismissed the application, giving his reasons in an extempore judgment: see <u>JSC BTA Bank v Solodchenko and others</u> [2012] EWHC 1983 (Ch). Mr ♆ **Ablyazov** ⬎ subsequently applied for permission to appeal from this decision, but his application was dismissed by Mummery LJ on 2 October 2012.

36. The strike out application having been dismissed, it is hardly surprising that Vos J then decided that the further hearing of the summary judgment application should be adjourned until after the Court of Appeal had delivered its judgment. It would plainly have been undesirable for Vos J to reach a conclusion on the beneficial ownership of Bubris, whether on the basis of issue estoppel or of an independent review of the underlying material, before the views of the Court of Appeal were known. Accordingly, by an order made on 13 July 2012 he adjourned the summary judgment application part-heard to be fixed on the first available date on or after 15 October 2012 for three days. He directed that the Bank's oral submissions (both in continuation of its opening submissions, and in reply) should be limited to a total of one day, and that Mr ♆ Ablyazov ⬎'s oral submissions should be limited to a total of two days. In relation to evidence, Vos J gave the Bank permission to file any further evidence on which it wished to rely by 1 August 2012, and similar permission to Mr ♆ **Ablyazov** ⬎ to file further evidence by 12 September 2012, with any evidence in reply (strictly so called) to be filed by the Bank by 26 September. In relation to the Bank's application of 6 July, Vos J granted permission to the Bank to rely on the documents which had been before Teare J on the Bubris issue, namely those contained in exhibit CGH 39, but adjourned the balance of the application to be dealt with at the further hearing in October. Permission was also granted to Mr ♆ **Ablyazov** ⬎ to rely on the evidence already filed on his behalf.

37. In his judgment dismissing the strike out application, Vos J summarised the three arguments advanced by Mr Béar in support of the application. First, Mr Béar submitted that the application was no longer based upon the same evidence as it had been at the outset, and the Bank had failed to comply with the procedural requirements of CPR Part 24. Secondly, he submitted that the case was anyway not suitable for summary judgment, in view of its huge complexity and the allegations of fraud made against Mr ♆ **Ablyazov** ⬎. Thirdly, he submitted that the application was pointless, because on the assumption that the Unless Order was not reversed by the Court of Appeal, there would be a judgment against Mr ♆ **Ablyazov** ⬎ for billions of dollars to which an additional judgment for US$300 million plus interest would be completely irrelevant.

38. After setting out the principles by reference to which the court may give summary judgment under CPR Part 24, and citing from the decision of the Court of Appeal in <u>Mentmore International Ltd v Abbey Healthcare</u> [2010] EWCA Civ 761 at [20] to [23], Vos J dealt in turn with the three arguments advanced on behalf of Mr ♆ **Ablyazov** ⬎.

39.  In relation to the first argument, he said this:

>"26. As I have indicated, Mr Béar argues that I should not override the rules that I have set out as to the filing of evidence so as to allow the Bank effectively to change its case and rely on a far wider gamut of documentation than was referred to in their original application.
>
>27. This would normally be a very strong point to make. In this case, however, whilst it is true that the Bank has widened the scope of the application, it has done so with an understanding of what is really in issue before the court. As Mr Béar said in his skeleton argument, citing a point that I made yesterday to Mr Smith:
>
>>"But you confine yourself to saying, (1) here are the transactions, (2) it is wholly implausible that they are honest, (3) loss was caused, and (4) it is perfectly obvious from the UBO material that he, ☎ **Ablyazov** ⤴, must have been the UBO".
>
>Mr Smith accepted that. It is therefore now clear, even if it was not clear at the outset of this application, that the Bank is seeking to establish that on the information that was before Teare J it is not necessary to go into the detail of the transactions or to have disclosure in relation to the detail of the AAA transactions in order to satisfy the court that summary judgment is appropriate.
>
>28. Mr Béar would plainly be correct in saying that it would be impossible to decide a summary judgment application if it were necessary to go into the details of the AAA transactions. Effectively, the Bank is saying that the transactions speak for themselves.
>
>29. Nonetheless, the Bank realised in the course of its argument that it needed to put me in the same position as Teare J and the Court of Appeal was in when they heard those applications. That is the reason why additional evidence has been filed (in addition to the question of Kazakh law) and in my judgment it is reasonable to allow the Bank to make sure that its application can sensibly be heard by ensuring that what is before me is as comprehensive as what was before Teare J and what was before the Court of Appeal. But they cannot go further than that and I do not think they seek to."

Vos J then considered whether the Bank should be allowed the necessary indulgence to serve the material in question later than they should have done. He held that the indulgence should be granted: see paragraphs [31] to [34].

40.  On the second question, namely whether the case was suitable for summary judgment, Vos J also made some important observations which I need to quote:

>"37. In effect, Mr Béar says that there would need to be a much higher degree of certitude in this case than in other cases, not only because it is a fraud but because it is a complex case where cross-examination and disclosure may reveal all sorts of things which we can only imagine at this stage, and he says that this is a short cut that is wholly inappropriate in this kind of case.
>
>38. I do not accept those submissions. I have considered the issues that have been placed before me thus far. Nothing I say should be taken as giving any indication of the way in which I may in due course decide the summary judgment application. I have not yet heard full argument and I have no view, even a provisional view, as to the likely outcome of it.

39. But it does seem to me that the Bank is seeking to raise a relatively simple argument. I say "relatively simple" because it is only relatively simple in the context of an extremely complex case. One of the problems with this litigation has been throughout that there have been so many decisions and so many appeals in different courts with different personnel that until one understands the history, one is hardly in a position to understand the application with which the court is faced at any particular time. But I have had the good fortune to hear, I think, six days of argument in this case on a quite separate matter of a committal motion against another defendant [*Mr Ereshchenko*] only a couple of weeks ago. Whilst that has been the subject of complaint by Mr Béar, who says that Mr Smith and I are ahead of him because he did not attend that hearing, it has enabled me to get a grip on the complex history of this case.

…

42. I now have an extremely clear idea of what would need to be decided in order to grant summary judgment. I also have an extremely clear idea of the defences that Mr ⬆ **Ablyazov** ↘, through Mr Béar, is intending to raise. I can say, without giving any indication as to my view, that those are in some cases formidable arguments but they are formidable arguments that need to be resolved and can be resolved in a further period of just three days' argument.

…

45. But the reason, just briefly, why I think summary judgment may be appropriate is because … it is possibly arguable on behalf of the Bank that it could be obvious from the transactions that they were not honest. I am fully conscious of Mr Béar's submission that quite the reverse is obvious, but it seems [to] me that until full argument has been heard I cannot take a view one way or the other.

46. If it were obvious that the transactions were dishonest then that would be one point in the Bank's favour. That would negate the need for what could be a massive investigation into the detail of these transactions and the personnel involved in them.

47. Likewise, I have not heard argument on the question of loss. Under Kazakhstan law it is common ground that causation of loss must be shown. It seems to me that that could be arguably obvious and equally it could be arguably not obvious. But the Bank is simply saying: "We succeed if it is obvious and we do not succeed if it is not obvious". As it seems to me that, again, is something that remains in play.

48. The further questions that I have to take into account are difficult questions, raised by the defendant, of Kazakhstan law. I have not yet had an opportunity to hear any argument on that and again do not have any view, even a provisional view. But from the little I have read it at least seems to me possible that the Bank will be able to argue that the very interesting disputes between the experts on Kazakhstan law are nothing to the point in this particular case. Again, I am not prejudging it. Mr Béar may be entirely right that the arguments are substantial and need to be resolved after oral evidence. But if he were not right and in one day's further argument on Kazakhstan law I could reach a clear view, then that would save days, and possibly weeks of court time …

49. As regards the fourth point – namely whether or not it is obvious that the UBO material shows that Mr ⬆ **Ablyazov** ↘ must have been the UBO of the five BVI defendants – that, as it seems to me, is a question which has already been

determined against Mr Béar by Teare J on the criminal standard. So there must be some possibility that I will decide it against him again."

41. Finally, Vos J also rejected Mr Béar's third argument, for reasons which I need not rehearse. A point not mentioned by Vos J in this context, but made to me on behalf of the Bank, is that a summary judgment on the merits is likely to be easier to enforce in foreign jurisdictions than a default judgment. For the same reason, I have been asked to produce a fully reasoned judgment on this application, even though it is undefended.

42. I must now bring the procedural position up to date. On 1 August 2012, the Bank filed a further statement by Mr Hardman (his twenty-second), to which Mr ☏ **Ablyazov** �‚ replied on 12 September in his third statement. A point worth noting is the acceptance by Mr ☏ **Ablyazov** ➚ in this statement that he did not use email during his time at the Bank, and while there were email addresses available for him to use, this happened "very rarely", and he never sent the email himself. A further statement on behalf of Mr ☏ **Ablyazov** ➚ was also filed by Kitaj Woodward, an associate of Addleshaw Goddard, containing material relevant to the Bank's knowledge of the AAA transactions. Mr Hardman then made a statement in reply (his twenty-third) on 26 September 2012.

43. Because the Court of Appeal had still not handed down its judgment, the hearing arranged for mid-October 2012 had to be vacated. The Court of Appeal's judgment was handed down on 6 November 2012, but by then there was no realistic prospect of re-listing the summary judgment application in the near future because the Bank's legal team was fully occupied with the 14 week trial of the Drey, Granton and Chrysopa proceedings which began on 7 November 2012. Teare J handed down his judgment in that trial on 19 March 2013. Not long afterwards, the promotion of Vos J to the Court of Appeal was announced, with effect from 1 October 2013. Efforts were made by the Bank to obtain a listing of the adjourned summary judgment application before Vos J during the summer of 2013, but this was not possible because of the unavailability of Mr ☏ **Ablyazov** ➚'s counsel. Accordingly, the application was eventually released by Vos J and a hearing before another judge (in the event, myself) was listed for the week commencing 7 October 2013. Meanwhile, on 6 September 2013 Mr Hardman filed another statement (his twenty-fourth) dealing with events since the matter had last been before Vos J in July 2012.

**Summary judgment: relevant principles**

44. CPR rule 24.2 provides as follows:

"The court may give summary judgment against a … defendant on the whole of a claim or on a particular issue if –

(a) it considers that –

…

(ii) that defendant has no real prospect of successfully defending the claim or issue; and

(b) there is no other compelling reason why the case or issue should be disposed of at a trial."

By virtue of rule 24.3(2), the court may give summary judgment against a defendant "in any type of proceedings", subject to immaterial exceptions.

45. The principles that the court should apply in deciding whether a defendant has no real prospect

of successfully defending the claim have been considered by the courts in a number of well-known authorities. In respectful agreement with Vos J, I consider that for present purposes it is enough to cite the guidance given by Carnwath LJ (with whom Morgan J and Arden LJ agreed) in the Mentmore case at paragraphs [20] to [23], as follows:

"20. It is important to keep in mind the principles to be applied in deciding whether a case is suitable for disposal on a summary basis. The most authoritative up-to-date statement is that of Lord Hope in *Three Rivers DC v Bank of England (No. 3)* [2001] 2 All ER 513:

"In other cases it may be possible to say with confidence before trial that the factual basis for the claim is fanciful because it is entirely without substance. It may be clear beyond question that the statement of facts is contradicted by all the documents or other material on which it is based. The simpler the case the easier it is likely to be to take that view and resort to what is properly called summary judgment. But more complex cases are unlikely to be capable of being resolved in that way without conducting a mini-trial on the documents, without discovery and without oral evidence. As Lord Woolf said in *Swain v Hillman* [2001] 1 All ER 91, at p. 95 that is not the object of the rule. It is designed to deal with cases that are not fit for trial at all."

21. Another frequently cited passage on the same theme is the judgment of Colman J in *De Molestina v Ponton* [2002] 1 Lloyd's Rep 271, 280 para 3.5, speaking of the difficulty of basing summary judgment on inferences of fact in a complex case:

"…, as *Three Rivers District Council* shows, where the application in such complex cases relies on inferences of fact, the overriding objective may well require the claim to go to trial in the interest of a fair trial. That is because the relevant inference could not be safely drawn without further discovery and oral evidence at the trial. It is thus necessary, where such inferences are relevant, to guard against the temptation of drawing them as a matter of probability, because the achievement of the overriding objective requires a much higher degree of certitude. Where in a complex case, as may often be the situation, the frontier between what is merely improbable and what is clearly fanciful is blurred, the case or issue should be left to trial."

22. To these familiar citations, Mr Reza adds the words of Potter LJ in *ED&F Man Liquid Products v Patel* [2003] EWCA Civ 472 para 10:

"However, that does not mean that the court has to accept without analysis everything said by a party in his statements before the court. In some cases it may be clear that there is no real substance in factual assertions made, particularly if contradicted by contemporary documents. If so, issues which are dependent upon those factual assertions may be susceptible of disposal at an early stage so as to save the cost and delay of trying an issue the outcome of which is inevitable …"

23. If Mr Reza was hoping to find in those words some qualification of Lord Hope's approach, he will be disappointed. The *Three Rivers* case was specifically cited by Potter LJ. He was in my view intending no more than a summary of the same principles. Lord Hope had spoken of a statement contradicted by "*all* the documents or other material on which it is based" (emphasis added). It was only in

such a clear case that he was envisaging the possibility of rejecting factual assertions in the witness statements. It is in my view important not to equate what may be very powerful cross-examination ammunition, with the kind of "knock-out blow" which Lord Hope seems to have had in mind."

46. It does not follow from these salutary principles, however, that summary judgment can never be appropriate in a complex case where fraud is alleged. As an example of such a case, counsel for the Bank referred me to the decision of Hart J in R B G Resources Plc (in liquidation) v Rastogi and others [2004] EWHC 1089 (Ch). In that case, summary judgment was granted, after a four day contested hearing, for a sum in excess of US$300 million against individuals who, on the claimant's case, had orchestrated a fraudulent scheme involving hundreds of allegedly bogus metal trading transactions with companies which they secretly controlled. Although the fraud was, as Hart J said, "both massive and complex", he acknowledged that its proof turned on the establishment of one central proposition, namely the connection between the supposedly independent counterparties and the defendants: see paragraph [13]. As Hart J recorded in paragraph [11], the alleged fraud involved over 250 companies and the claimant relied on "nine voluminous witness statements and thousands of exhibited documents". The defendants had therefore submitted that the application for summary judgment necessarily involved conducting a "mini trial" on the documents, and doing so in circumstances which were manifestly unfair to the defendants, given that there had been no disclosure by the claimant, the defendants themselves had no access to documentation, and they were unable to test the evidence deployed against them. Hart J nevertheless held, in paragraph [14], that:

> "… the ability of the defendants to show a realistic prospect of success on the "control" issue should be determinative of this application so far as liability is concerned. The litigation disadvantages on which they rely (absence of disclosure or independent sources of documentation and so forth) have to be seen in that context."

### The beneficial ownership of the BVI defendants

47. In considering whether Mr ♆ **Ablyazov** ⤸ has a realistic prospect of successfully defending the Bank's claim, it is convenient to begin with the question of the beneficial ownership of the BVI Defendants. Mr Smith accepts on behalf of the Bank that there are three propositions of fact which the Bank needs to establish to the summary judgment standard, of which the first is that Mr ♆ **Ablyazov** ⤸ was the ultimate beneficial owner and controller of the BVI Defendants. The second proposition is that the BVI Defendants received the AAA Investments without providing any consideration for them and without ever having any intention that any, or any meaningful, consideration would be provided for them. The third proposition is that the transfer of the AAA Investments caused loss to the Bank.

48. In relation to the first proposition, the starting point is that Mr ♆ **Ablyazov** ⤸'s beneficial ownership of Bubris, one of the five BVI Defendants, has already been established by Teare J in the committal proceedings to the criminal standard of proof, and Mr ♆ **Ablyazov** ⤸'s appeal against that conclusion has been dismissed by the Court of Appeal. In my judgment it is clear that these findings give rise to an issue estoppel, which would preclude Mr ♆ **Ablyazov** ⤸ from contending the contrary in the AAA proceedings unless he could bring himself within the narrow exception recognised by the House of Lords in Arnold v NatWest Bank Plc [1991] 2 AC 93. In order to create an issue estoppel, three requirements have to be satisfied. They were stated as follows by Lord Brandon of Oakbrook in The Sennar (No. 2) [1985] 1 WLR 490 at 499B:

> "The first requirement is that the judgment in the earlier action relied on as creating an estoppel must be (a) of a court of competent jurisdiction, (b) final and conclusive and (c) on the merits. The second requirement is that the parties (or

privies) in the earlier action relied on as creating an estoppel, and those in the later action in which that estoppel is raised as a bar, must be the same. The third requirement is that the issue in the later action, in which the estoppel is raised as a bar, must be the same issue as that decided by the judgment in the earlier action."

49. It is plain, in my view, that each of those requirements is satisfied. The judgment of Teare J was a judgment of the English High Court; it was final and conclusive as between the Bank and Mr **Ablyazov**, subject only to the possibility of a successful appeal; and it was a judgment "on the merits" in the sense explained in The Sennar (No. 2) by Lord Diplock at 494A-C and by Lord Brandon at 499F-G. The relevant parties in each action are the same, namely the Bank and Mr **Ablyazov**. The issue is also the same, namely whether Mr **Ablyazov** was at the material times the beneficial owner of Bubris.

50. The exception recognised by the House of Lords in Arnold was formulated by Lord Keith of Kinkel (with whose speech the other members of the House agreed) in the following terms, at 109A:

"In my opinion your Lordships should affirm it to be the law that there may be an exception to issue estoppel in the special circumstance that there has become available to a party further material relevant to the correct determination of a point involved in the earlier proceedings, whether or not that point was specifically raised and decided, being material which could not by reasonable diligence have been adduced in those proceedings. One of the purposes of estoppel being to work justice between the parties, it is open to courts to recognise that in special circumstances inflexible application of it may have the opposite result …"

51. In the evidence adduced by him on the summary judgment application, Mr **Ablyazov** has in my judgment been unable to point to any further material which might cast doubt on the correctness of the conclusion reached by Teare J and affirmed by the Court of Appeal. The highest he could put the point would be to say that, if the case went to a full trial, further material might become available which in turn might arguably be sufficient to trigger the exception. In my view, however, this possibility is so remote that it can safely be dismissed as fanciful. In the first place, a large amount of documentary and oral evidence was considered by Teare J, including the oral evidence of Mr **Ablyazov** himself, in reaching his conclusion. Secondly, the question whether sufficient material was available to enable the court to adjudicate with safety on the issue was expressly considered, both when the Bubris issue was selected as one of the three sample counts of alleged contempt and when Teare J considered the evidence at the trial. In each case, he concluded that the matter could be determined without any risk of injustice to Mr **Ablyazov**. Furthermore, although there had been no general order for disclosure in the AAA proceedings, the Bank was ordered in the committal proceedings against Mr **Ablyazov** to give disclosure of any material relevant to the Bubris issue which might assist Mr **Ablyazov**'s case. Thirdly, given the nature of the issue, it seems to me inherently most improbable that the Bank would be in possession of any further documents which might cast doubt on Mr **Ablyazov**'s beneficial ownership of Bubris. Conversely, his contention that Mr Sadykov was the beneficial owner was examined in meticulous detail by Teare J and dismissed as a fabrication.

52. I am accordingly satisfied that I can safely proceed on the assumption that, if the case were to go to trial, Mr **Ablyazov** would be estopped from denying his beneficial ownership of Bubris. In those circumstances, it is strictly unnecessary for me to consider the detailed reasoning which led Teare J to his conclusion, or the reasoning of the Court of Appeal in dismissing Mr **Ablyazov**'s appeal on the issue. Still less is it necessary for me to undertake the same exercise for a third time myself. Nevertheless, I will say that I was taken through the relevant parts of both judgments by Mr Smith, and shown most of the underlying material upon which they were based. Having done this, I can only say that, were it necessary to do so, I

would have no hesitation in reaching the same conclusion myself.

53. It may also be helpful if, without descending into the question in detail, I give some indication of the reasoning which led Teare J and the Court of Appeal to their respective conclusions. Teare J dealt with the Bubris allegation in paragraphs 84 and following of his judgment. After discussing the evidence relating to the successive nominal or ostensible UBOs of Bubris, he expressed his main conclusions as follows (under the heading "Who was the true beneficial owner of Bubris?"):

"119. I accept that there is no direct evidence that Mr. Ablyazov was the true ultimate beneficiary of the shares in Bubris. In the circumstances of this case that is not a matter of surprise. His ownership of assets is expressly structured to ensure that no paper trail leads to him. Nevertheless, the Bank has the burden of making the court sure that the only reasonable inference to be drawn from the matters to which I have referred is that Mr. Ablyazov is the true beneficiary of those shares.

120. Mr. Sadykov has said in a written statement dated 25 November 2011 that he was the owner of Bubris. But he also said that he informed Mr. Kythreotis by post in May 2010 that he had been the owner or beneficiary of Bubris since April 2008. The suggestion that he wrote such a letter in May 2010 was untrue for the reasons I have already given …

121. Whether or not Mr. Sadykov is a man of such wealth as would enable him, through the vehicle of a creature company, to enter into obligations to the Bank worth $300m., the fact that Mr. Batyrgarejev [*an admitted close business associate and nominee of Mr Ablyazov's*] was appointed the UBO in April 2009 and remained so until February 2010 sits most unhappily alongside the notion that Mr. Sadykov is and always was the true beneficial owner. For, as I have already said, Mr. Batyrgarejev's appointment as UBO is a powerful indication that Mr. Ablyazov was the true beneficial owner. Further, the circumstances in which Mr. Batyrgarejev was removed as UBO in February 2010 and the fact that the letter dated 7 May 2010 from Mr. Sadykov was backdated are indicative of steps being taken by those administering Bubris to keep Mr. Ablyazov's interest in Bubris secret from the Bank. Finally, there is no credible reason why Mr. Sadykov, if he were the true owner of Bubris and had remained hidden since 2008, should choose September 2010 to take centre stage after Bubris had been made a defendant to the AAA proceedings.

122. For these reasons I am persuaded so that I am sure that Mr. Ablyazov is and has been at all material times the true beneficiary of the shares in Bubris. The shares were held on his behalf, successively, by Mr. Udovenko, Syrym Shalabayev, Mr. Batyrgarejev, Mr. Kovalenko and finally Mr. Sadykov. In reaching this conclusion I have considered all of Mr Matthews' submissions at pp.112-145 of his Closing Submissions but they do not cause me to doubt the conclusion I have reached. Nor do I consider that Mr. Ablyazov's denial of ownership may be true. I am sure that it is not. I have noted the submission that in circumstances where the ownership of Bubris is an issue in the AAA action I ought not to decide the matter now when I have not heard all the evidence which will be adduced at trial and that in such circumstances I cannot be sure that Bubris is owned by Mr. Ablyazov. When giving directions for the trial of the contempt allegation this point was considered and rejected. There was an appeal from my decision and the appeal was dismissed; see [2011] EWCA Civ 1386. In any event I remain of the view that it is unlikely that there will be any more material evidence on this issue beyond that which has been provided on this occasion."

54. In the Court of Appeal, Rix LJ dealt with the Bubris allegation in paragraphs 65 to 75 of his judgment. He began by saying that there were 54 paragraphs of skeleton argument devoted to Bubris, and then summarised the complaints that were made on Mr ♟**Ablyazov** ↘'s behalf. He continued:

> "66. These submissions track the whole of the evidence and arguments deployed at trial. It is an attempt simply to reargue the trial. The judge was meticulous in dealing with every aspect of that evidence and argument in his judgment. I have considered these submissions, with the aid of the bank's skeleton and the judge's judgment, with care, but I cannot find in the submissions made on appeal any reason for doubting the judge's own careful evaluations and conclusions, which I find compelling. It is probably superfluous, and, given this court's far lesser exposure to the materials and evidence and argument than the judge enjoyed, even problematical, to attempt to put into my own words, succinctly, the reasons why I find the bank's case on the Bubris allegation fully proved, to the criminal standard. That is not even of course the test on appeal. There is simply no error shown in the judge's findings or reasoning. His conclusion is entirely safe."

55. Despite that disclaimer, however, Rix LJ went on to consider the relevant arguments in considerable detail, before concluding as follows:

> "74. There is thus compelling circumstantial evidence that Mr ♟**Ablyazov** ↘ was the true owner of Bubris. There is no documentary evidence to the contrary (the declaration of Mr Sadykov as the UBO stands by itself in no different category from the four previous UBO declarations). The judge was entitled and right to discount the evidence of Mr ♟**Ablyazov** ↘ and his other witnesses, and indeed to find that such evidence was incredible and to be lies.
>
> 75. For these reasons, which essentially track those of the judge, I would dismiss this appeal in relation to the first finding of contempt."

56. On the assumption that Mr ♟**Ablyazov** ↘ was indeed the ultimate beneficial owner of Bubris, the inference that he was also the UBO of the other four BVI Defendants is in my judgment irresistible. As I have already said, it is their own pleaded case that they have always been in the same beneficial ownership, and there is no evidence that they have ever acted independently of one another (with the single exception of the apparent retention by Bubris of approximately US$42.5 million of its share of the proceeds of the short sales: see paragraph 15(7) above). More generally, the known facts about the impugned transactions clearly show that the BVI Defendants were throughout acting together in pursuit of a common plan.

57. For these reasons, I am satisfied that Mr ♟**Ablyazov** ↘ was the ultimate beneficial owner of all five BVI Defendants, and that there is no reasonable prospect of the court reaching a contrary conclusion if the case were to go to trial. I emphasise that I am not merely deciding this question on a balance of probabilities, which (as the authorities show) would be insufficient at this stage. I consider the chances of a different conclusion being reached at trial to be truly insignificant.

**Possible justifications for the transactions**

58. Pausing at this point, it is now established that in June 2008 the BVI Defendants, beneficially owned by Mr ♟**Ablyazov** ↘, entered into short sales of securities equivalent to the AAA Investments, and received the full amount of the consideration for the sales. In January 2009, the AAA Investments themselves were transferred by the Bank, under the signature of Mr Solodchenko, to the BVI Defendants for no recorded consideration, thereby enabling the BVI

Defendants to honour their delivery obligations to Alfa Equity. On the face of it, therefore, beneficial ownership of the AAA Investments passed from the Bank to the BVI Defendants, and then from the BVI Defendants to Alfa Equity, without the Bank receiving anything in return. How could such a series of transactions possibly be justified as having been in the commercial interests of the Bank? In considering this question, it is instructive to examine the attempts which appear to have been made to provide a paper trail which might provide at least a superficial justification for the transactions.

59.  The first possible attempt of which there is some evidence concerns the email of 13 June 2008 and the documents sent with it for signature by Mr Solodchenko. It will be remembered that this email said that the "transaction with Alfa Bank" was under the control of Mr ⬑ **Ablyazov** ⬎. The attached documents were five draft sale and purchase agreements, each entered into between the Bank as seller and one of the BVI Defendants as purchaser. Two of the draft agreements were dated 9 June 2008; the other three were undated. Each had apparently been signed on behalf of the relevant BVI Defendant, but remained to be signed on behalf of the Bank. In addition, neither the identity of the securities to be sold, nor the purchase price, had yet been filled in. Each draft agreement provided for the purchase price to be paid ten business days after the date of delivery of the securities, which was itself three business days after the date of the agreement. There was no provision for any form of security for either the payment or the delivery obligations. The agreements were said to be governed by English law, and provision was made for their execution in both English and Russian language versions, with the English version to prevail in the event of any conflict.

60.  There is no evidence that these draft agreements were ever executed, and (assuming they were intended to apply to the AAA Investments) it is hard to see how they could have been, given that most of the proceeds of the short sales were immediately paid on by the BVI Defendants to the Further Recipients. There is no explicit connection between the draft agreements and the AAA Investments. Nevertheless, given the terms of the covering email, and the absence of evidence of any other transactions between the Bank and the BVI Defendants at this date, there is a strong inference that the agreements were in some way intended to provide an ostensible justification for the AAA Investments ending up in the hands of the BVI Defendants. Even if that is wrong – and I accept that the truth on this point could only be conclusively established at trial – the episode is still of significance, because on any view it establishes, as counsel for the Bank put it in their skeleton argument, "a further clear contemporaneous connection between the Bank's assets and the "short" sale entered into by the BVI Defendants".

61.  The AAA Investments were transferred by the Bank to the BVI Defendants on or around 22 January 2009. It is unlikely to be a coincidence that 22 January 2009 was also the date when the financial regulatory authority of the Kazakh government (the Financial Market and Financial Organisations Control and Supervision Agency, the "AFN") sent its final report to the Bank following inspections which it had carried out between October and December 2008. In the Trial Judgment, Teare J described the content of this report in the following terms:

> "41. On 22 January 2009 the AFN sent the Bank its final report following its inspections between 22 October and 12 December 2008, the purpose of which had been (a) to check on whether the Bank had implemented any plan to eliminate the violations found in the previous inspection and (b) to classify the Bank's loan portfolio. The AFN concluded that the required steps to improve the Bank's business had not been taken. The AFN noted the continuing practice of lending to companies in the BVI and the Seychelles and that notwithstanding the AFN's advice about a conflict of interest the Bank had, on 30 April 2008, arranged for Mr ⬑ **Ablyazov** ⬎ to chair the regional credit committees for Russia and the CIS. Following its review of the loan portfolio (in which the AFN classified 19.46% of the portfolio as non-performing whereas the Bank had classified only 1.82% as

non-performing) the AFN required additional provisions of … about US$3.58 billion based upon the financial position as at 1 October 2008."

62. By this stage, if not before, the senior management of the Bank must have realised that the writing was on the wall, and that there was no prospect of the Bank finding the additional funding required by the AFN. Less than two weeks later, on 2 February 2009, the Bank was nationalised, Mr ☎ **Ablyazov** ↘ was dismissed as chairman of the Bank's board of directors, and he fled from Kazakhstan to London. Around the same time, Mr Solodchenko's employment by the Bank also came to an end. According to his own amended defence, he was dismissed as a member of the Bank's board of directors on 3 February 2009; on 17 February 2009, he was dismissed as chairman of the Bank's management board, and appointed as deputy chairman of it; he then left Kazakhstan in early March 2009, travelling to Moscow and then to London; and on 6 March 2009, he resigned from his employment with the Bank and his position as deputy chairman of the management board. On any view, therefore, his relationship with the Bank had terminated by 6 March 2009 at the latest.

63. Two days later, on 8 March 2009, Syrym Shalabayev (Mr ☎ **Ablyazov** ↘'s brother-in-law), from an email address at Eastbridge Capital Limited, sent to Mr Kythreotis a set of five new sale and purchase agreements apparently entered into between the Bank as seller and the BVI Defendants as purchasers. The agreements were dated 5 January 2009, and unsigned. In his email, Mr Shalabayev asked Mr Kythreotis for confirmation "that these documents can be signed". Each agreement:

(a) identified the relevant AAA Investments to be purchased by the relevant BVI Defendant;

(b) required the Bank to ensure "no later than the 22nd of January, 2009" that the relevant securities were re-registered from the name of the Bank in the name of the purchaser;

(c) provided for the specified purchase price to be paid no later than 5 January 2010 (that is to say, one year later than the ostensible date of the document);

(d) provided for interest to accrue in the meantime at the rate of 15% per annum; and

(e) required security to be provided under a Pledge Agreement over 100% of the shares in a company called TOO Orken Kapital KZ ("Orken Kapital").

Mr ☎ **Ablyazov** ↘ has admitted that he is the owner of Orken Kapital, and of Gemestra Limited ("Gemestra"), a BVI company which entered into the Pledge Agreement in order to pledge the shares in Orken Kapital. Despite this admission, however, Mr ☎ **Ablyazov** ↘ claimed to know nothing about the transaction: see paragraphs 13 and 61 of his first statement.

64. There are no signed versions of these sale and purchase agreements in evidence, but they all envisaged signature by the chairman of the Bank's management board, that is to say Mr Solodchenko. Furthermore, there is a signed version of the Pledge Agreement which is apparently dated 22 January 2009 and signed by Mr Solodchenko on behalf of the Bank as well as by a director of a company called Primi Limited on behalf of Gemestra. The purported date of signature of the Pledge Agreement must be false, because it had been sent as an unsigned draft by Mr Ereshchenko to Mr Kythreotis on 9 March 2009. It appears that it was then signed on behalf of Gemestra and forwarded by Mr Kythreotis to Eastbridge Moscow where it was signed by Mr Solodchenko, presumably en route to London.

65. Even if the precise details of execution of the Pledge Agreement remain unclear, it cannot seriously be doubted, in my judgment, that it was deliberately backdated to 22 January 2009 and signed by Mr Solodchenko at a time when he no longer had any authority to act on behalf of the Bank. It is equally clear that the sale and purchase agreements themselves were not

prepared until early March 2009, that they too were deliberately backdated, and that they were still in draft (even if they were subsequently executed) after Mr Solodchenko's resignation from the Bank.

66.  These transactions are in my view highly significant, for the following reasons. First, it was clearly perceived as necessary to provide a justification for the transfer of the AAA Investments to the BVI Defendants. This in itself implies that, in the absence of a proper justification, the transfer would have been exposed as improper. Secondly, the purported justification was provided after the event, by means of back-dated documents, after the dismissal and flight of Mr ⬑ **Ablyazov** ⬎, and after the termination of Mr Solodchenko's employment by the Bank. The need to employ such disreputable tactics speaks volumes about the true nature of the underlying transaction. Thirdly, by the date when the Pledge Agreement was in fact executed it must have been obvious to all concerned that the security given was all but worthless. As Mr Hardman explains in his twenty-second statement, the value, if any, in the Orken Kapital shares lay in the fact that it owned a stake in the Bank. When the Bank was nationalised on 2 February 2009, that stake was approximately 7%. On the nationalisation, however, the Bank's capital was diluted in return for payment of the local equivalent of US$1.7 billion, thereby reducing Orken Kapital's stake to less than 1%. Further recapitalisations of over US$10 billion have subsequently taken place, and Mr ⬑ **Ablyazov** ⬎ has accepted that his shares in the Bank are worthless. Even if the full extent of the Bank's financial plight may not have been apparent in early March 2009, the very poor quality of the Bank's loan book had already been exposed by the AFN, and it is inconceivable that the Bank's new management would have accepted shares in the Bank as security for the obligations ostensibly undertaken by the BVI Defendants under the sale and purchase agreements being circulated in draft in March 2009.

67.  In summary, I consider that not only was the attempt to provide a retrospective justification for the transactions relating to the AAA Investments demonstrably false and worthless, but the perceived need to embark on such an exercise, after the nationalisation of the Bank and the dismissal and flight of Mr ⬑ **Ablyazov** ⬎, itself provides strong evidence of the fraud alleged by the Bank.

68.  Nor is it credible, in my judgment, to suppose that the transactions relating to the AAA Investments could have taken place without the authority, knowledge and involvement of Mr ⬑ **Ablyazov** ⬎. Quite apart from his beneficial ownership of the BVI Defendants, and all the circumstantial evidence linking him to the alleged fraud, there are two pieces of evidence which directly implicate him in the transactions. The first is the email of 13 June 2008. The second is the Pledge Agreement, which purported to grant security over shares in a company which Mr ⬑ **Ablyazov** ⬎ accepts he owns. The overall picture thus built up is in my judgment a compelling one, and the explanation for the June 2008 email proffered by Mr ⬑ **Ablyazov** ⬎ in his first statement seems to me frankly incredible. His later suggestion that the transactions formed part of a repo deal is, if anything, even more implausible. He has not begun to explain how the available evidence could be reconciled with a proper repo transaction, and he is in no position to contradict the evidence of the Bank's former Head of Treasury, Mr Mukhametzhanov, about the limited circumstances in which the Bank made use of such transactions: see paragraph 29 above.

69.  To revert to the second and third of the key propositions of fact which counsel submit lie at the heart of the Bank's claims in the present proceedings, I am satisfied in the light of all the available evidence, to the standard of proof necessary for a summary judgment application, that:

> (a) the BVI Defendants received the AAA Investments without providing any consideration for them, and without ever having any intention that any, or any meaningful, consideration would be provided for them; and

> (b) the transfer of the AAA Investments caused loss to the Bank corresponding to

their market value at the date of transfer.

**The Kazakh law issues**

70. It has always been common ground that the Bank's claims against Mr ♘ **Ablyazov** ↘ must be made good as a matter of Kazakh law, and in particular that they are not governed by English law. Apart from the Kazakh law claims, there is also pleaded against Mr ♘ **Ablyazov** ↘ a claim for damages for conspiracy under BVI law, but that claim is not pursued in the present application.

71. The provisions of Kazakh law relied on by the Bank are contained in the Law No. 414-II of the Republic of Kazakhstan on Joint Stock Companies ("the JSC Law"). The Bank claims damages on the basis that Mr ♘ **Ablyazov** ↘ breached obligations imposed on him by Articles 62, 67 and 71 to 73 of the JSC Law, giving rise to claims in damages under Articles 63 and 74(2). The meaning and effect of many of the relevant provisions were considered by Teare J in the Trial Judgment, after he had heard expert evidence from Professor Maggs on behalf of the defendants and from Mr Vataev, a partner in Dechert LLP in Kazakhstan, on behalf of the Bank. Teare J found Mr Vataev to be "an impressive witness": see paragraph 68 of the Trial Judgment. His assessment of Professor Maggs' evidence, in paragraph 69, included the following:

> "He gave evidence in a clear, authoritative and fair manner. It was a striking feature of his evidence that whatever question he was asked he had, without hesitation, a clear answer to it. I concluded that he had an exceptionally clear grasp and understanding of the relevant codes. If he had a weakness it was that he tended to give insufficient weight to Articles 2 and 6 of the Civil Code which, as the experts agreed, enabled the Kazakhstani court to adopt a purposive construction in cases of ambiguity or lack of clarity. It may be that his lack of practical experience in the Kazakhstani courts contributed to this weakness and to his over-reliance on the apparent rigidity of the codes."

72. The Bank wishes to rely on the conclusions reached by Teare J in relation to a number of matters of Kazakh law, and to that end it served a notice under CPR Rule 33.7 on 25 June 2013 giving notice that, in accordance with section 4(2) of the Civil Evidence Act 1972, it intended at the present hearing to adduce certain specified findings made or decisions given by Teare J in the Trial Judgment. The effect of section 4(2) of the 1972 Act is that where any question of foreign law has been determined in specified proceedings (including proceedings at first instance in the High Court), then in any civil proceedings:

> "(a) any finding made or decision given on that question in the first-mentioned proceedings shall, if reported or recorded in citable form, be admissible in evidence for the purpose of proving the law of that country … with respect to that matter; and
>
> (b) if that finding or decision, as so reported or recorded, is adduced for that purpose, the law of that country … with respect to that matter shall be taken to be in accordance with that finding or decision unless the contrary is proved."

There can be no doubt that the Trial Judgment recorded the relevant findings or decisions of Teare J in citable form within the meaning of subsection (5), so by virtue of subsection (2) his findings or decisions on Kazakh law are admissible in the present proceedings for the purpose of proving that law, and are conclusive unless the contrary is proved.

73. The Bank's claims are advanced under two main heads. Under the first head, it is alleged that Mr ♘ **Ablyazov** ↘ failed to disclose a related-party transaction in breach of Articles 67, 71 to 73 and 74(2) of the JSC Law. These provisions need to be read with the definition of "affiliates" in

Article 1(3), and the list of affiliates set out in Article 64. Article 1(3) defines "affiliates" to mean "physical or legal persons … that have the opportunity to directly and/or indirectly determine decisions, and/or influence decisions made by each other (one of the persons), including influence derived from concluded transactions". Article 64(1) provides that:

> "The following shall be an affiliate of a company:
>
> (1) a major shareholder;
>
> (2) …
>
> (3) an official of a company … except for an independent director;
>
> (4) a legal entity which is controlled by an individual who is a major shareholder or an official of the company;
>
> …"

And by virtue of Article 64(2):

> "Control of a company or another legal entity shall include the opportunity to determine decisions adopted by such company or such another legal entity, respectively."

74.   The relevant provisions of Articles 67 and 71 to 74 read as follows:

> "67. **Disclosure of information regarding affiliates of a company**
>
> …
>
> 3. Individuals and legal entities being affiliates of a company shall be obliged to submit to the company information regarding their affiliates within seven days from the date of the occurrence of such affiliation.
>
> 4. A company shall be obliged to submit a list of its affiliates to the authorized agency according to the procedure established by the authorized agency.
>
> …
>
> 71. **Interest in a company's effectuation of a transaction**
>
> 1. A company's affiliates shall be recognised as persons who are interested in a company carrying out a transaction (hereinafter "interested parties"), provided that they are:
>
> (1) a party to such transaction or participate in such transaction as representatives or intermediaries; or
>
> (2) affiliates of a legal entity which is a party to such transaction or participates in such transaction as a representative or an intermediary.
>
> …
>
> 72. **Information regarding interest in a company's effectuation of a transaction**

1. Persons referred to in Clause 1 of Article 71 shall be obliged to provide the board of directors with the following information:

(1) that they are a party to the relevant transaction or participate in such transaction as a representative or intermediary;

(2) regarding legal entities with which they are affiliated, including legal entities in which they individually or jointly with their affiliates own ten per cent or more of the voting shares …; and

(3) regarding ongoing or proposed transactions of which they are aware and in which they may be recognised as an interested party.

73. **Procedural requirement for the execution of a transaction in which there is an interest**

1. A decision regarding the execution of a transaction in which there is an interest shall be adopted by a simple majority of votes of the members of the board of directors who are not interested in such transaction.

…

74. **Consequences of execution by a company of transactions in respect of which special terms and conditions are established**

1. Failure to comply with this Law's requirements when effectuating a major transaction or a transaction in which there is an interest shall result in the invalidation of such transaction by a court based upon a suit from an interested party.

2. A person that is interested in the company's execution of a transaction which is concluded in violation of the procedural requirements for its conclusion shall be liable to the company in the amount of losses caused by such person to the company. If the relevant transaction is effectuated by several persons, then they shall have joint responsibility to the company.

…"

75. It is undisputed that Mr Ablyazov was at all material times an affiliate of the Bank, both because he was an officer of the Bank and because he was its majority shareholder. He was also an affiliate of the BVI Defendants, by virtue of his ultimate beneficial ownership which gave him the opportunity to directly and/or indirectly determine or influence decisions made by them: see Articles 1(3) and 64(2) of the JSC Law, and paragraphs 16 to 21 of Mr Markov's first report. I am satisfied that the assertion in Mr Ablyazov's defence to the effect that "only legally recognised and enforceable relationships" are recognised as capable of giving rise to "control" over a legal entity within the meaning of Article 64.1(4) is untenable, for the reasons given by Mr Markov, and I note that in the Trial Judgment Teare J relied on Article 1(3) in order to find that Mr Ablyazov was an affiliate of Chrysopa Holding BV, even though there was no formal documentary proof of Mr Ablyazov's ability to control that company: see paragraphs [337] to [338]. In reaching that conclusion, Teare J must have accepted that an informal relationship may suffice to establish control, and the de facto ability to determine or influence the other entity's conduct is what matters.

76. Further strong support for this conclusion is contained in a legal opinion of Professor M K Suleimenov dated 24 May 2012 which is annexed to Mr Markov's supplemental expert report. Professor Suleimenov is recognised by Professor Maggs as being "Kazakhstan's leading expert in Civil Law" (paragraph 36 of his first report in the present proceedings). The views of Professor Suleimenov entirely support those of Mr Markov, and include the following:

> "7. In my opinion, the *de facto* ability to determine decisions made by the BVI Companies through a nominee beneficial holding is sufficient to give rise to an affiliation, even in the absence of any documentary proof. Documentary proof of affiliation is possible where there is direct control and open ownership of a controlling stake. However, indirect forms of control may be proved either by documentation, or, depending on the nature of the relationship, may be proved otherwise."

77. On a purposive interpretation, this view appears to me clearly correct, and I do not think Mr Ablyazov would have any reasonable prospect of establishing the contrary if the case went to trial. Once Mr Ablyazov's affiliation with the BVI Defendants is established, the remaining steps in the argument are relatively straightforward. It was then Mr Ablyazov's duty under Article 67(3) to inform the Bank of the existence of the affiliation within seven days of its arising. It was also his duty, under Articles 71 and 72, to inform the Bank's board of directors of his affiliation with the BVI Defendants, and the transactions taking place between the Bank and the BVI Defendants (including the transfers of 22 January 2009). This does not appear to be disputed by Professor Maggs, who said in paragraph 17 of his first report:

> "I agree with Mr Markov, that if an official of the Bank was affiliated to an outside company, such official had an obligation to inform the Bank of this affiliation, and would be considered an interested person with respect to any transaction between the Bank and such company. Also as pointed out by Mr Markov, this interest would trigger special approval procedures of the Law on Joint-Stock Companies."

78. Mr Ablyazov failed to comply with these obligations, with the result that he is liable under Article 74(2) for the amount of losses thereby caused to the Bank. Mr Markov confirms (paragraph 29 of his first report) that an invalidation claim under Article 74(1) and a damages claim under Article 74(2) are independent remedies, and the company may choose whether to pursue one or the other, or both in parallel. The existence of loss to the Bank is clearly established. The necessary causal link must be shown as a question of fact. There is considerable discussion of this requirement in the expert evidence, but I see no reason to doubt that it would be easily satisfied, whatever the precise nature of the requirement may be. If proper disclosure had been made to the board by Mr Ablyazov, the decision whether to transfer the AAA Investments to the BVI Defendants for no consideration would have been taken by a simple majority of the votes of the members of the board who were not interested in the transaction: see Article 73(1). No director acting properly in the best interests of the Bank could possibly have sanctioned such a transaction, and Mr Talvitie has made it clear that he would not have done so. As Mr Markov puts it, in paragraph 20 of his supplemental report:

> "If Mr Ablyazov was the ultimate beneficial owner of the BVI Defendants and failed to disclose this fact to the Bank, then the transfer away of assets with a value of approximately US$300 million for nothing in return would seem to be a clear example of Mr Ablyazov's omission resulting in money being taken out of one pocket (the Bank's) and put in another's (the BVI Defendant's) to the Bank's detriment."

79. A possible, if unattractive, counter-argument which I need to consider is that, even if full disclosure had been made, a majority of the board of directors of the Bank (apart from Mr Ablyazov) would still have voted in favour of the transactions, because they were either too

corrupt, too supine or too frightened to thwart his wishes. Without a clear consensus of expert evidence, I would be reluctant to decide that circumstances of this nature would have broken the chain of causation. That apart, however, there is in my judgment an answer to the point. The one truly independent member of the board was Mr Talvitie, who represented the interests of East Capital, an investor in the Bank. He gave evidence to Teare J that at board meetings Mr Ablyazov had already made the decisions, and the other members of the board were "straw men": see the trial judgment at paragraph [19]. In paragraph [346] Teare J dealt with a similar argument about causation, and found that if the other members of the board were willing to approve the loan to Chrysopa in circumstances where it could be seen to be for the benefit of Mr Ablyazov rather than for the benefit of the Bank:

> "… it is more likely than not, it seems to me, that he [*Mr Talvitie*] would have informed the AFN. For it would have appeared to him an improper and unwise thing for the Board to do and such conduct would have imperilled East Capital's investment. Had he done so it is more likely than not that in those circumstances the AFN would have intervened to prevent the loan being made."

Teare J reached this conclusion after hearing Mr Talvitie give oral evidence and be cross-examined. I see no reason to doubt that a similar conclusion would be reached in the present case, if it went to trial.

80.   The second main way in which the Bank puts its case against Mr Ablyazov relies on Articles 62 and 63 of the JSC Law. So far as material, those Articles provide as follows:

> "62. **Principles of activities of officials of a company**
>
> A company's officials:
>
>> 1. shall fulfil their obligations faithfully and with methods which they reasonably deem to best represent the interests of the company and its shareholders;
>>
>> 2. may not use or permit the use of the company's property in violation of the company's charter or decisions of a general shareholders' meeting or the board of directors, or for personal purposes or abuse their powers when concluding transactions with its affiliates;
>>
>> …
>
> 63. **Responsibilities of officials of a company**
>
>> 1. Officials of a company shall be responsible to the company and the shareholders for damage caused by their actions (omission), pursuant to Kazakhstan legislation, as well as for damage cause by:
>>
>> (1) presentation of misleading or false information;
>>
>> (2) violation of the procedure for presenting information established by this Law.
>>
>> 2. Based upon a decision of a general shareholders' meeting, a company may file with a court a claim against an official for reimbursement of damage or losses caused by such official to the company."

81.   Mr Ablyazov was an officer of the Bank, and as such he was subject to the duties imposed

upon him by Article 62. In paragraph 82(a) of his defence, Mr ♘ **Ablyazov** ↘ has admitted that as an officer of the Bank he was obliged to "fulfil the duties placed on him in good faith and use means which to the greatest extent possible reflect the interests of the society (i.e. the Claimant) and its stockholders". He also admits in paragraph 91(b) that an officer may be obliged to pay damages for breach of such a duty in accordance with Article 63. One of the requirements of Article 63 is that a shareholder resolution is needed to authorise the company to pursue a claim for damages against an officer. In the present case, that requirement causes no difficulty. The necessary resolution was passed on 19 August 2010, before Mr ♘ **Ablyazov** ↘ was joined as a defendant to the present action on 14 March 2011. (Even if his joinder had pre-dated the resolution, it would not have mattered, because one of the points of Kazakh law decided by Teare J was that a resolution under Article 63(2) may be retrospective: see the Trial Judgment at paragraphs [210] to [214]).

82.  In order for a claim under Article 63 to succeed, breach, loss and causation have to be established in much the same way as for a claim under Article 74. In the light of the conclusions which I have reached on the Article 74 claim, I consider that these requirements are likewise satisfied in relation to the Article 63 claim.

83.  It remains to consider two further related defences under Kazakh law upon which Mr ♘ **Ablyazov** ↘ relies. In paragraph 10 of his defence he alleges that he was employed by the Bank under a written contract of employment, and says that any claims by the Bank against him arising out of his employment must therefore be based in contract and not in tort, because it is a general principle of post-Soviet legal systems that "where a written contract governs a relationship between two parties, a party cannot be liable in tort in respect of any act within the scope of that written contact". This doctrine is often called the prohibition of "competition of claims" and contrasts with the general freedom accorded to a claimant by English law to choose between concurrent causes of action available to him. Consistently with this alleged prohibition, Mr ♘ **Ablyazov** ↘ goes on to allege that Article 1(3) of the Civil Code provides that labour relations are governed by the Labour Code of Kazakhstan dated 15 May 2007 ("the Labour Code"), and by other laws only to the extent that they are not inconsistent with the Labour Code. Article 172(2) of the Labour Code provides for a one year limitation period for bringing a claim against an employee under his contract of employment. More precisely, the permitted period is:

> "one year from the day when the employee or employer knew or should have known of the violation of its right."

Thereafter, according to Professor Maggs, the Bank's claim would be permanently time-barred. Mr ♘ **Ablyazov** ↘'s argument is that the Bank's claim against him was not begun within that one year period.

84.  Despite numerous searches of the Bank's documents, no contract of employment for Mr ♘ **Ablyazov** ↘ has ever been found. Nor has any copy of a contract of employment ever been disclosed by Mr ♘ **Ablyazov** ↘ or his co-defendants in any of the proceedings brought by the Bank. Nevertheless, it is possible that a written contract would emerge if the present case went to trial, so I will proceed on the assumption that one exists, or at least was in existence at the material times. On that footing, the Bank relies on the rejection by Teare J of the principle of competition of claims in the context of claims for breach of a statutory duty by an officer of a joint stock company: see the Trial Judgment at paragraphs [219] to [230]. Teare J reached this conclusion after hearing the expert evidence of Mr Vataev and Professor Maggs, and considering some extracts from a work by Professor Suleimenov (who did not give evidence).

85.  Teare J accepted that the principle of competition of claims was part of the law of Kazakhstan, but said Professor Maggs had been unable to refer him to any decided case which determined that the principle operated so as to require a company to bring claims against an officer of the

company for breach of his duties as officer in accordance with the Labour Code. He continued:

> "227. In light of the acceptance by both experts of the principle in question I accept that claims in delict or tort must be brought in accordance with the Labour Code where there is a contract of employment. But I find it difficult to accept, in circumstances where Articles 62 and 63 of the JSC Law impose duties upon the officers of a company and provide an express remedy for breach of such duties, that such remedies may only be exercised in accordance with the provisions of the Labour Code where there is also a relationship of employer/employee between the company and the officer. In particular it is difficult to accept that, although the JSC Law provides for unlimited liability and a limitation period of three years, the more restrictive limitation provisions of the Labour Code must apply. I accept that this may be the reaction of a common lawyer rather than that of a lawyer familiar with the principle of the competition of claims but I take comfort from the circumstance that Mr Vataev, not a common lawyer, was also unable to accept the apparent logic of Professor Maggs' opinion.

> 228. Ultimately I have been persuaded that the principle which governs parallel claims in contract or tort does not apply to parallel claims for breach of a contractual duty as employee and for breach of a statutory duty as officer of a joint stock company. The latter is not a claim in delict or tort but one which arises from the defendant's status as an officer of the company. The latter status gives rise to the obligations under the JSC Law whether or not the officer is an employee of the company. In the absence of clear decisions of the Kazakhstan courts showing that the Labour Code applies exclusively to claims against officers for breach of their duties under the JSC Law I was not persuaded that the remedies for breach of those duties should be limited in the manner in which claims against an employee under the Labour Code are.

> 229. I have noted Mr Norbury's submission that the Labour Code, being a Code, takes precedence over the JSC Law, which is only a law and not a code. However, I remain of the view that the clear statement as to the limitation period applicable to officers in the JSC Law must have been intended to apply where officers are sued …

> 230. It follows that where breach of Article 62 of the JSC Law is relied upon against an officer of the company the Bank has three years in which to bring its claim. The one year limitation in the Labour Code is inapplicable."

86. By virtue of section 4(2) of the Civil Evidence Act 1972, the findings and decision of Teare J on this point are conclusive in the present proceedings unless the contrary is proved. The expert evidence in the present case of Mr Markov and Professor Suleimenov strongly supports the reasoning and conclusion of Teare J. The only evidence to the contrary is that of Professor Maggs, who in his first report sought to rely on views expressed by Professor Suleimenov in his work "Liability in Civil Law" in support of his thesis that the Bank's claims against Mr Ablyazov are governed by the Labour Code. Professor Suleimenov explains, however, in the expert Opinion subsequently obtained from him by the Bank's solicitors and attached to Mr Markov's supplemental report, that Professor Maggs' reliance on his views was inappropriate. Section 2 of his Opinion includes the following passage:

> "7. However, even if the duties in an employment agreement of an officer of the company mirror provisions of the law, it is incorrect to identify the liability of this officer arising on the basis of the law (including the JSC Law) with the liability arising on the basis of an employment agreement. It is also incorrect to speak of liability arising from an officer's breach of statutory provisions (mirrored by

provisions of an employment contract) as being a breach of the conditions of the employment agreement with liability arising under that contract. Hence reference to my article "Liability in Civil Law" in Mr ♘ Ablyazov ↘'s response to the Bank's claim and Professor Maggs' expert report as far as competition of claims is concerned is inappropriate.

8. Accordingly, the activity of the chairman and members of the board of directors of a joint-stock company is regulated not by the Labour Code, but by the JSC Law, the Code of Corporate Governance approved by the company's general meeting of shareholders, the company's charter, and other internal normative documents of the company."

87. After further discussions of the JSC Law, he concluded:

"14. In light of the above, it is my opinion that the existence of any employment agreement between the Bank with members of the board of directors of the Bank (including Mr ♘ Ablyazov ↘) does not prevent the Bank bringing claims and suing such members of the board of directors for breach of principles of officers' activities established by the JSC Law or for breach of the obligation to disclose information about affiliated persons of the company and breach of the procedure for making related-party transactions, including claims for compensation of damages on the basis of Articles 63 and 74 of the JSC Law."

88. The debate between Professor Maggs and Professor Suleimenov continued, on this and other matters, in subsequent reports and opinions which have been put in evidence. I have read this material, but it does not cause me to change my view that, if the case went to trial, the overwhelming likelihood is that the court would reach the same conclusion as Teare J, and would not hold that the contrary had been proved for the purposes of section 4 of the 1972 Act.

89. I would add, for completeness, that even if Professor Maggs were correct in his view that the one year limitation period in the Labour Code applied, it would still be open to the Bank to establish, if it could, that it neither became aware, nor should have become aware, of the violation of its rights by Mr ♘ Ablyazov ↘ more than one year before his joinder as a defendant on 14 March 2011; and even if that condition could not be satisfied, the court would still have a discretion to extend the limitation period where there is a "valid reason" for doing so. These issues were considered by Teare J, and decided by him in the Bank's favour, in paragraphs [231] to [242] of the Trial Judgment. It is possible, and may even be probable, that the court would reach similar conclusions in the present case after a full trial; but I accept that it is not possible to do so on an application for summary judgment.

**Is there any other compelling reason why the case should go to trial?**

90. In view of Mr ♘ Ablyazov ↘'s decision not to defend the present application, the arguments which he has previously raised about the need for the case to go to trial may appear rather hollow. But I will briefly consider them. A recurrent theme in his defence and witness statements has been the need for full disclosure, and for oral evidence to be given by those within the Bank, both before and after its nationalisation. If it were necessary to understand every detail of the transactions relating to the AAA Investments, I would agree that a full trial was necessary. As I have explained, however, I consider that enough is now known about the transactions, on the evidence as it stands, to establish to the summary judgment standard that Mr ♘ Ablyazov ↘ must have been personally responsible for the misappropriation of the AAA Investments, and that the Bank has good causes of action under Kazakh law to hold him responsible accordingly. In those circumstances, it would be wrong to put the Bank to the delay, inconvenience and expense of proving its case at trial.

91. Moreover, I can see no solid basis for Mr ☂ **Ablyazov** �’s concerns about disclosure. In the light of his own pleaded case, it is most improbable that the Bank would turn out to hold significant further documentation relating to the impugned transactions. Furthermore, a substantial disclosure exercise has already been carried out by the Bank in the context of the committal application, which included searches for documents relating to the allegations about the ownership of Bubris. In that context, the Bank was obliged to, and did, search for and disclose documents which either supported Mr ☂ **Ablyazov** �’s case or undermined the Bank's case. Teare J was clearly satisfied that the disclosure given was sufficient to enable him to decide, to the criminal standard of proof, that Mr ☂ **Ablyazov** ➘ was the beneficial owner of Bubris; and his decision was upheld by the Court of Appeal, despite the complaints of unfairness made by Mr ☂ **Ablyazov** ➘.

92. Mr ☂ **Ablyazov** ➘ has also claimed that he is the victim of alleged political persecution. I am in no position to form a view on the truth or otherwise of this contention. I certainly cannot dismiss it out of hand as inherently incredible. For present purposes, however, that is not the point. The Bank claims to have been defrauded of securities worth some US$300 million by Mr ☂ **Ablyazov** ➘. The Bank must be entitled to take legal action to recover that sum, even on the assumption that its motivation for so doing was mainly political. This point was clearly articulated by Teare J when dismissing an application by Mr ☂ **Ablyazov** ➘ to stay the Drey proceedings on the ground of alleged abuse of process: see JSC BTA Bank v ☂ **Ablyazov** ➘ (No. 6) [2011] EWHC 1136 (Comm), [2011] 1 WLR 2996, especially at paragraph [54].

**<u>Conclusion</u>**

93. For the reasons which I have given, I am satisfied that the Bank's application for summary judgment should succeed. The principal amount for which judgment is claimed in the application notice is US$294,138,715.27, that being the total amount paid by Alfa Bank to the BVI Defendants in June 2008. I will order Mr ☂ **Ablyazov** ➘ to pay that sum, which represents the financial benefit received by his companies as a result of his fraud.

94. In relation to interest, Mr Smith submitted, and I agree, that it should be awarded under section 35A of the Senior Courts Act 1981 at the rate of 7.3% per annum. This was the rate determined by Teare J in a separate judgment on interest in the Granton, Drey and Chrysopa proceedings which he delivered on 19 April 2013: see [2013] EWHC 867 (Comm). On the evidence before him, Teare J was satisfied that for the period 2006 to 2012 the average rate of interest paid by Kazakh banks when borrowing money was just under 7.3%. He also decided, and again I agree, that interest should run under section 35A from the date on which the Bank's cause of action accrued, even if a different date might be relevant under Kazakh law. As he said in paragraph [26], interest under section 35A is essentially a procedural remedy, and it is appropriate for the court, when awarding its own procedural remedy, to have regard to economic reality.

**BAILII:** <u>Copyright Policy</u> | <u>Disclaimers</u> | <u>Privacy Policy</u> | <u>Feedback</u> | <u>Donate to BAILII</u>
URL: *http://www.bailii.org/ew/cases/EWHC/Ch/2013/3691.html*