UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CF 135 FLAT LLC, CF 135 WEST MEMBERS LLC, and THE CHETRIT GROUP, LLC,<br><br>        Interpleader Plaintiffs,<br><br>- against -<br><br>TRIADOU SPV S.A. and CITY OF ALMATY, a foreign city,<br><br>        Interpleader Defendants.<br><br>CITY OF ALMATY, KAZAKHSTAN and BTA BANK JSC,<br><br>        Crossclaim Plaintiffs,<br><br>- against -<br><br>MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, and TRIADOU SPV S.A.,<br><br>        Crossclaim Defendants. | ECF Case<br><br>No. 15 CV 05345 (AJN) |

**AFFIDAVIT OF CESARE CERRITO**

I, CESARE CERRITO, hereby declare as follows under penalty of perjury:

1.    I am an Italian national, and currently reside in Switzerland. I attended the University of Genoa, where I studied Business Administration. I then received my Master's in corporate finance from the SDA Bocconi School of Management. After my education, I worked in equity capital markets and corporate finance, before transitioning to work in real estate finance and private equity investment.

2.    Since November 2009, I have been the Chief Financial Officer (CFO) of Swiss

Development Group ("SDG"). Since 31 October 2014, I also have been the sole director of Triadou SPV S.A. ("Triadou"), one of SDG's subsidiaries. In my role as SDG's CFO, I worked closely with Ilyas Khrapunov from November 2009 and until the sale of SDG in March 2013 to Mr. Philippe Glatz. Since March 2013, I have worked closely with Mr. Glatz in every aspect of operations and management of SDG and its subsidiaries. As such, I have a thorough understanding of all aspects of SDG's operations, finances, and investments from November 2009 through present day.

## I.      The Origin of SDG

3.      SDG was incorporated in July 2008, and I joined the company in November 2009. The initial funding for SDG came from Ilyas Khrapunov and his sister, Elvira Kudryashova, who was a shareholder of SDG. Thereafter, SDG raised several mortgages and construction loans from major Swiss banks, and issued several rounds of bonds purchased by bona-fide third parties, including certain Swiss banks. The overall funding raised by SDG over the entire period of my tenure that came from Ilyas Khrapunov and his sister constitutes a minor portion of the total funds raised. Most recently, SDG raised fresh bank financing in the amount of $16.5 million USD.

4.      At the time that I joined SDG, Ilyas Khrapunov was the Chairman and remained so until June 2012, at which time he became an adviser to SDG's Board until the sale to Mr. Glatz. I understand that Ilyas Khrapunov became an adviser due to the negative press surrounding his family, which was hindering SDG's ability to do business. During the period before Mr. Glatz purchased SDG (November 2009 to March 2013), I frequently met with Ilyas Khrapunov in various working meetings and during SDG Board meetings. During this period, I observed that Ilyas Khrapunov took the advice of management and other Board

2

members – including Marc Gillieron, Nicolas Garnier, Christian Grandjean, and Jean-Francois Garneau – in reaching decisions that would steer the company.

5.  At no point did I observe, nor was I aware of, any involvement of, consultation with, or decisions made by Viktor Khrapunov or Mukhtar Ablyazov in connection with the business of SDG, and to my knowledge, no one else at SDG was aware of any decisions being made by either of those individuals either.

## II. The Formation of Triadou

6.  In or about 2011, SDG's Board decided to create a real estate fund to invest in luxury real estate across the world (the "Fund"). The Fund was initially named "SDG Investment Fund," and later renamed "Element One." The decision to create the Fund came out of the intention to specialize SDG as a development company providing services to owners of assets, rather than owning assets itself. In or about July 2011, SDG retained the services of Nicolas Bourg as an outside consultant to head the Fund project. Mr. Bourg had two major mandates:

- To incorporate the Fund and the management company in Luxembourg, and to take care of all registration and approval formalities, particularly with Luxembourg's Commission de Surveillance du Secteur Financier ("CSSF"). Mr. Bourg assured SDG management (as described above) of his ability to complete this task in less than one (1) year, and we therefore expected that the Fund would be up and running by mid-2012. Attached as Exhibit 1 is a true and correct copy of the 8 March 2012 agenda of the international real estate investment conference (MIPIM) (publically available at http://www.mipim.com/RM/RM_MIPIM_v2/ documents/pdf/mipim/MIPIM-2012-events-calendar-March1.pdf).[1] As

---

[1] I note that while SDG did not prepare the MIPIM "Events Programme" attached as Exhibit 1, it is a true and correct copy of what was issued by MIPIM. That said, the document mistakenly identifies Mr. Nicolas Garnier as Chairman of SDG; at the time, Mr. Garnier was CEO of SDG, while, as stated above, Ilyas Khrapunov was Chairman of the Board.

        can be seen, the Fund was already being announced and marketed at the time.

- In parallel with the registration activities, Mr. Bourg was tasked with marketing the Fund, seeking out seed investors to put up money for the Fund, and seeking out potential investments for the Fund so that it could deploy money as soon as it was launched.

7. Mr. Bourg failed to establish the Fund by mid-2012, and the situation was still unresolved by September 2012. By that time, Mr. Bourg already had incurred significant expenses – all paid for by SDG – for researching a number of potential investments, such that not investing would have resulted in negative financial consequences. Also by that time, Ilyas Khrapunov had lined up another investor, Mr. Gennady Petelin (described below), who remained interested in the potential investments even though the Fund's creation was delayed.

8. By September 2012, SDG's Board decided that SDG and Mr. Petelin would proceed to invest in those projects found by Mr. Bourg, while SDG and Mr. Petelin waited for the Fund to be incorporated. Then, once the Fund was established, both SDG and Mr. Petelin would contribute the investments "in kind" into the Fund and become the shareholders of the Fund. Mr. Bourg recommended that the "interim" investments should be made through Special Purpose Vehicles (SPVs) incorporated in Luxembourg because they could be made tax-efficient and it would later facilitate "in kind" contributions into a Luxembourg-domiciled Fund. It was in this context that SDG incorporated three (3) wholly-owned SPVs in October 2012: Porto Heli SPV S.A., Igloo SPV S.A., and Triadou.

### III. Funding from Telford

9. As noted above, one of the investors Ilyas Khrapunov identified for the Fund was his sister's father-in-law, Mr. Petelin, who expressed an interest in the project. In October 2012, Ilyas Khrapunov and Mr. Petelin agreed that Mr. Petelin would provide debt

financing to Triadou to invest in U.S. real estate projects.

10. Since Triadou was a wholly-owned subsidiary of SDG, it was my duty to conduct know-your-customer diligence on Mr. Petelin. In this context, I reviewed documents demonstrating several transactions engaged in by companies owned by Mr. Petelin, one of which was an investment in a significant oil-and-gas asset from which Mr. Petelin netted several hundred million USD. Based on the documents I reviewed, I independently verified through the Internet that the named companies were engaged in real transactions with major international investors. Finally, I reviewed documents on the entity that would provide the funding to Triadou, known as Telford International Limited ("Telford"). These documents showed that Telford was 100% owned by Telford Trust, which in turn belonged to Mr. Petelin's wife, Elena Petelina. Attached as Exhibit 2 is a true and correct copy of the Deed of Trust of Telford Trust that I reviewed during my diligence of Mr. Petelin showing Elena Petelina as the beneficiary.

## IV. Triadou's Investment in the Flatotel Project

11. In or about early November 2012, Triadou invested in the Flatotel condominium project (the "Flatotel") by entering into an operating agreement for CF 135 West Member LLC. Under the terms of this agreement, Triadou would provide 52.5% of all the equity for the project, but would be entitled to 37.5% of the profit.

12. Nicolas Bourg states in his affidavit that he received a fee from the Chetrits at the time that Triadou initially invested in Flatotel. At the time, I did not know, and to my knowledge, no one else at SDG knew, that Mr. Bourg was going to receive some form of direct payment from the Chetrits for the Flatotel project, and the deal documents did not in any way provide for such a payment to Mr. Bourg.

### V. The Sale of SDG to Philippe Glatz

13. Sometime in late 2012, Ilyas Khrapunov was tasked by SDG's shareholders to approach investors who might be interested in purchasing SDG. He approached Mr. Glatz, whom he knew through their mutual involvement in the Christian Democratic People's Party of Switzerland. My understanding of the relationship between Ilyas Khrapunov and Mr. Glatz is that of business acquaintances. To my knowledge, they do not meet socially, and based on the interactions I have observed, I would not describe the two individuals as "friends."

14. Mr. Glatz is a well-known Geneva businessman, who also has investments in Brazil and France. In Geneva, he owns one of the largest private hospitals and has business interests in aeronautics, packaging, and real estate. Although I am not privy to all of Mr. Glatz's finances, I understand, based on working with him for the past three years and on publically available information, that Mr. Glatz's finances were and are sufficient to have purchased SDG and to have continued to support it through the present day.

15. Ilyas Khrapunov formally made the offer to sell SDG and its subsidiaries to Mr. Glatz in late December 2012. Mr. Glatz expressed interest, and the due diligence and deal negotiation process commenced in early January 2013 and closed on 25 March 2013. Mr. Glatz hired an investment bank to conduct the due diligence and prepare a valuation, and retained his own lawyers to work on the deal documents. During that time, Mr. Glatz held multiple meetings with Ilyas Khrapunov and the SDG Board. Based on my 15 years of experience as an investment professional, the transaction was undertaken with all the rigor of a bona fide, arms-length deal.

16. The purchase of SDG by Mr. Glatz involved the purchase of 100% of the equity in SDG Capital SA by Mr. Glatz's company, Greencos S.A. I am not aware, and to my knowledge, no one else at SDG was aware, of any arrangement between Ilyas Khrapunov and Mr. Glatz under which Mr. Glatz purchased SDG with funds loaned to him by Ilyas Khrapunov. In contrast, I know that the sale to Mr. Glatz received intense scrutiny from the Geneva Prosecutor and the Swiss banks investing with SDG, and the purchase was allowed to proceed.

17. Since purchasing SDG, Mr. Glatz has provided several million Swiss Francs of his own funding to support the business. SDG itself holds several real estate investments in Switzerland that far exceed the value of the money owed to Triadou by the Chetrits as a result of the August 2014 Assignment Agreement. SDG also has investments from, and accounts with, various financial institutions in Switzerland, including La Compagnie Privée de Conseils et d'Investissements S.A.

18. As to the $21 million USD owed to Triadou by the Chetrits, when that money is recovered, SDG intends to invest it in one of several current real estate projects it has in Switzerland.

VI.  **Mr. Glatz's Control of SDG and the Role of Ilyas Khrapunov after the Sale**

19. In my experience, it is common practice that when someone purchases a privately held business, they require certain managers of the business to remain after the sale to assist with the transition of ownership, particularly when those managers have in-depth knowledge about the business. Here, it is my understanding that Mr. Glatz made it a condition of the purchase of SDG that for two (2) years following the sale, Ilyas Khrapunov had to remain available as an adviser to the Board, to participate in meetings when so

requested, and to assist Mr. Glatz in interfacing with any partners/counterparts with whom Ilyas Khrapunov originally held the relationship. These requirements were included in the SDG Stock Purchase Agreement ("SPA").

20. While Ilyas Khrapunov remained an adviser, all decisions made at SDG after the sale to Mr. Glatz were made and authorized either by Mr. Glatz personally or, in most cases, by the Board of SDG.

21. Since Mr. Glatz purchased SDG, I have observed Mr. Glatz's active involvement in every aspect of SDG's business, including the investments into U.S. real estate through Triadou. Because the Board of SDG was so actively involved in its management, between April 2013 and the present day, SDG held more than 60 Board meetings. I have been present at most of these meetings, and I was copied on the circulation of the minutes for every meeting. I can confirm based on my attendance at these meetings and my review of the minutes for meetings that I did not attend that Mr. Glatz was present at the majority of these Board meetings and took part in discussing the assets and business matters of SDG.

22. I also personally have had many working meetings and calls with Mr. Glatz in which he instructed me to take certain actions or prepare for him specific information in connection with the management and operations of SDG and its subsidiaries. Since the sale, Ilyas Khrapunov has not been in charge of making payments, disposing or purchasing assets, or anything other than advising the SDG Board and management.

23. As regards Triadou and its U.S. real estate investments, I can confirm that these matters were discussed at multiple SDG Board meetings, including some at which Mr. Bourg was present. Attached hereto as Exhibits 3 and 4 are true and correct copies of

minutes of the Board meetings of SDG held on 26 June 2013 and 6 February 2014. As can be seen on pages 3-4 of Exhibit 3, and on pages 4-5 of Exhibit 4, Mr. Bourg spent a significant amount of time reporting to Mr. Glatz and the SDG Board the status of the Fund and the U.S. investments, including Flatotel. The minutes also reflect that Mr. Bourg received instruction from SDG's Board, which included Mr. Glatz.

24. I also understand that Mr. Bourg had a number of working meetings with Mr. Glatz on the subject of the Fund and concerning the U.S. investments. I was not present at any of these meetings.

### VII. Triadou's Assignment of Its Flatotel Ownership Interest

25. In March and April 2014, the Chetrits informed Triadou that a further capital call was needed from all equity partners in the Flatotel project. While I do not know who specifically with the Chetrits provided this information, I was informed about the capital call by Mr. Bourg's assistant Kevin Meyer in March or April 2014. Shortly thereafter, Triadou informed the Chetrits that it did not wish to participate in this capital call. As a result, the Chetrits offered to buy out Triadou's membership interest in CF 135 West Member LLC. The Chetrits initially approached Ilyas Khrapunov with the buyout offer, and asked him to introduce the offer to Mr. Glatz, as the Chetrits did not know Mr. Glatz at the time. Upon consultation with Mr. Glatz, Mr. Bourg was authorized to negotiate a buyout and commenced such negotiations in April 2014. In late April 2014, Mr. Bourg and Triadou's attorney met with the Chetrits and their attorneys to discuss the structure of the buyout. An email setting forth the agenda for that meeting is attached hereto as Exhibit 5. Furthermore, I understand the meeting occurred because SDG received a report of the meeting from counsel.

## VIII. SDG's Termination of Mr. Bourg

26. As previously mentioned, Mr. Bourg was tasked with incorporating and registering the Fund by mid-2012. By March 2013, when Mr. Glatz purchased SDG, Mr. Bourg still had not been able to complete his tasks with respect to the Fund. Mr. Glatz, as SDG's new owner, allowed Mr. Bourg more time. Despite these extensions, Mr. Bourg still was unable to register the Fund.

27. While working for Triadou, however, Mr. Bourg improperly spent SDG's money. Attached as Exhibit 6 is a true and correct copy of an email I sent to Mr. Bourg on 8 April 2014 (with a translation following). Among those copied is Marc Gilliéron, who was at the time the Chairman of SDG. Exhibit 6 summarizes the expenses incurred by Mr. Bourg and his team over the years of "trying to form the Fund." While some of expenses were legitimate business expenses and fees of external service providers, others were not. Mr. Bourg regularly traveled in First Class (or by private plane or helicopter), and stayed in 5-star hotels at the expense of SDG, including a nine-day "business trip" to New York in which Mr. Bourg invoiced SDG for over 22,000 Swiss Francs for staying at the Four Seasons and multiple visits to the spa.

28. Mr. Bourg was fired as a result of Mr. Glatz's lack of confidence in him resulting from Mr. Bourg's failure to timely register the Fund, his improper expenditures, and other concerns. I understand that it was Mr. Glatz who decided to fire Mr. Bourg, not Ilyas Khrapunov.

Cesare Cerrito

I, Laurent BRECHBUHL, notary public in Geneva/Switzerland, hereby certify the signature affixed hereover by Mr. Cesare CERRITO.
Geneva, May 11th, 2016.




**BRECHBUHL & RODRIGUEZ**
**NOTAIRES**
38, route de Malagnou - Case postale 401
1211 GENEVE 12
Tél. +41 22 707 15 00 - Fax +41 22 735 05 56
E-mail  notaires@brnotaires.com