# EXHIBIT 4

MINUTES OF THE MEETING OF THE BOARD OF DIRECTORS
SDG CAPITAL SA
(the "Company")
6 February 2014

Participants:

| | |
|---|---|
| Marc GILLIERON | Chairman |
| Bernard KATZ | Director |
| Philippe GLATZ | Director |

Attending:

| | |
|---|---|
| Jean-François GARNEAU | CEO |
| Cesare CERRITO | CFO |
| David GAYMARD | Executive Director Development and Acquisitions |
| Nicolas BOURG | Consultant |
| Kevin MEYER | Analyst |
| Agnès COSSU | Chabrier Avocats |

The meeting opened on 6 February 2014 at 10:00 am at the seat of the Company.

\* \* \*

1. **OPENING**

    1.1. **Chairman and Secretary**

    Mr. Marc GILLIERON took the chair, noted that the quorum was present and confirmed that the board of directors might validly deliberate.

    The Chairman appointed Ms Agnès COSSU as secretary, who accepted. He then reviewed the agenda.

    1.2. **Approval of minutes of previous meeting**

    The minutes of the previous meeting held on 29 January 2014 were approved.

    \* \* \*

2. **OVERVIEW AND FUNDING REQUIREMENTS FOR THE GROUP**

Mr. Philippe GLATZ informed the board that some investors were to invest the amount of CHF 10,000,000.- according to the needs of the Company.

The Chairman gave an overview of the situation of J. Safra Sarasin bank (the "Bank"). He confirmed that the Bank agreed on the proposed terms and proposed schedule up to October 2014, without any additional requirement.

He confirmed that the amount of CHF 18,000,000.- was necessary to complete Hôtel du Parc. Consequently, taking into account the above investments, there would yet be a CHF 2,500,000.- shortfall, exclusive of the group's Opex and the funding of the other projects. He then confirmed that the deal with Deutsche Bank in London was no longer necessary though negotiations would continue until the bank was ready to close.

CONFIDENTIAL

Mr. Bernard KATZ enquired whether all those endeavours were viable as the Opex was high, the level of sales was low, the other projects were to be funded too. He enquired whether the outlook could possibly clear up.

The Chairman replied that as far as the liability of the directors of the Company was concerned, this was limited as the board had always done all its best and diligent endeavours to inform the Bank objectively on the situation of the Company and to protect the creditors of the Company. He then added that as far as the situation itself was concerned, this was still a challenging situation but all possible actions were taken in order to solve it.

Mr. Philippe GLATZ was in the opinion that the Igloo project should be sold away and that the board should ascertain the willingness and competence of the officers to achieve this. He was in the opinion that this should be entrusted to an external expert. The Chairman indicated that the project should be clearly allocated to either Mr. Nicolas BOURG or the officers as there had been some overlaps on this project and that the board of the Company should have full authority on this project. The board agreed that this situation should be sorted out during the meeting.

M. Bernard KATZ stressed out the lack of reporting from the officers on some important actions such as the trip to China for which the board had not received any feedback.

The Chairman confirmed that the officers had been very active on marketing actions and that there had been an increasing interest over the past year. He confirmed that once the works are completed, the situation should clear up. As the situation with the Bank was settled, the focus should be on completing the works. The outstanding amounts should be paid to contractors and a financial reserve should be allocated to ensure advance payments to contractors in order to restore their confidence and to prevent any legal mortgage that would automatically terminate the deal with the Bank. The Board agreed that risks of any future legal mortgage should be closely monitored.

\* \* \*

Then the officers joined the meeting.

\* \* \*

Mr. Cesare CERRITO gave an overview of the current situation. He confirmed that the funding requirements were substantial for February 2014. Two scenarii were discussed for resuming and completing the Hôtel du Parc project.

He also highlighted the various funding requirements to be considered for the group's running costs, and overdue costs in other projects. In particular was highlighted the 51 ° project, for which payments have been stopped since September 2013, and although the management team understood the Hôtel du Parc project as the ultimate priority, it was also in their opinion that in order to maintain the value of the investments, some payments would have to be made to keep potential lawsuits at bay, and set the stage for the project continuation. The exercise of the option on the lands for Phase 2 was discussed, representing an amount of CHF 3,500,000.- required for late April. MM. GAYMARD and GARNEAU indicated that they were meeting with the Bourgeoisie in order to negotiate another extension, although the board was also informed that this being the third extension, the Bourgeoisie had indicated there would be no more extension. In all cases a meeting was set for 13 February 2014 in Leukerbad. It was noted that the support documentation did not include the amount of CHF 3,500,000.- relating to the pre-emption right for phase II. Negotiations were ongoing with UBS to address this issue.

The management team informed that some downsizing in the SDG group was ongoing and that efforts were deployed to that effect. 7 people had been let go so far. The management team informed that discussions had taken place and the Company could henceforth share its premises with Adlux Group thus vacating two full floors of premises. Mr. Cesare CERRITO reminded the board ongoing discussions with the landlord, who was expected to accept this continuation of lease, would

CONFIDENTIAL

likely enable the Company to maintain offices on the premises if, and only if, the outstanding rent invoices were settled.

He also recalled the coming payment of the coupon relating to the note.

### 3. HOTEL DU PARC AND FUNDING REQUIREMENTS

#### 3.1. Review of Incoming Funding

The board enquired whether there had been any new deals or sales since the last board meeting. Mr. Jean-François GARNEAU confirmed that there had not at this time.

The board confirmed that the CHF 10,000,000.- loan should be paid by instalments with a first down-payment allowing to cover the expenses for February and March 2014.

#### 3.2. Review of Outstanding Payments

The Chairman informed the officers that the risks of potential legal mortgages had from then to be closely monitored and reported to the board without any delay.

As far as the new legal mortgage issued by LMT for an amount of CHF 300,000.- was concerned, this had to be lifted without delay while fully complying the legal applicable procedure: payment against written waiver from the creditor.

The board informed the officers that the Company should take a new stance towards third parties in order to prove itself a company that meets its commitments rather than a failing company.

***The board required that the officers convene all the pending creditors of Hôtel du Parc in order to inform them that there had been some new funding that allowed the works to resume to completion and that the outstanding payments should be paid immediately.***

The adviser was in the opinion that the officers provide a synoptic table showing all the pending risks of legal mortgages to be updated regularly in order to prevent any single risk of legal mortgage. The board agreed to this.

#### 3.3. Funding Requirements

Mr. Jean-François GARNEAU confirmed that, in order to complete the works, CHF 25,000,000. were required, including CHF 7,000,000.- overdue, CHF 12,000,000.- cost to complete (except penthouse) and CHF 6,000,000.- for penthouse base-build fit-out, which would be committed only when a purchaser is found. The overdue amount of CHF 7,000,000.- could possibly be covered with the proceeds of the sale of unit 4 if the negotiation with the Bank had a positive outcome.

### 4. SARASIN DEAL AND ALTERNATIVE FUNDING

#### 4.1. Deutsche Bank in London

Mr. Cesare CERRITO informed the board that, following the current situation, the bank required some further updated information. The deadline to complete the dossier internally was set to the coming Friday.

Even though the funding needs changed in the meantime thanks to the new agreement with the Bank and the future funding from external investors in the amount of USD 10,000,000.-, the board agreed that negotiations should continue and that a decision should be made once the bank is ready to close. The board agreed that the final deadline for closing should be set to late March 2014.

CONFIDENTIAL

### 4.2. Sarasin Bank

The board informed the officers that, following their latest proposal received the same day, the officers should send the same day a letter confirming the agreement.

### 4.3. Other sources of funding

This item was not addressed independently.

## 5. OTHER PROJECTS

### 5.1. Status of other projects

Igloo Project

The board enquired on the status of the project. Internally, Mr. Cesare CERRITO and David GAYMARD were dealing with the project, currently discussing with Mr. MARTINI, a broker whose services were retained for the purpose of finding construction financing, as well as providing information to a dataroom set up for the use of BNP Paribas bank, which was carrying out its due diligence audit. The management team confirmed that the works were stopped but that a funding was sought urgently. A meeting with BNP Paribas was imminent. It was also reported that Banque Postale showed some interest for a pooling with BNP Paribas.

*The board required a termsheet in order to ease the sale and to make some added-value to the project.*

The board enquired on some current prospects who had demonstrated interest in buying the project. The officers confirmed that they were to send a proposal for EUR 20,000,000.- net for the project. The adviser was in the opinion to commission a real estate broker for this sale such as Jones Lang Lasalle. He also advised to position the product (residence vs hotel). The sale had to be done before spring-time when works actually resume. If the sale could not be concluded before then, then the product would lose some of its appeal and value.

Mr. Jean-François GARNEAU reminded the board that currently the outstanding payments had stopped not only the construction works, but also the finalizing of the project development. More delays could put the project schedule at risk.

*The board confirmed that any opportunity of sale, including direct sales should be considered in order to sell as soon as possible. The board also confirmed that the officers should lead the project.*

\* \* \*

Then MM. Nicolas BOURG and Kevin MEYER joined the meeting.

Mr. Nicolas BOURG gave an overview of the pending projects.

Registration of the fund:

Mr. Nicolas BOURG indicated that he recently met with all the concerned parties for the registration except from officers of the CSSF. He confirmed that the CSSF required additional information. Consequently, failing to receive the agreement of the CSFF within 5 days, Mr. Nicolas BOURG would commission a new legal counsel who would be better known to the CSSF in order to smooth out the process to completion. Apart from the Igloo project, all the projects of the fund were fully equity-financed. He highlighted that a solution was to be sought for as the current situation with the Company was not comfortable and that the absence of a regulated entity would also raise some tax issues as there would be some cash-in from May 2014.

4

He confirmed that alternatively, the fund could be registered in Malta.

<u>Porto Heli Project</u>

The project still needed equity in the amount of EUR 5,100,000.- to be fully financed, and had been subject to some delays in payment from the Company. There had been a proposal of purchase of a portion of the 75% stake, but this failed to close. Alternatively, Dolphin Capital proposed to grant a loan to SPV 5 Ltd in the amount of EUR 5,100,000.-, with a 11% interest rate p.a and a one year maturity with a payment in arrears, annually renewable with the agreement of all parties. As a guarantee, the shares of SPV 5 Ltd held by SPV Porto Heli SA and Dolphin Capital would be pledged, and liberated on a pro-rated basis following reimbursement. This would enable to fund the project to completion without having to contribute additional equity until the project is soldstarts yielding positive cash-flows.

***The board agreed to the subscription of a EUR 5,100,000.- loan by SPV 5 Ltd according to the terms set above.***

<u>Igloo Project</u>

Mr. Nicolas BOURG confirmed that a EUR 25,000,000.- loan was necessary to complete the project. He also confirmed that so far approximately EUR 14,000,000.- had been invested and that an additional EUR 10,000,000 equity contribution was necessary.

He confirmed that he had a discussion with a debt broker for a EUR 8,000,000.- loan with Banque Espirito Santo et de la Vénétie, but that this amount would not be sufficient to finalise the project, and that the counterpart bank would most likely request a first lien on the asset; further financing would hence require a refinancing . He indicated that he had to commission a debt broker as banks such as Crédit Foncier actually declined.

He stressed that a partner should be sought for a 50% equity stake or alternatively the project would have to be sold off entirely.

The adviser was in the opinion to subscribe a EUR 5,000,000.- loan with the above bank in order to clear the debts with GTM and to provide some value to the project.

***The board instructed Mr. Nicolas BOURG to negotiate with the bank for at least EUR 5,000,000.- loan and to try to get a discount on the commission for the broker.***

The Chairman confirmed that the sale would go through Jones Lang Lasalle. The aim was to sell as soon as possible at a price ranging from EUR 15,000,000.- to EUR 20,000,000.- net (for a 100% stake). Mr. David GAYMARD also stressed the need to discuss the matter with Six Senses.

***The board confirmed that MM. Nicolas BOURG and Kevin MEYER had to coordinate constantly and at any time with the officers of SDG Capital SA for the purpose of the sale of the Igloo project.***

\* \* \*

### 5.2. Funding Requirements

This item was not addressed independently.

### 5.3. Sale of Thermal Development SA

The Chairman reviewed the memo issued by Chabrier Avocats hereto attached that highlighted the possible options for the purchase of units according to the LFAIE restrictions. He also advised that the layout of units (*Propriété Par Etage* - "*PPE*") should be completed beforehand and this should take some time. He contemplated a sale to be concluded on the basis of a provisional PPE to be determined at the later stage provided that the purchaser was a Swiss or E.U. national.

5

**CONFIDENTIAL**

Mr. David GAYMARD informed the board that there had been an issue pending relating to the encroachment on an adjoining land which is the property of the municipality, preventing the completion of the PPE. The municipality agreed to the sale of such plot of land at the price to be determined but in the vicinity of CHF 100,000.-. The officers were to meet the notary, as well as the representatives of the Commune and the Bourgeoisie the following week regarding this matter. The parcel needed to be surveyed, agreed to by the parties, then transferred upon payment for the PPE to be finalized.

The Chairman confirmed that as a way round to this issue, a reservation rather than a promise to sell was to be executed.

The Chairman also confirmed that the potential buyer would like to purchase from 1 to 3 units hence the project would henceforth have full self-financing potential (excluding the amount for the purchase of the adjoining plot of land).

### 5.4. Governance of Igloo SPV SA and SPV Megève 1 SCI

This issue was not addressed.

## 6. MISCELLANEOUS

### 6.1. Overall review and rules of communication to third parties

This issue was not addressed.

## 7. WRAP UP AND CLOSE

### 7.1. Next Board Meeting

The next Board meeting was scheduled for Wednesday 5 March 2014 at 3pm.

### 7.2. Close

There being no further business the Chairman brought the meeting to a close at 12:10 pm.

The Chairman                                    The Secretary

CONFIDENTIAL