UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CF 135 FLAT LLC, CF 135 WEST MEMBER LLC and THE CHETRIT GROUP, LLC, <br><br>          Interpleader Plaintiffs, <br><br>    -against- <br><br> TRIADOU SPV S.A., CITY OF ALMATY, a foreign city, and BTA BANK JSC, <br><br>          Interpleader Defendants. | 15 Civ. 5345 (AJN) (SN) |
| CITY OF ALMATY, KAZAKHSTAN and BTA BANK JSC, <br><br>          Crossclaim Plaintiffs, <br><br>    -against- <br><br> MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, and TRIADOU SPV S.A., <br><br>          Crossclaim Defendants. | |

## DECLARATION OF LEE EICHEN

I, Lee Eichen, hereby declare as follows under penalty of perjury.

### BACKGROUND AND QUALIFICATIONS

1.       I am presently a Managing Director and Founding Partner of Centerboard Group, LLC, a boutique financial advisory firm located at 410 Park Avenue, 8th Floor, New York, New York 10022.

2.       I have over 20 years of real estate investment experience, having begun my career in 1995 at Salomon Smith Barney, Inc. Prior to forming Centerboard, I most recently ran the Real Estate Mergers & Acquisitions business of Bank of America Securities, LLC, a leading global investment banking franchise. In that role, I personally advised clients on more than $100

billion of real estate mergers and acquisitions deals from 2006 to 2009, including many industry-leading transactions such as Equity Office Properties ($36 billion buyside of office building real estate investment trust on behalf of Blackstone), Archstone Smith ($22 billion buyside of apartment building real estate investment trust on behalf of Tishman and Lehman) and CNL Lodging ($6 billion sellside of hotel real estate investment trust which included the development and sale of condominimum units to the public).

3.      At Centerboard, in addition to advising on numerous real estate transactions in an advisory role, I am presently the managing member of a dedicated real estate private equity fund which invests in and manages its own development projects.  In that capcacity, I personally oversee all development activity undertaken by the funds' portfolio companies.

4.      I am also currently advising the Department of Justice as asset manager for various real estate assets which were forfeited in connection with the Bernard L. Madoff Ponzi scheme and have worked extensively with Irving Picard, the court-appointed SIPA trustee for Bernard L. Madoff Investment Securities, LLC.  In connection with that assignment, I am familiar with the process of a court-appointed trustee and the accompanying impacts on decision making, project execution and valuation.

5.      Additional information on my educational background and work experience is attached hereto as Exhibit 11.

6.      I have been retained by Boies, Schiller & Flexner LLP, on behalf of the City of Almaty and BTA Bank, to offer my opinion as to the consequences, if any, of judgment enforcement efforts generally, and the imposition of a receiver specifically, on the condominium conversion of the former Flatotel, located at 135 West 52nd Street, New York, New York (the "Flatotel" or the "Project").  In connection with this work, Centerboard has been paid my usual

hourly rate, which is $855.  Other Centerboard employees have assisted me in this work, at their usual hourly rates, which range from $400 to $855.  In sum, Centerboard has billed approximately $31,070 in connection with this assignment.

<u>OVERVIEW OF OPINIONS</u>

7.      In my opinion, enforcement of judgments against the managers of the Flatotel, and certainly the imposition of a receiver, will present a number of grave risks to the Flatotel, and will delay and disrupt construction, deter buyers, and potentially stall the Project entirely. Even the imposition of a very limited receiver will, in my opinion, carry these extreme consequences as the market, vendors, and others will react to the news of a receiver being appointed, rather than the particular features of the receivership.  If a receiver is appointed who has the power to make operational decisions or who must approve payments, the consequences to the Project will be particularly severe as the delay caused by the new receiver familiarizing him- or herself with the project and all of the people involved will deter buyers, frustrate vendors,  and risk the completion of the Project altogether.

8.      A complete list of the documents that I considered in forming the opinions expressed herein is attached as Exhibit 12.

9.      I have also spoken with Matthew Meltsner, the project manager for 135 West 52nd Street Holder LLC (the "Project Manager").

<u>IMPACT ON BUYERS</u>

10.      Appointment of a receiver over the Project will have a significant negative impact on the ability to market and sell new units.  In my experience, the market for high end residential units in New York City is characterized by a limited number of marketing agents, brokers, lawyers, and other professionals.  Trade publications such as "The Real Deal" immediately

publicize news about large developments, and news that a project such as the Flatotel was placed in receivership will sure to be covered.  For example, "The Real Deal" covered extensively the 2010 receivership of a much smaller condominium development, the Sorrento New York, (e.g., David Jones, Receiver appointed at $84 million Midtown hotel and condo foreclosure, The Real Deal, Nov. 23, 2010, available at http://bit.ly/1SJn7aW), and generally covers significant projects in apparent distress (e.g., David Jones, Relying on receivers again, The Real Deal, Apr. 1, 2009, available at http://bit.ly/1X5uNcI (quoting a developer as saying, "I would think the worst thing for the lender and the property is [to hand it over to a] receiver. . . .  Really, a receiver is a last resort.").

11.     I would expect that the appointment of a receiver will be immediately reported by New York real estate media, and in my opinion, based on investing and advising in this market for over 20 years, the uniform perception of the marketplace, regardless of the exact details of the receivership, will be that the Project is experiencing extreme financial distress.  This will lead to strong hesitation by prospective buyers (and the broker community at large), who will be reluctant to become involved in a project that they perceive may ultimately fail and be unable to complete the promised build-out and/or fund startup operating expenses.

12.     Prospective buyers will also be seriously deterred by the fact that receivership will be pereceived as causing – and is in fact likely to cause – a delay in construction, as well as to create uncertainty as to when their units would be available, and to make financing their purchase more difficult and cloud the possibility of resale.

13.     New buyers are critical to the success of the Project, as it currently has 22 units remaining to be sold, representing an expected $148 million in revenue, or approximately 40% of the Project's total expected revenue for sale of residential units.  The inventory remaining

consists of the more expensive, upper-floor units (which range from $8 million to $16 million in asking price) and will be marketed toward more sophisticated purchasers who typically have greater resources in perfoming due diligence and negotiating for concessions as a result of any perceived defect.

14.     The market for such units has softened over the past several months, with more inventory becoming available and prices beginning to slump.  In 2017, it is expected that more than 14,000 new units will become available.

15.     The mere fact that a receiver has been appointed, along with this increase in high-end condominium inventory, will in my opinion place the Project at a serious disadvantage relative to comparable properties on the market.

16.     Moreover, as discussed below, I understand from speaking to the Project Manager that many of the Project's amenities – including the fitness center and pool – have not yet been completed.  Prospective buyers of multi-million dollar units demand these amenities, and the uncertainty created by receivership will impair the sales and marketing of even units that are already substantially complete.

17.     Buyers who are under contract, but have yet to close, will also be significantly disrupted by the appointment of a receiver.  Even where potential buyers are willing to purchase in a development under receivership—possibly after extracting price discounts or other concessions—financing for those purchases will be difficult.  Most buyers rely on some level of financing for purchases in a development such as the Flatotel.  Banks, however, carefully review the circumstances of each new development Project they are lending against and will be reluctant to finance purchases in a development under receivership, limiting even willing purchasers' ability to close.

18.     Although I am not an expert in condominium law, I am aware as an experienced New York City real estate investor that New York General Business Law §352e requires all condominium offerings to file an offering plan with the New York Attorney General's office, and that 13 N.Y.C.R.R. § 20.3(r)(4) requires that offering plan to identify any "special risks" in the project.  Any potential buyer will review the condominium's offering plan and any amendments.  If the appointment of a receiver is considered a special risk that requires an amendment to be filed, or if the receivership is disclosed on an amended offering plan for any other reason, that fact will certainly be noted by any sophisticated purchaser, advised by a real estate attorney.  The disclosure of receivership as a "special risk" in the offering plan will amplify the consequences of publicity, described above, by making buyers and lenders even more hesitant to invest in the Project when there are so many other comparable choices.

19.     In addition, the Flatotel offering plan is referenced in each of the sales contracts of units in the Flatotel. For example, attached as Exhibit 13 is the Purchase Agreement for Unit 31C in the Flatotel. While amendments to the plan generally do not excuse performance by purchasers, that is not the case where an amendment includes a "material adverse amendment." Ex13, at ¶ 3(c). This term is defined in the plan as any change "affecting the rights, obligations or liabilities of then existing purchasers or reducing the undertakings or obligations of [the developer]." (Offering Plan, at 177). Purchasers are able to argue that the addition of a new "special risk" such as a receiver constitutes such a material adverse change, and may seek to withdraw from their contracts.  Alternatively, if the offering plan is not amended, purchasers looking to withdraw from their contracts without sacrificing their deposits may claim that the offering plan needed to be amended, and use that as a reason to break their contracts. Particularly as the Manhattan condominium market shifts in buyers' favor, high-end buyers will

find other, less risky developments to buy into.

20.     Furthermore, buyers nearing closing expect numerous "punch list" items to be completed and construction defects in their units to be remedied prior to closing.  In my experience this process is prone to conflicts arising between buyers and the sponsor, to the extent that some developers even hire specialized companies to handle the punch list process and ensure that a buyer is satisfied and closes as scheduled.  This is especially true in the most expensive units, because they are likely to be the most intricate and customized.  Buyers nearing closing who are dissatisfied with their units (or their decision to purchase at all, in light of prevailing market conditions) will undoubtedly use the appointment of a receiver as an additional reason to back out of their purchase obligation.

21.     Finally, appointment of a receiver will also have a negative impact on buyers who have already closed.  These buyers will perceive that the value of their investment has been impaired and will worry about the orderly completion of construction, the ongoing stability of the Project and the impact on resale of their units.  These concerns are likely to result in litigation which will be expensive to defend and divert management time and resources during a critical point in the Project.

### IMPACT ON OUTSTANDING CONSTRUCTION AND COMPLETION

22.     Based on my discussions with the Project Manager, I understand that significant construction remains to be done on the exterior of the building and common areas in the Flatotel, including the public lobby, the 7th floor amenities (including the fitness center, pool, and residents' lounge), and the roof deck.  Construction and inspections are also required on all floors above the 33rd prior to any Certificate of Occupancy being issued by the New York City Department of Buildings.  At this point in a project such as the Flatotel, first hand knowledge

and experience with the specific issues which arose during construction is critical for all finishing work and inspections.

23.     Appointment of a receiver that displaced the Project's current management would be enormously disruptive.  New management at this phase would inevitably delay finishing construction, as that management would need to be educated on the project's prior issues, current status, and current construction plan before making any decisions.  This Project in particular encountered unique and difficult structural issues due to the age of the building and former use as a hotel, which had to be addressed early on in the construction phase and the remaining work includes some of the more complex items involved in the Project, such as intricate interior work on the most expensive units.  Transferring responsibility for such construction matters would be, at the very least, difficult and time-consuming and likely to lead to delays and increased cost.

24.     Preserving current management, but layering a receiver on top of that structure would create a separate, but still serious set of problems as the same education process would need to precede any decision by the receiver to authorize an expenditure.  I know from my experience in this market generally and from talking to the Project Manager that current management makes numerous operational decisions every day that require the authority to commit funding.  For example, currently, I understand that Joseph Chetrit personally approves the expenditures for many significant change orders, and that the Project Manager has authority to approve smaller expenditures.  The multitude of decisions and expenditures that must be made by management daily would be hindered by a continuing need to educate the receiver on the basis for each management expenditure.  Indeed, a receiver who did not slow the pace of work on the project in order to become familiar with the justifications for all expenditures would likely be violating his or her fiduciary or professional obligations as an agent of the court. To do the

task he or she is appointed to do, the receiver would necessarily have to disrupt the current management and decision making.

25.     Moreover, a receiver would not have the extensive relationships that exist between current management and the various construction crews, architects, consultants, and other professionals who work on the Project.  Currently, those professionals will execute on management's instructions immediately, often without need for documented and approved change orders, in light of their course of dealing with one another over a period of years.  If a receiver is appointed, however, I would expect that those professionals will require written approval of all change orders before undertaking the work, for fear of not being paid.  This will cause continuous delays that will further hinder completion of the Project and deter buyers and lenders.

26.     There is also no efficient procedure for managing disputes between management and a receiver in such a hypothetical receivership, other than referring matters to the Court for resolution.  For example, there are many situations which will arise where management recommends a course of action in order to finish construction and market the remaining units, but the receiver disagrees.  These disputes could very well arise from and be exacerbated by the fact that management is primarily focused on maximizing the overall value of the Project and the receiver is seeking to preserve sufficient value for satisfaction of the existing judgments.  The disputes, if unresolved, could lead management to conclude that it is unwilling to continue to work on the Project if it has limited ability to control the outcome but would retain legal and reputational risk.  Such disputes would presumably need to be brought to the Court, which would inevitably lead to further delay and potentially disrupt the entire Project.

27.     The consequenes of delay to a construction project like the Flatotel are

significant.  When development of a project is delayed, it causes units to be sold more slowly and for lower prices, which in turn depletes the capital available to complete the project, which is a further discentive to buyers and lenders.  This cycle has the potential to stall the entire project, requiring outside funding to complete the work, which is unlikely for any project in receivership in the current market.

## IMPACT ON RELATIONSHIPS WITH THIRD PARTIES

28.    I know from speaking to the Project Manager that current management has developed a relationship and course of dealing over the past several years with various critical third parties who are necessary in successful completion of the Project.  These third parties include the marketing firm, the general contractor, trade suppliers, government departments and agencies, city inspectors, purchasers of the retail and office condos and various others.  Each of these relationships needs to be individually managed based on the circumstances and personalities, and current management has invested a significant amount of time and effort to develop a good working relationship with each of the parties involved.

29.    These relationships are developed over time and are not easily transferrable to a receiver, especially when the Project is so near completion.  At the very least, each of these critical third parties has been operating under a particular strategy and mandate and will be confused by the appointment of a receiver of any type.  Each of these third parties will require clarification and reassurance that the mandate has not shifted and that they will continue to be paid by remaining with the Project.  Some may even require financial guarantees due to the general perception that any court-ordered receivership is accompanied by financial distress.

## ALTERNATIVE TO RECEIVERSHIP

30.    In my opinion, the negative consequences of receivership are grossly

disproportional to the size of the judgments in question.  The sponsor currently has approximately $100 million of equity invested in the Project and has retired all of the secured debt on the project.  The remaining value of units left to be sold (i.e., the anticipated profit) is approximately $150 million.  In contrast, the Judgment Creditor currently holds judgments worth $10.5 million, a fraction of the value of the units remaining to be sold in the Project and roughly the same order of magnitude as the sale of a single remaining condo unit.

31.     I understand that an alternative has been proposed whereby 75% of all net sale proceeds will be placed into escrow until the amount is sufficient to satisfy the outstanding judgments.  In my opinion, this would be a far less disruptive and more appropriate alternative to receivership and would ensure the Project could move forward in an orderly fashion toward completion without the substantial negative impacts from appointment of a receiver, while at the same time providing security for the Judgment Creditor.  Based on the fact that the amount in question is only $10.5 million, I would expect the escrow to be fully funded quickly.

## CONCLUSION

32.     In my opinion, based upon my analysis of relevant documents, my conversation with Mr. Meltsner, and my knowledge of the relevant markets, receivership presents a number of grave risks to the Flatotel, and will delay and disrupt construction, deter buyers, and potentially stall the Project entirely.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: New York, New York
       May 2, 2016

_____
Lee Eichen