UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CF 135 FLAT LLC, CF 135 WEST MEMBER
LLC and THE CHETRIT GROUP, LLC,

                Interpleader Plaintiffs,

    -against-

TRIADOU SPV S.A., CITY OF ALMATY, a
foreign city, and BTA BANK JSC,

                Interpleader Defendants.

---

CITY OF ALMATY, KAZAKHSTAN and BTA
BANK JSC,

                Crossclaim Plaintiffs,

    -against-

MUKHTAR ABLYAZOV, VIKTOR
KHRAPUNOV, ILYAS KHRAPUNOV, and
TRIADOU SPV S.A.,

                Crossclaim Defendants.

15 Civ. 5345 (AJN) (SN)

## SUPPLEMENTAL DECLARATION OF LEE EICHEN

I, Lee Eichen, hereby declare as follows under penalty of perjury.

### BACKGROUND

1.      I previously submitted a declaration dated May 2, 2016, in the above captioned

case (the "May 2 Declaration").  I submit this supplemental declaration to address certain

intervening developments, and to re-affirm the opinions in the May 2 Declaration.

2.      On May 4, 2016, New York State Supreme Court Justice David B. Cohen entered

an order in the case captioned <u>Triadou SPV S.A. v. CF 135 Flat LLC, CF 135 West Member</u>

<u>LLC, and the Chetrit Group LLC</u>, Index no. 653462/2014 (the "State Court Action") establishing

a court-appointed monitorship over 135 Flat LLC, 135 West Member LLC, and the limited

liability company ("LLC") membership interests in 135 West 52nd Street Holder LLC, an LLC majority owned by 135 West Member LLC (collectively with 135 Flat LLC and 135 West Member LLC, the "135 LLCs"), for the sole purpose of monitoring the financial transactions of the Flatotel Condominium project and monitoring and collecting all distributions and any other funds to which 135 Flat LLC and 135 West Member LLC are entitled, up to the amount necessary to satisfy Triadou's judgments in the cases with state court index nos. 653462/2015 and 650239/2015 in the aggregate amounts of $10.5 million together with pre- and post-judgment interest, and any judgments that may in the future be entered in the cases with state court index nos. 154681/2015 and 156907/2015.

3.      In light of the monitorship order, I have been asked to offer my further opinions as to (a) whether a monitorship of the type ordered in the State Court Action would be viewed by the public differently that the receivership that was the subject of my May 2 Declaration; and (b) whether there has been any negative impact from the announcement of the monitorship in the State Court Action.

<u>OPINIONS</u>

4.      First, in my opinion and based upon my experience in the New York real estate market, a monitorship of the type ordered in the State Court Action, regardless of the exact details regarding the scope or purpose of the monitorship, will be viewed by the public (including brokers, lenders, and potential purchasers) same as the appointment of a receiver. In this case, the market's perception of the monitorship order is further influenced by the sensational nature of the foreign money laundering allegations, the complex legal relationship between the State Court Action and this case, and the fact that a real estate monitorship is an unusual arrangement with no commonly recognized scope, powers or purpose.

2

5.      Recently, there has been significant focus on the potential connection between New York City real estate and foreign money laundering.  For example, in mid-January, the Treasury Department's Financial Crimes Enforcement Network ("FinCEN") issued a Geographic Targeting Order aimed at combatting money laundering specifically in New York (and Miami) real estate.  In issuing the order, the Director of FinCEN stated that "We are seeking to understand the risk that corrupt foreign officials, or transnational criminals, may be using premium U.S. real estate to secretly invest millions in dirty money."  A true and correct copy of the Order is attached as Exhibit 36, and a copy of the accompanying press release is attached as Exhibit 37.  Moreover, earlier this month, the presidential administration announced related policies designed to combat noney laundering, including with respect to enhanced customer due diligence of shell companies.  A true and correct copy of The White House's May 5, 2016 announcement is attached as Exhibit 38.  In my experience, the New York real estate market is well aware of these developments, and is acutely focused on the risks of money laundering in real estate projects.

6.      The underlying facts (as alleged) in this case naturally has led to high interest by the press, sophisticated purchasers, and the real estate community generally.  These allegations cast suspicion and doubt on the overall project regardless of the exact nature of the facts, especially in light of the potential penalties associated with money laundering activities.

7.      Due to the complex relationship between this case and the State Court Action, it will also be difficult for the press and the public generally to distinguish between the monitorship remedy ordered in that case and the money laundering allegations in this case.  The fact that there are multiple cases in multiple jurisdictions, each with slightly different parties and different claims, will be extremely hard for any broker, buyer, lender, or journalist to understand without

extensive advice from legal counsel.

8.      Finally, because a monitorship is an unusual arrangement in real estate, the real estate market will assume it a monitorship is essentially the same as a receivership with the same general scope, powers, and purpose.  Buyers, investors, lendors, brokers, and others in the real estate community are generally familiar with a receivership and, as previously discussed in my May 2 Declaration, associate receivership with a distressed project.  Most people are not familiar with a monitorship, which is not often imposed over real estate projects, and how it may differ from a receivership, if at all.

9.      Second, in my opinion there already has been negative impacts of the kind previously identified in my May 2 Declaration from the announcement of the monitorship in the State Court Action.  The appointment of a monitor was reported widely in the New York real estate press.  Moreover, those articles do not merely report the imposition of a monitorship – which would have the effects I described in my May 2 Declaration – but most, if not all, of the articles also focus on the connection between the Flatotel and allegations of foreign money laundering, and do not accurately report the intended limited nature of the monitorship.  See "Dirty Condo Money Seized by Courts," "Two Alleged Kazakh Criminals May Have Tried to Launder $40M in Chetrit Project," "Some Proceeds from Condo Sales at Flatotel Conversion Will Be Held," and "Portion of Profits From Chetrit's Flatotel Will be Frozen Pending Money Laundering Allegations."  True and correct copies of these articles are attached as Exhibits 39, 40, 41 and 42.

10.      I understand that the reports of monitorship has already led to concerns among buyers and existing owners, which were expressed in a a recent owners' meeting.  This further confirms my opinion that the imposition of a monitor will have the same effects as a receiver, as

discussed in my May 2 Declaration.

11.     A complete list of the documents that I considered in forming the opinions

expressed herein is attached as Exhibit 43.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  New York, New York
        May 14, 2016

_____
Lee Eichen