# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CF 135 FLAT LLC, CF 135 WEST MEMBERS LLC, and THE CHETRIT GROUP, LLC, | ECF Case |
| Interpleader Plaintiffs, | No. 15 CV 05345 (AJN) |
| - against - | |
| TRIADOU SPV S.A. and CITY OF ALMATY, a foreign city, | |
| Interpleader Defendants. | |
| CITY OF ALMATY, KAZAKHSTAN and BTA BANK JSC, | |
| Crossclaim Plaintiffs, | |
| - against - | |
| MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, and TRIADOU SPV S.A., | |
| Crossclaim Defendants. | |

# TRIADOU'S CONCLUSIONS OF LAW
## IN OPPOSITION TO THE CITY OF ALMATY AND BTA BANK'S
## MOTIONS FOR PRELIMINARY INJUNCTION AND ATTACHMENT

BLANK ROME LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174-0208
Telephone: (212) 885-5000
Facsimile: (212) 885-5001

*Attorneys for Crossclaim Defendant
Triadou SPV S.A.*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT ........................................................................... 1

ARGUMENT ...................................................................................................... 2

I.    ALMATY/BTA ARE NOT ENTITLED TO THE HARSH REMEDY OF
      ATTACHMENT .......................................................................................... 2

II.   THE EVIDENCE, WEIGHING STRONGLY IN TRIADOU'S FAVOR, DOES NOT
      SUPPORT ALMATY/BTA'S CLAIMS ...................................................... 2

      A.    Nicolas Bourg's Testimony Is Not Credible ................................... 3

      B.    Cerrito's Testimony Is Credible ...................................................... 8

      C.    The UK Judgments Have No Evidentiary Value As To Triadou ......... 12

      D.    Almaty/BTA Are Not Entitled To A Missing Witness Adverse Inference ......... 14

III.  ALMATY/BTA CANNOT SHOW THE REQUISITE "STRONGER PROOF" OF A
      PROBABILITY OF SUCCESS ON THEIR CLAIMS .................................... 17

      A.    Almaty/BTA Cannot Establish Predicate Acts By Triadou In Support Of Their
            RICO Claims ................................................................................ 17

      B.    Almaty/BTA's Common Law Claims Will Fail ................................ 20

      C.    Almaty/BTA's Fraudulent Transfer And CPLR § 5239 Claims Cannot Act As
            Predicate Claims For An Attachment Order .................................... 22

IV.   ALMATY/BTA CANNOT SHOW THAT CPLR §§ 6201(1) OR (3) APPLIES ......... 23

      A.    Almaty/BTA Have Not Made The Heightened Showing Required Under
            § 6201(1) ..................................................................................... 23

      B.    Section 6201(3) Does Not Apply Because Almaty/BTA Cannot Show Triadou
            Has The Requisite Fraudulent Intent ............................................. 25

V.    EVEN IF THE COURT FINDS THAT ALMATY/BTA HAVE SATISFIED THE
      STRICT STATUTORY ELEMENTS FOR ATTACHMENT, IT SHOULD EXERCISE
      ITS DISCRETION TO DENY THE MOTION ............................................. 29

VI.   ALMATY/BTA ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION ......... 30

      A.    The Evidence Adduced Fails To Establish Irreparable Harm From Any Source,
            And Transfer Of The Judgment Proceeds Alone Does Not Warrant An Injunction
            ..................................................................................................... 30

            1.    No Harm Can Arise From "Mooting" An Invalid CPLR § 5239 Claim . 31

            2.    The Harm To The Flatotel Project From The Monitorship Is Speculative.
                  ........................................................................................... 32

i

3.      Triadou's Disclosed Intent To Transfer Assets, Without The Requisite
Intent To Frustrate Judgment, Cannot Lead To Irreparable Harm. .......... 34

B.      Almaty/BTA's Claims Are Not Likely To Succeed On The Merits ................... 35

C.      The Relevant Public Interest Is That Of The Swiss Authorities, Not FinCEN ..... 35

CONCLUSION .................................................................................................................. 35

TABLE OF AUTHORITIES

Page(s)

<u>Cases</u>

*Adelson v. Hananel*,
    652 F.3d 75 (1st Cir. 2011) .................................................................................15

*Allstate Ins. Co. v. Rozenberg*,
    771 F. Supp. 2d 254 (E.D.N.Y. 2011) .................................................................20

*Ally Bank v. Reimer*,
    No. CV 09-2795 (ADS) (WDW), 2010 WL 446025 (E.D.N.Y. Jan. 29, 2010)...............22, 23

*Ames v. Clifford*,
    863 F. Supp. 175 (S.D.N.Y. 1994) ...................................................23, 24, 25, 29

*Ayyash v. Bank Al-Madina*

    3 F.R.D. 325, 327 (S.D.N.Y. 2005) .....................................................................20

*Bank of China, New York Branch v. NBM L.L.C.*,
    192 F. Supp. 2d 183 (S.D.N.Y. 2002)............................................................2, 23, 24

*Bell & Howell: Mamiya Co. v. Masel Supply Co.*,
    719 F.2d 42, 45 (2d Cir. 1983)...........................................................................31

*Boucher v. U.S. Suzuki Motor Corp.*,
    73 F.3d 18, 22 (2d Cir. 1996)) ...........................................................................33

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*,
    373 F.3d 296 (2d Cir. 2004)...............................................................................20

*Brooks v. Outboard Marine Corp.*,
    234 F.3d 89 (2d Cir. 2000).................................................................................34

*Buckley v. Deloitte & Touche USA LLP*,
    888 F. Supp. 2d 404 (S.D.N.Y. 2012), *aff'd*, 541 F. App'x 62 (2d Cir. 2013).......................33

*Buy This, Inc. v. MCI Worldcom Commc'ns, Inc.*,
    178 F. Supp. 2d 380 (S.D.N.Y. 2001)...............................................................25

*Chevron Corp. v. Donziger*,
    974 F. Supp. 2d 362 (S.D.N.Y. 2014)...............................................................12

*Computer Strategies, Inc. v. Commodore Bus. Machs., Inc.*,
    105 A.D.2d 167, 483 N.Y.S.2d 716, 721 (2d Dep't 1984)...............................25, 29

*Considar, Inc. v. Redi Corp. Establishment*,
   238 A.D.2d 111 (1st Dep't 1997) ................................................................24

*Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Brookville CDO I Ltd.*,
   No. 08-Civ-9565, 2008 WL 5170178 (S.D.N.Y. Dec. 10, 2008) .......................34

*Cruz v. FXDirectDealer, LLC*,
   720 F.3d 115 (2d Cir. 2013) ........................................................................17

*Cruz v. TD Bank. N A.*,
   22 N.Y.3d 61, 979 N.Y.S.2d 257 (2013) ........................................................31

*DLJ Mortgage Cap., Inc. v. Kontogiannis*,
   594 F. Supp. 2d 308 (S.D.N.Y. 2009) .................................................. *passim*

*Eastman Kodak Co. v. Camarata*,
   No. 05-CV-6384L, 2006 WL 3538944, at *15 (S.D.N.Y. Dec. 6, 2006) ...............21

*Elton Leather Corp. v. 1st Gen. Res. Co.*,
   138 A.D.2d 132, 529 N.Y.S.2d 769 (1st Dep't 1988) ......................................24

*Encore Credit Corp. v. LaMattina*,
   No. 05-CV-5442, 2006 WL 148909, at *3 (E.D.N.Y. Jan. 18, 2006) ...............25, 26

*In re Feit & Drexler, Inc.*,
   760 F.2d 406 (2d Cir. 1985) .......................................................................34

*Ferrauiolo v. Wescott*,
   183 A.D.2d 471, 583 N.Y.S.2d 416 (1st Dep't 1992) ......................................31

*First Cap. Asset Mgmt. v. Satinwood*,
   385 F.3d 159 (2d Cir. 2004) .......................................................................20

*Giles v. Rhodes*,
   171 F. Supp. 2d 220 (S.D.N.Y. 2001) ...........................................................34

*ITC Entm't, Ltd. v. Nelson Film Partners*,
   714 F.2d 217, 219 (2d Cir. 1983) ................................................................24

*Kamerling v. Massanari*,
   295 F.3d 206 (2d Cir. 2002) .......................................................................31

*Lerwick v. Kelsey*,
   150 F. App'x 62 (2d Cir. 2005) ...................................................................19

*LiButti v. United States*,
   107 F.3d 110 (2d Cir. 1997) .......................................................................16

iv

*Lutin v. New Jersey Steel Corp.*,
    122 F.3d 1056, 1997 WL 447005 (2d Cir. 1997) .................................................19

*Man Wei Shiu v. New Peking Taste Inc.*,
    No. 11-CV-1175 (NGG) (RLM), 2013 WL 2351370 (E.D.N.Y. May 28,
    2013) .................................................................................................................29

*Martinez v. Cap. One, N A.*,
    No. 10-CV-8028 (RJS), 2014 WL 4179866 (S.D.N.Y. Aug. 20, 2014).................................31

*Meridien Int'l Bank Ltd. v. Gov't of Republic of Liberia*,
    No. 92 Civ. 7039 (AGS), 1996 WL 22338 (S.D.N.Y. Jan. 22, 1996) .............................23, 24

*NAACP v. Town of E. Haven*,
    70 F.3d 219 (2d Cir. 1995)...................................................................................32

*Nat'l Audubon Soc., Inc. v. Sonopia Corp.*,
    No. 09 Civ. 975 (PPG), 2009 WL 636952 (S.D.N.Y. Mar. 6, 2009) ...........................2, 3, 14

*New York Dist. Council of Carpenters Pension Fund v. KW Constr., Inc.*,
    No 07-CV-8008, 2008 WL 2115225 (S.D.N.Y. May 16, 2008) ...............................25, 26, 28

*Nipper v. Snipes*,
    7 F.3d 415 (4th Cir. 1993) ...................................................................................12

*Pac. M. Int'l Corp. v. Raman Int'l Gems, Ltd.*,
    888 F. Supp. 2d 385 (S.D.N.Y. 2012)......................................................................21

*Passlogix, Inc. v. 2FA Tech., LLC*,
    708 F. Supp. 2d 378 (S.D.N.Y. 2010)......................................................................34

*Reading & Bates Corp. v. Nat'l Iranian Oil Co.*,
    478 F. Supp. 724, 726 (S.D.N.Y. 1979)....................................................................24

*Rep. of Haiti v. Duvalier*,
    211 A.D.2d 379, 626 N.Y.S.2d 472 (1st Dep't 1995) ...................................................21, 22

*Royster v. Ercole*,
    06 CIV 12942 SASJCF, 2008 WL 542505 (S.D.N.Y. Feb. 29, 2008 ...................................16

*Sagendorf-Teal v. Cty. of Rensselaer*,
    100 F.3d 270 (2d Cir. 1996)..................................................................................16

*Skyline Steel, LLC v. PilePro, LLC*,
    No. 13-CV-8171, 2015 WL 5076695 (S.D.N.Y. Aug. 27, 2015).........................................29

*Strategic Growth Int'l, Inc. v. RemoteMDx, Inc.*,
    No. 06-CV-3915, 2008 WL 4179235, at *8 (S.D.N.Y. Sept. 10, 2008)................................25

*Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.*,
    5 Misc. 3d 285, 783 N.Y.S.2d 758 (Sup. Ct. N.Y. Cnty. 2004) .............................................30

*Trafalgar Power, Inc. v. Aetna Life Ins. Co.*,
    131 F. Supp. 2d 341 (N.D.N.Y. 2001) ...................................................................................22, 23

*Tribune Co. v. Purcigliotti*,
    No. 93-7222, 1996 WL 337277 (S.D.N.Y. June 19, 1996) .........................................................8

*United States v. S. Cal. Edison Co.*,
    300 F. Supp. 2d 964 (E.D. Cal. 2004) .....................................................................................12

Statutes

18 U.S.C. § 1962 ............................................................................................................................17

CPLR § 5239 ..............................................................................................................22, 23, 31, 32

CPLR § 6201 .........................................................................................................2, 23, 24, 25 29

CPLR § 6212(a) ...............................................................................................................................2

Triadou SPV S.A. ("Triadou") respectfully submits its conclusions of law in opposition to the motions of the City of Almaty ("Almaty") and BTA Bank JSC ("BTA") (collectively, "Almaty/BTA") for an injunction (ECF No. 106) and attachment (ECF No. 140).

## PRELIMINARY STATEMENT

Almaty/BTA have an uphill battle on their injunction motion, where they concede that the ultimate relief sought is money damages.  Not surprisingly, none of their three concocted theories of irreparable harm is legally tenable.  Apparently recognizing this insurmountable problem, Almaty/BTA shifted their focus to their subsequently filed attachment motion.  But Almaty/BTA cannot satisfy the heavy burden necessary to obtain the harsh remedy and drastic action of an attachment – particularly where the evidence on which Almaty/BTA rely is so weak. Almaty/BTA's principal source of evidence is Triadou's terminated director Nicolas Bourg, an admitted bribe-taker who has "nothing to lose," has axes to grind against Triadou, its parent Swiss Development Group ("SDG"), and Ilyas Khrapunov, and had several apparent inconsistencies in his testimony.  Almaty/BTA also rely on judgments from the United Kingdom (the "UK Judgments") against Mukhtar Ablyazov and Khrapunov, neither of whom is a target of the pending motions, and therefore have no evidentiary value as to Triadou.  Almaty/BTA is thus left to resort to innuendo and distortion of the record in a futile attempt to link Triadou to the murky "Ablyazov-Khrapunov families" and alleged criminal conduct that occurred years ago in Kazakhstan.

Given the gaps and other infirmities in their adduced proof, Almaty/BTA have failed to establish the requisite elements for their motions for attachment and a preliminary injunction – both of which should therefore be denied.

1

# ARGUMENT

## I.   ALMATY/BTA ARE NOT ENTITLED TO THE HARSH REMEDY OF ATTACHMENT

To obtain an order of attachment under New York law, a movant must demonstrate that (1) it has stated a claim for a money judgment; (2) it has a probability of success on the merits; (3) one or more grounds for attachment set out in CPLR § 6201 exists; and (4) the amount demanded exceeds all counterclaims[1] known to the party.  CPLR § 6212(a); *Bank of China, New York Branch v. NBM L.L.C.*, 192 F. Supp. 2d 183, 187 (S.D.N.Y. 2002).  "The remedy of attachment is recognized to be harsh and extraordinary," *Bank of China*, 192 F. Supp. 2d at 186; and the statutory factors "must be strictly construed in favor of those against whom attachment is sought," *DLJ Mortgage Cap., Inc. v. Kontogiannis*, 594 F. Supp. 2d 308, 319 (S.D.N.Y. 2009) (internal quotations and citation omitted).  This strict construction requirement imposes a "heavy burden" on the plaintiff.  *Nat'l Audubon Soc., Inc. v. Sonopia Corp.*, No. 09 Civ. 975 (PPG), 2009 WL 636952, at *2 (S.D.N.Y. Mar. 6, 2009).  And, even if the plaintiff satisfies the statutory criteria, "the issuance of this relief is discretionary, and the Court must exercise care in its application." *Bank of China*, 192 F. Supp. 2d at 186.

Almaty/BTA cannot bear this heavy burden with their sketchy evidence – innuendo, non-existent inferences and speculation result in claims unlikely to succeed and the absence of grounds for attachment.

## II.   THE EVIDENCE, WEIGHING STRONGLY IN TRIADOU'S FAVOR, DOES NOT SUPPORT ALMATY/BTA'S CLAIMS

To show a probability of success on the merits, Almaty/BTA must demonstrate through evidence "that it is more likely than not that it will succeed on its claims." *DLJ Mortgage*, 594 F.

---

[1]  Because of its pending dismissal motion, Triadou has not asserted any cross- or counterclaims. For purposes of this motion, Triadou does not contest this fourth element.

Supp. 2d at 319.  While Almaty/BTA claim they are entitled "to have all inferences drawn in their favor," COL[2] at 8 n.1, ample case law confirms that they are entitled only to *legitimate inferences* from the evidence.  *See id.*; *Nat'l Audubon Soc.*, 2009 WL 636952, at *2.  Even in light of this entitlement, Almaty/BTA "nevertheless must make an evidentiary showing of proof stronger than that required to establish a prima facie case in order to satisfy this requirement."  *DLJ Mortgage*, 594 F. Supp. 2d at 319 (internal quotations and citations omitted).

Almaty/BTA thus had every incentive to provide the Court with the best evidence in their possession.  Yet, despite litigating for several years in multiple jurisdictions, Almaty/BTA has mustered only the testimony of a biased witness with secondhand knowledge and substantial credibility issues, an attempt to shift its burden to Triadou by seeking adverse inferences regarding non-parties, and foreign judgments that carry no evidentiary weight and relate to individuals who are not the target of Almaty/BTA's motions – evidence that fails to meet the requisite "stronger" showing of proof.

> A.    <u>Nicolas Bourg's Testimony Is Not Credible</u>

Almaty/BTA rely almost exclusively on the testimony of Nicolas Bourg for their assertions regarding Triadou.  Indeed, if the Court finds that Bourg is not credible, Almaty/BTA have no hope of meeting their heavy burden.  But Bourg's testimony is not credible for a host of reasons, including his substantial and admitted bias against Triadou, SDG, and Ilyas Khrapunov, his admission to taking bribes from the Chetrits while negotiating on Triadou's behalf, his admission to obtaining a release from Almaty/BTA in return for his testimony and cooperation, and various inconsistencies between his declarations and documentary evidence.

---

[2]  References to "COL" are to Almaty/BTA's Proposed Conclusions of Law (ECF No. 166);  "FOF" refers to Almaty/BTA's Proposed Findings of Fact (ECF No. 165); "CSF" refers to Triadou's counter-statement of facts, which includes cited facts and exhibits in its responses to Almaty/BTA's FOF and Triadou's own proposed findings of fact.

***Bourg's Bias***.  Bourg has clear bias against Triadou, SDG, and Ilyas Khrapunov.  SDG terminated Bourg's directorship of Triadou on November 13, 2014, CSF ¶¶ 63, 117; Bourg has described his termination as "not an elegant move" and showing a "lack of respect," claiming that SDG "kicked me out of Triado[u] without telling me anything," CSF ¶ 234.[3]  Bourg also claims that Triadou owes him "a substantial amount of money," as to which his lawyer made certain demands.  CSF ¶ 235.

Bourg's recorded meetings with Joseph Chetrit ("Chetrit") – made without Chetrit's knowledge – also reveal Bourg's substantial bias.  Bourg stated that Khrapunov purportedly denounced loans to Bourg, so that he and Khrapunov "are no longer on friendly terms." CSF ¶ 238.[4]  Bourg further declared that "[t]hat guy [Ilyas] shows no appreciation for all that I've done for him."  *Id.*  In response to all of these actions, Bourg had lawsuits prepared against Triadou and Khrapunov that he never filed.  CSF ¶ 239.  He did, however, tell Chetrit, "I have just drawn the conclusions I had to draw and I'll do what I think is best," and described those who he believed had wronged him as "stupid because I [Bourg] have nothing to lose."  CSF ¶¶ 197, 234.

***Bourg's Bribes***.  Aside from his bias, Bourg admitted to taking bribes from Chetrit in connection with Triadou's investment in the Flatotel project while acting as Triadou's sole director, and attempted to collect the unpaid portions of those bribes in his meetings with Chetrit on March 22-23, 2015, stating, "There was a 1 million commission for the deal," and acknowledging that "on the one hand, the commission, you have already paid 400 [thousand].  You still owe 600 [thousand]."  CSF ¶ 236.  Bourg reiterated, "For Flats.  We struck a deal.  A first

---

[3]  Cesare Cerrito ("Cerrito") testified, and attached evidence confirming, that Bourg was terminated from SDG because Philippe Glatz ("Glatz") lost confidence in him due to Bourg's failure to timely register the investment fund and Bourg's unauthorized expenditures.  CSF ¶ 233.

[4]  Later in the meeting, Bourg clarified that the loans relate to his company Niel, and stated that "there is no reason for me to help [Ilyas Khrapunov]."  CSF ¶ 197.

payment was made and then you paid nothing else." *Id.* Chetrit did not dispute these facts, stating that Bourg received a commission for both Triadou's initial investment in Flatotel and its later assignment back. *Id.* ("No . . . you got something. You received something for each deal that we made. [inaudible] In that deal you were paid 100."). Taking a bribe from the counterparty to a deal while acting as a fiduciary to Triadou is a conflict of interest that drastically undermines Bourg's credibility.

**_Bourg's Inconsistencies_**. The evidence also reveals major inconsistencies in Bourg's declarations. In his first declaration, Bourg testified that "In response [to Almaty's California Action], Ilyas [Khrapunov] directed me to begin liquidating Triadou's assets in New York so that funds could be removed from the United States and concealed elsewhere." Bourg Decl. ¶ 38; *see also id.* ¶ 39 ("I contacted Chetrit, explaining that the threat of *the litigation* in California required Triadou to liquidate and transfer their assets out of the United States.") (emphasis added). In his supplemental declaration, Bourg reaffirmed this testimony, stating that Triadou assigned its Flatotel interest "in response to *the litigation* against [Khrapunov's] family in California." Bourg Supp. Decl. ¶ 5 (emphasis added).[5] These statements are not supported by the record.

Cerrito testified that in March or April 2014, *before* the filing of the California Action, the Chetrits approached Triadou for another capital call in connection with the Flatotel, and in which Triadou did not wish to participate. CSF ¶¶ 224-25. Almaty/BTA's own evidence confirms that this capital call was not expected. *See* CSF ¶ 88 ("No further capital call shall take place until the project's completion, which is due in 4Q2015"). In response to Triadou's declination, the Chetrits offered to "buy out Triadou's membership" in the Flatotel project, and negotiations about a potential assignment occurred *before* the California action was filed. CSF ¶¶ 159, 225-27. The

---

[5] Almaty/BTA do not cite Bourg's supplemental declaration in their FOF.

Assignment Agreement confirms that the Chetrits paid Triadou the first $1 million for the assignment on May 9, 2014, CSF ¶ 159, before Almaty filed the California Action on May 13, 2014, CSF ¶ 157.  Ultimately, even Bourg acknowledged on cross examination that negotiations for the assignment occurred *before* Almaty's California suit was filed.  CSF ¶ 159.  The evidence simply does not support Bourg's initial testimony that he was instructed to liquidate Triadou's New York assets *in response to* (i.e., after) the filing in California.

Bourg's testimony about his sparse meetings with Glatz also has been refuted.  Bourg claimed that

> during all the years that I ran Triadou . . . I *never saw* Glatz in any meetings . . . .  I only met Glatz on three occasions, for approximately 10 minutes each time, and he never discussed SDG's or Triadou's operations in those brief meetings, which were purely social.

Bourg Decl. ¶ 34 (emphasis added).  Several pieces of evidence eviscerate this testimony.  First, Triadou Exhibits 3 and 4 are minutes from two SDG board meetings – not social gatherings – held after the sale to Glatz, both of which Glatz and Bourg attended.  Both meetings involved discussions of SDG investments, and in one of those meetings, Bourg presented information regarding Triadou's investments.  CSF ¶¶ 221-23.  Second, it is undisputed that SDG held more than 60 board meetings after Glatz acquired the company and that Glatz was present at the majority of those meetings.  CSF ¶ 220.[6]  Cerrito, the source of this evidence and SDG's CFO since 2009, has certainly played a larger role as a chief officer of his own company than did Bourg, an outside consultant acting as director for one subsidiary of SDG.

In any event, even Bourg's supplemental declaration steps back from his initial testimony, stating that Glatz "may have attended" some presentations Bourg made to SDG.  Bourg Supp.

---

[6]  This evidence also contradicts Bourg's testimony that Khrapunov continued to control SDG after the sale to Glatz.  *Compare* CSF ¶ 219 *with* Bourg Decl. ¶ 33.

Decl. ¶ 8.  Then, on cross examination, Bourg offered the bizarre excuse that he did not consider SDG board meetings to constitute instances in which he "met" Glatz because he believes a "meeting [] involves an interaction between two individuals."  CSF ¶ 230.[7]

Finally, Bourg testified that in his secret recordings, "Ilyas is referred to by the pseudonym 'Pedro.'"  Bourg Decl. ¶ 46.  But the transcripts of those recordings reflect that Khrapunov was referred to as "Elias."  *See* Almaty/BTA Ex. 9.  More tellingly, Almaty/BTA did not adopt Bourg's testimony and instead contradict it by positing that it is Viktor Khrapunov who is referred to as "Pedro" in the recordings.  CSF ¶ 137.

***Other Credibility Issues***.  Beyond the questionable substance in Bourg's declarations, the declarations themselves raise serious questions about his credibility.  Both declarations are written in English, and as the Court noted, "[t]his declaration came in in English, in fluent English, without a French translation.  I think assumptions could have been made based on that."  Hr'g Tr., at 83:23-25 (May 19, 2016) ("Tr.").  The documentary evidence also indicates that Bourg transacts business in English.  CSF ¶ 229.  It is reasonable to infer from these facts that Bourg "needed" a translator to hinder the Court's and the parties' ability to assess his credibility.[8]

---

[7]  Given Bourg's change in testimony from his initial to his supplemental declaration, his statement that "I cannot recall him [Glatz] or his representatives asking me a single question or offering any comments regarding Triadou's operations or investments" is not credible.  Bourg Supp. Decl. ¶ 8.  In any event, Bourg's testimony is that that he "cannot recall," not that such interaction never happened, and the documentary evidence confirms that it did happen.  CSF ¶ 222.  Thus, Bourg's memory regarding Glatz's involvement is, at best, shaky.

[8]  The accuracy and completeness of Bourg's declarations are also subpar.  Both declarations misspell his first name, Bourg Decl. at 13; Bourg Supp. Decl. at 4, and Bourg's first declaration has an unfilled bracket "[year]" that Bourg could not answer in court, saying he would have to think about it, Tr. 71:8-9.

7

Other concerns with Bourg's credibility include (a) he was testifying on behalf of, and cooperating with, Almaty/BTA in exchange for a legal release, CSF ¶ 240;[9] (b) Bourg's proffered recordings with Chetrit were made without Chetrit's knowledge; (c) Bourg's recordings reflect disputes over investments made by Chetrit into separate Bourg investments that Triadou was told were for $6 million, but which Bourg acknowledged was only $4.2 million (the difference in which Bourg expected to collect as a "commission" from Chetrit), CSF ¶ 237; (d) Bourg's testimony as to the present status of Triadou, SDG, Khrapunov, or Cerrito is not credible given that he was terminated by SDG in November 2014, CSF ¶¶ 63, 117; and (e) most of Bourg's information was secondhand, allegedly from Ilyas Khrapunov (*see, e.g.*, Bourg Decl. ¶¶ 9, 10, 20).  Regardless, it is not credible that Khrapunov, whom Almaty/BTA assert is subject to several criminal investigations in multiple jurisdictions since at least 2012, would share intimate details of purported criminal activity (his and others') based on a limited business relationship with Bourg.

### B.      **Cerrito's Testimony Is Credible**

In contrast to Bourg's testimony, the evidence provided by Cerrito is direct and credible.

***Cerrito's Knowledge of SDG's Operations Is Solid***.  Cerrito, Triadou's current director, has been SDG's CFO since November 2009, two years before Bourg was retained as a consultant to the company.  CSF ¶¶ 49, 60.  Cerrito was hired while Khrapunov was SDG's Chairman, and remained the CFO when Khrapunov stepped down to the role of advisor, and after Glatz purchased SDG in early 2013.  CSF ¶¶ 43, 45, 49.  Cerrito is thus well-situated to testify about the workings of SDG and provided ample testimony that SDG's Board (not Khrapunov) made the decisions for the company.  CSF ¶¶ 60-61, 69, 149.  He further testified that neither Ablyazov nor Viktor

---

[9] *See Tribune Co. v. Purcigliotti*, No. 93-7222, 1996 WL 337277, at *2-3 (S.D.N.Y. June 19, 1996) (noting that settlement between witness and party may bear "on the issues of his bias and prejudice," including where agreement obtained witness's cooperation).

Khrapunov provided funding to, or played any role at any time in, SDG.  CSF ¶¶ 67, 69, 206.  And when asked whether he saw Glatz engaging in "anything that was not legitimate in terms of his business dealings at SDG," Cerrito testified unequivocally, "Never."  Tr. at 151:7-11.  Given his seven years of service as CFO of SDG – as opposed to Bourg's three years as a consultant who was fired – Cerrito's testimony on what he witnessed at SDG is entitled to substantial weight.

**_SDG's Sale Was Legitimate_**.  While Almaty/BTA repeatedly assert that the purchase price of SDG evidences that the transaction was a "sham" (COL at 2-3), that argument ignores reality.  Cerrito testified that he witnessed Glatz's due diligence regarding SDG, which included the hiring of an investment bank and retention of legal counsel.  CSF ¶¶ 128, 131.  As SDG's CFO, Cerrito was best situated to know that the purchase price of 3.5 million CHF was appropriate because SDG's assets and liabilities were almost equal.  CSF ¶¶ 55, 133.  SDG's higher enterprise value reflected only the company's assets and potential future value, which is confirmed (as Almaty/BTA note) by Cerrito's testimony that SDG to this day has not turned a profit.  CSF ¶ 54.[10] Almaty/BTA's references to the valuation of Triadou's assets as in the hundreds of millions is misleading, as those valuations were prepared by Bourg as Triadou's sole director.  CSF ¶¶ 63, 89. Bourg had every incentive to inflate the value of the Flatotel investment in selling it to SDG because he had negotiated to receive a commission from the Chetrits for finalizing the deal (and another one for the assignment of the interest back to the Chetrits).  *See* CSF ¶¶ 89, 236.[11]

---

[10]  Almaty/BTA's argument that SDG's equity value was the same before and after the assignment of Triadou's Flatotel interest (COL at 2) is a non-sequitur, as it ignores that the value of other SDG investments also could have changed in that timeframe.

[11]  The value of Triadou's investments alone does not contradict Cerrito's testimony; SDG had other projects, including several in Switzerland.  CSF ¶¶56, 215.  Almaty/BTA offer no evidence on the equity value of those investments, and thus cannot undercut Cerrito's direct testimony.

Ample record evidence nonetheless confirms that SDG had substantial debt. Almaty Exhibit 6 notes $75 million in loans to Triadou as of May 2013. CSF ¶194. That document also confirms that Telford is Triadou's creditor. Almaty/BTA Ex. 6 at 4 (arrow from Telford to Triadou titled "Debt"); *see also* CSF ¶ 194 (Telford provided debt financing to Triadou). Almaty/BTA admit as much, noting that Telford provided millions in funding on Triadou's behalf. CSF ¶¶ 92, 99-108. And the Black Sea Bank valued SDG as having a "negative equity of CHF 28.5 million" just after Glatz's purchase,[12] which, if true, would mean the sale relieved Khrapunov of substantial debt. *See* CSF ¶¶ 146, 194.

***Cerrito Performed Diligence on Telford***. Almaty/BTA also attempt to compare Bourg's testimony regarding Telford with Cerrito's testimony. There is no comparison. Cerrito testified that he personally conducted know-your-customer diligence on Telford's owner, Gennady Petelin, that revealed several transactions by Petelin's companies, including one that netted several hundred million USD in the oil-and-gas sector. CSF ¶ 190. Cerrito also reviewed documents demonstrating that Telford International Limited, the entity that provided funding to Triadou, was fully owned by Telford Trust, which was beneficially owned by Petelin's wife, Elena Petelina. *Id.* Almaty/BTA do not dispute this testimony.

In contrast, Bourg has only secondhand information he claims to have heard from Ilyas Khrapunov, Bourg Decl. ¶¶ 9, 10, 30, 33, while admitting that he had no interaction with the Petelins whatsoever, CSF ¶ 231. Nor does the single document Almaty/BTA offer regarding Eesh Aggerwal's purported connection to Ablyazov and Telford do anything to corroborate Bourg's

---

[12]   While Triadou does not adopt Black Sea Bank's valuation of SDG, that valuation better corroborates Cerrito's testimony regarding SDG's assets and liabilities.

secondhand testimony.  *See* COL at 3 (citing FOF ¶¶ 73-74); CSF ¶ 74.  Indeed, there is no real

evidence connecting Aggerwal to Telford or Ablyazov.[13]

**_Cerrito's Testimony Is Consistent and Credible_**.  Almaty/BTA attack several portions of

Cerrito's testimony, but those attacks are either baseless or illogical.

- While Cerrito testified he had a general understanding of Glatz's finances based on three years of working for Glatz and public information, it is not surprising that Cerrito, as SDG's employee, does not have specific information regarding Glatz's finances.  CSF ¶¶ 139, 192-93.[14]  Cerrito's Affidavit and his testimony during cross examination are not inconsistent.

- Almaty/BTA's phantom concerns that SDG never discussed jettisoning Khrapunov as an advisor due to the difficulties his presence created (COL at 2) is a red herring. Cerrito testified that Khrapunov himself stepped down as Chairman in response to those concerns, and that the SDG Board later tasked Khrapunov with finding investors and potential purchasers for SDG.  CSF ¶¶ 45, 128. That SDG did not discuss Khrapunov's removal after the sale to Glatz is of no moment, as it was clearly discussed before, when Glatz and SDG's Board decided (and contracted) to retain Khrapunov as a transitional advisor.  *See* CSF ¶¶ 127, 217.  Cerrito described the calculus as a "tradeoff."  CSF ¶¶ 127, 148, 197.

- Almaty/BTA grossly mischaracterize Cerrito's testimony regarding Black Sea Bank's refusal to provide funding to SDG as "just a joke."  COL at 3.  Properly read, Cerrito's testimony was that the bank's refusal, in his view, was based on a lazy assessment from reviewing a basic D&B report, "just download[ing] information from the internet."  CSF ¶ 191.  Cerrito responded "No" when asked whether the bank's communication reflected its view that Glatz was a "fraud owner" of SDG.  *Id.*  In short, what Cerrito viewed as a "joke" was the level of diligence employed by the bank.

- Another red herring is that Cerrito met with Khrapunov and not with Glatz to fact check certain items.  The information in Cerrito's testimony regarding Glatz is both more recent and more general.  *Compare* CSF ¶¶ 204, 211-14 *with* CSF ¶¶ 43, 45, 208-09.  Cerrito's desire to be correct and complete in his declaration is in sharp contrast with the erroneous and missing information in Bourg's declarations.  *See supra* n.8.

---

[13]  While two of the UK Judgments (Almaty Exs. 23-24) relating to Ablyazov list "Telford Financiers Corp." in attached schedules – not Telford International Limited – those schedules identify "undisclosed assets," which means that BTA, not Ablyazov, provided that information.  *See infra* p.13.  None of the UK Judgments makes any findings regarding Telford.

[14]  Almaty/BTA criticize Cerrito's testimony that he did not believe financial institutions share information on loan applications, COL at 2, but they offer no contrary evidence.  In any event, Almaty/BTA asked for his view but chose not to explore the bases, so the testimony is of no import.

Because Cerrito's testimony is credible and well supported, it is entitled to great weight.

**C.**     **The UK Judgments Have No Evidentiary Value As To Triadou**

The UK Judgments that Almaty/BTA offer as "evidence" – Almaty/BTA Exhibits 22-26, 33, and 34 – are entitled to no evidentiary weight beyond the fact that they were entered and that they contain the statements they contain. The judgments *are not* evidence of the truth of the matters asserted in those statements, which in any event apply to individuals who are not targets of Almaty/BTA's pending motions.[15] *See, e.g.*, FOF ¶¶ 1-40.

Courts in this jurisdiction and elsewhere refuse to take judicial notice of the truth of factual findings in foreign judgments because such findings constitute hearsay. *See, e.g.*, *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 604-05 & n.1562 (S.D.N.Y. 2014) (finding that "statements and conclusions contained in [Ecuadorian] decisions and rulings were out of court statements," and thus would not have been admissible absent some hearsay exception, and further noting that the public records exception does not apply to judicial findings); *Nipper v. Snipes*, 7 F.3d 415, 416 (4th Cir. 1993) (judicial findings of fact entered in state court in a different case should not have been admitted and read to the jury in action involving fraud and RICO claims); *United States v. S. Cal. Edison Co.*, 300 F. Supp. 2d 964, 974 (E.D. Cal. 2004) ("While the authenticity and existence of a particular order, motion, pleading or judicial proceeding, which is a matter of public record, is judicially noticeable, veracity and validity of its contents (the underlying arguments made by the parties, disputed facts, and conclusions of applicable facts or law) are not."). While this Court may take judicial notice of the existence of the UK Judgments, the judicial findings contained therein are hearsay, and therefore not entitled to any weight.

---

[15] Almaty/BTA raise the validity of the UK Judgments, COL at 8, but Triadou has not contested their validity at this time (though it reserves the right to do so later). Rather, Triadou sought to exclude the UK Judgments as *evidence* because those judgments have no evidentiary value here.

Even if the Court were to ascribe the substance of the UK Judgments any weight, *none of those judgments* is against (or even pertain to) Triadou, the subject of Almaty/BTA's present motions.  None of the UK Judgments even mentions Triadou.  Rather, those decisions relate to Khrapunov, who has not been served here, and Ablyazov, who was only recently served, but has not participated at all.  The findings set forth in the UK Judgments thus are not relevant to Triadou.[16]  For example, the UK Judgments criticize Ablyazov's purported misconduct in litigating those actions, FOF ¶ 34, but there is no evidence that Triadou has acted improperly in *this* litigation.  Instead, Triadou has agreed to submit to the jurisdiction of the Swiss courts should this Court dismiss on *forum non conveniens* grounds, and has informed the Court and parties where Triadou intends to transfer the $21 million plus interest it is entitled to collect from the Chetrits.

While Almaty/BTA assert that those UK Judgments offer some connection between Ablyazov and Telford, and Khrapunov and SDG, that is unsupported by the documents.  Telford Financiers Corp. (not Telford International Limited) is identified in two of the UK Judgments, but listed as an "undisclosed asset" of Ablyazov.  Almaty Ex. 24 at 3, 36  (defining disclosed assets as those identified by Ablyazov in response to freezing orders, and distinguishing undisclosed assets as including those in Schedule 3A, which lists Telford Financiers Corp.); Almaty Ex. 23 at 2 (noting *BTA's application* without notice to Ablyazov to include "undisclosed assets" in the freezing order).  This means that BTA, not Ablyazov, suggested to the UK courts that Telford has some connection to Ablyazov.  Despite a long history of litigation, Almaty/BTA fail to offer any documentary evidence here linking Telford and Ablyazov.

---

[16] Almaty/BTA have not sought collateral estoppel as to the UK Judgments; nor could they succeed in doing so, given that Triadou was not a party to, or in any way involved in, any of those actions.

With respect to SDG and Khrapunov, the freezing order's reference to SDG relates only to assets or interests Khrapunov may have in SDG.  CSF ¶ 38.  It does not purport to find that he actually has such assets; as Cerrito testified, Khrapunov no longer has any financial interest in SDG.  CSF ¶ 38.  More importantly, the only two UK Judgments that relate to Khrapunov are a freezing order and a judgment directing that Khrapunov could make the disclosures required under the freezing order without incriminating himself.  *See* Almaty/BTA Exs. 25, 26.  Neither reflects a litigation against Khrapunov on the merits of the claims here.[17]

Thus, even if the Court chooses to ascribe any evidentiary weight to the UK Judgments (which it should not), that weight should be, at best, minimal.

### D. Almaty/BTA Are Not Entitled To A Missing Witness Adverse Inference

In claiming entitlement to adverse inferences as a legal matter, Almaty/BTA again misstate the controlling law by asserting they are entitled to "all inferences" in their favor.  COL at 5.  The law entitles them only to "legitimate inferences" that can be drawn from the facts.  *DLJ Mortgage*, 594 F. Supp. 2d at 319.  The facts do not support an adverse inference against Triadou based on actions taken by Ablyazov or Khrapunov, neither of whom are targets of the pending motions, and only one of whom has even been served.  Nor are Almaty/BTA entitled to an adverse inference because Glatz did not testify, particularly where Almaty/BTA bear the "heavy burden" because the statutory factors for attachment must be strictly construed against them.  *Nat'l Audubon Soc.*, 2009 WL 636952, at *2.

---

[17]  Almaty/BTA's argument that "Triadou has put in no evidence whatsoever in opposition" to the UK Judgments, COL at 10, is meritless.  Those judgments relate to Ablyazov and Khrapunov, over whom Triadou has no control and as to whom Triadou had no opportunity to cross examine.  Conversely, Almaty/BTA should have the evidence that BTA submitted in connection with the UK Judgments, but have not offered it here.  Had they identified any witnesses, or submitted any such direct evidence, Triadou could have conducted an appropriate cross examination.  Almaty/BTA apparently did not want to give Triadou that chance.

Almaty/BTA assert that Ablyazov's and Khrapunov's "assertion of their privilege against self-incrimination when questioned about their assets" entitles Almaty/BTA to an adverse inference. COL at 5. Neither is a target of Almaty/BTA's motions for attachment or preliminary injunction. Nor could they be targets, given that Triadou alone is owed the $21 million plus interest based on contracts with the Chetrits. CSF ¶ 166. Almaty/BTA offer no basis to penalize Triadou, a different party, for the conduct of Ablyazov and Khrapunov in separate, foreign litigation. And the credible evidence from SDG's long-time CFO indicates that Khrapunov divested himself of all interest in SDG when he sold the company to Glatz, and that Ablyazov has never had any role in SDG. CSF ¶¶ 38, 67, 69, 213. Almaty/BTA's request for an adverse inference against Triadou based on conduct of others in foreign actions is therefore not legitimate or reasonable.[18]

Almaty/BTA also impermissibly seek to shift their heavy burden to Triadou. *See, e.g.*, COL at 7 (arguing that burden on disproving "sham" sale "rests with Triadou").[19] That is neither equitable nor appropriate, and Almaty/BTA offer no case law in support of the proposition that a defendant bears any burden in connection with a pre-discovery attachment motion. As the fact-finder here, the Court has more latitude to determine whether to draw an adverse inference from a supposedly missing witness. *See Adelson v. Hananel*, 652 F.3d 75, 87 (1st Cir. 2011) (applying more stringent standard of review where district court, not jury, was fact-finder, and noting where no inference was drawn that doing so is permitted, not compelled). More to the point, in deciding whether to draw such an inference, "the overarching concern is fundamentally whether the adverse

---

[18]   Almaty/BTA assert that Triadou "chose not to call . . . Ilyas Khrapunov" (COL at 5), which implies that Triadou has control over him. Triadou does not have any such control. Almaty/BTA's argument is baseless.

[19]   Almaty/BTA several times take issue with the amount of evidence proffered by Triadou, *see, e.g.*, COL at 4-8, but this tactic simply confirms that they seek to avoid their burden. Forcing Triadou to produce every document and witness it can in response to *pre-discovery* motions, particularly where Triadou does not bear the burden of proof, would be a backwards result.

inference is trustworthy under all of the circumstances and will advance the search for truth." *LiButti v. United States*, 107 F.3d 110, 124 (2d Cir. 1997).

The circumstances here demonstrate that for several reasons, an adverse inference is not trustworthy, and is therefore unwarranted.  Glatz has not invoked his privilege against self-incrimination, did not refuse to testify at all in this matter, and is a foreign citizen and a non-party.[20] Moreover, Almaty/BTA seek this inference before any discovery has been taken – indeed, they fought even preliminary discovery related to their settlement agreement with the Chetrits – and even before Triadou's motion to dismiss on *forum non conveniens* grounds (among others) has been decided.  Given the limited scope of Almaty/BTA's affirmative evidence – which is limited to the secondhand knowledge of an admitted bribe-taker, and to UK Judgments pertaining to parties who are not the targets of the pending motions – and given Cerrito's testimony, Glatz's testimony was unnecessary at this time.  There is thus no basis within the record (or without) to infer that Glatz's testimony would be unfavorable to Triadou.

In contrast, while Almaty/BTA spend pages asking the Court to make adverse inferences against Triadou, they ignore that despite several years of litigation in multiple jurisdictions, Almaty/BTA did not produce a single witness here with firsthand knowledge of the alleged misconduct that occurred in Kazakhstan underlying their claims, did not produce any contemporaneous document regarding that conduct, and did not produce any documentary

---

[20]  Triadou recognizes that Glatz is the owner of its parent corporation SDG, but neither Glatz nor SDG is a party to this suit.  Almaty/BTA fail to cite a single case in which the Court found an adverse inference in a pre-discovery motion setting, let alone under the circumstances here, where the foreign beneficial owner of the parent corporation of the non-moving party did not testify in connection with a pre-discovery motion. *See* COL at 5-8.  This is unsurprising, as case law regarding missing witnesses generally relates to the use (or non-use) of jury instructions at trial, not in connection with pre-discovery motions.  *See, e.g., Sagendorf-Teal v. Cty. of Rensselaer*, 100 F.3d 270, 275 (2d Cir. 1996) ("The charge allows the jury to draw an adverse inference . . ."); *Royster v. Ercole*, 06 CIV 12942 SASJCF, 2008 WL 542505, at *4-5 (S.D.N.Y. Feb. 29, 2008) (affirming trial court's denial of giving missing witness charge to jury).

evidence (a) linking Telford to Ablyazov; (b) linking Telford's funds to Ablyazov's conduct; or (c) identifying the source of the funds Telford transmitted on Triadou's behalf.

Thus, to the extent any adverse inference is appropriate, it should be against Almaty/BTA, who have litigated for several years against Ablyazov and the Khrapunovs, but who have failed to provide direct evidence regarding those individuals' transmittals on behalf of Triadou.

## III. ALMATY/BTA CANNOT SHOW THE REQUISITE "STRONGER PROOF" OF A PROBABILITY OF SUCCESS ON THEIR CLAIMS

Given the vagaries and gaps in their evidence, Almaty/BTA cannot demonstrate that they are "more likely than not" to succeed on their claims and cannot make "an evidentiary showing of proof stronger than that required to establish a prima facie case in order to satisfy this requirement." *DLJ Mortgage*, 594 F. Supp. 2d at 319 (internal quotations and citations omitted).

### A. Almaty/BTA Cannot Establish Predicate Acts By Triadou In Support Of Their RICO Claims

Almaty/BTA's RICO claims are unlikely to succeed on the merits because no probative evidence exists that Triadou used Ablyazov's ill-gotten money for its investment – the linchpin of those RICO claims. Instead, Almaty/BTA offer conclusory statements and dubious secondhand testimony in an attempt to link Ablyazov and Telford. Their evidence is insufficient.

To establish a RICO claim under 18 U.S.C. § 1962(c), a plaintiff must show that each defendant engaged in (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.[21] *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115, 120 (2d Cir. 2013) (affirming dismissal of RICO claims). Because Almaty/BTA cannot show that Triadou used stolen funds or engaged in criminal activity, they cannot satisfy any of these four elements.

---

[21] A pattern of racketeering activity is required by the text of §§ 1962(a) and (b), as well.

***No racketeering activity.***   Almaty/BTA's racketeering activity theory fails because they cannot link Triadou and Telford to Ablyazov's alleged misconduct.   Almaty/BTA acknowledge that Telford funded Triadou's Flatotel investment, and the unrebutted documentary evidence shows that Telford is owned by Elena Petelina.   CSF ¶¶ 73-74, 190.   While Almaty/BTA suggest some strong filial link between Ablyazov and the Petelins, that "link" – as Ablyazov's son-in-law's sister's in-laws – is tenuous.   CSF ¶¶ 44, 48, 208.   The July 2015 FinCEN press release against FBME that Almaty/BTA cite, *see* COL at 12, came years after Telford wired funds to the Chetrits, and does not specifically connect Telford to any improper activity,   CSF ¶ 109.   Thus, Almaty/BTA are left with a chasm that their evidence cannot bridge.

Nor does Almaty/BTA's mischaracterization of SDG's and Triadou's funding, COL at 13, satisfy their proof burden.   To date, SDG has raised in excess of 250 million CHF, none of which came from Telford.   CSF ¶¶ 205, 209.   Khrapunov and Kudryashova invested approximately 35-40 million CHF in SDG, funds which Cerrito understood came from Khrapunov's mother (a well-known entrepreneur).   CSF ¶¶ 50-51.   The remaining funds SDG raised, more than 210 million CHF, were invested or loaned by major banks and bona fide third parties.   *See* CSF ¶ 205.   In response, Almaty/BTA offer only secondhand information from Bourg, and no direct evidence linking Ablyazov to Telford, Triadou, or SDG, despite litigating against Ablyazov for several years in multiple jurisdictions.   *See* FOF ¶¶ 73-74 (citing Bourg Decl. ¶10).[22]

Almaty/BTA also unsuccessfully seek to bolster their money laundering claims by alleging that SDG's sale was a sham and that Triadou sold its investments for inadequate returns.   COL at 13.   As described *supra* section Section II.B, however, ample evidence confirms that Glatz paid

---

[22]   Contrary to Almaty/BTA's assertion (COL at 12), there is no evidence that Viktor Khrapunov's assets are subject to a global freezing order.

fair value for SDG.  CSF ¶¶ 55, 133.  Beyond Bourg's uninformed account, there is no evidence

of an alleged loan by Khrapunov to Glatz to finance the deal, and Bourg's testimony is contradicted

by Cerrito, who has direct knowledge of the due diligence performed by Glatz's investment bank,

and the Geneva Prosecutor and Swiss banks' scrutiny of the sale.  CSF ¶¶ 131-32.[23]

As to the sale of Triadou's assets, Bourg alone created and pushed the valuations upon

which Almaty/BTA now rely.  CSF ¶¶ 119-21, 163, 168.  Bourg had clear incentive to inflate those

valuations in light of Almaty/BTA's evidence concerning the commissions he expected to receive

from those transactions.  CSF ¶¶ 89, 236.  And, as discussed *infra* Section IV.B, the timing of

Triadou's assignment of its Flatotel interest (before the filing of the California Action and due to

an unexpected capital call) does not aid Almaty/BTA.

Finally, Almaty/BTA vaguely refer to "filing fraudulent documents" as a predicate act.

COL at 14.  That statement is entirely unsupported in Almaty/BTA's COL and FOF.  Almaty/BTA

have failed to prove a single predicate act, and thus, cannot sustain their RICO claims.

**_No pattern_**.  Almaty/BTA cannot show the continuity or duration necessary to establish a

pattern of racketeering.   Almaty/BTA suggest that SDG's creation in 2008 (and later its

subsidiaries), and Khrapunov's four-year term as Chairman, establish a multi-year closed-ended

pattern.  COL at 13.  These acts, alone or in concert, do not suffice to show a pattern because

conduct must be criminal to be a predicate act for purposes of RICO.  *See Lerwick v. Kelsey*, 150

F. App'x 62, 64 (2d Cir. 2005); *Lutin v. New Jersey Steel Corp.*, 122 F.3d 1056, 1997 WL 447005,

---

[23]  The Black Sea Bank incident also does not aid Almaty/BTA, who distort the relevant evidence.
Black Sea stated only that a reason they denied a loan is that they "are not persuaded there's been
any real change" in SDG's ownership.  CSF ¶ 146.  But Cerrito explained that "that it's always
difficult to get [the] real reason why [banks] don't get into the finance of the company."  CSF ¶ 191.
Cerrito also testified that he believed the denial to be "a stupid answer because that was based on
. . . an automatic report, generated by a company with no employees that just downloads information
from the internet."  *Id.*

*6 (2d Cir. 1997) (forming a company is not a criminal act per se). The money transfers also are not criminal because, as shown above, Almaty/BTA have not shown the funds were ill-gotten.

Almaty/BTA fare no better in their effort to prove an open-ended pattern "(i.e., past criminal conduct coupled with a threat of future criminal conduct)." *First Cap. Asset Mgmt. v. Satinwood*, 385 F.3d 159, 180 (2d Cir. 2004) (affirming dismissal for failure to plead a racketeering pattern). Without the requisite Ablyazov-Telford link, Almaty/BTA cannot prove Triadou's participation in a conspiracy, and therefore cannot establish "a threat of future criminal activity." *Id.* Even Bourg's unsubstantiated claims of Khrapunov's wrongdoing at SDG do not support a threat of ongoing criminal activity where Almaty/BTA failed to show that the 2013 SDG sale was a sham. Almaty/BTA have not shown past or present criminal activity on Triadou's part, or the threat of future activity, and thus cannot prove a pattern of racketeering.

Because of these failures, Almaty/BTA are unlikely to succeed on the merits of their RICO claims, and therefore are not entitled to an order of attachment or a preliminary injunction based on those claims. *See DLJ Mortgage*, 594 F. Supp. 2d at 326.[24]

### B.      Almaty/BTA's Common Law Claims Will Fail

Given the missing links in their evidence, Almaty/BTA cannot show a probability of success on the merits of their unjust enrichment or conversion law claims.

Unjust enrichment requires Almaty/BTA to prove that Triadou was enriched, at Almaty/BTA's expense, and equity and good conscience militate against permitting Triadou to retain what Almaty/BTA seeks to recover. *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004). Almaty/BTA argue that they are likely to succeed on their claim

---

[24] Almaty/BTA's reliance on *Ayyash v. Bank Al-Madina* is misplaced, as the request for attachment in that case was withdrawn as to the only defendant who appeared. 233 F.R.D. 325, 327 (S.D.N.Y. 2005); *see also Allstate Ins. Co. v. Rozenberg*, 771 F. Supp. 2d 254, 269 (E.D.N.Y. 2011) (denying attachment absent evidence individual defendant transferred money to a money laundering entity).

because Ablyazov defrauded BTA (based on the UK Judgments), and Bourg testified that "some of these stolen funds were used to purchase[] assets in New York." COL at 16-17 (citing FOF ¶¶ 67-69). As described *supra* Section II.C, however, the UK Judgments have no evidentiary value here. Furthermore, Almaty/BTA have not adduced sufficient evidence linking Telford, the source of Triadou's investment funds, to Ablyazov. *See* CSF ¶¶ 73-74, 77, 190. As a result, Almaty/BTA cannot show that Triadou was enriched at their expense.[25]

Almaty/BTA's conversion claim fares no better. To prove conversion, Almaty/BTA must show a possessory right to the money Triadou used for its investment, and Triadou's dominion over that money. *See Pac. M. Int'l Corp. v. Raman Int'l Gems, Ltd.*, 888 F. Supp. 2d 385, 396 (S.D.N.Y. 2012). "Where the property is money, it must be specifically identifiable." *Rep. of Haiti v. Duvalier*, 211 A.D.2d 379, 384, 626 N.Y.S.2d 472, 475 (1st Dep't 1995). Almaty/BTA cannot specifically identify the source of any money. Instead, they offer a circumstantial contention that Telford and Ablyazov are linked, and that as a result, Triadou's investments funded by Telford must have used Ablyazov's money. *See* FOF ¶¶ 73-74, 97-100. That is insufficient. In *Duvalier*, the Republic of Haiti

> demonstrated that public monies from its national defense account were used to open the personal bank account at issue, that deposits to the bank account were traceable to Haitian government checks, that over $5 million in cash were deposited in the bank account by friends and relatives of Mrs. Duvalier, and that the deposits to the bank account far exceed the Duvaliers' known sources of legitimate income.

---

[25] Almaty/BTA also seek an inference that Glatz's and Triadou's connection to the alleged scheme is "not too attenuated" because (a) Glatz did not testify, and (b) of the price paid for SDG. COL at 17 (citing *Eastman Kodak Co. v. Camarata*, No. 05-CV-6384L, 2006 WL 3538944, at *15 (S.D.N.Y. Dec. 6, 2006)). Neither argument holds water. As shown above, Almaty/BTA are not entitled to any adverse inference based on Glatz not testifying, and ample evidence supports the price Glatz paid to acquire SDG. CSF ¶¶ 131-34, 191, 194, 212-13.

211 A.D.2d at 384-85. Almaty/BTA have not adduced any similar evidence linking the alleged gains from Ablyazov's purported misconduct to Telford's funds, despite having litigated against Ablyazov for several years.[26] Because Almaty/BTA cannot demonstrate a possessory right to the money used for Triadou's investment in the Flatotel, they cannot sustain a conversion claim.

### C. Almaty/BTA's Fraudulent Transfer And CPLR § 5239 Claims Cannot Act As Predicate Claims For An Attachment Order

Almaty/BTA's actual and constructive fraudulent transfer claims – which seek only to set aside Triadou's assignment of its Flatotel interest to the Chetrits, Crossclaims ¶¶ 169-180 – do not satisfy the first statutory requirement for obtaining an attachment because they do not seek a money judgment. *See, e.g.*, *Ally Bank v. Reimer*, No. CV 09-2795 (ADS) (WDW), 2010 WL 446025, at *3-4 (E.D.N.Y. Jan. 29, 2010) (denying order of attachment where plaintiff, who had stated a claim under Sections 273, 275, 276, and 276-a of New York's Debtor and Creditor Law, had not stated a claim for money damages); *Trafalgar Power, Inc. v. Aetna Life Ins. Co.*, 131 F. Supp. 2d 341, 349 (N.D.N.Y. 2001) (denying attachment motion where plaintiff failed to show probability of success for its conversion claim, and only remaining claims were under New York Debtor and Creditor Law seeking to set aside a conveyance).[27] Almaty/BTA's CPLR § 5239 claim likewise cannot serve as the basis for an attachment order because it seeks to set aside Triadou's state court

---

[26] While Almaty/BTA assert that it is difficult to ascertain where Ablyazov's assets are held, FOF ¶¶ 75-76, they rely on the UK Judgments, not direct evidence. Further, a review of the cited parts of the UK Judgments reveals that they were not discussing Telford. *See* Almaty Ex. 33 ¶¶ 12-13.

[27] Almaty/BTA also seek an adverse inference for Glatz's non-appearance on the ground that his testimony would be critical to Triadou's affirmative defense to Almaty/BTA's fraudulent transfer claims. COL at 7. Ignoring for a moment that Triadou has not yet had the opportunity to answer the Crossclaims – and thus has had no opportunity to plead affirmative defenses – that affirmative defense would be irrelevant here because Almaty/BTA's fraudulent transfer claims cannot act as predicates for their attachment motion, and those claims are not cited as bases for their injunction motion. Therefore, the Court should not draw any inference on this ground.

judgments.[28]   Thus, if Triadou demonstrates that Almaty/BTA cannot show a probability of success on their other claims – as Triadou has done above – then Almaty/BTA are not entitled to an attachment on the basis of its fraudulent transfer and CPLR § 5239 claims.

## IV.    ALMATY/BTA CANNOT SHOW THAT CPLR §§ 6201(1) OR (3) APPLIES

Almaty/BTA cannot show that § 6201(1) applies because they cannot demonstrate that "drastic action" is required to maintain the security of Triadou's assets.   Similarly, Almaty/BTA cannot satisfy CPLR § 6201(3) because there is no evidence that Triadou's eventual movement of the $21 million plus interest it is owed by the Chetrits will be made with any fraudulent intent (because no such intent exists).   These failures present an independent reason for the Court to deny Almaty/BTA's motion for attachment.

### A.    Almaty/BTA Have Not Made The Heightened Showing Required Under § 6201(1)

CPLR § 6201 provides that "[a]n order of attachment may be granted in any action, . . . when . . . the defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state."   *Meridien Int'l Bank Ltd. v. Gov't of Republic of Liberia*, No. 92 Civ. 7039 (AGS), 1996 WL 22338, at *2 (S.D.N.Y. Jan. 22, 1996) (quoting § 6201(1)).   Section 6201(1) serves two independent purposes:   "'obtaining jurisdiction over and securing judgments against nondomiciliaries residing without the state.'"   *Ames v. Clifford*, 863 F. Supp. 175, 177 (S.D.N.Y. 1994) (citation omitted).   Where the nondomiciliary has submitted to the court's jurisdiction, however, and "'the only purpose for a pre-judgment attachment is security, a different analysis should apply than that used for jurisdictional attachments.'"   *Bank of China*, 192

---

[28]   While Almaty/BTA's CPLR § 5239 claim also seeks attorneys' fees, *Ally Bank* made clear that obtaining such fees would not occur unless the plaintiff was successful on the merits of its claims seeking equitable relief (not a money judgment), and therefore did not satisfy the first statutory requirement for attachment.   2010 WL 446025, at *4 (citing *Trafalgar*, 131 F. Supp. 2d at 349).

F. Supp. 2d at 188 (quoting *Reading & Bates Corp. v. Nat'l Iranian Oil Co.*, 478 F. Supp. 724, 726 (S.D.N.Y. 1979)).  Where, as here, jurisdiction is not in question, attachment should issue only upon a showing that "*drastic action* is required for security purposes," which has led New York courts to require "an additional showing that something, whether it is a defendant's financial position or past and present conduct, poses a real risk of the enforcement of a future judgment." *Id.* (quoting *Meridien Int'l*, 1996 WL 22338, at *3); *Ames*, 863 F. Supp. at 177 (same).[29]

Almaty/BTA offer only two points in support of the "drastic action" of attachment: Triadou's admission of limited connection to New York, and conclusory arguments about Triadou's overseas connections.  Neither is sufficient to merit application of § 6201(1).  First, Triadou has submitted to the jurisdiction of this Court, so its limited connection to the forum matters only in the context of *forum non conveniens*.  Second, Triadou has done nothing during the course of this lawsuit (or before) evidencing any intent to secrete or dispose of the $21 million plus it is owed by the Chetrits.  In fact, Triadou has been straightforward with the Court in indicating that the $21 million will be sent back to Switzerland to invest in Triadou's parent-company's existing real estate investments.  CSF ¶ 56.

Since Triadou already has consented to the jurisdiction of the Swiss courts, there is nothing secret or improper regarding Triadou's conduct; nor is there any inference to that effect.[30]  "Mere

---

[29]   Almaty/BTA's citation in their moving brief to *Considar, Inc. v. Redi Corp. Establishment*, 238 A.D.2d 111, 111-13 (1st Dep't 1997), implies that the reversal of the lower court was due to some mistake relating to the defendant's foreign status, Mem. of Law in Supp. of Mot. for Attachment, 15 (May 12, 2016) (ECF No. 141) (Attachment Mem.), but the reversal was unrelated.

[30]   The court in *Ames*, 863 F. Supp. at 177-78, discussed two cases in which § 6201(1) applied to defendants who had submitted to the jurisdiction of New York courts, noting findings in both cases of troubling or false conduct by the defendants that are not present here.  *Id.* (citing *ITC Entm't, Ltd. v. Nelson Film Partners*, 714 F.2d 217, 219 (2d Cir. 1983) (court found "defendant had at times conducted business 'in a less than exemplary manner'") and *Elton Leather Corp. v. 1st Gen. Res. Co.*, 138 A.D.2d 132, 529 N.Y.S.2d 769 (1st Dep't 1988) (finding that defendants' attempt to register their company with New York was "obvious ploy" to defeat plaintiff's attempt to recover money).

removal or other disposition of property is not in itself grounds for attachment." *Ames*, 863 F. Supp. at 178 (citing *Computer Strategies, Inc. v. Commodore Bus. Machs., Inc.*, 105 A.D.2d 167, 483 N.Y.S.2d 716, 721 (2d Dep't 1984)).  Accordingly, Almaty/BTA cannot show that § 6201(1) applies to Triadou.

### B.    Section 6201(3) Does Not Apply Because Almaty/BTA Cannot Show Triadou Has The Requisite Fraudulent Intent

Almaty/BTA wrongly assert that their attachment motion satisfies § 6201(3).  Section 6201(3) provides that an attachment order may issue where a defendant "with intent to defraud his creditors or frustrate the enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of, encumbered or secreted property, or removed it from the state or is about to do any of these acts."  This requires Almaty/BTA to prove not only that Triadou will engage in one of the enumerated acts, but also that it has "the actual intent to defraud" Almaty/BTA.  *Buy This, Inc. v. MCI Worldcom Commc'ns, Inc.*, 178 F. Supp. 2d 380, 382 (S.D.N.Y. 2001).

"Removal, assignment, or other disposition of property is not a sufficient ground for attachment; fraudulent intent must be proven, not simply alleged or inferred, and the facts relied upon to prove it must be fully set forth in the moving affidavits."  *DLJ Mortgage*, 594 F. Supp. 2d at 319 (quoting *Encore Credit Corp. v. LaMattina*, No. 05-CV-5442, 2006 WL 148909, at *3 (E.D.N.Y. Jan. 18, 2006)).  Fraudulent intent is not to be lightly inferred, and Almaty/BTA's papers must contain "evidentiary facts as opposed to conclusions proving the fraud."  *Id.* (quoting *Encore Credit Corp.*, 2006 WL 148909, at *3).  "Affidavits containing allegations raising a mere suspicion of an intent to defraud are insufficient."  *Id.* (quoting *Strategic Growth Int'l, Inc. v. RemoteMDx, Inc.*, No. 06-CV-3915, 2008 WL 4179235, at *8 (S.D.N.Y. Sept. 10, 2008)); *accord New York Dist. Council of Carpenters Pension Fund v. KW Constr., Inc.*, No 07-CV-8008, 2008 WL 2115225, at *4 (S.D.N.Y. May 16, 2008) ("The existence of actual intent to defraud is never

25

presumed, and intent to defraud cannot be found based merely on suspicion, conjecture, or doubtful inference.") (internal quotations and citation omitted). Rather, it must appear from the evidence "that such fraudulent intent really exists in the defendant's mind." *Id.* (quoting *Encore Credit Corp.*, 2006 WL 148909, at *3).

Almaty/BTA effectively concede that they have no direct proof of fraudulent intent. Because "fraudulent intent is rarely susceptible to direct proof," courts in this jurisdiction look to whether "allegedly suspicious transactions exhibit 'badges of fraud' that give rise to a sufficient inference of intent." *DLJ Mortgage*, 594 F. Supp. 2d at 320 (citing *New York Dist. Council of Carpenters*, 2008 WL 2115225, at *4-5). Almaty/BTA's first brief in support of their attachment motion alleges only a few badges: the chronology of events, inadequacy of consideration, and the relationship between the parties. Attachment Mem., at 16-17. None of these badges is present.

Almaty/BTA first point to the chronology of Triadou's assignment of its Flatotel interest, arguing that after Almaty filed suit in California against Khrapunov in May 2014, "Khrapunov then immediately 'directed [Bourg] to begin liquidating Triadou's assets in New York so that funds could be removed from the United States and concealed elsewhere.'" Attachment Mem. at 16 (quoting Bourg Decl. ¶ 38); *see also id.* (asserting Triadou's assignment was "made in secret *shortly after and because of the filing* of racketeering claims against Triadou's beneficial owner" (emphasis added)). This description of the chronology is incorrect, which Almaty/BTA implicitly concede in their FOF. *Compare id.*; Bourg Decl. ¶ 38 ("In response to this [California] lawsuit, Ilyas directed me to begin liquidating Triadou's assets in New York") *with* FOF ¶ 159 ("In response to *the threat of litigation* in the United States, Ilyas Khrapunov instructed Bourg to liquidate Triadou's investments with Chetrit." (emphasis added)).

Of course, Almaty/BTA had to acknowledge that Bourg's statements were false.  Cerrito testified that in March or April 2014, *before the filing of the California Action*, the Chetrits approached Triadou for another capital call in connection with the Flatotel, and in which Triadou did not wish to participate.  CSF ¶¶ 224-25.  Even Almaty/BTA's evidence confirms this capital call was not expected.  *See* CSF ¶ 88 ("No further capital call shall take place until the project's completion, which is due in 4Q2015").  In response to Triadou's position, the Chetrits offered to "buy out Triadou's membership" in the Flatotel project, and meetings about the potential assignment took place before the filing of the California Action.  CSF ¶¶ 159, 225-26.  The final Assignment Agreement also indicates that the Chetrits first paid Triadou $1 million on May 9, 2014, CSF ¶ 159, four days before Almaty filed the California Action on May 13, 2014, CSF ¶ 157.  Ultimately, even Bourg acknowledged that negotiations for the assignment occurred before Almaty filed its suit in California.  CSF ¶ 159.

Almaty/BTA cannot save Bourg's testimony by claiming that he was not involved in any conversations between lawyers regarding the California Action, *see* FOF ¶ 160, as there is no evidence that Almaty's attorneys contacted Khrapunov's attorneys to alert them to the filing of that suit.  Even if such evidence existed (which is unlikely), it would be within Almaty's control, but has not been offered here.  Second, it makes no sense that Almaty's lawyers provided Khrapunov's lawyers with advance notice of the California Action in light of Almaty/BTA's repeated claim that the Ablyazov-Khrapunov group has continued to try to hide assets.  The assignment's chronology therefore does not reflect a badge of fraud.[31]

---

[31] Almaty/BTA's theory is not credible for other reasons.  While they assert that the assignment was "made in secret" (Attachment Mem. at 16), Almaty/BTA cite no evidence to that effect.  Triadou's assignment of its Flatotel interest also is consistent with Cerrito's testimony that after Glatz purchased SDG, he refocused its ongoing projects in Switzerland.  CSF ¶¶ 153, 170.  Finally, while Almaty/BTA claim that Khrapunov remained SDG/Triadou's beneficial owner, even Jehoshua Graff testified that he understood Glatz to be Triadou's beneficial owner.  CSF ¶ 128.

Nor can Almaty/BTA show that Triadou assigned its Flatotel interest for inadequate consideration, *see* Attachment Mem. at 16-17, let alone the grossly inadequate consideration that is required to reflect a badge of fraud, *see DLJ Mortgage*, 594 F. Supp. 2d at 320 (identifying "gross inadequacy of consideration" as badge of fraud).   Almaty/BTA admit that Triadou invested roughly $34 million in the Flatotel project, CSF ¶ 165, and in return for Triadou's assignment – which aided it in avoiding a capital call – Triadou was due to receive a minimum of $32 million in consideration, CSF ¶ 166.   Specifically, the Assignment Agreement reflects a $1 million payment to Triadou on May 9, 2014, $21 million to be paid in installments, a minimum of $4 million in profit-sharing (an amount that could increase depending on the project's success), and conveyance of an interest in $6 million in investments the Chetrits made in the "Happy Family" and "Landscape" projects. *Id.*   Thus, Triadou assigned its Flatotel interest at a small discount that could eventually exceed its initial investment based on the profit-sharing component (and is consistent with a present value discount).   There is no gross inadequacy of consideration here.[32]

Where "these badges of fraud [are] absent from the questioned transactions, that absence will constitute evidence that there was no intent to defraud." *DLJ Mortgage*, 594 F. Supp. 2d at 320 (citing *New York Dist. Council of Carpenters*, 2008 WL 2115225, at *4).[33]   There is ample evidence of legitimate intent here, and Triadou has been straightforward with the Court and the parties about where the $21 million-plus-interest will be moved.   CSF ¶ 56.   Triadou has long

---

[32]   Almaty/BTA claim that "Triadou valued" its investment at $100 million, but as shown above, that description is misleading.   Bourg, Triadou's sole director, prepared the marketing materials that contain this assessment, *see* Almaty/BTA Ex. 6, and Bourg had an incentive to inflate the value so he would receive the commission promised him by the Chetrits for finalizing the deal, CSF ¶¶ 119-21, 236.   Similarly, Bourg also expected to receive a commission for the Assignment Agreement (which he alone negotiated), CSF ¶¶ 161, 227, 236, so if there is any concern regarding fraud, it should be attributable to Bourg, not Triadou.

[33]   Almaty/BTA's citation to *New York District Council of Carpenters*, 2008 WL 2115225, at *6, is unavailing (Attachment Mem. at 16-17); Almaty/BTA have not demonstrated even one past fraudulent transfer by Triadou, let alone a pattern sufficient permit the inference of fraudulent intent.

argued that Switzerland, where it will move the money to be invested in SDG's existing real estate projects, is a more appropriate forum to litigate the Crossclaims; in any event, "[m]ere removal or other disposition of property is not in itself grounds for attachment." *Ames*, 863 F. Supp. at 178 (citing *Computer Strategies*, 483 N.Y.S.2d at 721).

Finally, Triadou initially requested in its motion to dismiss the Amended Interpleader Complaint that if the Court chose not to dismiss, it should order deposit of the $21 million plus interest in its registry. Mem. in Supp. of Mot. to Dismiss Am. Interpleader Compl., 12-14 (Aug. 31, 2015) (ECF No. 31). Triadou's enforcement efforts began only after the State Court ordered such deposit, the Chetrits failed to comply, this Court dismissed the Amended Interpleader Complaint on the grounds that Almaty/BTA are not entitled to the $21 million, and the stay in the State Court actions was lifted. Where a party offers a legitimate justification for its transfer of funds, courts will hesitate to grant attachment. *Man Wei Shiu v. New Peking Taste Inc.*, No. 11-CV-1175 (NGG) (RLM), 2013 WL 2351370, at *18 (E.D.N.Y. May 28, 2013) (because fraudulent intent is not to be lightly inferred, declined to infer where defendants have proffered an arguably legitimate reason for transfer). Here, Cerrito testified regarding Glatz's reprioritization of SDG's business, and that testimony is consistent with other testimony indicating that Triadou loaned other money to SDG. CSF ¶¶ 116, 153. This reflects a legitimate justification based on which the Court should decline to infer any fraudulent intent.

Because this evidence is not consistent with a finding that Triadou intends to defraud or frustrate judgment, Almaty/BTA have not satisfied CPLR § 6201(3).

## V.   EVEN IF THE COURT FINDS THAT ALMATY/BTA HAVE SATISFIED THE STRICT STATUTORY ELEMENTS FOR ATTACHMENT, IT SHOULD EXERCISE ITS DISCRETION TO DENY THE MOTION

Notwithstanding that a plaintiff satisfies the statutory requirements for attachment, courts in New York may, in their discretion, deny the motion. *See, e.g.*, *Skyline Steel, LLC v. PilePro,*

*LLC*, No. 13-CV-8171, 2015 WL 5076695, at *2 (S.D.N.Y. Aug. 27, 2015) ("even where the statutory requirements for attachment are met, a court may nevertheless deny a writ of attachment where the movant has not established a need for the writ"); *Sylmark Holdings Ltd. v. Silicone Zone Int'l Ltd.*, 5 Misc. 3d 285, 301, 783 N.Y.S.2d 758, 773 (Sup. Ct. N.Y. Cnty. 2004) ("the granting of prejudgment attachments is discretionary, and even when the statutory requisites are met, the order may be denied") (internal quotations and citation omitted).  Even if the Court finds here that Almaty/BTA have satisfied the statutory elements for attachment, it should exercise its discretion and deny the attachment motion, if the Court also dismisses Almaty/BTA's Crossclaims on *forum non conveniens* grounds.  In such circumstances, attachment would create logistical difficulties by forcing litigation overseas while Triadou's assets are forced to remain here.  Thus, the Court and justice would be best served by denying Almaty/BTA's motion.

## VI.   ALMATY/BTA ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION

As this Court aptly observed, Almaty/BTA's "argument is that the attachment motion is the PI motion minus irreparable harm."  Tr. 155:5-6.  The deficiencies of their attachment motion combined with a complete lack of irreparable harm serve to defeat Almaty/BTA's injunction motion, which should also be denied.[34]

### A.   The Evidence Adduced Fails To Establish Irreparable Harm From Any Source, And Transfer Of The Judgment Proceeds Alone Does Not Warrant An Injunction

The fact that Almaty/BTA's irreparable harm argument has been relegated to barely three pages at the back of their COL underscores the weakness of their showing with respect to "'[p]erhaps the single most important prerequisite' for a preliminary injunction, irreparable harm.

---

[34] The Anti-Injunction Act also warrants denial of the injunction motion.  *See* Mem. of Law in Opp. to Almaty/BTA's Mot. for Injunction, 4-6 (Apr. 15, 2016) (ECF No. 109); Skakel Letter, at 1 (May 12, 2016) (ECF No. 147).

*Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (*quoting Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983))." Mem. and Order Denying TRO, at 1 (May 3, 2016) (ECF No. 131) ("5/3/2016 Order"). Almaty/BTA have struck out swinging with their three-part irreparable harm proffer.

### 1.     No Harm Can Arise From "Mooting" An Invalid CPLR § 5239 Claim.

Because Almaty/BTA's CPLR § 5239 claim fails as a matter of law, there can be no irreparable harm as a result of "extinguishing" that claim. The CPLR claim is legally deficient for two reasons. First, § 5239 does not apply to Almaty/BTA's alleged claim. "By its own terms, and as confirmed by the Court of Appeals in *Cruz III* [*Cruz v. TD Bank. N A.*, 22 N.Y.3d 61, 75, 979 N.Y.S.2d 257, 266 (2013)], section 5239 is about determin[ing] rights in the property or debt [to be levied upon].'" *Martinez v. Cap. One, N A.*, No. 10-CV-8028 (RJS), 2014 WL 4179866, at *5 n.4 (S.D.N.Y. Aug. 20, 2014) (quoting CPLR § 5239). In their preliminary injunction moving brief, Almaty/BTA assert that the subject "property" "in this case [is] the $21 million that resulted from Triadou's assignment of an interest purchased with stolen money." Reply Mem. in Supp. of Mot. for Prelim. Injunction, 5 (Apr. 22, 2016) (ECF No. 117). But in dismissing the interpleader action, this Court already has ruled that Almaty/BTA have no claim to "the property or debt [to be levied upon]," here, the $21 million the Chetrits owe Triadou. *Martinez*, 2014 WL 4179866, at *5 n.4. And while Almaty/BTA may assert certain crossclaims against Triadou based on the assignment of the Flatotel interest, that "property" is *not* "the property or debt [to be levied upon]" – i.e., the assignment is different "property" than the $21 million debt underlying the judgments. CPLR § 5239 would apply to the $21 million,[35] but not the assignment. Second, even if § 5239

---

[35]  While Almaty/BTA contend that a § 5239 petitioner need not be a judgment creditor, they have cited no case where the § 5239 petitioner is not also the judgment creditor – which makes sense given how § 5239 works. *See, e.g.*, *Ferrauiolo v. Wescott*, 183 A.D.2d 471, 583 N.Y.S.2d 416 (1st Dep't 1992).

applied to the property consisting of the assignment (which it does not), Almaty/BTA cannot validly assert a claim against Triadou "to determine rights" in the assignment of the Flatotel interest, where Almaty/BTA have already obtained that Flatotel interest as a result of their settlement with the Chetrits.  CSF ¶ 210.

Given that their § 5239 claim is not legally viable, Almaty/BTA cannot predicate any harm on the "mooting" of that untenable claim.

## 2.   <u>The Harm To The Flatotel Project From The Monitorship Is Speculative.</u>

The evidence regarding the effect of the Monitorship on the Flatotel Project established that there was no adverse impact in the near term and any longer term negative effect was wholly speculative.  Almaty/BTA have failed to meet their burden of showing "'that the injury [they] will suffer is likely and imminent, not remote or speculative, and that such injury is not capable of being fully remedied by money damages.'  *NAACP v. Town of E. Haven*, 70 F.3d 219, 224 (2d Cir. 1995)."  5/3/2016 Order at 1-2.

The entirety of Almaty/BTA's showing as to their second source of supposed irreparable harm boils down to a single sentence:  "Record evidence corroborates Eichen's conclusion that the real estate press will conflate monitorship and receivership and create an atmosphere of negative publicity about the Flatotel while units are still being marketed."  COL at 21 (citing FOF ¶¶ 183-189).  But that purported "record evidence" as to the forecast for the Flatotel Project is contrary to what actually happened soon after the Monitor (whose authority and powers are very limited) was appointed – namely, vendors were paid, unit sales closed and were scheduled to close, and funds representing distributions to the Chetrits were deposited into the Monitor's escrow account.  *See*

32

ECF No. 149 at 4-6 (letter from D. Segal to Hon. Herman Cahn, dated May 12, 2016, filed in State Court on May 15, 2016 (NYSCEF No. 75)).[36]

Almaty/BTA's long-range forecast of Armageddon at the Flatotel consists of their expert's logically flawed analysis and speculative conclusions.  Initially, the "record evidence" supporting supposed expert Lee Eichen's conclusions consists of four trade press articles in which the description of Almaty/BTA's claims against Ablyazov – *not* the news of the monitor's appointment – is the "negative" publicity.  *See* Almaty Exs. 39-42.  But the Chetrits – the Flatotel owners and those with the most to lose – agreed to the consent order appointing the Monitor, and have made deposits into the Monitor's escrow account.

The unacceptably speculative nature of Eichen's conclusions is not surprising given that (i) he does not profess to have expertise in the area of monitorships, conceding that "a monitorship is an unusual arrangement"; and (ii) despite the admittedly "unusual" nature of the monitorship, he freely opines as to what "the public generally," "the real estate market," and "most people" will do or believe.  Eichen Supp. Decl. ¶ 8.  Because Mr. Eichen's opinions are wildly speculative, and thus would not be useful to the factfinder, they should be afforded minimal weight.  *See Buckley v. Deloitte & Touche USA LLP*, 888 F. Supp. 2d 404, 412 (S.D.N.Y. 2012), *aff'd*, 541 F. App'x 62 (2d Cir. 2013) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 22 (2d Cir. 1996)) (excluding expert testimony that "neglects the factual underpinnings and reliable methodology that make opinion testimony useful to the [factfinder]").

---

[36] Rather than "mere attorney argument," as Almaty/BTA contends, the filing in the State Court actions concerning the Monitorship are representations made by the Chetrits' counsel, have already been addressed here (*see* Letter from M. Schwartz, at 2 (May 17, 2016) (ECF No. 151)), and have been – and continue to be – properly considered by this Court.

This Court need not – and should not – credit Eichen's testimony, notwithstanding Triadou did not proffer a rebuttal report.  *See Brooks v. Outboard Marine Corp*., 234 F.3d 89, 91 (2d Cir. 2000) (court's gate-keeping role does not disappear when a proposed expert witness is not challenged by an opposing expert witness; neither *Daubert* nor *Kumho Tire* suggest that expert testimony "could only be 'called sufficiently into question' by a rebuttal expert"); *Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 396 (S.D.N.Y. 2010) (where court is factfinder, "it uses 'the discretion given to it . . . [to] parse and evaluate the evidence . . . for its weight and worth.' Pursuant to its role as factfinder, the Court may credit an expert's testimony in whole or in part, regardless of whether another expert is called in rebuttal.") (citations omitted); *accord Giles v. Rhodes*, 171 F. Supp. 2d 220, 226-27 (S.D.N.Y. 2001).

### 3.    Triadou's Disclosed Intent To Transfer Assets, Without The Requisite Intent To Frustrate Judgment, Cannot Lead To Irreparable Harm.

Almaty/BTA's "asset flight" theory does not fly absent a showing that Triadou intends by its actions to frustrate judgment, and Almaty/BTA cannot make that showing here.  Triadou has forthrightly informed this Court that its recovery will be transferred to SDG in Switzerland – and has also disclosed where SDG will apply those funds (existing and known real estate projects in Switzerland), that SDG has bank accounts in Switzerland, and that SDG has assets greater than the $21 million in question here.  CSF ¶¶ 56, 57, 215.  Providing all of these disclosures – and acknowledging Triadou and SDG are subject to the jurisdiction of the Geneva courts – hardly connotes an intent on the part of Triadou to frustrate judgment.  Almaty/BTA's continued reliance on *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416  (2d Cir. 1985), underscores the weakness of their irreparable harm argument; the defendant there engaged in "'numerous'" and "'substantial efforts to hide and secrete assets,'" including lying in sworn testimony about the existence of foreign bank accounts and violating a TRO.  *See Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v.*

34

*Brookville CDO I Ltd.*, No. 08-Civ-9565, 2008 WL 5170178, at *8-9 (S.D.N.Y. Dec. 10, 2008) (noting need for "clear evidence of bad faith efforts to frustrate the entry of final judgment" to show irreparable harm). Here, there is no evidence of any efforts, bad faith or otherwise, by Triadou that would support a finding of irreparable harm under this third prong.

### B.      Almaty/BTA's Claims Are Not Likely To Succeed On The Merits

For the reasons set forth *supra* Argument Sections III & VI.A, Almaty/BTA have not made the requisite showing that any of their claims are likely to succeed on the merits.

### C.      The Relevant Public Interest Is That of the Swiss Authorities, Not FinCEN

It is ironic that Almaty/BTA wave the FinCEN flag regarding foreign ownership of U.S. real estate when *they* now own the Flatotel interest that was the subject of their claims against the Chetrits and Triadou. As Triadou demonstrated in its *forum non conveniens* dismissal motion (ECF Docs. 84-86, 90-92), it is the Swiss authorities and courts that are most vested in addressing Almaty/BTA's allegations and where, having long ago commenced investigatory proceedings in Geneva and continued to pursue them, Almaty/BTA should return.

## CONCLUSION

The evidentiary hearing did nothing to resuscitate Almaty/BTA's injunction motion and its particularly inadequate irreparable harm showing. Nor is Almaty/BTA's "Plan B" – their attachment motion lacking the predicate meritorious claims and statutory grounds – legally viable. This Court should deny both motions in their entirety.

Dated: New York, New York
      June 13, 2016

Respectfully submitted,

BLANK ROME LLP

By:    s/Deborah A. Skakel  
      Deborah A. Skakel
      Alex E. Hassid
      Robyn L. Michaelson
The Chrysler Building
405 Lexington Avenue
New York, New York  10174-0208
Telephone: (212) 885-5000
Facsimile: (212) 885-5001
dskakel@blankrome.com
ahassid@blankrome.com
rmichaelson@blankrome.com

*Attorneys for Crossclaim Defendant
Triadou SPV S.A.*