UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CF 135 FLAT LLC, CF 135 WEST MEMBERS LLC, and THE CHETRIT GROUP, LLC,<br><br>        Interpleader Plaintiffs,<br><br>    - against -<br><br>TRIADOU SPV S.A. and CITY OF ALMATY, a foreign city,<br><br>        Interpleader Defendants.<br>CITY OF ALMATY, KAZAKHSTAN and BTA BANK JSC,<br><br>        Crossclaim Plaintiffs,<br><br>    - against -<br><br>MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, and TRIADOU SPV S.A.,<br><br>        Crossclaim Defendants. | ECF Case<br><br>No. 15 Civ. 05345 (AJN) |

**THE CITY OF ALMATY, KAZAKHSTAN AND BTA BANK'S REPLY TO TRIADOU SPV S.A.'S COUNTERSTATEMENT OF FACTS AND PROPOSED FINDINGS OF FACT [ECF NO. 169]**

The City of Almaty, Kazakhstan and BTA Bank (collectively the "Kazakh Entities") respectfully submit the following responses to Triadou SPV S.A's ("Triadou's") proposed findings of fact in opposition to the Kazakh Entities' motions for attachment [ECF No. 140] and injunctive relief [ECF No. 106].

## RESPONSES TO TRIADOU'S PROPOSED COUNTER-STATEMENT OF FACTS

**The Creation of SDG and Triadou**

*205.   SDG raised funding through several mortgages and construction loans from major Swiss banks, and issued several rounds of bonds purchased by bona-fide third parties, including Swiss banks. SDG recently raised $16.5 million USD in bank financing. Cerrito Aff. ¶ 3. To date, SDG has raised in excess of $250 million USD. Tr. 102:25-103:4.*

**RESPONSE:** Cerrito has admitted SDG was denied bank financing during the relevant time period of 2012-13, Tr. at 108:12-14,[1] and any outside bank financing SDG received is irrelevant to the question of whether Triadou was used to launder Ablyazov's funds through Telford.

*206.   Viktor Khrapunov has never had (and currently has no) involvement with, or decision-making authority for, SDG. Cerrito Aff. ¶ 5.*

**RESPONSE:** Lacking information sufficient to admit or deny, the Kazakh Entities deny.

*207.   In July 2011, SDG's Board tasked Bourg with (1) incorporating the Fund and the management company in Luxembourg, and handling all registration and approval requirements; and (2) marketing, seeking seed investors, and identifying potential investments for the Fund. Bourg represented to SDG's Board that he would accomplish incorporation within one year. Cerrito Aff. ¶ 6. Bourg had not established the Fund by September 2012. Cerrito Aff. ¶ 7.*

**RESPONSE:** Bourg received his instructions directly from Ilyas Khrapunov. Bourg Decl. at ¶ 9 ("Although I was the sole director of Triadou, Ilyas was in charge of Triadou's operations and investments. I would research investment opportunities, Ilyas would select which deals to invest in, and then he would negotiate the deal and organize payment."); Almaty Ex 4, at 9.

*208.   By September 2012, Khrapunov had lined up another investor, Gennady Petelin, Kudryashova's father-in-law; although the Fund was not yet registered, Petelin remained interested*

---

[1]   References to "Tr." refer to the transcript of the May 19, 2016 hearing before the Court.

1

*in potential investments. Cerrito Aff. ¶¶ 7, 9.*

*209.    Petelin, through Telford, provided debt financing to Triadou. Cerrito Aff. ¶¶ 9-10; Almaty Ex. 6 at 4. Telford never invested in SDG. Tr. 147:11-12 (Cerrito).*

**RESPONSE:** Denied as to ¶¶ 208-209. All funding through Telford was provided from funds of Ablyazov, Bourg Decl. ¶ 9-10, and wired by his financial advisor, Eesh Aggerwal. Almaty Ex. 4, at 9. Triadou has offered no contemporaneous documentation connecting the funds transferred to the Petelins, no proof as to the terms of this purported "debt financing," and no explanation for Aggerwal's involvement.

**Triadou's Investment in the Flatotel Development**

*210.    Triadou no longer owns an interest in CF 135 West Member LLC. Tr. 34:1-22 (Graff). The Chetrits, who now own Triadou's former interest, will transfer that interest to Almaty/BTA, pursuant to a settlement agreement between the Chetrits and Almaty/BTA entered into on or about November 12, 2015. (ECF No. 69). Pursuant to the terms of the settlement agreement, Almaty/BTA will indemnify the Chetrits for costs incurred in connection with the pending litigation and the Chetrits must cooperate with Almaty/BTA. Tr. 35:3-21, 36:1-3 (Graff).*

**RESPONSE:** Admit that Triadou no longer owns an interest in CF 135 West Member LLC. Denied insofar as Triadou incorrectly describes the terms of the confidential settlement between Almaty/BTA and Chetrit which are, in any event, entirely irrelevant.

**Glatz Purchases SDG in 2013**

*211.    Glatz is a well-known businessman in Geneva, who also has investments in Brazil and France. In Geneva, he owns one of the largest private hospitals and has business interests in aeronautics, packaging, and real estate. Glatz's finances were and are sufficient to have purchased SDG and to have continued to support it through the present day. Cerrito Aff. ¶ 14.*

**RESPONSE:** Admit that Glatz is a businessman in Geneva, but the Kazakh Entities lack information sufficient to admit or deny any businesses purportedly owned by Glatz. Deny that Glatz's finances were sufficient to have purchased SDG, as that testimony was based on unverifiable hearsay, the source of which Cerrito could not recall. Tr. at 121:1-10.

*212.    While conducting due diligence on SDG and negotiating the purchase, Glatz held multiple meetings with Khrapunov and the SDG Board. Cerrito Aff. ¶ 15.*

**RESPONSE:** Denied; Cerrito essentially admitted on cross-examination that he had no factual basis to make this statement in his affidavit. Tr. at 122:4-12. Triadou failed to call Glatz as a witness, failed to produce any documentary evidence of the claimed due diligence, and the purported transaction involving Glatz was "outside the scope" of Cerrito's knowledge. CSF ¶ 140.

213.   *Glatz, through his company Greencos S.A., purchased 100% of SDG Capital SA's equity.  Cerrito Aff. ¶ 16.*

**RESPONSE:** Denied. The purported sale to Glatz was a sham sale for no real consideration and was financed using money provided by Ilyas Khrapunov in the first instance. Bourg Decl. ¶ 33. Triadou failed to call Glatz as a witness, and any transfers of funds to or from Glatz were "outside the scope" of Triadou's sole witness's knowledge. CSF ¶ 140.

214.   *Since purchasing SDG, Glatz has provided several million Swiss Francs of his own funding to support the business.  Cerrito Aff. ¶ 17.*

**RESPONSE:** Lacking information sufficient to admit or deny, the Kazakh Entities deny; however no evidence was provided that the source of any funds "invested" by Glatz into SDG were actually his own money, as opposed to stolen money in the possession of the Ablyazov-Khrapunov family. Credible testimony demonstrated that the initial purchase price "paid" by Glatz, for example, came from the Ablyazov-Khrapunov family. Bourg Decl. ¶ 33. Testimony by Cerrito indicates that SDG nonetheless remains insolvent. Tr. at 144:17-20.

215.   *SDG holds several real estate investments in Switzerland that far exceed the value of the money the Chetrits owe Triadou under the Assignment Agreement.  Cerrito Aff. ¶ 17.*

**RESPONSE:** Denied in so far as Cerrito testified that SDG's assets are roughly equal to its liabilities, and that SDG's value is approximately CHF 3.5 million, Tr. at 144:15-20, far less than the $21 million in controversy here.

216.   *SDG also has investments from, and accounts with, Swiss financial institutions, including La Compagnie Privée de Conseils et d'Investissements S.A.  Cerrito Aff. ¶ 17.*

**RESPONSE:** Lacking information sufficient to admit or deny, the Kazakh Entities deny.

**Control of SDG after the Sale**

     217.    *The terms of the SDG Stock Purchase Agreement ("SPA") obligated Khrapunov to continue to advise SDG's Board, to participate in meetings when so requested, and to assist Glatz in interfacing with any partners/counterparts with whom Khrapunov originally held the relationship. Cerrito Aff. ¶ 19; Tr. 117:24-117:1.*

**RESPONSE:** Triadou has not produced the purported stock purchase agreement – which is the sole document concerning the purported sale of SDG to Glatz that Triadou's witness claimed that he had seen, Tr. at 122:4-12 – and in the absence of this document, the Kazakh Entities deny.

     218.    *Since Glatz purchased SDG, he has been actively involved in all aspects of the business, including the investments in U.S. real estate through Triadou. Cerrito Aff. ¶ 21.*

**RESPONSE:** Denied. After the "sale" of SDG, Bourg continued to carry out Triadou's business in the United States at the direction of Ilyas Khrapunov and, through him, Mukhtar Ablyazov. Bourg Supp. Decl. ¶ 7-8. Cerrito admitted under cross-examination that his affidavit was incorrect in this regard, when he testified that "[Glatz] didn't quite understand what was going on in the US because of lack of information," Tr. at 150:24-25, and that Ilyas Khrapunov remained involved in all of SDG's significant decisions and "engaged in critical discussions." Tr. at 105:25-106:8; 115:3-23.

     219.    *Since the sale, Khrapunov has not been in charge of making payments, disposing of or purchasing assets, or anything beyond advising SDG management, which advisory role ceased in late 2014. Cerrito Aff. ¶ 22; Tr. 137:7-10.*

**RESPONSE:** Denied. Cerrito testified that after the purported sale Khrapunov was "asked to intervene on critical matters," Tr. at 115:17-20, and documentary evidence indicates that Khrapunov was responsible for dealing with, among other things, the denial of financing from Black Sea Trade and Development Bank, Almaty Ex. 7. Khrapunov and Bourg were copied on communications regarding payments by Telford, while Glatz and Cerrito were not. Almaty Ex. 4. Further, Bourg testified that Ilyas Khrapunov and, though him, Mukhtar Ablyazov continued to control all of SDG and Triadou's critical investment decisions after the "sale." Bourg Supp. Decl. ¶ 7-8.

     220.    *Since Glatz purchased SDG in March 2013, the company has held more than sixty*

*Board meetings. Glatz was present at the majority of these Board meetings and participated in discussing SDG's assets and business matters. Cerrito Aff. ¶ 21.*

**RESPONSE:** Admit that SDG has held board meetings, but the Kazakh Entities lack sufficient information to admit or deny the number or participation of these board meetings.

*221. Triadou's U.S. real estate investments were discussed at multiple SDG Board meetings, including some that Bourg and Glatz both attended. Cerrito Aff. ¶ 23; Tr. 81:25-82:3; Triadou Ex. 3 at 1, 3 and 4.*

**RESPONSE:** Admit to the extent that Bourg attended some board meetings at which Glatz or his representatives may have been present. Bourg testified that Glatz or his representatives may have attended presentations Bourg made, but he "could not recall [Glatz] or his representatives asking [him] a single question or offering any comments regarding Triadou's operations or investments, and [he] continued to receive all instructions from Ilyas." Bourg Supp. Decl. ¶ 7-8.

*222. At one such Board meeting on June 26, 2013, which Glatz attended, Bourg gave an overview of the current projects of the Fund and the status of its registration. Id. at 1-2. During Bourg's presentation, "GLATZ enquired on the expectations of the investments [of the Fund]. Mr. Nicolas BOURG replied that the outlook is good and investments are going well on the 2 main projects sponsored by SDG Capital: Igloo and Porto Heli." Id.*
*223. Glatz and Bourg both attended another Board meeting on February 6, 2014. Bourg received instruction at that meeting from SDG's Board regarding the sale of the Igloo investment, and he was told that he "had to coordinate constantly and at any time with the officers of SDG Capital SA for the purpose of the sale of the Igloo project." Triadou Ex. 4.*

**RESPONSE:** As to ¶¶ 222-223, admitted that the document contains the quoted language, but the Kazakh Entities lack sufficient information to admit or deny whether such an exchange – which concerned an SDG investment outside of the United States – actually took place.

**Triadou Assigns Its Flatotel Ownership Interest**

*224. In or about March and April 2014, the Chetrits informed Triadou that a further capital call was needed from all equity partners in the Flatotel project. Cerrito Aff. ¶ 25.*

**RESPONSE:** Lacking information sufficient to admit or deny, the Kazakh Entities deny.

*225. Shortly after being informed of this capital call, in or about March and April 2014 Triadou informed the Chetrits that it did not wish to participate. In response, the Chetrits offered to buy out Triadou's membership interest in CF 135 West Member LLC. Cerrito Aff. ¶ 25.*

5

**RESPONSE:** Denied. Bourg approached Chetrit seeking a sale of the Flatotel interest, at the direction of Ilyas Khrapunov. Bourg Decl. ¶ 38-39; Tr. at 74:11-16 ("I started the negotiations and the work for that sale when Mr. Khrapunov asked me to do so because there was some legal pressure on his family in California.").

226.   *The Chetrits initially approached Khrapunov with the buyout offer, and asked him to introduce the offer to Glatz, as the Chetrits did not know Glatz at the time. Cerrito Aff. ¶ 25.*

**RESPONSE:** Denied. Bourg approached Chetrit seeking a sale of the Flatotel interest, at the direction of Ilyas Khrapunov. Bourg Decl. ¶ 38-39.

227.   *Upon consultation with Glatz, Bourg was authorized to negotiate a buyout and commenced such negotiations in April 2014. Cerrito Aff. ¶ 25.*

**RESPONSE:** Denied. Ilyas Khrapunov determined the terms of the buyout. Bourg Decl. ¶ 38-39.

228.   *Triadou and CF 135 Flat LLC entered into the Assignment Agreement on August 4, 2014. Triadou Ex. AA.*

**RESPONSE:** Admit.

**Bourg Is Biased and his Testimony Is Not Credible**

229.   *Bourg has conducted business in English. Almaty Exs. 5, 6, and 7.*

**RESPONSE:** Admit in part, although this fact is irrelevant. Bourg primarily conducts business in French, Almaty Ex. 17-18, and Bourg's communications with Cerrito were in French. Triadou Ex. 6. To the extent that Triadou is suggesting that Bourg lacks credibility because he testified in French with the aid of an interpreter, that argument is entirely misplaced; people often choose to conduct sworn testimony in their native language because of the solemnity of the occasion. Bourg testified that he reviewed his declarations in French, for example. Tr. at 56:16-19.

230.   *Bourg initially testified that he "never saw Glatz in any meetings" and "only met Glatz on three occasions, for approximately 10 minutes each time, and he never discussed SDG's or Triadou's operations in those brief meetings, which were purely social." Bourg Decl. ¶ 34. When shown SDG Board meeting minutes evidencing attendance by Glatz and himself, Bourg still denied any meetings, stating that a meeting "involves an interaction between two individuals." Tr. 82:6-7.*

6

*Bourg further testified that he does not "consider a board meeting a meeting" "[w]hen one is not part of the [board]." Tr. 82:10-12.*

**RESPONSE:** Denied as a mischaracterization of Bourg's testimony. Bourg testified that he "did not receive any inquiries or instructions from Glatz" and "could not recall [Glatz] or his representatives asking [him] a single question or offering any comments regarding Triadou's operations or investments, and [he] continued to receive all instructions from Ilyas." Bourg Supp. Decl. ¶ 7-8.

*231.  Bourg has never communicated or met with the Petelins.  Bourg Supp. Decl. ¶ 2.*

**RESPONSE:**  Admit.

*232.  Unbeknownst to SDG, Bourg personally made $64 million off "the totality of Triadou."  Almaty Ex. 10 at 11.*

**RESPONSE:** Denied. Triadou grossly mischaracterizes this testimony. Bourg stated that he made $64 million *for* Triadou as its director, and "not with [Chetrit]." Almaty Ex. 10 at 11. Triadou elected not to question Bourg on the meaning of these statements.

*233.  SDG fired Bourg in November 2014 due to his failure to timely register the Fund and his improper and unauthorized business expenditures, including traveling first class on private planes and helicopters, staying in 5-star hotels, and making spa visits.  Cerrito Aff. ¶¶ 27-28.*

**RESPONSE:** Denied. Bourg testified that all of his travel was approved by Ilyas Khrapunov, Bourg Supp. Decl. ¶ 10, and his termination letter states only that "due to some recent developments" Triadou decided "to appoint a new director for the company" Almaty Ex. 7.

*234.  On March 22 and 23, 2015, Bourg told Chetrit, "they kicked me out of Triado[u] without telling me anything. . . . That was not an elegant move." Almaty Ex. 9 at 20. Bourg stated, "It's just a lack of respect." Id. at 9. Bourg also stated, "I didn't deserve this, see? So now, I have just drawn the conclusions I had to draw and I'll do what I think is best." Id. at 20. Bourg also told Chetrit, "I'm not on their side." Almaty Ex. 10 at 15.*

**RESPONSE:**  Admit that the document contains the quoted language.  Triadou elected not to question Bourg on the meaning of these statements.

*235.  In a letter to Chetrit, Bourg claimed to be owed "a substantial amount of money" by*

7

*Triadou and Khrapunov. Almaty Ex. 32 at 1.*

**RESPONSE:** Admit that the document contains the quoted language. Triadou elected not to question Bourg on the meaning of these statements.

*236. On March 22 and 23, 2015, Bourg demanded payment from Joseph Chetrit for $1 million in "commissions" Bourg was promised for Triadou's investment in the Flatotel and its later assignment back of that interest. Almaty Ex. 9 at 10-14; Almaty Ex. 10 at 10. Bourg stated, "there was a 1 million commission for the deal," and that "There was, on the one hand, the commission, you have already paid 400 [thousand]. You still owe 600 [thousand]." Almaty Ex. 9 at 10. Bourg also said, "For Flats. We struck a deal. A first payment was made and then you paid nothing else." Id. at 17. Chetrit told Bourg, "You received something for each deal that we made. [inaudible] In that deal you were paid 100." Id. at 18.*
*237. Bourg demanded a $1.8 million commission for other deals, telling Chetrit, "They paid 6 to reimburse you and you gave 4.2. So there is a 1.8 discrepancy." Almaty Ex 9 at 12-13. Bourg demanded payment from Chetrit of an additional $800,000 for other deals. Id. at 11-12.*

**RESPONSE:** As to ¶¶ 236-237, admit that Bourg and Chetrit had business dealings separate from those involving Triadou, and discussed those separate deals in the quoted language. Triadou elected not to question Bourg on the meaning of these statements.

*238. Bourg told Chetrit, "We had a deal with Elias. He had loaned part of those funds . . . . But the conditions weren't acceptable for us." "So he is denouncing those loans and we are no longer on friendly terms." Almaty Ex. 9 at 4. Bourg also stated, "That guy Elias shows no appreciation for all that I've done for him." Id. at 16.*

**RESPONSE:** Admit that the document contains the quoted language. Triadou elected not to question Bourg on the meaning of these statements.

*239. Bourg prepared lawsuits against Triadou, Khrapunov, and Chetrit, but never filed any of them. Tr. 67:5-10, 67:20-68:1 (Bourg).*

**RESPONSE:** Admit.

*240. Bourg received a release from Almaty/BTA in exchange for his testimony and agreement to cooperate with Almaty/BTA. Tr. 58:3-13 (Bourg)*

**RESPONSE:** Admit. Bourg's obligation under that agreement is to testify truthfully when requested, which is the same agreement that Almaty/BTA reached with Chetrit. Tr. at 36:1-3.

Dated: New York, New York
June 20, 2016

                                        Respectfully submitted,

                                        BOIES, SCHILLER & FLEXNER LLP

By:   /s/ Matthew L. Schwartz
       Matthew L. Schwartz
       Randall W. Jackson
       Daniel G. Boyle
       Craig Wenner

       BOIES, SCHILLER & FLEXNER LLP
       575 Lexington Avenue
       New York, New York 10022
       Telephone: 212-446-2300
       Facsimile: 212-446-2350