# EXHIBIT A

# KAZAKHSTAN 2015 HUMAN RIGHTS REPORT

*Note: This report was updated 5/18/16; see Appendix F: Errata for more information.*

## EXECUTIVE SUMMARY

The Republic of Kazakhstan has a government system dominated by President Nursultan Nazarbayev and the ruling Nur Otan Party. The constitution concentrates power in the presidency. The president controls the legislature and judiciary as well as regional and local governments. Changes or amendments to the constitution require presidential consent. The April 26 presidential election, in which President Nazarbayev received 97.5 percent of the vote, was marked by irregularities and lacked genuine political competition. The 2012 national legislative elections for the Mazhilis (lower house of parliament) fell short of international standards. Civilian authorities maintained effective control over the security forces.

The most significant human rights problems were limits on citizens' ability to change the government through the right to vote in free and fair elections; restrictions on freedoms of expression, press, assembly, religion, and association, particularly through the increased use of the law prohibiting "inciting social, national, clan, racial, or religious discord"; and lack of an independent judiciary and due process, especially in dealing with pervasive corruption and abuses by law enforcement and judicial officials. New criminal and administrative codes that entered into effect January 1, as well as a new trade union law, further limit freedoms of speech, assembly, and religion.

Other reported abuses included: arbitrary or unlawful killings; military hazing that led to deaths; detainee and prisoner torture and other abuse; harsh and sometimes life-threatening prison conditions; arbitrary arrest and detention; infringements on citizens' privacy rights; prohibitive political party registration requirements; restrictions on the activities of nongovernmental organizations (NGOs); violence and discrimination against women; abuse of children; sex and labor trafficking; discrimination against persons with disabilities; societal discrimination against lesbian, gay, bisexual, transgender, and intersex (LGBTI) persons; discrimination against those with HIV/AIDS; and child labor.

The government prosecuted officials who committed abuses, especially in high-profile corruption cases; nevertheless, corruption remained widespread, and

impunity existed for those in positions of authority as well as for those connected to government or law enforcement officials.

**Section 1. Respect for the Integrity of the Person, Including Freedom from:**

**a. Arbitrary or Unlawful Deprivation of Life**

There were reports the government or its agents committed arbitrary or unlawful killings.

On August 9, Atyrau City Court No. 2 sanctioned a two-month pretrial arrest of a 22-year-old local policeman on suspicion of kidnapping and killing a 26-year-old citizen of Uzbekistan.  On August 5, the policeman and an accomplice allegedly tried to extort money from the victim.  Under the pretext that the Uzbek man looked like another person wanted by police, investigators alleged, the policeman forced the victim into a car and took him to the countryside, where the officer and accomplice stabbed the foreigner to death and buried his body.  The next day the policemen and accomplice allegedly broke into the house of a relative of the victim and stole money and jewelry.  A criminal case continued at year's end.

Military hazing led to deaths, suicides, and serious injuries.  For example, on May 29, Army Private Yeldos Ozhanov of military unit 5516, Karaganda Oblast, was admitted to Karaganda Oblast Hospital with serious injuries.  According to the victim, senior privates beat him for several days.  The military unit commanders denied the beatings.

**b. Disappearance**

There were no reports of politically motivated disappearances.

**c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment**

The law prohibits torture; nevertheless, police and prison officials allegedly tortured and abused detainees.

The National Preventive Mechanism (NPM) against Torture came into force in March 2014 when the prime minister signed rules permitting the monitoring of institutions.  Some observers commented that NPM staff lacked sufficient knowledge and training to recognize instances of torture.  The NPM is part of the

Office of the Human Rights Ombudsman and thus is not independent of the government.  The human rights ombudsman reported in 2014 that he received 96 complaints alleging torture, violence, and other cruel and degrading treatment and punishment, and stated that this was an increase compared with previous years and likely due to the NPM's monitoring activities.  In its first report published in March and covering activities in 2014, the NPM reported that the risk of human rights violations was high at temporary detention centers, especially in the first few hours.  The Public Monitoring Commission (PMC) corroborated that report and elaborated that torture typically occurred during the initial period of detention. Suspects often were beaten during transit or in police stations.

According to the NGO Kazakhstan International Bureau for Human Rights and Rule of Law (KIBHR), in the first eight months of the year, the bureau received 67 complaints of torture and mistreatment.  The Coalition of NGOs against Torture recorded 45 complaints of torture in the first six months of the year.  The Prosecutor General's Committee for Legal Statistics reported that during the first eight months of the year, it registered 116 complaints of torture.

Human rights activists asserted the domestic legal definition of torture was noncompliant with the definition of torture in the UN Convention against Torture.

**Prison and Detention Center Conditions**

Prison conditions were generally harsh and sometimes life threatening, and facilities did not meet international health standards.  Health problems among prisoners went untreated in many cases, or prison conditions exacerbated them.

Physical conditions:  According to Penal Reform International (PRI), although men and women were held separately and pretrial detainees were held separately from convicted prisoners, during transitions between temporary detention centers, pretrial detention, and prisons, youth often were held with same-sex adults. Conditions did not vary by inmate gender but by the age of the detention facility.

Abuse occurred in police cells, pretrial detention facilities, and prisons.  Observers cited the primary cause of mistreatment as the lack of professional training programs for administrators.

The NPM reported infrastructure problems in prisons, such as unsatisfactory sanitary and hygiene conditions, including poor plumbing and sewerage systems and unsanitary bedding.  It also reported shortages of medical staff and insufficient

medicine, as well as problems of mobility for prisoners with disabilities.  In many places the NPM noted restricted connectivity with the outside world and limited access to information about prisoners' rights.  The PRI reported there was a widespread lack of heating and adequate ventilation in prisons.

The statistics committee of the Prosecutor General's Office reported two suicides and 14 attempts at suicide in pretrial detention centers in the first eight months of the year, and three cases of suicide and 28 cases of attempted suicide in prisons.

According to the PMC, in the first eight months of the year, there were 63 cases of civil disobedience and self-mutilation by prisoners.

Administration:  The law does not allow prayer rooms and religious facilities in prisons.  By law a prisoner in need of "religious rituals" or his relatives may ask to invite a representative of a registered religious organization to carry out religious rites, ceremonies, and/or meetings, provided they do not obstruct prison activity or violate the rights and legal interests of other individuals.

Independent Monitoring:  There were no independent international monitors of prisons, including the International Committee of the Red Cross/Red Crescent.  The local independent monitoring group PMC visited approximately 600 facilities during the year.

Improvements:  The new criminal code introduces alternative sentences including fines and public service.  Alternatives for sentencing nonviolent offenders were used more frequently during the year.

According to the Criminal Correctional System Committee, new prison facilities that complied with international standards were constructed in three oblasts.  These new facilities include a cell system with 71 square feet per inmate and a toilet in every cell.

## d. Arbitrary Arrest or Detention

The law prohibits arbitrary arrest and detention, but the practice occurred.  The Presidential Commission on Human Rights reported that in 2014, 1,047 individuals were unreasonably held in temporary isolation facilities and 459 individuals unlawfully were held in offices of criminal prosecution units.

## Role of the Police and Security Apparatus

The Ministry of Internal Affairs supervises the national police force, which has primary responsibility for internal security, including investigation and prevention of crimes and administrative offenses, and maintenance of public order and security.  The Agency of Civil Service Affairs and Anticorruption has administrative and criminal investigative powers.  The Committee for National Security (KNB) plays a role in border security, internal and national security, antiterrorism efforts, and the investigation and interdiction of illegal or unregistered groups, such as extremist groups, military groups, political parties, religious groups, and trade unions.  The KNB, Syrbar (a separate foreign intelligence service), and Agency of Civil Service Affairs and Anticorruption report directly to the president.  Many government ministers maintained personal blogs where citizens could register complaints.

Although the government took some steps to prosecute officials who committed abuses, impunity existed.

**Arrest Procedures and Treatment of Detainees**

Although the judiciary has the authority to deny or grant arrest warrants, judges authorized prosecutor warrant requests in the vast majority of cases.  Prosecutors continued to have the power to authorize investigative actions, such as search and seizure.

Persons detained, arrested, or accused of committing a crime have the right to the assistance of a defense lawyer from the moment of detention, arrest, or accusation. The new criminal procedure code, which went into effect January 1, introduced an obligation for the police to inform detainees about their rights, including the right to an attorney.  Human rights observers alleged that prisoners were constrained in their ability to communicate with their attorneys and that penitentiary staff often remained present during their meetings with clients.  The human rights ombudsman reported that in 2014 law enforcement officials dissuaded detainees from seeing an attorney, gathered evidence through preliminary questioning before a detainee's attorney arrived, and in some cases used defense attorneys loyal to the government to gather evidence.  The law states that the government must provide an attorney for an indigent suspect or defendant when the suspect is a minor, has physical or mental disabilities, or faces serious criminal charges, but public defenders often lacked the necessary experience and training to assist defendants. Defendants are barred from freely choosing their defense counsel if the cases

against them involve state secrets.  The law allows only lawyers who have special clearance to work on such cases.

Arbitrary Arrest:  Prosecutors reported continuing problems with arbitrary arrest and detention.

The government frequently arrested and detained political opponents and critics, sometimes for minor infractions, such as unsanctioned assembly, that led to fines or up to 10 days' administrative arrest.  By law detainees may remain in pretrial detention for up to two months.  Depending on the complexity and severity of the alleged offense, authorities may extend the term for up to 18 months while investigation takes place.  The pretrial detention term may not be longer than the potential sentence for the offense.

Pretrial Detention:  The law allows police to hold a detainee for 72 hours before bringing charges.  Human rights observers criticized this period as too lengthy and alleged that authorities often used this phase of detention to torture, beat, and abuse inmates to extract confessions.

The new criminal code introduced the concept of conditional release on bail.  The bail system is designed for persons who commit a criminal offense for the first time or for a crime of minor or moderate severity not associated with causing death or grievous bodily harm to the victim, provided that the penalties for committing such a crime contain a fine as an alternative penalty.

The law grants prisoners prompt access to family members, although authorities occasionally sent prisoners to facilities located far from their homes and relatives, thus preventing access for those who could not afford to travel.

**e. Denial of Fair Public Trial**

The law does not provide for an independent judiciary.  The executive branch sharply limited judicial independence.  Prosecutors enjoyed a quasi-judicial role and had the authority to suspend court decisions.

Corruption was evident at every stage of the judicial process.  Although judges were among the most highly paid government employees, lawyers and human rights monitors alleged that judges, prosecutors, and other officials solicited bribes in exchange for favorable rulings in many criminal and civil cases.

On September 11, the Zhambyl District Court sentenced a judge of Taraz Court No. 2 to four years in prison for attempted fraud, and an attorney received the same sentence for aiding and abetting fraud.  The judge allegedly solicited a 200,000 tenge ($740) bribe for illegal assistance in a case.

Military courts have jurisdiction over civilian criminal defendants in cases allegedly connected to military personnel.  Military courts use the same criminal code as civilian courts.

**Trial Procedures**

All defendants enjoy a presumption of innocence and are protected from self-incrimination under the law.  Trials are public except in instances that could compromise state secrets or when necessary to protect the private life or personal family concerns of a citizen.  Only defendants charged with capital crimes facing the death penalty or a life sentence are entitled to trial by jury.

Courts conducted jury trials for aggravated murder cases.  Observers noted that the juror selection process was inconsistent.  For example, on some occasions the court learned after a trial concluded that a juror had a previous criminal conviction, which normally excludes potential members from the juror pool.

Indigent defendants in criminal cases have the right to counsel and a government-provided attorney.  By law a defendant must be represented by an attorney when the defendant is a minor, has mental or physical disabilities, does not speak the language of the court, or faces 10 or more years of imprisonment.  Defense attorneys, however, reportedly participated in only one-half of criminal cases, in part because the government failed to pay them properly or on time.  The law also provides defendants the rights to be present at their trials, to be heard in court, to confront witnesses against them, and to call witnesses for the defense.  They have the right to appeal a decision to a higher court.  According to observers, prosecutors dominated trials, and defense attorneys played a minor role.

Domestic and international human rights organizations reported numerous problems in the judicial system, including lack of access to court proceedings, lack of access to government-held evidence, frequent procedural violations, denial of defense counsel motions, and failure of judges to investigate allegations that authorities extracted confessions through torture or duress.

Lack of due process was a problem, particularly in a handful of politically motivated trials involving protests by opposition activists and in cases in which there were allegations of improper political or financial influence.

Human rights and international observers noted investigative and prosecutorial practices that emphasized a confession of guilt over collection of other evidence in building a criminal case against a defendant.  Courts generally ignored allegations by defendants that officials obtained confessions by torture or duress.

**Political Prisoners and Detainees**

A group of civil society activists maintained a list of individuals they considered detained or imprisoned based on politically motivated charges.  The group added some names during the year including Yermek Narymbayev, Serikzhan Mambetalin, Bolatbek Blyalov, and Saken Tulbayev, in addition to the previously designated Mukhtar Dzhakishev, Aron Atabek, Vladimir Kozlov, and Vadim Kuramshin.

On December 8, Kapshagai City Court refused to release Kozlov on parole, citing his "poor disciplinary record."  Kozlov was the leader of unregistered political party "Alga!," which was banned countrywide in 2012.  He was sentenced to seven and a half years in jail in 2012 after the Zhanaozen events (wherein oil workers held a months-long strike that culminated in 2011 when police killed at least 16 protesters) for charges including "creating and leading a criminal organization" and "inciting social, ethnic, racial, or religious hatred."

**Civil Judicial Procedures and Remedies**

Individuals and organizations may seek civil remedies for human rights violations through domestic courts.  Economic and administrative court judges handle civil cases under a court structure that largely mirrors the criminal court structure.  Although the law and constitution provide for judicial resolution of civil disputes, observers viewed civil courts as corrupt and unreliable.

**f. Arbitrary Interference with Privacy, Family, Home, or Correspondence**

The constitution and law prohibit violations of privacy, but the government at times infringed on these rights.

The law provides prosecutors with extensive authority to limit citizens'
constitutional rights.  The KNB, the Ministry of Internal Affairs, and other
agencies, with the concurrence of the Prosecutor General's Office, may infringe on
secrecy of private communications and financial records, as well as on the
inviolability of the home.  According to the NGO Human Rights Watch, on
October 12, police detained Ermek Narymbaev (see section 2.a.), searched his
office and home, and confiscated laptops and modems.  Police did not permit
Zhanara Balgabaeva, Narymbaev's lawyer, who arrived at his office after the
search began, to enter during the search, although she was present during the
search of her client's home.

Courts may hear an appeal of a prosecutor's decision but may not issue an
immediate injunction to cease an infringement.  The law allows wiretapping in
medium, urgent, and grave cases.

Government opponents, human rights defenders, and their family members
continued to report the government occasionally monitored their movements.

UN Special Rapporteur on Freedom of Assembly and of Association Maina Kiai
expressed serious concern about an incident that occurred during his visit to the
country in January.  When departing a meeting with members of civil society, he
noted unidentified men in a car outside taking pictures of the participants leaving
the meeting.  The special rapporteur approached the individuals and demanded to
know their identity and their purpose in taking photographs, at which point they
drove off without responding.  Kiai lodged a formal complaint the same day to the
Mangystau Oblast Interior Department.  Police later presented a written confession
from "the perpetrator," who Kiai maintained was not the person taking the
photographs.

**Section 2. Respect for Civil Liberties, Including:**

**a. Freedom of Speech and Press**

While the constitution provides for freedom of speech and of the press, the
government limited freedom of expression and exerted influence on the media
through a variety of means, including laws, harassment, licensing regulations,
internet restrictions, and criminal and administrative charges.  Judicial actions
against journalists and media outlets, including civil and criminal libel suits filed
by government officials, led to the suspension of several media outlets and
encouraged self-censorship.  The law provides for additional measures and

restrictions during "social emergencies," defined as "an emergency on a certain territory caused by contradictions and conflicts in social relations that may cause or have caused loss of life, personal injury, significant property damage, or violation of conditions of the population." In these situations, the government may censor media sources by requiring them to provide their print, audio, and video information to the authorities 24 hours before issuance/broadcasting for approval. Political parties and public associations may be suspended or closed should they obstruct the efforts of security forces. The regulations also allow the government to restrict or ban copying equipment, broadcasting equipment, and audio and video recording devices and temporarily seize sound-enhancing equipment.

Freedom of Speech and Expression: The government limited individual ability to criticize the country's leadership, and regional leaders attempted to limit criticism of their actions in the local media. The law prohibits insulting the president or the president's family.

The new criminal code penalizes "intentionally spreading false information" with fines of up to 12.96 million tenge ($48,000) and imprisonment for up to 10 years. It penalizes "inciting social, national, clan, racial, or religious discord" with imprisonment of up to 20 years. For example, on October 12, police arrested Ermek Narymbaev, a blogger and activist, and Serikzhan Mambetalin, former head of the Rukhaniyat Party, after receiving information that "they had circulated material on social media that contained clear signs of inciting national discord [and] insulting national honor and dignity." According to Human Rights Watch, by arresting Narymbaev and Mambetalin, police appeared more interested in muzzling government critics than in combating actual criminal activity. An Almaty court confirmed a two-month pretrial detention order on October 15.

Press and Media Freedoms: Many privately owned newspapers and television stations received government subsidies. Lack of transparency in media ownership is a significant problem. Companies allegedly controlled by members of the president's family or his loyal associates owned the majority of those broadcast media outlets that the government did not control outright. According to media observers, the government wholly or partly owned most of the nationwide television broadcasters. Regional governments owned several frequencies, and the Ministry of Investment and Development distributed those frequencies to independent broadcasters via a tender system.

All media are required to register with the Ministry of Investment and Development, although websites are exempt from this requirement. The law limits

the simultaneous broadcast of foreign-produced programming to 20 percent of a locally based station's weekly broadcast time.  This provision burdened smaller, less-developed regional television stations that lacked resources to create programs, although the government did not sanction any media outlet under this provision.  Foreign media broadcasting does not have to meet this requirement.

Violence and Harassment:  During the first six months of the year, press advocacy NGO Adil Soz recorded four attacks on editorial offices and journalists.  According to the NGO, authorities prevented reporters from carrying out their duties in 18 instances during the same period, and authorities denied or significantly restricted journalists' access to public information 92 times.  In the first half of the year, Adil Soz reported two instances of violence against journalists.  In each case authorities caught the perpetrators, who apologized to the victims.

Journalists working in opposition media and covering stories related to corruption reported harassment and intimidation by government officials and private actors.

Censorship or Content Restrictions:  The law enables the government to restrict media content through amendments that prohibit undermining state security or advocating class, social, race, national, or religious discord.  Owners, editors, distributors, and journalists may be held civilly and criminally responsible for content unless it came from an official source.  The government used this provision to restrict media freedom.

The law allows the prosecutor general to suspend access to the internet and other means of communication without a court order.  In cases where communication networks were used "for criminal purposes to harm the interests of an individual, society, or the state, or to disseminate information violating the Election Law … or containing calls for extremist or terrorist activities, riots, or participation in mass (public) activities carried out in violation of the established order," the prosecutor general may suspend communication services.

By law internet resources, including social media, are classified as forms of mass media and governed by the same rules and regulations.  During the year the government used this definition to close a social media outlet of a news portal that had been closed by court order.

On October 22, an Almaty court permanently shut down independent news outlet *ADAM* magazine and ordered its Facebook page closed.  This followed an August

court ruling to suspend the publication for three months for violating a provision of its registration papers under which it was required to publish in both Kazakh and Russian.  Prosecutors stated the magazine was the same publication as its predecessor, *ADAMbol*, which a court order closed in December 2014.  The government won a court order in February to cancel *ADAMbol*'s registration and right to publish after it published allegedly "prowar propaganda" in an article on the Ukraine conflict.

Libel/Slander Laws:  The law provides enhanced penalties for libel against senior government officials.  Private parties may initiate criminal libel suits without independent action by the government, and an individual filing such a suit is also able to file a civil suit based on the same allegations.  Officials used the law's libel and defamation provisions to restrict media outlets from publishing unflattering information.  Both the criminal and civil codes contain articles establishing broad liability for libel, with no statute of limitation or maximum amount of compensation.  The requirement that owners, editors, distributors, publishing houses, and journalists prove the veracity of published information, regardless of its source, encouraged self-censorship at each level.

The law includes penalties for defamatory remarks made in the mass media or "information-communication networks," including heavy fines and prison terms.  Journalists and human rights activists feared these provisions would strengthen the government's ability to restrict investigative journalism.

NGOs reported that libel cases against journalists and media outlets remained a problem.  For example, in April Kazkommertsbank, one of the largest banks in the country, sued the web portal Nakanune.kz for publishing a reader's letter.  The bank claimed the website published false information implicating the bank in corruption.  In June the Almaty City Court ordered the owner of Nakanune.kz, Guzyal Baydalinova, to pay a 20-million-tenge ($74,000) fine in compensation for damages to the business reputation of Kazkommertsbank.  According to Human Rights Watch, Baydalinova maintained that the article published by Nakanune.kz contained credible allegations on a matter of serious public concern that police should investigate.  Baydalinova's lawyer also pointed out that the bank did not establish for the court any actual financial cost to the bank because of the article.

National Security:  The law criminalizes the release of information regarding the health, finances, or private life of the president, as well as economic information, such as data about mineral reserves or government debts to foreign creditors.  To

avoid possible legal problems, media outlets often practiced self-censorship regarding the president and his family.

The law prohibits "influencing public and individual consciousness to the detriment of national security through deliberate distortion and spreading of unreliable information."  Legal experts noted the term "unreliable information" is overly broad.  The law also requires owners of communication networks and service providers to obey the orders of authorities in case of terrorist attacks or to suppress mass riots.

The law prohibits publication of any statement that promotes or glorifies "extremism" or "incites social discord," terms that international legal experts noted the government did not clearly define.  The government subjected to intimidation media outlets that criticized the president; such intimidation included law enforcement actions and civil suits.  Although these actions continued to have a chilling effect on media outlets, some criticism of government policies continued. Incidents of local government pressure on the media continued.

**Internet Freedom**

Observers reported the government blocked or slowed access to opposition websites.  Many observers expressed the view that the government planted progovernment propaganda in internet chat rooms.  The government regulated the country's internet providers, including state-owned Kazakhtelecom.  Nevertheless, websites carried a wide variety of views, including viewpoints critical of the government.  Official statistics reported 68 percent of the population had internet access in 2014.

The Ministry of Investment and Development controlled the registration of ".kz" internet domains.  Authorities may suspend or revoke registration for locating servers outside the country.  Observers criticized the registration process as unduly restrictive and vulnerable to abuse.

The government implemented regulations on internet access that mandated surveillance cameras in all internet cafes, required visitors to present identification to use the internet, demanded internet cafes keep a log of visited websites, and authorized law enforcement officials to access the names and internet histories of users.  In 2014 the president signed a law further restricting freedoms of communication (see section 2.a.).

**KAZAKHSTAN**                                                                14

NGO Adil Soz reported 10 cases of blocking or restricting access to websites during the first half of the year.  In September a district court in Astana ordered *Vimeo.com* to shut down for allegedly posting extremist content; access was restored in October.  *Flickr.com* was also unavailable between September and October, although there was no legal action relating to that site.  Intermittent blocking of website *LiveJournal* continued, although it was unblocked in November.  According to NGO Freedom House's *Freedom on the Net* 2015 report, the most significant cases of censorship were related to domestic and international coverage of the country's connection to the Islamic State of Iraq and the Levant.

In several cases the government denied it was behind the blocking of websites.  Bloggers reported anecdotally their sites were periodically blocked, including the independent news sites *ratel.kz*, *zonakz.net*, and *uralskweek.kz*, as well as the website of the banned newspaper *Respublika*.  *Radio Azattyk* reported that some of its news reports were not accessible in the country.

Authorities charged pro-Russia blogger Yermek Taychibekov with "inciting interethnic hatred" for his allegedly antagonistic writings and Facebook postings after blogger Botagoz Isayeva filed a complaint.  During police questioning in August, Taychibekov allegedly exhibited behaviors that led to his committal for a 30-day psychiatric evaluation.  He was declared competent and released from the psychiatric institution on September 9.  Authorities returned Taychibekov to the detention center while a trial proceeded.

Government surveillance was also prevalent.  According to the *Freedom on the Net* report, Facebook users who planned to take part in protests reported several times they received police visits to their residences to "discuss their Facebook posts" and warn them against going to an unsanctioned gathering.  In January social media announced and coordinated an unauthorized rally in support of the *ADAMbol* magazine, but authorities detained key participants--including journalists and human rights activists--near their residences as they were heading to the gathering.

*Freedom on the Net* reported during the year that the country had a system of operative-investigative measures that allowed the government to use surveillance methods called Deep Packet Inspection (DPI).  While Kazakhtelecom maintained that it used its DPI system for traffic management, there were reports that Check Point Software Technologies installed the system on its backbone infrastructure in 2010.

**Academic Freedom and Cultural Events**

The government generally did not restrict academic freedom, although the government prohibited academics, like other citizens, from infringing on the dignity and honor of the president and his family.  Many academics practiced self-censorship.

## b. Freedom of Peaceful Assembly and Association

### Freedom of Assembly

The law provides for limited freedom of assembly, but there were significant restrictions on this right, and police used force to disrupt peaceful demonstrations. The law defines unsanctioned gatherings, public meetings, demonstrations, marches, picketing, and strikes that upset social and political stability as national security threats.

The law includes penalties for organizing or participating in illegal gatherings and for providing organizational support in the form of property, means of communication, equipment, and transportation, if the enumerated actions cause significant damage to the rights and legal interests of citizens, entities, or legally protected interests of the society or the state.

By law organizations must apply to local authorities for a permit to hold a demonstration or public meeting at least 10 days in advance.  Opposition figures and human rights monitors complained that complicated and vague procedures and the 10-day notification period made it difficult for groups to organize public meetings and demonstrations and noted local authorities turned down many applications for demonstrations or only allowed them to take place outside the city center.

Authorities often briefly detained and fined organizers of unsanctioned gatherings, including political party gatherings.  The NGO KIBHR, which monitored demonstrations in 15 cities, recorded 114 peaceful demonstrations during 2014, 90 percent of which were unsanctioned.

In January the UN special rapporteur on the rights to freedom of peaceful assembly and of association, Maina Kiai, expressed concern that the country's approach to the rights to freedom of peaceful assembly and association adversely affected public discourse.  Authorities frequently viewed opposition or dissenting views as a source of possible instability.

In August police detained bloggers Yermek Narymbayev and Rinat Kibrayev on their way to protest the tenge devaluation.  On August 20, Narymbayev wrote on his Facebook wall that he intended to protest the devaluation.  Authorities released Kibrayev the same day while holding Narymbayev for 20 days--15 days for violating the law on public assembly and another five days for contempt of court for allegedly not obeying court orders.

**Freedom of Association**

The law provides for limited freedom of association, but there were significant restrictions on this right.  Any public organization set up by citizens, including religious groups, must be registered with the Ministry of Justice, as well as with the local departments of justice in every region in which the organization conducts activities.  The law requires public or religious associations to define their specific activities, and any association that acts outside the scope of its charter may be warned, fined, suspended, or ultimately banned.  Participation in unregistered public organizations may result in administrative or criminal penalties, such as fines, imprisonment, the closure of an organization, or suspension of its activities.

NGOs reported difficulty in registering public associations.  For example, in his latest report, the special rapporteur on the rights to freedom of peaceful assembly and of association noted authorities had denied registration to certain public associations, such as Kok-Zhailau, an ecological group, and Amanat Aktau and Aktau Voice, which supported families of the victims of the Zhanaozen crisis.  According to government information, there were discrepancies in the submitted documents.  The special rapporteur encouraged authorities to facilitate the formation of public associations proactively, since they could play a crucial role in advancing human rights and development.

Membership organizations other than religious groups, covered under separate legislation, must have at least10 members to register at the local level and must have branches in more than half the country's regions for national registration.  The government considered political parties and labor unions to be membership organizations but required political parties to have 40,000 signatures for registration.  If authorities challenge the application by alleging irregular signatures, the registration process may continue only if the total number of eligible signatures exceeds the minimum number required.  The law prohibits parties established on an ethnic, gender, or religious basis.  The law also prohibits members of the armed forces, employees of law enforcement and other national

security organizations, and judges from participating in trade unions or political parties.

According to a January 27 statement, Special Rapporteur Kiai noted the law regulating the establishment of political parties is problematic as it imposes onerous obligations prior to registration, including high initial membership requirements that prevent small parties from forming and extensive documentation that requires time and significant expense to collect. He also expressed concern regarding the broad discretion granted to officials in charge of registering proposed parties, noting that the process lacked transparency and the law allows for perpetual extensions of time for the government to review a party's application.

In September the lower house of parliament passed amendments to NGO financing that include new provisions governing registration and recordkeeping. Under the new law, all "nongovernment organizations, subsidiaries, and representative offices of foreign and international noncommercial organizations" would be required to provide information on "their activities, including information about the founders, assets, …sources of their funds and what they are spent on…." An unidentified "authorized body" may initiate a "verification" of the information submitted based on information received in mass media reports, complaints from individuals and entities, or other subjective sources. Untimely or inaccurate information contained in the report, discovered during verification, is an administrative offense and may carry fines up to 49,550 tenge ($184) or suspension for three months in case the violation is not rectified or is repeated within one year. In extreme cases criminal offenses are possible, which may lead to a large fine, suspension, or closure of the organization.

The law prohibits illegal interference by members of public associations in the activities of the government, with a fine of up to 594,600 tenge ($2,200) or imprisonment for up to 75 days. If committed by the leader of the organization, the fine may be up to 991,000 tenge ($3,670) or imprisonment for no more than 90 days. The law does not clearly define "illegal interference."

Under the law a public association, along with its leaders and members, may face fines for performing activities outside its charter. The delineation was unclear between actions an NGO member takes in his or her private capacity versus as part of an organization.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at
www.state.gov/religiousfreedomreport/.

## d. Freedom of Movement, Internally Displaced Persons, Protection of Refugees, and Stateless Persons

The law provides for freedom of internal movement, foreign travel, emigration, and repatriation.  Despite some regulatory restrictions, the government generally respected these rights.  The government cooperated with the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations to provide protection and assistance to internally displaced persons, refugees, returning refugees, asylum seekers, stateless persons, and other persons of concern.

In-country Movement:  The government required foreigners who remained in the country for more than five days to register with the migration police.  Foreigners entering the country had to register at certain border posts or airports where they enter.  Some foreigners experienced problems traveling in regions outside their registration area.  The government's *Concept on Improving Migration Policy* covers internal migration, repatriation of ethnic Kazakh returnees (oralmans), and external labor migration.  There is a registration exemption for families of legal migrant workers for a 30-day period after the worker starts employment.  The government has broad authority to deport those who violate the regulations.

Since 2011 the government has not reported the number of foreigners deported for gross violation of visitor rules.  Individuals facing deportation may request asylum if they fear persecution in their home country.  The government required persons who were suspects in criminal investigations to sign statements they would not leave their city of residence.

Authorities required foreigners to obtain prior permission to travel to certain border areas adjoining China and cities in close proximity to military installations.  The government continued to declare particular areas closed to foreigners due to their proximity to military bases and the space launch center at Baikonur.

Foreign Travel:  The government did not require exit visas for temporary travel of citizens, yet there were certain instances in which the government may deny exit from the country, including in the case of travelers subject to pending criminal or civil proceedings or having unfulfilled prison sentences, unpaid taxes, fines, alimony or utility bills, or compulsory military duty.  Travelers who present false documentation during the exit process may be denied the right to exit, and

authorities controlled travel by active-duty military personnel.  The law requires persons who had access to state secrets to obtain permission from their employing government agency for temporary exit from the country.

Exile:  The law does not prohibit forced exile if authorized by an appropriate government agency or through a court ruling.

Emigration and Repatriation:  The law provides for the right to emigrate and the right to repatriate, and the government generally respected these rights.  An exception is the law on national security, which prohibits persons who had access to state secrets from taking up permanent residence abroad for five years after leaving government service.  The government required a permanent exit visa for emigration.  Obtaining this visa required criminal checks, credit checks, and letters from parents and any dependents over age 10 expressing no objection to exit visa issuance.

**Protection of Refugees**

The government cooperated with UNHCR and other organizations to provide protection and assistance to refugees from countries where their lives or freedom would be threatened on account of their race, religion, nationality, membership in a particular social group, or political opinion.  The government recognized 65 persons as refugees during the first six months of the year, out of 149 asylum seekers at various stages of the process.

Access to Asylum:  The law provides for the granting of asylum or refugee status, and the government has established a system for providing protection to refugees.  UNHCR legally may appeal to the government and intervene on behalf of individuals facing deportation.  The law and several implementing regulations and by-laws regulate the granting of asylum and refugee status.

The Refugee Status Determination outlines procedures and access to government services, including the right to be legally registered and issued official documents.  The Department of Migration Police in the Ministry of Internal Affairs conducts status determination procedures.  Any individual seeking asylum in the country has access to the asylum procedure.  According to UNHCR, the staff assigned for asylum processing lacked knowledge and qualifications, and decisions often contradicted existing national legislation and provisions of the 1951 Convention or applicable international standards.  UNHCR also noted that the application of refugee criteria was not consistent throughout the country, and the recognition rate

remained low.  Reports indicated that regional authorities also discouraged some asylum seekers from applying for asylum.  The Uralsk City Court noted serious procedural flaws on February 9, when the court returned the case of a 17-year-old (Donetsk) Ukrainian citizen who had been denied asylum to the West Kazakhstan Migration Police for additional consideration.

A legislative framework does not exist to manage the movement of asylum seekers between the country's borders and authorities in other areas.  There are no reception facilities for asylum seekers.  The government does not provide accommodation, allowances, or any social benefits to asylum seekers.  The law does not provide for differentiated procedures for persons with specific needs, such as separated children, and persons with disabilities.  Asylum seekers and refugees with specific needs are not entitled to financial or medical assistance.  There are no guidelines for handling sensitive cases, including LGBTI cases.

The law envisages refugees as individuals fleeing persecution because of their race, religion, nationality, membership in a particular social group, or political opinion.  It does not envisage protection to be provided to persons fleeing wars or situation of generalized violence.  Authorities appeared to use this scenario in the asylum applications of persons fleeing Syria and Ukraine.

In April Almaty Migration Police denied refugee status to the stateless Abdrashid Kushayev from Uzbekistan on the grounds that he failed to provide evidence regarding persecution based on race, nationality, religion, nationality, membership of a particular social group, or political opinion in Uzbekistan.  The Almalinskiy District Court of Almaty denied his complaint against the Migration Police.  In July Kushayev entered Russia in search of refugee status there.

Employment:  Refugees face difficulties in gaining employment and social assistance from the government.  By law refugees have the right to work, with the exception of engaging in individual entrepreneurship.  Refugees faced difficulties in accessing the labor market due to local employers' lack of awareness of refugee rights.

Access to Basic Services:  All refugees recognized by the government receive a refugee certificate that allows them to stay in the country legally.  The majority of refugees have been residing in the country for many years.  Their status as "temporarily residing aliens" hinders their access to the full range of rights stipulated in the 1951 Convention and the law.  Refugee status lasts for one year and is subject to annual renewal.  Given their temporary status, refugees do not

have the right to apply for nationality, even after permanently residing in the country for more than five years.  Children of refugees born in the country are also not recognized as citizens and would be stateless or at risk of statelessness if their nationality in the country of origin of their parents may not be conferred.  The law also lacks provisions on treatment of asylum seekers and refugees with specific needs.  Refugees have no access to social benefits or allowances.

UNHCR reported cordial relations with the government in assisting refugees and asylum seekers.  The government usually allowed UNHCR access to detained foreigners to ensure proper treatment and fair determination of status.

The government was generally tolerant in its treatment of local refugee populations.

Consistent with the Minsk Convention on Migration within the Commonwealth of Independent States (CIS), the government did not recognize Chechens as refugees.  Chechens are eligible for temporary legal resident status for up to 180 days, as are any other CIS citizens.  This temporary registration is renewable, but local migration officials have discretion over the renewal process.

The government has an agreement with China not to tolerate the presence of ethnic separatists from one country on the territory of the other.  UNHCR reported no new cases of Uighur refugees during the year.

**Stateless Persons**

The constitution and law provide avenues to deal with those considered stateless, and the government generally took seriously its obligation to ease the burden of statelessness within the country.  As of June 30, there were 7,038 persons officially registered by the government as stateless.  The majority of individuals residing in the country with undetermined nationality, de facto statelessness, or those at heightened risk of statelessness, are primarily those who have no identity documents, or have invalid identity documents from a neighboring CIS country or are holders of Soviet passports.  These individuals typically resided in remote areas without obtaining official documentation.

According to UNHCR the law provides a range of rights to persons recognized by the government as stateless.  The legal status of officially registered stateless persons is documented and considered as having permanent residency, which is granted for 10 years in the form of a stateless person certificate.  According to the

law after five years of residence in the country, stateless persons are eligible to apply for citizenship.  Children of officially recognized stateless persons born in the country are recognized as nationals.  A legal procedure exists for ethnic Kazakhs; those with immediate relatives in the country; and citizens of Ukraine, Belarus, Russia, and Kyrgyzstan, with which the country has agreements.  The law gives the government six months to consider an application for citizenship.  Some applicants complained that, due to the lengthy bureaucratic process, obtaining citizenship often took years.  In summary the law does not provide a simplified naturalization procedure for stateless persons.  Existing legislation prevents children of parents without identity documents from obtaining birth certificates, which hindered their access to education, free health care, and freedom of movement.

Persons rejected or whose status of stateless persons has been revoked may appeal the decision, but such appeals involved a lengthy process.

Officially recognized stateless persons have access to free medical assistance on the level provided to other foreigners, but it is limited to emergency medical care and to treatment of 21 contagious diseases on a list approved by the Ministry of Health and Social Development.  Officially recognized stateless persons have a right to employment, with the exception of government positions.  They may face challenges when concluding labor contracts, since potential employers may not understand or be aware of this legal right.

UNHCR reported that stateless persons without identity documents may not legally work, which led to the growth of illegal labor migration, corruption, and abuse of authority among employers.  Children of stateless parents were also considered stateless, including those born in the country.

**Section 3. Freedom to Participate in the Political Process**

The constitution and law provide citizens the ability to choose their government in free and fair periodic elections based on universal and equal suffrage, but the government severely limited exercise of this right.

Although the 2007 constitutional amendments increased legislative authority in some spheres, the constitution continues to concentrate power in the presidency.  The president appoints and dismisses most high-level government officials, including the prime minister, cabinet, prosecutor general, KNB chief, supreme court and lower-level judges, and regional governors.  The Mazhilis must confirm

the president's choice of prime minister, and the senate must confirm the president's choice of prosecutor general, KNB chief, supreme court judges, and National Bank head.  Parliament has never failed to confirm a presidential nomination.  Modifying or amending the constitution effectively requires the president's consent.  Constitutional amendments exempt President Nazarbayev from the two-term presidential term limit and protect him from prosecution.

Two 2010 laws, termed "Leader-of-the-Nation laws," establish President Nazarbayev as chair of the Kazakhstan People's Assembly, grant him lifetime membership on the Constitutional and Security councils, allow him "to address the people of Kazakhstan at any time," and stipulate that all "initiatives on the country's development" must be coordinated through him.

**Elections and Political Participation**

Recent Elections:  An early presidential election on April 26 gave President Nazarbayev 97.5 percent of the vote.  According to the *New York Times*, his two opponents, who supported the Nazarbayev government, were seen as playing a perfunctory role as opposition candidates.  The Organization for Security and Cooperation in Europe (OSCE) stated that the election process generally was managed effectively, although the OSCE head of mission stated that voters were not given a choice of political alternatives and noted both "opposition" candidates had openly praised Nazarbayev's achievements and some voters reportedly had been pressured to vote for the incumbent.

Political Parties and Political Participation:  Political parties must register members' personal information, including date and place of birth, address, and place of employment.  This requirement discouraged many citizens from joining political parties.

There were seven political parties registered, including Ak Zhol, Birlik, and the new joint Party of Patriots of Kazakhstan/Kazakh Social Democratic Party "Auyl," called People's Patriotic Party Auyl.  A court order in August closed the Communist Party of Kazakhstan for not having the minimum number of members.  One party remained registered although it was defunct, leaving six functioning parties.  The parties generally did not oppose President Nazarbayev's policies.

In order to register, a political party must hold a founding congress with minimum attendance of 1,000 delegates, including representatives from two-thirds of the oblasts and the cities of Astana and Almaty.  Parties must obtain at least 600

signatures from each oblast and the cities of Astana and Almaty, registration from the Central Election Commission (CEC), and registration from each oblast-level election commission.  Opposition parties have not been able to register.

Participation of Women and Minorities:  Traditional attitudes sometimes hindered women from holding high office or playing active roles in political life, although there were no legal restrictions on the participation of women or minorities in politics.

## Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for corruption by officials.  The government did not implement the law effectively, and officials frequently engaged in corrupt practices with impunity.

Corruption:  Corruption was widespread in the executive branch, law enforcement agencies, local government administrations, the education system, and the judiciary, according to opposition leaders and human rights NGOs.  The Ministry of Internal Affairs, the Agency on Civil Service Affairs and Combatting Corruption, the KNB, and the Disciplinary State Service Commission are responsible for combating corruption.  The Prosecutor General's Office reported that in the first 10 months of the year, more than a thousand officials were convicted of corruption offenses, and it started investigations into 3,088 corruption-related offenses.

In June Almaty District Court No. 2 of Astana issued an arrest warrant for Astana Chief Executive Talgat Yermegiyayev.  He was placed under house arrest on charges of embezzling 4.2 billion tenge ($15.6 million).  The arrest warrant named an additional 23 persons, including other officials, most if not all of whom were in pretrial detention at year's end.  The total amount allegedly embezzled was 10 billion tenge ($37 million).  Yermegiyayev's arrest was extended until November.  The investigation has concluded, and defendants and their attorneys were reviewing case materials.

The new criminal code toughened criminal liability and punishment for crimes related to corruption.  Under it probation is not allowed for corruption crimes.  There is also an additional penalty of a lifetime ban on employment in the civil service, as well as mandatory forfeiture of titles, ranks, grades, and state awards.  The statute of limitation does not apply to persons charged with corruption.

<u>Financial Disclosure</u>:  The law requires government officials, applicants for government positions, and those recently released from government service to declare their income and assets in the country and abroad to tax authorities annually.  The same requirement applies to their spouses, dependents, and adult children.  Similar regulations exist for members of parliament and judges.

<u>Public Access to Information</u>:  Although the law mandates that the government, public associations, officials, and media outlets provide citizens with information that affects their rights and interests, citizen requests for information were not properly fulfilled.  NGOs reported problems with access to information from government agencies, citing red tape, poor content on official websites, and poor quality of results.  According to an assessment by the local branch of Transparency International in 2014, all governmental ministries received poor transparency ratings except for the Ministry of Culture and Sport, evaluated as average.

In November the president signed a new Law on Access to Information.  It broadens the range of entities that must provide information to the public: government bodies, national companies, quasi-government organizations, and monopolies.  The law requires transparency of any information concerning the government's budget and its expenditures.  The law toughens requirements for the composition of information on the websites of the institutions.  Additionally, meetings of government bodies, local executive offices, and open meetings of the parliament are required to have live online broadcasting.  The law calls for a list to be prepared of information that must be disclosed to the public.

Although parliament published several draft laws, some parliamentary debates, and occasionally its recorded votes, many parliamentary activities took place outside public view.  Accredited journalists and representatives of public associations could observe some parliamentary sessions via video link from a separate room.  Transcripts of parliamentary sessions were not available to the public.  Parliament continued to prohibit public and media access to discussion of controversial legislation.

**Section 5. Governmental Attitude Regarding International and Nongovernmental Investigation of Alleged Violations of Human Rights**

A number of domestic and international human rights groups operated with some freedom to investigate and publish their findings on human rights cases, although some restrictions on human rights NGO activities remained.  International and local human rights groups reported the government monitored NGO activities on

sensitive issues and practiced harassment, including police visits to and surveillance of NGO offices, personnel, and family members.  Government officials often were uncooperative or nonresponsive to their views.

The Ministry of Foreign Affairs-led Consultative Advisory Body (CAB) for dialogue on democracy, human rights, rule of law, and legislative work continued to operate during the year.  The CAB includes government ministries and prominent international and domestic NGOs, as well as international organizations as observers.  The NGO community generally was positive about the work of the CAB, saying the platform enabled greater communication with the government about issues of concern.  The government and NGOs, however, did not agree on recommendations on issues the government considered sensitive, and some human rights concerns were barred from discussion.  NGOs reported that government bodies accepted some recommendations, although the accepted recommendations were technical rather than substantive.

KIBHR, Adil Soz, Freedom House, and PRI were among the most visibly active human rights NGOs.  Some NGOs faced occasional difficulties in acquiring office space and technical facilities.  Government leaders participated in--and included NGOs in--roundtables and events on democracy and human rights.

The United Nations or Other International Bodies:  The government invited UN special rapporteurs to visit the country and meet with NGOs dealing with human rights.  The government generally did not prevent other international NGOs and multilateral institutions dealing with human rights from visiting the country and meeting with local human rights groups and government officials.  National security laws prohibit foreigners, international organizations, NGOs, and other nonprofit organizations from engaging in political activities.  The government prohibited international organizations from funding unregistered entities.

Government Human Rights Bodies:  The Presidential Commission on Human Rights is a consultative and advisory body that includes members of the public appointed by the president.  The commission reviews and investigates complaints, issues recommendations, monitors fulfillment of international human rights conventions, and publishes annual human rights reports in close cooperation with several international organizations, such as UNHCR, the OSCE, International Organization for Migration, and the UN Children's Fund.  The commission does not have legal authority to remedy human rights violations or implement its recommendations in the annual human rights reports.

The presidentially appointed human rights ombudsman is the chair of the Coordinating Council of the National Preventive Mechanism against Torture.

In 2014 the ombudsman investigated approximately 700 citizen complaints of human rights violations.  The ombudsman did not have the authority to investigate complaints concerning decisions of the president, heads of government agencies, parliament, cabinet, Constitutional Council, Prosecutor General's Office, CEC, or courts, although he may investigate complaints against individuals.  The ombudsman's office has the authority to appeal to the president, cabinet, or parliament to resolve citizens' complaints; cooperate with international human rights organizations and NGOs; meet with government officials concerning human rights violations; visit certain facilities, such as military units and prisons; and publicize in the media the results of investigations.  The ombudsman's office also published an annual human rights report.  During the year the ombudsman's office occasionally briefed the media and issued reports on complaints it had investigated.

Domestic human rights observers indicated that the ombudsman's office and the Human Rights Commission were unable to stop human rights abuses or punish perpetrators.  The commission and ombudsman avoided addressing underlying structural problems that led to human rights violations, although they advanced human rights by publicizing statistics and individual cases, and aided citizens with less controversial social problems and issues involving lower-level elements of the bureaucracy.

## Section 6. Discrimination, Societal Abuses, and Trafficking in Persons

While the law prohibits discrimination based on race, gender, disability, language, or social status, the government did not effectively enforce the law.  There were reports of violence against women, trafficking in persons, and discrimination against persons with disabilities and LGBTI persons.

### Women

Rape and Domestic Violence:  The law criminalizes rape.  The punishment for rape, including spousal rape, ranges from three to 15 years' imprisonment.  Under the law a prosecutor may not initiate a rape case absent aggravating circumstances, such as gang rape, unless the victim files a complaint.  Once a complaint is filed, the criminal investigation may not be dismissed if the rape victim recants or refuses to cooperate further with the investigation.  There were anecdotal reports of

police and judicial reluctance to act on reports of rape, particularly in spousal rape cases.

Legislation identifies various types of domestic violence, such as physical, psychological, sexual, and economic, and outlines the responsibilities of local and national governments and NGOs in providing support to domestic violence victims.  The law also outlines mechanisms for the issuance of restraining orders and provides for the 24-hour administrative detention of abusers.  The law sets the maximum sentence for spousal assault and battery at 10 years in prison, the same as for any assault.  The law also permits prohibiting offenders from living with the victim if the perpetrator has somewhere else to live; allows victims of domestic violence to receive appropriate care regardless of the place of residence; and replaces financial penalties with administrative arrest if paying fines was hurting victims as well as perpetrators.

NGOs maintained the domestic violence law does not have an effective mechanism for implementation.  According to NGOs, domestic violence remained a serious problem.  Although official statistics were scarce, activists estimated more than one in four families suffered from some form of domestic violence.

Police intervened in family disputes only when they believed the abuse was life threatening.  Every regional administrative police unit has a specialist on gender issues, and these specialists are primarily women.  Local community police, however, are generally men, and they are the first responders to calls and the first to work with victims.  Police often encouraged the two parties to reconcile.  Even when a charge was filed, the victim often withdrew the charge later.  NGOs reported women often withdrew their complaints because of economic insecurity.

In the aftermath of 2014 changes to the law on Prevention of Domestic Violence, the government opened domestic violence shelters in each region that did not already have an established shelter.  As a result approximately 3,500 women were referred to crisis centers in 2014 for legal and psychological support.  According to the Interior Ministry, there are 28 crisis centers.  They received 20 percent of their funding from the government and 80 percent through international grants from NGOs.

Other Harmful Traditional Practices:  Although prohibited by law, the practice of kidnapping women and girls for forced marriage continued in some remote areas.  The law prescribes a prison sentence of eight to 10 years for kidnapping.  A person who voluntarily releases an abductee is absolved of criminal responsibility if, in

this action, he/she did not commit another offense.  Because of this law, a typical bride kidnapper is not necessarily held criminally responsible for the act.  Cases were typically not pursued, since families and victims usually did not file complaints or withdrew them and found ways to resolve the problem privately. Law enforcement agencies often advised abductees to sort their situation out themselves.  According to civil society organizations, making a complaint to police could be a very bureaucratic process and often subjected families and victims to humiliation.  If a complaint is filed, the government is obliged to take action on it but rarely did so.

Sexual Harassment:  Sexual harassment remained a problem.  The law prohibits some forms of sexual harassment, but legal and gender experts regarded the legislation as inadequate.  There were reports of incidents of harassment, but in no instance was the law used to protect the victim, nor were there reports of any prosecutions.  No law protects women from sexual harassment, and only force or taking advantage of a victim's physical helplessness carries criminal liability in terms of sexual assault.

Reproductive Rights:  Couples and individuals have the right to decide the number, spacing, and timing of their children and had the means to do so free from discrimination, coercion, or violence.  Women and men received equal treatment for sexually transmitted infections.  According to a study published by the UN Fund for Population, in 2014 approximately half of women used some form of contraception.  According to data published by the World Health Organization, in 2014 skilled personnel attended more than 99 percent of births.

Discrimination:  The constitution and law provide for equal rights and freedoms for men and women.  The law prohibits discrimination based on gender. According to observers, women in rural areas faced greater discrimination than women in urban areas and suffered from a greater incidence of domestic violence, only limited education and employment opportunities, limited access to information, and discrimination in their land and other property rights.

**Children**

Birth Registration:  Citizenship is derived both by birth within the country's territory and from one's parents.  The government registers all births upon receipt of the proper paperwork, which can come from the parents, other interested persons, or the medical facility where the birth occurred.

Education:  The constitution makes education compulsory until the completion of secondary school, which happened typically around ages 17 or 18.  The law provides for free schooling until the end of secondary school.  Access to education, however, was a challenge for some migrant children who do not have an individual identification number, which became a requirement for school enrollment in September 2014.

Child Abuse:  There were reports of child abuse.  NGOs estimated more than one-half of all children younger than 14 experienced at least one incident of physical or psychological abuse by adults.  Abuse was more common in rural areas.  Minors age 16 or older have the right to file petitions related to their interests directly with a court.  In 2014 there were 46 criminal investigations of parents or guardians suspected of child abuse, as well as more than 4,000 parents held administratively liable for failing to perform their parental duties, which led to the termination of parental rights of 900 parents.

The president of the NGO Union of Crisis Centers stated the number of psychological abuse cases exceeded the number of physical abuse cases.  In the first eight months of the year, the union's hotline for children received 2,224 calls from children, 322 of which were for domestic violence.  The union reported that the call center received 170 calls on suicide issues, including 56 from children.

There were reported incidents of child-selling.  Shymkent police arrested two medical personnel in June on suspicion of selling newborn babies.  Nine additional cases in South Kazakhstan were uncovered.  The medical personnel sold newborn babies abandoned in the hospital to childless couples who each paid between 270,000 and 810,000 tenge ($1,000 and $3,000) for a child.  The South Kazakhstan prosecutor's office admitted there were likely to be additional such cases.  In September the press service of the Almaty prosecutor's office reported uncovering a baby-selling operation involving at least 13 infants since 2013.

Early and Forced Marriage:  The legal minimum age for marriage is 18, but it may be reduced to 16 in the case of pregnancy or mutual agreement.  NGOs noted several cases of marriage under 18, especially in the south.  According to the NGO League of Women of Creative Initiative, 2,000-3,000 early and forced marriages occur annually.  According to the NGO, there were approximately 2,200 such marriages in 2014.  The majority of these were due to cultural traditions.  Many couples first married in mosques and then registered officially when the bride reached the legal age.  The government did not take any action to address the issue.  As reported in September, the Spiritual Administration of Muslims of Kazakhstan

issued an order forbidding mosques to conduct religious marriage rites (nikah) without an official marriage certificate, but the practice continued.

Sexual Exploitation of Children:  The law does not specify the minimum age for consensual sex, but it provides for eight to 15 years in prison as punishment for individuals who force boys or girls under age 18 to have sexual intercourse.  The deputy prosecutor general reported 726 sex offenses against children were committed in the first seven months of the year.

The law criminalizes the production and distribution of child pornography and provides administrative penalties to cover the sale of pornographic materials to minors.  The country retains administrative penalties for child pornography.  Perpetrators convicted of sexual offenses against minors receive a lifetime ban on working with children.

Displaced Children:  According to a statement by the National Commission for Women Affairs, Family, and Demographic Policy, in the first quarter of the year, authorities placed 215 street children with foster or adoptive parents and returned 219 to their homes.

Institutionalized Children:  According to the Children's Rights Protection Committee, approximately 10,000 of the country's 33,000 orphaned children lived in 188 orphanages in 2014.  The rest of the children were in foster or other home care.  Incidents of child abuse in state-run institutions, such as orphanages, boarding schools, and detention facilities for delinquent children, were "not rare," according to government sources.  NGOs alleged half the children in orphanages or closed institutions suffered from abuse by teachers or other children.

International Child Abductions:  The country is a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction.  For country-specific information see the Department of State's report at travel.state.gov/content/childabduction/english/country/Kazakhstan.html.

**Anti-Semitism**

Approximately 30,000 to 40,000 Jews lived in the country.  Leaders of the Jewish community reported no incidents of anti-Semitism by the government or in society.

**Trafficking in Persons**

See the Department of State's *Trafficking in Persons Report* at
www.state.gov/j/tip/rls/tiprpt/.

**Persons with Disabilities**

The Ministry of Health Care and Social Development was the primary government
agency responsible for protecting the rights of persons with disabilities.  The law
prohibits discrimination against persons with physical, sensory, intellectual, and
mental disabilities in employment, education, and access to health care, and in the
provision of other government services, but significant discrimination existed in
the areas of employment, education, and access to government services.

The law provides for access to information for persons with disabilities.  The
government produced periodicals, scientific journals, reference literature, and
fictional works that were recorded either on disc or in Braille.  The law requires
one national television channel to broadcast news programs with sign-language
interpretation.  NGOs stated implementation of the law on disability was lacking,
and the Nur Otan Party's Institute of Parliamentary Development concluded that
access for persons with disabilities to information and communications was
insufficient.

The law requires companies to set aside 3 percent of their jobs for persons with
disabilities.  International and local observers noted some improvement regarding
the rights of persons with disabilities.  During the year the government showed
commitment to addressing the rights of persons with disabilities, including high-
level enforcement of measures to enhance their economic opportunities.
Nevertheless, there were reports persons with disabilities faced difficulty
integrating into society and finding employment.  The vice minister of health care
and social development identified the two biggest problems facing persons with
disabilities as poor infrastructure and lack of access to education.  Persons with
disabilities had difficulty accessing public transportation.  The government has
enacted high-level enforcement of measures to enhance economic opportunities for
citizens with disabilities, part of the president's *Strategy 2050*.

Citizens with mental disabilities may be committed to state-run institutions without
their consent or judicial review, and the government committed young persons
under age 18 with the permission of their families.  Institutions were poorly
managed, understaffed, and inadequately funded.

There are no regulations regarding the rights of patients in mental hospitals. Human rights observers believed this led to widespread abuse of patients' rights. NGOs reported that patients often experienced poor conditions and a complete lack of privacy.  According to an NPM report, most of the hospitals required extensive maintenance.  Other problems observed included shortage of personnel, unsatisfactory sanitary-hygienic conditions, poor food supply, overcrowding, and lack of light and air.

Members of the NPM may visit mental hospitals to monitor conditions and signs of torture of patients, but any institutions holding children, including orphanages, were not on the list of institutions NPM members may visit.

The government did not legally restrict the right of persons with disabilities to vote and arranged home voting for individuals who could not travel to polling places inaccessible to them.

**National/Racial/Ethnic Minorities**

Kazakh is the official state language, although local organizations may officially use Russian on an equal basis with Kazakh.  The law does not require the ability to speak Kazakh for entry into the civil service and prohibits discrimination based on language.  Nonetheless, Kazakh language ability is looked upon favorably, which non-Kazakh speakers protested as language discrimination.  The law requires presidential candidates to be fluent in Kazakh.

The creation of Kazakh-language schools and the conversion of some Russian-language schools to Kazakh reduced the number of Russian-only language schools.

**Acts of Violence, Discrimination, and Other Abuses Based on Sexual Orientation and Gender Identity**

According to the constitution, no one shall be subject to any discrimination for reasons of origin; occupational, social, or property status; sex; race; nationality; language; religion or belief; place of residence; or any other circumstances.  The country does not criminalize consensual same-sex sexual activity.  During the year a law on "protecting the child" that included a provision that would have prohibited "propaganda of nontraditional sexual relations" was discussed in the parliament.  The Senate chairman sent the law to the Constitutional Council, which declared it unconstitutional.

Although gender-reassignment documentation exists, the law requires a transgender person to fulfill three steps before being able to receive identity documents that align with the person's outward gender:  1) a month of inpatient psychiatric evaluation, 2) a course of hormone replacement therapy, and 3) approval and completion of gender-reassignment surgery.  Those who receive gender-reassignment surgery outside of the country fall outside this process.  Many individuals lived with nonconforming documents for years and reported problems with securing employment, housing, and health care.

According to a survey conducted during the year, half of transgender persons indicated that they experienced physical abuse due to prejudice against transgender individuals or did not experience such abuse because their gender identity was unknown.  The KIBHR noted in a 2015 report, "To this date we have no knowledge of any court cases regarding discrimination [against] sexual minorities."

Although there were no government statistics on discrimination or violence based on sexual orientation or gender identity, there were reports of such actions.  According to representatives of international and local organizations, negative social attitudes towards members of marginalized groups, including LGBTI persons, impeded the willingness of the latter to come forward, organize, or seek access to HIV/AIDS programs.  Hate crime legislation or other legal mechanisms do not exist to aid prosecution of bias-motivated crimes against members of the LGBTI community.  There were no prosecutions of anti-LGBTI violence.

NGOs reported members of the LGBTI community seldom turned to law enforcement agencies to report violence against them because they feared hostility, ridicule, and occasionally violence.  They were reluctant to use mechanisms such as the national commissioner for human rights to seek remedies for harms inflicted, because they did not trust these mechanisms to safeguard their identities, especially with regard to employment.

**HIV and AIDS Social Stigma**

The law prohibits discrimination against persons with HIV and AIDS.  Observers reported cultural stigma against drug users and other at-risk groups resulted in societal discrimination that continued to affect access to information, services, treatment, and care.  The National Center for AIDS provides free diagnostic and treatment to all citizens.  Several NGOs under the Association for Kazakhstan's People Living with AIDS help solve social and economic issues related to

diagnosing and living with AIDS.  They work with sex workers, the LGBTI community, and injection drug users.

## Section 7. Worker Rights

### a. Freedom of Association and the Right to Collective Bargaining

The law protects workers' right to unionize but jeopardizes workers' freedom of association.

A trade union law passed and entered into force in 2014 restricts worker freedom of association by requiring existing independent labor unions to affiliate with larger unions at the industry, sector, or regional level and by erecting significant barriers to the creation of new independent unions.  The law gave existing unions until mid-2015 to re-register.  In June, one month before the re-registration deadline, there were 896 unions in the country.  As of the end of July, after the deadline, the country had 163 re-registered and reorganized unions.  Independent labor unions not affiliated with the Federation of Trade Unions of the Republic of Kazakhstan (FPRK) were denied re-registration.  The FPRK is the largest national trade union association, the successor to state-sponsored Soviet-era labor organizations.  It had approximately 90 percent of union workers on its rolls.  Critics charged that it was too close to the government to advocate for workers effectively.  The government in turn exercised considerable influence on organized labor and favored state-affiliated unions over independent ones.

The new trade union law requires labor unions that are independent to affiliate with larger, progovernment ones, violating the country's obligations under international labor standards on freedom of association and setting the stage for government-sanctioned unions potentially to monopolize the country's labor union movement.  Labor officials argued that requiring independent unions to affiliate with larger ones would make them more effective and improve their ability to bargain collectively, thus preventing labor disputes and social unrest.

The law protects the right of workers to bargain collectively.  It provides that an individual contract between an employer and each employee sets the employee's wage and outlines the rights and responsibilities of the employee and the employer.  The law protects workers against antiunion discrimination, and a court may order reinstatement of a worker fired for union activity.

The law protects the right to strike in principle but imposes onerous restrictions that made strikes less effective, impose severe penalties, or deny the right to strike to a variety of workers.

A blanket legal restriction bars certain occupations from striking.  Military and other security service members, emergency medical, fire and rescue crews, as well as those who operate "dangerous" production facilities are forbidden to strike.  Under the law such strikes are illegal.

The right to strike is restricted for much of the working population.  Workers employed in the railway, transport and communications, civil aviation, health care, and public utilities sectors may strike, but only if they maintain minimum services, do not interrupt nonstop production processes (such as metallurgy), and leave key equipment unaffected.

Numerous legal limitations restrict worker rights to strike in other industries as well.  Generally, workers may not strike unless a labor dispute cannot be resolved through compulsory arbitration procedures.  Decisions to strike must be taken in a meeting where at least one-half of an enterprise's workers are present.  A written notice announcing a strike must be submitted to the employer at least five days in advance.  Employers may fire striking workers after a court declares a strike illegal.  The law enables the government to target labor organizers whose strikes are deemed illegal.  Those changes set stiff penalties for those who participate in strikes deemed illegal, a point that arouses special concern because judges responsible for determining whether a strike is illegal lacked independence.  Thus, observers were concerned the provisions were more likely to be used to target labor organizers unfairly.

One labor rights activist predicted that such onerous preconditions for commencing a legal strike would result in spontaneous illegal strikes and further negative consequences, including arrests and imprisonment of strikers and heightened social discontent.

A new labor code, signed into law in November, also limits worker rights to make claims on their employers.  For example, its Article 11 requires employers to negotiate any labor-related act with official employee representatives.  If there are multiple official representatives, they have three days in which to form a unified body to discuss the proposed act.  If this group cannot come to consensus, any one representative may accept the act without the consent of the others.  Article 49 includes 27 new reasons an employer may fire a worker.

Disagreements between unions and their employers may be presented to a tripartite commission composed of representatives of the government, labor unions, and employer associations.  State-affiliated and independent labor unions participate in tripartite commissions.  The tripartite commission is responsible for developing and signing annual agreements governing most aspects of labor relations.

Foreign workers have the right to join unions, but the law prohibits the operation of foreign unions and the financing of unions by foreign entities, such as foreign citizens, governments, and international organizations.  Irregular migrants and self-employed individuals resided in the country and were not per se exempt from the law.  Approximately 2.4 million of the nine million economically active citizens were self-employed.

## b. Prohibition of Forced or Compulsory Labor

The law prohibits all forms of forced or compulsory labor, except when it is a consequence of a court sentencing or a condition of a state of emergency or martial law.  The government did not effectively enforce applicable law.  Resources, inspections, and remediation were not sufficient to deter violations.

Violations of labor law may result in an administrative penalty, such as a fine, or in civil or criminal liability.  The Ministry of Health and Social Development is responsible for handling issues related to labor.  Labor inspectors are responsible for enforcing law, including prevention of forced labor.  By law labor inspectors conduct inspections to detect safety and other labor violations.  In 2014 none were conducted due to the moratorium on inspections of small and medium businesses-- a moratorium driven by the government's intention to rid the inspection process of endemic corruption.  The moratorium was extended through 2015.  No official data were available on labor violations for the period.  The Ministry of Internal Affairs is responsible for identifying victims of forced labor and initiating criminal proceedings.  Police conducted interagency operations to find victims of forced labor and trafficking.

In 2014 police identified 74 victims of trafficking, including 16 victims of labor exploitation.  Three individuals were from Kyrgyzstan, two from Uzbekistan, and one from Tajikistan.

Forced labor occurred.  Migrant workers were considered most at risk for forced or compulsory labor.  Reports varied on the number of labor migrants in the country.

Estimates ranged from 300,000 to 750,000, with the majority of migrant workers coming from Kyrgyzstan, Tajikistan, and Uzbekistan. Migrant workers found employment primarily in agriculture and construction. The Ministry of Health and Social Development is responsible for handling issues related to migrant labor.

Also see the Department of State's *Trafficking in Persons Report* at www.state.gov/j/tip/rls/tiprpt/.

## c. Prohibition of Child Labor and Minimum Age for Employment

The general minimum age for employment is 16. With parental permission, however, children between ages 14 and 16 may perform light work that does not interfere with their health or education. The law also restricts the length of the workday for employees younger than 18.

The Ministry of Health and Social Development is responsible for enforcement of child labor laws and for administrative offenses punishable by fines. In 2014 fines for violation of child labor laws increased from 594,600 tenge ($2,200) to 4 million tenge ($14,800). The ministry conducts labor inspections to enforce the minimum age for employment, but in 2014-15 no inspections were conducted due to the moratorium on inspections of small and medium businesses. Penalties were insufficient to deter violations. The Ministry of Internal Affairs is responsible for investigating criminal offenses and trains criminal and migration police in investigating the worst forms of child labor. In 2014 police investigated 17 criminal cases in relation to forced sexual exploitation and coercion of minors into prostitution. No criminal cases of labor exploitation of children were initiated.

NGOs reported some instances of child labor in domestic servitude, markets, construction sites, and activities such as car washes, cultivation of vegetables, and begging. Some media reported instances of child labor in cotton farming in Maktaralskyi District of South Kazakhstan in September; NGO Sana Sezim reported that those were children helping their parents. Other media reported that a memorandum signed with the largest cotton manufacturers of South Kazakhstan asserted that raw cotton would not be purchased from the producers if the cotton was harvested with the help of child labor.

The government cooperated with trade unions, employers, and NGOs to raise awareness of and promote interagency cooperation in eliminating child labor.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at www.dol.gov/ilab/reports/child-labor/findings/.

## d. Discrimination with Respect to Employment and Occupation

Law and regulations prohibit discrimination with respect to employment and occupation based on gender, age, disability, race, ethnicity, language, place of residence, religion, political opinion, affiliation with tribe or class, public associations, or property, social, or official status.  The law did not specifically prohibit discrimination with respect to employment and occupation based on disability, sexual orientation, gender identity, age, HIV-positive status, or having other communicable diseases.  The government effectively enforced the law and regulations.  Discrimination is a criminal offense punishable by a fine up to 991,000 tenge ($3,670) or imprisonment for up to 90 days, which was generally sufficient to deter violations.

Discrimination, however, occurred with respect to employment and occupation for persons with disabilities, orphans, and former convicts.  Disability NGOs reported that despite government efforts, obtaining employment was difficult.  The law does not require equal pay for equal work for women and men.  NGOs reported no government body assumed responsibility for implementing antidiscrimination legislation and asserted the law's definition of gender discrimination does not comply with international standards.  More women than men were self-employed or underemployed relative to their education level.

## e. Acceptable Conditions of Work

In January the national monthly minimum wage was 21,364 tenge ($79).  Most workers earned above the minimum wage in urban areas.  At the end of July 2014, 3 percent of the population lived below the monthly subsistence income level of 19,202 tenge ($71).

The law stipulates the normal workweek should not exceed 40 hours and limits heavy manual labor or hazardous work to no more than 36 hours per week.  The law limits overtime to two hours per day, or one hour per day for heavy manual labor, and requires overtime to be paid at least at a 50-percent premium.  The law prohibits compulsory overtime and overtime for work in hazardous conditions. The law provides that labor agreements may stipulate the length of working time, holidays, and paid annual leave for each worker.  The government sets occupational health and safety standards.  The law requires employers to suspend

work that could endanger the life or health of workers and to warn workers about any harmful or dangerous work conditions or the possibility of any occupational disease.  The law specifically grants workers the right to remove themselves from situations that endanger their health or safety without suffering adverse employment action.

The new labor code, however, has lower overtime pay coefficients than the previous rates of 2 and 1.5, to 1.25 for holiday and after-hours work.  The new code also removed provisions requiring a minimum wage for work in hazardous conditions.  Under previous law, a tripartite commission was charged with negotiating and determining a minimum wage for miners, metallurgists, and others working in hazardous industries.

The Ministry of Labor and Social Protection enforces the minimum wage, workhour restrictions, overtime, and occupational safety and health standards.  The law codifies the right of government labor inspectors to conduct unannounced inspections of workplaces to detect safety and other violations.  Ministry inspectors conducted random inspections of employers.  The ministry had 258 labor inspectors.  The Human Rights Commission reported that the number of inspectors was insufficient.  There were reports some employers ignored regulations concerning occupational health and safety.  Occupational safety and health conditions in the construction, industrial, and agricultural sectors often were substandard.  Workers in factories sometimes lacked quality protective clothing and sometimes worked in conditions of poor visibility and ventilation.

In August the Administrative Court of Burlinsky District, West Kazakhstan, suspended operations of BurlinGazStroi for one month due to labor violations found during a scheduled inspection.  The company had failed to comply with a Labor Office resolution, and the court required the company to pay an employee 189,000 tenge ($700) of back wages.

In the first half of the year, the government reported 840 individuals injured at their workplaces and 112 workplace deaths.  The government attributed many labor-related deaths to antiquated equipment, insufficient detection and prevention of occupational diseases in workers engaged in harmful labor, and disregard for safety regulations.  The most dangerous jobs in 2014 were in mining, construction, and oil and gas, according to an expert analysis of occupations with the highest fatalities.