UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: DEC 2 3 2016

City of Almaty, Kazakhstan and BTA
Bank JSC,

                    Plaintiffs,

          —v—

Mukhtar Ablyazov, Viktor Khrapunov, Ilyas
Khrapunov, and Triadou SPV S.A.,

                    Defendants.

15-CV-5345 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

On June 21, 2016, the Court granted in part and denied in part the motion of Triadou SPV
S.A. ("Triadou") to dismiss various crossclaims that are asserted against it by the City of Almaty,
Kazakhstan ("Almaty") and BTA Bank JSC ("BTA") (together, the "Kazakh Entities").  Dkt.
No. 174.  In light of the Supreme Court's decision issued the previous day in *RJR Nabisco, Inc.
v. European Cmty.*, 136 S.Ct. 2090 (2016), however, the Court declined to address Triadou's
argument that the Kazakh Entities' claims under the Racketeer Influenced and Corrupt
Organizations Act,  ("RICO"), 18 U.S.C. § 1961 *et seq.*,  are impermissibly extraterritorial.
Instead, the Court invited additional briefing as to whether and how *RJR Nabisco* affects this
action.  Dkt. No. 174 at 32.  Having considered the parties' briefing on that question along with
several supplemental authority letters, Dkt. Nos. 188, 195-97, 202, 240, 244, 248-50, the Court
concludes, for the reasons set forth below, that the Kazakh Entities' RICO crossclaims must now
be dismissed.

I.     **Background**

Both the procedural history of this matter and the factual allegations giving rise to the
RICO crossclaims currently at issue are complex, and an exhaustive recitation is unnecessary

here. The reader is referred to the Court's Memoranda and Orders dated June 21, 2016 and June 24, 2016, Dkt. Nos. 174 and 175, for more comprehensive background. For present purposes, however, the following will suffice.

### A.    Factual Allegations

Greatly simplified, what remains of this sprawling litigation concerns an alleged conspiracy by which prominent Kazakh citizens looted billions of dollars from the Kazakh Entities and then laundered the stolen funds around the world, including ultimately by investing – through Triadou – in New York City real estate projects.

Almaty, the largest city in Kazakhstan, claims that its former mayor Viktor Khrapunov, along with certain associates and family members including his son Ilyas Khrapunov, embezzled approximately $300 million from Almaty between approximately 1997 and 2004, principally by appropriating various public assets for their personal use. Dkt. No. 219 ¶¶ 45-55[1]  Often, Almaty claims, this was achieved in one of two ways: fraudulent auctions in which Khrapunov confederates acquired valuable assets at nominal prices; or Viktor Khrapunov's exercise of eminent domain power to seize private property and transfer it to entities owned or controlled by the Khrapunovs. *Id.* ¶¶ 49-55. For its part, BTA, a formerly state-owned banking institution based in Kazakhstan, claims that its former chairman Mukhtar Ablyazov siphoned more than $6 billion out of BTA between approximately 2005 and 2009, primarily through a series fraudulent loans to valueless entities owned or controlled by Ablyazov himself. *Id.* ¶¶ 28-33.

The Kazakh Entities further allege that, in order to evade law enforcement, the Khrapunovs and Ablyazov – who were related by marriage – joined together to move the stolen funds out of Kazakhstan and to launder them through a series of shell companies, sham

---

[1] All citations herein concerning the Kazakh Entities' allegations refer to the Kazakh Entities' First Amended Crossclaims, filed on September 7, 2016, which is the operative pleading in this case. Dkt. No. 219. Although Triadou's motion to dismiss targeted the Kazakh Entities' crossclaims as originally set forth in Almaty's initial pleading in this action, dated October 12, 2015, Dkt. No. 49, the Kazakh Entities filed the First Amended Crossclaims shortly after the supplemental briefing on *RJR Nabisco* was submitted, and, for purposes of the Court's extraterritoriality analysis, there is no meaningful difference between the original and amended versions of the RICO crossclaims.

transactions, and outwardly-legitimate investments. *See, e.g., id.* ¶¶ 56-59, 68-72, 77-97. To help accomplish this, the Khrapunovs and Ablyazov allegedly created, among other things, a Switzerland-based real estate investment vehicle called SDG Capital, S.A. ("SDG") into which they funneled hundreds of millions of dollars of illicit proceeds before engaging in a sham sale of the company to conceal their continued control. *Id.* ¶¶ 58, 78-84. The Khrapunovs and Ablyazov then purportedly facilitated the creation of several entities under Luxembourg law for the purpose of investing stolen funds in United States-based real estate projects. *Id.* ¶¶ 86-87. Among these entities was Triadou, a special purpose vehicle wholly owned and controlled by SDG – and thus purportedly by the Khrapunovs and Ablyazov. *Id.*

In 2012 and 2013, Triadou, acting at the direction of the Khrapunovs and Ablyazov, invested funds allegedly embezzled from the Kazakh Entities in several New York City real estate projects, including the Flatotel and the Cabrini Medical Center, with prominent New York-based real estate developer Joseph Chetrit and several of his corporate affiliates (the "Chetrit Entities"). *Id.* ¶¶ 88-97, 111-113. Funding for these investments was allegedly wired to counsel for the Chetrit Group in the United States from accounts held by a Dubai-based private contracting entity called Telford International Limited (which was allegedly controlled by the Khrapunovs and Ablyazov) in FBME Bank, a Tanzanian-headquartered institution with operations primarily in Cyprus. *Id.* ¶¶ 21, 78, 98-106, 111-113. The Kazakh Entities allege that, in order to consummate these transactions and ensure concealment of the stolen funds, Triadou accepted contract terms on at least one investment that were unreasonably favorable to Chetrit and the Chetrit Entities. *See, e.g., id.* ¶¶ 97, 148.

In 2014, facing mounting law enforcement pressure abroad and litigation initiated by Almaty in California federal court, Ablyazov and the Khrapunovs allegedly caused Triadou to liquidate its real estate assets in New York so that stolen funds could be removed from the United States and hidden once again. *Id.* ¶¶ 114-123. To that end, Triadou – acting at the direction of Ablyazov and the Khrapunovs – engaged in a sham transaction with the Chetrit

Entities whereby Triadou assigned its interest in the Flatotel to the Chetrit Entities and released its entitlement to equity in the Cabrini Medical Center in exchange for a "fraction of the fair market value of the properties" and personal bribery payments to at least one Triadou executive. *Id.*

**B.    Procedural Posture**

This litigation began its life as an interpleader action against Triadou and Almaty brought by the Chetrit Entities, which claimed to face multiple liability under their 2014 assignment agreement with Triadou. Dkt No. 25 ¶¶ 11-17. In its answer to the interpleader complaint, Almaty asserted a variety of counterclaims against the Chetrit Entities, crossclaims against Triadou, and third-party claims against Ablyazov, Khrapunovs, and Joseph Chetrit. Dkt. No. 49.

All claims brought by or against the Chetrit Entities or Chetrit were ultimately resolved through dismissal or settlement. And in June 2016, the Court consolidated the litigation further by granting Almaty's motion to join BTA, the Khrapunovs, and Ablyazov to the pending dispute between Almaty and Triadou. Dkt. No. 174 at 6.[2]

The subject of this decision is the Kazakh Entities' RICO crossclaims.[3] In its June 21 Order on Triadou's motion to dismiss the crossclaims, the Court rejected the argument that the Kazakh Entities fail to state RICO claims under Federal Rules of Civil Procedure 9(b) and 12(b)(6), but, as noted, it deferred decision on whether those claims are impermissibly extraterritorial pending further consideration of the *RJR Nabisco* decision. Dkt. 174 at 19-27, 32. Triadou – now joined in pertinent part by Ablyazov and the Khrapunovs[4] – continues to press its extraterritoriality argument in light of *RJR Nabisco*, urging that the Supreme Court's decision forecloses the Kazakh Entities' RICO claims.

---

[2] The Kazakh Entities have since filed another motion for joinder, targeting FBME Bank. *See* Dkt. No. 216. That motion is still pending.

[3] For purposes of this discussion, Triadou, Ablyazov, and the Khrapunovs are collectively referred to as the "Crossclaim Defendants."

[4] *See* Dkt. Nos. 196-197 (letters from Ablyazov and the Khrapunovs adopting Triadou's contentions by reference). Since their joinder, Ablyazov and the Khrapunovs have also separately filed their own motions to dismiss, which were recently fully submitted and remain pending. *See* Dkt. Nos. 227-29, 231-33, 241, 246-47.

4

## II.     Discussion

### A.     Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully.   Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556-57) (internal quotation marks and citation omitted).

### B.     RICO Claims

#### 1.     Statutory Framework

RICO establishes four criminal offenses, and, separately, a private civil cause of action. *RJR Nabisco*, 136 S.Ct. at 2096-97.  Sections 1962(a)-(d) make it unlawful to engage in several specific activities involving a "pattern of racketeering activity."  Specifically, as summarized by the Supreme Court:

> Section 1962(a) makes it unlawful to invest income derived from a pattern of racketeering activity in an enterprise.  Section 1962(b) makes it unlawful to acquire or maintain an interest in an enterprise through a pattern of racketeering activity.  Section 1962(c) makes it unlawful for a person employed by or associated with an enterprise to conduct the enterprise's affairs through a pattern of racketeering activity.  Finally, [Section] 1962(d) makes it unlawful to conspire to violate any of the other three prohibitions.

5

*RJR Nabisco*, 136 S.Ct. at 2097.   The statue defines "racketeering activity" to include a wide variety of state and federal offenses generally referred to as "predicates." *Id.* at 2096-97; *see also* 18 U.S.C. §§ 1961(1)(A)-(G).

Section 1963(a) provides for criminal penalties for violations of the substantive prohibitions set forth in Section 1962, and Sections 1964(a)-(b) permit the Attorney General to institute civil proceedings to enforce those prohibitions.   Section 1964(c) – the provision under which the Kazakh Entities assert claims – creates a private right action for "[a]ny person injured in his business or property by reason of a violation of [S]ection 1962," and provides for recovery of treble damages, attorney's fees, and costs.

To state a viable claim for relief under Section 1964(c), a plaintiff must allege a substantive violation of the RICO statute, "injury to business or property," and "causation of the injury by the violation."   *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23 (2d Cir. 1990).   While "a plaintiff must plead predicate acts sounding in fraud or mistake according to the particularity requirement of [Federal Rule of Civil Procedure] 9(b)," the "other elements" of a RICO claim, "such as non-fraud predicate acts or . . . the existence of an 'enterprise,'" need "satisfy only the 'short and plain statement' standard of Rule 8(a)."   *D. Penguin Bros. v. City Nat. Bank*, 587 F. App'x 663, 666 (2d Cir. 2014) (Summary Order) (citation omitted).

### 2.   *RJR Nabisco* Makes Clear that Private RICO Plaintiffs Must Allege and Prove *Domestic* Injury to Their Business or Property

In *RJR Nabisco*, the Supreme Court considered whether RICO applies extraterritorially – "that is, to events occurring and injuries suffered outside the United States."   136 S.Ct. at 2096. The Court construed this question to raise two related but importantly distinct issues: first, "do RICO's substantive prohibitions, contained in [Section] 1962, apply to conduct that occurs in

6

foreign countries?"; and second, "does RICO's private right of action, contained in [Section] 1964(c), apply to injuries that are suffered in foreign countries?". 136 S.Ct. at 2099. Both questions, the Court noted, implicated the canon of statutory construction known as the presumption against extraterritoriality: the proposition that "[a]bsent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application." *Id.* at 2100 (citing *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 255 (2010)).

On the first question, the Court held that the substantive prohibitions of Section 1962 do "appl[y] to *some* foreign racketeering activity," explaining that "[a] violation of [Section] 1962 may be based on a pattern of racketeering that includes predicate offenses committed abroad, provided that each of those offense violates a predicate statute that is itself extraterritorial." *Id.* at 21003 (emphasis added). The Court reasoned that while "Congress has not expressly said" in the statutory language that RICO applies extraterritorially, its definition of "'racketeering activity' . . . to encompass violations of predicate statutes that *do* expressly apply extraterritorially" is a sufficient "clear, affirmative indication that [Section] 1962 applies to foreign racketeering activity – but only to the extent that the predicates alleged in a particular case themselves apply extraterritorially." *Id.* at 2012-03.[5] Accordingly, conduct occurring in foreign countries may violate Section 1962, and thus give rise to criminal liability or a civil enforcement proceeding, when the state or federal statutes setting forth the underlying predicate offenses overcome the presumption against extraterritoriality.

---

[5] The Court declined to make a definitive determination on this issue with respect to the conspiracy prohibitions of Section 1962(d), instead "assum[ing] without deciding that [Section] 1962(d)'s extraterritoriality tracks that of the [substantive] provision underlying the alleged conspiracy." *Id.* at 2103. It also recognized the possibility that while Section 1962(a)'s prohibition on the use or investment of racketeering-derived income clearly applies when the relevant income is derived from foreign patterns of racketeering, the prohibition "arguably . . . extends only to domestic uses of the income." *Id.*

On the second question, however, the Court held – with critical implications for the instant case – that "[i]rrespective of any extraterritorial application of [Section] 1962 . . . [Section] 1964(c) does not overcome the presumption against extraterritoriality," and a "private RICO plaintiff must therefore allege and prove a *domestic* injury to its business or property." *Id.* at 2106 (emphasis in original).  In reaching this conclusion, the Court first emphasized the importance of "separately apply[ing] the presumption against extraterritoriality to RICO's cause of action" notwithstanding its determination regarding the statute's substantive prohibitions, as the two questions raise "distinct extraterritoriality problems." *Id.* at 2106, 2210.  The Court rejected the notion that the presumption against extraterritoriality "is primarily concerned with the question of what *conduct* falls within a statute's purview," *id.* at 2106 (internal quotation marks omitted) (emphasis in original), and explained that "'[t]he creation of a private right of action raises issues beyond the mere consideration whether underlying primary conduct should be allowed or not, entailing, for example, a decision to permit enforcement without the check imposed by prosecutorial discretion,'" *id.* (quoting *Sosa v. Alvarez-Machain*, 542 U.S. 692, 727 (2004)).  One important "issue[]," the Court noted, is that "providing a private civil remedy for foreign conduct creates a potential for international friction beyond that presented by merely applying U.S. substantive law to that foreign conduct." 136 S.Ct. at 2106.  As a primary example of international friction, the Court highlighted the "danger" that "[a]llowing recovery for foreign injuries in a civil RICO action, including treble damages," could result in injured citizens of foreign countries choosing to "bypass" their home jurisdictions' "less generous remedial schemes" in order to bring suit in U.S. federal court. *Id.* at 2106-07 (citing warnings by various foreign country *amici curiae* in earlier cases that such application of U.S. antitrust and securities fraud laws would conflict with their own and sometimes "very different" choices as to how to

8

implement certain substantive proscriptions – such as "preferring state actions, not private ones" – and potentially "upset that delicate balance and offend the sovereign interests of foreign nations" (internal quotation marks and brackets omitted)). When extraterritorial application of U.S. law raises the "risk" of "international friction" in such a manner, the Court explained, "the need to enforce the presumption [against extraterritoriality] is at its apex."[6] *Id.* at 2107.

With that background, the Court proceeded to analyze Section 1964(c) independently and concluded that nothing about that provision "provides a clear indication that Congress intended to create a private right of action for injuries suffered outside of the United States." *Id.* at 2108. "If anything," the Court observed, certain cabining language – such as the limitation of the private cause of action to particular kinds of injury – "signal[s] that the civil remedy is not coextensive with [Section] 1962's substantive prohibitions." *Id.* Accordingly, the Court held that "Section 1964(c) requires a civil RICO plaintiff to allege and prove a domestic injury to business or property and does not allow recovery for foreign injuries." *Id.* at 2111. The Court observed – presciently – that "disputes may arise as to whether a particular alleged injury is 'foreign' or 'domestic.'" *Id.* But it declined to offer guidance on such issues in light of a stipulation filed during the pendency of the appeal waiving plaintiffs' damages claims for domestic injuries. *Id.* As such, the Court dismissed the plaintiffs' RICO claims because they "rest[ed] entirely on injury suffered abroad." *Id.*

---

[6] The Court expressly rejected the argument that concerns of international friction are inapplicable when the plaintiffs are "not foreign citizens seeking to bypass their home countries' less generous remedial schemes but rather the foreign countries themselves." *Id.* at 2107-08 (refusing to "discard those reservations when a foreign state sues a U.S. entity in this country under U.S. law – instead of in its own courts and under its own laws – for conduct committed on its own soil," and foreclosing the possibility of permitting extraterritorial RICO suits "based on a case-by-case inquiry that turns on or looks to the consent of the affected sovereign").

### 3.     The Kazakh Entities' Claims

The Kazakh Entities assert five causes of action under RICO based on alleged violations of the substantive prohibitions set forth in Sections 1962(a), (c), and (d).  Dkt. No. 219 ¶¶ 127-161.  They allege that the so-called "Ablyazov-Khrapunov Group and numerous other individuals and entities, including SDG and Telford," together constituted a RICO enterprise – as did several of the individual Chetrit Entities – and they plead numerous predicates occurring both abroad and in the United States, including money laundering, transactions in money or property derived from unlawful activity, interstate or foreign transport of stolen money or property, mail fraud, and wire fraud.  *Id.*  In support of their RICO claims, the Kazakh Entities generally allege that they "have been injured in their business or property" and "have suffered damages in an amount . . . presently estimated to be not less than $6 billion."  *See, e.g.*, *id.* ¶ 134.

### 4.     The Parties' Contentions

Consistent with Justice Alito's prediction, the parties disagree vehemently as to whether the Kazakh Entities' alleged RICO injuries are "domestic" or "foreign" within the meaning of *RJR Nabisco*.  This subsection explicates the parties' contentions.

Triadou avers that courts applying *RJR Nabisco*'s domestic-injury rule should ask two questions.  "First, what business or property . . . was injured?  Second, where was that business or property located when the injury occurred"?[7]  Answering those questions in this case, Triadou contends, is a straightforward exercise that compels dismissal of the RICO claims: the only injury alleged here is the looting of Kazakhstan-based assets held by the Kazakh Entities, occurring within the geographical boundaries of Kazakhstan.  Br. at 4-6.

---

[7] *See* Triadou's Supplemental Brief in Support of Its Motion to Dismiss the RICO Claims of the City of Almaty and BTA Bank, Dkt. No. 188 ("Br.") at 4.

Anticipating the Kazakh Entities' response, Triadou also argues that while several alleged RICO predicates no doubt occurred within the United States, such acts do not convert the otherwise foreign injury into a domestic one.  That is because, Triadou continues, those acts (e.g., the alleged concealment of stolen funds in New York real estate) occurred only *after* the misappropriation of the assets at issue was complete, and, as such, they cannot be said to have proximately caused any loss.  Br. at 5-9.  To support this proposition, Triadou relies heavily on pre-*RJR Nabisco* case law holding that "'an act which proximately caused an injury is analytically distinct from one which furthered, facilitated, permitted, or concealed an injury which happened or could have happened independently of the act,'" and that a predicate, even when "'an integral part of the underlying criminal scheme,'" may only satisfy RICO's causation requirements when "'the plaintiff's original loss could not have occurred without the commission of the act.'"  *See, e.g.*, Br. at 8 (internal brackets and emphasis omitted) (quoting *Leung v. Law*, 387 F. Supp. 2d 105, 122 (E.D.N.Y. 2005).

Separately, Triadou analogizes the domestic-versus-foreign-injury inquiry to identifying the situs of an injury for the purpose of determining where a cause of action accrued under New York's so-called "borrowing statute," CPLR § 202.  Specifically, it notes New York's default rule that "'where an alleged injury is purely economic, the place of injury usually is where the plaintiff resides and sustains the economic impact of the loss.'"  *Br.* at 9-10 (brackets omitted) (quoting *Chigirinskiy v. Panchenkova*, 14-cv-4410, 2015 WL 1454646, at *15 (S.D.N.Y. Mar. 31, 2015)).  Applying a similar rule here, according to Triadou, confirms that the Kazakh Entities' alleged injuries are wholly foreign.

The Kazakh Entities' principal argument in opposition, distilled to its simplest form, is that they allege domestic injury because they allege domestic predicate acts with a sufficient

11

causal nexus to the economic losses that they have suffered.[8]  In support of this contention, the

Kazakh Entities urge that a "RICO's plaintiff's harm may have more than one proximate cause,"

and that it is "impossible to distinguish the underlying theft by Ablyazov and the Khrapunovs

from the subsequent money laundering scheme." *Id.* at 8, 10 (internal quotation marks omitted).

The Kazakh Entities also purport to identify independent property injuries suffered within

the United States.  Specifically, they maintain that Triadou's alleged money laundering and

related activities in the United States have "caused the enterprise to maintain control of property

that rightfully belongs to the Kazakh Entities" and that the "below-market assignment of

Triadou's investment in the Flatotel back to the Chetrit Entities . . . significantly diminished the

value of the Kazakh Entities' property." *Id.* at 10.

### 5.       The Kazakh Entities Fail to Allege Domestic Injury to Their Business or Property

The Court agrees with Triadou that *RJR Nabisco* forecloses the Kazakh Entities' RICO

claims.  The Supreme Court, as noted, "offered no explicit framework" in that decision for

determining whether a particular alleged injury is "domestic" or "foreign." *Bascuñan v. Elsaca*,

15-cv-2009, 2016 WL 5475998, at *5 (S.D.N.Y. Sept. 28, 2016).  The Court, however, sees

nothing in the Kazakh Entities' pleading that provides any basis to conclude that they have

plausibly alleged domestic injury.

### a.       The Location of the Alleged Injuries Must be Analyzed Independently of the Location of the Alleged Predicate Acts

As an initial matter, the Court rejects any suggestion that an alleged RICO injury may be

deemed "domestic" or "foreign" purely by reference to the location of the predicate acts that

---

[8] BTA Bank and The City of Almaty, Kazakhstan's Supplemental Brief in Response to Defendants' Motion to Dismiss the RICO Claims, Dkt. No. 195 ("Op.") at 8-10.

purportedly caused it.   Indeed, to accept such an argument would be to ignore, for all intents and purposes, the Supreme Court's emphatic directive that the "presumption against extraterritoriality must be applied *separately* to both RICO's substantive prohibitions and its private right of action." *RJR Nabisco*, 136 S.Ct. at 2108 (emphasis added) (rejecting related argument that a RICO plaintiff may necessarily "sue for foreign injury that was caused by the violation of a predicate statute that applies extraterritorially" and noting that "something more is needed" to bring a private RICO action). *RJR Nabisco* makes clear that "domestic injury to business or property" is an *independent* requirement for bringing a private RICO action – separate and apart from the requirement of a substantive RICO violation that is either domestic or permissibly extraterritorial – and, as such, the existence of such an injury cannot, as a matter of logic, turn entirely on whether it was caused by conduct occurring in the U.S.   Put slightly differently, "[d]etermining the location where a putative plaintiff suffered an alleged injury to determine whether that plaintiff has a private cause of action under § 1964(c) is," after *RJR Nabisco*, "an inquiry that is independent of the inquiry determining the location of a defendant's conduct to determine the applicability of § 1962's substantive prohibitions." *Bascuñan*, 2016 WL 5475998, at *5 (emphasis omitted).   Accordingly, to the extent that any party maintains either that the Kazakh Entities' injuries are necessarily domestic because they were proximately caused, in part, by conduct in the U.S., or, conversely, that the injuries are necessarily *foreign* because they were *not* proximately caused by conduct in the U.S., that argument fails.

> **b.    Any Injury from the Alleged Misappropriation of the Kazakh Entities' Funds Was Suffered" Outside of the U.S.**

In the Court's view, the appropriate subject of the inquiry required by *RJR Nabisco* is not the location of the Crossclaim Defendants' purportedly injurious conduct but the location where the injury itself arose. *See RJR Nabisco*, 136 S.Ct. at 2108. ("Nothing in [Section] 1964(c)

provides a clear indication that Congress intended to create a private right of action for *injuries suffered outside of the United States*.") (emphasis added); *see also Bascuñan*, 2016 WL 5475998, at *5 (under *RJR Nabisco*, "the location where the *plaintiff suffered* the alleged injury dictates whether the plaintiff may pursue a private right of action under [Section] 1964(c).") (emphasis in original). The facts of this case compel the conclusion that the critical location is Kazakhstan.

In the only decision in this Circuit thus far interpreting the domestic-injury rule articulated in *RJR Nabisco*, Judge Daniels concluded that to determine where an alleged economic injury was suffered for purposes of Section 1964(c) the court should focus "upon where the economic impact of the injury was ultimately felt" and ask "two common-sense questions: (1) who became poorer, and (2) where did they become poorer." *Bascuñan*, 2016 WL 5475998, at *4-6 (internal citations and quotation marks omitted). This approach was adapted from the framework used to determine where an injury occurred, and thus where the corresponding cause of action accrued, for purposes of New York's borrowing statute, CPLR § 202. *Bascuñan*, 2016 WL 5475998, at *4 (citing, for example, *Deutsche Zenlral-Genossenchaftsbank AG v. HSBC N. Am. Holdings, Inc.*, 12-cv-4025, 2013 WL 6667601, at *6 (S.D.N.Y. Dec. 17, 2013)). As Judge Daniels recognized, under that framework as applied by the courts of this Circuit, "[i]n cases involving economic harm, [the place of injury] is normally the state of plaintiff's residence," and foreign corporations are recognized to "reside either in their principal place of business or their place of incorporation." *Deutsche*, 2013 WL 6667601, at *5 (internal quotation marks omitted); *cf. Sack v. Low*, 478 F.2d 360, 365-66 (2d Cir. 1973) (concluding that New York courts would follow the "traditional" approach and recognize securities fraud claim as accruing "where the loss is suffered," which, in the fraud context, is where "the economic impact is felt, normally the plaintiff's residence"); *Gorlin v. Bond Richman*

14

& *Co.*, 706 F. Supp. 236, 239-40 (S.D.N.Y. 1989) (RICO and securities fraud claims injuries were sustained in plaintiff's state of residence). "A limited exception to the general place of injury is where a plaintiff maintains a separate financial base and the impact of the financial loss is felt at that location," but that exception "is applied only in the extremely rare case where the party has offered unusual circumstances evincing that economic injury occurred at a place other than the plaintiff's residence." *Robb Evans & Assocs. LLC v. Sun Am. Life Ins.*, 10-cv-5999, 2012 WL 488257, at *4 (S.D.N.Y. Feb. 14, 2012) (internal quotation marks, citations, and brackets omitted).

Utilizing this approach, Judge Daniels dismissed the RICO claims at issue in *Bascuñan*. Those claims arose out of a conspiracy to embezzle millions of dollars from a Chilean citizen and resident, in large measure by fraudulently causing "New York banks holding Plaintiffs' funds to wire money from Plaintiffs' accounts to Defendants' accounts located in New York and elsewhere" and by physically removing stock certificates beneficially owned by plaintiff out of a safety deposit box in New York and transferring them abroad. 2016 WL 5475998, at *1-2. Notwithstanding substantial domestic conduct on the part of the defendants, Judge Daniels held that the economic loss alleged in the complaint constituted wholly "foreign" injury because the ultimate owner of the funds at issues "suffered the losses in Chile" by virtue of his residency and citizenship in that country. *Id.* at *6.

The *Bascuñan* approach has garnered somewhat mixed reception among the few other courts to address the domestic-injury issue. In a case with parallels to the instant matter, Judge Zagel of the Northern District of Illinois adopted a similar approach and held that corporate RICO plaintiffs based in the United Arab Emirates suffered injury from an alleged illegal kickback scheme "where their business and economic operations are centered" – i.e., in the

UAB – even though "the illegally obtained kickback proceeds ultimately financed land purchases in the United States" and certain of the kickbacks were paid via wires originating in the U.S. *Exceed Indus., LLC v. Younis*, 15-c-14, 2016 WL 6599949, at *1-3 (N.D. Ill. Nov. 8, 2016) (citing *Bascuñan*). Noting that plaintiffs had not "maintained a United States presence, either at the time of the alleged scheme or now," the *Younis* court characterized the after-the-fact land purchases as mere "downstream effects of the initial injury that impacted [plaintiffs] in the UAE" and thus as insufficient to form the basis of a private RICO action. *Id.* at *3.

In *Tatung Co., Ltd. v. Shu Tze Hsu*, however, Judge Carter of the Central District of California "decline[d] to follow *Bascuñan*," citing concerns that its approach "amounts to immunity for U.S. corporations who, acting entirely in the United States, violate civil RICO at the expense of foreign corporation doing business in the country" and precludes suit by "foreign individual[s] . . . for financial injuries incurred while they are working, traveling, or doing business in this country as the result of an American RICO operation." CV 13-1743, 2016 WL 6683201, at *6-7 (C.D. Cal. Nov. 14, 2016). Reasoning that plaintiff, a foreign corporation, "maintained a 'hub'" and did business in the U.S. and had been injured by a RICO conspiracy to prevent it from collecting an arbitration award issued and confirmed in California and arising out of a commercial credit dispute in the U.S., Judge Carter concluded that plaintiff had suffered a domestic injury. *Id.* at *7-8.[9]

---

[9] Another district court has arguably developed a third approach, which borrows from a test used to determine whether the federal antitrust statutes may reach anticompetitive behavior occurring outside of the U.S. and asks whether the RICO defendant's "conduct is intended to or has produced 'substantial effects' in the United States." *See Union Comm. Servs. Ltd. v. FCA Int'l Ops. LLC*, 16-cv-10925, 2016 WL 6650399, at *4-5 (E.D. Mich. Nov. 10, 2016) (ultimately dismissing RICO claim because plaintiff – a company incorporated overseas, owned by Angolan citizens, and with its principal place of business in Angola – suffered its alleged lost sales and profits wholly overseas and as a result of conduct by defendants "directed solely at the Angolan auto market"). Although the Kazakh Entities urge this Court by supplemental letter to adopt this "effects" test, Dkt. No. 249, the Court finds reliance on extraterritoriality jurisprudence from the antitrust context to be at odds with the *RJR Nabisco* Court's express "reluctance" to determine the territorial scope of Section 1964(c) by reference to its past interpretations of the antitrust statutes. *See RJR Nabisco*, 136 S.Ct. at 2109-2111 (noting that certain such interpretations were

16

This Court agrees that the *Bascuñan* rule is consistent with the Supreme Court's focus in assessing the extraterritoriality of Section 1964(c) on injuries "suffered overseas." *RJR Nabisco*, 136 S.Ct. at 2109; see also *id.* at 2115-16 (Ginsburg, J., dissenting) (noting that Court's domestic-injury rule means that "U.S. defendants commercially engaged here and abroad would be answerable civilly to U.S. victims of their criminal activities, but foreign parties similarly injured would have no RICO remedy"). Nevertheless, it shares the *Tatung* court's hesitation to broadly endorse an absolutist version of the rule that would, for example, categorically preclude foreign corporations with business operations or property interests maintained in the U.S. from bringing RICO actions to recover for injuries to those assets. The instant case, however, presents no such circumstances. The Kazakh Entities are undisputedly both aliens that are not alleged to hold assets or to maintain any operations, instrumentalities, or other presence in the United States. They were not "working, traveling, or doing business" in the U.S. when they incurred their alleged injuries. *Cf. Tatung*, 2016 WL 6683201, at *6-7; *see also Akishev v. Kapustin*, C.A. 13-7152, 2016 WL 7165714, at *6-8 (D.N.J. Dec. 8, 2016) (finding domestic injury because foreign-based plaintiffs "travel[ed] by way of the Internet" to defendant's "United States-based website representing United States-based car dealerships," where they were "induced by fraud" to send funds "by wire transfer to [defendant's] U.S. bank"). The purported misappropriations giving rise to this action occurred within Kazakhstan and targeted only assets

---

rendered "before we honed our extraterritoriality jurisprudence"). Triadou recognizes this reluctance but nevertheless suggests that the *RJR Nabisco* Court's passing remarks on the passage of the Foreign Trade Antitrust Improvements Act suggest that decisions interpreting that statute, at least, "represent[] an analogous body of federal law" that should inform the Court's conclusion here. Dkt. No. 249 at 2 n.1. But the so-called "domestic effects exception" to the FTAIA's otherwise categorical exclusion from the reach of the antitrust laws of "conduct involving trade or commerce . . . with foreign nations" is based on an express statutory carve-out that sets forth specific categories of qualifying domestic "effects." *See F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 158-59 (2004) (citing 15 U.S.C. § 6a). The RICO statute contains no express analogue, and the Court sees no reason to infer one. Accordingly, the Court declines to follow the *Union Commercial* approach.

held overseas.  Framed as to answer Judge Daniels' overarching questions, the Kazakh Entities

clearly "got poorer" in Kazakhstan.  Indeed, the Kazakh Entities' own characterizations of their

crossclaims underscore that they seek to redress grievances whose economic impact has been

suffered abroad.  *See, e.g.*, Dkt. No. 219 ¶¶ 2-3 (asserting that the crossclaims are aimed at

"regain[ing] assets looted by [BTA's] former Chairman, Mukhtar Ablyazov, who abused his

position to enrich himself and treat BTA as private property," as well as "assets looted by

[Almaty's] former mayor, Victor Khrapunov . . . to be returned for the benefit of the people of

Almaty").

      Nor does the RICO claims' connection to the U.S. – that is, the alleged investment of the

stolen funds in New York real estate projects – present the sort of "'extremely rare'"

circumstances contemplated by the *Bascuñan* approach under which injuries allegedly suffered

by foreign plaintiffs could be deemed domestic.  *Bascuñan*, 2016 WL 5475998, at *4 (quoting

*Robb Evans*, 2012 WL 488257, at *4).  The Kazakh Entities' allegations do not implicate the

most established example of such circumstances: that some "discrete financial base . . .

established away from home" suffered the brunt of the losses at issue.  *In re LIBOR-Based Fin.*

*Instruments Antitrust Litig.*, 11-MDL-2262, 2015 WL 6243526, at *118-119 (S.D.N.Y. Oct. 20,

2015).  And courts in this district, applying the CPLR § 202 framework from which *Bascuñan*

borrows, have consistently recognized that a plaintiff's mere "financial connection to New

York" – whether it be in the form of branch offices, investment activity, or bank accounts – is an

insufficient basis to find that a foreign entity suffered injury in New York.  *See, e.g., id.* (out-of-

state fraud victims who held money in New York bank accounts, had to post collateral in New

York for the fraudulent transactions, and/or had those transactions overseen by New York-based

traders did not suffer loss in New York); *Deutsche*, 2013 WL 6667601, at *6-7 (no New York

injury even though the "decisions, operations, accounting, diligence, and purchases for the RMBS investments" at issue were performed in New York or out of New York bank accounts and plaintiff's New York branch had its funds "diminished," liquidity "reduced," and workforce "downsized" as a result of fraud). Considered against the weight of the case law, the after-the-fact concealment in the U.S. of funds stolen entirely abroad does not constitute a basis for concluding that the Kazakh Entities have alleged injury suffered in the U.S. *Cf. Younis*, 2016 WL 6599949, at *1-3 (use of ill-gotten kickback proceeds to purchase land in the U.S. was only a "downstream effect[] of the initial injury that impacted Plaintiffs [abroad], where their business and economic operations are centered").

**c.      The Kazakh Entities' Attempts to Identify Other Injuries to Their Property Occurring within the United States Fail**

Shifting gears slightly, the Kazakh Entities seemingly attempt to identify allegations of injury to property in the United States that are entirely independent of the original misappropriations in Kazakhstan. Assuming *arguendo* that such allegations would be sufficient to plead domestic injury under *RJR Nabisco*, the Kazakh Entities' attempts are unavailing.

First, the Kazakh Entities aver that they were "injured . . . in the United States" because the Crossclaim Defendants' alleged money laundering and fraudulent transactions allowed the purported RICO enterprises to "maintain control" of property belonging to the Kazakh Entities. Op. at 9-10. But the Kazakh Entities do not cite any authority, and the Court is aware of none, for the proposition that a defendant's post-theft "control" of embezzled funds in and of itself constitutes a discrete injury that that could be recognized as domestic. *Cf. Younis*, 2016 WL 6599949, at *3 (declining to adopt "broad 'continued deprivation' standard in defining domestic injury" and focus on ill-gotten assets' current presence in U.S.); *Hourani v. Mirtchev*, 943 F. Supp. 2d 159, 162, 167 (D.D.C. 2013), *aff'd* 796 F.3d 1 (D.C. Cir. 2015) (characterizing

19

extortion victims' RICO "injuries" as "the loss of their assets in Kazakhstan," notwithstanding allegations of post-extortion money laundering in the United States). Indeed, the cases cited by the Kazakh Entities suggest only that there may be circumstances under which the concealment of stolen funds was so critical to facilitating an ongoing theft in the first place that money laundering may be recognized as having proximately caused some portion of the *original* injury. *See, e.g.*, *City of N.Y. v. Vekataram*, 396 Fed. App'x 722, 724-25 (2d Cir. 2010) (Summary Order) (defendant's filing of fraudulent subcontractor invoices was "essential" to inducing undeserved payments by the City in the first place and "there [was] no record support for distinguishing the acts of money laundering and embezzlement"); *Maiz v. Virani*, 253 F.3d 641, 673-74 (11th Cir. 2001) (defendants' money laundering "conceal[ed] the existence of . . . profits" made on misappropriated funds contributed by plaintiff and thus "induce[d] further contributions," and plaintiff likely "would have discovered the fraud and withdrawn [its] funds were it not for the money laundering"); *U.S. v. Wilson*, 98 F.3d 281, 283-84 (7th Cir. 1996) (defendant's use of funds defrauded from investors to purchase cashier's checks to pay earlier investors "helped keep the fraudulent scheme afloat by lulling investors into a false sense of security" and thus was an "integral cog[] in continuing the scheme") (internal quotation marks omitted). [10]

As already explained, the alleged thefts in Kazakhstan cannot be deemed domestic injuries under *RJR Nabisco* purely because they may have been proximately caused, in part, by after-the-fact money laundering in the United States. In any event, the types of circumstances

---

[10] *See also Eastman Kodak Co. v. Camarata*, 05-cv-6384, 2006 WL 3538944, at *11 (W.D.N.Y. Dec. 6, 2006) ("it is certainly conceivable that [defendant's] alleged acts of money laundering had the effect of not simply concealing a completed a crime, but allowed it continue for longer than it otherwise would have"); *Levine v. Torino Jewelers, Ltd.*, 05-cv-3159, 2006 WL 709098, at *4 (S.D.N.Y. Mar. 22, 2006) (it was "at least conceivable that defendants' actions assisted [embezzler] in covering her tracks and therefore helped her steal more from plaintiff than she otherwise would have").

under which post-theft money laundering may proximately cause theft-related loss are not alleged here. To the contrary, there is no dispute that the purported misappropriations were complete – and the embezzled funds removed from Kazakhstan – well before the Crossclaim Defendants' alleged transactions in the United States. *See, e.g.*, Dkt. 219 ¶¶ 28-34, 45-58, 64, 77-106, 111-119. As such, while those transactions may have been "necessary to the [Crossclaim Defendants'] efforts to retain the property siphoned out of the [Kazakh Entities]," they are not alleged to have been "an indispensable part of the theft itself" and thus at most they "may have concealed, but did not cause" the losses in Kazakhstan. *Leung v. Law*, 387 F. Supp. 2d 105, 122 (E.D.N.Y. 2005); *see also Oki Semiconductor Co. v. Wells Fargo Bank, Nat. Ass'n*, 298 F.3d 768, 773-74 (9th Cir. 2002) (defendant's employee's laundering of proceeds after sale of goods stolen from plaintiff was the not the proximate cause of plaintiff's RICO loss – "it was theft"); *Picard v. Kohn*, 907 F. Supp. 2d 392, 397 (S.D.N.Y. 2012) ("Acts that merely furthered, facilitated, permitted, or concealed an injury which happened or could have happened independently of the act do not directly cause that [RICO] injury, and thus do not proximately cause it.") (internal quotation marks omitted).

The Kazakh Entities also appear to contend that one aspect of Triadou's domestic activities in particular – the "below-market assignment of [its] investment in the Flatotel back to the Chetrit Entities" – "diminished the value of the Kazakh Entities' property." Op. at 10. It is not entirely clear to the Court precisely what "property" the Kazakh Entities reference – that is, whether they intend to suggest that the assignment lessened the value of the Flatotel itself, of the funds stolen in Kazakhstan and invested in the Flatotel, or something else entirely. Regardless, the Court sees no basis to infer that the Flatotel assignment injured any property owned by the Kazakh Entities. First, it is unclear that the Kazakh Entities (purported embezzlement victims)

had a cognizable property or business interest in the Flatotel itself (a property in which embezzled funds were allegedly invested) at the time of Triadou's assignment. *See United States v. Brimberry*, 779 F.2d 1339, 1348 (8th Cir. 1985) ("[w]hen an embezzler purchases property with stolen funds, the property may be subjected to a constructive construct in favor of the victim" but "[u]ntil a court grants the victim such a constructive trust remedy," the victim "merely has a right to seek" it and the "existence of such a right does not establish an interest in the specific property").   Even assuming they did, however, the Kazakh Entities do not plausibly allege that the assignment itself in any way decreased the intrinsic value of the Flatotel project. Finally, the transfer of stolen funds (effected by the assignment) from Triadou to other participants in the alleged RICO enterprises cannot plausibly be alleged to have somehow diminished the value of the funds themselves or to have impaired the Kazakh Entities' purported right of recovery. *Cf. Harvey v. Fresquez*, 10-cv-5291, 2011 WL 855875, at *2 (S.D.N.Y. Mar. 8, 2011) ("money is fungible" and a plaintiff "does not need to retrieve those precise dollars and cents that were taken from his bank account").   Accordingly, the Court is not persuaded that the Kazakh Entities have plausibly alleged any injury to their property occurring within the United States.

### d.   The Court's Conclusion is Consistent with the Supreme Court's Express Concerns about International Comity

Finally, while not dispositive, the Court notes that its conclusion that the Kazakh Entities have failed to plausibly allege domestic injury serves the very comity interests that the Supreme Court emphasized in determining that Section 1964(c) does not apply extraterritorially. *See RJR Nabisco*, 136 S.Ct. at 2106-08.  The *RJR Nabisco* Court, as discussed, premised its decision in substantial part on the risks of "international friction" associated with allowing foreign entities to "bypass" potentially "less generous remedial schemes" available in their home jurisdictions and

pursue treble damages for injuries suffered abroad through civil RICO actions in the United States. *Id.* at 2106-07 (internal quotation marks omitted). Here, the Kazakh Entities urge, in sum and substance, that they may maintain RICO claims (and seek treble damages) in U.S. federal court based on the post-theft investment in New York real estate of less than 1% of some $6 billion stolen from Kazakh victims by Kazakh citizens in Kazakhstan. *See* Dkt. No. 219 ¶¶ 1, 28-55, 134 (alleging that the Crossclaim Defendants conspired to conceal approximately $40 million in New York-based real estate projects out of more than $6 billion embezzled in Kazakhstan). They do so notwithstanding the Kazakh government's conceded interest in this matter, as evidenced by its investigations and prosecutions of several of the Crossclaim Defendants and its ongoing attempts to extradite, at least, Viktor Khrapunov in connection with many of the same activities alleged here. Dkt. No. 219 ¶¶ 62-65, 118. Allowing the Kazakh Entities' RICO claims to proceed under these circumstances would be at odds with the Supreme Court's directive that the need to enforce the presumption against extraterritoriality is "at its apex" when remedies available in United States courts may conflict with those available abroad. *RJR Nabisco*, 136 S.Ct. at 2107; *see also id.* at 2107-08 (rejecting argument that courts should discard concerns about international friction when the plaintiff is a foreign state itself suing "for conduct committed on its own soil").

**III.    Conclusion**

For the foregoing reasons, Triadou's motion to dismiss the Kazakh Entities' RICO claims, as joined by Ablyazov and the Khrapunovs, is GRANTED, and causes of action numbers one through five of the Amended Crossclaims are DISMISSED with prejudice.

This resolves Dkt. Nos. 84, 188, 196, and 197.


SO ORDERED.

Dated: December ___, 2016
        New York, New York

ALISON J. NATHAN
United States District Judge