# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ——————————————————— ) | |
| CITY OF ALMATY, KAZAKHSTAN, ) | |
| and BTA BANK JSC ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 15-cv-05345 (AJN) (KHP) |
| ) | |
| MUKHTAR ABLYAZOV, ILYAS ) | |
| KHRAPUNOV, VICTOR KHRAPUNOV ) | |
| and TRIADOU SPV S.A., ) | |
| ) | |
| Defendants. ) | |
| ——————————————————— ) | |

**LETTER OF REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE**
**PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970 ON**
**THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS**

The United States District Court for the Southern District of New York (the "Court"), presents its compliments to the Ministry of Justice and Public Order of the Republic of Cyprus under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Convention"), and requests international judicial assistance to obtain evidence to be used in a civil proceeding before this Court in the above-captioned matter. This Court respectfully requests that the Ministry of Justice and Public Order recognize this Letter of Request and arrange for its execution, in adherence to the Hague Convention and in the interest of comity.

### A.     Sender

The Honorable Alison J. Nathan, United States District Judge for the Southern District of New York, New York, New York, United States of America.

1

**B.** **Central Authority of the Requested State**

The Ministry of Justice and Public Order
125 Athalassas Avenue
1461 Nicosia, Cyprus
(registry@mjpo.gov.cy)

**C.** **Person to Whom the Executed Request Is to Be Returned**

This Court hereby requests that the executed Letter of Request and all documents and

materials covered by this Letter of Request be returned to the following attorney for Plaintiffs the

City of Almaty, Kazakhstan and BTA Bank (collectively, the "Plaintiffs"), as an officer of this

Court:

> Matthew L. Schwartz, Esq.
> Boies Schiller & Flexner, LLP
> 575 Lexington Avenue
> New York, New York 10022
> Telephone Number: (212) 446-2300
> Fax Number: (212) 446-2350
> mlschwartz@bsfllp.com

As an officer of this Court, he will act as confidential courier of this Court and deliver the

executed Letter of Request and all related documents and materials directly to me at the

following address:

> The Honorable Alison J. Nathan
> United States District Court for the Southern District of New York
> Thurgood Marshall United States Courthouse
> 40 Foley Square, Room 2102
> New York, New York 10007

All documents and materials deposited with the Court in accordance with this Letter of

Request will be available to all parties and their counsel.

**D.** **Purpose of Evidence Sought and Requested Date of Receipt of Response**

The requested documents will be used by the parties in support of their claims or defenses. The Court accordingly respectfully requests a prompt response to this Letter of Request.

## I.   HAGUE CONVENTION REQUIREMENTS

This Court requests the assistance more specifically described herein as necessary in the interests of justice. In conformity with Article 3 of the Hague Convention, the undersigned applicant has the honor to submit the following request:

### A.   Requesting Judicial Authority

The Honorable Alison J. Nathan
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square
New York, New York 10007, USA

### B.   Central Authority of the Requested State

The Ministry of Justice and Public Order
125 Athalassas Avenue
1461 Nicosia, Cyprus

### C.   Name of the Case and Identifying Number

All documents and materials requested will be used in relation to the above-captioned civil lawsuit, which can be identified by the following information:

Case Name:   *City of Almaty, Kazakhstan, et al. v. Mukhtar Ablyazov, et al.*
Court:          United States Federal District Court for the Southern District of New York
Case Number: 15-cv-05345 (AJN) (KHP)

### D.   Names and Addresses of the Parties and their Representatives

1.   Plaintiffs

The City of Almaty, Kazakhstan ("Almaty") and BTA Bank JSC ("BTA") are, respectively, a political subdivision and a citizen of the Republic of Kazakhstan.

2.     Plaintiffs' Representative

Matthew L. Schwartz, Esquire
Boies, Schiller & Flexner LLP
575 Lexington Avenue
New York, NY  10022
Telephone: (212) 446-2300
Fax: (212) 446-2350
Email: mschwartz@bsfllp.com

3.     Defendants

Defendant Mukhtar Ablyazov is a national of the Republic of Kazakhstan, currently domiciled in Paris, France. Defendant Ilyas Khrapunov is a national of the Republic of Kazakhstan, currently domiciled in Geneva, Switzerland.  Defendant Viktor Khrapunov is a national of the Republic of Kazakhstan, currently domiciled in Geneva, Switzerland.  Defendant Triadou SPV S.A. is a company established under the laws of Luxembourg, with its headquarters at Grand-Rue 60, Luxembourg City, Luxembourg.

4.     Defendants' Representatives

Mukhtar Ablyazov
Jonathan D. Cogan, Esquire
Kobre & Kim LLP
800 Third Avenue, 6th Floor
New York, New York  10022
Telephone: (212) 488-1200
Facsimile:  (212) 488-1220
Email: jonathan.cogan@kobrekim.com

Ilyas and Victor Khrapunov
John J. Kenney, Esquire
Hoguet, Newman, Regal & Kenney, LLP
10 East 40th Street.
New York, NY 10016
Telephone: (222) 689-8808
Facsimile:  (212) 689-5101
Email: jkenney@hnrklaw.com

Triadou SPV S.A.
Deborah A. Skakel, Esquire
Blank Rome LLP
405 Lexington Avenue
New York, NY 10174
Telephone: (212) 885-5000
Facsimile:  (212) 885-5001
Email: dskakel@blankrome.com

**E.      Nature of the Proceedings and Summary of the Case and Relevant Facts**

The above-captioned case is a civil lawsuit brought by Plaintiffs under the United States statutory law and common law doctrines seeking money damages for injuries resulting from the alleged embezzlement and laundering of funds belonging to Plaintiffs and enforcement of a foreign judgment under New York law. *See* Exhibit A (Plaintiffs' Amended Crossclaims). Defendant Mukhtar Ablyazov is the former chairman of BTA Bank.  Defendant Victor Khrapunov is the former mayor of the City of Almaty.  Defendant Ilyas Khrapunov is Viktor Khrapunov's son. Defendant Triadou SPV S.A. ("Triadou") is an entity established in Luxembourg and allegedly controlled by Ilyas Khrapunov at the behest of Mukhtar Ablyazov.

Plaintiffs allege that Ablyazov and Viktor Khrapunov stole billions of dollars in Kazakhstan by abuse of their offices; Ablyazov through embezzlement from BTA Bank (*see* Ex. A, at ¶ 28-44), and Viktor Khrapunov through corruption of his office as Mayor of Almaty. *See* Ex. A, at ¶ 45-61. They are alleged to have then laundered some of the proceeds of their actions into the United States through a special purpose vehicle, Defendant Triadou. *See* Ex. A, at ¶ 77-97. Once those assets were discovered, they are alleged to have entered into transactions in the United States that caused further and distinct injuries to the Plaintiffs, including allegedly engaging in fraudulent conveyances that diminished the value of those assets.

 The courts of the United Kingdom have already awarded BTA Bank billions of dollars in judgments against Ablyazov and his associates, and this Court has granted attachment of Triadou's assets in the State of New York. *See* Ex. B (Order of Attachment).

As specifically relevant to this request, Plaintiffs contend that the Khrapunov and Ablyazov families used the services of Eesh Aggarwal ("Aggarwal"), a financial adviser based in Dubai, United Arab Emirates, to move and launder stolen funds through the Federal Bank of the

Middle East ("FBME"). *See* Ex. A, at ¶ 99. FBME is headquartered in both Tanzania and Cyprus, but until recently, conducted the majority of its operations from its branch in Nicosia, Cyprus. In 2014, FBME was designated a "foreign financial institution of primary money laundering concern" and effectively banned from the legitimate international financial system by the Financial Crimes Enforcement Network ("FinCEN") of the U.S. Department of the Treasury. The Central Banks of Cyprus and Tanzania have taken control of the bank pending completion of an investigation into its operations. *See* Ex. A, at ¶ 107-110.

Plaintiffs contend that Aggarwal utilized connections at FBME that allowed him to execute millions of dollars in suspicious transfers on behalf of the Ablyazov and Khrapunov families from accounts at FBME. Specifically, Plaintiffs allege that Aggarwal was responsible for transferring not less than $70 million from accounts at FBME in the name of "Telford International Limited" to escrow accounts in the United States on behalf of Triadou. *Id.* at ¶ 100. These transfers were executed by FBME's Nicosia branch, and identify Aggarwal's Dubai, UAE, business address as Telford's place of business. *See* Exhibit C (compilation of Telford wire transfers). In granting attachment of Triadou's assets, this Court preliminarily found that these funds transferred from the Telford accounts were traceable to Defendant Ablyazov, *see* Ex. B (Order of Attachment, at 6), who is currently the subject of freezing and receivership orders issued by the Courts of the United Kingdom. Plaintiffs now seek documentary evidence as to the sources of the funds sent from the Telford accounts at FBME.

Plaintiffs and Defendants currently are engaged in discovery, where the parties exchange information concerning their claims and defenses. The Court accordingly has not addressed the merits of Plaintiffs' allegations.

Plaintiffs contend that the information sought by this request is available to the Ministry

of Justice and Public Order of Cyprus. This Court respectfully requests Cyprus act on this request expeditiously.

**F.      Evidence to Be Obtained**

Based on the foregoing, this Court respectfully requests that the Senior Master of the Ministry of Justice and Public Order of Cyprus provide assistance to obtain the following documents in response to this Letter of Request that may be lawfully obtained by the Ministry of Justice and Public Order or any other department, division, or office of the government of the Republic of Cyprus, that relate to Plaintiffs' allegations against Defendants:

1.  Account records for accounts belonging to "Telford International Limited" at FBME, including for Account Number CY4511501001402320, as identified in the wire transfers documented in Exhibit C.

2.  Account opening or creation documents for the accounts belonging to "Telford International Limited" at FBME, including Account Number CY4511501001402320, including due diligence, customer identification, and know-your-customer documents that show the ultimate beneficial owners or signatories for these accounts.

3.  Reports to government or regulatory agencies concerning transactions or activity in the accounts belonging to "Telford International Limited" at FBME, including for Account Number CY4511501001402320.

**II.     OTHER REQUIREMENTS**

**A.      Fees and Costs**

Plaintiffs are responsible for reasonable copy costs and charges associated with the processing and handling of this request by the Ministry of Justice and Public Order of Cyprus.

**B.      Reciprocity**

This Court expresses its sincere willingness to provide similar assistance to the courts of the Republic of Cyprus, if future circumstances so require.

**III.    CONCLUSION**

This Court, in the spirit of comity and reciprocity, hereby requests international judicial

assistance in the form of this Letter of Request seeking information, documents, testimony, and

things described herein, from the Ministry of Justice and Public Order. This Court extends to all

judicial and other authorities of the Republic of Cyprus the assurances of its highest

consideration.


Date: _____         _____
                                  The Honorable Alison J. Nathan
                                  United States District Court for the
                                  Southern District of New York
                                  Thurgood Marshall United States Courthouse
                                  500 Pearl Street, Room 1620
                                  New York, New York 10007-1312

                                  SEAL OF THE UNITED STATES DISTRICT
                                  COURT FOR THE SOUTHERN DISTRICT OF
                                  NEW YORK

# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CF 135 FLAT LLC, CF 135 WEST MEMBERS LLC and THE CHETRIT GROUP, LLC, | ) ) ) ) ) | Case No. 15-cv-05345-AJN |
| Interpleader Plaintiffs, | ) ) |
| -against- | ) ) | **AMENDED CROSSCLAIMS** |
| TRIADOU SPV S.A., CITY OF ALMATY, a foreign city, and BTA Bank, | ) ) ) |
| Interpleader Defendants. | ) ) ) |
| CITY OF ALMATY, KAZAKHSTAN and BTA BANK, | ) ) ) ) |
| Crossclaim Plaintiffs, | ) ) |
| -against- | ) ) ) |
| MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, TRIADOU SPV S.A., AND FBME BANK LTD., | ) ) ) ) ) ) |
| Crossclaim Defendants. | ) ) |

## Table of Contents

INTRODUCTION ................................................................................................................ 1

THE PARTIES ................................................................................................................... 5

JURISDICTION AND VENUE ......................................................................................... 6

FACTUAL BACKGROUND ............................................................................................. 8

*Mukhtar Ablyazov Defrauded BTA Bank of in Excess of $6 billion.* ................................. 8

*Viktor Khrapunov Defrauded the City of Almaty of Approximately $300 million.* .......... 13

*The Khrapunovs and Ablyazov Join Together to Launder Their Stolen Money.* ............... 15

*The Ablyazov-Khrapunov Group Conspires to Transfer and Hide Illicit Funds in the United States.* ...................................................................................................................... 21

*Through SDG, the Ablyazov-Khrapunov Group Creates Triadou to Hide their Illicit Funds in New York Real Estate Transactions with the Chetrit Group.* ........................... 22

*Kazakh Authorities Target the Ablyazov-Khrapunov Group's Holdings in the United States, and the Ablyazov-Khrapunov Group Liquidates Those Assets at Below-Market Value with the Chetrit Group's Assistance.* ....................................................... 30

FIRST CAUSE OF ACTION .......................................................................................... 33

*(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)) Against All Defendants*

SECOND CAUSE OF ACTION ...................................................................................... 38

*(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)) Against All Defendants*

THIRD CAUSE OF ACTION .......................................................................................... 40

*(VIOLATIONS OF RICO, 18 U.S.C. § 1962(a)) Against All Defendants*

FOURTH CAUSE OF ACTION ...................................................................................... 41

*(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)) Against All Defendants*

FIFTH CAUSE OF ACTION ........................................................................................... 42

*(VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)) Against All Defendants*

SIXTH CAUSE OF ACTION .......................................................................................... 43

*(ACTUAL FRAUDULENT TRANSFER) Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

SEVENTH CAUSE OF ACTION .................................................................................... 44

*(CONSTRUCTIVE FRAUDULENT TRANSFER) Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

EIGHTH CAUSE OF ACTION ....................................................................................... 45

*(UNJUST ENRICHMENT) Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

NINTH CAUSE OF ACTION ................................................................................................ 46

    *(CONVERSION) Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

TENTH CAUSE OF ACTION ............................................................................................... 46

    *(CONSTRUCTIVE TRUST) Against All Defendants*

ELEVENTH CAUSE OF ACTION ........................................................................................ 47

    *(PURSUANT TO CPLR § 5239 FOR FRAUD AND CONVERSION) Against All Defendants*

TWELFTH CAUSE OF ACTION .......................................................................................... 48

    *(PURSUANT TO CPLR § 5303 FOR RECOGNITION AND ENFORCEMENT OF A FOREIGN JUDGMENT UNDER NEW YORK LAW) Against Defendant Ablyazov*

THIRTEENTH CAUSE OF ACTION ..................................................................................... 49

    *(AIDING AND ABETTING) Against Defendant FBME*

DEMAND FOR JURY TRIAL .............................................................................................. 50

DEMAND FOR RELIEF ....................................................................................................... 50

Crossclaim Plaintiffs City of Almaty ("Almaty") and BTA Bank ("BTA" or "BTA Bank," and together with Almaty, the "Kazakhstan Plaintiffs"), by and through their undersigned counsel, for the Kazakhstan Plaintiffs' crossclaims against Defendants Triadou SPV S.A., Viktor Khrapunov, Mukhtar Ablyazov, Ilyas Khrapunov, and FBME Bank Ltd. (collectively the "Ablyazov-Khrapunov Group") allege as follows:

## INTRODUCTION

1.       Joseph Chetrit ("Chetrit") is a well-known New York based real estate developer, who, along with crossclaim defendants Mukhtar Ablyazov ("Ablyazov"), Victor Khrapunov, Ilyas Khrapunov and others known and unknown, combined, conspired, and confederated in the commission of an international scheme to launder and conceal at least $40 million stolen from the Kazakhstan Plaintiffs.  Chetrit conspired with these international criminals by, among other things, partnering with Triadou SPV S.A. ("Triadou"), a nominee entity owned, controlled, and funded by the Ablyazov-Khrapunov Group, for the purposes of converting the stolen funds into valuable New York City real estate.

2.       BTA, a bank based in Almaty, Kazakhstan, seeks to regain assets looted by its former Chairman, Mukhtar Ablyazov, who abused his position to enrich himself and treat BTA as his personal property.  BTA has commenced and successfully obtained judgments in proceedings against Ablyazov in the courts of the United Kingdom for defrauding BTA Bank of no less than $4 billion.

3.       Almaty, the largest city in the Republic of Kazakhstan, seeks to regain assets looted by its former mayor, Victor Khrapunov ("Khrapunov"), and his family and co-conspirators, to be returned for the benefit of the people of Almaty.  Khrapunov abused and corrupted his position as the mayor of Almaty for the purposes of embezzlement, fraudulent self-

Kazakhstan and then secreting these stolen funds across the globe.

dealing, and blatant looting of public assets.  He reaped an estimated $300 million or more through various fraudulent activities, including rigged auctions, the improper sale of public property to  friends and co-conspirators, and fraudulent abuse of eminent domain powers, before fleeing Kazakhstan and   secreting these stolen funds across the globe.

4.      The Khrapunovs and Ablyazov, both fighting law enforcement investigations and asset seizures by Kazakh authorities, joined forces and commingled their stolen funds.  Through joint investments across the globe, the two renegade families combined and conspired to launder their illicit wealth into real estate, energy assets, and other investments in locales they deemed safe from seizure.  Ilyas Khrapunov, related by marriage to Ablyazov, helped orchestrate these efforts and steered the families' joint investments into assets within this Court's jurisdiction.

5.      The Ablyazov-Khrapunov Group's money laundering schemes relied heavily on the cooperation of officers within FBME Bank, Ltd ("FBME"), a Tanzanian-incorporated financial institution operating primarily out of the Republic of Cyprus. Until 2014, FBME had long been known as a financial institution open for business to money launderers and international criminals. FBME joined the Ablyazov-Khrapunov Group's money laundering conspiracy by knowingly aiding the Ablyazov-Khrapunov Group's members in hiding and laundering funds and evading asset freezes and investigations. In 2014, FBME was designated a "foreign financial institution of primary money laundering concern" and effectively banned from the legitimate international financial system by the Financial Crimes Enforcement Network ("FinCEN") of the U.S. Department of the Treasury, a decision subsequently described by FBME as a "death sentence."

6.      Collectively, the Ablyazov-Khrapunov Group has been the subject of numerous proceedings and investigations across the globe, arising from their theft of billions of dollars from

entities and municipalities in the Republic of Kazakhstan. They have sought to hide their stolen wealth from investigators and law enforcement through a vast network of shell corporations and outwardly-legitimate investments, including major New York real estate developments such as the Flatotel and Cabrini Medical Center condominium conversions. Through these investments, the Chetrit Group allied itself with the Ablyazov-Khrapunov Group and their global money laundering endeavor.

7.      The Ablyazov-Khrapunov Group laundered their ill-gotten assets through a number of shell corporations, including Triadou. With the help of Chetrit and the Chetrit Group, the  Ablyazov-Khrapunov Group parked these corrupt assets in New York City real estate, hoping to  avoid the scrutiny of escalating international investigations into the Ablyazov-Khrapunov Group's  illicit activities.

8.      Due to heavy scrutiny by international law enforcement, including criminal investigations by the Kazakh and Swiss authorities, the funds that the Ablyazov-Khrapunov Group, through Triadou, invested into the Flatotel and Cabrini Medical Center projects could not pass through legitimate banking channels. The Crossclaim Defendants devised a plan to circumvent legitimate banks and transfer funds directly from the Ablyazov-Khrapunov Group's offshore accounts with FBME to the escrow account of the Chetrit Group's long-time attorneys.

9.      In return for facilitating the Ablyazov-Khrapunov Group's money laundering scheme, the Chetrit Group got access to the stolen funds to fund its real estate projects, and entered into deals that entitled the Chetrit Group to a disproportionate share of the projects' profits.

10.     Due to concern that he was partnering with reputed international criminals, however, Chetrit conducted his communications with the Ablyazov-Khrapunov Group by using

code names. For example, Chetrit used code names such as "Jose" and "Pedro" to refer to and communicate with crossclaim defendant Ilyas Khrapunov. It was only in face-to-face meetings, many of which were secretly recorded, that Ablyazov's involvement, legal difficulties and incarceration were openly discussed.

11.     Ultimately, Almaty and BTA Bank were able to trace the stolen assets to the United States. Rather than let Almaty and BTA reclaim their rightful property, the Ablyazov-Khrapunov Group, through Triadou, began to urgently liquidate their real estate holdings, hoping to spirit their illicit funds to more permissive locales. In an attempt to monetize the Ablyazov-Khrapunov Group's real estate interests as quickly as possible, Triadou entered into a fraudulent, below-market assignment with the Chetrit Group for Triadou's principal New York assets, interests in the Flatotel and Cabrini Medical Center real estate developments.

12.     Specifically, in May 2014, the City of Almaty filed an action in federal court in California against members of the Ablyazov-Khrapunov Group. With the Kazakhstan Plaintiffs' collection efforts having expanded to the United States, and with the Ablyazov-Khrapunov Group in imminent danger of having its stolen assets seized or attached, the Ablyazov-Khrapunov Group, through Triadou, took immediate steps to liquidate its U.S. assets and move its money offshore again. The Chetrit Group's assistance was essential to placing the stolen assets out of the reach of the Kazakhstan authorities.

13.     Upon information and belief, Chetrit seized on this opportunity to double cross his co-conspirators. Understanding that the potential asset seizures or restraints put the Ablyazov-Khrapunov Group in a desperate situation, he devised scheme to acquire Triadou's investments for a fraction of their value. To achieve this result, Chetrit bribed Triadou's Director to drive down the purchase price of the assignment. The Chetrit Group ultimately succeeded in acquiring

Triadou's interest in both the Flatotel and Cabrini properties for as little as $26,000,000.00 — far less than even what Triadou had originally invested — at a time when real estate values in New York were at an all-time high.

14.     Almaty and BTA Bank now seek, among other relief, to unwind and recover the proceeds of these fraudulent transactions.  Doing so will hold  the Crossclaim Defendants liable for their corruption and fraud, and  return the full value of Triadou's New York assets to their rightful owners: BTA Bank and the City of Almaty.

## THE PARTIES

15.     Crossclaim plaintiff Almaty is a legal subdivision of the Republic of Kazakhstan. Almaty is the former capital of the country, and continues to be the largest city in the Republic of Kazakhstan, with more than 1.5 million residents.

16.     Crossclaim plaintiff BTA Bank is a Joint Stock Company and Kazakhstan bank with its headquarters in Almaty, Kazakhstan.  Until in or about September 2014, BTA Bank was majority owner and controlled by the Republic of Kazakhstan.

17.     Crossclaim defendant Triadou SPV S.A. is a special purpose  investment vehicle incorporated under the laws of Luxembourg, with a principal place of business at  3, Rue du Mont-Blanc, 1201 Geneva, Switzerland.  Triadou SPV S.A. is wholly-owned by SDG Capital S.A.

18.     Crossclaim defendant Viktor Khrapunov, an individual, is the former  Mayor of the City of Almaty, who, upon information and belief, currently resides in the  city of Geneva, Switzerland.

19.     Crossclaim defendant Mukhtar Ablyazov, an individual, is the former Chairman of BTA Bank and has been found liable for defrauding BTA of in excess of $6 billion.  Ablyazov

was the subject of eleven proceedings commenced by BTA Bank in the United Kingdom to recover assets Ablyazov stole.  During those proceedings, Ablyazov was found by multiple international courts to have lied, misled, misconstrued, and concealed assets in blatant disregard of Court orders, and was ordered imprisoned for 22 months.  During these proceedings, Ablyazov fled the United Kingdom to avoid the many judgments against him.   He is currently incarcerated in France pending extradition to Russia or Ukraine.

20.     Crossclaim defendant Ilyas Khrapunov, an individual, is the son of Viktor Khrapunov, as well as the former president of SDG Capital S.A., who, upon  information and belief, currently resides in the city of Geneva, Switzerland.  Ilyas Khrapunov is married to Ablyazov's daughter, Madina.

21.     Crossclaim defendant FBME Bank Ltd. is a financial institution headquartered in Dar es Salaam, Tanzania and operating primarily out of Cyprus. FBME is jointly owned by Ayoub-Farid Saab and Fady Saab, but is currently controlled and administered by representatives of the Central Bank of Cyprus.

## JURISDICTION AND VENUE

22.     The Crossclaims are brought under Rule 13 of the Federal Rules of Civil Procedure.  This Court has subject matter jurisdiction under 28 U.S.C. §  1331 and 18 U.S.C. § 1964(c) over the claims for relief alleging violations of the  federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§  1961 et seq. and for conspiracy to violate RICO.   This Court has supplemental jurisdiction  over the sixth through thirteenth claims for relief pursuant to 28 U.S.C. § 1367, as those  claims are substantially related to Almaty's and BTA Bank's claims under RICO and arise from a common  nucleus of operative facts, and thus they form part of the same case or controversy under  Article III of the United States Constitution.

23.     Alternatively, this Court has supplemental jurisdiction over Almaty's and BTA Bank's claims under 28 U.S.C. § 1367, as those claims are substantially related to the original interpleader suit brought by Chetrit and arise from a common nucleus of operative facts, and thus they form part of the same case or controversy under Article III of the United States Constitution.

24.     Alternatively, the City of Almaty is a "foreign state" as that term is defined in 28 U.S.C. § 1603, and this Court has jurisdiction over Almaty's and BTA Bank's claims under 28 U.S.C. §§ 1330, 1441(d), which provide for the removal of any civil action brought in a State court against a foreign state.

25.     Alternatively, this Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because at the time this action was filed (i) there was complete diversity of citizenship between the parties, and (ii) more than $75,000, exclusive of interest and costs, is at stake.

26.     Venue is proper in this District and before this Court pursuant to 28 U.S.C. § 1391(b)(2) because events giving rise to Almaty's and BTA Bank's claims occurred in this District, including, among other things, the negotiation, investment and subsequent transfer of interest in the Flatotel and Cabrini Medical Center properties located in New York, New York.

27.     This Court has personal jurisdiction over Triadou, Ablyazov, Viktor Khrapunov, Ilyas Khrapunov, and FBME because each of them knowingly committed acts in New York that form the basis of this action, directed or conspired with others to commit acts in New York, and/or purposely availed themselves of the privileges of doing business in New York, as fully set forth herein.

## FACTUAL BACKGROUND

### *Mukhtar Ablyazov Defrauded BTA Bank of in Excess of $6 billion.*

28.     Ablyazov was the Chairman of BTA Bank from May 2005 until February 2009.
He is the father-in-law of crossclaim defendant Ilyas Khrapunov, who is married to Ablyazov's
daughter, Madina.  Along with crossclaim defendant Viktor Khrapunov, Ablyazov is a central
member of the Ablyazov-Khrapunov Group money laundering and embezzlement conspiracy.

29.     As the Courts of the United Kingdom have found, while Chairman of BTA Bank,
Ablyazov exercised virtually unfettered control over the bank's operations while hiding that
control from Kazakhstan's banking regulators, and used this influence to treat BTA's assets as his
own. As Justice Teare of the High Court of England and Wales (Commercial Court) found:

> [P]rior to the nationalisation of the Bank in February 2009, Mr. Ablyazov admitted
> to owning over 75% of the shares in the Bank. Those shares were not held by Mr.
> Ablyazov personally but by nine companies on his behalf. However, Mr. Ablyazov
> did not admit that ownership to the AFN, the banking regulator in Kazakhstan. In
> January 2009, shortly before the nationalisation of the Bank, the AFN requested
> Mr. Ablyazov to state whether he owned more than 10% of the shares in the Bank.
> He replied on 19 January 2009 that he did not own directly or indirectly more than
> 10% of the shares in the Bank. That statement was untrue.
>
> . . .
>
> Banks in Kazakhstan tend to be operated in a different manner from that in which
> they are typically operated in the West. It is common for banks to be owned by a
> single shareholder who is both chairman of the board of directors and also closely
> involved in the management of the bank. He therefore has considerable influence
> over the operation of the bank. Mr. Ablyazov's relationship with the Bank
> conformed with this general description of Kazakh banking practice. Thus Mr.
> Talvitie, the independent member of the Board of Directors of the Bank from East
> Capital, gave evidence that it seemed to him that at board meetings Mr. Ablyazov
> had already made the decisions. He described the other members of the board as
> "straw men". Others in the Bank, below board level, had the same impression.
> Thus Ms. Tleukulova (a member of the Credit Committee) gave evidence in
> Russia in 2012 that "all top managers of the bank, including Board Members, have
> to obey him". Mr. Khazhaev also gave evidence in Russia in 2012 that Mr.
> Ablyazov was "the main" person in the Bank who controlled the granting of the
> largest and most important loans. Mr. Ablyazov's control of the Bank is illustrated
> by his issue of an order ("the Ablyazov Order") whereby he, as Chairman,
> amended certain procedural rules governing the grant of loans.

. . .

[O]fficers and staff in the Bank did not draw a clear distinction between the Bank having an interest in a project and Mr. Ablyazov, as shareholder in the Bank, having a personal interest in a project. Thus [Deputy Chairman] Zharimbetov, when being crossexamined, failed to draw a clear distinction, in the context of the offshore companies with which he dealt, between Mr. Ablyazov and the Bank. Thus the unfortunate reality appears to have been that little, if any, distinction was drawn by personnel in the Bank between the Bank's property and Mr. Ablyazov's property. The Vitino port project was an example of that reality. Mr. Khazhaev told a Russian court in 2012 that Mr. Ablyazov treated the Bank as his property.

30.     Ablyazov's abuse of his position as chairman took many forms, principally through enormous loans to valueless entities owned by Ablyazov, which would then be obscured by transfers among different shell corporations, and never repaid.

31.     For example, in one series of loans (referred to as the "Original Loans" by the UK court in the "Granton Action"), between March 2006 and August 2008, Ablyazov directed twenty loans totaling $1,428,840,000 to entities with minimal assets and for no apparent reason.  These loans were made to entities outwardly unaffiliated with Ablyazov ("Original Borrowers"), but were actually transferred to entities controlled by Ablyazov ("Original Real Borrowers").  As the UK court found:

Mr. Ablyazov did not disclose to the Board that he owned or controlled those [Original] Borrowers. He has never claimed that he did so and there is no evidence that he did. None of the represented Defendants has suggested that he did. In those circumstances there can be only one explanation for the fact that the very large sums of money which were advanced were immediately transferred to companies owned or controlled by Mr. Ablyazov, namely, that the Original Loans were part of a dishonest scheme whereby Mr. Ablyazov sought to misappropriate monies which belonged to the Bank. The scheme was fraudulent because Mr. Ablyazov did not disclose to the Board his interest in the Original Borrowers or that the real purpose of the loans was to pay out the Bank's money to the Original Real Borrowers who were to use the monies for Mr. Ablyazov's purposes. The purpose of such nondisclosure must have been to deceive the Board so that it remained in ignorance of the "related party" nature of the Original Loans and of their true purpose.

32.     When, in or about 2008, Ablyazov's involvement in the Original Loans was in

danger of discovery, he directed that additional fraudulent loans be made in an attempt to cover up his earlier fraud.

33.     Between November 4, 2008, and December 4, 2008 a number of loans (the "Later Loans") totaling $1,031,263,000 were made, ostensibly for the purchase of oil and gas resources. The UK court, however, found it "beyond argument" that these loans of BTA funds were made only to hide Ablyazov's earlier theft:

> The Later Loans were made between 5 November and 8 December 2012 but they were paid out, not to the Later Borrowers, but to Intermediaries who paid them on to other companies, the Recipients, who in turn paid them to the Bank in apparent discharge of the Original Loans. They were not used for the purchase of oil and gas equipment. Documents said to support and evidence the Later Loans were created after the monies had been paid out by the Bank but backdated. Thus contracts for the purchase of oil and gas equipment supposedly by the Later Borrowers were still being prepared in late November 2008 and backdated to 23 October 2008.
>
>   . . .
>
> Expert evidence as to the oil and gas industry was adduced by the Bank to establish that the oil and gas contracts were shams because of the lack of specific provisions which would be appropriate for contracts of their size. But such evidence was unnecessary. The email evidence shows that the contracts were prepared by persons within the Bank.
>
>   . . .
>
> It is beyond argument that the Later Loans were a mere cloak which sought to hide from view the reality, which was that money was being extracted from the Bank for the purpose of paying back the Original Loans. Since this circular exercise benefitted Mr. Ablyazov (because he owned or controlled the Original Borrowers) it is also clear that he must have orchestrated or, at the least, authorised this fraud.

34.     As a result of Ablyazov's siphoning billions out of the company, in 2009, BTA Bank defaulted on billions of dollars of debt held by investors including Credit Suisse Group AG, HSBC Holdings Plc, JPMorgan Chase & Co. and Royal Bank of Scotland Group Plc. Kazakhstan's sovereign wealth fund, Samruk-Kazyna, was forced to take control of BTA Bank, and Ablyazov fled to London.

35.     BTA then commenced the first in a series of lawsuits against Ablyazov, claiming that he had misappropriated approximately $295,000,000 pursuant to this fraudulent scheme. Other proceedings followed against Ablyazov in the Chancery Division and England High Court. In every proceeding, BTA alleged (and ultimately proved) that Ablyazov treated BTA as his own private source of funds.  In all, BTA commenced eleven proceedings against Ablyazov and his lieutenants for defrauding BTA in excess of $6 billion.  The UK courts took the unprecedented legal step of granting BTA a Worldwide Freezing Order over Ablyazov's assets.

36.     As part of these UK proceedings, in late 2010 BTA obtained a number of search and disclosure orders that uncovered a vast network of undisclosed companies and assets used by Ablyazov to hold and invest his stolen wealth.  The UK courts ordered Ablyazov's assets to be put in the receivership of the accounting firm KPMG (the "Receivership Order"), finding that Ablyazov had breached various disclosure and freezing orders against him.  The Receivership Order gave the receiver the right to recover a network of many hundreds of entities, worth billions of dollars.

37.     On January 26, 2011, a further 212 companies were added to the scope of the Receivership Order and on April 8, 2011, a further 3,890 companies were added.

38.     After Ablyazov defied the Receivership Order entered by the UK courts, BTA obtained judgments and sanctions against him for, among other acts, flaunting court orders, fleeing and hiding from judicial proceedings, lying during proceedings, and refusing to comply with orders directing him to uncover assets.  For his numerous actions in contempt of court, Ablyazov was sentenced to 22 months imprisonment for his conduct.

39.     On February 16, 2012, despite having promised the court his attendance at his contempt hearing, Ablyazov did not appear.  Ablyazov left behind a 100-acre estate in the English

countryside and a London mansion, valued at least 20 million pounds sterling (approximately $31 million) each, and no fewer than 750 shell companies used to invest his stolen funds in oil production, property development, and agriculture.

40.     On November 6, 2012, the Court of Appeal unanimously upheld the judgments and contempt orders against Ablyazov.  Concurring in the judgment, Lord Justice Maurice Kay stated that it was "difficult to imagine a party to commercial litigation who has acted with more cynicism, opportunism and deviousness towards court orders than Mr. Ablyazov."

41.     Following Ablyazov's flight from justice, BTA has been granted judgments in 5 of the 11 claims against Ablyazov and his associates, with others still pending, and has been awarded over $4 billion in damages by the UK courts, with interest continuing to accrue. (the "Ablyazov Judgments").

42.     After a global search spearheaded by BTA Bank, French special forces found and arrested Ablyazov in a luxury villa in France on July 31, 2013.  He remains detained in a French prison pending extradition, and the courts of France have refused to release him on bail three times.

43.     Following Ablyazov's capture and imprisonment, through his counsel and other channels, Ablyazov remained in regular communication with his son-in-law, Ilyas Khrapunov, who assumed operational control of much of Ablyazov's money laundering operations and, in concert with Ablyazov and Viktor Khrapunov, has continued the Ablyazov-Khrapunov Group's combined efforts to hide their wealth.

44.     Ilyas Khrapunov's continuing role in facilitating the Ablyazov-Khrapunov Group's money laundering efforts was confirmed on July 17, 2015, when Justice Males of the Commercial Division of the Queen's Bench of the U.K. High Court of Justice expanded the

freezing order against Ablyazov to encompass specified assets of Ilyas Khrapunov. In response to the disclosure obligations imposed by the freezing order, Ilyas Khrapunov invoked his privilege against self-incrimination.

***Viktor Khrapunov Defrauded the City of Almaty of Approximately $300 million.***

45.      In 1991, the Republic of Kazakhstan declared its independence from the former Soviet Union and began the process of transitioning from communism to an open market economy.  This transition required substantial privatization of vast state assets in order to restart the nation's economy and raise revenue for improvements to the nation's infrastructure and public services.

46.      Viktor Khrapunov became mayor of the City of Almaty on or about June 16, 1997, and remained in that position until approximately December 2004.  At the time Viktor Khrapunov took office, the Republic of Kazakhstan was experiencing the beginning of a natural resources boom and accompanying drive for investment, infrastructure upgrades, and new construction.  Almaty was the nation's former capital and largest city, and held enormous public assets remaining to be privatized and developed, a responsibility which the office of the mayor oversaw and directed.

47.      Before Viktor Khrapunov assumed the office of the mayor of Almaty, he took an oath of office to obey the Constitution and laws of the Republic of Kazakhstan.  Among other things, he expressly and impliedly promised that he would uphold his fiduciary duties to the people of Almaty, would honor his obligation to provide honest services, and would not convert money, property, or assets belonging to the City of Almaty for his own use or that of his family, friends, or associates.

48.      In reality, Viktor Khrapunov, along with his son, Ilyas Khrapunov, and other

Khrapunov family members and co-conspirators, almost immediately began a multi-year scheme to enrich themselves through the corrupt abuse of Khrapunov's public position as mayor.

49.      Viktor Khrapunov repeatedly and systemically used the powers of the office of the mayor to transfer public assets belonging to the City of Almaty to his family and their co-conspirators for prices that were a fraction of their fair value.  This  was often achieved by arranging fraudulent auctions to ensure that interested bidders won  these assets at nominal prices.  In other instances, Viktor Khrapunov used the  eminent domain powers of the office of the mayor to seize private property ostensibly for  the City of Almaty, but then promptly transferred that property to entities owned or  controlled by the Khrapunovs.  They would then pass these assets through a series  of shell or holding corporations to conceal the destination of these assets, before reselling  them for prices an order of magnitude greater than what they had paid the City of  Almaty.

50.      Three examples of these corrupt schemes to subvert and acquire the public property of the City of Almaty follow:

*Transaction One*

51.      In or about 2000, Viktor Khrapunov used his position as mayor of Almaty  to transfer a large tract of state-owned land near the two rivers area of Almaty to his  spouse and co-conspirator, Leila Khrapunov, for a total price of approximately $121,000.  The final recipient of this transfer was concealed through a series of fraudulent transactions and front  companies controlled by the Khrapunovs.  The Khrapunovs ultimately resold  this parcel of real estate for an estimated $15.57 million, a more than $15 million profit  on one interested transaction.

52.      In short, the Khrapunovs paid approximately $121,000 for a parcel of  public real estate which they later resold for a total of $15.57 million; a 128,000 percent  profit.

*Transaction Two*

53.     On or about April 16, 2001, Viktor Khrapunov used his position as mayor to cause a public building in Almaty to be sold at a fixed and rigged public auction to KRI, a company owned by Leila Khrapunov, for approximately $347,000.  The property was ultimately resold to an unrelated third party for approximately $4.1 million.

*Transaction Three*

54.     In addition to the sale of state-owned assets to Leila  Khrapunov and other family members and co-conspirators, Viktor Khrapunov also  abused his authority as mayor to enrich the Khrapunovs by seizing privately-owned property and transferring it to the Khrapunovs and others for resale.  For example, on or  about August 25, 2003, Viktor Khrapunov caused the City of Almaty to seize land owned  by privately-owned third party Shadid Engineering LLP. Approximately one month  later, he caused the property to be sold to Leila Khrapunov's company, Karasha, for  approximately $105,000.  Leila Khrapunov then caused Karasha to sell the property  directly to her, whereupon she transferred it to another company, BSC, and it was sold as part of BSC to an  unrelated third party, in a transaction that valued the parcel at approximately $2 million.  As a result, the Khrapunovs obtained nearly $1.9 million in unjustified profit.

55.     In short, through similar transactions uncovered and  still under investigation, the Khrapunovs are estimated to have illegally acquired at  least 80 pieces of real estate, which they converted into approximately $300 million in  illicit funds.

**The Khrapunovs and Ablyazov Join Together to Launder Their Stolen Money.**

56.     Seeking to avoid law enforcement attention and possible seizure of this ill-gotten wealth, the Ablyazov-Khrapunov Group funneled their corrupt assets into real estate and development entities located in, among other places, the United States and Switzerland.

15

57.     Among other locations, the Ablyazov-Khrapunov Group transferred their stolen funds to Switzerland,  where Ilyas Khrapunov and Madina Ablyazov reside, using accounts and sham entities owned or ultimately  controlled by the Ablyazov-Khrapunov Group.  The Ablyazov-Khrapunov Group ultimately transferred to  Switzerland hundreds of millions of dollars, moved out of Kazakhstan by  Viktor Khrapunov and laundered through offshore holding companies to appear  legitimate.

58.     Seeking to hide the proceeds of their frauds, the Ablyazov-Khrapunov Group created a series of entities in Switzerland and overseas to launder these illicit funds into outwardly-legitimate investments.  One such entity was Swiss  Development Group, formally SDG Capital S.A., formed and controlled by Ilyas  Khrapunov for the benefit of the Ablyazov-Khrapunov Group.  Between 2008 and 2012, the  Ablyazov-Khrapunov Group and sham companies they controlled funneled at least $115 million  into SDG derived from the Ablyazov-Khrapunov Group's self-dealing and fraud.

59.     Through these foreign investment vehicles, the Ablyazov-Khrapunov Group sought  to obscure their wealth from law enforcement in the Republic of Kazakhstan and abroad, by maintaining the appearance of a modest family of civil servants.

60.     The Ablyazov-Khrapunov Group took numerous steps to maintain this facade and  conceal their looting of the City of Almaty's public assets from authorities.  Among other schemes,  Viktor Khrapunov regularly filed false annual tax returns with Kazakhstan's  taxation authority, the Tax Committee of the Ministry of Finance of Kazakhstan.  The false returns concealed millions of dollars in monies, properties, and assets the  Ablyazov-Khrapunov Group had acquired and laundered through their corrupt enterprise.

61.     For example, according to their 2007 tax returns, which required Viktor  and

Leila Khrapunov to list their entire net worth accumulated through all sources as of  December 31, 2007, Viktor Khrapunov reported a combined net worth  equivalent to $113,298, in addition to three vehicles, five modest pieces of real estate,  and two parking stalls.  While claiming to have a total net worth of less than $120,000,  Viktor Khrapunov had in fact amassed a fortune estimated at no less than $300  million.  Indeed, according to public news reports, in 2009 Viktor Khrapunov was one of  the richest people in Switzerland with a fortune of over $300 million. Similarly, in 2012  Viktor Khrapunov was again listed among Switzerland's 300 richest people, with a  fortune estimated at $324– $432 million.

### The Ablyazov-Khrapunov Group's Corruption is Exposed and Investigations Begin in Kazakhstan and Switzerland

62.     In late 2007, Viktor Khrapunov was tipped off that the Kazakh  government had begun investigating the financial dealings of the  Ablyazov-Khrapunov Group and their associates for a range of criminal acts and self-dealing.  In anticipation of possible criminal charges, on or about November 9, 2007, Viktor and Leila Khrapunov boarded a private  jet and fled Kazakhstan for Switzerland, where Ilyas Khrapunov and Madina Ablyazov resided, and  the bulk of their looted funds were held.

63.     On or about May 27, 2011, the Investigation Department of the Agency  for Economic and Corruption-Related Crimes of Kazakhstan (the "Investigation  Department") filed two criminal cases against Viktor Khrapunov for abuse of power and  fraudulent acts, and on or about July 21, 2011, obtained a court-ordered arrest warrant for  Viktor Khrapunov.  Through 2011 and 2012 additional charges were brought in  Kazakhstan against Viktor, Leila, and Ilyas Khrapunov, arising from the theft of public  property and the ultimate laundering of funds during Viktor Khrapunov's tenure as Mayor of Almaty.

64.     On or about February 20, 2012 and September 14, 2012, the Investigation

Department applied to the Federal Office of Justice in Switzerland for legal assistance in connection with the effort to prosecute Viktor, Leila, and Ilyas Khrapunov for crimes in Switzerland and Kazakhstan relating to their corrupt acts in Almaty and the laundering of the resulting funds. In response to this request, in mid-2012 the Public Prosecutor of Geneva opened an investigation into the Ablyazov-Khrapunov Group on suspicion of violating Swiss money laundering laws. The Public Prosecutor of Geneva subsequently seized financial and banking documents from the Ablyazov-Khrapunov Group and ordered Swiss accounts and assets belonging to them be frozen, including accounts held at Swiss banks Sarasin & Co. Ltd., Credit Suisse, and Schroeder & Co. This investigation by the Swiss authorities is ongoing, and in August 2013 the Public Prosecutor of Geneva froze additional assets belonging to the Ablyazov-Khrapunov Group.

65.     At this time, in addition to the numerous judgments against Ablyazov in the United Kingdom, there are no less than 24 criminal charges pending against Viktor Khrapunov in Kazakhstan for embezzlement, fraud, money laundering, establishing and directing an organized criminal group for criminal purposes, abuse of power, and bribery. There are additional charges pending against Leila Khrapunov and Ilyas Khrapunov in Kazakhstan for, among other offenses, money laundering and establishing and directing an organized criminal group for criminal purposes. Assets of the Ablyazov-Khrapunov Group remain frozen by Swiss authorities, and the Government of the Republic of Kazakhstan has formally requested extradition of Viktor Khrapunov.

66.     Despite the numerous investigations and freezing orders against the members of the Ablyazov-Khrapunov Group, the conspirators continue to launder their commingled stolen wealth through acts of fraud and in furtherance of the conspiracy.

67.     As one example, from 2011 through the present, members of the Ablyazov-Khrapunov Group, including Ilyas Khrapunov and Ablyazov himself, conspired to fund Ablyazov's widespread global legal campaign with laundered funds, despite global freezing and receivership orders against Ablyazov's assets.

68.     In May of 2011, two entities that Ablyazov had been using to fund his various litigations were put in receivership, based on findings that they were not arms-length lenders, but in fact controlled and funded by Ablyazov himself. Deprived of a funding source, Ablyazov conspired with other members of the Ablyazov-Khrapunov Group to circumvent the receivership and freezing orders against him and began funding his litigation – including litigation against the Republic of Kazakhstan – through loans from a series of shell companies, including the Belizean-registered entity Green Life International SA ("Green Life").

69.     The conspirators represented to the U.K. receivers and courts that Green Life was an arms-length entity owned and funded by Gennady Petelin, but did not disclose that Petelin was related by marriage to the Ablyazov and Khrapunov families.

70.     In fact, Green Life was one more in a long series of shell entities used by the Ablyazov-Khrapunov Group to launder their stolen funds. At Ablyazov's direction, Ilyas Khrapunov and other members of the Ablyazov-Khrapunov Group transferred millions of dollars in funds from accounts controlled by the Ablyazov-Khrapunov Group through Petelin and Green Life to Ablyazov's counsel. To obscure this scheme, all funds were transferred from Green Life to Chabrier Avocats, the Swiss counsel for the Khrapunov family and SDG, before being paid to Ablyazov's counsel.

71.     Using Petelin's name to deter suspicion, the conspirators were able to launder and spend millions of dollars in stolen funds that should rightly have been placed in receivership.

72.     The use of Petelin as a front for Ablyazov shell corporations such as Green Life was based in part on the close relationship between Petelin and Viktor Khrapunov. Viktor Khrapunov, whose daughter is married to Petelin's son, collaborated with Petelin on investments of the Ablyazov-Khrapunov Group's funds in Russia, where Petelin resided and had an extensive network of contacts. For example, in 2013, Viktor Khrapunov engaged in discussions with Petelin for the purpose of utilizing Petelin's contacts in Russia to facilitate the investment of the Ablyazov-Khrapunov Group's funds in Russian oil and energy assets.

73.     As another example of the Ablyazov-Khrapunov Group's continuing operations, members of the Ablyazov-Khrapunov Group hired computer hackers to illegally surveil French prosecutors and other public officials in an effort to free Ablyazov from French prison.

74.     Ablyazov was arrested by French special forces in 2013 after fleeing the U.K., but has remained in continuous contact with his coconspirators during his imprisonment. During his incarceration, Ablyazov directed his coconspirators, and his son-in-law Ilyas Khrapunov in particular, to use an array of unlawful means to secure his release.

75.     At Ablyazov's direction, in 2013 Ilyas Khrapunov hired a "black hat" computer security group to hack into the personal and work communications of numerous French public officials, including the prosecutors in Ablyazov's French extradition proceedings. Without permission and in violation of law, these hackers successfully breached the computers and mobile phones of numerous French law enforcement and justice officials, intercepted their electronic communications, and installed malicious software permitting them to remotely activate the microphones on these public officials' mobile phones to eavesdrop on and record their conversations. The hackers then transmitted French officials' intercepted communications, including emails, text messages, documents, and photographs, to Ilyas Khrapunov, who shared

and discussed this illegally-obtained surveillance with Ablyazov himself. Ablyazov then used this information as part of his legal campaign to avoid extradition.

76.      In return for this illegally-intercepted information, the Ablyazov-Khrapunov Group paid hundreds of thousands of dollars to these hackers-for-hire, from funds traceable to the thefts from BTA Bank and the City of Almaty.

### The Ablyazov-Khrapunov Group Conspires to Transfer and Hide Illicit Funds in the United States.

77.      In 2011 and 2012, in response to escalating pressure on the Ablyazov-Khrapunov Group from both Kazakh and Swiss authorities and legal proceedings in the United Kingdom, the Ablyazov-Khrapunov Group embarked on a scheme to secret the families' illicit wealth in real estate investments in the United States. Upon information and belief, the Ablyazov-Khrapunov Group selected the United States as a harbor for these stolen funds because they believed real estate investments in the United States would be difficult for Kazakh authorities to access.

78.      To execute this scheme the Ablyazov-Khrapunov Group used SDG, their Swiss real estate vehicle, and Telford International Limited ("Telford"), a Dubai-based private contracting entity controlled by the Ablyazov-Khrapunov Group.

79.      To create the appearance that SDG was independent of the Ablyazov-Khrapunov Group, in 2012 SDG was purportedly sold to a close friend and political ally of the Ablyazov-Khrapunov Group, Philippe Glatz. This sale was in fact a sham transaction, with the Ablyazov-Khrapunov Group maintaining beneficial ownership and control of SDG.

80.      Upon information and belief, the Ablyazov-Khrapunov Group paid Mr. Glatz to purchase SDG using the Ablyazov-Khrapunov Group's own funds: Glatz accepted a loan from the Ablyazov-Khrapunov Group and then repaid that loan while outwardly claiming that this payment to the Ablyazov-Khrapunov Group was for the purchase of SDG. In fact, the transfer

of SDG was illusory, as Mr. Glatz was merely repaying a prior obligation, and effectively getting SDG for free.

81.     To reduce the amount of cash needed to effectuate this sham sale, Ilyas Khrapunov offered SDG to Glatz at an incredibly discounted price. Although at the time of the purported sale SDG's assets were valued at approximately $150 million, Glatz only transferred approximately $3.5 million in cash to the Khrapunov family for SDG – roughly two percent of SDG's assessed asset value.

82.     To justify this incredible discount to asset value, Ilyas Khrpaunov used his control of SDG to falsely book millions of dollars in supposed debt and liabilities to hide the fraudulent nature of the transition he had orchestrated.

83.     This sham transaction served the Ablyazov-Khrapunov Group's purposes by creating the appearance that SDG had changed ownership, although the Ablyazov-Khrapunov Group received no net consideration for the purported sale, and Glatz was left beholden to the Ablyazov-Khrapunov Group and explicitly obligated to hold their interest in the investment.

84.     The capital structure, organization, management, and illicit purpose of SDG remained the same after the purported sale, and the Ablyazov-Khrapunov Group still profits from and manages SDG's operations. Ilyas Khrapunov continues to control SDG while holding himself out to be a mere "outside advisor" to the company, all the while protecting and reaping the benefits of the Ablyazov-Khrapunov Group's investments in SDG.

### Through SDG, the Ablyazov-Khrapunov Group Creates Triadou to Hide their Illicit Funds in New York Real Estate Transactions with the Chetrit Group.

85.     In or about 2011, Ilyas Khrapunov, on behalf of the Ablyazov-Khrapunov Group, approached Nicolas Bourg, a Belgium-based real estate fund manager, seeking to create a new entity controlled by SDG to mask the Ablyazov-Khrapunov Group's efforts to invest in real

estate opportunities in the United States.

86.    In consultation with Ilyas Khrapunov, Bourg formed a series of entities  under the laws of Luxembourg for the specific purpose of investing the Ablyazov-Khrapunov Group's funds in real estate in the United States.  These entities included Triadou, an investment vehicle wholly owned and controlled by SDG, which  was itself a front for the Ablyazov-Khrapunov Group's activities.

87.    Triadou is a special purpose vehicle:  a limited-liability legal  entity created to fulfill a specific purpose, often used to insulate a parent entity  from financial risk or liability. SPVs can also be used, as Triadou was, to hide the true ownership of assets held by the SPV, or to obscure relationships between individuals and  entities.  Bourg became the sole director of Triadou, operating at the direction of the   Ablyazov-Khrapunov Group, who continued to control SDG, Triadou's sole shareholder.

88.    At the direction of Ilyas Khrapunov, Bourg made contact with Eric Elkain,  an agent of Chetrit and the Chetrit Group.  Bourg and  Elkain agreed to arrange a meeting between Chetrit and Ilyas Khrapunov for the purpose  of exploring concealed investments by the Ablyazov-Khrapunov Group in the United States with the Chetrit Group.

89.    In or about 2012, Chetrit and his brother and partner Meyer  Chetrit met with Ilyas Khrapunov and Bourg in Geneva, Switzerland.  While the Ablyazov-Khrapunov Group had purportedly divested  itself of any interest in SDG by this time, Ilyas Khrapunov held himself out to Chetrit as having a controlling ownership interest in SDG.

90.    At this meeting, Chetrit and Ilyas Khrapunov discussed  possible investment strategies for the Ablyazov-Khrapunov Group in the United  States real estate sector.  In these discussions, Ilyas Khrapunov disclosed the fact that the  Ablyazov-Khrapunov Group was facing

criminal charges and asset freezes directed by the governments of Kazakhstan, Switzerland, and the United Kingdom, and needed to move funds to other jurisdictions. During the continuing course of his dealings with the Ablyazov-Khrapunov Group, this situation was repeatedly and unequivocally made clear to Chetrit. Specifically, the Ablyazov-Khrapunov Group needed to move funds that were the subject of criminal charges and asset freezes as a result of the proceedings both against Ablyazov and the Ablyazov-Khrapunov Group. Chetrit expressed sympathy with this situation, stating that his own family had faced political sanctions in his native Morocco, a result of having defrauded the King and being forced to flee. Chetrit and Ilyas Khrapunov agreed in principle to seek joint investments in the United States, and agreed to meet further.

91. Following this meeting in Geneva, Ilyas Khrapunov and Bourg met with Chetrit again in New York City, to evaluate potential investment options. While discussing specific investment opportunities, the parties again openly and repeatedly discussed the criminal charges against the Ablyazov-Khrapunov Group and the efforts of the governments of Switzerland and Kazakhstan to locate and seize the assets of the Ablyazov-Khrapunov Group. Again, Ilyas Khrapunov acted on behalf of SDG and Triadou, despite the Ablyazov-Khrapunov Group's purported sale of SDG a year prior.

92. As a result of these discussions, the Ablyazov-Khrapunov Group invested, through Triadou, with Chetrit and the Chetrit Group in a number of real estate opportunities in New York City. The most significant of these were investments in the Flatotel and Cabrini Medical Center developments in New York City.

93. The Flatotel is a 289-room business hotel opened in 1991, located at 135 West 52nd St, New York, New York.

94.    The Cabrini Medical Center hospital campus closed in 2008 and is now comprised of several buildings containing approximately 250 condominium units.

95.    Both the Flatotel and the Cabrini Medical Center properties were purchased by members of the Chetrit Group, along with co-investors.  The developers have  been executing plans to convert both properties into luxury condominiums, and are close to completion.

96.    The Chetrit Group owned a 75% interest in the Flatotel, and created a series of limited liability entities to hold that interest, including Counterclaim Defendants CF 135 FLAT LLC and CF 135 West Member LLC.

97.    The Chetrit Group offered to sell half of their 75% investment in the Flatotel to Triadou, after which the Chetrit Group and Triadou would each own 37.5%.  Triadou would provide 70% of the capital needed – against Chetrit's 30%, the difference amounting to an above-market "promote fee" for Chetrit that ensured that the Chetrit Group would reap the largest profits from the Flatotel development, even as it put in the least capital – and the parties would then divide the profits  from the investment.  In or about March 25, 2013, Triadou accepted this  offer, notwithstanding the fact that the terms strongly favored Chetrit, and committed to transmit funds to the Chetrit Group to secure the 37.5% interest in the Flatotel property.

### *The Ablyazov-Khrapunov Group Enlists FBME to Facilitate Their Money Laundering Scheme in the United States*

98.    The Ablyazov-Khrapunov Group sought to fund Triadou's investments with money from the Ablyazov-controlled entity Telford, held in accounts with FBME.

99.    Telford's FBME accounts were managed by Eesh Aggarwal, Chairman of Azure Consultants DMCC, and a close financial advisor to Ablyazov. Aggarwal had connected Ablyazov and other members of the Ablyazov-Khrapunov Group to FBME through Aggarwal's

contacts with high-level officers at FBME, and in time FBME became one of the Ablyazov-Khrapunov Group's primary banks. On information and belief, the conspirators favored FBME due to its presence inside of the European Union, its lack of anti-money laundering protections, and its eagerness to service high-risk clientele and shell corporations such as Telford.

100.     FBME promoted its weak due diligence standards to attract high-risk, high-value clients just like the Ablyazov, and was known for its willingness to do business with clients seeking to avoid regulatory oversight. In particular, FBME relied on an "Approved Third Party" program, where FBME's contacts could introduce new, high-value clients to the bank with virtually no due diligence of these new relationships. Upon information and belief, Aggarwal was one such "Approved Third Party," and with the approval of certain FBME officers, was able to launder the Ablyazov-Khrapunov Group's funds through FBME by way of entities such as the Ablyazov-controlled Telford, with effectively no scrutiny or due diligence by FBME.

101.     FBME had a history of moving funds for Aggarwal and Ablyazov with no questions asked, which led the conspirators to favor FBME for their criminal schemes aimed at the United States. For example, on June 11, 2011, FBME executed more than $27 million in transfers of Ablyazov's stolen funds to Amber Limited, a shell company registered in the U.A.E. (where Aggerwal operates) subsequently found to be an undisclosed Ablyazov asset and added to the U.K. courts' freezing and receivership orders.

102.     Telford's accounts at FBME bank were used to covertly move and invest funds stolen by Ablyazov from BTA Bank. Because the Telford accounts consisted of Ablyazov's stolen funds, Ilyas Khrapunov conferred with Ablyazov regarding investments of funds from Telford, and Ablyazov's approval was required for transfers from Telford. Even after Ablyazov's incarceration in France he remained in contact with his coconspirators, and while Ilyas

Khrapunov took operational control of much of the Ablyazov-Khrapunov Group's network, Ablyazov continued to direct specific transfers of funds, including those from Telford's FBME accounts.

103.    Triadou attempted to transfer Telford's funds held in FBME for the Flatotel and Cabrini deals through banks in Luxembourg, but those banks refused to accept wire transfers from the Ablyazov-Khrapunov Group's FBME accounts due in part to the investigations or proceedings led by the Kazakh, Swiss, and United Kingdom authorities.

104.    Bourg then contacted Chetrit about alternative wire transfer arrangements. Informed that commercial banks refused to handle Triadou's funds from Telford, Chetrit conspired to launder the money, instructing Bourg to disregard the banks and transfer funds directly from the Ablyazov-Khrapunov Group's offshore accounts to the escrow account of Chetrit's personal and corporate attorneys. Bourg then directed a series of wire transfers, on behalf of Triadou, from Telford's accounts at FBME directly to Chetrit's counsel.

105.    FBME executed these transfers despite their blatant indicia of money laundering, including that (1) Telford was a recently incorporated offshore shell company with no obvious business purpose, (2) Telford was purportedly owned by another offshore nominee-shareholder trust, (3) Telford was seeking to transfer millions of dollars into escrow accounts with no due diligence, and (4) Telford was transferring these funds from a high-risk jurisdiction for the benefit of an unrelated third party operating in a more financially-rigorous jurisdiction.

106.    This was not the only instance of FBME executing such obviously suspicious transfers for Aggerwal and the Ablyazov-Khrapunov Group without concern for money laundering red flags. At the same time FBME began to execute transfers from Telford to the accounts of Chetrit's counsel, on or about October 9, 2013, FBME executed wire transfers for $25

million from Telford's accounts for an investment in overseas telecommunications assets. Again Telford was transferring millions of dollars of Ablyazov's money for the benefit of another entity linked to the Ablyazov-Khrapunov Group.

107.     Subsequent to these transfers, on July 22, 2014, the U.S. Financial Crimes Enforcement Network ("FinCEN") designated FBME Bank a "foreign financial institution of primary money laundering concern."  FinCEN found that FBME Bank was regularly "used by its customers to facilitate money laundering, terrorist financing, transnational organized crime," had "systemic failures in its anti-money laundering controls that attract high-risk shell companies," and performed a "significant volume of transactions and activities that have little or no transparency and often no apparent legitimate business purpose."

108.     Under Section 311 of the PATRIOT Act, FinCEN barred U.S. financial institutions from opening or maintaining "payable-through" accounts with FBME.[1]  In the accompanying official announcement, FinCEN's then-Director emphasized that FBME was not merely negligent, but rather "promotes itself on the basis of its weak Anti Money Laundering (AML) controls in order to attract illicit finance business from the darkest corners of the criminal underworld," and "openly advertises the bank to its potential customer base as willing to facilitate the evasion of AML regulations."

109.     In its updated rule barring U.S financial institutions from dealing with FBME, FinCEN noted in particular FBME's pervasive dealings with obscure shell companies just like Telford, serving no purpose but to facilitate money laundering:

          FinCEN considered all of the relevant information and is particularly

---

[1]      FBME challenged FinCEN's rulemaking in the United States District Court for the District of Columbia and won a temporary reprieve, but FinCIN reissued the rule in substantially the same form on March 31, 2016. That updated rule is now undergoing judicial review.

concerned with: (1) The large number of FBME customers that are either shell companies or that conduct transactions with shell companies; (2) the lack of transparency with respect to beneficial ownership or legitimate business purposes of many of FBME's shell company customers; (3) the location of many of its shell company customers in other high-risk money laundering jurisdictions outside of Cyprus; (4) the high volume of U.S. dollar transactions conducted by these shell companies with no apparent business purpose; and (5) FBME's longtime facilitation of its shell company customers' anonymity by allowing thousands of customers to use the bank's physical address in lieu of their own.

110.    The Central Bank of Cyprus has frozen all assets transfers to or from FBME, and taken control of the bank pending completion of an investigation into its operations. FBME remains under the control of the Central Bank of Cyprus, and upon information and belief, continues to hold millions in funds belonging to the Ablyazov-Khrapunov Group and shell companies they control.

### The Ablyazov-Khrapunov Group Enters a Second Deal with Chetrit, Again Funded By Telford through FBME

111.    Through Triadou, the Ablyazov-Khrapunov Group entered a second investment with the Chetrit Group shortly thereafter.   In late 2012, Triadou agreed to invest $12 million in the Cabrini Medical Center conversion, a joint venture between the Chetrit Group and another private developer to convert a former medical center in New York City into luxury condominiums.

112.    Due to increasing scrutiny on the Ablyazov-Khrapunov Group's finances, the contemplated $12 million investment became impossible. Bourg discussed this obstacle with Chetrit, who agreed that Triadou should invest $6 million, half the originally-agreed amount, until further funds became available. In return for this $6 million investment, Triadou would receive a promissory note and the right to convert that note into equity in the entity holding the Chetrit Group's interest in the Cabrini deal, 227 East 19th Holder, LLC.

113.    Again, the funds to execute the Cabrini deal were transferred, on May 20, 2013,

directly from the Ablyazov-Khrapunov Group's Telford accounts at FBME Bank to a law firm in New York working on Chetrit's behalf. Again, this transfer of funds from Telford was only executed after Ilyas Khrapunov received explicit direction from Ablyazov.

### Kazakh Authorities Target the Ablyazov-Khrapunov Group's Holdings in the United States, and the Ablyazov-Khrapunov Group Liquidates Those Assets at Below-Market Value with the Chetrit Group's Assistance.

114. In 2014, Almaty filed an action in California federal court against members of the Ablyazov-Khrapunov Group seeking to seize assets that they had attempted to launder through real estate investments in California. That action is *City of Almaty v. Viktor Khrapunov, et al*, Case No. 2:14-cv-03650-FMO-CW (filed May 13, 2014; dismissed September 21, 2015) (the "California Litigation"). On information and belief, this lawsuit led the Ablyazov-Khrapunov Group to believe their assets in the U.S. were no longer safe from seizure by the government of Kazakhstan.

115. In response, in late 2014, Ilyas Khrapunov directed Bourg, Triadou's director, to begin liquidating Triadou's assets in New York so that the funds could be removed from the United States and hidden. Specifically, Ilyas Khrapunov told Bourg to liquidate Triadou's investments in Flatotel and the Cabrini Medical Center as quickly as possible.

116. Bourg approached Chetrit, explaining that the threat of the California Litigation was pressuring Triadou and the Ablyazov-Khrapunov Group into moving their assets out of the United States. Chetrit offered to purchase an assignment of Triadou's interest in the Flatotel at a substantial discount from the price originally paid by Triadou. By this point, the value of Triadou's investment had in fact increased substantially beyond the funds originally invested.

117. Chetrit simultaneously proposed to bribe Bourg, so Chetrit could further take advantage of Triadou and secretly influence it to obtain a discounted price. Specifically, Chetrit

proposed that Bourg covertly use his position as director of Triadou to accept a lower price for the Chetrit Group's purchase of an assignment, thus decreasing Triadou's recovery from the investment and increasing the Chetrit Group's profit. In return for securing for Chetrit a lower assignment price, Chetrit agreed to surreptitiously pay Bourg $3 million.

118.    In or about August of 2014, Bourg, acting on behalf of Triadou and at the direction of the Ablyazov-Khrapunov Group, agreed to assign Triadou's interest in the Flatotel back to the Chetrit Group for a price as low as $26 million, only a fraction of the fair market value of the properties. At the same time, Bourg executed a release of the promissory note that Triadou held entitling it to equity in the Cabrini Medical Center development. At the time of this assignment and release, Viktor Khrapunov was facing criminal charges as well as possible fines and disgorgement in Kazakhstan; the Kazakh government had formally sought extradition of Viktor Khrapunov from Switzerland; Ablyazov was being held in French prison awaiting extradition; and the Swiss assets of the Ablyazov-Khrapunov Group remained frozen. Not only were all of these facts widely disseminated in the news, they were known by all parties to the assignment and release transactions, including Chetrit, and it was not uncommon for their meetings to begin with a discussion of the possibility of the incarceration of members of the Ablyazov-Khrapunov Group.

119.    Following the assignment and release, Bourg invoiced Chetrit for $1 million of the agreed-upon $3 million bribe. After receiving the invoice, Chetrit paid Bourg $400,000, but refused to pay the full amount demanded by Bourg.

120.    In or about March 2015, Bourg met with Chetrit, and recorded the meeting. As captured on audio, Bourg demanded the remainder of his promised compensation. Chetrit acknowledged that he had paid Bourg "400 or 500," but responded that Bourg would receive the

additional $600,000 only when Chetrit paid what he owed Triadou for the assignment, and that he had no intention of paying Triadou until forced to do so. Chetrit further stated on tape that Bourg would not receive any remaining money.

121. At that meeting, Bourg and Chetrit repeatedly discussed the legal troubles of Mukhtar Ablyazov and Victor and Ilyas Khrapunov. Chetrit repeatedly avoided using Ilyas Khrapunov's actual name, referring to him instead by the code name "Pedro." Chetrit and Bourg discussed how "Pedro" was "sought by Interpol" and his "father-in-law [was] still in prison," and Chetrit agreed that law enforcement was "coming at [the Ablyazov-Khrapunov Group] from all sides."

122. Also at that meeting, Chetrit and Bourg discussed the fact that due to the investigation in Switzerland, Ilyas Khrapunov could not leave the country and was under intense law enforcement pressure. In addition, Chetrit once again acknowledged his longstanding understanding that Ablyazov and his criminal situation was behind the motivations of the Ablyazov-Khrapunov investments in the United States. Chetrit further acknowledged his longstanding understanding that the Ablyazov-Khrapunov Group had made similar investments in other countries, such as Greece, to conceal and launder the proceeds of their crimes.

123. On or about March 22, 2015, after his meeting with Chetrit, Bourg contacted Elkain, Chetrit's agent in Europe, and also recorded that phone call. In that call, Bourg sought to confirm the terms of his secret deal with Chetrit. During this recorded conversation, Bourg and Elkain agreed that the secret deal between Chetrit and Bourg called for $3 million in compensation for Bourg. Elkain agreed that he "confirmed the deal" between Chetrit and Bourg, and "would have never said that if [Chetrit] hadn't told [him] so." Bourg requested Elkain's aid in receiving the remainder of his payment, but Elkain responded that whether or not the

agreement would be honored was up to Chetrit.

124.    Despite the finalized assignment agreement and release, the Chetrit Group refused to make any payments to Triadou following the sale.  In response, Triadou filed a  series of actions in New York state courts, seeking summary judgment and payment of  these obligations under the assignment agreement.  Those actions are *Triadou SPV S.A. v.  CF 135 FLAT LLC, et al.*, No. 653462/2014 (Nov. 10, 2014); *Triadou SPV S.A. v. CF  135 FLAT LLC, et al.*, No. 650239/2015 (Jan. 26, 2015); *Triadou SPV S.A. v. CF 135  FLAT LLC, et al.*, No. 154681/2015 (May 11,  2015), and *Triadou SPV S.A. v. CF 135  FLAT LLC, et al.*, No. 156907/2015 (July 9,  2015),

125.    Each of these actions seeks the payment of money to Triadou derived from  the sale of property illicitly obtained by the Ablyazov-Khrapunov Group, and rightfully owned by BTA and Almaty.

126.    By this lawsuit, BTA Bank and the City of Almaty seek to hold Crossclaim Defendants responsible for their illegal conduct in the United States in violation of U.S. law.

## FIRST CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))
### *Against All Defendants*

127.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 126 as if fully set forth herein.

128.    This cause of action is against all Crossclaim Defendants (the "Count 1 Defendants").

129.    From 1997 and continuing to the present, the Ablyazov-Khrapunov Group and numerous other individuals and entities, including SDG and Telford, have constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 1

Enterprise").

130.    In 2012, the Chetrit Group knowingly and willfully joined the Count 1 Enterprise by aiding the Ablyazov-Khrapunov Group's schemes to hide and launder their illicit assets through investments by SDG through Triadou in properties owned by the Chetrit Group.

131.    The Count 1 Enterprise was engaged in, and the activities of the Count 1 Defendants affected, interstate and foreign commerce.

132.    The Count 1 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 1 Enterprise through a pattern of racketeering activity consisting of the following predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B):

a.    The Count 1 Defendants engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by conducting numerous financial transactions using illegally obtained funds to purchase real estate investments in New York City and elsewhere and to fund business entities including SDG and Triadou, knowing that such funds were unlawfully converted from the City of Almaty and BTA Bank, with the goal of concealing the source of those funds. The Count 1 Defendants further engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by transporting, transmitting, and/or transferring funds stolen from Almaty and BTA into and within the United States in order to conceal their source and existence from lawful investigations conducted by Swiss, Kazakh, and United Kingdom authorities.

b.    The Count 1 Defendants further engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by conducting financial transactions

34

using those stolen funds by, among other things, using stolen funds to purchase real estate and other assets in New York City and elsewhere and to fund business entities, including Triadou and SDG, with the intent to further the Count 1 Enterprise and to conceal the source of those funds.

c.  The Count 1 Defendants engaged and conspired to engage in money transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 by, among other things, knowingly transferring funds in excess of $10,000 stolen from Almaty and BTA into and within the United States to invest in real estate and other assets in New York City with the aid of the Chetrit Group, knowing that such funds were stolen from the City of Almaty and BTA Bank.

d.  The Count 1 Defendants engaged and conspired to engage in mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 by knowingly using the mails and wires to transfer illegally obtained funds into and within the United States, for the purpose of furthering the Count 1 Enterprise and, while concealing the funds' illegal source, used those funds to purchase real estate in New York City and to fund business entities, including SDG and Triadou, that enabled those entities to conduct business in the United States using the illegally-obtained funds.

e.  The Count 1 Defendants unlawfully transported or caused to be transported in interstate or foreign commerce securities or money having a value of $5,000 or more which was stolen, converted or taken by fraud from Almaty and BTA Bank, and knowing the same to be stolen, converted or taken by fraud in violation of 18 U.S.C. § 2314.

     f.  The Count 1 Defendants received, possessed, concealed, sold, or disposed of securities or money having the value of $5,000 or more, or conspired to do the same, which crossed a state or United States boundary after being stolen, unlawfully converted, or taken from Almaty and BTA Bank, and knowing the securities or money to have been stolen, unlawfully converted, or taken in violation of 18 U.S.C. § 2315.

133.    Each of the Count 1 Defendants conducted or  participated, directly or indirectly, in the conduct of the affairs of the Count 1 Enterprise through a pattern of racketeering activity, within the meaning of  18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c).  Each of the Count 1 Defendants engaged or conspired to engage in two or more predicate  acts of racketeering, and each committed at least one such act of racketeering after the  effective date of RICO.  From in or about 1997, and continuing to the present,  Count 1 Defendants associated together, with one another and with  others, and acted in concert for the common and unlawful purposes of the Count 1 Enterprise and in order to implement the schemes and employ the devices  described herein.  The specific related predicate acts that constitute the pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to, the following acts of money laundering, transactions in money and property derived  from specified unlawful activity, foreign transport of stolen money or property known to be stolen, converted or taken by fraud, mail fraud, and/or wire fraud:

     a.  The 2012 sham sale of SDG to Philippe Glatz to create the appearance that SDG was independent of the Ablyazov-Khrapunov Group;

     b.  the fraudulent loan from the Ablyazov-Khrapunov Group to Mr. Glatz to facilitate the SDG sale transaction;

c.  the formation of Triadou and other entities by SDG at the direction of Bourg and in consultation with Ilyas Khrapunov;

d.  Chetrit's meetings with Ilyas Khrapunov in or about 2012 in Switzerland and New York City, and their subsequent agreement to invest the Ablyazov-Khrapunov Group's unlawfully obtained money in real estate in New York City;

e.  E-mails directly between Chetrit and Ilyas Khrapunov as well as through intermediaries discussing the Ablyazov-Khrapunov Group's possible investments in New York real estate;

f.  the formation of the investment vehicles necessary to facilitate the Flatotel and Cabrini investments;

g.  Telford's failed attempt to transfer funds held in FBME Bank for the Flatotel and Cabrini deals through banks in Luxembourg;

h.  the May 20, 2013 transfer of funds from Telford to Chetrit's attorney representing Triadou's investment of $6 million in the Cabrini deal, along with Chetrit's promissory note and Triadou's right to convert that debt into equity in Cabrini;

i.  a series of other wire transfers on behalf of Triadou from Telford's accounts at FBME Bank Ltd. to Chetrit's counsel in New York, including transfers on November 9, 2012, and January 22, February 13, February 19, April 8, April 16, and April 24, 2013;

j.  a May 22, 2013 wire transfer of $28 million from Telford to a different law firm's Citibank account in New York used for a separate New York real estate investment with Chetrit;

k.  a May 2014 agreement (executed August 2014) to transfer Triadou's interest in the

Flatotel to the Chetrit Group at a below-market price;

l.   Chetrit's and Triadou's signed May 2014 release of the promissory note regarding
     Triadou's $6 million investment in the Cabrini Medical Center development;

m.  Chetrit's payment of $400,000 to Bourg in partial satisfaction of Chetrit's
     agreement with Bourg to pay him $3 million in exchange for securing Chetrit a
     lower assignment price for Triadou's interests in the Flatotel and Cabrini deals;
     and

n.   a payment of $1 million from Chetrit to Triadou in partial satisfaction of Chetrit's
     obligations under the fraudulent assignment.

134.     As a direct and proximate result of RICO violations by the Count 1 Defendants
of 18 U.S.C. § 1962(c),  Almaty and BTA have suffered damages in an amount to be determined
at trial and presently  estimated to be not less than $6 billion.  Almaty and BTA have been injured
in their business or  property by reason of each Count 1 Defendants' violations and,  pursuant to
the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to  recover threefold the
damages suffered, together with the costs of this suit and  reasonable attorneys' fees.

### SECOND CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))
### *Against All Defendants*

135.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 134
as if fully set forth herein.

136.     This cause of action is against all Crossclaim Defendants (the "Count 2
Defendants").

137.     From its formation and continuing to the present, CF 135 West Member LLC,
has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 2

Enterprise").

138.     The Count 2 Enterprise was engaged in, and the activities of the Count 2 Defendants affected, interstate and foreign commerce.

139.     The Count 2 Defendants engaged in a pattern of racketeering activity consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) described in paragraph 132 above.

140.     Each of the Count 2 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 2 Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c). Each of the Count 2 Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. The Count 2 Defendants associated together, with one another and with others, and acted in concert for the common and unlawful purposes of the Count 2 Enterprise and in order to implement the schemes and employ the devices described herein. The specific related predicate acts that constitute the pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to, those acts described in paragraph 133 above.

141.     As a direct and proximate result of RICO violations by the Count 2 Defendants of 18 U.S.C. § 1962(c), Almaty and BTA have suffered damages in an amount to be determined at trial. Almaty and BTA have been injured in their business or property by reason of each Count 2 Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

## THIRD CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(a))
### *Against All Defendants*

142.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 141 as if fully set forth herein.

143.    This cause of action is against all Crossclaim Defendants (the "Count 3 Defendants").

144.    From its formation and continuing to the present, CF 135 West Member LLC, has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 3 Enterprise").

145.    The Count 3 Enterprise was engaged in, and the activities  of the Count 3 Defendants affected, interstate and foreign commerce.

146.    The Count 3 Defendants received income derived from a pattern of racketeering activity consisting of the related predicate acts of racketeering described in paragraphs 132 and 133 above.

147.    The Count 3 Defendants used or invested the income derived from their racketeering activity in the acquisition of an interest in, or the establishment or operation of, the Count 3 Enterprise in violation of 18 U.S.C. § 1962(a).

148.    The Count 3 Defendants used or invested the income derived from their racketeering activity in the Count 3 Enterprise in fraudulent and below-market transactions, including by accepting unreasonable contractual terms to transfer wealth to the Chetrit Group.

149.    As a direct and proximate result of RICO violations by the Count 3 Defendants of 18 U.S.C. § 1962(a),  Almaty and BTA have suffered damages in an amount to be determined at trial.  Almaty and BTA have been injured in their business or  property by reason of each Count 3

Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

### FOURTH CAUSE OF ACTION

**(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))**
*Against All Defendants*

150.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 149 as if fully set forth herein.

151.    This cause of action is against all Crossclaim Defendants (the "Count 4 Defendants").

152.    From its incorporation and continuing to the present, 227 East 19th Holder LLC has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 4 Enterprise").

153.    The Count 4 Enterprise was engaged in, and the activities of the Count 4 Defendants affected, interstate and foreign commerce.

154.    The Count 4 Defendants engaged a pattern of racketeering activity consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) described in paragraph 132 above.

155.    Each of the Count 4 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 4 Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c). Each of the Count 4 Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. The Count 4 Defendants associated together, with one another and with others, and acted in concert for the common and

unlawful purposes of the Count 4 Enterprise and in order to implement the schemes and employ the devices described herein. The specific related predicate acts that constitute the pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to, those acts described in paragraph 133 above.

156.     As a direct and proximate result of RICO violations by the Count 4 Defendants of 18 U.S.C. § 1962(c), Almaty and BTA have suffered damages in an amount to be determined at trial. Almaty and BTA have been injured in their business or property by reason of each Count 4 Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

### FIFTH CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(d))
### *Against All Defendants*

157.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 156 as if fully set forth herein.

158.     This cause of action is against all Crossclaim Defendants (the "Count 5 Defendants").

159.     As alleged herein, Count 5 Defendants conspired to engage in the acts described above in the United States to further the goals of their criminal enterprises in violation of U.S. law.

160.     In so doing, Count 5 Defendants unlawfully, willfully, and knowingly did combine, conspire, confederate, and agree together, with each other and with others to commit RICO violations under 18 U.S.C. § 1962(c) and, thereby, violated 18 U.S.C. § 1962(d). In furtherance of the conspiracy and to achieve its objectives, Count 5 Defendants committed the

overt acts as described in paragraph 133 in the Southern District of New York and elsewhere.

161. As a direct and proximate result of RICO violations by the Count 5 Defendants of 18 U.S.C. § 1962(d), Almaty and BTA have suffered damages in an amount to be determined at trial. Almaty and BTA have been injured in their business or property by reason of each Count 5 Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

## SIXTH CAUSE OF ACTION

### (ACTUAL FRAUDULENT TRANSFER)
### *Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

162. The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 161 as if fully set forth herein.

163. At all relevant times, the City of Almaty and BTA Bank have held an interest in the illicit funds taken by the Ablyazov-Khrapunov Group and invested by and through Triadou, as these funds were the unlawful profits of embezzlement, fraud, and the corruption of the public office of the mayor of Almaty. The intermediary transfers or investment of those funds did not alter or diminish either Almaty or BTA's interest.

164. The 2014 assignment of Triadou's interest in the Flatotel and Cabrini Medical Center was not for adequate consideration, and in fact, represented a value significantly below the fair value of that interest, due to the improper motivations of Triadou's ownership, the Ablyazov-Khrapunov Group, to hide their illicit assets and move them offshore, and the Chetrit Group's secret deal to drive down the price of the assignment through bribery.

165. This assignment was made for the specific purpose of liquidating a fixed asset to frustrate a future creditor. Defendants knew of the numerous judgments against Ablyazov in the

43

United Kingdom, and of Almaty's claims against the Ablyazov-Khrapunov Group in the California Litigation, and knew that Triadou was owned and controlled by the defendants in those actions. Defendants intended and believed that the assignment of the Ablyazov-Khrapunov Group's interest in the Flatotel and Cabrini Medical Center would hinder, delay, and defraud current and future judgment creditors, specifically the City of Almaty and BTA Bank.

166. For these reasons, the assignment was fraudulently and illegally intended to remove an asset from the jurisdiction of the United States, namely Triadou's interests in the Flatotel and Cabrini Medical Center, convert those assets to cash, and transfer those funds beyond the reach of the Swiss, Kazakh, and United Kingdom authorities

167. As a result of the foregoing, pursuant to sections 275, 276, and 279 of the New York Debtor and Creditor Law, the August 2014 assignment agreement should be set aside as the product of clearly-inequitable conduct.

## SEVENTH CAUSE OF ACTION

### (CONSTRUCTIVE FRAUDULENT TRANSFER)
*Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

168. The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 167 as if fully set forth herein.

169. At all relevant times, the City of Almaty and BTA Bank have held an interest in the illicit funds taken by the Ablyazov-Khrapunov Group and invested by and through Triadou, as these funds were the unlawful profits of embezzlement, fraud, and corruption of the public office of the mayor of Almaty. The intermediary transfers or investment of those funds did not alter or diminish either Almaty or BTA's interest.

170. Triadou, although an arm of a massive international fraud and money laundering conspiracy, is and has been insolvent itself. Triadou holds no funds or other assets of its own,

and relies on funding from other Ablyazov-Khrapunov Group entities, such as Telford, to meet its obligations. Assets that flow to Triadou are promptly moved to other Ablyazov-Khrapunov Group entities offshore.

171.     As Triadou is controlled by the Ablyazov-Khrapunov Group, whose members face multi-billion dollar judgments in other jurisdictions, Triadou is effectively kept insolvent at all times, so as to limit the Ablyazov-Khrapunov Group's exposure in the United States.

172.     Similarly, because Triadou is controlled by and is an alter ego of the Ablyazov-Khrapunov Group, at the time it liquidated the Flatotel and Cabrini interests and transferred the proceeds to other entities, it had liabilities – including resulting from the UK judgments – that far outstripped its assets.

173.     As a result of the foregoing, pursuant to sections 273 and 273-a of the New York Debtor and Creditor Law, the August 2014 assignment agreement should be set aside.

## EIGHTH CAUSE OF ACTION

### (UNJUST ENRICHMENT)
*Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

174.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 173 as if fully set forth herein.

175.     The Crossclaim Defendants were unjustly enriched at the expense of the City of Almaty and BTA Bank when they invested funds embezzled from the City of Almaty and BTA Bank to acquire assets in the United States including an interest in the Flatotel project, and did so knowing that authorities of Switzerland, the Republic of Kazakhstan, and the United Kingdom were seeking the wrongfully-taken assets held by the Ablyazov-Khrapunov Group, and that further sales of the same assets would potentially frustrate their identification by the lawful authorities.

176.    It would be against equity and good conscience to permit the Crossclaim Defendants to retain the profits derived from the looting of assets rightfully belonging to the City of Almaty and BTA Bank.

## NINTH CAUSE OF ACTION

### (CONVERSION)
### *Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

177.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 176 as if fully set forth herein.

178.    None of the Defendants has a superior interest to the City of Almaty or BTA in the assets wrongfully taken by the Ablyazov-Khrapunov Group. These funds, and the assets they were used to purchase, are the rightful property of the people of Almaty and BTA.

179.    Defendants knowingly bought and sold assets obtained with these funds derived from the corruption of the office of the mayor of the City of Almaty and control of BTA Bank.

180.    As a result, Defendants have wrongfully and without authorization exercised of dominion and control over property of Almaty and BTA, and thus are liable for converting the same.

## TENTH CAUSE OF ACTION

### (CONSTRUCTIVE TRUST)
### *Against All Defendants*

181.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 180 as if fully set forth herein.

182.    As mayor of Almaty, Viktor Khrapunov owed fiduciary duties to the people of Almaty, and through his oath of office, expressly promised to execute those duties.

183.    Despite that promise, Viktor Khrapunov breached those fiduciary duties repeatedly by transferring public assets of the City of Almaty to other members of the Ablyazov-

Khrapunov Group for fractions of their market value, and then assisted the Ablyazov-Khrapunov Group in laundering the funds resulting from those illicit transfers of public property.  Through these breaches of fiduciary duty, the Ablyazov-Khrapunov Group has been unjustly  enriched.

184.     A constructive trust over the 50% interest in CF 135 West Member LLC assigned by Triadou, and all profits therefrom, is the appropriate equitable remedy to prevent further  dissipation of the funds resulting from these breaches of fiduciary duty.

185.     Defendants have also conspired to  fraudulently transfer Triadou's interest in the Flatotel for the purpose of hiding the  Ablyazov-Khrapunov Group's assets and frustrating any recovery resulting from Almaty and BTA's investigations and pursuits of their stolen assets. Separate and aside from the Ablyazov-Khrapunov Group's breaches of fiduciary duty,  this knowingly fraudulent transfer by Cross- and Counterclaim Defendants justifies imposition of a constructive trust to prevent any further transfers or encumbrances of this  property.

186.     Absent this remedy, the Ablyazov-Khrapunov Group will continue to use Triadou  and SDG to launder the fruits of these breaches of fiduciary duty and hide these assets from law enforcement, and the Chetrit Group will continue to be unjustly enriched by these acts of fraud.

## **ELEVENTH CAUSE OF ACTION**

### **(PURSUANT TO CPLR § 5239 FOR FRAUD AND CONVERSION)**
### *Against All Defendants*

187.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 186 as if fully set forth herein.

188.     Triadou has filed serial actions in the courts of the state of New York  seeking payment on the fraudulent assignment agreement between Triadou and the Chetrit  Group.  While Triadou has been awarded summary judgment in some of these  actions, none of these judgments

have been satisfied by any sheriff or receiver.

189.     The City of Almaty and BTA Bank are the rightful owners of Triadou's interest in the Flatotel and Cabrini Medical Center and/or any funds derived from the sale of that interest, as the interest was purchased with funds unlawfully converted by the Ablyazov-Khrapunov Group and laundered through SDG and Triadou.

190.     Pursuant to CPLR § 5239, this court is empowered to vacate any such judgments and direct the disposition of the property in question, as well as direct which party should keep possession of the property during the pendency of this action.

191.     The court should set aside any judgments in Triadou's favor in light of the City of Almaty's and BTA's superior interest in this illicitly-obtained property, direct that Triadou's interest in the Flatotel and Cabrini Medical Center be transferred to the City of Almaty and BTA Bank, and pursuant to CPLR § 5239, award the City of Almaty and BTA Bank its reasonable attorneys' fees in bringing this claim.

## TWELFTH CAUSE OF ACTION

### (PURSUANT TO CPLR § 5303 FOR RECOGNITION AND ENFORCEMENT OF A FOREIGN JUDGMENT UNDER NEW YORK LAW)
### *Against Defendant Ablyazov*

192.     BTA Bank repeats and realleges paragraphs 1 through 191 as if fully set forth herein.

193.     The United Kingdom of Great Britain and Northern Ireland is a "foreign state" within the meaning of N.Y. C.P.L.R. § 5301(a).

194.     The Ablyazov Judgments are "foreign country judgments" within the meaning of N.Y. C.P.L.R. § 5301(b).

195.     The Ablyazov Judgments are "final, conclusive and enforceable" in England within the meaning of N.Y. C.P.L.R. § 5302.

196.    The Ablyazov Judgments grant recovery of a sum of money and are enforceable by an action on the judgments in New York pursuant to N.Y. C.P.L.R. § 5303.

197.    None of the grounds for non-recognition of a foreign country judgment set forth in N.Y. C.P.L.R. § 5304 applies to the Ablyazov Judgments.

198.    The Ablyazov Judgments are required to be enforced pursuant to N.Y. C.P.L.R. § 5303.

199.    Triadou is the alter ego of the Ablyazov-Khrapunov Group, and is thus liable for all current and future obligations against the Ablyazov-Khrapunov Group. Maintaining the separateness of Triadou and its alter ego, the Ablyazov-Khrapunov Group, would allow the Ablyazov-Khrapunov Group to avoid otherwise enforceable obligations and would be highly inequitable to the people of the city of Almaty and BTA Bank.

## THIRTEENTH CAUSE OF ACTION

### (AIDING AND ABETTING)
### *Against Defendant FBME*

200.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 199 as if fully set out herein.

201.    The Ablyazov-Khrapunov Group converted property that rightfully belongs to the Kazakhstan Plaintiffs through wire transfers executed by FBME Bank, and the Ablyazov-Khrapunov Group was unjustly enriched by the use and investment of the same funds.

202.    FBME Bank was aware that the funds wired were the proceeds of crime and that the wire transfers were an effort by the Ablyazov-Khrapunov Group to obscure the illicit nature of those funds.

203.    Due to its longstanding relationship with the Ablyazov-Khrapunov Group and deliberately ineffective protocols for preventing money laundering, FBME Bank aided and

abetted the Ablyazov-Khrapunov Group's laundering scheme.

204.     FBME's active participation in the Ablyazov-Khrapunov Group's money laundering network rendered substantial assistance to the Ablyazov-Khrapunov Group's acts of conversion, fraud, and subsequent unjust enrichment, and the Kazakhstan Plaintiffs seek relief from FBME to the extent Defendants are found liable for these acts.

## DEMAND FOR JURY TRIAL

Almaty and BTA Bank demand a jury trial on all claims for which trial by jury is available, including on the underlying interpleader action.

## DEMAND FOR RELIEF

WHEREFORE, Almaty and BTA Bank demand the Court enter judgment as follows:

A.     For injunctive relief and rescission of the 2014 assignment agreement and release;

B.     For compensatory, punitive, and treble damages;

C.     For declaratory relief;

D.     For all costs and fees incurred in prosecuting this Complaint;

E.     For such other and further relief as this Court deems just and proper.

Dated: New York, New York
September 7, 2016

Respectfully Submitted,

BOIES, SCHILLER & FLEXNER LLP

By: /s/ Matthew L. Schwartz
Matthew L. Schwartz
Randall W. Jackson
Daniel G. Boyle
Craig Wenner

BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
Telephone: 212-446-2300
Facsimile: 212-446-2350

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CF 135 Flat LLC *et al.*,

                            Plaintiffs,

            –v–

Triadou SPV N.A. *et al.*,

                            Defendants.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUN 2 4 2016

15-CV-5345 (AJN)

MEMORANDUM AND
ORDER

ALISON J. NATHAN, District Judge:

On April 1, 2016, Almaty and BTA Bank ("Movants") requested a preliminary injunction

pursuant to Federal Rule of Civil Procedure 65 to prevent Triadou from enforcing its $10.5

million state court judgment against CF 135 Flat LLC, CF 135 West Member LLC, and the

Chetrit Group LLC ("the Chetrit Entities"). Dkt. No. 106. On May 11, 2016, Movants filed an

additional motion for attachment of Triadou's assets under Federal Rule of Civil Procedure 64

and New York Civil Procedure Law and Rules ("CPLR") § 6212(a). Dkt. No. 140. The Court

construed Movants' papers as requesting a temporary restraining order while the preliminary

injunction motion was pending, but the Court denied that request on May 3, 2016. Dkt. No. 131.

For the reasons articulated below, Movants' motion for a preliminary injunction is denied, but

their motion for attachment is granted.

## I.    BACKGROUND AND PROCEDURAL HISTORY

In 2014, Triadou assigned its interest in the New York-based Flatotel condominium

project to the Chetrit Entities. Dkt. No. 103 at 1. Under the contract, the Chetrit Entities were to

pay Triadou $21 million in four installment payments. *Id.* The Chetrit Entities did not make the

required payments and Triadou has, to date, been awarded judgments totaling $10.5 million in the course of ongoing state court litigation on the issue. *Id.*

In July 2015, the Chetrit Entities initiated an interpleader complaint based on the 2014 assignment agreement. Dkt. No. 1. In their Answer, Movants filed a number of crossclaims, counterclaims, and claims against third parties. Dkt. No. 49. Although the interpleader complaint has been dismissed, Dkt. No. 103, and Movants have settled their claims against the Chetrit Entities, Dkt. Nos. 69, 71, the Movants' claims against Triadou, Ilyas Khrapunov, Viktor Khrapunov, and Mukhtar Ablyazov are still pending. The substance of those claims is discussed at length in the Court's June 21, 2016 Memorandum and Order, Dkt. No. 174, and the Court assumes familiarity with that material. In brief, Almaty and BTA Bank allege that the Khrapunovs and Ablyazov stole substantial amounts of money from them and then laundered those funds throughout the world. Dkt. No. 49 ¶¶ 20-23. Particularly relevant here, Movants allege that Triadou worked with the Chetrit Entities to launder these stolen funds into real estate projects, including the Flatotel and Cabrini Medical Center projects in New York. *Id.* ¶¶ 24-25.

Based on their allegations that Triadou is a vehicle for money laundering, Movants now seek to enjoin Triadou from enforcing its $10.5 million state court judgment against the Chetrit Entities. Dkt. No. 106. Shortly after that motion was filed, Movants informed the Court that Triadou had filed an application in state court to enforce its judgment against the Chetrit Entities through the appointment of a receiver. Dkt. No. 113 at 1. Because the state court set a May 4, 2016 hearing date on Triadou's receiver request, Movants requested an expedited schedule to resolve the preliminary injunction hearing. *Id.* at 2. The Court construed this as a request for a temporary restraining order. Dkt. No. 131 at 1. On April 28, 2016, Triadou and the Chetrit Entities entered into a stipulation narrowing the scope of the requested receivership. Dkt. No.

127 Ex. 1. Based in large part on this stipulation, the Court denied Movants' request for a temporary restraining order. Dkt. No. 131.

On May 11, 2016, Movants supplemented their motion for a preliminary injunction by adding an alternate request that the Court authorize attachment of Triadou's assets under Federal Rule of Civil Procedure 64 and CPLR § 6212(a). Dkt. No. 140. The Court held an evidentiary hearing on the preliminary injunction motion and motion for attachment on May 19, 2016. In connection with that hearing, Movants elicited testimony from Abigail Tudor (a paralegal), Jehoshua Graff (lawyer for the Chetrit Entities), Nicolas Bourg (former director of Triadou), Lee Eichen (a partner at a real estate financial advisory firm), and Matthew Meltsner (the project manager of the Flatotel project). Triadou elicited testimony from Cesare Cerrito, the current director of Triadou. Following trial, the parties filed post-hearing briefing and updated proposed findings of fact[1] that were fully submitted on June 20, 2016.

## II.    FINDINGS OF FACT[2]

When "essential facts are in dispute" in connection with a motion for a preliminary injunction, "there must be a hearing and appropriate findings of fact must be made." *Visual Scis., Inc. v. Integrated Commc'ns Inc.*, 660 F.2d 56, 58 (2d Cir. 1981) (first citing *Forts v. Ward*, 566 F.2d 849 (2d Cir. 1977); then citing Fed. R. Civ. P. 52(a)). "These findings are not conclusive, and may be altered after a trial on the merits" but nevertheless "must be made." *Id.* Based on the information presented in connection with the preliminary injunction proceedings, the Court makes the following findings of fact.

---

[1] Both parties submitted post-hearing findings of fact and were provided an opportunity to respond to each other's proposed findings of fact with opposing record citations. *See* Dkt. Nos. 165, 169, 171. If a party did not oppose a proposed finding of fact with an appropriate record citation, and if that unopposed proposed finding of fact was supported by an appropriate record citation, the Court deemed that fact admitted and incorporates unopposed facts as factual findings of the Court.

[2] To the extent that any finding of fact reflects a legal conclusion, it shall to that extent be deemed a conclusion of law, and vice versa.

**A.    Ablyazov Embezzles From BTA Bank and Becomes the Target of an Asset-Freezing Order[3]**

Ablyazov was the Chairman and controlling shareholder of BTA Bank from 2005 until February 2009. Almaty Ex. 33 ¶¶ 15, 42. In this role, Ablyazov embezzled between $3 and $4 billion from BTA Bank by causing the bank to issue loans to or purchase at inflated prices companies in which Ablyazov had an undisclosed interest. *Id.* ¶¶ 19, 77, 83, 87-89, 93, 96-110; Almaty Ex. 22 ¶ 3; Almaty Ex. 34 ¶ 11. Based on Ablyazov's embezzlement, Justice Teare of the Commercial Division of the Queen's Bench entered a freezing order against Ablyazov's assets. Almaty Ex. 23 ¶¶ 3-5. An entity called Telford Financiers Corp. was named as an "Undisclosed Asset" in that order. Almaty Ex. 23 at 15; Almaty Ex. 24 at 3-4, 36. Although Ablyazov did not admit his ownership in Telford Financiers Corp., Almaty Ex. 24 at 3-4, other evidence in the record before Justice Teare, *id.* at 18-21 (listing each of the items in the evidentiary record), justified its inclusion in the order freezing Ablyazov's assets. The freezing order also listed a number of "Disclosed Assets" with ties to the Seychelles and Cyprus. *Id.* at 22-28.

**B.    Ilyas Khrapunov Founds SDG and Triadou**

The Swiss Development Group ("SDG") was incorporated in July 2008. Dkt. No. 169 ¶ 42. SDG only has bank accounts in Switzerland and Luxembourg and has never generated any profits. *Id.* ¶¶ 54, 57. Ilyas Khrapunov, son-in-law to Ablyazov, and his sister Elvira provided

---

[3] The factual findings in section II.A are based on the findings of UK courts in a series of proceedings against Ablyazov (the "UK Judgments"). Although this evidence is hearsay, such evidence "may be considered by a district court in determining whether to grant a preliminary injunction." *Mullins v. City of New York*, 626 F.3d 47, 52 (2d Cir. 2010). While the fact that certain evidence is hearsay "goes to [the] weight" that the Court may afford certain evidence, it is not a basis for "preclusion" at this stage. *Id.* The Court rejects Triadou's argument that the UK Judgments "are entitled to no evidentiary weight" solely because they are hearsay, Dkt. No. 170 at 12, as inconsistent with *Mullins*. The Court is persuaded that the UK Judgments are entitled to substantial weight because they constitute "uncontroverted findings of a respected foreign court based on an appropriate evidentiary record." Dkt. No. 172 at 12. In fact, Ablyazov appeared before the UK courts and contested the claims against him until he fled the jurisdiction. Almaty Ex. 33 ¶ 3; Almaty Ex. 34 ¶¶ 4-7. Notably, Triadou does not argue that some flaw in the UK proceedings renders these factual findings unreliable, nor does it present any contrary version of these facts.

initial funding of between 35 and 40 million Swiss Francs (CHF) to SDG.  *Id.* ¶¶ 44, 48, 51.

Ilyas Khrapunov and his sister were the only private individual investors in SDG.  *Id.* ¶ 52.

Ilyas Khrapunov was the Chairman of SDG from July 2008 to June 2012.  *Id.* ¶¶ 42-43.

In or around 2011, SDG's Board, headed by Khrapunov, decided to create a real estate

investment fund and retained Nicolas Bourg as an outside consultant to head that project.  *Id.*

¶¶ 60-61.  In 2012, Triadou was incorporated under the laws of Luxembourg as a wholly-owned

investment vehicle for SDG, *id.* ¶¶ 61-62, in order "to conceal the movement and investment" of

Khrapunov and Ablyzov funds.  Bourg Decl. ¶ 6.[4]  Bourg was the sole director of Triadou from

2011 until November 2014, when he was fired and replaced by Cesare Cerrito.  *Id.* ¶¶ 63, 117.

### C.    Triadou Invests in the Flatotel Project

In 2012, SDG's Board decided to invest in the Flatotel and Cabrini projects through

Triadou.  *Id.* ¶¶ 79, 83.  In October of that year, Triadou acquired a 37.5% interest in the Flatotel

project from the Chetrit Entities.  *Id.* ¶ 83.  Triadou was a passive capital investor and was

entitled to half the profits of the Flatotel project.  *Id.* ¶ 87.

Funds to meet Triadou's capital obligations to the Flatotel project were wired from

Telford International Ltd ("Telford") to an escrow account held by the Chetrit Entities' outside

counsel.  *Id.* ¶ 92.  Telford is 100% owned by Telford Trust, which belongs to Elena Petelina.

*Id.* ¶ 73.  Petelina is married to Gennady Petelin, *id.*, who is Ilyas Khrapunov's sister's father-in-

law.  Cerrito Decl. ¶ 9.  Telford Trust was registered in Belize with an administrator and nominee

located in Madagascar.  Cerrito Decl. Ex. 2 at 2; Dkt. No. 169 ¶ 77.  The Deed of Trust was

---

[4] Contrary to Triadou's arguments, Dkt. No. 170 at 3-8, the Court finds Bourg's testimony credible.  Any
bias he may hold against Triadou due to his termination does not give him a motive to implicate himself in a far-
reaching money laundering conspiracy that could open him up to civil and possibly criminal liability.  The release
from liability he obtained from Movants is logically only valuable to the extent that Bourg *has* any liability to them
based on the alleged misconduct, and thus does not cause the Court to question his credibility.  Although there are
several minor inconsistencies in his testimony they are not as significant as Triadou claims.  Most importantly,
however, the Court finds Bourg credible because his testimony, unlike that of Cerrito, is consistent with the weight
of the other evidence on key issues.

prepared by a Seychellois corporation and the Trust had bank accounts at FBME Bank Ltd in Cyprus. Cerrito Decl. Ex. 2 at 7; Dkt. No. 169 ¶ 77; Bourg Decl. ¶ 20. Telford is an Ablyazov investment entity used to move Ablyazov's funds.[5] Bourg Decl. ¶ 10. Between November 2012 and May 2013, the Chetrit Entities received approximately $34 million from Telford's accounts at FBME Bank Ltd. on Triadou's behalf. *Id.* ¶¶ 99, 102-108. In July 2015, a component of the U.S. Treasury Department designated FBME Bank Ltd. as a "foreign financial institution of primary money laundering concern" due to its prominent and permissive use by money launderers. *Id.* ¶ 109.

**D.    Ilyas Khrapunov Steps Down As Chairman**

Ilyas Khrapunov stepped down from his position as Chairman in 2012 and became an adviser to the SDG Board due to "negative press" surrounding his family. *Id.* ¶ 45. At this time, members of the Khrapunov family, including Ilyas and his father Viktor Khrapunov, were under criminal investigation in Kazakhstan and Switzerland for money laundering. *Id.* ¶ 46; *see also* Almaty Ex. 26 ¶ 11. Also around this time, Ilyas and Viktor Khrapunov were added to the Interpol list of wanted persons at the request of the Government of Kazakhstan. *Id.* ¶ 47. The negative press surrounding Khrapunov's family hindered SDG's ability to do business, particularly while Khrapunov was Chairman. *Id.* ¶ 125. For example, SDG was refused loans "a few times" due to "the presence of Mr. Khrapunov." *Id.* ¶ 91. Due, in part, to this negative press, SDG's Board decided to sell SDG. *Id.* ¶ 130.

---

[5] Triadou argues that "Almaty/BTA have not adduced sufficient evidence linking Telford, the source of Triadou's investment funds [in the Chetrit investments], to Ablyazov." Dkt. No. 170 at 21. Bourg testified about the connection between Telford and Athat Telford was an "Ablyazov investment entity used to conceal and move his funds." Bourg Decl. ¶ 10. This testimony is corroborated by the UK asset freezing order naming another Telford entity, Telford Financiers Corp, as an "Undisclosed Asset" of Ablyazov's, Almaty Ex. 24 at 36; the connections Telford Trust has to the Seychelles and Cyprus that mirror other Ablyazov entities, *id.* at 22-28; and Telford's connection to FBME Bank. Dkt. No. 169 ¶¶ 108-109.

6

**E.      SDG Is Sold to Glatz in a Sham Sale**

The "sale" of SDG to Philippe Glatz closed on March 25, 2013. *Id.* ¶ 128; Cerrito Decl.

¶ 15. Although Khrapunov was no longer Chairman, he remained an advisor to SDG's Board of

Directors for two years after the sale for an annual salary of CHF 250,000. Dkt. No. 169 ¶ 149.

During this period of transition, SDG sought financing from Black Sea Trade & Development

Bank. *Id.* ¶ 145. Black Sea declined to provide such financing and, in doing so, indicated that it

had doubts as to Glatz's ability to finance the purchase of SDG. Almaty Ex. 7 at 4. Based on

this information, a representative of Black Sea stated: "I am not persuaded that there's been any

real change in the ownership of SDG." *Id.*; Dkt. No. 169 ¶ 146.

In light of this opinion from Black Sea, Triadou's argument that the sale of SDG to Glatz

was legitimate is not credible. Triadou attempted to rebut Black Sea's conclusion through

Cerrito,[6] who testified: "Although I am not privy to all of Mr. Glatz's finances, I understand,

based on working with him for the past three years and on publically available information, that

Mr. Glatz's finances were and are sufficient to have purchased SDG . . . ." Cerrito Decl. ¶ 14.

As Cerrito admitted on cross-examination, however, he did not have any personal insight into

Glatz's finances, May 19, 2016 Tr. ("Tr.") 120:11-13, "ha[d] no idea honestly" about "how

much money . . . Glatz [wa]s worth," Tr. 120:22-23, and refused to even provide a rough

estimate of Glatz's net worth. Tr. 121:1-4.

Because Triadou introduced evidence about Glatz's finances through Cerrito and not

Glatz himself, Movants urge the court to draw a negative inference against Triadou based on the

---

[6] The Court did not find the testimony of Cerrito credible. Due to his current positions as Director of
Triadou and CFO of SDG, Cerrito Decl. ¶ 2, he has a significant interest in denying that SDG and Triadou engaged
in any misconduct. Second, his description of his "due diligence" of Telford, *id.* ¶ 10, is not credible in light of his
knowledge of the money laundering allegations against the Khrapunovs, Tr. 109:3-4, 130:11-24, 133:6-25, 134:1,
and Telford's suspicious ties to Belize, Madagascar, the Seychelles, and FBME Bank. Cerrito Decl. Ex. 2, 7.
Finally, his description of the sale of SDG and the 2014 assignment are contrary to the weight of the evidence.

absence of Glatz's testimony. Courts may "draw an adverse inference" when "a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction yet . . . fails to call those witnesses." *Sagendorf-Teal v. Cty. of Rensselaer*, 100 F.3d 270, 275 (2d Cir. 1996) (quoting *United States v. Torres*, 845 F.2d 1165, 1169 (2d Cir. 1988)) (internal quotation marks omitted). Movants put forth evidence from Black Sea, a neutral party who was conducting due diligence in connection with a proposed loan, that the sale of SDG to Glatz may not have been legitimate. As Triadou concedes, Glatz is the owner of Triadou's parent corporation, Dkt. No. 170 at 16 n.20, and is thus "closely allied or related to" Triadou. *Chevron Corp. v. Donziger*, 974 F. Supp. 2d 362, 700 (S.D.N.Y. 2014). As such, he was "peculiarly within [Triadou's] power to produce," and his "testimony would [have] elucidate[d] the transaction" in question, namely the sale of SDG. *Sagendorf-Teal*, 100 F.3d at 275 (quoting *Torres*, 845 F.2d at 1169). Glatz's testimony, far from being "unnecessary," Dkt. No. 170 at 16, would have gotten at the heart of the issue, namely his financial ability to purchase SDG, in a way that Cerrito's testimony was unable to do. Because Triadou chose to call Cerrito and not Glatz to discuss Glatz's finances and the sale of SDG, the Court will "draw an adverse inference that . . . [Glatz's] testimony . . . would have been unfavorable" to Triadou by confirming that Glatz lacked the financial ability to purchase SDG.[7] *Sagendorf-Teal*, 100 F.3d at 275.

For this reason, Glatz used funds loaned to him by the Khrapunov family to purchase the company. Dkt. No. 165 ¶ 132; Bourg Decl. ¶ 33. As a result of this arrangement, SDG was

---

[7] Triadou suggests that it is improper to draw this adverse inference at this stage. Dkt. No. 170 at 16 & n.20. Although missing witness instructions are usually given in jury trials, Triadou cites no authority suggesting that it is improper for the Court to draw such an inference in deciding a preliminary injunction motion. Courts routinely draw adverse inferences in connection with preliminary injunction proceedings. *See, e.g., John Paul Mitchell Sys. v. Quality King Distributors, Inc.*, 106 F. Supp. 2d 462, 471 (S.D.N.Y. 2000) (adverse inference for invoking Fifth Amendment). Courts also draw missing witness adverse inferences in connection with bench trials. *Donziger*, 974 F. Supp. 2d at 700; *Adelson v. Hananel*, 652 F.3d 75, 87 (1st Cir. 2011). Although there are few cases on missing witness adverse inferences at the preliminary injunction stage, at least one court in this circuit has drawn such an inference, *Lopez v. Delta Funding Corp.*, No. 98-CV-7204 (CPS), 1998 WL 1537755, at *1 n.1 (E.D.N.Y. Dec. 23, 1998, and the Court can find no decision declining to do so on the grounds Triadou advances.

8

"sold" for a mere CHF 3.5 million (its equity value) when Glatz's investment bank valued the enterprise value of the company at CHF 150 million. Dkt. No. 165 ¶ 133; Dkt. No. 169 ¶ 133. Khrapunov and his sister did not withdraw their CHF 35-40 million investment from SDG after the purported sale. Dkt. No. 169 ¶ 194.

### F.   Triadou Assigns Its Interest in the Flatotel Back to the Chetrits

By 2014, Triadou had invested $34,885,565 in the Flatotel project. Dkt. No. 169 ¶ 165. Bourg, still the director of Triadou at that time, valued Triadou's U.S. assets at approximately $114 million, estimating the Flatotel project alone to be worth $62 million. *Id.* ¶¶ 119-120. Bourg estimated that Triadou's U.S. assets would grow in value to $179 million. *Id.* ¶ 121. Bourg informed the SDG Board that the Flatotel investment was worth $100 million. *Id.* ¶¶ 164, 168; *see also* Tr: 129:12-17. However, Triadou's interest in the Flatotel was assigned back to the Chetrits for approximately $32 million. Dkt. No. 169 ¶ 166. This below-market assignment was motivated by the threat of litigation against the Khrapunovs. [8] Bourg Decl. ¶ 39-40.

Triadou's alternative explanation, that the Flatotel interest was sold because Triadou did not wish to meet an unexpected capital call, is wholly implausible. Bourg testified that "if a partner missed a capital call, that partner would either be diluted, or the counterparty could make that capital call instead, which would be treated as a loan at a generous rate," Bourg Rep. Decl. ¶ 4, a description of the terms of the agreement that Triadou does not dispute. Dkt. No. 169 ¶ 170. Cerrito admitted that SDG, through the assignment, agreed to "give up the investment that it believed was worth $100,000,000 for less than half of that." Tr. 130:2-5. Triadou did not present any evidence to suggest that the penalty for missing a capital call was sufficiently severe

---

[8] Although the lawsuit in California was not filed until after assignment negotiations began, Dkt. No. 169 ¶¶ 157, 159, the close temporal proximity between these events and the implausibility of Triadou's explanation demonstrates persuasively that the assignment was motivated by the threat of litigation, not a missed capital call.

to justify assigning its interest in the Flatotel for $2 million less than it had already invested, less than half of its estimated market value, and less than a quarter of its projected value.

### G. Triadou Attempts to Enforce the Assignment Agreement

After the assignment agreeement was executed, the Chetrit Entities failed to pay Triadou the $21 million in installment payments owed under the contract. Dkt. No. 110 ¶ 3. Triadou and the Chetrit Entities are currently engaged in state court litigation on this topic, and the state court has awarded Triadou $10.5 million in judgments. Dkt. No. 103 at 1. On May 5, 2016, the state court approved a Monitorship Order to which the Chetrit Entities had consented. Dkt. No. 132 & Ex. 1. Under the terms of the Monitorship, Herman Cahn was appointed a Monitor "for the sole purpose of monitoring the financial transactions of the Flatotel Condominium project and monitoring and collecting all distributions and any other funds to which [the Chetrit Entities] are entitled up to the amount so as to satisfy Triadou's judgments." Dkt. No. 132 Ex. 1 ¶ A. If Triadou recovers funds from the Chetrit Entities in connection with the 2014 assignment agreement, it will transfer its recovery to its parent, SDG, to invest in real estate projects in Switzerland. Dkt. No. 169 ¶ 56.

### H. Triadou's Enforcement Efforts Have Not Been Negatively Perceived by the Real Estate Press

After the Monitorship was imposed by the state court, Movants' expert Lee Eichen predicted that the public would view the Monitorship imposed by the state court, "regardless of the exact details" of that Monitorship, "the same as the appointment of a receiver." Eichen Supp. Decl. ¶ 4. He also predicted that "the uniform perception of the marketplace, regardless of the exact details of [any monitorship or receivership], will be that the Project is experiencing extreme financial distress." Eichen Decl. ¶ 11. Contrary to this prediction, the real estate press has, for the most part, accurately reported the terms of the Monitorship. One articled explained

10

that "a monitor will have access to the books and will hold onto $10.5 million in sales from

Chetrit's condo conversion of the Flatotel" in what the article characterized as an "escrow

account." Almaty Ex. 39 at 1. Another described how "profits from the Chetrit Group's

Flatotel . . . [will] be frozen in court." Almaty Ex. 40 at 1. Yet another noted that "[a] court

appointed monitor will hold on to some of the profits from Joseph Chetrit's Flatotel

condominium conversation project" and goes on to explain that "[t]he monitor . . . will have

access to the books at the condominium project and eventually collect $10.5 million in condo

sales" which "will be held in an escrow account." Almaty Ex. 41 at 1. A final article indicated

that the money collected by the Monitor "will be held in escrow." Almaty Ex. 42 at 1. In

addition to reporting the details of the Monitorship, these articles also described the basic

allegations against the Khrapunovs and Ablyazov; namely, that they are accused of stealing

substantial sums of money from Kazakhstan and then "sought to launder [those funds] in the

Flatotel condo conversion." Almaty Ex. 39; *see also* Alamaty Exs. 40-42.

## III.    CONCLUSIONS OF LAW

The Court will first address whether Movants are entitled to the requested preliminary

injunction and will then consider the request for an order of attachment.

### A.    Rule 65 Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter*

*v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). A court may issue a preliminary

injunction only "upon a clear showing that the plaintiff is entitled to such relief." *Id.* at 22. In

the Second Circuit, a party may demonstrate that it is entitled to such relief in one of two ways.

First, he may "show that he is likely to succeed on the merits; that he is likely to suffer

irreparable harm in the absence of preliminary relief; that the balance of equities tips in his favor;

11

and that an injunction is in the public interest." *Am. Civil Liberties Union v. Clapper*, 785 F.3d

787, 825 (2d Cir. 2015). Alternatively, "he may show irreparable harm and either a likelihood of

success on the merits or 'sufficiently serious questions going to the merits to make them a fair

ground for litigation and a balance of hardships tipping decidedly toward the party requesting the

preliminary relief.'" *Id.* (quoting *Christian Louboutin S.A. v. Yves Saint Laurent Am. Holdings,*

*Inc.*, 696 F.3d 206, 215 (2d Cir. 2012)).

In opposing the pending motion for a preliminary injunction, Triadou first argues that any

such relief is barred by the Anti-Injunction Act. Dkt. No. 109 at 4. Second, Triadou argues that

Movants have not demonstrated irreparable injury. Dkt. No. 170 at 30. Finally, Triadou argues

that Almaty has not demonstrated a likelihood of success on the merits. Dkt. No. 170 at 17.

### 1.     Anti-Injunction Act

The Anti-Injunction Act does not permit a court to "grant an injunction to stay

proceedings in a State court except as expressly authorized by Act of Congress, or where

necessary in aid of its jurisdiction, or to protect or effectuate its judgments." 28 U.S.C. § 2283.

The Supreme Court has twice held that the Anti-Injunction Act does not bar a court from

enjoining a party from enforcing a state court judgment if the injunctive relief is sought by

"strangers to the state court proceedings." *Imperial Cty. v. Munoz*, 449 U.S. 54, 59 (1980)

(quoting *Hale v. Bimco Trading*, 306 U.S. 375, 378 (1939)). The Supreme Court suggested that

this is so because state proceedings do not "b[in]d the independent suitor in the federal court as

though he were a party to the litigation in the state court." *Id.* (quoting *Hale*, 306 U.S. at 378).

Although no court in the Second Circuit has had occasion to evaluate this language, other circuits

and treatises have. *See Gottfried v. Med. Planning Servs., Inc.*, 142 F.3d 326, 329 (6th Cir.

1998) ("[T]he Anti–Injunction Act does not bar federal lawsuits filed by individuals who . . .

12

were 'strangers to the state court proceedings.'"); *Chezem v. Beverly Enters.-Tex., Inc.*, 66 F.3d 741, 742 (5th Cir. 1995) ("[T]he Anti–Injunction Act has no application herein because [the movants] were neither parties nor privies of parties to the state court action."); 17A Charles Alan Wright *et al.*, Fed. Prac. & Proc. § 4222 (3d ed. 2007), at 66-67 ("The Anti-Injunction Act does not bar a suit by third parties for an injunction that would nullify an earlier state court judgment . . . if the persons bringing the federal action were 'strangers to the state court proceeding.'").

The Ninth Circuit, however, has addressed this situation in the most detail. In *Prudential Real Estate Affiliates, Inc. v. PPR Realty, Inc.*, 204 F.3d 867 (9th Cir. 2000), the Ninth Circuit evaluated the "continued vitality" of the so-called "strangers exception" to the Anti-Injunction Act. *Id.* at 879 (internal quotation marks omitted). Noting that no Supreme Court decision had reconsidered the issue since *Imperial County* and that the exception "has been regularly applied" by circuits in recent years, the Ninth Circuit concluded that "[o]ne who is not a party to state proceedings, nor in privity with a party, may seek a federal injunction against enforcement of a judgement obtained in those proceedings." *Id.* at 879-80 (collecting cases). For determining who is a "stranger to the state court proceedings," the Ninth Circuit held that "one who is not bound directly by virtue of a sufficiently close relationship with a party [under preclusion doctrine] is not bound indirectly by the Anti-Injunction Act." *Id.* at 879. This appears to be a faithful application of binding Supreme Court precedent articulated in *Imperial County* and *Hale*, and so the Court will apply that approach here.

Triadou does not argue (nor could it) that Movants are bound by the state court proceedings between Triadou and the Chetrit Entities under any preclusion doctrine. As a result, they are "strangers to the state court proceedings" and the Anti-Injunction Act is no bar to the requested injunctive relief. *Imperial Cty.*, 449 U.S. at 59 (quoting *Hale*, 306 U.S. at 378).

13

## 2.    Irreparable Harm

"The showing of irreparable harm is '[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction'". *Kamerling v. Massanari*, 295 F.3d 206, 214 (2d Cir. 2002) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir. 1983)). Under this prong, parties seeking a preliminary injunction "must show that, on the facts of their case" and in the absence of the requested injunction, they will suffer a harm that "cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81-82 (2d Cir. 2010).

Movants put forward three arguments on irreparable harm. First, they argue that their claims under CPLR § 5239 "would be extinguished upon enforcement of Triadou's judgments" against the Chetrit Entities. Dkt. No. 166 at 20. Next, they argue that Triadou's enforcement of its judgment against the Chetrit Entities will irreparably harm the Flatotel project. *Id*. at 21. Finally, they argue that Triadou will remove its recovery from the jurisdiction if it succeeds in enforcing its judgment. *Id*. at 22.

### a.    Movants do not establish that Triadou's enforcement efforts will irreparably harm their CPLR § 5239 claims

Movants argue that their CPLR § 5239 claims "will be effectively mooted" if "Triadou is able to collect on its state-court judgments against Chetrit." Dkt. No. 166 at 20. At no point in any of Movants' four briefs in support of its preliminary injunction motion do they point to any authority suggesting that enforcement of a judgment necessarily "moot[s]" or "extinguishe[s]" a claim under CPLR § 5239 to vacate that judgment. *See* Dkt. No. 107 at 6; Dkt. No. 117 at 4-5; Dkt. No. 166 at 20; Dkt. No. 172 at 19-20. Movants' initial brief indicates that their real concern is that their CPLR § 5239 claim will not be viable if the Court vacates the relevant judgment after Triadou has enforced its judgment *and removed those assets from the jurisdiction*.

14

Dkt. No. 107 at 6 ("[A] ruling vacating judgments that have already been enforced would be a nullity, *particularly if Triadou has spirited away any assets collected upon.*") (emphasis added). For this reason, the Court does view this argument as distinct from Movants' asset flight argument, which it will consider separately below.

>    **b.    Movants do not establish that Triadou's enforcement efforts will irreparably harm the Flatotel project**

Relying on Eichen's testimony, Movants argue that Triadou's enforcement of its judgment against the Chetrit Entities will irreparably harm Almaty and BTA Bank. Specifically, they argue "that the real estate press will conflate Monitorship and receivership and create an atmosphere of negative publicity about the Flatotel while units are still being marketed," which could scare investors and cause the project to fail. Dkt. No. 166 at 21. Movants argue that they will ultimately bear the cost of this injury because the Flatotel is "the very asset that [they] seek to reclaim" in this action. Dkt. No. 107 at 7.

The evidence in the record refutes Movants' irreparable injury argument. Multiple real estate press articles, *see* Almaty Exs. 39-42, accurately reflect the "details regarding the scope [and] purpose of the Monitorship," Eichen Supp. Decl. ¶ 4, and do not express any opinion that the Monitorship indicates that the Flatotel project "is experiencing extreme financial distress." Eich. Decl. ¶ 11. To the contrary, they suggest that the project is profitable, as the articles repeatedly note that only *profits* will be held in "escrow." Almaty Exs. 39-42. This evidence demonstrates that there has been no "conflat[ion of] monitorship and receivership." Dkt. No. 166 at 21. While there is undoubtedly "negative publicity about the Flatotel" in the "real estate press" that could potentially affect the profitability of the Flatotel, *id.,* this "negative publicity" is focused on the substance of Movants' allegations that the managers of the Flatotel project worked in concert with Ablyazov and the Khrapunovs to launder money, not the Monitorship.

15

Almaty Exs. 39-42. Because negative publicity of this sort is unrelated to Triadou's enforcement efforts, Movants cannot demonstrate that they are "likely to suffer" the specific harms associated with negative press "in the absence of" the specific preliminary injunction requested.[9] *Clapper*, 785 F.3d at 825.

The Court thus concludes that Movants have not demonstrated that Triadou's enforcement of its judgment against the Chetrit Entities will irreparably harm the Flatotel project.

> ### c. Movants do not establish that the requested preliminary injunction is appropriate relief from the potential risk of asset flight

Finally, Movants argue that Triadou is likely to move its assets out of the jurisdiction as soon as it succeeds in enforcing its judgment against the Chetrit Entities. Dkt. No. 166 at 22. As the Court found above, Triadou has conceded that it will transfer any recovery from the Chetrit Entities to SDG for investment in Swiss real estate. Dkt. No. 169 ¶ 56.

Movants correctly note that "federal courts have found preliminary injunctions appropriate where it has been shown that the defendant intended to frustrate any judgment on the merits by transferring its assets out of the jurisdiction." *In re Feit & Drexler, Inc.*, 760 F.2d 406, 416 (2d Cir. 1985) (internal quotation marks and alterations omitted). However, the preliminary injunctions granted in such cases have been limited to prohibiting the unlawful *transfer* of assets, not prohibiting the relevant party from coming into possession of any assets for fear of later unlawful transfer. *See id.* (a preliminary injunction was granted "to prevent [the defendant] from making uncollectible any judgment the Trustee may eventually obtain against her); *Republic of Philippines v. Marcos*, 806 F.2d 344, 356 (2d Cir. 1986) (the preliminary injunction "prevent[ed] any transfer or encumbrance of . . . properties that would place them beyond" the

---

[9] The Court also notes that, insofar as Movants' concern is the decreased profitability of "the very asset that [they] seek to reclaim," Dkt. No. 107 at 7, they have not demonstrated that any financial harm to the Flatotel project in the form of reduced profitability would be *irreparable*.

reach of the court). Even the cases the Movants cite are limited to preserving available assets, not precluding enforcement of judgments. *See Seide v. Crest Color, Inc.*, 835 F. Supp. 732, 734 (S.D.N.Y. 1993) (party sought to "enjoin the sale" of certain assets); *see* also Dkt. No. 172 at 20-21 (describing injunctions "freezing assets" and requiring "security against a possible future judgment," but not precluding enforcement of judgments).

As the Ninth Circuit has noted, "[p]reliminary injunctive relief should be narrowly tailored, and should be no more burdensome than necessary to preserve a plaintiff's ability to obtain the complete permanent relief to which it is entitled." *State of Cal. v. Am. Stores Co.*, 872 F.2d 837, 845 (9th Cir. 1989), *rev'd on other grounds by* 495 U.S. 271 (1990); *see also Constitution State Challenge, Inc. v. Nyemchek*, No. CIV A. 300CV650 (CFD), 2001 WL 640417, at *7 (D. Conn. June 1, 2001) (finding an injunction "not narrowly tailored to the irreparable harm alleged by the plaintiffs," and, as a result "arbitrary and overly broad."); *Transamerica Rental Fin. Corp. v. Rental Experts*, 790 F. Supp. 378, 382 (D. Conn. 1992) ("In fashioning an injunction, the court should make the relief as narrow as required to attain the desired result."). Neither the Second Circuit nor the Supreme Court have directly addressed this issue. The Supreme Court has, however, cited the Ninth Standard's "narrowly tailored" standard, albeit in passing, without disapproval. *See Winter*, 555 U.S. at 17 ("The appellate court concluded . . . that a blanket injunction . . . was overbroad, and remanded the case to . . . narrow its injunction . . . ."). The Second Circuit and district court decisions cited above further suggest that, when confronted with the alleged irreparable harm of asset transfer, courts are expected to limit injunctive relief to enjoining asset transfer.

In light of authority suggesting that injunctions should be narrowly tailored to the alleged harm, and specifically suggesting that the appropriate relief where the threat of unlawful transfer

of assets is alleged is an injunction against such transfer, Movants have not demonstrated that are

entitled to the requested preliminary injunction on the basis of the alleged irreparable harm.

Specifically, Movants have not demonstrated that an injunction enjoining Triadou from

enforcing its judgment against the Chetrit Entities is necessary to prevent asset flight, particularly

where a narrower injunction specifically targeting asset flight is a viable alternative.

Because Movants have not demonstrated that the requested preliminary injunction is

"narrowly tailored . . . and no more burdensome than necessary," *Am. Stores.*, 872 F.2d at 845, to

prevent asset flight and have not established any other basis for irreparable harm, their motion

for a preliminary injunction is denied.

**B.     Rule 64 Attachment**

Federal Rule of Civil Procedure 64 authorizes "[e]very remedy . . . that, under the law of

the state where the court is located, provides for seizing a person or property to secure

satisfaction of the potential judgment." Fed. R. Civ. P. 64(a). The rule specifically mentions

attachment as an available remedy. Fed. R. Civ. P. 64(b). New York's Civil Procedure Law and

Rules ("CPLR") permits attachment upon a showing "that there is a cause of action, that it is

probable that the plaintiff will succeed on the merits, that one or more grounds for attachment

provided in section 6201 exist, and that the amount demanded from the defendant exceeds all

counterclaims known to the plaintiff." CPLR § 6212(a). Because Triadou has not brought any

counterclaims against Movants, the Court will first consider whether Movants have demonstrated

sufficient grounds for attachment under the relevant statute and will then evaluate whether it is

probable that they will succeed on the merits.

1. **Movants have demonstrated grounds for attachment under CPLR §§ 6201(1) and (3)**

CPLR § 6201(1) authorizes attachment if "the defendant is a nondomiciliary residing without the state, or is a foreign corporation not qualified to do business in the state." CPLR § 6201(1). This statute "is designed to serve two independent purposes: obtaining jurisdiction over and securing judgments against nondomiciliaries residing without the state." *ITC Entm't, Ltd. v. Nelson Film Partners*, 714 F.2d 217, 220 (2d Cir. 1983). Even if attachment is "unnecessary to secure jurisdiction," it may be "appropriate to secure the judgment" against nondomicilaires. *Id.* However, "[a]ttachment under New York law solely for security purposes is appropriate only when it appears likely that a plaintiff will have difficulty enforcing a judgment." *TAGC Mgmt., LLC v. Lehman*, 842 F. Supp. 2d 575, 586-87 (S.D.N.Y. 2012) (quoting *Katz Agency, Inc. v. The Evening News Ass'n*, 514 F. Supp. 423, 429 (S.D.N.Y. 1981)). In evaluating the question, the Court "must determine whether the defendant has assets within the State that could satisfy a judgment and whether petitioner's fear that the judgment will not be satisfied is reasonable." *Id.* (quoting *Moran v. Arcano*, No. 89-CV-6717 (CSH), 1990 WL 96761, at *2 (S.D.N.Y. July 3, 1990)). This can be made by "showing that something, whether it is a defendant's financial position or past and present conduct, poses a real risk of the enforcement of a future judgment." *Bank of China, N.Y. Branch v. NBM L.L.C.*, 192 F. Supp. 2d 183, 188 (S.D.N.Y. 2002) (quoting *Meridien Int'l Bank Ltd. v. Gov't of Republic of Liberia*, No. 92-CV-7039, 1996 WL 22338, at *3 (S.D.N.Y. Jan 22, 1996)). However, unlike § 6201(3), § 6201(1) does not require a showing that the risk of an unsatisfied judgment stems from the party's "intent to defraud . . . creditors or frustrate the enforcement of a judgment." CPLR § 6201(3).

19

Triadou, incorporated under the laws of Luxembourg,[10] has admitted that, if it succeeds

in enforcing its judgment against the Chetrit Entities, it will transfer its recovery to its parent,

SDG, to invest in real estate projects in Switzerland. Dkt. No. 169 ¶¶ 56, 62. Triadou's candid

admission of its intent to transfer these funds, once obtained, to Switzerland demonstrates "a real

risk of the enforcement of a future judgment," *Bank of China*, 192 F. Supp. 2d at 188 (citation

omitted), thus showing the requisite likelihood "that [Movants] will have difficulty enforcing a

judgment" to satisfy § 6201(1). *TAGC Mgmt.*, 842 F. Supp. 2d at 586-87.

Movants also meet the more stringent requirements of CPLR § 6201(3), which permits

attachment only if "the defendant, with intent to defraud his creditors or frustrate the

enforcement of a judgment that might be rendered in plaintiff's favor, has assigned, disposed of,

encumbered or secreted property, or removed it from the state or is about to do any of these

acts." Under this provision, unlike § 6201(1), "[r]emoval, assignment, or other disposition of

property is not a sufficient ground for attachment; *fraudulent intent* must be proven, not simply

alleged or inferred, and the facts relied upon to prove it must be fully set forth in the moving

affidavits." *DLJ Mortg. Capital, Inc. v. Kontogiannis*, 594 F. Supp. 2d 308, 319 (E.D.N.Y.

2009) (citation omitted) (emphasis added). Because "[f]raudulent intent is rarely susceptible to

direct proof . . . courts have developed 'badges of fraud' to establish the requisite actual intent to

defraud." *In re Kaiser*, 722 F.2d 1574, 1582 (2d Cir. 1983). Among these "badges of fraud" are:

> (1) the lack or inadequacy of consideration; (2) the family,
> friendship or close associate relationship between the parties; (3)
> the retention of possession, benefit or use of the property in
> question; (4) the financial condition of the party sought to be
> charged both before and after the transaction in question; (5) the
> existence or cumulative effect of a pattern or series of transactions
> or course of conduct after the incurring of debt, onset of financial
> difficulties, or pendency or threat of suits by creditors; and (6) the
> general chronology of the events and transactions under inquiry.

---

[10] Triadou does not contest that it is "not qualified to do business in the state." CPLR § 6201(1).

*Id.* at 1582-83.

These "badges of fraud" are apparent in Triadou's 2014 assignment of its Flatotel interest back to the Chetrit Entities. As the Court found, and Triadou admitted, it had invested $34,885,565 million into the Flatotel project, Bourg valued the project between $62 and $100 million, the Board was informed that the project was worth $100 million, but the assignment was consummated for approximately $32 million. Dkt. No. 169 ¶¶ 120, 164-68. On cross-examination, Cerrito admitted that, in this transaction, SDG's Board had agreed to "give up the investment that it believed was worth $100,000,000 for less than half of that." Tr. 130:2-5. Due to Triadou's implausible explanation of this below-market assignment and the temporal proximity between the sale and the initiation of litigation in California, the Court found that the assignment was motivated by the threat of litigation in California. Thus, the "inadequacy of consideration" and "general chronology of events and transactions under inquiry," notably the liquidation of assets in response to the threat of litigation in California, *see In re Kaiser*, 722 F.2d at 1582-83, demonstrate that the 2014 assignment was undertaken with fraudulent intent. As a result, Triadou has, in connection with the California litigation, already "with intent to . . . frustrate the enforcement of a judgment that might be rendered . . . assigned property" (its Flatotel interest) and has attempted, through its enforcement efforts in New York, to "remove[] . . . from the state" the consideration due on that assignment agreement. CPLR § 6201(3). This evidence, coupled with Triadou's stated intent to the assets in question in this litigation from the jurisdiction, further demonstrate that Triadou will "do . . . these acts" again in connection with the instant litigation. *Id.*

For the foregoing reasons, the Court finds the statutory grounds for attachment described in both CPLR § 6201(1) and CPLR § 6201(3) to be satisfied.

### 2. Movants have demonstrated a probability of success on the merits

In addition to satisfying § 6201, a party must also demonstrate "that it is probable that [it] will succeed on the merits" before a motion for attachment may be granted. CPLR § 6212(a). Triadou argues that Movants have not demonstrated a probability of success on their RICO, unjust enrichment, or conversion claims. Dkt. No. 170 at 17-21. Triadou further argues that attachment is not appropriate on Movants' fraudulent conveyance claims. *Id.* at 22. Because the Court finds that Movants have demonstrated a probability of success on their unjust enrichment claim, it need not consider Triadou's other arguments.

To prevail on an unjust enrichment claim, "[a] plaintiff must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (internal quotations and alterations omitted). Triadou argues that Movants fail to meet these requirements because "the UK Judgments have no evidentiary value" and "Almaty/BTA have not adduced sufficient evidence linking Telford . . . to Ablyazov." Dkt. No. 170 at 21. The Court, rejecting these arguments, found above that the UK Judgments are entitled to weight and that Telford is an Ablyazov investment entity used to move Ablyazov funds. As a result, the only arguments Triadou advances against Movants' unjust enrichment claim fail.

The evidence submitted by Movants unquestionably demonstrates "that it is probable that the [they] will succeed on the merits" of their unjust enrichment claim. CPLR § 6212(a). Triadou was enriched when it acquired a 37.5% interest in the Flatotel project with $34,885,565.00 in funds obtained from Telford. Dkt. No. 169 ¶¶ 83, 92, 165. This enrichment was at Movants' expense, as Ablyazov had embezzled between $3 and $4 billion from BTA

Bank, Almaty Ex. 22 ¶ 3; Almaty Ex. 34 ¶ 11, and used Telford as an entity "to conceal and

move his funds." Bourg Decl. ¶ 10. It would be "against equity and good conscience to permit"

Triadou to retain either the value of the money paid on its behalf by Telford or the profits from

its assignment of that same 37.5% interest, *Wildenstein*, 944 N.E.2d at 1110, because Triadou,

like SDG and Telford, was "used to conceal the movement and investment" of Khrapunov and

Ablyzov funds. Bourg Decl. ¶¶ 6-7; *see also Amusement Indus., Inc. v. Midland Ave. Assos.,*

*LLC*, 820 F. Supp. 2d 510, 537 (S.D.N.Y. 2011) (finding unjust enrichment where defendants

"improperly obtained possession of a portion of" an escrow account and "knew that they were

being given [plaintiff's] money"); *Eastman Kodak Co. v. Camarata*, No. 05-CV-6384 (DGL),

2006 WL 3538944, at *15 (W.D.N.Y. Dec. 6, 2006) (finding unjust enrichment where defendant

"knowingly furthered [a] scheme to defraud by means of money laundering, and . . . in so doing

. . . was enriched through her receipt of substantial sums of money.").

     As a result, Movants meet the requirements for attachment under CPLR § 6212(a).

###     3.    The Court will not exercise its discretion to deny the motion for attachment

     Finally, Triadou asks the Court to exercise its discretion to deny the motion for

attachment "if the Court also dismissed Almaty/BTA's Crossclaims on *forum non conveniens*

grounds." Dkt. No. 170 at 29-30. Because the Court did not dismiss Movants crossclaims on

*forum non conveniens* grounds, the Court will not deny the motion for attachment on that basis.

Instead, for the reasons above, the Court grants Movants' motion for attachment.

## IV.    CONCLUSION

     Because Movants have not demonstrated that an injunction preventing Triadou from

enforcing its judgment against the Chetrit Entities is necessary to prevent any irreparable harm,

its motion for preliminary injunction is denied. However, because Movants have demonstrated

that attachment is appropriate under CPLR §§ 6201(1) and 6201(3) and that it is probable that they will prevail on the merits of their unjust enrichment claim, their motion for attachment is granted.

Triadou shall submit any objections to Movants' proposed order of attachment on or before June 29, 2016. Also by June 29, 2016, the parties shall meet and confer and submit a proposed amount for Movants' undertaking.

This resolves Dkt. Nos. 106, 140.

SO ORDERED.

Dated: June **24**, 2016
      New York, New York

_____
ALISON J. NATHAN
United States District Judge

**Exhibit C**

```
----------------- Instance Type and Transmission --------------
Notification (Transmission) of Original sent to SWIFT (ACK)
Network Delivery Status   : Network Ack
Priority/Delivery         : Normal
Message Input Reference   : 1920 130522FBMECY2NAXXX0999601752
------------------------- Message Header -----------------------
Swift Input                       : FIN 103 Single Customer Credt Transfer
Sender   : FBMECY2NXXX
           FBME BANK LTD
           NICOSIA CY
Receiver : BKTRUS33XXX
           DEUTSCHE BANK TRUST COMPANY AMERICAS
           NEW YORK,NY US
------------------------- Message Text -------------------------
 20: Sender's Reference
     NICOPSD131420130
23B: Bank Operation Code
     CRED
32A: Val Dte/Curr/Interbnk Settld Amt
     Date          : 22 May 2013
     Currency      : USD (US DOLLAR)
     Amount        :          #28.000.000,#
33B: Currency/Instructed Amount
     Currency      : USD (US DOLLAR)
     Amount        :          #28.000.000,#
50K: Ordering Customer-Name & Address
     /CY4511501001402320USDCACC001
     TELFORD INTERNATIONAL LIMITED
     PO BOX 487922
     DUBAI, UNITED ARAB EMIRATES
57D: Account With Inst -Name & Addr
     //FW021000089
     CITIBANK N.A
     153 EAST 53 STREET
     NEW YORK NY 10022
 59: Beneficiary Customer-Name & Addr
     /37301114
     KRAMER LEVIN NAFTALIS AND FRANKEL
     LLP
     ATTORNEY ESCROW ACCOUNT
 70: Remittance Information
     ATTN: REETIKA AGARWAL
     212 559-6299
71A: Details of Charges
     OUR
------------------------- Message Trailer ----------------------
{CHK:32B197A99E0F}
PKI Signature: MAC-Equivalent
------------------------- Interventions ------------------------
Category      : Network Report
Creation Time : 22/05/13 19:18:58
Application   : SWIFT Interface
Operator      : SYSTEM
Text
{1:F21FBMECY2NAXXX0999601752}{4:{177:1305221920}{451:0}}
```

Received by josh graff

1. $10,500,051.25 on November 9,2012
2. $2,625,053.01 on January 22, 2013

{1:F01FBMECY2NAXXX1111111111}
{2:I103BKTRUS33XXXXN}
{4:
:20:NICOPSD130220087
:23B:CRED
:32A:130122USD2625053,01
:33B:USD2625053,01
:50K:/CY4511501001402320USDCACC001
TELFORD INTERNATIONAL LIMITED
PO BOX 487922
DUBAI, UNITED ARAB EMIRATES
:57A:CITIUS33
:59:/61768742
SUKENIK SEGAL and GRAFF
ATTORNEY TRUST IOLA ACCOUNT
:70:ABA NO. 021-0000-89
:71A:OUR

3. $15,925,102.16 on February 13, 2013

{1:F01FBMECY2NAXXX1111111111}
{2:I103BKTRUS33XXXXN}
{4:
:20:NICOPSD130440115
:23B:CRED
:32A:130213USD15925102,16
:33B:USD15925102,16
:50K:/CY4511501001402320USDCACC001
TELFORD INTERNATIONAL LIMITED
PO BOX 487922

DUBAI, UNITED ARAB EMIRATES
:57A:CITIUS33
:59:/61768742
SUKENIK SEGAL and GRAFF
ATTORNEY TRUST IOLA ACCOUNT
:70:amendment to the loan agreement

> dated 07 Nov 12
> :71A:OUR

4. $175,101.32 on February 19, 2013

Other Received by Graff:

5. $5,660,256.77 on April 13, 2013

> 1:F01FBMECY2NAXXX1111111111}
> {2:I103BKTRUS33XXXXN}
> {4:
> :20:NICOPSD130930140
> :23B:CRED
> :32A:130408USD5660256,77
> :33B:USD5660256,77
> :50K:/CY4511501001402320USDCACC001
> TELFORD INTERNATIONAL LIMITED
> PO BOX 487922
> DUBAI, UNITED ARAB EMIRATES
> :57A:CITIUS33
> :59:/61768742
> SUKENIK SEGAL and GRAFF
> ATTORNEY TRUST IOLA ACCOUNT
> :70:ABA NO. 021-0000-89
> :71A:OUR

6. $390,056.29 on April 16, 2013

> {1:F01FBMECY2NAXXX1111111111}
> {2:I103BKTRUS33XXXXN}
> {4:
> :20:NICOPSD131060020
> :23B:CRED
> :32A:130416USD390056,29
> :33B:USD390056,29
> :50K:/CY4511501001402320USDCACC001
> TELFORD INTERNATIONAL LIMITED
> PO BOX 487922
> DUBAI, UNITED ARAB EMIRATES
> :56A:MRMDUS33
> :57A:CCFRFRPP

:59:/FR7630056000390039004012516
IOTA SASU
Paris, France
:70:payment for invoice 0042013
:71A:OUR

I think was first sent to Kramer Levin: First payment to Kramer bounced, second to Graff here below

7.  $6,000,189.25 on May 20, 2013 (Cabrini)

SWIFT:
{1:F01FBMECY2NAXXX1111111111}
{2:I103BKTRUS33XXXXN}
{4:
:20:NICOPSD131400016
:23B:CRED
:32A:130520USD6000189,25
:33B:USD6000189,25
:50K:/CY4511501001402320USDCACC001
TELFORD INTERNATIONAL LIMITED
PO BOX 487922
DUBAI, UNITED ARAB EMIRATES
:57A:CITIUS33
:59:/61768742
SUKENIK SEGAL and GRAFF
ATTORNEY TRUST IOLA ACCOUNT
:70:as per loan agreement
:71A:OUR

Tricounty money:
8.  $2'800'045.23 on April 24, 2013

9.  {1:F01FBMECY2NAXXX1111111111}
10. {2:I103BKTRUS33XXXXN}
11. {4:
12. :20:NICOPSD131140081
13. :23B:CRED
:32A:130424USD2800045,23
:33B:USD2800045,23
:50K:/CY4511501001402320USDCACC001

TELFORD INTERNATIONAL LIMITED
PO BOX 487922
DUBAI, UNITED ARAB EMIRATES
:57A:CITIUS33
:59:/37301114
Kramer levin Naftalis and Frankel
LLP Attorney Escrow Account
FOA Reetika Agarwal (212) 559-6299
:70:ABA No. 021000089
:71A:OUR

14. $28,000,000.00 on May 22, 2013