UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITY OF ALMATY, KAZAKHSTAN
AND BTA BANK JSC,

        Crossclaim Plaintiffs,

-against-

MUKHTAR ABLYAZOV, VIKTOR
KHRAPUNOV, ILYAS KHRAPUNOV,
AND TRIADOU SPV S.A.,

        Crossclaim Defendants.

15 Civ. 5345 (AJN) (KHP)

**DECLARATION OF MATTHEW GEORGE JENKINS**

I, Matthew George Jenkins, declare as follows:

1. I am a solicitor and partner in the firm of Hughmans located at 32 Farringdon Street, London, United Kingdom. My firm has represented Ilyas Khrapunov ("Mr. Khrapunov") in connection with the proceedings JSC BTA Bank has brought against Mr Khrapunov in the United Kingdom. I submit this declaration in support of Mr. Khrapunov's response to the Letter Motion of April 19, 2017 filed by JSC BTA Bank and the City of Almaty (together, "BTA/Almaty") requesting an order that the deposition of Mr Khrapunov take place at an agreed location other than Switzerland.

**Mr. Khrapunov Was Added to INTERPOL'S List of Wanted Persons in 2014 and Since Being Added to the List, He Has Not Left Switzerland**

2. Mr. Khrapunov is a Kazakh national and is a resident of Switzerland. He lives in Geneva with his wife and two young children.

3. The Kazakh government authorities, based on allegations made by the City of Almaty, allege that Mr. Khrapunov has been involved in illegal criminal activity. At their instigation, an INTERPOL Red Notice was issued in April 2014. An extract from this Red Notice

is displayed online at: https://www.interpol.int/notice/search/wanted/2014-26980, (*See* INTERPOL Red Notice, attached hereto as **Exhibit 1**).

4. This is not the full version of the INTERPOL Red Notice that would have been distributed to law enforcement authorities, as is stated on the page: "This extract of the Red Notice has been approved for public dissemination."

5. In the extract published online, it is stated that Mr. Khrapunov is "WANTED BY THE JUDICIAL AUTHORITIES OF KAZAKHSTAN FOR PROSECUTION / TO SERVE A SENTENCE". Also, under the heading "Charges" it is stated: "The creation and guidance of an organised criminal group or criminal association (criminal organisation), and participation in a criminal association; Legalization of monetary funds or other property obtained illegally".

6. The fact of the issued and maintained an INTERPOL Red Notice demonstrates that the Kazakh authorities are actively interested in securing Mr. Khrapunov's extradition. It is apparent from the gravity of the alleged crimes as to why this is the case.

7. Mr. Khrapunov has advised me that he has not left Switzerland since the INTERPOL Red Notice was issued. He has not done so because of the effect of the INTERPOL Red Notice and the risk to his liberty were he to leave Switzerland.

**The Effects of Being Subject to an INTERPOL Red Notice**

8. Should Mr. Khrapunov leave Switzerland, he must expect to be stopped at the Swiss border or a foreign airport upon arrival to identify himself. Although the existence of the Schengen Area, an area created by the Schengen Agreement which allows citizens to cross internal borders without being subjected to border checks, has eliminated border control between some European countries, the UK is outside of the Schengen Area.

2

9. Essentially, a Red Notice status is a request for any country to identify or locate an individual with a view to their provisional arrest and extradition in accordance with the country's national laws. An individual who is subject to an INTERPOL Red Notice is subject to arrest in any member country. The UK and Spain are INTERPOL member countries.

10. There is no formal extradition treaty between the UK and Kazakhstan. However, that is not a bar to the extradition of a person from the UK to Kazakhstan. For instance, extradition could be effected by the governments entering into an *ad hoc* special extradition arrangement (provided for under the Extradition Act of 2003).

11. In this regard, it is highly relevant that co-operation between the UK and Kazakhstan in respect of criminal matters is ever growing. On April 4, 2016, a new treaty came into force, "Treaty between the United Kingdom of Great Britain and Northern Ireland and the Republic of Kazakhstan on Mutual Legal Assistance in Criminal Matters." The Home Office's Explanatory Memorandum (command paper no. 9179) states: "[t]his Treaty is a clear commitment by both parties to mutual-cooperation in the cross-border fight against crime and will strengthen bilateral relations more generally."

12. It is in this context that the prospect of an agreement being reached between the UK and Kazakh authorities to facilitate the extradition of Mr. Khrapunov can be readily anticipated.

**There is a High Likelihood that Kazakhstan Could Generate a "Surrogate" Extradition Request**

13. The Kazakh authorities have worked closely with other former Soviet countries which have standing extradition processes with the United Kingdom and Spain to generate "surrogate" extradition requests.

14. Both the Russian Federation and Ukraine are designated as "category 2" territories for the purposes of the UK's Extradition Act 2003, and as such, any requests for Mr. Khrapunov's provisional arrest or extradition from either of these countries would follow a more stream-lined procedure than were the request to come directly from Kazakhstan. Were an extradition request (or provisional arrest request) for Mr. Khrapunov to be received by the UK from Russia or Ukraine it would be certified and executed in the normal way.

15. Therefore, the absence of an extradition treaty in place between Kazakhstan and the UK is clearly not an impediment to the possible detention and attempted extradition of Mr. Khrapunov.

**Ukrainian Criminal Proceedings**

16. Indeed, November 2016 Mr. Khrapunov discovered that there are unfounded extant criminal proceedings against him in the Ukraine and that these were commenced as far back as October 2015. The Ukrainian criminal proceedings are in relation to unsupported allegations that Mr. Khrapunov illegally intervened in the work of computers owned and used by the attorneys of Ilyashev & Partners Law Firm, the firm that represents JSC BTA Bank. This first came to his attention when a journalist provided him with a copy of a bundle of documents (the "Ukraine Documents Bundle"), a copy of which is attached hereto as **Exhibit 2**.

17. The Ukraine Document Bundle also includes English language versions of the various stamped, sealed and signed original documents. It is not apparent if the English language versions are official translations from the official bodies who authored the original documents. I believe that they faithfully translate the meaning and words of the original documents into English.

18. I describe the documents in the Ukraine Documents Bundle by reference to the contents of those English language versions:

4

(a) A document entitled *"RESOLUTION on putting the accused on the wanted list"* dated 17.03.16. It is a document from a police major at the *"the National Police of Ukraine; Head Administration of the National Police; in the city of Kyiv; Investigation Department"*. This letter refers to a criminal case against Mr Khrapunov opened on 29.10.15 in connection with the alleged conspiracy by Mr Khrapunov from late summer – early autumn 2013 to interfere in the computer systems of the Bank's Ukrainian lawyers, Ilyashev & Partners, executed on 13.11.13, contrary to various provisions of the Ukrainian Criminal Code. It says that a 'notice of suspicion' was approved on 17.03.16. By this document it resolved to put Mr Khrapunov on the wanted list. This document expressly identifies Ilyashev & Partners as: *"represent[ing] interests of JSC "BTA Bank" (Republic of Kazakhstan)"*.

(b) A document entitled *"RULING"* which, on its face, is a record of the ruling of a Ukrainian investigating judge dated 22.03.16 upon an application by the Ukrainian police authorities for permission to detain Mr Khrapunov to bring him to Court on the basis of the Hacking Allegations. The document sets out that an investigating judge in Kiev ruled in a <u>closed</u> court session that it is necessary to permit detention of Mr Khrapunov to bring him to Court. It also states that on 17.03.16, Mr Khrapunov was put on the wanted list (as per the resolution in the preceding document).

(c) A document entitled *"RULING"* which, on its face, is a record of the ruling of the same Ukrainian investigating judge dated 19.08.16 upon an application by the Ukrainian police authorities for permission to detain Mr Khrapunov in custody on the basis of the Hacking Allegations. The document sets out that the investigating judge ruled that Mr Khrapunov be detained in custody as a preventative measure. This document states that Mr Khrapunov was put on the international wanted list by way of a letter from the Ukrainian bureau of Interpol on 10.05.16.

(d) A letter dated 15.09.16 to Mr Herasymiv of Ilyashev & Partners (the Bank's Ukrainian lawyers), in which the police authority set out details of the listing on

5

Interpol's wanted list of persons connected with allegations of fraud against the Bank. This letter states that it is in response to his *"attorney's request"* – presumably this is a reference to a formal legal request Mr Herasymiv made on 08.09.16. I note that the top left hand side of the letter reads: *"Your ref. no.: No number of September 08, 2016"*. In this letter, it states that according to the records of the Interpol General Secretariat that Mr Khrapunov is searched for at the instance of both the Ukrainian and Kazakh bureaux of Interpol.

19. Given that Mr. Khrapunov's attendance of a deposition is a pre-planned scheduled event the existence of which is known to the Kazakh authorities, they will have plenty of time to set the necessary procedures in place, including organizing surrogate extradition requests. Furthermore, as explained above, due to the INTERPOL Red Notice, it is very likely that upon entering the UK the relevant UK authorities would communicate the fact of Mr. Khrapunov's presence in the UK back to the Kazakh and Ukrainian authorities.

20. In light of all of the foregoing, there is every reason to believe that the Kazakh and/or Ukrainian authorities would take advantage of the occasion of a scheduled visit by Mr. Khrapunov to England for an appearance at a deposition in this case to seek his detention and extradition. Indeed, this is exactly what they seem to have done in relation to a hearing scheduled for 26 May 2016 at which they expected Mr. Khrapunov to attend Court in London.

**Misleading of the Court by the Bank in relation to the Ukrainian criminal proceedings**

21. On 26 May 2016 Mr. Khrapunov was due to attend Court in London but he instead applied for permission to give evidence by video link from Switzerland. The Judge refused the application on the basis of submissions from the Bank that there was no reason to suspect the Ukrainian authorities were likely to seek Mr. Khrapunov's extradition. On 26 November 2016 the Court of Appeal initially refused Mr. Khrapunov's application for permission to appeal against that decision.

22.     However, on 26 April 2017 the Court of Appeal set aside its initial order, on the grounds that both the Court of Appeal and Mr. Justice Philips had been misled by the Bank: in direct contradiction to the submissions it made to the Court, the Bank knew at all material times that there were outstanding criminal proceedings against Mr. Khrapunov in Ukraine and that the Ukrainian authorities had placed Mr. Khrapunov on the INTERPOL wanted list on 10 May 2016, 16 days before he was due to attend Court in London to give evidence (see Court of Appeal's order attached hereto as **Exhibit 3**).

**Mr. Khrapunov's View that He is Safe From Extradition in Switzerland is Justified**

23.     Both Switzerland and France have seen through Kazakhstan's efforts to extradite by generating surrogate extradition requests made by Russia and Ukraine.[1] Furthermore, the Swiss authorities have twice previously rejected requests to extradite Mr. Khrapunov's father, Viktor Khrapunov, to Kazakhstan. (*See* certified translated copy of a letter dated June 19, 2014 from the Swiss Federal Office of Justice, attached hereto as **Exhibit 4**). The basis for this refusal to grant extradition was Article 2 of the Swiss Federal Act on International Mutual Assistance in Criminal Matters, which provides:

> A request for cooperation in criminal matters shall not be granted if there are reasons to believe that the foreign proceedings

---

[1] France refused to extradite to Russia after finding that the individual whose extradition was sought was an opponent of the political regime of Kazakhstan and further finding that the evidence showed Kazakhstan sought to pressure the Russian authorities to initiate criminal prosecution against the individual and to request his extradition to Russia. The French opinion cites Article 3(§ 2) of the European Convention on Extradition, which states that extradition shall not be granted "if the requested Party has substantial grounds for believing that a request for extradition for an ordinary criminal offence has been made for the purpose of prosecuting or punishing a person on account of his race, religion, nationality or political opinion, or that that person's position may be prejudiced for any of these reasons". The opinion goes on to find that the individual's extradition to Russia was sought for a political purpose. (*See* December 9, 2016 Decision of The French *Conseil D'Etat* (Counsel of State) and Administrative Justice, attached hereto as **Exhibit 5**).

7

    a.    do not meet the procedural requirements of the European Convention for the Protection of Human Rights and Fundamental Freedoms of 4 November 1950, or the International Covenant on Civil and Political Rights of 16 December 1966;

    b.    are being conducted so as to prosecute or punish a person on account of his political opinions, his belonging to a certain social group, his race, religion, or nationality;

    c.    could result in aggravating the situation of the defendant for any of the reasons mentioned under letter b; or

    d.    have other serious defects.

In the circumstances of the failed attempts to extradite his father, one can see why it would be unlikely that the Kazakh authorities would spend time and money seeking to have Mr. Khrapunov extradited from Switzerland, and indeed, why Mr. Khrapunov would feel a high degree of assurance that any such attempt would be unsuccessful.

    24.    The Swiss refusal to extradite to Kazakhstan, directly or indirectly, is a product of Swiss law, procedure and policy.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 2, 2017

Matthew George Jenkins