# Exhibit 1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| ———————————————— | ) | |
| CITY OF ALMATY, KAZAKHSTAN, | ) | |
| and BTA BANK JSC | ) | |
|  | ) | |
| Plaintiffs, | ) | |
|  | ) | |
| v. | ) | No. 15-cv-05345 (AJN) (KHP) |
|  | ) | |
| MUKHTAR ABLYAZOV, ILYAS | ) | |
| KHRAPUNOV, VIKTOR KHRAPUNOV | ) | |
| and TRIADOU SPV S.A., | ) | |
|  | ) | |
| Defendants. | ) | |
| ———————————————— | ) | |

**LETTER OF REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE**
**PURSUANT TO THE HAGUE CONVENTION OF 18 MARCH 1970 ON**
**THE TAKING OF EVIDENCE ABROAD IN CIVIL OR COMMERCIAL MATTERS**

The United States District Court for the Southern District of New York (the "Court"), presents its compliments to the Geneva Civil Court of the First Instance of the Swiss Confederation under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters ("Hague Convention"), and pursuant to Article 17 of the Hague Convention, requests international judicial assistance to obtain evidence to be used in a civil proceeding before this Court in the above-captioned matter. This Court respectfully requests that the Geneva Civil Court recognize this Letter of Request from this Court and accompanying Commission,  and that the Federal Department of Justice and Police authorizes the taking of evidence in the territory of Switzerland by the commissioners appointed for this purpose as developed below, in adherence to Article 17 of the Hague Convention and in the interest of comity.

1

**A.      Sender**

The Honorable Alison J. Nathan, United States District Judge for the Southern District of

New York, New York, New York, United States of America.

**B.      Central Authority of the Requested State**

The present Letter of Request is addressed to:

Tribunal civil - Tribunal de première instance
Place du Bourg-de-Four 1
Case postale 3736
CH-1211 Genève 3, Switzerland
tpi.securise@justice.ge.ch

With a copy to:

Federal Office of Justice FOJ
Private International Law Unit
CH-3003 Bern, Switzerland

**C.      Person to Whom the Authorized Commission is to Be Returned**

This   Court   hereby   requests   that   this   executed   Letter   of   Request   and   authorized

Commission   be   returned   to   the   following   attorneys   for   the   Plaintiffs,   the   City   of   Almaty,

Kazakhstan and BTA Bank (collectively, the "Plaintiffs"), as an officer of this Court:

Matthew L. Schwartz, Esq.
Boies Schiller & Flexner, LLP
575 Lexington Avenue
New York, New York 10022
Telephone Number: +1 (212) 446-2300
Fax Number: +1 (212) 446-2350
mlschwartz@bsfllp.com

Represented in Switzerland by the Plaintiffs' Swiss attorney:

Balz Gross, Esq.
Claudio Bazzani, Esq.
Homburger AG
Prime Tower
Hardstrasse 201
CH-8005 Zurich, Switzerland

Telephone: +41 43 222 1000
Fax:_ +1 43 222 1500
Email: balz.gross@homburger.ch
Email: claudio.bazzani@homburger.ch

As an officer of this Court, he will act as confidential courier of this Court and deliver the executed Letter of Request, authorized Commission, and any related documents and materials directly to me at the following address:

The Honorable Alison J. Nathan
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square, Room 2102
New York, New York 10007

All documents and materials deposited with the Court in accordance with this Letter of Request and Commission will be available to all parties and their counsel.

**D.      Purpose of Evidence Sought and Requested Date of Receipt of Response**

The requested commission will permit the collection of evidence to be used by the parties in support of their claims or defenses. The Court accordingly respectfully requests a prompt response to this Letter of Request.

**I.      HAGUE CONVENTION REQUIREMENTS**

This Court requests the assistance more specifically described herein as necessary in the interests of justice.  In conformity with Article 3 of the Hague Convention, the undersigned applicant has the honor to submit the following request:

**A.      Requesting Judicial Authority**

The Honorable Alison J. Nathan
United States District Court for the Southern District of New York
Thurgood Marshall United States Courthouse
40 Foley Square

3

New York, New York 10007, USA

**B.     Central Authority of the Requested State**

Tribunal Civil - Tribunal de Première Instance
Place du Bourg-de-Four 1
Case postale 3736
CH-1211 Genève 3, Switzerland

**C.     Name of the Case and Identifying Number**

All evidence requested will be used in relation to the above-captioned civil lawsuit,

which can be identified by the following information:

Case Name:    *City of Almaty, Kazakhstan, et al. v. Mukhtar Ablyazov, et al.*
Court:          United States Federal District Court for the Southern District of New York
Case Number: 15-cv-05345 (AJN)

**D.     Names and Addresses of the Parties and their Representatives**

      1.     <u>Plaintiffs</u>

The City of Almaty, Kazakhstan ("Almaty") and BTA Bank JSC ("BTA") are,

respectively, a political subdivision and a citizen of the Republic of Kazakhstan.

      2.     <u>Plaintiffs' Representative</u>

Matthew L. Schwartz, Esquire
Boies, Schiller & Flexner LLP
575 Lexington Avenue
New York, NY  10022
Telephone: +1 (212) 446-2300
Fax: +1 (212) 446-2350
Email: mschwartz@bsfllp.com

and

Balz Gross, Esq.
Claudio Bazzani, Esq.
Homburger AG
Prime Tower
Hardstrasse 201
CH-8005 Zurich, Switzerland
Telephone: +41 43 222 1000

4

Fax:_ +1 43 222 1500
Email: balz.gross@homburger.ch
Email: claudio.Bazzani@homburger.ch

    3.    <u>Defendants</u>

Defendant Mukhtar Ablyazov is a national of the Republic of Kazakhstan, currently domiciled in Paris, France. Defendant Ilyas Khrapunov is a national of the Republic of Kazakhstan, currently domiciled in Geneva, Switzerland.  Defendant Viktor Khrapunov is a national of the Republic of Kazakhstan, currently domiciled in Geneva, Switzerland.  Defendant Triadou SPV S.A. is a company established under the laws of Luxembourg, with a registered address at 60 Grand-Rue, L-1660 Luxembourg.

    4.    <u>Defendants' Representatives</u>

<u>Mukhtar Ablyazov</u>
Jonathan D. Cogan, Esquire
Kobre & Kim LLP
800 Third Avenue, 6th Floor
New York, New York  10022
Telephone: +1 (212) 488-1200
Facsimile:  +1 (212) 488-1220
Email: jonathan.cogan@kobrekim.com

<u>Ilyas and Viktor Khrapunov</u>
John J. Kenney, Esquire
John P. Curley, Esquire
Hoguet, Newman, Regal & Kenney, LLP
10 East 40th Street.
New York, NY 10016
Telephone: +1 (222) 689-8808
Facsimile:  +1 (212) 689-5101
Email: jkenney@hnrklaw.com
Email: jcurley@hnrklaw.com

<u>Triadou SPV S.A.</u>
Deborah A. Skakel, Esquire
Blank Rome LLP
405 Lexington Avenue
New York, NY 10174
Telephone: +1 (212) 885-5000
Facsimile:  +1 (212) 885-5001
Email: dskakel@blankrome.com

**E.**    **Nature of the Proceedings and Summary of the Case and Relevant Facts**

The above-captioned case is a civil lawsuit brought by Plaintiffs seeking equitable relief and money damages for injuries resulting from the alleged embezzlement and laundering of funds belonging to Plaintiffs, and enforcement of a foreign judgment under New York law. *See*

Ex. A (Plaintiffs' Amended Crossclaims). Defendant Viktor Khrapunov is the former mayor of the City of Almaty. Defendant Mukhtar Ablyazov is the former chairman of BTA Bank. Defendant Ilyas Khrapunov is Viktor Khrapunov's son and Defendant Ablyazov's son-in-law. Defendant Triadou SPV S.A. ("Triadou") is an entity established in Luxembourg and allegedly controlled by Ilyas Khrapunov.

Plaintiffs allege that Viktor Khrapunov abused his office as the Mayor of Almaty, Kazakhstan to enrich himself and his family members through a series of corrupt property dealings, channeling state-owned property to his family members and associates for below-market values, which were then resold to third parties for enormous profits. *See* Ex. A, at ¶ 45-61. Plaintiffs also allege that Defendant Ablyazov embezzled billions of dollars by abuse of his office at BTA Bank, one of Kazakhstan's largest banks, which was subsequently nationalized by the Government of Kazakhstan. *See* Ex. A, at ¶ 28-44.  When his actions were uncovered by bank regulators in Kazakhstan, Ablyazov fled to the United Kingdom, where BTA brought a series of civil fraud actions against him. Ablyazov repeatedly defied orders of the U.K. courts to disclose his assets, leading to his being sentenced to 22 months imprisonment for contempt. Ablyazov fled sentencing in the U.K. and went into hiding, and the U.K. courts awarded BTA billions of dollars in judgments against Ablyazov and his associates for their theft from BTA. Ablyazov was subsequently discovered and arrested in France. Plaintiffs have alleged that while fighting extradition, Ablyazov conspired with his son-in-law, Ilyas Khrapunov, to hack the mobile phones and computers of French judicial authorities and prosecutors. *See* Ex. A ¶ 73 – 76.  Ablyazov has since been released from French prison, but claims that he is applying for asylum in France and thus cannot travel to give testimony in this matter.

As specifically relevant to the above-captioned action, Ablyazov and Viktor Khrapunov are alleged to have laundered some of the commingled proceeds of their actions into the United States through a special purpose vehicle, Defendant Triadou SPV S.A ("Triadou") controlled by Ilyas Khrapunov. *See* Ex. A, at ¶ 77 – 97. Once those assets were discovered, the Defendants are alleged to have entered into transactions in the United States that caused further and distinct injuries to the Plaintiffs, including allegedly engaging in fraudulent conveyances that diminished the value of those assets. The Court has granted attachment of Triadou's assets in New York in the amount of $69,275,810.00.

Plaintiffs and Defendants currently are engaged in discovery, where the parties exchange information concerning their claims and defenses.  The Court accordingly has not addressed the merits of Plaintiffs' allegations.

Plaintiffs contend that the information sought by this request is available to the Geneva Civil Court. This Court respectfully requests that the Geneva Civil Court act on this request expeditiously.

## F.     Evidence to Be Obtained

Based on the foregoing, this Court respectfully requests that the Geneva Civil Court recognize the attached Commission, so that the appointed commissioners may lawfully obtain testimony from the following witnesses, on the below-stated topics:

1.     A deposition of Ilyas Khrapunov, who resides at 295, Route d'Hermance, 1247 Anieres, Geneva, Switzerland, on the following topics:

  1)   Triadou SPV S.A., including its formation, operation, funding, and its investments, including but not limited to:
      a.   The Flatotel condominium conversion in New York, NY;
      b.   The Cabrini Medical Center conversion in New York NY;
      c.   The Syracuse Mixed Use Complex in Syracuse, NY;

7

        d.  The Tri-County Mall in Cincinnati, OH;

2)     Telford International Limited ("Telford"), including

        a.  Funding provided by Telford for Triadou's investments;

        b.  The sources of funds Triadou received from Telford;

        c.  Due diligence done on Telford and its beneficial owners;

        d.  Funding provided by Telford for any investment by SDG or Ilyas Khrapunov, including the purchase of any securities;

        e.  Any connection or relationship between Telford Financiers and Telford International Limited

3)     The formation of a real estate investment fund incorporated in Luxembourg including Triadou's assets and investments;

4)     The structure and operations of SDG Capital SA ("SDG"), including any current or former subsidiaries or affiliates, including:

        a.  The sources of SDG's funding;

        b.  SDG's investments through Porto Heli SPV;

        c.  SDG's investments through Igloo SPV;

5)  The purported sale of SDG to Philippe Glatz in 2013, including:

        a. Ilyas Khrapunov's relationship and communications with Philippe Glatz;

        b. The source(s) of funds used to acquire SDG; and

        c.  Ilyas Khrapunov's employment or services to SDG before and after the purported sale;

6)     FBME Bank ("FBME"), including:

        a.  Any accounts held at FBME by Ilyas Khrapunov or entities he or his family members (including in-laws) own or control;

        b.  Any transfers of funds from accounts at FBME for the benefit of Triadou or SDG;

        c.  Any communications between officers or employees of FBME and Ilyas Khrapunov or his agents;

7)     Transfers of funds involving the following entities:

        a.  VILDER Company

        b.  Northern Seas Waterage

        c.  Crownway Limited

        d.  Beford Limited

        e.  Beron Holdings

      f.   Ignoramus Limited

      g.  Ramasita Investments

      h.  Lampwood Limited

      i.   Sartfield Limited

      j.   Claremont Holdings Limited

      k.  RPM USA

      l.   RPM-Maro

      m. San Vito Investments Corp.

      n.  Adlux Group

      o.  SWISS TV

8)    Ilyas Khrapunov's relationship and communications with Peter Sztyk (a/k/a Petro Sztyk), including:

      a.  The involvement of Mr. Sztyk in funding Triadou, SDG, or any of their subsidiaries of affiliates;

      b.  Any intended or planned sale of Triadou, in whole or part, to Mr. Sztyk or any entity owned or controlled by him;

      c.  Any services or representation Mr. Sztyk provided to Ilyas Khrapunov or Ablyazov;

9)    Ablyazov's assets, both in his name and held by associates for his benefit;

10)   Ablyazov's ownership or control of any corporate entities;

11)   The sources of funding for Ablyazov's legal expenses in the United Kingdom;

12)   Disclosures made by Ilyas Khrapunov pursuant to any freezing or receivership orders of the courts of the United Kingdom;

13)   Acts of hacking or unauthorized access to the electronic communications of any government officials, including:

      a.  the employment of or payments to any their-party computer hackers;

      b.  Ilyas Khrapunov's receipt of electronic communications obtained without authorization;

14)   Ilyas Khrapunov's relationship and communications with Nicolas Bourg, including those related to Bourg's companies the Niel entities;

15)   Ilyas Khrapunov's communications with Laurent Foucher;

16)   Ilyas Khrapunov's communications with Kevin Meyer;

17)   Ilyas Khrapunov's communications with Mukhtar Ablyazov;

18)   Ilyas Khrapunov's communications with Eesh Aggarwal;

19) Ilyas Khrapunov's communications with Viktor Khrapunov;

20) Ilyas Khrapunov's communications with Gennady Petelin;

21) Ilyas Khrapunov's communications with Elena Petelina;

22) Ilyas Khrapunov's communications with Petr Krasnov;

23) Ilyas Khrapunov's communications with Alexander Yassik;

24) Ilyas Khrapunov's communications with Joseph Chetrit;

25) Ilyas Khrapunov's communications with Felix Sater;

26) Ilyas Khrapunov's communications with Daniel Ridloff;

27) Ilyas Khrapunov's communications with Botagoz Dzhardemali (a/k/a Bota Jardemalie);

28) Ilyas Khrapunov's retention of relevant documents or electronic communications, or maintenance of such documents by SDG, Triadou, or any of Ilyas Khrapunov's employees, counsel, or agents.

29) The allegations in the Amended Crossclaims.

2.   A deposition of Viktor Khrapunov, who resides at 28b Chemin du Petit-Saconnex, 1209 Geneva, Switzerland, on the following topics:

1) Viktor Khrapunov's actions as Mayor of the City of Almaty Kazakhstan, including:

   a. Viktor Khrapunov's oath of office and ethical and legal obligations as Mayor of Almaty;

   b. The transfer of property in the "Two Rivers" area of Almaty, as referenced in ¶ 51 of the Amended Crossclaims;

   c. The April 2001 transfer of property to "KRI", as referenced in ¶ 53 of the Amended Crossclaims;

   d. The 2003 seizure and resale of property from Shadid Engineering, as referenced in ¶ 54 of the Amended Crossclaims;

   e. The transfer for sale of any property owned or controlled by the City of Almaty to Leila Khrapunova or entities owned or controlled by her;

2) Transfers of funds involving the following entities:

   a. TOO KazRealIncom

   b. TOO KarashaPlus

   c. TOO Building Service Company

   d. TOO Compania Stroytech

   e. TOO Altay

f. Viled Establishment

3)   The formation, funding, and investments of SDG Capital SA ("SDG"), including any current or former subsidiaries or affiliates, including:

   a.   The sources of SDG's funding;

   b.   SDG's investments through Porto Heli SPV;

   c.   SDG's investments through Igloo SPV;

   d.   The purported sale of SDG to Philippe Glatz in 2013;

4)   The formation, operation, funding, and investments of Triadou SPV S.A., including Triadou's investments in:

   a.   The Flatotel condominium conversation in New York, NY;

   b.   The Cabrini Medical Center conversion in New York NY;

   c.   The Syracuse Mixed Use Complex in Syracuse, NY;

   d.   The Tri-County Mall in Cincinnati, OH;

5)   Telford International Limited ("Telford"), including

   a.   Funding provided by Telford for Triadou's investments;

   b.   The sources of funds Triadou received from Telford;

   c.   Due diligence done on Telford and its beneficial owners;

   d.   Any connection between Telford International Limited and Telford Financiers Corp.;

6)   FBME Bank ("FBME"), including:

   a.   Any accounts held at FBME by Viktor Khrapunov or entities he or his family members (or in-laws) own or control;

   b.   Any transfers of funds from accounts at FBME for the benefit of Triadou or SDG;

   c.   Any communications between officers or employees of FBME and Ilyas Khrapunov or his agents;

7)   The net worth of Viktor Khrapunov and his immediate family, as referenced in public reports and ¶ 61 of the Amended Crossclaims;

8)   Tax reporting by Viktor Khrapunov and his spouse, as referenced in ¶ 61 of the Amended Crossclaims;

9)   Viktor Khrapunov's disclosures and statements to Swiss law enforcement authorities;

10)  Investments by Viktor Khrapunov and his immediate family members in the United States, including the purchase and sale of any real property;

11)  Acts of hacking or unauthorized access to the electronic communications of any government officials, including:

      a.  the employment of or payments to any third-party computer hackers;

      b.  Viktor Khrapunov's receipt of electronic communications obtained without authorization;

12)    Viktor Khrapunov's communications with Mukhtar Ablyazov;

13)    Viktor Khrapunov's communications with Abylaykhan Karymsakov;

14)    Viktor Khrapunov's communications with Eesh Aggarwal;

15)    Viktor Khrapunov's communications with Ilyas Khrapunov;

16)    Viktor Khrapunov's communications with Leila Khrapunova;

17)    Viktor Khrapunov's communications with Gennady Petelin;

18)    Viktor Khrapunov's communications with Elena Petelina;

19)    Viktor Khrapunov's communications with Petr Krasnov;

20)    Viktor Khrapunov's communications with Alexander Yassik;

21)    Viktor Khrapunov's communications with Peter Sztyk (a/k/a Petro Sztyk);

22)    Viktor Khrapunov's communications with Nicolas Bourg;

23)    Viktor Khrapunov's retention of relevant documents or electronic communications, any of Viktor Khrapunov's employees, counsel, or agents.

24)    The allegations in the Amended Crossclaims.

The witnesses Ilyas Khrapunov and Viktor Khrapunov have voluntarily agreed to be deposed in connection with the above-captioned case and know that they cannot be subjected to any coercive measures, that they cannot be forced to participate or to appear and that they have the right to invoke any exemption or prohibition to give evidence provided for by the laws of Switzerland or of the United States of America.  *See* Exs. A, B.

## G.    Procedure for Obtaining the Evidence

If authorized, testimony from the witnesses will be obtained by the commissioners at the offices of one of the appointed commissioners in Switzerland, and will be under oath and recorded by video and stenography. Cross-examination of the witnesses is requested, and it is requested that each of the commissioners be authorized to conduct examination.

The testimonies from the witnesses should be obtained as soon as practically possible. The exact date(s) will be scheduled once the Federal Department of Justice and Police has issued its authorization.  The parties will notify the date(s) to the Geneva Civil Court. The Parties expect the Commissioners, if authorized, would seek to collect the identified evidence on or about September 11-15, 2017.

## II.     OTHER REQUIREMENTS

### A.     Fees and Costs

Plaintiffs are responsible for reasonable copy costs and charges associated with the processing and handling of this request by the Geneva Civil Court.

For the purpose of determining the court fees, the parties estimate the amount in dispute to be in excess of USD 70 million.

### B.     Reciprocity

This Court expresses its sincere willingness to provide similar assistance to the courts of the Swiss Confederation, if future circumstances so require.

## III.     CONCLUSION

This Court, in the spirit of comity and reciprocity, hereby requests international judicial assistance in the form of this Letter of Request seeking information, testimony, and things described herein, from the Geneva Civil Court. This Court extends to all judicial and other authorities of the Swiss Confederation the assurances of its highest consideration.

Date: _____          _____
                                    The Honorable Alison J. Nathan
                                    United States District Court for the

13

Southern District of New York
Thurgood Marshall United States Courthouse
500 Pearl Street, Room 1620
New York, New York 10007-1312

SEAL OF THE UNITED STATES DISTRICT
COURT FOR THE SOUTHERN DISTRICT OF
NEW YORK

# Exhibit A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CF 135 FLAT LLC, CF 135 WEST MEMBERS LLC and THE CHETRIT GROUP, LLC, | ) ) ) Case No. 15-cv-05345-AJN ) ) |
| Interpleader Plaintiffs, | ) ) |
| -against- | ) **AMENDED CROSSCLAIMS** ) |
| TRIADOU SPV S.A., CITY OF ALMATY, a foreign city, and BTA Bank, | ) ) ) |
| Interpleader Defendants. | ) ) ) |
| CITY OF ALMATY, KAZAKHSTAN and BTA BANK, | ) ) ) ) |
| Crossclaim Plaintiffs, | ) ) |
| -against- | ) ) |
| MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, TRIADOU SPV S.A., AND FBME BANK LTD., | ) ) ) ) ) ) |
| Crossclaim Defendants. | ) |

# **Table of Contents**

INTRODUCTION ................................................................................................... 1

THE PARTIES ....................................................................................................... 5

JURISDICTION AND VENUE ............................................................................. 6

FACTUAL BACKGROUND .................................................................................. 8

    *Mukhtar Ablyazov Defrauded BTA Bank of in Excess of $6 billion.* ................................. 8

    *Viktor Khrapunov Defrauded the City of Almaty of Approximately $300 million.* .......... 13

    *The Khrapunovs and Ablyazov Join Together to Launder Their Stolen Money.* .............. 15

    *The Ablyazov-Khrapunov Group Conspires to Transfer and Hide Illicit Funds in the United States.* ........................................................................................ 21

    *Through SDG, the Ablyazov-Khrapunov Group Creates Triadou to Hide their Illicit Funds in New York Real Estate Transactions with the Chetrit Group.* ........................... 22

    *Kazakh Authorities Target the Ablyazov-Khrapunov Group's Holdings in the United States, and the Ablyazov-Khrapunov Group Liquidates Those Assets at Below-Market Value with the Chetrit Group's Assistance.* ........................................ 30

FIRST CAUSE OF ACTION ................................................................................ 33

    *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)) Against All Defendants*

SECOND CAUSE OF ACTION ........................................................................... 38

    *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)) Against All Defendants*

THIRD CAUSE OF ACTION ............................................................................... 40

    *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(a)) Against All Defendants*

FOURTH CAUSE OF ACTION ............................................................................ 41

    *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c)) Against All Defendants*

FIFTH CAUSE OF ACTION ................................................................................ 42

    *(VIOLATIONS OF RICO, 18 U.S.C. § 1962(d)) Against All Defendants*

SIXTH CAUSE OF ACTION ............................................................................... 43

    *(ACTUAL FRAUDULENT TRANSFER) Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

SEVENTH CAUSE OF ACTION ......................................................................... 44

    *(CONSTRUCTIVE FRAUDULENT TRANSFER) Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

EIGHTH CAUSE OF ACTION ............................................................................ 45

    *(UNJUST ENRICHMENT) Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

NINTH CAUSE OF ACTION ................................................................................. 46

    *(CONVERSION) Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

TENTH CAUSE OF ACTION ................................................................................. 46

    *(CONSTRUCTIVE TRUST) Against All Defendants*

ELEVENTH CAUSE OF ACTION ......................................................................... 47

    *(PURSUANT TO CPLR § 5239 FOR FRAUD AND CONVERSION) Against All Defendants*

TWELFTH CAUSE OF ACTION ........................................................................... 48

    *(PURSUANT TO CPLR § 5303 FOR RECOGNITION AND ENFORCEMENT OF A FOREIGN JUDGMENT UNDER NEW YORK LAW) Against Defendant Ablyazov*

THIRTEENTH CAUSE OF ACTION ...................................................................... 49

    *(AIDING AND ABETTING) Against Defendant FBME*

DEMAND FOR JURY TRIAL ............................................................................... 50

DEMAND FOR RELIEF ........................................................................................ 50

Crossclaim Plaintiffs City of Almaty ("Almaty") and BTA Bank ("BTA" or "BTA Bank," and together with Almaty, the "Kazakhstan Plaintiffs"), by and through their undersigned counsel, for the Kazakhstan Plaintiffs' crossclaims against Defendants Triadou SPV S.A., Viktor Khrapunov, Mukhtar Ablyazov, Ilyas Khrapunov, and FBME Bank Ltd. (collectively the "Ablyazov-Khrapunov Group") allege as follows:

## <u>INTRODUCTION</u>

1.      Joseph Chetrit ("Chetrit") is a well-known New York based real estate developer, who, along with crossclaim defendants Mukhtar Ablyazov ("Ablyazov"), Victor Khrapunov, Ilyas Khrapunov and others known and unknown, combined, conspired, and confederated in the commission of an international scheme to launder and conceal at least $40 million stolen from the Kazakhstan Plaintiffs.  Chetrit conspired with these international criminals by, among other things, partnering with Triadou SPV S.A. ("Triadou"), a nominee entity owned, controlled, and funded by the Ablyazov-Khrapunov Group, for the purposes of converting the stolen funds into valuable New York City real estate.

2.      BTA, a bank based in Almaty, Kazakhstan, seeks to regain assets looted by its former Chairman, Mukhtar Ablyazov, who abused his position to enrich himself and treat BTA as his personal property.  BTA has commenced and successfully obtained judgments in proceedings against Ablyazov in the courts of the United Kingdom for defrauding BTA Bank of no less than $4 billion.

3.      Almaty, the largest city in the Republic of Kazakhstan, seeks to regain assets looted by its former mayor, Victor Khrapunov ("Khrapunov"), and his family and co-conspirators, to be returned for the benefit of the people of Almaty.  Khrapunov abused and corrupted his position as the mayor of Almaty for the purposes of embezzlement, fraudulent self-

dealing, and blatant looting of public assets.  He reaped an estimated $300 million or more through various fraudulent activities, including rigged auctions, the improper sale of public property to  friends and co-conspirators, and fraudulent abuse of eminent domain powers, before fleeing Kazakhstan and   secreting these stolen funds across the globe.

4.        The Khrapunovs and Ablyazov, both fighting law enforcement investigations and asset seizures by Kazakh authorities, joined forces and commingled their stolen funds.  Through joint investments across the globe, the two renegade families combined and conspired to launder their illicit wealth into real estate, energy assets, and other investments in locales they deemed safe from seizure.  Ilyas Khrapunov, related by marriage to Ablyazov, helped orchestrate these efforts and steered the families' joint investments into assets within this Court's jurisdiction.

5.        The Ablyazov-Khrapunov Group's money laundering schemes relied heavily on the cooperation of officers within FBME Bank, Ltd ("FBME"), a Tanzanian-incorporated financial institution operating primarily out of the Republic of Cyprus. Until 2014, FBME had long been known as a financial institution open for business to money launderers and international criminals. FBME joined the Ablyazov-Khrapunov Group's money laundering conspiracy by knowingly aiding the Ablyazov-Khrapunov Group's members in hiding and laundering funds and evading asset freezes and investigations. In 2014, FBME was designated a "foreign financial institution of primary money laundering concern" and effectively banned from the legitimate international financial system by the Financial Crimes Enforcement Network ("FinCEN") of the U.S. Department of the Treasury, a decision subsequently described by FBME as a "death sentence."

6.        Collectively, the Ablyazov-Khrapunov Group has been the subject of numerous proceedings and investigations across the globe, arising from their theft of billions of dollars from

entities and municipalities in the Republic of Kazakhstan.  They have sought to hide their stolen wealth from investigators and law enforcement through a vast network of shell corporations and outwardly-legitimate investments, including major New York real estate developments such as the Flatotel and Cabrini Medical Center condominium conversions.  Through these investments, the Chetrit Group allied itself with the Ablyazov-Khrapunov Group and their global money laundering endeavor.

       7.      The Ablyazov-Khrapunov Group laundered their ill-gotten assets through a number  of shell corporations, including Triadou.  With the help of Chetrit and the Chetrit Group, the  Ablyazov-Khrapunov Group parked these corrupt assets in New York City real estate, hoping to  avoid the scrutiny of escalating international investigations into the Ablyazov-Khrapunov Group's  illicit activities.

       8.      Due to heavy scrutiny by international law enforcement, including criminal investigations by the Kazakh and Swiss authorities, the funds that the Ablyazov-Khrapunov Group, through Triadou, invested into the Flatotel and Cabrini Medical Center projects could not pass through legitimate banking channels.  The Crossclaim Defendants devised a plan to circumvent legitimate banks and transfer funds directly from the Ablyazov-Khrapunov Group's offshore accounts with FBME to the escrow account of the Chetrit Group's long-time attorneys.

       9.      In return for facilitating the Ablyazov-Khrapunov Group's money laundering scheme, the Chetrit Group got access to the stolen funds to fund its real estate projects, and entered into deals that entitled the Chetrit Group to a disproportionate share of the projects' profits.

       10.      Due to concern that he was partnering with reputed international criminals, however, Chetrit conducted his communications with the Ablyazov-Khrapunov Group by using

code names.  For example, Chetrit used code names such as "Jose" and "Pedro" to refer to and communicate with crossclaim defendant Ilyas Khrapunov.  It was only in face-to-face meetings, many of which were secretly recorded, that Ablyazov's involvement, legal difficulties and incarceration were openly discussed.

11.     Ultimately, Almaty and BTA Bank were able to trace the stolen assets to the United States.  Rather than let Almaty and BTA reclaim their rightful property, the Ablyazov-Khrapunov Group, through Triadou, began to urgently liquidate their real estate holdings, hoping to spirit their illicit funds to more permissive locales.  In an attempt to monetize the Ablyazov-Khrapunov Group's real estate interests as quickly as possible, Triadou entered into a fraudulent, below-market assignment with the Chetrit Group for Triadou's principal New York assets, interests in the Flatotel and Cabrini Medical Center real estate developments.

12.     Specifically, in May 2014, the City of Almaty filed an action in federal court in California against members of the Ablyazov-Khrapunov Group.  With the Kazakhstan Plaintiffs' collection efforts having expanded to the United States, and with the Ablyazov-Khrapunov Group in imminent danger of having its stolen assets seized or attached, the Ablyazov-Khrapunov Group, through Triadou, took immediate steps to liquidate its U.S. assets and move its money offshore again. The Chetrit Group's assistance was essential to placing the stolen assets out of the reach of the Kazakhstan authorities.

13.     Upon information and belief, Chetrit seized on this opportunity to double cross his co-conspirators.  Understanding that the potential asset seizures or restraints put the Ablyazov-Khrapunov Group in a desperate situation, he devised scheme to acquire Triadou's investments for a fraction of their value.  To achieve this result, Chetrit bribed Triadou's Director to drive down the purchase price of the assignment.  The Chetrit Group ultimately succeeded in acquiring

Triadou's interest in both the Flatotel and Cabrini properties for as little as $26,000,000.00 — far less than even what Triadou had originally invested — at a time when real estate values in New York were at an all-time high.

14.     Almaty and BTA Bank now seek, among other relief, to unwind and recover the proceeds of these fraudulent transactions.  Doing so will hold  the Crossclaim Defendants liable for their corruption and fraud, and  return the full value of Triadou's New York assets to their rightful owners: BTA Bank and the City of Almaty.

## THE PARTIES

15.     Crossclaim plaintiff Almaty is a legal subdivision of the Republic of Kazakhstan. Almaty is the former capital of the country, and continues to be the largest city in the Republic of Kazakhstan, with more than 1.5 million residents.

16.     Crossclaim plaintiff BTA Bank is a Joint Stock Company and Kazakhstan bank with its headquarters in Almaty, Kazakhstan.  Until in or about September 2014, BTA Bank was majority owner and controlled by the Republic of Kazakhstan.

17.     Crossclaim defendant Triadou SPV S.A. is a special purpose  investment vehicle incorporated under the laws of Luxembourg, with a principal place of business at  3, Rue du Mont-Blanc, 1201 Geneva, Switzerland.  Triadou SPV S.A. is wholly-owned by SDG Capital S.A.

18.     Crossclaim defendant Viktor Khrapunov, an individual, is the former  Mayor of the City of Almaty, who, upon information and belief, currently resides in the  city of Geneva, Switzerland.

19.     Crossclaim defendant Mukhtar Ablyazov, an individual, is the former Chairman of BTA Bank and has been found liable for defrauding BTA of in excess of $6 billion.  Ablyazov

was the subject of eleven proceedings commenced by BTA Bank in the United Kingdom to recover assets Ablyazov stole.  During those proceedings, Ablyazov was found by multiple international courts to have lied, misled, misconstrued, and concealed assets in blatant disregard of Court orders, and was ordered imprisoned for 22 months.  During these proceedings, Ablyazov fled the United Kingdom to avoid the many judgments against him.  He is currently incarcerated in France pending extradition to Russia or Ukraine.

20.     Crossclaim defendant Ilyas Khrapunov, an individual, is the son of Viktor Khrapunov, as well as the former president of SDG Capital S.A., who, upon  information and belief, currently resides in the city of Geneva, Switzerland.  Ilyas Khrapunov is married to Ablyazov's daughter, Madina.

21.     Crossclaim defendant FBME Bank Ltd. is a financial institution headquartered in Dar es Salaam, Tanzania and operating primarily out of Cyprus. FBME is jointly owned by Ayoub-Farid Saab and Fady Saab, but is currently controlled and administered by representatives of the Central Bank of Cyprus.

## JURISDICTION AND VENUE

22.     The Crossclaims are brought under Rule 13 of the Federal Rules of Civil Procedure.  This Court has subject matter jurisdiction under 28 U.S.C. §  1331 and 18 U.S.C. § 1964(c) over the claims for relief alleging violations of the  federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§  1961 et seq. and for conspiracy to violate RICO.   This Court has supplemental jurisdiction  over the sixth through thirteenth claims for relief pursuant to 28 U.S.C. § 1367, as those  claims are substantially related to Almaty's and BTA Bank's claims under RICO and arise from a common  nucleus of operative facts, and thus they form part of the same case or controversy under  Article III of the United States Constitution.

23.     Alternatively, this Court has supplemental jurisdiction over Almaty's and BTA Bank's claims under 28 U.S.C. § 1367, as those claims are substantially related to the original interpleader suit brought by Chetrit and arise from a common nucleus of operative facts, and thus they form part of the same case or controversy under Article III of the United States Constitution.

24.     Alternatively, the City of Almaty is a "foreign state" as that term is defined in 28 U.S.C. § 1603, and this Court has jurisdiction over Almaty's and BTA Bank's claims under 28 U.S.C. §§ 1330, 1441(d), which provide for the removal of any civil action brought in a State court against a foreign state.

25.     Alternatively, this Court has diversity jurisdiction under 28 U.S.C. § 1332(a) because at the time this action was filed (i) there was complete diversity of citizenship between the parties, and (ii) more than $75,000, exclusive of interest and costs, is at stake.

26.     Venue is proper in this District and before this Court pursuant to 28 U.S.C. § 1391(b)(2) because events giving rise to Almaty's and BTA Bank's claims occurred in this District, including, among other things, the negotiation, investment and subsequent transfer of interest in the Flatotel and Cabrini Medical Center properties located in New York, New York.

27.     This Court has personal jurisdiction over Triadou, Ablyazov, Viktor Khrapunov, Ilyas Khrapunov, and FBME because each of them knowingly committed acts in New York that form the basis of this action, directed or conspired with others to commit acts in New York, and/or purposely availed themselves of the privileges of doing business in New York, as fully set forth herein.

## FACTUAL BACKGROUND

### *Mukhtar Ablyazov Defrauded BTA Bank of in Excess of $6 billion.*

28.     Ablyazov was the Chairman of BTA Bank from May 2005 until February 2009.
He is the father-in-law of crossclaim defendant Ilyas Khrapunov, who is married to Ablyazov's
daughter, Madina.  Along with crossclaim defendant Viktor Khrapunov, Ablyazov is a central
member of the Ablyazov-Khrapunov Group money laundering and embezzlement conspiracy.

29.     As the Courts of the United Kingdom have found, while Chairman of BTA Bank,
Ablyazov exercised virtually unfettered control over the bank's operations while hiding that
control from Kazakhstan's banking regulators, and used this influence to treat BTA's assets as his
own. As Justice Teare of the High Court of England and Wales (Commercial Court) found:

> [P]rior to the nationalisation of the Bank in February 2009, Mr. Ablyazov admitted
> to owning over 75% of the shares in the Bank. Those shares were not held by Mr.
> Ablyazov personally but by nine companies on his behalf. However, Mr. Ablyazov
> did not admit that ownership to the AFN, the banking regulator in Kazakhstan. In
> January 2009, shortly before the nationalisation of the Bank, the AFN requested
> Mr. Ablyazov to state whether he owned more than 10% of the shares in the Bank.
> He replied on 19 January 2009 that he did not own directly or indirectly more than
> 10% of the shares in the Bank. That statement was untrue.
>
> . . .
>
> Banks in Kazakhstan tend to be operated in a different manner from that in which
> they are typically operated in the West. It is common for banks to be owned by a
> single shareholder who is both chairman of the board of directors and also closely
> involved in the management of the bank. He therefore has considerable influence
> over the operation of the bank. Mr. Ablyazov's relationship with the Bank
> conformed with this general description of Kazakh banking practice. Thus Mr.
> Talvitie, the independent member of the Board of Directors of the Bank from East
> Capital, gave evidence that it seemed to him that at board meetings Mr. Ablyazov
> had already made the decisions. He described the other members of the board as
> "straw men". Others in the Bank, below board level, had the same impression.
> Thus Ms. Tleukulova (a member of the Credit Committee) gave evidence in
> Russia in 2012 that "all top managers of the bank, including Board Members, have
> to obey him". Mr. Khazhaev also gave evidence in Russia in 2012 that Mr.
> Ablyazov was "the main" person in the Bank who controlled the granting of the
> largest and most important loans. Mr. Ablyazov's control of the Bank is illustrated
> by his issue of an order ("the Ablyazov Order") whereby he, as Chairman,
> amended certain procedural rules governing the grant of loans.

. . .

[O]fficers and staff in the Bank did not draw a clear distinction between the Bank having an interest in a project and Mr. Ablyazov, as shareholder in the Bank, having a personal interest in a project. Thus [Deputy Chairman] Zharimbetov, when being crossexamined, failed to draw a clear distinction, in the context of the offshore companies with which he dealt, between Mr. Ablyazov and the Bank. Thus the unfortunate reality appears to have been that little, if any, distinction was drawn by personnel in the Bank between the Bank's property and Mr. Ablyazov's property. The Vitino port project was an example of that reality. Mr. Khazhaev told a Russian court in 2012 that Mr. Ablyazov treated the Bank as his property.

30.     Ablyazov's abuse of his position as chairman took many forms, principally through enormous loans to valueless entities owned by Ablyazov, which would then be obscured by transfers among different shell corporations, and never repaid.

31.     For example, in one series of loans (referred to as the "Original Loans" by the UK court in the "Granton Action"), between March 2006 and August 2008, Ablyazov directed twenty loans totaling $1,428,840,000 to entities with minimal assets and for no apparent reason.  These loans were made to entities outwardly unaffiliated with Ablyazov ("Original Borrowers"), but were actually transferred to entities controlled by Ablyazov ("Original Real Borrowers").  As the UK court found:

Mr. Ablyazov did not disclose to the Board that he owned or controlled those [Original] Borrowers. He has never claimed that he did so and there is no evidence that he did. None of the represented Defendants has suggested that he did. In those circumstances there can be only one explanation for the fact that the very large sums of money which were advanced were immediately transferred to companies owned or controlled by Mr. Ablyazov, namely, that the Original Loans were part of a dishonest scheme whereby Mr. Ablyazov sought to misappropriate monies which belonged to the Bank. The scheme was fraudulent because Mr. Ablyazov did not disclose to the Board his interest in the Original Borrowers or that the real purpose of the loans was to pay out the Bank's money to the Original Real Borrowers who were to use the monies for Mr. Ablyazov's purposes. The purpose of such nondisclosure must have been to deceive the Board so that it remained in ignorance of the "related party" nature of the Original Loans and of their true purpose.

32.     When, in or about 2008, Ablyazov's involvement in the Original Loans was in

danger of discovery, he directed that additional fraudulent loans be made in an attempt to cover up his earlier fraud.

33.     Between November 4, 2008, and December 4, 2008 a number of loans (the "Later Loans") totaling $1,031,263,000 were made, ostensibly for the purchase of oil and gas resources. The UK court, however, found it "beyond argument" that these loans of BTA funds were made only to hide Ablyazov's earlier theft:

> The Later Loans were made between 5 November and 8 December 2012 but they were paid out, not to the Later Borrowers, but to Intermediaries who paid them on to other companies, the Recipients, who in turn paid them to the Bank in apparent discharge of the Original Loans. They were not used for the purchase of oil and gas equipment. Documents said to support and evidence the Later Loans were created after the monies had been paid out by the Bank but backdated. Thus contracts for the purchase of oil and gas equipment supposedly by the Later Borrowers were still being prepared in late November 2008 and backdated to 23 October 2008.
>
> . . .
>
> Expert evidence as to the oil and gas industry was adduced by the Bank to establish that the oil and gas contracts were shams because of the lack of specific provisions which would be appropriate for contracts of their size. But such evidence was unnecessary. The email evidence shows that the contracts were prepared by persons within the Bank.
>
> . . .
>
> It is beyond argument that the Later Loans were a mere cloak which sought to hide from view the reality, which was that money was being extracted from the Bank for the purpose of paying back the Original Loans. Since this circular exercise benefitted Mr. Ablyazov (because he owned or controlled the Original Borrowers) it is also clear that he must have orchestrated or, at the least, authorised this fraud.

34.     As a result of Ablyazov's siphoning billions out of the company, in 2009, BTA Bank defaulted on billions of dollars of debt held by investors including Credit Suisse Group AG, HSBC Holdings Plc, JPMorgan Chase & Co. and Royal Bank of Scotland Group Plc. Kazakhstan's sovereign wealth fund, Samruk-Kazyna, was forced to take control of BTA Bank, and Ablyazov fled to London.

35.     BTA then commenced the first in a series of lawsuits against Ablyazov, claiming that he had misappropriated approximately $295,000,000 pursuant to this fraudulent scheme. Other proceedings followed against Ablyazov in the Chancery Division and England High Court. In every proceeding, BTA alleged (and ultimately proved) that Ablyazov treated BTA as his own private source of funds.  In all, BTA commenced eleven proceedings against Ablyazov and his lieutenants for defrauding BTA in excess of $6 billion.  The UK courts took the unprecedented legal step of granting BTA a Worldwide Freezing Order over Ablyazov's assets.

36.     As part of these UK proceedings, in late 2010 BTA obtained a number of search and disclosure orders that uncovered a vast network of undisclosed companies and assets used by Ablyazov to hold and invest his stolen wealth.  The UK courts ordered Ablyazov's assets to be put in the receivership of the accounting firm KPMG (the "Receivership Order"), finding that Ablyazov had breached various disclosure and freezing orders against him.  The Receivership Order gave the receiver the right to recover a network of many hundreds of entities, worth billions of dollars.

37.     On January 26, 2011, a further 212 companies were added to the scope of the Receivership Order and on April 8, 2011, a further 3,890 companies were added.

38.     After Ablyazov defied the Receivership Order entered by the UK courts, BTA obtained judgments and sanctions against him for, among other acts, flaunting court orders, fleeing and hiding from judicial proceedings, lying during proceedings, and refusing to comply with orders directing him to uncover assets.  For his numerous actions in contempt of court, Ablyazov was sentenced to 22 months imprisonment for his conduct.

39.     On February 16, 2012, despite having promised the court his attendance at his contempt hearing, Ablyazov did not appear.  Ablyazov left behind a 100-acre estate in the English

countryside and a London mansion, valued at least 20 million pounds sterling (approximately $31 million) each, and no fewer than 750 shell companies used to invest his stolen funds in oil production, property development, and agriculture.

40.     On November 6, 2012, the Court of Appeal unanimously upheld the judgments and contempt orders against Ablyazov.  Concurring in the judgment, Lord Justice Maurice Kay stated that it was "difficult to imagine a party to commercial litigation who has acted with more cynicism, opportunism and deviousness towards court orders than Mr. Ablyazov."

41.     Following Ablyazov's flight from justice, BTA has been granted judgments in 5 of the 11 claims against Ablyazov and his associates, with others still pending, and has been awarded over $4 billion in damages by the UK courts, with interest continuing to accrue. (the "Ablyazov Judgments").

42.     After a global search spearheaded by BTA Bank, French special forces found and arrested Ablyazov in a luxury villa in France on July 31, 2013.  He remains detained in a French prison pending extradition, and the courts of France have refused to release him on bail three times.

43.     Following Ablyazov's capture and imprisonment, through his counsel and other channels, Ablyazov remained in regular communication with his son-in-law, Ilyas Khrapunov, who assumed operational control of much of Ablyazov's money laundering operations and, in concert with Ablyazov and Viktor Khrapunov, has continued the Ablyazov-Khrapunov Group's combined efforts to hide their wealth.

44.     Ilyas Khrapunov's continuing role in facilitating the Ablyazov-Khrapunov Group's money laundering efforts was confirmed on July 17, 2015, when Justice Males of the Commercial Division of the Queen's Bench of the U.K. High Court of Justice expanded the

freezing order against Ablyazov to encompass specified assets of Ilyas Khrapunov. In response to the disclosure obligations imposed by the freezing order, Ilyas Khrapunov invoked his privilege against self-incrimination.

### *Viktor Khrapunov Defrauded the City of Almaty of Approximately $300 million.*

45.     In 1991, the Republic of Kazakhstan declared its independence from the former Soviet Union and began the process of transitioning from communism to an open market economy.  This transition required substantial privatization of vast state assets in order to restart the nation's economy and raise revenue for improvements to the nation's infrastructure and public services.

46.      Viktor Khrapunov became mayor of the City of Almaty on or about June 16, 1997, and remained in that position until approximately December 2004.  At the time Viktor Khrapunov took office, the Republic of Kazakhstan was experiencing the beginning of a natural resources boom and accompanying drive for investment, infrastructure upgrades, and new construction.  Almaty was the nation's former capital and largest city, and held enormous public assets remaining to be privatized and developed, a responsibility which the office of the mayor oversaw and directed.

47.     Before Viktor Khrapunov assumed the office of the mayor of Almaty, he took an oath of office to obey the Constitution and laws of the Republic of Kazakhstan.  Among other things, he expressly and impliedly promised that he would uphold his fiduciary duties to the people of Almaty, would honor his obligation to provide honest services, and would not convert money, property, or assets belonging to the City of Almaty for his own use or that of his family, friends, or associates.

48.     In reality, Viktor Khrapunov, along with his son, Ilyas Khrapunov, and other

13

Khrapunov family members and co-conspirators, almost immediately began a multi-year scheme to enrich themselves through the corrupt abuse of Khrapunov's public position as mayor.

49.     Viktor Khrapunov repeatedly and systemically used the powers of the office of the mayor to transfer public assets belonging to the City of Almaty to his family and their co-conspirators for prices that were a fraction of their fair value.  This  was often achieved by arranging fraudulent auctions to ensure that interested bidders won  these assets at nominal prices.  In other instances, Viktor Khrapunov used the  eminent domain powers of the office of the mayor to seize private property ostensibly for  the City of Almaty, but then promptly transferred that property to entities owned or  controlled by the Khrapunovs.  They would then pass these assets through a series  of shell or holding corporations to conceal the destination of these assets, before reselling  them for prices an order of magnitude greater than what they had paid the City of  Almaty.

50.     Three examples of these corrupt schemes to subvert and acquire the public property of the City of Almaty follow:

*Transaction One*

51.     In or about 2000, Viktor Khrapunov used his position as mayor of Almaty  to transfer a large tract of state-owned land near the two rivers area of Almaty to his  spouse and co-conspirator, Leila Khrapunov, for a total price of approximately $121,000.  The final recipient of this transfer was concealed through a series of fraudulent transactions and front  companies controlled by the Khrapunovs.  The Khrapunovs ultimately resold  this parcel of real estate for an estimated $15.57 million, a more than $15 million profit  on one interested transaction.

52.     In short, the Khrapunovs paid approximately $121,000 for a parcel of  public real estate which they later resold for a total of $15.57 million; a 128,000 percent  profit.

*Transaction Two*

53.     On or about April 16, 2001, Viktor Khrapunov used his position as mayor to cause a public building in Almaty to be sold at a fixed and rigged public auction to KRI, a company owned by Leila Khrapunov, for approximately $347,000.  The property was ultimately resold to an unrelated third party for approximately $4.1 million.

*Transaction Three*

54.      In addition to the sale of state-owned assets to Leila  Khrapunov and other family members and co-conspirators, Viktor Khrapunov also  abused his authority as mayor to enrich the Khrapunovs by seizing privately-owned property and transferring it to the Khrapunovs and others for resale.  For example, on or  about August 25, 2003, Viktor Khrapunov caused the City of Almaty to seize land owned  by privately-owned third party Shadid Engineering LLP.  Approximately one month  later, he caused the property to be sold to Leila Khrapunov's company, Karasha, for  approximately $105,000.  Leila Khrapunov then caused Karasha to sell the property  directly to her, whereupon she transferred it to another company, BSC, and it was sold as part of BSC to an  unrelated third party, in a transaction that valued the parcel at approximately $2 million.  As a result, the Khrapunovs obtained nearly $1.9 million in unjustified profit.

55.     In short, through similar transactions uncovered and  still under investigation, the Khrapunovs are estimated to have illegally acquired at  least 80 pieces of real estate, which they converted into approximately $300 million in  illicit funds.

**The Khrapunovs and Ablyazov Join Together to Launder Their Stolen Money.**

56.     Seeking to avoid law enforcement attention and possible seizure of this ill-gotten wealth, the Ablyazov-Khrapunov Group funneled their corrupt assets into real estate and development entities located in, among other places, the United States and Switzerland.

57.     Among other locations, the Ablyazov-Khrapunov Group transferred their stolen funds to Switzerland,  where Ilyas Khrapunov and Madina Ablyazov reside, using accounts and sham entities owned or ultimately  controlled by the Ablyazov-Khrapunov Group.  The Ablyazov-Khrapunov Group ultimately transferred to  Switzerland hundreds of millions of dollars, moved out of Kazakhstan by  Viktor Khrapunov and laundered through offshore holding companies to appear  legitimate.

58.     Seeking to hide the proceeds of their frauds, the Ablyazov-Khrapunov Group created a series of entities in Switzerland and overseas to launder these illicit funds into outwardly-legitimate investments.  One such entity was Swiss  Development Group, formally SDG Capital S.A., formed and controlled by Ilyas  Khrapunov for the benefit of the Ablyazov-Khrapunov Group.  Between 2008 and 2012, the  Ablyazov-Khrapunov Group and sham companies they controlled funneled at least $115 million  into SDG derived from the Ablyazov-Khrapunov Group's self-dealing and fraud.

59.     Through these foreign investment vehicles, the Ablyazov-Khrapunov Group sought  to obscure their wealth from law enforcement in the Republic of Kazakhstan and abroad, by maintaining the appearance of a modest family of civil servants.

60.     The Ablyazov-Khrapunov Group took numerous steps to maintain this facade and  conceal their looting of the City of Almaty's public assets from authorities.  Among other schemes,  Viktor Khrapunov regularly filed false annual tax returns with Kazakhstan's  taxation authority, the Tax Committee of the Ministry of Finance of Kazakhstan.  The false returns concealed millions of dollars in monies, properties, and assets the  Ablyazov-Khrapunov Group had acquired and laundered through their corrupt enterprise.

61.     For example, according to their 2007 tax returns, which required Viktor  and

Leila Khrapunov to list their entire net worth accumulated through all sources as of December 31, 2007, Viktor Khrapunov reported a combined net worth equivalent to $113,298, in addition to three vehicles, five modest pieces of real estate, and two parking stalls. While claiming to have a total net worth of less than $120,000, Viktor Khrapunov had in fact amassed a fortune estimated at no less than $300 million. Indeed, according to public news reports, in 2009 Viktor Khrapunov was one of the richest people in Switzerland with a fortune of over $300 million. Similarly, in 2012 Viktor Khrapunov was again listed among Switzerland's 300 richest people, with a fortune estimated at $324–$432 million.

### The Ablyazov-Khrapunov Group's Corruption is Exposed and Investigations Begin in Kazakhstan and Switzerland

62.     In late 2007, Viktor Khrapunov was tipped off that the Kazakh government had begun investigating the financial dealings of the Ablyazov-Khrapunov Group and their associates for a range of criminal acts and self-dealing. In anticipation of possible criminal charges, on or about November 9, 2007, Viktor and Leila Khrapunov boarded a private jet and fled Kazakhstan for Switzerland, where Ilyas Khrapunov and Madina Ablyazov resided, and the bulk of their looted funds were held.

63.     On or about May 27, 2011, the Investigation Department of the Agency for Economic and Corruption-Related Crimes of Kazakhstan (the "Investigation Department") filed two criminal cases against Viktor Khrapunov for abuse of power and fraudulent acts, and on or about July 21, 2011, obtained a court-ordered arrest warrant for Viktor Khrapunov. Through 2011 and 2012 additional charges were brought in Kazakhstan against Viktor, Leila, and Ilyas Khrapunov, arising from the theft of public property and the ultimate laundering of funds during Viktor Khrapunov's tenure as Mayor of Almaty.

64.     On or about February 20, 2012 and September 14, 2012, the Investigation

Department applied to the Federal Office of Justice in Switzerland for legal assistance in connection with the effort to prosecute Viktor, Leila, and Ilyas Khrapunov for crimes in Switzerland and Kazakhstan relating to their corrupt acts in Almaty and the laundering of the resulting funds. In response to this request, in mid-2012 the Public Prosecutor of Geneva opened an investigation into the Ablyazov-Khrapunov Group on suspicion of violating Swiss money laundering laws. The Public Prosecutor of Geneva subsequently seized financial and banking documents from the Ablyazov-Khrapunov Group and ordered Swiss accounts and assets belonging to them be frozen, including accounts held at Swiss banks Sarasin & Co. Ltd., Credit Suisse, and Schroeder & Co. This investigation by the Swiss authorities is ongoing, and in August 2013 the Public Prosecutor of Geneva froze additional assets belonging to the Ablyazov-Khrapunov Group.

65.     At this time, in addition to the numerous judgments against Ablyazov in the United Kingdom, there are no less than 24 criminal charges pending against Viktor Khrapunov in Kazakhstan for embezzlement, fraud, money laundering, establishing and directing an organized criminal group for criminal purposes, abuse of power, and bribery. There are additional charges pending against Leila Khrapunov and Ilyas Khrapunov in Kazakhstan for, among other offenses, money laundering and establishing and directing an organized criminal group for criminal purposes. Assets of the Ablyazov-Khrapunov Group remain frozen by Swiss authorities, and the Government of the Republic of Kazakhstan has formally requested extradition of Viktor Khrapunov.

66.     Despite the numerous investigations and freezing orders against the members of the Ablyazov-Khrapunov Group, the conspirators continue to launder their commingled stolen wealth through acts of fraud and in furtherance of the conspiracy.

67.     As one example, from 2011 through the present, members of the Ablyazov-Khrapunov Group, including Ilyas Khrapunov and Ablyazov himself, conspired to fund Ablyazov's widespread global legal campaign with laundered funds, despite global freezing and receivership orders against Ablyazov's assets.

68.     In May of 2011, two entities that Ablyazov had been using to fund his various litigations were put in receivership, based on findings that they were not arms-length lenders, but in fact controlled and funded by Ablyazov himself. Deprived of a funding source, Ablyazov conspired with other members of the Ablyazov-Khrapunov Group to circumvent the receivership and freezing orders against him and began funding his litigation – including litigation against the Republic of Kazakhstan – through loans from a series of shell companies, including the Belizean-registered entity Green Life International SA ("Green Life").

69.     The conspirators represented to the U.K. receivers and courts that Green Life was an arms-length entity owned and funded by Gennady Petelin, but did not disclose that Petelin was related by marriage to the Ablyazov and Khrapunov families.

70.     In fact, Green Life was one more in a long series of shell entities used by the Ablyazov-Khrapunov Group to launder their stolen funds. At Ablyazov's direction, Ilyas Khrapunov and other members of the Ablyazov-Khrapunov Group transferred millions of dollars in funds from accounts controlled by the Ablyazov-Khrapunov Group through Petelin and Green Life to Ablyazov's counsel. To obscure this scheme, all funds were transferred from Green Life to Chabrier Avocats, the Swiss counsel for the Khrapunov family and SDG, before being paid to Ablyazov's counsel.

71.     Using Petelin's name to deter suspicion, the conspirators were able to launder and spend millions of dollars in stolen funds that should rightly have been placed in receivership.

72.     The use of Petelin as a front for Ablyazov shell corporations such as Green Life was based in part on the close relationship between Petelin and Viktor Khrapunov. Viktor Khrapunov, whose daughter is married to Petelin's son, collaborated with Petelin on investments of the Ablyazov-Khrapunov Group's funds in Russia, where Petelin resided and had an extensive network of contacts. For example, in 2013, Viktor Khrapunov engaged in discussions with Petelin for the purpose of utilizing Petelin's contacts in Russia to facilitate the investment of the Ablyazov-Khrapunov Group's funds in Russian oil and energy assets.

73.     As another example of the Ablyazov-Khrapunov Group's continuing operations, members of the Ablyazov-Khrapunov Group hired computer hackers to illegally surveil French prosecutors and other public officials in an effort to free Ablyazov from French prison.

74.     Ablyazov was arrested by French special forces in 2013 after fleeing the U.K., but has remained in continuous contact with his coconspirators during his imprisonment. During his incarceration, Ablyazov directed his coconspirators, and his son-in-law Ilyas Khrapunov in particular, to use an array of unlawful means to secure his release.

75.     At Ablyazov's direction, in 2013 Ilyas Khrapunov hired a "black hat" computer security group to hack into the personal and work communications of numerous French public officials, including the prosecutors in Ablyazov's French extradition proceedings. Without permission and in violation of law, these hackers successfully breached the computers and mobile phones of numerous French law enforcement and justice officials, intercepted their electronic communications, and installed malicious software permitting them to remotely activate the microphones on these public officials' mobile phones to eavesdrop on and record their conversations. The hackers then transmitted French officials' intercepted communications, including emails, text messages, documents, and photographs, to Ilyas Khrapunov, who shared

and discussed this illegally-obtained surveillance with Ablyazov himself. Ablyazov then used this information as part of his legal campaign to avoid extradition.

76.     In return for this illegally-intercepted information, the Ablyazov-Khrapunov Group paid hundreds of thousands of dollars to these hackers-for-hire, from funds traceable to the thefts from BTA Bank and the City of Almaty.

### The Ablyazov-Khrapunov Group Conspires to Transfer and Hide Illicit Funds in the United States.

77.     In 2011 and 2012, in response to escalating pressure on the Ablyazov-Khrapunov Group from both Kazakh and Swiss authorities and legal proceedings in the United Kingdom, the Ablyazov-Khrapunov Group embarked on a scheme to secret the families' illicit wealth in real estate investments in the United States. Upon information and belief, the Ablyazov-Khrapunov Group selected the United States as a harbor for these stolen funds because they believed real estate investments in the United States would be difficult for Kazakh authorities to access.

78.     To execute this scheme the Ablyazov-Khrapunov Group used SDG, their Swiss real estate vehicle, and Telford International Limited ("Telford"), a Dubai-based private contracting entity controlled by the Ablyazov-Khrapunov Group.

79.     To create the appearance that SDG was independent of the Ablyazov-Khrapunov Group, in 2012 SDG was purportedly sold to a close friend and political ally of the Ablyazov-Khrapunov Group, Philippe Glatz. This sale was in fact a sham transaction, with the Ablyazov-Khrapunov Group maintaining beneficial ownership and control of SDG.

80.     Upon information and belief, the Ablyazov-Khrapunov Group paid Mr. Glatz to purchase SDG using the Ablyazov-Khrapunov Group's own funds: Glatz accepted a loan from the Ablyazov-Khrapunov Group and then repaid that loan while outwardly claiming that this payment to the Ablyazov-Khrapunov Group was for the purchase of SDG. In fact, the transfer

of SDG was illusory, as Mr. Glatz was merely repaying a prior obligation, and effectively getting SDG for free.

81.     To reduce the amount of cash needed to effectuate this sham sale, Ilyas Khrapunov offered SDG to Glatz at an incredibly discounted price. Although at the time of the purported sale SDG's assets were valued at approximately $150 million, Glatz only transferred approximately $3.5 million in cash to the Khrapunov family for SDG – roughly two percent of SDG's assessed asset value.

82.     To justify this incredible discount to asset value, Ilyas Khrpaunov used his control of SDG to falsely book millions of dollars in supposed debt and liabilities to hide the fraudulent nature of the transition he had orchestrated.

83.     This sham transaction served the Ablyazov-Khrapunov Group's purposes by creating the appearance that SDG had changed ownership, although the Ablyazov-Khrapunov Group received no net consideration for the purported sale, and Glatz was left beholden to the Ablyazov-Khrapunov Group and explicitly obligated to hold their interest in the investment.

84.     The capital structure, organization, management, and illicit purpose of SDG remained the same after the purported sale, and the Ablyazov-Khrapunov Group still profits from and manages SDG's operations. Ilyas Khrapunov continues to control SDG while holding himself out to be a mere "outside advisor" to the company, all the while protecting and reaping the benefits of the Ablyazov-Khrapunov Group's investments in SDG.

**_Through SDG, the Ablyazov-Khrapunov Group Creates Triadou to Hide their Illicit Funds in New York Real Estate Transactions with the Chetrit Group._**

85.     In or about 2011, Ilyas Khrapunov, on behalf of the Ablyazov-Khrapunov Group, approached Nicolas Bourg, a Belgium-based real estate fund manager, seeking to create a new entity controlled by SDG to mask the Ablyazov-Khrapunov Group's efforts to invest in real

estate opportunities in the United States.

86.     In consultation with Ilyas Khrapunov, Bourg formed a series of entities  under the
laws of Luxembourg for the specific purpose of investing the Ablyazov-Khrapunov Group's
funds in real estate in the United States.  These entities included Triadou, an investment vehicle
wholly owned and controlled by SDG, which  was itself a front for the Ablyazov-Khrapunov
Group's activities.

87.     Triadou is a special purpose vehicle:  a limited-liability legal  entity created to
fulfill a specific purpose, often used to insulate a parent entity  from financial risk or liability.
SPVs can also be used, as Triadou was, to hide the true ownership of assets held by the SPV, or
to obscure relationships between individuals and  entities.  Bourg became the sole director of
Triadou, operating at the direction of the   Ablyazov-Khrapunov Group, who continued to control
SDG, Triadou's sole shareholder.

88.     At the direction of Ilyas Khrapunov, Bourg made contact with Eric Elkain,  an
agent of Chetrit and the Chetrit Group.  Bourg and  Elkain agreed to arrange a meeting between
Chetrit and Ilyas Khrapunov for the purpose  of exploring concealed investments by the
Ablyazov-Khrapunov Group in the United States with the Chetrit Group.

89.     In or about 2012, Chetrit and his brother and partner Meyer  Chetrit met with Ilyas
Khrapunov and Bourg in Geneva, Switzerland.  While the Ablyazov-Khrapunov Group had
purportedly divested  itself of any interest in SDG by this time, Ilyas Khrapunov held himself out
to Chetrit as having a controlling ownership interest in SDG.

90.     At this meeting, Chetrit and Ilyas Khrapunov discussed  possible investment
strategies for the Ablyazov-Khrapunov Group in the United  States real estate sector.  In these
discussions, Ilyas Khrapunov disclosed the fact that the  Ablyazov-Khrapunov Group was facing

criminal charges and asset freezes directed by the governments of Kazakhstan, Switzerland, and the United Kingdom, and needed to move funds to other jurisdictions. During the continuing course of his dealings with the Ablyazov-Khrapunov Group, this situation was repeatedly and unequivocally made clear to Chetrit. Specifically, the Ablyazov-Khrapunov Group needed to move funds that were the subject of criminal charges and asset freezes as a result of the proceedings both against Ablyazov and the Ablyazov-Khrapunov Group. Chetrit expressed sympathy with this situation, stating that his own family had faced political sanctions in his native Morocco, a result of having defrauded the King and being forced to flee. Chetrit and Ilyas Khrapunov agreed in principle to seek joint investments in the United States, and agreed to meet further.

91.     Following this meeting in Geneva, Ilyas Khrapunov and Bourg met with Chetrit again in New York City, to evaluate potential investment options. While discussing specific investment opportunities, the parties again openly and repeatedly discussed the criminal charges against the Ablyazov-Khrapunov Group and the efforts of the governments of Switzerland and Kazakhstan to locate and seize the assets of the Ablyazov-Khrapunov Group. Again, Ilyas Khrapunov acted on behalf of SDG and Triadou, despite the Ablyazov-Khrapunov Group's purported sale of SDG a year prior.

92.     As a result of these discussions, the Ablyazov-Khrapunov Group invested, through Triadou, with Chetrit and the Chetrit Group in a number of real estate opportunities in New York City. The most significant of these were investments in the Flatotel and Cabrini Medical Center developments in New York City.

93.     The Flatotel is a 289-room business hotel opened in 1991, located at 135 West 52nd St, New York, New York.

94.     The Cabrini Medical Center hospital campus closed in 2008 and is now comprised of several buildings containing approximately 250 condominium units.

95.     Both the Flatotel and the Cabrini Medical Center properties were purchased by members of the Chetrit Group, along with co-investors.  The developers have  been executing plans to convert both properties into luxury condominiums, and are close to completion.

96.     The Chetrit Group owned a 75% interest in the Flatotel, and created a series of limited liability entities to hold that interest, including Counterclaim Defendants CF 135 FLAT LLC and CF 135 West Member LLC.

97.     The Chetrit Group offered to sell half of their 75% investment in the Flatotel to Triadou, after which the Chetrit Group and Triadou would each own 37.5%.  Triadou would provide 70% of the capital needed – against Chetrit's 30%, the difference amounting to an above-market "promote fee" for Chetrit that ensured that the Chetrit Group would reap the largest profits from the Flatotel development, even as it put in the least capital – and the parties would then divide the profits  from the investment.  In or about March 25, 2013, Triadou accepted this  offer, notwithstanding the fact that the terms strongly favored Chetrit, and committed to transmit funds to the Chetrit Group to secure the 37.5% interest in the Flatotel property.

### *The Ablyazov-Khrapunov Group Enlists FBME to Facilitate Their Money Laundering Scheme in the United States*

98.     The Ablyazov-Khrapunov Group sought to fund Triadou's investments with money from the Ablyazov-controlled entity Telford, held in accounts with FBME.

99.     Telford's FBME accounts were managed by Eesh Aggarwal, Chairman of Azure Consultants DMCC, and a close financial advisor to Ablyazov. Aggarwal had connected Ablyazov and other members of the Ablyazov-Khrapunov Group to FBME through Aggarwal's

contacts with high-level officers at FBME, and in time FBME became one of the Ablyazov-Khrapunov Group's primary banks. On information and belief, the conspirators favored FBME due to its presence inside of the European Union, its lack of anti-money laundering protections, and its eagerness to service high-risk clientele and shell corporations such as Telford.

100.     FBME promoted its weak due diligence standards to attract high-risk, high-value clients just like the Ablyazov, and was known for its willingness to do business with clients seeking to avoid regulatory oversight. In particular, FBME relied on an "Approved Third Party" program, where FBME's contacts could introduce new, high-value clients to the bank with virtually no due diligence of these new relationships. Upon information and belief, Aggarwal was one such "Approved Third Party," and with the approval of certain FBME officers, was able to launder the Ablyazov-Khrapunov Group's funds through FBME by way of entities such as the Ablyazov-controlled Telford, with effectively no scrutiny or due diligence by FBME.

101.     FBME had a history of moving funds for Aggarwal and Ablyazov with no questions asked, which led the conspirators to favor FBME for their criminal schemes aimed at the United States. For example, on June 11, 2011, FBME executed more than $27 million in transfers of Ablyazov's stolen funds to Amber Limited, a shell company registered in the U.A.E. (where Aggerwal operates) subsequently found to be an undisclosed Ablyazov asset and added to the U.K. courts' freezing and receivership orders.

102.     Telford's accounts at FBME bank were used to covertly move and invest funds stolen by Ablyazov from BTA Bank. Because the Telford accounts consisted of Ablyazov's stolen funds, Ilyas Khrapunov conferred with Ablyazov regarding investments of funds from Telford, and Ablyazov's approval was required for transfers from Telford. Even after Ablyazov's incarceration in France he remained in contact with his coconspirators, and while Ilyas

Khrapunov took operational control of much of the Ablyazov-Khrapunov Group's network, Ablyazov continued to direct specific transfers of funds, including those from Telford's FBME accounts.

103. Triadou attempted to transfer Telford's funds held in FBME for the Flatotel and Cabrini deals through banks in Luxembourg, but those banks refused to accept wire transfers from the Ablyazov-Khrapunov Group's FBME accounts due in part to the investigations or proceedings led by the Kazakh, Swiss, and United Kingdom authorities.

104. Bourg then contacted Chetrit about alternative wire transfer arrangements. Informed that commercial banks refused to handle Triadou's funds from Telford, Chetrit conspired to launder the money, instructing Bourg to disregard the banks and transfer funds directly from the Ablyazov-Khrapunov Group's offshore accounts to the escrow account of Chetrit's personal and corporate attorneys. Bourg then directed a series of wire transfers, on behalf of Triadou, from Telford's accounts at FBME directly to Chetrit's counsel.

105. FBME executed these transfers despite their blatant indicia of money laundering, including that (1) Telford was a recently incorporated offshore shell company with no obvious business purpose, (2) Telford was purportedly owned by another offshore nominee-shareholder trust, (3) Telford was seeking to transfer millions of dollars into escrow accounts with no due diligence, and (4) Telford was transferring these funds from a high-risk jurisdiction for the benefit of an unrelated third party operating in a more financially-rigorous jurisdiction.

106. This was not the only instance of FBME executing such obviously suspicious transfers for Aggerwal and the Ablyazov-Khrapunov Group without concern for money laundering red flags. At the same time FBME began to execute transfers from Telford to the accounts of Chetrit's counsel, on or about October 9, 2013, FBME executed wire transfers for $25

27

million from Telford's accounts for an investment in overseas telecommunications assets. Again Telford was transferring millions of dollars of Ablyazov's money for the benefit of another entity linked to the Ablyazov-Khrapunov Group.

107.    Subsequent to these transfers, on July 22, 2014, the U.S. Financial Crimes Enforcement Network ("FinCEN") designated FBME Bank a "foreign financial institution of primary money laundering concern."  FinCEN found that FBME Bank was regularly "used by its customers to facilitate money laundering, terrorist financing, transnational organized crime," had "systemic failures in its anti-money laundering controls that attract high-risk shell companies," and performed a "significant volume of transactions and activities that have little or no transparency and often no apparent legitimate business purpose."

108.    Under Section 311 of the PATRIOT Act, FinCEN barred U.S. financial institutions from opening or maintaining "payable-through" accounts with FBME.[1]  In the accompanying official announcement, FinCEN's then-Director emphasized that FBME was not merely negligent, but rather "promotes itself on the basis of its weak Anti Money Laundering (AML) controls in order to attract illicit finance business from the darkest corners of the criminal underworld," and "openly advertises the bank to its potential customer base as willing to facilitate the evasion of AML regulations."

109.    In its updated rule barring U.S financial institutions from dealing with FBME, FinCEN noted in particular FBME's pervasive dealings with obscure shell companies just like Telford, serving no purpose but to facilitate money laundering:

> FinCEN considered all of the relevant information and is particularly

---

[1]      FBME challenged FinCEN's rulemaking in the United States District Court for the District of Columbia and won a temporary reprieve, but FinCIN reissued the rule in substantially the same form on March 31, 2016. That updated rule is now undergoing judicial review.

concerned with: (1) The large number of FBME customers that are either shell companies or that conduct transactions with shell companies; (2) the lack of transparency with respect to beneficial ownership or legitimate business purposes of many of FBME's shell company customers; (3) the location of many of its shell company customers in other high-risk money laundering jurisdictions outside of Cyprus; (4) the high volume of U.S. dollar transactions conducted by these shell companies with no apparent business purpose; and (5) FBME's longtime facilitation of its shell company customers' anonymity by allowing thousands of customers to use the bank's physical address in lieu of their own.

110.    The Central Bank of Cyprus has frozen all assets transfers to or from FBME, and taken control of the bank pending completion of an investigation into its operations. FBME remains under the control of the Central Bank of Cyprus, and upon information and belief, continues to hold millions in funds belonging to the Ablyazov-Khrapunov Group and shell companies they control.

### The Ablyazov-Khrapunov Group Enters a Second Deal with Chetrit, Again Funded By Telford through FBME

111.    Through Triadou, the Ablyazov-Khrapunov Group entered a second investment with the Chetrit Group shortly thereafter. In late 2012, Triadou agreed to invest $12 million in the Cabrini Medical Center conversion, a joint venture between the Chetrit Group and another private developer to convert a former medical center in New York City into luxury condominiums.

112.    Due to increasing scrutiny on the Ablyazov-Khrapunov Group's finances, the contemplated $12 million investment became impossible. Bourg discussed this obstacle with Chetrit, who agreed that Triadou should invest $6 million, half the originally-agreed amount, until further funds became available. In return for this $6 million investment, Triadou would receive a promissory note and the right to convert that note into equity in the entity holding the Chetrit Group's interest in the Cabrini deal, 227 East 19th Holder, LLC.

113.    Again, the funds to execute the Cabrini deal were transferred, on May 20, 2013,

directly from the Ablyazov-Khrapunov Group's Telford accounts at FBME Bank to a law firm in New York working on Chetrit's behalf. Again, this transfer of funds from Telford was only executed after Ilyas Khrapunov received explicit direction from Ablyazov.

### Kazakh Authorities Target the Ablyazov-Khrapunov Group's Holdings in the United States, and the Ablyazov-Khrapunov Group Liquidates Those Assets at Below-Market Value with the Chetrit Group's Assistance.

114. In 2014, Almaty filed an action in California federal court against members of the Ablyazov-Khrapunov Group seeking to seize assets that they had attempted to launder through real estate investments in California. That action is *City of Almaty v. Viktor Khrapunov, et al*, Case No. 2:14-cv-03650-FMO-CW (filed May 13, 2014; dismissed September 21, 2015) (the "California Litigation"). On information and belief, this lawsuit led the Ablyazov-Khrapunov Group to believe their assets in the U.S. were no longer safe from seizure by the government of Kazakhstan.

115. In response, in late 2014, Ilyas Khrapunov directed Bourg, Triadou's director, to begin liquidating Triadou's assets in New York so that the funds could be removed from the United States and hidden. Specifically, Ilyas Khrapunov told Bourg to liquidate Triadou's investments in Flatotel and the Cabrini Medical Center as quickly as possible.

116. Bourg approached Chetrit, explaining that the threat of the California Litigation was pressuring Triadou and the Ablyazov-Khrapunov Group into moving their assets out of the United States. Chetrit offered to purchase an assignment of Triadou's interest in the Flatotel at a substantial discount from the price originally paid by Triadou. By this point, the value of Triadou's investment had in fact increased substantially beyond the funds originally invested.

117. Chetrit simultaneously proposed to bribe Bourg, so Chetrit could further take advantage of Triadou and secretly influence it to obtain a discounted price. Specifically, Chetrit

proposed that Bourg covertly use his position as director of Triadou to accept a lower price for the Chetrit Group's purchase of an assignment, thus decreasing Triadou's recovery from the investment and increasing the Chetrit Group's profit. In return for securing for Chetrit a lower assignment price, Chetrit agreed to surreptitiously pay Bourg $3 million.

118.    In or about August of 2014, Bourg, acting on behalf of Triadou and at the direction of the Ablyazov-Khrapunov Group, agreed to assign Triadou's interest in the Flatotel back to the Chetrit Group for a price as low as $26 million, only a fraction of the fair market value of the properties. At the same time, Bourg executed a release of the promissory note that Triadou held entitling it to equity in the Cabrini Medical Center development. At the time of this assignment and release, Viktor Khrapunov was facing criminal charges as well as possible fines and disgorgement in Kazakhstan; the Kazakh government had formally sought extradition of Viktor Khrapunov from Switzerland; Ablyazov was being held in French prison awaiting extradition; and the Swiss assets of the Ablyazov-Khrapunov Group remained frozen. Not only were all of these facts widely disseminated in the news, they were known by all parties to the assignment and release transactions, including Chetrit, and it was not uncommon for their meetings to begin with a discussion of the possibility of the incarceration of members of the Ablyazov-Khrapunov Group.

119.    Following the assignment and release, Bourg invoiced Chetrit for $1 million of the agreed-upon $3 million bribe. After receiving the invoice, Chetrit paid Bourg $400,000, but refused to pay the full amount demanded by Bourg.

120.    In or about March 2015, Bourg met with Chetrit, and recorded the meeting. As captured on audio, Bourg demanded the remainder of his promised compensation. Chetrit acknowledged that he had paid Bourg "400 or 500," but responded that Bourg would receive the

additional $600,000 only when Chetrit paid what he owed Triadou for the assignment, and that he had no intention of paying Triadou until forced to do so. Chetrit further stated on tape that Bourg would not receive any remaining money.

121.     At that meeting, Bourg and Chetrit repeatedly discussed the legal troubles of Mukhtar Ablyazov and Victor and Ilyas Khrapunov. Chetrit repeatedly avoided using Ilyas Khrapunov's actual name, referring to him instead by the code name "Pedro." Chetrit and Bourg discussed how "Pedro" was "sought by Interpol" and his "father-in-law [was] still in prison," and Chetrit agreed that law enforcement was "coming at [the Ablyazov-Khrapunov Group] from all sides."

122.     Also at that meeting, Chetrit and Bourg discussed the fact that due to the investigation in Switzerland, Ilyas Khrapunov could not leave the country and was under intense law enforcement pressure. In addition, Chetrit once again acknowledged his longstanding understanding that Ablyazov and his criminal situation was behind the motivations of the Ablyazov-Khrapunov investments in the United States. Chetrit further acknowledged his longstanding understanding that the Ablyazov-Khrapunov Group had made similar investments in other countries, such as Greece, to conceal and launder the proceeds of their crimes.

123.     On or about March 22, 2015, after his meeting with Chetrit, Bourg contacted Elkain, Chetrit's agent in Europe, and also recorded that phone call. In that call, Bourg sought to confirm the terms of his secret deal with Chetrit. During this recorded conversation, Bourg and Elkain agreed that the secret deal between Chetrit and Bourg called for $3 million in compensation for Bourg. Elkain agreed that he "confirmed the deal" between Chetrit and Bourg, and "would have never said that if [Chetrit] hadn't told [him] so." Bourg requested Elkain's aid in receiving the remainder of his payment, but Elkain responded that whether or not the

agreement would be honored was up to Chetrit.

124.     Despite the finalized assignment agreement and release, the Chetrit Group refused to make any payments to Triadou following the sale.  In response, Triadou filed a series of actions in New York state courts, seeking summary judgment and payment of these obligations under the assignment agreement.  Those actions are *Triadou SPV S.A. v. CF 135 FLAT LLC, et al*., No. 653462/2014 (Nov. 10, 2014); *Triadou SPV S.A. v. CF 135 FLAT LLC, et al*., No. 650239/2015 (Jan. 26, 2015); *Triadou SPV S.A. v. CF 135 FLAT LLC, et al*., No. 154681/2015 (May 11, 2015), and *Triadou SPV S.A. v. CF 135 FLAT LLC, et al*., No. 156907/2015 (July 9, 2015),

125.     Each of these actions seeks the payment of money to Triadou derived from the sale of property illicitly obtained by the Ablyazov-Khrapunov Group, and rightfully owned by BTA and Almaty.

126.     By this lawsuit, BTA Bank and the City of Almaty seek to hold Crossclaim Defendants responsible for their illegal conduct in the United States in violation of U.S. law.

## FIRST CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))
### *Against All Defendants*

127.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 126 as if fully set forth herein.

128.     This cause of action is against all Crossclaim Defendants (the "Count 1 Defendants").

129.     From 1997 and continuing to the present, the Ablyazov-Khrapunov Group and numerous other individuals and entities, including SDG and Telford, have constituted an association-in-fact enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 1

33

Enterprise").

130.    In 2012, the Chetrit Group knowingly and willfully joined the Count 1 Enterprise by aiding the Ablyazov-Khrapunov Group's schemes to hide and launder their illicit assets through investments by SDG through Triadou in properties owned by the Chetrit Group.

131.    The Count 1 Enterprise was engaged in, and the activities of the Count 1 Defendants affected, interstate and foreign commerce.

132.    The Count 1 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 1 Enterprise through a pattern of racketeering activity consisting of the following predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B):

a.    The Count 1 Defendants engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by conducting numerous financial transactions using illegally obtained funds to purchase real estate investments in New York City and elsewhere and to fund business entities including SDG and Triadou, knowing that such funds were unlawfully converted from the City of Almaty and BTA Bank, with the goal of concealing the source of those funds. The Count 1 Defendants further engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by transporting, transmitting, and/or transferring funds stolen from Almaty and BTA into and within the United States in order to conceal their source and existence from lawful investigations conducted by Swiss, Kazakh, and United Kingdom authorities.

b.    The Count 1 Defendants further engaged and conspired to engage in money laundering in violation of 18 U.S.C. § 1956 by conducting financial transactions

using those stolen funds by, among other things, using stolen funds to purchase real estate and other assets in New York City and elsewhere and to fund business entities, including Triadou and SDG, with the intent to further the Count 1 Enterprise and to conceal the source of those funds.

c. The Count 1 Defendants engaged and conspired to engage in money transactions in property derived from specified unlawful activity in violation of 18 U.S.C. § 1957 by, among other things, knowingly transferring funds in excess of $10,000 stolen from Almaty and BTA into and within the United States to invest in real estate and other assets in New York City with the aid of the Chetrit Group, knowing that such funds were stolen from the City of Almaty and BTA Bank.

d. The Count 1 Defendants engaged and conspired to engage in mail fraud in violation of 18 U.S.C. § 1341 and wire fraud in violation of 18 U.S.C. § 1343 by knowingly using the mails and wires to transfer illegally obtained funds into and within the United States, for the purpose of furthering the Count 1 Enterprise and, while concealing the funds' illegal source, used those funds to purchase real estate in New York City and to fund business entities, including SDG and Triadou, that enabled those entities to conduct business in the United States using the illegally-obtained funds.

e. The Count 1 Defendants unlawfully transported or caused to be transported in interstate or foreign commerce securities or money having a value of $5,000 or more which was stolen, converted or taken by fraud from Almaty and BTA Bank, and knowing the same to be stolen, converted or taken by fraud in violation of 18 U.S.C. § 2314.

  f. The Count 1 Defendants received, possessed, concealed, sold, or disposed of securities or money having the value of $5,000 or more, or conspired to do the same, which crossed a state or United States boundary after being stolen, unlawfully converted, or taken from Almaty and BTA Bank, and knowing the securities or money to have been stolen, unlawfully converted, or taken in violation of 18 U.S.C. § 2315.

133. Each of the Count 1 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 1 Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c). Each of the Count 1 Defendants engaged or conspired to engage in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. From in or about 1997, and continuing to the present, Count 1 Defendants associated together, with one another and with others, and acted in concert for the common and unlawful purposes of the Count 1 Enterprise and in order to implement the schemes and employ the devices described herein. The specific related predicate acts that constitute the pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to, the following acts of money laundering, transactions in money and property derived from specified unlawful activity, foreign transport of stolen money or property known to be stolen, converted or taken by fraud, mail fraud, and/or wire fraud:

  a. The 2012 sham sale of SDG to Philippe Glatz to create the appearance that SDG was independent of the Ablyazov-Khrapunov Group;

  b. the fraudulent loan from the Ablyazov-Khrapunov Group to Mr. Glatz to facilitate the SDG sale transaction;

c. the formation of Triadou and other entities by SDG at the direction of Bourg and in consultation with Ilyas Khrapunov;

d. Chetrit's meetings with Ilyas Khrapunov in or about 2012 in Switzerland and New York City, and their subsequent agreement to invest the Ablyazov-Khrapunov Group's unlawfully obtained money in real estate in New York City;

e. E-mails directly between Chetrit and Ilyas Khrapunov as well as through intermediaries discussing the Ablyazov-Khrapunov Group's possible investments in New York real estate;

f. the formation of the investment vehicles necessary to facilitate the Flatotel and Cabrini investments;

g. Telford's failed attempt to transfer funds held in FBME Bank for the Flatotel and Cabrini deals through banks in Luxembourg;

h. the May 20, 2013 transfer of funds from Telford to Chetrit's attorney representing Triadou's investment of $6 million in the Cabrini deal, along with Chetrit's promissory note and Triadou's right to convert that debt into equity in Cabrini;

i. a series of other wire transfers on behalf of Triadou from Telford's accounts at FBME Bank Ltd. to Chetrit's counsel in New York, including transfers on November 9, 2012, and January 22, February 13, February 19, April 8, April 16, and April 24, 2013;

j. a May 22, 2013 wire transfer of $28 million from Telford to a different law firm's Citibank account in New York used for a separate New York real estate investment with Chetrit;

k. a May 2014 agreement (executed August 2014) to transfer Triadou's interest in the

Flatotel to the Chetrit Group at a below-market price;

l.  Chetrit's and Triadou's signed May 2014 release of the promissory note regarding Triadou's $6 million investment in the Cabrini Medical Center development;

m.  Chetrit's payment of $400,000 to Bourg in partial satisfaction of Chetrit's agreement with Bourg to pay him $3 million in exchange for securing Chetrit a lower assignment price for Triadou's interests in the Flatotel and Cabrini deals; and

n.  a payment of $1 million from Chetrit to Triadou in partial satisfaction of Chetrit's obligations under the fraudulent assignment.

134.  As a direct and proximate result of RICO violations by the Count 1 Defendants of 18 U.S.C. § 1962(c), Almaty and BTA have suffered damages in an amount to be determined at trial and presently estimated to be not less than $6 billion. Almaty and BTA have been injured in their business or property by reason of each Count 1 Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

## SECOND CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))
### *Against All Defendants*

135.  The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 134 as if fully set forth herein.

136.  This cause of action is against all Crossclaim Defendants (the "Count 2 Defendants").

137.  From its formation and continuing to the present, CF 135 West Member LLC, has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 2

Enterprise").

138.    The Count 2 Enterprise was engaged in, and the activities of the Count 2 Defendants affected, interstate and foreign commerce.

139.    The Count 2 Defendants engaged in a pattern of racketeering activity consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) described in paragraph 132 above.

140.    Each of the Count 2 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 2 Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c). Each of the Count 2 Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. The Count 2 Defendants associated together, with one another and with others, and acted in concert for the common and unlawful purposes of the Count 2 Enterprise and in order to implement the schemes and employ the devices described herein. The specific related predicate acts that constitute the pattern of racketeering activity within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to, those acts described in paragraph 133 above.

141.    As a direct and proximate result of RICO violations by the Count 2 Defendants of 18 U.S.C. § 1962(c), Almaty and BTA have suffered damages in an amount to be determined at trial. Almaty and BTA have been injured in their business or property by reason of each Count 2 Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

## THIRD CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(a))
### *Against All Defendants*

142.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 141 as if fully set forth herein.

143.    This cause of action is against all Crossclaim Defendants (the "Count 3 Defendants").

144.    From its formation and continuing to the present, CF 135 West Member LLC, has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 3 Enterprise").

145.    The Count 3 Enterprise was engaged in, and the activities of the Count 3 Defendants affected, interstate and foreign commerce.

146.    The Count 3 Defendants received income derived from a pattern of racketeering activity consisting of the related predicate acts of racketeering described in paragraphs 132 and 133 above.

147.    The Count 3 Defendants used or invested the income derived from their racketeering activity in the acquisition of an interest in, or the establishment or operation of, the Count 3 Enterprise in violation of 18 U.S.C. § 1962(a).

148.    The Count 3 Defendants used or invested the income derived from their racketeering activity in the Count 3 Enterprise in fraudulent and below-market transactions, including by accepting unreasonable contractual terms to transfer wealth to the Chetrit Group.

149.    As a direct and proximate result of RICO violations by the Count 3 Defendants of 18 U.S.C. § 1962(a), Almaty and BTA have suffered damages in an amount to be determined at trial. Almaty and BTA have been injured in their business or property by reason of each Count 3

Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

### FOURTH CAUSE OF ACTION

**(VIOLATIONS OF RICO, 18 U.S.C. § 1962(c))**
*Against All Defendants*

150. The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 149 as if fully set forth herein.

151. This cause of action is against all Crossclaim Defendants (the "Count 4 Defendants").

152. From its incorporation and continuing to the present, 227 East 19th Holder LLC has constituted an enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Count 4 Enterprise").

153. The Count 4 Enterprise was engaged in, and the activities of the Count 4 Defendants affected, interstate and foreign commerce.

154. The Count 4 Defendants engaged a pattern of racketeering activity consisting of the predicate acts of racketeering within the meaning of 18 U.S.C. § 1961(1)(B) described in paragraph 132 above.

155. Each of the Count 4 Defendants conducted or participated, directly or indirectly, in the conduct of the affairs of the Count 4 Enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(5) in violation of 18 U.S.C. § 1962(c). Each of the Count 4 Defendants engaged in two or more predicate acts of racketeering, and each committed at least one such act of racketeering after the effective date of RICO. The Count 4 Defendants associated together, with one another and with others, and acted in concert for the common and

unlawful purposes of the Count 4 Enterprise and in order to implement the schemes and employ

the devices described herein. The specific related predicate acts that constitute the pattern of

racketeering activity within the meaning of 18 U.S.C. § 1961(1) include, but are not limited to,

those acts described in paragraph 133 above.

156.    As a direct and proximate result of RICO violations by the Count 4 Defendants of

18 U.S.C. § 1962(c), Almaty and BTA have suffered damages in an amount to be determined at

trial. Almaty and BTA have been injured in their business or property by reason of each Count 4

Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are

thereby entitled to recover threefold the damages suffered, together with the costs of this suit and

reasonable attorneys' fees.

## FIFTH CAUSE OF ACTION

### (VIOLATIONS OF RICO, 18 U.S.C. § 1962(d))
### *Against All Defendants*

157.    The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 156

as if fully set forth herein.

158.    This cause of action is against all Crossclaim Defendants (the "Count 5

Defendants").

159.    As alleged herein, Count 5 Defendants conspired to engage in the acts described

above in the United States to further the goals of their criminal enterprises in violation of U.S.

law.

160.    In so doing, Count 5 Defendants unlawfully, willfully, and knowingly did

combine, conspire, confederate, and agree together, with each other and with others to commit

RICO violations under 18 U.S.C. § 1962(c) and, thereby, violated 18 U.S.C. § 1962(d). In

furtherance of the conspiracy and to achieve its objectives, Count 5 Defendants committed the

overt acts as described in paragraph 133 in the Southern District of New York and elsewhere.

161. As a direct and proximate result of RICO violations by the Count 5 Defendants of 18 U.S.C. § 1962(d), Almaty and BTA have suffered damages in an amount to be determined at trial. Almaty and BTA have been injured in their business or property by reason of each Count 5 Defendants' violations and, pursuant to the civil remedy provisions of 18 U.S.C. § 1964(c), are thereby entitled to recover threefold the damages suffered, together with the costs of this suit and reasonable attorneys' fees.

## SIXTH CAUSE OF ACTION

### (ACTUAL FRAUDULENT TRANSFER)
### *Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

162. The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 161 as if fully set forth herein.

163. At all relevant times, the City of Almaty and BTA Bank have held an interest in the illicit funds taken by the Ablyazov-Khrapunov Group and invested by and through Triadou, as these funds were the unlawful profits of embezzlement, fraud, and the corruption of the public office of the mayor of Almaty. The intermediary transfers or investment of those funds did not alter or diminish either Almaty or BTA's interest.

164. The 2014 assignment of Triadou's interest in the Flatotel and Cabrini Medical Center was not for adequate consideration, and in fact, represented a value significantly below the fair value of that interest, due to the improper motivations of Triadou's ownership, the Ablyazov-Khrapunov Group, to hide their illicit assets and move them offshore, and the Chetrit Group's secret deal to drive down the price of the assignment through bribery.

165. This assignment was made for the specific purpose of liquidating a fixed asset to frustrate a future creditor. Defendants knew of the numerous judgments against Ablyazov in the

United Kingdom, and of Almaty's claims against the Ablyazov-Khrapunov Group in the California Litigation, and knew that Triadou was owned and controlled by the defendants in those actions. Defendants intended and believed that the assignment of the Ablyazov-Khrapunov Group's interest in the Flatotel and Cabrini Medical Center would hinder, delay, and defraud current and future judgment creditors, specifically the City of Almaty and BTA Bank.

166.     For these reasons, the assignment was fraudulently and illegally intended to remove an asset from the jurisdiction of the United States, namely Triadou's interests in the Flatotel and Cabrini Medical Center, convert those assets to cash, and transfer those funds beyond the reach of the Swiss, Kazakh, and United Kingdom authorities

167.     As a result of the foregoing, pursuant to sections 275, 276, and 279 of the New York Debtor and Creditor Law, the August 2014 assignment agreement should be set aside as the product of clearly-inequitable conduct.

## SEVENTH CAUSE OF ACTION

### (CONSTRUCTIVE FRAUDULENT TRANSFER)
***Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov***

168.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 167 as if fully set forth herein.

169.     At all relevant times, the City of Almaty and BTA Bank have held an interest in the illicit funds taken by the Ablyazov-Khrapunov Group and invested by and through Triadou, as these funds were the unlawful profits of embezzlement, fraud, and corruption of the public office of the mayor of Almaty.   The intermediary transfers or investment of those funds did not alter or diminish either Almaty or BTA's interest.

170.     Triadou, although an arm of a massive international fraud and money laundering conspiracy, is and has been insolvent itself.  Triadou holds no funds or other assets of its own,

and relies on funding from other Ablyazov-Khrapunov Group entities, such as Telford, to meet its obligations. Assets that flow to Triadou are promptly moved to other Ablyazov-Khrapunov Group entities offshore.

171.     As Triadou is controlled by the Ablyazov-Khrapunov Group, whose members face multi-billion dollar judgments in other jurisdictions, Triadou is effectively kept insolvent at all times, so as to limit the Ablyazov-Khrapunov Group's exposure in the United States.

172.     Similarly, because Triadou is controlled by and is an alter ego of the Ablyazov-Khrapunov Group, at the time it liquidated the Flatotel and Cabrini interests and transferred the proceeds to other entities, it had liabilities – including resulting from the UK judgments – that far outstripped its assets.

173.     As a result of the foregoing, pursuant to sections 273 and 273-a of the New York Debtor and Creditor Law, the August 2014 assignment agreement should be set aside.

## EIGHTH CAUSE OF ACTION

### (UNJUST ENRICHMENT)
*Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

174.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 173 as if fully set forth herein.

175.     The Crossclaim Defendants were unjustly enriched at the expense of the City of Almaty and BTA Bank when they invested funds embezzled from the City of Almaty and BTA Bank to acquire assets in the United States including an interest in the Flatotel project, and did so knowing that authorities of Switzerland, the Republic of Kazakhstan, and the United Kingdom were seeking the wrongfully-taken assets held by the Ablyazov-Khrapunov Group, and that further sales of the same assets would potentially frustrate their identification by the lawful authorities.

176.     It would be against equity and good conscience to permit the Crossclaim Defendants to retain the profits derived from the looting of assets rightfully belonging to the City of Almaty and BTA Bank.

## NINTH CAUSE OF ACTION

### (CONVERSION)
### *Against Defendants Triadou, Ablyazov, Viktor Khrapunov and Ilyas Khrapunov*

177.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 176 as if fully set forth herein.

178.     None of the Defendants has a superior interest to the City of Almaty or BTA in the assets wrongfully taken by the Ablyazov-Khrapunov Group. These funds, and the assets they were used to purchase, are the rightful property of the people of Almaty and BTA.

179.     Defendants knowingly bought and sold assets obtained with these funds derived from the corruption of the office of the mayor of the City of Almaty and control of BTA Bank.

180.     As a result, Defendants have wrongfully and without authorization exercised of dominion and control over property of Almaty and BTA, and thus are liable for converting the same.

## TENTH CAUSE OF ACTION

### (CONSTRUCTIVE TRUST)
### *Against All Defendants*

181.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 180 as if fully set forth herein.

182.     As mayor of Almaty, Viktor Khrapunov owed fiduciary duties to the people of Almaty, and through his oath of office, expressly promised to execute those duties.

183.     Despite that promise, Viktor Khrapunov breached those fiduciary duties repeatedly by transferring public assets of the City of Almaty to other members of the Ablyazov-

Khrapunov Group for fractions of their market value, and then assisted the Ablyazov-Khrapunov Group in laundering the funds resulting from those illicit transfers of public property. Through these breaches of fiduciary duty, the Ablyazov-Khrapunov Group has been unjustly enriched.

184. A constructive trust over the 50% interest in CF 135 West Member LLC assigned by Triadou, and all profits therefrom, is the appropriate equitable remedy to prevent further dissipation of the funds resulting from these breaches of fiduciary duty.

185. Defendants have also conspired to fraudulently transfer Triadou's interest in the Flatotel for the purpose of hiding the Ablyazov-Khrapunov Group's assets and frustrating any recovery resulting from Almaty and BTA's investigations and pursuits of their stolen assets. Separate and aside from the Ablyazov-Khrapunov Group's breaches of fiduciary duty, this knowingly fraudulent transfer by Cross- and Counterclaim Defendants justifies imposition of a constructive trust to prevent any further transfers or encumbrances of this property.

186. Absent this remedy, the Ablyazov-Khrapunov Group will continue to use Triadou and SDG to launder the fruits of these breaches of fiduciary duty and hide these assets from law enforcement, and the Chetrit Group will continue to be unjustly enriched by these acts of fraud.

## ELEVENTH CAUSE OF ACTION

### (PURSUANT TO CPLR § 5239 FOR FRAUD AND CONVERSION)
### *Against All Defendants*

187. The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 186 as if fully set forth herein.

188. Triadou has filed serial actions in the courts of the state of New York seeking payment on the fraudulent assignment agreement between Triadou and the Chetrit Group. While Triadou has been awarded summary judgment in some of these actions, none of these judgments

have been satisfied by any sheriff or receiver.

189.     The City of Almaty and BTA Bank are the rightful owners of Triadou's interest in the  Flatotel and Cabrini Medical Center and/or any funds derived from the sale of that interest, as the interest was  purchased with funds unlawfully converted by the Ablyazov-Khrapunov Group and laundered  through SDG and Triadou.

190.     Pursuant to CPLR § 5239, this court is empowered to vacate any such  judgments and direct the disposition of the property in question, as well as direct which  party should keep possession of the property during the pendency of this action.

191.     The court should set aside any judgments in Triadou's favor in light of the City of Almaty's and BTA's superior interest in this illicitly-obtained property, direct that Triadou's interest in the Flatotel and Cabrini Medical Center be transferred to the City of Almaty and BTA Bank, and pursuant to CPLR § 5239,  award the City of Almaty and BTA Bank its reasonable attorneys' fees in bringing this claim.

## TWELFTH CAUSE OF ACTION

### (PURSUANT TO CPLR § 5303 FOR RECOGNITION AND ENFORCEMENT OF A FOREIGN JUDGMENT UNDER NEW YORK LAW)
### *Against Defendant Ablyazov*

192.     BTA Bank repeats and realleges paragraphs 1 through 191 as if fully set forth herein.

193.     The United Kingdom of Great Britain and Northern Ireland is a "foreign state" within the meaning of N.Y. C.P.L.R. § 5301(a).

194.     The Ablyazov Judgments are "foreign country judgments" within the meaning of N.Y. C.P.L.R. § 5301(b).

195.     The Ablyazov Judgments are "final, conclusive and enforceable" in England within the meaning of N.Y. C.P.L.R. § 5302.

196.     The Ablyazov Judgments grant recovery of a sum of money and are enforceable by an action on the judgments in New York pursuant to N.Y. C.P.L.R. § 5303.

197.     None of the grounds for non-recognition of a foreign country judgment set forth in N.Y. C.P.L.R. § 5304 applies to the Ablyazov Judgments.

198.     The Ablyazov Judgments are required to be enforced pursuant to N.Y. C.P.L.R. § 5303.

199.     Triadou is the alter ego of the Ablyazov-Khrapunov Group, and is thus liable  for all current and future obligations against the Ablyazov-Khrapunov Group. Maintaining the separateness of Triadou and its alter ego, the  Ablyazov-Khrapunov Group, would allow the Ablyazov-Khrapunov Group to avoid otherwise  enforceable obligations and would be highly inequitable to the people of the city of  Almaty and BTA Bank.

## THIRTEENTH CAUSE OF ACTION

### (AIDING AND ABETTING)
### *Against Defendant FBME*

200.     The City of Almaty and BTA Bank repeat and reallege paragraphs 1 through 199 as if fully set out herein.

201.     The Ablyazov-Khrapunov Group converted property that rightfully belongs to the Kazakhstan Plaintiffs through wire transfers executed by FBME Bank, and the Ablyazov-Khrapunov Group was unjustly enriched by the use and investment of the same funds.

202.     FBME Bank was aware that the funds wired were the proceeds of crime and that the wire transfers were an effort by the Ablyazov-Khrapunov Group to obscure the illicit nature of those funds.

203.     Due to its longstanding relationship with the Ablyazov-Khrapunov Group and deliberately ineffective protocols for preventing money laundering, FBME Bank aided and

abetted the Ablyazov-Khrapunov Group's laundering scheme.

204.    FBME's active participation in the Ablyazov-Khrapunov Group's money laundering network rendered substantial assistance to the Ablyazov-Khrapunov Group's acts of conversion, fraud, and subsequent unjust enrichment, and the Kazakhstan Plaintiffs seek relief from FBME to the extent Defendants are found liable for these acts.

## DEMAND FOR JURY TRIAL

Almaty and BTA Bank demand a jury trial on all claims for which trial by jury is available, including on the underlying interpleader action.

## DEMAND FOR RELIEF

WHEREFORE, Almaty and BTA Bank demand the Court enter judgment as follows:

A.    For injunctive relief and rescission of the 2014 assignment agreement and release;

B.    For compensatory, punitive, and treble damages;

C.    For declaratory relief;

D.    For all costs and fees incurred in prosecuting this Complaint;

E.    For such other and further relief as this Court deems just and proper.

Dated: New York, New York
        September 7, 2016

                           Respectfully Submitted,

                           BOIES, SCHILLER & FLEXNER LLP

By:    /s/ Matthew L. Schwartz
       Matthew L. Schwartz
       Randall W. Jackson
       Daniel G. Boyle
       Craig Wenner

       BOIES, SCHILLER & FLEXNER LLP
       575 Lexington Avenue
       New York, New York 10022
       Telephone: 212-446-2300
       Facsimile: 212-446-2350

# Exhibit B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITY OF ALMATY, KAZAKHSTAN and BTA
BANK JSC,

           Crossclaim Plaintiffs,

           -against-

MUKHTAR ABLYAZOV, VIKTOR
KHRAPUNOV, ILYAS KHRAPUNOV, and
TRIADOU SPV S.A.,

           Crossclaim Defendants.

No. 15-CV-05345(AJN) (KHP)

## DECLARATION OF VIKTOR KHRAPUNOV

I, Viktor Khrapunov, hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct:

1. I submit this declaration in connection with the accompanying request for international judicial assistance.

2. have voluntarily agreed to be deposed in connection with the above-captioned case and know that I cannot be subjected to any coercive measures, that I cannot be forced to participate or to appear, and that I have the right to invoke any exemption or prohibition to give evidence provided for by the laws of Switzerland or of the United States of America.

Dated: July 21, 2017

Viktor Khrapunov

# Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITY OF ALMATY, KAZAKHSTAN and BTA
BANK JSC,

          Crossclaim Plaintiffs,

          -against-

MUKHTAR ABLYAZOV, VIKTOR
KHRAPUNOV, ILYAS KHRAPUNOV, and
TRIADOU SPV S.A.,

          Crossclaim Defendants.

No. 15-CV-05345(AJN) (KHP)

## DECLARATION OF ILYAS KHRAPUNOV

    I, Ilyas Khrapunov, hereby declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct:

    1. I submit this declaration in connection with the accompanying request for international judicial assistance.

    2. have voluntarily agreed to be deposed in connection with the above-captioned case and know that I cannot be subjected to any coercive measures, that I cannot be forced to participate or to appear, and that I have the right to invoke any exemption or prohibition to give evidence provided for by the laws of Switzerland or of the United States of America.

Dated: July 21, 2017

_____
Ilyas Khrapunov