# EXHIBIT A

Witness Statement<br>
Claimant<br>
I J Tucker<br>
Fifth<br>
"IJT5"<br>
14 June 2016

CLAIM NOS. 2009 FOLIO 1099;<br>
CL-2015-000549

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

BETWEEN:

**JSC BTA BANK**

**Claimant/Applicant**

- and -

**(1) MUKHTAR ABLYAZOV**

**(2) ILYAS KHRAPUNOV**

**Defendants**

- and -

**EESH AGGARWAL**

---

**FIFTH WITNESS STATEMENT OF IAIN JAMES TUCKER**

---

I, **Iain James Tucker**, of Atlantic House, 50 Holborn Viaduct, London, EC1A 2FG, will say as follows:

1. I am a solicitor at Hogan Lovells International LLP, the English solicitors retained in this matter by JSC BTA Bank (the "**Bank**") and am one of the team involved in the day-to-day conduct of these proceedings on the Bank's behalf. I have previously made four witness statements in these proceedings.

2. I am authorised to make this witness statement in support of the Bank's application for a disclosure order against the Respondent, Eesh Aggarwal ("**Mr Aggarwal**") in accordance with the Court's *Norwich Pharmacal* jurisdiction and/or the Court's general powers under section 37 of the Senior Courts Act 1981, together with orders restricting Mr Aggarwal's travel pending compliance with the disclosure order and restricting disclosure of this application to any third party (the "**Bank's Application**").

3.  I will refer in this witness statement to a bundle of documents marked "**IJT5**". References to page numbers in this witness statement are to pages of IJT5, unless otherwise stated.

4.  The facts and matters stated in this witness statement are either within my own knowledge, in which case they are true, or are based on information or documents supplied by third parties whom I will identify, in which case they are true to the best of my knowledge, information and belief. In particular, part of the factual basis for this application is a meeting that took place between Chris Hardman, the partner at this firm in charge of the conduct of these proceedings for the Bank ("**Mr Hardman**") and an individual called Stuart Page, as set out in detail below. Ordinarily, this statement would have been made by Mr Hardman. However, Mr Hardman is currently away from the office and unable to sign the statement. For the reasons set out below, it is important that the Bank's Application be made immediately. Accordingly, I am making this statement following detailed discussions with Mr Hardman about the matters within his knowledge as set out below. Such matters are true to the best of my knowledge, information and belief.

5.  Where there is reference to "the Bank" carrying out investigations or making discoveries, that is to be understood as a reference to the team assisting the Bank which, in large part, is constituted of the Bank's lawyers and investigation agents.

SECTION 1: OVERVIEW

6.  The principal relief sought by the Bank's Application (which is made pursuant to CPR Part 23) is an order for disclosure. The information of which disclosure is sought relates to what the Bank believes to have been dealings in assets belonging to the First Defendant ("**Mr Ablyazov**") in breach of this Court's freezing orders over those assets.

7.  Although believed ordinarily to be resident in Dubai, Mr Aggarwal is understood to be a British citizen who owns residential property in and frequently travels to England. As developed below, the Bank understands that at least some of the information and documentation relevant to its Application may be stored in England.

8.  The Bank seeks disclosure from Mr Aggarwal of all information and documents relating to his dealings with assets on behalf of Mr Ablyazov and his son-in-law, Ilyas Khrapunov ("**Mr Khrapunov**") - whom the Bank alleges has been involved in administering and/or dealing with Mr Ablyazov's assets for a number of years - since 1 November 2012, being the first month in relation to which the Bank has evidence that Mr Aggarwal was involved in transfers of money on behalf of Messrs Ablyazov and Khrapunov (as detailed in paragraph 37 below). On the basis of the information in Section 3 below, Mr Aggarwal will almost certainly have relevant knowledge and documents in his control. The

information sought will assist the Bank in securing and then enforcing against Mr Ablyazov's assets. In addition, the Bank seeks orders restricting Mr Aggarwal's travel pending compliance with the disclosure order and restricting disclosure of this application to any third party.

9. The remainder of this witness statement is structured as follows:

    **Section 2:** Background to the Bank's Application;

    **Section 3:** The Bank's Application;

    **Section 4:** Orders sought by the Bank;

    **Section 5:** Jurisdiction;

    **Section 6:** Full and frank disclosure; and

    **Section 7:** Conclusion.

### SECTION 2: BACKGROUND TO THE BANK'S APPLICATION

10. The Bank's Application arises in the context of the wide-ranging fraud that has been found in various proceedings to have been perpetrated against it by certain members of its former management, in particular the former Chairman of its Board of Directors, Mr Ablyazov, and their associates. The Bank's multiple sets of proceedings in this Court and the Chancery Division have sought compensation of many billions of dollars from Mr Ablyazov and others, and judgments of this Court and the Chancery Division have found that Mr Ablyazov fraudulently misappropriated vast sums of money from the Bank. To date, the judgment debts owed by Mr Ablyazov to the Bank (with interest) amount to in excess of US$4.85 billion.

11. In August 2009, the Bank obtained a worldwide freezing order against Mr Ablyazov (among others) in one set of proceedings which, in December 2009, was made (in effect) unlimited in amount as regards assets outside the jurisdiction of England and Wales (the "**Ablyazov Freezing Order**"). Following the entering of judgment against Mr Ablyazov in those proceedings, the Ablyazov Freezing Order was continued by Mr Justice Teare in November 2012 with no maximum sum limit.

12. Notwithstanding the vast judgment debt against Mr Ablyazov, the Bank has not succeeded in recovering amounts of a magnitude remotely approaching that sum via its enforcement efforts. Despite the imposition of the Ablyazov Freezing Order in August 2009, Mr Ablyazov has been determined to conceal as many of his assets as possible via the use of nominee arrangements, complex structures and dealings in breach of the

- 4 -

freezing and disclosure orders of the English courts. On 16 February 2012, Mr Ablyazov was sentenced (in his absence, having fled the jurisdiction in further breach of court order) to 22 months' imprisonment for contempt of court based upon a number of sample counts arising out of some of these numerous breaches. He was subsequently discovered and arrested in July 2013 by the French authorities in the south of France. He is currently detained in Fleury-Mérogis prison in the suburbs of Paris pending the resolution of extradition proceedings to Russia and Ukraine.

13. A detailed summary of the proceedings against Mr Ablyazov and his associates can be found in Mr Justice Popplewell's judgment dated 8 August 2014 ([2014] EWHC 2788 (Comm)).

14. A further set of proceedings with Claim No. CL-2015-000549 was commenced by the Bank on 17 July 2015, directed at Mr Ablyazov and Mr Khrapunov. For a full account of the Bank's evidence against Mr Khrapunov, I refer the Court to Mr Hardman's first affidavit of in those proceedings dated 13 July 2015 ("**Hardman 1**").

15. On 17 July 2015, the Bank obtained a worldwide freezing order against Mr Khrapunov (with no maximum sum limit) (the "**Khrapunov Freezing Order**"), which was continued by Mr Justice Teare on 23 March 2016. Pursuant to the Khrapunov Freezing Order, Mr Khrapunov was ordered not to dispose of, deal with or diminish the value of any of his own or Mr Ablyazov's assets and to give disclosure of various pieces of information to the Bank's solicitors, including:

    (a) all of his own assets worldwide exceeding £10,000 in value, whether in his own name or not and whether solely or jointly owned, and whether he is interested in those assets legally, beneficially or otherwise, giving the value, location and details of all such assets (the "**Personal Asset Disclosure**");

    (b) all assets with a value exceeding £10,000 which have at any time since 1 January 2013 been administered by him for Mr Ablyazov or dealt with in accordance with Mr Ablyazov's direct or indirect instructions, giving the value, location and details of all such assets and the manner in which he has administered or dealt with those assets (the "**Ablyazov Asset Disclosure**"); and

    (c) the current value, location and details of certain Swiss assets (identified in paragraph 6(a) of the Khrapunov Freezing Order), and the nature of Mr Ablyazov's direct and/or indirect interests in those assets at all times after 1 August 2009 (the "**Swiss Asset Disclosure**").

16. Mr Khrapunov's solicitors, Hughmans Solicitors, wrote to my firm on 4 December 2015 in respect of the Ablyazov Asset Disclosure and Swiss Asset Disclosure, stating that Mr Khrapunov "*has not at any time since 1 January 2013 administered any assets for Mr Ablyazov or dealt with any assets in accordance with Mr Ablyazov's direct or indirect instructions*" and that he "*does not know the nature of any direct or indirect interest of Mr Ablyazov in any of the [Swiss] assets at any time after 1 August 2009*" (see **page 1**). Mr Khrapunov subsequently swore an affidavit on 9 December 2015 to the same effect.

17. Mr Khrapunov did not give the Personal Asset Disclosure until 29 March 2016 (as subsequently confirmed by affidavit on 1 April 2016), and only once he had exhausted all conceivable means of delay, including an unsuccessful attempt to invoke the privilege against self-incrimination. The Personal Asset Disclosure is subject to a restricted information regime; however, I can confirm for present purposes that the information provided is not adverse to the relief sought on this application. Insofar as is necessary, this information can be shared with the Court if an order is made to that effect.

18. In support of the Bank's application for the Khrapunov Freezing Order in July 2015, Mr Hardman swore Hardman 1, in which he detailed the results of the Bank's investigations and the information, evidence and documents obtained by the Bank which show Mr Khrapunov to have been closely involved in administering and concealing Mr Ablyazov's assets.

19. It is the Bank's position that much of the information given by Mr Khrapunov regarding his involvement with Mr Ablyazov's is either inaccurate or untruthful, not least because it is contradicted by the substantial evidence in Hardman 1 regarding the role that Mr Khrapunov fulfilled for Mr Ablyazov. I do not intend to repeat the contents of Hardman 1 here, but I summarise a small number of these inconsistencies below by way of example:

    (a) An individual named Sergei Tyschenko ("**Mr Tyschenko**"), who has been involved in the Bank's wider litigation against Mr Ablyazov as one of his former associates (see paragraphs 24 to 32 of Hardman 1), stated in December 2013 that Mr Khrapunov was "*effectively Mr Ablyazov's right-hand man*" (see paragraph 45). In addition, Mr Tyschenko's former wife, Elena ("**Mrs Tyschenko**"), who has admitted to being involved in administering and/or dealing with Mr Ablyazov's assets (at least in 2013), had told Mr Tyschenko that "*Khrapunov was now in charge instead of Ablyazov*" (see paragraph 45).

    (b) It is widely-known that Mrs Tyschenko had a very close relationship with Mr Ablyazov for at least several months in 2013 and assisted him in concealing his assets from the Bank. She was, therefore, very well-placed to give information as to the other individuals involved in the administration of Mr Ablyazov's assets and

told Mr Hardman in the course of discussions in 2013 and 2014 that Mr Ablyazov's aim was to position Mr Khrapunov to take over all of his businesses in early 2012 and that Messrs Ablyazov and Khrapunov had met on numerous occasions in France and Italy following Mr Ablyazov's departure from England in early 2012 in order to discuss the planning and structuring of this transfer (see paragraphs 47 and 48 of Hardman 1).

(c) In a Skype conversation between Mr Khrapunov and Mrs Tyschenko on 5 August 2013, Mr Khrapunov clearly acknowledged his role in administering Mr Ablyazov's assets, stating that "*everything should be done throught [sic.] me*" (see paragraph 57 of Hardman 1). Numerous other Skype logs obtained by the Bank further evidence Mr Khrapunov's dealings with Mr Ablyazov's assets, for example on 14 August 2013 in respect of a logistics park in the Sverdlovsky district of Russia (see paragraph 117 of Hardman 1), Marine Gardens LLC (see paragraph 125 of Hardman 1), OJSC Paveletskaya and OAO Gostinichniy Kompleks Cosmos (see paragraphs 132 to 133 of Hardman 1). All of these assets have been added to the Ablyazov Freezing Order (and, indeed, the receivership imposed over Mr Ablyazov's assets by Mr Justice Teare on 6 August 2010 (the "**Receivership Order**")) on the basis that either Mr Ablyazov has admitted to owning them or the Court has found there to be good reason to believe that they are owned by him.

(d) Mr Khrapunov appears to have a continued involvement with a Swiss law firm called Chabrier Avocats ("**Chabrier**") – as set out in detail in paragraphs 60 to 94 of Hardman 1, Chabrier appears to have been used by Mr Ablyazov on numerous occasions to facilitate the transfer of funds from or between companies which the Bank has established there is good reason to believe belong to Mr Ablyazov. I have been informed by the Bank's investigation agents that they have regularly observed Mr Khrapunov attending Chabrier's offices (at Rue du Mont-Blanc 3, 1201 Geneva).

20. In light of the inconsistencies between the Bank's evidence and Mr Khrapunov's disclosure, the Bank applied on 18 December 2015 for permission to cross examine Mr Khrapunov on his purported compliance with his disclosure obligations under the Khrapunov Freezing Order. Permission was granted by Mr Justice Teare on 23 March 2016 and a hearing for Mr Khrapunov's cross-examination was listed for 26 May 2016, being the first available convenient date.

21. Mr Khrapunov made a very belated application on 20 May 2016 for an order that the cross-examination on 26 May 2016 be adjourned and that he be cross-examined from Switzerland via video link in accordance with the Hague Evidence Convention 1970. Mr

Khrapunov alleged that if he were to travel to England for cross-examination, there would be a real risk that he would be arrested and made subject to an extradition request from Kazakhstan (primarily), Russia or Ukraine. On the other hand, if he were to remain in Switzerland, he claimed to consider himself relatively safe from such extradition. The Bank challenged this application on the basis that there is no credible evidence for either of these propositions.

22. The application was listed to be heard on 26 May 2016, the day that had been set aside by the court for the cross-examination to take place, before Mr Justice Phillips.

23. Mr Justice Phillips rejected Mr Khrapunov's claim that he was at risk of extradition if he were to come to England for cross-examination, labelling that risk *"effectively non-existent"* ([2016] EWHC 1346 (Comm) at paragraph 18). Given (amongst other things) the lateness of the application, Mr Justice Phillips also dismissed Mr Khrapunov's application that the cross-examination hearing on 26 May 2016 be adjourned, stating that it was *"absolutely hopeless"* (see **page 4**) and, therefore, that *"Mr Khrapunov has failed to comply with the order [of Mr Justice Teare dated 23 March 2016] and has done so without reasonable or indeed any justification"* (at paragraph 11). As such, Mr Khrapunov was, and continues to be, in breach of Teare J's order in failing to attend on 26 May 2016.

24. As yet, Mr Khrapunov has made no attempt to purge his contempt. He has now applied to the Court of Appeal for permission to appeal the order of Mr Justice Phillips, although the Bank does not consider that this has any real prospect of success.

25. Separate to these proceedings, proceedings are also ongoing in the United States District Court for the Southern District of New York involving (*inter alios*) Mr Khrapunov and Mr Ablyazov (the **"New York Proceedings"**). My firm is not acting in relation to the New York Proceedings, which are being conducted by Boies, Schiller & Flexner LLP, originally acting for the City of Almaty. Since the New York Proceedings began, the Bank has intervened as co-plaintiff, although it is not separately represented.

26. The New York Proceedings relate to investments in American real estate projects by a company registered in Luxembourg called Triadou SPV SA (**"Triadou"**). It is alleged that Triadou was directed by Mr Khrapunov and made these investments with funds which had been wrongfully appropriated from the City of Almaty and/or from the Bank.

27. In May 2016, an individual called Nicolas Bourg (**"Mr Bourg"**), the sole director of Triadou between 2011 and 2014, gave evidence for the plaintiffs in the New York Proceedings by affidavit (see **pages 38 to 50**) which (*inter alia*) described how he had been told by Mr Khrapunov that an entity called Telford International Limited (**"Telford"**) had been used to move Mr Ablyazov's funds to execute real estate deals in the United States through

Triadou. Specifically, Telford is said to have funded all of the money which Triadou was to invest in the "Flatotel" project, a particular real estate deal with an American real estate investor called Joseph Chetrit to which the New York Proceedings (*inter alia*) relate.

## SECTION 3: THE BANK'S APPLICATION

28. Even with the information which the Bank has been able to uncover, it does not have anything close to full visibility of Mr Khrapunov's activities, which Mr Ablyazov and Mr Khrapunov will have been concerned to conceal from the Bank as much as possible. The content of Hardman 1 sets out information which the Bank has been able to gather thus far from its investigations in its other proceedings against Mr Ablyazov; however, the Bank considers it almost certain that that information forms only part of Mr Khrapunov's involvement and that there are activities and payments in relation to Mr Ablyazov's assets involving Mr Khrapunov of which the Bank remains unaware.

29. In that regard, the Bank has recently discovered that Mr Ablyazov and Mr Khrapunov have been working Mr Aggarwal. The Bank has made enquiries of publicly available information in relation to Mr Aggarwal and has discovered the following information:

    (a) Mr Aggarwal was born on 8 January 1964 and is a second-generation British Indian, although his primary residence is Dubai (see **pages 5 and 7**).

    (b) Mr Aggarwal is Chairman of the Azure consultancy group (the "**Azure Group**") which purports to specialise in "*the bespoke design and management of legal and financial structures to protect and grow your wealth*" (see **page 11**). On his own website, Mr Aggarwal states that "*[f]or the last 18 years, [he] has helped clients to protect and build their wealth, using international planning solutions, and offshore company and trust management*" (see **page 5**). Indeed, it is in this role that the Bank understands him to have been involved in assisting in the transfer of money and assets on behalf of Messrs Ablyazov and Khrapunov. An individual called Anshu Aggarwal ("**Mrs Aggarwal**"), whom the Bank understands to be Mr Aggarwal's wife, is also a director of a number of entities within the Azure Group (see **page 29**) and refers to herself as "manager" of the Azure Group more generally (see **page 12**).

    (c) Mr Aggarwal also appears to be the founder and sole-practitioner of a London-based firm of chartered accountants and auditors called Appleby Windsor Limited (see **page 14 and 22**). I note that it appears from Companies House filings that Appleby Windsor Limited is effectively dormant (see **pages 22.1 to 26**).

(d) Mr Aggarwal states on a profile set out on his website (and in other public biographies) that he has a number of professional affiliations:

(i) he is a fellow of the Institute of Chartered Accountants in England and Wales, for whom he appears to have been a final professional examinations marker for three years (see **pages 5 and 18**);

(ii) he is Chairman of the Education Committee of the Arabia branch of the Society of Trust and Estate Practitioners (see **page 6**);

(iii) he is a member of the International Tax Planning Association (see **page 6**); and

(iv) he is a member of the Chartered Institute of Journalists, London (see **page 6**).

The first two of the above institutions have searchable online databases from which the Bank has been able to confirm that Mr Aggarwal is indeed recorded as a member (see **pages 20 to 21**). In addition, he is registered as a Statutory Auditor with the Institute of Certified Public Accountants of Cyprus (see **page 19**).

(e) In addition, Mr Aggarwal claims to have been a guest lecturer at the London School of Economics and to have been appointed as a lecturer on behalf of the Financial Services Authority (the "**FSA**") to teach students studying for FSA qualifications (see **page 5**). He also claims to have a diploma in Offshore Trust and Corporate Planning from the Institute of Chartered Secretaries in the Isle of Man (see **page 6**).

(f) Mr Aggarwal holds active directorships for four English companies (see **pages 22 and 27**). Mrs Aggarwal holds 15 active directorships of English companies (see **pages 28 to 33**).

(g) The Bank understands from its investigation agents that Mr and Mrs Aggarwal own a ground-floor apartment near High Street Kensington in London, namely 22 Wynnstay Gardens, W8 6UR (the "**Kensington Apartment**"). An official copy of the register of title of the Kensington Apartment, obtained from the Land Registry, is exhibited at **pages 34 to 35** showing both of them on the proprietorship register. The Bank's investigation agents have observed that, until recently, one of Mr Aggarwal's sons lived in the Kensington Apartment but moved out, apparently while building work was taking place.

30. An approach to the Bank was made earlier this year by an individual called Stuart Page ("**Mr Page**"), the chairman of what he claimed to be a global investigation and protection organisation called Page Group Limited (the "**Page Group**"). The Page Group appears from a statement on its website to have been formed in 2009 following a merger between companies in the security and investigations sectors (see **page 36**). According to his biography on the Page Group's website, Mr Page began his career as a police officer in the Metropolitan Police (where he was assigned to Scotland Yard's Anti-Terrorist Squad and Special Branch) and subsequently served as an Army Reservist with the Royal Military Police. He claims to have over 20 years of experience in the security and investigations sectors and to have conducted complex international fraud and asset tracing investigations for which he has "*an acknowledged reputation for expertise*" (see **page 37**).

31. Mr Page had contacted the Bank directly to arrange with a meeting with the Bank's representatives. This took place on 17 February 2016 between Mr Hardman and Nurlan Nurgabylov, the First Deputy Chairman of the Management Board of the Bank, (on behalf of the Bank) and Mr Page (the "**Meeting**"). I understand from Mr Hardman that during the Meeting Mr Page claimed to have access to information and documentation which would assist the Bank in proving Mr Aggarwal's involvement in dealing with assets for Messrs Ablyazov and Khrapunov. The information from the Meeting, as set out below, is based on what Mr Hardman has told me.

32. The Meeting began with Mr Page giving some background detail on Mr Aggarwal. He explained that Mr Aggarwal was a British citizen living in Dubai and that he operated a business known as the Azure Consultancy, which focused on the creation of trusts and offshore structures for its clients. Mr Page also explained that Mr Aggarwal has a long-standing friend called Adrian O'Shea ("**Mr O'Shea**"), with whom Mr Page had previously worked in Afghanistan.

33. Mr Page informed us that certain Israeli computer hackers (no further information as to the identity of the hackers was given), for whom Mr Page was acting as agent, had hacked a huge volume of data (measured in gigabytes) from Mr Aggarwal's computer, which was said to evidence that Mr Aggarwal had been involved in dealing with assets for Mr Ablyazov and Mr Khrapunov. Mr Page said that the hacked materials showed the movement of funds by Mr Aggarwal on behalf of Mr Ablyazov and Mr Khrapunov in the sum of around US$600-700 million and emphasised that he did not believe that these funds had yet been uncovered by the Bank in the course of its investigations. Mr Page elaborated that Mr Aggarwal was using Tanzania, Madagascar and the Seychelles as jurisdictions through which to transfer the funds. The aim of the Israeli hackers was to sell the hacked material to the Bank, through the agency of Mr Page.

34. When pressed as to whether he was sure from what he had seen that Mr Aggarwal had been managing assets for Mr Ablyazov and Mr Khrapunov, Mr Page stated that he was certain and that the Bank would be left in no doubt when it had seen the material obtained from Mr Aggarwal's computer.

35. Mr Page said that he had asked Mr O'Shea to contact Mr Aggarwal to make him aware of the fact that his computer had been hacked in an attempt to persuade Mr Aggarwal to divulge his dealings with Mr Ablyazov and Mr Khrapunov. It was said that, during Mr O'Shea's communications with him, Mr Aggarwal admitted to dealing with assets on behalf of Mr Ablyazov and Mr Khrapunov and to being paid around US$7 million for doing so. However, although he appeared to be concerned about the risk of action being taken against him, he was unwilling to cooperate with Mr Page and claimed to have done nothing wrong. Any such dealings with Mr Ablyazov's assets after 1 August 2009 would have been in breach of the Ablyazov Freezing Order.

36. It is notable that Mr Aggarwal purportedly told Mr O'Shea that some of the transactions he undertook for Mr Ablyazov and Mr Khrapunov related to the Federal Bank of the Middle East ("**FBME**"). As detailed in paragraphs 114 to 116 of Hardman 1, FBME and its subsidiaries appear to have had significant dealings with Mr Khrapunov (on behalf of Mr Ablyazov) in relation to transfers in apparent breach of the Ablyazov Freezing Order. In particular, Mr Khrapunov appears to have made a deposit of US$70 million in FBME in order to secure a loan from BTF Bank (a subsidiary of FBME) to a Russian company called CJSC Medion which was added to the Ablyazov Freezing Order and the Receivership Order in early 2014 on the basis that there was good reason to believe that it belongs to Mr Ablyazov. It is understood that Mr Khrapunov was also in charge of negotiating the loan itself with the son of a director of FBME.

37. The affidavit of Mr Bourg in the New York Proceedings also states that the Telford accounts through which the Khrapunov/Ablyazov investments in the New York real estate projects were funded by a number of payments between November 2012 and February 2013 were held with FBME in Cyprus (see paragraph 20 at **page 43**). Mr Bourg confirms at paragraph 24 of his affidavit that the controller of the accounts was Mr Aggarwal (see **page 44**); indeed, earlier in his affidavit Mr Bourg states that Telford as a whole was controlled by Mr Aggarwal, who is described as Mr Ablyazov's "*loyal*" financial advisor (see paragraph 10 at **pages 40 to 41**). Mr Bourg exhibits an email chain to him via "elvis elvis theuraniumguy@gmail.com", sending a SWIFT confirmation for one of the payments from January 2013, which originates from "Eesh Aggarwal" (see **pages 62 to 71**). Mr Bourg explains in his affidavit that the "Elvis Elvis" account is a pseudonymous email account of Mr Khrapunov.

38. At the Meeting, Mr Page produced and showed to Mr Hardman certain documents, which he said clearly showed that Mr Aggarwal had been dealing with the assets of Mr Ablyazov and Mr Khrapunov and would be of significant use to the Bank. Mr Hardman sought quickly to take notes of some of these documents, although the process was necessarily only summary and somewhat rushed. None of the documents was left with the Bank following the Meeting.

39. With the benefit of those notes, Mr Hardman has informed me that the documents produced by Mr Page included:

   (a) a copy of Mr Ablyazov's 12th witness statement dated 15 November 2010 in the Bank's Drey Proceedings against Mr Ablyazov (Claim No. 2009 Folio 1099) – this witness statement set out at great length Mr Ablyazov's claims that he had been politically persecuted by the Kazakh government and that all criminal investigations and allegations of fraud and embezzlement against him and his associates were entirely false. Mr Page produced the first four pages of this witness statement as evidence that Mr Aggarwal possessed it and commented that there could be no reason for Mr Aggarwal to hold this document if he were not working with Mr Ablyazov or his associates. The Bank understands that Mr Ablyazov made a copy of this witness statement publicly available on the internet, so it is possible that Mr Aggarwal simply obtained it from the public domain. However, it is not clear why he would have saved the witness statement to his computer if he were not involved with Mr Ablyazov and, given the further links between the two (as set out in this witness statement), it seems highly improbable that Mr Aggarwal's possession of Mr Ablyazov's witness statement is merely coincidental;

   (b) a spreadsheet entitled "*Ilyas companies' spreadsheet*" – this showed a final value of funds held by companies purportedly owned by Mr Khrapunov of US$107,472,888. The companies listed on the spreadsheet included Claremont Holding, Sartfield, Vilder, Romford, Fincogest, Unedel, RPM Marco, and Eastway Dubai. The spreadsheet showed aggregate dealings of US$232,126,342 in the name of Sartfield alone;

   (c) a document related to assets described as "*Northern Project*" – this document purported to set out the cash positions as at 1 May 2013 of various companies within the so-called Northern Project. One company called Lowtides appears to have held US$60.4 million in cash; another called Derwi Investment was said to hold US$43 million with FBME; another called Telford Investments purported to hold US$14.7 million with FBME, as well as a trading account with a further

US$15 million; and another called Northern Seas was said to hold US$40.1 million. As noted in paragraphs 36 and 37 above, the involvement of FBME in holding funds for Mr Ablyazov and Mr Khrapunov is notable in the circumstances; and

(d) Mr Page also claimed that he held numerous screenshots of Skype messages making reference to "*Napoleon*", which he said was Mr Aggarwal's code name for Mr Khrapunov. One such screenshot was produced, although Mr Hardman noted that the code name was misspelled as "*Napolean*".

Prior to the Meeting, none of these companies was known to the Bank.

40. In addition to the documents produced at the Meeting, Mr Page claimed that emails from April 2013 had been obtained which concerned transactions made on behalf of Mr Khrapunov and that a copy of a Skype message with "*Elvis*" had been recovered which evidenced the transfer of funds. As noted above, "Elvis" has been described by Mr Bourg as a pseudonym used by Mr Khrapunov in communications relating to the transfer of funds for Mr Ablyazov.

41. It is also notable that Mr Page suggested that, in addition to the material obtained by the hackers, a substantial amount of Mr Aggarwal's confidential business papers are stored in the Kensington Apartment, rather than held in Dubai. Indeed, Mr Page went on to claim that he knew someone who had been inside the Kensington Apartment and had seen racks of files. Mr Page appeared to consider it likely that the files in the Kensington Apartment would contain hard-copy documents relating to Mr Aggarwal's involvement in dealings with Mr Ablyazov and Mr Khrapunov.

42. The Bank did not agree with Mr Page to purchase the hacked material.

## SECTION 4: ORDERS SOUGHT BY THE BANK

### Disclosure order

43. The Bank's case is that Mr Ablyazov and Mr Khrapunov have conspired to prevent the Bank from being able to secure and enforce its judgments against Mr Ablyazov's assets, and that Mr Aggarwal has been involved in transactions by which they have sought to do so. The extent of such wrongdoing is unknown to the Bank, as are many of the particular schemes used.

44. Against this background, the Bank submits that its request for all information and documents relating to Mr Aggarwal's dealings with assets for Mr Ablyazov and Mr Khrapunov since 1 November 2012 is necessary and proportionate in the context of the

-14-

potential scale of the wrongdoing which the Bank suspects has occurred. The Bank seeks an order that Mr Aggarwal respond in the usual way, by providing a sworn affidavit with responsive documents exhibited.

**Travel restrictions and preservative injunction**

45. The information that has come into the Bank's possession suggests that Mr Aggarwal has been involved in dealings directed at concealing assets belonging to Mr Ablyazov worth many hundreds of millions of dollars, assisting Mr Ablyazov in committing very serious breaches of this Court's orders.

46. Given the publicity surrounding the Bank's proceedings against Mr Ablyazov, the Bank suggests that it is unlikely that Mr Aggarwal did so without being aware that this involved such breaches being committed by Mr Ablyazov.

47. In the course of the Meeting, it was reported by Mr Page that Mr Aggarwal is very cautious when it comes to his business and, when travelling, gives very little sign of forward planning. Mr Page stated that Mr Aggarwal always flies economy class and purchases numerous return tickets for each business trip in order to make him more difficult to follow.

48. In the circumstances, the Bank considers it likely that, if Mr Aggarwal were served with a disclosure order, absent additional orders imposing travel restrictions, it is reasonably to be inferred that he would simply leave the jurisdiction as soon as possible, destroy the relevant evidence which he holds, refuse to comply with the Court's order and remain outside the jurisdiction.

49. Accordingly, the Bank considers that an order prohibiting Mr Aggarwal from leaving the jurisdiction and requiring him to surrender his passport, pending compliance, would be proportionate.

50. As noted above, in the context of Mr Aggarwal's apparent involvement in such serious breaches of this Court's orders, the Bank considers it likely that Mr Aggarwal would have no qualms about destroying all documents relevant to his dealings with Mr Ablyazov and Mr Khrapunov. As such, the Bank seeks a further order that Mr Aggarwal preserve all documents responsive to the Bank's Application.

**Restriction on disclosure to other parties**

51.  In addition, the Bank seeks an order to restrain Mr Aggarwal from disclosing the Bank's Application and any consequent court order to any party. As noted above, Mr Page stated his belief that the Bank is, as yet, unaware of the existence of the assets uncovered by the hackers. If Mr Aggarwal were to inform Mr Khrapunov (or, indeed, Mr Ablyazov) of a court order requiring him to reveal that information, there is a real and substantial risk that Mr Khrapunov will seek to transfer and/or restructure the relevant assets (without Mr Aggarwal's involvement) in order to evade the Court's order and to frustrate potential enforcement by the Bank of its judgments against Mr Ablyazov over those assets. Clearly any such dealings would be in breach of the Ablyazov Freezing Order and/or the Khrapunov Freezing Order, but the Bank's previous experience in its proceedings against Mr Ablyazov demonstrate that prohibitive orders such as these do not necessarily prevent further dealings taking place.

### SECTION 5: JURISDICTION

52.  Mr Aggarwal has significant links to and, the Bank understands from both Mr Page and its own investigation agents, appears frequently to visit England. Indeed, the Bank's Application is brought on urgently because the Bank understands from its investigation agents that Mr Aggarwal is currently in the jurisdiction, having flown in from Dubai on 13 June 2016. It is therefore the Bank's intention to serve any order made by the Court on him personally in this jurisdiction. As such, Mr Aggarwal will be subject to the jurisdiction of the English courts.

53.  Companies House filings record Mr Aggarwal as a British citizen (see **pages 22 and 27**) and he and Mrs Aggarwal own the Kensington Apartment at which one of his sons is (or, until at least very recently, was) resident (see **pages 34 to 35**). During the Meeting, Mr Page stated that Mr Aggarwal regularly travels to London and that he has transferred many of his business documents from Dubai to the Kensington Apartment. It is stated on Mr Aggarwal's website that "*you'll usually find him at his office, either in Dubai or London*" (see **page 7**). In addition, according to Companies House records, Mr and Mrs Aggarwal hold no fewer than 19 active directorships of English companies between them (see **pages 22 and 27 to 33**).

## SECTION 6: FULL AND FRANK DISCLOSURE

54. The Bank's Application is brought without notice. This necessary and appropriate given the nature of Mr Aggarwal's apparent conduct and his relationship with Mr Ablyazov and Mr Khrapunov. If the Bank were to bring this application on notice, Mr Aggarwal would be likely to avoid coming into the jurisdiction (if served out of the jurisdiction) or would respond by leaving the jurisdiction (if served within the jurisdiction) and may simply destroy materials which would be responsive to the Bank's Application.

55. Having regard to the Bank's duty of full and frank disclosure on a without notice application such as this, I deal below with a number of points which it seems to the Bank may be taken contrary to the Bank's Application (although the Bank respectfully submits that, upon proper analysis, none of these in fact constitute any good reason why the relief sought should not be granted).

### Professional qualifications and affiliations

56. As set out above, Mr Aggarwal has various professional affiliations and qualifications, and claims to have lectured at a number of prestigious organisations.

57. On the basis of these qualifications and affiliations, Mr Aggarwal may seek to argue that he is a respectable professional and, as such, there is no risk of him attempting to evade a court order. However, given the potential scale of the wrongdoing which the Bank suspects has occurred as a result of Mr Aggarwal's activity, the Bank submits that this should not prevent the orders sought from being made.

### Ties to the jurisdiction

58. As set out in Section 5 above, Mr Aggarwal appears to have ties to the jurisdiction, on the basis of which he might argue that he does not constitute a flight risk and there is no real risk of him simply avoiding the jurisdiction.

59. However, the Bank understands that Mr Aggarwal does the majority of his work from Dubai and, as noted above, is very cautious when travelling, giving very little sign of forward planning and purchasing numerous return tickets for each business trip in order to make him more difficult to follow. As such, the Bank believes that, if Mr Aggarwal were served with the Bank's Application and/or the orders sought by the Bank absent a restriction on his travel pending compliance, there is a real risk that Mr Aggarwal will simply leave the jurisdiction and avoid the jurisdiction going forwards.

**Onerous burden**

60. It may be argued that that the order sought by the Bank places too onerous a burden on Mr Aggarwal. This will be addressed in submissions.

**Legitimacy of Mr Page's information**

61. It may be said that Mr Page (and the Israeli hackers) have fabricated the purportedly hacked material, using Mr Aggarwal as a realistic protagonist, and are simply looking to extort money from the Bank. It may also be said that Mr Page is simply mistaken in his understanding of the material.

62. However, on the basis of the evidence explained and shown to Mr Hardman at the Meeting, coupled with the Bank's understanding of Mr Aggarwal's association with Mr Ablyazov and Mr Khrapunov in relation to the New York proceedings, it seems clear that Mr Aggarwal has indeed been involved in dealings with assets in breach of the Ablyazov Freezing Order and will, therefore, possess substantial knowledge and information relevant to the Bank's Application.

**Timing of the Bank's Application**

63. The Bank has been aware of Mr Aggarwal's involvement in administering assets for Mr Ablyazov and Mr Khrapunov for some time and had been working up papers towards an application of this nature. However, the Bank understands from its investigation agents that Mr Aggarwal's son, who was resident at the Kensington Apartment, returned to Dubai earlier this year and neither Mr Aggarwal nor his son had been seen in the UK since. Accordingly, the Bank had thought that the opportunity to obtain a disclosure order and to serve it on Mr Aggarwal may have been missed.

64. However, the Bank's investigation agents, who have been periodically monitoring Mr Aggarwal in Dubai, informed the Bank yesterday that Mr Aggarwal flew to the jurisdiction on 13 June 2016. Accordingly, papers in support of the Bank's Application were finalised as quickly as possible and an urgent hearing is sought.

65. The Bank respectfully requests that its Application should now be granted because, on the basis of the evidence available to the Bank, it seems highly likely that Mr Aggarwal holds information and/or documentation relating to the assets of Mr Ablyazov and Mr Khrapunov of which the Bank has previously been unaware and against which, depending on information uncovered, the Bank may wish to take appropriate steps.

**Proceedings against Mr Khrapunov**

66. For completeness in respect of the Bank's proceedings against Messrs Ablyazov and Khrapunov (Claim No. CL-2015-000549), and in addition to Mr Khrapunov's extant application for permission to appeal Mr Justice Teare's order dated 23 March 2016 (see paragraph 24 above), I note that Mr Khrapunov is currently appealing Mr Justice Teare's finding that the Court has jurisdiction to hear the claim.

### SECTION 7: CONCLUSION

67. For the reasons set out above, the Bank respectfully asks the Court to grant the order sought in the draft appended to the Bank's Application.

### STATEMENT OF TRUTH

I believe that the facts stated in this witness statement are true.

*[signature]*

Iain James Tucker

Dated this 14th day of June 2016

Witness Statement
Claimant
I J Tucker
Fifth
"IJT5"
14 June 2016

CLAIM NOS. 2009 FOLIO 1099;
CL-2015-000549

IN THE HIGH COURT OF JUSTICE
QUEEN'S BENCH DIVISION
COMMERCIAL COURT

BETWEEN:

JSC BTA BANK

Claimant/Applicant

- and -

(1) MUKHTAR ABLYAZOV

(2) ILYAS KHRAPUNOV

Defendants

- and -

EESH AGGARWAL

Respondent

---

**FIFTH WITNESS STATEMENT
OF IAIN JAMES TUCKER**

---

Hogan Lovells International LLP
Atlantic House
Holborn Viaduct
London EC1A 2FG
Ref: D3/CGH/IJT/WJM/5503907

Solicitors for the Claimant/Applicant

LIB03/TUCKERIA/5612394.1

Hogan Lovells