# EXHIBIT H

# EXHIBIT A

# THE NEW YORKER

NEWS DESK

# HARVEY WEINSTEIN'S ARMY OF SPIES

*The film executive hired private investigators, including ex-Mossad agents, to track actresses and journalists.*

By Ronan Farrow    November 6, 2017

In the fall of 2016, Harvey Weinstein set out to suppress allegations that he had sexually harassed or assaulted numerous women. He began to hire private security agencies to collect information on the women and the journalists trying to expose the allegations. According to dozens of pages of documents, and seven people directly involved in the effort, the firms that Weinstein hired included Kroll, which is one of the world's largest corporate-intelligence companies, and Black Cube, an enterprise run largely by former officers of Mossad and other Israeli intelligence agencies. Black Cube, which has branches in Tel Aviv, London, and Paris, offers its clients the skills of operatives "highly experienced and trained in Israel's elite military and governmental intelligence units," according to its literature.

Two private investigators from Black Cube, using false identities, met with the actress Rose McGowan, who eventually publicly accused Weinstein of rape, to extract information from her. One of the investigators pretended to be a women's-rights advocate and secretly recorded at least four meetings with McGowan. The same operative, using a different false identity and

implying that she had an allegation against Weinstein, met twice with a journalist to find out which women were talking to the press. In other cases, journalists directed by Weinstein or the private investigators interviewed women and reported back the details.

The explicit goal of the investigations, laid out in one contract with Black Cube, signed in July, was to stop the publication of the abuse allegations against Weinstein that eventually emerged in the New York *Times* and *The New Yorker*. Over the course of a year, Weinstein had the agencies "target," or collect information on, dozens of individuals, and compile psychological profiles that sometimes focussed on their personal or sexual histories. Weinstein monitored the progress of the investigations personally. He also enlisted former employees from his film enterprises to join in the effort, collecting names and placing calls that, according to some sources who received them, felt intimidating.

In some cases, the investigative effort was run through Weinstein's lawyers, including David Boies, a celebrated attorney who represented Al Gore in the 2000 Presidential-election dispute and argued for marriage equality before the U.S. Supreme Court. Boies personally signed the contract directing Black Cube to attempt to uncover information that would stop the publication of a *Times* story about Weinstein's abuses, while his firm was also representing the *Times*, including in a libel case.

Boies confirmed that his firm contracted with and paid two of the agencies and that investigators from one of them sent him reports, which were then passed on to Weinstein. He said that he did not select the firms or direct the investigators' work. He also denied that the work regarding the *Times* story represented a conflict of interest. Boies said that his firm's involvement with the investigators was a mistake. "We should not have been contracting with and paying investigators that we did not select and direct," he told me. "At the time, it seemed a reasonable accommodation for a client, but it was not

thought through, and that was my mistake. It was a mistake at the time."

Techniques like the ones used by the agencies on Weinstein's behalf are almost always kept secret, and, because such relationships are often run through law firms, the investigations are theoretically protected by attorney-client privilege, which could prevent them from being disclosed in court. The documents and sources reveal the tools and tactics available to powerful individuals to suppress negative stories and, in some cases, forestall criminal investigations.

In a statement, Weinstein's spokesperson, Sallie Hofmeister, said, "It is a fiction to suggest that any individuals were targeted or suppressed at any time."

In May, 2017, McGowan received an e-mail from a literary agency introducing her to a woman who identified herself as Diana Filip, the deputy head of sustainable and responsible investments at Reuben Capital Partners, a London-based wealth-management firm. Filip told McGowan that she was launching an initiative to combat discrimination against women in the workplace, and asked McGowan, a vocal women's-rights advocate, to speak at a gala kickoff event later that year. Filip offered McGowan a fee of sixty thousand dollars. "I understand that we have a lot in common," Filip wrote to McGowan before their first meeting, in May, at the Peninsula Hotel in Beverly Hills. Filip had a U.K. cell-phone number, and she spoke with what McGowan took to be a German accent. Over the following months, the two women met at least three more times at hotel bars in Los Angeles and New York and other locations. "I took her to the Venice boardwalk and we had ice cream while we strolled," McGowan told me, adding that Filip was "very kind." The two talked at length about issues relating to women's empowerment. Filip also repeatedly told McGowan that she wanted to make a significant investment in McGowan's production company.

Filip was persistent. In one e-mail, she suggested meeting in Los Angeles and then, when McGowan said she would be in New York, Filip said she could meet there just as easily. She also began pressing McGowan for information. In a conversation in July, McGowan revealed to Filip that she had spoken to me as part of my reporting on Weinstein. A week later, I received an e-mail from Filip asking for a meeting and suggesting that I join her campaign to end professional discrimination against women. "I am very impressed with your work as a male advocate for gender equality, and believe that you would make an invaluable addition to our activities," she wrote, using her wealth-management firm's e-mail address. Unsure of who she was, I did not respond.

Filip continued to meet with McGowan. In one meeting in September, Filip was joined by another Black Cube operative, who used the name Paul and claimed to be a colleague at Reuben Capital Partners. The goal, according to two sources with knowledge of the effort, was to pass McGowan to another operative to extract more information. On October 10th, the day *The New Yorker* published my story about Weinstein, Filip reached out to McGowan in an e-mail. "Hi Love," she wrote. "How are you feeling? . . . Just wanted to tell you how brave I think you are." She signed off with an "xx." Filip e-mailed McGowan as recently as October 23rd.

In fact, "Diana Filip" was an alias for a former officer in the Israeli Defense Forces who originally hailed from Eastern Europe and was working for Black Cube, according to three individuals with knowledge of the situation. When I sent McGowan photos of the Black Cube agent, she recognized her instantly. "Oh my God," she wrote back. "Reuben Capital. Diana Filip. No fucking way."

Ben Wallace, a reporter at *New York* who was pursuing a story on Weinstein, said that the same woman met with him twice last fall. She identified herself only as Anna and suggested that she had an allegation against Weinstein. When I presented Wallace with the same photographs of

Black Cube's undercover operative, Wallace recalled her vividly. "That's her," he said. Like McGowan, Wallace said that the woman had what he assumed to be a German accent, as well as a U.K. cell-phone number. Wallace told me that Anna first contacted him on October 28, 2016, when he had been working on the Weinstein story for about a month and a half. Anna declined to disclose who had given her Wallace's information. Over the course of the two meetings, Wallace grew increasingly suspicious of her motives. Anna seemed to be pushing him for information, he recalled, "about the status and scope of my inquiry, and about who I might be talking to, without giving me any meaningful help or information." During their second meeting, Anna requested that they sit close together, leading Wallace to suspect that she might be recording the exchange. When she recounted her experiences with Weinstein, Wallace said, "it seemed like soap-opera acting." Wallace wasn't the only journalist the woman contacted. In addition to her e-mails to me, Filip also e-mailed Jodi Kantor, of the *Times*, according to sources involved in the effort.

The U.K. cell-phone numbers that Filip provided to Wallace and McGowan have been disconnected. Calls to Reuben Capital Partners' number in London went unanswered. As recently as Friday, the firm had a bare-bones Web site, with stock photos and generic text passages about asset management and an initiative called Women in Focus. The site, which has now been taken down, listed an address near Piccadilly Circus, operated by a company specializing in shared office space. That company said that it had never heard of Reuben Capital Partners. Two sources with knowledge of Weinstein's work with Black Cube said that the firm creates fictional companies to provide cover for its operatives, and that Filip's firm was one of them.

Black Cube declined to comment on the specifics of any work it did for Weinstein. The agency said in a statement, "It is Black Cube's policy to never

discuss its clients with any third party, and to never confirm or deny any speculation made with regard to the company's work. Black Cube supports the work of many leading law firms around the world, especially in the US, gathering evidence for complex legal processes, involving commercial disputes, among them uncovering negative campaigns. . . . It should be highlighted that Black Cube applies high moral standards to its work, and operates in full compliance with the law of any jurisdiction in which it operates—strictly following the guidance and legal opinions provided by leading law firms from around the world." The contract with the firm also specified that all of its work would be obtained "by legal means and in compliance with all applicable laws and regulations."

Last fall, Weinstein began mentioning Black Cube by name in conversations with his associates and attorneys. The agency had made a name for itself digging up information for companies in Israel, Europe, and the U.S. that led to successful legal judgments against business rivals. But the firm has also faced legal questions about its employees' use of fake identities and other tactics. Last year, two of its investigators were arrested in Romania on hacking charges. In the end, the company reached an agreement with the Romanian authorities, under which the operatives admitted to hacking and were released. Two sources familiar with the agency defended its decision to work for Weinstein, saying that they originally believed that the assignment focussed on his business rivals. But even the earliest lists of names that Weinstein provided to Black Cube included actresses and journalists.

On October 28, 2016, Boies's law firm, Boies Schiller Flexner, wired to Black Cube the first hundred thousand dollars, toward what would ultimately be a six-hundred-thousand-dollar invoice. (The documents do not make clear how much of the invoice was paid.) The law firm and Black Cube signed a contract that month and several others later. One, dated July 11, 2017, and bearing Boies's signature, states that the project's "primary objectives" are to

"provide intelligence which will help the Client's efforts to completely stop the publication of a new negative article in a leading NY newspaper" and to "obtain additional content of a book which currently being written and includes harmful negative information on and about the Client," who is identified as Weinstein in multiple documents. (In one e-mail, a Black Cube executive asks lawyers retained by the agency to refer to Weinstein as "the end client" or "Mr. X," noting that referring to him by name "will make him extremely angry.") The article mentioned in the contract was, according to three sources, the story that ultimately ran in the *Times* on October 5th. The book was "Brave," a memoir by McGowan, scheduled for publication by HarperCollins in January. The documents show that, in the end, the agency delivered to Weinstein more than a hundred pages of transcripts and descriptions of the book, based on tens of hours of recorded conversations between McGowan and the female private investigator.

Weinstein's spokesperson, Hofmeister, called "the assertion that Mr. Weinstein secured any portion of a book . . . false and among the many inaccuracies and wild conspiracy theories promoted in this article."

The July agreement included several "success fees" if Black Cube met its goals. The firm would receive an additional three hundred thousand dollars if the agency "provides intelligence which will directly contribute to the efforts to completely stop the Article from being published at all in any shape or form." Black Cube would also be paid fifty thousand dollars if it secured "the other half" of McGowan's book "in readable book and legally admissible format."

The contracts also show some of the techniques that Black Cube employs. The agency promised "a dedicated team of expert intelligence officers that will operate in the USA and any other necessary country," including a project manager, intelligence analysts, linguists, and "Avatar Operators" specifically hired to create fake identities on social media, as well as "operations experts

with extensive experience in social engineering." The agency also said that it would provide "a full time agent by the name of 'Anna' (hereinafter 'the Agent'), who will be based in New York and Los Angeles as per the Client's instructions and who will be available full time to assist the Client and his attorneys for the next four months." Four sources with knowledge of Weinstein's work with Black Cube confirmed that this was the same woman who met with McGowan and Wallace.

Black Cube also agreed to hire "an investigative journalist, as per the Client request," who would be required to conduct ten interviews a month for four months and be paid forty thousand dollars. Black Cube agreed to "promptly report to the Client the results of such interviews by the Journalist."

In January, 2017, a freelance journalist called McGowan and had a lengthy conversation with her that he recorded without telling her; he subsequently communicated with Black Cube about the interviews, though he denied he was reporting back to them in a formal capacity. He contacted at least two other women with allegations against Weinstein, including the actress Annabella Sciorra, who later went public in *The New Yorker* with a rape allegation against Weinstein. Sciorra, whom he called in August, said that she found the conversation suspicious and got off the phone as quickly as possible. "It struck me as B.S.," she told me. "And it scared me that Harvey was testing to see if I would talk." The freelancer also placed calls to Wallace, the *New York* reporter, and to me.

Two sources close to the effort and several documents show that the same freelancer received contact information for actresses, journalists, and business rivals of Weinstein from Black Cube, and that the agency ultimately passed summaries of those interviews to Weinstein's lawyers. When contacted about his role, the freelancer, who spoke on condition of anonymity, said that he had been working on his own story about Weinstein, using contact information fed to him by Black Cube. The freelancer said that he reached

out to other reporters, one of whom used material from his interviews, in the hopes of helping to expose Weinstein. He denied that he was paid by Black Cube or Weinstein.

Weinstein also enlisted other journalists to uncover information that he could use to undermine women with allegations. A December, 2016, e-mail exchange between Weinstein and Dylan Howard, the chief content officer of American Media Inc., which publishes the *National Enquirer*, shows that Howard shared with Weinstein material obtained by one of his reporters, as part of an effort to help Weinstein disprove McGowan's allegation of rape. In one e-mail, Howard sent Weinstein a list of contacts. "Let's discuss next steps on each," he wrote. After Weinstein thanked him, Howard described a call that one of his reporters made to Elizabeth Avellan, the ex-wife of the director Robert Rodriguez, whom Rodriguez left to have a relationship with McGowan.

Avellan told me that she remembered the interview. Howard's reporter "kept calling and calling and calling," she said, and also contacted others close to her. Avellan finally called back, because "I was afraid people might start calling my kids." In a long phone call, the reporter pressed her for unflattering statements about McGowan. She insisted that the call be off the record, and the reporter agreed. The reporter recorded the call, and subsequently passed the audio to Howard.

In subsequent e-mails to Weinstein, Howard said, "I have something AMAZING . . . eventually she laid into Rose pretty hard." Weinstein replied, "This is the killer. Especially if my fingerprints r not on this." Howard then reassured Weinstein, "They are not. And the conversation . . . is RECORDED." The next day, Howard added, in another e-mail, "Audio file to follow." (Howard denied sending the audio to Weinstein.) Avellan told me that she would not have agreed to coöperate in efforts to discredit McGowan. "I don't want to shame people," she said. "I wasn't interested. Women should

stand together."

In a statement, Howard said that, in addition to his role as the chief content officer at American Media Inc., the *National Enquirer's* publisher, he oversaw a television-production agreement with Weinstein, which has since been terminated. He said that, at the time of the e-mails, "absent a corporate decision to terminate the agreement with The Weinstein Company, I had an obligation to protect AMI's interests by seeking out—but not publishing—truthful information about people who Mr. Weinstein insisted were making false claims against him. To the extent I provided 'off the record' information to Mr. Weinstein about one of his accusers—at a time when Mr. Weinstein was denying any harassment of any woman—it was information which I would never have allowed AMI to publish on the internet or in its magazines." Although at least one of Howard's reporters made calls related to Weinstein's investigations, Howard insisted that he strictly divided his work with Weinstein from his work as a journalist. "I always separated those two roles carefully and completely—and resisted Mr. Weinstein's repeated efforts to have AMI titles publish favorable stories about him or negative articles about his accusers," Howard said. An A.M.I. representative noted that, at the time, Weinstein insisted that the encounter was consensual, and that the allegations were untrue.

Hofmeister, Weinstein's spokesperson, added, "In regard to Mr. Howard, he has served as the point person for American Media's long-standing business relationship with The Weinstein Company. Earlier this year, Mr. Weinstein gave Mr. Howard a news tip that Mr. Howard agreed might make a good story. Mr. Howard pursued the tip and followed up with Mr. Weinstein as a courtesy, but declined to publish any story."

Weinstein's relationship with Kroll, one of the other agencies he contracted with, dates back years. After Ambra Battilana Gutierrez, an Italian model, accused Weinstein of sexually assaulting her, in 2015, she

reached a settlement with Weinstein that required her to surrender all her personal devices to Kroll, so that they could be wiped of evidence of a conversation in which Weinstein admitted to groping her. A recording of that exchange, captured during a police sting operation, was released by *The New Yorker* last month.

During the more recent effort to shut down emerging stories, Kroll again played a central role. E-mails show that Dan Karson, the chairman of Kroll Americas' Investigations and Disputes practice, contacted Weinstein at his personal e-mail address with information about women with allegations. In one October, 2016, e-mail, Karson sent Weinstein eleven photographs of McGowan and Weinstein together at different events in the years after he allegedly assaulted her. Three hours later, Weinstein forwarded Karson's e-mail to Boies and Weinstein's criminal-defense attorney, Blair Berk, and told them to "scroll thru the extra ones." The next morning, Berk replied that one photo, which showed McGowan warmly talking with Weinstein, "is the money shot."

Berk defended her actions. "Any criminal-defense lawyer worth her salt would investigate unproven allegations to determine if they are credible," she said. "And it would be dereliction of duty not to conduct a public-records search for photographs of the accuser embracing the accused taken after the time of the alleged assault."

Another firm, the Los Angeles-based PSOPS, and its lead private investigator, Jack Palladino, as well as another one of its investigators, Sara Ness, produced detailed profiles of various individuals in the saga, sometimes of a personal nature, which included information that could be used to undermine their credibility. One report on McGowan that Ness sent to Weinstein last December ran for more than a hundred pages and featured McGowan's address and other personal information, along with sections labelled "Lies/Exaggerations/Contradictions," "Hypocrisy," and "Potential Negative

Character Wits," an apparent abbreviation of "witnesses." One subhead read "Past Lovers." The section included details of acrimonious breakups, mentioning Avellan, and discussed Facebook posts expressing negative sentiments about McGowan. (Palladino and Ness did not respond to multiple requests for comment.)

Other firms were also involved in assembling such profiles, including ones that focussed on factors that, in theory, might make women likely to speak out against sexual abuse. One of the other firm's profiles was of Rosanna Arquette, an actress who later, in *The New Yorker*, accused Weinstein of sexual harassment. The file mentions Arquette's friendship with McGowan, social-media posts about sexual abuse, and the fact that a family member had gone public with an allegation that she had been molested as a child.

All of the security firms that Weinstein hired were also involved in trying to ferret out reporters' sources and probe their backgrounds. Wallace, the reporter for *New York*, said that he was suspicious when he received the call from the Black Cube operative using the pseudonym Anna, because Weinstein had already requested a meeting with Wallace; Adam Moss, the editor-in-chief of *New York*; David Boies; and a representative from Kroll. The intention, Wallace assumed, was to "come in with dossiers slagging various women and me." Moss declined the meeting.

In a series of e-mails sent in the weeks before Wallace received the call from Anna, Dan Karson, of Kroll, sent Weinstein preliminary background information on Wallace and Moss. "No adverse information about Adam Moss so far (no libel/defamation cases, no court records or judgments/liens/UCC, etc.)," Karson wrote in one e-mail. Two months later, Palladino, the PSOPS investigator, sent Weinstein a detailed profile of Moss. It stated, "Our research did not yield any promising avenues for the personal impeachment of Moss."

Similar e-mail exchanges occurred regarding Wallace. Kroll sent Weinstein a list of public criticisms of Wallace's previous reporting and a detailed description of a U.K. libel suit filed in response to a book he wrote, in 2008, about the rare-wine market. PSOPS also profiled Wallace's ex-wife, noting that she "might prove relevant to considerations of our response strategy when Wallace's article on our client is finally published."

In January, 2017, Wallace, Moss, and other editors at *New York* decided to shelve the story. Wallace had assembled a detailed list of women with allegations, but he lacked on-the-record statements from any victims. Wallace said that the decision not to run a story was made for legitimate journalistic reasons. Nevertheless, he said, "There was much more static and distraction than I've encountered on any other story."

Other reporters were investigated as well. In April, 2017, Ness, of PSOPS, sent Weinstein an assessment of my own interactions with "persons of interest"—a list largely consisting of women with allegations, or those connected to them. Later, PSOPS submitted a detailed report focussing jointly on me and Jodi Kantor, of the *Times*. Some of the observations in the report are mundane. "Kantor is NOT following Ronan Farrow," it notes, referring to relationships on Twitter. At other times, the report reflects a detailed effort to uncover sources. One individual I interviewed, and another whom Kantor spoke to in her separate endeavor, were listed as having reported the details of the conversations back to Weinstein.

For years, Weinstein had used private security agencies to investigate reporters. In the early aughts, as the journalist David Carr, who died in 2015, worked on a report on Weinstein for *New York*, Weinstein assigned Kroll to dig up unflattering information about him, according to a source close to the matter. Carr's widow, Jill Rooney Carr, told me that her husband believed that he was being surveilled, though he didn't know by whom. "He thought he was being followed," she recalled. In one document, Weinstein's

investigators wrote that Carr had learned of McGowan's allegation in the course of his reporting. Carr "wrote a number of critical/unflattering articles about HW over the years," the document says, "none of which touched on the topic of women (due to fear of HW's retaliation, according to HW)."

Weinstein's relationships with the private investigators were often routed through law firms that represented him. This is designed to place investigative materials under the aegis of attorney-client privilege, which can prevent the disclosure of communications, even in court.

David Boies, who was involved in the relationships with Black Cube and PSOPS, was initially reluctant to speak with *The New Yorker*, out of concern that he might be "misinterpreted either as trying to deny or minimize mistakes that were made, or as agreeing with criticisms that I don't agree are valid."

But Boies did feel the need to respond to what he considered "fair and important" questions about his hiring of investigators. He said that he did not consider the contractual provisions directing Black Cube to stop the publication of the *Times* story to be a conflict of interest, because his firm was also representing the newspaper in a libel suit. From the beginning, he said, he advised Weinstein "that the story could not be stopped by threats or influence and that the only way the story could be stopped was by convincing the *Times* that there was no rape." Boies told me he never pressured any news outlet. "If evidence could be uncovered to convince the *Times* the charges should not be published, I did not believe, and do not believe, that that would be averse to the *Times*' interest."

He conceded, however, that any efforts to profile and undermine reporters, at the *Times* and elsewhere, were problematic. "In general, I don't think it's appropriate to try to pressure reporters," he said. "If that did happen here, it would not have been appropriate."

Although the agencies paid by his firm focussed on many women with allegations, Boies said that he had only been aware of their work related to McGowan, whose allegations Weinstein denied. "Given what was known at the time, I thought it was entirely appropriate to investigate precisely what he was accused of doing, and to investigate whether there were facts that would rebut those accusations," he said.

Of his representation of Weinstein in general, he said, "I don't believe former lawyers should criticize former clients." But he expressed regrets. "Although he vigorously denies using physical force, Mr. Weinstein has himself recognized that his contact with women was indefensible and incredibly hurtful," Boies told me. "In retrospect, I knew enough in 2015 that I believe I should have been on notice of a problem, and done something about it. I don't know what, if anything, happened after 2015, but to the extent it did, I think I have some responsibility. I also think that if people had taken action earlier it would have been better for Mr. Weinstein."

Weinstein also drafted individuals around him into his efforts—willingly and not. In December, 2016, Weinstein asked the actress Asia Argento, who ultimately went public in *The New Yorker* with her allegation of rape against Weinstein, to meet in Italy with his private investigators to give testimony on his behalf. Argento, who felt pressure to say yes, declined after her partner, the chef and television personality Anthony Bourdain, advised her to avoid the meeting. Another actress, who declined to be named in this story, said that Weinstein asked her to meet with reporters to extract information about other sources.

Weinstein also enlisted two former employees, Denise Doyle Chambers and Pamela Lubell, in what turned out to be an effort to identify and call people who might speak to the press about their own, or others', allegations. Weinstein secretly shared the lists they compiled with Black Cube.

Case 1:15-cv-05345-AJN-KHP   Document 467-8   Filed 11/20/17   Page 18 of 19

Hofmeister, speaking on Weinstein's behalf, said, "Any 'lists' that were prepared included names of former employees and others who were relevant to the research and preparation of a book about Miramax. Former employees conducting interviews for the book reported receiving unwanted contacts from the media."

Doyle Chambers declined an interview request. But Lubell, a producer who worked for Weinstein at Miramax decades ago, told me that she was manipulated into participating. In July, 2017, Lubell visited Weinstein's offices to pitch him on an app that she was developing. In the middle of the meeting, Weinstein asked Lubell if they could have a private conversation in his office. Lubell told me that a lawyer working with Weinstein was already there, along with Doyle Chambers. Weinstein asked if Lubell and Doyle Chambers could write a "fun book on the old times, the heyday, of Miramax." "Pam," she recalled him saying, "write down all the employees that you know, and can you get in touch with them?"

A few weeks later, in August, after they had made the list, Weinstein "called us back into the office," Lubell recalled. "And he said, 'You know what, we're going to put a hold on the book.' " He asked Doyle Chambers and Lubell to "call some of your friends from the list and see if they got calls from the press." In early September, Weinstein summoned Lubell and Doyle Chambers to his office and asked them to start making calls to people connected to several actresses. "It got kind of intense," Lubell recalled. "We didn't know these people, and all of a sudden this was something very different from what we signed up for." Several of the targeted women said that they felt the calls they received from Lubell and Doyle Chambers, and from Weinstein himself, were frightening.

Lubell told me that hours before the first *Times* story broke, on October 5th, Weinstein summoned her, Doyle Chambers, and others on his team, including the attorney Lisa Bloom, who has since resigned, to his office. "He

was in a panic," Lubell recalled. "He starts screaming, 'Get so-and-so on the phone.' " After the story was published, the team scrambled to respond to it. Bloom and others pored over pictures that, like the ones featured in the Kroll e-mails, showed ongoing contact between Weinstein and women who made allegations. "He was screaming at us, 'Send these to the board members,' " Lubell recalled. She e-mailed the photographs to the board ahead of the crisis meeting at which Weinstein's position at his company began unravelling.

Since the allegations against Weinstein became public, Lubell hasn't slept well. She told me that, although she knew that Weinstein "was a bully and a cheater," she "never thought he was a predator." Lubell has wondered if she should have known more, sooner.

After a year of concerted effort, Weinstein's campaign to track and silence his accusers crumbled. Several of the women targeted, however, said that Weinstein's use of private security agencies deepened the challenge of speaking out. "It scared me," Sciorra said, "because I knew what it meant to be threatened by Harvey. I was in fear of him finding me." McGowan said that the agencies and law firms enabled Weinstein's behavior. As she was targeted, she felt a growing sense of paranoia. "It was like the movie 'Gaslight,' " she told me. "Everyone lied to me all the time." For the past year, she said, "I've lived inside a mirrored fun house."

*Ronan Farrow, a television and print reporter, is the author of the upcoming book "War on Peace: The End of Diplomacy and the Decline of American Influence." Read more »*