**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF ALMATY, KAZAKHSTAN and BTA
BANK JSC,

                Plaintiffs,

   -against-

MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV,
ILYAS KHRAPUNOV, and TRIADOU SPV S.A.,

          Defendants

15 Civ. 5345 (AJN) (KHP)

**THE CITY OF ALMATY AND BTA BANK'S POST-HEARING MEMORANDUM OF
LAW IN FURTHER SUPPORT OF THEIR MOTION FOR SANCTIONS [ECF No. 453]**

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

BACKGROUND ..................................................................................................... 2

LEGAL STANDARD ............................................................................................... 4

ARGUMENT ......................................................................................................... 7

    I.      Only Ilyas Khrapunov Had the Means, Motive, and Opportunity to Leak the Transcript ...........................................................................................7

    II.     The Court Should Find that The Khrapunovs leaked the Transcript, and Impose Sanctions ............................................................................19

    III.    The Court Should Reject the Khrapunovs' Request to De-Designate Mr. Rakishev's Testimony.........................................................................22

CONCLUSION .................................................................................................... 25

# TABLE OF AUTHORITIES

**Cases**

*DiBella v. Hopkins,*
    403 F.3d 102 (2d Cir. 2005) ................................................. 18
*Flaherty v. Filardi,*
    No. 03 Civ. 2167 (LTS) (HBP), 2009 WL 3762305 (S.D.N.Y. 2009)................................... 9
*King v. Allied Vision, Ltd.,*
    65 F.3d 1051 (2d Cir.1995) ................................................. 10
*Marku v. Holder,*
    418 F. App'x 52 (2d Cir. 2011)................................................. 18
*Michalic v. Cleveland Tankers, Inc.,*
    364 U.S. 325 (1960) ................................................. 24
*N.Y. State Nat'l Org. for Women v. Terry,*
    886 F.2d 1339 (2d Cir.1989) ................................................. 10
*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Tech., Inc.,*
    369 F.3d 645 (2d Cir.2004) ................................................. 10
*Park-Tower Development Group, Inc. v. Goldfeld,*
    87 F.R.D. 96 (S.D.N.Y. 1980) ................................................. 25
*Residential Funding Corp. v. DeGeorge Fin. Corp.,*
    306 F.3d 99 (2d Cir. 2002) ................................................. 9
*S.E.C. v. Moran,*
    922 F. Supp. 867 (S.D.N.Y. 1996) ................................................. 24
*Sara Lee Corp. v. Bags of New York, Inc.,*
    36 F. Supp. 2d 161 (S.D.N.Y. 1999) ................................................. 18
*Schiller v. City of N.Y.,*
    No. 04 Civ. 7921, 2007 WL 1623108 (S.D.N.Y. June 5, 2007)................................... 10
*Shapiro v. Freeman,*
    38 F.R.D. 308 (S.D.N.Y. 1965) ................................................. 25
*Worldwide Home Prod., Inc. v. Bed, Bath & Beyond, Inc.,*
    74 F. Supp. 3d 626 (S.D.N.Y.) ................................................. 24

**Rules**

Fed. R. Civ. P. 37................................................. 10

The City of Almaty, Kazakhstan and BTA Bank (together, the "Kazakh Entities") respectfully submit this post-hearing memorandum of law in support of their motion for sanctions, pursuant to the Court's instructions at the November 17, 2017 evidentiary hearing.

## PRELIMINARY STATEMENT

Ilyas Khrapunov leaked the confidential deposition transcript of Kenges Rakishev in violation of this Court's confidentiality order. There is no other plausible explanation for the Transcript's sudden appearance on a Russian-language website on the very same day Khrapunov moved this Court to allow him to use it in foreign litigation, and just in time for Khrapunov to cite that public disclosure in support of his motion.

The evidentiary record proves that Ilyas Khrapunov was the *only* person who received the transcript aside from the court reporters and counsel for the parties. Prior to the deposition, Ilyas and his father, Viktor Khrapunov, announced on Facebook that they would use the deposition to harass Mr. Rakishev, and the post revealing the leak and linking to the leaked transcript bears striking similarities to the Khrapunovs' Facebook posts. Ilyas' testimony to this Court, even without being subjected to cross-examination, is demonstrably false, and he has a practice of posting hacked documents online and using Cryptoheaven's file-sharing capabilities to share information among his co-conspirators without leaving a paper trail.

In short, the evidence is plain that Ilyas Khrapunov was the only person with the motive, opportunity, and means to leak the Transcript. He should be sanctioned for doing so.

# BACKGROUND[1]

On June 15, 2017, the Khrapunovs noticed the deposition of Kenges Rakishev, who is the Chairman of the Board of Directors of BTA Bank and holder of approximately 98% of its voting shares. FoF ¶ 2. Because Mr. Rakishev had no involvement with the bank until approximately 2013 – long after the alleged embezzlement from the bank by its former chairman, Mukhtar Ablyazov – the Kazakh Entities requested a meet and confer to understand why the testimony of the bank's senior-most official was relevant.  During that meet and confer, the Khrapunovs' counsel asserted that they intended to question Mr. Rakishev on his ultimate oversight of this litigation. *See* Roytblat Ex. 4 [ECF No. 482-05], at 1. But while the Khrapunovs' counsel were representing that they would question Mr. Rakishev regarding matters at least arguably relevant to this lawsuit, the Khrapunovs themselves told a very different story publicly.

On September 15, 2017, Viktor Khrapunov made a post on his personal Facebook page, which was reposted by Ilyas the same day, attaching a copy of the deposition notice and (falsely) claiming that "[t]he judge has decided to depose" Mr. Rakishev (the "Facebook Posts"). FoF ¶ 10-11; Roytblat Exs. 2, 2-T, 3 [ECF Nos. 482-02, -03, -04].  In the Facebook Posts, the Khrapunovs claimed that Mr. Rakishev was an "errand-boy," and a straw owner of BTA Bank, and explicitly stated their plan to question Mr. Rakishev on matters unrelated to this action:  "It is interesting that American law permits the parties, when sworn testimony is being given, to ask the most varied questions, not limited to the subject of the case." Roytblat Ex. 2-T [ECF No. 482-03]. The Khrapunovs' also announced their intention to use Mr. Rakishev's deposition to

---

[1]     The full factual background underlying the Kazakh Entities' motion for sanctions, with detailed citations to the record of the evidentiary hearing, is set forth in the Kazakh Entities' proposed Findings of Fact, attached hereto as Exhibit A. Citations herein to "FoF" refer to those proposed findings of fact.

"question [his] morality" and accuse him of being a "pedophile," and then share his testimony with their followers ("Stock up on popcorn, dear friends!"). *Id.*

In response to the Facebook Posts, the Kazakh Entities sought an emergency protective order limiting the questioning in Mr. Rakishev's deposition, directing the Court's attention to the Khrapunovs' stated intent to abuse Mr. Rakishev's deposition. FoF ¶ 14. The Court granted that protective order on October 10, 2017, restricting questioning at the deposition to issues relevant to a claim or defense in this action. FoF ¶ 15-16; *see also* Roytblat Ex. 4 [ECF No. 482-05].

Mr. Rakishev's deposition went forward on October 11, 2017. FoF ¶ 4. At the start of the deposition, counsel for the Kazakh Entities designated the entire deposition transcript and recording confidential under the Confidentiality Order in this action. FoF ¶ 8. During the deposition, counsel for the Kazakh Entities was repeatedly forced to invoke the Court's October 10th protective order to object to irrelevant and harassing questioning of Mr. Rakishev. FoF ¶ 17.

On October 16, 2017 counsel for the Khrapunovs received a copy of the complete, final transcript of Mr. Rakishev's deposition (the "Transcript"), FoF ¶ 19, and shortly thereafter sent a copy of the Transcript to counsel for the Kazakh Entities, requesting that they de-designate the confidentiality of certain of Mr. Rakishev's testimony so that the Khrapunovs could use it in proceedings between BTA Bank, Ablyazov, and Ilyas Khrapunov in the United Kingdom (the "U.K. Proceedings"). FoF ¶ 20.

On October 26, 2017, at 6:30 a.m., someone uploaded a copy of the Transcript to a publicly-available webpage on a file-sharing website named Fex.Net (the "File-Sharing Website"). FoF ¶ 21. The copy of the Transcript uploaded to the File-Sharing Website was stripped of all metadata, apparently by printing and scanning the Transcript. FoF ¶ 24. Approximately 8 hours later, an article was posted on a Russian-language website named "URA-

3

Inform," titled "Trial on Laundering of Money Allegedly Stolen in Kazakhstan Takes an

Unexpected Turn (the "URA-Inform Article"). FoF ¶ 25. The URA-Inform Article copied the

first five pages of the Transcript, and directed and linked readers to the File-Sharing Website,

where the Transcript could be freely downloaded. FoF ¶ 27. At approximately 10:00 PM on the

same day, the Khrapunovs' filed a letter-motion with the Court by e-mail. FoF ¶ 29.  In that letter

motion, the Khrapunovs disclosed that the Transcript had been leaked and posted on URA-

Inform, and attributed the leak of Transcript to a "disgruntled employee of BTA Bank." [ECF

No. 452, at 2, n.1].

On October 30, 2017, the Kazakh Entities moved for an evidentiary hearing and

sanctions as a result of this clear breach of the Court's confidentiality order. [ECF No. 453].  On

November 17, 2017, the Court held an evidentiary hearing on that motion, at which it received

the written testimony of counsel for the Kazakh Entities, counsel for Triadou SPV, S.A., and

employees of Magna Legal Services, the court reporter, as well as numerous documentary

exhibits.  [ECF Nos. 471-487].  The Court also took live testimony from counsel for the

Khrapunovs, and from defendant Ablyazov via telephone.  Viktor and Ilyas Khrapunov

submitted affidavits, but refused to appear for cross-examination.  [ECF Nos. 487-05, -06].  As

set forth in the attached Findings of Fact, and as explained below, the record of that hearing

establishes beyond any doubt that Ilyas Khrapunov leaked the Transcript, in violation of the

Court's order.

## LEGAL STANDARD

Sanctions are appropriate in this case either under this Court's inherent authority, or

under Federal Rule of Civil Procedure 37.

On November 30, 2016, Judge Nathan signed the stipulated protective order (the

4

"Confidentiality Order") that has governed discovery in this action. [ECF No. 253]. The Confidentiality Order detailed a process for designating documents and testimony disclosed in discovery confidential, explicitly identifying, "upon pain of contempt," *id.* at 1, (1) what types of material could be designated confidential, *id*. at ¶ 3, (2) who was permitted access to confidential discovery material, *id*. at ¶ 6, and (3) how confidential material may be used. *Id*. at ¶ 2. The Confidentiality Order further imposed a duty of care upon each person receiving protected information:  "Each person who has access to Confidential Discovery Material shall take all due precaution to prevent the unauthorized or inadvertent disclosure of such Material." *Id.* at ¶ 10.

To ensure that these provisions had teeth, the Confidentiality Order explicitly stated that it could be enforced through sanctions: "This Court shall retain jurisdiction over all persons subject to this Order to the extent necessary to enforce any obligations arising hereunder *or to impose sanctions for any contempt thereof*." *Id*. at ¶ 21 (emphasis added).

The recognition that the obligations in the Confidentiality Order are "upon pain of contempt" and that the Court may "impose sanctions for any contempt" of the Order reflects this Court's inherent authority to sanction a party that violates a court order, which "is a necessary function for purposes of managing and maintaining order in the efficient and expeditious administration of justice."  *Flaherty v. Filardi*, No. 03 Civ. 2167 (LTS) (HBP), 2009 WL 3762305, at *4 (S.D.N.Y. 2009); *see also Residential Funding Corp. v. DeGeorge Fin. Corp*., 306 F.3d 99, 106–07 (2d Cir. 2002) ("Even in the absence of a discovery order, a court may impose sanctions on a party for misconduct in discovery under its inherent power to manage its own affairs.").

"A party may be held in civil contempt for failure to comply with a court order if (1) the order the contemnor failed to comply with is clear and unambiguous, (2) the proof of

noncompliance is clear and convincing, and (3) the contemnor has not diligently attempted to comply in a reasonable manner." *Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys. Info. Tech., Inc.*, 369 F.3d 645, 655 (2d Cir.2004) (internal quotations and citations omitted). A "clear and unambiguous order" is one "specific and definite enough to apprise those within its scope of the conduct that is being proscribed." *N.Y. State Nat'l Org. for Women v. Terry*, 886 F.2d 1339, 1352 (2d Cir.1989) (quoting *In re Baldwin–United Corp.*, 770 F.2d 328, 339 (2d Cir.1985)).  In other words, the "order is one that leaves no uncertainty in the minds of those to whom it is addressed, who must be able to ascertain from the four corners of the order precisely what acts are forbidden." *King v. Allied Vision, Ltd.*, 65 F.3d 1051, 1058 (2d Cir.1995) (citations and quotations marks omitted).

In addition to its explicit terms, the Confidentiality Order may also be enforced by this Court through Rule 37(b). *See Flaherty v. Filardi*, No. 03 Civ. 2167 (LTS)(HBP), 2009 WL 3762305, at *4 (S.D.N.Y. Nov. 10, 2009); *Schiller v. City of N.Y.*, No. 04 Civ. 7921, 2007 WL 1623108, at *3 (S.D.N.Y. June 5, 2007) ("Discovery orders that can be enforced through Rule 37(b) include protective orders issued under Federal Rule of Civil Procedure 26(c).").

Permissible remedial measures include "treating as contempt of court the failure to obey any order except an order to submit to a physical or mental examination." Fed. R. Civ. P. 37(b)(2)(A) (vii). In addition to any other sanction, Rule 37 requires an award of attorney's fees incurred as a result of the violation, unless it was substantially justified or other circumstances make an award of expenses unjust. Fed. R. Civ. P. 37(b)(2)(C).

**ARGUMENT**

I.      **Only Ilyas Khrapunov Had the Means, Motive, and Opportunity to Leak the Transcript**

There is no dispute that the Confidentiality Order was violated. FoF ¶ 31. Mr. Rakishev's deposition testimony was designated confidential in the manner proscribed in the Confidentiality Order. FoF ¶¶ 8-9, 27. The court reporters who recorded and processed Mr. Rakishev's deposition disclosed each and every person who received the Transcript from them, all of whom were counsel for parties in this action, FoF ¶ 33-35, and thus subject to the Confidentiality Order. Similarly, there can be no suggestion that the Confidentiality Order is unclear or ambiguous. To the contrary, the Confidentiality Order was negotiated by the parties before being submitted to the Court, and it was signed by counsel for all parties, including the Khrapunovs. *See* Roytblat Ex. 1 [ECF No. 482-01], at 11.

Instead, the single question outstanding is *who* leaked the Transcript, in plain violation of the Confidentiality Order. On that question, all credible evidence points to Ilyas Khrapunov.

The record of the evidentiary hearing before this Court establishes precisely who had access to the Transcript before it was leaked, and those persons can be sorted into three discrete groups: (1) the court reporters, (2) counsel, and (3) the users of the account "yodamaster@cryptoheaven.com."  FoF ¶¶ 33, 36, 41, 46-48.

The first group, the court reporters, have offered sworn statements detailing how they handled the Transcript, had no reason to leak the Transcript, and have an obvious professional interest in protecting court-ordered confidentiality. FoF ¶ 33-35. The second group, counsel for the parties who received the Transcript, are all officers of the Court, or staff working at counsel's direction, and have professional obligations to abide by court orders. *See, e.g.,* 22 NYCRR 1200, N.Y. Rule Professional Conduct 8.4 (b-c) ("A lawyer or law firm shall not: . . . (c) engage in

7

conduct involving dishonesty, fraud, deceit or misrepresentation [or] (d) engage in conduct that is prejudicial to the administration of justice").  Both the court reporters and counsel have testified before this Court, and submitted to cross-examination, and confirmed that they did not distribute the Transcript in any way. FoF ¶¶ 33-39; 41-43; 46-48.

The sole exception is that counsel for the Khrapunovs e-mailed a copy of the Transcript on October 18, 2017, to "yodamaster@cryptoheaven.com" – the third group. FoF ¶ 48. According to counsel, the "yodamaster" account is used by them to communicate with Ilyas Khrapunov and, indirectly, his father Viktor. FoF ¶ 50-52.  While the Khrapunovs have offered self-serving affidavits denying knowledge of the leak – while refusing to appear so they might be cross-examined – all credible evidence confirms that they must be the source of the leak:

- Ilyas Khrapunov is the only party to have received the Transcript,

- The Khrapunovs' initial explanation for the leak – attributing it to a rogue employee of BTA Bank – has been disproven;

- The Khrapunovs publicly threatened to use Mr. Rakishev's deposition to attack and embarrass him and to share it with their social media followers;

- The URA-Inform Article posting the leaked Transcript mirrored the language of the Khrapunovs' Facebook Posts word-for-word in places;

- Ilyas Khrapunov knew about the leak within hours of it happening, and used it that same day in the motion to de-designate Mr. Rakishev's testimony;

- Ilyas Khrapunov's self-serving affidavit is not credible and in at least one respect, is demonstrably false, and the Khrapunovs have repeatedly misled this Court, hidden evidence, destroyed documents, and refused to participate in discovery;

- Ilyas Khrapunov has a history of causing illicitly-obtained information to be posted on-line in an attempt to distance himself from it, such as with documents hacked from Kazakh government officials; and

- Ilyas Khrapunov has a history of using accounts at Cryptoheaven, such as the "yodamaster" account, to share files with his co-conspirators without leaving a paper trial.

## A.   Ilyas Khrapunov is the only party to have received the Transcript

The evidentiary hearing established that the court reporters sent the Transcript to counsel for defendant Triadou, counsel for the Kazakh Entities, and counsel for the Khrapunovs. FoF ¶ 35.[2]  Counsel for Triadou testified that they never provided the Transcript to their clients, nor to anyone outside of their law firm. FoF ¶ 41-44.  Similarly, counsel for the Kazakh Entities testified that they had never provided the Transcript to their clients, nor to anyone else outside of their law firm. FoF ¶ 36-37.  The Khrapunovs declined to cross-examine any representatives of the court reporting service, counsel for Triadou, or counsel for the Kazakh Entities.

Counsel for the Khrapunovs, however, testified that they sent the Transcript to "yodamaster@cryptoheaven.com," an e-mail address they use to communicate with Ilyas Khrapunov, and through him, Viktor Khrapunov. FoF ¶ 50-52. Other than that single e-mail to an account associated with Ilyas Khrapunov, no one who received the Transcript from the court reporters ever transmitted it or provided access to it to anyone outside of their respective law firms.  Put differently, other than the e-mail to "yodamaster," every single person at the court reporting service and at the law firms representing the parties who had access to the Transcript

---

[2]     According to the court reporters, the Transcript was never sent to the designated agent for service for defendant Ablyazov, and Ablyazov himself denied having ever seen or had access to the Transcript.  FoF ¶¶ 35, 45. Counsel for the Khrapunovs declined to cross-examine Ablyazov.

has testified – and been willing to be subject to cross-examination – that they did not further

distribute it, or otherwise leak it.

**B.     The Khrapunovs' initial explanation for the leak – attributing it to a rogue**
**        employee of BTA Bank – has been disproven**

In their letter motion disclosing that the Transcript had leaked, the Khrapunovs quoted

the URA-Inform Article to argue that that Transcript was leaked by a "disgruntled employee of

BTA Bank" (Ltr. at 2, n.1). This cover story is false, as the evidentiary hearing proved.

Upon learning that the Transcript had leaked, counsel for the Kazakh Entities conducted a

thorough internal investigation into the leak. FoF ¶ 38. Counsel obtained sworn statements from

the court reporters at Magna Legal Services, identifying each and every person who had received

the Transcript. FoF ¶ 33-35. Counsel for the Kazakh Entities then obtained sworn statements

from each and every one of the Boies Schiller Flexner LLP ("BSF") attorneys or staff that had

access to the Transcript, affirming that they had not shared or disclosed the Transcript with

anyone outside of the law firm. FoF ¶ 36-36. Counsel's IT staff then reviewed BSF's e-mail

servers and confirmed that the Transcript had not left BSF. FoF ¶ 39. Finally, counsel confirmed

with the Kazakh Entities' representatives that they had never received the Transcript. FoF ¶ 40.

In short, there is no way the Transcript could have been leaked by a disgruntled BTA employee

working on this matter through an unnamed representative, because no one at BTA Bank ever

received the Transcript.

None of this evidence was challenged by the Khrapunovs at the Evidentiary Hearing. The

Khrapunovs did not question any of the evidence establishing that BTA Bank never received the

Transcript, and thus could not have been the source of the leak. Nor did the Khrapunovs raise a

single question or offer a shred of evidence supporting their initial explanation that an

anonymous BTA employee was the source of the leak.

In contrast, the Khrapunovs' counsel admitted that the entirety of their 'investigation' into the leak was to offer affidavits from their clients – who refused to be cross-examined on those statements. FoF ¶ 56. The Khrapunovs did not attempt to investigate the leak, because they know who caused it: they did.

**C.     The Khrapunovs publicly threatened to use Mr. Rakishev's deposition to attack and embarrass him, and the URA-Inform Article posting the leaked Transcript mirrored the language of the Khrapunovs' Facebook Posts word-for-word in places**

The Khrapunovs' motives for leaking the Transcript are patently obvious. Before Mr. Rakishev's deposition, the Khrapunovs took to Facebook and publicly threatened to use Mr. Rakishev's deposition to attack him and share his testimony, telling their followers to "Stock up on popcorn." Roytblat Ex. 2-T. When the Transcript was leaked and disclosed, the URA-Inform Article repeated the Khrapunovs' Facebook Posts threatening Mr. Rakishev nearly word for word in numerous places:

| **URA-Inform Article[3]** | **Khrapunov Facebook Post** |
|---|---|
| "[t]he New York court decided to depose at a hearing the plaintiff Kenes Rakishev, a man who has been exposed as a shill" [Roytblat Ex. 8-T, at 1 [ECF No. 482-10]; *accord* Khrapunov Ex. D, at 1 [ECF No. 487-4]] | "[t]he judge has decided to depose  Kenes Rakishev, Chairman of the Board of Directors and 'owner' of BTA Bank." [Roytblat Ex. 2-T [ECF No. 482-3]] |
| Depositions are "often used to show the court the political component of a case or to cast doubt on the moral qualities or truthfulness of the witness's or plaintiff's party." [Roytblat Ex. 8-T, at 1 [ECF No. 482-10]; *accord* Khrapunov Ex. D, at 1-2 [ECF No. 487-4]] | Depositions "can show the court the suit's political side" and "the court may question the morality of that witness or counsel" [Roytblat Ex. 2-T [ECF No. 482-3]]. |

---

[3]      The Khrapunovs submitted their own certified translation of the URA-Inform Article. *See* Khrapunov Ex. D [ECF No. 487-04].  The Kazakh Entities believe that the Khrapunovs' translation is actually is identical to the one submitted by the Kazakh Entities, *see* Roytblat Ex. 8-T, except that the Khrapunovs' "Translation Certification" page is unsigned and undated in their Exhibit D.  In the interests of completeness, however, the Kazakh Entities cite to both versions in the chart above.

| | |
|---|---|
| "thanks to those same American laws, during a deposition all trial parties have the right to ask any questions of the person under oath. Even if they do not directly concern the subject of the case." [Roytblat Ex. 8-T, at 1 [ECF No. 482-10]; *accord* Khrapunov Ex. D, at 1 [ECF No. 487-4]] | "It is interesting thatAmerican law permits the parties, when sworn testimony is being given, to ask the most varied questions, not limited to the subject of the case." [Roytblat Ex. 2-T [ECF No. 482-3]]. |
| The Khrapunovs' counsel "had probably prepared numerous interesting questions for Rakishev," and "counsel had promised even before October 11 that they would certainly ask question in court about Rakishev's relationship with Timur Kulibayev . . . Goga Ashkenazi, and Nursultan Nazarbayev himself." [Roytblat Ex. 8-T, at 2 [ECF No. 482-10]; *accord* Khrapunov Ex. D, at 2 [ECF No. 487-4]] | "we are preparing many interesting questions for him, including questions about his relationship with Timur Kulibayev, Goga Ashkenazi and Nursultan Nazarbayev." [Roytblat Ex. 2-T [ECF No. 482-3]]. |

It is simply impossible not to see a coordinated strategy here: the Khrapunovs publicly threatened to use Mr. Rakishev's deposition to attack and embarrass him, and then the Transcript of that deposition was leaked and posted online repeating the exact same attacks. Only now, the Khrapunovs added a tactic: claiming that Mr. Rakishev had "incriminate[ed] himself" by invoking the October 10th protective order issued by the Court (Roytblat Ex. 8-T [ECF No. 482-10], at 4) – the very same protective order the Court granted in response to the Khrapunov's attacks.

**D.**   **Ilyas Khrapunov knew about the leak within hours, and used it that same day in the motion to de-designate Mr. Rakishev's Testimony**

The timing of the leak of the Transcript and the Khrapunovs' letter motion also demonstrates that Ilyas Khrapunov is the source of the leak. The leaked version of the Transcript was created on October 24, 2017, FoF ¶ 24, but was not uploaded to the File-Sharing Website until 6:30 AM on October 26th. FoF ¶ 21. The URA-Inform Article posting the leaked Transcript and linking to the File-Sharing Website was posted on 1:38 PM on the same day, roughly 7 hours

12

after the Transcript was first posted on line, and 8 hours before the Khrapunovs filed their request to de-designate the Transcript, which cited to the URA-Inform Article in support.[4] FoF ¶¶ 25, 29.

Put another way, despite Ilyas Khrapunov denying any knowledge of how the Transcript leaked, he somehow became aware of its presence on an obscure Ukrainian blog mere hours after the URA-Inform Article was posted, and alerted his counsel in time for this revelation to be offered in support of the Khrapunovs' request to de-designate.[5] On the very same day: the Transcript was leaked, the Khrapunovs discovered this news, they filed their motion to de-designate the Transcript, and were able to use the leak in support of their motion, arguing that the Transcript was already public. FoF ¶¶ 21, 25, 29-30.  This is not a coincidence:  Ilyas Khrapunov plainly leaked the Transcript to bolster an argument that the Kazakh Entities would not be prejudiced by removing the confidentiality designation over parts of the Transcript.  As explained below, this is precisely what Ilyas Khrapunov did previously with certain hacked e-mails.

**E.    Ilyas Khrapunov's self-serving affidavit is not credible (and in at least one respect is demonstrably false), and the Khrapunovs have repeatedly misled this Court, hidden evidence, destroyed documents, and refused to participate in discovery**

The Khrapunovs have, of course, denied that they leaked the Transcript.  But their self-serving affidavits should be disregarded.  In at least one case, Ilyas Khrapunov's affidavit is

---

[4]    All of these timecodes are copied verbatim from the sources referenced. While it is possible there is some discrepancy due to differing time zones, any such discrepancy would be a matter of hours, not days.  It is not disputed that in the same day, the leaked Transcript was posted on the File-Sharing Website, referenced and linked to in the URA-Inform Post, and then cited in the Khrapunov's October 26th letter motion.

[5]    Counsel for the Khrapunovs testified that they only communicate with Ilyas Khrapunov, and have not communicated with Viktor Khrapunov directly. FoF ¶ 30. As such, it could not have been Viktor Khrapunov that notified counsel to the leak, leaving only Ilyas Khrapunov.

demonstrably false, and the Khrapunovs have a demonstrated pattern of hiding evidence, refusing to participate in discovery, and playing games with the courts.

In deciding what weight, if any, to give the Khrapunovs' affidavits, the Court is entitled to consider the Khrapunovs' conduct in this litigation. *See DiBella v. Hopkins*, 403 F.3d 102, 118 (2d Cir. 2005) (party's misleading conduct in related litigation properly admitted for the purpose of impeaching his credibility); *Sara Lee Corp. v. Bags of New York, Inc*., 36 F. Supp. 2d 161, 168 (S.D.N.Y. 1999) (finding that defendant's "conduct during the course of the litigation was entirely inappropriate" and defendant's "[a]ctive effort to mislead the court" properly factored into assessing the defendant's credibility); *Marku v. Holder*, 418 F. App'x 52, 53 (2d Cir. 2011) (summary order) (defendants' credibility properly called into question where it was "reasonably inferred" that they had submitted documents in order "to mislead the court"). The Khrapunovs have repeatedly misled this Court, each time attempting to sabotage or delay the evidentiary hearing to their own benefit.

After the Kazakh Entities made their motion requesting the evidentiary hearing, Ilyas Khrapunov submitted an affidavit and volunteered to appear by phone during any such hearing. *See* ECF No. 456 ("[W]e ask that Mr. Khrapunov be permitted to testify by phone at any evidentiary hearing."). After the Court ordered an evidentiary hearing on November 6th [ECF No. 458], both Khrapunovs moved on November 8th to give testimony by phone. [ECF No 459]. But just three days before the evidentiary hearing was scheduled to take place, the Khrapunovs revealed that they would not appear, citing a provision of Swiss law that they claimed prevented them from being cross-examined by phone, and suggesting that the hearing should wait until they might be deposed in Switzerland. [ECF No. 463].

Ilyas Khrapunov knew full well that he and his father would never appear telephonically, and their offers to testify, and last second change of heart, are a strategy he has used more than once, leading one judge to observe that Ilyas Khrapunov was "playing games" with the U.K courts. More than a year ago, Judge Teare of the U.K. High Court ordered Ilyas Khrapunov to appear and give evidence in the U.K. Proceedings. FoF ¶ 67. Ilyas Khrapunov's U.K. counsel stated at that time that Ilyas had "sought and obtained advice from Swiss counsel concerning the effect of Article 271 of the Swiss Criminal Code" – citing the very same provision of Swiss law the Khrapunovs invoked here to avoid appearing. FoF ¶ 68. As he did here, in the U.K Proceedings Ilyas waited until the eleventh hour to try and scuttle the evidentiary proceeding at which he would be cross-examined, FoF ¶ 69, leading Lord Justice Longmore on appeal to note that Khrapunov "has been playing games with the court." FoF ¶ 72.

Despite this history, Ilyas Khrapunov nonetheless offered to appear by phone here, hoping he could bluff his way past this issue. When the Court called that bluff and ordered the Khrapunovs to appear, Ilyas waited until the last minute to reveal what he already knew: that Swiss law purportedly prevented both him and his father being cross-examined – while still submitting self-serving exculpatory sworn statements. The Court is entitled to consider this deceptive and contumacious behavior when assessing Ilyas Khrapunov's credibility.

In addition, Ilyas Khrapunov's affidavit is also not credible because it is demonstrably false. While the Kazakh Entities were denied the opportunity to cross-examine Ilyas Khrapunov on his sworn statement, documentary evidence alone proves that his affidavit is false or misleading in at least some ways. Ilyas Khrapunov says that he directed his counsel to seek to de-designate Mr. Rakishev's testimony after reviewing what he defined as the final Transcript. *See* 11/2/17 I. Khrapunov Aff. [ECF No. 487-06], ¶ 4-5 ("Shortly thereafter Allison Angel

15

forwarded to me by email a final copy of the transcript of the deposition of Kenges Rakishev ('the Transcript'). . . . After reviewing the Transcript . . . I contacted my attorneys at Hoguet Newman Regal and Kenney to ask that they take the necessary steps to lift the confidential designation."). But documentary evidence establishes that Ilyas Khrapunov did not receive the final Transcript until *after* his counsel had already requested that the Kazakh Entities lift the confidentiality of the Transcript. *Compare* FoF ¶ 20(Request to de-designate made on October 17, 2017) *with* FoF ¶ 47; Roytblat Ex. 18 [ECF No. 482-20] (reflecting October 18, 2017 email from A. Angel to "yodamaster" attaching "final copy of Kenges Rakishev deposition transcript."). Despite the fact that Ilyas Khrapunovs' affidavit was prepared within weeks of the events in question, key details – such as when he received the Transcript – are either omitted or simply wrong. This is further reason not to credit this testimony.[6]

Finally, Ilyas Khrapunov's assertion that he does not know how the URA-Inform website obtained the Transcript is mere artful drafting and plausible deniability. *See* 11/2/17 I. Khrapunov Aff. [ECF No. 487-06], ¶ 8. It is apparent from the factual record that the

---

[6]     Similarly, Mukhtar Ablyazov's testimony about his conversation with Ilyas Khrapunov concerning the Transcript is not credible. Ablyazov testified that he had discussed the leak with Ilyas Khrapunov, who "said that apparently there was a leak of information and it is not known how it happened." 11/17/17 Hr'g Tr. 25:22-26:2. The two discussed "nothing else" on that subject. *Id.* at 26:3-11. This testimony is simply not credible, especially given that Ablyazov and Ilyas Khrapunov speak "every few days." *Id.* at 24:3-9. It is not credible, among other things, that Ablyazov and Ilyas Khrapunov would discuss Mr. Rakishev's deposition and not discuss the Kazakh Entities' sanctions motions or their upcoming testimony, especially given that both Ablyazov and Ilyas Khrapunov have previously studiously avoided testifying in any forum; did not discuss the embarrassing and irrelevant questions put to Mr. Rakishev; and did not discuss the alleged inconsistencies between Mr. Rakishev's testimony and BTA Bank's representations in the UK litigation against Ablyazov and Ilyas Khrapunov. In addition, Ablyzov was not forthcoming with the Court about the circumstances of his own testimony; although he testified that he was alone when testifying (*see* 11/17/17 Hr'g Tr. at 14:14-6), other voices could plainly be heard conferring with Mr. Ablyazov in Russian while he testified.
       Put simply, this testimony is either untrue or a false exculpatory conversation designed to put Ilyas' words into the record without subjecting him to cross-examination.

Transcript was first uploaded to the File-Sharing Website, hours before the URA-Inform Article was posted and linked to it (FoF ¶¶ 21, 25), so Ilyas Khrapunov's failure to mention the File-Sharing Website is particularly conspicuous. Similarly, Khrapunov claims not to know "how the Russian website ura-inform.com obtained the transcript," 11/2/17 I. Khrapunov Aff. [ECF No. 487-06], ¶ 8, but URA-Inform is not "Russian." URA-Inform is a Ukrainian news website prominently featuring the Ukrainian flag colors on its webpage, and with copyright identifications referencing the "Ukrainian Rating Agency," *see* Roytblat Exs. 8, 8-T [ECF Nos. 482-09, -10], simply published in the Russian language. Whether this is error or evasiveness, it is more reason to discount Ilyas Khrapunov's affidavit.

**F.     Ilyas Khrapunov has a history of causing illicitly-obtained information to be posted online in an attempt to distance himself from it, such as with documents hacked from Kazakh government officials**

This is not the first time Ilyas Khrapunov has attempted to "wash" confidential material through the internet so that he might claim it was obtained from public sources and use it in this litigation. Less than 24 hours before the deposition of BTA Bank's Rule 30(b)(6) representative, the Khrapunovs produced a trove of documents stolen from the private e-mail accounts of Republic of Kazakhstan government officials, and attempted to use those hacked documents during the deposition. FoF ¶ 63. Despite the fact that Ilyas Khrapunov has been positively identified as the source of the hacking of Kazakh and French government officials, FoF ¶ 61, the Khrapunovs argued to the Court that they should be permitted to the use the stolen documents because they were purportedly posted on a public website at some point. FoF ¶ 64. While this

17

Court substantially rejected the Khrapunovs' request,[7] the pattern is impossible to miss: Ilyas

Khrapunov leaks confidential or improperly-obtained material onto the internet, and then claims

that the documents are publicly-available, and thus fair game.

**G.    Ilyas Khrapunov has a history of using accounts at Cryptoheaven, such as the "yodamaster" account, to share files with his co-conspirators without leaving a paper trial**

Even taking Ilyas Khrapunov's self-serving affidavit at face value, the Court should still

find that he was the source of the leak. Record evidence shows that Ilyas Khrapunov has used a

range of Cryptoheaven accounts, and that his agents and co-conspirators have access to at least

some of these. While Ilyas Khrapunov focused his testimony on whether he *personally* shared or

forwarded the Transcript (ECF No. 487-06 at ¶¶ 3, 7-8), the record compels the inference that

Khrapunov leaked the Transcript either by actively sharing it with others, or by passively

providing access to others through Cryptoheaven's file-sharing capabilities. FoF ¶ 84-85.

Third-party discovery has revealed that Ilyas Khrapunov used at least one other

Cryptoheaven account ("jabba@cryptoheaven.com") during the pendency of this litigation to try

to broker the sale of assets belonging to one of Triadou's subsidiaries. FoF ¶ 82.[8] Ilyas failed to

disclose this Cryptoheaven account when served an interrogatory demanding that he identify his

relevant e-mail accounts. *See* Roytblat Ex. 15 [ECF No. 482-17], at 4. While some of the

---

[7]    In granting the Kazakh Entities a protective order prohibiting the use of hacked documents at depositions, the Court largely declined to wade into the merits of the hacking allegations, noting that those allegations are the subject of a separate lawsuit between the Republic of Kazakhstan and Ilyas Khrapunov pending in the Northern District of California. It is worth noting, however, that there has subsequently been clear and unrebutted testimony in this case establishing that Ilyas Khrapunov was responsible for the hacking of Kazakh government officials. FoF ¶ 2061; Roytblat Ex. 17 [ECF No. 482-19].

[8]    Beyond the fact that numerous e-mails from the "jabba" account were signed by Khrapunov, FoF ¶ 82, the name of the account confirms that it was used by Ilyas Khrapunov, who appears to have used a series of Star Wars themed e-mail accounts, including "yodamaster," "jabba," "Leia," and "obiwankenobi." FoF ¶ 86; Roytblat Ex. 15 [ECF No. 482-17].

"jabba@crypoheaven.com" e-mails were sent and signed by Ilyas himself, FoF ¶ 82, others from the same account were signed with other names or referred to Ilyas Khrapunov in the third person. FoF ¶ 83. The third party who produced these documents confirmed that "some of the emails . . . from 'Jabba' were signed by other people who were acting on behalf of Ilyas." *See* Roytblat Ex. 16 [ECF No. 482-18].

While Ilyas Khrapunov avoided being examined on this question, there is record evidence that other individuals acting on his behalf have access to his Cryptoheaven accounts, and every reason to believe that is still the case.  Moreover, in addition to being an encrypted e-mail service, Cryptoheaven advertises secure file-sharing capabilities that Ilyas Khrapunov has historically used to disguise his misconduct, including the ability to share files anonymously with his "trusted associates." FoF ¶ 85.

Indeed, Ilyas Khrapunov directed his agents to use Cryptoheaven accounts precisely to take advantage of these file-sharing services.  For example, one former employee of Ilyas Khrapunov, who was trusted to among other things obtain a Geocopter to be used as part of a prison escape plan, was asked to sign numerous corporate documents as part of Ilyas Khrapunov and Mukhtar Ablyazov's money laundering scheme. FoF ¶ 87. That employee testified, "In order to access and sign certain forms, I was given a special log-in to a program called Cryptoheaven. Petr, Alex, and [Ilyas] Khrapunov all had log in credentials as well.  When instructed, I would access and print out forms that were sent to me via Cryptoheaven, sign them, and get them notarized and apostled.  I would then rescan the documents and send them back through Cryptoheaven."  Roytblat Ex. 19 [ECF No. 482-21], ¶19.

II.    **The Court Should Find that The Khrapunovs leaked the Transcript, and Impose Sanctions**

As detailed above, Ilyas Khrapunov was the only party to have received the Transcript, and the only plausible way for it to have been leaked is for him to have leaked it. In spite of both the Confidentiality Order and the October 10th Protective Order granted specifically in response the Khrapunovs' Facebooks Posts, all credible evidence demonstrates that Ilyas Khrapunov followed through with these threats to use Mr. Rakishev's deposition to smear him publicly.

In this case, the evidence points without exception to Ilyas Khrapunov being the source of the leak.  There is literally no evidence to the contrary besides the Khrapunovs' uncorroborated, self-serving affidavits, nor any other plausible source of the leak.  The fact that the evidence against Ilyas Khrapunov is circumstantial, insofar as he cannot be forensically connected to the File-Sharing Website or the URA-Inform Article, is of no significance. Criminal defendants can be and frequently are convicted solely on the basis of circumstantial evidence, despite the exacting "beyond a reasonable doubt" standard of proof. *See Worldwide Home Prod., Inc. v. Bed, Bath & Beyond, Inc*., 74 F. Supp. 3d 626, 634–35 (S.D.N.Y.), ("Because direct evidence of deceptive intent is rare, a district court may infer intent from indirect and circumstantial [evidence] . . .  to meet the clear and convincing evidence standard, the specific intent to deceive must be 'the single most reasonable inference able to be drawn from the evidence'"); *S.E.C. v. Moran*, 922 F. Supp. 867, 890 (S.D.N.Y. 1996) ("The Supreme Court has noted that 'circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" (quoting *Michalic v. Cleveland Tankers, Inc*., 364 U.S. 325, 330 (1960))). Here, the evidence is overwhelming and uncontroverted that Ilyas Khrapunov violated the Confidentiality Order and was the source of the leak.

For this violation of the Confidentiality Order, the Court should impose the following sanctions:

20

First, the Khrapunovs should be barred from using Mr. Rakishev's testimony for any purpose. *See* Fed. R. Civ. P. 37(b)(2)(A)(ii) (sanctions for violating a discovery order may include an order prohibiting the offending party "from introducing designated matters in evidence"). It is now apparent that Mr. Rakishev's deposition was nothing more than a Trojan Horse for the Khrapunovs to slander Mr. Rakishev and to ambush BTA in foreign proceedings by evading their discovery rules. Permitting the Khrapunovs to use his testimony for any purpose would simply reward their malicious behavior.

Second, the Court should appoint a special master, at the Khrapunovs' expense, to oversee their conduct in discovery here. Despite the fact that discovery has been ongoing for more than a year, the Khrapunovs' counsel admitted that they have no access to the Khrapunovs' documents – including the "yodamaster@cryptoheaven" email account at issue here – and have neither collected nor reviewed their clients' documents for production in litigation. FoF ¶ 53-55. Counsel also conceded on that stand that they had done no investigation of the leak other than receiving affidavits from the Khrapunovs. FoF ¶ 56. Pursuant to Rule 53(a), a court may appoint a Special Master to ensure the effective and timely management of discovery, including complicated technological issues. In *Park-Tower Development Group, Inc. v. Goldfeld*, 87 F.R.D. 96, 98 (S.D.N.Y. 1980), after the court determined that one group of defendants were guilty of misconduct in falling to comply with various discovery efforts, the trial court appointed a special master to supervise discovery while requiring those defendants to post a bond with obligation to underwrite the entire cost of the special master. *See also Shapiro v. Freeman*, 38 F.R.D. 308, 312 (S.D.N.Y. 1965) (appointing special master to oversee discovery "lest there be repetition of these obstructive tactics, further delay, waste, expense, and still more needless burdens cast upon this congested court" and ordering the offending party to pay the special

21

master's fees).  The special master should be empowered to compel disclosures from the

Khrapunovs, including by demanding access to their electronic accounts and overseeing the

collection and transmission of documents related to this litigation – as it is now plainly apparent

that the Khrapunovs cannot be trusted to honor their discovery obligations. FoF ¶ 53-56; *see also*

11/17/17 Hr'g Tr. at 66:10-13 ("Q:  . . . [Y]our firm has not collected any e-mail accounts of

Ilyas Khrapunov for review and production in litigation? A. Not to my knowledge, no.").

Finally, the Court should award the Kazakh Entities their reasonable attorney's fees and

costs associated with (a) the Rakishev deposition, (b) the October 10th Protective Order, and (c)

this sanctions motion.[9]  The record demonstrates without question that the Khrapunovs'

deposition of Mr. Rakishev was entirely pretextual, designed only to embarrass him and to

advance their interests in the U.K. Proceedings, but having absolutely nothing to do with this

case – as counsel for the Kazakh Entities warned the Khrapunovs' lawyers at the initial meet and

confer when they noticed his deposition.  *See* Roytblat Ex. 4 [ECF No. 482-05] at 1.  It is now

clear, including because the Khrapunovs' lawyers were unaware of their Facebook Posts until the

Kazakh Entities brought them to the Court's attention, FoF ¶ 15, that the Khrapunovs are

manipulating their lawyers into using this litigation for improper purposes.  The entire deposition

of Mr. Rakishev, not to mention the motion practice before and after it, was a massive waste of

time that has nothing whatsoever to do with this case.  Ilyas Khrapunov should be ordered to pay

for that time.

**III.   The Court Should Reject the Khrapunovs' Request to De-Designate Mr.
         Rakishev's Testimony**

---

[9]     If the Court agrees, the Kazakh Entities will promptly submit contemporaneous time and
expense records.

Finally, the Khrapunovs' cross-motion to lift the confidentiality designation over certain of Mr. Rakishev's testimony should be denied.  As detailed above, the Khrapunovs should be barred from using Mr. Rakishev's deposition testimony for any purpose, based on their violation of the Confidentiality Order. Yet setting aside the leaking of the Transcript, the Khrapunovs' request to de-designate should nonetheless be rejected.

First, Mr. Rakishev's testimony was properly designated confidential and the Khrapunovs have failed to explain how this designation was improper. Mr. Rakishev's testimony explicitly concerns undisclosed financial information, ownership of entities, and sensitive non-public information, all of which are properly designated as confidential under the protective order. *Compare* ECF No. 253 (Confidentiality Order) at ¶¶ 3(a-b), (e), *with* ECF No. 452, at 1; 452-01 (describing Rakishev testimony to be de-designated).  The Khrapunovs made no effort to establish that this information has been publicly disclosed, and if this information were public, the Khrapunovs would not be making this request. Because Mr. Rakishev's testimony falls comfortably within the terms of the Confidentiality Order, it was properly designated.

Second, the Khrapunovs have failed to explain how their request is permissible under the terms of the Confidentiality Order that they negotiated and signed. The Confidentiality Order was heavily negotiated between the parties, and it was at the defendants' insistence – and over the Kazakh Entities' objections – that a provision was added that barred the use in other litigations of discovery material designated confidential in this action. [ECF No. 253, ¶ 2].  This Court has already rejected similar requests by the defendants to de-designate confidential material so that the defendants might use it in other actions, and that reasoning applies equally here. On July 13, 2017, the Court heard argument on defendant Triadou's motion to de-designate a confidential settlement agreement between the Kazakh Entities and certain third parties, so that

23

Triadou might use that agreement in separate litigation. The Court rejected that request, holding that if Triadou wanted evidence in a separate action, they should seek relief from that court. *See* 7/13/17 Hr'g Tr. at 22:21-23:8; *see also id*. at 9:22-10:2 (THE COURT: "No state court judge has ruled on this issue but you're coming to me in federal court, asking me to aid a separate action that may be brought in state court that can be resolved, that discovery issue can be resolved by that state court judge ultimately, isn't that correct?"). If the Khrapunovs want to collect evidence to use in the U.K. Proceedings, they should collect it in those proceedings, and seek relief from the appropriate U.K. tribunal if they have concerns about obtaining that evidence.

Finally, the Khrapunovs' improper motives in taking the deposition are now obvious, and rewarding their conduct would simply encourage more delay and abuse of discovery here. The Khrapunovs noticed Mr. Rakishev's deposition under misleading pretenses, claiming that they wished to question him on his oversight of BTA Bank's litigation here. They then threatened Mr. Rakishev publicly via Facebook, and spent his deposition questioning him on numerous issues unrelated to this proceeding (but apparently at issue the U.K. Proceedings). Before their clients had even seen the final transcript, they then sought to use his testimony in the U.K. Proceedings.

Discovery is not a Trojan Horse for the Khrapunovs to collect evidence for foreign proceedings, particularly when the Khrapunovs have refused to produce evidence here and have admitted to destroying relevant documents. Permitting the Khrapunovs to make an end-run around the discovery processes in the U.K. Proceedings would simply encourage them to use this action as a vehicle for their overseas litigation.

## **CONCLUSION**

For the above reasons, and those stated in the Kazakh Entities' initial motion for an evidentiary hearing and sanctions [ECF No. 453], this Court should grant the sanctions requested above, and deny the Khrapunovs request to de-designate the confidentiality of the Transcript.

Dated:          December 4, 2017
                New York, New York

                                               Respectfully,

                                                /s/ Matthew L. Schwartz
                                              Matthew L. Schwartz
                                              Peter M. Skinner
                                              Daniel Boyle
                                              Elise Milne

                                              BOIES SCHILLER FLEXNER LLP
                                              575 Lexington Avenue
                                              New York, New York 10022
                                              Telephone: (212) 446-2300
                                              Facsimile:  (212) 446-2350
                                              E-mail: mlschwartz@bsfllp.com