UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITY OF ALMATY, KAZAKHSTAN and BTA BANK JSC,

        Plaintiffs,

-against-

MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, and TRIADOU SPV S.A.,

        Defendants.

No. 15-CV-05345(AJN)

**POST-HEARING MEMORANDUM OF LAW IN OPPOSITION TO BTA/ALMATY'S MOTION FOR SANCTIONS AND IN FURTHER SUPPORT OF THE KHRAPUNOVS' MOTION TO REMOVE CONFIDENTIALITY DESIGNATIONS AS TO PORTIONS OF THE RAKISHEV DEPOSITION TRANSCRIPT**

John J. Kenney
John P. Curley
Hoguet Newman Regal & Kenney, LLP
10 East 40th Street, 35th Floor
New York, NY 10016
Phone:  212-689-8808

*Counsel for Defendants Viktor Khrapunov and Ilyas Khrapunov*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................... ii

PRELIMINARY STATEMENT ...............................................................................................1

ARGUMENT ...............................................................................................................................3

  I.  BTA/ALMATY HAVE NOT DEMONSTRATED THAT
     ILYAS KHRAPUNOV WAS THE SOURCE OF THE LEAK..................................3

    A. The Court Should Consider the Possibility
       that the Transcript was Obtained and Leaked by Hacking ................................3

    B. Circumstantial Evidence Corroborates Ilyas
       Khrapunov's Testimony That He Was Not the Source of the Leak ................5

    C. BTA's Evidence is Speculative, Unsubstantiated
       and, in Most Instances, False ...................................................................................7

  II. PROPOSED SANCTIONS ARE NOT WARRANTED............................................9

III. THE CONFIDENTIALITY DESIGNATION SHOULD
     BE REMOVED AS TO SELECT PORTIONS OF MR.
     RAKISHEV'S DEPOSITION TRANSCRIPT ...................................................... 11

    A.  BTA/Almaty Has Not Demonstrated Good
        Cause for Protecting the Transcript Testimony
        that the Khrapunovs Seek to De-Designate ................................................... 12

    B.  BTA Does Not Deny or Even Address Their
        Inconsistent Statements to the Courts Should
        Not Be Permitted to Perpetrate a Fraud on the UK Court............................13

CONCLUSION.........................................................................................................................14

# TABLE OF AUTHORITIES

*A. V. by Versace, Inc. v. Gianni Versace, S.p.A.*,
  87 F. Supp. 2d 281 (S.D.N.Y. 2000) ............................................................................... 10

*Am. Civ. Liberties Union v. Dept. of Def.*, 827
  F. Supp. 2d 217, 231 (S.D.N.Y. 2011) ............................................................................. 9

*Blum v. Schlegel*,
  108 F.3d 1369 (2d Cir. 1997) ........................................................................................... 3

*Chao v. Gotham Registry, Inc.*,
  514 F.3d 280 (2d Cir. 2008) ............................................................................................. 3

*Chase v. Czajka*,
  2007 WL 680741 (N.D.N.Y. Feb. 28, 2007) .................................................................. 10

*Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH*,
  2017 WL 3605583 (S.D.N.Y. July 26, 2017) ................................................................... 9

*Cipollone v. Liggett Group, Inc.*,
  785 F.2d 1108 (3d Cir. 1986) ......................................................................................... 12

*Haley v. Merial, Ltd.*,
  2010 WL 5185386 (N.D. Miss. Dec. 15, 2010) ............................................................. 10

*Hindsight Sols., LLC v. Citigroup Inc.*,
  53 F. Supp. 3d 747, 772 (S.D.N.Y. 2014)……………………………………………...8

*Idan Computer, Ltd. v. Intelepix, LLC*,
  2010 WL 3516167, (E.D.N.Y. Aug. 27, 2010) .............................................................. 10

*Koch v. Greenberg*,
  2012 WL 1449186 (S.D.N.Y. Apr. 13, 2012) ................................................................ 12

*Latino Officers Ass'n City of N.Y., Inc. v. City of N.Y.*,
  558 F.3d 159 (2d Cir. 2009) ............................................................................................. 3

*Levin v. Tiber Holding Corp.*,
  277 F.3d 243 (2d Cir. 2002) ............................................................................................. 3

*Park-Tower Dev. Grp., Inc. v. Goldfeld*,
  87 F.R.D. 96 (S.D.N.Y. 1980) ....................................................................................... 11

*Schiller v. City of New York*,
  2007 WL 136149 (S.D.N.Y. Jan. 19, 2007) .............................................................. 11, 12

*Shapiro v. Freeman*,
  38 F.R.D. 308 (S.D.N.Y. 1965) ..................................................................................... 11

*Stand. Inv. Chartered, Inc. v. Natl. Ass'n of Securities Dealers, Inc.*,
  621 F. Supp. 2d 55 (S.D.N.Y. 2007) .............................................................................. 13

*U2 Home Ent., Inc. v. KyLin TV, Inc.*,
    2008 WL 1771913 (E.D.N.Y. Apr. 15, 2008) ...................................................................... 11

*U.S. v. Chimurenga*,
    760 F.2d 400 (2d Cir.1985) ................................................................................................... 3

Defendants Viktor and Ilyas Khrapunov (the "Khrapunovs") respectfully submit this post-hearing memorandum of law in opposition to BTA/Almaty's Motion for Sanctions and in support of the Khrapunovs' motion to remove confidentiality designations from portions of the Rakishev deposition transcript (the "Transcript").

## PRELIMINARY STATEMENT

Throughout this case, BTA/Almaty have used the Protective Order to make blanket confidentiality designations of all but one of the depositions they have defended, and they are now hiding behind the Court's order as a way to prevent a UK court from learning that BTA and its chairman have given inconsistent evidence in proceedings against Ilyas Khrapunov. As we explained in our letter seeking to de-designate certain limited portions of his deposition transcript, ▮▮▮▮ At no point has BTA offered an explanation for these inconsistencies. Instead, it has accused Mr. Khrapunov of leaking the transcript in a transparent effort to distract from its inconsistencies and prevent the Khrapunovs from using Mr. Rakishev's testimony.

Mr. Khrapunov denied that he is the source of the leak in a sworn declaration and, following the evidentiary hearing, a forensic exam was done on Mr. Khrapunov's email accounts to rule out the possibility that Mr. Khrapunov sent the Transcript to anyone. *See* Exhibit A, Decl. of Mattias Aggeler. BTA's case against him is entirely circumstantial and flows from the flawed premise that Mr. Rakishev's deposition was a "Trojan horse" designed to elicit irrelevant testimony. This is baseless. Mr. Rakishev is BTA's chairman, ▮▮▮▮

1

▉ The Khrapunovs were plainly justified in taking his deposition.

The remainder of BTA's case rests on the idea that Mr. Khrapunov has motive and opportunity to leak the transcript. The motive point is a red herring—Mr. Khrapunov has adhered to the Protective Order, including by directing his lawyers to seek de-designation so that he could use portions of the Transcript in the UK. It is illogical to think Mr. Khrapunov would leak the Transcript and invite a motion for sanctions at the same time his lawyers were seeking relief through proper channels. And the opportunity point is overstated because the Court should not rule out the possibility that the Transcript was obtained by hacking.

Additionally, the proposed sanctions are not appropriate. BTA/Almaty seeks an order barring the Khrapunovs from using Mr. Rakishev's deposition for any purpose. This request is meritless because it was plainly proper for the Khrapunovs to depose Mr. Rakishev, and BTA/Almaty's request speaks volumes about the real reason they are pursing this motion: rather than explain the inconsistencies in BTA's evidence, they want to erase them. BTA/Almaty also seek to appoint a special master, but this relief is unnecessary and unwarranted because BTA/Almaty have not demonstrated that exceptional circumstances exist, and this Court is more than capable of resolving any discovery disputes between the parties.

Finally, the Court should de-designate the selected portions of the Transcript because BTA/Almaty has not shown good cause to prevent a UK tribunal from learning about evidence that Mr. Rakishev provided in New York.

**ARGUMENT**

I.  **BTA/ALMATY HAVE NOT DEMONSTRATED THAT ILYAS KHRAPUNOV WAS THE SOURCE OF THE LEAK.**

BTA/Almaty has not demonstrated that Ilyas Khrapunov was the source of the leak as required by law. Under federal law, proof of non-compliance with a court's order must be "clear and convincing." *Chao v. Gotham Registry, Inc.*, 514 F.3d 280, 291 (2d Cir. 2008). When contempt sanctions are sought for violation of a protective order, courts also apply "clear and convincing" standard, *Blum v. Schlegel*, 108 F.3d 1369, at *1 (2d Cir. 1997), which requires "a quantum of proof adequate to demonstrate a reasonable certainty that a violation occurred," *Levin v. Tiber Holding Corp.*, 277 F.3d 243, 250 (2d Cir. 2002). The "clear and convincing evidence" standard imposes a higher burden of proof than a "preponderance of the evidence" but is less than "beyond a reasonable doubt." *U.S. v. Chimurenga*, 760 F.2d 400, 405 (2d Cir.1985). "[A] contempt order is a 'potent weapon,' that is inappropriate if 'there is a fair ground of doubt as to the wrongfulness of the defendant's conduct.'" *Latino Officers Ass'n City of N.Y., Inc. v. City of N.Y.*, 558 F.3d 159, 164 (2d Cir. 2009) (quoting *Cal. Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618, 5 S.Ct. 618, 28 L.Ed. 1106 (1885)).

A.  **The Court Should Consider the Possibility that the Transcript was Obtained and Leaked by Hacking.**

None of the parties can rule out the possibility that the Transcript was obtained by hacking. Both sides have accused one another of hacking or working with hackers[1]. Law firms, associates and accounting firms have reportedly suffered email hacks[2]. News articles recounting these events report that "[t]he alleged offences range from improper interference in the judicial

---

[1] The Kazakhstan government reportedly pays millions to intelligence firm Arcanum, who in turn
[2] Menn, Joseph. "Kazakh Dissidents and Lawyers Hit by Cyber Attacks." *Reuters* Aug. 2, 2016.

3

process to illegal espionage and kidnapping."³ A 2016 Reuters article, titled "Kazakh Dissidents and Lawyers Hit By Cyber Attacks," states that "[h]ackers believed to be working on behalf of Kazakhstan government officials tried to infect lawyers and other associates of exiled dissidents and publishers with spyware."⁴

Mr. Khrapunov has stated in sworn interrogatory responses that there have been repeated attempts by unknown third parties to hack his private information. *See* Exhibit B, Ilyas Khrapunov's Responses and Objections to BTA/Almaty's First Interrogatories at p.3-4. Details of suspected hacking and the malware campaign initiated by the Kazakh government against his family and other similarly situated political dissidents have been reported through various news outlets, including Reuters⁵ and the Electronic Frontier Foundation.⁶ A criminal investigation in Switzerland is currently looking into, among other things, the hacking attempts on Ilyas and his family. *See* ECF No. 468-4, Nov. 1, 2016 article entitled "Swiss Court Reopens Probes of Alleged Espionage by Kazakh Agents."

Although the Khrapunovs do not have proof that the Transcript was hacked, several things suggest that hacking is a possibility. One, it has been widely reported that BTA, as well as the Kazakhstan government, works with intelligence groups and public relations specialists to malign and damage the public perception of their political opponents. This process, known as "Black PR" is described at length in an article on the Plaintiffs' counterintelligence activities against Ablyazov and the Khrapunovs, including their relationships with Arcanum Global (spy agency), FTI Consulting (investigations group), World PR, Portland Communications,

---

³ Burgis, Tom. "Spies, Lies and the Oligarch: Inside London's Booming Secrets Industry." *The Financial Times* Sept. 27, 2017
⁴ *See* Footnote 2, *supra*.
⁵ *Id*.
⁶ https://www.eff.org/files/2016/08/03/i-got-a-letter-from-the-government.pdf

Diligence (corporate intelligence).[7] Black PR, writes the Financial Times author, involves "putting [out] the negatives of your opponents, without any fingerprints[8]." Marat Beketayev, Kazahstan's Justice Minister, discussed this media manipulation strategy with the Financial Times, stating that it was a necessary approach because "we were losing this PR war[9]" with Ablyazov and his associates.

Two, BTA has acknowledged that its representatives took a meeting with an individual named Stuart Page during which Mr. Page offered to provide BTA with hacked documents. [ECF No. 487-1, Fifth Witness Statement of Ian James Tucker at ¶¶ 30-33]. ███████████████████████████████████████████████████████████████████████████████████████████████████████

In other words, BTA is no stranger to illicit activities and the chance remains that the Transcript was obtained by hacking as a way to frame Mr. Khrapunov and distract from his efforts to de-designate Mr. Rakishev's transcript.

### B. Circumstantial Evidence Corroborates Ilyas Khrapunov's Testimony That He Was Not the Source of the Leak.

Without any direct evidence of Ilyas Khrapunovs' responsibility for publishing the Transcript, BTA/Almaty tries to make a circumstantial case, but in many ways the evidence undercuts the inference that Mr. Khrapunov committed a violation of the protective order. *First*, the URA Article itself describes a BTA employee as the source of the Transcript. Aside from BSF's cursory inquiry to unidentified BTA employees concerning whether anyone at BTA received or disclosed the Transcript, (*See* ECF No. 454, Schwartz Decl. at ¶ 15) BTA has not

---

[7] Burgis, Tom. "Spies, Lies and the Oligarch: Inside London's Booming Secrets Industry." *The Financial Times* Sept. 27, 2017.
[8] *Id*.
[9] *Id.*

5

demonstrated that it investigated itself as the source of the leak. Given BTA's reported use of cyber-attacks, such an investigation is warranted.

*Second*, Mr. Khrapunov's conduct in this litigation demonstrates that he understood and took seriously the Protective Order's requirements. On October 17, 2017, nine days before anyone noticed the leak, Mr. Khrapunovs' counsel proposed a meet-and-confer to discuss lifting the confidentiality restriction on portions of the Transcript in order to present Mr. Rakishev's testimony to the UK court. When the leak was discovered, it was promptly brought to the Court's attention. [ECF No. 452 at 2 n.1].

*Third*, relatedly, Mr. Khrapunov has sought this Court's permission to use portions of the Rakishev deposition in UK proceedings and it would have been deeply counterproductive to violate the Protective Order while simultaneously asking the Court to modify the designations on the Transcript. BTA/Almaty tries to explain this away by arguing that the leak was part of a strategy to bolster the Khrapunovs' motion to de-designate, but this makes no sense—the unauthorized disclosure of confidential discovery material would not vitiate the Protective Order as to that document and no one in this case has argued otherwise.

*Fourth*, the thrust of the URA Article suggests that it was not driven by Mr. Khrapunov. Its headline refers to a "money laundering trial," which from Mr. Khrapunov's perspective is an inflammatory—and, now that the RICO claims have been dismissed—inaccurate way to describe what in, Mr. Khrapunov's view, is the pursuit of baseless claims against him and his family. *See* ECF 482-3 (September 15, 2017 Facebook post describing this action as a "publicized but legally unjustified suit"); ECF 482-5 at 16-17 (September 11, 2017 Facebook post describing this action as an "unreasonable but very unjustified lawsuit which Nazarbayev's regime filed against me and members of my family").

### C. BTA's Evidence is Speculative and Unsubstantiated.

BTA/Almaty has no reliable evidence, let alone clear and convincing evidence, that Ilyas Khrapunov was responsible for the leak.

BTA/Almaty argues that Ilyas "has a history of causing illicitly-obtained information to be posted online," despite the fact that there has never been any finding by any court connecting Ilyas to the Kazaword hack or any other leak of confidential documents. BTA/Almaty's suspicion that Ilyas Khrapunov is responsible for the Kazaword hack is founded solely on the uncorroborated accusations of Nicholas Bourg, a former business associate of Mr. Khrapunov's with personal, legal and financial motivations to impugn Mr. Khrapunov's reputation. On June 16, 2015, Mr. Bourg signed a release agreement with the Republic of Kazakhstan, the City of Almaty and BTA Bank, whereby the Kazakh entities agreed to release him from future litigation in exchange for his cooperation in BTA's asset recovery process. [ECF No. 487-3, Bourg Release and Confidentiality Agreement]. ██████████████████████████████████████████████████████████████████ *see also* Exhibit D, Bourg Tr., 35:13-18]. Moreover, Mr. Bourg also harbors personal resentment towards our client; in a recorded conversation, Mr. Bourg described his falling out with Mr. Khrapunov as follows: "I mean that's just a lack of respect….[W]hen you treat someone like they treated me when I gave everything for him, it's not good." [ECF No. 142-9 at 21.] Mr. Bourg's personal bias and legal/financial incentive to help BTA/Almaty's position in this lawsuit severely undermines his credibility as a witness.

This Court has previously found that BTA/Almaty's allegations in a separate case that Ilyas Khrapunov was responsible for Kazaword was a sufficient basis to preclude him from using Kazaword documents at least while the other case is pending [ECF No. 369 at 7], but neither

7

BTA/Almaty's suspicion nor allegations in a complaint support a finding of contempt by clear and convincing evidence. *See Hindsight Sols., LLC v. Citigroup Inc.,* 53 F. Supp. 3d 747, 772 (S.D.N.Y. 2014) (holding that the clear and convincing standard "demands a high order of proof" which cannot be met by "circumstances of mere suspicion.").

BTA/Almaty makes much of two purported inaccuracies in Mr. Khrapunov's declaration, but this argument is so strained as to be misleading. BTA/Almaty claim that Mr. Khrapunov's statement that "After reviewing the Transcript…I contacted my attorneys" to take steps necessary to lift the confidentiality designations is incorrect because Mr. Khrapunov only received the *final* version of the Transcript after counsel sought a meet-and-confer on the issue. Br. at 16. Mr. Khrapunov had reviewed the rough copy of the Transcript, which he received the day after Mr. Rakishev's deposition [ECF No. 487-6, I. Khrapunov Decl. at ¶ 3], and his declaration plainly uses the capitalized "Transcript" to include either the rough or final versions [*id.* at ¶ 7: "I did not send any version of the Transcript (rough or final) to anyone…."]. The second purported inaccuracy is equally silly: BTA/Almaty complain that Mr. Khrapunov referred to the Russian-language URA website as a "Russian website." Br. at 16. Mr. Khrapunov apparently did not realize that URA is a Ukrainian publication; his unfamiliarity is not surprising inasmuch as he was not the source of the leak.

BTA/Almaty's baseless claim that the Khrapunovs misled the Court through their motion to lift the confidentiality designation misapprehends the relevant timeline. Br. at 12-13. BTA/Almaty suggest that the Khrapunovs sought to lift the designations on the same day they discovered the leak, but this is inaccurate. Counsel began the meet-and-confer process on October 17, 2017, nine days before the leak was discovered. [*See* ECF No. 482-20, HNRK Privilege Log].

8

BTA/Almaty cite the Khrapunovs' inability to appear at the evidentiary hearing as evidence of their deceptive conduct but—tellingly—they do not dispute that Swiss law prohibits the Khrapunovs from providing telephonic testimony from Switzerland. *See* Br. 14-15. The Khrapunovs should not be penalized for upholding the laws of the country in which they reside.

BTA/Almaty also focuses on Facebook to argue that because the URA article "mirrors" certain language in the Khrapunovs' publicly-available social media posts the source of the URA leak must therefore be Ilyas Khrapunov. This is not logical. A far simpler and more likely explanation is that the article's author copied the Facebook posts to give context to the lawsuit about which he or she was writing—and in fact the article directly references the Khrapunovs' writings. *See* ECF No. 487-4, URA Inform Article at 3 ("the respondents'… urged those interested in the progress of the trial to stock up on popcorn.")

## II.   THE PROPOSED SANCTIONS ARE NOT WARRANTED.

Civil contempt sanctions "are intended either to coerce the contemnor into future compliance with the court's order or to compensate the complainant for losses resulting from the contemnor's past noncompliance;" that is, they "must be remedial and/or compensatory, rather than punitive." *Church & Dwight Co. v. SPD Swiss Precision Diagnostics GmbH*, No. 14-CV-585, 2017 WL 3605583, at *4 (S.D.N.Y. July 26, 2017); *Am. Civ. Liberties Union v. Dept. of Def.*, 827 F. Supp. 2d 217, 231 (S.D.N.Y. 2011) ("An adjudication of civil contempt is coercive—to compel obedience to a lawful court order"—whereas "criminal contempt is imposed to punish the contemnor for an offense against the public and to vindicate the authority of the court." (citing *United States v. Grand Jury Witness (In re Grand Jury Witness)*, 835 F.2d 437, 440 (2d Cir.1987)).

In determining whether a contempt sanction is appropriate, a court "must consider whether the ends justify the means" and should issue a contempt order only if that order is

necessary to insure compliance with the violated order. *A. V. by Versace, Inc. v. Gianni Versace, S.p.A.*, 87 F. Supp. 2d 281, 296 (S.D.N.Y. 2000).

There is thus no basis for BTA/Almaty's request to bar the Khrapuovs from using the Rakishev Transcript because this sanction would serve no remedial or compensatory purpose. And, in any event, BTA/Almaty cites no caselaw to support this request.

BTA/Almaty's request to appoint a special master is also unwarranted. While Rule 53 permits appointment of special masters to supervise pretrial matters, the Advisory Committee Notes make clear that such appointments should only be made in limited circumstances and when the need is clear. *See* FRCP 53, advisory committee's note, 2003: "appointment of a master must be the exception and not the rule." The standard for appointing a special master to deal with pretrial matters is set forth subsection (a)(1)(C), and requires a showing that the matters "cannot be effectively and timely addressed by an available district judge or magistrate judge of the district." Where such showing is not made, the appointment of a special master is not appropriate. *See Idan Computer, Ltd. v. Intelepix, LLC*, No. CV-09-4849, 2010 WL 3516167, (E.D.N.Y. Aug. 27, 2010) (holding that a special master could only be appointed if the court was unable to "effectively and timely" address the pretrial issues in this action); *Haley v. Merial, Ltd.*, No. 4:09CV00094-WAP-DAS, 2010 WL 5185386, at *1 (N.D. Miss. Dec. 15, 2010) (rejecting request for a special master where movant had not established a clear need for such appointment); and *Chase v. Czajka*, No. 1:05XCV0779, 2007 WL 680741, at *2 (N.D.N.Y. Feb. 28, 2007) (refusing to appoint a special master as "no demonstration has been made showing exceptional circumstances or why this Court should otherwise abandon the usual practice of referring to the co-assigned Magistrate Judge." ).

BTA/Almaty does not discuss or present evidence sufficient to meet this standard, and the cases they cite are readily distinguishable from the facts here. In *Park-Tower Dev. Grp., Inc. v. Goldfeld*, 87 F.R.D. 96, 97 (S.D.N.Y. 1980), the court found that discovery was "out of hand" and recommended appointment of a special master, but only after noting that defendants were "in woeful default" and engaged in "flagrant and grating" disregard of the opposing counsel's right to discovery. *Id*. at 98. Even so, the district court acknowledged that the appointment may have been a "reaction to overkill conduct on the part of the plaintiffs." *Id*. Likewise, the Court in *Shapiro v. Freeman*, 38 F.R.D. 308, 312 (S.D.N.Y. 1965), appointed a special master *sua sponte* as a response to plaintiff's counsel's "obstructive tactics" during depositions. The court found that counsel "appears to be bent on concealing vital facts or, at best, waging a war of delay, expense, harassment and frustration" and that there was no justification for his conduct. *Id*. The Khrapunovs have not engaged in any "woeful" or "obstructive tactics" warranting appointment of a special master.

### III. THE CONFIDENTIALITY DESIGNATION SHOULD BE REMOVED AS TO SELECT PORTIONS OF MR. RAKISHEV'S DEPOSITION TRANSCRIPT.

Where a court has entered a global protective order permitting parties to designate discovery materials as confidential without a showing of good cause and the confidentiality designation of a document is contested, "the party seeking to maintain confidential treatment for the challenged document will have the burden of establishing good cause for the continuation of that treatment." *U2 Home Ent., Inc. v. KyLin TV, Inc.*, 06-CV-2770 (DLI), 2008 WL 1771913, at *2 (E.D.N.Y. Apr. 15, 2008) (quoting *Lachica v. City of New York*, 94-CV-7379 (LAK), 1995 WL 77928, at *1 (S.D.N.Y. Feb. 23, 1995)); *see also Schiller v. City of New York,* No. 04 Civ. 7922(KMK)(JCF), 2007 WL 136149, 2007 U.S. Dist. LEXIS 4285 (S.D.N.Y. Jan. 19, 2007). The burden of establishing good cause for maintaining confidentiality lies solely with the party

11

resisting disclosure. *Koch v. Greenberg*, No. 07 Civ. 9600 BSJ DF, 2012 WL 1449186, at *1 (S.D.N.Y. Apr. 13, 2012) (quoting *In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 243 (S.D.N.Y. 2009)); *Cipollone v. Liggett Group, Inc.*, 785 F.2d 1108, 1122 (3d Cir.1986) (where protective order covers all documents that producing party deems confidential, "burden of justifying the confidentiality of each and every document ... remains on [that party]; any other conclusion would turn Rule 26(c) on its head.").

### A. BTA/Almaty Has Not Demonstrated Good Cause for Protecting the Transcript Testimony that the Khrapunovs Seek to De-Designate.

To demonstrate good cause, BTA/Almaty must show that disclosure of parts of the Transcript "will result in a clearly defined, specific and serious injury." *Schiller v. City of New York,* No. 04 Civ. 7922 KMK JCF, 2007 WL 136149, at *3 (S.D.N.Y. Jan. 19, 2007). "[G]eneralized and unsupported claims of harm that might result from disclosure" do not constitute good cause. *Id.* (quoting *Allen v. City of New York*, 420 F. Supp. 2d 295, 302 (S.D.N.Y. 2006)). Simply because the disclosure of information "might result in adverse publicity" does not, in itself, suffice to render it proprietary or commercially sensitive, sufficient to justify judicial protection from disclosure. *Koch v. Greenberg*, No. 07 CIV. 9600 BSJ DF, 2012 WL 1449186, at *2 (S.D.N.Y. Apr. 13, 2012).

BTA/Almaty argue that the challenged confidentiality designations should remain because they cover "undisclosed financial information, ownership of entities, and sensitive non-public information." Br. 23. As an initial matter, this does not even attempt to justify the confidentiality protections for Mr. Rakishev's testimony ███████████████████████████████████████████████████████ There is plainly nothing confidential about this testimony, and it should be de-designated.

The other challenged designation should be removed, too, because █████████ ███████████████████████████████ this information was placed in issue in the UK litigation and disclosure of Mr. Rakishev's testimony here is necessary to correct the record in the UK. *See* Point III B, *infra*.

The fact that the Khrapunovs intend to introduce the Transcript in the UK proceeding has no bearing on the good cause showing that BTA/Almaty must make for continued protection of the document. *See Stand. Inv. Chartered, Inc. v. Natl. Ass'n of Securities Dealers, Inc.,* 621 F. Supp. 2d 55, 63 (S.D.N.Y. 2007) (failing to find good cause in Defendants' argument that Plaintiffs are seeking to use confidential documents in an Italian litigation, holding that "the motive of the party seeking access to, or disclosure of, documents is irrelevant to the question of whether and how strong a public right of access exists with respect to those documents.").

### B. BTA May Not Hide Behind the Protective Order to Avoid Coming Clean in the UK.

This Court should not permit BTA/Almaty to distort the intended purpose of the Protective Order and use it to avoid correcting the record in the UK. As we noted in our October 26, 2017 letter motion, ████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

13



## **CONCLUSION**

For the foregoing reasons, the Court should deny BTA/Almaty's motion for sanction and grant the Khrapunovs' motion to de-designate select portions of the Transcript.

Dated: December 15, 2017
New York, New York

HOGUET NEWMAN REGAL & KENNEY, LLP

_____/s/ John P. Curley_____
John J. Kenney
John P. Curley
Hoguet Newman Regal & Kenney, LLP
10 East 40th Street, 35th Floor
New York, NY 10016
Phone: 212-689-8808

*Counsel for Viktor Khrapunov and
Ilyas Khrapunov*

14