———————————————————————

|  |  |  |
|---|---|---|
| CITY OF ALMATY, KAZAKHSTAN, and BTA BANK | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | No. 15-cv-05345 (AJN) (KHP) |
| MUKHTAR ABLYAZOV, ILYAS KHRAPUNOV, VIKTOR KHRAPUNOV and TRIADOU SPV S.A., | ) ) ) ) | |
| Defendants. | ) ) | |

———————————————————————

**THE CITY OF ALMATY, KAZAKHSTAN AND BTA BANK'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO STRIKE ILYAS & VIKTOR KHRAPUNOV'S OPPOSITION TO THE MOTION FOR SANCTIONS [ECF No. 502]**

BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Crossclaim Plaintiffs City of Almaty, Kazakhstan and BTA Bank*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ..................................................................................... 1

RELEVANT BACKGROUND .................................................................................... 2

ARGUMENT ............................................................................................................... 7

   I.    The Khrapunovs Should Not be Permitted to Expand the Record ...................................... 8

   II.    The New Evidence Should Also Be Excluded Because It Violates The Court's November 21 Order ......................................................................................................... 19

   III.    The Kazakh Entities Are Entitled to Fees .................................................................... 20

CONCLUSION ........................................................................................................... 22

# TABLE OF AUTHORITIES

**Cases**

*Advanced Analytics, Inc. v. Citigroup Glob. Markets, Inc.*,
    301 F.R.D. 31 (S.D.N.Y.)     21

*Catskill Assocs., L.L.C. v. Benza*,
    No. 1:08 Civ. 598 (LEK), 2009 WL 3756593 (N.D.N.Y. Nov. 6, 2009)     21

*Hous. Works, Inc. v. Turner*,
    362 F. Supp. 2d 434 (S.D.N.Y. 2005)     10

*John v. Sotheby's, Inc*.,
    858 F. Supp. 1283 (S.D.N.Y. 1994)     9

*Korea First Bank v. Lee*,
    14 F. Supp. 2d 530 (S.D.N.Y. 1998)     9, 10

*Moreno v. Empire City Subway Co.*,
    No. 05 CIV. 7768 LMM HBP, 2008 WL 793605 (S.D.N.Y. Mar. 26, 2008)     21

*New World Sols., Inc. v. NameMedia Inc*.,
    150 F. Supp. 3d 287 (S.D.N.Y. 2015)     10

*Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc*.,
    926 F. Supp. 371 (S.D.N.Y. 1996)     9

*Playboy Enterprises, Inc. v. Dumas*,
    960 F.Supp. 710 (S.D.N.Y.1997)     9

*Shred-It USA, Inc. v. Mobile Data Shred, Inc*.,
    238 F. Supp. 2d 604 (S.D.N.Y. 2002)     9, 11

*Ventra v. United States*,
    121 F. Supp. 2d 326 (S.D.N.Y. 2000)     20

**Rules**

Fed. R. Civ. P. 37 ........................................................................................................... 20, 21

The City of Almaty and BTA Bank (together, the "Kazakh Entities") respectfully submit this memorandum of law in support of their motion to strike Viktor & Ilyas Khrapunov's opposition to the Kazakh Entities' motion for sanctions ("the Opposition"), [ECF No. 502], or at a minimum, to strike the New Evidence (as that term is defined below) submitted by the Khrapunovs as part of their Opposition.

## PRELIMINARY STATEMENT

In late November, the Court held an evidentiary hearing to determine whether Ilyas Khrapunov should be sanctioned for violating the confidentiality order in this case, after it turned out that he was the only person other than counsel and court reporters who had access to a confidential deposition transcript that was leaked on-line. At that hearing, the Court was careful to ensure that the parties made a clear evidentiary record, and at several points counsel for the Khrapunovs confirmed that they had no further evidence to offer. The Court then entered a written order, requiring the parties to file electronically all evidence introduced during the hearing, precisely so the record would be clear.

But a full month after the hearing, and after they had the benefit of seeing the Kazakh Entities' post-hearing briefing setting out their arguments for sanctions against Ilyas Khrapunov, the Khrapunovs filed an Opposition replete with New Evidence that was never referenced, let alone moved into evidence, at the evidentiary hearing. The New Evidence includes deposition excerpts, news articles, and even the testimony of a brand new expert witness – without so much as a word of explanation as to why the evidence was not presented previously, or why it should be permitted now.

It should *not* be permitted. The New Evidence was introduced too late; it could have been introduced earlier; it is deeply prejudicial; it is unreliable; it is inadmissible on its face; and it

violates the Court's order. It would be profoundly unjust to allow the Khrapunovs to rely on the New Evidence when the Kazakh Entities have no ability to confront it, and the Khrapunovs' attempt to inject the New Evidence at this point violates every rule of courtroom practice. The New Evidence, and the Opposition that is based almost entirely upon it, should be stricken.

## RELEVANT BACKGROUND

### A.     The Leak of Confidential Information

On October 26, 2017, Viktor and Ilyas Khrapunov ("the Khrapunovs") moved the Court to lift the confidentiality designation on portions of the deposition of Kenges Rakishev, the Chairman of BTA Bank's board of directors, so that it could be used in proceedings in the United Kingdom. [ECF No. 452]. In that motion, the Khrapunovs revealed that the entire confidential transcript of Mr. Rakishev's deposition ("the Transcript") had been leaked, and was available on a file-sharing website, accompanied by a Russian-language blog post (the "Article"). *Id*. at 2.

In response to the leak, counsel for the Kazakh Entities immediately undertook an internal investigation. Counsel identified each person who had received the Transcript, how it had been handled, and most importantly of all, confirmed that the Transcript had never been sent or shared with the Kazakh Entities themselves – notwithstanding the Article's claim that it had come from someone at BTA Bank. [ECF No. 472 – 481]. This investigation revealed that only one party – indeed, only one *person*, aside from the court reporters and law firms involved – had ever received the Transcript: Ilyas Khrapunov.

### B.     The Sanctions Motion

Having determined that the only plausible source of the leak was Ilyas Khrapunov, the Kazakh Entities sought an evidentiary hearing and sanctions against him. [ECF No. 453]. The sanctions motion explained how the Khrapunovs had threatened to use Mr. Rakishev's

deposition to attack and harass him, *id*. at 1, noted that the Court had granted a specific protective order in response to these threats, *id*., and identified unquestionable similarities between Facebook posts made by the Khrapunovs and the Article announcing the leak of the Transcript. *Id*. at 2-3. In addition, the Kazakh Entities established that the Article had been posted just hours before the Khrapunovs made their motion to lift the confidentiality designation on portions of the Transcript. *Id.* at 3.

The Court granted the Kazakh Entities' request and scheduled an evidentiary hearing for November 17, 2017, also setting dates for the parties to make applications to present witnesses by telephone or video. [ECF No. 458].[1] In advance of that hearing, counsel for the Kazakh Entities provided all parties with witness and exhibit lists, and suggested that any other party that intended to introduce evidence in its case-in-chief do so as well, consistent with the practice in this District. *See* Ex. A (November 15, 2017 e-mail from M. Schwartz, stating "we all need to finalize witness lists, so that all parties can prepare accordingly and there are no undue surprises or logistical hiccups. I suggest we exchange final witness lists by noon tomorrow"); Ex. B (Kazakh Entities' pre-hearing witness and exhibit lists, served on November 16, 2017). In addition, the Kazakh Entities provided a proposed stipulation as to the testimony of certain witnesses, and affidavits from all of the others representing the substance of their direct testimony. The *only* witnesses whose testimony was not contained in either the stipulation or an affidavit shared by the Kazakh Entities in advance of the hearing were Mukhtar Ablyazov, counsel for the Khrapunovs, and the Khrapunovs themselves. Notwithstanding the Kazakh

---

[1]     As the Court is aware, the Khrapunovs applied for permission to appear by telephone, which the Court granted. [ECF Nos. 459, 461]. Six days after that application was made, and only three days before the hearing, the Khrapunovs reversed course, and their counsel informed the Court that neither of the Khrapunovs would in fact appear, citing Swiss law. [ECF No. 463].

Entities' requests (and custom in this District), counsel for the Khrapunovs did not disclose any witness or exhibit lists in advance of the hearing.

## C.    The Evidentiary Hearing

The evidentiary hearing went forward as scheduled. At the hearing, the Kazakh Entities presented the parties' stipulation and the other testimonial affidavits – which collectively established that the Transcript was never shared outside of their own firms by counsel for the Kazakh Entities or counsel for Triadou, and that the court reporting service shared it only with the lawyers in this case – and supporting documentary exhibits, which the Court received into evidence without objection. *See* 11/17/17 Hr'g Tr. at 12:13-17; ECF Nos. 472–481.[2] The Khrapunovs declined to cross-examine any of those witnesses. The Kazakh Entities also called Ablyazov (telephonically, from France), and three lawyers for the Khrapunovs. Again, the Khrapunovs declined to conduct any cross-examination, except for a handful of clarifying questions to one of their own lawyers.

Taken together, counsel for the Khrapunovs testified that Ilyas Khrapunov was aware that the Transcript had been designated confidential, 11/17/17 Hr'g Tr. at 43:23-24, that the only person outside of their firm that counsel forwarded the Transcript to was Ilyas Khrapunov, *id*. at 44:15-25, 66:22-25, and that it was Ilyas Khrapunov who informed them that the Transcript had been leaked. *Id*. at 63:10-18. Counsel for the Khrapunovs also admitted that they had conducted no substantive investigation into how the Transcript had been leaked, nor had they collected or reviewed the e-mail account they had sent it to—whether as evidence that the Transcript had

---

[2]    This evidence was introduced solely for purposes of the Kazakh Entities' sanctions motion; Triadou and the Khrapunovs reserved their rights to object to its use for any other purpose. *See* 11/17/17 Hr'g Tr. at 33:1-12.

been leaked from that account or for document production in this action.[3] *Id*. at 48:13-21, 64:24-65:24, 67:15-20.

At the conclusion of the Kazakh Entities' case, they rested "subject of course to the availability of Viktor and Ilyas Khrapunov." *Id*. at 68:2-4. The Khrapunovs then declared that they "will have no witnesses," *id.* at 68:12, but introduced a handful of documents.

Throughout, both counsel for the Kazakh Entities and the Court were careful to make a clear record of what evidence was properly before it on the sanctions motion. For example, when counsel for the Khrapunovs stated "that's all we have," after going through some documentary exhibits, the Kazakh Entities clarified, "[w]ere you not intending to introduce the declarations of Ilyas and Viktor Khrapunov?" Counsel for the Khrapunovs replied "The Court has those," (they had been filed on ECF earlier), and counsel for the Kazakh Entities stated "I want to be clear in a sanctions proceeding about what the record is on this motion, on this hearing." *Id*. at 72:1-9. Counsel for the Khrapunovs agreed, *id.* at 72:10, and the Court confirmed "[A]re there any other exhibits that the Khrapunovs would wish to enter at this time?" *Id*. at 72:19-20. The Khrapunovs then clarified that they wanted certain news articles that had been attached to an earlier letter to the Court to be considered. *Id*. at 72:21-73:10. In total, the Khrapunovs admitted eleven exhibits, labeled Khrapunov Exhibits A through K.

The Court then directed the parties to file all of the stipulations, affidavits, and documentary exhibits on ECF, and to e-mail unredacted copies to chambers, "so it's crystal clear what the record is here." 11/17/17 Hr'g Tr. at 73:14-19 (comments of counsel for the Kazakh Entities, to which the Court responded "Yes. I would like you to do that."). At that point, the Khrapunovs confirmed again that "we have nothing more." *Id.* at 74:7.

---

[3]    Counsel for the Khrapunovs conceded that they actually had not reviewed *any* of Ilyas Khrapunov's email accounts for documents to be produced here. 11/17/17 Hr'g Tr. at 66:14-17.

Thus, at the close of the hearing, all of the evidence on the Kazakh Entities' motion had been introduced and the record was closed, with the sole exception of the Kazakh Entities' possible cross-examination of the Khrapunovs themselves – as the Khrapunovs' direct testimony having been introduced by affidavit. [ECF Nos. 487-05, -06].[4] After the hearing, the Court formalized its order directing that all exhibits be filed electronically for clarity of the record, and set a schedule for post-hearing briefing. [ECF No. 470].

**D.      The Khrapunovs' Opposition, and the New Evidence**

The Kazakh Entities filed their post-hearing brief on December 4, 2017, and late on Friday evening, December 18, 2017, the Khrapunovs filed their Opposition. Attached to and cited throughout the Khrapunovs' Opposition was a host of evidence that had not been moved into evidence at the hearing or filed in accordance with the Court's November 21 Order (collectively, the "New Evidence"). The New Evidence consists of both exhibits attached to the Khrapunovs' Opposition (confusingly identified as Exhibits A through E, when the Court had previously accepted different evidence with those designations), as well as news articles cited throughout the text of the Opposition but not otherwise attached. *See, e.g.,* Opposition, at 3 n.2; 4 & nn. 3 and 6; 5 nn. 7-8 (quoting articles from *Reuters* and The Electronic Frontier Foundation for the truth of the matters asserted).

Among the New Evidence was the testimony of an entirely new expert witness: an information technology consultant purportedly retained by counsel for the Khrapunovs to "cull,

---

[4]      *See also* 11/17/17 Hr'g Tr. at 75:22-76:3 ("I understand that there is an open question of Viktor and Ilyas' testimony, although I submit to you that to find that Mr. Khrapunov violated the protective order, you don't need to hear anything further from him. He has put forward his affirmative testimony here. He had the opportunity to testify, and he's taken advantage of that opportunity to present his direct testimony."). Counsel for the Khrapunovs likewise confirmed that they were prepared to make closing arguments that day, but asked the Court's permission to do so at a later date, citing a scheduling conflict. *Id.* at 76:14-15.

collect, ingest and analyze electronically stored information for multiple email accounts and electronic devices belonging to Ilyas Khrapunov," including the email account to which counsel for the Khrapunovs had forwarded the Transcript. [ECF No. 502-01]. The New Evidence also included numerous reports and articles predating the hearing but not entered into the record at that time,[5] as well as deposition testimony from other witnesses in this action who were not identified on any witness list, and who were not examined or cross-examined at the hearing. The Khrapunovs' opposition relies heavily on the New Evidence to offer an entirely new and fanciful narrative, arguing – with virtually no admissible evidence – that Ilyas Khrapunov was framed by BTA Bank for the leak through computer hacking and corporate espionage.

## ARGUMENT

The New Evidence, and the Opposition relying on it, must be stricken: it was not introduced into evidence at the hearing; the Kazakh Entities were given no notice or opportunity to address it or cross-examine the new witnesses; and most of the New Evidence is not properly admissible in the first place. Furthermore, because the Opposition is so infected by the New Evidence, it should be stricken in its entirety. The Khrapunovs chose to present no defense at the evidentiary hearing, and that is the record they should be forced to rely on.

The Opposition is contaminated top-to-bottom with New Evidence offered after the record closed and never moved into evidence, in spite of the Court's November 21 Order to do

---

[5]     Collectively, the New Evidence consists of Exhibits A, B, D & E to the Opposition [ECF Nos. 502-01, -02, -04, -05], as well as the sources cited at footnotes 1, 2, 4, 5 & 6 of the Opposition. (Footnote 1 appears to be an unfinished sentence, but its substance does not discernably refer to any evidence in the record).  The Khrapunovs' new Exhibit C, meanwhile, is identical to the document already moved into evidence by the Kazakh Entities as Exhibit 15, attached to the declaration of Sophie Roytblat [ECF No. 482-17].  The fact that the Khrapunovs re-submitted the same document, apparently without any recognition that it was already in evidence, just goes to show how disinterested they are in the record actually created at the hearing.

exactly that. The Kazakh Entities have been denied any opportunity to address, examine, or brief the New Evidence,[6] including the testimony of an entirely new expert witness who purports to – but does not, even taken at face value – exonerate Ilyas Khrapunov of the leak. Given that the Khrapunovs chose not to offer the New Evidence while the record was open, they have no right to rely on the New Evidence submitted after the record was closed and after the Kazakh Entities filed their post-hearing brief. Not only does this conduct fly in the face of the Court's orders and basic courtroom practice, it is itself sanctionable under the Federal Rules of Evidence.

## I.    The Khrapunovs Should Not be Permitted to Expand the Record

There is no more fundamental rule of the courtroom than when a party rests its case, it loses the ability to insert new evidence into the record as part of its case-in-chief. While courts occasionally allow the record to be re-opened to correct technical errors (*e.g.*, the failure to move an exhibit into evidence that was the subject of testimony, or to correct the record when the wrong version of a document was admitted into evidence), that is not what the Khrapunovs have tried to do here. To the contrary, they waited until the evidentiary record was closed *and* the Kazakh Entities had submitted their post-hearing brief, and then offered an array of previously undisclosed evidence. Imagine a criminal defendant trying to call a new witness after the prosecution's closing argument; no court would tolerate that. But that is exactly what the Khrapunovs have done here. Their tactics are not only antithetical to the adversary system, but encourage exactly the kind of trial-by-surprise that the Federal Rules prohibit.

---

[6]     The Court ordered post-hearing briefing from the parties, but explicitly ordered "no replies." 11/17/17 Hr'g Tr. at 77:17-18.

### a. The Khrapunovs Cannot Expand the Record Now With Evidence They Could Easily Have Offered Earlier

When a party seeks to expand or reopen the record to inject new evidence, "the movant must establish that it 'failed to adduce the evidence sought to be added notwithstanding its own due diligence.'" *Korea First Bank v. Lee*, 14 F. Supp. 2d 530, 531 (S.D.N.Y. 1998) (quoting *Playboy Enterprises, Inc. v. Dumas*, 960 F.Supp. 710, 723 (S.D.N.Y.1997); *see also Ortho Diagnostic Sys., Inc. v. Abbott Labs., Inc*., 926 F. Supp. 371, 372 (S.D.N.Y. 1996) ("An application to reopen the record ordinarily will be denied unless the party seeking to expand the record failed to adduce the evidence sought to be added notwithstanding its own due diligence"); *Shred-It USA, Inc. v. Mobile Data Shred, Inc*., 238 F. Supp. 2d 604, 607 (S.D.N.Y. 2002) (precluding new testimony offered after "all sides rested at the conclusion of the evidentiary phase of the proceeding" and "defendants had ample opportunity to seek leave to present a rebuttal witness [but] chose not to, and now offer no compelling reason why the trial record should be reopened"); *John v. Sotheby's, Inc*., 858 F. Supp. 1283, 1288 (S.D.N.Y. 1994), *aff'd*, 52 F.3d 312 (2d Cir. 1995) (considering, in addition to the movant's due diligence, "the extent to which reopening the record might prejudice the non-movant" and "the interests of justice.").

While much of this case law deals with parties who have explicitly moved the court for permission to expand the record – an issue on which the proponent of the evidence bears the burden, *see John*, 858 F. Supp. at 1288 ("The movant has the burden of demonstrating that the moving party's failure to submit evidence was not the result of its own lack of diligence, reopening the record would not unduly prejudice the nonmovant, and reopening the record would further the interests of justice."), the Khrapunovs' conduct here is even more concerning, as they simply make arguments based upon the New Evidence without even notifying the Court that it

was never put in the record, despite the Court's November 21 Order explicitly directing the parties to do exactly that.

Courts regularly strike untimely evidence in analogous circumstances, such as where it is submitted when an opposing party has no opportunity to examine or respond to it; this is simply an aspect of the Court's inherent authority to police the courtroom. *See, e.g., New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 308 (S.D.N.Y. 2015) (striking declaration attached to summary judgment opposition where movant "had no opportunity prior to the Motions for Summary Judgment to question [new witness] about his assertions of fact in his declaration."); *Hous. Works, Inc. v. Turner*, 362 F. Supp. 2d 434, 438, n. 4 (S.D.N.Y. 2005) (striking new evidence attached to objection to magistrate judge's ruling, and noting that "permitting such piecemeal presentation of evidence is exceptionally wasteful . . . [and] parties would be encouraged to withhold evidence" (quoting *Morris v. Amalgamated Lithographers of Am., Local One*, 994 F. Supp 161, 163 (S.D. N.Y. 1998))).

### b. The Khrapunovs Have No Reasonable Excuse for Withholding the New Evidence Until After the Record Closed

The Khrapunovs' failure to introduce the New Evidence at the evidentiary hearing is not simply a technical fault. This was evidence that was available to the Khrapunovs long before the hearing, and which they chose to sit on or generate until they had seen all of the Kazakh Entities' proof and all of the Kazakh Entities' arguments. There is simply no reason to think that that they could not have "adduce[d] the evidence sought to be added notwithstanding [their] own due diligence." *Korea First Bank*, 14 F. Supp. 2d at 531.

As detailed above, the Court and the parties established a clear and discrete record at the hearing. The parties moved documents into evidence, 11/17/17 Hr'g Tr. at 12: 13-17, subject to a negotiated agreement for the limited admissibility of that evidence, *id*. at 33: 1-12, and the Court

10

ordered this evidence to be filed and docketed, creating a discrete record for the briefing schedule ordered by the Court. *Id*. at 34:8-12. When the record was set to close, the Court explicitly confirmed with the Khrapunovs' counsel that they had no further evidence to offer, to which they responded "we have nothing more." *Id*. at 74:7.

Courts only permit a party to expand such a record when the evidence to be added could not have been offered in a timely fashion through reasonable due diligence, but here, virtually all of the New Evidence existed in its present form prior to the hearing. The Khrapunovs' failure to introduce it was either a lack of planning and due diligence, or a desire to gain a tactical advantage by sandbagging (or both) – none of which justifies expanding the record now. *See Shred-It USA*, 238 F. Supp. 2d at 607 ("To introduce the testimony and report of a supposed expert witness at this point manifests an absence of due diligence. Acceptance of the evidence would contravene the letter and spirit of Federal Rule of Civil Procedure 26 and unduly prejudice Shred–It").

For example, the Khrapunovs plainly understood that they wanted to introduce evidence to try to attack the credibility of Nicholas Bourg – the eyewitness to Ilyas Khrapunov's participation in acts of computer hacking, whom Judge Nathan has previously found to be credible. [ECF Nos. 482-91; 175 at 5 n.4]. To that end, they introduced their Exhibits B and C at the evidentiary hearing, which are certain release agreements between Bourg and the Kazakh Entities that the Khrapunovs contend are relevant to the witness's bias. [ECF Nos. 487-02,-03]. In the New Evidence, however, the Khrapunovs also include excerpts of Bourg's deposition. [ECF No. 502-05]. This evidence was plainly available at the time of the hearing, and indeed the Kazakh Entities themselves included portions of Bourg's deposition on their exhibit list disclosed to the Khrapunovs prior to the hearing, *see* Ex. B, at 3, giving the Khrapunovs ample

opportunity to cross-designate additional passages. They chose not to do so, instead waiting until the record was closed to cherry-pick a single quotation to try to create the false impression that the witness has a financial interest in the outcome of this case. Had the Kazakh Entities been given notice, they could have (and would have) cross-designated additional portions of Bourg's testimony that explained the context of this New Evidence.

But the most insidious use of the New Evidence is the Khrapunovs' attempt to manufacture some alternative explanation for what brought about the underlying motion for sanctions, which is Ilyas Khrapunov's leaking of the Transcript in plain violation of the protective order. In an attempt to come up with some other narrative, the Khrapunovs hypothesize that "the Transcript was obtained by hacking." Opp. at 3. Although the Khrapunovs do not spell out their accusation explicitly – because doing so would illustrates just how laughable it is – what they are claiming is that BTA (or perhaps Almaty, or maybe the Republic of Kazakhstan) commissioned hackers who, as part of a "Black PR" scheme, hacked into Ilyas' e-mail account, leaked the Transcript, and then framed him for the leak – yet publicly attributed the leak to a rogue BTA Bank employee. Setting aside the very many things wrong with this theory, there is no question that the Khrapunovs could easily have come up with this theory and 'supporting' evidence prior to the hearing. Indeed, all of the news articles they rely upon predated the hearing, as did the deposition testimony they attempt to inject after the fact. *See* Opp. at 3, n.2 (Reuters article dated August 2, 2017); at 4, n. 6 (Electronic Frontier Foundation report dated August 2016); Opp. Ex. B (excerpt of May 3, 2017 deposition of BTA Bank); Opp. Ex. D (excerpt of October 11, 2017 deposition of K. Rakishev); Opp. Ex. E (excerpt of September 11-12, 2017 deposition of N. Bourg).

The sole piece of New Evidence that does not predate the Evidentiary Hearing is the testimony of an expert witness who offers his "professional opinion" in an attempt to exonerate Ilyas. [ECF No. 502-01]. This testimony certainly could have been obtained prior to the hearing, but wasn't, and there is simply no plausible excuse for the Khrapunovs' failure to offer this witness during the hearing. Instead, they listened to the evidence submitted by the Kazakh Entities – including their own lawyers' damaging admission that they had never collected any documents from Ilyas' e-mail accounts, or conducted any sort of investigation into the source of the leak – and only then sought out a purported expert in an attempt to generate an opinion that might create some doubt about who leaked the Transcript (it doesn't, as explained below). Counsel acknowledged that they had been aware of Ilyas's "yodamaster@crypotheaven.com" account for over a year, so such a review could (and certainly should) have been conducted long ago. There is no conceivable excuse – and none has been offered – for their waiting until *after* the evidentiary hearing and *after* the Kazakh Entities submitted their post-hearing brief to do so.

  **c. Although the New Evidence Is Not Persuasive, the Kazakh Entities Would be Deeply Prejudiced by Its Unchallenged Admission after the Record Closed**

While the Khrapunovs' failure to offer the New Evidence while the record was open is certainly grounds enough to strike the Opposition, the Court is also entitled to consider the serious prejudice the late disclosure of the New Evidence will have on the Kazakh Entities. *See John v. Sotheby's, Inc.*, 858 F. Supp. at 1288. While the New Evidence is largely inadmissible or easily-discredited, it has been offered after the record closed, denying the Kazakh Entities the opportunity to challenge this evidence on evidentiary and substantive grounds or offer their own evidence in response.

The Khrapunovs' counsel was forced to admit on the stand that they had done no investigation into the leaking of the Transcript other than passing along blanket denials from

their clients, both of whom reneged on their offers to be cross-examined. Faced with this

admission, the Khrapunovs have now interjected the New Evidence to try and muddy the waters

enough to escape sanctions. Admitting the New Evidence now would allow the Khrapunovs to

put up the façade of a case without allowing the Kazakh Entities to properly test it.

*i. Admitting the Expert's Testimony Would Prejudice the Kazakh Entities*

As noted above, the Khrapunovs have not offered any reason why their surprise expert

witness, Mattias Aggeler, did not appear to be examined at the Evidentiary Hearing. His out-of-

court, un-confronted statements are inadmissible hearsay, and no plausible exception applies

here. *See* Fed. R. Evid. 801, 802.[7] Every witness except the Khrapunovs themselves, and now

Aggeler, volunteered and was available to be cross-examined on their testimony. In contrast,

every single witness the Khrapunovs have offered found a way to avoid being examined on their

testimony. The Kazakh Entities are obviously prejudiced when they are denied the chance to

cross examine a supposedly independent expert witness who claims to exonerate Ilyas

Khrapunov. Even if the Court is entitled to consider inadmissible hearsay at this pretrial stage,

any value Aggeler's testimony might have is dramatically outweighed by the prejudice to the

Kazakh Entities.

In addition to being inadmissible hearsay, Aggeler also purports to offer expert testimony

despite completely failing to qualify as an expert or make the other disclosures required of

experts. He concludes his affidavit by explicitly offering his "professional opinion," but the

---

[7]      At the hearing, both parties offered certain documents that were arguably hearsay, but
which were admitted by agreement for the purposes of the sanctions motion. Obviously, the
Kazakh Entities object to the New Evidence, which does not fall within the parties' prior
agreement on limited admissibility. Moreover, with respect to every witness whose testimony
was admitted, the parties were given the opportunity to cross-examine and either took advantage
of that opportunity or knowingly waived it. Here, the Kazakh Entities have had no opportunity to
cross-examine Aggeler, nor was he identified as a potential witness that might have been
deposed.

Khrapunovs have not made any of the necessary expert disclosures, nor does Aggeler's testimony on its face disclose his qualifications, his experience as an expert, his fees, his methodology, or the bases for his opinions. *See generally* Fed. R. Civ. P. 26(a)(2)(B) (requiring paid experts to produce a signed, written report containing certain required disclosures, including about their qualifications, experience, compensation, methodology, and opinions); *see also* Fed. R. Evid. 702; *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir. 2002) ("[T]he district court has a 'gatekeeping' function under Rule 702—it is charged with the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."). Beyond its general failure to qualify Aggeler as an expert, his declaration does not indicate that he has any expertise or even familiarity with Cryptoheaven's particular capabilities, and his affidavit entirely fails to address Cryptoheaven's file-sharing capabilities, as discussed below. By offering Aggeler's testimony after the evidentiary hearing and thus denying the Kazakh Entities the chance to examine him and test his qualifications, the Khrapunovs are trying to sidestep rules for expert testimony – which certainly prejudices the Kazakh Entities.[8]

Separate from his qualifications, Aggeler describes his review as "forensic" and offers his "professional opinion," Aggeler Decl., ¶ 9, but his declaration simply says that he ran searches through the "Yodamaster" account. As explained above, Aggeler does not offer any professional credentials, does not suggest any expertise in the Cryptoheaven platform, and does not explain what he did to copy or preserve these accounts. This is significant, as the Khrapunovs have previously claimed an inability to obtain documents from Cryptoheaven in responses to motions

---

[8] The Khrapunovs' failure to make the other disclosures required by Rule 26 is no less prejudicial. For example, the Kazakh Entities have no idea what Aggeler was paid for his opinion, whether he has testified before, or whether courts have previously rejected him as an expert. (A Westlaw search for "Mattias Aggeler" returns no results in any reported state or federal judicial decision).

to compel. *See* ECF No. 422, at 1-2. From his declaration, Aggeler appear to have done nothing more than looked in Ilyas's mailbox to see what is in there now – hardly the kind of "forensic" review that the Court can put faith in. Aggeler admittedly conducted his review of Ilyas Khrapunovs' accounts after the hearing, as his declaration is dated December 15, 2017, and thus long after Ilyas Khrapunov was on notice that the "Yodamaster" account was at the center of this sanctions motion. Khrapunov had ample time to delete any incriminating traces in his "outbox or sent items." Aggeler Decl. ¶ 9. This means that Aggeler's analysis is only as trustworthy as Ilyas Khrapunov himself – which is to say, not at all. *See* ECF No. 490, at 13-16.[9] Both Ilyas Khrapunov and Aggeler have avoided cross-examination on these questions, however, compounding the prejudice on the Kazakh Entities.

Finally, Aggeler's testimony was prepared well after the Khrapunovs had received and reviewed the Kazakh Entities' post-hearing sanctions brief, but still fails to address key points. *Compare* ECF No. 490 (Kazakh Entities' post-hearing brief, dated December 4, 2017) *with* Aggeler Decl. (dated December 15, 2017). Aggeler says nothing about the file-sharing capabilities of Cryptoheaven accounts, which allow Cryptoheaven users to share files anonymously with "trusted associates." [ECF No. 482-14, 482-15]. As the Khrapunovs themselves argued in earlier correspondence, Cryptoheaven "provides services for the secure exchange of computer files, end-to-end encrypted email and secure file sharing." [ECF No. 422, at 2]. Aggeler only states that he reviewed the "outbox or sent items folder" of the "Yodamaster" account (Aggeler Decl. ¶¶ 6, 8), failing to address the single most obvious method for Ilyas

---

[9]     Ilyas Khrapunov's willingness to conveniently "lose" evidence can barely be debated at this point. The Kazakh Entities have identified at least four relevant e-mail accounts belonging to Ilyas Khrapunov, all of which were used to discuss or direct events central to this lawsuit, and all of which have been deleted or rendered inaccessible. *See* ECF Nos. 308, 422.

Khrapunov or his agents to share the Transcript without leaving a trace – a method which actual evidence before the Court demonstrates Ilyas has historically used to transfer files with his co-conspirators. [ECF Nos. 482-21, -27]. The New Evidence is not intended to actually rebut the Kazakh Entities' submission – it is intended to create confusion and the appearance of compliance with the Khrapunovs' discovery obligations.[10]

Each of these points, and many others, would certainly have been raised had Aggeler been properly disclosed and present for cross-examination.[11] Of course, he was not, and the Khrapunovs are now trying to use his plainly-inadmissible declaration to create enough of a specter of doubt to avoid sanctions. Admitting this testimony would not only prejudice the Kazakh Entities, it would mock the adversary system.

### ii. Admitting the Remaining New Evidence Would Prejudice the Kazakh Entities

While the remainder of the New Evidence is similarly unpersuasive, admitting it now, when the Kazakh Entities have no opportunity to rebut it or offer evidence in response, would be

---

[10]     Aggeler also states that he was retained to "cull, collect, ingest and analyze electronically stored information from multiple email accounts and electronic devices belonging to Ilyas Khrapunov." Aggeler Decl. ¶ 2. It can't be overstated that the Kazakh Entities quite literally had to put the Khrapunovs' counsel on the stand and place them under oath before they admitted that the Khrapunovs had not even taken such basic steps to fulfill their discovery obligations as collecting documents. *See* 11/17/17 Hr'g Tr. at 66:10-13. And even now, the Kazakh Entities have yet to receive any documents that may have been collected by Aggeler. This is exactly why the Court should appoint a special master to oversee the Khrapunovs' discovery conduct in this litigation. [ECF No. 490, at 21].

[11]     The Khrapunovs may well offer to permit Aggeler's cross-examination in response to this motion. That is not enough. The possibility of a re-opened evidentiary hearing or further briefing on the underlying motion is inadequate, inefficient, and unfair. It has been nearly two months since the Transcript was leaked and resources began to pour into the underlying motion, which concerns a willful violation of the Court's orders. And yet only at (after, really) the last possible moment has counsel for the Khrapunovs chosen to put on a case. Conducting an entirely new hearing, at which Aggeler could be examined and further evidence could be offered in response to the New Evidence, would consume an enormous amount of the parties' and the Court's time and resources. Even then, there is no guarantee that the record would actually close – by rewarding the Khrapunovs for this ambush, the Court would simply be incentivizing them to continue this conduct in the future.

deeply prejudicial. The Khrapunovs offer news articles – which predate the hearing and certainly could have been moved into evidence at that time – to support a farcical new "hacking" theory they apparently had too much shame to raise in open court.

It is not hard to imagine why the Khrapunovs failed to offer this "hacking" evidence or any supporting witnesses at the evidentiary hearing: the theory falls apart under the slightest scrutiny. There is non-hearsay evidence of only one party engaging in unlawful computer hacking, and that evidence describes how Ilyas Khrapunov retained hackers to breach various government communications. *See* ECF No. 482-19. While the Khrapunovs have time and again accused the Kazakh Entities of counter-hacking, this is another transparent attempt to muddy the waters and distract from the fact the evidence of hacking only points one way: toward Ilyas Khrapunov.

The Khrapunovs admit that that they have no proof of hacking, Opp. at 4, but nonetheless imply that BTA sought to "frame" Ilyas Khrapunov by hacking his e-mail and leaking the Transcript. *Id*. at 5. This theory makes no sense at all. If BTA was trying to "frame" Ilyas Khrapunov, then why would the article disclosing the leak attribute the leak to one of BTA's own employees – a point the Khrapunovs cite in their defense? More importantly, how could these unnamed hackers have known that counsel for the Kazakh Entities would not forward the transcript to BTA before the leak was disclosed? How could they have known Ilyas Khrapunov would receive the Transcript at all? If these unnamed hackers had access to Ilyas Khrapunov's e-mail accounts, why didn't they leave evidence there to "frame" him?

These are exactly the kind of questions that would have been addressed if the Khrapunovs had disclosed the New Evidence and submitted themselves for examination as they were obligated to. Permitting the Khrapunovs to offer the New Evidence to support this

nonsensical conspiracy theory would be enormously prejudicial: without the New Evidence, this theory has virtually no evidentiary support at all, but this so-called support was disclosed at a point when the Kazakh Entities cannot rebut it. By injecting this evidence after the record was closed and the Kazakh Entities' post-hearing brief was filed, the Khrapunovs could just as well have offered evidence claiming that the moon landing was faked, and with no further opportunity to respond, this 'evidence' would stand uncontroverted. This is not how the adversary system works.[12]

The prejudice to the Kazakh Entities of the New Evidence is overwhelming, notwithstanding the underwhelming nature of the New Evidence itself. Significant resources were put into the underlying motion, the Evidentiary Hearing, and the subsequent briefing. And at the eleventh hour – actually more like the thirteenth hour – the Khrapunovs have attempted to insert the New Evidence into the record without giving the Kazakh Entities any opportunity to respond. This was a clear violation of the basic rules of the courtroom, and one that (if permitted) will prejudice the Kazakh Entities tremendously and encourage more sharp practice from the Khrapunovs in the future. The Court should not permit it.

## II.   The New Evidence Should Also Be Excluded Because It Violates the Court's November 21 Order

By itself, the Khrapunovs' failure to file the New Evidence in accordance with the Court's November 21 Order justifies striking it. The Court ordered the parties to file all

---

[12]   The Khrapunovs also offer a snippet of testimony from BTA Bank's Rule 30(b)(6) witness in an attempt to justify their notice of Mr. Rakishev's deposition, but the Kazakh Entities have never disputed that the Khrapunovs had a plausible *pretext* for seeking to depose Mr. Rakishev – that is why they allowed it to proceed without moving to quash. The Khrapunovs' conduct, however, demonstrates that it was only a pretext; as they subsequently announced their intention on Facebook to use the deposition to attack and smear Mr. Rakishev, and then spent virtually the entire deposition delving into matters not relevant in this case – which they now seek the Court's permission to use in foreign litigation.

affidavits, stipulations, and exhibits on the public docket and the e-mail unredacted copies to chambers – precisely so the record on the Kazakh Entities' sanctions motion would be clear and unambiguous. The Khrapunovs' failure to obey that order provides an independent reason to exclude the New Evidence.

Federal Rule of Civil Procedure 37(c)(1) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." (Rule 26(e), in turn, requires a party to make any evidentiary disclosures "ordered by the Court.") "The purpose of the rule is to prevent the practice of 'sandbagging' an adversary with new evidence." *Ventra v. United States*, 121 F. Supp. 2d 326, 332 (S.D.N.Y. 2000).

Here, the Court's November 21 Order explicitly directed the parties to disclose and submit all evidence they offered regarding the sanctions motion. As explained above, the Khrapunovs' failure to obey this simple order was neither substantially justified – they could easily have offered the New Evidence at the time of the hearing – nor harmless. As a result, they are "not allowed to use that information or witness to supply evidence on a motion [or] at a hearing." Fed. R. Civ. P. 37(c)(1).

## III. The Kazakh Entities Are Entitled to Fees

Finally, the Kazakh Entities are entitled to reasonable attorneys' fees and costs in connection with this motion to strike. Fees are justified by the Khrapunovs' failure to disclose the New Evidence as directed in the Court's November 21 Order, pursuant to Federal Rule of Civil Procedure 37. *Catskill Assocs., L.L.C. v. Benza*, No. 1:08 Civ. 598 (LEK), 2009 WL 3756593, at *3 (N.D.N.Y. Nov. 6, 2009); *Moreno v. Empire City Subway Co.*, No. 05 CIV. 7768

LMM HBP, 2008 WL 793605, at *2 (S.D.N.Y. Mar. 26, 2008). And the court has the power to assess attorneys' fees for "willful disobedience of a court order." *Advanced Analytics, Inc. v. Citigroup Glob. Markets, Inc.*, 301 F.R.D. 31, 37 (S.D.N.Y.), *objections overruled,* 301 F.R.D. 47 (S.D.N.Y. 2014).

For the past two years, the Kazakh Entities have participated in discovery in good faith, and have not sought fees when they had to move to compel to get the most basic discovery or for protective orders in light of the defendants' outrageous conduct – even though an award of fees is mandatory in those situations. *See* Fed. R. Civ. P. 37(a)(5)(A). But the Khrapunovs' tactics here have escalated their obstructive behavior to new levels, and the fact that the Kazakh Entities have to make this motion at all is preposterous. The Court should award the Kazakh Entities its reasonable fees and costs. The Kazakh Entities will be prepared to submit appropriate documentation of those fees and costs once the briefing for this motion, including any reply, is complete.

## <u>CONCLUSION</u>

For the above reasons, the New Evidence should be precluded and the Khrapunovs'

Opposition to the Kazakh Entities' motion for sanctions, [ECF No. 502], should be stricken in its

entirety.


Dated:   January 2, 2018
          New York, New York                  Respectfully submitted,

                                                /s/ Matthew L. Schwartz
                                            Matthew L. Schwartz
                                            Peter M. Skinner

                                            BOIES SCHILLER FLEXNER LLP
                                            575 Lexington Avenue
                                            New York, New York 10022
                                            Telephone: (212) 446-2300
                                            Facsimile: (212) 446-2350
                                            E-mail: mlschwartz@bsfllp.com