# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CITY OF ALMATY, KAZAKHSTAN and BTA
BANK JSC,

                Crossclaim Plaintiffs,

    - against -

MUKHTAR ABLYAZOV, VIKTOR
KHRAPUNOV, ILYAS KHRAPUNOV, and
TRIADOU SPV S.A.,

                Crossclaim Defendants.

ECF Case

No. 1:15-cv-05345 (AJN)(KHP)

## TRIADOU'S MEMORANDUM OF LAW IN OPPOSITION TO THE MOTION OF THE CITY OF ALMATY AND BTA BANK FOR RELIEF FROM THE COURT'S DECEMBER 23, 2016 ORDER DISMISSING THE RICO CROSSCLAIMS

Dated:  February 23, 2018

BLANK ROME LLP
The Chrysler Building
405 Lexington Avenue
New York, New York 10174-0208
Telephone: (212) 885-5000
Facsimile: (212) 885-5001

*Attorneys for Crossclaim Defendant*
*Triadou SPV S.A.*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................................ii

PRELIMINARY STATEMENT ............................................................................................1

BACKGROUND ....................................................................................................................2

ARGUMENT ..........................................................................................................................5

I.  **The Second Circuit's Decision in *Bascuñán II* Is Not an Intervening Change in the Law Controlling This Court's December 23 Order** ..................................................5

    A.  Bascuñán II *Supports the Dismissal of the RICO Crossclaims* ...........................7

    B.  Bascuñán II *Does Not Alter the Conclusions Reached in the December 23 Order* ....................................................................9

II.  **Even Under *Bascuñán II*, Almaty/BTA Have Not Plausibly Alleged a Domestic Injury to Their Business or Property** ................................................................12

    A.  *Almaty/BTA Have Not Alleged Distinct RICO Schemes or Injuries* ...................12

    B.  *Any Alleged Money Laundering in the United States Did Not Injure Property Interests Belonging to Almaty/BTA* ..............................13

    C.  *Conversion Is Not a RICO Predicate Act* ..........................................................15

III.  **The Assignment of the Flatotel Did Not Injure Any Domestic Property Interests Belonging to Almaty/BTA** ........................................................................18

IV.  **Comity Is Best Served by Affirming the Dismissal of the RICO Crossclaims** .........21

CONCLUSION .....................................................................................................................22

# TABLE OF AUTHORITIES

**Page(s)**

<u>CASES</u>

*Amusement Indus., Inc. v. Midland Ave. Assocs., LLC,*
    820 F. Supp. 2d 510 (S.D.N.Y. 2011)......................................................................17

*Bascuñán v. Elsaca,*
    874 F.3d 806 (2d Cir. 2017)........................................................................ *passim*

*Bascuñán v. Elsaca*, No. 15-cv-2009 (GBD),
    2016 WL 5475998 (S.D.N.Y. Sept. 28, 2016)....................................................4, 6, 9

*City of Almaty, Kazakhstan v. Ablyazov,*
    226 F. Supp. 3d 272 (S.D.N.Y 2016)............................................................ *passim*

*City of Almaty, Kazakhstan v. Ablyazov*, No. 1:15-cv-05345 (AJN)(KHP),
    2017 WL 1424326 (S.D.N.Y. Apr. 20, 2017)...................................................4, 5, 22

*Doe v. N.Y. City Dept. of Social Servs.,*
    709 F.2d 782 (2d Cir. 1983)...............................................................................11

*Elsevier, Inc. v. Grossman,*
    199 F. Supp. 3d 768 (S.D.N.Y. 2016)..................................................................12

*Elsevier Inc. v. Grossman*, No. 12 Civ. 5121 (KPF),
    2017 WL 5135992 (S.D.N.Y. Nov. 3, 2017)..........................................................10

*Fogel v. Chestnutt,*
    668 F.2d 100 (2d Cir. 1981).................................................................................6

*Green v. Beer*, No. 06 Civ. 4156 (KMW)(JCF),
    2009 WL 3401256 (S.D.N.Y. Oct. 22, 2009)..........................................................6

*Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Invs. Ltd.*,
    154 F. Supp. 2d 682 (S.D.N.Y. 2001)...................................................................16

*King v. Fox,*
    28 F. App'x 95 (2d Cir. 2002) ............................................................................17

*Leveraged Leasing Admin. Corp. v. Pacificorp Capital, Inc.,*
    87 F.3d 44 (2d Cir. 1996) .................................................................................17

*Maiz v. Virani,*
    253 F.3d 641 (11th Cir. 2001) .......................................................................14, 15

*Mendelson v. Boettger,*
257 A.D. 167 (2d Dep't 1939) ................................................................................17

*Newman v. Jewish Agency for Israel*, No. 16-cv-7593,
2017 WL 6628616 (S.D.N.Y. Dec. 28, 2017) ...........................................................8

*Oakes v. Muka,*
69 A.D.3d 1139 (3d Dep't 2010) ............................................................................21

*Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP,*
322 F.3d 147 (2d Cir. 2003) .....................................................................................6

*Pescatore v. Pan Am. World Airways, Inc.,*
97 F.3d 1 (2d Cir. 1996) ...........................................................................................6

*RJR Nabisco, Inc. v. European Cmty.,*
136 S. Ct. 2090 (2016) .................................................................................. *passim*

*Songbyrd, Inc. v. Estate of Grossman,*
23 F. Supp. 2d 219 (N.D.N.Y. 1998) ......................................................................17

*United States v. Brimberry,*
779 F.2d 1339 (8th Cir. 1985) ..........................................................................18, 19

*Villoldo v. BNP Paribas S.A.,*
648 F. App'x 53 (2d Cir. 2016) ........................................................................19, 20

*Villoldo v. BNP Paribas S.A.*, No. 14 Civ. 9930 (AKH),
2015 WL 13145807 (S.D.N.Y. July 21, 2015) .......................................................20

## Statutes

18 U.S.C. § 1962 ..................................................................................................................19

18 U.S.C. § 1964(c) .........................................................................................................4, 18

## Other Authorities

Fed. R. Civ. P. 54(b) .........................................................................................................5-6

Crossclaim-Defendant Triadou SPV S.A. ("Triadou") respectfully submits this memorandum of law in opposition to the motion of the City of Almaty, Kazakhstan ("Almaty") and BTA Bank JSC ("BTA") (together, "Almaty/BTA") for relief from the Court's December 23, 2016 Memorandum and Order (ECF 257, the "December 23 Order") dismissing their RICO Crossclaims. (ECF 518).

## PRELIMINARY STATEMENT

The Second Circuit's decision in *Bascuñán v. Elsaca*, 874 F.3d 806 (2d Cir. 2017) (*Bascuñán II*), neither mandates reversal of, nor undermines, this Court's December 23 Order, which found that Almaty/BTA failed to allege a domestic injury to their business or property as required by the Supreme Court's decision in *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016). Much like *Bascuñán II* rejected a flat "residency-based" rule for determining domestic injury, this Court refused to apply "an absolutist version of [that] rule" in dismissing the RICO Crossclaims. In doing so, this Court recognized, as did the Second Circuit in *Bascuñán II*, that it is critical under the domestic injury analysis that the plaintiff, not the defendant, establishes some connection between the purportedly injured property and the United States. Almaty/BTA have alleged no such connection here. And, in any event, this Court has already conducted the very analysis that Almaty/BTA seek in their reconsideration motion—i.e., to consider Almaty/BTA's contentions that they possessed property in the United States that had been injured as a result of the Crossclaim Defendants' alleged conduct. Under that analytical approach, this Court found that Almaty/BTA have failed to plausibly allege a domestic injury to their business or property.

Moreover, even if this Court believes that the December 23 Order should be reevaluated in light of *Bascuñán II*, Almaty/BTA's arguments seeking to identify purported property interests that were injured in the United States – contentions that are entirely new and are nowhere pled in

the Amended Crossclaims – fundamentally misapprehend the law and fail to identify injuries to any property that could sustain the RICO Crossclaims.  Accordingly, for the reasons stated herein – and for those already set forth in Triadou's original memoranda on this issue, (ECF 188, 202) – the Court should affirm its December 23 Order's dismissal of the RICO Crossclaims.

## BACKGROUND

The allegations in Almaty/BTA's Crossclaims[1] pertinent to the RICO Crossclaims have not changed since the Court issued its December 23 Order.  Almaty/BTA allege that Viktor Khrapunov ("Khrapunov"), a former mayor of Almaty, and Mukhtar Ablyazov ("Ablyazov"), a former chairman of BTA, misappropriated money and property from Kazakhstan, in amounts exceeding $4 billion, and did so while Khrapunov and Ablyazov held their respective positions in Kazakhstan.  (*See, e.g.*, ECF 219, ¶¶ 2-3, 11).  Almaty/BTA allege that Khrapunov and Ablyazov, through Ilyas Khrapunov and companies he purportedly controlled (including Triadou), subsequently moved these supposed ill-gotten gains out of Kazakhstan and into Switzerland, and then other locations around the world including the United States.  *Id.* ¶¶ 57-58.

The Amended Crossclaims make clear that Almaty/BTA's injuries arose from the alleged theft, self-dealing, and embezzlement of the city's and bank's assets, which were located in Kazakhstan when they were purportedly misappropriated.  For example, BTA claims that it seeks "to regain assets looted by its former Chairman, Mukhtar Ablyazov, who abused his position to enrich himself and treat BTA as his personal property," and that Ablyazov allegedly "siphon[ed] billions out of" BTA which resulted in a default on "billions of dollars of debt." *Id.* ¶¶ 2, 34. Similarly, Almaty claims that it seeks "to regain assets looted by its former mayor, [Khrapunov],

---

[1] Because the December 23 Order was based on Almaty/BTA's First Amended Crossclaims (ECF 219), Triadou cites to that document herein.

and his family and co-conspirators, to be returned for the benefit of the people of Almaty." *Id.* ¶ 3; *see also City of Almaty, Kazakhstan v. Ablyazov,* 226 F. Supp. 3d 272, 284 (S.D.N.Y 2016) ("the Kazakh Entities' own characterizations of their crossclaims underscore that they seek to redress grievances whose economic impact has been suffered abroad.") [ECF 257].  Khrapunov is alleged to have "abused and corrupted his position" as mayor "for the purposes of embezzlement, fraudulent self-dealing, and blatant looting of *public assets* . . . through various fraudulent activities, including rigged auctions, the improper sale of public property to friends and co-conspirators, and fraudulent abuse of eminent domain powers, *before fleeing Kazakhstan and secreting these stolen funds across the globe.*"  (ECF 219, ¶ 3 (emphasis added)).  According to Almaty/BTA, Khrapunov's self-dealing in Almaty real estate generated $300 million.  *Id.* ¶ 55.[2]

On December 18, 2015, Triadou moved to dismiss the Crossclaims, arguing in part that the RICO Crossclaims should be dismissed as improperly extraterritorial, and noting that the then-precedential case in the Second Circuit (*RJR Nabisco*) was under review by the Supreme Court. (ECF No. 86 at 30 n.23, 32).  In its June 21, 2016 Order, this Court invited "additional briefing as to whether and how the Supreme Court's decision in [*RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016)] affects this action."  (ECF No. 174 at 32).  In response, Triadou submitted briefing showing that Almaty/BTA's injuries are entirely foreign.  (*See* ECF 188, 202).

On December 23, 2016, this Court issued a the December 23 Order dismissing Almaty/BTA's RICO Crossclaims on the grounds that Almaty/BTA had not alleged any domestic

---

[2] Almaty/BTA's other allegations confirm that their claimed injuries arose in Kazakhstan.  *See id.* ¶ 6 (describing foreign proceedings against Ablyazov/Khrapunov as "arising from their theft of billions of dollars from entities and municipalities in the Republic of Kazakhstan"); *id.* ¶¶ 45-55 (alleging that Khrapunov privatized Almaty-owned assets and "repeatedly and systemically used the powers of the office of the mayor to transfer public assets belonging to the City of Almaty"); *id.* ¶ 63 (alleging that Kazakhstan instituted criminal proceedings against Khrapunov "arising from the theft of public property and the ultimate laundering of funds during his tenure as Mayor").

injury to their business or property. *City of Almaty*, 226 F. Supp. 3d 272 [ECF 257]. This Court relied in part on the decision issued by Judge Daniels in *Bascuñán v. Elsaca*, No. 15-cv-2009 (GBD), 2016 WL 5475998 (S.D.N.Y. Sept. 28, 2016) (*Bascuñán I*). *See City of Almaty*, 226 F. Supp. 3d at 284; *see also City of Almaty, Kazakhstan v. Ablyazov*, No. 1:15-cv-05345 (AJN)(KHP), 2017 WL 1424326, at *3 (S.D.N.Y. Apr. 20, 2017) (acknowledging that the December 23 Order "discussed—and, ***to some degree***, relied upon" *Bascuñán I*) (emphasis added). With respect to the rule in *Bascuñán I*—that evaluating domestic injury to business or property should focus on "where the economic impact of the injury was ultimately felt"—this Court agreed it was "consistent with the Supreme Court's focus in assessing extraterritoriality of [18 U.S.C. § 1964(c)] on injuries 'suffered overseas.'" *City of Almaty*, 226 F. Supp. 3d at 284 (quoting *RJR Nabisco*, 136 S. Ct. at 2109). Nevertheless, the Court refused "to broadly endorse an absolutist version of the rule that would, for example, categorically preclude foreign corporations ***with business operations or property interests maintained in the U.S.*** from bringing RICO actions to recover for injuries to those assets." *Id.* at 284 (emphasis added). Importantly, the Court recognized that this case "presents no such circumstances," and specifically found that Almaty/BTA "are undisputedly both aliens that are not alleged to hold assets or to maintain any operations, instrumentalities, or other presence in the United States." *Id.* Likewise, the Court found that the "purported misappropriations giving rise to this action occurred within Kazakhstan and targeted only assets held overseas." *Id.*; *see also id.* at 285 (stating that "the after-the-fact concealment in the U.S. of funds stolen entirely abroad does not constitute a basis for concluding that the Kazakh Entities have alleged injury suffered in the U.S."). The Court further held that "there is no dispute that the purported misappropriations were complete—and the embezzled funds

removed from Kazakhstan—well before the Crossclaim Defendants' alleged transactions in the United States." *Id.* at 286.

But the Court did not stop there. Of particular significance to the instant reconsideration motion, in its December 23 Order, this Court also considered Almaty/BTA's contentions that they possessed property that was located and injured in the United States. *Id.* at 285. The Court acknowledged that Almaty/BTA "seemingly attempt[ed] to identify allegations of injury to property in the United States that are entirely independent of the original misappropriations in Kazakhstan," and then assumed (but did not find) "that such allegations would be sufficient to plead domestic injury under *RJR Nabisco*." *Id.* Yet even under that framework – and after analyzing each of the alleged injuries to property in the United States – this Court determined that Almaty/BTA had failed to allege a domestic injury under RICO. *Id.* at 285-87.

Almaty/BTA subsequently sought interlocutory appeal of the December 23 Order, which this Court denied, while acknowledging the then-pending review of *Bascuñán I*. *See City of Almaty*, 2017 WL 1424326, at *2-3. On October 30, 2017, the Second Circuit issued its decision in that appeal, *Bascuñán v. Elsaca*, 874 F.3d 806 (2d Cir. 2017) (*Bascuñán II*). Based on *Bascuñán II*, on January 4, 2018, Almaty/BTA moved for reconsideration of the December 23 Order. Reconsideration should likewise be denied. *Bascuñán II* does not impair, and instead supports, this Court's dismissal of the RICO Crossclaims in its December 23 Order.

## ARGUMENT

### I.   The Second Circuit's Decision in *Bascuñán II* Is Not an Intervening Change in the Law Controlling This Court's December 23 Order

The Second Circuit's decision in *Bascuñán II* is not a basis for this Court to reverse its December 23 Order. Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, courts may revise interlocutory orders "at any time before the entry of a judgment adjudicating all the claims

and all the parties' rights and liabilities."  Fed. R. Civ. P. 54(b); *see also Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand*, *LLP*, 322 F.3d 147, 167 (2d Cir. 2003).  The Second Circuit has limited the district courts' discretion to reconsider earlier decisions under Rule 54(b) by requiring those decisions to be treated "as law of the case," which in turn requires "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice" as a basis to change such rulings.  *Coopers & Lybrand*, *LLP*, 322 F.3d at 167 (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)).  Courts "will not depart from [the law of the case] absent cogent or compelling reasons."  *Pescatore v. Pan Am. World Airways, Inc.*, 97 F.3d 1, 8 (2d Cir. 1996) (internal quotation marks and citation omitted).  Further, "[i]t is not enough  . . . that [a party] could now make a more persuasive argument under more recent case law."  *Green v. Beer*, No. 06 Civ. 4156 (KMW)(JCF), 2009 WL 3401256, at *2 (S.D.N.Y. Oct. 22, 2009).  Rather, there must be more than "mere doubt" regarding the effect of an apparent change in the controlling law to open a matter for reconsideration.  *Fogel v. Chestnutt*, 668 F.2d 100, 109 (2d Cir. 1981).

Here, *Bascuñán II* does not constitute an intervening change in the law controlling the December 23 Order for multiple reasons.  First, contrary to Almaty/BTA's amped-up arguments, the Second Circuit's ruling in *Bascuñán II* is consistent with the Court's dismissal of the RICO Crossclaims.  Second, this Court relied *only in part* on Judge Daniels' decision in *Bascuñán I*, and did not base its dismissal of the RICO Crossclaims solely on the premise that Almaty/BTA's residency determined the location of their injury.  Third, in the December 23 Order, the Court undertook exactly the analysis that Almaty/BTA request in their motion for reconsideration, (ECF 518 at 7); that is, the Court has already analyzed whether Almaty/BTA have allegedly suffered injuries "to property in the United States that are entirely independent of the original

6

misappropriations in Kazakhstan" (assuming for purposes of that additional analysis that such allegations were sufficient to establish a domestic injury), *City of Almaty*, 226 F. Supp. at 285. Thus, the Court has already determined that Almaty/BTA have not alleged a domestic injury to any property located in the United States.

    A.    <u>*Bascuñán II Supports the Dismissal of the RICO Crossclaims*</u>

In *Bascuñán II*, the Second Circuit rejected a purely residency-based test for assessing whether a civil RICO plaintiff has alleged a domestic injury to their business or property. 874 F.3d at 814. Instead, it held that "when a foreign plaintiff **maintains tangible property in the United States**, the misappropriation of that property constitutes a domestic injury." *Id.* (emphasis added). It then evaluated four purported RICO schemes alleged by Bascuñán, affirming the dismissal of two of those schemes for failure to allege a domestic injury. *Id.* at 818-19. The two dismissed schemes most closely track Almaty/BTA's claims here, while the two schemes for which the Second Circuit reinstated Bascuñán's claims are wholly distinguishable.

With respect to the two schemes for which the Second Circuit affirmed dismissal ("the Dividend Scheme" and "the General Anacapri Investment Fraud Scheme"), Bascuñán alleged that defendant Elsaca stole funds "that were legally owned by a foreign corporation (and beneficially owned by Bascuñán himself, a foreign citizen and resident) and held in a foreign bank account." *Id.* at 818. The only domestic elements alleged in these schemes were that the defendant "*transferred these foreign funds* to his own accounts in New York," or "*launder[ed] stolen money* using bank accounts in the United States and elsewhere," which, according to the Second Circuit, was "not enough to allege a domestic injury." *Id.* (emphasis added). The Second Circuit found it important that "the only domestic connections alleged here were acts of *the defendant*. [Plaintiff] Bascuñán and his relevant property always remained abroad, and these injuries did not arise from any preexisting connection between Bascuñán and the United States." *Id.* at 819.

Here, Almaty/BTA similarly allege misappropriations of money and property located in Kazakhstan from a bank and city located there, all of which was completed no later than 2009. (*See* ECF 219, ¶¶ 28-34, 45-55).[3]   As this Court has already found, "there is no dispute that the purported misappropriations were complete—and the embezzled funds removed from Kazakhstan—well before the Crossclaim Defendants' alleged transactions in the United States." *City of Almaty*, 226 F. Supp. 3d at 286.   Likewise, this Court recognized that Almaty/BTA have never "maintain[ed]" property in the United States or otherwise directed any of their property into the United States.  *See id.* at 284 ("The Kazakh Entities are undisputedly both aliens that are not alleged to hold assets or to maintain any operations, instrumentalities, or other presence in the United States.").  Rather, it is the Crossclaim Defendants who directed the allegedly stolen assets to the United States, thereby creating the only nexus between that property and the United States. (*See, e.g.*, ECF 219, ¶¶ 56, 77).  Almaty/BTA concede as much.  (ECF 518 at 10 (acknowledging that "[t]he defendants invested the Kazakh Entities' stolen money in U.S. real estate")).  This is precisely the type of circumstance the Second Circuit found insufficient to show a domestic injury when it affirmed the dismissal of the Dividend and General Anacapri Schemes alleged in *Bascuñán II*.  874 F.3d at 819; *see also Newman v. Jewish Agency for Israel*, No. 16-cv-7593, 2017 WL 6628616, at *5 (S.D.N.Y. Dec. 28, 2017) (rejecting plaintiffs' effort to establish a domestic injury "by alleging that some of the [defendants] located in the United States made off with illicit proceeds derived from Plaintiffs' assets" because it "improperly turns the focus on the location of the Defendants, and not, as it should, on the location of Plaintiffs' property or financial interests").

---

[3] BTA's allegedly stolen funds are particularly comparable to the dismissed schemes in *Bascuñán II*, as they were held by a foreign bank resident in Kazakhstan – by definition, "held in a foreign bank account."  *See* 874 F.3d at 818.

Conversely, the Second Circuit in *Bascuñán II* reinstated only the two schemes—"the New York Trust Account Scheme" and "the BCI Share Theft"—involving property that was located in the United States when it was misappropriated.  874 F.3d at 821, 824.  That is, the Second Circuit reinstated claims for injuries to property that the plaintiff (not the defendant) had brought to the United States.  Here, in contrast, "the purported misappropriations giving rise to this action occurred within Kazakhstan and targeted only assets held overseas."  *City of Almaty*, 226 F. Supp. 3d at 284.  In short, the Second Circuit's decision in *Bascuñán II* further validates the dismissal of Almaty/BTA's RICO Crossclaims.[4]

B.   *Bascuñán II Does Not Alter the Conclusions Reached in the December 23 Order*

Separately, *Bascuñán II* does not compel reversal of the December 23 Order because this Court did not rely solely on *Bascuñán I* in reaching its decision.[5] While the Court found that *Bascuñán I*'s approach was consistent with *RJR Nabisco*, it also "declined to adopt an absolutist version" of that approach that would preclude "foreign corporations with business operations or **property interests maintained in the U.S.** from bringing RICO actions to recover for injuries to those assets."  *City of Almaty*, 226 F. Supp. 3d at 284 (emphasis added).  This caveat confirms the

---

[4] Almaty/BTA's assertion that "residency is irrelevant for the types of business and property injured here" is not supported by *Bascuñán II*.  In the first instance, the Second Circuit explicitly denied that its holding meant that "a plaintiff's place of residence is never relevant to the domestic injury inquiry required by *RJR Nabisco*.  A plaintiff's residence may often be relevant—perhaps even dispositive—in determining whether certain types of business or property injuries constitute a domestic injury."  *Bascuñán II*, 874 F.3d at 824.  Here, residency is relevant because it reflects where the misappropriations giving rise to Almaty/BTA's injuries occurred.  Almaty's injuries arose from the alleged improper seizure of its public land and assets, and BTA's injuries arose from the alleged embezzlement of its funds, both of which necessarily occurred in Kazakhstan. (*See, e.g.*, ECF 219, ¶¶ 2-3, 28-34, 45-55).  The subsequent alleged laundering into the United States did not change the total amount purportedly stolen from Almaty or BTA.

[5] Almaty/BTA concede that the December 23 Order did not rely exclusively on a "residency-based" test to evaluate the RICO Crossclaims.  (*See* ECF 518 at 4 (noting that the Court "*largely* adopted the residency-based test") (emphasis added); *id.* at 7 (noting that the Court "employed *principally* the residency-based test") (emphasis added)).

Court's reluctance to adopt a blanket "residency rule," and its acknowledgment that injuries to property "maintained in the U.S." could give rise to RICO claims.  Importantly, however, the Court found that this case "presents no such circumstances." *Id.*  As the Court recognized both implicitly and explicitly, the RICO Crossclaims' only alleged connection to the U.S. arose from "the after-the-fact concealment" of "funds stolen entirely abroad," and that connection is not "a basis for concluding that the Kazakh Entities have alleged injury suffered in the U.S." *Id.* at 285.[6]

Almaty/BTA also overstate the Court's holding in arguing that the December 23 Order reflects the Court's determination that, "[s]hort of a connection rising to the level of a 'discrete financial base,' . . . 'a plaintiff's mere financial connection to New York . . . is an insufficient basis to find that a foreign entity suffered injury in New York.'"  (ECF 518 at 8-9 (quoting *City of Almaty*, 226 F. Supp. 3d at 285)).  But the Court simply noted that Almaty/BTA failed to allege even "the most established example" of a circumstance in which a civil RICO plaintiff might show a domestic injury—i.e., "that some 'discrete financial base … established away from home' suffered the brunt of the loss at issue." *City of Almaty*, 226 F. Supp. 3d at 285.

In any event, both the Second Circuit and this Court recognized that a critical element to finding a domestic injury is whether ***the plaintiff's*** actions establish a connection between the injured property and the United States.  Here, Almaty/BTA did not allege any such connection; instead, their allegations confirm that the allegedly stolen property would not have reached the United States absent ***the defendants'*** purported conduct.  (ECF 219, ¶ 77 (alleging that the

---

[6] Underscoring the continued correctness of this Court's December 23 Order is the follow-on decision in the *Elsevier* case, issued in the Southern District after the Second Circuit's decision in *Bascuñán II*, which positively cited the December 23 Order's dismissal of the RICO Crossclaims. *See Elsevier Inc. v. Grossman*, No. 12 Civ. 5121 (KPF), 2017 WL 5135992, at *4 (S.D.N.Y. Nov. 3, 2017) (citing *City of Almaty*, 226 F. Supp. 3d at 284).  An earlier decision in *Elsevier*, on which Almaty/BTA rely, is discussed *infra* n.7.

Crossclaim Defendants "selected the United States as a harbor for these stolen funds")). "To allow such a plaintiff to recover treble damages would thus 'unjustifiably permit [foreign] citizens to bypass their own [nation's] less generous remedial schemes.'" *Bascuñán II*, 874 F.3d at 819.

Moreover, because the December 23 Order already analyzed the RICO Crossclaims using the property-based analysis that Almaty/BTA seek here – and nevertheless found a failure to allege a domestic injury – the Second Circuit's decision in *Bascuñán II* does not require the reversal of that Order. Specifically, the Court acknowledged Almaty/BTA's attempts "to identify allegations of injury to property in the United States that are entirely independent of the original misappropriations in Kazakhstan," and evaluated those allegations "[a]ssuming *arguendo* that [they] would be sufficient to plead domestic injury under *RJR Nabisco*." *City of Almaty*, 226 F. Supp. 3d at 285. That analysis effectively included Almaty/BTA's contention that the alleged money laundering in the United States reflected a separate RICO scheme than the original thefts in Kazakhstan. *Compare City of Almaty*, 226 F. Supp. 3d at 285-87, *with* ECF 518 at 11-18. The Court has therefore already found Almaty/BTA's attempts to be "unavailing." *City of Almaty*, 226 F. Supp. 3d at 286-87.

This Court thus assessed the RICO Crossclaims based not only on Almaty/BTA's residency, but also on the location of the allegedly injured property, and, under both scenarios, determined that Almaty/BTA had failed to allege a domestic injury to their business or property. *Id.* at 285, 287. Because the December 23 Order already analyzed Almaty/BTA's claims using the approach outlined in *Bascuñán II*, that decision does not constitute an intervening change in controlling law. *Cf. Doe v. N.Y. City Dept. of Social Servs.*, 709 F.2d 782, 789-90 (2d Cir. 1983) (rejecting government's motion for reconsideration on grounds of intervening change in law when

private plaintiff obtained jury verdict based on more stringent standard than would have been applied in asserted new decision).[7]

## II.   Even Under *Bascuñán II*, Almaty/BTA Have Not Plausibly Alleged a Domestic Injury to Their Business or Property

Even if the Court considers *Bascuñán II* to reflect an intervening change in the law controlling the December 23 Order, Almaty/BTA nonetheless have failed to allege a domestic injury to any property interest they possessed.

### A.   *Almaty/BTA Have Not Alleged Distinct RICO Schemes or Injuries*

Almaty/BTA's first effort to erase the results of the December 23 Order is to argue that the Second Circuit determined in *Bascuñán II* that district courts are required to separately analyze each RICO scheme and the alleged injuries arising therefrom.  (*See* ECF 518 at 9 (citing *Bascuñán II*, 874 F.3d at 813)).  Almaty/BTA contend that, under this framework, they have alleged "at least two distinct RICO schemes – the embezzlement of funds in Kazakhstan, and the extensive conversion and laundering of stolen money in the United States."  *Id.* at 11.  This contention fails for two reasons.  First, Almaty/BTA ignore a critical requirement of *Bascuñán II*'s holding—that the separate schemes "harmed materially distinct interests to property or business."  874 F.3d at 814.  Almaty/BTA have not identified any such harm.  Whichever purportedly "distinct RICO scheme[]" the Court evaluates, Almay/BTA seek vindication of the same property interests:  the

---

[7] Contrary to Almaty/BTA's assertions, the decision in *Elsevier, Inc. v. Grossman*, 199 F. Supp. 3d 768, 786 (S.D.N.Y. 2016), would not yield a different determination here.  (*See* ECF 518 at 2, 7 n.6 (citing *City of Almaty*, 2017 WL 1424326, at *2)).  In *Elsevier*, the court held that in connection with an injury to property, "the court should ask where the plaintiff parted with the property or where the property was damaged."  199 F. Supp. 3d at 786.  That question is nearly identical to the questions Triadou posed in its first brief addressing domestic injury:  "First, what business or property . . . was injured?  Second, where was that business or property located when the injury occurred?"  *City of Almaty*, 226 F. Supp. 3d at 280; (ECF 188 at 4).  As this Court recognized in the December 23 Order, all of Almaty/BTA's property was located in Kazakhstan when it was allegedly misappropriated.  To find otherwise would enable Almaty/BTA to recover twice for the same allegedly misappropriated property.

money and property that was allegedly misappropriated *in Kazakhstan*. (*See, e.g.*, ECF 219, ¶¶ 77, 86, 102). Second, all five RICO causes of action in the Amended Crossclaims – even those Almaty/BTA claim "are firmly grounded in New York City," (ECF 518 at 3 n.2) – rely on the same pattern of racketeering activity and predicate acts. (ECF 219, ¶¶ 132-33, 139-40, 146, 154-55, 160). Such allegations confirm that Almaty/BTA have not alleged distinct schemes.[8]

B.     *Any Alleged Money Laundering in the United States Did Not Injure Property Interests Belonging to Almaty/BTA*

Next, Almaty/BTA attempt to revive their argument that the money laundering alleged in the Amended Crossclaims caused distinct and additional injury to Almaty/BTA's property cognizable under RICO. (ECF 518 at 11). The Court has already rejected this argument, however, and the Second Circuit's decision in *Bascuñán II* did not implicate or address the line of cases Almaty/BTA invoke.

Based on Almaty/BTA's arguments in the initial briefing subsequent to the Supreme Court's decision in *RJR Nabisco*, the December 23 Order considered several cases cited by Almaty/BTA for the proposition that "the Crossclaim Defendants' alleged money laundering and fraudulent transactions allowed the purported RICO enterprises to 'maintain control' of property belonging to the Kazakh Entities." *City of Almaty*, 226 F. Supp. 3d at 285. The Court rejected that argument. *Id.* at 285-86. Almaty/BTA now press a dressed-up variant of that argument, claiming that the alleged "domestic acts of money laundering harmed the Kazakh Entities by concealing their property, depriving them of its use, and causing them to devote substantial time and resources . . . in an attempt to trace and recover their property." (ECF 518 at 11-12 (citing

---

[8] The Amended Crossclaims offer no basis to disaggregate damages from these supposedly "distinct" schemes, as all five RICO Crossclaims include the same verbatim allegation, "Almaty and BTA have been injured in their business or property." (ECF 219, ¶¶ 134, 141, 149, 156, 161).

*Maiz v. Virani*, 253 F.3d 641, 674 (11th Cir. 2001))).  However they dress the argument, it remains legally unsupported.

As this Court found, *Maiz v. Virani* and similar cases "suggest only that there may be circumstances under which the concealment of stolen funds was so critical to facilitating an ongoing theft in the first place that money laundering may be recognized as having proximately caused some portion of the *original* injury."  *City of Almaty*, 226 F. Supp. 3d at 285-86.  Contrary to Almaty/BTA's argument, the December 23 Order did not describe such circumstances as "rare," and instead simply found that "the types of circumstances under which post-theft money laundering may proximately cause theft-related loss are not alleged here."  *See id.*[9]  The Court's determination thus flows directly from Almaty/BTA's own allegations and timeline, which show that Almaty/BTA incurred their alleged injuries in or before 2009 when their public property and money were supposedly misappropriated in Kazakhstan, while any alleged money laundering occurred years later.  Further, the RICO Crossclaims are devoid of any allegation remotely suggesting that Triadou's 2014 Flatotel transaction was "critical" to facilitating the alleged misappropriations in Kazakhstan years earlier.

There is also no support for the argument that *Bascuñán II* "counsels against interpreting *Maiz* and related cases as rare exceptions to a rule." (ECF 518 at 12).  *Bascuñán II* does not address *Maiz* and related cases, or circumstances under which money laundering may proximately cause a distinct injury to property.  Even putting that aside, Almaty/BTA's claims are based on facts that are entirely distinguishable from those in *Maiz*.  For example, Almaty/BTA argue that the money laundering in *Maiz* "caused a distinct harm by depriving the plaintiffs of the use of and profits

---

[9] Notably, the Court evaluated *Maiz* and related cases in the context of Almaty/BTA's contentions that they had suffered injury to property in New York, and not based on Almaty/BTA's residency. *See City of Almaty*, 226 F. Supp. 3d at 285-87.

14

generated by their money." (ECF 518 at 12 (citing *Maiz*, 253 F.3d at 674)). But in *Maiz*, the plaintiffs voluntarily co-invested *with* the defendants, and the alleged money laundering diverted profits that plaintiffs reasonably expected would have been available to the partnerships in which plaintiffs and defendants were members. 253 F.3d at 674. Thus, the *Maiz* plaintiffs' deprivation of the "use and benefit" of the diverted portion of their investments is tethered to their expectations of how that money would be used.

Here, in contrast, Almaty/BTA had no reasonable expectations as to how the Crossclaim Defendants would use or invest the allegedly misappropriated funds, or even where in the world the Crossclaim Defendants might take those funds. Almaty/BTA were not in a partnership or any similar relationship with Crossclaim Defendants, and they cannot claim any reasonable expectations to be involved in the Crossclaim Defendants' alleged post-theft activities. These critical differences demonstrate why the *Maiz* plaintiffs, who had certain "reasonable expectations about the future use" of the funds allegedly laundered in that case, are much differently situated than Almaty/BTA, who had no such "reasonable expectations about the future use" of the funds allegedly stolen from Kazakhstan and later laundered in the U.S. *See id.* at 674. In short, the December 23 Order correctly found that *Maiz* and the cases similar to it do not establish that Almaty/BTA suffered a domestic injury.

      C.     <u>*Conversion Is Not a RICO Predicate Act*</u>

Almaty/BTA also reference the Second Circuit's "analogizing to conversion law," and argue that such discussion demonstrates that "each act of transferring the Kazakh Entities' stolen property to a co-conspirator constituted a *separate* act of conversion," which in turn "caused the Kazakh Entities 'domestic injury.'" (ECF 518 at 13; *id.* at 10 (citing *Bascuñán II*, 874 F.3d at 820 n.56)). This argument is confused, misunderstands *Bascuñán II*, and finds no support in the law.

In the first instance, while the Second Circuit "analogized" to conversion law, Almaty/BTA seek to rely directly on conversion law to establish their purported RICO injury.  (ECF 518 at 13-14).  They cannot do so, however, as conversion does not constitute a predicate act under RICO.  *See, e.g.*, *Jordan (Bermuda) Inv. Co., Ltd. v. Hunter Invs. Ltd.*, 154 F. Supp. 2d 682, 690 (S.D.N.Y. 2001) (citing *Shams v. Fisher*, 107 F. Supp. 2d 266, 273 (S.D.N.Y. 2000) ("common law fraud and conversion . . . are not acts of racketeering activity")).  Nothing in *Bascuñán II* changes that rule of law.  Rather, the Second Circuit merely discussed in a footnote that conversion law provided a basis for comparing "the way money is treated" in such a claim "'where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question.'"  *Bascuñán II*, 874 F.3d at 820-21 n.56 (quoting *Mfrs. Hanover Tr. Co. v. Chem. Bank*, 160 A.D.2d 113, 124 (1st Dep't 1990)).  The Second Circuit found the comparison "particularly appropriate" in *Bascuñán II* based on "the facts alleged [t]here," namely, the existence of "a specific, identifiable fund" held in a New York bank account (and placed there by the plaintiff) prior to the alleged misappropriation.  *Id.* at 820 n.56.

Here, Almaty/BTA's deliberately vague and constantly shifting description of their purported injured property interests in the United States, demonstrate that those interests are neither "specific" nor "identifiable."  (*See* ECF 518 at 13 (referencing repeated conversion as a cause of a domestic injury, but not identifying the property); *id.* at 14 (referring to Almaty/BTA's "domestic property, which included U.S. property rights to take possession of and profit from the investments").[10]  And to the extent Almaty/BTA now assert that their domestic property interests

---

[10]  In that regard, Almaty/BTA's argument suffers from the same deficiency identified in the December 23 Order, namely, that it was "not entirely clear to the Court precisely what 'property' the Kazakh Entities reference—that is, whether they intend to suggest that the assignment lessened the value of the Flatotel itself, of the funds stolen in Kazakhstan and invested in the Flatotel, or something else entirely."  *City of Almaty*, 226 F. Supp. 3d at 286-87.  Nor do Almaty/BTA's attempts to clarify the "property" in question help their cause.  This is so because they now claim

consist of their unproven conversion and constructive trust claims, (ECF 518 at 14-15), because those claims are unproven, they do not reflect "a specific, identifiable fund [or] an obligation to return or otherwise treat" the underlying property in a particular way. Put more simply – and as shown below – unproven legal claims are too speculative to sustain a RICO claim.[11]

In any event, Almaty/BTA fail to cite even a single case for the proposition that "each act of transferring the Kazakh Entities' stolen property to a co-conspirator constituted a *separate* act of conversion." (ECF 518 at 13). This is unsurprising, as the law holds otherwise. Conversion claims accrue at the time of the theft, and are not subject to a "continuing tort" theory. *See King v. Fox*, 28 F. App'x 95, 98 (2d Cir. 2002) (citing *Sporn v. MCA Records, Inc.*, 58 N.Y.2d 482, 488 (N.Y. 1983)) (continuing tort theory does not apply to actions for conversion, which involves the taking of property rather than interference with it); *Songbyrd, Inc. v. Estate of Grossman*, 23 F. Supp. 2d 219, 222 (N.D.N.Y. 1998) (statute of limitations on conversion based on theft "begins to run from the time of the theft").[12]

---

that it is "the same property over which the Kazakh Entities have a valid constructive trust claim," (ECF 518 at 16); but, this Court has already held that a constructive trust claim over certain property does not constitute a legally cognizable interest in that property. *See infra* pp. 18-20.

[11] Almaty/BTA mischaracterize the Court's finding that they "stated valid claims for conversion," (ECF 518 at 14), which was limited to rejecting a challenge under Federal Rule of Civil Procedure 9(b). (ECF 174 at 27-28). The Court did not test the timeliness of the claim or assess it on the merits, particularly with regard to domestic injury or in light of other allegations that the funds supposedly stolen from Kazakhstan "have been within the Individual Defendants' dominion by way of the various entities they purportedly control," including Triadou (i.e., allegations pertinent to whether the conversion claim against Triadou is time-barred or duplicative). (*Compare id.* at 27-28, *with* ECF 426 at 36).

[12] The cases cited by Almaty/BTA do not support their "multiple conversion" theory. For example, the cited portion of *Amusement Industry, Inc. v. Midland Avenue Assocs., LLC*, 820 F. Supp. 2d 510 (S.D.N.Y. 2011), deals with an evaluation of certain defendants' "actual knowledge" in connection with a claim for aiding and abetting conversion, not conversion itself. (ECF 518 at 13 (quoting *Amusement Industry*, 820 F. Supp. 2d at 536)). Likewise, the examples in *Mendelson v. Boettger*, 257 A.D. 167, 169-70 (2d Dep't 1939), and *Leveraged Leasing Administration Corp. v. Pacificorp Capital, Inc.*, 87 F.3d 44, 50 (2d Cir. 1996), do not involve property that was allegedly

### III.    The Assignment of the Flatotel Did Not Injure Any Domestic Property Interests Belonging to Almaty/BTA

Almaty/BTA argue that "the 2014 assignment of the Flatotel and Cabrini Medical Center interests caused a discrete and identifiable financial injury to the Kazakh Entities in the United States," (ECF 518 at 15); but the Court has already rejected that argument.  The Second Circuit's holding in *Bascuñán II* cannot save Almaty/BTA's RICO Crossclaims.

While Almaty/BTA concede that what they possess is "a claim to a constructive trust," they continue to assert that the existence of the claim confers upon them a property interest in the Flatotel itself.  (ECF 518 at 16 (describing their injured property as the "value of 'the 50% interest in CF 135 West Member LLC assigned by Triadou'")).  But as the Court already found, possessing a claim for constructive trust does not create "a cognizable property or business interest in the Flatotel itself."  *City of Almaty*, 226 F. Supp. 3d at 287 (citing *United States v. Brimberry*, 779 F.2d 1339, 1348 (8th Cir. 1985)).  Almaty/BTA cite no law to the contrary.

In a futile attempt to circumvent this finding, Almaty/BTA embrace *Brimberry* (and assert that the Court omitted a key portion) as showing that ***"[a] right to seek a constructive trust over specific property is a property interest in itself*,"** and then assert that, here, their property interest is "domestic" because, *ipso facto*, their constructive trust claim is pending before this Court.  (ECF 518 at 17 (citing *Brimberry*, 779 F.2d 1348 (internal citations and quotation omitted))).[13] While a clever refinement of their initial position, this argument is tortured.  First, Almaty/BTA's

---

stolen and then repeatedly converted.  Rather, both cases contemplate various scenarios in which conversion might occur in the first instance.

[13] Almaty/BTA cite no law in support of the assertion that their constructive trust claim is "domestic" because it was filed in the U.S.  (*See* ECF 518 at 17).  The logic of that assertion is, at best, questionable, as it would allow foreign litigants who did not maintain property in the U.S. to avail themselves of RICO simply by asserting common law claims in this country.  Such a result is at odds with the comity concerns set forth in *RJR Nabisco* and *Bascuñán II*, as well as the presumption against extraterritoriality that the Supreme Court held applies to 18 U.S.C. § 1964(c).

contention is based on incorrectly conflating the ***right to pursue a constructive trust*** (and other legal claims) with the status of their rights ***if*** those claims had been successfully proven. (*See* ECF 518 at 7 ("The moment the defendants invested the Kazakh Entities' stolen money in U.S. real estate, the Kazakh Entities had enforceable property interests in the United States."); *id.* ("The defendants held multiple physical properties in the United States in constructive trust for the Kazakh Entities, giving rise to property rights, including the right to seek possession of the properties."); *id.* at 14 ("the defendants also harmed the Kazakh Entities' U.S. rights to property held in constructive trust for their benefit")).[14]   However, this conflation skips a vital step: obtaining a judgment in their favor.  Absent a judgment, Almaty/BTA possess only an ***unproven claim*** for a constructive trust, which is not equivalent to a direct interest in the underlying property over which they seek the trust.  To find otherwise would ignore the holdings in both *Brimberry* and this Court's December 23 Order, neither of which were affected by *Bascuñán II*.

Because Almaty/BTA possess, at most, a property interest in an unproven legal claim, they cannot show a non-speculative injury sufficient to sustain the RICO Crossclaims.  (*See* ECF 518 at 15, 17).  "The hope of collecting upon a judgment if one's suit proves successful is precisely the sort of mere expectation that is too speculative to constitute a property right within the meaning of 18 U.S.C. § 1962."  *Villoldo v. BNP Paribas S.A.*, 648 F. App'x 53, 55 (2d Cir. 2016) (summary order) (citing *McLaughlin v. Am. Tobacco Corp.*, 522 F.3d 215, 228 (2d Cir. 2008), *abrogated on*

---

[14] Almaty/BTA argue that "[w]hen a fraudster acquired property, that fraudster holds the property in constructive trust for his or her victim.  The obligation on the fraudster is imposed by law and arises immediately," (ECF 518 at 14), but (yet again) cite no law in support of their contentions. This failure is not surprising since Almaty/BTA's pronouncement is inconsistent with this Court's holding in the December 23 Order that "'[w]hen an embezzler purchases property with stolen funds, the property may be subjected to a constructive construct [sic] in favor of the victim' but '[u]ntil a court grants the victim such a constructive trust remedy,' the victim 'merely has a right to seek' it and the 'existence of such a right does not establish an interest in the specific property.'" *City of Almaty*, 226 F. Supp. 3d at 287 (quoting *Brimberry*, 779 F.2d at 1348).

*other grounds by Bridge v. Phx. Bond & Indem. Co.*, 553 U.S. 639 (2008)).  The Second Circuit's

decision in *Villoldo*, while not precedential, is nonetheless instructive.  There, the Second Circuit

rejected the plaintiffs' argument "that their right to bring an action against Cuba at the time of [the

alleged] wrongdoing constituted a property right cognizable under RICO."  *Id.* at 55.  In doing so,

the court held that the defendants "did not interfere with plaintiffs' right or ability to bring suit . .

. and plaintiffs had no non-speculative property right to collect compensatory damages from Cuba

until their lawsuit resulted in the entry of judgment."  *Id.*[15]  The circumstances here are quite

similar.  Almaty/BTA do not allege interference with their "right or ability to bring suit," and they

had no property interest in the Flatotel or Cabrini Medical Center at the time of Triadou's alleged

assignment, either directly or in the form of an existing judgment subjecting those properties to a

constructive trust.  As a result, Almaty/BTA had only a mere expectancy in the form of an

unproven constructive trust claim, which is not a sufficiently definite domestic property interest to

sustain the RICO Crossclaims.[16]

        In any event, Almaty/BTA could not plausibly allege an injury to their unproven

constructive trust claim because neither the claim nor their ability to bring it was injured by the

---

[15] The district court in *Villoldo v. BNP Paribas S.A.* found that the plaintiffs had only an
"expectancy interest" at the time of the underlying conduct because they did not "as of the dates
of the alleged transfers, possess a judgment or any other property interest" in the relevant wire
transfers.  No. 14 Civ. 9930 (AKH), 2015 WL 13145807, at *3 (S.D.N.Y. July 21, 2015).
Almaty/BTA effectively concede they had no such property interest because they acknowledge
that they must be able to demonstrate that the money brought into the United States "was their
money in the first place," (*see* ECF 518 at 20), which has not been done here.

[16] Almaty/BTA have not alleged interference with their "right or ability to bring suit." Rather, they
have argued, and now re-argued, that the Crossclaim Defendants' alleged conduct somehow
diminished "the total value of all of the Kazakh Entities' money laundered into the United States."
(ECF 518 at 16 and n.8).  The Court has already rejected this argument.  *City of Almaty*,
226 F. Supp. 3d at 287 (finding that Almaty/BTA have not plausibly alleged that the Flatotel
assignment or related transfer of funds "in any way decreased the intrinsic value of the Flatotel
project" or "diminished the value of the funds themselves").

Crossclaim Defendants' alleged conduct.  Almaty/BTA would have the same claim to seek a constructive trust over the same property – the Flatotel ownership interest – regardless of whether Triadou or Chetrit (alleged co-conspirators) held that interest.  As this Court found, "the transfer of stolen funds (effected by the assignment) from Triadou to other participants in the alleged RICO enterprises cannot plausibly be alleged to have somehow diminished . . . the Kazakh Entities' purported right of recovery."  *City of Almaty*, 226 F. Supp. 3d at 287.[17]

Lastly, Almaty/BTA cannot sustain their RICO Crossclaims because, even assuming their unproven legal claims actually reflected non-speculative property interests, and assuming further that those claims had been harmed in some way, the Amended Crossclaims are devoid of any allegation asserting harm to those legal claims.  (*See* ECF 219, ¶¶ 127-168).  The bottom line is that Almaty/BTA cannot base their RICO Crossclaims on injuries they have not pled.[18]

## IV.   Comity Is Best Served by Affirming the Dismissal of the RICO Crossclaims

Nothing in the December 23 Order's comity analysis has been unsettled or changed by the Second Circuit's decision in *Bascuñán II*.  This Court found that Almaty/BTA's attempt to seek treble damages "based on the post-theft investment in New York real estate of less than 1% of some $6 billion stolen from Kazakh victims by Kazakh citizens in Kazakhstan" would have been "at odds with the Supreme Court's directive that the need to enforce the presumption against

---

[17] Nor can Almaty/BTA show a domestic injury based on "any *appreciation* in value" of the Flatotel. (*See* ECF 518 at 17).  *Oakes v. Muka*, on which Almaty/BTA rely, involved the appeal of an already-granted constructive trust.  69 A.D.3d 1139, 1141-42 (3d Dep't 2010).  Here, no constructive trust has been granted, and Almaty/BTA therefore have no interest in any unproven appreciation (if it even exists) in the value of property that has not been subjected to such a trust.

[18] The arguments in Argument Section III apply equally to Almaty/BTA's unproven conversion claim.  That unproven claim is a mere expectancy, and therefore is too speculative to sustain the RICO Crossclaims; Almaty/BTA cannot plausibly allege any injury to the claim itself or their ability to bring it based on the conduct alleged in the Amended Crossclaims; and, in any event, Almaty/BTA have not pled any injury to their unproven conversion claim.

extraterritoriality is 'at its apex' when remedies available in the United States courts may conflict with those available abroad."  *City of Almaty*, 226 F. Supp. 3d at 287 (citing *RJR Nabisco*, 136 S. Ct. at 2107).  The Second Circuit made a similar finding in *Bascuñán II* where it affirmed dismissal of the Dividend and General Anacapri Schemes, in part because there – as here – the defendant, not the plaintiff, created the connection with the United States.  874 F.3d at 819 (quoting *RJR Nabisco*, 136 S. Ct. at 2106-07) (noting that where "the only domestic connections" were based on "acts of *the defendant*," allowing the plaintiff to recover treble damages would "'unjustifiably permit [foreign] citizens to bypass their own [nation's] less generous remedial schemes'").  Where a plaintiff has not voluntarily availed themselves of this jurisdiction – that is, where they have not, of their own accord, sought to maintain property in the United States or conduct business here – they cannot be said to have a reasonable expectation of protection by a U.S. statutory regime.

Further, Almaty/BTA's comity argument continues to ignore that this Court analyzed the RICO Crossclaims based on Almaty/BTA's contentions of domestically injured property, and that the December 23 Order is based largely on the particular facts alleged by Almaty/BTA, a point the Court noted in denying interlocutory appeal.  *City of Almaty*, 2017 WL 1424326, at *3 (describing the December 23 Order as "highly fact-specific").  Those particular factual allegations, as shown above, differ substantially from those on which the Second Circuit relied in reinstating a portion of the plaintiff's RICO claims in *Bascuñán II*, and doom the RICO Crossclaims here.

## CONCLUSION

For the reasons stated in this Memorandum, and for those set forth in Triadou's original briefing regarding the Supreme Court's decision in *RJR Nabisco*, (ECF 188, 202), the Court should deny Almaty/BTA's motion to reconsider the December 23 Order and affirm dismissal of the RICO Crossclaims for failure to allege a domestic injury.

Dated: New York, New York
       February 23, 2018

Respectfully submitted,

BLANK ROME LLP

By:    *s/Deborah A. Skakel*
      Deborah A. Skakel
      Alex E. Hassid
      Robyn L. Michaelson
The Chrysler Building
405 Lexington Avenue
New York, New York  10174-0208
Telephone: (212) 885-5000
Facsimile: (212) 885-5001
dskakel@blankrome.com
ahassid@blankrome.com
rmichaelson@blankrome.com

*Counsel for Crossclaim Defendant*
*Triadou SPV S.A.*