**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF ALMATY, KAZAKHSTAN and BTA BANK JSC,

Crossclaim Plaintiffs,

-against-

MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, and TRIADOU SPV S.A.,

Crossclaim defendants.

15 Civ. 5345 (AJN) (KHP)

**REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THE CITY OF ALMATY AND BTA BANK'S MOTION FOR RELIEF FROM THE COURT'S DECEMBER 23, 2016 ORDER DISMISSING THEIR RICO CLAIMS, IN LIGHT OF NEW CONTROLLING AUTHORITY**

BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for the City of Almaty, Kazakhstan and BTA Bank JSC*

# TABLE OF CONTENTS

**TABLE OF AUTHORITIES** .......... **ii**

**ARGUMENT** .......... **1**

**I. The Court Has Not Yet Considered the Kazakh Entities' Domestic Injury Under the New Standard** .......... **1**

A. The December 23 Order, Like *Bascuñán I*, Relies on Residency and Choice of Law Principles, Not on the Second Circuit's New Property-Based Standard .......... 1

B. The Court Did Not Address the Kazakh Entities' Damages Based on Their Rights for Conversion or to Seek a Constructive Trust, Nor the Costs Associated with Their Enforcement Efforts .......... 3

**II. The Kazakh Entities' Domestic Injury Satisfies the *Bascuñán II* Standard** .......... **5**

A. Domestic Torts, such as Conversion and Constructive Trust, Explain What the Kazakh Entities' Property Was and Where It Was Injured .......... 5

B. Liquidating the Real Estate at a Below-Market Price and Further Laundering the Kazakh Entities' Money Caused Harm Separate From the Original Thefts in Kazakhstan .......... 9

**CONCLUSION** .......... **10**

# TABLE OF AUTHORITIES

**Cases**

*Bascuñán v. Elsaca*,
874 F.3d 806 (2d Cir. 2017)........ passim

*Bascuñán v. Elsaca*,
No. 15 Civ. 2009 (GBD), 2016 WL 5475998 (S.D.N.Y. Sept. 28, 2016)........ 1

*City of Almaty, Kazakhstan v. Ablyazov*,
No. 15 Civ. 5345 (AJN), 2017 WL 1424326 (S.D.N.Y. Apr. 20, 2017)........ 4

*City of Almaty, Kazakhstan v. Ablyazov*,
226 F. Supp. 3d 272 (S.D.N.Y. 2016)........ 1, 2, 3

*Deutsche Zenlral-Genossenchaftsbank AG v. HSBC N. Am. Holdings, Inc.*,
No. 12 Civ. 4025 (AT), 2013 WL 6667601 (S.D.N.Y. Dec. 17, 2013)........ 1, 2

*In re LIBOR-Based Fin. Instruments Antitrust Litigation*,
No. 11 MDL 2262 NRB, 2015 WL 6243526 (S.D.N.Y. Oct. 20, 2015)........ 2

*Maiz v. Virani*,
253 F.3d 641 (11th Cir. 2001)........ 4

*Pasquantino v. United States*,
544 U.S. 349 (2005)........ 7

*Stochastic Decisions, Inc. v. DiDomenico*,
995 F.2d 1158 (2d Cir. 1993)........ 4

*United States v. Brimberry*,
779 F.2d 1339 (8th Cir. 1985)........ 3

*Villoldo v. BNP Paribas S.A.*,
648 F. App'x 53 (2d Cir. 2016)........ 3, 6, 7, 8

**Statutes**

18 U.S.C. § 1964........ 2, 4, 8

**Rules**

N.Y. Civil Practice Law and Rule 202........ 1, 2

The Kazakh Entities respectfully submit this reply memorandum of law in further support of their motion for relief from the Court's December 23 Order.[1]

## ARGUMENT

### I. The Court Has Not Yet Considered the Kazakh Entities' Domestic Injury Under the New Standard

#### A. The December 23 Order, Like *Bascuñán I*, Relies on Residency and Choice of Law Principles, Not on the Second Circuit's New Property-Based Standard

The Court held previously that the Kazakh Entities did not suffer a domestic injury because the defendants' initial "misappropriations giving rise to this action occurred within Kazakhstan," and "the Kazakh Entities clearly 'got poorer' in Kazakhstan." *City of Almaty, Kazakhstan v. Ablyazov*, 226 F. Supp. 3d 272, 284 (S.D.N.Y. 2016). This reasoning is virtually identical to the residency-based test employed by Judge Daniels in *Bascuñán I*, No. 15 Civ. 2009 (GBD), 2016 WL 5475998, at *4 (S.D.N.Y. Sept. 28, 2016), which has its foundation in choice of law principles, namely CPLR 202. *See Deutsche Zenlral-Genossenchaftsbank AG v. HSBC N. Am. Holdings, Inc.*, No. 12 Civ. 4025 (AT), 2013 WL 6667601, at *6 (S.D.N.Y. Dec. 17, 2013) (for an economic injury, the choice-of-law test asks who became poorer and where they become poorer), *cited by Bascuñán I*. That test is fundamentally different from the test the Second Circuit articulated in *Bascuñán II*, 874 F.3d 806 (2d Cir. 2017), which seeks to identify any property interest in the United States that was harmed by racketeering activity. The defendants thus err is arguing that *Bascuñán II* does not constitute an intervening change in the law controlling the December 23 Order. *See, e.g.*, Triadou Mem. in Opp'n ("Triadou Mem.") at 6 [ECF No.557].

The defendants also err in arguing that reconsideration is unnecessary because the Court has already applied the *Bascuñán II* test, either directly or "effectively." *See* Triadou Mem. at 11;

[1] Capitalized terms in this brief have the same meaning as in the Kazakh Entities' moving brief. *See* ECF No. 518.

Khrapunov Mem. in Opp'n ("Khrapunov Mem.") at 5–7 [ECF No. 558]. When the Court looked to the U.S. investments, it did so through the CPLR 202 lens, because it looked for the "extremely rare" circumstance when a foreign plaintiff can be considered to have a domestic presence, *not* the much more common scenario where a foreign plaintiff owns *any* kind of property in the United States. *City of Almaty*, 226 F. Supp. 3d at 285 (finding that the Kazakh Entities did not have some "discrete financial base established away from home [that] suffered the brunt of the losses at issue" (internal quotation marks and alterations omitted)). Tellingly, the Court noted that even if the Kazakh Entities had some financial connection to New York, "whether it be in the form of branch offices, investment activity, or bank accounts," it would still be "an insufficient basis to find that a foreign entity suffered injury in New York." *Id.* But this is not the test under *Bascuñán II*. Under the new standard, domestic investment activity or even one bank account may be all that is required to allege a domestic property interest under 18 U.S.C. § 1964(c).

The cases cited by the Court further demonstrate that the Court applied the wrong test, as they concern jurisdiction and choice of law – where a cause of action accrues under CPLR 202. The court in *In re LIBOR-Based Fin. Instruments Antitrust Litigation*, for example, noted the "usual rule, however, that an economic injury does not accrue in New York simply because a plaintiff holds money in a New York bank account or conducts some of its financial operations in New York." No. 11 MDL 2262 NRB, 2015 WL 6243526, at *118 (S.D.N.Y. Oct. 20, 2015). In *Deutsche Zentral-Genossenchaftsbank AG v. HSBC N. Am. Holdings, Inc.*, "the certificate purchases were carried out in New York, involving New York accounts, and the certificates were later managed in New York," but the economic impact was still ultimately felt at company headquarters abroad. No. 12 CIV. 4025 AT, 2013 WL 6667601, at *7 (S.D.N.Y. Dec. 17, 2013).

In each of these cases, the result is inconsistent with *Bascuñán II,* where a domestic bank account from which money was stolen established a domestic injury despite the plaintiff's foreign residence, where the plaintiff "got poorer" abroad.

For all of these reasons, the Court did not apply *Bascuñán II's* test, either directly or "effectively," in resolving the domestic injury question.

**B. The Court Did Not Address the Kazakh Entities' Damages Based on Their Rights for Conversion or to Seek a Constructive Trust, Nor the Costs Associated with Their Enforcement Efforts**

Nor did the Court – as both the Khrapunovs and Triadou mistakenly argue (*see* Khrapunov Mem. at 11; Triadou Mem. at 11–12) – address the Khazakh Entities' property interests in the United States, as required by *Bascuñán II*. The Court asked whether "the Flatotel assignment injured any property owned by the Kazakh Entities," *City of Almaty*, 226 F. Supp. 3d at 287, and concluded that the Kazakh Entities did not plead that the assignment in "any way decreased the intrinsic value of the Flatotel project," and that "the transfer of stolen funds (effected by the assignment) from Triadou to other participants in the alleged RICO enterprises cannot plausibly be alleged to have somehow diminished the value of the funds themselves or to have impaired the Kazakh Entities' purported right of recovery." *Id.* at 287. The Court's assumption, however, was based on the premise that the Kazakh Entities' rights to the Flatotel project were limited to the money that was initially invested, and not all of the benefits that came along with that investment, such as profit participation and the appreciation in value that was lost when the defendants fraudulently agreed to accept an artificially low price.

The Court also did not assume "the Kazakh Entities had domestic property interests in the form of *their right to seek* a constructive trust over the property located here." Kazakh Entities Mem. at 15 (citing *United States v. Brimberry*, 779 F.2d 1339 (8th Cir. 1985)). Unlike in *Villoldo v. BNP Paribas S.A.*, 648 F. App'x 53 (2d Cir. 2016), cited by Triadou and discussed more

below, the defendants' actions following the California lawsuit did directly impact the Kazakh Entities' ability to seek a constructive trust over New York property, which the defendants liquidated.

Finally, the Court did not consider the RICO damages arising out of the defendants' attempts to frustrate the Kazakh Entities' collection efforts. The amounts where the defendants "successfully frustrated" the Kazakh Entities' collection constitute RICO damages. *See Stochastic Decisions, Inc. v. DiDomenico*, 995 F.2d 1158, 1165–66 (2d Cir. 1993) ("a debt is lost and thereby becomes a basis for RICO trebling only if the debt (1) cannot be collected (2) by reason of a RICO violation." (internal quotation marks omitted)). Additionally, the Kazakh Entities are entitled to "'the cost of the [RICO] suit, including a reasonable attorney's fee.'" *Id.* at 1167 (quoting § 1964(c)) (upholding trebled award of RICO attorneys' fees).

As the *Maiz* court noted, "[f]ocusing on the initial decision to invest as the only possible point of injury is misplaced." *Maiz v. Virani*, 253 F.3d 641 (11th Cir. 2001). Indeed, if that "were correct, it would be difficult to imagine how these statutory offenses [like money laundering] could ever serve as predicate acts in civil RICO cases." *Id.* at 674. The answer is simple: where, as here, racketeering acts frustrate collection efforts and deprive a property owner of the use and benefit of their property, and impose additional costs in litigation, they constitute RICO injuries.

The Court recognized as much, noting that alternative approaches to RICO injuries, such as the incremental damages suffered by the Kazakh Entities, "could at least potentially yield differing determinations." *City of Almaty, Kazakhstan v. Ablyazov*, No. 15 Civ. 5345 (AJN), 2017 WL 1424326, at *2 (S.D.N.Y. Apr. 20, 2017). Now that the Second Circuit has determined that a different approach is required, the Court should revisit those damages and determine whether they constitute RICO injuries.

## II. The Kazakh Entities' Domestic Injury Satisfies the *Bascuñán II* Standard

The defendants mischaracterize the Kazakh Entities' domestic injury when they argue that the U.S.-based laundering of the Kazakh Entities' money "does not transform a foreign injury into a domestic one." Khrapunov Mem. at 1. The Kazakh Entities' domestic RICO injury does not depend on the embezzlements and thefts in Kazakhstan, except for the single, well-pleaded factual allegation that the money was originally theirs. Rather, the domestic RICO injury arises out of the property interests the Kazakh Entities had by virtue of state law torts, and the defendants' *subsequent* racketeering acts that interfered with and diminished the value of those rights. *See* Kazakh Entities' Mem. at 2–3, 15–18.

### A. Domestic Torts, such as Conversion and Constructive Trust, Explain What the Kazakh Entities' Property Was and Where It Was Injured

As in *Bascuñán II*, state law torts, such as conversion and constructive trust, define Kazakh Entities' U.S.-based property interests and how the defendants injured them. In *Bascuñán II*, in connection with the misappropriation of the funds held in a New York bank account (the "New York Trust Account Scheme"), the Second Circuit first identified the property interest, finding that the money at issue, while "fungible," was "situated in a specific geographic location at the time of injury such that we can treat it as tangible property for purposes of this inquiry." *Bascuñán II*, 874 F.3d at 820–21. Stated differently, it could be converted, which explained how the misappropriation of money could cause a domestic injury for a foreign plaintiff. *See id.*

The Second Circuit naturally found then that the misappropriation of the plaintiff's money held in *foreign* accounts was *not* a domestic injury (the "Dividend Scheme and the General Anacapri Investment Fraud Scheme"). And the defendants' "use of bank accounts located within the United States to facilitate or conceal the theft of property located outside of

the United States does not, on its own, establish a domestic injury." *Bascuñán II*, 874 F.3d at 819. That is because it was the same stolen money – the same foreign property – that was deposited in the new account in the United States. As such, the "defendant's mere use of a domestic bank account" could not "transform an otherwise foreign injury into a domestic one . . . ." *Id.*

But that is not what happened here. The defendants did not "merely" deposit the Kazakh Entities' stolen money in a domestic bank account – they bought buildings and engaged in a course of conduct across the country involving the acquisition and liquidation of real estate, the formation of domestic shell entities, kickbacks, and fraudulent assignments. When the defendants used the money they stole from the Kazakh Entities to pay for real property in New York City, the Kazakh Entities acquired domestic property interests that were materially different from the stolen funds used to acquire them – such as the right to seek possession of the properties and participate in their appreciation in value. The Kazakh Entities also had the right to sue the defendants to secure the benefits of the real property bought with their stolen money. This case thus has the "something more" that, under the Second Circuit's reasoning, turns what was once a foreign injury into a domestic one. *See Bascuñán II*, 874 F.3d at 819 (noting that the mere "use of bank accounts located within the United States" "does not, on its own, establish a domestic injury").

Triadou argues that these rights are too speculative, relying on *Villoldo v. BNP Paribas S.A.*, 648 F. App'x 53 (2d Cir. 2016). Triadou Mem. at 19–20. *Villoldo* is instructive, but not in the way Triadou reads it. The plaintiffs in *Villoldo* were victims of state-sponsored terrorism during the regime of Fidel Castro. The plaintiffs sued banks in the United States that failed to freeze Cuban assets. At the time of the banks' alleged wrongful acts, however, the plaintiffs'

only *property right* was a right to bring a claim against Cuba under a federal statute, the Terrorism Risk Insurance Act of 2002, for compensatory damages. The banks' failure to freeze Cuban assets did not in any way interfere with the plaintiffs' right to bring their claims against Cuba, which they did. Later, after the plaintiffs could not collect on their judgment against Cuba, the plaintiffs sued the banks for those earlier transactions that had occurred *before* the plaintiffs had a judgment. *See id.* at 55 ("the default judgment was the alleged impaired property, it could not have been injured by defendants' alleged RICO violations because plaintiffs did not obtain their default judgment until after the RICO violations had ended.").

The Kazakh Entities, in contrast, have always had a specific property right in their stolen money, as well as in the assets purchased with that money. That right is not speculative: as pleaded, it existed at the time of the defendants' racketeering acts and is the proper subject of a RICO claim. *See, e.g.*, *Villoldo*, 648 F. App'x at 55 ("We have recognized a chose in action as a property right under the federal mail fraud statute, a RICO predicate, and courts within this circuit have found interference with the ability to bring suit actionable under RICO."). A plaintiff's right to its own money "is 'property' in its hands." *Id.* (quoting *Pasquantino v. United States*, 544 U.S. 349, 355 (2005)). In *Villoldo*, however, at the time of the banks' alleged racketeering acts, the plaintiffs – unlike the Kazakh Entities – simply did not have a claim to the money. *Villoldo* is entirely consistent with the claims the Kazakh Entities have brought here.

Triadou's argument that the Kazakh Entities "do not allege interference with their right or ability to bring suit," Triadou Mem. at 20 (internal quotation marks alleged), is similarly misplaced. The Kazakh Entities allege that the defendants, after learning of the Kazakh Entities suits in California, liquidated their position in the Flatotel to prevent the Kazakh Entities from suing in New York. Triadou incorrectly claims that the Kazakh Entities had nothing more at the

time than a "mere expectancy in the form of an unproven constructive trust claim," relying on the timing in *Villoldo* – where the plaintiff's statutory claim for compensatory damages against Cuba had no relationship to the defendants' alleged interference with asset recovery against Cuba generally. *Id.* This case is in fact quite different, as the Kazakh Entities had a direct claim against assets that were being liquidated through the defendants' racketeering predicate acts.

There is no dispute that a plaintiff's claim to money still held by a fraudster is concrete under § 1964(c). The fact that money is invested in real property cannot render a claim on that property speculative. The claim to cash and the claim to real property are equally "unproven." Triadou Mem. at 20. If the Court were to credit Triadou's argument, it would simply reward the defendants for converting the stolen funds into real property and allow any money launderer to break the nexus between a victim's original claim to stolen funds and their subsequent claims to property bought with those funds.

Indeed, any claim, including a claim to the original money, has yet to be proven. The problem in *Villoldo* was that the plaintiff simply had the hope that they would one day in the future have a claim. Here, however, the Kazakh Entities had a claim the moment the money was stolen in Kazakhstan, and under *RJR Nabisco*, they had a RICO claim in the United States the moment the defendants committed acts of racketeering here that interfered with the Kazakh Entities' domestic property interests.[2]

---

[2] Contrary to the defendants' arguments, *see* Khrapunov Mem. at 12 and Triadou Mem. at 15–17, the Kazakh Entities do not allege anywhere that conversion is, standing alone, a racketeering predicate act. That does not mean, however, that conversion is not part of the RICO claims. Conversion is one of the means by which the defendants committed money laundering, wire fraud, and other predicate crimes, which the Kazakh Entities *do* allege were predicate acts. *See, e.g.*, AC ¶ 132(a). State law torts also help define what property interests existed in the United States and were damaged by the defendants' actions here. *See Bascuñán II*, 874 F.3d at 820 & n.56 (analogizing to a claim for conversion and finding the "scheme to have involved the misappropriation of tangible property located within the United States").

### B. Liquidating the Real Estate at a Below-Market Price and Further Laundering the Kazakh Entities' Money Caused Harm Separate From the Original Thefts in Kazakhstan

Once the Kazakh Entities had property interests firmly grounded in the United States, they possessed a "preexisting connection" to the United States that the Second Circuit noted was lacking for certain of the schemes in *Bascuñán II*. 874 F.3d at 819. The fact that this ownership interest arose out of actions taken by the defendants rather than the Kazakh Entities does not change what the Kazakh Entities actually owned from that point forward.

Regardless, the Kazakh Entities did take action in the United States. The Kazakh Entities first brought suit against the defendants in California, where the defendants had also purchased real estate with the Kazakh Entities' stolen money. AC ¶ 114. In response, the defendants and their co-conspirators began liquidating other U.S. assets – the Kazakh Entities' other domestic property interests. *Id.* ¶ 115. This injured the Kazakh Entities here as it deprived the Kazakh Entities of the benefits from their rights in the real estate (such as their profit participation), diminished the value of their property by selling at below-market prices and by paying bribes and kickbacks, and frustrated the Kazakh Entities' efforts at recovering their property.

As mentioned in the Kazakh Entities' moving brief, the question of what portion of the Kazakh Entities' domestic injury arises out of these post-theft activities rather than the original theft is a matter best left for trial. The Kazakh Entities are not seeking to transform the entirety of their damages from the embezzlement in Kazakhstan into their RICO injury here – this case is about what the defendants did in the United States with the Kazakh Entities' money. For example, "the value of Triadou's investment had in fact increased substantially beyond the funds originally invested." AC ¶ 117. The Kazakh Entities had a property interest in that increased value – a property interest that was necessarily domestic, because it did not exist until the Kazakh Entities' money had been invested in U.S. real estate – which was then squandered when

sold at "only a fraction of the fair market value of the properties." *Id.* ¶¶ 117–18.

**CONCLUSION**

For the reasons stated here and in the Kazakh Entities' moving memorandum in support [ECF No. 518], the Kazakh Entities respectfully request that the Court revisit its December 23 Order and deny the defendants' motions to dismiss the RICO claims.

Dated: March 2, 2018
New York, New York

Respectfully Submitted,

/s/ Matthew L. Schwartz

Matthew L. Schwartz
Peter M. Skinner

BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
Telephone: 212-446-2300
Facsimile: 212-446-2350
E-mail: mlschwartz@bsfllp.com