# Exhibit 12

Document Filed Under Seal

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------

CITY OF ALMATY, KAZAKHSTAN and
BTA BANK JSC,

      Plaintiffs,

  -vs-    Case Number:
       15 Civ. 5345
       (AJN)(SN)

MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV,
ILIYAS KHRAPUNOV and TRIADOU SPV SA,

      Defendants.
------------------------------------------

VIDEOTAPED DEPOSITION

OF

FELIX SATER

THURSDAY, SEPTEMBER 13, 2018

8:30 a.m.

Magna Legal Services
866-624-6221
www.MagnaLS.com

Reported by:  Adrienne M. Mignano, RPR

Job Number:  426577



Page 18

1          Sater
2



Page 22

1          Sater
2



Page 26

1          Sater
2





Page 34

1          Sater
2



Slip Sheet

Page 238

```
1              Sater
2
```

Page 240

```
1              Sater
2  questions you have had.
3      A    Of course.
4      Q    And I apologize if I'm
5  repeating.
6
```

```
25    to.
```

Page 239

```
1              Sater
2      Let's take a break, five
3  minutes.
4        THE VIDEOGRAPHER:  The time is
5  3:09 p.m., and we're going off the
6  record.
7        (Thereupon, a recess was taken,
8  and then the proceedings continued as
9  follows:)
10       THE VIDEOGRAPHER:  This is the
11  start of media labeled number five.
12  The time now is 3:17 p.m., and we're
13  back on the record.
14  EXAMINATION BY
15  MR. SOLOMON:
16     Q    Good afternoon, Mr. Sater.  My
17  name is Andrew Solomon.
18       We have never met before; is
19  that correct, sir?
20     A    We have never met.
21     Q    We have never spoken before; is
22  that correct?
23     A    We have never spoken.
24     Q    I want to ask a couple of
25  follow-up questions to some of the
```



Page 242

1          Sater
2

Page 246

1          Sater
2

Page 250

```
1              Sater
2
```

Page 253

```
 1              Sater
 2      A   No.
 3      Q   Going back to Moses & Singer,
 4  does Moses & Singer represent LitCo 2?
 5      A   I don't remember.  I would have
 6  to check.
 7      Q   Does Moses -- has Moses & Singer
 8  ever represented Triadou?
 9      A   I'm sorry.  I don't know.
10      Q   Has Moses & Singer ever
11  represented SDG?
12      A   I don't believe so.
13      Q   Has Moses & Singer ever
14  represented Tri-County Mall Investors?
15      A   I don't believe so.
16      Q   Has Moses & Singer ever
17  represented RPM USA?
18      A   I don't believe so.
19      Q   Has Moses & Singer ever
20  represented RPM-Maro, M-A-R-O?
21      A   I don't believe so.
22      Q   Have you ever heard of the law
23  firm, I may mangle this so you'll excuse
24  me, Beys, Stein, Mobargha & and Berland?
25      A   Yes.
```



1              Sater
2      Q    Has that firm ever represented
3  you personally?
4      A    Yes.
5      Q    Has that firm ever represented
6  Triadou?
7      A    I don't believe so.
8      Q    How about SDG?
9      A    I don't believe so.
10     Q    How about Tri-County Mall?
11     A    I don't believe so.
12     Q    How RPM USA?
13     A    I don't believe so.
14     Q    How about RPM-Maro?
15     A    I don't believe so.
16     Q    Now, have you ever been
17  represented by a gentleman named Arnie
18  Herz?
19     A    Yes, I have.
20     Q    And has Arnie Herz represented
21  RPM USA?
22     A    I believe he has.
23     Q    And how about RPM-Mora?
24     A    I believe he has.
25     Q    Does Arnie Herz still represent

1              Sater
2  you in any capacity?
3      A    No, he does not.  He might.  We
4  may have old matters that will pop up that
5  I will come back and visit him on.  So I
6  would say -- I would answer it a different
7  way.  Arnie Herz has represented me in the
8  past and may represent me in the future.
9          MR. WOLF:  Just so the record is
10     clear, you individually?
11         THE WITNESS:  I don't know if it
12     was entities or individuals.
13  BY MR. SOLOMON:
14     Q    Okay.
15         So when I was asking those
16  questions -- again, I apologize.
17         MR. WOLF:  I want him to be
18     clear because I don't think it is --
19         MR. SOLOMON:  Totally fair
20     criticism.
21  BY MR. SOLOMON:
22     Q    When I'm saying, "Did Arnie Herz
23  represent you?" I meant you or any of the
24  entities that you closely control?
25     A    Yes, yes, he has.  Yes, he has

1              Sater
2  and he probably will in the future.  At
3  least I hope so because he charges a hell
4  of a lot less than all of you guys in this
5  room.  Just kidding.
6          MR. WOLF:  You said that
7      already.
8          THE WITNESS:  What did you say,
9      you said repetition is good?
10  BY MR. SOLOMON:
11     Q    All right.
12         Mr. Sater, stay focused.
13     A    I'm trying.
14         MR. BOYLE:  Objection.  Coaching
15

                                            .
22     Q    Now, you understand the basic
23  allegations in this lawsuit here in New
24  York.
25         Is that fair to say?

1              Sater
2      A    No.  That's not fair to say.
3      Q    Do you understand that one of
4  the allegations that BTA and Almaty are
5  making is that the money that was used by
6  Triadou really belongs to BTA and Almaty?
7          Do you understand that?
8      A    Yes, I understand.
9

20     Q    Thank you.
21         We'll move on a little bit here.
22         I asked you about RPM USA.  You
23  were the managing member of that or
24  manager of that --
25     A    I believe so, yes.

Page 258

Sater

1
2      Q    And did you understand that as
3 the manager, you owed RPM USA fiduciary
4 duties?
5         MR. BOYLE:  Objection.
6      A    I understand that as a manager,
7 somebody owes fiduciary duties to their
8 companies, yes.
9      Q    And who was the owner of RPM
10 USA?
11      A    I don't remember whether it
12 was --
13         MR. BOYLE:  Objection.
14      A    I'm not guessing.  I'm answering
15 properly.
16         RPM was either myself or Elvira
17 or Iliyas.  And there were different RPM
18 entities and I don't remember which one
19 was which.
20      Q    All right.
21         Now, at some point you opened up
22 a bank account at Chase Manhattan -- JP
23 Morgan Chase, I'm dating myself, JP Morgan
24 Chase on behalf of RPM USA, LLC; is that
25 correct?

Page 259

Sater

1
2      A    Probably.  I don't remember.  I
3 don't recall, but I assume that that's
4 probably right.
5      Q    And you bank at the Port
6 Washington branch of JP Morgan Chase.
7         Is that also correct?
8      A    No longer.  I do not now.
9      Q    In 2012, you did?
10      A    I might have.  I believe I did,
11 yes.
12      Q    And do you remember the name,
13 Jason Lee?
14      A    Yes, I do.
15      Q    He was a representative at the
16 bank?
17      A    He was either a branch manager
18 or a customer rep or something like that,
19 yes.
20      Q    And do you remember that when
21 you opened up the account for RPM USA in
22 the Port Washington branch, that you and
23 Daniel Ridloff were given signatory
24 authority over that account?
25      A    You're probably correct.  I

Page 260

Sater

1
2 don't remember, but I assume you're
3 correct.
4      Q    And do you know that you also
5 received an ATM card for that account?
6      A    No, I don't remember.  I'm
7 sorry.
8      Q    Now, at some point after you
9 came to some dispute regarding the
10 proceeds from Tri-County Mall, did you
11 start using money from RPM USA for
12 personal purposes?
13         MR. BOYLE:  Objection.
14      A    I don't remember.
15      Q    Do you know the Citibank across
16 from Schreiber in Port Washington?
17      A    Yes, of course.
18      Q    Did you ever go to the ATM
19 machine there?
20      A    Yes.
21      Q    Do you recall that in one month
22 you went every day or every other day and
23 withdrew $1,000 on an ATM card from the
24 RPM USA account?
25         MR. BOYLE:  Objection.

Page 261

Sater

1
2      A    Possibly, yes.
3         What month was that?
4      Q    In September of 2013.
5      A    Yep, that was poker month.
6      Q    Do you recall on September 9,
7 2013, you withdrew $1,000 with a $3 charge
8 from the Citibank account -- on a Citibank
9 ATM machine?
10         MR. BOYLE:  Objection.
11      A    To answer you, I do not remember
12 a day when I would withdraw $1,000 or not.
13 I'm sorry.  I'm not contesting that I did,
14 but to ask me if I remember, in 2013, when
15 I went to an ATM to withdraw $1,000 is not
16 helpful because I would never remember
17 such a thing.
18      Q    Okay.
19         Do you recall what the business
20 purpose was or whether there was a
21 business purpose for taking out $1,000
22 from RPM USA on one, two, three, four,
23 five, six, seven -- eight different times
24 in the month of September 2013?
25         MR. WOLF:  I object.

Page 262

```
 1              Sater
 2         He just said he doesn't recall
 3    doing that so how can he answer a
 4    question about what a business purpose
 5    was for something he doesn't recall
 6    doing?
 7    Q    You can answer the question.
 8    A    It could have been a number of
 9    things.  Reimbursement for expenses.  It
10    could have been -- I don't know.  I don't
11    remember.  I'm sorry.
12    Q    Let me see if I can refresh your
13    recollection.
14    A    Sure.
15         MR. SOLOMON:  What are we up to
16    on Sater?
17         (Whereupon, Statement from Chase
18         Bank, for August 31, 2013 through
19         September 30, 2013, was marked as
20         Sater Exhibit 15 for identification,
21         as of this date.)
22    BY MR. SOLOMON:
23    Q    So for the record, we've marked
24    as Sater 15, a Chase statement for RPM
25    USA, LLC, and it's for the period August
```

Page 263

```
 1              Sater
 2    31 to September 30, 2013.
 3    A    Okay.
 4    Q    And there is no question.  I
 5    just want you to, you know, take a look at
 6    the statement.
 7    A    Yeah.  Okay.
 8    Q    And I'm asking you whether --
 9    having looked at this statement and
10    looking at these transactions, whether it
11    refreshes your recollection as to what the
12    purpose was for these ATM withdrawals at
13    the -- in September of 2013 from this
14    account?
15    A    No, sir, it does not refresh my
16    recollection.
17    Q    You can set that document aside.
18         Now, you had -- you were talking
19    about an office you maintained in Port
20    Washington and you said you gave it up.
21    A    I had a few offices in Port
22    Washington.
23    Q    Did you have one at 130 Shore
24    Road?
25    A    No, sir.
```

Page 264

```
 1              Sater
 2    Q    What were the addresses of your
 3    offices?
 4    A    I forgot the address.  One was
 5    on Manorhaven, I believe it was Manorhaven
 6    Boulevard.  And the other one was on Haven
 7    Avenue in -- right off of Main Street.
 8    Q    Do you know who maintained an
 9    address in your universe at 130 Shore
10    Road?
11    A    That is a mailing service.
12    There is probably 400 boxes there.
13    Q    Okay.
14         So it is like a --
15    A    UPS.  Not a -- Mail Boxes Etc.
16    style, yeah.  I just use it for mailing so
17    the mailbox doesn't get clogged up.  And I
18    have used it for many, many years.
19    Q    So that is an address you use,
20    but it is not an office?
21    A    Yes, it's an address I use for
22    mail, shipping and receiving, but not as
23    an office.
24    Q    Now, do you recall in June of
25    2013 wiring $30,000 from RPM USA's account
```

Page 265

```
 1              Sater
 2    to Moses & Singer?
 3    A    No, I do not.
 4    Q    So as you sit here today, you do
 5    not have any knowledge as to why that wire
 6    took place?
 7         MR. WOLF:  Objection again.
 8         Wait, if I'm saying something, don't
 9         answer.  I'm objecting.  No
10         foundation.
11         You're speaking as if something
12         happened that he can confirm happened
13         and you're incorporating into his
14         answer.  He hasn't said that he knows
15         a wire transfer occurred or can verify
16         it.  So if you want to rephrase your
17         question, rephrase it.
18         MR. SOLOMON:  Absolutely.  I
19         appreciate the objection.  Thank you.
20         MR. WOLF:  It wasn't designed
21         for your appreciation.
22         MR. SOLOMON:  I take your
23         objection to heart.  And I am going to
24         correct question so that it does not
25         cause --
```

MAGNA
LEGAL SERVICES

1          Sater
2          MR. WOLF:  Do you want accurate
3    answers or not?
4          MR. SOLOMON:  I want this to be
5    a correct answer so I'm taking your
6    objection.
7          MR. WOLF:  Thank you.
8    BY MR. SOLOMON:
9     Q    Let's mark as Sater 16.  This is
10   a Chase account statement from June 1 to
11   June 26, 2013.
12         (Whereupon, Statement from Chase
13         Bank, for June 1, 2013 through June
14         28, 2013, was marked as Sater Exhibit
15         16 for identification, as of this
16         date.)
17   BY MR. SOLOMON:
18    Q    Again, I have the same
19   limitation.  I do apologize.
20    A    Okay.
21    Q    All right.
22         Now, if you look on June 3,
23   which is the second page of Sater 16, you
24   see there is a $30,000 wire?
25    A    Yes.

1          Sater
2     Q    Excuse me.  I'm looking at the
3    wrong thing here.
4          MR. SOLOMON:  Withdrawn.
5     Q    Oh, there we go.  On 6-20.
6          Great objection.  Great
7    objection.
8          On 6-20, there was a $20,000
9    wire -- $20,000 wire to Moses & Singer.
10         Do you see that?
11    A    Oh, now -- I still don't know
12   what it was for.
13    Q    That doesn't refresh your
14   recollection?
15    A    No.
16    Q    And you don't know what the
17   business purpose was for that?
18    A    No, sir, I don't remember.
19    Q    Now, you see also there is
20   $100,000 wire on 6-17 and it is "AETRS
21   Cardmember Depository."
22         Do you see that, second line on
23   RPM 5717?
24    A    I'm sorry.
25         On what date?

1          Sater
2     Q    On 6-17.
3     A    I'm sorry, 6-17.
4     Q    It says, "Online Wire Transfer
5    A/C AETRS card member."  Do you see that?
6          Do you see where I'm looking at?
7     A    I see what you're talking about.
8    Now, I do.
9     Q    And that's a $100,000 wire,
10   right?
11    A    Yes, sir.
12    Q    And that's American Express, you
13   recognize that, right, AETRS?
14    A    Oh, no, but if you say so.
15    Q    All right.
16         Well, you see Felix Sater on the
17   next line?
18    A    Yes, sir.
19    Q    And then you see there's a
20   number on there?
21    A    That is my account number, yes.
22   That is American Express.
23    Q    So on June 17, 2013, you wired
24   $100,000 from RPM USA's account to your
25   American Express account?

1          Sater
2     A    Yes, sir.
3     Q    What was the reason for that
4    wire?
5     A    I'm certain to pay the American
6    Express bill.
7     Q    What charges were on that
8    American Express bill?
9     A    Sir, I couldn't possibly
10   remember what charges were on my August
11   2013 American Express bill.
12    Q    What is Maven Technologies?
13    A    I don't remember.
14    Q    Is that a business that was
15   involved with Iliyas Khrapunov?
16         MR. BOYLE:  Objection.
17    A    I don't know.  Hold on.
18         Yes, Maven Technologies was a
19   company that Iliyas Khrapunov and his
20   sister Elvira wanted to invest in.  It was
21   a medical company ran by a gentleman -- by
22   a doctor named William Rasmussen.  I have
23   his contact info.
24    Q    Okay.
25    A    And I looked it up, that's where

MAGNA
LEGAL SERVICES

Page 270

1              Sater
2  I realized what Maven was.
3       Q    Thank you.  Now, another
4  question.
5            Do you recall in August of 2013
6  wiring $353,500 to Moses & Singer?
7            MR. BOYLE:  Objection.
8       A    No, I do not.
9       Q    Let me see if this refreshes
10  your my recollection.  This will be marked
11  as Sater Exhibit 17.
12           (Whereupon, Statement from Chase
13      Bank, for August 1, 2013 through
14      August 30, 2013, was marked as Sater
15      Exhibit 17 for identification, as of
16      this date.)
17           MR. SOLOMON:  I have to withdraw
18      that question.
19  BY MR. SOLOMON:
20       Q    That is a deposit.
21           Do you recall receiving a
22  deposit from Moses & Singer in the amount
23  of 353,500 into the RPM USA account on
24  August 1, 2013?
25           MR. BOYLE:  Objection.

Page 271

1              Sater
2       A    No, sir, I do not.
3       Q    And looking at this doesn't
4  refresh your recollection?
5       A    No, sir, it does not.
6       Q    Now, if you look down from that
7  wire, on August 23, there is also a
8  deposit of $50,000 from Ultra Escrow,
9  Incorporated, Tustin, California.
10           Do you know what that's all
11  about?
12       A    No, sir, I do not remember.
13       Q    Okay.
14           Now, you see there are also on
15  this statement, which has been marked as
16  Sater 17, ATM withdrawals mostly in the
17  amount of $1,003.
18           Do you recall making those ATM
19  withdrawals from the RPM account?
20       A    I don't remember making them
21  but -- no, I don't.  I'm sure I did, I
22  just don't remember making them.
23       Q    What Kombi Corporation,
24  K-O-M-B-I?
25       A    Kombi is a technology

Page 272

1              Sater
2  development company in Seattle area,
3  Washington, that does various sort of apps
4  and things of that nature.
5       Q    Was that also an investment that
6  Iliyas Khrapunov was involved in or his
7  sister?
8       A    I think we were trying to do
9  something with them.  I don't even
10  remember the details of that.
11           Oh, no, no, no, no, no, no.
12  Kombi, we were thinking about as an
13  investment, but actually Kombi was
14  providing some sort of services for World
15  Health Networks.
16       Q    Okay.  Thank you.
17           MR. WOLF:  Can we take a quick
18  two-minute break?
19           MR. SOLOMON:  Sure.
20           THE VIDEOGRAPHER:  The time is
21  3:48 p.m., and we're going off the
22  record.
23           (Thereupon, a recess was taken,
24  and then the proceedings continued as
25  follows:)

Page 273

1              Sater
2           THE VIDEOGRAPHER:  This is the
3  start of media labeled six.  The time
4  is 3:57 p.m.  We are back on the
5  record.
6  BY MR. SOLOMON:
7       Q    Mr. Sater, were you a manager of
8  Tri-County Mall Investors, LLC?
9       A    I'm sorry.  I don't remember.  I
10  don't remember what my position within
11  the -- how it was characterized.
12       Q    Did you open an account at Chase
13  for Tri-County Mall Investors, LLC?
14       A    I probably did.
15       Q    Do you recall whether you had
16  authority over the bank account for
17  Tri-County Mall Investors, LLC, in the
18  middle of 2013?
19       A    I probably did, but I don't
20  remember.
21       Q    Do you recall initiating a wire
22  transfer from Tri-County Mall Investors,
23  LLC's Chase account in the amount of
24  $866,350 to Bayrock Group, Inc., at their
25  account at Wells Fargo in Great Neck?



Page 274

```
1              Sater
2     A    I don't remember, but it sounds
3  about right.
4     Q    Normally, I would ask a
5  follow-up question, but I do not feel like
6  getting objected to.  So I'm going to mark
7  this document.
8     A    I thought you guys live for this
9  shit.
10         (Whereupon, Chase Bank Wire
11     Transfer Outgoing Request, was marked
12     as Sater Exhibit 18 for
13     identification, as of this date.)
14  BY MR. SOLOMON:
15     Q    Wire transfer, outgoing request,
16  BTA0158735, and it is Sater 18.
17         All right.  Just have a quick
18  look at that.
19         Mr. Sater, do you recognize this
20  transaction?
21     A    No, I don't.
22     Q    And does it refresh your
23  recollection in any way that you initiated
24  this transaction on September 24, 2013,
25  transferring $866,350 to Bayrock Group?
```

Page 275

```
1              Sater
2         Is that correct?
3     MR. WOLF:  Objection to the form
4  of the question.  You're incorporating
5  in your question when you're saying,
6  "Does it refresh your recollection
7  that 'you' initiated."  You don't have
8  any foundation.  You didn't show him
9  any banks statement that showed a
10  transaction occurred.  To which he
11  said, "I don't have a recollection."
12         And if you want to break that up
13  and ask him, you know, has he
14  initiated the transaction that he
15  doesn't recall?  Then at least there
16  will be a basis of did he or did he
17  not initiate anything.  But that's
18  what your question says.
19         I'm not trying to be overly
20  difficult, but you're sneaking in, you
21  know, "you did this" after he just
22  said "I don't recall."
23     Q    All right.
24         Do you see at the top of this
25  Sater 18, the sender's name is Felix
```

Page 276

```
1              Sater
2  Sater?
3     A    Yes, I do.
4     Q    And you have no reason to
5  believe that this is not a genuine
6  document from Chase.
7         Correct?
8     A    No, I have no reason to believe
9  it is not genuine.
10     Q    And you have no reason to
11  dispute the information that's provided on
12  this document.
13         Correct?
14     A    No, I do not.
15     Q    But you can't explain what this
16  wire is all about?
17     A    I don't remember what this wire
18  is about.
19     Q    Now -- you can set that document
20  aside, sir.
21         Do you remember a transaction
22  called Swansea Mall?
23     A    Yes.
24     Q    What was that transaction?
25     A    We were going to, with Iliyas,
```

Page 277

```
1              Sater
2  purchase a second mall called Swansea
3  Mall.
4     Q    And did that transaction ever go
5  through?
6     A    No.
7     Q    What happened?
8     A    In the middle of the
9  transaction, Iliyas tried to fuck me and
10  it blew up all our business, including
11  Swansea Mall.
12     Q    So the Tri-County dispute was
13  what caused the transaction to fall apart
14  because you were done at that point?
15     A    Yes.
16     Q    Who is Roy Justice?
17     A    I mean, it rings a bell, but I
18  don't remember.
19     Q    All right.
20         Do you recall initiating a wire
21  transfer on September 18, 2013, from
22  Tri-County's account at Chase to the law
23  firm of Beys Stein Mobargha & Berland,
24  with a text to recipient "Swansea Mall-Roy
25  Justice"?
```

Page 278

```
1              Sater
2    A    No, I don't remember.
3    Q    Do you recall ever sending any
4  money to Beys Stein Mobargha & Berland
5  from Tri-County's Chase account?
6    A    I've sent dozens of wires to
7  Beys Stein.  I cannot remember from where,
8  on what day, for what.
9    Q    Was Beys Stein involved in the
10 Swansea Mall transaction?
11   A    They may have been doing some
12 legal on it for us.
13   Q    Do you know whether they did a
14 million dollars' worth of legal on it?
15   A    I don't know that it was for
16 legal services, the million dollars.  I
17 may have tried to use them for a deposit.
18 I don't remember.  I'm not suggesting
19 any --
20       MR. WOLF:  You don't have to
21 explain.
22   A    That's all.
23       (Whereupon, Chase Bank Wire
24   Transfer Outgoing Request, was marked
25   as Sater Exhibit 19 for
```

Page 279

```
1              Sater
2    identification, as of this date.)
3  BY MR. SOLOMON:
4    Q    So I'm going to show you what's
5  been marked as Sater 19, and just ask you
6  if whether looking at this document in any
7  way refreshes your recollection about the
8  transaction?
9    A    No, it does not.
10   Q    But you have no reason to doubt
11 the genuineness of this document?
12   A    No.
13       MR. WOLF:  This is another
14   document.
15       THE WITNESS:  Yeah, I know.  It
16   says, "Felix Sater.  From Chase."
17       And this looks familiar.
18 BY MR. SOLOMON:
19   Q    Now, do you recall on or about
20 October 1, 2013, transferring 36 million
21 dollars, and I'm rounding, all right, from
22 Tri-County Mall Investors' account at
23 Chase to an account also in Tri-County's
24 name, but at Capital One in Mattituck, New
25 York?
```

Page 280

```
1              Sater
2    A    I believe, yes, I made that
3  transaction.
4    Q    And you did that because you
5  didn't want the folks who were investing
6  in Tri-County Mall from stopping -- from
7  taking away your control over those funds.
8       Correct?
9       MR. BOYLE:  Objection.
10   A    No, that is not why.
11   Q    Why did you do it?
12   A    Because they were trying to fuck
13 me out of money due to me and I was
14 protecting monies that were owed to me.
15   Q    Okay.
16       But the purpose of the transfer
17 was you wanted to make sure you maintained
18 control over that money.
19       Is that fair?
20       MR. BOYLE:  Objection.
21   A    I answered you.  I answered the
22 way you asked me.
23       The people, being your client,
24 tried to fuck me out of money due to me
25 and was going to do it, and I wanted to
```

Page 281

```
1              Sater
2    make sure that I received my just and due
3    entitlement.  That is the way I'm
4    answering that question, and that is the
5    way I will answer the question in the next
6    27 ways you can ask it.
7    Q    Let me try one more way.
8    A    Give it a shot.
9    Q    How does transferring the money
10 from the Chase account to the Capital One
11 account achieve the objective you just
12 described?
13       MR. BOYLE:  Objection.
14   A    Because they would not know of
15 that account nor could they steal my money
16 out of the combined monies and fuck me for
17 the money that they told me to my face
18 they would fuck me over using the Ablyazov
19 excuse.
20   Q    Okay.
21       Now, do you recall on August 30,
22 2013, which is the day before you
23 transferred to Capital One, initiating a
24 transfer of $2,586,382 from the Tri-County
25 Mall account at Chase to Bayrock's account
```



Page 282

Sater

1          Sater
2   at Wells Fargo in Great Neck?
3       A    No, I do not remember.
4       Q    Well, let's just mark that real
5   quick.  All right.
6       A    Sure.
7       Q    This is Sater Exhibit 20.
8          (Whereupon, Chase Bank Wire
9       Transfer Outgoing Request, was marked
10      as Sater Exhibit 20 for
11      identification, as of this date.)
12  BY MR. SOLOMON:
13      Q    This is the Chase statement that
14  I just described.
15      A    Okay.
16      Q    So, Mr. Sater --
17         MR. WOLF:  Give me a minute.
18      You're not giving me a copy at the
19      same time.  So I just want to take a
20      look.
21         Okay.
22      Q    Mr. Sater, looking at this wire
23  transfer, does it refresh your
24  recollection about this transaction?
25      A    No, it does not.

Page 283

Sater

1          Sater
2       Q    Is it fair to say that in
3   September -- in August of 2013, that you
4   were a partner in Bayrock Group?
5       A    Yes.  Yes.
6       Q    I would like two minutes.  I'm
7   going to look at my notes and then I'm
8   going to conclude.  So thank you.
9       A    No problem.  Take your time.
10      Q    I'm not giving up the mic until
11  I have made that determination.
12      A    All right as well.
13      Q    I do have a couple of questions.
14         When you spoke with the lawyers
15  from Boies Schiller yesterday.
16      A    Yes, sir.
17      Q    Did they rehearse with you
18  questions and answers that they wanted to
19  ask today?
20         MR. WOLF:  Objection.
21         MR. BOYLE:  Objection.
22      A    No.
23      Q    Did they tell you that there
24  were certain areas that they wanted to
25  focus on with you?

Page 284

Sater

1          Sater
2          MR. BOYLE:  Objection.
3       A    No.
4       Q    At any point, has somebody from
5   Boies Schiller asked you to assist in the
6   litigation before yesterday?
7          MR. BOYLE:  Objection.
8       A    No.  No.
9       Q    So, in fact, yesterday was the
10  first time you spoke to the folks from
11  Boies Schiller?
12         MR. BOYLE:  Objection.
13      A    No.
14      Q    When did you speak to them
15  before that?
16      A    I previously had participated
17  in, if I'm not mistaken, one or two
18  meetings on the Chetrit settlement stuff
19  when that was going on back then.  So I
20  participated in a few meetings with Boies
21  Schiller then once or twice.  That was my
22  previous contact -- that would be my first
23  contact with Boies Schiller.
24      Q    And what was the nature of that
25  contact?

Page 285

Sater

1          Sater
2       A    I don't recall, but it was about
3   the settlement or potential settlement
4   going on with Chetrit.
5       Q    Oh, I see, when they were
6   settling with Chetrit?
7       A    Yes.
8       Q    And before that, you had never
9   spoken to them?
10         MR. BOYLE:  Objection.
11      A    To the firm, no.
12      Q    To representatives of the firm,
13  lawyers representing the firm?
14      A    I bumped into David Boies a
15  couple of times, but never on this case.
16      Q    Okay.  Thank you very much.
17      A    That's it?
18         Dude, come on.
19      Q    We're cheap and I work
20  efficient.
21         MR. BOYLE:  Let's go off the
22  record.
23         THE VIDEOGRAPHER:  The time is
24  4:10 p.m., and we're going off the
25  record.

MAGNA
LEGAL SERVICES