**Solomon & Cramer LLP**
1441 Broadway, Suite 6026
New York, New York 10018
(t) 212-884-9102
(f) 516-368-3896
----------
Andrew T. Solomon
Jennifer G. Cramer

October 17, 2018

**Via ECF**

Hon. Katharine H. Parker, U.S.M.J.
United States District Court
  Southern District of New York
Daniel Patrick Moynihan
United States Courthouse
500 Pearl St., Courtroom 17D
New York, NY 10007-1312

Re:   *City of Almaty v Ablyazov,* 1:15-CV-5345 (AJN) (KHP)

Dear Judge Parker:

This firm represents defendants Viktor Kharpunovs and Ilyas Khrapunov.  We write in response to the Kazakh Entities letter to the Court dated October 9, 2018 ("BSF Ltr.") and pursuant to the Court's order of October 12, 2018 (Dkt. 868).

Despite a string of recent defeats both here and in two federal courts in California,[1] and until this case is finally dismissed, the Kazakh Entities are free to portray this "politically motivated witch hunt" (Plaintiffs' words) as a genuine claim for damages.  But they must play by U.S. rules—one of which is the prohibition against paying off fact witnesses.

The Kazakh Entities believe that they can escape the consequences of their conduct, at least in this forum, by asserting that the criminal statute cited by the Khrapunovs, 18 U.S.C. § 201(c)(2), does not contain a "private right of action."  BSF Ltr. p. 8.  Not so.  The statute codifies long-standing common law rules that must be obeyed in the civil context, *Hamilton v. Gen. Motors Corp.*, 490 F.2d 223, 228 (7th Cir. 1973) (quoting 14 Williston on Contracts § 1716 (3d ed. 1972)), and it is the policy of New York.  *In re Robinson*, 151 A.D. 589, 136 N.Y.S. 548 (App. Div. 1912); *Caldwell v. Cablevision Sys. Corp.*, 20 N.Y.3d 365, 371, 960 N.Y.S.2d 711, 714

---

[1] *City of Almaty v. Khrapunov*, No. CV 14-3650 FMO (CWx), 2018 U.S. Dist. LEXIS 168271 (C.D. Cal. Sep. 27, 2018); *City of Almaty v. Ablyazov*, No. 15-CV-5345 (AJN), 2018 U.S. Dist. LEXIS 124609 (S.D.N.Y. July 25, 2018); *Republic of Kazakhstan v. Ketebaev*, No. 17-CV-00246-LHK, 2018 U.S. Dist. LEXIS 97031 (N.D. Cal. June 8, 2018).

(2013) ("What is not permitted and, in fact, is against public policy, is any agreement to pay a fact witness in exchange for favorable testimony, where such payment is contingent upon the success of a party to the litigation").

To justify their illegal payments, the Kazakh Entities argue that they are allowed to "reimburse or indemnify a witness for expenses incurred as a consequence of their cooperation," BSF Ltr. at 3, and that 18 U.S.C. § 201 permits a witness "to be reimbursed for their reasonable time and expenses," *id.* at 8. These points are of no moment. The Kazakh Entities did not merely reimburse witnesses for time and expenses; they offered material fact witnesses bounties based on the success of their litigation efforts and made payments far in excess of reimbursements, indemnities, or fees for time. From July 2015 to February 2018, the Kazakh Entities ████████████████████████████████████████████████████████████████
████████████████████████████

The Kazakh Entities attempt to hide their illegal arrangements and payments under the cloak of "work product" also fails With rare exceptions, none of which has been shown here, neither retainer agreements with attorneys and consultants nor payments to attorneys and consultants constitute work product. *Chevron Corp. v. Salazar*, 11 Civ. 3718 (LAK) (JCF), 2011 U.S. Dist. LEXIS 92628, at *4 (S.D.N.Y. Aug. 16, 2011) ("Retainer agreements, fee records, and arrangements for financing litigation are not in themselves privileged or subject to the work product doctrine") (*citing Lefcourt v. United States*, 125 F.3d 79, 86 (2d Cir. 1997); *S.E.C. v. Sassano*, 274 F.R.D. 495, 497 (S.D.N.Y. 2011); *Solidda Grp., S.A. v. Sharp Elecs. Corp.*, No. 12-24469-CIV-DIMITROULEAS/S, 2013 U.S. Dist. LEXIS 200188, at *13-14 (S.D. Fla. Mar. 18, 2013) (consulting agreements are not work product) (citing *United States v. Hecker*, 2010 U.S. Dist. LEXIS 111329 at *2 (D. Minn. 2010); *J.P. Morgan Chase Bank v. PT Indah Kiat Pulp and Paper Corp.*, 2011 U.S. Dist. LEXIS 147176 at *11-12 (N.D. Ill. 2011)).

At bottom, the Kazakh Entities cannot (and do not) dispute that an inquiry into their financial arrangements with material fact witnesses is relevant to bias. Thus, the only real question is remedy and the need to balance and apply "just" and "speedy," as required under Rule 1 of the Federal Rules of Civil Procedure. Here, the Khrapunovs have made clear that they need additional discovery. But they do not want to prolong discovery any further than is absolutely necessary. Thus, the Khrapunovs are willing to pare down their requests to obtain information sufficient to (A) determine the true nature of the ████████████████████████; (B) determine the extent to which the Kazakh Entities improperly obtained information from Sater in violation of Sater's legal duties of confidentiality[2]; and (C) determine whether the claims of

---

[2] That ████████████████████████████████████████████████████████████ is far from dispositive, as the Kazakh Entities suggest (BSF Ltr. 9). We do not take the denial at face value and, more importantly, it dodges the real issue of when the Kazakh Entities first received the agreements containing those provisions.


Hon. Katharine H. Parker
October 17, 2018
Page 3

privilege/work product are genuine.  The Kazakh Entities actually admit that Sater should not have been talking to them and, in an effort to rewrite history, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  (Of course, they conveniently made this demand only *after* they used him for everything he was worth in this litigation).

Here is the narrowed wish list:

1) All documents and communications between Monstrey/Sater[3] and the Kazakh Entities concerning fees, expenses, and payments. This includes demands, invoices, backup documentation, and the records showing the transmission of money that we know about and that which has not been disclosed.

2) All documents showing the date when the Kazakh Entities acquired knowledge of Sater's confidentiality duties under (i) ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and (ii) the February 8, 2012 Consultant Agreement between Sater and Swiss Promotion Group.

3) For each meeting between the Kazakh Entities and Sater, the subject matter and date of the meeting, the place, and the attendees.

4) For each meeting between the Kazakh Entities and Monstrey, the subject matter and date of the meeting, the place, and the attendees.

5) As to Sater's communications, the Kazakh Entities must provide (a) a description of the subjects that he disclosed, with sufficient particularity to enable evaluation of the extent to which the Kazakh Entities received information in violation of Sater's contractual obligations, and (b) the documents that he provided to them.

In responding to these requests, the Kazakh Entities must answer for themselves and for persons acting on their behalf, including counsel, consultants, and investigators.  Of course, depending on what we learn, the Khrapunovs reserve their right to seek an evidentiary hearing to ascertain the scope of Sater's breaches and the extent of the Kazakh Entities' knowledge and collusion (ECF 453 at pp. 3-4) and, if warranted, to pursue sanctions, *see, e.g., City of Almaty v. Ablyazov,* No. 1:15-cv-05345 (AJN) (KHP), 2018 U.S. Dist. LEXIS 35920 (S.D.N.Y. Mar. 5, 2018).

The Court should reject the Kazakh Entities' argument that the demands come too late.  *First*, although fact discovery is closed generally, it is ongoing as to Sater and Monstrey, whose depositions are still open.  *Second*, the Kazakh Entities have a continuing obligation to update prior discovery responses.  *Third*, the Khrapunovs would have pursued this discovery had the Kazakh Entities made complete disclosures regarding Sater and Monstrey in response to their

---

[3] The identification of a person includes the person and any person or entity acting on the person's behalf including entities and counsel.

Hon. Katharine H. Parker
October 17, 2018
Page 4

First Interrogatories (*See* Ex. A at ¶¶ 1-2, 4-5; Ex. B, BTA/Almaty's October 6, 2016 response). As set forth in the Khrapunovs' moving papers, the Kazakh Entities first revealed Monstrey (after hiding him for a year[4]) on May 24, 2018 and we did not get any inkling of the Kazakh Entities' dealings with him until just days before his July 17, 2018 deposition.[5] We did not learn of Sater's cooperation with the Kazakh Entities until his deposition in September 2018. *Fourth,* justice and fairness demand a further inquiry due to the importance of the issues under review.

It is interesting to imagine BSF's reaction were the shoe on the other foot. What if the Khrapunovs had hired former Almaty officials or BTA bank employees who were likely fact witnesses in the case as "consultants," paid them millions of dollars, and offered them bonuses based on the outcome of this case. The Kazakh Entities would be howling, just as they did when they accused the Khrapunovs of violating the protective order. But when it is their own misconduct, the Kazakh Entities blithely shrug off potential criminal and civil violations and urge this Court to apply a double standard.

Respectfully yours,

/s/Andrew T. Solomon

Andrew T. Solomon
asolomon@solomoncramer.com
(m) (917) 664-557

---

[4] In our moving letter, we recounted the false representations made by the Kazakh Entities to the Court regarding the timing of their knowledge of Monstrey's supposed role in this case. The recitation of the facts is undisputed.

[5] As of this writing, we still do not have a date for the continuation of Monstrey's deposition testimony.