UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X

CITY OF ALMATY, KAZAHKSTAN, and
BTA BANK JSC,

                                    Plaintiffs,

                    -against-

MUKHTAR ABLYAZOV, ILYAS KHRAPUNOV,
VIKTOR KHRAPUNOV and TRIADOU SPV S.A.,

                                    Defendants.

----------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12-3-2018

**ORDER**

**15-CV-05345 (AJN) (KHP)**

**KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

        The parties in this long-running and dramatic case are nearly done with discovery.  Fact

discovery was set to conclude on October 31, 2018.  (Doc. No. 649.)  However, a dispute arose

concerning the depositions of two witnesses, Felix Sater and Frank Monstrey, and certain

documents not yet produced, including those related to a company owned by Sater called Litco

LLC ("Litco"), that Defendants believe are pertinent to Sater's credibility.  Sater's ownership of

Litco was first revealed on day one of Sater's deposition.  As a result, the parties adjourned

Sater's deposition and put off the deposition of Monstrey.  Unable to resolve their dispute

through the meet-and-confer process, this Court set a briefing schedule for Defendants'

motions to compel production of documents.  (Doc. No. 832.)  In their typical exuberance, the

parties submitted far more briefing than originally authorized by this Court.  The Court has

reviewed all of the submissions in reaching its decision herein but directs the parties to refrain

from filing additional letters and briefs beyond that ordered by this Court in the future.

1

On September 20, 2018, Defendants Viktor and Ilyas Khrapunov (the "Khrapunovs") submitted their motion to compel. (Doc. No. 837.[1]) They seek broad discovery from Plaintiffs concerning Monstrey, Sater and a third fact witness (Nicolas Bourg), all of whom have entered into cooperation and/or settlement agreements with Plaintiffs the City of Almaty, Kazakhstan ("Almaty") and BTA Bank JSC ("BTA Bank") (together, the "Kazakh Entities" or "Plaintiffs"). The Khrapunovs request production of all agreements and financial/business transactions between Plaintiffs, on the one hand, and Sater, Monstrey and Bourg (or their related entities and proxies), on the other hand (including the "Litco Agreement" between Litco and Plaintiffs). They also request communications concerning any such agreements, witness interview materials and any statements made by the three witnesses, communications between Plaintiffs' counsel and counsel for the three witnesses, communications concerning the settlement of disputes between Plaintiffs and the three witnesses, documents reflecting the scheduling of meetings, interviews and depositions relating to the three witnesses, and invoices and other documents reflecting payments made by Plaintiffs or their agents to the three witnesses (and their related entities and proxies).

On September 21, 2018, Defendant Triadou SPV S.A. ("Triadou") submitted its motion to compel the production of documents related to Litco, of which Defendants recently learned Sater is the sole owner and beneficiary. (Doc. No. 834.[2]) Triadou seeks copies of the Litco Agreement and any other agreements between Litco and Plaintiffs, communications between Litco and Plaintiffs, and documents reflecting transactions or payments made by Plaintiffs to

---

[1] Referred to herein as the "Khrapunov Letter."
[2] Referred to herein as the "Triadou Letter."

Litco or Sater or their shared attorney, Robert Wolf of Moses & Singer LLP.  Triadou also seeks sanctions against Plaintiffs in the form of attorneys' fees and costs associated with the need to conduct a continued day of Sater's deposition due to Plaintiffs' failure to disclose the Litco Agreement in fact discovery.

Plaintiffs filed a letter with the Court on October 3, 2018 suggesting that the key document sought by Defendants was the Litco Agreement and records of payments from Plaintiffs to Litco or its counsel.  (Doc. No. 856[3].)  Because Plaintiffs believe the Litco Agreement is protected under the work product doctrine, they offered a compromise which they contend moots the motions to compel:  to produce the Litco Agreement subject to an appropriate order under Federal Rule of Evidence 502 ("Rule 502") so that it can be used by Defendants in this litigation but not used by any person or entity outside of this litigation.  Plaintiffs also produced a spreadsheet listing dozens of payments totaling more than $2.5 million to Litco and that identifies BTA Bank as the payor.  (Triadou Reply,Ex. 1.)

On October 9, 2018, the Khrapunovs and Triadou filed letters objecting to the proposed compromise on the grounds that the Litco Agreement is not privileged, that a Rule 502 order is inappropriate, and that other information besides the Litco Agreement was needed.  (Doc. Nos. 857, 858.)  Later that same day, Plaintiffs filed a more substantive letter objecting to the motions to compel and attaching various exhibits.  (Doc. No. 861.[4])

On October 10, 2018, Triadou and the Khrapunovs filed letters requesting that the Court strike Plaintiffs' Opposition Letter because it was filed a week late and without authorization

---

[3] Referred to herein as "Plaintiffs' Compromise Letter."
[4] Referred to herein as "Plaintiffs' Opposition Letter."

from the Court.  The letters also included substantive replies in support of their motions to

compel.  (Doc. Nos. 863, 864.[5])  That same day, Plaintiffs filed another letter responding to the

Khrapunov and Triadou Reply.  (Doc. No. 866.)  Then, on October 17 and 19, 2018, the

Khrapunovs and Triadou, respectively, filed supplemental replies in support of their motions to

compel.  (Doc. Nos. 870, 874.[6])  On October 22, 2018, Plaintiffs filed a letter to "clarify" the

issues in dispute.  (Doc. No. 878.)

On November 14, 2018, the parties appeared for a case management conference and

provided the Court with additional argument concerning the motions to compel.  At the

conference, this Court stated that because all parties had fully responded to each other, the

Court would deny Defendants' respective motions to strike Plaintiffs' Opposition Letter and rule

on the merits of the motions to compel.  However, the Court directs the parties to comply with

the briefing schedules and limitations set by this Court going forward.[7]

For the reasons discussed below, Defendants' motions to compel are GRANTED in part

and DENIED in part.  Plaintiffs' request for a Rule 502 order is DENIED.

## BACKGROUND

The Court assumes the reader's knowledge of this case from the many opinions issued

in this matter and sets forth only those facts relevant to the present motions.  The Kazakh

Entities contend that Defendants Viktor Khrapunov and Mukhtar Ablyazov, the former mayor of

---

[5] Referred to herein as the "Khrapunov Reply," the "Triadou Reply," and, collectively, the "Khrapunov and Triadou Reply."
[6] Referred to herein as the "Khrapunov Sur-Reply," the "Triadou Sur-Reply," and, collectively, the "Khrapunov and Triadou Sur-Reply."
[7] In deciding the present motions, the Court has also considered the arguments made by the parties in the most recent filings on November 18 and November 20, 2018 (Doc. Nos. 887, 888, and 890), though these filings were not authorized by the Court.

Almaty and Chairman of BTA Bank, respectively, embezzled billions of dollars and laundered the stolen funds through various sham entities and transactions. Some of the stolen money allegedly made its way to Triadou and was used for investments in real estate in New York and elsewhere. Former Defendants CF 135 Flat LLC, CF 135 West Member LLC, and the Chetrit Group LLC (the "Chetrit Entities") were involved in two real estate investments at issue in this case, the Flatotel and Cabrini Medical Center condominium conversions.[8] Ilyas Khrapunov, the son of Viktor Khrapunov and son-in-law of Ablyazov, is alleged to have managed the money laundering operation by setting up and managing various companies, including Triadou and its parent entity SDG Capital S.A. ("SDG"), through which the stolen money flowed. Defendants deny the allegations and contend that the funding for Triadou's real estate investments came from the Petelin family, who are related to the Khrapunovs by marriage, and not from any stolen funds.

The Kazakh Entities have filed lawsuits against Defendants in several jurisdictions around the world, including a California federal court and a court in the United Kingdom ("UK"), in an effort to recover the stolen funds. They also retained an entity called Arcanum "to develop evidence and intelligence about [Defendants] Mukhtar Ablyazov, Viktor Khrapunov, their associates, and the disposition of money they [allegedly] stole." (Doc. No. 333.) The Kazakh Entities previously represented to this Court that they have no direct communication with Arcanum and all communications are between their counsel and Arcanum. (*Id*.) They also admit they have entered into multiple cooperation agreements with fact witnesses in this

---

[8] A settlement was reached through which the Chetrit Entities gave up an equity interest in the Flatotel and agreed to cooperate with Plaintiffs in their efforts to recover the stolen funds. https://on.wsj.com/2QxtF2r. Plaintiffs produced the settlement agreement with Chetrit to Defendants in discovery. (Plaintiffs' Opposition Letter.)

matter, including Monstrey, Bourg and the Chetrit Entities, who have agreed to assist in Plaintiff's recovery of their stolen assets. (Plaintiffs' Opposition Letter.) Some of these agreements were negotiated through Arcanum. Plaintiffs have produced to Defendants the agreements with the Chetrit Entities, Bourg, Bourg's business associate Laurent Foucher, and Monstrey. (Plaintiffs' Opposition Letter, Exs. 2, 3, 4, 7.) They also have permitted Defendants to ask the witnesses in their depositions about the agreements and any payments made or due to them in connection with their cooperation. (*Id*.) Plaintiffs also admit that they entered into a confidential assistance agreement with Litco (the "Litco Agreement") in June 2015. (*Id*.) Plaintiffs have objected to producing that agreement on the ground that it is allegedly protected by the work product doctrine. However, as noted above, Plaintiffs did produce to Defendants a spreadsheet listing payments made by BTA Bank to Litco (and received by Sater).

### 1. The Bourg and Foucher Agreements

Bourg is a former director of Triadou and now one of the Plaintiffs' key witnesses. In their 2015 agreement with Bourg, the Kazakh Entities released Bourg from claims against him for his role in stealing and/or laundering their money in exchange for his cooperation in providing information relevant to this litigation and Plaintiffs' broader asset recovery efforts. Bourg agreed to maintain the confidentiality of the agreement. (Plaintiffs' Opposition Letter, Ex. 2.) Plaintiffs entered into a similar release with Foucher, as well as a "Settlement Deed" with both Bourg and Foucher, in 2016 and 2017, respectively. (Plaintiffs' Opposition Letter. Exs. 2, 3, 4.) Bourg and Foucher testified that they agreed to give up their majority interest in certain companies they controlled and to give BTA Bank that portion of their assets traceable to

stolen funds to settle Plaintiffs' claims against them.  (Khrapunov Letter and Reply; Triadou Reply and Sur-Reply.)

### 2. The Monstrey Agreement

Monstrey is the former CEO of Nostrum Oil & Gas PLC ("Nostrum") and has been identified by Plaintiffs as a key witness who can link the money used by Triadou to invest in New York real estate to the money allegedly stolen by Defendant Ablyazov from BTA Bank. (*See* Doc. No. 773 for background.)  According to Plaintiffs, Monstrey helped Defendants misappropriate hundreds of millions of funds through backdated agreements.  (*Id*.)  In the first half of 2017, Plaintiffs entered into a settlement agreement with Monstrey that provided for Monstrey's cooperation in Plaintiffs' asset recovery efforts and reimbursement of costs associated with his cooperation, including legal costs, travel expenses and personal security expenses.  (Khrapunov Letter.)  Monstrey agreed to give up to BTA Bank his equity interest in Nostrum (valued at $146 million) as part of the agreement.  (*Id.*, Ex. 4.)  BTA Bank agreed to indemnify Monstrey with respect to certain encumbrances on the equity, loans and personal guarantees Monstrey had tied to his Nostrum shares.  (*Id.)*

### 3. The Litco Agreement

On June 12, 2015, Plaintiffs, through Arcanum, entered into a "Confidential Assistance Agreement" with Litco.  (Plaintiffs' Opposition Letter, Ex. 9.)  Robert Wolf negotiated the Litco Agreement on behalf of Litco.  Under the Litco Agreement, Litco agrees to provide "information, assistance and cooperation to Arcanum in its investigative efforts to locate and recover assets directly or indirectly related to" the Khrapunovs, Ablyazov and persons and entities affiliated with them.  *(Id.* ¶ 1.)  The Litco Agreement describes Arcanum as an agent of

Plaintiffs.  It provides for a monthly fee to Litco of $100,000 for the greater of 12 calendar months or the duration of the assistance, as well as 16% of all amounts recovered on behalf of Plaintiffs, Kazakhstan and its governmental entities regardless of whether Plaintiffs or various Kazakhstan governmental authorities had previous knowledge of the information provided by Litco (except those amounts recovered wholly independent of assistance or information provided by Litco).  (*Id.* ¶ 2.)  The Litco Agreement also provides for reimbursement of travel, lodging, and meals.  (*Id.* ¶ 4.)  It states that "[n]o potential witness which Litco identifies and produces to Arcanum. . . shall have any ownership interest in Litco" or in the payments made to Litco under the agreement.  (*Id.* ¶ 6(e).)

Under the Litco Agreement, Plaintiffs and the Kazakhstan governmental authorities release Litco and its present and future officers, directors, shareholders, attorneys and others (the "Releasees") from all claims, known and unknown, or which may develop in the future, for any acts or omission related to or arising from the agreement, and for "Releasees' previous, current or future contractual obligations and any other matter between the parties."  (*Id.* ¶ 10.)  The Litco Agreement also contains a "No Admission of Liability" clause in which the parties acknowledge that no information, assistance, cooperation, collaboration or support provided by Litco and related persons, and the agreement itself, do not and will not constitute an admission that Litco and related persons have engaged in any wrongful or unlawful activity.  (*Id.* ¶ 16.)  The release provision survives termination of the agreement, as do the payment provisions.  (*Id.* ¶ 12.) The Litco Agreement contains a confidentiality provision.  (*Id.* ¶ 11.)  It is signed by Kalsom Kam, a purported Director of Litco.  (*Id.*)  Sater's name appears nowhere on the face of the Litco Agreement.

### 4. Discovery of Sater's Involvement in Litco

Sater, who Plaintiffs identified as a key witnesses for their case, is a former business partner of Triadou who was involved in some of the real estate transactions at issue in this case, including Triadou's investment in the Tri-County Mall. (Khrapunov Letter, Ex. 2.) Sater's relationship with Triadou ended in a dispute as to the amount Sater was due from the Tri-County Mall deal. (*Id.*) Ultimately, Triadou and Sater settled, ███████████████████████ ███████████████████████████

Based on an email produced by another non-party witness named ███████, Triadou learned that Sater was associated with Litco. (Triadou Letter, Ex. 4; Doc. Nos. 578, 798.) The email is an exchange between ███████████ dated September 29-30, 2016. The email exchange suggests that various fact witnesses, ████████████████, were all working as a "team" with Arcanum on behalf of Plaintiffs so that "the full financial entitlements of the asset recovery efforts can be achieved by all." (Triadou Letter, Ex. 4.) ███████████ ████████████████████████████████████████ ████████████████████████████████████████ ███████████████

In the first day of his deposition, Sater testified that he was the sole owner or member of Litco and the sole beneficiary of the payments made by Plaintiffs to Litco. (Triadou Letter, Ex. 5.) Sater admitted that he had received at least one million dollars under the agreement for assistance provided solely in this case (and not the global recovery efforts). *(Id*.) Sater testified that he met with Plaintiffs' counsel for four hours in advance of his deposition and three to five

more times in the past several years to discuss facts relevant to this case as a representative of Litco. (*Id.*)

Plaintiffs state they have no agreement with Sater personally. (Plaintiffs' Opposition Letter.) Plaintiffs state they and their counsel in this action did not know that Sater was Litco's sole member or the beneficiary of funds paid to Litco until Sater's deposition. (*Id.*) After Sater's revelation of his interest in Litco at his deposition, Plaintiffs terminated the agreement with Litco and demanded that Litco repay all sums received pursuant to the agreement. (*Id.*)

## ANALYSIS

The Court first addresses whether the work product doctrine attaches to the Litco Agreement and the propriety of a Rule 502 order as proposed by Plaintiffs. It then addresses production of the broader categories of documents requested by Defendants.

### 1. *Applicability of Work Product Doctrine to Litco Agreement and Related Documents*

### A. *Legal Standard*

Attorney work product is protected from discovery. *Hickman v. Taylor*, 329 U.S. 495, 510-11 (1947). The burden is on the party resisting discovery to establish privilege or work product protection. *United States v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011); *In re Grand Jury Subpoena Dated July 6, 2005*, 510 F.3d 180,183 (2d Cir. 2007).

The work product doctrine "is intended to preserve a zone of privacy in which a lawyer can prepare and develop legal theories and strategy with an eye toward litigation, free from unnecessary intrusion by his adversaries." *United States v. Adlman,* 134 F.3d 1194, 1196 (2d Cir.1998) (citing *Hickman*, 329 U.S. at 510-11). The Second Circuit has made clear that documents prepared in anticipation of litigation are work product, even if they also are

intended to assist with a business decision.  *Id.* at 1204; *Schaeffler v. U.S.*, 806 F.3d 34, 43 (2d Cir. 2015).  In contrast, documents prepared in the ordinary course of business are not protected by the doctrine.  *Schaeffler*, 806 F.3d at 43-44.

The Federal Rules of Civil Procedure codified and expanded the work product doctrine to apply to materials prepared by or for a party or any representative acting on his or her behalf in anticipation of litigation.  *See* Fed. R. Civ. P. 26(b)(3) advisory committee's note to 1970 amendment.  Federal Rule of Civil Procedure 26(b)(3)(A) provides that "[o]rdinarily, a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent)."  Fed. R. Civ. P. 26(b)(3)(A); *see also U.S. v. Nobles*, 422 U.S. 225, 238-39 (1975) (the work product doctrine "is intensely practical" and "grounded in the realities of litigation in our adversary system;" recognizing that attorneys "must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial.").  The doctrine applies to documents containing legal theories, strategies and factual material.  *Adlman*, 134 F.3d at 1197-98.  However, if the party shows that the documents or information in them are relevant and proportional to the needs of the case and that "it has substantial need for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means," the Court may compel disclosure.  Fed. R. Civ. P. 26(b)(3)(A)(i)-(ii).  Nevertheless, even if disclosure is ordered, the Court is required to "protect against disclosure of the mental impressions, conclusions, opinions or legal theories of a party's attorney or other representative concerning the litigation."  Fed. R. Civ. P. 26(b)(3)(B).

In *Newmarkets Partners, LLC v. Sal. Oppenheim Jr. & Cie S.C.A.*, which addressed similar issues to the present case, the Court found that draft engagement letters between a party and an attorney consultant were not protected work product because allowing disclosure of the letters was "wholly consistent" with the rationale of the work product doctrine, which is to protect a party from unnecessary intrusion into its litigation preparation and prevent one party from benefitting from the work performed by its opponent. 258 F.R.D. 95, 103 (S.D.N.Y. 2009). The Court noted that the engagement letters did not contain any legal analysis or other core attorney work product. *Id.* Nevertheless, the Court found that even if the letters were work product, the defendants had demonstrated a substantial need for the documents as they contained certain factual material pertinent to essential elements of the defense and/or material to the issue of standing, and therefore compelled disclosure. *Id.* at 111; *see also In re Grand Jury Subpoena Dated July 6, 2005,* 510 F.3d at 185 ("Where relevant and non-privileged facts remain hidden in an attorney's file and where production of those facts is essential to the preparation of one's case, discovery may properly be had") (quoting *Hickman,* 329 U.S. at 511).

Even when the doctrine applies, work product protection can be waived. A party cannot resist disclosure in reliance of the work product doctrine if it relies on the document in support of a claim or defense. *See Trudeau v. New York State Consumer Protection Bd.*, 237 F.R.D. 325, 340-41 (N.D.N.Y. 2006); *see also In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000); *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991); *Robinson v. Vineyard Vines, LLC*, No. 15-cv-4972 (VB) (JCM), 2016 WL 845283, at *6 (S.D.N.Y. Mar. 4, 2016). For this reason, the Court in *U.S. v. Nobles* held that a party who called his investigator as a witness waived work product protection as to the investigator's report. 422 U.S. at 239-40.

### B. Analysis of Litco Agreement

The Litco Agreement does not contain any mental impressions, conclusions, opinions or legal theories of the Plaintiffs' counsel or other representatives. Thus, it contains no "core" work product. By its express terms, the purpose of the Litco Agreement was to engage Litco "to provide information, assistance and cooperation" to Arcanum in "its investigative and asset recovery efforts." (Plaintiffs' Opposition Letter, Ex. 9 § 1.) It states that Arcanum is "seeking to locate, seize and recover billions of U.S. Dollars in worldwide assets" of Ablyazov and Victor Khrapunov, members of their families, and entities which they own or control. (*Id.* at Recital B.) It has now been revealed that Sater – a key witness of Plaintiffs in this action – is the sole owner or member of Litco and the sole beneficiary of over a million dollars in payments made by Plaintiffs to Litco in connection with assistance in this matter exclusively. (Triadou Letter, Ex. 5.) Moreover, the Litco Agreement provides Litco (and, thereby Sater as the sole owner or member of Litco) with a percent of recovery that Plaintiffs obtain in this action. (Plaintiffs' Opposition Letter, Ex. 9 § 3.) Thus, Defendants have demonstrated the relevance of the Litco Agreement to challenging Slater's credibility. Moreover, producing the document clearly is not disproportionate to the needs of this action, especially considering that Plaintiffs have offered to produce it and it is only one document.

The Court also notes that engagement letters and agreements generally are not protected by the work product privilege. *See Chevron Corp. v. Salazar*, No. 11-cv-3718 (LAK) (JCF), 2011 WL 13243797, at *1 (S.D.N.Y. Aug. 16, 2011) ("Retainer agreements, fee records, and arrangements for financing litigation are not in themselves privileged or subject to work product protection."); *see also Abbo-Bradley v. City of Niagara Falls*, 293 F.R.D. 401, 407

(W.D.N.Y. 2013) (work product doctrine does not protect facts concerning the creation of work product) (citing 6 Moore's Fed. Prac., 26.70[2][a], p. 26-435). As discussed above, extending work product protection to engagement agreements (such as the Litco Agreement) would not conform to the purpose of the work product doctrine, which is to ensure the integrity of the adversary process. Rather, extending protection to the Litco Agreement would be antithetical to the purpose of the doctrine given that it provides for substantial payments to the company of a key witness based on the amounts recovered by Plaintiffs in this action. *See State of N.Y. v. Solvent Chem. Co., Inc.*, 166 F.R.D. 284, 289 (W.D.N.Y. 1996). For this reason, the Court finds that the terms of the Litco Agreement are not privileged.

Even if work product protection extended to the Litco Agreement, it nevertheless should be produced because Defendants have demonstrated the relevance of the document and demonstrated a substantial need for it; namely, that it is needed to demonstrate bias of Sater, one of Plaintiffs' key witnesses, for impeachment purposes. *See Colon v. City of New York*, No. 12-cv-9205 (JMF), 2014 WL 3605543, at *2 (S.D.N.Y. July 8, 2014) (granting motion to compel as to document that is protected by work product doctrine because defendants demonstrated a "substantial need" for the materials, namely, to impeach a central witness in the case) (collecting cases); *see also United States v. Harvey,* 547 F.2d 720, 722 (2d Cir. 1976) ("The law is well settled in this Circuit, as in others, that bias of a witness is not a collateral issue and extrinsic evidence is admissible to prove that a witness has a motive to testify falsely"); *U.S. v. Chichakli*, No. 09-cr-1002, 2014 WL 5369424, at *17 (S.D.N.Y. Oct. 16, 2014) ("Bias is a 'permissible and established basis of impeachment' and significant in assessing credibility")

(quoting *United States v. Abel*, 469 U.S. 45, 50 (1984)). Moreover, Defendants cannot obtain the equivalent of this document by other means.

Finally, by calling Sater as a witness and, at the same time, engaging his company as a consultant, Plaintiffs have waived any privilege that attaches to the terms of Litco's engagement. *See Trudeau*, 237 F.R.D. at 340 ("It is well settled law that in certain circumstances a party's assertion of factual claims can, out of consideration of fairness to the party's adversary, result in the involuntary forfeiture of privileges for matters pertinent to the claims asserted"); *In re Grand Jury Proceedings*, 219 F.3d at 182 ("[A] party cannot partially disclose privileged communications or affirmatively rely on privileged communications to support its claim or defense and then shield the underlying communications from scrutiny by the opposing party."). Accordingly, Plaintiffs must produce the Litco Agreement by **November 28, 2018**.

### C. Rule 502 Order

The Court rejects Plaintiffs' request that it issue a Rule 502(d) order protecting the Litco Agreement for the simple reason that the agreement is not protected work product. Moreover, Plaintiffs' suggestion that Rule 502(d) authorizes selective waiver is incorrect. *See* Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 5:35 (4th ed. 2018) citing Statement of Congressional Intent Regarding Rule 502 of the Federal Rules of Evidence (Cong. Rec. H7818, Sept. 8, 2008) ([Subdivision (d)] "does not provide a basis for a court to enable parties to agree to a selective waiver of the privilege, such as to a federal agency conducting an investigation, while preserving the privilege as against other parties seeking the information.")).

**2.  Relevance and Proportionality of Other Information Requested By Defendants**

    **A.  Litco-Related Documents**[9]

Defendants seek a number of categories of other documents related to Plaintiffs'

relationship with Litco/Sater. These include:

- Any other agreements or "side letters" between Plaintiffs and Litco, Sater or their proxies not already produced or, alternatively, a representation that there are no such other agreements or side letters.
- Back-up documentation underlying the spreadsheet of payments and reimbursement of expenses made to Litco, such as invoices, bank ledgers, and wire transfer receipts.
- Information about the date, place, attendees, and subject matter of meetings between and among Plaintiffs, Sater and Litco about this action and efforts to recover assets that are at issue in this action (*i.e.,* Triadou's New York real estate investments).
- Communications between or among Litco, Wolf, Sater, Plaintiffs, Plaintiffs' counsel, Arcanum or their proxies concerning the negotiation of the Litco Agreement and communications generated as a result of the Agreement (e.g., facts conveyed by Litco to Plaintiffs that are pertinent to this litigation).
- Documents showing the date when Plaintiffs first learned of Sater's confidentiality duties to Triadou under the Tri-County Mall settlement and his confidentiality duties to the Khrapunovs under a February 8, 2012 Consultant Agreement between Sater and Swiss Promotion Group, an entity established by Ilyas Khrapunov; and a description of the subjects that Sater disclosed to Plaintiffs with sufficient particularity to enable evaluation of the extent to which Sater violated his confidentiality obligations to Triadou and the Khrapunovs under the above-referenced settlement and consulting agreements, as well as any documents Sater provided to Plaintiffs that are pertinent to this action.

The Court addresses each of these categories below.

First, Defendants seek any other agreements or "side letters" between Plaintiffs and

Litco, Sater or their proxies.  For the same reasons the Court ordered the production of the

Litco Agreement, by **November 28, 2018**, Plaintiffs must produce any other agreements or

---

[9] The Court rejects Plaintiff's contention that Defendants should first propound discovery requests relating to Litco. (Doc. No. 888.)  No judicial economy is gained at this point in the litigation by doing so when it is clear there is a dispute as to the scope of production.

"side letters" between Plaintiffs and Litco, Sater or their proxies not already produced or, alternatively, represent that there are no such other agreements or side letters.

Second, Defendants seek back-up documentation underlying Plaintiffs' payment spreadsheet. Under Federal Rule of Evidence 1006, a party may use a summary or chart to prove the content of voluminous records that cannot be conveniently examined in court. Fed. R. Evid. 1006. However, the proponent must make the underlying documents available for examination or copying, and the court may order their production in court. *Id.* Plaintiffs already have provided a schedule of fees, expenses and payments made to Sater, Litco and other witnesses. Thus, they correctly recognize that this information is not privileged work product and concede its relevance on the issue of bias. *Cf. Amster v. River Capital Intern. Group*, LLC, No. 00-cv-9708 (DCDF), 2002 WL 2031614, at *2 (S.D.N.Y. Sept. 4, 2002) (recognizing that testifying expert's compensation is not privileged). In fairness, Defendants must be given the opportunity to review the original documents such as invoices, ledger entries and wire transfer confirmations to confirm the accuracy and completeness of the information provided in the spreadsheet. Accordingly, Plaintiffs must produce the back-up documentation for the spreadsheet of payments by **December 7, 2018**.

Next, Defendants seek information about the date, place, attendees, and subject matter of meetings between and among Plaintiffs, Sater and Litco concerning this action and efforts to recover assets that are at issue in this action (*i.e.,* the New York real estate investments of Triadou). This information is not privileged work product. Indeed, this is the very information that is required to be included on a privilege log in this District. Fed. R. Civ. P. 26b)(5); S.D.N.Y. R. 26.2. Moreover, this information is certainly relevant for Defendants to ascertain the scope

of work and time spent by Sater and Litco in proportion to the payments received from Plaintiffs.  Accordingly, Plaintiffs must produce this information by **December 7, 2018**.

Defendants also seek communications between or among Litco, Wolf, Sater, Plaintiffs, Plaintiffs' counsel, Arcanum or their proxies concerning the negotiation of the Litco Agreement and communications generated as a result of the agreement (e.g., facts conveyed by Litco to Plaintiffs that are pertinent to this litigation).   As to documents reflecting these communications, some may be protected (in whole or in part) by the attorney-client privilege or work product doctrine.  *See e.g., New York Times v. Dep't of Justice*, 138 F. Supp. 3d 462, 472-78 (S.D.N.Y. 2015) (finding reports of, and transcriptions reflecting, witness statements constitute work product only "when they reveal an attorney's strategic impressions and mental processes," and accepting various memoranda prepared by attorneys as work product); *Adlman*, 134. F.3d at 1201 (collecting cases finding work product protection applies to attorney opinion letters, "memoranda prepared by a lawyer" to counsel client as to whether to accept a license agreement, and documents analyzing potential legal challenges).  Core attorney work product such as attorney notes and interview preparation materials are also protected from disclosure.  *See* Section 1A-B *supra.*

At this point, however, the Court has scant information about what documents, if any, exist that are responsive to this request.  Plaintiffs have not provided a detailed privilege log that would permit an assessment of privilege.  The Court directs Plaintiffs to prepare and serve a detailed privilege log as to the documents responsive to this last category of documents by **December 7, 2018**.  Plaintiffs' privilege log should be itemized, rather than categorical, which Plaintiffs have agreed to do.  (Doc. No. 888.)  Plaintiffs need not include attorney notes and

other documents internal to Plaintiffs' counsel's and Arcanum's offices (and not shared with Sater, Litco or other non-party witnesses) on the log.

Finally, in the Khrapunovs' most recent letter (Doc. No. 887), the Khrapunovs seek documents showing the date when Plaintiffs first learned of Sater's confidentiality duties to Triadou under the Tri-County Mall settlement and his confidentiality duties to the Khrapunovs under a February 8, 2012 Consultant Agreement between Sater and Swiss Promotion Group, an entity established by Ilyas Khrapunov. They also seek a description of the subjects that Sater disclosed to Plaintiffs with sufficient particularity to enable evaluation of the extent to which Sater violated his confidentiality obligations to Triadou and the Khrapunovs under the above-referenced settlement and consulting agreements, as well as any documents Sater provided to Plaintiffs that are pertinent to this action. They contend that such information may give rise to an argument that certain information cannot be used at trial on the theory that Plaintiffs obtained the information illegally. *See, e.g., Pure Power Boot Camp v. Warrior Fitness Boot Camp*, 587 F. Supp. 2d 548, 571 (S.D.N.Y. 2008) ("In the end, the one thing that should remain unsullied is the integrity of the judicial process. In this Court's view, that integrity is threatened by admitting evidence wrongfully, if not unlawfully, secured"); *Fayemi v. Hambrecht and Quist, Inc.*, 174 F.R.D. 319, 325 (S.D.N.Y. 1997) ("A court may . . . exercise its inherent equitable powers to sanction a party that seeks to use in litigation evidence that was wrongfully obtained.").

The Khrapunovs can ask Sater if and when he disclosed his obligations to Triadou and the Khrapunovs to Plaintiffs at the next day of his deposition. Thereafter, the Khrapunovs can determine whether a request to admit is appropriate. No documents are necessary to obtain

this information.  The Khrapunovs also may ask Sater about the factual information he disclosed to Plaintiffs in connection with this action at his deposition.  To the extent Sater provided Plaintiffs with documents pertaining to this action (i.e., Triadou's real estate transactions in New York and the source of the money for same) belonging to the Khrapunovs personally or to Triadou, Plaintiffs shall produce copies of such documents to the extent they have not already been produced.  This production shall occur on or before **December 12, 2018** and in advance of Sater's deposition.

This Court notes that Defendants' document requests were expansively worded.  To the extent they can be interpreted to sweep in documents pertaining to Plaintiffs' asset recovery efforts outside of this specific action, they are overbroad.  Accordingly, to the extent this Court has required production of documents and/or preparation of a privilege log, its ruling is intended to be restricted to the categories of documents described herein and as narrowed by this Court.

### B.  Monstrey and Bourg Documents

In addition to the above, the Khrapunovs seek the following additional information to the extent not already produced in this action:

- Any other agreements or "side letters" between Plaintiffs and Bourg or Monstrey or their proxies not already produced or, alternatively, a representation that there are no such other agreements or side letters.
- Documentation reflecting any payments made by Plaintiffs or their proxies to Monstrey or Bourg under any agreement between and/or among them such as invoices, bank ledgers, and wire transfer receipts.
- Information about the date, place, attendees, and subject matter of meetings between and among Plaintiffs, Bourg, Monstrey (and their proxies) about this action and efforts to recover assets that are at issue in this action.
- Communications between or among Bourg, Monstrey, Plaintiffs, Plaintiffs' counsel, Arcanum or their proxies concerning any cooperation agreement related to this

litigation or Plaintiffs' asset recovery mission (including any notes, witness statements and the like).

Fact discovery in this case has closed except as to specific limited categories. Plaintiffs already produced their agreements with Bourg. Defendants questioned Bourg extensively about these agreements at his deposition where he testified about payments received (which included reimbursement for travel and legal fees). (Plaintiffs' Opposition Letter, Exs. 5, 6.) The Khrapunovs had ample opportunity to request additional information about Bourg but did not do so. Nor have they provided an adequate or persuasive excuse for not requesting additional information about Bourg. There being no good cause to extend discovery for this purpose, this Court denies the Khrapunovs' motion to compel to the extent it seeks additional information pertaining to Bourg.

In contrast, Monstrey's deposition has not yet occurred, and he was only disclosed as a witness for Plaintiffs at the very end of discovery. Therefore, this Court does not deem the Khrapunovs' requests concerning Monstrey to be untimely. For the same reasons this Court is ordering disclosure of the first three bulleted categories of documents to be produced with respect to Litco/Sater, it will require the same disclosure with respect to Monstrey. In light of the fact that Monstrey's deposition is scheduled for later this month, Plaintiffs shall produce this information by **November 28, 2018**. Plaintiffs shall provide an itemized privilege log as to communications responsive to the fourth bulleted category above by **December 7, 2018**.

### 3. *Referral to Department of Justice*

The Khrapunovs contend that Plaintiffs have violated the federal anti-gratuity statute, 18 U.S.C. § 201(c)(2), which provides that it is unlawful to give, offer or promise anything of

value to a person, for or because of testimony under oath or affirmation given or to be given by such person as a witness at a trial, hearing or other proceeding before a court. The statute permits payment for out-of-pocket expenses incurred by a witness and lost income from the time spent preparing for and testifying at court proceedings. 18 U.S.C. § 201(d). The Khrapunovs contend that Plaintiffs should be referred to the U.S. Department of Justice for the violation.

At this point, this Court believes this request is premature. Plaintiffs have terminated the agreement with Litco and demanded repayment of the monies paid thereunder. Although Defendants contend that it defies credulity that Plaintiffs did not know of Sater's affiliation with Litco, this Court has little information to conclude that Plaintiffs were acting with an intent to violate federal law. It is of course tremendously concerning to this Court that Plaintiffs may have offered an inducement to a fact witness to testify in such a way as to maximize Plaintiffs' recovery in this matter. The additional discovery ordered by this Court and obtained from the deposition of Sater may shed more light on this situation and provide a firmer basis for such a referral.

## TIMING OF REMAINING DISCOVERY AND DISCOVERY-RELATED MOTIONS

At the last case management conference, the parties discussed a number of scheduling issues. The Court addresses those as follows:

1. Plaintiffs have requested permission to file a motion for discovery sanctions against Defendants pursuant to Federal Rule of Civil Procedure 27 (Doc. No. 879). The Court sets the following briefing schedule: Plaintiffs' motion to be filed by January 8, 2019; Defendants' opposition to be filed by January 22, 2019; Plaintiffs' reply to be filed by January 29, 2019. Plaintiffs shall file one moving brief of no more than 35 pages which contains three separate sections addressing the alleged violations of Triadou, Ablyazov and the Khrapunovs. Plaintiffs' reply brief shall be limited to 15 pages and

shall likewise be an omnibus brief.  Triadou, Ablyazov and the Khrapunovs may file separate opposition briefs of no more than 20 pages.  No sur-replies shall be filed.

2. In light of the remaining fact discovery, the deadline to complete expert discovery is extended to April 26, 2019.

3. Plaintiffs failed to depose Ms. Leila Khrapunova within the discovery deadline set by this Court.  Absent a showing of good cause and need, her deposition has been forfeited.

4. The Court will hold a case management conference on **January 4, 2019 at 10:00 a.m. in Courtroom 17D, United States Courthouse, 500 Pearl Street, New York, New York**.  Mr. Ablyazov may appear telephonically at the conference, and the courtroom deputy shall call Mr. Ablyazov at 10:00 a.m. EST on January 4, 2019.

An unredacted copy of this Order has been placed under seal.  Counsel for Triadou is directed to serve a copy of this Order on Mr. Ablyazov's representative in New York.

**SO ORDERED.**

Dated: November 26, 2018
        New York, New York

_____
KATHARINE H. PARKER
United States Magistrate Judge