**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CITY OF ALMATY, KAZAKHSTAN, and BTA BANK JSC | ) ) ) |
| Plaintiffs, | ) ) |
| v. | )     No. 15-cv-05345 (AJN) (KHP) ) |
| MUKHTAR ABLYAZOV, ILYAS KHRAPUNOV, VIKTOR KHRAPUNOV and TRIADOU SPV S.A., | ) ) ) ) |
| Defendants. | ) ) |

# THE KAZAKH ENTITIES' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO AMEND THE CROSSCLAIMS

BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Crossclaim Plaintiffs City of Almaty, Kazakhstan and BTA Bank*

1

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATMENT ................................................................................................ 1

BACKGROUND ................................................................................................................ 2

ARGUMENT ...................................................................................................................... 8

    A.    Legal Standard ......................................................................................... 8

    B.    Rule 15 Is Satisfied Because the Proposed Amendment Is in the Interest of
           Justice ....................................................................................................... 8

    C.    Good Cause Also Exists for the Proposed Amendment ..................................... 19

CONCLUSION ................................................................................................................. 21

## TABLE OF AUTHORITIES

**Cases**

*A.V. by Versace, Inc. v. Gianni Versace S.p.A.*,
    87 F.Supp.2d 281 (S.D.N.Y. 2000) ................................................................. 18

*AEP Energy Servs. Gas Holding Co. v. Bank of America, N.A.*,
    626 F.3d 699 (2d Cir.2010) ........................................................................... 18

*Blagman v. Apple, Inc.*,
    307 F.R.D. 107 (S.D.N.Y. 2015) .................................................................... 16

*CIBC Mellon Tr. Co. v. Mora Hotel Corp. N.V.*,
    100 N.Y.2d 215 (2003) .................................................................................. 14

*Coale v. Metro-N. R. Co.*,
    No. 08 Civ. 01307 (CSH), 2009 WL 4881077 (D. Conn. Dec. 11, 2009) ............ 22

*Cummins, Inc. v. New York Life Ins.*,
    No. 10 CIV. 9252, 2012 WL 3870308 (S.D.N.Y. Sept. 6, 2012) ......................... 21

*Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*,
    304 F.R.D. 170 (S.D.N.Y. 2014) .................................................................... 10

*Hernandez v. DMSI Staffing, LLC.*,
    79 F. Supp. 3d 1054 (N.D. Cal. 2015) ............................................................ 16

*John Galliano, S.A. v. Stallion, Inc.*,
    15 N.Y.3d 75 (2010) ..................................................................................... 12

*Kreisler v. P.T.Z. Realty, L.L.C.*,
    318 F.R.D. 704 (S.D.N.Y. 2016) .................................................................... 20

*Olaf Soot Design, LLC v. Daktronics, Inc.*,
    299 F. Supp. 3d 395 (S.D.N.Y. 2017) ............................................................ 22

*Parker v. Columbia Pictures Indus.*,
    204 F.3d 326 (2d Cir. 2000) .............................................................. 10, 11, 12

*Perfect Pearl Co. v. Majestic Pearl & Stone, Inc.*,
    889 F. Supp. 2d 453 (S.D.N.Y. 2012) ............................................................ 11

*Sokol Holdings, Inc. v. BMB Munai, Inc.*,
    No. 05 CV 3749 KMW DCF, 2009 WL 3467756 (S.D.N.Y. Oct. 28, 2009) ......... 22

*Soroof Trading Dev. Co., Ltd. v. GE Microgen, Inc.*,
    283 F.R.D. 142 (S.D.N.Y. 2012) .................................................................... 22

*Thomas & Agnes Carvel Found. v. Carvel*,
    736 F. Supp. 2d 730 (S.D.N.Y. 2010) ............................................................ 12

**Statutes**

28 U.S.C. § 1367 ............................................................................................. 15

C.P.L.R. § 302 ............................................................................................................... 13

C.P.L.R. § 5302 ............................................................................................................. 12

C.P.L.R. § 5303 ................................................................................................. 11, 12, 19

C.P.L.R. § 5304 ............................................................................................................. 12

C.P.L.R. § 5305 ............................................................................................................. 13

**Rules**

Fed. R. Civ. P. 15 ..................................................................................................... 10, 20

Fed. R. Civ. P. 16 ........................................................................................................... 10

**Treatises**

Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1471 (3d ed.) ........................................ 10

Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1487 (3d ed.) ........................................ 16

The City of Almaty and BTA Bank (together, the "Kazakh Entities" or "Plaintiffs") respectfully submit this memorandum of law in support of their Motion to Amend the operative pleading in this action, the Second Amended Crossclaims.

## PRELIMINARY STATMENT

In August of 2018, a court in the United Kingdom unsealed a judgment against Ilyas Khrapunov and in favor of BTA Bank involving the very funds at issue in this case. Shortly thereafter, the Kazakh Entities sought Ilyas' agreement to amend this action to add a claim to recognize and enforce that judgment — just as the Kazakh Entities had previously done with a similar U.K. judgment entered against Mukhtar Ablyazov. Ilyas refused, preferring to require BTA Bank to file a new action, in a different court, and then to have to go through the lengthy Hague Convention process to serve him in Switzerland.  The Federal Rules of Civil Procedure abhor such inefficiency and waste of resources, however.  Because amendment is proper under both Rules 15 and 16 of the Federal Rules of Civil Procedure, the Court should grant the Kazakh Entities' motion.

Under Rule 15's liberal "interests of justice" standard, the amendment is warranted because it is not futile (virtually the same claim was already added against Ablyazov), it was not brought in bad faith (the Kazakh Entities have not misrepresented the facts or waited to add the claim at this time to seek tactical advantage), there was no undue delay (any delay was caused by the meet and confer process), there is no undue prejudice (Ilyas will need no new discovery, and he will expend at least the same resources defending the claim here as he would in a new action), and it is in the interests of judicial economy (this Court already knows the facts and is all too-familiar with Ilyas' dilatory litigation history).

Under Rule 16's good cause standard, which courts sometimes look to when approving amendments later in the life of a case, the motion should be granted because the Kazakh Entities' diligence in pursuing this claim in a timely manner is virtually beyond dispute. Indeed, they could not possibly have met the original deadline for amended pleadings (back in 2016), as the U.K. judgment was handed down years after the pleadings were closed here.

And under both rules, the interests of comity and fairness dictate that this Court is the correct forum to resolve this judgment recognition and enforcement claim. Ilyas Khrapunov's history of playing games with courts is well known. His only plausible motivation for refusing to agree to the amendment is the same motivation that governs most of his litigation decisions — obstruction and delay. Given this Court's previous experience with the facts of this case and Ilyas' litigation tactics, it will certainly resolve any dispute over the judgment recognition and enforcement claim more quickly and efficiently than another court encountering Ilyas for the first time.

For all of these reasons, the Kazakh Entities' motion to amend should be granted.

## BACKGROUND

Beginning in 2009, BTA Bank brought a series of actions in the courts of the United Kingdom against BTA's former chairman, Mukhtar Ablyazov. These actions were brought by BTA's new management after the bank's highly-publicized collapse following the 2008 global financial crisis, and subsequent rescue by the Republic of Kazakhstan's sovereign wealth fund. *See generally*, Landon Thomas Jr., "Kazakh Bank Lost Billions in Western Investments," N.Y. Times, Nov. 27, 2009, *available at* https://nyti.ms/2SBQLGv. ("From 2003 to 2008, the likes of Credit Suisse, Morgan Stanley, Royal Bank of Scotland, ING and others funneled more than $10 billion in loans into Kazakhstan's largest bank [BTA] . . . So many of these loans are now bust

that many foreign banks are facing write-offs of as much as 80 percent of their value, prompting investigations into why the loans went so bad so fast."). In the wake of BTA's collapse, a team of international lawyers, accountants, and regulators concluded that Ablyazov had moved billions of dollars of BTA's assets into offshore shell companies he controlled through nominees, leaving the bank unable to repay its lenders and depositors. By this time, Ablyazov had fled Kazakhstan and taken up residence in London, where he appeared through counsel to defend himself, claiming to be the victim of political persecution.

On November 12, 2009, the High Court of Justice of the United Kingdom entered a worldwide freezing order over Ablyazov's assets.  That order required Ablyazov to disclose his assets and refrain from alienating them during the pendency of the U.K. proceedings. [*See* ECF No. 143-09; *see also* ECF No. 143-08 (U.K. Supreme Court judgment in *JSC BTA Bank v. Ablyazov*, analyzing "terms of a freezing order which was made by Teare J on 12 November 2009 and was subsequently amended.")]. The November 2009 freezing order was followed by a worldwide receivership order entered on July 16, 2010, which designated court-ordered receivers to administer certain of Ablyazov's assets and ensure his assets were not dissipated. The freezing and receivership orders were subsequently amended on multiple occasions. [*See* ECF No. 143-10; *see also* ECF No. 433, ¶¶ 35-36 66-67 (describing the freezing and receivership orders)].

Ablyazov flouted both the freezing and receivership orders, disobeying them so often and so egregiously that he was held in criminal contempt. *See JSC BTA Bank v. Ablyazov*, [2012] EWHC 237 (Comm). He fled the United Kingdom shortly before his sentencing in February of 2012, leading the court to strike his defenses and to sentence him in absentia to twenty-two months' incarceration. He remained in hiding for over a year, before ultimately being apprehended in France in mid-2013 on Russian and Ukrainian warrants.

Ablyazov remained incarnated in France for nearly three years pending extradition to Russia. He was ultimately released in December of 2016, after France's highest administrative court, the *Conseil d'Etat*, canceled the Russian extradition request. Ablyazov never returned to the United Kingdom to serve any portion of his criminal contempt sentence. He apparently remains in France to this day.

Even in his absence, however, Ablyazov continued to litigate the U.K. proceedings through counsel, including by appealing the orders striking out his defenses due to his contempt and flight. His appeals failed, with Lord Justice Maurice Kay going so far as to find that it was "difficult to imagine a party to commercial litigation who has acted with more cynicism, opportunism and deviousness towards court orders than Mr. Ablyazov." *JSC BTA Bank v. Ablyazov*, 2012 [EWCA] Civ. 1411, ¶ 202.

During this time, BTA continued to investigate Ablyazov's global campaign to evade the freezing and receivership orders by laundering his assets through nominees and trusted associates. One such co-conspirator was Ablyazov's son-in-law, Ilyas Khrapunov. In July of 2015, BTA brought claims in the U.K. High Court of Justice against Khrapunov, alleging that he had met with Ablyazov in London and conspired with him to violate the freezing and receivership orders by dissipating his assets. *See* Ex. A, ¶ 3-5.[1]

---

[1]     Much of the terminology in the U.K. judgment attached as Ex. A will be familiar to the Court.  Indeed, the judgment refers extensively to the "N Project," which describes the laundering of funds that are directly at issue in this case, beginning with an entity called Northern Seas Waterage and ultimately passing through Telford International and into the U.S., where the money was invested on behalf of Triadou into the Flatotel and other U.S. real estate projects.  The Kazakh Entities have put evidence before the Court documenting the flow of funds through this structure. [*See, e.g.,* ECF No. 579-01 (Chart of "N Project – Cash Movements" showing movement of funds through "Telford" to "Triadou")]. Similarly, the U.K. judgment references Eesh Aggarwal, whose role has been known to this Court as far back as the attachment phase of this action, where Triadou's former director testified that "Ilyas informed

Khrapunov challenged the U.K. courts' jurisdiction over him up to the Supreme Court of the United Kingdom, where he ultimately lost. *See* Ex. B, *JSC BTA Bank v Khrapunov*, [2018] UKSC 19 (Hilary Term), Mar 21, 2018, ¶ 41. While Khrapunov's jurisdictional appeals worked their way up to the U.K.'s highest court, BTA obtained a freezing order against Khrapunov similar to that against Ablyazov. [*See* ECF No. 143-11]. Like Ablyazov, Khrapunov was obligated to truthfully disclose his assets, including any assets he was administering for Ablyazov. *See id.*, at ¶ 7. Also like Ablyazov, Khrapunov repeatedly disobeyed this order.

Khrapunov first tried to avoid disclosing his or Ablyazov's assets by appearing in the proceedings to invoke his privilege against self-incrimination. *See* Ex. C. Khrapunov based this purported fear of self-incrimination on the fact that he was a named defendant *in this action* at that time (*see id.* at ¶ 11) — despite the fact that he had been avoiding service for months and would not actually appear here until some months later, only after Triadou's assets were attached. Khrapunov's attempt to avoid disclosing his assets was unsuccessful, but in light of his invocation of the privilege, the U.K. court imposed strict confidentiality over the U.K. proceedings — what is known in the U.K. as a "confidentiality club." In short, the U.K. court barred BTA from using, sharing or disclosing non-public information obtained in the U.K. proceedings without the court's permission, and ordered all such information to be maintained on an attorneys-eyes-only basis:

> the Bank is not entitled to use any information disclosed to take proceedings abroad without permission of the court. The confidentiality provisions add a further significant layer of protection to Mr Khrapunov, in that, self-evidently, the material cannot be disclosed to anyone other than the lawyer directly involved in this case, an[d] in particular, the Bank itself will not have access to the materials.

---

me that Telford was an Ablyazov investment entity used to conceal and move his funds, and was controlled by Eesh Aggerwal, a financial advisor loyal to Ablyazov." [ECF No. 142, ¶ 10].

*Id*., at ¶ 31

Undeterred by his failure to invoke the privilege against self-incrimination, Khrapunov continued to obstruct the U.K. proceedings. He made a series of facially-deficient disclosures and refused to appear to be examined on his non-compliance with the orders entered against him. Although ordered to appear for cross-examination in March of 2016, Khrapunov resorted to a variety of procedural gambits and meritless appeals to avoid doing so. Ultimately, the U.K. Court of Appeals found his maneuvering to avoid testifying "totally without merit" and concluded that he was "playing games with the court." [ECF No. 482-29]. Still, Khrapunov continued to refuse to appear as ordered, claiming that he was a political opponent of the Republic of Kazakhstan, and that doing so would subject him to risk of extradition or rendition.

On June 21, 2018, Khrapunov's game-playing in the U.K. courts finally caught up with him. Having exhausted his appeals, his failure to attend his court-ordered examination triggered an "unless order," which struck out his defenses. As a result, on August 21, 2018, the Hon. Judge Waksman of the High Court of Judgment, Business and Property Courts of England and Wales, handed down a judgment in favor of BTA Bank. *See* Ex. A, at ¶ 14-19.

Judge Waksman found that through the "N Project" structure and Aggarwal's efforts – the same structure and efforts at issue here – Khrapunov had "effected the transfer of . . . assets of Mr Ablyazov" knowing "perfectly well what he was doing which was to assist Mr Ablyazov to evade the court orders." *Id*., ¶ 3-4. The court also detailed the procedural history of the action, noting Khrapunov's repeated failures to follow the discovery orders against him:

> A number of interim measures were granted by this court over a number of years against Mr Khrapunov in order to secure the claims against him. They included a worldwide freezing order made as long ago as July 2015, by Mr Justice Males. That order contained information requirements by which Mr Khrapunov was to provide not only details of his personal assets, but also details of his dealings with Mr Ablyazov's assets. *Mr Khrapunov signally failed to deal with those disclosure*

*requirements.*

*Id.*, at ¶ 6 (emphasis added).

Judge Waksman found that Khrapunov had been ordered to appear to give testimony, that Khrapunov's appeals of that order were "certified as totally without merit" (*id.*, at ¶ 8), and that Khrapunov nonetheless failed to appear as ordered, despite having "the means and ability to come [to the U.K.], if he wished, to object to this judgment in default or indeed to put submission in writing as to why it should not be made." *Id.* at ¶ 24. Judge Waksman also detailed how Khrapunov's claimed reasons for refusing to travel to give testimony – his claim that he might be subject to extradition to Kazakhstan – was not credible and had been repeatedly rejected by the U.K. courts. *Id.*, at ¶¶ 8-14, 21-23.

Based upon the evidentiary showing made by BTA Bank, and along with an accompanying order (*see* Ex. D), Judge Waksman entered judgment against Khrapunov and in favor of BTA Bank in the amount of $424,110,000, plus interest of $75,851,783.01, running at a rate of 5%. *See* Ex. A, at ¶ 27-29; *see also* Ex. D, at ¶ 1(a-b) (collectively, the judgment and accompanying order are referred to herein as the "Khrapunov Judgment").

After the Khrapunov Judgment was handed down in late August 2018, the Kazakh Entities met and conferred with Khrapunov's counsel to obtain his consent to add a claim under C.P.L.R. § 5303 for recognition and enforcement of the Khrapunov Judgment in this action. Through his counsel, Khrapunov declined to consent. The Kazakh Entities now move the Court for leave to amend the Second Amended Crossclaims ("SAC") solely to add a recognition and enforcement claim under C.P.L.R. § 5303.  *See* Ex. E (proposed Third Amended Crossclaims) and Ex. F (comparison identifying the proposed changes).

## ARGUMENT

**A.**     **Legal Standard**

Rule 15 states that, with respect to amendments of pleadings prior to trial "the court should freely give leave when justice so requires." Fed. R. Civ. P. 15 (a)(2).  Rule 15 was enacted "to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities. This is demonstrated by the emphasis Rule 15 places on the permissive approach that the district courts are to take to amendment requests, no matter what their character may be." *See* Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1471 (3d ed.).

Where, as here, a party seeks to amend its pleadings relatively late in the course of litigation, when the Court would also have to alter an existing scheduling order, courts in this District also look to Rule 16, which generally requires "good cause" for a schedule to be amended.  *See* Fed. R. Civ. P. 16(b)(4) ("A schedule may be modified only for good cause and with the judge's consent").  In such cases, "a finding of 'good cause' depends on the diligence of the moving party." *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 340 (2d Cir. 2000).  In addition to diligence, courts may also consider any prejudice to the non-movant.  *See Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*, 304 F.R.D. 170, 175 (S.D.N.Y. 2014) ("[I]n deciding whether there is 'good cause' to amend under Rule 16(b), a trial court may consider not only the diligence of the moving party but also the prejudice to the opposing party.").

**B.**     **Rule 15 Is Satisfied Because the Proposed Amendment Is in the Interest of Justice**

The Court should decide this motion under Rule 15's "lenient standard," which provides that pleadings should be amended unless contrary to the interests of justice, because the proposed amendment will not require any alteration of the scheduling order. *See Parker*, 204 F.3d at 340.

Under that standard, leave to amend should be "freely given" unless there is some good reason not to, such as "futility, bad faith, undue delay, or undue prejudice to the opposing party."

*Perfect Pearl Co. v. Majestic Pearl & Stone, Inc*., 889 F. Supp. 2d 453, 459 (S.D.N.Y. 2012)

(citing *McCarthy v. Dun & Bradstreet Corp*., 482 F.3d 184, 200 (2d Cir. 2007)).  There is no

such reason to deny leave to amend here; to the contrary, the relevant considerations all weigh in

favor of amending the pleadings to add a judgment enforcement claim against Ilyas Khrapunov.

### 1.      Amendment Will Not Require Alteration of the Scheduling Order

The proposed amendment will not require alteration of the current scheduling order.

There is no need for fact discovery concerning the judgment recognition and enforcement claim

at issue, and there has been no discovery concerning the similar judgment enforcement claim that

has already been added against Ablyazov. And as explained below in Section B.2., the

determination of whether the U.K. judgment should be recognized and enforced will not turn on

any new facts. Plaintiffs anticipate no need for expert discovery to address a recognition and

enforcement claim, but to the extent any expert opinions are needed, they can be obtained under

the existing expert discovery schedule. Further, there will be no need to adjust the summary

judgment schedule, which remains months away. In short, the new judgment recognition and

enforcement claim against Ilyas Khrapunov can be readily addressed under the existing case

management schedule.

### 2.      Adding a C.P.L.R. § 5303 Claim Would Not Be Futile

Amendment of the complaint to add a recognition and enforcement claim would not be

futile. *See Parker*, 204 F.3d at 339 ("[W]here the amended portion of the complaint would fail to

state a cause of action, however, the district court may deny the party's request to amend.").

Indeed, it is difficult to imagine how the defendants could credibly argue futility given that a

near-identical judgment enforcement claim was already added against Ablyazov and survived a

motion to dismiss here. [*See* ECF No. 426, at 40-41]. In any event, the Khrapunov Judgment

meets all requirements for recognition and enforcement under C.P.L.R. § 5303, and none of the

non-recognition conditions under C.P.L.R. § 5304 apply. *See John Galliano, S.A. v. Stallion,*

*Inc.*, 15 N.Y.3d 75, 81 (2010) (if the absence of grounds for non-recognition has been

established, "the foreign judgment should be enforced in New York under well-settled comity

principles without microscopic analysis of the underlying proceeding"). Further, this Court will

have subject matter jurisdiction over the new claim.

*First*, the Khrapunov Judgment is, on its face, a final and conclusive money judgment,

meeting the standards of C.P.L.R. § 5302. *See* Ex. D, at ¶ 1 (ordering Khrapunov to pay to BTA

"US$424,110,000" in principle and "US$75,851,783.01" in interest); *see also* C.P.L.R. § 5303

("a foreign country judgment meeting the  requirements of section 5302 is conclusive between

the parties to the extent that it grants or denies recovery of a sum of money").

*Second*, non-recognition under C.P.L.R. § 5304(a) does not apply, as the fairness and

impartiality of the U.K. courts cannot seriously be questioned. *See Thomas & Agnes Carvel*

*Found. v. Carvel*, 736 F. Supp. 2d 730, 746 (S.D.N.Y. 2010) ("[T]he judicial system in England

has long been recognized as providing impartial tribunals and procedures compatible with the

requirements of due process of law." (internal quotation marks omitted)).

*Third*, non-recognition under C.P.L.R. § 5304(b) does not apply, as the Supreme Court of

the United Kingdom specifically found jurisdiction over Khrapunov based on his conduct in the

U.K., after he litigated the issue up to the U.K.'s court of last resort:

> We consider that the Court of Appeal correctly identified the place where the
> conspiratorial agreement was made as the place of the event which gives rise to
> and is at the origin of the damage. As Sales LJ explained (at para 76), in entering
> into the agreement Mr Khrapunov would have encouraged and procured the
> commission of unlawful acts by agreeing to help Mr Ablyazov to carry the
> scheme into effect. Thereafter, Mr Khrapunov's alleged dealing with assets the
> subject of the freezing and receivership orders would have been undertaken
> pursuant to and in implementation of that agreement, whether or not he was acting

10

on instructions from Mr Ablyazov. *The making of the agreement in England should, in our view, be regarded as the harmful event which set the tort in motion*.

*See* Ex. B, at ¶ 41 (emphasis added).  Jurisdiction based on a litigant's tortious conduct in the forum is a bedrock of New York personal jurisdiction law as well. *See* C.P.L.R. § 302(2) (providing for personal jurisdiction where a defendant "commits a tortious act within the state"). Under New York's recognition statute, "courts have typically looked to the framework of CPLR 302, New York's long-arm statute, using it as a parallel to assess the propriety of the foreign court's exercise of jurisdiction over a judgment debtor." *Sung Hwan Co. v. Rite Aid Corp.*, 7 N.Y.3d 78, 83 (2006). Here, both the U.K.'s highest court and C.P.L.R. § 302 are in accord: Khrapunov's tortious acts within England provided the U.K. courts with jurisdiction over him.

Similarly, C.P.L.R. § 5305(a)(2), which provides for personal jurisdiction where a party voluntarily appears, applies here. As the U.K. decisions make clear, Khrapunov "voluntarily appeared in the [U.K.] proceedings" to contest a range of issues, including to assert his privilege against self-incrimination to avoid disclosing his assets and impose the "confidentiality club," *see* Ex. C, ¶ 31, and to oppose giving testimony based on a purported fear of extradition. *See* Ex. A, ¶¶ 7-8, 10-12.[2] More importantly, he offered substantive argument on the primary merits issue: the scope of the tort of conspiracy alleged. The New York Court of Appeals addressed virtually the same fact pattern in *CIBC Mellon Tr. Co. v. Mora Hotel Corp. N.V.*, where a litigant in the English Courts had challenged various discovery orders while also challenging jurisdiction over him, and ultimately had his defenses struck out for failure to comply with discovery orders.

---

[2]     Judge Waksman's decision leaves no question that Khrapunov appeared to contest various discovery maters, including his own testimony. *See* Ex. A, at ¶ 7 ("[Khrapunov] was ordered to attend for cross-examination, originally by Mr Justice Teare, in March 2016.  He appealed that decision, inter alia, on the basis that, if he were to come to England to be cross-examined, he was likely to be the subject of an extradition request").

When the judgment creditor sought recognition of the resulting judgment in New York, the judgment debtor opposed recognition on personal jurisdiction grounds, claiming that § 5305(a)(2) did not apply, and arguing that he had appeared before the English courts only to challenge that court's jurisdiction over him. The Court of Appeals rejected that argument and found in favor of the judgment creditor, holding that § 5305(a)(2) forecloses a defendant "from contesting a foreign judgment for lack of personal jurisdiction once the defendant has done anything more than it had to do to preserve its jurisdictional objection." *CIBC Mellon Tr. Co. v. Mora Hotel Corp. N.V*., 100 N.Y.2d 215, 223 (2003). Much like in *CIBC*, the U.K. Supreme Court's decision in the Khrapunov proceedings leaves "no room for doubt that defendants were arguing the merits of the conspiracy claims in the English proceedings." *CIBC*, 100 N.Y.2d at 225. As the U.K. Supreme Court stated, Khrapunov's appeal was

> made on two grounds. The first is that there is no such tort as the Bank asserts, because contempt of court cannot constitute unlawful means for the purpose of the tort of conspiracy. This, [Khrapunov's counsel] submits on his behalf, is because means are unlawful for this purpose only if they would be actionable at the suit of the claimant apart from any combination. Contempt of court, he submits, is not actionable as such.

Ex. B, at ¶ 5.

*Finally*, this Court will have subject matter jurisdiction over the new claim — the sole issue raised by Khrapunov previously in opposing amendment. [*See* ECF No. 886]. Under 28 U.S.C. § 1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy."[3]

---

[3]      In an opinion and order dated September 25, 2017, Judge Nathan found subject matter

As described above, the Khrapunov Judgment arose out of Khrapunov's conspiracy with Ablyazov to breach the U.K. freezing and receivership orders by laundering the "N Project" funds with the aid of Eesh Aggarwal. *See* Ex. A, at ¶ 3-4. Those same "N Project" monies funded the New York investments at the center of this case. [*See, e.g.,* ECF No. 579-01 (Chart of "N Project — Cash Movements" showing movement of funds through "Telford" to "Triadou")]. Indeed, Judge Waksman recognized as such when issuing the Khrapunov Judgement, accepting BTA's offer to carve out approximately $70 million – the approximate amount traceable to Triadou from the N Project — to avoid any possible claim of double recovery. *See* Ex. A at ¶ 27 ("The total principal sum claimed is $495.8 million. The Bank has discounted that to avoid any risk of double recovery, which concerns some New York proceedings. . .."). As such, both this action and that resulting in the Khrapunov Judgment arise from the same "case or controversy" — Khrapunov's knowing assistance in Ablyazov's laundering scheme.

### 3. The Kazakh Entities Have Acted In Good Faith

Plaintiffs have also acted in good faith. Courts have suggested that bad faith may be found where the party seeking to amend a pleading makes allegations "that are contrary to facts of which he has personal knowledge or are verifiably false," or where the amending party seeks a "tactical advantage." *See Blagman v. Apple, Inc.*, 307 F.R.D. 107, 112-113 (S.D.N.Y. 2015); *see also Hernandez v. DMSI Staffing, LLC.*, 79 F. Supp. 3d 1054, 1059 (N.D. Cal. 2015) (finding bad faith where party seeking to amend "engaged in forum-shopping" and "timed her motion to amend so that she could have the benefit of previewing Defendants' motion to compel arbitration

---

jurisdiction in the form of removal jurisdiction under 28 U.S.C. 1441(d). [*See* ECF No. 423, at 11-13]. As such, neither 28 U.S.C. § 1367(b-c) apply here. Neither are there novel or complex issues of state law, or any other exceptional circumstances that would prevent this Court from hearing the new claim in supplemental jurisdiction.

before deciding whether to abandon the federal case in favor of the parallel state case"). Those types of facts are absent here.

The Kazakh Entities cannot seriously be accused of making "verifiably false" allegations. The U.K. judgments speak for themselves.

Nor can the Kazakh entities be accused of timing their motion to seek tactical advantage. As explained in greater detail below in Section B.4, the Kazakh Entities could not have sought to add the U.K. judgments until they became public in August 2018, and they sought to do so promptly thereafter.

Courts typically allow amendments to pleadings "when the opponent could not claim surprise, but effectively should have recognized that the new matter included in the amendment would be at issue." *See* Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1487 (3d ed.). That is precisely the case here. Ilyas Khrapunov knew about the U.K. judgment because he was a party to the U.K. action. The First Amended Crossclaims, filed on September 7, 2016, also explicitly referenced the proceedings in the U.K. against Ilyas. [ECF No. 219, at ¶ 44]. And the Kazakh Entities had previously added similar recognition and enforcement claims against Ablyazov with respect to a similar U.K. judgment. [ECF No. 219, at ¶¶ 192-99]. The only surprise would have been if the Kazakh Entities did nothing here with respect to the U.K. judgment against Ilyas.

 In sum, Plaintiffs have acted in good faith, providing timely information from the U.K. proceedings against Khrapunov at the time they filed the FAC — but the Khrapunov Judgment was still nearly two years in the future when the FAC was filed. Khrapunov had ample notice that he was facing suit in the U.K., and must have understood that any judgment against him might be the subject of recognition and enforcement in the U.S., just as the judgments against Ablyazov currently are.

### 4.    There Has Been No Delay, Much Less Undue Delay

The Khrapunov Judgment was not entered until late-August 2018.[4]  The Kazakh Entities

then promptly asked Ilyas Khrapunov's counsel whether Ilyas would consent to amendment of

the pleadings to add a recognition and enforcement claim. Khrapunov declined to do so in early

October. *See* Ex. G (Oct. 2, 2018 email from Khrapunov's counsel stating that "Ilyas will not

consent to adding a judgment enforcement claim to this case.").

Although they did not appear to have a horse in this race, at the end of October 2018

Triadou also insisted on conferring about the motion to amend. The Kazakh Entities obliged,

conferring with counsel for Triadou in early November. Eventually, after the conferral process

was exhausted, the Kazakh Entities were able to raise the issue by letter dated November 13,

2018. All told, roughly two-and-a-half months passed between the time the Khrapunov Judgment

was handed down and the date Kazakh Entities raised this issue with the Court. During virtually

that entire period, the Kazakh Entities were seeking the Defendants' position on the motion, as

required by the Local Rules and the Court's Individual Practices, and in the hope of avoiding

motion practice on what appeared to be a straight-forward issue — particularly given that the

Court had already permitted prior amendment of the pleadings to add claims to enforce a U.K.

judgment against Ablyazov. There was thus no delay in bringing this motion to amend, much

---

[4]      Though dated "21 June 2018" (*see* Ex. A), the Khrapunov Judgment was not "handed
down" publicly until August 23, 2018. *See* Christina Maza, "Kazakh Who Allegedly Laundered
Money Through Trump Tower Ordered to Pay Bank Back," Newsweek, Aug. 23, 2018,
*available at* https://bit.ly/2Nw8QTy (August 23rd press article stating that "[a] British high court
*ruled Thursday* [August 23rd] that Ilyas Khrapunov, the son of the former mayor of the Kazakh
city of Almaty, conspired with the former chairman of the Kazakh bank BTA to swindle over $6
billion." (emphasis added)); Max Walters, "High Court: 'No Merit' to Kazakh's Extradition
Fears in £4.6bn Fraud Hearing," The Law Society Gazette, Aug. 29, 2018, *available at*
https://bit.ly/2NLN3H9 (August 29th article stating that "[i]n a ruling *published this week*, His
Honour Judge David Waksman said there was no risk that Ilyas Khrapunov would be extradited
from his current base in Switzerland to either Kazakhstan or Russia. (emphasis added)).

less undue delay.

### 5. Khrapunov Will Suffer No Undue Prejudice

Neither Ilyas Khrapunov nor any of the other defendants will be prejudiced by an amendment at this time to add a straightforward recognition and enforcement claim.

"Amendment may be prejudicial when, among other things, it would require the opponent to expend significant additional resources to conduct discovery and prepare for trial or significantly delay the resolution of the dispute." *AEP Energy Servs. Gas Holding Co. v. Bank of America, N.A.*, 626 F.3d 699, 725 (2d Cir.2010). But "[a]llegations that an amendment will require the expenditure of additional time, effort, or money do not [themselves] constitute undue prejudice." *A.V. by Versace, Inc. v. Gianni Versace S.p.A.*, 87 F.Supp.2d 281, 299 (S.D.N.Y. 2000) (internal quotation marks omitted); *see also Margel v. E.G.L. Gem Lab Ltd.*, No. 04 Civ. 1514, 2010 WL 445192, at *10 (S.D.N.Y. Feb. 8, 2010)) ("[t]he prejudice that would flow from any additional required discovery can generally be mitigated by adjustments to the discovery schedule"). As another judge in this District explained, "[w]hether a party had prior notice of a claim and whether the new claim arises from the same transaction as the claims in the original pleading are central to [the] determination" of prejudice. *Blagman*, 307 F.R.D. at 115.

In this case, as has already been explained, the Kazakh Entities had no ability to use the U.K. judgment until it was handed down, *see* Section B.4, and the new claim arises out of the exact same transactions giving rise to this lawsuit, *see* Section B 2. Accordingly, this is simply not an instance where an opponent is prejudiced by an effort to cram untimely and unrelated claims into a previously-filed lawsuit.

Moreover, the new claim will cause Ilyas Khrapunov no actual additional burden.[5] Plaintiffs perceive no need for any factual or expert discovery on the judgment enforcement claim, which will likely be resolved at summary judgment, as is typical in recognition actions. *See* C.P.L.R. § 5303 (stating that recognition may be brought by motion for summary judgment in lieu of complaint). The sole burden on Khrapunov will thus be to brief this issue on summary judgment, which remains months away. This should not be a substantial burden. *See* Section B.2. (laying out the factors to be considered). Moreover, it is a burden that will be shared by Ablyazov, who is already defending a similar judgment enforcement claim. In short, any "burden" imposed by adding a judgment enforcement claim will be minimal, and it certainly will be the same if not less than what Ilyas would face defending a stand-alone state court recognition and enforcement action.

Neither would amendment cause the defendants prejudice by delaying the resolution of this action. As already explained, there should be no need to alter the current case schedule. And based on the most recent discovery schedules exchanged by the parties, summary judgment briefing is not expected until March-April of this year at the earliest; Khrapunov will have ample time to prepare to brief the issue.

In short, this is simply not a case where undue prejudice is a legitimate concern. Indeed, Ilyas will likely expend more resources opposing this motion than he will litigating the claim, if the motion is granted.

---

[5]     The proposed recognition and enforcement claim is solely against Ilyas Khrapunov. It is irrelevant to this motion to amend whether Triadou might someday be held to account as an alter ego of Ilyas should the Khrapunov Judgment be recognized. Triadou will not be subject to any additional fact discovery for a new recognition and enforcement claim, nor will Triadou have to oppose such a claim on summary judgment.

### 6.      <u>Judicial Economy Supports Amendment Here</u>

Finally, and perhaps uniquely important with this defendant and in this case, the proposed amendment will serve judicial economy. Rule 15(a) provides that a court "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "The policy behind this rule is that liberal amendment promotes judicial economy by making it possible to dispose of all contentions between parties in one lawsuit." *Kreisler v. P.T.Z. Realty, L.L.C*., 318 F.R.D. 704, 706 (S.D.N.Y. 2016) (internal quotation marks omitted).

Ilyas Khrapunov's history of gamesmanship in the U.K. proceeding and in this Court is well documented. He has done whatever he can to delay judicial determinations of the claims against him. And he has said whatever he needs to say to serve his interests. [*See, e.g*., ECF No. 564, at 12 ("[T]he Court does not find Ilyas Khrapunov's testimony or affidavit credible. Ilyas Khrapunov has played games with this Court in the past . . .")]. The only reason Ilyas could have to oppose this motion is to force the Kazakh Entities to bring a stand-alone claim against him in a New York State court – and to require the Kazakh Entities to jump through the Hague Convention's hoops to serve him in Switzerland – thereby delaying consideration of the claim. The Kazakh Entities are prepared to do that, but they should not have to, particularly where this Court is already intimately familiar with the facts and Ilyas' prior abuse of the judicial process. Nor does it make sense to burden a sister court with a new action when this Court knows the case and will be considering another judgment recognition claim (against Ablyazov) arising out of a related U.K. litigation.

Amendment would also alleviate the need for serving Khrapunov in a new action through the cumbersome Hague service convention, eliminating a burden on Swiss judicial authorities. *See* Convention of 15 November 1965 on the Service Abroad of Judicial and Extrajudicial

18

Documents in Civil or Commercial Matters, Arts. 3, 5 *available at*

https://www.hcch.net/en/instruments/conventions/full-text/?cid=17 (describing service of process

through receiving state Central Authority, and Central Authority's responsibly to effect service

of process within foreign state). The interests of comity thus favor amendment here to alleviate

burdens on other tribunals.

* * *

For all of these reasons, the Court should allow the proposed amendment under Rule 15's

liberal standard.

**C.    <u>Good Cause Also Exists for the Proposed Amendment</u>**

Were the Court to find that the addition of the judgment enforcement claim would require

amendment of the Rule 16 scheduling order, the "good cause" standard is also easily met here.

The main consideration in assessing good cause to amend under Rule 16 is a party's

diligence. *See Parker*, 204 F.3d at 340; *Cummins, Inc. v. New York Life Ins.*, No. 10 CIV. 9252,

2012 WL 3870308, at *3 (S.D.N.Y. Sept. 6, 2012) ("The focus of the good cause inquiry is on

the diligence of the party seeking to amend, and the court may deny leave to amend where the

party seeking it knew or should have known the facts sought to be added to the complaint.").

Here, the Kazakh Entities have shown such diligence.

As explained above, the Kazakh Entities began the process of seeking leave to amend

promptly after the U.K. judgment was entered in late-August 2018. All told, roughly two-and-a-

half months passed between the time the Khrapunov Judgment was handed down and the time

the Kazakh Entities raised this issue with the Court. During that time, the Kazakh Entities were

engaged in the meet and confer process. But even if they were solely responsible for the passage

of two-and-a-half months, the delay would be well within the diligence expected by courts in this

district. *See, e.g., Olaf Soot Design, LLC v. Daktronics, Inc.*, 299 F. Supp. 3d 395, 399 (S.D.N.Y.

19

2017)  (motion to amend "within a few months" not a failure of diligence); *Soroof Trading Dev. Co., Ltd. v. GE Microgen, Inc*., 283 F.R.D. 142, 148–49 (S.D.N.Y. 2012) (finding diligence and allowing amendment filed two months after facts allegedly learned during discovery); *Permatex, Inc. v. Loctite Corp.*, No. 03 Civ. 943 (GWG), 2004 WL 1354253, at *3 (S.D.N.Y. June 17, 2004) (plaintiff exhibited diligence by moving to amend two months after deposition brought new information to light).

The Kazakh Entities likewise could not possibly have met the original deadline for amended pleadings, as the Khrapunov Judgment was handed down years after the pleadings were closed here. *See Sokol Holdings, Inc. v. BMB Munai, Inc*., No. 05 CV 3749 KMW DCF, 2009 WL 3467756, at *2 (S.D.N.Y. Oct. 28, 2009) ("The party must show that, despite its having exercised diligence, the applicable deadline could not reasonably have been met").

Moreover, even if Plaintiffs had not shown such diligence, the Court would still have discretion to grant amendment under Rule 16, so long as there was not undue prejudice to Ilyas Khrapunov. *See Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc*., 304 F.R.D. 170, 176 (S.D.N.Y. 2014) ("[I]n appropriate circumstances, a district court has discretion to grant a motion to amend even where the moving party has not shown diligence in complying with a deadline for amendments in a Rule 16 scheduling order"); *Coale v. Metro-N. R. Co*., No. 08 Civ. 01307 (CSH), 2009 WL 4881077, at *3 (D. Conn. Dec. 11, 2009) (granting leave to amend where defendant identified no prejudice, despite plaintiff's lack of diligence); *Contrera v. Langer*, 314 F. Supp. 3d 562, 575 (S.D.N.Y. 2018) ("nearly two year" delay did not preclude amendment of pleadings, where no prejudice to defendants). As explained above, *see* Section B.5., there is no prejudice here.

In sum, even if the Court were to apply Rule 16's heightened standard, the Kazakh

20

Entities' motion to amend should be granted.

## **CONCLUSION**

For the above reasons, the Kazakh Entities respectfully request leave to amend the

SAC, in the form accompanying this motion as Exhibit E.


Dated:   New York, New York
         January 7, 2019

                                        Respectfully,

                                         /s/ Matthew L. Schwartz
                                        Matthew L. Schwartz
                                        Peter M. Skinner

                                        BOIES SCHILLER FLEXNER LLP
                                        575 Lexington Avenue
                                        New York, New York 10022
                                        Telephone: (212) 446-2300
                                        Facsimile: (212) 446-2350
                                        E-mail: mlschwartz@bsfllp.com