**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CITY OF ALMATY, KAZAKHSTAN and BTA
BANK JSC,

               Plaintiffs,

     -against-

MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV,
ILYAS KHRAPUNOV, and TRIADOU SPV S.A.,

               Defendants

15 Civ. 5345 (AJN) (KHP)

---

## THE CITY OF ALMATY AND BTA BANK'S MEMORANDUM OF LAW
## IN SUPPORT OF THEIR MOTION FOR DISCOVERY SANCTIONS
## AGAINST DEFENDANTS

BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Plaintiffs City of Almaty,*
*Kazakhstan and BTA Bank JSC*

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................ 1

FACTUAL BACKGROUND .................................................................................... 1

I.      Ilyas Khrapunov and Triadou Destroyed Material Evidence. ..............................1

      A.      Ilyas Khrapunov Controlled Relevant Documents from 2010 to 2014. ..................2

      B.      After the Kazakh Entities Sued Ilyas, Ilyas and Triadou Got Rid of their E-Mails and Started Using Encrypted Messaging. ....................................................4

      C.      Ilyas Deleted His Family Office E-Mails. ................................................................6

      D.      Ilyas Deleted His Encrypted E-Mails. ......................................................................7

II.      Ilyas Khrapunov, Viktor Khrapunov, and Mukhtar Ablyazov Engaged In Extensive Discovery Misconduct During this Litigation......................................8

      A.      Ilyas Obstructed Discovery and Failed to Produce Responsive Documents. ..........8

            1.      Ilyas Failed to Produce His E-Mails. ........................................................ 8

            2.      Ilyas Failed to Produce Records of His Dealings with Frank Monstrey. ................................................................................................. 9

            3.      Ilyas Failed to Produce Records Concerning Eesh Aggarwal. ................. 10

            4.      Ilyas Failed to Disclose the Location of Gennady Petelin. ...................... 10

            5.      Ilyas Stage-Managed Viktor Khrapunov's and the Petelins' Discovery and Litigation Conduct. ........................................................... 10

      B.      Viktor Khrapunov Obstructed Jurisdictional Discovery and Failed to Produce Responsive Documents......................................................................12

      C.      Mukhtar Ablyazov Obstructed Discovery and Failed to Produce Responsive Documents......................................................................................14

ARGUMENT ......................................................................................................... 19

I.      Ilyas and Viktor Khrapunov..............................................................................19

      A.      The Court Should Enter Terminating Sanctions Against Ilyas...........................20

            1.      Ilyas Intentionally Destroyed Electronic Data After He Learned of the Kazakh Entities' Enforcement Efforts in the United States and Failed to Produce Material Documents in His Control....................................... 21

i

2. The Court Should Enter Judgment by Default Against Ilyas, or in the Alternative, Impose an Adverse Inference and Preclude Certain of Ilyas's Defenses. ...................................................................................... 23

B. The Court Should Strike Viktor's Personal Jurisdiction Defense. ........................28

II. The Court Should Impose an Adverse Inference Against Triadou...................................30

III. The Court Should Enter Judgment by Default Against Ablyazov, or in the Alternative, Preclude Ablyazov's Defenses. ....................................................................34

CONCLUSION.................................................................................................................... 35

The City of Almaty, Kazakhstan and BTA Bank (together, the "Kazakh Entities") respectfully submit this memorandum in support of their motion for sanctions.

## PRELIMINARY STATEMENT

The defendants in this case have each engaged in intentional behavior to destroy evidence or prevent the Kazakh Entities from obtaining relevant documents. Triadou deleted the e-mail accounts of three key people, including two accounts belonging to Ilyas Khrapunov – after Ilyas had been sued by the City of Almaty. Ilyas also deleted at least two other e-mail accounts he used to conduct relevant business, hid the location of a key witness, and failed to produce documents from "hundreds" of other e-mail accounts as well as any documents about the hundreds of millions of dollars that he claims he was entrusted to invest. And Viktor Khrapunov and Mukhtar Ablyazov have, between them, produced precisely zero documents – aside from a copy of Viktor's memoir, which his counsel had shipped directly from Amazon to the Plaintiffs' counsel.

This and other, similar intentional misconduct has deprived the Kazakh Entities of numerous sources of undisputedly relevant evidence and compounded the costs of this litigation. As a result, the Court should impose sanctions on each of the defendants.

## FACTUAL BACKGROUND

**I.      Ilyas Khrapunov and Triadou Destroyed Material Evidence.**

The Court is well-familiar with the core facts of this case, which have been developed in evidentiary hearings and explained in many previous filings. [*See, e.g.*, DE 175, 541, 564, 749, 915]. To summarize: Ablyazov stole money from BTA Bank, Viktor Khrapunov stole money from the City of Almaty, and the two of them then worked together with Ilyas Khrapunov and others to launder that money through investments in the United States and elsewhere. As relevant to this case, the stolen money was laundered into the United States through payments made by an entity called Telford International, which purported to invest money on behalf of Triadou – Triadou being a real estate investment fund wholly-owned by Swiss Development Group, or SDG, an entity founded, owned, and controlled by Ilyas Khrapunov.

**A.     Ilyas Khrapunov Controlled Relevant Documents from 2010 to 2014.**

As the Kazakh Entities have explained many times [*see, e.g.*, DE 579, 693, 799], the money that funded the investments at issue in this case traces back from Telford to a shell company called Northern Seas Waterage ("NSW"). NSW was in turn funded — via transfers totaling $440 million — by a man named Frank Monstrey, who owed a purported debt to Ablyazov. [*See, e.g.*, DE 693 at 2-4].

At some point in or about 2010,



Ilyas retained the help of a Dubai-based accountant named Eesh Aggarwal to facilitate the laundering of NSW money through accounts at FBME Bank. And he oversaw the deployment of the $440 million Monstrey paid to: (1) personal and living expenses for Ilyas and his family, including several residential properties in California and condominiums in the Trump Soho building in New York City; (2) international and U.S. real estate investments by SDG — the company Ilyas founded — and SDG's wholly owned subsidiary, Triadou[2]; and (3) Ablyazov's legal defense. [*See*

---

[1] At that time, Ablyazov was subject to global freezing and receivership orders from the U.K. courts. He was thus under an obligation to truthfully disclose his assets, including the Monstrey debt. *See* Schwartz Decl. Exs. 18, 19. Ablyazov did not do so, and instead, worked with Ilyas to divert funds and hide assets — as the U.K. Courts recently found when issuing judgment against Ilyas. [*See* Schwartz Decl. Ex. 20 ¶¶ 2-6.]

[2] This Court previously found that Triadou is the alter ego of SDG. On April 21, 2017, the Kazakh Entities moved to compel the deposition of Marc Gillieron, Triadou's former director and the then-Chairman of the Board of Triadou's parent, SDG. The Court granted the Kazakh Entities' motion, finding that Triadou and SDG were alter egos for discovery purposes. [ECF No. 330, at 16-17; *see also* ECF No. 536 at 2 (order granting in part the Kazakh Entities motion to compel the production of documents from Gillieron and adhering to its prior determination that Triadou and SDG are alter egos").] Through Triadou and its subsidiaries, SDG owned various Unites States-based investments, including (at least) interests in the Flatotel, Cabrini Medical Center, and Syracuse Center in New York, and the Tri-County Mall in Ohio.

Schwartz Decl. Ex. 22.] As relevant to this motion, Ilyas created, received, and sent many records in the course of overseeing the movement of funds into and out of NSW's accounts.

Ilyas also coordinated the activities of SDG and Triadou. As Judge Nathan determined in issuing the Attachment Order in this case, Ilyas was forced in 2012 to step down as Chairman of SDG due to the increasing difficulty SDG was having in securing loans and conducting its business under Ilyas's shadow. [*See* ECF No. 175 at 6.] He sold SDG to Philippe Glatz in a "sham sale" in March 2013, which failed to persuade a third-party bank "'that there's been any real change in the ownership of SDG.'" [*Id.* at 7-9.] ███████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████ Notwithstanding this purported "sale," Ilyas undisputedly remained associated with SDG and Triadou as a nominal consultant until at least March 2015, [*see* Schwartz Decl. Ex. 11 at at 117:5-118:1 (████████████████████████████████████████████████████

████████████████████████████████████████ and as set forth below in fact continued to control certain aspects of SDG and Triadou's activities – including with respect to the U.S. investments – until long after this lawsuit was filed, [Schwartz Decl. Ex. 29].

During this time period, roughly 2010 to 2014, Ilyas had ample reason to anticipate that his actions with respect to NSW, SDG, and Triadou would be the subject of litigation. ██████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ And Ilyas understood he might be the subject of criminal inquiries, admitting to Nicolas Bourg — Triadou's director at the time and a witness Judge Nathan found credible [ECF No. 175 at 5, n.4]

—████████████████████████████████████████████████████████████

[REDACTED]

[REDACTED]

Ilyas also understood that his oversight of SDG's investments in the United States — through its alter ego, Triadou — might lead to litigation. [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

Similarly, in 2014, when the Kazakh Entities in 2014 began closing in on Ilyas's United State-based money laundering enterprise, Ilyas began divesting Triadou's properties in the United States due to the threat of litigation. For example, as Judge Nathan found at the attachment hearing in this case, Ilyas in April 2014 directed Triadou to assign the Flatotel investment back to the Chetrit Group in a below-market assignment that "was motivated by the threat of litigation against the Khrapunovs." [ECF No. 175 at 9.]

For all of these reasons, Ilyas was living under a constant threat of litigation, on many fronts, from at least 2010 into 2014. Nevertheless, even when faced with actual litigation by the Kazakh Entities, he ignored his preservation obligations and instead destroyed the many records he and Triadou controlled.

**B.      After the Kazakh Entities Sued Ilyas, Ilyas and Triadou Got Rid of their E-Mails and Started Using Encrypted Messaging.**

On May 13, 2014, the City of Almaty filed a lawsuit in the Central District of California against Ilyas and members of his family – the very lawsuit that Sater had warned Ilyas about back in October 2013, as explained above. *See City of Almaty v. Viktor Khrapunov, et al.*, No. 14-cv-3650 (C.D. Cal.).[3]

Up until that time, Ilyas had conducted his business on behalf of Triadou and SDG through at least three e-mail accounts: ██████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████      ████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

As explained below, however, in or around July 2014 – months *after* Ilyas was sued in California – Ilyas stopped using these accounts.

At some point by the end of 2014, the contents of Ilyas's two @sdg.ch accounts were entirely deleted,[4] as were the e-mail accounts for two other people directly involved in Triadou's U.S. investments: Nicolas Bourg and Kevin Meyer. SDG/Triadou did not preserve any copies of the deleted date, nor did it retain any backups. This is not a matter of dispute: Triadou admits that the server deletion occurred "[i]n or about August or September of 2014," [ECF No. 308 at 1], at a time when Ilyas continued to "consult" for SDG/Triadou (and after he had been sued in California), and while Bourg continued to be Triadou's sole director.[5]

---

[3]     The Kazakh Entities are aware of at least two separate groups of investments that Ilyas made in the United States – the personal investments for Ilyas and his family (largely in California), and investments through SDG. (It was through discovery in this action that the Kazakh Entities determined that both groups of investments were funded with the same NSW money.) The California action describes the same money laundering scheme alleged here, but with respect to certain of the first group of properties.

[4]     The Kazakh Entities first learned of the spoliation in a meet and confer with Triadou immediately following the deposition of Triadou's corporate representative, ██████████████████

████████████████████████████████████████████████████████

The Kazakh Entities first raised the defendants' destruction of documents in connection with motion practice relating to the deposition of Ilyas Khrapunov. [*See* ECF No. 303 at 1.]

[5]     ████████████████████████████████████████████████████

After wiping the SDG/Triadou server clean, Ilyas and SDG/Triadou went even further: the server settings for Ilyas's @sdg.ch accounts were changed to "POP-3." Triadou's Responses and Objections to Almaty/BTA's Second Set of Interrogatories at 6 (Apr. 24, 2017). This is a configuration that allows messages from an e-mail account to be sent or received, but deletes them from a server automatically. *See* Craig D. Ball, *E-Discovery: Right...From the Start*, SS006 ALI-ABA 247, 345 (2010) (describing how, with POP3, e-mails are automatically deleted from the server when they are accessed). That is, after deleting all of his old @sdg.ch e-mails, Ilyas and SDG/Triadou took affirmative steps to ensure that Ilyas's future e-mails would not be retained.

### C.    Ilyas Deleted His Family Office E-Mails.

Ilyas also deleted the "@rprca-omc.ch" e-mails he and his "family office" representatives used. The Kazakh Entities identified material communications from this account in the records produced by Bourg, including Ilyas's instructions to his subordinates about the fund transfers at issue in this case. [*See* Schwartz Decl. Ex. 38 (1/22/13 e-mail from "ik@rprca-omc.ch" to N. Bourg regarding funds transfers); *Id.* Ex. 39 (3/18/13 e-mail from "ik@rprca-omc.ch" to N. Bourg regarding new Triadou loan agreements).] ████████████████████████████████

████████████████████████████████████████████████    ████  ████

████████████ Ilyas thus conduct Triadou's business using this e-mail account, including long after he purportedly sold any interest in SDG.

When confronted with these e-mails at his deposition, ████████████████████

████████████████████████████████████████████████████████████

██████████.[7]  When asked why Ilyas had failed to produce any e-mails from this account,

_____

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████, nor could he

justify his failure to preserve Triadou-related communications.

### D. Ilyas Deleted His Encrypted E-Mails.

At around the same time that Ilyas ceased using the @sdg.ch and @rprca-omc.ch e-mail accounts that he held in his own name, Ilyas began using anonymous, encrypted e-mails hosted by Cryptoheaven to transact business on behalf of SDG and Triadou. For instance, Ilyas and Cesare Cerrito — an SDG executive and Triadou's director after Nicolas Bourg — began using Cryptoheaven accounts ("Jabba" and "Ikarus") to direct Triadou's domestic investments. ███

██████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

███████████████████████████.[8] Ilyas did not produce documents

from any of these Cryptoheaven accounts in discovery, despite the fact that he was actively using them to manage Triadou's U.S. investments during the pendency of this case. Ilyas and Triadou's other agents continued to use their Cryptoheaven accounts even as Triadou was claiming before Judge Nathan that it had no continuing relationship with Ilyas. [*Compare* Schwartz Decl. Ex. 29, *with* ECF No. 156 at ¶ 22 (May 11, 2016 affidavit of Cesare Cerrito stating "Since the sale [of

---

██████████████████████████████████████████████████

████████████████████████

[8] In addition, Ilyas maintained a series of natural resource themed e-mail accounts ("nickel guy," "uranium guy," "oil man"), which he used, so far as the Kazakh Entities have been able to discern, primarily to communicate with Aggarwal. As described below, Ilyas either failed to preserve, or at least failed to produce, communications from any of these accounts.

SDG to Phillipe Glatz], Ilyas Khrapunov has not been in charge of making payments, disposing or purchasing assets, or anything other than advising the SDG Board and management.").]

Despite their use of these accounts *while this case pending*, neither Ilyas nor Triadou has produced documents from the Cryptoheaven accounts. Instead, Ilyas admitted to deactivating at least one Cryptoheaven account at some point in 2016. [Schwartz Decl. Ex. 36 (representing, through counsel, that "Ilyas Khrapunov does not currently use Jabba@Cryptoheaven.com and the account is no longer active."]. Triadou has never explained why its employees, including Cerrito, have failed to produce their Cryptoheaven e-mails.

\* \* \*

In sum, both at a time when litigation was likely and after litigation was already pending, Ilyas, acting on his own and Triadou's behalf, and Triadou, acting through its other agents, systematically destroyed or otherwise failed to preserve evidence from corporate, Cyryptoheaven and personal accounts.

## II. Ilyas Khrapunov, Viktor Khrapunov, and Mukhtar Ablyazov Engaged In Extensive Discovery Misconduct During this Litigation.

In addition to these affirmative acts of spoliation, all three individual defendants have engaged in further discovery misconduct. Specifically, Ilyas and Viktor have been repeatedly obstructive and, while producing some documents, have failed to meaningfully participate in document discovery. And Ablyazov has failed to participate at all.

### A. Ilyas Obstructed Discovery and Failed to Produce Responsive Documents.

In addition to the many instances described above where there is clear evidence that Ilyas destroyed evidence, he has also failed to collect and produce evidence he likely still has. He also controlled and tried to limit discovery produced by Viktor and by Gennady Petelin.

#### 1. *Ilyas Failed to Produce His E-Mails.*

███████████████████████████████ Despite his personal involvement in negotiating and overseeing the investments at issue in this case, Ilyas did not produce any of his communications from the relevant time period, save for a select few. Indeed, Ilyas has produced a grand total of less than 500 documents reflecting his own communications, virtually all of which were created after this litigation began, and the vast majority of which he initially withheld as purportedly-privileged until threatened with a motion to compel.

Aside from his destruction of the @sdg.ch and @rprca-omc.ch accounts, examples of Ilyas's failure to produce e-mails from accounts that he clearly controls include:

- *Jabba@CryptoHeaven.com*: After Khrapunov's former counsel admitted that they had not collected Ilyas's document nearly a year into discovery, they produced a subset of "yodamaster" e-mails from Cryptoheaven, despite the fact they had previously claimed they could not recover e-mails from Cryptoheaven at all [*see, e.g.*, ECF No. 422]. But the "Jabba" account, which Ilyas undisputedly used to conduct Triadou business, was "no long active" and Ilyas claimed not to be able to access it.

- *theuraniumguy@gmail.com*: From Nicolas Bourg, the Kazakh Entities obtained a limited number of e-mails sent by Ilyas from "theuraniumguy@gmail.com." [*See* Schwartz Decl. Ex. 34 ¶ 23 (Decl. of Nicolas Bourg).] Ilyas used that e-mail account to communicate with Bourg in connection with acquiring the Flatotel. [*See id.* Tab 4 at 9.].

- *thenickelguy@gmail.com*: Through files from Eesh Aggarwal, the Kazakh Entities learned that Ilyas used the address "thenickelguy@gmail.com" when discussing the need for the sham sale of SDG [*See* Schwartz Decl. Ex. 49.]

- *oilman2030@hotmail.com*: Through files from Eesh Aggarwal, the Kazakh Entities learned that Ilyas used the address "thenickelguy@gmail.com" when discussing the NSW funding structure. [*See, e.g.*, Schwartz Decl. Exs. 50, 63.]

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████.

### 2. *Ilyas Failed to Produce Records of His Dealings with Frank Monstrey.*

Ilyas sat at the center of the negotiations that resulted in Monstrey wiring $440 million

---

9 ███████████████████████████████████████████

███████████████████████████████

dollars to NSW. ███████████████████████████

████████████████████████████████████████████

██████████████████████ – but there is no dispute that the funds invested by Ilyas in the

United States on behalf of Triadou came from this $440 million. By all accounts, Ilyas was the

one who coordinated contact with Monstrey and he must have had written communications and

possessed documents relating to the deal – indeed, ████████████████████████████

████████████████████ Ilyas has nevertheless failed to produce a single document

relating to the Monstrey's transactions with NSW, ████████████████████

████████████████████████████████████████████

█████████████████

### 3. *Ilyas Failed to Produce Records Concerning Eesh Aggarwal.*

As demonstrated by e-mails the Kazakh Entities received from Aggarwal's files, Aggarwal

and Ilyas corresponded regularly by e-mail. See, e.g., Schwartz Decl. Exs. 50, 63. ████████

████████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ But Ilyas did not

produce a single document relating to Aggarwal's services.

### 4. *Ilyas Failed to Disclose the Location of Gennady Petelin.*

The defense theory has long been that the money invested in the United States belonged

not to Ablyazov, but rather to Petelin, another member of the family. (Ilyas's sister is married to

Petelin's son, while Ilyas is married to Ablyazov's daughter). Petelin was therefore always a

critical defense witness, which is why he was identified on both the Khrapunovs' and Triadou's

initial disclosures under Rule 26(a)(1). The Khrapunovs, however, listed Petelin's whereabouts as

"unknown." *See* Schwartz Decl. Ex. 56 at 4. But the Khrapunovs have known all along that

Petelin was living in California, ████████████████████████████████

███████████████

### 5. *Ilyas Stage-Managed Viktor Khrapunov's and the Petelins' Discovery and*

***Litigation Conduct.***

Ilyas has been behind the litigation decisions of his father and multiple other critical witnesses, including Petelin and his wife. Ilyas's prior attorneys testified that they communicated with Viktor through him, and that they relied on Ilyas to collect and review Viktor's documents. Schwartz Decl. Ex. 14 at 62:11-17. Ilyas decided what to share with Viktor, and what from Viktor to share with their attorneys. ██████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████ Eventually the Court ordered Viktor to participate, which as detailed further below, Viktor failed to do.

Ilyas's role in handling Gennady Petelin's responses to third-party subpoenas was even more pronounced. Despite the Khrapunovs' failure to list the location of Gennady Petelin, the Kazakh Entities were eventually able to locate Petelin's wife, Elena Petelina, and arranged for her third-party deposition in California. ████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████. The Kazakh Entities immediately subpoenaed Petelin, who tried to avoid service, and then repeatedly objected to giving testimony or producing documents. *See* Motion to Compel and Joint Stipulation at 12-13, 15-16, *City of Almaty v. Petelin*, No. 18-mc-00227-AJN-KHP (S.D.N.Y. Apr. 13, 2018) (summarizing Petelin service and response issues).

For the next eight months, it was Ilyas who surreptitiously managed Petelin's truly frivolous opposition to the document and deposition subpoenas. Much like when Ilyas coordinated Viktor's litigation and discovery strategy, Ilyas decided what Petelin should disclose and when. The Kazakh Entities previously described this conduct in detail on their motion to compel discovery of Petelin. [*See* ECF No. 703.][10] All along, it turned out, Ilyas had acted as an

---

[10] As noted above, Ilyas's role was hidden from Plaintiffs and the court. The Kazakh Entities

"intermediary" between Petelin and Petelin's lawyers, a fact the Court noted as suspicious. [*See* ECF No. 749 at 10]. ███████████████████████████████████████████
████████████████████████████

    With this new information in hand, the Kazakh Entities renewed their demands for communications involving the Khrapunovs and Petelin or Petelin's lawyers. [ECF No. 703]. Despite claiming to act as an intermediary for Petelin, Ilyas did not produce a single record showing he actually passed documents and information on to Petelin. As far as the documentary records shows, every document or communications stopped with Ilyas. Eventually, the Kazakh Entities were able to take the deposition of Petelin, but were forced to do so with incomplete information. Ilyas never produced his communications with Petelin, despite acting as Petelin's intermediary and representing to Petelin's new counsel that he would pass information on to Petelin and convey instructions from Petelin.

    **B.**    **Viktor Khrapunov Obstructed Jurisdictional Discovery and Failed to Produce Responsive Documents.**

    From the beginning, Viktor has never participated meaningfully in document discovery. Viktor has failed to produce a single document from his files. He has not produced any hard copy documents or even a single communication from any electronic account. ██████████████
████████████████████████████████████████████████████████████████████████
██████████████████████████████████████████████]████████████████████████████
██████████████████████████████████████████████████████████████████████
███████████████████████

    Judge Nathan recognized in 2017 that Viktor was non-compliant with his discovery obligations, denying his motion to dismiss and ordering him to participate in jurisdictional discovery. [*See* ECF No. 426 at 50-52.] But Viktor never completed this discovery and chose to continue to obstruct discovery. ███████████████████████████████████████████

---

only learned of Ilyas's involvement when Ilyas accidentally copied an attorney for the Kazakh Entities on a communication with Petelin's lawyer. But for this mistake, there is no reason to think Ilyas or Petelin would ever have disclosed this co-ordination.

██████████████████████████████████████████████████████████

████████████████████████████████ – yet these are the same communications Judge

Nathan identified as key jurisdictional discovery. *See* ECF No. 426, at 51. When the Kazakh

Entities pressed Viktor at his deposition on his failure to produce documents, ███████████

███████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████ In response, the Kazakh Entities asked the Court

to direct Viktor to produce a privilege log that included communications with Ilyas. *See* Schwartz

Decl. Ex. 16 at 75-76, 83-84; *see* ECF No. 768 at 14. Viktor then produced a privilege log that

failed to list a single communication with Ilyas. Viktor also has no excuse for failing to produce

other responsive documents. Viktor admitted at his deposition that there are multiple potential

sources for relevant records.[11]

Following Viktor's deposition, Plaintiffs served a written demand on the Khrapunovs'

then-counsel that they collect, review, and produce Viktor's documents. Viktor's counsel replied

with a one-sentence response, stating that "[a]fter reasonable investigation into his personal files,

Viktor Khrapunov is not in possession, custody, or control of any documents responsive to

[Plaintiffs' document requests]." [*See* ECF No. 800 at 2.] It was only under questioning by the

Court that Viktor's then-counsel admitted that they had trusted their clients (*i.e.*, Ilyas) to do his

own document collection in this action, and had simply been relaying their clients' representations

as to whether they had responsive documents. *See* Schwartz Decl. Ex. 14. at 62:6-12.

Rather than participate in discovery as ordered, Viktor again moved to dismiss on June 20,

2018. [*See* ECF No. 736.] The Kazakh Entities opposed and cross-moved for a second time to

compel Viktor to produce documents and verify that he had searched for certain documents that

---

11 ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████ .

the Kazakh Entities had requested. [ECF No. 768]. At a conference, the Court recognized that Viktor's blanket, unsworn denial that he possessed any responsive documents could not be credited standing alone, *see* Schwartz Decl. Ex. 15 at 24:22-24, and directed his counsel to personally conduct further review and collection of Viktor's documents. *Id*. at 25:6-24. The Court granted the Kazakh Entities' motion to compel in a July 23, 2018 written decision. [ECF No. 800 at 2.][12]

On September 6, 2018, Viktor filed a declaration that purported to "certify" his compliance with this Court's July 23, 2018 Order. [*See* ECF No. 827.] Contrary to the Order, Viktor searched for responsive documents himself, rather than providing his attorneys or another third party with access to his accounts to conduct such searches. [*Id*. ¶¶ 4, 6]. Viktor also used search terms that were far too narrow to comply with the Court's Order.[13] And Viktor claimed, with no further explanation, that he could not access the contents of one of the e-mail accounts that he was required to search. [*See* ECF No. 827 ¶ 7.b.]

### C. Mukhtar Ablyazov Obstructed Discovery and Failed to Produce Responsive Documents.

Ablyazov has not produced a single document in this action. From the very beginning of the case, the Kazakh Entities have sought records from Ablyazov concerning their claims against him and his defenses. Despite testifying to the existence of numerous categories of relevant

---

[12] The Court ordered Viktor, among other things, to "search for and provide to his counsel via secure electronic means (such as a secure FTP site) his own e-mails, text messages, Facebook messages and What's App communications with his son, Petelin and Ablyazov for the period 2010 to the present" concerning various relevant entities, communications, and transactions. [*Id*. at 3.] The Court further required Viktor to "produce an affidavit that identifies the specific e-mail, phone and social media accounts searched (which shall include those identified in his deposition); disclose the search terms or parameters used to search; and identify the number of document hits resulting from the search(es)." [*Id*. at 4].

[13] For instance, the Court required Viktor to search for documents concerning "any of the U.S. properties in which Triadou invested," but Viktor failed to include responsive search terms, omitting, for example, "Syracuse Center" and "Tri-County Mall." [See ECF No. 827 ¶ 4]. Viktor also excluded obvious jurisdictional search terms, such as "New York," that are plainly relevant to the question of personal jurisdiction and might "reflect[] a knowledge of, or participation in the conspiracy alleged in the Complaint in this action." [ECF No. 800 at 3.]

documents in his control, and admitting to regularly communicating with his co-defendants, including about this action – not to mention the fact that he has been involved in litigation concerning some of the same subject matter as here for nearly a decade – Ablyazov has produced nothing.[14]

From the start, Ablyazov has resisted discovery. It took nearly two years, dozens of filings, and numerous court orders for Ablyazov to be deposed. *See* Schwartz Decl. ¶ 3.g. The Kazakh Entities endeavored over the course of the next year to push Ablyazov's deposition forward, including by making multiple inquiries of the French tribunal through phone, e-mail, and letters, and by attempting to secure Ablyazov's cooperation in scheduling a date. Meanwhile, Ablyazov was completely silent. He was silent regarding whether he was ever contacted or summoned by the tribunal, although the Kazakh Entities subsequently learned that his French counsel had been in communication with the tribunal and had raised various objections to the form of any deposition. [ECF No. 811, at 2]. Ablyazov also failed to appear for discovery conferences in this case, [*see, e.g.*, Schwartz Decl. Ex. 15 at 4:12-14], despite the Court's prior orders directing him to appear by telephone, [*see* Schwartz Decl. Ex. 13 at 5:4-8]. [*See also* ECF No. 469 (requiring also that he submit requests in writing to be excused from appearances).] It was only after yet further motion practice, [*see* ECF No. 881] and a second Hague request – to which Ablyazov again objected [*see* ECF No. 842] – that he was ultimately deposed.

Meanwhile, Ablyazov consistently failed to respond to the Kazakh Entities' document requests and interrogatories.[15] Ablyazov's conduct cannot be described as anything other than

---

[14]    For example, the Kazakh Entities' first request for production of documents, served on August 26, 2016, requested documents concerning Ablyazov's ownership and position as Chairman of BTA Bank, relevant documents produced in litigation in the United Kingdom regarding his assets, documents reflecting the sources of funding for SDG, documents concerning FBME Bank (the source of the relevant wire transfers), and documents and communications concerning Gennady Petelin and purported loans between Ablyazov and Petelin. *See* Schwartz Decl. Ex. 55 at 3-5, 22-23, 39, 45-46.

[15]    Ablyazov has persistently failed to respond to interrogatories, doing so only after forcing the Kazakh Entities to move to compel. For example, after Ablyazov's former counsel moved to withdraw and requested that Ablyazov be given additional time to respond to Plaintiffs' first interrogatories, the Court granted the motion to withdraw but did not extend Ablyazov's time to

obstructive. The Kazakh Entities previously raised Ablyazov's non-compliance at the hearing before the Court on July 23, 2018. *See* Schwartz Decl. Ex. 15 at 38:14-25. At the direction of the Court, on August 1, 2018, the Kazakh Entities moved to compel Ablyazov to produce various categories of documents, including his correspondence regarding his deposition. [*See* ECF No. 811 at 3]. Ablyazov did not respond, and on August 10, 2018, the Court ordered Ablyazov to produce documents responsive to the Kazakh Entities' document requests and to coordinate his deposition. [*See* ECF No. 813]. Again, Ablyazov produced nothing.

Ablyazov was finally deposed on October 30 and 31, 2018, and confirmed ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

As one example, ██████████████████████████████████████

████████████ From Ablyazov's website, the Kazakh Entities obtained a copy of one witness statement Ablyazov disclosed in U.K. legal proceedings (described on its face as Ablyazov's twelfth such statement) and confronted Ablyazov at his deposition with inconsistent statements from his sworn U.K. testimony. Despite uploading to his website one witness statement out of at least a dozen such statements submitted to the U.K. courts, ████████████████████████████

████████████████████████████████████████████████████████

---

respond to the discovery requests. [*See* ECF No. 393.] The Kazakh Entities nonetheless waited an additional 30 days before moving to compel responses. [*See* ECF No. 399.] (This was the same motion in which the Kazakh Entities moved to compel Ablyazov to sit for deposition.) As the Kazakh Entities warned Ablyazov at that time, his failure to participate in discovery could result in a later motion for sanctions. [*See id.* at 3 n.4.] In his opposition to the motion to compel, Ablyazov provided blanket denials in response to the Kazakh Entities' interrogatories, which the Court found mooted that aspect of the motion. [*See* ECF No. 420 at 2.] But Ablyazov's discovery responses were misleading and entirely incomplete, as subsequent discovery would prove.



In addition to his witness statements, ██████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████

Ablyazov's only excuse for not producing any of this information in this case ██████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████, documents in his lawyers' possession are within Ablyazov's "possession, custody, or control." Fed. R. Civ. P. 34(a)(1). The need to pay a lawyer's fee in order to access the client's records is not an excuse for failing to meet discovery obligations. *See Barnes v. Alves*, 10 F. Supp. 3d 391, 394-95 (W.D.N.Y. 2014) (noting court's broad discretion to assign cost burden of discovery, especially where "producing party's own conduct" is cause of cost).

---

[16]     These prior statements are key evidence here. Not only did Ablyazov repeatedly ████████ ██████████████████████████████████████████████████ but in light of his failure to produce any documents, his prior statements are the next best thing. For example, confronted with just this one witness statement, ████████████████████████████████ ██████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████

17

Ablyazov also failed to produce documents relevant to his "defense" that the case against him is politically motivated.[17] Ablyazov testified, for example, ██████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████ ███████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████████. Again, Ablyazov produced none of this evidence in this case.

As to his personal communications, Ablyazov admitted that ██████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████

The above examples concern Ablyazov's failure to produce records from specific sources that he controls. But Ablyazov also failed to respond to discovery requests demanding relevant

---

[17] The Kazakh Entities certainly do not concede that Ablyazov's claims of political persecution or selective prosecution state a viable defense, and would move to preclude any such defense as a matter of law, even if Ablyazov had complied with his discovery obligations.

information, not just documents. For example, Ablyazov admitted that ██████████
███████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
█████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
███████████████████████████

**ARGUMENT**

## I.    Ilyas and Viktor Khrapunov

On multiple prior occasions in this case, the Kazakh Entities have successfully obtained

Court orders in response to the Khrapunovs' discovery tactics. On July 19, 2017, the Court issued

a protective order limiting the Khrapunovs' use of stolen documents that they produced less than

24 hours before a deposition and then used to harass BTA Bank's corporate representative with

irrelevant, privileged, and personal material purportedly from his personal e-mail account. [*See*

ECF No. 369.[18] On October 10, 2017, the Court issued a protective order limiting the Khrapunovs'

questioning of BTA Bank's Chairman and controlling shareholder after the Kazakh Entities

learned through social media that the Khrapunovs intended to question the witness about

unfounded accusations regarding his personal life in an attempt to embarrass him. [*See* ECF No.

439.] In the same motion, the Kazakh Entities described the Khrapunovs' prior attempt to notice

the deposition of Kazakhstan's former Prime Minister and Chairman of the Committee for

National Security; a deposition the Khrapunovs quietly abandoned after the Kazakh Entities

threatened a motion for sanctions during a meet and confer. On March 5, 2018, the Court

---

[18]    After additional motion practice, the Court ordered the Khrapunovs to produce all of the
stolen documents (approximately 138,000 documents), which accounts for substantially all (over
99%) of the documents the Khrapunovs have produced in this action. [*See* ECF No. 541.]

sanctioned Ilyas and Viktor for leaking BTA's Chairman's confidential deposition transcript to further their political agenda, and the Court awarded the Kazakh Entities their attorneys' fees and costs. [*See* ECF No. 564 at 12 ("Ilyas Khrapunov has played games with this Court in the past, and his violation of the Confidentiality Order here is simply another example of this behavior.").]

The Khrapunovs also did not produce any of their own communications until their prior counsel was put on the stand during the evidentiary hearing that led to the March 2018 sanctions order. At that hearing, the Khrapunovs' then-counsel was forced to admit that they had not collected *any documents* from their clients. *See* 11/17/18 Hr'g Tr. at 65:2-66:13. It was only after this startling admission – three years into this litigation – that the Khrapunovs began to produce any of their communications (solely those of Ilyas), and they initially withheld more than 95% of these communications as privileged. *See* 2/12/18 Hr'g Tr. at 61:7-12 (counsel's admission that the Khrapunovs withheld all but 150 of 3000 document collected from Ilyas's computer). When it was revealed that hundreds of those withheld documents were in fact non-privileged communications between Ilyas and counsel for non-party Gennady Petelin, the Khrapunovs nonetheless refused to produce them until threatened with yet another motion to compel.[19]

Despite the Court's best efforts to police the Khrapunovs' misconduct, including protective orders and sanctions, they have yet to be held fully accountable for their improper discovery conduct. The Kazakh Entities describe below additional sanctionable conduct by each of the Khrapunovs for which the Court should impose targeted and appropriate sanctions.

### A.     The Court Should Enter Terminating Sanctions Against Ilyas.

Ilyas Khrapunov's sanctionable discovery conduct here is calculated and overwhelming. For years Ilyas has engaged in a protracted campaign to flout discovery and shape the evidence to

---

[19]     The Khrapunovs' failure to produce these communications is detailed in Plaintiffs' letter of June 1, 2018 [ECF No. 703].

his own narrative. He has ambushed witnesses with their stolen documents, broadcast an intention to harass and intimidate witnesses on Facebook, noticed the deposition of a high-ranking Kazakh government official just to post on Facebook about it, refused to produce (or even to collect) responsive documents, ███████████████████████████████████ ████████████████ orchestrated the destruction of an e-mail server for one of the few accounts he admits to using, lied extensively in his deposition, failed to disclose the location of the key witnesses in the United States notwithstanding his claim that they will exonerate him, stage-managed the litigation strategy of third parties and his father, and attempted to dispose of assets in New York during the pendency of this action.

As detailed in the factual background above, this motion focuses on three discrete categories of Ilyas's discovery misconduct, and the appropriate sanctions: (1) Ilyas deleted his SDG, CrytpoHeaven, and family office e-mails in order to avoid their discovery; (2) Ilyas failed to produce, and ignored Court orders compelling him to produce, responsive records within his control; and (3) Ilyas intentionally hid and obstructed discovery into Monstrey and Petelin, who are at the center of the defense case.

Given Ilyas's disregard for the rules of discovery and the prior orders of this Court, the Kazakh Entities respectfully request terminating sanctions against Ilyas, striking his answer and rendering judgment against him. In the alternative, should the Court determine that lesser sanctions are warranted, the Kazak Entities request an adverse inference that documents he failed to produce would have been unfavorable to his defense, and an order precluding Ilyas's use of documents produced by Gennady Petelin and Petelin's testimony about those documents. Each of these lesser sanctions is specifically tailored to his conduct, described more fully below. The Kazakh Entities further request attorneys' fees and costs associated with this motion practice.

### 1. Ilyas Intentionally Destroyed Electronic Data After He Learned of the

***Kazakh Entities' Enforcement Efforts in the United States and Failed to Produce Material Documents in His Control.***

Despite his obligations to preserve and produce documents relating to his laundering of Ablyazov's money through NSW, he produced none of it, and in fact purposefully destroyed numerous e-mail accounts while claiming to have forgotten the rest. The Kazakh Entities, through great effort and expense, managed to recover a small portion of these documents from third parties, just enough to demonstrate the scope of what Ilyas destroyed or failed to produce. The factual background above describes at least four different e-mail accounts that Ilyas deleted. *See* Factual Background § I. Collectively, documents recovered from these e-mails demonstrate, among other things, Ilyas's involvement in laundering Ablyazov's stolen funds throughout the world, including in the United States, and his utter control over SDG and Triadou long after he purportedly "sold" SDG to Glatz. The Kazakh Entities also described the multiple different events across a period of several years that put Ilyas on clear notice that he had an obligation to preserve this data. *See id.* (discussing, *inter alia*, funneling money from NSW to investments in California and elsewhere in the United States through SDG and Triadou, , the fire sale of the Flatotel and deleting e-mail accounts, and the California lawsuit itself).

It is absurd to think that Ilyas, who purportedly managed the investment of nearly half a billion dollars on behalf of Petelin and oversaw SDG/Triadou's U.S. investments well into 2016, would have so little to show for it. The reasons are clear. What the above shows is a pattern of behavior by Ilyas designed to hide his criminal communications and protect them from discovery. In certain instances, Ilyas intentionally deactivated accounts or destroyed them. In other instances,

Ilyas simply failed to produce documents at all, or curated what he and others would produce. And the limited sets of documents that the Kazakh Entities have been able to obtain from third parties show how critically important these documents are to this case.

**2.**      ***The Court Should Enter Judgment by Default Against Ilyas, or in the Alternative, Impose an Adverse Inference and Preclude Certain of Ilyas's Defenses.***

Federal Rule of Civil Procedure 37 governs a party's failure to obey a discovery order or comply with discovery requests. *See* Fed. R. Civ. P. 37. The rule functions to "ensure that a party will not be able to profit from its own failure to comply" and "to secure compliance with the particular order at hand." *Cine Forty-Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066 (2d Cir. 1979). "[C]ourts have identified relevant considerations to assist in deciding whether discovery abuse warrants the entry of judgment, including: (a) willfulness or bad faith of the noncompliant party; (b) the history, if any, of noncompliance; (c) the effectiveness of lesser sanctions; (d) whether the noncompliant party had been warned about the possibility of sanctions; (e) the client's complicity; and (f) prejudice to the moving party." *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees & Rest. Employees Int'l Union*, 212 F.R.D. 178, 220 (S.D.N.Y. 2003) (internal quotation marks omitted).

Ilyas's discovery misconduct warrants the most severe sanctions. He knowingly lied about his e-mail accounts in his interrogatory responses; he knowingly lied about Petelin's whereabouts in his Rule 26 disclosures; he purposefully deleted responsive e-mails when he was on notice of pending litigation (the @sdg.ch and family office e-mails) and during this litigation (the Jabba account at the very least); he put forward his Petelin defense while at the same time obstructing discovery into Petelin and failing to produce documents that Ilyas signed relating to Monstrey and Petelin; he previously misled this Court and was sanctioned for violating the protective order; and

he failed to produce a broad range of responsive documents and e-mails.[20]

In light of this sweeping pattern of discovery abuse, the Court should send a strong message that at the same time remedies the prejudices that the Kazakh Entities have experienced. The Court should enter judgment by default, which the Court may do under either Rule 37(e) or the Court's inherent authority. *See* Fed. R. Civ. P. 37(e)(2); *West v. Goodyear Tire & Rubber Co*., 167 F.3d 776, 779 (2d Cir.1999) (Under inherent authority, "[d]ismissal is appropriate if there is a showing of willfulness, bad faith, or fault on the part of the sanctioned party."); *Cf. Gutman v. Klein*, No. 03CV1570(BMC)(RML), 2008 WL 4682208, at *12 (E.D.N.Y. Oct. 15, 2008) ("[L]esser sanctions such as adverse inferences are ill-suited to a case like this, where the spoliator has, in bad faith, irretrievably deleted computer files that likely contained important discovery information."), *report and recommendation adopted*, No. 03 CIV. 1570 (BMC), 2008 WL 5084182 (E.D.N.Y. Dec. 2, 2008), *aff'd*, 515 F. App'x 8 (2d Cir. 2013); *Southern New England Telephone Co. v. Global NAPs, Inc*., 251 F.R.D. 82, 95 (D. Conn. 2008) (awarding default where "orders compelling disclosure and imposing monetary sanctions have not worked" and "any adverse inference sufficient to sanction defendant[ ] ... would effectively amount to a directed verdict or the equivalent of a default judgment"), *aff'd*, 624 F.3d 123 (2d Cir. 2010).

Should the Court determine that lesser sanctions are warranted, the Court should impose an adverse inference for Ilyas's spoliation of his Jabba, family office, and SDG e-mails, establishing that the content of those e-mail accounts would have been unfavorable to the defense, and that the fact-finder is permitted to conclude based on Ilyas's spoliation that, at the very least: Ilyas

---

[20] Ilyas has obstructed discovery in numerous other ways, as well. For example, the Kazakh Entities were forced to seek the Court's intervention on multiple successive occasions in order to compel Ilyas to produce the so-called "Kazaword" documents, which he claimed to have downloaded from a public website. Of course, as detailed in the Kazakh Entities' various motions, Ilyas obfuscated what he had downloaded because he carelessly produced to the Kazakh Entities stolen documents that were never (to our knowledge) available on-line, such as an unsigned draft version of a release agreement with third-party Laurent Foucher.

controlled Triadou; Ilyas laundered funds through the NSW structure put in place by Aggarwal, and Ilyas was Jabba@CryptoHeaven.com and the other anonymous gmail accounts.

"The party seeking discovery sanctions on the basis of spoliation must show by a preponderance of the evidence: '(1) that the party having control over the evidence had an obligation to preserve it at the time it was destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense.'" *Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 628 (2d Cir. 2018) (upholding sanctions award against a company that allowed its agents to delete electronic data) (quoting *Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012)). "If these elements are established, a district court may, at its discretion, grant an adverse inference jury instruction insofar as such a sanction would serve the threefold purpose of (1) deterring parties from destroying evidence; (2) placing the risk of an erroneous evaluation of the content of the destroyed evidence on the party responsible for its destruction; and (3) restoring the party harmed by the loss of evidence helpful to its case to where the party would have been in the absence of spoliation." *Chin*, 685 F.3d at 162 (internal quotation marks and alterations omitted).

Ilyas's conduct easily meets the test for an adverse inference. As detailed above, Ilyas knowingly involved himself in Ablyazov's money laundering scheme as far back as 2011, ███ ███████████████████████████████████████████████████████████████████████ ███████████████ Judge Nathan has already found that Khrapunov and SDG/Triadou were anticipating litigation in early 2013 when they executed the sham sale, *see* ECF No. 175 at 7-9, and at the very *latest*, Ilyas was under a duty to preserve when he was named in the May 2014

lawsuit in California. As to his state of mind,[21] the circumstantial evidence surrounding Ilyas's use

and selective production of e-mails demonstrates his intent to deprive the Kazakh Entities of

discoverable evidence. Lastly, the documents from these accounts that the Kazakh Entities have

been able to recover demonstrate their relevance to the case. The examples listed above concern

the movement of NSW money, the structuring of the money laundering corporate scheme, Ilyas's

control over SDG/Triadou long after he claimed to have sold it and disassociated himself, and the

negotiations regarding the Flatotel and Syracuse property.

An adverse inference is also appropriate to further the goals of deterrence, placing the risk

on the responsible party, and restoring the Kazakh Entities to the place they would have been in

had the evidence not been destroyed. The e-mails and documents obtained through third party

discovery, such as those from Aggarwal and Bourg, directly implicate Ilyas in the money

laundering scheme. There is every reason to believe that the additional information that was

destroyed – as distinguished from the curated information Ilyas chose to disclose – would have

been favorable to the Kazakh Entities. Sanctions also compensate the Kazakh Entities for the

prolonged litigation and considerable expense they undertook to obtain information that should

have been produced by Ilyas in the first instance.

Additionally, the Court should preclude Ilyas's use of Petelin's documents and testimony

in aid of his defense. Under Rule 37(c)(1), "If a party fails to provide information or identify a

---

[21]     While the Kazakh Entities have established Ilyas's intentional conduct, the Kazakh Entities
respectfully submit that the prior version of Rule 37(e) should apply in determining Ilyas's
requisite state of mind, which required a showing of at least negligence. *See Residential Funding
Corp. v. DeGeorge Capital Corp.*, 306 F.3d 99, 108 (2d Cir. 2002). Ilyas was named in this and
the California lawsuits before, and the destruction of the @sdg.ch server occurred before, Rule 37
was amended in late 2015 to require a heightened showing of scienter. The application of the new
rule would therefore be unjust and impracticable. *See Distefano v. Law Offices of Barbara H.
Katsos, PC*, No. CV112893PKCAKT, 2017 WL 1968278, at *4 (E.D.N.Y. May 11, 2017);
*Hadiyah v. City of New York*, 12-CV-6180, 2017 WL 530460, at *26-*27 (E.D.N.Y. Feb. 7,
2017).

witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).[22] The Court may and should also award other sanctions, such as payment of fees, informing the jury of the party's failure, and other sanctions. There is no justification that Ilyas can provide for his obstruction into discovery of Petelin, including his failure to identify Petelin's known whereabouts in California and his failure to produce his communications with Petelin. Ilyas's conduct was also not harmless. The Kazakh Entities spent considerable time and expense in tracking Petelin down and forcing Petelin to cooperate in discovery. Ilyas delayed Petelin's deposition, waiting to see if Monstrey would be deposed, and after Monstrey was deposed, requesting additional time for "Petelin" to obtain selected documents to rebut Monstrey from an unidentified agent purportedly in Russia.[23] The Kazakh Entities therefore still have an incomplete picture of Petelin's relationship to Ilyas, and the services Ilyas provided on Petelin's behalf. In other words, the Kazakh Entities have been deprived of a fair opportunity to challenge Ilyas's Petelin defense, which they would have done at the beginning of the case. Instead, Ilyas delayed and was able to shape Petelin's testimony and document productions to fit Ilyas's false narrative, including by producing fraudulent and competing versions of Monstrey's documents. The Court should therefore preclude the introduction of Petelin's documents and testimony.

The Kazakh Entities also request that any of the above sanctions against Ilyas be accompanied by an award of costs and fees incurred as a result of the Kazakh Entities' efforts "to obtain the discovery to which they were entitled." *Syntel Sterling Best Shores Mauritius Ltd. v.*

---

[22]  *See also* Fed. R. Civ. P. 26(g)(3).
[23]  As noted elsewhere, ███████████████████████████████

*TriZetto Grp.*, No. 115CV00211LGSSDA, 2018 WL 4489286, at *22 (S.D.N.Y. Sept. 19, 2018) (awarding fees and reopening fact discovery at the sanctioned party's expense).

**B.    The Court Should Strike Viktor's Personal Jurisdiction Defense.**

Viktor has failed to participate in discovery other than to sit for his own deposition, at which ███████████████████████████████████████████████████████████████ ███████████████████████████████████[24] This strategy is contrary to the Federal Rules of Civil Procedure and is simply more of the Khrapunov's "catch me if you can" approach to this litigation. [*See* ECF No. 564, at 13]. It was only after the Court ordered Viktor to search for responsive records that he even made an attempt to comply. But Viktor remains non-compliant with multiple court orders compelling him to participate in discovery. *See* Factual Background § II(B). As such, the Court should impose appropriate sanctions, including denying Viktor's motion to dismiss for lack of personal jurisdiction.

Striking Viktor's personal jurisdiction defense is an appropriate sanction here to avoid rewarding Viktor for delay. "A defendant who has failed to obey a district court's order to produce information relating to his defense of lack of personal jurisdiction may properly be sanctioned by the striking of his personal jurisdiction defense." *Chevron Corp. v. Donziger*, 833 F.3d 74, 147 (2d Cir. 2016) (upholding district court decision to strike personal jurisdiction defenses). Such a sanction directly relates to the "claim or defense" which was at issue in the orders to provide discovery. *See Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982) (upholding imposition of a sanction that established personal jurisdiction for failure to comply

---

[24]    The Kazakh Entities have previously explained Viktor's misuse of this case to serve his own ends. [*See, e.g.*, ECF No. 768 at 6-14 (describing instances of Viktor's bad faith and incredible testimony, including that ████████████████████████████████████████ ████████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████).]

with an order directing jurisdictional discovery).

The sanction here is also "just" under Rule 37(b)(2). Viktor has been ordered twice, by two separate judges, to participate in jurisdictional discovery and failed both times. [*See* ECF No. 426 at 50-52; ECF No. 800 at 2.] In response to the first order, from September 2017, Viktor did absolutely nothing at all, ████████████████████████████████████████████ ███████████████████████████████████████████████████████. And in response to the second order, Viktor purposefully carved out communications with Ilyas from his production – the most likely source of communications showing his connection to the money laundering conspiracy that Judge Nathan already determined he was adequately alleged to have participated in. [*See* ECF No. 426 at 33-34.]  And after frivolously claiming privilege over all of his communications with his son, Viktor failed to log a single such communication.

Viktor also disobeyed the direction that someone other than Viktor or Ilyas search Viktor's records. And for the search that Viktor did complete, he used completely inadequate search terms. Courts regularly strike a personal jurisdiction defense as a sanction for failing to comply with jurisdictional discovery in situations similar to this one. *See, e.g.*, *Ins. Corp. of Ir., Ltd.*, 456 U.S. at 708-09 ("Having put the issue in question, [the non-complying parties] did not have the option of blocking the reasonable attempt of [the other party] to meet its burden of proof."); *Chevron Corp.*, 833 F.3d at 147-48; *see also Adrian Shipholding Inc. v. Lawndale Grp. S.A.*, No. 08 Civ. 11124(HB)(GWG), 2012 WL 104939, at *6-8 (S.D.N.Y. Jan. 13, 2012) (same and citing additional cases), *report and recommendation adopted*, 2012 WL 407475 (S.D.N.Y. 2012).

The Kazakh Entities respectfully request that the Court strike Viktor's personal jurisdiction defense and order costs and attorneys' fees associated with this motion.[25]

---

[25]   Because Viktor's motion to dismiss for lack of personal jurisdiction is currently before Judge Nathan, we respectfully submit that this Court should take as established that personal

## II.    The Court Should Impose an Adverse Inference Against Triadou.

The Kazakh Entities respectfully submit that Triadou is jointly responsible with Ilyas for the destruction of Ilyas's and others' @sdg.ch e-mail accounts and for the failure to preserve Ilyas's subsequent @sdg.ch e-mails by switching to the POP-3 e-mail protocol. Like Ilyas, Triadou – the shell subsidiary and alter ego of SDG – had control over the @sdg.ch server at the time it was destroyed.  Indeed, Triadou did not have separate e-mail servers, and all Triadou business was (or at least was supposed to have been) conducted through @sdg.ch accounts. Triadou knew that Ilyas was the subject of various enforcement and investigative actions concerning its U.S. investments, including at the very least the California action, and the evidence was clearly relevant to the claims and defenses in this case. *See Klipsch Grp., Inc*., 880 F.3d at 628. For the same reasons as with Ilyas, an adverse inference would uphold the threefold purpose of deterrence, placing the risk of destruction on Triadou rather than the Kazakh Entities, and restore the Kazakh Entities' case to where it would have been had the server not been destroyed. *See Chin*, 685 F.3d at 162.

This Court previously found that Triadou is the alter ego of SDG. On April 21, 2017, the Kazakh Entities moved to compel the deposition of Marc Gillieron, Triadou's former director and the then-Chairman of the Board of Triadou's parent, SDG. The Court granted the Kazakh Entities' motion, finding that Triadou and SDG were alter egos for discovery purposes. [ECF No. 330, at 16-17; *see also* ECF No. 536 at 2).][26]

Cesare Cerrito – Triadou's director at the time of the server deletion – ████████████████

---

jurisdiction exists and recommend to Judge Nathan that she deny Viktor's motion on that basis.
[26]    Triadou then sought reconsideration, revealing that Gillieron had inexplicably resigned some weeks earlier after his deposition was noticed, and was refusing to sit for a deposition. The Court denied reconsideration, and remarked that it was "troubled by the timing of Gillieron's resignation," and found Triadou's explanation for Gillieron's sudden resignation "implausible" and "incredible." [ECF No. 398, at 6-7].



. Each of these events occurred *after* the sale of Triadou's interest in the Flatotel, which Judge Nathan has already found to be a fraudulent conveyance intended to avoid asset seizures, ECF No. 175 at 9, and *after* the Khrapunovs were named in the California lawsuit.

Triadou has been tellingly unable to produce any documentary evidence explaining when or why it deleted the relevant e-mail accounts. At most, it claims that the accounts were deleted in connection with an office move "[i]n or about August or September of 2014[.]" [ECF No. 308 at 1].[28] Notably, this was right before Triadou brought suit against Chetrit regarding the Flatotel sale, and Triadou cannot credibly claim that it was not contemplating litigation at this time. The Court should not credit Triadou's explanation, or at the very least, the Court should hold an evidentiary hearing to determine why Triadou deleted Ilyas's e-mails.

The appropriate remedy against Triadou here is an adverse inference that the SDG e-mails

---

27 ████████████████████████████████████████████████████
████████████████████████████████████████████

Triaodu has been tellingly inconsistent on when exactly these accounts were deleted. For example, Triadou claimed that Cerrito was unable to answer many questions at his deposition because Bourg took "Triadou documents and emails when Triadou terminated him as director – documents that Bourg has apparently provided to Almaty/BTA." [ECF No. 319 at 2.] Bourg was terminated on or about October 31, 2014, *after* the supposed deletion of Bourg's e-mails from the SDG server. *See* Triadou 30(b)(6) (Cerrito) Dep. at 196:21-23.

would have contained information helpful to the Kazakh Entities' case,[29] as well as the fees and costs associated with bringing this motion. Each of the required elements for sanctions under Rule 37(e) satisfied with respect to Triadou, under either the old or new version of Rule 37(e). To begin with, there is no reasonably dispute that Triadou – which at the time was controlled by Ilyas – had an obligation to preserve Ilyas's e-mails.  The same reasons that the Court found that SDG and Triadou were alter egos still apply. In addition, SDG and its agents at the time of the server destruction, principally Ilyas, Cerrito, Peter Krasnov, and Marc Gillieron, conducted both SDG's and Triadou's affairs and were familiar with both Ilyas's legal liabilities and their relationship to Triadou's investment activities. The newly reformatted server was placed under Cerrito's control, then Triadou's director. And not only did Triadou fail to preserve the information on the old server, Triadou ensured the new server would not retain copies of Ilyas's e-mails going forward.[30] Glatz – the straw purchaser of SDG – testified that Ilyas remained an advisor to SDG following the sale of the company. Schwartz Decl. Ex. 3 at 276:24-277:9. But Glatz claimed to be unaware that Ilyas continued to directly supervise Triadou's U.S. investments. *Id.* at 395:23-396:8.

Based on this evidence and the evidence described in the factual background above, the Court should conclude that Triadou knowingly participated in the destruction of Ilyas's, Bourg's, and Meyer's @sdg.ch e-mails to deprive the Kazakh Entities of discoverable evidence. Multiple different events both put Triadou on notice that it should have preserved the content on the server and establish Triadou's motive to destroy the evidence: Triadou engaged in litigation with Felix Sater, ████████████████████████████████ Ilyas sold SDG to Glatz in a sham sale; Swiss prosecutors were investigating SDG and requesting documents, while SDG was

---

[29]     Should the Court grant the Kazakh Entities' motion, they are prepared to submit suggested forms of the inferences.

[30]     *See Orbit Comm'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 441 (S.D.N.Y. 2010) ("Courts consider the failure to adopt good preservation practices as one factor in the determination of whether discovery sanctions should issue.").

affirmatively misrepresenting Ilyas's ongoing connection to the company; ███████████ ████████████████████████████████████████████████████████████ Triadou was engaged in settlement talks with Chetrit and contemplating suing the Chetrit Group, which Triadou did shortly after deleting the server; and Ilyas was sued by the City of Almaty months before the server deletion in a lawsuit that specifically identified SDG as a money laundering front for the Khrapunovs.

An adverse inference is therefore a just sanction against Triadou, as it places the risk of what the server contained on Triadou and not the Kazakh Entities. *See Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir.1998) (observing that party's destruction of evidence "relevant to proof of an issue at trial can support an inference that the evidence would have been unfavorable to the party responsible for its destruction"), *overruled on other grounds*, *Rotella v. Wood*, 528 U.S. 549 (2000). An adverse inference would also remedy the prejudice the Kazakh Entities have suffered as a result of the spoliation. The Court previously recognized that Ilyas is a central actor in this case. [*See* ECF No. 330, at 13]. ██████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████

Finally, the @sdg.ch e-mails likely contained communications concerning a central issue in this case, which is why the defendants liquidated the Flatotel asset at a below-market price. Based on the evidence presented at the attachment hearing, Judge Nathan found that the "below-market assignment was motivated by the threat of litigation against the Khrapunovs." [ECF No. 175 at 9 & n.8.] Ilyas and Bourg directly negotiated the Flatotel transactions with the Chetrit Group on behalf of Triadou, and their deleted e-mails should have been preserved and produced. The circumstances surrounding the server deletion strongly suggest that those e-mails would have

further bolstered Judge Nathan's finding, not undermined it.[31]

## III. The Court Should Enter Judgment by Default Against Ablyazov, or in the Alternative, Preclude Ablyazov's Defenses.

Ablyazov has completely failed to meet his discovery obligations. The testimony of Ablyazov and others concerning discoverable evidence in Ablyazov's control, and the proven existence of responsive documents from independent sources, show that Ablyazov acted in bad faith. Ablyazov responded to interrogatories and requests for admission concerning the existence of responsive evidence with blanket denials, only after repeated threatened (or filed) motions to compel. He ignored multiple motions by the Kazakh Entities and court orders compelling him to respond to document and other discovery requests. The entry of judgment by default is an appropriate and just sanction to remedy Ablyazov's discovery abuses. *See, e.g.*, *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 96 S. Ct. 2778, 49 L. Ed. 2d 747 (1976) (noting the district court's substantial discretion and upholding dismissal where the sanctioned party acted in bad faith, failed to timely answer interrogatories, and its counsel disregarded its responsibilities); *Urbont v. Sony Music Entm't*, No. 11 Civ. 4516 (NRB), 2014 WL 6433347, at *1 (S.D.N.Y. Nov. 6, 2014) (granting a motion for sanctions, costs, and default judgment against a defendant who failed to participate in discovery).

At the very least, Ablyazov should be precluded from presenting defenses in this case where he has refused to produce relevant evidence. *See* Schwartz Decl. Ex. 10 at 112:2-4. One such defense, for example, is Ablyazov's claim that the case against him is politically motivated. While he referred to documentary evidence he submitted in other proceedings, ████████████

████████████████████████████████████████████████████████

---

[31]    The Kazakh Entities also respectfully request that the Court hold Ilyas and Triadou jointly and severally responsible for the fees and costs associated with discovery into, and motion practice relating to, the @sdg.ch server destruction.

██████████████████ Another such defense is the claim that the money at issue here did not belong to Ablyazov. Third-parties have produced documents about the funds at issue with Ablyazov's signature on them, none of which Ablyazov admitted to or produced. Since the Kazakh Entities have been completely unable to confront him with documents he claims support his defenses, Ablyazov should be precluded from offering documents later. *See Excellent Home Care Servs., LLC v. FGA, Inc.*, No. 13CV5390ILGCLP, 2018 WL 4782340, at *4 (E.D.N.Y. Sept. 4, 2018) (sanctioning and precluding the plaintiff from relying on documents that it did not produce in discovery), *report and recommendation adopted*, No. 13-CV-5390(ILG)(CLP), 2018 WL 4783957 (E.D.N.Y. Oct. 2, 2018). Evidence from third parties also confirms Ablyazov's misconduct. Both Khrapunov defendants, for example, admitted in their depositions that they remain in contact with Ablyazov through electronic means or interlocutors (all of which would be discoverable evidence).

## CONCLUSION

For the above reasons, this Court should grant the sanctions requested in this motion.

Dated:       January 8, 2019
                New York, New York

Respectfully,

 /s/ Matthew L. Schwartz
Matthew L. Schwartz
Peter M. Skinner

BOIES SCHILLER FLEXNER LLP
575 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-2300
Facsimile:  (212) 446-2350
E-mail: mlschwartz@bsfllp.com