**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF ALMATY, KAZAKHSTAN and BTA
BANK JSC,

                 Plaintiffs,

     -against-

MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV,
ILYAS KHRAPUNOV, and TRIADOU SPV S.A.,

                 Defendants

15 Civ. 5345 (AJN) (KHP)

## THE CITY OF ALMATY AND BTA BANK'S REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION FOR DISCOVERY SANCTIONS AGAINST DEFENDANTS

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Plaintiffs City of Almaty,*
*Kazakhstan and BTA Bank JSC*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT ............................................................................................................................. 1

I.  Triadou and Ilyas Intentionally Spoliated Electronic Evidence. ......................................1

    A.  Triadou and Ilyas Had a Duty to Preserve E-mails Relating to the
        Negotiations and Funding of SDG's U.S. Investments. ......................................1

    B.  The SDG Server Contained Highly Material Communications. ...........................7

    C.  Ilyas Destroyed Other Material Evidence. .........................................................7

    D.  Triadou's and Ilyas's Destruction of Electronic Evidence Was Deliberate ...........9

II.  Ilyas's Jurisdictional and Equitable Defenses to the Sanctions Motion Are
     Meritless...........................................................................................................................11

III.  The Court Should Strike Viktor's Personal Jurisdiction Defense ....................................13

IV.  Ablyazov Obstructed Discovery and Failed to Produce Responsive Documents. ............14

CONCLUSION.......................................................................................................................... 16

# TABLE OF AUTHORITIES

## Cases

*Ala. Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730 (N.D. Ala. 2017)................................ 10

*Altissima Ltd. v. One Niagara LLC*, No. 08-cv-00756, 2010 WL 502834 (W.D.N.Y. Feb. 8, 2010) ............................................................................................................................. 11

*Christopher v. Stanley-Bostitch, Inc.*, 240 F.3d 95 (1st Cir. 2001) ............................... 11

*E*Trade Securities LLC v. Deutsche Bank AG*, 230 F.R.D. 582 (D. Minn. 2005) ...................... 5

*Experience Hendrix, LLC v. Pitsicalis*, No. 17 Civ. 1927 (PAE), 2018 WL 6191039 (S.D.N.Y. Nov. 28, 2018) .......................................................................................................... 11

*Fayemi v. Hambrecht & Quist, Inc.*, 174 F.R.D. 319 (S.D.N.Y. 1997)....................................... 12

*Franklin v. Krueger International, Inc.*, No. 96 CIV. 2408 (DLC), 1997 WL 691424, at *5 (S.D.N.Y. Nov. 5, 1997) ..................................................................................................... 12

*GenOn Mid-Atl., LLC v. Stone & Webster, Inc.*, 282 F.R.D. 346 (S.D.N.Y. 2012) ..................... 10

*Hernandez v. Conriv Realty Assocs.*, 182 F.3d 121 (2d Cir. 1999) ................................... 11

*Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694 (1982).............. 13, 14

*Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620 (2d Cir. 2018) ............................... 9

*Kronisch v. United States*, 150 F.3d 112 (2d Cir. 1998)...................................................... 1

*Mastr Adjustable Rate Mortgages Tr. 2006-OA2 v. UBS Real Estate Sec. Inc.*, 295 F.R.D. 77 (S.D.N.Y. 2013)........................................................................................................... 3

*Moody v. CSX Transp., Inc.*, 271 F. Supp. 3d 410 (W.D.N.Y. 2017) ......................................... 10

*Morgan Hill Concerned Parents Ass'n v. California Dep't of Educ.*, 258 F. Supp. 3d 1114 (E.D. Cal. 2017)................................................................................................................... 12

*Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570 (S.D.N.Y. 2017) .......................... 11

*Rockman Co. (USA), Inc. v. Nong Shim Co.*, 229 F. Supp. 3d 1109 (N.D. Cal. 2017) ................. 6

*Rosa v. Genovese Drug Stores, Inc.*, No. 16 CV 5105 (NGG)(LB), 2017 WL 4350270 (E.D.N.Y. Apr. 24, 2017)................................................................................................................. 11

*Stinson v. City of New York*, 10 Civ. 4228 (RWS), 2016 WL 54684 (S.D.N.Y. Jan. 5, 2016) ...... 2

*Tchatat v. O'Hara*, 249 F. Supp. 3d 701 (S.D.N.Y. 2017) ........................................................... 7

*U.S. Catholic Conference v. Abortion Rights Mobilization, Inc*., 487 U.S. 72 (1988) ................ 11

*Zubulake v. UBS Warburg*, 220 F.R.D. 212 (S.D.N.Y. 2003) .................................................... 5, 8

**Rules**

Fed. R. Civ. P. 34 ....................................................................................................................... 15

The City of Almaty, Kazakhstan and BTA Bank (together, the "Kazakh Entities") respectfully submit this reply memorandum in further support of their motion for sanctions.

## PRELIMINARY STATEMENT

The Kazakh Entities have participated in discovery in good faith. They have produced more than a quarter million pages of documents, provided multiple party witnesses for depositions, and used what influence they have with third parties to make them available. They have received essentially nothing in return.

This is a problem inherent to the adversary system in civil litigation: how do you conduct discovery with criminals? After all, anyone who is willing to steal billions of dollars and then commit additional crimes to hide that theft is not going to blush at destroying evidence, ignoring court orders, and generally frustrating discovery. The answer, in part, is sanctions that prevent the party who abuses or refuses to participate in discovery from benefiting from that malfeasance. Here, sanctions are warranted to ensure some modicum of justice and fair play.

## ARGUMENT

I. **Triadou and Ilyas Intentionally Spoliated Electronic Evidence.**

  A. **Triadou and Ilyas Had a Duty to Preserve E-mails Relating to the Negotiations and Funding of SDG's U.S. Investments.**

Although the evidence demonstrates that SDG's e-mail servers were deleted several months after Triadou claims – after Triadou had itself initiated litigation over its investment in the Flatotel, giving rise to an undisputed duty to preserve – there is no real question that Triadou and Ilyas had a duty to preserve relevant documents even in August or September 2014, when Triadou says its servers were wiped. Triadou and Ilyas had a duty to preserve the SDG e-mail data at that time, because they "should have known" by at least August 2014 that "the evidence may [have been] relevant to future litigation." *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998).[1]

---

[1] The Court should not accept Triadou's unsubstantiated claim that the SDG servers were deleted "[i]n or about August or September of 2014" — a time period conveniently just prior to Triadou's lawsuit against Chetrit, which squarely addressed the same real estate investments at issue here. [ECF No. 308 at 1]. Triadou's explanation for the deletion of data from SDG's server is based solely on its interrogatory responses, which were verified by Cesare Cerrito — a witness Judge Nathan has already found incredible. According to him, "in connection with [an office] move," an "IT

Viktor and Ilyas Khrapunov had been sued by that time in the California action, which raised virtually the same claims as those here. The very first paragraph of the California complaint previewed this action:  the City of Almaty (one of the parties here) alleged that the Khrapunovs (two of the parties here) laundered funds stolen from Almaty by acquiring "assets located in the Central District of California" and by making "investments in entities in the United States" (which, of course, would include New York).  [Skakel Decl. Ex. 11 ¶ 1].  Those assets, according to the California complaint, included "real estate in New York" owned by SDG through "using a chain of Luxembourg and Delaware entities."  [*Id.* ¶ 54 (alleging that Ilyas had "caused SDG and SPG to move assets into the United States by, among other things, using a chain of Luxembourg and Delaware entities to invest in real estate in New York.").[2]].  Even if the pendency of the California litigation did not itself create a duty for Ilyas and Triadou to preserve relevant documents, *but see Stinson v. City of New York*, 10 Civ. 4228 (RWS), 2016 WL 54684, at *4 (S.D.N.Y. Jan. 5, 2016), it is difficult to imagine a clearer preview of this litigation, which

---

consultant" performed "routine maintenance on SDG's servers . . . to avoid server-space issues." [January 8, 2019 Declaration of Matthew L. Schwartz ("Schwartz Dec.") Ex. 31 at 5-6]. This "routine maintenance," "included deletion of empty email archives" of Bourg and Meyer, as well as the deletion of all of Ilyas's e-mails— that is, the SDG employees most directly involved in the Flatotel investment.  [*Id.* at 6].

    This story does not add up.  Bourg ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Cerrito's claim that Bourg's account was "deactivated" by September 2014, and that his email archive was "emptied" even earlier, is thus questionable at best.

    In his interrogatory responses, Cerrito also claimed that the deletion was part of "routine maintenance." [*Id.* at 5].  But under cross-examination, ████████████████████████████████████████████████████████████████████████████████████████████████████████████ nd there is no evidence — such as documents confirming the office move or a statement by the IT consultant who deleted the data — corroborating Cerrito's contradictory account. For all of these reasons, Cerrito simply cannot be credited.

[2]    SPG, the Swiss Promotion Group, ███████████████████████████████████████████████████████████████████████████████████████████████

concerns the New York real estate investments of Triadou, a Luxembourg entity wholly owned by SDG.  After the California case was filed, Triadou and Ilyas certainly could have and should have at least reasonably anticipated this case.[3]

The Khrapunovs respond that Plaintiffs failed to get them to admit during their depositions that they in fact knew that this litigation was imminent.  [Opp. Br. at 14].  But the Khrapunovs' self-serving and unsupported testimony should not be credited; this Court has already found Ilyas not be credible and concluded that he was "playing games with the Court" and displaying a "catch me if you can attitude."  [ECF No. 564 at 12-13.]  And in any event, the relevant standard is "not whether the party *in fact* reasonably foresaw litigation, but whether a reasonable party in the same factual circumstances would have reasonably foreseen litigation."  *Mastr Adjustable Rate Mortgages Tr. 2006-OA2 v. UBS Real Estate Sec. Inc.*, 295 F.R.D. 77, 82 (S.D.N.Y. 2013) (internal quotation marks omitted) (emphasis added).

Nor is it relevant whether Defendants were "familiar[] with U.S. rules concerning preservation of evidence," as the Khrapunovs wrongly suggest.  [Khrapunovs' Opp. Br. at 14; *see also* Triadou's Opp. Br. at 7 n.3 (claiming with no authority that imputing U.S. legal requirements to foreign entities is "inequitable")].  The standard is whether a reasonable party would have foreseen *litigation*, and nothing more.  To adopt the Defendants' view would raise the bar to a level where virtually no one other than U.S. lawyers familiar with the Federal Rules of Civil Procedure would ever be held to account for destroying evidence.

Moreover, although it is not necessary for the Court to so find, Ilyas and Triadou's actual awareness of anticipated litigation in August 2014 is clear.  Bourg testified that ████████████ ████████████████████████████████████████████████████████████████  Bourg further testified that ████████████████████████████████████

---

[3]     Triadou points to a mostly-redacted e-mail to argue that it did not have knowledge of the California action until May 2015.  Triadou Br. at 3.  But this misses the point.  In mid-2014, when the California action was filed, Ilyas continued to exercise substantial control over both SDG and Triadou, and indeed he remained responsible for Triadou's U.S. investments through at least 2016, well after *this* case was filed.  [*See* Schwartz Dec. Ex. 29.]

█████████████████████████████████████████████

███████████████████████████████████████████

Judge Nathan already credited precisely this testimony.  [ECF No. 175 at 9.]

Documents confirm the Defendants' fear of litigation concerning the New York

investments.  For instance, ████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████

████]  In short, the risk of litigation that prompted the fraudulent conveyance in this case is the

same risk of litigation that should have prompted Defendants to preserve evidence.

Triadou and Ilyas counter by emphasizing their purported separation from SDG.  [*See*

Triadou Br. 6-10; Khrapunov Br. at 4-5.]  But they were anything but separate at the time of the

California action, the deletion of the servers, and since.  ████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████

████████████ ██ ██████████████████████  Ilyas then continued to keep

abreast of developments concerning SDG and to advise on its U.S. operations, including, for

example, ███████████████████████████████████████

████████████████████████████████  And of course even in 2016, while

this action was pending, Ilyas ███████████████████████████████

██████████████████████████████

There likewise is no daylight between Triadou and SDG.  Triadou admits that it "used

SDG's server to conduct its business."  [Triadou's Opp. Br. at 7 n.3.]  The same individuals –

Ilyas, Cerrito, Gillieron, and others – were responsible for overseeing both SDG's and Triadou's

operations.  [*See* ECF No. 330 at 16-17 (discussing Cerrito and Gillieron).]  For instance, the same

July 2014 letter in which SDG explained its payment of CHF 400,000 to Ilyas was signed by

Cerrito, who claims to have conducted Triadou's 2012 due diligence into its funding from Petelin and just months later, in November 2014, was named Triadou's sole director.  [*See* ECF No. 156 at 11 (Cerrito affidavit signature); *id.* at 4-5 (describing Telford's funding for Triadou in October 2012 and stating that "Since Triadou was a wholly-owned subsidiary of SDG, it was my duty to conduct know-you-customer diligence on Mr. Petelin.").]  And the Court has already held that SDG and Triadou are alter egos for the purposes of discovery.[4]  [*See* Br. 30 & n. 26].

Even in the absence of the California action, there were many other red flags that reasonably should have put Ilyas and Triadou on notice of future litigation before August 2014. [*See* Br. at 3-4.  For the reasons explained in Plaintiffs' opening brief, those flags were more than enough to raise the specter of future litigation.  *See Zubulake v. UBS Warburg*, 220 F.R.D. 212, 216-17 (S.D.N.Y. 2003) (duty to preserve where litigant acknowledged that possibility of litigation "was something that was in the back of my head").  The Court should reject Triadou's and Ilyas's attempts to explain them away.

For example, Triadou argues that SDG was not the "subject" of a Swiss investigation, relying on the testimony of Marc Gillieron.  [Triadou Br. at 7].  But Gillieron's testimony does not undermine the import of the Swiss investigation.  To the contrary, Gillieron .  Triadou also adds fuel to the fire by directing the Court's attention to October 2014 SDG board minutes 

---

[4]     Triadou argues that the Court's alter ego findings were "limited."  [Triadou's Opp. Br. at 6.] This is of course true.  But it does not change the fact that the Court has already found, for some purposes, that Triadou and SDG were one and the same.  Moreover, it would not be "inequitable" to find Triadou responsible for SDG's deletion of the server under an alter ego theory [see *id.* at 7], as Triadou *admits* that it used SDG's servers to conduct its business [*id.* at 7 n.3 "Triadou does not contest that it used SDG's server to conduct its business")].  The only inequity would be if Triadou were permitted to use the corporate form to avoid responsibility for SDG's deletion of the server where it conducted its business.  *See E\*Trade Securities LLC v. Deutsche Bank AG*, 230 F.R.D. 582, 589 (D. Minn. 2005) (concluding that a corporate subsidiary (Nomura Canada) engaged in sanctionable conduct by destroying hard drives after its parent or affiliate company (NSI) had already been served with a bankruptcy court litigation notice).

████████████████████████████████████████ [Triadou Br. at 8; Schwartz Dec. Ex. 23.]

If SDG was worried that Swiss prosecutors were investigating Ilyas's beneficial ownership of

SDG, they had ample reason to anticipate litigation on the same subject.[5]

As to the sham sale to Glatz, Triadou argues that the sale itself should not have given rise

to an expectation of future litigation and that Judge Nathan's determination that the sale was a

sham should be disregarded.  [*See* Triadou Br. 7.]  This is wrong for many reasons, the most

important of which is this:  because the sale of SDG to Glatz was a sham, Ilyas did not actually

divest his beneficial ownership of SDG, and therefore Triadou, at the time of the sale.  Rather, as

Ilyas himself was forced to admit, ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████  The reality was that Ilyas continued to own

and control SDG, and therefore Triadou, long after the sham sale to Glatz, during the fraudulent

transfer of Triadou's stake in the Flatotel, and beyond.  [ECF No. 175 at 7-9.]

Triadou and Ilyas's only response it to ask this Court to disregard Judge Nathan's findings

because they were "preliminary" and because Glatz, who had refused to testify, has since been

deposed.  But Judge Nathan's finding that the sale was a sham was based on overwhelming

evidence and is not undermined by Glatz's subsequent (false) testimony.[6]  There is thus ample

---

[5]      *Rockman Co. (USA), Inc. v. Nong Shim Co.*, 229 F. Supp. 3d 1109 (N.D. Cal. 2017), cited by
Triadou [Triadou Br. at 8], is distinguishable. The court in *Rockman* found that the duty to preserve
under U.S. law was not enforceable by a U.S. court because the only event providing notice was a
Korean investigation of a price-fixing conspiracy that occurred solely abroad, with no direction toward
the United States, and no lawsuits had been filed in the United States. *See id.* at 1123. Ilyas and SDG,
on the other hand, specifically directed the money laundering scheme toward the United States and
engaged in at least three separate lawsuits here that raised allegations concerning the illicit source of
the funds for those investments.

[6]      Judge Nathan relied on the following:  Black Sea Trade & Development Bank, a "neutral party
who was conducting due diligence in connection with a proposed loan," had determined that there was
no "real change in the ownership of SDG"; Cerrito's testimony about the change in control was not
credible; Glatz, like Cerrito, "ha[d] a significant interest in denying that SDG and Triadou engaged in
any misconduct"; Bourg, who was intimately involved in Ilyas's business dealings and whom Judge
Nathan expressly found credible on this point, testified that Glatz used funds loaned to him by the
Khrapunov family to purchase the company; Ilyas sold SDG to Glatz "for a mere CHF 3.5 million (its
equity value) when Glatz's investment bank valued the enterprise value of the company at CHF 150
million"; and the Khrapunovs "did not withdraw their CHF 35-40 million investment from SDG after

evidence supporting Judge Nathan's conclusion that they sale was a sham.

In sum, Ilyas and Triadou's arguments that they could not have foreseen litigation at the time SDG's servers were deleted are meritless.

### B.    The SDG Server Contained Highly Material Communications.

Triadou argues that the Kazakh Entities "make no effort to show the relevance of the deleted documents." [Triadou Br. at 16.] In fact, the Kazakh Entities cited and relied on many material e-mails from the deleted SDG accounts that concern the U.S. investments and Triadou's funding. [*See, e.g.,*



Regardless, a court should not "hold[ ] the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence" because to do so "would subvert the prophylactic and punitive purposes of the adverse inference, and would allow parties who have intentionally destroyed evidence to profit from that destruction." *Tchatat v. O'Hara*, 249 F. Supp. 3d 701, 706 (S.D.N.Y. 2017), *objections overruled*, No. 14 CIV. 2385 (LGS), 2017 WL 3172715 (S.D.N.Y. July 25, 2017).  Although the Kazakh Entities must of course speculate to a degree about the substance of documents they never obtained because they were deleted, there can be no real doubt that the SDG server contained highly material content.

### C.    Ilyas Destroyed Other Material Evidence.

In addition to the SDG server deletion, Ilyas destroyed or failed to produce many other documents and e-mail accounts.  [Br. at 8-9.]  Each of these stands as a separate instance of spoliation.  Ilyas's attempts to dodge responsibility for these serial discovery failures are meritless.

---

the purported sale." [ECF No. 175 at 7-9.]

First, Ilyas argues that holding him accountable for lost encrypted e-mails would impose on him a "duty to create." [*Id.* at 16 n.9.] But no one asked Ilyas to send e-mails. He was not under a duty to "create" them. Once he did, however, he was under a duty to preserve them, and the law is well-settled that once a duty to preserve arises, potential litigants have a responsibility to change their document retention protocols to ensure that relevant evidence is not destroyed. *Zubulake*, 220 F.R.D. at 218. Ilyas, in contract, specifically switched from using corporate e-mails that were saved on servers to anonymous, encrypted e-mails that were not preserved. Likewise, the SDG server was wiped of his e-mails and set not to save new ones.

Second, Ilyas attempts to blame the Kazakh Entities for failing to track down alternative sources of the Monstrey and Aggarwal documents and argues that, in any event, these records are irrelevant to the case. [*See* Khrapunov Br. at 2-4, 7-8, 17-18.] But it is no answer that others may have the documents at issue (which, as a practical matter, they do not, as the Kazakh Entities have not been able to obtain the documents elsewhere). Put simply, it is Ilyas's burden alone to preserve and produce documents he signed and e-mails he sent – a burden he has ignored. [*See* Br. at 19-21 (detailing the Khrapunovs' failure to even attempt to collect documents until long after this case began and ordered by the Court).] There is also no question that these records are relevant and material because documents that Ilyas prepared for Monstrey and his e-mails with Aggarwal go to a core issue – whether the money came from Petelin or was stolen from the Kazakh Entities. Ilyas does not serious contest this point. Rather, ██████████████ ████████████████████████████████████████████████████. But it is undisputed that ████████████████████████████████████████████████ ████████████████████████ And with respect to Aggarwal, Ilyas takes a sentence from a submission to the U.K. Court to argue that Aggarwal's evidence is not relevant to this case. [Khrapunov Br. at 7.] But the Court has already found that documents concerning each of the companies in the funding chain leading from Monstrey to Triadou were relevant and proportional to the needs of the case. [*See* ECF No. 749 at 15-17.]

Third, the Court should not credit Ilyas's characterization of the "Central African

Republic" (or "C.A.R.") e-mails or his explanation for why he deleted them. [Khrapunov Br. 5-6.]

There is no dispute that ███████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███ Ilyas's responses are non sequiturs.  He argues that the Kazakh Entities "mislabeled" the

C.A.R. e-mails as Khrapunov "family office" e-mails.  ████████████████████████

████████████████████████████████████████████████████████████

██████████████] Ilyas has no explanation for why he used this supposed "diplomatic" server

to conduct Triadou's business.  [Br. at 7.]  And other evidence establishes that Ilyas was simply

paying for the right to use the C.A.R. name, ███████████████████████████████

██████████████████████████████████████████████████████

█████████.] As with Triadou's explanation for the SDG server spoliation, the Court should not

credit Ilyas's ambassador story.

Fourth, Ilyas does not even address the numerous other gmail and hotmail accounts that he

failed to preserve and produce. [*See* Br. at 9.]  At the very least, Ilyas's total disregard for his

obligations to collect and produce any of these documents justifies sanctions and the award of

fees.  *See Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 634 (2d Cir. 2018) ("[A]

party that disregards its obligations may create a reasonable suspicion that further investigation is

warranted, and thereby imposes costs on its adversary that would never have been incurred had the

party complied with its obligations in the first instance.").

### D.      Triadou's and Ilyas's Destruction of Electronic Evidence Was Deliberate

 Under Rule 37(e)(2), "a party may be bound to have acted with an intent to deprive . . .

where '(1) evidence once existed that could fairly be supposed to have been material to the proof

or defense of a claim at issue in the case; (2) the spoliating party engaged in an affirmative act

causing the evidence to be lost; (3) the spoliating party did so while it knew or should have known

of its duty to preserve the evidence; and (4) the affirmative act causing the loss cannot be credibly

explained as not involving bad faith by the reason proffered by the spoliator.'" *Moody v. CSX*

*Transp., Inc.*, 271 F. Supp. 3d 410, 431 (W.D.N.Y. 2017) (quoting *Ala. Aircraft Indus., Inc. v. Boeing Co.*, 319 F.R.D. 730, 746 (N.D. Ala. 2017)).  All of these elements are met with regard to both Triadou's and Ilyas's destruction of evidence.

The first and third elements – relevance and knowledge of a duty to preserve – are present for the reasons explained above and in Plaintiffs' moving brief. [*See* Br. at 4-7.]

The second element is present because SDG, Triadou's alter ego, affirmatively deleted the server contents and because Ilyas purposefully cycled through and deleted numerous other accounts.  Ilyas and Triadou both argue that Ilyas did not have the requisite "control" over SDG to be held responsible for SDG's actions. [Triadou Br. at 10-13, Khrapunov Br. at 17.]  But this presupposes that the Court will disregard Judge Nathan's findings, [ECF No. 433 at 21], and now hold that the sale to Glatz was legitimate and that Ilyas was actually separated from the company he founded, directly ran for years, and continued to run (at least with respect to the U.S. operations) until long after the spoliation occurred, and in fact during this case.

In any event, a party can be deemed to have "control" over a third party for spoliation purposes if there is "little doubt" that the third party "would have complied with a timely request . . . to preserve its information" given to it by the spoliating party. *GenOn Mid-Atl., LLC v. Stone & Webster, Inc.*, 282 F.R.D. 346, 355 (S.D.N.Y. 2012).  Whatever their formal relationship to SDG, either Ilyas or Triadou could have ensured that SDG preserve its e-mails, especially considering that SDG purportedly deleted the e-mails simply to save space.  As a result, Ilyas controlled SDG (Triadou's alter ego) and can be held responsible for SDG's failure to preserve evidence.

Lastly, the fourth element is satisfied because Triadou's and Ilyas's uncorroborated and inconsistent explanations for their deletion of data cannot be credited.  For instance, for the reasons explained above, Triadou's claim that it was done as part of routine maintenance is incredible.  And Ilyas offers no explanation at all other than too-convenient memory loss with respect to this passwords.  This is just another example of Ilyas "playing games with the Court" and exhibiting a "catch me if you can attitude."  [ECF No. 564 at 12-13.]  Courts facing similarly culpable conduct in the absence of credible explanations routinely enter terminating or adverse-

inference sanctions.[7] This Court should too.

## II.   Ilyas's Jurisdictional and Equitable Defenses to the Sanctions Motion Are Meritless.

The Khrapunovs persist in alluding to jurisdictional defenses that have not actually been

raised – and will fail if they ever are [*see* ECF No. 950 at 17-18] – and equitable defenses that are

both wrong and inapplicable.  In short, they are nothing but distractions.

The Kazakh Entities' sanctions motion does not present any risk that this Court might

exercise jurisdiction where none exists.  [*See* Khrapunov Br. 10-11.]  Judge Nathan determined

*after* the Chetrit Group was dismissed that the Court has foreign state and removal jurisdiction,

including jurisdiction over the fraudulent conveyance claim. [*See* ECF No. 426 at 9; *see also* ECF

No. 103 at 8-9 (discussing the fraudulent conveyance claim in detail).][8] The Court also has

personal jurisdiction over Ilyas, which gives it the authority to sanction him for failing to

participate in discovery and comply with court orders.  [*See* ECF No. 564 at 12 (sanctioning Ilyas

for playing "games with this Court").]  And even if the Khrapunovs had a pending motion to

---

[7]     *See, e.g.*, *Experience Hendrix, LLC v. Pitsicalis*, No. 17 Civ. 1927 (PAE), 2018 WL 6191039,
at *8–9 (S.D.N.Y. Nov. 28, 2018) (concluding that deleting files from computer satisfied intent
requirement because litigants "necessarily were aware each time the program" they used deleted a
file); *Ottoson v. SMBC Leasing & Fin., Inc.*, 268 F. Supp. 3d 570, 582 (S.D.N.Y. 2017) (finding
evidence plaintiff used e-mail, failed to preserve relevant e-mails, and failed to produce e-mails
sufficient to "satisf[y] the requisite level of intent required by [FRCP] 37(e)" and collecting
cases); *Rosa v. Genovese Drug Stores, Inc.*, No. 16 CV 5105 (NGG)(LB), 2017 WL 4350270
(E.D.N.Y. Apr. 24, 2017) (finding evidence of intent where store was equipped with video security
system, log noted that video of relevant incident was recorded, and video was not produced), *report
and recommendation adopted*, 2017 WL 4350276 (E.D.N.Y. July 31, 2017).

[8]     None of the Khrapunovs' cases concern circumstances where, as here, a court had subject
matter jurisdiction but later events raised a question of mootness.  *See U.S. Catholic Conference v.
Abortion Rights Mobilization, Inc.*, 487 U.S. 72 (1988) (remanding to the Court of Appeals to
determine whether the district court had subject matter jurisdiction, not just colorable jurisdiction,
when it issued subpoenas to non-parties); *Hernandez v. Conriv Realty Assocs.*, 182 F.3d 121, 123 (2d
Cir. 1999) (holding that, where a case was improperly removed to federal court, a dismissal with
prejudice as a sanction interferes "with the jurisdiction of state courts over certain cases, such as this
one, that do not implicate federal interests"); *Christopher v. Stanley-Bostitch, Inc.*, 240 F.3d 95 (1st
Cir. 2001) (holding that, where there was no jurisdiction in a case improperly removed from state
court, the district court could not preclude the plaintiff from seeking damages in excess of $75,000
when remanding); *Altissima Ltd. v. One Niagara LLC*, No. 08-cv-00756, 2010 WL 502834, at *8-9
(W.D.N.Y. Feb. 8, 2010) (declining to enter default judgment in a case that "never should have been
commenced in the first place[] because complete diversity was lacking" and exercising discretion not
to award other sanctions under Rule 37).

dismiss (which they do not), there would be no reason to delay because any recommendation by this Court for terminating sanctions would not prevent the Khrapunovs from making their jurisdictional argument to Judge Nathan.

The Khrapunovs' equitable defenses fare no better. Laches requires a showing of "unreasonable delay." Here, there has been no delay at all. The Kazakh Entities have moved diligently and persistently to identify relevant information and to compel Defendants to participating in discovery – filing nine motions to compel the production of documents and three motions for protective orders. [Schwartz Dec. ¶ 2; *see also id.* ¶ 3 (describing other delay caused by the defendants).] It is now appropriate to shift those costs to the Khrapunovs.[9]

The Khrapunovs' unclean hands defense should also be rejected. "Pursuant to that doctrine, a party will be denied equitable relief where it has itself acted unconscionably in relation to the matter at issue to the detriment of the other party." *Fayemi v. Hambrecht & Quist, Inc.*, 174 F.R.D. 319, 326-27 (S.D.N.Y. 1997) ("The Court will not exercise its equitable powers to preclude the use of information improperly obtained where the party seeking the order destroyed the evidence or failed to take the steps required for its preservation.") (cited by Khrapunovs). Nothing about the Kazakh Entities' pursuit of evidence from Monstrey and Sater, the Defendants' former business partners – let alone their pursuit of the defendants' own documents – has been "unconscionable" or in any way "to the detriment of the other party."[10] Accordingly, the unclean

---

[9]        The Khrapunovs' laches cases are inapplicable. In *Franklin v. Krueger International, Inc.*, for example, the court denied sanctions where the movant failed to present any evidence of spoliation and whose delay and own obstruction prevented the respondent "from conducting any discovery which would enable it to defend this motion." No. 96 CIV. 2408 (DLC), 1997 WL 691424, at *5 (S.D.N.Y. Nov. 5, 1997). *See also Morgan Hill Concerned Parents Ass'n v. California Dep't of Educ.*, 258 F. Supp. 3d 1114, 1133 (E.D. Cal. 2017) (denying sanctions where the movant's explanation for doing nothing for over a year was not credible and the respondent was denied an opportunity to defend itself as a result).

[10]       The Kazakh Entities labeled Monstrey a "confidential witness" because ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ There was nothing incorrect about this, much less unconscionable, and the Khrapunovs have had full discovery into Monstrey. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

hands doctrine is simply inapplicable.

### III.    The Court Should Strike Viktor's Personal Jurisdiction Defense

Viktor has obstructed discovery, jurisdictional and otherwise, and now has the audacity to claim that his failure to produce any documents in this case – aside from a copy of his memoir – proves that he was not involved in the New York real estate transactions.  He should not be rewarded for making a mockery of the adversary system.

Viktor has not produced a single document from his files. [Br. at 12.] He has ignored two orders, from two different judges, that he participate in jurisdictional discovery. [ECF No. 426 at 50-52; ECF No. 800 at 3-4.] At his deposition, ███████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████    This has put the Kazakh Entities in the position of being utterly unable to contest the specious assertion of privilege or to pursue further discovery of relevant documents. Presumably, the Khrapunovs failed to log these communications because they either were never actually gathered, or have been destroyed.  But either way, Viktor's non-compliance has continued for nearly a year and a half, since Judge Nathan ordered him to cooperate with jurisdictional discovery in September 2017. [ECF No. 426 at 50-52.] If anyone has been "dilatory" in this context [Khrapunov Br. at 19], it is Viktor.

The Court would be well within its discretion to sanction Viktor for his non-compliance. Striking Viktor's personal jurisdiction defense is both "'just' . . . [and] specifically relate[s] to the particular 'claim' which was at issue in the order to provide discovery." *Ins. Corp. of Ir., Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 707 (1982). There is no question that this sanction "relate[s]" to the jurisdictional discovery ordered by the Court. As to whether the sanction would be "just," Viktor himself admits that courts often take into account whether a party has violated "more than one" court order. [Khrapunov Br. at 21.]

---

████████    .  Indeed, the Khrapunovs' ability to secure discovery from Monstrey, Sater and Litco stands in stark contrast to the Kazakh Entities' frustrated efforts to secure anything comparable from the Khrapunovs.

Likewise weighing in the Kazakh Entities' favor is the fact that, contrary to Viktor's assertions, there is evidence sufficient to establish that Viktor is subject to personal jurisdiction under New York's long-arm statute. [*See* ECF No. 850 at 7-9.] As the Kazakh Entities previously explained, Viktor is subject to personal jurisdiction under New York's "conspiracy theory" of personal jurisdiction [*see* ECF No. 850 at 7-8], which easily exceeds the "not [] frivolous" threshold articulated in *Insurance Corp. of Ireland* for striking a personal jurisdiction defense. [*See also* ECF No. 426 at 50-51.][11]

In sum, Viktor's numerous violations – no less than ignoring two court orders by means of false assertion of privilege over communications with Ilyas, failure to produce a single document from his files, and excluding obvious jurisdictional search terms like "New York"[12] – support the jurisdictional presumption and smack of the "obvious disregard" for court orders that is as the benchmark for sanctions under Rule 37.[13] *See Ins. Corp. of Ir.*, 456 U.S. at 708.

## IV.   Ablyazov Obstructed Discovery and Failed to Produce Responsive Documents.

Ablyazov essentially admits the key failing of his non-participation in this case – he failed to produce documents relevant to his defense and responsive to the Kazakh Entities' requests when he otherwise could have.  This should be the end of the discussion with respect to sanctions.

---

[11]   The sanction of striking Viktor's personal jurisdiction defense fully comports with due process. *See Volkart Bros., Inc. v. M/V Palm Trade*r, 130 F.R.D. 285, 288 (S.D.N.Y. 1990) ("Where the court merely adopts the *presumption*—based on a defendant's non-compliance—that that party's factual allegations in opposition to personal jurisdiction are untrue, it does not offend constitutional 'notions of fair play and substantial justice.'").

[12]   *See* Br. at 14 n.13 (describing multiple deficiencies in Viktor's searches). To excuse his delay and deficient searches, Viktor argues that the Court never instructed anyone other than him to conduct the search for his records. [*See* Khrapunov Br. at 20.] This is wrong. The Court was "concerned about Mr. Viktor Khrapunov's actual attempts to search for documents and the thoroughness of his search." [07.23.18 Hr'g Tr. at 24:22-24.] Accordingly, the Court instructed Viktor's counsel "to see about obtaining a download of any Facebook messages and WhatsApp messages, email and texts between and among Viktor Khrapunov and Ilyas Khrapunov, Viktor Khrapunov and Mr. Petelin, and also Mr. Ablyazov." [*Id.* at 25:6-12.]

[13]   Viktor's citation to *Salahuddin v. Harris*, 782 F.2d 1127 (2d Cir. 1986), in an attempt to support his claim that his noncompliance lacked bad faith, is misplaced.  *Salahuddin* dealt with the inapposite scenario in which a party seeks *dismissal* as a discovery sanction under Rule 37, in that instance against a *pro se* litigant.  The court stated that a showing of bad faith is required when a party seeks imposition of the "drastic penalty" of dismissal.  *Id.* at 1132.

Nevertheless, a brief response to a few additional points is warranted.

First, Ablyazov is wrong to suggest that the Kazakh Entities could obtain his records from Kazaword.  [Ablyazov Br. at 2.]  Those documents are no longer available, as the Court has recognized. [See ECF No. 669 at 1-2.]  And in any event, Ablyazov has an obligation to produce documents in his possession and control.

Second, Ablyazov's defense of his failure to produce documents exchanged in the U.K. proceedings is totally misguided.  To begin with, it is no defense that Ablyazov himself does not physically have these documents, since he admits his lawyers do.  Documents in a party's lawyer's possession are within its "possession, custody, or control" for purposes of discovery.  Fed. R. Civ. P. 34(a)(1).   And Ablyazov offers no justification at all for his refusal to consent to allow BTA's own U.K. lawyers – who are otherwise prohibited from doing so – to share Ablyazov's productions and sworn testimony with their U.S. counsel.  [*See* Schwartz Reply Dec. Ex. 3 at 159:4-20; ECF No. 916-3 ¶ 31.]  This discovery could be accomplished easily and at no cost to Ablyazov if he were to only give his okay, and yet he has refused to do so.[14]

 Ablyazov is also wrong that the U.K. materials are irrelevant. [*See* Ablyazov Br. at 4.] Monstrey's companies were identified in the U.K. freezing orders, and those same companies are part of the laundering in this case. ECF No. 773 at 5-6.

Given his pattern of obstruction, including his refusal to produce responsive documents despite orders from this Court [*see* Br. at 14-19 & nn. 14-15], the Court should award fees and costs the Kazakh Entities have expended in seeking discovery from him and enter terminating sanctions, or at the very least, strike his affirmative defenses and preclude him from introducing documents later that he could have produced during discovery.

---

[14]      Ablyazov is wrong that BTA Bank obtained U.K. documents for use in a case in Virginia against his sister.  Rather, the U.K. court-appointed receiver – a receiver that answers to the Court, not to BTA, and which acts through its own counsel – joined that case and participated in discovery there, unlike here. [*See* Schwartz Reply Dec. Ex. 8 (Agreed Consolidated Protective Order for Confidential Information at 1, *BTA Bank v. Gaukhar Kussainova*, No. CL-2016-8335 (Va. Cir. Ct. Fairfax Cty. Dec. 6, 2018)).]

**CONCLUSION**

For the above reasons, this Court should grant the sanctions requested in this motion or, in the alternative, hold an evidentiary hearing.

Dated: February 11, 2019
New York, New York

Respectfully,

 /s/ Matthew L. Schwartz
Matthew L. Schwartz
Peter M. Skinner

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350
E-mail: mlschwartz@bsfllp.com