**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF ALMATY, KAZAKHSTAN and BTA
BANK JSC,

                    Plaintiffs,

      -against-

MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV,
ILYAS KHRAPUNOV, and TRIADOU SPV S.A.,

                  Defendants

15 Civ. 5345 (AJN) (KHP)

**THE CITY OF ALMATY AND BTA BANK'S MEMORANDUM OF LAW**
**IN OPPOSITION TO TRIADOU'S AND THE KHRAPUNOVS' MOTIONS FOR**
**DISCOVERY SANCTIONS AND TRIADOU'S MOTIONS TO COMPEL**
**AND TO PRECLUDE BTA BANK WITNESSES**

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Plaintiffs*
*City of Almaty, Kazakhstan and*
*BTA Bank JSC*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................... 1

FACTUAL BACKGROUND ......................................................................................... 3

I.  Career Criminal Felix Sater Played Both Sides. .................................................... 3

    A.  The Kazakh Entities Retained Litco LLC, an Asset Recovery Consultant. ........... 3

    B.  The Kazakh Entities Did Not Agree to Pay Felix Sater, a Fact Witness, Anything. ....................................................................................................... 7

    C.  After the Kazakh Entities Learned that Sater Owns Litco and Declared Litco in Breach, Sater Changed His Testimony to Help Litco. ....................................... 9

    D.  The Kazakh Entities Are Pursuing Every Available Claim Against Sater. .......... 10

II.  The Defendants Misrepresent the Factual Record. .............................................. 11

    A.  The Defendants Rely on Sater's Most Incredible Testimony and Make Claims About Litco that Are Unsupported By the Evidence. ............................... 12

    B.  The Defendants Attempt to Tie as Many of Their Unjustified Grievances to Litco as Possible. .......................................................................................... 18

LEGAL STANDARD .............................................................................................. 20

ARGUMENT ....................................................................................................... 21

I.  The Defendants Failed to Establish that the Kazakh Entities Acted in Bad Faith............. 21

II.  Sanctions Based on What the Defendants Say the Kazakh Entities "Should Have Known" Are Unjustified. ....................................................................................... 25

III.  Defendants' Requested Sanctions Are Excessive. ............................................... 30

    A.  The Kazakh Entities Should Not Have to Pay for the Costs of Litco Discovery or for Defendants' Costs Associated with Sater's Continued Deposition. ................................................................................................... 30

    B.  The Kazakh Entities Should Not Be Charged "Punitive Monetary Sanctions" in Relation to Sater and Litco. ....................................................................... 32

    C.  The Khrapunovs' Requested Sanction of Excluding Evidence from Nicolas Bourg Is Not Related to Sater or Litco and Should Be Rejected. ......................... 33

    D.  There Is Nothing Remotely Criminal About The Kazakh Entities' Behavior. ...... 35

IV.    Communications with Litco Are Protected by the Work Product Protection and
       Attorney–Client Privileged Under the Common Interest Doctrine ................................. 37

       A.    Legal Standard. ............................................................................................. 37

       B.    Communications with Litco Are Protected By the Work Product Doctrine. ....... 39

       C.    Litco and the Kazakh Entities Shared a Common Interest and
             Communications Between Them Are Protected By the Attorney–Client
             Privilege. ....................................................................................................... 40

V.     The Kazakh Entities Are Prepared to Produce Communications with Frank Monstrey
       Pursuant to a Rule 502(d) Order ....................................................................... 43

VI.    The Kazakh Entities Amended Rule 26 Disclosures Were Proper. .............................. 43

       A.    Relevant Facts ............................................................................................... 44

       B.    Discussion ...................................................................................................... 45

**CONCLUSION** ...................................................................................................... **51**

The City of Almaty, Kazakhstan and BTA Bank JSC (together, the "Kazakh Entities") respectfully submit this memorandum in opposition to Triadou's and the Khrapunovs' sanctions motions. [ECF Nos. 967, 968, 971, 972.][1]

## PRELIMINARY STATEMENT

Defendants' sanctions motion turns on a single false premise: that the Kazakh Entities knew all along that Sater owns Litco.  They did not.  As the evidence makes clear, they did not learn of Sater's ownership of Litco until he revealed it during the first day of his deposition.  No amount of wishful thinking can change that.

Defendants point to no documents establishing that the Kazakh Entities knew of Sater's ownership of Litco.  That is because there are none.  Sater's name is mentioned nowhere in the Litco agreements—instead, Litco represented that ██████████████████████ ████████████████████████████████████████ Nor are there any other documents, among the thousands produced in this case, that reveal that Sater owned Litco.

With respect to witnesses, only one witness has testified, in one fleeting comment, that the Kazakh Entities knew Sater owned Litco.  That witness was Sater himself.  Sater's one spare comment about the Kazakh Entities' knowledge cannot be credited because he had no way of knowing what the Kazakh Entities knew or did not know.

On day one of his deposition, Sater testified clearly that ████████████████ ███████████████████████████████████████████ ███████████████████████████████████ ██████████████████████ On day 2, after he had disclosed his ownership interest and the Kazakh Entities had terminated the Litco agreement, ████████████████. But in

---

[1]    The Kazakh Entities are submitting one consolidated opposition brief rather than two briefs, given the substantial overlap in the facts and arguments presented by the Defendants.

virtually the same breath, ███████████████████████████████████████████

███████████████████████████████████████

    In short, the Defendants' motion is based upon the speculation of a compromised witness.

Although Sater testified that ███████████████████████████████████ that

testimony – like any witness testifying about another person's state of mind – is inadmissible as a

matter of law.  His testimony about what words were actually spoken and what information was

actually conveyed establishes the opposite: ███████████████████████████████

███████████████████████████ Defendants simply cannot prove the "subjective bad

faith" required to impose sanctions.

    Nor should the Court credit the argument that the Kazakh Entities "should have known"

Sater's role.  Not only was the evidence to the contrary, but the law does not permit sanctions

based upon such a showing.  Only clear and convincing proof of *actual* knowledge or *willful*

blindness can justify sanctions, and no such proof exists here.

    The Court should also deny the Defendants' requests for more discovery, including

discovery into communications among Litco (acting through its counsel) and the Kazakh

Entities.  Those communications were protected by work product and attorney-client privilege in

light of Litco's role assisting the asset recovery efforts.  The fact that Sater secretly owned Litco

does not change the legal analysis, particularly because the communications were not with Sater.

    And finally, the Court should reject Triadou's request to exclude certain former BTA

employees with first-hand knowledge of facts relevant to this case.  Those witnesses were long

ago identified in interrogatory responses and in documents, and came as no surprise.  Moreover,

the Kazakh Entities should not be penalized for amending their disclosures because they had no

obligation to do so.  The preclusion of trial witnesses is a "drastic remedy" and is not appropriate

where, as here, the identity of the witnesses was well-known to all parties and there is ample

time for the Defendants to depose the witnesses or otherwise prepare for their trial testimony.

## FACTUAL BACKGROUND

### I.    Career Criminal Felix Sater Played Both Sides.

#### A.    The Kazakh Entities Retained Litco LLC, an Asset Recovery Consultant.

The Court is familiar with the general background of this case, which began with
Mukhtar Ablyazov and Viktor Khrapunov's theft of billions of dollars in Kazakhstan, which they
are their confederates laundered throughout the world. In August 2009, BTA Bank obtained an
unprecedented global freezing order from the U.K. courts against Ablyazov, which was later
extended to Ilyas Khrapunov. BTA subsequently obtained judgments against Ablyazov and Ilyas
that it is enforcing here and elsewhere. In developing their case and tracing the stolen assets, the
Kazakh Entities – both directly and indirectly – have sought the help of innumerable people in
countless countries, including witnesses, foreign governments, private investigators, law firms,
consultants, experts and, occasionally, co-conspirators.

Litco was one such consultant. Litco held itself out as an asset recovery specialist,
through its lawyer Robert Wolf.  The Kazakh Entities were first introduced to Wolf in early 2015
when he represented Triadou's former director Nicolas Bourg in Bourg's attempt to recover
monies from New York-based real estate developer Joseph Chetrit. [Declaration of Matthew L.
Schwartz ("Schwartz") Ex. 3.] The Court will recall that in late 2014, Ilyas's company SDG fired
Bourg as director of its subsidiary Triadou, and began litigation with Chetrit-related entities over
what Triadou claimed were missed payments owed to it as a result of Triadou's hasty sale of its
interest in the Flatotel. [*See, e.g.*, Schwartz Ex. 4 ¶¶ 41-42 (Bourg declaration in support of
attachment).] Wolf wrote to Chetrit on March 24, 2015 – the day after Litco was formed
[Schwartz Ex. 24] – to put him on notice that Triadou owed Bourg money from the fraudulent
assignment, and that Bourg might intervene in the Triadou-Chetrit lawsuit to protect his interests.

[Schwartz Ex. 3.] One week later, on March 31, 2015, Chetrit filed that letter publicly in the New York state action.[2] Then, on or about April 30, 2015, the City of Almaty █████████ ████████████████████████████████████████████████████████████████████████████ ███████████████████████████████ [*See* Schwartz Ex. 5.][3] These events led to Chetrit's interpleader action, which ultimately turned into the case presently before the Court.

Arcanum, a commercial intelligence firm retained on behalf of the Kazakh Entities, came into direct communication with Wolf, on the theory that "the enemy of my enemy is my friend." [Schwartz Ex. 6 (PRIV-001) (describing ████████████████████████████████ █████).] Wolf held himself out as the attorney for not only Bourg, but for an asset recovery consultant, Litco LLC, that claimed to be able to assist in the Kazakh Entities' efforts.[4] In late May 2015, Wolf and Arcanum began negotiating the terms of a contract whereby Litco would provide assistance in locating and recovering stolen assets. The negotiations were handled on behalf of Arcanum by Peder Garske, a lawyer and former partner at Baker & Hostetler LLP.  [*Id.* (PRIV-001 to -013) ███████████████████████████████ ██████████████████████████████]

The Kazakh Entities entered into a Confidential Assistance Agreement ("CAA") with Litco dated June 12, 2015. [Schwartz Ex. 7.] Under the CAA, Litco agreed █████████ █████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████

---

[2]      *See Triadou SPV S.A. v. CF 135 Flat LLC, et al.*, No. 650239/2015 (Sup. Ct. N.Y. Cnty, March 31, 2015) (NYSECF Doc. No. 26).

[3]      Almaty's initial letter to Chetrit came from its counsel in the then already-pending California action.  Undersigned counsel was retained about a month and a half later.

[4]      *See* Schwartz Ex. 2 (███████████████████████████████████████████████).

███████████████████████████████ Critically, the Kazakh Entities required that Litco

represent and warrant to them that

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

███████████████

[*Id.* § 6(e) (emphasis added).] Felix Sater is not mentioned anywhere in the CAA, and ███████

██████████████████. [*See* Schwartz Ex. 1 ("Sater Dep."), Sater Dep. 1, 23:9-13.]

Meanwhile, Wolf continued to represent Bourg, who settled in his personal capacity with

the Kazakh Entities on or about June 16, 2015. [Schwartz Ex. 8.] The Kazakh Entities agreed █

██████████████████████████████████████

██████████████████████████████████████

The June 2015 settlement with Bourg does not provide for the payment of any money to Bourg.

On or about July 8, 2015, shortly after executing the CAA, Litco and Arcanum executed

a Confidentiality and Non-Disclosure Agreement ("CNDA"), to which the Kazakh Entities were

not a party. [Schwartz Ex. 9.] Litco, according to the CNDA, ████████████████████

██████████████████████████████████████

████████████████████████████████

████████████████████████████████

██████████████████████████████████████

████████████████████████████

██████████████████████████████████████

██████████████████████████████████[5]

_____

[5]      Sater testified that █████████████████████████████████████

██████████████████████████████████████

As with the CAA, the CNDA makes no mention of Sater, and Sater did not sign the CNDA. [*See id.*] Arcanum, for its part, agreed in the CNDA ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████

Attorneys from Boies Schiller Flexner ("BSF") – which had been retained earlier that month – began communicating with Wolf on or about June 19, 2015, to discuss ███████████
████████████████████████████████████████████ As reflected on the privilege log, ████████████████████████████████████
████████████████████ [*See id.*] ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████

Peder Garske died suddenly on or about January 5, 2016.[6] [*See also* Schwartz Ex. 6 (PRIV-207) (████████████████████████████████).] After his death, the person at Arcanum with primary responsibility for this matter was Calvin Humphrey, a lawyer and former long-time U.S. government official.  After taking over, ████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████ Attorneys from BSF ████████████████████████████████████
████████████████████████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████

---

[6]      *See, e.g.*, University of Virginia, In Memoriam Spring 2016, *available at* https://www.law.virginia.edu/uvalawyer/spring-2016/memoriam.

███████████████████████████████████████████████

Throughout this period, Wolf met with the Kazakh Entities' representatives ████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████████. [*See* Schwartz Ex. 6.]

The Kazakh Entities and Litco memorialized their common interest agreement in May 2016

while preparing the motion for attachment before Judge Nathan. The Confidentiality and

Common Interest Agreement ("CCIA") ████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████████████[7]

## B.   The Kazakh Entities Did Not Agree to Pay Felix Sater, a Fact Witness, Anything.

The Defendants have pointed to no direct evidence to show any agreement by the Kazakh

Entities to pay Sater anything. This is because no such evidence exists. In fact, the evidence

shows that the Kazakh Entities did not know who owned Litco until September 2018, ████████████

█████████████████████████████████████████████████████

As stated above, the relevant agreements do not mention Sater, and the CAA expressly

---

[7]   The CCIA was signed on behalf of the Kazakh Entities by undersigned counsel from
BSF.  At the time that the CCIA was signed, BSF was unaware of the name "Litco." ████████████
████████████████████████████████████████████████.

████████████████████████████████████████████████████

Likewise, the CNDA ████████████████████████████████████████

████████████████████████████████████ The CAA is an agreement to compensate a

consultant, which acted through its counsel, for its role in recovering assets. It is not an

agreement to compensate Sater. ████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████. The Kazakh Entities also never

made a payment to Sater. ████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████

　　　Save for a few interactions with Sater ████████████████████████████████

████████████, the Kazakh Entities were provided information and assistance by Litco through

Wolf. Wolf put the Kazakh Entities' representatives in contact with Sater, but that was Litco's

job: to connect the Kazakh Entities with people who could help them. And Sater testified

unequivocally that ████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

8

**C.      After the Kazakh Entities Learned that Sater Owns Litco and Declared Litco in Breach, Sater Changed His Testimony to Help Litco.**

Sater first revealed that he owned Litco at his deposition on September 13, 2018. [*See id.*, Sater Dep. 1, 20:10-24:7.] Soon after, in October 2018, ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████

At his continued deposition in February 2019, Sater altered his testimony regarding Litco.

██████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

████████████████████████████████████

Sater provided other contradictory testimony as well. Initially, ██████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████████

███████████████████████████████

This was demonstrably false. ████████████████████████████████

██████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████

**D.**     **The Kazakh Entities Are Pursuing Every Available Claim Against Sater.**

███████████████████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████ Neither Arcanum, BSF, nor the Kazakh

Entities learned of Sater's gain from the Tri-County Mall settlement ███████████████

10

██████████████████████████████████████ Once the Kazakh Entities learned this fact,

Sater went from being witness to target, ████████████████████████████████████

████████████████ [9]

From then on, the Kazakh Entities were simultaneously investigating Sater and, not

knowing he owned Litco, communicating with Wolf as Litco's and Bourg's representative. That

investigation culminated with the approximately $40 million lawsuit against Sater that the

Kazakh Entities filed earlier today. *See City of Almaty, Kazakhstan, et. ano. v. Felix Sater, et al.*,

No. 19 Civ. 2645 (S.D.N.Y.) [Schwartz Ex. 26].[10]  Meanwhile, despite the Kazakh Entities'

realization that Sater had profited – at their expense – from the Tri-County Mall settlement, they

remained unaware that Sater was connected to Litco as anything more than a witness.

## II.    The Defendants Misrepresent the Factual Record.

The Defendants unjustifiably tied as much unrelated conduct into the present motion as

possible. They attempt to do this in two ways. The first is by adopting Sater's uncorroborated,

false testimony ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████ The Defendants' overreach is in their attempt to show

that the Litco story carries over to other cooperating witnesses, such as Bourg and Frank

Monstrey. Knowing that the testimony and evidence of cooperators is devastating to their case,

the Defendants have tried repeatedly to keep that evidence out. But their attempts here to link

---

[9] ████████████████████████████████████████████████

████████████████████████████████████████████

[10]    The Defendants will likely criticize the timing of this lawsuit being filed on the same day
as this response.  There is no doubt that the Kazakh Entities accelerated the filing in part to be
able to demonstrate the complete adversity between the Kazakh Entities and Sater.

Bourg and Monstrey to the Litco story are completely without any factual basis.

### A.   The Defendants Rely on Sater's Most Incredible Testimony and Make Claims About Litco that Are Unsupported By the Evidence.

The Defendants' account of the agreements and relationship between Litco and the Kazakh Entities is distorted by overreliance on carefully chosen and edited portions of testimony from Sater's continued deposition, and fails to find support in either the full record or logic. At every turn, the Defendants accuse the Kazakh Entities of nefarious motives in entering into agreements with Litco and failing to produce certain documents and information to them – accusations that the Court should not credit, since they are mere conjecture and even, at times, undermined by the Defendants' own citations.

Triadou goes so far as to say, incorrectly, that it is "undisputed" ███████████ ████████████████████████ Without any direct evidence, the Defendants substitute 20/20 hindsight to argue that the Kazakh Entities, Arcanum, and BSF must have seen through Sater's skilled deception as to Litco's ownership. No matter how many times the Defendants say that the Kazakh Entities agreed to pay "Sater," the Court should look carefully at the actual evidence the Defendants have proffered.

The reality is that Sater was not a party to a single agreement, nor did the Kazakh Entities pay a single penny directly to him. Instead, Sater hid behind Litco to fraudulently benefit himself.  And as explained in the sections that follow, even were the Court to accept the Defendants' assumptions and inferences, it would still be insufficient to demonstrate the bad faith required to impose sanctions under the Court's inherent authority.

To begin, the Defendants' claim that "the terms of the Litco Agreement raise several red flags" is misguided. [*Id.* at 19.] Specifically, the Defendants point to the provision of the CAA in which Litco ███████████████████████████████████████████

12

███████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████ Contrary to Defendants'

suggestion, there is nothing "unusual" about the inclusion of this provision in the CAA – no

more so than the similar clauses, affirming that the parties will comply with all applicable laws,

that appear in countless contracts.

In fact, the inclusion of this "compliance with laws" provision in the CAA underscores

how seriously the Kazakh Entities and their representatives took this issue, since it rendered ████

██████████████████████████████████████████████. Courts do

not infer nefarious motives from ordinary and ubiquitous "compliance with laws" clauses, and

this provision – providing for compliance with rules directly relevant to the asset recovery efforts

at the heart of the CAA – does not warrant different treatment.[11]  The Defendants' argument on

this point is backwards, urging the inference that because the Kazakh Entities insisted that Litco

obey the law, they therefore must have known that Litco was acting improperly.

Moreover, the requirement that ██████████████████████████████████

made particular sense in the context of the CAA.  Litco was tasked with identifying witnesses in

support of the Kazakh Entities' asset recovery efforts, and it was therefore important to ensure

that these witnesses were procured appropriately.  Because the Kazakh Entities would

necessarily not be privy to all of the details of how Litco came to find its witnesses, it was

---

[11]  For example, one prominent international law firm advises clients that the first of its "M&A Best Practices to Avoid Anti-Bribery Liability" is to secure a representation and warranty that the transaction did not involve any bribes or other violations of the Foreign Corrupt Practices Act.  *See* Gibson Dunn, "FCPA M&A: Identifying and Mitigating Anti-Corruption Risk in Cross-Border Transaction," *available at* https://www.gibsondunn.com/wp-content/uploads/2018/05/WebcastSlides-FCPA-and-Other-Risks-in-MandA-10-May-2018.pdf. By Triadou's backwards logic, rather than being a risk mitigant, such a provision would somehow prove knowledge of a bribe.

critical that Litco represent its compliance with the law generally and, specifically, ███████
███████████████████████████████████████████████████████████
███████████████████████. This is the opposite of a red flag; this is how the Kazakh
Entities should have behaved.

Similarly, the Defendants struggle to argue that the Kazakh Entities and their
representatives knew that Sater owned Litco by virtue of the facts that (1)████████████
████████████ and (2) Sater never received a personal release from the Kazakh Entities. [*Id.* at
19-20.] But the Defendants fail to adduce evidence demonstrating how the CAA's mere
inclusion███████████████████████████████████████████████
███████████████████ would inform the Kazakh Entities or their representatives that
a witness with whom they had not yet met had an impermissible ownership interest in Litco.
[Schwartz Ex. 7 § 10.] Nor can the Kazakh Entities be blamed for not volunteering a personal
release to Sater, [*see* Triadou Br. 20], or for failing to divine Litco's ownership from a release
that Sater neglected to ask for.

The same goes for the Defendants' misguided attempts to read between the lines of the
CCIA. [*Id.* at 18 n.12.] Although the CCIA states███████████████████████████
████████████████████████████████ is not synonymous with
knowledge of Litco's owners or members. [*See* Schwartz Ex. 10 at p. 1.] Relatedly, even if the
Kazakh Entities or BSF knew or should have known███████████████████████ they
had no means of knowing, from the existence of the CCIA or other circumstances, that Litco was
owned by Sater and████████████████████████████████.

The Defendants also twist the language of the CNDA to suggest that█████████████
████████████████████████████████████████████. [*See, e.g.*,
Khrapunovs Br. 1]. That is not what was agreed to in the CNDA. The CNDA – like the CAA –

makes no mention of Sater. [*See* Schwartz Ex. 9.] In fact, the CNDA, ███████████████

███████████████████████████████████████████████████

█████████████████████████████.  This language provides no support

for the Defendants' claims that Arcanum knew or should have known who owned Litco. And

Arcanum agreed in the CNDA ███████████████████████████

█████████████████████████████████████████████

██████████████████████████

　　　　Furthermore, the Defendants overlook Sater's admission ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████ ██

████████████████████████, does nothing to change

the fact that he actively hid Litco's ownership from the Kazakh Entities and their representatives.

Nor do the Defendants point to any proof – beyond Sater's self-serving statements, ████████

████████████████████████████████ – that Arcanum knew or

had reason that know that Sater owned Litco, either before or after the CNDA was executed.

　　　　The Defendants rely heavily on Sater's claim █████████████████████

████████████████ [Triadou Br. 4.] However, the Defendants fail to grapple

with the changes in Sater's testimony between September 2018 and February 2019 – other than

dismissing, in a footnote, Sater's earlier testimony, in which he ███████████████

--------------------------------

12 ███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

█████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████

The Defendants' outsized reliance on testimony from Sater's continued deposition warps their narrative. By way of example, the Defendants seize on Sater's claim ███████████████

████████████████████████████████████████████████████████

████████████████████████████ [Triadou Br. 4.] But what the Defendants neglect to address – and omit from their exhibit containing Sater's testimony [*see* Triadou Ex. 2] – is evidence that Sater's ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████ [13]

Similarly, the Defendants depend on Sater's █████████████████████████

---

[13]     Even if there were other meetings, that would be irrelevant.  Consistent with the Court's order, the Kazakh Entities produced a chart of meetings with Sater "concerning this action and efforts to recover assets that are at issue in this action (*i.e.*, the New York real estate investments of Triadou)." [ECF No. 901 at 17.] ███████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████ expand any potential sanction regarding Litco to every conceivable source of evidence – the "fruit of the poisonous tree." [*See* Khrapunovs Br. 6-7, 20.]  But Sater's self-serving boasts are demonstrably false.  As to Bourg, as previously referenced, Wolf's letter in March 2015 on behalf of Bourg threatening the Chetrit Group predates the CAA by nearly three months and makes no reference to Litco, which had only formed the day before on March 23. [Schwartz Exs. 3, 24.] The Chetrit Group filed that letter publicly within days, and the Kazakh Entities immediately seized on that new information to put Chetrit on notice of their claims against the Flatotel assets.[14]

Similarly, as explained above, Sater ridiculously claims credit for all of the Eesh Aggarwal evidence. The Kazakh Entities learned of Aggarwal from an unrelated investigator and ultimately obtained the evidence as victims of crime from Kazakh law enforcement authorities, who had obtained it through a Mutual Legal Assistance Treaty request from the Republic of Kazakhstan to the United Arab Emirates. The Khrapunovs engaged in motion practice about that source to the U.K. courts, [*see* Schwartz Ex. 13 ¶ 25,] but they did not hesitate here to adopt Sater's alternative version of events. [*See* Khrapunovs Br. 6-7.] The Kazakh Entities' knowledge of these sources predated the CAA and any meeting with Sater. Sater's contradictory statement is nothing more than a naked attempt to claim credit for as many assets as possible, ████████████ ████████████████████████ and – in the face of documentary evidence to the contrary – cannot support the Defendants' desired sanctions.

---

[14]     The CCIA recites that ██████████████████████████████████████████ ██████████████████████, but this does not undermine the point that the Kazakh Entities were previously independently alerted to Bourg and would have pursued him regardless.

B.      **The Defendants Attempt to Tie as Many of Their Unjustified Grievances to Litco as Possible.**

Hoping to take their motions as far as they can, the Defendants raise their oft-repeated claims that the Kazakh Entities acted unethically with regard to Nicolas Bourg and Frank Monstrey. These allegations are factually inaccurate and have no connection to the question of whether or not the Kazakh Entities knew Sater owned Litco.

The Khrapunovs accuse the Kazakh Entities of delaying the production of Monstrey-related documents and of being "less than candid" about Monstrey's unwillingness to testify. [Khrapunovs Br. 11.] As the Kazakh Entities have explained in prior briefing, [*see, e.g.*, ECF No. 782,] in June 2017 BTA Bank entered into a settlement agreement with Frank Monstrey,

████████████████████████████████████████████████████

████████████████████████ Shortly after entering into the settlement agreement, Monstrey

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████[15] Rather, the Kazakh Entities' U.S. counsel learned of Monstrey's relevance to this case by tracing the stolen assets at issue through discovery.  U.S. counsel only later obtained Monstrey's U.K. witness statement when Monstrey voluntarily produced it to BSF directly; BSF then produced it to the Defendants in a matter of hours.

The Khrapunovs also raise, again, the Kazakh Entities' initial description of Monstrey as a "confidential witness" in a motion for leave to depose him. [*See* Khrapunov Br. 11-13; *see also* ECF No. 942 at 3.] This is both entirely unrelated to Litco, and entirely justifiable based on

---

[15]     The existence of a settlement between BTA Bank and Monstrey's company, Nostrum Oil & Gas, was public as of June 2017. ████████████████████████████

████████████████████████████████████████████████.

Monstrey's sworn witness statement. Monstrey stated ███████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ ████████████████████████, ██████████████████████████

███████████████████████, the Kazakh Entities labeled Monstrey a "confidential

witness" when they sought to extend discovery to, among other reasons, depose him. [ECF No.

639 at 2.] This was not a litigation tactic, ████████████████████████████████. And there

was certainly no prejudice to the Khrapunovs, no matter the number of times they raise the issue.

    As to Bourg, he at least was represented by Wolf and so understandably is discussed by

the Defendants in connection with Litco. As explained above, the mere fact that Bourg was

represented by the same attorney as Litco says nothing about whether the Kazakh Entities knew

Sater owned Litco. But the Defendants go further. Triadou argues, as the Khrapunovs previously

have, that the Kazakh Entities' settlement with Bourg and Foucher's Niel Companies ████████

████████████████████████████████████████████████████████████████

████████████████████ [Triadou Br. 4-5; *see also* ECF No. 837 at 4.]

    Like with their arguments about the Litco agreements, Triadou fundamentally

misinterprets what that settlement actually means. The settlement states that █████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████.

    And even if Bourg and Foucher were allowed to retain some small amount of tainted

funds, there would be nothing improper about that.  If Triadou's argument is credited, it would

mean that a plaintiff in a complex case with multiple actual and potential defendants could never

settle with anyone, as any person with liability would necessarily be a fact witness.  By Triadou's

logic, any settlement that did not involve a 100% capitulation by the defendant – and which, like virtually all settlements, allowed the defendant to retain some portion of the amount in controversy – would represent an improper payment to a fact witness.  That is not the law.

## LEGAL STANDARD

The Defendants ask the Court to sanction the Kazakh Entities under its inherent power. [*See* Triadou Br. 15-16; Khrapunovs Br. at 13.][16]  Courts have the inherent power to punish for contempt and have discretion to fashion "an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44-45 (1991). Because of the "very potency" of the inherent contempt powers, a court must exercise them "with restraint and discretion." *Id.* at 44.

"[T]he party seeking sanctions pursuant to Fed. R. Civ. P. 37 or the court's inherent power[] bears the burden of proof to establish the existence of grounds for the requested sanctions." *United States v. Acquest Transit LLC*, No. 12-CV-1146S, 2016 WL 9526566, at *3 (W.D.N.Y. Nov. 3, 2016). Specifically, "[t]o impose sanctions under the Court's inherent authority . . . there must exist clear and convincing evidence that an individual's conduct was not merely negligent but was undertaken with subjective bad faith." *S.E.C. v. Smith*, 798 F. Supp. 2d 412, 422 (N.D.N.Y. 2011), *aff'd* 710 F.3d 87 (2d Cir. 2013); *see Sakon v. Andreo*, 119 F.3d 109, 114-15 (2d Cir. 1997) ("[W]e have construed . . . the court's inherent power to be authorized only when there is a finding of conduct constituting or akin to bad faith."); *Shafii v. British Airways, PLC*, 83 F.3d 566, 571 (2d Cir. 1996) (stating sanctions to be awarded "when there is a

---

[16]    If on reply the Defendants argue for sanctions under a different rule or statute, the Kazakh Entities will request permission to file a sur-reply, but note that the arguments included in this brief apply with equal force to a sanctions motion under this Court's inherent powers, Federal Rule of Civil Procedure 11, and 28 U.S.C. § 1927.

clear showing of bad faith").[17]  Subjective bad faith requires "proof of deliberate fraud or wrongdoing." *Smith*, 798 F. Supp. 2d at 424.

<u>**ARGUMENT**</u>

**I.     The Defendants Failed to Establish that the Kazakh Entities Acted in Bad Faith.**

Neither of the Defendants' briefs makes any serious effort to explain the relevant legal standards to impose the sanctions they seek, let alone to meet those standards.  The reason is clear: the Defendants cannot possibly meet the high bar of establishing, by "clear and convincing evidence," the Kazakh Entities' "deliberate fraud or wrongdoing."

The Defendants' argument is based almost exclusively on a handful of curated and uncorroborated excerpts from Sater's deposition, presented apart from their context or the full record.  The Kazakh Entities respectfully submit that the Court should decline the Defendants' invitation to rely on Sater's contradictory, self-promoting, and ultimately speculative claim ███

███████████████████████████ .  To do so would be to credit a witness the

---

[17]     The Second Circuit has identified a specific class of cases in which bad faith does not have to be found in order to sanction an attorney under a court's inherent powers, while recognizing that bad faith is more commonly required:

> When a district court invokes its inherent power to impose attorney's fees or to punish behavior by an attorney in the actions that led to the lawsuit . . . [or] conduct of the litigation, which actions are taken on behalf of a client, the district court must make an explicit finding of bad faith. But, when the district court invokes its inherent power to sanction misconduct by an attorney that involves that attorney's violation of a court order or other misconduct that is not undertaken for the client's benefit, the district court need not find bad faith before imposing a sanction under its inherent power.

*United States v. Seltzer*, 227 F.3d 36, 41-42 (2d Cir. 2000) (internal quotation marks and citations omitted) (alteration in original). The Khrapunovs cite *Seltzer* and note, without explanation, that courts sometimes impose sanctions under their inherent powers "without even a showing of 'bad faith.'" Khrapunovs Br. 13. Here, there is no doubt that the allegedly sanctionable conduct was "conduct of the litigation," taken on behalf of clients, and the Defendants do not argue otherwise. Indeed, both Triadou and the Khrapunovs seek to sanction the Kazakh Entities. There is no allegation that BSF engaged in "misconduct that [was] not undertaken for the client's benefit," and so the "bad faith" requirement applies here.

Defendants acknowledge is "heavily biased and conflicted[,]" [Khrapunovs Br. 2,] in spite of his motive to lie on the critical question at issue as well as documentary evidence that clearly contradicts him.

The Defendants' evidentiary showing falls far short of establishing subjective bad faith by clear and convincing evidence. As explained above, the documentary evidence all establishes that the Kazakh Entities did not know that Sater owned Litco. The Kazakh Entities were alerted to Wolf when he threatened litigation against Chetrit on behalf of Bourg. [Schwartz Ex. 3.] Wolf, on behalf of Litco and before anyone met or communicated with Sater [*see* Triadou Exs. 5, 15], negotiated two separate agreements that each contained specific provisions ███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████ Neither agreement mentions or was signed by Sater. ██████████

███████████████████████████████████████████

██████████████████████. All of this points firmly to the truth, which is that the Kazakh Entities and their representatives had no knowledge that Sater owned Litco.[18]

---

[18]   If there is any doubt on this point, the Kazakh Entities are submitting with this opposition ███████████████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████. If the Court still has doubt, then the Kazakh Entities respectfully request that the Court hold an evidentiary hearing.

The Khrapunovs ask rhetorically what the purpose is for confidentiality and carefully worded contracts with potential cooperators if not to bribe them. [*See* Khrapunovs Br. 2.] Putting aside the fact that the Kazakh Entities did not actually enter into any agreement with Sater, as with any investigator trying to unravel a complicated and secretive criminal enterprise, the purpose is to negotiate the terms under which co-conspirators will flip. A release is a powerful – and entirely legitimate – tool for the government *or a victim* to use to secure cooperation and truthful testimony. Confidentiality is a creature of necessity given the accompanying dangers to co-conspirators, both professionally and physically, that come with acknowledging their own complicity in a crime. But what the provisions are not, however, are evidence that the Kazakh Entities knew who owned Litco.

In an effort to show bad faith, the Khrapunovs try to suggest that the Kazakh Entities are somehow responsible for Sater's unilateral decision to ███████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ██████████████████████████ But even Sater's testimony fails to support this theory. The Khrapunovs do not point to any evidence that the Kazakh Entities knew anything at all ████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ████████████████████

All the Defendants really have is Sater's speculative assertion that ██████████████████ ████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████

      Sater's original testimony, ████████████████████████████████████████

████████ was clear: █████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████

      The Defendants' mischaracterizations of documentary evidence and reliance on Sater – a witness they acknowledge is "heavily biased and conflicted[,]" [Khrapunovs Br. 2] – does not amount to "proof of deliberate fraud or wrongdoing" by clear and convincing evidence. *Smith*, 798 F. Supp. 2d at 424. Without such a showing, the Defendants' sanctions motions must be denied. *See, e.g.*, *Sakon*, 119 F.3d at 115 (reversing a sanctions award, finding that the sanctioned party had acted negligently, not in bad faith); *Acquest Transit LLC*, 2016 WL 9526566 at *3 ("[T]he record does not support Defendants' vituperations against Plaintiff of having a 'callous attitude,' toward Defendants' property rights, acting in 'bad faith,' or conducting a 'witch-hunt' in pursuing the instant litigation against Defendants." (internal citations omitted)).

24

## II.    Sanctions Based on What the Defendants Say the Kazakh Entities "Should Have Known" Are Unjustified.

The Defendants seek to overcome the complete lack of evidence of actual knowledge by urging the Court to rely on a "powerful inference" that the Kazakh Entities *should have known* that Sater owned Litco.[19] But such an inference would suggest only negligence at best and is insufficient as a matter of law to carry the Defendants' burden to show bad faith by clear and convincing evidence. Triadou cites no cases in which a court found that the bad faith requirement was satisfied by a mere "inference" that "should" have been known to the sanctioned party.

---

[19]    Even if the Court were to determine that Arcanum ought to have known of Litco's true ownership, such knowledge cannot be imputed to the Kazakh Entities or BSF given the circumstances of this case and the applicable legal standards. Defendants parrot the basic rule that information that an agent knows or has reason to know is imputed to the principal, but fail to acknowledge a well-worn exception to this rule: that an agent's knowledge is not imputed to the principal when the agent "is subject to a duty to another not to disclose the fact to the principal." Restatement (Third) of Agency § 5.03 (Am. L. Inst. 2006); *see also Ceja v. Scribner*, No. LA CV 07-00606-VBF-KES, 2016 WL 4035665, at *7 (C.D. Cal. Mar. 3, 2016) (recognizing this exception); *TTT Stevedores of Tex., Inc. v. M/V Jagat Vijeta*, 696 F.2d 1135, 1139 n.1 (5th Cir. 1983) ("There is apparently universal agreement to the effect that where an agent's duties to others prevent him from disclosing facts to the principal . . . the principal is not bound because of the agent's knowledge."). That the agent's assumption of this duty later turns out to be ill-advised – due perhaps to false pretenses by the party seeking the duty – does not change the fact that information subject to such a duty is not imputed to the principal.

The Kazakh Entities find themselves in such a position here .

Rather, to impose sanctions, there must be clear and convincing evidence of *actual* knowledge (or true, willful blindness) on the part of the Kazakh Entities.  Sanctioning the Kazakh Entities because they should have inferred – but did not actually know – Sater's role in Litco would require the Court to ignore the requirement of "subjective bad faith," *Smith*, 798 F. Supp. at 422, and would go against the Supreme Court instruction to courts to exercise their inherent sanction powers "with restraint and discretion" "[b]ecause of their very potency," *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44 (1991).

In addition to the threshold bad faith element, courts consider six factors in deciding whether to impose sanctions, as Triadou points out in its brief. [Triadou Br. 21.] These six factors are: willfulness or bad faith of the noncompliant party; the history, if any, of noncompliance; the effectiveness of lesser sanctions; whether the noncompliant party had been warned about the possibility of sanctions; the client's complicity; and prejudice to the moving party. *Metropolitan Opera Ass'n, Inc. v. Local 100, Hotel Empls. & Restaurant Empls. Int'l Union*, 212 F.R.D. 178, 220 (S.D.N.Y. 2003). An analysis of these factors also weighs strongly against the imposition of any sanctions, even assuming the Defendants could establish bad faith.

**History of Noncompliance.** Triadou suggests that the Kazakh Entities have a history of noncompliance when it states that "the Court has expressed concerns regarding Almaty/BTA's discovery conduct in the past." [Triadou Br. 22.]  Yet the only examples Triadou points to refer to the alleged misconduct that is at issue in this motion.  As the case Triadou cites makes clear, this is not sufficient: the "history of non-compliance" must be *other* discovery non-compliance in the same action. *See Metropolitan Opera*, 212 F.R.D. at 227.

Although the Defendants do their best to make it appear that the Kazakh Entities and their attorneys willfully ignored their requests for documents and other information regarding Sater and Litco, the Kazakh Entities' productions – viewed in light of their knowledge at the

time – were made in the utmost good faith and responsive. For example, the Defendants accuse the Kazakh Entities of failing to respond fully to their requests in July 2017 for "documents concerning Sater, including any agreements . . . Sater had with Almaty, BTA, or Arcanum." [Triadou Br. 6.] They continue, accurately, that "Almaty/BTA's counsel repeatedly represented that they were not aware of any such agreements" – an assertion that the Defendants do not, and cannot, contest with anything more than conjecture. [*Id.*] Since the Kazakh Entities and their counsel did not and could not have known that Sater owned Litco until Sater's first deposition on September 13, 2018, their failure to produce the CAA, CNDA, and CCIA in response to the Defendants' prior requests for agreements with *Sater* cannot be faulted. Defendants in fact admit that the Kazakh Entities had signed no agreements with Sater personally. [*See id.* at 20.] Thus, the Kazakh Entities consistently responded to the Defendants' requests for agreements with Sater precisely and accurately.[20]

The Khrapunovs argue that "counsel played a role" in delaying production of the CAA. [Khrapunov Br. 8.] The only arguments the Khrapunovs make in support of this position are that (1) the Kazakh Entities made a "contrived" argument that the CAA was protected by the work product doctrine and (2) the Kazakh Entities did not identify Sater as a witness until August 2017. [*Id.*]  But it is demonstrably not correct to say that the Kazakh Entities tried to delay production of the CAA.  To the contrary, the Kazakh Entities offered to immediately produce the CAA once Sater revealed his ownership of Litco, subject to Rule 502(d) order – clearly evidencing the reality that counsel's concern was with waiver of work product protection,

---

[20]     Moreover, as the Kazakh Entities have noted previously, documents concerning Litco were not actually responsive to the Defendants' document requests, which never mentioned Litco and only called for documents concerning Sater personally.  Even had counsel known that Sater owned Litco – which we certainly did not – it would not have been remotely sanctionable to withhold agreements with Litco in light of the language of Defendants' actual requests.

and not withholding the CAA itself. [*See* Schwartz Ex. 19 at 38:18-19; ECF No. 861.] And the
Kazakh Entities did not identify Sater as a witness until August 2017 because they did not know
of Sater's involvement in the Tri-County Mall dispute ████████████████████████████
███████████████ [Schwartz Ex. 14.]

**Severity of Sanctions.** While Triadou states that it is "seeking the least severe sanction
available – money," the Khrapunovs seek far more extensive sanctions. The Kazakh Entities
explain below why the Khrapunovs' demand for "punitive" sanctions is inappropriate, but
nowhere do the Khrapunovs explain why monetary sanctions would not suffice, in the event that
the Court determines any sanctions are appropriate (which, of course, it should not). As a result,
the Khrapunovs fail to meet their burden on this point.

Even as to a monetary sanction, in the circumstances of this case, a lesser but adequate
sanction would be the preclusion of Sater as a witness at trial. At its core, the Defendants'
sanctions motion is based on the assumption that Sater's testimony is wholly unreliable because
the Kazakh Entities provided him financial inducements to testify favorably to their case. While
it is not necessary to preclude Sater, given that the parties have ample evidence to impeach his
credibility, precluding him is at least a sanction that would addresses the alleged discovery
misconduct. A monetary fine, in contrast, would unjustifiably sanction the Kazakh Entities for
their good faith conduct in litigating the many other issues bound up with Triadou's requested
fees. [*See* Triadou Br. 21 n.13.] This is particularly the case when the Defendants made their own
strategic decisions that prolonged this dispute, such as their decision to never subpoena or depose
Litco, even after the Kazakh Entities invited them to, [*see* ECF No. 861 at 4-5,] nor to issue
document requests calling for evidence relating to Litco despite knowing about its existence as
far back as September 2017, [*see id.* at 4].

**Involvement of Clients.** Trying to implicate the Kazakh Entities themselves, the

Khrapunovs cite to deposition testimony from two of BTA's witnesses, Nurlan Nurgabylov and

Kenes Rakishev, on the relationship between BTA and Arcanum. [Khrapunovs Br. 7-8.] The

Khrapunovs characterize as a "big lie" Nurgabylov's testimony that ██████████████████

██████████████████████████████████████

     This was no lie, ████████████████████████████████████ The

ordinary meaning of the question "is there a contract between X and Y?" is "is there a contract

with X on one side and Y on the other, creating obligations between the two?" While BTA and

Arcanum were both signatories to the CAA, the agreement did not create any obligations

between them – the operative provisions obligated ████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████

    **Prejudice.** Triadou essentially admits that it was not prejudiced by the conduct it now

seeks to sanction. In its brief, Triadou requests the production of documents on the Kazakh

Entities' privilege log, and states that it "requests permission to seek leave to depose Litco, its

counsel, and/or Arcanum (as needed) *to ensure that Triadou is not prejudiced* by the late

disclosure." [*See* Triadou Br. 14 n.9.] Triadou is correct that the Defendants have not been

prejudiced by the delay in the production of Litco materials. They have materials now, well in

advance of summary judgment and trial. If the Court rejects the Kazakh Entities' work product

doctrine and common interest arguments and decides to order production of materials on the

Kazakh Entities' privilege log, Triadou would not be prejudiced by the production of those

materials either.[21]

---

[21]    The Kazakh Entities would not oppose a request by Triadou to seek leave to depose
Litco, if Triadou could articulate some proper purpose for that discovery.  At the status

Taken together, these factors do not support the imposition of any sanction. With no evidence of bad faith – only speculation about what the Kazakh Entities knew or an accusation about what they should have known – and no other factor falling in the Defendants' favor, the Court should decline to impose sanctions.

## III.   Defendants' Requested Sanctions Are Excessive.

For the reasons explained above, the Kazakh Entities did not engage in sanctionable conduct, and the Defendants have certainly not met their burden of proof to show otherwise. If the Court nonetheless decides to impose sanctions on the Kazakh Entities, the sanctions suggested by Defendants are excessive.

### A.   The Kazakh Entities Should Not Have to Pay for the Costs of Litco Discovery or for Defendants' Costs Associated with Sater's Continued Deposition.

First, the Kazakh Entities should not be forced to pay Triadou's fees. Triadou asks for discovery costs "[b]ecause Almaty/BTA sought to hide the Litco Agreement and related discovery based on a claimed lack of knowledge that their agent possessed . . . ." [Triadou Br. 21.]  To begin with, as discussed above, the neither the Kazakh Entities nor their agent knew Sater owned Litco, and even if Arcanum did know it, their purported knowledge cannot properly be imputed to the Kazakh Entities as a matter of law.  *See supra,* note 17.

More to the point, any delay here was occasioned by Triadou's own litigation decisions. Triadou waited almost a year after first learning of the existence of Litco to seek discovery about it, and that delay means whatever excess costs Triadou has allegedly incurred in seeking discovery into Litco are of Triadou's own making. [*See* ECF No. 861 at 4-5 (noting first

---

conference on February 26, 2019, Triadou stated that its requested discovery was not aimed at providing grist for further sanctions applications against the Kazakh Entities. [Schwartz Ex. 15 at 15:15-21.] It is therefore unclear what relevance a deposition of Litco could have, other than perhaps improperly trying to pry into the Kazakh Entities' other asset recovery efforts.

reference to Litco in this litigation came during deposition of Nicolas Bourg in September 2017, Triadou was first given a document mentioning Litco in March 2018, and Triadou did not seek discovery about Litco until August 31, 2018).] Indeed, at the February 26, 2019 conference, Triadou conceded that it had no good reason for failing to seek discovery directly from Litco. [Schwartz Ex. 15 at 16:1-10.] Whatever prejudice Triadou suffered from the additional costs caused by its not getting Litco-related documents sooner was caused by Triadou's own delay in propounding discovery requests for or to Litco.

In addition to seeking fees and costs associated with Litco-related filings, Triadou specifically seeks attorneys' fees associated with the second day of Sater's deposition. Charging those costs to the Kazakh Entities is completely unjust because the second day of Sater's deposition would have occurred regardless of the schedule of productions of Litco-related documents to the Defendants. Sater arrived at the first day of his deposition nearly two hours late, [Sater Dep. 1, 2:3; 6:13-14], and his attorney insisted on the deposition concluding at 5:30 p.m., despite the late start, [*id.* at 357:13-18.]]. The Kazakh Entities were given less than 90 minutes to question Sater at the first day of his deposition, [*id.* at 286:5-10; 357:19-20; 366:5-7], and had approximately an hour of additional questioning when they were "cut off." [*See* Schwartz Decl. Ex. 5.] It was therefore necessary that Sater return for a second day, regardless of the Litco issue, as the Kazakh Entities stated on the record at the time. [Sater Dep. 1, 364:25-365:9.] The Defendants also indicated that they had further questions for Sater that needed to be asked at a second day of his deposition. [*Id.* at 365:17-18.] As a result, Triadou is mistaken to the extent it is tying Sater's second deposition to Litco-related disclosures. Because the second day of Sater's testimony was necessary in any event, requiring the Kazakh Entities to pay for it can not be an appropriate sanction. *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1186-87 (2017) (emphasizing "the need for a court, when using its inherent sanctioning authority" (or

acting under "[r]ule-based and statutory sanction regimes," id. at 1186 n.5) "to establish a causal

link – between the litigant's misbehavior and" the award granted, id. at 1186, and stating that

"when 'the cost[] would have been incurred in the absence of' the discovery violation, then the

court (possessing only the power to compensate for harm the misconduct has caused) must leave

it alone," *id*. at 1187 (quoting Fox v. Vice, 563 U.S. 826, 838 (2011)).

**B.     The Kazakh Entities Should Not Be Charged "Punitive Monetary Sanctions"
in Relation to Sater and Litco.**

In support of their demand for "punitive monetary sanctions" in relation to Sater and

Litco, the Khrapunovs rely heavily on two cases. The first, *New York v. Solvent Chem. Co.*, 166

F.R.D. 284 (W.D.N.Y. 1996), is nothing like this case.  As the Kazakh Entities have explained:



> The defendants both cite *Solvent Chemical*, where the court ordered the defendants to pay the costs associated with a second deposition. That case bears no resemblance to this one. In *Solvent Chemical*, after a third party witness had been subpoenaed by one party, the opposing party entered into a "consulting agreement" with the witness, who . . . "was made part of [the] trial team," and paid an hourly fee for providing fact information. *State of N.Y. v. Solvent Chem. Co.*, 166 F.R.D. 284, 290 (W.D.N.Y. 1996). When the witness was deposed, he falsely claimed not to have had any "business relationship" with the party that had hired him. *Id.* at 286. Counsel for that party – who was personally aware of the consulting arrangement – took no steps to correct the record. *Id*. And when – on the third day of his deposition – information about the consulting agreement finally surfaced, the witness was directed not to answer numerous questions. *Id.* Counsel also refused to produce the consulting agreement, even in redacted form. *Id.* at 288.
>
> Here, by contrast, the Kazakh Entities believed they were engaging asset recovery services from Litco, not from a witness, and ██████████████████████ ██████████████████████████████████████████. When counsel and the Kazakh Entities learned that Sater was Litco's sole member, ████ ████████████████████ And unlike in *Solvent Chemical*[], the defendants were free to explore the nature of Sater's relationship with the Kazakh Entities at length at his deposition. *See also Goldstein v. Exxon Research & Eng'g Co.*, No. CIV. 95-2410, 1997 WL 580599, at *6 (D.N.J. Feb. 28, 1997) (denying sanctions and holding that, "Because it is really the credibility of Dr. Effron's testimony which is at issue, I conclude that ordering the full disclosure of the consulting agreement, permitting Plaintiff to disclose its contents to the jury, as well as allowing Plaintiff to cross-examine Effron at trial accords Plaintiff full relief.").

[ECF No. 861 at 10 (citations omitted).]

The second case the Khrapunovs rely on, *Patel v. 7-Eleven, Inc.*, 14-cv-00519 (PSG)

(DTBx), 2015 WL 9701133 (C.D. Cal. Apr. 14, 2015), is no more applicable. The court in *Patel*

disqualified defense counsel who knowingly entered into a contract to pay a witness that counsel

argued was an expert, but who the court concluded was a fact witness paid for his testimony. *Id.*

at *4. The court concluded that "Plaintiffs' counsel hired and paid [the witness] because it

wanted [his] fact testimony." *Id.* Here, the Kazakh Entities and their counsel never understood

they were paying Felix Sater directly at all, whether for expert or fact testimony. The agreement

to which the Kazakh Entities were parties warranted ████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████

████████████████████████. And for the reasons given above, *supra* note 14, even if Arcanum

knew Sater owned Litco, that knowledge could not be imputed to the Kazakh Entities or BSF as

a matter of law.███████████████████████████.

When the Kazakh Entities learned that Sater owned Litco and was being compensated

through Litco, ████████████████████████████████████████████████████████████

████████. The Kazakh Entities also sued Sater personally for the tens of millions of dollars of the

Kazakh Entities' money that he misappropriated for himself. *City of Almaty, Kazakhstan, et. ano.*

*v. Felix Sater, et al.*, No. 19 Civ. 2645 (S.D.N.Y.). *Patel* would only be persuasive if the Kazakh

Entities continued paying Sater after learning that he owned Litco. Instead, the Kazakh Entities

stopped paying Sater and never claimed they intended to pay Sater for his supposed expertise.

    **C.**    **The Khrapunovs' Requested Sanction of Excluding Evidence from Nicolas**
                    **Bourg Is Not Related to Sater or Litco and Should Be Rejected.**

If the Court decides that some sanction is necessary, there is no reason the Court should

accept the Khrapunovs' unrelated suggestion that evidence obtained from Nicolas Bourg be excluded. [Khrapunovs Br. 2, 20.] This proposed sanction lacks a basis in law and depends on a flawed assumption that the Kazakh Entities would never have obtained evidence from Bourg without Sater.

As explained above, Bourg approached the Kazakh Entities through his attorney, Robert Wolf. The Kazakh Entities had no reason to believe that Bourg was directed to contact the Kazakh Entities by Litco. In fact, Bourg, through Wolf, contacted Joseph Chetrit several months before the CAA was signed between Litco and the Kazakh Entities, [Schwartz Ex. 3] – at a time when Litco had only existed for one day, [Schwartz Ex. 24]. The Kazakh Entities would have pursued Bourg regardless, as they did with countless other witnesses, including Chetrit.

More importantly, once the Kazakh Entities began dealing directly with Bourg, they entered into a separate agreement with him that was totally independent of Litco, and which was entirely lawful and appropriate. The Defendants certainly do not argue that Bourg had any interest in Litco. At most, Triadou makes a half-hearted attempt to suggest Bourg – who was entitled to no payments from the Kazakh Entities – was incentivized to lie based on the fact that the Kazakh Entities settled with the Niel Companies on terms that ███████████████████████ ██████████████████████████. *See* Section II(B), *supra*.

Even assuming the Kazakh Entities depended on Litco to identify and produce Bourg, excluding Bourg's evidence and testimony is still not a justifiable sanction. First, there is no "fruit of the poisonous tree" theory applicable to civil cases, as the Khrapunovs suggest. [2/26/19 Hr'g Tr. 18:5-21.] *See Envtl. Servs., Inc. v. Recycle Green Servs., Inc.*, 7 F. Supp. 3d 260, 278 (E.D.N.Y. 2014) ("[T]he fruit of the poisonous tree is an evidentiary doctrine that does not apply

in civil matters." (internal quotation marks omitted)).[22] Second, neither Triadou nor the Khrapunovs seriously argue that the Kazakh Entities made any illegal or unethical payments to Bourg himself, only to Sater. Third, the Defendants do not argue that the Kazakh Entities specifically made payments to Sater in order to obtain evidence from Bourg. In fact, Bourg approached Joseph Chetrit in an effort to protect Bourg's *own interest* in amounts he was owed by Triadou. [Schwartz Ex. 3.]

Triadou and the Khrapunovs are free to challenge Bourg's credibility as an alleged disgruntled former employee of Triadou, as well as based upon the terms of the Kazakh Entities' actual agreements with Bourg himself, but there is no reason to exclude Bourg. Relevant for both Bourg and Sater, the Kazakh Entities did not choose the witnesses in this case. Bourg and Sater are both former business partners of the Defendants and their testimony and evidence in this case is relevant because the Defendants chose to do business with them.  Excluding highly relevant evidence as a sanction would distort the truth-seeking process, and be unrelated to and disproportionate to the alleged wrongdoing.

### D.    There Is Nothing Remotely Criminal About The Kazakh Entities' Behavior.

This Court already once denied the Khrapunovs' request to make a criminal referral to the Department of Justice [ECF No. 901 at 21-22], and the Khrapunovs' second request should fare no differently. The Khrapunovs allege that "[t]he Kazakh Entities used Arcanum . . . to intentionally establish a secret arrangement to pay a fact witness for favorable testimony in

---

[22]    And if the Khrapunovs are allowed to borrow the "fruit of the poisonous tree" doctrine from Fourth Amendment law, then the Kazakh Entities are equally entitled to rely on the "inevitable discovery" exception for the reasons discussed above. *See United States v. Eng*, 971 F.2d 854, 859 (2d Cir. 1992) ("The doctrine of inevitable discovery . . . allows unlawfully obtained evidence to be admitted at trial if the government can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." (internal quotation marks omitted)).

violation of 18 U.S.C. § 201(c)." [*Id.*] In November 2018 the Court denied the Khrapunovs'

request for this sanction, calling it premature. [ECF No. 901 at 21-22.] Despite the additional

discovery that the Defendants have obtained in the interim, they still fall far short of showing

that this extreme measure is warranted.

First, and most fundamentally, the Kazakh Entities did not know that Sater owned Litco –

and thus received compensation despite being identified and produced as a witness by Litco –

until Sater's deposition in September 2018, and the Defendants have failed to adduce any

credible evidence to the contrary. Accordingly, there was nothing "intentional[]" about the

compensation that Sater received from the Kazakh Entities, leaving no basis for criminal

prosecution under the federal statute that the Khrapunovs cite.

Second, the courts in this District have recognized that they "should be very cautious

about making such a referral and should do so only in exceptional cases." *Sec. & Exch. Comm'n

v. Payton*, 176 F. Supp. 3d 346, 357 (S.D.N.Y. 2016) (denying request for criminal referral); *see

Antidote Int'l Films, Inc. v. Bloomsbury Publ'g, PLC*, No. 06 Civ. 6114(JSR), 2007 WL

1834839, at *2 (S.D.N.Y. June 26, 2007) (same), *see also Payton*, 176 F. Supp. 3d at 357

(explaining that because a formal referral "from a federal judge carries heavy weight, it may

impede the prosecution from exercising its own independent judgment as to whether [a crime]

has occurred or whether, even if it has, criminal prosecution is appropriate").

Recognizing this high bar, the Kazakh Entities have not sought a criminal referral for

Ilyas Khrapunovs' perjury, even though the Court has already found him not to be credible and

sanctioned him. [ECF No. 564.]  The Defendants have certainly not overcome that high bar here,

since they have failed to show that the Kazakh Entities or their representatives knew or had

reason to know of the fraud perpetrated on them by Sater. Thus, the conduct of the Kazakh

Entities and their representatives does not support sanctions, much less criminal prosecution.[23]

## IV.   Communications with Litco Are Protected by the Work Product Protection and Attorney–Client Privileged Under the Common Interest Doctrine

The Kazakh Entities have previously explained that their and their agents' communications with Litco are protected by the work product doctrine. [*See* ECF No. 861 at 6-7.] Despite being aware that the Kazakh Entities have long maintained that these communications are protected work product, both the Khrapunovs and Triadou chose to focus their sanctions motions on the supposed lack of a common interest between the Kazakh Entities and Litco. [*See* Triadou Br. 11-14; Khrapunovs Br. 9.] As explained below, the Kazakh Entities do share a common legal interest with Litco (making the communications privileged), but regardless of that common interest, the Kazakh Entities' communications with Litco are protected by the work product doctrine.

### A.   Legal Standard.

The attorney–client privilege attaches "(1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived . . . ." *United States v. Int'l Broth. Of Teamsters*, 119 F.3d 210, 214 (2d Cir. 1997) (internal quotation marks and citation omitted). "'Generally, communications made between a defendant and counsel in the known presence of a third party are not privileged.'" *Allied Irish Banks v. Bank of Am., N.A.*, 240 F.R.D. 96, 103 (S.D.N.Y. 2007) (quoting *People v. Osorio*, 75 N.Y.2d 80, 84 (1989)). One exception to that rule is "known as the 'common interest' doctrine or 'joint

---

[23]   Of course, the Khrapunovs are certainly free to present whatever evidence they wish to the Department of Justice themselves, subject only to this Court's orders.

defense' privilege" and "'serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel.'" *Bank of Am., N.A. v. Terra Nova Ins. Co.*, 211 F. Supp. 2d 493, 496 (S.D.N.Y. 2002) (quoting *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989)).

The work product doctrine is enshrined in Rule 26, which states that "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial or for another party or its representative (including the other party's attorney, consultant, . . . or agent)." Fed. R. Civ. P. 26(b)(3)(A). The work product doctrine is less protective than the attorney–client privilege: work product may be discoverable upon the showing of a "substantial need for the materials." Fed. R. Civ. P. 26(b)(3)(A)(ii). But work product is also less susceptible to waiver. While disclosure of attorney–client privileged material to a third party waives that privilege, the "immunity afforded by the work product doctrine is not automatically waived by disclosure to a third party." *Ricoh Co., Ltd. v. Aeroflex Inc.*, 219 F.R.D. 66, 70 (S.D.N.Y. 2003).

Instead of the attorney–client privilege rule that known disclosure to a third party effects a waiver of the privilege, "courts generally find a waiver of the work product privilege only if the disclosure substantially increases the opportunity for potential adversaries to obtain the information." *Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc.*, 229 F.R.D. 441, 445 (S.D.N.Y. 2004) (internal quotation marks and citations omitted). Like with the attorney–client privilege, there is no waiver of work product if the party disclosed-to shares a "common interest" with the party holding the protection, *id.*, but the relevant inquiry for assessing whether disclosure to a third party waives the work product protection is not *exclusively* to ask whether the party disclosed-to shares a common interest. Instead, the question is whether the "covered materials are used in a manner that is inconsistent with the [work product] protection." *Bank of*

*Am., N.A. v. Terra Nova Ins. Co.*, 212 F.R.D. 166, 170 (S.D.N.Y. 2002). That means that a waiver occurs "when work product materials are either given to an adversary or used in such a way that they may end up in the hands of an adversary." *Id.*

      **B.**     **Communications with Litco Are Protected By the Work Product Doctrine.**

     At base, the communications between Litco – which acted almost exclusively through its attorney – and the Kazakh Entities go to the heart of the work product protection:  they are communications between a party and a consultant hired to assist that party in actual and anticipate litigation.  Sater's ownership of Litco ultimately does not change that fact.

     All communications with Litco were made in anticipation of litigation, because the purpose of the Litco agreement ████████████████████████████████████ ████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ At the time the Litco agreement was signed, both BTA (in the United Kingdom) and Almaty (in California) were engaged in active litigation with several of the defendants. [ECF Nos. 433 ¶¶ 12, 36.] Communications between the Kazakh Entities, their attorneys, Arcanum, and Litco were thus "prepared in anticipation of litigation" by parties to litigation and their "attorney[s] . . . or agent[s]" and subject to the work product doctrine. Fed. R. Civ. P. 26(b)(3)(A).

     There was also no waiver, as the communications did not occur "in a manner that is inconsistent with the [work product] protection." *Bank of Am.*, 212 F.R.D. at 170. By providing work product materials to Litco, the Kazakh Entities did not use them "in such a way that they may end up in the hands of an adversary." *Id.* As a result, the communications with Litco are work product, and the Defendants may only obtain them by showing "substantial need."

     Neither Triadou's nor the Khrapunovs' briefs present any "substantial need" for the Litco communications. Only Triadou actually requests the production of Litco documents not already

produced; as the Khrapunovs' counsel clarified at the February 26, 2019 status conference, they are not seeking additional discovery. [2/26/19 Hr'g Tr. 17:11-12.] Triadou articulates no need for the additional discovery.  Its counsel stated at the last conference that the purpose of the discovery was not to pursue additional sanctions, [*id.* at 15:15-21], so the only conceivable purpose for the discovery would be either (1) to learn about the Kazakh Entities' litigation and asset recovery strategy, including with respect to other assets, and/or (2) to impeach Sater.  The first of these purposes is plainly improper, and the second is cumulative and certainly does not rise to the level of "substantial need."  As the Khrapunovs themselves point out, the Defendants already have more than enough evidence to attack Sater's credibility. [Khrapunovs Br. 2.]

### C.       Litco and the Kazakh Entities Shared a Common Interest and Communications Between Them Are Protected By the Attorney–Client Privilege.

Communications between Litco and the Kazakh Entities are also covered by the attorney–client privilege because Litco and the Kazakh Entities shared a "joint defense effort or strategy" that was "decided upon and undertaken by the parties and their respective counsel." *Bank of Am.*, 211 F. Supp. 2d at 496.

As Triadou points out, one way that parties may have a demonstrated common legal interest is if they have "formed a coordinated legal strategy." *Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*, No. 13-cv-8997 (JPO)(GWG), 2015 WL 3450045, at *3 (S.D.N.Y. May 28, 2015); *see* Triadou Br. 13.Triadou argues that there is no coordinated legal strategy because

███████████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████Triadou cites no authority in support of its implicit premise that there is no common

interest when one party retains ultimate discretion over litigation decisions. There is no logical reason why two parties that agree to a common legal strategy ultimately set by just one of the parties should be treated any differently than two parties that agree to a common legal strategy that both of the parties developed together.  Such a rule would preclude application of the common interest doctrine to consultants, in direction contravention of controlling caselaw.  *See, e.g., United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961) (Friendly, *J.*) (holding that accountants retained by counsel are within attorney-client privilege); *Abu Dhabi Commercial Bank v. Morgan Stanley & Co., Inc.*, 2011 WL 4716334, at *2-3 & n.20 (S.D.N.Y. Oct. 3, 2011) (explaining that under common interest doctrine and *Kovel* rule, waiver does not occur when communications are made through "an agent of either attorney or client to facilitate communication" and that the "scope of the privilege is not defined by the third parties' employment or function" but instead on whether "the client had a reasonable expectation of confidentiality under the circumstances" (internal quotation marks omitted)).

Triadou argues that there is no common interest between the Kazakh Entities and Litco by citing to cases finding that litigation funders do not share a common interest. [Triadou Br. 13-14.][24] Litco is not like the litigation funders in the cases Triadou cites. Litco was retained by the Kazakh Entities as part of their worldwide efforts to recover judgments from Ablyazov and the Khrapunovs. By signing the Litco agreement and joining a coordinated legal strategy against Ablyazov and the Khrapunovs, Litco and the Kazakh Entities created a common legal interest between themselves. *Schaeffler v. United States*, 22 F. Supp. 3d 319, 330 (S.D.N.Y. 2014)

---

[24]    The principal case Triadou relies upon, *Cohen v. Cohen*, involved communications with a non-attorney litigation funder for supposed "litigation support." No. 09 Civ. 10230(LAP), 2015 WL 745712, at *1 (S.D.N.Y. Jan. 30, 2015). This line of argument thus would not speak to whether the Kazakh Entities' attorneys' communications with Robert Wolf, Litco's attorney and representative, would be privileged or not.

(noting common legal interest created by forming coordinated legal strategy); *overruled on other grounds* 806 F.3d 34 (2d Cir. 2015). In communications involving their attorneys, Litco, Arcanum, and the Kazakh Entities were discussing or seeking "legal advice in pending or reasonably anticipated litigation in which the joint consulting parties have a common legal interest." *The OMNI Health & Fitness Complex of Pelham, Inc. v. P/A-Acadia Pelham Manor, LLC*, 33 Misc.3d 1211(A), at *2 (N.Y. Sup. Ct. Westchester Cty. Sept. 28, 2011).

The better (and appropriate) analogy for Litco is to investigators retained by counsel.
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████ These are services typically provided by investigators, and it is well-settled that investigators working at the direction of counsel are protected by both the work product protection and attorney-client privilege under *Kovel*. *See, e.g., Costabile v. Westchester, N.Y.*, 254 F.R.D. 160, 164 (S.D.N.Y. 2008) (stating that the work-product doctrine covers documents prepared for a party by anyone "perform[ing] investigative or analytical tasks to aid counsel in preparation for litigation").

Finally, Triadou argues that the common interest between Litco and the Kazakh Entities was "pecuniary, not legal" because Litco had only a financial interest in recovering assets from Ablyazov and the Khrapunovs. [Triadou Br. 13.] But the Second Circuit has expressly rejected the argument that there is no common legal interest because the parties to an agreement all stood to lose only money as a result of a failure in litigation. In *Schaeffler v. United States*, the appeal of the Southern District of New York case cited above, the Second Circuit concluded that there was a common legal interest between a company and the banks that provided a refinancing to the company on the issue of the tax treatment of the refinancing, because all parties to the refinancing stood to suffer, financially, if the tax treatment was decided a particular way. *Schaeffler*, 806 F.3d at 42 ("In our view, the fact that the [banks] stood to lose a lot of money

(along with appellants) if appellants' tax arguments failed is not support for the position that no common legal interest existed. To the contrary, it was the interest in avoiding the losses that *established* a common legal interest." (emphasis added)).

Litco and the Kazakh Entities established a common legal interest through the CAA, which interest was reduced to writing in the CCIA. All parties to the CAA shared a financial interest in the outcome of particular litigation, specified in the agreement. Legal aspects of the agreement "materially affect[ed] the financial interests" of Litco and the Kazakh Entities and that, coupled with the joint legal strategy contemplated by the agreement, established their common legal interest. As a result, the attorney–client privilege that attached to those communications was not broken by sharing them with Litco.[25]

## V. The Kazakh Entities Are Prepared to Produce Communications with Frank Monstrey Pursuant to a Rule 502(d) Order

For the same reasons as stated above with regard to Litco, the Kazakh Entities maintain that communications between them and their attorneys and Frank Monstrey and his attorneys are attorney work product and should be protected by that doctrine. (The Kazakh Entities do not assert a common interest privilege with respect to Monstrey).  However, in order to protect the Kazakh Entities' attorneys' other work product, the Kazakh Entities are prepared to produce their communications with Monstrey and his attorney subject to an order under Federal Rule of Civil Procedure 502(d) that such production will not waive work product protection in this litigation.

## VI. The Kazakh Entities Amended Rule 26 Disclosures Were Proper.

Triadou seeks to preclude two witnesses on the grounds that the Kazakh Entities

---

[25]     If not for the fact that, as it turns out, Sater own Litco, there would really be no argument that communications with Litco are privileged and/or work product.  But as discussed above, Sater's ownership of Litco does not change the analysis of whether a common legal interest existed, it only speaks to whether the Defendants have a "substantial need" to overcome work product protections.  For the reasons given above, they do not.

belatedly added them to their Rule 26 initial disclosures.  But those witnesses and their relevance to this case were identified to the defendants well in advance of the discovery cut-off, making them proper trial witnesses.  Moreover, there has been no prejudice to the Defendants from any purported late disclosure, and to the extent the Defendants wish to depose the witnesses, the Kazakh Entities have no objection notwithstanding the close of the fact discovery period.

### A.    Relevant Facts

The Kazakh Entities' first Rule 26 disclosure from August 12, 2016, listed (among others) six former BTA Bank employees whom the Kazakh Entities at that time identified as potentially having discoverable information relevant to this case concerning "Mukhtar Ablyazov's conduct as Chair of BTA Bank." [Schwartz Ex. 20.] Triadou did not express any interest in deposing any of these individuals or complain about the adequacy of the description of their possible relevance.

Over the next year and a half, the Kazakh Entities' investigation into the specific source of funds for the U.S. investments at issue in this case progressed substantially. In particular, the Kazakh Entities traced the money for the U.S. investments principally back to an investment by Mukhtar Ablyazov in a company called Zhakmunai (now Nostrum Oil & Gas), run by Frank Monstrey, and beyond that to certain purported loans from BTA Bank to an entity called Tradestock.  On October 5, 2018, the Kazakh Entities amended their Rule 26 disclosures (their Third Amended Disclosures) and added two additional former BTA employees, Zaure Dzhunusova and Gaini Duysenbina, who had both general knowledge of the fraud at BTA and specific knowledge concerning Tradestock.

This was not the first time that the Kazakh Entities had provided notice to the Defendants of these witnesses.  In addition to their presence on relevant documents produced by the Kazakh Entities, [see Schwartz Decl. Ex. 23,] the Kazakh Entities specifically identified both

44

Dzhunusova and Duysenbina in response to the Khrapunovs' *first* interrogatory on October 6, 2016, which asked for the Kazakh Entities to "Identify each individual with knowledge concerning the facts, events, circumstances or issues alleged in the Crossclaims, or any fact concerning claims and defenses in this litigations." [Triadou Ex. 19 at 4, 7.][26]  Thus, as of October 6, 2016, the Defendants were on notice of the relevance of these witnesses.

As the Kazakh Entities noted at the recent discovery conference on February 26, 2019, they have been working to determine whether and how these two witnesses could be made available to testify at depositions and at trial, to ensure that this is a live issue for the Court's consideration. [*See* 02/26/19 Hr'g Tr. 7:16-8:9.] Since the conference, counsel has contacted both Dzhunusova and Duysenbina, as well as other similarly-situated former BTA employees. Based upon those communications, the Kazakh Entities anticipate that Zaure Dzhunusova will be available for trial, but Gaini Duysenbina will not be.  In Duysenbina's place, the Kazakh Entities have identified two other individuals, Akzhan Moldakhmet and Kairat Sadikov, who possess similar knowledge and who will be available for deposition and trial.[27]  Both Moldakhmet and Sadikov were also identified on October 6, 2016 – two and a half years ago –  in response to the same interrogatory discussed in the previous paragraph.  [Triadou Ex. 19 at 8-9.]

## B.    Discussion

The Court should deny Triadou's motion to preclude these former BTA Bank employees for a host of reasons.

*First*, fact discovery had not ended in October 2018, when the Kazakh Entities served

---

[26]    The Kazakh Entities also identified specific documents relating to relevant BTA Bank loans concerning Tradestock on which these witnesses appeared in their response to Triadou's 20th interrogatory on October 5, 2018. [*See* Schwartz Decl. Ex. 22 at 7-8.]

[27]    The Kazakh Entities are serving with this brief their Fourth Amended Initial Disclosures, removing Gaini Duysenbina and adding Akzhan Moldakhmet and Kairat Sadikov.

their Third Amended Disclosures. [*See* ECF No. 649 at 8.] Of particular importance – given that the Amended Disclosures listed witnesses relating to Ablyazov's crimes at BTA Bank – the Court specifically extended fact discovery for the deposition of Ablyazov until October 31, 2018. This alone justifies permitting the witnesses.  The depositions of Sater and Monstrey also had not concluded, and the Defendants were still requesting broad discovery relating to those witnesses. [*See* ECF No. 901.]

*Second*, the Kazakh Entities timely identified the witnesses through interrogatory responses and other discovery, and were not required to amend their initial disclosures.  In an abundance of caution, the Kazakh Entities complied with Rule 26(e)'s requirement that a party "supplement or correct its disclosure or response: (A) in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect . . . ." Fed. R. Civ. P. 26(e). That is precisely what happened, as Triadou acknowledges. As explained in the Kazakh Entities' letter to Triadou in November 2018, the Kazakh Entities responded to Triadou's 20th interrogatory regarding documents showing particular asset tracing. [Triadou Ex. 18 at 1.] In doing so, the Kazakh Entities pointed to specific bank records. Those particular bank records were attached to e-mails circulated internally at BTA Bank. The names of the individuals who sent and received those e-mails (*i.e.*, Dzhunusova and Duysenbina) were not on the Kazakh Entities' initial disclosures. Accordingly, the Kazakh Entities added them, as they could potentially testify about those records. These are witnesses who can testify to general background information on Ablyazov's bank fraud scheme, and specifically on facts relevant to the asset tracing at issue in this case.  Replacing one such witness (Duysenbina) with similarly-placed witnesses (Moldakhmet and Sadikov ) also does not materially change the disclosures.

Moreover, the witnesses can lay the foundation for the admission of certain bank records.[28]

But given that Triadou already knew of these witnesses, were pointed to the relevant documents relating to Tradestock, and had the Kazakh Entities' interrogatory responses, the Kazakh Entities did not even need to amend their initial disclosures. Rule 26(e) only requires a supplemental disclosure "if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing[.]" Fed. R. Civ. P. 26(e). All of these witnesses were originally identified in response to the Khrapunovs' first interrogatories, and they appear on relevant documents that Triadou has had since the beginning of this case.  Moreover, these documents were not buried in the Kazakh Entities' productions, but were specifically identified in response to other interrogatories.  Dzhunusova, for example, was on an e-mail identified in the Kazakh Entities' response to Triadou's 20th Interrogatory. [Schwartz Decl. Ex. 22 at 7-8 (response to interrogatory 20, describing document bates stamped Almaty-BTA0077421); *id.* Ex. 23 (e-mail without spreadsheet attachment).]

*Third*, even if the Court determines that the Kazakh Entities were required to list the witnesses on their Rule 26 disclosures and did not do so before the close of fact discovery, the failure was substantially justified and harmless. Ablyazov's crimes at BTA Bank continued for over a decade and involved countless fraudulent loans to shell companies owned by his many

---

[28]    In the event that the Court is inclined to preclude these witnesses, they should at the very least be allowed to testify for the purpose of authenticating and laying the foundation for certain documentary evidence.  It is well-settled that a party's initial disclosures need not identify every document custodian.  *See E.E.O.C. v. New Breed Logistics*, No. 10-2696-STA-tmp, 2013 WL 1404926, at *1 n.2 (W.D. Tenn. Apr. 5, 2013) (overruling objection to declaration from witness not included in initial disclosures because witness was "not testifying as to her knowledge of events; rather, [she] serves as a custodian authenticating business records"); *see also Mendez v. Deutsche Bank Nat'l Trust Co.*, No. 17-CV-563, 2017 WL 2992450, at *4 (S.D. Tex. June 1, 2017) (overruling objections to affidavit attesting to authenticity of documents submitted by witness not included in Rule 26 disclosures, where disclosures noted intent to call witnesses from same company as affiant).

trusted nominees. Like any large corporation – even one perpetrating a massive fraud – there was significant turnover in the employees responsible for administering the day-to-day functions of the bank. It took years of investigation and formal discovery in this case alone to identify the specific transfers at BTA Bank that ultimately funded the Flatotel investment. Those were the records Triadou asked the Kazakh Entities to identify in their 20th interrogatory. The Kazakh Entities were not being recalcitrant – they were finding the needle that Ablyazov had buried in a haystack. Once the Kazakh Entities identified BTA witnesses with the most relevant knowledge, they promptly identified them to the Defendants in response to interrogatories and in amended initial disclosures.

There is also no prejudice to Triadou. It has known of these witnesses for years and has had access to all the documentary evidence that the Kazakh Entities would rely on. Triadou also has ample notice of the witnesses whom the Kazakh Entities may call. And if those witnesses are called, Triadou will be able to depose them before trial.[29] Triadou never sought to depose any former BTA Bank employees before, and so their sudden change in posture should be seen for what it is: an attempt to keep the truth from ultimately coming out at trial.

*Fourth*, even if the Court determines that the failure to amend the disclosures earlier was both a violation of Rule 26 *and* not justified and harmless, the Court should not impose the

---

[29]     As the Kazakh Entities stated at the February 26, 2019 conference, they have no objection to Triadou deposing these witnesses and will make every effort to efficiently arrange those depositions. [2/26/19 Hr'g Tr. 7:20-8:3.] The Kazakh Entities have no objection to those depositions occurring now or, if Triadou prefers, occurring closer to trial after final witness lists are exchanged.  It is not uncommon for depositions to take place immediately prior to – or even in the middle of – trial where a new witness has been added for one reason or another.  *See, e.g., Dunlap-McCuller v. Riese Organization*, 980 F.2d 153, 158 (2d Cir. 1992) (finding no abuse of discretion in district court permitting depositions of witnesses not included on witness list during trial).  It would be inequitable to exclude relevant and available witnesses that Triadou has known about for years, and which had been identified on amended initial disclosures a year prior to the likely trial date in this case.

drastic sanction of preclusion under Rule 37(c)(1). *See Design Strategy, Inc. v. Davis*, 469 F.3d

284, 298 (2d Cir. 2006) (holding that preclusion is not mandatory because "the plain text of the

rule provides that if an appropriate motion is made and a hearing has been held, the court does

have discretion to impose other, less drastic, sanctions."); *accord Capitol Records, LLC v.*

*Escape Media Grp., Inc.*, No. 12-cv-6646, 2015 WL 1402049, at *21–22 (S.D.N.Y. Mar. 25,

2015) (Nathan, *J.*).

"In deciding whether to exercise its discretion to impose sanctions, a court should

consider: '(1) the party's explanation for the failure to comply with the [disclosure requirement];

(2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by

the opposing party as a result of having to prepare to meet the new testimony; and (4) the

possibility of a continuance.'" *Pal v. New York Univ.*, No. 06-cv-5892, 2008 WL 2627614, at *3

(S.D.N.Y. June 30, 2008) (citing *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir.2006)).

Courts in the Second Circuit "recognize that preclusion of evidence . . . is a drastic remedy and

should be exercised with discretion and caution." *Ebewo v. Martinez*, 309 F.Supp.2d 600, 607

(S.D.N.Y.2004). In fact, "[m]any courts in this District have found that 'flagrant bad faith' and

'callous disregard' of the Federal Rules are necessary prerequisites to witness preclusion."

*Martinez v. Port Auth. of N.Y. & N.J.*, No. 01-cv-721, 2005 WL 2143333, at *14 (S.D.N.Y. Sept.

2, 2005) (internal citations omitted).

As explained above, the circumstances here have nothing approaching the "flagrant" bad

faith that district courts require to preclude testimony. The Kazakh Entities could not have

identified these witnesses until after concluding a years-long investigation.[30] Now that the

---

[30]     In theory, the Kazakh Entities *could* have identified the witnesses by listing literally
every former BTA employee on their initial disclosures. But that approach would certainly have
run afoul of Rule 26. *See Robinson v. Champaign Unit 4 Sch. Dist.*, 412 Fed. App'x 873, 877
(7th Cir. 2011) (underscoring that, although the form and "degree of specificity" of initial

Kazakh Entities finally identified critical bank records and substantially completed the asset tracing connecting BTA's money to the Defendants' U.S. investments, precluding the testimony of witnesses who could explain what the records are and how they were generated would be extremely damaging to the Kazakh Entities' case – and to the truth-seeking process –for no good reason. Triadou has notice and plenty of time before trial to prepare to depose these witnesses. In the *Martinez* case, for instance, two trial witnesses were identified as "trial witnesses approximately three weeks prior to trial." *Martinez*, 2005 WL 2143333, at *15. There, the court did not preclude the witnesses but, instead, ordered their deposition be taken. When the defendants failed to take their depositions, the court still allowed them to testify. *Id*.

Triadou has used this same logic in its own favor. When Triadou issued untimely third-party subpoenas under a pretense of "expert discovery," the Court did not impose the drastic remedy of preclusion. [*See* ECF No. 929 at 4-5 (Opinion & Order Jan. 22, 2019) ("Indeed, if Triadou's assertion were to be believed, it would mean that fact discovery could continue long after the close of fact discovery, so long as such discovery were made for purposes of developing expert reports.").] The Court instead examined the multi-factor test to determine whether to reopen discovery and allowed Triadou's untimely subpoenas *nunc pro tunc*. [*Id.* at 8-9.] The Court should employ the same pragmatism here that it did for Triadou – with respect to witnesses identified on the Kazakh Entities' initial disclosures long before Triadou issued the subpoenas that the Court allowed to stand – and deny Triadou's motion to preclude the former BTA Bank employees from testifying at trial.

---

disclosures "ha[ve] not been the subject of many decisions in either the appellate or district courts," "the advisory committee notes to the 1993 enactment emphasize that the 'disclosure requirements should, in short, be applied with common sense' to help focus the attention on the 'discovery that is needed . . .'").

## **CONCLUSION**

For the above reasons, this Court should deny the sanctions requested in the Defendants'

motions.


Dated: March 25, 2019
New York, New York

Respectfully,

/s/ Matthew L. Schwartz
Matthew L. Schwartz
Peter M. Skinner

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350
E-mail: mlschwartz@bsfllp.com