**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| CITY OF ALMATY, KAZAKHSTAN, and BTA BANK JSC<br><br>Plaintiffs,<br><br>v.<br><br>MUKHTAR ABLYAZOV, ILYAS KHRAPUNOV, VIKTOR KHRAPUNOV and TRIADOU SPV S.A.,<br><br>Defendants. | No. 15-cv-05345 (AJN) (KHP) |

**PLAINTIFFS' SUPPLEMENTAL BRIEF REGARDING FRAUDULENT CONVEYANCE CLAIMS**

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Crossclaim Plaintiffs City of Almaty, Kazakhstan and BTA Bank*

i

## **TABLE OF CONTENTS**

**BACKGROUND** ..................................................................................................................1

      A.     The Fraudulent Conveyance ..............................................................................2

      B.     The Settlement with the Chetrit Entities ............................................................3

**ARGUMENT** ......................................................................................................................3

**I.**     **The Kazakh Entities Did Not Receive the Fraudulently-Transferred Property in the Settlement.** ........................................................................................................4

**II.**    **Triadou and the Individual Defendants Are Liable for Fraudulent Conveyance.** .....9

      A.     **A Damages Remedy Is Still Available Against Triadou and the Individual Defendants as Beneficiaries of the Fraudulent Conveyance.** ...............................9

      B.     **Triadou and the Individual Defendants Are Also Transferees of the Kazakh Entities' Stolen Money Paid in the August 2014 Assignment.** ...........................12

**III.**   **The Settlement Agreement with the Chetrit Parties Did Not Effectuate the Other Defendants' Release.** ......................................................................................14

# **TABLE OF AUTHORITIES**

**Cases**

*Amusement Industry, Inc. v. Midland Ave. Assocs., LLC*, 820 F. Supp. 2d 510 (S.D.N.Y. 2011) 10

*Cadle Co. v. Newhouse*, 74 F. App'x 152 (2d Cir. 2003) ............................................................. 9

*D'Mel & Assocs. v. Anthco, Inc.*, 963 N.Y.S.2d 65 (App. Div. 2013) ........................................... 9

*Excelsior Capital, LLC v. Allen*, 536 F. App'x 58 (2d Cir. 2013) ............................................... 12

*Kim v. Ji Sun Yoo*, 311 F. Supp. 3d 598 (S.D.N.Y. 2018) ....................................................... 6, 11

*Lippe v. Barinco Corp.*, 229 B.R. 598 (S.D.N.Y. 1999) ................................................................ 9

*MFS/Sun Life Trust v. Van Dusen Airport Services*, 910 F. Supp. 913 (S.D.N.Y. 1995). 14, 15, 16

*Paradigm BioDevices, Inc. v. Biscogliosi Bros., LLC*, 842 F. Supp. 2d 661 (S.D.N.Y. 2012). 4, 11

*RTC Mortgage Trust 1995-S/NI v. Sopher*, 171 F. Supp. 2d 192 (S.D.N.Y. 2001) ................... 5, 9

*TLC Merchant Bankers, Inc. v. Brauser*, No. 01 Civ. 3044 GEL, 2003 WL 1090280 (S.D.N.Y. Mar. 11, 2003) ........................................................................................................................ 11

*United States v. Bushlow*, 832 F. Supp. 574 (S.D.N.Y. 1993) .................................................... 11

**Treatises**

N.Y. Jur. 2d Creditors' Rights ...................................................................................................... 10

Wright & Miller, 13C Fed. Prac. & Proc. Juris. (3d ed. 2019) ..................................................... 11

The City of Almaty and BTA Bank (together, the "Kazakh Entities" or "Plaintiffs") respectfully submit this supplemental memorandum in response to the Court's May 22, 2019 Order, in which the Court stated that it would decide the so-called "mootness" issue raised by certain defendants [ECF No. 1055].[1]

## PRELIMINARY STATEMENT

The defendants' framing of this issue as one of "mootness," or subject matter jurisdiction, is misguided. There can be no legitimate question as to the Court's continued subject matter jurisdiction over this lawsuit. The arguments raised by the defendants, instead, go to the merits of the Kazakh Entities' fraudulent transfer claims, and raise disputed issues of fact that should be decided at trial. In particular, the defendants' "mootness" argument turns on the assertion that the Kazakh Entities received in their settlement with Chetrit the property that was fraudulently conveyed. But that is not so: Triadou conveyed an interest in the Flatotel that it believed was worth $114 million. The Kazakh Entities agreed to receive in settlement an interest in the Flatotel that they never actually got, and which had been stripped of tens of millions of dollars in distributions, and which was encumbered by a substantial indemnification obligation. To the extent that the defendants argue these two things are the same, there is at the very least a disputed issue of fact that must be resolved at trial.

## BACKGROUND

The relevant factual background is explained in the Kazakh Entities' March 29, 2019 letter, [ECF No. 998], and briefly summarized here for the Court's convenience.

---

[1] The Kazakh Entities incorporate and do not repeat their prior briefing on this subject, most notably including their March 29, 2019 letter response to Judge Parker [ECF No. 998; *see also, e.g.,* ECF No. 850]. This supplemental memorandum is aimed primarily at clarifying the Kazakh Entities' position on the fraudulent conveyance claims and responding to arguments raised by the defendants in their April 8, 2019 reply letters [ECF Nos. 1006, 1014].

1

A.     **The Fraudulent Conveyance**

In March 2013, Triadou agreed to invest approximately $34 million in the Flatotel, which was being developed by the Chetrit Parties. [June 3, 2019 Declaration of Matthew L. Schwartz ("Schwartz Decl.") Ex. A at 30].[2] Triadou obtained a 50% interest in CF 135 West Member LLC, which in turn held 75% of the Flatotel. [*Id.* at 26]. In May 2013, Triadou made a further $6 million investment with Chetrit, in the Cabrini Medical Center. [Schwartz Decl. Ex. B at 1]. In November 2013, Triadou estimated the exit value of these two investments as $114 million and $14.4 million for the Flatotel and Cabrini, respectively. [Schwartz Decl. Ex. C at 6].

On August 4, 2014, under pressure from the Kazakh Entities' asset recovery efforts and despite the fact that both the Flatotel and Cabrini projects were still under development, Triadou agreed to convey its interest in the two projects back to the Chetrit Parties. [Schwartz Decl. Ex. B]. Under their "assignment agreement," Chetrit agreed to repay the $6 million loan for the Cabrini project without interest, to pay an additional $1 million in cash up front, and to pay $21 million in four installment payments spread out over a year. [*Id.* ¶ 1]. Triadou also retained a residual interest in the Flatotel's profits, if any. [*Id.* ¶ 1(g)].

████████████████████████████████████████

████████████████████████████████████████

████████████ Chetrit never paid any of the installments, which resulted in Triadou suing Chetrit in New York State court. Ultimately, the return-of-capital and profit distributions attributable to Tradou's former 50% interest in CF 135 West Member LLC were deposited with

---

[2]     The money that funded Triadou's investments was transferred by an entity called Telford International; no money ever came from Triadou. According to the defendants, Telford is an entity owned by Gennedy and Elena Petelin, and Triadou's U.S. investments were allegedly their personal investments. ████████████████████████████████████████
████████████████████████████████████████
████████

a monitor appointed by the state court, which is where the funds ($23.5 million, including interest) remain. [ECF No. 1004 at 2-5]. As Triadou has previously advised the Court, it intends to direct any additional payments from Chetrit directly overseas to SDG. [ECF No. 169 ¶ 56].

### B. The Settlement with the Chetrit Entities

In late 2015, the Kazakh Entities brought claims against the defendants and Chetrit for, among other things, actual and constructive fraudulent transfer for the below-market assignment of the Flatotel interest. [ECF No. 49 ¶¶ 169-180]. Recognizing their potential liability, Chetrit settled in November 2015. [Schwartz Decl. Ex. E]. ███████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████

The Kazakh Entities thus settled for less than the interest Triadou fraudulently conveyed back to Chetrit and far less than the interest Triadou originally had in the Flatotel project. ███
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████ The defendants' claim that the Kazakh Entities were made whole by their settlement with Chetrit, thereby mooting their fraudulent transfer claims against Triadou and the Khrapunovs, is simply false.

### ARGUMENT

3

### I. The Kazakh Entities Did Not Receive the Fraudulently-Transferred Property in the Settlement.

At base, the defendants' motion raises one central question: Did the Kazakh Entities, through the settlement, "receive[ ] all that they had demanded in their pleading and the maximum remedy that the law would ever permit"? [ECF No. 983 at 1; *see also* ECF No. 981 at 1 ("Almaty/BTA have obtained the very asset that is the target of their claims.")]. The answer to that question is no.

To begin with, as they have explained in previous filings, the Kazakh Entities did not obtain from the Chetrit Parties all they could have received "had there been no conveyance at all." *Paradigm BioDevices, Inc. v. Biscogliosi Bros., LLC*, 842 F. Supp. 2d 661, 667 (S.D.N.Y. 2012). Had there been no conveyance in August 2014, Triadou would have continued to hold a 50% investment in CF 135 West Member LLC, and would have enjoyed all of the benefits of ownership – including receiving all distributions in the form of return-of-capital or profits (*i.e.*, the $23.5 million currently held by the monitor) and all entitlements to future profits. The Chetrit Parties, on the other hand, would have had more capital (the funds invested by Ablyazov and the Khrapunovs, through Telford International, on behalf of Triadou) and the obligation to pay Triadou under the terms of the companies' operating agreements.

Under that *ex ante* scenario, the Kazakh Entities could have pursued all of the money traceable to the funds stolen from them. The Kazakh Entities could have recovered from Chetrit at least the $34 million they received from the conspirators' investment in the Flatotel. As against Triadou, the Khrapunovs, and Ablyazov, the Kazakh Entities could have recovered their property interests in the Flatotel investment (and other U.S. investments and assets), including their right to receive any distributions from Chetrit. The Flatotel asset, according to Triadou's own valuation, would have been worth $114 million at its exit.

4

But under the *ex post* scenario—the one that the fraudulent conveyance claims are intended to rectify—Triadou gave up its ownership interest in the Flatotel in exchange for cash, future installment payments, and a diminished share of future profits, if any. Chetrit ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ paid a further $23.5 million (thus far) into the Monitorship Account, which the Kazakh Entities were forced to attach. That initial cash payment is now lost overseas.

To even begin evaluating whether the Kazakh Entities' were restored to the *ex ante* position by virtue of their settlement with the Chetrit Parties, the Court must be able to put specific values on the property rights gained and lost in the fraudulent conveyance, as well as specific values on what the Kazakh Entities recovered in the settlement itself. After all, the equitable remedies under a fraudulent conveyance claim are intended to restore the plaintiffs to the position they would have been in absent the conveyance. That can be done by unwinding the conveyance, if possible, or by holding beneficiaries of the transfer responsible for the monetary shortfall, or both. *See RTC Mortgage Trust 1995-S/NI v. Sopher*, 171 F. Supp. 2d 192, 201 (S.D.N.Y. 2001) ("Because the assets transferred no longer exist, a money judgment is proper. . . . [A] creditor may recover money damages against parties who participate in the fraudulent transfer and are either transferees of the assets or beneficiaries of the conveyance.").

The parties do not agree on the values of what was bought, sold, and settled. At least three separate values remain in dispute: (1) the value of Triadou's Flatotel interest in August 2014 (the time of the fraudulent assignment); (2) the value of the consideration the Chetrit Parties agreed to pay to Triadou; and (3) the value of the Kazakh Entities' settlement with the Chetrit Parties. The Court cannot make these determinations as a matter of law.

As to the value of Triadou's Flatotel interest, as previously stated, Triadou anticipated

5

that the investment would be worth $114 million at the conclusion of the development. Other values for Triadou's interest could be calculated based on the value of the holding company assets and Triadou's rights in the holding company. Indeed, the factual record in this case includes at least four separate valuations: one prepared contemporaneously by Triadou, two contemporaneously prepared by third-party appraisers, and one prepared by an expert witness. These different values, together with other inputs, such as the holding companies' cash and liabilities, and possibly an evaluation of the company membership rights, can result in very different assessments of the value of Triadou's interest in the Flatotel development project.

With respect to the consideration, the Chetrit Parties gave up a diminished profit participation in the Flatotel development as part of the fraudulent conveyance. The value of that retained interest (and the Kazakh Entities' corresponding indemnity obligation under their settlement with Chetrit) and the value of what Triadou may be ordered to pay as damages to reflect that benefit from the fraudulent transfer, is not clearly established.

Lastly, as the Kazakh Entities explained in prior briefing [ECF No. 998 at 5], ■■

6

██████████████████████████████████████ Since the Kazakh Entities did not receive in the settlement the fraudulently-conveyed property in full, "[e]quity merits a money judgment here." *Kim v. Ji Sung Yoo*, 311 F. Supp. 3d 598, 621–22 (S.D.N.Y. 2018), *aff'd*, No. 18-1447 (2d Cir. June 3, 2019). Otherwise, the defendants would be allowed "to keep fruits of the fraudulent transfers." *Id.* (setting aside the transfer and awarding damages for the value of the mortgage subsequently taken out on the property conveyed).[3]

█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
████████████████████████████

The defendants try to avoid this reality by arguing that the Kazakh Entities must suffer any decline in the value of the property, [ECF No. 1014 at 2; ECF No. 1006 at 2], ████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████

---

[3] This further underscores why Triadou's argument that the settlement with the Chetrit Parties should offset any other recovery is (1) inequitable and (2) a damages question for trial. *See Kim*, Summary Order at 4, No. 18-1447 (2d Cir.) ("Because the money judgment was entered against Mrs. Yoo only as necessary to satisfy the mortgages, if Mrs. Yoo pays the outstanding balance on the mortgages to the mortgagees, she will not be liable to the plaintiffs for any money judgment. This will ensure that Mrs. Yoo is not at risk of double liability." (internal citation and quotation marks omitted)).

██████████████████████████████████████

Imagine, for example, that X fraudulently transferred the 45.5 carat, $350 million Hope Diamond to Y. Y then shaved off a few carats and sold them for $10 million, which she remitted to X under their transfer agreement, rendering the Hope Diamond somewhat smaller, but sufficiently intact to continue to bear that name. Along comes Z, the rightful owner of the diamond, who asserts and settles against Y a fraudulent transfer claim to reclaim the 42 carat Hope Diamond. No court would agree that Z did not also have a claim against X for the other 3.5 carats (or the $10 million), just because she got back something called the "Hope Diamond."

████████████████████████████████████████████

████████████████████████████████████████ It is worth noting as well that the Kazakh Entities had many more claims against Chetrit than just the fraudulent conveyance claim. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

████████████████████████████████████████

███████████████████████████████████

As had been made clear, Triadou and the Khrapunovs disagree and argue that the Kazakh Entities have already obtained the full interest to which they are entitled. [ECF No. 983 at 3 (stating that the Kazakh Entities "obtained the very relief they demanded in the [Second Amended Crossclaims] (the return of the Flatotel Interest)"); ECF No. 981 at 3-4 (stating that the Kazakh Entities "obtained the Flatotel interest directly from the transferees").] But this is what a trial is for: to resolve the question of whether the Kazakh Entities obtained the full value to

which they are entitled. It is essentially a question of damages — a question the Court cannot answer as a matter of law on the present record.

## II. Triadou and the Individual Defendants Are Liable for Fraudulent Conveyance.

Separate from the argument that the Kazakh Entities received everything to which they were entitled (which they did not), the defendants also argue that the Kazakh Entities' claims for fraudulent conveyance became moot when the Kazakh Entities settled with the Chetrit Parties because the Chetrit Parties were the transferees, and as such were the only proper parties. But this ignores the defendants' role in and liability for the fraudulent conveyance. Triadou and the Individual Defendants remain liable for fraudulent conveyance because they benefited from the August 2014 assignment and received stolen funds that had been held with the Chetrit Parties.

### A. A Damages Remedy Is Still Available Against Triadou and the Individual Defendants as Beneficiaries of the Fraudulent Conveyance.

In a typical fraudulent conveyance case, the debtor (the transferor) agrees to fraudulently convey money or property to another (the transferee), thereby reducing the value of the debtor's estate. "'Under New York law, a creditor may recover money damages against parties who participate in the fraudulent transfer and are either transferees of the assets or beneficiaries of the conveyance.'" *Cadle Co. v. Newhouse*, 74 F. App'x 152, 153 (2d Cir. 2003) (quoting *RTC Mortgage Trust 1995-S/NI v. Sopher*, 171 F. Supp. 2d 192, 201 (S.D.N.Y. 2001)); *see Lippe v. Barinco Corp.*, 229 B.R. 598, 601 (S.D.N.Y. 1999) (stating that a fraudulent conveyance claim exists against "transferees and beneficiaries of the challenged conveyances"); *D'Mel & Assocs. v. Anthco, Inc.*, 963 N.Y.S.2d 65, 67 (App. Div. 2013).

A transferor who receives a cash payment in the fraudulent conveyance may also be a beneficiary. Triadou has claimed incorrectly that another court in this district held that "New York law does not permit a transferor to be the target of a fraudulent transfer claim." [ECF No.

1006 at 3 [citing *Lippe*]. But *Lippe* makes clear that the transferee is not the only legitimate target of such a claim and that a beneficiary can be held to account for a fraudulent conveyance made for its benefit. *Lippe*, 229 B.R. at 601. Specifically, as the *Lippe* court stated, a fraudulent conveyance claim under New York law "lies only against the transferees *and beneficiaries* of the challenged conveyances." *Id* (emphasis added).

That holding is consistent with many other cases from this court applying the New York law of fraudulent conveyances. S*ee, e.g.*, *Amusement Industry, Inc. v. Midland Ave. Assocs., LLC*, 820 F. Supp. 2d 510, 527 (S.D.N.Y. 2011) (stating that a fraudulent conveyance claim "seeking to recover money damages can only be maintained against a person who participates in the fraudulent transfer as either the transferee of the assets or the beneficiary of the conveyance"). For instance, in *Amusement Industry*, the fact that the beneficiary of the transaction also controlled both the transferor and the transferee was no obstacle to bringing a fraudulent conveyance against him as a beneficiary. *Id*. at 529.

The Khrapunovs argue that their benefit from the conveyance is not "relevant to the fraudulent conveyance claim alleged." [ECF No. 1014 at 2.] The Khrapunovs state that "[i]f Triadou ███████████████████████████████ the fraudulent conveyance law is inapplicable." *Id.* ███████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████

---

4 ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

10

███████████████████████████████████████

█████████████████████████████████████████

████████████████████████████████████

████████████████████████████ is "'available to satisfy the judgment had there been no conveyance,' rendering any fraudulent conveyance claim as to those restored assets moot." [ECF No. 1014 at 2 (quoting *TLC Merchant Bankers, Inc. v. Brauser*, No. 01 Civ. 3044 GEL, 2003 WL 1090280, at *3 (S.D.N.Y. Mar. 11, 2003).] The Khrapunovs declined to quote the next sentence of *TLC Merchant Bankers*, which states that "[w]here the assets fraudulently transferred were subsequently sold by the defendants to a third party in order to benefit both transferor and transferee over other creditors, a cash judgment may be entered against the defendant to satisfy his liability to the creditor for an amount up to the value of the fraudulently transferred assets." *TLC Merchant Bankers*, 2003 WL 1090280 at *3. ████████████████████████████

█████████████████████████████████████████

██████████████████████████ ████████████████████

█████████hus, both Triadou and the Khrapunovs benefited from the fraudulent conveyance and are proper parties here.

With claims against the defendants, a court can order a suitable remedy to put the Kazakh Entities in the position of having obtained all they could get "had there been no conveyance at all." *Paradigm BioDevices,* 842 F. Supp. 2d at 667. Such remedies may include unwinding the conveyance—ordering the transferee and any other beneficiaries to return property to the debtor or to the plaintiff—and ordering beneficiaries to pay the plaintiff for the difference between what was conveyed and what was recovered. In this case, the form of the remedy against Triadou and

---

████████████████████████████████████████

the Individual Defendants would be money damages.

As described above, the quantum of damages has yet to be determined. Deciding now as a matter of law (under the guise of mootness) that the damages are functionally zero would ignore the live factual dispute currently before the Court. Triadou originally acquired a 50% interest in CF 135 West Member—the value of which is disputed. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Far from putting the Kazakh Entities in the position as if there had "been no conveyance at all," ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ These types of damages questions "should be [decided] on the merits, not on grounds of mootness." Wright & Miller, 13C Fed. Prac. & Proc. Juris. § 3533.3 (3d ed. 2019).

### B. Triadou and the Individual Defendants Are Also Transferees of the Kazakh Entities' Stolen Money Paid in the August 2014 Assignment.

Each of the participants in and beneficiaries of the below-market assignment of the Flatotel interest—Triadou, Chetrit, the Khrapunovs, and Ablyazov—is or was a "debtor" to the Kazakh Entities. They each participated, one way or another, in the scheme to launder stolen assets through U.S. real estate and to evade worldwide freezing orders. They were each named as

defendants in the Kazakh Entities' state law claims, including for unjust enrichment and fraudulent conveyance. [ECF No. 49 ¶¶ 169-185.] And with respect to the fraudulent conveyance, in which the Chetrit Parties transferred stolen funds and Triadou transferred a wrongfully obtained interest in the Flatotel, the defendants are both transferors and transferees.

In response to the Kazakh Entities' efforts to recover assets from the defendants in the United States, Triadou and the Individual Defendants attempted to disentangle themselves from illiquid U.S. real estate investments and move the stolen assets overseas. [ECF No. 175 at 21]. This was a transaction that benefited both the defendants and the Chetrit Parties. The Chetrit Parties were able to exit a partnership with criminals and re-acquire an interest in the Flatotel for far less than it was worth. Triadou and the Individual Defendants, on the other hand, got back what remained of the stolen assets (about $28 million between Flatotel and Cabrini, reflecting the cost of laundering the money and having to make a hasty exit from the investments) and escaped overseas, plus they retained the promise of future payments in the diminished profit participation, which they told the Court they intend to direct overseas. [ECF No. 169 ¶ 56]. Triadou and the individual defendants were thus the transferees (or beneficiaries) of the money the Chetrit Parties agreed to pay them in the August 2014 assignment, along with the residual future profit interest. Those payments to Triadou and the individual defendants are a fraction of the stolen money the Chetrit Parties had originally accepted in the money laundering scheme.

The Kazakh Entities instituted these proceedings to remedy both the initial laundering and the subsequent fraudulent conveyance. Had the defendants not engaged in unlawful conduct to conceal their wrongdoing, the Kazakh Entities could have attached both Triadou's assets and any stolen funds the Chetrit Parties received in order to prevent any further diminishment in value. The fraudulent conveyances prevented the Kazakh Entities from taking those actions

(though they did intercept and attach the installment payments that are in the Monitorship Account). Nevertheless, both Triadou and the Chetrit Parties' assets would have been subject to attachment. If the Kazakh Entities had settled with Triadou first and recovered the stolen money, then the question would have been what remedy remained against the Chetrit Parties—what shortfall were they responsible for paying. Triadou and the Chetrit Parties, in other words, were both transferors and transferees of stolen funds and assets. The necessary conclusion is that the Kazakh Entities have fraudulent conveyance claims against Triadou as the both the transferee and beneficiary of a fraudulent conveyance with the Chetrit Parties and have fraudulent conveyance claims against the individual defendants as beneficiaries of the fraudulent conveyance.

### III. The Settlement Agreement with the Chetrit Parties Did Not Effectuate the Other Defendants' Release.

The defendants are also wrong in arguing that the Kazakh Entities' settlement with Chetrit effectively released any claims against them. Contract law governs settlements, and whether a settlement releases a party depends on that contract. *See MFS/Sun Life Trust v. Van Dusen Airport Services*, 910 F. Supp. 913, 932 (S.D.N.Y. 1995). The Kazakh Entities' settlement with Chetrit expressly did not release the remaining defendants.

In *MFS/Sun Life Trust*, the plaintiffs (holders of a class of the defendant company's debt) sued three sets of defendants involved in a leveraged buyout of the company: the purchasers of the company, the company itself, and the prior owners of the company who profited from the sale. *Id.* at 917. The plaintiffs settled with the company and its new owners and went to trial only against the prior owners, who argued that the settlement with the company extinguished their debt to the plaintiffs and mooted the fraudulent conveyance claims. *Id.* at 931.

*MFS/Sun Life Trust*'s decision that the claims were not mooted by settlement relied

14

heavily on the intentions of the parties to the settlement agreement and their mutual understanding that the claims against the remaining defendants would continue. [ECF No. 998 at 7.] Defendants focus on the fact that the settlement in *MFS/Sun Life* was between a creditor and a fraudulent transferor, [ECF No. 1014 at 2-3, ECF No. 1006 at 3], but that argument is off base for two reasons. First, there is no reason to cabin the reasoning of *MFS/Sun Life* to settlements between transferors and creditors. The case and its reasoning apply with equal force to settlements with transferees like Chetrit, where there are remaining claims against other transferees or beneficiaries, as here. Second, much like this case, *see* Point II.B, it is possible to characterize the fraudulent conveyance in *MFS/Sun Life* as going "both ways," that is, as a conveyance of money from the company's new purchasers to its prior owners and as a conveyance of the assets of the company from its prior owners to its purchasers. *Id.* at 917.

    The court in *MFS/Sun Life* went further than saying that the settlement agreement in that case should not form the basis of rejecting fraudulent conveyance claims against the remaining defendants: it concluded that if the fraudulent conveyance claims were dismissed, the settlement agreement would be "voidable as based upon mutual mistake" because the parties to the settlement clearly intended that the litigation would continue against the remaining defendants. *Id.* at 933. ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████████

███████████████████████████

**CONCLUSION**

The Kazakh Entities' fraudulent transfer claims are not moot.[5]

Dated: New York, New York
June 3, 2019

Respectfully,

/s/ Matthew L. Schwartz
Matthew L. Schwartz
Peter M. Skinner

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350
E-mail: mlschwartz@bsfllp.com

---

[5] Mukhtar Ablyazov, the ultimate beneficiary of the transfers, has not moved to dismiss the fraudulent transfer claims or otherwise advanced the "mootness" argument. Especially because the other defendants' argument is actually a merits question rather than one of subject matter jurisdiction, the Court should not dismiss the claims against Ablyazov in any case.