USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 07/03/2019

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITY OF ALMATY, KAZAKHSTAN, and BTA
BANK JSC,

                              Plaintiffs,

               -against-

MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV,
ILYAS KHRAPUNOV, and TRIADOU SPV S.A.,

                              Defendants.

**OPINION & ORDER**

15-CV-05345 (AJN) (KHP)

**KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

Defendants Triadou SPV S.A. ("Triadou") and Victor and Ilyas Khrapunov seek sanctions against Plaintiffs City of Almaty, Kazakhstan ("Almaty") and BTA Bank JSC ("BTA Bank") (collectively the "Kazakh Entities") pursuant to Federal Rule of Civil Procedure 37 ("Rule 37") for their alleged misconduct in discovery.  (ECF Nos. 967 and 971.)  In their motion, Defendants also seek to compel disclosure of various communications listed on Plaintiffs' privilege log.  The withheld documents fall into three categories: communications between Plaintiffs or their agent, Arcanum (Asia) Limited ("Arcanum") (an investigative firm), and (1) non-party Felix Sater; (2) non-party Frank Monstrey; and (3) Litco, a company wholly owned by Sater. (Doc. Nos. 967 and 971.) Plaintiffs contend the communications are protected by the attorney-client privilege, the work product doctrine, and the joint defense or common interest doctrine.

This Opinion addresses Defendants' motions only insofar as they challenge Plaintiffs' privilege designations.  The Court will provide its rulings on other aspects of the motions, including Defendants' requests for attorneys' fees and costs associated with their Motion to Compel Production of what they say are wrongfully withheld documents, in a separate opinion.

**BACKGROUND FACTS**

### 1. General Background

The Court assumes the reader's familiarity with the background of this case discussed in numerous prior opinions and orders.[1]  For this reason, the Court sets forth only those facts needed for context in this Opinion.

Plaintiffs allege that Viktor Khrapunov, former Mayor of Almaty, and Mukhtar Ablyazov, former Chairman of BTA Bank, embezzled billions of dollars from them in the early 2000s, co-mingled the money, and laundered it through various shell entities and investments across the globe.  Ablyazov was Chairman of BTA Bank from 2005 to 2009, and allegedly embezzled money in that time period by, among other things, approving phony loans.  He left BTA Bank and his home country in 2009 and is currently living in hiding in France.  Viktor Khrapunov was Mayor of Almaty from in or about 1997 to 2004.  He also fled Kazakhstan and now lives in Switzerland. The Kazakh Entities assert that Ilyas Khrapunov, who is Viktor's son and Ablyazov's son-in-law, assisted both men by helping them launder the stolen money.  They contend that Ilyas formed Triadou to funnel some of the stolen money into real estate investments in the United States. Two of Triadou's U.S. investments are at issue in this case: the Flatotel and a new condominium complex being built at the site of the former Cabrini Medical Center, both of which are located in New York City. Another real estate group, the Chetrit Group, also was involved in the two investments.  Plaintiffs initially asserted claims against the Chetrit Group, but settled those claims early in this litigation.

---

[1] *See City of Almaty, Kazakhstan v. Ablyazov*, No. 15-cv-5345 (AJN), 2018 WL 3579100 (S.D.N.Y. July 25, 2018); *City of Almaty, Kazakhstan v. Ablyazov*, 278 F. Supp. 3d 776 (S.D.N.Y. 2017); *City of Almaty, Kazakhstan v. Ablyazov*, 226 F. Supp. 3d 272 (S.D.N.Y. 2016).

### 2. *Plaintiffs' Investigative Efforts Through Arcanum*

As part of their quest to recover their stolen assets, Plaintiffs have filed various actions

in the United Kingdom, California, New York, and elsewhere.  Plaintiffs retained an entity called

Arcanum to develop evidence and intelligence about Ablyazov, Viktor Khrapunov, their

associates, and the disposition of the money they allegedly stole. (Doc. Nos. 333 and 973-1.)  As

described in a May 10, 2017 filing with this Court, Plaintiffs' counsel, Boies Schiller & Flexner

LLP ("BSF"), stated that "Arcanum is an investigations firm, retained by counsel for the Kazakh

Entities, which has been engaged in assisting counsel to prosecute the Kazakh Entities' global

asset recovery efforts."  (Doc. No. 333, 1.)

Arcanum helped Plaintiffs trace their stolen funds by, among other means, identifying

individuals with knowledge of Ablyazov's and the Khrapunovs' financial arrangements and who

were involved in some way, either knowingly or unknowingly, in the scheme to launder the

stolen funds.  In some cases, Plaintiffs actually threatened or asserted claims against the

individuals identified by Arcanum, to the extent the individuals received or profited from the

stolen funds. One such individual was Frank Monstrey, whose communications are at issue in

Defendants' motion.  Plaintiffs subsequently entered into settlement agreements with a

number of these individuals, including Monstrey, and released them from liability in exchange

for their cooperation and return of some of the stolen monies or other assets, transforming

them from litigation targets into cooperating witnesses.  Arcanum has negotiated multiple such

cooperation agreements with individuals on Plaintiffs' behalf.

Nicolas Bourg and his partner Laurence Foucher were two other individuals identified by

Arcanum as having knowledge of Triadou's investments and Ilyas Khrapunov's relationship to

Triadou.  Plaintiffs entered into cooperation agreements with both Bourg and Foucher in 2015.

Arcanum, through its counsel, BakerHostetler ("BH"), negotiated the cooperation agreements

with Bourg and Foucher on Plaintiffs' behalf.  The agreements contain confidentiality provisions

pursuant to which Bourg and Foucher agree to maintain confidentiality with respect to the

release agreement itself.[2]

In or about June 2015, attorney Robert Wolf, of the law firm Moses & Singer LLP,

approached Arcanum on behalf of a company named Litco and offered to help with Plaintiffs'

asset recovery efforts.  Not coincidentally, Wolf represented non-party witnesses Bourg and

Foucher in the negotiation of their cooperation agreements with Plaintiffs.  Arcanum's counsel,

BH, then negotiated a Confidential Assistance Agreement ("Litco CAA") between and among

Arcanum, Plaintiffs, and Litco.  Under the Litco CAA, Litco agreed to provide assistance to

Plaintiffs in their asset recovery efforts, and Plaintiffs agreed to pay Litco: (1) a monthly fee in

the amount of $100,000 for the greater of twelve months or the duration of the assistance and

(2) 16 percent of all monies, remuneration, proceeds, accounts, assets, real estate, art, or other

economic value recovered in Arcanum's asset recovery efforts on behalf of Plaintiffs and

Kazakhstan against the Khrapunovs and Ablyazov and entities controlled by them.  The

payments commenced in June 2015 and were sent by Plaintiffs to Moses & Singer's escrow

account or to the escrow account of another law firm named Todd & Levi LLP.  Kalsam Kam, a

director of Litco, signed the agreement on Litco's behalf.  Individual representatives from the

---

[2] See this Court's decision dated December 3, 2018 at Doc. No. 901 for more details on the agreements with Bourg and Foucher, which are not repeated here for the sake of brevity.

City of Almaty and BTA signed the agreement as well.  (Doc. No. 992-6, PRIV-001 to -013; Doc. No. 973-1; *see also* Doc. No. 901.)

Plaintiffs retained BSF to represent them in this action shortly after the Litco CAA was signed.  BSF attorneys began communicating with Wolf in his capacity as Litco's attorney on or about June 19, 2015 to discuss the Flatotel.  (Doc. No. 992-6, PRIV-014.) In July 2015, Litco and Arcanum entered into a Confidentiality and Non-Disclosure Agreement ("Litco NDA"), whereby the identity of Litco's owner was designated as confidential and Arcanum promised not to tell its clients (*i.e.*, City of Almaty and BTA Bank) or their lawyers (*i.e.*, BSF) the identity of Litco's owners.  (Doc. No. 973-2.)  Under the Litco NDA, Arcanum states that it will not proffer Litco's owner as a potential witness in any action contemplated by the Litco CAA.  However, the NDA permits Arcanum to inform its affiliate entities and their partners, officers, employees, and counsel of the identity of Litco's owner on a need-to-know basis.  (*Id*.)

Early on in its relationship with Plaintiffs, Litco identified Felix Sater as a person with knowledge of Defendants' financial transactions.  Notably, however, Plaintiffs never entered into a cooperation and confidentiality agreement with Sater.  Nevertheless, BSF and Arcanum began meeting with Sater to learn information he had that was relevant to this case and Plaintiffs' broader asset recovery efforts.  Sater met with Arcanum's attorneys from BH between July 2015 and March 2016 to provide information about the Flatotel, Bourg, Foucher, and other potential asset recovery targets.  (Doc. Nos. 992-11 and Doc. No. 973-12.) Additionally, Sater's attorney, Wolf, was in frequent email contact with Plaintiffs, BSF, Arcanum, and BH.  (Doc. No. 973-7.)  In November 2016, Sater and Wolf met with BSF attorneys to discuss

the settlement with the Chetrit Entities, which were previously parties in this action.  (Doc. No. 992-11.)

### 3.  *Felix Sater*

Sater has been described in news reports as "a Russian-born dealmaker with organised-crime connections who worked on property ventures . . . ."  (Doc. No. 500-11, 2.)  He met Ilyas Khrapunov in or about 2008.  In February 2012, Swiss Promotion Group ("SPG"), a company owned by Ilyas Khrapunov, hired Sater as a consultant.  (Doc. No. 973-6; *see also* Doc. Nos. 500-11 and 500-12.)  At some point, Sater also became Triadou's consultant and business partner.

As part of his consulting work with Triadou, Sater assisted Triadou with its Flatotel and Cabrini Medical Center investments.  (Doc. No. 973-7, 153:4-154:16, 193:10-20.)  Sater also partnered with Triadou in making an investment in the Tri-County Mall in Cincinnati, Ohio.  (Doc. No. 992-12, 105:02-109:02; *see also* Doc. No. 500-11, 10.)  Sater's relationship with Triadou ended following a dispute regarding the compensation Sater was due from the Tri-County Mall deal.  Sater engaged in self-help by retaining certain funds from the deal, causing Triadou to sue Sater in New York state court.  Triadou and Sater settled the suit in December 2013, shortly after it was filed.  Sater received more than $20 million from the settlement.  (Doc. No. 969-3, 105:06-110:03; Doc. No. 969-28; Doc. No. 973-7, 18:18-22; Doc. No. 973-9; Doc. No. 973-10; *see also* Doc. No. 901.)

Notwithstanding having met with Sater numerous times since 2015, Plaintiffs claim they did not learn of Sater's involvement with Triadou, and specifically the Tri-County Mall project and settlement, until March of 2017. (Doc. No. 992-14, 107:14-109:02.) They state that upon learning this fact, Sater went from being a witness to a target, and the Kazakh Entities stopped

meeting with him.  (Doc. Nos. 992-11 and Doc. No. 993, 10-11.)  Nonetheless, in August 2017, Plaintiffs identified Sater as a witness in their amended Rule 26(a)(1) disclosures.  (Doc. No. 973-15, 5.)  Attorneys from BSF also met with Sater in September 2018 in preparation for his deposition in this action.  (Doc. No. 992-11.)

At his deposition on September 13, 2018, Sater testified that he had been receiving payments from Plaintiffs for his work through his company, Litco.  BSF claims that it had no idea that Sater owned Litco and promptly terminated the Litco CAA and demanded return of the funds paid.  They say, to the extent Arcanum knew that Sater was its owner, Arcanum never informed BSF of this because of the Litco NDA.  Sater and Litco then brought a claim against Plaintiffs for breach of contract in arbitration.  That claim is still pending.  Then, in March 2019, Plaintiffs sued Sater and various other related parties in this District claiming fraud, conspiracy, unjust enrichment, and conversion, among other causes of action.  *City of Almaty, Kazakhstan et al. v. Felix Sater* et al., No. 19-cv-0245 (AJN)(KHP) (S.D.N.Y.).

### 4. *The Common Interest Agreement with an Undisclosed Person*

In May 2016, BSF negotiated a "Confidentiality and Common Interest Agreement" ("Common Interest Agreement") with Robert Wolf who was acting on behalf of an "undisclosed client." In the agreement, BSF states that Plaintiffs share "common legal interests" with the undisclosed client with respect to the instant litigation.  (Doc. No. 973-3.)  Plaintiffs state that the undisclosed client was Sater/Litco.  The Common Interest Agreement states that the undisclosed client was responsible for identifying Bourg.  (*Id.*)  Plaintiffs have not explained how they could determine that an undisclosed person has a common legal interest with them.

Moreover, as noted above, Plaintiffs claim that, as of May 2016, they had no inkling that Sater owned Litco.

### 5. Frank Monstrey

Frank Monstrey is the former C.E.O. of Nostrum Oil & Gas PLC ("Nostrum"), an energy company operating in Kazakhstan.  Monstrey also controlled another entity called Claremont Holdings Limited ("Claremont") that was allegedly involved in transferring some of BTA's stolen funds for the benefit of Ablyazov.  BTA Bank sought a freezing order in the United Kingdom against Nostrum in March 2017 (the "UK Litigation").  In or about June 2017, BTA Bank settled the UK Litigation and acquired a stake in Nostrum (valued at nearly $150 million) and Claremont.  As part of the settlement, Monstrey agreed to cooperate with Plaintiffs in their asset recovery efforts and maintain the cooperation agreement confidential.  Under the agreement, BTA agreed to maintain as confidential certain information and documents provided by Monstrey, subject to certain exceptions.  Notably, however, Monstrey made no commitment to maintain confidentiality with respect to information he proffers as a cooperator.  Rather, he promised only to keep the terms of the settlement and negotiations concerning the settlement confidential.  (Doc. No. 973-17.) BTA Bank also agreed to indemnify Monstrey with respect to certain encumbrances on the equity, loans, and personal guarantees Monstrey had tied to his Nostrum shares, and to reimburse Monstrey for travel and security costs associated with his cooperation.  (*Id*.; Doc. No. 901.) BSF assisted in negotiating this agreement.

**LEGAL STANDARDS**

### 1.  *Attorney-Client Privilege*

The attorney-client privilege protects communications between client and counsel that are made for the purpose of obtaining or providing legal advice and intended to be and, in fact, kept confidential.  *Sokol v. Wyeth, Inc.,* No. 07 Civ. 8442 (SHS)(KNF), 2008 WL 3166662, at *5 (S.D.N.Y. Aug. 4, 2008) ("The privilege . . . shields from discovery advice given by the attorney as well as communications from the client to the attorney." (citation omitted)).  In diversity cases such as this one, where state law governs the parties' claims, federal courts look to state law to determine whether the attorney-client privilege applies.  *See* Fed. R. Evid. 501; *In re Am. Tobacco Co.*, 880 F.2d 1520, 1527 (2d Cir. 1989)*; Kleeberg v. Eber*, No. 16-CV-9517 (LAK) (KHP), 2019 WL 2085412, at *6 (S.D.N.Y. May 13, 2019) (citation omitted).

As the United States Supreme Court explained in *Upjohn Co. v. United States*, 449 U.S. 383, 388–89 (1981), the attorney-client privilege encourages full and frank communications between a client and counsel, which in turn promotes an understanding of, and compliance with, the law and the administration of justice.  The privilege is narrowly construed, however, "because it renders relevant information undiscoverable . . . ." *In re County of Erie*, 473 F.3d 413, 418 (2d Cir. 2007) (citations omitted); *see also* N.Y. C.P.L.R. § 4503(a)(1); *Rossi v. Blue Cross & Blue Shield of Greater N.Y.*, 540 N.E.2d 703, 73 N.Y.2d 588 (1989).

Internal investigation notes and documents may also fall within the ambit of the attorney-client privilege.  Indeed, because the "first step in the resolution of any legal problem is ascertaining the factual background and sifting through the facts with an eye to the legally relevant," factual investigations conducted or directed by an attorney fall within the attorney-

client rubric. *Upjohn Co.,* 449 U.S. at 390–91 (employees' factual responses to questionnaires received from counsel in connection with an internal investigation conducted to provide legal advice protected by attorney-client privilege); *Gucci Am., Inc. v. Guess?, Inc.,* 271 F.R.D. 58, 71 (S.D.N.Y. 2010) (citations omitted) (collecting cases); *Spectrum Sys. Int'l Corp. v. Chem. Bank*, 581 N.E.2d 1055, 1060, 78 N.Y.2d 371, 378–79 (1991) (report prepared by outside law firm for the purpose of conducting internal fraud investigation was privileged). The burden of establishing attorney-client privilege rests on the party asserting it. *See Sokol*, 2008 WL 3166662, at *5 (citing *United States v. Constr. Products Research, Inc.*, 73 F.3d 464, 473 (2d Cir. 1996)); *Spectrum Sys. Int'l Corp.*, 581 N.E.2d at 1059, 78 N.Y.2d at 377 (citations omitted).

### 2. *Work Product Doctrine*

Pursuant to Rule 26(b)(3) of the Federal Rules of Civil Procedure, documents and tangible things prepared by a party or its representative in anticipation of litigation are protected under the work product doctrine. *See Welland v. Trainer,* No. 00 Civ. 0738(JSM), 2001 WL 1154666, at *2 (S.D.N.Y. Oct. 1, 2001) (holding that if a document "is created because of the prospect of litigation," it is eligible for work product protection) (citing *United States v. Adlman,* 134 F.3d 1194, 1202 (2d Cir. 1998)); *see also Hickman v. Taylor,* 329 U.S. 495 (1947) (establishing and articulating application of the work product doctrine). Unlike the attorney-client privilege, the work product protection in diversity cases is governed by federal law. *See Egiazaryan v. Zalmayev*, 290 F.R.D. 421, 435 (S.D.N.Y. 2013).

The key factor in determining the applicability of this doctrine is whether the documents or things were prepared with an eye toward or in anticipation of or because of the prospect of litigation. *Hickman*, 329 U.S. at 510 (holding that a party may not seek discovery of items

"prepared or formed by an adverse party's counsel in the course of his legal duties" for the litigation); *Schaeffler v. United States*, 806 F.3d 34, 43–44 (2d Cir. 2015) (protecting documents prepared in anticipation of litigation, rather than in the ordinary course of business); *Adlman*, 134 F.3d at 1202 (holding that documents are protected when "the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation" (emphasis in original) (citations omitted)); *Egiazaryan*, 290 F.R.D. at 435 ("'[T]he purpose of the rule is to provide a zone of privacy for strategizing about the conduct of litigation itself . . . .'" (quoting *Calvin Klein Trademark Tr. v. Wachner*, 198 F.R.D. 53, 55 (S.D.N.Y. 2000)).

"'[T]he doctrine is not satisfied merely by a showing that the material was prepared at the behest of a lawyer or was provided to a lawyer.  Rather the materials must result from the conduct of investigative or analytical tasks to aid counsel in preparing for litigation.'" *In re Symbol Techs., Inc. Sec. Litig.*, No. CV 05-3923 (DRH) (AKT), 2017 WL 1233842, at *8 (E.D.N.Y. Mar. 31, 2017) (quoting *Wultz v. Bank of China Ltd.,* 304 F.R.D. 384, 393–94 (S.D.N.Y. 2015)). Thus, to determine whether work product protection applies, a court must determine if the materials would have been prepared in "'essentially similar form irrespective of the litigation.' " *Id*. at *8 (quoting *Adlman*, 134 F.3d at 1202); *Clarke v. J.P. Morgan Chase & Co.*, No. 08 Civ. 2400 (CM) (DF), 2009 WL 970940, at *7 (S.D.N.Y. Apr. 10, 2009) (email was not subject to work product protection where party claiming the privilege failed to demonstrate that "but for the prospect of litigation, the e-mail in question would not have been prepared in the ordinary course of business or in substantially the same form").

Unlike the rule for invoking attorney-client privilege, the predominant purpose of the work product to be protected need not be to procure legal advice; rather, the work product

need only have been prepared or obtained because of the prospect of litigation.  *Adlman*, 134

F.3d at 1202; *In re Symbol Techs., Inc. Sec. Litig.*, 2017 WL 1233842, at *8.  The burden of

establishing that a document is protected by the work product doctrine rests on the party

asserting it.  *See In re Symbol Techs., Inc. Sec. Litig.*, 2017 WL 1233842, at *10; *Sokol*, 2008 WL

3166662, at *5. Work product protection is not absolute.  When a party demonstrates a

"substantial need" for work product, such as to impeach a witness, courts will compel

disclosure. *See Colon v. City of New York*, No. 12-cv-9205 (JMF), 2014 WL 3605543, at *2

(S.D.N.Y. July 8, 2014) (collecting cases and granting motion to compel as to document

protected by the work product doctrine because defendants demonstrated a "substantial

need" for the materials, namely, to impeach a central witness in the case).

### 3.  *Waiver of Privilege and Work Product Protection*

A party may waive privilege or work product protection by voluntarily disclosing

otherwise protected information to a third party or injecting protected material into a litigation.

Thus, the party asserting attorney-client privilege or work product protection has the burden of

establishing that there has been no waiver.  *In re Symbol Techs., Inc. Sec. Litig.*, 2017 WL

1233842, at *10; *Egiazaryan*, 290 F.R.D. at 431, 437 (citing *John Blair Commc'ns, Inc. v. Reliance

Capital Grp.,* 182 A.D.2d 578, 579, 582 N.Y.S.2d 720 (N.Y. App. Div. 1992)).

In the case of the attorney-client privilege, "'disclosure of attorney-client

communication to a third party or communications with an attorney in the presence of a third

party, not an agent or employee of counsel, vitiates the confidentiality required for asserting

the privilege.'" *Egiazaryan*, 290 F.R.D. at 430 (alterations omitted) (quoting *Delta Fin. Corp. v.

Morrison*, 13 Misc.3d 441, 444–45, 820 N.Y.S.2d 745 (N.Y. Sup. Ct. 2006)); *see also Gruss v.*

*Zwirn*, No. 09 Civ. 6441(PGG)(MHD), 2013 WL 3481350, at *12 (S.D.N.Y. July 10, 2013) ("[T]he general rule is that a one-time voluntary disclosure of privileged documents to an adverse party is sufficient to destroy both the attorney-client privilege and work product protection." (citing *In re Steinhardt Partners, L.P.*, 9 F.3d 230, 235 (2d Cir. 1993)).  New York courts narrowly construe the agency exception and "have required that the third party be nearly indispensable or serve some specialized purpose in facilitating the attorney-client communications." *Egiazaryan*, 290 F.R.D. at 432 (internal quotation marks and citations omitted); *see also Kleeberg*, 2019 WL 2085412, at *7 (courts apply a two-part test to determine whether the agency exception applies under New York law: (1) whether the disclosing party had a "'reasonable expectation of confidentiality under the circumstances,'" and (2) that such disclosure "'was necessary for the client to obtain informed legal advice.'" (quoting *Ross v. UKI Ltd.*, No. 02 Civ. 9297(WHP)(JCF), 2004 WL 67221, at *3 (S.D.N.Y. Jan. 15, 2004)).

Unlike the attorney-client privilege, work product protection is not waived merely because the material is disclosed to a third party. *See Adlman,* 134 F.3d at 1200 n.4 (explaining that work product may be shown to others "simply because there [is] some good reason to show it" without waiving the protection).  Indeed, as explained by the Supreme Court in *Hickman v. Taylor*, the doctrine exists to promote our adversarial system of jurisprudence and permits attorneys to work "with a certain degree of privacy, free from unnecessary intrusion by opposing parties and their counsel." 329 U.S. at 510; *see also United States v. American Tel. & Tel. Co.*, 642 F.2d 1285, 1298 (D.C. Cir. 1980) (explaining that the work product doctrine exists to "promote the adversary system by safeguarding the fruits of an attorney's trial preparations from the discovery attempts of the opponent"). Therefore, protection is typically waived only

when work product is actually disclosed, or put at risk of disclosure, to an adversarial third party. *See In re Steinhardt Partners*, 9 F.3d at 235 (finding waiver of work product privilege where a trader being investigated by the SEC voluntarily disclosed a privileged memorandum to the agency prior to the commencement of an enforcement action); *see also In re Symbol Techs., Inc. Sec. Litig.,* 2017 WL 1233842, at *9 (finding that a disclosure that substantially increases the opportunities for potential adversaries to obtain information protected as work product results in a waiver of that protection).

Waiver also can occur when a party places a document at issue by relying on it in support of a claim or defense.  *See Trudeau v. New York State Consumer Prot. Bd.*, 237 F.R.D. 325, 340–41 (N.D.N.Y. 2006); *see also In re Grand Jury Proceedings*, 219 F.3d 175, 182 (2d Cir. 2000); *United States v. Bilzerian*, 926 F.2d 1285, 1292 (2d Cir. 1991); *Robinson v. Vineyard Vines, LLC*, No. 15 Civ. 4972 (VB)(JCM), 2016 WL 845283, at *6 (S.D.N.Y. Mar. 4, 2016).  Similarly, if a party calls a person it used as an investigator as a witness to testify on matters relating to the protected work product, it may waive work product protection as to documents pertaining to the fact investigation.  *United States v. Nobles,* 422 U.S. 225, 239–40 (1975) (a party "can no more advance the work-product doctrine to sustain a unilateral testimonial use of work-product materials than he could elect to testify in his own behalf and thereafter assert his Fifth Amendment privilege to resist cross-examination on matters reasonably related to those brought out in direct examination" (citation omitted)).

### 4.  *Common Interest Doctrine*

The common interest doctrine, also referred to as the joint defense privilege, recognizes that separate parties may share a common legal interest and protects communications shared

between them in furtherance of that common interest.  *See, e.g.*, *Sokol*, 2008 WL 3166662, at

*5. This doctrine does not establish separate grounds for privilege, but rather is an exception to

the rule that voluntary disclosure of privileged material to a third party waives protection from

disclosure.  *Id*.; *Ambac Assur. Corp. v. Countrywide Home Loans, Inc.*, 27 N.Y.3d 616, 626, 57

N.E.3d 30 (2016); *see also United States v. Schwimmer*, 892 F.2d 237, 243–44 (2d Cir. 1989),

*cert. denied*, 502 U.S. 810 (1991) (describing the common interest doctrine as "an extension of

the attorney client privilege" (citation omitted)).  Like the attorney-client privilege, here, the

application of the common interest doctrine is governed by New York law.  However, because

New York courts frequently look to federal courts for guidance on how to apply the doctrine,

this Court will look to both New York and federal case law to determine whether the doctrine

applies.  *Egiazaryan*, 290 F.R.D. at 433 (citations omitted).

The common interest doctrine is narrowly construed because it is contrary to truth-

finding and liberal discovery standards.  *ACE Sec. Corp. v. DB Structured Prod., Inc.,* 40 N.Y.S.3d

723, 732, 55 Misc. 3d 544, 556 (N.Y. Sup. Ct. 2016). For the doctrine to apply: "(1) the party who

asserts the rule must share a common legal interest with the party with whom the information

was shared and (2) the statements for which protection is sought [must have been] designed to

further that interest." *Egiazaryan*, 290 F.R.D. at 434 (first citing *Allied Irish Banks, P.L.C. v. Bank

of Am., N.A.*, 252 F.R.D. 163, 171 (S.D.N.Y. 2008; and then citing *Gulf Islands Leasing, Inc. v.

Bombardier Capital, Inc.,* 215 F.R.D. 466, 471 (S.D.N.Y. 2003)).

To meet the first element of this test, the parties must show that they are "coplaintiffs

or persons who reasonably anticipate that they will become colitigants" concerning "pending or

reasonably anticipated litigation." *Ambac Assur. Corp.*, 27 N.Y.3d at 627–28, 57 N.E.3d at 37–38

(collecting cases).  With respect to the second element, the parties must show that an oral or

written agreement between them embodies "a cooperative and common enterprise towards

an identical *legal* strategy" and that their communications were made in furtherance of that

strategy. *Globalrock Networks, Inc. v. MCI Commc'ns Servs.*, *Inc.*, No. 1:09-CV-1284(MAD)(RFT),

2012 WL 13028650, at *2 (N.D.N.Y. May 7, 2012) (emphasis added) (first citing *Shamis v.

Ambassador Factors Corp.*, 34 F. Supp. 2d 879, 893 (S.D.N.Y. 1999); and then citing *United

States v. Weissman*, 1996 WL 737042, at *10 (S.D.N.Y. Dec. 26, 1996)); *see also Ambac Assur.

Corp.*, 27 N.Y.3d at 631, 57 N.E.3d at 40 ("[A]lthough total identity of interest is not necessary,

the parties asserting the privilege must have a common *legal* interest." (emphasis in original)

(quoting *In re Megan-Racine Assocs., Inc.*, 189 B.R. 562, 573 (Bankr. N.D.N.Y. 1995))).  It is

paramount that each party to the agreement understand that the communications between

and amongst them are provided in confidence.  *See Weissman,* 195 F.3d 96, 99 (2d Cir. 1999)

(defendant, a former chief financial officer, did not share a common interest with his company

when he divulged damaging information regarding his own conduct to company

representatives without first entering into a joint defense agreement).

The burden is on the party seeking to invoke the common interest doctrine to make a

"substantial showing . . . of the need for a common defense as opposed to the mere existence

of a common problem." *Finkelman v. Klaus*, No. 5257/05, 2007 WL 4303538, at *4 (N.Y. Sup. Ct.

Nov. 28, 2007) (citations, internal quotation marks, and alterations omitted).  Thus, for

example, the doctrine "does not encompass a joint business strategy which happens to include

as one of its elements a concern about litigation," and, instead, requires that parties have

"demonstrated cooperation in developing a common legal strategy." *Bank Brussels Lambert v.

16

*Credit Lyonnais (Suisse) S.A.*, 160 F.R.D. 437, 447 (S.D.N.Y. 1995) (citations omitted); *see also Ambac Assur. Corp., Inc.*, 27 N.Y.3d at 628, 57 N.E.3d at 37 (communications and documents shared between two companies that were merging regarding disclosures, regulatory approvals, contractual obligations, employee benefit plans, and legal advice on state and federal tax consequences were not privileged because such disclosures were not made "in furtherance of a common legal interest in pending or reasonably anticipated litigation").

The burden of showing that parties share a common legal interest is on the party asserting it and can be met only "through competent evidence," such as the admission of affidavits, deposition testimony or other admissible evidence and not "unsworn motion papers authored by attorneys." *Gulf Islands Leasing, Inc.*, 215 F.R.D. at 472 (citing *Spectrum Sys. Int'l Corp.*, 581 N.E.2d at 1059, 78 N.Y.2d at 377).

## DISCUSSION

This Court previously held that the Litco CAA and information pertaining to various other agreements between Arcanum/Plaintiffs and Litco were relevant to proving bias insofar as Sater has been named as a witness in this action and was being paid by Plaintiffs pursuant to the Litco engagement.  It also found that, by calling Sater as a witness and at the same time engaging his company as a paid consultant, Plaintiffs waived any privilege that attaches to the terms of Litco's engagement.  (Doc. No. 901.)  This Court further required Plaintiffs to produce the agreements between Arcanum and other non-party witnesses and provide a privilege log. (*Id.*)

In December 2018, Plaintiffs produced a privilege log in accordance with this Court's order.  Their log lists two communications between counsel for Sater and counsel for Plaintiffs

regarding Triadou's subpoena to Sater and Sater's document production in this action. (Doc.

No. 969-15.) It also lists approximately 600 communications between Sater, Litco, and/or their

counsel on the one hand and Almaty/BTA, Arcanum and/or their counsel on the other. (*Id.*) The

privilege log also reflects 130 communications between counsel for Almaty/BTA and Monstrey's

counsel. (*Id.*) Plaintiffs assert attorney-client privilege, work product protection, and the

common interest doctrine as to these documents. As discussed below, with the exception of

communications between and among Plaintiffs, Arcanum, BSF, and Litco that exclude Sater,

Plaintiffs are not entitled to withhold these documents on the bases asserted.

### 1.  *Communications with Sater*

Sater is a non-party witness who never entered into a cooperation agreement with

Plaintiffs in his personal capacity. Plaintiffs never engaged Sater directly as a consultant, nor

did they enter into any agreement with Sater in which he agreed to maintain communications

he had with Plaintiffs' counsel confidential. Thus, because Sater never entered into an

attorney-client relationship with Plaintiffs' counsel, the attorney-client privilege clearly does not

apply to communications between Plaintiffs or their agents on the one hand and Sater and his

counsel on the other.

To the extent work product protection could apply to BSF and Arcanum's investigation,

any information exchanged with Sater resulted in a waiver of the information exchanged. Sater

never agreed to maintain any information as confidential and, thus, Plaintiffs had no assurance

that information shared would not be disclosed to Defendants or other potentially adverse

parties. This was particularly true after March of 2017, when Plaintiffs concede that Sater

actually became a target of their investigation. (Doc. No. 993, 11 (Sater "went from being

18

witness to target" when Almaty/BTA learned of his participation in the Tri-County Mall transaction).)  Additionally, because Plaintiffs claim they were unaware that they were paying Sater through Litco until the first day of his deposition, Plaintiffs cannot claim that their privilege claims were preserved by arguing that they considered Sater to be a paid consultant or an agent.

Plaintiffs argue that they did not waive work product protection by sharing protected materials with Sater due to the common interest doctrine.  This argument is frivolous.  As explained *supra*, the test for "common interest" under New York law is narrow and demanding, applying only to "codefendants, coplaintiffs or persons who reasonably anticipate that they will becomes colitigants." *Ambac Assurance Corp.*, 27 N.Y.3d at 628, 36 N.Y.S.3d at 845. Thus, there is no common legal interest between Plaintiffs and Sater under this test.  Indeed, Sater's interests, if any, would be aligned with Defendants, not Plaintiffs, insofar as he is alleged to have received some of the stolen funds in connection with the Tri-County Mall investment and is now being sued by Plaintiffs in a separate action. *City of Almaty, Kazakhstan et al. v. Felix Sater* et al., No. 19-cv-0245 (AJN)(KHP) (S.D.N.Y.).

The Confidentiality and Common Interest Agreement does not assist Plaintiffs.  It is on behalf of an "undisclosed client" and does not mention Sater.  This Court is aware of no legal authority finding such an agreement enforceable, and Plaintiffs provide none.  A party simply cannot evaluate whether it has a common legal interest with an undisclosed person or entity. Thus, Plaintiffs' assumption that the "enemy of my enemy is my friend," falls far short of meeting the high burden imposed by the common interest doctrine.

Finally, Plaintiffs waived work product privilege with respect to communications with Sater because such communications were exchanged with the understanding that Sater would be a third-party witness in this action.  Indeed, "[d]istrict courts in this Circuit have held that disclosure to a third-party witness in the action waives privilege where the witness does not share a common interest with the disclosing party." *Alexander Interactive, Inc. v. Adorama, Inc.*, No. 12 Civ. 6608 (PKC) (JCF), 2014 WL 12776440, at *11 (S.D.N.Y. June 17, 2014) (citations omitted); *S.E.C. v. Gupta*, 281 F.R.D. 169, 171 (S.D.N.Y. 2012).  As Magistrate Judge Barbara Moses recently explained, "[T]he question is not whether the non-adversary has actually revealed the materials to an adversary . . . , but whether, at the time of the disclosure, the disclosing party had reason to believe that further disclosure, to its party-opponent, would be 'likely.'" *Hedgeserv Ltd. v. Sungard Sys. Int'l Inc.*, No. 16-cv-5617 (LGS) (BCM), 2018 WL 6538197, at *2 (S.D.N.Y. Nov. 20, 2018) (quoting *In re Gulf Oil/Cities Serv. Tender Offer Litig.*, 1990 WL 108352, at *4 (S.D.N.Y. July 20, 1990)).  Accordingly, Defendants' Motion to Compel Production of Communications with Sater is granted.

### 2.  Communications with Litco

It is undisputed that Litco was a paid consultant of Plaintiffs.  The Litco CAA states that the parties shall maintain confidentiality of the existence of the Litco CAA.  However, nothing in the Litco CAA requires Litco or its employees, officers, and agents to maintain the confidentiality of information exchanged between them.  Further, nothing in the agreement states that the communications between the parties are deemed work product of Plaintiffs' counsel.  A more carefully drafted document would have expressly stated these concepts and

contained other provisions as to Litco's obligations to ensure that its employees maintained confidentiality.

However, the Litco CAA does state that Arcanum was "engaged directly and/or through legal counsel or consultants by" City of Almaty and BTA.  Additionally, BSF has represented to this Court that it has directed Arcanum with regard to its investigation of facts pertinent to this matter.  If these were the only facts, work product protection would likely apply.  *See Aboeid v. Saudi Arabian Airlines, Inc.*, No. CV-10-2518(SJ)(VVP), 2012 WL 3637430, at *3 (E.D.N.Y. 2012) ("Generally speaking, reports of investigations undertaken by a private investigator hired by a party in connection with an ongoing litigation are work-product."); *Costabile v. Westchester, New York*, 254 F.R.D. 160 (S.D.N.Y. 2008) (private investigator's report that included his findings based on interviews with witnesses subject to work product protection); *NXIVM Corp. v. O'Hara*, 241 F.R.D. 19 (N.D.N.Y. 2007) (investigator's report protected by work product doctrine because information gathered could create strategies for plaintiff in prosecuting claims against defendant); *see also Merrill Lynch & Co. v. Allegheny Energy, Inc.*, 229 F.R.D. 441 (S.D.N.Y. 2004) (disclosure of investigatory report to independent auditor did not waive work product protection where auditor was not an adversary or conduit to potential adversary).

Yet, these are not the only facts.  As it turns out, Sater is Litco's sole owner, and Plaintiffs and Sater/Litco are now adversaries in an arbitration in which both parties claim breach of the Litco CAA.  No doubt many of the communications between and among Litco, its counsel, BSF, Plaintiffs, and Arcanum will be disclosed in the arbitration.  Disclosure of these communications in the arbitration will not necessarily result in public dissemination outside of the arbitration or to individuals who were not already privy to the information under the

protective umbrella of the work product doctrine.  Thus, there is no basis, at this point, to believe that disclosure in this context will result in a total waiver of work product protection.

As explained above, Plaintiffs and Sater are also now adversaries in a federal court case. At this point, the relevance of communications between and among Litco, its counsel, BSF, Plaintiffs, and Arcanum is not apparent to this Court.  There have been no disclosures of such communications in that action, as discovery has only just started.  Accordingly, there is also no basis for finding waiver of work product protection based on the mere fact that Plaintiffs are suing Sater in his personal capacity and as a principal in companies other than Litco.

In sum, Defendants' motion to compel production of communications between Plaintiffs and their agents and Litco and its counsel at Moses & Singer is denied.  However, because Plaintiffs have stated that they were unaware that Sater was Litco's principal, to the extent Sater was present and/or copied on such communications, the privilege is waived because to Plaintiffs' knowledge, they were disclosing the communications to a non-party witness who was unaffiliated with Litco and could not have had any expectation that such information would remain confidential.

The Court does not address the common interest doctrine because it is inapplicable to Litco.  The Court also notes that Defendants did not argue that they have a substantial need for the Litco communications.  These communications relate solely to Plaintiffs' hunt for the missing funds and not facts relevant to the remaining claims and defenses in this matter. Moreover, Plaintiffs already produced the documents (obtained with Litco's assistance) upon which they are relying in support of their claims, and Defendants have been provided an opportunity to depose witnesses identified by Litco who were named as witnesses in this

matter. Thus, it is clear that Defendants do not have a substantial need for the Litco communications.

### 3. Communications with Monstrey

Plaintiffs' communications with Monstrey are similar to their communications with Sater, except that Plaintiffs had a cooperation agreement with Monstrey.   Clearly any communications with Monstrey prior to entering into the June 2017 cooperation agreement with him are not protected, as Monstrey was Plaintiffs' adversary.  Although Plaintiffs entered into a cooperation agreement with Monstrey after they settled with him, nothing in the agreement required Monstrey to keep information shared with him confidential.  Thus, the confidentiality provisions in the cooperation agreement, alone, did not provide the requisite assurances to Plaintiffs that the information shared with Monstrey would not be shared with their adversaries.

Additionally, and as explained *supra*, disclosures made to a third-party witness in an action waives privilege where the witness does not share a common interest with the disclosing party.  *See Alexander Interactive, Inc.*, 2014 WL 12776440, *11 (citations omitted); *Gupta*, 281 F.R.D. at 171.  Here, the common interest doctrine does not apply to any communications with Monstrey because Monstrey does not have a common legal (as opposed to a pecuniary) interest in the outcome of this litigation with Plaintiffs.  *See Ambac Assur. Corp.*, 27 N.Y.3d at 628, 57 N.E.3d at 37–38.

Plaintiffs have offered to produce their communications with Monstrey and his attorney subject to an order under Federal Rule of Civil Procedure 502(d) that such production will not

waive work product protection in this litigation.  However, as this Court previously held, Rule

502(d) is not applicable when the communications are not protected in the first place.

## **CONCLUSION**

For the reasons set forth above, Defendants' motion to compel (ECF No. 967 and 971) is

granted as to communications with Sater and Monstrey but denied as to communications with

Litco (so long as Sater was not present).  Plaintiffs shall produce the documents required by this

Order by no later than **July 12, 2019**.

**SO ORDERED.**

Dated: July 3, 2019
New York, New York

_____
KATHARINE H. PARKER
United States Magistrate Judge