**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF ALMATY, KAZAKHSTAN,
and BTA BANK JSC,

        Plaintiffs,

        v.

MUKHTAR ABLYAZOV, ILYAS
KHRAPUNOV, VIKTOR KHRAPUNOV, and
TRIADOU SPV S.A.,

        Defendants.

No. 15 Civ. 5345 (AJN) (KHP)

**THE CITY OF ALMATY AND BTA BANK'S OPPOSITION TO TRIADOU'S MOTION
TO PRECLUDE EVIDENCE ORIGINATING FROM SMP PARTNERS**

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone (212)446-2300
Facsimile: (212) 446-2350

*Attorneys for Plaintiffs City of Almaty,
Kazakhstan and BTA Bank*

i

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................ 1

RELEVANT BACKGROUND ................................................................................ 2

    A.    The Kazakh Entities Did Not Know About SMP Partners Until March 2018. ...... 2

    B.    The SMP Partners Evidence Only Became Non-Cumulative in August 2018. ...... 5

    C.    The Kazakh Entities Pursued Evidence from SMP Partners Diligently. ................ 6

    D.    The Kazakh Entities Finally Obtained, and Produced, the SMP Partners Evidence in Early 2019. .................................................................................. 7

    E.    The SMP Partners Evidence Directly Contradicts the Core Defense Theory, Demonstrates the Perjury of Defense Witnesses, and Provides Information Critical to the Fact Finder. ...................................................................... 8

    F.    Triadou's Counter-Narrative Is Factually Wrong: The Kazakh Entities Did Not Know About SMP Partners in 2017, Produced Everything from SMP Partners, and Did Not Use Kazakh Law Enforcement as a Cat's Paw. ................. 9

ARGUMENT .................................................................................................... 10

I.    The SMP Partners Evidence Should Not Be Precluded Under Rule 37(c)(1). .......... 11

    A.    Legal Standard .................................................................................. 11

    B.    The Kazakh Entities Did Not Fail to Produce Discovery. ...................................... 12

    C.    Triadou's Attempts to Charge the Kazakh Entities with Knowledge They Did Not Have, and Control over Documents They Did Not Possess, Should Be Rejected. ......................................................................................... 14

    D.    The Kazakh Entities' Production of Highly Relevant Evidence Obtained After the Close of Discovery Was Substantially Justified and Harmless. ............ 16

II.    In the Alternative, the Court Should Permit the Kazakh Entities to Reopen Discovery for the Purposes of Producing the SMP Partners Evidence ..................... 24

III.    At the Very Least, The SMP Partners Evidence May Be Used For Impeachment and Relied on by Experts. ................................................................. 24

IV.    In the Alternative, the Court Should Hold an Evidentiary Hearing .......................... 25

CONCLUSION .................................................................................................. 25

The City of Almaty and BTA Bank (together, the "Kazakh Entities" or "Plaintiffs") respectfully submit this memorandum of law in opposition to Triadou's motion to preclude evidence originating from SMP Partners [ECF No. 1078 ( "Brief" or "Br.")].

## PRELIMINARY STATEMENT

The SMP Partners evidence is critically relevant to what has become the central issue in this case: whether Mukhtar Ablyazov or Gennady Petelin funded the defendants' U.S. investments. But prior to August 2018, when Petelin produced fraudulent, alternative versions of transaction documents previously obtained from Frank Monstrey, the Kazakh Entities had no particular reason to pursue evidence from SMP Partners. It would have been cumulative of the evidence produced by Monstrey. It was only in August 2018, with the introduction of Petelin's fraudulent documents, that it became important to corroborate which set of documents was real.

Once the relevance of the SMP Partners evidence became apparent, the Kazakh Entities tried to obtain it. . We asked Ablyazov about the entities maintained by SMP Partners, but he denied knowing about them. The Kazakh Entities entered into an agreement that required Frank Monstrey to request records from SMP Partners, which he did, but we received nothing back.

The Kazakh Entities produced the SMP Partners documents to defendants

The Kazakh Entities did not fail to produce timely discovery, they timely supplemented their existing discovery responses as required by the Federal Rules. And in any event, allowing the SMP Partners evidence to be used for discovery purposes works no undue

prejudice to the defendants, whereas precluding highly relevant evidence will obscure the truth by allowing the defendants to adhere to a demonstrably false narrative.

## RELEVANT BACKGROUND

In the defendants' telling, the Kazakh Entities have known for years that SMP Partners had evidence relevant to this case, failed to pursue that discovery,  and then reviewed that evidence to ensure that it was helpful before choosing to produce it to the defendants.

Every part of this story is wrong. For purposes of this case, the Kazakh Entities had not heard of SMP Partners until March 2018, and had no reason to believe that it was a source of important evidence – as opposed to one amongst literally thousands of sources of potentially relevant information in this far-reaching case – until shortly before Gennady Petelin's deposition in August 2018. The Kazakh Entities then diligently pursued the SMP Partners evidence and produced it ██████████████████████████████

**A.    The Kazakh Entities Did Not Know About SMP Partners Until March 2018.**

The Kazakh Entities obtained and produced several years ago documents from the files of Eesh Aggarwal, a Dubai-based financial services provider who was responsible for overseeing accounts at FBME Bank. As with the SMP Partners documents, the Aggarwal evidence was originally obtained by Kazakh law enforcement through a Mutual Legal Assistance Treaty request to the United Arab Emirates, and then shared with BTA Bank as a recognized victim of crime under Kazakh law. *See* Declaration of Matthew L. Schwartz ("Decl.") ¶ 3.

The Aggarwal evidence showed that the funds ultimately invested by the defendants in the United States came, indirectly, from an entity called Northern Seas Waterage ("NSW"). NSW was a shell company administered by Ilyas Khrapunov, but owned on paper by Gennady Petelin, which maintained an account at FBME. NSW received approximately $440 million from two other entities, known as Claremont and Sartfield, which banked at ING Bank. At the time, the

Kazakh Entities did not know what Claremont and Sartfield were, or who owned them. Decl. ¶ 4. To advance their investigation, the Kazakh Entities requested on July 25, 2017 that this Court issue an amended Hague request to the United Kingdom for, among other things, documents from ING Bank. [ECF No. 364 & Ex. 3].

On January 11, 2018, the High Court of Justice, Queens Bench Division, pursuant to this Court's Hague request, ordered ING Bank to disclose records relating to Claremont, Sartfield, and related companies and individuals. *See* Decl. Ex. 1 at 3. In late March 2018, the Kazakh Entities finally received a response to the Hague request. The responsive records included internal ING documents showing that Frank Monstrey was the beneficial owner of Claremont and Sartfield; before that time, we had no idea that Monstrey was critical to the funding chain linking the Kazakh Entities' stolen money to the defendants' U.S. investments. Decl. ¶ 5. The ING records also included information that Claremont and Sartfield were administered by an Isle of Man-based corporate services provider known as SMP Partners. *See generally* Decl. Ex. 1. Before that, the Kazakh Entities had no idea that SMP Partners had potentially relevant evidence to the claims and defenses in this action. Decl. ¶ 11.

Shortly after receiving the evidence tying Monstrey to the funds at issue in this case, on March 26, 2018, the Kazakh Entities for the first time tried to contact Monstrey to obtain information from him relevant to this case. Decl. Ex. 2. At the time, neither U.S. counsel nor BTA itself had access to Monstrey's confidential U.K. witness statements, in deference to the U.K. court's confidentiality club. Decl. Exs. 3 & 4. As a result, U.S. counsel requested throughout March and April that Monstrey consent to share his witness statements with us, but he refused to do so. Decl. Exs. 3 & 5. Monstrey finally allowed U.S. counsel to review the witness statements in May 2018, but he refused to allow BTA to possess or use his statements in this

action throughout June and into July.[1] Decl. Exs. 7, 8, & 9. It was not until this Court ordered Monstrey's deposition to go forward – and with the help of direct communications between BTA Bank and Monstrey himself, Decl. Ex. 10 – that Monstrey on or about July 12 finally gave U.S. counsel copies of his witness statements and permission to disclose them. Decl. Exs. 11 & 12. The witness statements were then immediately produced to the defendants. Decl. ¶ 9.

Meanwhile, it was the March 2018 revelation that Monstrey was integral to the flow of funds in this case that led, in part, to the Kazakh Entities' May 2018 application to the Court to extend fact discovery and for leave to depose Monstrey. [*See* ECF No. 639 at 2-3.][2] The Court granted that request. Monstrey's documents and testimony helps demonstrate how he at least nominally acquired an investment in a company known as Zhaikmunai (now known as Nostrum Oil & Gas) with money stolen from the Kazakh Entities. Monstrey and Ablyazov, with Ilyas Khrapunov's help, then monetized that asset in a complex transaction meant to evade the U.K. freezing orders by funding NSW and, ultimately, Triadou's U.S. investments. SMP Partners was the corporate services provider for many of the entities involved in these transactions.

Following his deposition, the defendants requested that Monstrey search for and produce



additional documents. The Kazakh Entities immediately requested that Monstrey do so, under the terms of the initial settlement agreement, and followed up repeatedly. Decl. Exs. 14 & 15.[3] (Monstrey produced those documents in late 2018, prior to his second deposition. Decl. ¶ 10.)

### B.   The SMP Partners Evidence Only Became Non-Cumulative in August 2018.

The documents Monstrey produced show how Ablyazov directed Monstrey to repay money to NSW rather than back to BTA Bank. SMP Partners appears on these documents as the corporate services provider facilitating the transactions, but there was nothing at the time that indicated that SMP Partners possessed any non-cumulative evidence – that is, evidence other than copies of the same documents Monstrey had already produced. Moreover, the Kazakh Entities were mindful that in extending discovery and allowing Monstrey's deposition, the Court had at the same time refused to allow the deposition of Alexander Udovenko, who ran a different corporate services provider involved in the defendants' scheme. [ECF No. 773 at 7-9.] Unlike SMP Partners, which is located in the Isle of Man, Udovenko lives in the United States and could have been efficiently and cost-effectively deposed, but the Court precluded it. Consistent with that ruling and the Federal Rules' mandate "to secure the just, speedy, and inexpensive determination of every action and proceeding," Fed. R. Civ. P. 1, the Kazakh Entities did not pursue what appeared to be needless discovery from SMP Partners at that time. Decl. ¶ 12.

That all changed in August 2018. After months of delay, an order compelling him to produce documents, [ECF Nos. 749, 767 & 803], and further delay as an unidentified intermediary fetched them from Russia, [ECF No. 799 at 2], on August 10, 2018, Gennady Petelin produced his own documents. Among them were versions of some of the same transaction documents that Monstrey had produced. Petelin's documents were largely (and in some cases

---

[3]   To the extent that Triadou insinuates that it ever requested that the Kazakh Entities or Monstrey procure documents *from SMP Partners*, that is incorrect. *E.g.*, Br. at 6, 11-12,  Triadou's request was always that Monstrey search for and produce documents in his possession. [*See* ECF No. 1080-12 (August 11, 2018 Hassid email).] Certainly, if Triadou knew that SMP Partners possessed relevant information that it wanted in August 2018, it could have pursued that discovery itself as easily as the Kazakh Entities.

literally) identical to Monstrey's, except they replaced Ablyazov's name and signature with Petelin's. Decl. Ex. 16. Later in August, Petelin testified that he and not Ablyazov funded NSW, and that his versions of the documents were the genuine ones. *See* Decl. Ex. 17 at 108-14. (Later, while disclaiming any knowledge of the entities or transactions involved, Ablyazov testified that Monstrey's documents were forged. *See* Decl. Ex. 18 at Day 1: 168-69, Day 2: 126. A distinguished handwriting expert disagrees.)

It was only then, in late August 2018, that it became clear that the defendants intended to challenge the authenticity of Monstrey's documents and at the same time present their own fake versions. At that point, SMP Partners stopped being one among many sources of potentially relevant evidence and became an independent document custodian that could corroborate whose version of events was real and whose was made up. Just days after this crucial moment in the case, however, discovery closed for all but a few discrete purposes.

### C.  The Kazakh Entities Pursued Evidence from SMP Partners Diligently.

From the moment they understood Petelin and the defendants' position, the Kazakh Entities sought to obtain records directly from SMP Partners that would corroborate Monstrey's version of the facts. This was no simple task. SMP Partners is a non-party located in the Isle of Man, an offshore jurisdiction known for its privacy protections. Decl. ¶ 11. SMP Partners had also – assuming Monstrey was right – worked directly for Ablyazov, meaning that SMP Partners had a vested interest in not providing relevant information lest it be sucked into a global money laundering investigation. And even if the defendants' version of events was correct – which we knew was not the case – SMP Partners would have a potential bias in favor of its client Petelin.[4]

---

[4]      Indeed, by Triadou's logic, Ablyazov and/or Petelin had an obligation to procure documents from SMP Partners because they could have gotten their own client files upon request. *See* Br. at 22-23 (arguing that BTA had "control" over documents in Kazakh law enforcement's possession by virtue of its rights as a victim of a crime, which permitted it to request documents). Similarly, one would have expected Ilyas Khrapunov to produce documents from SMP Partners if he were participating in discovery honestly. Ilyas personally signed as a witness *both* versions of the deal documents relating to funding NSW: the true versions signed by Ablyazov, and the fake back-dated versions signed by Petelin. Decl. Exs. 19 & 33.

The Kazakh Entities nevertheless pursued the evidence from SMP Partners, starting with the most efficient options. ███████████████████████████████████████████ ███████████████████████████████████████████████████████████ The Kazakh Entities were prepared to ask Ablyazov to do the same, but he denied having any knowledge about the entities administered by SMP Partners. Decl. ¶ 14. [*See also* ECF No. 1101 at 10-12 (the Court, noting Ablyazov's implausibly convenient lack of memory)].

The Kazakh Entities also drafted a request to SMP Partners on behalf of Monstrey, and asked him to send it as a current client of SMP. ████████████████████████████████ ██████████████████████████████████ Decl. Ex. 20. Accordingly, on or about November 22, 2018, Monstrey requested that SMP Partners provide him various documents, including some of the ones that Petelin had falsified. Decl. Ex. 21. There was no response.[5]

The Kazakh Entities also prepared a draft Hague request and asked the defendants to consent to the submission of that request to the Court, but they declined. Br. at 16 n.12.

**D.      The Kazakh Entities Finally Obtained, and Produced, the SMP Partners Evidence in Early 2019.**

████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

---

[5]      Although relations with Monstrey have deteriorated since November, counsel for the Kazakh Entities spoke with counsel for Monstrey on July 15, 2019, to confirm that Monstrey had never received documents in response to this request. Decl. ¶ 15.

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████

     ████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████  ████ The Kazakh Entities

produced the documents to defendants on April 2, 2019.[6] Decl. ¶ 24.

    **E.    The SMP Partners Evidence Directly Contradicts the Core Defense Theory, Demonstrates the Perjury of Defense Witnesses, and Provides Information Critical to the Fact Finder.**

    Triadou clearly appreciates that the records from SMP Partners are devastating to the

defense case. As the Kazakh Entities expected (and therefore did not see a need earlier on to

pursue), SMP Partners produced some of the same records that Monstrey had, corroborating his

---

[6]    Triadou complains about the volume of documents, noting that the Kazakh Entities produced 22,000 documents ██████████████. The Kazakh Entities would be happy to do a further responsiveness review to limit the number of documents at issue, but Triadou seems to object to that, noting that there may be "useful" documents to the defense, as well. Br. at 16.

version of events and providing compelling proof that the alternative versions produced by Petelin are fake. But SMP Partners also produced evidence that the Kazakh Entities had no idea existed, and which further underscores the falsity of the defense narrative. ████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████

**F.    Triadou's Counter-Narrative Is Factually Wrong: The Kazakh Entities Did Not Know About SMP Partners in 2017, Produced Everything from SMP Partners, and** ████████████████████████████████

The chronology above is what actually happened, and demonstrates how the Kazakh Entities came to obtain critically important documents that effectively prove who really was responsible for funding NSW, and thus the U.S. investments at issue in this case. Drawing unsupported and incorrect inferences, Triadou's argument relies on the false premise that the Kazakh Entities knew about SMP Partners in May 2017, when Monstrey submitted a witness statement in the U.K. High Court that mentioned SMP Partners. *See* Br. at 3. In Triadou's imagination, the Kazakh Entities then willfully failed to pursue this critical evidence for two years as part of some unexplainable strategic gambit, and then ████████████████████ ████████████████████ got a sneak peek at what they contained, and then selectively produced them to the defendants. This story is totally wrong.

*First*, as set out above, both the Kazakh Entities themselves and their U.S. counsel did not have access to Monstrey's witness statements until May 2018, and the information in them – while known to U.K. counsel – was entirely hidden for purposes of this action. Decl. ¶¶ 6-7. Just

as the confidentiality order here restricts the use of confidential information to this case, [ECF No. 253], the U.K. proceedings have an even more stringent "confidentiality club" that, as we have discussed before, Decl. Ex. 24 ¶ 31 (Almaty-BTA0166258 at 13-19), rendered much of the evidence there effectively attorneys'-eyes-only and usable only within the confines of the High Court litigation. Decl. ¶ 6. As the chronology and evidence cited above makes crystal clear, BTA and its U.S. counsel did not have access to Monstrey's witness statements until he finally gave us permission to see them in May 2018 (at which point U.S. counsel was already generally aware of the existence, but not the importance, of SMP Partners via the ING Bank evidence described above), and to possess them in July 2018.



*Second*,

*Third*, and relatedly, Triadou worries that it does not have the complete production ▮▮▮ ▮▮▮▮▮. The reality is that the defendants have the entire ▮▮▮▮▮ production. Decl. ¶ 25. Last week, the Kazakh Entities provided the defendants additional metadata that should assuage their concerns. Decl. ¶ 26.

## ARGUMENT

The Court should deny Triadou's motion. The SMP Partners evidence was not produced late; it was produced immediately after the Kazakh Entities obtained it. The Kazakh Entities therefore did not "delay" in producing it or otherwise engage in conduct that could give rise to preclusion under Rule 37. And even if they did, any such failure was both "harmless" and

"substantially justified," as Rule 37 contemplates. To the extent that the Court looks to the test for reopening discovery, as it has in other recent decisions that permitted "late" disclosures by both Triadou and the Kazakh Entities, it is obvious that the relevant considerations likewise weigh in favor of permitting a fact-finder to hear this critical evidence. And if nothing else, there is absolutely no basis on which to preclude the evidence for impeachment and in expert opinions.

## I.    The SMP Partners Evidence Should Not Be Precluded Under Rule 37(c)(1).

Triadou's entire legal theory – that the Kazakh Entities violated Rule 37(c)(1) by disclosing the SMP Partners evidence after the close of discovery, *see* Br. at 9-10 – is misguided because the Kazakh Entities could not have disclosed evidence that was not in their possession any sooner than they did.[7] To the contrary, the Kazakh Entities produced the SMP Partners evidence promptly after obtaining it. Far from being sanctionable, the Kazakh Entities were *required* to supplement their prior productions with the SMP Partners evidence because it is responsive to the defendants' document requests. Moreover, the timing and manner of the Kazakh Entities' production was both harmless and substantially justified.

### A.    Legal Standard

Under Rule 37(c)(1), "[i]f a party fails to provide information . . . as required by Rule 26(a) or (e), the party is not allowed to use that information . . . to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." Rule 26(a) in turn provides that a party must disclose documents that the "party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment." Fed. R. Civ. P. 26(a)(1)(A)(ii). And Rule 26(e) in relevant part requires a party to supplement "in a timely manner" its Rule 26(a) disclosures, its interrogatory responses, responses to requests for production, and responses to requests for admission. Fed. R. Civ. P.

---

[7]    Triadou also invokes the Court's inherent authority, *see* Br. at 24, but that argument fails for the same reasons that Rule 37 is inapplicable. Moreover, sanctions under the Court's inherent authority require wilfullness or bad faith, which is totally lacking here.

26(e)(1)(A). Taken together, Rule 37(c)(1) provides that a party may not rely on evidence (other than impeachment evidence) in its possession, custody, or control that it fails to timely disclose, unless that failure is harmless or substantially justified.

As the Court recently noted when sanctioning Ablyazov, when determining whether to employ the drastic sanction of precluding a party from using evidence it failed to disclose,

> courts consider among the following non-exhaustive factors: "(1) the party's explanation for the failure to comply with the discovery rules; (2) the importance of the precluded evidence; (3) the prejudice suffered by the opposing party as a result of having to prepare to address the new evidence; and (4) the possibility of a continuance."

[ECF No. 1101 at 13 (citing *Excellent Home Care Servs., LLC v. FGA, Inc.*, No. 13 CV 5390 (ILG)(CLP), 2018 WL 4782340, at *2 (E.D.N.Y. Sept. 4, 2018).]

### B.     The Kazakh Entities Did Not Fail to Produce Discovery.

Triadou's argument fails to grapple with the actual rule; it simply assumes that the Kazakh Entities' production of materials they received after the discovery deadline was in violation of the disclosure rules. *See* Br. at 9-10 (arguing that the late disclosure in violation of Rule 26(a) and (e) was not substantially justified or harmless). ██████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████ Indeed, once the Kazakh Entities had the evidence, they were required under Rule 26(e) to produce it to supplement prior responses to the defendants' document requests. For example, Triadou has at various times requested "all" documents in the Kazakh Entities' possession "concerning" Gennady Petelin, Decl. Ex. 27 at 3, Northern Seas Waterage and Sartfield, *id.* Ex. 26 at 6-7, and the allegations in the crossclaims that "enormous loans to valueless entities owned by Ablyazov" were "never repaid," *id.* Ex. 25 at 7. The SMP Partners documents are responsive to each of these outstanding requests for production.

The law is clear that Rule 37(c)(1) is inapplicable when a party produces newly-acquired

documents to supplement its prior disclosures. *See Humane Soc'y of U.S. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, Civil Action No. DKC 13-1822, 2016 WL 3668028, at *7 (D. Md. July 11, 2016) ("*Failure to supplement* with newly-obtained relevant information subjects a party to sanctions under Rule 37(c) . . . ." (emphasis added)).[8] This Court has recognized that principle in this case, finding after Triadou issued post-discovery fact subpoenas for certain real estate valuations that Triadou "did not violate Rule 37(c)(1) because it promptly supplemented the disclosures it made pursuant to Rule 26(a) by serving the third-party subpoenas shortly after its expert advised that he would need [them]." [ECF No. 929 at 4.] In that case, Triadou waited a full month before producing the documents it received, and only after the Kazakh Entities complained. [ECF No. 929 at 4.] Still, the Court held that Triadou had acted "promptly."

Unlike in the cases cited by Triadou, the Kazakh Entities did not sit on relevant discovery materials in their possession only to strategically disclose it to prejudice the defendants. Triadou repeatedly cites *In re General Motors LLC Ignition Switch Litigation*, for example. *See* Br. at 12-14, 18-19 (citing No. 14-MD-2543 (JMF), 2017 WL 2880882 (S.D.N.Y. July 5, 2017)). There, the sanctioned party, "Ward," sought and obtained information after the close of discovery "and just before the depositions" of the other side's experts. 2017 WL 2880882, at *2. Ward then used the information to prepare for the expert deposition *without disclosing* it to the opposing party, and continued to gather more, similar evidence. *Id.* It was only when the parties exchanged trial exhibits that Ward finally provided the new material – and "only a subset of the overall material." *Id.* As the court noted, the material Ward obtained "was plainly within the scope of" the other side's discovery requests "and was subject to prompt disclosure under Rule 26." *Id.*

---

[8]     Triadou itself agrees. For example, in recent discussions about the overlap in discovery between this action and the related *Sater* action, Triadou made clear that it did not wish for discovery in the *Sater* action to be used as a back-door to reopen discovery in this case. The Kazakh Entities agreed, but noted their obligation to supplement prior discovery responses and asked Triadou if it would consent to relieve the Kazakh Entities of that requirement as it related to evidence gathered in discovery in the *Sater* case. Triadou refused. *See* Decl. Ex. 28.

The circumstances here bear no resemblance to those in *General Motors*. The Kazakh Entities did not sit on the documents; they produced them immediately upon possessing them and receiving permission to disclose them. Moreover, the Kazakh Entities did not make use of the SMP Partners evidence prior to producing it, and derived no strategic advantage from its "late" production. The need for the documents also did not arise until late, after months of delay by Petelin when he finally produced an alternative version of the Monstrey records.

**C.     Triadou's Attempts to Charge the Kazakh Entities with Knowledge They Did Not Have, and Control over Documents They Did Not Possess, Should Be Rejected.**

Triadou makes three arguments to try to overcome the reality that the Kazakh Entities did not have the SMP Partners documents, none of which is convincing. *First*, ███████████████
███████████████████████████████████████████████
███████████████████████████████. ███████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

██████████████████████████████████████████

*Second*, and relatedly, Triadou argues that the Kazakh Entities actually did have "possession, custody, or control" of the SMP Partners evidence ████████████████ ███████████████████████████████████████. *See* Br. at 22-23 (arguing that the Kazakh Entities had "control" over documents in the Kazakh government's possession by virtue of its rights as a victim of a crime). Triadou's own cases refute this argument, because they recognize that in order to be charged with "control" over documents held by a third party, a party must have "the legal right . . . to obtain documents from" that source "upon demand." *Id.* at 22 (quoting *M.L.C., Inc. v. N. Am. Philips Corp.*, 109 F.R.D. 134, 136 (S.D.N.Y. 1986))████████████ ████████████████████████████████████████ ██████████████████████████████ ██████████████ Kazakh law provides – like U.S. law – that data from criminal investigations "cannot be disclosed. They may be made public only with the permission of the procurator in the extent to which it will be recognized that possible, if it is not contrary to the interests of the investigation and does not infringe the rights and legitimate interests of others." Kazakhstan Crim. P. Code, Art. 201(1), available at http://adilet.zan.kz/eng/docs/K1400000231. In exactly the same way, law enforcement authorities in the United States often help victims of crime by providing access to information or evidence, but only insofar as doing so does not undermine their own investigation – in the sole discretion of law enforcement, of course. *See* 18 U.S.C. § 3771; 34 U.S.C. § 20141 (2019); *see also* https://www.fbi.gov/resources/victim-services/rights-of-federal-crime-victims.

*Third*, Triadou accuses the Kazakh Entities of failing to pursue evidence from SMP Partners with reasonable diligence. Br. at 5-7, 11-13. Indeed, Triadou repeatedly faults the Kazakh Entities for failing to take any steps to obtain documents from SMP Partners, or to obtain the additional documents requested by Triadou. As set out above, neither of these things is true. Triadou's version of events depends on charging the Kazakh Entities with knowledge of the

existence and importance of SMP Partners in mid-2017, when Monstrey submitted a sealed

witness statement in the U.K. proceedings.

Even if the Kazakh Entities did lack diligence in pursuing evidence from SMP Partners,

moreover, that has nothing to do with Rule 37(c)(1). Under that Rule, a party can only be

sanctioned with preclusion if it possessed or controlled evidence and failed to produce it.

### D.    The Kazakh Entities' Production of Highly Relevant Evidence Obtained After the Close of Discovery Was Substantially Justified and Harmless.

Even if the Court were to find that the Kazakh Entities had somehow failed in their

discovery obligations with respect to the SMP Partners evidence, the evidence should still not be

precluded because any such failure "was substantially justified [and] harmless," Fed. R. Civ. P.

37(c)(1). Under the four-factor test identified above, each factor weighs in favor of allowing the

SMP Partners evidence.

### 1.    The Kazakh Entities Have Provided a Compelling Explanation for the Timing of Their Disclosure.

As set out above, the Kazakh Entities had no reason to pursue discovery from SMP

Partners prior to August 2018, when Petelin produced his alternative set of documents. After

August 2018, the Kazakh Entities exercised reasonable and appropriate diligence to obtain

documents from SMP Partners and produced them promptly once they were obtained. This is not

a situation where the Kazakh Entities derived any strategic advantage from not obtaining the

documents sooner. To the contrary, they were at a strategic disadvantage, because they missed the

opportunity to confront Petelin and the defendants about them.

Triadou's argument that the Kazakh Entities knew about SMP Partners in mid-2017 and

should have pursued discovery from the Isle of Man far sooner is misguided. The Kazakh Entities

did not actually know about SMP Partners at all until March 2018, seeking discovery from SMP

Partners to obtain evidence that Monstrey had already provided – when there was no reason to

believe the authenticity of documents he produced would be questioned – would have been

"unreasonably cumulative or duplicative." Fed. R. Civ. P. 26(b)(2)(C)(i). Monstrey, in other words, was the "source [of the evidence] that is more convenient, less burdensome, or less expensive," when the alternative was to pursue burdensome and uncertain discovery from the Isle of Man. *Id*.

Triadou also faults the Kazakh Entities for not pursuing a Hague request to the Isle of Man. But the reality is that fact discovery closed within ten days of the time that the Kazakh Entities learned the significance of the SMP Partners evidence. At that point, Triadou surely would have objected to a Hague request, consistent with its previous objections to additional discovery. The Kazakh Entities – mindful of the fact that the Court had already refused to allow the deposition of Udovenko, another corporate services provider – decided not to burden the Court with additional motion practice over disputed discovery, and instead continued to pursue the evidence through informal means, particularly Monstrey. Decl. ¶¶ 13-16. The Kazakh Entities also tried to obtain consent from Petelin and Ablyazov for SMP Partners to disclose information from their client files, but Petelin refused to do so and Ablyazov claimed not to know anything about the entities administered by SMP Partners. Supra Section C.

Accordingly, the Kazakh Entities' actions are aligned with those of litigants where courts have been satisfied that the producing parties acted diligently. For example, in *Sealed Plaintiff No. 1 v. Sealed Defendant No. 1*, after the discovery deadline, the plaintiffs sought a sixty-day extension to make a disclosure they did not know was necessary until the deposition of a witness about a month before the close of discovery. 221 F.R.D. 367, 368 (N.D.N.Y. 2004). The court had previously suggested that this witness be deposed earlier in discovery; however, the parties proceeded with their own plans. The magistrate judge initially precluded the plaintiffs' disclosures in part because it found the "plaintiffs could have completed the deposition earlier and therefore was [*sic*] not diligent in efforts to complete discovery." *Id.* at 369. The district court held the magistrate judge clearly erred in administering that sanction. *Id.* Even though the

plaintiffs could have theoretically obtained the evidence sooner, they did not know the information was necessary until after the witness was deposed. *See id.* (distinguishing the facts at hand where "the need for an additional expert arose after the deposition of a witness, not, as was the case in *Softel, Inc.*, because of a fee dispute with a former expert").

As this Court's has observed, the Kazakh Entities' diligence in seeking relevant discovery cannot reasonably be questioned. [*See* ECF No. 1101 at 20 ("Having closely supervised this case for over two years, this Court is familiar with the complex investigation by Plaintiffs to locate assets and trace those assets through multiple shell corporations across the globe back to BTA Bank and the City of Almaty. The Court is also familiar with, and has commented on, Plaintiffs' diligence in pursuing discovery.").]

### 2. The SMP Documents Are Directly Relevant to the Kazakh Entities' Claims and Defendants' Defense.

The second factor – the importance of the evidence – weighs strongly in favor of inclusion and, on these facts, predominates over the other factors. The core contention in this case is that the money invested on Triadou's behalf in the United States was stolen from the Kazakh Entities. The defense is that the funds came from Petelin's vast personal wealth. There is no dispute that the actual flow of funds into the United States goes back to NSW, and to Claremont and Sartfield before that.

Monstrey produced documents showing that Ablyazov controlled the relevant entities, demanded the relevant payments, and signed the relevant documents. The defendants claim that Petelin controls the entities and signed the documents. Both versions of the documents are counter-signed by Ilyas Khrapunov (who conveniently acted as intermediary/translator between Petelin and his counsel). Until Petelin produced his versions, there was no documentary support for the defendants' narrative; his documents are therefore integral to the defense.

Given these competing sets of documents, the evidence ████████████ could not be

more important. As the corporate services provider involved in these transactions, SMP received those documents *at the time the transactions were executed*. Thus, the documents are relevant to both to tracing the stolen funds and to debunking Petelin's narrative.

Triadou cannot contest the relevance of the SMP Partners documents, but asks rhetorically if the documents are so important, why didn't the Kazakh Entities try harder to get them? The answer, as set forth above, is that their importance was not apparent until ten days before the discovery cutoff, and, once it became apparent, the Kazakh Entities *did* try to get them, but were unsuccessful until earlier this year, at which point they were produced immediately. (In an impressive act of sophistry, Triadou later argues that the documents are *too* important to permit. *See* Br. at 18).

Triadou also argues that the "importance" of the documents is undermined by Monstrey's testimony ███████████████████████████████████████████ Br. at 14-15. This, however, is not an argument about the documents' importance, it is an argument about the weight that a fact-finder should afford them or, at most, an argument about whether the documents should be admissible *at trial*. Triadou will be free to call the documents into question using Monstrey's prior testimony if it chooses to persist in advancing a false narrative, but this is no reason to preclude the documents as unimportant under Rule 37. (



).

Finally. Triadou questions the importance of the documents because "Triadou has no way to confirm whether Almaty/BTA produced everything" Kazakhstan received ██████████ ███████████. ████████████████████████████████████████████ ████████████████████████    ███████████████████████████ to ███████  ████████████████████. Decl. Ex. 29.

### 3.    Triadou Will Not Suffer Any Undue Prejudice.

Triadou will also not suffer any undue prejudice as a result of allowing the SMP Partners evidence. Triadou's argument to the contrary turns on the false notion that it will have to re-depose every important witness in light of this evidence. *See* Br. at 16-17. It is not true as a general matter that fairness demands that every witness can be confronted with every shred of paper. And Triadou's arguments rings especially hollow here, where the relevant witnesses actually *did* have an opportunity to testify about the documents. And to the extent that Triadou has a legitimate need for some additional discovery, there is time enough for that – Triadou itself recently told the Court that it is premature to even think about setting a summary judgment schedule. [ECF No. 1098 at 3.]

Triadou has already had the SMP Partners records for over three months. It has seen how the Kazakh Entities intend to use the evidence in support of their expert reports. And it even admits that there is possibly useful evidence in the SMP Partners documents for its own defense. *See* Br. at 16. These facts weigh against any finding of prejudice.

Triadou complains that it has had no opportunity to depose anyone from SMP Partners, *id.* at 16, but it had the same opportunity as the Kazakh Entities to do so. It is not clear what questions Triadou seeks to put to SMP Partners, other than to authenticate the documents. *See* Br. at 16. To the extent that the authenticity of the documents is in question, Triadou has every right to cross-examine a document custodian who will introduce the evidence.[9] *See generally* ECF 1101 (allowing amended disclosures and further depositions).

Triadou also argues it would be prejudiced by the need to take continued depositions of Ilyas, Ablyazov, Monstrey, and Petelin, resulting in an extensive delay. *See* Br. at 17. But Ilyas, Ablyazov, and Petelin already testified regarding SMP Partners and either completely disclaimed

---

[9]     To the extent the Court deems it necessary, Triadou is free to depose a witness on the authenticity of the SMP Partners documents. The Kazakh Entities expect that such witnesses will be in New York for the evidentiary hearing scheduled for September 24, 2019.

any knowledge of it (Ilyas and Ablyazov) ███████████████████████████████

████ Decl. Ex. 18 at Day 1: 168–69, Day 2: 126.; Decl. Ex. 17 at 108–14. Ablyazov testified

that the documents provided by Monstrey – which are the same as the SMP Partners evidence –

were fake. Decl. Ex. 18 at Day 1: 168-69; Day 2: 126. It is not clear what else those witnesses

need to be deposed on, other than to be given an opportunity to come up with some story

explaining why SMP Partners only has the supposedly forged version of the documents, and

doesn't have a shred of correspondence with Petelin, who the defendants claim was SMP's real

customer. If Ablyazov, Ilyas, or Petelin wish to tell that story, they are welcome to do so at trial.

Monstrey, meanwhile, produced and testified about his version of the documents, which are the

same as the ones SMP Partners possessed. *Compare* Decl. Ex. 30, *with* Decl. Ex. 31.

Lastly, Triadou complains that it did not have the full picture of the asset tracing until

recently, whereas the Kazakh Entities "had the information in June 2017 but did not leak it out

until" later. Br. at 17 n.13. As set out above, the notion that the Kazakh Entities had for any

relevant purpose knowledge of Monstrey's story in June 2017 is undisputedly factually wrong.

Triadou, meanwhile, has presumably known all along where it got its money from, and

understandably did not pursue discovery of the truth.

This point cannot be stressed enough: any claim of prejudice is entirely undermined by

the fact that the defendants uniquely had knowledge of how the U.S. investments were funded,

and have worked diligently in this litigation to obscure the truth. Ilyas Khrapunov knew about

SMP Partners – he signed some of the relevant documents – but produced nothing and failed to

identify SMP Partners as a source of potentially relevant information. Triadou has claimed for

years that all of its investments were funded by its single investor, Petelin, who allegedly was

SMP Partners' client. Decl. Ex. 32 at 7-9.

## 4.     To the Extent One Is Needed, Triadou May Obtain A Continuance

As set forth above, no additional discovery should be necessary because each of the

relevant witnesses has had an opportunity to testify about the relevant transactions. To the extent Triadou absolutely needs to depose a document custodian, that can be accomplished within the existing schedule. Even if Petelin needs to be re-deposed and confronted with the SMP Partners evidence, that can presumably be accomplished in late September when he will be in New York for the sanctions hearing anyway. Triadou's scenario of discovery being "extended into 2020 and beyond" is simply not realistic. Br. at 17.

As this Court recently held, "Preclusion of discovery is a drastic remedy that should be used only in cases where a different remedy cannot be crafted to minimize any prejudice to the party opposing discovery." *See* ECF 929 at 8 (citing *See, e.g., Torres v. Dematteo Salvage Co., Inc.,* No. 14-cv-774 (ADS) (AKT), 2016 WL 845326, at *6 (E.D.N.Y. Mar. 2, 2016))

**5.** ███████████████████████████████████████

Triadou adds to the four factors courts look to under Rule 37 a fifth: ███████████
███████████████████████████████████████. *See* Br. at 19-23. Unsurprisingly, this section of Triadou's argument is unsupported by a single legal citation, other than its claim – debunked above, *see* Section I.C. – ██████████████████████████████
████████████████████████████

This aspect of Triadou's argument is supported entirely by inference and innuendo. For example, Triadou writes, "██████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████ Br. at 19-20. But actually, it was coincidental. ██████████████████████████
██████████████████████    █████   ████████████
███████████████████████████████████████
████████████████████████████   ████████

Indeed, the Kazakh Entities were precluded by this Court's confidentiality order from sharing

Petelin's forged versions of the documents ██████████████████████████████████
████████████████████████████████. Decl. ¶ 19.

 At base, Triadou imagines a relationship between Kazakh law enforcement and the Plaintiffs here that does not exist. Rather, the relationship is akin to the one that exists in every case – in the U.S. as elsewhere – between victims and law enforcement. The victims provide information to law enforcement, who acts upon it. Law enforcement may provide some information or evidence to the victim, so long as it does not interfere with its investigation. The victims may pursue their own civil claims and therefore to some extent investigate in parallel with law enforcement, but the two are decidedly separate. In that regard, Triadou complains that Kazakh prosecutors denied its request for the signed minutes and videotape of interview of two witnesses. But it is not surprising that law enforcement has given permission for BTA to access documentary evidence, but not finalized witness statements. Prosecutors in the U.S. routinely do the same, for example intervening in civil litigation to stay depositions of prosecution witnesses even while they permit document discovery. *See, e.g.*, *Sec. & Exch. Comm'n v. Blaszczak*, No. 17-CV-3919 (AJN), 2018 WL 301091, at *1 (S.D.N.Y. Jan. 3, 2018).

 Courts in this district recognize that prosecutors and civil litigants pursuing similar aims nonetheless are separate, such that evidence in one's possession cannot be attributed to the other. Even in cases where criminal prosecutors and civil regulatory enforcement authorities such as the SEC pursue investigations hand-in-glove – exchanging documents with one another, interviewing witnesses together, sharing work product and legal strategy, etc. – courts in this district have repeatedly refused to blur the lines between them for discovery purposes. *See United States v. Blaszczak*, 308 F. Supp. 3d 736, 741-42 (S.D.N.Y. 2018).

 There is no reason to hold the Kazakh Entities to a different standard.

## II.   In the Alternative, the Court Should Permit the Kazakh Entities to Reopen Discovery for the Purposes of Producing the SMP Partners Evidence

For largely the same reasons, if the Court looked to the six-factor test for reopening fact discovery, the Court should likewise permit the "late" use of the SMP Partners documents. The six-factor test, which this Court previously looked to when permitting Triadou's late subpoenas [ECF No. 929 at 6], examines:

> (1) [W]hether trial is imminent, (2) whether the request is opposed, (3) whether the non-moving party would be prejudiced, (4) whether the moving party was diligent in obtaining discovery within the guidelines established by the court, (5) the foreseeability of the need for additional discovery in light of the time allowed for discovery by the district court, and (6) the likelihood that the discovery will lead to relevant evidence.

*Bakalar v. Vavra*, 851 F. Supp. 2d 489, 493 (S.D.N.Y. 2011). Other than the second factor (though we note that only one of the four defendants has opposed), each of these considerations weigh strongly in favor of reopening discovery for the limited purpose of allowing the SMP Partners documents. There is no trial date in this case, no schedule for summary judgment, and Triadou has opposed even setting one. As set out above, the Kazakh Entities have been diligent in pursuing the evidence, and Triadou will not suffer undue prejudice from its introduction. No or minimal additional discovery is realistically entailed by the allowance of the SMP Partners evidence and, most importantly, the evidence is highly – almost dispositively – relevant.

## III.   At the Very Least, The SMP Partners Evidence May Be Used For Impeachment and Relied on by Experts.

Separate and apart from its affirmative use, there is no basis on which to preclude the SMP Partners documents as impeachment evidence or to prevent experts from relying on them.

The Kazakh Entities had no obligation to produce impeachment evidence under Rule 26, so cannot be sanctioned for failing to produce it under Rule 37. *See* Fed. R. Civ. P. 26(a)(1)(A) & (a)(3)(A); *see also Brannan v. Great Lakes Dredge & Dock Co.*, No. 96 CIV. 4142 (DC), 1998 WL 229521, at *1 (S.D.N.Y. May 7, 1998) (recognizing that impeachment evidence is not subject to pre-trial disclosure). Triadou somehow interprets these rules and case law as only

24

applying to evidence a party *created* for the purpose of impeachment. *See* Br. at 25 n.17. This is incorrect under the text of the federal rules, *see, e.g.,* Fed. R. Civ. P. 26(a)(1)(A)(ii) (requiring parties to produce documents "unless the use would be solely for impeachment"), and none of the cases Triadou relies upon turn on when or why the impeachment evidence was created.

Similarly, experts may properly rely on the SMP Partners evidence even if it is otherwise inadmissible. "Under Rule 703 a district court may allow an expert to testify based on inadmissible evidence . . . if the evidence . . . is 'of a type reasonably relied upon by experts in the particular field.'" *In re Rezulin Prods. Liability Litig.*, 309 F. Supp. 2d 531, 561 (S.D.N.Y. 2004) (quoting Fed. R. Evid. 703). There is no question that the documents in the SMP Partners production are the kind of documents that are reasonably relied upon by the experts working in this litigation. The production includes signatures that can be relied upon by handwriting experts, and corporate documents that are frequently relied upon by accountants and financial experts.

## IV.   In the Alternative, the Court Should Hold an Evidentiary Hearing

Although Triadou has utterly failed to carry its burden of demonstrating that the Kazakh Entities should be sanctioned, should the Court have any questions, they should be addressed at an evidentiary hearing. *See* June 4, 2019 Hr'g Tr. at 6:4-7, 7:23-8:2 (Your Honor suggesting that a hearing might be appropriate on this motion). At such a hearing, the Kazakh Entities will present evidence confirming the chronology set forth above.[10]

## CONCLUSION

For the reasons stated above, the Court should deny Triadou's motion.

---

[10]    If the Court determines to hold a hearing, the Kazakh Entities respectfully request that it be conducted on September 24, 2019, alongside the hearing on the motion to sanction Gennady Petelin, because many of the same issues and witnesses are involved. Moreover, if the Court determines that Petelin perjured himself and fabricated his version of the documents, as we expect, that may weigh heavily in the Court's consideration of this motion.

Dated:      New York, New York
            July 17, 2019

Respectfully Submitted,

_____/s/ Matthew L. Schwartz_____
MATTHEW L. SCHWARTZ

Matthew L. Schwartz
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: 212-446-2300
Facsimile: 212-446-2350

ATTORNEYS FOR PLAINTIFFS