UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

CITY OF ALMATY, KAZAKHSTAN, and BTA BANK JSC,

                           Plaintiffs,

-against-

MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, and TRIADOU SPV S.A.,

                           Defendants.

**OPINION ADDRESSING TRIADOU'S MOTION TO PRECLUDE USE OF SMP DOCUMENTS**

1:15-CV-05345 (AJN) (KHP)

**KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

    Fact discovery in this case closed on August 31, 2018, except for limited purposes, including the depositions of non-party witnesses Frank Monstrey and Felix Sater and the production of documents related to their depositions. (Doc. Nos. 649 and 901.) Expert discovery is scheduled to close on August 30, 2019, although at the last court conference, this Court permitted the parties to complete certain discrete expert discovery items in September of 2019. (Doc. Nos. 1066 and 1141.)

    In April 2019, Plaintiffs the City of Almaty, Kazakhstan ("Almaty") and BTA Bank JSC ("BTA") (collectively, the "Kazakh Entities") supplemented their prior document production with documents obtained from a non-party named SMP Partners (the "SMP Documents"), an entity located on the Isle of Man. Plaintiffs obtained the SMP Documents from the Prosecutor General of the Republic of Kazakhstan ("ROK").[1] Some of the documents produced by the ROK were copies of documents previously produced by Plaintiffs.

---

[1] The Isle of Man is a self-governing island located in the Irish Sea. Its people are, however, classified as British citizens. The Hague Convention covers service of legal process in the Isle of Man. *See Service of Process*, U.S. MARSHALS SERVICE (last accessed Aug. 29, 2019), https://www.usmarshals.gov/process/hague_service.htm.

Defendant Triadou SPV S.A. ("Triadou") objects to Plaintiffs' "late" supplementation of their document production and moves pursuant to Federal Rule of Civil Procedure 37(c)(1) ("Rule 37") to preclude their use in this case for all purposes as a sanction for Plaintiffs' alleged failure to pursue, obtain, and produce the SMP Documents during fact discovery. (Doc. No. 1078.) Triadou and the other Defendants also separately filed a motion seeking sanctions against Plaintiffs under Rule 37, and allege that Plaintiffs purposely delayed identifying Monstrey as a witness and misrepresented when they learned about him in order to obtain an extension of discovery to take his deposition. (Doc. Nos. 967 and 971.) For the reasons discussed below, Triadou's motion to preclude the SMP Documents is DENIED, and Defendants' motions for sanctions against Plaintiffs for allegedly making misrepresentations about Monstrey are also DENIED.

**BACKGROUND**

As discussed in prior decisions, a core issue in this case is whether Defendant Mukhtar Ablyazov or non-party witness Gennady Petelin funded Triadou's real estate investments in the United States with money stolen from Plaintiffs. *See City of Almaty, Kazakhstan v. Ablyazov*, No. 15-cv-5345 (AJN), 2018 WL 3579100 (S.D.N.Y. July 25, 2018); *City of Almaty, Kazakhstan v. Ablyazov*, 278 F. Supp. 3d 776 (S.D.N.Y. 2017); *City of Almaty, Kazakhstan v. Ablyazov*, 226 F. Supp. 3d 272 (S.D.N.Y. 2016). Specifically, Plaintiffs seek to prove that Ablyazov embezzled money from BTA, co-mingled it with money Defendant Viktor Khrapunov allegedly embezzled from Almaty, and laundered the funds, with the assistance of Defendant Ilyas Khrapunov, through various shell entities and ultimately through Triadou into real estate investments in New York. In considering this motion, the Court notes the close relationship between and

among the Defendants and Petein. Petelin is related to the Khrapunov Defendants by marriage and Ilyas Khrapunov is Ablyazov's son-in-law.  Ilyas founded Triadou and acted as a consultant to Triadou and also acted as a translator for Petelin and provided Petelin with an explanation of his obligation to produce documents in response to the subpoena issued to him in this action.

To support their claims, Plaintiffs obtained and produced documents acquired from a non-party Dubai-based witness named Eesh Aggarwal.  Plaintiffs contend that these documents help trace the flow of money from Ablyazov through various entities all the way to Triadou.  Some of these entities were Northern Seas Waterage ("NSW"), Claremont Holdings Limited ("Claremont"), and Sartfield Navigation Limited ("Sartfield").  NSW is an entity owned by non-party witness Petelin, but is administered by Ilyas Khrapunov.  The Aggarwal documents show that NSW received $440 million from Claremont and Sartfield via accounts held at ING Bank.  This information caused Plaintiffs to seek additional information from ING Bank about Claremont and Sartfield, which they had to obtain through a Hague request.  In March 2018, through their Hague request, Plaintiffs learned that Frank Monstrey was a beneficial owner of Claremont and Sartfield and that both of these entities were administered by an entity based in the Isle of Man called SMP Partners.

Frank Monstrey is the former C.E.O. of Nostrum Oil & Gas PLC ("Nostrum" ), an energy company operating in Kazakhstan.  BTA Bank knew about Monstrey and Nostrum prior to March 2018; indeed, it sought a freezing order in the United Kingdom ("UK") against Nostrum in March 2017 in a separate litigation (the "UK Litigation").  In or about June 2017, BTA Bank settled the UK Litigation with the assistance of its UK counsel, and acquired a stake in Nostrum (valued at nearly $150 million) and Claremont (the "2017 Monstrey Settlement Agreement").

As part of the settlement, Monstrey agreed to cooperate with BTA Bank in its asset recovery efforts and maintain the Settlement Agreement confidential.  Under the Agreement, BTA agreed to maintain as confidential certain information and documents provided by Monstrey in the UK Litigation, subject to certain exceptions. (Doc. No. 973-17.) BTA Bank also agreed to indemnify Monstrey with respect to certain encumbrances on the equity, loans, and personal guarantees Monstrey had tied to his Nostrum shares, and to reimburse Monstrey for travel and security costs associated with his cooperation. (*Id*.; Doc. No. 901.)

Plaintiffs state they first contacted Monstrey seeking information relevant to this case in March 2018 when then learned he may have knowledge relevant to this case through their Hague request for documents from ING about Claremont and Sartfield.  According to Plaintiffs' counsel, BTA did not have access to witness statements submitted by Monstrey in the UK Litigation — only the UK Court and BTA's UK counsel had those statements – and thus Plaintiffs' counsel in this action and their contacts at BTA were unaware of Monstrey's connection to Claremont and Sartfield until March 2018.  In May 2018, Plaintiffs requested an extension of the fact discovery schedule so they could depose Monstrey in this action, which this Court granted.  (Doc. No. 639.)  Although Plaintiffs initially refused to identify Monstrey on the grounds that he feared for his safety, they subsequently identified him.  The basis for Plaintiffs' representation regarding Monstrey's safety was that Monstrey stated that he feared for his safety and, in fact, negotiated a promise from BTA to protect his safety should he be required to travel to certain places in connection with his cooperation under the 2017 Monstrey Settlement Agreement. (Doc. No. 1080-3 ¶ 125 (Second Witness Statement of Frank Joseph Monstrey) ("Mr. Khrapunov in an angry manner, raising his voice, told me that if I would not

4

make the necessary arrangements to pay fast '*he would send some other 'special' people to come after me*' (or words to that effect) and that I would quickly realise that I should have listened to him. He said it would not be possible to control '*those kind of people*' (or words to that effect) if I did not quickly comply." (emphases in original)).)

In July of 2018, after this Court ordered Monstrey's deposition to go forward, Monstrey permitted BTA to review his witness statements from the UK Litigation and produce them in this action. (*See id.*) Monstrey's documents and deposition testimony provided greater clarity about the flow of money from Ablyazov to Triadou, and revealed that Monstrey acquired his stake in Nostrum with money Ablyazov allegedly stole from BTA Bank. According to Plaintiffs, Monstrey and Ablyazov, with Ilyas Khrapunov's help, then entered into a complex transaction involving NSW, Claremont, Sartfield, and SMP Partners (the "NSW Transaction"). The Transaction was designed to simultaneously hide the source of the funds and funnel some of the funds to Triadou into real estate investments in the United States. Monstrey produced certain documents in this action memorializing the NSW Transaction that bore Ablyazov's signature. He testified that SMP Partners also would have copies of these documents. Monstrey's deposition was cut short, however, and this Court directed the parties to meet and confer about obtaining additional documents pertinent to Monstrey's testimony and a second date to continue his deposition.

In mid-August 2018, Triadou requested several categories of documents from Plaintiffs, including Monstrey's client agreement with SMP Partners and other SMP documents pertinent to the NSW Transaction. Also in August 2018, Petelin produced documents in connection with his deposition. Some of the documents were versions of documents already produced by

Monstrey concerning the NSW Transaction. However, the documents produced by Petelin replaced Ablyazov's name and signature with Petelin's name and signature. At the end of August 2018, Petelin testified that the documents he provided showed that he, and not Ablyazov, had funded NSW. This testimony is critical to Triadou's (and the other Defendants') defense, because Defendants have long maintained that Petelin was the source of Triadou's funding and that the money cannot be traced back to the stolen funds.

On October 30, 2018, Ablyazov, who had resisted being deposed, submitted to questioning and testified that the documents Monstrey produced were forged, disclaiming his signature on them. Then, in November or December 2018, Monstrey finally produced additional documents and sat for the second day of his deposition. Monstrey only agreed to continue his deposition after BTA Bank's UK counsel negotiated an additional agreement with him, pursuant to which he agreed not to take legal action against BTA Bank based on its apparent failure to fulfill certain obligations to under the 2017 Monstrey Settlement Agreement.

Plaintiffs state that when they initially produced Monstrey, they did not anticipate the need to obtain documents directly from SMP Partners, but rather expected to rely on the documents Monstrey produced relevant to the NSW Transaction. Moreover, the process of obtaining documents from a non-party located in the Isle of Man is difficult and lengthy, because it involves utilizing the process set forth in the Hague Convention. After Petelin produced his version of the NSW Transaction documents, Plaintiffs asked for his consent to allow SMP Partners to produce his records to corroborate the authenticity of the documents he produced. Petelin refused. Defendants did not join in the request although, presumably, they

would have had more sway over Petelin given that they are relying on him for their defense and had/have an interest in corroborating the authenticity of the documents he produced in light of Monstrey's contrary prior testimony. Plaintiffs also asked Monstrey to consent to the production of his records directly from SMP Partners. Monstrey did not provide his consent until November of 2018, because his dispute with BTA regarding the 2017 Monstrey Settlement Agreement was not resolved until then. In November 2018, Monstrey sent a letter to SMP requesting that it provide him with various documents. SMP Partners, however, did not respond to Monstrey's request or provide the documents. Plaintiffs also prepared a draft Hague request to obtain documents from SMP Partners, but Defendants objected to Plaintiffs' proposed Hague request on the ground that fact discovery had already closed

In late January 2019, pursuant to a mutual legal assistance request from ROK to the Isle of Man, the Manx Attorney General obtained witness statements and documents from SMP Partners related to the NSW Transaction and provided them to ROK authorities. BTA learned about ROK's receipt of the documents and requested copies and permission to produce them in this case. Then, in mid-to-late March 2019, ROK consented, and Plaintiffs produced the documents on April 2, 2019. The SMP Documents are purportedly identical to the documents produced by Monstrey.

## LEGAL STANDARD

Rule 37 sets forth the relief available to parties due to an adversary's or third-party's failure to make disclosures or cooperation in discovery. It provides, among other things, "If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing,

or at a trial, unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). In addition to or in lieu of this sanction, a party may move for an order requiring payment of attorneys' fees and other expenses caused by the discovery failure, disclosure of the failure to the jury, prohibiting the disobedient party from supporting or opposing designated claims or defenses or introducing certain information in evidence, among other sanctions. *Id.*; *see also* Fed. R. Civ. P. 37(b)(2)(A).

Discovery sanctions serve several purposes: (1) to ensure that a party will not benefit from its failure to comply; (2) to obtain compliance with the court's orders; and (3) to deter noncompliance, both in the particular case and in litigation in general. *Cine Forty–Second St. Theatre Corp. v. Allied Artists Pictures Corp.*, 602 F.2d 1062, 1066 (2d Cir. 1979) (citations omitted); *see also Southern New England Tel. Co. v. Global NAPs Inc.*, 624 F.3d 123, 147–49 (2d Cir. 2010) (district court did not err by imposing default judgment on defendants who willfully deleted and refused to produce relevant documents); *Update Art, Inc. v. Modiin Publ'g, Ltd.*, 843 F.2d 67, 70–71 (2d Cir. 1988) (granting summary judgment to plaintiff was an appropriate sanction where defendant engaged in extreme dilatory tactics).

Harsh sanctions such as dismissal or default are reserved for extreme situations. *See Agiwal v. Mid Island Mortg. Corp.*, 555 F.3d 298, 302 (2d Cir. 2009); *see also Shcherbakovskiy v. Da Capo Al Fine, Ltd.*, 490 F.3d 130, 140 (2d Cir. 2007) (noting that "the severity of sanction must be commensurate with the non-compliance"). At the same time, the Second Circuit has "consistently rejected the 'no harm, no foul' standard for evaluating discovery sanctions." *Southern New England Telephone Co,* 624 F.3d at 148–49. The rationale for this approach is that Rule 37 sanctions not only "protect other parties to the litigation from prejudice resulting

from a party's noncompliance with discovery obligations," but also deter parties from flouting their discovery obligations and the court's orders and ensure that parties will not benefit from their noncompliance.  *Id.*

When determining the appropriate sanction to impose under Rule 37, courts in the Second Circuit weigh several factors, including:  "'(1) the willfulness of the non-compliant party or the reason for noncompliance; (2) the efficacy of lesser sanctions; (3) the duration of the period of noncompliance; and (4) whether the non-compliant party had been warned of the consequences of . . . noncompliance.'" *World Wide Polymers, Inc. v. Shinkong Synthetic Fibers Corp.*, 694 F.3d 155, 159 (2d Cir. 2012) (alteration in original) (quoting *Agiwal*, 555 F.3d at 302).  Prejudice to the moving party may also be a significant consideration, though not an absolute prerequisite in all circumstances. *See Southern New England Telephone Co.*, 624 F.3d at 148–49; *see also Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006).  No one of the above factors is dispositive. *World Wide Polymers*, 694 F.3d at 159 (noting that "these factors are not exclusive, and they need not each be resolved against the [sanctioned] party" (quoting *Southern New England Telephone Co.*, 624 F.3d at 144)).  Rather, the court weighs each factor in determining the appropriate sanctions.

Additionally, when considering whether preclusion is an appropriate sanction, the Court must consider the following four factors: "(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006) (precluding testimony of defense witnesses identified shortly

before trial); *see also Design Strategy, Inc.*, 469 F.3d at 296 (precluding plaintiff from presenting evidence in support of its claim for lost profits where it failed to disclose the computation of those profits).

In addition to the power to sanction under Rule 37, courts have the inherent power to punish parties for contempt and have discretion to "'fashion an appropriate sanction for conduct which abuses the judicial process.'" *Ceglia v. Zuckerberg,* 600 F. App'x 34, 36 (2d Cir. 2015) (quoting *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44–45 (1991)); *CAT3, LLC v. Black Lineage, Inc.*, 164 F. Supp. 3d 488, 497–98 (S.D.N.Y. 2016). "These powers are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers*, 501 U.S. at 43 (internal quotation marks and citation omitted). However, because of the "very potency" of the court's inherent contempt powers, a court must exercise them "with restraint and discretion." *Id*. at 44.

The court has broad discretion to determine the appropriate sanction and does so on a case-by-case basis. *See West v. Goodyear Tire & Rubber Co.*, 167 F.3d 776, 780 (2d Cir. 1999). However, the Court should impose the least harsh sanction that will remedy the discovery violation and deter such conduct in the future. *See id*. (remanding for the application of lesser sanctions after the trial court imposed dismissal as a sanction); *see also Hawley v. Mphasis Corp.*, 302 F.R.D. 37, 46 (S.D.N.Y. 2014).

**DISCUSSION**

The Court turns first to Defendants' motion to sanction Plaintiffs for their late disclosure of Monstrey. In their motion, Defendants request attorneys' fees and costs associated with

having to depose Monstrey after discovery was supposed to have ended and fees and costs associated with the instant sanctions motions on this issue.  Plaintiffs have fully explained how and when they learned of Monstrey and his relevance to this case.  While it is true that BTA knew of Monstrey as early as 2017, the Court recognizes that BTA may not have appreciated his relevance to the alleged money trail in this case until later.  Indeed, Ablyazov is accused of stealing significant amounts of money and laundering it through an intricate network of shell companies set up under other peoples' names and through complex loan and payback transactions and investments.  The Court appreciates that it is not easy to trace the flow of money through schemes such as these, and finds that Plaintiffs have adequately explained why they did not recognize Monstrey's connection to the money Triadou invested in New York until late in this case.  Additionally, Plaintiffs timely requested to extend the discovery period to depose Monstrey.  Although this Court raised a concern in a prior order about Plaintiffs' possible gamesmanship in discovery, subsequent information in the form of sworn deposition testimony and declarations, and other evidence have alleviated that concern.  Accordingly, I find there is no basis to sanction Plaintiffs or their counsel in connection with the timing of their identification of Monstrey as a witness in this case.  I further find that Plaintiffs acted with caution, rather than in an attempt to mislead, when flagging Monstrey's safety concerns.  Indeed, other witnesses in this case also have expressed safety concerns and discussed threats made by Ablyazov and Ilyas Khrapunov.

      Turning next to use of the SMP Documents, I find that although the SMP Documents were produced after the completion of fact discovery, the supplementation was appropriate.  Rule 26 requires parties to supplement their disclosures in a timely manner.  Fed. R. Civ. P.

26(e)(1)(A).  Here, Plaintiffs supplemented during expert discovery, and within weeks of being permitted by ROK to view the SMP Documents and within days of receiving permission to produce them.  The Court also notes that Triadou did not request the SMP Documents from Plaintiffs until mid-August 2018, and Monstrey's second day of deposition did not occur until December 2018.  Although Plaintiffs timely sought the documents from Monstrey after Triadou requested them, they did not have full control over him—all they had was a contract providing that Monstrey had to cooperate.  Plaintiffs tried to enforce that obligation and eventually obtained his cooperation.  But even then, Monstrey could produce only the documents he had in his possession and had to make a request to SMP Partners to provide him copies of documents.  For unknown reasons, SMP Partners did not answer Monstrey's request.

Triadou did not make things easier for Plaintiffs, notwithstanding their request and apparent desire for the documents.  Triadou refused to consent to Plaintiffs' proposed Hague request and took no action on its own to seek the documents directly from SMP Partners. Yet, Triadou was in an equally strong position to do either of these things by asking its key witness—Gennady Petelin—to obtain them from SMP Partners or to go through the Hague process. Triadou has an equal interest in corroborating the authenticity of the documents it seeks to enter through Petelin as Plaintiffs have in corroborating the authenticity of the documents they seek to enter through Monstrey and Aggarwal.  The individual Defendants, who, like Triadou, are relying on the argument that Petelin funded Triadou as their defense, also had an ability to obtain and produce documents related to the NSW Transaction, yet did not.  It is also difficult to ignore that, Ilyas Khrapunov, who formed Triadou and worked as a consultant for Triadou, served as a translator for Petelin after he was served with a document subpoena in this case

and Petelin produced his documents and testified *after* Monstrey, and also that Ilyas Khrapunov is related to both Petelin and Ablyazov through marriage.

As discussed above, the Court credits Plaintiffs' explanation as to the timing of their realization regarding Monstrey's importance to this case and the later realization that obtaining documents directly from SMP Partners would be necessary to resolve the dispute created when Petelin and Ablyazov disclaimed the authenticity of the NSW Transaction documents produced by Monstrey. Further, both Petelin and Ablyazov were deposed at the very end of fact discovery and only after the intervention of this Court. In short, Rule 37 sanctions are not appropriate. The court finds that Plaintiffs timely pursued relevant documents from their own witness, from Defendants witness, and ultimately from ROK and produced them without undue delay.

The case cited by Triadou, *In re General Motors LLC Ignition Switch Litigation*, No. 14-MD-2543 (JMF), 2017 WL 2880882 (S.D.N.Y. July 5, 2017), is not applicable here. In that case, the plaintiff sought additional discovery from a third party after fact discovery had closed and used that information to prepare for expert discovery. The plaintiff subsequently sought additional discovery and, only then, disclosed the discovery to the defendant. Here, unlike the Plaintiff in *In re General Motors LLC Ignition Switch Litigation*, Plaintiffs made active attempts to obtain the SMP Documents, obtained some documents from Monstrey and produced them, and continued to seek the documents through multiple channels, informing Triadou of their efforts. The Court cannot ignore that Triadou's allegation, that Plaintiffs delayed providing information, is based on speculation and that Plaintiffs have provided a clear chronology of their efforts backed up by an attorney declaration. Neither BTA nor Almaty, a municipality of

ROK, could control when the Manx Attorney General would respond to ROK's request for legal assistance or when ROK would consent to disclosure and use of the SMP Documents in this case.[2]

The importance of the SMP Documents is obvious—they will reveal whether Petelin's or Monstrey's documents are the real documents. These documents relate to the source of Triadou's funding for the very investments at issue in this case. All parties have an interest in these documents, which bear on the truth of witness testimony.

The Court also finds that the timing of the production of the SMP Documents is not unfairly prejudicial to Triadou or the other Defendants. Any alleged prejudice can be remedied by permitting Defendants to conduct discovery on the authenticity of the documents. The parties have indicated that a knowledgeable person will be available at a previously scheduled hearing on September 24, 2019 to testify about the documents. Accordingly, the Court will permit Defendants to question such person about the authenticity of the SMP Documents on that day. Defendants may arrange for a court reporter and conduct a short deposition of the witness in this Court's jury room on the morning of the hearing. Alternatively, Defendants may question the witness during the hearing.

As explained above, Plaintiffs' did not unreasonably delay identifying Monstrey as a witness or obtaining the SMP Documents. Accordingly, the Court is satisfied that declining to impose sanctions against Plaintiffs will not encourage them to delay discovery going forward.

---

[2] While this Court does not purport to interpret Kazakh law, Plaintiffs state that Kazakh law provides that data from criminal investigations "cannot be disclosed . . . and may be made public only with the permission of the procurator in the extent to which it will be recognized that possible, if it is not contrary to the interests of the investigation and does not infringe the rights and legitimate interests of others." Kazakhstan Crim. P. Code, Art. 201(1), *available at* http://adilet.zan.kz/eng/docs/K1400000231.

Finally, the Court finds there is no need to reopen the depositions of any other witnesses regarding the SMP Documents, as they have already testified about the NSW Transaction and SMP Partners.

## **CONCLUSION**

For the reasons set forth above, Defendants' motions to sanction Plaintiffs in connection with the timing of their disclosure of Monstrey and the SMP Documents are denied. Defendants should file a letter by no later than **September 9, 2019** informing the Court whether they will seek to question a witness with respect to the SMP Documents and, if so, providing the name of the witness and the time when the questioning will take place.

The Clerk of Court is respectfully requested to terminate the motion at ECF No. 1078.

**SO ORDERED.**

Dated: August 30, 2019
New York, New York

*[signature: Katharine H. Parker]*

_____
KATHARINE H. PARKER
United States Magistrate Judge