

MATTHEW L. SCHWARTZ
Tel.: (212) 303-3646
E-mail: mlschwartz@bsfllp.com

March 29, 2019

**BY ECF**

Honorable Katharine H. Parker
United States Magistrate Judge
Southern District of New York
500 Pearl Street, Suite 1950
New York, New York 10007

Re: *City of Almaty, Kazakhstan, et ano. v. Mukhtar Ablyazov, et al.*,
Case No. 15 Civ. 5345 (AJN) (KHP)

Dear Judge Parker:

We represent the City of Almaty, Kazakhstan and BTA Bank (the "Kazakh Entities") and write in response to the Court's March 1, 2019 Order [ECF No. 978] and Defendants' March 15, 2019 letters to the Court [ECF Nos. 981, 983].

## Relevant Facts

The circumstances surrounding the fraudulent conveyance in this case – which was part of a sophisticated, global money laundering conspiracy – are, needless to say, unique among the cases cited by the Defendants in their letter briefs.

In March 2013, Triadou SPV S.A. agreed to invest approximately $34 million in the Flatotel condominium conversion, which was being developed by the Chetrit Entities. [Ex. A at 30.] Triadou's investment was paid for by Telford International Limited, a company that was purportedly owned by Elena Petelina but was in fact controlled by Ilyas Khrapunov and funded with the Kazakh Entities' stolen money. [*See* ECF Nos. 142-4; 156-2.] For its investment, Triadou acquired a 50% ownership interest in CF 135 West Member LLC, which (through another LLC) had a 75% interest in the Flatotel project. [*Id.* at 26.] Triadou thus indirectly owned 37.5% of the economic value of the Flatotel development. In May 2013, Triadou followed up its first investment with the Chetrit Entities by investing approximately $6 million in another development, the Cabrini Medical Center condominium conversion. [Ex. B at 1.] This investment was structured as a convertible loan, though Triadou never exercised its option to convert the debt it held to equity. [Ex. C, May 25, 2017 Deposition of Joseph Chetrit at 122:4-23.] Triadou estimated the exit value of its investments in the Flatotel and Cabrini would be $114 million and $14.4 million, respectively. [Ex. D at Tab 6, 6.]

On August 4, 2014, while both the Flatotel and Cabrini projects were still under development, Triadou and the Chetrit Entities entered into an agreement whereby the Chetrit Entities would buy back Triadou's interest in the Flatotel. [Ex. B.] This request came at the immediate direction of Ilyas Khrapunov, who was concerned about the possibility of litigation brought by the Kazakh Entities and wanted to move money back overseas. [ECF No. 175 at 21.] Under the August 2014 agreement, Chetrit agreed to immediately repay the $6 million Cabrini loan without interest, pay an additional $1 million upfront, pay $21 million in four installment payments, and grant Triadou a residual interest in the Flatotel's profits, if any. [Ex. B ¶ 1.] The initial $7 million payment from the Chetrit Group was never received by Triadou, but was paid directly by the Chetrit Group to SDG, Triadou's parent company, in Switzerland. [Ex. G.]



Triadou also intended to direct any additional payments from Chetrit overseas directly to its parent company, SDG. [ECF No. 169 ¶ 56.]

In October 2015, the Kazakh Entities filed their claims against the Defendants, including claims for actual and constructive fraudulent conveyance [*see* ECF 49 ¶¶ 169-180], and a claim pursuant to N.Y. C.P.L.R. § 5239 to vacate state-court judgments Triadou had obtained against the Chetrit Entities. [*Id.* ¶¶ 207-211.] These claims were also included in the Kazakh Entities' First Amended Crossclaims [*see* ECF No. 219 ¶¶ 162-173, 187-191], and in the operative Second Amended Crossclaims. [*See* ECF No. 433 ¶¶ 162-173, 187-191.]

**1. The Fraudulent Conveyance Claims**. After investing nearly $35 million in the Flatotel for a stake that it believed was worth more than $100 million, Triadou sold its interest back to the Chetrit Entities for $22 million, plus a greatly diminished profit participation. [Ex. B ¶ 1.] In granting the Kazakh Entities' motion for attachment, Judge Nathan concluded that this was a "below-market assignment" that "was motivated by the threat of litigation against the Khrapunovs." [ECF No. 175 at 9.] This assignment is the fraudulent conveyance.

There are three groups of entities relevant to the fraudulent conveyance scheme. Triadou, the holder of the interest in the Flatotel project, was the transferor. The Chetrit Entities were the transferees. Finally, the individual defendants were the beneficiaries of the fraudulent conveyance both because $7 million of the proceeds of the transfer (including the Cabrini loan repayment) went abroad to SDG, a company controlled by Ilyas Khrapunov, [Ex. D ¶ 45], and because the defendants wanted to move funds out of the United States to frustrate the Kazakh Entities' global asset-recovery efforts. For the same reasons and more (including its interest in residual profit sharing), Triadou is also a beneficiary of the transfer. [Ex. B at 2.] Judge Nathan has already found that the only explanation Triadou put forward for why it would have made this conveyance, that it "did not wish to meet an unexpected capital call, is wholly implausible." [ECF No. 175 at 9.] But for this Court's attachment order, the individual defendants would have benefited even more, because they would have moved an additional $21 million (plus interest) in stolen funds that they invested in the United States back overseas.

**2. The Settlement With Chetrit.** In October 2015, the Kazakh Entities also brought claims against the Chetrit Entities for violations of RICO, actual and constructive fraudulent transfer, unjust enrichment, alter ego, conversion, constructive trust, replevin, and under C.P.L.R. § 5239. Recognizing their potential liability to the Kazakh Entities – including as the transferee in the Kazakh Entities' fraudulent conveyance claims – the Chetrit Entities quickly settled in November 2015. [Ex. E.] Under the terms of the settlement, among other things, the Chetrit Entities agreed to give the Kazakh Entities a 50% interest in CF 135 West Member LLC. In return, the Kazakh Entities agreed to indemnify the Chetrit Entities from Triadou's claims arising out of its sale of the Flatotel interest back to Chetrit, and further agreed that up to $21 million *plus* interest *plus* an amount sufficient to cover Triadou's claims for profit participation would be escrowed to secure the indemnity. [*Id.* ¶¶ 1, 2, 3, 4, 5].

As a result, under the Settlement Agreement, **the Kazakh Entities did not receive the interest Triadou fraudulently conveyed to the Chetrit Entities**. Rather, under the settlement they were supposed to receive that interest *less* $21 million plus interest (currently, $23.5 million) plus any profit participation owed to Triadou, which would go to either Triadou (and therefore benefit the individual defendants) or the Kazakh Entities *depending on the outcome of this case*. [*Id.* ¶ 5]. Moreover, the Chetrit Entities never actually gave the Kazakh Entities their

2



50% interest in CF 135 West Member LLC. [Ex. F at 3 ("[T]he Kazakhstan Entities were never transferred the Flatotel Interest or made a party to the CF 135 WEST MEMBER LLC Operating Agreement, and have not received any distribution of any kind. . . .").][1]

The Settlement Agreement also released the Kazakh Entities' claims against the Chetrit Entities. [Ex. E ¶ 7.] And the Chetrit Entities agreed to "cooperate in good faith . . . in the prosecution" of this lawsuit, including specifically by providing testimony and evidence, which they have done. [*Id.* ¶ 8.] The Settlement Agreement thus specifically contemplated that this litigation would continue against the remaining Defendants. [*See id.* ¶ 7 ("For the avoidance of doubt, no claim against Mukhtar Ablyazov, Viktor Khrapunov, Ilyas Khrapunov, or Triadou is discontinued or waived, nor is any claim to the interpleaded fund in th[is] Lawsuit discontinued or waived.").]

### Argument

The Court's March 1 Order asks the Kazakh Entities to address three things: (1) their "position as to whether the settlement with the Chetrit Group moots this action as to each of the Defendants"; (2) "whether this issue is ripe for adjudication as to any of the Defendants and, if not, why not"; and (3) to "identify those remaining claims, if any, that are not impacted by the settlement." [ECF No. 978.][2]

Taking these questions in reverse order, the defendants only contend that the Chetrit settlement moots the fraudulent conveyance claims. It is therefore undisputed that several of the Kazakh Entities' remaining claims are unaffected, including their remaining common law claims against Triadou for unjust enrichment, conversion, and constructive trust, [ECF No. 433 ¶¶ 174-186],[3] as well as BTA's foreign judgment enforcement claim against Ablyazov (and, if the Court permits amendment, Ilyas Khrapunov), [*Id.* ¶¶ 192-198; ECF No. 914].

Next, the defendant's "mootness" argument is not ripe for at least two reasons. *First*, as discussed below, the argument turns on disputed questions of fact. *Second*, this supposedly "jurisdictional" argument in fact concerns the merits of the fraudulent conveyance claims, and thus would necessitate a dispositive motion under Federal Rule of Civil Procedure 12(b) or, more appropriately for the reasons discussed below, a motion for summary judgment under Rule 56. On numerous occasions, courts have distinguished between subject matter jurisdiction – a court's power to hear a case – and the "separate" question of "whether the allegations the plaintiff makes entitle him to relief." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010); *see also Abramov v. I.C. Sys., Inc.*, 65 F. Supp. 3d 323, 326 (E.D.N.Y. 2014). The limitation in N.Y. Debtor and Creditor Law § 278 on setting aside a conveyance "to the extent necessary to satisfy [the creditor's] claim" is not a jurisdictional requirement, but rather an element of the claim for relief (or more accurately, a limit on the remedy). *See MFS/Sun Life Trust v. Van Dusen Airport Services,* 910 F. Supp. 913, 931 (S.D.N.Y. 1995) (stating that complete satisfaction of a debt deprives a creditor of a fraudulent conveyance "cause of action,"

---

[1] In or about March 2018, the Kazakh Entities and the Chetrit Entities entered into a further agreement, pursuant to which the Kazakh Entities received two apartments and some cash. [Ex. F ¶ 2.]

[2] The Order also asks the parties to "address any other relief obtained by Plaintiff from other non-parties that may bear on the mootness issue." The Kazakh Entities are not aware of any such relief.

[3] Earlier today, Judge Nathan declined to dismiss these claims against Triadou. [ECF No. 996.]

3



with no mention of subject-matter jurisdiction). Similarly, the Defendants' arguments, although framed as matters of jurisdiction, actually go to the merits of the Kazakh Entities' fraudulent conveyance claims and thus do not bear on the Court's subject-matter jurisdiction.

Third, and finally, the defendants are wrong to argue that the Chetrit settlement "moots" or otherwise resolves the Kazakh Entities' fraudulent conveyance claims. In support of this misguided argument, the defendants advance two contentions. They claim that this Court cannot grant the Kazakh Entities' relief because the Chetrit Entities are necessary parties, as transferees to the fraudulent conveyance. And they argue that the Kazakh Entities have obtained the only relief available through the fraudulent conveyance claims – the return of the conveyed property – through the settlement. [Triadou Ltr. at 3-4; Khrapunov Ltr. at 3-4.] Both arguments are incorrect and, most importantly, disregard the purpose of the Settlement Agreement between the Chetrit Entities and the Kazakh Entities. Indeed, if the defendants' arguments were correct, a plaintiff in a multi-defendant case that includes fraudulent transfer claims could never settle with just one defendant without "mooting" all of its other claims.

**1. Failure to Join Necessary Party**. The Defendants' argument that the fraudulent conveyance claims must be dismissed because the Chetrit Entities are necessary parties is incorrect for at least two independent reasons.

*First,* a plaintiff is entitled to settle with a "necessary party" without abandoning the remainder of its case. Both Defendants ignore the fact that the Chetrit Entities *were* a party to the fraudulent conveyance claims before they were dismissed following the settlement. [ECF 49.] Once a previously indispensable party settles the claims that make it indispensable, "the party may be dismissed from the action." *Disabled in Action of Pa. v. Southeastern Pa. Transp. Auth.*, 224 F.R.D. 601, 606-07 (E.D. Pa. 2004) (collecting cases).

*Second*, the defendants misunderstand which parties are necessary in a fraudulent conveyance claim. In *Lyman Commerce Solutions, Inc. v. Lung*, No. 12-cv-4398, 2013 WL 4734898 (S.D.N.Y. Aug. 30, 2013), cited in both letters from the Defendants, the court stated that "[t]he only necessary parties to a fraudulent conveyance action are the transferee and any other party who may claim an interest in the property conveyed." *Id.* at *8. The fact that any party with an interest in the conveyed property is a necessary party to a fraudulent conveyance claim is obvious – in the absence of any such party, the resolution of a fraudulent conveyance claim might "impair or impede the person's ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(B)(i). Another case cited by the Khrapunovs makes this point explicit: "The transferee of the assets at issue is a necessary party to the lawsuit because the action to set aside the allegedly fraudulent transfer necessarily impacts the transferee's interest in the property the transferee received." *Nastro v. D'Onofrio*, 263 F. Supp. 2d 446, 450 (D. Conn. 2003); *see* Khrapunov Ltr. at 3.

The fraudulent conveyance claims against the remaining defendants are proper because they were beneficiaries of the challenged transfer. *See Lippe v. Bairnco Corp.*, 229 B.R. 598, 601 (Bankr. S.D.N.Y. 1999) (stating that a fraudulent conveyance claim exists against "transferees and beneficiaries of the challenged conveyances"). In addition to the reasons given above, the Defendants are beneficiaries in at least two ways: they have a residual profits claim to the Flatotel project arising out of the conveyance, and they have a claim against the $23.5 million held in escrow as a result of the conveyance – $23.5 million that otherwise would have been distributed to the Kazakh Entities on account of the Flatotel interest. [Ex. B at 1-2.]



**2. Lack of Remedy**. Defendants' argument that the Chetrit settlement gave the Kazakh Entities all that they could obtain from their fraudulent conveyance claims is premised on a misunderstanding of the settlement. Because the Chetrit settlement did not give the Kazakh Entities the property previously held by Triadou, the fraudulent transfer claims are not "moot."

The settlement with the Chetrit Entities did not put the Kazakh Entities in the position of having obtained all they could get "had there been no conveyance at all." *Paradigm BioDevices, Inc. v. Viscogliosi Bros., LLC*, 842 F. Supp. 2d 661, 667 (S.D.N.Y. 2012). In particular, the Kazakh Entities received in the settlement far less than what Triadou possessed: even if the Chetrit Entities had actually given them the 50% interest in CF 135 West Member LLC (which they didn't), that interest came with substantial encumbrances under the Settlement Agreement that did not exist when Triadou owned the property: an obligation to indemnify Chetrit from Triadou's claims and a diversion of at least $21 million (plus interest and an amount equal to Triadou's residual right to profits) in proceeds that should have been distributed on account of that 50% interest to an escrow account to secure the indemnity. [Ex. E ¶ 5.] In reality, the $23.5 million in escrow is part of the property that was fraudulently conveyed.

Put differently, under the settlement, the Kazakh Entities would only get the unencumbered 50% interest in CF 135 West Member if they prevail in their fraudulent transfer and other claims against the remaining defendants. Far from putting the Kazakh Entities in the position as if there had "been no conveyance at all," and therefore "moot" the fraudulent transfer claims against the other defendants, the settlement was specifically designed to put the Kazakh Entities in that position only if they prevailed on those claims – which is why the Chetrit Entities pledged their cooperation, and why the agreement specifically preserved any claims against the remaining defendants. [*Id.* ¶ 7.]

An analogy proves the point. Imagine that Smith sold a house (that wasn't really his) to Jones for $21 in a fraudulent conveyance. Jones got the house, but never paid Smith the $21. So Smith sued Jones for the $21 purchase price. Along comes Anderson, the true owner of the house, who sues Smith and Jones for fraudulent conveyance, trying to get her house back. Jones, who has the house, agrees to settle with Anderson by giving back the house, but only on the condition that Anderson indemnify her from Smith's lawsuit, *and* on the condition that Anderson take out a $21 mortgage on the house and escrow the money to secure the indemnity. No one could plausibly argue in this scenario that Anderson got the same thing "had there been no conveyance at all." If there was no conveyance, Anderson would have gotten her house back, free and clear. What she got instead was a house with a huge mortgage on it, with the proceeds of that mortgage pledged to pay Jones's potential debt to Smith.

This analogy replicates the exact structure of the Chetrit settlement. The Kazakh Entities (Anderson) were supposed to get their house (the 50% interest) back, but only subject to a huge mortgage (the diversion of $21 million plus interest plus profit participation into escrow), pledged to pay Chetrit's (Jones's) potential debt to Triadou and the individual defendants (Smith). The Kazakh Entities will only really have their house back when they win this lawsuit, and thereby extinguish Triadou's entitlement to the funds in escrow.

Entirely separately, Triadou received (or rather, directed to SDG) $7 million in cash as part of the fraudulent conveyance. [Ex. B at 1.] There is no contention that the Kazakh Entities recovered those funds in the settlement.

5



A plaintiff may recover money damages to the extent fraudulently conveyed property has been diminished in value, consistent with the purpose of the fraudulent transfer laws. *See Citibank, N.A. v. Benedict*, No. 97 Civ. 9541 AGS, 2000 WL 322785, at *15 (S.D.N.Y. Mar. 28, 2000). Although it appears to be an issue of first impression in New York, at least one other jurisdiction interpreting the Uniform Fraudulent Conveyance Act held that this right can be applied against the transferee or the transferor. *See Orlando Residence, Ltd. v. Nashville Lodging Co.*, 104 S.W.3d 848, 853 (Tenn. Ct. App. 2002) ("If the creditor can sue the fraudulent grantee, it must follow that he can sue the fraudulent grantors and those who conspire with them to defeat the creditor's claims.").[4]

Even if the Kazakh Entities had received an unencumbered 50% interest in CF 135 West Member LLC – which they certainly did not – that interest is only a fraction of its former value. This, too, is a substantial issue of fact: what was the value of Triadou's Flatotel interest at the time of the conveyance, and what is its value now (or at the time of the settlement)? As the on-going expert discovery will demonstrate, not only was the value of the interest substantially higher just prior to the fraudulent conveyance, but the conveyance itself damaged the value of the property. It is undisputed that such money damages may be recovered from the beneficiaries of a fraudulent conveyance, such as the individual defendants. *See Cadle Co. v. Newhouse*, 74 F. App'x 152, 153 (2d Cir. 2003) ("'Under New York law, a creditor may recover money damages against parties who participate in the fraudulent transfer and are either transferees of the assets or beneficiaries of the conveyance.'" (quoting *RTC Mortgage Trust 1995-S/N1 v. Sopher*, 171 F. Supp. 2d 192, 201 (S.D.N.Y. 2001))).

**3. Purpose of Settlement Agreement**. The Defendants' arguments never address the important fact that the Settlement Agreement between the Kazakh Entities and the Chetrit Entities expressly contemplated that litigation over the conveyance of the Flatotel interest would continue against the remaining defendants. The case most factually similar to this one, *MFS/Sun Life Trust v. Van Dusen Airport Services*, 910 F. Supp. 913 (S.D.N.Y. 1995) – which concerned a settlement with only a fraudulent transferor – turned on that very issue. That case concerned a leveraged buyout that the plaintiffs (holders of one class of the company's debt) alleged was a fraudulent conveyance. The plaintiffs sued three sets of defendants: the purchasers of the company, the company itself, and the prior owners of the company who profited from the sale. *Id.* at 917. Before trial, the plaintiffs settled with the company and the new owners, and only went to trial against the prior owners. *Id.* The settlement explicitly contemplated that litigation against the remaining defendants would continue, and obligated the settling defendants to provide assistance in that litigation. *Id.* at 932. The prior owners of the company argued that the settlement extinguished the debt and mooted the claims. *Id.* at 931.

Judge Francis agreed that if the settlement resulted in the debt being completely satisfied, "the creditor no longer has a cause of action to recover assets conveyed by the debtor to a transferee." *Id.* But crucially, Judge Francis noted that "the parties to a settlement can structure it in ways that will preserve the plaintiff's right to pursue related litigation." *Id.* at 932. Reviewing the agreement, Judge Francis found that "the parties to it intended that the fraudulent conveyance

---

[4] *See Perkins v. Brunger*, 303 S.W.3d 688, 691 n.5 (Tenn. Ct. App. 2009) (noting that Tennessee applied the Uniform Fraudulent Conveyances Act until July 1, 2003); *see also Taberna Preferred Funding II, Ltd. V. Advance Realty Grp LLC*, 45 Misc. 3d 1204(A), at *9 (N.Y. Sup. Ct. 2014) ("New York has adopted the Uniform Fraudulent Conveyance Act").



action proceed against the remaining defendants" and "simply intended to limit the settling defendants' liability to" the amount of the settlement, "not to extinguish the debt altogether." *Id.* "In a formal, if not a practical sense, [the company] would remain liable to the [plaintiffs] so that the plaintiffs could pursue their claims against the non-settling defendants." *Id.* If the fraudulent conveyance claims were dismissed, then the settlement agreement would be "voidable as based upon mutual mistake," because the parties to the settlement clearly intended that litigation continue against the remaining defendants. *Id.* at 933.

The Kazakh Entities and the Chetrit Entities had the same understanding as the plaintiffs and settling defendants in *MFS/Sun Life Trust*: that litigation against the remaining defendants would continue and that the settling defendants would assist in the surviving litigation. The Settlement Agreement states as follows:

> For the avoidance of doubt, no claim against Mukhtar Ablyazov, Viktor Khrapunov, Ilyas Khrapunov, or Triadou is discontinued or waived, nor is any claim to the interpleaded fund in the Lawsuit discontinued or waived. . . . The City of Almaty, Kazakhstan and JSC BTA Bank will continue to pursue claims against Mukhtar Ablyazov, Viktor Khrapunov, Ilyas Khrapunov, and Triadou SPV S.A.

[Ex. E ¶ 7; *see id.* ¶ 8 (describing Chetrit Entities' obligations to cooperate in the Kazakh Entities' continued lawsuit against the other defendants).] The "most coherent construction of the settlement" is that the Kazakh Entities and the Chetrit Entities intended to limit the Chetrit Entities' liability to the consideration outlined in the agreement. *MFS/Sun Life Trust*, 910 F. Supp. at 932. In no sense did any party to the Settlement Agreement intend to "extinguish the debt altogether." *Id.* It would frustrate the purpose of the Settlement Agreement to dismiss the remaining claims against the defendants, when the Kazakh Entities have not had an opportunity to recover fully on the debt they owe.[5]

By the same token, it would make no sense for a settlement with the Chetrit Entities to have the effect of allowing Triadou to keep at least more than $23.5 million (*i.e.*, the amount of proceeds attributable to the 50% interest in CF 135 West Member LLC currently held in escrow), which it obtained by virtue of the fraudulent transfer. If the Court determines that the settlement commands that result (which it does not), then it, too, should be voidable as a mutual mistake.

---

[5] Triadou attempts to distinguish *MFS/Sun Life Trust* on the grounds that it concerned a "settlement between a creditor and a debtor" and the settlement extinguished the creditor's fraudulent transfer claims against the transferee. [Triadou Ltr. at 4 n.5.]. This is an illusory distinction: the opinion in *MFS/Sun Life Trust* includes nothing to suggest that the express terms of a settlement agreement should be given less (or no) weight if the parties to the settlement agreement, selected from the various parties with an interest in a fraudulent conveyance, were to change. To the contrary, the thrust of the defendants' "mootness" argument is that the only thing that matters is whether the settlement is with transferee or transferor.

The Khrapunovs' argument is slightly different but no more persuasive. They argue that *MFS/Sun Life Trust* stands for a narrow rule that "a creditor can agree to settle with the debtor for part of the debt and then seek to recover from fraudulent transferees . . . to satisfy the rest of the debt." [Khrapunov Ltr. at 4 n.3.] But the actual language and reasoning of the opinion in *MFS/Sun Life Trust* is focused not on the creditor/debtor relationship, but on the freedom parties have to structure their settlements in ways they see fit "to preserve the plaintiff's right to pursue related litigation." *MFS/Sun Life Trust*, 910 F. Supp. at 932. In any case, the Kazakh Entities' settlement only allowed them to recover a part of the debt.



**4. CPLR § 5239.** Triadou also argues that the settlement with the Chetrit Entities moots the Kazakh Entities' C.P.L.R. § 5239 claim. [Triadou Ltr. at 5.] Triadou admits that the Kazakh Entities' C.P.L.R. § 5239 claim expressly seeks different relief than their fraudulent conveyance claims. [*Id.*] Specifically, the Kazakh Entities ask that the court vacate Triadou's state court judgments against the Chetrit Entities and award the Kazakh Entities' attorneys' fees, pursuant to statute. [ECF No. 433 ¶¶ 189-191.] Triadou points to Judge Nathan's decision dismissing the interpleader and reads that decision to say that the Kazakh Entities have no interest in the money judgments, but Judge Nathan's decision was that the Kazakh Entities could not sue the *Chetrit Entities* for those judgments. [ECF No. 103 at 8-9.] Judge Nathan later specifically denied Triadou's motion to dismiss the § 5239 claim. [ECF No. 174.] The Kazakh Entities claim an interest in the judgments, and under the plain text of C.P.L.R. § 5239, this claim survived the settlement with the Chetrit Entities.

**5. Offsetting Recovery.** The Court also should reject Triadou's argument that the Kazakh Entities' recovery on their claims in this action should be offset by their recovery in the 2015 settlement. As an initial matter, this is a damages question that is not ripe for the Court's attention. And in any event, Triadou is wrong. As noted in the lone case that Triadou cites in support of this argument, New York's General Obligations Law § 15-108(a) applies only to tort actions. *See Whalen v. Kawasaki Motors Corp., U.S.A.*, 92 N.Y.2d 288, 292 (N.Y. 1998). Fraudulent transfer is not a tort under New York law. *See United States v. Franklin Nat'l Bank*, 376 F. Supp. 378, 381-82 (E.D.N.Y. 1973); *Hearn 45 St. Corp. v. Jano*, 283 N.Y. 139, 142-44 (N.Y. 1940); *Duell v. Brewer*, 92 F.2d 59, 61 (2d Cir. 1937) (L. Hand, *J.*). Because § 15-108(a) applies only to tort actions, and fraudulent transfers do not sound in tort under New York law, § 15-108(a) and *Whalen* are inapplicable to the Kazakh Entities' fraudulent transfer claims, making offset inappropriate.[6]

Furthermore, the Kazakh Entities' settlement with the Chetrit Entities does not qualify as a release or covenant with a subset of multiple defendants "liable or claimed to be liable in tort *for the same injury.*" N.Y. Gen. Oblig. Law § 15-108(a) (emphasis added). While the Chetrit Entities participated in certain of Triadou's misconduct, it was not involved in all of it: Triadou laundered tens of millions of dollars through transactions in which Chetrit had no part. Thus, although there was *some* overlap in the injuries caused by Chetrit's and Triadou's conduct, their actions did not result in "the *same* injury." Finally, even if § 15-108(a) were applicable, it is "notably" "an affirmative defense" that "must be pled by a tortfeasor seeking its protection." *Whalen*, 92 N.Y.2d at 293. Because Triadou has not previously pled this defense, it has been waived. *See* Fed. R. Civ. P. 12(b).[7]

---

[6] Likewise, none of the Kazakh Entities' state common law claims against Triadou sound in tort, save their conversion claim. Nor is the Kazakh Entities' claim against Triadou under C.P.L.R. § 5239 a tort. Thus, § 15-108(a) is inapplicable.

[7] The Khrapunovs claim that the Kazakh Entities have "not pleaded a claim for" attorneys' fees pursuant to Debtor & Creditor Law § 276-a. [Khrapunov Ltr. at 3 n.2.] That is not true. The Kazakh Entities' Second Amended Crossclaims include a request for "all costs and fees incurred in prosecuting this Complaint." [ECF 433 at 50.] The Kazakh Entities will prove actual fraudulent intent on the part of the Defendants and could also collect attorneys' fees based on, for example, the claim to set aside Triadou's state-court judgments. *See In re Kovler*, 253 B.R. 592, 600 (Bankr. S.D.N.Y. 2000) (noting same facts can support both a merits issue and an award of fees under § 276-a).

8



**Conclusion**

For the reasons just given, defendants' "mootness" arguments are not ripe, and are in any case without merit.

Respectfully,

 /s/  Matthew L. Schwartz
Matthew L. Schwartz