# EXHIBIT F

CONFIDENTIAL

## AGREEMENT

This AGREEMENT (hereinafter, the "**Agreement**") is made and entered into as of this 8th day of March, 2018 (the "**Effective Date**"), by and among JOSEPH CHETRIT, CF 135 FLAT LLC, CF 135 WEST MEMBER LLC, and THE CHETRIT GROUP LLC (hereinafter, collectively the "**Chetrit Entities**") and JSC BTA BANK ("**BTA**") and the CITY OF ALMATY, KAZAKHSTAN ("**Almaty**") (hereinafter, collectively, the "**Kazakhstan Entities**"), all of whom are referred to collectively as the "**Parties**" and individually as a "**Party**."

WHEREAS, by agreement dated as of August 4, 2014, CF 135 FLAT LLC entered into an agreement and assignment (together, the "**Assignment**") with Triadou SPV S.A. (together with its successors and assignees, but not including any of the Chetrit Entities, "**Triadou**") pursuant to which Triadou was to and did assign to CF 135 FLAT LLC Triadou's 50% interest in CF 135 WEST MEMBER LLC, which is a member of and possesses a 75% membership interest in 135 WEST 52ND STREET HOLDER LLC, which is the sole member of 135 WEST 52ND STREET MEZZ LLC, which in turn is the sole member of 135 WEST 52ND STREET OWNER LLC (the "**Sponsor**"), the owner of the property located at 135 West 52nd Street, New York, New York (the "**Property**"). The 50% interest in CF 135 WEST MEMBER LLC that was the subject of the Assignment shall hereinafter be referred to as the "**Flatotel Interest**." The Assignment transferred the Flatotel Interest from Triadou to CF 135 FLAT LLC, and as consideration obligated CF 135 FLAT LLC, among other things, to pay $21 million to Triadou in installments (following the Assignment's execution).

WHEREAS, by guaranty dated as of August 4, 2014, CF 135 WEST MEMBER LLC and THE CHETRIT GROUP LLC executed a full and unconditional guaranty of CF 135 FLAT LLC's obligations under the Assignment.

**CONFIDENTIAL**

1

Confidential

CONFIDENTIAL

WHEREAS, Triadou instituted five separate actions (altogether, the "**Proceedings**")

against certain of the Chetrit Entities in the Supreme Court of the State of New York, County of

New York.  Four of those actions collectively sought payment of the $21 million, plus interest,

provided in the Assignment.  The fifth such action, which remains pending, seeks (among other

things) payment under Paragraph 1(g) of the Assignment.  A complete list of the Proceedings is

annexed hereto as Annex 1.

WHEREAS, certain of the Chetrit Entities filed an interpleader action captioned CF 135

FLAT LLC, CF 135 WEST MEMBER LLC and THE CHETRIT GROUP LLC v. TRIADOU

SPV S.A., and CITY OF ALMATY, a Foreign City, in New York State Supreme Court, New York

County, Index #156834/15 which Almaty removed to the United States District Court for the

Southern District of New York, and which was assigned case number 15-cv-05345 (AJN)

(hereinafter, the "**Lawsuit**").

WHEREAS, in the Lawsuit, the Kazakhstan Entities raised certain counterclaims and

cross-claims (the "**Cross-Claims**") seeking to recover funds that had been stolen from the

Kazakhstan Entities and transferred into the United States through Triadou.  The Kazakhstan

Entities alleged that a portion of the allegedly stolen money was transferred to various assets in the

United States, including the Flatotel Interest.

WHEREAS, the Chetrit Entities and the Kazakhstan Entities entered into a Settlement

Agreement on or about November 28, 2015 (the "**Settlement Agreement**"), whereby the

Kazakhstan Entities agreed to dismiss the Cross-Claims against the Chetrit Entities in exchange

for, among other things, certain rights with respect to the Flatotel Interest, including the right to

become a member of CF 135 WEST MEMBER LLC.  A copy of the Settlement Agreement is

attached as Annex 2.

**CONFIDENTIAL**

2

Confidential

Almaty-BTA0249804

CONFIDENTIAL

WHEREAS, the Kazakhstan Entities were never transferred the Flatotel Interest or made a party to the CF 135 WEST MEMBER LLC Operating Agreement, and have not received any distributions of any kind on account of the Flatotel Interest.

WHEREAS, the development of the Property being substantially completed, the Parties wish to resolve any remaining issues between them.

NOW, THEREFORE, for good and valuable consideration as set forth herein, the Parties agree as follows:

1.     Settlement Agreement Not Affected.  Except as explicitly stated herein, nothing in this Agreement shall affect the rights and responsibilities of the Parties under the Settlement Agreement.  Among other things, the Chetrit Entities' cooperation responsibilities under Paragraph 8 of the Settlement Agreement (the "**Cooperation Provision**") shall survive in full force and effect, as shall the Kazakhstan Entities' indemnification and defense obligations under Paragraphs 1, 2, and 3 of the Settlement Agreement (altogether, the "**Indemnification Provisions**").  Paragraph 5 of the Settlement Agreement is hereby deleted.  Additionally, the Kazakhstan Entities' indemnity obligations under Paragraphs 1, 2 and 3 of the Settlement Agreement shall include indemnification against any requirement that any of the Chetrit Entities make deposits into escrow related to the Assignment, including without limitation (i) in the Proceedings (including for accrued interest), or (ii) any other action arising from the Assignment and otherwise subject to the Indemnification Provisions.

2.     Exchange of Interest.  Subject to the terms and conditions set forth herein, in full satisfaction of their rights to the Flatotel Interest under the Settlement Agreement, and any amounts they would be entitled to as a Member of CF West 135 Member LLC, simultaneously with the execution and delivery of this Agreement, the Kazakhstan Entities, and two entities

**CONFIDENTIAL**

3

Almaty-BTA0249805

CONFIDENTIAL

wholly owned by BTA and designated by the Kazakhstan Entities (the "**Kazakh Designees**," and each a "**Kazakh Designee**"), shall receive the consideration set forth in this Paragraph 2. The consideration consists of:

(i)     The payment by The Chetrit Group LLC to the Kazakhstan Entities of the sum of one million, six hundred and twenty-three thousand dollars ($1,623,000.00) (the "**Cash Payment**"), via wire transfer of such sum to the account set forth in Annex 3; and

(ii)    The transfer of the following real property by Sponsor to two different Kazakh Designees (collectively, the "**Unit Transfers**"):

a.   All right, title, and interest in the real property known as Unit PH2 at 135 West 52nd Street, New York, New York (together with all rights and interests appurtenant thereto, the "**PH2 Unit**"), which the Parties agree has a fair-market value of $6,415,000.00, which transfer shall be effectuated through the execution and delivery of the sale agreement set forth as Annex 4 and the deed included therein, and in accordance with Exhibit A attached hereto;

b.   All right, title, and interest in the real property known as Unit PH3 at 135 West 52nd Street, New York, New York (together with all rights and interests appurtenant thereto, the "**PH3 Unit**" and, collectively with the PH2 Unit, the "**Units**"), which the Parties agree has a fair-market value of $6,750,000.00, which transfer shall be effectuated through the execution and delivery of the sale agreement set forth as Annex 5 and the deed included therein, and in accordance with Exhibit A attached hereto; and

**CONFIDENTIAL**                                    4

Confidential                                                                Almaty-BTA0249806

CONFIDENTIAL

(iii)   All right, title, and interest (if any) of each and every one of the Chetrit Entities (except for Joseph Chetrit) and Sponsor in all funds (currently approximately $23,500,000) held by the law firm of the Honorable Herman Cahn pursuant to the Monitorship Order entered in certain of the Proceedings (the "**Monitor Account Funds**"), which transfer shall be effectuated through the delivery of an assignment in the form attached hereto as Annex 6. As used in this Agreement, the Monitor Account Funds include all funds that may be escrowed, segregated, or otherwise held by the court-appointed monitor, or any other person or entity, in connection with the Proceedings and any other action subject to the Indemnification Provisions, including any and all funds that may be deposited after the date of this Agreement. For the avoidance of doubt, upon any release of Monitor Account Funds, such funds shall be transferred directly to an account designated by Boies Schiller Flexner LLP, on behalf of the Kazakhstan Entities, and shall not be transferred to the Chetrit Entities or Sponsor. No representation is made as to the rights or interests of the Chetrit Entities or Sponsor in or to the Monitor Account Funds.

The Chetrit Entities further release the Kazakhstan Entities from all obligations and liabilities, if any, the Kazakhstan Entities have, had, or might have had with respect to the Flatotel Interest, and further indemnify the Kazakhstan Entities for any claims of third-parties arising out of the construction, maintenance, or operations of the Property. The Chetrit Entities do not release any claims against the Kazakhstan Entities for breach of this Agreement. For the avoidance of doubt, (a) other than the Cash Payment, the Units, the Monitor Account Funds, and the indemnity set forth in this Paragraph, the Kazakhstan Entities shall not be entitled to any other distributions of

Confidential

Almaty-BTA0249807

CONFIDENTIAL

any kind from the Flatotel Interest or from the Chetrit Entities or Sponsor, and (b) the Kazakhstan Entities shall have no claim to the Flatotel Interest. In the event of any conflict between this Agreement and the sale agreements annexed hereto as Annex 4 and Annex 5, the terms and provisions of this Agreement (including without limitation Exhibit A) shall control.

3.   Release. Upon the completion of the (i) execution and delivery of this Agreement including its annexes and exhibits, (ii) conveyance of the Units to the Kazakh Designees, (iii) delivery of the documents to be executed and/or delivered pursuant to Paragraph 2 hereof, (iv) payment of the Cash Payment, and (v) assignment of the Chetrit Entities' (except for Joseph Chetrit) and Sponsor's interest in the Monitor Account Funds to the Kazakhstan Entities (if any), the Kazakhstan Entities shall be deemed to have automatically and completely released any and all rights and claims relating to the Flatotel Interest, subject to any rights granted to the Kazakhstan Entities and Kazakhstan Designees pursuant to this Agreement.

4.   Transfer of Real Property. Exhibit A attached hereto (which is hereby incorporated by reference into this Agreement) sets forth the terms and conditions upon which the Units are being conveyed on the date hereof to the Kazakh Designees.

5.   Tax Treatment. Unless a court of competent jurisdiction upon entry of a final, non-appealable order determines otherwise, it is agreed among the Parties that the transfer (a) of the Units to the Kazakh Designees, (b) the Cash Payment, and (c) the Chetrit Entities' (except for Joseph Chetrit) and Sponsor's interest in the Monitor Account Funds to the Kazakhstan Entities, shall be treated by all Parties for tax purposes as a return of capital or recovery of stolen property from Triadou SPV, S.A., Mukhtar Ablyazov, Viktor Khrapunov, Ilyas Khrapunov, and their co-conspirators. Accordingly, such transfer shall not be subject to withholding or to Form 1099-MISC reporting.

Confidential

Almaty-BTA0249808

CONFIDENTIAL

6.   Tax Basis. Unless a court of competent jurisdiction upon entry of a final, non-appealable order determines otherwise, the Kazakhstan Entities intend to report (for all federal, state, and local tax purposes) the tax basis of the real property described in Paragraphs 2(i)(a), 2(i)(b), and 2(i)(c) above and transferred to them pursuant to this Agreement as equal to the portion of the Kazakhstan Entities' released claims attributable to Triadou's original contribution to the Flatotel project (i.e., $34,885,753.76, as set forth in the Settlement Agreement), or as otherwise determined by reputable tax counsel chosen by the Kazakhstan Entities. Such tax basis shall be allocated among the aforementioned properties based on relative fair market value. The Chetrit Entities have expressed no opinion in respect thereto.

7.   Security for Obligations.

a.   Subject to clause (d) below, as security for the Kazakhstan Entities' obligations under the Indemnification Provisions of the Settlement Agreement as modified hereunder (the "**Continuing Obligations**"), the Kazakhstan Entities are, simultaneously herewith, granting to the Chetrit Entities a lien on 100% of the shares of each of the Kazakh Designees in the form appended hereto as <u>Annex 7</u>, in an amount not to exceed $5.5 million ($5,500,000.00) (the "**Pledge**"). The Kazakhstan Entities represent and warrant that as of the date of this Agreement, neither of the Kazakh Designees owes debts (whether matured, unmatured, or contingent) greater than $50,000.00 in the aggregate.

b.   The maximum amount of the liability of the Kazakhstan Entities under the Continuing Obligations shall not exceed $9.5 million ($9,500,000.00) in addition to the $5.5 million secured by the Pledge and in addition to the Monitor Account Funds. The Kazakhstan Entities agree that any claim under the

Confidential

Almaty-BTA0249809

CONFIDENTIAL

Continuing Obligations, not to exceed $9.5 million, plus the Pledge (not to exceed $5.5 million), plus the Monitor Account Funds, shall fall within the commercial activities exception to the Foreign Immunities Act, 28 U.S.C. 1605 (a)(2), and that they shall not assert any sovereign immunity defense in connection with any claim under the Continuing Obligations. For purposes of any claim under the Continuing Obligations, the choice-of-law, forum selection, service, and other provisions of Paragraph 13 hereof shall apply.

c. Subject to clause (d) below, the Kazakhstan Entities shall not authorize, cause, or otherwise permit either Kazakh Designee to transfer, finance, or encumber title to its Unit or to undertake any Debt (as hereinafter defined), unless one of the following conditions is met: (1) $5.5 million (the "**Escrow Amount**"), which may be derived from the proceeds of a sale, finance or encumbrance of any Units at the election of the Kazakhstan Entities) is deposited in escrow (the "**Escrow Account**") with an escrow agent (the "**Escrow Agent**") agreed to by the Parties pursuant to a mutually agreeable escrow agreement (the "**Escrow Agreement**") in the Parties' reasonable discretion; (2) the Kazakhstan Entities have satisfied the Continuing Obligations; or (3) the applicable Debt constitutes Permitted Debt. The Parties agree that the Pledge shall automatically terminate in full upon the earlier to occur of the events described in the foregoing clauses (1) or (2) (each, a "**Pledge Termination**"), after which there shall be no restriction on the transfer, finance, or encumbrance of any of the Units or any other action taken with respect to any of the Units.

Confidential                                                                    Almaty-BTA0249810

CONFIDENTIAL

d.  Notwithstanding any other provision of this Agreement or the Pledge, (i) the Kazakhstan Entities may terminate the Pledge as to one Kazakh Designee (i.e., all pledges of equity interests in such Kazakh Designee shall be released from the lien of the Pledge) by paying the Chetrit Entities the sum of ten dollars ($10.00) (the "**Release Sum**") and simultaneously advising the Chetrit Entities, on ten (10) days' written notice, that the lien created by the Pledge shall automatically be deemed released as to one Kazakh Designee specifically identified in such notice, and (ii) upon the occurrence of the events described in the forgoing clause, the Released Designee and the Kazakhstan Entities shall not be restricted from transferring, financing, or encumbering the Unit owned by the Released Designee and/or the equity interest in the Released Designee, and the Released Designee shall be permitted to incur Debt (as hereinafter defined). Upon the expiration of the notice period, the lien created by the Pledge shall be deemed released as to the shares in the Kazakh Designee identified in the notice (the "**Released Designee**"). The release available under this clause (d) may only be effectuated once by the Kazakhstan Entities.

e.  Subject to clause (d) above, the Kazakhstan Entities shall not authorize, cause, or otherwise permit either Kazakh Designee to enter into a loan, financing, credit transaction, or any other manner of indebtedness or encumbrance (each, a "**Debt**"), and any such transaction shall be null and void, unless one of the following conditions is met (one or more of such conditions is referred to herein as "**Permitted Debt**"): (1) the Debt is undertaken solely by the Released Designee; (2) the Debt is incurred in the Kazakh Designee's ordinary course of

Confidential

Almaty-BTA0249811

CONFIDENTIAL

business as owner of the Unit (which, for the avoidance of doubt, shall include customary payables and other costs applicable to the Unit including, without limitation, entering into brokerage or management or consulting agreements, incurring utility charges, cleaning charges, extermination charges and other expenses typically incurred by high-end residential apartment owners); or (3) a Pledge Termination has occurred.

f. The Chetrit Entities hereby acknowledge and agree that, notwithstanding the Pledge and the foregoing, the Kazakhstan Entities shall be permitted to grant to one or more third-party creditors a lien on the shares of the Kazakh Designees, but only so long as the following two conditions are met: (i) such lien is subordinate in all respects to the lien of the Pledge, and (ii) in the event the third party creditor elects to foreclose its lien, the terms of sale shall provide that the purchaser may not transfer, finance, or encumber any Unit (other than a Unit obtained from the Released Designee) unless and until a Pledge Termination has occurred, it being agreed that a Pledge Termination may be effectuated with the proceeds of Debt.

g. If at any time prior to the occurrence of a Pledge Termination the Kazakhstan Entities make any payment in respect of the Continuing Obligations, all references herein and in the Pledge to $5.5 million shall be reduced on a dollar for dollar basis by the amount of such payment(s). Payments from the Monitor Account Funds shall not be deemed such a payment, and neither the $5.5 million Pledge nor the $9.5 million additional liability shall be reduced as a result of a payment from the Monitor Account Funds.

**CONFIDENTIAL**

Confidential

Almaty-BTA0249812

CONFIDENTIAL

h. For the avoidance of doubt, and notwithstanding the foregoing, if at any time the Continuing Obligations have been satisfied, the obligation to deposit the Escrow Amount shall be deemed terminated (and any amounts previously so deposited shall be immediately returned to an account designated by Boies Schiller Flexner LLP, on behalf of the Kazakhstan Entities, and the Escrow Agreement shall be terminated).

i. Any funds in the Escrow Account may only be used by the Kazakhstan Entities to pay the Continuing Obligations, and may not be used for any other purpose (other than the distribution thereof to the Kazakhstan Entities if applicable pursuant to the provisions hereof, or of the Pledge or the Escrow Agreement).

j. The Chetrit Entities authorize the Escrow Agent to file a UCC-3 Termination Statement upon the deposit of $5.5 million with the Escrow Agent.

k. Upon the release of the lien as to the Released Designee or the occurrence of a Pledge Termination, the Chetrit Entities shall execute and deliver to the Kazakhstan Entities such other documents as may be reasonably requested by the Kazakhstan Entities in order to confirm such release or termination.

l. The Parties agree that, with respect to the sale, financing or encumbrance of the Unit held by the Released Designee (or, if a Pledge Termination has occurred, as to both Units), all proceeds generated therefrom, except as to funds deposited into the Escrow Account in accordance with clause (c) of this Paragraph, shall be for the sole account of the Kazakhstan Entities, may be distributed to investors or otherwise retained or utilized by the Kazakhstan Entities as they may see fit and are not subject to the Pledge or any of the other provisions

**CONFIDENTIAL**                    11

Confidential

Almaty-BTA0249813

CONFIDENTIAL

hereof in favor of the Chetrit Parties (and the Continuing Obligations shall not be secured by such Unit or the proceeds therefrom).

8.   Transfer Taxes and Closing Costs. The Kazakhstan Entities and the Chetrit Entities each shall pay, simultaneously with the execution of this Agreement, 50% of all transfer taxes, mansion taxes, flip taxes, transfer fees, and legal fees of the condominium corporation and/or Sponsor and all costs, processing or administrative fees, recording charges and any fees charged by the managing agent and/or Sponsor in connection with the transfer of the Units (other than Sukenik, Segal & Graff, P.C. or Boies Schiller Flexner LLP); provided, however, Sponsor itself shall not be entitled to receive any payments pursuant to this paragraph irrespective of whether or not Sponsor receives similar payments from other unit purchasers and/or if such payments are described in the Plan.

9.   Title Insurance. The Kazakhstan Entities may obtain, at their own cost and expense, title insurance on the Units. Upon request by the Kazakhstan Entities, the Chetrit Entities shall supply to the title company such documents as the title company may reasonably require in connection with the transfer of a condominium unit in the City of New York.

10.   No Representations. The Parties expressly agree and acknowledge that the Chetrit Entities and Sponsor have not made, shall not make, and shall not be deemed to have made any warranties or representations to the Kazakhstan Entities or the Kazakh Designees as to the condition of or title to the Units except as expressly set forth herein. The Kazakhstan Entities have inspected the Units and agree that they and the Kazakh Designees shall accept them "as is" subject to the terms hereof. The Kazakhstan Entities and Kazakh Designees shall make no claim under the Plan (as defined in Exhibit A hereto) against the Chetrit Entities or the Sponsor (but may make any such claim against the condominium association under the Plan or otherwise) except as expressly

Confidential

Almaty-BTA0249814

CONFIDENTIAL

provided herein; provided however, that the representations and warranties in the Plan shall run with the Units for the benefit of any person or entity to whom the Kazakh Designees sell the Unit(s) for fair consideration (including, without limitation, any foreclosing lender or buyer from the Kazakh Designees). The Kazakh Designees shall accept title to the Units subject to the provisions of the Plan, except as otherwise provided herein.

11.    No Personal Liability.  The Parties expressly agree that Joseph Chetrit, a signatory to the Settlement Agreement and this Agreement, (i) neither had nor has any obligations under the Settlement Agreement or this Agreement apart from the responsibilities set forth in the Cooperation Provision, and (ii) shall not be liable for monetary damages for any past, present or future breach of the Settlement Agreement or this Agreement, including a breach of the Cooperation Provision. However, the Kazakhstan Entities may bring an action for specific performance to enforce any obligation of Joseph Chetrit under the Cooperation Provision.

12.    Time is of the Essence.  With regard to all acts set forth or referred to in this Agreement, Time is of the Essence.

13.    Governing Law and Dispute Resolution.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to any applicable conflicts of law principles. The prevailing party shall have the right to collect from the losing party its reasonable costs and necessary disbursements and attorneys' fees actually incurred in enforcing this Agreement. This also includes any costs, disbursements and fees actually incurred by the prevailing party in its collection of such fees. The Parties agree that in the event of a breach of the Cooperation Provision of the Settlement Agreement, the Kazakhstan Entities shall be entitled to equitable relief, including specific performance in addition to reasonable out of pocket costs, disbursements and attorney's fees as set forth above.  Any action or proceeding between one or

Confidential

Almaty-BTA0249815

CONFIDENTIAL

more of the Parties shall be brought in the United States District Court for the Southern District of New York, or if unavailable because of a lack of jurisdiction, the New York State Supreme Court, County of New York, and the Parties consent to the jurisdiction of such courts. Service on the Chetrit Entities may be made by mail to Sukenik, Segal & Graff, P.C., Attn: David Segal, Esq., 450 Seventh Avenue, 42nd floor, New York, New York, 10123, with a copy by e-mail to davidsegal@ssglaw.com. Service on the Kazakhstan Entities and the Kazakh Designee(s) may be made by mail to Boies Schiller Flexner LLP, 575 Lexington Avenue, New York, New York, 10022, Attn: Matthew L. Schwartz, with a copy by e-mail to MLSchwartz@BSFLLP.com.

14.   Complete Agreement. The Parties acknowledge that this Agreement, including all accompanying Annexes and Exhibits, contains the full and complete agreement between and among them, and that there are no written, oral or implied agreements or understandings not specifically set forth herein. To the extent that there are any inconsistencies between this Agreement and any of its Annexes or Exhibits, this Agreement shall govern. Each Party acknowledges that no other Party, or agent or attorney of any other Party, or any person, firm, corporation, trust, or any other entity has made any promise, representation, or warranty, whatsoever, express, implied, or statutory, not contained herein, concerning the subject matter hereof, to induce the execution of this Agreement. Each signatory also hereby acknowledges that he, she, or it has not executed this Agreement in reliance on any promise, representation, or warranty not contained herein.

15.   Amendments. This Agreement may not be amended except by a writing signed by all Parties to this Agreement.

16.   Successors and Assigns. All of the terms, covenants, representations, warranties and conditions of this Agreement shall be binding upon, and shall inure to the benefit of and be

CONFIDENTIAL

14

enforceable by, the Parties hereto and their respective heirs, executors, legal representatives, administrators, successors and assigns.  No Party may transfer or assign any of its duties or obligations under this Agreement.

17.   Faxed, Electronic, and Duplicates of Originals. This Agreement may be executed in two or more counterparts. The execution pages may contain original, scanned, or photocopied signatures and may be delivered to the Parties by U.S. mail, facsimile, e-mail, or electronically, and each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Third parties may rely on a photocopy of the fully executed Agreement or the counterpart signature pages.

18.   Construction of Agreement. This Agreement shall not be construed more strictly against one Party than against any other Party merely by virtue of the fact that it might be prepared by counsel for one of the Parties, it being recognized that all Parties have contributed substantially and materially to the preparation of this Agreement.

19.   Confidentiality   The Parties agree not to disclose any part of this Agreement or its contents to any other person or entity other than the Parties, Sponsor, the Kazakh Designees, and the members, officers, employees, agents, representatives, lenders, prospective lenders, lender representatives, and affiliates of each of these entities, except as shall be necessary to effectuate its terms or where legally required to do so, provided however, that upon inquiry, the Parties shall be permitted to disclose generally that any or all remaining or outstanding issues between the Parties were or have been settled pursuant to an agreement.  Where a legal demand is made for disclosure of this Agreement or its contents, the recipient of such demand shall give each other Party at least ten (10) days' written notice of the demand in order the allow the other Parties time to contest the disclosure. Where, notwithstanding this provision, a Party believes that voluntary disclosure of

Confidential

Almaty-BTA0249817

CONFIDENTIAL

any part of this Agreement or its contents is necessary, no such disclosure shall be permitted unless and until all Parties consent to the requested disclosure in writing.

20.   Notice. All notices to be given hereunder shall be made to the mail and email addresses set forth in Paragraph 13 hereof.

*[signatures on following page]*

Confidential

Almaty-BTA0249818

CONFIDENTIAL

WHEREFORE, the Parties intending to be legally bound execute this Agreement as of the Effective Date.

JOSEPH CHETRIT

By: _____
Name: Joseph Chetrit

CF 135 FLAT LLC

By: _____
Name: Meyer Chetrit
Title: Authorized Signatory

CF 135 WEST MEMBER LLC

By: _____
Name: Meyer Chetrit
Title: Authorized Signatory

THE CHETRIT GROUP LLC

By: _____
Name: Meyer Chetrit
Title: Authorized Signatory

JSC BTA BANK

By: _____
Name: Nurlan Nurgablyev
Title: Director

CITY OF ALMATY, KAZAKHSTAN

By: _____
Name: Bauerzhan Dzhumagulov

17

CONFIDENTIAL

Almaty-BTA0249819

CONFIDENTIAL

## Annex 1

### List of Proceedings

1.   Triadou SPV S.A. v. CF 135 Flat LLC, CF 135 West Member LLC, and The Chetrit Group
     LLC, Index No. 653462/2014 (N.Y. Sup. Ct.)

2.   Triadou SPV S.A. v. CF 135 Flat LLC, CF 135 West Member LLC, and The Chetrit Group
     LLC, Index No. 650239/2015 (N.Y. Sup. Ct.)

3.   Triadou SPV S.A. v. CF 135 Flat LLC, CF 135 West Member LLC, and The Chetrit Group
     LLC, Index No. 154681/2015 (N.Y. Sup. Ct.)

4.   Triadou SPV S.A. v. CF 135 Flat LLC, CF 135 West Member LLC, and The Chetrit Group
     LLC, Index No. 156907/2015 (N.Y. Sup. Ct.)

5.   Triadou SPV S.A. v. CF 135 Flat LLC, CF 135 West Member LLC, and The Chetrit Group
     LLC, Index No. 655623/2017 (N.Y. Sup. Ct.)

Confidential

Almaty-BTA0249820

CONFIDENTIAL

## Annex 2

## Settlement Agreement

Confidential

Almaty-BTA0249821

J7

EXECUTION COPY

## SETTLEMENT AGREEMENT

This SETTLEMENT AGREEMENT (hereinafter, the "Agreement") is made and entered into this _____ day of November, 2015 (the "Effective Date"), by and among JOSEPH CHETRIT, CF 135 FLAT LLC, CF 135 WEST MEMBER LLC, and THE CHETRIT GROUP LLC (hereinafter, collectively the "Plaintiffs") and JSC BTA BANK and the CITY OF ALMATY, KAZAKHSTAN (hereinafter, collectively, "Kazakhstan Entities"), all of whom are referred to collectively as the "Parties" and individually as a "Party."

WHEREAS, on August 4, 2014, Plaintiffs entered into an agreement and assignment (together, the "Assignment") with Triadou SPV S.A. (together with its successors and assignees, "Triadou") to assign to CF 135 FLAT LLC Triadou's 50% interest in CF 135 WEST MEMBER LLC, which is a member of and possesses a 75% ownership interest in 135 WEST 52ND STREET HOLDER LLC, which is the sole member of 135 WEST 52ND STREET MEZZ LLC, which in turn is the sole member of 135 WEST 52ND STREET OWNER LLC, the owner of the property located at 135 West 52nd Street, New York, New York (the "Property"). The 50% interest in CF 135 WEST MEMBER LLC that was the subject of the Assignment shall hereinafter be referred to as the "Flatotel Interest." The Assignment transferred the Flatotel Interest from Triadou to CF 135 FLAT LLC, and as consideration obligated Plaintiffs, among other things, to pay $21 million to Triadou in installments (following the Assignment's execution).

WHEREAS, on or about May 14, 2013, 227 EAST 19th HOLDER LLC ("Holder") executed a promissory note (the "Note") in favor of Triadou evidencing a loan from Triadou to Holder in the amount of $6 million in furtherance of the development of the former Cabrini Hospital property (the "Cabrini Hospital Property"), located at 227 East 19th Street in Manhattan. Under the terms of a related agreement, Holder agreed that Triadou could, at Triadou's election,

1

**CONFIDENTIAL**

Confidential

Almaty-BTA0249822

EXECUTION COPY

exercised any time prior to repayment of the Note (the "Option") convert the Note to an equity participation in Holder, which was the beneficial owner of a 25% Tenancy in Common Interest in the Cabrini Hospital Property.

WHEREAS, Triadou did not exercise the Option and the Note was repaid in full in or about May, 2014.

WHEREAS, Triadou has instituted a series of proceedings (the "Proceedings") in the Supreme Court of the State of New York seeking payment of $21 million, plus interest, provided in the Assignment. A list of all of the Proceedings is attached hereto as Annex 1.

WHEREAS Plaintiffs filed a certain interpleader action captioned CF 135 FLAT LLC, CF 135 WEST MEMBER LLC and THE CHETRIT GROUP LLC v. TRIADOU SPV S.A., and CITY OF ALMATY, a Foreign City, in New York State Supreme Court, New York County, Index #156834/15 which the City of Almaty removed to the United States District Court for the Southern District of New York, and which was assigned case number 15-cv-05345 (AJN) (hereinafter, the "Lawsuit").

WHEREAS, in the Lawsuit, the Kazakhstan Entities raised certain counterclaims and cross-claims against, among others, Joseph Chetrit ("Chetrit"), Plaintiffs and Holder (the "Cross Claims").

NOW, THEREFORE, for good and valuable consideration as set forth herein, the Parties agree as follows: [for the purpose of this Agreement "Plaintiffs" shall include Chetrit and Holder]

1.   Indemnity.        The Kazakhstan Entities shall indemnify and hold Plaintiffs harmless from and against any loss, cost, damage or claim (including reasonable attorney's fees) arising out of any judgment entered against one or more of Plaintiffs arising out of claims of Triadou made in the Proceedings described in Annex 1 or the Lawsuit or arising out of the

2

**CONFIDENTIAL**

Confidential

Almaty-BTA0349893

EXECUTION COPY

Assignment (the "Indemnity"). The Indemnity does not cover incidental or consequential damages, lost profits or revenues, or diminution in value arising out of claims by parties other than Triadou or persons claiming to act on behalf of the Kazakhstan Entities.

2.   Triadou Claims.  The Kazakhstan Entities at their sole cost and expense shall defend Plaintiffs in the Proceedings and the Lawsuit and any other action of Triadou against Plaintiffs arising out of the Assignment, including, but not limited to, any future action by Triadou seeking any profit distribution under the Assignment. The Parties acknowledge that one or more judgments have been entered in the Proceedings against Plaintiffs. In connection with the Indemnity, the Kazakhstan Entities shall either (a) obtain a stay of the collection or enforcement of such judgments, or (b) pay or bond such judgments.

3.   Compliance with Indemnity.  The Kazakhstan Entities shall be deemed to have fully complied with the Indemnity upon the delivery to Plaintiffs of either:

a.   A full release by Triadou of (i) all claims raised or which could have been raised in the Proceedings and the Lawsuit and (ii) any and all claims that Triadou may have against Plaintiffs under the Assignment; or

b.   Both (i) a final non-appealable judgment dismissing any and all claims of Triadou against Plaintiffs (A) raised in the Proceedings or the Lawsuit and (B) arising under the Assignment and (ii) vacating or satisfying, all judgments entered in the Proceedings.

4.   Agreement Related to the Interests.  The Parties agree to the following with respect to the Flatotel Interest and the Cabrini Interest:

a.   Kazakhstan Entities acknowledge and agree that the Note was paid in full and they have no interest in the Cabrini Hospital Property or any beneficial owner thereof and waive all claims thereto.

3

**CONFIDENTIAL**

Confidential

EXECUTION COPY

b.   No later than 10 days following the receipt of written consent from the holders of any mortgage or mezzanine loan encumbering the Property or any interest therein, Plaintiffs shall, or shall cause any of their respective affiliates or related entities to, assign to the Kazakhstan Entities, or such other entity or person that JSC BTA Bank may designate in writing, the Flatotel Interest, by executing the assignment in the form annexed hereto as Annex 2 (the "Flatotel Interest"). The parties acknowledge and agree that the assignment of the Flatotel Interest is subject to obtaining the prior written consent thereto of mortgage and mezzanine lenders (the "Lenders") holding a lien against the Property or membership interests in the owner of the Property. Prior to obtaining the consent of the Lenders, any funds that would have been paid to the Kazakhstan Entities pursuant to such assignment shall be held in escrow. Plaintiffs shall use commercially reasonable efforts to obtain the above referenced consent and approval. If this consent and approval is not obtained within 60 days of the Effective Date, Plaintiffs shall treat the Kazakhstan Entities as if they were holders of the Flatotel Interest and members of CF 135 West Member LLC, as provided in the Operating Agreement and pursuant to the terms of this Agreement as if consent and approval had been obtained, including (a) paying to the Kazakhstan Entities the amount of the Flatotel Interest Capital Account and 37.5 % of the profits of the project, which they would have received as members, in accordance with the terms of this Agreement, and (b) affording to the Kazakhstan Entities all audit and inspection rights. The above referenced consent and approval shall be waived if and when all obligations to the Lenders have been satisfied.

c.   Simultaneously with the assignment of the Flatotel Interest, the Parties (or, on behalf of the Kazakhstan Entities, such other entity or person as shall have been designated pursuant to section 4.b. above) shall execute an amended and restated limited

4

**CONFIDENTIAL**

Almaty-BTA0249825

EXECUTION COPY

liability company agreement of CF 135 WEST MEMBER LLC (hereinafter, the "Company LLC Agreement").

d.     Subject to obtaining the consent of the Lenders, the Company LLC Agreement shall be in the form of the Operating Agreement executed by CF 135 FLAT LLC and Triadou, effective November 7, 2012, a copy of which is attached hereto as Annex 3, but with the Kazakhstan Entities, or such other entity or person that JSC BTA Bank may designate in writing, replacing Triadou for all purposes thereunder. To the extent there is any conflict between the Operating Agreement and this Agreement, this Agreement shall govern.

e.     With respect to the Flatotel Interest, the interests assigned to the Kazakhstan Entities, or such other entity or person that JSC BTA Bank may designate in writing, shall include all accompanying right, title and interest in and to CF 135 WEST MEMBER LLC, including, without limitation, all of Triadou's former 50% interest as a member in CF 135 WEST MEMBER LLC, (the "Membership Interest") which it is agreed constitutes 37.5% of the entire Flatotel Project, all voting rights, if any, rights to distributions, and capital accounts in CF 135 WEST MEMBER LLC prior to the Assignment, any sums that may be reflected on the CF 135 WEST MEMBER LLC's books otherwise as a loan made by Triadou or any affiliate of Triadou, the right to receive distributions of cash or property, including return of capital, and the right to participate in and receive profits and/or income from CF 135 WEST MEMBER LLC, together with any and all other rights which Triadou ever had or to which it may hereafter be entitled as a member of CF 135 WEST MEMBER LLC as set forth in the Company LLC Agreement or pursuant to applicable law or otherwise, including the right to conduct an audit.

5

**CONFIDENTIAL**

Confidential

EXECUTION COPY

f.    The Capital Account of the Kazakhstan Entities Membership Interest pursuant to Article III, Section 3.4 of the CF 135 WEST MEMBER LLC Operating agreement, executed on or about November 7, 2012 (the "Operating Agreement"), attached as Annex 3, is, as of the date this Settlement Agreement is executed, $27,885,753.76. This has been computed as follows:  Triadou contributed a total of $40,885,753.76 toward the Note and the Flatotel Interest. $6,000,000.00 was paid in full repayment of the Note, and $1,000,000.00 in cash and $6,000,000.00 was repaid in assets pursuant to the Assignment.

g.    Any Capital Contributions or loans heretofore made or that may be made in the future by Plaintiffs under Article III, Section 3.5 of the Operating Agreement, shall be treated as Loans under Section 3.5 (4)(I) and (4)(II) and shall bear interest as set forth in the Operating Agreement. All Loans together with interest thereon at 13.25% per annum shall be repaid before any distributions of capital. Thereafter, distributions of capital shall be made. After all Loans, together with interest, and all capital has been repaid as set forth herein, profits shall be distributed.

h.    Under no circumstances shall Plaintiffs be entitled to seek dilution of the Kazakhstan Entities Membership Interest in CF 135 WEST MEMBER LLC, it being expressly understood that Plaintiffs waive any and all claims to seek dilution of the Membership Interest under Article III, Section 3.5 of the Operating Agreement or otherwise.

i.    The Parties shall execute for themselves and any assignee any and all additional agreements or documents and shall take any and all actions necessary to promptly assign the Flatotel Interest to the Kazakhstan Entities, or such other entity or person that JSC BTA Bank may designate in writing as set forth herein, and subject to

6

CONFIDENTIAL

Confidential

Almaty-BTA0240027

EXECUTION COPY

obtaining the Lenders' consent, including any Know-Your-Customer or FIRPTA certifications required.

5.   Distributions into Escrow.   Any profit distribution amounts to which the Kazakhstan Entities may be entitled pursuant to the Operating Agreement for the Flatotel Interest up to $11 million, plus interest as demanded in the Proceedings and an amount representing Triadou's claim under the Assignment for future profits, shall be paid into an escrow account established for such purpose (the "Kazakhstan Escrow") until the Kazakhstan Entities have complied with the Indemnity, at which point the escrow balance and any future payments owed to the Kazakhstan Entities will be paid to an account designated by the Kazakhstan Entities. The Parties agree that any Indemnity amounts shall only be paid from the Kazakhstan Escrow and no other source.

6.   Breach of Indemnity.   If the Kazakhstan Entities are in breach of the Indemnity, Plaintiffs shall have the right to deduct from the Kazakhstan Escrow an amount equal to the amount Plaintiffs paid in connection with liability in the Proceedings described in Annex I or the Lawsuit or other claims arising out of the Assignment that should have been indemnified hereunder by the Kazakhstan Entities. For the avoidance of doubt, Plaintiffs shall not be entitled to interest on any such amount. In the event of any breach of Indemnity, the Kazakhstan Entities shall have fifteen (15) days as of the date the Kazakhstan Entities receive notice of any such breach, to cure any such breach.

7.   Releases. (a) Except for claims arising out of this Agreement, (A) the Kazakhstan Entities release all claims that they may have against Plaintiffs, and (B) Plaintiffs release all claims that they may have against the Kazakhstan Entities. Upon execution of this Agreement, the Parties shall execute and file all required court documents pursuant to which the Kazakhstan Entities shall discontinue with prejudice all cross claims and counterclaims against Plaintiffs.

7

**CONFIDENTIAL**

Confidential

EXECUTION COPY

For the avoidance of doubt, no claim against Mukhtar Ablyazov, Viktor Khrapunov, Ilyas Khrapunov, or Triadou is discontinued or waived, nor is any claim to the interpleaded fund in the Lawsuit discontinued or waived.

(b) Upon execution of this Agreement, the Parties shall issue a joint press release stating:

"A civil dispute arose between the City of Almaty, Kazakhstan and JSC BTA Bank on one side and The Chetrit Group LLC and its affiliates on the other side. This dispute has been amicably resolved after cooperation by The Chetrit Group LLC and its affiliates and further evaluation by the City of Almaty and JSC BTA Bank. The City of Almaty, Kazakhstan and JSC BTA Bank have voluntarily dismissed with prejudice all claims against Joseph Chetrit, The Chetrit Group LLC and its affiliates. The City of Almaty, Kazakhstan and JSC BTA Bank will continue to pursue claims against Mukhtar Ablyazov, Viktor Khrapunov, Ilyas Khrapunov, and Triadou SPV S.A."

8.   Cooperation. The Parties shall cooperate in good faith to effectuate this Agreement and in the prosecution or defense of the Proceedings described in Annex 1, the Lawsuit, or any other proceedings to which the Indemnity might apply. Specifically, Plaintiffs agree to cooperate with the Kazakhstan Entities including by (a) attending meetings and participating in interviews as requested by the Kazakhstan Entities, at reasonable times convenient to both Parties, (b) providing to the Kazakhstan Entities, upon written request, any document, record, or other tangible evidence in their possession relating to the Proceedings described in Annex 1, the Lawsuit, or any other proceedings to which the Indemnity might apply, or the subject matter thereof; (c) providing to the Kazakhstan Entities, upon written request, any truthful testimony, whether in the form of affidavit or live testimony at deposition, hearing, trial, or other legal proceeding; and (d) providing written notice to the Kazakhstan Entities before discussing the

8

CONFIDENTIAL

Confidential

Almaty-BTA0249830

EXECUTION COPY

subject matter of the Proceedings described in Annex 1, the Lawsuit, or any other proceedings to which the Indemnity might apply, with anyone other than the Kazakhstan Entities or Plaintiffs' counsel, lenders, prospective lenders, brokers, joint venturers, or proposed joint venturers. Written notice under this paragraph may be made by electronic mail to the e-mail address(es) set forth in paragraph 10 of this Agreement, with all such written notices kept confidential by the Parties.

9.    Authority. Simultaneously with the execution of this Agreement, the Kazakhstan Entities shall provide to Plaintiffs the opinion of their attorneys unconditionally opining that the individuals executing this Agreement on behalf of the Kazakhstan Entities have the power and authority to execute this Agreement and bind the Kazakhstan Entities and that the Kazakhstan Entities are bound by the terms of this Agreement.

10.   Time is of the Essence. With regard to all acts set forth or referred to in this Agreement, time is of the essence.

11.   Governing Law. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York without regard to any applicable conflicts of law principles. The prevailing party shall have the right to collect from the other party its reasonable costs and necessary disbursements and attorneys' fees incurred in enforcing this Agreement. This also includes any costs, disbursements and fees incurred by the prevailing party in its collection of such fees. Any action or proceeding between one or more of the Parties shall be brought in the United States District Court for the Southern District of New York or, if unavailable because of a lack of jurisdiction, New York State Supreme Court, and the Parties consent to the jurisdiction of such courts. Service on Plaintiffs may be made by mail to Suknik, Segal & Graff, P.C., Attn: David Segal, Esq., at 404 Fifth Avenue, 5th floor, New York, New York, 10018, with a copy by e-mail to davidsegal@ssglaw.com. Service on the Kazakhstan Entities may be made by mail to

9

CONFIDENTIAL

Confidential

Almaty-BTA0349830

EXECUTION COPY

Boies, Schiller & Flexner, LLP, 575 Lexington Avenue, New York, New York, 10022, Attn: Matthew L. Schwartz and Randall Jackson, Esq., with a copy by e-mail to MLSchwartz@BSFLLP.com and RJackson@BSFLLP.com.

12.  Complete Agreement. The Parties acknowledge that this Agreement, including all accompanying Annexes, contains the full and complete agreement between and among them, and that there are no written, oral or implied agreements or understandings not specifically set forth herein. Each Party acknowledges that no other Party, or agent or attorney of any other Party, or any person, firm, corporation, trust, or any other entity has made any promise, representation, or warranty, whatsoever, express, implied, or statutory, not contained herein, concerning the subject matter hereof, to induce the execution of this Agreement. Each signatory also hereby acknowledges that he, she, or it has not executed this Agreement in reliance on any promise, representation, or warranty not contained herein.

13.  Amendments. This Agreement may not be amended except by a written agreement signed by the Party to be charged.

14.  Faxed, Electronic, and Duplicates of Originals. This Agreement may be executed in two or more counterparts. The execution pages may contain original, scanned, or photocopied signatures and may be delivered to the Parties by U.S. mail, facsimile, e-mail, or electronically, and each of which shall be deemed an original but all of which together shall constitute one and the same instrument. Third parties may rely on a photocopy of the fully executed Agreement or the counterpart signature pages.

15.  Construction of Agreement. This Agreement shall not be construed more strictly against one Party than against any other Party merely by virtue of the fact that it might be prepared by counsel for one of the Parties, it being recognized that all Parties have contributed substantially and materially to the preparation of this Agreement.

10

**CONFIDENTIAL**

Confidential

Almaty-BTA0249831

EXECUTION COPY

16. Notice. All notices to be given hereunder shall be made to the mail and email addresses set forth in paragraph 10 hereof.

*[signatures on following page]*

11

**CONFIDENTIAL**

Confidential

Almaty-BTA0249832

EXECUTION COPY

WHEREFORE, the Parties intending to be legally bound execute this Agreement as of the Effective Date.

JOSEPH CHETRIT

By: _____
Name: Joseph Chetrit

CF 135 FLAT LLC

By: _____
Name: Joseph Chetrit
Title: Authorized Signatory

CF 135 WEST MEMBER LLC

By: _____
Name: Joseph Chetrit
Title: Authorized Signatory

THE CHETRIT GROUP LLC

By: _____
Name: Joseph Chetrit
Title: Authorized Signatory

JSC BTA BANK

By: _____
Name:
Title:

CITY OF ALMATY, KAZAKHSTAN

By: _____
Name:
Title:

APPROVED AS TO FORM BY:

SUKENIK, SEGAL & GRAFF, P.C.
Attorneys for Joseph Chetrit, The Chetrit
Group LLC, CF 135 Flat LLC, and CF135 M
First Member LLC

By: _____
David C. Segal, Esq.
Josh Graff, Esq.
404 Fifth Avenue, 5th Floor
New York, New York 10018
E-mail:   davidsegal@ssglaw.com
          jgraff@ssglaw.com

APPROVED AS TO FORM BY:

BOIES, SCHILLER & FLEXNER LLP
Attorneys for JSC BTA Bank and the City of
Almaty, Kazakhstan

By: _____
Matthew L. Schwartz
Randall W. Jackson
575 Lexington Avenue
New York, New York 10022
E-mail:   mlschwartz@bsfllp.com
          rjackson@bsfllp.com

12

**CONFIDENTIAL**

Almaty-BTA0348833

EXECUTION COPY

## Annex I

### List of Proceedings brought by Triadou

1. *Triadou SPV S.A. v. CF 135 FLAT LLC, et al.*, No. 653462/2014 (Sup. Ct. N.Y. Cnty, Nov. 10, 2014)

2. *Triadou SPV S.A. v. CF 135 FLAT LLC, et al.*, No. 650239/2015 (Sup. Ct. N.Y. Cnty, Jan. 26, 2015)

3. *Triadou SPV S.A. v. CF 135 FLAT LLC, et al.*, No. 154681/2015 (Sup. Ct. N.Y. Cnty, May 11, 2015)

4. *Triadou SPV S.A. v. CF 135 FLAT LLC, et al.*, No. 156907/2015 (Sup. Ct. N.Y. Cnty, July 9, 2015).

13

CONFIDENTIAL

Confidential

Almaty-BTA0249834

EXECUTION COPY

Annex 2

Pledged Interest Assignment Agreement

14

**CONFIDENTIAL**

Confidential

Almaty-BTA0249835

EXECUTION COPY

Annex 3

CF 135 WEST MEMBER LLC Operating Agreement effective November 7, 2012

15

**CONFIDENTIAL**

Confidential

Almaty-BTA0249836

CONFIDENTIAL

## Annex 3

### Account Information

Confidential

Almaty-BTA0249837

CONFIDENTIAL

Boies Schiller Flexner LLP
Ref: Flatotel
Wells Fargo Bank██████
Account Number: ████████1415
Routing Number: ████████

Confidential

Almaty-BTA0249838

CONFIDENTIAL

## Annex 4

### Sale Agreement and Deed for PH2 Unit

CONFIDENTIAL

Confidential

Almaty-BTA0249839

CONFIDENTIAL

## PURCHASE AGREEMENT

AGREEMENT made as of March 8, 2018 between 135 WEST 52ND STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, 16th Floor, New York, New York 10018 ("Seller" or "Sponsor"), and SETTLEMENT RECOVERY 135 WEST PH2, INC., c/o Boies Schiller Flexner LLP, 575 Lexington Avenue, New York, New York 10022 ("Purchaser").

**Purchaser's Attorney:**      Boies Schiller Flexner LLP

Address:   575 Lexington Avenue, New York, New York 10022

Seller agrees to sell and convey, and Purchaser agrees to purchase, Unit No. PH2 ("Unit") in the building ("Building") known as 135 WEST 52ND STREET Condominium ("Condominium") and located at 135 WEST 52ND STREET, New York, New York 10019, together with a 1.2400% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein.   The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

1.   **Purchase Price**

The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 6 and 7 below ("Purchase Price") is $6,415,000.00, payable upon the signing of this Agreement.   The parties agree that the value of the personal property contained in the Unit is de-minimis, and no part of the Purchase Price is allocated thereto.

2.      **Definitions**   The following terms shall have the meanings ascribed to them:
(a)     "Building" shall mean the building located at 135 West 52nd Street, New York, New York 10019.
(b)     "Closing Date", "closing", "closing of title" and words of similar import are used synonymously and mean the settlement of the mutual obligations of Seller and Purchaser under this Agreement, including the payment of the Purchase Price and the delivery to Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.
(c)     "Condominium" shall mean The 135 West 52nd Street Condominium.
(d)     "Declaration" shall mean the Declaration of the 135 West 52nd Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.
(e)     "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.
(f)     "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.
(g)     "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.

Any other capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

**CONFIDENTIAL**

Confidential   Almaty-BTA0249840

CONFIDENTIAL

### 3.  Plan

Purchaser represents that Purchaser has possessed the Plan and any filed amendments thereto at least three (3) business days prior to submitting this Agreement.

### 4.    Closing of Title

The closing of title shall occur simultaneously with the execution of this Agreement.

### 5.    State of Title

Legal ownership to the Unit shall be transferred to Purchaser at Closing subject only to the liens, encumbrances and title conditions (hereinafter called the "Permitted Encumbrances") enumerated in Exhibit A to this Agreement. The existence of the Permitted Encumbrances shall not be deemed a breach of Sponsor's covenant in the deed, even though the deed does not expressly provide that it is given subject to the Permitted Encumbrances. It is intended and agreed that the deed for the Unit to be given by Sponsor to Purchaser at closing shall be deemed to be subject to the Permitted Encumbrances to the same effect as if set forth therein at length.

### 6.    Closing Adjustments

(a)    At closing, Seller and Purchaser shall apportion, as of 11:59 p.m. of the day preceding the closing:

(i)    Real estate taxes, B.I.D. tax, and assessments, if any (as discussed below) (for purposes of this paragraph 6, the term real estate taxes shall be deemed to include assessments, if any. Real estate taxes and B.I.D. tax will be apportioned at closing between Sponsor and the Purchaser based on the period such taxes have been prepaid by Sponsor); and

(ii)    Common Charges for the month in which title closes (based on the number of days in the month in which title closing occurs).

(b)    The "Customs in Respect to Title Closings" recommended by The Real Estate Board of New York, Inc., as amended to date, shall apply to the adjustments and other matters therein mentioned, except as otherwise provided herein.

(c)    Any errors or omissions in computing apportionments at closing shall be corrected and payment made to the proper party promptly after discovery. This provision shall survive the closing.

(d)    Installments for tax assessments due after the delivery of the deed, if any, shall be paid by the Purchaser and shall not be considered a defect in title..

### 7.    Transfer Taxes and Closing Costs

Seller and Purchaser each shall pay, simultaneously with the execution of this Agreement, 50% of all transfer taxes, mansion taxes, flip taxes, transfer fees, and legal fees of the condominium corporation and/or Seller and all costs, processing or administrative fees, recording charges and any fees charged by the managing agent and/or Seller in connection with the transfer of the Units (other than Sukenik, Segal & Graff, P.C. or Boies Schiller Flexner, LLP); provided, however, Seller itself shall not be entitled to receive any payments pursuant to this paragraph irrespective of whether or not Seller receives similar payments from other unit purchasers and/or if such payments are described in the Plan.

**CONFIDENTIAL**             Annex 4 Page 3

Confidential

Almaty-BTA0249841

CONFIDENTIAL

**8. Inspection of Unit**

The Parties expressly agree and acknowledge that Seller has not made, shall not make, and shall not be deemed to have made any warranties or representations as to the condition of or title to the Unit except as expressly set forth herein. Purchaser has inspected the Unit and agrees that it shall accept the Unit "as is."

**9.     Further Assurances**

Either party shall execute, acknowledge and deliver to the other party such instruments and take such other actions, in addition to the instruments and actions specifically provided for herein, as such other party may reasonably request in order to effectuate the provisions of this Agreement or of any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction.

**10.     Governing Law**

The provisions of this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York.

**11.     Waiver of Jury Trial**

Except as prohibited by law, the parties shall, and they hereby do, expressly waive trial by jury in any litigation arising out of, connected with, or relating to this Agreement or the relationship created hereby or in the Plan. With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.

**12.     Gender**

A reference in this Agreement to any one gender, masculine, feminine, or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context otherwise requires.

**13.     Certain References**

The term "herein", "hereof" or "hereunder" or similar terms used in this Agreement refer to this entire Agreement and to the particular provision in which the term is used. Unless otherwise stated, all references herein to paragraphs, subparagraphs or other provisions are references to paragraphs, subparagraphs or other provisions of this Agreement.

**14.     Captions**

The captions in this Agreement are for convenience and reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

**15. Successors and Assigns**

The provisions of this Agreement shall bind and inure to the benefit of Purchaser and Purchaser's heirs, legal representatives, successors and permitted assigns and shall bind and inure to the benefit of Seller and its successors and assigns.

Confidential

Almaty-BTA0249842

CONFIDENTIAL

### 16.   No Oral Changes

This Agreement cannot be changed or any provision waived orally.   ANY CHANGES OR ADDITIONAL PROVISIONS OR WAIVERS MUST BE SET FORTH IN A RIDER ATTACHED HERETO OR IN A SEPARATE WRITTEN AGREEMENT SIGNED BY THE PARTIES.

### 17.   Counterpart Signature Pages

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument.   This Agreement may be executed by facsimile or .pdf and such shall be deemed originals.

CONFIDENTIAL

Confidential

Almaty-BTA0249843

CONFIDENTIAL

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SELLER:                                    PURCHASER:

135 WEST 52ND STREET OWNER LLC     SETTLEMENT RECOVERY 135 WEST PH2, INC.

By:_____        By:_____
     Meir Chetrit                              Nurlan Nurgabiyev

Confidential

Almaty-BTA0249844

CONFIDENTIAL

EXHIBIT A TO PURCHASE AGREEMENT
Permitted Encumbrances

1. Building restrictions and zoning laws and other regulations, resolutions and ordinances and any amendments thereto now or hereafter adopted by any governmental or quasi-governmental authority having jurisdiction, provided they do not prevent the use of the subject Unit for dwelling purposes.

2. State of facts shown on a survey made by Earl B. Lovell-S.P. Belcher, Inc. dated March 12, 2013 and any state of facts which a more recent survey or personal inspection of the land and building would show, provided such additional state of facts would not prevent the use of the subject Residential Unit for dwelling purposes and further provided that such state of facts do not render title unmarketable.

3. The terms, burdens, covenants, restrictions, conditions, easements and rules and regulations set forth in the Declaration, the By-Laws (and the Rules and Regulations thereto), the Power of Attorney from Purchaser to the Condominium Board, Sponsor, the Commercial Unit Owners and the Retail Unit Owner and the Floor Plans, all as same may be amended from time to time.

4. Consents by Sponsor, or any former owner of the Land for the erection of any structure or structures on, under or above any land, street or streets on which the Land may abut.

5. Any easement or right of use in favor of any utility company for construction, use, maintenance, repair and replacement of all utility lines, wires, terminal boxes, mains, pipes, cables, conduits, poles, connections and other equipment and facilities on, under and across the Land and Building.

6. Revocability of licenses for vault space, if any, under the sidewalks and streets and the lien of any unpaid vault tax (which is to be paid by the Condominium Board, the Retail Unit Owner or the Commercial Unit Owners (as the case may be)).

7. Encroachments of stoops, areas, cellar steps or doors, trim, copings, retaining walls, bay windows, terraces, balconies, sidewalk elevators, fences, fire escapes, cornices, foundations, footings, chutes, fuel oil lines, drainage and stand pipes, and similar projections, if any, on, over, or under the Property or the streets or sidewalks abutting the property and the rights of governmental authorities to require the removal of any such projections, and variations between record lines of the Property and retaining walls and the like, if any.

Confidential

Almaty-BTA0249845

CONFIDENTIAL

8.    Leases and service, maintenance, employment, management, concessionaire and license agreements, if any, of other Units or portions of the Common Elements, provided same are disclosed in the Plan or in an amendment thereto.

9.    The lien of any unpaid Common Charge, real estate tax, water charge or sewer rent, provided the same are adjusted at the closing of title.

10.    The lien of any unpaid assessment payable in installments (whether imposed by a taxing authority or the Condominium Board), except that Sponsor shall pay all such assessments due prior to the Closing Date and Purchaser shall pay all assessments due from and after such date (however, the then current installment shall be adjusted at closing).

11.    Any encumbrance as to which either the Title Insurance Company or the title insurance company which insures Purchaser's title to the Unit would be willing to insure at its regular rates, without additional premium, in a fee policy issued by it to Purchaser to insure that such encumbrance, (a) will not be collected out of or enforced against the Unit if it is a lien and (b) will not prevent the use of the subject Residential Unit for dwelling purposes.  (Any exception which the Title Insurance Company has omitted or insured at its regular rates and without additional premium, which will not be collected out of or enforced against a Unit, in a fee title insurance policy for other Units, is not an objection to title.)

12.    The Certificate of Occupancy or Temporary Certificate of Occupancy issued or to be issued covering the Building, provided it authorizes occupancy of the subject Residential Unit for residential purposes.

13.    Any violations against the Property (other than the subject Unit) which are the obligation of the Condominium Board or another Unit Owner to correct.

14.    Standard printed exceptions contained in the form of fee title insurance policy then issued by the title insurance company insuring Purchaser's title to the subject Unit.

15.    Any easement or right of use required for Sponsor to obtain a temporary, final or amended Certificate of Occupancy for the Building, provided such easement or right of use will not prevent the use of the subject Residential Unit for dwelling purposes.

16.    Distinctive Street Improvement Maintenance Agreement in Reel 1109 Page 862.

17.    Zoning Lot Certification in Reel 789 Page 115.

Confidential

Almaty-BTA0249846

## UNIT DEED

**THIS INDENTURE** made the 8th day of March, 2018, between

**135 WEST 52ND STREET OWNER LLC,** a Delaware limited liability company having an office at 512 Seventh Avenue, New York New York 10018 "Grantor";

and,

Settlement Recovery 135 West PH2, Inc., with an address at c/o Boies Schiller Flexner LLP, Attn: Matthew L. Schwartz, 575 Lexington Avenue, 7th Floor, New York, NY 10022 "Grantee";

### WITNESSETH:

That the Grantor, in consideration of Ten ($10.00) Dollars and other valuable consideration paid by the Grantee, does hereby grant and release unto the Grantee, and the heirs or successors and assigns of the Grantee, forever:

The Condominium Unit (hereinafter referred to as the "Unit) known as Unit PH2 in the building (hereinafter referred to as the "Building") known as the 135 West 52nd Street Condominium and by the Street Number 135 West 52nd Street, Borough of Manhattan, County, City and State of New York, said Unit being designated and described as Unit PH2 in a certain Declaration dated 04/27/2015, made by Grantor pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act"), establishing a plan for condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit "A" annexed hereto and by reference made a part hereof), which Declaration was recorded in the Office of the New York City Register on 08/18/2015 in CRFN 2015000286327 (which Declaration and Amendments thereto are collectively referred to as the "Declaration"). The Unit is also designated as Tax Lot 1110 in Block 1005 on the Tax Map of the City of New York for the County of New York and on the Floor Plans of the Building, certified by John Centra on 08/10/2015 as Condominium Plan Number 2605, and also filed in the Office of the New York City Register on 08/18/2015 as Condominium Map Number 2605.

Being and intended to be part of the same premises as conveyed to the Grantor by deed dated 3/25/2013 recorded 4/29/2013 in CRFN: 2013000169272.

**TOGETHER** with an undivided 1.2400% interest in the Common Elements as such term is defined in the Declaration (hereinafter called the "Common Elements");

**CONFIDENTIAL**

Confidential

**TOGETHER** with an easement for the continuance of all encroachments by the Unit on any adjoining Units or Common Elements now existing as a result of construction of the Building, or which may come into existence hereafter as a result of settling of the Building, or as a result of repair or restoration of the Building, or the Unit, after damage by fire or other casualty, or after taking in condemnation or eminent domain proceedings, or by reason of an alteration or repair to the Common Elements made by or with the consent of the Board of Managers, so that any such encroachments may remain so long as the Building shall stand;

**TOGETHER** with an easement in common with the Owners of other Units to use any pipes, wires, ducts, cables, conduits, public utility lines, and other Common Elements located in any of the other Units or elsewhere on the Property, and serving the Unit;

**TOGETHER** with the appurtenances and all the estate and rights of the Grantor is and to the Unit;

**TOGETHER** with all easements of necessity in favor of the Unit or in favor of other Units or the Common Elements;

**TOGETHER** with and **SUBJECT TO EASEMENTS**, rights of way, restrictions and encumbrances created by the Declaration for 135 West 52nd Street Condominium recorded in the New York County Office of the Register of the City of New York on the 18th day of August, 2015, as CRFN 2015000286327.

**SUBJECT** to the provisions of the Declaration, By-Laws, and Floor Plans of the Condominium recorded simultaneously with and as part of the Declaration, as the same may be amended from time to time by instruments recorded in the New York County Office of the Register of the City of New York, which provisions, together with any amendments thereto, shall constitute covenants running with the land and shall bind any person having at any time any interest or estate in the Unit, as though such provisions were recited and stipulated at length herein;

**EXCEPT** as otherwise specifically permitted by the Board of Managers of the Condominium or provided in the Declaration or in the By-Laws, the Unit is intended for Residential use only;

**AND** the Grantor covenants that the Grantor has not done or suffered anything whereby the said premises have been encumbered in any way whatsoever, except as aforesaid;

**TO HAVE AND TO HOLD** the same unto the Grantee, and the heirs or successors and assigns of the Grantee, forever.

If any provision of the Declaration or the By-Laws is invalid under, or would cause the Declaration or the By-Laws to be insufficient to submit the Property to, the provisions of the Condominium Act, or if any provision that is necessary to cause the Declaration and the By-Laws to be sufficient to submit the Property to the provisions of the Condominium Act is missing from the Declaration or the By-Laws, or if the Declaration and the By-Laws are

**CONFIDENTIAL**

Confidential

Almaty-BTA0249848

insufficient to submit the Property to the provisions of the Condominium Act, the applicable provisions of clause 17 of the Declaration shall control.

The Grantor, in compliance with Section 13 of the Lien Law, covenants that the Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvements before using any part of the same for any other purpose.

The Grantee accepts and ratifies the provisions of the Declaration and the By-Laws and the Rules and Regulations of the Condominium recorded simultaneously with and as part of the Declaration and agrees to comply with all the terms and provisions thereof, as the same may be amended from time to time by instruments recorded in the office of the New York City Register, New York County.

This conveyance has been made with the consent of all the members of the party of the first part entitled to vote thereon at a meeting duly called.

**IN WITNESS WHEREOF**, the Grantor has duly executed this deed the day and year first above written.

Grantor:

135 WEST 52ND STREET OWNER LLC

By:_____
Name:
Title:

Settlement Recovery 135 West PH2, Inc.

By:_____
Name: Nurlan Nurgabiyev
Title: Director

**CONFIDENTIAL**

Confidential

Almaty-BTA0249849

STATE OF NEW YORK      )
                       )ss.:
COUNTY OF NEW YORK  )

On the _____ day of _____, in the year _____ before me, the undersigned, a Notary Public in and for said state, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to in the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

STATE OF NEW YORK      )
                       )ss.:
COUNTY OF NEW YORK  )

On the _____ day of _____, in the year _____, before me, the undersigned, a Notary Public in and for said state, personally appeared _____ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to in the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

**CONFIDENTIAL**

Almaty-BTA0249850

## EXHIBIT "A"

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the Northerly side of West 52nd Street, distant 375 feet Westerly from the Northwesterly corner of Avenue of the Americas (formerly known as Sixth Avenue) and West 52nd Street;

RUNNING THENCE Northerly and parallel with Avenue of the Americas, 100 feet 5 inches to the center line of the block between West 52nd Street and West 53rd Street;

THENCE Westerly along the said center line of the block, 82 feet 6 inches;

THENCE Northerly parallel with Avenue of the Americas, 100 feet 5 inches to the Southerly side of West 53rd Street;

THENCE Westerly along the Northerly side of West 53rd Street, 37 feet 6 inches;

THENCE Southerly parallel with Avenue of the Americas and part of the distance through a party wall, 100 feet 5 inches to the center line of the block;

THENCE Westerly along the center line of the block, 5 feet 0 inches;

THENCE Southerly parallel with Avenue of the Americas, 100 feet 5 inches to the Northerly side of West 52nd Street;

THENCE Easterly along the Northerly side of West 52nd Street, 125 feet 0 inches to the point or place of BEGINNING.

**CONFIDENTIAL**

Almaty-BTA0249851

CONFIDENTIAL

## Annex 5

### Sale Agreement and Deed for PH3 Unit

Confidential

CONFIDENTIAL

## PURCHASE AGREEMENT

AGREEMENT made as of March 8, 2018 between 135 WEST 52ND STREET OWNER LLC, maintaining an office at 512 Seventh Avenue, 16th Floor, New York, New York 10018 ("Seller" or "Sponsor"), and SETTLEMENT RECOVERY 135 WEST PH3, INC., c/o Boies Schiller Flexner LLP, 575 Lexington Avenue, New York, New York 10022 ("Purchaser").

**Purchaser's Attorney:**      Boies Schiller Flexner LLP

   Address:    575 Lexington Avenue, New York, New York 10022

Seller agrees to sell and convey, and Purchaser agrees to purchase, Unit No. PH3 ("Unit") in the building ("Building") known as 135 WEST 52ND STREET Condominium ("Condominium") and located at 135 WEST 52ND STREET, New York, New York 10019, together with a 1.3900% undivided interest in the Common Elements appurtenant thereto, all upon and subject to the terms and conditions set forth herein.   The Unit shall be as designated in the Declaration of Condominium Ownership (as the same may be amended from time to time, the "Declaration") of the Condominium, recorded in New York County, New York or the By-Laws (as the same may be amended from time to time, the "By-Laws") of the Condominium.

**1.    Purchase Price**
The purchase price, exclusive of closing adjustments and costs referred to in Paragraphs 6 and 7 below ("Purchase Price") is $6,750,000.00, payable upon the signing of this Agreement.   The parties agree that the value of the personal property contained in the Unit is de-minimis, and no part of the Purchase Price is allocated thereto.

**2.    Definitions**   The following terms shall have the meanings ascribed to them:
(a)    "Building" shall mean the building located at 135 West 52ND Street, New York, New York 10019.
(b)    "Closing Date", "closing", "closing of title" and words of similar import are used synonymously and mean the settlement of the mutual obligations of Seller and Purchaser under this Agreement, including the payment of the Purchase Price and the delivery to Purchaser of the deed transferring full ownership (fee simple title) to the Unit on the terms set forth in this Agreement.
(c)    "Condominium" shall mean The 135 West 52ND Street Condominium.
(d)    "Declaration" shall mean the Declaration of the 135 West 52ND Street Condominium establishing condominium ownership of the Property, as same may be amended from time to time.
(e)    "Plan" shall mean the Offering Plan for Condominium Ownership of the Property and any amendments thereto filed prior to the date upon which Purchaser signs this Agreement.
(f)    "Property" shall mean the Building, the land upon which it is erected and all other improvements thereon more fully described in the Declaration.
(g)    "Title Insurance Company" shall mean any reputable title insurance company licensed to do business in the State of New York.
Any other capitalized terms not defined herein shall have the meaning ascribed to them in the Plan.

Confidential

Almaty-BTA0249853

CONFIDENTIAL

### 3.  Plan

Purchaser represents that Purchaser has possessed the Plan and any filed amendments thereto at least three (3) business days prior to submitting this Agreement

### 4.  Closing of Title

The closing of title shall occur simultaneously with the execution of this Agreement.

### 5.  State of Title

Legal ownership to the Unit shall be transferred to Purchaser at Closing subject only to the liens, encumbrances and title conditions (hereinafter called the "Permitted Encumbrances") enumerated in Exhibit A to this Agreement. The existence of the Permitted Encumbrances shall not be deemed a breach of Sponsor's covenant in the deed, even though the deed does not expressly provide that it is given subject to the Permitted Encumbrances. It is intended and agreed that the deed for the Unit to be given by Sponsor to Purchaser at closing shall be deemed to be subject to the Permitted Encumbrances to the same effect as if set forth therein at length.

### 6.  Closing Adjustments

(a)      At closing, Seller and Purchaser shall apportion, as of 11:59 p.m. of the day preceding the closing:

(i)      Real estate taxes, B.I.D. tax, and assessments, if any (as discussed below) (for purposes of this paragraph 6, the term real estate taxes shall be deemed to include assessments, if any.  Real estate taxes and B.I.D. tax will be apportioned at closing between Sponsor and the Purchaser based on the period such taxes have been prepaid by Sponsor); and

(ii)      Common Charges for the month in which title closes (based on the number of days in the month in which title closing occurs).

(b)      The "Customs in Respect to Title Closings" recommended by The Real Estate Board of New York, Inc., as amended to date, shall apply to the adjustments and other matters therein mentioned, except as otherwise provided herein.

(c)      Any errors or omissions in computing apportionments at closing shall be corrected and payment made to the proper party promptly after discovery.  This provision shall survive the closing.

(d)      Installments for tax assessments due after the delivery of the deed, if any, shall be paid by the Purchaser and shall not be considered a defect in title..

### 7.  Transfer Taxes and Closing Costs

Seller and Purchaser each shall pay, simultaneously with the execution of this Agreement, 50% of all transfer taxes, mansion taxes, flip taxes, transfer fees, and legal fees of the condominium corporation and/or Seller and all costs, processing or administrative fees, recording charges and any fees charged by the managing agent and/or Seller in connection with the transfer of the Units (other than Sukenik, Segal & Graff, P.C. or Boies Schiller Flexner, LLP); provided, however, Seller itself shall not be entitled to receive any payments pursuant to this paragraph irrespective of whether or not Seller receives similar payments from other unit purchasers and/or if such payments are described in the Plan.

CONFIDENTIAL

Confidential

Almaty-BTA0249854

CONFIDENTIAL

### 8. Inspection of Unit

The Parties expressly agree and acknowledge that Seller has not made, shall not make, and shall not be deemed to have made any warranties or representations as to the condition of or title to the Unit except as expressly set forth herein. Purchaser has inspected the Unit and agrees that it shall accept the Unit "as is."

### 9. Further Assurances

Either party shall execute, acknowledge and deliver to the other party such instruments and take such other actions, in addition to the instruments and actions specifically provided for herein, as such other party may reasonably request in order to effectuate the provisions of this Agreement or of any transaction contemplated herein or to confirm or perfect any right to be created or transferred hereunder or pursuant to any such transaction.

### 10. Governing Law

The provisions of this Agreement shall be governed by, and construed and enforced in accordance with, the laws of the State of New York.

### 11. Waiver of Jury Trial

Except as prohibited by law, the parties shall, and they hereby do, expressly waive trial by jury in any litigation arising out of, connected with, or relating to this Agreement or the relationship created hereby or in the Plan. With respect to any matter for which a jury trial cannot be waived, the parties agree not to assert any such claim as a counterclaim in, nor move to consolidate such claim with, any action or proceeding in which a jury trial is waived.

### 12. Gender

A reference in this Agreement to any one gender, masculine, feminine, or neuter, includes the other two, and the singular includes the plural, and vice versa, unless the context otherwise requires.

### 13. Certain References

The term "herein", "hereof" or "hereunder" or similar terms used in this Agreement refer to this entire Agreement and to the particular provision in which the term is used. Unless otherwise stated, all references herein to paragraphs, subparagraphs or other provisions are references to paragraphs, subparagraphs or other provisions of this Agreement.

### 14. Captions

The captions in this Agreement are for convenience and reference only and in no way define, limit or describe the scope of this Agreement or the intent of any provision hereof.

### 15. Successors and Assigns

The provisions of this Agreement shall bind and inure to the benefit of Purchaser and Purchaser's heirs, legal representatives, successors and permitted assigns and shall bind and inure to the benefit of Seller and its successors and assigns.

Confidential

Almaty-BTA0249855

CONFIDENTIAL

## 16.   No Oral Changes

This Agreement cannot be changed or any provision waived orally.  ANY CHANGES OR ADDITIONAL PROVISIONS OR WAIVERS MUST BE SET FORTH IN A RIDER ATTACHED HERETO OR IN A SEPARATE WRITTEN AGREEMENT SIGNED BY THE PARTIES.

## 17.   Counterpart Signature Pages

This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all counterparts shall constitute one (1) instrument.  This Agreement may be executed by facsimile or .pdf and such shall be deemed originals.

Confidential                                                                Almaty-BTA0249856

CONFIDENTIAL

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first above written.

SELLER:                                      PURCHASER:

135 WEST 52ND STREET OWNER LLC   SETTLEMENT  RECOVERY  135  WEST  PH3, INC.

By:_____        By: _____
     Meir Chetrit                          Nurlan Nurgablyev

CONFIDENTIAL

### EXHIBIT A TO PURCHASE AGREEMENT
Permitted Encumbrances

1. Building restrictions and zoning laws and other regulations, resolutions and ordinances and any amendments thereto now or hereafter adopted by any governmental or quasi-governmental authority having jurisdiction, provided they do not prevent the use of the subject Unit for dwelling purposes.

2. State of facts shown on a survey made by Earl B. Lovell-S.P. Belcher, Inc. dated March 12, 2013 and any state of facts which a more recent survey or personal inspection of the land and building would show, provided such additional state of facts would not prevent the use of the subject Residential Unit for dwelling purposes and further provided that such state of facts do not render title unmarketable.

3. The terms, burdens, covenants, restrictions, conditions, easements and rules and regulations set forth in the Declaration, the By-Laws (and the Rules and Regulations thereto), the Power of Attorney from Purchaser to the Condominium Board, Sponsor, the Commercial Unit Owners and the Retail Unit Owner and the Floor Plans, all as same may be amended from time to time.

4. Consents by Sponsor, or any former owner of the Land for the erection of any structure or structures on, under or above any land, street or streets on which the Land may abut.

5. Any easement or right of use in favor of any utility company for construction, use, maintenance, repair and replacement of all utility lines, wires, terminal boxes, mains, pipes, cables, conduits, poles, connections and other equipment and facilities on, under and across the Land and Building.

6. Revocability of licenses for vault space, if any, under the sidewalks and streets and the lien of any unpaid vault tax (which is to be paid by the Condominium Board, the Retail Unit Owner or the Commercial Unit Owners (as the case may be)).

7. Encroachments of stoops, areas, cellar steps or doors, trim, copings, retaining walls, bay windows, terraces, balconies, sidewalk elevators, fences, fire escapes, cornices, foundations, footings, chutes, fuel oil lines, drainage and stand pipes, and similar projections, if any, on, over, or under the Property or the streets or sidewalks abutting the property and the rights of governmental authorities to require the removal of any such projections, and variations between record lines of the Property and retaining walls and the like, if any.

Confidential                                                                Almaty-BTA0249858

CONFIDENTIAL

8.      Leases and service, maintenance, employment, management, concessionaire and license agreements, if any, of other Units or portions of the Common Elements, provided same are disclosed in the Plan or in an amendment thereto.

9.      The lien of any unpaid Common Charge, real estate tax, water charge or sewer rent, provided the same are adjusted at the closing of title.

10.     The lien of any unpaid assessment payable in installments (whether imposed by a taxing authority or the Condominium Board), except that Sponsor shall pay all such assessments due prior to the Closing Date and Purchaser shall pay all assessments due from and after such date (however, the then current installment shall be adjusted at closing).

11.     Any encumbrance as to which either the Title Insurance Company or the title insurance company which insures Purchaser's title to the Unit would be willing to insure at its regular rates, without additional premium, in a fee policy issued by it to Purchaser to insure that such encumbrance, (a) will not be collected out of or enforced against the Unit if it is a lien and (b) will not prevent the use of the subject Residential Unit for dwelling purposes.  (Any exception which the Title Insurance Company has omitted or insured at its regular rates and without additional premium, which will not be collected out of or enforced against a Unit, in a fee title insurance policy for other Units, is not an objection to title.)

12.     The Certificate of Occupancy or Temporary Certificate of Occupancy issued or to be issued covering the Building, provided it authorizes occupancy of the subject Residential Unit for residential purposes.

13.     Any violations against the Property (other than the subject Unit) which are the obligation of the Condominium Board or another Unit Owner to correct.

14.     Standard printed exceptions contained in the form of fee title insurance policy then issued by the title insurance company insuring Purchaser's title to the subject Unit.

15.     Any easement or right of use required for Sponsor to obtain a temporary, final or amended Certificate of Occupancy for the Building, provided such easement or right of use will not prevent the use of the subject Residential Unit for dwelling purposes.

16.     Distinctive Street Improvement Maintenance Agreement in Reel 1109 Page 862.

17.     Zoning Lot Certification in Reel 789 Page 115.

Confidential                                                                                    Almaty-BTA0249859

## UNIT DEED

**THIS INDENTURE** made the 8th day of March, 2018, between

**135 WEST 52ND STREET OWNER LLC**, a Delaware limited liability company having an office at 512 Seventh Avenue, New York New York 10018 "Grantor";

and,

Settlement Recovery 135 West PH3, Inc., with an address at c/o Boies Schiller Flexner LLP, Attn: Matthew L. Schwartz, 575 Lexington Avenue, 7th Floor, New York, NY 10022 "Grantee";

## WITNESSETH:

That the Grantor, in consideration of Ten ($10.00) Dollars and other valuable consideration paid by the Grantee, does hereby grant and release unto the Grantee, and the heirs or successors and assigns of the Grantee, forever:

    The Condominium Unit (hereinafter referred to as the "Unit) known as Unit PH3 in the building (hereinafter referred to as the "Building") known as the 135 West 52nd Street Condominium and by the Street Number 135 West 52nd Street, Borough of Manhattan, County, City and State of New York, said Unit being designated and described as Unit PH3 in a certain Declaration dated 04/27/2015, made by Grantor pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act"), establishing a plan for condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit "A" annexed hereto and by reference made a part hereof), which Declaration was recorded in the Office of the New York City Register on 08/18/2015 in CRFN 2015000286327 (which Declaration and Amendments thereto are collectively referred to as the "Declaration"). The Unit is also designated as Tax Lot 1109 in Block 1005 on the Tax Map of the City of New York for the County of New York and on the Floor Plans of the Building, certified by John Centra on 08/10/2015 as Condominium Plan Number 2605, and also filed in the Office of the New York City Register on 08/18/2015 as Condominium Map Number 2605.

Being and intended to be part of the same premises as conveyed to the Grantor by deed dated 3/25/2013 recorded 4/29/2013 in CRFN: 2013000169272.

**TOGETHER** with an undivided 1.3900% interest in the Common Elements as such term is defined in the Declaration (hereinafter called the "Common Elements");

**CONFIDENTIAL**

Confidential

Almaty-BTA0249860

**TOGETHER** with an easement for the continuance of all encroachments by the Unit on any adjoining Units or Common Elements now existing as a result of construction of the Building, or which may come into existence hereafter as a result of settling of the Building, or as a result of repair or restoration of the Building, or the Unit, after damage by fire or other casualty, or after taking in condemnation or eminent domain proceedings, or by reason of an alteration or repair to the Common Elements made by or with the consent of the Board of Managers, so that any such encroachments may remain so long as the Building shall stand;

**TOGETHER** with an easement in common with the Owners of other Units to use any pipes, wires, ducts, cables, conduits, public utility lines, and other Common Elements located in any of the other Units or elsewhere on the Property, and serving the Unit;

**TOGETHER** with the appurtenances and all the estate and rights of the Grantor in and to the Unit;

**TOGETHER** with all easements of necessity in favor of the Unit or in favor of other Units or the Common Elements;

**TOGETHER** with and **SUBJECT TO EASEMENTS**, rights of way, restrictions and encumbrances created by the Declaration for 135 West 52nd Street Condominium recorded in the New York County Office of the Register of the City of New York on the 18th day of August, 2015, as CRFN 2015000286327.

**SUBJECT** to the provisions of the Declaration, By-Laws, and Floor Plans of the Condominium recorded simultaneously with and as part of the Declaration, as the same may be amended from time to time by instruments recorded in the New York County Office of the Register of the City of New York, which provisions, together with any amendments thereto, shall constitute covenants running with the land and shall bind any person having at any time any interest or estate in the Unit, as though such provisions were recited and stipulated at length herein;

**EXCEPT** as otherwise specifically permitted by the Board of Managers of the Condominium or provided in the Declaration or in the By-Laws, the Unit is intended for Residential use only;

**AND** the Grantor covenants that the Grantor has not done or suffered anything whereby the said premises have been encumbered in any way whatsoever, except as aforesaid;

**TO HAVE AND TO HOLD** the same unto the Grantee, and the heirs or successors and assigns of the Grantee, forever.

If any provision of the Declaration or the By-Laws is invalid under, or would cause the Declaration or the By-Laws to be insufficient to submit the Property to, the provisions of the Condominium Act, or if any provision that is necessary to cause the Declaration and the By-Laws to be sufficient to submit the Property to the provisions of the Condominium Act is missing from the Declaration or the By-Laws, or if the Declaration and the By-Laws are

**CONFIDENTIAL**

Confidential

Almaty-BTA0249861

insufficient to submit the Property to the provisions of the Condominium Act, the applicable provisions of clause 17 of the Declaration shall control.

The Grantor, in compliance with Section 13 of the Lien Law, covenants that the Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvements before using any part of the same for any other purpose.

The Grantee accepts and ratifies the provisions of the Declaration and the By-Laws and the Rules and Regulations of the Condominium recorded simultaneously with and as part of the Declaration and agrees to comply with all the terms and provisions thereof, as the same may be amended from time to time by instruments recorded in the office of the New York City Register, New York County.

This conveyance has been made with the consent of all the members of the party of the first part entitled to vote thereon at a meeting duly called.

**IN WITNESS WHEREOF**, the Grantor has duly executed this deed the day and year first above written.

Grantor:

135 WEST 52ND STREET OWNER LLC

By: _____
Name:
Title:


Settlement Recovery 135 West PH3, Inc.

By: _____
Name: Nurlan Nurgablyev
Title: Director

**CONFIDENTIAL**

Confidential

STATE OF NEW YORK   )
                                    )ss.:
COUNTY OF NEW YORK  )

On the _____ day of _____, in the year_____, before me, the
undersigned, a Notary Public in and for said state, personally appeared _____,
personally known to me or proved to me on the basis of satisfactory evidence to be the individual
whose name is subscribed to in the within instrument and acknowledged to me that he executed
the same in his capacity, and that by his signature on the instrument, the individual, or the person
upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

STATE OF NEW YORK   )
                                    )ss.:
COUNTY OF NEW YORK  )

On the _____ day of _____, in the year_____, before me, the
undersigned, a Notary Public in and for said state, personally appeared _____,
personally known to me or proved to me on the basis of satisfactory evidence to be the
individual(s) whose name(s) is (are) subscribed to in the within instrument and acknowledged to
me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature
on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted,
executed the instrument.

_____
Notary Public

**CONFIDENTIAL**

Confidential

Almaty-BTA0249863

## EXHIBIT "A"

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the Northerly side of West 52nd Street, distant 375 feet Westerly from the Northwesterly corner of Avenue of the Americas (formerly known as Sixth Avenue) and West 52nd Street;

RUNNING THENCE Northerly and parallel with Avenue of the Americas, 100 feet 5 inches to the center line of the block between West 52nd Street and West 53rd Street;

THENCE Westerly along the said center line of the block, 82 feet 6 inches;

THENCE Northerly parallel with Avenue of the Americas, 100 feet 5 inches to the Southerly side of West 53rd Street;

THENCE Westerly along the Northerly side of West 53rd Street, 37 feet 6 inches;

THENCE Southerly parallel with Avenue of the Americas and part of the distance through a party wall, 100 feet 5 inches to the center line of the block;

THENCE Westerly along the center line of the block, 5 feet 0 inches;

THENCE Southerly parallel with Avenue of the Americas, 100 feet 5 inches to the Northerly side of West 52nd Street;

THENCE Easterly along the Northerly side of West 52nd Street, 125 feet 0 inches to the point or place of BEGINNING.

**CONFIDENTIAL**

Almaty-BTA0249864

CONFIDENTIAL

## Annex 6

### Assignment of Monitor Account Funds

**CONFIDENTIAL**

Confidential

Almaty-BTA0249865

CONFIDENTIAL

## ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption Agreement is dated as of March 8, 2018, and is entered into by and between the Assignors identified in item 1 below (the "Assignors") and the Assignees identified in item 2 below (the "Assignees").

For an agreed consideration, and pursuant to Section 2(ii) of the Agreement (as defined below), the Assignors hereby irrevocably sell and assign to the Assignees, and the Assignees hereby irrevocably purchase and assume from the Assignors, as of the date hereof, the Assigned Interest (as defined below).

1. **Assignors:** 135 West 52nd Street Owner LLC; CF 135 Flat LLC; CF 135 West Member LLC; and The Chetrit Group LLC.

2. **Assignees:** JSC BTA Bank and The City of Almaty, Kazakhstan.

3. **The Agreement:** Agreement, dated as of March 8, 2018 (as may be amended, restated, supplemented, or otherwise modified from time to time), between and among Joseph Chetrit, CF 135 Flat LLC, CF 135 West Member LLC, The Chetrit Group LLC, JSC BTA Bank, and The City of Almaty, Kazakhstan.

4. **Assigned Interest:** Any right, title, or interest of the Assignors in all funds on deposit with Wolf Haldenstein Adler Freeman & Herz LLP (presently in the approximate amount of $23.5 million), inclusive of any future deposits into such account, subject to any existing right, title, or interest of Triadou SPV S.A. therein, in connection with the work of the Honorable Herman Cahn (retired) as monitor, pursuant to the order of the Court dated May 4, 2016, in the cases captioned *Triadou SPV S.A. v. CF 135 Flat LLC, CF 135 West Member LLC, and The Chetrit Group LLC*, Index Nos. 653462/2014, 650239/2015, 154681/2015 and 156907/2015 and of any further order of the Supreme Court of New York requiring additional deposits into such account. The "Assigned Interest" also includes all funds that may be escrowed, segregated, or otherwise held by the Wolf Haldenstein Adler Freeman & Herz LLP, or any other person or entity, in connection with the cases bearing Index Nos. 653462/2014, 650239/2015, 154681/2015 and 156907/2015; the case captioned *Triadou SPV S.A. v. CF 135 Flat LLC, CF 135 West Member LLC, and The Chetrit Group LLC*, bearing Index No. 655623/2017, and any other action subject to the Indemnification Provisions (as defined in the Agreement), including any and all funds that may be deposited after the date of the Agreement or this Assignment. The Assignors make no representation that they have any right, title or interest in the funds on deposit.

[Remainder of Page Intentionally Left Blank]

Confidential

Almaty-BTA0249866

The terms set forth in this Assignment and Assumption are hereby agreed to:

135 WEST 52ND STREET OWNER LLC

By: _____
    Name: Meir Chetrit
    Title:  Authorized Signatory

CF 135 FLAT LLC

By: _____
    Name: Meir Chetrit
    Title:  Authorized Signatory

CF 135 WEST MEMBER LLC

By: _____
    Name: Meir Chetrit
    Title:  Authorized Signatory

THE CHETRIT GROUP, LLC

By: _____
    Name: Meir Chetrit
    Title:  Authorized Signatory

JSC BTA BANK

By: _____
    Name: Nurlan Nurgabiyev
    Title: Director

CITY OF ALMATY, KAZAKHSTAN

By: _____
    Name: Bauuzhan Aononaatsbav

**CONFIDENTIAL**

Almaty-BTA0249867

CONFIDENTIAL

## Annex 7

### Form of Pledge Agreement

Confidential    Almaty-BTA0249868

CONFIDENTIAL

## PLEDGE AGREEMENT

This PLEDGE AGREEMENT dated as of March 8, 2018 (this **"Pledge Agreement"**), is made by BTA Bank JSC (**"Pledgor"**), to CF 135 Flat LLC, a Delaware limited liability company, CF 135 West Member LLC, a Delaware limited liability company, and The Chetrit Group LLC, a New York State limited liability company (collectively, **"Obligee"**).

**WHEREAS**, Pledgor, Obligee, and others entered into a Settlement Agreement, dated November 28, 2015 (the **"Settlement Agreement"**), and a second Agreement, dated as of March 8, 2018 (the **"Second Agreement"**);

**WHEREAS**, Pledgor is the sole legal and beneficial owner of all the stock in Settlement Recovery 135 West PH2, Inc., a Delaware corporation, and Recovery 135 West PH3, Inc., a Delaware corporation (together, the **"Property Owners"**); and

**WHEREAS**, the Second Agreement requires that that Pledgor grant the security interests set forth in this Pledge Agreement to secure Pledgor's obligations in respect of the Continuing Obligations (as defined in the Second Agreement).

**NOW, THEREFORE**, in consideration of the premises and the agreements herein, Pledgor hereby agrees with Obligee, as follows:

Section 1. Definitions. As used in this Pledge Agreement, the following terms have the following meanings:

**"Breach"** has the meaning set forth in Section 14.

**"Collateral"** has the meaning set forth in Section 3.

**"Escrow Account"** has the meaning set forth in the Second Agreement.

**"Escrow Funds"** has the meaning set forth in Section 9

**"Events of Default"** means any of the events specified in Section 5.

**"Organizational Documents"** means all documents and agreements providing for, or related to, the formation, organization and governance of a company including, as applicable, articles of incorporation, bylaws, a certificate of formation, an operating agreement and any agreement among its members or shareholders related to such company.

**"Pledge Agreement"** has the meaning set forth in the preamble.

**"Pledged Interest"** has the meaning set forth in Section 3.

**CONFIDENTIAL**                              Annex 7 Page 2

                                                    Almaty-BTA0249869

CONFIDENTIAL

"**Pledgor Obligations**" means any and all present and future liabilities and obligations of Pledgor to Obligee with respect to the Continuing Obligations, together with all fees and expenses incurred in collecting any or all of the items specified in this definition or enforcing any rights under any of the documents executed in connection with any such liabilities and obligations, including all fees and expenses of Obligee's counsel and of any experts and agents which may be paid or incurred by Obligee in collecting any such items or enforcing any such rights (but only to the extent that Obligee prevails in such collection efforts or enforcement actions), and all obligations of Pledgor under this Pledge Agreement, provided, however, that notwithstanding the foregoing the Pledgor Obligations which may be enforced under this Pledge Agreement shall not be more than $5.5 million in the aggregate.

"**Sale Agreement**" has the meaning set forth in Section 8.

"**UCC**" means the Uniform Commercial Code of the State of New York as in effect from time to time.

All terms defined in the UCC that are used in this Pledge Agreement shall have the meaning specified in the UCC. Unless otherwise specified in this Pledge Agreement, all capitalized terms used herein that are not otherwise defined shall have the meanings set forth in the Settlement Agreement and Second Agreement.

Section 2. Rules of Interpretation. When used in this Pledge Agreement: (1) "or" is not exclusive, (2) any pronouns used shall include the corresponding masculine, feminine or neuter forms, (3) the singular form of nouns shall include the plural and vice versa, (4) a reference to a law includes any amendment or modification to such law, and (5) a reference to an agreement, instrument or document includes any permitted amendment or modification of such agreement, instrument or document.

Section 3. Pledge. Pledgor hereby pledges and grants to Obligee a continuing security interest in and lien on all right, title and interest of Pledgor in and to each of the following items, whether now owned or hereafter acquired (collectively, "**Collateral**") to secure Pledgor's obligations in respect of the Continuing Obligations.

(1) Pledged Interest. Except as provided in the Second Agreement, all of the ownership interests in Property Owners (the "**Pledged Interest**") and all distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such Pledged Interest, together with all voting rights, claims, powers, privileges, benefits, remedies, options and rights of any nature which now or hereafter exist with respect to or on account of such Pledged Interest, including all such items under or pursuant to the Organizational Documents of Property Owners.

(2) Intentionally Omitted.

(3) Proceeds. All proceeds of any and all of the foregoing.

Confidential

Almaty-BTA0249870

CONFIDENTIAL

For the avoidance of doubt, there shall be no restriction on Property Owners' right to use, dispose of, sell, finance or otherwise deal with the Units (as defined in the Second Agreement) except as expressly set forth herein or in the Second Agreement. In addition, the parties acknowledge and agree that (i) this Pledge Agreement solely applies to the Collateral and not any other assets or rights of Pledgor; and (ii) Pledgor is entering into this Pledge Agreement for the sole purpose of granting Obligee a security interest in the Collateral (subject to the terms hereof) and shall not have any other liability under this Pledge Agreement under any circumstances.

Section 4. <u>Security for Obligations</u>. The Collateral secures the prompt and complete payment when due of all Pledgor Obligations.

Section 5. <u>Events of Default</u>. Each of the following shall constitute an event of default (an "**Event of Default**") under this Pledge Agreement (and, for the avoidance of doubt, in no event shall any Obligee be permitted to exercise any remedies hereunder unless and until an Event of Default has occurred and is continuing):

(a)    The failure of Pledgor to fully comply with the Pledgor Obligations on the date such obligation is due after Pledgor shall have received no less than fifteen (15) day' notice and opportunity to cure such failure.

(b)    Intentionally Omitted.

Section 6. <u>Perfection of Security Interest</u>. Pledgor shall cause Property Owners to make the appropriate notations in Property Owners' books and records indicating that the Pledged Interest is subject to the security interest granted pursuant to this Pledge Agreement. By execution of its acknowledgment, consent and agreement at the end of this Pledge Agreement, Property Owners hereby consent to the security interest granted to Obligee in the Collateral pursuant to this Pledge Agreement.

Upon the written request of Obligee, Pledgor will take any and all reasonable additional actions required to perfect the security interest of Obligee in each and every item of Collateral. By execution of the acknowledgment, consent and agreement at the end of this Pledge Agreement, Property Owners hereby (1) consent to the security interest granted to Obligee in the Collateral pursuant to this Pledge Agreement, and (2) agree to comply with any "instructions" (as defined in Section 8-102(a)(12) of the UCC) with respect to the Pledged Interest originated by Obligee without further consent of Pledgor, including instructions regarding the transfer, redemption or other disposition of such Pledged Interest and other Collateral or the proceeds of such Pledged Interest and other Collateral, including any distributions with respect to such Pledged Interest and other Collateral. Additionally, Pledgor hereby authorizes Obligee to file one or more financing or continuation statements, and amendments thereto, relative to all or any part of the Collateral.

Pledgor will not take any actions or fail to perform any of its duties or obligations under this Pledge Agreement so that after giving effect to such action or inaction Obligee will then, or with the passage of time, cease to have a perfected first priority security interest in any of the Collateral. Pledgor agrees that from time to time, Pledgor will promptly execute and deliver all further instruments and documents, and take all further reasonable action, including but not limited

Confidential

Almaty-BTA0249871

CONFIDENTIAL

to any and all of the actions specified above in this Section that may be necessary or desirable, or that Obligee may reasonably request, in order to perfect and protect any security interest granted or purported to be granted under this Pledge Agreement or to enable Obligee to exercise and enforce its rights and remedies under this Pledge Agreement with respect to any of the Collateral.

Pledgor and Obligee acknowledge and agree that the Pledged Interest are not certificated securities and that this Pledge Agreement is pursuant to Article 8 of the UCC.

Pledgor will not, and Pledgor will not permit Property Owners to, (1) change the location of their chief executive offices or principal places of business without giving notice thereof within fifteen (15) days thereafter, (2) change their names, identity or, as to the direct interests held by Pledgor in Property Owners, their structure, or (3) reorganize under the laws of another jurisdiction.

Section 7. Voting Rights. As long as there are no outstanding Events of Default at the time of determination, Pledgor shall be entitled to exercise any and all management, voting and other rights pertaining to any or all of the Collateral except as otherwise expressly provided herein or in the Second Agreement. Upon the occurrence and during the continuation of Event of Default and the Obligee choosing to exercise the management, voting and consensual rights related to the Collateral, including all such rights under and pursuant to the terms of the Organizational Documents of Property Owners, all rights of Pledgor to exercise such management, voting and other rights shall cease, and Obligee shall then have the sole right to exercise such management, voting and other consensual rights. In exercising its management, voting or other consensual rights with respect to the Collateral, Pledgor agrees it will not agree to or vote for (1) any changes that contravene the terms of this Pledge Agreement, or (2) any amendments to the Organizational Documents of Property Owners that contravene the terms of this Pledge Agreement.

Section 8. Release of Collateral. Notwithstanding anything contained herein to the contrary,

(1) Upon the occurrence of a Pledge Termination (as defined in the Second Agreement), the Collateral shall be released from the lien created hereby and this Pledge Agreement and all obligations of the Obligee and Pledgor hereunder shall terminate (except as to Obligee's rights to an indemnity and to recover fees and expenses pursuant to Paragraph 16 of this Pledge Agreement, which rights shall survive such Pledge Termination and the release of the lien), all without delivery of any instrument or performance of any act by any party (except as set forth in the Second Agreement), and all rights to the Collateral shall revert to the Pledgor. Without limiting or modifying the provisions of the Second Agreement, Pledgor is hereby authorized to file UCC amendments at such time evidencing the termination of the liens so released and Obligee shall execute and deliver to the Pledgor such documents as the Pledgor reasonably requests to evidence such termination. Once a Pledge Termination has occurred, there should be no restriction on the Kazakhstan Entities' right to distribute, use or retain the proceeds of any sale or encumbrance of all Units and the lien created hereby shall not encumber such proceeds (nor shall Obligee have any further rights or remedies in respect of such proceeds); and

Confidential

Almaty-BTA0249872

Case 1:15-cv-05345-AJN-KHP  Document 1208-2  Filed 12/24/19  Page 72 of 118

CONFIDENTIAL

(2) Following payment of ten dollars ($10.00) and the simultaneous giving of ten (10) days' written notice to the Chetrit Entities of the identity of the Property Owner against which the lien created by this Pledge Agreement shall be released in accordance with Section 7, subsection (d) of the Second Agreement, upon the expiration of such notice period, the Collateral represented by the Pledged Interest in the Property Owner specifically identified in the notice shall be released from the lien created by this Pledge Agreement, all without delivery of any instrument or performance of any act by any party, and all rights to such released Collateral shall revert to the Pledgor. Upon such release, all obligations of Pledgor and the Released Designee (as defined in the Second Agreement) hereunder specifically pertaining to or affecting the Released Designee shall terminate, and the Released Designee shall be permitted to sell, finance, or encumber its Unit and to distribute the proceeds generated as a result of such sale to Pledgor (or to any other account designated by Boies Schiller Flexner LLP on behalf of Pledgor) and Pledgor (or to any other account designated by Boies Schiller Flexner LLP on behalf of Pledgor) shall be permitted to receive such distribution free and clear of the lien created by this Pledge Agreement or any other encumbrance that may be imposed by this Pledge Agreement. Upon the release of the lien as against the Released Designee, Pledgor is hereby authorized to file UCC amendments evidencing the modification of the lien created by this Pledge Agreement to expressly permit the distributions contained in this subsection. At the request of the Pledgor following any such release, the Obligee shall promptly execute and deliver to the Pledgor such documents as the Pledgor shall reasonably request to evidence such release. Nothing herein shall release, waive, or discharge (i) Obligee's lien as against the interests in the Property Owner that is not the Released Designee (the "Unreleased Designee"), or (ii) any obligations of Unreleased Designee, or of Pledgor related to the Unreleased Designee, under the Second Agreement or this Pledge Agreement.

Section 9. Escrow Obligation. The funds in the Escrow Account (the "Escrow Funds"), if applicable, shall serve as security for Pledgor's obligations in respect of the Continuing Obligations. The Escrow Funds shall not be redistributed to Property Owners or Pledgor until Pledgor has satisfied all Continuing Obligations.

Section 10. Intentionally Omitted.

Section 11. Representations and Warranties. Pledgor represents and warrants to Obligee as follows:

(1) Ownership of Collateral. Pledgor is the legal and beneficial owner of the Collateral and has good title to the Collateral. The Collateral is 100% of the outstanding stock of Property Owners.

(2) Ownership of Units. Property Owners are the legal and beneficial owners of the Units and have good title to such Units.

(3) No Substantial Debt. Neither Property Owner owes debts (whether matured, unmatured, or contingent) greater than $50,000.00 in the aggregate.

(4) Limitations on Collateral. Other than as expressly set forth herein or in the Second Agreement, none of the Collateral is subject to any agreement that (a) provides for the sale,

**CONFIDENTIAL**          Annex 7 Page 6

Confidential

Almaty-BTA0249873

CONFIDENTIAL

assignment, transfer or other disposition of such Collateral, or (b) limits or restricts the granting of a security interest in, or the sale of, such Collateral pursuant to this Pledge Agreement.

(5) Security Interest. To Pledgor's knowledge, this Pledge Agreement creates a valid security interest in the Collateral and such security interest secures the payment of all Pledge Obligations. None of the Collateral is subject to a security interest, lien, charge or encumbrance, except for the security interest created by this Pledge Agreement. To Pledgor's knowledge, all actions necessary or desirable to perfect and protect such security interest have been duly taken. To Pledgor's knowledge, such security interest is a first priority security interest with respect to the Collateral.

(6) Information Regarding Perfection of Security Interest. The exact legal name of Pledgor is set forth in the preamble to this Pledge Agreement. The Pledgor has not been known by any other name during the past five (5) years.

(7) Authority, No Contravention. The execution, delivery and performance by Pledgor of this Pledge Agreement are within its powers, have been duly authorized by all necessary action, and do not and will not (a) require any consent or approval of shareholders, members, or any of its principals which has not been obtained, or (b) contravene its Organizational Documents. The execution, delivery and performance by Pledgor of this Pledge Agreement do not and will not (a) violate any provision of any law, order, writ, judgment, injunction, decree, determination, or award presently in effect applicable to it, (b) result in a breach of or constitute a default under any indenture or loan or credit agreement or any other agreement, lease, or instrument to which it is a party or by which it or its properties may be bound or affected, or (c) result in, or require, the creation or imposition of any lien upon or with respect to any of the properties now owned or hereafter acquired by it (except as expressly set forth in this Pledge Agreement).

(8) Legally Enforceable Pledge Agreement. To Pledgor's knowledge, this Pledge Agreement is the legal, valid and binding obligation of Pledgor, enforceable against Pledgor in accordance with its terms, except to the extent that such enforcement may be limited by (1) applicable bankruptcy, insolvency, reorganization, receivership, and other similar laws affecting creditors' rights generally, or (2) general equitable principles (including specific performance and injunctive relief), regardless of whether the issue of enforceability is considered in a proceeding in equity or at law.

(9) Subordination. The obligations of Pledgor under this Pledge Agreement are not subordinated in any way to any other obligations of Pledgor or to the rights of any other Person.

(10) Organizational Documents. Each of the Organizational Documents of Property Owners has been duly executed by Pledgor and constitutes the legal, valid and binding obligations of a Property Owner, enforceable in accordance with their terms. Copies of each of the Organizational Documents of Property Owners have been delivered to Obligee and such copies are true, correct and complete copies of such Organizational Documents in effect on the date of this Pledge Agreement.

CONFIDENTIAL                    Annex 7 Page 7

Confidential

Almaty-BTA0249874

CONFIDENTIAL

(11)  Formation and Authority. Property Owners (a) are Delaware corporations, duly formed, validly existing, and in good standing under the laws of the jurisdiction of its formation, (b) have sufficient corporate power and authority to own their assets and to transact the business in which they now engage or propose to engage in, and (c) are duly qualified as Delaware corporations and are in good standing under the Laws of each other jurisdiction in which such qualification is required.

(12)  Governmental Approvals. No authorization, approval or other action by, and no notice to or filing with, any Governmental Authority is required for the due execution, delivery and performance by Pledgor of this Pledge Agreement (other than such approvals, notices and filings which have already been provided).

Section 12. Covenants. Pledgor agrees that:

(1)  Restrictions on Property Owner's Business Activity. Pledgor shall not authorize, cause, or otherwise permit Property Owners to undertake any transaction which violates the terms and conditions of the Second Agreement, a copy of which is annexed hereto as "Exhibit A."

(2)  Maintenance of Units. Pledgor shall cause Property Owners to pay all real estate taxes and common charges (except as otherwise provided in the Second Agreement) and to maintain their Units in substantially the same conditions as they are on the date hereof.

(3)  Reporting Requirements. Pledgor shall promptly notify Obligee if (a) Pledgor becomes aware of any claim that is made against the Collateral, (b) any representation and warranty included in this Pledge Agreement would no longer be true if made on such date, or (c) there is a redemption or exchange of any or all of the Collateral.

(3)  Defense of Ownership Rights. Pledgor will defend its ownership rights in the Collateral and the ownership rights of Property Owners in the Units against all claims and demands of all parties claiming any ownership rights therein.

(4)  Transfer of Collateral. Pledgor will at all times hereafter continue to be the legal and beneficial owner of 100% of the stock of Property Owners.  Except as provided in the Second Agreement, Pledgor shall not (a) sell, assign (by operation of law or otherwise), transfer, encumber, or otherwise dispose of any or all of the Collateral, (b) enter into any agreement for the sale, assignment, encumbrance, transfer or other disposition of any or all of the Collateral, or (c) enter into any agreement that limits or restricts the granting of a security interest in, or the sale of, any or all of the Collateral as contemplated hereby.

(5)  Issuance of Equity Interest. Pledgor will ensure that no additional equity interest is issued by Property Owners unless such equity interest is issued to Pledgor and is subject to a perfected first priority security interest in favor of Obligee.

(6)  Security Interest. Pledgor shall not grant or suffer to exist any security interest upon or with respect to any or all of the Collateral, except for the security interest granted under this Pledge

Confidential

Almaty-BTA0249875

CONFIDENTIAL

Agreement. Pledgor will discharge or cause to be discharged all security interests on any or all of the Collateral, except for the security interest under this Pledge Agreement.

(7) Books and Records. Pledgor will, and will cause Property Owners to keep true, complete and accurate books of record with regard to the Collateral. Obligee shall be entitled, on five (5) business days' notice to Pledgor, to inspect and copy all books and records with regard to the Collateral at Obligee's cost and expense. Obligee shall maintain the confidentiality of such books and records.

Section 13. Rights and Remedies. Upon the occurrence of an Event of Default, Obligee may exercise in respect of any or all of the Collateral each of the following rights, remedies and powers and Pledgor agrees that each of the following rights, remedies and powers is commercially reasonable:

(1) General Remedies. Obligee may exercise in respect of any or all of the Collateral all the rights and remedies provided for in this Pledge Agreement, by law, in equity or otherwise available to it, including all rights and remedies of a secured party under the UCC (whether or not the UCC applies to the affected Collateral).

(2) Remedies Before Sale. Pursuant and subject to Section 7 hereof, Obligee may exercise all management, voting and other consensual rights of Pledgor under or with respect to the Collateral.

(3) Sale of Collateral. Obligee may, without notice, except as specified below, sell any and all of the Collateral in one or more transactions at public or private sale, at any exchange, broker's board or at any of Obligee's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as Obligee may deem commercially reasonable. Pledgor agrees that, to the extent notice of sale shall be required by law, at least fifteen (15) days' notice to Pledgor of the time and place of any public or private sale shall constitute reasonable notification. Obligee shall not be obligated to make any sale of any or all of the Collateral after any notice of sale has been given. Obligee may adjourn any public or private sale from time to time by announcement at the time and place fixed for such sale, and such sale may, without further notice, be made at the time and place to which it was so adjourned. At any public or private sale, Obligee shall be permitted to bid for, and purchase, the Collateral, and Obligee shall be credited against its successful bid for the amount of any Pledgor Obligations which are then due and owing.

(4) Proceeds. If any of the Collateral is sold by Obligee upon credit or for future delivery, Obligee shall not be liable for the failure of the purchaser to purchase or pay for the same and, in the event of any such failure, Obligee may resell the Collateral. In no event shall Pledgor be credited with any part of the proceeds of sale of any Collateral until and to the extent cash payment in respect thereof is actually received by Obligee for the full amount of the Pledgor Obligations. To the extent any of the Pledgor Obligations are contingent cash proceeds received by Obligee in respect of any sale of, collection from, or other realization upon all or any part of the Collateral, such proceeds may, in the discretion of Obligee, be held by Obligee as collateral for such contingent Pledgor Obligations. Any cash held by Obligee as Collateral and all cash proceeds received by Obligee in respect of any sale of, collection from, or other realization upon all or any

CONFIDENTIAL          Annex 7 Page 9

Almaty-BTA0249876

CONFIDENTIAL

part of the Collateral may, in the discretion of Obligee, be applied, first, to pay all reasonable costs and expenses incurred by Obligee in connection with or incident to the custody, preservation, use or operation of, or the sale of, collection from, or other realization upon, any and all of the Collateral, second, to pay all matured and unpaid Pledgor Obligations, third, if and to the extent any of the Pledgor Obligations are unmatured or contingent, to provide cash collateral for all such Pledgor Obligations, and fourth, in accordance with applicable Law to Pledgor or such other party that is entitled to such proceeds in accordance with applicable law.

Obligee shall not, by any act, delay, omission or otherwise, be deemed to have waived any of its rights or remedies under this Pledge Agreement. A waiver by Obligee of any right or remedy under this Pledge Agreement on any one occasion, shall not be construed as a bar or waiver of any such right or remedy which Obligee would have had on any future occasion nor shall Obligee be liable for exercising or failing to exercise any such right or remedy.

(5) Private Sale. Obligee is authorized, in connection with any such sale, if it deems it advisable so to do, (1) to restrict the prospective bidders on or purchasers of any of the Collateral to a limited number of sophisticated investors who will represent and agree that they are purchasing for their own account for investment and not with a view to the distribution or sale of any of such Collateral, and (2) to impose such other limitations or conditions in connection with any such sale as Obligee deems necessary or advisable in order to comply with the Securities Act of 1933 or any other law. At the request of Obligee, Pledgor agrees that it will execute and deliver such documents and take such other action as Obligee reasonably deems necessary or advisable in order that any such sale may be made in compliance with law. Pledgor acknowledges and agrees that any such sale might result in prices and other terms less favorable to the seller than if such sale were a public sale without such restrictions. In the event of any such sale, Obligee shall incur no responsibility or liability for selling all or any part of the Collateral at a price that Obligee may in good faith deem reasonable under the circumstances, notwithstanding the possibility that a substantially higher price might have been realized if the sale were deferred until after registration as noted above or if more than a single purchaser were approached. Pledgor agrees that sales made pursuant to this paragraph are made in a commercially reasonable manner.

(6) Intentionally Omitted.

Section 14. Appointment as Attorney-in-Fact. After and during the continuation of an Event of Default, Pledgor hereby irrevocably appoints Obligee attorney-in-fact and proxy, with full authority in the place and stead of Pledgor and in the name of Pledgor, Obligee or otherwise to (1) take any and all action and exercise all rights and remedies granted to Obligee under this Pledge Agreement, and (2) execute any instrument which Obligee may reasonably deem necessary or advisable to accomplish the purpose of this Pledge Agreement.

Pledgor hereby ratifies and approves all acts of Obligee as its attorney in-fact pursuant to this Section, and Obligee, as its attorney in-fact, will not be liable for any acts of commission or omission, nor for any error of judgment or mistake of fact or law, other than those which result from Obligee's gross negligence, breach of this Pledge Agreement, the Settlement Agreement, the Second Agreement or willful misconduct (each, a "**Breach**"). This power, being coupled with an interest, is irrevocable so long as this Pledge Agreement remains in effect.

Confidential

Almaty-BTA0249877

CONFIDENTIAL

Section 15. Duties and Reasonable Care. The powers conferred on Obligee under this Pledge Agreement are solely to protect its interests in the Collateral and shall not impose any duty upon Obligee to exercise any such powers. Obligee shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral in its possession if such Collateral is accorded treatment substantially equal to that which Obligee accords its own property, it being understood that Obligee shall not have any responsibility for (1) ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, whether or not Obligee has or is deemed to have knowledge of such matters, (2) taking any necessary steps to preserve rights against any parties with respect to any Collateral, or (3) the performance of any duties or obligations under the Collateral. Pledgor will remain liable under the Organizational Documents of Property Owners to perform all of Pledgor's duties and obligations thereunder so long as it retains title to the ownership interests in Property Owners.

Section 16. Indemnity and Expenses. Pledgor agrees to pay all reasonable costs and expenses incurred by Obligee in connection with enforcement of this Pledge Agreement (but only to the extent that Obligee prevails in such enforcement efforts), except for claims, losses or liabilities resulting from the gross negligence, Breach, or willful misconduct of the person or entity to be indemnified. Pledgor will within ten (10) days of written demand pay to Obligee the amount of any and all expenses, including the fees and disbursements of its counsel and of any experts and agents, which Obligee may incur in connection with (1) the exercise or enforcement of any of the rights of Obligee under this Pledge Agreement, or (2) the failure by Pledgor to perform or observe any of the provisions of this Pledge Agreement (but only to the extent that Obligee prevails in the enforcement efforts). Obligee agrees to pay, within ten (10) days of written demand, all reasonable costs and expenses actually incurred by Pledgor in connection with the defense of any claim asserted by Obligee under this Pledge Agreement (but only to the extent that Obligee prevails in such defense).

Section 17. Amendments. No amendment or waiver of any provision of this Pledge Agreement, nor consent to any departure by Pledgor from this Pledge Agreement, shall in any event be effective unless the same shall be in writing and signed by both Pledgor and Obligee, and then such amendment or waiver shall be effective only in the specific instance and for the specific purpose for which given.

Section 18. Addresses for Notices. All notices and other communications provided for under this Pledge Agreement shall be in writing and, mailed (certified mail, return receipt requested) or delivered by messenger or overnight delivery service, addressed to the address specified below for the applicable party, with a duplicate copy sent by email; or as to any such party at such other address as shall be designated by such party in a written notice to the other party complying as to delivery with the terms of this Section.

To Pledgor:         BTA Bank JSC
                    c/o Matthew Schwartz, Esq.
                    Boies Schiller Flexner LLP
                    575 Lexington Avenue
                    New York, New York 10022

CONFIDENTIAL          Annex 7 Page 11

                                        Almaty-BTA0249878

CONFIDENTIAL

Email: mlschwartz@BSFLLP.com

To Obligee:

CF 135 Flat LLC
CF 135 West Member LLC
CF 135 52nd Street Owner LLC
The Chetrit Group LLC
c/o The Chetrit Group LLC
512 Seventh Avenue, 16th Floor
New York, New York 10018
Attention: Joseph Chetrit
Email: jochetrit@aol.com

With a copy to:

David Segal, Esq.
Sukenik, Segal & Graff, P.C.
450 Seventh Avenue, 42nd Floor
New York, New York 10123
Email: davidsegal@ssglaw.com

Except as otherwise provided herein or in the Second Agreement, all such notices and other communications shall, when mailed, be effective three (3) business days after being placed in the mail, or when delivered to a messenger or nationally recognized overnight delivery service, be effective one (1) business day after being delivered to the messenger or nationally recognized overnight delivery service, in each case, addressed as specified above.

Section 19. Successors and Assigns. This Pledge Agreement shall be binding upon Pledgor, its successors and assigns, and inure to the benefit of Obligee and its successors and assigns. Neither Pledgor nor Obligee may transfer or assign any of its duties or obligations under this Pledge Agreement. Upon termination hereof, Obligee shall, without limiting or modifying the provisions of the Second Agreement, (i) execute and deliver to Pledgor such documents as Pledgor shall reasonably request to evidence such termination, and (ii) file a UCC-3 termination statement acknowledging the termination of Obligee's security interest in the Collateral.

Section 20. Submission to Jurisdiction. Pledgor and Obligee hereby irrevocably submit to the jurisdiction of the United States District Court for the Southern District of New York and the New York State Supreme Court, County of New York, over any action or proceeding arising out of or related to this Pledge Agreement and agree that personal jurisdiction over Pledgor and Obligee rests with such courts for purposes of any action on or related to this Pledge Agreement. Pledgor and Obligee hereby waive personal service by manual delivery. and agree that service of process may be made by prepaid certified mail or by overnight mail delivery directed to Pledgor or Obligee at the addresses for notices under this Pledge Agreement or at such other address as may be designated in writing by Pledgor to Obligee or vice versa, with a copy emailed to such party's designated attorney, and that upon the mailing and emailing of such process as described, such service will be effective as if Pledgor or Obligee was personally served. Pledgor and Obligee agree that a final and non-appealable judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any manner provided by law.

**CONFIDENTIAL**

Confidential

Almaty-BTA0249879

CONFIDENTIAL

Pledgor and Obligee further waive any objection to venue in any such action or proceeding on the basis of inconvenient forum.

Section 21. Governing Law. This Pledge Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to its conflict of laws principles.

Section 22. Miscellaneous. This Pledge Agreement is in addition to and not in limitation of any other rights and remedies Obligee may have by virtue of any other instrument or agreement heretofore, contemporaneously herewith or hereafter executed by Pledgor or any other party or by law or otherwise. If any provision of this Pledge Agreement is contrary to applicable law, such provision shall be deemed ineffective without invalidating the remaining provisions of this Pledge Agreement. Titles in this Pledge Agreement are for convenience of reference only and shall not affect the interpretation or construction of this Pledge Agreement. Electronic and facsimile signatures upon this Pledge Agreement shall have the same force and effect as original signatures.

[THE REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

Confidential                                                                 Almaty-BTA0249880

CONFIDENTIAL

IN WITNESS WHEREOF, Pledgor has duly executed this Pledge Agreement as of the date of this Pledge Agreement.

**PLEDGOR:**

BTA Bank JSC

By:_____
Name: Nurlan Nurgabiyev
Title: Director

This Pledge Agreement is acknowledged and agreed to by Property Owners and Property Owners hereby confirm their consent to the security interest granted under the Pledge Agreement in accordance with Sections 3, 4, and 6 of such Agreement.

**PROPERTY OWNERS:**

Settlement Recovery 135 West PH2, Inc., a Delaware Corporation

By:_____
Name: Nurlan Nurgabiyev
Title: Director

Settlement Recovery 135 West PH3, Inc., a Delaware Corporation

By:_____
Name: Nurlan Nurgabiyev
Title: Director

Confidential

Almaty-BTA0249881

CONFIDENTIAL

## Exhibit A

### Terms and Conditions of Unit Transfers

The parties agree that the following provisions of this Exhibit A shall govern the rights and obligations of the Parties with respect to the Unit Transfers.

1. All obligations of the Chetrit Entities (other than Joseph Chetrit, who is not personally obligated) under this Exhibit A shall be joint and several. The Chetrit Entities, other than Joseph Chetrit, are hereinafter referred to as the "**Transfer Parties.**"

2. The Units are more specifically described on Exhibit A-1 attached hereto and made a part hereof and in the Condominium Offering Plan (as amended, the "**Plan**") for The 135 West 52nd Street Condominium (the "**Condominium**"). The Units constitute Unsold Units pursuant to the Plan.

3. All of the terms and provisions of the Plan which apply to purchase contracts of Units by buyers purchasing directly from the Sponsor (i.e. the types of provisions that customary are contained in unit purchase contracts) which burden such buyers such as obligations of buyers set forth in the purchase procedures and form of purchase contract contained in the Plan shall not apply to the Unit Transfers except as otherwise specifically set forth to the contrary below. In the event of any conflict between the provisions of this Exhibit A and the Plan, as between the Transfer Parties and the Kazakhstan Entities and the Kazakh Designees, the provisions of this Exhibit A shall govern and control.

4. The Unit Transfers include, without limitation, to the extent present in the Units as of the date hereof, the conveyance to the Kazakh Designees of the refrigerators, freezers, ranges, ovens, dishwashers, washing machines, clothes dryers, cabinets and counters, lighting and plumbing fixtures, air conditioning equipment, venetian and other blinds, shades, screens, storm windows and other window treatments, wall-to-wall carpeting, bookshelves, switchplates, door hardware, built-ins and other articles of property and all fixtures attached to or appurtenant to the Units (and all warranties, guaranties, permits, licenses, certificates, approvals, intangible property, common elements, voting rights and other rights of any nature appurtenant to or otherwise relating to the Units) (collectively, the "**Personal Property**"). All appliances shall be in good working order on the date hereof and all warranties and guaranties applicable thereto are being delivered to the Kazakh Designees on the date hereof to the extent in the possession or control of any Transfer Party (and to the extent any Transfer Parties are entitled to receive any such warranty or guaranty of which they have not yet been provided as of the date hereof, after the date hereof the Transfer Parties shall

**CONFIDENTIAL**

Confidential

Almaty-BTA0249882

CONFIDENTIAL

use reasonable efforts to obtain the same and deliver the same to the Kazakh Designees.

5. Intentionally omitted.

6. The Transfer Parties represent and warrant to the Kazakhstan Entities and the Kazakh Designees, as of the date hereof, as follows (which representations and warranties shall survive the consummation of the Unit Transfers for a period of one hundred and eighty (180) days):

    (a) The Transfer Parties have the full right, power and authority to consummate the transactions described herein.

    (b) Each Transfer Party is a duly formed limited liability company in good standing in the State of New York and its State of organization. There are no consents or approvals of any third parties, or any federal, state or local governmental authorities, or any holder of any direct or indirect interest in any Transfer Parties that are required in connection with the performance by the Transfer Parties of their obligations under this Exhibit A (which have not already been obtained and delivered to the Kazakh Designees). The execution, delivery and performance of this Agreement have been duly authorized by all necessary limited liability company action, and the execution and performance of this Agreement will not violate any term of any of the Transfer Parties' (or any of their direct or indirect owners' or managers') governing documents, the Plan or any other agreement, judicial decree, statute or regulation to which any Transfer Party is a party or by which any Transfer Party, or the Units may be bound or affected.

    (c) The percentage share of the common elements allocated to each of the Units is as set forth in the Plan.

    (d) To the Transfer Parties' knowledge, the monthly common charges for the Units on the date hereof are as follows: $3,466.00 for each Unit, and there are no other pending or contemplated additional common charges (or increases thereto), assessments or other charges due or to become due with respect to the Units.

    (e) To the Transfer Parties' knowledge, the Plan and related bylaws are in compliance with law. The Plan has been declared effective and is in full force and effect.

Confidential

Almaty-BTA0249883

CONFIDENTIAL

(f) No person or entity has any option or other right to purchase any of the Units.

(g) Sponsor has not designated any other person or entity as "Sponsor" or designee of Sponsor or in any similar capacity.

(h) Sponsor has not designated any other person or entity as "Declarant" or designee of Declarant or in any similar capacity.

(i) There are no management agreements, service contracts, brokerage agreements or other contracts, agreements or arrangements in effect with respect to the Units that would bind or otherwise affect the Units or the owner thereof after the Effective Date (other than under the Plan). The parties agree and acknowledge that there may be management agreements and service constraints affecting the Units that are reflected in the Plan.

(j) No Transfer Party is, nor is any Transfer Party acting on behalf of: (i) an "employee benefit plan" (as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA")) that is subject to Title I of ERISA, (ii) a "plan" as defined in and subject to Section 4975 of the Internal Revenue Code, or (iii) an entity deemed to hold plan assets of either of the foregoing.

(k) The right of first refusal of the Condominium and other restrictions on sales set forth in the Plan and the related documents do not apply to the transactions described in this Exhibit A.

(l) None of the Transfer Parties is a "foreign person" as defined in Internal Revenue Code §1445 as amended, and the regulations issued thereunder (the "**Code Withholding Section**").

(m) The Units are vacant and are not subject to any lease, license, occupancy agreement or any other right of any person or entity to occupy the same.

(n) All work ordered or performed by or at the direction of any Transfer Party with regard to the Units have been paid for and no mechanic's lien(s) shall be or have been filed against the Units as a result of the same.

Confidential                                                                                      Almaty-BTA0249884

CONFIDENTIAL

(o) To the Transfer Parties' knowledge, the reserve fund obligations of Sponsor to the Condominium pursuant to the Plan have been complied with by Sponsor and Sponsor is not now in default of any other obligations that it may have to the Condominium.

(p) Except for the Proceedings and the Lawsuit, there is no pending or, to the Transfer Parties' knowledge, threat of any, action, suit, claim, investigation or proceeding (involving governmental authorities or private parties) against or affecting the any of the Units (or the Condominium).

(q) No Transfer Party has filed, nor is any Transfer Party contemplating filing, a petition in any case, action, or proceeding under the United States bankruptcy code or any similar state law; no petition in any case, action, or proceeding under the United States bankruptcy code or any similar state law has been filed, or is contemplated to be filed, against any Transfer Party; and no Transfer Party has filed an answer or otherwise admitted in writing insolvency or inability to pay their debts or made an assignment for the benefit of creditors or consented to an appointment of a receiver or trustee of all or a material part of their property. The Transfer Parties are solvent and will not be rendered insolvent upon completion of the transactions contemplated hereunder.

(r) All work ordered or performed by or at the direction of any Transfer Party with regard to the Units has been paid for and completed and no mechanic's lien(s) which have not been satisfied or discharged of record shall be or have been filed against the Units as a result of the same. At the request of the Kazakh Designees, the Transfer Parties agree to coordinate and enforce the obligations of all contractors and other third parties who performed any work on the Units (or performed services relating thereto) for the benefit Kazakh Designees (including, without limitation, with respect to any construction warranties or guaranties).

7. The closing of the transfer of fee title to the Units to the Kazakhstan Entities or the Kazakh Designees is being consummated concurrently with the execution and delivery of this Agreement through execution and delivery of the following documents and instruments to the Kazakhstan Entities and the Kazakh Designee(s) and their designated title insurance company (i.e., First American Title Insurance Company of New York, whom the Transfer Parties hereby

**CONFIDENTIAL**

Confidential

Almaty-BTA0249885

CONFIDENTIAL

approve as the title insurer for such transactions), the receipt of which is hereby acknowledged.

(a) Bargain and Sale deeds with covenants against grantor's acts in customary New York form, duly executed by Sponsor.

(b) Consents, resolutions, certificates, organizational documents and such other documents as are reasonably necessary to establish to the satisfaction of the title insurance company and the Kazakhstan Entities that the consummation of the transactions described in this Agreement and the execution and delivery of the applicable documentation have been duly authorized by all necessary persons and entities.

(c) A certification stating that each Transfer Party is not a foreign person in the form then required by the Code Withholding Section, executed by each Transfer Party.

(d) A certificate from the managing agent of the Condominium acknowledging that all common charges and assessments due to the Condominium from the Sponsor with respect to the Units have been paid through the Effective Date and confirming that the transactions described herein are not subject to any right of first refusal, right of first offer or similar right (and acknowledging the conveyance described herein).

(e) All keys to the doors of, and mailboxes for, the Units.

(f) Such affidavits, indemnities and other deliveries as may be reasonably required by the title insurance company in order to issue the form of title insurance policy requested by the Kazakhstan Entities.

(g) New York City Real Property Transfer Tax Return and combined Real Property Transfer Tax Affidavits, and any other transfer tax returns required under any law, prepared, executed and acknowledged by Sponsor in proper form for submission.

(h) An affidavit stating that a single station smoke detecting alarm device is installed pursuant to New York Executive Law § 378(5), executed by Sponsor.

(i) A duly executed Bill of Sale conveying the Personal Property to the Kazakhstan Entities or the Kazakh Designee(s), executed by Sponsor, in the form approved by the Kazakhstan Entities, without representation

Confidential                                                                                        Almaty-BTA0249886

CONFIDENTIAL

or warranty except that the Personal Property is owned free and clear of encumbrances.

(j) Good standing certificates of each Transfer Party in their respective States of formation and the State of New York.

(k) New York State Equalization Return executed and acknowledged by Sponsor, in proper form for submission.

**CONFIDENTIAL**                    Exhibit A Page 6

Confidential                                          Almaty-BTA0249887

CONFIDENTIAL

**Exhibit A-1**

**Description of Units**

Confidential

Almaty-BTA0249888



Title No. 827451NY1
AMENDED 12/11/2017 (dmb)

## SCHEDULE "A"

THE CONDOMINIUM UNIT (THE "UNIT") KNOWN AS UNIT NO. PH2 IN THE BUILDING DESIGNATED AS 135 WEST 52ND STREET CONDOMINIUM IN THE DECLARATION ESTABLISHING A PLAN FOR CONDOMINIUM OWNERSHIP OF SAID PREMISES UNDER ARTICLE 9-B OF THE REAL PROPERTY LAW OF THE STATE OF NEW YORK (THE "NEW YORK CONDOMINIUM ACT"), DATED AS OF 04/27/2015 AND RECORDED IN THE OFFICE OF THE REGISTER OF NEW YORK COUNTY (THE "REGISTER'S OFFICE") ON 08/18/2015 AS CRFN 2015000286327, AS AMENDED BY FIRST AMENDMENT TO DECLARATION DATED AS OF 06/31/2017 AND RECORDED 10/05/2017 AS CRFN 2017000368925, AND ALSO DESIGNATED AS TAX LOT 1110 IN BLOCK 1005, OF THE BOROUGH OF MANHATTAN ON THE TAX MAP OF THE REAL PROPERTY ASSESSMENT DEPARTMENT OF THE CITY OF NEW YORK AND ON THE FLOOR PLANS OF SAID BUILDING, CERTIFIED BY JOHN CETRA, REGISTERED ARCHITECT, DATED 08/18/2015 AND FILED WITH THE REAL PROPERTY ASSESSMENT DEPARTMENT OF THE CITY OF NEW YORK AS CONDOMINIUM PLAN NO. 2605 AND ALSO FILED IN THE REGISTER'S OFFICE ON 08/18/2015 AS MAP NO. CRFN 2015000286328.

TOGETHER WITH AN UNDIVIDED 1.2400% INTEREST IN THE COMMON ELEMENTS.

THE PREMISES WITHIN WHICH THE UNITS ARE LOCATED ARE MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ALL THAT CERTAIN LOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE BOROUGH OF MANHATTAN, COUNTY, CITY AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF WEST 52ND STREET, DISTANT 375 FEET WESTERLY FROM THE NORTHWESTERLY CORNER OF AVENUE OF THE AMERICAS (FORMERLY KNOWN AS SIXTH AVENUE) AND WEST 52ND STREET;

RUNNING THENCE NORTHERLY AND PARALLEL WITH AVENUE OF THE AMERICAS AND PART OF THE WAY THROUGH A PARTY WALL, 100 FEET 5 INCHES TO THE CENTER LINE OF THE BLOCK BETWEEN WEST 52ND STREET AND WEST 53RD STREET;

THENCE WESTERLY ALONG THE SAID CENTER LINE OF THE BLOCK, 82 FEET 6 INCHES;

THENCE NORTHERLY PARALLEL WITH AVENUE OF THE AMERICAS AND PART OF THE DISTANCE THROUGH A PARTY WALL, 100 FEET 5 INCHES TO THE SOUTHERLY SIDE OF WEST 53RD STREET;

THENCE WESTERLY ALONG THE NORTHERLY SIDE OF WEST 53RD STREET, 37 FEET 6 INCHES;

THENCE SOUTHERLY PARALLEL WITH AVENUE OF THE AMERICAS AND PART OF THE DISTANCE THROUGH A PARTY WALL, 100 FEET 5 INCHES TO THE CENTER LINE OF THE BLOCK;

THENCE WESTERLY ALONG THE CENTER LINE OF THE BLOCK, 5 FEET 0 INCHES;

THENCE SOUTHERLY PARALLEL WITH AVENUE OF THE AMERICAS, 100 FEET 5 INCHES TO THE NORTHERLY SIDE OF WEST 52ND STREET;

CONTINUED...

## CONFIDENTIAL



TITLE NO. 3020-8274515NY1
SCHEDULE "A" CONTINUED

THENCE EASTERLY ALONG THE NORTHERLY SIDE OF WEST 52ND STREET, 125 FEET 0 INCHES TO THE POINT OR PLACE OF BEGINNING.

**THE** policy to be issued under this report will insure the title to such buildings and improvements erected on the premises, which by law constitute real property.

**FOR CONVEYANCING ONLY:** **TOGETHER** with all the right, title and interest of the party of the first part, of in and to the land lying in the street in front of and adjoining said premises.

**CONFIDENTIAL**

Confidential

Almaty-BTA0249890



Title No. 827451NY2

## SCHEDULE "A"

THE CONDOMINIUM UNIT (THE "UNIT") KNOWN AS UNIT NO. PH3 IN THE BUILDING DESIGNATED AS 135 WEST 52ND STREET CONDOMINIUM IN THE DECLARATION ESTABLISHING A PLAN FOR CONDOMINIUM OWNERSHIP OF SAID PREMISES UNDER ARTICLE 9-B OF THE REAL PROPERTY LAW OF THE STATE OF NEW YORK (THE "NEW YORK CONDOMINIUM ACT"), DATED AS OF 04/27/2015 AND RECORDED IN THE OFFICE OF THE REGISTER OF NEW YORK COUNTY (THE "REGISTER'S OFFICE") ON 06/18/2015 AS CRFN 2015000286327, AS AMENDED BY FIRST AMENDMENT TO DECLARATION DATED AS OF 08/31/2017 AND RECORDED 10/05/2017 AS CRFN 2017000368825, AND ALSO DESIGNATED AS TAX LOT 1109 IN BLOCK 1005, OF THE BOROUGH OF MANHATTAN ON THE TAX MAP OF THE REAL PROPERTY ASSESSMENT DEPARTMENT OF THE CITY OF NEW YORK AND ON THE FLOOR PLANS OF SAID BUILDING, CERTIFIED BY JOHN CETRA, REGISTERED ARCHITECT, DATED 06/18/2015 AND FILED WITH THE REAL PROPERTY ASSESSMENT DEPARTMENT OF THE CITY OF NEW YORK AS CONDOMINIUM PLAN NO. 2605 AND ALSO FILED IN THE REGISTER'S OFFICE ON 06/18/2015 AS MAP NO. CRFN 2015000286328.

TOGETHER WITH AN UNDIVIDED 1.3900% INTEREST IN THE COMMON ELEMENTS.

THE PREMISES WITHIN WHICH THE UNITS ARE LOCATED ARE MORE PARTICULARLY DESCRIBED AS FOLLOWS:

ALL THAT CERTAIN LOT, PIECE OR PARCEL OF LAND, SITUATE, LYING AND BEING IN THE BOROUGH OF MANHATTAN, COUNTY, CITY AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE NORTHERLY SIDE OF WEST 52ND STREET, DISTANT 375 FEET WESTERLY FROM THE NORTHWESTERLY CORNER OF AVENUE OF THE AMERICAS (FORMERLY KNOWN AS SIXTH AVENUE) AND WEST 52ND STREET;

RUNNING THENCE NORTHERLY AND PARALLEL WITH AVENUE OF THE AMERICAS AND PART OF THE WAY THROUGH A PARTY WALL, 100 FEET 5 INCHES TO THE CENTER LINE OF THE BLOCK BETWEEN WEST 52ND STREET AND WEST 53RD STREET;

THENCE WESTERLY ALONG THE SAID CENTER LINE OF THE BLOCK, 82 FEET 6 INCHES;

THENCE NORTHERLY PARALLEL WITH AVENUE OF THE AMERICAS AND PART OF THE DISTANCE THROUGH A PARTY WALL, 100 FEET 5 INCHES TO THE SOUTHERLY SIDE OF WEST 53RD STREET;

THENCE WESTERLY ALONG THE NORTHERLY SIDE OF WEST 53RD STREET, 37 FEET 6 INCHES;

THENCE SOUTHERLY PARALLEL WITH AVENUE OF THE AMERICAS AND PART OF THE DISTANCE THROUGH A PARTY WALL, 100 FEET 5 INCHES TO THE CENTER LINE OF THE BLOCK;

THENCE WESTERLY ALONG THE CENTER LINE OF THE BLOCK, 5 FEET 0 INCHES;

THENCE SOUTHERLY PARALLEL WITH AVENUE OF THE AMERICAS, 100 FEET 5 INCHES TO THE NORTHERLY SIDE OF WEST 52ND STREET;

CONTINUED...

## CONFIDENTIAL

Confidential                                                                    Almaty-BTA0249891



TITLE NO. 8274518NY2
SCHEDULE "A" CONTINUED

THENCE EASTERLY ALONG THE NORTHERLY SIDE OF WEST 52ND STREET, 125 FEET 0 INCHES TO THE POINT OR PLACE OF BEGINNING.

**THE** policy to be issued under this report will insure the title to such buildings and improvements erected on the premises, which by law constitute real property.

**FOR CONVEYANCING ONLY: TOGETHER** with all the right, title and interest of the party of the first part, of in and to the land lying in the street in front of and adjoining said premises.

**CONFIDENTIAL**

Confidential

Almaty-BTA0249892

CONFIDENTIAL

**Exhibit A-2**

**Temporary Certificates of Occupancy**

**CONFIDENTIAL**

Exhibit A-2 Page 1

Confidential

Almaty-BTA0249893



**Certificate of Occupancy**

Page 1 of 5

**CO Number:** 103146230T051

This certifies that the premises described herein conforms substantially to the approved plans and specifications and to the requirements of all applicable laws, rules and regulations for the uses and occupancies specified. No change of use or occupancy shall be made unless a new Certificate of Occupancy is issued. This document or a copy shall be available for inspection at the building at all reasonable times.

**A.**

| | | |
|---|---|---|
| Borough: Manhattan | Block Number: 01005 | Certificate Type: Temporary |
| Address: 129 WEST 52 STREET | Lot Number(s): 13 | Effective Date: 12/04/2017 |
| Building Identification Number (BIN): 1023160 | | Expiration Date: 03/04/2018 |
| | Building Type: New | |

For zoning lot metes & bounds, please see BISWeb.

**B.**

| | | |
|---|---|---|
| Construction classification: | 1-B | (1968 Code) |
| Building Occupancy Group classification: | J-1 | (1968 Code) |
| Multiple Dwelling Law Classification: | HAEA | |

| | | | |
|---|---|---|---|
| No. of stories: 48 | Height in feet: 492 | | No. of dwelling units: 109 |

**C.** Fire Protection Equipment:
Standpipe system, Fire alarm system, Sprinkler system

**D.** Type and number of open spaces:
None associated with this filing.

**E.** This Certificate is issued with the following legal limitations:
City Planning Commission - Recording Info: N850004ZCM

Outstanding requirements for obtaining Final Certificate of Occupancy:

There are 9 outstanding requirements. Please refer to BISWeb for further detail.

Borough Comments:   None

Borough Commissioner

Commissioner

DOCUMENT CONTINUES ON NEXT PAGE

**CONFIDENTIAL**

Confidential

Almaty-BTA0249894



**Certificate of Occupancy**

CO Number:     103146230T051

## Permissible Use and Occupancy

All Building Code occupancy group designations are 1968 designations, except RES, COM, or PUB which are 1938 Building Code occupancy group designations.

| Floor From To | Maximum persons permitted | Live load lbs per sq. ft. | Building Code occupancy group | Dwelling or Rooming Units | Zoning use group | Description of use |
|---|---|---|---|---|---|---|
| CEL | 3 | OG | J-2 | | 5 | PANTRY BREAK ROOM & ACCESSORY WORKSHOP & LOCKER ROOM |
| CEL | | OG | J-2 | | 2 | ACCESSORY BICYCLE STORAGE (TOTAL OF 550 SQ. FT.) |
| CEL | | OG | J-2 | | 5 | MAINTENANCE OFFICE, LAUNDRY & HOUSEKEEPING |
| CEL | 47 | OG | J-2 | | 5 | ACCESSORY POOL |
| CEL | | OG | J-2 | | 5, 2 | TELEPHONE ROOM, MECHANICAL ROOM, BOILER ROOM, CONDENSOR WATER ROOM, GAS METER ROOM, FIRE PUMP & WATER METER ROOM, ELEVATOR MACHINE ROOM, FUEL OIL TANK ROOM, SWITCHGEAR ROOM |
| 001 | 152 | 100 | E | | 6 | EATING AND DRINKING ESTABLISHMENT |
| 001 | | 100 | J-2 | | 2 | RESIDENTIAL LOBBY AND MAILROOM |
| 001 | | 100 | E | | 6 | COMMERCIAL LOBBY |
| 002 | | 100 | J-2 | | 6 | ELECTRICAL CLOSET & MECHANICAL ROOM |
| 002 | 62 | 100 | E | | 6 | COMMERCIAL OFFICE SPACE |
| 003 | | 100 | E | | 6 | ELECTRICAL CLOSET & MECHANICAL ROOM |
| 003 | 62 | 100 | E | | 6 | COMMERCIAL OFFICE SPACE |

Borough Commissioner

Commissioner

*DOCUMENT CONTINUES ON NEXT PAGE*

**CONFIDENTIAL**

Confidential

Almaty-BTA0249895


**Buildings**

*Certificate of Occupancy*

CO Number:      103146230T051

| Permissible Use and Occupancy | | | | | | |
|---|---|---|---|---|---|---|
| All Building Code occupancy group designations are 1968 designations, except RES, COM, or PUB which are 1938 Building Code occupancy group designations. | | | | | | |
| Floor From To | Maximum persons permitted | Live load lbs per sq. ft. | Building Code occupancy group | Dwelling or Rooming Units | Zoning use group | Description of use |
| 004 | | 100 | E | | 6 | ELECTRICAL CLOSET & MECHANICAL ROOM |
| 004 | 62 | 100 | E | | 6 | COMMERCIAL OFFICE SPACE |
| 005 | | 100 | E | | 6 | MECHANICAL ROOM |
| 005 | 62 | 100 | E | | 6 | COMMERCIAL OFFICE SPACE |
| 006 | 62 | 100 | E | | 6 | COMMERCIAL OFFICE SPACE |
| 006 | | 100 | E | | 6 | MECHANICAL ROOM |
| 007 | 52 | 40 | J-2 | | 6, 2 | ACCESSORY LOUNGE, ACCESSORY MEDIA ROOM, ACCESSORY STORAGE ROOM, CATERING KITCHEN |
| 007 | 22 | 40 | J-2 | | 6, 2 | ACCESSORY FITNESS ROOMS |
| 007 | 18 | 40 | E | | 6 | ACCESSORY OUTDOOR AMENITY TERRACE |
| 008 | | 40 | J-2 | 4 | 2 | FOUR (4) CLASS 'A' APARTMENTS |
| 009 015 | | 40 | J-2 | 6 | 2 | SIX (6) CLASS 'A' APARTMENTS ON EACH FLOOR |
| 016 020 | | 40 | J-2 | 3 | 2 | THREE (3) CLASS 'A' APARTMENTS ON EACH FLOOR |
| 021 024 | | 40 | J-2 | 4 | 2 | FOUR (4) CLASS 'A' APARTMENTS ON EACH FLOOR |

Borough Commissioner

Commissioner

*DOCUMENT CONTINUES ON NEXT PAGE*

**CONFIDENTIAL**

Confidential

Almaty-BTA0249896



## *Certificate of Occupancy*

**CO Number:**       103146230T051

| Permissible Use and Occupancy | | | | | |
|---|---|---|---|---|---|
| All Building Code occupancy group designations are 1968 designations, except RES, COM, or PUB which are 1938 Building Code occupancy group designations. | | | | | |
| Floor From To | Maximum persons permitted | Live load lbs per sq. ft. | Building Code occupancy group | Dwelling or Rooming Units | Zoning use group | Description of use |
| 025   028 | 40 | J-2 | 2 | 2 | TWO (2) CLASS 'A' APARTMENTS ON EACH FLOOR |
| 029   032 | 40 | J-2 | 3 | 2 | THREE (3) CLASS 'A' APARTMENT ON EACH FLOOR |
| 033   039 | 40 | J-2 | 1 | 2 | ONE (1) CLASS 'A' APARTMENT ON EACH FLOOR |
| 040 | 40 | J-2 | 0.5 | 2 | LOWER LEVEL OF ONE (1) CLASS 'A' APARTMENT (PH-A) |
| 041 | 40 | J-2 | 1 | 2 | UPPER LEVEL OF ONE (1) CLASS 'A' APARTMENT (PH-A) AND LOWER LEVEL OF ONE (1) CLASS 'A' APARTMENT (PH-B) |
| 042 | 40 | J-2 | 1 | 2 | LOWER LEVEL OF ONE (1) CLASS 'A' APARTMENTS (PH-C) AND UPPER LEVEL OF ONE (1) CLASS 'A' APARTMENTS (PH-B) |
| 043 | 40 | J-2 | 1 | 2 | UPPER LEVEL OF ONE (1) CLASS 'A' APARTMENT (PH-C) AND LOWER LEVEL OF ONE (1) CLASS 'A' APARTMENT (PH-D) |
| 044 | 40 | J-2 | 0.84 | 2 | UPPER LEVEL OF ONE (1) CLASS 'A' APARTMENT (PH-D) AND LOWER LEVEL (FIRST LEVEL) OF ONE (1) CLASS 'A' APARTMENT (PH-E) |
| 045 | 40 | J-2 | 0.33 | 2 | MID LEVEL (SECOND LEVEL) OF ONE (1) CLASS 'A' APARTMENT (PH-E) |
| 046 | 40 | J-2 | 0.33 | 2 | UPPER LEVEL (THIRD LEVEL) OF ONE (1) CLASS 'A' APARTMENT (PH-E) |
| 046 | 40 | J-2 | | 2 | ACCESSORY OUTDOOR AMENITY TERRACE |
| RO F | 40 | J-2 | | 2 | MECHANICAL ROOM, ELEVATOR MACHINE ROOM |

Borough Commissioner

Commissioner

DOCUMENT CONTINUES ON NEXT PAGE

**CONFIDENTIAL**

Confidential

Almaty-BTA0249897


**Buildings**

*Certificate of Occupancy*

Page 5 of 5

CO Number: 103146230T051

| Permissible Use and Occupancy | | | | | | |
|---|---|---|---|---|---|---|
| All Building Code occupancy group designations are 1968 designations, except RES, COM, or PUB which are 1938 Building Code occupancy group designations. | | | | | | |
| Floor From To | Maximum persons permitted | Live load lbs per sq. ft. | Building Code occupancy group | Dwelling or Rooming Units | Zoning use group | Description of use |
| RO F | | 400 | J-2 | | 2 | ELEVATOR HOIST ROOM, WATER TANK ROOM AND COOLING TOWER |

END OF SECTION

Borough Commissioner

Commissioner

103146230T051  12/4/2017  10:34:32 AM

**END OF DOCUMENT**

**CONFIDENTIAL**

Confidential

Almaty-BTA0249896

CONFIDENTIAL

**Exhibit A-3**

**Title**

Confidential

Almaty-BTA0249899

## MODIFICATION TO SETTLEMENT AGREEMENT

Agreement made March 8, 2018 by and among Joseph Chetrit, CF 135 Flat LLC, CF 135 West Member LLC, The Chetrit Group LLC (collectively, the "Chetrit Parties"), JSC BTA Bank and the City of Almaty (the "Parties").

WHEREAS, the Parties have entered into an agreement as of this date, which shall not be effective until released as set forth herein, a copy of which is attached hereto (the "Settlement Agreement"); and

WHEREAS, the Parties wish to amend the Settlement Agreement as set forth herein.

NOW THEREFORE IT IS AGREED AS FOLLOWS:

1)      Paragraph 2 of the Settlement Agreement is modified to provide that the $1,623,000 Cash Payment, as well as the Release Condition (as defined below), is to be made on April 30, 2018 rather than on the date hereof. The Cash Payment obligation is evidenced by a note (the "Note") of The Chetrit Group LLC, a copy of which is attached hereto as Exhibit 1.

2)      The obligations under the Note are being guaranteed by Joseph Chetrit pursuant to a Guaranty of Payment (the "Guaranty"), a copy of which is attached hereto as Exhibit 2.

3)      Until (a) the Cash Payment obligation evidenced by the Note is paid in full and (b) the transferor delivers a Satisfaction of Mechanics Lien in form acceptable to First American Title Insurance Company from Skyland Development Corp. and Greatest Glass & Mirror Inc. ((a) and (b) together, the "Release Condition"), the fully executed Settlement Agreement shall be held in escrow by Boies Schiller Flexner LLP ("BSF") and shall not be effective until released pursuant to Section 4 hereof. Upon compliance by the Chetrit Parties with the Release Condition, BSF shall immediately release the Settlement Agreement to Sukenik, Segal & Graff, P.C. ("SSG").

**CONFIDENTIAL**

Almaty-BTA0249900

4)      Subject to paragraph 5 below, if the Note is not paid or the Release Condition is not met by April 30, 2018, BSF shall notify SSG of such nonpayment, and if within ten (10) days after notice to SSG of such nonpayment the Note remains unpaid, the Settlement Agreement shall be deemed null and void.  If the Settlement Agreement is released to SSG it shall be deemed effective as of the date hereof. If the Note is not paid pursuant to its terms, the payee thereunder shall have the right to enforce the Note and Guaranty notwithstanding that its designee has acquired title to Units PH2 and PH3 as set forth in the Settlement Agreement.

5)      Notwithstanding anything to the contrary contained herein or in the Settlement Agreement, the parties hereto agree that, even though the Settlement Agreement is being held in escrow pursuant to the provisions hereof, the provisions thereof which relate to the transfer of the Units (as defined in the Settlement Agreements) are in full force and effect as of the date hereof including, without limitation, all representations and covenants set forth on Exhibit A to the Settlement Agreement (and in no event (including, without limitation, in the event that the Settlement Agreement is not released from escrow as provided herein) shall any Chetrit Party, Sponsor (as defined in the Settlement Agreement )or any other person or entity have any right to seek to rescind or unwind such transfer (which transfer the parties agree is final and irrevocable under all circumstances)).

6)      Paragraphs 15, 16, 17, 18, 19 and 20 of the Settlement Agreement are incorporated herein.

[Remainder of Page Intentionally Left Blank]

**CONFIDENTIAL**

Almaty-BTA0249901

4)      If the Note is not paid by the Due Date, BSF shall notify SSG of such nonpayment and if within ten (10) days after notice to SSG of such nonpayment the Note remains unpaid, the Settlement Agreement shall be deemed null and void.  If the Settlement Agreement is released to SSG it shall be deemed effective as of the date hereof. If the Note is not paid pursuant to its terms, the payee thereunder shall have the right to enforce the Note and Guaranty notwithstanding its designee has acquired title to Units PH2 and PH3 as set forth in the Settlement Agreement.

5)      Paragraphs 15, 16, 17, 18, 19 and 20 of the Settlement Agreement are incorporated herein.

IN WITNESS WHEREOF, the Parties have executed this Modification to Settlement Agreement as of the day and year first above written.

_____
Joseph Chetrit

CF 135 Flat LLC

By: _____

JSC BTA Bank

By: _____

CF 135 West Member LLC

By: _____

The Chetrit Group LLC

By: _____

City of Almaty, Kazakhstan

By: _____

**CONFIDENTIAL**

## *SATISFACTION OF MECHANIC'S LIEN*

To the **New York** County Clerk

**This is to Certify that** a certain Mechanic's Lien, filed in the Office of County Clerk

of      New York      on the      5-Feb-2018
in favor of claimant against the Building and Lot with the improvements thereon situated on

135 West 52nd Street
New York, NY 10019

### *Block 1005*
### *Lot 1003, 1005, 1006, 1100, 1101, 1103, 1105-1107, 1109-1111.*

Lienor                  **Greatest Glass & Mirror, Inc. dba Klahr Glass Co.**

Original Lien Amount      **$        355,704.50**

claimed against

**New Line Structures Inc.**
and
**135 West 52nd Street Owner LLC**

is satisfied,  and the undersigned does hereby consents that the same be discharged of record.

DATED      03/12/18

Jerry Manna Agent for
Greatest Glass & Mirror, Inc. dba Klahr Glass Co.

**ACKNOWLEDGMENT**

State of  New Jersey
County of  Hudson

On      March 12, 2018      before me, the above signor, personally appeared
Jerry Manna, Agent for  Greatest Glass & Mirror, Inc. dba Klahr Glass Co.
personally known to me or proved to me the basis of satisfactory evidence to be the individual(s) whose
name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the
same in his/her/their capacity(ies) and that by his/her/their signature(s) on the instrument, the individual(s), or
the person upon behalf of which the individual(s) acted, executed the instrument.

```
ANGELINE S MANGANIELLO
Commission # 50047763
Notary Public, State of New Jersey
My Commission Expires
October 14, 2021
```

Notary

**CONFIDENTIAL**

## SATISFACTION OF MECHANIC'S LIEN

To the Clerk of the County of New York and to others to whom it may concern:

**PLEASE TAKE NOTICE** that Skyland Development Corp., Lienor, had and claimed a Mechanic's Lien pursuant to the Lien Law of the State of New York, which Lien, in the amount of $108,532.80, was filed with the Office of the Clerk of the County of New York on February 5, 2018, against the property known as 135 West 52nd Street, New York, New York and designated as Block 1005 and Lot 1006, Lot 1101 and Lot 1110 on the New York County Tax Assessment Map, a copy of which lien is annexed hereto.

**PLEASE TAKE FURTHER NOTICE** that Skyland Development Corp., Lienor hereby consents to the release and discharge of the aforesaid Mechanic's Lien and directs that the Clerk of the County of New York discharge said Mechanic's Lien of record.

IN WITNESS WHEREOF, this Release and Discharge of Mechanic's Lien is executed under seal on the 28th day of February , 2018

Young S. Chung, the President of Skyland Development Corp., being duly sworn, has read the foregoing Release and Discharge of Mechanic's Lien and knows the contents thereof, and that the same is true to deponent's own knowledge, and that deponent is authorized to execute this Release and Discharge of Mechanic's Lien.

ACKNOWLEDGEMENT

By: _____

Name: Young s. Chung

Title: President


STATE OF New York )
                                    ) ss.:
COUNTY OF New York )

On the ___28th___ day of February in the year 2018, before me, the undersigned personally appeared Young S Chung , personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.


_____
NOTARY PUBLIC

JONG DAE HONG
Notary Public, State of New York
No. 01HO5017418
Qualified in Queens County
Commission Expires September 7, 2021

**CONFIDENTIAL**



**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

2018031500548001002E5EFC

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 6 |
|---|---|

**Document ID:** 2018031500548001
**Document Type:** DEED
**Document Page Count:** 5

Document Date: 03-08-2018          Preparation Date: 03-15-2018

**PRESENTER:**
FIRST AMERICAN TITLE INSURANCE CO NCS
666 THIRD AVENUE
3020-827451NY1AS
NEW YORK, NY 10017
212-850-0652
ASCARPA@FIRSTAM.COM

**RETURN TO:**
ASHER BELSKY
555 MADSION AVE 6TH FLOOR
DUVAL & STACHENFELD LLP
NEW YORK, NY 10022

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1005 | 1110 | Entire Lot  PH2 | 135 WEST 52ND STREET |

**Property Type:** BULK SALE OF CONDOMINIUMS

**CROSS REFERENCE DATA**

CRFN_____  *or*  DocumentID_____  *or* _____ Year_____ Reel____ Page_____  *or*  File Number_____

**PARTIES**

**GRANTOR/SELLER:**
135 WEST 52ND STREET OWNER LLC
512 SEVENTH AVENUE
NEW YORK, NY 10018

**GRANTEE/BUYER:**
SETTLEMENT RECOVERY 135 WEST PH2, INC
C/O BOIES SCHILLER FLEXNER LLP, 575
LEXINGTON AVENUE, 7TH FLOOR
NEW YORK, NY 10022

**FEES AND TAXES**

| Mortgage : | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ | 250.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | | | $ | 170,940.71 |
| TAXES:   County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 26,050.00 |
| Spec (Additional): | $ | 0.00 | | | |
| TASF: | $ | 0.00 | | | |
| MTA: | $ | 0.00 | | | |
| NYCTA: | $ | 0.00 | | | |
| Additional MRT: | $ | 0.00 | | | |
| TOTAL: | $ | 0.00 | | | |
| Recording Fee: | $ | 62.00 | | | |
| Affidavit Fee: | $ | 0.00 | | | |

**RECORDED OR FILED IN THE OFFICE**
**OF THE CITY REGISTER OF THE**
**CITY OF NEW YORK**
Recorded/Filed        05-15-2018 14:38
City Register File No.(CRFN):
**2018000090485**

*Annette M Hill*

**City Register Official Signature**

**CONFIDENTIAL**

Confidential                                                         Almaty-BTA0249905



**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City
Register will rely on the information provided
by you on this page for purposes of indexing
this instrument. The information on this page
will control for indexing purposes in the event
of any conflict with the rest of the document.

2018031500548001001EAEFC

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 6 |
|---|---|

**Document ID:** 2018031500548001    Document Date: 03-08-2018    Preparation Date: 03-15-2018
**Document Type:** DEED
**Document Page Count:** 5

**PRESENTER:**

FIRST AMERICAN TITLE INSURANCE CO NCS
666 THIRD AVENUE
3020-827451NY1AS
NEW YORK, NY 10017
212-850-0652
ASCARPA@FIRSTAM.COM

**RETURN TO:**

ASHER BELSKY
555 MADSION AVE 6TH FLOOR
DUVAL & STACHENFELD LLP
NEW YORK, NY 10022

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1005 | 1110 | Entire Lot PH2 | 135 WEST 52ND STREET |

**Property Type:** BULK SALE OF CONDOMINIUMS

**CROSS REFERENCE DATA**

CRFN_____ *or*  DocumentID_____ *or* _____ Year____  Reel____  Page____  *or*  File Number_____

**PARTIES**

**GRANTOR/SELLER:**
135 WEST 52ND STREET OWNER LLC
512 SEVENTH AVENUE
NEW YORK, NY 10018

**GRANTEE/BUYER:**
SETTLEMENT RECOVERY 135 WEST PH2, INC
C/O BOIES SCHILLER FLEXNER LLP, 575
LEXINGTON AVENUE, 7TH FLOOR
NEW YORK, NY 10022

**FEES AND TAXES**

| Mortgage : | | | Filing Fee: | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ 250.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | |
| Exemption: | | | | $ 170,940.71 |
| TAXES:  County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | | $ 26,050.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 0.00 | | |
| MTA: | $ | 0.00 | | |
| NYCTA: | $ | 0.00 | | |
| Additional MRT: | $ | 0.00 | | |
| TOTAL: | $ | 0.00 | | |
| Recording Fee: | $ | 62.00 | | |
| Affidavit Fee: | $ | 0.00 | | |

**CONFIDENTIAL**

Confidential

Almaty-BTA0249906

302~827451 NY/
B ~ 1005
L ~ 1109

## UNIT DEED

THIS INDENTURE made the 8th day of March, 2018, between

135 WEST 52ND STREET OWNER LLC, a Delaware limited liability company having an office at 512 Seventh Avenue, New York New York 10018 "Grantor";

and,

Settlement Recovery 135 West PH2, Inc., residing at c/o Boies Schiller Flexner LLP, Attn: Matthew L. Schwartz, 575 Lexington Avenue, 7th Floor, New York, NY 10022 "Grantee";

## WITNESSETH:

That the Grantor, in consideration of Ten ($10.00) Dollars and other valuable consideration paid by the Grantee, does hereby grant and release unto the Grantee, and the heirs or successors and assigns of the Grantee, forever:

The Condominium Unit (hereinafter referred to as the "Unit) known as Unit PH2 in the building (hereinafter referred to as the "Building") known as the 135 West 52nd Street Condominium and by the Street Number 135 West 52nd Street, Borough of Manhattan, County, City and State of New York, said Unit being designated and described as Unit PH2 in a certain Declaration dated 04/27/2015, made by Grantor pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act"), establishing a plan for condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit "A" annexed hereto and by reference made a part hereof), which Declaration was recoded in the Office of the New York City Register on 08/18/2015 in CRFN 2015000286327 (which Declaration and Amendments thereto are collectively referred to as the "Declaration"). The Unit is also designated as Tax Lot 1110 in Block 1005 on the Tax Map of the City of New York for the County of New York and on the Floor Plans of the Building, certified by John Centra on 08/10/2015 as Condominium Plan Number 2605, and also filed in the Office of the New York City Register on 08/18/2015 as Condominium Map Number 2605.

Being and intended to be part of the same premises as conveyed to the Grantee by deed dated 3/25/2013 recorded 4/29/2013 in CRFN: 2013000169272.

TOGETHER with an undivided 1.2400% interest in the Common Elements as such term is defined in the Declaration (hereinafter called the "Common Elements");

**CONFIDENTIAL**

Confidential

Almaty-BTA0249907

**TOGETHER** with an easement for the continuance of all encroachments by the Unit on any adjoining Units or Common Elements now existing as a result of construction of the Building, or which may come into existence hereafter as a result of settling of the Building, or as a result of repair or restoration of the Building, or the Unit, after damage by fire or other casualty, or after taking in condemnation or eminent domain proceedings, or by reason of an alteration or repair to the Common Elements made by or with the consent of the Board of Managers, so that any such encroachments may remain so long as the Building shall stand;

**TOGETHER** with an easement in common with the Owners of other Units to use any pipes, wires, ducts, cables, conduits, public utility lines, and other Common Elements located in any of the other Units or elsewhere on the Property, and serving the Unit;

**TOGETHER** with the appurtenances and all the estate and rights of the Grantor in and to the Unit;

**TOGETHER** with all easements of necessity in favor of the Unit or in favor of other Units or the Common Elements;

**TOGETHER** with and **SUBJECT TO EASEMENTS**, rights of way, restrictions and encumbrances created by the Declaration for 135 West 52nd Street Condominium recorded in the New York County Office of the Register of the City of New York on the 18th day of August, 2015, as CRFN 2015000286327.

**SUBJECT** to the provisions of the Declaration, By-Laws, and Floor Plans of the Condominium recorded simultaneously with and as part of the Declaration, as the same may be amended from time to time by instruments recorded in the New York County Office of the Register of the City of New York, which provisions, together with any amendments thereto, shall constitute covenants running with the land and shall bind any person having at any time any interest or estate in the Unit, as though such provisions were recited and stipulated at length herein;

**EXCEPT** as otherwise specifically permitted by the Board of Managers of the Condominium or provided in the Declaration or in the By-Laws, the Unit is intended for Residential use only;

**AND** the Grantor covenants that the Grantor has not done or suffered anything whereby the said premises have been encumbered in any way whatsoever, except as aforesaid;

**TO HAVE AND TO HOLD** the same unto the Grantee, and the heirs or successors and assigns of the Grantee, forever.

If any provision of the Declaration or the By-Laws is invalid under, or would cause the Declaration or the By-Laws to be insufficient to submit the Property to, the provisions of the Condominium Act, or if any provision that is necessary to cause the Declaration and the By-Laws to be sufficient to submit the Property to the provisions of the Condominium Act is missing from the Declaration or the By-Laws, or if the Declaration and the By-Laws are

**CONFIDENTIAL**

Confidential

insufficient to submit the Property to the provisions of the Condominium Act, the applicable provisions of clause 17 of the Declaration shall control.

The Grantor, in compliance with Section 13 of the Lien Law, covenants that the Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvements before using any part of the same for any other purpose.

The Grantee accepts and ratifies the provisions of the Declaration and the By-Laws and the Rules and Regulations of the Condominium recorded simultaneously with and as part of the Declaration and agrees to comply with all the terms and provisions thereof, as the same may be amended from time to time by instruments recorded in the office of the New York City Register, New York County.

This conveyance has been made with the consent of all the members of the party of the first part entitled to vote thereon at a meeting duly called.

**IN WITNESS WHEREOF,** the Grantor has duly executed this deed the day and year first above written.

Grantor:

135 WEST 52ND STREET OWNER LLC

By: _____
Name: 
Title: 

Settlement Recovery 135 West PH2, Inc.

By: _____
Name: Nurlan Nurgabiyev
Title: Director

**CONFIDENTIAL**

Confidential

Almaty-BTA0249909

STATE OF NEW YORK      )
                                                 )ss.:
COUNTY OF NEW YORK   )

On the _8th_ day of _March_, in the year _2018_, before me, the undersigned, a Notary Public in and for said state, personally appeared _Meyer Chelбит_ personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to in the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

MARK FRIEDMAN
Notary Public, State of New York
No. 01FR6079740
Qualified Kings County
Commission Expires Sept. 3, 2018

STATE OF NEW YORK      )
                                                 )ss.:
COUNTY OF NEW YORK   )

On the _8th_ day of _March_, in the year _2018_, before me, the undersigned, a Notary Public in and for said state, personally appeared _Nurlan Norganaliev_ personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to in the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

MARK FRIEDMAN
Notary Public, State of New York
No. 01FR6079740
Qualified Kings County
Commission Expires Sept. 3, 2018

**CONFIDENTIAL**

Almaty-BTA0249910

**EXHIBIT "A"**

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the Northerly side of West 52nd Street, distant 375 feet Westerly from the Northwesterly corner of Avenue of the Americas (formerly known as Sixth Avenue) and West 52nd Street;

RUNNING THENCE Northerly and parallel with Avenue of the Americas, 100 feet 5 inches to the center line of the block between West 52nd Street and West 53rd Street;

THENCE Westerly along the said center line of the block, 82 feet 6 inches;

THENCE Northerly parallel with Avenue of the Americas, 100 feet 5 inches to the Southerly side of West 53rd Street;

THENCE Westerly along the Northerly side of West 53rd Street, 37 feet 6 inches;

THENCE Southerly parallel with Avenue of the Americas and part of the distance through a party wall, 100 feet 5 inches to the center line of the block;

THENCE Westerly along the center line of the block, 5 feet 0 inches;

THENCE Southerly parallel with Avenue of the Americas, 100 feet 5 inches to the Northerly side of West 52nd Street;

THENCE Easterly along the Northerly side of West 52nd Street, 125 feet 0 inches to the point or place of BEGINNING.

**CONFIDENTIAL**

Confidential

Almaty-BTA0249911



**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

2018031501031001001E180E

| RECORDING AND ENDORSEMENT COVER PAGE | | PAGE 1 OF 6 |
|---|---|---|
| **Document ID:** 2018031501031001 | Document Date: 03-08-2018 | Preparation Date: 03-15-2018 |

Document Type: DEED
Document Page Count: 5

| **PRESENTER:** | **RETURN TO:** |
|---|---|
| FIRST AMERICAN TITLE INSURANCE CO NCS<br>666 THIRD AVENUE<br>3020-87451NY2AS<br>NEW YORK, NY 10017<br>212-850-0652<br>ASCARPA@FIRSTAM.COM | ASHER BELSKY<br>555 MADSION AVE 6TH FLOOR<br>DUVAL & STACHENFELD LLP<br>NEW YORK, NY 10022 |

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1005 | 1109 | Entire Lot | PH3 | 135 WEST 52ND STREET |

Property Type: BULK SALE OF CONDOMINIUMS

**CROSS REFERENCE DATA**

CRFN_____  *or*  DocumentID_____  *or*  _____  Year____  Reel____  Page_____  *or*  File Number_____

**PARTIES**

| **GRANTOR/SELLER:** | **GRANTEE/BUYER:** |
|---|---|
| 135 WEST 52ND STREET OWNER LLC<br>512 SEVENTH AVENUE<br>NEW YORK, NY 10018 | SETTLEMENT RECOVERY 135 WEST PH3, INC<br>C/O BOIES SCHILLER FLEXNER LLP, 575<br>LEXINGTON AVENUE, 7TH FLOOR<br>NEW YORK, NY 10022 |

**FEES AND TAXES**

| Mortgage : | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | | $ | 250.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | | |
| Exemption: | | | | $ | 179,867.46 |
| TAXES: County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 0.00 | | $ | 27,410.00 |
| Spec (Additional): | $ | 0.00 | **RECORDED OR FILED IN THE OFFICE** | | |
| TASF: | $ | 0.00 | **OF THE CITY REGISTER OF THE** | | |
| MTA: | $ | 0.00 | **CITY OF NEW YORK** | | |
| NYCTA: | $ | 0.00 | Recorded/Filed | 03-16-2018 09:49 | |
| Additional MRT: | $ | 0.00 | City Register File No.(CRFN): | | |
| TOTAL: | $ | 0.00 | | | 2018000091302 |
| Recording Fee: | $ | 62.00 | | | |
| Affidavit Fee: | $ | 0.00 | | | |

*City Register Official Signature*

**CONFIDENTIAL**

Confidential

Almaty-BTA0249912



**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

2018031501031001001E180E

| RECORDING AND ENDORSEMENT COVER PAGE | PAGE 1 OF 6 |
|---|---|

**Document ID:** 2018031501031001    Document Date: 03-08-2018    Preparation Date: 03-15-2018
**Document Type:** DEED
**Document Page Count:** 5

| PRESENTER: | RETURN TO: |
|---|---|
| FIRST AMERICAN TITLE INSURANCE CO NCS<br>666 THIRD AVENUE<br>3020-87451NY2AS<br>NEW YORK, NY 10017<br>212-850-0652<br>ASCARPA@FIRSTAM.COM | ASHER BELSKY<br>555 MADSION AVE 6TH FLOOR<br>DUVAL & STACHENFELD LLP<br>NEW YORK, NY 10022 |

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| MANHATTAN | 1005 | 1109 | Entire Lot  PH3 | 135 WEST 52ND STREET |

**Property Type:** BULK SALE OF CONDOMINIUMS

**CROSS REFERENCE DATA**

CRFN_____   or   DocumentID_____   or   _____ Year_____ Reel____ Page_____   or   File Number_____

**PARTIES**

| GRANTOR/SELLER: | GRANTEE/BUYER: |
|---|---|
| 135 WEST 52ND STREET OWNER LLC<br>512 SEVENTH AVENUE<br>NEW YORK, NY 10018 | SETTLEMENT RECOVERY 135 WEST PH3, INC<br>C/O BOIES SCHILLER FLEXNER LLP, 575<br>LEXINGTON AVENUE, 7TH FLOOR<br>NEW YORK, NY 10022 |

**FEES AND TAXES**

| Mortgage : | | | Filing Fee: | |
|---|---|---|---|---|
| Mortgage Amount: | $ | 0.00 | $ | 250.00 |
| Taxable Mortgage Amount: | $ | 0.00 | NYC Real Property Transfer Tax: | |
| Exemption: | | | $ | 179,867.46 |
| TAXES:   County (Basic): | $ | 0.00 | NYS Real Estate Transfer Tax: | |
| City (Additional): | $ | 0.00 | $ | 27,410.00 |
| Spec (Additional): | $ | 0.00 | | |
| TASF: | $ | 0.00 | | |
| MTA: | $ | 0.00 | | |
| NYCTA: | $ | 0.00 | | |
| Additional MRT: | $ | 0.00 | | |
| TOTAL: | $ | 0.00 | | |
| Recording Fee: | $ | 62.00 | | |
| Affidavit Fee: | $ | 0.00 | | |

**CONFIDENTIAL**

Confidential



302 - 8 (SHA)

B - 1005

L - 1109

## UNIT DEED

**THIS INDENTURE** made the 8th day of March, 2018, between

**135 WEST 52ND STREET OWNER LLC,** a Delaware limited liability company having an office at 512 Seventh Avenue, New York New York 10018 "Grantor";

and,

Settlement Recovery 135 West PH3, Inc., residing at c/o Boies Schiller Flexner LLP, Attn: Matthew L. Schwartz, 575 Lexington Avenue, 7th Floor, New York, NY 10022 "Grantee";

## WITNESSETH:

That the Grantor, in consideration of Ten ($10.00) Dollars and other valuable consideration paid by the Grantee, does hereby grant and release unto the Grantee, and the heirs or successors and assigns of the Grantee, forever:

The Condominium Unit (hereinafter referred to as the "Unit) known as Unit PH3 in the building (hereinafter referred to as the "Building") known as the 135 West 52nd Street Condominium and by the Street Number 135 West 52nd Street, Borough of Manhattan, County, City and State of New York, said Unit being designated and described as Unit PH3 in a certain Declaration dated 04/27/2015, made by Grantor pursuant to Article 9-B of the Real Property Law of the State of New York (hereinafter referred to as the "Condominium Act"), establishing a plan for condominium ownership of the Building and the Land (hereinafter referred to as the "Land") upon which the Building is situate (which Land is more particularly described in Exhibit "A" annexed hereto and by reference made a part hereof), which Declaration was recorded in the Office of the New York City Register on 08/18/2015 in CRFN 2015000286327 (which Declaration and Amendments thereto are collectively referred to as the "Declaration"). The Unit is also designated as Tax Lot 1109 in Block 1005 on the Tax Map of the City of New York for the County of New York and on the Floor Plans of the Building, certified by John Centra on 08/10/2015 as Condominium Plan Number 2605, and also filed in the Office of the New York City Register on 08/18/2015 as Condominium Map Number 2605.

Being and intended to be part of the same premises as conveyed to the Grantor by deed dated 3/25/2013 recorded 4/29/2013 in CRFN: 2013000169272.

**TOGETHER** with an undivided 1.3900% interest in the Common Elements as such term is defined in the Declaration (hereinafter called the "Common Elements");

**CONFIDENTIAL**

(s)

Confidential

**TOGETHER** with an easement for the continuance of all encroachments by the Unit on any adjoining Units or Common Elements now existing as a result of construction of the Building, or which may come into existence hereafter as a result of settling of the Building, or as a result of repair or restoration of the Building, or the Unit, after damage by fire or other casualty, or after taking in condemnation or eminent domain proceedings, or by reason of an alteration or repair to the Common Elements made by or with the consent of the Board of Managers, so that any such encroachments may remain so long as the Building shall stand;

**TOGETHER** with an easement in common with the Owners of other Units to use any pipes, wires, ducts, cables, conduits, public utility lines, and other Common Elements located in any of the other Units or elsewhere on the Property, and serving the Unit;

**TOGETHER** with the appurtenances and all the estate and rights of the Grantor in and to the Unit;

**TOGETHER** with all easements of necessity in favor of the Unit or in favor of other Units or the Common Elements;

**TOGETHER** with and **SUBJECT TO EASEMENTS**, rights of way, restrictions and encumbrances created by the Declaration for 135 West 52nd Street Condominium recorded in the New York County Office of the Register of the City of New York on the 18th day of August, 2015, as CRFN 2015000286327.

**SUBJECT** to the provisions of the Declaration, By-Laws, and Floor Plans of the Condominium recorded simultaneously with and as part of the Declaration, as the same may be amended from time to time by instruments recorded in the New York County Office of the Register of the City of New York, which provisions, together with any amendments thereto, shall constitute covenants running with the land and shall bind any person having at any time any interest or estate in the Unit, as though such provisions were recited and stipulated at length herein;

**EXCEPT** as otherwise specifically permitted by the Board of Managers of the Condominium or provided in the Declaration or in the By-Laws, the Unit is intended for Residential use only;

**AND** the Grantor covenants that the Grantor has not done or suffered anything whereby the said premises have been encumbered in any way whatsoever, except as aforesaid;

**TO HAVE AND TO HOLD** the same unto the Grantee, and the heirs or successors and assigns of the Grantee, forever.

If any provision of the Declaration or the By-Laws is invalid under, or would cause the Declaration or the By-Laws to be insufficient to submit the Property to, the provisions of the Condominium Act, or if any provision that is necessary to cause the Declaration and the By-Laws to be sufficient to submit the Property to the provisions of the Condominium Act is missing from the Declaration or the By-Laws, or if the Declaration and the By-Laws are

**CONFIDENTIAL**

Confidential

insufficient to submit the Property to the provisions of the Condominium Act, the applicable provisions of clause 17 of the Declaration shall control.

The Grantor, in compliance with Section 13 of the Lien Law, covenants that the Grantor will receive the consideration for this conveyance and will hold the right to receive such consideration as a trust fund for the purpose of paying the cost of the improvement and will apply the same first to the payment of the cost of the improvements before using any part of the same for any other purpose.

The Grantee accepts and ratifies the provisions of the Declaration and the By-Laws and the Rules and Regulations of the Condominium recorded simultaneously with and as part of the Declaration and agrees to comply with all the terms and provisions thereof, as the same may be amended from time to time by instruments recorded in the office of the New York City Register, New York County.

This conveyance has been made with the consent of all the members of the party of the first part entitled to vote thereon at a meeting duly called.

**IN WITNESS WHEREOF,** the Grantor has duly executed this deed the day and year first above written.

Grantor:

135 WEST 52ND STREET OWNER LLC

By: _____
Name: _____
Title: _____

Settlement Recovery 135 West PH3, Inc.

By: _____
Name: Nurlan Nurgabiyev
Title: Director

**CONFIDENTIAL**

Confidential

STATE OF NEW YORK        )

                                        )ss.:

COUNTY OF NEW YORK  )

   On the _____ day of _____ March _____, in the year 2018 _____, before me, the
undersigned, a Notary Public in and for said state, personally appeared _Ilyas Chelil_,
personally known to me or proved to me on the basis of satisfactory evidence to be the individual
whose name is subscribed to in the within instrument and acknowledged to me that he executed
the same in his capacity, and that by his signature on the instrument, the individual, or the person
upon behalf of which the individual acted, executed the instrument.

                                          _____
                                                   Notary Public

                                   MARK FRIEDMAN
                                Notary Public, State of New York
                                       No. 01FR6079740
                                    Qualified Kings County
                                Commission Expires Sept. 3, 2018

STATE OF NEW YORK        )

                                        )ss.:

COUNTY OF NEW YORK  )

   On the _____ day of _____ March _____, in the year 2018 _____, before me, the
undersigned, a Notary Public in and for said state, personally appeared _Nurlan Nurgaliyev_
personally known to me or proved to me on the basis of satisfactory evidence to be the
individual(s) whose name(s) is (are) subscribed to in the within instrument and acknowledged to
me that he/she/they executed the same in his/her/their capacity, and that by his/her/their signature
on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted,
executed the instrument.

                                          _____
                                                   Notary Public

                                   MARK FRIEDMAN
                                Notary Public, State of New York
                                       No. 01FR6079740
                                    Qualified Kings County
                                Commission Expires Sept. 3, 2018

**CONFIDENTIAL**

Confidential

## EXHIBIT "A"

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan, City, County and State of New York, bounded and described as follows:

BEGINNING at a point on the Northerly side of West 52nd Street, distant 375 feet Westerly from the Northwesterly corner of Avenue of the Americas (formerly known as Sixth Avenue) and West 52nd Street;

RUNNING THENCE Northerly and parallel with Avenue of the Americas, 100 feet 5 inches to the center line of the block between West 52nd Street and West 53rd Street;

THENCE Westerly along the said center line of the block, 82 feet 6 inches;

THENCE Northerly parallel with Avenue of the Americas, 100 feet 5 inches to the Southerly side of West 53rd Street;

THENCE Westerly along the Northerly side of West 53rd Street, 37 feet 6 inches;

THENCE Southerly parallel with Avenue of the Americas and part of the distance through a party wall, 100 feet 5 inches to the center line of the block;

THENCE Westerly along the center line of the block, 5 feet 0 inches;

THENCE Southerly parallel with Avenue of the Americas, 100 feet 5 inches to the Northerly side of West 52nd Street;

THENCE Easterly along the Northerly side of West 52nd Street, 125 feet 0 inches to the point or place of BEGINNING.

**CONFIDENTIAL**

Almaty-BTA0249918

# SUKENIK, SEGAL & GRAFF, P.C.

ATTORNEYS AND COUNSELORS AT LAW

450 SEVENTH AVENUE, 42ND FLOOR
NEW YORK, N.Y. 10123

212-725-9300 PHONE
212-481-5520 FAX

March 8, 2018

Matthew Schwartz, Esq.
Boies Schiller Flexner LLP
575 Lexington Avenue
New York, New York 10022

Re:     Settlement Agreement (the "Settlement Agreement") and Modification
        To Settlement Agreement (the "Modification"), each dated March 8,
        2018

Matt:

By signing below, Boies Schiller Flexner LLP hereby agrees and acknowledges that
it is holding the fully executed Settlement Agreement between our clients in escrow
pursuant to paragraph 3 of the Modification, and shall release the Settlement Agreement to
our firm upon our client's compliance with the Release Condition set forth in paragraph 3
of the Modification.

Very truly yours,

**SUKENIK, SEGAL & GRAFF, P.C.**

David C. Segal, Esq.

Agreed and Acknowledged:

**BOIES SCHILLER FLEXNER LLP**

By: Matthew Schwartz, Esq.

**CONFIDENTIAL**