# Exhibit 1

I, **NICOLAS BOURG**, being duly sworn, depose and state as follows:

1. I am a Belgian national, and currently reside in Belgium, where I was born. I attended the University of Leuven, where I studied economics. After my education I worked at a family business, C.P. Bourg, before transitioning to work in real estate finance.

2. I was the sole director of Triadou, a company formed in 2011 by Ilyas Khrapunov ("Ilyas"), until my termination in late 2014. As such, I worked closely with Ilyas, and executed most of Triadou's investments in the United States during that time.

### *Relationship with Ilyas*

3. In 2006, I was involved in a real estate deal in Switzerland. As part of that transaction, I first met Ilyas. Ilyas was attending university in Switzerland at that time, but expressed an interest in real estate investing. In 2008-2009, I again met Ilyas in Switzerland, where we discussed plans to form a real estate investment fund together. This fund was formed in Luxembourg and was started with seed money obtained from Ilyas' family wealth.

4. At that time, Ilyas told me that he had access to large amounts of capital, both through his immediate family and through his father-in-law, Mukhtar Ablyazov ("Ablyazov").

### *Formation of Triadou*

5. In or about 2011, Ilyas approached me seeking to create a real estate fund to be controlled by Swiss Development Group ("SDG"), which would invest in real estate opportunities worldwide. Ilyas told me that his family and the Ablyazov family were political opponents of the Government of the Republic of Kazakhstan, and as such, needed to conceal their assets and business dealings.

6. At Ilyas's direction, I formed a series of entities under the laws of Luxembourg for the specific purpose of investing in real estate in the United States. These entities included Triadou,

an investment vehicle wholly owned and controlled by SDG, which was beneficially owned by Ilyas and used to conceal that ownership and the movement and investment of Ablyazov's moneys. I was the sole director of Triadou, operating at Ilyas's direction, who continued to control SDG. SDG as set forth below was created by the Khrapunov family and controlled by Ilyas.

7.  With respect to my role in the Company, Ilyas was the only decision maker for Triadou. Ilyas selected the deals to invest in from a number of opportunities, then negotiated the deal and organized payment. However, Ilyas informed me that the only person who gave him final approval on any deal was Ablyazov. Ablyazov was the ultimate decision maker for Ilyas, as Ilyas stated he was managing Ablyazov's money. According to Ilyas, while he has significant freedom in the management of various investments, the final decisions were always from Ablyazov. I would confirm that fact on several occasions, wherein Ilyas needed to wait for Ablyazov's approval before authorizing a particular Triadou investment.

### *Triadou's Involvement in United States Investments*

8.  At Ilyas's direction, I contacted Eric Elkain, an agent of Joseph Chetrit of the Chetrit Group, a well-known real estate developer in New York. Elkain agreed to arrange a meeting between Chetrit and Ilyas to discuss investments by Ilyas in the United States.

9.  In or about 2012, Joseph Chetrit and his brother and partner, Juda Chetrit, met with Ilyas and me, in Geneva, Switzerland, to assess possible investment opportunities.

10. As a result of these discussions, Ilyas agreed to invest with Chetrit through Triadou in a number of real estate opportunities in New York City. The most significant of these were investments in the Flatotel and Cabrini Medical Center developments in New York City. The Flatotel is a 289-room business hotel opened in 1991, located at 135 West 52nd St, New York, NY. The Cabrini Medical Center hospital campus closed in 2008 and is now comprised of several

2

Almaty-BTA0166288

buildings containing approximately 250 condominium units. Both properties were purchased by members of the Chetrit Group. The developers have been executing plans to convert both properties into luxury condominiums, and are close to completion.

11. In Order to hold Chetrit's 75% interest in Flatotel, Chetrit created a series of limited liability entities to hold that interest, including CF 135 FLAT LLC and CF 135 West Member LLC.

12. Chetrit offered to sell half of their 75% investment in the Flatotel to Triadou. Chetrit proposed that Triadou purchase half of that 75% interest (37.5 of the total), with profits to be split 60/40 in favor of Chetrit, as compensation for Chetrit's efforts to promote and develop the property. Triadou accepted the offer. Based on current evaluations of the real estate market in New York City, Triadou's interest in this transaction would be worth approximately $100 million, plus reimbursement of the initial investment, for a total value of in the vicinity of $130 million. Due to the difficulties in moving money through Luxembourg, funds were transferred directly to Chetrit.

13. Chetrit was told at the time of these agreements that the funds being invested through Triadou were the same assets in controversy in proceedings in Switzerland and the U.K., wherein it was alleged that such assets were stolen from BTA Bank and the people of Almaty.

14. Chetrit was acutely aware of the criminal charges facing Ablyazov. Even at the first meeting, Chetrit inquired about Ablyazov's current criminal status and the attempts being made worldwide to seize his funds. Going forward, a conversation regarding Ablyazov's current criminal status was the starting point of every meeting between Chetrit, Ilyas, and myself. Many of these meetings were recorded.

15. Through Triadou, Ilyas entered a second investment with Chetrit shortly thereafter. In late 2012, Triadou agreed to invest $12 million in the Cabrini Medical Center conversion, a joint venture between Chetrit and another private developer to convert a former medical center in New

Almaty-BTA0166289

York City into luxury condominiums.

16. Due to increasing law enforcement scrutiny on the Ablyazov's finances, the $12 million investment became impossible. I discussed this obstacle with Chetrit, who agreed that Triadou should invest $6 million, half the originally-agreed amount, until further funds became available. Again, the funds to close this deal were transferred directly from the Ablyazov Family' offshore accounts to an attorney in New York working on Chetrit's behalf.

17. Monthly meetings occurred in Geneva between myself, Ilyas, Peter Sztyk (an advisor of Ilyas) and my longtime business partner, Laurent Foucher ("Foucher"). The agenda at each meeting was to discuss every deal that existed in the Ilyas's empire. At those meetings, I frequently received directions from Ilyas regarding the various business ventures, including Triadou. Ilyas told me that he mostly used a company named Telford International to execute the payments for the majority of the deals. Ilyas told me that Telford was one of Ablyazov's investment companies.

## *Formation of Element One*

18. At the direction of Ilyas, I formed a Luxembourg real estate entity named "Element One," of which I owned 25%. Philippe Glatz ("Glatz") and SDG owned the remaining 75%.

19. Ilyas met Glatz through their mutual involvement in a political party, the Party Democrat Christian ("PDC"). Ilyas informed me that Glatz was a front and would be the best protection to help insulate Ilyas and his family from potential money laundering investigation. Consistent with Ilyas' description of Glatz being nothing more than a nominee, during all the years that I ran Triadou and was involved in Element One, I never saw Glatz in any meetings, nor did he ever come to the U.S. to participate in any meetings. Glatz never took any role in the decision-making process and was never copied on any e-mail during the entire three-year period. I only met

4

Glatz on three occasions for approximately 10 minutes each time.

20. I was the CEO of Element One, while Glatz is the current owner of SDG, though his official title is President of SDG. As set forth above, this was a sham ownership and Ilyas effectively controlled Glatz. Indeed, as described below with the Porto Heli/Nikki Beach transaction, a bank (Black Sea Bank) declined funding based upon its KYC diligence of SDG, determining that Glatz was a straw purchaser and the original ownership and control of SDG by the Khrapunov's had not actually changed.

21. The formation of Element One was a slow process, as we had to comply with regulatory requirements in Luxembourg. While the formation process was underway, Ilyas and I went on a "roadshow" scouting properties for possible investments. Element One even began investing before the entity was fully formed and before it had completed the regulatory process in Luxembourg.

22. SDG was created with funds from the Khrapunov family. The funds used to create SDG were from Leila Khrapunov. Philippe Glatz was described by Ilyas as the "solution" to increasing law enforcement scrutiny on SDG in 2012. As indicated above, Glatz is the purported owner and President of SDG, but Ilyas runs all aspects of the business, ostensibly as an "external adviser" to SDG. This sham sale of SDG to Glatz was in response to banks refusals to move SDG's money, thus limiting its investment opportunities. The sale of SDG to Glatz was conducted as a real transaction, with money changing hands from Glatz to the Khrapunov family. However, the consideration paid by Glatz to SDG was itself loaned to Glatz by Ilyas, thus creating an apparent sale, but effectively leaving the parties in the same position financially. This sale occurred shortly after the initial purchase by Triadou of its interest in the Flatotel.

*Nikki Beach Development*

Almaty-BTA0166291

23. At Ilyas's direction, I formed a SPV called Port Heli for the purpose of investing in a luxury development in the Nikki Beach Development located in Porto Heli, Greece. On May 10, 2012, SDG signed a Memorandum of Agreement with Dolphin Capital Investors LTD ("Dolphin"), a Cypress company, in connection with the Porto Heli development. The development consisted of 44 apartments and 22 hotel rooms. Ilyas personally participated in the negotiations with Kambourides on behalf of SDG along with myself and discussed the well-publicized international legal accusations surrounding his family including his father-in-law Ablyazov. Kambourides was informed that the funds being invested were in fact ostensibly on behalf of Ablyazov. I personally discussed that with him on numerous occasions as well. Ilyas provided the standard explanation that the accusations were founded upon his family's victimization as political opponents of the government of Kazakhstan. In the course of negotiations, Miltos Kambouridis, the CEO and Director of Dolphin, nevertheless sought the investment of Ablyazov's funds, through SDG. In addition to obtaining an investment from SDG, the Greek Government pledged $4.250 million to the project, and Black Sea Bank initially offered a $6 million loan. However, Black Sea Bank declined to go forward with its funding based upon its KYC diligence of SDG determining that Glatz was a straw purchaser and the original ownership and control of SDG by the Khrapunov's had not actually changed. As a result, Black Sea Bank refused to provide funding.

24. Ilyas was personally involved in negotiations on these projects, and invested 12 million in the project on behalf of SDG. Kambouridis even tried to convince Ilyas and SDG to place additional funds in another hotel in Porto Heli called the Amanzoe. To that effect, Dolphin through Kabouridis went on to create a personal relationship with Ilyas, himself. Kambouridis even took the initiative to meet Ilyas in Geneva and then hosted him in Greece.

6

Almaty-BTA0166292

## *California Action*

25.    In 2014, the City of Almaty filed an action in the state of California against members of the Khrapunov family, seeking to seize assets that they had attempted to launder through real estate investments in that state. That action is City of Almaty v. Viktor Khrapunov, et al, Case No. 2:14-cv-03650-FMO-CW (May 13, 2014) (the "California Litigation").

26.    In response, in late 2014, Ilyas directed me to begin liquidating Triadou's assets in New York so that the funds could be removed from the United States and safely concealed elsewhere. Specifically, Ilyas instructed me to liquidate Triadou's investment in Flatotel and the Cabrini Medical Center as quickly as possible.

27.    I approached Chetrit, explaining that the threat of the California Litigation required Triadou to liquidate and transfer their assets out of the United States. Chetrit offered to purchase an assignment of Triadou's interest in the Flatotel at a substantial discount from the $40 million price originally paid by Triadou. By this point, the value of Triadou's investment had increased substantially beyond the $40 million originally invested and was worth more than $125 million.

## *Assignment of the Flatotel*

28.    In or about August of 2014, on behalf of Triadou and at the direction of the Ilyas, I agreed to assign Triadou's interest in the Flatotel and Cabrini Medical Center back to Chetrit for a price of $21 million, representing a small fraction of the fair market value of the property.

29.    In late 2014, I was terminated from Triadou, where I had the title of President. Prior to my termination, as indicated, I regularly attended board meetings for the Khrapunov entities, including Triadou. My primary role at these meetings was to explain the progress of Triadou's U.S. investments. Shortly thereafter I was terminated as CEO of Element One. I was owed significant sums by Ilyas at the time of my termination, but I have received no payments since I was terminated,

7

and I was left responsible for certain costs in connection with my work on behalf of Ilyas. Ilyas stated that the money owed to me belonged to his father-in-law, Ablyazov, and thus Ilyas could not release it. I subsequently communicated with Ilyas, but these conversations were unpleasant and unproductive.

30. My communications with SDG has been limited since my termination. SDG had previously invested in other significant real estate in Switzerland, including luxury developments named "51 Degrees" and "Du Parc Kempinski."

31. While I had limited interaction with other Khrapunov controlled entities, I was nevertheless was aware of information concerning many of these entities. For example, Khrapunov, through Telford International Limited provided substantial sums of money to "Niel Group", an entity owned 50/50 by myself and Foucher. With the Niel Group and Triadou, I came to learn of information concerning the following entities ostensibly owned and controlled by Ilyas and Ablyazov, all of which are alter egos used to move money and conceal true ownership.

32. **Telford International Limited**: Telford International Limited ("Telford") funded significant amounts of money to Niel Entities and Triadou, including all of the funds used by Triadou for investment in the United States. Telford's accounts were at Federal Bank of the Middle East (FBME) in Cyprus. FBME has been officially identified by the United States Treasury Department as an institution engaged in money laundering. Telford also provided funds to Niel Infrastructure through International Mining and Infrastructure Company ("IMIC") bonds in the amount of $25 million. Telford has initiated arbitration procedures in Paris to recover that money from Niel Entities. Presently, the IMIC bonds, which were subsequently converted to equity shares, are located in a bank in Geneva, Companie Priveux de Conseil et d'Investement ("CPCI"). Nabil-Jean Sab, who is the CEO of CPCI, is a long-time confidante of Ilyas, and possesses

8

Almaty-BTA0166294

significant financial information on Ablyazov and his family.

33. **Beford Central Inc.**: Beford Central Inc. ("Beford"), located in the island country of Seychelle, in owned by Elena Petelin ("Ms. Petelin"). Ms. Petelina is the mother-in-law of Ilyas's sister. Ilyas connected Foucher to Beford to obtain a $30 million "loan" investment prior to the creation of Niel Group. Eesh Aggarwal (Aggarwal), who is based out of Dubai, set up the loan on Foucher's behalf. It was with this money that Foucher started Niel Group. Presently, Beford is involved in arbitration procedures against Foucher and his former company, Unidel, in Switzerland, in which they are pursuing the bogus claim that they are owed $30 million.

34. **Mirren Investments Limited**: Mirren Investments ("Mirren") was created at the end of 2015 to pay the provision for the arbitration by Beford in Switzerland. The beneficial owner of the company is Gennady Petelin ("Mr. Petelin"), the father-in-law of Ilyas's sister, and the husband of Ms. Petelin, the owner of Beford.

35. **One Capital Group S.A.**: One Capital Group S.A. ("One Capital"), issued around $200 million worth of "loans" to entities controlled by Ilyas and Ablyazov. One Capital raised money for the sham loans by issuing bonds on behalf of Khrapunov entities, which One Capital claims was officially subscribed to by the Sovereign Fund of Libya. Despite the fact that almost all of these loans made to the Khrapunov entities are in default (worth over $200 million with interest), no judicial action has been taken against the Khrapunov entities. Among theses various loans made by One Capital Group S.A. was a $50 million loan to SwissTV, an entity owned and controlled by Ilyas in conjunction with Lloyd la Marca. Swiss TV is small TV broadcasting company, which does total revenue of $1,000,000 Swiss Francs per year. Of the $50 million loaned, Swiss TV funded Niel Telecom $45 million. SwissTV made a claim for that $45 million in the course of Niel Telecom's involuntary bankruptcy proceedings instituted by Swiss TV in

9

Luxembourg. The "loans" made by One Capital to SwissTV were unsecured, and One Capital never sought an interest payment from either SwissTV or the Niel Entities.

36. **Jevor PTE Limited**: Jevor PTE Limited ("Jevor") is an entity that was created by Ilyas to purchase $20 million of the $25 million in IMIC bonds from Niel Group. At that time, the IMIC bonds had been converted to equity shares. Niel Group agreed to the sale of $20 million shares to Jevor, and Jevor provided a $5 million down payment on the transaction. Ilyas directed me to convert $4 million of the $5 million to Firiana Group. Jevor never paid the remaining $15 million. Instead, they initiating an action against Niel Group in Geneva, claiming that Niel Group did not own the shares because the shares were originally loaned – not sold - to Niel Group.

37. **Adlux Holding S.A. / Adlux Sarl/ Adlux Switzerland Sarl ("Adlux")**: The Adlux entities were owned by Ilyas and managed by Max Intrebrick, for the ostensible purpose of providing digital advertisements in airports.

38. **Swiss Promotion Group**: Swiss Promotion Group, controlled by Ilyas, was the main shareholder of SwissTV and owner of Adlux Holding S.A.

39. **GT Global Opportunity Fund**: GT Global Opportunity Fund ("GT") was a company purportedly owned by Peter Sztyk.

NICHOLAS BOURG

Sworn to before me on this
3/ day of March, 2016.

Notary Public

ROBERT S. WOLF
Notary Public, State of New York
No. 02WO6276572
Qualified in Nassau County
Commission Expires Feb. 19, 2017

10

Almaty-BTA0166296