**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF ALMATY, KAZAHKSTAN
and BTA BANK JSC,

                Plaintiffs,

      v.

MUKHTAR ABLYAZOV, ILYAS KHRAPUNOV,
VIKTOR KHRAPUNOV, and TRIADOU SPV S.A.,

             Defendants.

No. 15 Civ. 5345 (AJN) (KHP)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'**
**MOTION TO PRECLUDE THE OPINIONS OF S. ILAN GUEDJ**

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
(t) +1 212 446 2300
(f) +1 212 446 2380

*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ....................................................................................................... 2

    A.    The Kazakh Entities' Experts' Appraisal of the Flatotel ........................ 3

    B.    Triadou Retains an Expert to Opine That It Sold The Flatotel Interest at a "Fair and Reasonable" Price, Although He Had No Idea What Fair Market Value Was ................................................................................................... 5

I.    Guedj Lacks the Expertise to Opine on the Value of the Flatotel Investment ................. 10

II.    Guedj Provides an Unreliable Opinion that Will Not Assist the Jury. ............................ 12

    A.    Guedj's Methodology Is Neither Standard Nor Accepted. ................................... 12

    B.    Guedj Improperly Applied Discounts that are Forbidden as a Matter of Law. .... 15

    C.    Guedj Relied on Unreasonable or Unsupported Assumptions. ........................... 17

        1.    Guedj Improperly Assumed the Transaction Was Negotiated at Arm's Length. .................................................................................................. 17

        2.    Guedj Improperly Assumed the Assignment Agreement Accurately Reflects the Consideration Triadou Received from Chetrit ..................... 17

        3.    Guedj Incorrectly Assumed Lack of Control and Lack of Marketability. .............................................................................................. 19

        4.    Guedj Improperly Added the Two Discounts Together, Rather Than Taking Them in Order ............................................................................. 20

        5.    Guedj Improperly Assumed a Third-Party Valuation of the Flatotel Real Estate Is Reliable. ............................................................................ 21

    D.    Guedj Improperly Incorporated Hindsight Bias Into His Analysis. .................... 22

III.    Guedj Offers an Inadmissible Legal Conclusions in Opining that the Sale Price Was "Fair and Reasonable." ....................................................................................................... 23

CONCLUSION ....................................................................................................... 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*523 IP LLC v. CureMD.com*,
   48 F. Supp. 3d 600 (S.D.N.Y. 2014) ....................................................................... 24

*Accord Friedman v. Beway Realty Corp.*,
   87 N.Y.2d 161 (1995) ................................................................................... 16, 17

Amorgianos v. Amtrak,
   303 F.3d 256 (2d Cir. 2002) ............................................................................... 17

*Chartwell Litig. Trust v. Addus Healthcare, Inc.*,
   346 B.R. 621 (E.D.N.Y. 2006) .......................................................................... 17

*Colon v. BIC USA, Inc.*,
   199 F. Supp. 2d 53 (S.D.N.Y. 2001) ................................................................ 14

*Daniels v. City of New York*,
   No. 16-cv-9080 (AJN), 2018 WL 5919307 ......................................................... 25

*Daniels v. City of New York*,
   No. 16-cv-9080 (AJN), 2018 WL 5919307 (S.D.N.Y. Nov. 13, 2018) ................... 23

*Daubert v. Merrell Dow Pharm., Inc.*,
   509 U.S. 579 (1993) .................................................................................. 1, 9, 10, 14

*Dryer v. Ryder Auto. Carrier Grp., Inc.*,
   367 F. Supp. 2d 413 (W.D.N.Y. 2005) ........................................................... 11, 12

*Faulkner v. Arista Records LLC*,
   46 F. Supp. 3d 365 (S.D.N.Y. 2014) ................................................................. 13

*Giles v. Rhodes*,
   94 Civ. 6385, 2000 WL 1425046 (S.D.N.Y. Sept. 26, 2000)............................. 11, 12

*Hewitt v. Metro-North-Commuter R.R.*,
   244 F. Supp. 3d 379 (S.D.N.Y. 2017) ........................................................... 23, 25

*Hygh v. Jacobs*,
   961 F.2d 359 (2d Cir. 1992) ............................................................................. 23

*In re Mirena IUD Prods. Liab. Litig.*,
   169 F. Supp. 3d 396 (S.D.N.Y. 2016) ............................................................. 9, 15

*Kumho Tire Co. v. Carmichael*,
   526 U.S. 137 (1999)........................................................................................... 9

*Lappe v. Am. Honda Motor Co., Inc.*,
   857 F. Supp. 222 (N.D.N.Y. 1994)................................................................... 11

*Louis Vuitton Malletier v. Dooney & Bourke, Inc.*,
   525 F. Supp. 2d 558 (S.D.N.Y. 2007) ........................................................... 16, 22

*Matter of Levine v. Seven Pines Assoc. Ltd. Partnership*,
   156 A.D.3d 524 (App. Div. 2017) .................................................................... 17

*S.E.C. v. Tourre*,
  950 F. Supp. 2d 666 (S.D.N.Y. 2013) ................................................................. 10

*Stagl v. Delta Air Lines*,
  117 F.3d 76 (2d Cir. 1997) ................................................................................... 11

*U.S. v. Vallejo*,
  237 F.3d 1008 (9th Cir. 2001) ............................................................................. 11

*United States v. Duncan*,
  42 F.3d 97 (2d Cir. 1994). ................................................................................... 23

*United States v. Garcia*,
  413 F.3d 201 (2d Cir. 2005) ................................................................................ 24

*United States v. Gentile,*
  233 Fed. App'x 86 (2d Cir. 2007) ....................................................................... 10

*United States v. Locascio*,
  6 F.3d 924 (2d Cir. 1993) .................................................................................... 10

*United States v. Romano*,
  794 F.3d 317 (2d Cir. 2015) ................................................................................ 10

*United States v. Tomassetta*,
  No. 10 Cr. 1205 (PAC), 2011 WL 6382562 (S.D.N.Y. 2011) ........................... 10, 23

*United States v. Williams*,
  506 F.3d 151 (2d Cir. 2007) ................................................................................ 11

*Washington v. Kellwood Co.*,
  105 F. Supp. 3d 293 (S.D.N.Y. 2015) ................................................................. 10

*Zelouf Intl. Corp. v. Zelouf*,
  47 Misc. 3d 346 (N.Y. Sup. Ct. 2014) ................................................................ 17

**Rules**

Federal Rule of Evidence 702 .......................................................................... 1, 11, 23

Plaintiffs City of Almaty, Kazakhstan and BTA Bank JSC (together, the "Kazakh Entities" or "Plaintiffs") respectfully submit this memorandum in support of their motion to preclude the opinions of Dr. Ilan Guedj proffered by Defendant Triadou SPV S.A. ("Triadou").

## PRELIMINARY STATEMENT

The Kazakh Entities will prove at trial that billions of dollars stolen from them was laundered throughout the world, including tens of millions of dollars invested through Triadou SPV S.A. in the Flatotel condominium development in Midtown. The defendants rushed to unwind their investment, even at a loss, once it became clear to them that the Kazakh Entities would try to recover the stolen funds invested in the United States. Despite contemporaneous internal valuations that it was worth at least $62 million, Triadou sold its stake in the Flatotel condominium development at the fire-sale contract price of $28 million, to be paid in installments, along with the potential for a small, but unlikely, share in profits. Consequently, the value of the Flatotel investment at the time of the sale will be an important issue at trial.

Triadou has not obtained any expert opinion on the market value of its Flatotel investment. Instead, it intends to offer Ilan Guedj's untestable opinion that Triadou sold the investment at a "fair and reasonable" price. There are many problems with this opinion.

First, Guedj is not qualified to offer it. He is an expert in financial economics, not business valuation. He simply does not have the expertise to determine what the Flatotel investment was worth, much less whether the price paid for it was "fair and reasonable."

Next, Guedj does not apply any recognized methodology to reach his conclusion. He admits that he searched for any economic theory that might support Triadou's sale of its interest under the terms described in the assignment agreement. This means of determining whether a transaction is "fair and reasonable" is not an accepted methodology in the field—it leads to absurd results to boot—and therefore cannot support an expert opinion under Rule 702.

Finally, Guedj's opinion does not assist the jury in resolving a contested issue of fact—that is, the value of the Flatotel at the time of the sale or the value of the consideration paid for it. Instead of answering either side of that equation, Guedj simply tells the jury to conclude that the sale price was reasonable. This is not the proper subject of expert testimony, which is perhaps why there is no recognized methodology for coming to the conclusion that Guedj did. The Court should therefore preclude Guedj from testifying.

## **BACKGROUND**

Several holding companies stood between Triadou and its indirect investment in the Flatotel development. Triadou held a 50 percent interest in CF 135 West Member LLC ("West Member"), a company created for the sole purpose of investing in and developing the Flatotel project. The other 50 percent was owned by entities related to Joseph Chetrit, the project's developer. West Member, in turn, held a 75 percent interest in another holding company, which in turn was the 100 percent owner of yet another holding company, which was the actual owner of the real estate. Therefore, Triadou possessed a 37.5 percent indirect economic interest in the Flatotel project. That interest's value—to the extent it is relevant at trial—is a question of fact for the jury, as is the value of the consideration that Triadou received when it tried to sell the asset after learning of the Kazakh Entities' enforcement efforts in the United States.[1]

In August 2014, Triadou sold its interest in the Flatotel project to Chetrit. The best evidence of what Triadou believed its stake in the Flatotel to be worth is its contemporaneous valuation. As reflected in internal Triadou documents, Triadou believed its interest in the Flatotel to be worth at least $62 million. *See* Schwartz Dec. Ex. A at 6 (Triadou Corporate and Financials).

---

[1]     Although the now-moot fraudulent conveyances claims most directly implicated whether Triadou sold its interest in the Flatotel for fair market value, that question is still highly relevant to Triadou's knowledge and intent.

In its agreement with Chetrit, however, Triadou accepted far less.  Chetrit agreed to pay $1 million upfront, and an additional $21 million in four equal installment paid over the following year. Chetrit also agreed to pay a percentage of residual profits in the Flatotel to Triadou, if there were any such profits, and to "appl[y] as a credit" $6 million previously paid by Chetrit in connection with something described as the "Happy Familiy" and "Landscape" transactions (the details and value of which, if any, remain a mystery).  *See* Schwartz Dec. Ex. Q at ¶ 1(a) (Assignment Agreement).

### A.      The Kazakh Entities' Experts' Appraisal of the Flatotel

While the jury can and should look to Triadou's contemporaneous valuation for evidence of the asset's value (or at the very least, evidence of what Triadou believed the asset was worth), the jury can also look to expert testimony offering assessments of the market value.  To help the jury make reasonable inferences from the price at which Triadou sold the asset, the Kazakh Entities retained Wayne Horvath, MAI, of BDO USA, LLP, to conduct an appraisal of the fee simple interest in the Flatotel—the sole asset held by the LLC in which Triadou had an indirect 37.5% ownership interest.  Schwartz Dec. Ex. B at 62 (BDO Rep.).  Horvath is a Director in BDO's Valuation and Business Analytics group.  *Id.* at 68.[2]  On April 19, 2019, Horvath provided a valuation of the Flatotel property concluding that, as of August 4, 2014, the retrospective market value of the fee simple estate in the Flatotel was $290,000,000.  *Id.* at iii.  Horvath further provided

---

[2]      Mr. Horvath is also a designated member of the Appraisal Institute, a Certified General Appraiser, and a member of the National Council of Real Estate Investment Fiduciaries ("NCREIF") Valuation Committee.  He also maintains several certifications in business valuation. Schwartz Dec. Ex. B at 68 (BDO Rep.).

a balance sheet showing the "non-discounted" value of the membership interests in the LLCs based on the market value of the Flatotel asset.[3]  *Id.* at 60–61.

The Kazakh Entities also retained Jennifer Sims Vu as a rebuttal expert.  Sims Vu is a Managing Director in BDO's Valuation and Business Analytics group with more than twenty years of valuation experience.[4]  Here, she used an accepted business valuation methodology to determine the fair value of Triadou's LLC membership interest with and without a discount for lack of marketability, the only possible discount applicable under the law.  Schwartz Dec. Ex. E at 3 (BDO Rebuttal).

Horvath and Sims Vu both conducted their respective valuations—or appraisals—in accordance with the Uniform Standards of Professional Appraisal Practice (USPAP).  Congress officially adopted USPAP in 1989, and it "is the generally recognized ethical and performance standards for the appraisal profession in the Unites States."[5]  An appraisal is "the act or process of developing an opinion of value."  Schwartz Dec. Ex. F at 3 (USPAP).  The USPAP definitions also note that "[a]n appraisal must be numerically expressed as a specific amount, as a range of

---

[3]    Whether discounts are applicable depends in part on the application of state law to the claims at issue.  The two discounts discussed in the reports here are "lack of control" and "lack of marketability."  A "discount for lack of control" is a discount sometimes assessed against a property interest of minority holders.  It is the inverse of a control premium, which is "an amount (expressed in either dollar or percentage form) by which the pro rata value of a controlling interest exceeds the pro rata value of a non-controlling interest in a business enterprise, that reflects the power of control."  *See* Schwartz Dec. Ex. C at 629 (*The Portable MBA in Finance and Accounting*).  A "discount for lack of marketability" may be assessed for property that cannot be easily transferred.  *See* Schwartz Dec. Ex. D at 191 (*Discounts for Lack of Marketability*).

[4]    Ms. Sims Vu is an Accredited Senior Appraiser and holds a Business Valuation/Intangible Assets Designation from the American Society of Appraisers.  Schwartz Dec. Ex. E at 1 (BDO Rebuttal).

[5]    *See* The Appraisal Foundation, *What is USPAP?*, https://www.appraisalfoundation.org/imis/TAF/Standards/Appraisal_Standards/Uniform_Standards_of_Professional_Appraisal_Practice/TAF/USPAP.aspx?hkey=a6420a67-dbfa-41b3-9878-fac35923d2af (last visited July 1, 2020).

numbers, or as a relationship (e.g., not more than, not less than) to a previous value opinion or numerical benchmark . . . ." *Id.* The appraiser is expected to "perform valuation services competently and in a manner that is independent, impartial, and objective." *Id.*

**B.  Triadou Retains an Expert to Opine That It Sold The Flatotel Interest at a "Fair and Reasonable" Price, Although He Had No Idea What Fair Market Value Was**

For a seemingly similar—but in reality entirely different—task, Triadou retained Ilan Guedj. Triadou purported to ask Guedj "to opine on the value of Triadou's 'Membership Interest' in CF 135 West Member LLC ('West Member' or 'Company') regarding the redevelopment of the Flatotel, a real estate property in New York ('Flatotel project'), at the time Triadou sold that Membership Interest in August 2014." Schwartz Dec. Ex. G at ¶ 9 (Guedj Rep.). But as Geudj readily admitted, his specific task was instead "to provide an opinion as to whether the price was fair and reasonable." *See* Schwartz Dec. Ex. H at 57:3–6 (Guedj depo); *see also* Schwartz Dec. Ex. G at ¶ 21 (Guedj Rep.).

Guedj was ill-suited to this task. This case was the first time Guedj ever offered an opinion concerning the value of an entity whose principal business was real estate or real estate development. *See* Schwartz Dec. Ex. H at 73:25–74:4 (Guedj depo). Guedj has no certifications in business valuation. *See id.* at 22:21–23. Only one of his twelve publications concerned valuation, and he co-authored it with Saurav Karki, a principal at Bates White whose company biography boasts of his "extensive experience providing . . . valuation services."[6] Schwartz Dec. Ex. G at A-3–4 (Guedj Rep). And beyond that one article, Guedj's only other related "valuation"

---

[6]  Bates White Economic Consulting, *Our People*, https://www.bateswhite.com/people-Saurav-Karki.html#Summary (last visited July 1, 2020).

experience comprised of teaching one course and taking "various classes that involved valuation."[7] Schwartz Dec. Ex. H at 20:9–14 (Guedj depo).  In short, and as he admitted, Guedj is a financial economist, not an appraiser.  *See* Schwartz Dec. Ex. H at 75:9–11 (Guedj depo).  While an appraiser develops opinions of value, a "[f]inancial economi[st] focuses centrally on [those] factors [that] influence the price of a security."  *See* Schwartz Dec. Ex. J at 346 (*Economic Crisis and the Integration of Law and Finance*).  Where an appraiser answers "how much," a financial economist answers "why."

Not surprisingly given his background, Guedj did not perform a business valuation according to USPAP and a recognized standard of value.  Instead, Guedj created a bespoke analysis to answer Triadou's question "as to whether the price was fair and reasonable."  In sum, he accepted the price at which Triadou agreed to sell its interest and then tried to determine whether "there is economic theory that could support such a price."  Schwartz Dec. Ex. H at 61:6–10 (Guedj depo).  If there was, then, according to Guedj, the price was fair and reasonable.  *Id.* at 61:11–62:2.  Put differently, Guedj's methodology was to back in to the desired opinion if any theory could conceivably support it.

Guedj reached his opinion without identifying a standard of value (for example, fair market value of fair value), without conducting an appraisal of the real estate asset, without conducting a valuation of Triadou's LLC membership interest, without determining the value of the consideration Triadou received in the sale of its interest to Chetrit, and without applying any known methodology that exists in any finance or valuation treatise.  *See id.* at 82:22–83:6, 289:7–11,

---

[7]     It is not even clear whether these courses related to business valuation, as Guedj appeared to view a business valuation as something wholly separate from a business appraisal. *See* Schwartz Dec. Ex. H at 20:20–21:13 (Guedj depo) (differentiating his use of valuation from "some people" and explaining that he "do[es] not use the term [appraisal] with regard to the valuation of business that he do[es]").

219:13–15, 224:14–24, 276:12–277:7 (Guedj depo). Rather, Guedj began with a host of factual assumptions provided by Triadou's counsel to determine whether the sale price of the asset fell within broad ranges of possible discounts observed in the marketplace. Guedj repeated this same analysis in a rebuttal report that he prepared in response to the valuation of the Flatotel asset by Horvath.

At his deposition, Guedj stated that he was only vaguely familiar with USPAP standards and guidelines, and he did not conduct an appraisal in accordance with those standards. *See id.* at 74:5–13. Instead, Guedj accepted at face value as the starting point for his analysis a third-party appraisal of the Flatotel real estate asset prepared by a company called Miller Cicero, and then determined the cash flow that he argues Triadou would have expected to receive through its LLC membership interest—what Guedj defines as the "Economic Value" of the membership interest. Schwartz Dec. Ex. G at ¶¶ 16–17 (Guedj Rep.). Guedj admitted at his deposition that the "Economic Value" was "[p]robably not" "the price at which you would have expected a willing buyer and willing seller to transact in Triadou's membership interest at that time," which is effectively fair market value. Schwartz Dec. Ex. H at 135:14–19 (Guedj depo).

Guedj then determined the "Economic Value" to Triadou of the sale of its membership interest to Chetrit, the buyer. Schwartz Dec. Ex. G at ¶18 (Guedj Rep.). As with his determination of the "Economic Value" of the membership interest itself, Guedj simply adopted the contractual price Triadou accepted for the sale to Chetrit as the actual consideration Triadou received in the transaction; even though Triadou did not in fact receive the sale price, Guedj's analysis included no adjustment for collection risk. Instead, Guedj assumed the value of the consideration Triadou was to receive in the sale based on instructions from Triadou's counsel. *See* Schwartz Dec. Ex. H at 219:13–15 (Guedj depo) ("I was instructed to assume that the assignment agreement was done

. . . as an arm's length transaction."); *see also id.* at 224:14–24 (stating that it was correct that Triadou instructed him to "assume that at the time of the August 2014 assignment, the value of the Happy Family and Landscape investments that Chetrit transferred was for the stated value of 6 million"); *id.* at 307:20–24 ("I was, as I mentioned before, was instructed by counsel to assume that this was an arm's length transaction.").  In reality, Triadou only received $1 million of the consideration as a cash payment, with the rest to be paid through future installments and potential profit-sharing.  Guedj assumed that there was no credit risk in those future payments, meaning Guedj applied a risk-free rate to bring those future payments forward to present dollars, as if Chetrit paid only slightly less than the $28 million contract price in cash when the contract was signed. *See id.* at 233:3–234:9 (testifying that he simply accounted for "the time value of money").  In other words, Guedj assumed payments from Chetrit were guaranteed and risk free.

For the potential profit share, Guedj again relied on projected cash flows from the third-party real estate appraisal.  Here, however, Guedj applied a 9.3 percent discount to the future profit share to "reflect the riskiness of the Flatotel development." *See id.* at 235:5–22.  This discount for the risk that the project would not be profitable stands in contrast to the risk-free rate Guedj applied to Chetrit's promise to pay under the assignment agreement, notwithstanding that the only source of funds under the assignment were likely to be the proceeds of the Flatotel development.

With these two highly questionable "Economic Values" (one for the membership interest and the other for the price purportedly paid in the assignment), Guedj calculated what he called the "discount" that Triadou accepted in the assignment.  Using a variety of assumptions, Guedj determined that the sale by Triadou to Chetrit occurred at a discount somewhere between 11 percent and 49 percent.  Schwartz Dec. Ex. G at ¶ 20 (Guedj Rep.).  Then, Guedj surveyed economic literature to come up with a range of discounts that could conceivably apply, and

weighed whether Triadou's discount fell within or below those ranges.  *Id.* Guedj concluded from here that there "is economic theory that could support such a price," and from there, that the price was "fair and reasonable."  Schwartz Dec. Ex. H at 61:6–10 (Guedj depo).

Guedj could not identify any basis—in his previous experience or in texts or treatises—for applying this method to determine whether a price is "fair and reasonable."  *See id.* at 60:19–63:6; *see also id.* at 276:12–277:7 (admitting that the definition he provided for "fair and reasonable" was his own definition) Instead, Guedj simply explained that he was "using well established economic principles."  *See id.* at 275:9–276:7; *see also id.* at 277:2–11 ("The fair and reasonable is my opinion.").

## LEGAL STANDARD

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

Whether an expert's testimony is admissible is a question of law for the Court to decide. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999).  The Court acts as a "gatekeeper" ensuring expert testimony admitted pursuant to Rule 702 "both rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 597 (1993); *see also In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 411–12 (S.D.N.Y. 2016) ("Despite the liberal standard, however, the district court still must ensure that 'any and all

scientific testimony or evidence admitted is not only relevant, but reliable.'" (quoting *Daubert*, 509 U.S. at 589)). To meet this responsibility, courts evaluate (1) whether the theory can be or has been tested; (2) whether the theory has been subjected to peer review and publication; (3) whether the theory has a known or potential error rate and standards controlling the technique's operation; and (4) whether the theory or technique is generally accepted in the scientific community. *See Daubert,* 509 U.S. at 592–95; *see also United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015).

The proponent of expert testimony bears "the burden of establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007) (citations omitted).

## ARGUMENT

### I.    Guedj Lacks the Expertise to Opine on the Value of the Flatotel Investment.

Guedj lacks the expertise to offer an expert opinion on the value of the Flatotel investment, which requires training and experience in business appraisals, not financial economics.

Pursuant to Federal Rule of Evidence 702, individuals who qualify as experts in the relevant subject matter may offer opinion testimony involving specialized knowledge if that testimony will assist the fact-finder in determining an issue of fact or understanding certain evidence. Although courts do not require proponents "to satisfy an overly narrow test" of the expert's qualifications, the "expert must, however, stay within the reasonable confines of his subject area, and cannot render expert opinion on an entirely different field or discipline." *See Lappe v. Am. Honda Motor Co., Inc.*, 857 F. Supp. 222, 227 (N.D.N.Y. 1994); *see also Giles v. Rhodes*, 94 Civ. 6385, 2000 WL 1425046, *20 (S.D.N.Y. Sept. 26, 2000). "Whether a proposed expert has the requisite qualifications depends on his or her educational background, training, and experience in the field(s) relevant to the opinions he or she seeks to give." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013). A court may properly preclude expert testimony if the

court determines a witness's "expertise is too general or too deficient." *See Dryer v. Ryder Auto. Carrier Grp., Inc.*, 367 F. Supp. 2d 413, 425–26 (W.D.N.Y. 2005) (quoting *Stagl v. Delta Air Lines*, 117 F.3d 76, 81 (2d Cir. 1997)).

Guedj is not qualified to render an opinion on the "value of Triadou's 'Membership Interest' in CF 135 West Member LLC[.]" Schwartz Dec. Ex. G at ¶ 9 (Guedj Rep.). While he is certainly well-credentialled, his education and experience are all in the field of financial economics. He has a PhD in Financial Economics from the Sloan School of Management at the Massachusetts Institute of Technology. *Id.* at ¶ 1. He began his career as a professor of finance at the University of Texas before spending a year at Securities Litigation and Consulting Group, a financial economics consulting firm. *Id.*[8] He currently works as a Principal at Bates White Economic Consulting, *id.*, which, according to the firm's website, "specializes in providing advanced economic, financial, and econometric analysis to law firms, companies, and government agencies."[9] He identifies himself in his report simply as a "financial economist" with "expertise in data, statistical, and econometric analysis and research."

Financial economics is a cousin of economic appraisals (or business valuations), but it is a distinct discipline. In litigation, financial economists typically offer opinions on risks in securities cases. *See, e.g.*, Schwartz Dec. Ex. J (*Lessons from Financial Economics*). Guedj's own experience bears this out. He has worked on many securities fraud cases, and he has deep experience evaluating trades and financial instruments. Schwartz Dec. Ex. G at A-1–B-1 (Guedj Rep.). But he has never valued a real estate investment. *See id.* at A-1–A-3; *see also* Schwartz

---

[8]     Securities Litigation and Consulting Group, https://www.slcg.com (last visited July 1, 2020).

[9]     Bates White Economic Consulting, *Our Firm*, https://www.bateswhite.com/about.html (last visited July 1, 2020).

Dec. Ex. H at 73:25–74:4 (Guedj depo). He has never authored a paper on this particular subject. *See* Schwartz Dec. Ex. G at A-4–A-5 (Guedj Rep.); *see also* Schwartz Dec. Ex. H at 33:8–34:19 (Guedj depo). And he has never been qualified as an expert to offer a real estate appraisal. *See* Schwartz Dec. Ex. G at B-1 (Guedj Rep.); *see also* Schwartz Dec. Ex. H at 289:7–19 (Guedj depo).

In short, Guedj could not perform an appraisal or valuation of Triadou's interest in the Flatotel because he lacks that expertise. *See Giles*, 2000 WL 1425046 at *20; *see also Dryer*, 367 F. Supp. 2d at 425–26 ("[W]here an expert's opinion exceeds the scope of his qualifications, the witness's opinions are subject to exclusion.").

## II.     Guedj Provides an Unreliable Opinion that Will Not Assist the Jury.

Not surprisingly given his lack of experience or expertise in in business valuation, Guedj's opinion is not based on a scientific methodology accepted in the field and, in any event, is reliant upon unreasonable assumptions that lack sufficient support. It should be precluded for that reason, as well.

### A.     Guedj's Methodology Is Neither Standard Nor Accepted.

Guedj set out to determine whether "there is economic theory that could support" the price Triadou accepted, as reflected in the assignment agreement. Schwartz Dec. Ex. H at 61:6–10 (Guedj depo). If there was, then, according to Guedj, the price was fair and reasonable. *Id.* at 61:11–62:2. This is not a standard or accepted methodology sufficient to satisfy the requirements of Rule 702(c). *See Faulkner v. Arista Records LLC*, 46 F. Supp. 3d 365, 384 (S.D.N.Y. 2014) (declining to admit expert testimony developed from "result-driven methodology").

To begin, Guedj calculated an "Economic Value" for the membership interest and the price Chetrit offered in the assignment agreement based on the expected cash flows under certain hypothetical scenarios. *See* Schwartz Dec. Ex. G at 24–26 (Guedj Rep.). Guedj then calculated the percentage difference between the cash flows Triadou might have expected to receive if it had

maintained its investment and what Triadou expected to receive as a result of the assignment. *See id.* at 28–31 Guedj identified the difference in the expected cash flows as the discount that Triadou accepted in the assignment agreement with Chetrit. *See id.* at 26–28. Guedj then constructed models to show the range of discounts observed in the marketplace across various assets. *See id.* at Figs. 8, 9, 11–14. Because Triadou's discount—according to Guedj—fell within these broad ranges, the transaction was for a fair and reasonable price. *See id.* at 34–36.

This methodology cannot be found in any authoritative literature. *See, e.g.*, Schwartz Dec. Ex. H at 275:4–277:11 (Guedj depo) (admitting that he created the methodology based on his own personal definition of what "fair and reasonable" means). The Kazakh Entities asked Guedj to provide authoritative support for his definition of fair and reasonable. *See id.* at 276:12–13. In response, Guedj admitted that it was "fair" to state that the definition he provided was his own definition. *See id.* at 276:14. When further asked to provide "in the academic literature, a definition of fair and reasonable that [was] consistent with the definition [Guedj] described," Guedj stated, "The fair and reasonable is my opinion." *See id.* at 277:2–7. Guedj did not identify any other instance where such a methodology was adopted, in a court or otherwise. For this reason alone, it cannot satisfy Rule 702. *See Daubert*, 506 U.S. at 595; *see also Colon v. BIC USA, Inc.*, 199 F. Supp. 2d 53, 78–79 (S.D.N.Y. 2001) (finding the expert's methodology was not "generally accepted" by the relevant community when it diverged from standards and was based instead on "'small' and 'minor' 'revisions,' 'modifications' and 'adapt[ations]'" to the accepted standards).

Were that not enough, the authoritative valuation literature suggests that Guedj's methodology would be disfavored—it does not say so outright only because Guedj's methodology has never been seen before. Guedj purports to compare the difference in expected cash flows if Triadou had sold or maintained its investment in the Flatotel to ranges of discounts observed in

the marketplace for transactions in a variety of assets. It is true that valuation experts review and analyze discounts applied in various publications and studies when selecting the appropriate discount for use in a specific appraisal. *See* Schwartz Dec. Ex. L at 270 (*Understanding Business Valuation*). However, it is understood that "[t]he dispersions of discounts in all studies is very wide." *See* Schwartz Dec. Ex. M (*Business Valuation Discounts and Premiums*). According to leading texts on valuation, simply taking an average of the discounts in publications and studies "is both dangerous and negligent." *See id.* But that is what Guedj did. *See* Schwartz Dec. Ex. G at ¶¶ 15, 20 (Guedj Rep.).

Furthermore, texts regulating the profession criticize analyses that rely on averages or ranges of data without adjusting the data and applying it to the specific facts and circumstances at hand.[10] Instead, experts are encouraged to compare the factors of the companies included in the studies to the subject-company and "judge discounts for lack of marketability accordingly, rather than just assuming that the broad averages of discount for lack of marketability studies automatically apply to any given company or interest in a company." *See* Schwartz Dec. Ex. M (*Business Valuation Discounts and Premiums*). Despite this guidance, Guedj cited wide ranges of data and applied the averages of that data. *See* Schwartz Dec. Ex. G at 15 (Guedg Rep.).

Lastly, even if it were an accepted methodology in the field (which it is not), Guedj's method—finding any economic theory to support the price—would not satisfy Rule 702 because it is inherently unreliable and leads to absurd results. For example, Guedj admits that price gauging would have to be considered fair and reasonable because economic theory can support such prices during sudden changes to the supply or demand of goods in the marketplace. *See* Schwartz Dec. Ex. H at 63:7–65:22 (Guedj depo) (describing economic theory behind spikes in prices during

---

[10]     *See* Schwartz Dec. Ex. M at 449 (*Valuing a Business*).

hurricanes).  Similarly, Guedj struggled to answer the simple question of whether *any* transaction between a willing buyer and a willing seller is fair and reasonable.  *Id.* at 66:25–68:21 (testifying that whether a distressed sale is fair and reasonable is "very hard to answer.  I would need to think more carefully.").

Whether a particular price is "fair and reasonable" price is not a function of whether some conceivable economic theory can be called upon to support it.  *See In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d at 444 ("It is not the district court's purview to analyze the validity of the expert's conclusions based on the universe of scientific knowledge, but rather to determine whether the expert's methodology was reliable and stands up to the intellectual rigor of the expert's field."); *see also Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 676–77 (S.D.N.Y. 2007) (excluding expert testimony that did not apply methods reliably and noting the expert's "conclusory statement that it [was] standard procedure [was] not sufficient to justify its admission").[11]  Because Guedj constructed a unique methodology that is not accepted in the field and is not reliable, the Court should preclude his testimony.

### B.    Guedj Improperly Applied Discounts that are Forbidden as a Matter of Law.

Guedj's opinion must also be rejected because it assumes discounts that are not permitted as a matter of law.

The centerpiece of Guedj's analysis was to take the Miller Cicero third-party valuation as a starting point, identify Triadou's economic interest, and then apply discounts for both a lack of control and a lack of marketability.  *See* Schwartz Dec. Ex. G at 17–22, 25 (Guedj Rep.).  Guedj

---

[11]      It is possible, of course, to appraise a property or investment using reliable valuation methods, as the experts put forward by the Kazakh Entities did.  A fact-finder could then compare the expert's valuation along with other relevant facts, such as the buyer's subjective beliefs about value, to the actual consideration received and draw its own conclusions about whether the price was fair and reasonable.

made no independent assessment of whether those discounts should apply; he was asked to assume that they did. *See* Schwartz Dec. Ex. G at 20–22 (Guedj Rep.); *see also* Schwartz Dec. Ex. H at 136:19–22 (Guedj Depo.). But whether those discounts apply is actually a function of state law, to be decided by the Court as a matter of law. *See* Schwartz Dec. Ex. K at 5 (*Understanding Business Valuation*) ("The appraiser cannot address such issues as control premiums and minority discounts without adequate legal information about the value definition to be used.").

As a general matter, where "fair value" is deemed the appropriate standard, "the trend over the past 25 years, as guided by the ABA and ALI and precedential case law, has been, in the absence of special circumstances, generally do not apply [discounts for lack of control and lack of marketability]." *See* Schwartz Dec. Ex. N at 10 (*Standards of Value Theory and Applications*).

This is the case under New York law. New York courts have determined that fair value is the appropriate standard to use in cases involving minority shareholders like Triadou. *Accord Friedman v. Beway Realty Corp.*, 87 N.Y.2d 161, 167–70 (1995) (refusing to discount the fair value of minority shares because it would be "inconsistent with the equitable principles developed in New York decisional law"); *see also Matter of Levine v. Seven Pines Assoc. Ltd. Partnership*, 156 A.D.3d 524, 526 (App. Div. 2017) ("However, respondent's business valuation expert applied a minority discount, i.e., a discount for lack of control, as well as a DLOM [*i.e.*, discount for lack of marketability]. This is impermissible.") (citing *Beway*, 87 N.Y.2d at 167). An expert should not discount for the lack of control when using fair value, and under circumstances similar to those presented here, he or she should not discount for the lack of marketability. *See Zelouf Intl. Corp. v. Zelouf*, 47 Misc. 3d 346, 350–51 (N.Y. Sup. Ct. 2014) (citing *Beway*, 87 N.Y.2d at 169)

("[A]pplying a DLOM here would be the economic equivalent of imposing a minority discount . . . . It is well settled that minority discounts are not permitted under New York law."). Since Guedj's whole analysis turns on discounts that are not applicable under New York law, his opinions should be barred as irrelevant and/or unreliable. *See Chartwell Litig. Trust v. Addus Healthcare, Inc.*, 346 B.R. 621, 629 (E.D.N.Y. 2006) (quoting *Amorgianos v. Amtrak*, 303 F.3d 256, 267 (2d Cir. 2002)) ("While minor flaws will not automatically bar expert testimony, the court must exclude the evidence 'if the flaw is large enough that the expert lacks good grounds for his or her conclusion.'").

### C.   Guedj Relied on Unreasonable or Unsupported Assumptions.

Guedj's methodology is likewise fundamentally flawed because it relies on unreasonable and unsupportable assumptions: (1) that the transaction was negotiated at arm's length; (2) that the price described in the assignment agreement is the consideration Triadou actually received; (3) that Triadou had no control or marketability; and (4) that a third-party valuation was reliable.

#### 1.   Guedj Improperly Assumed the Transaction Was Negotiated at Arm's Length.

Triadou's counsel instructed Guedj to assume that the assignment "was an arm's length transaction" *See* Schwartz Dec. Ex. H at 92:7–15 (Guedj depo). But the question of whether Triadou engaged in an arm's length transaction, or entered into an illicit agreement with Chetrit to accept what it knew to be a far-below-market price to remove liquidity before the investment could be frozen and unwound, is a core factual dispute in this case. And even if it were not so hotly contested, the standard in the industry is to analyze *whether* transactions are at arm's length, not to assume it. *See* Schwartz Dec. Ex. F at 286 (USPAP).

#### 2.   Guedj Improperly Assumed the Assignment Agreement Accurately Reflects the Consideration Triadou Received from Chetrit

Guedj also accepted the price described in the assignment agreement as the consideration Triadou was to actually receive. *See* Schwartz Dec. Ex. H at 224:14–24 (Guedj depo).  But these are two very different things; Chetrit did not pay cash, nor did he agree to.

In Guedj's opinion, the purchase price consisted of (1) an initial payment of $1 million, made on May 9, 2014; (2) an investment stake in Happy Family and Landscape, which Guedj assumed, with no analysis, was worth $6 million as of August 4, 2014; (3) and four scheduled payments of $5,250,000.  *See* Schwartz Dec. Ex. G at ¶ 43 (Guedj Rep.).  These assumptions should not have been accepted without further analysis.  The Happy Family and Landscape's value was provided by counsel, but multiple deponents admitted that the value was probably not $6 million. Cesare Cerrito, Triadou's own witness, testified that the value was assigned without any evaluation of the investments' actual worth.  Schwartz Dec. Ex. O at 185:1–5 (Cerrito depo) ("Chetrit assigned value of 6 million to those projects").  Bourg, Triadou's director, also testified that it was common knowledge that Chetrit did not actually invest $6 million into those entities. Schwartz Dec. Ex. P at 60:8–61:6 (Bourg depo).  The agreement could just as easily have valued Happy Family and Landscape (whatever they are) at $26 million—under Guedj's analysis, that would mean that Triadou received $46 million for its stake in the Flatotel, even though the actual consideration didn't change.

Additionally, instead of analyzing the risk associated with Chetrit's payments, Guedj assumed "there was no risk."  *See* Schwartz Dec. Ex. H at 232:4–233:2 (Guedj depo); *see also id.* at 233:3–234:9 (testifying that he simply accounted for "the time value of money").

Further, on top of the purported $28 million purchase price, Guedj also assumed that Triadou would receive at least $4 million in profit sharing. *See* Schwartz Dec. Ex. G at ¶ 12 (Guedj Rep.).  The assumption that Triadou would receive any profits at all is wildly speculative, as Chetrit

18

must first get back his initial capital contribution, plus 7 percent, before Triadou would have been entitled to *any* profits.  *See* Schwartz Dec. Ex. Q at 2 (Assignment Agreement).[12]

These unsupported assumptions inflate the price for the Flatotel interest that Guedj uses in his analysis, thereby making the discount that Triadou accepted appear lower and more "fair and reasonable."  They also run counter to the standards in the industry, which provide that a business valuator should analyze the price and terms, including any risks associated with repayment. *See* Schwartz Dec. Ex. F at 286 (USPAP).

### 3.    Guedj Incorrectly Assumed Lack of Control and Lack of Marketability.

Beyond improperly applying discounts for lack of control and lack of marketability, as discussed above, Guedj also calculated the discounts he applied improperly.  When Guedj selected the studies he would rely on to determine the ranges of discounts that could theoretically apply to Triadou's interest in the Flatotel, he made critical—and incorrect—assumptions with respect to Triadou's control and marketability.

For the control discount—which considers aspects of control each interest-holder has, including blocking or veto power—Guedj assumed Triadou had *no* control.  *See* Schwartz Dec. Ex. G at ¶ 68 (Guedj Rep.).  But the operating agreement directly contradicts this assumption, assigning Triadou a level of control.  For example, major decisions, including dissolution of the company, the sale of assets, or the acquisition of real property, required unanimous consent.  *See* Schwartz Dec. Ex. S at 84–85 (Limited Liability Company Agreement).  Further, two-thirds of the members had to approve any amendments to the operating agreement.  *See* Schwartz Dec. Ex. T (Operating Agreement).  If Guedj had considered these terms, he would have been forced to assess

---

[12]    As a matter of fact, Chetrit has stated publicly that there have been no profits from the Flatotel.  *See* Schwartz Dec. Ex. R at 2–3 (Chetrit Aff.).

a smaller discount for the lack of control, if he assessed one at all.  But Guedj did not consider them at all, Schwartz Dec. Ex. H at 244:4–245:10 (Guedj depo), which caused him to apply too high a range of discounts to Triadou's interest.  *See, e.g.*, *id.* at 239:13–25 (admitting that there were "serious limitations over Triadou's control," not that there was no control).

Similarly, for the discount for lack of marketability, Guedj assumed Triadou's interest was completely unmarketable.  *See* Schwartz Dec. Ex. G at ¶¶ 66–69 (Guedj Rep.).  Yet Section 6.1 of the Operating Agreement, which was titled "Transfers," gave Triadou a right to transfer any or all of its membership interest with the consent of the other members.  *See* Schwartz Dec. Ex. T (Operating Agreement).  Guedj looked solely to Section 6.2 of the Agreement, which provided for Triadou to sell its interest on or after January 1, 2018 or when Triadou provided more than $60,000,000 in capital.  *See id.*  This provision, however, must be read in conjunction with the preceding one.  Triadou could sell its interest to a third party before January 1, 2018 and without contributing any more funds, if it obtained its business partners' consent.  If Triadou was really unable to make capital calls, as it has contended, Chetrit presumably would have consented to a solvent third party acquiring its interest.

But Guedj proceeded as if a consent requirement rendered transfer impossible.  His report noted that "Triadou was not able to transfer any interest to third parties until January 1, 2018." *See id.* at ¶ 68.  It also noted that at the time of the transfer, "Triadou had not invested $60 million in capital into West Member." *See id.* at ¶ 69.  According to Guedj, "[t]hese terms greatly impaired the marketability of Triadou's Membership Interest in West Member." *See id.* at ¶ 68.  Not once did Guedj discuss how the terms in Section 6.1 affected marketability.  This failure led Guedj to apply a higher range of possible discounts for lack of marketability.

> **4.    Guedj Improperly Added the Two Discounts Together, Rather Than Taking Them in Order**

These errors concerning the selection of comparable discounts for lack of control and marketability were compounded when Guedj assumed the discounts were additive when considered together. *See id.* at ¶¶ 14, 49. In fact, "[m]inority and marketability discounts are multiplicative rather than additive" and should be "taken in sequence." Schwartz Dec. Ex. M at 384 (*Valuing a Business*). When factors are additive, they are considered to be disjoint, and cannot occur simultaneously; however, when factors are multiplicative there exists some overlap and their combined value is cumulative. *See id.* (combining a DLOC of 20% and a DLOM of 45% to get 56% instead of 65%); *see also* Schwartz Dec. Ex. K 286 (Understanding Business Valuation) ("If [DLOC of 25% and DLOC of 35%] were additive, the appraiser would add them together and apply a 60% discount" instead of the appropriate 51.25% cumulative discount.). Guedj determined that the discounts were additive and improperly added the discounts, resulting in even less reliable ranges of comparable discounts.

5.   **Guedj Improperly Assumed a Third-Party Valuation of the Flatotel Real Estate Is Reliable.**

To calculate the expected cash flow from the Flatotel investment, Guedj relied on net sales revenue calculations from a real estate appraisal conducted by a company called Miller Cicero, LLC. *See* Schwartz Dec. Ex. G at ¶ 17 (Guedj Rep.). Guedj deducted from the net sales revenue what Guedj called total costs, concluding that the Flatotel project profit expectations were $85,827,523 at the time of assignment. Guedj then compared 37.5 percent of that number—$32,185,340—to the Economic Value of the sale to Triadou to determine the discount at which Triadou sold its interest.

But Guedj did not test the veracity of the Miller Cicero appraisal, nor did he verify any of the underlying information Miller Cicero used to calculate the numbers in the report. When questioned about this lack of oversight or verification, Guedj admitted that taking any steps to

verify assumptions was outside his expertise. *See* Schwartz Dec. Ex. H at 101:6–13 (Guedj depo) ("I'm not an appraiser. I'm not a real estate appraiser[.]"). An expert opinion that simply regurgitates another export's opinion with no verification or supervision report is unreliable and inadmissible. *See Louis Vuitton Malletier*, 525 F. Supp. 2d at 666 (excluding Louis Vuitton's expert's opinion as unreliable because his reliance on another expert's opinion was impermissible when he had no supervision over the other expert and the opposing party had no opportunity to depose the other expert).[13]

### D.   Guedj Improperly Incorporated Hindsight Bias Into His Analysis.

Business valuation standards require valuation experts to only consider facts that were known or knowable as of the date of valuation. *See* Schwartz Dec. Ex. U at 2 (*Back to the Future, Part II*). Any fact or data that became known or was conducted after the valuation date is considered improper hindsight. *See id.* Guedj disregards this basic principle of business valuation in formulating his opinion.

First, Guedj's report considers closed-end fund data as of December 2014. This information was not available until the data was published in April 2016—long after the August 2014 sale of Triadou's interest in the Flatotel.[14]

Second, Guedj depended heavily on the Miller Cicero business valuation to determine the Economic Value to Triadou. Deutsch Bank commissioned Miller Cicero to perform a business

---

[13]   As Plaintiffs explained in their motion to preclude the testimony of Thomas Tener, the Miller Cicero appraisal was produced after the close of discovery, and they have not had the opportunity to depose or otherwise challenge the Miller Cicero appraisals. *See* ECF No. 1301, at 4–5. For the reasons given in the Tener motion, which is respectfully incorporated by reference herein, Guedj should not be permitted to be used as a conduit for hearsay from the Miller Cicero report. Alternatively, the Kazakh Entities should be given the opportunity to pursue discovery from Miller Cicero, including a deposition.

[14]   *See* Schwartz Dec. Ex. V (ICI Research Perspective).

valuation as of July 17, 2014.  That valuation was submitted to Deutsche Bank on August 15, 2014, eleven days after Triadou sold its membership.  *See* Schwartz Dec. Ex. Q at 1 (Assignment Agreement).  Thus, Triadou would not have had the luxury of these facts and analysis before it sold its interest on August 4, 2014, Guedj's valuation date.  By relying on a valuation that was hindsight, even by a matter of days, Guedj again contravened the principles and standards of the valuation community.

**III.    Guedj Offers an Inadmissible Legal Conclusions in Opining that the Sale Price Was "Fair and Reasonable."**

Even if Guedj were qualified to opine on the value of the Flatotel investment (which he is not), his opinion that the price Triadou accepted was "fair and reasonable" should be barred because it is an inadmissible legal conclusion.

A threshold question to whether a qualified expert's opinion should be admitted is whether the expertise "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see also Tomassetta*, 2011 WL 6382562, at *1.  "When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's."  *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).  When an expert provides a legal conclusion, he usurps the role of the judge. *See* Fed. R. Evid. 704 advisory committee's note (cautioning "against the admission of opinions which would merely tell the jury what result to reach"); *see also Daniels v. City of New York*, No. 16-cv-9080 (AJN), 2018 WL 5919307, *14 (S.D.N.Y. Nov. 13, 2018) (quoting *Hygh v. Jacobs*, 961 F.2d 359, 363 (2d Cir. 1992)).)

Triadou ostensibly hired Guedj "to opine on the value of Triadou's 'Membership Interest' in CF 135 West Member LLC . . . at the time Triadou sold that Membership Interest in August 2014."  *See* Schwartz Dec. Ex. G at ¶ 9 (Guedj Rep.).  But Guedj has no opinion as to what the

value of the investment was, and admits that he does not have the expertise to form an opinion on the value of Triadou's interest. Schwartz Dec. Ex. H at 289:7–290:6 (Guedj depo). So instead, he concluded that the price paid by Chetrit was "fair and reasonable." *See id.* at 57:3–6; Ex. G at ¶ 21 (Guedj Rep.).

In doing so, Guedj sidesteps numerous contested factual issues. Setting aside for the moment how it is even possible to render an opinion that a sale was fair and reasonable without knowing how much the asset was worth—discussed further above—this opinion is simply not helpful to the jury. The opinion tells the jury nothing about what the value of the asset was and instead tells the jury what result to reach about the transaction: that it was for a fair and reasonable price, regardless of what that price was or how far it was from the true value of the asset.

The Kazakh Entities' remaining claims against Triadou involve questions of Triadou's intent and whether the below-market assignment was designed to evade the Kazakh Entities' asset recovery efforts. If it was, then by definition Triadou was aware that its investments were likely to be the subject of those efforts, which is highly relevant to Triadou's knowledge that it was involved in a money laundering scheme. In the same way, when an individual flees the country when he gets wind of an investigation into a crime, that fact is strong evidence that the person was involved in the crime. *United States v. Al-Sadawi*, 432 F.3d 419, 424 (2d Cir. 2005) ("It is well-settled that flight can, in some circumstances, evidence consciousness of guilt. . . . Flight is an admission by conduct.").

The value of the investment and the consideration received from Chetrit, then, remain questions of fact that the jury may be called upon to decide. Those questions might be legitimately answered, in part, with expert testimony. But Guedj analyzes neither side of the equation, and only tells the fact-finder what to conclude about the nature of the transaction. Somehow, without

knowing the value of either X or Y, Guedj claims to be able to offer the opinion that the difference between X and Y is small enough that trading one for the other would be "fair and reasonable." For all the reasons given before, this opinion is unreliable and unconnected to any recognized methodology.  In addition, however, Guedj's opinion is inadmissible because it effectively "tell[s] the jury what result to reach.'" *See 523 IP LLC v. CureMD.com*, 48 F. Supp. 3d 600, 634 (S.D.N.Y. 2014) (quoting *United States v. Garcia*, 413 F.3d 201, 210 (2d Cir. 2005)); *see also Daniels v. City of New York*, No. 16-cv-9080 (AJN), 2018 WL 5919307, \*14 (quoting *Hygh*, 941 F.2d at 363); *see, e.g., Hewitt*, 244 F. Supp. 3d at 382–84 (permitting an expert to testify that certain ergonomic risk factors existed in the workplace but not that the existence of "those risk factors caused Hewitt's injuries," and permitting the expert to "opine on what steps a reasonable employer could have taken" but not that the employer was negligent).

Whether Chetrit paid a fair and reasonable price is an opinion the jury must reach on its own based on its resolution of contested facts concerning the value of the asset and the assignment. The Court should therefore preclude Guedj's opinion and testimony.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to preclude should be granted.

Dated:   New York, New York
         July 1, 2020

Respectfully,

 /s/ Matthew L. Schwartz
Matthew L. Schwartz
Peter M. Skinner
Craig Wenner
Valecia Battle

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, NY 10001
(t) +1 212 446 2300
(f) +1 212 446 2380

*Attorneys for Plaintiffs*