# Exhibit 208

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------)
                                )
CF 135 FLAT LLC, CF 135         )
WEST MEMBERS LLC                )
and THE CHETRIT GROUP, LLC,     )
                                ) Case No.
                                )15-cv-05345-AJN
                                )
        Interpleader Plaintiffs, )
                                )
                -against-       )
TRIADOU SPV S.A., CITY OF ALMATY,)
a foreign city, and BTA Bank,   ) AMENDED CROSS-
                                ) CLAIMS
        Interpleader Defendants. )
                                )
                                )
--------------------------------)
                                )
CITY OF ALMATY, KAZAKHSTAN      )
and BTA BANK,                   )
                                )
        Crossclaim Plaintiffs,)
                                )
                                )
                -against-       )
                                )
MUKHTAR ABLYAZOV,               )
VIKTOR KHRAPUNOV,               )
ILYAS KHRAPUNOV,                )
TRIADOU SPV S.A.,               )
and FBME BANK LTD.,             )
                                )
        Crossclaim Defendants.)
                                )
                                )
--------------------------------)

     VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION

                    of
        MR. NICOLAS BOURG (DAY ONE)
        On Monday, 11th September 2017



Page 21

1

2   Sunday before today; is that right?

3          A.     Yes.

4          Q.     Do you understand that I and my

5   firm represent BTA Bank in the city of Almaty in a

6   dispute that they are having with the Khrapunovs

7   and with other individuals, namely the Ablyazovs?

8               (Mr. Boyle left the room)

9          A.     Yes.

10          Q.     Were you obligated, for any reason,

11   to meet with us, meaning Boies Schiller, on

12   Saturday and Sunday?

13          A.     No.

14          Q.     Have you entered into agreements

15   with my clients BTA Bank and the city of Almaty as

16   well as some other parties that require you to

17   assist in asset recovery efforts?

18          A.     Yes.

19          Q.     How did you come to enter into

20   those agreements?

21          A.     The lawyers of BTA and Arcanum came

22   to see me and explained that they have a dispute

23   with Mr. Chetrit in New York.  They had heard that

24   I had a disagreement with Mr. Chetrit in New York

25   and asked if I wished against a release to help



Page 22

1

2    them.

3         Q.    We will talk about this in some

4    more detail later, but can you just briefly tell

5    us who Mr. Chetrit is?

6         A.    Mr. Chetrit is a, is the owner of

7    Chetrit Capital and a big real estate developer in

8    New York and the US and, who was involved in the

9    sale of Flatotel and Cabrini in which Triadou

10   invested.

11        Q.    What is Triadou?

12        A.    Triadou is a company owned by SDG

13   Capital.  The objective of which is to invest in

14   real estate in the US, of which I was the only CEO

15   until 2014.  Director, sorry.

16        Q.    Were the investments that Triadou

17   made, with respect to Mr. Chetrit, investments

18   that you were doing in connection with your work

19   with Ilyas Khrapunov?

20        A.    Yes.

21        Q.    You testified a moment ago that

22   lawyers for BTA and some others ----

23              THE WITNESS:  Arcanum.

24   BY MR. SKINNER:

25        Q.    -- and Arcanum came to you and said



Page 23

 1

 2    they understood that you were in a dispute with

 3    Mr. Chetrit; is that right?

 4             A.    (Through the Interpreter) Yes.

 5             Q.    You say that they offered you a

 6    release in exchange for your assistance?

 7             A.    To be more precise, I wrote, or

 8    rather my lawyer in the US, Robert Wolf, wrote a

 9    letter to Chetrit of disagreement and Mr. Chetrit

10    filed a letter to the New York court mentioning

11    the origin of the capital, and the lawyers of BTA

12    and Arcanum were interested in the recovery of

13    assets and found the link between me and the

14    Khrapunov family.

15             Q.    Mr. Bourg, what do you mean by the

16    "origin of the capital"?

17             A.    Khrapunov and Ablyazov.

18             Q.    Are you saying that the capital

19    belonged to Khrapunov and Ablyazov?

20                   MR. HASSID:  Objection.

21             A.    Yes, that's what I mean.

22    BY MR. SKINNER:

23             Q.    And what capital are you referring

24    to?

25             A.    Well, as I said the SDG was set up



Page 24

1

2    by Ilyas Khrapunov and essentially the capital

3    came from the Khrapunov family and, in a wider

4    sense, from Ablyazov.

5            Q.    What had the capital been used for?

6            A.    To invest in real estate projects.

7            Q.    And did those real estate projects

8    include the Flatotel and Cabrini projects that you

9    mentioned a moment ago?

10           A.    Yes.

11           Q.    Now, you say that you were offered

12   a release in exchange for your assistance;

13   correct?

14           A.    Yes.

15           Q.    What do you mean by a "release"?

16               MR. HASSID:   Objection.

17           A.    Simply that BTA and the state of

18   Kazakhstan would not pursue me any longer.

19   BY MR. SKINNER:

20           Q.    Pursue you?

21           A.    Would not file a suit against me;

22   initiate proceedings.

23           Q.    So, they were releasing you from

24   future legal proceedings?

25           A.    Yes.



1

2    Capital?

3          A.     Yes, I was entitled to a part of

4    the profits on the profits made by the real estate

5    developments, which I was managing.

6          Q.     Okay, and how much of the profit

7    were you entitled to under your agreement with SDG

8    Capital?

9          A.     Well, it was a rule which we

10   established under SDG and the management agreement

11   which I had that it should be somewhere in the

12   region of 20%.

13         Q.     Has Triadou invested in two

14   properties called Flatotel and Cabrini; is that

15   right?

16         A.     Yes.

17         Q.     Where were these properties

18   located?

19         A.     New York.

20         Q.     Did Triadou have any partners in

21   its investment in these properties?

22         A.     Yes, there was Chetrit.

23         Q.     What was Triadou's role and what

24   was Chetrit's role?

25         A.     Well, Chetrit was in charge of



1

2   developing and completing the project and Triadou

3   was the investor.

4        Q.     And where did Triadou get the

5   capital it invested?

6        A.     Telford International.

7        Q.     And how do you know that?

8        A.     Because I saw the Telford

9   International SWIFTs.

10       Q.     The SWIFTs are bank records?

11       A.     Yes.

12       Q.     How much did Triadou invest in each

13   of these projects?

14       A.     6 million for Cabrini and 35

15   million for Flatotel.

16       Q.     Do you know where Telford got the

17   capital that it paid, for these investments?

18       A.     Mr. Khrapunov told me that these

19   were funds which came from Mr. Ablyazov.

20       Q.     And who is Mr. Ablyazov?

21       A.     Ilyas Khrapunov's father-in-law.

22       Q.     Just to be clear with which

23   Mr. Khrapunov you are talking about, was this

24   Ilyas Khrapunov who told you that

25   Mr. Ablyazov ----



Page 46

```
 1
 2            A.      Yes.
 3            Q.      Have you ever met Ilyas Khrapunov's
 4  father?
 5            A.      Yes.
 6            Q.      And what's his name?
 7            A.      Viktor.
 8            Q.      During all of your testimony today,
 9  have you been talking thus far, when you said
10  Mr. Khrapunov, about Ilyas?
11            A.      Yes.
12            Q.      So I am going to assume, going
13  forward, that when we talk about Mr. Khrapunov,
14  you are referring to Ilyas, okay?
15            A.      Yes.
16            Q.      If you ever are referring to
17  something that Viktor Khrapunov did, please,
18  identify him specifically by the name Viktor.
19            A.      Okay.
20            Q.      Do you have an understanding as to
21  why Telford made the payments for the project
22  rather than Triadou?
23                    MR. HASSID:  Objection.
24            A.      Well, Triadou simply did not have
25  the necessary funds.
```



Page 47

```
 1
 2   BY MR. SKINNER:
 3           Q.     Did Triadou have a bank account?
 4           A.     Yes.
 5           Q.     So why wasn't the money for the
 6   investment transferred into Triadou's bank account
 7   and Triadou, then, would make the payment?
 8           A.     We attempted to transfer the
 9   capital from Telford to Triadou but the Luxembourg
10   bank prevented it, or would not do it.
11           Q.     Do you know why the Luxembourg bank
12   prevented the transfer from capital into Triadou?
13           A.     No, but I think it is because
14   Telford's bank, the FBME, had a bad reputation.
15           Q.     So, just to be clear, Triadou owned
16   interest in these two properties, Flatotel and
17   Cabrini?
18           A.     Yes.
19           Q.     But the payment for those interests
20   was made by a company called Telford?
21                  THE WITNESS: Oui.
22   BY MR. SKINNER:
23           Q.     And is your understanding that
24   Telford's money came from Mr. Ablyazov?
25           A.     (Through the Interpreter) Yes.
```



Page 48

```
 1
 2          Q.     And you believe that because that
 3   is what Ilyas Khrapunov told you?
 4          A.     Yes.
 5                 MR. KENNEY:  Can I ask to have that
 6   last question read back?  Sorry, withdrawn.  Got
 7   it.
 8                 MR. SKINNER:  Can we mark this as
 9   Bourg Exhibit 3.
10      (Exhibit 3 was marked for identification)
11                 MR. HASSID:  I will just state for
12   the record or ask for the record whether this
13   document had an e-mail associated with it?
14                 THE INTERPRETER:  Is this a
15   question for Mr. Bourg?
16                 MR. HASSID:  No, this is a question
17   for counsel.
18                 MR. BOYLE:  I don't know.  I
19   believe it did.
20                 MR. HASSID:  Then we'll object to
21   it being provided to the witness in incomplete
22   form.
23   BY MR. SKINNER:
24          Q.     Okay.  Can you look at what we
25   marked as Bourg Exhibit 3, please?
```



MAGNA
LEGAL SERVICES

1

2                    THE WITNESS:  Oui.

3    BY MR. SKINNER:

4         Q.    It's a two page document, pages

5    front and back.  Looking at the back page, do you

6    see what appears to be a printout of a

7    spreadsheet?

8         A.    (Through the Interpreter)  Yes.

9         Q.    Do you recognise the entities and

10   the amounts and the dates that are on this

11   spreadsheet?

12                   MR. HASSID:  Objection.

13        A.    Yes.

14   BY MR. SKINNER:

15        Q.    What are they?

16        A.    These are the payments made by

17   Telford to the US projects.

18        Q.    So at the top here we have Flatotel

19   in the first square at the top; is that right?

20        A.    Yes.

21        Q.    And it indicates that the total

22   payment for Flatotel was $34,885,565?

23        A.    Yes.

24        Q.    And that the payments were made in

25   five payments, beginning in November 2012 and



```
 1
 2    ending on April 13th of 2013?
 3         A.    Yes.
 4         Q.    Is that consistent with your
 5    understanding of how the payments were actually
 6    made by Telford on Triadou's behalf with respect
 7    to Triadou's investment?
 8         A.    Yes.
 9         Q.    Do you see in the box under
10    "Flatotel" where it says "Cabrini"?
11         A.    Yes.
12         Q.    It says that one payment was made
13    in the amount of $6,189,000 on May 20th 2013?
14         A.    Yes.
15         Q.    And again, is that consistent with
16    your understanding of the amount and time of the
17    payment that Telford made on Triadou's behalf for
18    its investment in Cabrini?
19         A.    Yes.
20         Q.    There is also payments here with
21    respect to something called Tri-County; is that
22    right?
23         A.    Yes.
24         Q.    And what is Tri-County?
25         A.    It is a shopping mall in New York,
```



1

2    I am sorry, in Cincinnati.

3            Q.      And what entity, or special purpose

4    vehicle invested in Tri-County?

5            A.      Triadou.

6            Q.      It says here Triadou paid roughly

7    $35 million for the Flatotel project; correct?

8            A.      Yes.

9            Q.      Was that all of the money that

10   Triadou was obligated to pay?

11           A.      I think that there was a last call

12   for capital, which hadn't been affected.

13           Q.      At the beginning of the agreement,

14   how much had Triadou agreed to invest in the

15   Flatotel project?

16           A.      About 40 million.

17           Q.      Again, looking at Bourg Exhibit 3,

18   do you see where it says "Syracuse - loan from

19   ADLUX" -- sorry, let me ask the question again.

20                   (To the Court Reporter)  The

21   translation I think is getting a little bit in the

22   way of the court reporter's ability to hear.  If

23   you have any trouble, just let us know, okay?

24                   (To the witness) The question was:

25   Do you see where it says "Syracuse - loan from



Page 52

1

2    ADLUX", A-D-L-U-X?

3              A.      Yes.

4              Q.      And what is -- what is that?

5              A.      It's a real estate investment, in

6    Syracuse.

7              Q.      And what is ADLUX?

8              A.      It is a company owned by Ilyas

9    Khrapunov.

10             Q.      So, was the Syracuse investment,

11   then, the origin of the funds was from a company

12   called ADLUX?

13             A.      Yes.

14             Q.      And the origin of the funds for the

15   Flatotel and Cabrini projects were Telford;

16   correct?

17             A.      Yes.

18             Q.      Where do the funds for the

19   Tri-County project come from?

20             A.      Telford.

21             Q.      You mentioned a moment ago that

22   Ilyas Khrapunov told you that the money for the

23   Flatotel and Cabrini investments came from

24   Mr. Ablyazov; correct?

25             A.      Yes, he told me that the funds,


MAGNA
LEGAL SERVICES

1

2   which were owned by Telford, came from

3   Mr. Ablyazov.

4          Q.      And to your knowledge, did he make

5   similar statements to any other people?

6          A.      Not as far as I know.

7          Q.      To your knowledge, did Mr. Ablyazov

8   play any role in the real estate investments that

9   Triadou was making in the United States?

10         A.      My understanding is that the final

11  decision was Mr. Ablyazov's.

12         Q.      And by "the final decision", you

13  mean the final decision as to whether to invest or

14  not?

15         A.      Yes.

16         Q.      How do you know that?

17         A.      Because Ilyas told me.

18         Q.      Do you have any examples of

19  instances where it was evident to you that

20  Mr. Ablyazov was approving the investment?

21         A.      Not as far as I know.

22         Q.      When you -- with respect to the

23  schedule of payments that are reflected on Bourg

24  Exhibit 3, who approved those payments being made?

25         A.      Ilyas Khrapunov.



Page 54

1

2          Q.      Alright and when you were speaking

3    with Mr. Khrapunov, did he ever delay his approval

4    of one of these payments because he needed to

5    speak to Mr. Ablyazov first?

6                  MR. HASSID:   Objection.

7          Q.      It was more a question of upstream

8    global agreement and then afterwards the payment

9    was effected by Ilyas Khrapunov.

10   BY MR. SKINNER:

11         Q.      If we are looking at the payments

12   that were made for the Flatotel, the first payment

13   in the amount of $10.5 million roughly was made in

14   November 2012; correct?

15         A.      Yes.

16         Q.      Can you describe for us, please,

17   the conversations you had with Mr. Khrapunov in

18   connection with Mr. Khrapunov's authorisation for

19   that payment to be made?

20         A.      I submitted to him a financial

21   analysis for the Flatotel project and he told me

22   that he had to get the approval of his

23   father-in-law and a couple of days later he came

24   back and said that it was approved.

25         Q.      When you did your financial



Page 55

```
 1
 2    analysis of the Flatotel, did you analyse what you
 3    anticipated the profits from that project to be?
 4           A.     Of course.
 5           Q.     How much profit did you forecast,
 6    based on the investment that Triadou was going to
 7    make?
 8           A.     About 100 million.
 9           Q.     And the investment was roughly 40
10    million?
11           A.     Yes.
12           Q.     So, if I am correct, then, you were
13    anticipating net profits of roughly 60 million?
14           A.     No.
15           Q.     What were the net profits you were
16    expecting?
17           A.     Between 80 and 100 million.
18           Q.     Did there come a time when you
19    learned that Mr. Ablyazov had been imprisoned?
20           A.     Yes.
21           Q.     Where was he imprisoned?
22           A.     In France.
23           Q.     When did you learn that he had been
24    imprisoned?
25           A.     July 2013.
```



Page 56

```
 1
 2          Q.      If we refer back to the list of
 3   payments that are reflected on Bourg Exhibit 3,
 4   what was the date of the last transfer that
 5   Telford made for Triadou's benefit?
 6          A.      May 2013.
 7          Q.      Is it May or April?
 8          A.      May.
 9          Q.      And at that point, Triadou still
10   owed a little more than $5 million in connection
11   with its original commitment to invest 40 million?
12          A.      I am sorry, you were right.  In the
13   case of Flatotel it was April, the last payment.
14          Q.      So the last payment for Flatotel
15   was April of 2013?
16          A.      Yes.
17          Q.      And at that point, Triadou still
18   owed money under its agreement; correct?
19          A.      Yes, but it hadn't been called yet.
20          Q.      And did Triadou ever make any other
21   payments in connection with its agreement?
22          A.      No.
23          Q.      Did Triadou receive any funding
24   from Telford after Mr. Ablyazov was imprisoned in
25   July 2013?
```



Page 57

```
 1
 2          A.     Not as far as I know.
 3          Q.     And after Mr. Ablyazov's arrest,
 4   did Triadou make any further investments?
 5          A.     Not as far as I know.
 6          Q.     Do you know an individual named
 7   Eesh Aggarwal?
 8          A.     Yes.
 9          Q.     Who is that?
10          A.     It was the manager of Telford.
11          Q.     And when -- did Mr. Aggarwal play
12   any role in the payments that are reflected on
13   Bourg Exhibit 3 that Telford was making in the US
14   investments?
15          A.     Yeah, he processed the payments.
16          Q.     And how would you go about
17   contacting Mr. Aggarwal?
18          A.     It was not I but Ilyas who
19   contacted him.  I probably sent him some e-mails,
20   but at the behest of Ilyas.
21          Q.     Let us mark this as Bourg 4.
22   Mr. Bourg, do you have the document we have marked
23   as Bourg Exhibit 4 in front of you?
24       (Exhibit 4 was marked for identification)
25          A.     Yes.
```



Page 60

1

2          A.     They, in the trial -- in the legal

3    procedure they turned out to be investors in --

4    effective, the UBOs of Telford.

5          Q.     In legal proceeding, you are

6    referring to the legal proceeding that you

7    testified at in May of 2016?

8          A.     Yes, amongst others.

9          Q.     And the first time that you had

10   heard that the Petelins were investing in Telford

11   was in May of 2016?

12         A.     More or less, yes.

13         Q.     Now, did there come a time when

14   Triadou decided to exit its investments in the

15   Flatotel and Cabrini projects?

16         A.     Yes.

17         Q.     And when did -- I will withdraw.

18   You were the sole director of Triadou; correct?

19                THE INTERPRETER:  You were the

20   sole?

21         Q.     The sole director of Triadou?

22                THE WITNESS:  Oui.

23   BY MR. SKINNER:

24         Q.     Did you decide to exit the

25   investments?



Page 61

```
 1
 2          A.     (Through the Interpreter)  To come
 3  out of it; to withdraw, you mean?
 4          Q.     Yes.
 5          A.     No, it was not me.
 6          Q.     Who made the decision to exit the
 7  investments?
 8          A.     Ilyas Khrapunov.
 9          Q.     And how did you learn about that?
10          A.     He asked me to sell our
11  participation, or our part, to Chetrit -- our
12  share, sorry.
13          Q.     He asked you to sell your share to
14  Chetrit?
15          A.     Yes.
16          Q.     When was it that Ilyas Khrapunov
17  asked you to sell Triadou's share to Chetrit?
18          A.     In 2014, April 2014.
19          Q.     Did you think it was a good idea to
20  exit the position at that point in time?
21          A.     No, I did not.  I thought it was a
22  very bad idea.
23          Q.     Why was that?
24          A.     Because the project was going very
25  well.  And I think as of today all the units have
```



Page 62

```
 1
 2   been sold, and it was a project which,
 3   potentially, could be very profitable.
 4          Q.     At that point in time, April of
 5   2013; correct -- or '14 -- - I am sorry, you had
 6   said April 2014?
 7                 THE WITNESS:  Yes, '14.
 8          Q.     At that point in time, had Triadou
 9   realised any profits from the investment?
10          A.     (Through the Interpreter)  No.
11          Q.     And if Triadou had realised
12   profits, you would have shared in those profits;
13   correct?
14          A.     Yes, absolutely.
15          Q.     You would have gotten 20%; is that
16   right?
17          A.     More or less.  That is what my
18   contract, at least, stated.
19          Q.     So by -- to your mind, by selling
20   the position in April 2013 you were potentially
21   losing money out of your own pocket?
22          A.     Yes, I agree.
23          Q.     But Ilyas told you to do it?
24          A.     Yes.
25          Q.     Did you do it?
```



Page 63

```
 1
 2            A.    Yes.
 3            Q.    What, if anything, did Ilyas tell
 4   you about why he wanted to sell the position at
 5   that point in time?
 6            A.    He told me that there was the risk
 7   of legal proceedings in the US on the part of BTA
 8   and Kazakhstan, in order to recover the assets
 9   that his family had in California, and so
10   therefore there weren't any assets in New York
11   which could risk being recovered.
12                 MR. SKINNER:  Can we take a very
13   brief break; is that all right with everybody?
14                 THE VIDEOGRAPHER:  We are going off
15   the record, the time is 11.26 a.m.
16           (Off the record at 11.26 a.m.)
17           (Back on the record at 11.37 a.m.)
18                 THE VIDEOGRAPHER:  We are back on
19   the record.  The time is 11.37 a.m.
20   BY MR. SKINNER:
21            Q.    Mr. Bourg, you testified a little
22   while ago that Ilyas Khrapunov told you to sell
23   Triadou's position back to Joe Chetrit; is that
24   right?
25            A.    Yes.
```



Page 66

```
 1
 2    to get -- asked Chetrit to get compensation from
 3    me -- I am sorry, I that I bill Mr. Chetrit for
 4    compensation which would be handed on to them.
 5         Q.    The deal that Triadou ultimately
 6    struck with Mr. Chetrit to sell back its position,
 7    did you recommend that deal to Ilyas Khrapunov?
 8              THE WITNESS:  No.
 9         A.    (Through the interpreter)  No.
10    BY MR. SKINNER:
11         Q.    Were you opposed to that deal?
12         A.    Yes.
13         Q.    And why were you opposed to that
14    deal?
15         A.    Because I was starting to make some
16    money on the deal.
17         Q.    Let us mark this as Bourg
18    Exhibit 5, please.  Mr. Bourg, do you have the
19    document in front of you that we have marked as
20    Exhibit 5?
21      (Exhibit 5 was marked for identification)
22         A.    Yes.
23         Q.    Do you recognise this?
24         A.    Yes.
25         Q.    Have you seen it before?
```



```
 1
 2          A.      Almost certainly, yes.
 3          Q.      What is it?
 4          A.      It is the minutes of a meeting
 5   which took place with the participants as listed.
 6          Q.      And what type of meeting was this?
 7          A.      It was a meeting to inform the
 8   participants as to the progress of the fund and
 9   the kind of projects which would be included in
10   the fund.
11          Q.      When you say the participants, what
12   do you mean?
13          A.      The individuals who are listed here
14   at the top.
15          Q.      Was this a meeting of SDG or
16   Triadou, or some other subsidiary?
17          A.      No, it was a meeting initiated by
18   myself to inform, as I said, as to the progress of
19   the investment fund which I was managing and the
20   projects which would be incorporated in the fund
21   eventually.
22          Q.      So the meeting was on 23rd May
23   2013; is that right?
24          A.      Yes.
25          Q.      And you and Kevin Meyer were there
```



Page 68

```
 1
 2    on behalf of the SDG investment fund?
 3            A.     Yes.
 4            Q.     Then it says that Cesare Cerrito
 5    was there on behalf of SDG SA; is that right?
 6            A.     Yes.
 7            Q.     And do you know Mr. Cerrito?
 8            A.     Yes.
 9            Q.     What is his role at SDG SA?
10            A.     CFO.
11            Q.     It also says that an individual
12    name Peter Sztyk was there; correct?
13            A.     Yes.
14            Q.     Who is Mr. Sztyk?
15            A.     A friend and a close associate of
16    Ilyas Khrapunov.
17            Q.     Why was Mr. Sztyk at this meeting?
18            A.     Mr. Sztyk was present at many
19    meetings, this amongst others.
20            Q.     Then there are three names,
21    Mr. Yassik, Mr. Zaharia and Mr. Krasnov?
22            A.     Yes.
23            Q.     They are all there, it says, for
24    the family office; is that right?
25            A.     Yes.
```



Page 69

```
 1
 2          Q.      What does "family office" refer to?
 3          A.      It was the personal family office
 4   of Ilyas.
 5          Q.      Then there is a few individuals
 6   from SCRM Avocats; do you see that?
 7          A.      Yes.
 8          Q.      And who are they?
 9          A.      It was the lawyers representing or
10   for the Luxembourg investment fund.
11          Q.      I am sorry, for the Luxembourg
12   investment fund?
13          A.      And the Luxembourg entities that
14   Triadou.
15          Q.      Then Marc Gillieron was there; is
16   that right?
17          A.      Yes.
18          Q.      Who is Mr. Gillieron?
19          A.      He is a partner/lawyer, of
20   Chabrier, which is a lawyer firm in Switzerland.
21          Q.      And who does Chabrier represent?
22          A.      SDG and Ilyas Khrapunov.
23          Q.      Then there was another lawyer, a
24   Perez-Pelletier, also from Chabrier; is that
25   right?
```



```
 1
 2            A.      Yes.
 3            Q.      Can I ask you to turn to page 5 of
 4  this agreement and let me direct your attention to
 5  the top where it says, "Black Sea trade loan"?
 6            A.      Yes.
 7            Q.      Do you see where it says:  "The
 8  bank agreed on the loan(Euro 8M) but waits for KYC
 9  information from Mr. Glatz"?
10            A.      Yes.
11            Q.      What is your understanding of that?
12            A.      Well, in the framework of the Porto
13  Heli project, Dolphin, which was a 25% partner in
14  this project, had negotiated a loan from the
15  Black Sea Bank and, inasmuch as SDG held 75%, and
16  that Mr. Glatz was the new owner of SDG Capital,
17  the bank wanted further information about the new
18  owner of SDG Capital.
19            Q.      Is that what is meant by, "KYC
20  information for Mr. Glatz"?
21            A.      Yes.
22            Q.      After this meeting, did Mr. Glatz
23  provide KYC information to the bank?
24            A.      Yes, I think so.
25            Q.      Was that information sufficient for
```



Page 71

```
 1
 2   the bank?
 3          A.     I don't know, but the bank -- the
 4   upshot of this is that the bank didn't want to
 5   continue the loan arrangement.
 6          Q.     So the loan was never actually
 7   made?
 8          A.     No.
 9          Q.     Do you know if the bank gave a
10   reason for not making the loan?
11          A.     Yes, they thought Mr. Glatz was not
12   a credible purchaser of SDG Capital.
13          Q.     Let us look a little further down
14   the page where it says, "Flatotel"?
15          A.     Yes.
16          Q.     Do you see under "Financing" it
17   says:  "The project is fully financed through
18   loans granted by P. Sztyk vehicle to Triadou SPV
19   SA"?
20          A.     Yes.
21          Q.     Then it says:  "No additional
22   information has been provided regarding the
23   financings"; that is correct?
24          A.     Yes.
25          Q.     You testified earlier that the
```



Page 72

 1
 2      financing for the Triadou investments was provided
 3      largely by an entity called Telford; correct?
 4              A.      Yes.
 5              Q.      So what is your understanding of
 6      Mr. Sztyk's role to Telford?
 7              A.      That he was presented as the owner
 8      of Telford.
 9              Q.      This is what was represented in the
10      meeting in May of 2013; is that correct?
11                      MR. HASSID:   Objection to the form.
12              A.      Yes.
13      BY MR. SKINNER:
14              Q.      Can you turn to the next page.   Do
15      you see where it says, "Sale of Triadou SPV SA"?
16              A.      Yes.
17              Q.      It says that:   "Today, Triadou SPV
18      SA is fully held by SDG Capital SA. SDG Capital SA
19      would like to sell its shares in Triadou SPV SA to
20      a vehicle owned by Mr. Sztyk."
21              A.      Yes.
22              Q.      It further says that Mr. Sztyk is
23      going to convert his debt into an equity position
24      in Triadou?
25              A.      Yes.



Page 73

1

2          Q.      So was there discussion at this

3     meeting about selling Triadou's assets to

4     Mr. Sztyk?

5          A.      It had been decided that Sztyk

6     should convert the Telford debt into equity and

7     would, therefore, by that fact, become owner of

8     Triadou.

9          Q.      And did you understand at that time

10    that Mr. Sztyk owed -- had debts -- or, excuse me,

11    did you understand at that time that Triadou owned

12    debts to Mr. Sztyk?

13         A.      Yes, apparently, as described here.

14         Q.      Are you just saying that is what is

15    on the paper, or is what your understanding was

16    back in May of 2013?

17         A.      No, I understood that in May 2013.

18         Q.      You say that you testified earlier

19    that later, in legal proceedings in this case,

20    were aware of claims that Telford was owned by the

21    Petelins; is that right?

22         A.      Yes.

23         Q.      Do you know whether Telford was

24    owned by Peter Sztyk or by the Petelins?

25         A.      It looks rather confused.



Page 74

```
 1
 2          Q.      Who controlled Telford?
 3          A.      Ilyas.
 4          Q.      Do you know why the meeting minutes
 5   say that Mr. Sztyk was responsible for funding
 6   Triadou?
 7                  MR. HASSID:  Objection to the form.
 8          A.      No, I do not know.
 9   BY MR. SKINNER:
10          Q.      If you look underneath the sale of
11   Triadou there is a "to-do" list of things that
12   were supposed to happen in connection with the
13   sale of Triadou?
14          A.      Yes.
15          Q.      And Mr. Sztyk's lawyers were
16   supposed to conduct due diligence and set up an
17   acquisition vehicle and do some other things; is
18   that right?
19          A.      Yes.
20          Q.      Did Mr. Sztyk ever conduct due
21   diligence on Triadou?
22          A.      Not to my knowledge.
23          Q.      Was there ever any discussion of
24   setting up an acquisition vehicle for Triadou?
25          A.      I do not know.
```



1

2    Triadou, and for Ilyas Khrapunov generally, what

3    e-mail address were you using for business

4    purposes?

5            A.      I used three.  Right, the three

6    were as follows:  "sdg.ch"; number 2,

7    "sdg-if.ch" -- sorry, the second one is

8    "sdg-if.com"; and the third one is "e-1.lu".

9            Q.      So the e-1.lu, is there a business

10   that that e-mail address is connected with?

11           A.      It was when the fund was opened and

12   subject to regulation in Luxembourg; it was called

13   "element 1" at that time.

14           Q.      The fund, you are referring to the

15   investment fund that you were creating for

16   Mr. Khrapunov?

17           A.      Yes.

18           Q.      And then the sdg-if.com address, is

19   that also associated with the investment fund?

20           A.      As it was being set up; the fund as

21   it was being set up.

22           Q.      The @sdg.ch, is that an e-mail

23   address that was affiliated with SDG?

24           A.      Yes, it was when I started the

25   assignment.



Page 78

 1

 2          Q.     It was that SDG Capital or the

 3   other SDG entity?

 4          A.     The other one.

 5          Q.     Which of these e-mails was your

 6   primary e-mail address during the time that you

 7   were working for Ilyas Khrapunov?

 8          A.     I never used all three at the same

 9   time.  They were all important, the one as the

10   other, since they succeeded each other.  First

11   I would use the first and then I went on to the

12   second and then the third.

13          Q.     I see.  The so the first one you

14   used was the sdg.ch?

15                 THE WITNESS:  Oui.

16   BY MR. SKINNER:

17          Q.     And then, after the fund was

18   actually established, you moved to the e-mail

19   addresses associated with the fund?

20          A.     (Through the Interpreter)  Yes, the

21   first one was when I was beginning, the second one

22   was while the fund was being set up, and the third

23   one was when it had been set up.

24          Q.     When you left SDG, what, if

25   anything, did you do with the e-mails that you had



Page 81

```
 1
 2                    MR. KENNEY:  Fine.
 3                    THE VIDEOGRAPHER:  We are going off
 4     the record.  The time is 12.10 p.m.
 5              (Off the record st 12.10 p.m.)
 6                (On the record at 1.27 p.m.)
 7                    THE VIDEOGRAPHER:  We are back on
 8     the record.  The time is 1.27 p.m.
 9     BY MR. SKINNER:
10          Q.    Mr. Bourg, welcome back.  Let me
11     direct your attention to the end of 2013.  Did
12     there come a time at the end of 2013 when you had
13     a meeting with Mr. Ilyas Khrapunov where you
14     discussed some documents that he had obtained?
15          A.    Yes.
16          Q.    And where did this meeting take
17     place?
18          A.    In the Geneva offices.
19          Q.    The offices where you and
20     Mr. Khrapunov had offices physically located next
21     to each other?
22          A.    Yes.
23          Q.    And who was at this meeting?
24          A.    Ilyas, Laurent Foucher and myself.
25          Q.    And what happened at this meeting?
```



Page 82

```
 1
 2          A.     Well, it was end of afternoon
 3   informal meeting.  Ilyas showed us a pile of
 4   documents and claimed that this was proof of
 5   hacking, and he maintained that this was hacking
 6   of the -- into the accounts of the French
 7   prosecution authorities and the Kazak -- Kazak
 8   prosecution.
 9          Q.     So this is what Mr. Ilyas Khrapunov
10   told you?
11                 THE WITNESS:  Oui.
12   BY MR. SKINNER:
13          Q.     And when you say there was a pile
14   of documents, there was a physical printout of
15   documents that you saw?
16          A.     (Through the Interpreter)  Yes.
17          Q.     What, if anything, did he say with
18   respect to who had done the hacking?
19          A.     He told me about an Israeli society
20   -- company.
21          Q.     Did Mr. Khrapunov explain what his
22   arrangement was with this Israeli hacking company
23   that allowed him to obtain these documents?
24          A.     No, he just said that he received
25   all these documents every week in printed form,
```



Page 83

```
 1
 2    and that he paid every week the sum of $200,000
 3    for this service.
 4         Q.    Did you have any conversation with
 5    him with respect to the size of the amount that he
 6    was paying?
 7         A.    No.
 8         Q.    You said that he indicated that he
 9    had documents from French authorities; is that
10    right?
11         A.    Yes, from the French prosecution in
12    the Ablyazov case -- the prosecutor.
13         Q.    Were there documents from any other
14    government authorities other than the French
15    authorities?
16         A.    Yes, he said that there was some
17    from the Kazakhstani prosecutor.
18         Q.    Anyone else, other than the French
19    and the Kazakhstani authorities?
20         A.    Not as far as -- not as far as
21    I know, or at least not what he told me.
22         Q.    What would happen, if you know, in
23    connection with Mr. Ablyazov's case with the
24    French authorities at that point in time; did you
25    talk to Mr. Khrapunov about this?
```



Page 106

 1

 2    question ----

 3               MR. WOLF:  Sorry, (unclear) 4.3.

 4               THE INTERPRETER:  There are four

 5    lines in 4.3:  Expenses.  The company will also

 6    undertake to pay all lodging and travel expenses

 7    which have been reasonably incurred by Mr. Bourg

 8    in the execution of this agreement, provided that

 9    supporting evidence is provided.  These expenses

10    will be reimbursed to Mr. Bourg at the end of each

11    month and -- in accordance with what has been

12    decided by the parties.  The ceiling for these

13    expenses -- and this is in italics -- is fixed at

14    24,000 Swiss francs per annum, or 2,000 Swiss

15    francs per month.

16    BY MR. HASSID:

17         Q.    Mr. Bourg, did you understand my

18    original question?

19         A.    Yes.

20         Q.    Is there a provision in this

21    section that entitles you to 20% bonuses on the

22    profits of the fund investments?

23         A.    This is not the only contract which

24    has to do with the business arrangements I had

25    with Mr. Khrapunov.



Page 107

```
 1
 2          Q.     So is there another contract that
 3   indicates you are entitled to 20%?
 4          A.     Yes, there is the regulation for
 5   the real estate investment fund in Luxembourg,
 6   which provides for a performance fee of 20% on the
 7   profits of the management company which I owned.
 8          Q.     So, to clarify, is it in a written
 9   agreement between you and either the fund or
10   Mr. Bourg, or are you saying that it is a legal
11   statute that entitles you to the profit?
12                 MR. SKINNER:  Objection.
13          A.     No, it is an agreement made between
14   the fund feeders, including Ilyas, and in line
15   with Luxembourg regulations.
16   BY MR. HASSID:
17          Q.     Do you recall if that is a document
18   you provided to Almaty and BTA?
19                 THE INTERPRETER:  What is the first
20   word, Almaty?
21                 MR. HASSID:  Almaty.
22          A.     Well, I would like to know exactly
23   which document you are referring to there, the one
24   that we have just been talking about, the 20%, or
25   something else?
```



Page 108

 1

 2   BY MR. HASSID:

 3          Q.     Correct, yes.

 4          A.     I don't think so.

 5                 MR. HASSID:  I know you are not

 6   necessarily taking requests, Mr. Wolf, but we

 7   would request that Mr. Bourg produce that

 8   document, if he still has it.

 9   BY MR. HASSID:

10          Q.     Mr. Bourg, I am now actually going

11   to hand you two documents at a time, to try and

12   save some time.  Mr. Bourg, I will represent to

13   you that these are your declarations, your May

14   2016 declarations, and the exhibits that were

15   attached, given in this case.  We printed them

16   directly off the filing of the ECF pacer website,

17   so this is directly from the court.  Have you seen

18   these before?

19   (Exhibits 9 and 10 were marked for identification)

20          A.     Yes.

21          Q.     At the hearing -- and you testified

22   that the contents of your declarations are true

23   and accurate, but this morning you indicated that

24   they are mostly accurate, but there may be some

25   clarifications needed for dates.  Did I recall



```
 1

 2    that right?

 3                MR. SKINNER:  Objection.

 4          A.    No.  No, that is not what I have

 5    said.

 6    BY MR. HASSID:

 7          Q.    What did you say?

 8          A.    No, I confirmed these declarations,

 9    the statements, are correct, but that I noticed

10    that I had made a slight error, perhaps, or

11    confusion about dates.  One date, one date.

12          Q.    Which date?

13          A.    It was April ----

14          Q.    Perhaps I can help you.  If you

15    look at paragraph 37?

16                MR. SKINNER:  Which one are we

17    looking at now?

18                MR. HASSID:  The main declaration.

19                MR. SKINNER:  Did we mark these?

20                MR. HASSID:  Yes, they have been

21    marked as 9 and 10.

22          A.    Yes, you are right.

23    BY MR. HASSID:

24          Q.    So in paragraph 37 you say:  "In

25    2014 I learned that the city of Almaty, Kazakhstan
```



```
 1
 2    had filed an action in the state of California
 3    against members of the Khrapunov family seeking to
 4    seize real estate investments that the Khrapunov
 5    family owned..."
 6              A.      Mmm-hmm.
 7              Q.      Was that a yes?
 8              A.      Yes.
 9              Q.      In paragraph 38 you say:  "In
10    response to this lawsuit" -- and is that what you
11    are changing, the "in response to" --you are
12    saying now it was in April 2014 when Mr. Khrapunov
13    directed you to liquidate the Flatotel?
14                     MR. SKINNER:  Objection.
15              A.      No.
16    BY MR. HASSID:
17              Q.      Please clarify for me what you were
18    saying?
19              A.      In paragraph 37 it says in 2014
20    I learnt that the city of Almaty was liable to
21    make -- to file a suit.  But it was more than
22    probable that they would.
23              Q.      Where did you obtain that
24    understanding?
25              A.      Ilyas.
```



1

2          Q.     Your testimony is that Ilyas

3    Khrapunov told you that Almaty was going to file a

4    suit in California?

5          A.     Yes, that they were intending to do

6    it.

7          Q.     Did he tell you that verbally or in

8    writing?

9          A.     Verbally.

10         Q.     So there are no documents

11   confirming that he told you this?

12         A.     No, but the consequence of this

13   surmise, or whatever, was to prompt me to start

14   negotiations with Chetrit to sell Triadou.  No, to

15   sell -- to sell part of Flatotel in Cabrini.

16         Q.     Mr. Bourg, I am handing you what

17   has been marked as Exhibit 11.  Mr. Bourg, do you

18   recognise that document?

19      (Exhibit 11 was marked for identification)

20         A.     No.

21         Q.     Please take a minute to look at it.

22   (Pause for reading).

23                THE WITNESS:  May I ask for a

24   break, please?

25                MR. HASSID:  Not while -- I mean,



1

2          A.     Yes, but I repeat, as I said

3    before, I did not have them all at the same time,

4    I used them consecutively.

5          Q.     So when you changed over e-mail

6    addresses from one to the other, were your old

7    e-mail accounts wrapped into them, so you had

8    access to all of your files in one set?

9          A.     Forwarded at least.

10         Q.     Forwarded?

11         A.     They were forwarded.

12         Q.     Do you recall who created the

13   sdg-if.com e-mail?

14         A.     No.

15         Q.     Who owned Element 1?

16         A.     I did.

17         Q.     Anyone else?

18         A.     Mr. Glatz must have had some kind

19   of share in the management company, but he never

20   turned up in Luxembourg or came to any meetings as

21   a shareholder of the company.

22         Q.     None of the SPVs that were created

23   to be incorporated in the fund were actually

24   incorporated into the fund; correct?

25                MR. SKINNER:  Objection.



Page 124

 1

 2          A.      No, unfortunately, they were not

 3   incorporated.

 4   BY MR. HASSID:

 5          Q.      What is the current status of

 6   Element 1?

 7          A.      I liquidated it.

 8          Q.      When did that happen?

 9          A.      When the Luxembourg judge asked me

10   to do so.  I cannot recall the exact date.  The

11   reason was that Element 1 did not meet the

12   requirements for the minimum amount of capital

13   which was being provided by Mr. Glatz, or SDG

14   Capital.

15          Q.      So if the fund has been liquidated

16   it is not currently conducting any business;

17   correct?

18          A.      Right.

19          Q.      Did the fund ever conduct any

20   business?

21               MR. KENNEY:  Could I ask that we

22   distinguish between the fund and the management

23   fund, management (unclear).

24               MR. HASSID:  In the question?

25               MR. KENNEY:  Unless I am mistaken,



Page 125

1

2      there is a management company and a fund, and

3      I think we are referring to them as all the same

4      word.

5                        THE INTERPRETER:  I have lost it

6      now, I am sorry.

7      BY MR. HASSID:

8              Q.      What was the management company for

9      Element 1, or was Element 1 the management

10     company?

11             A.      In order to set up such fund in

12     Luxembourg you have to have a SIF -- S-I-F -- and

13     there are two legal forms of doing that; to be a

14     SIF we chose the first way forward, which was to

15     set up a company ----

16                        THE WITNESS:  It is the legal form

17     of the company.

18                        THE INTERPRETER:  A company which

19     would be based on shareholding ----

20                        THE WITNESS:  No.

21             A.      (Through the Interpreter) To be a

22     regulated SIF fund, you have to meet with definite

23     legal structures.  One of those, the one we chose

24     to set up Element 1, is a company ----

25                        THE INTERPRETER:  And I do not know



```
 1
 2    how to translate this, I am sorry ----
 3           A.     (Through the Interpreter) -- which
 4    is based on shares.  "Un commodite par action".(?)
 5    This type of company requires two distinct bodies
 6    or entities to be established and that is a
 7    management company and a holding company, which
 8    has the money -- which has the funds.  And both of
 9    them are called Element 1.
10    BY MR. HASSID:
11           Q.     Got it.  So, let's talk about SDG
12    Capital.  I would like to call SDG Capital just
13    SDG, so if I mean something other, one of the
14    subsidiaries, I will use different terminology; is
15    that okay?
16           A.     Okay.
17           Q.     SDG was formed before you were
18    hired as a consultant in July 2011; correct?
19           A.     Yes.
20           Q.     At the time it was formed, do you
21    know who owned it?
22           A.     Ilyas Khrapunov.
23           Q.     Your contention is Ilyas Khrapunov
24    owned it, or that he was the owner in name; in
25    other words, did he legally own it?
```



Page 127

```
 1
 2                    MR. SKINNER:  Objection to form.
 3                    MR. HASSID:  It is a bad question.
 4                    THE INTERPRETER:  I think so, yes.
 5    BY MR. HASSID:
 6         Q.    Did you understand that Elvira
 7    Khrapunov or Elvira Korivashova(?) owned SDG
 8    Capital at some point?
 9         A.    Yes, I remember there was a change
10    from Ilyas to his sister.
11         Q.    Did you see any documents
12    reflecting that change?
13         A.    No.
14         Q.    In your role as an external
15    consultant to SDG, did you have access to SDG's
16    financial statements?
17         A.    I cannot recall.
18         Q.    Were you involved in SDG's real
19    estate development projects in Switzerland?
20         A.    No.
21         Q.    Were you ever an officer, director
22    or owner of SDG?
23         A.    No.
24         Q.    Were you ever responsible for
25    managing or directing SDG's day-to-day operations?
```



Page 128

```
 1
 2          A.     No.
 3          Q.     In October 2014, your consultancy
 4   with SDG ended.  Was that a termination or a
 5   voluntary departure from SDG?
 6          A.     No, my role, which -- my role, as
 7   defined by the management contract which we have
 8   alluded to before, was never terminated, in fact
 9   it is still in force.  But what I received in
10   October 2014 was a letter terminating my role in
11   Triadou as director.
12          Q.     So, after your termination as
13   director of Triadou, did you have any involvement
14   in SDG's affairs after that time?
15          A.     Yes, I think my role was to sell
16   the Triadou assets to Chetrit.
17          Q.     So you believe you were selling the
18   Triadou assets to Chetrit after you were
19   terminated as Triadou's director?
20          A.     No, it was initiated well in
21   advance of that, but discussions had to be
22   prolonged because Chetrit was not prepared to pay.
23          Q.     Other than that, other than that
24   activity, dealing with Chetrit, what involvement
25   did you have in SDG's affairs after you were
```



Page 129

```
 1
 2    terminated as director of Triadou?
 3            A.      I remember that, despite the fact
 4    that I had already received a termination letter
 5    from -- for my role as director of Triadou, Ilyas
 6    Khrapunov wanted to continue the activity of
 7    Element 1, but it never happened.
 8            Q.      Mr. Bourg, I think you said a
 9    little earlier today -- and correct me if I am
10    wrong -- that you were the sole director of
11    Triadou?
12            A.      Well, until such time as I received
13    the termination letter, yes.
14            Q.      When was Triadou formed?
15            A.      I think it was in 2012.
16            Q.      Can you pull out Exhibit 9, please.
17    Exhibit 9 is the May 2nd declaration, the one in
18    the spiral bound book.  Can you look at paragraph
19    2.  It says you were the sole director of Triadou
20    SPV SA from its formation in 2011 "by myself and
21    Ilyas Khrapunov" and you just said it was formed,
22    you think, in 2012.  Do you know which of those is
23    accurate?
24            A.      Well, it was 2011 or 2012, I cannot
25    recall exactly when.
```



Page 133

1

2          A.      I think it was the end of 2014.

3    BY MR. HASSID:

4          Q.      So around the time you were

5    terminated as director of Triadou?

6          A.      A couple of months later.

7          Q.      So, focusing on the time when you

8    were Triadou's director, what were your

9    responsibilities?

10         A.      Well, I was the legal administrator

11   of Triadou as director, I had a legal

12   responsibility.  But my role was to manage the

13   investments that Triadou was making.

14         Q.      By the way, when we were talking

15   about Element 1 before, were you looking to find

16   investments or investors?

17         A.      Both.

18         Q.      Were you looking for investors

19   other than Ilyas Khrapunov's family members?

20         A.      The strategy was as follows; the

21   fund was set up, ceded by the Khrapunov family

22   under Triadou projects, and then there was a

23   fund-raising activity for finding further

24   investors.

25         Q.      Going back to your time as



```
 1
 2    Triadou's director, were you responsible for
 3    preparing and keeping financial statements of the
 4    company?
 5            A.    No.
 6            Q.    Who was responsible for that?
 7            A.    SDG.
 8            Q.    Did you provide the information SDG
 9    might need to creates those statements?
10            A.    Yes, of course.
11            Q.    When you were director, did Triadou
12    have any employees?
13            A.    No.
14            Q.    When you were director, were you
15    responsible for entering or signing agreements on
16    behalf of Triadou?
17            A.    Yes.
18            Q.    Did you maintain those documents?
19            A.    Maintain?
20            Q.    Keep in your possession?
21                  MR. SKINNER:  Objection.
22            A.    No, I did not keep any physical
23    document, but of course all documents were on my
24    computer.
25    BY MR. HASSID:
```



Page 142

```
 1
 2    page 8.  In paragraph 31 you say:  "As explained
 3    above, SDG was created with the funds of the
 4    Khrapunov extended family, members of which
 5    (including Ablyazov, and Ilyas's father, Viktor
 6    Khrapunov) I understood to be facing criminal
 7    investigations in Kazakhstan and eventually in
 8    Switzerland."
 9         A.    Yes.
10         Q.    Why did you say in your May 2016
11    declaration that the funds were created by --
12    funds were drawn from Ilyas's extended family,
13    while in March 2016 SDG was created from funds
14    from Ilyas' mother?
15         A.    I think that what I was trying to
16    say was that SDG benefited from the funds coming
17    from an extended family, whereas the actual
18    creation or the setting up of the company came
19    from the mother.
20         Q.    Well, in paragraph 31 you use the
21    word "Created".
22               THE WITNESS:  Okay.
23    BY MR. HASSID:
24         Q.    You agree with that?
25         A.    (Through the Interpreter) Yes.
```



Page 143

1

2             MR. SKINNER:  Object to form.

3   BY MR. HASSID:

4        Q.    Did you obtain any new information

5   between your May 2016 and June 2016 declarations

6   that caused this change?

7        A.    Yes, I think essentially it was a

8   lack of precision on my part in paragraph 31, and

9   instead of saying it "was created" I should have

10  said, "Was created and financed".

11       Q.    Sticking with paragraph 31, what is

12  the basis for your statement that SDG was created

13  with funds from Ablyazov?

14       A.    Let me repeat what I already said,

15  it was a lack of precision here, accuracy, between

16  "created" and "financed".

17       Q.    I understand now.  Let me rephrase

18  my question.  Thank you.  What is the basis for

19  your statement that SDG was financed with funds

20  from Mr. Ablyazov?

21       A.    Financed by Ablyazov.  SDG issued a

22  bond which was entirely subscribed, he said, by

23  his family under -- which included Mr. Ablyazov.

24  And this bond, if I remember correctly, was in the

25  order of 80 million.



1

2    then I understood better, or they told me more

3    about what Ablyazov was accused of and I made my

4    own opinion on that basis.

5         Q.    I think we are getting close to the

6    end of the videotape.  Can we go off the record?

7              THE VIDEOGRAPHER:  We are going off

8    the record.  The time is 3.35.

9         (Off the record at 3.35 p.m.)

10        (Back on the Record at 3.54 p.m.)

11             THE VIDEOGRAPHER:  We are back on

12   the record.  The time is 3.54 p.m.

13   BY MR. HASSID:

14        Q.    Welcome back, Mr. Bourg.

15             THE WITNESS:  Thank you.

16        Q.    In your Exhibit 9, your May 2nd

17   declaration from 2016 in paragraph 4, you say

18   Ilyas told you that he had access to large amounts

19   of capital, both through his immediate family and

20   through his father-in-law, Mukhtar Ablyazov.  The

21   beginning of that paragraph says, "At that time",

22   when are you referring to?

23        A.    It was at the beginning of our

24   collaboration.

25        Q.    The beginning of your



Page 150

1
2    collaboration, meaning in 2011, or the beginning
3    of your collaboration, meaning when you met him in
4    those rare occurrences from 2006 through 2011?
5            A.     2011.
6            Q.     So you didn't know before then?
7            A.     No, but it was well-known in
8    Switzerland that he was a wealthy person and he
9    came from a wealthy family and, moreover, he was
10   classified as one of the wealthiest people in
11   Switzerland by the magazine Bilan -- B-I-L-A-N.
12           Q.     Did Ilyas Khrapunov tell you this
13   information verbally, or in writing?
14           A.     Verbally.
15           Q.     Later in the paragraph you say that
16   Ilyas stated his immediate and extended family
17   were in exile from Kazakhstan after being
18   persecuted by that country's government and for
19   that reason they needed to keep their finances
20   secret and conceal their business dealings?
21           A.     Yes.
22           Q.     What time frame are you talking
23   about Ilyas told you this -- still in paragraph 4.
24           A.     At that time.
25           Q.     No, in the middle of the paragraph,



Page 188

1

2   you is, in 2016 when you made this declaration,

3   did you view the value of the project as having

4   gone up or down?

5          A.    I think at the -- I think at the

6   time of the evaluation here we were basing

7   ourselves on the document submitted by Chetrit,

8   and these documents, they gave us to understood

9   they would be in the order of 100 million profit

10  for Triadou.

11         Q.    Right, but I am asking you

12  separately.  So at the time you made your

13  declaration, so in May of 2016, I am asking

14  whether you understood the value of the Flatotel,

15  if Triadou had retained its interest, whether that

16  would have gone up or down?

17         A.    No, that is not what I wanted to

18  say ----

19         Q.    I am not asking what you wrote,

20  I am asking your separate understanding.

21         A.    Yes, I think that it would have

22  been in the order of 80-100 million profit if

23  Triadou had remained until the end of the project.

24         Q.    Can you turn to Exhibit 11, which

25  is your March 2016 declaration.  Then when you are



Page 189

1

2    there please turn to paragraph 12.  11, your March

3    2016 exhibit, paragraph 12, please.  So this

4    paragraph is similar to the one we just looked at,

5    except there you say:  "Based on current

6    evaluations of the real estate market in New York

7    City, Triadou's interest in this transaction would

8    be worth approximately $100 million, plus

9    reimbursement of the initial investment, for a

10   total in the vicinity of $130 million."  Do you

11   see that?

12                 THE WITNESS:  Mmm-hmm.

13        Q.     There you use the language, "based

14   on current valuations of the real estate market."

15                 THE WITNESS:  Mmm-hmm.

16        A.     (Through the Interpreter)  Yes, the

17   market conditions have not substantially changed

18   since the creation of the project.

19        Q.     So in March 2016, your opinion is

20   that market conditions were roughly the same as

21   when Triadou invested in 2012?

22        A.     Yes.

23        Q.     When you say, "based on current

24   evaluations in the real estate market", what

25   evaluations are you referring to?



Page 220

1

2                    CERTIFICATE OF COURT REPORTER

3

4           I, Paula Foley, Accredited Court Reporter,

5    do hereby certify that I took the Stenograph notes

6    of the foregoing deposition, and that the

7    transcript thereof is a true and accurate record

8    transcribed to the best of my skill and ability.

9                    I further certify that I am neither

10   counsel for, related to, nor employed by any of

11   the parties to the action in which the deposition

12   was taken, and that I am not a relative or

13   employee of any attorney or counsel employed by

14   the parties hereto, nor financially or otherwise

15   interested in the outcome of the action.

16

17

22        ....................................

23        PAULA FOLEY

24

25   Dated this ...... day of ................. 2017


MAGNA
LEGAL SERVICES