# Exhibit 212

Page 1

                  UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK
         --------------------------------)
                                          )
         CF 135 FLAT LLC, CF 135          )
         WEST MEMBERS LLC                 )
         and THE CHETRIT GROUP, LLC,      )
                                          ) Case No.
                                          )15-cv-05345-AJN
                                          )
                 Interpleader Plaintiffs, )
                                          )
                         -against-        )
         TRIADOU SPV S.A., CITY OF ALMATY,)
         a foreign city, and BTA Bank,    ) AMENDED CROSS-
                                          ) CLAIMS
                 Interpleader Defendants. )
                                          )
                                          )
         --------------------------------)
                                          )
         CITY OF ALMATY, KAZAKHSTAN       )
         and BTA BANK,                    )
                                          )
                 Crossclaim Plaintiffs,   )
                                          )
                                          )
                         -against-        )
                                          )
         MUKHTAR ABLYAZOV,                )
         VIKTOR KHRAPUNOV,                )
         ILYAS KHRAPUNOV,                 )
         TRIADOU SPV S.A.,                )
         and FBME BANK LTD.,              )
                                          )
                 Crossclaim Defendants.   )
                                          )
                                          )
         --------------------------------)

            VIDEOTAPED DEPOSITION UPON ORAL EXAMINATION
                               of
                MR. NICOLAS BOURG (DAY TWO)
               On Tuesday, 12th September 2017



```
 1
 2                  MR. SKINNER:  Objection.
 3   BY MR. HASSID:
 4       Q.     Let me strike that and rephrase.
 5                  THE INTERPRETER:  Yes.
 6       Q.     Do you wish to change this
 7   testimony as well?
 8                  MR. SKINNER:  Objection.
 9       A.     (Through the Interpreter)  Why, "As
10   well"?
11   BY MR. HASSID:
12       Q.     You changed your -- you said -- you
13   clarified your May 2nd declaration; correct?
14                  MR. SKINNER:  Objection.
15       A.     No, we spoke about this matter and
16   there was a slight confusion about dates, that's
17   all.  No, Ilyas wanted to sell his US interests in
18   Triadou to Chetrit, because he was frightened of
19   the Californian lawsuit.  I mean, I stick by that.
20   Perhaps there is some confusion about dates, exact
21   dates, but that is the gist of it.
22   BY MR. HASSID:
23       Q.     So then, and thank you for
24   clarifying, is it fair to say that you are telling
25   me here that in paragraphs 25 and 26 there is
```



Page 50

```
 1
 2   similar confusion about dates?
 3          A.    No, I think in the first
 4   declaration I was focusing on the details of the
 5   events and there may be a few minor details to put
 6   right but to all intents and purposes the message,
 7   the main message, is the same.
 8          Q.    Right, but I'm -- I'm sorry, were
 9   you not finished?
10          A.    That is fine.
11          Q.    I was about the March 2016
12   declaration, the document in front of you.
13   Specifically, I just want to know if you think
14   paragraphs 25 and 26, as you wrote them, are
15   accurate?
16          MR. WOLF:  Why don't you just read
17   them quickly, they're short, and then I think
18   you'll perhaps understand the question better.
19   (Pause for reading).
20          A.    The correction which had been made
21   is in paragraph 26 on the date of the instruction
22   to sell.
23   BY MR. HASSID:
24          Q.    So the same correction as you made
25   with the other declaration ----
```



```
 1
 2   precise at the moment, I am sorry.  At noon, I can
 3   give you a better update.  Do you need to take a
 4   break for any reason Mr. Bourg?
 5                  THE WITNESS:  (Through the
 6   Interpreter) No, I just wanted to know how things
 7   were organised, that is all.  It is just that at
 8   the end of yesterday's meeting I was told that you
 9   had one and a half hours still to go.
10                  BY MR. HASSID: We were talking
11   about specific time allocation, not in terms of
12   the amount of time left on allocation.  It is a
13   separate issue, but no, unfortunately, I have a
14   little more than that.
15                  THE WITNESS:  Not unfortunate ----
16                  MR. HASSID:  Thank you.  I like
17   talking to you too!
18                  MR. WOLF:  He is beginning to like
19   you!
20   BY MR. HASSID:
21        Q.    This document, if you can just,
22   I know there is an exhibit cover page, two of
23   them, but do you recognise the agreement that
24   starts on the third page?
25
```



simply

Page 58

```
 1
 2            A.      (Through the Interpreter) Yes.
 3            Q.      What is it?
 4            A.      This is the sales contract from
 5   Triadou to Chetrit about the two projects, the
 6   Flatotel and Cabrini.
 7            Q.      Wait, this is about Cabrini too?
 8            A.      Yes.
 9            Q.      Mr. Bourg, just I would suggest
10   taking a moment and reading what is under
11   "Witnesseth" the "Whereas clauses" just to see if
12   that refreshes your recollection that this
13   pertains only to the Flatotel?
14                    MR. KENNEY:  Could he just read the
15   agreement, the first paragraph?
16                    MR. HASSID:  That is true, or the
17   first paragraph if you like.
18            A.      It is only on Flatotel.
19   BY MR. HASSID:
20            Q.      Okay and what's the date of this
21   document you see at the top?
22            A.      4th August 2014.
23            Q.      That is about three months after
24   that letter of intent we just looked at.
25                    THE WITNESS:  Oui.
```



Page 59

1

2          Q.     I would like to draw your attention

3    down to section 1.  This is talking about the

4    purchase price of Triadou's interest; correct?

5                     MR. WOLF:  Just take a moment to

6    read it.  If you want to read section 1 since the

7    question is on section 1.

8                     MR. HASSID:  If it will help

9    counsel, I plan to walk him through everything and

10   read stuff into the record so it might save time

11   if ----

12                     MR. WOLF:  I appreciate that but

13   I think he ought to be familiar with the document,

14   that may facilitate it.

15   BY MR. HASSID:

16          Q.     Well, then in that case, Mr. Bourg,

17   please read 1A first.

18                     THE WITNESS:  Okay.  (Pause for

19   reading).

20          A.     (Through the Interpreter)  Yes, I'm

21   ready.

22          Q.     Mr. Bourg, you see that that

23   paragraph -- because you read it I'm not going to

24   read it to you, but you see the paragraph reads

25   "Happy Family and Landscape".  We discussed those



Page 60

1

2    transactions yesterday; correct?

3          A.     Yes.

4          Q.     In this paragraph, it says:  "The

5    sum of $6 million heretofore paid by the Chetrit

6    Group in connection with those investments."

7          A.     Yes.

8          Q.     Did Mr. Chetrit actually invest $6

9    million in those projects?

10         A.     No.

11         Q.     How much did he actually invest?

12         A.     4.5 as far as -- 4.6 or 4.7, as far

13   as I know.

14         Q.     Who negotiated this document, this

15   agreement, Mr. Bourg?

16         A.     Myself, Krasnov and Ilyas

17   Khrapunov.

18         Q.     Did you know at the time that you

19   were negotiating this that Mr. Chetrit had

20   invested less than $6 million in Happy Family and

21   Landscape?

22         A.     Yes, everyone knew that.

23         Q.     When you say "everyone", who do you

24   mean?

25         A.     Krasnov and Khrapunov.



Page 66

```
 1
 2     rephrase it for you.  Did you ever tell the
 3     Chetrit Group or Joseph Chetrit that it did not
 4     have any obligations under this paragraph?
 5          A.     I don't understand the question,
 6     I'm sorry.
 7          Q.     I think you testified before that
 8     the Chetrits invested 4.6 or 4.7 million, to your
 9     recollection, in connection with Happy Family and
10     Landscape; correct?
11          A.     Yes.
12          Q.     And this document transferred that
13     interest, that value, to Triadou; correct?
14               MR. SKINNER:  Objection.
15          A.     I don't know.  I would have to read
16     the whole document.  I don't know if we think it
17     does talk, this document, about the transfer of
18     interest to Triadou, rather it explains how the 26
19     million are going to be paid.
20     BY MR. HASSID:
21          Q.     So, it's your understanding that
22     Chetrit was given $6 million for investments in
23     Happy Family and Landscape, and Triadou was -- and
24     those investments were made with Niel; right?
25     That's correct?
```



Page 80

1
2                    THE WITNESS:  Oui.
3          A.     (Through the Interpreter) but it's
4  a translation because the real meeting was in
5  French.
6          Q.    Got it.  So it's a translation of
7  the recording of the meeting?
8                    THE WITNESS:  Mmm-hmm.
9          Q.    Why did you decide to record this
10  meeting?  And if it was on the advice of your
11  lawyer you need only say that and I will not ask
12  any more.
13         A.     (Through the Interpreter) That's
14  it, on advice.
15         Q.    Okay.  It was not because Almaty or
16  BTA or Arcanum asked you to do that; correct?
17         A.    No, I had no relations with them
18  yet -- at that point.
19         Q.    So you first encountered -- you
20  first encountered the Kazak entities after these
21  recordings?
22         A.    Yes.
23         Q.    Can you, please, turn to page 9 of
24  that recording.
25                    MR. WOLF:  It's 9 of the



Page 81

```
 1
 2   transcript, not of the recording.
 3              MR. HASSID:  Thank you, 9 of the
 4   transcript.
 5              THE WITNESS:  Mmm-hmm, oui.
 6   BY MR. HASSID:
 7        Q.    Okay, if you look at the middle of
 8   the page there is a paragraph attributed to you.
 9              THE WITNESS:  Mmm-hmm.
10        Q.    And in the paragraph it says:  "If
11   the question is can I figure out how to
12   significantly reduce the price, do I know how to
13   do that?  The answer is yes, I know how."  Do you
14   see that?  It is the last line of that middle
15   paragraph.
16              THE WITNESS:  Okay.
17        A.    (Through the Interpreter) Yes.
18        Q.    So you see it?  Take a minute to
19   read that paragraph just so you get some context.
20              THE WITNESS:  Oui.
21        Q.    So, in this paragraph you're
22   talking about lowering the price that Triadou paid
23   -- I am sorry, lowering the price that Chetrit
24   paid to Triadou for its assignment of its Flatotel
25   interest; correct?
```



1

2    before Niel Infrastructure went into bankruptcy.

3          Q.     If you look a little further down,

4    Mr. Bourg, it says "If they managed to have it

5    declared bankrupt", do you see that?  Let me know

6    when you see it.

7                   THE WITNESS:  Mmm-hmm.

8          Q.      "If they manage to have it

9    declared bankrupt, that would be a disaster for me

10   and Laurent Foucher.  This is an active company

11   that owns real assets which were not financed by

12   Khrapunov and his sole objective is to take it

13   away from us." Do you see that?

14         A.     (Through the Interpreter) No, but

15   that is for Niel Financial Services.  If you read

16   the sentence before, you will see that it's

17   exclusively about NFS.

18         Q.     Thank you for the clarification.

19   But with respect to Niel Finance and Services, it

20   is your opinion that if that is declared bankrupt

21   it would be a disaster for you and Mr. Foucher;

22   correct?

23         A.     Yes.

24   (Exhibit 26 was marked for identification)

25         Q.     You can put that aside for now,



Page 110

```
 1
 2    sir.  I apologise, Mr. Bourg, I am going to go
 3    backward with the short time I have left.  Please,
 4    take a look at what is being handed to you as
 5    Exhibit 26.  Do you recognise that e-mail?
 6          A.    Yes.
 7          Q.    That is an e-mail from you to
 8    Mr. Chetrit transmitting an invoice; correct.
 9                THE WITNESS:  Oui.
10          Q.    Can you turn the page to the
11    attachment?
12          A.    Oui.
13          Q.    So the invoice is dated July 5th
14    2014.  Do you recall sending this invoice?
15          A.    (Through the Interpreter) Yes.
16          Q.    What does the description?
17    "Honoraire operation New York" mean?  I am sorry
18    for my French, I know it's bad.
19          A.    It means fees -- fees for the New
20    York operation.
21          Q.    Is that related to Flatotel?
22          A.    I think we have already spoken
23    about it.  It is the invoice which I had to draw
24    up for the intermediaries of Chetrit.  I think he
25    paid a very small part of that.  So obviously this
```



Page 111

1

2   is part of the money I was claiming from Chetrit.

3          Q.     But you -- did you receive a chunk

4   of this money as well?

5          A.     It was paid and I redistributed it

6   to the intermediaries.

7          Q.     All of it, because I believe you

8   testified earlier that you received $400,000 from

9   Mr. Chetrit?

10          A.     That's right.

11          MR. SKINNER:  Can I just clarify.

12   Are you saying "Yes, all of it was distributed" or

13   are you saying, "Yes, I received $400,000"?

14          A.     I received 400,000.

15   BY MR. HASSID:

16          Q.     Did you distribute it to this

17   account, here, that's at the bottom?

18          A.     Yes.

19     (Exhibit 27 was marked for identification)

20          Q.     I'm going to hand to you what is

21   Exhibit 27, which are the amended cross-claims

22   filed by Almaty and BTA.  Have you seen these

23   before?

24          A.     No.

25          Q.     Sorry, you have not seen this



Page 112

 1

 2    document before, sir?

 3           A.     No.

 4           Q.     In their amended cross-claims,

 5    Almaty and BTA allege ----

 6                  MR. Wolf:  Which page are you

 7    referring to?

 8                  MR. HASSID:  Actually,

 9    unfortunately, it seems my copy is missing, so I'm

10    sorry.  Oh now i found it.  I'm sorry.  Paragraph

11    13.

12    BY MR. HASSID:

13           Q.     Are you there?

14                  THE WITNESS:  Mmm-hmm.

15           Q.     If you look in paragraph 13:

16    "Almaty and BTA allege" -- they are talking about

17    Chetrit trying to double-cross his

18    co-conspirators.  It says:  To achieve this

19    result, Chetrit bribed Triadou's director to drive

20    down the purchase price of the assignment."

21           A.     (Through the Interpreter) Which

22    witness is this?  Can I know which witness is

23    this?

24           Q.     This is not a witness.  Almaty and

25    BTA, this is a litigation filing.  This is Almaty


MAGNA
LEGAL SERVICES

Page 113

1

2    and BTA's complaint in this case.  They are

3    alleging that this is what happened.  My question

4    to you is this allegation true, did Chetrit bribe

5    you?

6            A.    Well, it's an interpretation of

7    Chetrit's proposal, but as I have already said

8    there were a multitude of different business deals

9    that Chetrit was involved in and when I was

10   thanked for my role as director of Triadou, he

11   proposed that we work together.  This money, there

12   was a question of money, but I don't think that

13   this had any direct connection with the reduction

14   in the price.  But the best way of illustrating

15   that is that I only -- I was not involved in these

16   negotiations.  Obviously, Chetrit wanted to pay

17   less and Ilyas wanted the best price, but I wasn't

18   a decider in this.  So, they were the ones who

19   decided.  I was simply an intermediary.

20           Q.    Can you turn to paragraph 117,

21   which is on page 30.  In the paragraph it says

22   "Chetrit simultaneously proposed to bribe you" and

23   later in the paragraph it says that the amount was

24   $3 million?

25                 MR. WOLF:  What paragraph are we



1

2    on?

3              MR. HASSID:   Paragraph 117.

4    BY MR. HASSID:

5         Q.    Did Mr. Chetrit agree to pay you $3

6    million to lower the discount -- to lower the

7    price for Triadou's assignment of it's ownership

8    of the Flatotel interest?  To be clear, Mr. Bourg,

9    these are allegations, not proof.  I am asking if

10   these allegations, if you believe this is a true

11   statement?  That is all I want to know.

12             MR. WOLF:  Without any further,

13   please read what you want to read and then please

14   answer his question.

15        A.    I would just like to say that these

16   allegations are not necessarily false, but it's

17   impossible to agree to them, because I wasn't the

18   person to decide.  I was there simply on the spot

19   to embark on negotiations, but I had no deciding

20   power.  You could do nothing in that respect

21   without Ilyas Khrapunov's approval and signature.

22             MR. WOLF:  Excuse me.  (Pause for

23   instructions). (Unclear)

24   BY MR. HASSID:

25        Q.    Is there something you would like



Page 115

1

2    to clarify ----

3            A.      Yes, I was not in a position to be

4    bribed, because I had no deciding power about the

5    price.

6            Q.      Do you understand that Chetrit

7    intended to pay you this money as a bribe?

8            A.      Quite foreseeable, yes.

9            Q.      Did you clarify for him that you

10   did not have decision-making power?

11           A.      Yes, I did not need to clarify.

12   Every time there was a proposal put on the table,

13   I went, isolated myself in another office and

14   asked for Ilyas Khrapunov's approval.

15           Q.      Is 3 million -- is the $3 million

16   number in here accurate?  Is that what Mr. Chetrit

17   offered to pay you?

18           A.      No, I don't remember $3 million.

19           Q.      Thank you, Mr. Bourg.  I appreciate

20   your time.  To the extent that we have any left

21   over, I'll reserve.

22                   MR. SKINNER:  Can I ask the

23   videographer how long we have been on the record

24   since the lunch break?

25                   THE VIDEOGRAPHER:  36 minutes.



Page 138

```
 1
 2          A.      I think at the time it was in
 3   another building.  No, perhaps not yet at that
 4   time.  He was in the office next door.  On the
 5   same storey but next door.
 6          Q.      Next door meaning his office is on
 7   the same floor in the same building?
 8          A.      Yes.
 9          Q.      And am I not correct that at this
10   point the business of SDG has been declining since
11   the summer 2013?
12          A.      I don't know about difficulties,
13   but SDG was investing in very significant real
14   estate projects at the time, very expensive ones,
15   and they were beginning to feel the pinch, the
16   difficulties in sort of funding it.
17          Q.      At that time, in December of 2013,
18   Ablyazov had been in prison for five or six
19   months; right?
20          A.      Yes.
21          Q.      Had Ilyas told you that, "We are
22   going to have to dispose of all of our assets" at
23   that point?
24          A.      No, I did not intervene and stick
25   my nose in the SDG business in Switzerland.  That
```



Page 139

 1

 2   was not my role.

 3        Q.     I am asking you if the funding of

 4   the various companies had not begun to be very

 5   difficult?

 6             MR. SKINNER:  Mr. Kenney, could you

 7   give us the date that we are talking about.

 8             MR. KENNEY:  I have given you a

 9   date.

10             MR. SKINNER:  I am asking for my

11   sake.

12             MR. KENNEY:  Sure, 2013, late,

13   December, moving into 2014.

14        A.     Yes.

15   BY MR. KENNEY:

16        Q.     You did have something to do with

17   Triadou, didn't you?

18        A.     Yes,  yes.

19        Q.     In fact, you were the only person

20   really who was an officer of Triadou, or a

21   director?

22        A.     Yes.

23        Q.     And am I not correct that between

24   July and December of 2013 Triadou began to have

25   financial difficulties?



Page 140

 1

 2                    MR. SKINNER:  Objection.

 3          A.     No.  No, not as far as I know.

 4  BY MR. KENNEY:

 5          Q.     Am I correct that your relationship

 6  with Ilyas deteriorated in 2013 and become very

 7  bad in 2014?

 8                    MR. SKINNER:  Objection.

 9          A.     Yes, I think it began in 2013.

10  Just one moment.  No, you know, my relationship

11  with Ilyas was still very good at the end of 2013,

12  in fact.  My relations with Ilyas started to

13  deteriorate significantly when I received the

14  letter, the firing letter as director of Triadou,

15  which, unless I am mistaken, was in November 2014.

16  Whereas, in my opinion at least, I enjoyed good

17  relations with Ilyas Khrapunov.

18  BY MR. KENNEY:

19          Q.     So you think your relationship was

20  pretty good, or really good, at the end of 2013?

21                    MR. SKINNER:  Objection.

22          A.     I can't really, you know, say

23  anything about interpreting good or very good.

24  All I would say is that they were good.

25  BY MR. KENNEY:



Page 183

```
 1
 2    the future, are you going to get something new in
 3    the future if BTA Bank recovers?
 4              MR. HASSID:  Objection.
 5         A.    No.
 6              MR. KENNEY:  I join the objection.
 7    BY MR. SKINNER:
 8         Q.    So there is no new benefit to you
 9    in the future; it is an agreement as to how an
10    asset is going to be distributed that you already
11    own?
12              MR. HASSID:  Objection.
13              MR. KENNEY:  Objection.
14         A.    That is correct.
15    BY MR. SKINNER:
16         Q.    Mr. Bourg, I am going to show you a
17    document that we have marked as Bourg Exhibit 29.
18    Can I ask you to take a moment just to look at it.
19    Let me direct your attention to the second page,
20    the back side of this two-sided document?
21       (Exhibit 29 was marked for identification)
22         A.    Yes.
23         Q.    We have discussed Triadou quite a
24    bit over the last two days; correct?
25         A.    Yes.
```



Page 184

1

2          Q.     Can I ask you to tell us where

3    Triadou's name came from?

4               MR. HASSID:  I am just going to

5    lodge an objection to this line of questioning.

6    Where Triadou's name came from is not reasonably

7    within the scope of what was discussed.

8                    MR. SKINNER:  I asked you to

9    just ----

10                   MR. HASSID:  I did, but that one is

11   a special kind of objection, so that is why I said

12   that, but go for it.

13        A.     Triadou comes from the name of a

14   property in the South of France, though to be more

15   precise St Tropez, which was owned previously by

16   Mr. Cyril Dennis.

17   BY MR. SKINNER:

18        Q.     And who is Mr. Cyril Dennis?

19        A.     He is somebody who is very active

20   in the real estate market and who is of British or

21   English origin.

22        Q.     The e-mail that is on the back page

23   of Bourg Exhibit 29, is this an e-mail exchange

24   between yourself and Mr. Dennis as well as some

25   other people?



Page 185

```
 1
 2                    MR. HASSID:  Objection.
 3          A.     Yes.
 4  BY MR. SKINNER:
 5          Q.     Who wrote this e-mail?
 6                    THE WITNESS:  Mr. Dennis did.
 7                    MR. SKINNER:  And were you talking
 8  to Mr. Dennis about Triadou in July of 2012?
 9          A.     (Through the Interpreter)  Yes.
10                    MR. HASSID:  Objection.  It was a
11  prior, I got it in late.
12                    MR. SKINNER:  You are objecting to
13  the previous question?
14                    MR. HASSID:  Yes, sorry.
15  BY MR. SKINNER:
16          Q.     Do you see in the e-mail where it
17  says:  "From the past experience I had in dealing
18  with Elyas and his father in law, it was a
19  complete waste of time"?
20          A.     Yes.
21          Q.     What is your understanding of what
22  Mr. Dennis was referring to?
23                    MR. HASSID:  Objection.
24                    MR. KENNEY:  Objection.
25          A.     That he tried to do a deal with
```



Page 186

1

2    Ilyas Khrapunov and his father and it did not work

3    and, therefore, the relationship was not good.

4    BY MR. SKINNER:

5         Q.    Were you trying to do a deal on

6    behalf of SDG or Triadou in July of 2012?

7              MR. HASSID:  Objection.

8         A.    Yes.

9    BY MR. SKINNER:

10        Q.    What deal was that?

11        A.    The purchase of the premises that

12   I have just mentioned.

13        Q.    Which premises?

14        A.    Well, I said premises, but it is

15   grounds, or land, which belong to Mr. Dennis.

16        Q.    Who was to purchase this property

17   in St Tropez?

18             MR. HASSID:  Objection.

19        A.    Triadou company in Luxembourg.

20   BY MR. SKINNER:

21        Q.    At this point in time, on July 25th

22   of 2012, you were the sole director of Triadou; is

23   that right?

24             MR. HASSID:  Objection.

25        A.    No, I was not.



Page 195

```
 1

 2            Q.      In the letter, no reason is given

 3     for your termination, other than a reference to

 4     exchanges with the undersigned on 10th November;

 5     correct?

 6                    MR. HASSID:  Object to the form of

 7     the question.

 8            A.      (Through the Interpreter)  Yes,

 9     correct.

10     BY MR. SKINNER:

11            Q.      What exchanges did you have with

12     the undersigned, Philip Glatz, on 10 November

13     2014, if you recall?

14            A.      I don't know whether, when it says

15     "undersigned", whether it is Glatz or SDG, but

16     I remember the conversation I had on 10th

17     November.  I think a payment was due to Triadou

18     company, and I had asked that part of the moneys

19     should be set aside for the payment of the lawyers

20     and the other people who were working for Triadou

21     and Aragon, the Triadou and Aragon projects.

22            Q.      What happened as a result of you

23     asking for that?

24                    MR. HASSID:  Objection.

25            A.      They said they did not want to, so
```



Page 196

1

2    they dismissed me as a result of that, because

3    they were frightened I would take the action into

4    my own hands.

5            Q.     When you say "they", who are you

6    referring to?

7                   MR. HASSID:   Objection.

8            A.     I think, as I have always said, the

9    boss in all this, who was Ilyas Khrapunov.

10   BY MR. SKINNER:

11           Q.     One second.   When you testified a

12   moment ago -- bear with me, when you testified a

13   moment ago that you think you were sacked of your

14   position with regard to honouring the payment of

15   the people who were working for you, is that what

16   you were referring to?

17                  MR. HASSID:   Object to the form.

18           A.     Yes.

19   BY MR. SKINNER:

20           Q.     Let me show you what we have marked

21   as Bourg exhibit 30.   Let me draw your attention

22   to the -- what appears to be the middle e-mail on

23   the first page, the one that starts, "Dear Petr"

24   -- P-E-T-R.   Do you see that?

25        (Exhibit 30 was marked for identification)



1

2                    THE WITNESS:  Oui.

3          Q.     Is that an e-mail that you sent?

4          A.     (Through the Interpreter)  Yes.

5          Q.     What date did you send this?

6          A.     29th October 2014.

7          Q.     Why did you send this e-mail?

8          A.     For what I have just said, to pay

9     the people who were employed on the US projects.

10         Q.     Why did you say:  "Being the sole

11    director of the US company hence responsible for

12    its debt and payment"?

13         A.     Because the company was indebted to

14    these people and I was the only one who was

15    responsible for reimbursing them.

16         Q.     When you say you, "need to pay the

17    people who did work for us", what work are you

18    referring to?

19         A.     Lawyers, the security companies of

20    Syracuse, the external auditors -- the external

21    consultants we took for the real estate.

22         Q.     What projects had the work been

23    done for?

24                    MR. HASSID:  Objection.

25         A.     Well, in terms of the lawyers, it



 1
 2   was for all the American projects, and there was a
 3   lot of work to do there, in as much it was a
 4   question of drawing up contracts of sale to -- for
 5   Flatotel and Cabrini to Chetrit.
 6               MR. HASSID:  I will just caution
 7   the witness not to discuss what the lawyers told
 8   you.  Can you translate that.
 9   BY MR. SKINNER:
10        Q.    Are you finished with your answer,
11   Mr. Bourg?
12        A.    There were the lawyers -- no,
13   I have finished.
14        Q.    Was the work that was done on these
15   various projects, was that reflected in the
16   spreadsheet that was referenced, that had been
17   sent by Kevin?
18               MR. HASSID:  Objection.
19        A.    Yes.
20   BY MR. SKINNER:
21        Q.    What did you understand Mr. Petr
22   Krasnov's response to mean?
23        A.    He was asking for information not
24   to be kicked out subsequently ----
25        Q.    When you -- focusing again on the



Page 199

1

2   middle e-mail that you send ----

3         A.      -- sacked.

4         Q.      When you say next tranche --

5   withdrawn.  Do you see, focusing again on the

6   middle e-mail you sent, do you see the subject

7   line says:  "Re documents for next tranche from

8   Chetrit."  What did you mean by that?

9         A.      This was a request from Petr

10  Krasnov.

11        Q.      So that was his original subject

12  line, you are saying?

13        A.      Yes.

14        Q.      In your e-mail, where you say you

15  insist to split the amount in two, what amount are

16  you referring to?

17        A.      The next tranche from Chetrit.

18        Q.      Am I correct that you feel you were

19  terminated because of the position that you took

20  in this e-mail?

21              MR. HASSID:  Objection.

22              MR. KENNEY:  Objection as to form.

23        A.      Yes, and I obtained confirmation of

24  that by telephone.

25  BY MR. SKINNER:



Page 200

1
2          Q.      Who gave you that confirmation?

3          A.      Ilyas Khrapunov.

4          Q.      And what specifically do you recall
5     did Mr. Khrapunov say?

6          A.      He said, "Don't worry, it is not
7     serious, but Philip Glatz was frightened, SDG as
8     well, and that is why they did it".

9               MR. HASSID:  Can I clarify the
10    interpreter's response said, "I said, 'don't
11    worry'".  Can we ask the witness whether he said
12    "Don't worry" or Mr. Khrapunov said "don't worry."

13              THE INTERPRETER:  No, Mr. Khrapunov
14    said, "don't worry".

15    BY MR. SKINNER:

16         Q.      Okay.  Mr. Bourg, let me direct
17    your attention to the attempted transfer of funds
18    from the FBME bank that we have spoken about a few
19    times.

20         A.      (Through the Interpreter)  Yes.

21         Q.      Did there come a time when FBME
22    tried to send funds to Triadou's Luxembourg
23    accounts?

24              MR. HASSID:  Objection.

25         A.      Yes.



Page 212

1

2          A.      It was in the public domain.

3          Q.      I believe you testified -- and of

4   course the transcript will speak for itself but

5   just to link this to a specific portion of

6   cross-examination -- I believe you testified in

7   cross-examination that SDG's banks did not want to

8   work with SDG any longer, because they believed

9   that -- because they believed that Mr. Ablyazov

10  was involved with the company and Mr. Ablyazov had

11  criminal problems?

12              MR. HASSID:  Objection.

13  BY MR. SKINNER:

14         Q.      Is that accurate?

15              MR. KENNEY:  Objection.

16              THE WITNESS:  Oui.

17              THE INTERPRETER:  It is, yes.

18  BY MR. SKINNER:

19         Q.      To clarify, is the statement itself

20  accurate, as opposed to what you might have

21  testified to prior in this deposition?

22              MR. HASSID:  Objection.

23         A.      (Through the Interpreter) Yes.

24  BY MR. SKINNER:

25         Q.      Do you know whether SDG's banks



Page 213

```
 1
 2    knew of the other countries that were pursuing him
 3    criminally prior to July 2013?
 4              MR. HASSID:  Objection.
 5         A.    No, but as I said I think it is --
 6    it was in the public domain anyway.
 7    BY MR. SKINNER:
 8         Q.    You testified quite a bit about
 9    declarations that you have executed prior to this
10    litigation, and specifically declarations that you
11    executed in -- well, let's just use the actual
12    exhibits.  Let me just draw your attention to --
13    Alex, do you know the exhibit numbers for the May
14    declarations and the March one?
15              MR. HASSID:  The March one, no, but
16    the May one is Exhibit 9.
17    BY MR. SKINNER:
18         Q.    Exhibit 9.  Can you look at
19    Exhibit 8 then?
20              MR. HASSID:  I think it came after
21    this.
22    BY MR. SKINNER:
23         Q.    So 10 then, look at 9 and 10.  Let
24    us look at 9, 10, 12 and 13.  Are these all
25    declarations that you prepared in this case?
```



Page 234

1

2                    CERTIFICATE OF COURT REPORTER

3

4           I, Paula Foley, Accredited Court Reporter,

5    do hereby certify that I took the Stenograph notes

6    of the foregoing deposition, and that the

7    transcript thereof is a true and accurate record

8    transcribed to the best of my skill and ability.

9                    I further certify that I am neither

10   counsel for, related to, nor employed by any of

11   the parties to the action in which the deposition

12   was taken, and that I am not a relative or

13   employee of any attorney or counsel employed by

14   the parties hereto, nor financially or otherwise

15   interested in the outcome of the action.

16

22   ....................................

23       PAULA FOLEY

24

25   Dated this ...... day of ................ 2017

