UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:  3/29/2021
```

City of Almaty, Kazakhstan, *et al.*,

                    Plaintiffs,

        —v—

Mukhtar Ablyazov, *et al.*,

                    Defendants.

15-cv-5345 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

    In this case, the City of Almaty and BTA Bank JSC seek to recover funds allegedly embezzled in Kazakhstan and laundered in the United States.  Following nearly six years of litigation, only four claims remain.  The Kazakh Entities accuse Triadou SPV S.A. of conversion for knowingly receiving their stolen funds and helping to hide them in a series of real estate investments.  They claim Triadou was unjustly enriched at their expense.  And they assert two derivative claims to help them right those wrongs—the first, under the equitable doctrine of constructive trust; the second, under a New York statute authorizing courts to adjudicate competing claims to property subject to a state-court judgment.  Triadou moves for summary judgment on all claims.

    The Court concludes that BTA has offered enough evidence to support its claims.  It points to evidence showing that Mukhtar Ablyazov, the former chairman of the bank, wielded his influence to pilfer millions of dollars through sham loans to companies he controlled.  It traces those funds through a labyrinthine web of shell companies to Triadou.  Its evidence would allow

a reasonable juror to conclude that Triadou knew the money was stolen and helped launder it. This precludes summary judgment on BTA's claims.

The same cannot be said for Almaty. It cannot trace any specific funds stolen by its former mayor, Viktor Khrapunov, to Triadou's investments. It offers no evidence showing that Khrapunov funded Triadou's parent company, Swiss Development Group SA, with stolen funds, or that any money he invested in the company benefitted Triadou. Because it cannot show that any of its funds ended up in Triadou's hands, its claims cannot succeed.

The Court therefore grants Triadou's motion as to Almaty's claims and denies it as to BTA's claims.

## I.   Background

For purposes of this motion, the Court resolves all ambiguities in the Kazakh Entities' favor and credits all factual inferences that could rationally be drawn from their evidence. The Court assumes the parties' familiarity with this long-running litigation and describes only those portions of their voluminous submissions necessary to support its conclusions.[1]

### A.   Mukhtar Ablyazov and Viktor Khrapunov Steal from the Kazakh Entities

The two threads of this story each begin in Almaty, Kazakhstan, in the early years after the fall of the Soviet Union amidst a push for the privatization of public property. The first concerns BTA, a bank headquartered in Almaty and controlled by Kazakhstan's one-time Minister of Energy Mukhtar Ablyazov until he fled the country in 2009 shortly after the bank was nationalized. SOF ¶¶ 2–3, 7–8, 48, 236. Before and during his tenure as the bank's

---

[1] This Opinion cites to the Kazakh Entities' Rule 56.1 Statement of Facts, Dkt. No. 1361, as "SOF"; to the parties' exhibits, Dkt. Nos. 1288–1289, 1295, 1355–1359, as "Ex." followed by the exhibit number; to Triadou's memorandum of law in support of its motion, Dkt. No. 1297, as "Opening Br."; to the Kazakh Entities' memorandum of law in opposition, Dkt. No. 1363, as "Opp. Br.," and to Triadou's reply memorandum of law, Dkt. No. 1385, as "Reply Br."

chairman, BTA transferred large sums of money to companies that Ablyazov owned or controlled. *Id.* ¶ 8; Ex. 68 ¶¶ 15, 31, 56; Ex. 186, at 11:7–12:11.  The second concerns Viktor Khrapunov, who served as the "Akim" (mayor) of Almaty from 1997 through 2004.  SOF ¶ 5. As mayor of Almaty, Khrapunov oversaw a number of privatization deals that benefited members of his family and entities they controlled. *Id.* ¶¶ 320, 322–28.  These threads intertwine in a network of shell companies operated by Ilyas Khrapunov—Viktor's son (or adoptive son) and Ablyazov's son-in-law—for the apparent purpose of laundering the pair's ill-gotten gains. *Id.* ¶¶ 4, 259–61; Ex. 68, ¶¶ 23, 87–92.

Ablyazov purchased BTA bank for around $72 million through an investment group called Kazakh Investor that he controlled in 1998.  SOF ¶ 8; Ex. 177, at 80:10–81:24.  At the time, Ablyazov was serving as Kazakhstan's Minister of Energy, and so the day-to-day operations of the bank fell to his long-time business partner and fellow member of Kazakh Investor Yerzhan Tatishev.  *Id.* ¶¶ 7–8; Ex. 177, at 142:11–25.  Although Tatishev handled the bank's operations, Ablyazov had ultimate control over the bank's strategic decisionmaking as its key owner.  SOF ¶ 8; Ex. 177, at 142:11–25.

Ablyazov went to prison in July 2002 on charges of abuse of office and illegal commercial activity. SOF ¶ 8; Ex. 177, at 63:7–11.  While Ablyazov was in prison, Tatishev nominally owned—directly or indirectly—100 percent of the bank's voting shares.  Ex. 177, at 89:5–89:17.  However, Tatishev held about 60 percent of those shares for Ablyazov's benefit. Ex. 177, at 117:16–118:17.

Ablyazov took a more hands-on role at BTA following his release from prison in 2003. Ex. 180, at 39:17–20, 49:22–50:24.  Tatishev provided Ablyazov regular briefings and Ablyazov was "deeply involved" in the bank's operations from that point forward.  Ex. 180, at 50:1–24.

Following Tatishev's death in December 2004, Ablyazov acquired the bulk of Tatishev's shares from his widow and held no less than 75 percent of the bank's voting shares going forward. Ex. 177, at 118:19–21, 132:6–133:21; Ex. 180, at 57:2–58:20. Ablyazov then served as BTA's chairman from May 2005 through February 2009. SOF ¶ 3. In February 2009, Kazakhstan nationalized the bank, and BTA defaulted on billions of dollars in debt. *Id.* ¶ 236; Ex. 180, at 142:12–143:4. Ablyazov fled to London shortly thereafter. SOF ¶ 236.

Throughout the period when Ablyazov controlled BTA, the bank transferred millions of dollars to companies he owned or controlled. *Id.* ¶ 8; Ex. 68 ¶¶ 15, 31, 56; Ex. 186, at 11:7–12:13. These transfers were often denominated as loans. A department at the bank known as UKB6 (standing for "Corporate Business Department 6") was responsible for issuing loans to companies controlled by BTA's leadership—in particular, Ablyazov. SOF ¶ 18; Ex. 186, at 22:17–21. However, these loans lacked economic substance. They were either never repaid or were only nominally repaid by "roundtripping," a process in which UKB6 later issued new loans to other companies Ablyazov controlled, which were then routed through additional shell companies and back to BTA to create the appearance that the original loans had been paid as they became due. SOF ¶ 18; Ex. 68, ¶¶ 48–51, Ex. 186, at 22:23–23:14. 28:13–30:18. Some of the transfers from BTA to Ablyazov-controlled entities were payments for fictitious goods or services. SOF ¶ 32; Ex. 10, at 40:18–42:4, 92:8–17. Ablyazov's confidants within the bank also maintained so-called "black cash" not reported to Kazakh authorities and used for Ablyazov's personal expenses. SOF ¶ 18; Ex. 186, at 52:23–54:22.

The Kazakh entities focus on a series of direct and indirect transfers from BTA during the summer of 2004 to a company controlled by Ablyazov (through Tatishev) called Tradestock. SOF ¶ 8; *see* Ex. 184. BTA transferred $37 million directly to Tradestock between July and

4

August 2004 in two payments.  SOF ¶¶ 35–37.  On August 4, 2004, BTA transferred $24 million

to United Clearing & Processing Co., Ltd., which United Clearing transferred to Tradestock

eight days later.  *Id.* ¶ 40.  On August 5, 2004, BTA transferred $15.9 million to Balgaven Invest

Inc., which Balgaven transferred to Tradestock seven days later.  *Id.* ¶ 41.  On August 10, 2004,

BTA transferred $38.4 million to Comwork Ltd., which Comwork transferred to Tradestock two

days later.  *Id.* ¶ 39.  These payments totaled about $115 million.

    All of the transfers from BTA were denominated as loans.  BTA's records reflect

subsequent transfers from these entities back to BTA, which Triadou contends were payments on

the loans.  *Id.* ¶¶ 35–42.  However, there is evidence that these repayments were essentially false

and had been accomplished by roundtripping other funds from BTA.  *Id.*  For example,

Tradestock's "repayment" of $4,093,183.56 on July 7, 2005, followed receipt of $4,100,000 only

one day earlier from Anital LLC, which had just a day before that received $5,000,000 from

BTA.  *Id.*; *see* Ex. 194.  Tradestock's August 5, 2005 "repayment" of $3,892,602.74 followed

receipt of $3,900,000 from Calernen Finance, which had received $16,000,000 from BTA just

four days earlier.  *See* Ex. 194.  Of that $16,000,000, Calernan also sent $3,500,000 to Belgaven

on August 3, 2005, which Belgaven immediately used to repay $3,442,821.92 to BTA the same

day.  Another $5,200,000 went to United Clearing—also on August 3, 2005—which then

immediately transferred $5,190,136.99 back to BTA.  *See id.*  This is consistent with testimony

from a former UKB6 employee on the department's standard practice of using roundtripping to

create the appearance that purported loans to Ablyazov's companies had been repaid.  *See* SOF

¶ 18; Ex. 186, at 22:23–23:14. 28:13–30:18.

    During roughly the same period, Viktor Khrapunov embezzled millions of dollars from

Almaty as the city's mayor by arranging for public assets to be sold to members of his family or

companies they controlled at below-market rates.  SOF ¶¶ 320, 322–28.  Viktor and his wife,

Leila Khrapunova, fled Kazakhstan when they came under investigation and were subsequently

convicted of embezzlement in absentia.  *Id.* ¶ 320.  Although the Kazakh Entities describe one

specific transaction in which Leila earned about $1.6 million in profit from reselling a privatized

kindergarten building, they trace the proceeds of that transaction no further than her bank

account at BTA.  *See id.* ¶¶ 322–28.

      **B.**     **Funds Stolen from BTA Flow to Triadou's Investments**

      Over the next several years, the bulk of the funds Tradestock received from BTA in the

summer of 2004 made its way into an oil-and-gas investment company and then through a series

of shell companies before ultimately being used to finance Triadou's real estate investments.

      These transactions began with Tradestock's transfer of $103 million to Thyler Holdings

Ltd. between July and August 2004.  *Id.* ¶¶ 8–13.  Tradestock transferred the money to Thyler in

two payments, each closely on the heels of its receipt of funds from BTA.  *See id.* ¶¶ 13, 35–41.

At the time, Thyler was nominally owned by Tatishev and a business partner; however, records

from Thyler's corporate services provider reflect that Ablyazov was the beneficial owner at least

as early as July 2005, and his company Lineford acquired Thyler directly in 2007.  *Id.* ¶ 8; Ex.

189, at *4–5.  These funds quickly passed through Thyler—which did not previously have even a

bank account—to acquire Zhaikmunai, a company involved in oil and gas exploitation in

Kazakhstan.  *Id.* ¶¶ 8, 9, 15; Ex. 11, ¶ 52.  In July 2007, Lineford transferred ownership of

Zhaikmunai to Sartfield, a company beneficially owned by a third party.  SOF ¶ 8.  Under the

terms of the deed, Lineford was entitled to recoup its $103 million investment and receive 90%

of Zhaikmunai's profits, with many of Zhaikmunai's business decisions requiring Lineford's

prior written approval.  *Id.* ¶¶ 8, 60; Ex. 36.  Between 2007 and 2010, Zhaikmunai raised

additional capital from third parties and built an oil treatment facility. SOF ¶¶ 50–58; Ex. 11, ¶ 93.  In 2008, it was listed on the London Stock Exchange with an equity value of about $1 billion. SOF ¶ 50, Ex. 11, ¶ 93.

Beginning in late 2011, Sartfield made nine payments totaling about $439.6 million to a company called Northern Seas Waterage Inc. ("NSW").  SOF ¶¶ 63, 243.  According to Sartfield's owner, Ilyas Khrapunov approached him in late 2010 and informed him that Zhaikmunai's obligations to Lineford had been transferred to NSW.  *Id.* ¶ 62.  The documents purporting to memorialize these agreements appear to have been fabricated after the fact.  *Id.* ¶¶ 234–42, 255; Ex. 189, at *9–10.  NSW was beneficially owned by Gennady Petelin, who is related to Ablyazov and the Khrapunovs through his son's marriage to Ilyas's sister.  *Id.* ¶¶ 62, 71.  However, significant evidence suggests that the Petelins were only "fronts," identified as the nominees or nominal owners of companies including NSW that Ilyas and Ablyazov used to conduct business.  *Id.* ¶ 257.  This evidence includes testimony from Triadou's former director and another of its business associates, *see* Ex. 67, ¶ 3; Ex. 174, at 149:6–8, 152:10–24, the Petelins' inability to describe details related to their claimed financial holdings, *see* SOF ¶ 258, transfers of funds from NSW to other companies owned by Ilyas, *see id.* ¶¶ 261, 265, and Gennady's production of apparently forged documents purporting to show him as the owner of Lineford, *see id.* ¶ 242; *see, e.g.*, Opp. Br., Fig. 7; Ex. 39; Ex. 307.

After NSW, these funds were routed through accounts at FBME Bank for a series of five shell companies nominally owned by the Petelins before arriving in the account of Telford International Limited.  SOF ¶¶ 259–60; Ex. 68, ¶¶ 87–92; Ex. 388.  Telford was owned by Telford Trust, which was beneficially owned by Gennady's wife, Elena Petelina.  SOF ¶ 141.  However, as with NSW, there is evidence that Telford was actually controlled by Ilyas and used

as a vehicle to launder Ablyazov's money, including that those who dealt with the company interacted primarily with Ilyas and that Elena had never heard of the company or any related entities before her deposition. SOF ¶¶ 258–59, 267–71, Ex. 174, at 149:6–8, 152:10–24, Ex. 208, at 45:16–46:2; Ex. 255, at 103:20–104:4, 122:2–123:12. From Telford, these funds were then used to finance Triadou's real estate investments at issue in this case. SOF ¶ 139.

Triadou was a subsidiary of SDG Capital S.A. *Id.* ¶ 86. Ilyas formed Swiss Development Group SA in July 2007 and its holding company SDG Capital S.A. the following year (together, "SDG") in Geneva. *Id.* ¶ 66. SDG was largely financed with money from the Khrapunov family, including a loan of about $10 million from Leila and a capital contribution between 3 and 5 million Swiss francs from Elvira Kudryashova, who is Ilyas's sister and Gennady's daughter-in-law. *Id.* ¶¶ 77, 139; *see also* Ex. 174, at 126:12–127:15 (expressing uncertainty as to the amount of initial funding from the Khrapunovs). Ilyas later received $10 million for SDG projects from Ablyazov. SOF ¶ 78. Ilyas became the CEO of SDG in April 2008 and sometime later became its chairman, a position he held until June 2012. *Id.* ¶¶ 74–75.

SDG formed Triadou, a special purpose vehicle under the laws of Luxembourg, in September 2012. *Id.* ¶ 86. Nicolas Bourg served as Triadou's director, first along with SDG and another individual and then as its sole director beginning in April 2013, until he was removed from that position in October 2014. *Id.* ¶¶ 87–88. A Swiss entrepreneur later purchased SDG and Triadou. *Id.* ¶ 89. Negotiations for the sale began in December 2012, with a purchase agreement signed in May 2013. *Id.* ¶¶ 96, 106. Triadou was ultimately transferred from SDG to a company owned by the purchaser in May 2015. *Id.* ¶ 89. There is evidence that the new owner served as another front for Ilyas. This evidence includes documents suggesting that the funds used to purchase SDG originated from one of the shell companies used to route BTA's stolen

funds from NSW to Telford and testimony that individuals involved with SDG would joke about the nominal owner's lack of control over his investments. *Id.* ¶¶ 286–87; Ex. 174, at 138:17–139:13, 147:3–10; *see also* Ex. 66 ¶ 34. However, whether or not the sale was legitimate, at least some of the payments from Telford for Triadou's investments took place before negotiations began. *See* SOF ¶¶ 96, 142, 155.

In total, Telford transferred about $72 million on Triadou's behalf for investments between November 2012 and May 2013, which it denominated as loans. *Id.* ¶¶ 139, 142. In an October 2013 letter, Elena (Telford's nominal beneficial owner) "waived" Telford's loan to Triadou and "assume[d] personal liability in collecting" it, although she later testified that she was unfamiliar with either company and had no recollection of waiving any loans. *Id.* ¶ 139; Ex. 253; *see* Ex. 255, at 103:20–104:4, 122:2–123:12. There is no evidence that any portion of this purported loan has been repaid or that repayment has been sought.

The first of Triadou's investments with these funds was in the Flatotel, a project to convert a former hotel in Manhattan into luxury condominium apartments and office and retail space. SOF ¶ 147. In 2012, New York real estate developer Joseph Chetrit began talks with Bourg and Ilyas. *Id.* ¶¶ 143–44. He reached out to Bourg about the opportunity to invest in the Flatotel in October of that year. *Id.* ¶¶ 143, 147. Chetrit's company CF 135 Flat LLC and Triadou entered into an operating agreement to under which each company would own half of a 75% interest in the project through an entity called CF 135 West Member LLC. *Id.* ¶ 151. The operating agreement required Triadou to contribute 70% of the capital—$39,375,000—in exchange for half the profits of West Member. *Id.* ¶¶ 152–53. Between November 2012 and April 2013, Telford transferred about $35 million to the Chetrits on Triadou's behalf for its contribution to the Flatotel. *Id.* ¶ 155. Triadou also loaned $6 million to another of the Chetrits

companies for investment in the Cabrini Medical Center development project, with the funds again transferred from Telford on Triadou's behalf.  *Id.* ¶¶ 157–60.

Triadou also invested about $31 million in the Tri-County Mall in Cincinnati, Ohio, in April 2013 through its subsidiary Tri-County Mall Investors, LLC ("TCMI").  ¶¶ 161–62.  As with Triadou's investments with the Chetrits, Telford transferred the funds to purchase the Tri-County Mall note on Triadou's behalf.  *Id.* ¶ 162.  TCMI sold its interest in the Tri-County Mall in July 2013 for $45 million; however, it became embroiled in a legal dispute with a former manager and ultimately received only a portion of the sale proceeds pursuant to a settlement agreement.  *Id.* ¶¶ 163–66.

The Kazakh Entities' money laundering expert, Bruce G. Dubinsky, traced the flow of funds from BTA through Tradestock, Thyler, NSW, Telford, and ultimately to Triadou's investments.  *See* Ex. 68.  He concluded that misappropriated funds from BTA were used to purchase Triadou's investments in the Flatotel and Cabrini projects, and that the use of shell companies to obscure the true ownership of the funds bore the hallmark signs of money laundering.  *Id.* ¶¶ 103–108.  Triadou has not sought to preclude Dubinsky's testimony and, to the contrary, relies on his report in its briefing.  *See* Opening Br. at 4, 25–27 & n.18.

In April 2014, Ilyas directed Bourg to arrange for Triadou's withdrawal from the Flatotel project.  SOF ¶ 179.  Shortly thereafter, Triadou agreed for the Chetrits to buy out Triadou's interest in the Flatotel for $28 million and 12% of the profits generated by the project with a minimum of $4 million.  *Id.* ¶ 189.  Bourg also agreed, on behalf of SDG, to accept repayment of the $6 million Triadou had lent the Chetrits for the Cabrini project in full satisfaction of that loan.  *Id.* ¶¶ 182–83.  The Chetrits made payments to SDG in May 2014—$6 million for the Cabrini project and a $1 million initial payment for the Flatotel—which were denominated as

loans to SDG on behalf of Triadou. *Id.* ¶¶ 183–86. They defaulted on their subsequent payments under the agreement, and Triadou obtained four state-court judgments against the Chetrits, each for $5.25 million plus interest. *Id.* ¶ 190.

CF 135 Flat LLC and the Chetrit Group LLC filed this interpleader action in New York state court in 2015. Dkt. No. 1. The Kazakh Entities and the Chetrits have since settled in two agreements that granted the Kazakh Entities the 50% interest in West Member that was the subject of Triadou's assignment to the Chetrits and then a cash payment in satisfaction of that interest. SOF ¶¶ 211–16. After lengthy litigation, all that remains are four of the Kazakh Entities' claims against Triadou: conversion; unjust enrichment; constructive trust; and a claim under New York Civil Practice Law and Rules § 5239. Triadou now moves for summary judgment on those claims.

## II.    Legal Standard

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008) (internal citations omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "In applying this standard, [courts] 'resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" *Brown v. Henderson*, 257 F.3d 246, 251 (2d Cir. 2001) (quoting *Cifra v. General Electric Co.*, 252 F.3d 205, 216 (2d Cir. 2001)). However, the plaintiff bears the burden to point to at least some evidence in support of each element of their claim. "Rule 56(c) mandates the entry of summary

judgment, after adequate time for discovery and upon motion, against a party who fails to make a

showing sufficient to establish the existence of an element essential to that party's case, and on

which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317,

322 (1986).  The Second Circuit has held that a district court need not look beyond the portions

of the record identified in the parties' statements of undisputed facts in deciding a motion for

summary judgment.  *See Tompkins v. Metro-N. Commuter R.R. Co.*, 983 F.3d 74, 81 n.26 (2d

Cir. 2020)

      "A federal court sitting in a diversity case will apply the substantive law of the forum

state on outcome determinative issues." *McCarthy v. Olin Corp.*, 119 F.3d 148, 153 (2d Cir.

1997).  This Court thus must follow decisions of the New York Court of Appeals on questions of

New York law.  *Id.*  If the New York Court of Appeals has not authoritatively decided an issue,

this Court is "bound . . . to apply the law as interpreted by New York's intermediate appellate

courts [absent] persuasive evidence that the New York Court of Appeals . . . would reach a

different conclusion." *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris USA Inc.*,

344 F.3d 211, 221 (2d Cir. 2003) (first alteration in original) (quoting *Pahuta v. Massey–*

*Ferguson, Inc.*, 170 F.3d 125, 134 (2d Cir. 1999)).

## III.    Discussion

### A.    Genuine Factual Disputes Preclude Summary Judgment on BTA's Claims

#### 1.    BTA Identifies the Misappropriation of Specifically Identifiable Funds Necessary to Support a Claim for Conversion

      "Two key elements of conversion are (1) plaintiff's possessory right or interest in the

property and (2) defendant's dominion over the property or interference with it, in derogation of

plaintiff's rights." *Pappas v. Tzolis*, 982 N.E.2d 576, 580 (N.Y. 2012) (quoting *Colavito v. New*

*York Organ Donor Network, Inc.*, 860 N.E.2d 713, 717 (N.Y. 2006)).  New York law allows

claims for conversion of intangible property, even when that property is not represented in tangible form. *Thyroff v. Nationwide Mut. Ins. Co.*, 864 N.E.2d 1272, 1278 (N.Y. 2007). Thus, "an action will lie for the conversion of money where there is a specific, identifiable fund and an obligation to return or otherwise treat in a particular manner the specific fund in question." *Manufacturers Hanover Tr. Co. v. Chem. Bank*, 559 N.Y.S.2d 704, 712 (App. Div. 1990).

Triadou does not contest Dubinsky's tracing analysis or dispute that the funds transferred from BTA to Tradestock in the summer of 2004 then flowed to Zhaikmunai, NSW, Telford, and ultimately to Triadou. *See* SOF ¶¶ 10–16, 35–42, 59–65, 139; Opening Br. at 1–2, 4–14. Instead, Triadou advances two arguments in favor of summary judgment on BTA's conversion claim. First, it contends that because the payments from BTA to Tradestock were denominated as loans, BTA's claim is merely one for the repayment of money that was already repaid. Second, it contends that the funds at issue are not specifically identifiable because they passed through multiple entities and were comingled with funds from other sources. The Court concludes that genuine factual disputes preclude summary judgment on either basis.

Significant evidence in the record would allow a reasonable juror to conclude that BTA's transfers to Tradestock were not legitimate loans and were never legitimately repaid. A former UKB6 employee testified that the department frequently made purported loans to companies controlled by Ablyazov that would then be routed through his companies and used to create the appearance that existing loans had been repaid. SOF ¶ 18; Ex. 186, at 22:23–23:14. 28:13–30:18. Dubinsky identified other examples of this process, concluding that these transactions served as a mechanism to misappropriate funds and lacked economic substance. Ex. 69, ¶¶ 48–51. Transaction records reflect that Tradestock's purported loan repayments were immediately

preceded by transfers from other companies of nearly identical amounts that BTA had transferred to those companies only days before. *See* SOF ¶¶ 35–42; Ex. 194.

This would be a closer case if either evidence related to UKB6's general practice of roundtripping or evidence specific to the Tradestock transactions were lacking. However, the documentary evidence of suspicious payments to Tradestock immediately before its purported loan repayments corroborates the testimony of the former UKB6 employee. Triadou does not point to any evidence suggesting an alternative explanation for these payments, nor does it offer one in its briefing. This evidence is sufficient, on a motion for summary judgment, to create a genuine dispute as to whether BTA's "loans" to Tradestock were simply a pretense for embezzlement, rather than legitimate loans with an expectation of repayment.

Finally, each party devotes a footnote in its briefing to Dubinsky's deposition testimony on this issue. Opening Br. at 27 n.18; Opp. Br. at 27 n.11. Dubinsky testified that he did not see evidence that Tradestock ever repaid its purported loans—by roundtripping or otherwise—based on the documents he reviewed. Ex. 119, at 179:11–180:4, 206:11–24. Triadou contends that the Kazakh Entities should therefore be bound to the conclusion that Tradestock was not involved in any roundtripping scheme. However, Dubinsky did not testify that Tradestock legitimately repaid the funds it received from BTA. To the contrary, he testified that it did not do so. *Id*. If Dubinsky overlooked evidence of transactions between BTA and Tradestock, that may have some bearing on the reliability of his methods (though Triadou has not sought to preclude his testimony). But whether or not a juror were to accept his conclusions, they could reasonably conclude that the payments to Tradestock were not legitimate loans and were not repaid.

The Court next turns to Triadou's argument that the funds stolen from BTA are not specifically identifiable and thus cannot support a claim for conversion. Triadou does not

dispute that the Kazakh Entities have identified specific funds transferred from BTA to Tradestock.  *See* SOF ¶¶ 35–42.  Instead, it contends that because those funds were subsequently comingled with other funds—particularly in investments it claims were managed by independent third parties—BTA cannot state a claim for conversion.  However, there are genuine disputes as to these facts, and the Court disagrees with Triadou's formulation of the law.

To begin with, there is a genuine dispute as to whether any of the links in the chain from BTA to Triadou involved truly independent third parties.  The Kazakh Entities identify persuasive evidence that, instead, Ablyazov and those acting on his behalf exercised continued control over BTA's stolen funds throughout their circuitous journey to Triadou.  Evidence in the record supports the conclusion that Ablyazov—through Tatishev—controlled Lineford, and that Lineford exercised substantial control over Zhaikmunai under the terms of the deed to Sartfield.  *See id.* ¶¶ 8, 60; Ex. 36.  Evidence in the record supports the conclusion that the Petelins were mere fronts for entities actually controlled by Ilyas and Ablyazov, including NSW, and that the transfer of Zhaikmunai's obligations from Lineford to NSW was concocted after the fact.  *See* SOF ¶¶ 67, 234–42, 255, 257–58, 261, 265; Ex. 39; Ex. 174, at 149:6–8, 152:10–24; Ex. 307.  Evidence in the record also supports the conclusion that this control extended to Telford—which financed Triadou's investments with inexplicably "waived" loans, *see* SOF ¶ 139; Ex. 253—and to Triadou itself.  *See* SOF ¶¶ 258–59, 267–71, Ex. 174, at 149:6–8, 152:10–24, Ex. 208, at 45:16–46:2; Ex. 255, at 103:20–104:4, 122:2–123:12.  Triadou offers no plausible alternative explanations for many of the peculiar transactions in this case.  This evidence, coupled with Dubinsky's unchallenged conclusions that these transactions are consistent with an effort to obscure the source of funds misappropriated from BTA, leads the Court to conclude that there is a genuine factual dispute on this issue.

The Court also disagrees with Triadou's legal argument that subsequent comingling of the funds stolen from BTA with those held by independent third parties would necessarily preclude a claim for conversion.  To be sure, a claim for conversion of money under New York law "must be for recovery of a particular and 'definite sum of money, although the specific bills are not identified.'"  *ADP Inv. Commc'n Servs., Inc. v. In House Att'y Servs., Inc.*, 390 F. Supp. 2d 212, 224 (E.D.N.Y. 2005) (quoting *Jones v. McHugh*, 325 N.Y.S.2d 102, 102 (App. Div. 1971)).  But it is generally sufficient for a plaintiff to identify a specific transfer of funds that were misappropriated and trace those funds to a knowing recipient. *See, e.g.*, *id.*; *Simpson & Simpson, PLLC v. Lippes Mathias Wexler Friedman LLP*, 14 N.Y.S.3d 258, 259–60 (App. Div. 2015).  It is not the law that subsequently commingling stolen funds with others precludes a claim for conversion.  *See Simpson & Simpson*, 14 N.Y.S.3d at 260; *Republic of Haiti v. Duvalier*, 626 N.Y.S.2d 472, 475 (App. Div. 1995).

The New York Appellate Division dealt with such a case in *Republic of Haiti*.  There, the court allowed a claim for conversion when embezzled public funds were dispersed to friends and family members of the defendant before being deposited in foreign accounts.  *Republic of Haiti*, 636 N.Y.S.2d at 381, 475.  The key question under New York law is whether funds are "traceable" to specific sums in which the plaintiff had a possessory right or interest.  *Id.* at 475.  To the extent that language in some district court opinions could be read to suggest that pilfered funds must forever *remain* in a "separate, identifiable, segregated fund" to support a claim for conversion, *see, e.g.*, *Rolin v. Spartan Mullen Et Cie, S.A.*, No. 10-cv-1586 (CM) (FM), 2011 WL 5920931, at *11 (S.D.N.Y. Nov. 23, 2011), that reading is inconsistent with current law.

The Court thus concludes that genuine factual disputes preclude summary judgment on BTA's claim for conversion.

### 2.   Triadou's Legal Arguments on Unjust Enrichment Lack Merit

To succeed on a claim for unjust enrichment under New York Law, "a plaintiff must show that (1) the other party was enriched, (2) at that party's expense, and (3) that it is against equity and good conscience to permit the other party to retain what is sought to be recovered." *Mandarin Trading Ltd. v. Wildenstein*, 944 N.E.2d 1104, 1110 (N.Y. 2011) (cleaned up). Triadou's primary argument is that its relationship to BTA is too attenuated to support a claim for unjust enrichment. Triadou also contends that this claim is duplicative and that it would not be unjust to allow it to retain the proceeds of its real estate investments.

This Court recently held on essentially identical facts that the knowing receipt of stolen funds can support a claim for unjust enrichment under New York law. *City of Almaty v. Sater*, No. 19-cv-2645 (AJN), 2020 WL 7027566, at *5–6 (S.D.N.Y. Nov. 30, 2020). In recent years, the New York Court of Appeals "has disallowed some claims for unjust enrichment when the relationship between the plaintiff and the defendant was 'too attenuated.'" *Id.* at *5 (quoting *Georgia Malone & Co. v. Rieder*, 973 N.E.2d 743, 747 (2012)). However, these cases did not "abrogate the well-settled rule that a claim for unjust enrichment lies against the knowing recipient of wrongfully obtained property, or the myriad cases in which New York courts have imposed constructive trusts against defendants who had no direct business dealings with the plaintiff." *Id.*; *see, e.g.*, *Simonds v. Simonds*, 380 N.E.2d 189, 194 (N.Y. 1978); *Hazlett v. Fusco*, 576 N.Y.S.2d 427, 429 (App. Div. 1991); *Bronowski v. Magnus Enterprises, Inc.*, 402 N.Y.S.2d 868, 869 (App. Div. 1978). Thus, this Court followed others in this district to allow unjust enrichment claims against parties who helped launder stolen funds and held that Almaty could proceed with its claims against another individual involved with Triadou's Tri-County Mall investment. *Sater*, 2020 WL 7027566, at *6; *see also Amusement Indus., Inc. v. Midland Ave.*

*Assocs., LLC*, 820 F. Supp. 2d 510, 537 (S.D.N.Y. 2011).  For the reasons stated in *Sater*, the Court rejects Triadou's argument that its relationship with BTA was too attenuated to support a claim for unjust enrichment.

The court also rejects the arguments that BTA's claim is duplicative and that it would not be inequitable to allow Triadou to retain the proceeds of its real estate investments.  The claims for unjust enrichment and conversion are not duplicative because the remedies available to each—and the evidence required to prove each—may differ.  *See NetJets Aviation, Inc. v. LHC Commc'ns, LLC*, 537 F.3d 168, 175 (2d Cir. 2008).  In its claim for unjust enrichment, BTA seeks restitution of the amount Triadou was unjustly enriched (that is, the profits derived from the stolen funds), while its claim for conversion seeks compensatory damages.  The Court also finds that genuine factual disputes preclude summary judgment as to whether Triadou should be allowed to retain the proceeds of its investments.  There are genuine factual disputes about the level of Ablyazov's control over BTA's operations and whether SDG's subsequent purchaser acted as a front for Ilyas, who understood the funds originated from an illegitimate source.

The Court therefore concludes that Triadou is not entitled to summary judgment on BTA's claim for unjust enrichment.

### 3.  BTA's Derivative Claims Survive

BTA asserts two derivative claims that essentially serve to provide additional remedies for its claims of conversion and unjust enrichment.  First, BTA asserts a claim for constructive trust.  "In the words of Judge Cardozo, '[a] constructive trust is the formula through which the conscience of equity finds expression.  When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.'"  *Simonds*, 380 N.E.2d at 193 (alteration in original) (quoting *Beatty*

18

*v. Guggenheim Exploration Co.*, 122 N.E. 378, 380 (N.Y. 1919)).  Second, BTA asserts a claim under New York Civil Practice Law and Rules § 5239, which allows courts to adjudicate competing claims to property or debt that is the subject of a state-court judgment.

Triadou contends that BTA's constructive trust claim is moot because the Kazakh Entities have already settled with the Chetrits under an agreement granting the Chetrits the interest in West Member formerly held by Triadou.  However, BTA sought a constructive trust over both the underlying interest in West Member and any profits from that interest that might flow to Triadou.  While BTA's settlement agreement forecloses any remedy as to the interest in West Member now held by the Chetrits, it does not foreclose a constructive trust over Triadou's profits from that interest.  Thus, this claim is not moot.

The Court also rejects the argument that a constructive trust is unavailable because Triadou was not unjustly enriched and lacked a fiduciary relationship with BTA.  Both the Second Circuit and New York Court of Appeals have held that the existence of a fiduciary relationship is only one "factor" for a constructive trust—not a rigid requirement—and New York courts have in many instances imposed constructive trusts where the parties had no prior relationship, whether fiduciary or otherwise.  *In re Koreag Controle et Revision S.A.*, 961 F.2d 341, 352 (2d Cir. 1992); *see Simonds*, 380 N.E.2d at 194–95.  And as discussed above, the Court concludes that BTA's unjust enrichment claim survives summary judgment.

Triadou's arguments on the § 5239 claim cover largely the same ground, and the Court rejects them for the same reasons.  Because the Court denies summary judgment on BTA's conversion and unjust enrichment claims, BTA has claims that it may assert entitle it to property or debt subject to Triadou's state-court judgments under § 5239.  Of course, Triadou is correct that BTA cannot use § 5239 to obtain a double recovery.  But it may use that mechanism to

recover proceeds of Triadou's investment in the Flatotel that would unjustly enrich it, subject to proof at trial.

The Court thus concludes that Triadou is not entitled to summary judgment on BTA's constructive trust and § 5239 claims.

### 4. The Doctrine of In Pari Delicto Does Not Bar Recovery

"The doctrine of in pari delicto bars a party that has been injured as a result of its own intentional wrongdoing from recovering for those injuries from another party whose equal or lesser fault contributed to the loss." *Rosenbach v. Diversified Grp., Inc.*, 926 N.Y.S.2d 49, 51 (App. Div. 2011). However, this doctrine does not apply when a corporate officer enriches themselves at the corporation's expense. "Under the adverse interest exception, a corporate agent's actions are not imputed to the corporation where the agent has '*totally abandoned* his principal's interests and has acted *entirely* for his own or another's purposes.'" *Ramiro Aviles v. S & P Glob., Inc.*, 380 F. Supp. 3d 221, 302 (S.D.N.Y. 2019) (cleaned up) (quoting *Center v. Hampton Affiliates, Inc.*, 488 N.E.2d 828, 830 (N.Y. 1985)).

The Court concludes that in pari delicto does not bar BTA's recovery here for two reasons. First, Triadou did not raise this defense in its answer, and though the Court might have discretion to overlook that failure, it declines to do so in this posture. *See* Dkt. No. 1112. Second, the Court concludes that there are genuine factual disputes both as to the degree of BTA's participation in the alleged wrongdoing and the applicability of the adverse interest exception. Ablyazov's level of control over BTA at the time it transferred funds to Tradestock is disputed, and the Kazakh Entities identify significant evidence that he dominated the bank at that time. *See* SOF ¶ 8; Ex. 177, at 117:16–118:17, 142:11–143:23; Ex. 180, at 49:22–50:24; *see also* SOF ¶ 18; Ex. 186, at 52:23–54:22 (reflecting that Ablyazov used bank funds for his

personal expenses).  The Kazakh Entities also point to significant evidence that Ablyazov alone

benefited from the purported loans to Tradestock because they were never legitimately repaid,

but instead merely papered over with further fraudulent loans to other companies he controlled.

*See* SOF ¶¶ 18, 35–42; Ex. 186, at 22:23–23:14. 28:13–30:17; Ex. 194.  Thus, the Court

concludes that genuine factual disputes would preclude summary judgment on this defense even

if Triadou had not waived it.

### 5.  Triadou Had Fair Notice of BTA's Claims

Finally, Triadou makes one broader argument in favor of summary judgment on all of

BTA's claims.  It contends that the Kazakh Entities' present factual theory was absent from its

third amended crossclaims and that all claims should therefore be dismissed.  While their

crossclaims alleged that Ablyazov stole from BTA while he was the bank's chairman, they now

focus on transfers to Tradestock that occurred in the summer of 2014—shortly after he was

released from prison and about a year before he became chairman.  Triadou does not clearly

articulate a legal rationale for this argument, and it relies essentially entirely on a lonesome case

from the Seventh Circuit.  *See Chessie Logistics Co. v. Krinos Holdings, Inc.*, 867 F.3d 852 (7th

Cir. 2017).  Meeting Triadou a fair bit more than half way, the Court reads Triadou's complaint

to be that it lacked fair notice of BTA's claims.  The Court disagrees.

In their third amended crossclaims, the Kazakh Entities alleged that Ablyazov embezzled

money from BTA through sham loans to companies he controlled and then concealed this

embezzlement by roundtripping funds through further fraudulent loans.  Dkt. No. 1094, ¶¶ 30–

34.  They alleged that Ablyazov and the Khrapunovs funneled these funds into SDG between

2008 and 2012 and used them for Triadou's investments in order to launder them.  *Id.* ¶¶ 58–59,

87–97.  Now, following discovery, it turns out that the Kazakh Entities were slightly wrong

about exactly when Ablyazov embezzled the funds he took from BTA and laundered through Triadou (at least as to the embezzlement they can prove). Instead of in May 2005, after Ablyazov assumed the chairmanship, the embezzlement occurred in July and August 2004, during which time he was "deeply involved" with the bank's operations through Tatishev, who held a controlling interest in BTA on Ablyazov's behalf. *See* Ex. 180, at 39:17–20, 49:22–50:24; *see also* Ex. 177, at 117:16–118:17.

This minor factual discrepancy, based on information obtained during discovery, did not change the gravamen of BTA's claims or deprive Triadou of fair notice. The Kazakh Entities' crossclaims gave Triadou "adequate notice of the substance of [the] claims." *Simmons v. Abruzzo*, 49 F.3d 83, 87 (2d Cir. 1995). When a complaint does so, some variation in the proof offered at trial does not render the original pleading defective. *Id.* The Federal Rules do not contemplate amendment on the eve of trial to bring a complaint into perfect accord with the evidence obtained during discovery. The Court concludes that no further amendment to the crossclaims is necessary and that there is no basis to dismiss BTA's claims.

For these reasons, the Court concludes that genuine factual disputes preclude summary judgment on any of BTA's claims and that those claims may proceed to trial.

### B.     Almaty Identifies No Evidence Linking the Theft of Its Funds to Triadou

Almaty's claims fail for the same reason BTA's succeed: the Kazakh Entities trace the funds used for Triadou's real estate investments back to BTA alone. SOF ¶¶ 35–42; Ex. 68, ¶¶ 56–58. There is no evidence, nor do the Kazakh Entities contend, that the funds Triadou invested came from Almaty. *See* Opp. Br. at 48–50. Instead, they point to a much more attenuated connection: that Ilyas used money stolen from Almaty to create SDG. *Id.* No evidence supports this claim, and it is legally insufficient.

In their Rule 56.1 statement, the Kazakh Entities state that "Leila and Viktor stole [the] money" that Ilyas used to start SDG.  SOF ¶ 320.  The evidence they cite does not support this statement.  *See also id.* ¶ 321 (making essentially the same claim citing evidence that does not support it).  They point to ample evidence that Leila and Viktor stole from Almaty.  *See id.* ¶¶ 322–28 (describing Leila's profit of $1.6 million from reselling a privatized kindergarten building); *see also id.* ¶ 320 (describing Kazakhstani court judgments against the Khrapunovs).  And they point to some—albeit thin—evidence that Ilyas created SDG exclusively with money from Leila and Viktor, as opposed to from Leila and Elvira.  *See* Ex. 174 at 125:11–127:15 (deposition testimony from a Triadou associate that he "believe[d]" SDG was started with a gift or loan by Viktor and Leila but was not certain as to the amount); Ex. 162 ¶ 22 (affidavit from Bourg starting that "SDG was created with funds from the Khrapunov family").  What they do not cite is any record evidence supporting the proposition that *those* funds were stolen from Almaty.  Unlike BTA, which carefully traces its stolen funds to Triadou's investments, Almaty's claim rests on mere surmise—that because the Khrapunovs funded SDG, the money must have been stolen.

This inference would be plausible only if every dollar the Khrapunovs had was stolen from Almaty.  The Kazakh Entities make no such argument, nor do they point to any evidence so stating.  To the contrary, their account of the kindergarten-building deal reflects that the Khrapunovs had substantial wealth before any specific misappropriation they identify—Leila purchased the building for $350,000 and contributed it to a company she controlled that was already worth about $12,000,000.  SOF ¶¶ 324–27.  Thus, not only do the Kazakh Entities fail to trace SDG's seed money to any specific and identifiable stolen funds, they fail to establish it was stolen money at all.  The Kazakh Entities' evidence identified in their Rule 56.1 Statement is not

enough to allow any reasonable juror to conclude that the Khrapunovs funded SDG with money stolen from Almaty, and summary judgment is appropriate on that basis.  *See Celotex*, 477 U.S. at 322.

Even overlooking this serious defect in proof, the Kazakh Entities' claims in their Rule 56.1 statement are legally insufficient to support a claim for conversion or unjust enrichment against Triadou.  A claim for conversion of money under New York law lies only where the funds converted are "sufficiently identifiable and traceable."  *Simpson & Simpson*, 14 N.Y.S.3d at 260; *see also Republic of Haiti*, 626 N.Y.S.2d at 475.  The Kazakh Entities make no attempt to trace SDG's seed funding to any specific funds in which Almaty has a possessory right or interest, and they trace the money Triadou invested to another source entirely—BTA.  And while this Court has held that a sufficiently close relationship exists for a claim of unjust enrichment when a third party knowingly receives stolen funds, the Kazakh Entities do not argue or show that Triadou received any money from SDG.  That Triadou's parent company may have received funds stolen from Almaty is "too attenuated" to support Almaty's claims.  *See Georgia Malone*, 973 N.E.2d at 747.

Almaty's attempt to salvage these claims is entirely unavailing.  It contends that "Triadou's own operations were supported with Almaty's money—such as its acceptance of payments and loans by SDG to Triadou's agents for their work on behalf of Triadou."  Opp. Br. at 50.  It cites no evidence supporting this proposition and offers no details on how Triadou was "using [the Kazakh Entities' funds] to operate."  The Court is aware of no precedent holding that simply doing business with a company that received stolen funds or deriving some ancillary benefit from its existence supports a claim for conversion or unjust enrichment.  Thus, even

accepting Almaty's unsupported account that Ilyas used funds stolen from Almaty to create SDG, its claims fail as a matter of law.

Without its claims for conversion and unjust enrichment, Almaty's derivative claims fail, too.  A constructive trust is essentially a remedy for unjust enrichment.  *Simonds*, 380 N.E.2d at 193–94 ("It is agreed that the purpose of the constructive trust is prevention of unjust enrichment.").  Without a claim for unjust enrichment, there is no basis to impose a constructive trust.  Almaty likewise lacks a claim under § 5239 because, without its other claims, it lacks any interest in the subject of Triadou's state-court judgments.  *See Martinez v. Capitol One, N.A.*, No. 10-cv-8028 (RJS), 2014 WL 4179866, at *5 (S.D.N.Y. Aug. 20, 2014) (explaining that freestanding claims under § 5239 are limited to the narrow circumstance where a judgment debtor seeks to unwind a procedurally improper garnishment); *see also Milgram v. Orthopedic Assocs. Defined Contribution Pension Plan*, 666 F.3d 68, 78 (2d Cir. 2011) (holding that § 5239 generally provides no freestanding substantive rights).

Because Almaty identifies no evidence supporting an inference that its stolen funds flowed to Triadou, the Court concludes that it has failed to meet its burden of production on its claims, and that summary judgment is therefore appropriate.

### Conclusion

The Kazakh Entities trace funds embezzled from BTA to Triadou's investments and so BTA's claims survive summary judgment.  They point to no evidence linking funds stolen from Almaty to Triadou, and thus Almaty's claims perish.  The Court GRANTS Triadou's motion for summary judgment (Dkt. No. 1282) as to Almaty's claims and DENIES it as to BTA's claims.

This Opinion shall be temporarily filed under seal.  Within one week of this Opinion, any interested parties shall submit any proposed redactions under seal.  Any redactions shall be

narrowly tailored, shall be consistent with the Court's concurrently filed Order addressing the pending motions to seal, and shall be supported with reference to the Second Circuit's opinion in *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110 (2d Cir. 2006).

      SO ORDERED.

Dated: March 29, 2021
      New York, New York

_____
                ALISON J. NATHAN
            United States District Judge