## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CITY OF ALMATY, KAZAKHSTAN and BTA BANK JSC,

        Crossclaim Plaintiffs,

    - against -

MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, and TRIADOU SPV S.A.,

        Crossclaim Defendants.

ECF Case

No. 1:15-cv-05345 (AJN) (KHP)

**DEFENDANT TRIADOU SPV S.A.'S LOCAL CIVIL RULE 56.1
STATEMENT OF UNDISPUTED MATERIAL FACTS
IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Dated:  July 1, 2020

BLANK ROME LLP
1271 Avenue of the Americas
New York, New York 10020
Telephone: (212) 885-5000
Facsimile: (212) 885-5001

*Counsel for Crossclaim Defendant
Triadou SPV S.A.*

## <u>TABLE OF CONTENTS</u>

I.     The Current And Former Parties ............................................................................. 1

II.    The Tradestock Loan And Zhaikmunai .................................................................. 2

   A.   Frank Monstrey's Acquisition of Zhaikmunai.................................................. 2

   B.   UKB6, Its Role in the Issuance of Loans, and Its Monitoring of Customers ..................... 4

   C.   The Funding and Repayment of the Tradestock Loan Components................................. 10

   D.   Ablyazov Becomes BTA Chairman................................................................. 13

   E.   The Financing and Growth of Zhaikmunai's Business....................................... 14

   F.   Monstrey Repays the Tradestock Loan to Northern Seas Waterage ................. 16

III.   SDG And Triadou .................................................................................................. 19

   A.   The Formation of SDG ......................................................................... 19

   B.   SDG's Contemplated Investment Fund and the Formation of Triadou............................ 22

   C.   Philippe Glatz's Purchase of SDG and Ilyas's Post-Sale Involvement ............................ 24

   D.   Glatz Did Not Receive Loans from the Individual Defendants To Purchase SDG................ 30

IV.    Triadou's Real Estate Investments........................................................................ 33

   A.   The Source of Funds for Triadou's Investments........................................... 33

   B.   The Flatotel .......................................................................................... 34

   C.   Cabrini Medical Center......................................................................... 37

   D.   The Tri-County Mall ............................................................................. 38

   E.   Syracuse Center LLC ........................................................................... 39

V.     Triadou's Flatotel Assignment And Exit From The Cabrini Project...................... 40

VI.    Bourg's Double-Dealing ....................................................................................... 43

VII.   Plaintiffs Settle With The Chetrits ....................................................................... 48

VIII.  Viktor Khrapunov Had No Involvement With And Did Not Invest In Triadou................ 49

Triadou SPV S.A. ("Triadou"), by and through its undersigned counsel, respectfully submits the following statement of undisputed material facts in support of its motion for summary judgment pursuant to Southern District of New York Local Civil Rule 56.1.[1]

## I.   The Current And Former Parties

1.      The City of Almaty, Kazakhstan ("Almaty") is "a legal subdivision of the Republic of Kazakhstan.  Almaty is the former capital of the country, and continues to be the largest city" in Kazakhstan.  (ECF 1094, ¶ 15).  The Chetrit Entities originally sued Almaty in New York state court on July 7, 2015, which suit Almaty removed to this Court on July 9, 2015.  (ECF 1).

2.      BTA Bank JSC ("BTA") is "a Joint Stock Company and Kazakhstan bank with its headquarters in Almaty, Kazakhstan.  From 2009 until in or about July 2014, BTA Bank was majority owne[d] and controlled by the Republic of Kazakhstan." (Ex. 1; *see also* ECF 1094, ¶ 16). On June 21, 2016, this Court granted Almaty's motion to join BTA as a party to this action. (ECF 174 at 6).  Almaty and BTA are together referred to herein as "Almaty/BTA."

3.      Defendant Mukhtar Ablyazov ("Ablyazov") was Chairman of BTA's Board of Directors from May 2005 through February 2009.  (Ex. 2 (Ablyazov 10/30/2019 Dep.) at 141:20-22; Ex. 3 (Ablyazov 10/31/2019 Dep.) at 61:19-22).

4.      Former defendant Ilyas Khrapunov ("Ilyas") is the son of Leila Khrapunova and former defendant Viktor Khrapunov, and is Ablyazov's son-in-law through marriage in 2007 to his daughter, Madina Ablyazova.  (Ex. 4 (I. Khrapunov 2/1/2018 Dep.) at 20:16-25, 33:7-15).

5.      Former defendant Viktor Khrapunov ("Viktor") was the Akim or mayor of Almaty from 1997 through 2004.  (Ex. 4 at 21:11-22:8; Ex. 5 (V. Khrapunov 1/30/2018 Dep.) at 50:17-

---

[1] Paragraphs in this Rule 56.1 Statement are cited in Triadou's memorandum of law in support of its motion for summary judgment as "SOF ¶ ___."  Documents and testimonial excerpts cited herein as "Ex. ___" refer to Exhibits to the July 1, 2020 Declaration of Deborah A. Skakel that is being filed with Triadou's motion for summary judgment.

51:12). He was married to Leila Khrapunova from 1998 until 2010; they divorced because of the political attacks against their family. (Ex. 5 at 24:5-25:9). Viktor was dismissed as a defendant from this action on September 30, 2019, when the last remaining claims against him were dismissed with prejudice by Order of this Court. (ECF 1171 at 10).

6.      Triadou is a special purpose vehicle formed on September 12, 2012 in Luxembourg to invest in real estate projects. (Ex. 6 (Triadou 30(b)(6) Dep.) at 22:3-20; ECF 142-6 at 4-5).

## II.     **The Tradestock Loan And Zhaikmunai**

### A.     *Frank Monstrey's Acquisition of Zhaikmunai*

7.      From 1998 through December 2004, Yerzhan Tatishev was Chairman of BTA. (Ex. 2 at 142:5-25; Ex. 7 (Monstrey 7/17/2018 Dep.) at 11:16-24, 36:11-17; Ex. 8; Ex. 9 (Sadykov Dep.) at 9:1-12 (Tatishev was Chairman when he invited Kairat Sadykov to join the bank in November 2000); Ex. 10 (Junussova Dep.) at 40:8-17, 66:5-18, 71:1-2).

8.      In the spring of 2004, Frank Monstrey, a Belgian businessman, approached Tatishev about an opportunity Monstrey had to acquire the Zhaikmunai oil and gas field in the Uralsk region of Kazakhstan. (Ex. 7 at 11:16-24, 12:17-23; ███████████████). Monstrey initially met Tatishev in connection with a business venture in 1997-1998, (███████████████; Ex. 7 at 30:12-20), and they developed a ███████████ "friendly business relationship," (███████████; Ex. 7 at 56:1-3).

9.      ████████████████████████████████████████████████████████ ████████████████████████████████ Tatishev committed to assist Monstrey by financing the purchase. (███████████; Ex. 7 at 35:5-17, 44:20-23). ████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ████████████████████████████████████.

10.     Monstrey learned that Tatishev would provide financing through Tradestock Inc. ("Tradestock"), an entity Tatishev owned.  (███████; Ex. 7 at 35:5-36:10; Ex. 12 (Monstrey 12/12/2018 Dep.) at 40:13-41:6).

11.     Monstrey attempted to commit to writing the terms of his loan agreement with Tatishev, including designating Tradestock as the lender and a company Monstrey purchased called Thyler Holdings Limited ("Thyler") as the borrower.  (███████; Ex. 7 at 30:25-31:14, 39:24-40:2, 41:2-42:1, 45:17-46:23, 72:2-7).  Monstrey had acquired Thyler through a "corporate services and trust company" called Meespierson Intertrust ("Intertrust").  (███████; Ex. 7 at 45:17-46:23).

12.     ████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████████████████
████████████████████████.

13.     ████████████████████████████████████
████████████████████████████████████
█████████████████████.  On July 8, 2004, Tradestock transferred $7 million USD to Thyler, ████████████████████, (Ex. 14 at 1; ████████).  The remaining $96 million USD was transferred by Tradestock to Thyler on August 20, 2004.  (Ex. 14 at 1; ████ ████).  The $103 million transferred to Thyler is hereafter referred to as the "Tradestock Loan."

14.     At the time of the July and August 2004 transfers, there was no loan agreement in place signed by Tatishev or Tradestock.  (███████; Ex. 7 at 39:24-41:4; Ex. 13 at 6). Monstrey testified that "[t]here were many attempts to document that loan, but it never really got

properly documented," (Ex. 7 at 39:24-40:2), and also that business deals in Kazakhstan were often done on the basis of handshakes, and that a lack of documentation was not unusual, (*id.* at 41:9-42:1; ██████████████).

15.      Thyler was also the vehicle Monstrey used to acquire Zhaikmunai, and it transacted with the companies that indirectly owned the oil and gas field, Scoulton Holdings Limited ("Scoulton") ████████████████. (████████████; Ex. 7 at 31:15-32:2; Ex. 12 at 41:7-42:1).  Thyler used the $103 million USD Tradestock Loan to make this purchase. (████ ██████; Ex. 7 at 31:13-32:2; Ex. 12 at 41:10-22).

16.      ████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████.

17.      Ablyazov played no role in the acquisition of Zhaikmunai.  (Ex. 7 at 161:16-18; Ex. 2 at 166:4-168:11; Ex. 3 at 121:16-18, 125:4-6).

B.      *UKB6, Its Role in the Issuance of Loans, and Its Monitoring of Customers*

18.      At the time the Tradestock Loan was made, and before, BTA had a division called UKB6, also known as "Corporate Business Department 6," whose "purpose" was to "lend[] to companies that were owned by [BTA's] leadership," to issue "loans in order to repay previous loans," to issue "loans to buy securities and to finance projects,"  and also to issue "loans in order to buy securities, in order to grow owner's equity, and it provided loans to buy a stake or an ownership interest in other real projects."  (Ex. 15 (Moldakhmet Dep.) at 8:23-9:4; Ex. 10 at 22:17-23:14, 66:23-67:2; *see also* Ex. 16 at Almaty-BTA0109499 (May 2004 document bearing "Corporate Business Department 6" stamp).  Loans issued to customers of UKB6 were always

repaid with interest, which customers included offshore companies.  (Ex. 10 at 28:2-4, 50:7-10, 76:7-10, 79:3-20).  With regard to UKB6's purchase of "securities in the same BTA Bank" to grow "its owner's equity," this was done "in order to meet the regulator's requirements."  (*Id.* at 30:21-32:13).  "[I]f a bank wants to retain its license [in Kazakhstan], it will need to meet a requirement of having a minimum level of owner's equity.  Consequently, the bank had to grow its owner's equity."  (*Id.* at 80:19-81:18).

19.     UKB6 existed before Ablyazov became BTA Chairman.  (*See, e.g.*, Ex. 16 (dated May 2004); Ex. 15 at 8:12-9:4 (she joined BTA in the UKB6 division in 2002)).  UKB6 was known to, and not secret from, the rest of the bank.  (Ex. 10 at 66:23-68:16).

20.     Zaure Junussova (also spelled Dzhunusova) is a former BTA employee who joined the bank in November 2005 as a banker in UKB6 and left in February 2009.  (*Id.* at 10:6-7, 11:1-12:25).  Junussova remained in UKB6 throughout her time at BTA, and was promoted in early 2006 to head of UKB6's department for documentation management, and in early 2007 to deputy head of UKB6.  (*Id.* at 11:24-13:15).

21.     Junussova testified that "UKB-6 dealt with filing, with handling documents to issue loans."  (*Id.* at 24:18-22).   After UKB6 received an application for a loan, "it prepared a set of documents in order to issue a loan to an offshore company.  Then this application would be approved and a loan would be issued."  (*Id.* at 24:23-25:3).  UKB6 "never had the authority to issue loans on its own," and "[t]he head of UKB-6 has no personal authority to issue loans.  Only the credit committee and the leadership [of BTA] have the authority."  (*Id.* at 74:25-76:1).  BTA's Credit Committee, which was "made up of several people, mainly heads of divisions" and chaired by BTA's Deputy Chairman, would review and approve the loan.  (*Id.* at 25:4-20).   While

Junussova was employed by BTA, the Credit Committee "included the heads of different divisions," and had "[a]pproximately 13 members." (*Id.* at 76:2-6).

22.     BTA produced several documents reflecting meeting minutes of the Credit Committee (Russian language documents with translations) that indicate action to be taken by the Committee and the signatures of its members approving such action. (*See, e.g.*, Ex. 17 (concerning issue of credit to a company with both original and English translation); Ex. 18 (concerning cancellation of penalty charge for delayed repayment of loan with both original and English translation); Ex. 19 (English translation of issue of credit decision). The documents reflect that the Credit Committee's decisions were approved in writing by high-ranking BTA officials, including the Chairman of the Credit Committee, Vice-Chairman of the Board, several members of the Board, the Managing Director of Crediting, and the Head of the Legal Support Department. (Ex. 17 at Almaty-BTA0114140, 42; Ex. 18 at Almaty-BTA0114595-96, 599-601; Ex. 19).

23.     The Credit Committee's approval of a loan was communicated by a "signature list, a document that had signatures of all the authorized people … who signed, approved. There was a decision of the [C]redit [C]ommittee and these documents were submitted to UKB-6 and UKB-6 would prepare a loan agreement." (Ex. 10 at 25:14-20). UKB6 prepared a loan agreement only after the Credit Committee approved an application. (*Id.* at 26:12-17).

24.     Ablyazov testified that UKB6 "did not have any role to play in the decision-making when it came to credit loans. That is in line with existing Kazakh legislation and they just do not have the right to do so, whether we're talking about some offshore companies or any other type of companies whatsoever." (Ex. 2 at 144:16-145:9).

25.     Akzhan Moldakhmet began working at BTA in 2002 as a specialist in UKB6. (Ex. 15 at 8:12-9:1). Moldakhmet testified that UKB6's role was to provide "loans to non-resident

foreign companies." (*Id.* at 9:5-6).  Moldakhmet took maternity leave and left BTA in fall 2005, but returned in summer 2007.  (*Id.* at 9:16-10:1).

26.     Moldakhmet's responsibilities included "putting together sets of documents – or the so-called dockets of documents – and also … photocopying."  (*Id.* at 10:5-10).  Those "dockets" included loan agreements, security/collateral agreements, information about the borrowers, statements from the Credit Committee, and other standard documentation.  (*Id.* at 10:11-16).  The full loan dockets for Tradestock, Comwork Ltd. ("Comwork"), United Clearing & Processing Company, Ltd. ("United Clearing"), and Balgaven Invest ("Balgaven"), which, as described below, were customers of UKB6, were not produced by BTA.

27.     When Moldakhmet was promoted to "lead specialist" in 2004, she became responsible for "creating reports for the leadership" and monitoring repayments of loans by customers of UKB6.   Moldakhmet defined "leadership" as then head of UKB6 Mira Zhaksylykova, who reported to BTA's Chairman, Tatishev.  (*Id.* at 10:17-11:14).

28.     Moldakhmet also was responsible for creating spreadsheets that tracked the companies UKB6 monitored (the "Tracking Spreadsheets"), including for Tradestock, Comwork, United Clearing, and Balgaven.  (*Id.* at 23:18-25:9; Ex. 14).  Exhibit 20 (PX 240) lists offshore companies that were customers of UKB6, which list includes Tradestock, Comwork, United Clearing, and Balgaven.  (Ex. 20 at 2; *see also* Ex. 10 at 14:11-24 (Junussova testimony discussing Ex. 20)).  Moldakhmet created the Tracking Spreadsheets by downloading bank statements for these companies' accounts at another bank, Trasta Komerc Bank ("TKB"), and inputting the information from the TKB account statements into the Tracking Spreadsheets.  (Ex. 15 at 20:18-21:13, 26:11-19).  Moldakhmet acknowledged that the Tracking Spreadsheets she created for UKB6 customers could reflect mistakes or typographical errors made while inputting information,

and that if there is a difference in the information "in the Trasta Bank record" and the Tracking Spreadsheet, "[o]f course the information is authentic or is correct in the [TKB] banking statement." (*Id.* at 27:9-25).

29.     Both Moldakhmet and Junussova were responsible for downloading TKB account statements during their tenures with UKB6 between 2004 and 2009.  (*Id.* at 14:1-18:10; Ex. 10 at 20:8-10, 33:9-36:7, 38:24-40:15).   The Tracking Spreadsheets were updated on a regular basis. (Ex. 15 at 22:4-6; Ex. 10 at 39:4-20).  Junussova testified that she was responsible for updating the Tracking Spreadsheets for Tradestock, Comwork, United Clearing, and Balgaven.  (Ex. 10 at 96:24-97:13 (citing Ex. 14)).

30.     Exhibit 21 (PX 244 and PX 244T) reflects TKB account statements (including English translations) for several UKB6 customers, including Tradestock, Comwork, and Balgaven. (Ex. 10 at 33:9-34:12; Ex. 15 at 13:1-17:16).  Exhibit 14[2] and files identified as Exhibits 22A, 22B, and 22C[3] are examples of Tracking Spreadsheets prepared by UKB6 to track transactions of customers monitored by UKB6, and which included information from TKB account statements for the respective companies.  (Ex. 10 at 36:23-39:3, 42:9-44:11; Ex. 15 at 19:10-20:12, 23:18-25:9).

31.     Junussova testified that she understood that many of the companies in UKB6's portfolio belonged to Tatishev before he died.  (Ex. 10 at 40:8-17, 66:15-22).

---

[2] Exhibit 14 is cited as PX 246/PX 246T in Moldakhmet's and Junussova's depositions, and also was used as Dubinsky Exhibit 9 in the deposition of Almaty/BTA's proffered money laundering expert.  The latter version is included at Exhibit 14A because it is a color version that may be easier for the Court to evaluate.

[3] Exhibits 22A through 22C are files included on a flash drive marked as PX 247, which Plaintiffs sought to authenticate as a group of files through former BTA employees during depositions in Kazakhstan in September 2019.  While PX 247 included several more files related to other entities, Triadou cites here only to the Tracking Spreadsheets within PX 247 that are germane to the entities referenced in Triadou's motion for summary judgment.

32.     Junussova testified with regard to a transaction in the Tracking Spreadsheet that is Exhibit 14, reflecting a transfer of funds on January 23, 2006 between Tradestock and Seeria Alliance for purchase of agriculture equipment; while the transfer of funds occurred, the purchase of equipment did not, and the contract created to reflect the transfer was a "false agreement, or a forged agreement." (*Id.* at 40:18-41:16, 88:21-92:17). Junussova testified that "[a] contract for the delivery of goods that was signed by both parties [Tradestock and Seeria Alliance]" was provided to TKB, (*id.* at 41:17-42:4), but that she knew at the time the false agreement was provided to TKB that even though the funds would change hands, the purchase of equipment would not occur, (*id.* at 92:8-17).

33.     Kairat Sadykov joined BTA at Tatishev's invitation in November 2000 as a branch director. (Ex. 9 at 8:24-9:12). Sadykov remained branch director through April 2003 and then became "an advisor to the chairman," Tatishev. (*Id.* at 9:24-10:3). In his role as advisor to Tatishev, Sadykov was "responsible for the owner's equity at the bank" and supervised the activities of UKB6 from April 2003 through March 1, 2005, after which Sadykov continued to provide counsel to UKB6 as needed although he was not formally a part of the division. (*Id.* at 10:1-20, 12:16-23).

34.     Sadykov testified regarding another transaction reflected in the Tracking Spreadsheet that is PX 246 (Ex. 14) between Anital and Tradestock. (Ex. 9 at 24:22-26:02). Sadykov indicated that the July 6, 2005 transfer of $4.1 million from Anital to Tradestock—both were UKB6 customers—was listed as being payment for the purchase of soy flour, but no soy flour was purchased. (*Id.* at 24:22-25:17 (citing Ex. 14)). Sadykov testified that Tatishev instructed him to make the transfer of funds (and the transfer was made), and that Sadykov

instructed Moldakhmet to include the false description of the purpose of the transfer in BTA's records.  (*Id.* at 25:4-26:02).

        C.    *The Funding and Repayment of the Tradestock Loan Components*

        35.     The Tradestock Loan (i.e., the $103 million USD loaned by Tradestock to Thyler), was funded by five individual transfers that Tradestock received totaling $115.3 million USD. (*See, e.g.*, Ex. 14).  Each of these components (together, the "Tradestock Loan Components" and each individually a "Tradestock Loan Component") are described below.

        36.     The "First Tradestock Loan Component" was issued by BTA to Tradestock on July 7, 2004, with the loan identifier 2000/04/100/869, for $19 million USD.  (*Id.* at 13; Ex. 23). Tradestock repaid the First Tradestock Loan Component in seven installments, with interest, between December 28, 2004 and July 2, 2007, in the total amount of $22,975,452.06, and the payments reference the relevant loan identifier.  (Ex. 14 at 13-18 (reflecting several repayments); Ex. 23 at Almaty-BTA0230863, 64, 67-69, 72 (Tradestock TKB account statement with entries reflecting repayment of First Tradestock Loan Component)).

        37.     The "Second Tradestock Loan Component" is a separate loan BTA issued to Tradestock on August 4, 2004, with loan identifier 2000/04/100/1061, for $18 million USD. (Ex. 21 at 31 (noting original transaction, amount, loan date, and identifier); Ex. 23 at Almaty-BTA002308864 (showing repayments to correct loan identifier with August 4, 2004 date); *see also* Ex. 14 at 13 (referencing August 4, 2004 loan for $18 million, but with incorrect loan identifier). Tradestock repaid the Second Tradestock Loan Component in seven installments, with interest, between February 2, 2005 and August 2, 2007, in the total amount of $21,769,175.68.  (Ex. 14 at 13-18; Ex. 23 at Almaty-BTA0230863-65, 68, 70, 72 (Tradestock TKB account statement with entries reflecting repayment of the Second Tradestock Loan Component)).  Tradestock's TKB account statements confirm the August 4, 2004 loan originally bore the 2000/04/100/1061 loan

identifier, and that several repayments were made referencing the correct loan identifier (some of which also reference the original loan date of "04/08/04," which is the European style for the date August 4, 2004). (Ex. 21 at 31 (reflecting date, amount, and identifier of loan from BTA); Ex. 23 at Almaty/BTA-00230863-65, 68, 70, 72 (reflecting repayments)).

38.     BTA's Tracking Spreadsheet for Tradestock reflects in certain entries an incorrect loan identifier for the August 4, 2004 loan by BTA, listing instead the identifier associated with the July 7, 2004 loan Tradestock received from BTA. (*Compare* Ex. 14 at 13, *with* Ex. 21 at 31). Tradestock's TKB account statements confirm that the August 4, 2004 loan bears the identifier 2000/04/100/1061, (Ex. 21 at 31), and that the repayments Tradestock made to BTA between February 2005 and August 2007 were applied to the August 4, 2004 loan and associated identifier of 2000/04/100/1061. (Ex. 23 at Almaty-BTA0230863-65, 68, 70, 72). Moldakhmet confirmed in testimony that the Tradestock Tracking Spreadsheet included an incorrect loan identifier for the August 4, 2004 loan. (Ex. 15 at 28:1-30:24 (discussing Ex. 21)).

39.     The "Third Tradestock Loan Component" was an August 12, 2004 transfer of $38.4 million USD by Comwork to Tradestock. (Ex. 14 at 13; Ex. 21 at 31; Ex. 24 at 1). On August 10, 2004, Comwork had received a loan from BTA in the same amount ($38.4 million USD) with the identifier 2000/04/100/1125. (Ex. 21 at 46-47 (reflecting BTA loan and transfer to Tradestock); Ex. 22A (Russian language Comwork Tracking Spreadsheet reflecting BTA loan and transfer to Tradestock); Ex. 24 (English translation of Ex. 22A)). Comwork repaid the Third Tradestock Loan Component in seven installments, with interest, between February 16, 2005 and August 20, 2007, in the total amount of $46,474,637.19. (Ex. 22A; Ex. 24; Ex. 25 at Almaty-BTA0082044-45 (2005 TKB account statement reflecting payments on February 16, 18, and August 10, 2005 to the relevant loan identifier); Ex. 26 at Almaty-BTA0082063-64 (2006 TKB

account statement reflecting payments on February 9 and August 11, 2006 to the relevant loan identifier); Ex. 27 at Almaty-BTA0082090, 94-95 (2007 TKB account statement reflecting payments on February 9 and August 9, 2007 to the relevant loan identifier)).

40.     The "Fourth Tradestock Loan Component" was an August 12, 2004 transfer of $24 million USD by United Clearing to Tradestock.  (Ex. 14 at 13; Ex. 21 at 32).  On August 4, 2004, United Clearing had received a loan from BTA in the same amount ($24 million USD) with the identifier 2000/04/100/1063.   (Ex. 22B (Russian language United Clearing tracking spreadsheet reflecting repayment on relevant BTA loan identifier); Ex. 28 (English language translation of Ex. 22B); Ex. 29 at Almaty-BTA0230926, 28, 31 (United Clearing TKB account statement reflecting installment repayments for loan and listing loan identifier and loan issue date)).  United Clearing repaid the Fourth Tradestock Loan Component in three installments, with interest, between February 4, August 4, and December 30, 2005, in the total amount of $27,421,808.23.   (Ex. 22B; Ex. 28; Ex. 29 at Almaty-BTA0230926, 28, 31 (reflecting first repayment on February 4, 2005 of loan with identifier 2000/04/100/1063 and issue date of August 4, 2004, and remaining repayments on August 4 and December 30, 2005)).

41.     The "Fifth Tradestock Loan Component" was an August 12, 2004 transfer of $15.9 million USD by Balgaven to Tradestock.  (Ex. 14 at 13; Ex. 21 at 31-32).  On August 5, 2004, Balgaven had received a loan from BTA in the same amount ($15.9 million USD) with the identifier 2000/04/100/1077.  (Ex. 30 (confirming loan date and amount); Ex. 22C (Russian language Balgaven tracking spreadsheet reflecting repayments to specific BTA loan identifier); Ex. 31 (English language version of Ex. 22C)).  Balgaven repaid the Fifth Tradestock Loan Component in three installments, with interest, on February 4, August 3, and December 22, 2005, in the total amount of $18,133,841.11.  (Ex. 22C; Ex. 31; Ex. 30 at Almaty-BTA0190454 (BTA

credit opinion reflecting that August 5, 2004 loan of $15.9 million USD to Balgaven was repaid in full on December 23, 2005)).[4]

42.     In total, BTA was repaid $136,774,914.27 for the five Tradestock Loan Components, which reflects $21,474,914.27 in interest.  (*See* SOF, ¶¶ 36-41).

43.     A letter produced by third-party corporate services provider SMP Partners, dated August 26, 2004, bears BTA's letterhead and states that "[w]e confirm herewith that we Bank Turan Alem have provided the funds to Tradestock Inc. for the acquisition by Thyler Holdings Limited of Scoulton Holdings Limited in the form of a loan and that Bank Turan Alem has the capacity to grant such loan under its license, charter and Kazakhstan law."  The letter further states that Bank Turan Alem is "acting for its own account and not on behalf of any other third party," and was signed by the "Deputy Chairman of the Management Board."  (Ex. 32).

D.     *Ablyazov Becomes BTA Chairman*

44.     On December 19, 2004, Tatishev died in a hunting accident.  (Ex. 8; Ex. 7 at 47:15-21; Ex. 2 at 118:19-21; ▮▮▮▮▮▮▮).  Tatishev did not sign the August 2004 loan agreement between Tradestock and Thyler before he died.  (Ex. 7 at 48:18-50:1; ▮▮▮▮▮▮▮).

45.     Tatishev's widow, Anar Aitzhanova, became the successor to his estate, which included the right to be repaid for the Tradestock Loan.  (Ex. 7 at 61:8-25, 162:2-8; ▮▮▮▮▮▮▮ ▮▮).  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

46.     Monstrey first heard of and met Ablyazov in May 2005, during his travel to Vienna to meet with Tatishev's widow.  (▮▮▮▮▮▮▮; Ex. 7 at 11:8-12:10; Ex. 12 at 181:14-19).

---

[4] Appendix A to the Declaration of Deborah A. Skakel (the "Skakel Declaration") contains a chart that reflects the repayment dates and amounts for the five Tradestock Loan Components, described in Paragraphs 36 through 41.

47.     In May 2005, Ablyazov became BTA's Chairman.   (Ex. 2 at 141:20-22; Ex. 33, ¶ 130; Ex. 34).

48.     Ablyazov held an ownership stake of more than 50% in BTA beginning in March 1998, when he acquired, along with a consortium of investors, Turan-Alem Bank (which would become BTA).  (Ex. 2 at 80:10-85:5; Ex. 33, ¶¶ 40, 123).  Tatishev was part of this group and also became part owner of BTA.  (Ex. 2 at 85:6-14; Ex. 33, ¶¶ 40, 123).  Ablyazov's holdings in BTA were through "various legal entities," but the fact of his ownership was kept secret due in part to fears that the Kazakh government would attempt to take his assets because Kazakhstan's President Nazarbayev had done this to other prominent Kazakh business figures.  (Ex. 2 at 85:15-86:21; Ex. 3 at 40:6-43:9 (explaining nominees were used to hold business interests because of efforts by Kazakhstan's president to seek to take their assets)).  Ablyazov continued to own this stake in BTA during his imprisonment for alleged corruption—which Ablyazov claims was, in truth, a politically-motivated imprisonment—although Ablyazov's shares were under Tatishev's control during this period and during the period after Ablyazov's early release from prison and exile in Moscow.  (Ex. 2 at 88:19-92:20, 112:18-114:4; Ex. 33, ¶¶ 85-87).

49.     After Tatishev died, Ablyazov re-acquired his shares in BTA and purchased a portion of Tatishev's shares from Aitzhanova.  (Ex. 2 at 130:24-133:14; Ex. 33, ¶¶ 127-28).

E.     *The Financing and Growth of Zhaikmunai's Business*

50.     ███████████████████████████████████████████

██████████████████████████████████   ████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████.

51.   █████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████████████████████████████ .

52.   Zhaikmunai had a successful IPO that led to its listing on the London Stock
Exchange in April 2008, ███████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████████████████ .

53.   Monstrey testified that "all of those loans that Zhaikmunai took out from BTA Bank
were repaid," in full, on time, and with interest.  (Ex. 7 at 169:4-11).  Monstrey testified that any
loan Zhaikmunai received from BTA involved loan agreements signed by bank representatives
and a representative of Zhaikmunai.  (*Id.* at 169:12-20).

54.   ████████████████████████████████████████████████

█████████████████████████████████████████████████████

██████████████   █████████████████████████████████████

██████████████████████████████████████████████████ .

55.   In an equity offering ███████████████████████████ Zhaikmunai
sought to raise $300 million USD through the issuance of "new Common Units," some of which
were subscribed to by a company Monstrey owned called Claremont Holdings Limited
("Claremont").  (███████████████ ; Ex. 12 at 92:16-18).  █████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████.

56.     Monstrey also had discussions with KazStroy Service Global ("KSS Global")—

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████. Kulibayev, at times, was thought to be a potential

heir to Nazarbayev.  (Ex. 7 at 174:7-14; *see also* Ex. 35 at 6).

57.     KSS Global signed a term sheet to purchase 50 million Common Units from

Monstrey's company Claremont (at $4 per unit, totaling approximately $200 million USD) after

the capital increase for Zhaikmunai took place.  (████████████; Ex. 7 at 174:23-175:10).  At

the time, however, no funds changed hands, as Claremont immediately loaned the money back to

KSS Global at a 12% interest rate, which KSS Global eventually repaid in January 2012.  (Ex. 7

at 175:11-176:2; ████████████).  By that point, the $4 per unit cost of Zhaikmunai Common

Units was well below market cost.  (Ex. 7 at 175:20-177:2).

58.     ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████.

F.     *Monstrey Repays the Tradestock Loan to Northern Seas Waterage*

59.     ████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████   ██████████.  In February 2007, in connection with this process, Monstrey acquired a company called Sartfield Limited ("Sartfield") from SMP Partners, the corporate services provider formerly known as Intertrust. (████████; Ex. 7 at 17:8-14, 73:24-74:9; Ex. 12 at 117:9-118:16).

60.     Sartfield held the obligation to repay the Tradestock Loan and was obligated to pay the debt to a company called Lineford Limited ("Lineford").  (███████████████; Ex. 36; Ex. 7 at 18:2-12).  The terms by which Sartfield had to repay the Tradestock Loan to Lineford are detailed in a signed Deed agreement, dated July 16, 2007.  (Ex. 36).  Further, due to the signing of the Deed agreement, Harrison Limited (Intertrust's entity that held Thyler's ownership in trust) executed a declaration of trust confirming that it held 100% of the shares in Thyler—which itself indirectly held the ownership of Zhaikmunai—in trust for Sartfield.  (████████████████; Ex. 36 at 105 (Harrison Limited Declaration of Trust)).

61.     ████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
███████████████████████████.

62.     ██████████████████ Monstrey was put into contact with Ilyas concerning the repayment of the Tradestock Loan.  (██████████████; Ex. 7 at 18:14-16).  Monstrey testified that when he was ready to repay the loan, Ilyas informed him that Lineford's interest in the Tradestock Loan had been transferred to Northern Seas Waterage Inc. ("NSW"), which Ilyas said was owned by Gennady Petelin and which documents confirm was beneficially owned by Petelin.  (████████

███████; Ex. 7 at 16:22-18:19; Ex. 37).  Documents confirm that the obligation Sartfield owed to Lineford was transferred to NSW.  (*See* Ex. 38; Ex. 39).[5]

63.    ████████████████████████████████████████████

████████████████████████████. Monstrey's companies, Claremont and Sartfield, repaid the Tradestock Loan to NSW as follows: (i) $24,817,798 USD on November 25, 2011, representing the first installment paid to an NSW bank account, (Ex. 40 at Almaty-BTA0249583; Ex. 41 at Almaty-BTA0249414); (ii) $41,461,709 USD, which comprised 10% of the second installment paid to NSW, on or around each of February 22, March 23, March 29, April 5, and April 13, 2012, (Ex. 42 at Almaty-BTA02494443, 444, 447; Ex. 43 at Almaty-BTA0235585-87); (iii) $107,472,888 USD on or around August 28, 2018, (Ex. 43 at Almaty-BTA0235591); (iv) $50 million USD on or around September 14, 2012, (*id.* at Almaty-BTA0235567); and (v) $50 million USD on or around October 15, 2012, (*id.*).  (*See also* ████████████; Ex. 44; Ex. 45).  Claremont made the first payment totaling $24,817,798 USD described in (i), while Sartfield made the remaining payments described in (ii)-(v); and in total, NSW received $439,599,231 USD.  (████████████; Ex. 44; Ex. 45).[6] ████████████████████████

████████████████████████████████████████████.[7]

64.    A document titled "N Project – Cash movements 02.10.2013" indicates that after NSW received the approximately $440 million USD from Monstrey's companies, those funds

---

[5] The documents and testimony reflect a dispute as to the identity of the ultimate beneficial owner of Lineford, but for purposes of this motion, the dispute is immaterial (as shown in Triadou's memorandum of law in support of its motion for summary judgment).  (*See, e.g.*, Ex. 38 (purportedly signed by Ablyazov); Ex. 39 (purportedly signed by Petelin)). Monstrey produced the document identified as Ex. 38, while Petelin produced the document identified as Ex. 39.

[6] ████████████████████████████████████████████
████████████████████████████████████████.

[7] For purposes of Triadou's motion for summary judgment, the discrepancy in what Monstrey expected to pay and actually paid to NSW is not material.

were divided and transferred to and through several different entities, including Fairlean, Alkine, Crownway, Speville, and Darwin.  (Ex. 47).  Eventually, approximately $95.84 million USD reached Telford International Limited ("Telford"), although documents indicate that some of the funds Telford received included $13.55 million USD in "unrealized gains."  (Ex. 47; *see also* Ex. 48 (reflecting similar diagram, dated a month earlier, with Telford receiving less money)).

65.     Petelin confirmed in testimony that after Monstrey repaid NSW, ███████████████
████████████████████████████████████████████████████████████████████. Petelin also testified that NSW provided funds to Telford.  (*Id.* at 120:14-121:5).

## III.   SDG And Triadou

### A.     *The Formation of SDG*

66.     On July 27, 2007, Swiss Development Group SA was formed in Geneva.  (Ex. 51). Swiss Development Group SA was incorporated by Harlem Securities, Ltd., of which Ilyas was the beneficiary.  (Ex. 52 (I. Khrapunov 2/2/2018 Dep.) at 14:5-15:10; Ex. 58).  On July 28, 2008, SDG Capital S.A. was formed in Geneva.  (Ex. 53 at TRIA0009222; Ex. 54, ¶ 3).  SDG Capital S.A. is the holding company for Swiss Development Group SA, and the latter is the operational entity.  (Ex. 52 at 14:3-15:2).  Hereafter, "SDG" will refer to SDG Capital and Swiss Development Group together and the name of each individual entity will be used where appropriate.

67.     Swiss Development Group "was created in 2007 to invest in and to develop high-luxury, landmark real estate projects, including five[-]star condominium hotels and luxury private hotel-residences in both Switzerland and abroad."  (Ex. 55 at TRIA0003332).  Swiss Development Group specializes "in the creation of high-end real estate located exclusively in prestigious locations in Switzerland and abroad."   (Ex. 56 at TRIA0009032; Ex. 57 at TRIA0008305). "SDG's activities include the acquisition, development, management, and sale of residential, hospitality, and mixed-use properties."  (Ex. 56 at TRIA0009032).

68.     Ilyas testified that he viewed SDG as a "real estate service company" that provided the service of development, including finding the project, getting it authorized, "finding a use for the actual site," and "going through the whole process of the actual development, sales, marketing, basically [a] turnkey solution." (Ex. 4 at 39:9-22).

69.     SDG's projects were initially funded through "mortgages, construction loan and equity." (*Id.* at 39:23-40:1). Subsequently, "there was a separate structure, which is SDG Capital SA, which served as a holding company, and under that holding company there would be special purpose vehicles usually created for each project." (*Id.* at 40:2-20).

70.     From July 24, 2008 to May 12, 2009, Harlem Securities Ltd. was the sole shareholder of SDG Capital. (Ex. 58 at TRIA0009381).

71.     On May 12, 2009, Elvira Kudryashova ("Elvira") became the sole shareholder of SDG Capital, which she remained until April 20, 2012. (*Id.*). Elvira is Ilyas's sister, the daughter of Leila Khrapunova, the adopted daughter of Viktor Khrapunov, and the wife of Dmitry Kudryashov (the son of Gennady Petelin and Elena Petelina). (Ex. 5 at 26:12-16; Ex. 4 at 41:12-14, 42:18-23).

72.     Elvira became the main shareholder for SDG because Swiss Development Group was going to become involved in residential real estate investment in Switzerland, which required the owner to be a Swiss citizen or have a comparable status, and Ilyas did not have such status. (Ex. 52 at 15:11-16:5; Ex. 59 (Gillieron Dep.) at 160:22-162:18).

73.     On April 20, 2012, Erich Sager and Michel Gillieron became nominee shareholders of SDG Capital. (Ex. 58 at TRIA0009381; Ex. 52 at 55:23-56:10). Elvira transferred a portion of her shares to Sager and Michel Gillieron, which they held for her on a fiduciary basis. (Ex. 59 at 163:7-164:7). Neither Sager nor Michel Gillieron were involved in SDG's operations; ███████

██████████████████████████████████████████████

████████████.  (Ex. 52 at 56:2-13; ███████████████).

74.     Ilyas signed an employment agreement with Swiss Development Group, effective April 15, 2008, to be its Chief Executive Officer.  (Ex. 60).

75.     Ilyas later became the Chairman of Swiss Development Group, a position he held until June 2012.  (Ex. 54, ¶ 4; Ex. 52 at 20:22-21:5).

76.     At the time Ilyas became Chairman, Swiss Development Group hired another CEO who was "senior and seasoned," Nicholas Garnier.  (Ex. 52 at 20:22-21:14).  As of May 31, 2012, Garnier held three percent of the shares in SDG Capital.  (Ex. 58 at TRIA0009381).

77.     SDG was initially funded with $10 million USD from Leila Khrapunova over the course of a year.  (Ex. 52 at 16:24-17:13).  Elvira Kudryashova also contributed approximately three to five million Swiss Francs ("CHF") in early funding to SDG.  (*Id.* at 17:24-18:6).

78.     In early 2008, Ablyazov loaned, through entities, $10 million USD to Ilyas that was used for certain SDG projects, namely, 51 Degrees and Hotel Du Parc.  (Ex. 2 at 180:10-17; Ex. 3 at 93:23-94:12; Ex. 4 at 43:16-45:25).  The loan was repaid with interest.  (Ex. 4 at 46:8-14; Ex. 52 at 17:15-19).

79.     Aside from this loan to Ilyas, Ablyazov had no dealings with and no role in SDG Capital or Swiss Development Group, and he was never an employee, officer, or director of either entity.  (Ex. 3 at 100:9-101:4).

80.     In November 2009, Ilyas hired Cesare Cerrito as a finance manager for SDG, and after a year, Cerrito was promoted to Chief Financial Officer of SDG, a position he held until December 2018.  (Ex. 6 at 8:1-7; Ex. 61 at 5:5-11, 28:22-29:6).

B.   *SDG's Contemplated Investment Fund and the Formation of Triadou*

81.   SDG intended to create an investment fund to attract outside investments and then "to leverage … the already created know-how and experience and abilities of Swiss Development Group as a service provider in real estate development services, and basically leverage that ability and provide that service to outside investors."  (Ex. 52 at 25:21-26:10).  The investment fund would be targeted at investing in luxury real estate.  (Ex. 54, ¶ 6).  Element One was the intended name of the fund, (Ex. 6 at 58:10-59:3), which is hereafter referred to as the "Investment Fund" or "Element One."

82.   In July 2011, SDG hired Nicolas Bourg and tasked him with incorporating the Investment Fund and a related management company in Luxembourg, as well as marketing, seeking investors, and identifying potential investments for the Fund.  (Ex. 54, ¶ 6; Ex. 4 at 158:11-17; Ex. 52 at 25:4-10; Ex. 59 at 73:11-21; Ex. 62 (Bourg 9/11/2017 Dep.) at 14:19-15:2, 40:21-41:7, 100:2-18; Ex. 63).

83.   Ilyas understood that Bourg had prior experience in real estate.  (Ex. 4 at 163:14-166:10).  Bourg was hired in part based on his representation that he could incorporate the Investment Fund within one year.  (*Id.* at 163:14-166:10; Ex. 52 at 25:4-20; Ex. 54, ¶ 6).  Bourg also told Ilyas and SDG's Board that he had "soft commitments" from outside investors who would invest once the Investment Fund was incorporated, but SDG never saw anything "tangible."  (Ex. 4 at 166:19-167:3).

84.   The Investment Fund's only investor was Gennady Petelin—Elvira's father-in-law—whom Ilyas lined up as the "anchor" and "initial investor."  (*Id.* at 166:19-167:3, 215:21-216:4; Ex. 52 at 30:2-25).

85.   Due to Bourg's failure to timely incorporate the Investment Fund, separate entities were formed as special purpose vehicles to hold the individual investments with the intention that

22

those investments would ultimately be rolled up into the Fund.  (Ex. 54, ¶ 8; Ex. 52 at 27:11-30:25; Ex. 6 at 22:3-16, 94:11-15).

86.     One of these special purpose vehicles was Triadou, which was formed on September 12, 2012 under the laws of Luxembourg and registered as a subsidiary of SDG Capital. (Ex. 54, ¶ 8; Ex. 64 at Almaty-BTA0152096; Ex. 65 at 10).

87.     At the time of its formation, Triadou's directors were Bourg, Marc Gillieron, and SDG Capital.  (Ex. 64 at Almaty-BTA0152097).  Gillieron and SDG Capital resigned as directors of Triadou in April 2013.  (Ex. 6 at 21:10-24; 84:25-86:3; Ex. 62 at 131:8-132:5; Ex. 59 at 55:16-25, 56:24-57:10; *see also* Ex. 65 at 11 (updated trade register extract for Triadou showing only Bourg as director in November 2013)).

88.     Bourg remained Triadou's sole director from April 2013 through October 31, 2014, when he was removed and replaced by Cerrito (who then became Triadou's sole director).  (Ex. 62 at 128:3-11; Ex. 66, ¶ 41; Ex. 54, ¶ 28; Ex. 67, ¶ 9; Ex. 6 at 21:10-24; Ex. 69 at TRIA005543). Bourg sent Ilyas a text on November 1, 2014 that acknowledged his (Bourg's) removal, and Bourg also received a letter confirming his removal.  (Ex. 70 at KHRAPUNOV0000167; Ex. 71).

89.     SDG Capital remained Triadou's parent company until May 2015, at which time Greencos S.A. ("Greencos") became Triadou's parent company.   (Ex. 65 at 5; Ex. 72; Ex. 73 (Glatz Dep.) at 406:13-17; Ex. 6 at 20:3-21:3).  Greencos is owned by Philippe Glatz, a Swiss entrepreneur (described below).  (Ex. 6 at 21:4-6; Ex. 74; Ex. 53 at TRIA0009224; Ex. 73 at 11:14-12:3).

90.     Glatz testified that the Investment Fund still was not created as of December 2013. (Ex. 73 at 414:19-415:3).  Minutes from the February 6, 2014 meeting of SDG Capital's Board of Directors indicate that the Investment Fund was not incorporated as of that date.  (Ex. 75 at

TRIA0011247-48).   A document Bourg provided to Almaty/BTA (which Plaintiffs then produced), titled "Element One Fund SIF SICAV-SCA," includes the Investment Fund's constitution and is dated March 24, 2014.  (Ex. 76).

91.    Triadou and its investments were intended to be rolled into the Investment Fund, but this never occurred.  (Ex. 73 at 97:4-21, 414:13-22; Ex. 52 at 29:19-23; Ex. 59 at 73:11-19; Ex. 6 at 316:24-317:2).  As an entity, Element One was never used. (Ex. 6 at 58:7-59:3).

C.    *Philippe Glatz's Purchase of SDG and Ilyas's Post-Sale Involvement*

92.    Philippe Glatz is an entrepreneur and has owned several businesses, including one of the largest private hospitals in Geneva, Clinique des Grangettes ("Grangettes"), ██████

████████████████████████████████████████████████████████████████████

████████████████████.

93.    ████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████   ███████████████   ███████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████.

94.    Glatz and Ilyas first met in 2011 when they were introduced by another member of their Swiss political party (the Christian Democratic Party).  (Ex. 73 at 18:12-19:16).

95.    In late 2012, SDG decided to seek investors who might invest in or purchase the company.  (Ex. 54, ¶ 13; Ex. 52 at 42:17-43:4; Ex. 78 at TRIA0010585; Ex. 79 at TRIA0010619).  Before it was sold, SDG was in "some financial distress."  (Ex. 59 at 260:16-23).

96.    On December 20, 2012, Ilyas emailed Glatz about potentially selling SDG and its holdings.  (Ex. 80; Ex. 54, ¶ 15; Ex. 73 at 28:9-29:4; Ex. 52 at 38:3-17).  Ilyas stated that "pressure from Kazakh authorities on the swiss [sic] authorities to investigate the source of our wealth," was having an effect on SDG's "relations with banks," as was the connection between Ilyas's family and SDG.  (Ex. 80 at KHRAPUNOV0000207-08; *see also* Ex. 52 at 40:13-42:14).  Ilyas then suggested that Glatz might be interested in purchasing SDG and states that a third party was, at the time, preparing "a valuation of SDG."  (Ex. 80 at KHRAPUNOV0000208).  Ilyas's email also stated that to move forward would require Glatz to sign a non-disclosure agreement.  (*Id.*).

97.    On January 14, 2013, Glatz responded to Ilyas's email stating that Glatz "might analyze his company and review his company, and that we might present an offer to buy his company."  (Ex. 73 at 41:7-16; Ex. 80 at KHRAPUNOV0000207).  On January 25, 2013, a non-disclosure agreement was signed by Nicholas Garnier (SDG's president at the time) and a representative of PIDJI.  (Ex. 52 at 43:5-44:9; Ex. 81; Ex. 73 at 47:10-48:21).

98.    After the signing of the NDA, Glatz wanted to perform due diligence and a valuation of SDG, so SDG "opened up the data room with all the documents" for Glatz; due diligence and negotiations were conducted between January and March 2013.  (Ex. 52 at 44:10-45:21; Ex. 82; Ex. 83; Ex. 54, ¶ 15; Ex. 73 at 44:6-52:13, 67:4-73:20; Ex. 84).

99.    On January 14, 2013, The Corporate Finance Group ("TCFG")—which SDG retained to value the company—issued a valuation of SDG and its assets at 5.5 million CHF.

(Ex. 82 at TRIA0000102, 104-05).  On February 5, 2013, this valuation was sent to Glatz and his representatives.  (Ex. 85).

100.     Jean-Christophe Pernet, PIDJI's general manager and director, spearheaded due diligence for Glatz.  (Ex. 73 at 44:14-46:10; Ex. 85).  Glatz and Pernet spoke "many times" about the possible acquisition of SDG, and during those conversations, Pernet suggested that Glatz retain an external firm to conduct due diligence.  (Ex. 73 at 49:24-50:20).

101.     Glatz hired JPH Hottinguer Corporate Finance ("Hottinguer") to conduct due diligence; he began discussions with them in January or February 2013 and signed an engagement letter on March 1, 2013.  (*Id.* at 67:4-22, 69:15-18, 71:6-72:18; Ex. 83).  Hottinguer was given access to the SDG data room. (Ex. 86).

102.     On March 7, 2013, Hottinguer provided a report to Glatz reflecting the results of its due diligence into SDG.  (Ex. 83; Ex. 73 at 70:3-10).  Hottinguer suggested in the report that Glatz would need to provide a capital infusion for SDG, and that an offer in the range of CHF 2-5 million would already incorporate the value of SDG's good will.  (Ex. 83; Ex. 73 at 72:19-73:20, 74:7-77:25 (discussing Ex. 83 and Ex. 82)).

103.     Glatz testified that his interest in acquiring SDG stemmed from "the context of developing hospital facilities," and requests from foreign entities for assistance in setting up those facilities.  (Ex. 73 at 52:17-56:5).  Glatz's "goal was actually and primarily to buy the competencies within SDG, to use it as the arm or division of the hospital development project that we had been offered to participate."  (*Id.* at 55:8-19).  Pernet told Glatz "that SDG didn't have tremendous potential for profitability," but Pernet supported Glatz's acquisition of the company for the goal of acquiring SDG's competencies.  (*Id.* at 56:6-12, 68:13-25).

104.    On March 10, 2013, Glatz sent an email to Marc Gillieron with an attachment relaying his offer to purchase SDG for CHF 2.63 million.    (Ex. 87; Ex. 88 at KHRAPUNOV0000065; Ex. 73 at 116:2-119:12).  Glatz's offer letter described his understanding of SDG's financial situation and substantiated his view that TCFG's valuation of SDG included several errors that needed correction.    (Ex. 88 at KHRAPUNOV0000064-65).    Glatz also demanded that the current shareholders give up, at a minimum, their claims to CHF 10 million owed to them by SDG; otherwise, the value of SDG would be negative.    (Ex. 88 at KHRAPUNOV0000064-65; Ex. 73 at 116:8-119:12 (discussing Ex. 88)).

105.    On March 11, 2013, Gillieron responded with a counter-demand of CHF 3.5 million for the purchase of SDG, which Glatz accepted. (Ex. 89; Ex. 73 at 121:5-122:9).

106.    The sale was memorialized in a Share Purchase Agreement with a contract date of March 12, 2013.  (Ex. 90).   The parties to the Share Purchase Agreement were the then shareholders of SDG (Elvira, Erich Sager, and Michel Gillieron) as the sellers, and Glatz's company Greencos as the buyer.  (*Id.* at KHRAPUNOV0000186-88).

107.    The Share Purchase Agreement explicitly includes Triadou in the transfer of SDG and its assets to Greencos.  (*Id.* at KHRAPUNOV0000188).

108.    The Share Purchase Agreement provided that Greencos would pay CHF 3.5 million in two installments to purchase SDG.  (*Id.* at KHRAPUNOV0000195-96).

109.    On or about March 11, 2013, Glatz transferred 350,000 CHF to SDG's counsel, Chabrier Avocats.  (Ex. 73 at 124:23-125:21; Ex. 91).  The payment is evidenced in part by a "payment discharge" form provided by SDG's counsel (Chabrier Avocats) upon receipt of the payment.  (Ex. 91).  ████████████████████████████████████████

██████████████████████.

110.   ██████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

███████████████████.

111.   On or about July 5-6, 2013, Glatz transferred CHF 3.15 million ████████

████████████████████ to Chabrier for the remainder of the SDG purchase price.

████████████████████████████████████. A payment discharge signed

on behalf of SDG's former shareholders confirms the payment was made on or around that time.

(Ex. 97).

112.   Glatz did not seek or obtain external funding for the acquisition of SDG.  (Ex. 73 at

125:19-129:5,  402:19-403:23).   ████████████████████████████████

██████████████████████████████████████████████

████████████████████████████.

113.   ██████████████████████████████████████████

██████████████████████.

114.   Ilyas testified that when SDG was sold to Glatz and Greencos, there was no

"buyback arrangement" as to SDG or any of its subsidiaries, and that Ilyas did not have any

ownership of those companies after the sale to Glatz.  (Ex. 52 at 53:9-25).

115.    Glatz controlled SDG after the sale and became involved in every aspect of SDG's business.  (Ex. 52 at 61:3-7, 86:20-87:4, 91:6-13; Ex. 6 at 23:22-24:12, 100:6-19; Ex. 59 at 360:9-361:13; Ex. 54, ¶¶ 21-22).

116.    Meeting minutes of SDG Capital's Board of Directors reflect that Glatz consistently attended and participated in meetings after he acquired SDG, ███████████████████████████

████████████.  (*See, e.g.*, Exs. 98-102; Ex. 75; Ex. 103 at TRIA0011304; Ex. 73 at 317:12-319:12).  Glatz became Chairman of the SDG Board of Directors in late 2014.  (Ex. 104).

117.    The Share Purchase Agreement by which Greencos acquired SDG Capital and its holdings included a "key man" provision that required Ilyas to continue working for SDG Capital for at least twelve months. (Ex. 90 at KHRAPUNOV0000198 (§ 9.1); Ex. 52 at 58:11-59:3).  Glatz initially wanted Ilyas to remain involved with investments related to the Investment Fund, including Triadou, to ensure a smooth transition because Glatz lacked familiarity with those investments.  (Ex. 52 at 59:24-61:2; Ex. 73 at 87:15-88:22, 89:19-90:21; Ex. 54, ¶ 19; Ex. 59 at 261:18-262:15).

118.    Glatz testified that Ilyas's role "was to supervise the way the [Investment F]und was set up in collaboration with Mr. Bourg, and to report to [Glatz] in collaboration with Mr. Bourg," and that this role began in April 2013 and continued for approximately a year and a half, (Ex. 73 at 89:19-90:12).  Glatz testified that Ilyas did not supervise the U.S. investments and was responsible only for ensuring the projects "were well-organized."  (*Id.* at 90:13-21).

119.    In his narrowed role, Ilyas reported to Glatz and SDG's Board, and worked mostly with Bourg and Cerrito.  (Ex. 52 at 61:3-7; Ex. 73 at 89:19-92:5; *see also* Ex. 54, ¶ 20).

120.    After a dispute arose regarding the Tri-County Mall investment made by a Triadou subsidiary in late 2013, (*see infra* ¶¶ 161-68), Ilyas's involvement with SDG and the investments

that were intended for the Investment Fund effectively ended, and Ilyas "was already basically out." (Ex. 73 at 328:18-329:9).

121.    Ilyas testified that he "would have definitely been sidelined from the process of basic work at SDG" as of April 2014, "stemming from the fact that Mr. Glatz, I think rightfully, blamed me [Ilyas] for what can only be called a fiasco with the Tri-County Mall, and I would basically be as a result not … I would pretty much be not as welcomed in working as I used to at -- at Swiss Development Group." (Ex. 52 at 85:14-86:3 (discussing Ex. 105); *id.* at 84:16-85:2 (referencing that Ilyas had been "sidelined from work at SDG")).

122.    Ilyas's employment with SDG ended on July 31, 2014. (Ex. 106; Ex. 52 at 61:14-25; Ex. 59 at 262:11-15 (testifying Ilyas's SDG employment ended summer 2014).

> D.    *Glatz Did Not Receive Loans from the Individual Defendants To Purchase SDG*

123.    Eesh Aggarwal, through his company Azure Consultants, is a corporate services provider whose services included providing directors and nominees and assisting with the transfer of funds. (Ex. 4 at 61:4-62:12, 138:10-18).

124.    Petelin testified that Aggarwal managed for him "[e]verything that came from Zhaik[munai] in 2012," and confirmed that was the approximately $440 million USD Monstrey repaid to NSW. (Ex. 49 at 84:3-8). Ilyas communicated with Aggarwal to relay Petelin's instructions regarding the companies belonging to Petelin and his family. (Ex. 4 at 88:1-23).

125.    ████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████.

126.    Glatz's conversation with Ilyas about ██████████ was unrelated to the potential

acquisition of SDG, and SDG was not discussed.  (*Id.* at 63:5-17).

127.    Glatz spoke to Aggarwal and asked him to suggest ████████████

████████████████████████████████████████████    ████████████

████████████. Glatz did not engage with Aggarwal for any other purpose. (*Id.* at 402:24-

403:2).

128.    Aggarwal and his company "presented some ideas" to Glatz ████████████

████████, but Glatz did not execute any of them because "they were rather confusing."  (*Id.*

at 144:3-146:4).   None of Azure's or Aggarwal's ideas related in any way to the possible

acquisition of SDG.  (*Id.* at 146:5-8).

129.    Glatz did not find Azure to be credible because "they were never presenting any

serious proposal as far as I can recall.  Their ideas were not simple and they were difficult to

implement.  It was very complicated."  (*Id.* at 144:14-146:4).

130.    Glatz testified that Azure "was harassing" him with questions because they wanted

Glatz to provide substantial information, that "as early as May [2013], I must have told Azure that

I had no intention of working with him [Aggarwal]," and that he never replied to the later emails

from Aggarwal/Azure.  (*Id.* at 191:20-193:7).

131.    Glatz testified that he was not familiar with the company Toplink Limited, and

before preparing for deposition, had not seen any documents related to that company or reflecting

his purported beneficial ownership of it.  (*Id.* at 202:12-205:8).   Glatz also was not aware of

whether the bank ABN Amro opened an account for Toplink in April 2013.  (*Id.* at 227:13-17).

132.    Glatz was never the beneficiary of Toplink Trust and never signed any documents

associated with that entity.  (*Id.* at 229:8-231:10).  Glatz testified the he "never authorized anything

at any time that authorized anyone to create any trust where I would be designated as a beneficiary." (*Id.* at 231:11-234:5).

133.    Glatz did not engage Eesh Aggarwal or Azure "to facilitate or help [] obtain a loan with which to purchase SDG Capital"; ████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████.

134.    In his May 2, 2016 declaration, Bourg testified that in March 2013, "Ilyas purported to sell SDG to a friend of his, Philippe Glatz," and that Glatz used money loaned by Ilyas to pay for SDG. (Ex. 66, ¶¶ 29-33).

135.    A little more than a month later, during his June 14-16, 2016 interrogation by Kazakh authorities, Bourg said that the sale of SDG took place "in the autumn of 2013 after Ablyazov" was arrested, and that the sale was due to "difficulties with flows of funds" that resulted from Ablyazov's arrest. (Ex. 107 at Almaty-BTA0232477). Bourg stated that "negotiations about the sale began after the summer of 2013 ended," but admitted that he "personally was not involved in the transaction." (*Id.*).

136.    Bourg admitted during the Kazakh interrogation that he "was not involved in SDG and SDG Capital," and that SDG and Glatz "did the documents for the transactions themselves." (*Id.* at Almaty-BTA0232546). Bourg stated that he understood SDG was purchased for CHF 3.5 million, he learned that information by reading the transcript of Cerrito's testimony from the May 2016 attachment hearing, and he (Bourg) did not know if Glatz had such funds to purchase SDG. (*Id.* at Almaty-BTA0232546-47).

137.    When asked in the June 2016 interrogation by Kazakh authorities, "[d]id you know that Ilias [sic] lent the money to Glatz," Bourg responded, "No, I don't know.  May be for purchasing this company?  I don't know.  But I think so." (*Id.* at Almaty-BTA0232547).

138.    During his deposition on September 11-12, 2017, Bourg admitted that he knew nothing about Glatz's finances or about the value of Grangettes, and that he had never seen any financial documents related to Grangettes.  (Ex. 108 (Bourg 9/12/2017 Dep.) at 29:4-24).  Bourg also admitted that he was not personally involved in the sale of SDG Capital to Glatz, he did not participate on either side, he did not communicate with Glatz or his representatives during the sale, and he did not see the Share Purchase Agreement at the time of the sale.  (*Id.* at 34:8-23).

IV.    **Triadou's Real Estate Investments**

    A.    *The Source of Funds for Triadou's Investments*

139.    All of the funds Triadou invested in the United States came from Gennady Petelin or his family's company, Telford.  (Ex. 4 at 128:8-13; Ex. 52 at 71:14-72:10; Ex. 6 at 82:8-11. Petelin's son is married to Ilyas's sister, Elvira.  (Ex. 109 (V. Khrapunov 1/31/2018 Dep.) at 58:23-25; Ex. 4 at 42:18-23; Ex. 52 at 128:1-17; Ex. 6 at 78:8-79:16).

140.    Before Petelin loaned funds to Triadou, he provided a letter to SDG Capital, addressed to Ilyas, and dated November 1, 2012.  (Ex. 110).  Ilyas provided the letter by hand to Cerrito.  (Ex. 6 at 144:16-145:4).

141.    In his role as CFO of SDG, Cerrito conducted due diligence on Petelin that included review of documents concerning the ownership of Telford and internet research attempting to confirm the information in Petelin's November 1, 2012 letter.  (*Id.* at 137:5-141:20, 142:14-143:20, 146:2-14, 318:3-319:6; Ex. 52 at 76:23-77:14).[8]  Cerrito testified that even though such

---

[8] Documents indicate that Telford is 100% owned by Telford Trust, for which Elena Petelina is the ultimate beneficial owner. (Ex. 111).

diligence was not required by law, it was "[n]ormal business practice . . . to make a minimum investigation about an individual willing to invest in a subsidiary of the group [SDG]." (Ex. 6 at 147:4-10).  Cerrito also reviewed documents confirming Telford's ownership by Telford Trust, which in turn was beneficially owned by Elena Petelina (Petelin's wife). (*Id.* at 79:9-16, 139:12-25; Ex. 111).

142.    On November 7, 2012, Triadou and Telford entered into a loan agreement that would provide $10,500,000 USD to Triadou.  (Ex. 112; Ex. 113).  The loan agreement was amended seven times to increase the total amount available to $74,000,000 and to extend the repayment date.  (Ex. 112; Ex. 113; Ex. 65 at 4).  During the period from November 9, 2012 through May 22, 2013, Triadou drew down approximately $72 million USD of the available loan amount from Telford.  (*See* SOF ¶¶ 155, 160, 162).

B.    *The Flatotel*

143.    In 2012, Bourg was introduced (through an intermediary) to a developer in New York City named Joseph Chetrit.  (Ex. 114 (Chetrit Dep.) at 30:15-31:8).  Chetrit and Bourg later met in person in Switzerland in September 2012, a meeting that Ilyas also attended.  (*Id.* at 34:11-38:6; Ex. 115 at CHETRIT00000761).

144.    Chetrit testified that he met mainly with Bourg, that he met with Ilyas a maximum of "about four times," and that at every such meeting with Ilyas, Bourg was in attendance.  (Ex. 114 at 39:10-23).  Chetrit understood that Bourg "was basically the CEO of the company [Triadou] and he was in charge of the business."  (*Id.* at 40:14-24).  Chetrit testified that "[m]y only discussions and other business was with Nicolas Bourg," and that he (Chetrit) did not discuss potentially investing in real estate with Ilyas.  (*Id.* at 49:2-17).

145.    Chetrit testified that he did not discuss SDG with Ilyas; "if anything, it was Nicolas Bourg that was handling all the discussions and negotiations because he was in charge of the

34

company." (*Id.* at 41:24-42:11). Chetrit never had a discussion with Ilyas about Ilyas owning SDG, and Bourg told Chetrit that Ilyas was an investor. (*Id.* at 42:12-22).

146.    Chetrit could not recall ever discussing Ilyas's family with Ilyas, including in 2012, and instead recalled he knew "in 2015, through either Bourg or – but I don't know if I had direct discussion with him [Ilyas]." (*Id.* at 43:7-47:7). Chetrit believes Bourg told him about the charges against Viktor at some point in 2015, and that Chetrit also learned about the allegations against Ablyazov in 2015 from public information. (*Id.* at 52:13-53:20).

147.    On October 23, 2012, Chetrit's company, the Chetrit Group LLC, sent a letter to Bourg and SDG concerning an "offering" on the Flatotel, a property located at 135 West 52nd Street, New York, New York. (Ex. 116). The Flatotel project involved the conversion of a former hotel into luxury condominium apartments and office and retail space. (Ex. 66, ¶ 15; Ex. 117, ¶ 3).

148.    Chetrit's letter described the project, the price to acquire the Flatotel, and how much capitalization was needed; the letter also stated that Chetrit and SDG would own 75% of the venture. (Ex. 116 at Almaty/BTA0153432-33; Ex. 114 at 68:12-70:6). Under the proposal, SDG would be responsible for 70% of the capital contributions needed to cover the 75% interest, and Chetrit would be responsible for the remaining 30% of capital, but profits would be split 50/50 between SDG and Chetrit. (Ex. 116 at Almaty/BTA0153433). The third page of Chetrit's letter included a proposed schedule of capital contributions totaling $39,375,000 for SDG. (*Id.* at Almaty/BTA0153434; Ex. 114 at 74:8-20 (discussing Ex. 116, which is Chetrit Dep. Ex. 5)).

149.    Chetrit testified that the difference in capital to be contributed was due to Chetrit's company getting a "promote" because Chetrit would be doing more work on the transaction; Chetrit testified that "[a] promote is anybody that has a deal is – they get rewarded for … bringing

the deal for getting the financing, for developing the deal, for every day's work … to develop the whole project."  (Ex. 114 at 71:18-73:13).

150.    On or about October 31, 2012, Bourg agreed, on behalf of Triadou, to participate in the Flatotel project under the terms proposed by Chetrit.  (Ex. 118).

151.    On November 7, 2012, an operating agreement was executed for the entity CF 135 West Member LLC (the "Operating Agreement"), which held the 75% interest in the Flatotel project; the remaining 25% was held by Clipper LLC (owned by David Bistricer).  (Ex. 119; Ex. 114 at 107:25-108:10).  Through the Operating Agreement, Triadou acquired a 50% ownership interest in CF 135 West Member LLC ("West Member"); the other 50% was held by CF 135 Flat LLC, which was owned by the Chetrits.  (Ex. 119 at TRIA0006151-74; Ex. 120, ¶ 2; Ex. 121 at 2).

152.    The Operating Agreement required Triadou to contribute 70% of the expected capital that West Member owed for the Flatotel project, and in return, granted Triadou 50% of the profits earned by West Member (equivalent to 37.5% of the profits for the entire Flatotel project). (Ex. 50 at TRIA0006159, 6174).

153.    A side-letter appended to the Operating Agreement that was signed by Chetrit and Triadou, states that the timing of the funding for capital contributions by Triadou, CF 135 Flat LLC (Chetrit), and the other "25% Investor" (Bistricer), would be pursuant to the schedule attached to the side letter, and that schedule set Triadou's capital contributions at $39,375,000. (*Id.* at TRIA0006176-78). The side letter schedule is the same as the one included in Chetrit's October 23, 2012 letter to Bourg soliciting SDG's investment.  (Ex. 116 at 3).

154.    Exhibit 121 reflects the holding structure for the Flatotel at the time of Triadou's ownership of half of West Member.  (*See also* Ex. 120, ¶ 2).

155.    The Chetrits received (to their attorney's account) the following amounts which were transferred by Telford on Triadou's behalf for investment in the Flatotel:  (i) $10,500,051.25 on November 9, 2012; $2,625,053.01 on January 22, 2013; $15,925,102.16 on February 13, 2013; $175,101.32 on February 19, 2013; and $5,660,256.77 on April 13, 2013.  (Ex. 122 at 2; Ex. 123 at 3-4).[9]   In total, Triadou contributed $34,885,565 in capital to the Flatotel.   (Ex. 50 at TRIA0006179).

156.    November 2013 marketing materials for Triadou that Bourg prepared state, no further capital call would occur "until project's completion . . . due 4Q2015."  (Ex. 65 at 12).

C.    *Cabrini Medical Center*

157.    In May 2013, Triadou made a loan in the sum of $6 million USD to an entity called 227 East 19th Holder LCC, which was the sole member of the entity 227 East 19th Mezz LLC, which itself was the sole member of 227 East 19th Street Owner LLC.  (Ex. 50 at TRIA0006149). The loan proceeds were used "to fund a portion of the equity contribution of [227 East 19th Street Owner LLC] in connection with the acquisition … of an undivided 25% tenant in common interest in and to premises located at 227 East 19th Street, New York, New York."  (*Id.*).

158.    The 227 East 19th Street entities were owned directly or indirectly by the Chetrits and were used to invest in the Cabrini Medical Center development project, involving the conversion to condominiums of the former medical facility that consisted of "more than 250 units spread across four buildings with addresses on East 19th and East 20th Streets between Second and Third Avenues."  (Ex. 65 at 14; Ex. 66, ¶ 15; Ex. 52 at 80:15-14).

---

[9] To avoid confusion, page cites to ECF-stamped documents such as Exhibits 65, 122, and 123 are to the PDF page (not the page number listed on the bottom, as not all pages are so numbered).

159.    Triadou's investment took the form of a "convertible loan agreement for the amount of USD $6,000,000.00, by which it received both: (a) A right to convert this amount into a 6% equity stake in the project[, and] (b) A right to increase said amount to USD 12 million, raising its equity stake to 12 %." (Ex. 65 at 14; Ex. 50 at TRIA0006149-50; *see also* Ex. 50 at TRIA0006146-48 (Cabrini promissory note reflecting Triadou's investment)).

160.    On May 20, 2013, the Chetrits received (to their attorney's account) $6,000,189.25 from Telford, which was sent on Triadou's behalf as the loan for the Cabrini Medical Center project. (Ex. 123 at 5; Ex. 50 at TRIA0006179).

D.      *The Tri-County Mall*

161.    Triadou also invested, through its subsidiary Tri-County Mall Investors, LLC ("TCMI"), in the Tri-County Mall in Cincinnati, Ohio. (Ex. 126 at TRIA0011240; Ex. 65 at 6-7, 18; Ex. 6 at 52:2-16). Specifically, TCMI acquired a mortgage on the mall toward the end of April 2013, which it financed through loans from Telford. (Ex. 73 at 350:16-352:11; Ex. 123 at 5-6; Ex. 65 at 7, 18; Ex. 127, ¶ 9; Ex. 128 at 16:13-25).

162.    On April 24, 2013, Telford wired $2,800,045.23 to TCMI's law firm for the initial deposit to acquire the Tri-County Mall mortgage. (Ex. 123 at 5-6). On May 22, 2013, Telford wired $28,000,000 to TCMI's law firm to complete the acquisition of the Tri-County Mall mortgage. (*Id.* at 2).

163.    On July 18, 2013, TCMI sold its interest in the Tri-County Mall for approximately $45 million and $42,720,529.55 after payment of taxes and fees. (Ex. 65 at 7, 18; Ex. 127, ¶¶ 10-13; Ex. 129 at 1).

164.    In or about August 2013, Felix Sater, who had been authorized to act as a co-manager of TCMI, diverted the proceeds of the sale to an account only he (Sater) controlled. (Ex.

127, ¶¶ 13, 15; Ex. 130 (Sater 2/5/2019 Dep.) at 25:2-26:15 (discussing Ex. 131); Ex. 6 at 105:18-109:2; Ex. 73 at 352:21-355:2; Ex. 4 at 202:22-203:10).

165.    On December 19, 2013, after several months of unsuccessful negotiations, TCMI filed suit against Sater and another former manager of the company, Daniel Ridloff, for the misappropriation of those funds.  (Ex. 127; Ex. 132 at TRIA0004253).

166.    On December 23, 2013, Triadou, TCMI, and Sater entered into a settlement agreement in which TCMI agreed to dismiss its lawsuit in exchange for the return of $20 million of the funds that Sater misappropriated.  (Ex. 129).

167.    Glatz agreed to settle the Tri-County Mall dispute with Sater because Bourg represented that he had ready and willing investors for the Investment Fund, and that a lawsuit would discourage investments.  (Ex. 73 at 358:25-361:20, 366:18-370:6).

168.    Because of the Tri-County dispute, Glatz re-evaluated Ilyas's work with Triadou in the U.S. and began to phase out Ilyas from SDG's and Triadou's operations.  (*Id.* at 87:15-88:22; Ex. 52 at 85:14-86:3; *see also* Ex. 6 at 100:20-101:22, 275:19-25 (Glatz became more active in U.S. operations "at the end of 2013").

E.    *Syracuse Center LLC*

169.    On July 10, 2013, Triadou obtained a $1.9 million loan from a Swiss company called Adlux SARL ("Adlux").  (Ex. 133; Ex. 6 at 79:17-25).  Adlux was owned by Ilyas and Maxim Interbrick.  (Ex. 52 at 97:21-98:7; Ex. 6 at 80:4-13).

170.    Triadou obtained the loan for the purpose of acquiring "real property located at 800-802 South Wilbur Avenue in the City of Syracuse … through [Triadou's] affiliate Syracuse Center LLC," and the loan itself was provided to Syracuse Center LLC "as [an] initial capital contribution."  (Ex. 133 at TRIA0011251-52).

171.    A loan agreement for this transaction was signed on December 13, 2013 and applied retroactively to the loan.  (*Id.* at TRIA0011254-55; Ex. 134).  The agreement provided that the loan accrued interest of 3% per year beginning July 10, 2013, and must be repaid within five years.  (Ex. 133 at TRIA0011254; Ex. 134 at TRIA0011679).

172.    Syracuse Center LLC, a New York limited liability company, is directly held by a Delaware corporation called Argon Holding, Corp. ("Argon Holding")—formerly known as SDG-US Holdings Corp.  (Exs. 135-137; Ex. 65 at 6).  Argon Holding is wholly owned by Triadou.  (Ex. 138; Ex. 65 at 6).

173.    Ilyas testified that the money that Adlux loaned to Triadou came from Petelin.  (Ex. 52 at 98:8-10).[10]

## V.    Triadou's Flatotel Assignment And Exit From The Cabrini Project

174.    In or around March or April 2014, Joseph Chetrit informed Triadou that an additional capital call for the Flatotel was needed.  (Ex. 6 at 167:22-168:5; Ex. 73 at 422:9-22; Ex. 54, ¶ 25).

175.    Triadou was told the capital call would be for $40 million, of which Triadou would be responsible for $21 million (i.e., 70% of 75% of the total call).  (Ex. 6 at 167:22-168:11, 174:3-20; Ex. 4 at 175:10-178:4; Ex. 52 at 82:18-83:12; Ex. 73 at 416:14-417:11; Ex. 140 at TRIA0012972; Ex. 141 at TRIA0000188).

176.    Glatz decided not to make this additional capital call for several reasons, including that Glatz personally did not want to provide the funds, the additional risk did not make sense, and Glatz wanted to exit the U.S. investments for which he did not have a complete picture and did not

---

[10] As Triadou warned the parties and the Court, (ECF 634), the City of Syracuse seized the Syracuse Center property in August 2019 for back taxes owed.  (Ex. 139).

know his business partner (Chetrit).  (Ex. 6 at 167:22-175:23; Ex. 4 at 175:10-176:12, 176:22-177:4; Ex. 73 at 416:14-417:11; Ex. 140 at TRIA0012974).

177.    Chetrit testified that Triadou's assignment of its Flatotel ownership interest was precipitated by Triadou not making a capital call, although Chetrit could not recall the amount. (Ex. 114 at 199:18-200:9).

178.    Chetrit proposed that he purchase Triadou's interest in the Flatotel.  (Ex. 6 at 175:24-181:5; Ex. 73 at 416:14-417:11; Ex. 54, ¶ 25; *see also* Ex. 114 at 212:17-21).

179.    On April 25, 2014, Ilyas emailed Kevin Meyer, Bourg's assistant, saying that Bourg should coordinate the transaction with Cerrito and Petr Krasnov (an outside consultant with Fiscus S.A.) because, by that time, Ilyas had been "sidelined from the process of basic work at SDG." (Ex. 105; Ex. 52 at 83:13-86:7; *see also* Ex. 73 at 328:18-329:9).

180.    Later on April 25, 2014, Meyer sent to Cerrito, with a copy to Bourg, an email with terms on which Triadou would "start the negotiation" with Chetrit for the sale of Triadou's interests in the Flatotel, but acknowledged that Chetrit had not yet agreed to the numbers. (Ex. 142).  The email also discusses terms by which Triadou would redeem its convertible loan note on the Cabrini Medical Center project.  (*Id.*).

181.    Cerrito and Glatz testified that Bourg negotiated the transaction by which Triadou assigned its Flatotel ownership interest to Chetrit.  (Ex. 6 at 176:12-177:6; Ex. 73 at 416:14-417:11).  Chetrit testified regarding all of the deals with Triadou, "[t]hat's how I'm looking at Bourg.  He's the owner of the company and he give me the directions who to pay and not to [] pay. He's the one that made all these deals, this transaction, the payment, the schedule.  That was the only person I knew to deal with."  (Ex. 114 at 250:10-252:2).

182.    On May 6, 2014, Chetrit sent Triadou a letter (which Triadou's attorney counter-

signed), confirming that if Triadou was repaid the $6 million it invested in Cabrini by May 6, 2014, Triadou would accept that amount in full satisfaction of the Cabrini promissory note and would waive entitlement to any other amounts due under the note.  (Ex. 143).

183.    Bourg signed a "Satisfaction and Release of Promissory Note" document acknowledging that Triadou received the $6 million in repayment and deemed the Cabrini promissory note cancelled and fully satisfied as of May 9, 2014.  (Ex. 144; Ex. 108 at 72:19-73:9).

184.    Also on May 6, 2014, Triadou and Chetrit signed a letter of intent concerning their agreement in principle for the sale of Triadou's ownership interest in the Flatotel to Chetrit.  (Ex. 145).  The letter of intent is signed by Triadou's attorney and by the Chetrits and sets forth the main terms of the anticipated assignment.  (*Id.*).

185.    The May 6, 2014 letter of intent states that a component of the purchase price for Triadou's assignment of its Flatotel interest includes a $1,000,000 USD payment; that payment was made on or about May 9, 2014.  (*Id.* at Almaty-BTA0127764; *see also* Ex. 146, § 1(b)).

186.    A wire transfer authorization produced by Jehoshua Graff (Chetrit's attorney), dated May 7, 2014, reflects that $7,000,000 USD was wired from the Chetrits to SDG Capital's account, as a loan from Triadou.  (Ex. 147; Ex. 120, ¶ 11; Ex. 148 at 38:14-23 (confirming the date was May 7, 2014)).  The $7 million payment included $6 million for the Cabrini note repayment and $1 million as an initial payment for the Flatotel assignment.  (Ex. 120, ¶ 11; Ex. 147; Ex. 6 at 185:22-187:6; Ex. 148 at 29:1-6 (confirming "Exhibit C" referenced in Graff's affidavit is the same as Exhibit 16 to Tudor's Declaration)).

187.    Negotiations over the final assignment agreement between Chetrit and Triadou continued until August 4, 2014.  (Ex. 114 at 221:4-9; Ex. 108 at 57:21-58:25; Ex. 146).

188.    On August 4, 2014, Triadou and Chetrit entered into an agreement by which

Triadou assigned its ownership interest in the Flatotel to Chetrit's company, CF 135 Flat LLC (the "Assignment Agreement").  (Ex. 146).

189.    Under the terms of the Assignment Agreement, in consideration for assigning its interest in the Flatotel (i.e., its ownership interest in West Member), Triadou would initially receive an aggregate amount of $28 million, as follows:  (a) $6 million by way of Chetrit's transfer of investments he had made with Bourg's Niel companies (*see infra* ¶ 199), Happy Family and Landscape; (b) the $1 million Chetrit transferred in May 2014; and (c) four tranches of $5.25 million on each of 90 days, 150 days, 240 days, and 330 days after execution of the Assignment Agreement, for a total of $21 million.  (Ex. 146, §§ 1(a)-(f); Ex. 114 at 173:24-175:10, 201:13-16 (interests in Happy Family and Landscape were transferred to Triadou under the Assignment Agreement).  Triadou also received a right to the equivalent of 12% of the profits generated by the sale of the Flatotel condominiums and space, with a minimum of $4 million due under this profit participation clause.  (Ex. 146, § 1(g)).

190.    Chetrit defaulted on each of the four tranches of $5.25 million owed to Triadou, which in turn led Triadou to file summons and motions for summary judgment in lieu of complaint for each tranche, which bear Index Nos. 653462/14, 154681/2015, 650239/15, and 156907/2015. (Exs. 149-52 (each exhibit reflects a judgment and order from Triadou's four respective actions)). In each action, Triadou obtained a judgment for the $5.25 million due under the Assignment Agreement, plus appropriate interest.  (Exs. 149-52).

## VI.    **Bourg's Double-Dealing**

191.    Bourg was removed as Triadou's director in October 2014 because Bourg did not have "information in the reporting about the U.S. investments, because we [SDG] were under the impression that he [Bourg] was not protecting the company interest," and because of "the

enormous amount of money that he spent just in the performance of his duties." (Ex. 6 at 206:8-20; Ex. 54, ¶¶ 27-28).

192.   On July 9, 2014, in the midst of negotiating the Flatotel Assignment Agreement, Bourg sent Chetrit an invoice for $1 million USD to be paid directly to Bourg. (Ex. 153).

193.   On January 22, 2015, Bourg's attorney sent a letter to Chetrit claiming that Bourg had received only $400,000 of the July 2014 invoiced amount, and that Chetrit owed $600,000 to Bourg. (Ex. 154 at Almaty-BTA0127189). The letter from Bourg's attorney reattached the July 2014 invoice. (*Id.* at Almaty-BTA0127191).

194.   On March 22 and 23, 2015, Bourg secretly recorded conversations in which he demanded payment from Chetrit for the $1 million USD in "commissions" that Bourg claimed to have been promised for Triadou's investment in and assignment of the Flatotel. (Ex. 155 at 10-14; Ex. 156 at 10; *see also* Ex. 153; Ex. 154).

195.   Bourg stated in the March 22, 2015 recording that "there was a 1 million commission for the deal," and that "[t]here was, on the one hand, the commission, you have already paid 400 [thousand]. You still owe 600 [thousand]." (Ex. 155 at 11). He also stated, "[f]or Flats. We struck a deal. A first payment was made and then you paid nothing else." (*Id.* at 18). In the same recording, Chetrit told Bourg, "You received something for each deal that we made. [inaudible] In that deal you were paid 100[,000]." (*Id.* at 19).

196.   Chetrit testified that he paid Bourg either $200,000 or $400,000, and that he did so at Bourg's direction. (Ex. 114 at 252:18-253:24).

197.   When confronted with Almaty/BTA's allegations that Bourg received bribes from Chetrit in connection with the Flatotel transaction, Bourg testified, "[w]ell, it's an interpretation of Chetrit's proposal," and that the allegations "are not necessarily false . . . ." (Ex. 108 at 112:15-

115:18).  When asked if he understood "that Chetrit intended to pay [Bourg] this money as a bribe," Bourg responded, "[q]uite foreseeable, yes."  (*Id.* at 115:6-8).

198.    Chetrit acknowledged that he agreed to pay Bourg a commission, but claimed it was "part of a total transaction," and that Bourg received personal payments of several hundred thousand dollars.  (Ex. 114 at 250:24-253:9 (discussing Ex. 153)).

199.    Bourg demanded $1.8 million from Chetrit for including the Happy Family and Landscape deals in the Assignment Agreement, claiming that the price in the Assignment Agreement for those investments ($6 million) was less than Chetrit paid, and that Triadou "paid 6 [million] to reimburse" Chetrit, but Chetrit provided only $4.2 million to Bourg to invest in those projects; as a result, "there is a 1.8 [million] discrepancy," which granted Chetrit an "additional discount" that Bourg expected to receive.  (Ex. 155 at 13-14; Ex. 108 at 59:22-60:13; 67:7-68:16; Ex. 114 at 202:21-204:11).

200.    On June 16, 2015, Bourg signed a "Release and Confidentiality Agreement" with the Republic of Kazakhstan, Almaty, and BTA.  (Ex. 157).  In the agreement, the Kazakh entities released all claims against Bourg in exchange for his "assistance in relation to investigative and asset recovery efforts" concerning the Ablyazov and Khrapunov families.  (*Id.*, § III).

201.    Bourg has a business partner, Laurent Foucher.  (Ex. 62 at 34:8-18).  During the relevant period, they owned a group of companies collectively called the "Niel Companies."  (*Id.* at 34:8-18, 91:8-92:8; Ex. 159 at Almaty-BTA0232030-31; Ex. 161 at Almaty-BTA0231209).

202.    On or around April 4, 2016, Foucher also signed a "Release and Confidentiality Agreement" with the Republic of Kazakhstan, Almaty, and BTA.  (Ex. 160 at Almaty-BTA0201934, 37).  In addition to providing Foucher, Foucher's wife, Kevin Meyer (Bourg's assistant), and the Niel Companies a release of all claims, the Kazakh entities also granted Foucher

and certain Niel Companies "financial entitlements" in exchange for their cooperation and assistance.  (*Id.*, §§ III, IV). The specific financial entitlements are set forth in a schedule appended to Foucher's Release and Confidentiality Agreement, several of which go to the Niel Companies that Bourg and Foucher jointly own.  (*Id.* at Almaty-BTA0201938-39).

203.    On April 13, 2017, Bourg and Foucher executed a "Deed of Settlement" with BTA that superseded their respective "Confidentiality and Release Agreements" only as to the terms with BTA.  (Ex. 161 at Almaty-BTA0231186).  The Deed still provides a release to Bourg, Foucher, their Niel Companies, and certain of their associates, while also obligating BTA to make explicit payments to Bourg and Foucher or on their behalf, including £882,696.90 to Bourg's and Foucher's attorneys and financial entitlements to Foucher and Bourg through various companies. (*Id.* at Almaty-BTA0231190-91, 97-98).

204.    Bourg's testimony has changed on multiple occasions regarding the timing of Almaty's action in California against various members of the Khrapunov family (the "California Action"), and Triadou's decision to sell its Flatotel interest, (*compare* Ex. 162, ¶¶ 25-26, *with* Ex. 66, ¶¶ 37-38, *and* Ex. 148 at 72:2-74:23, *and* Ex. 62 at 63:3-11, 109:24-111:15, *and* Ex. 108 at 46:24-51:2).  Almaty filed the California Action, which is captioned *City of Almaty v. Khrapunov, et al.*, No. 1:14-cv-3650 (FMO) (CW) (C.D. Cal.), on May 13, 2014.

205.    Bourg signed an affidavit, which he prepared with the assistance of his lawyer and that was notarized on March 31, 2016, which states, "In 2014, the City of Almaty filed an action in the state of California against members of the Khrapunov family, seeking to seize assets that they had attempted to launder through real estate investments in that state. . . . In response, in late 2014, Ilyas directed me to begin liquidating Triadou's assets in New York so that the funds could be removed from the United States and safely concealed elsewhere.  Specifically, Ilyas instructed

me to liquidate Triadou's investment in Flatotel and the Cabrini Medical Center as quickly as possible." (Ex. 162, ¶¶ 25-26; Ex. 62 at 114:18-20). Bourg's March 2016 declaration includes the California Action's caption and date of filing. (Ex. 162, ¶ 25).

206.    On May 2, 2016, Bourg submitted a signed declaration in this case stating that "In 2014, I learned that the City of Almaty, Kazakhstan had filed an action in the state of California against members of the Khrapunov family, seeking to seize real estate investments the Khrapunov family owned in that state," and that "[i]n response to this lawsuit, Ilyas directed me to begin liquidating Triadou's assets in New York so that funds could be removed from the United States and concealed elsewhere. Specifically, Ilyas instructed me to liquidate Triadou's investment in Flatotel and the Cabrini Medical Center as quickly as possible." (Ex. 66, ¶¶ 37-38).

207.    Bourg's May 14, 2016 signed reply declaration in this case states: "The actual reason for the assignment [of Triadou's Flatotel interest] was Ilyas'[s] desire to remove assets from the United States in response to the litigation against his family in California." (Ex. 67, ¶ 5).

208.    In deposition, after being confronted with documents reflecting that Triadou began negotiations to sell its interest in Flatotel and Cabrini in April 2014, Bourg testified that he needed to correct his declarations, and that what they mean are that Bourg learned "that the city of Almaty was liable to make – to file a suit. But it was more than probable that they would." (Ex. 62 at 108:10-111:15). Bourg testified that Ilyas told him this verbally, and that there are no documents confirming that Ilyas shared this information. (*Id.* at 110:23-111:15).

209.    Bourg admitted during his interrogation by Kazakh authorities that there are many lawsuits against his Niel Companies being brought by Ilyas, Petelin, and Telford, and that if Niel can prove in those cases that certain companies or funds belong to Ilyas, then claims against Bourg, Foucher, and Niel in those cases will be disregarded. (Ex. 107 at Almaty-BTA0232481-83).

Bourg also admitted that if the involuntary bankruptcy proceedings against Niel Financial Services, Bourg's and Foucher's main holding company, were successful, it "would be a disaster for [Bourg] and Laurent Foucher." (*Id.* at Almaty-BTA0232483).

210.    In his August 24, 2016 interrogation by Kazakh authorities, Bourg also stated, in connection with responding to lawsuits brought by companies perceived to be connected to Ilyas and Petelin, that his (Bourg's) "intention is to collaborate with the real owner of the funds, the Republic of Kazakhstan, and to arrange the conflict.  It is necessary to find a solution which will satisfy both the company Niel and the Republic of Kazakhstan."   (Ex. 163 at Almaty-BTA0232766).   Bourg went on to agree that the money loaned by Ilyas's entities to Bourg's companies was stolen from the Republic of Kazakhstan, and he knew that "[b]ecause, I listen to you, the representatives of Kazakhstan authorities.  And I am sure now, that's the point.  So my goal is to help the Republic of Kazakhstan and to save Niel.  And also the assets we have." (*Id.*).

## VII.    Plaintiffs Settle With The Chetrits

211.    On or about November 12, 2015, Almaty/BTA reached a settlement with the Chetrit parties (the "2015 Chetrit Settlement").  (ECF 69, Ex. 164).   On the same day, Almaty/BTA filed a notice of voluntary dismissal with prejudice of the Chetrit parties.  (ECF 70).

212.    On November 16, 2015, the Court so-ordered the dismissal of the Chetrit parties with prejudice, who were let out of the case entirely on September 9, 2016.  (ECF 71; ECF 221)

213.    Under the terms of the 2015 Chetrit Settlement, the Chetrits agreed to assign to Almaty/BTA "the 50% interest in [West Member] that was the subject of [Triadou's] Assignment," defined in the settlement as the "Flatotel Interest."  (Ex. 164 at 1, ¶ 4(b)).

214.    Under the terms of the 2015 Chetrit Settlement, Almaty/BTA released all claims against the Chetrit parties.  (*Id.*, ¶ 7).

215.    Under the terms of the 2015 Chetrit Settlement, Almaty/BTA agreed that Triadou's note pertaining to Cabrini Medical Center was paid in full by the Chetrits, and that they (Almaty/BTA) have no interest in Cabrini or any beneficial owner thereof and waive all claims thereto.  (*Id.*, ¶ 4(a)).

216.    On March 8, 2018, Almaty/BTA entered into a second settlement agreement with the Chetrit entities (the "2018 Chetrit Settlement") in which Almaty/BTA affirmatively accepted cash payments and substitute consideration "in full satisfaction of their rights to the Flatotel Interest" they were granted through the 2015 Chetrit Settlement.  (Ex. 165, ¶ 2).  Other than as explicitly stated in the 2018 Chetrit Settlement, none of the other terms of the 2015 Chetrit Settlement were affected.  (*Id.*, ¶ 1).

## VIII.   <u>Viktor Khrapunov Had No Involvement With And Did Not Invest In Triadou</u>

217.    BTA's corporate representative testified that he was aware of Almaty's allegations against Viktor based on news reports, and he acknowledged that BTA did not investigate Viktor's conduct.  (Ex. 166 (BTA 30(b)(6) Dep.) at 117:20-118:13).

218.    BTA's corporate representative testified that BTA's understanding of why at least part of the money that Triadou invested in U.S. real estate originated from BTA and part originated from Almaty is because of the allegations against Viktor and Ablyazov and the fact that they became related through the marriage of their children.  (*Id.* at 137:3-138:2).

219.    BTA's corporate representative testified that the basis for BTA's understanding that a portion of the funds Triadou invested originated in part from Almaty came from three things: Bourg's declarations in this case; a purported disclosure made by Eesh Aggarwal in BTA's U.K. proceedings that was not produced in this case and that BTA itself had not seen; and a U.K. Freezing injunction against Ilyas, but for which the underlying evidence was subject to an

attorneys' eyes only provision and therefore was not produced in this action.  (*Id.* at 138:4-139:6, 143:11-144:4, 153:20-154:13, 155:3-15).

220.    The U.K. Freezing Order produced in this action does not include Telford International Limited, but it does include another entity called Telford Financiers Corp., which is incorporated in a different jurisdiction than Telford International Limited.  (*Compare* Ex. 167 at 36 (Telford Financiers incorporated in BVI), *with* Ex. 168 at Almaty-BTA0235989-6015 (Telford International Limited incorporated in Marshall Islands)).

221.    Viktor testified that he never had any role with Swiss Development Group, and that he was not familiar with an entity called SDG Capital.  (Ex. 109 at 49:8-9, 49:21-23).  He also testified that he had not heard of Triadou before, did not know the company existed or who owned it, and he is not familiar with or involved in any of Triadou's investments.  (*Id.* at 43:16-44:4, 130:16-132:19).

222.    Bourg testified that Triadou's investments in Flatotel, Cabrini, and the Tri-County Mall were funded by Telford International Limited, and that Ilyas told Bourg that Telford's funds came from Ablyazov.  (Ex. 62 at 45:4-46:2, 52:14-53:3).

223.    In his June 14, 2016 interrogation by Kazakh authorities, Bourg stated that he understood that Telford's funds "belonged to Ablyazov."  (Ex. 107 at Almaty-BTA0232473).

224.    While Bourg stated in his May 2, 2016 declaration that "SDG was created with the funds of the Khrapunov extended family," including Viktor, (Ex. 66, ¶ 31), Bourg admitted that he has "no documentary evidence" to support this assertion and that his conclusion was based on "supposition" because Viktor and Ilyas were "very close."  (Ex. 62 at 144:23-145:8 (discussing Ex. 66, ¶ 31)).

225.    Bourg testified that he has no evidence that Viktor ever invested in SDG Capital

and that he does not know if Viktor ever invested in Triadou.  (*Id.* at 151:18-152:9).  Bourg testified that Ilyas told him that all of Telford's funds belonged to Ablyazov.  (*Id.* at 45:4-46:2, 52:14-53:3).

226.    Chetrit testified that he never met or communicated with Viktor, and that he did not know who Viktor was beyond seeing his name in the news.  (Ex. 114 at 44:17-45:2, 58:14-59:3). Chetrit had no knowledge of whether Viktor was involved in Triadou's investments.  (*Id.* at 59:4-7).  Chetrit also testified that he did not know the source of Triadou's or Telford International Limited's funds.  (*Id.* at 150:21-151:12).

227.    Ilyas testified that all monies invested in Triadou were loaned by Petelin and Telford International Limited.  (Ex. 4 at 127:6-128:13; Ex. 52 at 71:14-72:10).

228.    Almaty's 30(b)(6) witness acknowledged that Almaty has no evidence that Ablyazov is affiliated with Telford nor any evidence of the source of Telford's funds.  (Ex. 169 (Almaty 30(b)(6) Dep.) at 34:20-35:6, 37:17-25, 44:22-46:16).

229.    Felix Sater testified that he does not know the source of Telford's funds.  (Ex. 170 (Sater 9/13/2018 Dep.) at 168:7-10).

Dated: New York, New York
   July 1, 2020

      Respectfully submitted,

      **BLANK ROME LLP**

      By:  *s/ Deborah A. Skakel*
         Deborah A. Skakel
         Alex E. Hassid
         Robyn L. Michaelson
      1271 Avenue of the Americas
      New York, New York 10020
      Telephone: (212) 885-5000
      Facsimile: (212) 885-5001
      dskakel@blankrome.com
      ahassid@blankrome.com
      rmichaelson@blankrome.com

      *Counsel for Crossclaim Defendant*
      *Triadou SPV S.A.*