UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED:___11/5/21___
```

City of Almaty, Kazakhstan, *et al.*,

Plaintiffs,

–v–

Mukhtar Ablyazov, *et al.*,

Defendants.

15-cv-5345 (AJN)

OPINION & ORDER

ALISON J. NATHAN, District Judge:

Before the Court are the parties' five separate motions to exclude certain expert

testimony under Federal Rule of Evidence 702.  For the following reasons, the Court grants in

part one of BTA's motions and denies the other two; it grants in part both of Triadou's motions.

I.      **Background**

The Court assumes the parties' familiarity with this long-running litigation.  In brief, the

City of Almaty and BTA Bank (collectively, "the Kazakh Entities") seek to recover funds

allegedly embezzled in Kazakhstan and laundered in the United States.  The Kazakh Entities

allege that some of these funds went to Triadou SPV S.A., against whom the Kazakh Entities

alleged claims for unjust enrichment and conversion, among other claims.  Third Am. Compl. ¶¶

141–47, Dkt. No. 1094.  Many of the Kazakh Entities' allegations concern the Flatotel, "a project

to convert a former hotel in Manhattan into luxury condominium apartments and office and retail

space."  Summary Judgment Opinion and Order ("SJ Op.") at 9, Dkt. No. 1428.  Triadou

transferred about $35 million to purchase an interest in the project, held indirectly through a 50

percent stake in CF 135 West Member LLC, a holding company that, through another holding

company, held a 75 percent stake in the Flatotel.  *Id.* at 9–10.  According to the Kazakh Entities, these funds were misappropriated from them.  *Id.* at 10.

The parties on July 1, 2020, filed five motions to exclude expert testimony.  Triadou moved to exclude the testimony of Jennifer Sims Vu, Sims Vu Motion, Dkt. No. 1274; Triadou Sims Vu Br., Dkt. No. 1275, and of Tarig Kozouz, Dkt. No. 1277; Triadou Kozouz Br., Dkt. No. 1278.  The Kazakh Entities moved to exclude the testimony of Thomas Tener, Tener Motion, Dkt. No. 1299; BTA Tener Br., Dkt. No. 1301, of Ryan Pisarik, Dkt. No. 1305; BTA Pisarik Br., Dkt. No. 1306, and of S. Ilan Guedj, Dkt. No. 1308; BTA Guedj Br., Dkt. No. 1309.  Each motion is fully briefed and supported by sworn declarations.

The Court on March 29, 2021, granted Triadou's motion for summary judgment on the City of Almaty's claims but denied summary judgment as to BTA's claims, which the Court found were supported by sufficient evidence to raise a triable question of fact.  SJ Op. at 25. That same day, the Court administratively denied the outstanding motions to exclude expert testimony because there was significant doubt as to which, if any, of BTA's claims against Triadou could be tried before a jury.  Dkt. No. 1421.  Upon additional briefing from the parties, the Court on May 20, 2021, concluded that at least "BTA's claims for conversion and unjust enrichment should be tried to a jury."  Dkt. No. 1451.  A jury trial is tentatively scheduled for February 7, 2022.  Dkt. No. 1452.  The parties' motions to exclude expert testimony are therefore ripe for resolution.  *See* Dkt. No. 1455.

## II.    Legal standard

Federal Rule of Evidence 702 governs the admissibility of expert testimony. That rule states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The party offering the expert must demonstrate these requirements by a preponderance of the evidence. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 592 n.10 (1993). A rebuttal expert need not "produce models or methods of their own" but still "must meet *Daubert*'s threshold standards regarding the qualifications of the expert, sufficiency of the data, reliability of the methodology, and relevance of the testimony." *Scott v. Chipotle Mexican Grill, Inc.*, 315 F.R.D. 33, 44 (S.D.N.Y. 2016) (first quote from *In re Zyprexa Prods. Liab. Litig.*, 489 F.Supp.2d 230, 285 (E.D.N.Y. 2007)).

Under *Daubert*, district courts analyzing the admissibility of expert testimony exercise a "gatekeeper function." *Restivo v. Hessemann*, 846 F.3d 547, 575 (2d Cir. 2017). Specifically, courts have "an obligation to determine whether the expert's specialized knowledge will assist the trier of fact, *i.e.*, will be not only relevant, but reliable." *United States v. Romano*, 794 F.3d 317, 330 (2d Cir. 2015). The court should "focus on the principles and methodology employed by the expert" and exclude the expert's testimony if those principles and methodology are unreliable. *In re Pfizer Inc. Sec. Litig.*, 819 F.3d 642, 662 (2d Cir. 2016) (citation omitted).

Although it establishes a "gatekeeper" function for expert testimony, the *Daubert* test is nonetheless "a liberal" and "permissive" standard of admissibility. *Nimely v. City of New York*,

414 F.3d 381, 395–96 (2d Cir. 2005).  Expert testimony should be excluded only "if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison."  *Restivo*, 846 F.3d at 577 (quoting *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009).  Absent this degree of unreliability, any "other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony."  *Id.* (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)).

## III.    Discussion

### A.  The Court will not exclude the testimony of S. Ilan Guedj

According to BTA, Triadou sold its 37.5 percent interest in the Flatotel at a significantly discounted price once Triadou "learn[ed] of the Kazakh Entities' enforcement efforts in the United States."  BTA Guedj Br. at 2.  Triadou allegedly believed its interest was worth $62 million, but it sold for $28 million plus a profit share of at least $4 million, to be paid in installments.  *Id.* at 2–3.  What Triadou's interest in the Flatotel was worth at the time is a question to be decided by the jury, BTA argues, and is relevant to determining Triadou's knowledge and intent.  *Id.* at 2 & n.1.

One way that BTA seeks to prove the Flatotel's worth is by the expert testimony of Wayne Horvath, a certified appraiser who directs the valuation and business analytics group at BDO USA, who in 2019 appraised the Flatotel to be worth $290 million when Triadou sold its interest in August 2014.  *Id.*, Ex. B ("BDO Rep.") at 58, Dkt. No. 1309.[1]  Horvath reached that figure using primarily the "income capitalization approach" to real estate appraisal, which

---

[1] It appears that BTA erroneously filed the exhibits to the Schwartz declaration as attachments to its brief.  *See* Dkt. Nos. 1309, 1310.  The Court will cite the exhibits as filed.

determined the Flatotel's value based on the income that its condominiums would generate.  *Id.* at 33.  Triadou has not moved to exclude Horvath's expert testimony.

Triadou retained two experts to rebut Horvath, the first of which is S. Ilan Guedj.  Guedj has a PhD in financial economics, is a principal at an economic consulting firm, and has practiced, taught, and published in the field of business valuations.  Skakel Decl., Ex. 1 ("Guedj Rep.") at 3, Dkt. No. 1347.  In his report, Guedj assessed the economic value to Triadou of its interest in the Flatotel at $60.4 million, which relied on an independent appraisal by Miller Cicero, LLC, and the value it received from the sale at $35.2 to $39.7 million, meaning it accepted a discount of 34 to 42 percent.  *Id.* at 6.  He then took account of the value of avoiding a capital call of the Flatotel's investors, and discounts for lack of marketability and lack of control, because Triadou indirectly owned a minority interest in the Flatotel.  *Id.* at 6–7.  Based on Guedj's calculations of these discounts, he concluded that Triadou sold its interest in the Flatotel for a "fair and reasonable" price, meaning that it sold at a discount that was "within the range of discounts observed in real world transactions and described in the academic literature for illiquid assets over which the seller has no control."  *Id.* at 7.

BTA raises three primary arguments for excluding Guedj's testimony.  First, it argues that his background as a financial economist does not qualify him to provide appraisals of real estate.  BTA Guedj Br. at 1.  Second, it contends that Guedj relied on no recognized methodology but instead searched for a theory to justify Triadou's sale price.  *Id.*  And third, BTA argues that Guedj's report would not assist the jury to decide a question of fact but instead simply concludes that Triadou sold at a fair and reasonable price.  *Id.* at 2.  The Court considers each in turn.

### 1.  Guedj's qualifications

"Whether a proposed expert has the requisite qualifications depends on his or her educational background, training, and experience in the field(s) relevant to the opinions he or she seeks to give." *S.E.C. v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013). Even if a witness is otherwise qualified as an expert, "where an expert's opinion exceeds the scope of his qualifications, the witness's opinions are subject to exclusion." *Dreyer v. Ryder Auto. Carrier Grp., Inc.*, 367 F. Supp. 2d 413, 425 (W.D.N.Y. 2005) (citing *Stagl v. Delta Air Lines, Inc.*, 117 F.3d 76, 81 (2d Cir. 1997)). BTA argues that while Guedj is "well-credentialed," his background as a financial economist is distinct from the background needed to perform appraisals. BTA Guedj Br. at 11. In particular, BTA contends that Guedj has valued securities but never before appraised real estate. *Id.* at 12 (citing Schwartz Decl., Ex. G ("Guedj Dep.") at 289, Dkt. No. 1310 ("I do not have the qualification to perform an appraisal of a real estate entity.")).

The Court disagrees and finds Guedj to be qualified to offer an economic valuation of Triadou's interest in the Flatotel. First, as Triadou notes, Guedj has taught valuations in business and graduate schools and half of his economic consulting work concerns valuations, including valuations of businesses. Triadou Guedj Resp. at 7, Dkt. No. 1346. Second, much of BTA's argument boils down to an insistence that the value of Triadou's interest in the Flatotel can be assessed only by an appraiser that follows the Uniform Standards of Professional Appraisal Practice ("USPAP"). *See* BTA Guedj Br., Ex. F ("USPAP"). The Court finds no authority for such a bright-line rule. To the extent Guedj applied an improper methodology or did not answer a question relevant to the jury, that issue is addressed below. Third, for similar reasons, the Court concludes that Guedj's qualifications in valuing businesses, rather than real estate, are adequate because the direct subject of valuation is Triadou's stake in the CF 135 West Member

LLC.[2]  BTA's response that experience valuing real estate is more important because the holding

company's only asset is a real estate project, BTA Guedj Reply Br. at 2, Dkt. No. 1392, is a basis

for cross-examination, not for exclusion.

### 2.  Guedj's methods

Briefly summarized, Guedj's report attempted to determine the economic value to

Triadou of its interest in the Flatotel by, in Guedj's words, using a discounted cash flow ("DCF")

method to model the expected cash flows that Triadou would have expected from its continued

ownership, including if investors were asked for an additional capital call of $40 million,

compared to if it sold.  Guedj Rep. at 24, 28–29.  He stated in his deposition that he had

previously used a DCF method in business valuations.  Guedj Dep. at 29.  The foundation of

Guedj's calculations was the value of the Flatotel determined in Miller Cicero's appraisal for use

by Deutsche Bank.  Guedj Rep. at 25.  Guedj's report characterized that appraisal as "a

contemporaneous, relevant, and independent third-party assessment of the value of the Flatotel

project" that Guedj found to be a "reasonable estimate of the expected value of the Flatotel

project."  *Id.*  After Guedj then took into account the discounts already described, he performed a

series of "sensitivity analyses" to "test the soundness of the economic conditions and information

on which the appraisals estimates were based" as well as the discount rates he applied.  *Id.* at 32–

---

[2] BTA also purports to dispute whether Guedj has any experience in valuing businesses.  BTA
Guedj Reply at 2 n.1; BTA Guedj Br. at 6.  The Court finds that Triadou has shown by a
preponderance of the evidence that Guedj has experience in business valuation.  First, he stated
at his deposition that about half of his work in economic consulting involved valuations and that
about "10 percent" of his work involves business valuations.  Skakel Decl., Ex. 2 ("Guedj Dep.")
at 73.  Second, he has authored or co-authored several articles on business valuations, as even
BTA admits.  *Id.* at 32–34 (noting, additionally, his work valuing the assets of a private equity
firm); BTA Guedj Br. at 5.

36.  BTA raises a series of arguments that Guedj's methods were so unreliable as to require exclusion of his expert opinion.

*First*, BTA characterizes Guedj's methodology as being fundamentally results-driven: He took as a given the price at which Triadou sold its interest in the Flatotel and then searched for any "economic theory that could support" that price, concluding that the price was "fair and reasonable" so long as there was such a theory.  BTA Guedj Br. at 12–15 (quoting Guedj Dep. at 61).  Understood this way, Guedj's method appears in no textbook or other authoritative literature and it would lack the indicia of reliability required by *Daubert*.  *Id.* at 13–14.  Because the Court disagrees with this view of Guedj's report, the Court rejects this argument.  As explained, Guedj applied a DCF method to value Triadou's interest, a method of which courts in this circuit have consistently approved.  *See, e.g.*, *Lippe v. Bairnco Corp.*, 288 B.R. 678, 689 (S.D.N.Y. 2003), *aff'd*, 99 F. App'x 274 (2d Cir. 2004); *In re Med Diversified, Inc.*, 334 B.R. 89, 98 (Bankr. E.D.N.Y. 2005).  He then reduced that calculated value by discounts for lack of marketability, for lack of control, and for present value, the permissibility of which the Court addresses below.  Guedj Rep. at 17–23, 26–27.  BTA places undue focus on Guedj's ultimate characterization of the sale price as "fair and reasonable," conflating that isolated summation of his conclusion with the method he applied.  Guedj admitted that phrase is not a term of art used in financial economics or derived from the academic literature but instead the summation of his "own opinion," meaning that a discounted sale price "is within the ranges that have been observed in the past in applicably similar situations."  Guedj Dep. at 276–77.  The Court concludes that Guedj's basic method was both reliable and accepted.

*Second*, BTA argues that the discounts applied by Guedj—namely, for lack of marketability and for lack of control—are forbidden under New York law, which governs the

claims that will be tried before the jury.  BTA Guedj Br. at 15–17 (citing, e.g., *Friedman v.*

*Beway Realty Corp.*, 87 N.Y.2d 161, 167–70 (1995); *In re Levine v. Seven Pines Assoc. Ltd.*

*P'ship*, 156 A.D.3d 524, 526 (N.Y. App. Div. 2017)).  But Triadou correctly observes that the

case law upon which BTA relies concerns only actions brought under New York law for a

valuation of a minority shareholder's interest in a company.  Triadou Guedj Resp. at 14–16; *see*

N.Y. Bus. Corp. § 623.  The rationale behind New York law's prohibition on applying discounts

in this context does not apply here where it would not similarly "encourage oppressive majority

conduct" to "driv[e] down the compensation necessary to pay for the value of minority shares."

*Friedman*, 87 N.Y.2d at 169.  The Court concludes that this is not a basis for excluding Guedj's

testimony.

        BTA further argues that Guedj improperly derived such discounts from averages of

different academic studies without considering the particular facts of this case.  BTA Guedj Br.

at 13–14.  But the Court finds that Guedj adequately considered the studies at hand and did not,

as the case law BTA relies upon forbids, simply use averages from judicial opinions.  *See*

Triadou Guedj Resp. at 12–13.  Guedj's use of averages is otherwise a topic for cross-

examination.

        In its reply, BTA emphasizes that "Guedj never explained *why* the discounts should be

applied in the first place," and cites to case law that such discounts are already accounted for in a

DCF method.  BTA Guedj Reply at 8–9 (citing, e.g., *Lippe*, 288 B.R. at 698).  Because this

argument is raised for the first time on reply, it is waived.  *See Melo v. United States*, 825 F.

Supp. 2d 457, 464 (S.D.N.Y. 2011).  The Court additionally finds that Guedj explained that these

discounts were applied to correctly value Triadou's interest at the time of its sale given the

limitations on that interest that the buyer would inherit.  Guedj Rep. at 5, 16–17.  Guedj

explained that given the Operating Agreement that bound Triadou's interest, such discounts were appropriate, distinguishing this case from the case law that BTA cites. *Id.* at 22–23. The Court otherwise finds that a discount for lack of marketability is permissible under New York law, including when valuing real estate.[3]

*Third*, BTA raises a series of objections to assumptions that Guedj made in conducting his analysis. BTA Guedj Br. at 17–22. These attacks may provide fertile ground for cross-examination, but the Court finds that none of them justify exclusion. First, Guedj assumed that Triadou's sale of its interest to the other member of the CF 135 West Member LLC was done at arm's length, an assumption directed by Triadou's counsel, though he disputed at his deposition whether that affected his result. Guedj Dep. at 92–93. As BTA argues, whether the sale was at arm's length is a question of fact. BTA Guedj Br. at 17. If it is proven at trial that the transaction was not at arm's length, that may affect the weight of Guedj's opinion, but does not require exclusion.[4] Second, BTA argues that Guedj improperly assumed that Triadou would receive the full value of the sale of its Flatotal interest without accounting for the risk of nonpayment. BTA Guedj Br. at 18. As it turned out, "Triadou did not in fact receive the sale price." *Id.* at 7. But this assumption was not so "unrealistic or contradictory as to suggest bad faith" or otherwise compromise Guedj's analysis. *Restivo*, 846 F.3d at 577. That, in hindsight,

---

[3] BTA cites to *In re Jamaica Acquisition, Inc.*, 901 N.Y.S.2d 907, 907 (Sup. Ct. 2009), quoting a prior case of the Appellate Division, *Cohen v. Cohen*, 279 A.D.2d 599, 600 (N.Y. App. Div. 2001), for the proposition that the discount applies only to a corporation's goodwill. BTA Guedj Reply at 9. But *Jamaica* plainly held the opposite, stating in no uncertain terms that to "argue that the Second Department has limited a DLOM to goodwill or other intangible assets *flies in the face of other Second Department cases*." 901 N.Y.S.2d at 907 (emphasis added) (collecting cases).

[4] The Court also agrees with Triadou that assuming an arm's length transaction does not violate any binding standards in the field of business evaluation. Triadou Guedj Resp. at 17.

Triadou did not receive fully payment and that it should have appreciated that risk at the time of sale is, again, a matter of cross-examination.

Third, BTA argues that Guedj merely assumed Triadou's lack of control and the lack of marketability of its interest in the Flatotel. BTA Guedj Br. at 19–20. But in both his report and deposition, Guedj justified why he found there to be "serious limitations on [Triadou's] control. Guedj Dep. at 239–40 (agreeing "[t]hey did" have "control over certain things"); Guedj Rep. at 22–23 (analyzing the terms of Triadou's Operating Agreement). Fourth, BTA argues that Guedj improperly added the two discounts together rather than multiplying them, as the academic literature suggests he should have. BTA Guedj Br. at 20–21. Triadou's response does not address BTA's concern, pointing only to a portion of Guedj's deposition in which he said that the discounts were "additive," by which he meant "*not* mutually exclusive." Triadou Guedj Resp. at 20 n.19 (emphasis added) (citing Guedj Dep. at 104). Regardless of this clarification, Guedj's report plainly added the two discounts together. Guedj Rep. at 6. But this apparent error does not sufficiently affect the report's reliability as to require exclusion, particularly because the discounts that Guedj found that Triadou accepted are nevertheless within the bounds of the discounts had they been properly multiplied. *Compare id.* at 7 (finding that "Triadou's sale occurred at a discount in the range of 16%–49%"), *with* BTA Guedj Br. at 21 (correcting Guedj's upper discount range from 65% to 56%).

Fifth, BTA argues that Guedj improperly assumed without verifying that the Miller Cicero appraisal of the Flatotal was reliable and so merely regurgitated another expert's opinion. BTA Guedj Br. at 21–22 (citing *Louis Vuitton Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 676–77 (S.D.N.Y. 2007)). At his deposition, Guedj explained that he does "not have the qualifications to perform an appraisal of a real estate entity." Guedj Dep. at 289. Rather, Guedj

used the appraisal as an "input[ ] into [his] model," Guedj Dep. at 290, one that he found to be a reasonable estimate because it was "contemporaneous, relevant, and independent" by a third party, Guedj Rep. at 25.  The Court understands the Miller Cicero appraisal not to be an expert opinion but instead factual hearsay that Guedj could rely on so long as, in his expertise, he found it to be reliable, as he did.  *See United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2003).  That view of the Miller Cicero report is confirmed by Judge Parker's finding that the appraisal was properly part of Triadou's fact, not expert, discovery.  Dkt. No. 924 at 5; *see also* Dkt. No. 910 (arguing that Triadou's subpoena for the appraisal "plainly sought discovery of factual material").

*Fourth*, BTA accuses Guedj of incorporating hindsight bias into his analysis because he used data, including the Miller Cicero appraisal, that postdated the date of Triadou's sale.  BTA Guedj Br. at 22–23.  The Court finds no basis for exclusion on this account, as virtually any attempt to determine the Flatotel's value for this litigation will necessarily require a backward-looking approach, as Triadou's experts also used.  *E.g.*, BTA Guedj Br. at 3 (referring to Horvath's appraisal as a "retrospective market value").

*Fifth*, in its reply brief, BTA additionally argues that Guedj fundamentally did not perform any expert task at all but instead simply performed a series of mathematical calculations that the jury could do itself.  Reply at 6–7.  Because it was raised first on reply, this argument is waived.  Additionally, the Court finds that Guedj's determination of economic value, particularly the identification of arguably relevant discounts for Triadou's lack of control and lack of marketability, reflected skills or knowledge "outside the ken of the average person" and justifies Guedj's status as an expert witness.  *United States v. Felder*, 993 F.3d 57, 72 (2d Cir. 2021) (quoting *United States v. Garcia*, 413 F.3d 201, 216 (2d Cir. 2005)).

### 3.  Guedj's assistance to the jury

Last, BTA argues that Guedj's conclusion that Triadou sold its interest in the Flatotel at a "fair and reasonable" price must be excluded "because it is an inadmissible legal conclusion." BTA Guedj Br. at 23.  It is well established that an expert witness may not "tell the jury what result to reach" and thereby "substitute the expert's judgment for the jury's."  *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994).  For this reason, courts are wary of expert witnesses who provide an opinion on legal elements of a claim that a jury must find.  *Id.* at 101–02 (stating that testimony is impermissible when it "repeatedly tracked the exact language of the statutes and regulations which the defendant had allegedly violated").  But expert opinion is not inadmissible "just because it embraces an ultimate issue" to be decided by the trier of fact.  Fed. R. Evid. 704(a).

Here, whether the price at which Triadou sold its interest in the Flatotel was "fair and reasonable" is not an element in any remaining claim brought by BTA against Triadou.  It is therefore not a "legal conclusion" and it does not "communicat[e] a legal standard—explicit or implicit—to the jury."  *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992).  Rather, whether Triadou sold its Flatotal interest at a price near to its actual value is relevant to the jury's finding of Triadou's intent.  BTA Guedj Reply at 10.  Guedj's opinion supports Triadou's position that its intent was a permissible one, but Guedj's opinion does not direct the jury to find one way or another on the issue.

The Court will, however, exclude Guedj's characterization of this price as "fair and reasonable" under Rule 403 because its minimal probative value is substantially outweighed by its prejudicial effect.  The phrase is likely to confuse jurors by suggesting that fairness or reasonableness are considerations relevant to Triadou's sale.  Instead, Guedj may state only his

longer and more specific conclusion—that the price at which Triadou sold its ownership interest falls within the range of prices that the academic literature would predict.

In sum, the Court finds no basis on which to exclude Guedj's testimony as an expert witness.

### B.  The Court will partially exclude the testimony of Thomas Tener

Thomas Tener is the second expert that Triadou retained to rebut Horvath's appraisal of the Flatotel at $290 million at the time Triadou sold its interest.  Tener conducted a review of both Hovarth's appraisal and the Miller Cicero appraisal relied on by Guedj, and also made repeated reference to a third appraisal done by Metropolitan Valuation Services ("MVS") in 2013.  Schwartz Decl., Ex. C ("Tener Rep.") at 1–2, Dkt. No. 1300.  While Horvath used the income approach to calculate value, Miller Cicero and MVS used the sales approach, which compares the Flatotel to comparable sales in the market.  *Id.* at 2.  Tener is a founding principal at KTR Real Estate Advisors LLC and has more than 30 years' experience in real estate, including appraisals.  *Id.*, Addenda at 3.  Unlike Guedj, Tener is a certified real estate appraiser and he represented that his report was "prepared[ ] in conformity with the [USPAP]."  *Id.* at 15. Tener did not reach his own appraisal of the Flatotel or Triadou's interest in it but instead identified a series of alleged errors in Horvath's analysis, concluding that Horvath's BDO Report "overstat[ed] the [Flatotel's] Market Value as of August 4, 2014," when Triadou sold its interest. *Id.* at 14.  At his deposition, Tener stated that he "was not engaged to do an appraisal" and had "not developed an opinion of value."  Schwartz Decl., Ex. D ("Tener Dep.") at 63, Dkt. No. 1300.  BTA raises two main arguments for excluding Tener's expert testimony.

### 1.  Tener's compliance with USPAP

Tener certified that he adhered to the USPAP in his report.  Tener Rep. at 15.  The USPAP contemplates that appraisers will conduct such "appraisal reviews," which the USPAP defines as "the act or process of developing an opinion about the quality of another appraiser's work that was performed as part of an appraisal or appraisal review assignment."  USPAP at 3.  The USPAP standard rules contemplate that an appraisal review may express an opinion of value or an opinion of quality.  *Id.* at 27 (Standard Rule 3.2(c)), 112 (Advisory Opinion 20).

"Where an expert is bound by, or purports to be bound by, established standards for arriving at conclusions in a particular field, courts have looked to the extent of the expert's compliance with such standards in assessing the expert's reliability."  *S.E.C. v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 504 (S.D.N.Y. 2018).  Following that rule, courts in this district have repeatedly excluded experts who certified that they complied with the USPAP but whose methods nevertheless departed from the USPAP.  *E.g.*, *id.*; *Davis v. Carroll*, 937 F. Supp. 2d 390, 415–17 (S.D.N.Y. 2013); *In re Methyl Tertiary Butyl Ether (MTBE) Prod. Liab. Litig.*, No. 1:00-1898, 2008 WL 2324112, at *4 (S.D.N.Y. June 5, 2008).

BTA contends that Tener departed from the USPAP because he developed an opinion of the Flatotel's value by finding the BDO Report's value to be overstated but without conducting an independent appraisal of the Flatotel, as, BTA contends, is required by the USPAP.  BTA Tener Br. at 7.  Triadou argues that Tener conducted an appraisal review of both the BDO and Miller Cicero appraisals and then, rather than "provid[ing] a value opinion himself," "simply compare[d] the two appraisals," concluding that the BDO Report was less reliable and its value overstated.  Triadou Tener Resp. at 2, 10, Dkt. No. 1352.

The Court excludes those portions of Tener's testimony that consist of opinions of value.  Under the USPAP, an appraisal review may provide an opinion of quality, which assesses "the

completeness, accuracy, adequacy, relevance, and reasonableness of the analysis in the work

under review," or an opinion of value.  USPAP at 28 (Rule 3.3(a) Comment).  To provide an

opinion of value, an appraisal review must comply with USPAP Standards 1, 5, 7, or 9, which

define the procedures for conducting an independent appraisal of a property.  *Id.* (Rule 3.3(c)(i)).

An opinion of value is further defined in USPAP Advisory Opinion 20, which provides the

following examples as opinions of value:

> • "I concur (or do not concur) with the value."
>
> • "I agree (or disagree) with the value."
>
> • "In my opinion, the value is (the same)."
>
> • "In my opinion, the value is incorrect and should be $XXX."
>
> • "In my opinion, the value is too high (or too low)."

*Id.* at 116 (Advisory Opinion 20).

As the Advisory Opinion explains, such language "represents that the reviewer has

completed the steps required to develop his or her own value opinion."  *Id.*  To be sure, an

appraisal review may, in providing an opinion of quality, identify "errors or inconsistences in the

original work" in a way that "does not imply an appraisal by the reviewer."  *Id.*  But the review

"has taken on the 'opinion of value' characteristic" once those errors are identified "in relation to

a value or value range, *such as indicating a direction in value* (i.e., more than, less than) or to an

established benchmark."  *Id.* (emphasis added).

The parties agree that Tener did not conduct an appraisal of the Flatotel's value.  *See,*

*e.g.*, Tener Dep. at 63.  Yet, the Court finds, his report plainly includes opinions of value as

defined in Advisory Opinion 20.  For example, he states that the BDO report "materially

overstated market value" of the Flatotel, Tener Rep. at 2, and that the sum of the errors he

16

identified in the report "contribute heavily to BDO's overstatement of value," *id.* at 14.  The

Court, following the court's thoroughly reasoned conclusion in *Yorkville*, the operative facts of

which match almost exactly the facts here, excludes these opinions of value.  *See* 305 F. Supp.

3d at 506 (excluding, for example, statements that an appraised value was "materially greater"

than the correct value).

Triadou responds that Tener did not provide an opinion of value but simply observed that

the BDO Report was "not complete, accurate, adequate, or reasonable under USPAP" and

compared the value of the BDO report to the value in the Miller Cicero appraisal, which lacked

such errors.  Triadou Tener Resp. at 10.  Triadou similarly distinguishes *Yorkville* by noting that

the testimony there stated not only that the appraisal's value was overstated, but also provided

"the dollar amounts by which those investments were overvalued."  *Id.* at 11 (quoting *Yorkville*,

305 F. Supp. 3d at 506).  The Court finds that this is not a meaningful distinction.  The *Yorkville*

court applied the examples of opinions of value listed in Advisory Opinion 20 to conclude that

an appraisal review's opinion of value was impermissible.  Several of those examples are

indistinguishable from Tener's conclusion here.  *E.g.*, USPAP at 116 ("In my opinion, the value

is too high (or too low).").

Triadou also argues that Advisory Opinion 20 is not a part of the USPAP standards that

bind Tener, Triadou Tener Br. at 13–15, noting language at the top of the opinion that it "does

not establish new standards or interpret existing standards" but only "illustrate[s] the

applicability of appraisal standards in specific situations and to offer advice," USPAP at 112.

The Court agrees, so far as it goes, that the Advisory Opinion is not itself a binding rule.  But

courts in this district have repeatedly relied on USPAP advisory opinions to define the contours

of binding USPAP standards.  *E.g.*, *Yorkville*, 305 F. Supp. 3d at 504–507; *Fed. Hous. Fin.*

17

*Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 509 (S.D.N.Y. 2015), *aff'd sub nom.*, 873 F.3d 85 (2d Cir. 2017); *In re MTBE Prod. Liab. Litig.*, 2008 WL 2324112, at *4. The Court does the same here: Tener failed to fully adhere to USPAP Standards Rule 3-3 for appraisal reviews, a conclusion that is supported by Advisory Opinion 20's "illustrat[ion]" of that rule in "specific situations." USPAP at 112.

Yet the Court does not exclude the entirety of Tener's opinion because, as developed in the report, he offers permissible opinions of quality of the BDO Report that do not wander into unsupported opinions of value. *E.g.*, Triadou Tener Resp. at 8–9 (listing potential examples of opinions of quality). Insofar as Tener testifies as to opinions of quality, but does not indicate a direction of value, his testimony is not excluded. *See Yorkville*, 305 F. Supp. 3d at 507 (similarly permitting testimony as to "whether [the appraisal's] analyses were appropriate and credible within the context of the requirements applicable to that work, along with the reasons for any disagreement with such analyses").[5]

### 2. Whether Tener may offer the Miller Cicero and MVS appraisals for their truth

BTA additionally argues that Tener should be precluded from offering to the jury the values reached in the Miller Cicero and MVS appraisals, arguing that they are inadmissible hearsay that BTA has not had the opportunity to challenge. BTA Tener Br. at 16–18. Triadou agrees that the appraisals are hearsay but contends that they are nevertheless admissible for their truth because (a) Tener permissibly relied on the appraisals to form his expert opinion, under

---

[5] This conclusion is also consistent with Triadou's primary case, which permitted testimony on opinions of quality but not opinions of value, quoting Advisory Opinion 20's instruction that "[i]f the language of such rejection is based on errors or inconsistencies in the original work *and does not include any qualifiers that would relate to a direction in value*, it does not imply an appraisal by the reviewer." *Kilbride Invs. Ltd. v. Cushman & Wakefield of Pa., Inc.*, No. CV 13-5195, 2018 WL 1960826, at *5 (E.D. Pa. Apr. 26, 2018) (emphasis added).

Federal Rule of Evidence 703, and (b) the appraisals are business records admissible under Rule 803(6).

The Court concludes that, on the present record, the appraisal values reached in the reports prepared by Miller Cicero and MVS are not admissible. Each appraisal is, as the parties agree, hearsay and so presumptively inadmissible. Fed R. Evid. 801, 802. The Court further concludes that neither hearsay exception raised by Triadou permits the appraisal values to be admitted for their truth. *First*, "[u]nder Rule 703, experts can testify to opinions based on inadmissible evidence, including hearsay, if 'experts in the field reasonably rely on such evidence in forming their opinions.'" *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008). But Rule 703 does not permit an expert to "simply transmit that hearsay to the jury." *Id.* Instead, "the expert must form his own opinions by 'applying his extensive experience and a reliable methodology' to the inadmissible materials." *Id.* (quoting *United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2003)). As he did with the DBO Report, Tener performed an appraisal review of the Miller Cicero appraisal. Tener Rep. at 1. Yet because he did not perform his own appraisal, he cannot provide any opinion of value as to the Miller Cicero appraisal, such as stating, "I concur . . . with the value" it reached. USPAP at 116 (Advisory Opinion 20). In sum, Tener may, so long as it is relevant, provide his opinion of the quality of the Miller Cicero appraisal, but that testimony may not serve as a means to present to the jury the value that the Miller Cicero appraisal reached or whether Tener agrees or disagrees with that value. The value in the Miller Cicero appraisal would have to be admitted under a different hearsay exception. [6]

---

[6] This restriction on the admission of the Miller Cicero appraisal's value similarly applies to Guedj's testimony.

The value reached by the MVS appraisal is even more clearly excludable because Tener did not purport to conduct a review of the MVS appraisal or reach a conclusion as to its quality. Tener Rep. at 1.

The Court further finds that even if Rule 703 permitted Tener to disclose to the jury the appraisal values reached by Miller Cicero or MVS that the probative value of those underlying facts would not "substantially outweigh[ ] their prejudicial effect."  Fed. R. Evid. 703.  The jury may very well accept these values on equal footing with the value reached by Horvath, despite the fact that Tener did not perform the analysis necessary to provide an opinion of value and the despite the fact that BTA has not had the opportunity to test the veracity of either the Miller Cicero or MVS appraisal by, for example, deposing those reports' authors.

> *Second*, under the business-record exception, hearsay is admissible if:
>
> (A) the record was made at or near the time by--or from information transmitted by--someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) or with a statute permitting certification; and
>
> (E) the opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.
>
> Fed. R. Evid. 803(6).

Triadou identifies several cases that have admitted records analogous to the appraisals at issue here as business records.  *See* Triadou Tener Resp. at 21–22 (citing *Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, No. 11CV6201 DLC, 2015 WL 1137572, at *2 (S.D.N.Y. Mar. 13, 2015); *Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 213 F. Supp. 2d

331, 347 (S.D.N.Y. 2002), *vacated and remanded on other grounds*, 89 F. App'x 287 (2d Cir. 2004)).  But in the cases cited, and other cases that admitted appraisals as business records, the record's proponent introduced evidence, such as a sworn affidavit or deposition testimony, that established that the record at issue was authentic and that it was produced "in the course of a regularly conducted activity of a business."  *See, e.g.*, *Nat'l W. Life Ins.*, 213 F. Supp. 2d at 347; *United States v. Panza*, 750 F.2d 1141, 1151 (2d Cir. 1984) (admitting "relevant insurance company files, which were authenticated by qualified representatives of the companies involved," including appraisals).

Because Triadou has not identified evidence that would lay a proper foundation for admitting the appraisals as business records—whether that took the form of deposition testimony, an affidavit, or testimony at trial—the Court does not now conclude that the appraisals may be admitted for the truth of their appraisal values.

### C.  The Court will not exclude the testimony of Ryan Pisarik

Triadou seeks to introduce Ryan Pisarik as an expert witness to rebut BTA's expert witness Bruce Dubinsky, whose expert testimony Triadou has not sought to exclude.  In his report, Dubinsky ultimately concluded that "[m]onies originating from BTA were used by Ablyazov in a series of transactions in a money laundering scheme, which involved the purchase of interests in real estate investments in the U.S. and were structured in a manner that concealed the true origin of the monies," including through Triadou's investments in the Flatotel.  Schwartz Decl., Ex. A ("Dubinsky Rep.") at 20, 41–46, Dkt. No. 1304.  Relevant here, Dubinsky concluded that in 2004, a division of BTA named UKB6, then under Mukhtar Ablyazov's control, loaned $115,000,000 to Tradestock, a company also controlled by Ablyazov.  *Id.* at 24–

26.  According to Dubinsky, a portion of those funds were then transferred through a series of fraudulent loans and ultimately ended in U.S. real estate investments by Triadou.  *Id.* at 26–41.

Pisarik "is a Senior Managing Director at FTI Consulting" and has over 20 years' experience in forensic accounting, anti-money laundering, and other financial investigations. Skakel Decl., Ex. 1 ("Pisarik Rep.") at A-1, Dkt. No. 1345.  He is a certified public accountant, certified in financial forensics, a certified fraud examiner, and a certified anti-money laundering specialist.  *Id.*  In his rebuttal report, Pisarik identified a series of errors in Dubinsky's report that relate to the initial step in the laundering scheme identified by Dubinsky, BTA's loan to Tradestock at Ablyazov's direction.  Pisarik concluded that "there is insufficient evidence for Dubinsky to conclude that: [1] all of the funds transferred to Tradestock originated from BTA; [2] the funds involved in the Tradestock Loan . . . were misappropriated; [3] Ablyazov was in control of BTA at the time of the Tradestock Loan; [4] UKB6 was connected in any way to the Tradestock Loan . . . ; or [5] at the time of the Tradestock Loan, Ablyazov controlled Tradestock or the entities that allegedly loaned funds to Tradestock."  *Id.* at 21.

BTA argues that Pisarik's testimony should be excluded because his bottom line—that Dubinsky lacked sufficient evidence to reach the conclusion that he did—did not require expertise and can instead be demonstrated during cross-examination of Dubsinky.  BTA Pisarik Br. at 19.  BTA also purports to identify "numerous factual errors" in Pisarik's report that, in combination, render his expert opinion unreliable.  *Id.* at 16.  Last, BTA requests that Pisarik's testimony be contained to the opinions in his report, *id.* at 20, a request that Triadou does not oppose, Triadou Pisarik Resp. at 23–24, Dkt. No. 1342, and so this Court does not address further.

The Court finds that neither of BTA's arguments justify excluding Pisarik's testimony. *First*, the Court finds that Pisarik applied a reliable method to reach an opinion that will be helpful to jurors in evaluating Dubinsky's expert opinion.  The "flexibility" of Rule 702 is particularly appropriate when an expert's field does not lend itself to "the exactness of hard science methodologies."  *E.E.O.C. v. Bloomberg L.P.*, No. 07-CV-8383 (LAP), 2010 WL 3466370, at *13–14 (S.D.N.Y. Aug. 31, 2010) (second quote from *United States v. Simmons*, 470 F.3d 1115, 1123 (5th Cir. 2006)); *Hughes v. The Ester C Co.*, 317 F.R.D. 333, 341 (E.D.N.Y. 2016) ("Because these disciplines require the use of professional judgment, expert testimony is less likely to be excluded because challenges may ultimately be viewed as matters in which reasonable experts may differ." (quoting *In re Air Cargo Shipping Servs. Antitrust Litig.*, 06–MD–1175, 2014 WL 7882100, at *8 (E.D.N.Y. Oct. 15, 2014)).  Both Pisarik and Dubinsky agree that while there is no set "recipe . . . for conducting a fraud examination," the "general tenets" of their profession are reflected in the Certified Fraud Examiner's manual. Skakel Decl., Ex. 6 ("Dubinsky Dep.") at 17, Dkt. No. 1343; *see also* Pisarik Rep. at 4, B-11 (citing the manual).  As Dubinsky explained at his deposition, his "methodology centers around understanding the facts of the case, looking at available documents, what is the universe that's available.  Going through those documents and assessing whether they support or refute the allegations."  Dubinsky Dep. at 31.  That description closely resembles Pisarik's, as he explained he would first "look at the bank's internal accounting records, their financial records, the books and records of a bank to understand what exactly happened with various transactions" as well as to "loan agreements and loan repayment schedules" and to "external communications between the bank and the customer."  Skakel Decl., Ex. 2 ("Pisarik Dep.") at 53–54, Dkt. No. 1343; *see also id.* at 77–78.

Here, Pisarik considered the same evidence as did Dubinsky and, applying his own experience and training in the same field, came to a different conclusion, namely that Triadou could not be linked to BTA's stolen funds with the degree of confidence that an expert in their field would accept to be sufficient.  Pisarik Dep. at 21.  That assessment goes beyond a lay juror's understanding of the evidence at issue here and, in line with the role of an expert, appropriately "identif[ies] variations in the evidence or record evidence overlooked."  *Scott*, 315 F.R.D. at 48; *accord Wiand v. Wells Fargo Bank, N.A.*, No. 8:12-CV-00557-T-27, 2014 WL 1819616, at *2 (M.D. Fla. May 7, 2014) (noting that an "expert should not be called simply to support arguments lawyers can draw from cross examination" but that an expert is appropriate to offer "criticism of [another expert's] methodology").  To the extent BTA argues that Dubinsky's report better accounts for the factual record than does Pisarik's, that also does not justify exclusion of his testimony.  *See In re Digital Music Antitrust Litig.*, 321 F.R.D. 64, 80 (S.D.N.Y. 2017) ("Where expert witnesses disagree on the interpretation of evidence properly admitted before the Court, it is not the Court's role to resolve the dispute through exclusion of one of the expert's opinions.").  Nor is Pisarik, as a rebuttal witness, obligated to provide his own affirmative narrative of where Triadou's funding originated.  *Scott*, 315 F.R.D. at 44.

*Second*, the Court concludes that Pisarik's report does not contain inaccuracies sufficient to exclude it as unreliable.  As Triadou notes, many of the alleged factual errors that BTA identifies in Pisarik's report are evident only by reference to evidence that was obtained after Dubinsky himself prepared his report.  Triadou Pisarik Resp. at 17–18, 20–22.  These apparent errors are therefore ripe for cross examination of Pisarik, but do not require his exclusion.  Nor is Pisarik's report unreliable because he focuses on only one portion of Dubinsky's report.  A

rebuttal witness has no obligation to address all portions of an expert's opinion so long as the rebuttal testimony is relevant, as Pisarik's, if credited, undeniably would be.

Last, the Court rejects BTA's alternate request, raised only in a footnote, BTA Pisarik Br. at 21 n.10, that Pisarik's testimony be excluded for lack of qualifications. As Triadou describes, Pisarik's credentials and experience qualify him to conduct the analysis in his report and he has conducted similar analyses of financial transactions and money laundering in the past, whether for litigation or other purposes. Triadou Pisarik Resp. at 10–11, Dkt. No. 1342; *see also In re M/V MSC FLAMINIA*, No. 12-CV-8892 (KBF), 2017 WL 3208598, at *15 n.9 (S.D.N.Y. July 28, 2017).

The Court therefore denies BTA's motion to exclude Pisarik's testimony as an expert witness.

### D. The Court will partially exclude the testimony of Jennifer Sims Vu

BTA retained Jennifer Sims Vu as a rebuttal expert to Triadou's expert Guedj. Sims Vu is a certified public accountant, is accredited in business valuation, and is an accredited senior appraiser who works as a managing director in the valuation and business analytics group at BDO, where Horvath also works. Skakel Decl., Ex. 3 ("Sims Vu Rep.") at 1, Dkt. No. 1276. In her report, Sims Vu identifies several purported errors in Guedj's report, including that he did not identify a standard of value, did not perform an independent valuation of Triadou's interest, and calculated an improper discount for lack of marketability, among other issues. "In responding to Dr. Guedj's assessment," Sims Vu also conducted an independent valuation of Triadou's interest, correcting for Guedj's supposed errors. *Id.* at 17. Triadou raises three arguments for Sims Vu's exclusion.

*First*, it seeks exclusion of legal conclusions in Sims Vu's report about what standard of value is required under New York law and whether New York law permits discounts for lack of marketability or lack of control. *See* Sims Vu Rep. at 5–6. BTA claims Sims Vu's report only assumes aspects of New York law and offers no impermissible conclusions. BTA Sims Vu Resp. at 14–15, Dkt. No. 1350. The Court agrees that Sims Vu lacks the qualifications to testify as to the proper measure of value under New York law or on whether New York law permits the application of certain discounts in calculating that value. More importantly, testimony on either issue would be an impermissible legal conclusion. To the extent Sims Vu may seek to offer an opinion at trial on what calculations New York law does or does not permit, that testimony is excluded. *See Sacerdote v. N.Y. Univ.*, No. 16 CIV. 6284 (AT), 2019 WL 2763922, at *3 (S.D.N.Y. July 1, 2019), *aff'd*, 9 F.4th 95 (2d Cir. 2021). But Sims Vu may, of course, offer an expert opinion that relies on assumptions about the law provided by Triadou's counsel. Should Triadou demonstrate that those legal assumptions are erroneous, that could affect the weight, but not the admissibility, of the opinion. *See Wantanabe Realty Corp. v. City of New York*, No. 01 Civ.10137 (LAK), 2004 WL 27720, *2 (S.D.N.Y. Jan. 5, 2004).

*Second*, Triadou identifies two errors in Sims Vu's two-step calculation of a discount for lack of marketability that, Triadou says, undermines her conclusion's reliability. First, much like Guedj, Sims Vu relied on academic stock studies to calculate a "benchmark" discount. Sims Vu Rep. at 20. Sims Vu considered the results of three studies to calculate a weighted average, assigning 80 percent of the weight to the FMV Restricted Stock Study, which had the lowest discount rate of the three. *Id.* at 20–27. She explained that she placed such weight on the study "based on [its] larger sample of transactions" and because it "utilizes the most recent dat." *Id.* at 27; *see also* Schwartz Decl., Ex. 6 ("Sims Vu Dep.") at 166, Dkt. No. 1351. Triadou argues that

particular weighting was "arbitrary and unexplained," requiring exclusion.  Triadou Sims Vu Br. at 11–13 (citing, e.g., *In re Mirena Ius Levonorgestrel-Related Prod. Liab. Litig. (No. II)*, 341 F. Supp. 3d 213, 248 (S.D.N.Y. 2018), *aff'd sub nom.*, 982 F.3d 113 (2d Cir. 2020) ("[W]here experts have claimed to apply Bradford Hill [epidemiological factors], courts have insisted on a clear explication of the weighting assigned to the different criteria.").  In the course of questioning on this issue, Sims Vu stated at her deposition that "this is what ultimately we selected."  Sims Vu Dep. at 171.  Had Sims Vu used a different weighting, Triadou observes, the ultimate valuation of Triadou's interest in the Flatotel would have been different, and almost certainly lower.  Triadou Sims Vu Br. at 13.

The Court concludes that Sims Vu's selected weighting is a proper basis for cross-examination but does not justify exclusion.  "An expert can theoretically assign the most weight to only a few factors, or draw conclusions about one factor based on a particular combination of evidence."  *Daniels-Feasel v. Forest Pharms., Inc.*, No. 17 CV 4188-LTS, 2021 WL 4037820, at *7 (S.D.N.Y. Sept. 3, 2021) (quoting *In re Zoloft (Sertraline Hydrochloride) Prod. Liab. Litig.*, 858 F.3d 787, 796 (3d Cir. 2017)).  Sims Vu reasonably assigned significantly greater weight to the FMV Restricted Stock Study because its dataset was both larger and more recent than the other two studies used.  Indeed, only the FMV study included data from this millennium.  Sims Vu Rep. at 20–27.  Moreover, Triadou's suggestion that Sims Vu should have instead assigned equal weight to each study would, if anything, result in an even more arbitrary result.

Sims Vu followed this quantitative weighting of the studies with a qualitative adjustment to account for differences between the studies and the facts of this case according to the factors listed in *Mandelbaum v. Commissioner*, 69 T.C.M. (CCH) 2852 (T.C. 1995), *aff'd*, 91 F.3d 124 (3d Cir. 1996).  Sims Vu Rep. at 28–29.  For each factor, Sims Vu noted how this case compared

to companies evaluated in the stock studies and noted the direction that the discount for lack of marketability should be adjusted. *Id.* at 29–31. Sims Vu then assigned a numerical adjustment to each qualitative factor. *Id.* at Schedule 3A. For example, she assigned an upward adjustment of 3 percent because of the lack of available financial statements, which would suggest to the buyer that Triadou's interest in the Flatotel was a riskier investment. *Id.* After calculating all factors, Sims Vu increased the discount by 7 percent above what the quantitative step alone found. *Id.*

Triadou does not object to Sims Vu's use of the *Mandelbaum* factors or her qualitative assessment of the direction in which each factor points, but, it says, Sims Vu "did not explain or offer analysis as to how she chose the specific numerical adjustments she used." Triadou Sims Vu Br. at 13–14. Instead of adjusting for 3 percent, for example, she could have adjusted by 12 percent—no reliable methodology dictated one over the other. *Id.* at 14 & n.7. BTA responds that Sims Vu made these numerical adjustments using her "professional judgment," citing to a leading treatise's instruction that "'there is no empirically supported formula to assess the impact of each' of the factors." BTA Sims Vu Resp. at 22.

The Court agrees with Triadou. It reiterates that an expert in Sims Vu's field need not necessarily act with "the exactness of hard science methodologies." *Bloomberg L.P.*, 2010 WL 3466370, at *13–14. But Sims Vu's report provides no justification whatsoever for the numerical values that she selected to make her adjustments. Triadou's reference to Sims Vu's "professional judgment" is, without more, insufficient to fill this gap. *See United States v. Percoco*, No. 16-CR-776 (VEC), 2018 WL 879499, at *4 (S.D.N.Y. Feb. 13, 2018) (finding inadequate an expert's explanation that a particular numerical value was "just a judgment call"); *523 IP LLC v. CureMD.Com*, 48 F. Supp. 3d 600, 643 (S.D.N.Y. 2014) ("[A]n expert basing his

opinion solely on his experience must do more than aver conclusorily that his experience led to his opinion . . . .").  The Court's concern is heightened by several statements in Sims Vu's deposition highlighted by Triadou.  *E.g.*, Sims Vu Dep. at 163 (referring to the adjustments as "an overall sanity check"); 164 ("It's professional judgment, what that qualitative factor and how it's baked in, but, ultimately, the concluded discount for lack of marketability, we need to find comfort in that number.").  These statements, in the absence of another basis on which the adjustments were made, are suggestive of "reverse-engineering a theory to fit the desired outcome."  *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-CV-5810 (JMF), 2017 WL 6729295, at *8 (S.D.N.Y. Dec. 28, 2017) (quoting *In re Mirena*, 169 F. Supp. 3d at 430).

The Court therefore excludes any portion of Sims Vu's testimony that relies upon her numerical adjustments based on the *Mandelbaum* factors.

*Last*, Triadou argues that all portions of Sims Vu's valuation of Triadou's interest in the Flatotel should be excluded because it is affirmative expert testimony but Sims Vu was produced only as a rebuttal expert after the deadline for disclosing affirmative expert reports had passed.  Triadou Sims Vu Br. at 16–21.  The Court rejects this argument.

Under Federal Rule of Civil Procedure 26, a rebuttal expert "is intended solely to contradict or rebut evidence on the same subject matter identified by another party."  Fed. R. Civ. P. 26(a)(2)(D)(i).  Courts in this Circuit "have been reluctant to narrowly construe the phrase 'same subject matter' beyond its plain language."  *Scott*, 315 F.R.D. at 44 (quoting *Allen v. Dairy Farmers of Am., Inc.*, 09-CV-230, 2013 WL 211303, at *5 (D. Vt. Jan. 18, 2013)).  "A rebuttal expert is permitted to use new methodologies 'for the purpose of rebutting or critiquing the opinions of [the opposing party's] expert witness.'"  *Id.*  (quoting *Park W. Radiology v. CareCore Nat'l LLC*, 675 F. Supp. 2d 314, 326 (S.D.N.Y. 2009)).

Here, Sims Vu's affirmative valuation of the Triadou's interest applied a new methodology—ostensibly correcting for Guedj's errors—to the same subject matter of Guedj's report.  Other courts have permitted rebuttal experts in similar circumstances.  *E.g.*, *Scott*, 315 F.R.D. at 41–42, 45 (finding that a rebuttal expert's own calculations, allegedly correcting for errors by the first expert, "falls within the permissible bounds of rebuttal testimony"); *Hart v. BHH, LLC*, No. 15CV4804, 2018 WL 3471813, at *9 (S.D.N.Y. July 19, 2018) (finding that a new damages calculation "is proper rebuttal because it offers a new methodology").  Triadou's primary case, *Olivero v. Trek Bicycle Corp.*, 291 F. Supp. 3d 1209 (D. Colo. 2017), is not to the contrary.  *See* Triadou Sims Vu Br. at 18.  There, the court admitted all but one paragraph of the expert's report over objections that the report presented a "fanciful" new defense theory. *Olivero*, 291 F. Supp. 3d at 1216.  The court emphasized that the analysis "was at least foreseeable" to the plaintiffs, a rationale that supports admission of Sims Vu's valuation here. *Id.*; *accord Glass Dimensions, Inc. ex rel. Glass Dimensions, Inc. Profit Sharing Plan & Tr. v. State St. Bank & Tr. Co.*, 290 F.R.D. 11, 16 (D. Mass. 2013) (finding a report "falls outside the scope of proper rebuttal" where it "does not purport to respond to . . . or even refer to" the original expert's report).

In reply, Triadou additionally argues that BTA engaged in "gamesmanship" by including an initial valuation of Triadou's interest in the Flatotel prepared by Sims Vu, albeit without her name, as Exhibit A to Horvath's appraisal.  Triadou Sims Vu Reply at 1–4; BDO Rep., Ex. A. Sims Vu stated her agreement with Exhibit A and then applied discounts to arrive at her affirmative valuation of Triadou's interest in the Flatotel.  *See* Sims Vu Rep. at 18 & n.52.

The Court concludes that this set of facts does not convert Sims Vu's rebuttal into an affirmative expert report or otherwise justify exclusion.  First, this argument is new in reply as

neither Horvath's report nor Exhibit A to that report were mentioned in Triadou's initial brief. The argument is therefore waived. Second, this argument does not alter the Court's assessment of Sims Vu's report. Had Exhibit A not been provided at all, the Court would find that Sims Vu's report was a proper rebuttal to Guedj. That Horvath made Exhibit A available to Triadou before Sims Vu's rebuttal—for whatever reason—at most appears to have put Triadou on notice of BTA's alternative valuation of the Flatotel. And third, Triadou does not demonstrate how Sims Vu's use of Exhibit A as a starting point for her valuation differs materially from Guedj's own use of the Miller Cicero appraisal as a foundation for his opinion.

In sum, the Court partially grants Triadou's motion to exclude Sims Vu's testimony as to the legal conclusions expressed in her report and her adjustment of the discount for lack of marketability based on her numerical calculation of the *Mandelbaum* factors.

### E. The Court will partially exclude the testimony of Tarig Kozouz

BTA retained Tarig Kozouz as an expert witness on the structure of the alleged money laundering scheme in which Triadou was involved. Kozouz is a director at a financial and operational consulting firm, a certified fraud examiner, and a certified public accountant with over 20 years' experience in various forms of financial analysis. Skakel Decl., Ex. 1 ("Kozouz Rep.") at 3–4, Dkt. No. 1279. In his report, Kozouz looked at numerous financial statements and transactions between Triadou and its parent and subsidiaries. *Id.* at 9–10. In brief, he concluded (1) that Triadou has not maintained books and records in accordance with standard accounting practice; (2) that Triadou did not repay its loans and that Triadou's lenders did not act in an "economically rational" manner; (3) that Triadou transferred its proceeds to other corporate entities, including its parent, even as Triadou was financially distressed; and (4) that Triadou's parent did not repay a loan to Triadou. *Id.* at 10–11. Kozouz made repeated reference to his

professional "experience" in contrasting Triadou's records with what records he would expect to see.

Triadou argues that Kozouz's testimony should be excluded in its entirety because he references his experience only generally without further support, he does not cite specific accounting industry practices or customs to support his conclusions, and his summary of the facts are unnecessary to assist the jury. BTA argues that Kozouz's expertise is necessary to explain complex financial arrangements to the jury and that, in the alternative, his testimony should be admitted as a permissible summary of the documents under Federal Rule of Evidence 1006.

The Court agrees in part with Triadou and excludes those portions of Kozouz's testimony as an expert witness for which his general references to his professional experience are inadequate and those opinions that, even if the product of expertise, are not helpful to the jury in its determination of facts. The Court proceeds opinion-by-opinion.

First, the Court does not exclude Kozouz's opinion that Triadou did not regularly keep financial books and records in conformity with standard accounting practices. Such a fact, if true, could be relevant to a jury's determination of whether Triadou and its associated companies were engaged in a legitimate business enterprise. *See* BTA Kozouz Resp. at 17, Dkt. No. 1348; *contra* Triadou Kozouz Br. at 17 n.6. An explanation of what records would be proper to keep would be helpful to the jury and falls within the expertise of an accountant with Kozouz's experience. Triadou's claim that Kozouz has no experience with "standard accounting practices" for companies based in Switzerland or Luxembourg, as Triadou and its parent are, is belied by statements made during Kozouz's deposition. Schwartz Decl., Ex. 2 ("Kozouz Dep.") at 60–61,

Dkt. No. 1349 ("I have worked on a number of cases for companies that were domiciled in Luxembourg.").

Second, Kozouz's opinion that Triadou's lenders did not act in an "economically rational" manner is excluded. *See* Kozouz Rep. at 10, 14. Kozouz does not define the term in his report. In his deposition, he ultimately defines it as "an economic actor acting in their own best interest." Kozouz Dep. at 178. BTA has not shown that this definition is derived from any authoritative source or from Kozouz's expert experience. The Court finds that a lay juror is capable of determining whether it is "rational" for a lender to seek or not seek repayment of funds that it loaned out. *Cf. United States v. Finazzo*, 682 F. App'x 6, 10 (2d Cir. 2017) (affirming the exclusion of a financial accountant's opinion that the terms of a loan were a "good deal" because "it addressed lay matters that the jury was capable of understanding and deciding without the expert's help"). Kozouz's conclusory statements based on his experience of what actions he would expect of a lender that acted rationally do not amount to expertise that would be helpful to the jury's determination. *See LinkCo, Inc. v. Fujitsu Ltd.*, No. 00-CV-7242 (SAS), 2002 WL 1585551, at *4 (S.D.N.Y. July 16, 2002) ("If experts are permitted to testify on an issue of fact, they must provide some explanation for their conclusions, rather than referring generally to their experience.").

Kozouz may, however, use his expertise in reviewing and analyzing complex financial documents to testify whether, based on the documents he has reviewed, there is evidence that certain loans were repaid and, in the event of default, whether lenders took actions to seek repayment. Though jurors are capable of reading loan agreements and related financial statements themselves, courts in this district have admitted the testimony of forensic accountants to reconcile transactions recorded in financial documents and thereby assist the jury. *See, e.g.*,

*Sec. Inv. Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 592 B.R. 513, 519 (Bankr. S.D.N.Y. 2018), *aff'd sub nom.*, 605 B.R. 570 (S.D.N.Y. 2019), *aff'd sub nom.*, 830 F. App'x 669 (2d Cir. 2020) ("Ms. Collura sought to reconcile cash transactions reflected on the statements of the BLMIS customer accounts with available BLMIS bank records and other sources and trace the flow of those funds — tasks typically performed by forensic accountants.").

Third, for similar reasons, Kozouz may testify as to the series of financial transactions by which the proceeds of Triadou's investments in the United States were allegedly transferred to other corporate entities, including Triadou's parent. Even if a perceptive and persistent juror could sort through the documents and track the funds themselves, the Court nevertheless concludes that such expert testimony is admissible so long as it "'synthesizes' or 'summarizes' data in a manner that 'streamlines the presentation of that data to the jury, saving the jury time and avoiding unnecessary confusion.'" *Scott*, 315 F.R.D. at 45 (cleaned up) (quoting *Louis Vuitton Malletier S.A. v. Sunny Merch. Corp.*, 97 F.Supp.3d 485, 504 (S.D.N.Y.2015)).

Fourth, as with his second opinion, Kozouz may testify that, in his review of documents, he did not identify evidence that Triadou's parent repaid its loan to Triadou or that Triadou took efforts to enforce repayment. But Kozouz may not testify as to whether Triadou's behavior was economically rational or whether, in his experience, he would have expected Triadou to take a particular action in response to nonpayment.

The Court emphasizes that Kozouz's testimony may not act as a vehicle for BTA to "offer[ ] a narrative history" of the case to the jury or to simply "'regurgitate' the evidence" already available in the record. *In re Fosamax Prod. Liab. Litig.*, 645 F. Supp. 2d 164, 192 (S.D.N.Y. 2009) (second quote from *In re Prempro Prods. Liab. Litig.*, 554 F. Supp. 2d 871, 880, 886 (E.D. Ark. 2008)). Rather, Kozouz's testimony must remain limited to "defining any

34

complex or specialized terminology" that would be helpful in the jury's independent assessment of the documents as well as "drawing inferences that would not be apparent without the benefit of experience or specialized knowledge" that Kozouz possesses. *Id.*[7]

Triadou's remaining arguments do not require total exclusion of Kozouz's testimony. Triadou argues that Kozouz apparently overlooked certain documents in preparing his report. *E.g.*, Triadou Kozouz Br. at 13–14. Such an argument goes to the weight, not admissibility, of testimony. Triadou's argument that Kozouz did not adequately reference prevailing industry customs or standards, *id.* at 15–16, is addressed by limiting Kozouz's testimony as outlined above.

## IV.     Conclusion

For the reasons above, the Court DENIES BTA's motion to exclude the expert testimony of S. Ilan Guedj, Dkt. No. 1308, GRANTS IN PART BTA's motion to exclude the expert testimony of Thomas Tener, Dkt. No. 1299, DENIES BTA's motion to exclude the expert testimony of Ryan Pisarik, Dkt. No. 1305, GRANTS IN PART Triadou's motion to exclude the expert testimony of Jennifer Sims Vu, Dkt. No. 1274, and GRANTS IN PART Triadou's motion to exclude the expert testimony of Tarig Kozouz, Dkt. No. 1277.

The parties' motions for oral argument on their *Daubert* motions are DENIED as moot. Dkt. Nos. 1311, 1387.

This resolves docket numbers 1274, 1277, 1299, 1305, 1308, 1311, and 1387.

---

[7] The Court also notes, but does not decide, that some aspects of Kozouz's testimony as summarized may also be admissible as a "summary" or "chart" of "voluminous writings." Fed. R. Evid. 1006; *United States v. Am. Exp. Co.*, No. 10-CV-4496 NGG RER, 2014 WL 2879811, at *17 (E.D.N.Y. June 24, 2014) (noting that such summary may be offered in oral testimony but "reserv[ing] decision on whether" a summary is admissible).

SO ORDERED.


Dated: November 5, 2021
       New York, New York
                                              _____
                                                   ALISON J. NATHAN
                                                United States District Judge