# EXHIBIT 5.1

---

### MINUTES OF THE MEETING OF THE BOARD OF DIRECTORS

### SDG CAPITAL SA

(the "Company")

### 10 December 2012

---

Participants:

| | |
|---|---|
| Marc GILLIERON | Chairman |
| Nicolas GARNIER | Director |
| Christian GRANDJEAN | Director |

Attending:

| | |
|---|---|
| Cesare CERRITO | CFO |
| Jean-François GARNEAU | CEO |
| David GAYMARD | Acquisition Manager |
| Iliyas KHRAPUNOV | Advisor to the board of directors |
| Agnès COSSU | Chabrier Avocats |

The meeting opened on 10 December 2012 at 10:10 am at the seat of the Company.

\* \* \*

1. **OPENING**

    1.1. **President and Secretary**

    Mr. Marc GILLIERON took the chair, noted that all the directors were present and confirmed that the board of directors might validly deliberate.

    The Chairman appointed Ms Agnès COSSU as secretary, who accepted. He then reviewed the agenda which raised no comments.

    1.2. **Minutes of the previous meeting of the board of directors**

    The directors reviewed the minutes of the meeting of the board of 12 November 2012 and resolved to approve it.

2. **STATUS OF CURRENT SITUATION**

    2.1. **Operational Implications**

The directors discussed that the Company has been undergoing investigations order by the Prosecutor of Geneva in the context of the identities of one of the beneficial owners of the Company.

    2.2. **Financial Implications**

The President explains that the Prosecutor has not ordered the blocking of bank accounts of the Company except those with Banque Sarasin & Cie AG, Crédit Suisse, Schroeder & Co Banque SA. However, Banque Raiffeisen de Meyrin has unilaterally decided to block the accounts for an

Confidential
TRIA0010584

undetermined period of time. More generally, the banks have become extremely careful. Besides, deceptive information have been circulated by the media.

Considering the above, two new bank accounts were being opened, respectively in Italy and Belize, in order to be able to make payments, in particular salaries.

The directors discussed the opportunity of the potential transfer the Company to an external purchaser in order to smooth out operations and to resolve the issue of shareholding. They discussed the potential price which should range from CHF 5,000,000.- to CHF 10,000,000.-. PricewaterhouseCoopers could assist in the valuation of the Company. The fund could be or not be segregated at the discretion of the purchaser.

The directors agreed that the current financial situation of the Company would eventually impact the selling price. To this respect, they discussed the opportunity of a partial sale of assets (51°, Peach, Saas Fee properties).

### 2.3. Legal Implications

The Prosecutor did not order any searches at the premises of the Company nor at the premises of Chabrier Avocats.

The directors agreed that the board of the Company should write a letter to the Prosecutor in order to inform him on the situation with Banque Raiffeisen de Meyrin and to request that he intervene, as such blocking puts the business and operations of the Company at risk.

**Privileged**

Copies of such letter should be sent to the Prosecutor and the FINMA.

### 3. COMMUNICATIONS

#### 3.1. Communication Strategy

The directors agreed that a sole interview to the press be agreed upon the transfer of the Company and not before.

#### 3.2. Management of Communications

##### 3.2.1. Staff

The directors discussed that internal communication was already done upon the occurrence of the case. They agreed that the potential sale of the Company should not be disclosed to the staff for now.

##### 3.2.2. Providers

This item was discussed together with the officers of the Company who confirmed that the management team had endeavoured to communicate extensively with providers on the current situation as presented by the media. They pinpointed that such situation had greatly impacted their capacity to negotiate in particular deadlines.

##### 3.2.3. Clients

This item was not discussed independently.

Confidential
TRIA0010585

### 4. GOVERNANCE

#### 4.1. Discussion of the draft Organizational Regulations for the Company and Swiss Development Group SA

The directors reviewed the draft Organizational Regulations for the Company and Swiss Development Group SA and resolved to approve them.

\* \* \*

MM. Cesare CERRITO, Jean-François GARNEAU and David GAYMARD then joined the meeting. The directors of the Company informed them of the potential transfer of the Company to an external investor in order to smooth out operations. In such context, the directors requested from officers to compile statistics (number of jobs created, amounts of taxes paid, etc) in order to prepare the future steps. The directors confirmed that they had been working on solving the issue with banks and that officers should focus on the sale of 51° and Du Parc.

\* \* \*

### 5. SDG FUND

This item was not fully addressed during the meeting.

### 6. PROJECTS REVIEW – DISCUSSION, INSTRUCTIONS AND RECOMMENDATIONS

#### 6.1. Loeche Les Bains – 51°

David Gaymard reviewed this project. He confirmed that the local zoning plan had been filed (phase I and II) and that the results of the public enquiry will be received before year-end. Works had been launched but have been interrupted until spring because of snow. He advised that there have been a potential purchaser for a penthouse for an amount of CHF 6,000,000.- who should visit in the course of December/January.

The directors advised that services providers should be contacted to bring business opportunities. They also enquired on the funds to be injected which amount to CHF 4,100,000.- exclusive of ancillary expenses. The directors agreed that they need to check the Participative Loan Agreement entered into with Mr. Ziya BABAEV in order to check the level of dilution. The commercial portions remains to SDG Capital SA.

The decision is to sell both phases and an information memorandum should be dispatched before year-end.

#### 6.2. Saas Fee

There are 3 chalets. Chalet 11 has been transferred to Rockefeller Living SA. The sales teams have been briefed for the sale of the 2 remaining chalets at the price of CHF 17,000.- / $m^2$. Works will start in spring 2013 when both chalets are sold. Excavation works have been completed.

The officers confirmed that this project does not impact the cashflow of the Company as there is currently no works.

#### 6.3. Toepffer

3

Confidential
TRIA0010586

The directors agreed that this should be considered and file as a private mansion. It would be desirable and more potentially successful to file with the LDTR the application on behalf of a purchaser rather than as a developer but application should be filed in either case without delay.

David Gaymard advised that there are 2 potential buyers for 2 flats. The directors agreed that the offer should be reviewed. If such offer is not of any interest, then the building should be filed as one single private mansion. Furthermore, in view of the current situation of the shareholder of the Company, it would be more advisable to have this property transferred to an external purchaser rather than to the Company. The sale by unit shall be considered only if offers are registered in the CHF 36,000.-/sqm range in order to cover the current mortgage.

### 6.4. Edelweiss

David GAYMARD advises that he has recovered the deposit amount of CHF 4,000,000.-. The purchaser is willing to re-discuss the terms of the agreement.

The project has been launched without being in conformity with the zoning plan as it required the application of a zoning plan procedure.

The city of Sion was informed that the project has been maintained. The city of Sion has issued a call for tender with architects. The call for tender was a good opportunity to advertise the project and SDG. Furthermore the final decision of the choice of the architect is at the sole discretion of SDG.

## 7. OTHER PROJECTS AND FINANCIAL COMMITMENTS

### 7.1. Mayens de Bruson

For this project, a CHF 1,000,000.- deposit is required. The directors took good note of the project.

David Gaymard noted that guarantees should be provided should the fund never be launched.

### 7.2. Shop at Rue du Mont-Blanc

The real estate agency has provided the 10 years lease which is yet to be signed. The counterparty asks for a 6 months rent guarantee but David GAYMARD has been discussing into reducing it to 3 months.

Some works are to be undertaken. The rents will be paid all the same but paid-back once the works are completed.

The cost estimate for these works amounts to CHF 1,000,000.-. The public parts of the premises will have a cultivated style whereas the private parts a more simple design.

The directors resolved to approve such project.

### 7.3. Shop-windows at Four Seasons

The lease is renewable annually. The rent is payable as from January 2013.

The windows will be used to advertised Du Parc.

### 7.4. Current recruitment

The directors and officers reviewed the current needs in recruitment. Considering the overall situation, the directors agreed that recruitment should for now only focus on 2 positions:

- Group Sales Manager ;
- CEO for Rockefeller Estates SA.

4

Confidential
TRIA0010587

## 8. STRATEGIC PLAN FOR SALES AT DU PARC

The directors agreed that this review should only focus on Du Parc.

### 8.1. Marketing and Sales Strategies

M. Jean-François GARNEAU reviewed his presentation highlighting the focus of the sales strategy. The directors advised that they need a practical review listing in detail the advertising events, venues, dates, etc.

The directors advised that a new campaign should be launched as soon as possible. To this end, brokers should be contacted for Europe, Russia and China for the ski season.

The team management was provided with detailed advice on roadshows organisation and with an action plan which advancements are to be reported to them at the earliest:

1. Direct advertising : objects, concepts, types of images, timing, venues with focus on Russia, UE and Switzerland;
2. Marketing;
3. Roadshows: 20 minimum of 3-days duration, dates, venues, approaches of partners, list of appeals to potential clients (services, boarding schools, etc), entertainments. The directors advised that pop up events are only useful for data collection, should not be the priority and should only be grated small budgets. Real estates agents should also be approached with commission offers.
4. PR campaigns: the 20 roadshows should be used to attract PR professionals. Also, there should be a focus on galleries to team up with.

### 8.2. Team Strategy

See item 8.1.

The management team is to provide an indicative budget to the directors.

## 9. BUDGET 2013

### 9.1. Discussion of budget 2013

Mr. Cesare CERRITO advised that the current organisation does not allow a monthly reporting. Mr. Christian GRANDJEAN objected on the use of IFRS format which involves additional costs.

Then Mr. Cesare CERRITO reviewed the group's investment plans for FY2013 which reveals an overall need in equity of CHF 40,000,000.-.

The directors noted that a CHF 57,000,000.- cash injection is needed in the next few months and, in the worst case scenario, this cash injection would amount to CHF 85,000,000.-.

Mr. Cesare CERRITO advised that he cannot provide a cash flow for end of month as this depends on sales. In the event of no sales, there will be no other alternative but to discuss with providers into delaying deadlines.

Mr. Cesare CERRITO proposed to boost the sales at Du Parc by offering to purchasers to cover the PPE costs amounting to CHF 150,000.- in exchange of immediate payment of the purchase. However he highlighted the issue of confidence of the potential purchasers in the current context of investigations by the prosecutor. The directors advised that the team should talk into the purchasers to guarantee that the projects will not be abandoned.

The directors agreed that an action will be decided after meeting the prosecutor. They discussed the potential issuance of a comfort letter.

Confidential
TRIA0010588

The directors asked for cashflow needs reviews, respectively monthly reviews, a 6-months review and a 12-months review.

Mr. Cesare CERRITO advised that he needs confirmations of pending projects in order to be able to deliver a FY2013 operational forecast.

The Board of directors noted the budget and agreed that the financing plan would depend on the cash-flow situation.

## 10. WRAP UP AND CLOSE

### 10.1. Next Board Meeting

The directors agreed that they should convene again in the next few days once Mr. Cesare CERRITO would be able to provide the cashflow figures.

### 10.2. Close

There being no further business the President brought the meeting to a close at 3:50 pm.

_____          _____
The Chairman                     The Secretary

6

Confidential
TRIA0010589