# EXHIBIT 5.10

---

**MINUTES OF THE MEETING OF THE BOARD OF DIRECTORS**

**SDG CAPITAL SA**

(the "Company")

2 October 2013

---

Participants:

| | |
|---|---|
| Marc GILLIERON | Chairman |
| Philippe GLATZ | Director |
| Bernard KATZ | Director |

Attending:

| | |
|---|---|
| Cesare CERRITO | CFO |
| Jean-François GARNEAU | CEO |
| David GAYMARD | Executive Director Development and Acquisitions |
| Agnès COSSU | Chabrier Avocats |

The meeting opened on 2 October 2013 at 9:35 am at the seat of the Company.

\* \* \*

1. **OPENING**

    1.1. **Chairman and Secretary**

Mr. Marc GILLIERON took the chair, noted that the quorum was present and confirmed that the Board of directors might validly deliberate.

The Chairman appointed Ms Agnès COSSU as secretary, who accepted. He then reviewed the agenda.

   1.2. **Approval of minutes of previous meeting**

The board reviewed the draft minutes of the meeting of 3 September 2013. Mr. Bernard KATZ highlighted an omission in the attendance list. The minutes were amended accordingly and the board resolved to approve them.

2. **MANAGEMENT**

   2.1. **Review of current regulations**

The board decided to postpone the review of the current regulations to the next board meeting.

Confidential
TRIA0011286

3. **REVIEW OF INVESTMENT FUND**

The Chairman noted that MM. Nicolas BOURG and Kevin MEYER were excused but no information nor update was provided by them to the board of directors of the Company as to the latest developments with the investment fund, in particular the registration of the funds and the outcome of negotiations with Crédit Foncier bank.

The Board decided not to grant any further funding to the Igloo project.

The Chairman confirmed that the Porto Heli 2 project was discarded. The initial deposit in the amount of EUR 1,000,000.- required for this project has been allocated to the Porto Heli project.

The Board discussed the possible hindrances that have so far delayed the registration of the fund.

The Chairman explained that the project has probably not been introduced and filed in a proper manner with the authorities and that it might never be filed as a regulated fund as it might be deemed as not sound enough. The concept of the fund was a good concept though. The alternative options include private equity funding or the allocation to a sub-fund of an existing external regulated fund.

The Board decided to wait until year end for the final decision of the CSSF and enquired the advice of the external consultant of the Company.

4. **FINANCE**

   4.1. **Status of the Financial Restructuring Plan**

The Chairman confirmed that the financial restructuring plan was nearly completed with the reduction and subsequent increase of the share capital of the Company that occurred on 1st October 2013.

The Chairman indicated that Ms Hélène LE MARCHAND is to provide a definite balance sheet as of 1st October 2013 including the above financial operations on the share capital of the Company.

   4.2. **Financing: Deutsche Bank and Sarasin Bank**

As far as Sarasin bank is concerned, the Chairman indicated that the bank has been fully cooperating and its visit of the Du Parc site went well. It has come fully to their knowledge and awareness that Hotel du Parc, Mont Pélerin SA ("HDP") has undergone some cash-flow shortfalls.

Deposits on the sale of unit 4 were made up to CHF 5'650'000 as at date of meeting. There were negotiations with Sarasin bank on whether HDP might use part of such amount in order to pay the construction works. So far, the bank had agreed to allow HDP to use CHF 2'825'000 corresponding to 50% of the first two deposits made but such amount would not be sufficient to cover the construction costs amounting to CHF 4,000,000.- for September. HDP has therefore been negotiating with the bank for a CHF 4,000,000.- retainer. The third deposit CHF 2,000,000.- shall be made in the next few days and could allow a financial bridge for HDP if the bank agrees to use such deposit for the construction. The board agreed that it is in the bank's benefit to allow the completion of the construction works. The bank was to communicate its decision later the same day.

As far as the Deutsche Bank is concerned, the negotiations had gone well but the LFAIE remained a key issue. The bank required a complete LFAIE ruling which eventually provided the amendment of the security package. Indeed the bank had required a guarantee on the shares of the vehicle holding

Confidential
TRIA0011287

the property in addition to the property itself but the LFAIE authorities rules state that the borrower must not be dependent on the lender.

In order to balance such requirement from the LFAIE authorities, the bank then further required a personal guarantee from the beneficial owner in the amount of CHF 15,000,000.-. This new requirement led to a deadlock in the negotiations. Consequently, endeavours have focused on explaining to the bank that a guarantee on shares vs a guarantee on the property itself does not make any difference at all under Swiss law and could even be more burdensome as it raises tax and other regulatory issues. The board does not quite understand the motives of such additional request from the bank. Besides, the bank intends to make an amended filing with the LFAIE authorities including the CHF 15,000,000.- personal guarantee. The Board agreed that a meeting with the counterparty, the Swiss counsels of Deutsche Bank and Chabrier team be organised as soon as possible in order to discuss all legal pending issues and to talk with them regarding the only viable option of guarantee on the property rather than on the shares.

The board discussed the possibility for the bank to retain out of the CHF 125,000,000.- loan the amount of CHF 10,000,000.- as the required cash guarantee.

Then the board members discussed the potential available options with Sarasin Bank. They recalled that the bank is the creditor in the amount of grossly CHF 89,000,000.-. HDP could negotiate an additional CHF 15,000,000.- credit line with Sarasin Bank that would enable to enter into an agreement with Deutsche Bank and release Sarasin Bank from the CHF 89,000,000.- claim.

Besides, Sarasin Bank is a creditor to Dévol SA (which does not belong to the Company) and has received a related cash guarantee in the amount of CHF 10,000,000.-. If one finds an alternative funding for Dévol SA, then the cash guarantee of CHF 10,000,000.- could be released in favour of the respective shareholder and then possibly lent to the Company. Such amount could be used as the additional cash guarantee required to HDP by Deutsche Bank.

Alternatively, a CHF 10,000,000.- guarantee could be proposed to Deutsche Bank on the outbuilding of the Du Parc property.

Mr. Cesare CERRITO stressed that the proceeds of the sale of unit 4 are currently deposited on a notary's account in the amount of CHF 7,650,000.-. Sarasin bank has agreed to the use by HDP of 50% of CHF 5,650,000.- though this amount shall not be sufficient to cover all the contractors' bills. He added that he could try to discuss with Sarasin bank for the use of the whole of the proceeds.

The board agreed that a solution must be found as the units of the Du Parc property sell well. The board agreed that the Company should not rely entirely on the investment fund and that alternative options must be found. Meanwhile, the Company should focus primarily on the Du Parc project in order to have the construction works completed and the sales closed. The funding requirements of HDP for the completion of the works of the Du Parc project amount to CHF 30,000,000.-.

The board agreed that the overall situation of HDP is not that bad considering the current level of sales (12 as at date of meeting). The main issue for HDP consists in the immediate need for cash-flow and that consequently, the new guarantee requirements made by Deutsche Bank look actually excessive. Considering that HDP had already invested CHF 67,000,000.- equity in the project, the proposed mortgage guarantee over the property was deemed by the board to be sufficient. The board set a final deadline to Deutsche Bank to late October to accept the filing of the LFAIE ruling without the CHF 15,000,000.- personal guarantee.

The board agreed that cost-cutting wherever workable must be implemented.

### 4.3. Review of status – follow up on cost rationalisation plan

3

Confidential
TRIA0011288

Mr. Cesare CERRITO reviewed the cost situation. Most of the expenses relate to interest rates, salaries, premises and marketing. The most of interest expenses on bond emissions are subordinated (CHF 60,000,000.-). Therefore their related burden does not have an impact on the Company's cash-flow.

The workforce shall be reduced depending on the projects to be kept or sold off. Management shall adjust accordingly.

As far as the premises expenses are concerned, the third floor of the office situated at 20 Rue Philippe-Plantamour in Geneva currently partially sub-rented to Rockefeller Estates should be sub-let. There are already some potential tenants.

The boutique at rue du Mont-Blanc could be handed back for a saving on the rent and fit-out works that are still necessary. It is noted that the external consultant will be consulted.

As far as marketing events are concerned, it is discussed by the officers that the participations to the Montreux Jazz and MIPIM events, be scaled back. The Management team would continue to leverage and attend these events but it is agreed that full sponsorship for the Montreux Jazz event and Yacht for the MIPIM event be suspended until further notice. The Womanity Charity contribution is discussed. Until further notice no money should be disbursed for this project, but the officers suggested the Board to also discuss this issue with the external consultant.

Then Mr. Cesare CERRITO reviewed the various projects and entities based on his presentation. He stressed that each project could be either sold off or further funded.

Fund: the board notes that the disbursements paid for the fund have not been reimbursed yet:

- Igloo: the option could be to find some funding for the subsequent transfer of the land. So far, CHF 15,000,000.- have been invested. It is of the management's opinion that this project requires attention to maintain value of current investments. The accounts with GTM need to be settled. Then the sub-contracted works have to be completed since they have been initiated. As a management agreement was signed with Six Senses, the project will be easily attractive to potential investors.

   The board resolved to try to find some alternate funding to the current efforts deployed by Fund manager which have yielded nothing. In parallel the management will seek a potential purchaser for the project. Mr. Philippe Glatz is to liaise the officers with a broker in order to discuss a possible funding source with banks.

- Porto Heli: the Porto Heli 2 project (Amanzoe Chedi) was abandoned. The initial deposit in the amount of EUR 1,000,000.- made for this project has been allocated to the Porto Heli 1 project.

Revolution PRCo: the officers reported on a meeting with PrCo London, at which the fate of Revolution/PrCo was discussed. It is agreed to further discussions of integration of Revolution in the PrCo world with Robert Lyle, on the basis that the Revolution/PrCo entity in Geneva could be sustainable financially. This will be further investigated.

51°C: the Company has invested substantial equity in the project. The officers would pursue sales of indicidual units, bulk sales of units as well as finding new equity partners for the project. As of today it is estimated selling the project could yield CHF 15,000,000.- i.e. 54% of the book value.

Edelweiss: CHF 4,000,000.- have been invested in the purchase of Ours resorts. The officers believed that the best course of action was to increase the mortgage on the land at this point to free up some cash, in order to pay for the *plan de quartier*. It is discussed that It shall be difficult to monetize the project in any other way. The sale to a third party would be challenging at this time since the Company is currently a 50% partner with Mr. JM Fournier. This would not be a short-term option but rather a long-term one.

4

Confidential
TRIA0011289

<u>Phoenix</u>: both entities should be merged into one single entity, or one of the two entity dissoluted. The sale of the key money at the rue du Rhone in Geneva is being investigated with potential prospective retailers.

<u>Toepffer</u>: Mr. Jean-François GARNEAU confirmed that the LDTR authorities have rejected the application for the conversion of the property into units. The property should then be sold as it is (short term option). Besides, Mr. Cesare CERRITO confirmed that the Company has supported the burden of the interests of the loan granted by Sarasin Bank to Dévol SA. The officers should put together a clear action plan for selling as it is with the possibility of making it into a *hotel particulier*.

<u>Other:</u> Mr. Jean-François GARNEAU reviewed the outstanding fees due to the Company, mostly from the Fund, but also from accrued fees on other projects. The officers have also been exploring third party deals whereby the Company would act as a Project Manager under mandates. He further informed the board that the Company has been approached by various third parties for project management mandates.

The board welcomed this information and encouraged the project management mandates whenever possible.

### 4.4. Funding Requirements

Mr. Cesare CERRITO confirmed that the funding shortfall for the completion of the works of the Du Parc property amount to CHF 30,000,000.-.

Besides, he reminded the funding requirements to cover operating expenses for the next 3 months including the interests to be paid in September, November and April relating to the note issuance. Liquidity currently held in the Company (CHF 300,000.-) is not sufficient to cover end of October needs. If no sale of any asset nor recovery of outstanding payables actually occurs before the end of October, then an alternative source of funds would have to be found.

Mr. Cesare CERRITO informed the board that he has had discussions with other banks including Aareal and Royal Bank of Scotland among others.

Mr. Cesare CERRITO confirmed that, even with the sale of the Saas Fee property and the cash received from the Igloo project, the Company would still need some funding for its operating expenses.

The option to use a mezzanine loan in the amount of CHF 30,000,000.- was also discussed but to be considered as a last resort option.

## 5. REVIEW OF CURRENT PROJECTS

### 5.1. Hotel du Parc

There have been some good prospects for new purchases including two Chinese prospects for the penthouse.

Endeavours have been made in China to make contacts with family offices, as well as local brokers. The Penthouse generally receives good reviews and some traction in the Chinese market.

So far, 12 units have been sold. The closing for unit 18 is to take place in the next few days.

### 5.2. 51° Degree

No major development was to be reported.

Confidential
TRIA0011290

### 5.3. Other projects

<u>Saas Fee</u>: the officers informed on a written purchase offer in the amount of CHF 560,000.-. The initial purchase price amounted to CHF 1,000,000.-.

Another offer in the amount of CHF 900,000.- is being discussed, but only verbally as the purchaser is foreign and may have some Lex Koller, Lex Weber issues.

The board decided that the project should be sold off at the price of CHF 560,000.- The Company will try to leverage this offer with the other offer if possible. Mr. Jean-François GARNEAU also mentioned that a promote clause has been included in the offer, tying the selling price of the apartments to a higher purchase price.

## 6. WRAP UP AND CLOSE

### 6.1. Next Board Meeting

The next Board meeting is to be confirmed.

### 6.2. Close

There being no further business the Chairman brought the meeting to a close at 12:25 pm while Mr. Bernard KATZ left the meeting at 12:10 pm.

_____  _____
The Chairman             The Secretary

6

**Confidential**
**TRIA0011291**