# EXHIBIT 5.11

---

**MINUTES OF THE MEETING OF THE BOARD OF DIRECTORS**

**SDG CAPITAL SA**

(the "Company")

**26 June 2013**

---

Participants:

| | |
|---|---|
| Marc GILLIERON | Chairman |
| Philippe GLATZ | Director |
| Bernard KATZ | Director |

Attending:

| | |
|---|---|
| Cesare CERRITO | CFO |
| Jean-François GARNEAU | CEO |
| David GAYMARD | Executive Director Development and Acquisitions |
| Nicolas BOURG | Consultant |
| Kevin MEYER | Senior Analyst |
| Agnès COSSU | Chabrier Avocats |

The meeting opened on 26 June 2013 at 2:10 pm at the seat of the Company.

\* \* \*

### 1. OPENING

#### 1.1. Chairman and Secretary

Mr. Marc GILLIERON took the chair, noted that the quorum was present and confirmed that the Board of directors might validly deliberate.

The Chairman appointed Ms Agnès COSSU as secretary, who accepted. He then reviewed the agenda.

#### 1.2. Approval of minutes of previous meeting

The board reviewed the draft minutes of the meeting of 6 June 2013. The board resolved to approve it.

\* \* \*

The board decided unanimously to slightly change the sequencing of the items of the agenda for organisational reasons but the layout of the present minutes shall comply with the initial sequencing of the agenda as submitted to the board.

### 2. MANAGEMENT

#### 2.1. Review of current regulations

The board decided to postpone the review of the current regulations to the next board meeting.

Confidential
TRIA0011238

### 3. REVIEW OF INVESTMENT FUND

Mr. Nicolas BOURG gave an overview of the current projects of the fund and the status of the registration of the fund.

Mr. Nicolas BOURG explained that the CSSF, the Luxembourg financial regulation body, had required that the future General Partner provide a business plan to be more precise on the contemplated operations, which was done accordingly. No other issue was raised by the CSSF for the time being. The outlook is positive and the outcome should now only be a matter of weeks.

Mr. Kevin MEYER further explained that the team is now working on the setting up of the structure itself to allow the Fund to be created smoothly after authorization by the CSSF, which should not take long. He reckons that the structure should be in place by late July.

Mr. Philippe GLATZ enquired on the expectations of investments. Mr. Nicolas BOURG replied that the outlook is good and investments are going well on the 2 main projects sponsored by SDG Capital: Igloo and Porto Heli.

#### Igloo

The Letter of Intent from investors was received for a 50% stake which implies that Mr. L. FOUCHER's stake shall not be diluted. This investment enables the Company to cash-in fees in the amount of EUR 2,000,000 as project manager.

The Chairman inquired on the chance for this to close. Mr. Nicolas BOURG confirmed that the counterparty is reliable. The closing is scheduled for a date in 3 weeks' time.

Mr. Kevin MEYER further explained that the initial works started which is a good signal for investors and for the potential lender, Crédit Foncier. Mr. Nicolas BOURG explained that most compliance issues have been addressed with Crédit Foncier and that the Chairman of Crédit Foncier with whom Mr. Bourg has had contact, approves of Credit Foncier financing a part of the project. Mr. Nicolas BOURG further explained that he obtained from the potential lender a verbal agreement for a minimum of a EUR 10,000,000 loan (that is the amount of what has already been invested in the project) provided that the Company is able to provide a 50% equity for 50% loan by Crédit Foncier. Mr. Nicolas BOURG confirmed that following the Board decision as communicated by the Chairman by email to Kevin MEYER on 17 June 2013, to allocate up to EUR 800'000 to the project, there should be enough cash to finance works until September.

#### Porto Heli

The Chairman enquired on the two Memorandums of Understanding to be entered into with Dolphin Capital Investors Ltd ("Dolphin"). Mr. Nicolas BOURG explained that Dolphin's Porto Heli Nikki Beach project, in which the Company has already invested CHF 4,200,000, belongs to a wider global portfolio of projects known as the "Porto Heli Collection". The "Porto Heli Collection" includes the Amanzoe project relating to the existing Amanzoe Hotel and its luxury seafront villas. This Amanzoe hotel is already profitable, thanks to the strong Aman brand, and its products are successful.

The "Porto Heli Collection" portfolio also includes the "Chedi and Jack Nicklaus Signature Golf Course", which is a golf course conceived by renowned golf player and golf course designer Jack Nicklaus, and includes a hotel and 260 seafront villas.

Mr. Nicolas BOURG explained that the 3 projects actually enhance each other's value and potential. Furthermore, based on the Porto Heli Nikki Beach project experience, one can say that Dolphin is a reliable partner and that the partnership with Swiss Development Group (Alberto Hervello) has worked well.

2

Confidential
TRIA0011239

The contemplated deals are to enter into the said projects at a lesser value than that in the books of Dolphin. Mr. Nicolas BOURG reckoned that within 5 years, the yield should be 4 times the initial investment, in addition to the 25% stake in the hotel which shall also be profitable. As far as the golf project is concerned, the Company would acquire shares at a lesser value than that in the books of Dolphin and at half the price recently granted to Rosewood Hotels and Resorts. This good value is granted by Dolphin because SDG is a strategic partner to Dolphin. He confirmed that the vehicle for these acquisitions should be Porto Heli SPV SA, in Luxembourg.

Mr. Nicolas BOURG also explained that a new Greek legal frame provides the granting of a residence permit for the purchaser of a residential real estate asset from a certain value. This new legal provisions are particularly attractive to some investors, in particular Chinese citizens, and provides a solid customer base for the residential elements of the projects.

USA projects

Mr. Nicolas BOURG then introduced the 4 projects in the USA:

- The Flatotel project: the hotel went bankrupt in the past years, was acquired in order to to be converted into residential units, restaurants and office spaces. The Company owns a 37.5% stake. Brokers have shown a keen interest on the project, and as soon as the permit is granted (in the course of November), brokers should be involved to sell the residential units on plan. Mr. Nicolas BOURG reckoned that the project should be then sold out within 6 months with a significant profit for the owners.

- The Tri-County Mall in Cincinnati: the Company acquired a distressed loan for an amount of USD 28,350,000 for a note of a face value of USD 200,000,000 and with a planned exit in one year time. Current NOI of the mall already represents a 20% yield on this project.

- The Cabrini project: the building is a former hospital next to Gramercy Park in Manhattan, to be converted into high-end residential units. The Company, through its subsidiary Triadou SPV SA, has invested USD 6,000,000 (a 12% stake) which after capital raises will represent up to USD 12,000,000 invested by fund investors.

- The Syracuse project: this is a 100% stake acquisition, through Triadou SPV SA, of a 50 km$^2$ campus in Syracuse (NY) due to foreclosure (with no pending debt), for an amount of USD 2,200,000 (corresponding to the reserve price of the auctions sale). The concept is yet to be found but an agreement could be reached with a foreign state willing to set up a university, a research pole or an industrial project. The risk is close to nought.

MM. Nicolas BOURG and Kevin MEYER concluded that such high value projects shall be very attractive to future potential fund investors and compensate partly for the lack of track record of the fund. Furthermore, the General Partner shall receive a share of 20% on any profit above 9% IRR. This could prove very profitable considering that the Company owns a 75% stake in the General Partner. Mr. Nicolas BOURG explains that the team has been focused on obtaining the CSSF's agreement for the fund in order for it to be a regulated investment vehicle. This oversight by the Luxembourg regulator is an additional guarantee to investors, and it also enables substantial tax advantages.

4. **REVIEW OF CURRENT PROJECTS**

   4.1. **Sales Review**

51°: The works are currently suspended and should start again in the fall. Project Plan de Quartier has been approved, finally, and subject to standard one month recourse. There have been marketing endeavours for the summer season and construction signage and hoarding is to be installed in July, the showroom will be refreshed and on a go-forward basis act as a capture point. Although it is

3

Confidential
TRIA0011240

expected the clientele will be targeted Russian, it is important to have a local presence. Prioject pricing will be aggressive for first units. The current revised pricing has involved much value engineering of the project to achieve costs that are more in line with market. There has also been a focus on building contacts with the local community. Renewed marketing efforts will focus on new website, ad campaign and potential roadshow in Moscow from September.

Saasfee: the works are still suspended. Discussions are still ongoing with UK group interested in buying entire project.

Edelweiss: the acquisition of the land is finalised and the transfer of ownership from M. FOURNIER to the Company is in progress. Attention is now focused on completing the *plan de quartier*. MM. Garneau and Gaymard will be meeting with M. Fournier to finalize set-up of SPV Ours resort. It is expected the Plan de Quartier process will take anywhere from 18 to 24 months.

Devol SA: SDG is currently awaiting the "pre-avis positif" from the authorities, after which the application for permit will be deposited. Marketing activities, creation of small website and brochures underway.

Igloo: the issue is to safeguard the permit. To this end, the negotiated construction contract is to be signed GTM Annecy Pays de Savoie SAS.

Crans-Montana: the preliminary studies concluded potential for a resort hotel development. The first drafts seem acceptable. At this stage, before going any further, management suggests meeting informally with the authorities, to validate potential next steps. Because the purchase price of the land is attractive it is agreed to explore further. M. Garneau has briefly discussed the project with The Fund as an investment opportunity for them.

### 4.2. Financing

51°C:

Mr. Cesare CERRITO advised that Thermal Developments 2 SA is to issue bonds for the financing of the project. As the subscriber would be a foreign bank, he enquired whether this issuance would raise any LFAIE issues.

The Chairman advised that this would potentially raise some LFAIE issues. The solution could be to dispatch the issuance between two entities. He also advised that a ruling should be asked for to the LFAIE authorities on a no-name basis in order to have it approved in principle. He further advised that it could be confirmed to the LFAIE authorities that the financing does not affect whatsoever the control of the company and a exemption could be applied for. If the project is approved as a commercial project by the cantonal LFAIE authorities, then there should not be any issues. The granting of a *plan de quartier* is a positive first step. The city of Leukerbad could also issue a letter confirming that the project is commercial. Mr. David GAYMARD confirmed that the permit for phase II could be obtained promptly.

Based on this, Mr. Cesare CERRITO proposed a bridge financing but he was confirmed that some money is expected from Igloo SPV SA in the amount of EUR 10,000,000 in the next three weeks.

The Chairman advised that the confirmation from the city of Leukerbad that the project is commercial should be obtained as soon as possible, and that financing would be decided accordingly.

Edelweiss: the financing amounts to CHF 7,000,000 for which a shareholder's loan is expected.

Devol SA: expenses shall be born by Devol SA.

Igloo: the amount for works as of 31 July 2013 is of EUR 250,000 before tax. But these expenses have already been provisioned for. The amount of EUR 1,400,000 shall be disbursed in February 2014 but by this time, the project will be financed by the fund.

4

Confidential
TRIA0011241

### 5. REVIEW OF HOTEL DU PARC

#### 5.1. Sales Review

There have been 2 sales since the last board meeting. An additional one is about to be concluded and another one is pending subject to the incorporation of its acquisition vehicle. Mr. Jean-François GARNEAU confirmed that the sovereign fund is still interested in the penthouse but the fund is rather focused on the 51°C project.

Works have been handicapped by late mayments of last few months, however have resumed. On the critical path, discussions are ongoing with the millwork subcontractor who has slowed down the construction once again.

#### 5.2. Financing

This issue was not addressed as an independent item.

### 6. REVIEW OF BOND ISSUANCE

#### 6.1. Introducing

The Chairman gave a brief update of bond issuances of the Company.

#### 6.2. Subordination Agreement

He confirmed that the Company obtained the subordination from Compagnie Privée de Conseils et d'Investissements SA of its claims in the amount of CHF 60,000,000.

#### 6.3. Status

There shall be not other bond issuance in the near future.

### 7. FINANCE

#### 7.1. Review of status

Mr. Cesare CERRITO gave an overview of the current situation in particular with Banque Sarasin & Cie. The loan that would be granted by Deutsche Bank in London would enable to find a way out with Banque Sarasin & Cie.

The pending issue with Deutsche Bank in London is that of valuation. The target of the Company is CHF 125,000,000. Deutsche Bank in London commissioned CBRE for the valuation survey but CBRE is not favourable choice for the Company. Nevertheless CBRE delivered a marketing plan some years ago for the Company, so CBRE could not give any adverse opinion.

Mr. Cesare CERRITO confirmed that, should negotiations with Deutsche Bank in London fail, then the Company would be insolvent. He also confirmed that the notice is too short to find an alternative financing with another bank. Furthermore, a contractual clause in the agreement with Deutsche Bank in London, actually prohibits negotiations with other banks for a period of 45 days upon the signing of the term sheet. But the attendants agreed that the outlook is positive as the valuation is the only blocking issue in the negotiations.

Confidential
TRIA0011242

- Intra-group write-off of claims:
    - Claims of the Company against the subsidiaries in the amount of CHF 20,000,000: this should be an extraordinary income for the subsidiaries that should have a tax impact for them.
    - The above waivers would be an additional loss for the Company. The amount of CHF 28,000,000 should be injected as equity in order to ensure financial balance. This is exactly the amount of claims that Greencos SA and Daniyel KHRAPUNOV have against the Company. Greencos SA should capitalise its claims and Mr. Daniyel KHRAPUNOV should waive his claims. The accounts would then be reorganised in order to solve the capital loss situation but the cash flow issue would remain. The Company would then have to find some solutions to inject some cash unless some sales of Du Parc close within 3 weeks.
    - In order to avoid any negative impact of the debts of the Company on the new share subscription by Greencos SA, the share capital of the Company should be decreased to CHF 0 and then successively increased to the amount of the subscription by Greencos SA.

The above measures should be submitted for approval by the general meeting once the 3% stake of Mr. Nicolas GARNIER in the share capital of the Company is transferred to Greencos SA.

Mr. Philippe GLATZ noted that the operational charges amount to CHF 7,000,000 p.a. which is substantial and that cost-cutting measures should be considered. The board discussed the fact that charges could be decreased by CHF 1,500,000 p.a. This should be done after the summer in a way that the Company should not be destabilised. Focus should be on increasing performance levels in order to boost motivation, in particular in the new positive context of the group.

*The board of directors resolved to approve the above financial reorganisation measures.*

### 7.3. Funding Requirements

This issue was not addressed as an independent item. The above resolution of the board of directors was communicated to the officers during the meeting.

## 8. WRAP UP AND CLOSE

### 8.1. Next Board Meeting

The next Board meetings are the following:

- 18.07.2013 - 2pm;
- 03.09.2013 – 2pm.

### 8.2. Close

There being no further business the Chairman brought the meeting to a close at 4:50 pm.

The Chairman

The Secretary

6

Confidential
TRIA0011243