UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CITY OF ALMATY, KAZAKHSTAN and BTA BANK JSC,

                Plaintiffs,

   -against-

MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV, ILYAS KHRAPUNOV, and TRIADOU SPV S.A.,

                Defendants.

15 Civ. 5345 (JGK) (KHP)

---

**PLAINTIFF BTA BANK'S MEMORANDUM IN OPPOSITION TO TRIADOU'S MOTION IN LIMINE NO. 2 TO EXCLUDE EVIDENCE PERTAINING TO VIKTOR KHRAPUNOV AND THE KINDERGARTEN INVESTMENT**

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300
Facsimile: (212) 446-2350

*Attorneys for Plaintiffs
City of Almaty, Kazakhstan and
BTA Bank JSC*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................... 1

RELEVANT BACKGROUND .............................................................................................. 2

    I.       The Khrapunov Family and their Misappropriations from Almaty ........................... 2

    II.      Funding of SDG Capital and Triadou ........................................................................ 5

ARGUMENT ........................................................................................................................... 7

    I.       The Kindergarten Scheme is Relevant Under Rule 401. ............................................ 7

    II.      The Probative Value of the Kindergarten Scheme Is Not Substantially
               Outweighed by the Danger of Unfair Prejudice. ...................................................... 10

CONCLUSION ...................................................................................................................... 11

# **TABLE OF AUTHORITIES**

**Cases**

*Baxter Diagnostics Inc. v. Novatek Med. Inc.*,
  No. 94 Civ. 5220 (AJP), 1998 WL 665138 (S.D.N.Y. Sept. 25, 1998) ................................... 10

*E. Coast Novelty Co. v. City of New York*,
  842 F. Supp. 117 (S.D.N.Y. 1994) ........................................................................................ 8

*Omega SA v. 375 Canal, LLC*,
  984 F.3d 244 (2d Cir. 2021) ................................................................................................. 9

*United States v. Carboni*,
  204 F.3d 39 (2d Cir. 2000) ................................................................................................... 8

*United States v. Gilmore*,
  No. 19 CR. 724 (JGK), 2021 WL 4151009 (S.D.N.Y. Sept. 13, 2021) (Koeltl, *J.*) ................ 9

*United States v. Gonzalez*,
  110 F.3d 936 (2d Cir. 1997) ............................................................................................. 8, 9

*United States v. Gotti*,
  No. S8 02 CR 743 (RCC), 2004 WL 2423799 (S.D.N.Y. Oct. 29, 2004) .............................. 12

*United States v. Lombardozzi*,
  No. S1 02 CR. 273(PKL), 2003 WL 1907965 (S.D.N.Y. Apr. 17, 2003) ............................... 8

*United States v. Mercado*,
  573 F.3d 138 (2d Cir. 2009) ............................................................................................... 11

*United States v. Reifler*,
  446 F.3d 65 (2d Cir. 2006) ................................................................................................... 8

*United States v. Salerno*,
  868 F.2d 524 (2d Cir. 1989) ................................................................................................. 8

*United States v. Snype*,
  441 F.3d 119 (2d Cir. 2006) ............................................................................................... 11

**Rules**

Fed. R. Evid. 401 ........................................................................................................................ 8

Fed. R. Evid. 403 ...................................................................................................................... 10

Plaintiff BTA Bank JSC ("BTA") respectfully submits this memorandum of law in opposition to Defendant Triadou SPV S.A.'s Motion *in Limine* No. 2 to Exclude Evidence Pertaining to Viktor Khrapunov and the Kindergarten Investment.

**PRELIMINARY STATEMENT**

The Court should permit BTA to introduce a narrow set of evidence relating to a fraud committed by Viktor Khrapunov during his time as mayor of the City of Almaty. This evidence is part of an overall narrative and background that explains how Triadou was involved in a complex, money-laundering scheme that a criminal family operated against BTA and Almaty for years.

Triadou participated in a conspiracy to launder stolen money that was broader than just a handful of investments in the United States. For many years, Ilyas Khrapunov used Triadou and its parent company, Swiss Development Group, to launder the combined and ill-gotten wealth of both Ilyas's father-in-law, Mukhtar Ablyazov, and his father, Viktor Khrapunov. Although the precise dollars invested through Triadou that are the subject of trial trace to the fraud on BTA, evidence of Triadou's place within this broader conspiracy helps explain the nature and scope of the criminal enterprise and rebuts Triadou's contention that it was merely an innocent company making a handful of investments with money it believed was legitimately sourced. BTA seeks to introduce evidence of Viktor Khrapunov's misappropriation through one specific exemplar transaction, which will serve as critical background evidence of that money-laundering scheme. This evidence is also relevant to how Triadou was capitalized and underscores its sole purpose: money laundering. Accordingly, the Court should deny Triadou's motion and permit BTA to present the evidence.

**RELEVANT BACKGROUND**

This case involves a global criminal enterprise to launder funds stolen from BTA through various investments in the United States. Mukhtar Ablyazov stole billions of dollars from BTA in one of the largest bank frauds in history and executed a long-term conspiracy to launder that money through seemingly legitimate enterprises around the world. Ablyazov was assisted by his family and other co-conspirators, including members of the Khrapunov family, who are related to him through marriage. The Khrapunovs not only played a key role in helping Ablyazov hide the funds he stole from BTA, but they were also themselves stealing from the City of Almaty. As Ablyazov was stealing billions from BTA, the Khrapunovs were stealing hundreds of millions from Almaty and funneling that money to their son (and Ablyazov's son-in-law), Ilyas Khrapunov, for his real estate investments through SDG, Defendant Triadou's parent company. Evidence concerning Viktor Khrapunov's thefts from Almaty and the Khrapunovs' funding of SDG is highly relevant and helps explains the background and nature of the joint criminal enterprise between Ablyazov and the Khrapunovs.

**I.     The Khrapunov Family and their Misappropriations from Almaty**

Ilyas Khrapunov is the son of Leila Khrapunova and Viktor Khrapunov, and is Ablyazov's son-in-law through marriage in 2007 to his daughter, Madina Ablyazova. [ECF No. 1362 ¶ 4]. Viktor was the akim (or mayor) of Almaty from 1997 through 2004. [*Id.* ¶ 5; ECF No. 1516-30 at 50:17–51:12]. Ilyas and his family, including his parents Viktor and Leila, were under criminal investigation in Kazakhstan and Switzerland for money laundering. [ECF No. 1362 ¶ 320; ECF No. 1359-9 ¶ 11; ECF No. 1516-30 at 24:18–21].

Viktor abused his position as akim and conspired with Leila to misappropriate assets from the City of Almaty and conceal them through the money laundering scheme run by Ablyazov and Ilyas. Specifically, Viktor abused his position as akim of Almaty to privatize property in the city,

2

sell the assets for below-market rates to shell entities, transfer the property to Leila, sell the property at a substantial markup, and thus generate millions of dollars in profit. [ECF No. 1362 ¶¶ 319–30].

What Triadou calls the "Kindergarten Investment" is just one example of how Viktor and Leila executed their scheme to misappropriate money from Almaty. Through the scheme, Viktor generated a profit of $1.6 million at Almaty's expense, and Ablyazov was able to cause BTA to issue tens of millions of dollars in additional loans to Ablyazov-controlled entities that held the investment. At trial, BTA intends to introduce evidence of this transaction primarily through the testimony of two witnesses, which together will take approximately one hour of trial time: Viktor Khrapunov himself, and Bruce Dubinsky, a forensic accountant and money laundering expert. The scheme worked as follows.

On April 16, 2001, Viktor issued a government decree to privatize Kindergarten Building No. 186 in Almaty, which was then offered for sale by the Republic of Kazakhstan Territorial Committee of State Property and Privatisation of Almaty ("Tercom"). [*See* ECF Nos. 1516-1 (Viktor's privatization decree); 1516-5; 1516-6; *see also* ECF No. 1516-30 at 145:12–23; ECF No. 1516-31 at 63:8–17].[1] On December 26, 2001, TOO KazRealIncom ("KazRealIncom") bought the property for 52,155,100 Kazakhstani tenge, or about $350,000. [*See* ECF No. 1516-2 (12/26/01 agreement between Tercom and KazRealIncom); *see also* ECF No. 1359-14 at 61 (12/31/01 exchange rates)]. KazRealIncom's CEO, Abylaikhan Karymsakov, was only a nominal head and Leila Khrapunov controlled KazRealIncom. [ECF No. 1362 ¶ 324; *see also* ECF No. 1356-3 at 145:9–11 (01/30/18 Viktor Dep.) (acknowledging that Leila "may[]" have controlled

---

[1] The exhibits on BTA's exhibit list relevant to the Kindergarten scheme are attached to the Declaration of Deborah A. Skakel, ECF No. 1516.

3

KazRealIncom)].

Title to the Kindergarten Building transferred multiple times from 2001 to 2003 to other entities owned or controlled by Leila—and ultimately to Leila personally. [*See* ECF Nos. 1516-8 (04/11/02 resolution from TOO General Realty to KazRealIncom); ECF No. 1516-9 (09/26/03 Tercom certificate to KazRealIncom); ECF No. 1516-10 (09/30/03 resolution from KazRealIncom to TOO Karasha Plus); ECF No. 1516-11 (accompanying 10/01/03 contract); ECF No. 1516-12 (10/03/03 contract between TOO Karasha Plus and Leila); *see also* ECF No. 1516-13 (noting that Leila, Elvira, and Ilyas Khrapunov were founders); ECF No. 1359-22; ECF No. 1359-23 (noting that Karymsakov is CEO)].

In October 2003, Leila contributed the property as capital to TOO Building Service ("Building Service"), which she controlled, and the contribution agreement set the value of the Kindergarten Building at 288,304,892 Kazakhstani tenge, or about $1.95 million. [*See* ECF Nos. 1516-14, 1516-15; *see also* ECF No. 1516-31 at 70:18–23 (01/31/18 Viktor Dep.); ECF No. 1359-26 at 45 (09/30/03 exchange rates)]. Around that time, Leila sold her 100% interest in Building Service—which included the Kindergarten Building—to TOO Stroytech ("Stroytech") for 2,079,832,300 Kazakhstani tenge, or about $14 million. [*See* ECF No. 1516-4 (10/16/03 contract); ECF No. 1516-16 (10/16/03 resolution); ECF No. 1516-17 at 2 (bank record); *see also* ECF No. 1359-26 45 (09/30/03 exchange rates)].

Because Leila-controlled KazRealIncom purchased the Kindergarten Building for about $350,000 in 2011 and $1.95 million of Building Service's value in 2013 was traced to the building, Leila through the $14 million sale to Stroytech made about $1.6 million in profits from the building. On behalf of Stroytech, the $14 million in funds were transferred from BTA to Leila's JSC Eurasian Bank account on October 20, 2003. [*See* ECF No. 1516-17 at 2]. On May 7, 2004,

4

Building Service transferred the Kindergarten Building to Stroytech. [*See* ECF No. 1516-18 (05/07/04 transfer agreement)].

About three years later, on June 2, 2007, Stroytech transferred the property to BASK INVEST TOO ("BASK INVEST"). [*See* ECF No. 1516-19 at 13 (08/26/11 Kazakh police record of registered deeds for 242-a Furmanov Street in the Medeu District of Almaty)]. At the time, BASK INVEST was a subsidiary owned by TOO Eseke LTD ("Eseke"). [*See* ECF No. 1516-20 (BASK INVEST profile); ECF No. 1516-21 (Eseke profile)].

Two months later, in or about August 2007, Eseke and a company called Dudar Capital Ltd. used BASK INVEST as collateral for loans from BTA, in the amounts of $50,000,000 for Eseke and $51,275,000 for Dudar Capital. [*See* ECF No. 1359-33 at 10, 14–16 (08/15/17 BTA loan memorandum)]. Ablyazov controlled BASK INVEST, Eseke, and Dudar Capital at the time. [*See id*. at 12, 15; ECF No. 1357-55 at Schedule J ¶¶ 209–10; *id*. Schedule K ¶ 11].

Eventually, the Kazakh courts found Viktor and Leila guilty of embezzling about $300 million from Kazakhstan while Viktor served as akim, and the courts in October 2018 sentenced the pair in absentia to seventeen and fourteen years in prison, respectively. [*See* ECF No. 1356-1 at 278:6–16 (BTA Dep.); ECF No. 1359-10 ¶ 17 (Darmanbekov Decl.) (noting that akimat, or municipal government, of Almaty was deemed a victim under Kazakh law on November 25, 2011); *id*. Exs. C–D (Kazakh Anti-Corruption and Financial Crime Agency victim-designation resolution) ("The [Kazakh criminal] investigation uncovered many cases in which public properties belonging to the city of Almaty were alienated to the benefit of individuals and legal entities with ties to the Khrapunov family."); ECF No. 1359-11 (Former Almaty mayor, wife, sentenced to prison, Astana Times (Oct. 9, 2018))].

## II.     Funding of SDG Capital and Triadou

As explained in various submissions to the Court, members of the Khrapunov family were

key figures in Ablyazov's money-laundering scheme, which is at the heart of this case. Ilyas Khrapunov was central to the scheme: Ilyas was in charge of many of the shell companies used to hide the money that Ablyazov stole from BTA, and actively worked with Ablyazov to conceal his ownership of the stolen funds once BTA obtained freezing orders against Ablyazov's assets. [*See, e.g.*, ECF No. 1362 ¶¶ 236–282]. Viktor and Leila, in turn, used their ill-gotten wealth to fund Ilyas' money laundering operations through Triadou.

Multiple witnesses have testified that Triadou was controlled by Ilyas and that Triadou's parent company, SDG Capital, was funded at least in part by money from Leila Khrapunov. [ECF No. 1356-4 at 125:11–127:15 (09/13/18 Sater Dep.); ECF No. 1285-42 ¶ 22 (03/31/16 Bourg Aff.)]. In 2007, Ilyas Khrapunov incorporated a group of companies with the help of Nicolas Bourg. [ECF No. 1362 ¶ 67]. SDG Capital is the top holding company of the group, holding all its real estate assets, and Swiss Development Group S.A. was a wholly owned subsidiary and the service company running the business of the group. [*Id.*]. The real estate companies (collectively "SDG") were all controlled by Ablyazov and Ilyas and used to conceal the movement of Ablyazov's money into real estate development projects. [*See, e.g.*, ECF No. 1284-6 ¶ 6 (Bourg Decl.); ECF No. 1356-39 at 41:17–24 (09/27/17 Glatz Dep.)].

SDG was "created and financed" through "funds coming from" Ablyazov and Ilyas' extended family. [ECF No. 1356-38 at 142:10–143:10 (09/11/17 Bourg Dep.); ECF No. 1285-42 ¶¶ 22 (03/31/16 Bourg Aff.)]. The funding "came from the Khrapunov family and, in a wider sense, from Ablyazov." [ECF No. 1356-38 at 23:23–24:4 (09/11/17 Bourg Dep.)]. In particular, SDG Capital and Swiss Development were initially financed by a "gift or loan" by Leila and Viktor to Ilyas. [ECF No. 1356-4 at 125:11–127:15 (09/13/18 Sater Dep.); *see also* ECF No. 1285-42 ¶ 22 (03/31/16 Bourg Aff.) (testifying that Swiss Development "was created with funds from the

6

Khrapunov family"); *cf*. ECF No. 1356-43 at 49:21–50:10 (01/31/18 Viktor Dep.) (noting that it is "possible" that Leila provided "some support" to Swiss Development); ECF No. 1359-37 at 102:11–24, 132:19–133:5, 141:3–4, 145:3–11 (Cerrito Deposition)].

Nicolas Bourg also stated that "Ilyas told [him] that he had access to large amounts of capital, both through his immediate family and through" Ablyazov, and that SDG "was created with funds from the Khrapunov family." [ECF No. 1285-42 ¶¶ 4, 22 (03/31/16 Bourg Aff.)]. He then testified that SDG "was created with the funds of the Khrapunov extended family, . . . including Ablyazov, and Ilyas's father, Viktor Khrapunov." [ECF No. 1284-6 ¶ 31 (Bourg Decl.)]. He later clarified that he should have earlier said "created and financed," not just "created," and that the shell "benefited from the funds coming from [Ilyas's] extended family." [ECF No. 1356-38 at 142:10–143:10 (09/11/17 Bourg Dep.); *see also id.* at 23:23–24:4 ("SDG was set up by Ilyas Khrapunov and essentially the capital came from the Khrapunov family and, in a wider sense, from Ablyazov.")].

Ilyas later directed Bourg to form Triadou as a subsidiary of SDG Capital, which he did on September 12, 2012. [ECF No. 1362 ¶ 86]. SDG wholly owned Triadou until 2015. [*Id.* ¶ 87]. Triadou, like its parent company and affiliates, was created to launder the Kazakh Entities' stolen money into U.S. real estate investments that Ilyas selected and negotiated, with oversight from Ablyazov. [*Id.* ¶ 139].

## ARGUMENT

### I. The Kindergarten Scheme is Relevant Under Rule 401.

Evidence relating to Viktor Khrapunov and the Kindergarten Building scheme is relevant to demonstrating the scope, purpose, and operation of the criminal enterprise giving rise to BTA's claims in this case. Under Rule 401, evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in

7

determining the action." Fed. R. Evid. 401.  "To be relevant, evidence need only tend to prove the [plaintiff's] case, and evidence that adds context and dimension to the [plaintiff's] proof of the charges can have that tendency." *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997). Thus, courts often admit evidence "to provide background for the events alleged" or "to enable the jury to understand the complete story" of the alleged schemes. *United States v. Reifler*, 446 F.3d 65, 91–92 (2d Cir. 2006) (internal quotation marks omitted).  For example, evidence of uncharged conduct in a criminal case is relevant to issues other than witness credibility "if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial." *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000); *see also E. Coast Novelty Co. v. City of New York*, 842 F. Supp. 117, 119 (S.D.N.Y. 1994) ("The Second Circuit generally allows into evidence relevant facts regarding a defendant's prior crimes except to the extent such prior crimes would tend to prove only criminal propensity.").

     Here, the evidence at issue is relevant to demonstrate how the criminal enterprise in this case—a joint effort of two crime families to launder their illicit wealth—operated and the scope of that enterprise.  The Kindergarten scheme is all part of the same "series of transactions" as the transactions directly at issue in this case—a scheme by Ablyazov and the Khrapunovs to steal from BTA and Almaty, and launder that money around the world.  *See Carboni*, 204 F.3d at 44. Evidence of the scheme is also necessary to provide the jury with context about the crime family at issue.  *See, e.g.*, *United States v. Salerno*, 868 F.2d 524, 536 n.5 (2d Cir. 1989) (evidence of association with organized crime admissible to show "the background of interfamily relationships and the development of interfamily trust"); *United States v. Lombardozzi*, No. S1 02 CR. 273(PKL), 2003 WL 1907965, at *4 (S.D.N.Y. Apr. 17, 2003) ("the Court will permit some

8

background information to be supplied to the jury regarding where a made member fits into the hierarchy of a crime family").

Triadou's principal argument as to why the Kindergarten scheme is not relevant is that the Court found that the funds from the Kindergarten scheme are not directly traceable to Triadou and that a jury could not find that Almaty is entitled to recover those funds from Triadou by means of a conversion claim, thus dismissing Almaty's claims against Triadou at summary judgment. [Def. Mem. at 5]. BTA recognizes that Judge Nathan ruled on Almaty's standing to bring a conversion claim against Triadou based on the money Viktor stole from it through the Kindergarten scheme. But whether the funds from the Kindergarten scheme are directly traceable to Triadou—and thus whether Triadou is liable for converting them—is an entirely different question from whether the scheme is *relevant*. "Relevant evidence is not confined to that which directly establishes an element of the crime." *Gonzalez*, 110 F.3d at 941. Demonstrating relevance is a much lower burden than proving the elements of conversion: "[t]he standard for relevance is a low one." *United States v. Gilmore*, No. 19 CR. 724 (JGK), 2021 WL 4151009, at *2 (S.D.N.Y. Sept. 13, 2021) (Koeltl, *J.*); *see also Omega SA v. 375 Canal, LLC*, 984 F.3d 244, 257 (2d Cir. 2021) (district court in trademark trial did not err in admitting evidence of the sale of counterfeited marks not at issue in case for purpose of showing state of mind).

The background of where the Khrapunovs' wealth came from is also relevant to explain Triadou and SDG's sole purpose: to launder stolen money. Here, evidence shows that SDG's initial capital came from the Khrapunovs, including Viktor and Leila, whose wealth derives from millions of dollars stolen from Almaty. [ECF No. 1362 ¶¶ 319–30; ECF No. 1285-42 ¶ 22 (3/31/16 Bourg Decl.); ECF No. 1356-38 at 23:23–24:4 (9/11/17 Bourg Dep.)]. Testimony confirms that SDG was funded using "a $50-million-dollar gift or loan by Viktor and Leila to Iliyas to start the

9

company." [ECF No. 1356-4 at 126:12–127:12 (9/13/18 Sater Dep.)]. The funds the Khrapunovs used to capitalize SDG were then used to form and operate Triadou, which Ilyas used to further the money laundering schemes at issue in this case. [ECF No. 1362 ¶¶ 77, 224–25, 319–21]. Even if Almaty's funds were not the exact funds wired for Triadou's benefit and used to invest in the U.S. real estate at issue in this case, Triadou's money-laundering conduct could not have occurred but for Ilyas's receipt of money the Khrapunovs stole from Almaty.

## II. The Probative Value of the Kindergarten Scheme Is Not Substantially Outweighed by the Danger of Unfair Prejudice.

Limited evidence of the Kindergarten scheme will not cause unfair prejudice, confuse the issues, mislead the jury, or waste time. Pursuant to Rule 403, "[t]he court may exclude relevant evidence if its probative value is *substantially outweighed* by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403 (emphasis added).

Triadou first argues that even if the Kindergarten scheme is relevant, it should be excluded because it is only relevant to dismissed claims. [Defs.' Mem. at 6]. But as explained above, the evidence is relevant to BTA's remaining claims because it provides important context and background relating to the criminal enterprise through which the Ablyazov and Khrapunov families embezzled billions of dollars. Each of the cases Triadou cites is thus distinguishable. *See, e.g.*, *Baxter Diagnostics Inc. v. Novatek Med. Inc.*, No. 94 Civ. 5220 (AJP), 1998 WL 665138, at *3 (S.D.N.Y. Sept. 25, 1998) (excluding all evidence that related only to parties' dismissed punitive damages claims unless the evidence was relevant for other purposes).

Second, Triadou argues that the jury "may seek to punish Triadou for Viktor's alleged conduct, despite the fact that the conduct is wholly unrelated to Triadou and its investments." [Def. Mem. at 7]. Such a concern seems far-fetched – it is hard to imagine a scenario in which the jury

10

believes Triadou is innocent of laundering BTA's stolen money, but holds it responsible for Viktor's theft from Almaty – and in any case can be cured through an appropriate limiting instruction. *See, e.g.*, *United States v. Mercado*, 573 F.3d 138, 142 (2d Cir. 2009) (denying motion to exclude "evidence not directly related to the charged conduct" that had "the potential to be prejudicial" because, among other things, "the District court gave several careful instructions to the jury regarding what inferences it could draw from the admitted evidence"); *United States v. Snype*, 441 F.3d 119, 129–30 (2d Cir. 2006) (noting that "the law recognizes a strong presumption that juries follow limiting instructions").

Finally, Triadou argues that introducing the evidence "may create a mini-trial within the already-lengthy trial, distracting the jury." [Defs.' Mem. at 7]. But Triadou overstates the time it will take to present the evidence to the jury. In reality, evidence of the Kindergarten transaction will take place in approximately an hour of trial time, consisting of about 25–30 minutes of Viktor Khrapunov's testimony, plus similar length testimony from a money laundering expert.[2] Further, we do not understand Triadou to have a different account of this evidence, meaning that it will be presented efficiently and not devolve into the proverbial trial-within-a-trial.

## CONCLUSION

The Court should deny Triadou's motion in limine to Exclude Evidence Pertaining to Viktor Khrapunov and the Kindergarten Investment or, in the alternative, defer ruling. *See, e.g.*,

---

[2] BTA has marked 29 documentary exhibits related to the Kindergarten transaction, which is a function of the numerous entities involved in perpetrating that scheme through multiple steps. The expert will go through that evidence efficiently, and they will be admitted through Viktor's deposition testimony and/or a representative of Almaty.

11

*United States v. Gotti*, No. S8 02 CR 743 (RCC), 2004 WL 2423799, at *6 (S.D.N.Y. Oct. 29, 2004).

Dated: August 5, 2022
New York, New York                                    Respectfully,

 /s/ Matthew L. Schwartz
Matthew L. Schwartz
Craig A. Wenner
Sabina Mariella

BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300

*Attorneys for Plaintiff BTA Bank JSC*

12

**CERTIFICATION OF COUNSEL**

I hereby state that the foregoing Memorandum of Law was prepared on a computer using Microsoft Word. Pursuant to the word count system in Microsoft Word, the total number of words in the Brief, excluding the caption, signature block, and this certification is 3,447.

Dated: August 5, 2022                         Respectfully submitted,

/s/ *Matthew L. Schwartz*

Matthew L. Schwartz
Craig A. Wenner
Sabina Mariella
BOIES SCHILLER FLEXNER LLP
55 Hudson Yards
New York, New York 10001
Telephone: (212) 446-2300

*Attorneys for Plaintiff BTA Bank JSC*