**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

CITY OF ALMATY, KAZAKHSTAN and BTA
BANK JSC,

                Plaintiffs,

    -against-

MUKHTAR ABLYAZOV, VIKTOR
KHRAPUNOV, ILYAS KHRAPUNOV, and
TRIADOU SPV S.A.,

              Defendants.

ECF Case
No. 1:15-cv-05345 (JGK) (KHP)

**PLAINTIFF BTA BANK'S POST-TRIAL**
**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

## TABLE OF CONTENTS

I.   Findings of Fact ............................................................................................. 1

     A.   The Parties ..................................................................................... 1

          1.   BTA Bank ............................................................................. 1

          2.   Triadou SPV S.A. ................................................................. 2

     B.   Mukhtar Ablyazov Stole Billions of Dollars from BTA Bank ............................... 2

          1.   Mukhtar Ablyazov's Control of BTA Bank ................................. 3

          2.   Ablyazov's Corruption of Corporate Business Department No. 6 ("UKB6") ........................................................................... 5

          3.   Ablyazov's Transfer of $115.3 Million of BTA's Funds to Tradestock ......................................................................... 10

          4.   Ablyazov's Transfer of $103 Million of BTA's Funds from Tradestock to Thyler and Investment in Zhaikmunai ............................. 12

          5.   BTA's Discovery of Ablyazov's Embezzlement ...................................... 14

     C.   Ilyas and Ablyazov Use Their Family Member, Gennady Petelin, to Further Conceal the Source of the Laundered Money .......................................... 17

          1.   Ablyazov and Ilyas Khrapunov's Transfer of $103 Million of BTA's Funds, Plus Profits Derived from BTA's Funds, to Northern Seas Waterage ...................................................... 17

          2.   Ablyazov and Ilyas Khrapunov's Transfer of $95.84 Million through Shell Entities to Telford ............................................ 21

     D.   Triadou Invests $73.6 Million of BTA's Stolen Funds in U.S. Real Estate ........ 23

          1.   Khrapunov Invested Ablyazov's Money in the Flatotel. ......................... 25

          2.   Khrapunov Invested Ablyazov's Money in the Cabrini Medical Center. ....................................................................... 27

          3.   Khrapunov Invested Ablyazov's Money in the Tri-County Mall............. 28

          4.   Khrapunov Invested Ablyazov's Money in the Syracuse Development Center ............................................................. 28

5.      Khrapunov Ordered the Liquidation of Triadou's U.S. Investments Once Almaty Sued in the U.S. ................................................................ 30

E.      Triadou is a Shell Entity Controlled by Ilyas Khrapunov, Created for the Sole Purpose of Laundering Money. ................................................. 35

1.      Khrapunov Always Controlled SDG, Triadou's Parent Company .......... 35

2.      Khrapunov Also Controlled Triadou and Directed its Activities ............ 36

3.      Khrapunov Tried to Conceal His Ownership of SDG and Triadou with a Sham Sale of SDG to Phillipe Glatz ............................................. 37

4.      Khrapunov Tried to Hide His Identity When Conducting Business On Behalf of Triadou ................................................................................ 43

5.      Triadou Alleges that Petelin Funded its Investments, but the True Source of Funds Was Money Stolen from BTA By Ablyazov ................ 44

II.   **Conclusions of Law** ........................................................................................ **46**

A.      The Court has Jurisdiction ...................................................................... 46

B.      Triadou's Agents Knowledge Can Be Imputed to Triadou ................... 47

C.      BTA Is Entitled to an Award of $73,600,000 in Damages Against Triadou for Conversion, with Pre-Judgment Interest Running from April 8, 2013 .......... 49

D.      BTA Is Entitled to an Additional Award of $27,000,000 in Damages Against Triadou for Unjust Enrichment, with Pre-Judgment Interest Running from July 18, 2013 ................................................................... 50

E.      BTA is Entitled to a Constructive Trust .............................................. 53

F.      BTA Is Entitled to Relief Under Article 52 of the C.P.L.R. in Relation to Triadou's State Court Enforcement Proceedings Against Chetrit ....................... 58

G.      Triadou's Unclean Hands Defense Is Without Merit. .......................... 61

H.      Triadou's Bona Fide Purchaser Defense Is Inapplicable. ...................... 64

Consistent with Federal Rule of Civil Procedure 52(a)(1), plaintiff BTA Bank JSC respectfully submits these Proposed Findings of Fact and Conclusions of Law in support of the entry of judgment on its claims for the imposition of constructive trust and under Article 52 of the New York Civil Practice Law and Rules against defendant Triadou SPV S.A., which were tried to the Court in November and December of last year at the same time as a jury heard, and found in BTA's favor on, BTA's claims for conversion and unjust enrichment.

## I.    Findings of Fact

### A.   The Parties

#### 1.   BTA Bank

1.      BTA Bank JSC ("BTA" or the "Bank") is a Joint Stock Company and Kazakhstan bank with its headquarters in Almaty, Kazakhstan.  Until 2014, BTA was "a full-service bank" in Kazakhstan that extended services to business entities and individuals, issued and serviced loans, processed deposits, exchanged foreign currency, and provided account services for its clients. (Trial Tr. 79:2-8 (Sadykov Testimony)).

2.      From 2009 until in or about July 2014, BTA Bank was majority owned and controlled by Samruk-Kazyna, Kazakhstan's sovereign wealth fund.  (Trial Tr. 406:9–408:1, 408:19–24 (Nartay Testimony); Trial Tr. 120:14-17 (Sadykov Testimony)).

3.      In 2014, BTA was purchased from Samruk-Kazyna by a private party and its banking operations were merged with Kazkommertzbank's banking operations.  (Trial Tr. 408:22–409:13 (Nartay Testimony)).

4.      At the time of its nationalization in early 2009, BTA had "about 20 branches" in Kazakhstan and about 20 affiliates outside of Kazakhstan.  "Roughly 5,000 people" were employed by BTA at the time.  BTA was "within the three largest Kazakhstan banks" and it was considered a "systemic bank," meaning "that the size or the scope of the assets of the bank was

meaningful for the economy of the whole country." (Trial Tr. 78:21-23, 78:24-79:1, 79:11-21 (Sadykov Testimony)).

### 2.  Triadou SPV S.A.

5.      Triadou SPV S.A. ("Triadou") is a special purpose vehicle formed on September 12, 2012, in Luxembourg by Nicolas Bourg at the direction of Ilyas Khrapunov. (PTX-581 at 4; Bourg 9/11/17 Dep. 22:11-15; Khrapunov 2/01/18 Dep. 38:23-39:8).[1] Khrapunov formed Triadou to make investments in U.S. real estate projects. (*Id.*).

6.      Around 2007, Ilyas Khrapunov had previously founded Swiss Development Group SA ("SDG").   (Bourg 9/11/17 Dep. 42:7-10; Khrapunov 2/01/18 Dep. 38:23-8). SDG was incorporated by Harlem Securities, Ltd., which is also owned by Ilyas Khrapunov.  (Khrapunov 2/02/2018 Dep. at 14:5-15:10; DTX-194).  SDG Capital S.A. is the holding company for Swiss Development Group SA.  (Bourg 9/12/17 Dep. 14:5-15:2).  SDG Capital wholly owned Triadou until May 2015.  (Khrapunov 2/01/18 Dep. 47:3–6; Cerrito 3/09/17 Dep. 20:21–21:3).

7.      Bourg was Triadou's director until October 2014, when SDG's Chief Financial Officer, Cesare Cerrito, was appointed the sole director of Triadou. (Bourg 9/11/17 Dep. 43:6-8, 68:4-10; Trial Tr. 168:13-16 (Kozouz Testimony)).  Triadou has no official place of business nor any offices or employees of its own.  (Cerrito 3/09/17 Dep. 26:8-13, 46:10-12).

### B.  Mukhtar Ablyazov Stole Billions of Dollars from BTA Bank

---

[1]      All deposition testimony cited in BTA's proposed findings of fact was designated and played for the jury at trial, and has been filed at ECF No. 1729.

### 1. Mukhtar Ablyazov's Control of BTA Bank

8.      In March 1998, Mukhtar Ablyazov bought BTA, then called Bank TuranAlem, through an auction for $72 million using an investment consortium called Kazakh (or Kazakhstani) Investors, which he controlled.  (Trial Tr. 596:20-22 (Dubinsky Testimony); Ablyazov 10/30/18 Dep. 80:20–23, 81:11–82:4,); 10/31/18 Ablyazov Dep. 33:4–17).

9.      Ilyas Khrapunov is Ablyazov's son in law.  In September 2007, Khrapunov married Ablyazov's daughter, Madina Ablyazova. (Khrapunov 2/01/18 Dep. 33:7-15).  As noted in a 2013 background investigation by a prospective third-party lender to Triadou conducted during the time of Triadou's investments, it was publicly reported that "Ilyas is the son of Viktor Khrapunov (a former politician and 'disgraced' Mayor of Almaty, Kazakhstan) and his wife Leyla Khrapunov are both on Interpol's 'wanted list' on behalf of Kazakhstan authorities and reportedly subject to a formal request for extradition from Kazakhstan from their current residency in Switzerland. They are also reportedly to be subject of a judicial investigation in Switzerland for money laundering." (PTX-632 at 5.)

10.      From 1998 to 2009, Mukhtar Ablyazov was the majority owner of the Bank and controlled it and considered himself to be "the key owner."  (Ablyazov 10/30/18 Dep. 142:5-19).

11.      During that period, Ablyazov's ownership of the voting shares in BTA never fell below 75%, and he always had the power "to make all the key decisions."  (Ablyazov 10/30/18 Dep. 132:6–133:14).

12.      Beginning with the auction at which Ablyazov purchased BTA through companies he controlled, Ablyazov regularly used nominees and shell companies to hide his assets. (Ablyazov 10/30/18 Dep. 67:4–20, 69:6–70:15, 85:25–86:8, 88:9–18, 152:11–154:1, 155:6–13).  Ablyazov finds it "just impossible" to count the number of nominees he used because the ownership schemes are "very complex."  (*Id*. at 69:6–15).

13.     Ablyazov initially controlled BTA with the help of his co-conspirator Yerzhan Tatishev.  In 1998, Tatishev was appointed chairman of BTA.  (Ablyazov 10/30/18 Dep. 142:9-13).  Tatishev reported to Ablyazov, and Ablyazov used Tatishev as a nominee.  (Trial Tr. 76:7–9 (Sadykov Testimony); Ablyazov 10/30/18 Dep. 142:5-142:19; Ablyazov 10/31/18 Dep. 36:6-10).

14.     Tatishev was Ablyazov's "trusted partner" and handled the "operational aspects of the banking activity," while Ablyazov controlled BTA's "general strategy."  (Ablyazov 10/30/18 Dep. 142:5–19).

15.     In July 2002, Ablyazov was arrested for abuse of office and illegal commercial activity in connection with his role as Kazakhstan's Minister for Energy, Industry, and Trade.  (Ablyazov 10/30/18 Dep. 65:8–16, 65:8–16, 89:12–17, 114:5–18).  Tatishev directly or indirectly held 100% of BTA's voting shares on his and Ablyazov's behalf during Ablyazov's imprisonment.  (*Id*. at 89:12–17, 114:14–18, 118:19–118:21).

16.     Ablyazov was released from prison on May 13, 2003, and moved to Moscow.  (Ablyazov Dep. 10/31/18 39:18–20, 49:22–50:6).  Tatishev had monthly meetings with Ablyazov in Moscow to discuss BTA operations.  (*Id*. at 49:22–50:22).  Ablyazov remained "deeply involved" in BTA.  (*Id*. at 50:22–23).

17.     In December 2004, Tatishev died in a hunting accident and Tatishev's widow transferred to Ablyazov for no consideration the assets and BTA stock that Tatishev had been holding on Ablyazov's behalf.  (Ablyazov 10/30/18 Dep. 112:17-113:5; 132:6-133:21).  Ablyazov also purchased from Tatishev's widow the BTA shares that Tatishev held personally.  (*Id*. at 643:24-644:17)

18.     After Tatishev's death, in May 2005, Ablyazov became Chairman of BTA Bank and served as Chairman until he was forced to step down on February 2, 2009. (Ablyazov

10/30/2019 Dep. 141:20-22; Ablyazov 10/31/18 Dep. 61:19-22; Trial Tr. 81:5–9 (Sadykov Testimony), 406:24–407:3 (Nartay Testimony)).

## 2. Ablyazov's Corruption of Corporate Business Department No. 6 ("UKB6")

19.     BTA had seven or eight corporate business departments that facilitated loans to BTA's clients across different industries.  (Trial Tr. 213:8-17 (Gozhakhmetova Testimony)).

20.     Corporate Business Department No. 6 ("UKB6") was one of the corporate business departments within BTA that "facilitated loans."  UKB6 had approximately ten employees.  (Trial Tr. 213:2-7, 214:2-4 (Gozhakhmetova Testimony), 76:19-24, 77:8-10 (Sadykov Testimony)).

21.     UKB6 existed as early as 2002, when Tatishev was Chairman and Ablyazov had voting control of BTA.  (Moldakhmet Dep. 8:18-9:1).  In 2003, UKB6's purported credit portfolio was "approximately $250 million" and increased to "approximately $500 million" in 2004, around the time Tatishev died.  (Trial Tr. 79:25-80:5 (Sadykov Testimony)).

22.     UKB6 caused BTA to issue fake loans to offshore companies "chartered in tax-free environments such as the British Virgin Islands or the Cayman Islands."  (Trial Tr. 80:6-12 (Sadykov Testimony)).

23.     The offshore companies that were "customers" of UKB6 were all owned or controlled by Ablyazov, and the "loans" it issued had no economic substance.  (Trial Tr. 267:5-8 (Junussova Testimony); 577:14-17 (Dubinsky Testimony)).  Instead of being arms-length transactions, the "loans" facilitated by UKB6 were meant to conceal Ablyazov's misappropriation of funds from BTA.  (Trial Tr. 610:12–611:10, 613:1–19 (Dubinsky Testimony)).

24.     Zhaksylyk Zharimbetov was "first deputy chairman of the board" of BTA and reported to Ablyazov.  (Trial Tr. 77:22-78:8 (Sadykov Testimony)).

25.     While Ablyazov was Chairman of BTA, Zharimbetov determined which individuals should have power of attorney for each of the UKB6 offshore companies.  (Trial Tr. 97:18-98:1 (Sadykov Testimony)).  Zharimbetov himself also served as the individual with the power of attorney for several of the UKB6 offshore companies, including Tradestock, Comwork, United Clearing, Seeria Alliance, Pancontinental, Argonex, and Lestul.  (PTX-14 at 2–4, 9, 21, 24, 26, 28; Trial Tr. 261:15-20, 260:17-18 (Junussova Testimony)).

26.     UKB6 operated secretly and separately from the other credit departments within BTA.  For example, BTA's "Middle Office" was responsible for storing credit dossiers containing information about each client to whom the corporate business departments extended loans, including:

> all information related to the client to whom the credit is extended – incorporation documents, the charter of the company, incorporation agreement, all the beneficiaries, up to the ultimate beneficiary; also information regarding the president of the company, the accountant; also financial statements of the company and tax documents, the business plan of the company, different decisions rendered by the divisions of the bank, credit or loan agreements and also financing applications, and also documents that confirm the purpose of the loan, and also collateral documents, if collateral is required.

(Trial Tr. 207:18-208:4 (Gozhakhmetova Testimony)).

27.     But the Middle Office serviced all of the corporate business departments "except for UKB6 because UKB6 had its own middle office within its structure," which was "responsible for compiling the credit dossier and also storing that dossier."  (Trial Tr. 207:14-17, 214:7-11 (Gozhakhmetova Testimony)).  Because UKB6 was "a closed entity," it compiled purported credit dossiers itself, it "did not share this information with anyone," and the rest of BTA did not know the purpose of the sham loans, when repayment would occur, or the terms of repayment.  (Trial Tr. 214:12-24 (Gozhakhmetova Testimony)).

28.     When UKB6 employees "would send something to the printer…they tried to do it as fast as possible and not to share this information with anybody else" that was a non-UKB6 employee sitting on the same floor.  (Trial Tr. 215:1-7 (Gozhakhmetova Testimony)).

29.     Like most large lending institutions, BTA had a Credit Committee, which was "a body established by the chairman of the board of the bank . . . comprised of heads of different departments in the bank in order to assess the risks of" loans BTA extended. (Trial Tr. 114:18-23 (Sadykov Testimony), 608:17–609:7 (Dubinsky Testimony)).

30.     When Ablyazov was BTA's chairman, the "credit committee was headed by Mr. Zharimbetov."  (Trial Tr. 114:15-17 (Sadykov Testimony)).

31.     The Credit Committee did not approve the sham loans facilitated to offshore companies through UKB6 in the way that the Credit Committee approved loans facilitated through the other corporate business departments at BTA. (Trial Tr. 215:8–25 (Gozhakhmetova Testimony)).

32.     For loans issued by other corporate business departments at BTA, the Credit Committee would convene to assess the risks of a loan, a credit manager from the corporate business department would make a presentation including information about the client and ultimate beneficiary of the loan, and the Credit Committee members would vote on whether or not to issue the loan.  (Trial Tr. 115:3-9 (Sadykov Testimony), 211:6-212:6 (Gozhakhmetova Testimony)).

33.     For the sham loans facilitated by UKB6, however, the Credit Committee never met in person to discuss the loans or to vote on them.  (Trial Tr. 115:1016 (Sadykov Testimony), 215:16-22 (Gozhakhmetova Testimony)).  The only requirement for a UKB6 "loan" to issue was a fraudulent version of the Credit Committee minutes signed only by the chair of the Credit

Committee, Ablyazov's co-conspirator Zharimbetov.  (Trial Tr. 114:9-14 (Sadykov Testimony)).
For the loans facilitated by UKB6, there was no assessment of risk at all because the UKB6
customers receiving the "loans" were not real companies.  (Trial Tr. 612:15–613:1 (Dubinsky
Testimony)).

34.     The UKB6 customers generally received funding from BTA into payment accounts
with the Latvian bank Trasta Komercbanka ("TKB"), which were controlled by the "personnel of
UKB6."  (Trial Tr. 100:12-13 (Sadykov Testimony); *see, e.g.*, PTX-9 (TKB statements for
companies including Tradestock, Comwork, United Clearing, and Balgaven)).

35.     The TKB accounts "belong[ed] to the offshore companies that were serviced
through UKB6, and they belonged to the director – to the chairman of the board of directors, Mr.
Ablyazov."  (Trial Tr. 260:20-261:4 (Junussova Testimony)).

36.     UKB6 employees were able to access and download the offshore companies' TKB
account statements directly on TKB's website. (Moldakhmet Dep. 15:24-17:16).

37.     UKB6 employees monitored the transfers of funds it facilitated from BTA to UKB6
customers with tracking spreadsheets that they created using information gathered from TKB bank
statements. (PTX-44; PTX-10; Trial Tr. 99:20-100:1 (Sadykov Testimony) (explaining that
PTX-44 "demonstrates movement of funds through the company Tradestock"), 263:8-13, 263:17-
21 (Junussova Testimony)).

38.     In tracking the sham loans it facilitated to offshore companies, UKB6 falsified the
purpose of payment information for the loans to make it look like the loans were legitimate loans
with a legitimate business purpose.  (Trial Tr. 101:19-22, 103:23-104:5, 104:10-12 (Sadykov
Testimony), 263:22–264:18 (Junussova Testimony); PTX-10).  "It was up to [UKB6 employees]

to make such decisions" on what to document as the purpose of payment for the transfer of funds between offshore companies.  (Trial Tr. 26:6-9 (Junussova Testimony)).

39.     UKB6 ensured that the sham loans it facilitated would not default by paying outstanding debt using funds from new sham loans—a practice referred to as "roundtripping." (Trial Tr. 613:2–19 (Dubinsky Testimony)).  UKB6 made it appear as if the offshore companies were repaying the sham loans by getting a new sham loan from BTA and transferring those funds to a different offshore company before using them to repay the so-called loan.  (Trial Tr. 83:23-84:9 (Sadykov Testimony); PTX-12).  "Those would be the same line of companies or some other companies occasionally that were used in order to make such transfers to the company whose terms were up for repayment" and UKB6 employees understood that the "repayments" of the sham loans were fake.  (Trial Tr. 278:3-18 (Junussova Testimony)).  Accordingly, some of the "loans" were "repaid" on paper through the roundtripping scheme, in order to create the appearance of legitimacy and allow the fraud to continue.  (Trial Tr. 612:15-613:19 (Dubinsky Testimony) (explaining that, with UKB6 loans, "whatever paper you see was paper created to make it look like kind of the fiction to keep that going.")).

40.     As one example of roundtripping between UKB6 companies, on September 27, 2007, a $52 million purported loan to Global Team Company for "[w]orking capital financing" was approved by Ablyazov co-conspirators Zharimbetov and Solodchenko, circumventing the credit committee.  (PTX-905; *see also* Trial Tr. At 116:17-117:3 (Sadykov Testimony) (explaining that he would personally secure signatures outside the credit committee process)).  The next day, $52 million was transferred from Global Team Company to Imex Capital.  (PTX-44 at 287).  Then, the same $52 million (along with round-tripped funds from another UKB6 company) were transferred from Imex Capital to Brighton. (PTX-44 at 287).  On September 28, 2007, the same

day that Brighton received this transfer from Imex, the funds were sent from Brighton right back to BTA as a purported loan repayment.  (PTX-44 at 374).

41.      Another example of roundtripping involves a July 5, 2005 transfer of $5 million from BTA to Anital.  (PTX-44 at 9; PTX-1000).  The following day, on July 6, 2005, $4.1 million were transferred from Anital to Tradestock and, one day after that, $4.093 million were transferred from Tradestock back to BTA.  (PTX-44 at 46; PTX-1000).

42.      UKB6 largely ceased operations in December 2008 after an audit in which "the agency for financial oversight issued an opinion that it should be shut down." (Trial. Tr. 95:12-16; 96:10-11 (Sadykov Testimony), 405:18-23 (Nartay Testimony), 216:4-11 (Gozhakhmetova Testimony)).

### 3.   Ablyazov's Transfer of $115.3 Million of BTA's Funds to Tradestock

43.      Tradestock Inc. ("Tradestock") was an offshore company that had a bank account at TKB, that was controlled by Ablyazov and his co-conspirators, and that was one of UKB6's customers.  (Trial Tr. 100:2-6 (Sadykov Testimony), 262:2-21 (Junussova Testimony); PTX-7).  Tradestock "did not have assets," it did not provide services of any kind, and it had no employees. (Trial Tr. 82:22-83:2 (Sadykov Testimony)).

44.      United Clearing, Balgaven Invest, and Comwork Ltd. Were also offshore shell companies that were customers of UKB6.  (Trial Tr. 111:9-11 (Sadykov Testimony)).

45.      Through UKB6, Ablyazov amassed $115.3 million in Tradestock through the following transfers.  (PTX-1002 at 1).

       a.   On July 7, 2004, BTA transferred $19 million to Tradestock's TKB account. (PTX-44 at 46).

       b.   On August 4, 2004, BTA transferred $18 million to Tradestock's TKB account. (PTX-9 at 7-8; PTX-44 at 46).

    c.  On August 4, 2004, BTA transferred $24 million to United Clearing, which then transferred $24 million to Tradestock.  (PTX-9 at 32; PTX-44 at 46).

    d.  On August 5, 2004, BTA transferred $15.9 million to Balgaven, which then transferred $15.9 million to Tradestock on August 12, 2004.  (PTX-9 at 8; PTX-44 at 46).

    e.  On August 10, 2004, BTA transferred $38.4 million to Comwork, which then transferred $38.4 million to Tradestock on August 12, 2004.  (PTX-9 at 23-24; PTX-44 at 46, 523).

46.    Ablyazov's co-conspirator, Sadykov, structured the transfers to Tradestock to go through other UKB6 customers in smaller amounts to evade national banking regulations, which prohibited one-time transactions over a certain limit. (Trial Tr. 111:24-112:14 (Sadykov Testimony)).

47.    Although papered over as so-called "loans," the transfers to Tradestock were never repaid to BTA, were never intended to be repaid, and were eventually written off.  (Trial Tr. 702:22-703:6 (Dubinsky Testimony)).

48.    Although Tradestock later made transfers of funds to BTA, (DSX-1, DSX-2, DSX-3), those transfers were part of the roundtripping scheme.  Specifically, certain of those transfers were immediately preceded by a transfer to Tradestock from another Ablyazov-controlled shell company.  And those other Ablyazov-controlled entities had received that money from BTA in new sham loans.  (*See, e.g.*, PTX-1000; PTX-44 (08/05/05 Tradestock entry, showing inbound transfer from Ablyazov-controlled Calernan Finance; 08/01/05 Calernan Finance entry; 08/10/05 Comwork entry, showing inbound transfer from Ablyazov-controlled AEG Systems Inc; 08/09/05 AEG Systems Inc. entry).

### 4. Ablyazov's Transfer of $103 Million of BTA's Funds from Tradestock to Thyler and Investment in Zhaikmunai

49.     On July 8, 2004 and August 20, 2004, Tradestock transferred a total of $103 million stolen from BTA for the benefit of an entity called Thyler Holdings Limited ("Thyler").  (PTX-44 at 46; PTX-9 at 28, 33).

50.     Years after this transfer, an unsigned loan agreement was drafted purporting that Tradestock was loaning $103 million to Thyler in order to make it appear that the transfer was a loan.  (Monstrey 7/17/18 Dep 39:24–41:1, 42:3–8, 42:19–43:5, 43:14–16, 48:18–25; DTX 65 at 1 (purported unexecuted loan agreement)).  Ablyazov himself admitted that he often documented straight transfers of money as "loans," without any expectation of repayment, and that he perceived no difference between a "loan" and a gift.  Ablyazov thinks it "shrewd" to transfer funds under the guise of calling them a loan.  (Ablyazov 10/31/18 Dep. 93:23–94:12).

51.     The transfers from Tradestock to Thyler were not made pursuant to a "loan."  Thyler was another shell entity held for Ablyazov's benefit.  Harrison, an offshore company managed for the benefit of Ablyazov, was the nominee shareholder of Thyler and held Thyler on Ablyazov's behalf.  (Trial Tr. 638:3-7, 642:21-643:9 (Dubinsky Testimony); PTX-159 (SMP document showing that Ablyazov owns Harrison)).

52.     At the time of the initial transfer of $103 million to Thyler from Tradestock, Tatishev was the owner of Thyler on paper.  (Trial Tr. 117:7-10 (Sadykov Testimony); PTX-114 (Thyler SMP client services agreement signed by Tatishev, witnessed by Sadykov); Monstrey 7/17/18 Dep. 158:11-24).

53.     Thyler never directly "received" the funds from Tradestock because it never had a bank account.  Tradestock transferred the funds to corporate services provider MeesPierson (an

12

affiliate of SMP Partners ("SMP")) for Thyler's benefit.  (PTX-44 (showing $7 million transfer from Tradestock to Thyler)).

54.     Ablyazov used the money from Tradestock to purchase an investment in Zhaikmunai, "an oil and gas company that is involved with exploitation of an oil and gas field in the western part of Kazakhstan."  (Trial Tr. 106:8-11 (Sadykov Testimony)).

55.     After Tatishev's death, his widow Anar Tatisheva (a/k/a Anar Aidzhanova) became the successor to the "debt" owed on the Tradestock "loan" to Thyler, and became the purported ultimate beneficial owner of Thyler. (PTX-132 (letter from MeesPierson Intertrust informing that "following the death of the beneficial owner, the ownership of the above company [Thyler] will be transferring to the widow and family of the deceased in accordance with the succession laws of Kazakhstan"); PTX-134 (MeesPierson Intertrust Client Agreement with Thyler, executed by Anar Tatisheva)).

56.     Tatisheva expressly transferred her interest in the Tradestock loan and Thyler to Ablyazov for no cash consideration, reflecting the reality that Ablyazov was always the true beneficial owner of Thyler.  (PTX-254 (June 2008 Letter from Tatisheva to Ablyazov ("Please be advised that I have assigned my entire interest in the loan note from Tradestock Inc. (Lender) to Thyler Holdings Limited (Borrower), dated 8th of July 2004 to M. Ablyazov."); PTX-151 (January 4, 2007 Letter from Frank Monstrey ("As you know, I have personally witnessed several rounds of negotiations between the teams of Mrs. Aidzhanova and Mr. Ablyazov and can confirm that, as indicated in my letter of November 30th, the transfer of ownership of Thyler did not involve any cash consideration."); PTX-145 (MeesPierson Client Agreement for Thyler signed by Ablyazov); PTX-242 (SMP letter from Tatishev transferring shares of Thyler to Ablyazov); PTX-132 (Thyler SMP client agreement signed by Tatisheva)).

57.     In 2007, Ablyazov retained his control over Thyler when Lineford, a company he owned, acquired Thyler directly.  (Monstrey 7/17/18 Dep. 78:24–25; Monstrey 12/12/18 Dep. 239:25–240:3, 246:9–19; *see also* DTX-65 ¶ 89; DTX-68 at 5; PTX-244 (SMP documents showing Ablyazov owns Lineford); PTX-165 (SMP email from Udovenko showing Ablyazov owns Lineford); PTX-236 (Lineford client services agreement signed by Ablyazov)).

58.     A man named Frank Monstrey was hired as a consultant to manage Zhaikmunai. (PTX-244).   On paper, Monstrey was the owner of a company called Sartfield, of which he held indirect ownership through legal entities.  (Monstrey 12/12/18 Dep. 239:18-24).

59.     On or around July 16, 2007, Ablyazov caused Lineford to transfer the ownership of Thyler to Sartfield.  (PTX-253).  This allowed Ablyazov to further conceal his ownership of the Zhaikmunai asset and create the appearance of ownership by Monstrey.  But under the terms of the "sale" from Ablyazov/Lineford to Monstrey/Sartfield, Ablyazov/Lineford was entitled to (a) a return of its $103 million original investment, plus interest (b) a return of 90% of the profits of Zhaikmunai, on an on-going basis; and (c) control over Zhaikmunai.  (*Id*. at 3–4, 6–7, 9–11).  Sartfield promised "not to give any instructions to Harrison."  (*Id*. at 6). All decisions regarding Zhaikmunai required prior written approval of Lineford, and Ablyazov possessed the power to unilaterally reassign Thyler (and thus Zhaikmunai) back to his entity Lineford.  (*Id*. at 9–11).   In other words, Ablyazov was and always remained the owner of the Zhaikmunai asset, which he purchased with money stolen from BTA.

### 5.  BTA's Discovery of Ablyazov's Embezzlement

60.     In early 2009, BTA Bank discovered that Ablyazov had stolen billions of dollars from it.  (Trial Tr. 405:18-406:8 (Nartay Testimony)).

61.     As a result, BTA defaulted on billions of dollars of debt held by international investors.  (Trial Tr. 406:11-13, 407:6-15; 407:23-408:1 (Nartay Testimony)).  BTA Bank was bailed out by Samruk-Kazyna.  (Trial Tr. 408:19-24 (Nartay Testimony)).

62.     After BTA discovered the fraud, Ablyazov and Zharimbetov were removed from their positions at BTA and fled to England.  (Trial Tr. 406:25-407:3 (Nartay Testimony), 120:1-2 (Sadykov Testimony)).

63.     Certain UKB6 employees who were complicit in Ablyazov's fraud also fled Kazakhstan, and Ablyazov financially supported them.  (Trial Tr. 121:8-12 (Sadykov Testimony), 265:20-23 (Junussova Testimony)).

64.     After BTA's credit availability evaporated in 2008, the outstanding UKB6-related loans defaulted and were not repaid.  (Trial Tr. 96:10-14 (Sadykov Testimony); *see also* 652:1-5 (Dubinsky Testimony)).

65.     After Ablyazov arrived in London, BTA Bank initiated a series of lawsuits against him and his associates in England's High Court of Justice, alleging that he misappropriated billions of dollars in assets.  BTA filed its first lawsuit against Ablyazov in England in August 2009 just a few months after his departure from Kazakhstan.  (Trial Tr. 409:25-410:3 (Nartay Testimony)).

66.     Beginning in late 2009, the U.K. courts granted BTA worldwide freezing orders over Ablyazov's assets and issued numerous search and disclosure orders uncovering a vast network of Ablyazov's shell companies.  (Trial Tr. 411:23-412:2 (Nartay Testimony); PTX-199 at 4 (prohibiting Ablyazov from in any way disposing of, dealing with, or diminishing the value of "any of their assets whether they are in or outside England and Wales up to the value of £175 million."); PTX-83 (May 2011 freezing order against Ablyazov's assets)).

15

67.     The freezing orders included schedules listing companies that held Ablyazov's assets.  (PTX-86 (67 pages of schedules listing entities including Balgaven, Comwork, United Clearing, Tradestock and Anital); Trial Tr. 415:14–420:2 (Nartay Testimony)).  BTA sought to add these companies to the worldwide freezing order so that Ablyazov wouldn't be able to "deal via these companies and to conceal monies which were embezzled from BTA."  (Trial Tr. 418:20-24 (Nartay Testimony)).

68.     In 2010, all of Ablyazov's frozen assets were "put into receivership because [the] UK court didn't trust Mr. Ablyazov . . . since he was still dealing with those assets in breach of [the] worldwide freezing order."  (Trial Tr. 410:19-411:5 (Nartay Testimony)); *see* PTX-82 at 5 (court appointing KPMG receivers), at 14 ("The terms of this order will affect the following persons in a country or state outside the jurisdiction of this court"), at 15 (listing Ilyas Khrapunov)).

69.     In 2012, because Ablyazov "failed to disclose his assets" and "failed to surrender his passports to UK authorities," he received a 22-month prison sentence for contempt of court. (Trial Tr. 411:6-18 (Nartay Testimony)).  Ablyazov fled to France before he could be incarcerated in the United Kingdom.  (Trial Tr. 415:23-24 (Nartay Testimony))

70.     BTA eventually secured final money judgments against Ablyazov for approximately $6 billion.  (Trial Tr. 410:14-18 (Nartay Testimony) (BTA was "successful in obtaining judgments against Mr. Ablyazov and his accomplices for 6 billion US dollars, plus interest, which is accruing day by day"); PTX-84; PTX-85).

71.     In 2015, BTA also sued Ilyas Khrapunov in the English High Court of Justice for concealing assets and money laundering.  (Trial Tr. 425:7-13 (Nartay Testimony)). BTA obtained a worldwide freezing order against Khrapunov.  (PTX-82).  In 2018, BTA also obtained a money judgment for $500 million plus interest. (PTX-90).

16

72.     To date, neither Ablyazov nor Khrapunov have paid any of the money they owe as a result of these judgments.  (Trial Tr. 426:3-9 (Nartay Testimony)).

73.     Ablyazov used his influence over former UKB6 employees to limit BTA's asset recovery efforts and to further his agenda in the U.K. litigation including, for example, by attempting to influence witness testimony.  (Trial Tr. 118:17-20, 120-1:3 (Sadykov Testimony)). For example, Ablyazov and Zharimbetov threatened Sadykov and forced him to sign a witness statement that Sadykov knew to be false.  (Trial Tr. 121:18-122:13 (Sadykov Testimony)).

74.     In July 2013, Ablyazov was arrested in France and incarcerated.  (Ablyazov 10/31/18 Dep. 89:23-90:1).

75.     Ablyazov's fraud affected "BTA itself, its employees, its depositors, like ordinary individuals who deposit money at the bank, local companies,…creditors worldwide, its bondholders, [the] country itself."  (Trial Tr. 408:2-7 (Nartay Testimony)).

### C.  Ilyas and Ablyazov Use Their Family Member, Gennady Petelin, to Further Conceal the Source of the Laundered Money

#### 1.  Ablyazov and Ilyas Khrapunov's Transfer of $103 Million of BTA's Funds, Plus Profits Derived from BTA's Funds, to Northern Seas Waterage

76.     In November 2011, to evade the 2009 UK freezing orders and with his son-in-law Ilyas Khrapunov's assistance, Ablyazov transferred Lineford's interests in Zhaikmunai to Northern Seas Waterage ("NSW"). (PTX-255; Monstrey 7/17/18 Dep. 78:5-79:5).

77.     NSW was controlled by Khrapunov and Ablyazov, and nominally owned by another family member, Gennady Petelin. (Khrapunov 2/01/8 Dep. 151:20–24; Monstrey 07/17/18 Dep. 82:9–10).

78.     Petelin is related to Khrapunov by marriage; Khrapunov's sister "Elvira was married to Dimitri Kudryashov," who is Petelin's son.   (Trial Tr. 581:23-82:1 (Dubinsky Testimony)).



(PTX-1002 at 3).

79.     The purpose of NSW itself was to conceal Ablyazov's role and the true source of the stolen BTA funds.  NSW is a shell company assigned to Petelin in 2011, (Khrapunov 2/01/18 Dep. 151:20–24; Monstrey 7/17/18 Dep. 82:9–10), but beneficially owned by Ilyas.  (Monstrey 7/17/18 Dep. 17:12-18:1; 83:17-22).  At Ilyas' direction, in or about 2011, a nominee agreement for NSW between nominal owner Petelin and nominee Annick L. Razafindrakoto and a deed of trust for NSW signed by both were backdated to November 26, 2007, to create the appearance that NSW operated as a legitimate business for years prior to its creation.  (PTX-302 at 78–84).

80.     NSW maintained its bank account with FBME, which was shut down in 2014 for being a foreign financial institution of primary money laundering concern. (PTX-250; Khrapunov 2/01/18 Dep. 252:19-25).

81.     Ablyazov directed Monstrey to pay the "Tradestock loan" used to purchase Zhaikmunai to NSW, instead of paying it back to Lineford.  Monstrey paid the money to NSW after Khrapunov told him that the debt had been transferred to NSW, but Monstrey did not receive any documentation.  (Monstrey 7/17/18 Dep. 78:5-15).

82.     In the fall of 2011, Monstrey prepared and executed a set of four documents purporting to transfer Sartfield's right to be repaid under the so-called Tradestock "loan"—then deemed to be worth $439.6 million—to NSW, and he backdated those documents to April 2009 at Ilyas' direction, before the date of the original 2009 U.K. freezing orders.  (Monstrey 7/17/18 Dep. 81:16-82:3, 88:23-89:6; Monstrey 12/12/18 Dep. 276:9-277:13).

83.     There are four backdated documents that collectively purported to transfer the right to repayment from Sartfield to NSW.  One is a deed settlement signed in November 2011 and backdated to April 10, 2009, in which Sartfield is discharged of its purported debts to Lineford in exchange for entering a new "loan facility" with NSW. (PTX 257 at 1-2). The stated purpose of this deed settlement was to release Sartfield of any obligations—including its obligation to pay Lineford for the purported Tradestock "loan."  (Monstrey 7/17/18 Dep. 88:2-8).

84.     The second document is the "loan facility" signed in November 2011, and backdated to April 10, 2009, in which Sartfield represented that it owed NSW a principal of $387,600,000, plus accruing contractual interest of 5%.  (PTX-258 at 1, 3; *see also* Monstrey 12/12/18 Dep. 261:3-17).  The stated purpose of the agreement was to "formali[ze] . . . the transfer of the Tradestock loan obligation to NSW."  (Monstrey 12/12/18 Dep. 262:17–24).  The

$387,600,000 was Monstrey's back-of-the-envelope calculation of the amount owed as of April 10, 2009, on the purported July 8, 2004, $103 million Tradestock "loan," with interest, and the right to recover Zhaikmunai profits.  (Monstrey 12/12/18 Dep. 260:10-20; PTX-258).

85.     The third document is a letter backdated April 10, 2009, and co-signed by Ilyas as witness, in which Ablyazov told SMP that he had transferred "all [his] beneficial interests" in Lineford to NSW.  (PTX-259; *see also* Monstrey 12/12/18 Dep. 30:14-23, 262:25-263:4, 264:14–24, 276:9–277:13).

86.     And the fourth document is a deed poll signed in November 2011, backdated to April 10, 2009, and co-signed by Ilyas as witness, in which Ablyazov purported to release Monstrey-owned Sartfield from obligations related to the purported Tradestock "loan." (PTX-260 at 1–2; *see also* Monstrey 12/12/18 Dep. 31:10-20, 262:25–263:4, 264:14–24 (authenticating deed poll and Ablyazov's signature)).

87.     Petelin, however, produced alternative versions of these backdated records purporting to show that he was the beneficial owner of the Zhaikmunai investment. (PTX-292 (letter); PTX-293 (deed poll)).

88.     Whereas the authenticity of the documents produced by Monstrey, described in paragraphs 85 and 86 above, is corroborated by versions obtained from an independent third party (SMP) that maintained those documents contemporaneously as of their signing in 2011, (PTX-196 (SMP-produced version of PTX-259); PTX-197 (SMP-produced version of PTX-260)), the versions produced by Petelin are forgeries and were not maintained by SMP Partners.  *Compare* PTX-292, *and* PTX-293, *with* PTX-196, *and* PTX-197.

89.     BTA's handwriting expert – the former Chief Document Examiner for the U.S. Secret Service – confirmed that the signatures on the letter and deed poll produced by Monstrey

match Ablyazov's and Ilyas Khrapunov's.  (Trial Tr. 381:16-24 (Hargett Testimony), referencing PTX-259 and PTX-260).

90.     Shortly after the 2011 execution of the four backdated documents, (PTX-257, PTX-258, PTX-259, PTX-260), Sartfield made nine payments to NSW totaling $439.6 million, representing the principal on the "Tradestock loan" plus profits.  (Trial Tr. 664:19-23 (Dubinsky Testimony)).

91.     Sartfield made nine payments totaling $439,999,271 to NSW. (PTX-677 (Deutsche Bank bank statement); PTX-250 (NSW transfer spreadsheet); PTX-300 (NSW bank statement); PTX-269 (Sartfield ING Bank bank statements); PTX-270 (Sartfield wire instructions; PTX-255 or -259 (letter transferring Lineford interest in Monstrey's debt to NSW, signed by Ablyazov and produced by Monstrey); Monstrey Dep. 7/17/18 78:5-79:5 (explaining PTX-255 that Lineford is Ablyazov and that Ilyas told Monstrey to pay NSW); PTX-267 (payment instructions from Claremont to ING to make first payment to NSW); PTX-253 (N project chart)).

92.     These payments ignored the payment schedule and the default terms set forth in the backdated "loan facility" agreement.  (*See* PTX-258).

## 2.  Ablyazov and Ilyas Khrapunov's Transfer of $95.84 Million through Shell Entities to Telford

93.     Once it received the $439.6 million, NSW started funneling funds through Ablyazov- and Khrapunov-controlled shells, using the money manager Eesh Aggarwal to transfer funds.  (Bourg 9/11/17 Dep. 57:6-57:15; *see also, e.g.*, PTX-580 (Khrapunov emails Bourg: "You need to send this to Eesh and do amendment to the loan again.")).

94.     Aggarwal was a "corporate service provider" who provided accounting and bookkeeping services and created companies and transferred money according to Khrapunov's instructions.  (Khrapunov 2/01/18 Dep. 61:4-62:1; 62:10-11).

95.     While living in Dubai, United Arab Emirates, Aggarwal also created corporations on Ilyas' behalf; retained records for Ablyazov- and Ilyas-controlled entities; and managed the bank accounts for Ilyas, Ablyazov, and their family members.  (Khrapunov 2/01/18 Dep. 62:4–9, 129:7–22).

96.     Aggarwal communicated regularly and directly with Khrapunov.  (*See* Bourg 9/11/17 Dep. 57:16-20 (Ilyas contacted Aggarwal and Bourg only send Aggarwal "some e-mails, but at the behest of Ilyas").

97.     Aggarwal utilized accounts at FBME Bank.  (Khrapunov 2/01/18 Dep. 131:11-18 (admitting that FBME was the only bank that he dealt with because "as regards what was handled with Eesh Aggarwal there was FBME Bank"); *see also, e.g.*, PTX-244, PTX-245, PTX-246, PTX-247, PTX-249).

98.     Charts prepared by Aggarwal accurately explain the flow of funds from NSW to a company called Telford International, Ltd. ("Telford"). (PTX-327).  Specifically, NSW transferred $369.68 million to Fairlean; Fairlean transferred $369.65 million to Alkine; Alkine transferred $369.61 million to Crownway; Crownway transferred $130.11 million to Speville; Speville transferred $129.16 million to Darwin; and Darwin transferred $95.84 million to Telford.  (PTX-327; PTX-369; PTX-376; PTX-342).  Each of these entities was nominally owned by Petelin, his wife, or his son; was administered by Aggarwal; and was in fact controlled by Ilyas and Ablyazov. (PTX-301).

99.     NSW transferred $69.3 million of the $439.6 million to Vilder, which is beneficially owned and controlled by Ilyas.  (Gillieron Dep. 247:16–20, 249:5–9, 252:14–18, 252:25-253:22, 255:4-17; Khrapunov 2/01/18 Dep. 63:1-7; *see also* PTX-253 (N project chart). And on Ilyas' behalf, Petelin "waived" NSW's "loan" to Vilder and assumed "personal liability"

over the debt.  (PTX-301).  Aggarwal helped open the bank account for Vilder.  (Khrapunov 2/01/18 Dep. 62:23–63:3).

100.    Triadou contended that Telford was Petelin's family company, and that it is controlled by Petelin's wife, Elena Petelina.  But Ablyazov and Ilyas, not Petelina, control Telford. (Bourg 9/11/17 Dep. at 74:2-3).  Petelina had never heard of Telford prior to her deposition. (Petelina Dep. 103:24–104:1).

101.    Triadou has alleged that Aggarwal managed Petelin's money.  But Petelin never received a report or summary from Aggarwal concerning his supposed investments.  Although Aggarwal was purportedly managing approximately $440 million of Petelin's money, receiving such a report was "not a primary concern."  (Petelin 8/21/18 Dep 122:1–122:12, 122:17–123:7).

102.    Petelin testified that Khrapunov communicated with Aggarwal on Petelin's behalf to assist in managing Petelin's money.  This testimony is not credible.  Petelin supposedly relied on Ilyas as his principal or potentially even sole financial advisor despite Ilyas' youth and lack of experience.  (Khrapunov 2/01/18 Dep at 88:8–90:13).  Petelin provided "no direct payment" for Ilyas' services, despite Ilyas' alleged help with investing hundreds of millions of dollars of Petelin's money. (Petelin 8/21/18 Dep. 75:2–12).  There was no written agreement for Ilyas' purported assistance with Petelin's investments related to Zhaikmunai.  (*Id*. at 76:20–24).  Petelin could not recall ever receiving a report concerning his supposed investments from Ilyas.  (*Id*. at 122:13–16).

**D.  Triadou Invests $73.6 Million of BTA's Stolen Funds in U.S. Real Estate**

103.    Triadou relied on SDG Capital and Telford to fund its real estate investments because it lacked the necessary funding to make any investments.  (Bourg 9/11/17 Dep. 46:20-22, 46:24-25, 47:8-14).

104.    Specifically, a total of at least $71,685,798.99 stolen from BTA flowed from Telford to either Sukenik, Segal & Graff, P.C. ("Sukenik") or Kramer Levin Naftalis & Frankel LLP ("Kramer Levin") on Triadou's behalf from November 9, 2012, to May 22, 2013.  The May 22, 2013, transfer was for $28 million.  (PTX-582; PTX-597; *see also* PTX-676 (entries 139, 143, 189, 217, 228, 251, 252, 269); PTX-253 (N project chart reporting that Telford gave $71.69 million to Triadou); Trial Tr. 664:24-665:3 (Dubinsky Testimony); PTX-1001 (summary chart of amounts wired)).

105.    Telford and Triadou signed purported "loan" documents and amendments that eventually authorized up to $74 million in "loan" funding from Telford to Triadou. (PTX-409; PTX-295; Trial Tr. 171:9-13, 172:10-173:1; 177:11-19, 181:7-11 (Kozouz Testimony); PTX-1001).  The deadline for paying back the "loan," with interest, was November 7, 2015, or else Triadou would have to pay a daily penalty.    (PTX-409 (loan agreement at 1-2, 9)).

106.    The Telford "loans" to Triadou were never repaid.  (Trial Tr. 171:23-172:1, 182:12-14 (Kozouz Testimony), 540:20-25 (Glatz Testimony) (admitting that, with respect to the Telford loans, "to this date, they're still owed")).

107.    The Petelins purported to "waive" all "loans" by Telford to Triadou and assumed personal liability for collecting the debts.  (PTX-359 (October 2, 2013 letter from Petelina to Telford stating the loans are "waived" she is going to assume personal liability in collecting approximately $71.7 million from Triadou)).

108.    Neither Telford nor Petelina ever pursued their rights to collect the amounts owed by Triadou.  (Trial Tr. 181:25-182:3 (Kozouz Testimony)).

### 1.  Khrapunov Invested Ablyazov's Money in the Flatotel.

109.    In 2012, Bourg introduced Khrapunov to Joseph Chetrit, a real estate developer in New York City. (Khrapunov 2/01/18 Dep. 65:17-66:1).  Chetrit is a real estate developer who has been involved in "all different kinds of real estate ventures," including the development of "multifamily apartment buildings, warehouse buildings, [and] office buildings."  (Trial Tr. 344:25-345:4 (Graff Testimony)).

110.    Chetrit and Bourg later met in person with Khrapunov in Switzerland in September 2012. (Bourg 9/11/17 Dep. 173:20-22, 174:9-10).

111.    Bourg represented to Chetrit that SDG had "sufficient liquidity to finance in equity" the purchase of the Sony Building in Manhattan with $1.15 billion in the "total funds required." (PTX-534 at 3 (letter from Nicolas Bourg to Joseph Chetrit regarding "Availability of funds for the acquisition of the Sony building, New York")).

112.    On October 23, 2012, Chetrit's company, the Chetrit Group LLC, sent a letter to Bourg and SDG concerning an "offering" on the Flatotel, a property located at 135 West 52nd Street, New York, New York.  (PTX-549).  The Flatotel was a vacant, former hotel, on West 52nd Street and Chetrit planned to "convert it into condominium apartments."  (Trial Tr. 347:18-22 (Graff Testimony); PTX-549 (Chetrit Flatotel proposal)).

113.    On November 7, 2012, an operating agreement was executed for the entity CF 135 West Member LLC (the "Flatotel Operating Agreement"), which held a 75% interest in the Flatotel project.  Through the Flatotel Operating Agreement, Triadou acquired a 50% ownership interest in CF 135 West Member LLC ("West Member"); the other 50% was held by CF 135 Flat LLC, which was owned by the Chetrits.  (PTX-531 (Operating Agreement between CF 135 Flat LLC and Triadou SPV S.A.; *see also* PTX-510 (organizational structure of the Flatotel transaction);

Trial Tr. 349:17–350:6 (Graff Testimony) (describing ownership structure of the Flatotel investment)).

114.    Ablyazov and Khrapunov made the final decision on whether Triadou would invest in the Flatotel.  (Bourg 9/11/17 Dep. 54:16-24 (after Bourg "submitted to [Ilyas] a financial analysis for the Flatotel project," Ilyas told him "that he had to get the approval of his father-in-law."); PTX-579 (email from Bourg to Khrapunov forwarding email from Chetrit about "Chetrit/Jose:75percent," and stating "Jose is us.")).

115.    The Chetrits received (to their attorney's account) the following amounts which were transferred by Telford on Triadou's behalf for investment in the Flatotel:  (i) $10,500,051.25 on November 9, 2012; $2,625,053.01 on January 22, 2013; $15,925,102.16 on February 13, 2013; $175,101.32 on February 19, 2013; and $5,660,256.77 on April 13, 2013.   (PTX-582).  In total, Triadou contributed $34,885,565 in capital to the Flatotel.  (PTX-504; *see also* Bourg 9/11/17 Dep. 45:7-15).

116.    The money that Triadou invested in the Flatotel came from Telford, and ultimately, from BTA.  (PTX-504; *see also* Bourg 9/11/17 Dep. 45:7-15; Trial Tr. 351:6-12, 352:4-6 (Graff Testimony)).

117.    The wires from Telford to Sukenik's escrow account took "five to seven days," when international wire transfers otherwise usually only take "a day or two" to complete.  (Trial Tr. 353:1-8 (Graff Testimony)).  Upon inquiring why the wire transfers were taking unusually long to receive, the attorney for Triadou, Arnie Herz, said "they had to move money around."  (Trial Tr. 353:9-14 (Graff Testimony)).



(PTX-1002 at 9).

### 2. Khrapunov Invested Ablyazov's Money in the Cabrini Medical Center.

118.   On May 20, 2013, Triadou loaned $6,000,189 to an entity called 227 East 19th Holder LLC, which was the sole member of another Chetrit entity.  (PTX-504).

119.   The loan proceeds were used to fund a portion of an equity contribution in one of Chetrit's properties called the Cabrini Medical Center, also located in Manhattan, to be converted to condominium ownership.  (Trial Tr. 345:19-23 (Graff Testimony)).

120.   Triadou's investment took the form of a convertible loan agreement by which it received (a) a right to convert this amount into a 6% equity stake in the project, and (b) a right to increase that amount to $12 million, raising its equity stake to 12%. (PTX-538 (Cabrini Promissory Note); PTX-637, PTX-581 (Triadou corporate profile describing investment)).

121.     On May 20, 2013, the Chetrits received (to their attorney's account) $6,000,189.25 from Telford, which was sent on Triadou's behalf as the loan for the Cabrini Medical Center project.  (PTX-504).

### 3. Khrapunov Invested Ablyazov's Money in the Tri-County Mall.

122.     On April 22, 2013, Khrapunov, on Triadou's behalf, won a bid on a loan to the Cincinnati-based Tri-County Mall, which was in foreclosure.  The ultimate buyer was Triadou's subsidiary, Tri-County Mall Investors, LLC ("TCMI").  (Cerrito 3/09/17 Dep. 105:18–106:11; Bourg 9/11/17 Dep. 50:20-1:5; PTX-337 (email from Felix Sater to Khrapunov: "We won the Cincinnati deal…The buying entity is our newco Tri-County Mall Investors, LLC, that Arnie formed today.")).

123.     On April 24, 2013, Telford wired $2,800,045.23 to TCMI's law firm for the initial deposit to acquire the Tri-County Mall mortgage.  (PTX-667 (TCMI bank records); PTX-582 (SWIFT information showing wire transfer); PTX-581 (Triadou corporate profile showing money came from Telford)).

124.     On May 22, 2013, Telford wired $28,000,000 to TCMI's law firm to complete the acquisition of the Tri-County Mall mortgage.  (PTX-582).

125.     On August 30, 2013, TCMI sold its investment for about $43.4 million after costs and commissions, representing a substantial profit.  (PTX-620; *see infra* ¶154).

### 4. Khrapunov Invested Ablyazov's Money in the Syracuse Development Center

126.     On July 10, 2013, Triadou obtained a $1.9 million transfer from Adlux, one of Ilyas Khrapunov's companies.   (PTX-504, PTX-628, PTX-1001; Trial Tr. 174:21-23 (Kozouz Testimony), 538:20-23 (Glatz Testimony)).

127.    The purpose of the transfer was to acquire the Syracuse Development Center, an approximately 800,000 square foot former state facility that was built in early 1990 for "developmentally and physically handicapped people run by the state."  (Trial Tr. 288:12-17 (Dowd Testimony)); PTX-504 (Triadou records of investments with Adlux funds)).

128.    This wire was papered over with a purported loan agreement between Triadou and Adlux dated several months later, December 13, 2013. (PTX-628; Trial Tr. 173:11-25 (Kozouz Testimony)).

129.    The Adlux "loan" to Triadou was never repaid.  (Trial Tr. 171:23-172:1, 182:12-14 (Kozouz Testimony)).

130.    Adlux's funds came from an Ilyas-controlled shell that received its funding from Ablyazov.  (Gillieron Dep. at 247:16–248:14, 249:5–9, 252:14–253:13, 255:4–10 Khrapunov 2/01/18 Dep. 63:1-7; PTX-327 (10/02/13 chart).

131.    CBRE is a worldwide real estate brokerage firm that listed the Syracuse Center property for sale.  (Trial Tr. 288:5-6, 288:18-20 (Dowd Testimony)).

132.    Martin Dowd, a broker for CBRE, was involved in marketing the Syracuse Center from approximately August 2015 to April 2017.  (Trial Tr. 293:20-22 (Dowd Testimony)).

133.    In summer 2015, Ilyas Khrapunov first reached out to Dowd.  Khrapunov told Dowd that he was the owner of the Syracuse Development Center.  (Trial Tr. 289:6-8 (Dowd Testimony)).

134.    Throughout the summer and into early 2016, Khrapunov negotiated with Dowd the listing agreement outlining the terms to market the Syracuse Development Center.  (Trial Tr. 289:19-23, 290:5-7 (Dowd Testimony)).  Khrapunov also received the final draft agreement and prepared due diligence materials for CBRE to review.  (Trial Tr. 290:8-17 (Dowd Testimony)).

135.    Dowd received a full price, $3.5 million, offer from a potential buyer for the Syracuse Center, but never heard back from Khrapunov as the seller.  (Trial Tr. 291:13-18, 291:21-292:10 (Dowd Testimony)).

### 5. Khrapunov Ordered the Liquidation of Triadou's U.S. Investments Once Almaty Sued in the U.S.

136.    As noted above, BTA secured numerous final money judgments against Ablyazov in the United Kingdom from November 2012 to November 2013.  (Trial Tr. 410:16-18 (Nartay Testimony)).

137.    Further, in July 2013, Ablyazov was arrested in France after he fled the U.K. criminal contempt judgment.  (Ablyazov 10/31/18 Dep. 89:23-90:1).  Ablyazov was imprisoned at "the very end of July, maybe the very beginning of August…of 2013" and this "was major news in the newspapers all over the world."  (Khrapunov 2/02/18 Dep. 95:7-17).  Bourg knew that Khrapunov and Ablyazov were being pursued by BTA in 2013.  (Bourg 9/12/17 Dep. 55:18-25 (admitting he learned about a Swiss investigation into the Khrapunov family "[i]n the course of 2013"); 39:13-20 (admitting he learned that Ablyazov was imprisoned in France in "July 2013")).

138.    Phillipe Glatz, the "purchaser" of SDG (*see infra* ¶182), also knew that Khrapunov and Ablyazov were being pursued by BTA in 2013.  (Trial Tr. 509:13-17 (Glatz Testimony) (admitting that in PTX-707 Khrapunov informs Glatz that there were investigations into the source of the Khrapunov family's wealth); 535:18-536:4 (admitting that it was widely reported that Ablyazov was being sought on embezzlement charges by Kazakhstan, Russia, and Ukraine)).

139.    After Ablyazov was imprisoned, in July 2013, Triadou did not receive any funding from Telford and it did not itself make any further U.S. investments.  (Bourg 9/11/17 Dep. 56:23-57:4).

140.    In August 2013, FBME froze the bank accounts that Aggarwal managed for Khrapunov.  (PTX-350 at 2 (Email from Eesh Aggarwal to Ilyas Khrapunov on August 18, 2013: "I talked to C and he is very upset and all funds are frozen with immediate effect.  Therefore, we are recommending to our client companies that no transactions shall be effected until matters are resolved.  We would recommend that no further communication with us shall be made except to arrange the end of month meeting wherein we can discuss all matters in detail.")).

141.    Banks refused to give SDG loans due to a Swiss investigation into Khrapunov. (Gillieron Dep. 305:13-19; PTX-626 (email from Bourg to Ilyas stating "[t]he loan was refused from Black see bank for Nicki beach…We are trying to find a solution with another bank"; Ilyas responds "[w]e need to work on this and find the right answer.  We could easily provide tax returns of mr. Glatz, his valuation and presantations (sic) of his companies.")).

142.    After the FBME operation was shut down, the Petelins purported to "waive" all "loans" by Telford to Triadou and assumed personal liability for collecting the purported debts. **(**PTX-359 (October 2, 2013 letter from Petelina to Telford stating the loans are "waived" she is going to assume personal liability in collecting approximately $71.7 million from Triadou)).

143.    On May 13, 2014, the City of Almaty, a former Plaintiff in this action, filed an asset-recovery lawsuit in California federal court against Ilyas, his sister Elvira, and others.  (Bourg 9/11/17 Dep. 48:6-20).  Ilyas knew before the filing that the lawsuit was likely to be filed and, in April 2014, directed Bourg to start liquidating Triadou's assets in New York.  (Bourg 9/11/17 Dep. 47:4-8, 47:10-11, 60:13-61:18, 63:3-11 (Khrapunov told Bourg in April 2014 "that there was the risk of legal proceedings in the US on the part of BTA . . . in order to recover the assets that his family had in California, and so therefore there weren't any assets in New York which could risk being recovered")).

144.    As a result of the banks' refusal to conduct business with him and BTA and Almaty's asset recovery efforts, Khrapunov panicked and directed Bourg to start liquidating Triadou's assets in New York—including the Flatotel and Cabrini investments.  (PTX-859 (Bourg recording of conversation with Chetrit) ("The way things went down, as you know, with the stepfather being in prison and all.  The little one started to panic.  So he sold SDG…I was the president of all these SPVs and it was supposed to be integrated into the Real Estate Fund.  But when he panicked with the situation, he liquidated everything.  So SDG Capital was bought out by Philip Glatz."); Bourg 9/11/17 Dep. 63:3–11).

145.    Chetrit offered to repurchase Triadou's interest in the Flatotel and return the $6 million that Triadou invested in Cabrini, without interest.  (PTX-561 (letter of intent by which Triadou agrees to assign its ownership interest in the Flatotel to Chetrit's Company, CF 135 Flat LLC)).  Both Ilyas and Ablyazov—who already had four U.K. judgments against him—gave their approval of the arrangement.  (Bourg 9/11/17 Dep. 60:24–61:18).

146.    Triadou assigned its interest in the Flatotel for far less than Triadou believed it was worth, and for far less than it was actually worth.  At the time, Triadou estimated that the total net *profit* from the Flatotel project would be between $163,092,218 and $232,212,218, (PTX-549 at 6)—which means that Triadou's profit interest alone was worth $61,159,581.75 to $87,079,581.75.  Including return on capital, (PTX-531 at § 4.3(d)), Triadou's own internal valuation of the entire Flatotel interest in November 2013 was more than $118 million, (PTX-581 at 11).

147.    Triadou's former director estimated that the Flatotel interest was valued at between $80 and $100 million, perhaps more, around the time of Triadou's exit in 2014.  (Bourg 9/11/17 Dep. 54:25–55:17).

148.     SDG Capital, not Triadou, received the funds from Chetrit. On May 7, 2014, Chetrit wired $7 million to a to a Compagnie Privee de Conseils et d'Investissements SA ("CPCI") account of SDG Capital, representing repayment for Triadou's $6 million loan in Cabrini and $1 million as an initial payment for the Flatotel assignment (PTX-584 (wire transfer authorization and agreement showing $7 million payment); Trial Tr. 355:2-5 (Graff Testimony)).  Triadou's lawyers instructed Chetrit's lawyer Graff to describe the wire as a "loan on behalf of Triadou SPV S.A." (PTX-584; Trial Tr. 355:20-22 (Graff Testimony)).

149.     On August 4, 2014, three months after the payment from Chetrit had been made, the agreement was formally memorialized.  (PTX-509 (Assignment Agreement)).

150.     Part of Triadou's purported consideration was a "credit" for $6 million that Chetrit allegedly invested in two unrelated projects known as Happy Family and Landscape.  (PTX-509 at § 1(a)).  But Triadou never received any such credit, nor was paperwork ever created to evidence the aforesaid credit, as the agreement provided.  (Cerrito 3/09/17 Dep. 184:5-20).  There is no evidence that Triadou ever took any steps to obtain that credit.

151.     Pursuant to the Assignment Agreement, Chetrit's entity CF 135 Flat LLC ("CF 135 Flat") was to pay Triadou four payments in the amount of $5,250,000 each, totaling $21,000,000. (PTX-509; PTX-5001).

152.     Upon signing the Assignment Agreement, Chetrit refused to make further payments to Triadou.  Triadou sued Chetrit for breaches of the Assignment Agreement and secured four New York state-court judgments totaling $23,110,144.46 against his entities CF 135 Flat LLC, CF 135 West Member LLC, and The Chetrit Group LLC.  (PTX-5001).

153.     Eventually, after litigation, CF 135 Flat paid the amounts owed under the Assignment Agreement into an escrow account, the balance of which as of December 8, 2022, is

together with interest, $27,501,672.40, pursuant to judgments in the four New York state court cases filed by Triadou.  (PTX-5001).[2]

154.    On July 18, 2013, TCMI sold its investment in the Tri-County Mall for about $43.4 million after costs and commissions.  (PTX-667; PTX-620).

155.    In August 2013, Felix Sater, who was authorized to act as a co-manager of TCMI, diverted the proceeds of the sale to an account only he controlled.  (PTX-691; Cerrito 3/09/17 Dep. 105:18-106:11).  On or about October 30, 2013, Sater's counsel sent Ilyas and Triadou a letter demanding payment of "at least many tens of millions of dollars," purportedly in earned fees. (PTX-622).  The letter reported Ilyas's statements that the companies managed by Sater at his request were his (Ilyas's) alter ego entities; that the funds in those companies belong to Ablyazov; and that Ablyazov's funds were used to pay for the Tri-County Mall debt (PTX-622 ("Mr. Khrapunov's excuse to Mr. Sater that he could not pay him on this because the transaction was controlled and funded by Mr. Ablyazov.").

156.    On December 19, 2013, after several months of unsuccessful negotiations, TCMI filed suit against Sater and another former manager of the company, Daniel Ridloff, for the misappropriation of those funds.  (PTX-691; PTX-503 at TRIA0004253).

157.    On December 23, 2013, Triadou, TCMI, and Sater entered into a settlement agreement in which Sater agreed to return $20 million of the funds that he misappropriated, in exchange for the relinquishment of Triadou's claim to a majority of the sales proceeds, mutual releases, a non-disclosure agreement, and a mutual non-disparagement agreement.  (PTX-433).

---

[2]    The funds in the escrow account have been attached by order of this Court since June 24, 2016.  [ECF No. 175 (Memorandum and Order of Atttachment)].

The releases ran to the benefit of numerous individuals and entities who helped Ablyazov and Ilyas launder BTA's stolen funds, but who had nothing to do with the Tri-County Mall dispute.  (*See id*).

### E.  Triadou is a Shell Entity Controlled by Ilyas Khrapunov, Created for the Sole Purpose of Laundering Money.

#### 1.  Khrapunov Always Controlled SDG, Triadou's Parent Company

158.    Around 2007, Khrapunov founded SDG.  (Bourg 9/11/17 Dep. 42:7-10; Khrapunov 2/01/18 Dep. 38:23-8).

159.    SDG Capital is the holding company for SDG, initially owned by "the Khrapunov family." (Bourg 9/11/17 Dep. 41:21-22; 42:7-10).

160.    SDG Capital has never generated any profits.  (Cerrito 3/09/17 Dep. 143:19–25). SDG Capital's offices from 2011 to 2015 were the same as Ilyas' personal offices, in Geneva. (Gillieron Dep. 22:6–11, 23:11–17, 24:13–16; Bourg 9/11/17 Dep. 16:21-17:6).  SDG Capital's banks stopped working with the company because they believed that Ablyazov was involved and had criminal issues.  (Gillieron Dep. 305:13-306:3).

161.    Ilyas controlled SDG and SDG Capital at all relevant times.  He directly owned the company for a time, but he later had his company Harlem own SDG in his stead.  (Gillieron Dep. 148:14–16, 150:24-151:9, 151:3–9).  Meanwhile, Ablyazov moved funding from purported BTA "loans" through Harlem and other shell entities.  (*See, e.g.,* Ablyazov 10/31/18 Dep. 93:23–94:12). In May 2009, Harlem transferred its shares in SDG to Elvira Kudryashova ("Elvira"), Ilyas' sister and the wife of Dmitry Kudryashov (the son of Gennady Petelin and Elena Petelina).  (Gillieron Dep. 151:3–9).  Nonetheless, Ilyas was involved at the time in managing the company and publicly presented himself as owner.  (Gillieron Dep. 159:6–160:21, 162:22–163:4).  He also hired company employees.  (*Id*. 74:17–22).

162.     Ilyas signed an employment agreement with SDG, effective April 15, 2008, to be its Chief Executive Officer.  (DTX-131).

163.     Ilyas later became the Chairman of SDG, a position he held until June 2012. (Khrapunov 2/02/18 Dep. 20:22-21:5).

164.     On May 12, 2009, Elvira became the sole shareholder of SDG Capital.  (DTX-194 at TRIA0009381).  However, Elvira was only "[f]ormally" the main shareholder of SDG Capital. (Gillieron Dep. 160:22–161:14).

### 2.   Khrapunov Also Controlled Triadou and Directed its Activities

165.      Khrapunov first met Nicolas Bourg in 2006.  (Bourg 9/11/17 Dep. 11:17-19).  In July 2011, Ilyas hired Nicolas Bourg to incorporate an investment fund called Element One, or SDG Investment Fund.  (Khrapunov 2/01/18 Dep. 164:3-4).  Ilyas' extended family initially was slated to provide seed funding to Element One for Triadou's real estate assets.  (Bourg 9/11/17 Dep. 133:14–17).  Khrapunov tasked Bourg with identifying potential investors and investments for the fund.  (Khrapunov 2/02/18 Dep. 65:21-66:1).

166.     Khrapunov instructed Bourg to form Triadou as an SDG subsidiary, to make investments in U.S. real estate projects. (Bourg 9/11/17 Dep. 22:11-15; Khrapunov 2/01/18 Dep. 38:23-39:8).  Triadou was formed on September 12, 2012.  (DTX-22).

167.     As of October 2014, Cesare Cerrito was CFO of SDG Capital and the sole director of Triadou. (Trial Tr. 168:13-16 (Kozouz Testimony); *see also* Bourg 9/11/17 Dep. 68:4-10).  Prior to that, Bourg was also a director of Triadou.  (Bourg 9/11/17 Dep. 43:6-8).

168.     Triadou has no official place of business.  (Cerrito 3/09/17 Dep. 26:8-13).  Neither does it have any offices or employees of its own.  (*Id*. at 26:8-13, 46:10-12).  Triadou also lacked

balance sheets from 2013 at the latest to the present (*Id*. at 30:2–32:5), which means that Triadou had at most one year of balance sheets since its creation.

169.    Failing to maintain general ledger activity or financial statements is inconsistent with standard accounting practice, especially for a company that transacts millions of dollars. (Trial Tr. 164:24-16:1 (Kozouz Testimony)).

170.    At no point prior to the date of his testimony at trial did Triadou's purported owner, Phillipe Glatz, receive Triadou's books and records (Trial Tr. 47:24-48:19-21 (Glatz Testimony)).

171.    Ilyas did not deny that "for every single Triadou investment the paper trial begins with" him.  (Khrapunov 2/02/18 Dep. 192:9–13).  Nonetheless, Ablyazov had ultimate decision-making authority because Triadou was using his money; Ilyas could not proceed with particular investments without Ablyazov's approval.  (Bourg 9/11/17 Dep. 53:7–17).  Ablyazov made the decisions even when he was imprisoned for three and a half years in France starting in July 2013. (Bourg 9/11/17 Dep. 53:7-17; Khrapunov 2/01/18 Dep. 155:1–4, 209:23–25).

### 3.  Khrapunov Tried to Conceal His Ownership of SDG and Triadou with a Sham Sale of SDG to Phillipe Glatz

172.    Khrapunov first met Phillipe Glatz around 2011.  (Trial Tr. 470:23-25 (Glatz Testimony)).

173.    In summer 2012, Glatz and Khrapunov traveled to Central Africa, where Glatz met Nicolas Bourg for the first time.  (Trial Tr. 471:20-25 (Glatz Testimony)).

174.    In late 2012, after BTA began its asset recovery efforts against Ablyazov, Khrapunov offered to "sell" SDG to Glatz because he understood that banks were reluctant to lend to SDG because of allegations made around the source of his family's wealth. (PTX-707).  In early 2013, Glatz stated that he would consider presenting an offer to buy SDG.  (PTX-707).

175.     As of a December 31, 2012, valuation, SDG was valued at 5.5 million CHF.  That valuation, however, did not include any of Triadou's assets.  (PTX-414) (*see also* Trial Tr. 479:10-15, 481:19-22, 483:14-16 (Glatz Testimony) (admitting Glatz reviewed PTX-414, and "shared this report with several people" because it is "a description of what [he] was going to buy," but that he does not remember Triadou mentioned anywhere in the report)).

176.     Glatz was aware that purchasing SDG would not be a profitable business decision. For example, Glatz knew that SDG reported three years of multi-million dollar losses.  (PTX-414 at 12 ("The Company has made losses for the last three years: CHF 8.1 million in 2010, CHF 20.8 million in 2011 and a budgeted loss of CHF 14.0 million for 2012 (the budget for 2013 is expected to be at a break-even situation).")); Trial Tr. 479:7-15 (Glatz Testimony) (Glatz reviewed this report and shared it with several people on his team).

177.     One of Glatz's advisors and general managers, John Cristov Pernet, told Glatz that SDG would likely not be profitable (Trial Tr. 485:12-20 (Glatz Testimony)).

178.     Glatz hired advisors at JPH Hottinguer to analyze the profitability of his potential acquisition of SDG, who stated: "The most important thing that emerged from the interviews was that the new shareholder must be prepared to inject funds to finance current and future projects and commitments." (Trial Tr. 486:14-16; 487:4-6 (Glatz Testimony); PTX-645 at 6). Hottinguer determined that SDG had enormous expenses. (PTX-645 at 7 ("[W]e were made to understand that SDG's operating costs are, or at least were, very high, which is partially justified when you are I the very high end but is problematic In a situation where funding is a challenge."); Trial Tr. 488:20-489:8 (Glatz Testimony) (admitting that SDG was spending too much money on expenses because it was "dealing in very high-end luxury")).

179.    Glatz did no due diligence on Triadou, SDG's subsidiary, prior to purchasing SDG. (Trial Tr. 501:3-14 (Glatz Testimony) (admitting he "personally" had no understanding of the company's assets or liabilities)).

180.    At the time Glatz purchased SDG, he did not have any information about Triadou's assets other than "knowledge of its price and the value of Triadou."  (Trial Tr. 499:4-8 (Glatz Testimony); *see also* 501:3-7 (admitting he did not have any idea what potential upside Triadou might bring to SDG)).

181.    Glatz denied knowing Ilyas was related to Ablyazov during the negotiations, but the connection was obvious at that time and available through public sources.  (Trial Tr. 509:4-10 (Glatz Testimony); PTX-632 (Karlin Real Estate report on Swiss Background Investigation ("The wife of Ilyas Khrapunov, Madina Ablyazova, appears to be the daughter of Mukhtar Ablyazov" and "A number of potentially adverse articles and posts on blog forums were found which related to the association of SDG Capital, Swiss Development Group and the Khrapunov family who are reportedly implicated in and subject to investigation in connection with money laundering."); PTX-707).

182.    On March 12, 2013, Glatz signed a Share Purchase Agreement, in which his company Greencos S.A. ("Greencos") purported to purchase SDG for CHF 3.5 million.  The Share Purchase Agreement provided that Greencos would pay CHF 3.5 million in two installments to purchase SDG.   (PTX-648).

183.    Although Greencos technically acquired SDG from Elvira and two other people, Glatz understood that Ilyas was the true owner of SDG.  He never spoke with Elvira or the other nominal owners of SDG prior to his purchase of the company.  (Trial Tr. 786:8-20 (Glatz Testimony)).

184.    Ilyas and Ablyazov provided Glatz with the funds to purchase SDG.  In March 2013, Crownway—one of the shell entities that received BTA's stolen funds from NSW—transferred $10 million of its funds in purported "consultancy" fees to an entity called Classic Design Inc. ("Classic Design"), which in turn transferred $7 million to the ABN AMRO Bank ("ABN AMRO").  (PTX-348; PTX-330; PTX-340; PTX-347).

185.    Then, ABN AMRO issued a $7 million purported "loan" to an entity called Hazelview Limited ("Hazelview"), which then made a $6.5 million purported "loan" to an entity called Toplink Ltd. ("Toplink"), a United Arab Emirates-based entity beneficially owned by Glatz through a Belize-based trust called the Toplink Trust.  (PTX-348 ($4 million sent from Hazelview to Toplink); PTX-342; PTX-343 (incorporation documents); PTX-416 (nominee agreement showing Glatz owned Toplink), PTX-412 (Aggarwal Toplink structure chart)).  Glatz and Ilyas worked with Eesh Aggarwal, who created the ABN AMRO account for Toplink.  (PTX-324, PTX-331 (Glatz emails to Aggarwal with important personal information and records to support account creation); *see also* PTX-338 (Aggarwal P Project chart); PTX-6000 (summary timeline showing key transfers and related communications)).

186.    Glatz conspired with Ilyas and Aggarwal to use the $6.5 million "loaned" to Toplink in order to purchase SDG by transferring the $6 million to a Glatz-controlled "Brazilian" company, which was then to "repay" the loan to Glatz's company PIDJI. (PTX-425; PTX-340; PTX-341).

187.    PIDJI then effected the purchase of SDG.  (DTX-1).  SDG Capital remained Triadou's parent company until March 12 2013, when Greencos took over as Triadou's parent company. (DTX-1 (March 12, 2013 contract for sale between Greencos and Elvira Kudryashova,

Michel Gillieron, and Erich Sager))**.** Greencos is owned by Phillipe Glatz.  (Trial Tr. 495:25-496:1 (Glatz Testimony)).

188.     The ultimate contract for the sale of SDG to Greencos/Glatz had a key man provision, requiring SDG to retain only Ilyas Khrapunov as an employee.  (DTX-1 at 33 (the parties agreed that Khrapunov "is to be considered as a key man for the development of the SDG Group")).

189.     Prior to closing the Flatotel deal, Khrapunov tried to hide his ownership of and control over Triadou by falsely presenting Glatz as the owner.  Graff, Chetrit's attorney involved in papering his real estate deals with Triadou, sought to ascertain the "warm bodies" who owned SDG from Triadou's counsel two days in a row to fulfill KYC requirement prior to closing the Flatotel transaction.  (Trial Tr. 359:13-360:12 (Graff Testimony); *see also* PTX-689 ("It is critical that we ascertain ASAP the warm bodies who own interest in SDG.  If we don't provide the information, we are in jeopardy of not closing on time."); PTX-840 ("Both the lender's attorney and the attorney preparing the noncon opinion for us need to know the warm bodies who own the interests in the sole member of Triadou.")).

190.     Attorney Arnie Herz told Graff that Glatz was the owner of SDG and Triadou to close the Flatotel transaction, *before* Glatz purchased SDG.  (PTX-689 at 2 (Herz "just spoke with Josh Graff.  He told me to send him the info of Mr. Glatz, and he will present Glatz as the beneficial owner.  He understands that Mr. Glatz is traveling and we cannot close until March 25"), at 3 (Khrapunov claims "[t]here will be no red flags with Mr. Glatz"); PTX-840 at 3 (Herz writes "Closing is set for March 21.  And Mr. Glatz won't be the owner until after the closing.  I'm concerned that this will raise a red flag for the lender.")).

191.    Although Greencos/Glatz acquired SDG and its subsidiary on paper, with money provided by Ilyas, Ilyas retained actual ownership and control of the companies.  (Trial Tr. 526:24-527:7 (Glatz Testimony) (Ilyas and bourg continued to manage Triadou's operations in the United States, while Glatz was owner of SDG, because Glatz "did trust them"); Gillieron Dep. 261:25-262:5 (Khrapunov "was still employed" at SDG after the sale to Glatz for "more than a year")). Khrapunov himself admitted he "was involved for sure" in SDG for years after Glatz bought SDG. (Khrapunov Dep. 106:6-107:7 (admitting that he directed bidding on behalf of Triadou in the auction to purchase the Syracuse in 2013, and in the efforts to sell the same property in 2015. Khrapunov claims he did "just a favour" for Cerrito by "approaching and identifying who would be the best company to do a valuation and then maybe a sale, handling the sale process."), 192:9-13 (it "could be" that the paper trail for every single Triadou investment starts with Khrapunov).

192.    Long after Glatz supposedly acquired SDG and long after Ilyas ceased to have any documented relationship with SDG (including as an employee or consultant), Ilyas held himself out as its owner and transacted business on its behalf.  (PTX-599, PTX-604, PTX-605, PTX-607, PTX-610, PTX-609, PTX-612 (emails with Dowd showing Ilyas's involvement in Syracuse Center)).

193.    For example, over the course of marketing the Syracuse Center property, CBRE broker Martin Dowd spoke with Ilyas – who held himself out as the owner of the investment – six or seven times over the course of 2015 and 2016 to negotiate aspects of the proposed transaction, and did not recall hearing Petelin's name or having any conversation with Phillipe Glatz.  (Trial Tr. 293:23-294:9 (Dowd Testimony)).

194.    Other third parties knew of Ilyas' continued control, too.  One bank, Black Sea Trade & Development Bank, refused to complete a $6 million loan agreement with SDG because

it completed due diligence and thought Glatz was not a "credible purchaser of SDG Capital." (Bourg 9/11/17 Dep. 70:3–71:12; PTX-625 at 3 (e-mail thread including Black Sea official, Ilyas, and Bourg) ("I am not persuaded that there's been any real change in the ownership of SDG.")).

195.     In May 2013, Khrapunov attempted to secure a mortgage loan from a third party, Karlin Real Estate ("Karlin"), to finance Triadou's Tri-County Mall acquisition.  On Khrapunov's orders, SDG Capital prepared due diligence materials for Karlin, whose attorneys prepared draft loan documents.  (PTX-659).  Karlin declined to invest after its background investigation was "not very positive" and revealed that, although Glatz was the purported owner, "Ilyas Khrapunov, the scion of a controversial Kazakh family, owns some portion of the company."  (PTX-632).

196.     Moreover, in July 2014, Triadou was aware that Deutsche Bank expressed concerns with "[r]eputational aspects related to the former owner of SDG" Capital, requiring for a certain loan an indemnity from the company "confirm[ing] that the previous owner (or any affiliate or family member) has no involvement with SDG [Capital] on any level."  (PTX-458).  Deutsche Bank told Triadou that it decided not to approve the loan because it was "important . . . to establish that the Borrower/SDG/their affiliates have no business dealings with Iliyas Khrapunov, his family or his affiliates" but that the due diligence on the issue, despite receiving assurances from SDG Capital, "has not been completed to [the bank's] satisfaction."  (PTX-464).

### 4. Khrapunov Tried to Hide His Identity When Conducting Business On Behalf of Triadou

197.     Ilyas Khrapunov admitted to using "hundreds of email accounts" since 2012. (Khrapunov 2/01/18 Dep. 27:2-5).     These included "oilman2030@gmail.com," "oilman2030@hotmail.com," "jabba@cryptoheaven.com," "theuraniumguy@gmail.com," thenickelguy@gmail.com, and "Ikhrapunov@sdg.ch," (PTX-303; PTX-308; PTX-607; PTX-322; PTX-329).  Although PTX-308 shows an email in which oilman2030@gmail.com sends Aggarwal

his mother's passport (referring to the passport of that of "my mum"), Khrapunov claimed that he could not remember whether he used that email address.  He claims he *could*, however, recall his mother giving birth to him.  (Khrapunov 2/01/18 Dep. 72:6-19).

198.    Khrapunov hid his last name from Martin Dowd throughout the entirety of the Syracuse Center negotiations. (Trial Tr. 288:21-289:5 (Dowd Testimony)).

199.    Bourg and Chetrit used code names when referring to Khrapunov (PTX-529, PTX-578 (emails referring to Khrapunov and Triadou as Jose and Pedro)).

### 5. Triadou Alleges that Petelin Funded its Investments, but the True Source of Funds Was Money Stolen from BTA By Ablyazov

200.    Ablyazov was the source of Triadou's funds, using money traceable to his theft from BTA.  Bourg testified that Ablyazov always made "the final decision" in approving the payments made for Triadou's U.S. investments.  (Bourg 9/11/17 Dep. 53:7-25).  Khrapunov told Bourg that that the Telford funds "were funds which came from Mr. Ablyazov."  (Bourg 9/11/17 Dep. 45:16-19).

201.    Although Petelin claims to be a billionaire, with the NSW money representing only a portion of his fortune, there is no actual evidence that Petelin had wealth independent of the misappropriated funds at issue in this case.  (*Compare* Khrapunov 2/01/18 Dep. 123:18-124:5 (Petelin purportedly sold his shares in Gazprom for hundreds of millions of dollars); Petelin 8/21/18 (estimating his current worth to be "anywhere from 0.9 to 1 billion") *with* Petelin 8/21/18 Dep. 14:15-17, 14:24-25 (lives in a rented condominium in Orange County, California), 63:25-64:18 (cannot say if he was a beneficiary of any other companies aside from NSW); Petelina Dep. 54:24-55:5, 58:21-22, 58:24, 59:1-60:18 (despite claiming to know "for a fact" that her husband acquired Gazprom shares, not recalling any other details regarding the shares, including when or even whether her husband supposedly sold those shares for hundreds of millions of dollars)).

Petelin was a public employee in the Russian government with a modest income.  (Petelina Dep. 52:2-6, 52:16-18, 52:24-53:2, 54:2-5).

202.    Further evidencing that Petelin was not the real source of its funds, Triadou's corporate records were falsified to say that another person, Peter Sztyk, was its investor, before Petelina was chosen as a replacement cover story.  (PTX-619 (referring to Sztyk as the "canadian investors"); Bourg 9/11/17 Dep. 72:14–73:8).

203.    During the course of this litigation, Khrapunov communicated with Petelin and Petelina's attorney as "an interpreter," while being a party to this same action in which they were witnesses.  Petelina prepared for her deposition by speaking to her attorneys by phone and Khrapunov joined the call as "an interpreter."   But despite talking with Khrapunov and her attorneys for an hour, Petelina claims to not "know anything about the case" and "[i]t's not something that interests [her]."  (Petelina Dep. 19:4-7; 19:4-20:5).  Khrapunov also participated in Petelin's communications with his attorney, while being a party to the action.  (Petelin 8/21/18 Dep. 17:13-22; 17:25-18:2).  It is reasonable to conclude that Khrapunov influenced, and certainly attempted to influence, Petelin and Petelina's testimony in this action.

204.    At the time of her deposition, Petelina claimed that she had never heard of Triadou, Aggarwal, Azure Consultants, Telford, or NSW.  (Petelina Dep. 72:17-21; 103:24-104:3; 123:5-7).  Nor did Petelina recall discussing the possibility of forgiving loans for which she was a beneficial owner, despite purportedly signing documents claiming to do just that.  (Petelina Dep. 114:17-20; 123:8-12; PTX-359).

205.    In total, the evidence presented at trial demonstrates conclusively that the funds invested on Triadou's behalf in the United States are directly traceable to the $115.3 million stolen from BTA Bank by Ablyazov through Tradestock.  (PTX-1002; Trial Tr. 577:14-17 (Dubinsky

Testimony)).  The evidence also conclusively establishes that Petelin and Petelina had no genuine interest in these funds, and that they were nominee owners of NSW, Telford, and other entities only.  (*See supra* ¶¶201, 203-04).

## II.    Conclusions of Law

### A.   The Court has Jurisdiction

1.        This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1441(d). As the Court previously concluded, the City of Almaty is a foreign state as defined in § 1603(a) and thus properly removed the interpleader action against it to this Court. [ECF No. 426 at 9.] Under Section 1441(d), "[a]ny civil action brought in a State court against a foreign state as defined in section 1603(a) of this title may be removed by the foreign state to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(d). The Court then granted the City of Almaty's motion to join BTA as a cross- and counter-claim plaintiff to the original interpleader suit under Rule 20 of the Federal Rules of Civil Procedure. [ECF No. 174 at 3–6.]

2.        This Court also has diversity jurisdiction under 28 U.S.C. § 1332(a) because (i) at the time this action was filed there was complete diversity of citizenship between the parties, and (ii) more than $75,000, exclusive of interest and costs, is at stake. At the time this action was filed, there was complete diversity because the Chetrit Entities are incorporated in either New York or Delaware and all have principal places of business in New York [ECF No. 1-1 ¶¶ 2–4]; Triadou SPV S.A. is a special purpose investment vehicle incorporated under the laws of Luxembourg, with a principal place of business in Switzerland [ECF Nos. 1094 ¶ 17; 1286 ¶ 6]; and the City of Almaty is a foreign city in the Republic of Kazakhstan [ECF Nos. 1 ¶ 16; 1361 ¶ 1.] The amount in controversy well exceeds $75,000, as the amount in controversy at the time the interpleader action was filed was $21 million. The later joinder of BTA, which was positioned similarly to the

City of Almaty, had no impact on the Court's diversity jurisdiction. Accordingly, this Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a). [*See* ECF No. 103 at 3 n.1 (holding that "the Amended Interpleader Complaint satisfies the diversity jurisdiction requirements of 28 U.S.C. § 1332(a) because the parties are of diverse citizenship and there is more than $75,000 in controversy").]

3.      Alternatively, the Court has supplemental jurisdiction over BTA's claims against Triadou. [*See* ECF No. 1254 at 12-13.] The Court noted that "Triadou did not dispute that the crossclaims against it derived from the same nucleus of operative fact as the interpleader." *Id.* at 13. And "there can be no dispute that the question of the interpleader, whether the Chetrits should pay Triadou the money at issue, was deeply intertwined with the claims presently asserted against Triadou." *Id.* Recognizing "the unusual complexity of the case and the substantial investment of judicial resources that had already occurred," the Court held that its exercise of supplemental jurisdiction under 28 U.S.C. §§ 1367, 1441(d) "over the claims against Triadou was and is appropriate." *Id.*

### B.  Triadou's Agents Knowledge Can Be Imputed to Triadou

4.      "Bedrock principles of agency law provide that the knowledge of an agent, acquired while acting within the scope of employment, is imputed to his principal." *In re: Lyondell Chem. Co.*, No. 16CV518 (DLC), 2016 WL 5818591, at *3 (S.D.N.Y. Oct. 5, 2016) (citing Restatement (Third) of Agency § 5.03 and Restatement (Second) of Agency § 272); *accord, e.g.*, *Carrion v. 605 Realty Assocs. Ltd.*, No. 02 CIV. 2166(DC), 2004 WL 1562815, at *4 (S.D.N.Y. July 13, 2004).

5.      Here, the evidence clearly shows that Ilyas Khrapunov and Nicholas Bourg were agents of Triadou and were acting within the scope of their employment for the benefit of Triadou during the relevant period.  Any facts known to Triadou's agents and employees, including Ilyas

Khrapunov and Nicholas Bourg, that were learned during the course of their employment when they were acting for the benefit of Triadou, are known by Triadou. For example, Bourg and Ilyas's knowledge that they were investing funds on behalf of Ablyazov and not Petelin is imputed to Triadou.

6.      Further, Triadou continues to be charged with knowledge of facts that were learned by its agents and employees, including Ilyas Khrapunov and Nicholas Bourg, during the course of their employment when they were acting for the benefit of Triadou, regardless of Philippe Glatz's acquisition of Triadou's parent company, SDG. That is, Glatz's acquisition of SDG/Triadou – regardless of whether it was genuine or a sham – does not erase Triadou's knowledge of facts properly imputed to it.

7.      Further, Ilyas and Bourg continued to be Triadou's agents long after Glatz's purported acquisition. For instance, Phillipe Glatz testified that even after his purported acquisition of SDG, he permitted Ilyas Khrapunov and Nicholas Bourg to manage Triadou's U.S. investments:

> Q. In late 2013, Mr. Khrapunov, along with Mr. Bourg, were supervising Triadou's investments in the United States. Correct?
> A. I cannot tell you if it was until the late 2013. But I can tell you that at a certain point, he was supervising the investments here.
> Q. And when you say you can't tell me if it's late, is that because at some point in 2013, he stopped supervising Triadou's investments in the United States?
> A. I cannot tell you just because I don't recall with a lot of detail and it's been like over ten years, but I was sure that at a certain point, he was supervising.
> Q. And during the time that he was supervising Triadou's investments in the United States, you trusted both Mr. Khrapunov and Mr. Bourg to do that. Correct?
> A. Yes. That is true, that at a certain point, I did trust both of them.
> **Q. And you permitted them, as the owner of SDG, to manage Triadou's operations in the United States during that time period.**
> **A. Yes. Yes. For a certain period of time, I did trust them.**
> Q. And what is your recollection of when Mr. Khrapunov was no longer managing Triadou's activities in the United States?
> A. As I recall, it was after the sale of three country.

Trial Tr. At 526:12 (emphasis added); *see, e.g.*, Trial Tr. 467:1–4 ("I do own Triadou since 2013. However, I'm not the one in charge of supervising it. It has its own team, its own management team.").  The sale of Triadou's investment in the Tri-County Mall occurred on August 30, 2013, PTX-620, meaning that it is uncontested that Khrapunov and Bourg managed Triadou throughout the entire period when Triadou made its investments in U.S. assets.

8.       Further, the March 12, 2013, Share Purchase Agreement that Glatz signed specifically states that Ilyas Khrapunov is "to be considered as a key man for the development of the SDG Group" and requires Glatz to maintain Ilyas Khrapunov's employment as SDG "for a minimum period of 12 months." DTX-1 at 33.  Additionally, Martin Dowd's testimony concerning the Syracuse Development Center shows that Ilyas managed (and held himself out as the owner of) Triadou's U.S. investments until as late as 2016.  *See* Trial Tr. At 289:4–290:17; 293:20–294:9.

### C. BTA Is Entitled to an Award of $73,600,000 in Damages Against Triadou for Conversion, with Pre-Judgment Interest Running from April 8, 2013

9.       As the Court instructed the jury, "A party, who, without authority, intentionally exercises control over the property of another, and thereby interferes with the other party's right of possession, has committed a conversion and is liable for the value of the property." (Trial Tr. 1006:9-13.) BTA was required to prove three elements by a preponderance of the evidence:

> First, BTA must prove that it had a possessory right or interest in the property at issue. Second, BTA must prove that Triadou exercised unauthorized control over that property in a way that interfered with BTA's rights. Third, BTA must prove that there is a specific identifiable fund that Triadou is obligated to return. To satisfy this element, it is necessary for BTA to identify a specific transfer of funds and trace those funds to a knowing recipient – here, Triadou. As long as BTA can identify specific funds that were stolen, it does not matter if the stolen funds were later commingled with other funds.

(*Id.* at 1007:13-1008:2.)

10.       Following the trial before Judge John G. Koeltl that was completed on December 14, 2022, a jury found Triadou liable to BTA for conversion and granted a verdict in favor of BTA

for damages of $73,600,000 against Triadou on that claim, with interest running from April 8, 2013.  (Trial Tr. 1051:20-1052:8.)

11.     The jury's conclusion is amply supported by the record. Triadou exercised unlawful control over $73,600,000 in funds stolen from BTA, and began receiving stolen funds as early as November 9, 2012. (PTX-597.)

### D.  BTA Is Entitled to an Additional Award of $27,000,000 in Damages Against Triadou for Unjust Enrichment, with Pre-Judgment Interest Running from July 18, 2013

12.     As the Court instructed the jury, "To succeed on a claim for unjust enrichment, a plaintiff must show that the defendant was enriched at the plaintiff's expense and that it is against equity and good conscience to permit the defendant to retain what is sought to be recovered.." (Trial Tr. 1008:13-17.) BTA was required to prove three elements by a preponderance of the evidence:

> First, BTA must prove that Triadou was enriched. To satisfy this element, BTA must demonstrate that Triadou received a financial benefit through the receipt of money or property. Second, BTA must prove that Triadou was enriched at BTA's expense. To satisfy this element, BTA must demonstrate that Triadou knowingly received the benefit of funds that were misappropriated from BTA. Third, BTA must prove that it would be against equity and good conscience for Triadou to retain what BTA seeks to recover.

(*Id.* at 1009:9-22.)

13.     Following the trial before Judge John G. Koeltl that was completed on December 14, 2022, a jury found Triadou liable to BTA for unjust enrichment and granted a verdict in favor of BTA for damages of $27,000,000 against Triadou on that claim, with interest running from July 18, 2013.  (Trial Tr. 1052:15-1053:1.)

14.     The jury's conclusion is amply supported by the record. Triadou received financial benefits through the receipt of money that was invested on Triadou's behalf.  For example, Triadou sold its investment in the Tri-County Mall at a profit on July 18, 2013. (PTX-581 at 6 (page 5 of

the report)).  After settling its dispute with Sater over the distribution of the proceeds, Sater paid $20,000,000 to Triadou from the proceeds of the Tri-County Mall. (Khrapunov 2/01/18 Dep. 210:22-211:4, 211:7-15; Cerrito 3/09/17 Dep. 115:25-116:6)  Triadou also sold its interest in the Flatotel and Cabrini investments to Chetrit for an immediate cash payment of $7 million. (PTX-509 (Assignment Agreement)). Alternatively, the jury's damage award of $27 million in unjust enrichment is slightly less than the amount currently held in the monitorship account, reflecting funds to which Triadou claims it is entitled that were derived from investments using money stolen from BTA. (PTX-5001.)

15.     It is against equity and good conscience to permit Triadou to retain the benefit of these investments, which Triadou received knowing that the money was stolen from BTA. Ablyazov committed one of the largest bank frauds in history, in which money stolen from BTA over the course of many years was laundered through Ablyazov-controlled entities, until it reached the United States, where it was invested on Triadou's behalf at the direction of Ilyas Khrapunov. *See* Prop. Finds. ¶¶ 8-42 (Ablyazov's theft from BTA); 43-59, 76-102 (transfer of stolen funds to Khrapunov-controlled entities); 103-135 (Khrapunov's investment of stolen funds in the United States, on Triadou's behalf).

16.     Ilyas Khrapunov, Triadou's agent, knew that the funds it was investing were not from Gennady Petelin but from Ablyazov, his father-in-law and former owner and chair of BTA. The Telford funds which funded Triadou's U.S. investments consisted of funds that Ablyazov stole from BTA.  *See* Prop. Finds. ¶¶ 76-102, 103-08.  Khrapunov conferred with Ablyazov regarding investments of the Telford funds, and Ablyazov's approval was required for every transfer from Telford.  *See* Prop. Finds. ¶¶ 171, 200.  Ilyas personally helped launder Ablyazov's receipt of funds from the sale of Zhaikmunai. *See* Prop. Finds. ¶¶ 79-92; *see also* Prop. Finds. ¶¶ 158-199

(Khrapunov's continuous control of Triadou and its parent company, SDG, despite repeated efforts to conceal his identity and control). Other Triadou agents, such as Nicolas Bourg and Felix Sater, both admitted that Ilyas told them the investments through SDG and Triadou were on Ablyazov's behalf. (*See supra* Prop. Finds. ¶¶ 155, 200.)

17.     Triadou was itself formed to help Ablyazov circumvent worldwide freezing orders and, specifically, to hide funds stolen from BTA.  *See* Prop. Finds. ¶¶ 66-68, 165, 168-69, 189-90. Khrapunov's sale of SDG to Glatz was a sham to deceive banks into thinking that Ilyas was no longer in control and, although Triadou may claim that Glatz was a bona fide purchaser, his purported due diligence excluded Triadou and the U.S. investments.  *See* Prop. Finds. ¶¶ 179-181. Further, at the time Glatz was supposedly vetting the purchase of SDG, he was conspiring with Khrapunov to fund the purchase with the same money laundered through NSW.  *See* Prop. Finds. ¶¶ 183-86.  And Khrapunov continued to manage Triadou long after Glatz's purported purchase, remaining in charge of its investments and an adviser to SDG Capital's board.  *See* Prop. Finds. ¶¶ 171, 188, 191-95.

18.     Early in this action, the Court correctly recognized that Triadou admitted that it would transfer any recovery it obtained from the Chetrit Entities *back* to SDG in Switzerland, and that numerous "badges of fraud" were apparent in Triadou's assignment of its Flatotel interest for far below market value.  (ECF No. 175 at 21.)  The Court specifically held that "[i]t would be 'against equity and good conscience to permit' Triadou to retain either the value of the money paid on its behalf *or the profits from its assignment of that same 37.5% interest* because Triadou, like SDG and Telford, was 'used to conceal the movement and investment' of Khrapunov and Ablyazov funds."  (ECF No. 175 at 23 (citations omitted).)

19.     CPLR § 5004 sets the statutory interest rate of pre-judgment interest in New York at "nine per centum per annum."

**E.   BTA is Entitled to a Constructive Trust**

20.     The jury found Triadou liable to BTA for conversion and unjust enrichment and granted a verdict in favor of BTA for total damages of $100,600,000 against Triadou, with interest running from 2013.  (Trial Tr. 1051:20-1053:1.)

21.     The imposition of a constructive trust over Triadou's assets is necessary because a money judgment is insufficient to protect BTA's rights and ability to enforce and satisfy the judgment.  As the Court previously found when granting BTA's motion for attachment over Triadou's assets, Triadou admitted it will transfer any funds it obtains "to its parent, SDG, to invest in real estate projects in Switzerland.  Triadou's candid admission of its intent to transfer these funds, once obtained, to Switzerland demonstrates a real risk of the enforcement of a future judgment, thus showing the requisite likelihood that [BTA] will have difficulty enforcing a judgment[.]"  (ECF No. 175 at 20 (Memorandum and Order of Attachment) (citations omitted); *see also* PTX-584 (wire transfer authorization and agreement for $7 million SWIFT to SDG account with instructions to identify transfer as a "Loan on behalf of Triadou SA"),

22.     A constructive trust is "is the formula through which the conscience of equity finds expression. When property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee." *Simonds v. Simonds*, 380 N.E.2d 189, 193 (N.Y. 1978) (alteration in original) (quoting *Beatty v. Guggenheim Exploration Co.*, 122 N.E. 378, 380 (N.Y. 1919)).  "A constructive trust will be erected whenever necessary to satisfy the demands of justice" and "is limited only by the inventiveness of men who find new ways to enrich themselves by grasping what should not belong to them." *Latham v. Father Divine*, 85 N.E. 2d 168, 170 (N.Y. 1949).

53

23.     In determining whether to impose a constructive trust, courts balance an array of factors. *See Jaffer v. Hirji*, 887 F.3d 111, 114 (2d Cir. 2018).  Relevant factors include whether there was "(1) a confidential or fiduciary relation between the parties, (2) a promise, express or implied, (3) a transfer made in reliance on that promise, and (4) unjust enrichment." *Id.* at 114.  No one factor is dispositive, and a constructive trust may be imposed to prevent the defendant's unjust enrichment even where there was no prior relationship between the plaintiff and the defendant. [*See, e.g.*, ECF. No. 1428 at 17 ("Both the Second Circuit and New York Court of Appeals have held that the existence of a fiduciary relationship is only one 'factor' for a constructive trust—not a rigid requirement—and New York courts have in many instances imposed constructive trusts where the parties had no prior relationship, whether fiduciary or otherwise.")]. These "factors are merely useful guides and are not talismanic."  *Coco v. Coco*, 107 A.D.2d 21, 24 (N.Y. App. Div. 1985) (internal quotations omitted); *In re Koreag, Controle et Revision S.A.*, 961 F.2d 341, 352 (2d Cir. 1992) ("Although these factors provide important guideposts, the constructive trust doctrine is equitable in nature and not to be rigidly limited," and "the absence of any one factor will not itself defeat the imposition of a constructive trust when otherwise required by equity") (internal quotations omitted); *Sanxhaku v. Margetis*, 151 A.D.3d 778, 779 (2017) ("a constructive trust may still be imposed even if all four elements are not established"); *Palazzo v. Palazzo*, 121 A.D.2d 261, 264 (1st Dep't 1986) ("[A] constructive trust need not neatly fit within that framework; these elements are simply considerations for the court to apply.").

24.     As this Court has already noted, BTA's constructive trust claim is "derivative" of its conversion and unjust enrichment claims and "essentially serve[s] to provide additional remedies for its claims of conversion and unjust enrichment."  [ECF No. 1428 at 18.]  The Court should defer to the jury's findings that are implicit in the verdict—and which are amply supported

by the record—when determining whether to order additional remedies on BTA's derivative claims. *See, e.g.*, *Song v. Ives Lab'ys, Inc.*, 957 F.2d 1041, 1048 (2d Cir. 1992) ("It is clear that a judge sitting at equity may not render a verdict which is inconsistent with that of a jury sitting at law on a claim involving the same essential elements."); *Reliability Rsch. Inc. v. Computer Assocs. Int'l, Inc.*, 851 F. Supp. 58, 61 (E.D.N.Y. 1993) ("The court, in later ruling on the equitable claims, will be bound by the findings of fact of the jury as to those common issues").

25.    Triadou was unjustly enriched because Triadou knowingly received BTA's stolen funds and helped hide them in a series of real estate investments. [*See, e.g.*, ECF No. 1428 at 17 ("[K]nowing receipt of stolen funds can support a claim for unjust enrichment under New York law").]  Implicit in the verdict, the jury necessarily found that: (1) Triadou was enriched; (2) Triadou's enrichment was at BTA's expense; (3) Triadou knowingly received the benefit of funds that were misappropriated from BTA; and (4) it would be against equity and good conscience for Triadou to retain the proceeds of its investments made with BTA funds.  (*See* Trial Tr. 1009:9-22 (Jury Charge on Unjust Enrichment)).

26.    Apart from the jury verdict, the record easily demonstrates that it would be against equity and good conscience to permit Triadou to retain any profits or proceeds it earned as a result of its U.S. investments.  *See supra* Conclusions of Law ¶¶ 15-18 (describing Triadou's unjust enrichment).  "[A]ssets acquired by fraud are subject to a constructive trust for the benefit of the defrauded party."  *SEC v. Credit Bancorp, Ltd.*, 290 F.3d 80, 88 (2d Cir. 2002); *see also Amusement Indus., Inc. v. Midland Ave. Assocs., LLC*, 820 F. Supp. 2d 10, 537 (S.D.N.Y. 2011) (unjust enrichment where, despite a lack of any direct business dealings with plaintiff, the defendant third-party recipients of stolen funds knew that funds rightfully belonged to plaintiff and that by accepting the funds they were "furthering a money-laundering scheme").

27.     The jury also necessarily found that Triadou exercised unlawful control over BTA's property.  Implicit in the jury's verdict: (1) BTA had a possessory right or interest over the money Triadou invested in the United States; (2) Triadou exercised unauthorized control over that property in a way that interfered with BTA's rights; and (3) there is a specific identifiable fund that Triadou is obligated to return.  (*See* Trial Tr. 1007:13-1008:2 (Jury Charge on Conversion)).

28.     The jury awarded BTA damages in the amount of $73,600,000 for conversion and $27,000,000 for unjust enrichment.  (Trial Tr. 1051:25-1052:22.)   The damages amount for conversion equals the total amount of funds that Triadou invested, (*see* PTX 504 at 2; PTX 1001 at 3,) meaning *all* of Triadou's property was knowingly obtained by Triadou with money stolen from BTA.  And as stated above, Triadou admits that it will transfer any funds it receives overseas to SDG, (ECF No. 175 at 20,) beyond the reach of BTA.

29.     Courts in New York regularly impose constructive trusts "on property 'traceable' to the stolen or misappropriated property."   *SEC v. Universal Express, Inc.*, No. 04-CV-2322 (GEL), 2008 WL 1944803, at *3 (S.D.N.Y. Apr. 30, 2008) (internal quotations omitted); *see, e.g.*, *Simonds*, 4 N.Y.2d 233, 236-42 (1978) (life insurance proceeds), *Shomron v. Griffin*, 70 A.D.3d 306, 545 (1st Dep't 2010) (rents and profits), *Cruz v. McAneney*, 31 A.D.3d 54, 55-63 (2d Dep't 2006) (litigation proceeds).  In fact, this Court already recognized that "'the victim of the theft . . . may be able to recover the property purchased with the stolen money . . . by virtue of a constructive trust imposed on the proceeds held by the thief or embezzler.'" [ECF No. 174 at 31 (quoting *Universal Express*, 2008 WL 1944803, at *3 (S.D.N.Y. Apr. 30, 2008) (emphasis added)].

30.     Triadou's unjust enrichment "is the most important" factor for imposing a constructive trust because "the purpose of the constructive trust is prevention of unjust

enrichment." *In re First Cent. Fin. Corp.* 377 F. 3d 209, 212 (2d Cir. 2004); *see also In re Koreag*, 961 F.2d at 354 (unjust enrichment is the "key factor" in determining whether a constructive trust should be imposed and "a person wrongfully acquiring property can be treated as a constructive trustee notwithstanding the lack of a fiduciary relationship"); *Motorola Credit Corp. v. Uzan*, 274 F. Supp. 2d 481, 579 (S.D.N.Y. Jul. 31, 2003) (internal quotations omitted) ("[O]ne or more of these elements can be relaxed when property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest.").

31.     Therefore, it is necessary and appropriate to impose a constructive trust for the benefit of BTA over the profits or proceeds that Triadou derived or may derive from its investments in real estate in the United States or may otherwise be owed to Triadou from the sale of Triadou's interest in any of its real estate investments, including the Tri-County Mall, the Flatotel, the Cabrini Medical Center, the Syracuse Center, and any funds currently held by a court-appointed receiver. (*See, e.g.*, PTX-509 (the "Assignment Agreement" with Chetrit, entitling Triadou to consideration in its sale of the Flatotel and Cabrini investments); PTX-5001 (stipulation describing the Monitorship Funds).)

32.     Triadou filed and obtained judgments in serial actions in the Supreme Court of the State of New York (Index Numbers 653462/2014, 154681/2015, 650239/2015, and 156907/2015; *see* PTX-5001) seeking payment on the Assignment Agreement between Triadou and the Chetrit Group—which was fraudulent in that it was entered into not as an arms-length agreement, but as a means to sell assets held in Triadou's name, but rightfully belonging to BTA, for a fraction of their fair market value in order to move them out of BTA's reach. (*See supra* ¶¶ 151-153).  In those actions, Triadou is pursuing (a) the proceeds of its investment in the Flatotel, including enforcement of its judgments for payment of the $21 million (plus interest) it was owed under the

2014 assignment of its Flatotel interest back to Chetrit and (b) its profit participation rights under that same agreement. (PTX-5001; *see also Triadou SPV S.A. v. Joseph Chetrit, et al.*, Index No. 153040/2020 (N.Y. Sup. Ct.), NYSCEF No. 1, and *Triadou SPV S.A. v. CF 135 Flat LLC*, Index No. 655623/2017 (the "Profit Participation Action").).  The Chetrit defendants paid the installment amounts owed to Triadou into an escrow account, the balance of which as of December 8, 2022, was, together with interest, $27,501,672.40.  (PTX-5001.)

33.     The constructive trust includes, but is not limited to, the assets currently subject to attachment, including all funds being held in escrow by the Honorable Herman Cahn, pursuant to the Monitorship Agreement dated May 4, 2016 between CF 135 Flat LLC, CF 135 West Member LLC, the Chetrit Group, LLC, and Triadou (the "Monitorship Agreement"), and any funds which may accumulate in such escrow pursuant to the Monitorship Agreement in the future.  (*See* PTX-5001).

### F.  BTA Is Entitled to Relief Under Article 52 of the C.P.L.R. in Relation to Triadou's State Court Enforcement Proceedings Against Chetrit

34.     New York Civil Practice Law and Rules § 5239 allows courts to adjudicate competing claims to property or debt that is the subject of a state-court judgment.

35.     This case was originally brought as an interpleader suit by Chetrit in New York State court, naming Almaty and Triadou as interpleader defendants.  The relief Chetrit sought explicitly concerned Triadou's claimed entitlements to payments under the Assignment Agreement.  (*See generally* ECF No. 1 (notice of removal and interpleader complaint)).  As this Court already found, BTA may use the CPLR § 5239 "mechanism to recover proceeds of Triadou's investment in the Flatotel that would unjustly enrich it, subject to proof at trial."  (ECF No. 1428 at 19-20.)

36.     A jury found Triadou liable to BTA for conversion and unjust enrichment.  For the same reasons and evidence that demonstrated Triadou's liability, BTA is the rightful owners of Triadou's former interest in the Flatotel and Cabrini Medical Center and/or any funds derived from the sale of that interest, as the interest was purchased with funds unlawfully converted by Ablyazov and laundered through SDG and Triadou. Accordingly, BTA is entitled to the property that is subject to Triadou's state-court judgments under § 5239, including the funds held in escrow by the court-appointed monitor.  (*See* ECF. No. 1428 at 20.).

37.     Pursuant to CPLR § 5239, this Court is empowered to vacate Triadou's state-court judgments and direct the disposition of any property obtained pursuant to those judgments, as well as direct which party should keep possession of the property. The purpose of Article 52 of the CPLR "is to facilitate the enforcement of judgments," and although Article 52 "provides procedures that can be invoked by judgment creditors," it also permits "any interested person" "to secure remedies for wrongs arising under the statutory scheme." *Cruz v. TD Bank, N.A.*, 2 N.E.3d 221, 229 (N.Y. 2013) ("*Cruz III*").

38.     Article 52 specifically provides the Court with power to "vacate the execution or order, void the levy, direct the disposition of the property or debt, or direct that damages be awarded."  CPLR § 5239. It also "grants the court substantial authority to order equitable relief," *Cruz III*, 2 N.E. 3d at 229, and a CPLR 5239 claim "may be brought as an 'action' in a federal court." *See Cruz v. T.D. Bank, N.A.*, 2014 WL 1569491, at *3 (S.D.N.Y. Apr. 17, 2014) ("*Cruz V*").

39.     At trial, BTA proved that Triadou simply cannot be trusted.  BTA has already secured judgments, and several global freezing and receivership orders from the U.K. courts against Ablyazov and Khrapunov, which include the parent of Triadou, SDG.  *See* Prop. Finds. ¶¶

60-75.  The record is replete with evidence of Triadou's knowing participation in a scheme to launder those stolen funds through investments in U.S. real estate.  *See supra* ¶¶ 16-17.

40.     Triadou is presently seeking to recover the proceeds of its investment in the Flatotel from Chetrit in the New York state court actions, including a claim to recover Triadou's purported profit participation rights under the Assignment Agreement.  *See Triadou SPV S.A. v. Joseph Chetrit, et al.*, Index. No. 153040/2020 (N.Y. Sup. Ct.).  If the Court does not use Article 52 here to determine that Triadou's interest in that asset and the resulting assignment agreement are rightfully BTA's assets, Triadou will be free to continue its state court litigation against Chetrit Entities and use that litigation to gain a tactical advantage against BTA.  BTA will be forced to continue litigation the issue in the state courts.  BTA may also incur additional fees and costs from Triadou's continued litigation in state court by virtue of an indemnification obligation BTA has with Chetrit, which was a result of the settlement reached between BTA and Chetrit. [ECF 1285-44]. Meanwhile, Triadou has already demonstrated and admitted its intention to immediately transfer any funds it receives to its affiliated companies overseas.

41.     The Court should thus set aside Triadou's four New York state-court judgments totaling $23,110,144.46 against CF 135 Flat LLC, CF 135 West Member LLC, and The Chetrit Group LLC in the New York Supreme Court cases with Index Numbers 653462/2014, 154681/2015, 650239/2015, and 156907/2015, (*see* PTX-5001), and direct that Triadou's interest in the proceeds from its investment in the Flatotel and Cabrini Medical Center – including the funds held by the court-appointed monitor – be transferred to BTA.

42.     The Court should also direct that any funds recovered pursuant to the Profit Participation Action against Chetrit be paid to BTA, as the Profit Participation Action also brings contract-based claims against CF 135 Flat LLC, CF 135 West Member LLC, and The Chetrit

Group LLC based on the fraudulent Assignment Agreement.  The Flatotel was purchased with funds stolen from BTA, entitling BTA to any profits derived from the Flatotel project.  The Court should further order Triadou to dismiss that action with prejudice.

43.    The Court should also award BTA its reasonable attorneys' fees in bringing this claim, in an amount to be determined by inquest, including any fees and costs BTA may be required to assume under its indemnification obligation to Chetrit.  CPLR § 5239 provides: "If the court determines that any claim asserted was fraudulent, it may require the claimant to pay to any party adversely affected thereby the reasonable expenses incurred by such party in the proceeding, including reasonable attorneys' fees, and any other damages suffered by reason of the claim." Triadou's investments were knowingly procured through fraud, as it laundered funds it knew were not invested by Petelin but were in fact the proceeds of Ablyazov's theft from BTA.  Triadou further attempted to abscond with the proceeds of the fraud through its liquidation of the Flatotel and Cabrini investments in its assignment agreement with Chetrit, through which it assigned illicitly obtained assets rightfully belonging to BTA for a fraction of their fair market value.  It was that fraudulent Assignment Agreement that formed the basis of Triadou's state-court claims against CF 135 Flat LLC, CF 135 West Member LLC, and The Chetrit Group LLC in the New York Supreme Court cases with Index Numbers 653462/2014, 154681/2015, 650239/2015, and 156907/2015.  *Cf. Capalbo v. Capalbo*, 256 A.D.2d 575, 575–76, 682 N.Y.S.2d 431, 431-32 (1998) (affirming judgment in CPLR 5239 proceeding setting aside conveyance of property as fraudulent and awarding attorneys' fees).

### G.  Triadou's Unclean Hands Defense Is Without Merit.

44.    Triadou has asserted no affirmative defense to BTA's conversion claim.

45.    With respect to BTA's claim for unjust enrichment, Triadou contends that BTA has unclean hands because "BTA committed willful misconduct by participating in Ablyazov's alleged

scheme through UKB6, a division of the bank. Triadou also asserts that the highest levels of BTA's management knew of and participated in Ablyazov's alleged scheme (including by approving loans requested by UKB6), that BTA benefitted from the alleged scheme, and that Triadou has been injured as a result of BTA's conduct." (ECF No. 1531 at 46 (Triadou's proposed jury charge).)

46.     Triadou's affirmative defense of unclean hands is meritless. To start, the conduct for which Triadou accuses BTA of having unclean hands is unrelated to the transactions by which Triadou was unjustly enriched. The jury considered and determined that equity and good conscience demand that Triadou return the profits and proceeds of its investments to BTA. In doing so, the jury considered the fairness between the parties as well as the history of Ablyazov's fraud at BTA. An unclean hands defense, in contrast, is narrower than the equitable considerations under unjust enrichment and must bear some relation to the conduct by which the defendant was purportedly enriched. *See Specialty Mins., Inc. v. Pluess-Staufer AG*, 395 F. Supp. 2d 109, 112 (S.D.N.Y. 2005) ("The unclean hands doctrine applies only where the misconduct alleged as the basis for the defense 'has immediate and necessary relation to the equity that [plaintiff] seeks in respect of the matter in litigation'"); *Gidatex S.r.L. v. Campeniello Imports, Ltd*., 82 F.Supp.2d 126, 131 (S.D.N.Y.1999) (holding that unclean hands defense failed in trademark infringement suit where misconduct underlying defense related to agreement between the parties but did not directly relate to trademark infringement claim). There is no evidence that BTA was involved in any of Triadou's investments in the United States.

47.     Regardless, BTA did not participate in a scheme to defraud itself. The sham loans issued by UKB6 were part of a fraud orchestrated by Mukhtar Ablyazov and his co-conspirators, who used their control over the bank to loot its assets. The bank's credit committee never approved

UKB6 loans; rather, Ablyazov circumvented the normal credit committee procedures when issuing fake loans through UKB6.  (*See* Trial Tr. 211:6-212:6, 215:8-25 (Gozhakhmetova Testimony); Trial Tr. 114:9-115:16 (Sadykov Testimony)).   Ablyazov relied on his trusted lieutenant, Zharimbetov – who headed the credit committee and directly controlled UKB6 companies – to push through UKB6 "loans" without involving the broader credit committee.  (*See* Trial Tr. 77:22-78:8, 114:15-17 (Sadykov Testimony); Trial Tr. 261:15-20, 260:17-18 (Junussova Testimony); PTX-14 at 9;).)  This process was concealed from BTA itself.  (*See, e.g.*, Trial Tr. 207:14-208:4, 214:12-24 (Gozhakhmetova Testimony)).  The UKB6 sham loans themselves had no economic substance and were used to either steal from BTA or used in a round-tripping scheme to create the appearance of loans repayments.  (*See, e.g.*, Trial Tr. 612:15–613:1 (Dubinsky Testimony)).

48.    Ablyazov's actions and the actions of his trusted associates were not in the interest of the bank.  The funds that Ablyazov misappropriated from the bank enriched Ablyazov, and the bank was further victimized when UKB6 engaged in round tripping – using new loans to create the appearance of repayment of old loans.  This was not unclean hands, it was a bank fraud committed against BTA.

49.    Relatedly, and implicit in the jury's verdict, the knowledge of Mukhtar Ablyazov and UKB6 employees cannot be imputed to BTA because under the adverse interest exception, "management misconduct will not be imputed to the corporation if the officer acted entirely in his own interests and adversely to the interests of the corporation."  *Wight v. BankAmerica Corp.*, 219 F.3d 79, 87 (2d Cir. 2000).  That is because "where an agent, though ostensibly acting in the business of the principal, is really committing a fraud for his own benefit, he is acting outside of the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it."  *Id.* (quoting *Munroe v. Harriman,* 85 F.2d 493, 495 (2d Cir.1936)).  Here,

Mukhtar Ablyazov and UKB6 employees acted ultra vires for their own benefit, to the detriment of BTA.  Accordingly, their knowledge cannot be imputed to BTA.  *See, e.g.*, *Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, No. 03 CIV. 3748 (DAB), 2006 WL 278138, at *10 (S.D.N.Y. Feb. 2, 2006) (refusing to impute conduct of bank's former employee to the plaintiff bank for the purposes of the defendant's *in pari delicto* defense where the former employee participated in a "rogue trading scheme" that "caused substantial losses" to the plaintiff bank).

### H.  Triadou's Bona Fide Purchaser Defense Is Inapplicable.

50.     Triadou may not raise a bona fide purchaser defense to BTA's remaining claims. In its Answer, Triadou raised this defense against BTA's claim for "Actual and Constructive Fraudulent Conveyance" concerning Triadou's sale of the Flatotel. [ECF No. 1112 ¶ 167 (Triadou Answer).] Those claims, which concerned the below-market assignment of Triadou's interest in the Flatotel to the Chetrit Group, were dismissed as moot following BTA's settlement with the Chetrit Entities, and the defense is misapplied to the remaining claims in any event, as explained further below.

51.     Triadou has tried to repurpose its bona fide purchaser defense to apply more broadly than to BTA's fraudulent conveyance claims.  Now, Triadou contends that its bona fide purchaser defense applies to all of BTA's claims because Glatz, "its ultimate owner[,] purchased Triadou and its then-parent company for value, without knowledge of any alleged money laundering." (ECF No. 1533 at 8).)  Triadou failed to assert any such defense in its Answer, which is therefore forfeited.  *See, e.g.*, *Clarendon Nat. Ins. Co. v. Hartford Ins. Co.*, No. 94 Civ. 5529 (AGS), 1998 WL 230936, at *2 (S.D.N.Y. May 8, 1998) ("Affirmative defenses must be pled in a defendant's answer, and if they are not, they are considered to have been waived."); *see also, e.g.*, ECF Nos. 1428, 1465 (refusing to allow Triadou to assert unpled affirmative defense of *in pari delecto*).

52.     In any event, Triadou's purported bona fide purchaser defense is meritless.  In 2015, long after Triadou had invested and received the benefit of BTA's stolen funds, Philippe Glatz's company called Greencos S.A. became Triadou's nominal new parent company. (*See* ECF No. 1361 ¶ 89.)  Earlier, in 2013 – again after Triadou had already begun investing stolen funds in the United States – Greencos had become the owner of Triadou's parent company, SDG. (*Id.* ¶¶ 106-111.)  None of these transactions are transactions that BTA contends unjustly enriched either Triadou or SDG – Greencos was never the "bona fide purchaser" of the investments that Triadou made with stolen funds.

53.     In other words, the bona fide purchaser defense applies when a defendant innocently acquires the asset sought to be recovered.  But here, the defendant is Triadou – not Phillipe Glatz – and the asset sought to be recovered is BTA's stolen funds and the investments Triadou acquired with those funds – not Triadou itself.  It is irrelevant whether Glatz purchased SDG and its subsidiaries in good faith because Glatz is not the defendant in this action and SDG and its subsidiaries are not the stolen property sought to be recovered.

54.     The real defendant – Triadou – cannot escape liability for its own wrongdoing by alleging that the new beneficial owner of its parent company was a bona fide purchaser in a later unrelated and irrelevant transaction.  SDG and its subsidiaries retained their own liabilities after Glatz's purported acquisition.  *See, e.g.*, *Ostashko v. Ostashko*, No. 00-CV-7162 (ARR), 2002 WL 32068357, at *27 (E.D.N.Y. Dec. 12, 2002) (holding that where bank "could not have claimed bona fide purchaser status," corporation, as bank's assignee, "steps into the banks shoes" and "too cannot invoke the defense" even though corporation "may not have been privy to" bank's "knowledge" of wrongdoer's "actual intent to defraud"), *aff'd sub nom. Ostashko v. Zuritta-Teks, Ltd.*, 79 F. App'x 492 (2d Cir. 2003); *International Ribbon Mills, Ltd. v. Arjan Ribbons, Inc.*, 36

N.Y.2d 121, 126 ("It is elementary ancient law that an assignee never stands in any better position than his assignor. He is subject to all the equities and burdens which attach to the property assigned because he receives no more ... than his assignor.").

55.      Furthermore, any bona fide purchaser defense is also meritless because Glatz/Greencos were not bona fide purchasers of SDG/Triadou.  BTA proved at trial by a preponderance of the evidence that Phillipe Glatz's acquisition of SDG was a sham paid for by Ilyas himself, and that Ilyas Khrapunov continued to control Triadou as recently as 2016.


Dated: March 2, 2023

                                                              Respectfully,

                                                               /s/      *Matthew L. Schwartz*
                                                              Matthew L. Schwartz
                                                              Craig Wenner
                                                              John Zach
                                                              Sabina Mariella
                                                              Valecia Battle
                                                              Erica Sweeting
                                                              Lindsey Ruff
                                                              Sophie Roytblat
                                                              BOIES SCHILLER FLEXNER LLP
                                                              55 Hudson Yards
                                                              New York, New York 10001
                                                              Phone: (212) 446-2300
                                                              Fax: (212) 446-2350

                                                              *Attorneys for Plaintiff BTA Bank JSC*