Witness Statement
Twelfth Additional Respondent
Frank Monstrey
Second
11 May 2017
Exhibit FJM2

**IN THE HIGH COURT OF JUSTICE**          **CL-2009-000212**

**QUEEN'S BENCH DIVISION**

**COMMERCIAL COURT**

**B E T W E E N :**

**JSC BTA BANK**

**Applicant/Claimant**

- and -

**(1) MUKHTAR ABLYAZOV**

**Respondent/**
**First Defendant**

**(2) ROMAN SOLODCHENKO & ORS**

**Defendants**

- and -

**(1) CLAREMONT HOLDINGS LIMITED**

**(2) CLAREMONT HOLDINGS C.V.**

**(3) STAK ADUNATIO**

**(4) B.M. LUMINA**

**(5) SEPTEMIUM INVESTMENTS S.A.**

**(6) ETERNUM HOLDINGS SARL**

**(7) ELITE INVESTMENTS B.V.**

**(8) BRAVO B.V.**

**(9) SECAP HOLDINGS LIMITED**

**(10) NEDMAC B.V.**

**(11) ZED B.V.**

**(12) FRANK MONSTREY**

**(13) PETRA NOE**

**Additional Respondents**

---

**SECOND WITNESS STATEMENT OF FRANK JOSEPH MONSTREY**

---

**CONFIDENTIAL**



Defense Exhibit
**DTX 065**
15-cv-5345

EXHIBIT
FM 1

I, **FRANK JOSEPH MONSTREY**, of Onze Lieve Vrouwstraat 72, 3052 Blanden 1200, Belgium will say as follows:

**Introduction**

1.    I am a Belgian citizen and live near Brussels. Until very recently (see paragraph 8 below), I was the executive chairman of Nostrum Oil & Gas Plc ("**Nostrum**"). Nostrum is a FTSE 250 London Stock Exchange premium listed company with a market capitalisation of approximately $1.075 billion.

2.    My first Witness Statement dated 10 April 2017 filed in these proceedings ("**my First Witness Statement**") sets out my position and interests in the First to the Eleventh Additional Respondents. The Thirteenth Respondent, Ms Noe is my wife. We have been married for 22 years and we have five children. I am reasonably fluent in English although I was born in the Flemish region of Belgium and so Dutch is my native language. I am also fluent in French and I speak some German.

3.    I make this Witness Statement for the purpose of proceedings in which, so I understand, there has been ordered a trial of the issues of whether Mukhtar Ablyazov has any interest (whether direct, indirect or otherwise) and, if so, what interest in: (a) the shares in Nostrum held by or for the First, Second and Seventh to Tenth Additional Respondents (the "**Nostrum Shares**"); and (b) the other assets of the First and Second Additional Respondents (together, the "**Claremont Respondents**"), which are subject to a freezing injunction granted by Mr Justice Teare on 31 March 2017 (the "**Freezing Order**"), an order containing undertakings of the same date (the "**Undertakings Order**") and, as regards the Nostrum Shares, also an Interim Charging Order of the same date (the "**Charging Order**").

4.    My First Witness Statement accurately explains the ownership and holding structure of the interests in the Nostrum Shares. That evidence, and the attached chart, sets out fully and accurately not just the apparent ownership structure for these assets but the actual ownership structure. Neither my wife nor I, nor any of the other Additional Respondents, are nominees for Mr Ablyazov, whether in respect of the Nostrum Shares or otherwise and he has no interest in the Nostrum Shares or the assets of the Claremont Respondents.

5.    I make this Second Witness Statement pursuant to paragraph 7 of the Charging Order and paragraph 5 of the Order of Mr Justice Knowles dated 28 April 2017 on my own behalf and also on behalf of the First to Eleventh and the Thirteenth Additional Respondents to enable the Court more fully to understand the relevant background in order to give further case

**CONFIDENTIAL**

management directions. I am duly authorised by each of the First to the Eleventh Additional Respondents and the Thirteenth Additional Respondent to make this Second Witness Statement on their behalf.

6. Although this is only my preliminary evidence, produced for the purpose of assisting with the making of directions, I have obviously been anxious to ensure that it is accurate and reasonably comprehensive. I must, however, explain something about the nature of this task and the circumstances in which the statement has had to be prepared, because I have been unable to recall everything and I am concerned that I may not have got some things absolutely right.

7. It is very hard to convey the immediate and devastating impact which the injunction had. I have explained in my First Witness Statement the damage that has been caused: it could not have come at a worse time so far as arrangements with some of my principal (and potential) lenders are concerned, and in respect of commercial opportunities which were near to fruition. I have been under immense pressure, effectively 'firefighting'.

8. I resigned on 18 April 2017 as the executive chairman of Nostrum because I have to devote my time to dealing with these proceedings and with my lenders, and also because I want to lessen as far as possible the damage being suffered by the company and to its share price by reason of the injunction. If I am distanced from the company I hope that will help, although I am bound to say that I am closely identified with the company. I intend to seek re-election to the board of Nostrum when these proceedings are successfully concluded, as I hope and expect that they will be.

9. As well as dealing with the fallout from the effect of the injunction, I have had to devote a lot of time to the proceedings. This has been extremely onerous. I have had to go back over events which took place over a decade ago, and to search out documents relating to them. I do not have all documents which may be relevant, either because I no longer have them (or may never have had them) or because I simply have not found them yet in the time that has been available. I am also in the process of requesting documents from third parties, where I have the power to do so, but this is taking a long time. One of the reasons I may not have some materials any more is because of the inability to retrieve some documents (whether physically or electronically) after a long passage of time: but I am checking records and IT systems and so on. Again, this is taking time.

CONFIDENTIAL

10. There have also been other demands on my time from the court process (with which I was unfamiliar), such as the need to prepare for and give instructions for court hearings, and of course the production of my First Witness Statement (which was substantial).

11. The injunction, and the allegations being made, have also had a personal impact. I am a respectable and respected businessman and Belgian citizen, and the stigma has been very hard to bear. Moreover, not only am I responsible for my immediate family (all of my children are still at home), I also support my disabled sister and my elderly parents. Since the injunction my father has been taken into hospital and has sadly suffered a stroke since his admission. It is a very difficult time for me.

12. Where matters to which I refer in this Witness Statement are within my own knowledge, they are true. Where they are not within my own direct knowledge, they are true to the best of my knowledge and belief and I indicate, where appropriate, the source of that knowledge and belief.

13. In this Witness Statement I explain how I first acquired my interest in what is now known as Nostrum; how the business developed and was financed over the years; and how my and the Additional Respondents' interests in Nostrum reduced from 100% to 13.2%. As will be seen from the account below, the story of Nostrum over the thirteen or so years from early 2004 to early 2017 is one of opportunities, risks, challenges and ultimately considerable success. I started my career as a venture capitalist and an entrepreneur, looking to make something of the opportunities that arose after the dissolution of the Soviet Union. One such opportunity, which became my great project over the years, was 'Zhaikmunai', later known as Nostrum. I built the business almost entirely from the ground up, taking it on at a very early stage with the support of my friend Yerzhan Tatishev, growing it very substantially, and bringing it through a number of financially tough times and some very serious challenges. During that time I was, as a result of tragic events and other circumstances, thrown into business relationships which were not of my choosing. However, I persevered to build the business, creating very considerable value in the often difficult realities of doing business in Kazakhstan. That process required me to seek to avoid conflict and confrontation wherever possible and to endure through difficult times, looking always to outlast and overcome the challenges which the business, and I personally, faced over the years. A full account of that history would require a very lengthy statement indeed, far beyond what is possible at this stage of these proceedings. Nevertheless, I have endeavoured to provide a useful summary in this document, insofar as has been possible, although this account is necessarily incomplete and there will inevitably be parts of the story on which I will want to elaborate at a later stage in these proceedings.

**CONFIDENTIAL**

14.   I refer in this Witness Statement to a paginated bundle of documents which is exhibited to this Second Witness Statement marked "**FJM2**". Unless indicated to the contrary, references to page numbers in this Second Witness Statement are to pages of Exhibit FJM2.

**Background**

15.   I am a graduate of the University of Louvain in Belgium. I began my career as a banker at Generale Bank in Istanbul between 1987 and March 1991. During that period, I also worked with Generale Bank in Shanghai (China) for a year in 1989.

16.   Upon leaving Generale Bank, I set up a corporate finance and business development firm in Belgium called Probel Capital Management N.V. ("**Probel**") which had its principal place of business in Istanbul. Probel later also opened satellite offices in Ashgabat and Brussels. Overall, it eventually employed around eight to ten people. Given my experience at Generale Bank, most of my work at Probel involved project and infrastructure finance. I started Probel in Turkey at the time the Iron Curtain fell and the Soviet Union disintegrated and so many of my projects and deals involved Turkish companies looking to develop and/or build projects in Turkmenistan, Belorussia, Russia and Kazakhstan. My role in those projects often started with the sourcing of the business opportunity, then leading commercial negotiations between the different parties (construction companies, developers, investors) and then sourcing, structuring and conducting commercial negotiations with third party finance providers (including the European Bank for Reconstruction and Development ("**EBRD**").

17.   My first experience of working in Kazakhstan was in or around 1992, when Probel was asked to put together a financing package of around US$8 million for the Ust-Kamenogorsk Zinc and Copper Combinate (although I recall that ultimately the financing was not required). My next substantial project in Kazakhstan came about in or around 1997 -1998 when I was approached by Fintraco (a Turkish construction company which is a sister company of the Uçgen Group) in relation to the construction of two high-rise buildings in Almaty, Kazakhstan called "Samal Towers". At the time, I knew the Uçgen Group well, having worked with them on other projects in the region. To the best of my recollection, Fintraco had signed a contract with Alem Bank (a predecessor of JSC Bank Turan Alem ("**Turan Alem**")) for the construction of their headquarters in Almaty (the "**Samal Towers**"). Originally the financing of this project was to be done partially by Turkish Eximbank and Alem Bank. However, I recall that Alem Bank did not have sufficient financial resources to complete the project and as a consequence the construction of the Samal Towers had been at a standstill for several years.

**CONFIDENTIAL**

18.  In 1999, through my efforts, Turan Alem (or an entity related to Turan Alem) formed a joint venture with Fintraco to own and construct the Samal Towers. In addition to bringing the parties together, I was also able to secure a US$9.8 million loan from the EBRD as well as a commitment from various tenants for the second Samal Tower (the first one being used as Turan Alem's headquarters). These factors made the Samal Project financially viable again, and I believe construction was completed around 2001. Between 1999 and 2001 I continued to follow the project without being formally involved. I explain below in this Witness Statement how it was this project that introduced me to Mr Yerzhan Tatishev.

19.  In or around 1999-2000, I decided to relocate from Turkey back to Brussels with my family. The move was mainly for personal reasons: I was in my early thirties; and my wife and I wanted our children to grow up in and go to school in Belgium. As part of my move back, I moved Probel's principal place of business from Istanbul to Brussels. However, Probel maintained a representative office in Istanbul from where I continued to try to source business opportunities in Turkey and the region.

20.  In addition to personal reasons for the relocation, I was also looking at the time to diversify Probel's business portfolio and my work. As explained above, the projects that Probel had been involved with in the 1990s were mainly in the infrastructure sector in Turkey, Russia and CIS region. Those projects tended to have binary outcomes – they either succeeded or failed (in which case I would have to absorb the total loss). Therefore, when moving back to Belgium, I was looking for opportunities to expand Probel's portfolio and grow a more stable business, while also maintaining my business development and project financing activities in Turkey and CIS countries.

21.  To that end, after I moved back to Belgium, in around 2000 -2001, I partnered with a Dutch investor/ entrepreneur named Eckart Wintzen whom I had met in Shanghai and with whom I had stayed in regular contact. Mr. Wintzen was an IT entrepreneur and had successfully sold his business a few years earlier. He then used that money to set up a venture capital fund named Ex'tent (incorporated in Netherlands) ("**Extent**"). Overall, Extent had approximately €70-80M assets under management until 2008 when Mr Wintzen died. I became a 20% shareholder and director of Extent and Probel acted as its investment advisor. Extent's investments were focussed on environmentally-conscious companies in the United States, France, Belgium and the Netherlands. As part of my activities in managing the investment portfolio, I served on the board of a number of target companies. Extent's investments included AITI Inc (Advanced Immunity): a US based biotech/drug discovery firm; Expression College for Digital Arts: a college in California, USA; Ben & Jerry's Benelux; and Nature & Découvertes Benelux: a specialty retail business.

6

**CONFIDENTIAL**

22.  Until around 2005, my work on Extent accounted for at least 2/3rd of my time. In that period, I would regularly travel to the United States, Netherlands and France to oversee and manage Extent's investments in those countries. For the remainder of my time, I continued developing my contacts in Turkey, Eastern Europe and the CIS countries; and I would travel to the region a few times a year seeking to further develop Probel's business development activities.

**Doing business in Kazakhstan**

23.  I believe that it is important to explain at this stage something about the way that business was and is conducted in Kazakhstan since this provides the proper context for the matters I describe in the next sections of this Witness Statement. I do so from my own observations and experience, after doing business there for over twenty-five years.

24.  Kazakhstan declared independence from Russia in October 1990 (the Berlin Wall having fallen in November 1989) and I first started doing business there less than two years later. Unsurprisingly, independence from the Soviet Union did not transform Kazakhstan overnight into a Western-style commercial economy. However, while an entrepreneurial and commercial culture developed fairly quickly, and while Kazakh businessmen have adopted some Western business customs and approaches, the country still maintains its own way of doing business and an outsider who comes there expecting it to replicate the culture and approach of, say, the City of London, or anything remotely even approaching that, even 20+ years after independence, is very unlikely to succeed. Consequently, in these early years, although Western and Asian banks were increasing their business in countries like Poland, Hungary, Czech Republic (etc.), they were reluctant to finance projects in the CIS countries.

25.  Kazakhstan is a huge country geographically but relatively small in terms of population. Its business community is likewise quite small and was, at the time, largely (if not exclusively) based in and around Almaty. There is a close identity between politics and business, in that people in political positions use those positions to build and consolidate their business interests. I am very aware that fortunes can change overnight. It would not be unusual to find senior government officials (including ministers) or CEOs of state-owned companies moving from one position to another, perhaps even being unexpectedly and promptly removed from office (against a background of negative rumours) before then resurfacing and being reinstated and rehabilitated in a different position soon thereafter. This results in a peculiar business culture, with often-changing alliances between people.

26.  In my experience of the last 20 or so years of operating in the region, I have come to understand that business opportunities there are sourced on the basis of your networks and

**CONFIDENTIAL**

personal relationships. Family connections are extremely important for Kazakhs doing business in Kazakhstan and there is a strong system of tribal networks that support each other. You also have to be sensitive to, and respect, the customary ways of doing business. Familiarity and personal relations are important. Businessmen will play their cards close to their chest. I think that this is partly cultural, but also because information is regarded as having a particular value (which it often does). This is all part of "leverage": there is much greater awareness (or perception) of relative strengths and merits in negotiations. It can sometimes appear rather unsophisticated, but it is just a different way of doing business.

27.    Certainly the ways in which arrangements are made, and agreements reached and recorded, can be haphazard, and not at all like developed European economies (or even the less developed economies at the time such as Turkey and China where I had a similar experience of business being conducted less formally). Business in Kazakhstan is still commonly conducted on the basis of a handshake between principals. That is not to say that deals are never documented, but the default position of many Kazakh businessmen is to keep documentation to a bare minimum. More often than not, the contract is not the end of the story; and despite what a contract may say the terms of the agreement between the parties can change as circumstances develop. The influence of Western counterparties and financiers has certainly resulted in an acceptance of the need for more sophisticated documentation but, generally, deals are not documented to the degree that would be regarded as standard in the West.

28.    Apart from Kazakh, many people (and nearly everyone in the business community) speak Russian, and there are close connections to Russia. I do not speak Kazakh or Russian, although most of my company staff speak English and the people on the ground in Uralsk speak Russian. I therefore often have to rely on interpreters. Quite often these people have a greater role than this, in that they are also agents for their principals: people who are trusted by their principals to act as 'go-betweens'. This was more so in my case because I do not speak their language and possibly because I am something of an outsider, and in any event I kept (and keep) a low profile, concentrating on my business. In my experience you have to be careful with these go-betweens because they sometimes claim to have more authority than they do, or have their own agendas. It is not only information that give rises to leverage; access does as well. It can be very difficult navigating these various relationships and power structures.

29.    In part, I believe that I have avoided becoming embroiled in the "commercial politics" of Kazakhstan because I have spent comparatively little time in the 'fishbowl' that is Almaty. I have also taken care to focus my attention on protecting and advancing my commercial

CONFIDENTIAL

interests, instead of getting involved in other people's affairs. I chose to operate discretely and not get involved in rumours and gossip. Many businesses, especially in my company's field of oil and gas, have large offices in Almaty, but we never did with Zhaikmunai/ Nostrum. Its offices are located in Uralsk, which is 80 km from the oil field in north-western Kazakhstan, some 3 hours flying time from Almaty. Since acquiring Zhaikmunai (now Nostrum), my focus has been on operational matters and most of my time has been spent in Uralsk or, as required, in Astana. More often than not, unless necessary, I would not even pass through Almaty during my visits to Nostrum/Zhaikmunai: I would fly direct to Uralsk or I would fly via Russia.

### Relationship with Yerzhan Tatishev

30.    Through my work on the Samal Project I was introduced to Mr Yerzhan Tatishev, who was the Chairman of the Management Board of Turan Alem. Yerzhan was directly involved in the project and we worked together on it, in the process developing a trusting relationship based on mutual respect. When I first met Yerzhan, Turan Alem was still a relatively small bank but it was growing and developing under his leadership. I was also aware that Yerzhan had a number of other business interests.

31.    In the course of working on the Samal Project I also developed a relationship with Arman Dunayev at Turan Alem, who was effectively leading the project on behalf of Turan Alem and reported to Yerzhan, and I maintained a friendly relationship with him (as well as Yerzhan) even after the project had concluded. Mr Dunayev later became the Minister of Finance in Kazakhstan in 2004 and subsequently he was appointed the Chairman of BTA between 2009 and 2011. I understand that he now sits on the board of Halyk Bank.

32.    Following the successful completion of the financing for the Samal Project, I stayed in regular contact with Yerzhan. I would often meet him in Frankfurt or in Vienna, Geneva or London for dinner or a drink. We had a lot in common. Yerzhan spoke English well. He would often travel to Europe for 'road-shows' when Turan Alem was looking to raise financing (for example, via bonds). He was pursuing a strategy of growing Turan Alem through acquisitions of banks in other CIS countries, but he would also mention that he was broadening its capital base by attracting strong international partners/shareholders such as the IFC, the EBRD and Raiffeisen International. He would often proudly refer to the success that the bank was having with placing bonds with institutional investors.

33.    Yerzhan was a charismatic and likeable businessman and I believe that this instilled confidence in investors and correspondent banks. We would discuss and consider business

**CONFIDENTIAL**

opportunities in the region, which I frequently considered to be promising. For example, in or around 2002 I learnt that a Polish bank, which was a part of a Belgian banking group, was looking to sell its subsidiary, Credit Bank Ukraine (although I understand that this deal did not go ahead). At the time, we were both young business professionals and our careers were developing and growing at the same time. On occasion he would say that I should not hesitate to discuss new business ideas with him, that he had confidence in my business skills and experience and that he would be ready to support me in new projects.

34. By 2004, Turan Alem's share in the Kazakh banking sector had grown very considerably under Yerzhan's stewardship and around this time it expanded its operations into several countries in the CIS region. I understood from my conversations with Yerzhan that he wanted to grow his businesses (including Turan Alem) further into different areas such as insurance, fund management, private equity and asset management.

### Acquisition of Zhaikmunai in 2004

35. TOO Zhaikmunai is a limited liability partnership which was registered in Kazakhstan on 20 March 1997 ("**Zhaikmunai**"). It is a Kazakh oil and gas business which has held the exploration and production license of the Chinarevskoye oil and gas field in Kazakhstan since 1997. The field is approximately 274 square kilometres in size and is located in the West-Kazakhstan region, near the border between Kazakhstan and Russia.

36. In or around early 2004, I learnt that the ultimate beneficial owners of Zhaikmunai, Mr Valery Diunusev and Mr Timur Kuanishev, had decided to sell their interests (totalling 100%) in Zhaikmunai as they were struggling to raise the financing to complete the minimum work program on the Chinarevskoye field (which was required as a term of the license granted by the Kazakh government). Those interests were, as I recall, held indirectly through a company called Apex Corporate Group Limited ("**Apex**"), which owned Scoulton Holdings Limited ("**Scoulton**") which ultimately owned the partnership interests in Zhaikmunai (although other corporate vehicles were involved in the structure as well). A structure chart is set out at Exhibit FJM2 at page 1. I commenced negotiations for the purchase of Scoulton in early 2004 with Mr Diunusev himself (to some extent) but also with a representative of his called Mr Dmitry Zhelezynyak.

37. This was an attractive opportunity for me. At the time, I saw the potential in the business and I approached the deal as a venture capitalist: my original aim was to raise the money for the acquisition; put in place a good management team; complete the minimum work program and then if possible, perhaps in three or four years' time, sell the business for a profit. At that

CONFIDENTIAL

time, although I had an interest in the commodities sector (since most of the CIS countries depended heavily on them and business opportunities would often be linked to this sector), I did not have actual experience in the oil and gas business. However, I did not see this as an obstacle as I was looking at each opportunity from a venture capital perspective and I knew I could hire the right people with the technical skills to make a success of it.

38. Naturally there were other players in the market who were also interested in acquiring Zhaikmunai. In particular, I was aware of at least one Chinese competitor (Sinopec) and also the shareholders of Halyk Bank who were interested in the acquisition. I believe I was told by Mr Zhelezynyak that they had submitted competing bids at that time.

39. As best I recall, it was in or around April or May 2004 that I discussed this potential acquisition of Zhaikmunai with Yerzhan. He agreed that it was a promising investment; and upon my request, he agreed to finance the acquisition. This was welcome news to me because I knew (from my previous experience) that it would have been very difficult to obtain acquisition finance for a transaction like this elsewhere. As I have explained, I had a good relationship with Yerzhan, and obtaining a commitment from him meant that I could be confident that he would come through with the financing so I did not have to explore other options at a time when there was already a lot of work to be done to complete the acquisition.

40. I recall that Yerzhan and I discussed the key terms of the loan in meetings in Moscow, London and Kazan and also over the phone. The discussions were not extensive (as I was under considerable time pressure to ensure that Probel's bid was accepted by Mr Diunusev and Mr Kuanishev over other competing offers) but the key terms were agreed. As I have explained above, it is not at all uncommon for deals of this kind in Kazakhstan to be negotiated directly between principals and agreed on the basis of a handshake and/or limited documentation, with further documentation to follow if required. I had initially thought that the loan would be advanced by Turan Alem, of which Yerzhan was the Chairman and in which he owned a significant stake at the time, but at some late stage in these discussions I was told that the loan would in fact be advanced by a company which Yerzhan owned called Tradestock Inc. ("**Tradestock**"). Based on my previous experience of working with Yerzhan on the Samal Towers project, this was not unusual or objectionable. I recall that he had co-financed some part of that project as well, through a company called (I believe) Samal Properties.

41. Following my initial due diligence, which was based on information provided by Mr Zhelezynyak, on or around 20 April 2004, Probel made an initial offer to acquire 100% of

**CONFIDENTIAL**

Zhaikmunai (see Exhibit FJM2 at pages 2-3). I was told by Mr Zhelezynyak that this initial offer had been refused because higher offers had been received from competing bidders.

42.  Following this I had further meetings/conversations with Mr Zhelezynyak in Moscow and/or in Almaty to discuss the acquisition. In light of my further due diligence and my discussions with Yerzhan about financing the proposed acquisition, and taking into account the competing bids, on 16 June 2004, Probel made a revised offer with a bid price of US$134 million (see Exhibit FJM2 at pages 4-5) and this was accepted. The revised offer letter made provision for the deposit of US$6.7 million (5% of the proposed transaction amount) in an escrow account, to show my commitment to the acquisition of Scoulton. At the time I believed, based on my conversations with Mr Zhelezynyak, that making such a deposit payment would improve the chances of Probel's bid ultimately being accepted over other competing bids.

43.  At around the same time, I approached Meespierson Intertrust ("**Intertrust**"), a corporate services and trust company in Geneva, to request a new company to use for the acquisition of Scoulton. Intertrust provided me with a list of companies and I chose Thyler Holdings Limited ("**Thyler**") which was incorporated in the British Virgin Islands ("**BVI**"). At some point prior to completion of the acquisition of Scoulton, Intertrust Geneva changed Thyler's place of administration to the Isle of Man and Intertrust Isle of Man took over that administration. Thyler became the counterparty for all agreements with Apex in connection with the sale and purchase of Scoulton. At that time, Harrison Limited ("**Harrison**"), a nominee company used by Intertrust Isle of Man, became the holder of 100% of the shares in Thyler and, although there was no formal declaration of trust put in place at that time, the clear agreement and understanding between Yerzhan and me was that I was the owner of the business (and Thyler) and that he, through Tradestock, was providing the finance.

44.  At some point during my negotiations with Yerzhan, and most likely (as best I can recall) after Probel's revised offer was accepted in June 2004 and Intertrust had set up Thyler, I started putting together a draft loan agreement between Thyler, as borrower, and Tradestock as the lender of US$103 million. The draft was intended to set out the key terms I had agreed with Yerzhan. The first drawdown was planned for early July 2004, to fund the deposit payment of US$6.7 million due to be placed into escrow as provided for in the revised offer letter. At that time, however, the loan documentation was not yet in place. Yerzhan was reliant on his staff to finalise the details but they were delaying matters and failing to progress the documentation. I recall that they would also seek to renegotiate terms that I had already agreed with Yerzhan. In the days before the first scheduled drawdown I spoke several times with Yerzhan on the telephone to express my concern regarding the lack of progress with the

**CONFIDENTIAL**

documentation. Each time he told me I should not worry, as the funds would be advanced and the loan agreement would be finalised later.

45.     On 9 July 2004 Tradestock advanced the first tranche of the loan to Thyler and this was used to place the US$6.7 million into escrow. Once the deposit had been made, the full due diligence process began, with a view (as I recall) to closing the acquisition by the end of August 2004. I was focusing on the management of the due diligence and the contract negotiations, against the background of this very ambitious timetable. There was a period of exclusivity during which, as part of this further due diligence, Ernst & Young (Kazakhstan) was appointed to carry out an accounting audit; White & Case (London) was appointed to advise on the acquisition; and Ryder Scott (USA) was appointed as independent petroleum consultant. I also recall that a Russian geologist was appointed to carry out due diligence on the oil field in Kazakhstan. In addition to the legal, accounting and technical due diligence, the share purchase agreement also needed to be negotiated and agreed.

46.     I recall that the months of July and August 2004 were extremely hectic. Summer holidays were approaching or were already under way, Mr Diunusev and Mr Zhelezynyak were pressuring me to finalise the deal as soon as possible and I wanted to complete as soon as possible to minimize the risk of losing the deal to the competing bidders. I recall that during those months I regularly travelled back and forth between the South of France where my family was on vacation, Kazakhstan (Uralsk and Almaty), Moscow for meetings with Messrs Diunusev and Zhelezynyak, London to meet with my advisers, and Brussels where I was based. The acquisition did not however complete within the initial exclusivity period secured by the deposit payment but a further exclusivity period was ultimately granted after repeated threats from the sellers that they would walk away and reengage with the Chinese competing bidder.

47.     As the expected date for the second drawdown approached, amongst all of the other matters I was attending to, the discussions with Yerzhan's 'back-office' team on the loan documentation also continued. However, it continued to be a problematic process and there seemed to be poor communication between Yerzhan himself and the members of his team. Darmen Jakishev, who was dealing with the paperwork for Yerzhan, repeatedly tried to alter the terms I had agreed with Yerzhan and little progress was made. I would complain to Darmen that he was trying to change the agreed terms, but with the time pressure of the due diligence and the contract negotiations, I had many other things to follow up. I had a number of phone calls with Yerzhan as the deadline for the final payment approached, urging on him the importance of getting the documentation finalised, but ultimately this did not get done.

13

**CONFIDENTIAL**

48.  This was a frustrating process, but Yerzhan and I did, however, agree the principal terms of the financing arrangements, including the fees, costs and expenses in connection with the acquisition, and we both proceeded thereafter on the basis that these key financial terms were binding.  In broad summary, Thyler was entitled to draw down a maximum of US$103 million, with a term of 5 years and an interest rate set at 15% per annum.  There was also a profit participation clause for the lender, of a 'venture capital' type.  These terms reflected the market at the time for this kind of transaction in Kazakhstan, where (as I recall) at the time banks were offering between 12-14% or even more for ordinary loans. I took comfort from my conversations with Yerzhan (whom I trusted) and from his reassurances both that he would personally see to it that the documentation would be completed and that the necessary funding would be available to meet the obligations to the vendors.

49.  As regards the loan documentation, these events took place a long time ago and so I cannot clearly remember how and when drafts were produced and amended, but I believe that there were at least two, if not more, different drafts produced around this time.  I recall that at some stage in this process, because I had not been able to get Yerzhan's representatives to conclude the final loan agreement based on the terms I had agreed with him, Intertrust was provided with a form of temporary/holding draft loan agreement and they faxed it to Yerzhan's representative.  It was a hectic time but the draft was provided so that there would be some document, even if temporary, to accompany the bank transfer.

50.  At around the same time, given the difficulties I had been experiencing with Mr Jakishev, I prepared a further loan document that was based on templates available to me, reflecting the key terms that I had agreed with Yerzhan (as outlined above at paragraph 48) and which I intended to conclude and have executed by Yerzhan/Tradestock once the entire process of the closing (and post-closing) of the deal was behind us.  I executed a copy of that agreement on behalf of Thyler.  Although I was expecting that Yerzhan might have had some further comments on the details, it reflects the material terms that I had agreed with Yerzhan.

51.  I have managed to locate a copy of this agreement, which is signed by me on behalf of Thyler, and dated 8 July 2004, and I exhibit this at FJM2 page 6-11.  I do not have a countersigned copy and I cannot recall now if one was ever provided to me.  Nevertheless, both Yerzhan and I considered these terms to be the binding financial terms.  The purpose of producing and signing a document at this stage from my perspective, was (as best I recall) to ensure that, notwithstanding the difficulties I had with dealing with Mr Jakishev, I would have a document available which would be used to conclude a final and comprehensive agreement, once the hectic process of closing the transaction was behind us and I had the opportunity to sit down with Yerzhan.

14

**CONFIDENTIAL**

52.  On or around 20 August 2004, notwithstanding that (so far as I recall and have as yet been able to ascertain) no signed documentation had been provided on behalf of Tradestock, Yerzhan and/or his staff arranged for the remaining US$96 million to be advanced to Thyler for the acquisition of Scoulton.  (No bank account had been put into place for Thyler by Intertrust Isle of Man, which had by this time replaced Intertrust Geneva, and so this payment was made, so far as I recall, by sending the money to an 'in-house' company of Intertrust called "Alpenside Limited" which received the payment from Tradestock and transferred it to the client account of White & Case from which the sellers could be paid.)  The transfer of the interests in Zhaikmunai was then effected by a share purchase agreement dated 9 September 2004 (the "**SPA**") for the sale of 100% of the shares in Scoulton between Thyler as purchaser and Apex as seller.  A copy of the SPA is at Exhibit FJM2 pages 12-77.

53.  In total, therefore, Thyler received approximately US$103 million from Tradestock for the purposes of the Scoulton acquisition (the "**Tradestock Loan**").  With no formal loan documentation in place formally to record the agreed terms, for the reasons I have explained above, Intertrust (Isle of Man) required that a client agreement in respect of Thyler was signed by Yerzhan.  As I have explained above, as between Yerzhan and me there had always been a clear understanding and agreement that the monies were to be (and then were) advanced by way of loan from Tradestock to Thyler and that Thyler was owned by me.  I believe that I explained these arrangements to Intertrust but since there was not yet an executed loan agreement, and because all of the financing of the acquisition had come from Tradestock, which was controlled by Yerzhan, they insisted on having a client agreement with Yerzhan for their records.  Essentially, they wanted to link the client agreement with the source of funding.  I spoke with Yerzhan and he agreed to comply with Intertrust's requirements and (so far as I recall) a client agreement was duly signed.  However, the agreement reached between Yerzhan and me in relation to the loan financing and my ownership of Thyler remained the same.

54.  As I have mentioned, it was my intention to put the formal documentation for my agreement with Yerzhan in place once the acquisition process was behind us.  I was however conscious of the fact that there was a risk of causing offence to Yerzhan, in the context of a strong relationship of personal trust, if I seemed overly eager in this regard or tried to press him immediately for the loan documentation or other documentation concerning (for example) the ownership of Thyler.  He had shown his trust in me by having Tradestock lend US$103 million to Thyler for the acquisition, and I felt that I had to reciprocate that trust by not offending him and waiting until the right time to finalise the loan documentation.  Also, of course, the fact that I trusted him completely, and that the agreement between us was clear,

15

meant that I did not feel a particular urgency or necessity to finalise these matters immediately and there were also many other matters to deal with at what was a very busy time. I was intending to work these issues out with Yerzhan in due course but his sudden and tragic death, which I explain below, meant that this proved impossible.

**Yerzhan's Death**

55.   On 19 December 2004, a few months after the acquisition of Zhaikmunai completed, I travelled from Frankfurt to Almaty. I do not recall the exact purpose of my visit but I believe it could have been to deal with matters relating to the recent acquisition of Zhaikmunai. I had also been discussing with Yerzhan at around this time another project: a potential investment (to which he had committed in principle) in a fund called "the Great Circle Fund" (the "**GC Fund**") which was intended to operate in the infrastructure sector.

56.   I recall speaking to Yerzhan from Frankfurt on the morning on 19 December 2004 and arranging to meet him later that day or in the next couple of days. However, once I arrived in Almaty I learnt that tragically he had died earlier that same day. I was told that he was involved in a hunting accident while in a jeep and had died from a gunshot injury. I do not now recall who told me about his death but this news came as a terrible shock to me and I was deeply saddened to lose a friend and business partner.

57.   I attended Yerzhan's funeral and left Almaty soon after, on or around 22 December 2004. I recall that almost immediately after his death there were rumours and theories circulating about the circumstances in which it had happened. This made me uncomfortable as I knew Yerzhan to be a measured and careful person and an experienced hunter of wild animals. I had difficulty imagining how he ended up in a situation in which a loaded gun was said to be accidentally fired in a moving jeep. I thought it was very strange and it upset me.

58.   Following Yerzhan's death, I went back to Almaty at the end of December 2004. While I was in Almaty, I was told by someone that Yerzhan's two brothers, Yerken and Yerlan Tatishev, wanted to meet me. I arranged to meet with them on or around 29 December 2004. I cannot recall if I met them both together or one after the other on the same day. In the meeting(s) the brothers presented themselves as the successors to their late brother's estate and told me that from then onwards I should deal with them in respect of Yerzhan's interests. To the best of my recollection, I believe I would have discussed with either one or both of the brothers at the meeting(s): (i) the existing Tradestock Loan; and (ii) the commitment which Yerzhan had made to invest in the GC Fund, which had not taken place by the time of his death.

**CONFIDENTIAL**

59.   After my meeting(s) with the brothers, later that evening, I also met with Yerzhan's widow,
      Ms Anara Aitzhanova, at her house. I had not previously spoken to Ms Anara, save that I
      would have likely greeted her at the funeral. At this meeting, Ms Anara urged me to deal
      exclusively with her in respect of all matters concerning Yerzhan's estate.

60.   Around that time, I also met with other Turan Alem employees such as Mr Saduakaz
      Mameshtegi (who was appointed as the Chairman of the Board of Turan Alem after
      Yerzhan's death), Mr Erik Sultankhulov (who was the Finance Director) and Mr Darmen
      Jakishev. I knew these individuals had been part of Yerzhan's team at the bank. I recall that I
      discussed the GC Fund investment with them and the need to make a decision as to whether
      Turan Alem would make the investment. (On this point, I note that the Claimant has made
      reference to this investment in these proceedings. I do not see how it is relevant, but by way
      of further explanation, Mr Sultankulov agreed to proceed with this project and in or around
      May 2005 an investment was made through TuranAlem Capital LLC and a company called
      Trantin Limited ("**Trantin**"). Trantin became a Limited Partner in the GC Fund, with
      liquidity provided by Turan Alem, and a subsidiary of Alfa Bank was the other major
      investor. I acted as investment advisor, and the fund invested over US$100m in projects in
      Russia, Turkey and Kazakhstan between 2005 and 2009. The fund was terminated with my
      agreement in May 2009 after the American executives told me in 2008 that they had learnt
      that the accounts for BTA, which had been thought to be the owner of Trantin, did not include
      TuranAlem Capital LLC as a subsidiary).

61.   By the end of this short trip to Almaty in December 2004, it had become clear to me that there
      was going to be a messy dispute over the inheritance of Yerzhan's interests, as his relatives
      and business associates were making conflicting claims, particularly in regard to Turan Alem.
      It is difficult to overstate just what a mess this was. It seemed to me that Yerzhan's wife was
      his obvious successor but his brothers and associates were clearly interested in making claims
      which would not have been impossible by any means in Kazakhstan. The difficulties for me
      were particularly acute because, as I have explained, my business dealings and agreements
      had been with Yerzhan personally, and I had not by this time finalised the documentation
      with him in relation to Thyler and the Tradestock Loan. In Yerzhan's absence I found myself
      having to deal with people who I did not know or trust and who seemed to be looking to
      exploit the situation to advance their own agendas.

62.   After I left Almaty at the end of December 2004, I recall that in early 2005, Ms Anara called
      me to let me know that she had relocated to Vienna as she was scared after Yerzhan's death.
      She was also hiding from Yerzhan's brothers who were challenging her claim to Yerzhan's
      estate. She asked me to visit her in Vienna to discuss how she proposed to deal with

**CONFIDENTIAL**

Yerzhan's estate. In my meetings with Ms Anara she was accompanied by Helmut Seitz, an Austrian lawyer who had previously worked with Yerzhan. I assumed he was assisting her in managing her financial and legal interests and advising her on how she should deal with Yerzhan's estate. Ms Anara's self-imposed exile in Vienna, and her obvious fear, were extremely disquieting.

63.    During my meetings with Ms. Anara, I informed her about the Tradestock Loan and she discussed how she proposed to deal with Yerzhan's estate. She had no experience of business matters and kept changing her mind about whether and how she should dispose of it.

64.    In or around that time, I also informed Intertrust that Yerzhan had died. As I have explained above, there had been a client agreement signed by Yerzhan due to the lack of formal documentation for the Tradestock Loan, and when Intertrust learnt of his death I arranged for Ms Anara to sign a new client agreement with them in respect of Thyler on the basis that she was Yerzhan's successor. This was a very difficult time for me as I was worried about the circumstances of Yerzhan's death and about the fact that Ms Anara was in hiding. She had put her trust in me because of my relationship with Yerzhan and I wanted to help her but I was unsure about how the situation would resolve in terms of succession to Yerzhan's estate, particularly as regards his interests in Turan Alem. I therefore decided to take a 'wait and see' approach which is what I believed at the time would best serve my interests and would be the safest course of action. In any event, there was not much else I could do. It seemed to me that the competing factions had to work themselves out and it would have been extremely unwise for me to have tried to insist on my arrangements with Yerzhan being formally recorded while all this controversy was going on.

**Mr Ablyazov**

65.    In the first week of May 2005, I travelled again to Vienna at Ms Anara's request and I met with her and Mr Seitz. At this meeting, I heard them discussing negotiations they had previously had with Mukhtar Ablyazov about transferring to him some or all of Yerzhan's stake in Turan Alem. It was at this meeting I believe, or around that time, that I first heard of Mr Ablyazov. I do not recall knowing about him or his role or position much, if at all, before then.

66.    During this same trip in May 2005, I then met Mr Ablyazov at a hotel together with Mr Seitz. Mr Alexander Udovenko was also present at the meeting. That was the first time I met Mr Ablyazov. It was a relatively short meeting. He was introduced as Ms Anara's "*business partner*", or words to that effect. I briefly described my acquisition of Zhaikmunai and the

18

concept of the GC fund. I recall that Mr Ablyazov indicated that his intention was to take control of Turan Alem. As Mr. Ablyazov's role in Turan Alem or vis-à-vis Ms Anara was not clear to me, I was cautious about saying too much.

67. During this very first meeting, and indeed in subsequent meetings with him, I found Mr Ablyazov's manner rude and arrogant. He did not come across as a pleasant person to deal with. He did not speak English and so Mr Alexander Udovenko, who also attended the meeting, translated as necessary. Towards the end of the meeting Mr Ablyazov informed me that Mr Udovenko would contact me for future communications or meetings. It was not at all surprising to me that I was asked to deal with his associate in this way. In my subsequent interactions with Mr Udovenko I formed the view that he worked for Mr Ablyazov as his trusted associate.

68. After this meeting, I recall Ms Anara saying that she was not sure about dealing with Mr Ablyazov and that she was reluctant to be in any partnership with him for a long period of time. My impression of the situation was that Ms. Anara was having a difficult time, but that together with Mr Seitz's assistance she was trying to negotiate with Mr. Ablyazov to a point where he would pay her as much as possible, as fast as possible, for her interests as Yerzhan's successor in (mainly) Turan Alem, but Mr. Ablyazov was trying to achieve the opposite (i.e. pay her as little as possible and as late as possible).

69. However, the arrangements or the understandings between Ms Anara and Mr Ablyazov, and the nature and mechanisms for any transfer between them, were never known to me. In Kazakhstan the acquisition and transfer of assets between principals is commonplace, as is the use of offshore vehicles, and the nuances and importance of corporate personality and legal title would have been of little relevance to them. I would have preferred to learn more about the arrangements, so that I might better understand the position I found myself in, but there was a great degree of suspicion between the parties and I did not consider myself to be in a position to demand answers.

70. It seemed to me, however, that a transfer had taken place, or was in the process of taking place. At some point during the months following the Vienna meeting in May, I believe I was informed that Ms Anara and Mr Ablayzov had indeed reached an agreement and that she had transferred (or would transfer) some or all of her interests to him. I do not remember exactly who informed me about this, but most likely it will have been one or other of Ms Anara, Mr Seitz or Mr Udovenko. I recall that I informed Intertrust about this, which resulted in new client agreements in respect of Thyler being signed between Intertrust and Mr Ablyazov in the Summer of 2006, replacing the one signed by Ms Anara. I was during this time anxious to

**CONFIDENTIAL**

know what was happening and in particular to have some confirmation of the fact that Ms Anara had transferred Tradestock and/or the Tradestock Loan to Mr Ablyazov. I wanted to know for sure who my counterparty was and, assuming it was to be Mr Ablyazov, to protect myself against any potential claims from Ms Anara in the future. (It was only much later, however, upon my request, when Mr Udovenko provided me a copy of a letter from Ms Anara confirming this position. I do not recall what date I was given this letter but it bears the date of 12 June 2008 (see Exhibit FJM 2 at page 78).

71.    Mr Ablyazov became the Chairman of the Board of Turan Alem in May 2005. From this point onwards in this Second Witness Statement I shall refer to Turan Alem as "**BTA**" although I understand that Turan Alem did not formally change its name to "JSC BTA Bank" until some point in 2008.

72.    After my first meeting with Mr Ablyazov in May 2005, my further contact with him (over the next five years) was limited. My meetings with him were always short (perhaps 15-30 minutes each, on average) and we communicated through his associates who acted as translators. I have never met him on a one-on-one basis and, so far as I can recall, I have never spoken to him on the phone.

73.    Mr. Ablyazov did not engage in any real dialogue or exchange opinions. He would typically be very short and direct in his manner. He did not bother with the details of any arrangements and simply left matters to be dealt with by his associates. This would often lead to misunderstandings and open contradictions between them, with Mr. Ablyazov changing his mind about instructions he may have previously given.

74.    At the meetings there was always at least one of his associates there (usually Mr Udovenko or Mr Anatoly Ereschenko) and, when we were discussing loans between BTA and Zhaikmunai, also other managers of BTA. I used to give him a general update on the business of Zhaikmunai and would inform him of my plans for repaying the Tradestock Loan.

75.    I often felt that Mr. Ablyazov was very dismissive of what I had achieved (and was achieving) with Zhaikmunai and he did not treat me with respect. In particular, he sometimes used to challenge my ownership of Zhaikmunai and talk about it (incorrectly) as if it were his own. This was of course a great cause of concern to me. My position was difficult because the client agreements for Thyler, coupled with the absence of a formal declaration of trust of the Thyler shares, which had not been a problem for me until Yerzhan's death, now gave Mr Ablyazov the opportunity to exert 'leverage' over me. But at the same time, he did not interfere with or seek to control my management or business plans for Zhaikmunai and, as I

**CONFIDENTIAL**

describe below, I was able during this time to continue my efforts to build and expand the company's operations from the ground up. I was also counting, to some extent at least, on Intertrust knowing the true history of the matter and not taking any steps to prefer Mr Ablyazov's interests without at least involving me so that I could object if necessary. As for Mr Ablyazov, I did not know whether in fact he had any real confidence in what he was saying about the ownership of Zhaikmunai or whether it, and the Tradestock Loan, were a priority for him. I suspected that he had obtained it from Ms Anara on very favourable terms, if indeed he had paid for it at all, and that he knew that repayment of the loan was dependent on my involvement and my ability to make a success of the business. So he essentially left me to it.

76. It was in this way that I was propelled by the tragedy that occurred to Yerzhan into a new and uncertain situation and a connection to Mr Ablyazov which was not my choice and not of my making. My arrangements had originally been with a long-standing, trusted friend but I now had as a counterparty a man I did not really know, and certainly did not trust. This was, to say the least, a situation with which I was extremely uncomfortable, but I had been given no choice. Having been thrown into these circumstances, I adopted a non-confrontational approach and tried to navigate the situation as carefully as possible, all the while seeking to protect my own interests. Throughout this five year period, further details of which I set out below, I was looking to find a way to end this connection with Mr Ablyazov as soon as I could, but without (at least completely) losing the equity I was building up in Zhaikmunai through my hard work.

## Development and Financing of Zhaikmunai

77. The vast majority of my time was however being spent working on the development of the business of Zhaikmunai. Over the years, my close involvement has been good for Zhaikmunai and its business, but it has obviously been very demanding. This was especially so in the early days when we were making substantial infrastructure investments, and building on the ground.

78. At the time of the acquisition, Zhaikmunai was still in the exploration phase and total area of the field under exploration was approximately 270 square kilometres. Only a few wells had been drilled and the field had a small production. It did not have direct access to pipeline and the crude oil produced was transported on trucks. However, a US$100 million minimum work programme had been agreed with Kazakh government under the license.

CONFIDENTIAL

79.   I therefore took on the arduous task of building the infrastructure at the field from the ground up and completing the minimum work programme. A development concept also needed to be agreed and approved by the Kazakh government. Substantial drilling works were carried out in 2005 and 2006, including (by July 2005) contracts with JCS Saipem SPA (by June 2006) an agreement with JSC OGCC KazStroyService ("**KSS**") for the construction of a pipeline and railway loading terminal to link the field directly to the railway at Rostoshi, near Uralsk.

80.   I also dedicated my efforts to putting together a management team. At the time of the acquisition there was a local management team of around 30-40 staff in Uralsk. Soon after the acquisition, by around November 2004, I had hired Kai-Uwe Kessel as the CEO for Zhaikmunai. At the time, Mr Kessel was working at Gaz De France in Paris as Senior Vice President for their Northern Africa division. Mr Kessel speaks English as well as fluent Russian. He had an impressive track record and I believed that his operational and technical expertise would complement my experience in raising finance as a venture capitalist. Mr Kessel and I continued to hire others and build the management team. Throughout this period, I would travel to Uralsk multiple times in a month to supervise the execution of the development plans, negotiate various contracts, meet with my management team and deal with any operational difficulties. I also travelled quite frequently to London and Moscow, and also worked in Brussels, negotiating agreements with oil traders, transportation providers and so on. The work was extremely demanding.

81.   As well as overseeing the operational side of the business, I also had to deal with the financing. This was very challenging and time consuming. For example, soon after the acquisition, it was apparent to me that Zhaikmunai needed further financing for its operational expenses and for capital investment to complete exploration and build the production capabilities on the field.

82.   At the time of Thyler's acquisition of Scoulton, Zhaikmunai already had a loan for approximately US$14 million from Halyk Bank and soon afterwards we approached Halyk Bank and BTA seeking loans for Zhaikmunai. We managed to obtain the approval of the BTA credit committee for various loans (as to which see below), something which I believe was possible because we had a strong business plan and, of course, because we were willing to provide valuable collateral.

83.   In July 2005, Zhaikmunai and BTA entered into a General Credit Agreement which fixed a credit limit of US$28 million from 7 July 2005 to 6 October 2012, secured by a pledge and by security over Zhaikmunai's bank accounts. The loan agreement and the pledge agreements

**CONFIDENTIAL**

were amended and supplemented over time and by April 2007 the credit limit had been increased to US$146 million.

84.    BTA also provided a bank guarantee of US$1.8 million in favour of JCS Saipem SPA as security for the fulfilment of Zhaikmunai's obligations to Saipem under the terms of the July 2005 drilling contract to which I have referred above. On 20 July 2007 BTA also extended an overdraft facility to Zhaikmunai (see Exhibit FJM2 pages 79-87).

**Attempts in 2006 – 2007 to sell my interest in Zhaikmunai**

85.    As I have explained above, my original intention when I first acquired the business was to exit the investment once I could do so profitably. I was also conscious of the need eventually to repay the Tradestock Loan and I believed that a strategic sale would enable this to be achieved. Further, as I have described above at paragraph 76, I wanted to end the connection with Mr Ablyazov, which had been forced upon me by Yerzhan's death, as soon as possible. Accordingly, in (I believe) the second half of 2006, at a time when the first oil treatment facility in the field was soon to be completed, I started the preparations for a potential strategic sale of the business. By early 2007, these preparations were coming together, and potential purchasers had been identified.

86.    For this sale to take place, however, it was going to be necessary to put in place some documentation regarding the ownership of Thyler and therefore also its subsidiaries, Scoulton and Zhaikmunai. In particular, it was necessary to resolve the very messy situation that had arisen following the insistence on the part of Intertrust (now known as "**SMP Partners**" following a reorganisation) on Yerzhan signing a client agreement in respect of Thyler, which had resulted from Tradestock having financed Thyler's acquisition and the absence of formal documentation for the Tradestock Loan. The execution of that client agreement, and the absence of a formal declaration of trust on the part of Harrison which held the shares in Thyler, were matters that I did not feel an urgent need to resolve immediately when they arose in late 2004 because of my trust in Yerzhan and the clear understanding between us regarding our agreements. However, after his sudden death I could have no such certainty in the position, and the existence of the 'successor' client agreements signed by Anara and Mr Ablyazov, as well as the continuing absence of a declaration of trust, caused me real concern. As I have explained, I had initially been content to adopt a 'wait-and-see' approach to this after Yerzhan's death, given the very messy, uncertain and uncomfortable position I had found myself in. However, the prospect of a potential sale of the business meant that these issues had to be addressed, one way or another.

**CONFIDENTIAL**

87.  That potential sale, however, as well as forcing me to confront these problems, also provided a potential context in which to seek to resolve them. The prospect of the cash that would be raised by the sale I was putting together strengthened my position, and gave me some much-needed 'leverage' of my own. In particular, it put me into a position to demand, albeit as part of a wider deal relating to the proposed sale of the business, that a formal declaration of trust by Harrison of the shares in Thyler would be executed in my favour (or, more accurately, in favour of a company owned by me). Inevitably there would be a price to be paid for establishing my ownership conclusively in this way, but this represented an opportunity to improve considerably my negotiating position, which had become very weak as a result of Yerzhan's death.

88.  I do not recall exactly when the negotiations (which were between me and Messrs Udovenko and Ereshenko) about this proposed transaction began, but I believe that it would have been in late 2006. I recall that various different possible structures and solutions were discussed over several months, but at some stage in the first half of 2007 agreement was reached on the terms of a deed to deal with the ownership of Thyler and the parties' rights in respect of the proceeds of a sale of Scoulton, which it owned, and which in turn owned Zhaikmunai.

89.  As part of this process, on 15 February 2007, the Sixth Additional Respondent, Eternum Holding Sarl ("**Eternum**") (the interests in which were ultimately owned by me) acquired from SMP Partners an 'empty' BVI company called Sartfield Limited ("**Sartfield**"). I believe that it was around the same time that SMP Partners also provided (by incorporation, or sale, I am not certain) another BVI company called Lineford Limited ("**Lineford**") which was (as I understood the position at the time) to be owned by Mr Ablyazov and was to be Sartfield's counterparty in the deed that was being negotiated.

90.  On 16 July 2007 Sartfield, Harrison, Thyler, Scoulton and Lineford entered into a deed of assignment and declaration of trust (the "**July 2007 Deed**") a copy of which is exhibited at pages 88-104 of FJM2. Clause 2 provided for an assignment by Lineford to Sartfield of 100% of the beneficial interest in the shares in Thyler and for Harrison (which held the Thyler shares) to execute a declaration of trust in favour of Sartfield to reflect this.

91.  For the reasons I have explained above, I did not believe that Lineford did own the beneficial interest in the Thyler shares prior to the execution of this document (and in this regard, recital (A) of the deed is closer to what I believed to be the position). However, the absence of any declaration of trust, the death of my counterparty in the original agreement, and the existence of the Thyler client agreements put me in a weak negotiating position, and what mattered to me was the outcome of the transaction. That outcome was, of course, favourable, because it

24

provided for a clear and firm declaration of trust by Harrison of the shares of Thyler in Sartfield's (and so my) favour, after a period of more than two years during which my ownership had been challenged, and that declaration of trust was duly executed – a copy is exhibited at page 105 of FJM2.

92.    However, it was of course necessary to pay a price to achieve this outcome. The July 2007 Deed envisaged that there would be a sale of a newly-created Guernsey partnership, which would ultimately own Zhaikmunai, and that the profit on that sale would, effectively, be shared (broadly-speaking) in a 90/10 split between Lineford and Sartfield. We had agreed that Thyler's debt to Tradestock under the Tradestock Loan, which had (so far as I was aware) been inherited by Anara after Yerzhan's death and was now, like Lineford, ultimately owned by Mr Ablyazov, would be dealt with under the terms of the July 2007 Deed and discharged when the sale proceeds were distributed in accordance with its provisions.

93.    It is important to appreciate that, at this time, I was expecting that the Zhaikmunai business was going to be sold at a very substantial profit indeed. As I have explained, the business had been bought with a little over US$100 million in debt just three years before, but during that time, as a result of an enormous amount of hard work on my part and with the able assistance of my management team, I had managed to complete the minimum work programme, significantly expand drilling operations, complete an oil treatment facility and commence construction of the oil pipeline and railway loading terminal. The business was at the time potentially worth around US$1 billion - an offer of US$1.2 billion had been received from Gaz de France, and furthermore less than a year later the business had an equity value of US$1 billion when it was listed on the London Stock Exchange in April 2008). The death of Yerzhan and the events that followed had left me in a weak negotiating position, and so even though the July 2007 Deed would see me receive only around 10% of the value of a business on a sale, that would still represent a huge profit for me over just three years. The deed also gave me the chance to walk away from the very uncomfortable situation I had found myself in after the violent death of my friend and business partner, and in particular from the very unpleasant connection with Mr Ablyazov that had been thrust upon me. Walking away with up to US$100 million for three years' work, in these circumstances, would have been a very good outcome.

94.    The sale process continued throughout the Spring and Summer of 2007 and, as a part of this process, there was also a restructuring at the holding company level. In summary, the effect of this restructuring was that an Isle of Man limited liability partnership called Zhaikmunai LP was created which ultimately owned the business and the interests in Zhaikmunai LP were, in turn, 100% owned (indirectly) by Eternum, Sartfield and Thyler.

**CONFIDENTIAL**

95.    During the sale process, approximately twenty companies were invited to bid, and we undertook a due diligence process to evaluate the bids received. At the end of the process only three or four companies remained, including Gaz de France and KazMunaiGas ("**KMG**"). Eventually these two companies submitted a joint bid for the acquisition of the interests in Zhaikmunai LP. However, in the summer of 2007, we pulled out of the sale process at a late stage, because the buyers had initially made a high bid which eliminated the competition but had later argued for a variable valuation formula, with the ultimate valuation to be determined by a third party expert based on further technical due diligence. This meant that there was a high degree of uncertainty involved in determining the final purchase price. I decided, together with the CEO (Kai-Uwe Kessel), assisted by our advisors, that it was not in the best interests of the sellers to transfer the interests in Zhaikmunai LP on the terms being offered, which would have required a commitment to sell before the ultimate price (which would then have to be accepted) was ascertained in a process which we could not control.

96.    I was of course disappointed that my plans for a strategic sale had not been successful, as I had hoped to sell Zhaikmunai LP, pay my debts and make a very considerable profit, while also ending the connection with Mr Ablyazov, as I have explained above. However, I had a 'back-up' plan, which was an IPO, and I contacted my legal and potential financial advisors to launch that process very soon after the proposed strategic sale fell through.

97.    Furthermore, the July 2007 Deed remained in place, and so although the sale of the business had not yet been achieved, I (through Sartfield) still had the benefit of the declaration of trust which clearly established my ownership of the business, through Thyler. There were of course rights on the part of Lineford (under the deed) to give notice to reverse that position and take ownership of Thyler when no proceeds of sale were forthcoming, of the kind that a lender will typically have if repayment of a secured debt is not made, but no such notice was ever given. This was probably (although I cannot know) because there remained a strong prospect that I was soon going to be able to raise a substantial amount of money and thereby discharge Sartfield's obligations to Lineford, and also because, in the meantime, my role in the business was vital as it faced a number of very serious (and indeed existential) challenges, which I explain below.

**Borrowing from BNP and the IPO**

98.    Following the collapse of the discussions with Gaz de France and KMG in the late summer of 2007, I had to attend to the commercial bank borrowing arrangements of the company and to secure the funding required for capital investment in the near future. As best I recall, I calculated that the aggregate amount needed to (a) repay the outstanding loans from BTA

26

(which at the time amounted to approximately US$246 million); and (b) make further investments for the operations of the business, in particular to finance the construction by KSS of the first two units of the gas treatment facility, was approximately $550 million in total.

99.    BTA had refused to provide any further financing and I considered other options. I commenced negotiations with BNP Paribas ("**BNP**") (who already had interests in Kazakhstan) for a loan facility of approximately US$550 million. Those negotiations were successful and on 12 December 2007, a facility agreement for up to US$550 million was entered into between BNP Paribas (Suisse) SA and Zhaikmunai (the "**BNP Facility**"). BTA was one of the banks which participated in the BNP facility which was syndicated.

100.    I also started the process for a potential IPO at around this same time, in the second half of 2007. In order to enable admission of Zhaikmunai LP to the Official List of the Financial Services Authority and to trading on the London Stock Exchange, the ownership structure of Zhaikmunai LP was to be restructured and a depositary was to be appointed to create global depositary receipts ("**GDRs**"), representing common units which in turn represented transferable interests in the underlying business, for purchase by institutional investors in the IPO. A chart setting out the proposed structure for admission to listing is set out at Exhibit FJM2 at page 106.

101.    The IPO attempt did not, however, succeed in 2007, primarily, I believe, because it involved a proposed significant sell-down of existing shares, which sent the wrong signal to the market about the potential of the business, and also because of the developing financial crisis at the time.

102.    When BNP learnt of the failed IPO attempt, it imposed a condition requiring Zhaikmunai LP to raise at least US$100 million in capital before it would make any advance under the loan. Zhaikmunai LP returned to the market in the first quarter of 2008, seeking to raise that US$100 million, using the same structure and substantially the same prospectus as had been used for the failed IPO in 2007.

103.    The restructuring was fairly complex, but it involved (amongst many other aspects) the incorporation of a new general partner of Zhaikmunai LP, Zhaikmunai Group Limited ("**ZGL**"). The restructuring involved direct discussions with the Financial Services Authority, as this was the first time that interests in a limited partnership, represented by GDRs, were admitted to the FSA's Official List and to trading on the London Stock Exchange. The listing of the GDRs also required an amendment to the laws of the Isle of Man, to allow for the

CONFIDENTIAL

possibility of more than 20 limited partners in Zhaikmunai LP, and this was completed in December 2007.

104.    ING Bank acted as 'Global Coordinator' in connection with the IPO.  As part of the reorganisation, Claremont Holdings Limited ("**Claremont**") bought the partnership interests from ING Bank, following the purchase by ING of the partnership interest in Zhaikmunai LP from Scoulton and Amery. A prospectus, approved by the UK Listing Authority, was issued by Zhaikmunai LP on 28 March 2008, which contained disclosures regarding the structure of Zhaikmunai LP, including the relationships between Scoulton, Thyler and Zhaikmunai LP (see Exhibit FJM2 at pages 107-424).

105.    The IPO was successful, and the listing on the London Stock Exchange took place in April 2008.  Thereafter, Claremont held 90.9% of the interest in Zhaikmunai LP.  Zhaikmunai LP raised US$100 million in capital, by issuing 10,000,000 new common units at US$10 each, which were subscribed for by investors such as JP Morgan, Capital, Templeton etc. The proceeds of this capital raising exercise were, as I recall, used to fund the company's investment programme into its drilling campaign, the oil treatment plant and the first gas treatment plant.

106.    The effect of raising this capital successfully was that it became possible to draw down funds under the BNP Facility.  By around this time, over US$290 million had been drawn down which had been used to repay outstanding loans to BTA and for other requirements.

**Acceleration of the BNP Facility in late 2008**

107.    From about July – August 2008, during the financial crisis, there was a significant and steady drop in the oil price and by about December 2008 the price had fallen to around US$30/barrel.  As a result, during the fourth quarter of 2008 BNP had been concerned that there would be a 'material adverse event' under the BNP Facility, given that the Zhaikmunai "banking case" (a cash flow forecast added to the loan agreement), on the basis of which BNP had agreed the "borrowing base" under the proposed facility, had assumed a minimum base price of US$50/barrel. Following several months of tough negotiations, on 31 December 2008, BNP served a notice of default which had the effect of accelerating the debt.

108.    This was an exceptionally difficult time for Zhaikmunai and I came close to losing the business altogether.  BNP was keen to force a sale of Zhaikmunai (which would have been at a steep discount) in order to recover its outstanding debt. I strongly resisted this and we appointed Rothschilds to advise on the restructuring of the BNP Facility.

**CONFIDENTIAL**

109.    At the same time, BNP was taking steps to find a buyer for Zhaikmunai. I understand BNP approached KMG in this regard due to (a) KMG's previous interest in acquiring a stake in the business back in 2006 (which I have described above); and (b) the Kazakh government's pre-emption rights and government approvals required under Kazakh law in respect of transferring interests in Zhaikmunai, which meant that it would be relatively straightforward to obtain government approval for a sale to KMG because it is majority owned by the government of Kazakhstan.

110.    KMG recognised that BNP was looking to force the sale of the interests in Zhaikmunai and it made offers as low as US$1 million and then, at one stage, US$1 (one dollar) to acquire Zhaikmunai LP's interest in Zhaikmunai. I rejected those offers as they were clearly not in the best interest of Zhaikmunai LP but BNP (which was itself, like many other banks, under stress in the wake of the Lehman Brothers collapse) put us under enormous pressure. However, Rothschilds also disagreed with BNP's strategy and threatened to resign, following which BNP gave us some breathing room to come up with an alternative source of re-financing.

**Capital increase of Zhaikmunai LP in 2009**

111.    In order to avoid the forced sale of the business by BNP and the destruction of the equity in the company that this would have caused, in the spring of 2009, I commenced efforts to raise US$300M from institutional investors by way of a capital increase. The terms of the equity offering were publicly announced in July 2009. Zhaikmunai LP was seeking to raise US$300 million through the issue of 75,000,000 new Common Units in the form of GDRs at an issue price of US$4.00 per GDR. 45,000,000 of the new Common Units were to be issued on a non-pre-emptive basis to investors procured by ING Bank, Mirabaud & Cie S.A., Renaissance Capital and FirstEnergy Capital pursuant to a placing agreement.

112.    Claremont agreed to subscribe for the other 30,000,000 Common Units in addition to its current holdings. In order to put Claremont in funds to subscribe to those additional 30,000,000 Common Units, I was successful in securing an investment of US$120 million from Baring Vostock Capital Partners (a Russian private equity group). To the best of my recollection, I believe that this investment was structured so as to involve a US$100 million convertible loan note between Dehus Dolmen Nominees (an affiliate of Baring Vostock) ("**Dehus**") and Claremont (the "**Dehus Loan Note**"), and also an immediate purchase by Dehus, as a part of the same transaction, at US$4 per unit, of 5 million of the 30 million Common Units for which Claremont had subscribed, resulting in a net increase in Claremont's holdings of 25 million Common Units.

**CONFIDENTIAL**

113. Having obtained sufficient confirmation that I had found the necessary investors to subscribe to the US$300 million capital increase, I started discussions with KazStroy Service Global B.V. ("**KSS Global**") to purchase a stake in Zhaikmunai LP once the capital increase was completed. At the time, KSS Global was ultimately owned by Timur Kulibayev (the son in law of Nursultan Nazarbayev, the president of Kazakhstan) and Arvind Tiku (the founder, Director and Chief Executive Officer of AT Capital Pte. Ltd and a long term business partner of Mr Kulibayev). (I also believe that at some stage Lakshmi Mittal also acquired a minority stake in KSS Global.) I approached KSS Global because it is part of the same corporate group as KSS, the entity contracted to build the gas treatment facility units in the oil field (and they therefore already had an interest in Zhaikmunai's success) and also, crucially, because of the identity of its owners, which potentially made it easier to obtain government approval for the capital increase which was to take place after the sale to KSS Global had been agreed.

114. In August 2009, KSS Global signed a term sheet agreeing to buy, once the capital increase had taken place, 50 million common units from Claremont at US$4 per unit. I then approached the Kazakh government to get the necessary approvals to implement the capital increase and this was secured by 15 September 2009. I believe that KSS Global's commitment to acquire an interest in Zhaikmunai LP was essential to receiving the government's approval.

115. The capital increase was formalized on 15 September 2009 and the 75 million new Common Units were issued. Claremont subscribed for 30 million of the new units, funded by the Dehus Loan Note, as a result of which (after 5 million had been transferred by Claremont to Dehus as explained above) Claremont held a total of 125,000,000 Common Units, representing approximately 67.6% of the issued Common Units. This was publicly disclosed in the 2009 Prospectus which was approved by the UKLA (see Exhibit FJM2 at pages 425-666). The other 45 million new Common Units were subscribed for by institutional investors.

116. KSS Global's purchase of 50 million units from Claremont took effect in, as best I recall, early November 2009. Under the terms of the deal which had been agreed, no cash changed hands at the time of the purchase, but instead (effectively as a vendor's loan) Claremont agreed to lend the money to KSS Global at 12% interest (the "**KSS Loan**"). These were of course favourable terms for KSS Global, but they had been in a position to negotiate them because of the importance of the KSS Global sale to obtaining the government approval for the capital increase.

**CONFIDENTIAL**

117.    When KSS Global acquired these 50 million units from Claremont, Claremont's interest in Zhaikmunai LP was reduced from 125 million to 75 million GDRs (40.6%). That interest was then further reduced in March 2012, when under the terms of the Dehus Loan Note a further 23.8 million units held in escrow were transferred to Dehus pursuant to and in discharge of the Dehus Loan Note (which had funded Claremont's subscription for the 30 million units in the capital increase, as explained above). Following this transaction, Claremont's interest in Zhaikmunai reduced to 51 million GDRs (27.7%).

118.    The US$300 million in capital raised in this process in 2009 was invested back into the business and was used, as I recall, to finance the gas treatment plant and the company's drilling programme. After the event of default in December 2008, BNP had agreed to restructure the loan facility, but it had reduced the size of the facility from US$550 million (as had been estimated to be necessary – see above at 98) to US$350 million, which was (I believe) approximately the outstanding balance of the loan at the time of the default. US$200 million of the capital raised in 2009 was used (broadly-speaking) in substitution for that tranche of the original BNP facility, and the remaining US$100 million was, as I recall, used to finance a funding gap that had developed as a result of lower oil prices in 2008 and 2009.

119.    This is a convenient point to add that the BNP Facility was ultimately repaid, at the end of 2010, using funds raised by a US$450 million bond issue, which was placed by Zhaikmunai Finance B.V. (a subsidiary of Zhaikmunai LP) and consisted of senior secured notes at 10.50% due on 19 October 2015, guaranteed by Zhaikmunai LP and all of its subsidiaries. The excess funds raised by that bond issue (above what was required to pay off the BNP Facility) were invested back into the business, as indeed were funds later raised by a second bond issue in 2012.

**Discharge of Sartfield's Obligations (and the Tradestock Loan)**

120.    I had also, in the latter months of 2009, been in further discussions with Mr Ereschenko about payment of Sartfield's obligations to Lineford under the July 2007 Deed. In particular, I was conscious that the capital increase and associated transactions, as well as the proposed sale by Claremont to KSS Global (described above, which still at the time of the deed, I believe, required regulatory approval and so was described in the deed as "pending"), required Lineford's consent under clause 6.1 of the July 2007 Deed and needed to be properly documented between Sartfield and Lineford.

121.    The result of these discussions was a further deed, dated 21 December 2009, a copy of which I attach at pages 667- 672 of FJM2 ("**the December 2009 Deed**"). The December 2009 Deed

**CONFIDENTIAL**

replaced the July 2007 Deed (see clause 10) but essentially replicated its broad substance and structure, providing for monies raised by sales of interests in Zhaikmunai to be split, with Sartfield (and therefore, ultimately, me) retaining an initial tranche (defined as "*Carried Interest*" and calculated under Annex 1 of the deed) and with the balance being paid to Lineford, which would include the Tradestock Loan being discharged (see clause 2). The express mention of the Tradestock Loan, and the fact that the discharge of Sartfield's obligations to Lineford would discharge it, were very important to me, so that there could be no suggestion later (after Lineford was paid) that the Tradestock Loan remained outstanding. The December 2009 Deed also provided in clause 8 for a 'back-stop' date of 31 January 2015 for the settlement of Sartfield's obligations to Lineford (including the Tradestock Loan).

122. As I have explained, from the time that the connection with Mr Ablyazov had been thrust upon me, I had been looking for a potential exit, while trying to keep for myself such value as was possible in the circumstances. Over time, by growing the business, by fending off very serious threats (for example, from BNP), by raising money when required to fund financing requirements from time to time, and by creating the possibility of sales of valuable stakes in the business for cash, which could be used to repay the obligations of Sartfield, I had strengthened my negotiating position vis-à-vis Mr Ablyazov and obtained some 'leverage'. In particular, at around this time, the sale by Claremont of the 50 million units at US$4 per unit had created the prospect of receipt of US$200 million (plus interest) in the relatively near future, although KSS Global delayed payment and it was not received until later). From 2010 onwards, against this background, I had further negotiations with Mr Ablyazov's representatives about discharging Sartfield's obligations.

123. It was during this period, in late 2010, as best I recall, that I was first introduced to Ilyas Khrapunov, during a meeting in London with Mr Ablyazov and Mr Ereschenko (who translated). The meeting was short, and I was told that from then onwards Mr Khrapunov would be looking after Mr Ablyazov's interests and I should deal exclusively with him going forward, or words to that effect. I did not initially know that Mr Khrapunov was Mr Ablyazov's son-in-law, but I learnt this later. As best I can recall, the Sartfield/Lineford obligations were not specifically discussed at this meeting and Mr Ablyazov himself just asked a few general questions about how the business was doing. So far as I can recall, this was the last occasion on which I met or spoke with Mr Ablyazov or Mr Ereschenko (nor for that matter did I subsequently meet or speak with Mr Udovenko, who was not at this meeting). Thereafter, as best I can recall, I dealt only with Mr Khrapunov.

124. Overall, I believe that I met with Mr Khrapunov approximately 6-7 times, mostly in Switzerland (in and around Geneva), but also once (maybe twice) in London and once in

**CONFIDENTIAL**

Paris at Charles de Gaulle airport. He would call me and request a meeting and we would arrange a time and a place. Nobody else attended these meetings.

125.    In my meetings with Mr Khrapunov, I found his demeanour to be arrogant and unsophisticated and at times aggressive. The basic administrative and legal requirements of international business were lost on him. I thoroughly disliked dealing with him. He insisted, from my first meeting with him, that he wanted "*to get their money*", or words to that effect, and over time he increased the pressure on me to make repayment such that I felt uncomfortable and physically threatened. This reached its climax during a meeting in the autumn of 2011 at Charles de Gaulle Airport in Paris where Mr. Khrapunov in an angry manner, raising his voice, told me that if I would not make the necessary arrangements to pay fast "*he would send some other 'special' people to come after me*" (or words to that effect) and that I would quickly realise that I should have listened to him. He said it would not be possible to control "*those kind of people*" (or words to that effect) if I did not quickly comply. I was obviously very concerned and uncomfortable and tried everything in my ability to move things forward so I could discharge Sartfield's obligations. I had for a long time been looking to free myself of the connection with Mr Ablyazov, but the introduction of Mr Khrapunov took things to a new level, and I was desperate to get out of the situation. However, while I was very anxious throughout this process to discharge the Sartfield obligations as soon as possible, I was also aware that the worst possible situation for me would be to promise to make repayments and then to fail to deliver, in light of the threats made by Mr Khrapunov.

126.    In or around (I believe) June 2011, I had received an indication from KSS Global , at a meeting in London also attended by Standard Chartered Bank, who were financing the repayment, that they would be paying back the KSS Loan soon. This would enable me to procure that Claremont used some or all of those proceeds (approximately US$200 million plus interest) to make a partial repayment of a debt that Claremont had to Sartfield (which had arisen during the restructuring) and then Sartfield could make payments to Lineford in partial discharge of its obligations. After this indication from KSS Global, I was in a position to discuss with Mr Khrapunov in more detail the terms of repayment of Sartfield's obligations, including the amounts outstanding, and how and to whom payments would be made. We discussed these matters at meetings in Geneva, London and Paris (as I have mentioned above).

127.    During these discussions, Mr Khrapunov told me that Sartfield's obligations to Lineford should be paid to a company called Northern Seas Waterage Inc. ("**NSW**"). He told me that NSW was beneficially owned by a Mr Gennadiy Petelin and that Mr Ablyazov had transferred his interests in Lineford to NSW, or wording to that effect. He said that Mr

**CONFIDENTIAL**

Petelin was a Russian businessman who had previously worked for Gazprom and had a close relationship with Viktor Chernomyrdin, formerly the chairman and shareholder of Gazprom and also formerly the Russian Prime Minister.

128.    I made inquiries in Moscow about Mr Petelin and learnt that he had been a former chief of staff and associate of Mr Chernomyrdin. Based on my understanding of the often opaque ways in which a Russian company like Gazprom operated, I believed that it was reasonable to think that a former close associate of Mr Chernomyrdin could (through NSW) have obtained the benefit of the Sartfield obligations from Mr Ablyazov/Lineford. During my years working in Kazakhstan and Russia I had come to understand how high-level, well-connected business people would often have a network of close business associates/friends who they would promote to important positions and who would become successful in their own right.

129.    Nevertheless, in order to get more comfortable about Mr Petelin and NSW's position, I asked Mr Khrapunov to arrange a meeting with Mr Petelin. I travelled to Moscow for this meeting and met with Mr Petelin at the lobby bar in the Marriot Hotel in Moscow. Mr Petelin spoke very little English and was accompanied by a woman who translated, although her English was not very good either. Mr Petelin or his translator also showed me a copy of his utility bill confirming his address and various documents (the details of which I do not recall) which confirmed his ownership of NSW. I asked him to confirm that he had taken over these interests from Lineford and he did so.

130.    I recall that I requested some 'KYC' documents in respect of NSW, and I received (as best I can recall, either from Mr Khrapunov or from Mr Petelin at the Moscow meeting) a certified copy of Mr Petelin's passport (see Exhibit FJM2 at page 673) and a reference letter dated 18 October 2011 from the Vice President of Transcapital Bank in Moscow. I obtained a copy of the annual report of Transcapital Bank and satisfied myself that it was a reputable bank with international auditors and international shareholders (including the EBRD). Based on these documents, and what I had learnt at the meetings with Mr Petelin and Mr Khrapunov, I satisfied myself that Mr Petelin was a legitimate business person who owned NSW and had taken over Lineford's interests.

131.    Also during these discussions after June 2011, I sought to persuade Mr Khrapunov that the arrangements that we were negotiating needed to be documented. This was very important to me. In order to leave behind completely and conclusively all connections with Mr Ablyazov and entities under his control, as well as the messy and complex history that I have described in this Witness Statement, I wanted documentation that provided both a clear basis under which to make future repayment, and also clear releases and discharges of the historic

34

position, to ensure that I had a complete and straightforward answer to any claim that might be asserted later in relation to these events. In short, I wanted to make absolutely sure that none of Mr Ablyazov, Mr Khrapunov or his other associates, or any connected entities, could come after me again, so that I could draw a clear line under the whole affair.

132.    Mr Khrapunov was initially very resistant to the suggestion that these matters would need to be documented. However, the prospect of upcoming payments gave me some leverage, which I used to persuade him to agree that documentation should be drawn up and executed in substantially the form that I wanted. In particular, as regards Sartfield's obligations, I wanted the documentation accurately to reflect the true position that these were straightforward debt obligations, and I approached the matter by reference to the terms I had agreed with Yerzhan when negotiating the Tradestock Loan at the start of the entire endeavour. I now also, of course, had the benefit of the Harrison declaration of trust in respect of the Thyler shares in favour of Sartfield, so I saw an opportunity, finally, to extricate myself from the involvement with Mr Ablyazov.

133.    In order to achieve these aims, as set out above, I had draft documentation drawn up in around October 2011. There were four documents in particular (to which I refer, collectively, as the "**NSW Loan Documentation**").

   a.    a letter (signed as a deed) from Mr Ablyazov to SMP Partners Limited, with the subject line "*Re Lineford Limited*", stating that he had transferred all his beneficial interests in Lineford and its assets to NSW, and that Lineford had no assets or liabilities and could be struck off from the register (see Exhibit FJM2 at pages 674-675);

   b.    a "*Deed Poll*" made Mr Ablyazov as the "*Releasing Person*" under which he released any actions, claims, rights, demands etc. which he (or any related parties) had against Sartfield (or any related parties) in connection with "*the Original Financing Agreements*" or any other agreements or anything else arising out those parties' past relationships (the "**Release**") (see Exhibit FJM2 at pages 676-679);

   c.    a "*Deed of Settlement*" between Lineford, Sartfied and NSW (the "**Settlement Deed**") confirming the release of the "*Original Financing Agreements*" between Sartfield and Lineford (and/or related parties), their replacement with the "*New Loan Agreement*", and releasing any and all claims other than those between Sartfield and NSW under the "*New Loan Agreement*" (as well as those between Lineford and NSW, and certain obligations under the Settlement Deed itself) (see Exhibit FJM2 at pages 680-685); and

**CONFIDENTIAL**

d.  a "*Loan Facility Agreement*" between Sartfield and NSW (the "**NSW Loan**") (see Exhibit FJM2 at pages 686-695). I make further reference to this below.

134.  I had raised the principle of requiring that documentation be drawn up and agreed fairly early in these discussions, and as things progressed, once I had had some documents drawn up, I delivered drafts to Mr Khrapunov in electronic format in person. Over the course of our meetings he ultimately agreed them, making (as best I recall) only some fairly minor amendments to the body of the documents. Eventually, the terms of the documents were fully agreed.

135.  However, there was one matter on which Mr Khrapunov insisted. At a fairly late stage, he refused to have the documents executed unless they were back-dated to April 2009. I was very reluctant to agree to this and said so to him clearly. However, he would not back down and was insistent on inserting the April date. I did not know the reason behind his insistence. I did know that Mr Ablyazov had received political asylum in the UK; that he was in a legal dispute with BTA; and that BTA had brought Court proceedings. I knew nothing, however, about the freezing order or the receivership order that had been made in those proceedings.

136.  As I have explained above in this Witness Statement, I was by this time desperate to put this situation behind me and sever all ties with Mr Ablyazov and Mr Khrapunov. I felt not only profoundly uncomfortable in the negotiations with Mr Khrapunov but also physically threatened. With the agreement in principle of Mr Khrapunov to have a release (and other documentation) executed, and with the imminent arrival of the delayed KSS Global funds, which would provide a basis to start making repayment of the sums due (which would buy me time to find the balance), I had a small window of opportunity finally to put everything behind me. As a result, eventually, when there seemed to be no other way, not seeing how any harm might be caused by the back-dating of the documents, and frankly in desperation, I reluctantly conceded that the documents would be back-dated.

137.  Mr Khrapunov arranged to have the final versions of the NSW Loan Documents executed on behalf of all the relevant persons/entities other than Sartfield and Lineford and he gave me the executed copies. I then gave copies of the Settlement Deed and the NSW Loan, which were the documents which required execution by Sartfield and Lineford, to Stephen Whitehead and Stephen McGowan of SMP Partners, who signed them. This was, as best I can recall, in or around early November 2011 (and so not on the April 2009 dates that the documents state).

138.  Mr Khrapunov's approach to this had been unsophisticated and, ultimately, he was interested only in how much money was to be received by NSW. From my perspective, as I have

**CONFIDENTIAL**

mentioned above, I had approached the matter by reference to the terms I had originally agreed with Yerzhan in relation to the Tradestock Loan when Zhaikmunai was first acquired. I had therefore calculated the total amount of the facility by taking the US$103 million advanced by Tradestock in July 2004; adding on the accumulated interest (first at 15%, rising to 20% by September 2008 as per clauses 3-5 of the Tradestock Loan) for the period up to April 2009 (giving a sum of US$242,376,853); and then adding US$145,223,811 as the relevant profit participation element under clause 6 of the Tradestock Loan; resulting in the total of US$387,600,000. I have prepared a document entitled "*Loan Balance Calculation*" (copy at page 696 of Exhibit FJM2) to show, in broad terms, and as best I can recall, how I arrived at the figures in the NSW Loan.

139.    Interest on the NSW Loan was due at 5% per annum. The principal and interest was to be repaid in two instalments as set out in clause 7.1: a first instalment of US$24,930,616 (comprised of US$22,100,000 principal and US$2,830,616 of accrued interest) on 15 November 2011 and a second instalment of US$414,617,192 (comprised of US$365,500,000 in principal and US$4,117,192 of accrued interest, on 31 December 2011). The total sum to be repaid, as per these two instalments, was therefore US$439,547,808.

140.    On or around 25 November 2011, US$24,817,798, representing the first instalment (with a very slight discrepancy, to which I refer below), was paid to a bank account of NSW, the details for which had been given to me by Mr Khrapunov. The repayment was made by Claremont, on behalf of Sartfield, to which it had a debt which had arisen during the course of the restructuring (and which was therefore discharged in part by this payment to NSW). At the time this repayment was due, the KSS Global funds had been delayed and had still not been received. I therefore made a request to KSS Global for a loan of US$40 million which was duly made to Claremont on or around 16 November 2011. From these funds, which were effectively an advance on the monies that KSS Global was to pay shortly, Claremont funded the repayment of the first instalment.

141.    The payment of US$200 million (plus US$38 million interest) from KSS Global had still not arrived when the second instalment fell due on 31 December 2011. However, it arrived soon after, on or around 11 January 2012. The US$40 million loan to Claremont, with around US$700,000 interest, was repaid to KSS on or around the same day. The balance of the money received from KSS Global (i.e. around US$212.5 million after payment of the first instalment and the interest on the US$40 million loan) was not, of course, going to be sufficient to meet the whole of the second instalment repayment due under the NSW Loan, and so I was in the course of raising other funds for this purpose (as I explain below). I decided that it would not be wise to pay all of the KSS Global funds over to NSW

**CONFIDENTIAL**

immediately, because if I did so I would lose leverage and I did not yet have the balance of the money. I therefore decided to pay the money to NSW in stages, while I raised the balance elsewhere. Sartfield therefore made a repayment of US$41,461,709 (10% of the second instalment) to NSW on or around 22 February 2012, and further repayments of the same amount on (or around), I believe, each of 23 March 2012, 29 March 2012, 4 April 2012 and 13 April 2012.

142.    It took me a few more months to complete the raising of the balance of the money. The raising of these further funds (in addition to the US$238 million from KSS Global) was a complicated process and it has not been possible in the time available for me fully to analyse the transactions and check all of the figures. However, as best I can say at this stage, I believe that the further funds for NSW, together with additional funds required to pay interest on the various financing arrangements that were involved, were obtained from the three sources described below (raising US$121.2 million, US$50 million and US$39.8 million respectively) giving a total sum raised, including the US$238 million from KSS Global, of approximately US$449,000,000:

   a.   In April 2012, I successfully arranged for bonds to be issued at holding company level in the structure, by Septinvest BV, a Dutch company ("**Septinvest**"). (I had, by this time, developed a good understanding of the bond market as a result of the earlier issue of the two Zhaikmunai bonds which I have mentioned above in this Witness Statement). The bonds issued by Septinvest had a 31 March 2015 maturity and a fixed coupon of 10% payable semi-annually and were collateralised by shares (the "**Septinvest Notes**"). The nominal value of the bond issue was US$165 million, but US$19 million was withheld in escrow in respect of interest and costs and so the money actually raised by the Septinvest Notes was US$146 million. Further, of this US$146 million, approximately US$24.8 million was raised from the Tenth Additional Respondent, Nedmac BV ("**Nedmac**"), using part of the Saybrook loan facility to which I refer immediately below. Accordingly, after that sum of US$24.8 million (which I include in paragraph (b) below) is removed, the Septinvest Notes raised around US$121.2 million.

   b.   Also in April 2012, I arranged a loan of US$50 million from Saybrook Capital Limited ("**Saybrook**") to the Ninth Additional Respondent, Secap Holdings Limited ("**Secap**"). As I have mentioned above, around US$24.8 million of these monies were used to finance the purchase of Septinvest Notes by Nedmac.

   c.   Also during the first half of 2012, US$39.8 million was raised in a total return swap transaction with ING Bank. Under the terms of these transactions, Claremont deposited

38

**CONFIDENTIAL**

shares worth US$42.8 million with ING and paid interest on the funds raised. I explain below at paragraph 150 how this transaction was later settled.

143.  These monies were then used, together with the balance of the KSS Global money, to fund the further repayments to NSW, paid in three instalments as follows: US$107,472,888 on or around 28 August 2012; US$50,000,000 on or around 14 September 2012; and a further US$50,000,000 on or around 15 October 2012. Thus, over the course of 2012, Sartfield repaid NSW (as the second instalment under the NSW Loan) a total of US$414,781,433. This was US$164,241 more than the second instalment amount. As best I can recall, this US$164,241 overpayment consisted of US$112,818 (which was the slight shortfall in the first instalment, as noted above) and US$51,423 (which in the time available, I have not been able to reconcile).

144.  I believed that the Release and the Settlement Deed had enabled me finally to draw a line under, and leave completely behind me, all connections with Mr Ablyazov (at least so far as I knew at the time) and the making of these repayments to NSW ended my brief connection with NSW and Mr Petelin. Since making the final repayment on or around 15 October 2012, I have had no contact at all with Mr Khrapunov, or anyone else who, at least to my knowledge, has been a representative of Mr Ablyazov (or Mr Ablyazov himself).

**Nostrum's Premium Listing in 2014 and Reductions in Claremont's % Stake**

145.  In January 2013, Zhaikmunai LP's principal place of business was moved from the Isle of Man to the Netherlands, in order to move away from an offshore ('tax haven') jurisdiction and into a jurisdiction where it could benefit from (amongst other things) investment protection treaties and double taxation treaties. Once this had been done, I commenced the process of moving Claremont, as well as certain other entities, 'on shore', to the Netherlands. Bringing the companies into the same jurisdiction had tax advantages but also simplified the holding structure and avoided the increasing negative connotations that were attaching to the use of offshore vehicles.

146.  In addition, for some years, Zhaikmunai LP had been considering the possibility of a corporate reorganisation into a UK PLC so as to effect a premium listing on the London Stock Exchange, in order to allow institutional investors (as was their preference) to hold shares, rather than GDRs, and to allow the business to be admitted to the FTSE indices. It was also considered that a premium listing would result in greater liquidity of trading the securities and would allow certain investors to hold them who would not have been permitted (by the terms of their investment authority) to hold GDRs.

CONFIDENTIAL

147.  From 2013 onwards, various professional advisors were engaged for the purpose of effecting a corporate reorganisation of the Zhaikmunai LP holding structure so as to permit a premium listing of a new English incorporated holding company which would hold the underlying interests in Zhaikmunai. In connection with this process, Zhaikmunai/Nostrum LP also engaged Deloitte (to provide Kazakh tax advice), Tiberghien (to provide Dutch tax advice), Greenberg Traurig (to provide Dutch law advice), White & Case (to provide English, Kazakh and US law advice) and Mann and Partners (to provide Isle of Man law advice). Zhaikmunai/Nostrum LP also appointed Deutsche Bank as its sponsor for the premium listing (a requirement of the Listing Rules of the Financial Conduct Authority) and VTB Capital plc ("**VTB**") to provide structuring and financing advice.

148.  For the purposes of the premium listing, Nostrum Oil & Gas plc (defined above as "**Nostrum**") was incorporated in England & Wales on 13 October 2013 and a prospectus was drafted for approval by the UK Listing Authority which was issued on 20 May 2014 (the "**Premium Prospectus**") (see Exhibit FJM2 at pages 697-709). The Premium Prospectus, approved by the UK Listing Authority, contained an extensive summary of the reorganisation process, which was to be effected by means of a contractual scheme of reorganisation of Zhaikmunai LP (by that point, renamed "**Nostrum Oil & Gas LP**"). It also involved Nostrum borrowing US$2.35 billion from VTB in order to fund the acquisition of the immediate holding company: Nostrum Oil Cooperatief U.A. This amount reflected the market capitalisation of Zhaikmunai LP on the business day prior to the acquisition and, as part of the reorganisation, Nostrum purchased the interests in Zhaikmunai. The funds borrowed from VTB were repaid on the same day as the completion of the acquisition.

149.  Deutsche Bank, in its capacity as sponsor to the premium listing, was obliged by the UK Listing Authority to undertake extensive due diligence on each of the directors of Nostrum (which included myself) and the means by which Zhaikmunai LP acquired its interest in Zhaikmunai. Deutsche Bank engaged Clifford Chance LLP to provide legal advice to it on its obligations as sponsor and to assist in the due diligence review.

150.  Following the completion of the Premium Listing (the admission date to the London Stock Exchange was on 20 June 2014), Claremont held 51,190,476 shares (27.2%) in Nostrum. This shareholding was thereafter reduced further, in two stages as follows:

    a.  In early April 2015, the stake was reduced from 27.2% to 17.3%, as follows:

             *i.*  By the end of March 2015, when the Septinvest Notes came to maturity, market conditions had been deteriorating significantly as a result of drops in

CONFIDENTIAL

the oil price and in the Nostrum share price. Consequently, it proved impossible to find sufficient investors/financiers to refinance the entire US$165 million facility. I arranged for approximately US$41 million to be repaid in cash, using money raised by new loans from Trafigura Ventures BV to Bravo BV (US$30 million) and Asiaciti Trust Singapore to Secap (US$10 million). However, the balance was settled pursuant to a 'repayment in kind' option in the Septinvest Notes, with approximately 6.5 million shares being transferred to VTB in respect of approximately US$58.6 million of debt (although this was in fact immediately refinanced, as I explain below) and with approximately 7.2 million shares being transferred to the other bondholders in respect of approximately US$65.4 million of debt.

*ii.* At around the same time, the ING total return swap, which I have described above at paragraph 142c, was settled by the transfer of approximately 4.8 million shares to ING Bank.

b. The stake was later reduced further, from 17.3% to 13.2% (which is the stake currently held by the Additional Respondents), as a result of a US$58.6 million transaction entered into by Claremont with VTB on 28 April and 23 June 2015, as a partial refinancing of the Septinvest Notes (the "**VTB Transaction**"). This was, in substance, a loan from VTB to Claremont, and one of the features of the loan was that when the value of the collateral dropped below a certain level (as a result of falls in the share price) Claremont was obliged to "top-up" the security by adding more shares into the escrow account, thereby putting more shares at risk. By April 2016, an additional 7,710,636 shares were held in escrow in respect of the VTB Transaction and after an event of default occurred (as a result of Claremont's failure to pay to VTB the "*Interim Exchange Amount*" required under the ISDA), all of the shares were taken (and, I believe, later sold) by VTB pursuant to a termination agreement, in settlement of the VTB Transaction. This reduced Claremont's total shareholding in Nostrum from 32,599,586 shares (17.3%) to 24,888,950 shares (13.2%). Those shares are now held by the Additional Respondents in the structure described in my First Witness Statement.

151. I was subsequently able to avoid any further reductions in the size of the Additional Respondents' stake in Nostrum by refinancing the outstanding debts (which, as things stand today, total approximately US$84.83 million). In summary (and I note that further details of some of these loans appear in my First Witness Statement):

**CONFIDENTIAL**

a. The Trafigura loan to Bravo remains in place (with an outstanding balance of approximately US$33.36 million including interest) as does the Asiaciti loan to Secap (with an outstanding balance of approximately US$10.32 million including interest);

b. The Saybrook loan to Secap (originally US$50 million) was refinanced by means of four transactions, as follows:

   i. In November 2014, US$20 million was raised from VTB through the sale of Septinvest Notes by Nedmac;

   ii. In June 2015, US$10 million was raised from Brisbane Equities Corp. This was refinanced in December 2016 by a loan taken by Elite Investment BV from Koramic Holding NV (which has an outstanding balance of approximately US$10.58 million);

   iii. US$10 million was raised from Saffelberg Investments NV and invested (in March 2015) through a subsidiary of Nedmac called Zed BV. The sum outstanding in respect of this investment stands at approximately US$12.87 million);

   iv. US$16.3 million (representing EUR15 million) was raised by a loan from Attent to a Belgian Company called Crest Capital, which invested the money (in March 2015) through Zed BV (together with the monies raised from Saffelberg, mentioned above). The sum outstanding in respect of this loan stands at approximately US$17.7 million including interest).

**Conclusion**

152. As I mentioned at the start of this Witness Statement, and as will be apparent, the history of Nostrum is complex and, undoubtedly, there is much more that I could (and in due course, will) say about it. However, I believe that it is clear beyond any doubt, from what appears above, that Mr Ablyazov has no interest in the Nostrum shares whatsoever and that I am not his nominee. He has in fact never owned Zhaikmunai/Nostrum, but even if (in his arrogance, and misguidedly) that is something he himself might not have accepted back in 2005-2007, the position was put beyond any doubt by the Harrison declaration of trust in July 2007 and, additionally, by the comprehensive releases agreed in late 2011.

**CONFIDENTIAL**

153. I also believe that my enormous efforts over the years in building the business and guiding it through immense challenges are entirely inconsistent with any suggestion that I was secretly holding the interests for the benefit of another. Additionally, I would refer to the extensive due diligence that was carried out by lenders and regulators during the re-financings, the restructurings and the listings, which revealed nothing of this kind. Further, I would suggest that the efforts I have made and the risks I have taken in recent years, including by giving personal guarantees of various debts, as explained above and in my First Witness Statement, are utterly inconsistent with a secret deal of the kind alleged. Finally, I would also like to think that the serious allegations of dishonesty against me, which the claim necessarily involves, are utterly implausible, as I believe anyone who truly knows me would agree. There is no merit in these allegations, and I hope that the claim will now swiftly be brought to an end.

CONFIDENTIAL

**STATEMENT OF TRUTH**

I believe that the facts stated in this Witness Statement are true.

Frank Monstrey

11 May 2017

CONFIDENTIAL

Witness Statement
Twelfth Additional Respondent
Frank Monstrey
Second
11 May 2017
Exhibit FJM2

**CL-2009-000212**

IN THE HIGH COURT OF JUSTICE

QUEENS BENCH DIVISION

COMMERCIAL COURT

B E T W E E N:

JSC BTA BANK

Claimant

- v -

MUKHTAR ABLYAZOV

First Defendant

(2) ROMAN SOLODCHENKO & ORS

& 15 Other Defendants

- and –

(1) CLAREMONT HOLDINGS LIMITED
(2) CLAREMONT HOLDINGS C.V.
(3) STAK ADUNATIO
(4) B.M. LUMINA
(5) SEPTEMIUM INVESTMENTS S.A.
(6) ETERNUM HOLDINGS SARL
(7) ELITE INVESTMENTS B.V.
(8) BRAVO B.V.
(9) SECAP HOLDINGS LIMITED
(10) NEDMAC B.V.
(11) ZED B.V.
(12) FRANK MONSTREY
(13) PETRA NOE

Additional Respondents

---

**SECOND WITNESS STATEMENT OF
FRANK JOSEPH MONSTREY**

---

**TRAVERS SMITH LLP**

10 Snow Hill

London EC1A 2AL

Tel: +44 (0)20 7295 5000

Ref: SPB/MKH/NEF

Solicitors to the Additional Respondents

**CONFIDENTIAL**