USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 11/8/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
CITY OF ALMATY, KAZAKHSTAN and BTA
BANK JSC,

                              Plaintiffs,

               -against-

MUKHTAR ABLYAZOV, VIKTOR KHRAPUNOV,
ILYAS KHRAPUNOV, and TRIADOU SPV S.A.,

                              Defendants.
-----------------------------------------------------------------X

**REPORT AND RECOMMENDATION ON MOTION FOR ATTORNEYS' FEES**

15-CV-5345 (JGK) (KHP)

**TO:    HONORABLE JOHN G. KOELTL, UNITED STATES DISTRICT JUDGE**
**FROM: KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

      Plaintiff BTA Bank JSC ("BTA") has moved for its attorneys' fees and costs pursuant to the Court's July 31, 2023, Judgment. It seeks $275,820.39 in fees and $7,269.97 in costs incurred in connection with its claims against Triadou SPV S.A. ("Triadou") and, pursuant to an indemnification provision under a settlement agreement between BTA and certain entities associated with the real estate developer Joseph Chetrit (the "Chetrit Entities"), it seeks $641,029 in expenses incurred as legal charges billed to the Chetrit Entities. No opposition to the motion was filed, so the motion is treated as unopposed.

      For the reasons set forth below, I recommend that the motion be granted and that BTA be awarded the amounts set forth below.

## BACKGROUND

### 1. The Parties

      The Court presumes familiarity with the background of this case and includes only those facts relevant to context and this motion. See ECF Nos. 1756-1757. BTA is a bank headquartered in Almaty, Kazakhstan. From 1998 to 2009, Mukhtar Ablyazov ("Ablyazov") was

1

the majority owner of the bank (p/k/a Bank TuranAlem).  Defendant Triadou is a special purpose vehicle formed by Ilyas Khrapunov to make real estate investments in the United States.  Its parent entity is SDG Capital S.A., which also is the holding company for Swiss Development Group ("SDG"), which are both controlled by Ilyas Khrapunov.  Ilyas Khrapunov is Ablyazov's son-in-law.

   2. **The Theft and Laundering of BTA Funds by Defendants Ablyazov and Ilyas Khrapunov**

Ablyazov, with help of others, embezzled billions of dollars from BTA.   His misconduct was discovered in early 2009, at which time Ablyazov was removed from his position at BTA. Ablyazov later fled to England, where he faced a series of lawsuits through which BTA sought to recover the stolen money.  In late 2009, courts in the United Kingdom ("UK") granted BTA's request for worldwide freezing orders over Ablyazov's assets and issued numerous search and disclosure orders uncovering a vast network of Ablyazov shell companies – all used to help him launder the funds he stole from BTA.  Ablyazov failed to comply with UK court orders and was sentenced to prison for contempt of court; however, Ablyazov fled to France before he could be jailed in the UK.  He was later arrested in France and jailed.  BTA eventually secured a money judgment in the amount of $6 billion against Ablyazov.

In 2015, BTA also sued Ilyas Khrapunov in the UK for helping Ablyazov conceal assets and laundering the stolen funds through numerous shell companies.  It obtained a worldwide freezing order against Khrapunov, as well as a money judgment in the amount of $500 million plus interest.

Some of the money Ablyazov stole from BTA was funneled through various shell companies to Triadou and invested in U.S. real estate with the help of Ilyas Khrapunov.   At all

times Khrapunov tried to hide his involvement in Triadou from counterparties and even purported to sell SDG in a sham sale intended to conceal his ownership of SDG and Triadou. Khrapunov also hid that the true source of the funds for Triadou's investments was money embezzled from BTA.

3. **Triadou's Investments at Issue in this Case**

There are three key investments in this case—all made with money stolen from BTA. One was made by Triadou in the Flatotel – a deal arranged through the Chetrit Entities. Under the deal, Triadou acquired a 50% ownership in the Flatotel at a cost of about $35 million, while the other 50% was held by Chetrit Entities. In another investment deal, Triadou loaned approximately $6 million to fund a portion of an equity contribution in the Cabrini Medical Center, another Chetrit Entities property that was supposed to be converted into condominiums. Triadou, through a subsidiary entity, also invested approximately $30 million in the Cincinnati-based Tri-County Mall. It later sold that investment, resulting in a profit of over $10 million.

4. **The Attempted Unwinding of Triadou Investments**

In May 2014, the City of Almaty filed a lawsuit in a California federal district court against Ilyas Khrapunov and others seeking return of certain assets it alleged were embezzled from it by Khrapunov's father, the former mayor of Almaty, co-mingled with BTA's stolen assets and laundered by Ilyas Khrapunov and others. In reaction to the lawsuit, and to protect the stolen funds from existing and potential judgment creditors, Ilyas Khrapunov directed the liquidation of Triadou's assets in New York, including the Flatotel and Cabrini investments.

A. *Flatotel and Cabrini Medical Center*

Chetrit offered to repurchase Triadou's interest in the Flatotel and return its investment in the Cabrini Medical Center. The unwinding of the Flatotel investment was more complex, involved considerably more money than the Cabrini Medical Center investment, and resulted in litigation. In brief, Triadou assigned its interest in the Flatotel for less than it was worth, then directed that Chetrit Entities send the funds to SDG Capital instead of Triadou and describe the payment as a "loan on behalf of Triadou SPV S.A." The Chetrit Entities were supposed to make repayments on the Flatotel investment in four installments but did not make the payments, resulting in Triadou suing the Chetrit Entities for breach of contract, ultimately securing New York state court judgments totaling about $23 million against Chetrit Entities. Triadou then filed a motion in state court under CPLR § 5228(a) for appointment of a receiver over certain Chetrit Entities. Triadou and the Chetrit Entities subsequently agreed to the appointment of a state court monitor who was authorized to collect and maintain in an escrow account monies due from the Chetrit Entities to Triadou. Following that agreement, the Chetrit Entities paid the required judgments into the account. That escrow account ultimately became subject to an attachment order issued in this case, which started as a state court interpleader action filed by the Chetrit Entities and removed to this Court.

BTA ultimately negotiated a settlement with the Chetrit Entities. Pursuant to the settlement, the Chetrit Entities agreed to give BTA a 50% interest in the Flatotel and BTA agreed to defend and indemnify the Chetrit Entities from Triadou's claims arising out of the Flatotel, including indemnification for reasonable costs, necessary disbursements and attorneys' fees associated with Triadou's litigation in the state court actions. (ECF No. 1285-44)

*B. Tri-County Mall*

In July 2013, Triadou's subsidiary sold its investment in the Tri-County Mall for about $43.4 million with the assistance of Felix Sater. Sater then demanded a substantial percentage of the proceeds as a fee. This led to another suit in New York state court that ultimately resulted in a settlement pursuant to which Sater kept a certain portion of the proceeds and the remainder went to Triadou's subsidiary.

**5. The Trial Against Triadou in this Case and Judgment**

After a lengthy period of discovery and trial, BTA obtained a judgment against Triadou in the amount of $73,600,000 for conversion of stolen assets, with pre-judgment interest and $27,000,000 for unjust enrichment, with pre-judgment interest, for a total damages award of $100,600,000 with interest. Additionally, the Court imposed a constructive trust over Triadou's assets because it found that a money judgment would be insufficient to protect BTA's rights and ability to enforce and satisfy the judgment. The constructive trust includes assets in the Flatotel escrow account mentioned above. In connection with these funds, the Court also held that it was empowered pursuant to New York CPLR § 5239 to vacate Triadou's state-court judgments against the Chetrit entities. The Court vacated those judgments and directed the disposition of property and funds obtained pursuant to those judgments to BTA. The Court also held that BTA was entitled to recover its attorneys' fees and costs in bringing the claim under Section 5239 and in connection with the indemnification agreement (ECF Nos. 1285-44) between it and the Chetrit Entities.

**LEGAL STANDARD**

A district court exercises "considerable discretion" in awarding attorneys' fees. *See Arbor Hill Concerned Citizens Neighborhood Ass'n v. Cty. of Albany & Albany Cty. Bd. of Elections*, 522 F.3d 182, 190 (2d Cir. 2008). "The party seeking fees bears the burden of demonstrating that its requested fees are reasonable." *TufAmerica Inc. v. Diamond*, 2016 WL 1029553, at *3 (S.D.N.Y. Mar. 9, 2016), *reconsideration granted in part*, 2016 WL 3866578 (S.D.N.Y. July 12, 2016), *and on reconsideration in part*, 2018 WL 401510 (S.D.N.Y. Jan. 12, 2018) (citing *Blum v. Stenson*, 465 U.S. 886, 897 (1984)). Attorneys' fees are awarded by determining a presumptively reasonable fee, or a "lodestar," reached by multiplying a reasonable hourly rate by the number of hours reasonably expended. *Id.* (citing *Millea*, 658 F.3d at 166); *see also Bergerson v. N.Y. State Office of Mental Health, Central N.Y. Psychiatric Ctr.*, 652 F.3d 277, 289-90 (2d Cir. 2011). When evaluating hourly rates, the Court looks at "what a reasonable, paying client would be willing to pay, given that such a party wishes to spend the minimum necessary to litigate the case effectively." *Bergerson,* 652 F.3d at 289 (internal citations and quotation marks omitted). The Second Circuit's "forum rule" generally requires use of "the hourly rates employed in the district in which the reviewing court sits in calculating the presumptively reasonable fee." *Id.* (internal citation and quotation marks omitted); *see also TufAmerica Inc.*, 2016 WL 1029553, at *5 ("rate must be in line with those rates prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation"). Courts in this district also have recognized that an "attorney's customary billing rate for fee-paying clients is ordinarily the best evidence of" a reasonable hourly rate. *In re Stock Exchanges Options Trading Antitrust Litig.*, 2006 WL 3498590, at *9 (S.D.N.Y. Dec. 4, 2006). Finally, the

6

Court may adjust base hourly rates to account for case-specific variables. *Arbor Hill Concerned Citizens Neighborhood Ass'n*, 522 F.3d at 1830-34.

When evaluating hours expended, the Court must make "a conscientious and detailed inquiry into the validity of the representations that a certain number of hours were usefully and reasonably expended." *Haley v. Pataki*, 106 F.3d 478, 484 (2d Cir. 1997) (quoting *Lunday v. City of Albany*, 42 F.3d 131, 134 (2d Cir. 1994)). In determining whether hours are excessive, "the critical inquiry is whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Samms v. Abrams*, 198 F.Supp. 3d 311, 322 (S.D.N.Y. 2016) (quoting *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992)). "Hours that are excessive, redundant, or otherwise unnecessary, are to be excluded . . . and in dealing with such surplusage, the court has discretion simply to deduct a reasonable percentage of the number of hours claimed as a practical means of trimming fat from a fee application." *Kirsch v. Fleet St., Ltd.*, 148 F.3d 149, 173 (2d Cir. 1998) (internal citations and quotation marks omitted); *accord Alicea v. City of New York,* 272 F. Supp. 3d 603, 608-09 (S.D.N.Y. 2017); *TufAmerica Inc.*, 2016 WL 1029553, at *3.

The Court also looks at the nature of the legal matter and reason for the fee award in considering what is a reasonable rate and reasonable time spent on a matter. Complex cases requiring particular attorney skills and experience may command higher attorney rates, as may cases requiring retention of a firm with the resources needed to prosecute a case effectively. *Arbor Hill Concerned Citizens Neighborhood Ass'n*, 522 F.3d at 187. Likewise, the Court may consider the purpose of the award. *See Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620, 633-34 (2d Cir. 2018).

7

**SPECIFIC LEGAL FEES AND COSTS REQUESTED**

BTA seeks fees and costs for the following four categories of work: (1) its defense of the Chetrit Entities against Triadou's State Court Actions as provided for under the Settlement Agreement indemnity provisions; (2) a portion of the fees BTA incurred in drafting the section of its post-trial submissions concerning the CPLR § 5239 claim after the jury returned a verdict in BTA's favor against Triadou; (3) the instant fee application; and (4) the fees and costs claimed by the Chetrit Entities' counsel in connection with their defense of Triadou's State Court Actions. BTA has submitted an affidavit from its counsel, Craig Wenner, of Boies Schiller Flexner LLP ("BSF"), setting forth the basis for the rates and hours expended and appending contemporaneous time records and invoices.

To summarize, in connection with category (1) above, BTA contends that it spent more than 350 hours assisting the Chetrit Entities defend against Triadou's judgment enforcement in New York state courts – all work contemplated under BTA's settlement agreement with the Chetrit Entities and necessary to prevent Triadou from absconding with proceeds of its fraud during the pendency of this action. In connection with this work, it seeks $230,624.50 in fees and $7,269.97 in costs. In connection with category (2) above, it seeks recovery of its expenses for one quarter of its fees incurred in connection with preparing its final proposed findings of fact and conclusions of law following the trial that resulted in the judgments against Triadou. This amounts to $33,515.89. In connection with category (3) above, it seeks fees in connection with the instant fee application in the amount of $11,680. Finally, in connection with category (4) above, it seeks reimbursement for time spent by counsel for the Chetrit Entities from January 2016 to June 2019 billed in connection with defense of Triadou's state court actions in

the amount of $641,029 – the total amount billed to the Chetrit Entities by Sukenik, Segal & Graff, P.C. ("SSG") in connection with the state court actions during the period when the indemnification agreement was in effect.  The total award sought is $924,119.36.

1. **Attorney Qualifications and Hourly Rates**

The attorneys who worked on this matter include:  Matthew Schwartz, Craig Wenner, Daniel Boyle, Nameer Shukri, Sabina Mariella, Andrew Chesley, Erica Sweeting, Valecia Battle, Lindsey Ruff, Elise Milne, Sophie Roytblat, Isaac Shapiro, Alexander Cuda, Olivia McKenzie, and Serena Sapienza.  In several prior decisions awarding fees and costs to Plaintiffs' counsel, this Court has already recognized the stellar qualifications of attorneys Schwartz, Wenner, Boyle, Mariella, Chesley, Sweeting, Battle, Ruff and Milne, as well as paralegals Shapiro and Roytblat who both went to law school and returned to BSF as lawyers.  It does not repeat those qualifications here and states only that their involvement in this case led to a successful outcome in this matter and that speaks to their zealous representation of BTA.  *See* (ECF Nos. 628, 1101, 1216, 1248, 1461, 1494.)

Mr. Shukri was an associate at BSF from 2016 until late 2019 when he left to open his own legal practice.  He obtained a law degree from Brooklyn Law School in 2011 and served as an assistant district attorney in Kings County and a law clerk to the Honorable Charles E. Ramos of the New York State Supreme Court, Commercial Division, before joining BSF.  Thus, he too is well qualified and performed work on this case commensurate with his experience.  Mr. Cuda, Ms. McKenzie and Ms. Sapienza served as paralegals on the case and seek the same rates already awarded to other paralegals.

The rates sought for work performed between 2017 and 2020 related to the indemnification of the Chetrit Entities in the state court actions are:

- Matthew Schwartz: $1,180
- Daniel Boyle: $660 in 2017, and $680 in 2018 and 2019
- Nameer Shukri: $660
- Andrew Chesley: $375 in 2018, 2019 and 2020
- Elise Milne: $300
- Sophie Roytblat: $150 in 2017, and $155 in 2018
- Isaac Shapiro: $155
- Alexander Cuda: $155
- Serena Sapienza: $155

The rates sought for 2022 and 2023 work completed in connection with the post-trial briefing in this action and the instant fee application are:

- Matthew Schwartz: $1,180
- Craig Wenner: $800
- Sabina Mariella: $700
- Erica Sweeting: $700
- Valecia Battle: $680
- Lindsey Ruff: $660
- Sophie Roytblat: $300 in 2022 and 2023
- Olivia McKenzie: $155

All of the rates sought are rates previously approved by the Court in this action and are less than what was actually billed to BTA.  Insofar as the rates paid are less than those actually billed, and because an attorney's customary billing rate for fee-paying clients is ordinarily "the best evidence of" a reasonable hourly rate, *In re Stock Exchanges Options Trading Antitrust Litig.*, 2006 WL 3498590, at *9, the rates sought are reasonable.  They also are consistent with rates awarded in similarly complex matters.  *See, e.g., U.S. Bank Nat'l Ass'n v. Dexia Real Estate Capital Markets*, 2016 WL 6996176, at *8 (S.D.N.Y. Nov. 30, 2016) (quoting *Themis Capital v. Democratic Republic of Congo*, 2014 WL 4379100, at *7 (S.D.N.Y. Sept. 4, 2014)) (recognizing

that partner rates of up to $1000 per hour are not uncommon in this District for complex litigation matters); *Gulino v. Bd. of Educ. of City Sch. Dist. of City of New York*, 2017 WL 1294557, at *10 (S.D.N.Y. Apr. 4, 2017) (in "complex" case, partner rate of $600 is reasonable; rate of $150 per hour for paralegals reasonable); *Themis Capital*, 2014 WL 4379100, at *7 n.5 (approving associate rates "from approximately $380 to $682" for associates in case involving "difficult questions of law and fact"); *TufAmerica*, 2016 WL 1029553, at *6 (reasonable rate for partners ranged from $572 to $715 per hour, for senior associates $476 to $560 per hour, for junior associates $375 to $425 per hour, and for paralegals $150 to $175 per hour); *Errant Gene Therapeutic, LLC v. Sloan-Kettering Inst. for Cancer Rsch.*, 286 F. Supp. 3d 585, 588 (S.D.N.Y. 2018), aff'd sub nom. *Errant Gene Therapeutics, LLC v. Sloan-Kettering Inst. for Cancer Rsch.*, 2018 WL 3094913 (S.D.N.Y. June 21, 2018) (in commercial litigation, court approved hourly rates for partners of $765 and for associates of up to $450). Further, Triadou filed no objection to the rates. Therefore, I recommend the Court accept the rates sought.

   **2. Hours Expended**

No objection has been filed to the hours expended. Nevertheless, the Court has carefully reviewed the billing records provided to ascertain whether the hours expended are reasonable.

   *A. Category 1*

Billing records for work performed with respect to category (1), which took place from in or about October 2017 through March 2020, reflect the following attorneys spent 360 total attorney hours and 10.3 paralegal hours broken down as follows:

- Schwartz:     60 hours
- Boyle:        62.5 hours

- Shukri:            101.7 hours
- Chesley:           120.6 hours
- Milne:             15.2 hours
- Roytblat:          4.1 hours
- Shapiro:           2.8 hours
- Cuda:              2.7 hours
- Sapienza:          .7 hours

The work consisted of a variety of legal services related to actions in both State and Federal Court.  Significant, but reasonable, blocks of time were billed to draft filings including an order to show cause on monitorship interest payments, a motion to stay state court actions, and for a temporary restraining order. Counsel conducted significant, but reasonable, legal research on the standards for a motion to stay proceedings, the order to show cause, and appellate procedure in the First Judicial Department. For some of these filings – namely the order to show cause, the motion to stay proceedings, and the motion for interest payments – counsel was tasked with a full briefing in support of their motions and replies in response to opposition briefs.  Following oral argument in State Court, and an adverse decision on the motion for interest payments, a reasonable number of hours were expended preparing an appeal and a calculation of interest costs in the event of an eventual award.  Only 16% of the total attorney time was incurred by partners.  Otherwise, the work was performed by associates, with more junior and mid-level associates performing the bulk of the work.  This reflects an appropriate allocation of work between partners and associates.  Given that there is no objection to the amount sought in this category and the Court's review showing the hours are reasonable, I recommend an award of $230,624.50 for this category.

*B. Category 2*

The billing records for category (2) reflect time spent in in connection with preparing final proposed findings of fact and conclusions of law following the trial that resulted in the judgments against Triadou. The following timekeepers spent the following amounts attributable to this category of fees:

- Schwartz:     4.15 hours
- Wenner:       9.61 hours
- Mariella:     4.86 hours
- Sweeting:     9.09 hours
- Battle:       1.27 hours
- Raff:         3.71 hours
- Roytblat:     29.73 hours
- McKenzie:     17.46 hours

This amounts to a total of 79.88 hours for a total fee of $33,515.89. BTA states that it seeks in this application only 25% of the total hours spent on the post-trial submissions. The post-trial submissions were extensive and involved summary of and citation to extensive testimony and documentary evidence involving a complex money laundering scheme. The majority of time spent on this submission was incurred by associates, not partners. Thus, tasks were properly allocated based on levels of experience. Further, having reviewed the time spent, the Court finds that though high, it was not unreasonable given the extensive factual record. Additionally, there has been no objection to the amount sought in this category. Accordingly, I recommend an award of $33,515.89 for this category.

*C. Category 3*

The billing records for work performed on the instant fee application – category (3) – reflect that Mr. Wenner spent a total of 3.5 hours and Ms. Roytblat spent a total of 29.6 hours.

The total fees requested are $11,680.  The total number of hours spent on the fee application is on the high end in terms of what courts in this district have approved.  However, the instant fee application required more time than in the typical case because counsel had to segregate time incurred on specific categories of work for voluminous bills incurred over a seven-year period.  See, e.g., *Fink v. City of New York*, 154 F. Supp. 2d 403, 413 (E.D.N.Y. 2001) (allowing for 30 hours for a fee application); *Cooper v. Sunshine Recoveries, Inc.*, 2001 WL 740765, at *4 (S.D.N.Y. June 27, 2001) (allowing 21 hours for fee application); *Colbert v. Furumoto Realty,* 144 F.Supp.2d 251, 261-62 (S.D.N.Y. 2001) (allowing 15.5 hours for fee application); *Rosasa v. Hudson River Club Rest.*, 1998 WL 106141, at *4 (S.D.N.Y. Mar. 9, 1998) (allowing 15 hours for fee application). Additionally, the bulk of the time spent was incurred by a relatively junior associate, which kept the total cost down to a reasonable amount and distinguishes this case from the ones where courts have found less hours were justified.  Finally, there is no objection to the total amount of fees requested in connection with this category.  Accordingly, I recommend that the full amount sought for this category be awarded.

*D.  Category 4*

Finally, in connection with category (4), BTA seeks reimbursement for fees in the amount of $641,029 billed to the Chetrit Entities by SSG from January 2016 to June 2019 in connection with defense of Triadou's state court actions.  This amount is sought pursuant to the indemnity provision in the settlement agreement between BTA and the Chetrit Entities.

Under New York law, an agreement by a party to a contract to indemnify the other for attorney's fees incurred in litigation between them must be "unmistakably clear from the language of the promise."  *See Hooper Assoc., Ltd. v. AGS Computers, Inc.,* 74 N.Y.2d 487, 492;

see also *John Wiley & Sons, Inc. v. Book Dog Books*, LLC, 327 F. Supp. 3d 606, 641 (S.D.N.Y. 2018); *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1255 (2d Cir. 1987). Here there is no dispute that the indemnification covers the attorneys' fees sought, and the Court has already determined that BTA is entitled to recover them under the indemnity.

Still, the amount a court may award under an indemnity contract is not unlimited. The court will award the amounts expended so long as the amounts are "not unreasonable." *Diamond D. Eners. USA, Inc. v. Steinsvaag*, 979 F.2d 14, 19 (2d Cir. 1992); *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1263 (2d Cir. 1987). Generally, the same lodestar analysis described above is used to assess the amount of attorneys' fees sought pursuant to a contractual indemnity. Thus, the party seeking indemnification of its attorneys' fees must submit contemporaneous billing records so that the court can assess their reasonableness by reviewing the rates and hours expended. *Restivo v. Hessemann*, 846 F.3d 547, 591 (2d Cir. 2017); *605 Fifth Property owner, LLC v. Abasic, S.A.*, 21-cv-811, 2022 WL 1239578 (S.D.N.Y. Apr. 27, 2022).

BTA has provided the billing records of SSG. The following timekeepers worked on the matter:

- David C. Segal spent 6.5 hours at the rate of $600/hour and 451.05 hours at the rate of $700/hour.
- David Salhanick spent 145.5 hours at the rate of $250/hour and 458.38 hours at the rate of $300/hour.
- Jehoshua Graff spent 36 hours at the rate of $700/hour.

The rates billed by SSG are well below those billed by BSF and consistent with rates awarded in this district for complex litigation matters. The time records reflect a variety of legal services related to appearances in the federal action, managing discovery, and attempts at

settlement or arbitration. Initially, the attorneys were reviewing settlement offers while preparing for hearings related to a proposed preliminary injunction/temporary restraining order. They were later tasked with drafting an order to show cause and responding to a motion to stay the federal proceedings. A significant but reasonable portion of the time billed was spent preparing witnesses for depositions and drafting materials for use in depositions, which was usually accompanied by other discovery-related work such as document review and responding to document requests. The associate billed approximately 57% of the total hours. While there were more tasks that arguably could have been allocated to an associate, many tasks were also reasonably performed by a partner such as witness preparation and depositions and negotiating a settlement. Thus, the allocation between partner and associate time is not unreasonable. Further, while the time records could have been more descriptive about the work performed, the total hours spent amount to about 26 weeks of work over a 3 ½ year period – again, not an unreasonable amount of time given the duration of the litigation and complexity of the issues. However, when the hours billed by each attorney are multiplied by their respective hourly rates and then added together, the fees total only $518,724. Therefore, there is no evidence that $641,029 in fees was actually incurred. Although there is no objection to the request for $641,029, applying the lodestar analysis, only an award up to $518,724 is reasonable.

Accordingly, I recommend an award of $518,724 for this category.

E. *Other Costs*

BTA is seeking costs and disbursements associated with its work in the state court actions in the total amount of $7,269.97. The only information about these costs and

disbursements is that they include transportation, working meals, courier and messenger costs, computer research, transcripts fees, court filing fee, and document reproduction.  The largest costs are attributable to transcripts and computer research, $5,243.74 and $1,170.40 respectively.  BTA's counsel, Craig Wenner, has submitted a declaration stating that these costs are taken directly from invoices billed to BTA.  He has not submitted the actual invoices.  Nor has he explained why these costs are reasonable or the disbursements necessary, which are the only allowable costs and disbursements under the indemnification agreement.  Nevertheless, "[c]osts for shipping, filing fees, process servers, and litigation support are routinely recoverable" under Federal Rule of Civil Procedure 54. *See, e.g.*, *Bank of America, N.A. v. Brooklyn Carpet Exchange, Inc.*, No. 15-CV-5981 (LGS) (DF), 2016 WL 8674686, at *11 (S.D.N.Y. May 13, 2016) (collecting cases), *adopted by* 2016 WL 3566237 (June 27, 2016).  Most of the costs incurred are also typical of what is charged to clients and in this case reflect actual charges.  Thus, costs incurred for these types of items can be construed as reasonable under the indemnification agreement.  Further, based on the Court's familiarity with this action, except for the costs for transportation and working meals, the total amount of costs in each category are within the amount that would be expected in a case of this complexity.  Moreover, there has been no objection to the application.  Based on the above, I recommend an award of costs in the amount of $7,073.96, which is the total sought less the costs of transportation and working meals.

## CONCLUSION

For the reasons set forth above, I respectfully recommend that BTA's motion be granted and BTA be awarded a total of $801,618.35 in attorneys' fees and expenses. I also recommend that it be awarded post judgment interest consistent with 28 U.S.C. § 1961.

Dated: New York, New York
November 8, 2023

Respectfully Recommended:

_____
KATHARINE H. PARKER
United States Magistrate Judge

## NOTICE

**Plaintiff shall have fourteen days, and Defendants shall have fourteen days, from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. See also Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties)). A party may respond to another party's objections after being served with a copy. Fed. R. Civ. P. 72(b)(2).**

**Plaintiff shall have fourteen days to serve and file any response. Defendants shall have fourteen days to serve and file any response. Fed. R. Civ. P. 72(b)(2). Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable John G. Koeltl at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be addressed to Judge Koeltl. The failure to file these timely objections will result in a waiver of those objections for purposes of appeal. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b);** *Thomas v. Arn*, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).